1  STACY TOLCHIN (SBN 217431)
   *stacy@tolchinimmigration.com*
2  LAW OFFICES OF STACY TOLCHIN
   776 E. Green St., Suite 210
3  Pasadena, CA 91101
   Telephone: (213) 622-7450
4  Facsimile: (213) 622-7233

5
   MOHAMMAD TAJSAR (SBN 280152)
6  *mtajsar@aclusocal.org*
   MAYRA JOACHIN (SBN 306065)
7  *mjoachin@qclusocal.org*
   EVA BITRAN (SBN 302081)
8  *ebitran@aclusocal.org*
   DAE KEUN KWON (SBN 313155)
9  *akwon@aclusocal.org*                    MARK ROSENBAUM (SBN 59940)
   OLIVER MA (SBN 354266)                   *mrosenbaum@publiccounsel.org*
10 *oma@aclusocal.org*                      REBECCA BROWN (SBN 345805)
   STEPHANIE PADILLA (SBN 321568)           *rbrown@publiccounsel.org*
11 *spadilla@qclusocal.org*                 SOPHIA WRENCH (SBN 354416)
   DIANA SANCHEZ (SBN 338871)               *swrench@publiccounsel.org*
12 *dianasanchez@aclusocal.org*             RITU MAHAJAN (SBN 252970)
   ACLU FOUNDATION OF                       *rmahajan@publiccounsel.org*
13 SOUTHERN CALIFORNIA                      GINA AMATO (SBN 215519)
   1313 West Eighth Street                  *gamato@publiccounsel.org*
14 Los Angeles, CA 90017-4022               PUBLIC COUNSEL
   Telephone: (213) 977-5232                610 South Ardmore Avenue
15 Facsimile: (213) 201-7878                Los Angeles, CA 90005
                                            Telephone: (213) 385-2977
16
   *Counsel for Stop/Arrest Plaintiffs*
17 (*additional counsel information on cont.*       *Counsel for All Plaintiffs*
   *page*)
18
19              **UNITED STATES DISTRICT COURT**

20        **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

21 Pedro VASQUEZ PERDOMO; Carlos       Case No.: 2:25-cv-05605-MEMF-SP
   Alexander OSORTO; and Isaac
22 VILLEGAS MOLINA; Jorge             **FIRST AMENDED PETITION**
   HERNANDEZ VIRAMONTES; Jason        **FOR WRIT OF HABEAS**
23 Brian GAVIDIA; LOS ANGELES         **CORPUS AND COMPLAINT**
   WORKER CENTER NETWORK;             **FOR DECLARATORY AND**
24 UNITED FARM WORKERS;               **INJUNCTIVE RELIEF**
   COALITION FOR HUMANE
25 IMMIGRANT RIGHTS; IMMIGRANT        **CLASS ACTION**
   DEFENDERS LAW CENTER,
26                                    Hon. Maame Ewusi-Mensah
         Plaintiffs,                  Frimpong
27
        v.
28
                              -1-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Kristi NOEM, in her official capacity as Secretary, Department of Homeland Security; Todd M. LYONS, in his official capacity as Acting Director, U.S. Immigration and Customs Enforcement; Rodney S. SCOTT, in his official capacity as Commissioner, U.S. Customs and Border Patrol; Michael W. BANKS, in his official capacity as Chief of U.S. Border Patrol; Kash PATEL, in his official capacity as Director, Federal Bureau of Investigation; Pam BONDI, in her official capacity as U.S. Attorney General; Ernesto SANTACRUZ JR., in his official capacity as Acting Field Office Director for Los Angeles, U.S. Immigration and Customs Enforcement; Eddy WANG, Special Agent in Charge for Los Angeles, Homeland Security Investigations, U.S. Immigration and Customs Enforcement; Gregory K. BOVINO, in his official capacity as Chief Patrol Agent for El Centro Sector of the U.S. Border Patrol; Jeffrey D. STALNAKER, in his official capacity as Acting Chief Patrol Agent, San Diego Sector of the U.S. Border Patrol; Akil DAVIS, in his official capacity as Assistant Director in Charge, Los Angeles Office, Federal Bureau of Investigation; Bilal A. ESSAYLI, in his official capacity as U.S. Attorney for the Central District of California,

      Defendants.

1   ANNE LAI (SBN 295394)
    alai@law.uci.edu
2   UC IRVINE SCHOOL OF LAW
    IMMIGRANT AND RACIAL
3   JUSTICE
    SOLIDARITY CLINIC
4   P.O. Box 5479
    Irvine, CA 92616-5479
5   Telephone: (949) 824-9894
    Facsimile:  (949) 824-2747
6
7   *Counsel for Stop/Arrest Plaintiffs*

8   LAUREN MICHEL WILFONG*
    lwilfong@ndlon.org
9   NATIONAL DAY LABORER
    ORGANIZING NETWORK
10  1030 S. Arroyo Parkway, Suite 106
    Pasadena, CA 91105
11  Telephone: (626) 214-5689

12  *Counsel for Stop/Arrest Plaintiffs*

13  BREE BERNWANGER (SBN 331731)
14  bbernwanger@aclunc.org
    AMERICAN CIVIL LIBERTIES
15  UNION FOUNDATION OF
    NORTHERN CALIFORNIA
16  39 Drumm Street
    San Francisco, CA 94111
17  Telephone: (415) 621-2493

18  *Counsel for Stop/Arrest Plaintiffs*

19  BRISA VELAZQUEZ OATIS
20  (SBN 339132)
    bvoatis@aclu-sdic.org
21  ACLU FOUNDATION OF
    SAN DIEGO & IMPERIAL
22  COUNTIES
    P.O. Box 87131
23  San Diego, CA 92138-7131
    Telephone: (619) 398-4199
24
25  *Counsel for Stop/Arrest Plaintiffs*

    MATTHEW J. CRAIG (SBN 350030)
    mcraig@heckerfink.com
    MACK E. JENKINS (SBN 242101)
    mjenkins@heckerfink.com
    HECKER FINK LLP
    1150 South Olive Street, Suite 10-140
    Los Angeles, CA 90015
    Telephone: (212) 763-0883
    Facsimile: (212) 564-0883

    *Counsel for Access/Conditions Plaintiffs*

    EDGAR AGUILASOCHO
    (SBN 285567)
    eaguilasocho@farmworkerlaw.com
    MARTINEZ AGUILASOCHO LAW, INC.
    1527 19th Street #332
    Bakersfield, CA 93301
    Telephone: (661) 859-1174

    *Counsel for Plaintiff United Farm Workers*

    CARL BERGQUIST*
    cbergquist@chirla.org
    COALITION FOR HUMANE
    IMMIGRANT RIGHTS
    2351 Hempstead Road
    Ottawa Hills, OH 43606
    Telephone: (310) 279-6025

    *Counsel for Plaintiff Coalition for Humane
    Immigrant Rights*

    ALVARO M. HUERTA (SBN 274787)
    ahuerta@immdef.org
    BRYNNA BOLT (SBN 339378)
    bbolt@immdef.org
    ALISON STEFFEL (SBN 346370)
    asteffel@immdef.org
    IMMIGRANT DEFENDERS LAW
    CENTER
    634 S. Spring St., 10th Floor
    Los Angeles, CA 90014
    Telephone: (213) 634-0999

    *Counsel for Plaintiff Immigrant
    Defenders Law Center*

    * Pro hac vice application forthcoming

26

27

28

-3-

## **INTRODUCTION**

1.     This lawsuit seeks to enjoin Defendants' ongoing pattern and practice of flouting the Constitution and federal law in connection with ongoing immigration raids in the Los Angeles area.

2.     Since early June, this District has been under siege. Masked federal agents, sometimes dressed in military-style clothing, have conducted indiscriminate immigration operations, flooding street corners, bus stops, parking lots, agricultural sites, day laborer corners, and other places, setting up checkpoints, and entering businesses, interrogating residents as they are working, looking for work, or otherwise trying to go about their daily lives, and taking people away.

3.     The raids in this District follow a common, systematic pattern. Individuals with brown skin are approached or pulled aside by unidentified federal agents, suddenly and with a show of force, and made to answer questions about who they are and where they are from. If they hesitate, attempt to leave, or do not answer the questions to the satisfaction of the agents, they are detained, sometimes tackled, handcuffed, and/or taken into custody. In these interactions, agents typically have no prior information about the individual and no warrant of any kind. If agents make an arrest, contrary to federal law, they do not make any determination of whether a person poses a risk of flight before a warrant can be obtained. Also contrary to federal law, the agents do not identify themselves or explain why the individual is being arrested.

4.     Further, apparently to accommodate the sharp rise in arrests, the government has resorted to keeping individuals at what is supposed to be a short-term processing center and ICE basement holding area in downtown Los Angeles, known as "B-18," often for days. In these dungeon-like facilities, conditions are deplorable and unconstitutional. The government has also unlawfully deprived those arrested of access to counsel. Under such conditions, some of those arrested are pressured into accepting voluntary departure. The government is aware that its

actions are unconstitutional and contrary to officers' training, but deliberately persists because this system allows it to coerce removals, avoid public accountability, and ultimately—given the limited bed space at longer-term detention facilities in the area—keep arrest numbers high.

5.      Federal immigration enforcement is constrained by law. But since the federal government began its mass immigration enforcement operations in this District on June 6, 2025, all of these legal requirements have given way to one overriding consideration: "numbers, pure numbers. Quantity over quality"[1]

6.      In late May, the White House and the Department of Homeland Security imposed a quota of 3,000 immigration-related arrests per day—with "consequences for not hitting arrest targets."[2]  In order to reach this target, White House Deputy Chief of Staff Stephen Miller directed high-level officials to change their approach to stops and arrests in the field. Agents and officers, according to him, should no longer conduct targeted operations based on investigations. Instead, they should "just go out there and arrest [unauthorized noncitizens]" by rounding up people in public spaces like "Home Depot" and "7-Eleven" convenience stores.[3]

7.      This comprehensive scheme has been guised as a crackdown on the "worst of the worst."[4] But the preponderance of individuals stopped and arrested in the raids have not been targeted in any meaningful sense of the word at all, except

---

[1] Jennie Taer, *Trump admin's 3,000 ICE arrests per day quota is taking focus off criminals and 'killing morale': insiders*, New York Post (June 17, 2025), https://nypost.com/2025/06/17/us-news/trump-admins-3000-ice-arrests-per-day-quota-is-taking-focus-off-criminals-and-killing-morale-insiders/.

[2]  Elizabeth Findell, et al., *The White House Marching Orders That Sparked the L.A. Migrant Crackdown*, The Wall Street Journal (June 9, 2025), https://www.wsj.com/us-news/protests-los-angeles-immigrants-trump-f5089877.

[3] *Id.*

[4] *Dep't of Homeland Sec., ICE Captures Worst of the Worst Illegal Alien Criminals in Los Angeles Including Murderers, Sex Offenders, and Other Violent Criminals (June 8, 2025), https://www.dhs.gov/news/2025/06/08/ice-captures-worst-worst-illegal-alien-criminals-los-angeles-including-murderers*

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

on the basis of their skin color and occupation.[5] Those who have borne the brunt of Defendants' heavy-handed pattern of unlawful conduct include day laborers, car wash workers, farm workers, street vendors, service workers, caregivers and others who form the lifeblood of communities across Southern California. Over a thousand residents in the District have already been impacted, including a shocking (though hardly surprising) number of U.S. citizens and individuals lawfully present in the country.

8.     This case challenges the government's use of unlawful tactics to achieve its intended arrest numbers in the District. Plaintiffs include five individuals and three membership organizations, the Los Angeles Worker Center Network, United Farm Workers, and the Coalition for Humane Immigrant Rights (together, the "Stop/Arrest Plaintiffs"), who, on behalf of themselves and others similarly situated, bring claims challenging Defendants' unlawful stop and arrest practices. Plaintiffs also include the Immigrant Defenders Law Center, who, alongside the Coalition for Humane Immigrant Rights (together, the "Access/Detention Plaintiffs"), seek to challenge Defendants' denial of access to counsel and illegal conditions of confinement at B-18. Despite the fear and risks associated with speaking publicly, they are taking courageous action to enforce the rule of law. They seek declaratory and injunctive relief as well as relief under the Administrative Procedure Act (APA).

## JURISDICTION AND VENUE

9.     Jurisdiction is proper and relief is available pursuant to 28 U.S.C. § 1331 (federal question), 5 U.S.C. §§ 702 and 706 (Administrative Procedure Act), 28 U.S.C. § 2241 (federal habeas statute), U.S. Const. art. I, § 9 (Suspension

---

[5] Rachel Uranga, "Most nabbed in L.A. raids were men with no criminal conviction, picked up off street," L.A. Times (June 24, 2025), https://www.latimes.com/california/story/2025-06-24/detention-centers-swell-with-immigrants-with-no-criminal-record.

Clause), 28 U.S.C. § 1651 (All Writs Act), 28 U.S.C. §§ 2201-02 (Declaratory Judgment Act), and Fed. R. Civ. P. 65 (injunctive relief).

10.     Defendants do not have immunity. *See, e.g.*, 5 U.S.C. § 702; *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689–90 (1949); *The Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 526 (9th Cir. 1989).

11.     Venue is proper under 28 U.S.C. § 1391(e)(1) because Defendants are officers or employees of the United States and at least one Plaintiff resides in this District; a substantial part of the events or omissions giving rise to the claims occurred in this District; and/or because a Defendant resides in this District.

## **<u>PARTIES</u>**

12.     **Plaintiff-Petitioner Pedro Vasquez Perdomo** is a resident of Pasadena, California who was arrested at a bus stop as he was waiting to be picked up for a job on June 18, 2025. He filed this action while detained in the basement of the Los Angeles downtown federal building, B-18. Because of his Latino ethnicity and identity as a day laborer, he fears being subject to a future stop by federal agents without reasonable suspicion.

13.     **Plaintiff-Petitioner Carlos Alexander Osorto** is a resident of Pasadena, California who was arrested at a bus stop as he was waiting to be picked up for a job on June 18, 2025. He filed this action while detained in the basement of the Los Angeles downtown federal building, B-18. Because of his Latino ethnicity and identity as a day laborer, he fears being subject to a future stop by federal agents without reasonable suspicion.

14.     **Plaintiff-Petitioner Isaac Villegas Molina** is a resident of Pasadena, California who was arrested at a bus stop as he was waiting to be picked up for a job on June 18, 2025. He filed this action while detained in the basement of the Los Angeles downtown federal building, B-18. Because of his Latino ethnicity and identity as a day laborer, he fears being subject to a future stop by federal agents without reasonable suspicion.

-7-

15.     **Plaintiff Jorge Hernandez Viramontes** is a resident of Baldwin Park, California. He works at a car wash in Orange County, California that has been visited three times by immigration agents, most recently on June 18, 2025, when he was questioned and detained by agents despite informing them he is a U.S. citizen. He fears being subjected to similar actions again on the basis of his Latino ethnicity and accent.

