MARK ROSENBAUM (SBN 59940)
*mrosenbaum@publiccounsel.org*
REBECCA BROWN (SBN 345805)
*rbrown@publiccounsel.org*
SOPHIA WRENCH (SBN 354416)
*swrench@publiccounsel.org*
RITU MAHAJAN (SBN 252970)
*rmahajan@publiccounsel.org*
GINA AMATO (SBN 215519)
*gamato@publiccounsel.org*
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, CA 90005
Telephone: (213) 385-2977

*Counsel for All Plaintiffs*

MATTHEW J. CRAIG (SBN 350030)
*mcraig@heckerfink.com*
MACK E. JENKINS (SBN 242101)
*mjenkins@heckerfink.com*
HECKER FINK LLP
1150 South Olive Street, Suite 10-140
Los Angeles, CA 90015
Telephone: (212) 763-0883
Facsimile: (212) 564-0883

*Counsel for Plaintiffs Coalition for Humane Immigrant
Rights and Immigrant Defenders Law Center*

(*additional counsel information on cont. page*)

# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Pedro VASQUEZ PERDOMO, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>Kristi NOEM, in her official capacity as Secretary, Department of Homeland Security, *et al.*,<br><br>    Defendants. | Case No.: 2:25-cv-05605-MEMF-SP<br><br>**PLAINTIFFS COALITION FOR HUMANE IMMIGRANT RIGHTS AND IMMIGRANT DEFENDERS LAW CENTER'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION**<br><br>Hon. Maame Ewusi-Mensah Frimpong |

CARL BERGQUIST* (DC BAR 1720816)
cbergquist@chirla.org
COALITION FOR HUMANE IMMIGRANT RIGHTS
2351 Hempstead Road
Ottawa Hills, OH 43606
Telephone: (310) 279-6025

*Counsel for Plaintiff Coalition for Humane Immigrant Rights*

ALVARO HUERTA (SBN 274787)
ahuerta@immdef.org
BRYNNA BOLT (SBN 339378)
bbolt@immdef.org
ALISON STEFFEL (SBN 346370)
asteffel@immdef.org
IMMIGRANT DEFENDERS LAW CENTER
634 S. Spring St., 10th Floor
Los Angeles, CA 90014
Telephone: (213) 634-0999

*Counsel for Plaintiff Immigrant Defenders Law Center*

\* *Pro hac vice* application forthcoming

Plaintiffs Coalition for Humane Immigrant Rights ("CHIRLA") and Immigrant Defenders Law Center ("ImmDef") hereby apply for a temporary restraining order and an order to show cause why a preliminary injunction should not issue pending the final disposition of this action.

As set forth in this application and the accompanying declarations, CHIRLA and ImmDef are likely to succeed on the merits of their claim that Defendants' restrictions on attorney access to Room B-18 of the Federal Building located at 300 North Los Angeles Street, Los Angeles, CA 90012 violates the Fifth Amendment to the United States Constitution, and, absent an injunction, CHIRLA and ImmDef will suffer immediate, irreparable harm.

Pursuant to Federal Rule of Civil Procedure 65(b)(1) and Local Rules 7-19 and 65-1, CHIRLA and ImmDef advised Defendants on July 2, 2025, of this application and its contents by call with Assistant United States Attorneys ("AUSAs") Pauline Helen Alarcon and Daniel Beck of the United States Attorney's Office for the Central District of California. Rosenbaum Decl. ¶¶ 2–3. AUSAs Alarcon and Beck stated that this application is opposed. *Id.* ¶ 4. Defendants requested until July 9, 2025, to file a response. *Id.* Given the severity of Defendants' continuing constitutional violations and the ongoing, irreparable harm, CHIRLA and ImmDef do not consent to Defendants' request for a week to respond to this application. CHIRLA and ImmDef respectfully request that the Court decide the application forthwith.

AUSA Alarcon has already appeared as counsel of record in this action for Defendants Kristi Noem, Todd Lyons, and Pam Bondi. *See* ECF No. 8. AUSA Alarcon's address is U.S. Attorney's Office for the Central District of California, 300 North Los Angeles Street, Suite 7516, Los Angeles, CA 90012. AUSA Alarcon's phone number is (213) 894-3992, and her email address is pauline.alarcon@usdoj.gov.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

FACTS ................................................................................................................. 2

LEGAL STANDARD ............................................................................................ 7

ARGUMENT ........................................................................................................ 7

    I.    Plaintiffs Are Likely to Succeed on the Merits of Their Claim That Defendants' Denial of Access to Counsel at B-18 Violates the Fifth Amendment ........................................................................................ 7

    II.   Plaintiffs Are Likely to Continue to Suffer Irreparable Harm .................... 11

    III.  The Balance of the Equities Favors Plaintiffs ............................................ 12

    IV.  No Security Under Rule 65(c) Should Be Required ................................... 13

CONCLUSION .................................................................................................... 14

i

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011)...............................................................................7

*Arrey v. Barr*,
916 F.3d 1149 (9th Cir. 2019)...............................................................................8

*Barahona-Gomez v. Reno*,
167 F.3d 1228 (9th Cir. 1999).............................................................................14

*Biwot v. Gonzales*,
403 F.3d 1094 (9th Cir. 2005)...........................................................................7, 8

*California v. Azar*,
911 F.3d 558 (9th Cir. 2018)...............................................................................12

*Castellano v. Napolitano*,
No. 09 Civ. 2281 (C.D. Cal.) ...............................................................................4

*Castillo v. Nielsen*,
No. 18 Civ. 1317, 2018 WL 6131172 (C.D. Cal. June 21, 2018) ...................12

*Castillo v. Nielsen*,
No. 18 Civ. 1317, 2020 WL 2840065 (C.D. Cal. June 1, 2020) .....................10

*City & Cnty. of San Francisco v. Trump*,
No. 25 Civ. 1350, 2025 WL 1282637 (N.D. Cal. May 3, 2025) .....................14

*Colmenar v. INS*,
210 F.3d 967 (9th Cir. 2000)................................................................................8

*Comm. of Cent. Am. Refugees v. INS*,
795 F.2d 1434 (9th Cir. 1986).........................................................................8, 10

*Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*,
321 F.3d 878 (9th Cir. 2003)...............................................................................13

*E. Bay Sanctuary Covenant v. Biden*,
   993 F.3d 640 (9th Cir. 2021)..................................................................................12

*Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*,
   954 F.3d 118 (2d Cir. 2020)...................................................................................11

*Food & Drug Admin. v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024) ...............................................................................................11

*Gilmore v. Wells Fargo Bank, N.A.*,
   No. 14 Civ. 2389, 2014 WL 3749984 (N.D. Cal. July 29, 2014)....................14

*Halvorsen v. Baird*,
   146 F.3d 680 (9th Cir. 1998)..................................................................................11

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ...............................................................................................11

*Hernandez v. Sessions*,
   872 F.3d 976 (9th Cir. 2017)..................................................................................13

*Hernandez-Gil v. Gonzales*,
   476 F.3d 803 (9th Cir. 2007)..................................................................................10

*Immigrant Defs. L. Ctr. v. Noem*,
   No. 20 Civ. 9893, 2025 WL 1172442 (C.D. Cal. Apr. 16, 2025)....................12

*Orantes-Hernandez v. Thornburgh*,
   919 F.2d 549 (9th Cir. 1990)............................................................................8, 10

*Pimentel v. Dreyfus*,
   670 F.3d 1096 (9th Cir. 2012).................................................................................7

*Preminger v. Principi*,
   422 F.3d 815 (9th Cir. 2005)..................................................................................13

*Rios-Berrios v. INS*,
   776 F.2d 859 (9th Cir. 1985)....................................................................................8

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
   240 F.3d 832 (9th Cir. 2001)....................................................................................7

iii

*Tawadrus v. Ashcroft*,
364 F.3d 1099 (9th Cir. 2004).................................................................10

*Torres v. U.S. Dep't of Homeland Sec.*,
411 F. Supp. 3d 1036 (C.D. Cal. 2019) .....................................................8

*Usubakunov v. Garland*,
16 F.4th 1299 (9th Cir. 2021).............................................................7, 8

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......................................................................................7

**RULES**

Fed. R. Civ. P. 65(b)(1)...................................................................................3

**OTHER AUTHORITIES**

Adrian Florido & Liz Baker, *DHS Vows Immigration Raids Will Continue as Resistance Mounts*, NPR (June 12, 2025), https://www.npr.org/2025/06/12/g-s1-72513/dhs-immigration-raids-los-angeles-protests ..................................3

Andrea Castillo & Queenie Wong, *L.A. Immigration Raids Force the Undocumented to Trade their Freedom for Safety*, L.A. Times (June 26, 2025), https://www.latimes.com/politics/story/2025-06-26/online-church-school-and-doctor-afraid-of-ice-raids-immigrants-go-digital ...............3

Chris Michael, *Los Angeles Protests: From Immigration Raids to Sending in the Marines – A Visual Timeline*, The Guardian (June 10, 2025), https://www.theguardian.com/us-news/2025/jun/09/los-angeles-protests-visual-guide ..................................................................................................2

Dani Anguiano, *U.S. Citizen Arrested During ICE Raid in What Family Describes as 'Kidnapping'*, The Guardian (June 26, 2025), https://www.theguardian.com/us-news/2025/jun/26/immigration-ice-raid-andrea-velez...................................................................................................3

Immigration and Customs Enforcement, National Detention Standards (2025), https://www.ice.gov/doclib/detention-standards/2025/nds2025.pdf ...............13

Immigration and Customs Enforcement, Non-Dedicated Intergovernmental Service Agreement Standards (2025), https://www.ice.gov/doclib/detention-standards/2025/ndids2025.pdf ..........................................................13

Jack Figge, *'The Fear is Wide' – L.A. Pastors Minister to Migrants Amid Immigration Raids*, The Pillar (June 25, 2025), https://www.pillarcatholic.com/p/the-fear-is-wide-la-pastors-minister.............3

Jonaki Mehta, Ailsa Chang & Christopher Intagliata, *This Beloved Mexican Market in LA is Losing Business Amid Immigration Crisis*, NPR (June 20, 2025), https://www.npr.org/2025/06/20/nx-s1-5434354/trump-immigration-ice-raids-los-angeles......................................................3

Jose Olivares, *U.S. Immigration Officers Ordered to Arrest More People Even Without Warrants*, The Guardian (June 4, 2025), https://www.theguardian.com/us-news/2025/jun/04/immigration-officials-increased-detentions-collateral-arrests..............................................2

Luzdelia Caballero, *Los Angeles Father Speaks Out After Wife, 9-Year-Old Child Detained During Immigration Appointment*, CBS News (June 19, 2025), https://www.cbsnews.com/losangeles/news/los-angeles-father-speaks-out-after-wife-9-year-old-child-detained-during-immigration-appointment ...........2

Ricardo Tovar, *LA County Officials Say ICE Agents Targeted Individuals at Churches*, KSBW8 Action News (June 12, 2025), https://www.ksbw.com/article/la-county-ice-agents-targeted-individuals-church/65039805 .................2

Sid Garcia, *ICE Agents Chase After Farmworkers as They Flee Fields During Latest Raid in Ventura County*, ABC 7 Eyewitness News (June 11, 2025), https://abc7.com/post/ice-agents-chase-farm-workers-flee-fields-during-latest-raid-ventura-county/16719564/ ................................................2

Travis Schlepp, *ICE Agents Make Arrest at Los Angeles Area Church*, KTLA 5 (June 11, 2025), https://ktla.com/news/local-news/ice-agents-make-arrest-at-los-angeles-area-church .......................................................2

**PRELIMINARY STATEMENT**

Over the last month, federal immigration authorities have implemented a policy of stopping people of color *en masse* without reasonable suspicion of immigration violations and subjecting them to warrantless arrest. Many of those arrested in these indiscriminate sweeps have ended up in a basement holding area known as "B-18" in the Federal Building in downtown Los Angeles. B-18 was designed to hold individuals only temporarily for processing before release or transport to a longer-term detention facility. It has no beds, showers, or medical facilities, and is limited in size. Previous litigation over conditions at B-18 resulted in a settlement requiring that individuals not be held there for more than 12 hours.

Yet, since early June 2025, B-18 has become a de facto long-term detention facility. Individuals are held there in inhumane conditions, and their contact with the outside world is purposely being obstructed. Critically, B-18 detainees are not permitted the access to prospective or retained legal counsel required under the Fifth Amendment. Without access to counsel, detainees are kept in the dark on how to assert their rights and are potentially removed from the country without an opportunity to first obtain legal advice. Defendants' current policies and practices are plainly unlawful, and they are causing significant irreparable harm to Plaintiffs Coalition for Humane Immigrant Rights ("CHIRLA") and Immigrant Defenders Law Center ("ImmDef") by severely undermining their ability to provide the immigration legal services at the core of their respective organizational missions.

For the reasons below, the Court should enter a temporary restraining order requiring Defendants to restore legal access at B-18.[1]

---

[1] The relief sought in this application for a temporary restraining order is specifically against Defendants Kristi Noem, Secretary of the Department of Homeland Security; Todd M. Lyons, Acting Director of U.S. Immigration and Customs Enforcement ("ICE"); and Ernesto Santacruz Jr., Acting Field Office Director for the Los Angeles Field Office of ICE.

1

## FACTS

***Defendants' mass, warrantless arrests.*** Beginning in early June 2025, federal immigration agents began conducting indiscriminate raids in Los Angeles, recurrently and systematically descending on parking lots, car washes, and other locations.[2] On June 9, 2025, ICE expanded its operations to neighboring Orange County, conducting raids in Santa Ana, Fountain Valley, and Whittier.[3] On June 10, 2025, ICE operations continued north of Los Angeles, in Ventura County, where agents detained farm workers as they labored in fields.[4] The actions continued with multiple raids throughout the City of Downey at a car wash, Home Depot, and LA Fitness, and in a church parking lot.[5] Raids continued through the end of June and into the month of July.

In an effort to increase the already unprecedented pace of deportations, Defendants have resorted to unlawful tactics. Officials have been instructed to get "creative" with arrests, including of undocumented people encountered by chance.[6] Immigration officers

---

[2] *See* Luzdelia Caballero, *Los Angeles Father Speaks Out After Wife, 9-Year-Old Child Detained During Immigration Appointment*, CBS News (June 19, 2025), https://www.cbsnews.com/losangeles/news/los-angeles-father-speaks-out-after-wife-9-year-old-child-detained-during-immigration-appointment.

[3] Chris Michael, *Los Angeles Protests: From Immigration Raids to Sending in the Marines – A Visual Timeline*, The Guardian (June 10, 2025), https://www.theguardian.com/us-news/2025/jun/09/los-angeles-protests-visual-guide.

[4] *See* Sid Garcia, *ICE Agents Chase After Farmworkers as They Flee Fields During Latest Raid in Ventura County*, ABC 7 Eyewitness News (June 11, 2025), https://abc7.com/post/ice-agents-chase-farm-workers-flee-fields-during-latest-raid-ventura-county/16719564/; *see also* Travis Schlepp, *ICE Agents Make Arrest at Los Angeles Area Church*, KTLA 5 (June 11, 2025), https://ktla.com/news/local-news/ice-agents-make-arrest-at-los-angeles-area-church.

[5] Ricardo Tovar, *LA County Officials Say ICE Agents Targeted Individuals at Churches*, KSBW8 Action News (June 12, 2025), https://www.ksbw.com/article/la-county-ice-agents-targeted-individuals-church/65039805.

[6] *See* Jose Olivares, *U.S. Immigration Officers Ordered to Arrest More People Even Without Warrants*, The Guardian (June 4, 2025), https://www.theguardian.com/us-news/2025/jun/04/immigration-officials-increased-detentions-collateral-arrests.

report being told to "turn the creative knob up to 11" and to "push the envelope."[7] The sheer scale of the raids have astonished "even longtime immigration officials."[8] In the deliberately manufactured chaos, U.S. citizens have also been detained, with their attorneys struggling to locate them in detention.[9]

The raids have sent a chill throughout Los Angeles and the surrounding areas. Immigration officials arrive masked, with firearms, in unmarked vehicles. *See, e.g.*, Toczylowski Decl. ¶ 46. Pastors report dramatically decreased Sunday Mass attendance because people, even those with lawful status, are scared to leave their homes.[10] Market vendors have been forced to shutter their doors, as their customers are terrified to venture outdoors.[11] Native-born U.S. citizens carry their birth certificates, fearing they will be wrongly detained or deported.[12] Immigrants are postponing their cancer treatments for fear of going to a hospital.[13]

---

[7] *See id*.

[8] *See* Adrian Florido & Liz Baker, *DHS Vows Immigration Raids Will Continue as Resistance Mounts*, NPR (June 12, 2025), https://www.npr.org/2025/06/12/g-s1-72513/dhs-immigration-raids-los-angeles-protests.

[9] *E.g.*, Dani Anguiano, *U.S. Citizen Arrested During ICE Raid in What Family Describes as 'Kidnapping'*, The Guardian (June 26, 2025), https://www.theguardian.com/us-news/2025/jun/26/immigration-ice-raid-andrea-velez.

[10] *See* Jack Figge, *'The Fear is Wide' – L.A. Pastors Minister to Migrants Amid Immigration Raids*, The Pillar (June 25, 2025), https://www.pillarcatholic.com/p/the-fear-is-wide-la-pastors-minister.

[11] *See* Jonaki Mehta, Ailsa Chang & Christopher Intagliata, *This Beloved Mexican Market in LA is Losing Business Amid Immigration Crisis*, NPR (June 20, 2025), https://www.npr.org/2025/06/20/nx-s1-5434354/trump-immigration-ice-raids-los-angeles.

[12] *See id.*

[13] *See* Andrea Castillo & Queenie Wong, *L.A. Immigration Raids Force the Undocumented to Trade their Freedom for Safety*, L.A. Times (June 26, 2025), https://www.latimes.com/politics/story/2025-06-26/online-church-school-and-doctor-afraid-of-ice-raids-immigrants-go-digital.

***Inhumane detention at B-18.*** What is happening following arrest, however, is equally troublesome and independently unlawful. Over the past month, Defendants have been taking individuals swept up in mass, warrantless arrests to the basement of 300 North Los Angeles Street, commonly referred to as "B-18." B-18 is designed to hold individuals temporarily so they can be processed and released or otherwise transported to another detention facility. *See* Thompson-Lleras Decl. ¶ 6. B-18 does not have beds, showers, or medical facilities. The unconstitutional conditions at B-18 were the subject of previous litigation in this District, *see Castellano v. Napolitano*, No. 09 Civ. 2281 (C.D. Cal.), which resulted in a settlement agreement in 2009, Compl. ¶ 75. Among the terms of that agreement was the requirement that individuals at B-18 not be held for more than 12 hours, and that ICE permit detainees at B-18 to "visit with current or prospective legal representatives and their legal assistants seven days a week, including holidays, for eight hours per day on regular business days (Monday through Friday), and four hours per day on weekends and holidays." Compl. ¶ 75. That settlement agreement expired in 2010. *Id.* ¶ 76.

But this June, the facility has been converted into a de facto long-term detention facility, and the very inhumane conditions that led to a settlement more than a decade ago are reoccurring and then some. One ImmDef client reported around 60 individuals being held in one B-18 cellblock. Toczylowski Decl. ¶ 37. As of June 20, it is believed that over 300 were being held at B-18. Compl. ¶ 77. When asked about why detainees were forced to sleep on floors and in bad conditions, a B-18 officer explained that B-18 is meant to be a processing center, where people are not to remain longer than 12 hours. R.P.R. Decl. ¶ 9; *see* Duran Decl. ¶ 10 ("'Normal' processing of a matter like this would have been to release him pending his next court hearing, since jurisdiction remains with the Executive Office of Immigration Review under section 240 of the [Immigration and Nationality Act]."). The officer did not know why detainees were forced to stay at B-18 for multiple days. R.P.R. Decl. ¶ 9; *see* Salas Decl. ¶ 34 (reports as of June 26 that detainees were being held for four to five days); Toczylowski Decl. ¶ 54 (report of one detainee who was held for 12 days).

4

***Denial of access to counsel at B-18***. The denial of access to counsel emerged as an issue as soon as Defendants began using B-18 to house the individuals swept up in recent raids and mass arrests.

On June 6, 2025, CHIRLA and ImmDef attorneys and legal representatives attempted to gain access to B-18 to advise detainees of their rights and assess their eligibility for relief, but they were not permitted to meet with anyone. Salas Decl. ¶¶ 11–15; Toczylowski Decl. ¶¶ 5–14. When they returned to B-18 on the morning of June 7, they were met with frightening force and denied access. The attorneys identified a handwritten notice on the door of the family and attorney entrance at B-18 indicating that the facility would not permit any attorney or family visits. Salas Decl. ¶¶ 16–17. Federal agents at the scene deployed an unknown chemical agent against family members, attorneys, and representatives, including CHIRLA legal staff, who were peacefully requesting access to detained individuals. *Id.* ¶¶ 17–24. The chemical agent caused everyone to cough and inflicted a burning sensation in the eyes, nose, and throat. *Id.* ¶¶ 21–22; Toczylowski Decl. ¶¶ 21, 24. That same morning, numerous unmarked white vans quickly departed B-18 with a group of detainees. CHIRLA and ImmDef attorneys and representatives attempted to loudly share know-your-rights information with the detainees in the vans. Salas Decl. ¶ 19. To prevent the detainees from hearing their rights, and therefore from exercising them, federal agents blasted their horns to drown them out. *Id.*; Toczylowski Decl. ¶ 19. On June 8, an ImmDef attorney and the ImmDef president also saw a sign on the door of the B-18 facility stating that attorney and family visits were again cancelled that day. Toczylowski Decl. ¶ 23. Family members and attorneys were prohibited from accessing B-18 until June 9. Toczylowski Decl. ¶ 15; *see* Duran Decl. ¶ 13 ("We had been informed that access was going to be allowed, but when we arrived at B-18, that statement had been revoked.").

These access issues continued to occur over the ensuing weeks, up to the present. Salas Decl. ¶¶ 32–36; Toczylowski Decl. ¶¶ 51–52. On June 16, ImmDef attorneys, as well as Congressman Jimmy Gomez, arrived at B-18 around 3:00 p.m. on a day when B-18 was

purportedly open for visiting between 8:00 a.m. and 4:00 p.m. Toczylowski Decl. ¶¶ 28–29. But they were denied access, along with family members who had been instructed to go to B-18 to pick up their loved ones' possessions. *Id.* ¶¶ 28–31. And on June 19, an ImmDef attorney arrived at B-18 to meet with detainees, including one who was scheduled for a chemotherapy appointment the next day. *Id.* ¶ 34. Despite showing a doctor's note confirming the appointment and specifying that missing the appointment would be detrimental to the detainee's health, the officers would not allow the attorney to meet with the ill detainee. *Id.* ¶¶ 34–37. In fact, one officer told the attorney that "he had no way to find [the detainee] because hundreds of people were detained in the facility." *Id.* ¶ 38.

On the rare and random occasions when family members and attorneys have been allowed access to their loved ones and clients, they have been made to wait hours at a time to see them, and the resulting visits have been limited to a matter of minutes. Vasquez Decl. ¶ 6 (two-minute meeting); R.P.R. Decl. ¶ 8 (five-minute meeting). CHIRLA and ImmDef attorneys have also been given a series of arbitrary reasons why they cannot meet with clients. Toczylowski Decl. ¶ 52 (not having physical bar card). Detention officers screen the very limited phone calls that detainees are permitted to make, and phone calls cannot be used for confidential communications. S.A.R. Decl. ¶ 10.

As a result of Defendants' actions, CHIRLA and ImmDef have been unable to serve their existing clients or establish new attorney-client relationships, undermining the organizations' core missions. And detainees held at B-18 have suffered as a result. Salas Decl. ¶¶ 32–36; Toczylowski Decl. ¶¶ 46, 51–58. Detainees have been coerced into signing forms without access to counsel or a rights advisal. S.K. Decl. ¶ 9 ("The officers at B-18 gave me paperwork to sign but I could not read it. I was so tired, I signed it, but I did not know what it said. They did not give me a copy of the documents."). Detainees are also not told about court hearings and are deported after missing their hearings. R.P.R. Decl. ¶ 13.

The lack of access to counsel also contributes to other constitutional violations—and deliberately so. One ImmDef client, for example, was released shortly after his attorney informed the ICE officers at B-18 that he had asylee status—this was the second time he

had been arrested by ICE in two weeks despite his status. Toczylowski Decl. ¶¶ 32–33. Without the flow of information between attorneys and clients, the full scope of the Fourth Amendment and other legal violations preceding detention remains unknown. And B-18 detainees are limited in their ability to report on the inhumane conditions that they are experiencing at B-18, from overcrowding and inadequate food, to lack of basic hygiene products and medical care. Toczylowski Decl. ¶¶ 32–50; C.B. Decl. ¶ 8; S.K. Decl. ¶ 5; R.P.R. Decl. ¶¶ 8, 10–11.

## LEGAL STANDARD

Plaintiffs are entitled to a temporary restraining order if they show that (1) they are likely to succeed on the merits of their claims; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (noting that preliminary injunction and temporary restraining order standards are "substantially identical"). A stronger showing on one element may offset a weaker showing on another. *See Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012). Under this sliding-scale approach, where a moving party would suffer irreparable harm in the absence of relief and demonstrates that an injunction would be in the public interest, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).

## ARGUMENT

**I.     Plaintiffs Are Likely to Succeed on the Merits of Their Claim That Defendants' Denial of Access to Counsel at B-18 Violates the Fifth Amendment**

The Due Process Clause of the Fifth Amendment safeguards the rights of noncitizens to hire and consult with attorneys. *See Usubakunov v. Garland*, 16 F.4th 1299, 1303 (9th Cir. 2021) ("As we have stressed, the importance of the right to counsel … cannot be overstated." (cleaned up)); *Biwot v. Gonzales*, 403 F.3d 1094, 1098 (9th Cir. 2005) ("The

right to counsel in immigration proceedings is rooted in the [Fifth Amendment] Due Process Clause[.]"); *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 554, 565 (9th Cir. 1990) (recognizing "aliens have a due process right to obtain counsel of their choice at their own expense," and affirming injunction against government practices "the cumulative effect of which was to prevent aliens from contacting counsel and receiving any legal advice," including the practice of denying visits with counsel); *cf. Colmenar v. INS*, 210 F.3d 967, 971 (9th Cir. 2000) ("[A]n alien who faces deportation is entitled to a full and fair hearing of his claims and a reasonable opportunity to present evidence on his behalf."). "The high stakes of a removal proceeding and the maze of immigration rules and regulations make evident the necessity of the right to counsel." *Biwot*, 403 F.3d at 1098; *see Usubakunov*, 16 F.4th at 1300 ("Navigating the asylum system with an attorney is hard enough; navigating it without an attorney is a Herculean task.").

To effectuate this right, immigrants are entitled to "reasonable time to locate counsel." *Rios-Berrios v. INS*, 776 F.2d 859, 863 (9th Cir. 1985); *Torres v. U.S. Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1060–61, 1063–64 (C.D. Cal. 2019). When the government has detained an individual, it cannot impose restrictions on access that undermine the opportunity to obtain counsel. *See Orantes-Hernandez*, 919 F.2d at 554, 565.

In addition to the opportunity to obtain counsel, due process guarantees noncitizens the right to communicate with counsel once counsel is retained. "Both Congress and [the Ninth Circuit] have recognized the right to retained counsel as being among the rights that due process guarantees to petitioners in immigration proceedings." *Arrey v. Barr*, 916 F.3d 1149, 1157 (9th Cir. 2019). Impediments to communication, including through detention in a difficult-to-access facility, can constitute a "constitutional deprivation" where they obstruct an "established on-going attorney-client relationship." *Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1439 (9th Cir. 1986).

CHIRLA and ImmDef have had no, or at best very limited, ability to communicate with current and prospective clients at B-18 because of the barriers to access that

Defendants have constructed. Officers are consistently preventing CHIRLA and ImmDef attorneys from visiting current and prospective clients at B-18, despite the attorneys' compliance with purported visitation procedures and instructions from government officials. Salas Decl. ¶¶ 12–23; Toczylowski Decl. ¶¶ 5–58; C.B. Decl. ¶ 9. They have at times received no response from the intercom system or doorbell at the entrance of B-18, Toczylowski Decl. ¶¶ 6–7, 22, 24; have been turned away when they had previously been told they would be given access, Thompson-Lleras Decl. ¶ 10; have been repeatedly told that attorneys could not enter because the building was overcrowded, Toczylowski Decl. ¶¶ 7, 12–13; Salas Decl. ¶ 14; have been denied access for arbitrary reasons, such as not having a physical bar card, Toczylowski Decl. ¶ 52; and have been denied access even when visiting was purportedly open, *id.* ¶¶ 28–29.

Even when they have been able to enter B-18, CHIRLA and ImmDef attorneys' efforts to meet with clients have been systematically stymied by Defendants. Detention officers have intimidated attorneys into leaving, Toczylowski Decl. ¶¶ 17, 26–27; have provided false information to attorneys that their clients were not detained at B-18, when in fact they were, Duran Decl. ¶ 11; Toczylowski Decl. ¶ 54; have denied attorneys' requests to locate their client using a Form G-28 because it did not have an A-number, even though individuals not previously subject to immigration proceedings would not receive an A-number until arriving at the facility, Toczylowski Decl. ¶¶ 8, 11–12; have denied attorneys' requests to locate clients using a Form G-28 even with A-numbers, Toczylowski Decl. ¶ 48; have made limited efforts to locate clients, such as only "call[ing] the client's name in the holding cells" and giving up when "no one had responded," Toczylowski Decl. ¶ 12; Vasquez Decl. ¶¶ 5, 6; *see also* S.A.R. Decl. ¶ 11 (describing inaccuracy of detainee locators); Barba Decl. ¶ 13 (same); C.B. Decl. ¶ 12 (same); and have denied access due to the purported lack of "attorney rooms" without explanation for why "family rooms" or other spaces could not be used, Toczylowski Decl. ¶ 13.

There can be no serious question that CHIRLA and ImmDef are likely to succeed on their claim that Defendants have obstructed established attorney-client relationships and

prevented CHIRLA and ImmDef attorneys from providing legal advice to B-18 detainees. *Orantes-Hernandez*, 919 F.2d at 565–66; *see Hernandez-Gil v. Gonzales*, 476 F.3d 803, 807–08 (9th Cir. 2007); *Comm. of Cent. Am. Refugees*, 795 F.2d at 1439.

Defendants' legal access policies and practices at B-18 have prevented prospective clients from accessing CHIRLA's and ImmDef's legal services as well. Such interference comes at a critical juncture. Individuals swept up in recent mass arrests may have interviews or hearings to prepare for, may miss immigration appointments with U.S. Citizenship and Immigration Services, may have removal proceedings instituted against them, may be forced to sign documents they do not understand, and may be misled into waiving their rights without the benefit of legal advice that would facilitate informed decisionmaking. *E.g.*, Toczylowski Decl. ¶¶ 4, 56; S.K. Decl. ¶¶ 4, 9 (describing the lack of response detainee received after asking for an attorney and the detainee signing paperwork he did not comprehend). Some detainees may have even agreed to "voluntary departure" or "self-deportation" without having first had the opportunity to consult counsel, even though the Fifth Amendment requires detainees to knowingly and voluntarily waive their right to an immigration court hearing. *See Tawadrus v. Ashcroft*, 364 F.3d 1099, 1103 (9th Cir. 2004). Preventing the formation of attorney-client relationships in this way is a clear violation of the Due Process Clause as well. *See Orantes-Hernandez*, 919 F.2d at 565 (upholding a mandatory injunction where the "cumulative effect" of government practices "was to prevent aliens from contacting counsel and receiving any legal advice").

Finally, the lack of contact with the outside world at B-18—with counsel as well as family members—raises the concern that Defendants are holding detainees at B-18 incommunicado, which also violates the Fifth Amendment. *Halvorsen v. Baird*, 146 F.3d 680, 688–89 (9th Cir. 1998) ("It would be hard to find an American who thought people could be picked up by a policeman and held incommunicado, without the opportunity to let anyone know where they were, and without the opportunity for anyone on the outside looking for them to confirm where they were."); *Castillo v. Nielsen*, No. 18 Civ. 1317, 2020 WL 2840065, at *5 (C.D. Cal. June 1, 2020) ("Defendants do not and cannot dispute

that holding civil immigration detainees incommunicado for such prolonged periods implicates due process concerns."). This right applies to civil detainees as well as those in criminal custody. *Halvorsen*, 146 F.3d at 689 ("That a person is committed civilly … cannot diminish his right not to be held incommunicado."). This fundamental requirement protects not only attorney access, but also detainees' rights to communicate with family members: "Communication has value even if it would not get a person released. A phone call could reduce the mental distress to the person confined. It could also reduce the anxiety of those who might wonder where he was, such as a spouse, parent, or unsupervised child." *Id*. at 688.

## II.     Plaintiffs Are Likely to Continue to Suffer Irreparable Harm

As set forth above, Defendants' violations of the Fifth Amendment right to counsel directly impede CHIRLA's and ImmDef's ability to engage in the representation of immigrants and refugees that is at the core of their founding mission. Defendants do so in numerous ways—by preventing CHIRLA and ImmDef attorneys from meeting with existing and prospective clients; by imposing limitations on access that make it impossible to give timely and confidential legal advice; and by forcing CHIRLA and ImmDef to devote significant staff time and other resources to navigating the unconstitutional barriers to access that Defendants have imposed, rather than engage in their core work of advising clients on their immigration proceedings and constitutional rights. *E.g.*, Salas Decl. ¶¶ 14–15, 17, 32–36; Toczylowski Decl. ¶¶ 5–7, 15, 28–30, 48, 51–52, 54–58.

These harms easily establish CHIRLA's and ImmDef's standing. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (finding that the false information provided by defendants "perceptibly impaired [the plaintiff's] ability to provide counseling and referral services for low- and moderate-income homeseekers"); *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) (explaining that the defendant's actions in *Havens* "directly affected and interfered with [the plaintiff's] core business activities"); *Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 126–27 (2d Cir. 2020) (concluding that public defender service suffered injury from interference with

11

clients' right to counsel). And these harms are irreparable for purposes of injunctive relief. Defendants' interference with CHIRLA's and ImmDef's existing and prospective client relationships comes at a critical juncture in the immigration process, Salas Decl. ¶¶ 31–36; Toczylowski Decl. ¶¶ 56–57, and cannot be remedied by a final judgment issued months (or possibly years) down the road. Indeed, as this District's Judge Bernal recently recognized in another case in which ImmDef was a plaintiff, "impairing [ImmDef's] ability to provide meaningful legal representation to clients in removal proceedings" constitutes irreparable harm. *Immigrant Defs. L. Ctr. v. Noem*, No. 20 Civ. 9893, 2025 WL 1172442, at *24 (C.D. Cal. Apr. 16, 2025); *see also E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677–78 (9th Cir. 2021) (finding irreparable harm where government actions frustrated organizational plaintiffs' core missions). Moreover, CHIRLA's and ImmDef's inability to recover monetary damages on their Fifth Amendment claim makes their harms irreparable as well. *See California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018).

Absent an injunction barring such conduct, Defendants have made clear that they remain committed to violating the right to retain and consult counsel at B-18, creating an intolerable risk of continuing harm. *See also, e.g.*, *Castillo v. Nielsen*, No. 18 Civ. 1317, 2018 WL 6131172, at *4 (C.D. Cal. June 21, 2018) (issuing temporary restraining order requiring attorney access for immigration detainees held at the Federal Bureau of Prisons facility in Victorville).

## III.    The Balance of the Equities Favors Plaintiffs

CHIRLA's and ImmDef's requested relief merely requires Defendants to comply with a well-established due process right of access to counsel by providing individuals detained at B-18 with the same access that the government already affords those held at immigration detention facilities across the country. *See, e.g.*, U.S. Immigration and Customs Enforcement, National Detention Standards at 65, 166 (2025) (requiring facilities to "permit legal visitation seven days a week, including holidays," for eight hours per day on regular business days, and to permit "[a]ll detainees, including those in disciplinary

segregation, … to place calls to attorneys");[14] U.S. Immigration and Customs Enforcement, Non-Dedicated Intergovernmental Service Agreement Standards at 11 (2025) (for non-dedicated facilities, likewise requiring seven-days-a-week legal visitation and the opportunity to place calls to attorneys at no cost).[15] Indeed, this is the same legal visiting schedule that the government agreed to for B-18 when its unconstitutional practices there were challenged more than a decade ago. Compl. ¶ 75. It is hard to imagine what prejudice Defendants could possibly experience from an order directing access to counsel for detainees at B-18. Regardless, any cost to Defendants in complying with their legal obligations would be "far outweighed by the considerable harm" to constitutional rights in the absence of an injunction. *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017).

Finally, the public interest heavily favors granting the injunction because it would ensure that Defendants' conduct complies with the law. *See id*. at 996; *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution."). There is no legitimate public interest in denying CHIRLA and ImmDef the ability to provide legal counsel to those individuals detained at B-18. Moreover, as a result of B-18 detainees' inability to communicate with the outside world, the full scope of Defendants' unconstitutional violations, both within B-18 and in connection with the warrantless arrests that preceded detention, remains unknown. Allowing basic legal access at B-18 will shine a greater light on the other unlawful conduct in which Defendants are engaged.

## IV.    No Security Under Rule 65(c) Should Be Required

District courts have "wide discretion" to waive Rule 65(c)'s requirement that a party seeking a temporary restraining order or preliminary injunction post security "if there is no evidence the [opposing] party will suffer damages from the injunction," *Conn. Gen. Life*

---

[14] https://www.ice.gov/doclib/detention-standards/2025/nds2025.pdf.

[15] https://www.ice.gov/doclib/detention-standards/2025/ndids2025.pdf.

13

*Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003), or if "there is a high probability of success that equity compels waiving the bond, [or] the balance of the equities overwhelmingly favors the movant," *Gilmore v. Wells Fargo Bank, N.A.*, No. 14 Civ. 2389, 2014 WL 3749984, at *6 (N.D. Cal. July 29, 2014). Where, as here, the imposition of a bond "would negatively impact [plaintiffs'] access to courts and their ability to assert their constitutional rights," no bond should be required. *City & Cnty. of San Francisco v. Trump*, No. 25 Civ. 1350, 2025 WL 1282637, at *39 (N.D. Cal. May 3, 2025). Should the Court decide that a bond is appropriate, it should exercise its "discretion as to the amount of security required" to make the amount nominal. *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999).

## CONCLUSION

CHIRLA and ImmDef respectfully request that this Court grant a temporary restraining order that requires Defendants to open B-18 for legal visitation seven days per week, eight hours per day on business days and four hours per day on weekends and holidays, and permits individuals detained at B-18 to communicate with their counsel by phone at no charge.

14

Dated: July 2, 2025

*Mark Rosenbaum*

MARK ROSENBAUM (SBN 59940)
*mrosenbaum@publiccounsel.org*
REBECCA BROWN (SBN 345805)
*rbrown@publiccounsel.org*
SOPHIA WRENCH (SBN 354416)
*swrench@publiccounsel.org*
RITU MAHAJAN (SBN 252970)
*rmahajan@publiccounsel.org*
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, CA 90005
Telephone: (213) 385-2977

*Counsel for All Plaintiffs*

MATTHEW J. CRAIG (SBN 350030)
*mcraig@heckerfink.com*
MACK E. JENKINS (SBN 242101)
*mjenkins@heckerfink.com*
HECKER FINK LLP
1150 South Olive Street, Suite 10-140
Los Angeles, CA 90015
Telephone: (212) 763-0883

*Counsel for Plaintiffs Coalition for Humane Immigrant Rights and Immigrant Defenders Law Center*

CARL BERGQUIST* (DC BAR 1720816)
*cbergquist@chirla.org*
COALITION FOR HUMANE IMMIGRANT RIGHTS
2351 Hempstead Road
Ottawa Hills, OH 43606
Telephone: (310) 279-6025

*Counsel for Plaintiff Coalition for Humane Immigrant Rights*

15

ALVARO HUERTA (SBN 274787)
*ahuerta@immdef.org*
BRYNNA BOLT (SBN 339378)
*bbolt@immdef.org*
ALISON STEFFEL (SBN 346370)
*asteffel@immdef.org*
IMMIGRANT DEFENDERS LAW
CENTER
634 S. Spring St., 10th Floor
Los Angeles, CA 90014
Telephone: (213) 634-0999

*Counsel for Plaintiff Immigrant Defenders Law Center*

* *Pro hac vice* application forthcoming