## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

Pedro VASQUEZ PERDOMO, *et al.*

    Plaintiffs,

    v.

Kristi NOEM, in her official capacity as Secretary, Department of Homeland Security, *et al.*

    Defendants.

Case No.: 2:25-cv-05605-MEMF-SP

**DECLARATION OF CHRIS DURAN**

Hon. Maame Ewusi-Mensah Frimpong

I, Chris Duran, declare under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.

1.    I am an attorney admitted to practice in the courts of the State of California, the U.S. District Court for the Central District of California, the U.S. Court of Appeals for the Ninth Circuit, and the U.S. Supreme Court. My State Bar Number is 110899.

2.    I am currently employed as senior staff counsel in the Removal Defense Unit (the "RDU") with the Coalition for Humane Immigrant Rights in Los Angeles ("CHIRLA").

3.    I have over 40 years of experience working in the field of deportation/removal defense in Los Angeles. The RDU is primarily engaged in pro bono defense of clients in removal proceedings, as well as seeking relief from removal for children who qualify for Special Immigrant Juvenile Status.

4.    In response to the recent Immigration and Customs Enforcement ("ICE") raids being conducted in California, our unit has begun responding to the call for a rapid response to assist detainees and their family members who have been swept up in the raids who are undocumented, have pending removal proceedings, have applications for immigration benefits pending with the United States Citizenship and Immigration Services, as well as some who are legal permanent residents and U.S. Citizens.

5.    We are also responding to the call for monitoring ICE operations as observers

and communicating with other immigrant rights organizations.

6. Following ICE arrest operations conducted in Los Angeles during the morning hours of Friday June 6, 2025, I joined my directing attorney Karla Aguayo at the Los Angeles ICE detention facility located in room B-18 within the Federal Building at 300 North Los Angeles Street, Los Angeles, California.

7. B-18 is where detainees are interviewed/processed, preferably by a different agent than the one who conducted the arrest. The "processing" requires the ICE officer to fill out a Form I-213 "Record of Deportable Alien" and advising detainees of their right to counsel; this right does not include the right to court-appointed counsel, as in the criminal context. It is unknown whether ICE agents actually give this advice and if they do, whether it comes before or after conducting an interview/interrogation.

8. The door to B-18 is always locked and the only way to communicate with the guards inside is through an intercom-speaker that has very poor audio quality making it very difficult to decipher any instructions relayed by the guards, as well as for them to understand us. Confirming the presence of detained clients can take hours on a "normal" day. On days with large numbers of detainees arriving by the van load, it took at least three to four hours before attorneys were allowed into the B-18 waiting room.

9. I was asked by a U.S.-citizen spouse of a Nicaraguan asylum seeker whom I met outside B-18 to confirm that her husband remained at B-18; he had been able to call her letting her know that he had been there hours before. This man's removal proceedings were already pending, and his attorney had advised him to carry copies of his marriage certificate, which reflected a marriage date in March 2025; his wife's birth certificate, which reflected that she was a native-born U.S. citizen; and the hearing notice for his next removal hearing scheduled for October 2025. He claimed that he presented these documents to the ICE officers processing him and they ignored them. Apparently, a decision to arrest him and commence "expedited removal" against him pursuant to section 235(b) of the Immigration and Nationality Act (the "INA") had been made based on his conviction of a Class B misdemeanor for reckless driving of a jet ski in Arizona, which is

2

not a crime involving moral turpitude, nor an offense establishing inadmissibility or removability.

10. "Normal" processing of a matter like this would have been to release him pending his next court hearing, since jurisdiction remains with the Executive Office of Immigration Review under section 240 of the INA. It is unknown what the disposition of this man's case was because his attorney then appeared at B-18, and I assumed that he would argue his case from that point. I requested that the guards turn over his car keys to his wife. This request was denied by the guards, who are contractors and not ICE agents.

11. I also met a prospective client's family member who requested my assistance. The guards initially advised me through the intercom that the prospective client was not present. Following my entrance to B-18, I asked about this client once again, and the guards stated that she was in fact there and that I should wait for her to be brought out to the interview rooms. I waited for her for about 20 minutes, at which time I inquired once again, and the guard then said that she was not there. I asked him if he knew where she was, and he stated that she was in El Paso, Texas. I went back outside B-18 to report to the family member, but she had grown very tired during her four-hour wait and departed. We called her later to relay the information regarding her location.

12. When I was leaving B-18 at about 4:15 P.M., a guard informed me and the other attorneys and family members still waiting outside B-18 that, contrary to their promise to stay open late to allow family visits, B-18 would be closing due to the protests beginning in the front of the building where B-18 is housed at 300 North Los Angeles Street.

13. On Saturday morning June 7, 2025, I returned to B-18 with my director, our executive director, additional attorneys, and certified Department of Justice representatives. We had been informed that access was going to be allowed, but when we arrived at B-18, that statement had been revoked. It is noted that no protest was ongoing at the time. We were able to shout advisal to people in ICE vans being staged for transport until the ICE agents began honking the horns. We were then ordered to leave the area by a

3

Bureau of Prisons officer decked out in full military uniform with flak jacket, helmet, etc.

14.    Shortly after our arrival at B-18 that morning we received information that an ICE raid of a meat packing plant was happening in the City of Paramount near a Home Depot on Alondra Blvd., which is a major east-west thoroughfare which runs through Paramount.

15.    Attorney Nicolas Thompson-Lleras and I were assigned to monitor such operations, and we drove down the Long Beach Freeway and took the Alondra offramp going east. The ramp was backed up with traffic because the California Highway Patrol had blocked both sides of the street and were directing traffic onto the Long Beach Freeway northbound. Nicolas exited the car prior to us being redirected from Alondra and made his way across the bridge over the freeway towards the Home Depot.

16.    I drove back north on the Long Beach Freeway, exited at the next major street, and went south back to the intersection of Orange and Alondra. This is about a quarter mile from the protest area made visible by exploding flash bang grenades. I parked at a Pollo Loco restaurant on the corner and started walking west on Alondra. I was stopped by yellow tape installed by the local sheriff's department and informed the officers that I was there to monitor the ICE raid and assist my clients in the event any had been arrested or threatened by arrest. The supervising officer denied my request to enter the taped off area, claiming that "they were throwing bombs." I waited for a few minutes and, when a woman told the officers that she had to go get her 80-year-old father who had joined the protest, I went with her to be of some assistance. A few minutes later as we approached within 50 yards of the protest area, the woman found her father, who had been tear gassed and was walking east back up Alondra Blvd. fleeing the gas. At that moment I noticed the tear gas floating in the air, and as I was downwind from the area. The cloud of gas overtook me, affecting my breathing, vision, and ability to run. I walked back to the corner of Orange and Alondra Blvd., called Nicolas, and told him I would attempt to drive to the other side of the area to try to pick him up. He assured me that he was okay and that he had contacted some other people from CHIRLA and would catch a ride with them.

17.  I went home and took a long shower but was suffering the effects of the gas through the following day.

I declare under penalty of perjury that the foregoing is true and correct.


Los Angeles, CA

Dated: June 30, 2025

By: _____

Chris Duran