**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA**

Pedro VASQUEZ PERDOMO, *et al.*

Plaintiffs,

v.

Kristi NOEM, in her official capacity as Secretary, Department of Homeland Security, *et al.*

Defendants.

Case No.: 2:25-cv-05605-MEMF-SP

**DECLARATION OF NICOLAS THOMPSON-LLERAS**

Hon. Maame Ewusi-Mensah Frimpong

I, Nicolas Thompson-Lleras, make the following statements on behalf of myself and the Coalition for Humane Immigrant Rights. I declare under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.

1.     I am an attorney admitted to practice in the State of Illinois, State Bar Number 6346605. I am also qualified to practice in front of the Executive Office of Immigration Review, EOIR Number QQ618464.

2.     I am currently employed as a staff attorney in the Removal Defense Unit ("RDU") with the Coalition for Humane Immigrant Rights in Los Angeles ("CHIRLA").

3.     RDU is primarily engaged in the pro bono defense of clients in removal proceedings, as well as the representation of clients seeking certain forms of affirmative relief such as with Special Immigrant Juvenile Status and U-Visas.

4.     Our unit has begun responding to the call for a rapid response to assist detainees who have been swept up in the federal immigration enforcement raids targeting the Los Angeles and southern California area, and the family members of detainees. We are also responding to the call for monitoring Immigration and Customs Enforcement ("ICE") operations as observers and communicating with other important stakeholders such as fellow immigrant rights organizations, elected officials, and community-run initiatives.

5.     On the morning of June 7th, 2025, I was directed to join CHIRLA's Executive

Director Angelica Salas, CHIRLA's Director of Legal Services Karla Aguayo, and two of CHIRLA's Fully Accredited Department of Justice Representatives, Alexis Hernandez and Boden Samuel Stringer, at the loading ramp behind the Los Angeles Federal Building at 300 North Los Angeles Street, Los Angeles, CA 90012. I arrived to find a group of fellow immigration attorneys, journalists, politicians, and family members of those who had recently been detained in Los Angeles.

6.     The loading ramp behind 300 North Los Angeles Street is a significant area for two reasons. First, it is where one can find the public access door to a special room known as Room B-18, or B-18 for short. B-18 is an area in the basement of the federal building where detainees are interviewed and processed and have been housed  prior to transfer to a properly equipped detention facility.

7.     The "processing" of detainees requires the ICE officer—preferably a different agent than the one who conducted the arrest—to fill out a Form I-213 "Record of Deportable Alien" and advise detainees of their right to counsel. However, unlike in criminal proceedings, this is not a right to *court-appointed* counsel. It is unknown whether ICE agents advise detainees of their right to counsel. If they do advise detainees of their right to counsel, it is unclear whether they do so before or after conducting an interview/interrogation.

8.     The second reason the loading ramp behind 300 North Los Angeles Street is a significant area is because just beyond the locked gate at bottom of the ramp there is a door by which at least some of the people detained in B-18 are forced to load into transportation vehicles before their departure to their next destination.

9.     Upon my arrival, I sought out the family member of a recently detained Los Angeles resident. This family member had contacted CHIRLA to ask for assistance in locating their detained family member and advocating for release on their behalf. I found the family member also waiting on the loading ramp and they filled out a Form G-28, authorizing me to communicate with ICE on the detainee's behalf to get information and advocate.

10. CHIRLA believed that access to B-18 was going to be allowed to attorneys, but as soon as we arrived, we learned that the statement had been revoked. The small group of people assembled were completely peaceful; most of them were either attorneys, journalists, advocates, or family members of detainees. There was no confrontation, violence, or even the vaguest threat of violence. Instead, the federal agents were denying me and other attorneys access to the detainees in B-18.

11. I approached the loading gate area to observe the loading process from a public area on the outside of the fenced-off loading area. I began to record the scene with my phone and, along with other assembled attorneys and DOJ Representatives, shout basic legal advisals to the group of restrained detainees being loaded into mostly unmarked white transportation vans. I figured that shouting would be the only way to communicate any information to my client as he was loaded into a van for transportation to yet another undisclosed location.

12. At around 9:49 a.m., federal agents began to maneuver and park transportation vans directly in front of me and the other attorneys in order to block our line of sight to the loading process. Shortly thereafter, an agent got behind the driver's seat of one of the vans and started repeatedly laying on the car horn, in an apparent attempt to antagonize the assembled attorneys and drown out their voices.

I declare under penalty of perjury that the foregoing is true and correct.

Los Angeles, CA

Dated: June 30, 2025

By: _____

_____

Nicholas Thompson-Lleras

3