# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

Pedro VASQUEZ PERDOMO, *et al.*

    Plaintiffs,

    v.

Kristi NOEM, in her official capacity as Secretary, Department of Homeland Security, *et al.*

    Defendants.

Case No.: 2:25-cv-05605-MEMF-SP

**DECLARATION OF LINDSAY TOCZYLOWSKI**

Hon. Maame Ewusi-Mensah Frimpong

I, Lindsay Toczylowski, make the following statements on behalf of myself and Immigrant Defenders Law Center. I declare under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.

1.    My name is Lindsay Toczylowski. I make this declaration based on personal knowledge and a review of records related to my position as President and Chief Executive Officer of Immigrant Defenders Law Center ("ImmDef").

2.    I am the President, and Chief Executive Officer of ImmDef, which I co-founded ten years ago. ImmDef is a non-profit organization incorporated in California and based in Los Angeles, with additional offices in Riverside, Santa Ana, and San Diego, California, that serves immigrants and asylum seekers throughout Southern California and across the U.S.-Mexico border in Tijuana, Mexico. It is the largest removal defense nonprofit in Southern California. ImmDef's mission is to provide immigration services through a universal representation model to ensure that no person must face an unjust immigration system alone.

3.    One of ImmDef's key programs is its Community Defense Program ("CDP"). Through CDP, ImmDef strives to make universal representation a reality by partnering with cities and counties to provide affirmative and removal defense legal services in areas with large immigrant populations. In 2025, as ImmDef began to see increased immigration enforcement actions occurring throughout these areas, we shifted resources from our direct

services to include our Rapid Response team and Welcoming Initiative. ImmDef's Welcoming Initiative provides Know Your Rights trainings throughout ImmDef's service area. Our Rapid Response team monitors a hotline and responds to notifications about individuals detained in enforcement actions and takes referrals to represent detained individuals in their immigration removal proceedings within ImmDef's service area. ImmDef also participates in the wider Los Angeles Rapid Response Network, including by responding to a hotline monitored by the Coalition for Humane Immigrant Rights ("CHIRLA") when enforcement actions are taking place.

4.    On June 6, 2025, federal immigration officials began conducting large-scale raids in Southern California. ImmDef attorneys quickly mobilized to observe and provide support to affected community members. My staff kept me informed of what was happening at each site, including at the detention processing floor located in the basement of the Roybal Federal Building, also known as "B-18." Multiple staff members decided to go to B-18 as soon as we started learning about the raids because, based on our experience with similar immigration enforcement actions in the past, we suspected that federal immigration authorities were systematically violating the civil and constitutional rights of the individuals they were arresting. We wanted to ensure that those arrested were given as much information about their rights as possible. We also wanted to meet with referred clients to determine what immigration relief they were eligible for, if any. We were worried that people would sign away their rights before understanding what those rights were or what relief they were eligible for. Over the next few weeks, ImmDef attorneys continued to visit B-18 and report on their ability to meet with clients.

### Attorney Access at B-18 on June 6, 2025

5.    On Friday, June 6, 2025, ImmDef learned of multiple federal immigration raids occurring in Los Angeles, leading to what we believed at the time was about 45 arrests. We learned that federal immigration authorities were taking those detained to B-18 to be processed for further detention. A group of ImmDef attorneys made their way to B-18 to provide legal intake and advice to those who had been arrested.

6.  A group of about four ImmDef attorneys arrived at B-18 around 3:00 p.m., and another group of about three arrived around 4:00 p.m. B-18 is accessed from E. Aliso Street, which runs along the north side of the Roybal Federal Building. Upon arriving at the Roybal Federal Building, the attorneys entered the outside area of B-18 via a down ramp. The area directly outside of B-18 consists of a small, approximately 10-by-13-foot cement court with a stairwell on one side, a gate looking into a garage on another, and a hallway leading to a security door with an intercom speaker. On this Friday, there was a group of about 20 to 25 people waiting in the hallway for their turn to be allowed into B-18. This group consisted mostly of family and friends who believed their loved ones were being held at B-18. One or two attorneys from other nonprofit organizations or private law firms were also present.

7.  Upon arriving at B-18, multiple ImmDef attorneys attempted to use the intercom to request access to the facility, but there was no answer. Several times the security door opened to allow family members to exit B-18. Each time the door opened, an ImmDef attorney would ask to enter. The guard at the door repeatedly told them that no attorneys would be allowed to enter because the building was at capacity. Despite the attorneys asking more than once what this meant, the guard provided no further clarification. This guard did not appear to be an ICE officer, but some kind of contractor, based on his uniform.

8.  While ImmDef's attorneys were waiting outside of B-18, they tried to collect information from the family members and friends gathered there about the people detained inside. Multiple family members, however, were turned away by the guard at the door because they did not have the Alien Registration Number ("A-number") assigned to their loved one's case. Some of the individuals detained had never had any encounter with immigration before their arrest, and so they did not have an A-number assigned to their case until that day. Their family members, therefore, had no way of knowing what that number was. These attorneys also began to complete Forms G-28, Notice of Entry of Appearance as Attorney ("Form G-28"), with these family members on behalf of their

detained loved ones. Without A-numbers, they filled out the forms using the individual's name and date of birth.

9. At around 4:25 p.m., one of ImmDef's attorneys, Nicholas Borkowski, was allowed into the waiting room on the other side of the security door of B-18. This waiting area had plenty of open space for people to sit and wait and, unlike the area outside of the security door, it had a restroom and central air conditioning. Mr. Borkowski had at least one client who he knew was being held in B-18 because he had spoken to the client's family members outside, and he intended to meet with other potential clients if he could.

10. Once inside, Mr. Borkowski observed additional family members and attorneys waiting to speak with loved ones and clients, respectively. Off the waiting room were two smaller rooms that a guard informed Mr. Borkowski were attorney consultation rooms. But Mr. Borkowski saw that only one attorney consultation room was in use while the other had the door closed and lights off. From the waiting room, he could not see where detained individuals were being held.

11. Mr. Borkowski asked to speak with his client in the empty consultation room. He had with him a Form G-28, and he provided his client's name and date of birth to the guard sitting at the front desk. The guard informed Mr. Borkowski that without an A-number (which Mr. Borkowski did not have because the number would not have been assigned until the client arrived at B-18), he could not guarantee that he would be able to locate Mr. Borkowski's client. When Mr. Borkowski asked why not, he was told it was because the guards were not federal immigration authorities and did not have the information needed to locate the individual being held in the facility.

12. At around 5:15 p.m., a different guard, Officer V. Mansour, let Mr. Borkowski into an attorney consultation room. But once inside, Office Mansour told Mr. Borkowski that without an A-number, he would not be able to find the client Mr. Borkowski intended to visit. Mr. Borkowski asked how Officer Mansour was searching for his client, and Officer Mansour explained that he had called the client's name in the holding cells, but that no one had responded. The officer then told Mr. Borkowski he could wait back in the

waiting area for another 30 minutes while Mr. Mansour tried again to find the client or otherwise come back later. Mr. Borkowski said he would wait for Officer Mansour to try to locate his client, but Officer Mansour never returned to the room. Twice, while Mr. Borkowski was waiting for his client, he heard an officer state that over 200 people were being processed at B-18 that night.

13. While Mr. Borkowski was inside the B-18 waiting area, the other ImmDef attorneys outside of B-18 continued to ask for access. When the attorneys asked why they were not being given access to the detained individuals, including those for whom the attorneys had Forms G-28, the guards told them multiple times that there were not enough "attorney rooms," to accommodate them, as only "family rooms" were available. When attorneys said they would be willing to use these "family rooms" to speak with clients, the guards told them that was not allowed. Only one other ImmDef attorney was ever given access to the waiting area of B-18 that day, but she was also unable to meet with any clients.

14. By 5:45 p.m., no more attorneys were being granted access to the building, despite having signed Forms G-28 for specific people detained. At around 6:00 p.m., the guards asked all attorneys to vacate the premises due to a protest occurring outside. From what the attorneys could see, the protest was limited to Alameda Street, while B-18 is located on the E Aliso side of the federal building. The guards told the attorneys to return at 8:00 a.m. the next morning. Attorneys were never given any other explanation as to why they had to leave before seeing their clients.

### Attorney Access at B-18 on June 7-8, 2025

15. At around 8:00 a.m. on Saturday, June 7, 2025, ImmDef staff, including multiple attorneys, returned to B-18 to try to speak with those detained at the facility. When our first staff member arrived, he was told by several family members waiting outside of B-18 that no visitors were being allowed in. He then spoke with a guard at the front door of B-18 who confirmed that both family and attorney visits would not be allowed until Monday. Several other ImmDef attorneys then arrived and received the same information.

16. In addition to ImmDef staff and attorneys, the only other people present in

front of B-18 were several family members hoping to meet with loved ones who they believed were detained at B-18, as well as several attorneys from the nonprofit organization CHIRLA. There were no protests happening directly in front of B-18.

17.     At around 9:00 a.m., ImmDef attorneys saw officers in gray and black uniforms with the words "Detention Officer" on their vests starting to move individuals from B-18 into unmarked white vans. The vans were parked inside of the B-18 garage and behind a metal gate. The agents attempted to obstruct this process from view by parking several additional vans in front of the gate and setting up room dividers between the B-18 entrance and the loading area. Attorneys were still able to see the individuals being moved, however, from a higher vantage point on the ramp leading out of the B-18 entrance. Our attorneys could see that the individuals were in shackles and chained together.

18.     The attorneys gathered in front of B-18 at this point started yelling general legal advice to the people being moved into the vans. The attorneys told them, in Spanish: "*Si tiene miedo de regresar, dígalo claramente.* (If you have a fear of return, state it clearly.)"; "*Tiene derecho a una entrevista de miedo creíble.* (You have a right to a credible fear interview.)"; "*Pida hablar con un abogado.* (Ask to speak to a lawyer.)"; "*No firme nada.* (Do not sign anything.)."

19.     As our attorneys were attempting to convey this advice, the guards began adding additional partitions to obstruct the attorneys' view of the vans. The attorneys' view was limited but they could still hear the chains of the people being moved. The drivers of the federal agency vans also began honking the horns of their vans to drown out the attorneys' advice whenever the attorneys spoke. The attorneys attempted to shout in unison to be heard over the horns, but it was unclear if the detained individuals heard their advice.

20.     At about 10:30 a.m., several ImmDef attorneys then left B-18 to provide assistance at the site of another enforcement action. Only one ImmDef attorney, Francesca Maiotto, and several CHIRLA attorneys remained at B-18.

21.     At approximately 10:45 a.m., while Ms. Maiotto could hear agents loading another van and she was attempting to chant legal advice, her throat began to itch and her

nostrils burned. She and the other people gathered in the entrance outside of B-18, which included attorneys, family members, and several congresspeople, all simultaneously began to cough. Those who had medical-grade and KN-95 masks quickly put them on. It was not possible to see or hear where the substance was coming from, and it was not visible in the air. The sensation, though, was like pepper spray. The sensation seemed to stop after the van left B-18's garage. The feeling returned at about 11:30 a.m., while another van was loading.

22.    By about 12:30 p.m., Ms. Maoitto could no longer hear vans or people being moved. Around the same time, a family member of an individual arrested on Friday arrived and attempted to ask through the intercom to be let into B-18. The officer who responded told her, so that Ms. Maiotto could overhear, that everyone had been moved from B-18 and the facility was empty. Ms. Maiotto left the area soon afterwards. She estimated that between 9:00 a.m. to 12:00 p.m. she saw or heard about five vans being loaded with between 20–30 people each.

23.    On Sunday, June 8, 2025, I visited B-18 personally to try to confirm whether anyone was still being detained at the facility. I arrived with my colleague and ImmDef Directing Attorney Melissa Shepard at approximately 1:40 p.m. When we approached the door of the facility, we saw a handwritten sign that read "Attorney/Family Visit Temporary Cancelled Today."

24.    I rang the doorbell at the intercom to try to speak with a guard but received no response. After about 20 seconds of waiting, I noticed my nose and throat burning. Ms. Shepard confirmed that she was also feeling the same burning. Without knowing what the substance was or if it would have any long-term effects, we did not feel it was safe to stay in the area and we left.

**ImmDef Attorneys Were Consistently Denied Access to B-18 Over the Next Week**

25.    Starting on June 6, 2025, ImmDef began collecting the names of individuals who were taken in the raids and who we believed were being held at B-18. These individuals were referred to us through family members and friends calling into the Rapid

Response hotline, as well as from our community partners. We believed they were being held at B-18 because ICE officers had told their family members they were being taken to B-18 and in some cases we could confirm they were there through the ICE detainee locator system.

26. On Tuesday, June 10, 2025, three ImmDef attorneys, including Legal Services Director Amanda Schuft, attempted to visit B-18 to determine whether any referred clients were still at the facility. As they approached E. Aliso Street, the attorneys saw about a dozen California Highway Patrol ("CHP") officers blocking access. The group could also see several members of the U.S. Marines outside the entrance of B-18.

27. Ms. Schuft greeted the officers and explained that they were immigration attorneys seeking access to B-18 to meet with anyone detained there. The officers told the group that no one was allowed to access the street. Ms. Schuft showed the officers her bar card, however they repeated they could not let anyone through and that she would have to contact the facility directly to see if they had available appointments. The group then approached B-18 from another entrance on E. Aliso Street, but as they neared the entrance, an officer in the distance waved them away, ordering them back. The group left the area without gaining access to B-18.

28. On June 16, 2025, ImmDef attorneys, including Managing Attorney Kristen Hunsberger, attempted to meet with clients at B-18. With Ms. Hunsberger and her colleagues was Congressman Jimmy Gomez. The attorneys were specifically trying to meet with family members of individuals who had called ImmDef's Rapid Response hotline.

29. Ms. Hunsberger arrived at B-18 around 3:00 p.m. She saw that attorney visiting hours were posted outside the security door as being from 8:00 a.m. to 4:00 p.m. However, when she asked to be let into the facility because she had a list of people she wanted to speak with, the guard at the door told her that no visits were being allowed. The guards refused to even look at the list of names that Ms. Hunsberger had with her.

30. At around 3:50 p.m., while Ms. Hunsberger was still trying to gain access to

B-18, four CHP officers arrived and told everyone waiting outside of B-18, including both attorneys and family members who had been called and told to come to B-18 to pick up their loved ones' possessions, to leave. About ten minutes later, an officer with a badge on his uniform identifying him as part of the Department of Homeland Security ("DHS") arrived with a canine. He and the canine then began to pace up and down the ramp outside of B-18's entrance to prevent anyone from approaching the security door.

31.    There were no protests happening on E. Aliso Street at this time, and Ms. Hunsberger observed a group of only about 20 peaceful protestors on Alameda Street as she was leaving. By contrast, she counted 25 law enforcement vehicles, some marked CHP and Los Angeles Police Department ("LAPD") and one brown passenger van parked on E. Aliso Street.

### ImmDef Was Finally Able to Meet with One Long-Term Client at B-18

32.    On June 19, 2025, an ImmDef attorney, James Nichols, was able to meet with a long-term client, J.M.E., who was being held at B-18. J.M.E. has asylee status and should never have been detained, but this was his second time being stopped by ICE in as many weeks.

33.    Mr. Nichols arrived at B-18 around 12:30 p.m. and asked the guard behind the intercom to speak with J.M.E. He informed the guard of J.M.E.'s asylee status. Mr. Nichols then showed a copy of J.M.E.'s asylum approval notice and was told to keep waiting. Mr. Nichols waited between two to three hours to be let into B-18. Once inside, he spoke with two more guards who took his bar card and J.M.E.'s A-number. Eventually, Mr. Nichols spoke with an ICE officer who introduced himself as Sergeant Vela. Mr. Nichols again explained J.M.E.'s asylee status and Sergeant Vela brought J.M.E. to a consultation room where he was only able to meet with J.M.E. for about 20 minutes.

34.    After speaking with J.M.E., Mr. Nichols again asked that J.M.E. be released. He was told that J.M.E. was scheduled to be sent to Adelanto. If not for Mr. Nichols' intervention, J.M.E. likely would have been sent to Adelanto. Mr. Nichols waited several more hours at B-18 until J.M.E. was released around 5:15 p.m.

35.     Since J.M.E. was released, I have spoken with him more about his arrests and the conditions at B-18. The first arrest happened on June 9, 2025, while he was traveling in a car with friends on the 101 freeway. Officers who J.M.E. thinks were ICE officers stopped traffic and pulled the car over. They made everyone in the car get out and tackled J.M.E. to the ground. They then handcuffed and threw J.M.E. and his friends in a van without showing them any warrants. J.M.E. had paperwork with him showing that he was granted asylum, and he told the officers to check it. They refused and eventually pulled over and left J.M.E. and his friends in the van for two to three hours. When they came back, one officer checked the paperwork and let J.M.E. go by dropping him off on the side of the freeway. His friends were not released, and J.M.E. learned later that one of them was transferred to Adelanto Detention Facility. J.M.E. had bruises on his arms and behind his ear from this arrest.

36.     On June 19, 2025, only ten days after J.M.E. was first arrested, he went to Home Depot around 5:00 a.m. to look for work. He was standing by the building with around 20 other people. At around 7:00 a.m., ICE pulled up in several white vans, some with green stripes. They drove up quickly and J.M.E. heard their tires skidding. ICE then grabbed about five of the men, including J.M.E. while the other 15 took off running. J.M.E. was then again handcuffed and thrown into one of the vans. As he was being arrested, J.M.E.'s bag was left behind on the ground. In it, J.M.E. had documents that proved his asylum grant. When he tried to inform the officers of these documents, however, he was told not to speak. The officers left the bag behind on the ground at the Home Depot.

37.     ICE officers then took J.M.E. to B-18. When he arrived around 8:00 a.m., he was given a small peanut butter sandwich but nothing else. He also told the guards that his head was hurting and that he felt like he had high blood pressure, so the guards gave him a pill. J.M.E. was then taken to a room with about seven or eight cells. Some of the cells had around 60 people in them. His cell had about 30 people. The cell he was in was very crowded, and there were no chairs or beds. It was very cold, but the guards did not provide anyone with any blankets. Around 10 a.m., the guards gave J.M.E. some yogurt and milk.

The yogurt looked expired, so he did not eat it.

38.     Finally, at around 12:40 p.m., J.M.E. was given access to the phone, and he called my assistant who sent Mr. Nichols to B-18. Since J.M.E. was released, ImmDef has tried to keep in touch with him. But he has mental health concerns and sometimes does not respond. I am constantly worried that he will be re-arrested.

**ImmDef Was Only Able to Meet with One Other Referred Client That Same Day**

39.     Also on June 19, 2025, Ms. Hunsberger returned to B-18 to meet with other detained individuals on ImmDef's referral list. We knew one individual, J.A.G., who was detained at B-18 was being treated for cancer and had a chemotherapy appointment scheduled for the next day. Ms. Hunsberger had with her a note from J.A.G.'s chemotherapy provider stating the date and time of his next appointment. The note also explained that missing a chemotherapy appointment would be detrimental to J.A.G.'s treatment.

40.     When Ms. Hunsberger attempted to show the note to the guard at the security door, she received no response. She then asked one of the Marines outside of B-18 if he could pass a message to one of the federal immigration officers inside that she needed to speak with an individual who should be released for medical and humanitarian reasons. She told the Marine that the medical reason was a chemotherapy appointment. J.A.G.'s family was also present with his medication but were similarly not being allowed to see him.

41.     At around 12:00 p.m., an ICE officer, Officer R. Chavez, according to his nametag, came out of B-18 to speak to Ms. Hunsberger. Ms. Hunsberger explained that she was there to speak to an individual who needed immediate release to attend a chemotherapy appointment in the morning. Officer Chavez told her that he would elevate her concerns to his supervisor.

42.     Ms. Hunsberger then waited another two hours outside of B-18. Every 15-30 minutes, she would approach the security door and use the intercom to ask for assistance. After about an hour, she received a response that Officer Chavez had gone to speak with a

11

supervisor. About an hour later, another officer came to speak with Ms. Hunsberger. He took her Form G-28 but became angry when he saw the G-28 was only signed by a family member and not J.A.G. Ms. Hunsberger explained she had been retained by the family because no one had been allowed to speak with J.A.G. and his medical condition made securing his release time sensitive. The officer left without providing Ms. Hunsberger any information.

43.    Soon afterwards, Ms. Hunsberger saw Officer Chavez, flagged him down, and again asked about meeting with her client. He told her that he had no way to find J.A.G. because hundreds of people were detained in the facility. Ms. Hunsberger suggested shouting J.A.G.'s name and seeing if whoever came forward could confirm his date of birth. Officer Chavez told her that he would try.

44.    Finally, at around 2:30 p.m., Ms. Hunsberger was told that J.A.G. was being pulled and she could speak with him. Ms. Hunsberger and J.A.G.'s nephew were then let into B-18, where Ms. Hunsberger was given an attorney consultation room to meet with her client.

45.    While Ms. Hunsberger was waiting for J.A.G., she was able to overhear guards in the hallway discussing the large influx of people being brought to B-18. One guard said, "There is nothing we can do, someone needs to tell Trump he needs to slow down." Others were complaining about maintaining health and safety conditions, asking "how are we supposed to house and feed them?," and exclaiming that "the ones who bring the bodies should pat them down."

46.    Ms. Hunsberger was able to meet with J.A.G. for about 45 minutes. He told her that he was arrested in Pasadena with a group of other day laborers. The men who arrested the laborers were masked, carrying guns, and driving unmarked vehicles. No one was shown a warrant of any kind. J.A.G. was physically restrained with both his hands and feet handcuffed. J.A.G. suffers from back pain and difficulty breathing because of his cancer, and the arrest was extremely painful for him. He had tried explaining about his chemotherapy appointment when he was arrested, but none of the officers had responded.

12

47.    After Ms. Hunsberger's interview with J.A.G. she was not able to speak with any other referrals from ImmDef's list. Around 4:00 p.m., a guard informed everyone standing outside of B-18, including attorneys and family members, that no one else would be allowed in the facility that day. Ms. Hunsberger stayed at B-18 until about 10:00 p.m. to continue advocating for J.A.G.'s release, speaking with any ICE or DHS officer she could flag down. But J.A.G. was not released that night.

48.    Another ImmDef attorney, Lavalee Forbes, also went to B-18 that day, but she was not able to meet with any clients. When she arrived at about 2:30 p.m. and requested to see her client over the intercom, an officer told her to wait. At 3:20 p.m., she was told that no more attorney visits could be held that day despite the attorney visitation time ending at 4:00 p.m. Another attorney from a private firm was also at B-18 who was not permitted entry despite asking multiple times and having the A-number for her client.

49.    The next day, June 20, 2025, at about 6:30 a.m., Ms. Hunsberger received a call from an ICE officer who told her that J.A.G. was being processed for release. She asked for an estimated time of release because his chemotherapy appointment was scheduled for 9:00 a.m. The officer could not provide an estimate.

50.    Ms. Hunsberger arrived at B-18 at 7:00 a.m. At 7:20 a.m., an ICE officer told Ms. Hunsberger that J.A.G. had been transferred to Adelanto Detention Center for the night because ICE was aware of his condition and had sent him to Adelanto "so he could have a bed" and because there were no beds at B-18. At 8:45 a.m., another officer told her that J.A.G. had just left Adelanto and was on his way. J.A.G. was finally released at 11:10 a.m., but he had already missed his chemotherapy appointment. Luckily, his family member, who was also at B-18 that morning, was able to reschedule the appointment. ICE released J.A.G. without any paperwork documenting his time in ICE custody.

**The Access to Counsel Issues at B-18 Continue to Persist Today**

51.    On June 27, 2025, ImmDef attorney Morgan Gehrls, went to B-18 at around 12:30 p.m. to meet with a client she represents and who ICE re-arrested on June 26, 2025. Upon arrival, Ms. Gehrls rang the intercom, and an officer asked what she was there for.

13

Ms. Gehrls explained that she was there to meet with her client and gave the officer her client's information. The officer then left, and Ms. Gehrls waited for 20-30 minutes.

52. When the officer returned, he asked Ms. Gehrls for her bar card. Ms. Gehrls explained that she does not have a bar card because she is licensed in the state of Illinois, and Illinois does not have bar cards. The officer responded to Ms. Gehrls, "well, we're in California." Ms. Gehrls explained that attorneys can practice before the Executive Office for Immigration Review ("EOIR") regardless of which state they are barred in, and that she has an EOIR number. Ms. Gehrls offered to present a complete G-28 and letter of good standing from the Illinois Supreme Court, but the officer refused. Ms. Gehrls explained that an attorney from our office who is licensed in New York was previously permitted entry after explaining that New York attorneys also do not have bar cards. The officer finally allowed Ms. Gehrls to speak to her client, but told her she would not be given attorney access. The officer only permitted Ms. Gehrls to talk with her client for ten minutes. She was not provided with a confidential meeting space to talk with her client and was in an area where staff could overhear their conversation. Ms. Gehrls overheard this officer tell another staff member that she was "not an attorney."

53. Ms. Gehrls' client, who is a Franco-Gonzalez v. Holder, 2014 WL 5475097 (C.D. Cal. April 23, 2013), class member told her that he has not received his medications since being at B-18, despite telling the guards that he needed the medication and that it was with his possessions. When Ms. Gehrls asked the guard why her client was not receiving his medications, the guard told her that they are unable to give a detainee their medications unless the detainee can tell them when they need it and dosages. Ms. Gehrls explained that her client has been found not competent by an immigration judge and that he also has in his possession paperwork providing this information. The guard told her that too many people are being processed at B-18 for the guards to go through the paperwork that everyone comes in with.

**ImmDef Has Struggled to Locate Individuals It Believes Are Being Held at B-18**

54. ImmDef attorneys have consistently had difficulty locating individuals we

believe are being held at B-18. Individuals held at B-18 do not show up on ICE's detainee locator tool online. Short of an attorney or family member going to B-18 to ask about an individual, there is no way to confirm that person is there. On at least one occasion, guards told an ImmDef attorney that an individual was not at B-18 only for that attorney to later learn through the person's family member that he was indeed there. This man, who federal immigration officials arrested at a carwash on June 19, 2025, and whose family ImmDef has kept in touch with as we consider him for representation, was held at B-18 for 12 days.

55. Due to the conditions at B-18, ImmDef attorneys are spending significant time and resources traveling to the facility in person and attempting to confirm whether individuals arrested in raids—and who have been referred to our organization by family members or partner organizations—are even located at the facility. This has immensely strained our staff, who already have full caseloads, and is imperiling our staff's ability to meet the needs of their individual cases. Our Rapid Response team is still small, and I have had to ask attorneys from across our direct services teams—including attorneys from our National Qualified Representative Program, Community Defense Program, and Children's Representation Program—to shift their workloads to assist with the urgent project of locating detained individuals. The directors from these teams are also working around the clock to develop new procedures for assigning out both internally and externally the cases referred to us as a result of the raids.

56. Even when ImmDef attorneys have been able to locate clients and prospective clients at B-18, conditions at the facility have hampered attorneys' ability to provide meaningful representation and constrained attorney-client relationships due to, for example, the lack of confidential meeting space and the short amount of time permitted during legal visits. Hindering ImmDef attorneys' access to B-18 also means, among other things, that clients and prospective clients may sign away their legal rights without the advice of counsel, further undermining ImmDef attorneys' ability to represent individuals in their immigration removal proceedings.

57. ImmDef's leadership team realized soon after the raids started that our

organization would not have the capacity to represent all the individuals detained in their various immigration proceedings. Those being held at B-18 need legal representation in a variety of matters, including at bond hearings, credible fear interviews, and full-scale removal cases. We simply do not have enough attorneys to cover this need.

58.   For those individuals that ImmDef is unable to represent, ImmDef is attempting to connect them to other nonprofit organizations and pro bono private attorneys who can represent them. It is, therefore, critical for us to speak to those who are detained to understand the type of representation they need, and if there are any factors that weigh in favor of ImmDef's immediate representation of them or connecting them with another attorney.

I declare under penalty of perjury that the foregoing is true and correct.

Los Angeles, CA

Dated: July 1, 2025

By: _____

Lindsay Toczylowski