HYDEE FELDSTEIN SOTO
(SBN 106866)
City Attorney
hydee.feldsteinsoto@lacity.org
VALERIE L. FLORES (SBN 138572)
valerie.flores@lacity.org
MICHAEL J. DUNDAS (SBN 226930)
mike.dundas@lacity.org
MARIA LOUISE COUSINEAU
(SBN 122280)
maria.cousineau@lacity.org
RANDALL G. SOMMER
(SBN 214099)
randall.sommer@lacity.org
SHUBHRA SHIVPURI (SBN 295534)
shubhra.shivpuri@lacity.org
OFFICE OF THE LOS ANGELES
CITY ATTORNEY
City Hall 200 North Spring Street
21st Floor
Los Angeles, CA 90012-4130
Tel.: 213-922-8382; Fax: 213-978-7957

*Attorneys for Proposed Intervenor
City of Los Angeles*

E. MARTIN ESTRADA
(SBN 223802)
martin.estrada@mto.com
DANIEL B. LEVIN (SBN 226044)
daniel.levin@mto.com
JOHN L. SCHWAB (SBN 301386)
john.schwab@mto.com
V. GRACE DAVIS (SBN 336732)
grace.davisfisher@mto.com
V. ROMAN LEAL (SBN 348892)
roman.leal@mto.com
WENDY QIUYU XIAO (SBN 342702)
wendy.xiao@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
50th Floor
Los Angeles, California 90071
Tel.: 213-683-9100; Fax: 213-687-3702

*Attorneys for Proposed Intervenors
Cities of Los Angeles, Culver City,
Montebello, Monterey Park, Pico
Rivera, Santa Monica, and West
Hollywood*

NICOLE DAVIS TINKHAM
(SBN 229592)
Chief Deputy
ntinkham@counsel.lacounty.gov
LILIANA CAMPOS (SBN 255753)
Assistant County Counsel
lcampos@counsel.lacounty.gov
BRIGIT GREESON ALVAREZ
(SBN 237301)
Deputy County Counsel
bgreesonalvarez@counsel.lacounty.gov
OFFICE OF THE LOS ANGELES
COUNTY COUNSEL
648 Kenneth Hahn Hall of Admin.
500 West Temple Street
Los Angeles, California 90012-2713
Tel.: 213-808-8736; Fax: 213-633-1915

*Attorneys for Proposed Intervenor
County of Los Angeles*

MICHELE BEAL BAGNERIS
(SBN 115423)
City Attorney
mbagneris@cityofpasadena.net
ARNOLD F. LEE (SBN 278610)
Chief Assistant City Attorney
aflee@cityofpasadena.net
ANDREW AARONIAN (SBN 318245)
Deputy City Attorney
aaaronian@cityofpasadena.net
OFFICE OF THE CITY ATTORNEY
OF PASADENA
100 N Garfield Ave, Rm N-210
Pasadena, CA 91101
Tel.: 626-744-4141; Fax: 626-744-4190

*Attorneys for Proposed Intervenor
City of Pasadena*

NOTICE OF MOTION AND MOTION TO INTERVENE

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

Pedro VASQUEZ PERDOMO; Carlos Alexander OSORTO; and Isaac VILLEGAS MOLINA; Jorge HERNANDEZ VIRAMONTES; Jason Brian GAVIDIA; LOS ANGELES WORKER CENTER NETWORK; UNITED FARM WORKERS; COALITION FOR HUMANE IMMIGRANT RIGHTS; IMMIGRANT DEFENDERS LAW CENTER,

Plaintiffs,

v.

Kristi NOEM, in her official capacity as Secretary, Department of Homeland Security; Todd M. LYONS, in his official capacity as Acting Director, U.S. Immigration and Customs Enforcement; Rodney S. SCOTT, in his official capacity as Commissioner, U.S. Customs and Border Patrol; Michael W. BANKS, in his official capacity as Chief of U.S. Border Patrol; Kash PATEL, in his official capacity as Director, Federal Bureau of Investigation; Pam BONDI, in her official capacity as U.S. Attorney General; Ernesto SANTACRUZ JR., in his official capacity as Acting Field Office Director for Los Angeles, U.S. Immigration and Customs Enforcement; Eddy WANG, Special Agent in Charge for Los Angeles, Homeland Security Investigations, U.S. Immigration and Customs Enforcement; Gregory K. BOVINO, in his official capacity as Chief Patrol Agent for El Centro Sector of the U.S. Border Patrol; Jeffrey D. STALNAKER, in his official capacity as Acting Chief Patrol Agent, San Diego Sector of the U.S. Border Patrol; Akil DAVIS, in his official capacity as Assistant Director in Charge, Los Angeles Office, Federal Bureau of Investigation; Bilal A. ESSAYLI, in his official capacity as U.S. Attorney for the Central District of California,

Defendants.

Case No.: 2:25-cv-05605-MEMF-SP

**NOTICE OF MOTION AND MOTION TO INTERVENE; MEMORANDUM OF POINTS AND AUTHORITIES**

[Filed Concurrently: Declaration of E. Martin Estrada; [Proposed] Order]

Hearing Date: August 21, 2025
Hearing Time: 10:00 am

Judge: Hon. Maame Ewusi-Mensah Frimpong

-2-
NOTICE OF MOTION AND MOTION TO INTERVENE

<u>**NOTICE OF MOTION**</u>

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that, on August 21, 2025, at 10:00 am, or as soon thereafter as the matter may be heard in the First Street Courthouse, located at 350 West First Street, Courtroom 8B, Los Angeles, California, 90012, before the Honorable Maame Ewusi-Mensah Frimpong, Plaintiffs-Intervenors ("Intervenors") the City of Los Angeles, the County of Los Angeles, the City of Culver City, the City of Montebello, the City of Monterey Park, the City of Pasadena, the City of Pico Rivera, the City of Santa Monica, and the City of West Hollywood will apply to the Court for leave to intervene in the above-captioned lawsuit as a matter of right in accordance with Federal Rule of Civil Procedure 24(a)(2), or in the alternative, for an order allowing permissive intervention under Federal Rule of Civil Procedure 24(b)(1)(B) (the "Motion").

Intervenors are entitled to intervene as of right under Rule 24(a)(2) because (1) this Motion is timely, (2) Intervenors have a significantly protectable interest in this action, (3) the disposition of this action will as a practical matter impair or impede Intervenors' ability to protect that interest, and (4) Intervenors' interest may be inadequately represented by the other parties.

Permissive intervention also is warranted under Rule 24(b)(1)(B) because (1) Intervenors have an independent basis for jurisdiction, (2) Intervenors' Motion is timely, and (3) Plaintiffs' and Intervenors' claims share common questions of law or fact.

This Motion is based upon this Notice of Motion and Motion; the supporting Memorandum of Points and Authorities; the concurrently filed declaration of E. Martin Estrada ("Estrada Decl."); all documents and pleadings on file in this action; and such other oral and documentary evidence and hearing as the Court may consider prior to or at the hearing on this Motion.

NOTICE OF MOTION AND MOTION TO INTERVENE

Because this Motion is being made "in connection with" Plaintiffs' application under Fed. R. Civ. P. 65 for a temporary restraining order, the general meet-and-confer requirements set forth in Civil Local Rule 7-3 do not apply. *See* Civ. L. R. 7-3 (exempting motions made "in connection with . . . applications under F. R. Civ. P. 65 for temporary restraining orders" from meet-and-confer requirements). Counsel for Intervenors nevertheless met and conferred with counsel for all parties as soon as practicable before filing this Motion. On July 8, 2025, Counsel for Intervenors met and conferred with counsel for Defendants regarding this Motion. Estrada Decl. ¶ 20. Defendants indicated that they were unable to take a position on the Motion at this time. *Id.* Counsel for Intervenors also conferred with Plaintiffs' counsel on July 7 regarding the date and substance of this Motion. *Id.* Plaintiffs do not oppose this Motion. *Id.*

Intervenors respectfully request that the Court grant this Motion and allow Intervenors to submit their proposed Complaint in Intervention, attached hereto as **Exhibit A**.

-2-
NOTICE OF MOTION AND MOTION TO INTERVENE

DATED:  July 8, 2025                     Respectfully submitted,


                                         By:        /s/ E. Martin Estrada
                                                 E. MARTIN ESTRADA

                                                 MUNGER, TOLLES & OLSON LLP

                                                 *Attorney for Proposed Intervenors*
                                                 *Cities of Los Angeles, Culver City,*
                                                 *Montebello, Monterey Park, Pico Rivera,*
                                                 *Santa Monica, and West Hollywood*


                                         By:        /s/ Hydee Feldstein Soto
                                                 HYDEE FELDSTEIN SOTO
                                                 City Attorney

                                                 OFFICE OF THE LOS ANGELES
                                                 CITY ATTORNEY

                                                 *Attorney for Proposed Intervenor*
                                                 *City of Los Angeles*


                                         By:        /s/ Brigit Greeson Alvarez
                                                 BRIGIT GREESON ALVAREZ
                                                 Deputy County Counsel

                                                 OFFICE OF THE LOS ANGELES
                                                 COUNTY COUNSEL

                                                 *Attorney for Proposed Intervenor*
                                                 *County of Los Angeles*


                                         By:        /s/ Michele Beal Bagneris
                                                 MICHELE BEAL BAGNERIS
                                                 City Attorney

                                                 OFFICE OF THE CITY ATTORNEY OF
                                                 PASADENA

                                                 *Attorney for Proposed Intervenor*
                                                 *City of Pasadena*

-3-
NOTICE OF MOTION AND MOTION TO INTERVENE

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ............................................................................................. 1

II.  BACKGROUND .............................................................................................. 2

    A.  Federal Raids in the City of Los Angeles and Surrounding Areas ......... 2

    B.  The Impact of Defendants' Unconstitutional and Unprecedented Conduct on Intervenors ....................................................................... 3

    C.  Plaintiffs' Claims .................................................................................. 5

III.  ARGUMENT ................................................................................................. 5

    A.  Intervenors are Entitled to Intervene as of Right ................................. 6

        1.  This Motion to Intervene Is Timely .............................................. 7

        2.  Intervenors Have a Significant Protectable Interest in This Action ........................................................................................ 7

            (a)  The City of Los Angeles Has a Significantly Protectable Interest in the Lead Action ............................ 8

            (b)  The County of Los Angeles Has a Significantly Protectable Interest in the Lead Action .......................... 10

            (c)  The City of Culver City Has a Significantly Protectable Interest in the Lead Action .......................... 11

            (d)  The City of Monterey Park Has a Significantly Protectable Interest in the Lead Action .......................... 12

            (e)  The City of Montebello Has a Significantly Protectable Interest in the Lead Action .......................... 13

            (f)  The City of Pasadena Has a Significantly Protectable Interest in the Lead Action .......................... 13

            (g)  The City of Pico Rivera has a Significantly Protectable Interest in the Lead Action .......................... 14

            (h)  The City of Santa Monica Has a Significantly Protectable Interest in the Lead Action .......................... 15

            (i)  The City of West Hollywood Has a Significantly Protectable Interest in the Lead Action .......................... 16

        3.  A Judgment for Defendants May Impair Intervenors' Significantly Protectable Interests ............................................. 17

-i-

NOTICE OF MOTION AND MOTION TO INTERVENE

4.     Plaintiffs May Not Adequately Represent Intervenors' Interests .................................................................. 18

B.     In the Alternative, the Court Should Grant Permissive Intervention Under Fed. R. Civ. P. 24(b)(1) ........................................ 20

IV.     CONCLUSION ............................................................................. 21

NOTICE OF MOTION AND MOTION TO INTERVENE

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*Allied Concrete & Supply Co. v. Baker,*
904 F.3d 1053 (9th Cir. 2018) ................................................................. 6

*Arakaki v. Cayetano,*
324 F.3d 1078 (9th Cir. 2003) ............................................................ 6, 18

*Berger v. N.C. State Conf. of the NAACP,*
597 U.S. 179 (2022) ............................................................................... 18

*Blum v. Merrill Lynch Pierce Fenner & Smith, Inc.,*
712 F.3d 1349 (9th Cir. 2013) ............................................................... 20

*Californians for Safe & Competitive Dump Truck Transp. v.
Mendonca,*
152 F.3d 1184 (9th Cir. 1998) ............................................................... 19

*Citizens for Balanced Use v. Mont. Wilderness Ass'n,*
647 F.3d 893 (9th Cir. 2011) ............................................................. 7, 20

*City of Chicago v. Sessions,*
888 F.3d 272 (7th Cir. 2018) ................................................................. 17

*City of Oakland v. Lynch,*
798 F.3d 1159 (9th Cir. 2015) ................................................................. 9

*Greene v. United States,*
996 F.2d 973 (9th Cir. 1993) ................................................................... 7

*Kelley v. Johnson,*
425 U.S. 238 (1976) ................................................................................. 8

*Lockyer v. United States,*
450 F.3d 436, 442 (9th Cir. 2006) ......................................................... 17

*New York v. U.S. Immigr. & Customs Enf't,*
431 F. Supp. 3d 377 (S.D.N.Y. 2019) ..................................................... 9

*Scotts Valley Band of Pomo Indians of Sugar Bowl Rancheria v. United States*,
921 F.2d 924 (9th Cir. 1990) ...................................................................... 8, 9, 10, 19

*Sw. Ctr. for Biological Diversity v. Berg*,
268 F.3d 810 (9th Cir. 2001) ........................................................................ 6, 17, 18

*T-Mobile Ne. LLC v. Town of Barnstable*,
969 F.3d 33 (1st Cir. 2020) ................................................................................... 21

*Trbovich v. United Mine Workers of Am.*,
404 U.S. 528 (1972) ............................................................................................. 18

*United States ex rel. McGough v. Covington Techs. Co.*,
967 F.2d 1391 (9th Cir. 1992) ................................................................................ 6

*United States v. Alisal Water Corp.*,
370 F.3d 915 (9th Cir. 2004) .................................................................................. 7

*United States v. City of Los Angeles*,
288 F.3d 391 (9th Cir. 2002) ......................................................................... 6, 7, 8

*Washington v. U.S. Dep't of Homeland Sec.*
614 F. Supp. 3d 863 (W.D. Wash. 2020) ............................................................... 9

**FEDERAL STATUTES**

28 U.S.C. § 1331 ................................................................................................... 21

**RULES - OTHER**

Fed. R. Civ. P. 24 ........................................................................................... *passim*

**OTHER AUTHORITIES**

Angelique Brenes, *ICE agents detain mother in Pasadena in front of children without showing a warrant*, KTLA 5 (June 28, 2025) ........................... 2

Brittny Mejia and Rachel Uranga, *Raid at a Home Depot in Hollywood shatters an immigrant refuge*, Los Angeles Times (June 20, 2025) ..................... 4

Camilo Montoya-Galvez, *Trump Directs Immigration Authorities to Prioritize Deportations in Democratic-Run Cities*, CBS News (June 16, 2025) ............................................................................................................. 4

NOTICE OF MOTION AND MOTION TO INTERVENE

Coalition for Humane Immigrant Rights, Mission & History, https://www.chirla.org/who-we-are/about-us/mission-history/ (last visited July 8, 2025).................................................................................19

James Queally, *ICE Arrests at L.A. Courthouse Met with Alarm*, Los Angeles Times (June 25, 2025) .................................................................4

Jennifer Medina, *'I'm an American, Bro!': Latinos Report Raids in Which U.S. Citizenship Is Questioned*, New York Times (June 15, 2025) ...........................................................................................................11

Jesus Jiménez et al., *'Completely Disrupted': Fear Upends Life for Latinos in L.A.*, New York Times (June 30, 2025) ...............................4

John Gittelsohn, *ICE Raids Derail Los Angeles Economy as Workers Go Into Hiding,* Bloomberg (July 6, 2025) ..........................................9

Les Dunseith, *UCLA Study Finds Strong Support for LAPD's Community Policing Program*, UCLA Luskin Sch. Pub. Affs. (May 21, 2020) ...........................................................................................9

Nathan Solis and Richard Winton, *'Who are these people?' Masked immigration agents challenge local police, sow fear in L.A.*, Los Angeles Times (June 24, 2025) .................................................................2

Victor M. Gordo, *Pasadena Mayor: Trump's Immigration Raids Hurt Communities Like Mine*, Time (June 18, 2025) .................................14

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Plaintiffs-Intervenors ("Intervenors") the City of Los Angeles, the County of Los Angeles, the City of Culver City, the City of Montebello, the City of Monterey Park, the City of Pasadena, the City of Pico Rivera, the City of Santa Monica, and the City of West Hollywood have endured weeks of disruption, chaos, and financial harm as a direct result of the activities detailed in Plaintiffs' Lead Complaint and in the Proposed Complaint in Intervention filed concurrently with this Motion.

Armed and masked individuals, purporting to be federal agents, have conducted unprecedented and unconstitutional searches and seizures across the Southland.  As a direct result, Intervenors have been forced to divert critical law enforcement resources to respond to and address the unlawful activities and manage the subsequent fallout.  Moreover, because these federal agents often remain anonymous, residents regularly confuse them for local law enforcement, thus eroding the trust that local law enforcement agencies have spent decades building with local communities.  And Intervenors have lost important tax revenues as local business owners shutter their stores and fearful residents remain in their homes.

Intervenors have a clear and direct interest in stopping these unlawful federal immigration actions, actions that are entirely unlike the lawful immigration enforcement that has occurred in Intervenors' municipalities for decades.  These raids pose a grave threat to Intervenors' residents, operations, and ability to enforce the law.

Intervenors share Plaintiffs' interest in stopping Defendants' unconstitutional actions, but Intervenors also seek to protect their distinct municipal interests in maintaining law and order and preserving essential business tax revenue for the benefit of all their residents.  Intervenors are uniquely positioned to represent their own municipal interests in this lawsuit, something Plaintiffs are not able to do.  Moreover, their intervention causes no prejudice to the existing parties.  Thus,

-1-

NOTICE OF MOTION AND MOTION TO INTERVENE

Intervenors are entitled to intervene as a matter of right under Federal Rule of Civil Procedure 24(a)(2).

Alternatively, Intervenors' claims clearly share common questions of law and fact with Plaintiffs' Lead Complaint, warranting permissive intervention under Federal Rule of Civil Procedure 24(b)(1)(B).

## II.    BACKGROUND

### A.    Federal Raids in the City of Los Angeles and Surrounding Areas

In recent weeks, the world has watched Los Angeles and neighboring communities as masked federal agents have carried out unlawful, and increasingly aggressive, immigration raids, resulting in unconstitutional arrests and detention of people without probable cause to believe the individuals are in violation of any immigration law, and without probable cause to believe the individuals pose a flight risk. Oftentimes the only basis for detention or arrest is the individual's skin color.

These unlawful raids and systematic detentions and arrests have sparked terror and fear throughout the City of Los Angeles and neighboring communities. The agents "show up without uniforms. They show up completely masked. They refuse to give ID." Estrada Decl. Ex. A (Transcript of June 20, 2025 Press Conference of Los Angeles Mayor Karen Bass). Defendants launch these raids without notice to, or coordination with, local law enforcement. This illegal activity has forced Intervenors to devote critical resources to determine whether armed action taken against local residents is part of a federal raid—or part of a crime. Estrada Decl. Ex. B (Nathan Solis and Richard Winton, *'Who are these people?' Masked immigration agents challenge local police, sow fear in L.A.*, Los Angeles Times (June 24, 2025)); *id.* Ex. C at 5 (Alex Stone, *Los Angeles police responded to a kidnapping call. But instead found an ICE operation*, ABC News (June 26, 2025)) (local law enforcement expending resources to investigate a federal immigration arrest as a kidnapping and another as a hit and run); *id.* Ex. D (Angelique Brenes,

*ICE agents detain mother in Pasadena in front of children without showing a warrant*, KTLA 5 (June 28, 2025)).

These unlawful raids, detentions and arrests cause irreparable harm to Intervenors and their residents, and must be stopped.

**B.    The Impact of Defendants' Unconstitutional and Unprecedented Conduct on Intervenors**

Defendants' unwarranted and unlawful actions have severely impacted the ordinary functioning of Los Angeles communities, with serious consequences for local businesses and Intervenors' tax base.  These unconstitutional raids and related activities also have impaired Intervenors' ability to protect their residents through the most basic law enforcement.  Intervenors thus have a clear and direct interest in the issues and in the relief sought in Plaintiffs' Lead Complaint.

*First*, Defendants' illegal activities have disrupted Intervenors' operations, including vital law enforcement services.  Defendants' "immigration enforcement" conduct is nothing at all like ordinary immigration actions.  Raids are conducted without warrants, and residents are detained and arrested without any probable cause.  Local law enforcement is therefore left to "deal with the aftermath" of raids, "including protests and questions from residents about what exactly happened." Estrada Decl. Ex. B.  In addition, the relationships that Intervenors and local law enforcement agencies have built with local communities, including immigrant communities, have been directly undercut by these unlawful raids, especially when impacted residents confuse the unlawful conduct of Defendants' agents with conduct of local police officers.  *See, e.g.*, Estrada Decl. Ex. B. at 6 (describing how "[o]fficers investigating a recent burglary were mistaken for federal immigration agents" in Los Angeles).  And state prosecutors have reported "having to drop cases" because undocumented immigrant witnesses are afraid to appear in state criminal court, which Defendants are using as staging grounds for federal

immigration enforcement.  *Id.* Ex. E at 2 (James Queally, *ICE Arrests at L.A. Courthouse Met with Alarm*, Los Angeles Times (June 25, 2025)).

This appears to be exactly what Defendants intended.  The President announced on his social media platform that he was calling on federal immigration officials "to do all in their power" to effect "the single largest Mass Deportation Program in History" in "Democratic Power Center[s]" "such as Los Angeles." *Id.* Ex. F (Camilo Montoya-Galvez, *Trump Directs Immigration Authorities to Prioritize Deportations in Democratic-Run Cities*, CBS News (June 16, 2025)).  As DHS Secretary Kristi Noem has made clear, the purpose of these raids is to disrupt the ordinary functioning of the City of Los Angeles:  "We are not going away.  We are staying here to liberate this city from the socialist and burdensome leadership that this Governor Newsom and this [M]ayor [Bass] placed on this country and what they have tried to insert into this city." *Id.* Ex. G (Helen Jeong, *Kristi Noem blames Democratic officials for making ICE raids in LA harder*, NBC Los Angeles (June 12, 2025)).

*Second*, these unlawful federal activities are harming Intervenors' tax revenue.  Defendants' unconstitutional activity has hindered local businesses, as customers and business owners—including U.S. citizens—choose to stay home out of fear of being chased, detained or even arrested, simply because of the color of their skin.  *See, e.g.*, *id.* Ex. H (Brittny Mejia and Rachel Uranga, *Raid at a Home Depot in Hollywood shatters an immigrant refuge*, Los Angeles Times (June 20, 2025)); *id.* Ex. I (Jesus Jiménez et al., *'Completely Disrupted': Fear Upends Life for Latinos in L.A.*, New York Times (June 30, 2025) ("Many people are afraid of getting taken . . . for simply walking outside their house.")).

The federal government's de facto lockdown of parts of the Los Angeles region has badly harmed businesses.  As Los Angeles Mayor Karen Bass has explained, "[w]orkers . . . are too afraid to come into work, and customers . . . feel they can't go outside of their house." *Id.* Ex. A.  Businesses are therefore "empty"

NOTICE OF MOTION AND MOTION TO INTERVENE

and business owners are "suffering" and "describing the situation as worse than COVID." *Id.* Intervenors, in turn, lose important tax revenue from those businesses.

### C.    Plaintiffs' Claims

On June 20, 2025, Plaintiffs filed a lawsuit challenging Defendants' unlawful immigration raids (the "Lead Action"). Plaintiffs filed their original Petition for a Writ of Habeas Corpus and Complaint for Declaratory and Injunctive Relief on June 20. ECF No. 1. On July 2, Plaintiffs then filed their First Amended Petition and Complaint. ECF No. 16 (the "Lead Complaint"). In the Lead Complaint, Plaintiffs seek declaratory, injunctive, and monetary relief for numerous constitutional violations.

*First*, Plaintiffs allege that Defendants violated the Fourth Amendment and federal regulations by conducting warrantless arrests of individuals without probable cause that the individuals are in violation of any immigration law, and with no reasonable suspicion the individuals pose a flight risk. Plaintiffs allege Defendants do so without identifying themselves as immigration officers and without explanation for the detention or arrest. *See* Lead Complaint ¶¶ 64–69, 215–233.

*Second*, Plaintiffs allege that Defendants have denied them access to counsel and subjected them to inhumane conditions of confinement in violation of the Fifth Amendment's Due Process Clause and Federal regulations. *Id*. ¶¶ 73–95, 234–247. Plaintiffs also allege that Defendants have coerced voluntary departure agreements from individuals in federal custody without giving them access to counsel, and without securing a knowing and voluntary waiver of their right to a hearing, in violation of the Fifth Amendment. *See id.* ¶ 94.

### III.    ARGUMENT

Intervention in a federal action is governed by Federal Rule of Civil Procedure 24. A party may intervene as of right under Rule 24(a), or permissively under Rule 24(b). In determining whether the requirements for intervention are met,

the Court must accept as true all nonconclusory allegations submitted in support of the motion to intervene. *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 820 (9th Cir. 2001).

Intervenors meet the requirements for both intervention as of right under Rule 24(a) and permissive intervention under Rule 24(b).

### A. Intervenors are Entitled to Intervene as of Right

Rule 24(a)(1) permits an applicant to intervene as of right based on a "four-part test": (1) the motion must be timely; (2) the applicant must claim a "significantly protectable interest" in the action; (3) the "disposition of the action must as a practical matter impair or impede the applicant's ability to protect that interest"; and (4) the "applicant's interest may be inadequately represented by the other parties." *Allied Concrete & Supply Co. v. Baker*, 904 F.3d 1053, 1067 (9th Cir. 2018); Fed. R. Civ. P. 24(a)(1). If the applicant makes the required showing, the court must grant the motion to intervene. Fed. R. Civ. P. 24(a).

Courts assessing a motion to intervene as of right generally construe the Rule "broadly in favor of [the] proposed intervenors." *United States v. City of Los Angeles*, 288 F.3d 391, 397 (9th Cir. 2002) (citing *United States ex rel. McGough v. Covington Techs. Co.*, 967 F.2d 1391, 1394 (9th Cir. 1992)); *Berg*, 268 F.3d at 818 (courts "construe Rule 24(a) liberally in favor of potential intervenors"); *Arakaki v. Cayetano,* 324 F.3d 1078, 1083 (9th Cir. 2003) (Rule 24 "traditionally receives liberal construction in favor of applicants for intervention"). This is because a "liberal policy in favor of intervention serves both efficient resolution of issues and broadened access to the courts." *City of Los Angeles*, 288 F.3d at 397–98 (quotation omitted).

Under these well-established guidelines, Intervenors are entitled to intervene as of right under Rule 24(a)(1).

### 1.    This Motion to Intervene Is Timely

Whether a motion to intervene is timely is determined by three factors: (1) the stage of the proceedings; (2) prejudice to other parties; and (3) the reason for and length of any delay.  *United States v. Alisal Water Corp.*, 370 F.3d 915, 921–23 (9th Cir. 2004).

Intervenors are filing this motion to intervene just three court days after Plaintiffs filed their Lead Complaint.  *See* Lead Complaint (filed July 2, 2025).  Because Intervenors filed their Motion "at an early stage of the proceedings," the parties will suffer no prejudice "from the grant of intervention at that early stage," and "intervention [will] not cause disruption or delay in the proceedings."  *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011) (motion to intervene filed "less than three months after the complaint was filed" was timely).  Thus, Intervenors' motion is timely.

### 2.    Intervenors Have a Significant Protectable Interest in This Action

Intervenors have a "significant protectable interest" in this lawsuit sufficient to merit intervention.  *City of Los Angeles*, 288 F.3d at 397 (quotation omitted).

As the Ninth Circuit recognized:  "An applicant has a 'significant protectable interest' in an action if (1) it asserts an interest that is protected under some law, and (2) there is a 'relationship' between its legally protected interest and the plaintiff's claims."  *Id.* at 398.  The relationship requirement is met "if the resolution of the plaintiff's claims actually will affect the applicant."  *Id.*  Importantly, "[t]he 'interest' test is not a clear-cut or bright-line rule, because [n]o specific legal or equitable interest need be established."  *Id.* (quotation omitted); *see Greene v. United States*, 996 F.2d 973, 976 (9th Cir. 1993) (same).  Instead, "the 'interest' test directs courts to make a practical, threshold inquiry, and is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons

as is compatible with efficiency and due process." *City of Los Angeles*, 288 F.3d at 398 (quotation omitted).  Intervenors meet those requirements here.

        *(a)     The City of Los Angeles Has a Significantly Protectable Interest in the Lead Action*

Defendants' ongoing unlawful actions both improperly intrude on the City of Los Angeles' ability to maintain law and order and impair the City's tax revenues.

*First*, Defendants' unlawful searches and seizures are frustrating the City's ability to maintain law and order and keep Angelenos safe.  The Ninth Circuit has recognized that a municipality's interest in enforcing "health and safety regulations" supports intervention as of right.  *See Scotts Valley Band of Pomo Indians of Sugar Bowl Rancheria v. United States*, 921 F.2d 924, 928 (9th Cir. 1990) (reversing district court's denial of city's motion to intervene as of right).  The City's basis for intervention is even stronger here, as Defendants' violations of federal law threaten the "safety of persons and property" in Los Angeles—a "core" responsibility "unquestionably" entrusted to the City's police power.  *Kelley v. Johnson*, 425 U.S. 238, 247 (1976).  Defendants' unlawful policies are striking "terror" across Los Angeles, as unidentified federal agents sideline local law enforcement to invade homes, businesses, schools, churches, workplaces, hospitals, and courthouses, and indiscriminately stop and detain Los Angeles residents to determine their immigration status.  Lead Compl. ¶¶ 2–3, 36–49, 97, 149; *see* Estrada Decl. Ex. A (Mayor Bass describing "the fear and the terror that [the raids have] created in our city, when you have cars driving around, people jumping out of those cars with guns and rifles and pulling people off the street").

As a result of Defendants' actions, City law enforcement is forced to divert limited resources to determine whether armed individuals exiting unmarked vehicles are masked, unidentified federal agents—or masked, unidentified criminals.  *See* Estrada Decl. Ex. B at 2 (describing an incident where "a man stepped out of his unmarked vehicle at an intersection, unholstered his pistol and aimed it at a group of

pedestrians," leaving local law enforcement in the aftermath to "determine that to the best of [their] estimation he was an ICE agent"). And when the federal agents are gone, City police are left to deal with protests and fractured trust from Angelenos, threatening decades of progress gained through longstanding community-policing efforts. *See id.* at 1 (explaining that "[p]olice have little or no insight into where the federal enforcement actions are taking place but often have to deal with the aftermath, including protests and questions from residents about what exactly happened").[1] The City has a "significant[] protectable interest" in defending its ability to police itself. *See Scotts Valley*, 921 F.2d at 927; *see also Washington v. U.S. Dep't of Homeland Sec.* 614 F. Supp. 3d 863, 881 (W.D. Wash. 2020) (recognizing claim for ICE's "undu[e] interfere[nce] with [the states'] core sovereign judicial and police functions in violation of the rights reserved to [the states] by the Constitution"); *New York v. U.S. Immigr. & Customs Enf't*, 431 F. Supp. 3d 377, 394 (S.D.N.Y. 2019) (same).

*Second*, Defendants' actions threaten the City's tax revenue. *See Scotts Valley*, 921 F.2d at 927–28 (threat of "los[t] tax revenue . . . establish[ed] a protectable interest" supporting intervention); *cf. City of Oakland v. Lynch*, 798 F.3d 1159, 1164 (9th Cir. 2015) (an "expected loss of tax revenue can constitute a sufficient injury" to confer Article III standing). Defendants' unlawful immigration raids have devastated community businesses. *See* Estrada Decl. Ex. K (John Gittelsohn, *ICE Raids Derail Los Angeles Economy as Workers Go Into Hiding*, Bloomberg (July 6, 2025) ("[b]usinesses have shuttered" as a result of federal immigration raids)). As Mayor Bass put it, businesses are "empty" because workers

---

[1] *See generally* Estrada Decl. Ex. J (Les Dunseith, *UCLA Study Finds Strong Support for LAPD's Community Policing Program*, UCLA Luskin Sch. Pub. Affs. (May 21, 2020)).

NOTICE OF MOTION AND MOTION TO INTERVENE

are "too afraid to come into work" and customers "feel they can't go outside of their house." Estrada Decl. Ex. A.

The damage to these businesses directly harms the City's tax revenues. In the past two years, business taxes made up approximately 6.5% of the City's annual revenue budget.[2] Those taxes are generally based on gross receipts.[3] Empty businesses do not generate gross receipts—and thus do not pay business taxes to the City. The ongoing harm to the City's tax revenue is a further protectable interest warranting intervention. *See Scotts Valley*, 921 F.2d at 927–28.

> (b)    *The County of Los Angeles Has a Significantly Protectable Interest in the Lead Action*

Since June 7, 2025, federal immigration agents have conducted frequent, large-scale raids across Los Angeles County in public parks and streets, hospitals, private homes, businesses, swap meets, parking lots, and in front of courthouses, among a multitude of other locations that impact virtually every facet of life for County residents.

Video footage and eyewitness accounts reveal that federal immigration agents typically have not shown judicial or even administrative warrants when conducting their operations. Some of the individuals detained, questioned, and arrested in these operations are U.S. citizens or hold valid immigration status; agents presumably did not have reasonable suspicion or probable cause to suspect immigration violations in at least these cases, and perhaps even in many cases of those without legal status.

---

[2] *Compare* Estrada Decl. Ex. L (showing the "Business Tax" revenue source for 2024–2025 was $837.06 million, or "6.53% of Revenue Budget") *with id.* Ex. M (showing the "Business Tax" revenue source for 2023–2024 was $847.20 million, or "6.44% of Revenue Budget").

[3] Estrada Decl. Ex. N (City of Los Angeles Office of Finance webpage entitled "About the Business Tax" explaining that "[m]ost business taxes are based on gross receipts. For those Business Tax Classifications, the tax rate is a specified amount per $1,000 of taxable gross receipts for each tax classification.").

-10-

One such encounter, which was shared in social media, showed an ICE agent repeatedly asking a twenty-nine-year-old Hispanic man, who is a U.S. citizen: "What hospital were you born at?" while detaining him.  *See* Estrada Decl. Ex. O (Jennifer Medina, *'I'm an American, Bro!': Latinos Report Raids in Which U.S. Citizenship Is Questioned*, New York Times (June 15, 2025)).  Video footage and eyewitness accounts also indicate that federal immigration agents often wear masks and plainclothes and do not identify themselves during these raids, heightening fear and tension among County residents who are investigated or detained, as well as bystanders and those who hear of the raids through the media accounts, word of mouth, and social media posts.  *Id.*

The masked, unidentified federal agents have created such a climate of fear, mistrust, and suspicion that County employees ranging from Sheriff's Department deputies to social workers have been mistaken for federal agents and confronted with vandalism of their vehicles, accusations, harassment, and threats, as well as non-cooperation.

Immigration raids in Los Angeles County have occurred at a clothing wholesaler where individuals were shopping, at a taco stand, and on County streets.  Many immigration raids have been recorded and shared on social media, heightening the fear in Latino communities in particular of participating in regular day-to-day activities.  *See id.* Ex. I.  As a result, food vendors, retailers, and even historic landmarks and tourist sites have seen decreases in business.  Some residents no longer shop at corner stores and stay holed up in their homes.

> (c) *The City of Culver City Has a Significantly Protectable Interest in the Lead Action*

Immigration raids carried out by masked individuals who lack arrest warrants have occurred throughout Culver City since late May 2025.  As a result of federal agents' raids—many of which involve masked agents in tactical gear without visible identification in unmarked vehicles—Culver City has had to divert its limited

-11-

NOTICE OF MOTION AND MOTION TO INTERVENE

resources to addressing community safety concerns, including continuously monitoring suspected federal enforcement activity in an attempt to confirm the identity and legitimacy of individuals claiming to act as federal agents.

Defendants' unlawful immigration enforcement activities also have had a detrimental impact on Culver City's tax revenues.  For example, the week of June 23, 2025 was the first week in 2025 where visits to the Culver City Westfield Mall were down all seven days of the week, across all hours of the day.  This kind of harm to Culver City's businesses has, in turn, decreased Culver City's business tax revenues.  Defendants' unlawfully conducted immigration raids continue to cause irreparable injuries to Culver City's ability to maintain law and order and its ability to obtain crucial business tax revenue.  Thus, Culver City has a significantly protectable interest in the Lead Action.

*(d)    The City of Monterey Park Has a Significantly Protectable Interest in the Lead Action*

Defendants' unlawful immigration activities within the Los Angeles region have cultivated a culture of fear and distrust within the Monterey Park community.  Residents of immigrant communities have expressed fear due to reports of masked, unidentified individuals (allegedly federal immigration agents or vigilantes) detaining people without due process.  Even U.S. citizens fear being mistaken for undocumented immigrants and unlawfully detained.  Monterey Park residents have thus demanded that the Monterey Park Police Department take proactive measures to verify the identity of purported federal agents to ensure public safety.  In response, Monterey Park has expended public resources to educate its residents on their rights, and to protect its residents during Defendants' illegal activities.  Those efforts interfere with Monterey Park's role in protecting the public health, safety, and well-being of its residents.

Defendants' unconstitutional activities also have been detrimental to the relationship of trust, respect, and open communication that Monterey Park officials

NOTICE OF MOTION AND MOTION TO INTERVENE

have developed and count on with their residents, and have thus undermined local law enforcement efforts. The City of Monterey Park therefore has a significantly protectable interest in the Lead Action.

(e)    *The City of Montebello Has a Significantly Protectable Interest in the Lead Action*

Unlawful immigration enforcement activities have occurred at numerous locations throughout Montebello. On June 13, 2025, for example, federal immigration agents violently and unlawfully arrested a United States citizen at his tow truck place of employment in the City.

There have been numerous federal immigration actions throughout Montebello at various business and residential locations within the city. Businesses are shutting down because of these federal immigration activities. Defendants' actions have spurred protests that have impacted both businesses and Montebello Police Department resources. Defendants' federal immigration enforcement has spread fear, confusion, and distress across the Montebello community. Montebello residents, even those who have lived in the city for decades, feel unsafe going outside to engage in everyday activities, such as commuting to work, taking their children to school, and attending community events due to concerns that they could be arbitrarily confronted and assaulted by federal agents.

(f)    *The City of Pasadena Has a Significantly Protectable Interest in the Lead Action*

Defendants' unlawful immigration activities have spread fear, confusion, and distress among Pasadena residents, including those who have lived in the city for decades. Residents feel unsafe going outside to engage in everyday activities, such as commuting to work, taking their children to school, and attending community events, as they fear they could be arbitrarily assaulted, arrested, or detained by federal agents, regardless of their immigration status.

Defendants' unlawful enforcement efforts have forced Pasadena to divert its limited police resources to address public safety issues that would not have arisen

-13-

absent these enforcement practices.  For example, plainclothes federal agents jumped out of unmarked vehicles and attempted to arrest a Pasadena resident in front of her children outside a Pasadena apartment building on June 28, 2025, prompting a 911 call to Pasadena Police about a suspected kidnapping.  Estrada Decl. Ex. D.  Defendants' activities have also led to declines in public participation in Pasadena's community programs, such as youth summer education and, in other cases, have forced Pasadena to cancel swim lessons and other community programs altogether due to public safety concerns.

Importantly, Defendants' illegal raids, detentions and arrests also have resulted in a marked decline in businesses' sales revenue and a corresponding decrease in Pasadena's tax revenue, as customers stay home, and local businesses remain closed due to residents' fear of being the next target of Defendants' unlawful immigration raids.  *Id.* Ex. P (Victor M. Gordo, *Pasadena Mayor: Trump's Immigration Raids Hurt Communities Like Mine*, Time (June 18, 2025)).

(g)    *The City of Pico Rivera has a Significantly Protectable Interest in the Lead Action*

Unlawful federal immigration enforcement activities have occurred at numerous locations throughout Pico Rivera, including the violent and unwarranted arrest of U.S. citizen Adrian Martinez on June 17, 2025 in a Walmart parking lot. This incident led to multiple community protests, including rallies outside of Pico Rivera City Hall.  Another significant incident occurred on June 17, 2025 at Ruben Salazar High School, where federal agents trespassed and publicly urinated on El Rancho Unified School District property, near locations where minor children were located.

Defendants' immigration enforcement actions have spread fear, confusion, and distress across the Pico Rivera community.  Pico Rivera residents, even those who have lived in the city for decades, feel unsafe going outside to engage in everyday activities, such as commuting to work, taking their children to school, and

-14-
NOTICE OF MOTION AND MOTION TO INTERVENE

attending community events due to concerns that they could be arbitrarily confronted and assaulted by federal agents.

Defendants' unlawful actions have forced Pico Rivera to divert its limited police resources to address public safety issues that would not have arisen absent these enforcement practices.  Federal immigration enforcement also has harmed Pico Rivera businesses, causing declines in businesses' sales revenue and a corresponding decrease in essential tax revenues on which Pico Rivera depends to fund its municipal operations.  The City of Pico Rivera thus has a significantly protectable interest in the Lead Action.

> (h)    *The City of Santa Monica Has a Significantly Protectable Interest in the Lead Action*

Defendants' unwarranted and aggressive immigration enforcement activity has caused a significant decline in Santa Monica's tourism revenue, as a marked decrease in international arrivals has resulted in substantial reductions in hotel occupancy rates and overall spending.

At the same time, members of local immigrant communities have been staying home in large numbers out of fear of being caught up in an unlawful immigration raid, with many community members failing to report to work or participate in public events.  Since many of Santa Monica's businesses rely on local residents' labor, including hotels, restaurants, sidewalk vendors, farmers' markets, car washes, and construction businesses, the resulting staffing shortages have affected business revenue, employment, and overall economic growth.  Santa Monica, in turn, loses critical transient occupancy and sales tax revenue it depends on to meet its municipal obligations.

Additionally, victims of misdemeanor crimes that have occurred within the City have been reluctant to cooperate with prosecutors, requiring the Santa Monica City Attorney's Office to go to extra lengths to secure witnesses' appearance in

-15-
NOTICE OF MOTION AND MOTION TO INTERVENE

court.  Local residents' fear of being caught up in Defendants' unlawful immigration raids is thus impacting the City's ability to obtain just outcomes for crime victims.

The City of Santa Monica thus has a significantly protectable interest in the Lead Action.

> (i)    *The City of West Hollywood Has a Significantly Protectable Interest in the Lead Action*

Defendants' unlawful immigration activities in West Hollywood, including an apparently warrantless July 4 raid at a West Hollywood car wash, are interfering with the City's ability to protect the public health, safety, and well-being of its residents.

Defendants' actions have diverted West Hollywood's law enforcement resources and obstructed the City's ability to carry out key public safety objectives. West Hollywood contracts with the Los Angeles County Sheriff's Department for law enforcement services.  In early June, the County Sheriff's Department was required to divert significant resources to address protests in nearby cities resulting from Defendants' unlawful actions, forcing the West Hollywood City Council to reschedule the discussion of a public safety issue that was of critical importance to the community.  Defendants' actions also resulted in protests in West Hollywood Park on June 14, 2025, reportedly attended by approximately 3,000 people, in response to which the City and Sheriff's Department had to expend further resources to maintain safety and order.

Taxpaying businesses in West Hollywood also have suffered economic harm due to Defendants' immigration enforcement activities.  Individuals who fear Defendants' immigration raids are choosing to remain at home, resulting in fewer open businesses and fewer people patronizing the businesses that remain open.  In addition, West Hollywood is a hospitality destination, and local hotels have reported that visitor rates are down overall for the international visitors who used to frequent West Hollywood in the summer.  As a result of the City's hospitality-based

NOTICE OF MOTION AND MOTION TO INTERVENE

economy, West Hollywood businesses are particularly vulnerable to the chilling effects Defendants' actions have not only on visits to hotels, but also on the bars, restaurants, and nightclubs that visitors often frequent when staying in the City.

Defendants' unlawful activities also are resulting in the unnecessary expenditure of West Hollywood's public resources. In response to community concerns, West Hollywood has expended public resources to provide "Know Your Rights" information to residents at City facilities and online. West Hollywood also is engaging in efforts to expand outreach and make information more accessible at public events and locations, develop clear protocols for local Sheriffs' involvement during federal immigration-enforcement activities, and provide assurances that local law enforcement stands with and protects all residents, regardless of immigration status. The City of West Hollywood thus has a significantly protectable interest in the Lead Action.

### 3. A Judgment for Defendants May Impair Intervenors' Significantly Protectable Interests

After finding a proposed intervenor has a significant protectable interest, courts "have little difficulty concluding" that the disposition of the case "may, as a practical matter, affect it." *See, e.g.*, *Lockyer v. United States*, 450 F.3d 436, 442 (9th Cir. 2006); *see Berg*, 268 F.3d at 822 (if a proposed intervenor "would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene") (citation omitted).

There can be no doubt that a judgment permitting Defendants to continue carrying out sweeping unlawful immigration raids will impair Intervenors' respective interests. Defendants' actions will further damage Intervenors' ability to maintain law and order and erode the relationships law enforcement has spent years building with local communities. *Cf. City of Chicago v. Sessions*, 888 F.3d 272, 280 (7th Cir. 2018), *reh'g en banc granted in part, opinion vacated in part by City of Chicago v. Sessions*, 2018 WL 4268817 (7th Cir. June 4, 2018), *vacated*, 2018 WL

-17-
NOTICE OF MOTION AND MOTION TO INTERVENE

4268814 (7th Cir. Aug. 10, 2018) (local law enforcement's inability to "obtain . . . victim and witness cooperation" from "persons who are here unlawfully . . . could both hinder law enforcement efforts and allow criminals to freely target communities with a large undocumented population").  At the same time, Defendants' actions would continue hollowing out local business—creating a situation "worse than COVID"—and depriving Intervenors of tax revenues.  Estrada Decl. Ex. A.  Because Intervenors "would be substantially affected in a practical sense by the determination" in this case, they are entitled to intervene as of right. *See Berg*, 268 F.3d at 822 (citation omitted).

**4.    Plaintiffs May Not Adequately Represent Intervenors' Interests**

Intervenors unquestionably meet their "minimal" burden to show that, even though Plaintiffs and Intervenors have some interests in common, Plaintiffs "may be" inadequate representatives of Intervenors' interests.  *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972); *see Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 197 (2022) ("Where 'the absentee's interest is similar to, but not identical with, that of one of the parties,' that normally is not enough to trigger a presumption of adequate representation." (citation omitted)).

Courts evaluating adequacy of representation examine three factors: (1) "whether the interest of a present party is such that it will undoubtedly make all of a proposed intervenor's arguments"; (2) "whether the present party is capable and willing to make such arguments"; and (3) "whether a proposed intervenor would offer any necessary elements to the proceeding that other parties would neglect." *Arakaki*, 324 F.3d at 1086.  It is sufficient for a proposed intervenor to show that because of a "difference in interests, it is likely that [the existing parties] will not advance the same arguments as Applicants." *Berg*, 268 F.3d at 824.

While Plaintiffs and Intervenors share an interest in stopping Defendants' unconstitutional actions, Intervenors also have distinct interests in maintaining law

-18-
NOTICE OF MOTION AND MOTION TO INTERVENE

and order and preserving essential business tax revenues for the benefit of their residents.  None of the current Plaintiffs represent those interests.[4]  The gap between Intervenors' broad municipal interests and Plaintiffs' "more narrow" ones is sufficient to establish the requisite inadequacy of representation for intervention as of right.  *See Californians for Safe & Competitive Dump Truck Transp. v. Mendonca*, 152 F.3d 1184, 1190 (9th Cir. 1998) (affirming grant of union's motion to intervene in federal preemption action and holding that "because the employment interests of [the union]'s members were potentially more narrow and parochial than the interests of the public at large, [the union] demonstrated that the representation of its interests by the named [governmental] defendants-appellees may have been inadequate"); *see also Scotts Valley*, 921 F.2d at 926–27 (reversing district court's denial of city's motion to intervene as of right where remaining parties were "not in a position adequately to protect any of the City's municipal interests" because "they do not directly share the City's municipal interest").  Because Plaintiffs are not in a position to represent Intervenors' distinct interests, the Court should grant Intervenors the right to intervene and represent their interests themselves.

---

[4] Plaintiff Immigrant Defenders' mission is to "defend[] immigrant communities against injustices in the immigration system."  Estrada Decl. Ex. K (Immigrant Defenders' 2023–2026 Strategic Plan).  Plaintiff The Coalition for Humane Immigrant Rights' stated mission is to "achieve a just society, fully inclusive of immigrants."  *Id.* Ex. L (The Coalition for Humane Immigrant Rights, Mission & History, https://www.chirla.org/who-we-are/about-us/mission-history/ (last visited July 8, 2025)).  Plaintiff Los Angeles Worker Center Network exists to "address injustices faced by low-wage workers in the greater Los Angeles area."  Lead Compl. ¶ 17.  Plaintiff United Farm Workers "aims to improve the lives, wages, and working conditions of agricultural workers and their families."  Lead Compl. ¶ 18.  The remaining Plaintiffs are individuals who were victims of Defendants' unlawful immigration raids.  Lead Compl. ¶¶ 12–16.

NOTICE OF MOTION AND MOTION TO INTERVENE

**B.** **In the Alternative, the Court Should Grant Permissive Intervention Under Fed. R. Civ. P. 24(b)(1)**

Should the Court determine Intervenors do not meet the requirements to intervene as of right, the Court should exercise its discretion and grant intervention under Fed. R. Civ. P. 24(b)(1).  A party may be granted permissive intervention under Rule 24(b)(1) when it: (1) brings a timely motion; (2) has a claim or defense that shares a common question of law or fact with the main action; and (3) has an independent ground for jurisdiction.  *Blum v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 712 F.3d 1349, 1353 (9th Cir. 2013).  In determining whether to exercise its discretion to grant permissive intervention, the Court considers "whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights."  Fed. R. Civ. P. 24(b)(3).  Intervenors meet the requirements for permissive intervention.

*First*, this Motion is timely.  As explained in Section III.A.1 *supra*, Intervenors moved to intervene just three court days after Plaintiffs filed their Lead Complaint.  *See* Lead Complaint (filed July 2, 2025).  Because Intervenors filed their Motion "at an early stage of the proceedings," the parties will suffer no prejudice "from the grant of intervention at that early stage," and "intervention [will] not cause disruption or delay in the proceedings."  *Mont. Wilderness Ass'n*, 647 F.3d at 897.

*Second*, Plaintiffs' and Intervenors' claims involve common questions of fact and law.  Both sets of claims arise from the unlawful federal raids in Los Angeles and the surrounding area.  Common questions of fact include, for example, Defendants' (1) arrests of individuals in Intervenors' respective jurisdictions, and whether these arrests occurred without warrants and without probable cause of flight risk; (2) detentions of Intervenors' residents, and whether federal agents had reasonable suspicion supporting these detentions; and (3) detainment conditions of Intervenors' residents, including Defendants' failure to explain to those in custody

their rights.  Whether the factual circumstances amount to a violation of Constitutional rights is the critical common question of law.

*Third*, this Court has federal question jurisdiction under 28 U.S.C. § 1331 over those claims in Intervenors' Proposed Complaint in Intervention that are different from the claims in the Lead Complaint.

Without question, should the Court conclude that Intervenors are not entitled to intervene as a matter of right, the Court should nonetheless exercise its discretion in favor of permissive intervention.  *See* Fed. R. Civ. P. 24(b).  As the entities responsible for upholding law and order in their respective municipalities, and administering key municipal operations, Intervenors offer valuable perspectives on how Defendants' actions affect both the local government and the local community. And intervention should be permitted when, as here, the proposed intervenors' "input is likely to make a significant and useful contribution to the development of the underlying factual and legal issues."  6 James Wm. Moore et al. *Moore's Federal Practice* § 24.10 (2025); *see T-Mobile Ne. LLC v. Town of Barnstable*, 969 F.3d 33, 41 (1st Cir. 2020) ("[A] district court mulling permissive intervention is free to consider whether the applicants may be helpful in fully developing the case." (cleaned up)).

## IV.    CONCLUSION

For the foregoing reasons, the City of Los Angeles, the County of Los Angeles, and the Cities of Culver City, Montebello, Monterey Park, Pasadena, Pico Rivera, Santa Monica, and West Hollywood respectfully request that the Court grant their Motion to Intervene and file the Proposed Complaint in Intervention attached as Exhibit A.

NOTICE OF MOTION AND MOTION TO INTERVENE

DATED:  July 8, 2025

Respectfully submitted,

By:  ___/s/ E. Martin Estrada___
E. MARTIN ESTRADA

MUNGER, TOLLES & OLSON LLP

*Attorney for Proposed Intervenors
Cities of Los Angeles, Culver City,
Montebello, Monterey Park, Pico Rivera,
Santa Monica, and West Hollywood*

By:  ___/s/ Hydee Feldstein Soto___
HYDEE FELDSTEIN SOTO
City Attorney

OFFICE OF THE LOS ANGELES
CITY ATTORNEY

*Attorney for Proposed Intervenor
City of Los Angeles*

By:  ___/s/ Brigit Greeson Alvarez___
BRIGIT GREESON ALVAREZ
Deputy County Counsel

OFFICE OF THE LOS ANGELES
COUNTY COUNSEL

*Attorney for Proposed Intervenor
County of Los Angeles*

By:  ___/s/ Michele Beal Bagneris___
MICHELE BEAL BAGNERIS
City Attorney

OFFICE OF THE CITY ATTORNEY OF
PASADENA

*Attorney for Proposed Intervenor
City of Pasadena*

-22-
NOTICE OF MOTION AND MOTION TO INTERVENE

# **ATTESTATION**

Pursuant to Local Rule 5-4.3.4(a)(2)(i), the filer attests that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

DATED:  July 8, 2025

By:   */s/ E. Martin Estrada*
    E. MARTIN ESTRADA

    MUNGER, TOLLES & OLSON LLP

    *Attorney for Proposed Intervenors Cities of Los Angeles, Culver City, Montebello, Monterey Park, Pico Rivera, Santa Monica, and West Hollywood*

NOTICE OF MOTION AND MOTION TO INTERVENE

## LOCAL RULE 11-6.2 CERTIFICATION

The undersigned, counsel of record for the Cities of Los Angeles, Culver City, Montebello, Monterey Park, Pico Rivera, Santa Monica, and West Hollywood, certifies that this brief contains 6,422 words, which complies with the word limit of L.R. 11-6.2.

DATED: July 8, 2025

By: _____ */s/ E. Martin Estrada* _____
E. MARTIN ESTRADA

MUNGER, TOLLES & OLSON LLP

*Attorney for Proposed Intervenors*
*Cities of Los Angeles, Culver City,*
*Montebello, Monterey Park, Pico Rivera,*
*Santa Monica, and West Hollywood*

-24-
NOTICE OF MOTION AND MOTION TO INTERVENE