**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Pedro VASQUEZ PERDOMO, *et al.*<br><br>   Plaintiffs,<br><br>   v.<br><br>Kristi NOEM, in her official capacity as Secretary, Department of Homeland Security, *et al.*<br><br>   Defendants. | Case No.: 2:25-cv-05605-MEMF-SP<br><br>**DECLARATION OF NICOLAS THOMPSON-LLERAS**<br><br><br>Hon. Maame Ewusi-Mensah Frimpong |

I, Nicolas Thompson-Lleras, make the following supplemental statements on behalf of myself and the Coalition for Humane Immigrant Rights. I declare under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.

1.      I incorporate by reference my previous declaration submitted to this Court on July 2, 2025, attached as Exhibit 10 in support of Plaintiffs' Motion for a Temporary Restraining Order.

2.      I have read over Defendants' Opposition to *Ex Parte* Application for Temporary Restraining Order and Order to Show Cause. On page 7, Defendants state that they were forced to restrict access to detainees at B-18 because "of the protests" in order to "provide for the safety of detainees and federal employees." Page 7, Line 4-6.

3.      There were no protests at 8:30 AM on June 7, 2025, when we arrived at B-18 with CHIRLA members, family members of the detainees, and other attorneys seeking to provide Know Your Rights information and consultations.

4.      As stated previously, on the morning of June 7, 2025, detainees were taken in white unmarked vans.  Defendants state that these were "unknown van drivers."  Opp. 4, 19–22. These drivers could *only* have been federal immigration employees, as *only* federal immigration employees are in charge of transporting detainees. At one point, I was directed by a Bureau of Prisons official (who explained he had been detailed to building protection) to stand back a certain distance from the side of the loading area as it was restricted space.

If I was denied access to a certain area on the *outside* of the locked gate, it's implausible that the drivers *inside* of both that denied area and the gate were unknowns.  In fact, it would be a shocking breach of Defendants' own apparent security protocol if unidentified individuals were operating detainee transport vans behind a clearly demarcated security barrier.

5.      Defendants do not state that they made any effort to identify the van drivers, obtain an explanation for the loud blaring of van horns to drown out our calling out of know your rights information about access to counsel, or hold these drivers accountable for their actions. No federal employee approached the vans to ask the drivers to stop blaring their horns. No federal employee provided us with any information about why the drivers sought to drown out our notification to the detainees in the van.

6.      No federal employee then or anytime thereafter provided us with the names of the detainees in the vans. To my knowledge, the detainees were never informed that there were attorneys, attorney representatives, and family members at B-18 seeking to provide legal counsel.

7.      There was no legitimate reason to remove people from B-18 at that point. June 6, 2025, was the first time protests took place over immigration enforcement in Los Angeles.[1] While there had been protests the night before, there were none at or near B-18 on the morning of Saturday, June 7. In fact, the protests on June 7, 2025 were in Paramount—"a  small city about 20 miles south of downtown Los Angeles."[2] The protests only spread downtown later in the afternoon that day.[3] This fact is omitted in Defendants' papers.

8.      Detainees, their family, and prospective counsel were not advised that

---

[1] *Maps and Timeline of the L.A. Immigration Protests and the Federal Response*, N.Y. Times, https://www.nytimes.com/interactive/2025/06/08/us/la-immigration-protests-photos-map.html (last updated June 12, 2025).

[2] *Id.*

[3] *Id.*

detainees were being moved on June 7, 2025. Instead, as I noted previously, officers posted a sign on the door saying "ATTY.//FAMILY//VISIT//TEMPORARY CANCELLED TODAY//THANK YOU." No officer provided any further information or explanation. No officer told family or counsel where the detainees were being taken, if the detainees would be back, or if the detainees knew we were there. Instead, as I have noted, the officers loudly blared their horns.

### Operations at B-18 Have Continued to Frustrate and Deny
### Access to Counsel Since June 24, 2024

9.    The problems I outlined in my initial declaration persist at B-18.

10.    For example, on July 3, 2025, I interviewed potential client Julien Riveros, who is being detained at Adelanto. Mr. Riveros told me he was captured by ICE on June 5, 2025, and taken to B18, where he was violently pulled out of the van by his neck. Once at B-18, Mr. Riveros spent between two or three days detained in a room with around 40 other individuals. He was sick when he arrived and progressively got worse – in particular, his throat was swelling shut and his lymph nodes were swelling. He asked for a toothbrush and toothpaste to keep his mouth clean, but he was denied these items. It wasn't until the third day of detention that he was provided a toothbrush. He was refused medical attention and medicine. Mr. Riveros also suffers from PTSD and was receiving treatment before getting detained.

11.    Mr. Riveros reported to me that the only water they were provided was from the spigot in the sink. There was only one toilet for forty people, and he said the smell was horrendous. The only food provided was the occasional small sandwich and chips.

12.    As another example, on July 7, 2025, a potential clients' family members went to B-18 to visit with him and bring him clothing and food. The potential client is a middle-aged man with no criminal record. Officers at B-18 had called the potential client's family to tell them that their family member would be kept at B-18 until July 12, that he was cold in need of a sweater, and to bring protein powder as the officers did not have enough food to feed him properly. The detainee's family member left work early on July 7 to make sure

they would arrive during the narrow visitation hours window between 1:00 pm and 4:00 pm. The family member told me they waited in the slow-moving line for visitors for two and a half hours, only to be told at 4pm that visiting hours were over and that they therefore could not see him that day.

13.    I was dispatched to B-18 at around 9:00 am on July 8, 2025 to meet with the aforementioned middle-aged detainee and a second detained individual. I immediately noticed that the environment of B18 is increasingly becoming noxious.  There are flies all around and it smells like rotten milk and garbage.  There is food waste and trash on the ground near the door to B-18. B-18 officials force attorneys and family members to await access in the public area outside the door, sometimes for hours. This public area has no seating, air conditioning or bathrooms, meaning that visitors are forced to wait in a noxious area with no reprieve for a bathroom or water, lest they lose their place in line and the opportunity to see a loved one or a client before they are taken away.

14.    When I arrived on July 8, the officers told me that the first detainee had already been removed from B-18 and transported to Adelanto without an opportunity to consult with an attorney or receive his supplemental food and clothing. Federal agents transported him despite telling his family that he would be held at B-18 until Saturday, July 12.

15.    The second detained individual I was there to visit had also been removed from B-18, but unlike the first individual, the officer refused to tell me where he was. After repeated questioning through the door intercom, the officer finally alleged that the second detainee was no longer at B-18 and I that I would need to use the ICE Detainee Locator to find them. The ICE Detainee Locator is a public facing tool that allows one to run searches for detainees with one of two sets of information: one can either provide an individual A-Number and country of birth, or their name, date of birth, and country of birth. The ICE Detainee Locator is an inconsistent tool that often shows misleading or incorrect information, especially when detainees are being moved quickly and often, as is currently the case.

16.     I pointed out to the officer that I had already provided him with the missing second detainee's name, date of birth, and alleged country of birth—the same information needed to run a public search—and asked him why he could not provide me that information using his presumably more up-to-date internal system. He repeated his claim that it was impossible and then asked me for the second detainee's A-Number, which I did not have.

17.     July 8, 2025, was my third visit to B-18, with each visit being conducted on behalf of three distinct potential clients. My experience on July 8 does not seem to be unique. It is my impression that immigration officers are purposefully transferring detainees out of B-18 overnight so that by the time attorneys arrive in the morning for visiting hours, the person is gone and cannot be accessed. The officers give confusing information and appear to change procedures on the fly. I have been practicing for about a year and a half and nothing like I have described has ever occurred previously. I have spoken with several colleagues about this observation, and they report the same conclusion.

18.     B-18 is not named as such in the ICE Detainee Locator; rather, it is referred to as the "Los Angeles Field Office" with no address being provided. There is no website that identifies B-18 as a detention facility, instructs one how to find it, or explains its operational access procedures.  B-18 is located at the bottom of a loading ramp and beyond an unmarked entryway that, for all intents and purposes, does not appear to be publicly accessible from the street. Once you are down the loading ramp, the "info you need" to access clients or loved ones is posted on an obscurely located door, including attorney hours, attire, etc. For example, here is a picture of the door I took on July 8, 2025:



19.    To my knowledge, there is no website where you can check this information ahead of time. This makes access to detainees incredibly difficult for both counsel and detainees' family members – many of whom do not speak English as their first language and are indigent. For example, I attempted to conduct a visit with a detainee on June 30, but because I did not know in advance about the restrictions on visiting hours, I arrived at 4:20 pm and was turned away on the basis that visiting hours had ended at 4:00 pm. It is

near to impossible to speak face-to-face with a live human being as officers almost exclusively address you via a poor quality intercom. And should B-18s procedures ever change, presumably the only way one could find out is by physically going to check the signs posted on the door: a meaningful waste of time for working visitors.

I declare under penalty of perjury that the foregoing is true and correct.

Los Angeles, CA

Dated: July 9, 2025

By: _____

Nicolas Thompson-Lleras

7