**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Pedro VASQUEZ PERDOMO, *et al.*<br><br>   Plaintiffs,<br><br>   v.<br><br>Kristi NOEM, in her official capacity as Secretary, Department of Homeland Security, *et al.*<br><br>   Defendants. | Case No.: 2:25-cv-05605-MEMF-SP<br><br>**SUPPLEMENTAL DECLARATION OF LINDSAY TOCZYLOWSKI**<br><br>Hon. Maame Ewusi-Mensah Frimpong |

I, Lindsay Toczylowski, make the following statements on behalf of myself and Immigrant Defenders Law Center. I declare under penalty of perjury that the following statement is true and correct, pursuant to 28 U.S.C. § 1746.

1. I make this declaration based on personal knowledge and a review of records related to my position as President and Chief Executive Officer of Immigrant Defenders Law Center ("ImmDef"). This declaration serves to supplement my earlier declaration, submitted to the Court on July 2, 2025, Dkt. 38-11, in support of Plaintiffs' Motion for a Temporary Restraining Order.

2. ImmDef is a non-profit organization incorporated in California and based in Los Angeles, with additional offices in Riverside, Santa Ana, and San Diego, California, that serves immigrants and asylum seekers throughout Southern California and across the U.S.-Mexico border in Tijuana, Mexico. It is the largest removal defense nonprofit in Southern California. ImmDef's mission is to provide immigration services through a universal representation model to ensure that no person must face an unjust immigration system alone. ImmDef is a leading member of the Los Angeles Rapid Response Network ("LARRN"), a group of non-profit legal services organizations tasked with responding to community needs that develop out of immigration enforcement actions.

3. The immigration raids that started on June 6, 2025, in Southern California fundamentally changed attorney access at B-18 both by exacerbating issues that have

always existed in a lesser form (e.g., wait times) and by creating new obstacles (e.g., being turned away entirely). The raids have also changed the functionality of B-18 from a short-term processing center to a long-term holding facility.

4.     Since June 6, 2025, immigration officers consistently try to turn away attorneys who are unable to provide the Alien Registration ("A") number assigned to the individual the attorney is trying to visit.  This presents a problem for our attorneys because the A number is typically generated by the government when an individual has contact with the immigration system either through an affirmative application with U.S. Citizenship and Immigration Services, removal proceedings before the Executive Office for Immigration Review, or an arrest by ICE.  Individuals who have never had prior contact with immigration officials, including most of the individuals ImmDef has tried to speak with over the last three weeks, do not have an A number until the government provides them one after they are arrested and detained. We have learned through our visits to B-18 that it is taking the government over a week to generate A numbers for individuals who do not already have one. The fact that officers continuously tell our attorneys that they cannot speak to individuals without an A number is especially frustrating where the government is responsible for creating those A numbers and is not doing so in a timely manner. The only way our attorneys have been able to speak with individuals without A numbers is to insist that the officers can use the person's name, date of birth, and country of origin to locate them. If any of this information is off, even slightly, or if the officers do not want to use this information, we are turned away.

5.     Another obstacle that has emerged to speaking with someone held at B-18 is determining whether that person is still being held there, or if ICE has moved them to another temporary processing center. For example, one ImmDef attorney, Andrew Freire, met with a potential client on June 25, 2025. When he first asked to meet with the individual, officers brought him another person entirely. Mr. Freire spent about 10 minutes arguing with officers about who he was speaking to. Officers eventually brought him the right person, and Mr. Freire took advantage of his time with the wrong person to

complete another intake. He determined that this second person was eligible for bond. Mr. Freire needed to consult his supervisor before offering bond representation, so he asked an officer at B-18 for the individual's A number to monitor the individual's location. Because the person had not yet been assigned an A number, the officer at B-18 provided Mr. Freire with a "subject number" to use. When Mr. Freire called B-18 the next week to learn if his potential client had been given an A number and if he was still being held at B-18, the officer he spoke with refused to provide any information over the phone, telling Mr. Freire that it was "above his pay grade" to provide that information. Mr. Freire then went to B-18 in person on July 2, 2025, to ask again about his potential client's location and A number. The officers refused to provide him with any information. When an officer who identified himself as the Lieutenant of B-18 began yelling at Mr. Freire, Mr. Freire asked to speak with an ICE supervisor. The ICE supervisor was eventually able to tell Mr. Freire that his potential client was transferred to El Paso Hardened Facility (a processing center outside of ImmDef's service area), and that he still had not been assigned an A number.

6.　An "A number" or Alien Registration Number is a unique identifying number assigned by the U.S. Department of Homeland Security that an individual receives when they are processed to be placed in removal proceedings. An A number is not needed to use the ICE Detainee Locator, the online system meant to assist the public in finding persons in immigration custody. Yet, ImmDef and our partners have repeatedly had issues in the last two months locating individuals through the ICE Detainee Locator and we received contradictory information from officers at B-18 about whether A numbers are even necessary to locate individuals in immigration custody. This has given us great concern as to whether Defendants 1) know *who* is in their custody and 2) *where* individuals in their custody are.

7.　Since June 20, 2025, at least three ImmDef attorneys have been told that the individuals they were trying to speak with at B-18 were unavailable because they had been moved, but the officers refused to tell the attorney where the individuals were

3

transferred to. On July 3rd, one attorney was told by an officer that he could not confirm where her client was because ICE was "moving bodies everywhere."

8.    An ImmDef attorney who visited B-18 on July 8th arrived at about 1:00 p.m. to speak with a person referred to us through LARRN. She buzzed the door as soon as she arrived and provided the individual's information. She then waited 40 minutes outside without hearing anything about when she would be able to speak to that person. At 2:00 p.m., she asked again and was let into the waiting room inside of B-18. When she was let in, an officer told her that the person she was looking for was at that moment being put on a van to be transferred. The attorney asked if his transfer could be stopped until she had an opportunity to speak with him. She explained that she had been waiting an hour already to see him. But the officer refused and said that the person could not be brought back. The attorney then asked to speak with a supervisor and was introduced to Supervisor Vela. She asked Supervisor Vela for the individual's A number, so she could track where her potential client was being moved to. Supervisor Vela said he would find that information but never returned to speak with her again. When she asked another officer to try to find the supervisor, he refused because he "would get in trouble."

9.    Another attorney who was at B-18 to visit a client that same day was unable to do so because her potential client had also been transferred. When the attorney asked when he was transferred and where, the officer could not tell her when the transfer took place and vaguely told her that he was "pretty sure" her potential client was in Arizona but did not know what facility. When the ImmDef attorney later spoke with this individual's daughter, his daughter broke down crying because the last time she had spoken to her father he had informed her that he was close to accepting a voluntary removal because the conditions in detention were so awful.

10.    When ImmDef attorneys are able to meet with individuals detained at B-18 and ask about the circumstances of their arrests, these individuals share distressing stories.  One individual, I.V., was arrested on June 20, 2025, in Bellflower, when leaving a construction job at an apartment building.  He was with three other coworkers when

unidentified officers arrived.  They did not present a warrant. Instead, they chased I.V., pepper sprayed him, threw him to the ground, and choked him.

11.    At least three other individuals that ImmDef attorneys have spoken with shared similar stories of being arrested without officers showing them any documents or identifying themselves. One individual, L.G.M., was approached by officers outside of the Home Depot where he was buying supplies. The officers only asked him "where he was born," handcuffed him, and threw him in a van with about five other people. When one individual attempted to assert her right to speak to a lawyer, the officers simply told her "no Spanish."

12.    Since June 24, 2025, individuals being in B-18 also continue to report that conditions are unsanitary and inhumane.  When attorney Mr. Freire met with him on June 25, I.V. had not showered and had been unable to brush his teeth or change his clothes since he was arrested on June 20. Individuals are fed two to three times a day, but the food they are given consists mostly of chips and cereal, and sometimes a small burrito and water or milk. If they want water at other times, they are told to drink it out of the bathroom sink.

13.    I.V. also reported that there was nowhere for the 60–65 individuals detained at B18 at that time to sleep.  There is no medical team on site, and when I.V. asked for help because his throat and neck hurt after being physically assaulted during his arrest, he was told the officers could do nothing about it.  I.V. reported seeing another person throwing up so much that he started foaming at the mouth, and at least three people had been taken to the hospital since he arrived. On June 27, I.V. opted for voluntary removal because he could no longer take the conditions in B-18.

14.    On July 2, Attorney Andrew Freire went to B-18 and met with another individual, P.G.C., who was arrested on June 30 at the Home Depot in Cypress Park by individuals who did not identify themselves, show him any documents, and would not let him show them his pending U visa application.

15.     On July 3, ImmDef attorney Kristin Hunsberger went to B-18 to speak to a potential client with severe medical concerns.  Ms. Hunsberger was told that she could not speak to the individual because she did not have the individual's A number. Eventually, she was informed that the individual had already been moved to Adelanto. Ms. Hunsberger asked if B-18 could inform Adelanto of the medical concerns and the officer said this was not something they were able to do.

16.     When ImmDef attorneys are able to meet with individuals, the "private" attorney rooms at B-18 are both located directly off of the waiting room at the entrance of the facility. Attorneys noted that they could still hear officers clearly from the rooms. One attorney was prevented from using a room at all because she did not have a bar card. When she tried explaining to the officer that she did not have a bar card because she was barred in a state that did not provide them and offered to show him her letter of good standing, he still refused to give her access to a private room. She was forced to speak with her client through the window that family members use to make visits next to multiple officers.

17.     No one ImmDef has spoken with at B-18 has been informed of their right to speak to an attorney, either at the time of their arrest or when they are taken to B-18. Contrary to the brief filed by Defendants on July 8, 2025, individuals are not provided access to phones to call attorneys. At most, they were given one chance to call a family member in the first 48 hours they were detained. None of the phone calls individuals were able to make were on private or unmonitored lines. They were not offered a list of legal services providers to consult.

18.     Individuals also continue to be asked to sign documents without an opportunity to speak to an attorney. Mr. Freire has heard from individuals he has spoken with that detainees are given the option of "returning home" or being transferred to other states, such as Florida. Other individuals have said that officers have tried to make them sign documents to "see a judge."

19.     ImmDef is still receiving referrals from family members and our partner organizations every day. Right now, ImmDef has a list of 532 individuals who have been detained since June 6th. For individuals who have been moved to Adelanto or Golden State Annex, we can schedule virtual visits to conduct intakes. But many individuals are being held at B-18 for five, seven, and even 12 days. Our Rapid Response team, which is still small, is forced to choose between visiting individuals held at B-18 during this critical time after they are arrested and spending time representing individuals on bond and in their full immigration proceedings. Spending hours at B-18 only to be told that we cannot see a client or that a client has been moved makes balancing these visits with our other critical work an impossible choice. Until attorney access at B-18 is guaranteed, we will continue to have to expend resources while knowing that we ultimately may not even be able to meet with the individuals we are looking for.

I declare under penalty of perjury that the foregoing is true and correct.

Los Angeles, CA

Dated: July 9, 2025

By: _____

Lindsay Toczylowski

7