UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

PEDRO VASQUEZ PERDOMO, ET AL, ) CASE NO: 2:25-cv-05605-MEMF-SPx
                               )
              Plaintiffs,      )              CIVIL
                               )
     vs.                       )      Los Angeles, California
                               )
KRISTI NOEM, ET AL,            )      Thursday, July 10, 2025
                               )
              Defendants.      )      (1:15 p.m. to 3:37 p.m.)


HEARING RE:

EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER
[DKT.NOs.38,45]


BEFORE THE HONORABLE MAAME EWUSI-MENSAH FRIMPONG,
UNITED STATES DISTRICT JUDGE


APPEARANCES:            See page 2


Court Reporter:         Recorded; CourtSmart


Courtroom Deputy:       Damon Berry


Transcribed by:         Exceptional Reporting Services, Inc.
                        P.O. Box 8365
                        Corpus Christi, TX 78468
                        361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>**APPEARANCES:**</u>


For Plaintiffs:              MARK D. ROSENBAUM, ESQ.
                            REBECCA S. BROWN, ESQ.
                            Public Counsel
                            610 S. Ardmore Ave.
                            Los Angeles, CA 90005
                            213-385-2977

                            MATTHEW J. CRAIG, ESQ.
                            Hecker Fink
                            1150 S. Olive St.
                            Suite 10-140
                            Los Angeles, CA 90015
                            212-763-0883

                            ANNE LAI, ESQ.
                            UCI Law Clinic
                            P.O. Box 5479
                            Irvine, CA 92616
                            949-824-9894

                            STACY E. TOLCHIN, ESQ.
                            Law Offices of Stacy Tolchin
                            776 E. Green St.
                            Suite 210
                            Pasadena, CA 91101
                            213-622-7450

                            ALVARO M. HUERTA, ESQ.
                            Immigration Defenders Law Center
                            634 S. Spring St.
                            10th Floor
                            Los Angeles, CA 90014
                            213-338-7542

                            DAE KEUN KWON, ESQ.
                            DIANA SANCHEZ, ESQ.
                            MAYRA B. JOACHIN, ESQ.
                            MOHAMMAD K. TAJSAR, ESQ.
                            STEPHANIE PADILLA, ESQ.
                            ACLU of Southern California
                            1313 West 8th St.
                            Suite 200
                            Los Angeles, CA 90017
                            213-977-9500

3

**APPEARANCES:**                    (CONTINUED)


For Defendants:              AUSA PAULINE H. ALARCON
                             AUSA ALEXANDER L. FARRELL
                             U.S. Attorney's Office
                             300 N. Los Angeles Street
                             Suite 7516
                             Los Angeles, CA 90012
                             213-894-3992
                             213-894-5557


                             SEAN SKEDZIELEWSKI, ESQ.
                             U.S. Department of Justice Civil Div.
                             950 Pennsylvania Ave. NW
                             Washington, DC 20530
                             202-307-1697

For Intervenors:             JOHN L. SCHWAB, ESQ.
                             WENDY Q. XIAO, ESQ.
                             Munger Tolles & Olson
                             355 S. Grand Ave.
                             50th Floor
                             Los Angeles, CA 90071
                             213-683-9100


                             LILIANA CAMPOS, ESQ.
                             NICOLE A. DAVIS TINKHAM, ESQ.
                             BRIGIT G. ALVAREZ, ESQ.
                             Office of the County Counsel
                             648 Kenneth Hahn Hall of Admin.
                             500 West Temple Street
                             6th Floor
                             Los Angeles, CA 90012
                             213-808-8729


                             MARIA L. COUSINEAU, ESQ.
                             Office of the LA City Attorney
                             Public Rights Branch
                             201 N. Figueroa St.
                             13th Floor
                             Los Angeles, CA 90012
                             213-978-8080

4

<u>**APPEARANCES**</u>:                    (CONTINUED)


For Intervenors:            ANDREW K. AARONIAN, ESQ.
                            ARNOLD F. LEE, ESQ.
                            MICHELE B. BAGNERIS, ESQ.
                            Pasadena City Attorney's Office
                            100 N. Garfield Ave.
                            Room N210
                            Pasadena, CA 91101
                            626-744-4141


Also present:               COUNCILMEMBER STEVE MADISON

                            MICHAEL J. DUNDAS, ESQ.
                            Los Angeles City Attorney's Office
                            City Hall East
                            200 N. Main Street
                            Suite 800
                            Los Angeles, CA 90012
                            213-978-8130

                            VALERIE L. FLORES, ESQ.
                            Office of the LA City Attorney
                            200 N. Spring Street
                            21st Floor
                            Los Angeles, CA 90012
                            213-978-7178

1      **Los Angeles, California; Thursday, July 10, 2025; 1:15 p.m.**

2                            **(Call to Order)**

3           **THE CLERK:**  Face the flag.  In the presence of the

4      flag emblematic of the constitution and remembering the

5      principals for which it stands, this United States District

6      Court for the Central District of California is now in session,

7      the Honorable Maame Ewusi-Mensah Frimpong, United States

8      District Judge, presiding.  You may be seated.

9           Now calling item number 2, case number LA CV 25-

10     05605, *Pedro Vasquez Perdomo, et al., versus Kristi Noem, et*

11     *al*.

12          Counsel, please stand and state your appearances.

13          **MR. ROSENBAUM:**  Good afternoon, Your Honor, Mark

14     Rosenbaum on behalf of plaintiffs from Public Counsel.

15          **MR. CRAIG:**  Matthew Craig from Hecker Fink LLP for

16     plaintiffs.

17          **MS. BROWN:**  Rebecca Brown, Public Counsel, for

18     plaintiffs.

19          **MR. TAJSAR:**  Mohammad Tajsar, ASA of Southern

20     California for the plaintiffs.  Thank you.

21          **MS. LAI:**  Your Honor, Anne Lai from the UCI Law

22     Clinics for the plaintiffs.

23          **MS. JOACHIN:**  Mayra Joachin, ACLU of Southern

24     California for the plaintiffs.

25          **MS. TOLCHIN:**  Good afternoon, Your Honor Stacy

1    Tolchin for the plaintiff.

2            **MR. HUERTA:**  Good afternoon, Your Honor, Alvaro

3    Huerta for the plaintiffs.

4            **MR. KWON:**  Good afternoon, Your Honor, Dae Keun Kwon,

5    ACLU So. Cal. for the plaintiffs.

6            **MS. SANCHEZ:**  Good afternoon, Your Honor, Diana

7    Sanchez for the plaintiffs.

8            **MS. PADILLA:**  Good afternoon, Your Honor, Stephanie

9    Padilla for the plaintiffs, ACLU So. Cal.

10           **MS. ALARCON:**  Good afternoon, Assistant United States

11   Attorney Pauline Alarcon on behalf of respondents/defendants.

12           **MR. FARRELL:**  Good afternoon, Assistant United States

13   Attorney Alexander Farrell on behalf of the defendants and

14   respondents.

15           **MR. SKEDZIELEWSKI:**  Good afternoon, Your Honor, Sean

16   Skedzielewski, Assistant -- counsel to the Assistant Attorney

17   General from the Department of Justice on behalf of all

18   defendants.

19           **MR. SCHWAB:**  Good afternoon, Your Honor, John Schwab,

20   Munger Tolles and Olson, on behalf of the proposed intervenors.

21           **MS. XIAO:**  Good afternoon, Your Honor, Wendy Xiao

22   from Munger Tolles and Olson on behalf of the proposed

23   intervenors.

24           **MS. BAGNERIS:**  Good afternoon, Your Honor, Michele

25   Beal Bagneris, Pasadena City Attorney, on behalf of proposed

1    intervenor, City of Pasadena.

2         **MS. ALVAREZ:**  Good afternoon, Your Honor, Deputy

3    County Counsel, Brigit Greeson Alvarez, on behalf of proposed

4    intervenors, County of Los Angeles.

5         **MS. CAMPOS:**  Good afternoon, Your Honor, Liliana

6    Campos, Assistant County Counsel, for proposed intervenor,

7    County of Los Angeles.

8         **MS. TINKHAM:**  Hello, good afternoon, Your Honor,

9    Nicole Davis Tinkham with County Counsel, on behalf of proposed

10   intervenor, County of Los Angeles.  Thank you.

11        **MR. LEE:**  Good afternoon, Your Honor, Arnold Lee,

12   Chief Assistant City Attorney for City of Pasadena on behalf of

13   proposed intervenor, City of Pasadena.  And with me is council

14   member Steve Madison of the City of Pasadena.

15        **MR. MADISON:**  Good afternoon, Your Honor.

16        **MS. COUSINEAU:**  Good afternoon, Your Honor, Deputy

17   City Attorney, Maria Louise Cousineau, on behalf of proposed

18   intervenors, the City of Los Angeles.

19        **MR. AARONIAN:**  Good afternoon, Your Honor, Andrew

20   Aaronian, Deputy City Attorney for City of Pasadena on behalf

21   of proposed intervenor, City of Pasadena.

22        **MR. DUNDAS:**  Good afternoon, Your Honor, Chief

23   Assistant City Attorney, Michael Dundas, on behalf of proposed

24   intervenor, City of Los Angeles.

25        **MS. FLORES:**  Good afternoon, Your Honor, Valerie

1    Flores, Chief Deputy City Attorney, City of Los Angeles, on

2    behalf of proposed intervenor, City of Los Angeles.

3            **THE COURT:**  Good afternoon to all counsel.

4            There were a couple of counsel who identified

5    themselves who I'm not sure that they're on the docket, so I

6    will just have you address that with Mr. Berry at the end.

7    That's Ms. Flores, Ms. Cousineau, and Mr. -- didn't quite get

8    your name.

9            **MR. DUNDAS:**  Mr. Dundas.

10           **THE COURT:**  Dundas.  Okay.  So you can address with

11   Mr. Berry getting on the docket.

12           And I do want to thank everybody for being here.  We

13   gave you a little bit more time in light of the delay with the

14   tentative and we're ready to go.

15           I do also want to welcome everyone in the gallery and

16   everyone who is watching in the overflow courtroom.  It is

17   truly a delight to have you all here.  I often say that in the

18   courtroom I sit above everybody, but I am really here to serve

19   you, this is you're courtroom, and it is a great honor of mine

20   to serve the people of the Central District.

21           The courts are one of the pillars of our democracy,

22   but most people don't get to see what we do and how we do it,

23   and so I'm privileged to have all of you with me today, and I

24   welcome you.

25           This is not my regular courtroom, but it's a

1   beautiful courtroom that can accommodate all of us today.  This

2   is what we refer to as our ceremonial courtroom and it has

3   portraits of the chief judges on whose shoulders I and my

4   colleagues stand starting from the earliest at the back and

5   moving counterclockwise.

6           Okay.  So with that we will begin.  Counsel, I

7   understand that you have received the Court's tentative, and I

8   will collect those from you at the end of the hearing.

9           It is my practice and a practice shared by many of my

10  colleagues here and those across the street in the Superior

11  Court, to provide you with a tentative.  The purpose of the

12  tentative is to give you an understanding of how I see the case

13  based upon the papers alone, but it is truly a tentative, it is

14  not final, there are plenty of times where I change my mind

15  based upon the arguments, so I want that to be clear.

16          And as you saw on the tentative itself, it's not to

17  be copied, it's not to be distributed, it's not to be used as

18  an exhibit, and you'll return it at the end of the hearing.

19          Okay.  And as I advised you this morning, my plan is

20  to -- just to keep this orderly and so we're not here late into

21  the evening, to allot 20 minutes per side for the access

22  detention TRO, that is the TRO concerning access to counsel at

23  B-18 and then 40 minutes per side for the other TRO concerning

24  the various stops and arrests and detentions.

25          I did want to address at the beginning, the

10

1   intervenors -- proposed intervenors had made a request to

2   participate, that was unopposed, and that the Court granted.  I

3   don't know whose speaking on behalf of the intervenors.  Okay.

4        So the request to my recollection did not specify

5   exactly how you wanted to participate, so my understanding was

6   you wanted to be present, sit at the equivalent of counsel

7   table and weigh in if the Court had questions that were

8   specific to you.

9        If however what you intended to do was assert some of

10  your own arguments either in favor of either TRO or to make

11  additional arguments, for instance, as to public interest or

12  the other Winter factors, I will just advise you that I would

13  need of course to give the Government a chance to respond.

14       My intention coming into this hearing given the

15  urgency and the weight of the matters at issue was to issue my

16  ruling tomorrow, which if I allow you to make arguments today

17  and I allow the Government a chance to respond I won't be able

18  to do.

19       So I just wanted to confirm that my original

20  understanding, which is you mainly just wanted to be present,

21  is accurate.

22       **MR. SCHWAB:**  Your Honor, we did originally intend to

23  ask you to actually be heard on a small number of issues that

24  we think are in support of plaintiffs' position here and

25  frankly in support of the tentative.  I hear the Court say that

11

1   that might be a problem for the Court to issue this quickly if

2   that is the case.

3          We think the most important thing is for this relief

4   to be issued as quickly as possible, and so we would not make

5   those arguments if that's what I'm understanding correctly.

6          **THE COURT:**  Yes.  Obviously as I said this is just a

7   tentative, so it may be that I deny the TRO, but if I am to

8   hear new arguments from you that are not in the papers,

9   obviously the Government needs an opportunity to respond and I

10  need a chance to consider them.  So either way I wouldn't be

11  able to issue my ruling tomorrow.

12         So I trust that with that you don't need to be heard

13  today?

14         **MR. SCHWAB:**  Unless the Court has questions or if

15  there's anything the Court thinks would be helpful we do not

16  need to be heard.

17         **THE COURT:**  Okay.  Thank you, I appreciate it.

18         **MR. SCHWAB:**  Thank you, Your Honor.

19         **THE COURT:**  Okay.  With that shall we begin?

20         It is the plaintiffs' motion, so I will let the

21  plaintiffs be heard first, and whoever is speaking on behalf of

22  plaintiffs with respect to what in my head I've been referring

23  to as the access to counsel TRO can take the podium.

24         And I will advise counsel that there is a button to

25  the right of the microphone at the podium that you can use to

12

1    raise or lower the podium if you need to.

2           **MR. ROSENBAUM:**  Good afternoon again, Your Honor,

3    Mark Rosenbaum on behalf of plaintiffs.

4           Your Honor, I want to begin by stating what I'm sure

5    all counsel in this courtroom believe, and that is to say thank

6    you to Your Honor and to your staff for what is clearly the

7    hard work and diligent review of all the papers that were

8    presented.  It is an urgent matter and I know all of us on both

9    sides appreciate the diligence and concern that Your Honor put

10   into these tentatives.

11          I don't have a lot to add to Your Honor's tentative,

12   I want to make just a few comments and then perhaps reserve my

13   right to rebuttal with respect to any points that the

14   Government makes.

15          **THE COURT:**  Absolutely.

16          **MR. ROSENBAUM:**  Your Honor, with respect to the

17   access to counsel, we believe Your Honor has stated the germane

18   cases here.

19          The truth is that there's really not any argument by

20   the Government as to the nature or character of that right, and

21   the way cases like Orantes and Reyes Barrios control this

22   particular matter.

23          In this context this right of access to counsel is

24   the right that is preservative of all rights for our clients,

25   and one would expect that the Government, the Federal

13

1   Government here would bend over backwards to make certain that

2   that right was honored.

3          I want to make specific comment to Your Honor's

4   discussion at pages 23 and 24 of the tentative.  That is it

5   where Your Honor discusses a number of matters with respect to

6   what happened on June 7th, and I want to emphasize a few

7   points.

8          To begin with the declaration submitted by the

9   Government, the Federal Government -- I'm going to call them

10  the Government unless I'm referring to the city -- the

11  argument -- the declaration submitted by the Federal

12  Government, the Uyeda declaration, U-Y-E-D-A, two-page

13  declaration, what's noteworthy about that declaration, Your

14  Honor doesn't refer to it on those pages, nor could Your Honor

15  refer to it on those two pages, because it doesn't reference

16  this incident at all.

17         That is remarkable, Your Honor, that an episode where

18  there are lawyers present and family members present in order

19  to attempt to provide these detainees who are housed in a

20  basement with a knowledge of their basic rights and the

21  response by the Government and the evidence is undisputed

22  referring specifically to the Thompson-Lleres (sic),

23  L-L-E-R-E-S, declaration at paragraph 7, that at that moment,

24  at 8:30 in the morning there was no demonstration in downtown

25  Los Angeles.  The nearest demonstration was Paramount, 20 miles

14

1    away, and that is not acknowledged.

2        But even more significantly Your Honor describes two

3    events that took place.  I believe these events are

4    unprecedented in American history.  That is while detainees

5    were being driven out of that B-18 facility, what the

6    Government did were two things.  The lawyers from IMDEF and

7    CHIRLA, who had not had any access to these individuals, seeing

8    them driving out attempted to shout out basic rights.  Nothing

9    complicated, you have a right to an attorney.  If you fear

10   going back to your country you can apply for asylum.  One would

11   expect the Government to want these detainees to know what

12   their basic rights were.

13       But two things happened.  One is that the drivers of

14   those vans began blaring their horns, honking those horns

15   loudly so the expression of those basic rights could not be

16   heard by any of the detainees.

17       And then shortly thereafter as Your Honor notes, a

18   chemical that caused burning in the eyes and the ears and the

19   nose of those individuals, lawyers, began to burn.  A

20   Government agent did that.

21       Now, what's remarkable is one, that's never

22   acknowledged in the Uyeda declaration, but at pages -- at 4,

23   lines 21 and 22 of the Government's brief, the opposition

24   brief, those drivers that -- and that individual, Government

25   agent who sent out the chemical, I'll refer to, quote, as

1   unknown.  How can that be?  How could the Government not take

2   steps to examine what had happened and why it occurred?

3          Now, with all respect, Your Honor, I believe the

4   Court was too generous in suggesting that there may be an

5   innocent explanation.  I will be interested to hear Government

6   counsel, because they didn't do it in their brief and it wasn't

7   in the declaration, I will be interested to hear what that

8   justification is.

9          But here's the reasonable inference, Your Honor.

10  This didn't have anything to do with security, this didn't have

11  anything to do with the pretext that the Government was

12  utilizing.  This was an attempt to make certain that those

13  individuals did not know their rights, and those individuals

14  were ping-ponged back and forth from Santa Ana.  But I think

15  those two episodes, they are the tells as to what the

16  Government's intent was all along, and that was to make sure

17  that these individuals had no awareness of their rights.

18          And Your Honor will recall that the case law in

19  this --

20          THE COURT:  If I might interrupt.  Can you address

21  the question of whether in order to find for the plaintiffs

22  with respect to these access to counsel issues the Court needs

23  to find that this was the intent of the Government or not?

24          MR. ROSENBAUM:  No.

25          THE COURT:  If you could address that that would be

16

1   helpful.  And then please move on.

2         MR. ROSENBAUM:  I'm pleased to address it.  I think

3   the Court got it exactly right, it's not germane.  The issue is

4   whether or not they in fact had access to counsel, access to

5   learn what their rights were, that's the end of the story.

6         THE COURT:  And is there a case that you would cite

7   to for that point?

8         MR. ROSENBAUM:  Oh, goodness.  The Orantes case.  I

9   have to confess, Your Honor, I am biased with respect to that

10  case.  I was the lead trial lawyer in the case 36 years ago, I

11  argued that case to the Nineth circuit 35 years ago.  I

12  probably shouldn't have admitted that.

13        (Laughter)

14        MR. ROSENBAUM:  But I want to say about Orantes, that

15  case was tried before Judge Kennon, a great judge, and the

16  denial of access to counsel was no worse in that case than it

17  is here.

18            In fact if Your Honor looks at page 554 of that

19  decision that's where the court generally -- generously

20  describes -- properly describes that it's a fundamental right,

21  and at page 565 of that decision the Ninth Circuit unanimously

22  said what that right encompasses, how it was being violated,

23  and that included denial of learning about the fact that

24  attorneys are available, that there was privacy -- that there

25  was no privacy for individuals to be able to consult with their

17

```
1   lawyers.  Precisely the situation in this case, and that is
2   reenforced by the other cases that appear in Your Honor's
3   ruling.  Reyes Barrios which talks about the critical moments.
4   This is at the beginning of their custody.
5           We know from, for example, the Toczylowski
6   supplemental declaration, paragraphs 4 through 9 and 12 and 13,
7   a lot was going on inside that building.  Individuals were
8   being processed, individuals were not being able to have any
9   meaningful contact with counsel who were standing there
10  available to talk to them.
11          Which goes to another point, Your Honor.  That is if
12  when this episode happened there's nothing in the record from
13  the Government that the Government said to the individuals in
14  those vans, hey, we want you to know that there were lawyers
15  there, that there are lawyers who want to talk to you, that
16  there are lawyers who think it's important that you know your
17  rights.  Wouldn't that have been the reasonable thing to do if
18  in fact the Government genuinely cared that that access be
19  delivered?
20          Now again, I want to repeat, I agree with the Court
21  that you don't need to find intent even if somehow this was
22  inadvertent, that's sufficient because of the paramount nature
23  of this right and the urgency of that situation.
24          But common sense tells us that you don't blare those
25  horns and you don't put chemicals at the feet of lawyers unless
```

18

1    you're trying to deliver a message, and that message was

2    delivered.

3                Something else I want to say about that.  Between

4    June 6th and June 13th and between June 14th and June 17th and

5    then June 23 and 24, our clients, the detainees, they were

6    ping-ponged back and forth to Santa Ana, but that fact would

7    not prevent the Government from taking care of what was inside

8    that basement.

9                Did anyone think to say during that time, because

10   people were staying there 5 days, 7 days, 12 days, record is

11   undisputed with respect to that, anyone think to -- and they

12   were in cell blocks with as many as 60 individuals -- anyone

13   from the Government think to say we ought to get some food

14   instead of frozen burritos and a sandwich sporadically given

15   them instead of juice box given them?  Anyone think to say

16   during that period of time, we ought to put a bed in here or

17   some beds in here so individuals don't have to lean against a

18   wall or somehow lie down on a cold floor in a basement?

19               **THE COURT:**  If I could interrupt you, counsel.

20               Just because I'm not sure that those issues which are

21   addressed are necessarily among the ones that the Court needs

22   to focus on in deciding whether to grant this TRO with respect

23   to access to counsel, and correct me if I'm wrong about that.

24               **MR. ROSENBAUM:**  I want to make two points with

25   respect to that.

1          **THE COURT:**  Okay.  And then I did want you to

2    address, because this came up in the Government's papers, I did

3    want you to also address what you understand the current state

4    of affairs to be.

5          **MR. ROSENBAUM:**  Okay.

6          **THE COURT:**  Thank you.  Go ahead.

7          **MR. ROSENBAUM:**  I'm glad to do that.

8          First with respect to -- we did not bring this TRO to

9    deal with those conditions themselves.  I raise those

10   conditions because they are germane, they add to the Court's

11   reasoning with respect to the coercive nature of the situation

12   that these individuals found themselves.

13         Again the Toczylowski supplemental declaration

14   specifically talks about the fact that individuals were saying

15   I'm going to take voluntary departure, because it's really not

16   voluntary, I haven't spoken to a lawyer, these conditions are

17   too much.

18         So for that limited purpose, Your Honor, I raise it,

19   it's not necessary to the Court's decision, even if they were

20   at the Hyatt Regency what the Government did was still a

21   constitutional denial.  But they weren't at the Hyatt Regency,

22   they were in a dank basement and they were dealing with some of

23   the most issues in their lives and the lives of their family.

24         Let me turn to the other question that Your Honor

25   raised, that Your Honor dealt with it quite persuasively in the

20

1    decision itself, but let me specifically talk.

2          The Government's argument is everything is great.

3    Had a rough time at the beginning, but everyone is great now.

4    Hardly.

5          The record in this case demonstrates that the denial

6    of access to counsel can be achieved not just by shutting the

7    doors, by putting a handwritten sign that says all appointments

8    canceled, but it can be denied some might say even more

9    dangerously by opening those doors and not provide counsel an

10   opportunity to speak with these individuals, not inform these

11   individuals that counsel were there.

12         And here are some of the facts.  Again Your Honor

13   quite eloquently described them, but let me just review some of

14   them for you.

15         For example, it is undisputed with respect to the

16   telephones, which is what they hold onto the most, that

17   telephones are not a surrogate for access to counsel, but it's

18   part of the process, it's one of the things that, for example,

19   the Orantes specifically discussed.  But what was the story

20   with these telephones?  The Government says, well there's a

21   telephone in every cell block, maybe six to seven cell block

22   ins that basement.  What they don't say is that there were 50,

23   60 individuals in those cell blocks.  These were not -- this

24   was not a situation where individuals could have confidential

25   conversations, this is an open room filled with other

1   individuals.

2          And what's so telling about Ms. Uyeda declaration, is

3   that she mentions the telephone, she doesn't mention how many

4   people were in the room, she doesn't mention what those

5   circumstances were, and she also doesn't say that these

6   telephone calls were not monitored.  She doesn't say that they

7   were confidential.  They couldn't have been any way because

8   they -- it was such a public space.

9          But you'd think if it were true they would have added

10  that all such phone calls were confidential the way

11  attorney/client conversations, the way detention standards

12  talk, the way the Bureau of Prisons operates, that's not part

13  of the record itself.

14          **THE COURT:**  And I'll just advice you counsel, you

15  have about three minutes left in your time if you wanted to

16  leave any time for rebuttal.

17          **MR. ROSENBAUM:**  All right, let me just quickly say

18  with respect to other matters that what the undisputed record

19  also reflects, and now I'm referring to the requirement that an

20  A number be provided, when in fact the undisputed record is

21  that it was not provided expeditiously, even though that

22  typically accompanies the arrest of an individual, and what the

23  record reflects and there's a whole -- all the declarations we

24  filed yesterday, Stea (phonetic) and Duran and Thompson-Lleras

25  and the Toczylowski, what they all show is that the Government

1   did not know who was in that room, who was in that detention

2   facility, that the Government did not know where individuals

3   were, that the -- some Government agents thought it was above

4   their pay level to in fact provide that sort of information,

5   and that is a denial of access to counsel as dramatic, as

6   unconstitutional as in fact closing the door.

7           If I have any time left I'd like to reserve it for

8   rebuttal.

9           **THE COURT:**  Thank you.

10          And I'll hear from Government counsel.  And the

11  button may be hidden by the tissue box.  Yeah.  Thank you.

12          **MR. SKEDZIELEWSKI:**  May it please the Court, Sean

13  Skedzielewski on behalf of all defendants in their official

14  capacity.

15          Plaintiffs' ex parte application prepared weeks in

16  advance and following the eve of a federal holiday alleging

17  misconduct from a month ago is exactly the type of abusive

18  practice courts in this district have previously rejected, it

19  should do so again here.

20          But procedural defects aside, Your Honor, plaintiffs'

21  claims also fail because they have not alleged facts sufficient

22  to show a violation of either the Fifth or Fourth Amendments --

23  we'll focus on the Fifth here -- but before reaching the merits

24  this Court should deny plaintiffs' request for lack of

25  jurisdiction due to their lack of standing.

1          The first request for a temporary restraining order

2    filed on July 2nd concerns organizational plaintiffs' coalition

3    for humane immigrant rights and immigrant defenders claims

4    under the Fifth Amendment that stem from their desire for

5    access to the temporary detention facility, B-18, located at

6    300 North Los Angeles Street.  But access to B-18 is no longer

7    under any restrictions, and has been operating on its normal

8    schedule since June 24th.  It's operating hours were only

9    modified because of riots immediately outside of the facility.

10   And I'd like sort of address the way that plaintiffs' counsel

11   characterized those events outside of B-18.

12          They emphasize that there were no demonstrations on

13   the morning of June 7th, but their own papers can see that

14   later in that day there were.

15          Plaintiffs were evacuated that morning as well

16   because the riots the previous day were so severe that the

17   agency who managed that facility had a genuine fear that the

18   facility would be breached by rioters.  And I'm not using the

19   word rioter inadvisable, there were assaults on federal, state,

20   and local law enforcement using rocks, fireworks, and other

21   objects, there was damage to federal property, they were spray

22   painting of death threats on federal property, and so the

23   agency that managed that facility took care to protect federal

24   employees and the detainees themselves who could have been

25   injured had a breach occurred.

24

1          I'd also like to mention regarding this incident on

2     the morning of June 7th about the honking of the horn, that

3     declarants clearly knew their rights in many cases based on

4     plaintiffs' papers where they're repeatedly not speaking to law

5     enforcement on the basis of their Fifth Amendment right, but

6     even beyond that there is nothing in the evidence to suggest

7     that these horns weren't being honked for the same reasons

8     they're typically used, which is to ask people to get out of

9     the way and to exit the facility, which to my understanding was

10    blocked.

11         And as the court in the Nineth Circuit recently held,

12    the President likely has -- had authority in these

13    circumstances to federalize the California National Guard and

14    that he likely complied with tenuous Code 12-4-06.

15         These were not minor disruptions, but severe

16    disruptions of the peace that federal agents at B-18 responded

17    to in an entirely appropriate manner to protect the employees

18    and the detainees.

19         Your Honor, the most pertinent facts, once we get

20    interest the details of what happened after June 6th, are as

21    follows.  After the riots on June 6th right outside of the

22    facility B-18 the facility was closed a little bit earlier than

23    usual in the afternoon.

24         Then the facility remained closed on June 7th due to

25    the fluid and unknown prospects fit for that day.

1          On June 7th detainees were moved again due to fears

2     that the facility would be breached, and they were moved to

3     Santa Ana.

4          And then so from June 7th to 12th and again from June

5     14th to 16 due to ongoing disturbances the detainees remained

6     at Santa Ana.  They came back -- at one point they went back to

7     Santa Ana.

8          Then on June 24th operations went back to normal,

9     namely the operational hours of 8 a.m. to 4 p.m., 7 days per

10    week.

11         Any changes in access at B-18 during this time were

12    solely for the protection of employees and detainees alike, and

13    did not amount under the law to a violation of anyone's Fifth

14    Amendment rights.

15         So, Your Honor, I'd like if I could to take a moment

16    to discuss the ex parte nature of this proceeding.

17         **THE COURT:**  Before you do that if you could just

18    respond to counsel's arguments that the detainees have not had

19    the ability to have private phone calls, that counsel have not

20    been able to let the detainees know that counsel is available,

21    and that the inability to find out who's there and when they're

22    there also impinges upon the right to counsel.

23         **MR. SKEDZIELEWSKI:**  Absolutely.

24         So, Your Honor, one thing that's mentioned in the

25    declarations -- defendants' declarations -- is that sometimes

26

1   detainees will misstate their names either to ICE agents in the

2   field or to agents at B-19 (sic), making it very difficult when

3   attorneys appear at the facility to then locate -- and the

4   attorneys are using their correct name, the agents have a false

5   name, it creates a logistical problem, it's not any intent on

6   the part of ats in the facility to deny them access to their

7   attorneys.

8           As far as the --

9           **THE COURT:**  So it's --

10          **MR. SKEDZIELEWSKI:**  Yes, Your Honor.

11          **THE COURT:**  And counsel, so it's your understanding

12  that to the extent that -- because as you've noted the

13  plaintiffs point to numerous examples where counsel had

14  difficulty identifying their clients or people that they knew

15  that were there.  It's your understanding that for the most

16  part that was due to those individuals giving false names?

17          **MR. SKEDZIELEWSKI:**  I don't want to overreach and say

18  that was in every case, Your Honor, but that is a common

19  occurrence at this facility.

20          **THE COURT:**  Okay.

21          **MR. SKEDZIELEWSKI:**  And then in addressing Your

22  Honor's question about the privacy of the conversations.  While

23  there is 24-hour telephone access in each room of B-18, there

24  are also two private attorney/client spaces for confidential

25  meetings.  So this an opportunity, if a private conversation is

27

1    needed, to have one.

2           But again, I'd also like to emphasize the temporary

3    nature of the B-18 facility.  Certainly access to counsel is

4    not denied, a detainee can retain counsel while there, and then

5    once he's -- once he or she has been transferred to a different

6    facility may then be able to have a much more fulsome

7    discussion with counsel.  But no one is intended to be kept at

8    B-18 for months on end and no one has been.

9           So just returning if I could to the -- if that

10   satisfied Your Honor's questions.

11           **THE COURT:**  Yes.

12           **MR. SKEDZIELEWSKI:**  To the ex parte posture here.

13           Plaintiffs have to make a showing on two fronts.

14   First that they'll be irreparably prejudiced if the underlying

15   motion is heard according to the regular notice motion

16   procedures as required by the federal rules, and here

17   plaintiffs' Fifth Amendment allegations principally stem from,

18   as we've been discussing, events that occurred at this point a

19   month ago, and so any emergency warranting the shortened

20   schedule with a limited record has long passed.

21           The second prong of that test --

22           **THE COURT:**  Could I ask -- sorry, counsel.

23           **MR. SKEDZIELEWSKI:**  Yes.

24           **THE COURT:**  Could I ask, so it's the Court's

25   understanding that -- I guess two questions that I have -- it's

28

1    the Court's understanding that the Government's position is

2    that the plaintiffs needed to meet the mission power

3    requirements in addition to the standard for a TRO.  So if you

4    could speak to what authority suggests that.

5            And then if you could speak to the prejudice to the

6    Government in particular what you would have done with more

7    time.  Thank you.

8            **MR. SKEDZIELEWSKI:**  Yes, Your Honor.

9            So I understand that mission power is Southern

10   District, so it's not a controlling precedent here, Your Honor,

11   but this Court I believe as it mentioned in its tentative has

12   relied on it in the past and it is within the Court's

13   discretion to rely on it.  To the extent that the Court finds

14   that precedent persuasive I would just like to emphasize that

15   the second prong which requires or suggests that plaintiffs

16   need to show that they're without fault in creating the crisis

17   that they seek relief from.

18           And so as far as timing goes the nature for the -- or

19   the request for immediate relief, you know, was only days'

20   worth of time for the parties to review the record, that's the

21   crisis that I think is created by the plaintiffs' choice to

22   file this proceeding on the evening of a federal holiday.

23           And this is not just prejudice to the defendants,

24   Your Honor, it's prejudice to the Court who now has the

25   difficult prospect of having to make a decision in a tough case

1    with a much more limited record than it would otherwise be

2    provided at the preliminary injunction stage, and that leads me

3    to your other question about what else the Government could or

4    would provide.

5         I'll just say this, because without committing the

6    Government to anything in particular, which is that in

7    conversations with the agencies there are a lot more facts to

8    these scenarios that are alleged than we've been able for get

9    into the record on this shortened timeline.  Without being able

10   to confer and find out exactly what they are I can't say for

11   sure, but I know based on various conversations that there are

12   we would like to say a lot more than we've said here today.

13        So if I could next address the issue of standing.

14   Plaintiffs are looking for affirmative relief in the form of a

15   prospective injunction, and they lack standing there because

16   there's no evidence that the riots that occurred at B-18 on the

17   6th will recur.  It's an extremely unusual circumstance.

18   There's -- to my knowledge there haven't been riots at B-18

19   before and we have no proof that there or really even evidence

20   to suggest there will be any there again.

21        **THE COURT:**  And if I could interrupt you.  I think

22   plaintiffs first of all would challenge the idea that what

23   they're complaining of was -- Mr. Rosenbaum used the word

24   pretext, that may be a bit strong -- but that not all of what

25   they complained about was even related to the riots and it

1  certainly has continued past the point where there was active

2  unrest out -- and I'm using riots because that's your word --

3  active unrest outside of B-18.

4         So to the extent that the Court also agrees that the

5  issues raised by counsel were not all related to civil unrest

6  outside of B-18, could you address why there is not a

7  likelihood of recurrence?

8         I understand your first argument being that it was

9  mainly all related to this unrest, that unrest was very

10 unusual, not likely to recur and therefore they don't have

11 standing on that ground, but if you could also address this

12 other point that would be helpful.

13         **MR. SKEDZIELEWSKI:**  Certainly, Your Honor.

14         I think one reason we can expect or hope that riots

15 will not recur at B-18 is that the President thankfully called

16 in the California National Guard.

17         **THE COURT:**  Not that point, I think we can move on

18 from the unrest.

19         **MR. SKEDZIELEWSKI:**  Okay.

20         **THE COURT:**  I'm -- what I'm asking about is to the

21 extent that the Court finds that the access to counsel issues

22 were unrelated to the unrest, on what basis would you say that

23 there is no evidence that this could recur and that on that

24 basis the plaintiffs don't have standing?

25         **MR. SKEDZIELEWSKI:**  Certainly, Your Honor.

1          **THE COURT:**  Okay.  Thank you.

2          **MR. SKEDZIELEWSKI:**  So as the declarations show that

3     are accompanied with our opposition, there's 24-hour access to

4     telephones in each holding room, there are two private

5     attorney/client rooms for confidential discussions, there are 8

6     hours a day at a reasonable time, 8 a.m. to 4 p.m., 7 days a

7     week during this counsel can visit.  The situation is fluid.

8     Things can come up.  There's not an infinity of room inside

9     this facility, so there could certainly be times where counsel

10    has to wait outside for a period of time before they could

11    enter, but the policy at B-18 is so long as an attorney makes

12    it to the facility before 4 p.m. if they're in line outside the

13    facility will remain open until that attorney gets to enter the

14    facility and speak with their client.

15          During the emergency a month ago that may not have

16    been the case then, but that is the policy on a going forward

17    basis.

18          So plaintiffs' measures to attempt to gain access,

19    just back to the standing point, their attempts to gain access

20    to B-18 when access was limited can't establish their standing

21    organizationally because the harm is not certainly impending

22    since we're looking forward.

23          Even if everything that they've alleged is true and

24    they were, you know, rebuffed from entering, that's not going

25    to happen again, there's no evidence that it will happen again,

1    and so this Court should not grant relief on that basis.

2          And they can continue by the way thinking -- you

3    know, plaintiffs have emphasized a lot, and understandably the

4    individuals inside of B-18, but those are not the plaintiffs

5    here, here the plaintiffs are these two organizations and

6    they're free to continue their mission anywhere they like.  If

7    there's a problem at B-18 they can continue their mission

8    anywhere else in the City of Los Angeles.  At best plaintiffs

9    hypothesize about the recurrence of unrest at B-18.

10          In Clapper versus Amnesty International, Your Honor,

11    the plaintiffs there sought relief based on their fear that the

12    Government would illegally target their international telephone

13    calls.

14          The court considered the many different events that

15    would have to occur in order for any harm to come to plaintiffs

16    on that basis, and held that the highly attenuated chain of

17    possibilities does not satisfy the requirement that threatened

18    injury must be certainly impending.

19          And so I would like to just walk through the highly

20    attenuated chain of assumptions that would have to occur in

21    order to plaintiffs to get to an injury in the future that

22    would require prospective injunctive relief.

23          First they would need there to be more riots at B-18.

24    I should rephrase that.  First there have been to be riots,

25    then they would also be -- they have to somehow descend on B-18

 1    again specifically.

 2          Then the LAPD, the California National Guard, and

 3    other law enforcement will all have to fail to swiftly quell

 4    those riots.

 5          Plaintiffs or their members would have to also be

 6    present at B-18 at the moment that order happens to break down.

 7          Officials inside of B-18 would again have to decide

 8    to shut down the facility in response to those riots.

 9          And they would then have to deny plaintiffs access to

10    telephone calls or counsel once that decision is made.

11          That's quite the attenuated list of events that

12    plaintiffs have not even attempted to establish as likely to

13    recur.

14          So to address the merits, Your Honor.  To show a

15    Fifth Amendment violation plaintiffs must show that the

16    cumulative effect of the practices of the defendants here was

17    to prevent aliens from contacting counsel and received any

18    legal advice.  That's Orantes-Hernandez.

19          There may have -- while there may have been some

20    impact on detainees at B-18 during the time in question,

21    perhaps while they were in transit from B-18 to Santa Ana and

22    didn't have access to counsel, you know, while in the van, that

23    is not enough to give a cumulative effect that would prevent

24    those individuals from receiving any legal advice.  They are

25    able to receive it before that trip or after that trip or once

34

1    the disruption, which was at most a few days, ends.

2          So a restriction is unreasonable or restriction on

3    Fifth Amendment rights to counsel is unreasonable or excessive

4    relative to the Government's proffered justification.

5          Here the proffered justification couldn't be more

6    serious, namely those disruptions that occurred on June 6th

7    where there was violence perpetrated against all manner of law

8    enforcement.

9          So plaintiffs' leading case Orantes is

10   distinguishable in a number of ways and I'll tick through them

11   very quickly as I know I'm short on time.

12         There plaintiffs were kept far from potential or

13   existing counsel.  As this courtroom demonstrates downtown Los

14   Angeles is full of attorneys.

15         In Orantes the United States Government did not

16   challenge plaintiff's claim that it has limited access to

17   counsel, but here we do challenge that, we vigorously dispute

18   that there with no access to counsel.  And in Orantes the

19   United States conceded that the detention facilities did not

20   have telephones at all.  Here we have a telephone with 24-hour

21   access in every room.

22         There's also -- I'll just mention quickly -- there's

23   mention that in one of the declarations of plaintiffs that

24   detainees at B-18 have to use a system to put money on a card

25   or to make a call, that's not the case.  Every detainee is able

35

1  to make calls for free to their consulates and collect to

2  anyone else in the country.

3          Also the Fifth Amendment claims here are simply not

4  redressable by this order.  If the Court issues the injunction

5  in the tentative --

6          **THE COURT:**  And you have -- you -- sorry, counsel,

7  you have about a minute left, I just wanted to let you know.

8          **MR. SKEDZIELEWSKI:**  Certainly.

9          **THE COURT:**  Yes.

10          **MR. SKEDZIELEWSKI:**  If the Court issues the tentative

11 as is and riots recur and for the safety of federal employees

12 and detainees alike, the facility needs to be shut down.  Those

13 who manage that facility are going to be in a true bind,

14 because this injunction will prohibit them from taking the

15 steps necessary to protect federal property and the detainees

16 themselves, who plaintiffs' counsel alleges -- or purports

17 rather, to have their interests in minds, but this order would

18 not have their interests in mind at all.

19          With very little time left, Your Honor, I'll just say

20 that as far as the equities and public interest, the protection

21 of federal buildings, personnel, and detainees are a well-

22 established and legitimate Government interest and whatever

23 access issues detainees may have faced were temporary and have

24 been removed.

25          And so for these reasons plaintiffs have failed to

36

1  show they're likely to prevail on the merits not least of all

2  because they lack -- this Court lacks jurisdiction over their

3  claims due to standing issues, but either way merits or

4  standing the defendants respectfully request this Court deny

5  the Fifth Amendment TRO.

6          **THE COURT:**  Thank you, counsel.

7          **MR. SKEDZIELEWSKI:**  Thank you.

8          **THE COURT:**  Mr. Rosenbaum, by my chest clock you have

9  one minute and 52 seconds.

10         **MR. ROSENBAUM:**  On the issue of telephones, Your

11  Honor, counsel did not say that those telephones in those rooms

12  were not monitored.  As I already explained previously those

13  are large common rooms.  The attorney rooms that he talked

14  about don't have telephones in them.

15         On the question of common occurrence, there's nothing

16  in the record to suggest that the individuals give the

17  incorrect name.  Nothing in the record that had anything to do

18  with access, in fact it is the routine of ICE and border patrol

19  to immediately issue A numbers when an individual is taken into

20  custody, when an individual is arrested, that wasn't done here.

21  The undisputed record is that it took more than a week for that

22  in fact to take place.  That was the basis of the declarant to

23  the attorney saying we want to see somebody, well they don't

24  have an A number, you can't see them therefore.

25         Last point, Your Honor, with respect to security.

37

1    Let's talk about what the record really says.

2          First of all there's nothing in the record that says

3    that these -- the lawyers were blocking the ingress and egress

4    to the building.  To the contrary the record is they were right

5    by the door, had nothing to do with that.  That's -- nothing in

6    the record supports that.

7          But let's look specifically at the Uyeda declaration,

8    paragraph 11, all it says is for safety and security.  There's

9    no fact to support what counsel describes as an all-out riot

10   that somehow affects what's inside the facility as opposed to

11   what was taking place outside.

12         You can't just cry security in a crowded basement and

13   say that that's a basis for denying the particular rights here.

14   There's nothing in the record that supports this apocalyptic

15   claim that counsel is offering today.

16         **THE COURT:**  Thank you.

17         Okay, so with that the matter is submitted on that

18   TRO.

19         I will want to address with the parties at the end of

20   the hearing with respect to both TROs, if the Court is to grant

21   either of them, some discussion of how we should address timing

22   going forward, and then I will just mention because I don't

23   want to forget, it's the Court's recollection that everything

24   on the docket for this case is restricted -- and I'm not sure

25   if it's because it was originally filed as an habeas or because

1  it's immigration related -- but I did want to address that with

2  the parties as well, to the extent that the parties wanted

3  another approach.

4          Okay.  So with that let us turn to the other TRO, and

5  because there are a number of additional issues with respect to

6  this TRO I indicated to the parties that I would give them 40

7  minutes per side.  Let me set my clock and then whoever is

8  going to handle the argument on behalf of the plaintiffs can

9  begin.  And again, if you need to adjust the podium there's the

10 button to the right of the microphone.

11         **MR. TAJSAR:**  Thank you, Your Honor.  Mohammad Tajsar

12 for the plaintiffs.

13         Your Honor, I'd like to make three brief points, and

14 then I'll reserve the balance of my time for any questions that

15 the Court may have, and then for rebuttal as well.

16         And then just quickly we would like to address the

17 docket issue at the end, so I'm thankful that Your Honor raised

18 that.

19         So, Your Honor, I'd like to make three points, one

20 about the record, one about the reasonableness of the TRO that

21 we're seeking, and then lastly about the -- its necessity.

22         So first on the record.  We have provided an

23 overwhelming record that demonstrates that the Federal

24 Government has a policy and practice of conducting so-called

25 roving patrols throughout this district to stop individuals

1   without ever making a particularized, individualized assessment

2   of reasonable suspicion that the person seized is in the United

3   States in violation of the U.S. immigration law.

4        You know, that record consists now of 20 declarations

5   with dozens of specific incidents that show that this practice

6   is ongoing, and has been occurring.  We also cite dozens of

7   news articles that report on this practice.  And we cite

8   numerous public statements and other statements from the

9   defendants themselves or from senior members of the Federal

10  Government that demonstrate that this practice is officially

11  sanctioned.

12       **THE COURT:**  Can I ask this question, and if you're

13  going to get to it later you can do that, and I will have some

14  questions for the Government about this as well.

15       One way of reading the Government's opposition is

16  that the Government agrees with you concerning the requirements

17  for reasonable suspicion, but the Government's view is that the

18  totality of the circumstances approach that they've taken and

19  in particular in looking at the four factors that are in your

20  proposed TRO in combination, do provide the individualized and

21  particularized assessment and they rely on some cases including

22  Brignoni-Ponce and its prodigy to address that.

23       So I will hear if them, maybe I've misunderstood

24  their argument, but if you could address that in the course of

25  your argument that would be helpful why the combination of

40

 1   those factors is not an individualized, particularized

 2   assessment of reasonable suspicion.

 3           Thank you.

 4           **MR. TAJSAR:**  Certainly happy to, Your Honor.  I can

 5   address that now, actually that was going to be my third point

 6   but we'll take that third point here.

 7           I mean we somewhere asked for this injunction because

 8   we think it is necessary and not burdensome at all for the

 9   Federal Government to follow the law.

10           You know, they say they are following the law and

11   that these factors are permissible for them to look at and

12   perhaps in combination with others, but we view that position

13   as a striking admission that they're in fact not following the

14   law.  Right?  And that's the reason why we need this

15   injunction.

16           You know, the citation to <u>Brignoni-Ponce</u> I think is

17   remarkable, because what it does is it completely ignores

18   controlling precedent in this circuit.

19           In <u>Montero Camargo</u> and <u>Manzo-Jurado</u>, that demonstrate

20   that the appearance or, you know, and like race are factors

21   that are categorically forbidden from the assessment of the

22   totality of circumstances --

23           **THE COURT:**  And I'm sorry to interrupt you, counsel,

24   I should have asked this before for some of the other cases,

25   but for the sake of the record can you spell the names of those

41

1    two cases that you mentioned?  At least the first part of the

2    last name just so that the record is clear.

3          **MR. TAJSAR:**  That's right.  Sot the first case,

4    that's United States v. Montero, M-O-N-T-E-R-O hyphen Camargo,

5    C-A-M-A-R-G-O.

6          The second case is it United States v. Manzo-Jurado.

7    That's M-A-N-Z-O hyphen J-U-R-A-D-O.

8          **THE COURT:**  Thank you.

9          **MR. TAJSAR:**  And there are other case that we cite in

10   the record.

11         **THE COURT:**  Of course.

12         **MR. TAJSAR:**  Both of those cases stand for the

13   proposition that there is a red line that the Government cannot

14   cross, and that line is when you consider, even considering the

15   factors of appearance as they put it, you know, they don't use

16   the word race, but I think that's what they mean when they talk

17   about appearance, you cannot use appearance and you cannot use

18   race as a factor, even in combination with others in a district

19   like this one that has such a high proportion of Latina

20   individuals, that that's categorically forbidden.

21         They evidently don't agree with the controlling

22   Nineth Circuit law on this, and that demonstrates just how

23   necessary this injunction is that they follow the law, because

24   they're clearly not doing it.  That's on that particular

25   factor, Your Honor.

42

1         We raise three others in our proposed order.  Those

2    factors, the Nineth Circuit has said in Manzo-Jurado that those

3    are of minimal probative value and the totality of

4    circumstances analysis, and it appears those factors include --

5    excuse me -- speaking Spanish in an accent -- or speaking

6    English in an accent in a Spanish language, workplace -- sort

7    of location and status as a particular work that the person is

8    doing.  So those three factors the Nineth Circuit has said

9    minimally probative, if at all.  Right?

10         So what we say is that at least those three factors,

11    if those are the only ones plus the race, if those are the only

12    ones that the Government is using that cannot suffice.

13         THE COURT:  And so just to be clear, because this

14    came up in one of the Government's declarations, so I want to

15    be clear on what you're requesting and we may need some more

16    classification on the distinction between the location and the

17    occupation.

18         But the request is that the defendants may not rely

19    solely on the factors below, a loaner and combination, but

20    presumably aside from what you've said about race or ethnicity,

21    the other factors, in combination with other -- with unlisted

22    factors could be appropriate.

23         MR. TAJSAR:  I think that's right, Your Honor.

24         THE COURT:  Okay.

25         MR. TAJSAR:  I think there is it for instance, I

43

1    think it's footnote 21 and 22 in <u>Manzo-Jurado</u> that talk about,

2    for instance, if the Government has -- like is specifically

3    targeting an individual and then use these factors, that might

4    be permissible, and that's permissible because it has these

5    other factors.  And for instance, it has like a target or a

6    final order of removal, whatever the case might be.  So that's

7    an absolute right.

8           They're minimally probative, if they have other

9    information you could use them, but just by themselves with or

10   without race is forboden, the Government cannot do that.

11          So that, the fact that the Government appears to only

12   be using these factors to make these detentive stops is reason

13   enough for imposing this particular injunction.  And for that -

14   - to put a finer point on it, you know, it's precisely because

15   of this misunderstanding of the law that the Government has

16   made so many stops of U.S. citizens throughout the course of

17   this campaign for the last month.

18          You know, including the plaintiff Brian Gavidia who's

19   actually in the courtroom with us this afternoon --

20          **THE COURT:**  Welcome.  Where is he?  I don't know if

21   he wants to identify himself, but welcome.  Thank you for being

22   here.  As the attorneys know we rarely -- we have a lot of

23   plaintiffs and defendants and rarely do we see the actual

24   people named on the captions in court.  So welcome, thank you.

25          **MR. TAJSAR:**  I will say it takes quite a bit of

44

 1    courage from Mr. Gavidia to be here --

 2            **THE COURT:**  I would agree.

 3            **MR. TAJSAR:**  -- to participate in the vindication of

 4    those rights.

 5            I want to raise his story because it's critically --

 6    it shows exactly the consequence of this failure to perform the

 7    necessary analysis before detaining individuals.  You know,

 8    Mr. Gavidia was physically assaulted, pushed up against the

 9    fence and stopped for no other reason than the fact that he's

10    Latino and he was at a tow yard in a predominantly Latinah

11    (phonetic) area.

12            You know, he protested that he was an American

13    citizen during this stop, but that didn't save him.  You know,

14    facts like his are replete in the record.  People who have

15    lawful status within -- here in the United States who are the

16    nevertheless being stopped.  Some of them stopped twice.

17            I mean in the Toczylowski declaration there was an

18    individual who's an asylee, lawfully present, had this happen

19    to them multiple times.  I mean, these stories continue to

20    happen, in fact, just before Your Honor came to the bench we

21    just got word from our clients, the United Farm Workers, that

22    there's an active raid in Camarillo happening at the farm site.

23    And our clients, the United Farm Workers, have members who are

24    in Camarillo and they're trying to respond to them right now.

25            So these incidents are happening right now and

1  precisely because of this fundamental misunderstanding of the

2  law from the Government.  We have seen so many unconstitutional

3  and unlawful arrests.

4         The final point I'll make and then I'll stop.  Is a

5  point about the reasonableness of the relief that we're seeking

6  here.  You know, what we are seeking mirrors precisely what

7  Judge Thurston in the Eastern District of California ordered in

8  the UFW v Noem case.  You know, a case that challenges actually

9  precisely the same conduct that we're challenging here from of

10  the same defendants, you know.

11         And, in fact, those defendants have actually said

12  that that operation in the Central Valley was a success and

13  they called it a quote proof of concept for what they might

14  unleash here in this district.  It's the same defendants, the,

15  you know, El Central Border Patrol that governs this district

16  as well too.

17         And indeed some of the same -- it's similar sort of -

18  - the same practice of roving patrols.  That -- so I think this

19  Court in issuing an injunction prohibiting this unlawful policy

20  and pattern and practice is not treading new ground here.  This

21  is a well-worn path consistent with what the Court in the

22  Eastern District has done and many other courts have done to

23  enjoin unlawful Fourth Amendment related practices from

24  authorities who enforce immigration law.

25         The final point I'll make relevant to that part of

46

1    the reason why this district-wide relief is reasonable is

2    because we have both the plaintiffs here, both the individuals

3    and the organizations enjoy associational standing to reach the

4    merits of this case.  That is to say that they have, you know,

5    under the Ninth Circuit's precedent in LaDuke and cases

6    thereafter.  LaDuke is L-A-D-U-K-E, and that's v Nelson from

7    1985.

8         Under LaDuke our plaintiffs have standing to seek

9    prospective in -- a prospective injunction both because of this

10   past conduct that I'm referring to and the quote avowed future

11   intent of the defendants.  All -- none of whom have suggested

12   that this -- these practices are going to stop.  In fact, just

13   a few days ago one of the defendants Gregory Gravino in -- as

14   part of a show of force at McArthur Park suggested as much,

15   that we are here in Los Angeles and these raids are going to

16   continue, in fact, intensify.

17        So we certainly have standing as to all of our

18   plaintiffs to reach for the liability phase of this case and

19   the fact that we have these organizations with associational

20   standing supports our request for district-wide relief,

21   precisely because of the factors that Your Honor laid out in

22   the tentative concerning the inability to fashion relief

23   without it being district-wide, per the Easy Rider's decision.

24        So with that, Your Honor, I'm happy to submit on the

25   tentative or address any other questions that you have.

47

1            **THE COURT:**  I don't have any questions right now.  I

2    may on rebuttal after I hear from the Government.  Thank you.

3            **MR. TAJSAR:**  Very good, thank you so much.

4            **THE COURT:**  And I'll hear from defense counsel, thank

5    you.

6            **MR. SKEDZIELEWSKI:**  You want your water bottle?

7            **MR. TAJSAR:**  Oh, I'm so sorry, yes.

8            **MR. SKEDZIELEWSKI:**  Thank you.

9            And we have 40 minutes this time, Your Honor; is that

10   right?

11           **THE COURT:**  Yes.

12           **MR. SKEDZIELEWSKI:**  Thank you.  So really I just want

13   to specifically address that was raised by plaintiffs just now.

14   When the Government says appearance, it means appearance and

15   any suggestion to the contrary is I think highly inappropriate.

16           **THE COURT:**  Then what does appearance mean?

17           **MR. SKEDZIELEWSKI:**  Every outward sign that a person

18   exhibits clothing, dress, manner, facial expression, anything

19   that you can see with your eyes.

20           **THE COURT:**  And so -- and I think the Court also

21   understood that by appearance you meant something akin to race,

22   given the cases that you cited to.  And so am I to understand

23   you to say appearances, clothing, dress, facial expressions but

24   not race?  Not that someone appears to be one race or the

25   other?

1          **MR. SKEDZIELEWSKI:**  Let me be very clear on this

2   point.

3          **THE COURT:**  Yes, thank you.

4          **MR. SKEDZIELEWSKI:**  The Government is not saying that

5   any of our agents are relying on race.  Period.  However, the

6   case law, irrelevant -- irrespective of what any particular

7   agents may be doing says that as part of a totality of the

8   circumstances, agents do not have to put blinders on and not

9   notice the race or ethnicity or the language or the location of

10  a potential target.  And that's obviously got to be the case.

11         If agents have intelligence that at a particular

12  location criminal conduct is afoot, there are 15 people there

13  and only one of them is a Caucasian and the Caucasian is the

14  one committing the criminal conduct, then they have to take

15  into account race.

16         **THE COURT:**  Can I ask this question to begin with?

17  As I understand it from the Government's opposition and from

18  the declarations there's a number of different things that have

19  been happening.  There have been some arrests pursuant to

20  warrants, which we're not really here to talk about.  Then

21  there has been some targeting of individuals that have been

22  identified in advance and I believe it was the Deputy Field

23  Office Director, Mr. Quinones that mentioned they are targeting

24  packets.  And then I understand that separate from the

25  targeting of individuals, there's the separate warrantless

49

1   arrests and detention based upon the totality of the

2   circumstances.  Am I correct about that?  Meaning, I guess I

3   want to be clear that because there weren't specifics in the

4   Government's opposition, it was not clear to me whether what

5   the Government was saying is, listen, everything that you've

6   seen, everything you've heard about was actually related to the

7   targeting of an individual.

8           And so when we went to call it a car wash, we had

9   information about somebody, John Doe, we went there looking for

10  John Doe.  We didn't have a warrant, but we went there looking

11  for John Doe and then based upon what we saw when we got there,

12  we may have detained or had voluntary conversations with

13  others.

14          So I'm not sure if the Government is saying all of

15  this is that or there's also some other category of, which the

16  declaration seems to suggest there's this other category of

17  determining that some combination of the factors, you've

18  indicated race is not one of the factors, so some combination

19  of car wash plus someone wiping down cars, plus other factors

20  like that, they identify places that they can go that they

21  think will yield people without status.  I hope -- is the

22  Court's question clear?

23          **MR. SKEDZIELEWSKI:**  I think so, Your Honor.

24          **THE COURT:**  Okay.

25          **MR. SKEDZIELEWSKI:**  And I think it's a matter of

1    plaintiff's incorrect framing of these types of actions.

2              **THE COURT:**  Okay.  So if you could assist with that,

3    that would be great, especially the actions that are not

4    related to targeting of an individual in advance by name.

5              **MR. SKEDZIELEWSKI:**  Totally understood.

6              **THE COURT:**  Okay.  Thank you.

7              **MR. SKEDZIELEWSKI:**  So, Your Honor, I think one

8    category of interaction that agents have with members of the

9    public that needs to be understood and that plaintiffs allied

10   (phonetic) in their conversation on this, is while agents may

11   be involved in a targeted stop that has a targeting packet

12   associated with, with all that evidence, they might not locate

13   that target.  They might locate the target and locate a number

14   of other individuals who are associating with that target.

15             And in the course of their targeted enforcement of

16   immigration law, they might come upon people engaged in

17   voluntary interactions that lead to a determination of

18   reasonable suspicion using the totality of the circumstances.

19             And so I think that's a key category that we need to

20   understand is that's the regular practice that the plaintiffs -

21   - they say that there's a policy and a practice of

22   indiscriminately, you know, targeting individuals based on

23   ethnicity and so on.  The policy and practice is that agents

24   receive intelligence, act on that intelligence, but then they

25   don't, as I said, put blinders on to the scene that they've

1    arrived on and ignore the opportunity to enforce immigration

2    law beyond whatever their original plan may have been.  And

3    that's what the declarations made clear.

4            These are sophisticated operations, Your Honor, where

5    DHS and the component agencies are using these packages that

6    have the immigrant's immigration history, their criminal

7    history, their residence, their employment information all to

8    help protect the country from cross border crime by enforcing

9    the Immigration and Nationality Act.

10            And in addition, as you can see in the Harbert

11    (phonetic) declaration, these agents are acting on information

12    from other law enforcement that they might receive, they're

13    analyzing trends like Your Honor's mentioned, they aren't

14    taking a sort of 30,000 foot view as well as the narrow

15    approach that's the focus of the case law.

16            And the agents in the field are developing facts.

17    They're relaying that back to HQ.  And the officers'

18    observations, training and experience all inform that process.

19    And so one of the main problems with this case as I understand

20    it, I don't see how the Court can effectively resolve at this

21    stage is each stop, to evaluate whether it's appropriate or

22    inappropriate under the law, would require a particular

23    analysis of all the factors that went into that stop.

24            **THE COURT:**  And so thank you for that.  And that is

25    the Court's concern is that it doesn't seem that the Government

1    has put into the record beside -- the two declarations to me

2    seem very general and they talk about what the normal practice

3    is or what the intended practice is.  And they therefore don't

4    really engage with the pretty high volume of evidence that the

5    plaintiffs have put in the record about the types of things

6    that we've all seen and heard on the news.

7            And so that's what I'm asking you to sort of bridge

8    that gap for the Court.  I would have thought that the

9    Government, if what you're saying is true, and there have been

10   a number of individuals that have been identified either in the

11   press reports or the plaintiffs themselves, that there would be

12   reports, of course the Court's normal experience in other parts

13   of my job, are with local and federal law enforcement that are

14   targeting people for crimes.

15           And there are reports after they've arrested somebody

16   as to why they arrested this person, how they happened to be

17   where they were and what they did.  And there doesn't seem to

18   be anything like that here which makes it difficult for the

19   Court to accept your description of what is happening.  Because

20   there is no proof that that is what is happening as opposed to

21   what the plaintiffs are saying is happening.

22           And the one piece of evidence that we have, the one

23   form, I've forgotten the name, the parties will remember.  It's

24   123, 113, in any event, the one form about one of the

25   individuals, I won't mention by name, it actually again does

1   what appears to be a very general description of this is --

2   these are all the law enforcement agencies involved in this

3   operation, this is generally what we're doing and then we

4   arrested Mr. So and So.

5          And so that's the Court's concern and I don't know if

6   there's anything that you can do to address that because that

7   makes it very hard for the Court to find that the plaintiffs do

8   not have a likelihood of success in showing that the defendants

9   are doing something unlawful and are not doing what you've

10  described.

11         **MR. SKEDZIELEWSKI:**  Thank you, Your Honor.  I think

12  three main points in response to that.

13         **THE COURT:**  Thank you.

14         **MR. SKEDZIELEWSKI:**  First, the lack of evidence that

15  Your Honor mentions is exactly why this Court should not grant

16  plaintiff's ex parte application.

17         The Fifth Amendment ex parte is one thing.  But this

18  ex parte with the volumes of evidence, with defendants having a

19  couple of days to try to identify each individual mentioned,

20  many of them are anonymous in their declarations, defendant

21  agencies have no way to figure out which individual was stopped

22  when they're referred in the plaintiff's declarations merely

23  anonymously.

24         And it would just be procedurally unfair to grant the

25  Fourth Amendment TRO when defendants have not had the

54

1   opportunity to muster the evidence that Your Honor requests.

2   So you're right, Your Honor is correct, excuse me, that we --

3   there are certainly more things that the agents considered when

4   they made their determinations of reasonable suspicion in all

5   the cases that plaintiff raised, we just haven't had a chance

6   to a) identify in many cases who the people who were stopped

7   even were, and let alone, over a holiday weekend get ahold of

8   the agents.  I mean, how -- it's really hard to imagine how we

9   could have done that.

10          **THE COURT:**  And so I understand you to be saying to

11  me it doesn't seem so unreasonable -- the volume that the

12  plaintiffs have put forth actually seems like it would be

13  easier for the Government to -- you could have -- if any one of

14  these people, if there was any one of these people and there

15  was a report about this is how we identified this tow yard

16  parking lot, et cetera, that would have been helpful.  And it's

17  hard for the Court to believe that in the time that you had,

18  you couldn't have done that.

19          So I do have some concerns with that.  And not

20  everybody was anonymous and to the extent that these are all

21  people that the Government is proceeding with proceedings on,

22  then I would think that there are records kept on them.

23          **MR. SKEDZIELEWSKI:**  Understood, Your Honor.  I would

24  just like to -- two other points on this.

25          **THE COURT:**  Yes, please, thank you.

1           **MR. SKEDZIELEWSKI:**  The exhibit, I believe the

2    exhibit you referenced I'll also avoid mentioning the name if

3    that's Your Honor's preference, but in that exhibit, the record

4    of the one named plaintiffs, the plaintiffs here claim that the

5    agents were not engaged in targeted operations.  That was Your

6    Honor's read of it as well.  But in that document, it

7    specifically says that the agents are quote focusing on

8    individuals with executable final orders of removal.  That's

9    what in the -- I can point you out to the page.

10           **THE COURT:**  And remind, just for the sake of the

11    record, remind me what the ECF No. for this one is.

12           **MR. SKEDZIELEWSKI:**  That's 81-1.

13           **THE COURT:**  Okay.  And so --

14           **MR. SKEDZIELEWSKI:**  And it's Exhibit A.

15           **THE COURT:**  -- counsel what I would have expected to

16    see then, what I would have expected to see is -- because that

17    all sounded fine, and then I would expected to see, we were --

18    we had identified person X and again, I'm not familiar with

19    these types of reports, I see them in other types of law

20    enforcement.  We had identified person X and we were going

21    after person X and that's when we came across person Y, but it

22    doesn't say that.  It just says in general this is what we're

23    doing and then it says we arrested this person.

24           So unclear whether this person is -- was the targeted

25    individual or they just came across him or on their way to

56

1    simply saw this.  So that would be helpful.

2          **MR. SKEDZIELEWSKI:**  I understand, Your Honor.  One

3    quick point that I wanted to make a moment ago about

4    plaintiff's evidence and then if I could address this.

5          **THE COURT:**  Yes.

6          **MR. SKEDZIELEWSKI:**  So the evidence is replete with

7    instances of stops.  It is not replete with any evidence that

8    those stops or that the agents in any way failed to follow the

9    law.

10          So there's allegations in some of the declarations

11    that the individuals felt, that's their language, not mine,

12    that they felt they had been targeted for their race, I can

13    understand how someone might feel that way, but of course,

14    that's not proof that the agents only considered race.

15          So it's the plaintiff's burden to demonstrate that

16    the agents acted improperly.  It is not the Government's burden

17    to, at this early stage, to show that every single interaction

18    that each agent had in plaintiff's declarations was above board

19    and they certainly were.

20          So speaking of the law, when making these reasonable

21    suspicion determinations Courts do need to, when they're

22    reviewing these interactions, take the same standard that the

23    agents have in the field and think about the totality of the

24    circumstances and whether there was a particularized and

25    objective basis for suspending or suspecting wrongdoing.  And

57

1  they also are permitted because the agents are to consider the

2  agent's objective, reasonable inferences from the facts.

3          So here, there's no allegations of a pattern and

4  practice of ignoring the requirements of particularized

5  suspicion.  What plaintiffs have shown is that agents are

6  regularly and vigorously enforcing federal immigration law.

7  But that's not evidence that each case involved misconduct.

8          Other than unsupported assertions in the

9  declarations, there's no other evidence that any particular

10  agent neglected to follow the requirements of the Fourth

11  Amendment.

12          So just consider -- and within plaintiff's own

13  evidence there is I think actually ample proof that the agents

14  are considering the totality of the circumstances.

15          So there was a -- the episode at the car wash in

16  Whittier, California that's described in a couple of the

17  declarations, this is the one where there were multiple visits

18  to that same car wash by immigration officials.  So agents

19  there did not indiscriminately stop and detain just anyone,

20  rather each time they spoke to individuals at the car wash and

21  reacted in response to what they learned from those

22  interactions.  You can see in the results.

23          So on day one, they make three arrests and there's

24  one stop.  Just the fact that on day one there's differing

25  results, it's already evidence that they're considering the

1    totality of the circumstances.  Three individuals they found

2    that they did have sufficient evidence to make arrests.  And

3    one, they made a stop, and then they didn't make an arrest.

4         On the second day they go back to the same car wash,

5    these days aren't back to back, I don't think, there's days in

6    between and they just make one arrest.  On the third day, and

7    keeping with Your Honor's practice of not mentioning the named

8    plaintiffs, one of the plaintiffs was temporarily stopped

9    over -- you know, a reasonable suspicion of immigration

10   violations and was removed to a different location for a brief

11   period of time to confirm his status and then returned to the

12   car wash.

13        And then another was briefly talked to, spoken to by

14   the agents and then that was it.  They had a voluntary action

15   and no further steps were taken, as far as trying to detain or

16   anything like that.

17        So simply put, declarant's unsupported assertions

18   that these stops were based on ethnicity or other, you know,

19   impermissible characteristics are -- it's not just there in the

20   record.  The results show that the agents are discerning

21   meaningful differences between the evidence in each case.

22        Plaintiff's further suggestion that targeting

23   specific locations or types of work is somehow inappropriate is

24   also simply not the law.  Those elements can be considered as

25   part of a totality of the circumstances.

1          The Court, the Supreme Court in <u>Arvizu</u> rejected what

2     it called --

3          **THE COURT:**  Please, and can you spell the name of the

4     record, the case for the record?

5          **MR. SKEDZIELEWSKI:**  Oh, yes, thank you.  It's

6     A-R-V-I-Z-U.

7          The Court there rejected this divide, what they

8     called a divide and conquer approach.  The incorrect way for a

9     Court to review, you know, reasonable suspicion stops is to

10    look at each factor considered by the officer in isolation and

11    then reject each one, if by itself and alone, the factor

12    appears to be innocent.  The Court said that's not taking the

13    totality of the circumstances into account.  Instead, the Court

14    said that the innocent, certain innocent factors, like language

15    or other things like that, which plaintiffs bring up, taken

16    together with surrounding circumstances can warrant further

17    investigation.

18         So we can't draw boundaries around all of these

19    different factors and say this factor, can't consider it, this

20    factor, can't consider it.  It's the totality of the

21    circumstances, not just the circumstances that plaintiffs would

22    like.

23         **THE COURT:**  And I do think, and I think I had counsel

24    clarify that, the four factors that they're talking about,

25    first of all it sounds like race is not an issue for you

60

1  because you've indicated that's not what the officers are

2  doing, that the four -- their problem is with using these four

3  factors alone, solely these factors in combination.

4      So if officers have these four factors and nothing

5  else, that is what they're saying is illegal and improper.  So

6  just to be clear, I'm not sure that it's exactly what you're

7  saying concerning the totality of the circumstances with the

8  exception of the race factor, which they believe shouldn't be

9  considered at all.

10     **MR. SKEDZIELEWSKI:**  Yes.  So, Your Honor, each of the

11 four factors -- let me put it this way.  When an agent is

12 making a voluntary stop after attempting to make a targeted

13 arrest, he's not going to put blinders on and ignore the four

14 factors that plaintiffs list.  And, in fact, to remove location

15 would make it impossible for the agents to react appropriately

16 to circumstances when they arrived at a location where they

17 know criminal activity is afoot.

18     So an agent may appear at a location where they know

19 criminal activity is afoot and then find that there are others

20 involved who they weren't expecting to find there and they

21 can't consider location, that's not consistent with the law.

22 And again, just to emphasize this about innocent seeming

23 factors, the Court in Arvizu considered even something as

24 innocuous as failing to waive to a police officer as a relevant

25 factor because in that context, the police officer and the

61

1    person driving by were the only two persons on a remote desert

2    road where the officer thought it was rather odd that the

3    driver didn't wave.

4              And then additionally, when that driver pulled -- was

5    in the process of tailing that driver, the plaintiff's children

6    were waving out the back window.  And the waving of the

7    children was a legitimate factor for consideration.  It's not

8    because there's anything wrong with children waving to police

9    officers, of course, that's welcome.  But in the totality of

10   the circumstances the officer had a reasonable suspicion that

11   some criminal activity was afoot, and in fact there was, there

12   was drug smuggling going on.

13             So the plaintiff's request for relief that Your Honor

14   just described as the -- with the four factors that they're

15   sort of concerned about would cause officers to have to ignore

16   the totality of the circumstances and would be contrary to the

17   law.  It would require totally revamping the policies and

18   procedures, not because our agents are out there constantly

19   breaking the law, but because this request for preliminary

20   relief is inconsistent with the law.

21             So officers are not required to ignore even the

22   relevant characteristics of a location, in determining whether

23   the circumstances are sufficiently suspicious to warrant

24   further investigation.  And as we've mentioned, appearance also

25   can be considered, but of course, not all by itself.

62

```
1          So, Your Honor, if I could return -- we've
2  discussed -- does Your Honor have any further questions on that
3  particular issue with the characteristics?
4          THE COURT:  I must say -- thank you.  I'm not really
5  as satisfied with respect to the characteristics and I do feel
6  like you're speaking in generalities.  I will review, of
7  course, the cases that you've pointed the Court to, but some of
8  the factors they just seem to the Court, even understanding the
9  totality of the circumstances, if you combine the fact that the
10 Government, and I understand it's not the Government's burden
11 to show the absence of X, Y, Z perhaps, if you take the absence
12 of any concrete examples of what this targeting looks like or
13 what the reasonable suspicion analysis is, together with some
14 of these locations seem so general and locations where numerous
15 people could be present and not associated -- and they're
16 places where not necessarily associated with not having status.
17          As they said, bus stop, car wash, tow yard, maybe
18 they're correlated with people who are low income or have low
19 income occupations, maybe they're correlated with race or
20 ethnicity, but they don't seem to be correlated with status.
21 And I'm not -- I guess I'm not hearing how -- I understand what
22 you're saying about the officers should not put blinders on,
23 but what they are considering should be things that give them a
24 reasonable suspicion that this person does not have status.
25 And that's what -- I'm not seeing that correlation.
```

63

 1          But, you know, given the limited time and I

 2   understand you've addressed this thoroughly in the papers, if

 3   you want to move on to the other arguments, you can do that.

 4          **MR. SKEDZIELEWSKI:**  I'll just make one further point

 5   on this, Your Honor.

 6          **THE COURT:**  Thank you.

 7          **MR. SKEDZIELEWSKI:**  Which is that what might seem

 8   like an arbitrary stop that comes out of nowhere, cars pull up

 9   and there's no preliminary interaction and agents jump out and

10   start speaking with somebody, there are -- agents are

11   performing work in the field all the time before these

12   interactions occur.

13          Right.  And so prior surveillance of that area, of

14   that person, of their interactions that the person who ends up

15   being stopped might be totally unaware of, are informing the

16   agent's decisions to approach in the first place.

17          And so while it might seem to plaintiffs that these

18   stops are only occurring because it's a Home Depot, that's not

19   the case.  And our agents are relying on, as we've said,

20   information from other law enforcement agencies, analysis of

21   trends, rational inferences from facts developed by agents in

22   the field to make these determinations.

23          **THE COURT:**  Thank you.

24          **MR. SKEDZIELEWSKI:**  So -- you're welcome, Your Honor.

25          So to return the standing issue here.  Again, in

64

1  Clapper as I emphasized previously, the highly attenuated chain

2  of possibilities does not satisfy the requirements that

3  threaten injury must be certainly impending.

4         So in the Fourth Amendment context, certainly the

5  federal government is going to continue to enforce federal

6  immigration law.  And so to that extent, the plaintiffs are

7  correct.  Yes, stops and arrests, that will all continue.  But

8  what they're not correct about and what the record does not

9  show is that there's going to be a continued violation of the

10  law with agents totally ignoring their training, ignoring

11  policies and procedures, and just ignoring all the intelligence

12  that they receive from headquarters.  You know, they get the

13  targeting package, they just throw that in the trash, I'm going

14  to go just grab somebody because of ethnicity instead of

15  relying on all the good intelligence that I have, that tells me

16  here the actual criminal conduct is and where the actual

17  immigration violations are occurring.

18         That's a huge assumption to make by plaintiffs.

19  There's nothing in the record that shows that.  There's no

20  document in evidence of ICE or CBP agents saying, yeah, we're

21  not interested in following the law, we're going to ignore all

22  the good information that we have, you know, headquarters told

23  us to go to location A today, where we know there's criminal

24  conduct afoot, but forget that, we're going to go and just

25  start grabbing people because of race and ethnicity.

65

1          They've not met that burden and they can't, because

2     that kind of conduct is just not happening.  But that would

3     just the first thing, the first huge assumption that they have

4     to make before they get to an impending and certainly --

5     certain to occur injury.

6          Then the individuals who are inappropriately stopped

7     would have to either be individually named plaintiffs, members

8     of the organizational plaintiffs, or members -- or the

9     organizations themselves if that were conceivable.

10          And so they -- the plaintiffs have not presented any

11     evidence to suggest that this -- even if there is misconduct,

12     that that misconduct is going to specifically target the

13     individuals that are named in the case or their members.

14          **THE COURT:**  And so the fact that -- if I remember

15     correctly some of the named plaintiffs have been stopped more

16     than once, that's not enough?

17          **MR. SKEDZIELEWSKI:**  The fact that some have been

18     stopped more than once?

19          **THE COURT:**  Yes.

20          **MR. SKEDZIELEWSKI:**  If the officers had reasonable

21     suspicion in each of those instances, then they've not shown

22     any violation of the law.  And that is, of course, our

23     position.

24          **THE COURT:**  Understood.

25          **MR. SKEDZIELEWSKI:**  I mean, one would certainly hope

66

1   it would be a very rare thing, but if someone is stopped every

2   day for seven days straight, because they happen to be in

3   circumstances that we could all objectively agree under a

4   totality of the circumstances do give rise to a reasonable

5   suspicion, there'd be nothing violating the Fourth Amendment

6   there.

7        **THE COURT:**  And then that would be that there's no

8   violation, not that whatever it is, is likely to recur.  I

9   thought you were addressing the likelihood of recurrence.

10       **MR. SKEDZIELEWSKI:**  Yes.  Yes, Your Honor.

11       **THE COURT:**  Okay.

12       **MR. SKEDZIELEWSKI:**  Correct.  So for the -- to take a

13  step back.  Once we've gone through the chain of assumptions,

14  the hypotheticals of agents continuing to do the stops and

15  arrests, granted they're going to continue to make stops and

16  arrests, then ignoring the law, acting inappropriately with

17  respect specifically to these plaintiffs and then that the

18  targeted individual has to consent to the stop as well, right,

19  for there to be standing.  There's just a number of assumptions

20  where we're expecting individuals to make decisions that this

21  Court can't possibly know about, that the plaintiffs have shown

22  no evidence of.

23       So in -- the Court in Lyons, the Court considered

24  police department policies there about chokeholds.  The

25  policies weighed against a finding of immediate threat because

1    the policies themselves were against chokeholds, right.  The

2    Court thought that was probative there.  The same is true here,

3    DHS policies -- excuse me, DHS has policies and training to

4    ensure compliance with the Fourth Amendment.  It's mandatory,

5    it's not an option for these agents.

6          Similarly, the Court in Rizzo -- excuse me, I should

7    spell the case, Lyons is L-Y-O-N-S.  And Rizzo is R-I-Z-Z-O.

8    So the Court found there that plaintiff's claims that every

9    stop by police would be unconstitutional were no more than mere

10   conjecture --

11         THE COURT:  All right.  Counsel, I think I heard a

12   phone going off.  I should have mentioned at the beginning but

13   I think the court security officers have addressed this, no

14   phones.  We don't want to have to stop the hearing and

15   confiscate phones, so whoever it was, turn it off and put it

16   away.  Thank you.  Please proceed, counsel.  I won't count that

17   against your time.

18         MR. SKEDZIELEWSKI:  Thank you, Your Honor.  That was

19   a very brief interruption.  So in Rizzo the Court found that

20   the plaintiff's claims that every stop by police in the future

21   would be unconstitutional was no more than a mere conjecture.

22         Plaintiffs essentially are alleging the same thing

23   here that on an ongoing basis, CBP and ICE are just going to

24   engage in one, disregard for the law and violate it with every

25   stop that they interact with.  Because, of course, the relief

1    sought is not to prohibit them from doing certain stops in

2    certain areas, but would apply across the board.

3            And also in Rizzo the plaintiffs sought relief from

4    inadequate disciplinary procedures for policeman's conduct.

5    But the Court found that plaintiff's claims to future injury

6    rested on what one of a small unnamed minority of policemen

7    might do to them in the future.

8            The scenario is the same here where what plaintiffs

9    are alleging is that a small unnamed minority of police are

10   going to continue to engage in violations of the law, but they

11   haven't pointed to any specifics that would say, yeah, actually

12   we know it's Agent X, he's the one, he just throws those

13   targeting packages in the trash.

14           **THE COURT:**  And I think this is obvious to everyone,

15   they're going to respond, nobody can identify these agents,

16   because they're all wearing masks.

17           **MR. SKEDZIELEWSKI:**  Your Honor, from the evidence

18   that I've reviewed that plaintiff submitted, the video

19   evidence, it was a little tough to review, without all the

20   videos working correctly, so please don't hold it against me if

21   I misstate something that was in those videos.  But from what I

22   could see, many of the officers had their badges on and when

23   one officer in particular was asked, what's your name, what's

24   your badge number.  He responded, my badge is right here,

25   here's my number and he stated the number out loud.

1            And the masks are really not at issue in this

2      litigation, but I understand Your Honor's point, but of course,

3      the reason that these agents are taking extra precaution is

4      because of the extraordinary violence that they've encountered

5      in response to them trying to enforce immigration law.

6            So like I was -- in comparing Rizzo to this case,

7      plaintiffs here similarly allege discreet misconduct with

8      respect to, you know, this named plaintiff or to this anonymous

9      declarant.  But yet, they seek agency-wide relief untethered to

10     those specific allegations.

11           So such a fear of unpredictable future misconduct

12     doesn't give plaintiffs standing.  They cite to Havens, H-A-V-

13     E-N-S.  But Havens stood for the proposition that organizations

14     have standing when their business is directly affected in some

15     negative way, but Lyons did not extend that case.  And

16     plaintiff's attorneys seem to be operating just fine, despite

17     immigration enforcement.

18           So, Your Honor, on irreparable harm, moving back to

19     the merits if I could briefly while I'm running out of time

20     here.

21           **THE COURT:**  You have seven minutes.

22           **MR. SKEDZIELEWSKI:**  Oh, seven minutes?  Okay, great.

23           So plaintiffs must show that irreparable harm is

24     likely to result in the absent of the injunction that they're

25     asking the Court for.  And to do that, they have to demonstrate

70

1  immediate threatened injury.

2           Plaintiff's future injuries, though, are speculative

3  and therefore insufficient to demonstrate the likelihood of an

4  irreparable injury.  What they have shown is that the stops and

5  arrests have occurred and that some of those individuals

6  stopped or arrested have made unsupported assertions that they

7  were done for improper motives.  But outside of that, there is

8  no evidence that the motivations were factors considered by the

9  agents were improper.

10          And as I emphasized, you know, agents are operating

11  based on this targeted individualized packages.  As for the

12  balance of the equities and public interest, subjecting the

13  executive here to essentially a pre-clearance regime for

14  immigration enforcement would severely infringe on the

15  President's Article 2 authority.

16          The Government has a legitimate and significant

17  interest in enforcing immigration laws.  It's not just the

18  President who wants to do that.  Congress passed the

19  Immigration and Nationality Act and these agents are carrying

20  out that congressional mandate.

21          **THE COURT:**  Counsel, how do you see this as a pre-

22  clearance regime?  Because I understand, and I will certainly

23  ask them to clarify, I understand the plaintiffs to -- maybe

24  you can explain what you mean by pre-clearance.  To the extent

25  that they're asking that the defendants maintain documentation,

71

1    I don't think they're asking that that documentation be

2    provided to the Court or to counsel in advance of completing

3    the stop, so what makes it a pre-clearance regime to you?

4            **MR. SKEDZIELEWSKI:**  Allow me to rephrase that, Your

5    Honor.

6            **THE COURT:**  Okay.

7            **MR. SKEDZIELEWSKI:**  And I'll withdraw the pre-

8    clearance language.

9            **THE COURT:**  Okay.

10           **MR. SKEDZIELEWSKI:**  I don't want to get hung up on

11   that.

12           **THE COURT:**  Okay.

13           **MR. SKEDZIELEWSKI:**  What plaintiffs are essentially

14   asking for is a permanent and unending opportunity to engage in

15   discovery with the Government.  There's nothing in the facts

16   that warrants that extensive request.  Where now at some, you

17   know, repeated periods of time the Government is going to have

18   to compile, redact, and you know, mark confidential and then

19   send all these documents to the plaintiffs on an ongoing basis.

20           Congress has the authority to regulate the, you know,

21   executive branch agencies, not plaintiff's counsel.

22           **THE COURT:**  And so to that point, if we were out of

23   the TRO context and handling this on a regular motion for

24   preliminary injunction or they haven't even sought preliminary

25   relief, they would be entitled, assuming they met the other

1  bars, obstacles that you've identified, standing,

2  justiciability, et cetera, jurisdiction, they might be able to

3  engage in discovery and get at this stuff.  You've indicated

4  that there is -- they have these unsupported assertions as to

5  what the agents are making their stops based on, but isn't this

6  documentation precisely what would either prove that they're

7  right or that you're right about what the basis of the stops

8  are?

9          **MR. SKEDZIELEWSKI:**  That may be, Your Honor, except

10  the problem with that is that if that's in a TRO context, then

11  the Government has already had to suffer the burden of shifting

12  its policies and practices to comply with the protective order.

13         **THE COURT:**  And what -- and this is important because

14  I do think it is important for the Court to consider the extent

15  to which the TRO would burden, otherwise lawful, immigration

16  enforcement.  And so it's not clear to me the burden that would

17  be imposed by the TRO that the plaintiffs have asked for.  If

18  what they're asking for again they have clarified that these

19  four factors, they're not claiming that those factors cannot be

20  used in connection with other factors, so according to you,

21  this would be consistent with the training and then the

22  documentation -- unless it's your assertion that this is not

23  documentation that already is kept, which I would have thought

24  and maybe the officers, the two declarations, excuse me, that

25  were filed by the defendants addressed this.  I guess I would

73

1    thought that the training requires some documentation every

2    time there's a stop of the reasons and what led up to the stop.

3          So neither of those seem particularly burdensome if

4    they're consistent with what you explained they're already

5    doing.  So it would be helpful, obviously there's something I'm

6    not seeing about what is particularly burdensome and so would

7    be helpful if you could sort of clarify that for the Court.

8          **MR. SKEDZIELEWSKI:**  Certainly, Your Honor.  So the --

9    as far as I understand and I don't want to overreach, the

10   agencies have not prepared to start, you know, compiling

11   information or documents in advance to comport with what would

12   be required in this request.

13         **THE COURT:**  And it doesn't necessarily need to be in

14   advance, but again taking the analogy that I've been using

15   throughout this hearing of a regular criminal case, the police,

16   the FBI after they arrest somebody, they write a report about

17   why they arrested this person.  And maybe you don't know the

18   answer to whether there is some equivalent in this context.

19         **MR. SKEDZIELEWSKI:**  Yeah, I can't say whether there

20   is an equivalent in this context --

21         **THE COURT:**  Okay.

22         **MR. SKEDZIELEWSKI:**  -- definitively, Your Honor.  I

23   don't want to say --

24         **THE COURT:**  Understood, I appreciate that --

25         **MR. SKEDZIELEWSKI:**  -- something the evidence doesn't

74

1    bear out.

2         THE COURT:  -- thank you for your candor.

3         MR. SKEDZIELEWSKI:  Yes, absolutely.

4         THE COURT:  So what, if you could describe for the

5    Court if what we're talking about is providing the after the

6    fact reports, to the extent that they exist, what is burdensome

7    about that?

8         MR. SKEDZIELEWSKI:  Generating the reports, redacting

9    the reports, reviewing the reports, man hours, you know, the

10   Federal Rules of Civil Procedure very tightly govern discovery.

11   This is essentially a discovery order and that's because

12   discovery is enormously burdensome and costly.

13        So, I mean, I think just the fact that there's a

14   request for documents alone is a burden.  Now, of course, the

15   federal rules do provide for discovery and if this case gets to

16   that point, the Government will of course comply with those

17   federal rules.  But it would much rather do so with the benefit

18   and the protection of the Federal Rules of Civil Procedure

19   rather than just this injunction that could sweep, you know,

20   things that are really not warranted into the protective order.

21        THE COURT:  Understood.

22        MR. SKEDZIELEWSKI:  Yes, Your Honor.

23        THE COURT:  You have about 20 seconds left, but in

24   fairness I did take up a lot of your time with my commentary

25   and questions.  So if you need a few more minutes, that's fine.

75

1          **MR. SKEDZIELEWSKI:**  Thank you, Your Honor.  I'll be

2     brief.  Just one more point on the equities.  In <u>Orantes</u>

3     that's -- I think it's already been spelled out for the Court,

4     the U.S. Government could not show that the preliminary

5     injunctive -- injunction caused the burden, but here as I've

6     just said, the burden is clear.  So there's a real distinction

7     between the relief granted there and the relief granted here.

8          And again, I think that the standard with respect to

9     the factors, at the very least, would be incredibly confusing

10    to agents in the field.  So I can consider, but I can't

11    consider them just by -- like they've already received very

12    effective training that they understand what the Fourth

13    Amendment requires, and adding this in would require an entire

14    new training.  It would be a big lift, I can imagine for the

15    agencies, very costly on the Government's expense.

16         And before I conclude, Your Honor, I just want to

17    request, should an injunction issue in this case, the

18    Government does request that plaintiffs post a bond and

19    keeping -- being extremely frugal here and giving only a

20    fraction of what this order, should it issue, cost agencies, we

21    request $30 million.

22         So to conclude, because the plaintiffs have failed to

23    show that they're likely to prevail on the merits, not least of

24    all because this Court lacks jurisdiction over the claims,

25    defendants respectfully request this Court deny both TROs.

76

1          **THE COURT:**  And the $30 million is meant to capture

2    the cost of doing this document production and the training of

3    the officers?

4          **MR. SKEDZIELEWSKI:**  I think a lot else as well, Your

5    Honor.  I mean, there's a lot of moving pieces to these

6    operations.  They're very sophisticated with a lot of moving

7    parts, and a lot of those different moving parts are going to

8    have to be shifted around in light of a preliminary injunction

9    here.  So 30 million is a very, very small fraction of the

10   actual cost.

11         **THE COURT:**  Understood, thank you.

12         **MR. SKEDZIELEWSKI:**  Yes, Your Honor.

13         **THE COURT:**  I appreciate it.

14         **MR. SKEDZIELEWSKI:**  Thank you.

15         **THE COURT:**  Okay.  Any rebuttal?

16         **MR. TAJSAR:**  Thank you, Your Honor.  Mohammad Tajsar

17   for the plaintiffs.

18         I'd like to address a few points to the record, this

19   question about targeting and I would like to address standing

20   briefly and then talk about race, so just a few points, I'll

21   stay within my time.

22         So on the first point about the record and the time

23   that they needed to respond, you know, they had time and they

24   have all the evidence.  You know, I would have expected that at

25   the very least they would have offered evidence to dispute five

77

1    of the stops, four, maybe even one or two, but they haven't

2    done that.  We are the ones who provided the I-213 in this

3    case.  You know, they have all of that as Your Honor pointed

4    out.

5           You know, our job is not to convince the Court to

6    conclusively find the existence of this officially sanctioned

7    policy.  Our job is to demonstrate the likelihood of success on

8    the merits, right.

9           We have provided all the evidence that we have

10   including the I-213s and they've provided none.  This case does

11   not involve a dispute of fact.

12          **THE COURT:**  Is there more than one I-213 in the

13   record?

14          **MR. TAJSAR:**  No, there's only one.

15          **THE COURT:**  Okay.  Go ahead.

16          **MR. TAJSAR:**  So far.  And on the question of the I-

17   213s I think Your Honor is absolutely right, if a person is in

18   removal proceedings there should be an I-213.  So to the extent

19   that they are engaged in any kind of enforcement activity in

20   which they place somebody in removal proceedings there should

21   be I-213s that ought to demonstrate the basis for the stops,

22   but they don't.  That's our contention.

23          On the issue of the targeting and the consent.  I

24   think if we think broadly about what's been happening in this

25   district you can put them in two buckets.  The targeting

 1    buckets and these roving patrol buckets.  We don't address any

 2    of the targeting issues, as Your Honor pointed out.  We are

 3    addressing the quote/unquote roving patrols and the -- what

 4    they claim are the consensual encounters, right.  They say

 5    they're consent based, we say they're clearly seizures.  And we

 6    cite all -- we have loads and loads of evidence in the record

 7    about how they cannot possibly be engaged and consent based

 8    encounters with individuals, especially, you know, given how

 9    they show up in these raids with guns, not just any ole guns,

10    assault rifles, masks, they're unidentified, they're running

11    aggressively at people.  They're ordering them, demanding them

12    to stop, they're blocking ingress and egress, they're shouting

13    commands, none of this is consent.  They're physically blocking

14    and holding people.

15         So I think that -- and we have evidence in the record

16    about how they're engaging in these stops.  And indeed evidence

17    about both in the -- even evidence about the quote/unquote

18    collateral encounters that my friend from the other side was

19    describing.

20         I point Your Honor to the RHD declaration, that's

21    4516 that describes one of these quote/unquote collateral stops

22    and how it does not comport with the Fourth Amendment

23    requirements.  And, in fact, that particular -- on the question

24    of race, that particular declaration demonstrates that the

25    collateral stops are not happening with individuals who are

1  white, right.  I think that's clear for everyone who's been

2  following the news, it's happening with people who appear to be

3  Latino.

4           And on the question of race, you know, they're not

5  going to admit this on the record, but the evidence is clear.

6  They're looking at race, you know.  The -- we -- there's -- the

7  evidence that we have provided -- you know, we have

8  declarations, I mentioned the RHD declaration, the declaration

9  of Mr. Jesus Cruz 4510 was a car wash worker who says that he

10  and his colleagues were stopped by these aggressive raids, but

11  he had colleague -- he had two colleagues who appear white, a

12  person who's of Russian descent and a person who's of Persian

13  descent.  They didn't go after them, you know.

14           There's -- we have -- the record is quite replete

15  about how it is that they're engaging in these encounters.  And

16  the suggestion that they're all consent based, I think is

17  difficult to square with the facts that are here.

18           I mean, for instance, we have -- we've cited to press

19  reports about a raid as a swap meet in Sante Fe Springs in

20  which witnesses reported seeing armed agents grabbing people

21  from bathrooms.  I cannot imagine that there was a consensual

22  encounter happening in a bathroom before somebody gets

23  physically pulled out from there.

24           So the -- I think the practice -- the evidence that

25  we have that's undisputed suggests that they are conducting

80

1     roving patrols in which they are stopping people and asking

2     questions later.

3              On the question of standing, Your Honor, to address

4     the two cases that my friend has raised, Clapper and some

5     discussions about Lyons.  I mean Clapper is not -- is

6     inapplicable for two reasons.  You know, one that case was

7     about individuals who couldn't prove -- the plaintiffs there

8     couldn't show that they had been harmed in the past.  And it

9     was speculative whether they'd be harmed in the future.  You

10    know, that's not this case.

11             You know, we have shown that we have been harmed in

12    the past and we can show that we are likely to be harmed in the

13    future, based on what's happening.  And I think -- and

14    similarly, Lyons doesn't control this case.

15             I point Your Honor, as I did in my opening remarks to

16    LaDuke in which the Ninth Circuit describes some of the factors

17    that are relevant to demonstrating why those plaintiffs there

18    and our plaintiffs here have standing to seek injunctive

19    relief, the fact of the policy being officially sanctioned,

20    which is different from Lyons.  You know, we have record

21    evidence about that, including from, you know, Stephen Miller

22    all the way on down.

23             The fact that these incidents are likely to recur.

24    The fact that this is -- you know, this is a case against the

25    feds rather than against the state, so there's no prudential

1  concerns.  You know, _LaDuke_ really lays out the roadmap of why

2  we have standing in this case.

3        **THE COURT:**  If I could interrupt you.  I'm not sure,

4  and maybe you can point the Court to, to the extent that there

5  are official statements, I'm not sure that they're official

6  statements saying that it's officially sanctioned to do stops

7  that are not based on reasonable suspicion.

8        So I think, at best, the official statements seem to

9  indicate that high level government officials approve of what

10  is -- what we're all seeing.  And you have some -- obviously

11  some conclusions that you would like the Court to draw about

12  what we're all seeing and what is happening.  But I'm not sure

13  that is, and please correct me if I'm wrong, that the evidence

14  shows that a policy of disregarding the requirement for

15  reasonable suspicion that there's any evidence that that's been

16  officially sanctioned beyond the inference that the Court could

17  draw from the fact that there seems to be approval of what is

18  happening and what is happening is in the plaintiff's view

19  unlawful.

20        **MR. TAJSAR:**  Thank you, Your Honor.  I think that's a

21  fair question.  I think what we would say is, we certainly have

22  the evidence of the pattern and practice.  The question of

23  what's been officially said, you know, they're not going to

24  come out and say we want you officially to violate the Fourth

25  Amendment.  But what they will say is, they will say quote,

82

1    push the limits.  You know, they will say, turn the creative

2    knob to 11.  They engaged in this practice and specifically

3    instructed their officers and agents and said, if it ends in

4    handcuffs, it's worth pursuing.

5             When Stephen Miller instructs high ranking ICE

6    officials and says, why are you just focused on criminals.  Why

7    aren't you at the 7-11's and the Home Depots.  That's as close

8    as we will get to an officially sanctioned policy that says we

9    don't care about whether they're criminals, whether they're

10   targeted, go out there and get me as many people as possible,

11   especially in the context in which they've imposed a 3,000

12   person arrest quota every day.

13            I mean, it is up for them -- you know, it strikes me,

14   you know, we haven't said this, but it strikes me as seriously

15   impossible to hit 3,000 arrests every day without some rampant

16   illegality going on.

17            The -- on the point about the speculative nature of

18   the allegations here, you know, we have -- sorry.  The

19   speculative nature of the future harm, you know, our -- the

20   member organizations here, the plaintiff's declarations, they

21   lay out exactly what is happening on the ground.

22            I mean, if we look at the CHIRLA declaration, you

23   know, CHIRLA has a membership of about 51,000 people in this

24   state, thousands and thousands of people in this district, most

25   of whom are low wage workers, many are day laborers, street

83

1   vendors, car wash workers, you know, they are -- and we have

2   provided evidence in the record about how all of these

3   industries are specifically being targeted, and indeed how, you

4   know, Mr. Miller and others are specifically targeting these

5   particular industries, right.

6          I mean, we have a member --

7          **THE COURT:**  If I could stop you for a moment.

8          **MR. TAJSAR:**  Please.

9          **THE COURT:**  I'm not sure that opposing counsel would

10  deny that those industries are being targeted.  I think he

11  would argue that it's appropriate to consider that along with

12  other factors.  I think one question I have for you, is for you

13  to respond to the point that opposing counsel made which is

14  that you have evidence of what the individuals detained have

15  experienced, but you don't have direct evidence of what was in

16  the minds of the agents and what they were doing.

17         And so I think he would say, it may appear to you

18  that the stop at, name the location, was just based on race and

19  the fact that it's a bus stop or a tow yard.  But in actual

20  fact, there's a lot that went into it and they have a lot of

21  intelligence that they're relying on and it's a very

22  sophisticated operation.  And ultimately it's your burden, the

23  plaintiff's burden to show that something illegal is happening

24  and a fairly high burden given the relief you're seeking.

25         And so if you could just respond to that point that

84

1  would be extremely helpful to the Court.

2          MR. TAJSAR:  Thank you, Your Honor.  On the question

3  of the locations, I raised them to suggest -- I raised them not

4  on the point of the totality of the circumstances, but to

5  demonstrate fear of future harm.

6          I think on the question that -- you know, on what my

7  friend has said about, you know, we don't have all of the

8  facts, fine.  You know, they do, let them bring those facts.

9  In the meantime, they should be ordered to follow the law, no

10 more, no less and if they want to bring in all the facts that

11 they want, to help -- to rebut the evidence that we have

12 provided that says that these stops are happening without any

13 assessment of reasonable suspicion.  It's clear from the

14 witnesses.

15         THE COURT:  If you could just again and maybe I'll

16 restate the question.  I think his point would be, the person

17 being detained, they cannot provide the evidence of whether the

18 detention or the stop or the encounter was based on

19 impermissible factors.  They have no idea what the factors

20 were.

21         So if you could address why the Court should find

22 that the plaintiffs are likely to succeed on their claim that

23 these stops actually are devoid of reasonable suspicion, given

24 the nature of the evidence and he didn't say what he's talking

25 about, but we -- I think we can agree.  The plaintiffs don't

85

1    have an agent saying what he said.  I'm going to throw my

2    training in the trash and just go after people because of race,

3    we know that.  And so if you could address that point, that

4    would be extremely helpful to the Court.

5             **MR. TAJSAR:**  I think what the evidence demonstrates -

6    - well, I'd say two things.  To the extent that the agents

7    have -- if they're engaged in targeted operations, fine.  If

8    they also want to engage on consensual encounters, so that

9    maybe they could draw out the suspicion, also fine.  We don't

10   challenge either of those.  The problem is we are challenging

11   stops in which there's no consent and in which it appears from

12   eyewitnesses and the individuals that no particular assessment

13   is being made.

14            And the reason why it's that, I think that's how I

15   would respond to my friend's suggestion about the, kind of

16   what's in the mindset of these agents is that they have said

17   that they are engaging in these roving patrols.  By definition,

18   they do not have the sort of particularity and the particular

19   assessment associated with that particular person.

20            I mean, mere proximity, for instance, we know is not

21   enough.

22            **THE COURT:**  And what would you point to in the record

23   to support the idea that defendants have said they're engaging

24   in roving patrols?

25            **MR. TAJSAR:**  I believe there is -- there's a quote

86

1    specifically from a Border Patrol agent who describes them as

2    roving patrols.  I think it's Kim, if I recall correctly, who

3    says that, you know, that it's difficult for them to do some of

4    the work that they're doing in Los Angeles, so they're

5    resorting to roving patrols.  That's their -- that's them

6    saying that.  I believe it's Kim, Your Honor, I can double-

7    check that with my co-counsel.

8            **THE COURT:**  And then I'll let you move on after

9    asking this --

10            **MR. TAJSAR:**  Sure.

11            **THE COURT:**  -- one different type.

12            You said it appears that there's no particular

13   assessment being made, but is that enough?  Is that appearance

14   enough for this Court to find the likelihood of success and to

15   grant the relief that the plaintiffs are seeking?

16            **MR. TAJSAR:**  I think so because this is not -- this

17   is a common scenario that we are finding ourselves in, in a

18   pattern and practice case alleging Fourth Amendment violations.

19   This is nothing new.  I mean, the same problem that my friend

20   has suggested here about well we don't know what's in the minds

21   of these officers is the same problem that happens in, you

22   know, in LaDuke, in Malindrez (phonetic), in all of these other

23   pattern and practice Fourth Amendment cases.

24            In the UFW case, you know, Anova, in Kidd, another --

25   K-I-D-D in the Central District, all of these cases have the

1    same -- except that that is the concern, all of the injunctions

2    that have ever been issued on Fourth Amendment violations

3    suffer from the same problem, we don't know what they have.

4    But that's doesn't save the day.

5          You know, what we need to demonstrate is a likelihood

6    of success based on the facts that's apparent to us and from

7    some of the information that we have from the I-213s, for

8    instance.  So that's like -- the I-213 in the one that we have

9    provided is evidence enough that demonstrates that there's

10   nothing -- at least they haven't said it.  There's nothing in

11   there that would support their position.

12         And then the final thing I'll add, Your Honor, is if

13   they had, if they truly were engaged in these assessments we

14   wouldn't have all of these people with status being stopped.

15   We wouldn't have U.S. citizens being stopped.  I mean, that's

16   part of what's so alarming I think to us, certainly to all the

17   intervenors, to the State, that they're sweeping so broadly and

18   they're doing it without ever conceding that what they're doing

19   is wrong, precisely because they are not engaged in that

20   individualized assessment, regardless of what the facts are,

21   they will stop you.  And that's the way that they've crafted

22   this policy and practice.

23         The final thing I'll say, Your Honor, is you know,

24   they are complaining -- what we want in this TRO is for them to

25   follow the law.  That's what we want in this application.  When

88

1    it comes time for the preliminary injunction, we can deal with

2    the questions around maintaining records, maintaining I-213s,

3    that's fine, we can deal with that later.  Right now, follow

4    the law.

5         To the extent that they think that that is burdensome

6    to them, it seems to me that it is far more burdensome for them

7    to violate the Constitution, than it is perhaps to prepare to

8    save the records concerning our clients that are being

9    impermissibly and unlawfully detained.

10        **THE COURT:**  I want to make sure I understand you.

11   Are you withdrawing the request for the documentation, the

12   guidance and the training?

13        **MR. TAJSAR:**  No.  So I guess what I'm suggesting,

14   Your Honor, is that that's -- our -- that is for the

15   preliminary injunction.  In other words, we would ask for that

16   at the PI stage.  What we're asking right now --

17        **THE COURT:**  I see.

18        **MR. TAJSAR:**  -- for this restraining order is not for

19   any of those things.

20        **THE COURT:**  Understood, understood, thank you.

21        **MR. TAJSAR:**  And then I think we have in our original

22   application the citation, it's footnote 28 on the roving

23   patrols, kind of official statements.  And so I'd direct the

24   Court to that particular footnote.

25        **THE COURT:**  And that ECF 4?

1          **MR. TAJSAR:**  Oh, sorry, that's 45.  I'm sorry.

2          **THE COURT:**  ECF 45?

3          **MR. TAJSAR:**  Yeah, that's right.

4          **THE COURT:**  Okay.

5          **MR. TAJSAR:**  And then I wasn't going to address the

6    bond issue, but we think that's inappropriate for the reasons

7    that are raised in the other TRO.  There's really no basis to

8    levy that kind of bond in a scenario in which we're only asking

9    again for them to follow the law and not any of the other

10   matters.

11         **THE COURT:**  Okay.

12         **MR. TAJSAR:**  Thank you so much.

13         **THE COURT:**  Thank you.  If I could -- let me just, on

14   this bond issue, counsel for the Government, if -- I just -- I

15   do have one additional -- two additional questions,

16   Mr. Skedzielewski.

17         **MR. SKEDZIELEWSKI:**  Yes.

18         **THE COURT:**  Skedzielewski, I apologize.

19         Plaintiff's counsel has clarified that the TRO is

20   only seeking the relief concerning the use of these factors and

21   not the documentation.  So I just want it to be clear even just

22   that, you believe the $30 million is appropriate because of

23   what you said about it requiring retraining and all of that.

24         **MR. SKEDZIELEWSKI:**  Yes, absolutely, Your Honor.

25         **THE COURT:**  Okay.  So even though there's no

1    additional documentation, no other discovery, the $30 million

2    is still appropriate.

3             **MR. SKEDZIELEWSKI:**  Yes, Your Honor.  My

4    conversations with the agencies actually didn't even involve

5    the documentary request --

6             **THE COURT:**  Oh, great.

7             **MR. SKEDZIELEWSKI:**  -- which I raised today.  It was

8    actually just squarely focused on, that is the second request

9    for relief about the factors.

10            **THE COURT:**  Understood, thank you.

11            And then plaintiff's counsel has -- you did talk

12   about a number of consensual encounters.  Plaintiff's counsel

13   has raised the issue of the way that these encounters, that

14   they have talked about, have occurred and they're not

15   consensual.

16            One of the factors that has been raised is the show

17   of force, the masks, et cetera, you have indicated that the

18   agents have been subjected to extraordinarily violent -- I

19   suppose some -- I can understand how you might argue that they

20   need to surprise people, they need to have weapons in light of

21   the response that they might get, I'm still not under -- sure

22   though that I understand the masks and the failure to identify.

23            So if you could address how that is a precautionary

24   measure with respect to violence that would be helpful.

25   Because it appears to this Court to be unusual in the law

91

1    enforcement context.

2            **MR. SKEDZIELEWSKI:**  Understood, Your Honor.  I think

3    the first thing to say is that the masks really are not

4    especially probative in deciding whether or not a detentive

5    stop has occurred, especially in a post COVID 19 environment

6    where I still regularly see people wearing masks all the time.

7            And what was -- the weapons was the other piece or

8    the surprise, I'm sorry, Your Honor?

9            **THE COURT:**  The masks were the main thing.

10           **MR. SKEDZIELEWSKI:**  The masks.  Yeah, so I don't

11   think it's especially probative to determine whether or not

12   there was a stop.

13           **THE COURT:**  But you indicated that they're wearing

14   the masks because of the extraordinary violence that they have

15   been faced with.  And I'm just not sure I understand the

16   correlation, so I wanted to give you the opportunity --

17           **MR. SKEDZIELEWSKI:**  Certainly.

18           **THE COURT:**  -- to address that.

19           **MR. SKEDZIELEWSKI:**  So I think one of the problems

20   that agents are facing is what they call doxxing, where an

21   individual's identity and personally identifying information is

22   released to the public.  So an agent is seen on camera doing

23   his job and then his home address is released.

24           I'm not aware and I don't want to represent to the

25   Court of any specific instances like that that have occurred,

92

1    but I'm aware of it as sort of general concern across the

2    agencies to prevent doxxing.

3            **THE COURT:**  Okay.  Thank you.

4            Okay.  This matter will be taken under submission.

5    Since I have the parties here, let us talk briefly regarding

6    timing.  If the Court is to grant the two TROs, I wanted to

7    talk about timing and sort of procedural issues.

8            What the Court would be inclined to do is to have the

9    parties meet and confer regarding an appropriate briefing

10   schedule for a preliminary injunction and a date for the

11   hearing of that injunction.  I did want to advise the parties

12   that the Court is unavailable the week of July 21st, July 28th,

13   August 4th.

14           So I'll just put that out there for the parties, to

15   the extent in the event that the Court grants the TROs, the

16   Court will be asking the parties to meet and confer on a

17   briefing schedule and a hearing date.  And I just wanted to

18   sort of give the parties the parameters in terms of my timing.

19           Is there anything else we should address with respect

20   to scheduling in the event that the Court grants the TRO?

21   Obviously if the Court decides to do something different than

22   what's in the tentative then I'm not sure that this is as much

23   of an issue.  Yes?

24           **MR. TAJSAR:**  Your Honor, just to clarify the Court's

25   schedule.  Was that the unavailable the week of the 21st?

93

1          **THE COURT:**  Unavailable the week of July 21st, July

2   28th, and August 4th.

3          **MR. TAJSAR:**  Understood, understood.

4          **THE COURT:**  Yes.

5          **MR. TAJSAR:**  If I may, we're --

6          **THE COURT:**  And just make sure, counsel, that you're

7   speaking into a microphone.

8          **MR. TAJSAR:**  I'll do that.

9          **THE COURT:**  Thank you.

10          **MR. TAJSAR:**  So just on that, Your Honor, we're happy

11   to meet and confer both on the hearing dates and the briefing

12   schedule.  I think on the -- speaking for the stop and arrest

13   plaintiffs we're ready to proceed with a hearing within 14

14   days.  Obviously that's not -- a hearing that's set in 14 days

15   and working backwards, but I gather that doesn't work for the

16   Court, so we can make it work.  That's between the parties.

17          **THE COURT:**  Okay.  Thank you.

18          **MR. TAJSAR:**  And actually I'll save that.

19          **THE COURT:**  Mr. Skedzielewski, would you like to be

20   heard on the timing issue?

21          **MR. SKEDZIELEWSKI:**  Just very briefly, Your Honor.

22          **THE COURT:**  Yes.

23          **MR. SKEDZIELEWSKI:**  And apologies if this is not

24   quite your question, but just if the TROs do issue, the

25   Government does request the seven days delay for the Solicitor

94

1   General to make his assessment.

2           **THE COURT:**  Okay.  And I will be candid, I'm not sure

3   that you've made that showing, but obviously you're always --

4   you can always file a motion for a stay at some point and/or

5   seek a stay from a higher court.

6           **MR. SKEDZIELEWSKI:**  Thank you, Your Honor.

7           **THE COURT:**  Thank you.  Okay.  And then let's address

8   the docket.  Again, it's not clear to me if the docket has

9   limited public access because it was originally filed as a

10  habeas or because it involves immigration.  I think either one

11  of those can mean that the docket is somewhat limited.

12          Obviously the case sort of has a different contours

13  than when it was first filed and so I don't know if the parties

14  want to be heard on whether they think the docket should be

15  handled differently or orders going forward should be handled

16  differently.  I -- since we're here, then we can address that,

17  yes.

18          **MR. TAJSAR:**  Thank you, Your Honor.  Yeah, we did

19  want to address this particular issue.  So we would make a

20  request from this Court to recharacterize the case as a civil

21  rights case given what we filed in the amended complaint and

22  that's the -- it's the categorization in that, in the civil

23  case cover sheet that causes this restriction.

24          **THE COURT:**  Okay.

25          **MR. TAJSAR:**  And we think that's appropriate just so

1    that the Court is aware, you know, two of the petitioners, the

2    original petitioners have been released on bond and the third

3    has a bond hearing set next week and, you know, we don't know

4    how that's going to go, but if the third is released then we

5    would file an amended complaint.

6         Again, the habeas portion would come out and then

7    that makes it sort of clear.  But regardless of what happens

8    next week, we would request that the Court make that sort of

9    change in the docket.  And we were told from the electronic

10   filing clerk that it is the Court's decision to do that, rather

11   than a clerical matter.

12        **THE COURT:**  Okay.  Understood.  And,

13   Mr. Skedzielewski, do you -- I trust you don't have any

14   objection to that.

15        **MR. SKEDZIELEWSKI:**  Very briefly, Your Honor, we

16   absolutely support a fair and open hearing, but at the moment,

17   only two of the original plaintiffs that were petitioners

18   rather, have been released.  There's one that is still not

19   released, so I don't think at this stage the docket should be

20   opened, while his case is still pending.

21        **THE COURT:**  I'm assuming and counsel can correct me

22   if I'm wrong, I guess I'm assuming that the restrictions on the

23   docket are for the protection of the petitioner and so if the

24   petitioner at any point wants to say, even if the habeas is

25   still proceeding, I don't need this to be restricted, I'm happy

1    for it to -- I think that's fine.  But I don't know if it's --

2    if your understanding is that there's something that is

3    protecting the Government and therefore, the Government might

4    object to all of the information on the docket being unsealed,

5    I'm going to use that in a very loose way.

6        **MR. SKEDZIELEWSKI:**  Yeah, I don't have case law on

7    that, Your Honor.

8        **THE COURT:**  Okay.

9        **MR. SKEDZIELEWSKI:**  But that is my instinct is to say

10   yes.  I mean, we've submitted documents on that record, on the

11   understanding that it's closed and I haven't had a chance to

12   even ask the question whether anything on there needs --

13       **THE COURT:**  Understood, understood.

14       **MR. SKEDZIELEWSKI:**  -- to be further redacted, yes.

15       **THE COURT:**  Okay.

16       **MR. SKEDZIELEWSKI:**  And I'll just also mention

17   quickly, Your Honor, that on pages 8 and 9 of the tentative --

18       **THE COURT:**  Yes.

19       **MR. SKEDZIELEWSKI:**  -- two of the detainees are

20   listed as still being detained, but they have been released.

21       **THE COURT:**  Okay.  Thank you.  We will address that.

22       **(Pause)**

23       **THE COURT:**  Okay.  Well, I do want to thank the

24   parties for the very thorough and very quick briefing.  It was

25   extremely helpful to the Court as was this hearing and no

1    matter which way the Court goes, it sounds like this case will

2    have a life that continues after today.  I must say,

3    Mr. Skedzielewski, I had your job when I worked at the DOJ some

4    years ago, so maybe at some point you'll have this job if you

5    want it.

6             **MR. SKEDZIELEWSKI:**  Thank you, Your Honor.

7             **THE COURT:**  Yes?  Do the proposed intervenors need to

8    be heard?

9             **MR. SCHWAB:**  My apologies, Your Honor.

10            **THE COURT:**  Yes.

11            **MR. SCHWAB:**  Can I be heard briefly just also on a

12   timing matter that relates to our motion to intervene?

13            **THE COURT:**  Yes, thank you.

14            **MR. SCHWAB:**  Thank you, Your Honor.  So we have a

15   pending motion to intervene.  We took the earliest hearing date

16   that the Court had which is mid to late August.  Obviously we

17   would like to -- we think we should be allowed to intervene,

18   obviously that's up to the Court.  But if the Court were to

19   decide that we are proper intervenors, that would be important

20   for us to get that as soon as possible.

21            So we plan to file an ex parte to advance the

22   hearing.  I heard the Court's earlier description of available

23   dates.  Is there any other guidance the Court would give us as

24   to when we might seek to have that motion heard?

25            **THE COURT:**  No.  I don't have any additional guidance

98

1    and I'm not sure.  I guess based upon what -- I think perhaps

2    you should go ahead and file the ex parte, because then you

3    could explain to the Court what the rush is, if -- especially

4    if the Court is going to grant the TROs.  You could explain

5    what the rush is to having the motion to intervene heard sooner

6    and what is going to change if you have to wait a few weeks,

7    so.

8              And to the extent that it is because you want to be

9    heard on the preliminary injunction, I assume that you could

10   work with the parties to figure out timing that works.  But if

11   the question is whether the Court has any availability -- how

12   to put this?

13             I'm not available those three weeks.  Because this

14   happened this week, a lot of what happened this week is moved

15   to next week.  So I pretty much am booked next week.  So I'm

16   not sure that there's time earlier than the time that you have

17   set, but obviously you'll make your arguments and the Court

18   will consider not just the Court's calendar, the Court

19   obviously has to consider the ex parte factors and the law.

20   And to the extent that it's legally required for it to be

21   heard, certainly the Court will endeavor to make that happen.

22             **MR. SCHWAB:**  I appreciate that, Your Honor.  What

23   we'll do is we'll wait to see what the Court decides on the TRO

24   so that we can give you an informed ex parte --

25             **THE COURT:**  Okay.

1          **MR. SCHWAB:** -- and of course, we'll meet and confer

2    with the parties.

3          **THE COURT:** Okay. Thank you.

4          **MR. SCHWAB:** Thank you.

5          **THE COURT:** And is there anything else before the

6    clerk closes? No.

7          **MR. SKEDZIELEWSKI:** Very briefly, Your Honor.

8          **THE COURT:** Yes.

9          **MR. SKEDZIELEWSKI:** We would oppose the filing of an

10   ex parte. We have not -- counsel has not reached out to me to

11   meet and confer about changing the timeline or anything to that

12   effect, so.

13         **THE COURT:** I understood him to be meaning that he's

14   planning on filing one, but not that he's going to dispense

15   with the requirements to meet and confer.

16         **MR. SCHWAB:** I believe I just said, Your Honor, that

17   I intend --

18         **THE COURT:** Oh, we don't have the microphone, sorry.

19         **MR. SCHWAB:** So what I just said, Your Honor, was I

20   intend to meet and confer with both parties --

21         **THE COURT:** Oh, great.

22         **MR. SCHWAB:** -- about that ex parte and that'll

23   happen.

24         **THE COURT:** Okay. Maybe it wasn't clear to him

25   what --

1        **MR. SKEDZIELEWSKI:**  It was not.  Thank you for the

2   clarification.

3        **THE COURT:**  Okay.  Thank you.  And again to the

4   people in the gallery and the people in the overflow courtroom,

5   thank you very much for your participation with us.  You're

6   welcome to any and all hearings that we have.  And have a

7   wonderful rest of the afternoon.  Please stay safe, everybody.

8   Take good care and for those coming from Washington, D.C. safe

9   travels.

10        **MR. SKEDZIELEWSKI:**  Thank you, Your Honor.

11        **THE COURT:**  Okay.  Court is adjourned.  The parties

12   are excused.

13        **(Proceedings concluded at 3:37 p.m.)**

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    July 12, 2025

          Signed                                               Dated

*TONI HUDSON, TRANSCRIBER*