MARK ROSENBAUM (SBN 59940)
*mrosenbaum@publiccounsel.org*
REBECCA BROWN (SBN 345805)
*rbrown@publiccounsel.org*
SOPHIA WRENCH (SBN 354416)
*swrench@publiccounsel.org*
RITU MAHAJAN (SBN 252970)
*rmahajan@publiccounsel.org*
GINA AMATO (SBN 215519)
*gamato@publiccounsel.org*
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, CA 90005
Telephone: (213) 385-2977

*Counsel for All Plaintiffs*

MATTHEW J. CRAIG (SBN 350030)
*mcraig@heckerfink.com*
MACK E. JENKINS (SBN 242101)
*mjenkins@heckerfink.com*
HECKER FINK LLP
1150 South Olive Street, Suite 10-140
Los Angeles, CA 90015
Telephone: (212) 763-0883

*Counsel for Access/Detention Plaintiffs*

(*additional counsel information on cont. page*)

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Pedro VASQUEZ PERDOMO, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>Kristi NOEM, in her official capacity as Secretary, Department of Homeland Security, *et al.*,<br><br>    Defendants. | Case No.: 2:25-cv-05605-MEMF-SP<br><br>**PLAINTIFFS COALITION FOR HUMANE IMMIGRANT RIGHTS AND IMMIGRANT DEFENDERS LAW CENTER'S NOTICE OF MOTION AND MOTION FOR A PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Hon. Maame Ewusi-Mensah Frimpong<br><br>Hearing date: September 24, 2025<br>Hearing time: 9:00 a.m. |

HELIA BIDAD (SBN 348633)
*hbidad@heckerfink.com*
HECKER FINK LLP
1050 K Street, NW
Washington, DC 20001
Telephone: (212) 763-0883

*Counsel for Access/Detention Plaintiffs*

CARL BERGQUIST*
*cbergquist@chirla.org*
COALITION FOR HUMANE IMMIGRANT RIGHTS
2351 Hempstead Road
Ottawa Hills, OH 43606
Telephone: (310) 279-6025

*Counsel for Plaintiff Coalition for Humane Immigrant Rights*

ALVARO M. HUERTA (SBN 274787)
*ahuerta@immdef.org*
BRYNNA BOLT (SBN 339378)
*bbolt@immdef.org*
ALISON STEFFEL (SBN 346370)
*asteffel@immdef.org*
IMMIGRANT DEFENDERS LAW CENTER
634 S. Spring St., 10th Floor
Los Angeles, CA 90014
Telephone: (213) 634-0999

*Counsel for Plaintiff Immigrant Defenders Law Center*

* Admitted pro hac vice

**NOTICE OF MOTION**

PLEASE TAKE NOTICE that, on September 24, 2025, at 9:00 a.m., or as soon thereafter as the matter may be heard in Courtroom 8B of the First Street Courthouse, located at 350 West First Street, Los Angeles, California, 90012, before the Honorable Maame Ewusi-Mensah Frimpong, Plaintiffs Coalition for Humane Immigrant Rights and Immigrant Defenders Law Center will move, and hereby do move, the Court for a preliminary injunction enjoining and prohibiting Defendants from violating the Fifth Amendment right to counsel for detainees held in the basement holding area known as "B-18" in the Federal Building in Downtown Los Angeles.

This motion is made on the grounds that Plaintiffs are likely to prevail on the merits, Plaintiffs will suffer irreparable injury unless the preliminary injunction issues, and that neither Defendants nor the public will suffer injury from the granting of the preliminary injunction.

This motion is made in accordance with the Local Rules of this Court and the Federal Rules of Civil Procedure, and is based upon this notice of motion and motion; the supporting memorandum of points and authorities; the concurrently filed declarations; all documents and pleadings on file in this action; and such other oral and documentary evidence and hearing as the Court may consider prior to or at the hearing on this motion.

Dated: July 28, 2025

Respectfully submitted,

*Mark Rosenbaum*

MARK ROSENBAUM

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ..................................................................................................... 2

LEGAL STANDARD............................................................................................. 10

ARGUMENT ........................................................................................................ 11

    I.    CHIRLA and ImmDef Have Standing to Raise Fifth Amendment Claims ......... 11

    II.   Plaintiffs Are Likely to Succeed on the Merits of Their Claim........................... 13

    III.  Plaintiffs Are Likely to Continue to Suffer Irreparable Harm.............................. 18

    IV.  The Balance of the Equities Favors Plaintiffs ........................................................ 22

    V.   No Security Under Rule 65(c) Should Be Required.............................................. 24

CONCLUSION ..................................................................................................... 24

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011)....................................................................................11

*Arizona v. Inter Tribal Council of Arizona, Inc.*,
570 U.S. 1 (2013) ........................................................................................................12

*Arrey v. Barr*,
916 F.3d 1149 (9th Cir. 2019).....................................................................................14

*Arroyo v. U.S. Dep't of Homeland Sec.*,
No. 19 Civ. 815, 2019 WL 2912848 (C.D. Cal. June 20, 2019) ...............................14

*Bell v. Wolfish*,
441 U.S. 520 (1979) ....................................................................................................18

*Biwot v. Gonzales*,
403 F.3d 1094 (9th Cir. 2005)...............................................................................13, 17

*California v. Azar*,
911 F.3d 558 (9th Cir. 2018).......................................................................................19

*Castellano v. Napolitano*,
No. 09 Civ. 2281 (C.D. Cal.) ........................................................................................4

*City & Cnty. of* San *Francisco v. Trump*,
No. 25 Civ. 1350, 2025 WL 1282637 (N.D. Cal. May 3, 2025) ................................24

*Colmenar v. INS*,
210 F.3d 967 (9th Cir. 2000).......................................................................................13

*Comm. of Cent. Am. Refugees v. INS*,
795 F.2d 1434 (9th Cir. 1986)................................................................................14, 15

*Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*,
321 F.3d 878 (9th Cir. 2003).......................................................................................24

*E. Bay Sanctuary Covenant v. Biden*,
    993 F.3d 640 (9th Cir. 2021)..................................................................................19

*E. Bay Sanctuary Covenant v. Trump*,
    932 F.3d 742 (9th Cir. 2018)..................................................................................11

*Fed. Defs of N.Y., Inc. v. Fed. Bureau of Prisons*,
    954 F.3d 118 (2d Cir. 2020)...................................................................................11

*Fellowship of Christian Athletes v. S.J. Unified Sch. Dist. Bd. of Educ.*,
    82 F.4th 664 (9th Cir. 2023)..................................................................................11

*Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*,
    566 U.S. 318 (2012) ..............................................................................................18

*Food & Drug Admin. v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) .........................................................................................11, 12

*Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) .........................................................................................12, 20

*Gilmore v. Wells Fargo Bank, N.A.*,
    No. 14 Civ. 2389, 2014 WL 3749984 (N.D. Cal. July 29, 2014)...........................24

*Gonzalez v. Arizona*,
    677 F.3d 383 (9th Cir. 2012)..................................................................................12

*Hamdi v. Rumsfeld*,
    542 U.S. 507 (2004) ..............................................................................................18

*Hamilton v. Knight Transp., Inc.*,
    No. 21 Civ. 1859, 2025 WL 1421839 (C.D. Cal. Mar. 24, 2025) ..........................11

*Hatim v. Obama*,
    760 F.3d 54 (D.C. Cir. 2014) .................................................................................18

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) .........................................................................................11, 12

*Hernandez v. Sessions*,
    872 F.3d 976 (9th Cir. 2017)..................................................................................23

*Hernandez-Gil v. Gonzales*,
476 F.3d 803 (9th Cir. 2007)...................................................................................15

*Hunt v. Washington State Apple Advertising Comm'n*,
432 U.S. 333 (1977) ..............................................................................................13

*Immigrant Defs. L. Ctr. v. Noem*,
No. 20 Civ. 9893, 2025 WL 1172442 (C.D. Cal. Apr. 16, 2025).......................19, 22

*Innovation L. Lab v. Nielsen*,
310 F. Supp. 3d 1150 (D. Or. 2018)........................................................................16

*Johnson v. Couturier*,
572 F.3d 1067 (9th Cir. 2009).................................................................................24

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*,
634 F.2d 1197 (9th Cir. 1980).................................................................................11

*Maine v. Moulton*,
474 U.S. 159 (1985) ..............................................................................................17

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012)...................................................................................23

*Nordstrom v. Ryan*,
856 F.3d 1265 (9th Cir. 2017).................................................................................12

*O'Shea v. Littleton*,
414 U.S. 488 (1974) ..............................................................................................22

*Orantes-Hernandez v. Holder*,
321 F. App'x 625 (9th Cir. 2009) ...........................................................................17

*Orantes-Hernandez v. Thornburgh*,
919 F.2d 549 (9th Cir. 1990).................................................................13, 14, 15, 16

*Pimentel v. Dreyfus*,
670 F.3d 1096 (9th Cir. 2012).................................................................................10

*Preminger v. Principi*,
422 F.3d 815 (9th Cir. 2005)..................................................................................23

*Rios-Berrios v. INS*,
776 F.2d 859 (9th Cir. 1985)..................................................................................14

*Sanchez v. Sessions*,
904 F.3d 643 (9th Cir. 2018)..................................................................................17

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
240 F.3d 832 (9th Cir. 2001)..................................................................................10

*Tawadrus v. Ashcroft*,
364 F.3d 1099 (9th Cir. 2004)................................................................................16

*Torres v. U.S. Dep't of Homeland Sec.*,
411 F. Supp. 3d 1036 (C.D. Cal. 2019) ............................................................14, 16

*Usubakunov v. Garland*,
16 F.4th 1299 (9th Cir. 2021)................................................................................13

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ..................................................................................................10

**OTHER AUTHORITIES**

Adrian Florido & Liz Baker, *DHS Vows Immigration Raids Will Continue as Resistance Mounts*, NPR (June 12, 2025), https://www.npr.org/2025/06/12/g-s1-72513/dhs-immigration-raids-los-angeles-protests..................................................................3

Alicia Victoria Lozano, *ICE Tragets Los Angeles Homeless Shelter*, NBC News (July 26, 2025), https://www.nbcnews.com/news/us-news/ice-targets-los-angeles-homeless-shelter-rcna220597..................................................................................3

Andrea Castillo & Queenie Wong, *L.A. Immigration Raids Force the Undocumented To Trade Their Freedom for Safety*, L.A. Times (June 26, 2025), https://www.latimes.com/politics/story/2025-06-26/online-church-school-and-doctor-afraid-of-ice-raids-immigrants-go-digital.......................................................4

*California Farm Worker Injured in Immigration Raids Dies; More Than 300 Arrested, Feds Say*, CBS News (July 12, 2025), https://www.cbsnews.com/news/more-than-300-arrested-immigration-raids-southern-california-farms-feds ...............................2

Chris Michael, *Los Angeles Protests: From Immigration Raids to Sending in the Marines – A Visual Timeline*, The Guardian (June 10, 2025), https://www.theguardian.com/us-news/2025/jun/09/los-angeles-protests-visual-guide ........................................................................................................................2

Claire Moses & Orlando Mayorquin, *L.A.-Area Bishop Excuses Faithful From Mass Over Fear of Immigration Raids, N.Y. Times* (July 10, 2025), https://www.nytimes.com/2025/07/10/us/california-san-bernardino-bishop-mass-church-ice-raids.html........................................................................................3

Clare Considine, *Immigration Agents Told a Teenage U.S. Citizen: 'You've Got No Rights.' He Secretly Recorded His Brutal Arrest*, Guardian (July 25, 2025), https://www.theguardian.com/us-news/2025/jul/25/florida-teen-immigration-arrest ........................................................................................................................22

Dani Anguiano, *U.S. Citizen Arrested During ICE Raid in What Family Describes as 'Kidnapping'*, Guardian (June 26, 2025), https://www.theguardian.com/us-news/2025/jun/26/immigration-ice-raid-andrea-velez................................................3

Eric Sondheimer, *ICE Raids Put a Chill on High School Football: 'I've Never Experienced Anything Like This'*, L.A. Times (July 22, 2025), https://www.latimes.com/ sports/highschool/story/2025-07-22/high-school-football-impacted-los-angeles-ice-raids................................................................................4

Jasmine Mendez, *ICE Holding Tunisian Man Without Proper Medical Help In Downtown L.A., Family Says, L.A. Times* (July 26, 2025), https://www.latimes.com/california/story/2025-07-26/tunisian-man-held-by-ice-downtown-los-angeles-no-medical-attention-family-says (describing individual detained for 12 days) .............5

Jenny Taer, *ICE Offering Six-Figure Salaries and $50K Bonuses As It Ramps Up Hiring to Fuel Deportations*, N.Y. Post (July 23, 2025), https://nypost.com/2025/07/23/us-news/ice-offering-six-figure-salaries-and-50k-bonuses-as-it-ramps-up-hiring-to-fuel-deportations............................................................................................22

Jose Olivares, *U.S. Immigration Officers Ordered To Arrest More People Even Without Warrants*, Guardian (June 4, 2025), https://www.theguardian.com/us-news/2025/jun/04/immigration-officials-increased-detentions-collateral-arrests ......3

Luzdelia Caballero, *Los Angeles Father Speaks Out After Wife, 9-Year-Old Child Detained During Immigration Appointment*, CBS News (June 19, 2025), https://www.cbsnews.com/losangeles/news/los-angeles-father-speaks-out-after-wife-9-year-old-child-detained-during-immigration-appointment ............................ 2

Melissa Gomez et al., *Heavily Armed Immigration Agents Descend on L.A.'s MacArthur Park*, L.A. Times (July 7, 2025), https://www.nytimes.com/2025/07/07/us/la-macarthur-park-immigration.html?smid=url-share .................................................. 21

NBC News, *DHS Secretary Kristi Noem Calls California Judge an 'Idiot' over Immigration Detention Ruling* (July 12, 2025), *available at* https://www.youtube.com/shorts/8iuX7hhiJMc ........................................................ 21

Ricardo Tovar, *LA County Officials Say ICE Agents Targeted Individuals at Churches*, KSBW8 Action News (June 12, 2025), https://www.ksbw.com/article/la-county-ice-agents-targeted-individuals-church/65039805 ...................................................... 2

Russell Payne, *ICE Is About to Go On A Hiring Spree*, Salon (July 26, 2025), https://www.salon.com/2025/07/26/ice-is-about-to-go-on-a-hiring-spree .............. 22

Sid Garcia, *ICE Agents Chase After Farmworkers as They Flee Fields During Latest Raid in Ventura County*, ABC 7 Eyewitness News (June 11, 2025), https://abc7.com/post/ice-agents-chase-farm-workers-flee-fields-during-latest-raid-ventura-county/16719564 .................................................................................... 2

Travis Schlepp, *ICE Agents Make Arrest at Los Angeles Area Church*, KTLA 5 (June 11, 2025), https://ktla.com/news/local-news/ice-agents-make-arrest-at-los-angeles-area-church ............................................................................................................ 2

U.S. Immigration and Customs Enforcement, National Detention Standards (2025), https://www.ice.gov/doclib/detention-standards/2025/nds2025.pdf ...................... 22

U.S. Immigration and Customs Enforcement, Non-Dedicated Intergovernmental Service Agreement Standards (2025), https://www.ice.gov/doclib/detention-standards/2025/ndids2025.pdf ............................................................................ 23

Veronica Miracle, et al., *How ICE Raids Turned Parts of Los Angeles Into Ghost Towns*, NPR (July 4, 2025), https://www.cnn.com/2025/07/04/us/los-angeles-ghost-towns ........................................................................................................... 4

**PRELIMINARY STATEMENT**

Starting in early June 2025, federal immigration authorities implemented a policy of stopping people of color *en masse* without reasonable suspicion and subjecting them to warrantless arrest. Many of those arrested have ended up in a basement holding area known as "B-18" in the Federal Building in downtown Los Angeles. B-18 was designed to hold individuals only temporarily for processing before release or transport to a longer-term detention facility. It has no beds, showers, or medical facilities, and is limited in size.

But Defendants have transformed B-18 into a de facto long-term detention facility, and individuals held there have had their contact with the outside world purposely obstructed. Perhaps most critically, B-18 detainees have not been permitted the access to prospective or retained legal counsel required under the Fifth Amendment. Without access to counsel, detainees are kept in the dark on how to assert their rights and are potentially deported without an opportunity to obtain advice as to the legal options available to them.

This Court has already considered Defendants' restrictions on legal access at B-18. Based on a "mountain of evidence," it held that Plaintiffs Coalition for Humane Immigrant Rights ("CHIRLA") and Immigrant Defenders Law Center ("ImmDef") were likely to succeed on the merits of their Fifth Amendment claims and that, absent injunctive relief, the organizations would face continued irreparable harm to their ability to provide the legal services at the core of their respective missions. The Court also held that Defendants would suffer no harm in doing what the Constitution already requires. The Court thus granted a narrow injunction that provides a baseline of legal access at B-18.

Defendants reacted with a metaphorical thumb of the nose. They promised that none of the government's operations "are going to change," have closed B-18 to legal visits without notice as recently as July 26, 2025, and have ignored the Court's directive regarding unmonitored attorney-client calls entirely. But the legal principles underlying the Court's decision have long been settled, and the evidence shows why a preliminary injunction is just as necessary as the TRO. The Court should enter a preliminary injunction and prevent Defendants from returning full bore to their unconstitutional practices.

## BACKGROUND

***Defendants' mass, warrantless arrests.*** Beginning in early June 2025, federal immigration agents began conducting indiscriminate raids in Los Angeles, recurrently and systematically descending on parking lots, car washes, and other locations.[1] On June 9, 2025, ICE expanded its operations to neighboring Orange County, conducting raids in Santa Ana and Fountain Valley.[2] On June 10, ICE operations continued north of Los Angeles, in Ventura County, where agents detained farm workers as they labored in fields.[3] The actions continued with multiple raids throughout the City of Downey at a car wash, Home Depot, LA Fitness, and in a church parking lot.[4] Raids have continued through the month of July, including at farm sites in Carpinteria and Camarillo on July 10,[5] and as

---

[1] *See* Luzdelia Caballero, *Los Angeles Father Speaks Out After Wife, 9-Year-Old Child Detained During Immigration Appointment*, CBS News (June 19, 2025), https://www.cbsnews.com/losangeles/news/los-angeles-father-speaks-out-after-wife-9-year-old-child-detained-during-immigration-appointment.

[2] Chris Michael, *Los Angeles Protests: From Immigration Raids to Sending in the Marines – A Visual Timeline*, The Guardian (June 10, 2025), https://www.theguardian.com/us-news/2025/jun/09/los-angeles-protests-visual-guide.

[3] *See* Sid Garcia, *ICE Agents Chase After Farmworkers as They Flee Fields During Latest Raid in Ventura County*, ABC 7 Eyewitness News (June 11, 2025), https://abc7.com/post/ice-agents-chase-farm-workers-flee-fields-during-latest-raid-ventura-county/16719564; *see also* Travis Schlepp, *ICE Agents Make Arrest at Los Angeles Area Church*, KTLA 5 (June 11, 2025), https://ktla.com/news/local-news/ice-agents-make-arrest-at-los-angeles-area-church.

[4] Ricardo Tovar, *LA County Officials Say ICE Agents Targeted Individuals at Churches*, KSBW8 Action News (June 12, 2025), https://www.ksbw.com/article/la-county-ice-agents-targeted-individuals-church/65039805.

[5] *See* Schlepp, *supra*; *see also California Farm Worker Injured in Immigration Raids Dies; More Than 300 Arrested, Feds Say*, CBS News (July 12, 2025), https://www.cbsnews.com/news/more-than-300-arrested-immigration-raids-southern-california-farms-feds.

recently as July 20 "in predominantly Latino neighborhoods in the San Fernando Valley."[6]

In an effort to increase the already unprecedented pace of deportations, Defendants have resorted to unlawful tactics. Officials have been instructed to get "creative" with arrests, including by arresting undocumented people that officers encounter by chance.[7] Immigration officers report being told to "turn the creative knob up to 11" and to "push the envelope."[8] The sheer scale of the raids have "astonished even longtime immigration officials."[9] In the deliberately manufactured chaos, U.S. citizens have also been detained, with their attorneys struggling to locate them in detention.[10]

The raids have sent a chill throughout Los Angeles and the surrounding areas. Immigration officials arrive masked, with firearms, in unmarked vehicles. *See, e.g.*, ECF 38-11 ("Toczylowski Decl.") ¶ 46. Churches in the region have had significant decreases in attendance, leading a local Bishop to take the "rare step" of excusing absences from Mass due to members' "genuine fear of immigration enforcement actions."[11] Football players have missed summer practice at Contreras, Roybal, and Belmont high schools due

[6] Alicia Victoria Lozano, *ICE Tragets Los Angeles Homeless Shelter*, NBC News (July 26, 2025), https://www.nbcnews.com/news/us-news/ice-targets-los-angeles-homeless-shelter-rcna220597.

[7] *See* Jose Olivares, *U.S. Immigration Officers Ordered To Arrest More People Even Without Warrants*, The Guardian (June 4, 2025), https://www.theguardian.com/us-news/2025/jun/04/immigration-officials-increased-detentions-collateral-arrests.

[8] *See id*.

[9] *See* Adrian Florido & Liz Baker, *DHS Vows Immigration Raids Will Continue as Resistance Mounts*, NPR (June 12, 2025), https://www.npr.org/2025/06/12/g-s1-72513/dhs-immigration-raids-los-angeles-protests.

[10] *E.g.*, Dani Anguiano, *U.S. Citizen Arrested During ICE Raid in What Family Describes as 'Kidnapping'*, The Guardian (June 26, 2025), https://www.theguardian.com/us-news/2025/jun/26/immigration-ice-raid-andrea-velez.

[11] *See* Claire Moses & Orlando Mayorquin, *L.A.-Area Bishop Excuses Faithful From Mass Over Fear of Immigration Raids*, N.Y. Times (July 10, 2025), https://www.nytimes.com/2025/07/10/us/california-san-bernardino-bishop-mass-church-ice-raids.html.

to fears of immigration raids.[12] Businessowners have been forced to shutter their doors and limit operations as their customers are terrified to venture outdoors.[13] Native-born U.S. citizens carry their birth certificates, fearing they will be wrongly detained or deported.[14] Immigrants are postponing their cancer treatments for fear of going to a hospital.[15]

***Inhumane detention at B-18.*** What is happening following arrest, however, is no less troublesome and is independently unlawful. Defendants have been taking individuals swept up in mass, warrantless arrests to the basement of 300 North Los Angeles Street, commonly referred to as "B-18." B-18 is designed to hold individuals temporarily, so they can be processed and released or otherwise transported to another detention facility. *See* ECF 38-10 ("Lleras Decl.") ¶ 6. B-18 does not have beds and lacks basic necessities like hygiene products and medical care. *See* Lleras Third Decl. ¶¶ 17–19, 24. The unconstitutional conditions at B-18 were the subject of previous litigation in this District, *see Castellano v. Napolitano*, No. 09 Civ. 2281 (C.D. Cal.), which resulted in a settlement agreement in 2009, Compl. ¶ 75. Among the terms of that agreement was the requirement that individuals at B-18 not be held for more than 12 hours, and that ICE permit detainees at B-18 to "visit with current or prospective legal representatives and their legal assistants seven days a week, including holidays, for eight hours per day on regular business days (Monday through Friday), and four hours per day on weekends and holidays." Compl. ¶ 75. That settlement agreement expired in 2010. *Id.* ¶ 76.

---

[12] *See* Eric Sondheimer, *ICE Raids Put a Chill on High School Football: 'I've Never Experienced Anything Like This'*, L.A. Times (July 22, 2025), https://www.latimes.com/sports/highschool/story/2025-07-22/high-school-football-impacted-los-angeles-ice-raids.

[13] *See* Veronica Miracle, et al., *How ICE Raids Turned Parts of Los Angeles Into Ghost Towns*, NPR (July 4, 2025), https://www.cnn.com/2025/07/04/us/los-angeles-ghost-towns.

[14] *See id.*

[15] *See* Andrea Castillo & Queenie Wong, *L.A. Immigration Raids Force the Undocumented To Trade Their Freedom for Safety*, L.A. Times (June 26, 2025), https://www.latimes.com/politics/story/2025-06-26/online-church-school-and-doctor-afraid-of-ice-raids-immigrants-go-digital.

But for almost two months now, the facility has been converted into a de facto long-term detention facility, and the very inhumane conditions that led to a settlement more than a decade ago are reoccurring and then some. Lleras Third Decl. ¶¶ 11–27. One ImmDef client reported around 60 individuals being held in one B-18 cellblock. *See* Toczylowski Decl. ¶ 37. Not long before this action was filed, it was believed that over 300 individuals were being held at B-18. Compl. ¶ 77.

When asked why detainees were forced to sleep on floors and in bad conditions, a B-18 officer explained that B-18 is meant to be a processing center, where people are not to remain longer than 12 hours. ECF 38-8 ("R.P.R. Decl.") ¶ 9; *see* ECF 38-5 ("Duran Decl.") ¶ 10 ("'Normal' processing of a matter like this would have been to release him pending his next court hearing, since jurisdiction remains with the Executive Office of Immigration Review under section 240 of the [Immigration and Nationality Act]."). The officer did not know why detainees were forced to stay at B-18 for multiple days. R.P.R. Decl. ¶ 9; *see* ECF 38-9 ("Salas Decl.") ¶ 34 (reports as of June 26 that detainees were being held for four to five days); Toczylowski Decl. ¶ 54 (report of one detainee who was held for 12 days).[16]

***Denial of access to counsel at B-18***. Denial of access to counsel emerged as an issue as soon as Defendants began using B-18 to house the individuals swept up in recent raids and mass arrests.

On June 6, 2025, CHIRLA and ImmDef attorneys and legal representatives attempted to gain access to B-18 to advise detainees of their rights and assess their eligibility for relief, but they were not permitted to meet with anyone. Salas Decl. ¶¶ 12–15; Toczylowski Decl. ¶¶ 5–14. When they returned to B-18 on the morning of June 7, they were met with frightening force and denied access. The attorneys identified a

---

[16] *See* Jasmine Mendez, *ICE Holding Tunisian Man Without Proper Medical Help In Downtown L.A., Family Says*, L.A. Times (July 26, 2025), https://www.latimes.com/california/story/2025-07-26/tunisian-man-held-by-ice-downtown-los-angeles-no-medical-attention-family-says (describing individual detained for 12 days).

handwritten notice on the door of the family and attorney entrance at B-18 indicating that the facility would not permit any attorney or family visits. Salas Decl. ¶¶ 16–17. Federal agents at the scene deployed an unknown chemical agent against family members, attorneys, and representatives, including CHIRLA legal staff, who were peacefully requesting access to detained individuals. *Id.* ¶¶ 17–23. The chemical agent caused everyone to cough and inflicted a burning sensation in the eyes, nose, and throat. *Id.* ¶¶ 21–22; Toczylowski Decl. ¶¶ 21, 24. That same morning, numerous unmarked white vans quickly departed B-18 with a group of detainees. CHIRLA and ImmDef attorneys and representatives attempted to loudly share know-your-rights information with the detainees in the vans. Salas Decl. ¶ 19. To prevent the detainees from hearing their rights, and therefore from exercising them, federal agents blasted their horns to drown them out. *Id.*; Toczylowski Decl. ¶ 19. On June 8, an ImmDef attorney and the ImmDef president also saw a sign on the door of the B-18 facility stating that attorney and family visits were again cancelled that day. Toczylowski Decl. ¶ 23. Family members and attorneys were prohibited from accessing B-18 until June 9. *Id.* ¶ 15; *see* Duran Decl. ¶ 13 ("We had been informed that access was going to be allowed, but when we arrived at B-18, that statement had been revoked.").

These access issues continued to occur over the ensuing period. Salas Decl. ¶¶ 32–36; Toczylowski Decl. ¶¶ 51–52; Freire Decl. ¶¶ 2–5. On June 16, ImmDef attorneys, as well as Congressman Jimmy Gomez, arrived at B-18 around 3:00 p.m. on a day when B-18 was purportedly open for visiting between 8:00 a.m. and 4:00 p.m. Toczylowski Decl. ¶¶ 28–29. But they were denied access, along with family members who had been instructed to go to B-18 to pick up their loved ones' possessions, *id.* ¶¶ 28–31, in contravention of the policy that Defendants have claimed applies, *see* TRO Hr'g Tr. 31:11–14. And on June 19, an ImmDef attorney arrived at B-18 to meet with detainees, including one who was scheduled for a chemotherapy appointment the next day. Toczylowski Decl. ¶ 39. Despite showing a doctor's note confirming the appointment and specifying that missing the appointment would be detrimental to the detainee's health, the officers would

not allow the attorney to meet with the ill detainee. *Id.* ¶¶ 39–42. In fact, one officer told the attorney that "he had no way to find [the detainee] because hundreds of people were detained in the facility." *Id.* ¶ 43.

On the rare and random occasions when family members and attorneys have been allowed access to their loved ones and clients, they have been made to wait hours at a time to see them, Lau Decl. ¶ 3, and the resulting visits have been limited to a matter of minutes. ECF 38-12 ("Vasquez Decl.") ¶ 6 (two-minute meeting); R.P.R. Decl. ¶ 8 (five-minute meeting). CHIRLA and ImmDef attorneys have also been given a series of arbitrary reasons why they cannot meet with clients. *E.g.*, Toczylowski Decl. ¶ 52 (not having physical bar card); Freire Decl. ¶¶ 2–4 (first being denied entry due to "all detainees [] being transferred," second due to "protests," and third due to detainees being transferred ahead of "anticipated protests" later in the weekend, all during the same visit). Detention officers screen the very limited phone calls that detainees are permitted to make, and phone calls cannot be used for confidential communications. S.A.R. Decl. ¶ 10; Freire Decl. ¶ 2; ECF 82-1 ("Barba Supp. Decl.") ¶¶ 3–5.

As a result of Defendants' actions, CHIRLA and ImmDef have been unable to fully serve their existing clients or establish new attorney-client relationships, undermining the organizations' core missions. Freire Decl. ¶¶ 2–5. And detainees held at B-18 have suffered predictably as a result. Salas Decl. ¶¶ 32–36; Toczylowski Decl. ¶¶ 46, 51–58. Detainees have been coerced into signing forms without access to counsel or a rights advisal. ECF 38-6 ("S.K. Decl.") ¶ 9 ("The officers at B-18 gave me paperwork to sign but I could not read it. I was so tired, I signed it, but I did not know what it said. They did not give me a copy of the documents."). Detainees are also not told about court hearings and are deported after missing their hearings. R.P.R. Decl. ¶ 13. At the hearing on the TRO, government counsel defended all of Defendants' actions at B-18 as constitutionally permissible. TRO Hr'g Tr. 22:20–25, 25:11–14, 33:19–35:5.

The lack of access to counsel also contributes to other constitutional violations—and deliberately so. One ImmDef client, for example, was released only after his attorney

informed the ICE officers at B-18 that he had asylee status—this was the second time he had been arrested by ICE in two weeks despite his status. Toczylowski Decl. ¶¶ 32–33. The flow of information between attorneys and clients is critical to understanding the full scope of Fourth Amendment and other legal violations preceding detention, as well as the inhumane conditions that individuals face once detained at B-18, from overcrowding and inadequate food, to lack of basic hygiene products and medical care. *Id.* ¶¶ 32–50; ECF 38-4 ("C.B. Decl.") ¶ 8; S.K. Decl. ¶ 5; R.P.R. Decl. ¶¶ 8, 11; Lau Decl. ¶ 9.

***The TRO and the aftermath.*** On July 11, 2025, this Court granted Plaintiffs' two separate applications for a TRO—one focused on Defendants' policy and practice of detentive stops without reasonable suspicion, the other focused on access to counsel at B-18. The Court recognized that "[m]ost of the questions before this Court are fairly simple and non-controversial," including whether it is "unlawful to prevent people from having access to lawyers who can help them in immigration court." ECF 87 ("TRO Order") at 2. Based on the "mountain of evidence" presented by Plaintiffs, the Court held that Plaintiffs were likely to succeed on their Fourth and Fifth Amendment claims, and that an injunction was necessary to prevent Defendants from committing further constitutional violations. *Id.*

With respect to access to counsel, in particular, the Court ordered Defendants to permit legal visitation at B-18 "seven days per week, for a minimum of eight hours per day on business days (Monday through Friday), and a minimum of four hours per day on weekends and holidays." *Id.* at 49. Accounting for Defendants' security concerns, the Court provided that if "exigent circumstances require closure for the safety of human life or the protection of property, the Defendants must notify Access/Detention Plaintiffs as soon as practicable and certainly within four (4) hours to make alternative arrangements for legal visitation and/or notice to affected detainees and attorneys, legal representatives, and legal assistants." *Id.* The Court further ordered that Defendants provide "individuals detained at B-18 with access to confidential telephone calls with attorneys, legal representatives, and legal assistants at no charge," and that such calls "not be screened, recorded, or otherwise monitored." *Id.*

In many ways, the TRO has had its intended effect, and B-18 has allowed for in-person visitation that has improved but is still not in accordance with the schedule the Court has ordered. *E.g.*, Lleras Third Decl. ¶ 3; Lau Decl. ¶ 7. That is not to say, however, that impediments to access do not remain. Visitation hours have been curtailed without notice, *see* Freire Decl. ¶¶ 2–5; Hunsberger Decl. ¶ 2 (attorney received no response and was denied access to B-18 despite arriving during business hours on July 26, 2025), and wait times for entry into B-18 are at times an issue, Lau Decl. ¶¶ 2–3 (describing family members waiting one to six hours to visit detainees on July 21, 2025). Attorneys have also been denied confidential visits with detainees. Lau Decl. ¶ 7 (describing officers requiring the door to an attorney consult room be cracked open where conversations could be overheard, "breaching confidentiality"); Lleras Third Decl. ¶¶ 7–10 (describing guards requiring the door to the attorney room remain open during an attorney-client meeting, despite the attorney contesting). Attorneys have also been denied access to meet with potential clients. Wrench Decl. ¶¶ 5–8. One detainee was told to sign papers in English, despite the detainee only speaking Spanish, and that doing so was "necessary so that she could 'speak with an asylum officer.'" Lau Decl. ¶ 8. When that detainee's attorney asked to review the paperwork, the attorney identified it as paperwork for removal, which also described the detainee's right to a reasonable fear interview. *Id.* The attorney also noted an attachment at the bottom of the paperwork, which was required pursuant to *Orantes-Hernandez v. Garland*, that the client clarified "was not included when they originally presented her with paperwork to sign." *Id.*

Access to confidential legal telephone calls has not improved, despite the clear directives of the existing TRO. An official at B-18 admitted that unmonitored phone calls are not permitted. *See* Freire Decl. ¶ 2 ("I asked whether the calls with attorneys were unmonitored, and he told me that individuals do not make those types of calls with attorneys because the facility only allows individuals to speak with attorneys for longer periods in person."). And detainees have reported only having access to phones in shared holding blocks where confidential attorney calls could not be had. Lau Decl. ¶ 9. One

CHIRLA client wanting to make a call reported that an officer "began aggressively insulting her and her case in an obvious attempt to browbeat her into signing what he said was self-deportation paperwork" and "told her that she was worthless and so was her case." Lleras Third Decl. ¶ 12. The officer then "switched tactics" and "told her that he would only let her speak to an attorney if she signed the deportation paperwork" and that "if she wanted to speak to an attorney, she had to pay to use the phones." *Id.* ¶¶ 13–14. The client added that no one "explained her right to use a phone per the terms of the TRO" and that "another detainee 'explained' to her that the only way to contact their families or attorneys was by paying 58 dollars per call." *Id.* ¶ 14.

Attorneys who have sought information to understand whether Defendants were in compliance with the TRO have faced pushback as well. *See* Freire Decl. ¶ 2 ("I asked where the phone was located ... and the officer told me that he 'did not want to get into that with me' and left."). Others were given conflicting information. Wrench Decl. ¶ 7 ("I also asked if detainees are offered free, private, unmonitored phone calls. The officer said 'yes.' I asked if these are calls from their cells or elsewhere. The officer responded, 'It's outside, they get one free 5-minute phone call when they arrive.'").

## LEGAL STANDARD

Plaintiffs are entitled to a preliminary injunction if they show that (1) they are likely to succeed on the merits of their claims; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (preliminary injunction and temporary restraining order standards are "substantially identical"). A stronger showing on one element may offset a weaker showing on another. *See Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012). Under this sliding-scale approach, where a moving party would suffer irreparable harm in the absence of relief and demonstrates that an injunction would be in the public interest, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff

can support issuance of an injunction." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011). To grant a preliminary injunction, a court only need examine whether a party has met the burden for a preliminary injunction; the court need not make a "final decision on the merits of any claim, nor [] a decision on the merits of the factual assertions either party made in support of any claim." *See Hamilton v. Knight Transp., Inc.*, No. 21 Civ. 1859, 2025 WL 1421839, at *3 (C.D. Cal. Mar. 24, 2025) (citing *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1200 (9th Cir. 1980)).

## ARGUMENT

## I. CHIRLA and ImmDef Have Standing to Raise Fifth Amendment Claims

In *Havens Realty Corp. v. Coleman*, the Supreme Court held that when a defendant's illegal conduct "perceptibly impair[s]" an organization's ability to carry out its established mission by creating a "drain on the organization's resources," there "can be no question that the organization has suffered injury in fact." 455 U.S. 363, 379 (1982). The Supreme Court recently reaffirmed that key holding, recognizing that "[u]nder th[e] Court's precedents, organizations may have standing 'to sue on their own behalf for injuries they have sustained,'" and explaining that in *Havens Realty* the allegedly unlawful action "perceptibly impaired [the organization's] ability to provide counseling and referral services" and thus interfered with its "core business activities." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 393, 395 (2024). A long line of cases recognizes the same. *E.g.*, *Fellowship of Christian Athletes v. S.J. Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 682–83 (9th Cir. 2023) (*en banc*); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 765 (9th Cir. 2018); *see also Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 126–27 (2d Cir. 2020) (concluding that public defender service suffered injury from interference with clients' right to counsel).

This case easily satisfies that standard. By repeatedly and substantially restricting legal access at B-18, Defendants[17] have directly impaired CHIRLA's and ImmDef's ability

---

[17] The relief sought here is specifically against Defendants Noem, Lyons, and Santacruz.

to engage in the representation of immigrants and refugees at the core of their founding missions. *E.g.*, Salas Decl. ¶¶ 14–15, 17, 32–36; Toczylowski Decl. ¶¶ 5–7, 15, 28–30, 48, 51–52, 54–58; ECF 82-6 ("Toczylowski Supp. Decl.") ¶ 19; ECF 82-3 ("Salas Supp. Decl.") ¶ 3. As a result, and for the reasons this Court has already explained, CHIRLA and ImmDef have organizational standing to pursue their Fifth Amendment claims. *See* TRO Order 18–21.

There is no reason to revisit that decision. For one, this Court's standing determination is now law of the case. Under that doctrine, "a court will generally refuse to reconsider an issue that has already been decided by the same court or a higher court in the same case." *Gonzalez v. Arizona*, 677 F.3d 383, 389 n.4 (9th Cir. 2012) (en banc), *aff'd sub nom. Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013). Courts must assure that a plaintiff has standing "at the time the action commences." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 170 (2000). And this Court did just that, assessing Defendants' jurisdictional objection against the extensive evidence of how Defendants impaired CHIRLA's and ImmDef's organizational missions. None of the exceptions to the law-of-the-case doctrine—*i.e.*, a clearly erroneous decision that would work manifest injustice, intervening controlling authority, or the emergence of substantially different evidence—applies. *See Gonzalez*, 677 F.3d at 389 n.4. The standing inquiry should end there. *See, e.g.*, *Nordstrom v. Ryan*, 856 F.3d 1265, 1270 (9th Cir. 2017) (petitioner's standing to assert Sixth Amendment claim was law of the case).

Even if the Court were to consider the issue anew, the Court was right on the merits. The only objection that Defendants previously raised to organizational standing was to label *Havens Realty* an "unusual case." ECF 70 ("TRO Opp.") at 10 n.7. But the Court rightly rejected this argument, TRO Order 19 & n.11, and the Supreme Court case on which Defendants rely merely cautioned that a party "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action," *All. for Hippocratic Med.*, 602 U.S. at 394. That is miles away from what is happening here. Just like the plaintiff in *Havens Realty* was frustrated in its ability to provide

12

"counseling and referral services," *id.* at 395, CHIRLA and ImmDef are frustrated in their ability to provide legal services to immigrants and persons seeking humanitarian protection. That more than suffices to give them organizational standing.[18]

## II.    Plaintiffs Are Likely to Succeed on the Merits of Their Claim

As this Court previously recognized, the legal principles underlying CHIRLA's and ImmDef's Fifth Amendment claims are "fairly simple and non-controversial." TRO Order 2; *see id.* at 23–24. The Due Process Clause safeguards the rights of noncitizens to hire and consult with attorneys. *See Usubakunov v. Garland*, 16 F.4th 1299, 1303 (9th Cir. 2021) ("As we have stressed, the importance of the right to counsel … cannot be overstated." (cleaned up)); *Biwot v. Gonzales*, 403 F.3d 1094, 1098 (9th Cir. 2005) ("The right to counsel in immigration proceedings is rooted in the [Fifth Amendment] Due Process Clause[.]"); *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 554, 565 (9th Cir. 1990) (recognizing noncitizens "have a due process right to obtain counsel of their choice at their own expense," and affirming injunction against government practices "the cumulative effect of which was to prevent aliens from contacting counsel and receiving any legal advice," including the practice of denying visits with counsel); *cf. Colmenar v. INS*, 210 F.3d 967, 971 (9th Cir. 2000) ("[A]n alien who faces deportation is entitled to a full and fair hearing of his claims and a reasonable opportunity to present evidence on his behalf."). "The high stakes of a removal proceeding and the maze of immigration rules and regulations make evident the necessity of the right to counsel." *Biwot*, 403 F.3d at 1098; *see Usubakunov*, 16 F.4th at 1300 ("Navigating the asylum system with an attorney is hard enough; navigating it without an attorney is a Herculean task.").

To effectuate this right, noncitizens are entitled to "reasonable time to locate

---

[18] The Court also found that CHIRLA had associational standing to raise Fifth Amendment claims on behalf of its members at B-18. *See* TRO Order 21–22. Although associational standing is not necessary for CHIRLA to seek the relief requested herein, that portion of the Court's decision is right on the merits and serves as law of the case as well. *See id.* (holding that CHIRLA satisfies requirements for associational standing in *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977)).

counsel." *Rios-Berrios v. INS*, 776 F.2d 859, 863 (9th Cir. 1985); *accord Torres v. U.S. Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1060–61, 1063–64 (C.D. Cal. 2019). And when the government has detained an individual, it cannot impose restrictions on access that undermine the opportunity to obtain counsel. *See Orantes-Hernandez*, 919 F.2d at 554, 565.

In addition to the opportunity to obtain counsel, due process guarantees noncitizens the right to communicate with counsel once counsel is retained. "Both Congress and [the Ninth Circuit] have recognized the right to retained counsel as being among the rights that due process guarantees to petitioners in immigration proceedings." *Arrey v. Barr*, 916 F.3d 1149, 1157 (9th Cir. 2019). Impediments to communication, including through detention in a difficult-to-access facility, can constitute a "constitutional deprivation" where they obstruct an "established on-going attorney-client relationship." *Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1439 (9th Cir. 1986); *see also Arroyo v. U.S. Dep't of Homeland Sec.*, No. 19 Civ. 815, 2019 WL 2912848, at *17 (C.D. Cal. June 20, 2019) ("[A] healthy counsel relationship in the immigration context requires confidential in-person visitation, especially where an immigrant must be forthcoming about sensitive matters such as past trauma, mental health issues, and criminal history.").

Applying these bedrock principles to the factual record here, the Court had no trouble concluding that CHIRLA and ImmDef had demonstrated a likelihood of success on their Fifth Amendment claims. TRO Order 23. Indeed, prior to the issuance of the TRO, CHIRLA and ImmDef had no, or at best very limited, ability to communicate with current and prospective clients at B-18 because of the barriers to access that Defendants had constructed. Officers consistently prevented CHIRLA and ImmDef attorneys from visiting current and prospective clients at B-18, despite the attorneys' compliance with purported visitation procedures and instructions from government officials. Salas Decl. ¶¶ 12–23; Toczylowski Decl. ¶¶ 5–58; C.B. Decl. ¶ 9; Freire Decl. ¶¶ 2–5. Attorneys at times received no response from the intercom system or doorbell at the entrance of B-18, Toczylowski Decl. ¶¶ 6–7, 22, 24; were turned away when they had previously been told they would be

given access, Lleras Decl. ¶ 10; were repeatedly told that attorneys could not enter because the building was overcrowded, Toczylowski Decl. ¶¶ 7, 12–13; Salas Decl. ¶ 14; were denied access for arbitrary reasons, such as not having a physical bar card, Toczylowski Decl. ¶ 52; and were denied access even when visiting was purportedly open, *id.* ¶¶ 28–29.

Even when they have been able to enter B-18, CHIRLA and ImmDef attorneys' efforts to meet with clients have been systematically stymied by Defendants. Detention officers have intimidated attorneys into leaving, *id.* ¶¶ 17, 26–27; have provided false information to attorneys that their clients were not detained at B-18, when in fact they were, Duran Decl. ¶ 11; Toczylowski Decl. ¶ 54; have denied attorneys' requests to locate their client using a Form G-28 because it did not have an A-number, even though individuals not previously subject to immigration proceedings would not receive an A-number until arriving at the facility, Toczylowski Decl. ¶¶ 8, 11–12; have denied attorneys' requests to locate clients using a Form G-28 even with A-numbers, Toczylowski Decl. ¶ 48; *see also* Lau Decl. ¶ 4 (access denied despite attorney providing detainee's name and A-number); have made limited efforts to locate clients, such as only "call[ing] the client's name in the holding cells" and giving up when "no one had responded," Toczylowski Decl. ¶ 12; Vasquez Decl. ¶¶ 5, 6; *see also* ECF 38-7 ("S.A.R. Decl.") ¶ 11 (describing inaccuracy of detainee locators); ECF 38-3 ("Barba Decl.") ¶ 13 (same); C.B. Decl. ¶ 12 (same); Freire Decl. ¶ 5 (same); and have denied access due to the purported lack of "attorney rooms" without explanation for why other spaces could not be used, Toczylowski Decl. ¶ 13.

There can thus be no serious question that CHIRLA and ImmDef are likely to succeed on their claim that Defendants have obstructed *existing* attorney-client relationships and prevented CHIRLA and ImmDef attorneys from providing legal advice to B-18 detainees. *Orantes-Hernandez*, 919 F.2d at 565–66; *see Hernandez-Gil v. Gonzales*, 476 F.3d 803, 807–08 (9th Cir. 2007); *Comm. of Cent. Am. Refugees*, 795 F.2d at 1439.

Defendants' legal access policies and practices at B-18 have prevented *prospective* clients from accessing CHIRLA's and ImmDef's legal services as well. Such interference

comes at a critical juncture. Individuals swept up in recent mass arrests may have interviews or hearings to prepare for, may miss immigration appointments with U.S. Citizenship and Immigration Services, may have removal proceedings instituted against them, may be forced to sign documents they do not understand, and may be misled into waiving their rights without the benefit of legal advice that would facilitate informed decisionmaking. *E.g.*, Toczylowski Decl. ¶¶ 4, 56; S.K. Decl. ¶¶ 4, 9 (describing the lack of response detainee received after asking for an attorney and the detainee signing paperwork he did not comprehend). Some detainees may have even agreed to "voluntary departure" or "self-deportation" without having first had the opportunity to consult counsel, even though the Fifth Amendment requires detainees to knowingly and voluntarily waive their right to an immigration court hearing. *See Tawadrus v. Ashcroft*, 364 F.3d 1099, 1103 (9th Cir. 2004). Preventing the formation of attorney-client relationships in this way is a clear violation of the Due Process Clause. *See Orantes-Hernandez*, 919 F.2d at 565 (upholding a mandatory injunction where the "cumulative effect" of government practices "was to prevent aliens from contacting counsel and receiving any legal advice").

The handful of merits arguments that Defendant previously offered can be easily dispatched.

*First*, Defendants have argued that Plaintiffs cannot show a Fifth Amendment violation because the restrictions on access to counsel—which Defendants effectively did not deny—have not been "punitive or excessive." TRO Opp. 16–17. But that misframes the test. The relevant question is whether the cumulative effect of Defendants' restrictions deny reasonable access to counsel. In *Orantes-Hernandez*, for instance, the Ninth Circuit found such a cumulative effect where there were limited attorney visitation hours, long delays in connecting detainees to counsel, inadequate systems to communicate with detainees, and inadequate efforts to ensure confidentiality of in-person and telephonic attorney meetings. 919 F.2d at 565; *see also Torres*, 411 F. Supp. 3d at 1060 (finding violation where there were restrictions on telephone access, legal mail, and in-person meetings); *Innovation L. Lab v. Nielsen*, 310 F. Supp. 3d 1150, 1162 (D. Or. 2018) (same

where there were limitations on access to facility to meet with clients, along with conflicting instructions on legal visitation hours).

If anything, the same access restrictions at B-18 are even more injurious than they would be if imposed at a longer-term detention facility. Individuals arrive at B-18 at a critical time in the immigration process, and the dire conditions of confinement put pressure on detainees who may be asked to waive rights without ever having the opportunity to consult with counsel. *See, e.g.*, Toczylowski Supp. Decl. ¶ 13 (describing detainee who, on June 27, 2025 "opted for voluntary removal because he could no longer take the conditions in B-18"). Those rights include the right to raise suppression challenges that, by virtue of Defendants' pattern and practice of suspicionless stops, *see, e.g.*, ECF 45–ECF 45-21, may be available to almost all B-18 detainees. *See Sanchez v. Sessions*, 904 F.3d 643, 649 (9th Cir. 2018); *cf. Maine v. Moulton*, 474 U.S. 159, 170 (1985) (to "deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself[,]" because what happens at the "earlier, 'critical' stages … 'might well settle the accused's fate'"). To "infuse the critical right to counsel with meaning," *Biwot*, 403 F.3d at 1098, the unique circumstances facing detainees at B-18 cannot be ignored. For all these reasons, the standard reflected in *Orantes-Hernandez* and many other cases is clearly met. *See* TRO Order 26.

*Second*, Defendants have insisted that B-18 detainees have always had access to a telephone. TRO Opp. 17. But the phones that Defendants have clung to are either in shared cells with no privacy or in a public location, cost money to use, and offer no guarantee of an unmonitored call. *See* S.A.R. Decl. ¶ 10; Freire Decl. ¶ 2; Barba Supp. Decl. ¶¶ 3–5. Allowing other inmates or the government itself to listen in on an attorney-client call, all while charging steep fees, is hardly the sort of access to counsel that due process guarantees. *See Orantes-Hernandez v. Holder*, 321 F. App'x 625, 629 (9th Cir. 2009) (upholding injunction requiring detention center to provide "at least one telephone per twenty-five detainees" and "ensure privacy of attorney-client communications"). As the Court observed, "Defendants miss the point," TRO Order 26 n.17, and the availability of

17

collect calls with no guarantees of privacy or confidentiality does nothing to bring B-18 in line with constitutional standards.

*Finally*, Defendants have argued that "[e]ven if [Plaintiffs] could show there was a rights violation," limitations on access to counsel should be excused because of Defendants' security concerns. TRO Opp. 2, 17–18. To be sure, a detention facility need not be blind to security considerations while facilitating the access to counsel that the Constitution requires. But simply invoking "security" does not justify whatever restrictions Defendants might impose, and "the constitutional limitations safeguarding essential liberties [ ] remain vibrant even in times of security concerns." *Hamdi v. Rumsfeld*, 542 U.S. 507, 539 (2004); *see Bell v. Wolfish*, 441 U.S. 520, 547 (1979). Here, the security concerns to which Defendants vaguely refer involve protests not in B-18 itself, but throughout the Southern California region. ECF 70-1 ¶¶ 10–11; *see* Lau Decl. ¶¶ 2–5 (citing a "riot" in Anaheim as the reason offered for cancelled visitation and understaffing at B-18, even though the situation referred to as a "riot" was a peaceful protest, which had ended earlier that day and was located dozens of miles away); Freire Decl. ¶ 4 (access restricted due to "anticipated" protests later in the weekend). This is hardly the sort of institutional security justification considered in Defendants' cited authorities. *See Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 328 (2012) (considering security justification in keeping contraband out of facilities in permitting strip searches upon entry); *Hatim v. Obama*, 760 F.3d 54, 59 (D.C. Cir. 2014) (same). And Defendants do not even try to link specific security concerns inside B-18 to the array of actions that they have taken that cumulatively violate the right to retain and consult with counsel. For these reasons, the Court rightly rejected Defendants' security-related excuses for denying access to counsel. TRO Order 26.

## III.    Plaintiffs Are Likely to Continue to Suffer Irreparable Harm

As set forth above, and as recognized by this Court, Defendants' violations of the Fifth Amendment right to counsel directly impede CHIRLA's and ImmDef's ability to engage in the representation of immigrants and refugees that is at the core of their founding

18

missions. Defendants do so in numerous ways—by preventing CHIRLA and ImmDef attorneys from meeting with existing and prospective clients; by imposing limitations on access that make it impossible to give timely and confidential legal advice; and by forcing CHIRLA and ImmDef to devote significant staff time and other resources to navigating the unconstitutional barriers to access that Defendants have imposed, rather than engage in their core work of advising clients on their immigration proceedings and constitutional rights. *E.g.*, Salas Decl. ¶¶ 14–15, 17, 32–36; Toczylowski Decl. ¶¶ 5–7, 15, 28–30, 48, 51–52, 54–58; Freire Decl. ¶¶ 2–5.

Those harms are irreparable for purposes of injunctive relief. Defendants' interference with CHIRLA's and ImmDef's existing and prospective client relationships comes at a critical juncture in the immigration process, Salas Decl. ¶¶ 31–36; Toczylowski Decl. ¶¶ 56–57, and cannot be remedied by a final judgment issued months (or possibly years) down the road. Indeed, as this District's Judge Bernal recently recognized in another case in which ImmDef was a plaintiff, "impairing [ImmDef's] ability to provide meaningful legal representation to clients in removal proceedings" constitutes irreparable harm. *Immigrant Defs. L. Ctr. v. Noem*, No. 20 Civ. 9893, 2025 WL 1172442, at *24 (C.D. Cal. Apr. 16, 2025); *see also E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677–78 (9th Cir. 2021) (finding irreparable harm where government actions frustrated organizational plaintiffs' core missions). Moreover, CHIRLA's and ImmDef's inability to recover monetary damages on their Fifth Amendment claims makes their harms irreparable as well. *See California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018).

Defendants previously argued that because "operations at B-18 normalized on June 24," CHIRLA and ImmDef could not show that that they faced a risk of continued irreparable harm and thus they had no standing to seek injunctive relief. TRO Opp. 9, 19. But CHIRLA and ImmDef submitted detailed evidence documenting the ways Defendants continued to inhibit access to counsel at B-18 after that date. *See, e.g.*, Salas Decl. ¶¶ 6, 33; Toczylowski Decl. ¶¶ 51–54, 56; Salas Supp. Decl. ¶¶ 2–3; Toczylowski Supp. Decl. ¶¶ 5, 7–8, 15–19; ECF 82-5 ("Lleras Supp. Decl.") ¶¶ 14–16; ECF 82-2 ("Duran Supp.

Decl.") ¶¶ 2–3; *see also* ECF 82 ("TRO Reply") 6–7. And the Court found a "likelihood that [CHIRLA's and ImmDef's] missions will continue to be interrupted, especially in light of the evidence ... that the attorneys were still denied access as of July 9, 2025." TRO Order 20 n.13; *see id.* at 27–28.

Defendants are no longer in a position to argue that a so-called "normalization" of operations defeats CHIRLA and ImmDef's request for preliminary injunctive relief. There has been a TRO in place since July 11—effectively a court-ordered "cessation" of Defendants' unconstitutional conduct. If Defendants were to claim that any change in B-18 operations since then should be considered a voluntary cessation of the type that might moot a claim for injunctive relief, they would face a "heavy burden" and could prevail only if "subsequent events make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 170, 189 (2000) (citation omitted). They could not do so for multiple reasons.

As an initial matter, Defendants have not fully complied with the existing TRO. The Court issued a clear directive that detainees have access "to confidential telephone calls with attorneys, legal representatives, and legal assistants at no charge" and that such calls "not be screened, recorded, or otherwise monitored. TRO Order 49. But detainees still have to pay for phone calls, the phones available for use are in a non-private, open holding area, and calls are still potentially monitored. *See* S.A.R. Decl. ¶ 10; Freire Decl. ¶ 2; Barba Supp. Decl. ¶¶ 3–5. When individuals detained at B-18 have sought to speak to attorneys through whatever inadequate system is in place, they have at times been met with hostility. One CHIRLA client who was "aggressively … browbeat" into signing voluntary departure papers was told by an officer that she could only contact an attorney through a pay phone, but was not instructed on how to load money for the pay phones. Lleras Third Decl. ¶¶ 12–14 (describing that another detainee "'explained' to her that the only way to contact their families or attorneys was by paying 58 dollars per call"). A guard also informed the CHIRLA client that "he would only let her speak to an attorney if she signed the deportation

paperwork." *Id.* ¶ 13.

Issues with in-person visitation persist too, illustrating that, if anything, the measures in the existing TRO may not go far enough to address Defendants' unconstitutional practices. *E.g.*, *id.* ¶¶ 4–10 (recounting B-18 officers' repeated refusal to permit confidential meeting with client as well as uncertain information about the visiting schedule at B-18); Freire Decl. ¶¶ 2–5 (describing curtailment of visiting hours, often with conflicting rationales); Hunsberger Decl. ¶ 2 (describing attorney's arrival at B-18 during business hours but receiving no response from the buzzer system and seeing "no sign on the door saying that attorney visits were cancelled or explaining why the facility seemed closed"). Unsurprisingly, however, when a person at B-18 is able to get access to an attorney, there are stark improvements in their case. *See* Toczylowski Decl. ¶¶ 39–50.

More generally, all the evidence suggests that Defendants will simply return to their unconstitutional practices if a preliminary injunction extending the existing interim relief does not issue. Defendant Noem made those plans explicit when she responded to the TRO by describing the Court as an "idiot" and affirming that "none of [the federal government's] operations are going to change."[19] Defendant Bovino, after federal agents and military troops descended on MacArthur Park in a show of force just days before the TRO hearing, publicly declared that Defendants "may well go back to MacArthur Park or other places in and around Los Angeles," as "[i]llegal aliens had the opportunity to self deport, now we'll help things along a bit."[20] The immigration arrest quotas that have animated Defendants' recent immigration operations in Southern California from the start remain firmly in

---

[19] NBC News, *DHS Secretary Kristi Noem Calls California Judge an 'Idiot' over Immigration Detention Ruling* (July 12, 2025), *available at* https://www.youtube.com/shorts/8iuX7hhiJMc.

[20] See Melissa Gomez et al., *Heavily Armed Immigration Agents Descend on L.A.'s MacArthur Park*, L.A. Times (July 7, 2025), https://www.nytimes.com/2025/07/07/us/la-macarthur-park-immigration.html?smid=url-share.

21

place.[21] And, as noted, Defendants have not conceded, either in their papers or at the TRO hearing, any constitutional infirmity in anything that has taken place at B-18.

This record is more than sufficient to establish the likelihood of continuing irreparable harm. *See Immigrant Defs. L. Ctr.*, 2025 WL 1172442, at \*22–24; *see also O'Shea v. Littleton*, 414 U.S. 488, 496 (1974) ("[P]ast wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury.").

**IV.    The Balance of the Equities Favors Plaintiffs**

The relevant considerations are the exact same as they were in connection with the TRO, when the Court concluded that CHIRLA and ImmDef had satisfied the remaining *Winter* factors. TRO Order 29–30. The Court should reach the same conclusion again.

The requested preliminary injunction, like the TRO, merely requires Defendants to comply with a well-established due process right of access to counsel by providing individuals detained at B-18 with the same access that the government already affords those held at immigration detention facilities across the country. *See, e.g.*, U.S. Immigration and Customs Enforcement, National Detention Standards at 65, 166 (2025) (requiring facilities to "permit legal visitation seven days a week, including holidays," for eight hours per day on regular business days, and to permit "[a]ll detainees, including those in disciplinary segregation, … to place calls to attorneys");[22] U.S. Immigration and Customs Enforcement, Non-Dedicated Intergovernmental Service Agreement Standards at 11 (2025) (for non-dedicated facilities, likewise requiring seven-days-a-week legal visitation and the

---

[21] *See, e.g.*, Jenny Taer, *ICE Offering Six-Figure Salaries and $50K Bonuses As It Ramps Up Hiring to Fuel Deportations*, N.Y. Post (July 23, 2025), https://nypost.com/2025/07/23/us-news/ice-offering-six-figure-salaries-and-50k-bonuses-as-it-ramps-up-hiring-to-fuel-deportations; Clare Considine, *Immigration Agents Told a Teenage U.S. Citizen: 'You've Got No Rights.' He Secretly Recorded His Brutal Arrest*, Guardian (July 25, 2025), https://www.theguardian.com/us-news/2025/jul/25/florida-teen-immigration-arrest; Russell Payne, *ICE Is About to Go On A Hiring Spree*, Salon (July 26, 2025), https://www.salon.com/2025/07/26/ice-is-about-to-go-on-a-hiring-spree.

[22] https://www.ice.gov/doclib/detention-standards/2025/nds2025.pdf.

22

opportunity to place calls to attorneys at no cost).[23] Indeed, the legal visiting schedule Plaintiffs request here is the same legal visiting schedule that the government agreed to for B-18 when its unconstitutional practices there were challenged more than a decade ago. Compl. ¶ 75. It is hard to imagine what prejudice Defendants could possibly experience from an order directing access to counsel for detainees at B-18. They have pointed to no legitimate policy or practice sanctioning otherwise. None exists. Regardless, any cost to Defendants in complying with their legal obligations would be "far outweighed by the considerable harm" to constitutional rights in the absence of an injunction. *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017).

The public interest makes the equities weigh even more heavily in favor of a preliminary injunction. "Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution," *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005), and it is "always in the public interest to prevent the violation of a party's constitutional rights," *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quotation marks and citation omitted). That holds especially true here, where the requested relief not only upholds the Fifth Amendment at B-18 directly but, by facilitating attorney-client communications, helps shed greater light on the unconstitutional conditions at that detention facility and the unconstitutional conduct that precedes detention. *See, e.g.*, Lleras Third Decl. ¶¶ 7–27 (describing, among other concerning incidents, a CHIRLA client's experience being detained at B-18 where a male guard led her to believe she had to remove her pants in front of him only to be told afterwards that he only wanted her to remove the drawstring from her pants); Lau Decl. ¶¶ 7–10.

Insofar as Defendants return to their claim that injunctive relief interferes with the government's ability to "tak[e] prompt, responsive action to preserve the safety of detainees and federal employees," TRO Opp. 20, that claim falls flat. The Court's TRO—

---

[23] https://www.ice.gov/doclib/detention-standards/2025/ndids2025.pdf.

23

and the preliminary injunction that CHIRLA and ImmDef now request—allows Defendants to temporarily limit access to B-18 "for the safety of human life or the protection of property," while providing for alternative arrangements for legal access. TRO Order 49. Defendants cannot point to any facts demonstrating why the provision in the TRO permitting conditional closures for security reasons is insufficient.

## V. No Security Under Rule 65(c) Should Be Required

District courts have wide discretion to waive Rule 65(c)'s requirement that a party seeking a temporary restraining order or preliminary injunction post security. *See Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009). Courts have not issued bonds where "there is no evidence the [opposing] party will suffer damages from the injunction," *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003), or where "there is a high probability of success that equity compels waiving the bond, [or] the balance of the equities overwhelmingly favors the movant," *Gilmore v. Wells Fargo Bank, N.A.*, No. 14 Civ. 2389, 2014 WL 3749984, at *6 (N.D. Cal. July 29, 2014). Where, as here, the imposition of a bond "would negatively impact [Plaintiffs'] access to the courts and their ability to assert their constitutional rights," no bond should be required. *City & Cnty. of San Francisco v. Trump*, No. 25 Civ. 1350, 2025 WL 1282637, at *39 (N.D. Cal. May 3, 2025). In issuing the TRO, this Court recognized that a bond is not warranted in this case. TRO Order 30. There is no reason for a different conclusion at this juncture.

## CONCLUSION

CHIRLA and ImmDef respectfully request that this Court issue a preliminary injunction that requires Defendants to (1) open B-18 for legal visitation seven days per week, eight hours per day on business days and four hours per day on weekends and holidays; (2) permit individuals detained at B-18 to engage in confidential communication with legal representatives by phone at no charge; and (3) verify each day that the facility was open for attorney visits during scheduled hours and that unmonitored, private phone calls were available to detainees to speak with counsel.

Dated: July 28, 2025

Respectfully submitted,

MARK ROSENBAUM

25

## LOCAL RULE 11-6.2 CERTIFICATION

The undersigned counsel of record for Plaintiffs Coalition for Humane Immigrant Rights and Immigrant Defenders Law Center certifies that this brief, in relevant part, is less than twenty-five pages in length, which complies with the page limit in section VIII.C of the Court's Civil Standing Order.

Dated: July 28, 2025                    Respectfully submitted,

                                        MARK ROSENBAUM