STACY TOLCHIN (SBN 217431)
*stacy@tolchinimmigration.com*
LAW OFFICES OF STACY TOLCHIN
776 E. Green St., Suite 210
Pasadena, CA 91101
Tel: 213-622-7450; Fax: 213-622-7233

MOHAMMAD TAJSAR (SBN 280152)
*mtajsar@aclusocal.org*
MAYRA JOACHIN (SBN 306065)
*mjoachin@aclusocal.org*
EVA BITRÁN (SBN 302081)
*ebitran@aclusocal.org*
DAE KEUN KWON (SBN 313155)
*akwon@aclusocal.org*
OLIVER MA (SBN 354266)
*oma@aclusocal.org*
STEPHANIE PADILLA (SBN 321568)
*spadilla@aclusocal.org*
DIANA SÁNCHEZ (SBN 338871)
*dianasanchez@aclusocal.org*
ACLU FOUNDATION OF
SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, CA 90017-4022
Tel: 213-977-5232; Fax: 213-201-7878

*Counsel for Stop/Arrest Plaintiffs*

(*Additional counsel listed on next page*)

MARK ROSENBAUM (SBN 59940)
*mrosenbaum@publiccounsel.org*
REBECCA BROWN (SBN 345805)
*rbrown@publiccounsel.org*
SOPHIA WRENCH (SBN 354416)
*swrench@publiccounsel.org*
RITU MAHAJAN (SBN 252970)
*rmahajan@publiccounsel.org*
GINA AMATO (SBN 215519)
*gamato@publiccounsel.org*
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, CA 90005
Tel: 213-385-2977

*Counsel for All Plaintiffs*

ANNE LAI (SBN 295394)
*alai@law.uci.edu*
UC IRVINE SCHOOL OF LAW
IMMIGRANT AND RACIAL JUSTICE
SOLIDARITY CLINIC
P.O. Box 5479
Irvine, CA 92616-5479
Tel: 949-824-9894; Fax: 949-824-2747

*Counsel for Stop/Arrest Plaintiffs*

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Pedro VASQUEZ PERDOMO; Carlos Alexander OSORTO; and Isaac VILLEGAS MOLINA; Jorge HERNANDEZ VIRAMONTES; Jason Brian GAVIDIA; LOS ANGELES WORKER CENTER NETWORK; UNITED FARM WORKERS; COALITION FOR HUMANE IMMIGRANT RIGHTS; IMMIGRANT DEFENDERS LAW CENTER,<br><br>    Plaintiffs,<br><br>    v.<br><br>Kristi NOEM, in her official capacity as Secretary, Department of Homeland Security; Todd M. LYONS, in his official capacity as Acting Director, U.S. Immigration | Case No.: 2:25-cv-05605-MEMF-SP<br><br>**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:  September 24, 2025<br>Time: 9:00 a.m.<br>Place: Courtroom 8B<br><br>Hon. Maame Ewusi-Mensah Frimpong |

and Customs Enforcement; Rodney S. SCOTT, in his official capacity as Commissioner, U.S. Customs and Border Patrol; Michael W. BANKS, in his official capacity as Chief of U.S. Border Patrol; Kash PATEL, in his official capacity as Director, Federal Bureau of Investigation; Pam BONDI, in her official capacity as U.S. Attorney General; Ernesto SANTACRUZ JR., in his official capacity as Acting Field Office Director for Los Angeles, U.S. Immigration and Customs Enforcement; Eddy WANG, Special Agent in Charge for Los Angeles, Homeland Security Investigations, U.S. Immigration and Customs Enforcement; Gregory K. BOVINO, in his official capacity as Chief Patrol Agent for El Centro Sector of the U.S. Border Patrol; Jeffrey D. STALNAKER, in his official capacity as Acting Chief Patrol Agent, San Diego Sector of the U.S. Border Patrol; Akil DAVIS, in his official capacity as Assistant Director in Charge, Los Angeles Office, Federal Bureau of Investigation; Bilal A. ESSAYLI, in his official capacity as U.S. Attorney for the Central District of California,

  Defendants.

JACOB S. KREILKAMP (SBN 248210)
jacob.kreilkamp@mto.com
JAMIE LUMA (SBN 331610)
jamie.luma@mto.com
SARA H. WORTH (SBN 341088)
sara.worth@mto.com
HENRY D. SHREFFLER (SBN 343388)
henry.shreffler@mto.com
MAGGIE BUSHELL (SBN 354048)
maggie.bushell@mto.com
KYLE A. GROVES (SBN 358085)
kyle.groves@mto.com
MUNGER, TOLLES & OLSON LLP
350 S. Grand Ave., 50th Floor
Los Angeles, CA 90071
Tel: 213-683-9100; Fax: 213-683-9100

*Counsel for Stop/Arrest Plaintiffs*


LAUREN MICHEL WILFONG*
lwilfong@ndlon.org
NATIONAL DAY LABORER
ORGANIZING NETWORK
1030 S. Arroyo Parkway, Suite 106
Pasadena, CA 91105
Tel: 626-214-5689

*Counsel for Stop/Arrest Plaintiffs*

BREE BERNWANGER (SBN 331731)
bbernwanger@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Tel: 415-621-2493

*Counsel for Stop/Arrest Plaintiffs*

BRISA VELAZQUEZ OATIS
(SBN 339132)
bvoatis@aclu-sdic.org
ACLU FOUNDATION OF
SAN DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
Tel: 619-398-4199

*Counsel for Stop/Arrest Plaintiffs*

MATTHEW J. CRAIG (SBN 350030)
mcraig@heckerfink.com
MACK E. JENKINS (SBN 242101)
mjenkins@heckerfink.com
HECKER FINK LLP
1150 South Olive Street, Suite 10-140
Los Angeles, CA 90015
Tel: 212-763-0883; Fax: 212-564-0883

*Counsel for Access/Conditions Plaintiffs*

EDGAR AGUILASOCHO
(SBN 285567)
eaguilasocho@farmworkerlaw.com
MARTÍNEZ AGUILASOCHO LAW, INC.
900 Truxtun Ave, Suite 300
Bakersfield, CA 93301
Tel: 661-859-1174

*Counsel for Plaintiff United Farm Workers*

CARL BERGQUIST*
cbergquist@chirla.org
COALITION FOR HUMANE IMMIGRANT
RIGHTS
2351 Hempstead Road
Ottawa Hills, OH 43606
Tel: 310-279-6025

*Counsel for Plaintiff Coalition for Humane Immigrant Rights*

ALVARO M. HUERTA (SBN 274787)
ahuerta@immdef.org
BRYNNA BOLT (SBN 339378)
bbolt@immdef.org
ALISON STEFFEL (SBN 346370)
asteffel@immdef.org
IMMIGRANT DEFENDERS LAW CENTER
634 S. Spring St., 10th Floor
Los Angeles, CA 90014
Tel: 213-634-0999

*Counsel for Plaintiff Immigrant Defenders Law Center*

* Admitted pro hac vice

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT on September 24, 2025 at 9:00 a.m., before the Honorable Maame Ewusi-Mensah Frimpong, in Courtroom 8B, Eighth Floor, 350 West First Street, Los Angeles, CA, 90012, Plaintiffs Pedro Vasquez Perdomo, Carlos Alexander Osorto, Isaac Villegas Molina, Jorge Hernandez Viramontes, Jason Brian Gavidia, the Los Angeles Worker Center Network, United Farm Workers, and Coalition for Humane Immigrant Rights (collectively "Stop/Arrest Plaintiffs" or "Plaintiffs") will, and hereby do, respectfully move the court for a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure and Local Civil Rule 65-1 of the U.S. District Court for the Central District of California.

Plaintiffs respectfully request the Court grant a preliminary injunction that enjoins Defendants from violating the Fourth Amendment by relying solely, alone or in combination, on the following factors to form reasonable suspicion for a detentive stop: (a) apparent race or ethnicity; (b) speaking a language other than English or speaking English with an accent; (c) presence at a location, such as a bus stop, car wash, tow yard, day laborer pick up site, or agricultural site, that is frequented by individuals lawfully present in the United States and is not used predominantly for purposes of unauthorized immigration; (d) the type of work the individual does.

Plaintiffs' motion is based on this Notice of Motion and Motion for Preliminary Injunction, the accompanying Memorandum of Points and Authorities, the declarations and all exhibits in support of the same, including attachments, all pleadings and other papers on file in this action, and all oral and documentary evidence that may be presented at the time of the hearing on this Motion.

Dated: July 28, 2025                    By:    *Mayra Joachin*
                                                *Attorney for Stop/Arrest Plaintiffs*

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION .................................................................................................1

II.   FACTUAL BACKGROUND...............................................................................2

    A.    In early June, Defendants began conducting roving, unconstitutional patrols throughout this District. ...........................................................................2

    B.    Defendants have an officially sanctioned pattern and practice of conducting detentive stops during roving patrols without reasonable suspicion. ..................................4

        1.    Defendants' stops are based on broad profiles, not individualized suspicion ..........................................................................4

            *a)*    *Profiling Based on Apparent Race or Ethnicity* ..........................................4

            *b)*    *Profiling Based on Spanish Language Use or Accent* ...............................6

            *c)*    *Profiling Based on Location* ...................................................6

            *d)*    *Profiling Based on Occupation* .................................................8

        2.    Defendants are conducting stops, not voluntary questioning. ...............................8

        3.    Defendants' policy and practice of unlawful stops is officially sanctioned and is intended to continue. ..................................................10

    C.    Defendants' policy and practice is causing irreparable harm. ............................................12

III.  LEGAL STANDARD...........................................................................................15

III.  ARGUMENT.......................................................................................................16

    A.    Plaintiffs have standing to obtain injunctive relief. ..........................................................16

        1.    The individual plaintiffs have standing.................................................................16

        2.    The organizational plaintiffs have standing.........................................................17

    B.    Plaintiffs are likely to succeed on the merits. ...................................................................18

        1.    Defendants are conducting seizures that require at least reasonable suspicion. ..................................18

        2.    Defendants' seizures are not supported by reasonable suspicion. .........................19

    C.    Without an injunction, Plaintiffs will suffer irreparable harm.........................................21

    D.    The balance of hardships tips sharply in Plaintiffs' favor, and an injunction is in the public interest..................................................21

    E.    The Court Has the Power to Grant the Requested Injunction............................................22

IV.   CONCLUSION....................................................................................................24

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*All. for the Wild Rockies v. Cottrell,*
632 F.3d 1127 (9th Cir. 2011) ................................................................................16

*Armstrong v. Davis,*
275 F.3d 849 (9th Cir. 2001) ..................................................................................16

*Barnes v. Healy,*
980 F.2d 572 (9th Cir. 1992) ..................................................................................21

*Benitez-Mendez v. I.N.S.,*
760 F.2d 907 (9th Cir. 1983) ..................................................................................20

*City of Los Angeles v. Lyons,*
461 U.S. 95 (1983)............................................................................................16, 17

*Coal. on Homelessness v. City & Cnty. of San Francisco,*
758 F. Supp. 3d 1102 (N.D. Cal. 2024) .............................................................17, 18

*Columbia Basin Apartment Ass'n v. City of Pasco,*
268 F.3d 791 (9th Cir. 2001) ..................................................................................18

*Costa v. Bazron,*
464 F. Supp. 3d 132 (D.D.C. 2020) ........................................................................21

*Davis v. United States,*
667 F.2d 822 (9th Cir. 1982) ..................................................................................23

*Doornbos v. City of Chicago,*
868 F.3d 572 (7th Cir. 2017) ....................................................................................9

*East Bay Sanctuary Covenant v. Trump,*
354 F. Supp. 3d 1094 (N.D. Cal. 2018) ..................................................................22

*Easyriders Freedom F.I.G.H.T. v. Hannigan,*
92 F.3d 1486 (9th Cir. 1996) .............................................................................23, 24

*Garcia v. City of Los Angeles,*
611 F. Supp. 3d 941 (C.D. Cal. 2020) ....................................................................18

*Gonzalez v. U.S. Immigr. & Customs Enfm't,*
975 F.3d 788 (9th Cir. 2020) ..................................................................................20

*Hodgers-Durgin v. de la Vina,*
199 F.3d 1037 (9th Cir. 1999) ................................................................................17

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) .................................................................................................. 17, 18

*Imm. Def. L. Ctr. v. Noem*,
--F.4th--, 2025 WL 2017247 (9th Cir. July 18, 2025) ................................................ 22

*Int'l Molders' & Allied Workers' Loc. Union No. 164 v. Nelson*,
799 F.2d 547 (9th Cir. 1986) ..................................................................................... 21

*Kidd v. Mayorkas*,
734 F. Supp. 3d 967 (C.D. Cal. 2024) ....................................................................... 24

*LaDuke v. Nelson*,
762 F.2d 1318 (9th Cir. 1985) ................................................................................... 16

*United States v. Manzo-Jurado*
457 F.3d 928 (9th Cir. 2006) ..................................................................................... 20

*Martinez v. Nygaard*,
831 F.2d 822 (9th Cir. 1987) ..................................................................................... 20

*Mayweathers v. Newland*,
258 F.3d 930 (9th Cir. 2001) ..................................................................................... 22

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) ................................................................. 16, 17, 20, 21

*Nat'l Grange of the Ord. of Patrons of Husbandry v. California State Grange*,
182 F. Supp. 3d 1065 (E.D. Cal. 2016)...................................................................... 22

*Natural Resources Defense Council Inc. v. Southwest Marine Inc.*,
242 F.3d 1163 (9th Cir. 2001) ................................................................................... 22

*Orhorhaghe v. I.N.S*,
38 F.3d 488 (9th Cir. 1994) ....................................................................................... 19

*Perez Cruz v. Barr*,
926 F.3d 1128 (9th Cir. 2019) ................................................................................... 20

*Pimentel v. Drefus*,
670 F.3d 1096 (9th Cir. 2012) ................................................................................... 16

*Preminger v. Principi*,
422 F.3d 826 (9th Cir.2005) ...................................................................................... 21

*Productive People, LLC v. Ives Design*,
2009 WL 1749751 (D. Ariz. June 18, 2009) ............................................................... 1

*Santiago v. City of Los Angeles*,
2016 WL 7176694 (C.D. Cal. Nov. 17, 2016).............................................................. 18

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

*Stavrianoudakis v. U.S. Fish & Wildlife Serv.*,
 108 F.4th 1128 (9th Cir. 2024) ...................................................................................18

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
 240 F.3d 832 (9th Cir. 2001) ......................................................................................15

*Thomas v. County of Los Angeles*,
 978 F.2d 504 (9th Cir. 1992) ......................................................................................23

*Trump v. CASA*,
 2025 WL 1773631 (U.S. June 27, 2025) ..............................................................14, 23

*United Farm Workers v. Noem*,
 2025 WL 1235525 (E.D. Cal. Apr. 29, 2025).............................................................11

*United States v. Brignoni-Ponce*,
 422 U.S. 873 (1975)....................................................................................................19

*United States v. Montero-Camargo*,
 208 F.3d 1122 (9th Cir. 2000) .................................................................................1, 19

*United States v. Valdes-Vega*,
 738 F.3d 1074 (9th Cir. 2013) ....................................................................................20

*United States v. Washington*,
 490 F.3d 765 (9th Cir. 2007) ......................................................................................19

*Warsoldier v. Woodford*,
 418 F.3d 989 (9th Cir. 2005) ......................................................................................21

*Washington v. Trump*,
 --F.4th--, 2025 WL 2061447 (9th Cir. July 23, 2025) ...............................................24

*Winter v. Nat. Res. Def. Council, Inc.*,
 555 U.S. 7 (2008)........................................................................................................15

*Ybarra v. Illinois*,
 444 U.S. 85 (1979)......................................................................................................20

*In re Zappos.com, Inc.*,
 888 F.3d 1020 (9th Cir. 2018) ....................................................................................16

*Zepeda v. INS*,
 753 F.2d 719 (9th Cir. 1983) ......................................................................................21

**CONSTITUTIONAL PROVISIONS**

Fourth Amendment ...................................................................................1, 11, 18, 22

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Plaintiffs brought this suit in response to an extraordinary campaign of unlawful immigration operations in the field in Southern California starting on or around June 6, 2025, targeting individuals for, among other things, detentive stops based on broad profiles. After reviewing "hundreds of pages of documentary evidence and video evidence," ECF 101 at 8, this Court found that Defendants were likely engaged in a pattern of conducting detentive stops based on nothing more than apparent race or ethnicity, speaking Spanish or speaking English with an accent, location, and occupation, and that such pattern and practice appeared to be officially sanctioned and was likely to imminently harm the Plaintiffs. ECF 87 ("TRO") at 35, 37–41. Accordingly, the Court properly granted a temporary restraining order requiring Defendants to adhere to the Fourth Amendment's requirement of reasonable suspicion based on "specific, articulable facts . . . particularized" to the person to be stopped. *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000).

Plaintiffs have gathered additional evidence that confirms Defendants' policy and practice. Statements by officials since the issuance of the TRO also make clear that Defendants remain committed to continuing their practice if given the opportunity. Because Plaintiffs continue to face irreparable harm in the form of a deprivation of rights absent court intervention, the Court should convert the TRO into a preliminary injunction. *See Productive People, LLC v. Ives Design*, 2009 WL 1749751, at *3 (D. Ariz. June 18, 2009) (granting preliminary injunction where "Defendants have given the Court no reason to alter the conclusions provided in its previous Order").

Defendants complain they did not have a fair opportunity to present evidence at the TRO stage, but now want to avoid a hearing where the Court can consider additional evidence. Notwithstanding Defendants' appeal of the TRO, this Court has jurisdiction to proceed to a preliminary injunction hearing. Moreover, the Court has the power to grant the requested injunction, which is no broader than necessary to provide Plaintiffs with adequate protection until the case can be resolved on the merits.

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

## II.     FACTUAL BACKGROUND

### A. In early June, Defendants began conducting roving, unconstitutional patrols throughout this District.

In early June, the federal government unleashed armed, masked agents[1] across Southern California to conduct raids in the community. Before the TRO issued, raids took place almost daily across the District, including Los Angeles and Orange Counties, the Inland Empire, and the Central Coast. ECF 45 at 2–4, 15. Defendants targeted Home Depots, car washes, agricultural sites, street corners, bus stops, parks, recycling centers, tow yards, a swap meet, a gym, churches, packing houses, and shopping malls. *Id.* at 5–6, 15; ECF 81 at 6. These operations were driven by an arbitrary arrest quota and are a shift from past practice in that they rely heavily on warrantless "roving patrols" and "collateral" stops, as opposed to "targeted operations" (where agents and officers are looking for, and stop and arrest, a specific person). ECF 45 at 5. This shift follows express directions from the White House to move beyond target lists and "just go out there and arrest" unauthorized noncitizens.[2] Agencies participating in the operations include DHS, including ICE ERO, ICE HSI, and Border Patrol, as well as DOJ law enforcement agencies including the FBI. *Id.* at 2.

Since filing their TRO papers, Plaintiffs have documented additional detentions, including: on June 12 of a U.S. citizen who worked at a tow yard in Montebello close to where Plaintiff Gavidia was stopped,[3] on June 12 of fruit vendors in San Bernardino,[4] on June 13 of a DACA recipient at a car wash

[1] Plaintiffs use "agents," "immigration agents" or "agents and/or officers" to refer to Border Patrol, ICE Homeland Security Investigations and other federal agents as well as ICE Enforcement and Removal Operations officers conducting immigration enforcement operations.

[2] Elizabeth Findell, et al., *The White House Marching Orders That Sparked the L.A. Migrant Crackdown*, The Wall Street Journal (June 9, 2025), https://www.wsj.com/us-news/protests-los-angelesimmigrants-trump-f5089877.

[3] Ex. 2, Declaration of Javier Ramirez ("Ramirez Decl."), ¶¶ 1, 5-10; Leo Stallworth, *Man arrested by ICE agents at Montebello two yard is US citizen, family says*, ABC 7 Eyewitness News (Jun. 13, 2025), https://abc7.com/post/man-arrested-ice-agents-montebello-towing-yard-is-us-citizen-family-says/16743898/.

[4] Ex. 3, Declaration of F.H.S. ("F.H.S. Decl."), ¶¶ 3–9. Plaintiffs submit this declaration and several others in connection with this motion under pseudonym out of concerns about privacy and possible harassment and retaliation. See *Does I thru XXIII v. Advanced Textile Corp.,* 214 F.3d 1058, 1067 (9th Cir. 2000) (discussing party anonymity). Plaintiffs intend to immediately provide the identity of (continued…)

-2-

in Temple City,[5] on June 19 at a Home Depot in Hollywood of street vendors in addition to others,[6] on June 19 of landscapers in a residential neighborhood in Ontario,[7] on June 21 of a landscaper outside an IHOP in Santa Ana,[8] on July 3 of landscapers trimming trees in a parking lot in Santa Fe Springs,[9] on July 3 of landscapers working in a Downey city park,[10] on July 8 of landscapers in Ontario,[11] and on July 10 at Glass House in Camarillo where numerous collateral arrests were made.[12]

Plaintiffs have also learned of incidents after the July 11 TRO that appear to involve agents casting a wide net to search for specific individuals, resulting in detentions of other individuals who were not being sought. *See* Ex. 6, Declaration of G.V.C. ("G.V.C. Decl."), ¶¶ 3–5 (describing being grabbed at a donut shop in Ontario on July 21, then later told, "Sorry, sorry! You weren't who we were looking for."). Others were also detained in the Ontario raid, including a U.S. citizen who was tackled to

---

declarants to Defendants' counsel under appropriate safeguards. If the Court desires, Plaintiffs can also lodge the declarations under seal.

[5] Ex. 4, Declaration of J.D.S. ("J.D.S. Decl."), ¶¶ 4–9.

[6] Ex. 5, Declaration of E.C.P. ("E.C.P. Decl."), ¶¶ 3-7; Karla Rendon, *U.S. citizen detained by federal agents in Hollywood recounts experience*, NBC 4 L.A. (Jun. 21, 2025), https://www.nbclosangeles.com/news/local/u-s-citizen-detained-by-federal-agents-in-hollywood-recounts-experience/3729350/ (reporting stop and arrest of U.S. citizen Job Garcia).

[7] Vivian Chow, *Gardeners reportedly taken by ICE agents while working outside Southern California home*, KTLA 5 (Jun. 19, 2025), https://ktla.com/news/local-news/gardeners-reportedly-taken-by-ice-agents-outside-while-working-outside-southern-california-home/.

[8] Jonathan Lloyd, *Father of Marines detained during landscaping job to be released on bond, family says*, NBC 4 Los Angeles (Jul. 10, 2025), https://www.nbclosangeles.com/news/local/gardener-deteained-santa-ana-tustin-marines/3742620/?utm_source=chatgpt.com.

[9] Whittierinformed, Instagram (July 3, 2025), https://www.instagram.com/reel/DLqhvftub3z/.

[10] Larollinnopalita, TikTok (July 3, 2025), https://www.tiktok.com/@larollinnopalita/video/7522994661800135966?_r=1&_t=ZP-8xjcRgPVFmg.

[11] Josh DuBose, *ICE detains man, 30, inside Ontario surgery center in heated confrontation*, KTLA News (July 9, 2205), https://ktla.com/news/local-news/ice-detains-man-30-inside-ontario-surgery-center-in-heated-confrontation/.

[12] Julia Watson, Amy Taxin, and Olga R. Rodriguez, *A chaotic raid, 360 arrests, and a tragic death: What happened at California's Glass House Farms*, AP News (July 14, 2025), https://apnews.com/article/immigration-raids-marijuana-farm-southern-california-arrests-ead862824a6e994fdfd5297aa1cd6c79 (over 300 individuals arrested, including U.S. citizens).

-3-

the ground.[13] These incidents raise serious concerns about whether Defendants are still relying improperly on racial and other kinds of improper profiling even despite the TRO.

To date, thousands have been arrested in this District in Defendants' dragnet-style operations,[14] and an untold number more have been subjected to detentive stops that did not result in an arrest.

**B. Defendants have an officially sanctioned pattern and practice of conducting detentive stops during roving patrols without reasonable suspicion.**

**1. *Defendants' stops are based on broad profiles, not individualized suspicion***

In the incidents challenged by Plaintiffs, Defendants do not have any particularized information about the individuals they stop and question. Rather, they are systematically resorting to broad stereotypes based on apparent race or ethnicity, language spoken or accent, a person's presence at a particular location, and/or the type of work a person does.

*a) Profiling Based on Apparent Race or Ethnicity*

Plaintiffs have documented a pattern of detentions based on apparent race or ethnicity.

For example, when officers descended on a Pasadena bus stop in the early morning of June 18, where Petitioners-Plaintiffs and day laborers Pedro Vasquez Perdomo, Carlos Alexander Osorto, and Isaac Villegas Molina were waiting to go to work, officers had no information about the three men other than their Latino appearance and that they were dressed in construction work clothes. Ex. 7, Second Declaration of Pedro Vasquez Perdomo ("Second Vasquez Perdomo Decl."), ¶¶ 4–9, 14; Declaration of Carlos Alexander Osorto ("Osorto Decl."), ECF 45-2, ¶¶ 4–8, 13; Ex. 8, Second Declaration of Isaac Villegas Molina ("Second Villegas Molina Decl.") ¶¶ 4–6, 11. Despite Defendants' claim that Mr.

---

[13] Jory Rand, *US citizen detained after federal agents show up at Ontario Stater Bros. store*, ABC7 Los Angeles (July 22, 2025), https://abc7.com/post/us-citizen-detained-federal-agents-show-ontario-stater-bros-store/17238509/ (According to Angel Pina, "I told them where I was born, I had an ID, I had a social, I had a birth certificate . . . None of the ICE agents that were on scene, they didn't care about none of that."); Christian Cazares and Karla Rendon, *3 detained following federal agents' presence at Ontario Stater Bros. store*, NBC Los Angeles, July 21, 2025, https://www.nbclosangeles.com/news/local/3-detained-following-federal-agents-presence-at-ontario-stater-bros-store/3750014/.

[14] Rachel Uranga & Sean Greene, *Majority of people arrested in L.A. immigration raids had no criminal history*, L.A. Times (Jul. 16, 2025), https://www.latimes.com/california/story/2025-07-16/ice-arrests-accelerate-socal-june.

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

Vasquez Perdomo, Mr. Osorto, and Mr. Villegas Molina were arrested as a result of "targeted enforcement," Defendants' own Forms I-213 show that Plaintiffs' arrests were *not* targeted. *See* Ex. 1, Declaration of Stacy Tolchin ("Tolchin Decl."), Att. A (Osorto Form I-213) at 2 (immigration officers were "working in support of ICE Operation At Large at or near Pasadena, CA" and "arrested [Mr.] OSORTO," without further information); ECF 81-1, Att. A (Vasquez Perdomo Form I-213) at 2–3 (similar).

Defendants' reliance on apparent race and ethnicity has meant that numerous Latine U.S. citizens have been needlessly stopped, questioned, and harassed, sometimes for extended periods of time. This includes Plaintiff Hernandez Viramontes, who was detained to "verify" his citizenship, and his co-manager Omar Gamez, both of whom are Latino. ECF 45-4 (Hernandez Viramontes Decl.) ¶ 10; ECF 45-5 (Gamez. Decl.) ¶ 7. This also includes Plaintiff Gavidia, whose encounter with agents on a sidewalk outside a tow yard where he was working on his car, in soiled clothing, left him shaken and fearing for his life. ECF 45-9 (Gavidia Decl.) ¶ 12 (stating "federal agents stopped me literally based on my skin color, just because of the way I look—because I am brown, Latino"). The same is true for Javier Ramirez, who was present at the tow yard where Plaintiff Gavidia was stopped and was detained on the same day. Agents who encountered Mr. Ramirez said of him, "Get him, he's Mexican!" before they promptly grabbed him, threw him to the ground, put a knee on top of his head, and ultimately arrested him, despite his pleas that he was a U.S. citizen. Ramirez Decl. ¶¶ 7–10. Mr. Ramirez was left bloody, dirty, and humiliated. *Id.* ¶ 9. He was later released after his only charge (of resisting a federal officer) was dismissed. *Id.* ¶ 11.

Other evidence in the record confirms Defendants' pattern and practice. Members of organizational Plaintiffs have experienced or witnessed the campaign of racial profiling. ECF 45 at 8. And numerous other community members have described similar incidents of being stopped for being visibly brown while others, appearing white, were not. *Id.* at 8–9;[15] *see also* TRO at 44–45 (describing testimony). Further, Plaintiffs have documented additional stops involving Latine community members.

---

[15] With this motion, Plaintiffs are resubmitting the Declaration of A.L., a witness to a raid, ECF 45-7 (A.L. Decl.), in updated and unredacted form as she is now willing to use her full name. *See* Ex. 12, Declaration of Aleca Le Blanc.

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

*See, e.g.*, J.D.S. Decl. ¶¶ 4–9, 15 (describing detention while working at a car wash, despite being a DACA recipient, based on what he believes was his Latino appearance); E.C.P. Decl. ¶¶ 3–6, 9 (describing detention at gunpoint by masked agents while selling food outside a Home Depot, alongside other Latine individuals, while white protesters were left alone). And as noted above, even after the issuance of the TRO on July 11, Defendants appear to have continued to rely on race to cast a wide net. *See*, *e.g.*, G.V.C. Decl. ¶¶ 3–5 (describing his brutal stop while leaving a donut shop along with another Latine-appearing individual while agents were looking for someone else).

         *b)   Profiling Based on Spanish Language Use or Accent*

The record also demonstrates that Defendants rely on the use of Spanish or speaking English with an accent to support a stop. For instance, when agents stopped U.S. citizen Javier Ramirez in Montebello, they first approached, without identifying themselves, and asked—in Spanish—"¿Adonde vas?" ("Where are you going?"). Ramirez Decl. ¶ 7. Mr. Ramirez, who is fluent in Spanish, responded instinctively in Spanish. This prompted agents to shout, "Get him, he's Mexican!" *Id*. The stop of Mr. Ramirez suggests a troubling possibility of agents initiating conversations in Spanish and then relying on Spanish language use as justification for a stop. Similarly, Plaintiff Hernandez Viramontes speaks English with an accent, which is one of the reasons he believes agents targeted him for "verification" of his citizenship. ECF 45-4 (Hernandez Viramontes Decl.) ¶ 15.

         *c)   Profiling Based on Location*

As noted above, Defendants have targeted numerous locations in their immigration raids, including day laborer sites, car washes, agricultural sites, tow yards, swap meets, and others. *See supra* at 2. The record shows that Defendants are identifying individuals for detentive stops due to their mere presence at these locations.

For example, in connection with Defendants' stay motion, Defendants submitted a new declaration that, in part, attempts to defend the seizures of Plaintiffs Vasquez Perdomo, Osorto, and Villegas Molina. That declaration states that their detentions "arose or were the result of a targeted enforcement action at a particular location where past surveillance and intelligence had confirmed that the target or individuals associated with him were observed to have recruited illegal aliens to work on landscaping jobs." ECF 94-1 (Quinones Decl.) ¶ 6. But the declaration says nothing about the Plaintiffs

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

themselves and omits that the "location" in question was a public bus stop in Pasadena and that Plaintiffs work in *construction*. In other words, Defendants' view is that a non-White, Spanish-speaking person's mere presence at a location—where someone else, associated with different people who lacked legal status, was present at a different time—can justify a deprivation of liberty.

Others have also experienced targeting based on their presence at locations associated with day laborers. *See, e.g.*, ECF 45-11 (Valdez Rios Decl.) ¶¶ 3–5 (detained at Home Depot while looking for work when agents did not know his identity or anything else about him); ECF 38-11 (Toczylowski Decl.) ¶¶ 32–38 (describing ImmDef client with asylee status who was stopped twice, the second time while standing at a Home Depot with other men); E.C.P. Decl. ¶ 7 (detained while selling food at a street vendor corner where day laborers gather outside a Home Depot); ECF 45-6 (Padilla Decl.), ¶¶ 4–11 (describing 8 to 12 masked agents detaining and arresting several day laborers at a Home Depot).

Numerous witnesses also have recounted being stopped for being present at car washes while they were being raided. B.V. was visiting a car wash with his father and brother as customers when his father and brother, who is 11 years old and a U.S. citizen, were detained. ECF 45-14 (B.V. Decl.) ¶¶ 7–8, 10. *See also*, *e.g.*, ECF 45-4 (Hernandez Viramontes Decl.) ¶¶ 4–14 (detained at car wash where he was working despite being a U.S. citizen and describing how on one occasion even customers were questioned); ECF 45-5 (Gamez Decl.) ¶¶ 5–7 (interrogated about his citizenship three times at same car wash); ECF 45-10 (Cruz Uitz Decl.) ¶¶ 3–14 (member of CLEAN detained at car wash when agents knew nothing about him); ECF 45-15 (M.N. Decl.) ¶¶ 2–7 (describing how agents approached and put hands on him while he was working at car wash); J.D.S. Decl. ¶¶ 2–9 (DACA recipient who is Deaf who was detained at car wash).

Witnesses have also been stopped at other locations because of where they happened to be. For example, Plaintiff Gavidia and Mr. Ramirez, both U.S. citizens, were stopped at Yank Towing in Montebello. ECF 45-9 (Gavidia Decl.) ¶¶ 6–8 (stopped at tow yard where he rents space to work on his car); Ramirez Decl. ¶¶ 5–10 (stopped at same tow yard). German Molina, likewise a U.S. citizen, was also asked for his papers. ECF 45-21 (Molina Decl.) ¶¶ 4–7 (worker at Yank Towing who was approached while on his way out and now carries his passport "in my chest pocket, so that the top of the passport is visible"); *see also* ECF 45-16 (R.H.D. Decl.) ¶¶ 5-9 (detained while agents were looking for

another individual in a residential area); G.V.C. Decl. ¶ 5 (detained while agents were looking for another individual in the vicinity).

<em>d)        Profiling Based on Occupation</em>

Defendants routinely rely on perceived occupation, whether as a day laborer, food vendor, landscaper, car wash worker, tow yard worker, or farm worker, as a substitute for individualized suspicion.

The examples above regarding location show that Defendants are relying on perceived occupation as a day laborer, car wash worker, or tow yard worker to stop individuals. Additionally, E.C.P. was stopped due to her skin color, location, and her work as a food vendor, along with other street vendors, on June 19. E.C.P. Decl. ¶¶ 3–6, 9. And days earlier, on June 12, F.H.S. was surrounded and stopped by masked agents as she finished selling fruit for the day, along with three other male vendors. F.H.S. Decl. ¶¶ 3–9.

Even when individuals are not actually working, they have been profiled based on their clothing or tools that signaled their probable occupation or status as a laborer. *See, e.g.*, ECF 45-9 (Gavidia Decl.) ¶ 12 (clothes were dirty from working on his car); ECF 45-16 (R.H.D. Decl.) ¶¶ 3–4 (preparing a home for painting outside, where home belonged to a family member). U.S. citizens, those with legal status, and others—including members of Plaintiff organizations—have similarly been targeted due to their affiliation with specific occupations. ECF 45-12 (Gudino Decl.) ¶¶ 25–27; ECF 45-13 (Melendrez Decl.) ¶¶ 14–17; Ex. 9, Second Declaration of Elizabeth Strater ("Second Strater Decl.") ¶¶ 19, 29–31, 32–34, 35–37; ECF 38-9 (Salas Decl.) ¶¶ 24, 27.

<strong>2. <em>Defendants are conducting stops, not voluntary questioning.</em></strong>

The Court previously found that Defendants are effectuating seizures, TRO at 37-38, based on a record showing that agents and officers on operations: (1) approached swiftly—by vehicle or foot—in an aggressive and intimidating manner; (2) often physically grabbed, surrounded, or blocked people, sometimes holding them at gunpoint, escalating matters when individuals declined to answer or try to terminate encounters; (3) often instructed or commanded people to stop and do other things, like provide IDs, answer questions, or "shut the f*** up"; and (4) moved about in large numbers, armed, masked, and dressed in plainclothes with bulletproof vests or military clothing. ECF 45 at 9–12. These tactics left

-8-

no doubt that the contacts are nonconsensual and that those approached do not have the ability to end the encounter. Further, agents' and officers' masked appearance and unwillingness to identify themselves makes it difficult for community members to view the contacts as anything but nonconsensual, *see* ECF 45 at 12, as there is little reason for a law enforcement officer intending a consensual encounter to not introduce themselves.[16]

Plaintiffs' newly submitted declarations confirm Defendants' "seize first, ask questions later" policy and practice. For example, Javier Ramirez observed a white SUV suddenly pull up to Yank Towing, followed by masked agents streaming through a narrow opening in a gate to the property, armed with handguns and, in one case, a military rifle. Ramirez Decl. ¶ 6. An agent grabbed him before he was asked any questions. *Id*. ¶ 7. Eventually, he was turned around, thrown to the ground, and cuffed, before being taken away. *Id*. ¶¶ 8–9. E.C.P. was "cornered" by cars, along with other food vendors, with armed, masked men running out of the cars and taking over the entire area. E.C.P. Decl. ¶ 4. They screamed at E.C.P. and others and said "Don't move!" while pointing guns at them, without asking any questions. *Id*. ¶¶ 4–5. F.H.S. and the other fruit vendors with her were stopped in a vehicle by cars that blocked their path, and told to step outside. F.H.S. Decl. ¶ 5. She was then tripped, shoved into a fence, grabbed by the back of the head, and pushed into the grass with a knee on her head while agents handcuffed her, all before she was asked for identification or any questions about her legal status. *Id*. ¶¶ 6–7. J.D.S. was approached by two armed, masked men coming out of an unmarked SUV who immediately started yelling at him. J.D.S. Decl. ¶ 6. After he informed them he was Deaf, he took out his wallet, and an officer confiscated it; he took out his phone to try to communicate with it, and the officer confiscated that. *Id*. ¶ 7. And G.V.C. was grabbed by two masked men in civilian clothing and bulletproof vests as he was leaving a donut shop, and slammed against a wall, with his hands behind his

---

[16] Defendants' decision to prioritize agents' and officers' anonymity has also made it more understandable why some community members have taken flight out of concerns for their safety. *See* ECF 81 at 5. As Plaintiffs have previously explained, the evidence shows Defendants are not relying on flight to decide who to stop or not. But even if they did, under these circumstances, flight would hardly be probative. *Id*.; TRO at 41 n. 30 (discussing the factor of flight); *see also Doornbos v. City of Chicago*, 868 F.3d 572, 583 (7th Cir. 2017) ("[I]t is generally not reasonable for a plainclothes officer to fail to identify himself when conducting a stop.").

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

back. G.V.C. Decl. ¶¶ 3–4. All this happened before the masked men took his wallet. *Id.* The men did not identify themselves or provide any warnings. *Id*. ¶¶ 3, 5.

### 3. *Defendants' policy and practice of unlawful stops is officially sanctioned and is intended to continue.*

As this Court previously found, there is reason to believe the policy and practice of unlawful stops had the "approval or authorization" of officials. TRO at 35. This finding was not based simply on statements by officials encouraging agents and officers to do *more* immigration enforcement; it was based on statements that numbers mean everything[17] regardless of what agents and officers have to do to get those numbers, and express instructions to "push the envelope," go out to places like Home Depot and 7-Eleven stores to round people up, and pursue "[a]ll collaterals."[18]

Officials necessarily were aware their directives would lead agents and officers to engage in indiscriminate profiling rather than targeted investigations. As a former ICE official explains, "only raids on 'construction, dairy [and] meat processing facilities, carpet mills' can achieve the high numbers being demanded."[19] "It's these low-wage jobs, that's where you get the numbers."[20] Defendants have also fostered a culture of impunity and normalized lawless, even violent, conduct. DHS dismantled long-

---

[17] Jennie Taer, *Trump admin's 3,000 ICE arrests per day quota is taking focus off criminals and 'killing morale': insiders*, New York Post (June 17, 2025), https://nypost.com/2025/06/17/us-news/trumpadmins-3000-ice-arrests-per-day-quota-is-taking-focus-off-criminals-and-killing-morale-insiders ("All that matters is numbers, pure numbers. Quantity over quality."); Tyler Pager, et al., *Trump's Conflicting Messages on Workplace Raids Leave Businesses Reeling*, N.Y. Times (June 17, 2025), https://www.nytimes.com/2025/06/17/us/politics/trump-conflicting-messages-workplace-raids.html (Secretary Noem: agents will be "judged every day" by "how many arrests [they], [their] teammates and [their] office are able to effectuate.").

[18] Elizabeth Findell, et al., *The White House Marching Orders That Sparked the L.A. Migrant Crackdown*, The Wall Street Journal (June 9, 2025), https://www.wsj.com/us-news/protests-los-angelesimmigrants-trump-f5089877; José Olivares, *US immigration officers ordered to arrest more people even without warrants*, The Guardian (June 4, 2025), https://www.theguardian.com/us-news/2025/jun/04/immigration-officialsincreased-detentions-collateral-arrests ("If it involves handcuffs on wrists, it's probably worth pursuing.").

[19] Laura Strickler, et al., *Trump, in reversal, may exempt farms and hotels from immigration raids*, NBC News (June 15, 2025), https://www.nbcnews.com/politics/immigration/trumpreversal-may-exempt-farms-hotels-immigration-raids-rcna212958.

[20] *Id.*

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

standing internal oversight mechanisms and restraints on agents' and officers' conduct. *See* ECF 45 at 13 & n.49. They have impeded accountability by allowing agents and officers to go into the field masked and to refuse to identify themselves as a matter of course. *See* ECF 45 at 12; *supra* at 8–9. And as Plaintiffs have noted, in the Eastern District of California earlier this year, a federal judge found that Border Patrol agents led by Defendant Bovino were engaged in a policy and practice of conducting detentive stops without individualized reasonable suspicion in likely violation of the Fourth Amendment as part of the so-called "Operation Return to Sender." *United Farm Workers v. Noem*, 2025 WL 1235525, at *1 (E.D. Cal. Apr. 29, 2025). A Border Patrol official deemed that operation "proof of concept," and Bovino is now leading operations in this District.[21]

Despite numerous alarming reports of violations of people's rights, Defendants also have not repudiated any incident or announced an investigation or discipline for a single one.[22] To the contrary, Defendants have praised agents and officers for doing an "excellent job."[23] Despite Defendants' claims about the adequacy of their training, in response to the Court's TRO, border czar Tom Homan defended Defendants' policy and practice, stating when an officer and agent briefly detain a person at "a Home Depot," the "typical facts" they rely on are the person's "location, the[ir] occupation, their physical

---

[21] Brittny Mejia and Rachel Uranga, *Fears of racial profiling rise as Border Patrol conducts 'roving patrols,' detains U.S. citizens*, L.A. Times (June 15, 2025), https://www.latimes.com/california/story/2025-06-15/latinos-targeted-in-raids-u-s-citizens-detained-indiscriminate-sweeps-home-depot-lots-targeted.

[22] A DOJ prosecutor recently reported that agents are arresting first and asking questions later, making even prosecutors' jobs difficult. James Queally and Brittny Mejia, *Trump's top federal prosecutor in L.A. struggles to secure indictments in protest cases*, L.A. Times (July 23, 2025), https://www.latimes.com/california/story/2025-07-23/protester-charges-essayli. Nonetheless, Defendant Essayli recently applauded an operation at a Home Depot in the Eastern District conducted by agents of Defendant Bovino. Matthew Seedorff, *Border Patrol performs raid in Sacramento, less than week after judge's ban*, Fox LA (July 17, 2025), https://www.foxla.com/news/border-patrol-performs-raid-sacramento-less-than-week-after-judges-ban.

[23] Defendant Essayli recently applauded an operation at a Home Depot in the Eastern District conducted by agents of Defendant Bovino. Matthew Seedorff, *Border Patrol performs raid in Sacramento, less than week after judge's ban*, Fox LA (July 17, 2025), https://www.foxla.com/news/border-patrol-performs-raid-sacramento-less-than-week-after-judges-ban. *See also* Elex Michaelson, *The Man Leading California's Border Patrol Raids (Full Interview with Greg Bovino)*, (July 19, 2025) https://www.youtube.com/watch?v=t_v5DfSQRrc (starting at 21:04).

-11-

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

appearance," and finally, "their actions."[24] And Defendants have made clear their commitment to continue their policy and practice if given the opportunity: Bovino promised his agents are "not going to quit . . . [w]e're going to turn and burn,"[25] and in response to a question about this Court's order, Secretary Noem vowed that "none of [their] operations are going to change."[26]

Absent a court order preventing unlawful stops without reasonable suspicion, the record makes clear that Defendants intend to continue conducting their operations unlawfully in this District.

## C. Defendants' policy and practice is causing irreparable harm.

Defendants' mission, as expressly stated by top officials, is to "flood the zone" in areas with sanctuary policies.[27] Absent an injunction, Plaintiffs will face profound and irreparable harm.

As Plaintiffs previously detailed in their TRO papers, Plaintiffs Hernandez Viramontes and Gavidia, both U.S. citizens, have every reason to fear they will be profiled and unlawfully stopped again. ECF 45-4 (Hernandez Viramontes Decl.) ¶ 15; ECF 45-9 (Gavidia Decl.) ¶¶ 12–13. Agents have already raided the car wash where Hernandez Viramontes works multiple times. ECF 45-4 (Hernandez Viramontes Decl.) ¶¶ 5–14; ECF 45-5 (Gamez Decl.) ¶¶ 4–7, 11. On the day federal agents illegally detained him, they raided the car wash twice, and the second set of agents seemed unaware of the first raid. ECF 45-5 (Gamez Decl.) ¶ 11. Three different agents questioned Gamez, who is also a U.S. citizen. *Id.* ¶ 7. The agents' practice was not to check whether someone had been previously detained, but

---

[24] Madison Colombo, *Homan accuses Dems, media of pushing 'fake' stories about ICE after agents clash with California rioters*, Fox News (July 11, 2025), https://www.foxnews.com/media/homan-accuses-dems-media-pushing-fake-stories-about-ice-after-agents-clash-california-rioters (describing "their actions" as a person "run[ning] away" or "walk[ing] away").

[25] NewsNation, *Border patrol chief on California raids: 'I'm going to go harder': Exclusive*, (July 18, 2025), https://www.youtube.com/watch?v=Ne_Tmg2uaak (starting at 23:52).

[26] CBS News, *Homeland Secretary Kristi Noem holds press conference in Tampa | full video*, (July 12, 2025), https://www.youtube.com/watch?v=3Sbu9WOVOpc (starting at 19:33).

[27] Robert Tait, *Trump's border czar to target sanctuary cities in US: 'We're gonna flood the zone,'* The Guardian (July 22, 2025) https://www.theguardian.com/us-news/2025/jul/21/trump-sanctuary-cities-noem-homan; *see also* USBPChiefELC, X (July 7, 2025) https://x.com/USBPChiefELC/status/1942331663784239126 ("We may well go back to MacArthur Park or other places in and around Los Angeles."); USBPChiefELC, X (July 21, 2025) https://x.com/USBPChiefELC/status/1947297433706491994 ("Sooner or later, this all will be normal. Once again, WE are not leaving LA until this mission is accomplished.")

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

instead to come "out of the vehicles and start[] grabbing" people. ECF 45-5 (Gamez Decl.) ¶ 5. Other U.S. citizens also report living in fear that they will be racially profiled, feeling "unsafe leaving home" and "not welcome," and carrying their U.S. passports on their person for "protection." ECF 45 at 16; *see also* Ramirez Decl. ¶ 12 ("Without a court order, I fear the same thing will happen again.").[28]

Petitioners-Plaintiffs Vasquez Perdomo, Osorto, and Villegas Molina likewise live in fear of being profiled again. ECF 45 at 16. In the wake of their detentions, once "vibrant neighborhoods" of Pasadena became "eerily quiet." *Id.* Petitioner-Plaintiff Vasquez Perdomo has since been released from detention but "remain[s] traumatized by what happened" to him and "avoid[s] leaving the house unnecessarily." Second Vasquez Perdomo Decl. ¶ 14. Petitioner-Plaintiff Villegas Molina is also now released but his "life was completely upended" and he is worried he will be detained again for "look[ing] like an immigrant." Second Villegas Molina Decl. ¶ 12.

Organizational Plaintiffs' members additionally face a continued threat of suspicionless stops. LAWCN, UFW, and CHIRLA all have members in low-wage industries that have been profoundly affected by raids. Members of LAWCN's worker centers—U.S. citizens and otherwise—have been afraid to go to work or be in public. ECF 45 at 16–17. Its worker center member CLEAN, which organizes workers in the car wash industry and had numerous members stopped and arrested, still has members who reasonably fear being racially profiled absent a court order. *Id.*; Ex. 10, Second Declaration of Flor Melendrez ("Second Melendrez Decl.") ¶ 5.

Plaintiff UFW has multiple members, U.S. citizens and otherwise, who live in continued fear that they will be racially profiled by agents who patrol the areas where they live, work, and commute.

---

[28] *See also* James Rainey, *Immigration raids have invaded not just L.A. but also its psyche*, L.A. Times (July 18, 2025) https://www.latimes.com/california/newsletter/2025-07-18/immigration-raids-have-invaded-not-just-l-a-but-its-psyche ("[P]eople are carrying their passports, fearing the color of their skin could get them stopped."); Jeniffer Stavros, *LA therapists are creating "whisper networks" to help immigrants during ICE raids*, L.A. Public Press (July 14, 2025) https://lapublicpress.org/2025/07/therapists-creating-whisper-networks-to-help-immigrants/ ("[I]mmigration raids sweeping Los Angeles have created such widespread fear that even naturalized citizens are afraid to leave their homes"); *id.* (discussing clients "struggling to access food, social interactions, sunlight, and hope for the future"); Brittny Mejia, *'Scared to be brown': California residents fearful amid immigration raids*, L.A Times (June 25, 2025), https://www.latimes.com/california/story/2025-06-25/california-residentsfearful-amid-immigration-raids-youre-scared-to-be-brown.

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

Second Strater Decl. ¶¶ 16, 19; *id.* ¶¶ 17, 24, 26 (describing "widespread panic" among UFW members). Some have already been stopped. *Id.* ¶¶ 29–31. After hearing about enforcement operations in Ventura County, members have avoided affected locations, and some have refrained from activities like going to laundromats or seeking medical care, attending church, or sending their children to school. ECF 45 at 17.[29] Those who have returned to work face worsening conditions due to staff shortages and the heat outdoors.[30] UFW's members' fears have become even more acute after the chaotic raid in Camarillo on July 10. Second Strater Decl. ¶¶ 24–25 (describing "heightened anxiety" and "trauma and psychological distress").[31]

Plaintiff CHIRLA's members similarly have significant reasonable fear due to the manner in which raids have been conducted. ECF 45 at 17. CHIRLA has tens of thousands of members in this District and members in every county in the District, and its membership consists of predominantly Latine people, including many day laborers, carwash workers, street vendors, and others. *Id.*; *see also* Ex. 11, Second Declaration of Angelica Salas ("Second Salas Decl."), ¶ 2. Some members are "on constant alert," have changed their routines, reduced their work, or withdrawn their children from school out of fear that they will be illegally stopped or assaulted. ECF 45 at 17; Second Salas Decl. ¶ 3.

---

[29] *See, e.g.*, Shreyas Teegala, *Fearing ICE raids, some LA residents skip doctor's visits: 'Everybody's life is on pause'*, The Guardian (June 24, 2025), https://www.theguardian.com/us-news/2025/jun/24/ice-raids-healthcare-los-angeles-ohio; Andrea Castillo and Queenie Wong, *L.A. immigration raids force the undocumented to trade their freedom for safety*, L.A. Times (June 26, 2025), https://www.latimes.com/politics/story/2025-06-26/online-church-school-and-doctor-afraid-of-ice-raids-immigrants-go-digital; Maanvi Singh, *As ICE infiltrates LA, neighborhoods fall quiet: 'We can't even go out for a walk,'* The Guardian (June 21, 2025), https://www.theguardian.com/us-news/2025/jun/21/los-angeles-ice-immigration-raids-impact; Dana Goldstein and Irene Casado Sanchez, *Immigration Raids Add to Absence Crisis for Schools*, N.Y. Times (June 16, 2025), https://www.nytimes.com/2025/06/16/us/immigration-raids-school-absences-deportation-fears.html.

[30] Marcos Magaña, *Fear of ICE raids is making heat intolerable for Southern California families*, L.A. Times (July 25, 2025), https://www.latimes.com/environment/story/2025-07-25/ice-raids-heat-immigrant-families-southern-california (farmworkers are "in the blazing sun for hours, afraid to return home" in the wake of raids, and those who have returned to work must "do the same amount of work, only now with fewer people"); *id.* (car wash employees are often exposed to "direct heat without regular access to water or breaks," worsened by staff shortages after many were apprehended or "no longer come in because they fear they could be next").

[31] *See also* Ryan P. Cruz, *More than 620 Arrests Reported in Immigration Operations on Central Coast*, Santa Barbara Independent (Jul. 24, 2025), https://www.independent.com/2025/07/24/more-than-620-arrests-reported-in-immigration-operations-on-central-coast/.

-14-

Recently, the cousin of a long-time CHIRLA member was stopped as he was returning from the laundromat in San Bernardino, contributing to fears that the member will also be stopped. Second Salas Decl. ¶ 6.

Plaintiffs' and their members' experiences underscore the devastating social and economic impact of Defendants' actions across the District.[32] Across ideological lines, Republicans as well as Democrats recognize that "the fear in our communities is real" and note "real concerns about potential economic impacts, especially upon agriculture, with the way that enforcement is being conducted."[33]

## III.    LEGAL STANDARD

The standards for a temporary restraining order and a preliminary injunction are the same. *See, e.g.*, *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). Plaintiffs are entitled to a preliminary injunction if they show that (1) they are likely to succeed on the merits of their claims; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Stuhlbarg*, 240 F.3d at 839 n.7. A stronger showing on

---

[32] *See, e.g.*, Jenny Gold, *'I already want to cry.' Undocumented parents prepare for the unthinkable: giving up their kids*, L.A. Times (July 15, 2025), https://www.latimes.com/california/story/2025-07-15/undocumented-parents-deportation-children-custody-ice-raids (5.62 million American children have an undocumented household member, half of whom do not have a parent with legal status); *id.* (influx of parents "preparing for arrest or deportation," reports of "children having nightmares about the possibility of being separated," and "profound impact on a child" that deportation of a parent can have); Nadra Nittle, *'This is the first time I've been afraid that I am Latina': ICE raids set L.A. on edge*, 19th News (June 16, 2025), https://19thnews.org/2025/06/ice-raids-los-angeles-mental-health/ (reporting "raids often reactivate intergenerational trauma" and patients "struggling with sleep, experiencing heightened stress," "adjusting their day-to-day routines out of fear," and "choosing not to access services they're entitled to"); Levi Sumagaysay, *Thousands of Californians lost work after LA immigration raids — including citizens*, Cal Matters (July 16, 2025), https://calmatters.org/economy/2025/07/immigration-raids-california-jobs/ (research showing 3.1% drop in private employment week after raids began, equal to loss of 271,574 jobs for citizens and 193,248 for non-citizens).

[33] Ben Fox and Melanie Mason, *The state where immigration raids are becoming a problem for Republicans*, Politico (July 23, 2025), https://www.politico.com/news/2025/07/23/california-republicans-ice-raids-backlash-00471909. Former DHS officials have also raised concerns that Defendants' operations will negatively impact the agency's core mission such as human trafficking investigations. Marianne LeVine and Derek Hawkins, *Under Trump, Border Patrol arrests immigrants far from U.S.-Mexico border*, Washington Post (July 22, 2025), https://www.washingtonpost.com/immigration/2025/07/22/border-patrol-arrests-us-mexico-border-trump/.

-15-

one element may offset a weaker showing on another. *See Pimentel v. Drefus*, 670 F.3d 1096, 1105 (9th Cir. 2012). Under this sliding-scale approach, where a moving party would suffer irreparable harm in the absence of relief and demonstrates that an injunction would be in the public interest, "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).

## III.   ARGUMENT

### A. Plaintiffs have standing to obtain injunctive relief.

Plaintiffs are individuals and organizations with members who have been harmed by Defendants' unlawful policy and practice and who remain under threat that they will be unlawfully seized.

#### 1. *The individual plaintiffs have standing.*

To establish Article III standing, a plaintiff must show that she or he "has sustained or is immediately in danger of sustaining some direct injury" as a result of the challenged conduct and "the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02 (1983) (internal citations omitted). Although past "exposure to illegal conduct" alone is insufficient to confer standing for injunctive relief, a plaintiff has standing if they can show that they are "realistically threatened by a repetition" of an injury. *Id.* at 109; *In re Zappos.com, Inc.*, 888 F.3d 1020, 1024 (9th Cir. 2018). In this Circuit, such a showing can be made by pointing to "a written policy" *or* "a pattern of officially sanctioned behavior, violative of the plaintiff's [federal] rights." *Melendres v. Arpaio*, 695 F.3d 990, 998 (9th Cir. 2012) (cleaned up); *see also Armstrong v. Davis*, 275 F.3d 849, 861 (9th Cir. 2001) (quoting *LaDuke v. Nelson*, 762 F.2d 1318, 1323 (9th Cir. 1985)). Where such a showing is made, "the likelihood of a future stop of a particular individual plaintiff" need not be "high," so long as the existence of a policy or practice renders the future injury "sufficiently likely." *Melendres,* 695 F.3d at 998.

Here, each of the individual Plaintiffs has experienced a direct injury as a result of Defendants' policy and practice of suspicionless stops. Plaintiff Gavidia, a U.S. citizen, was violently detained and interrogated about his citizenship on the basis of his ethnicity and his presence at a tow yard. *See supra* at 5, 7–8. Plaintiff Hernandez Viramontes, also a U.S. citizen, was detained and taken away from his workplace on the basis of his ethnicity and accent while working at a car wash. *See supra* at 5–7. And

Petitioners-Plaintiffs Vasquez Perdomo, Osorto, and Villegas Molina were seized on the basis of their apparent ethnicity and occupation while standing at a public bus stop. *See supra* at 4–7. As discussed above, Plaintiffs were seized as part of a pattern of conduct, and that pattern of conduct is officially sanctioned. *See Melendres,* 695 F.3d at 998; TRO at 35, 37–41; *supra* at 4–11. Moreover, Plaintiffs cannot avoid being subjected to Defendants' unlawful practice by avoiding unlawful activity. *Cf. Lyons*, 461 U.S. at 105–06, 110; *see Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1041 (9th Cir. 1999). Each was seized while going about their daily lives. Because each of the Plaintiffs continue to reside in the District and the characteristics that led to their stops have not changed, they have shown that they are likely to be stopped again if an injunction does not issue. *See supra* at 11–12 (discussing Defendants' commitment to continue their policy and practice).[34]

### 2. *The organizational plaintiffs have standing.*

"[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Coal. on Homelessness v. City & Cnty. of San Francisco*, 758 F. Supp. 3d 1102, 1122 (N.D. Cal. 2024) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). LAWCN, UFW, and CHIRLA each meet the *Hunt* test.

The first prong is met because individual members could establish injury-in-fact and standing to obtain an injunction. The CLEAN worker center, a member of LAWCN, has 1,800 members in the District and numerous members who have been stopped and fear being stopped on the basis of their occupation. *See* ECF 45-13 (Melendrez Decl.) ¶¶ 13–18; Second Melendrez Decl. ¶ 9; *supra* at 13. UFW is a membership organization with thousands of members in this District who reasonably live in fear that they will be profiled by agents who routinely patrol the areas where they live and work. Second Strater Decl. ¶¶ 16, 17, 26; *see supra* at 13–14. One UFW member already was seized before the TRO issued for no evident reason other than his Latino appearance and status as a day laborer. *Id.* ¶¶ 29–31. And CHIRLA's membership, numbering approximately 49,000 in the District, consists of

---

[34] Although Petitioner-Plaintiff Villegas Molina remains detained, he is actively seeking release and intends to return to Pasadena if released.

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

predominantly Latine people, many who work in industries that have been heavily impacted by these operations. They reasonably fear being stopped pursuant to Defendants' policy and practice. ECF 38-9 (Salas Decl.) ¶¶ 24–30; Second Salas Decl. ¶¶ 2–3; *see supra* at 14–15.

The second prong is met because safeguarding LAWCN, UFW, and CHIRLA members' liberty interests, including while working, is germane to the organizations' purposes. *See Garcia v. City of Los Angeles*, 611 F. Supp. 3d 941, 952 (C.D. Cal. 2020) (protecting homeless individuals' belongings from seizure was sufficiently germane to homeless aid organization's mission). LAWCN is a network of worker centers, which exist to support "low-wage, often immigrant workers[,]" ECF 45-12 (Gudino Decl.) ¶ 7, and CLEAN fights for car wash workers' dignity in the work place, where Defendants have repeatedly targeted its members for unlawful detentive stops based on the type of work they perform, ECF 45-13 (Melendrez Decl.) ¶ 3. UFW's mission is to "improve the lives, wages, and working conditions of agricultural workers and their families," and it "is a national leader in the movement for immigration reform and immigrants' rights." Second Strater Decl. ¶¶ 11, 17. And CHIRLA's mission is to "advance the human and civil rights of immigrants and refugees" and ensure immigrant communities are "integrated into our society with full rights and access to resources." ECF 39-9 (Salas Decl.) ¶ 2.

The third *Hunt* factor is met. The participation of individual members is not required because the organizations seek only preliminary injunctive relief. *See Columbia Basin Apartment Ass'n v. City of Pasco*, 268 F.3d 791, 799 (9th Cir. 2001). Defendants have argued that the organizations cannot vindicate their members' Fourth Amendment rights, ECF 71 at 11, but there is no Fourth Amendment exception to *Hunt. See, e.g.*, *Stavrianoudakis v. U.S. Fish & Wildlife Serv.*, 108 F.4th 1128, 1143 (9th Cir. 2024) (organization had standing under *Hunt* to vindicate members' rights against suspicionless searches); *Coal. on Homelessness*, 758 F. Supp. 3d at 1125 (same for seizures); *Santiago v. City of Los Angeles*, 2016 WL 7176694, at *6 (C.D. Cal. Nov. 17, 2016) (same).

**B.  Plaintiffs are likely to succeed on the merits.**

**1.  *Defendants are conducting seizures that require at least reasonable suspicion.***

The Court previously found Defendants are conducting seizures, and that they are conducting them as part of a consistent pattern and practice throughout the District. TRO Order at 37–38. Defendants have not offered any evidence to refute that agents and officers are descending upon a

-18-

location suddenly, armed and in numbers, with an overwhelming display of authority, sometimes physically grabbing people, blocking egress, and often yelling verbal commands almost immediately upon arrival. *See supra* at 8–9; ECF 45 at 19. Such encounters with law enforcement are not voluntary. *United States v. Washington*, 490 F.3d 765, 771 (9th Cir. 2007); *see also Orhorhaghe v. I.N.S*, 38 F.3d 488, 494–96 (9th Cir. 1994) (similar).

### 2. Defendants' seizures are not supported by reasonable suspicion.

"Except at the border and its functional equivalents," detentive stops must be supported by "specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that [the persons stopped are noncitizens] who may be illegally in the country." *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975). Reasonable suspicion comprises two elements: the assessment must be based upon the totality of the circumstances, and it "must arouse a reasonable suspicion that *the particular person being stopped* has committed or is about to commit a [violation of law]." *Montero-Camargo*, 208 F.3d at 1129 (emphasis in original).

The Court previously determined that Defendants were likely conducting stops without reasonable suspicion by relying solely on four broad demographic factors. TRO at 39–41. The Court then explained why *sole* reliance on the four factors, alone or in combination, cannot suffice under binding Circuit and Supreme Court case law. *Id.* at 42–44 (discussing cases). Plaintiffs' new evidence confirms the unlawful practice. *See supra* at 2–8.

The evidence Defendants have submitted discusses only (1) targeted operations, which are not being challenged in this lawsuit, and (2) what officers are trained to do, not their actual practice. TRO at 40-41. To the extent Defendants' evidence has addressed their practice for "roving patrols" and "collateral" stops since early June, it *acknowledges* that their sanctioned practice is to rely on "location" to generate reasonable suspicion. ECF 71-2 ¶ 7 (Harvick describing targeting of businesses such as car washes); ECF 94-1 ¶ 6 (Quinones describing selection of bus stop where Plaintiffs Vasquez Perdomo, Osorto, and Villegas Molina were stopped). Instead of looking for *specific* individuals at those locations or attempting consensual questioning, Defendants seize people before asking any questions, on the apparent premise that their mere presence at the location—perhaps together with being Latine, Spanish-

-19-

speaking, and/or engaged in a certain kind of work—is suspicion enough. *See supra* at 4–8 (discussing stops, including of plaintiffs).

Defendants' practice flies in the face of the law of this Circuit and of the Supreme Court. *See Ybarra v. Illinois*, 444 U.S. 85, 94 (1979) (*Terry* requires suspicion as to the particular person, even if "that person happens to be on premises where an authorized narcotics search is taking place");  *Perez Cruz v. Barr*, 926 F.3d1128, 1138 (9th Cir. 2019); *Martinez v. Nygaard*, 831 F.2d 822, 827 (9th Cir. 1987); *United States v. Manzo-Jurado*, 457 F.3d 928, 936–37 (9th Cir. 2006); *Benitez-Mendez v. I.N.S.*, 760 F.2d 907, 909 (9th Cir. 1983) ("[Officers] may not detain workers for citizenship status questioning unless the investigators are able to articulate objective facts providing them with a reasonable suspicion that *each questioned person*, so detained, is an [individual] illegally in this country.") (emphasis added). Because the factors Defendants rely upon are "no more indicative of illegal presence in the country than legal presence," TRO at 44, their practice also violates the precept that "an officer cannot rely solely on generalizations that, if accepted, would cast suspicion on large segments of the law-abiding population." *Manzo-Jurado*, 457 F.3d at 935.

Defendants try to paint the TRO as departing from the totality-of-the-circumstances test, but it is *Defendants* who have departed from that test in favor of sweeping demographic assumptions. The Court's TRO, read in the "context" of the record of this case, *United States v. Valdes-Vega*, 738 F.3d 1074, 1079 (9th Cir. 2013) (en banc), clearly requires that detentive stops be based on particularized facts that go beyond Defendants' broad profiles. *See* TRO at 44. This is certainly within the Court's authority to order. *See e.g.*, *Gonzalez v. U.S. Immigr. & Customs Enf't*, 975 F.3d 788, 819–23 (9th Cir. 2020) (injunction may be appropriate if Fourth Amendment standard not met); *Melendres*, 695 F.3d at 1001–02 (affirming injunction based on totality-of-the-circumstances analysis).

The CLEAN Carwash Worker Center reports that car wash raids were occurring almost daily in June and early July, but since the entry of the TRO, car wash raids have stopped. Second Melendrez Decl. ¶ 8. This is a strong indication that the car-wash seizures that were occurring before were not targeted, did not comply with the terms of the Fourth Amendment as set forth in the TRO, and that the TRO is clear on what conduct it prohibits. A preliminary injunction is necessary to ensure that Defendants do not return to flouting the Fourth Amendment again.

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

**C. Without an injunction, Plaintiffs will suffer irreparable harm.**

As this Court found in granting a TRO, without judicial intervention, Defendants' illegal policies and practices are likely to cause Plaintiffs continued irreparable harm. TRO at 46–47.

"It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Melendres*, 695 F.3d at 1002; *see also Warsoldier v. Woodford*, 418 F.3d 989, 1001–02 (9th Cir. 2005). Plaintiffs here need only demonstrate "a real possibility" that such irreparable constitutional harm will continue. *Melendres*, 695 F.3d at 1002; *Int'l Molders' & Allied Workers' Loc. Union No. 164 v. Nelson*, 799 F.2d 547, 553 (9th Cir. 1986). In connection with Plaintiff's TRO application, Plaintiffs presented evidence that they and their members experienced significant harm, including deprivation of liberty and the kind of emotional harm that courts regularly conclude constitutes irreparable injury. *See* TRO at 46–47 (citing, *inter alia*, ECF Nos. 45, 45-13, 81, 45-18). Plaintiffs continue to face the threat of this harm absent a preliminary injunction.

Defendants cannot argue an injunction is no longer necessary simply because unlawful seizures have slowed after the TRO. "The court's power to grant injunctive relief survives discontinuance of the illegal conduct," especially where that discontinuance flows from the party's compliance with a court order. *Barnes v. Healy*, 980 F.2d 572, 580 (9th Cir. 1992); *see Costa v. Bazron*, 464 F. Supp. 3d 132, 142 (D.D.C. 2020), *vacated as moot*, 2021 WL 9037763 (D.C. Cir. May 4, 2021) ("If compliance with the terms of a TRO were sufficient to defeat entry of a preliminary injunction, few—if any—cases would make it past the TRO stage."). Defendants' public statements following the TRO, *see supra* at 11–12, remove any doubt that, absent an injunction, Defendants' unconstitutional tactics are likely to continue.  An injunction remains necessary to prevent irreparable injury.

**D. The balance of hardships tips sharply in Plaintiffs' favor, and an injunction is in the public interest.**

This Court's conclusions that the balance of hardships weighs heavily in Plaintiffs' favor and that the injunction serves the public interest remain correct because "[c]omplying with the law does not impose harm." TRO at 47 (quoting *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1983); *accord Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) ("public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution").

-21-

Despite speculating that they would be harmed by a TRO, Defendants introduced no actual evidence of harm in opposing the TRO, in seeking a stay before this Court, or at the Ninth Circuit. *See* TRO 47–48 & n.36; ECF 90 (Hr. Tr. 71:13–19, 74:4–7, 75:13–15), ECF 108 at 6 ("Defendants provide no evidence that this Order—even if erroneous—will impair their ability to enforce immigration law."); *id.* ("Defendants do not provide any specific instances where their operations *were* hampered because of the Order"). And even if Defendants *had* shown any such instances, the Ninth Circuit recently affirmed that thwarting "the Executive Branch's desire to enact a policy is not sufficient" to show harm. *Imm. Def. L. Ctr. v. Noem*, --F.4th--, 2025 WL 2017247, at *5 (9th Cir. July 18, 2025).

Defendants may continue to assert that an injunction has a chilling effect on enforcement, *see* ECF 71 at 22–23, but that assertion is unsubstantiated, and any hesitation "would appear to flow from the Constitutional requirements of forming reasonable suspicion," not from "some defect in the TRO." TRO Stay Order, ECF 108, at 7 n.3. Courts regularly enter similar injunctions in the face of a pattern and practice of Fourth Amendment violations. *See supra* at 20; *see also* ECF 45 at 24 (collecting cases). An injunction would serve the public interest.

### E.  The Court Has the Power to Grant the Requested Injunction.

The Court has jurisdiction to grant the proposed preliminary injunction despite the pending appeal taken by Defendants of the Court's TRO; and District-wide relief is appropriate.[35]

The Court may enter Plaintiffs' proposed preliminary injunction order. The TRO is by its nature a temporary order that is intended to expire upon a decision on Plaintiff's motion for a preliminary injunction. *See East Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1105 n.3 (N.D. Cal. 2018), *aff'd*, 950 F.3d 1242 (9th Cir. 2020), *and aff'd sub nom. E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640 (9th Cir. 2021). The Court may act to extend the legal requirements that were in effect at the time the appeal was filed. *See Nat'l Grange of the Ord. of Patrons of Husbandry v. California State Grange*, 182 F. Supp. 3d 1065, 1072–73 (E.D. Cal. 2016). Even when an injunction touches the subject matter of an appeal, the district court at a minimum may "act to preserve the status quo," including by

---

[35] At this time, Plaintiffs do not seek the additional documentation, guidance, and training set forth in the Court's Order to Show Cause, TRO at 51, though Plaintiffs may request such measures at a later time if there are concerns about compliance with the Court's orders.

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

issuing another injunction. *Natural Resources Defense Council Inc. v. Southwest Marine Inc.*, 242 F.3d 1163, 1166 (9th Cir. 2001); *Mayweathers v. Newland*, 258 F.3d 930, 935 (9th Cir. 2001) (district court has the authority "to grant a second injunction pending an interlocutory appeal of the first.").

Acting to maintain the status quo also does not require that the court issue an identical injunction to that previously issued: "post-appeal modifications, which slightly modif[y] and enforce[] the injunction, to preserve the status quo" are acceptable, including "minor adjustments that effectuate[] the underlying purposes of the original requirements." *NRDC*, 242 F.3d at 1165, 1167 (holding that additional measures defining terms in an injunction and clarifying the timeline of compliance was preserving the status quo). Plaintiffs' proposed preliminary injunction order contains slight modifications from the language of the TRO to do just that—clarify and effectuate the Court's prior order.[36] Moreover, a court has the ability, even while its prior order is under appeal, to "act to assist the court of appeals in the exercise of its jurisdiction," *Davis v. United States*, 667 F.2d 822, 824 (9th Cir. 1982), such as by "fil[ing] written findings of fact and conclusions of law in support of the preliminary injunction order" on appeal. *Thomas v. Cnty. of Los Angeles*, 978 F.2d 504, 507 (9th Cir. 1992), *as amended* (Feb. 12, 1993).

As the Court previously found, a District-wide injunction is necessary to provide Plaintiffs with adequate relief. TRO at 35–36 (discussing *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486 (9th Cir. 1996)). The Supreme Court's recent decision in *Trump v. CASA*, 145 S. Ct. 2540 (2025), does not undermine this principle, but reinforces it. *See* TRO 30 n.21. In *CASA*, the Court limited nationwide injunctions against enforcement of an executive order on birthright citizenship, but "only to the extent that the injunctions [were] broader than necessary to provide complete relief" to the parties. 145 S. Ct. at 2562–63. The Court recognized that a court may grant injunctive relief that "incidental[ly]" benefits nonparties if such breadth is necessary to provide meaningful protection to the parties. *Id.* at 2557–58.

---

[36] For example, the clause "except as permitted by law" in the Court's TRO was intended to address situations not at issue in this case and did not undermine the clarity of the order, which was directed at Defendants' practice of flouting the Fourth Amendment's reasonable suspicion requirement during detentive stops in non-border areas in the Central District of California. Nevertheless, because Defendants have requested further clarification, Plaintiffs have spelled out the exceptions from the case law in their proposed preliminary injunction order. *See* Proposed Order ¶ 1. Plaintiffs have also adjusted the order to make clear that paragraphs one and two of the TRO must be read together.

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

The Ninth Circuit's decision last week in *Washington v. Trump*, --F.4th--, 2025 WL 2061447 (9th Cir. July 23, 2025), makes this crystal clear. There, the court affirmed a nationwide injunction on grounds that it is necessary to protect the plaintiffs from the harm that gives rise to their standing. *Id.* at \*17.

In this case, because Plaintiffs live, work, and move throughout the District and the organizational Plaintiffs have members spread throughout the District, *see supra* at 13–15, 17–18, a District-wide injunction is necessary to afford complete relief. *See, e.g.*, *Easyriders*, 92 F.3d at 1502 (explaining that a statewide injunction was necessary and proper where suit was brought by individual plaintiffs and a member organization). Given the way Defendants' detentive stops are carried out, there would be no way for Plaintiffs or organizational Plaintiff members to identify themselves *before* the harm of a detentive stop occurs. TRO at 36; ECF 45-9 (Gavidia Decl.) ¶¶ 9–11 (describing how he was stopped before agents looked at his ID); ECF 45 at 10.

Moreover, Defendants' illegal pattern and practice is widespread: as the record shows, no matter where Plaintiffs are in the District, what time of day, or what type of location, they are susceptible to such pattern and practice. ICE ERO's Los Angeles Field Office, a key player here, has an Area of Responsibility (AOR) that spans all seven counties in the District, with uniform policies and practices set at the District level.[37] Accordingly, relief should be District-wide. *See Kidd v. Mayorkas*, 734 F. Supp. 3d 967, 988 (C.D. Cal. 2024) (granting summary judgment in favor of plaintiffs and vacating LA ERO Field Office-wide unconstitutional policy).

Defendants offer no proposal for narrowing the injunction in a way that would nevertheless provide Plaintiffs with complete relief. *See Washington*, 2025 WL 2061447, at \*17. The Court should therefore decline to narrow the injunction. Additionally, and alternatively, District-wide relief would be appropriate if the Court were to grant Plaintiffs' anticipated motion for partial class certification.[38]

**IV.    CONCLUSION**

For the foregoing reasons, Plaintiffs request the Court enter a preliminary injunction.

---

[37] *See* https://www.ice.gov/contact/field-offices.

[38] Plaintiffs have informed Defendants of their intention to file such a motion and intend to do so by August 7, 2025.

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

Dated: July 28, 2025

Respectfully submitted,

ACLU FOUNDATION OF
SOUTHERN CALIFORNIA

By:      *Mayra Joachin*
*Attorney for Stop/Arrest Plaintiffs*


UC IRVINE SCHOOL OF LAW
IMMIGRANT AND RACIAL JUSTICE
SOLIDARITY CLINIC

By:      *Anne Lai*

*Attorney for Stop/Arrest Plaintiffs*

-25-

# CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2025, I electronically filed the foregoing with the Clerk of the U.S. District Court for the Central District of California using the CM/ECF system, which provided notification of such filing to all registered CM/ECF users, including all adverse parties. L.R. 65-1.

Dated:  July 28, 2025                              ACLU OF SOUTHERN CALIFORNIA


                                        By:    */s/ Mayra Joachin*
                                               Mayra Joachin
                                               *Counsel for Plaintiffs*

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel of record certifies that this filing is 12 point font and twenty-four pages, which complies with this Court's standing order.


DATED:  July 28, 2025                              ACLU OF SOUTHERN CALIFORNIA


                                    By:    */s/ Mayra Joachin*
                                           Mayra Joachin
                                           *Counsel for Plaintiffs*

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF