HYDEE FELDSTEIN SOTO
(SBN 106866)
City Attorney
hydee.feldsteinsoto@lacity.org
VALERIE L. FLORES (SBN 138572)
valerie.flores@lacity.org
MICHAEL J. DUNDAS (SBN 226930)
mike.dundas@lacity.org
MARIA LOUISE COUSINEAU
(SBN 122280)
maria.cousineau@lacity.org
RANDALL G. SOMMER
(SBN 214099)
randall.sommer@lacity.org
SHUBHRA SHIVPURI (SBN 295534)
shubhra.shivpuri@lacity.org
OFFICE OF THE LOS ANGELES
CITY ATTORNEY
City Hall 200 North Spring Street
21st Floor
Los Angeles, CA 90012-4130
Tel.: 213-922-8382; Fax: 213-978-7957

*Attorneys for Proposed Intervenor
City of Los Angeles*

E. MARTIN ESTRADA
(SBN 223802)
martin.estrada@mto.com
DANIEL B. LEVIN (SBN 226044)
daniel.levin@mto.com
JOHN L. SCHWAB (SBN 301386)
john.schwab@mto.com
V. GRACE DAVIS (SBN 336732)
grace.davisfisher@mto.com
V. ROMAN LEAL (SBN 348892)
roman.leal@mto.com
WENDY QIUYU XIAO (SBN 342702)
wendy.xiao@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
50th Floor
Los Angeles, California 90071
Tel.: 213-683-9100; Fax: 213-687-3702

*Attorneys for Proposed Intervenors
Cities of Los Angeles, Culver City,
Montebello, Monterey Park, Pico
Rivera, Santa Monica, and West
Hollywood*

NICOLE DAVIS TINKHAM
(SBN 229592)
Chief Deputy
ntinkham@counsel.lacounty.gov
LILIANA CAMPOS (SBN 255753)
Assistant County Counsel
lcampos@counsel.lacounty.gov
BRIGIT GREESON ALVAREZ
(SBN 237301)
Deputy County Counsel
bgreesonalvarez@counsel.lacounty.gov
OFFICE OF THE LOS ANGELES
COUNTY COUNSEL
648 Kenneth Hahn Hall of Admin.
500 West Temple Street
Los Angeles, California 90012-2713
Tel.: 213-808-8736; Fax: 213-633-1915

*Attorneys for Proposed Intervenor
County of Los Angeles*

MICHELE BEAL BAGNERIS
(SBN 115423)
City Attorney
mbagneris@cityofpasadena.net
ARNOLD F. LEE (SBN 278610)
Chief Assistant City Attorney
aflee@cityofpasadena.net
ANDREW AARONIAN (SBN 318245)
Deputy City Attorney
aaaronian@cityofpasadena.net
OFFICE OF THE CITY ATTORNEY
OF PASADENA
100 N Garfield Ave, Rm N-210
Pasadena, CA 91101
Tel.: 626-744-4141; Fax: 626-744-4190

*Attorneys for Proposed Intervenor
City of Pasadena*

-1-

COMPLAINT IN INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF OF PROPOSED INTERVENORS

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

Pedro VASQUEZ PERDOMO; Carlos Alexander OSORTO; and Isaac VILLEGAS MOLINA; Jorge HERNANDEZ VIRAMONTES; Jason Brian GAVIDIA; LOS ANGELES WORKER CENTER NETWORK; UNITED FARM WORKERS; COALITION FOR HUMANE IMMIGRANT RIGHTS; IMMIGRANT DEFENDERS LAW CENTER,

Plaintiffs,

vs.

Kristi NOEM, in her official capacity as Secretary, Department of Homeland Security; Todd M. LYONS, in his official capacity as Acting Director, U.S. Immigration and Customs Enforcement; Rodney S. SCOTT, in his official capacity as Commissioner, U.S. Customs and Border Patrol; Michael W. BANKS, in his official capacity as Chief of U.S. Border Patrol; Kash PATEL, in his official capacity as Director, Federal Bureau of Investigation; Pam BONDI, in her official capacity as U.S. Attorney General; Ernesto SANTACRUZ JR., in his official capacity as Acting Field Office Director for Los Angeles, U.S. Immigration and Customs Enforcement; Eddy WANG, Special Agent in Charge for Los Angeles, Homeland Security Investigations, U.S. Immigration and Customs Enforcement; Gregory K. BOVINO, in his official capacity as Chief Patrol Agent for El Centro Sector of the U.S. Border Patrol; Jeffrey D. STALNAKER, in his official capacity as Acting Chief Patrol Agent, San Diego Sector of the U.S. Border Patrol; Akil DAVIS, in his official capacity as Assistant Director in Charge, Los Angeles Office, Federal Bureau of Investigation; Bilal A. ESSAYLI, in his official capacity as U.S. Attorney for the Central District of California,

Defendants.

Case No. 2:25-cv-05605-MEMF-SP

**COMPLAINT IN INTERVENTION FOR DECLARATORY AND INJUNCTIVE RELIEF OF PROPOSED INTERVENORS THE CITY OF LOS ANGELES, THE COUNTY OF LOS ANGELES, THE CITY OF CULVER CITY, THE CITY OF MONTEBELLO, THE CITY OF MONTEREY PARK, THE CITY OF PASADENA, THE CITY OF PICO RIVERA, THE CITY OF SANTA MONICA, AND THE CITY OF WEST HOLLYWOOD**

Judge: Hon. Maame Ewusi-Mensah Frimpong

-2-

COMPLAINT IN INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF OF PROPOSED INTERVENORS

# INTRODUCTION

Pursuant to <u>Federal Rule of Civil Procedure 24(b)</u>, Plaintiffs-Intervenors ("Intervenors") the City of Los Angeles, the County of Los Angeles, the City of Culver City, the City of Montebello, the City of Monterey Park, the City of Pasadena, the City of Pico Rivera, the City of Santa Monica, and the City of West Hollywood allege as follows:

1. Since at least June 6, 2025, armed and masked individuals, often without visible credentials or other identification, have conducted unprecedented, illegal, and unconstitutional searches and seizures across the Los Angeles region.

2. For more than seventy years prior to June 6, immigration enforcement in the Los Angeles area consisted of lawful arrests pursuant to warrants, naming identified individuals for specified reasons, and created little or no impact on public safety and order. In the month since June 6, it has become clear that Defendants have tossed all of that history, and the basic notion of constitutional rights and adherence to law, into the trash bin.

3. These illegal seizures and related activities are conducted by federal agents, purportedly in support of the federal government's immigration-enforcement goals. Yet these sweeping raids are conducted without warrants, without probable cause, and without reasonable suspicion. Witnesses report that many of the resulting arrests appear to be based on nothing more than the perceived ethnicity of the detained individuals.

4. Community leaders who have witnessed Defendants' operations have described them as "kidnapp[ings]" and "disappear[ances]" evocative of "a totalitarian regime."[1] Once launched, these actions employ disproportionate levels of force and escalation tactics unwarranted by the threat levels presented.

---

[1] Martin Kaste, *As courts review military in LA, immigration enforcement accelerates*, NPR (June 19, 2025), https://www.npr.org/2025/06/19/g-s1-73569/as-courts-review-military-in-l-a-immigration-enforcement-accelerates.

COMPLAINT IN INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF OF PROPOSED INTERVENORS

5. These unlawful activities have included random and often brutal stops, raids, roundups, family separations, and detention without access to counsel or family.

6. The daily onslaught of armed, unidentified, often masked, and openly hostile forces appearing at workplaces, schools, courthouses, churches, parks, homes, baseball games, neighborhoods, and other public and private places where families and other residents live, work, worship and recreate has reverberated across the region. This has left many of Intervenors' residents, regardless of immigration status, frightened to go to work, shop, visit, recreate, pray, study, seek Intervenors' services, or even venture outside or engage in normal daily activity.

7. There is good reason for such fear. Defendants' choice to appear on city streets or in other public spaces in force, visibly armed, in masks and driving unmarked vehicles, radically increases the chance of violent encounters, whether with frightened residents, including citizens, or local law enforcement called to the scene. Some of the detentions have ensnared citizens and legal residents. Even federal actions that have *not* ended with arrest or detention have resulted in physical harm to citizens from tear gas, physical force and battery.

8. These illegal federal actions have caused tangible and intangible damage and harm to Intervenors in multiple ways, sowing chaos, fear, and mistrust in their communities.

9. The unlawful actions have diverted law enforcement resources away from enforcing local laws and promoting public safety. Local law enforcement agencies are forced to respond to numerous reports of armed, masked individuals converging on an area. This diverts scarce policing resources that ought to be deployed to reduce the incidence and fear of crime.

10. Not only have these raids been conducted by masked and unidentified individuals, but Defendants have also broken with decades of precedent to launch these raids without notice to, or coordination with, local law enforcement. As a

-4-

result, in many cases, law enforcement officers must respond without any idea whether the armed individuals are federal agents or individuals committing crimes, putting local officers at increased risk.

11. The primary goal of Defendants' campaign is not immigration enforcement. Defendants have been crystal clear that they seek to make an example of Intervenors for implementing policies that President Donald J. Trump dislikes. The President announced on his social media platform, Truth Social, that he was calling on federal immigration officials "to do all in their power" to effect "the single largest Mass Deportation Program in History" in "Democratic Power Center[s]" "such as Los Angeles."[2] As Secretary of Homeland Security Kristi Noem put it: "We are not going away. We are staying here to liberate this city from the socialist and burdensome leadership that this Governor Newsom and this mayor placed on this country and what they have tried to insert into this city."[3]

12. Beyond the direct impacts on local law enforcement, the illegal activities of federal immigration authorities have broadly harmed Intervenors' economies and financial health. Local businesses in each of the Intervenors' jurisdictions have been devastated because their employees and their customers are afraid to leave their homes. Intervenors have lost and are continuing to lose meaningful tax revenue, in addition to bearing the increased costs resulting from the increased demands on local law enforcement. Intervenors have also incurred tens of millions of dollars in direct, additional costs, including overtime and other unanticipated expenses resulting from these unlawful federal activities.

---

[2] Camilo Montoya-Galvez, *Trump directs immigration authorities to prioritize deportations in Democratic-run cities*, CBS News (June 16, 2025), https://www.cbsnews.com/news/trump-directs-ice-deportations-democratic-run-cities.

[3] Helen Jeong, *Kristi Noem blames Democratic officials for making ICE raids in LA harder*, NBC Los Angeles (June 12, 2025), https://www.nbclosangeles.com/news/local/kristi-noem-blames-democratic-officials-for-making-ice-raids-in-la-harder/3722800.

COMPLAINT IN INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF OF PROPOSED INTERVENORS

13.     Intervenors have sole provenance over local affairs and certain core functions, including providing for public safety, public services, and the health and welfare of the residents within their municipal boundaries.  Defendants' actions are a direct attack on, and an impediment to, each Intervenor's ability to carry out those duties.

14.     Each of the Intervenors is a local jurisdiction with compelling interests in the subject matter of this litigation.  Four of the Intervenors are charter cities (Culver City, Los Angeles, Pasadena, and Santa Monica), four are general law cities (Montebello, Monterey Park, Pico Rivera, and West Hollywood), and all of the cities are located within Intervenor County of Los Angeles.  Each charter city and two of the general law cities has its own police department, while the elected Sheriff of Los Angeles County serves as the principal law enforcement agency for the County and for the general law cities of Pico Rivera and West Hollywood.

### JURISDICTION AND VENUE

15.     This Court has federal question jurisdiction under 28 U.S.C. § 1331. The Court also has authority to award declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201–2202.

16.     Defendants do not have immunity.  *See, e.g.*, 5 U.S.C. § 702; *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689–90 (1949); *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 526 (9th Cir. 1989).

17.     Venue is proper under 28 U.S.C. § 1391(e)(1) because Defendants are officers or employees of the United States and at least one Plaintiff resides in this District; a substantial part of the events or omissions giving rise to the claims occurred in this District; and/or because at least one Defendant resides in this District.

COMPLAINT IN INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF OF PROPOSED INTERVENORS

## PARTIES IN INTERVENTION

18.     Allegations regarding the parties in Plaintiffs' First Amended Petition and Complaint (the "Lead Complaint"), ECF No. 16, ¶¶ 12–32, are incorporated herein by reference.

**Proposed Intervenor-Plaintiff the City of Los Angeles**

19.     Proposed Intervenor-Plaintiff the City of Los Angeles is a municipal corporation organized and existing under the laws of the State of California and is a charter city pursuant to Article XI of the California Constitution.

20.     The principal law enforcement agency of the City of Los Angeles is the Los Angeles Police Department ("LAPD").  The mission of the LAPD is to safeguard the lives and property of the people it serves, to reduce the incidence and fear of crime, and to enhance public safety while working with the diverse communities of Los Angeles to improve Angelenos' quality of life.  LAPD works in partnership with the people and organizations within Los Angeles to solve local problems that affect public safety.

21.     Historically, LAPD has received notice of large-scale, federal immigration enforcement efforts.

22.     Defendants launched the current immigration raids without notice to, or coordination with, the LAPD.

23.     As a result, LAPD officers have experienced confusion as to whether an individual conducting a raid is, in fact, a federal agent.

24.     LAPD has had to divert resources to responding to and managing the fallout from federal enforcement efforts.  Since June 6, 2025, LAPD has devoted more than 10,000 personnel (measured in days of deployment) and has spent more than $27.8 million in total costs in responding to and managing the fallout from Defendants' actions, including in receiving and responding to numerous 911 calls or other reports about federal raids or other reports of "crimes" that turned out to be federal immigration enforcement actions.

-7-

25.     The relationships that LAPD has built with Angeleno communities, including immigrant communities, have been and continue to be harmed by Defendants' unlawful enforcement actions.  LAPD officers have been confused for federal agents, and accused by Angelenos of aiding federal agents.  Victims of crimes are hesitant to speak to local law enforcement investigators due to fears that investigators knocking on their doors may actually be federal agents.

26.     The warrantless arrests of individuals in Los Angeles, including in and around courthouses, interferes with Los Angeles' ability to protect and to obtain cooperation from its immigrant communities.  For example, victims of crimes have reported being afraid to come to court or otherwise cooperate with law enforcement due to concerns about federal immigration enforcement.

27.     Defendants' actions have also chilled economic activity in Los Angeles.  Ridership for DASH, Los Angeles' public bus service, has declined across the City, with downtown DASH ridership for June 2025 down 35% from the prior year.  Restaurants and retail businesses have emptied out.  Owners report declines in sales and employees who are not showing up for work.  Some businesses are reporting up to 75% declines in foot traffic and sales.  Los Angeles has lost both sales and business tax income as a consequence.

**Proposed Intervenor-Plaintiff the County of Los Angeles**

28.     Los Angeles County is a subdivision of the State of California, and one of its original 27 counties, ratified under the first County Charter in 1912.  It has the largest population of any county in the United States at over 10 million residents—who comprise more than one quarter of California's population—and is the nation's largest county government, with more residents than most states.  The County covers 4,084 square miles, and more than one million residents live in unincorporated areas outside of the County's eighty-eight cities.  Close to 49% of County residents are of Hispanic or Latino origin, with another 16.4% of Asian, Native Hawaiian, or Pacific Islander origin, 9% Black, and 25.3% of White or Non-

-8-

Hispanic origin.  As of February 2025, the County budget exceeds $49 billion in federal, state, and local funds to support a range of vital commitments including, but not limited to, healthcare, public safety, public benefits, workforce development, foster care, child support, housing and emergency management.

29.    Since June 7, 2025, federal immigration agents have conducted large-scale and frequent raids across the County in public parks and streets, hospitals, private homes, businesses, swap meets, parking lots, and in front of courthouses, among a multitude of other locations that impact virtually every facet of life for County residents.

30.    Video footage and eyewitness accounts of these raids reveal that federal immigration agents typically have not shown judicial, or even administrative, warrants when conducting their operations.  Some of the individuals detained, questioned, and arrested in these operations are U.S. citizens or hold valid immigration status; federal agents presumably did not have reasonable suspicion or probable cause to suspect immigration violations in at least these cases, and perhaps even in many cases of those without legal status.  One such encounter, which was shared in social media, included an ICE agent repeatedly asking a twenty-nine-year-old Hispanic man, who is a U.S. citizen: "What hospital were you born at?" while temporarily detaining him.

31.    Video footage and eyewitness accounts also indicate that federal immigration agents often wear masks and plainclothes and do not identify themselves during these raids, heightening fear and tension among County residents who are investigated or detained, as well as bystanders and others who learn of these raids through the media accounts, word of mouth, and social media posts.

32.    The vast majority of County residents targeted by these raids are of Hispanic or Latino origin, followed by members of the Asian and Pacific Islander communities.

COMPLAINT IN INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF OF PROPOSED INTERVENORS

33.    As a result of the federal immigration raids, large numbers of Latino and other residents have become fearful of leaving their homes to go to work, take public transportation, access County services including medical services, access open public programs and resources, and even attend appointments with immigration lawyers and legal service providers funded by the County.

34.    The masked, unidentified federal agents have created such a climate of fear, mistrust, and suspicion that County employees ranging from Los Angeles County Sheriff's Department's deputies to social workers have been mistaken for federal agents and confronted with vandalism of their vehicles, verbal accusations, harassment, and threats, as well as non-cooperation.

35.    This confusion and mistrust also impacts public safety because victims and witnesses are unwilling to cooperate with Sheriff's deputies.  In addition, due to its expanded duties resulting from the public outcry against the large-scale federal immigration raids, the Sheriff's Department has incurred over $9 million in additional costs since Defendants' immigration raids began in June.

36.    Public fear of federal immigration agents also has disrupted the work of social workers in the County's Department of Children and Family Services ("DCFS") and Department of Aging & Disabilities, preventing them from protecting the County's most vulnerable residents: children and elders.  As one example, DCFS operates a Multi-Agency Response Team ("MART") that helps provide emergency protective services to children in imminent danger from illegal gangs, guns, and drugs.  In cooperation with local law enforcement, MART protects children in "intelligence sensitive" child endangerment cases.  On June 16, 2025, the Sheriff's Department requested MART's presence in executing a warrant.  During the execution of the warrant, a crowd gathered and shouted profanities at the DCFS MART social worker, making statements showing that they believed DCFS workers were, or were helping, federal immigration enforcement agents.  Despite the social worker's showing a DCFS identification card, several individuals in the crowd

-10-

continued to mistakenly believe that MART staff were associated with federal immigration authorities. Following those events, to reduce the risk to DCFS staff, DCFS altered its procedures and began instructing its staff to meet law enforcement at their precincts, instead of meeting them in the community.

37. These fears pose significant personal and public health risks, with the no-show rate across the County's health systems increasing to approximately 20% from 18% since June 8, 2025. As a result, low-level health problems may become severe if left untreated, with individuals, families, and their wider communities ultimately paying the price. Not only do such widespread negative health consequences threaten all of us, but they strain a health care safety net already under threat.

38. The federal immigration raids' disregard for probable cause, reasonable suspicion, and warrant requirements have also had a chilling effect on the economic life of the County, similar to the impact of the COVID-19 shutdown in 2020, and have affected County tax revenues accordingly.[4]

39. Immigration raids in Los Angeles County have occurred at a clothing wholesaler where individuals were shopping, at a taco stand, and on County streets. Many immigration raids have been recorded and shared on social media, heightening the fear in Latino communities in particular of participating in regular day-to-day activities.[5] As a result, food vendors, retailers, and even historic landmarks and tourist sites have seen decreases in business. Some residents no longer shop at corner stores and stay holed up in their homes. In addition to the public safety, public health, and economic impacts, civic life and activities throughout the County have also been diminished as a result of the raids. Because

[4] Jesus Jiménez et al., *'Completely Disrupted': Fear Upends Life for Latinos in L.A.*, N.Y. Times (June 30, 2025), https://www.nytimes.com/2025/06/30/us/latinos-los-angeles-immigration.html.

[5] *Id.*

COMPLAINT IN INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF OF PROPOSED INTERVENORS

of the pervasive fear and insecurity the raids have engendered, the County's Department of Parks and Recreation has had to cancel multiple concerts and events, including its Fourth of July celebration.

**Proposed Intervenor-Plaintiff the City of Culver City**

40.     Proposed Intervenor-Plaintiff the City of Culver City is a municipal corporation organized and existing under the laws of the State of California and is a charter city pursuant to Article XI of the California Constitution.

41.     Federal immigration raids have occurred throughout Culver City since late May 2025, including at Culver City Express Hand Car Wash[6] and on Culver City's streets by masked individuals who lack arrest warrants.[7]

42.     As a direct result of federal agents using unmarked vehicles, masks, tactical gear, and personnel without visible identification or federal markings, Culver City has been forced to divert resources to address community safety concerns.  For example, the Culver City Police Department now must monitor any suspected federal enforcement activity in the City and, when possible, confirm the identity and legitimacy of individuals claiming to act as federal agents.

43.     Culver City businesses have experienced significant negative economic impacts due to federal immigration enforcement activities.  For example, the week of June 23, 2025 was the first week in 2025 where visits to the Culver City Westfield Mall were down all seven days of the week, across all hours of the day. The Westfield Mall generates a significant portion of Culver City's retail sales tax revenue.

---

[6] Suhauna Hussain, *"They are grabbing people." LA and Orange County car wash workers targeted by federal immigration raids*, L.A. Times (June 11, 2025) https://www.latimes.com/business/story/2025-06-11/l-a-orange-county-car-washes-hit-by-ice-raids.

[7] Vivian Chow, *Community outraged after ice cream vendor detained by immigration agents in Culver City*, KTLA News (June 25, 2025). https://ktla.com/news/local-news/community-outraged-after-ice-cream-vendor-detained-by-immigration-agents-in-culver-city/.

COMPLAINT IN INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF OF PROPOSED INTERVENORS

**Proposed Intervenor-Plaintiff the City of Montebello**

44.    Proposed Intervenor-Plaintiff the City of Montebello is a municipal corporation, duly organized and existing as a general law city under the laws of the State of California, and located in the County of Los Angeles.  It has a population of approximately 60,015 residents.  Over 78% of the city's population is Latino.

45.    Unlawful immigration enforcement activities have occurred at numerous locations throughout Montebello.  Of note is the violent and unjustified arrest of a U.S. citizen on June 13, 2025, at his tow truck place of employment in Montebello.

46.    There have been numerous federal immigration actions throughout Montebello at various commercial and residential locations within the city.  Businesses are shutting down because of these federal immigration activities.  Protests of the federal immigration activities have occurred, which have impacted both businesses and Montebello Police Department resources.

47.    Montebello maintains its own Police Department for law enforcement services.  Montebello is responsible for costs associated with the Montebello Police Department's services and law enforcement activities.  The recent events and federal immigration actions throughout Montebello have caused a significant diversion of public safety resources to address the resulting protests.

48.    Montebello's relationship with its community has suffered because of the unlawful immigration enforcement activity.  Montebello Police Department officers have been erroneously accused on social media of cooperating with federal agents, thus eroding trust in the Department.  Staff resources, including the Montebello Police Chief and City Manager, as well as other Montebello city staff and personnel, have been diverted to develop and promote material that presents facts and eases community fears.

49.    Following unlawful immigration activities throughout the region, fearful residents have held protests and appeared at Montebello City Council

COMPLAINT IN INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF OF PROPOSED INTERVENORS

meetings to share their sincere fears for the safety of the immigrant community in Montebello. These events required Montebello officers to be diverted from their normal assignments to provide protection and general community safety.

50. Montebello prides itself on providing a range of first-class recreational, social, and civic resources to its residents. These include, among other things, a senior center, youth programs, and other community events. Since the recent federal immigration actions, participation in Montebello events has decreased, including at the annual City-sponsored Independence Day celebration and concerts in the park activities. On information and belief, the drop in attendance at these Montebello events is attributable to fears of unlawful immigration enforcement activity at these public locations.

51. In an effort to counter the harm caused by the unlawful immigration enforcement activities, Montebello's City Council has publicly condemned the activity by way of a resolution and is using City funds to create a humanitarian assistance program for immigrants within the Montebello community.

52. Defendants' federal immigration enforcement has spread fear, confusion, and distress across the Montebello community. Montebello residents, even those that have lived in the city for decades, feel unsafe going outside to engage in everyday activities, such as commuting to work, taking their children to school, and attending community events due to concerns that they could be arbitrarily confronted and assaulted by federal agents.

53. In addition to harming Montebello residents, the federal immigration enforcement inflicts concrete and particularized injury to Montebello as a municipal entity, including injury to the operations of its police department, management of its community programs, and production of its tax revenue.

54. Defendants' federal immigration enforcement has forced Montebello to divert its limited police resources to address public safety issues that would not have arisen absent these unlawful enforcement practices.

55.    Montebello depends on local taxes to fund its municipal operations. The unlawful federal immigration enforcement has produced chilling effects on Montebello businesses, causing declines in businesses' sales and tax revenues to the City.

**Proposed Intervenor-Plaintiff the City of Monterey Park**

56.    Proposed Intervenor-Plaintiff the City of Monterey Park is a municipal corporation and general law city organized and existing under the laws of the State of California.  It has a population of approximately 61,096 residents.  Over half of the city's population, approximately 51.6%, is foreign-born.  It serves as a significant immigrant gateway, especially for Asian and Hispanic communities.

57.    Monterey Park is notable for having one of the highest concentrations of Asian Americans in the United States, with approximately 64-66% of the population being Asian, predominantly of Chinese descent.  Monterey Park also has a longstanding Mexican-American community; the Latino population makes up approximately 27–28% of City residents.  Monterey Park is also home to historic enclaves of Japanese-American, Armenian, and Jewish residents.

58.    Federal immigration activities within the Los Angeles region have cultivated a culture of fear and distrust within the Monterey Park community.  On July 2, 2025, community members provided public comment to the Monterey Park City Council regarding their experiences with recent federal raids and inquired about the City's response to immigrant rights and protection.

59.    Multiple speakers expressed fear among immigrant communities due to reports of masked, unidentified individuals (allegedly federal agents or vigilantes) detaining people without due process.  The speakers' shared personal and family experiences highlighted the fear and anxiety within the community relating to federal agents' racial profiling and abductions, and underscored the perceived need to keep documentation on hand at all times to prove legal status.  Their emotional

-15-

COMPLAINT IN INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF OF PROPOSED INTERVENORS

testimony underscored the psychological toll on the residents of Monterey Park, including U.S. citizens mistaken for undocumented immigrants.

60.    Residents requested clear communication and proactive measures from the Monterey Park Police Department to verify the identity of enforcement agents and ensure public safety.

61.    In response to community member concerns, Monterey Park has expended public resources to provide information to residents including "Know Your Rights" cards available in multiple languages at community centers, the library, and online.  It has ongoing efforts to expand outreach and make information more accessible at public events and locations, develop clear protocols for local police involvement during federal immigration activities, and provide assurances that local law enforcement stands with and protects all residents, regardless of immigration status.

62.    The fear resulting from the unlawful federal immigration activity has also harmed local law enforcement efforts.  For example, while executing inspection warrants in June 2025, the Monterey Park Police Department and Monterey Park Fire Department were erroneously identified as federal immigration agents on social media despite Monterey Park's extra efforts to inform residents regarding the legitimate law enforcement activities occurring at the site.

63.    Fostering a relationship of trust, respect, and open communication between Monterey Park officials and residents is essential to the City's mission of delivering efficient public services in partnership with the community, ensuring public safety, and promoting a prosperous economic environment, opportunities for Monterey Park's youth, and a high quality of life.

64.    The federal government's activities are interfering with Monterey Park's crucial role in protecting the public health, safety, and well-being of its residents.  Such activity is also resulting in the unnecessary expenditure of public resources.

COMPLAINT IN INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF OF PROPOSED INTERVENORS

**Proposed Intervenor-Plaintiff the City of Pasadena**

65.    Proposed Intervenor-Plaintiff the City of Pasadena is a municipal corporation organized and existing under the laws of the State of California and is a charter city pursuant to Article XI of the California Constitution.  Pasadena alleges the following facts relating to federal immigration activity within Pasadena upon information and belief.

66.    In recent weeks, Pasadena has experienced an unprecedented increase in unlawful federal immigration enforcement activity within its jurisdictional borders.[8]  For example, Pasadena residents Pedro Vasquez Perdomo, Carlos Alexander Osorto, and Isaac Villegas Molina (collectively, "Pasadena Resident Plaintiffs") report that in the early morning of June 18, 2025, approximately six masked federal agents equipped with weapons jumped out of unmarked cars and arrested the Pasadena Resident Plaintiffs while they waited at a Pasadena bus stop across the street from Winchell's Donuts to be picked up for jobs.  *See* Lead Compl. ¶¶ 12–14, 111–13, 124–26, 137–39.[9]  The Pasadena Resident Plaintiffs report that federal agents made these arrests without first securing arrest warrants, making an individualized determination of risk of flight, establishing a reasonable suspicion of an immigration law violation, and identifying themselves as federal agents.  *Id*. ¶¶ 114–19, 127–32, 140–44.

67.    Federal agents have reportedly adhered to the same or similar improper practices on multiple other occasions when conducting enforcement activities in Pasadena.  For example, plainclothes federal agents jumped out of unmarked

---

[8] *See Police Chief Reiterates His Department Does Not Assist or Participate in ICE Enforcement, Urges Calm*, Pasadena Now (July 1, 2025), https://pasadenanow.com/main/police-chief-urges-calm-reiterates-his-department-does-not-assist-or-participate-in-ice-enforcement.

[9] Sophie Flay, *ICE agents detain several people at Pasadena bus stop, conducts raids across the city*, ABC 7 (June 19, 2025), https://abc7.com/post/ice-agents-detain-2-men-pasadena-bus-stop-conduct-raids-city/16785979/.

-17-

COMPLAINT IN INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF OF PROPOSED INTERVENORS

vehicles and, while using excessive force, attempted to arrest a Pasadena resident in front of her children outside a Pasadena apartment building on June 28, 2025, prompting a 911 call to Pasadena Police about a suspected kidnapping.[10] Multiple Pasadena Police personnel responded to the scene to investigate, and it was determined that the federal agents had mistakenly identified the Pasadena resident for another individual they were seeking. Paramedics also responded to the scene and medically treated the Pasadena resident due to the injuries she sustained from the incident. Such action, and similar activities by Defendants as described herein, is tantamount to a nuisance in Pasadena.

68.    This federal immigration enforcement has spread fear, confusion, and distress across the Pasadena community. Pasadena residents, even those who have lived in the City for decades, feel unsafe going outside to engage in everyday activities, such as commuting to work, taking their children to school, and attending community events due to concerns that they could be arbitrarily confronted and assaulted by federal agents.

69.    In addition to harming Pasadena residents, the federal immigration enforcement inflicts concrete and particularized injury to Pasadena as a municipal entity, including injury to the operations of its police department, management of its community programs, and production of its tax revenue.

70.    The federal immigration enforcement has forced Pasadena to divert its limited police resources to address public safety issues that would not have arisen absent these enforcement practices.

---

[10] Angelique Brenes, *ICE agents detain mother in Pasadena in front of children without showing a warrant*, KTLA 5 (June 28, 2025), https://ktla.com/news/local-news/ice-agents-detain-mother-in-pasadena-in-front-of-children-without-a-warrant/; *ICE Agents Detain Mother In Front of Her Children in Pasadena*, Pasadena Now (June 29, 2025), https://pasadenanow.com/main/ice-agents-detain-mother-in-front-of-her-children-in-pasadena.

COMPLAINT IN INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF OF PROPOSED INTERVENORS

71.     The federal immigration enforcement has also led to declines in public participation in Pasadena's community programs such as youth summer education and, in other cases, forced Pasadena to cancel swim lessons and other community programs altogether due to public safety concerns.[11]

72.     Pasadena depends on local taxes to fund its municipal operations. Federal immigration enforcement has harmed and produced chilling effects on Pasadena businesses, causing declines in businesses' sales revenue and a corresponding decrease in Pasadena's tax revenue.[12]

### Proposed Intervenor-Plaintiff the City of Pico Rivera

73.     Proposed Intervenor-Plaintiff the City of Pico Rivera is a municipal corporation, duly organized and existing as a general law city under the laws of the State of California, and located in the County of Los Angeles.

74.     Pico Rivera is more than 90% Latino.

75.     On information and belief, unlawful federal immigration enforcement activities have occurred at numerous locations throughout Pico Rivera.  Of note is the violent and unjustified arrest of a U.S. citizen, Adrian Martinez, on June 17, 2025 at the Walmart parking lot in the City.  This incident led to multiple community protests, including rallies outside of Pico Rivera City Council Hall.

76.     Federal immigration authorities have reportedly adhered to the same or similar improper practices on multiple other occasions when conducting enforcement activities in Pico Rivera.

---

[11] Tim Caputo, *Pasadena cancels Saturday swim lessons, other park programs after reports of immigration enforcement*, ABC 7 (June 22, 2025), https://abc7.com/post/pasadena-cancels-saturday-swim-lessons-other-park-programs-reports-immigration-enforcement/16810001/.

[12] *See* Victor M. Gordo, *Pasadena Mayor: Trump's Immigration Raids Hurt Communities Like Mine*, Time (June 18, 2025), https://time.com/7295305/pasadena-trump-immigration-raids.

COMPLAINT IN INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF OF PROPOSED INTERVENORS

77.    Another significant incident occurred on June 17, 2025, at Ruben Salazar High School in Pico Rivera, where video evidence was secured to demonstrate what appears to federal immigration authorities trespassing upon El Rancho Unified School District ("ERUSD") property and federal personnel engaging in purported public urination on ERUSD property, near locations where minor children were located.  The School Board of ERUSD conducted a press conference where such conduct was condemned and an investigation was demanded.

78.    The unlawful federal immigration enforcement has spread fear, confusion, and distress across the Pico Rivera community.  Pico Rivera residents, even those who have lived in the City for decades, feel unsafe going outside to engage in everyday activities, such as commuting to work, taking their children to school, and attending community events due to concerns that they could be arbitrarily confronted and assaulted by federal agents.

79.    Pico Rivera contracts with the Los Angeles County Sheriff's Department for law enforcement services.  Pico Rivera is responsible for costs associated with the Sheriff's presence within the City.  The events of June 17 caused a significant diversion of resources to address the resulting protests.

80.    Since the events of June 17, and subsequent unlawful immigration activities throughout the region, fearful residents have held protests and appeared at Pico Rivera City Council Hall to share their sincere fears for the safety of the immigrant community in Pico Rivera.  These events required Sheriff's deputies to be diverted from their normal assignments to provide protection and general community safety.

81.    Pico Rivera's relationship with its community has suffered as a result of the unlawful immigration enforcement activity.  According to the Sheriff's Department, its deputies have been erroneously accused on social media of cooperating with federal agents, thus eroding trust in the Department.  Pico Rivera

COMPLAINT IN INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF OF PROPOSED INTERVENORS

has been erroneously accused of "covering up" the presence of a Department of Homeland Security office within its jurisdiction. Staff resources, including its Public Information Officer, Assistant City Manager, and City Manager, as well as contract communications support, have been diverted to develop and promote material that presents facts and eases community fears.

82.    Pico Rivera prides itself on providing a range of first-class recreational, social, and civic resources to its residents. These include, among other things, a senior center, youth events, and other community events. Participation in some City events has decreased since the recent events conducted by federal agents and personnel. On information and belief, the drop in attendance at some Pico Rivera events is attributable to fears of unlawful immigration enforcement activity at these public locations.

83.    In addition to harming Pico Rivera residents, the unlawful federal immigration enforcement activity inflicts concrete and particularized injury to Pico Rivera as a municipal entity, including injury to the operations of its police department, management of its community programs, and production of its tax revenue. The unlawful federal immigration enforcement has forced Pico Rivera to divert its limited police resources to address public safety issues that would not have arisen absent these enforcement practices.

84.    Pico Rivera depends on local taxes to fund its municipal operations. Federal immigration enforcement has harmed and produced chilling effects on Pico Rivera businesses, causing declines in businesses' sales revenue and a corresponding decrease in Pico Rivera's tax revenue.

**Proposed Intervenor-Plaintiff the City of Santa Monica**

85.    Proposed Intervenor-Plaintiff the City of Santa Monica is a municipal corporation organized and existing under the laws of the State of California and is a charter city pursuant to Article XI of the California Constitution. Santa Monica

-21-

borders the City of Los Angeles and is directly affected by activities occurring there and in the region.

86. Santa Monica is a prime destination for travel and tourism, particularly international travel, with more visits usually expected during summer vacations. Unlawful federal immigration activity in the region has harmed Santa Monica's reputation as a tourist destination and international arrivals have decreased significantly, resulting in less overall spending and lower hotel occupancy rates.

87. Immigrant communities staying home out of fear of a federal immigration raid diminishes economic activity and participation in public events as well as the overall vibrancy and appeal of Santa Monica as a tourist destination. It also negatively impacts many businesses that rely on immigrant labor, including hotels, restaurants, sidewalk vendors, vendors at the farmers markets, car washes, and construction trades, affecting business revenue, employment, and overall economic growth. Santa Monica, in turn, loses critical transient occupancy and sales tax revenue it depends on.

88. Because many members of immigrant or mixed status households who live and/or work in Santa Monica are too afraid to leave their homes to go to work, Santa Monica is exploring setting up a fund to help affected households pay for food, rent, and other necessities.

89. The Santa Monica City Attorney's Office prosecutes all misdemeanor crimes that occur within the city. Victims have been more reluctant to cooperate with prosecutors and have required additional staff efforts to secure appearances in court. Fear of arrest by federal immigration authorities in public or at courthouses is impacting the City's ability to obtain just outcomes for victims.

90. Santa Monica has been required to employ significant City resources to prepare for federal immigration raids at City facilities, which preparation is made significantly more difficult by federal immigration authorities conducting unannounced activities without identification.

-22-

COMPLAINT IN INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF OF PROPOSED INTERVENORS

91. Community members responded to regional federal immigration raids with a large-scale public demonstration in Santa Monica on June 14, which required the City to deploy significantly more Santa Monica Police Department and other City resources to ensure public safety. There has been at least one occurrence of masked, armed, and unidentified federal immigration agents arresting a Latino construction worker on 16th Street near Washington Street in Santa Monica on June 12. The agents appeared not to communicate with the construction worker before detaining him using zip ties and placing him in an unmarked car. The City has obtained a video and declaration from at least one witness describing the incident and how it terrified her.

**Proposed Intervenor-Plaintiff the City of West Hollywood**

92. Proposed Intervenor-Plaintiff the City of West Hollywood is a municipal corporation, duly organized and existing as a general law city under the laws of the State of California, and located in the County of Los Angeles.

93. A federal immigration raid occurred in West Hollywood on July 4, 2025 at the Santa Palm Car Wash by masked individuals who reportedly lacked arrest warrants.

94. West Hollywood businesses have experienced economic impacts due to federal immigration enforcement activities. Employees are remaining at home, making it difficult for businesses to operate at normal levels. There are fewer people patronizing businesses, fewer vendors on the streets, and fewer employees showing up to work.

95. West Hollywood is a hospitality destination and the local hotels report to the City that visitor rates are down overall for the international market sector that used to frequent West Hollywood in the summer. Defendants' policies and enforcement actions have positioned the United States as an unwelcoming destination for foreign guests with uncertainty and volatility. As a city with a hospitality-based economy, West Hollywood has experienced a strong negative

COMPLAINT IN INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF OF PROPOSED INTERVENORS

impact from Defendants' actions—not only on hotels but also on the bars, restaurants, and nightclubs that visitors will often frequent when utilizing lodging options in the city.

96.    Defendants' actions have diverted West Hollywood's law-enforcement resources.  West Hollywood contracts with the Los Angeles County Sheriff's Department for law enforcement services.  Defendants' actions in early June caused a significant diversion of resources to address the resulting protests in nearby cities.  The West Hollywood City Council was scheduled to have multiple high-ranking representatives from the Los Angeles County Sheriff's Department present at its June 9, 2025 City Council meeting to discuss a public safety agenda item that was of critical importance to the community.  The Sheriff's Department representatives were not able to attend the City Council meeting, as the regional protests utilized all available resources in the region.  The City Council had to continue the item to a later date when the Sheriff's Department could provide the needed resources to West Hollywood.

97.    Defendants' unlawful actions also caused protests against Defendants' policies and immigration activities in the region in West Hollywood Park on June 14, 2025, where it is reported that at least 3,000 people attended.  The City and Sheriff's Department had to expend significant resources to maintain safety and order.

98.    In response to community member concerns, West Hollywood has expended public resources to provide information to residents including "Know Your Rights" public information available at City facilities and online.  It has ongoing efforts to expand outreach and make information more accessible at public events and locations, develop clear protocols for Sheriff's Department involvement during federal immigration-enforcement activities, and provide assurances that local law enforcement stands with and protects all residents, regardless of immigration status.

-24-

COMPLAINT IN INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF OF PROPOSED INTERVENORS

99.    Defendants' activities are interfering with West Hollywood's crucial role in protecting the public health, safety, and well-being of its residents.  Such activity is also resulting in the unnecessary expenditure of public resources.

## FACTUAL ALLEGATIONS

100.    On July 2, 2025, Plaintiffs filed the Lead Complaint challenging Defendants' use of unlawful searches and seizures to terrorize residents under the guise of federal immigration enforcement.  *See* ECF No. 16.  As set forth in detail in the Lead Complaint, in recent weeks, Defendants have carried out increasingly aggressive and unlawful immigration raids in communities throughout the Los Angeles region.  Masked federal agents who refuse to identify themselves are stopping, arresting, and detaining people all over the County, seemingly based solely on their apparent ethnicity, capturing citizens and noncitizens alike. Defendants' actions have sparked terror throughout the region.

101.    As described in the Lead Complaint, Defendants' indiscriminate, unchecked, and wanton enforcement efforts are violating the Fourth and Fifth Amendment rights of Intervenors' community members, and exceed the scope of Defendants' statutory authority under the Immigration and Nationality Act, 8 U.S.C. § 1357.  Those same actions violate Intervenors' rights under the Tenth Amendment.  This Complaint in Intervention incorporates the allegations in the Lead Complaint by reference and adds further allegations to describe how Defendants' unlawful actions are inflicting distinct additional harm on the Intervenors.

### A.    *Defendants' Unlawful Raids Impair Intervenors' Ability to Maintain Law and Order*

102.    Defendants' raids are not routine, lawful immigration enforcement actions.  In an unprecedented departure from longstanding practices, armed, often unidentified federal agents are carrying out raids without prior notice to, or coordination with, the Los Angeles County Sheriff's Department or any of the

-25-

Intervenor cities' police departments.  As a result, local authorities are left in the dark about when and where federal enforcement actions or other activities are scheduled to occur in their jurisdictions.

103.    Because the unlawful raids are being conducted by masked, armed agents, often without any visible identification, from the perspective of the Intervenors' residents, many of these activities are not readily distinguishable from, and are therefore confused with, criminal activity.  Witnesses have called 911 to report kidnappings after witnessing events like a "group of armed, masked men . . . dragging a woman into an SUV."[13]  Local law enforcement agencies thus have been required to divert limited resources to determining whether armed and masked individuals jumping out of unmarked vehicles are federal agents or individuals committing crimes.

104.    Defendants are detaining and arresting Intervenors' residents en masse and without probable cause, which leads Intervenors' residents to reasonably infer that the detentions are based on resident appearance alone.  Eyewitness accounts reveal a disturbing pattern of racial profiling.  As one observer described, "They don't care if you have papers, as long as you look like what they want you to look like, they'll take you."[14]  A witness to another raid similarly recounted that "if you looked Hispanic in any way, they just took you."[15]

[13] Libor Jany, *Kidnappers or ICE agents?  LAPD grapples with surge in calls from concerned citizens*, L.A. TIMES (July 3, 2025), https://www.latimes.com/california/story/2025-07-03/los-angeles-police-immigration-kidnappings.

[14] Travis Schlepp, *ICE agents make arrest at Los Angeles area church*, KTLA 5 (June 11, 2025), https://ktla.com/news/local-news/ice-agents-make-arrest-at-los-angeles-area-church/#:~:text=Community%20members%20and%20religious%20leaders,in%20the%20church%20parking%20lot.

[15] Jasmine Mendez et al., *Immigration raids continue as Trump appears to soften on targeting some workplaces*, L.A. TIMES (June 15, 2025), https://www.latimes.com/california/story/2025-06-15/los-angeles-immigration-raids-continue.

-26-

COMPLAINT IN INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF OF PROPOSED INTERVENORS

105.    Defendants' pattern of arresting people merely because they appear to be immigrants reaches U.S. citizens and other individuals with legal status.  In one recent example, Defendants arrested U.S. citizen Andrea Velez, forcibly "lifting [her] off the ground and carrying her away" without explanation; Ms. Velez's only apparent offense was "the color of her skin."[16]

106.    Local law enforcement is left to deal with the aftermath of Defendants' actions, including protests and hostility from residents whose community members are the victims of such actions.

107.    Defendants' unlawful actions are directly harming the relationship between Intervenors' local law enforcement and their communities, including immigrant communities.  Local law enforcement, including the Los Angeles County Sheriff's Department and the Intervenor cities' police departments, has implemented policies and practices designed to promote the safety of residents by fostering cooperation and trust between members of the region's many immigrant communities and law enforcement.  One fundamental goal of these local policies and practices has been to encourage victims and witnesses to collaborate with the police, regardless of immigration status.  But Defendants' actions are eroding Intervenors' hard-won gains.  Indeed, local law enforcement officers have already been confused for federal agents and confronted by protestors who thought they were conducting surveillance for an immigration sweep, and Intervenors' ability to obtain just outcomes for victims is being hindered by fear of arrest by federal agents in public or at courthouses.

---

[16] Dani Anguiano, *US citizen arrested during ICE raid in what family describes as 'kidnapping,"* THE GUARDIAN (June 26, 2025), https://www.theguardian.com/us-news/2025/jun/26/immigration-ice-raid-andrea-velez.

COMPLAINT IN INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF OF PROPOSED INTERVENORS

**B.**    ***Defendants' Terror Campaign Chills Business and Drains Intervenors' Tax Revenue***

108.   Defendants' actions also are harming Intervenors' tax revenue. Intervenors depend in part on business, sales, and/or hotel and motel taxes to fund municipal operations.  But because Defendants' unlawful raids are sweeping up citizens and noncitizens alike, many residents are unsurprisingly choosing to stay home, regardless of their legal status.

109.   The consequences for Intervenors are significant.  Many residents and people who work in Intervenors' jurisdictions are immigrants or children or other relatives of immigrants from ethnic backgrounds that Defendants are indiscriminately and illegally targeting in their raids, including, as described in detail in the Lead Complaint, people of Latino origin.  Over 1.8 million City of Los Angeles residents—nearly 48%—identify as Hispanic or Latino.[17]  Over 4.8 million in the County—nearly 49%—do so.  Another 15% of the County identifies as Asian. Pico Rivera is more than 90% Latino.  Monterey Park is approximately 65% Asian.

110.   Defendants' actions have instilled widespread fear in Intervenors' communities.  People are afraid to leave their homes in order to avoid becoming the next victim of Defendants' unlawful raids.  In the MacArthur Park neighborhood and in Boyle Heights, for example, children are being sent out on errands unaccompanied by their parents.  Intervenors Culver City, Montebello, Monterey Park, Pasadena, Pico Rivera, Santa Monica, and West Hollywood all document a similar chilling effect on their residents.  As a result, Defendants' actions have created a *de facto* lockdown of neighborhoods throughout the region.  Shops and

---

[17] U.S. Census Bureau, Los Angeles City, California, https://data.census.gov/profile/ Los_Angeles_city_California?g=160XX00US0644000#race-and-ethnicity (identifying 1,829,991 "Hispanic or Latino" individuals in Los Angeles); Los Angeles City Planning, Demographics, https://planning.lacity.gov/resources/ demographics (identifying 48% of Los Angeles population as "Hispanic").

restaurants are sitting empty and suffering business owners describe the situation as akin to the loss of business in the COVID pandemic.

111. Intervenors, in turn, lose vital tax revenue from those businesses. In the past two years, business and sales taxes comprised approximately 12.5% of Intervenor Los Angeles's annual revenue budget. Those taxes are generally based on gross receipts. Empty businesses do not generate gross receipts—and thus do not pay business taxes or remit sales taxes to Los Angeles. As another example, Intervenor Culver City documented lower visits to the Culver City Westfield Mall for the entire week of June 23, 2025. Taxes from businesses in the Culver City Westfield Mall are a substantial source of revenue for Culver City.

**C.    *Defendants' Actions Threaten the Functioning of California Courts***

112. California law prohibits the "civil arrest in a courthouse" of any person "attending a court proceeding or having legal business in the courthouse." Cal. Civ. Code § 43.54. This prohibition reflects the California legislature's judgment that courthouse arrests pose a "threat to the proper functioning of California's government and to the rights enjoyed by all Californians."[18] As the former Chief Justice of the California Supreme Court, Tani G. Cantil-Sakauye, has explained, "enforcement policies that include stalking courthouses and arresting undocumented immigrants . . . . undermine the judiciary's ability to provide equal access to justice."[19]

113. Moreover, a long-established federal common law privilege forbids civil arrests in or near courthouses. This privilege extends to parties, witnesses, and all people going to court on business.

---

[18] *See* A.B. No. 668, 2019–2020 Legis. Sess., § 1(a) (Cal. 2019).

[19] Letter from Chief Justice Tani G. Cantil-Sakauye to Attorney General Jeff Sessions (March 16, 2017), https://newsroom.courts.ca.gov/sites/default/files/newsroom/document/Chief%2520Justice%2520Cantil-Sakauye%2520Letter_AG%2520Sessions-Secretary%2520Kelly_3-16-17.pdf.

-29-

114.    Despite the clear statutory and common law prohibitions on civil arrests in and around courthouses, Defendants have seized Intervenors' residents who are traveling to and from state courthouses to attend legal proceedings or address other legal business.  For example, federal immigration agents recently stalked two women in the hallways of the Airport Courthouse on La Cienega Boulevard and arrested the women after they appeared for their scheduled court proceedings.  Federal agents handcuffed the women, placed them in unmarked vehicles, and drove away.  The court was not provided advance notice of these arrests.[20]

115.    Defendants' actions interfere with the functioning of California's judiciary and threaten the rights enjoyed by all Californians, including Intervenors' residents.  To take just one example, prosecutors report that some victims and witnesses are reluctant to even come to court out of fear of being accosted by federal immigration officials.

## CAUSES OF ACTION

## COUNT I

### Violation of the Fourth Amendment:
### Detention Stop Without Reasonable Suspicion

### (Asserted by Plaintiffs and Intervenor Plaintiffs)

116.    The foregoing allegations are re-alleged and incorporated herein by reference.

117.    Except at the border and its functional equivalents, the Fourth Amendment prohibits Defendants from conducting a detentive stop to investigate a person's immigration status without reasonable suspicion that a person is a noncitizen unlawfully in the United States.

---

[20] James Queally, *ICE arrests at L.A. courthouse met with alarm: 'Absolutely blindsided'*, L.A. TIMES (June 25, 2025), https://www.latimes.com/california/story/2025-06-25/ice-arrests-los-angeles-courthouse.

COMPLAINT IN INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF OF PROPOSED INTERVENORS

118. "A person's mere propinquity to others independently suspected of [unlawful] activity does not, without more, give rise to probable cause to search [or seize] that person." *Perez Cruz v. Barr*, 926 F.3d 1128, 1138 (9th Cir. 2019) (alterations in original, citation omitted). "'Reasonable suspicion' is no different." *Id.* (citation omitted).

119. Defendants have a policy, pattern, and practice of stopping individuals without regard to reasonable suspicion that they are unlawfully in the United States.

120. As a part of Defendants' policy, pattern, and practice, when conducting stops, Defendants engage in a show of force so overwhelming that a reasonable person would not feel free to leave. As a matter of policy, pattern, and practice, Defendants do not evaluate the need for force or tailor the force they use to the circumstances of individual stops and arrests.

121. Defendants' policy, pattern, and practice violates the Fourth Amendment to the U.S. Constitution.

122. Defendants' policy, pattern, and practice have caused ongoing harm to Intervenors.

## COUNT II

### Violation of 8 U.S.C. § 1357(a)(2):
### Warrantless Arrests Without Probable Cause of Flight Risk

### (Asserted by Plaintiffs and Intervenor Plaintiffs)

123. The foregoing allegations are realleged and incorporated herein by reference.

124. 8 U.S.C. § 1357(a)(2) requires that arrests without a warrant be accompanied by "reason to believe" that an individual is "likely to escape before a warrant can be obtained for [their] arrest."

125. Defendants have a policy, pattern, and practice of making arrests without any warrant and without making an individualized determination of flight risk. They have no mechanism for ensuring compliance with the statutory limits of

COMPLAINT IN INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF OF PROPOSED INTERVENORS

agents' and officers' warrantless arrest authority and do not provide guidance to agents and officers on how to make an individualized determination of likelihood of escape.  Defendants permit agents and officers to make warrantless arrests *carte blanche* in violation of law.

126.   Defendants' policy, pattern, and/or practice of making warrantless arrests without the required individualized flight risk analysis is "final agency action" that is "in excess of statutory jurisdiction, authority, or limitations" under 8 U.S.C. § 1357(a)(2).  5 U.S.C. §§ 704, 706(2)(C).

127.   Separate from the APA, Defendants' policy, pattern, and practice of making warrantless arrests without the required individualized flight risk analysis is *ultra vires*.

128.   Defendants' policy, pattern, and practice have caused ongoing harm to Intervenors.

## COUNT III

### Violation of 8 C.F.R. § 287.8(c)(ii)
### Standards for Stops and Warrantless Arrests

### (Asserted by Plaintiffs and Intervenor Plaintiffs)

129.   The foregoing allegations are realleged and incorporated herein by reference.

130.   Defendants are bound by regulation to conform warrantless arrests to the standards in 8 C.F.R. § 287.8(c), including the requirement at 8 C.F.R. § 287.8(c)(2)(ii) that officers have reason to believe that an individual is "likely to escape before a warrant can be obtained."

131.   Defendants have a policy, pattern, and practice of making arrests without any warrant and without making an individualized determination of flight risk.  They have no mechanism for ensuring compliance with the regulatory limits of agents' and officers' warrantless arrest authority and do not provide guidance to agents and officers on how to make an individualized determination of likelihood of

escape. Defendants permit agents and officers to make warrantless arrests *carte blanche* in violation of law.

132. Defendants' policy, pattern, and practice is "final agency action" that is "in excess of statutory jurisdiction, authority, or limitations" under 8 C.F.R. § 287.8(c)(2)(ii). 5 U.S.C. §§ 704, 706(2)(C).

133. Defendants' policy, pattern, and practice have caused ongoing harm to Intervenors.

## COUNT IV

### Violation of 8 C.F.R. § 287.8(c)(2)(iii)
### Failure to Identify Authority and Reason for Arrest

### (Asserted by Plaintiffs and Intervenor Plaintiffs)

134. The foregoing allegations are realleged and incorporated herein by reference.

135. The regulations require agents and officers, at the time of an arrest or as soon as it is practicable and safe to do so, to identify themselves as "an immigration officer who is authorized to execute an arrest" and "[s]tate that the person is under arrest and the reason for the arrest." 8 C.F.R. § 287.8(c)(2)(iii).

136. Defendants have a policy, pattern, and practice of not timely identifying themselves, their authority to execute an immigration arrest, or the reasons for an arrest.

137. Defendants' policy, pattern, and practice is a "final agency action" that is "in excess of statutory jurisdiction, authority, or limitations" under 8 C.F.R. § 287.8(c)(2)(ii). 5 U.S.C. §§ 704, 706(2)(C).

138. Defendants' policy, pattern, and practice have caused ongoing harm to Intervenors.

COMPLAINT IN INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF OF PROPOSED INTERVENORS

## COUNT V

### Administrative Procedure Act:
### Agency Action Exceeding Statutory Authority

### (Asserted by Intervenor Plaintiffs)

139.    The foregoing allegations are realleged and incorporated herein by reference.

140.    Administrative agencies may only exercise authority validly conferred by statute.  Under the Administrative Procedure Act, courts must "hold unlawful and set aside" federal agency action that is "in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. § 706(2)(C).

141.    California law prohibits the civil arrest in a courthouse of any person attending a court proceeding or having legal business in the courthouse.

142.    Congress has not authorized Defendants to conduct courthouse arrests in violation of California law.

143.    A long-established federal common-law privilege forbids civil arrests in or near courthouses.  This privilege extends to parties, witnesses, and all people attending the courts on business.

144.    Congress did not displace the federal common-law privilege when it enacted the Immigration and Nationality Act.

145.    Defendants' activities, including the warrantless arrests of individuals in or near courthouses, exceed the scope of Defendants' authority and violate this long-established prohibition on civil arrests and interfere with the ability of Intervenors' law enforcement agencies to obtain cooperation from individuals in immigrant communities, regardless of immigration status.

-34-

COMPLAINT IN INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF OF PROPOSED INTERVENORS

## COUNT VI

**Administrative Procedure Act:**
**Agency Action Contrary to Constitutional**
**Right, Power, Privilege, or Immunity**

**(Asserted by Intervenor Plaintiffs)**

146.   The foregoing allegations are realleged and incorporated herein by reference.

147.   The Administrative Procedure Act instructs courts to "hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

148.   The Tenth Amendment to the United States Constitution reserves "[t]he powers not delegated to the United States by the Constitution . . . to the States."

149.   The states' judicial and police powers are among the most important powers that the Constitution reserves to the states.

150.   Defendants' final agency actions have resulted in harm to Intervenors.

151.    In violation of the Tenth Amendment, Defendants' policy, pattern, and practice of arresting individuals in or around California state courthouses located within Intervenors' boundaries (the "Courthouse Arrest Policy") commandeers California's judicial system and unduly interferes with California's core sovereign judicial and police functions by, among other things, preventing residents of Intervenors from accessing state courts.

152.   Defendants' violation causes ongoing harm to Intervenors and their residents.

## COUNT VII

**Administrative Procedure Act:**
**Arbitrary and Capricious Action**

**(Asserted by Intervenor Plaintiffs)**

153.   The foregoing allegations are realleged and incorporated herein by reference.

-35-

COMPLAINT IN INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF OF PROPOSED INTERVENORS

154.   Under the Administrative Procedure Act, courts must hold unlawful and set aside federal agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

155.   Defendants' final agency actions have resulted in harm to Intervenors.

156.   Defendants' Courthouse Arrest Policy is arbitrary and capricious in violation of the Administrative Procedure Act.

157.   The Courthouse Arrest Policy is arbitrary and capricious because Defendants do not sufficiently explain to whom the Policy applies, do not explain how the Policy complies with congressional statutes requiring certain non-citizens to appear in state courts to qualify for immigration relief, fail fully to consider the foreseeable harms and/or costs of the Policy, do not adequately explain its prioritizing of civil arrests in or near courthouses over the harms triggered by those arrests, and do not adequately justify the change from Defendants' prior policies on courthouse arrests.

158.   Defendants' violation causes ongoing harm to Intervenors and their residents.

## COUNT VIII

### Tenth Amendment

### (Asserted by Intervenor Plaintiffs)

159.   The foregoing allegations are realleged and incorporated herein by reference.

160.   The Tenth Amendment preserves the states' historic, sovereign, and fundamental autonomy to control the operation of their judiciaries and to pursue criminal prosecutions.

161.   The states' judicial and police powers are among the most important powers that the Constitution reserves to the states.

162.   In violation of the Tenth Amendment, Defendants' policy of arresting Intervenors' residents in and around state courthouses commandeers California's

COMPLAINT IN INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF OF PROPOSED INTERVENORS

judicial system and unduly interferes with California's core sovereign judicial and police functions by preventing Intervenors' residents from accessing state courts.

163. In violation of the Tenth Amendment, Defendants' policy of conducting warrantless seizures and detentions of Intervenors' residents, without notice to or coordination with local law enforcement, effectively commandeers local law enforcement into responding to these incidents to ensure the safety of Intervenors' residents and federal agents, and into dealing with the incidents' aftermaths.

164. Federal courts possess the power in equity to grant injunctive relief with respect to violations of federal law by federal officials.

165. Defendants' violation causes ongoing harm to Intervenors and their residents.

<b>PRAYER FOR RELIEF</b>

WHEREFORE, Intervenors respectfully request that this Court enter judgment in their favor, and grant the following relief:

1. Declare that Defendants' actions violate the Fourth and Tenth Amendments of the United States Constitution and the Administrative Procedure Act;

2. Issue a preliminary and permanent injunction enjoining further violations of the Fourth and Tenth Amendments and Administrative Procedure Act;

3. Declare that Defendants' unlawful policies and practices violate 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8(c)(2)(ii); and 8 C.F.R. § 287.8(c)(2)(iii);

4. Declare that the Courthouse Arrest Policy exceeds Defendants' statutory jurisdiction, authority, or limitations;

5. Declare that the Courthouse Arrest Policy is unconstitutional;

6. Enjoin Defendants and all of their officers, employees, agents, and anyone acting in concert with them, from civilly arresting parties, witnesses, and

-37-

COMPLAINT IN INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF OF PROPOSED INTERVENORS

any other individual coming to, attending, or returning from state courthouses or court-related proceedings;

7.    Award Intervenors their reasonable fees, costs, and expenses, including attorneys' fees; and

8.    Grant such other and further relief as the Court deems just and proper.

COMPLAINT IN INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF OF PROPOSED INTERVENORS

DATED:  July 8, 2025                    Respectfully submitted,


                                        By:    /s/ E. Martin Estrada
                                               E. MARTIN ESTRADA

                                               MUNGER, TOLLES & OLSON LLP

                                               *Attorney for Proposed Intervenors*
                                               *Cities of Los Angeles, Culver City,*
                                               *Montebello, Monterey Park, Pico Rivera,*
                                               *Santa Monica, and West Hollywood*


                                        By:    /s/ Hydee Feldstein Soto
                                               HYDEE FELDSTEIN SOTO
                                               City Attorney

                                               OFFICE OF THE LOS ANGELES
                                               CITY ATTORNEY

                                               *Attorney for Proposed Intervenor*
                                               *City of Los Angeles*


                                        By:    /s/ Brigit Greeson Alvarez
                                               BRIGIT GREESON ALVAREZ
                                               Deputy County Counsel

                                               OFFICE OF THE LOS ANGELES
                                               COUNTY COUNSEL

                                               *Attorney for Proposed Intervenor*
                                               *County of Los Angeles*


                                        By:    /s/ Michele Beal Bagneris
                                               MICHELE BEAL BAGNERIS
                                               City Attorney

                                               OFFICE OF THE CITY ATTORNEY OF
                                               PASADENA

                                               *Attorney for Proposed Intervenor*
                                               *City of Pasadena*

-39-

COMPLAINT IN INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF OF PROPOSED INTERVENORS

**ATTESTATION**

Pursuant to Local Rule 5-4.3.4(a)(2)(i), the filer attests that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

DATED:  July 8, 2025

By: _____/s/ E. Martin Estrada_____
E. MARTIN ESTRADA

MUNGER, TOLLES & OLSON LLP

*Attorney for Proposed Intervenors Cities of Los Angeles, Culver City, Montebello, Monterey Park, Pico Rivera, Santa Monica, and West Hollywood*

-40-
COMPLAINT IN INTERVENTION
FOR DECLARATORY AND INJUNCTIVE RELIEF OF PROPOSED INTERVENORS