**FOR PUBLICATION**

FILED

AUG 1 2025

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| PEDRO VASQUEZ PERDOMO *et al.*,<br><br>Plaintiffs - Appellees,<br><br>v.<br><br>KRISTI NOEM, Secretary, Department of Homeland Security, *et al.*,<br><br>Defendants - Appellants. | No. 25-4312<br><br>D.C. No. 25-cv-05605<br><br>ORDER |

Appeal from the United States District Court
for the Central District of California
Maame Ewusi-Mensah Frimpong, District Judge, Presiding

Argued and Submitted July 28, 2025
San Francisco, California

Before: Ronald M. Gould, Marsha S. Berzon, and Jennifer Sung, Circuit Judges.

PER CURIAM:

On June 6, 2025, U.S. Customs and Border Patrol agents and officers were sent to join officers from the Enforcement and Removal Operations directorate of U.S. Immigration and Customs Enforcement to carry out "Operation At Large" in Los Angeles, California. According to Defendants, this operation involves "contact teams" that "typical[ly] . . . consist of three to five agents who contact individuals in public places such as streets, sidewalks, and publicly accessible portions of

businesses." Defendants further explain, "Certain types of businesses, including carwashes, were selected for [contact team] encounters because past experience demonstrated that they are likely to employ persons without legal documentation. During operations in Los Angeles, [federal] agents temporarily detained individuals, and made arrests for immigration violations and federal criminal statutes."

Plaintiffs refer to these contact teams as "roving patrols" and allege they have detained individuals without reasonable suspicion, in violation of the Fourth Amendment's safeguard against unreasonable seizures by the government.

To give just one example, Plaintiff Jason Brian Gavidia is a U.S. citizen who was born and raised in East Los Angeles and identifies as Latino. On the afternoon of June 12, he stepped onto the sidewalk outside of a tow yard in Montebello, California, where he saw agents carrying handguns and military-style rifles. One agent ordered him to "Stop right there" while another "ran towards [him]." The agents repeatedly asked Gavidia whether he is American—and they repeatedly ignored his answer: "I am an American." The agents asked Gavidia what hospital he was born in—and he explained that he did not know which hospital. "The agents forcefully pushed [Gavidia] up against the metal gated fence, put [his] hands behind [his] back, and twisted [his] arm." An agent asked again, "What hospital were you born in?" Gavidia again explained that he did not know which

2

hospital and said "East L.A." He then told the agents he could show them his Real ID. The agents took Gavidia's ID and his phone and kept his phone for 20 minutes. They never returned his ID.

On July 3, Plaintiffs filed an application for a temporary restraining order, which Defendants opposed. After a hearing, the district court determined that Plaintiffs had shown they are likely to succeed in proving that seizures requiring—but not supported by—reasonable suspicion have occurred as part of Operation At Large in Los Angeles, and that Defendants have authorized or approved that practice. The district court issued the requested TRO on July 11.

On July 17, Defendants filed an emergency motion for a stay pending their appeal of the TRO.[1] Defendants focus their arguments on Plaintiffs' standing to seek equitable relief and the terms and scope of the TRO. For the following reasons, we deny Defendants' motion for a stay except as to a single clause.

## I. BACKGROUND

In this putative class action, five individual plaintiffs and three membership associations allege that Defendants, twelve senior federal officials who share responsibility for directing federal immigration enforcement in the Los Angeles area, "have an ongoing policy, pattern, and/or practice of conducting detentive

---

[1]    Defendants filed their first emergency motion for a stay pending appeal on July 14. We denied that motion without prejudice for failure to comply with Federal Rule of Appellate Procedure 8(a)(2)(A).

stops in [the Central District of California] without reasonable suspicion that the

person to be stopped is within the United States in violation of U.S. immigration

law, in contravention of the Fourth Amendment." Plaintiffs allege that government

agents are engaging in these "unlawful stop and arrest practices" when conducting

roving patrols and other immigration enforcement operations throughout the

Central District.[2]

---

[2]    Plaintiffs contend that these practices stem in part from an official target of
3,000 arrests per day by Immigration and Customs Enforcement (ICE).

During oral argument, we asked Defendants' counsel whether the federal
government has a policy of directing ICE field offices to make 3,000 arrests or
deportations per day—whether that directive may come from ICE, the President, or
some other official in the administration. Defense counsel replied that he was
aware of no such policy. We asked him to look into the matter and submit a 28(j)
letter with an answer.

Defendants submitted a 28(j) letter, which states:

In response to the Court's inquiry at oral argument, DHS has
confirmed that neither ICE leadership nor its field offices have been
directed to meet any numerical quota or target for arrests, detentions,
removals, field encounters, or any other operational activities that ICE
or its components undertake in the course of enforcing federal
immigration law.

Plaintiffs' allegation that the government maintains a policy
mandating 3,000 arrests per day appears to originate from media
reports quoting a White House advisor who described that figure as a
"goal" that the Administration was "looking to set." That quotation
may have been accurate, but no such goal has been set as a matter of
policy, and no such directive has been issued to or by DHS or ICE.

To be sure, enforcement of federal immigration law is a top priority
for DHS, ICE, and the Administration. But the government conducts
its enforcement activities based on individualized assessments,
available resources, and evolving operational priorities—not volume

The Central District includes Los Angeles County, Ventura County, Santa Barbara County, San Luis Obispo County, Orange County, Riverside County, and San Bernardino County. Those counties have a combined estimated population of 19,233,598 people, including 9,096,334 people that identify as "Hispanic or Latino." That means people who identify as "Hispanic or Latino" make up almost half—about 47.3%—of the estimated population of the Central District.

Plaintiffs applied for an ex parte TRO seeking to prohibit federal officials "from conducting detentive stops for the purposes of immigration enforcement without first establishing individualized, reasonable suspicion that the person to be stopped is unlawfully in the United States." The district court did not grant the application for an ex parte TRO and instead ordered full briefing and a hearing.

---

metrics. Enforcement activity is firmly anchored in binding legal constraints—constitutional, statutory, and regulatory requirements that apply at every stage, from identification to arrest to custody— with multiple layers of supervisory review to ensure compliance with the law. This framework, not anonymous reports in the newspapers, governs ICE's operations.

(footnote omitted).

We note that, on May 28, 2025, White House Deputy Chief of Staff Stephen Miller stated during an interview with Fox News: "Under President Trump's leadership, we are looking to set a goal of a minimum of 3,000 arrests for ICE every day, and President Trump is going to keep pushing to get that number up higher each and every single day." Hannity, *Stephen Miller says the admin wants to create the strongest immigration system in US History*, FOX NEWS (May 28, 2025, 6:29 pm PT), available at https://www.foxnews.com/video/6373591405112 (last visited July 31, 2025).

5

In support of their TRO, Plaintiffs submitted 21 sworn declarations. Five were from the individual named plaintiffs and described the circumstances in which they were stopped by Defendants. Three were declarations from representatives of two of the plaintiff organizations, describing the effect of Defendants' operation on their members, including instances in which particular members were subjected to detentive stops. Five other declarants described being seized by Defendants conducting roving patrols, and five described witnessing such seizures. Plaintiffs also submitted social media posts and cited numerous news articles that documented Defendants' roving patrols.

Defendants opposed Plaintiffs' TRO application and submitted two declarations in support of their opposition. One was from an official affiliated with ICE's Enforcement and Removal Operations (ERO). It described training of ERO officers and described ERO's general practices of creating targeting packets for individuals to be arrested and conducting consensual interviews with other individuals they encounter. The other declaration came from an official affiliated with Customs and Border Control (CBP). It described CBP's participation in operations in Los Angeles, including both consensual encounters and investigative detentions. Neither declaration rebuts Plaintiffs' evidence regarding any particular stop.

6

The district court held a hearing on the TRO on July 10. The parties discussed the factors that Defendants use when making stops, the terms of Plaintiffs' proposed TRO, and whether imposing those terms would be consistent with the Fourth Amendment's requirements for reasonable suspicion.

Based on all the evidence presented, including Defendants' evidence opposing the TRO, the district court determined that Plaintiffs are likely to succeed in proving their factual allegations regarding Defendants' stop and arrest practices. Defendants do not challenge that determination (either in whole or in part) in their motion for a stay of the TRO pending appeal. Therefore, for purposes of deciding that motion, we assume Plaintiffs will likely succeed in proving those factual allegations and summarize the pertinent facts below.

**A.    Since June 6, 2025, Defendants have been conducting "Operation At Large" in Los Angeles.**

On June 6, 2025, federal law enforcement arrived in Los Angeles to participate in what federal officials have described as "the largest Mass Deportation Operation . . . in History."[3] As part of this operation, Defendants are dispatching

---

[3]    *Vasquez Perdomo v. Noem*, Case No. 2:25-cv-05605-MEMF-SP, 2025 WL 1915964, at *1 (C.D. Cal. July 11, 2025) (quoting Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (June 16, 2025, 12:43 AM), https://truthsocial.com/@realDonaldTrump/posts/114690267066155731). According to a declaration submitted by Defendants: "On June 6, 2025, in support of U.S. Immigration and Customs Enforcement, CBP agents and officers were sent to Los Angeles, California in support of Immigration and Customs Enforcement-Enforcement and Removal Operations (ICE-ERO). As part of this operation, CBP

what they call "contact teams," and what Plaintiffs refer to as "roving patrols." As described by the Deputy Incident Commander for Defendants' operation in Los Angeles, Kyle Harvick: "CBP agents and officers are typically divided into teams, composed of three to five agents, who contact individuals in public places such as streets and sidewalks, parking lots, or the publicly-accessible portions of businesses. Certain types of businesses, including carwashes, have been selected for encounters because past experiences have demonstrated that illegal aliens utilize and seek work at these locations."[4]

**B.    As part of Operation At Large, agents have stopped and interrogated the individual plaintiffs.**

**i.    Jason Brian Gavidia**

Plaintiff Jason Brian Gavidia is a U.S. citizen, born and raised in East Los Angeles. He lives and works in Los Angeles County. He is of Latino ethnicity, a proud Christian, and a businessman. He is also an active volunteer in his church

---

agents and officers, along with their federal partners, participate in a variety of different law enforcement encounters and enforcement actions as part of the operation in Los Angeles. These activities have included consensual encounters, investigative detentions, warrantless arrests made where probable cause is developed in the field, arrests carried out pursuant to federal immigration warrants, and criminal arrests under judicial warrants."

[4]    At oral argument, Defendants asserted that the contact teams engage only in "voluntary interactions" with individuals who are not the subject of a "targeting packet." But the district court found that Plaintiffs were likely to succeed in showing that those interactions occurred under objectively coercive circumstances, making them detentive stops for which reasonable suspicion is required. Defendants do not dispute that determination in their motion for a stay.

and supporter of his community. He rents space from a tow yard in Montebello, California, to work on cars. On June 12, 2025, around 4:30 p.m., he was working on his car in the tow yard when he heard someone say that immigration agents might be at the premises. Out of curiosity, he went outside to see whether agents were present.

While standing on the sidewalk outside the tow yard gate, he saw agents wearing green vests; some were carrying handguns, but at least two had military-style rifles. When Gavidia started to head back inside the tow yard, a masked agent said, "Stop right there." Gavidia stopped because he is a "law-abiding citizen," and he "felt [he] could not leave, and that the agent had stopped [him]." While the masked agent approached him, another "unmasked agent ran towards [him]" and questioned him, asking whether he is American. Gavidia told him, "I am an American." The agent repeated the question, and Gavidia responded the same way, at least two more times. Then the agent asked Gavidia what hospital he was born in. Gavidia "calmly replied that [he] did not know." The agent repeated the same question two more times, and each time, Gavidia explained that he did not know which hospital he was born in. At that point, "the agents forcefully pushed [him] up against the metal gated fence, put [his] hands behind [his] back, and twisted [his] arm." The agent asked again, "What hospital were you born in?" Gavidia responded again that he did not know and said "East L.A." He then told the agents

9

he could show them his Real ID. When he showed his Real ID, an agent took it from him. They also took his phone. After about 20 minutes, they returned his phone, but they never returned his Real ID.

### ii.    Jorge Luis Hernandez Viramontes

Plaintiff Jorge Luis Hernandez Viramontes is a 29-year-old resident of Baldwin Park, California. He is a dual citizen of the United States and Mexico. He is of Latino ethnicity. He has lived in the United States for about 11 years, and he is married to a Legal Permanent Resident. They have two young children, both of whom are U.S. citizens. Hernandez Viramontes has worked at a carwash in Whittier, California, for about 10 years; he is currently a manager. On June 9, 2025, masked agents arrived at the carwash in unmarked vehicles, many wearing "military style clothing." When they arrived, "the agents started grabbing people and asking their status." On June 14, 2025, agents arrived again, this time driving border patrol vehicles and wearing clothing that identified them as border patrol. The agents asked both workers and customers if they were citizens.

On June 18, 2025, around 10:30 a.m., agents again arrived in unmarked vehicles and started asking employees their status. Hernandez Viramontes and some of his coworkers asked the agents if they had a warrant. The agents responded only by saying, "Shut the fuck up." An agent asked Hernandez Viramontes if he was a citizen, and Hernandez Viramontes answered, "Yes." The

10

agent asked for ID, and Hernandez Viramontes gave him his California driver's license. The agent asked Hernandez Viramontes where he was born, and he responded, "Mexico." The agent asked Hernandez Viramontes if he had his passport. Hernandez Viramontes asked if as a dual citizen he was required to carry his passport. The agent told Hernandez Viramontes his driver's license wasn't enough, and that because he didn't have his passport with him, he had to go with the agents. The agent grabbed his arm and escorted him to a silver SUV. Agents took him to a warehouse area nearby. After about 20 minutes, they took him back to the carwash. The agents never identified themselves, and they did not wear any visible badges.

### iii.    Pedro Vasquez Perdomo, Carlos Alexander Osorto, and Isaac Antonio Villegas Molina

Plaintiffs Pedro Vasquez Perdomo, Carlos Alexander Osorto, and Isaac Antonio Villegas Molina live in Pasadena, California. Each is of Latino ethnicity. Vasquez Perdomo is 54 years old and has lived in Pasadena since he was a young man. Osorto is 50 years old; he has lived in Pasadena for about 14 years, and he is the proud grandfather to seven U.S. citizen grandchildren. Villegas Molina is 47 years old; in 2010, he won a scholarship to study culinary arts and English in Florida, and he moved to Pasadena about 13 years ago. The three men are day laborers and coworkers. Villegas Molina is new to the trade; Vasquez Perdomo and Osorto have built homes all over Los Angeles.

11

On the morning of June 18, 2025, Vasquez Perdomo, Osorto, and Villegas Molina waited to be picked up for a construction job at a Metro bus stop in front of a Winchell's Donuts in Pasadena. They were drinking coffee. Vasquez Perdomo and Osorto sat on the bench, and Villegas Molina stood next to them. Suddenly, four unmarked cars pulled up and surrounded them. The cars were large and black with tinted windows and had no license plates. The doors opened and men in masks with guns started running at them aggressively. One of the men had a "large" military-style gun. The masked men wore regular clothes, they had no visible badges, and they did not identify themselves. Vasquez Perdomo, Osorto, and Villegas Molina were afraid they were being kidnapped. Vasquez Perdomo tried to move away but was immediately surrounded by several men with guns. They grabbed him, put his hands behind his back, and handcuffed him. Then, one of the men asked him for identification. Vasquez Perdomo said in English, "I have the right to remain silent."

Villegas Molina stood still and tried to remain calm. A masked and armed man came up to him and yelled, "Don't run!" Villegas Molina responded calmly, in English, "I'm not going to run." The man asked Villegas Molina to show his ID, and Villegas Molina provided his California Driver's license. Then the man asked Villegas Molina if he had any papers, and he said no. The man handcuffed Villegas Molina.

12

Osorto did not know the men were government agents. Terrified, he tried to run. The men yelled "stop" but did not identify themselves as law enforcement officers. Soon, one of the men caught up to Osorto, pointed a taser over his heart, and yelled, "Stop or I'll use it!" Osorto stopped immediately, and the man handcuffed him.

The unidentified, masked, and armed men put Vasquez Perdomo, Osorto, and Villegas Molina into separate cars and drove them to a parking lot where they interrogated them further. Eventually, the men chained each plaintiff at the hands, waist, and feet and took them to a Los Angeles detention center. The men never identified themselves to the plaintiffs, never stated they were immigration officers authorized to make arrests, never stated that they had arrest warrants, and never informed the plaintiffs of the bases for their arrests.[5] Vasquez Perdomo and

---

[5] In opposing the TRO, Defendants submitted a declaration from Andre Quinones, the Deputy Field Office Director of the Los Angeles Field Office ERO. Quinones attested that ERO Los Angeles officers sometimes apprehend illegal aliens by using "targeted investigations" which "focus on aliens with final removal orders and/or serious criminal history." "Individual targeting packages, consisting of the targeted alien's immigration history and/or status, criminal history, last known residence and employment information are prepared during the targeted investigation, prior to contact with the targeted alien." "When non-targeted individuals are encountered during the targeted operations, ERO Los Angeles officers are trained to develop reasonable suspicion through consensual encounters. ERO Los Angeles officers identify themselves to the arrestee at the time of arrest/encounter or as soon as practicable when safe to do so." Defendants did not provide any evidence that any of the stops experienced by the individual Plaintiffs

13

Villegas Molina have since been released on bond, and the district court ordered that Osorto be released on bond on July 30, 2025.

      C.      **Because of Operation At Large, members of the plaintiff associations have been detained and interrogated or credibly fear they will be detained, regardless of immigration status.**

      i.      **United Farm Workers of America**

The United Farm Workers of America (UFW) is the largest farm worker union in the country. As of June 2025, UFW has approximately 10,000 members, the majority of whom reside in California, including counties across the Central District. Elizabeth Strater, National Vice President of UFW, attests that the manner in which immigration enforcement operations have been conducted—"including by individuals hiding behind masks, who fail to identify themselves, and wearing military gear—has UFW members and staff fearing for their safety," regardless of

---

or described in Plaintiffs' other evidence involved the detention or arrest of a targeted individual.

When Defendants filed their motion for a stay of the TRO, they provided a supplemental declaration by Quinones in which he states: "Regarding the allegations of Plaintiffs Pedro Vasquez Perdomo, Carlos Alexander Osorto, and Issac Villegas Molina, all three arrests arose or were the result of a targeted enforcement action at a particular location where past surveillance and intelligence had confirmed that the target or individuals associated with him were observed to have recruited illegal aliens to work on landscaping jobs. It was also determined to be a location where the target and the workers would get food before heading off for a job." Notably, Quinones represents only that these Plaintiffs were at a location where the target had been seen in the past. Quinones does not state that any of the Plaintiffs are the target or associates of the target. Nor does Quinones state that agents observed the target at or near the bus stop when they detained the Plaintiffs there.

their immigration status. UFW members who are U.S. citizens and lawful permanent residents, and those who have employment authorization documents, such as H-2A temporary agricultural visas, T-visas, Temporary Protected Status, Deferred Action for Labor Enforcement, or Deferred Action for Childhood Arrivals, nevertheless express fear about being swept up in enforcement actions and seized, arrested, or detained without regard to their authorization to be in the U.S. Through her role as a UFW officer, Strater received a report about a UFW member, "Angel."

Angel is a U.S. citizen who identifies as Latino. Angel was walking to a community center with a coworker when two vehicles "pulled up to them suddenly." One was a U.S. Customs and Border Patrol truck, the other was a "plain, white car filled with what appeared to be soldiers wearing military clothing." The agent driving the truck asked Angel where he was born. Angel responded, "Simi Valley." The agent then asked: "What hospital?" Angel provided the hospital's name. The agent then turned to Angel's coworker, asking, "What about you?" The coworker, Roberto, responded in Spanish. The agents exited their vehicle, grabbed Roberto, and loaded him into their truck. Angel started walking away, but the agents demanded that he return. Angel told them again that he is a U.S. citizen. The agents directed Angel to show them his identification. They did

15

not let him leave until he showed them his California ID. Angel fears that agents will stop him again simply because of his apparent race or profession.

### ii.    Los Angeles Worker Center Network

The Los Angeles Worker Center Network (LAWCN) has eight member organizations. These include CLEAN Carwash Worker Center, the Garment Worker Center, the Koreatown Immigrant Workers Alliance, the Los Angeles Black Worker Center, the Philipino Workers Center, the Warehouse Worker Resource Center, the UCLA Labor Center, and Bet Tzedek Legal Services. LAWCN's member organizations currently represent over 3,800 workers.

CLEAN has approximately 1,800 individual members, all of whom are carwash workers in Southern California. CLEAN has members that live or work in Los Angeles, Orange, San Bernadino, Ventura, and Riverside counties. CLEAN's members are "predominantly Latine, with many being immigrants or the children of immigrants." CLEAN's Executive Director is Flor Melendrez.

Since Defendants' operation commenced in June 2025, dozens of CLEAN members who work at carwashes in Los Angeles and Orange counties have been stopped or arrested by immigration agents. Melendrez is also aware of dozens more carwash workers who work alongside CLEAN's members who have been detained or arrested by immigration agents. Based on reports from members, members' families, and staff, Melendrez understands that "carwashes have been a

16

consistent and ongoing target of immigration agents" and that "agents have targeted some carwashes more than once."

Plaintiffs submitted a declaration from CLEAN member Jesus Aristeo Cruz Uitz. Cruz Uitz has been a member of CLEAN since 2020. He is 51 years old and has four U.S. citizen children, ages five to sixteen. Before the events at issue in this case, Cruz Uitz had lived in the U.S. for more than 30 years, and he was a resident of Inglewood, Los Angeles County, California. He had no criminal convictions, and no encounters with immigration or law enforcement.

On Sunday, June 8, 2025, Cruz Uitz went to work at a carwash in Los Angeles, where he had been working for about eight years. At about 3:30 p.m., six vehicles pulled up in a "very fast and intimidating" manner and parked at the entrance. Some vehicles were unmarked, others had green stripes that said Border Patrol. About two agents came out of each vehicle, wearing masks. Some of the carwash workers ran, but Cruz Uitz stayed where he was. One of the people who got out of the vehicles approached Cruz Uitz "angrily and grabbed [Cruz Uitz's] arms. He was wearing green pants and a black vest. His clothes did not have any symbols or letters. He had a pistol. He asked [Cruz Uitz] in Spanish, 'Do you have papers?'" As soon as Cruz Uitz answered, the agent began handcuffing Cruz Uitz without saying anything else. Cruz Uitz told the agent, "You're hurting me." The agent responded, "You're not understanding. We're kicking you out." The agent

17

pushed Cruz Uitz into the backseat of a vehicle, causing Cruz Uitz "to hit into a metal median." When Cruz Uitz explained that the handcuffs were hurting him, the agent ignored him. About a minute later, the agents brought in one of Cruz Uitz's coworkers. Two of Cruz Uitz's coworkers "have light skin"—one is Persian, and the other is from Russia—and neither of them was approached by immigration agents or arrested.

### iii. Coalition for Humane Immigrant Rights

The Coalition for Humane Immigrant Rights (CHIRLA) is a nonprofit and membership organization headquartered in Los Angeles, California, with eight offices throughout California.

CHIRLA's activities include providing legal services and education. It has approximately 50,000 active members across California. Its membership is predominantly Latino and includes U.S. citizens, non-U.S. citizens with lawful status, and non-U.S. citizens without lawful status. Many of its members belong to mixed-status families—that is, families consisting of both individuals with citizenship or lawful status and individuals without. Many of its members "are day laborers who wait outside Home Depots, carwash workers, and street vendors who sell their products on public sidewalks."

CHIRLA's Executive Director, Angelica Salas, attests that many of CHIRLA's members "are experiencing significant levels of fear over the

possibility of being grabbed and snatched in immigration raids in public areas based on racial profiling." Even CHIRLA members with U.S. citizenship, work authorization, or pending applications for legal permanent residency have changed their daily routines out of fear that they will be detained based on their Latino appearance.

### D.    The District Court's TRO

The district court found that Plaintiffs "are likely to succeed in showing [that] seizures requiring reasonable suspicion have occurred."[6] Reviewing Plaintiffs' evidence regarding the circumstances surrounding the stops, it found that the conditions were coercive enough that the interactions were not consensual. The district court also found that Plaintiffs are "likely to succeed in showing that the seizures are based upon the four enumerated factors" or a subset of them. Those factors are (1) apparent race or ethnicity; (2) speaking Spanish or speaking English with an accent; (3) presence at a particular location; and (4) the type of work one does. The district court then concluded that "sole reliance on the four enumerated

---

[6]    Two of the association plaintiffs also challenge "denial of access to counsel and illegal conditions of confinement" at a federal facility in Los Angeles. **Complaint at 6.** Those plaintiffs applied for a separate TRO based on those practices. **ECF 38.** The district court granted both TRO applications in a single order. Defendants appealed only the district court's grant of the Stop/Arrest TRO application. Although the complaint also challenges Defendants' stop-and-arrest practices on statutory and regulatory bases, because the Stop/Arrest TRO was based only on Plaintiffs' Fourth Amendment claim, we do not address in detail Plaintiffs' other claims and allegations. **ECF 89.**

factors does not constitute reasonable suspicion." And, finally, the district court found that Defendants' stops based only on the four factors were part of an officially-sanctioned "pattern of conduct." Particularly, the court found that, despite there being no evidence of an "official policy" of making stops based only on the four factors and without reasonable suspicion, there was sufficient evidence to show that Defendants were routinely doing so. The court also observed that "a plethora" of public statements by high-level officials supported the finding that the challenged practice was approved or authorized by officials. Based on those findings, the district court granted Plaintiffs' application for the TRO.

The TRO provides:[7]

   a. As required by the Fourth Amendment of the United States Constitution, Defendants shall be enjoined from conducting detentive stops in this District unless the agent or officer has reasonable suspicion that the person to be stopped is within the United States in violation of U.S. immigration law.
   b. In connection with paragraph [a], Defendants may not rely solely on the factors below, alone or in combination, to form reasonable suspicion for a detentive stop, except as permitted by law:
      i.   Apparent race or ethnicity;
      ii.  Speaking Spanish or speaking English with an accent;
      iii. Presence at a particular location (e.g., bus stop, car wash, tow yard, day laborer pick up site, agricultural site, etc.); or
      iv.  The type of work one does.

---

[7]    In the district court's order, paragraph b. references "paragraph (1)," not "paragraph a." We think it obvious that the district court meant to refer to paragraph a. Accordingly, we have corrected that typographical error in our recitation of the TRO's terms. We note that, in challenging the TRO, Defendants do not rely on paragraph b.'s reference to "paragraph (1)."

### E.    Defendants' Motion for a Stay Pending Appeal

Defendants filed a notice of appeal and an emergency motion to stay the district court's TRO pending appeal.

It is important to note the issues Defendants did *not* raise in their motion for a stay. Defendants did not dispute the district court's finding that detentive stops requiring reasonable suspicion have occurred. They did not dispute that these detentive stops have been based solely on the four enumerated factors. They did not challenge the district court's findings that those stops are part of a pattern of conduct that has apparent official approval. And, finally, they did not meaningfully dispute the district court's conclusion that sole reliance on the four enumerated factors, alone or in combination, does not satisfy the constitutional requirement of reasonable suspicion. Their motion so states in a single sentence, without argument or citation to any legal authority. In their reply, they addressed that issue in three paragraphs, only one of which makes any reference to legal authority.

Here are the arguments that Defendants *do* make: They first argue that Plaintiffs cannot show a sufficient likelihood of future injury to support standing for injunctive relief and, even if they can meet the Article III threshold, they still cannot show a "real and immediate threat" that they will be harmed again sufficient to justify injunctive relief. As to the substance of the TRO, they argue

21

that it is impermissibly vague, inconsistent with the Fourth Amendment, and exceeds what is necessary to provide the Plaintiffs "complete relief."

## II. JURISDICTION

We begin with two threshold questions: statutory jurisdiction and Article III standing.

### A.     Statutory Jurisdiction

We have jurisdiction under the All Writs Act, 28 U.S.C. § 1651, to consider a motion for a stay of a TRO pending appeal. *Newsom v. Trump*, 141 F.4th 1032, 1043 (9th Cir. 2025). The question whether the TRO is appealable informs the likelihood Defendants will succeed on the merits of their appeal; the answer does not affect our jurisdiction to consider a stay while the question is litigated. *Id.* at 1044.

### B.     Article III Standing

We have jurisdiction to consider "Cases" and "Controversies" "in Law and Equity." U.S. Const. Art. III. For there to be a "Case," a plaintiff must have a "personal stake" such that he or she is "the proper party to bring [the] suit." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). Standing is jurisdictional; we consider it de novo and sua sponte. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).

To satisfy the "irreducible constitutional minimum of standing," a plaintiff "must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not

22

conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up). There also must be "a causal connection between the injury and the conduct complained of," and "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (cleaned up).

"Because standing is 'an indispensable part of the plaintiff's case,' it 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.'" *Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017) (quoting *Lujan*, 504 U.S. at 561). "At this very preliminary stage of the litigation, [plaintiffs] may rely on the allegations in their Complaint and whatever other evidence they submitted in support of their TRO motion to meet their burden." *Id.* "With these allegations and evidence, [plaintiffs] must make a 'clear showing of each element of standing.'" *Id.* (quoting *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013)).

The record shows—and Defendants do not dispute—that each of the individual plaintiffs, and members of both UFW and LAWCN, were stopped by government agents as part of the challenged operation. That is enough to make a "clear showing" of injury in fact. *Id.* Defendants challenge only Plaintiffs' standing to seek prospective injunctive relief.

To have standing to seek an injunction against future unlawful conduct, a plaintiff must show a "sufficient likelihood" that they will suffer a similar injury in the future. *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983); *see also LaDuke v. Nelson*, 762 F.2d 1318, 1324 (9th Cir. 1985). "Although questions of standing are reviewed de novo, we will affirm a district court's ruling on standing when the court has determined that the alleged threatened injury is sufficiently likely to occur, unless that determination is clearly erroneous or incorrect as a matter of law." *Mayfield v. United States*, 599 F.3d 964, 970 (9th Cir. 2010).

Here, the district court found that plaintiff Gavidia had standing to seek prospective injunctive relief because "there is a real and immediate threat that the conduct complained of will continue," and "[a]ll of the evidence adduced suggests a high likelihood of recurrent injury."

In their motion for a stay, Defendants argue that none of the plaintiffs have standing to seek prospective injunctive relief. We consider first whether the individual plaintiffs have standing to obtain equitable relief, and then whether the association plaintiffs have standing to obtain such relief on their members' behalf.[8]

---

[8]    Only one plaintiff with standing is sufficient for Article III. Still, we consider the standing of each plaintiff to address Defendants' argument about the scope of relief. *See infra*, Section III.A.4.

### 1.    Individual Plaintiffs

We conclude that each of the individual plaintiffs has standing to seek injunctive relief because there is a "realistic[] threat[]" that each will be stopped without reasonable suspicion as part of Defendants' Operation at Large. *Lyons*, 461 U.S. at 106.

As we have explained, a plaintiff can show that an injury is likely to recur by "demonstrat[ing] that the harm is part of a pattern of officially sanctioned behavior, violative of the plaintiffs' federal rights." *Melendres v. Arpaio*, 695 F.3d 990, 998 (9th Cir. 2012) (cleaned up). The district court here found that Plaintiffs' evidence demonstrated "a pattern of conduct," and that "a plethora of statements suggest[ed] approval or authorization" of the challenged stop-and-arrest practices, including a recent statement by Defendant Gregory K. Bovino, the Chief Patrol Agent for the El Centro Sector of the CBP. Defendants do not meaningfully dispute these findings, and they are well supported by the record. The sworn declarations describe more than a dozen stops based on less than reasonable suspicion— targeting Hispanic or Latino people in public places and at businesses like Home Depots and carwashes. Defendants' declarations corroborate key allegations regarding the commencement of Operation At Large in Los Angeles and the dispatching of "contact teams" to public places and businesses. Their general descriptions of training regarding the requirements for a lawful seizure do little to

25

overcome Plaintiffs' specific evidence showing a series of similar detentive stops without reasonable suspicion. On this record, we agree with the district court that Plaintiffs have shown that the challenged conduct is "part of a pattern of officially sanctioned behavior" and thus that the alleged injury is "likely to recur." *Id.* at 997–98 (cleaned up).

Defendants argue that the record fails to show that any specific plaintiff is likely to be stopped again. As they note, the record shows only one individual, J.M.E., has been stopped by Defendants twice. But that one recurrence is significant, especially considering that Defendants' agents stopped J.M.E. twice in just 10 days—first on June 9, and again on June 19. Gavidia and the other individual plaintiffs were each stopped only once.[9] But Defendants made all those stops and dozens more in a single month. Defendants commenced Operation at Large in Los Angeles on June 6, and Plaintiffs submitted their evidence of stops on July 3. Additionally, the record shows that Defendants' ongoing Operation At Large involves sending contact teams to public places and types of businesses, such as carwashes and Home Depots that they believe are "utilized" by illegal immigrants. And, the record includes evidence that Defendants have sent teams to the same place repeatedly. Accordingly, we conclude that there is a "real and

---

[9]    We agree with Defendants that the district court's finding that Gavidia has been subjected to multiple stops was clearly erroneous.

immediate threat," *Lyons*, 461 U.S. at 102, that Defendants' patrols will send contact teams to the same locations and encounter the same individuals.

Our conclusion is consistent with the Supreme Court's holding in *Lyons*. In that case, police officers subjected Lyons to a chokehold during a routine traffic stop. Lyons sought an injunction against future use of chokeholds by police officers under circumstances "which do not threaten death or serious bodily injury." *Id.* at 100. The Supreme Court concluded that Lyons lacked standing to pursue injunctive relief because it was "no more than speculation to assert [] that Lyons himself" would again be subject to a chokehold. *Id.* at 108.

This case is a far cry from *Lyons*. To start, Plaintiffs seek to enjoin the stops themselves, not some subsequent conduct that might occur only after a stop, like a chokehold. In *Lyons* and other cases where the asserted future injury was insufficient to confer standing, "there was either little indication in the record that the plaintiffs had firm intentions to take action that would trigger the challenged governmental action, or little indication in the record that, even if plaintiffs did take such action, they would be subjected to the challenged governmental action." *Associated Gen. Contractors of Cal. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1407 (9th Cir. 1991); *see also Lyons*, 461 U.S. at 111 (concluding that Lyons's risk of future injury was speculative, in part because his claim of future injury depended on him being stopped for a traffic violation or some other offense). The

27

same is not true here. Unlike in *Lyons*, the individual plaintiffs here cannot escape future injury by avoiding unlawful activity. There is no predicate action that the individual plaintiffs would need to take, other than simply going about their lives, to potentially be subject to the challenged stops.

Further, the district court in *Lyons* did not make an explicit finding about the likelihood of recurrence, and the record in *Lyons* did not establish a policy of chokeholds "authorized absent some resistance or other provocation." 461 U.S. at 110. Here, in contrast, the district court specifically found that the evidence indicates that the challenged stops are part of an officially-sanctioned pattern and that, as a result, there is "a high likelihood of recurrent injury."

In sum, unlike in *Lyons*, the district court in this case made an explicit finding of likelihood of recurrence, there is evidence that the complained-of conduct stems from a pattern or practice by Defendants, and there is no specific predicate action required by Plaintiffs to trigger Defendants' challenged practice. We distinguished *Lyons* on those same bases in *Melendres v. Arpaio*, explaining that the district court did not err in finding that the threatened constitutional injury was likely to occur again where "the district court expressly found that the Plaintiffs [were] sufficiently likely to be seized in violation of the Fourth Amendment," the plaintiffs presented evidence that defendants "engaged in a pattern or practice of conducting [the challenged] stops," and the plaintiffs could not "avoid injury by

28

avoiding illegal conduct." 695 F.3d at 998 (cleaned up). Defendants suggest that Plaintiffs must provide "direct evidence of an unlawful policy" to establish standing. But no official statement or express policy is required to demonstrate a "pattern of officially sanctioned behavior, violative of the plaintiffs' federal rights." *Armstrong v. Davis*, 275 F.3d 849, 861 (9th Cir. 2001) (cleaned up). In *Nicacio v. INS*, for example, we held plaintiffs had standing to seek injunctive relief where the district court found that "the INS was engaged in a pattern of unlawful stops to interrogate persons of Hispanic appearance traveling by automobile on Washington highways," based on the plaintiffs' testimony about their experiences. 797 F.2d 700, 701–04 (9th Cir. 1985).

We therefore conclude that the individual plaintiffs have made a sufficient showing of future injury to establish standing to seek injunctive relief.

### 2.   Association Plaintiffs

To establish "associational" standing and bring suit on behalf of its members, an association must show that: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (quoting *Hunt v. Wash. St. Apple Adver. Comm'n*, 432 U.S. 333, 343

(1977)). Further, "[w]here it is relatively clear, rather than merely speculative, that one or more members have been or will be adversely affected by a defendant's action, and where the defendant need not know the identity of a particular member to understand and respond to an organization's claim of injury," the organization is not required to "identify by name the member or members injured" to establish associational standing. *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015). *See also Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1163 (11th Cir. 2008) (holding that, "[t]o satisfy the requirements of associational standing, all that plaintiffs need to establish is that at least one member faces a realistic danger of" being injured by the challenged practice).

### a.     Members' Standing

At least some of each association's members would have standing to sue in their own right. UFW and LAWCN each submitted evidence regarding individual members' experiences of detentive stops. As to CHIRLA, the district court found that it has members who "reasonably fear being subject to the stop and arrest practices challenged in this case." Based on this reasonable fear, the record shows that CHIRLA members have changed their routines and tried to avoid leaving their homes.

As with the individual plaintiffs, we conclude that the associations' individual members can establish standing to seek injunctive relief based on a real and

30

immediate threat of future injury. *Lyons*, 461 U.S. at 105. The associations have thousands of members across California and the Central District, and the evidence suggests that Defendants are engaged in a high-volume, District-wide practice of making detentive stops with less than reasonable suspicion. The large scale of the association plaintiffs' Los Angeles-area memberships "increases the threat of future harm to [the association plaintiffs'] members." *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1100 (9th Cir. 2024) (quoting *Nat. Res. Def. Council v. U.S. E.P.A.*, 735 F.3d 873, 878 (9th Cir. 2013)). In these circumstances, it is highly likely that at least one member of each association will be subject to Defendants' challenged practices. *See id.*; *see also Fla. State Conf. of N.A.A.C.P.*, 522 F.3d at 1163 (concluding that plaintiff associations had standing to seek prospective relief against a state statute barring voter registrations in the event of social security or drivers' license number "mismatches" because it was "highly unlikely—even with only a one percent chance of rejection for any given individual—that not a single [association] member will have his or her application rejected due to a mismatch").

### b.    Associations' Interests

The interests the association plaintiffs seek to protect are germane to their purposes. Each of the association plaintiffs has a mission to defend the rights of low-wage workers with various immigration statuses. The association plaintiffs' stated "institutional goals" to protect "a broad range of rights" for their members is

31

sufficient for purposes of establishing associational standing. *Cal. Rural Legal Assistance, Inc. v. Legal Servs. Corp.*, 917 F.2d 1171, 1174 (9th Cir. 1990).

### c.    Members' Participation

Lastly, neither the claim asserted nor the relief requested requires the participation of the associations' individual members in this lawsuit. As a general matter, membership organizations may bring constitutional claims on behalf of their members. *See, e.g.*, *Students for Fair Admissions*, 600 U.S. at 200–01; *Stavrianoudakis v. U.S. Fish & Wildlife Serv.*, 108 F.4th 1128, 1143 (9th Cir. 2024) (holding organization had associational standing to seek injunctive relief to protect its members' Fourth Amendment rights). Because Plaintiffs allege an ongoing pattern of unconstitutional detentive stops, demonstrating the likelihood of future such stops does not require the participation of individual members. And because Plaintiffs seek only prospective injunctive relief (not damages), individual participation is not necessary for effective relief. *See, e.g.*, *id.*; *Columbia Basin Apartment Ass'n v. City of Pasco*, 268 F.3d 791, 799 (9th Cir. 2001) (holding that claims for injunctive relief "do not require individualized proof" of harm). Finally, associational standing is particularly appropriate where the "constitutional rights of persons who are not immediately before the Court could not be effectively vindicated except through an appropriate representative before the Court." *NAACP v. Ala. ex. Rel. Patterson*, 357 U.S. 449, 459 (1958). Here, the intense fear of

32

discriminatory stops that Defendants' roving patrols have provoked may prevent the association plaintiffs' members from active participation in the lawsuit.[10]

In sum, we have jurisdiction to decide whether to stay the district court's TRO pending appeal, and all Plaintiffs—the individuals and associations—have established their standing to seek prospective equitable relief.

### III. DISCUSSION

We next turn to the central question before us: Should we stay the district court's TRO during the appeal proceedings?

We consider the four "*Nken* factors" in deciding whether to grant a stay pending appeal. The factors are: (A) "whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits" of its appeal; (B) "whether the applicant will be irreparably injured absent a stay"; (C) "whether issuance of the stay will substantially injure the other parties"; and (D) "where the public interest lies." *Newsom*, 141 F.4th at 1044 (quoting *Nken v. Holder*, 556 U.S. 418, 426

---

[10]     The associations are bringing claims on behalf of their members to vindicate their *members'* personal rights; they are not seeking to benefit themselves by asserting a third party's rights. The cases cited by Defendants involving parties seeking either to exclude evidence or to assert a 42 U.S.C. § 1983 claim based on the violation of a third party's Fourth Amendment rights are inapplicable. *See Rakas v. Illinois*, 439 U.S. 128, 138–40 (1979) (third-party exclusionary rule); *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1111 (9th Cir. 2001) (third-party § 1983 claim). Moreover, the practical considerations that counsel against extending the exclusionary rule to third parties are not at issue here. *See Heartland Acad. Cmty. Church v. Waddle*, 427 F.3d 525, 532 (8th Cir. 2005).

(2009)). A stay pending appeal is "an exercise of judicial discretion"; "[a] stay is not a matter of right, even if irreparable injury might otherwise result." *Nken*, 556 U.S. at 433 (cleaned up). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* at 433–34.

### A.      Likelihood of Success on the Merits of Appeal

The first stay inquiry is whether Defendants have "made a strong showing" that they are likely to succeed on the merits of their appeal. *Nken*, 556 U.S. at 434. Because Defendants cannot succeed on the merits of their appeal unless the TRO is appealable, we begin by addressing that issue. Then we address each of Defendants' bases for appealing the TRO.

### 1.      Appealability of the TRO

We first address the threshold jurisdictional question that will be a precondition to the merits of Defendants' appeal: Is the district court's TRO appealable?

Under 28 U.S.C. § 1291(a)(1), we have jurisdiction over appeals of "[i]interlocutory orders . . . granting . . . injunctions." "Ordinarily, a TRO is not an appealable order." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 762 (9th Cir. 2018). But a TRO can be appealed if it has the "same effect as a preliminary injunction." *Id.* "We treat a TRO as a preliminary injunction where an adversary hearing has been held, and the court's basis for issuing the order is strongly

challenged." *Id.* (cleaned up). "Further, a key distinction . . . is that a TRO may issue without notice and remains in effect for only 14 days." *Id.* at 762–63.

Here, the district court entered the TRO on appeal after notice, expedited briefing, and a hearing. Defendants "strongly challenged" the district court's basis for entering the TRO. *Id.* at 762. The TRO will remain in effect for longer than 14 days.

We therefore conclude that Defendants are likely to succeed in establishing that the district court's TRO is appealable under § 1291(a)(1).

### 2.    Sufficient Likelihood of Injury to Warrant Equitable Relief

Defendants argue that, even if Plaintiffs have shown injury sufficient for Article III standing, "they cannot come close to showing the threat of immediate and irreparable harm that is necessary for an injunction."

For this argument, Defendants principally rely on *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999). In *Hodgers-Durgin*, this court assumed that even if plaintiffs had established a sufficient threat of future injury to confer Article III standing to seek prospective relief, the asserted injury was not sufficiently immediate to warrant an injunction as a matter of the law of equitable remedies. *Id.* at 1042. In that case, the plaintiffs had sought an injunction against Border Patrol practices. But the two named plaintiffs had each been stopped "only once in 10 years." *Id.* at 1044. Based on this record, this court concluded that the

35

plaintiffs had not established that it was sufficiently likely they would be stopped again. *Id.*

This case is decisively different. It is undisputed that Defendants have been conducting a massive and ongoing immigration enforcement operation in the Los Angeles region since early June. The record shows Defendants' agents have conducted many stops in the Los Angeles area within a matter of weeks, not years, some repeatedly in the same location. For the association plaintiffs, the likelihood of harm corresponds with the likelihood that one or more of their members will be stopped by one of Defendants' agents—which, for the reasons discussed above, is considerable.

Based on this record, the district court did not clearly err in "affirmatively find[ing] that there is a real *and immediate* threat that the conduct complained of will continue." (Emphasis added). And "[i]t is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d at 1002 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

### 3.     Objections to the Terms of the TRO

Defendants primarily argue that portions of the TRO constitute an impermissibly vague "follow-the-law" injunction. They also argue that the TRO is inconsistent with the Fourth Amendment. We address each argument in turn.

### i.        Vagueness

Federal Rule of Civil Procedure 65(d)(1) requires that any injunction or TRO be "specific in terms" and "describe in reasonable detail—and not by reference to the complaint or other document—the act or acts sought to be restrained." "[T]he specificity provisions of Rule 65(d) are no mere technical requirements. The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). The terms of the injunction should be clear enough to be understood by a lay person, not just by lawyers and judges. *Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1134 (9th Cir. 2006).

Whether the TRO is sufficiently clear is a context-specific inquiry that "must be applied in the light of the circumstances surrounding the order's entry," including "litigation history." *Id.* at 1133-34 (cleaned up); *see also Melendres v. Skinner*, 113 F.4th 1126, 1138 (9th Cir. 2024) (interpreting district court's injunction in light of previous orders and "the [district] court's exchanges . . . at a status conference before the issuance of the" injunction). When interpreting the district court's order, we consider the text of the order itself together with the "accompanying opinion" and other documents attached to the order. *See Schmidt*, 414 U.S. at 476; *cf. Reno Air Racing*, 452 F.3d at 1132 (permitting incorporation

by reference of an exhibit attached to an order). We will not set aside an injunction under Rule 65 unless it is "so vague" that it has "no reasonably specific meaning." *Skinner*, 113 F.4th at 1140 (cleaned up).

As previously noted, the TRO at issue here provides:

a. As required by the Fourth Amendment of the United States Constitution, Defendants shall be enjoined from conducting detentive stops in this District unless the agent or officer has reasonable suspicion that the person to be stopped is within the United States in violation of U.S. immigration law.

b. In connection with paragraph [a], Defendants may not rely solely on the factors below, alone or in combination, to form reasonable suspicion for a detentive stop, except as permitted by law:
   i.  Apparent race or ethnicity;
   ii. Speaking Spanish or speaking English with an accent;
   iii. Presence at a particular location (e.g., bus stop, car wash, tow yard, day laborer pick up site, agricultural site, etc.); or
   iv. The type of work one does.

As Defendants point out, paragraph b. prohibits sole reliance on the four factors to form reasonable suspicion to support a detentive stop, "except as permitted by law." We agree with Defendants that the "except as permitted by law" clause makes paragraph b. impermissibly vague: what is "permitted by law" is not clear to lawyers and judges, much less lay persons who are the "target of the injunction." *Reno Air Racing*, 452 F.3d at 1134. We therefore conclude that Defendants are likely to succeed on the merits as to that specific clause.

Defendants, however, are not likely to succeed on their remaining arguments.

Defendants contend that paragraph a. is impermissibly vague because it simply "restates the constitutional requirement of reasonable suspicion." The first paragraph, standing alone, could be an impermissible follow-the-law injunction. But, as the TRO states, paragraph a. must be read "[i]n connection with" with paragraph b., which specifies exactly what Defendants are prohibited from doing. When read together, paragraphs a. and b. prohibit Defendants from making detentive stops based solely on the four factors, or some combination of them. The TRO does not expose Defendants to the threat of contempt when they make a stop based on other factors—even if a court later concludes that Defendants lacked reasonable suspicion for the stop.

### ii.    Fourth Amendment

As Defendants correctly note, when making reasonable-suspicion determinations, "reviewing courts . . . must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). Further, in light of *Arvizu*, we have recognized that "the nature of the totality-of-the-circumstances analysis" precludes courts from "holding that certain factors are presumptively given no weight without considering those factors in the full context of each particular case." *United States*

39

*v. Valdes-Vega*, 738 F.3d 1074, 1079 (9th Cir. 2013) (en banc). Thus, in *Valdes-Vega*, we concluded that earlier Ninth Circuit decisions "holding that certain factors are *per se* not probative or are *per se* minimally probative do not now comply with Supreme Court precedent." *Id.* at 1079. As the *Arvizu* Court explained, a "divide-and-conquer" analysis of individual factors is inappropriate because, even when each in a series of facts is innocent on its own, those facts may give rise to reasonable suspicion when viewed together. 534 U.S. at 274.

Defendants primarily argue that the TRO runs afoul of *Valdes-Vega* because, in their view, the TRO enjoins them from relying on the four factors at all, even in combination with other factors. This argument misreads the TRO. The TRO does not prohibit Defendants from relying on the four factors at all. Rather, the TRO clearly states that "Defendants may not rely *solely* on the [four factors], alone or in combination, to form reasonable suspicion for a detentive stop." (Emphasis added.) The TRO is clear, but if Defendants remain confused, they need only read the accompanying opinion. In adopting Plaintiffs' proposed TRO, the district court explained that the proposed TRO would "enjoin reliance *solely* on these four enumerated factors alone or in combination." (Emphasis in original.) It would "not . . . enjoin reliance on these factors along with other factors, nor—contrary to Defendants' mischaracterizations—[would it] require that Defendants ignore these factors or 'put blinders on' when they run across these factors." The district court

40

clarified the same point in the TRO hearing, confirming that the proposed TRO would prohibit sole reliance on the four factors, but it would not prohibit reliance on those factors in combination with unlisted factors.

Defendants also argue that, even if the TRO prohibits only detentive stops based solely on the four factors, the TRO creates a categorical rule about the relevance of those factors which, in Defendants' view, is inconsistent with the general principle that reasonable-suspicion determinations depend on the "totality of the circumstances." This argument fails for several reasons.

To begin, the TRO does not create a categorical rule. Rather, the TRO prohibits Defendants from relying solely on the four factors in the context of the current enforcement activities in a particular place, the Central District. The district court concluded that, in that context, the four factors establish only a "broad profile" that, without "additional information that winnows the broad profile into an objective and particularized suspicion of the person to be stopped," "do[es] not demonstrate reasonable suspicion for any particular stop." Additionally, the TRO does not establish an impermissible *per se* rule because it says nothing about how to weigh the four factors in other circumstances or if other relevant factors are present. If future stops are based on additional, relevant facts, those scenarios will be unaffected by the TRO.

Moreover, the TRO's rule—that Defendants may not rely solely on the four factors to form reasonable suspicion for a detentive stop in the Central District—is entirely consistent with the general principle that reasonable-suspicion determinations must be based on the totality of the circumstances. Courts routinely assess specific groupings of factors to determine whether those factors together give rise to reasonable suspicion. That is exactly what a reasonable-suspicion determination entails. *See, e.g.*, *Ornelas v. United States*, 517 U.S. 690, 698 (1996). Moreover, in *Ornelas*, the Supreme Court held that a de novo standard of review for reasonable suspicion determinations is appropriate because "de novo review tends to unify precedent and will come closer to providing law enforcement officers with a defined set of rules" regarding what constitutes reasonable suspicion. *Id.* at 697. In so holding, the Court acknowledged that, "because the mosaic which is analyzed for a reasonable-suspicion or probable-cause inquiry is multi-faceted, one determination will seldom be a useful precedent for another." *Id.* (cleaned up). "But," the Court explained, "there are exceptions." *Id.* The Court went on to identify multiple pairs of cases in which the circumstances of two cases "were so alike" that precedent compelled the same reasonable-suspicion determination in the later case. *Id.* Consistent with *Ornelas*, the TRO provides Defendants with appropriate guidance regarding a particular set of circumstances that appears repeatedly in the record of this case.

42

Finally, Defendants argue that the TRO is improper because "some combination of the enumerated factors will at least sometimes support reasonable suspicion for a stop." Because Defendants "fail[ed] to develop" this argument by offering any analysis, legal authority, or examples in support, we are not obligated to consider it. *See, e.g.*, *Iraheta-Martinez v. Garland*, 12 F.4th 942, 959 (9th Cir. 2021). We nonetheless address Defendants' argument to explain why the TRO is consistent with the Fourth Amendment.

The TRO prohibits Defendants from making a detentive stop based only on the following four factors, or some subset of these factors: (1) the person's apparent race or ethnicity; (2) that the person speaks Spanish or speaks English with an accent; (3) the person's presence at a particular location—whether that be a random location, such as a sidewalk or front yard, or a location selected "because past experiences have demonstrated that illegal aliens utilize or seek work at these locations"; and (4) the type of work the person does or appears to do, even if that is a job that, in the officers' experience, is more often performed by illegal immigrants than are other jobs.

"The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975). In *Brignoni-Ponce*, the Supreme Court considered the Border Patrol's authority to stop automobiles in

areas near the Mexican border. The Court held that, "[e]xcept at the border and its functional equivalents," the Fourth Amendment does not allow immigration enforcement officers to make detentive stops unless they are "aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion" that the persons stopped or detained "may be illegally in the country." *Id.* at 884.

Reasonable suspicion must be "particularized and objective." *Arvizu*, 534 U.S. at 273. That is, an officer must have reasonable suspicion as to "*the particular person being stopped.*" *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc); *accord Brown v. Texas*, 443 U.S. 47, 51 (1979). In making a reasonable-suspicion determination, "the facts must be filtered through the lens of the agents' training and experience," *Valdes-Vega*, 738 F.3d at 1079 (citing *Brignoni-Ponce*, 422 U.S. at 885), "but 'experience' does not in itself serve as an independent factor in the reasonable suspicion analysis." *Montero-Camargo*, 208 F.3d at 1131. "In other words, an officer's experience may furnish the background against which the relevant facts are to be assessed," *id.*, but the officers' "rational inferences" and "permissible deductions" must "flow from objective facts and be capable of rational explanation." *Nicacio*, 797 F.2d at 705.

To form reasonable suspicion, an officer must rely on facts and inferences specific enough that they do not describe "[l]arge numbers," *Brignoni-Ponce*, 422

44

U.S. at 886, or a "broad profile" of individuals, *United States v. Manzo-Jurado*, 457 F.3d 928, 939 (9th Cir. 2006). Reasonable suspicion cannot be based on "generalizations that, if accepted, would cast suspicion on large segments of the lawabiding population." *Id.* at 935. Rather, the specific facts articulated "must provide a rational basis for separating out the illegal aliens from American citizens and legal aliens." *Orhorhaghe v. INS*, 38 F.3d 488, 497 (9th Cir. 1994) (cleaned up). Accordingly, "[a] characteristic common to both legal and illegal immigrants does little to arouse reasonable suspicion." *Manzo-Jurado*, 457 F.3d at 937.

We agree with the district court that, in the context of the Central District of California, the four enumerated factors at issue—apparent race or ethnicity, speaking Spanish or speaking English with an accent, particular location, and type of work, even when considered together—describe only a broad profile and "do not demonstrate reasonable suspicion for any particular stop."

The Central District's demographics are relevant to this analysis. *See, e.g.*, *Brignoni-Ponce*, 422 U.S. at 885–87 & n.12 (considering probative value of "apparent Mexican ancestry" near the Mexican border in light of the demographics of the border states). Plaintiffs' undisputed evidence shows that nearly half—about 47 percent—of the Central District's population identifies as Hispanic or Latino.

In the United States generally, apparent Hispanic or Latino race or ethnicity generally has limited probative value, because "[l]arge numbers of native-born and

45

naturalized citizens have the physical characteristics identified with [Hispanic or Latino ethnicity]." *Id*. at 886. That probative value is even less in an area like the Central District in which "a substantial part . . . of the population is Hispanic." *Montero-Camargo*, 208 F.3d at 1132.

Speaking Spanish and speaking English with an accent are likewise characteristics that "appl[y] to a sizable portion of individuals lawfully present in this country." *Cf. Manzo-Jurado*, 457 F.3d at 936–37 (discussing the limited probative value of observation that "group members spoke to each other exclusively in Spanish and did not understand English"). These characteristics have very little probative value in the Central District of California. *See, e.g.*, U.S. Census Bureau, Language Spoken at Home (Table S1601), *Am. Cmty. Survey* (indicating that more than 55% of the population in Los Angeles County speaks a language other than English at home, including 37.7% of the population that speaks Spanish at home).

As to location, both the Supreme Court and this court have made clear that an individual's presence at a location that illegal immigrants are known to frequent does little to support reasonable suspicion when U.S. citizens and legal immigrants are also likely to be present at those locations. *See, e.g.*, *Brignoni-Ponce*, 422 U.S. at 882–83 (holding that "roving" border patrols must have reasonable suspicion to make stops even on roads "near the border," because those roads "carry not only

aliens seeking to enter the country illegally, but a large volume of legitimate traffic as well"); *United States v. Sigmond-Ballesteros*, 285 F.3d 1117, 1124 (9th Cir. 2002) (holding that an individual's presence on a highway that "smugglers" "common[ly]" used was "of only minimal significance" given that the highway connected various cities and "substantially all of the traffic in and around these cities is lawful" (cleaned up)).

The district court found that Defendants select certain types of public places and businesses because their "past experiences" indicate that illegal immigrants are present at and seek work at those locations. Defendants, however, provide no evidence—not even a bald assertion—that any of the public places or types of businesses they are targeting are used exclusively, or even predominantly, by individuals illegally in the country. *See Manzo-Jurado*, 457 F.3d at 937–38 & n. 10.[11] To the contrary, the evidence indicates that presence at such locations is "[a]

---

[11]    In *Manzo-Jurado*, we concluded that the group's appearance as a work crew was only "marginally relevant," even though officers testified that Border Patrol had encountered "numerous" work crews that contained illegal immigrants. *Id.* at 937–38. In so holding, we noted that the officers did not discuss "the proportion of work crews in [the city] that have illegal aliens, even though they encountered "numerous" work crews with illegal aliens, because they did not testify about how many work crews they had encountered in the city "that did not have illegal aliens." *Id.* Further, even though "officials' skilled judgment plays a significant role in determining whether there was reasonable suspicion," the officers' "testimony regarding their prior encounters with works crews in [the city] which had contained illegal immigrants does not explain how their experience and

characteristic common" to legal immigrants, illegal immigrants, and U.S. citizens alike. *See id.* at 937. Consequently, the fact that a person is present at a business (such as a carwash) or other location (such as a bus stop) "does little to arouse reasonable suspicion," even when paired with officers' knowledge that illegal immigrants have frequented or sought work at that location. *See id.*

Like location, the type of work one does is at most "marginally relevant to establishing reasonable suspicion," even if it is work commonly performed by immigrants without legal status. *See id.* at 937–38. In *Manzo-Jurado*, we held that a group's "appearance as a work crew" was only "marginally relevant" because it was a "characteristic common to both legal and illegal immigrants"—even though officials testified they had encountered "numerous" individuals in that type of work who were present in the country illegally. *Id.* We have also explained that evidence that a particular employer is employing a large number of undocumented workers does not create reasonable suspicion as to each individual employee. *Perez-Cruz v. Barr*, 926 F.3d 1128, 1138 (9th Cir. 2019).

Even taken together, the four enumerated factors describe only a "broad profile" that does not supply the reasonable suspicion required to justify a detentive stop. *Manzo-Jurado*, 457 F.3d at 939. We considered a very similar set of

---

expertise led to a reasonable inference of criminality that might well elude an untrained person." *Id.* at 938 n.10 (cleaned up).

factors in *Manzo-Jurado*. There, we concluded that the Border Patrol lacked reasonable suspicion that any individuals in a group were in this country illegally where the officers observed that the individuals (1) appeared Hispanic; (2) appeared to be a work crew; (3) spoke Spanish and were unable to speak English; and (4) were within 50 miles of the Canadian border. *Id.* at 932, 939–40. We held Border Patrol lacked reasonable suspicion to justify its stop based on those facts even though "proximity to the Canadian border supports reasonable suspicion," *id.* at 936, and even though Border Patrol had encountered numerous work crews in the city that employed illegal aliens, in some cases, "all illegal aliens," *id.* at 938 & n.9.[12]

As in *Manzo-Jurado*, the factors at issue here impermissibly "cast suspicion on large segments of the lawabiding population," including anyone in the District who appears Hispanic, speaks Spanish or English with an accent, wears work clothes, and stands near a carwash, in front of a Home Depot, or at a bus stop. *Id.* at 935. This conclusion is amply supported by the record, which shows that U.S. citizens and lawfully present immigrants were seized based on the four factors or a

---

[12]    *See also, e.g., United States v. Diaz-Juarez*, 299 F.3d 1138, 1142 & n.2 (9th Cir. 2002) (explaining that officer's observation of individual close to the border, at a time that was unusual to encounter traffic, in an area "notorious for smuggling," shortly after receiving reports that "contraband was poised for smuggling into the United States," only ripened into reasonable suspicion when he observed the individual's "unusual car and driving behavior").

49

subset of them—including the three U.S. Citizens discussed above, an 11-year-old U.S. citizen at a carwash, a lawfully present day laborer outside a Home Depot, and a legally present immigrant who was stopped by Defendants once while driving and again while standing outside a Home Depot.

A combination of factors that describes a large segment of the population has "weak" probative value and therefore cannot amount to reasonable suspicion "unless . . . combined with other more probative factors," *Nicacio*, 797 F.2d at 704, that "corroborate[] [the officers'] initial suspicions," *Manzo-Jurado*, 457 F.3d at 939. "Although an officer, to form a reasonable suspicion . . . , may rely in part on factors composing a broad profile, he must also observe additional information that winnows the broad profile into an objective and particularized suspicion of the person to be stopped." *Manzo-Jurado*, 457 F.3d at 939–40.[13] Because the enumerated factors fail to "provide a rational basis for separating out the illegal

---

[13]     In their reply brief, Defendants assert that some or all of the factors could furnish reasonable suspicion when "viewed against the backdrop of agents' experience." **Reply at 7.** Although officers may draw on their own experience and specialized training to make inferences from the cumulative information available to them, "we will defer to officers' inferences only when such inferences rationally explain how the objective circumstances aroused a reasonable suspicion that *the particular person being stopped* had committed or was about to commit a crime." *Manzo-Jurado*, 457 F.3d at 934–35 (quoting *Montero-Camargo*, 208 F.3d at 1129 (cleaned up)). And "while an officer may evaluate the facts supporting reasonable suspicion in light of his experience, experience may not be used to give the officers unbridled discretion in making a stop." *Montero-Camargo*, 208 F.3d at 1131 (quoting *Nicacio*, 797 F.2d at 705).

aliens from American citizens and legal aliens," they do not, without more, give rise to reasonable suspicion that an individual is in this country illegally. *Orhorhaghe*, 38 F.3d at 497 (cleaned up).

In sum, we conclude that Defendants are likely to succeed only on their objection that the TRO is rendered impermissibly vague by the phrase "except as permitted by law." Defendants have not shown that they are likely to prevail as to any other arguments aimed at the substance of the TRO.

### 4.    Scope of Relief Granted

Finally, in evaluating the likelihood that Defendants will succeed on their appeal of the TRO, we consider the remaining remedial question that would be raised by the appeal: Did the district court exceed its jurisdiction, or abuse its discretion, in entering a district-wide TRO?

"[T]he scope of a district court's equitable powers . . . is broad, for breadth and flexibility are inherent in equitable remedies." *Milliken v. Bradley*, 433 U.S. 267, 281 (1977) (cleaned up). Courts thus have "broad discretion in fashioning a remedy." *Melendres v. Arpaio*, 784 F.3d 1254, 1265 (9th Cir. 2015). Injunctions "must be tailored to remedy the specific harm alleged." *Id*. But "a federal court may order relief that the Constitution would not of its own force initially require if such relief is necessary to remedy a constitutional violation." *Toussaint v. McCarthy*, 801 F.2d 1080, 1087 (9th Cir. 1986) (citing *N.C. State Bd. of Educ. v.*

*Swann,* 402 U.S. 43, 46 (1971) *and Swann v. Charlotte-Mecklenburg Bd. of Educ.,* 402 U.S. 1, 15–16 (1971)); *see also Melendres v. Arpaio*, 784 F.3d at 1265.

Consistent with the nature of equitable relief, we review the district court's "choice of [equitable] remedies" for "abuse of discretion." *Stone v. City & County of San Francisco*, 968 F.2d 850, 861 & n.19 (9th Cir. 1992). Our inquiry is not whether there is some conceivable injunction that is *more* tailored while providing equal relief; Defendants must establish that "no reasonable person could take the view adopted by the trial court." *Id.*

We review factual findings underlying the district court's decision for clear error, and we review de novo any underlying legal determinations. *Roman v. Wolf*, 977 F.3d 935, 941 (9th Cir. 2020). The scope of a district court's statutory jurisdiction is a legal question we review de novo; to the extent that determination relies on factual findings, we review those findings for clear error. *Cf. Robinson v. United States*, 586 F.3d 683, 685 (9th Cir. 2009) ("A district court's findings of fact relevant to its determination of subject matter jurisdiction are reviewed for clear error.").

Here, the district court's decision to award temporary preliminary relief relied on factual determinations about the effects that potential remedies would have and whether various remedies would be sufficient to completely rectify the alleged harms. The district court specifically "[found] that the breadth of the TRO is

52

necessary to give Plaintiffs what they are entitled to." Defendants have not pointed to any clear errors in the district court's factual findings, nor can we discern any based on our review of the evidence each side submitted.

As to the breadth of the TRO, one limitation on the district court's discretion to order injunctive relief is that, under the Judiciary Act of 1789, district courts likely lack authority to issue "universal injunctions"—orders that "prohibit enforcement of a law or policy against *anyone*"—to the extent "*broader* than necessary to provide complete relief to each plaintiff." *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2548, 2562–63 (2025) (second emphasis added). Party-specific injunctions may "advantage nonparties," but "only incidentally." *Id.* at 2557 (cleaned up).

At the same time, "[t]he equitable tradition has long embraced the rule that courts generally may administer complete relief between the parties.'" *Id.* (quoting *Kinney-Coastal Oil Co. v. Kieffer*, 277 U.S. 488, 507 (1928)). Accordingly, we recently held in *Washington v. Trump* that "the district court did not abuse its discretion in issuing a universal injunction in order to give the State[ plaintiffs] complete relief." —— F.4th ——, 2025 WL 2061447, at *17 (July 23, 2025).

Here, the TRO enjoining a certain practice of suspicionless stops within the Central District of California is not an impermissible "universal" injunction like the ones disapproved in *CASA*. One obvious difference is geographical: the

injunction here is not national, but limited to one judicial district. But much more importantly, the scope and structure of the TRO is reasonably necessary to provide complete relief to the Plaintiffs and benefits non-plaintiffs only incidentally. Here is why:

Plaintiffs assert that federal officials are stopping people "based not on individualized suspicion, but . . . profiling"—in other words, individuals in the Los Angeles area are being subjected to detentive stops based on group rather than individual characteristics, *before* the federal agents conducting the roving patrols know who the people stopped are. As the district court recognized, given the nature of the challenged conduct—detentive stops of individuals based solely on a broad profile—enjoining Defendants from stopping *only the Plaintiffs* would not afford the Plaintiffs meaningful relief. How would a federal agent who is about to detain a person whose identity is not known, based on some combination of the person's ethnicity, language, location, and occupation, discern in advance whether that person is on the list of individuals that agents are enjoined from stopping? The agents cannot stop first and then check whether the stopped person is one of the covered individuals; at the point of the stop, the challenged harm has already occurred.

We considered an analogous injunction in *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501–02 (9th Cir. 1996). *Easyriders* involved an

injunction intended to prevent Fourth Amendment violations by the California

Highway Patrol (CHP). The injunction applied statewide, rather than only to the

named individual and association plaintiffs. This court explained that due to the

nature of the challenged conduct, the injunction was appropriately tailored:

> The injunction's limitations on the CHP's actions against *all* motorcyclists, instead of an injunction that merely restricts the CHP's citation of the named plaintiffs, is appropriate in this case. . . . While there are only fourteen named plaintiffs in this case . . . and an unknown number of members of Easyriders [the association plaintiff], an injunction against the CHP statewide is appropriate. Because . . . it is unlikely that law enforcement officials who were not restricted by an injunction governing their treatment of all motorcyclists would inquire before citation into whether a motorcyclist was among the named plaintiffs or a member of Easyriders, the plaintiffs would not receive the complete relief to which they are entitled without statewide application of the injunction.

*Id.* 1501–02. Notably, in *Easyriders*, we held that a statewide injunction was

appropriate because it was merely "unlikely" that CHP officers would determine

whether someone was a plaintiff before impermissibly issuing a citation. Here, as

noted, the nature of the challenged misconduct means that the federal agents will

almost certainly not determine whether an individual is a plaintiff (or association

member) before stopping them—and here, it is the detentive stop, not any later

citation or arrest, that is the asserted constitutional violation.

The inadequacy of a list-of-protected-people injunction is multiplied because

the list would have to include all of the members of the plaintiff associations,

which have thousands of members who live or work in the area. Requiring

organizations to share membership lists with Defendants could raise additional constitutional problems regarding the freedom of association and privacy. *Cf. NAACP*, 357 U.S. 449.[14]

In sum, we agree with the district court's conclusion that a district-wide injunction is necessary "to provide complete relief" to each of the Stop/Arrest Plaintiffs "with standing to sue"—including the named individuals and associations. Because the district-wide TRO is necessary to provide complete temporary relief to the Plaintiffs with standing, we conclude that the district court did not abuse its discretion by entering an order that applies throughout its district. *See CASA*, 145 S.Ct. at 2563.[15]

---

[14]   In *Zepeda v. INS*, 753 F.2d 719 (9th Cir. 1983), this court vacated and remanded an injunction that was too broad because it prohibited a challenged practice "not only against the individual plaintiffs before the court, but also against other individuals who are not before the court"—"broad relief" that was "not necessary to remedy the rights of the individual plaintiffs." *Id.* at 729 n.1. The injunction in *Zepeda* is not analogous to the TRO here. To start, the *Zepeda* injunction was far broader, and restricted federal officials' practices with respect to private residences as well as in public. *Id.* at 723. Presumably, it would have been straightforward for federal officials to avoid the named plaintiffs' homes without a broad restriction. More fundamentally, *Zepeda* included only seven individual plaintiffs, not associations, and the district court had denied class certification. *See id.* at 722.

[15]   The TRO might alternatively be permissible as an exercise of the district court's authority to protect its jurisdiction to address the putative class members' claims, before even "provisional" class certification. A district court can "certify[] a provisional class for purposes of [a] preliminary injunction." *Meyer v. Portfolio Recovery Assocs.*, 707 F.3d 1036, 1040 (9th Cir. 2012). Once a "provisional" class

In sum, Defendants have not established that the district court's order likely exceeded the district court's authority to completely protect the named individual and association plaintiffs from the threatened injuries.

### B.   Injury to Defendants

Our second stay inquiry is whether the absence of a stay will irreparably injure Defendants. The burden is on the applicant to show that a stay is necessary to avoid likely irreparable injury. *See Nken*, 556 U.S. at 434.

Here, Defendants have not shown that they are likely to suffer irreparable injury without a stay. The TRO enjoins Defendants only from conducting detentive stops based solely on any combination of a subject's race or ethnicity, language or accent, presence at a particular location, or the type of work, in the Central District

---

is certified, a preliminary injunction may provide relief to all class members. *See Nat'l Ctr. for Immigrants Rights v. INS*, 743 F.2d 1365, 1371 (9th Cir. 1984).

Additionally, the Supreme Court recently held that even before a class is certified— "provisionally" or otherwise—courts "may properly issue temporary injunctive relief to the putative class in order to preserve [their] jurisdiction pending appeal." *A.A.R.P. v. Trump*, 145 S.Ct. 1364, 1369 (May 16, 2025) (per curiam); *see also* 28 U.S.C. § 1651 ("The Supreme Court and all [federal] courts . . . may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.").

Here, because the TRO was warranted to provide complete relief to the named plaintiffs, we need not decide whether the TRO could have been alternatively justified as necessary "to preserve [the district court's] jurisdiction." *See A.A.R.P.*, 145 S.Ct. at 1367. In any event, plaintiffs indicated at oral argument that they may seek provisional class certification in conjunction with their motion for a preliminary injunction. Provisional certification may provide a useful mechanism for tailoring relief at that later stage.

of Los Angeles. Defendants, of course, "cannot reasonably assert that [they are] harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1983).

Defendants also assert that the TRO will have a "chilling effect" on enforcement operations given the threat of contempt for violating the TRO. This argument rests primarily on the premise that the TRO is a vague follow-the-law injunction. Although we agree the TRO's "except as permitted by law" clause created such a problem, this order cures it. Likewise, Defendants can no longer profess to be confused about whether the TRO prohibits them from considering the four factors at all—it does not. Lastly, Defendants argue that, with more time, they will be able to prove that "reasonable suspicion did exist" for some of the stops described in the record. If, as Defendants suggest, they are not conducting stops that lack reasonable suspicion, they can hardly claim to be irreparably harmed by an injunction aimed at preventing a subset of stops not supported by reasonable suspicion. Thus, we conclude that Defendants have failed to establish that they will be "chilled" from their enforcement efforts at all, let alone in a manner that constitutes the "irreparable injury" required to support a stay pending appeal. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974).

In sum, Defendants have not established either of the first two *Nken* stay factors: they have not established that they are likely to succeed on the merits of

58

their appeal, except as to the "as permitted by law" exception, and they have not shown that they will likely be irreparably harmed absent a stay pending appeal. Although these "first two factors of the . . . [stay] standard are the most critical," we briefly address the two final factors. *See Nken*, 556 U.S. at 434.

### C.    Injury to the Plaintiffs

Our third stay inquiry is whether a stay will substantially injure Plaintiffs. As noted, the district court concluded that Plaintiffs were "likely to suffer irreparable harm" without a TRO, because there was a sufficiently "real possibility that irreparable harm will continue absent the instant TRO in place." Defendants have failed to establish that the district court abused its discretion in concluding that Plaintiffs would be irreparably injured without a TRO. *See supra*, Section III.A.2.b. The future injuries from which Plaintiffs seek to be protected are violations of their constitutional rights. "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Warsoldier v. Woodford*, 418 F.3d 989, 1001–02 (9th Cir. 2005) (cleaned up). For the same reasons the district court concluded a TRO was warranted, we conclude that Plaintiffs would be substantially injured if the TRO were stayed pending appeal.

59

### D.    Public Interest

Our final stay inquiry is whether the public interest favors a stay. "[P]ublic interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution." *Preminger v. Pirncipi*, 422 F.3d 815, 826 (9th Cir. 2005) (cleaned up). As Plaintiffs have adequately demonstrated that their constitutional rights would be violated absent the TRO, and Defendants have not established that they will be irreparably harmed if the TRO is not stayed, we conclude that the public interest does not weigh in favor of staying the TRO pending appeal.

### E.    District Court's TRO Proceedings

Finally, we address Defendants' complaint that "any factual findings by the district court were a product of fundamentally unfair procedures," in part because Defendants had only two business days and a holiday weekend to prepare their materials in opposition to the TRO.

That argument is severely undercut by the fact that Defendants had the exact amount of time they requested to file their opposition to Plaintiffs' TRO application. They requested a deadline of Tuesday, July 8, 2025, to file their opposition to both of Plaintiffs' proposed TROs, and the district court adopted that deadline. And, like the emergency stay procedure Defendants are invoking now, the district court's procedure was, by design, expedited and preliminary.

Defendants will have time to gather additional evidence before the preliminary injunction hearing that is set for September 24, 2025. At that point, the district court (and this court, if there is an appeal) will consider afresh whether the record establishes that Plaintiffs are likely to succeed in showing an authorized pattern of detentive stops without reasonable suspicion in the Central District. Alternatively, if Defendants identify evidence that would justify dissolving the TRO before that date, they can move to dissolve it under Rule 65(b)(4).

## CONCLUSION

For the reasons above, we GRANT Defendants' motion to stay as to the "except as permitted by law" clause in paragraph b., and otherwise DENY it.