HYDEE FELDSTEIN SOTO
(SBN 106866)
City Attorney
hydee.feldsteinsoto@lacity.org
VALERIE L. FLORES (SBN 138572)
valerie.flores@lacity.org
MICHAEL J. DUNDAS (SBN 226930)
mike.dundas@lacity.org
MARIA LOUISE COUSINEAU (SBN
122280)
maria.cousineau@lacity.org
RANDALL G. SOMMER (SBN
214099)
randall.sommer@lacity.org
SHUBHRA SHIVPURI (SBN 295534)
shubhra.shivpuri@lacity.org
OFFICE OF THE LOS ANGELES
CITY ATTORNEY
City Hall, 200 N. Spring St., 21st Floor
Los Angeles, CA 90012-4130
Tel.: 213-922-8382; Fax: 213-978-7957

*Attorneys for Intervenor*
*City of Los Angeles*

E. MARTIN ESTRADA (SBN 223802)
martin.estrada@mto.com
DANIEL B. LEVIN (SBN 226044)
daniel.levin@mto.com
JOHN L. SCHWAB (SBN 301386)
john.schwab@mto.com
V. GRACE DAVIS (SBN 336732)
grace.davisfisher@mto.com
V. ROMAN LEAL (SBN 348892)
roman.leal@mto.com
WENDY QIUYU XIAO (SBN 342702)
wendy.xiao@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071
Tel.: 213-683-9100; Fax: 213-687-3702

*Attorneys for Intervenors Cities of Los*
*Angeles, Anaheim, Bell Gardens,*
*Beverly Hills, Carpinteria, Culver City,*
*Huntington Park, Long Beach, Lynwood,*
*Montebello, Monterey Park, Oxnard,*
*Paramount, Pico Rivera, Pomona, Santa*
*Ana, Santa Barbara, Santa Monica,*
*South Gate, and West Hollywood*

NICOLE DAVIS TINKHAM
(SBN 229592)
Chief Deputy
ntinkham@counsel.lacounty.gov
LILIANA CAMPOS (SBN 255753)
Assistant County Counsel
lcampos@counsel.lacounty.gov
BRIGIT GREESON ALVAREZ
(SBN 237301)
Deputy County Counsel
bgreesonalvarez@counsel.lacounty.gov
OFFICE OF THE LOS ANGELES
COUNTY COUNSEL
648 Kenneth Hahn Hall of Admin.
500 West Temple Street
Los Angeles, California 90012-2713
Tel.: 213-808-8736; Fax: 213-633-1915

*Attorneys for Intervenor*
*County of Los Angeles*

MICHELE BEAL BAGNERIS
(SBN 115423)
City Attorney
mbagneris@cityofpasadena.net
ARNOLD F. LEE (SBN 278610)
Chief Assistant City Attorney
aflee@cityofpasadena.net
ANDREW AARONIAN (SBN 318245)
Deputy City Attorney
aaaronian@cityofpasadena.net
OFFICE OF THE CITY ATTORNEY
OF PASADENA
100 N Garfield Ave, Rm N-210
Pasadena, CA 91101
Tel.: 626-744-4141; Fax: 626-744-4190

*Attorneys for Intervenor*
*City of Pasadena*

-1-

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

NORMAN L. EISEN*
Norman@democracydefenders.org
STEPHEN A. JONAS (SBN 542005)
Steve @democracydefenders.org
JOSHUA G. KOLB*
Joshua@democracydefenders.org
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE, Suite 15180
Washington, DC 20003
Tel: (202) 594-9958

*PHV Forthcoming

*Attorneys for Intervenor City of Los
Angeles*

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Pedro VASQUEZ PERDOMO; Carlos Alexander OSORTO; and Isaac VILLEGAS MOLINA; Jorge HERNANDEZ VIRAMONTES; Jason Brian GAVIDIA; LOS ANGELES WORKER CENTER NETWORK; UNITED FARM WORKERS; COALITION FOR HUMANE IMMIGRANT RIGHTS; IMMIGRANT DEFENDERS LAW CENTER, | Case No. 2:25-cv-05605-MEMF-SP |

Plaintiffs,

vs.

Kristi NOEM, in her official capacity as Secretary, Department of Homeland Security; Todd M. LYONS, in his official capacity as Acting Director, U.S. Immigration and Customs Enforcement; Rodney S. SCOTT, in his official capacity as Commissioner, U.S. Customs and Border Patrol; Michael W. BANKS, in his official capacity as Chief of U.S. Border Patrol; Kash PATEL, in his official capacity as Director, Federal Bureau of Investigation; Pam BONDI, in her official capacity as U.S. Attorney General; Ernesto SANTACRUZ JR., in his official capacity as Acting Field Office Director for Los Angeles, U.S. Immigration and Customs Enforcement; Eddy WANG, Special Agent in Charge for Los Angeles, Homeland Security Investigations, U.S. Immigration and Customs Enforcement; Gregory K. BOVINO, in his official capacity as Chief Patrol Agent for El Centro Sector of the U.S. Border Patrol; Jeffrey D. STALNAKER, in his official capacity as Acting Chief Patrol Agent, San Diego Sector of the U.S. Border Patrol; Akil DAVIS, in his official capacity as Assistant Director in Charge, Los Angeles Office, Federal Bureau of Investigation; Bilal A. ESSAYLI, in his official capacity as U.S. Attorney for the Central District of California,

Defendants.

**AMENDED COMPLAINT IN INTERVENTION FOR DECLARATORY AND INJUNCTIVE RELIEF OF INTERVENORS THE CITY OF LOS ANGELES, THE COUNTY OF LOS ANGELES, THE CITY OF ANAHEIM, THE CITY OF BELL GARDENS, THE CITY OF BEVERLY HILLS, THE CITY OF CARPINTERIA, THE CITY OF CULVER CITY, THE CITY OF HUNTINGTON PARK, THE CITY OF LONG BEACH, THE CITY OF LYNWOOD, THE CITY OF MONTEBELLO, THE CITY OF MONTEREY PARK, THE CITY OF OXNARD, THE CITY OF PARAMOUNT, THE CITY OF PASADENA, THE CITY OF PICO RIVERA, THE CITY OF POMONA, THE CITY OF SANTA ANA, THE CITY OF SANTA BARBARA, THE CITY OF SANTA MONICA, THE CITY OF SOUTH GATE, AND THE CITY OF WEST HOLLYWOOD**

Judge: Hon. Maame Ewusi-Mensah Frimpong

-3-

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

Pursuant to Federal Rule of Civil Procedure Rules 15(a) and 24(b), Plaintiffs-Intervenors ("Intervenors") the City of Los Angeles, the County of Los Angeles, the City of Anaheim, the City of Bell Gardens, the City of Beverly Hills, the City of Culver City, the City of Huntington Park, the City of Long Beach, the City of Lynwood, the City of Montebello, the City of Monterey Park, the City of Oxnard, the City of Paramount, the City of Pasadena, the City of Pico Rivera, the City of Pomona, the City of Santa Ana, the City of Santa Barbara, the City of Santa Monica, the City of South Gate, and the City of West Hollywood allege as follows:

1. Since at least June 6, 2025, armed and masked individuals, often without visible credentials or other identification, have conducted unprecedented, illegal, and unconstitutional searches and seizures across the Los Angeles area and neighboring regions within the Central District of California.

2. Defendants have conducted these illegal raids purportedly in support of the federal government's immigration enforcement goals. Yet the sweeping raids are conducted without warrants, without probable cause, and without reasonable suspicion.

3. Eyewitness accounts reveal a disturbing pattern of racial profiling. As one observer described, "They don't care if you have papers, as long as you look like what they want you to look like, they'll take you."[1] A witness to another raid similarly recounted that "if you looked Hispanic in any way, they just took you."[2] Indeed, federal officials have admitted their profiling practices. *See* Aaron Rupar,

---

[1] Travis Schlepp, *ICE agents make arrest at Los Angeles area church*, KTLA 5 (June 11, 2025), https://ktla.com/news/local-news/ice-agents-make-arrest-at-los-angeles-area-church/#:~:text=Community%20members%20and%20religious%20leaders,in%20the%20church%20parking%20lot.

[2] Jasmine Mendez et al., *Immigration raids continue as Trump appears to soften on targeting some workplaces*, L.A. Times (June 15, 2025), https://www.latimes.com/california/story/2025-06-15/los-angeles-immigration-raids-continue.

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Bluesky (July 11, 2025), https://tinyurl.com/pw3cusdc ("Border Czar" Tom Homan asserting that federal agents may detain individuals based on "the location, their occupation, their physical appearance, their accent").

4.    Defendants' pattern of arresting people merely because they appear to be immigrants also reaches U.S. citizens.  In one recent example, immigration officers violently arrested a U.S. citizen and Army veteran—spraying him with pepper spray and kneeling on his neck and back—and then held him in custody for three days without offering any explanation for his arrest.[3]  Defendants arrested U.S. citizen Andrea Velez during another raid, forcibly "lifting [her] off the ground and carrying her away" without explanation; Ms. Velez's only apparent offense was "the color of her skin."[4]  Yet another encounter, shared on social media, showed an ICE agent repeatedly asking Plaintiff Brian Gavidia, a U.S. citizen: "What hospital were you born at?" while detaining him.[5]

5.    Community leaders who have witnessed Defendants' operations have described them as "kidnapp[ings]" and "disappear[ances]" evocative of "a totalitarian regime."[6]

6.    The daily onslaught of armed, unidentified, often masked, and openly hostile forces appearing at workplaces, schools, courthouses, churches, parks,

---

[3] Daniel Trotta, *US citizen says he was jailed for three days after California immigration raid*, Reuters (July 16, 2025), https://www.reuters.com/legal/government/us-citizen-says-he-was-jailed-three-days-after-california-immigration-raid-2025-07-17.

[4] Dani Anguiano, *US citizen arrested during ICE raid in what family describes as 'kidnapping,'* The Guardian (June 26, 2025), https://www.theguardian.com/us-news/2025/jun/26/immigration-ice-raid-andrea-velez.

[5] Jennifer Medina, *'I'm an American, Bro!': Latinos Report Raids in Which U.S. Citizenship Is Questioned*, N.Y. Times (June 15, 2025), https://www.nytimes.com/2025/06/15/us/hispanic-americans-raids-citizenship.html.

[6] Martin Kaste, *As courts review military in LA, immigration enforcement accelerates*, NPR (June 19, 2025), https://www.npr.org/2025/06/19/g-s1-73569/as-courts-review-military-in-l-a-immigration-enforcement-accelerates.

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

homes, baseball games, neighborhoods, and other public and private places where families and other residents live, work, worship and recreate has reverberated across the region.  This has left many of Intervenors' residents, regardless of immigration status, frightened to go to work, shop, visit, recreate, pray, study, seek Intervenors' services, or even venture outside or engage in normal daily activity.

7.    There is good reason for such fear.  Defendants' choice to appear on city streets or in other public spaces in force, visibly armed, in masks and driving unmarked vehicles, radically increases the chance of violent encounters, whether with frightened residents, including citizens, or local law enforcement called to the scene.  Even federal actions that have *not* ended with arrest or detention have resulted in physical harm to citizens from tear gas, physical force, and battery.

8.    The primary goal of Defendants' campaign is not immigration enforcement.  Defendants have been crystal clear that they seek to make an example of Intervenors for implementing policies that President Donald J. Trump dislikes. The President announced on his social media platform, Truth Social, that he was calling on federal immigration officials "to do all in their power" to effect "the single largest Mass Deportation Program in History" in "Democratic Power Center[s]" "such as Los Angeles."[7]  As Secretary of Homeland Security Kristi Noem put it: "We are not going away.  We are staying here to liberate this city from the socialist and burdensome leadership that this Governor Newsom and this mayor placed on this country and what they have tried to insert into this city."[8]

---

[7] Camilo Montoya-Galvez, *Trump directs immigration authorities to prioritize deportations in Democratic-run cities*, CBS News (June 16, 2025), https://www.cbsnews.com/news/trump-directs-ice-deportations-democratic-run-cities.

[8] Helen Jeong, *Kristi Noem blames Democratic officials for making ICE raids in LA harder*, NBC Los Angeles (June 12, 2025), https://www.nbclosangeles.com/news/local/kristi-noem-blames-democratic-officials-for-making-ice-raids-in-la-harder/3722800.

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

9.    Defendants have shown no intention of stopping their unlawful assault. Defendant Noem responded to the District Court's July 11 Temporary Restraining Order with open defiance, describing the District Court as an "idiot" and declaring that "none of our operations are going to change."[9]  Indeed, on August 6, 2025, Defendants executed a "Trojan Horse" raid in which a driver drove a Penske truck to a Home Depot, asked for workers, and then had several agents descend from the back of the truck and sweep up 16 individuals.[10]  One Defendant bragged about the operation, saying:  "For those who thought Immigration enforcement had stopped in Southern California, think again."[11]

10.    Defendants' agents also recently marched through MacArthur Park in tactical gear, including past a playground filled with children at a summer day camp.[12]  "Better get used to us now, cause this is going to be normal very soon," Defendant Gregory Bovino told a reporter.[13]  "We will go anywhere, anytime we want in Los Angeles."[14]  Defendant Bovino suggested Defendants "may well go

---

[9] NBC News, *DHS Secretary Kristi Noem calls California judge an 'idiot' over immigration detention ruling* (July 12, 2025), https://www.youtube.com/shorts/8iuX7hhiJMc.

[10] Nathan Solis et al., *Federal agents use Penske rental truck as 'Trojan Horse' to raid Los Angeles Home Depot*, L.A. Times (Aug. 6, 2025), https://www.latimes.com/california/story/2025-08-06/more-raids-home-depot-in-macarthur-park-raided.

[11] *Id.*

[12] Michelle Krupa et al., *Tensions are rising in Southern California over immigration raids.  Here's what we know*, CNN (July 13, 2025), https://www.cnn.com/2025/07/11/us/california-immigration-raids-la-wwk.

[13] Jill Cowan & Mimi Dwyer*, Federal Agents March Through L.A. Park, Spurring Local Outrage*, N.Y. Times (July 7, 2025), https://www.nytimes.com/2025/07/07/us/la-macarthur-park-immigration.html.

[14] *Id.*

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

back to MacArthur Park or other places in and around Los Angeles," as "[i]llegal aliens had the opportunity to self deport, now we'll help things along a bit."[15]

11.    Defendants' unwarranted and unlawful actions have severely impacted the ordinary functioning of Intervenors' communities, with serious consequences for Intervenors' ability to maintain law and order.  Defendants are carrying out the roving immigration raids without any notice to local law enforcement, thus forcing Intervenors' law enforcement officers to divert their limited resources to determine whether armed individuals exiting unmarked vehicles are masked, unidentified federal agents—or masked, unidentified criminals.[16]  And when the federal agents are gone, law enforcement is left to "deal with the aftermath" of raids, "including protests and questions from residents about what exactly happened."[17]

12.    The trust and relationships that Intervenors and local law enforcement agencies have built with local communities, and immigrant communities in particular, have been deeply undermined by Defendants' unlawful raids, especially when impacted residents confuse the unlawful conduct of Defendants' agents with the conduct of local first responders.[18]  Protestors and people subject to Defendants' unlawful raids have mistaken not only Intervenors' police officers, but also social workers, firefighters, and building inspectors, for federal agents and have confronted them with accusations, threats, and non-cooperation.  And local prosecutors have reported having difficulties prosecuting cases because undocumented immigrant

---

[15] *See* Melissa Gomez et al., *Heavily armed immigration agents descend on L.A.'s MacArthur Park*, L.A. Times (July 7, 2025), https://www.latimes.com/california/story/2025-07-07/immigration-agents-descend-on-macarthur-park.

[16] Nathan Solis & Richard Winton, *'Who are these people?' Masked immigration agents challenge local police, sow fear in L.A.*, L.A. Times (June 24, 2025), https://www.latimes.com/california/story/2025-06-24/masked-immigration-agents-local-law-enforcement-tension.

[17] *See id.*

[18] *See id.*

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

witnesses are afraid to appear in county courthouses, which Defendants are using as staging grounds for federal immigration enforcement.

13.    Beyond the direct impacts on local law enforcement, Defendants' illegal activities have broadly harmed Intervenors' economies and financial health. Local businesses in Intervenors' jurisdictions have been devastated because their employees and their customers are afraid to leave their homes.  Intervenors have lost and are continuing to lose meaningful tax revenue, in addition to bearing the increased costs resulting from the increased demands on local law enforcement. Intervenors have also incurred tens of millions of dollars in direct, additional costs, including overtime and other unanticipated expenses resulting from Defendants' unlawful activities.

14.    Intervenors have sole responsibility for local affairs and certain core public functions, including providing for public safety, public services, and the health and welfare of the residents within their municipal boundaries.  Defendants' actions are a direct attack on, and an impediment to, each Intervenor's ability to carry out those duties.

15.    Each Intervenor is a local jurisdiction with compelling interests in the subject matter of this litigation.  Nine Intervenors are charter cities (Anaheim, Culver City, Long Beach, Los Angeles, Pasadena, Pomona, Santa Ana, Santa Barbara, and Santa Monica).  Twelve are general law cities (Bell Gardens, Beverly Hills, Carpinteria, Huntington Park, Lynwood, Montebello, Monterey Park, Oxnard, Paramount, Pico Rivera, South Gate, and West Hollywood).  Most of the cities are located within the jurisdiction of Intervenor the County of Los Angeles, which is the most populous county in the United States.  Anaheim is the most populous city and Santa Ana is the third most populous city within Orange County, Oxnard is the most populous city within Ventura County, and Carpinteria and Santa Barbara are located within Santa Barbara County.

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## JURISDICTION AND VENUE

16. This Court has federal question jurisdiction under 28 U.S.C. § 1331. The Court also has authority to award declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201–2202.

17. Defendants do not have immunity. *See, e.g.*, 5 U.S.C. § 702; *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689–90 (1949); *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 526 (9th Cir. 1989).

18. Venue is proper under 28 U.S.C. § 1391(e)(1) because Defendants are officers or employees of the United States and at least one Plaintiff resides in this District; a substantial part of the events or omissions giving rise to the claims occurred in this District; and/or because at least one Defendant resides in this District.

## PARTIES IN INTERVENTION

19. Allegations regarding the parties in Plaintiffs' First Amended Petition and Complaint (the "Lead Complaint"), ECF No. 16, ¶¶ 12–32, are incorporated herein by reference.

### Intervenor-Plaintiff the City of Los Angeles

20. Intervenor-Plaintiff the City of Los Angeles is a municipal corporation organized and existing under the laws of the State of California and is a charter city pursuant to Article XI of the California Constitution.

21. The principal law enforcement agency of the City of Los Angeles is the Los Angeles Police Department ("LAPD"). The mission of the LAPD is to safeguard the lives and property of the people it serves, to reduce the incidence and fear of crime, and to enhance public safety while working with the diverse communities of Los Angeles to improve Angelenos' quality of life. LAPD works in partnership with the people and organizations within Los Angeles to solve local problems that affect public safety.

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

22. Historically, LAPD has received notice of large-scale, federal immigration enforcement efforts.

23. Defendants launched the current immigration raids without notice to, or coordination with, the LAPD.

24. As a result, LAPD officers have experienced confusion as to whether an individual conducting a raid is, in fact, a federal agent.

25. LAPD has had to divert resources to responding to and managing the fallout from federal enforcement efforts. Since June 6, 2025, LAPD has devoted more than 10,000 personnel (measured in days of deployment) and has spent more than $27.8 million in total costs in responding to and managing the fallout from Defendants' actions, including in receiving and responding to numerous 911 calls or other reports about federal raids or other reports of "crimes" that turned out to be federal immigration enforcement actions.

26. The relationships that LAPD has built with Angeleno communities, including immigrant communities, have been and continue to be harmed by Defendants' unlawful enforcement actions. LAPD officers have been confused for federal agents, and accused by Angelenos of aiding federal agents. Victims of crimes are hesitant to speak to local law enforcement investigators due to fears that investigators knocking on their doors may actually be federal agents.

27. The warrantless arrests of individuals in Los Angeles, including in and around courthouses, interferes with Los Angeles' ability to protect and to obtain cooperation from its immigrant communities. For example, victims of crimes have reported being afraid to come to court or otherwise cooperate with law enforcement due to concerns about federal immigration enforcement.

28. Defendants' actions have also chilled economic activity in Los Angeles. Ridership for DASH, Los Angeles' public bus service, has declined across the City, with downtown DASH ridership for June 2025 down 35% from the prior year. Restaurants, retail businesses have emptied out. Owners report declines in

-11-

sales and employees who are not showing up for work.  Some businesses are reporting up to 75% declines in foot traffic and sales.  Los Angeles has lost both sales and business tax income as a consequence.

**Intervenor-Plaintiff the County of Los Angeles**

29.    Los Angeles County is a subdivision of the State of California, and one of its original 27 counties, ratified under the first County Charter in 1912.  It has the largest population of any county in the United States at over 10 million residents—who comprise more than one quarter of California's population—and is the nation's largest county government, with more residents than most states.  The County covers 4,084 square miles, and more than one million residents live in unincorporated areas outside of the County's eighty-eight cities.  Close to 49% of County residents are of Hispanic or Latino origin, with another 16.4% of Asian, Native Hawaiian, or Pacific Islander origin, 9% Black, and 25.3% of White or Non-Hispanic origin.  As of February 2025, the County budget exceeds $49 billion in federal, state, and local funds to support a range of vital commitments including, but not limited to, healthcare, public safety, public benefits, workforce development, foster care, child support, housing and emergency management.

30.    Since June 7, 2025, federal immigration agents have conducted large-scale and frequent raids across the County in public parks and streets, hospitals, private homes, businesses, swap meets, parking lots, and in front of courthouses, among a multitude of other locations that impact virtually every facet of life for County residents.

31.    Video footage and eyewitness accounts of these raids reveal that federal immigration agents typically have not shown judicial, or even administrative, warrants when conducting their operations.  Some of the individuals detained, questioned, and arrested in these operations are U.S. citizens or hold valid immigration status; federal agents presumably did not have reasonable suspicion or probable cause to suspect immigration violations in at least these cases, and perhaps

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

even in many cases of those without legal status.  One such encounter, which was shared in social media, included an ICE agent repeatedly asking a twenty-nine-year-old Hispanic man, who is a U.S. citizen: "What hospital were you born at?" while temporarily detaining him.

32.    Video footage and eyewitness accounts also indicate that federal immigration agents often wear masks and plainclothes and do not identify themselves during these raids, heightening fear and tension among County residents who are investigated or detained, as well as bystanders and others who learn of these raids through the media accounts, word of mouth, and social media posts.

33.    The vast majority of County residents targeted by these raids are of Hispanic or Latino origin, followed by members of the Asian and Pacific Islander communities.

34.    As a result of the federal immigration raids, large numbers of Latino and other residents have become fearful of leaving their homes to go to work, take public transportation, access County services including medical services, access open public programs and resources, and even attend appointments with immigration lawyers and legal service providers funded by the County.

35.    The masked, unidentified federal agents have created such a climate of fear, mistrust, and suspicion that County employees ranging from Los Angeles County Sheriff's Department's deputies to social workers have been mistaken for federal agents and confronted with vandalism of their vehicles, verbal accusations, harassment, and threats, as well as non-cooperation.

36.    This confusion and mistrust also impacts public safety because victims and witnesses are unwilling to cooperate with Sheriff's deputies.  In addition, due to its expanded duties resulting from the public outcry against the large-scale federal immigration raids, the Sheriff's Department has incurred over $9 million in additional costs since Defendants' immigration raids began in June.

-13-
INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

37.     Public fear of federal immigration agents also has disrupted the work of social workers in the County's Department of Children and Family Services ("DCFS") and Department of Aging & Disabilities, preventing them from protecting the County's most vulnerable residents: children and elders.  As one example, DCFS operates a Multi-Agency Response Team ("MART") that helps provide emergency protective services to children in imminent danger from illegal gangs, guns, and drugs.  In cooperation with local law enforcement, MART protects children in "intelligence sensitive" child endangerment cases.  On June 16, 2025, the Sheriff's Department requested MART's presence in executing a warrant.  During the execution of the warrant, a crowd gathered and shouted profanities at the DCFS MART social worker, making statements showing that they believed DCFS workers were, or were helping, federal immigration enforcement agents.  Despite the social worker's showing a DCFS identification card, several individuals in the crowd continued to mistakenly believe that MART staff were associated with federal immigration authorities.  Following those events, to reduce the risk to DCFS staff, DCFS altered its procedures and began instructing its staff to meet law enforcement at their precincts, instead of meeting them in the community.  These changes in protocol have resulted in delays in services and greater trauma to children served by DCFS.

38.     These fears have forced other County departments, including but not limited to the Department of Consumer and Business Affairs and the Department of Public Health, to shift resources away from established priorities to assist County employees and affected residents attempting to navigate the current climate. County officials have had to dedicate limited resources to reestablish trust with the community and to create events that address the current fears in the community. This has resulted in fewer resources being dedicated to various programs and strategic plans benefiting the public.

-14-
INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

39. These fears have also curtailed usual services to residents from County field workers deterred from carrying out their services by the prospect of being subject to the improper immigration enforcement tactics themselves.

40. Furthermore, the current climate of fear instilled on the immigrant community has resulted in fewer people willing to file formal complaints with County officials including those relating to instances of fraud and abuse.

41. These fears pose significant personal and public health risks, with the cancellation and no-show rates across the County's health systems increasing after June 8, 2025 for a wide range of critical health services, and the number of patients seen at County public health clinics falling year-over-year in June 2025 by 25%. As a result, low-level health problems may become severe if left untreated, with individuals, families, and their wider communities ultimately paying the price in communicable diseases and chronic health conditions. Not only do such widespread negative health consequences threaten all of us, but they strain a health care safety net already under threat.

42. The federal immigration raids' disregard for probable cause, reasonable suspicion, and warrant requirements have also had a chilling effect on the economic life of the County, similar to the impact of the COVID-19 shutdown in 2020, and have affected County tax revenues accordingly.[19]

43. Immigration raids in Los Angeles County have occurred at a clothing wholesaler where individuals were shopping, at a taco stand, and on County streets. Many immigration raids have been recorded and shared on social media, heightening the fear in Latino communities in particular of participating in regular day-to-day activities.[20] As a result, food vendors, retailers, and even historic

[19] Jesus Jiménez et al., *'Completely Disrupted': Fear Upends Life for Latinos in L.A.*, N.Y. Times (June 30, 2025), https://www.nytimes.com/2025/06/30/us/latinos-los-angeles-immigration.html.

[20] *Id.*

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

landmarks and tourist sites have seen decreases in business. Some residents no longer shop at corner stores and stay holed up in their homes. In addition to the public safety, public health, and economic impacts, civic life and activities throughout the County have also been diminished as a result of the raids. Because of the pervasive fear and insecurity the raids have engendered, the County's Department of Parks and Recreation has had to cancel multiple concerts and events, including its Fourth of July celebration.

## Intervenor-Plaintiff the City of Anaheim

44. Intervenor-Plaintiff the City of Anaheim is a municipal corporation organized and existing under the laws of the State of California, is a charter city pursuant to Article XI of the California Constitution, and is located in Orange County. It has a population of approximately 360,000 residents. Over 50% of the City's population is Hispanic/Latino.

45. Unlawful immigration enforcement activities have occurred at locations within Anaheim, destabilizing local families, neighborhoods and the City's economic activity. Local business owners have been impacted when unlawful immigration enforcement operations detain employees or frighten employees away from their jobs and stores.

46. Some community members are afraid to leave their homes, take their children to school, go to medical appointments, or visit businesses to buy groceries and household items. As such, residents' fear of unlawful enforcement and arbitrary detention negatively affects businesses in Anaheim and depresses tax revenue derived from such activities.

47. The illegal enforcement also wastes and misdirects other city investments in the community. For example, Anaheim operates three Family Resource Centers, at which staff assess the family needs of local residents, coordinate human services, distribute food and other necessities, and provide bilingual programs and supportive services for local families. Anaheim has

-16-
INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

observed a significant reduction in the number of residents using the resource centers after commencement of Defendants' unlawful immigration enforcement activities.  City resources go unused and are wasted because residents are fearful of seeking them.

48.    Anaheim has also observed that fear of unlawful immigration enforcement has motivated some residents to avoid public transportation, which further inhibits their access to services and participation in the City's economy.

**Intervenor-Plaintiff the City of Bell Gardens**

49.    Intervenor-Plaintiff the City of Bell Gardens is a municipal corporation, duly organized and existing as a general law city under the laws of the State of California, and is located in the County of Los Angeles.  It has a population of approximately 38,000 residents.  Approximately 96% of the population is Latino.

50.    Federal immigration raids have occurred throughout Bell Gardens by masked, armed agents in unmarked vehicles.  As a result, the Bell Gardens Police Department has had to monitor suspected federal immigration activity and attempt to confirm the legitimacy of individuals in masks, unmarked vehicles, and in plain clothes.

51.    The relationship between the Bell Gardens Police Department and the community has suffered due to the federal immigration raids, as there are community concerns that the Bell Gardens Police Department is cooperating with federal immigration agencies.  At times, Bell Gardens Police Department officers have been mistakenly identified as federal immigration enforcement officers.

52.    Significant Bell Gardens resources have been diverted as a result of the raids.  The Bell Gardens Police Department expended approximately $25,000 to address resident protests of the raids at a major intersection in Bell Gardens, Eastern Avenue and Florence Avenue  Other Bell Gardens resources, including the City Manager's Office, City Council, City Attorney, City Clerk, Public Works, and Finance/Administration have been diverted to develop and promote material that

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

presents facts and resources and eases community fears. The expenditure of those resources has led Bell Gardens to incur additional expenses of approximately $60,000.

53.    After the federal immigration raids began in Bell Gardens and the greater Los Angeles region, the Bell Gardens Recreation/Community Services Department saw a 70% decline in attendance at City events. The decline led Bell Gardens to cancel all public events during the month of July, including a large-scale Independence Day Celebration. Deposits have been lost for multiple vendors.

54.    Bell Gardens has also experienced decreased revenue as a result of the federal immigration raids. As just one example, the Parkwest Bicycle Hotel and Casino experienced a monthly revenue decline of 10% in June 2025 compared to May 2025, resulting in a corresponding decrease in City General Fund revenues of $148,000. Additionally, the Bell Gardens trolley service ridership decreased by approximately 40% and the dial-a-ride program ridership decreased by 14% in June 2025 compared to June 2024.

**Intervenor-Plaintiff the City of Beverly Hills**

55.    Intervenor-Plaintiff the City of Beverly Hills is a municipal corporation, duly organized and existing as a general law city under the laws of the State of California, and is located in the County of Los Angeles.

56.    Beverly Hills is a global destination and premier destination for travel and tourism, attracting more than five million visitors a year. It is known domestically and internationally for its hotels, retail shopping, restaurants, and entertainment. Iconic destinations in Beverly Hills include Rodeo Drive, the Beverly Hills Hotel, and flagship luxury boutiques. Beverly Hills hosts one of the largest concentrations of Forbes Five-Star and AAA Five-Diamond properties in the United States.

57.    Federal immigration raids in the region, including in the neighboring cities of West Hollywood and Los Angeles, have economically impacted Beverly

-18-

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Hills. International visitors and hotel occupancy have decreased compared to last year. The General Manager of one of Beverly Hills' Forbes Five-Star hotels informed attendees at a media event in New York that its hotel was seeing cancellations of bookings after mass protests against the federal immigration raids across Los Angeles in June. Beverly Hills has experienced a loss of sales tax and transient occupancy tax revenue as a result of the federal immigration raids.

58. Tourism is not the only industry impacted in Beverly Hills. Construction contractors have informed the City that some workers are not coming to work due to concerns of being detained or physically injured by federal agents. The federal immigration raids have also impacted the operations of Beverly Hills' Building and Safety Department, as Building Inspectors have experienced delays on inspections, including delays caused by laborers fleeing construction sites after mistaking the Building Inspectors for federal agents.

59. Beverly Hills has deployed significant numbers of Beverly Hills Police Department and Department of Public Works personnel to respond to public demonstrations, including a June 14, 2025 demonstration along one of Beverly Hills' major corridors, Santa Monica Boulevard.

**Intervenor-Plaintiff the City of Carpinteria**

60. Intervenor-Plaintiff the City of Carpinteria is a municipal corporation, duly organized and existing as a general law city under the laws of the State of California, and is located in the County of Santa Barbara.

61. In July 2025, federal agents conducted three separate enforcement actions in Carpinteria, resulting in the arrest of at least a dozen individuals. These operations, often conducted by plains clothes agents in unmarked vehicles, have raised serious concerns about the legality and conduct of federal agents operating in the city and created a pervasive sense of fear in the community.

62. Residents across the City have reported that individuals of Latino or Hispanic heritage have been stopped and detained during the series of raids that

-19-

have occurred, regardless of citizenship or legal immigration status.  Specifically, at least two people were detained at the parking lot of Carpinteria's Smart & Final on July 7.  One person was also detained in a residential neighborhood near El Carro Park on July 8.  In the July 8 instance, videos show one of the alleged ICE agents breaking the driver's side window of a landscaping truck when the man inside did not roll down the window.  In both the July 7 and July 8 instances, the alleged agents were wearing plain clothes with tactical vests labeled "POLICE" and/or "ERO" and were in unmarked vehicles.  These encounters appear to have been conducted without any clear or individualized suspicion, suggesting that agents lacked the specific, articulable facts required to justify such seizures.

63.     The most aggressive action occurred on July 10, 2025, when at least 10 farmworkers were detained during a raid on Glass House Farms, a cannabis operation on Casitas Pass Road right outside City limits in Ventura County.  According to witnesses at the scene, including State Senator Monique Limón and Congressman Salud Carbajal, the agents included a mix of National Guard and ICE agents, with some wearing military-style camouflage uniforms and bulletproof vests, and others wearing t-shirts and jeans under tactical vests.  Vehicle checkpoints with armored vehicles were also set up at Casitas Pass Road and Highway 192/Foothill Road, and at Highway 150 and Foothill Road/Highway 192, further escalating the sense of militarized enforcement.  Agents—many of whom wore face coverings—deployed flash-bang and smoke grenades indiscriminately at a crowd of peaceful civilian protesters gathered near the greenhouses.  Carpinteria City Councilwoman Mónica Solórzano said she was injured when agents deployed flash-bang grenades and pushed back the crowd without warning.

64.     During this federal immigration raid, which occurred in Ventura County just outside Carpinteria City limits, one farmworker, Jaime Alanis, fell over 30 feet from a greenhouse roof, broke his neck and skull, and later died in the

-20-

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

hospital where he was being treated. As a result of the July 10 actions, several children—some as young as 10 months old—have been left without their parents.

65. The economic and social consequences of these raids have been immediate and severe. Residents have reported being afraid to go to work, shop for groceries, or even put gas in their cars within Carpinteria. Residents have also reported a sense of community distrust of law enforcement due to these raids, making it more difficult for the Santa Barbara Sheriff's Office (which contracts with the City to provide law enforcement services) to perform their duties. This climate of fear is not only disrupting daily life but also threatening the stability of the region's $4 billion agricultural industry.

66. After receiving a multitude of anecdotal evidence suggesting that these raids have disrupted business operations, workforce availability, and customer activity across the region to the detriment of commerce and community well-being, the Santa Barbara South Coast Chamber of Commerce and Visit Santa Barbara released a survey in late July to better understand the economic impact of the raids. The results of this survey show that, of the 31 business respondents that identified as operating within the City of Carpinteria, 39% have been directly impacted by recent immigration enforcement to a "significant" or "moderate" degree, with 23% of respondents having experienced a "significant decrease" in customer traffic, revenue, or sales believed to be a result of immigration enforcement activity. Twenty-three of the 31 business respondents reported impacts including drops in customer activity, revenue loss, increased employee anxiety, or cancelled contracts or projects, and 5 of the 31 business respondents reported losing between 10 and 40 employee hours as a result of immigration enforcement activity.

67. Community participation has also declined sharply. Attendance at public events and festivals has dropped significantly in the last month. For example, the annual three-day St. Joseph Church Festival, which drew approximately 10,000 attendees last year, saw only about 8,000 attendees this year. This drop reflects a

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

broader erosion of public trust and safety, as residents increasingly avoid public spaces out of fear of arbitrary detention. If allowed to continue, this erosion of public trust will continue to damage the region's economy, diminish use of public services, and jeopardize the ability of local law enforcement to protect public safety.

**Intervenor-Plaintiff the City of Culver City**

68. Intervenor-Plaintiff the City of Culver City is a municipal corporation organized and existing under the laws of the State of California and is a charter city pursuant to Article XI of the California Constitution.

69. Federal immigration raids have occurred throughout Culver City since late May 2025, including at Culver City Express Hand Car Wash[21] and on Culver City's streets by masked individuals who lack arrest warrants.[22]

70. As a direct result of federal agents using unmarked vehicles, masks, tactical gear, and personnel without visible identification or federal markings, Culver City has been forced to divert resources to address community safety concerns. For example, the Culver City Police Department now must monitor any suspected federal enforcement activity in the City and, when possible, confirm the identity and legitimacy of individuals claiming to act as federal agents.

71. Culver City businesses have experienced significant negative economic impacts due to federal immigration enforcement activities. For example, the week of June 23, 2025 was the first week in 2025 where visits to the Culver City Westfield Mall were down all seven days of the week, across all hours of the day.

---

[21] Suhauna Hussain, *"They are grabbing people." LA and Orange County car wash workers targeted by federal immigration raids*, L.A. Times (June 11, 2025) https://www.latimes.com/business/story/2025-06-11/l-a-orange-county-car-washes-hit-by-ice-raids.

[22] Vivian Chow, *Community outraged after ice cream vendor detained by immigration agents in Culver City*, KTLA News (June 25, 2025). https://ktla.com/news/local-news/community-outraged-after-ice-cream-vendor-detained-by-immigration-agents-in-culver-city/.

-22-

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

The Westfield Mall generates a significant portion of Culver City's retail sales tax revenue.

### Intervenor-Plaintiff the City of Huntington Park

72.    Intervenor-Plaintiff the City of Huntington Park is a municipal corporation, duly organized and existing as a general law city under the laws of the State of California, and is located in the County of Los Angeles.  It has a population of approximately 58,000.  More than 97% of the City's residents identify as Hispanic or Latino, and approximately half were born outside of the United States.  Huntington Park prides itself on its longstanding connection to the Hispanic/Latino community.

73.    Huntington Park has been a hotbed for unlawful immigration enforcement activities, often carried out without warrants.  To name just a few examples, on June 9, 2025, federal agents conducted a raid in the parking lot of a Huntington Park Home Depot, during which they arrested approximately ten day laborers.  Agents wore masks and failed and/or refused to identify themselves during the course of the arrests. [23]

74.    On June 12, 2025, federal agents, accompanied by Defendant Department of Homeland Security Secretary Kristi Noem, TV personality Dr. Phil, and a film crew, raided the home of a pregnant U.S. citizen and her children with guns drawn.  While this raid was in progress, federal agents simultaneously raided another house across the street.[24]

---

[23] Jory Rand, Demonstrators protest after raid at Huntington Park Home Depot, ABC7 (June 10, 2025), https://abc7.com/post/demonstrators-protest-raid-huntington-park-home-depot/16711032/; Tyler Shaun Evains, *Southeast LA officials denounce ICE raids after arrests at Huntington Park Home Depot*, Daily Breeze (June 9, 2025), https://www.dailybreeze.com/2025/06/09/southeast-la-officials-denounce-ice-raids-after-arrests-at-huntington-park-home-depot/.

[24] Ruben Vives, *Huntington Park resident describes illegal immigration enforcement operation*, L.A. Times (June 12, 2025), https://www.latimes.com/00000197-66a1-df7d-a7ff-f7fd577c0000-123; Mekahlo Medina * Helen Jeong, *How U.S. citizen in Huntington Park found DHS Sec. Kristi*

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

75.    On June 27, 2025, masked federal agents destroyed a wrought iron door and window while forcibly entering a residence.  The agents used a "flash bang" in the course of their entry and failed and/or refused to identify themselves.  The only occupants present when approximately nine federal agents entered the home with their rifles drawn were a young mother and her two children.  No arrests were made.[25]

76.    The unlawful federal enforcement actions have been detrimental to the relationship of trust, respect and communication between the Huntington Park Police Department and Huntington Park residents.  That relationship is essential to protect the public health, safety, and general welfare.  On information and belief, there has been an overall reduction in crime reporting throughout the City since the federal immigration raids began, undermining local law enforcement efforts.

77.    Further undermining local law enforcement efforts, the Huntington Park Police Department has also been required to expend resources investigating individuals impersonating federal officers.  In one instance, City police officers arrested an individual whom they initially believed to be an undercover federal agent but later learned to be a member of the public posing as a border patrol agent

---

*Noem at her door*, NBC Los Angeles, (June 12, 2025), https://www.nbclosangeles.com/news/local/how-u-s-citizen-in-huntington-park-found-dhs-sec-kristi-noem-at-her-door/3722903/.

[25] Amy Powell, *Federal agents blast door off, shatter window during raid in Huntington Park*, ABC7 (June 27, 2025), https://abc7.com/post/federal-agents-blast-door-off-shatter-window-during-raid-huntington-park-home-children-inside/16867990/; Lauren Coronado & Jonathan Lloyd, *Video shows federal agents blast their way into Huntington Park home*, NBC Los Angeles, (June 27, 2025), https://www.nbclosangeles.com/news/local/huntington-park-border-patrol-agents-door-explosion/3734095/.

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

in possession of formal border patrol documents, a list of purported illegal immigrants, and loaded firearms and ammunition.[26]

78.    Huntington Park has also received an influx of reports of unmarked vehicles and suspicious persons believed to be federal agents, each requiring an otherwise unnecessary expenditure of resources in the form of a police response and/or investigation, all of which revealed no criminal activity.  To restore public trust, the Huntington Park Police Department now requires that: (1) officer(s) and a supervisor be dispatched to any request for assistance with validating the official status of federal agents; (2) officers attempt to verify the official status of apparent federal agents any time they are observed in public; and (3) a formal report be made about any interaction with federal agents.  The Huntington Park Police Department has further been required to develop policies specifically designed to protect ICE agents in the event of an unruly or hostile crowd.

79.    The federal immigration raids have resulted in mass hysteria, panic, and fear amongst Huntington Park's residents.  Numerous businesses have shuttered and/or started operating on an "appointment only" basis.  Participation in community events, including City-sponsored gatherings, has also diminished, as has City residents' use of public facilities and transportation services.  Among other things, the City was forced to cancel its planned Independence Day celebration due to a lack of attendance, including a celebratory drone show.  The City has also been forced to cancel its weekly community movie nights and regularly scheduled, city-sponsored yard sale, which required the City to refund each of the vendors that had committed to participate.

80.    This severe reduction in commerce and palpable increase in residents staying home has diminished business revenue, employment, and overall economic

---

[26] Lily Dallow, *L.A. Man with previous human smuggling arrest may have been impersonating ICE agent*, KTLA (June 27, 2025), https://ktla.com/news/local-news/l-a-man-arrested-in-huntington-park-for-possibly-impersonating-federal-agent/.

-25-

growth in Huntington Park.  In turn, Huntington Park has been deprived of monies upon which it depends to meet its municipal obligations, including but not limited to sales tax revenue.

**Intervenor-Plaintiff the City of Long Beach**

81.    Intervenor-Plaintiff the City of Long Beach is a municipal corporation organized and existing under the laws of the State of California and is a charter city pursuant to Article XI of the California Constitution.

82.    Federal immigration actions have taken place in areas frequented by Long Beach residents, including Home Depots, transit stops, churches, and parking lots.  Long Beach has received multiple reports of increased community fear, deterrence from reporting crimes, and avoidance of public spaces and municipal services by Long Beach's large immigrant population.

83.    The Long Beach Police Department's law enforcement efforts have been undermined by the widespread fear in immigrant communities caused by the federal immigration actions.  Residents hesitate to contact the Long Beach Police Department to report crimes, act as witnesses, or seek help.  This erosion of trust hinders community policing efforts and directly threatens public safety.

84.    Long Beach has diverted staff and resources from the City Manager's Office, the Office of Equity, and the City Prosecutor's Office to conduct public education, host multilingual "know your rights" workshops, and facilitate coordination with legal service providers and community-based organizations to protect residents from unlawful stops, arrests, and removals.

**Intervenor-Plaintiff the City of Lynwood**

85.    Intervenor-Plaintiff the City of Lynwood is a municipal corporation, duly organized and existing as a general law city under the laws of the State of California, and is located in the County of Los Angeles.  Over 88% of the City's population is Latino.

-26-

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

86. Unlawful immigration enforcement activities have occurred at numerous locations throughout Lynwood. Defendants' unlawful federal immigration enforcement has spread fear, confusion, and distress across the Lynwood community. Lynwood residents—even those that have lived in the city for decades—feel unsafe going outside to engage in everyday activities, such as commuting to work, taking their children to school, and attending community events due to concerns that they could be arbitrarily confronted and assaulted by federal agents.

87. Federal immigration actions have occurred at various commercial and residential locations within Lynwood. Lynwood depends on local taxes to fund its municipal operations. Federal immigration enforcement has harmed and produced chilling effects on Lynwood businesses. Businesses are experiencing declines in sales or simply shutting down, which affects Lynwood's tax revenues.

88. Lynwood contracts with the Los Angeles County Sheriff's Department for law enforcement services and is responsible for costs associated with the Sheriff Department's presence within the City.

89. Lynwood's relationship with its community has suffered because of the unlawful immigration enforcement activity. According to the Sheriff's Department, its deputies have been erroneously accused on social media of cooperating with federal agents, thus eroding trust in the Department. Lynwood staff resources, including its Department Directors, Senior Management Analyst, and City Manager, as well as contract communications support, have been diverted to develop and promote material that presents facts and eases community fears regarding the federal immigration enforcement actions.

90. Since the events and subsequent unlawful immigration activities throughout the region, fearful residents have held protests and appeared at Lynwood City Council meetings to share their sincere fear for the safety of the immigrant community in Lynwood. These events require Sheriff's deputies to be diverted

-27-

from their normal assignments to provide protection and to ensure general community safety.

91.    Lynwood prides itself on providing a range of first-class recreational, social, and civic resources to its residents.  These include, among other things, a senior center, youth programs, and other community events.  Participation in City events has decreased since the recent events conducted by federal agents and personnel, including an annual City-sponsored Independence Day celebration and Movies in the Park activities.  The drop in attendance in these Lynwood events is attributable to fears of unlawful immigration enforcement activity at these public locations.

92.    In an effort to counter the harm caused by the unlawful immigration enforcement activities, Lynwood's City Council has publicly condemned the activities by way of a resolution and appropriated funds to create the City of Lynwood Justice Fund to support legal aid and resources for immigrants within the Lynwood community.

**Intervenor-Plaintiff the City of Montebello**

93.    Intervenor-Plaintiff the City of Montebello is a municipal corporation, duly organized and existing as a general law city under the laws of the State of California, and is located in the County of Los Angeles.  It has a population of approximately 60,015 residents.  Over 78% of the City's population is Latino.

94.    Unlawful immigration enforcement activities have occurred at numerous locations throughout Montebello.  Of note is the violent and unjustified arrest of a U.S. citizen on June 13, 2025, at his tow truck place of employment in Montebello.

95.    There have been numerous federal immigration actions throughout Montebello at various commercial and residential locations within the city. Businesses are shutting down because of these federal immigration activities.

-28-

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Protests of the federal immigration activities have occurred, which have impacted both businesses and Montebello Police Department resources.

96.    Montebello maintains its own Police Department for law enforcement services.  Montebello is responsible for costs associated with the Montebello Police Department's services and law enforcement activities.  The recent events and federal immigration actions throughout Montebello have caused a significant diversion of public safety resources to address the resulting protests.

97.    Montebello's relationship with its community has suffered because of the unlawful immigration enforcement activity.  Montebello Police Department officers have been erroneously accused on social media of cooperating with federal agents, thus eroding trust in the Department.  Staff resources, including the Montebello Police Chief and City Manager, as well as other Montebello city staff and personnel, have been diverted to develop and promote material that presents facts and eases community fears.

98.    Following unlawful immigration activities throughout the region, fearful residents have held protests and appeared at Montebello City Council meetings to share their sincere fears for the safety of the immigrant community in Montebello.  These events required Montebello officers to be diverted from their normal assignments to provide protection and general community safety.

99.    Montebello prides itself on providing a range of first-class recreational, social, and civic resources to its residents.  These include, among other things, a senior center, youth programs, and other community events.  Since the recent federal immigration actions, participation in Montebello events has decreased, including at the annual City-sponsored Independence Day celebration and concerts in the park activities.  On information and belief, the drop in attendance at these Montebello events is attributable to fears of unlawful immigration enforcement activity at these public locations.

-29-
INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

100.   In an effort to counter the harm caused by the unlawful immigration enforcement activities, Montebello's City Council has publicly condemned the activity by way of a resolution and is using City funds to create a humanitarian assistance program for immigrants within the Montebello community.

101.   Defendants' federal immigration enforcement has spread fear, confusion, and distress across the Montebello community.  Montebello residents, even those that have lived in the city for decades, feel unsafe going outside to engage in everyday activities, such as commuting to work, taking their children to school, and attending community events due to concerns that they could be arbitrarily confronted and assaulted by federal agents.

102.   In addition to harming Montebello residents, the federal immigration enforcement inflicts concrete and particularized injury to Montebello as a municipal entity, including injury to the operations of its police department, management of its community programs, and production of its tax revenue.

103.   Defendants' federal immigration enforcement has forced Montebello to divert its limited police resources to address public safety issues that would not have arisen absent these unlawful enforcement practices.

104.   Montebello depends on local taxes to fund its municipal operations. The unlawful federal immigration enforcement has produced chilling effects on Montebello businesses, causing declines in businesses' sales and tax revenues to the City.

**Intervenor-Plaintiff the City of Monterey Park**

105.   Intervenor-Plaintiff the City of Monterey Park is a municipal corporation and general law city organized and existing under the laws of the State of California.  It has a population of approximately 61,096 residents.  Over half of the city's population, approximately 51.6%, is foreign-born.  It serves as a significant immigrant gateway, especially for Asian and Hispanic communities.

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

106.    Monterey Park is notable for having one of the highest concentrations of Asian Americans in the United States, with approximately 64-66% of the population being Asian, predominantly of Chinese descent.  Monterey Park also has a longstanding Mexican-American community; the Latino population makes up approximately 27–28% of City residents.  Monterey Park is also home to historic enclaves of Japanese-American, Armenian, and Jewish residents.

107.    Federal immigration activities within the Los Angeles region have cultivated a culture of fear and distrust within the Monterey Park community.  On July 2, 2025, community members provided public comment to the Monterey Park City Council regarding their experiences with recent federal raids and inquired about the City's response to immigrant rights and protection.

108.    Multiple speakers expressed fear among immigrant communities due to reports of masked, unidentified individuals (allegedly federal agents or vigilantes) detaining people without due process.  The speakers' shared personal and family experiences highlighted the fear and anxiety within the community relating to federal agents' racial profiling and abductions, and underscored the perceived need to keep documentation on hand at all times to prove legal status.  Their emotional testimony underscored the psychological toll on the residents of Monterey Park, including U.S. citizens mistaken for undocumented immigrants.

109.    Residents requested clear communication and proactive measures from the Monterey Park Police Department to verify the identity of enforcement agents and ensure public safety.

110.    In response to community member concerns, Monterey Park has expended public resources to provide information to residents including "Know Your Rights" cards available in multiple languages at community centers, the library, and online.  It has ongoing efforts to expand outreach and make information more accessible at public events and locations, develop clear protocols for local police involvement during federal immigration activities, and provide assurances

-31-

that local law enforcement stands with and protects all residents, regardless of immigration status.

111. The fear resulting from the unlawful federal immigration activity has also harmed local law enforcement efforts. For example, while executing inspection warrants in June 2025, the Monterey Park Police Department and Monterey Park Fire Department were erroneously identified as federal immigration agents on social media despite Monterey Park's extra efforts to inform residents regarding the legitimate law enforcement activities occurring at the site.

112. Fostering a relationship of trust, respect, and open communication between Monterey Park officials and residents is essential to the City's mission of delivering efficient public services in partnership with the community, ensuring public safety, and promoting a prosperous economic environment, opportunities for Monterey Park's youth, and a high quality of life.

113. The federal government's activities are interfering with Monterey Park's crucial role in protecting the public health, safety, and well-being of its residents. Such activity is also resulting in the unnecessary expenditure of public resources.

**Intervenor-Plaintiff the City of Oxnard**

114. Intervenor-Plaintiff the City of Oxnard is a municipal corporation organized and existing as a general law city under the laws of the State of California.

115. Since June 2025, Oxnard has experienced unlawful federal immigration enforcement activity within its jurisdictional borders, as well as in neighboring municipalities. Oxnard maintains its own Police Department ("OPD") for law enforcement services and Fire Department for public safety services. Both departments have responded to incidents stemming from immigration enforcement activity. Responding to those incidents has diverted resources away from vital community needs, which would not have been affected in the absence of the

-32-

activity, and has negatively impacted Oxnard's relationship with its residents, fostering a culture of fear and distrust within the community that has led to a decline in participation in public services.

116. On June 18, 2025, the OPD expended its resources to respond to a vehicular collision that occurred on Vineyard Avenue in Oxnard involving a woman and federal immigration agents. The collision took place when the woman was following the agents' vehicle, and the agents suddenly applied the brakes. Following the collision, the masked agents immediately exited their vehicle and drew a firearm on the woman.

117. On July 10, 2025, OPD expended significant resources responding to St. John's Regional Medical Center following a large-scale immigration raid that took place at Glass House Farms. During that raid, vehicles from Border Patrol and Customs and Border Protection blocked a road lined with fields and greenhouses as military-style vehicles and a helicopter flew overhead.[27] Video footage and eyewitness accounts show federal agents dressed in military garb, clothing, and carrying military grade weapons.[28] This raid prompted tense confrontations between federal agents and hundreds of protesters, including those who are Oxnard residents and elected officials. Some of the protesters were exposed to and injured by gas used by federal immigration agents to disperse the crowds.

118. The tense confrontations between federal agents and protesters caused OPD to utilize its personnel, equipment, and resources, dispatching to St. John's Regional Medical Center in Oxnard, where some protesters were being treated for injuries from the gas used by federal immigration agents.

---

[27] Amy Taxin, *Protesters and federal agents clash during raid at Southern California farm*, AP News (July 10, 2025), https://apnews.com/article/california-farm-immigration-raid-d58bb572cd1638c2c4b8d3ef26c2b430.

[28] Michelle Krupa et al., *Tensions are rising in Southern California over immigration raids. Here's what we know*, CNN (July 13, 2025), https://www.cnn.com/2025/07/11/us/california-immigration-raids-la-wwk.

-33-

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

119. The Oxnard Fire Department ("OFD") also expended its resources responding to the raid that took place on July 10, 2025, which it would not have done absent the unlawful immigration enforcement activity. The OFD initially dispatched two units in response to a medical call at the Glass House Farms facility, which cleared within 22 minutes of arriving at the scene. Shortly after the incident escalated, OFD contributed resources to expand the Multi-Causality Incident ("MCI"). That MCI response included an engine on scene for over eight hours, a Battalion Chief on scene for over eight hours, and an Assistant Chief on scene for nearly two hours. The OFD also responded to the St. John's Regional Medical Center in Oxnard shortly after the immigration raid at Glass House Farms. At the hospital, the emergency room went on diversion, and two ambulances with patients that would have been treated at St. John's hospital were diverted to hospitals further away.

120. The Oxnard City Attorney's Office and City Manager's Office also expended their resources responding to unlawful federal immigration enforcement within Oxnard by implementing a city-wide protocol and training to prepare staff for potential encounters with federal immigration enforcement officials.

121. In addition to the diversion of significant city resources to responding to federal immigration enforcement, federal immigration activities within Oxnard have cultivated a culture of fear and distrust within the community. For example, on June 15, 2025, OPD discovered that a federal immigration enforcement vehicle was parked in the public parking lot of their headquarters building and requested that it cease this practice since it caused at least one community group to allege that OPD was cooperating with federal immigration enforcement efforts.

122. The mistaken community perception that Oxnard is actively cooperating with federal immigration enforcement efforts is bolstered further when OPD and OFD are dispatched to immigration raids, protests, and other encounters with federal immigration enforcement efforts. This perception negatively impacts

-34-
INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

public safety in Oxnard because victims and witnesses of crimes are unwilling and less likely to cooperate with local law enforcement and public safety services.

123.   The culture of fear and distrust resulting from federal immigration activities within Oxnard has also negatively impacted participation in community services.  Since June 2025, there has been a reduction in public participation in various city programs.  For example, the Oxnard Public Library has seen a decrease in attendance, circulation of books, and activation of library cards.  Additionally, the City has observed a troubling direct impact of ICE enforcement on the City's public housing tenants.  On two occasions, tenants have asked staff to pick up their rent checks rather than dropping their checks off to Housing Department staff due to fear of leaving their units, reflecting a climate of intimidation and anxiety within the community.  Moreover, the City has received several complaints that landlords have threatened to report tenants to ICE as a means of intimidation and coercion.  Such tactics exacerbate tenant vulnerability and undermine trust between residents and housing providers.  This pattern of intimidation, even when indirect, interferes with tenants' ability to safely access essential public services and threatens the stability of housing within the Oxnard community.

**Intervenor-Plaintiff the City of Paramount**

124.   Intervenor-Plaintiff the City of Paramount is a municipal corporation, duly organized and existing as a general law city under the laws of the State of California, and is located in the County of Los Angeles.  Paramount is more than 80% Latino.

125.   Paramount contracts with the Los Angeles County Sheriff's Department for law enforcement services.  Paramount is responsible for costs associated with the Sheriff's presence within the City.

126.   Paramount's relationship with its community has been strained as a result of the unlawful immigration enforcement activity.  According to the Sheriff's Department, its deputies have been accused on social media of cooperating with

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

federal agents, thus eroding trust in the Department.  Paramount has also been erroneously accused of "covering up" the presence of a Department of Homeland Security office within its jurisdiction.  Staff resources, including its Public Information Officer, Assistant City Manager, and City Manager, as well as contract communications support, have been diverted to develop and promote material that presents facts and eases community fears regarding the federal immigration enforcement actions.

127.   In an effort to counter the harm caused by the unlawful immigration enforcement activities, Paramount's City Council has publicly condemned the activities by way of a resolution and is using City funds to create a humanitarian assistance program for immigrants within the Paramount community.

128.   As just one example of such activity, unlawful federal immigration raids have occurred at a Paramount Home Depot.  Paramount's Home Depot has been forced to close on at least two separate occasions since federal agents began their immigration enforcement activities on or about June 6, 2025.  The store closures are expected to cause a loss of approximately $7,700 in combined sales tax and transactions and use tax revenue to Paramount.

129.   Additionally, Paramount is home to one of the largest swap meets in the region.  The Paramount Swap Meet supports numerous small businesses and generates significant sales tax revenue for Paramount.  Paramount relies upon sales tax revenues, along with other tax revenues, to maintain its services.  Due to fear of possible unlawful immigration enforcement, attendance at the Paramount Swap Meet is down, which has resulted in lower sales tax revenues.  Paramount expects to lose approximately $17,800 in exhibitor taxes and food and beverage sales. This figure reflects an 80% revenue loss over two weeks and a 50% loss over one additional week.

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**Intervenor-Plaintiff the City of Pasadena**

130.    Intervenor-Plaintiff the City of Pasadena is a municipal corporation organized and existing under the laws of the State of California and is a charter city pursuant to Article XI of the California Constitution.  Pasadena alleges the following facts relating to federal immigration activity within Pasadena upon information and belief.

131.    In recent weeks, Pasadena has experienced an unprecedented increase in unlawful federal immigration enforcement activity within its jurisdictional borders.[29]  For example, Pasadena residents Pedro Vasquez Perdomo, Carlos Alexander Osorto, and Isaac Villegas Molina (collectively, "Pasadena Resident Plaintiffs") report that in the early morning of June 18, 2025, approximately six masked federal agents equipped with weapons jumped out of unmarked cars and arrested the Pasadena Resident Plaintiffs while they waited at a Pasadena bus stop across the street from Winchell's Donuts to be picked up for jobs.  *See* Lead Compl. ¶¶ 12–14, 111–13, 124–26, 137–39.[30]  The Pasadena Resident Plaintiffs report that federal agents made these arrests without first securing arrest warrants, making an individualized determination of risk of flight, establishing a reasonable suspicion of an immigration law violation, and identifying themselves as federal agents.  *Id*. ¶¶ 114–19, 127–32, 140–44.

132.    Federal agents have reportedly adhered to the same or similar improper practices on multiple other occasions when conducting enforcement activities in Pasadena.  For example, plainclothes federal agents jumped out of unmarked

---

[29] *See Police Chief Reiterates His Department Does Not Assist or Participate in ICE Enforcement, Urges Calm*, Pasadena Now (July 1, 2025), https://pasadenanow.com/main/police-chief-urges-calm-reiterates-his-department-does-not-assist-or-participate-in-ice-enforcement.

[30] Sophie Flay, *ICE agents detain several people at Pasadena bus stop, conducts raids across the city*, ABC 7 (June 19, 2025), https://abc7.com/post/ice-agents-detain-2-men-pasadena-bus-stop-conduct-raids-city/16785979/.

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

vehicles and, while using excessive force, attempted to arrest a Pasadena resident in front of her children outside a Pasadena apartment building on June 28, 2025, prompting a 911 call to Pasadena Police about a suspected kidnapping.[31]  Multiple Pasadena Police personnel responded to the scene to investigate, and it was determined that the federal agents had mistakenly identified the Pasadena resident for another individual they were seeking.  Paramedics also responded to the scene and medically treated the Pasadena resident due to the injuries she sustained from the incident.  Such action, and similar activities by Defendants as described herein, is tantamount to a nuisance in Pasadena.

133.    This federal immigration enforcement has spread fear, confusion, and distress across the Pasadena community.  Pasadena residents, even those who have lived in the City for decades, feel unsafe going outside to engage in everyday activities, such as commuting to work, taking their children to school, and attending community events due to concerns that they could be arbitrarily confronted and assaulted by federal agents.

134.    In addition to harming Pasadena residents, the federal immigration enforcement inflicts concrete and particularized injury to Pasadena as a municipal entity, including injury to the operations of its police department, management of its community programs, and production of its tax revenue.

135.    The federal immigration enforcement has forced Pasadena to divert its limited police resources to address public safety issues that would not have arisen absent these enforcement practices.

---

[31] Angelique Brenes, *ICE agents detain mother in Pasadena in front of children without showing a warrant*, KTLA 5 (June 28, 2025), https://ktla.com/news/local-news/ice-agents-detain-mother-in-pasadena-in-front-of-children-without-a-warrant/; *ICE Agents Detain Mother In Front of Her Children in Pasadena*, Pasadena Now (June 29, 2025), https://pasadenanow.com/main/ice-agents-detain-mother-in-front-of-her-children-in-pasadena.

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

136. The federal immigration enforcement has also led to declines in public participation in Pasadena's community programs such as youth summer education and, in other cases, forced Pasadena to cancel swim lessons and other community programs altogether due to public safety concerns.[32]

137. Pasadena depends on local taxes to fund its municipal operations. Federal immigration enforcement has harmed and produced chilling effects on Pasadena businesses, causing declines in businesses' sales revenue and a corresponding decrease in Pasadena's tax revenue.[33]

**Intervenor-Plaintiff the City of Pico Rivera**

138. Intervenor-Plaintiff the City of Pico Rivera is a municipal corporation, duly organized and existing as a general law city under the laws of the State of California, and is located in the County of Los Angeles.

139. Pico Rivera is more than 90% Latino.

140. On information and belief, unlawful federal immigration enforcement activities have occurred at numerous locations throughout Pico Rivera. Of note is the violent and unjustified arrest of a U.S. citizen, Adrian Martinez, on June 17, 2025 at the Walmart parking lot in the City. This incident led to multiple community protests, including rallies outside of Pico Rivera City Council Hall.

141. Federal immigration authorities have reportedly adhered to the same or similar improper practices on multiple other occasions when conducting enforcement activities in Pico Rivera.

---

[32] Tim Caputo, *Pasadena cancels Saturday swim lessons, other park programs after reports of immigration enforcement*, ABC 7 (June 22, 2025), https://abc7.com/post/pasadena-cancels-saturday-swim-lessons-other-park-programs-reports-immigration-enforcement/16810001/.

[33] *See* Victor M. Gordo, *Pasadena Mayor: Trump's Immigration Raids Hurt Communities Like Mine*, Time (June 18, 2025), https://time.com/7295305/pasadena-trump-immigration-raids.

-39-

142. Another significant incident occurred on June 17, 2025, at Ruben Salazar High School in Pico Rivera, where video evidence was secured to demonstrate what appears to federal immigration authorities trespassing upon El Rancho Unified School District ("ERUSD") property and federal personnel engaging in purported public urination on ERUSD property, near locations where minor children were located. The School Board of ERUSD conducted a press conference where such conduct was condemned and an investigation was demanded.

143. The unlawful federal immigration enforcement has spread fear, confusion, and distress across the Pico Rivera community. Pico Rivera residents, even those who have lived in the City for decades, feel unsafe going outside to engage in everyday activities, such as commuting to work, taking their children to school, and attending community events due to concerns that they could be arbitrarily confronted and assaulted by federal agents.

144. Pico Rivera contracts with the Los Angeles County Sheriff's Department for law enforcement services. Pico Rivera is responsible for costs associated with the Sheriff's presence within the City. The events of June 17 caused a significant diversion of resources to address the resulting protests.

145. Since the events of June 17, and subsequent unlawful immigration activities throughout the region, fearful residents have held protests and appeared at Pico Rivera City Council Hall to share their sincere fears for the safety of the immigrant community in Pico Rivera. These events required Sheriff's deputies to be diverted from their normal assignments to provide protection and general community safety.

146. Pico Rivera's relationship with its community has suffered as a result of the unlawful immigration enforcement activity. According to the Sheriff's Department, its deputies have been erroneously accused on social media of cooperating with federal agents, thus eroding trust in the Department. Pico Rivera

-40-

has been erroneously accused of "covering up" the presence of a Department of Homeland Security office within its jurisdiction.  Staff resources, including its Public Information Officer, Assistant City Manager, and City Manager, as well as contract communications support, have been diverted to develop and promote material that presents facts and eases community fears.

147.   Pico Rivera prides itself on providing a range of first-class recreational, social, and civic resources to its residents.  These include, among other things, a senior center, youth events, and other community events.  Participation in some City events has decreased since the recent events conducted by federal agents and personnel.  On information and belief, the drop in attendance at some Pico Rivera events is attributable to fears of unlawful immigration enforcement activity at these public locations.

148.   In addition to harming Pico Rivera residents, the unlawful federal immigration enforcement activity inflicts concrete and particularized injury to Pico Rivera as a municipal entity, including injury to the operations of its police department, management of its community programs, and production of its tax revenue.  The unlawful federal immigration enforcement has forced Pico Rivera to divert its limited police resources to address public safety issues that would not have arisen absent these enforcement practices.

149.   Pico Rivera depends on local taxes to fund its municipal operations. Federal immigration enforcement has harmed and produced chilling effects on Pico Rivera businesses, causing declines in businesses' sales revenue and a corresponding decrease in Pico Rivera's tax revenue.

**Intervenor-Plaintiff the City of Pomona**

150.   Intervenor-Plaintiff the City of Pomona is a municipal corporation organized and existing under the laws of the State of California and is a charter city pursuant to Article XI of the California Constitution.

-41-

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

151. Unlawful federal immigration activities have occurred at numerous locations throughout Pomona. Extensive federal immigration enforcement activities and associated protests in Pomona have diverted already-strained Pomona Police Department resources away from their core law enforcement and maintaining of the peace functions.

152. In particular, federal agents lack clear identification to facilitate differentiation between their activities and those of local law enforcement. The federal immigration activities have fostered an environment of general distrust among the City's residents, resulting in increased calls for service, including incidents of vandalism, that negatively impact the Pomona Police Department's ability to respond to, investigate, and clear the City's already-high normal volume of calls for service.

153. Additionally, the City Manager's Office and Pomona Police Department have expended significant staff resources to address social media speculation and rumors alleging City resource coordination with ICE activities. These challenges have cast the City and the Pomona Police Department into the unfortunate position of having to dedicate already-limited local resources in an effort to offset community harm, and have eroded trust in local government programs and activities and municipal law enforcement operations.

**Intervenor-Plaintiff the City of Santa Ana**

154. Intervenor-Plaintiff the City of Santa Ana is a municipal corporation organized and existing under the laws of the State of California and is a charter city pursuant to Article XI of the California Constitution.

155. The federal immigration activities have disrupted public safety and spread fear in the immigrant community of Santa Ana. Upon information and belief, U.S. citizens and legal permanent residents in Santa Ana have been detained for questioning. Federal immigration raids have occurred at individuals' homes, schools, places of work, places of worship, places of public accommodation, swap

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

meets, grocery stores, medical facilities, and hotels.  Residents of Santa Ana have shared stories of racial profiling and the arrest of residents without criminal records.

156.  The aggressive and unlawful tactics used by federal agents have heightened tensions between the residents of Santa Ana and the Santa Ana Police Department.  They have also damaged trust in law enforcement and eroded the critical relationship between residents and the Santa Ana Police Department.  The community is less safe because families are too afraid to report crimes or engage with local authorities.

157.  The unlawful federal immigration activities have also resulted in negative economic and social impacts to Santa Ana.  For example, Santa Ana city centers are "deserted,"[34] and fewer people are frequenting commercial and retail establishments, such as local restaurants, grocery stores, medical facilities, places of public accommodation, and entertainment venues, for fear of being targeted by federal agents.

**Intervenor-Plaintiff the City of Santa Barbara**

158.  Intervenor-Plaintiff the City of Santa Barbara is a local municipality organized and existing under the laws of the State of California and is a charter city pursuant to Article XI of the California Constitution.  Santa Barbara is located in the County of Santa Barbara.

159.  Federal immigration enforcement activities have occurred in various locations throughout Santa Barbara as well as in neighboring communities within the County of Santa Barbara.  These activities have cultivated feelings of fear and

---

[34] Suhauna Hussain & Md Fazlur Rahman, *California's economy is already getting hit by immigration raids*, L.A. Times (July 30, 2025), https://www.latimes.com/business/story/2025-07-30/people-reporting-to-work-in-private-sector-in-california-down-after-raids-report-says.

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

distrust within the Santa Barbara community. At least 111 arrests have been made in Santa Barbara County since January 2025.[35]

160. On July 10, 2025, federal law enforcement agents conducted raids on Glass House Farms in Carpinteria and Camarillo, California. Carpinteria is a community that is ten miles from Santa Barbara. At least ten people were detained during this raid in Carpinteria. Further down the coast, in Camarillo, at least 350 people were detained.

161. On July 15, 2025, community members provided public comment to the Santa Barbara City Council regarding their experiences with recent federal raids and expressed concerns for the safety of immigrant communities in Santa Barbara. Hundreds of members of the community attended this meeting, demonstrating the high level of concern.

162. Santa Barbara businesses have experienced, and will continue to experience, significant negative economic impacts and disruptions to business operations due to federal immigration enforcement activities. Employees are remaining at home, making it difficult for businesses to operate at normal levels. There are fewer people patronizing businesses, fewer vendors on the streets, and fewer employees showing up to their workplaces.

163. The Santa Barbara South Coast Chamber of Commerce compiled a survey and sent it to local businesses to evaluate the impact immigration activity has had on business operations. The Chamber of Commerce received approximately 167 responses within three days of distributing the survey. One of the respondent businesses indicated that their employee, who is a U.S. citizen, was detained and

---

[35] Ryan P. Cruz, *More than 620 Arrests Reported in Immigration Operations on Central Coast*, Santa Barbara Independent (July 24, 2025), https://www.independent.com/2025/07/24/more-than-620-arrests-reported-in-immigration-operations-on-central-coast/.

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

unable to report to work for a week because federal agents would not let him retrieve his identification.

164.   Many of the respondent businesses also noted decreased revenue and general commercial activity due to immigration activities.  Businesses in the hospitality industry, including restaurants and hotels, noted a drastic decrease in patrons since recent immigration enforcement actions.  While these businesses typically see many more patrons during the summer months due to tourism, they reported significantly fewer visitors.

165.   Other businesses reported difficulty hiring contractors and handymen to complete projects, and delayed response times due to a decrease in staff. The businesses reported that these issues were attributable to recent immigration enforcement actions.

166.   Santa Barbara is a prime destination for travel and tourism, particularly during the summer months.  Federal immigration activity in the area has harmed Santa Barbara's reputation as a tourist destination, resulting in less overall spending and lower hotel occupancy rates, specifically for international travelers.

167.   Every year in Santa Barbara, residents and businesses celebrate Santa Barbara's Spanish history during Old Spanish Days, more commonly referred to as "Fiesta."  Fiesta celebrations include events throughout Santa Barbara such as official parades, markets, a rodeo, dance exhibitions, and more.  Fiesta 2025, the 101st Fiesta celebration in Santa Barbara, is scheduled to be held from July 30 through August 3, 2025.  Fiesta events both generate significant tax revenue throughout Santa Barbara and are the premiere events for local nonprofits to raise funds.  Fiesta has an annual budget exceeding $1,000,000.

168.   Due to recent immigration enforcement activities, fewer patrons are expected to frequent the event and purchase goods and services, in turn reducing overall revenue.  The Children's Fiesta Parade, one of the hallmark events of Fiesta, has experienced a 15% decrease in parade entries.  On July 14, 2025, the Downtown

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Club announced that it was cancelling its Fiesta Carnival de Los Niños, which is a major fundraising event in the City.  The Downtown Club stated that it was cancelling the event "to assure the safety of the kids" as well as due to declining attendance at other community events, thereby making the carnival a financial risk.[36]  Members of the community have further expressed concern that federal immigration officials will attend other Fiesta events and target the community at these events.[37]

169.    On July 13, 2025, the Santa Barbara Museum of Contemporary Art announced that it was cancelling its Dia de Los Muertos event due to recent immigration enforcement actions.

170.    The federal immigration enforcement has also led to declines in public participation in Santa Barbara's community programs and events, such as youth education programs and other social services.  Santa Barbara rents City-owned facilities to both private organizations and nonprofits, which generates revenue for the City necessary to manage and operate the facilities.  When comparing the first half of 2025 to the first half of 2024, there has been a 26% decrease in rentals with four recent facility rental cancellations.

171.    Community members are also afraid of visiting local food banks in Santa Barbara for fear of federal immigration officials showing up at these locations.  The number of individuals visiting local food banks in recent months is down 75% at the Westside Neighborhood Center (from 767 recipients to 226 recipients), 21% at the Franklin Neighborhood Center (from 249 recipients to 199 recipients), and 23% at Parque de Los Ninos (from 256 recipients to 199 recipients).

---

[36] Edhat Staff, *Old Spanish Days Leaders Address Immigration Concerns as Fiesta Prepares for 101st Celebration*, Edhat (July 21, 2025), https://www.edhat.com/news/old-spanish-days-leaders-address-immigration-concerns-as-fiesta-prepares-for-101st-celebration/.

[37] Daniel Green, *Downtown Club Cancels Fiesta Carnival de Los Niños Event*, Noozhawk (July 14, 2025), https://www.noozhawk.com/downtown-club-cancels-fiesta-carnival-de-los-ninos-event/.

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

At least one nonprofit organization in Santa Barbara has coordinated a food drive to ensure individuals who are food insecure and afraid of visiting local food banks due to immigration activity have access to food.

172.   The unlawful federal immigration activities are also preventing vulnerable members of the community from engaging in legal proceedings.  The Santa Barbara County District Attorney's Office prosecutes all misdemeanor crimes that occur within the County of Santa Barbara.  Fears of arrest by federal immigration authorities in public and at courthouses have made victims more reluctant to appear, thereby impacting the Office's ability to obtain just outcomes for victims.

173.   The unlawful federal immigration enforcement has spread fear, confusion, and distress across the Santa Barbara community and produced chilling effects on Santa Barbara businesses.

**Intervenor-Plaintiff the City of Santa Monica**

174.   Intervenor-Plaintiff the City of Santa Monica is a municipal corporation organized and existing under the laws of the State of California and is a charter city pursuant to Article XI of the California Constitution.  Santa Monica borders the City of Los Angeles and is directly affected by activities occurring there and in the region.

175.   Santa Monica is a prime destination for travel and tourism, particularly international travel, with more visits usually expected during summer vacations.  Unlawful federal immigration activity in the region has harmed Santa Monica's reputation as a tourist destination and international arrivals have decreased significantly, resulting in less overall spending and lower hotel occupancy rates.

176.   Immigrant communities staying home out of fear of a federal immigration raid diminishes economic activity and participation in public events as well as the overall vibrancy and appeal of Santa Monica as a tourist destination.  It also negatively impacts many businesses that rely on immigrant labor, including

-47-

hotels, restaurants, sidewalk vendors, vendors at the farmers markets, car washes, and construction trades, affecting business revenue, employment, and overall economic growth. Santa Monica, in turn, loses critical transient occupancy and sales tax revenue it depends on.

177. Because many members of immigrant or mixed status households who live and/or work in Santa Monica are too afraid to leave their homes to go to work, Santa Monica is exploring setting up a fund to help affected households pay for food, rent, and other necessities.

178. The Santa Monica City Attorney's Office prosecutes all misdemeanor crimes that occur within the city. Victims have been more reluctant to cooperate with prosecutors and have required additional staff efforts to secure appearances in court. Fear of arrest by federal immigration authorities in public or at courthouses is impacting the City's ability to obtain just outcomes for victims.

179. Santa Monica has been required to employ significant City resources to prepare for federal immigration raids at City facilities, which preparation is made significantly more difficult by federal immigration authorities conducting unannounced activities without identification.

180. Community members responded to regional federal immigration raids with a large-scale public demonstration in Santa Monica on June 14, which required the City to deploy significantly more Santa Monica Police Department and other City resources to ensure public safety. There has been at least one occurrence of masked, armed, and unidentified federal immigration agents arresting a Latino construction worker on 16th Street near Washington Street in Santa Monica on June 12. The agents appeared not to communicate with the construction worker before detaining him using zip ties and placing him in an unmarked car. The City has obtained a video and declaration from at least one witness describing the incident and how it terrified her.

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**Intervenor-Plaintiff the City of South Gate**

181.   Intervenor-Plaintiff the City of South Gate is a municipal corporation, duly organized and existing as a general law city under the laws of the State of California, and is located in the County of Los Angeles.  It has a population of approximately 90,700 residents.  Over 90% of the population is Latino.

182.   Federal immigration enforcement activities have occurred at numerous locations in South Gate.  These activities involve masked agents flooding street corners, bus stops, churches, car washes, parking lots, educational facilities, and other places, entering businesses, and interrogating residents as they are working, looking for work, or otherwise trying to go about their daily lives, including when providing lawn and gardening services.  Some of the detained individuals are U.S. citizens.

183.   Residents have come to South Gate City Council meetings to discuss their concerns regarding the effect that federal immigration enforcement activities have had on South Gate families, churches, and businesses.  The residents have expressed concern about federal agents' failure to self-identify and the use of masks to cover their faces, which creates an atmosphere of confusion about whether detention activity is the work of federal law enforcement or kidnappers and/or assailants.

184.   South Gate resources have been used to monitor public protests calling out the unlawful federal immigration enforcement activity.  South Gate also cancelled its annual Fourth of July multi-day carnival and fireworks contracts because of the uncertainty created by the federal immigration enforcement and the concern of civil unrest following federal immigration enforcement activity.

185.   The federal immigration enforcement activity also means South Gate will incur a loss of tax revenue due to decreased economic activity.

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**Intervenor-Plaintiff the City of West Hollywood**

186.    Intervenor-Plaintiff the City of West Hollywood is a municipal corporation, duly organized and existing as a general law city under the laws of the State of California, and is located in the County of Los Angeles.

187.    A federal immigration raid occurred in West Hollywood on July 4, 2025 at the Santa Palm Car Wash by masked individuals who reportedly lacked arrest warrants.

188.    West Hollywood businesses have experienced economic impacts due to federal immigration enforcement activities.  Employees are remaining at home, making it difficult for businesses to operate at normal levels.  There are fewer people patronizing businesses, fewer vendors on the streets, and fewer employees showing up to work.

189.    West Hollywood is a hospitality destination and the local hotels report to the City that visitor rates are down overall for the international market sector that used to frequent West Hollywood in the summer.  Defendants' policies and enforcement actions have positioned the United States as an unwelcoming destination for foreign guests with uncertainty and volatility.  As a city with a hospitality-based economy, West Hollywood has experienced a strong negative impact from Defendants' actions—not only on hotels but also on the bars, restaurants, and nightclubs that visitors will often frequent when utilizing lodging options in the city.

190.    Defendants' actions have diverted West Hollywood's law-enforcement resources.  West Hollywood contracts with the Los Angeles County Sheriff's Department for law enforcement services.  Defendants' actions in early June caused a significant diversion of resources to address the resulting protests in nearby cities.  The West Hollywood City Council was scheduled to have multiple high-ranking representatives from the Los Angeles County Sheriff's Department present at its June 9, 2025 City Council meeting to discuss a public safety agenda item that was of

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

critical importance to the community. The Sheriff's Department representatives were not able to attend the City Council meeting, as the regional protests utilized all available resources in the region. The City Council had to continue the item to a later date when the Sheriff's Department could provide the needed resources to West Hollywood.

191. Defendants' unlawful actions also caused protests against Defendants' policies and immigration activities in the region in West Hollywood Park on June 14, 2025, where it is reported that at least 3,000 people attended. The City and Sheriff's Department had to expend significant resources to maintain safety and order.

192. In response to community member concerns, West Hollywood has expended public resources to provide information to residents including "Know Your Rights" public information available at City facilities and online. It has ongoing efforts to expand outreach and make information more accessible at public events and locations, develop clear protocols for Sheriff's Department involvement during federal immigration-enforcement activities, and provide assurances that local law enforcement stands with and protects all residents, regardless of immigration status.

193. Defendants' activities are interfering with West Hollywood's crucial role in protecting the public health, safety, and well-being of its residents. Such activity is also resulting in the unnecessary expenditure of public resources.

## FACTUAL ALLEGATIONS

194. On July 2, 2025, Plaintiffs filed the Lead Complaint challenging Defendants' use of unlawful searches and seizures to terrorize residents under the guise of federal immigration enforcement. *See* ECF No. 16. As set forth in detail in the Lead Complaint, in recent weeks, Defendants have carried out increasingly aggressive and unlawful immigration raids in communities throughout the Los Angeles region. Masked federal agents who refuse to identify themselves are

-51-
INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

stopping, arresting, and detaining people all over the County, seemingly based solely on their apparent ethnicity, capturing citizens and noncitizens alike. Defendants' actions have sparked terror throughout the region.

195.  As described in the Lead Complaint, Defendants' indiscriminate, unchecked, and wanton enforcement efforts are violating the Fourth and Fifth Amendment rights of Intervenors' community members, and exceed the scope of Defendants' statutory authority under the Immigration and Nationality Act, 8 U.S.C. § 1357.  Those same actions violate Intervenors' rights under the Tenth Amendment.  This Amended Complaint in Intervention incorporates the allegations in the Lead Complaint by reference and adds further allegations to describe how Defendants' unlawful actions are inflicting distinct additional harm on the Intervenors.

***A.      Defendants' Unlawful Raids Impair Intervenors' Ability to Maintain Law and Order***

196.  Defendants' raids are anything but routine, lawful immigration enforcement actions.  In an unprecedented departure from longstanding practices, armed, often unidentified federal agents are carrying out these roving raids without prior notice to the Los Angeles County Sheriff's Department or any of the Intervenor cities' police departments.  As a result, local authorities are left in the dark about when and where federal enforcement actions or other activities are scheduled to occur in their jurisdictions.

197.  Because the unlawful raids are being conducted by masked, armed agents, often without any visible identification, from the perspective of the Intervenors' residents, many of these activities are not readily distinguishable from, and are therefore confused with, criminal activity.  Witnesses have called 911 to report kidnappings after witnessing events like a "group of armed, masked

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

men . . . dragging a woman into an SUV."[38]  Local law enforcement agencies thus have been required to divert limited resources to determining whether armed and masked individuals jumping out of unmarked vehicles are federal agents or individuals committing crimes.  At least one local law enforcement agency has arrested a civilian posing as a border patrol agent who possessed a list of purported illegal immigrants and loaded firearms and ammunition.[39]

198.  Defendants are detaining and arresting Intervenors' residents en masse and without probable cause, which leads Intervenors' residents to reasonably infer that the detentions are based on residents' appearance alone.  As one observer described, "They don't care if you have papers, as long as you look like what they want you to look like, they'll take you."[40]  A witness to another raid similarly recounted that "if you looked Hispanic in any way, they just took you."[41]

199.  Defendants' pattern of arresting people merely because they appear to be immigrants reaches U.S. citizens and other individuals with legal status.  In one recent example, immigration officers violently arrested a U.S. citizen and Army veteran—spraying him with pepper spray and kneeling on his neck and back—and then held him in custody for three days without offering any explanation for his

---

[38] Libor Jany, *Kidnappers or ICE agents?  LAPD grapples with surge in calls from concerned citizens*, L.A. TIMES (July 3, 2025), https://www.latimes.com/california/story/2025-07-03/los-angeles-police-immigration-kidnappings.

[39] Lily Dallow, *L.A. man with previous human smuggling arrest may have been impersonating ICE agent*, KTLA (June 27, 2025), https://ktla.com/news/local-news/l-a-man-arrested-in-huntington-park-for-possibly-impersonating-federal-agent/.

[40] Travis Schlepp, *ICE agents make arrest at Los Angeles area church*, KTLA 5 (June 11, 2025), https://ktla.com/news/local-news/ice-agents-make-arrest-at-los-angeles-area-church/#:~:text=Community%20members%20and%20religious%20leaders,in%20the%20church%20parking%20lot.

[41] Jasmine Mendez et al., *Immigration raids continue as Trump appears to soften on targeting some workplaces*, L.A. TIMES (June 15, 2025), https://www.latimes.com/california/story/2025-06-15/los-angeles-immigration-raids-continue.

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

arrest.[42]  As another example, Defendants arrested U.S. citizen Andrea Velez, forcibly "lifting [her] off the ground and carrying her away" without explanation; Ms. Velez's only apparent offense was "the color of her skin."[43]

200.    Local law enforcement is left to deal with the aftermath of Defendants' actions, including protests and hostility from residents whose community members are the victims of such actions.

201.    Defendants' unlawful actions are directly harming the relationship between Intervenors' local law enforcement and their communities, including immigrant communities.  Local law enforcement agencies, including the Los Angeles County Sheriff's Department and Intervenors' police departments, have implemented policies and practices designed to promote the safety of residents by fostering cooperation and trust between members of the region's many immigrant communities and law enforcement.  One fundamental goal of these local policies and practices has been to encourage victims and witnesses to collaborate with the police, regardless of immigration status.  But Defendants' actions are eroding Intervenors' hard-won gains.  Indeed, not only Intervenors' police officers, but also social workers, firefighters, and building inspectors, have already been confused for federal agents and confronted by protestors who thought they were conducting surveillance for an immigration sweep.  Intervenors' ability to obtain just outcomes for victims also is being hindered by fear of arrest by federal agents in public or at courthouses.

---

[42] Daniel Trotta, *US citizen says he was jailed for three days after California immigration raid*, Reuters (July 16, 2025), https://www.reuters.com/legal/government/us-citizen-says-he-was-jailed-three-days-after-california-immigration-raid-2025-07-17.

[43] Dani Anguiano, *US citizen arrested during ICE raid in what family describes as 'kidnapping*," THE GUARDIAN (June 26, 2025), https://www.theguardian.com/us-news/2025/jun/26/immigration-ice-raid-andrea-velez.

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

***B.***     ***Defendants' Terror Campaign Chills Business and Drains Intervenors' Tax Revenue***

202.   Defendants' actions also are harming Intervenors' tax revenue. Intervenors depend in part on business, sales, and/or hotel and motel taxes to fund municipal operations.  Because Defendants' unlawful raids are sweeping up citizens and noncitizens alike, many residents are unsurprisingly choosing to stay home, regardless of their legal status.  So too are international tourists, causing a negative economic impact to the revenues of tourist destinations like Intervenors Beverly Hills, the City of Los Angeles, Santa Barbara, Santa Monica, and West Hollywood.

203.   The consequences for Intervenors are significant.  Many residents and people who work in Intervenors' jurisdictions are immigrants or children or other relatives of immigrants from ethnic backgrounds that Defendants are indiscriminately and illegally targeting in their raids, including, as described in detail in the Lead Complaint, people of Latino origin.  Over 1.8 million City of Los Angeles residents—nearly 48%—identify as Hispanic or Latino.[44]  Over 4.8 million in the County—nearly 49%—do so.  Another 15% of the County identifies as Asian. Intervenors Bell Gardens, Huntington Park, Pico Rivera, and South Gate are more than 90% Latino.  Intervenor Monterey Park is approximately 65% Asian.

204.   Defendants' actions have instilled widespread fear in Intervenors' communities.  People are afraid to leave their homes in order to avoid becoming the next victim of Defendants' unlawful raids.  In the MacArthur Park neighborhood and in Boyle Heights, for example, children are being sent out on errands unaccompanied by their parents.  Intervenors all document a similar chilling effect on their residents.

---

[44] U.S. Census Bureau, Los Angeles City, California, https://data.census.gov/profile/ Los_Angeles_city,_California?g=160XX00US0644000#race-and-ethnicity (identifying 1,829,991 "Hispanic or Latino" individuals in Los Angeles); Los Angeles City Planning, Demographics, https://planning.lacity.gov/resources/ demographics (identifying 48% of Los Angeles population as "Hispanic").

205.    As a result, Defendants' actions have created a *de facto* lockdown of neighborhoods throughout the region.  Shops and restaurants are sitting empty and suffering business owners describe the situation as akin to the loss of business in the COVID-19 pandemic.

206.    Intervenors, in turn, lose vital tax revenue from those businesses.  In the past two years, business and sales taxes comprised approximately 12.5% of Intervenor Los Angeles's annual revenue budget.  Those taxes are generally based on gross receipts.  Empty businesses do not generate gross receipts—and thus do not pay business taxes or remit sales taxes to Los Angeles.  As another example, Intervenor Culver City documented lower visits to the Culver City Westfield Mall for the entire week of June 23, 2025.  Taxes from businesses in the Culver City Westfield Mall are a substantial source of revenue for Culver City.

**C.    Defendants' Actions Threaten the Functioning of California Courts**

207.    California law prohibits the "civil arrest in a courthouse" of any person "attending a court proceeding or having legal business in the courthouse."  Cal. Civ. Code § 43.54.  This prohibition reflects the California legislature's judgment that courthouse arrests pose a "threat to the proper functioning of California's government and to the rights enjoyed by all Californians."[45]  As the former Chief Justice of the California Supreme Court, Tani G. Cantil-Sakauye, has explained, "enforcement policies that include stalking courthouses and arresting undocumented immigrants . . . . undermine the judiciary's ability to provide equal access to justice."[46]

---

[45] *See* A.B. No. 668, 2019–2020 Legis. Sess., § 1(a) (Cal. 2019).

[46] Letter from Chief Justice Tani G. Cantil-Sakauye to Attorney General Jeff Sessions (March 16, 2017), https://newsroom.courts.ca.gov/sites/default/files/newsroom/document/Chief%2520Justice%2520Cantil-Sakauye%2520Letter_AG%2520Sessions-Secretary%2520Kelly_3-16-17.pdf.

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

208.   Moreover, a long-established federal common law privilege forbids civil arrests in or near courthouses.  This privilege extends to parties, witnesses, and all people going to court on business.

209.   Despite the clear statutory and common law prohibitions on civil arrests in and around courthouses, Defendants have seized Intervenors' residents who are traveling to and from state courthouses to attend legal proceedings or address other legal business.  For example, federal immigration agents recently stalked two women in the hallways of the Airport Courthouse on La Cienega Boulevard and arrested the women after they appeared for their scheduled court proceedings.  Federal agents handcuffed the women, placed them in unmarked vehicles, and drove away.  The court was not provided advance notice of these arrests.[47]

210.   Defendants' actions interfere with the functioning of California's judiciary and threaten the rights enjoyed by all Californians, including Intervenors' residents.  To take just one example, prosecutors report that some victims and witnesses are reluctant to even come to court out of fear of being accosted by federal immigration officials.

**CAUSES OF ACTION**

**<u>COUNT I</u>**

**Violation of the Fourth Amendment:
Detention Stop Without Reasonable Suspicion**

**(Asserted by Plaintiffs and Intervenor Plaintiffs)**

211.   The foregoing allegations are re-alleged and incorporated herein by reference.

---

[47] James Queally, *ICE arrests at L.A. courthouse met with alarm: 'Absolutely blindsided'*, L.A. TIMES (June 25, 2025), https://www.latimes.com/california/story/2025-06-25/ice-arrests-los-angeles-courthouse.

212.   Except at the border and its functional equivalents, the Fourth Amendment prohibits Defendants from conducting a detentive stop to investigate a person's immigration status without reasonable suspicion that a person is a noncitizen unlawfully in the United States.

213.   "A person's mere propinquity to others independently suspected of [unlawful] activity does not, without more, give rise to probable cause to search [or seize] that person." *Perez Cruz v. Barr*, 926 F.3d 1128, 1138 (9th Cir. 2019) (alterations in original, citation omitted).  "'Reasonable suspicion' is no different." *Id.* (citation omitted).

214.   Defendants have a policy, pattern, and practice of stopping individuals without regard to reasonable suspicion that they are unlawfully in the United States.

215.   As a part of Defendants' policy, pattern, and practice, when conducting stops, Defendants engage in a show of force so overwhelming that a reasonable person would not feel free to leave.  As a matter of policy, pattern, and practice, Defendants do not evaluate the need for force or tailor the force they use to the circumstances of individual stops and arrests.

216.   Defendants' policy, pattern, and practice violates the Fourth Amendment to the U.S. Constitution.

217.   Defendants' policy, pattern, and practice have caused ongoing harm to Intervenors.

## COUNT II

### Violation of 8 U.S.C. § 1357(a)(2):
### Warrantless Arrests Without Probable Cause of Flight Risk

### (Asserted by Plaintiffs and Intervenor Plaintiffs)

218.   The foregoing allegations are realleged and incorporated herein by reference.

219.    8 U.S.C. § 1357(a)(2) requires that arrests without a warrant be accompanied by "reason to believe" that an individual is "likely to escape before a warrant can be obtained for [their] arrest."

220.    Defendants have a policy, pattern, and practice of making arrests without any warrant and without making an individualized determination of flight risk.  They have no mechanism for ensuring compliance with the statutory limits of agents' and officers' warrantless arrest authority and do not provide guidance to agents and officers on how to make an individualized determination of likelihood of escape.  Defendants permit agents and officers to make warrantless arrests *carte blanche* in violation of law.

221.    Defendants' policy, pattern, and/or practice of making warrantless arrests without the required individualized flight risk analysis is "final agency action" that is "in excess of statutory jurisdiction, authority, or limitations" under 8 U.S.C. § 1357(a)(2).  5 U.S.C. §§ 704, 706(2)(C).

222.    Separate from the APA, Defendants' policy, pattern, and practice of making warrantless arrests without the required individualized flight risk analysis is *ultra vires*.

223.    Defendants' policy, pattern, and practice have caused ongoing harm to Intervenors.

## COUNT III

### Violation of 8 C.F.R. § 287.8(c)(ii)
### Standards for Stops and Warrantless Arrests

### (Asserted by Plaintiffs and Intervenor Plaintiffs)

224.    The foregoing allegations are realleged and incorporated herein by reference.

225.    Defendants are bound by regulation to conform warrantless arrests to the standards in 8 C.F.R. § 287.8(c), including the requirement at 8 C.F.R.

§ 287.8(c)(2)(ii) that officers have reason to believe that an individual is "likely to escape before a warrant can be obtained."

226.  Defendants have a policy, pattern, and practice of making arrests without any warrant and without making an individualized determination of flight risk.  They have no mechanism for ensuring compliance with the regulatory limits of agents' and officers' warrantless arrest authority and do not provide guidance to agents and officers on how to make an individualized determination of likelihood of escape.  Defendants permit agents and officers to make warrantless arrests *carte blanche* in violation of law.

227.  Defendants' policy, pattern, and practice is "final agency action" that is "in excess of statutory jurisdiction, authority, or limitations" under 8 C.F.R. § 287.8(c)(2)(ii).  5 U.S.C. §§ 704, 706(2)(C).

228.  Defendants' policy, pattern, and practice have caused ongoing harm to Intervenors.

## COUNT IV

### Violation of 8 C.F.R. § 287.8(c)(2)(iii)
### Failure to Identify Authority and Reason for Arrest

### (Asserted by Plaintiffs and Intervenor Plaintiffs)

229.  The foregoing allegations are realleged and incorporated herein by reference.

230.  The regulations require agents and officers, at the time of an arrest or as soon as it is practicable and safe to do so, to identify themselves as "an immigration officer who is authorized to execute an arrest" and "[s]tate that the person is under arrest and the reason for the arrest."  8 C.F.R. § 287.8(c)(2)(iii).

231.  Defendants have a policy, pattern, and practice of not timely identifying themselves, their authority to execute an immigration arrest, or the reasons for an arrest.

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

232.  Defendants' policy, pattern, and practice is a "final agency action" that is "in excess of statutory jurisdiction, authority, or limitations" under 8 C.F.R. § 287.8(c)(2)(ii).  5 U.S.C. §§ 704, 706(2)(C).

233.  Defendants' policy, pattern, and practice have caused ongoing harm to Intervenors.

## COUNT V

**Administrative Procedure Act:**
**Agency Action Exceeding Statutory Authority**

**(Asserted by Intervenor Plaintiffs)**

234.  The foregoing allegations are realleged and incorporated herein by reference.

235.  Administrative agencies may only exercise authority validly conferred by statute.  Under the Administrative Procedure Act, courts must "hold unlawful and set aside" federal agency action that is "in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. § 706(2)(C).

236.  California law prohibits the civil arrest in a courthouse of any person attending a court proceeding or having legal business in the courthouse.

237.  Congress has not authorized Defendants to conduct courthouse arrests in violation of California law.

238.  A long-established federal common-law privilege forbids civil arrests in or near courthouses.  This privilege extends to parties, witnesses, and all people attending the courts on business.

239.  Congress did not displace the federal common-law privilege when it enacted the Immigration and Nationality Act.

240.  Defendants' activities, including the warrantless arrests of individuals in or near courthouses, exceed the scope of Defendants' authority and violate this long-established prohibition on civil arrests and interfere with the ability of

-61-

Intervenors' law enforcement agencies to obtain cooperation from individuals in immigrant communities, regardless of immigration status.

## COUNT VI

**Administrative Procedure Act:
Agency Action Contrary to Constitutional
Right, Power, Privilege, or Immunity**

**(Asserted by Intervenor Plaintiffs)**

241. The foregoing allegations are realleged and incorporated herein by reference.

242. The Administrative Procedure Act instructs courts to "hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

243. The Tenth Amendment to the United States Constitution reserves "[t]he powers not delegated to the United States by the Constitution . . . to the States."

244. The states' judicial and police powers are among the most important powers that the Constitution reserves to the states.

245. Defendants' final agency actions have resulted in harm to Intervenors.

246. In violation of the Tenth Amendment, Defendants' policy, pattern, and practice of arresting individuals in or around California state courthouses located within Intervenors' boundaries (the "Courthouse Arrest Policy") commandeers California's judicial system and unduly interferes with California's core sovereign judicial and police functions by, among other things, preventing residents of Intervenors from accessing state courts.

247. Defendants' violation causes ongoing harm to Intervenors and their residents.

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## COUNT VII

### Administrative Procedure Act:
### Arbitrary and Capricious Action

### (Asserted by Intervenor Plaintiffs)

248.    The foregoing allegations are realleged and incorporated herein by reference.

249.    Under the Administrative Procedure Act, courts must hold unlawful and set aside federal agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

250.    Defendants' final agency actions have resulted in harm to Intervenors.

251.    Defendants' Courthouse Arrest Policy is arbitrary and capricious in violation of the Administrative Procedure Act.

252.    The Courthouse Arrest Policy is arbitrary and capricious because Defendants do not sufficiently explain to whom the Policy applies, do not explain how the Policy complies with congressional statutes requiring certain non-citizens to appear in state courts to qualify for immigration relief, fail fully to consider the foreseeable harms and/or costs of the Policy, do not adequately explain its prioritizing of civil arrests in or near courthouses over the harms triggered by those arrests, and do not adequately justify the change from Defendants' prior policies on courthouse arrests.

253.    Defendants' violation causes ongoing harm to Intervenors and their residents.

## COUNT VIII

### Tenth Amendment

### (Asserted by Intervenor Plaintiffs)

254.    The foregoing allegations are realleged and incorporated herein by reference.

255. The Tenth Amendment preserves the states' historic, sovereign, and fundamental autonomy to control the operation of their judiciaries and to pursue criminal prosecutions.

256. The states' judicial and police powers are among the most important powers that the Constitution reserves to the states.

257. In violation of the Tenth Amendment, Defendants' policy of arresting Intervenors' residents in and around state courthouses commandeers California's judicial system and unduly interferes with California's core sovereign judicial and police functions by preventing Intervenors' residents from accessing state courts.

258. In violation of the Tenth Amendment, Defendants' policy of conducting warrantless seizures and detentions of Intervenors' residents, without notice to or coordination with local law enforcement, effectively commandeers local law enforcement into responding to these incidents to ensure the safety of Intervenors' residents and federal agents, and into dealing with the incidents' aftermaths.

259. Federal courts possess the power in equity to grant injunctive relief with respect to violations of federal law by federal officials.

260. Defendants' violation causes ongoing harm to Intervenors and their residents.

## PRAYER FOR RELIEF

WHEREFORE, Intervenors respectfully request that this Court enter judgment in their favor, and grant the following relief:

1. Declare that Defendants' actions violate the Fourth and Tenth Amendments of the United States Constitution and the Administrative Procedure Act;

2. Issue a preliminary and permanent injunction enjoining further violations of the Fourth and Tenth Amendments and Administrative Procedure Act;

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

3.      Declare that Defendants' unlawful policies and practices violate 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8(c)(2)(ii); and 8 C.F.R. § 287.8(c)(2)(iii);

4.      Declare that the Courthouse Arrest Policy exceeds Defendants' statutory jurisdiction, authority, or limitations;

5.      Declare that the Courthouse Arrest Policy is unconstitutional;

6.      Enjoin Defendants and all of their officers, employees, agents, and anyone acting in concert with them, from civilly arresting parties, witnesses, and any other individual coming to, attending, or returning from state courthouses or court-related proceedings;

7.      Award Intervenors their reasonable fees, costs, and expenses, including attorneys' fees; and

8.      Grant such other and further relief as the Court deems just and proper.

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

DATED: August 8, 2025          Respectfully submitted,


By:     /s/ E. Martin Estrada
          E. MARTIN ESTRADA

          MUNGER, TOLLES & OLSON LLP

          *Attorneys for Intervenors Cities of Los Angeles, Anaheim, Bell Gardens, Beverly Hills, Carpinteria, Culver City, Huntington Park, Long Beach, Lynwood, Montebello, Monterey Park, Oxnard, Paramount, Pico Rivera, Pomona, Santa Ana, Santa Barbara, Santa Monica, South Gate, and West Hollywood*


By:     /s/ Hydee Feldstein Soto
          HYDEE FELDSTEIN SOTO
          City Attorney

          OFFICE OF THE LOS ANGELES CITY ATTORNEY

          *Attorney for Intervenor City of Los Angeles*


By:     /s/ Brigit Greeson Alvarez
          BRIGIT GREESON ALVAREZ
          Deputy County Counsel

          OFFICE OF THE LOS ANGELES COUNTY COUNSEL

          *Attorney for Intervenor County of Los Angeles*

-66-

INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

By: _____/s/ Michele Beal Bagneris_____
MICHELE BEAL BAGNERIS
City Attorney

OFFICE OF THE CITY ATTORNEY OF PASADENA

*Attorney for Intervenor*
*City of Pasadena*

-67-

**ATTESTATION**

Pursuant to Local Rule 5-4.3.4(a)(2)(i), the filer attests that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

DATED:  August 8, 2025

By:    /s/ E. Martin Estrada
E. MARTIN ESTRADA

MUNGER, TOLLES & OLSON LLP

*Attorneys for Intervenors Cities of Los Angeles, Anaheim, Bell Gardens, Beverly Hills, Carpinteria, Culver City, Huntington Park, Long Beach, Lynwood, Montebello, Monterey Park, Oxnard, Paramount, Pico Rivera, Pomona, Santa Ana, Santa Barbara, Santa Monica, South Gate, and West Hollywood*

-68-
INTERVENORS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF