UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Pedro VASQUEZ PERDOMO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> KRISTI NOEM, IN HER OFFICIAL CAPACITY AS SECRETARY OF HOMELAND SECURITY, et al., <br><br> Defendants. | Case No. 2:25-cv-05605-MEMF-SP <br><br> **DECLARATION OF DANIEL PARRA** |

### **DECLARATION OF DANIEL I. PARRA**

I, Daniel I. Parra, declare and affirm that the following is true to the best of my knowledge, information, and belief:

1. I am employed by U.S. Border Patrol, an operational component of U.S. Customs and Border Protection (CBP) within the Department of Homeland Security (DHS). CBP is charged with enforcing the Nation's immigration laws in order to protect national security and uphold the integrity of the immigration system. As part of this mission, CBP Border Patrol Agents are responsible for preventing the unlawful entry of individuals into the United States, apprehending those who attempt to enter illegally or who have violated the immigration laws in accordance with the Constitution and other applicable laws. Through these activities, CBP seeks to secure the border, disrupt human smuggling and trafficking networks, and ensure consistent enforcement of the immigration laws of the United States

2. I am the Deputy Chief Patrol Agent of the El Centro Sector and have been in this position since May 8, 2022. In this role, I am responsible for managing U.S. Border Patrol operations and administrative functions within the El Centro Sector, which

1

encompasses 70 miles of land border, as well as inland areas of California extending to the Oregon State line. I oversee a workforce of over 1,200 employees and manage a multimillion-dollar budget.

3. I entered on duty with the U.S. Border Patrol on July 28, 2002. My first assignment as a Border Patrol Agent was at the El Centro Station, El Centro Sector. Across the span of my career with the U.S. Border Patrol, I have served in a variety of leadership positions ranging in scope and complexity. These assignments include Supervisory Border Patrol Agent and Field Operations Supervisor, Indio Station, El Centro Sector; Executive Officer of Operations, El Centro Sector; Assistant Chief, U.S. Border Patrol Headquarters, Law Enforcement Operations Directorate - Pacific Corridor; Deputy Patrol Agent in Charge of Operations, Ajo Station, Tucson Sector; Patrol Agent in Charge, Blythe Station, Yuma Sector; and Division Chief, Law Enforcement Operational Programs, Tucson Sector. As the Division Chief, I oversaw multiple law enforcement operational programs in Tucson Sector, the largest and one of the busiest sectors in the nation

4. My current Role is Incident Commander at the Incident Command Post for the current CBP operation in Los Angeles. In this position, I have operational oversight and am responsible for all U.S. Border Patrol assets and operations in the greater Los Angeles area. Furthermore, I ensure that all personnel under my command have the proper resources, not only in terms of materiel, but the requisite training needed to operate in such a complex and fluid environment, including instruction in constitutional law. As the Incident Commander, I report directly to National Incident Commander Center.

5. On June 6, 2025, to support U.S. Immigration and Customs Enforcement (ICE-ERO), CBP agents and officers were deployed to Los Angeles, California, as part of a national, multi-agency operation. The operation focuses on enhancing public safety and enforcing immigration law through law enforcement efforts.

6.      As part of this operation, CBP officers and agents, in coordination with other federal agencies, along with their federal partners, are involved in a variety of different law enforcement encounters and enforcement actions. Officers and agents regularly engage in consensual encounters, investigative detentions, lawful warrantless arrests, and arrests pursuant to both immigration and criminal judicial warrants.

7.      During the Summer 2025 operations in Los Angeles, CBP personnel were encouraged to engage in consensual encounters first. During those consensual encounters, the individuals were free to walk away and terminate the encounter, decline to answer questions, and refuse to provide requested identification documents. While some of the individuals encountered freely answered questions about their names and place of birth and provided identification documents, others refused to answer questions and/or walked away from the encounters without any further interaction.

8.      CBP agents also engaged in lawful investigative detentions during the operation in Los Angeles. Prior to engaging in investigative detentions, agents are trained to have developed reasonable suspicion that the individual has committed or is committing a federal crime or federal immigration violation. This determination is evaluated based on the totality of the circumstances. The factors that contribute to reasonable suspicion are numerous. Relevant factors include, but are not limited to, information from intelligence sources, information from law enforcement and open-source databases, analysis of trends and patterns associated with immigration violations, previous encounters with undocumented individuals at a specific location, and information provided by human sources, which may include confidential informants. Other factors relevant to the totality of circumstances analysis also include facts observed directly by the agents in the field together with rational inferences drawn from an agent's training and experience that lead the agent to suspect someone has committed criminal or immigration violations. Agents are trained to consider all these factors together rather than in isolation and rely heavily on their training and experience in the field to evaluate the totality of the

3

circumstances when determining whether reasonable suspicion exists.

9. The CBP personnel assigned to the Los Angeles operation have extensive tenure and experience working for the agency. Over time, they have developed specialized expertise and practical knowledge of the factors that are most indicative of immigration violations. Their understanding is informed by thousands of prior stops, arrests, interviews, and operations, as well as surveillance and intelligence reporting regarding migration flow. That experience and information enable them to recognize people and settings that are often associated with unlawful presence. For example, agents know from past encounters involving undocumented individuals, that certain behaviors such as nervousness; tensing of muscles; or unprovoked flight observed in a high-crime area, or in a location known through intelligence or prior enforcement activity to be a common gathering place for individuals unlawfully present in the United States, can be highly relevant indicators in the context of the totality of the circumstances, and when combined with other specific, articulable facts, may contribute to establishing reasonable suspicion.

10. Location and occupation are also critical considerations because both can be tied to known patterns of immigration violations. For example, certain industries, such as construction, agriculture, car washing businesses, etc., that rely heavily on cash-paid day labor have historically attracted undocumented workers. They have historically attracted undocumented workers because one can earn a living without producing the required documentation to work lawfully in the United States. Similarly, certain locations, such as Home Depot, are repeatedly identified in surveillance, intelligence reports, and countless field interviews as gathering points for individuals unlawfully present in the United States. Giving little or no weight to these factors contradicts the established method for developing reasonable suspicion, as it would force agents to ignore their training, experience, and common sense—an approach that is entirely unworkable in real-world operational settings. In the context of immigration enforcement, certain

4

occupations and locations have a consistently reliable association with unlawful immigration activity, making them highly probative indicators of such activity even when other factors are limited. Preventing agents from appropriately considering these factors disregards decades of enforcement experience and hampers effective law enforcement, since factors that may appear insignificant in one context can be highly meaningful when evaluated within the broader investigative and operational framework.

11.     When probable cause for an immigration violation or federal crime is established during an investigative detention, the Agent arrests the individual. Border Patrol Agents have authority to conduct warrantless arrests of individuals, with probable cause, for federal felonies and federal misdemeanors that occur in their presence. For example, in those situations in which CBP engages in immigration enforcement activities and individuals (regardless of citizenship) damage federal property or assault a federal officer, CBP law enforcement officers are authorized to arrest those individuals. CBP officials create various written records regarding encounters that result in an arrest. These forms generally contain a summary of the subject's biographical information, prior criminal or immigration history, and may contain a brief narrative describing the encounter and law enforcement actions.

12.     If a subject is not arrested and processed for some type of immigration and/or criminal violation, a record of the event will likely not be generated. The Plaintiffs reference numerous encounters where CBP has no written record of those events because they were not arrested by us.

13.     I have had the opportunity to review several of the incidents referenced by Plaintiffs in connection with the motion, and I can provide some background regarding those encounters here. Please note, that it is difficult to locate information regarding these incidents as many of the declarants are anonymous.

14.     I reviewed the June 12, 2025, arrest of Mr. Javier Ramirez, Plaintiff's Exhibit 2

Declarant, at a tow yard in Montebello, California. Mr. Ramirez was later determined to be a U.S. citizen. While a consensual encounter was underway with another subject, another Agent observed Mr. Ramirez try to evade Border Patrol Agents by hiding between vehicles to conceal himself. His evasive conduct escalated as he fled without provocation, behavior based on the officer's training and experience is often linked to potential illegal activity. When the agent approached to investigate, Mr. Ramirez attempted to run out of the tow yard and ran directly into the agent, knocking a cell phone off the agent's chest and nearly causing him to lose balance. He spoke to the agents in Spanish and refused to answer questions about his citizenship. Mr. Ramirez tried to push away the officer, resisted apprehension, and bit the agent's leg, which led to his arrest for assaulting a federal officer. Mr. Ramirez stated he was a U.S. citizen only after being handcuffed and awaiting transport.

15. I was also able to review, what I believe to be, an encounter mentioned in the Declaration of C.B. in the original TRO motion. That Declarant mentioned the arrest of E.D.P. on June 19, 2025, at a Home Depot in Hollywood, California. There is not enough information to definitively identify this individual; however, an encounter involving a female individual on that date, at that location, with similar initials, and approximate age, occurred when Border Patrol Agents went to a Home Depot.[1] That location was selected based on general intelligence and longstanding experience, and it is a well-known place where undocumented individuals frequently gather to obtain cash-based day labor. The agents were wearing official Border Patrol identifiers, including body armor displaying a visible badge and shoulder patches clearly stating their status as Border Patrol Agents. The body armor also had clear wording on both front and back stating that they were federal agents with the Border Patrol. As two agents approached the subject, she fled without provocation, even before the agents could verbally identify themselves. The location and the behavior of evasive, unprovoked flight were factors that raised the agent's suspicion. Once they caught up to the subject for an investigative

detention, she stated she was a citizen of Guatemala and was in the United States illegally, providing probable cause for her arrest for a violation of immigration law.

16.   I am aware of the encounter with Jorge Hernandez Viramontes that occurred at a car wash located in Whittier, California on June 18, 2025. An agent exited the vehicle and approached Mr. Viramontes and inquired about his immigration status. Mr. Viramontes initially informed the agent he was a citizen of Mexico. A crowd of approximately 10 people surrounded Mr. Viramontes and the agent, yelling and cursing. Mr. Viramontes was walked to the agent's vehicle without restraints in order to safely continue the immigration inspection.  He was told the reason he was being moved to the agent's vehicle was due to the unsafe environment. Mr. Viramontes remained calm and compliant. The agents drove approximately two stops lights away while conducting a system records check on Mr. Viramontes, which indicated he was a U.S. citizen. Agents promptly returned Mr. Viramontes to the car wash and released him without further incident.

17.   The TRO has been in effect since July 11, 2025. All agents assigned to this operation are made aware that a TRO is in effect. Following the order, I disseminated guidance on its parameters to my leadership staff. This information was then cascaded down from my leadership staff to agents in the field during operational briefings and onboarding of new personnel rotating into the operation. Implementing the TRO required direct conversations with agents because the limitations that the TRO imposed regarding the four factors was confusing to agents who are trained to evaluate the totality of the circumstances, which is normally viewed through their experience, knowledge, and training. This created particular difficulty because some the factors restricted by the TRO are, in practice, highly probative to the overall totality of the circumstances analysis for establishing reasonable suspicion. As a result, leadership had to not only explain what the TRO limits, but also why agents needed to focus on other legally sustainable factors, beyond the four factors within the TRO, when conducting

7

investigative stops.

18.   The TRO has created significant operational challenges for agents in the field and has negatively impacted CBP's ability to carry out its law enforcement mission.  Although the order restates that investigative detentions require reasonable suspicion—a standard agents already uphold—it creates an arbitrary evidentiary checklist of prohibited factors, which undermines the totality of the circumstances agents should be using to establish reasonable suspicion.  Particularly when those factors have historically been critical in identifying immigration violations.  Instructions not to consider factors that provide important context—such as the location in which an encounter occurs or the occupation of the subject of an encounter—creates confusion among agents regarding what factors they can legally consider, leading to hesitation in the field, and causing our agents to doubt their own judgement, training, and specialized experience. Hesitation in the field is very concerning in a fast-moving and often dangerous environment.  Ultimately, the TRO has detrimentally impacted CBP's ability to conduct lawful enforcement operations effectively and safely.

19.   The most immediate and concerning impact of the TRO is the hesitation it has introduced into CBP's enforcement activities.  Agents are required to act quickly to assess situations and evaluate reasonable suspicion factors, relying on their training and experience.  Under the TRO, agents are forced to disregard their experience and are now second-guessing whether they have enough "other" factors anytime location or occupation is part of the totality of the circumstances analysis, leading them to not engage with subjects they normally would.  In addition, agents feel like they need to have probable cause—a higher standard than reasonable suspicion—before engaging with individuals in fear of violating the TRO.  Due to this hesitation, they are less inclined to take lawful enforcement actions they would normally take, such as consensual encounters, which undermines the ability to carry out CBP's mission.

20.   This hesitation is also dangerous. Agents working within the district have faced

escalating hostility, including violent crowds, assaults involving rocks, frozen bottles, Molotov cocktails, and even gun fire. In this volatile environment, agents must make split-second decisions. Any delay or uncertainty about their legal authority compromises the effectiveness of the enforcement operation and also endangers the agents and the public around them.

21.     The TRO has also significantly slowed lawful enforcement operations. Prior to the TRO, agents were able to conduct multiple enforcement actions in a single day. Now, due to the restrictions imposed by the TRO, agents are often limited to fewer enforcement actions per day, with the remainder of their time spent drafting arrest reports to document the incident and address any potential allegations of noncompliance. This shift has transformed routine field encounters into time-consuming administrative tasks, hindering our ability to carry out the immigration enforcement mission effectively.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my information, knowledge and belief.

Executed this 28th day of August, 2025, at Long Beach, California.

_____
DANIEL I. PARRA