BRETT A. SHUMATE
Assistant Attorney General
Civil Division

DREW C. ENSIGN
Deputy Assistant Attorney General

TIBERIUS DAVIS
SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney General

JONATHAN K. ROSS
Senior Litigation Counsel
STEPHANIE L. GROFF
JASON K. ZUBATA
ANIELLO DESIMONE
Trial Attorneys
Office of Immigration Litigation
Civil Division, U.S. Dept. of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 532-5239
Email: Aniello.DeSimone@usdoj.gov

BILAL A. ESSAYLI
Acting United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
DANIEL A. BECK
Assistant United States Attorney
Chief, Complex and Defensive Litigation Section
ALEXANDER L. FARRELL (SBN 335008)
PAULINE H. ALARCON (SBN 345785)
Assistant United States Attorneys
  Federal Building, Suite 7516
  300 North Los Angeles Street
  Los Angeles, California 90012
  Telephone: (213) 894-5557 | 3992
  E-mail:  Alexander.Farrell@usdoj.gov
          Pauline.Alarcon@usdoj.gov

*Counsel for Defendants*

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| PEDRO VASQUEZ PERDOMO; *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> KRISTI NOEM, in her official capacity as Secretary of Homeland Security; *et al.*, <br><br> Defendants. | No. 2:25-cv-05605-MEMF-SP <br><br> **DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION (Fourth Amendment Claim) [ECF 128]** <br><br> Hearing Date:  September 24, 2025 <br> Hearing Time:  9:00 a.m. <br> Location:       First Street Courthouse <br>             350 West First Street <br>             Los Angeles, CA 90012 <br>             Courtroom 8B <br>             8th Floor <br><br> Hon. Maame Ewusi-Mensah Frimpong <br> United States District Judge |

**TABLE OF CONTENTS**

UNITED STATES DISTRICT COURT ..................................................................................................i

BACKGROUND ......................................................................................................................... 1

I.      Procedural History ........................................................................................................... 1

II.     Federal Law Enforcement Procedures ............................................................................. 2

III.    Individual Allegations....................................................................................................... 3

        A.      Consensual Encounters: Hernandez Viramontes, Gamez, and Villegas Molina .............. 3

        B.      Arrests: Non-party Ramirez........................................................................................ 4

        C.      *Terry* Stops with Additional Lawful Justifications: Plaintiffs F.H.S., J.D.S. .................... 5

        D.      Self-Initiated Contact with Federal Agents................................................................. 8

IV.     Organizational Plaintiff Allegations ................................................................................. 9

STANDARD OF REVIEW ........................................................................................................ 9

ARGUMENT .......................................................................................................................... 10

I.      Plaintiffs Lack Standing or Irreparable Harm to Enjoin Lawful Investigative Stops................. 10

II.     Plaintiffs Cannot Show a Fourth Amendment Violation......................................................... 15

        A.      The Fourth Amendment Allows Consideration of Various Factors .............................. 15

        B.      The Stops were Lawful ............................................................................................. 17

                1.      Consensual Encounters ................................................................................. 18

                2.      Arrests .......................................................................................................... 20

                3.      *Terry* Stops with Additional Lawful Justifications............................................ 20

                4.      Self-Initiated Contact with Federal Agents..................................................... 22

III.    The Requested Injunction Is Overbroad and Improper in Scope................................................ 23

IV.     The Equities and Public Interest Favor Denial of Injunction ...................................................... 25

CONCLUSION........................................................................................................................ 25

L.R. 11-6.2 CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

### CASES

**Page(s)**

*Abel v. United States*,
  362 U.S. 217 (1960).................................................................................................2

*Alderman v. United States*,
  394 U.S. 165 (1969)..............................................................................................14

*Arizona v. United States*,
  567 U.S. 387 (2012)..........................................................................................1, 18

*Atwater v. Lago Vista*,
  532 U.S. 318 (2001)..............................................................................................20

*Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*,
  501 U.S. 1301 (1991)............................................................................................25

*Black Lives Matter L.A. v. City of Los Angeles*,
  113 F.4th 1249 (9th Cir. 2024).............................................................................14

Caribbean Marine Servs. Co. v. Baldrige,
  844 F.2d 668 (9th Cir. 1988).................................................................................17

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983).......................................................................................1, *passim*

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013)....................................................................................10, *passim*

*Drakes Bay Oyster Co. v. Jewell*,
  747 F.3d 1073 (9th Cir. 2014)...............................................................................25

*Earth Island Inst. v. Carlton*,
  626 F.3d 462 (9th Cir. 2010)...................................................................................9

*EEOC v. AutoZone, Inc.*,
  707 F.3d 824 (7th Cir. 2013).................................................................................24

*Elend v. Basham*,
  471 F.3d 1199 (11th Cir. 2006) ............................................................................24

*FDA v. Alliance for Hippocratic Med.*,
  602 U.S. 367 (2024)........................................................................................11, 13

*Florida v. Bostick*,
    501 U.S. 429 (1991) .................................................................................................. 18, 22

*Florida v. Rodriguez*,
    469 U.S. 1 (1984) ............................................................................................................ 12

*Garcia v. Google, Inc.*,
    786 F.3d 733 (9th Cir. 2015) ........................................................................................... 9

*Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt Cnty.*,
    542 U.S. 177 (2003) .................................................................................................. 12, 19

*Hunt v. Washington State Apple Adver. Comm'n*,
    432 U.S. 333 (1977) ....................................................................................................... 13

*Illinois v. Wardlow*,
    528 U.S. 119 (2000) ............................................................................................. 12, 21, 22

*INS v. Delgado*,
    466 U.S. 210 (1983) .................................................................................................. 19, 20

*Jennings v. Rodriguez*,
    583 U.S. 281 (2018) ....................................................................................................... 25

*Kaley v. United States*,
    571 U.S. 320 (2014) ....................................................................................................... 15

*Knife Rts., Inc. v. Vance*,
    802 F.3d 377 (2d Cir. 2015) .......................................................................................... 14

*Lopez v. Brewer*,
    680 F.3d 1068 (9th Cir. 2012) ......................................................................................... 9

*Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*,
    237 F.3d 1101 (9th Cir. 2001) ....................................................................................... 14

*Maldonado v. Holder*,
    763 F.3d 155 (2d Cir. 2014) .......................................................................................... 16

*Melendres v. Arpaio*,
    784 F.3d 1254 (9th Cir. 2015) ....................................................................................... 24

*Nken v. Holder*,
    556 U.S. 418 (2009) ....................................................................................................... 25

*Rakas v. Illinois*,
    439 U.S. 128 (1978) ....................................................................................................... 14

*Schmidt v. Lessard,*
  414 U.S. 473 (1974).................................................................................................24

*Stavrianoudakis v. United States Fish & Wildlife Serv.,*
  108 F.4th 1128 (9th Cir. 2024) ............................................................................. 13

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009)........................................................................................ 10, 14

*Terry v. Ohio,*
  392 U.S. 1 (1968)............................................................................................ 18, 20

*Trump v. CASA,*
  145 S. Ct. 2540 (2025)............................................................................... 1, 24, 25

*United States v. Arvizu,*
  534 U.S. 266 (2002)................................................................................. 15, 16, 21

*United States v. Brignoni-Ponce,*
  422 U.S. 873 (1975)................................................................................. 15, 16, 21

*United States v. Garcia,*
  179 F.3d 265 (5th Cir. 1999) ................................................................................ 16

*United States v. Manzo-Jurado,*
  457 F.3d 928 (9th Cir. 2006) ................................................................................ 17

*United States v. Montero-Camargo,*
  208 F.3d 1122 (9th Cir. 2000) ........................................................................ 16, 21

*United States v. Sokolow,*
  490 U.S. 1 (1989).............................................................................................. 1, 15

*United States v. Watson,*
  423 U.S. 411 (1976)............................................................................................. 20

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008)................................................................................................. 10

## STATUTES

**Immigration and Nationality Act of 1952, as amended:**

8 U.S.C. § 1357(a)(1).................................................................................................. 2

8 U.S.C. § 1357(a)(2).................................................................................................. 2

18 U.S.C. § 111 .......................................................................................................... 5

## REGULATIONS

8 C.F.R. § 287.8(b)(2) ................................................................................................................ 15, 18

8 C.F.R. § 287.5 ................................................................................................................................ 2

## FEDERAL RULES OF CIVIL PROCEDURE

Federal Rules of Civil Procedure 65(d) ......................................................................................... 24

Plaintiffs ask the Court to convert the July 11 Order into a district-wide injunction regulating every on-the-ground immigration stop in the Central District. The harms from that Order are already manifesting: it has materially curtailed lawful investigative stops and chilled routine field operations, encroaching on the Executive Branch's authority to enforce the immigration laws. Third Declaration of Andre Quinones ("Quinones Decl.") ¶ 16; *cf. Arizona v. United States*, 567 U.S. 387, 416 (2012). The Fourth Amendment already requires individualized reasonable suspicion, a "low bar" that is "considerably less than … a preponderance," evaluated under the totality of the circumstances. *United States v. Sokolow*, 490 U.S. 1, 7-8 (1989). Plaintiffs have not shown any officially sanctioned practice of ignoring it; their submission stitches together media reports, subjective feelings, speculation, and scattered anecdotes from different teams, places, and dates. That does not establish the "real and immediate" threat required for prospective relief, much less justify district-wide judicial supervision of every investigative stop. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 101-11 (1983).

The motion should be denied. Plaintiffs lack Article III standing and their claims fail on the merits. But at minimum, any relief must be limited to the parties before the Court and must preserve consensual encounters and officers' ability to consider person-specific conduct, operation-specific intelligence, and time-and-place factors as part of the totality. *See Trump v. CASA*, 145 S. Ct. 2540, 2551 (2025).

## BACKGROUND

### I.     Procedural History

Plaintiffs filed this action on June 20, 2025, later amending on July 2, 2025. ECF 16. In early July, they sought emergency relief to enjoin allegedly suspicionless stops. ECF 38, 45. On July 11, 2025, the Court enjoined all investigative stops based on four factors alone or in combination: race, language, location, or occupation. ECF 87, 101. Defendants appealed and sought stays in this Court and the Ninth Circuit; both were denied.[1] ECF 89, 94, 108, 109. The Ninth Circuit agreed that the July 11 Order was an appealable preliminary injunction. This Court has persisted with briefing and a hearing on the same issues. A stay application to the Supreme Court remains pending. No. 25A169.

---

[1] Notably, the Ninth Circuit found this Court's use of the phrase "except as permitted by law" as impermissibly vague and held that Defendants are likely to succeed on the merits as to this specific clause. *See* ECF 63.1 at 41.

## II.    Federal Law Enforcement Procedures

Immigration officers pursuant to 8 U.S.C. § 1357(a)(1) are authorized to interrogate, without a warrant, any alien or person believed to be an alien regarding their right to be or remain in the United States. Immigration officers are also authorized to perform the warrantless arrest of:

> [A]ny alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest, but the alien arrestee shall be taken without unnecessary delay . . . before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States.

8 U.S.C. § 1357(a)(2); *see Abel v. United States*, 362 U.S. 217, 232-37 (1960) (discussing longstanding administrative arrest procedures in deportation cases).

In accordance with 8 U.S.C. § 1357(a)(1), 8 C.F.R. § 287.5, and the limits imposed by the Fourth Amendment, Officers in ICE's Los Angeles Enforcement and Removal Operations ("ERO Los Angeles") receive Ninth Circuit–specific immigration enforcement training, including instruction on Fourth Amendment requirements, twice annually. Quinones Decl. ¶ 5. They are trained that reasonable suspicion and probable cause are evaluated under the totality of the circumstances standard. Quinones Decl. ¶¶ 5-6. ERO Los Angeles officers also receive training on the statutory and regulatory provisions of the Immigration and Nationality Act ("INA") and are instructed to follow ICE procedures emphasizing targeted investigations and arrests of aliens with final removal orders and/or serious criminal histories. *Id*. ¶ 7. For non-targeted individuals, officers are trained to develop reasonable suspicion through consensual encounters. *Id* ¶ 7. The ICE Office of the Principal Legal Advisor ("OPLA") also provides Ninth Circuit–specific immigration enforcement training, including Fourth Amendment and INA requirements, to local law enforcement partners within the U.S. Department of Justice. ECF 94-1 ¶¶ 10-11. ERO Los Angeles participates in multi-agency operations (including with CBP) using pre-operation target packets focused on noncitizens with final orders or significant criminal histories. ECF 94-1 ¶¶ 12, 6. When officers encounter non-targets, they use consensual interviews to assess individualized reasonable suspicion. *Id*. Federal immigration officers have specialized expertise and practical knowledge of factors that are most indicative of immigration violations, illegal activity, and behaviors typically

associated with unlawful presence. *See* Second Declaration of Daniel I. Parra ("Parra Decl.") ¶ 9. Prior to engaging in investigative detentions, [CBP] agents are trained to have developed reasonable suspicion that the individual has committed or is committing a federal crime or federal immigration violation. *Id.* ¶ 8. This determination is evaluated based on the totality of the circumstances. *Id.* The factors that contribute to reasonable suspicion include, but are not limited to, information from intelligence sources, information from law enforcement and open-source databases, analysis of trends and patterns associated with immigration violations, previous encounters with undocumented individuals at a specific location, and information provided by human sources, which may include confidential informants. *Id.*

### III.    Individual Allegations

Plaintiffs and non-party witnesses allege unlawful immigration operations by defendants in Los Angeles and surrounding counties throughout the month of June 2025. ECF 45 at 6-13, ECF 128 at 12-15. However, these alleged encounters, when viewed in the totality of the circumstances, fall under one of four categories demonstrating the overall baselessness of their claimed Fourth Amendment violations. Specifically, both named Plaintiffs and unnamed non-party witness allegations can be categorized as: (A) Consensual encounters which do not implicate the Fourth Amendment; (B) outright arrests; (C) *Terry* stops with additional lawful justifications; and (D) self-initiated contact with federal immigration agents.

####     A.    Consensual Encounters: Hernandez Viramontes, Gamez, and Villegas Molina

**June 9, 2025**: Plaintiffs Jorge Luis Hernandez Viramontes ("Hernandez Viramontes") and Omar Andre Gamez ("Gamez"), are both United States citizens and co-managers of a car wash in Whittier, California. ECF 45-4 ¶¶ 2, 4; ECF 45-5 ¶¶ 2-3; ECF 128 at 12-13. Hernandez Viramontes and Gamez allege that the agents asked people their immigration status and arrested three workers from the car wash. ECF 45-4 ¶ 6; ECF 45-5 ¶ 5.

**June 14, 2025**: Hernandez Viramontes and Gamez alleged that uniformed Border Patrol agents arrived in marked vehicles to the car wash in Whittier, California, questioned workers and customers about their immigration status, and arrested one worker. ECF 45-4 ¶ 7; ECF 45-5 ¶ 6.

**June 18, 2025:** Hernandez Viramontes and Gamez alleged that the federal immigration agents returned in unmarked vehicles to the car wash in Whittier, questioned workers and arrested one individual. ECF 45-4 ¶ 8; ECF 45-5 ¶ 7. On that date, Plaintiff Hernandez Viramontes alleged that an

agent asked if he was U.S. citizen, to which he responded "yes." ECF 45-4 ¶ 9. When asked for identification, Hernandez Viramontes claims that he provided his California driver's license and told the officer he was born in Mexico. *Id.* Hernandez Viramontes noted that the officer informed him that because he did not have his passport, he would need to go with the agents to investigate if he was a U.S. citizen. *Id.* He was then transported to another location where they verified his citizenship and returned him to the car wash 20 minutes later. ECF 45-4 ¶¶ 9-14; ECF 45-5 ¶¶ 8-11. However, CBP avers that when Viramontes was first asked about his immigration status, he initially informed the agent that he was a citizen of Mexico. Parra Decl. ¶ 16. A crowd of approximately 10 people surrounded Mr. Viramontes and the agent, yelling and cursing. *Id.* Mr. Viramontes was walked to the agent's vehicle without restraints in order to safely continue the immigration inspection. *Id.* He was told that the reason he was being moved was due to the unsafe environment. *Id.* Mr. Viramontes remained calm and compliant. *Id.* The agents drove approximately two stop lights away, and promptly returned Mr. Viramontes back to the car wash upon verifying his U.S. citizenship. *Id.* Gamez alleged that he was approached multiple times by officers and asked if he was a U.S. citizen. ECF 45-5 ¶ 7. Gamez also noted that another group of agents arrived at the car wash later that day, "said that they were looking for someone" but left without arresting anyone. *Id.* ¶ 11

### B.    Arrests: Non-party Ramirez

**June 12, 2025**: Non-party witness Javier Ramirez ("Ramirez"), a U.S. citizen, was at Yank Towing located in Montebello, California. ECF 128-2 ¶¶ 1-2, 4-6. Based on the direction from CBP agents' intelligence group, which gathers location information based on various factors including "known patterns of immigration violations", officers were directed to conduct immigration enforcement at the tow yard through consensual encounters. *See* Declaration of Border Patrol Agent C217 ("C217 Decl.") ¶¶ 4-5; Parra Decl. ¶ 10. Ramirez claimed that federal agents approached him outside a towing business, he did not tell the agents he was born in the U.S. at first, and was subsequently arrested and charged with Assaulting, Resisting, or Impeding a Federal Officer. ECF 128-2 ¶¶ 7, 9-11. However, Ramirez's conduct was not as innocent as he portrays to be in his declaration, *see* ECF 128, which neglects to mention that he actively resisted arrest and bit one of his arresting officers on the leg. C217 Decl. ¶ 6; Parra Decl. ¶ 14. In fact, according to Deputy Chief Patrol Agent Parra, Ramirez exhibited behavior consistent with raising

suspicion of his involvement with potential illegal activity. Parra Decl. at ¶ 14. He hid between vehicles to conceal himself from officers. *Id.* He then fled without provocation, which exhibited "behavior based on the officer's training and experience is often linked to potential illegal activity." *Id.* Furthermore, when the agent "approached to investigate, Mr. Ramirez ran into the agent, knocking a cell phone off the agent's chest and nearly causing him to lose balance." *Id.* He spoke to the agents in Spanish and refused to answer questions about his citizenship. *Id.* Ramirez tried to push the officer away, resisted apprehension, and bit the agent's leg, which led to his arrest and charge for assaulting a federal officer pursuant to 18 U.S.C. § 111. *Id.*; C217 Decl. ¶ 11. Ramirez only informed the agents that he was a U.S. citizen after being handcuffed and awaiting further transport. *Id.*

**June 18, 2025**: Plaintiff Villegas Molina is a day laborer of an unspecified immigration status. ECF 45-3 ¶¶ 2-3, ECF 128-8 ¶ 4. On June 18, ERO officers conducted a targeted action to locate an alien with a final removal order and serious criminal convictions. ECF 94-1 ¶ 6. Surveillance indicated the target, who operated a landscaping business, regularly picked up workers outside Windell's Donut Shop in Pasadena, California. *Id*. Molina alleges that he was waiting for work at Metro bus stop outside of Windell's Donut Shop in Pasadena, California, when around four unmarked vehicles appeared at the bus stop and armed men in civilian clothes emerged. ECF 45-3 ¶ 5, ECF 128-8 ¶¶ 4-5. While others attempted to flee, Molina did not run from the agents. ECF 45-2 ¶ 6, ECF 128-8 ¶ 6. According to Molina, when an agent asked for his identification and if he had any papers, Molina showed his California driver's license and responded that he did not have papers. ECF 45-2 ¶ 6, ECF 128-8 ¶ 5-6. After this consensual encounter in which Molina answered the agents' questions, he was arrested and transported to a detention facility in downtown Los Angeles. ECF 45-3 ¶¶ 7-9. Molina posted bond and was released on July 7, 2025. ECF 128-8 ¶ 10.

    **C.**    ***Terry* Stops with Additional Lawful Justifications: Plaintiffs F.H.S., J.D.S.**

**June 12, 2025**: Plaintiff F.H.S., a 54-year-old San Bernardino resident and food vendor was selling oranges near a grocery store when she and other vendors saw a black car pull up with an individual staring at them. ECF 128-3 ¶ 3. She alleged that she and three other vendors got in the car and attempted to exit, when federal agents approached and blocked their vehicle. *Id.* ¶¶ 2-4. The agents ordered them out of the car and F.H.S. claims that she began to video the interaction with her phone. *Id.* ¶ 5. The agents

arrested F.H.S., and she claimed that she was not asked for identification or questioned about her legal status, and her questions about why she was being detained went unanswered. ECF 128-3 ¶¶ 6-7. Yet, F.H.S.'s declaration seemingly fails to address that the officers conducted a traffic stop in which F.H.S. attempted to flee the vehicle, tripped and fell, and injured herself.[2] Quinones Decl. ¶ 11. When an officer attempted to assist F.H.S. off the ground, she became combative and attempted to bite the assisting officer. *Id.* The agents transported her to the San Bernardino processing center. ECF 128-3 ¶¶ 8-9. Ultimately, F.H.S. was transferred to the Adelanto ICE Processing Center, where she remains detained. ECF 128-3 ¶¶ 10-11.

**June 13, 2025:** Plaintiff J.D.S., a 32-year-old deaf, non-verbal DACA recipient, was returning to his work at a car wash in Temple City, California, when he heard ICE officers were in the area. ECF 128-4 ¶¶ 2-6. He claims that he saw people running, and he ran too out of fear when agents wearing "HSI" vests approached him. ECF 128-4 ¶¶ 5-6. After he indicated his deafness and presented identification, including a valid work permit, the officers allegedly confiscated his wallet and phone, detained him, and placed him in a vehicle without explanation or a warrant. ECF 128-4 ¶¶ 7-8. He was transported to multiple locations before being transferred to El Paso, Texas, where he remained in custody until a July 2, 2025, bond hearing at which he met his attorney. ECF 128-4 ¶¶ 9-12, 14.

**June 18, 2025**: Plaintiffs Vasquez Perdomo and Carlos Osorto are day laborers of unspecified immigration status. ECF 45-1 ¶¶ 2-3; ECF 45-2 ¶¶ 2-3; ECF 128-1, Exh. A. Perdomo and Osorto were apprehended during the same ERO Los Angeles encounter at Windell's Donut Shop in Pasadena, California, based on ERO's targeted action to locate an alien with a final removal order and serious criminal convictions and the individual having a history of employing illegal aliens. ECF 94-1 ¶ 6. Perdomo and Osorto were waiting for work at Metro bus stop outside the donut shop when they claim that around four unmarked vehicles appeared. ECF 45-1 ¶ 5; ECF 45-2 ¶ 5; ECF 128-7 ¶ 5, ECF 128-8 ¶ 5. Perdomo stated that he believed the agents were from immigration and he attempted to move away. ECF 128-7 ¶¶ 6-7. However, Perdomo stated that after he tried to flee, he was surrounded by the agents who handcuffed him and asked for his identification, to which he responded in English that he had the

---

[2] Plaintiffs' use of initials hampers Defendants' ability to investigate; this likely refers to a June 11, 2025 action in San Bernardino. Quinones Decl. ¶ 11.

DEFENDANTS' OPPOSITION TO PI (4TH AMENDMENT)

6

right to remain silent. ECF 128-7 ¶ 7. Osorto "tried to run" from the agents, but one of the agents caught up to him. ECF 45-2 ¶ 6. After the agents asked the men their immigration status, they were taken to a CVS parking lot for further questioning and transported them to a detention facility in downtown Los Angeles for processing. ECF 45-1 ¶¶ 7-8; ECF 45-2 ¶ 6; ECF 128-7 ¶¶ 8-9. Perdomo posted bond and was released on July 8, 2025. ECF 128-7 ¶ 13.

**June 19, 2025:**[3] Plaintiff E.C.P., a 58-year-old food vendor of unspecified immigration status, was selling outside a Home Depot in Los Angeles. That location was selected based on general intelligence and longstanding experience, and it is a well-known place where undocumented individuals frequently gather to obtain cash-based day labor. Parra Decl. ¶ 15. The agents were wearing official Border Patrol identifiers, including body armor displaying a visible badge and shoulder patches clearly stating their status as Border Patrol Agents. *Id.* As two agents approached the subject, she fled without provocation, even before the agents could verbally identify themselves. *Id.* Once they caught up to the subject for an investigative detention, she stated she was a citizen of Guatemala and was in the United States illegally, providing probable cause for her arrest for a violation of immigration law. *Id.*

**July 21, 2025:** Plaintiff G.V.C., a 58-year-old resident of Ontario, California, was leaving Miss Donuts when two agents detained him. ECF 128-6 ¶¶ 2–3. According to G.V.C., the agents took his wallet, emptied its contents, and placed him in a vehicle, where one of the agents stated he was not the person they were looking for. ECF 128-6 ¶¶ 4–5. Yet, the declaration from ICE ERO provides necessary context to this legal encounter. *See* Quinones Decl. ¶ 9. According to Deputy Field Office Director Quinones, the events that transpired this day were part of a targeted enforcement operation to locate an individual who was previously removed from the United States and subsequently re-entered illegally. *Id.* Agents observed a male subject matching the photo and available biographical information exiting a residence and driving to "Miss Donuts" shop located in Ontario, California. *Id.* An ERO officer engaged the target as he was leaving Miss Donuts, but the target ran to his truck, was blocked by the officer, and threw hot coffee at the officer's arm and face. *Id.* The target fled on foot and the agents attempted to

---

[3] While E.C.P. does not include the date for the alleged events, the PI indicates that the events in question transpired on June 19, 2025. ECF 128-5. And again, Plaintiffs' use of initials hampers Defendants' investigation, but the circumstances indicate they are referencing the same individual. Parra Decl. ¶ 15.

follow him. *Id.* During the search for the target, an officer who was guarding the rear exit of a nearby market encountered G.V.C. *Id.* According to Quinones, the officer may have initially thought G.V.C. was the target based on the similarity of their clothing. *Id.* However, according to the officer, he conducted a consensual field interview with G.V.C. in which he admitted that he was born in Mexico, had entered the United States illegally, and had no documents allowing him to be in the United States. *Id.* G.V.C. was taken to the San Bernardino processing center, where he was questioned about his immigration status, and reported he had applied to renew his work permit. ECF 128-6 ¶ 6. He was then transported to the Adelanto ICE Processing Center and remains detained there. *Id.*

### D.    Self-Initiated Contact with Federal Agents

**June 12, 2025**: Plaintiff Brian Gavidia ("Gavidia") is a United States citizen. ECF 45-9 ¶ 1. Gavidia was repairing his car at a towing yard in Montebello, California, when he heard reports that there were immigration agents outside. ECF 45-9 ¶¶ 6-7. Gavidia encountered an immigration agent in a green uniform, and other agents with "Border Patrol Federal Agent" on their vests as he emerged from tow yard gates. ECF 45-9 ¶ 7. An agent told Gavidia to stop when Gavidia attempted to reenter the tow yard. ECF 45-9 ¶ 8. He stated that an agent asked him if he was a U.S. citizen and, when he confirmed that he was, the agent asked in which hospital he was born. ECF 45-9 ¶ 9. Gavidia could not name the hospital but produced a REAL ID proving his citizenship. ECF 45-9 ¶¶ 9-11. However, CBP agents dispute Mr. Gavidia's recollection of what transpired that day. Based on direction from their intelligence group, officers were directed to conduct immigration enforcement at the tow yard through consensual encounters. C217 Decl. ¶¶ 4-5. During the arrest of Ramirez, an agent exited the tow yard to investigate activities on the street. *Id.* ¶ 7. A minute later that same agent yelled out "somebody get out here" and then specifically called out to C217 by name to "get out there." *Id.* When C217 stepped out to assist, he saw "a crowd of approximately 10 people" approach the officers on scene and began "yelling out various curse words toward us." *Id.* ¶¶ 7-8. C217 observed that an individual, later identified as Mr. Gavidia, stood very close to another officer. *Id.* ¶ 8. Based on Mr. Gavidia's close proximity to the officer and the determination that the other officer's safety was threatened, Mr. Gavidia was restrained by C217. *Id.* While Mr. Gavidia was placed against the fence for officer's safety, he *voluntarily* disclosed that he was an American citizen. *Id.* After voluntarily sharing his citizenship status, the officer asked which hospital

he was born. *Id.* Mr. Gavidia told C217 that he was born "here, East LA" and that he had an ID and reiterated "let me show you my shit." *Id.* C217 allowed Gavidia, unrestrained, to produce his ID from his wallet but the officer could not ascertain his citizenship because the crowd prevented him from asking Gavidia any further questions through disruptive rhetoric that included "telling us to get the fuck out of here" and "we are all U.S. Citizens bitch." *Id.* ¶ 9. Mr. Gavidia was ultimately left at the tow yard and was not taken into custody. *Id.* ¶ 11.

**June 23, 2025:** On June 23, 2025, Aleca Le Blanc ("Le Blanc"), a U.S. citizen and resident of Los Angeles County, went to a Home Depot at Slauson Ave. and S. Fairfax Ave. to check on the community after learning of an ICE raid at another location. ECF 128-12 ¶¶ 2, 4. She observed a man in plain clothes, later joined by another man in plain clothes with a Border Patrol patch, chase and handcuff a woman street vendor. ECF 128-12 ¶¶ 5-8, 12. Le Blanc voluntarily approached federal agents, "repeatedly asked the men to identify themselves and to show a warrant with a judge's signature." *Id.* ¶ 10. Two SUVs arrived, and six more agents in street clothes and camouflage vests placed the woman in a vehicle, and drove away. ECF 128-12 ¶¶ 9-11, 12-13.

**IV.      Organizational Plaintiff Allegations**

Organizational Plaintiffs, LAWCN, UFW, and CHIRLA, allege that their organization members and those members' relatives have been placed in fear of detention or have been detained by Defendants' immigration enforcement actions. ECF 45-8 ¶¶ 16-36; ECF 45-12 ¶¶ 25-28; ECF 38-9 ¶¶ 24-31; ECF 128-9 ¶¶ 16-38; ECF 128-11 ¶¶ 3-8.

**STANDARD OF REVIEW**

Injunctive relief "is an extraordinary and drastic remedy," *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (internal quotation marks and citation omitted), that is "never awarded as of right," *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (internal quotation marks and citation omitted). Thus, this relief "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Lopez*, 680 F.3d at 1072 (internal quotation marks and citation omitted; emphasis in original). This is a "difficult task." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010). To prove their entitlement to such relief, Plaintiffs must establish that: (1) they are likely to succeed on the merits, (2) are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of

equities tips in their favor, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

**ARGUMENT**

**I.      Plaintiffs Lack Standing or Irreparable Harm to Enjoin Lawful Investigative Stops**

Plaintiffs must show a real and immediate risk of future injury to them—not merely past contact or generalized allegations. As such, Plaintiffs lack Article III standing for forward-looking relief. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 (2013). In order to secure an injunction, the irreparable harm must also be immediate, concrete, and "likely." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Past contact does not create a presumption of imminent repetition. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105-06 (1983). Plaintiffs identify no written policy authorizing stops on the four enumerated factors because there is none. And the record shows mixed, incident-specific operations by different components—not a uniform "official sanction." Nor is there evidence that any of the Plaintiffs have been unlawfully stopped since. Without a concrete, near-term risk that these Plaintiffs will again be detained without individualized suspicion, their injunctive claim fails for a lack of standing or irreparable harm. *See also Summers v. Earth Island Inst.*, 555 U.S. 488, 497–99 (2009) (associational standing requires an identified member facing imminent harm, not statistical probability).[4]

**A. Individual Plaintiffs**

At the outset, the five individual plaintiffs lack Article III standing to obtain injunctive relief barring investigative stops based on the purported prohibited factors alone or in combination, to form reasonable suspicion for an investigative stop.[5] No individual Plaintiff was stopped based solely on those factors. Plaintiffs' only evidence to the contrary is baseless speculation. Only the Officers conducting the stops know what factors they considered in the rapidly evolving situations where the alleged stops occurred. And the Officers had a variety of facts they were considering for each stop. Plaintiffs therefore cannot demonstrate that they were stopped solely based on the factors at issue, much less that they face

---

[4] Though they did not move for a preliminary injunction on their own accord, the intervenors also lack standing and thus cannot justify and injunction either. *See* ECF 147.

[5] Defendants maintain that this Court lacks jurisdiction to issue another preliminary injunction because the Court's July 11 Order on the exact same issues is currently on appeal. ECF 89, 94, 108, 109. The Court should wait to issue any new order until that appeal is resolved.

DEFENDANTS' OPPOSITION TO PI (4ᵀᴴ AMENDMENT)

10

any *immediate* and likely risk of being subjected to such a stop in the future.[6] *See Clapper*, 568 U.S. at 412; ECF 128-13 at 15 (listing four factors of (i) apparent race or ethnicity; (ii) speaking Spanish or English with an accent; (iii) presence in certain locations; and (iv) type of work one does). To establish standing, a plaintiff must demonstrate (i) that he has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024).

The Supreme Court rejects "past-is-prologue" standing. *City of Los Angeles v. Lyons* held that a plaintiff previously subjected to a chokehold lacked standing to enjoin future chokeholds absent a concrete, imminent threat that he personally would be choked again; a past incident and an alleged departmental practice were not enough. *See* 461 U.S. 95, 101-11 (1983). Individual Plaintiffs' standing theory is a redux of *Lyons*. First, Plaintiff Gavidia alleges a past Fourth Amendment injury from law enforcement in which he alleges that he was stopped based on his "skin color". ECF 45-9 ¶¶ 2-3. But Gavidia was stopped because one officer was uncharacteristically yelling for help and Gavidia approached the officers during a tense standoff, not because of his skin color as he speculates without basis. C217 Decl. ¶¶ 7-8. Even so, as in *Lyons*, Gavidia seeks prospective relief to enjoin the challenged practice (here, reliance solely on the four factors in investigative stops). *See* Preliminary Injunction Motion ("PI Mot.") 12; *see* ECF 45-9 ¶¶ 12-13. However, like *Lyons*, Gavidia cannot show standing because he has no basis beyond mere speculation to believe that he was stopped or will be stopped without reasonable suspicion based solely on the four factors. "Absent a sufficient likelihood that he will again be wronged in a similar way," he is "no more entitled to an injunction than any other citizen of Los Angeles; and a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional." *Lyons*, 461 U.S. at 111.

Next, Viramontes alleged that agents visited the carwash where he works twice *without* stopping him, then detained him for about 20 minutes on their third visit until they could verify his citizenship status, which he did. ECF 45-4 ¶¶ 5-11. There is no basis, other than his speculation, that he was stopped

---

[6] Plaintiffs characterize these encounters as "detentive stops" (*e.g.*, Mot. at 1), but that label is inaccurate. The proper term is investigative stop—a brief, non-arrest encounter supported by reasonable suspicion. Treating such stops as arrests misstates their legal character and exaggerates the scope of Plaintiffs' claims.

based on impermissible factors. That single interaction provides no basis to believe Viramontes will be subject to any future stops, let alone wrongful ones. Indeed, the fact that the location was visited three times and he was only stopped once demonstrates that a future stop based only on the contested factors is completely speculative.

Additionally, the named individual plaintiffs, who are not U.S. citizens, fail to demonstrate standing or that they face a prospective likelihood of future harm. Specifically, the only "evidence" of Perdomo's standing is his "belie[f]" that he will be stopped again. ECF 45-1 ¶ 11, ECF 128-7 ¶ 14. Similarly, Molina noted his "worr[y]" that he will be arrested again for "look[ing] like an immigrant." ECF 45-11 ¶ 3, ECF 128-8 ¶ 13. Plaintiff Osorto stated that he is afraid he will likely be arrested again for similar reasons due to his Latino ethnicity and construction clothes. ECF 45-2 ¶ 13. These nonspecific claims of fear of being stopped again in the future and that the stop would possibly be illegal "is not certainly impending" and "cannot manufacture standing." *Clapper*, 568 U.S. at 416.

Moreover, many of the named plaintiffs and declarants did not demonstrate that they experienced a seizure rising to the level of a Fourth Amendment violation, undermining their argument relating to standing and future irreparable harm. For instance, Plaintiff Molina, Perdomo, and Osorto interacted with federal agents in a place in public outside of Windell's Donut Shop in Pasadena, California, which agents visited based on ERO's targeted action to locate an alien with a final removal order and serious criminal convictions, who operated a landscaping business, regularly picked up workers outside this location. ECF 94-1 ¶ 6. Molina's interaction constituted a consensual encounter in which he voluntarily informed the agents, in a public place, that he did not have papers to be in the U.S. ECF 128-8 ¶ 6; *see Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt Cnty.*, 542 U.S. 177, 185 (2003) ("[I]nterrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure."). On the other hand, named Plaintiffs Perdomo and Osorto admitted that they ran from federal agents and were eventually arrested where it was determined that they were not legally present in the U.S. ECF 45-2 ¶ 6, 8; 128-7 ¶¶ 7-9; *see also* ECF 128-1, Exh. A (Osorto Form I-213); *see, e.g.*, *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); *Florida v. Rodriguez,* 469 U.S. 1, 6 (1984) (speaking furtively and urging the need to leave).

Here, Plaintiffs' allegations of the possibility of repeated stops that would be based on or in combination of the four factors are entirely speculative. They claim that the federal government has an unstated practice of relying on just four factors to supply reasonable suspicion for immigration stops, and that those factors could describe broad swaths of the population. But Plaintiffs offer nothing to substantiate their premise that they—out of the 20 million or so inhabitants of the Central District of California—would be stopped again. Plaintiffs acknowledged that the government in certain cases relies on additional factors, and they do not challenge stops that rely on the four factors plus even one additional factor as lacking reasonable suspicion. *See* PI Mot. 19-20. That just aggravates the standing problem: even if Plaintiffs were stopped in the future, they have no basis for alleging that they would be stopped *solely* based on the four prohibited factors, not for some additional reasons. Like *Lyons*, it is insufficient to just speculate that federal agents may continue a general, unstated policy of relying solely on the four factors. 461 U.S. at 107 n.7. Rather, what matters is that Plaintiffs cannot show any realistic immediate threat that they will likely be stopped and detained solely based on those factors again. *See also Clapper*, 568 U.S. at 401 (holding that the plaintiffs' claim "[wa]s too speculative to satisfy the well-established requirement that threatened injury must be certainly impending") (internal quotations omitted). "Absent a sufficient likelihood that [they] will again be wronged *in a similar way*," *Lyons*, 461 U.S. at 111 (emphasis added), Plaintiffs cannot establish standing to seek an injunction much less irreparable harm.

**B. Associational Standing**

That same imminence defect defeats organizational Plaintiffs' standing and irreparable harm to pursue prospective injunctive relief. Associational standing requires proof (*inter alia*) that an organization's "members would otherwise have standing to sue in their own right" and "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Alliance for Hippocratic Med.*, 602 U.S. at 398 (Thomas, J., concurring) (quoting *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). But, just like the individual Plaintiffs in this case, any risk of future harm for the organizations' members is speculative. *See id.* at 381 (citing *Clapper*, 568 U.S. at 409). Absent any nonspeculative probability of injury to their members, the organizations lack standing. *See Stavrianoudakis v. United States Fish & Wildlife Serv.*, 108 F.4th 1128, 1143–44 (9th Cir. 2024) (citing *Lyons*, 461 U.S. at 101) (no associational standing for warrantless searches because it was

speculative that any members would be harmed in the future).

Nor can organizational Plaintiffs argue their members face an imminent threat of injury based on pure statistical inference and anecdotes from certain uncorroborated members. Because organizational Plaintiffs are sufficiently numerous, and the enforcement action of the federal government in this district is high-volume, this cannot bridge the gap needed for standing. Particularly, organizational plaintiffs include thousands of unidentified organizational members across the entirety of California who assert some risk of being detained by immigration officers in a district populated by 20 million people. PI Mot. 17-18. However, the Supreme Court has held that organizational standing based on the mere "statistical probability that some of [the organization's thousands of] members are threatened with concrete injury" would "make a mockery of [the Court's] prior cases," and it has instead required specific, concrete allegations of harm to one or more "*identified* member[s]" of an organizational plaintiff. *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (emphasis added). Therefore, organizational Plaintiffs fail to establish the requisite standing much less irreparable harm.

Moreover, it is inappropriate for the organizational Plaintiffs to assert standing and allege Fourth Amendment violations based on their group's members. It is well-known that "Fourth Amendment rights are personal rights which . . . may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165, 174 (1969). In *Rakas v. Illinois*, the Supreme Court "decline[d] to extend the rule of standing in Fourth Amendment cases" to the petitioners, as the petitioners did not experience any Fourth Amendment violation. 439 U.S. 128, 133-134 (1978). This applies outside of the exclusionary rule as well to actions under section 1983. *See Knife Rts., Inc. v. Vance*, 802 F.3d 377, 387 (2d Cir. 2015); *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1111 (9th Cir. 2001). This makes sense because Fourth Amendment claims are too fact-specific and context-dependent to satisfy the requirements of organizational standing or class actions. For instance, the Ninth Circuit in *Black Lives Matter L.A. v. City of Los Angeles* addressed Fourth Amendment claims from a group of plaintiffs, and held that [w]hether the use of tight handcuffs violates the Fourth Amendment, like other excessive force issues, is usually fact-specific and likely to turn on the credibility of the witnesses[,]" and is ill situated for a class-action claim. 113 F.4th 1249, 1258-1262 (9th Cir. 2024). Such third party standing is an ill fit for Plaintiffs claims.

**II.    Plaintiffs Cannot Show a Fourth Amendment Violation**

Even putting standing aside, Plaintiffs cannot show that the Defendants violated the Fourth Amendment or are likely to do so again. Plaintiffs' request for extraordinary injunctive relief hinges on demonstrating irreparable harm stemming from likely Fourth Amendment violations. The alleged Fourth Amendment violations are relying on four factors alone or in combination: (1) race; (2) language; (3) location; (4) occupation. But the Fourth Amendment does not allow such categorical restrictions on which facts may be considered in the totality of the circumstances analysis. In any event, each stop of Plaintiffs was supported by reasonable suspicion and factors beyond the four this Court identified as suspect. So there was no Fourth Amendment violation in the past, much less a likelihood of imminent future violations.

**A.    The Fourth Amendment Allows Consideration of Various Factors**

The four factors identified by Plaintiffs as problematic cannot be categorically excluded as grounds for reasonable suspicion alone or in combination. The reasonable suspicion is inherently individualized and context specific, so no set of bright line rules can cabin what facts officers can consider in the moment.

The Fourth Amendment guarantee against unreasonable searches and seizures "extend[s] to brief investigatory stops of persons or vehicles that fall short of traditional arrest," including stops of individuals suspected of being in the United States illegally. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). By virtue of "the limited nature of the intrusion," however, "stops of this sort may be justified on facts that do not amount to the probable cause required for an arrest." *United States v. Brignoni-Ponce*, 422 U.S. 873, 880 (1975). Instead, an officer may conduct such a stop based on reasonable suspicion— supported by "specific articulable facts, together with rational inferences from those facts"—that a person is an illegal alien. *Id.* at 884; *see* 8 C.F.R. § 287.8(b)(2). Reasonable suspicion requires only "'some minimal level of objective justification' for making the stop," a standard that is "obviously less demanding than that for probable cause," *Sokolow*, 490 U.S. at 7 (citation omitted)—which is itself "not a high bar," *Kaley v. United States*, 571 U.S. 320, 338 (2014). Given that probable cause "is something more than a bare suspicion, but need not reach the fifty percent mark," reasonable suspicion requires even less certainty. *See United States v. Garcia*, 179 F.3d 265, 269 (5th Cir. 1999). The reasonable-suspicion

DEFENDANTS' OPPOSITION TO PI (4TH AMENDMENT)

15

inquiry "turn[s] on the totality of the particular circumstances." *Brignoni-Ponce*, 422 U.S. at 885 n.10; *see Arvizu*, 534 U.S. at 273. By definition, *no particular circumstantial factor is categorically off-limits*— whether that factor is a person's appearance, behavior, or the officer's past experience with the particular offense, location, or suspect. *See, e.g.*, ECF 94-1 ¶ 5 (collecting examples of reasonable-suspicion factors in the immigration-enforcement context). Reasonable suspicion is accordingly context-dependent and cannot be reduced to per se rules that treat certain factors as categorically insufficient.

Here, the question is what constitutes reasonable suspicion for illegal presence in the United States—a status shared by an estimated 10 percent of the population of the District, or about 2 million people. In that context, the four factors enumerated in the district court's injunction are plainly relevant. To take one example, if officers know based on their experience or past enforcement history that a particular business has a history of employing illegal aliens and has, for instance, been cited 20 times for failing to verify employees' identification, officers may well have reasonable suspicion to stop people gathering to seek employment there, especially given the concentration of illegal aliens in the District. *See, e.g., United States v. Montero-Camargo*, 208 F.3d 1122, 1138 (9th Cir. 2000) (en banc) (describing relevance of location to reasonable suspicion). Similarly, if agents know that particular jobs are attractive to illegal aliens because they do not require documentation or verification, that too can support reasonable suspicion. *See, e.g., Maldonado v. Holder*, 763 F.3d 155, 161 (2d Cir. 2014) (noting that day labor is "an occupation that is one of the limited options for workers without documents"). Thus, if officers know from past experience that illegal aliens seeking construction jobs congregate in a particular parking lot to meet prospective employers, they may well have reasonable suspicion for investigative stops of non-English-speaking persons congregated there.

Likewise, apparent ethnicity can be a factor supporting reasonable suspicion in appropriate circumstances—for instance, if agents know that the members of a criminal organization under investigation are disproportionately members of one ethnic group—even if it would not be relevant in other circumstances. *See Brignoni-Ponce*, 422 U.S. at 885-886 ("apparent Mexican ancestry" did not "alone" supply reasonable suspicion). And, in context, officers might reasonably rely on the fact that someone exclusively speaks Spanish to support reasonable suspicion that the person is here illegally, not least because a disproportionate percentage of illegal aliens in the Central District speak Spanish and do

not speak English fluently or at all. *See, e.g., United States v. Manzo-Jurado*, 457 F.3d 928, 937 (9th Cir. 2006) (fact that group was "speaking to each other only in Spanish" was "relevant to the reasonable suspicion inquiry"). All of this reflects common sense: the reasonable-suspicion threshold is low, and the number of people who are illegally present and subject to detention and removal under the immigration laws in the Central District is extraordinarily high and starts off at a 1 in 10 probability just among the general population. In that context, the four factors at issue—especially when most illegal aliens in the Central District hail from Mexico and Central America, often speak Spanish exclusively, and seek out jobs that do not require documentation—can obviously support reasonable suspicion for a brief investigative stop in at least some circumstances. Just because the four factors may not supply reasonable suspicion in some circumstances, however, does not mean they will never do so. On this basis alone, Plaintiffs' request for an injunction must fail.

**B.    The Stops were Lawful**

In any event, the stops were lawful even if reasonable suspicion requires something more than the four factors Plaintiffs target as problematic. As such, there have been no Fourth Amendment violations and any future violations are wholly speculative.

Plaintiffs' claim that the government partakes in a "policy and practice of suspicionless stops" based solely on the four factors at issue. *See* PI Mot. 16-17. But that is highly speculative and unsupported by their evidence. *See also Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 675 (9th Cir. 1988); *Clapper*, 568 U.S. at 410. As noted before, such a policy does not exist. *See* ECF 71 at 19. The Court recognized the same. ECF 87 at 45 n.33. Instead, federal agents follow Fourth Amendment case law, which embraces a totality-of-the-circumstances, noncategorical approach that recognizes that the strength of particular factors may vary in context and that factors in combination can supply reasonable suspicion even if they do not individually. ECF 71-2 ¶ 8. Officers are repeatedly trained on this standard in line with Ninth Circuit Precedent. *See* ECF 71-1 ¶ 5, 94-2 ¶ 11; C217 Decl. ¶ 2. If anything, the policy is to follow the prevailing case law, not violate it. And statements from high-ranking officials that they want more immigration enforcement in no way proves there is a policy of stopping people based on the fourth factors at issue—that is a non-sequitur to say the least. The Executive Branch has every authority to enforce the immigration laws, and any reiteration of this long standing principle by those associated

with the Executive continue to demonstrate only a policy of wanting to enforce and follow the laws as it relates to the Fourth Amendment. *See, e.g.*, *Arizona*, 567 U.S. at 416.

Consistent with 8 C.F.R. § 287.8(b)(2), the agents' reasonable suspicions are based on "specific articulable facts" that the person being questioned is an alien illegally present in the United States. ECF 94-1 ¶ 5. This analysis is fact-specific and includes factors such as "intelligence sources, querying law enforcement and open-source databases, analysis of trends, facts developed in the field by agents, rational inferences that lead an agent or officer to suspect that criminal activity has or is occurring, and the officers or agents' observations, training, and experience." *Id.* Moreover, consistent with the totality of the circumstances approach, agents may consider the location of the encounter, whether it was in a public place or businesses known to employ aliens without documentation, including specific streets, parking lots, and car washes. *See* ECF 71-1 ¶¶ 7-8.

Plaintiffs' record to the contrary is long on unauthenticated social media clips and news reports and short on the key link their theory requires: that supervisors ordered, approved, or ratified non-individualized stops or that individual officers did or routinely do stop individuals based solely on these four factors. Anecdote is not policy. Rather, on the named incidents, Defendants' declarations supply the missing particulars (pre-op target packets; visible identifiers; officer self-identification; flight; admissions). The evidence reflects the realistic probability that the federal agents' actions involved with these various encounters fell into one of four possible categories: (1) consensual encounters, which are not seizures under the Fourth Amendment; (2) outright arrests, rather than investigative stops; (3) Terry stops with additional lawful justifications; and (4) self-initiated contact with federal agents.

### 1.    Consensual Encounters

It is a basic principle of the Fourth Amendment that law enforcement officers, including federal agents conducting immigration enforcement, can approach individuals and ask them questions in a consensual fashion. *Florida v. Bostick*, 501 U.S. 429, 434 (1991). Specifically, "a seizure does not occur simply because a police officer approaches an individual and asks a few questions[,]" and as long "as a reasonable person would feel free to disregard the police and go about his business . . . the encounter is consensual and no reasonable suspicion is required." *Id.* (internal citations omitted); *see Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968); *see also INS v. Delgado*, 466 U.S. 210, 218 (1983) (holding that no seizure

occurred when immigration officers raided a factory to search for undocumented workers and did not create the impression that individuals would not be free to leave).

Named Plaintiff Molina's claim falls directly under this category of a consensual encounter in which he was never "seized" and he voluntarily answered questions from federal agents regarding his citizenship status without physical or verbal coercion. ECF 45-3 ¶ 6, 128-8 ¶ 6; *see Hiibel v. Sixth Judicial District Court of Nevada*, 542 U.S. 177, 185 (2003) (explaining that law enforcement "interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure"). Molina's declarations reflect that when he was approached by immigration agents, he did not run, and consented to the questioning. ECF 45-2 ¶ 6; ECF 128-8 ¶ 6. In fact, when asked for his identification and if he had any legal status in the United States, Molina showed his California driver's license and responded that he did not have papers. ECF 45-2 ¶ 6, ECF 128-8 ¶ 5-6. Plaintiffs cannot establish that this consensual encounter is indicative of any of the four proposed factors they claim are prohibited. Rather, Molina voluntarily answered the officer's questions, admitted to his illegal status, and thus the pre-admission encounter did not fall under the Fourth Amendment's view of a seizure. Thus, once Molina admitted his lack of lawful status, the resulting arrest was plainly supported by probable cause.

Additionally, named Plaintiff Hernandez Viramontes and Gamez, both United States citizens, also detail their interactions with federal agents and reflect consensual encounters. ECF 45-4 ¶ 7; ECF 45-5 ¶ 6. Both individuals note that on multiple occasions, officers came to their place of work to question workers regarding their status in the United States, and both individuals voluntarily informed officers of their citizenship. ECF 45-4 ¶ 7; ECF 45-5 ¶ 6. Hernandez Viramontes alleged that on one of the interactions, an agent asked if he was U.S. citizen, to which he *voluntarily* responded yes, provided his California driver's license, and told the officer that he was born in Mexico. ECF 45-4 ¶ 9. The officer appropriately informed Hernandez Viramontes that because he did not have his passport, he would need to go with the agents to investigate if he was a U.S. citizen, and he was transported to another location for citizenship verification and returned to his place of work 20 minutes later. *Id.* Hernandez Viramontes's consensual encounter does not trigger Fourth Amendment principles, and rather, shows that the agents sought to conduct their due diligence in verifying his citizenship status in a safe environment, and quickly

returning him to his place of work. *See* Parra Decl.; *see also Delgado*, 466 U.S. at 218. Thus, Plaintiffs have failed to demonstrate that these interactions with law enforcement trigger any Fourth Amendment violation such that they demonstrated a "pattern" of prohibited conduct.

### 2.    Arrests

Similarly, the declaration from Ramirez, a U.S. Citizen who is not a party to this litigation, does not support Plaintiffs' theory of the existence of a policy or practice of unlawful investigative stops. ECF 128-2 ¶¶ 7, 9-11. Instead, his own account reflects that he was arrested for possible criminal conduct. *See, e.g.*, *Atwater v. Lago Vista*, 532 U.S. 318, 354 (2001) (allowing for the warrantless arrests under Fourth Amendment for misdemeanors and other crimes committed in an officer's presence); *United States v. Watson*, 423 U.S. 411, 417 (1976) (holding that the Fourth Amendment requires only probable cause). As Ramirez exhibited behavior consistent with raising suspicion of his involvement with potential illegal activity by hiding between vehicles in the tow yard to conceal himself from officers, fleeing without provocation, and ultimately biting an officer, it was appropriate for the agents to arrest and process Ramirez. C217 Decl. ¶ 6; Parra Decl. at ¶ 11. Ramirez was subsequently charged with Assaulting, Resisting, or Impeding a Federal Officer, ECF 128-2 ¶¶ 7, 9-11, and while his declaration notes that the complaint was dismissed, the federal agents' *arrest* cannot support Plaintiffs' claim of a pattern of illegal *stops*. *Cf. Terry*, 392 U.S. at 26 ("An arrest is [] wholly different. . . [a]n arrest is the initial stage of a criminal prosecution. It is intended to vindicate society's interest in having its laws obeyed, and it is inevitably accompanied by future interference with the individual's freedom of movement, whether or not trial or conviction ultimately follows.").

### 3.    *Terry* Stops with Additional Lawful Justifications

Next, allegations by various named Plaintiffs and non-party witnesses clearly constitute lawful "Terry" stops in which the federal agent possessed "reasonable suspicion" that the individual is or will soon be engaged in illegal activity, and therefore it is appropriate to briefly stop the person to assess the situation. *See Terry*, 392 U.S. at 22 ("Through a series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation."). Importantly, the Supreme Court has held that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion[,]" which as noted previously involves a totality of the circumstances approach. *Wardlow*, 528 U.S. at 124 ("[I]t was not

merely respondent's presence in an area of heavy narcotics trafficking that aroused the officers' suspicion, but his *unprovoked flight* upon noticing the police.") (emphasis added); *see also Brignoni-Ponce*, 422 U.S. at 885.

Here, Officers had reasonable suspicion to stop Plaintiffs' Perdomo and Osorto's, as they attempted to flee when federal agents approached the bus stop they were waiting for work as a day laborer. *See* ECF 45-1 ¶ 6; ECF 45-2 ¶ 6; *see also Montero-Camargo*, 208 F.3d at 1130 ("In short, conduct that is not necessarily indicative of criminal activity may, in certain circumstances, be relevant to the reasonable suspicion calculus."). Both Plaintiffs detailed that while they were waiting for work as a day laborer, they saw whom they believed to be immigration officers approach and immediately attempted to run away. ECF 45-1 ¶ 5; ECF 45-2 ¶ 5; ECF 128-7 ¶ 5, ECF 128-8 ¶ 5. Based on the officers' training on reasonable suspicion and Fourth Amendment principles, Perdomo and Osorto's behavior was indicative of unlawful activity and the agents acted properly within the scope of a *Terry* stop to briefly detain Plaintiffs and later ascertain their status in the United States. *See* ECF 71-1 ¶ 5. Therefore, named Plaintiffs' situation here fails to demonstrate a "pattern" of prohibited conduct such that they can demonstrate that they would be irreparably harmed.

Additionally, the declarations of non-party witnesses F.H.S., J.D.S., E.C.P., and G.V.C., all indicate that the federal agents utilized a Terry stop with additional lawful justifications rising to the level of a reasonable suspicion. *See Arvizu*, 534 U.S. at 273. F.H.S. was in a car of individuals leaving their job of food vendors, when federal agents conducted a lawful traffic stop. Quinones Decl. ¶ 11. F.H.S.'s own declaration fails to mention that she attempted to flee the vehicle after the stop, tripped and fell and injured herself, and when an officer attempted to assist F.H.S. off the ground, she became combative and attempted to bite him. *Id.*; *but see* ECF 128-3 ¶¶ 4-5. Based on this, the officers reasonably conducted a Terry stop and ultimately took F.H.S. in for processing. *Wardlow*, 528 U.S. at 124-25.

On the other hand, J.D.S.'s declaration notes that he saw people running from federal agents, which caused him to run from the agents, and he was eventually stopped and showed the agents his expired work permit. ECF 128-4 ¶¶ 5-7. *Id.* His flight from federal agents and willingness to demonstrate his immigration status shows the agents acted based on the totality of the circumstances in stopping J.D.S. *Id.* Next, according to CBP officers' recounting of E.C.P.'s situation, E.C.P. was approached by Border

DEFENDANTS' OPPOSITION TO PI (4TH AMENDMENT)
21

Patrol agents where she was selling food and she fled without provocation, even before the agents could verbally identify themselves. Parra Decl. ¶ 15. The location and the behavior of evasive, unprovoked flight were factors that raised the agent's suspicion. *Id.* Once they caught up to the subject for a stop based on the reasonable suspicion of her flight and other relevant factors, she stated she was a citizen of Guatemala and was in the United States illegally, providing probable cause for her arrest for a violation of immigration law. *Id.*

Moreover, G.V.C.'s declaration noted that federal agents were looking for an individual at a donut shop and arrested him during this encounter. ECF 128-6 ¶¶ 3-5. Here, there was a targeted immigration arrest, and G.V.C.'s encounter during this targeted law enforcement action is proper and follows the totality of the circumstances approach to reasonable suspicion. The detaining officer believed G.V.C. was their suspected target based on the similarity of their clothing, but he subsequently learned through a consensual interview G.V.C. was not the subject, and G.V.C. admitted he was born in Mexico and he had entered the United States illegally, and had no documents allowing him to be in the United States. *See* Quinones Decl. ¶ 9; *see also* ECF 128-6 ¶¶ 4-5. The interactions for non-party witnesses all establish that federal immigration officers properly followed Fourth Amendment procedures in which they looked to a variety of factors, most prominently flight from law enforcement, to determine whether there was reasonable suspicion warranting investigation through a *Terry* stop. Therefore, Plaintiffs cannot establish that Defendants' exhibit a pattern of prohibited conduct if they themselves cannot point to any such violation.

### 4. Self-Initiated Contact with Federal Agents

Finally, to the extent any Plaintiff or any non-party declarant initiated contact on their own with federal agents involved in a law enforcement action, this is a far cry from demonstrating a Fourth Amendment violation or a "pattern" or "policy" of prohibited conduct such that Plaintiffs merit an injunction. *See, e.g.*, *Florida v. Bostick*, 501 U.S. 429, 439 (1991) ("Fourth Amendment proscribes unreasonable searches and seizures; it does not proscribe voluntary cooperation"). First, named Plaintiff and U.S. citizen Gavidia's situation falls under the category of self-initiated contact with Federal agents. *See* ECF 45-9. Importantly, Gavidia was present during a law enforcement operation at a tow yard when "a crowd of approximately 10 people" approached the officers on scene and yelled various curse words

at the officer. C217 Decl. ¶ 8. When C217 stepped out of the tow yard to assist another agent after he yelled "somebody get out here" and then specifically called out to C217 by name to "get out there[,]" C217 observed an individual, later identified as Mr. Gavidia, very close to another officer. *Id.* ¶¶ 7-8. Based on Mr. Gavidia's close proximity to the officer and the determination that the other officer's safety was threatened by calling for help, Mr. Gavidia was restrained by C217. *Id.* When Gavidia was restrained by the officer he voluntarily disclosed that he was an American citizen. *Id.* While Gavidia's declaration does not necessarily align with Defendants' recounting, he does not dispute that he informed the officers that he was a U.S. citizen and provided his identification. ECF 45-9 ¶¶ 9-11. Ultimately, Mr. Gavidia was left at the tow yard and was not taken into custody. *Id.* at 11.

Second, non-party witness and U.S. citizen Le Blanc's declaration shows that she voluntarily approached federal agents and attempted to get involved in a law enforcement action with no prior knowledge of the situation. ECF 128-12 ¶ 10. Rather, her account shows that she inserted herself into a potentially dangerous situation, "repeatedly asked the men to identify themselves and to show a warrant with a judge's signature[,]" and along with other individuals hovered over to the agents as they arrested the possible alien. *Id.* ¶¶ 10-13. As noted by CBP's Parra, immigration agents are facing "escalating hostility, including violent crowds, assaults involving rocks, frozen bottles, Molotov cocktails, and even gun fire." Parra Decl. ¶ 18. Le Blanc's declaration demonstrates that she voluntarily engaged in her interactions with federal agents, contributing to a volatile environment that is nowhere near demonstrating any Fourth Amendment violation.

### III.    The Requested Injunction Is Overbroad and Improper in Scope

Jurisdiction aside, Plaintiffs' requested relief is legally improper because it misapprehends the Fourth Amendment by placing under judicial supervision all immigration-enforcement stops within the Central District and subjecting every such encounter between agents and potential illegal aliens to the threat of contempt. First, Petitioners' request for an injunction is impermissibly vague and overbroad. Specifically, Plaintiffs' proposed order demands that pursuant to the Fourth Amendment, agents "may not conduct a[n investigative] stop for purpose of enforcing the immigration laws . . . unless the agent or officer, pre-stop, has reasonable suspicion, based on specific, articulable facts, that the person to be stopped has committed a violation of or is present in violation of the immigration laws," with the

exception of stops conducted at a port of entry, checkpoint, or other border equivalent. ECF 128-13 at 15. This order is impermissibly vague, overbroad, and constitutes a "follow the law" injunction which is prohibited by Ninth Circuit precedent. The Ninth Circuit has "long held that injunctive relief must be tailored to remedy the specific harm alleged." *Melendres v. Arpaio*, 784 F.3d 1254, 1265 (9th Cir. 2015) ("[A]n injunction against state actors must directly address and relate to the constitutional violation itself and must not require more of state officials than is necessary to assure their compliance with the constitution.").

Plaintiffs' premise—that restating existing law suffices—is incorrect; Rule 65(d) forbids non-specific "obey-the-law" injunctions. The relief must be much more *specific*. *See Elend v. Basham*, 471 F.3d 1199, 1209 (11th Cir. 2006) (court cannot fashion an injunction that abstractly commands the Secret Service to obey the First Amendment, noting that injunction requiring party to do nothing more specific than 'obey the law' is impermissible."); *accord EEOC v. AutoZone, Inc.*, 707 F.3d 824, 841 (7th Cir. 2013). As the Supreme Court has explained in *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974), Rule 65(d) "was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." Reiterating existing law as an injunction does not perform this function. In violation of these rules, the first section of Plaintiffs' proposed order gives an incredibly generic recitation of law. ECF 128-13 at 15.

In addition, issuing an injunction encompassing anyone within the Central District of California, which encompasses potentially millions of nonparties, is contrary to the Supreme Court's decision in *CASA*, 145 S. Ct. at 2551. The scope of the Plaintiffs' proposed injunction improperly extends beyond what is necessary to provide Plaintiffs relief, and granting their proposed order would exceed the District Court's equitable powers. Under *CASA*, any injunctive relief should be applied only to named Plaintiffs, and this Court cannot broadly enjoin Defendants from "conduct[ing an investigative] stop for purpose of enforcing the immigration laws of the United States unless the agent or officer, pre-stop, has reasonable suspicion, based on specific, articulable facts, that the person to be stopped has committed a violation of or is present in violation of the immigration laws, except when such a stop is conducted at a port of entry, checkpoint, or other functional equivalent of the border[,]" and defining reasonable suspicion to preclude sole reliance on the four factors. Ultimately, the proposed injunction improperly extends beyond what is

necessary and this Court cannot interfere with the Executive Branch's comprehensive immigration enforcement decisions.

## IV. The Equities and Public Interest Favor Denial of Injunction

Finally, where the government is a party, the balance of equities and public interest factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Courts "explore the relative harms to applicant and respondent, as well as the interests of the public at large." *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991) (internal quotation marks and citation omitted). Here, the balance of the equities and public interest tips decisively in Defendants' favor. Plaintiffs' motion fails to acknowledge the substantial governmental harm an injunction imposes by usurping authority over enforcement of our Nation's immigration laws, which the Constitution and federal statutes commit to the Executive Branch. The Los Angeles area is a crucial priority for immigration enforcement where millions of aliens have broken the law and remain illegally. Yet, the July 11 Order, and this proposed preliminary injunction would throw a central element of immigration enforcement, investigative stops, into intolerable uncertainty. The granting of this order would risk unintended operational consequences and officer/public-safety concerns. Indeed, as shown by Plaintiffs' supplemental preliminary injunction order, such an injunction would inject the judiciary into micromanaging every operation and stop conducted in a district of 20 million people. That is untenable for the Executive and the Judiciary. It will effectively hamper immigration enforcement in a district with millions of illegal immigrants. The public interest favors lawful, effective enforcement carried out within constitutional limits. *Nken*, 556 U.S. at 435; *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018). Preventing the Executive Branch from implementing a major enforcement priority and effectuating the immigration laws Congress enacted weighs in favor of the denial of the preliminary injunction. The proposed injunction also would inflict irreparable harm by supplanting the political Branches' judgments and intruding on the separation of powers. *See CASA*, 145 S. Ct. at 2561.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion.

Dated: August 29, 2025                                Respectfully submitted,


BRETT A. SHUMATE
Assistant Attorney General
Civil Division

DREW C. ENSIGN
Deputy Assistant Attorney General

TIBERIUS DAVIS
SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney General

JONATHAN K. ROSS
Senior Litigation Counsel

STEPHANIE L. GROFF
JASON K. ZUBATA
JACOB A. BASHYROV
Trial Attorneys

*/s/ Aniello DeSimone*
ANIELLO DESIMONE
Trial Attorney
Office of Immigration Litigation
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 532-5239
Email: Aniello.DeSimone@usdoj.gov

*Counsel for Defendants*

DEFENDANTS' OPPOSITION TO PI (4ᵀᴴ AMENDMENT)

26

**L.R. 11-6.2 CERTIFICATE OF COMPLIANCE**

The undersigned counsel of record certifies that this filing is less than twenty-five (25) pages, which complies with L.R. 11-6.1 and this Court's Standing Order, Part VIII.C.

Dated: August 29, 2025                    Respectfully submitted,

                                          */s/ Aniello DeSimone*
                                          ANIELLO DESIMONE
                                          Trial Attorney
                                          Office of Immigration Litigation
                                          U.S. Department of Justice

                                          *Counsel for Defendants*