16.     **Plaintiff Jason Brian Gavidia** is a resident of East Los Angeles, California. He was stopped and questioned by immigration agents at a tow yard in Los Angeles County on June 12, 2025, despite explaining multiple times he is a U.S. Citizen. Agents pushed him against the metal gated fence, put his hands behind his back, and twisted his arm. He was finally let go, but was terrified by this experience and fears being subjected to similar actions again on the basis of his Latino ethnicity.

17.     **Plaintiff Los Angeles Worker Center Network (LAWCN)** is a multi-racial, multi-ethnic, and multi-industry organization comprised of worker centers and labor organizations that work together to address injustices faced by low-wage workers in the greater Los Angeles area, including immigrant and non-English speaking workers. LAWCN's worker center members include the CLEAN Carwash Worker Center, the Garment Worker Center, the Koreatown Immigrant Workers Alliance, the Los Angeles Black Worker Center, the Philipino Workers Center, and the Warehouse Worker Resource Center. These worker center members in turn have members, including noncitizens with legal status and U.S. citizens, who have been subjected to and are at risk of being subjected in the future to the stop and arrest policies and practices challenged in this case.

18.     **Plaintiff United Farm Workers (UFW)** is the largest farm worker union in the country with approximately 10,000 members, with more members in California than in any other state. UFW aims to improve the lives, wages, and working conditions of agricultural workers and their families, including by

advocating for immigration reform and immigrants' rights. UFW's members in California work at agricultural sites as well as non-agricultural sites within the District. UFW has members, including noncitizens with legal status and U.S. citizens, who have been, and are at risk of being, subjected in the future to the stop and arrest policies and practices challenged in this case.

19.    **Plaintiff Coalition for Humane Immigrant Rights (CHIRLA)** is a nonprofit organization with its principal place of business in Los Angeles, California. CHIRLA was founded in 1986 to advance the human and civil rights of immigrants and refugees. Since then, CHIRLA has become one of the largest and most effective advocates for immigrant rights, organizing, educating and defending immigrants and refugees in the streets, in the courts, and in the halls of power. As a membership organization, CHIRLA has approximately 50,000 members across California, including both U.S. citizens and noncitizens of varying immigration status. CHIRLA has members in every county in the District. CHIRLA's staff also includes attorneys and Department of Justice (DOJ) accredited representatives who provide pro bono legal services to clients in removal proceedings, including those who are detained. Additionally, CHIRLA coordinates the Los Angeles Rapid Response Network (LARRN) and educates its membership as well as the broader community through know-your-rights programming, workshops, social media, and educational literature about a variety of social services and benefits, including immigration law, financial literacy, workers' rights, and civic engagement.

20.    **Plaintiff Immigrant Defenders Law Center (ImmDef)** is a nonprofit organization having its principal place of business in Los Angeles, California. Besides Los Angeles, ImmDef has offices in Riverside, Santa Ana, and San Diego, California, and works across the U.S.-Mexico border in Tijuana. ImmDef was founded in 2015 to protect the due process rights of immigrants facing deportation. At its founding, ImmDef was focused on ensuring that every immigrant before the immigration court had a lawyer by their side. In the years that followed, ImmDef

1  expanded its mission beyond helping individuals facing deportation to also work

2  towards systemic change that reimagines a more just immigration system. ImmDef

3  provides deportation defense, legal representation, legal education, and social

4  services to detained and non-detained children and adults.

5       21.    **Defendant Kristi Noem** is the Secretary of the Department of

6  Homeland Security (DHS), which is responsible for administering and enforcing the

7  nation's immigration laws pursuant to 8 U.S.C. § 1103(a). In this role, she oversees

8  component agencies such as ICE and U.S. Customs and Border Protection (CBP).

9  Defendant Noem is sued in her official capacity.

10      22.    **Defendant Todd M. Lyons** is the Acting Director of U.S. Immigration

11 and Customs Enforcement (ICE), an agency of the United States and a division of

12 DHS. ICE's mission includes the enforcement of criminal and civil laws related to

13 immigration. Among other things, ICE is responsible for the stops, arrests, and

14 custody of individuals believed to be in violation of civil immigration law.

15 Defendant Lyons is sued in his official capacity.

16      23.    **Defendant Rodney S. Scott** is the Commissioner of CBP, the agency

17 within DHS that is responsible for enforcing immigration laws at or close to the U.S.

18 border. In that capacity, Defendant Scott has direct authority over all CBP policies,

19 procedures, and practices related to stops, arrests, and detention. Defendant Scott is

20 sued in his official capacity.

21      24.    **Defendant Michael W. Banks** is Chief of the U.S. Border Patrol. In

22 that capacity, Defendant Banks has direct authority over all Border Patrol policies,

23 procedures, and practices related to stops, arrests, and detention. Defendant Banks is

24 sued in his official capacity.

25      25.    **Defendant Kash Patel** is Director of the U.S. Federal Bureau of

26 Investigation (FBI). In that capacity, Defendant Patel is responsible for the direction

27 and oversight of all operations of the FBI. Defendant Patel is sued in his official

28 capacity.

26.    **Defendant Pam Bondi** is the U.S. Attorney General. In that capacity, Defendant Bondi is head of the Department of Justice (DOJ) and is responsible for the direction and oversight of all operations of the DOJ, including DOJ law enforcement agencies such as the FBI, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and the Drug Enforcement Administration (DEA). Defendant Bondi is sued in her official capacity.

27.    **Defendant Ernesto Santacruz Jr.** is the Acting Field Office Director for the Los Angeles Field Office of ICE. In that capacity, Defendant Santacruz Jr. is responsible for the supervision of personnel within ICE's Enforcement and Removal Operations (ERO) in the geographic area covered by the Los Angeles Field Office, which comprises the seven counties in the District, and facilities within the District including the basement of the Los Angeles federal building, B-18. Defendant Santacruz Jr. is sued in his official capacity.

28.    **Defendant Eddy Wang** is the U.S. Homeland Security Investigations Special Agent in Charge for Los Angeles. In that capacity, Defendant is responsible for the supervision of agents within ICE's Homeland Security Investigations (HSI) in the Los Angeles Area including as to stops and arrests. Defendant Wang is sued in his official capacity.

29.    **Defendant Gregory K. Bovino** is the Chief Patrol Agent for the El Centro Sector of CBP. In that capacity, Defendant Bovino is responsible for the supervision of agents in the El Centro Sector including as to stops, arrests, and detention. Defendant Bovino is sued in his official capacity.

30.    **Defendant D. Stalnaker** is the Acting Chief Patrol Agent for the San Diego Sector of CBP. In that capacity, Defendant Stalnaker responsible for the supervision of agents in the San Diego Sector including as to stops, arrests, and detention. Defendant Stalnaker is sued in his official capacity.

31.    **Defendant Akil Davis** is the Assistant Director of the Los Angeles Office of the FBI. In that capacity, Defendant Davis is responsible for the

1  supervision of all agents in the Los Angeles Office including as to stops and arrests.

2  Defendant Davis is sued in his official capacity.

3      32.    **Defendant Bilal A. Essayli** is the U.S. Attorney for the Central District

4  of California. In that capacity, Defendant Essayli has authority over federal law

5  enforcement operations within the District, including those of the FBI, ATF, and

6  DEA. Defendant Essayli is sued in his official capacity.

7                          **FACTUAL ALLEGATIONS**

8      33.    Starting on or around June 6, 2025, the federal government unleashed

9  immigration agents and officers into the streets, worksites, and neighborhoods of

10 Los Angeles and surrounding counties, creating an illegal detention and deportation

11 dragnet that shows no signs of ceasing.

12 **A.    Suspicionless Stops Based on Racial Profiling**

13     34.    The constitutional, statutory, and regulatory framework is clear about

14 the practices immigration officers must follow. The Fourth Amendment protects

15 "[t]he right of the people to be secure in their persons . . . against unreasonable

16 searches and seizures." U.S. Const. amend. IV. "Except at the border and its

17 functional equivalents," immigration agents may stop individuals in public only

18 after identifying "specific articulable facts, together with rational inferences from

19 those facts, that reasonably warrant suspicion" of a violation of immigration law.

20 *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975); *Benitez-Mendez v.*

21 *I.N.S.*, 752 F.2d 1309, 1311 (9th Cir. 1983), *amended*, 760 F.2d 907 (9th Cir. 1983);

22 *see also* 8 C.F.R. § 287.8(b)(2). Reasonable suspicion cannot be based "on broad

23 profiles which cast suspicion on entire categories of people without any

24 individualized suspicion of the particular person to be stopped." *United States v.*

25 *Rodriguez Sanchez*, 23 F.3d 1488, 1492 (9th Cir. 1994).

26     35.    Immigration officials in Southern California are not abiding by this

27 framework.

28

-12-

36.     One of the clearest patterns that have emerged in the raids in Southern California over the past few weeks has been stops and interrogations based on nothing but broad profiles, including on the basis of apparent race and ethnicity.[6] On information and belief, Defendants have adopted a policy and practice of conducting immigration operations in violation of their obligation to stop individuals in public only if there is reasonable suspicion.

37.     As often happens when agencies adopt a pattern and practice of racial profiling, among those most vulnerable have been individuals whose work makes them a visible target in public spaces.

38.     Day laborer pickup locations have become central sites of immigration enforcement.[7] On June 6, 2025, federal agents detained multiple day laborers outside of the Westlake Home Depot.[8] In the following days, similar raids occurred

---

[6] Brittany Mejia & Rachel Uranga, *Fears of racial profiling rise as Border Patrol conducts 'roving patrols,' detains U.S. Citizens*, L.A. Times (June 15, 2025), https://www.latimes.com/california/story/2025-06-15/latinos-targeted-in-raids-u-s-citizens-detained-indiscriminate-sweeps-home-depot-lots-targeted

[7] Kaitlyn Huamani, *Home Depot caught in the crosshairs of L.A. immigration raids*, L.A. Times (June 9, 2025), https://www.latimes.com/business/story/2025-06-09/home-depot-in-the-crosshairs-of-immigrations-raids (discussing how Home Depots across Southern California have been impacted by the immigration raids); Maanvi Singh, *At Home Depot, Ice raids terrorize the workers who helped build LA: "They just come and grab you"*, The Guardian (June 16, 2025), https://www.theguardian.com/us-news/2025/jun/16/home-depot-ice-raids-los-angeles; Pat Maio, *Home Depot's day laborer haven turns into immigration target across Southern California*, L.A. Daily News (June 13, 2025), https://www.dailynews.com/2025/06/13/home-depot-a-longtime-destination-for-day-laborers-part-of-symbolic-southern-california-raids/ (listing multiple Home Depot locations in Los Angeles and Orange County where day laborers have been detained).

[8] Cameron Kiszla, *Immigration agents raid several L.A. businesses, encounter protesters*, KTLA 5 (June 6, 2025), https://ktla.com/news/local-news/federal-agents-raid-home-depot-in-westlake-district/ (reporting that masked officers wearing vests emblazoned with "HSI" took individuals into custody at a Home Depot in Westlake); Helen Jeong, *45 people arrested during ICE raids at 3 downtown LA locations*, NBC 4 (June 6, 2025), Telemundo 52, *Actividad de autoridades federales en distintas areas de Los Angeles*, YouTube (June 7, 2025), https://www.youtube.com/watch?v=y-MrC5tzd3o (featuring a day laborer witness who recalled hearing someone yell "la migra, la migra!" and observed officers arrest several day laborers without presenting any documents or warrants; the entire operation reportedly lasted only 20 minutes).

-13-

1  at Home Depot stores in Whittier,[9] Huntington Park,[10] Santa Ana,[11] Downey,[12]

2  Upland,[13] Paramount,[14] Hollywood,[15] Costa Mesa,[16] Inglewood,[17] Baldwin Park,[18]

---

[9] Kaitlyn Huamani, *Home Depot caught in the crosshairs of L.A. immigration raids*, L.A. Times (June 9, 2025), https://www.latimes.com/business/story/2025-06-09/home-depot-in-the-crosshairs-of-immigrations-raids (noting an immigration raid conducted by federal agents at a Home Depot in Whittier); Maanvi Singh, *At Home Depot, Ice raids terrorize the workers who helped build LA: "They just come and grab you"*, The Guardian (June 16, 2025), https://www.theguardian.com/us-news/2025/jun/16/home-depot-ice-raids-los-angeles (same); Tracey Leong & Karla Rendon, *'Hope he comes back.' Long Beach family says father detained outside Whittier Home Depot*, NBC 4 (Jun, 14, 2025), https://www.nbclosangeles.com/news/local/long-beach-grandfather-detained-immigration/3724461/ (highlighting the emotional impact of immigration raids on a Long Beach family after a loved one was detained outside the Whittier Home Depot).

[10] Pat Maio, *supra*, note 7; Nathan Solis, et al., *What businesses are the feds targeting during L.A. immigration sweeps? Here's what we know*, L.A. Times (June 10, 2025), https://www.latimes.com/california/story/2025-06-10/ice-sweep-targets-what-we-know.

[11] Pat Maio, *supra*, note 7; Nathan Solis, *supra*, note 10.

[12] Karla Rendon, *Immigration raids reported near Downey churches*, NBC 4 (June 11, 2025), https://www.nbclosangeles.com/news/local/downey-churches-home-depot-immigration-raids/3721686/.

[13] Helen Jeong, *ICE agents fail to detain day laborers at Upland Home Depot after bystanders intervene*, NBC 4 (June 16, 2025), https://www.nbclosangeles.com/news/local/ice-agents-fail-to-detain-day-laborers-at-upland-home-depot-after-bystanders-intervene/3725645/.

[14] Pat Maio, *supra*, note 7.

[15] Brittny Mejia & Rachel Uranga, *Raid at a Home Depot in Hollywood shatters an immigrant refuge*, L.A. Times (June 20, 2025), https://www.latimes.com/california/story/2025-06-20/border-patrol-agents-arrest-street-vendors-outside-hollywood-home-depot.

[16] Pat Maio, *supra*, note 7. .

[17] NBCLA, *Federal agents detain people near Hollywood Home Depot*, YouTube (June 19, 2025), https://www.youtube.com/watch?v=sjCJYBR24gw.

[18] *Baldwin Park Among Cities Targeted in Immigration Raids Wednesday Morning*, Baldwin Park News (June 29, 2025), https://baldwinparknewsonline.com/baldwin-park-among-cities-targeted-in-immigration-raids-wednesday-morning/.

-14-

1  Sylmar,[19] Glendale, [20] Marina Del Rey,[21] and Los Angeles.[22]  Other day laborer

2  pickup sites—a 99 cents store in Hawthorne,[23] a shopping center in Los Angeles,[24] a

3  Walmart in Pico Rivera,[25]—have also been targeted.

4         39.    Car wash workers have also been heavily impacted. Car washes, in

5  which workers typically wash, dry, and detail vehicles outdoors, have been hit

6  across Southern California, including more than once. Indeed, during the initial days

7  of the raids, between June 7, 2025, and June 11, 2025, federal agents raided at least

8  nine car washes in Los Angeles and Orange Counties, with at least 25 workers and

9  one customer arrested.[26]

---

[19] Semantha Raquel Norris, *Federal Immigration Agents Terrorize the Northeast Valley*, San Fernando Valley Sun (June 19, 2025), https://sanfernandosun.com/2025/06/19/federal-immigration-agents-terrorize-the-northeast-valley/.

[20] 209 Drone Shots (@209_drone_shots), Instagram (June 27, 2025), https://www.instagram.com/p/DLZCN6TOHoW.

[21] NBC San Diego (@nbcsandiego), Instagram (June 28, 2025, https://www.instagram.com/p/DLP893MsqS6/

[22] Unión Del Barrio (@uniondelbarrio), Instagram (June 26, 2025), https://www.instagram.com/p/DLYF94bBUYs.

[23] Eric Villagomez (@puroslatinotx), Instagram (June 8, 2025), https://www.instagram.com/p/DKqboCRptBU.

[24] Eric Villagomez (@purolatinostv), Instagram (June 6, 2025), https://www.instagram.com/p/DKkr84sBSgX.

[25] Pico Rivera, California (@picoriveracommunity), Instagram (June 17, 2025), https://www.instagram.com/p/DLA7wZYzlKY; Fox 11 Los Angeles, *Adrian Martinez: Young man detained by ICE outside a Walmart in Pico Rivera*, YouTube (June 17, 2025), https://www.youtube.com/watch?v=iZ6J99cnYqs.

[26] Emily Baumgaertner Nunn & Anushka Patil, *Carwashes become easy targets in California's ICE raids*, N.Y. Times (June 11, 2025), https://www.nytimes.com/live/2025/06/11/us/los-angeles-protests-trump-ice?smid=url-share#carwashes-become-easy-targets-in-californias-ice-raids; Suhauna Hussain, *'They are grabbing people.' L.A. and Orange County car wash workers targeted by federal immigration raids*, L.A. Times (June 11, 2025), https://www.latimes.com/business/story/2025-06-11/l-a-orange-county-car-washes-hit-by-ice-raids.

-15-

40.    Additionally, farm and agricultural workers have been targeted. Between Monday, June 9, 2025, and June 13, 2025, at least 43 people were detained on farms in Ventura and Santa Barbara Counties.[27]

41.    The manner in which the foregoing raids have been conducted bears no hallmarks of reasonable suspicion: there are no indicia that agents had any specific articulable facts sufficient to justify a seizure. Instead, those who appear to be non-white have been categorically stopped, sometimes without even being asked for identification.

42.    This pattern has continued with other types of workers as well. On the first day of the raids, HSI agents executed a search warrant and made collateral arrests of workers they encountered as well.[28] The raids have also resulted in interrogation of street vendors[29] and workers at recycling centers,[30] tow yards,[31] and

---

[27] Amy Taxin & Dorany Pineda, *Immigration Raids are threatening businesses that supply America's food, farm bureaus say*, Associated Press (June 13, 2025), https://www.kvpr.org/local-news/2025-06-13/immigration-raids-are-threatening-businesses-that-supply-americas-food-farm-bureaus-say.

[28] Génesis Miranda Miramontes, *US Attorney confirms FBI, federal agencies serve a search warrant in downtown LA*, NBC 4 (June 6, 2025), https://www.nbclosangeles.com/news/local/us-attorney-confirms-fbi-federal-agencies-search-warrant-downtown-los-angeles/3717411/.

[29] Leanne Suter, *Community members try to help street vendor taken by federal agents in Ladera Heights, video shows*, ABC7 (June 27, 2025), https://abc7.com/post/community-members-try-help-street-vendor-taken-ice-ladera-heights/16863236/.

[30] *See, e.g.*, Ryan P. Cruz, *Immigration Enforcement Shakes Up Communities of Santa Barbara County*, Santa Barbara Independent (June 20, 2025), https://www.independent.com/2025/06/20/immigration-enforcement-shakes-up-communities-of-santa-barbara-county/.

[31] *See, e.g.*, Brittny Mejia, *Video shows immigration agents interrogating a Latino U.S. citizen: 'I'm American, bro!'*, L.A. Times (June 13, 2025), https://www.latimes.com/politics/story/2025-06-13/video-shows-immigration-agents-interrogating-a-latino-u-s-citizen-im-american-bro.

1  packing houses.[32] Farmers markets and a swap meet have been visited,[33] as well as

2  bus stops,[34] parks,[35] an LA Fitness gym,[36] and a church.[37]

3        43.    For example, on the morning of June 6, 2025, a local resident, R.H.D.,

4  and his brother-in-law were helping their relative paint his home in Orange County.

5  Both are Latino. As they were working outside, a group of ICE and FBI agents

6  approached and began questioning them. This questioning was not voluntary. The

7  

8  [32] Al Rojo Vivo, *Agentes federales realizan redadas en zona industrial de California*, (June 14, 2025), https://www.youtube.com/watch?v=TXMlJqmME0U (reporting that at least two women leaving work at packing house, along with one woman's son who had gone to pick her up, were detained during an immigration raid).

[33] Josh Dubose, *Dozens of heavily armed ICE agents swarm popular L.A. County swap meet*, KTLA 5 (June 15, 2025), https://ktla.com/news/local-news/dozens-of-heavily-armed-ice-agents-swarm-popular-l-a-county-swap-meet/; Jasmine Mendez, et al., *Immigration raids continue as Trump appears to soften on targeting some workplaces*, L.A. Times (June 15, 2025), https://www.latimes.com/california/story/2025-06-15/los-angeles-immigration-raids-continue ("If you looked Hispanic in any way, they just took you."); Tim Pulliam & Amanda Palacios, *Several people taken into custody during immigration raid at Santa Fe Springs Swap Meet*, ABC 7 (June 16, 2025), https://abc7.com/post/several-people-taken-custody-during-immigration-raid-santa-fe-springs-swap-meet/16753752/; Levi Sumagaysay & Lauren Hepler, *From San Diego to the Bay Area, California Restaurants are on Edge Over Immigration Raids,* CalMatters (June 19, 2025), https://calmatters.org/economy/2025/06/california-restaurants-immigration-raids/.

[34] Sophie Flay, *ICE agents detain several people at Pasadena bus stop, conducts raids across the city*, ABC 7 (June 19, 2025), https://abc7.com/post/ice-agents-detain-2-men-pasadena-bus-stop-conduct-raids-city/16785979/.

[35] Douglas Saunders Sr., *OC attorney says she was detained in ICE raid at Santa Ana park*, Daily Journal (June 19, 2025), https://www.dailyjournal.com/articles/386228-oc-attorney-says-she-was-detained-in-ice-raid-at-santa-ana-park#:~:text=Orange%20County%20attorney%20Heidi%20M,an%20operation%20in%20the%20area (detailing how a U.S. citizen and Orange County attorney was detained by ICE agents while walking at a park.)

[36] Ricardo Tovar, *LA County Officials Say ICE Agents Targeted Individuals at Churches*, KSBW8 (June 12, 2025), https://www.ksbw.com/article/la-county-ice-agents-targeted-individuals-church/65039805 ("A council member confirmed that ICE conducted raids at a Home Depot, LA Fitness, and inside and outside of two churches in the city."); Union del Barrio (@uniondelbarrio), Instagram (June 11, 2025), https://www.instagram.com/p/DKxKR5AIOUq/.

[37] Vicent Medina, *Tensions high as immigration sweeps reach Downey churches*, The Downey Patriot (June 16, 2025), https://www.thedowneypatriot.com/articles/tensions-high-as-immigration-sweeps-reach-downey-churches.

-17-

agents surrounded the man and prevented him from walking away before they knew who he was. There were several people at nearby residences who appeared Caucasian and were also working outside in their yards, but on information and belief, they were not questioned or detained.

44.     At a Home Depot in Santa Ana on June 10, 2025, Junior Ortega recounted that agents arrived in unmarked vehicles and began detaining individuals at gunpoint.[38] An agent approached him, pointed a gun and then demanded to see his identification. He complied, fearing for his safety. After inspecting the identification, the agent released Junior without ever providing a reason for the stop.

45.     At the Downey Memorial Christian Church on June 11, 2025, a witness recalled that "the gentleman who they took was dark-skinned and only spoke Spanish. They don't care if you have papers, as long as you look like what they want you to look like, they'll take you."[39] No reason for the stop was provided.

46.     At a military-style raid at the Santa Fe Springs swap meet on June 14, 2025, 60 heavily armed agents were present.[40] One witness reported that "if you looked Hispanic in any way, they just took you."[41] Another witness described seeing agents pull people from the bathrooms and demand identification from everyone they encountered.[42]

47.     It is illegal for Defendants to stop anyone—U.S. citizens or not—without reasonable suspicion. But predictably, in addition to noncitizens,

---

[38] *Raids in Southern California rattle immigrant communities – including those in the US legally*, The Tribune (June 11, 2025), https://tribtown.com/2025/06/11/raids-in-southern-california-rattle-immigrant-communities-including-those-in-the-us-legally/.

[39] Travis Schlepp, *ICE agents make arrest at Los Angeles area church*, KTLA 5 (June 11, 2025), https://ktla.com/news/local-news/ice-agents-make-arrest-at-los-angeles-area-church/#:~:text=Community%20members%20and%20religious%20leaders,in%20the%20church%20parking%20lot.

[40] Josh Dubose, *supra*, note 33.

[41] *Id.*

[42] *Id.*

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Defendants' practices have led to numerous U.S. citizens who work, reside, or just happen to be in neighborhoods with large numbers of people of color also getting swept up.

48.    On June 14, 2025, Heidi Plummer, a U.S. citizen, was walking through a park in Santa Ana when she got caught up in an immigration raid occurring there. She was handcuffed, placed in a vehicle with others, and taken to an ICE station in Santa Ana where she was kept for an hour and a half before being released.[43]

49.    Additionally, more recently, Andrea Velez, a U.S. citizen, was being dropped off at work in downtown Los Angeles when federal agents grabbed her without explanation. Her mother, who witnessed the incident, described it as looking like "they'e kidnapping [her]." Witnesses said agents never asked Andrea for identification. No justification was provided. Her mother remarked, "the only thing wrong with her . . . was the color of her skin."[44]

**B.    A Show of Force: Intimidation, Violence, and Anonymity**

50.    While the government may describe the encounters agents and officers are having with individuals as consensual, they are far from that. A stop, even brief, must be supported by reasonable suspicion if "a reasonable person would [believe] that he was not free to leave." *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

51.    In a typical encounter, agents and officers approach suddenly and in large numbers. Typically dressed in military style or SWAT clothing, heavily armed with weapons displayed, and masked, their vests may display only a generic "POLICE" patch (if they display anything at all). For example, an estimated 60 ICE

---

[43] Douglas Saunders Sr., *OC Attorney Says She Was Detained in ICE Raid at Santa Ana Park*, Daily Journal (June 19, 2025), https://www.dailyjournal.com/articles/386228-oc-attorney-says-she-was-detained-in-ice-raid-at-santa-ana-park.

[44] Dani Anguiano, *US Citizen Arrested During ICE Raid in What Family Describes as 'Kidnapping,'* The Guardian (June 26, 2025), https://www.theguardian.com/us-news/2025/jun/26/immigration-ice-raid-andrea-velez.

agents dressed in military tactical gear and carrying rifles raided a swap meet in Los

Angeles on June 15, 2025[45]:



*Dozens of heavily armed, masked ICE agents seen raiding a Santa Fe Springs Swap Meet on June 14, 2025. (OnSceneTV)*

52.     This grossly disproportionate display of force is enough to make any

person fear for their safety and feel compelled to comply. Moreover, agents

typically position themselves around individuals, aggressively engage them, and/or

bark commands, making it nearly impossible for individuals to decline to answer

their questions.

53.     When individuals have tried to avoid an encounter with agents and

officers, they have been chased and pushed to the ground, sometimes even beaten,

and then taken away. Such seizures look less like lawful arrests and more like

brazen, midday kidnappings.

54.     These incidents have been widely reported in the news, further

contributing to the climate of intimidation and fear.[46]

---

[45] Josh DuBose, *supra*, note 33.

[46] Alicia A. Caldwell, *Stun grenades, armored trucks in ICE raids spur tensions*,
Bloomberg (June 6, 2025), https://www.bloomberg.com/news/articles/2025-06-
06/rifles-stun-grenades-armored-trucks-in-ice-raids-spur-tensions?srnd=undefined.

55.    For example, in Westchester on June 8, 2025, several armed agents in camouflage uniforms and helmets tackled a fruit vendor on a corner, pinning him to the ground.[47] A witness recalled: "They had him pressed down on the ground. They had weapons drawn so no one could get near to help him."[48]

56.    At a hand car wash in Culver City also on June 8, 2025, agents dressed in either camouflaged fatigues or plainclothes arrived in unmarked vehicles.[49] A witness, waiting for her car to be washed, recalled seeing "an agent carrying an assault rifle . . . chasing after a customer, pursuing him across a four-lane road," while other customers screamed "Don't shoot!"[50] The federal agent caught the man and took him into custody.[51]

57.    At a Home Depot in Santa Ana on June 9, 2025, a U.S. asylum seeker from Peru was detained and later released upon producing documents. He recalls that "[the agents] arrived in an aggressive manner," pointing guns, as if to "rob them."[52]

58.    At the Downey Memorial Christian Church on June 11, 2025, three SUVs with tinted windows pulled up to the church.[53] Six agents with neck gaiters, hats, and sunglasses, rushed out of unmarked vehicles. Armed, some carrying

---

[47] L.A. Times, *Unidentified agents detain L.A. fruit vendor: 'Like he'd been kidnapped'*, L.A. Times (June 12, 2025), https://www.latimes.com/00000197-61d1-d4a7-addf-f1d59c1d0000-123.

[48] *Id.*

[49] Dani Anguiano, et al., *'Snatching off the streets': Ice targets churches, car washes and workplaces*, The Guardian (June 12, 2025), https://www.theguardian.com/us-news/2025/jun/12/los-angeles-ice-raids.

[50] *Id.*

[51] *Id.*

[52] Hetty Change & Jonathon Lloyd, *Day laborers targeted in raid at Santa Ana Home Depot, OC officials say*, NBC 4 (June 10, 2025), https://www.nbclosangeles.com/news/local/day-laborers-santa-ana-home-depot-immigration-raid/3720487.

[53] Jesus Jiménez & Emily Baumgaertner Nunn, *Church Leaders Shaken After a Man was Detained in Their Parking Lot*, N.Y. Times (June 11, 2025), https://www.nytimes.com/2025/06/11/us/la-protests-ice-raids-church-arrest.html.

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Case 2:25-cv-05605-MEMF-SP    Document 16    Filed 07/02/25    Page 22 of 65    Page ID
#:69

assault rifles, they detained a man in the parking lot.[54] The agents refused to identify which agency they worked for and did not provide a warrant.[55] When a senior pastor of the church tried to communicate in Spanish with the man being detained, an agent pointed a gun at her.[56]

59.    Recently, in Santa Ana, agents were observed on video repeatedly beating Narciso Barranco, father to three sons who have served in the U.S. Marines, on the head and neck, even though Barranco was already on the ground.[57]

60.    Two days later at a Home Depot in Ladera Heights, eight heavily armed masked men surrounded a young woman street vendor clinging to a tree. After they had arrested the woman and were driving away, they threw three tear gas canisters at the small group of community members bearing witness to the arrest. The men refused to identify themselves.[58]

61.    When people refuse to answer questions and try to leave, agents respond with violence. In one widely circulated social media video, a driver refused to answer questions and tried to drive away. The undercover agent pointed his

---

[54] Jesus Jiménez & Emily Baumgaertner Nunn, *Church Leaders Shaken After a Man was Detained in Their Parking Lot*, N.Y. Times (June 11, 2025), https://www.nytimes.com/2025/06/11/us/la-protests-ice-raids-church-arrest.html.

[55] *Id.*; Travis Schlepp, *ICE agents make arrest at Los Angeles area church*, KTLA 5 (June 11, 2025), https://ktla.com/news/local-news/ice-agents-make-arrest-at-los-angeles-area-church/#:~:text=Community%20members%20and%20religious%20leaders,in%20the%20church%20parking%20lot.

[56] Jesus Jiménez & Emily Baumgaertner Nunn, *supra*, note 54.

[57] Obed Manuel, *U.S. Marine veteran says father's violent arrest by immigration agents was 'inhumane'*, NPR (June 27, 2025), https://www.npr.org/2025/06/27/nx-s1-5442653/father-of-u-s-marines-violently-arrested-by-ice#:~:text=Father%20of%20U.S.%20Marines%20violently%20arrested%20by%20ICE&text=The%20scene%20in%20Santa%20Ana,when%20the%20agent%20strikes%20him

[58] Leanne Suter, *Community members try to help street vendor taken by federal agents in Ladera Heights, video shows*, ABC 7 (June 27, 2025), https://abc7.com/post/community-members-try-help-street-vendor-taken-ice-ladera-heights/16863236/.

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

firearm at the driver and said "I'll [expletive] shoot you," before being instructed by another agent to let him go.[59]

62.    Agents and officers have not only employed these tactics with alarming regularity, but they have also refused to identify themselves or what agency they are with when asked. Such refusal to identify themselves endangers public safety,[60] frustrates any efforts at accountability, including in this case, and ultimately normalizes lawless and dangerous conduct behind the shield of anonymity.

## C.    Warrantless Arrests Without an Individualized Determination of Flight Risk

63.    Congress enacted a strong preference that immigration arrests be based on warrants. *See Arizona v. U.S.*, 567 U.S. 387, 407–08 (2012). The Immigration and Nationality Act thus provides immigration agents with only limited authority to conduct warrantless arrests. 8 U.S.C.§ 1357(a)(2). Federal regulations track the strict limitations on warrantless arrests. *See* 8 C.F.R. § 287.8(c)(2)(ii).

64.    An immigration officer can make an arrest without a warrant only if they have probable cause to believe that the individual "is in the United States in violation of any [immigration] law or regulation," *and* (2) the individual "is likely to escape before a warrant can be obtained" for his arrest. § 1357(a)(2); § 287.8(c)(2)(ii) (same); *Tejeda-Mata v. INS*, 626 F.2d 721, 725 (9th Cir. 1980). The requirement that officers establish probable cause of flight risk before conducting a warrantless arrest requires a particularized finding of likelihood of escape. *Mountain High Knitting, Inc. v. Reno*, 51 F.3d 216, 218 (9th Cir. 1995).

---

[59] Benicia Garcia (@ b_b_b_beniandthejets), Instagram (June 26, 2025), https://www.instagram.com/p/DLXk-kSRRy3/.

[60] *See, e.g.*, Lily Dallow, *L.A. man with previous human smuggling arrest may have been impersonating ICE agent*, KTLA 5 (June 27, 2025), https://ktla.com/news/local-news/l-a-man-arrested-in-huntington-park-for-possibly-impersonating-federal-agent/; José Olivares, *US sees spate of arrests of civilians impersonating Ice officers*, The Guardian (June 28, 2025), https://www.theguardian.com/us-news/2025/jun/28/civilians-impersonating-ice-officers.

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

65.     Defendants have a policy and practice of effectuating warrantless arrests without making an individualized flight risk determination.

66.     As one witness to a raid at a Home Depot recounted, the officers "just grab[] people" and "don't ask questions."[61]

67.     For example, on June 8, 2025, Jesus Cruz Uitz, a member of CLEAN Carwash Worker Center, which is part of Plaintiff LAWCN, was working at the car wash he has worked at for approximately 8 years when masked agents arrived. Mr. Cruz Uitz stayed where he was working but an officer angrily approached him, grabbed him by the arms, and ultimately arrested him. The officer did not have a warrant to arrest Mr. Cruz Uitz and did not ask him any questions to assess his individualized flight risk.

68.     On June 9, 2025, a resident, M.N., was working at the same car wash when agents arrested him without a warrant and without asking him any questions relevant to assess his flight risk.

69.     And on June 9, 2025, Jose Valdez Rios was at Home Depot when agents arrested him without a warrant and without asking him any questions relevant to assess his flight risk. Agents never asked him about his job, family, community, or other ties to the United States.

**D.     Arrests Without Identification of Authority or Reason**

70.     Regulations also require immigration officers to (1) identify themselves "as an immigration officer who is authorized to execute an arrest"; and (2) "[s]tate that the person is under arrest and the reason for the arrest," as soon as it is practical and safe to do so. 8 C.F.R. § 287.8(c)(2)(iii).

71.     Defendants have a policy and practice of failing to identify themselves or explain the basis for an arrest upon taking someone into custody. As noted above,

---

[61] Arelis R. Hernández, *'La migra!': Day laborers recount ICE raid outside Los Angeles Home Depot*, The Washington Post (June 8, 2025) https://www.washingtonpost.com/immigration/2025/06/08/ice-los-angeles-home-depot-raid-trump/.

1   agents and officers have often shown up masked, without any visible badges or

2   insignia indicating what agency they are with, and have refused to identify

3   themselves when asked. This has extended through the time of arrest, with

4   individuals left in the dark about who they are interacting with or why they are

5   under arrest.

6   **E.    Conditions at B-18 and the Denial of Access to Counsel**

7       72.    James Pendergraph, former Executive Director of ICE Office of State

8   and Local Coordination once said, "If you don't have enough evidence to charge

9   someone criminally but you think he's illegal, we can make him disappear."[62] That

10  ethos is animating Defendants' Los Angeles operations today.

11      73.    Individuals detained in immigration operations have a right to counsel

12  that is rooted in the Due Process Clause of the Fifth Amendment. *Usubakunov v.*

13  *Garland*, 16 F.4th 1299, 1304 (9th Cir. 2021); *Biwot v. Gonzales*, 403 F.3d 1094,

14  1098 (9th Cir. 2005); *see also Torres v. United States Dep't of Homeland Sec.*, 411

15  F. Supp. 3d 1036, 1060-61 (C.D. Cal. 2019). When the government detains

16  individuals as part of immigration enforcement efforts, it cannot impose restrictions

17  on access to attorneys that undermine the opportunity to obtain counsel or

18  communicate with retained counsel. *See Orantes-Hernandez v. Thornburgh*, 919

19  F.2d 549, 554, 565 (9th Cir. 1990); *see also Usubakunov*, 16 F.4th at 1300

20  ("Navigating the asylum system with an attorney is hard enough; navigating it

21  without an attorney is a Herculean task."); *Comm. of Cent. Am. Refugees v. INS*, 795

22  F.2d 1434, 1439 (9th Cir. 1986) (recognizing that impediments to communication,

23  especially in connection with a difficult-to-access facility, can constitute a

24

25

---

26  [62] Debbie Cenziper et. al, *Under Trump, ICE aggressively recruited sheriffs as*

27  *partners to question and detain undocumented immigrants*, The Washington Post (Nov. 23, 2021),

28  https://www.washingtonpost.com/investigations/interactive/2021/trump-ice-sheriffs-immigrants-287g/.

"constitutional deprivation" where they obstruct an "established on-going attorney-client relationship.").

74.    Further, civil detainees have "a right to adequate food, shelter, clothing, and medical care." *Youngberg v. Romeo*, 457 U.S. 307 (1982). Their conditions of confinement become unconstitutional if they "amount to punishment," *Bell v. Wolfish*, 441 U.S. 520, 535 (1979), in other words, when "the harm or disability caused by the government's action . . . significantly exceed[s], or [is] independent of, the inherent discomforts of confinement[.]" *Demery v. Arpaio*, 378 F.3d 1020, 1030 (9th Cir. 2004). During the ongoing raids, and as an integral part of the policy and pattern of unlawful stops and arrests described above, Defendants have been taking individuals who are swept up en masse to the basement of the federal building at 300 North Los Angeles Street in Los Angeles, commonly referred to as "B-18." B-18 is a facility for immigrant detainees designed to hold a limited number of individuals temporarily so they can be processed and released, or processed and transported to a long-term detention facility. It does not have beds, showers, or medical facilities.

75.    B-18 was previously the subject of litigation in this District, and a lawsuit over the inhumane treatment of detainees there resulted in a 2009 settlement agreement requiring that individuals not be held at B-18 for more than 12 hours. *See Castellano v. Napolitano*, No. 2:09-CV-02281 (C.D. Cal. Sept. 16, 2009). Other provisions of the agreement required that detainees at B-18 be allowed to "visit with current or prospective legal representatives and their legal assistants seven days a week, including holidays, for eight hours per day on regular business days (Monday through Friday), and four hours per day on weekends and holidays."

76.    The settlement agreement has since expired. But under the immense pressure to receive individuals arrested in recent weeks, the unlawful conditions that led to the settlement more than a decade ago are recurring today. Individuals taken to B-18 are being kept in overcrowded, inhumane conditions. They are held in small

-26-

windowless rooms with dozens or more other detainees, in extremely cramped quarters. Some rooms are so cramped that detainees cannot sit, let alone lie down, for hours at a time.

77.     As of June 20, 2025, upon information and belief, over 300 individuals were being held at B-18. They are expected to sleep in cold rooms on floors without cots, bedding, or blankets. Some are even forced to sleep in tents outside.

78.     When asked why detainees have been forced to sleep in such cramped conditions, an officer at B-18 explained that B-18 is meant to be a processing center, not a detention facility. Historically, processing of individuals in removal proceedings would result in the release of an individual detained pending their next court hearing or, barring release, immediate transfer to a detention facility. But B-18 is not being used that way today, and individuals are being held there far longer than 12 hours, often for days on end.

79.     Detainees are also routinely deprived of food. Some have not even been given water other than what comes out of the combined sink and toilet in the group detention room. And upon asking for food, detainees have been told repeatedly that the facility has run out.

80.     Detainees are routinely denied access to necessary medical care and medications, too. Individuals with conditions that require consistent medications and treatment are not given any medical attention, even when that information is brought to the attention of the officers on duty. The facility cannot even provide detainees with basic hygiene. Individuals who are menstruating have had to wait long periods before receiving menstrual pads, if they receive them at all.

81.     To make matters worse—and, indeed, to keep the true nature and scope of Defendants' constitutional violations, including those related to stops and arrest, hidden from the outside world—individuals detained at B-18 have had their access to prospective or retained counsel severely and unconstitutionally restricted.

82.     On June 6, 2025, attorneys and legal representatives from organizational Plaintiffs CHIRLA and ImmDef attempted to gain access to B-18 to advise detainees of their rights and assess their eligibility for relief, but they were not permitted to enter.

83.     When they returned to B-18 the next morning, attorneys identified a handwritten notice on the door of the family and attorney entrance at B-18 indicating that they would not permit any visits that day. Federal officers then deployed an unknown chemical agent against family members, attorneys, and representatives, including CHIRLA and ImmDef legal staff, who were peacefully requesting access to detained individuals. The chemical agent that federal agents sprayed caused everyone to cough and inflicted a burning sensation in the eyes, nose, and throat.

84.     That same morning, numerous unmarked white vans quickly departed B-18 with a group of detainees. CHIRLA and ImmDef attorneys and representatives attempted to loudly share know your rights information with the detainees in the vans. To prevent the detainees from hearing their rights, and therefore exercising them, the federal agents blasted their horns to drown them out.

85.     On June 7, 2025, another ImmDef attorney arrived at B-18 to find a handwritten notice that the facility was closed to visitation, as shown below:[63]

_____

[63] Photos taken by LARRN attorney Helen Boyer Saturday June 7, 2025 at approx 8:50 AM.

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

 

86.    As a result, attorneys and family members were unable to access B-18 the entire weekend during the first few days of the raids.

87.    On the rare occasions when attorneys and family members have been allowed access to their clients or loved ones, they have been made to wait hours at a time to see them, and the resulting visits have been limited to a mere five to 10 minutes. Detention officers screen the very limited phone calls that detainees are permitted to make, and phone calls cannot be used for confidential legal communications.

88.    In many cases, attorneys and family members have been unable to determine whether a particular individual is even detained at B-18, or whether they have been transferred to another facility. B-18 officers have refused to provide clear answers to questions about detainees' whereabouts, or refused to answer questions altogether. ICE's online locator, which provides information about detainees' location, is not updated in a timely manner.

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

89.    The severe access restrictions have persisted as Defendants' mass arrests continue to occur across Southern California.

90.    On June 16, 2025, ImmDef attorneys, as well as Congressman Jimmy Gomez, arrived at B-18 around 3:00 p.m. on a day when B-18 was purportedly open for visiting between 8:00 a.m. to 4:00 p.m. But they were denied access, along with family members who had been instructed to go to B-18 to pick up their loved ones' possessions.

91.    On June 19, 2025, an ImmDef attorney arrived at B-18 to meet with detainees, including one who was scheduled for a chemotherapy appointment the next day. Despite showing a doctor's note confirming the appointment and specifying that missing the appointment would be detrimental to the detainee's health, the guards repeatedly would not allow the attorney to meet with the ill detainee. One officer told the attorney that he had no way to find the individual because hundreds of people were detained in the facility.

92.    B-18 officers have and continue to consistently close the doors to detainees' prospective or retained counsel at unexpected and unexplained times.

93.    The use of B-18 as a makeshift, long-term detention center for hundreds of individuals has and continues to cause significant, ongoing harm. Defendants have intentionally restricted detainees' access to those who may be able to intervene on their behalf at a critical time when they are likely to face imminent government action in their case. Indeed, one of ImmDef's clients who has been granted asylum and who should never have been arrested was picked up at a Home Depot looking for work. He would have disappeared into the detention system if not for an ImmDef attorney's last minute intervention at B-18 on June 19, 2025.

94.    In fact, some individuals have accepted voluntary departure from this country under 8 U.S.C. § 1229c(a)(1), without having had the opportunity to consult with counsel, even though due process requires that any waiver of a right to a hearing be knowing and voluntary. *See, e.g., United States v. Ramos*, 623 F.3d 672,

-30-

682–83 (9th Cir. 2010). Upon information and belief, the inhumane conditions at B-18 create a coercive environment that pressures some of those detained individuals to take voluntary departure without first consulting with counsel and despite potential deportation relief because they fear lengthy detention in deplorable conditions.

95.     Combined with the continued deplorable conditions at B-18—lack of food, medical care, basic hygiene, and overcrowding—B-18 is a disaster continuing to happen. And until these issues are resolved, the true scale of the legal violations Defendants are engaged in will remain unknown.

**F.     Defendants' Pattern of Illegal Conduct Is Officially-Sanctioned**

96.     Defendants' unlawful stops, arrests, denial of access to counsel and conditions at B-18 are the predictable result of directives from top officials to agents and officers.

97. In January, the administration gave ICE field offices an arrest quota of 75 arrests a day.[64] As offices attempted to carry out such a mandate, workplace raids increased,[65] ICE check-ins became traps,[66] and courthouse arrests surged.[67]

98. Also, to help meet the quota, the administration granted agencies outside of DHS immigration enforcement powers.[68]

---

[64] Nick Miroff & Maria Sacchetti, *Trump Officials Issue Quotas to ICE Officers to Ramp Up Arrests*, The Washington Post (last updated Jan. 26, 2025), https://www.washingtonpost.com/immigration/2025/01/26/ice-arrests-raids-trump-quota/.

[65] Marianne LeVine, et al., *ICE is Arresting Migrants in Worksite Raids. Employers are Largely Escaping Charges*, The Washington Post (June 30, 2025), https://www.washingtonpost.com/immigration/2025/06/30/ice-raids-arrests-workers-companies/ (noting an April announcement by ICE officials that the agency had arrested more than 1,000 workers during Trump's first 100 days and collecting stories of workplace raids across the country); Mark Moran, *ICE Detains More than 530 People in Workplace 'Raids' in U.S. Northeast*, United Press International (Jan. 23, 2025), https://www.upi.com/Top_News/US/2025/01/23/ice-details-538-ion-workplace-raids/7811737692376/.

[66] Maanvi Singh & Will Craft, *As deportations ramp up, immigrants increasingly fear Ice check-ins: 'All bets are off'*, The Guardian (Apr. 6, 2025), https://www.theguardian.com/us-news/2025/apr/06/deportations-immigrants-ice-trump; Nidia Cavazos, *Immigrants at ICE check-ins detained, held in basement of federal building in Los Angeles, some overnight*, CBS News (June 7, 2025), https://www.cbsnews.com/news/immigrants-at-ice-check-ins-detained-and-held-in-basement-of-federal-building-in-los-angeles/.

[67] Julia Ainsley, *Trump admin tells immigration judges to dismiss cases in tactic to speed up arrests*, NBC News (June 11, 2025), https://www.nbcnews.com/politics/national-security/trump-admin-tells-immigration-judges-dismiss-cases-tactic-speed-arrest-rcna212138; Luis Ferré-Sadurní, *Inside a Courthouse, Chaos and Tears as Trump Accelerates Deportations*, N.Y. Times (June 12, 2025), https://www.nytimes.com/2025/06/12/nyregion/immigration-courthouse-arrests-trump-deportation.html; Ximena Bustillo, *ICE's novel strategy allows for more arrests from inside immigration courts*, NPR (June 12, 2025), https://www.npr.org/2025/06/12/nx-s1-5409403/trump-immigration-courts-arrests; Martha Bellisle, et al., *Immigration officers intensify arrests in courthouse hallways on a fast track to deportation*, AP News (June 11, 2025), https://apnews.com/article/immigration-court-arrests-ice-deportation-99d822cdc93ae7dc26026c27895d5ea1 (describing new tactic in which immigration judges grant a government motions dismiss deportation proceedings, enabling ICE officers—often masked—to arrest noncitizens immediately outside in the hallway and place them on an expedited path to removal).

[68] Press Release, DHS, *Statement from a DHS Spokesperson on Directive Expanding Immigration Law Enforcement to Some Department of Justice Officials* (Jan. 23, 2025), https://www.dhs.gov/news/2025/01/23/statement-dhs-spokesperson-directive-expanding-immigration-law-enforcement.

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

99.     Meanwhile, the administration began systematically dismantling internal accountability mechanisms and restraints on immigration agents' and officers' conduct. The administration shut down multiple oversight agencies (retaining only a version of their former selves after the administration was sued).[69] Investigations were closed.[70] Officers no longer had to abide by enforcement priorities.[71] Long-standing guidance restricting enforcement operations in sensitive locations—schools, hospitals, places of worship and public demonstrations—was rescinded.[72]

100.     But these changes were not enough, according to the administration. In late May, Deputy Chief of Staff Stephen Miller summoned 25 ERO Field Office Directors and 25 HSI Special Agents to a meeting to demand that "everybody" be targeted.[73] Under Miller's directive, agents no longer needed to develop vetted target

---

[69] Nicolae Viorel Butler, *Court Forces DHS to Preserve Immigrant Rights Offices,* Migrant Insider (May 27, 2025), https://migrantinsider.com/p/court-forces-dhs-to-preserve-immigrant?utm_source=CLINIC%2BMail&utm_campaign=f9e1ee6428-tips-6-2-25&utm_medium=email&utm_term=0_-663ab9ab77-284225192"https://migrantinsider.com/p/court-forces-dhs-to-preserve-immigrant?utm_source=CLINIC%2BMail&utm_campaign=f9e1ee6428-tips-6-2-25&utm_medium=email&utm_term=0_-663ab9ab77-284225192.

[70] Press Release, Government Accountability Project, *DHS Halted 500+ Civil Rights Investigations When It Shut Down Oversight Office, Whistleblowers Say* (May 15, 2025), https://whistleblower.org/press-release/dhs-halted-500-civil-rights-investigations-when-it-shut-down-oversight-office-whistleblowers-say/.

[71] Press Release, DHS, Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole (Jan. 21, 2025), https://www.dhs.gov/news/2025/01/21/statement-dhs-spokesperson-directives-expanding-law-enforcement-and-ending-abuse (noting a directive "rescind[ing] the Biden Administration's guidelines for . . . enforcement actions that thwart law enforcement in or near so-called "sensitive" areas).

[72] Marisa Kabas, *ICE agents get green light to make unjustified warrantless arrests*, The Handbasket (June 12, 2025), https://www.thehandbasket.co/p/ice-warrantless-arrests-castanon-nava.

[73] Stuard Anderson, *Stephen Miller's Order Likely Sparked Immigration Raids and Protests*, Forbes, Jun. 9, 2025, https://www.forbes.com/sites/stuartanderson/2025/06/09/stephen-millers-order-likely-sparked-immigration-arrests-and-protests/.

-33-

lists of individuals suspected of being in the United States unlawfully.[74] ICE agents were instructed in an email to "turn the creativity knob up to 11" and aggressively "push the envelope," including by pursuing "collaterals"—individuals that by definition would not have warrants.[75] As another e-mail put it: "If it involves handcuffs on wrists, it's probably worth pursuing."[76]

101.    The administration set a new arrest quota of 3,000 arrests per day and reportedly threatened job consequences if officials failed to meet arrest quotas.[77]

102.    The overriding message to agents and officers carrying out immigration operations on the ground was to prioritize arrest numbers, regardless of the law. Agents and officers were granted sweeping discretion to achieve this goal.

**G.    Defendant Agencies Have a History of Unconstitutional and Unlawful Conduct**

103.    The agencies involved in the Los Angeles area immigration raids include DHS and its components, ICE ERO, ICE HSI, and the U.S. Border Patrol, as well as DOJ law enforcement agencies including the FBI[78] and others (including

---

[74] Elizabeth Findell, s*upra* note 2 (reporting that agents were no longer required to develop target lists of noncitizens unlawfully present in the U.S., marking a shift from longstanding policy).

[75] José Olivares, *US immigration officers ordered to arrest more people even without warrants*, The Guardian (June 4, 2025), https://www.theguardian.com/us-news/2025/jun/04/immigration-officials-increased-detentions-collateral-arrests.

[76] José Olivares, *US immigration officers ordered to arrest more people even without warrants*, The Guardian, (June 4, 2025), https://www.theguardian.com/us-news/2025/jun/04/immigration-officials-increased-detentions-collateral-arrests.

[77] Elizabeth Findell, et al., s*upra* note 2; Julia Ainsley, et al., *A sweeping new ICE operation shows how Trump's focus on immigration is reshaping federal law enforcement,* NBC News (June 4, 2025), https://www.nbcnews.com/politics/justice-department/ice-operation-trump-focus-immigration-reshape-federal-law-enforcement-rcna193494.

[78] Cameron Kiszla, *Immigration agents raid several L.A. businesses, encounter protestors*, KTLA (June 6, 2025), https://ktla.com/news/local-news/federal-agents-raid-home-depot-in-westlake-district/ ("The FBI confirmed to KTLA that it is participating in the HSI raids, not just in Los Angeles but nationwide, 'as directed by the Attorney General. As we have been asked to do, we are sending Agents to participate in these immigration enforcement efforts,' the statement said.").

ATF[79] and DEA).[80] A number of these agencies have a history of engaging in unconstitutional and unlawful stops and arrests.

104.   For example, the U.S. Border Patrol has a documented history of Fourth Amendment violations in the U.S. interior: U.S. Border Patrol agents have relied on perceived race or ethnicity to select who to stop, conducted suspicionless stops, executed warrantless home raids, and carried out illegal worksite operations. Courts have repeatedly intervened to curb these practices. *See LaDuke v. Nelson*, 762 F.2d 1318 (9th Cir. 1985), *amended*, 796 F.2d 309 (9th Cir. 1986), *affirmed*, 799 F.2d 547, 551 (9th Cir. 1986) (upholding permanent classwide injunction against warrantless raids on farmworker housing in Washington, Idaho, and Montana); *International Molders' and Allied Workers' Local Union No. 164 v. Nelson*, 643 F. Supp. 884, 887-89, 899-901 (N.D. Cal. 1986) (granting preliminary injunction barring the now-defunct Livermore Border Patrol Sector from replicating the unlawful practices it had used in "Operation Jobs," a weeklong series of about 50 workplace raids across Northern California where agents stopped workers for questioning without reasonable suspicion and arrested people who refused to answer questions, including U.S. citizens).

105.   Most recently, the El Centro Sector of the U.S. Border Patrol, one of the key participants in the raids being challenged in this suit, was the focus of a suit filed in the Eastern District of California over a Kern County operation called "Operation Return to Sender." The tactics challenged here—including widespread racial profiling, suspicionless stops, and warrantless arrests without determination of

---

[79] Press Release, ICE, *ICE Los Angeles announces 239 illegal aliens were arrested during recent operation* (May 14, 2025), https://www.ice.gov/news/releases/ice-los-angeles-announces-239-illegal-aliens-were-arrested-during-recent-operation (confirming ATF's involvement in ICE operations in the Los Angeles area).

[80] *Id*. (confirming DEA's involvement in ICE operations in the Los Angeles area).

flight risk—bear the unmistakable hallmarks of "Operation Return to Sender."[81] Like the raids challenged here, "Operation Return to Sender" spread through agricultural communities and also targeted day laborer pick up sites. On April 29, 2025, the court granted a preliminary injunction barring the U.S. Border Patrol from engaging in these unlawful practices. *United Farm Workers v. Noem*, No. 1:25-CV-00246 JLT CDB, 2025 WL 1235525, at *1 (E.D. Cal. Apr. 29, 2025). The ruling recognizes that, in the Ninth Circuit, "Hispanic appearance is of little or no use in determining which particular individuals among the vast Hispanic populace should be stopped." *Id.* at *46 (quoting *United States v. Montero-Camargo*, 208 F.3d 1122, 1134 (9th Cir. 2000)). And the El Centro Sector Chief Bovino, who led "Operation Return to Sender," is now at the helm of operations in the Los Angeles area, inviting him to replicate his tactics in this District.

106.    ICE, which typically handles immigration enforcement in the interior and "manag[es] all aspects of the immigration enforcement process, including the identification, arrest, detention, and removal of [noncitizens],"[82] has likewise been found to violate the Fourth Amendment, statutory, and regulatory rights of individuals it encounters in the field.

107.    For instance, in 2008, ICE HSI agents conducted a workplace raid in Van Nuys, California. Agents executed a search warrant but also engaged in detentive stops of workers without individualized reasonable suspicion. The Ninth Circuit eventually ruled that this was unlawful and invalidated the ensuing removal proceedings. *Perez Cruz v. Barr*, 926 F.3d 1128, 1137 (9th Cir. 2019) (citing 8 C.F.R. § 287.8(b)).

---

[81] Sergio Olmos & Wendy Fry, *Border Patrol said it targeted known criminals in Kern County.  But it had no record of 77 of 78 arrestees*, CalMatters (Apr. 8, 2025), https://calmatters.org/economy/2025/04/border-patrol-records-kern-county/.

[82] *Enforcement and Removal Operations*, U.S. Immigration & Customs Enforcement, *https://www.ice.gov/about-ice/ero* (last visited June 30, 2025).

108.    In *Nava v. DHS*, a plaintiff class in Chicago challenged a pattern and
practice of ICE conducting warrantless arrests without making required
determinations under 8 U.S.C. § 1357. *Nava v. Dep't of Homeland Sec.*, 435 F.
Supp. 3d 880, 885 (N.D. Ill. 2020). The case resulted in a settlement that included a
nationwide policy about warrantless arrests and vehicle stops.[83] In June 2025,
despite a pending motion to enforce the settlement agreement and motion to extend
the settlement agreement, ICE terminated its policy under the settlement that
required officers to document the circumstances of warrantless arrests and vehicle
stops.[84]

109.    Meanwhile, in this District, in May 2024, plaintiffs secured a summary
judgment order in *Kidd v. Mayorkas*, 734 F. Supp. 3d 967, 982 (C.D. Cal. 2024),
holding unlawful ICE's practice of entering onto the curtilage of homes during
"knock and talks" for the purpose of carrying out arrests without a judicial warrant.
Public reports confirm that in late May, Defendant Essayli, instead directed DOJ law
enforcement agencies to take over door knocking tasks.[85]

110.    In sum, Defendants in this case have demonstrated a willingness to
bypass basic constitutional, statutory, and regulatory requirements when it comes to
immigration enforcement, even before top-down pressure demanded adherence with

---

[83] *See Nava v. DHS*, Proposed Settlement Agreement, https://www.aclu-
il.org/sites/default/files/field_documents/proposed_settlement.pdf; see also National
Immigrant Justice Center, *Final Settlement Regarding ICE Warrantless Arrests and
Vehicle Stops: Overview of Settlement Requirements and Remedies* (last updated
Jan. 17, 2025), https://immigrantjustice.org/final-settlement-regarding-ice-
warrantless-arrests-and-vehicle-stops-overview-of-settlement-requirements-and-
remedies/.

[84] Marisa Kabas, *ICE agents get green light to make unjustified warrantless arrests*,
The Handbasket (June 12, 2025), https://www.thehandbasket.co/p/ice-warrantless-
arrests-castanon-nava.

[85] Hamed Aleaziz & Todd Heisler, *Under Pressure From the White House, ICE
Seeks New Ways to Ramp Up Arrests*, N.Y. Times (June 11, 2025),
https://www.nytimes.com/2025/06/11/us/politics/ice-la-protest-arrests.html.
Defendants in that case also indicated in a court pleading that they intend to resume
ICE knock and talks as of July 1, 2025. Plaintiffs in that case have sought to confirm
whether this is still their intent and have not received a response.

dramatically higher arrest quotas. When their practices have come under scrutiny, rather than take the opportunity to conform their conduct to the law, they have evaded accountability by replicating those practices in another geographic area, declining to document what they do, and directing other federal partners not under court order to take over tasks that have been found to be unconstitutional. It is therefore no surprise that the immigration raids in the Los Angeles area have been marked by systematic disregard of the law.

**H.    Experiences of Individual Plaintiffs**

*Petitioner-Plaintiff Pedro Vasquez Perdomo*

111.    In the early morning of June 18, 2025, in Pasadena, California, Petitioner-Plaintiff Vasquez Perdomo was waiting at a bus stop across the street from Winchell's Donuts with several co-workers to be picked up for a job.

112.    Suddenly, about four cars converged on his location, and about half a dozen masked agents jumped out on either side of him. They had weapons and masks, and did not identify themselves.

113.    To Petitioner-Plaintiff Vasquez Perdomo, it felt like a kidnapping. He tried to leave but was swiftly surrounded, grabbed, handcuffed, and put into one of the vehicles.

114.    At the time he was handcuffed, agents did not have reasonable suspicion of a violation of immigration law.

115.    It was only after he was brought to a nearby CVS parking lot that agents checked Petitioner-Plaintiff Vasquez Perdomo's identification.

116.    No warrant was shown. Upon information and belief, agents did not have a warrant of any kind for Petitioner-Plaintiff Vasquez Perdomo's arrest.

117.    Agents proceeded with a warrantless arrest of Petitioner-Plaintiff Vasquez Perdomo without making an individualized determination of risk of flight.

118.    If agents had evaluated Petitioner-Plaintiff Vasquez Perdomo for risk of flight, they would have learned he had lived in Pasadena for decades.

119.   Agents did not inform Petitioner-Plaintiff Vasquez Perdomo that they were immigration officers authorized to make an arrest or of the basis for his arrest.

120.   At the time this action was filed, Petitioner-Plaintiff Vasquez Perdomo had been transported to and was being held at the federal building at 300 North Los Angeles St. in B-18. There he experienced extremely crowded and unsanitary conditions, was given little to eat or drink, and slept on the floor. Today he remains in custody at the Adelanto ICE Processing Center.

121.   Petitioner-Plaintiff has representation in his removal proceedings. His counsel is located in Pasadena, California.

122.   Petitioner-Plaintiff's family is located in Pasadena, California.

123.   Petitioner-Plaintiff is diabetic and has felt increasingly ill since his arrest. He has felt depressed since his arrest and reasonably fears being racially profiled again if he is released from detention.

*Petitioner-Plaintiff Carlos Alexander Osorto*

124.   In the early morning of June 18, 2025, in Pasadena, California, Petitioner-Plaintiff Osorto was waiting to be picked up for work with his co-worker Petitioner-Plaintiff Vasquez Perdomo.

125.   When federal agents approached, Petitioner-Plaintiff Osorto was terrified. He had seen videos of what had been happening around Los Angeles and also had heard of masked people who were not even government agents taking community members away. He tried to run, but one of the agents caught up to him and pointed a taser at his head and said "stop or I'll use it!" Petitioner-Plaintiff Osorto stopped immediately.

126.   Petitioner-Plaintiff Osorto was handcuffed and put into a vehicle.

127.   At the time he was handcuffed, agents did not have reasonable suspicion of a violation of immigration law.

128.   It was only after he was brought to a nearby CVS parking lot that agents asked Petitioner-Plaintiff Osorto if he had papers.

129.   No warrant was shown. Upon information and belief, agents did not have a warrant of any kind for Petitioner-Plaintiff Osorto's arrest.

130.   Agents proceeded with a warrantless arrest of Petitioner-Plaintiff Osorto without making an individualized determination of risk of flight.

131.   If agents had evaluated Petitioner-Plaintiff Osorto for risk of flight, they would have learned he had built homes all around Los Angeles, lived in Pasadena for more than a decade, and had 7 grandchildren who are U.S. citizens.

132.   Agents did not inform Petitioner-Plaintiff Osorto that they were immigration officers authorized to make an arrest or of the basis for his arrest.

133.   At the time this action was filed, Petitioner-Plaintiff Osorto had been transported to and was being held at the federal building at 300 North Los Angeles St. in B-18. The facility was full and when people asked for help officers told them there was no food, no water, and no medicine. Today he remains in custody at the Adelanto ICE Processing Center.

134.   Petitioner-Plaintiff Osorto has representation in his removal proceedings. His counsel is located in Pasadena, California.

135.   Petitioner-Plaintiff Osorto's family is located throughout Los Angeles County, including in Pasadena, California.

136.   Petitioner-Plaintiff Osorto has developed high blood pressure, he believes as a result of the stress he has experienced. He has been scared and overwhelmed by what happened and fears being targeted again, if he is released, for being a Latino person in construction clothes.

*Petitioner-Plaintiff Isaac Antonio Villegas Molina*

137.   In the early morning of June 18, 2025, in Pasadena, California, Petitioner-Plaintiff Villegas Molina was waiting to be picked up for work with his co-workers Petitioner-Plaintiff Vasquez Perdomo and Petitioner-Plaintiff Alexander Osorto.

138.   When federal agents approached, Petitioner-Plaintiff Villegas Molina was also afraid but tried his best to stay calm.

139.   An agent yelled at Petitioner-Plaintiff Villegas Molina not to run, even though he was still and calm. He was told to provide his ID and he provided his California ID, but the agent kept questioning him. At this point, he did not feel free to leave.

140.   When they were questioning him, agents did not have reasonable suspicion of a violation of immigration law.

141.   No warrant was shown. Upon information and belief, agents did not have a warrant of any kind for Petitioner-Plaintiff Villegas Molina's arrest.

142.   Agents proceeded with a warrantless arrest of Petitioner-Plaintiff Villegas Molina without making an individualized determination of risk of flight.

143.   If agents had evaluated Petitioner-Plaintiff Villegas Molina for risk of flight, they would have learned he had lived in Pasadena for 13 years and had worked at restaurants across Los Angeles.

144.   Agents did not inform Petitioner-Plaintiff Villegas Molina that they were immigration officers authorized to make an arrest or of the basis for his arrest.

145.   At the time this action was filed, Petitioner-Plaintiff Villegas Molina had been transported to and was being held at the federal building at 300 North Los Angeles St. in B-18. He slept on the floor and was given almost nothing to eat. Today he remains in custody at the Adelanto ICE Processing Center.

146.   Petitioner-Plaintiff has representation in his removal proceedings. His counsel is located in Pasadena, California.

147.   Petitioner-Plaintiff has had a difficult time in detention. He fears being targeted again because of his race.

*Plaintiff Jorge Hernandez Viramontes*

148.   On the morning of June 18, 2025, Plaintiff Hernandez Viramontes was working at a car wash in Orange County, where he has worked for approximately 10

-41-

years, when immigration agents arrived. This was the third time that agents had
raided the carwash since June 9, 2025.

149.    During this visit by agents, like with previous visits, agents did not
identify themselves. They did not show a warrant. They simply went from person to
person interrogating them about their identity and immigration status.

150.    Agents questioned Plaintiff Hernandez Viramontes' co-worker, a U.S.
citizen, about his citizenship *three* separate times in one visit.

151.    When agents got to Plaintiff Hernandez Viramontes, they asked him if
he was a citizen, and he replied yes and explained he was a dual citizen of the U.S.
and Mexico. They asked for an ID, which he provided. Agents then explained that
his ID wasn't enough and since he didn't have his passport, they were taking him.

152.    Agents placed Plaintiff Hernandez Viramontes in a vehicle and
transported him away. During this time, Plaintiff Hernandez Viramontes did not
know if they were going to take him to a detention center.

153.    Agents verified his citizenship and about 20 minutes later, brought him
back to the car wash, but not before his brother called his wife, who had become
deeply worried.

154.    When agents brought Plaintiff Hernandez Viramontes back to the car
wash, they did not apologize.

155.    Shortly after agents returned Plaintiff Hernandez Viramontes to the car
wash, yet *another* group of agents raided the carwash again.

156.    Plaintiff Hernandez Viramontes is shaken by what happened and fears
being targeted again on the basis of his Latino appearance and accent.

*Plaintiff Jason Brian Gavidia*

157.   In the afternoon of June 12, 2025, Plaintiff Gavidia, a U.S. citizen, was at a tow yard in Los Angeles County that was visited by immigration agents conducting a roving patrol.[86]

158.   Around 4:30 p.m., upon hearing someone say immigration agents may be at the premises, Plaintiff Gavidia went outside to confirm this. At the time, his clothes were dirty from working on his car.

159.   On the sidewalk outside the gate, Plaintiff Gavidia saw a federal agent between two cars step forward. Soon after, Plaintiff Gavidia saw several other agents wearing similar vests with the words "Border Patrol Federal Agent." He also noticed the agents were carrying handguns and at least two of the agents had a military-style rifle.

160.   As Plaintiff Gavidia attempted to head back inside the tow yard premises, an agent said, "Stop right there." At this point, Plaintiff Gavidia did not feel that he could leave. The agent was masked.

161.   While the agent approached Plaintiff Gavidia, another unmasked agent ran towards him and asked if he was American. Plaintiff Gavidia told the agent that he is American multiple times. The agent responded by asking, "What hospital were you born in?" Plaintiff Gavidia calmly replied that he did not know. The agent repeated the same question two more times, and each time Plaintiff Gavidia provided the same answer. At that point, the agents forcefully pushed Plaintiff Gavidia up against the metal gated fence, put his hands behind his back, and twisted his arm. Plaintiff Gavidia had been on his phone, and the masked agent also took his phone from his hand at that point.

162.   Plaintiff Gavidia explained that the agents were hurting him and that he was American. The unmasked agent asked a final time, "What hospital were you

---

[86] Complaint, *United States v. Javier Ramirez*, No. 2:25-MJ-03646-DUTY (C.D. Cal. June 13, 2025); *see also* Brittny Mejia, *supra* note 23.

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1  born in?" Plaintiff Gavidia responded again that he did not know and said East L.A.
2  Plaintiff Gavidia then told the agents that he could show them his Real ID. The
3  agents had not asked to see Plaintiff Gavidia's identification.

4      163.   When Plaintiff Gavidia showed his Real ID to the agents, one of them
5  took it from him. It ultimately took about 20 minutes for -Plaintiff Gavidia to get his
6  phone back. But the agents never returned Plaintiff Gavidia's Real ID.

7      164.   Plaintiff Gavidia's interaction with the federal agents was one of the
8  worst experiences he has ever had. He is disturbed and deeply concerned about
9  being targeted again because of his race.

10  **I.     Harms to Organizational Plaintiffs and/or Their Members**

11      165.   Since they began on June 6, 2025, federal immigration raids have led to
12  the arrest of over 1,500 people and counting, many of whom have been stopped
13  without reasonable suspicion, and/or arrested without probable cause. For those who
14  have been arrested, many have been denied the right to consult with their attorneys,
15  and have been held under conditions with insufficient food, shelter, clothing, and
16  medical care. These conditions, of both arrests and detentions, have caused profound
17  harm to individuals and families, and destabilized entire communities. The chilling
18  effect extends beyond directly impacted individuals. For example, the Mayor of
19  Pasadena described seeing a "huge drop in attendance at local community
20  programs," once "vibrant neighborhoods" now "eerily quiet" and business owners
21  "concerned that their workers and customers alike are too afraid to show up."[87]

22      166.   These harms have extended to organizational Plaintiffs and/or their
23  members.

[87] Victor M. Gordo, *Pasadena Mayor: Trump's Immigration Raids Hurt Communities Like Mine,* Time (June 18, 2025), https://time.com/7295305/pasadena-trump-immigration-raids.

-44-

***Plaintiff Los Angeles Worker Center Network (LAWCN)***

167.   LAWCN is a regional organization made up of eight worker centers and labor organizations that work together to build power and develop worker leadership organizing with Black, immigrant, and refugee workers and other workers of color in the Los Angeles region. LAWCN's member organizations work to improve conditions in low-wage industries, including car wash, garment, home care, restaurant, retail, warehouse, and other low-wage sectors. LAWCN's members each have at least one representative on its Executive Committee, and the Committee has regular standing meetings in which the member organizations provide input on LAWCN's strategic planning and goals, including by having the voting members cast votes on key strategic questions.

168.   LAWCN improves conditions for low-wage workers through capacity building, organizing, services, and policy advocacy at the city, county, and state level. In pursuing LAWCN's mission to build the power and grow the capacity of local worker centers to organize and advocate for low-wage workers, LAWCN has a long term and sustained focus on issues related to immigration and immigrant workers. LAWCN has engaged in policy reform and advocacy aimed at increasing immigrant workers' access to governmental services. Additionally, through its capacity-building efforts, LAWCN's work supports immigrant justice by improving the conditions and dignity of immigrant workers in Southern California.

169.   LAWCN brings this suit on behalf of its member organizations, worker centers that organize and advocate for low-wage workers in the greater Los Angeles region. At least one of LAWCN's member organizations, CLEAN Carwash Worker Center (CLEAN), has been harmed by the ongoing raids in Southern California. CLEAN is a grassroots worker center that fights for the self-determination of immigrant and working-class people by empowering carwash workers to make lasting changes in the carwash industry and their communities.

170.    CLEAN has approximately 1,800 members who are carwash workers from the greater Los Angeles area. Its members are predominantly Latino and many are immigrants or the children of immigrants. CLEAN has three tiers of membership available to workers, depending on how much each member wishes to participate in CLEAN's organizing work. CLEAN's members help set the priorities for the organization. It holds standing membership meetings during which members provide feedback and input into CLEAN's goals and work.

171.    CLEAN's mission includes fighting for the self-determination of immigrants. A consistent focus of CLEAN's work is to provide its members access to immigration-related support and resources. Some of this work involves providing training and support to members about immigration issues. CLEAN has also organized programming and events, including attending rallies and events, in support of immigration reform.

172.    Carwashes have been a consistent and ongoing target of immigration agents during the course of the raids—at least two dozen have been raided so far.[88] Some carwashes have closed because so many workers have either been detained or fear future raids.[89]

173.    Dozens of CLEAN's members have been detained by immigration agents while at work. At least one identifiable CLEAN member, Jesus Aristeo Cruz Utiz, has been subjected to Defendants' unlawful stop and arrest practices.

174.    Many CLEAN members, regardless of the stability or permanence of their immigration status, fear that immigration agents will subject them to unlawful stops and arrests. They are terrified that masked and unidentifiable immigration agents will invade their workplaces without a warrant, grab them, handcuff them,

---

[88] Kaitlyn Huamani & Suhauna Hussain, *More L.A. car washes targeted in immigration raids, some closed amid fears of further sweeps*, L.A. Times (June 20, 2025), https://www.latimes.com/business/story/2025-06-20/la-car-washes-targeted-immigration-raids-business-closures.

[89] *Id.*

and take them away. They are fearful of being racially profiled and stopped by immigration agents while in public or at their places of employment.

***Plaintiff United Farm Workers (UFW)***

175.   Founded in 1962 by Cesar Chavez, Dolores Huerta, Larry Itliong and other labor leaders, UFW is the largest farm worker union in the country. UFW's mission is to improve the lives, wages, and working conditions of agricultural workers and their families. UFW is dedicated to the cause of eliminating discrimination against farm workers, immigrants, people of color, and any other groups that have been the target of unfair or unlawful treatment. As part of this work, UFW is a national leader in the movement for immigration reform and immigrants' rights.

176.   UFW has approximately 10,000 members. California is home to more UFW members than any other state, with members in counties across the Central District of California, such as Los Angeles County, Orange County, Riverside County, Ventura County, and San Bernardino County. UFW membership is voluntary and consists of various categories of members. Among these, contributing or associate members are individuals who make a monthly or annual contribution of a designated amount to UFW. Dues-paying members are those who benefit from a UFW collective bargaining agreement.

177.   UFW members play an important role in deciding what activities UFW engages in as an organization. At the UFW's quadrennial Constitutional Convention, members introduce and vote on motions to govern and guide the union's work, and to elect the Union Executive Board. On an ongoing basis, UFW members respond to surveys, provide feedback, and participate in advisory meetings (known as "consejo de base" in Spanish) to actively participate in the Union's decisions. UFW has created various programs in response to members' feedback and requests.

178.    UFW membership comes with a variety of benefits. Dues-paying members receive protections from collective bargaining in which UFW engages on their behalf. Contributing or associate members (also called "direct" members) receive UFW photographic identification, accidental life insurance of $4,000, access to UFW discounts with private businesses, and other benefits. For services that prioritize agricultural workers, UFW direct membership establishes membership.

179.    UFW brings this action on behalf of its members. UFW's members have been harmed by the ongoing immigration raids in Southern California and fear being subjected to unlawful stops, arrests, and detention practices in the future. At least one UFW member—Angel—has been subjected to Defendants' stop and arrest practices.

180.    Despite UFW's lawsuit against DHS and the Border Patrol, filed on February 26, 2025,[90] these concerns remain today.

181.    Many UFW members, regardless of the stability or permanence of their immigration status, fear that immigration agents will continue to subject farm workers and day laborers to unlawful immigration stops and arrests, especially those who appear non-white. These members face irreparable harm from Defendants' unlawful practices.

***Plaintiff the Coalition for Humane Immigrant Rights (CHIRLA)***

182.    CHIRLA was founded in 1986, and its mission is to advance the human and civil rights of immigrants and refugees. CHIRLA ensures immigrant communities are fully integrated into our society with full rights and access to resources.

183.    As a membership organization, CHIRLA has approximately 50,000 members across California, including both U.S. citizens and noncitizens of varying

---

[90] Complaint, *UFW v. Noem*, No. 1:25-cv-00246 JLT CDB (E.D. Cal. Feb. 26, 2025), https://www.aclusocal.org/sites/default/files/001_complaint.pdf.

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

immigration status. CHIRLA has members in every county in this District. Many of CHIRLA members are day laborers, car wash workers, and street vendors. CHIRLA's membership is predominantly Latino.

184.    CHIRLA is the largest statewide immigrant rights organization in California, with over 185 staff members who provide services to thousands of Californians each year. Its legal department has assisted approximately 30,000 people with direct services and legal education, including numerous CHIRLA members.

185.    Some of CHIRLA's members pay dues to the organization, and those dues help fund the organization's operations. Other CHIRLA members have become members by virtue of their participation in the organization's meetings, programs, and policy campaigns.

186.    CHIRLA's members regularly meet with each other in regional committees. Committee meetings can range from a small handful of people to hundreds. In addition, CHIRLA's student members hold regional statewide conference calls and meetings throughout the year. During these meetings, CHIRLA's members plan local advocacy campaigns, share information, and discuss issues that affect them, their families, and their local communities. Information from these meetings is reported to CHIRLA's leadership and used to guide CHIRLA's programmatic agenda.

187.    CHIRLA also holds quarterly membership retreats at which coreleaders discuss issues they are seeing in their communities and set priorities for the organization.

188.    CHIRLA also coordinates the Los Angeles Rapid Response Network (LARRN) and educates its membership as well as the broader community through know your rights programming, workshops, social media, and educational literature about a variety of social services and benefits, including immigration law, financial literacy, workers' rights, and civic engagement. CHIRLA is often a first point of

1    contact for individuals seeking direct assistance and accurate information about

2    policy changes impacting immigrants.

3        189.   CHIRLA brings this action on behalf of its members who reasonably

4    fear being subject to the stop and arrest practices challenged in this case and

5    subsequent detention at B-18. Since immigration authorities began arresting and

6    detaining predominately Latino people across Southern California, including in

7    places where CHIRLA members live and go, they have become terrified that they

8    too will be taken from their families and communities. Indeed, some CHIRLA

9    members, including those with legal status, have begun carrying around their

10   passports, have refrained from being at bus stops, and have reduced how much they

11   go out in public because they are afraid of being stopped and detained unlawfully.

12       190.   As a result of Defendants' actions, CHIRLA's mission to serve the

13   immigrant community, including through the provision of legal advice and services,

14   is being frustrated. Throughout the last month, CHIRLA's attorneys and

15   representatives have attempted to communicate with individuals at B-18, were

16   denied access, and were thwarted in their efforts to offer legal advice to even those

17   detainees they saw at a distance as government officials used car horns to drown

18   them out. Defendants' actions are also thwarting CHIRLA's work to coordinate the

19   LARRN as other attorneys and representatives summoned by CHIRLA to B-18 have

20   been similarly denied access.

21   ***Plaintiff Immigrant Defenders Law Center (ImmDef)***

22       191.   ImmDef was founded in 2015 with the mission of protecting the due

23   process rights of immigrants facing deportation. At its inception, it sought to achieve

24   this goal through implementation of the universal representation model—i.e.,

25   ensuring that every immigrant appearing before the immigration court was

26   represented by an attorney. ImmDef is now the largest removal defense nonprofit

27   organization in Southern California, providing full-scale deportation defense, legal

28

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   representation, legal education, and social services to approximately 30,150 detained

2   and non-detained children and adults annually.

3        192.   ImmDef's Welcoming Project provides "Know Your Rights" trainings

4   throughout ImmDef's service area, which includes the counties of Los Angeles,

5   Orange, Kern, Riverside, San Bernardino, and San Diego. These trainings aim to

6   educate immigrant community members about the immigration system and about

7   their due process and civil rights.

8        193.   ImmDef's Rapid Response team is also part of LARRN, with

9   CHIRLA, and monitors a hotline and responds to notifications about individuals

10  detained in enforcement actions. When possible, ImmDef takes referrals to represent

11  detained individuals in their removal proceedings within ImmDef's service area.  If

12  ImmDef is unable to represent an individual referred through LARRN, ImmDef

13  attempts to connect that individual with pro bono representation.

14       194.   ImmDef's attorneys and representatives have been denied access to

15  people in detention, including those being held at B-18. As a result of Defendants'

16  actions, ImmDef's mission to serve the immigrant community, including through

17  the provision of legal advice and services, is being fundamentally frustrated.

18  **J.    Defendants' Illegal Conduct Will Continue if Not Enjoined**

19       195.   The federal government has repeatedly made clear its intent to continue

20  its operations and unlawful stops, arrests, and detentions. Defendants have been

21  candid about their determination to continue pursuing these unlawful policies and

22  practices, unless this Court enjoins them from doing so.

23       196.   Indeed, federal officials have been open about the ongoing and

24  expanding nature of these unlawful immigration raids.

25       197.   White House official Tom Homan recently maligned Los Angeles as a

26  sanctuary city and vowed, "We're going to send a whole boatload of agents. . . .

27

28

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

We're going to swamp the city.[91] He has stated, "This operation is not going to

end,"[92] and, "Every day in LA we're going to enforce immigration law. I don't care

if they like it or not."[93]  Kristi Noem has also said, "We're going to stay here and

build our operations until we make sure that we liberate the city of Los Angeles."[94]

Noem told agents "your performance will be judged every day by how many arrests

you, your teammates and your office are able to effectuate. Failure is not an

option."[95]

198.   While immigration enforcement may be done lawfully, these

statements demonstrate a commitment to continue operations at any cost, including

at the expense of individuals' constitutional and legal rights. Plaintiffs have already

been harmed, and they face a reasonable likelihood of continuing harm, as a result

of Defendants' unlawful policies and practices described herein. Plaintiffs have no

---

[91] Jenny Jarvie & Grace Toohey, *Trump immigration raids: Stunning, yet predictable*, L.A. Times Online (June 15, 2025), https://www.latimes.com/california/story/2025-06-15/clash-trump-los-angeles-immigration-inevitable.

[92] Andrea Castillo, *'We need to find these people': L.A. immigration raids a sign of what's to come, officials say*, L.A. Times Online (June 12, 2025), https://www.latimes.com/politics/story/2025-06-12/we-need-to-find-these-people-l-a-immigration-raids-a-sign-of-whats-to-come-officials-say.

[93] Jacob Soboroff & Doha Madani, *Trump's border czar threatens arrest for immigration interference, warns Newsom and Bass not to 'cross that line'*, NBC (June 8, 2025), https://www.nbcnews.com/news/us-news/tom-homan-trump-border-czar-los-angeles-rcna211701.[94] Adrian Florido & Liz Baker, *DHS vows immigration raids will continue as resistance mounts*, NPR (June 12, 2025), https://www.npr.org/2025/06/12/g-s1-72513/dhs-immigration-raids-los-angeles-protests.[95] Tyler Pager, et al., *Trump's Conflicting Messages on Workplace Raids Leave Businesses Reeling*, N.Y. Times (June 17, 2025), https://www.nytimes.com/2025/06/17/us/politics/trump-conflicting-messages-workplace-raids.html.

[94] Adrian Florido & Liz Baker, *DHS vows immigration raids will continue as resistance mounts*, NPR (June 12, 2025), https://www.npr.org/2025/06/12/g-s1-72513/dhs-immigration-raids-los-angeles-protests.[95] Tyler Pager, et al., *Trump's Conflicting Messages on Workplace Raids Leave Businesses Reeling*, N.Y. Times (June 17, 2025), https://www.nytimes.com/2025/06/17/us/politics/trump-conflicting-messages-workplace-raids.html.

[95] Tyler Pager, et al., *Trump's Conflicting Messages on Workplace Raids Leave Businesses Reeling*, N.Y. Times (June 17, 2025), https://www.nytimes.com/2025/06/17/us/politics/trump-conflicting-messages-workplace-raids.html.

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

plain, adequate, or complete remedy at law to address the wrongs described herein. Injunctive and declaratory relief is necessary to redress their ongoing injuries.

## CLASS ACTION ALLEGATIONS

199.   The Stop/Arrest Plaintiffs bring this action on behalf of themselves, and in the case of the organizational Stop/Arrest Plaintiffs, their members. In addition, the Stop/Arrest Plaintiffs bring this action under Federal Rules of Civil Procedure 23(a) and (b)(2), on behalf of classes of persons similarly situated to themselves and their members. Plaintiffs seek to represent three classes of individuals who have been or will be subjected to several of the unlawful practices this lawsuit challenges: suspicionless stops; warrantless arrests without evaluations of flight risk; and the failure to identify authority and the reason for arrest.

### *The Suspicionless Stop Class*

The Stop/Arrest Plaintiffs seek to represent a class under Federal Rules of Civil Procedure 23(b)(2) consisting of:

> All persons who, since June 6, 2025, have been or will be subjected to a detentive stop by federal agents in this District without a pre-stop, individualized assessment of reasonable suspicion concerning whether the person (1) is engaged in an offense against the United States or (2) is a noncitizen unlawfully in the United States.

200.   *Numerosity.* The proposed class meets the numerosity requirements of Rule 23(a)(1) because it consists of a large number of similarly situated individuals located within this District, such that joinder of all members of the class is impracticable. Although the number of individuals who have been or will be subject to unconstitutional detentive stops by federal agents is not known with precision, class members number in the thousands. Since June 6, 2025, federal agents have arrested more than 1,500 people within the District, and likely conducted unconstitutional detentive stops on many more.

201.   *Common Questions of Law and Fact.* The proposed class meets the commonality requirements of Rule 23(a)(2) because all members of the proposed class have been or will be subjected to the same unconstitutional practices. Thus, there are numerous questions of law and fact common to the proposed class, which predominate over any individual questions, including:

(a)    Whether Defendants have a policy, pattern, or practice of conducting stops without regard to whether reasonable suspicion exists that the person (1) is engaged in an offense against the United States or (2) is a noncitizen unlawfully in the United States; and

(b)    Whether Defendants' policy, pattern, or practice of conducting stops without regard to whether reasonable suspicion exists that the person (1) is engaged in an offense against the United States or (2) is a noncitizen unlawfully in the United States violates the Fourth Amendment or applicable regulations.

### The Warrantless Arrest Class

202.   The organizational Stop/Arrest Plaintiffs—LAWCN, UFW, and CHIRLA—also seek to represent a class consisting of:

All persons, since June 6, 2025, who have been arrested or will be arrested in this District by federal agents without a warrant and without a pre-arrest, individualized assessment of probable cause that the person poses a flight risk.

203.   *Numerosity.* The proposed class meets the numerosity requirements of Rule 23(a)(1) because it consists of a large number of similarly situated individuals located within this District, such that joinder of all members of the class is impracticable. Although the number of individuals who have been or will be subject to unlawful warrantless arrests by Defendants is not known with precision, class members number in the thousands. Since June 6, 2025, federal agents have arrested more than 1,500 people within the District, with no indications of possessing a

warrant or conducting any sort of pre-arrest, individualized assessment of probable cause that the person poses a flight risk.

204.    *Common Questions of Law and Fact.* The proposed class meets the commonality requirements of Rule 23(a)(2) because all members of the proposed class have been or will be subjected to the same unconstitutional practices. Thus, there are numerous questions of law and fact common to the proposed class, which predominate over any individual questions, including:

(a)    Whether Defendants have a policy, pattern, or practice of conducting warrantless arrests without probable cause that an individual is likely to escape before a warrant can be obtained for the arrest;

(b)    Whether Defendants' policy, pattern, or practice of conducting stops without probable cause that an individual is likely to escape before a warrant can be obtained for the arrest violates 8 U.S.C. § 1357(a)(2); and

(c)    Whether Defendants' policy, pattern, or practice of conducting stops without probable cause that an individual is likely to escape before a warrant can be obtained for the arrest violates 8 C.F.R. § 287.8(c)(2)(ii).

***The Failure to Identify Class***

205.    The organizational Stop/Arrest Plaintiffs—LAWCN, UFW, and CHIRLA—also seek to represent a class consisting of:

All persons who, since June 6, 2025, have been arrested or will be arrested in this District by federal agents, where agents (1) fail to identify as an immigration officer who is authorized to execute an arrest, and/or (2) fail to state that person is under arrest and the reason for arrest, after it is practical and safe to do so.

206.    *Numerosity.* The proposed class meets the numerosity requirements of Rule 23(a)(1) because it consists of a large number of similarly situated individuals located within this District, such that joinder of all members of the class is impracticable. Although the number of individuals who have been or will be subject

to unlawful arrests in which agents failed to identify themselves in the manner required by law is not known with precision, class members number in the thousands. Since June 6, 2025, federal agents have arrested more than 1,500 people within the District, and it has been widely reported that Defendants do not generally identify themselves during these arrests.

207.  *Common Questions of Law and Fact.* The proposed class meets the commonality requirements of Rule 23(a)(2) because all members of the proposed class have been or will be subjected to the same unconstitutional practices. Thus, there are numerous questions of law and fact common to the proposed class, which predominate over any individual questions, including:

(a)    Whether Defendants have a policy, pattern, or practice of (1) failing to (1) identify as an immigration officer who is authorized to execute an arrest, or (2) failing to state that person is under arrest and the reason for arrest, after it is practical and safe to do so; and

(b)    Whether Defendants' policy, pattern, or practice of (1) failing to identify as an immigration officer who is authorized to execute an arrest, or (2) failing to state that person is under arrest and the reason for arrest, after it is practical and safe to do so violates 8 C.F.R. § 287.8(c)(2)(iii).

**Allegations Common to All Classes**

208.  The proposed classes satisfy the requirements of Federal Rule of Civil Procedure 23(a)(1) because they are sufficiently numerous so as to make joinder impracticable.

209.  Joinder is also impractical because the proposed class includes individuals who will be subject to Defendants' unlawful practices in the future and therefore cannot be joined.

210.  *Typicality.* The proposed classes further meet the typicality requirement of Federal Rule of Civil Procedure 23(a)(3). Plaintiffs' legal claims are typical to all members of the proposed classes. Plaintiffs have no interests separate from those of

the classes they seek to represent, and seek no relief other than the relief sought on behalf of each class. Defendants have acted and intend to act in a manner adverse to the rights of the Suspicionless Stops Class and the Warrantless Arrest Class, making final injunctive and declaratory relief appropriate with regard to each class as a whole.

211.    *Propriety of Class Action Mechanism.* The prosecution of individual actions against Defendants by individual members of the proposed class would be inefficient and create a risk of inconsistent and varying adjudications.

212.    *Adequacy of Class Representation.* The proposed classes meet the adequacy requirements of Federal Rule of Civil Procedure 23(a)(4). Each putative class representative has committed to fairly and adequately representing the interests of the Suspicionless Search Class, the Warrantless Arrest Class, and the Failure to Identify Class. Plaintiffs know of no conflict between their interests and those of the proposed class and, in fact, seek relief identical to the relief sought by all class members.

213.    *Adequacy of Counsel for the Class.* The Stop/Arrest Plaintiffs' counsel are experienced in class action, civil rights, and immigrants' rights litigation. Plaintiffs' counsel have the requisite level of expertise to adequately prosecute this case on behalf of Plaintiffs and the proposed classes. Plaintiffs' counsel will fairly and adequately represent the interests of each class.

214.    Finally, the proposed classes satisfy Rule 23(b)(2) because Defendants have acted on grounds generally applicable to the class, thereby making equitable relief appropriate with respect to the class as a whole.

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

# CAUSES OF ACTION

## COUNT ONE

### *Violation of Fourth Amendment:*
### *Unreasonable Seizures*
### *On Behalf of the Stop/Arrest Plaintiffs and the Suspicionless Stop Class*
### *Against All Defendants*

215.    Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

216.    Except at the border and its functional equivalents, the Fourth Amendment prohibits Defendants from conducting a detentive stop to question a person without reasonable suspicion that a person is a noncitizen unlawfully in the United States.

217.    "A person's mere propinquity to others independently suspected of [unlawful] activity does not, without more, give rise to probable cause to search [or seize] that person." *Perez Cruz v. Barr*, 926 F.3d 1128, 1138 (9th Cir. 2019) (quotation omitted). "'Reasonable suspicion' is no different." *Id*.

218.    Defendants have a policy, pattern, and practice of stopping individuals without regard to reasonable suspicion that they are unlawfully in the United States.

219.    As a part of Defendants' policy, pattern, and practice, when conducting stops,  Defendants engage in a show of force so overwhelming that a reasonable person would not feel free to leave.  As a matter of policy, pattern, and practice, Defendants do not evaluate the need for force or tailor the force they use to the circumstances of individual stops and arrests.

220.    Defendants' policy, pattern, and practice violates the Fourth Amendment to the U.S. Constitution.

## COUNT TWO

*Violation of 8 U.S.C. § 1357(a)(2)*
*Warrantless Arrests Without Probable Cause of Flight Risk*
*On Behalf of Plaintiffs LAWCN, UFW, CHIRLA,*
*and the Warrantless Arrest Class*
*Against All Defendants*

221.    Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

222.    8 U.S.C. § 1357(a)(2) requires that arrests without a warrant be accompanied by "reason to believe" that an individual is "likely to escape before a warrant can be obtained for [their] arrest."

223.    Defendants have a policy, pattern, and practice of making arrests without any warrant without making an individualized determination of flight risk. They have no mechanism for ensuring compliance with the statutory limits of agents' and officers' warrantless arrest authority and do not provide guidance to agents and officers on how to make an individualized determination of likelihood of escape. Defendants permit agents and officers to make warrantless arrests *carte blanche* in violation of law.

224.    Defendants' policy, pattern, and/or practice of making warrantless arrests without the required individualized flight risk analysis is "final agency action" that is "in excess of statutory jurisdiction, authority, or limitations" under 8 U.S.C. § 1357(a)(2). 5 U.S.C. §§ 704, 706(2)(C).

225.    Separate from the APA, Defendants' policy, pattern, and practice of making warrantless arrests without the required individualized flight risk analysis is *ultra vires*.

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

# COUNT THREE

***Violation of 8 C.F.R. § 287.8(c)(2)(ii)***
***Standards for Stops and Warrantless Arrests***
***On Behalf of Plaintiffs LAWCN, UFW, CHIRLA,***
***and the Warrantless Arrest Class***
***Against All Defendants***

226.   Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

227.   Defendants are bound by regulation to conform warrantless arrests to the standards in  8 C.F.R. § 287.8(c), including the requirement at 8 C.F.R. § 287.8(c)(2)(ii) that officers have reason to believe that an individual is "likely to escape before a warrant can be obtained."

228.   Defendants have a policy, pattern, and practice of making arrests without any warrant without making an individualized determination of flight risk. They have no mechanism for ensuring compliance with the regulatory limits of agents' and officers' warrantless arrest authority and do not provide guidance to agents and officers on how to make an individualized determination of likelihood of escape. Defendants permit agents and officers to make warrantless arrests *carte blanche* in violation of law.

229.   Defendants' policy, pattern, and practice is "final agency action" that is "in excess of statutory jurisdiction, authority, or limitations" under 8 C.F.R. § 287.8(c)(2)(ii). 5 U.S.C. §§ 704, 706(2)(C).

# COUNT FOUR

***Violation of 8 C.F.R. § 287.8(c)(2)(iii)***
***Failure to Identify Authority and Reason for Arrest***
***On Behalf of Plaintiffs LAWCN, UFW, CHIRLA***
***Against All Defendants***

230.   Plaintiffs incorporate the allegations in the paragraphs above as though fully set forth here.

231.   The regulations require agents and officers, at the time of an arrest or as soon as it is practicable and safe to do so, to identify themselves as "an immigration

officer who is authorized to execute an arrest" and "state that the person is under arrest and the reason for the arrest." 8 C.F.R. § 287.8(c)(3).

232.   Defendants have a policy, pattern, and practice of not timely identifying themselves, their authority to execute an immigration arrest, or the reasons for an arrest.

233.   Defendants' policy, pattern, and practice is a "final agency action" that is "in excess of statutory jurisdiction, authority, or limitations" under 8 C.F.R. § 287.8(c)(2)(ii). 5 U.S.C. §§ 704, 706(2)(C).

## COUNT FIVE

***Violation of the Fifth Amendment:***
***Access to Counsel***
***On Behalf of the Access/Conditions Plaintiffs***
***Against Defendants Noem, Lyons, and Santacruz Jr.***

234.   Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

235.   Individuals detained at B-18 have the right to hire and consult with attorneys. Due process also requires that detainees have adequate opportunities to obtain counsel and to visit and communicate with counsel once counsel is retained. Defendants have a policy, pattern, and practice of turning away attorneys at the door of B-18 and depriving detainees of access to confidential legal consultations by phone. This lack of counsel has severe consequences. Detainees are forced to interact with federal immigration officials without the benefit of legal advice even though it is readily available.

236.   Defendants' actions violate the Fifth Amendment.

## COUNT SIX

***Violation of 8 U.S.C. § 1362***
***Access to Counsel***
***On Behalf of the Access/Conditions Plaintiffs***
***Against Defendants Noem, Lyons, and Santacruz Jr.***

237.   Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

238.    The Immigration and Nationality Act (INA) guarantees noncitizens the right to counsel in connection with inadmissibility and deportability proceedings. 8 U.S.C. §1362; *see also* 8 U.S.C. § 1229a(b)(4)(A); *Colmenar v. INS*, 210 F.3d 967, 971 (9th Cir. 2000); *Orantes-Hernandez*, 919 F.2d at 564.

239.    This protection necessarily entails the right to consult with an attorney in advance of any hearing—especially a hearing at which a noncitizen faces potentially permanent banishment from the United States. *Rios-Berrios*, 776 F.2d at 862. The same substantive standards that protect the Plaintiffs' right to counsel under the Due Process Clause apply to their statutory rights under the INA. *See Agyeman v. INS*, 296 F.3d 871, 877 (9th Cir. 2002) ("If a[] [noncitizen] is prejudiced by a denial of any of the applicable procedural protections, he is denied his constitutional guarantee of due process.").

240.    Defendants have a policy, pattern, and practice of turning away attorneys at the door of B-18 and depriving detainees of access to confidential legal consultations by phone. This lack of counsel has severe consequences. Detainees are forced to interact with federal immigration officials without the benefit of legal advice even though it is readily available.

241.    Defendants' policy, pattern, and practice of denying detained individuals access to legal advice is "final agency action" that is in excess of statutory authority. *See* 5 U.S.C. §§ 704, 706(2)(C).

## COUNT SEVEN

***Violation of the Fifth Amendment:***
***Conditions of Confinement***
***On Behalf of the Access/Conditions Plaintiffs***
***Against Defendants Noem, Lyons, and Santacruz Jr.***

242.    Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

243.    Civil detainees' conditions of confinement are unconstitutional if they "amount to punishment." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).

244.    Defendants have allowed conditions to deteriorate at B-18 to an extent
that they amount to punishment. They have failed to provide basic necessities like
food, water, adequate hygiene facilities, and medical care. Defendants have also
violated detainees' constitutional right to due process by subjecting them to
overcrowding and failing to provide adequate sleeping accommodations at B-
18.Defendants' ongoing violations of the Fifth Amendment directly harm CHIRLA
and ImmDef's missions to provide legal services and assistance to community
members, and harm CHIRLA members who will be subject to detentions at B-18 by
depriving them of their fundamental right to an "appropriate place of detention," and
serving to coerce some detained individuals into accepting voluntary departure
before they have an opportunity to consult counsel.

## COUNT EIGHT

*Violation of Fifth Amendment:*
*Due Process*
*On Behalf of Petitioner-Plaintiffs Perdomo, Osorto, and Molina*
*Against Defendants Noem, Lyons, and Santacruz Jr.*

245.    Petitioners-Plaintiffs repeat, re-allege, and incorporate by reference
each and every allegation in the preceding paragraphs as if fully set forth herein.

246.    The government may not deprive a person of life, liberty, or property
without due process of law. U.S. Const. amend. V. "Freedom from imprisonment—
from government custody, detention, or other forms of physical restraint—lies at the
heart of the liberty that the Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690
(2001).

247.    The government's detention of Petitioners-Plaintiffs violates their
rights to due process because they have been detained without lawful authority,
infringing on their fundamental right to liberty.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that this Court grant the following relief:

(1)    Assume jurisdiction over this matter;

(2)    Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2);

(3)    Appoint the counsel for Stop/Arrest Plaintiffs as class counsel pursuant to Federal Rule of Civil Procedure 23(g);

(4)    Declare that Defendants' policy, pattern, and practice of conducting stops without reasonable suspicion violate the Fourth Amendment of the United States Constitution;

(5)    Declare that Defendants' policy, pattern, and practice of making warrantless arrests without individualized flight risk determinations violate 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8(c)(2)(ii); and the APA;

(6)    Declare that Defendants' policy, pattern, and practice of failing to identify the authority and reasons for arrests violate 8 C.F.R. § 287.8(c)(2)(iii); and the APA;

(7)    Declare that Defendants' denial of access to counsel violates the Due Process Clause of the Fifth Amendment of the United States Constitution;

(8)    Declare that Defendants' policy and practice of denying access to counsel violate the rights of the Access/Detention Plaintiffs under 8 U.S.C. § 1362 and the APA;

(9)    Declare that the conditions of confinement imposed by Defendants at B-18 violate the Fifth Amendment of the United States Constitution;

(10)    Issue a preliminary and permanent injunction enjoining further violations of Plaintiffs' rights;

(11)    Vacate Defendants' unlawful policies and practices that violate statutory and regulatory law under the APA;

(12)    Enjoin Defendants from transferring Petitioner-Plaintiffs outside of this judicial district during the pendency of removal proceedings;

(13)    Enjoin Defendants from removing Petitioner-Plaintiffs from the United
        States without the procedures for removal identified in the INA;

(14)    Order the immediate release of Petitioner/Plaintiffs pending these
        proceedings;

(15)    Award reasonable attorneys' fees, costs, and other disbursements
        permitted under the Equal Access to Justice Act, 28 U.S.C. § 2412, and
        any other applicable statute, and;

(16)    Order any and all such other relief as the Court deems just, equitable,
        and proper.


DATED:  July 1, 2025                    Respectfully submitted,



                                By:    /s/ *Stacy Tolchin*
                                       Stacy Tolchin
                                       *Attorneys for Stop/Arrest Plaintiffs*



                                By:    /s/ *Mohammad Tajsar*
                                       Mohammad Tajsar
                                       *Attorney for Stop/Arrest Plaintiffs*



                                By:    /s/ *Mark Rosenbaum*
                                       Mark Rosenbaum
                                       *Attorney for Plaintiffs*

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF