Jonathon P. Hauenschild (SBN 249615)
FEDERATION FOR AMERICAN IMMIGRATION REFORM
25 Massachusetts Ave., NW, Ste. 330
Washington, DC 20001
(202) 328-7004
jhauenschild@irli.org

Counsel for *Amicus* Federation for American Immigration Reform

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL OF CALIFORNIA

| | |
|---|---|
| PEDRO VASQUEZ PERDOMO, *et al.*,<br><br>                Plaintiffs,<br><br>        v.<br><br>KRISTI NOEM, *et al.*,<br><br>                Defendants. | Case No. 2:25-cv-05605<br><br>**Proposed *Amicus Curiae* Brief of Federation for American Immigration Reform**<br><br>Courtroom 8B, Hon. Maame Ewusi-Mensah Frimpong |

///

///

///

///

///

///

[Page intentionally left blank]

///

///

///

///

///

///

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................... ii

TABLE OF AUTHORITIES .............................................................................. iii

INTEREST OF *AMICUS CURIAE* ....................................................................1

SUMMARY OF ARGUMENT..............................................................................1

ARGUMENT........................................................................................................2

    A.   This Court should avoid applying a higher standard for temporary detentions than the reasonable suspicion standard required by the Fourth Amendment. ......................................................................................................2

    B.   The Fourth Amendment is less demanding in the immigration context than in the criminal context................................................................................9

CONCLUSION.................................................................................................. 17

# TABLE OF AUTHORITIES

## CASES

*Alasaad v. Mayorkas*,
  988 F.3d 8 (1st Cir. 2021)..................................................................... 16

*Almeida-Sanchez v. United States*,
  413 U.S. 266 (1973)........................................................................... 16

*Beck v. Ohio*,
  379 U.S. 89 (1964)...............................................................................4

*Bivens v. Six Unknown Named Agents*,
  403 U.S. 388 (1971)..............................................................................6

*Boyd v. United States*,
  116 U.S. 616 (1886)........................................................................... 15

*Cabell v. Chavez-Salido*,
  454 U.S. 432 (1982)........................................................................... 10

*Carroll v. United States*,
  267 U.S. 132 (1925)........................................................................ 4, 15

*Cruz v. Barr*,
  926 F.3d 1128 (9th Cir. 2019) ............................................................ 11

*DHS v. Thuraissigiam*,
591 U.S. 103 (2020)........................................................................... 12

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)........................................................................... 10

*Florida v. Bostick*,
  501 U.S. 429 (1991)......................................................................... 3, 7

*Florida v. Royer*,
  460 U.S. 491 (1983)...............................................................................3

*Florida v. White*,
  526 U.S. 559 (1999)...............................................................................7

*Foley v. Connelie*,
  435 U.S. 291 (1978)...................................................................................... 10

*Illinois v. Lafayette*,
  462 U.S. 640 (1983)..................................................................................... 6, 7

*INS v. Delgado*,
  446 U.S. 210 (1984)..................................................................................... 3, 7

*INS v. Lopez-Mendoza*,
  468 U.S. 1032 (1984)................................................................................... 6, 9

*Kansas v. Glover*,
  589 U.S. 376 (2020)..................................................................................... 5, 9

*Landon v. Plasencia*,
  459 U.S. 21 (1982)........................................................................................ 11

*Martinez-Aguero v. Gonzalez*,
  459 F.3d 618 (5th Cir. 2006) ........................................................................ 11

*Martinez-Medina v. Holder*,
  673 F.3d 1029 (9th Cir. 2011) .........................................................................3

*Muehler v. Mena*,
  544 U.S. 93  (2005)....................................................................................... 3, 7

*Navarette v. California*,
  572 U.S. 393 (2014)...................................................................................... 4, 5

*Riley v. California*,
  573 U.S. 373 (2014)......................................................................................... 16

*Terry v. Ohio*,
  392 U.S. 1 (1968)......................................................................................... 4, 7

*United States v. Bejar-Guizar*,
  142 F.4th 1188, 2025 U.S.App.LEXIS 16841 (9th Cir. 2025)......................8

*United States v. Brignoni-Ponce*,
  422 U.S. 873 (1975)..................................................................................... 8, 14

*United States v. Cortez*,
    449 U.S. 411 (1981)......................................................................................5

*United States v. Cotterman*,
    709 F.3d 952 (9th Cir. 2013) ................................................................. 16

*United States v. Gutierrez-Casada*,
    553 F. Supp. 2d 1259 (D. Kan.)............................................................. 11

*United States v. Hernandez-Alvarado*,
    891 F.2d 1414 (9th Cir. 1989) ............................................................. 4, 5

*United States v. Kolsuz*,
    890 F.3d 133 (4th Cir. 2018) ................................................................. 16

*United States v. Martinez-Fuerte*,
    428 U.S. 543 (1976)............................................................................... 16

*United States v. Noster*,
    590 F.3d 624 (9th Cir. 2009) ...................................................................5

*United States v. Portillo-Muñoz*,
    643 F.3d 437 (5th Cir. 2011) ................................................................. 11

*United States v. Ramsay*,
    431 U.S. 606 (1977)............................................................................... 15

*United States v. Rodriguez-Franco*,
    749 F.2d 1555 (11th Cir. 1985) ...............................................................4

*United States v. Sharpe*,
    470 U.S. 675 (1985).................................................................................7

*United States v. Sokolow*,
    490 U.S. 1 (1989)................................................................................. 4, 5

*United States v. Touset*,
    890 F.3d 1227 (11th Cir. 2018) ............................................................. 16

*United States v. Verdugo-Urquidez*,
    494 U.S. 259 (1990)............................................................................... 10

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) ................................................................ 11

**STATUTES**

8 U.S.C. § 1357 ....................................................................... 14

**REGULATIONS**

8 C.F.R. § 287.1 ...................................................................... 15

8 C.F.R. § 287.8 ........................................................................8

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend IV ................................................................2

U.S. Const. amend. I .............................................................. 10

U.S. Const. amend. II ............................................................. 10

U.S. Const. amend. IX ............................................................ 10

U.S. Const. amend. X ............................................................. 10

U.S. Const. amend. XIV .......................................................... 10

U.S. Const. amend. XVII ......................................................... 10

U.S. Const. art. I, § 2 ............................................................. 10

U.S. Const., amend IV .............................................................9

U.S. Const., amend. V ............................................................ 10

U.S. Const., pmbl. .................................................................. 10

## INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* Amicus curiae Federation for American Immigration Reform (FAIR) is a nonprofit corporation and membership organization that was founded in 1979 and has its principal place of business in Washington, D.C. FAIR's mission is to inform the public about the effects of both unlawful and lawful immigration, and to defend American citizens, American workers, and the nation's environment by limiting overall immigration, enhancing border security, and ending illegal immigration. In short, FAIR seeks to protect all Americans against the substantial harms of mass migration by attaining strongly-enforced, patriotic immigration reform. To that end, FAIR has been involved in more 100 legal cases since 1980, either as a party or as *amicus curiae*, in which it has consistently defended American interests against illegal immigration into the United States.

The decision in this case will likely have a substantial impact on the tools available to the executive branch of the federal government in dealing efficiently, fairly, and safely with an illegal alien population estimated to exceed 18 million people in the United States. Amicus FAIR has direct and vital interests in defending the executive branch's authority to address the current illegal alien crisis.

## SUMMARY OF ARGUMENT

Many interactions between suspected illegal aliens and federal immigration officials are consensual encounters to which the Fourth Amendment does not apply. Though federal regulations frequently govern the process immigration officials must follow, officials do not need

---

[1] No counsel for a party in this case authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation of this brief. No person other than *amicus curiae*, its members, or its counsel made a monetary contribution to the preparation or submission of this brief.

reasonable suspicion to ask individuals certain questions about their place or birth or immigration status.

Where consensual encounters turn into investigative or detentive stops, the Fourth Amendment to the Constitution of the United States requires merely that searches and seizures be "reasonable." The Supreme Court has long held that for temporary investigative "stops" or detentions, this requirement of reasonableness is met by "reasonable suspicion," a low standard that, both generally and even more so in the specific context of immigration law enforcement, is significantly short of the probable cause standard required for an arrest.

The Supreme Court has well defined the reasonable suspicion standard. This Court should avoid imposing a vastly higher and more exacting standard than that dictated by the Supreme Court. This Court, too, should avoid raising the standard for two reasons: First, many illegal aliens in the Central District of California are not part of "the people" protected by the Fourth Amendment; and, Second, the longstanding Border Search Exception Doctrine – which encompasses most of the Central District – applies here.

The Plaintiffs are unlikely to succeed on the merits and, as such, this Court should deny Plaintiffs' Motion for Preliminary Injunction.

**ARGUMENT**

**A. This Court should avoid applying a higher standard for temporary detentions than the reasonable suspicion standard required by the Fourth Amendment.**

The Fourth Amendment to the Constitution of the United States is straightforward: searches and seizures must be "reasonable." U.S. Const. amend IV. Plaintiffs have failed to show a likelihood of success because reasonable suspicion under the Fourth Amendment requires far less than the

requirements they seek to impose through this Court.

Not all encounters between immigration officials and suspected aliens are seizures. *Florida v. Bostick*, 501 U.S. 429, 434 (1991). Many interactions are, instead, consensual encounters. That is, immigration officials asking individuals questions, including questions about their immigration status, do not constitute searches or seizures. Adopting Chief Justice Rehnquist's dissent in *Florida v. Royer*, 460 U.S. 491, 523-524 (1983) the Supreme Court noted that law enforcement officers "do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence a criminal prosecution his voluntary answers to such questions." *Bostick*, 501 U.S. at 434. *See also Muehler v. Mena*, 544 U.S. 93, 100-101 (2005) (Mere questioning of individuals is not a "Fourth Amendment event"). Relevant for this case, the Supreme Court has stated that officers do "not need reasonable suspicion to ask [an individual] for her name, date and place of birth, or immigration status." *Id*. at 101, *citing Bostick*, 501 U.S. at 434-435, and *INS v. Delgado*, 446 U.S. 210, 212 (1984). *See also Martinez-Medina v. Holder*, 673 F.3d 1029, 1034 (9th Cir. 2011) (Mere questioning of an individual about his immigration status is a consensual encounter, not a seizure).

Assuming a consensual encounter turns into a detentive or investigative stop, the Fourth Amendment may apply equally in the criminal and immigration settings, though courts should be careful to apply the Fourth Amendment correctly. *Delgado*, 466 U.S. at 215 (Consensual encounter turns into a detentive stop "if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he

FAIR Proposed Amicus Brief, No. 2:25-cv-05605                                    3

was not free to leave").[2] When law enforcement officials transition from a consensual encounter to a detentive stop, the standard a court must look to in analyzing the reasonableness under the Fourth Amendment of such a "stop" or detention has remained fundamentally the same since the Supreme Court's decision in *Terry v. Ohio*, 392 U.S. 1 (1968). "[I]n justifying the particular intrusion the police officer must be able to point to *specific and articulable facts* which, taken together with *rational inferences from those facts*, reasonably warrant that intrusion." *Id.* at 21 (emphases added). The *Terry* Court stressed that the officer must have more than a hunch or good faith; rather, "it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Id.* at 21-22 (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925), and citing *Beck v. Ohio*, 379 U.S. 89, 96-97 (1964)); *see also United States v. Hernandez-Alvarado*, 891 F.2d 1414, 1416 (9th Cir. 1989) (Reasonable suspicion must "be more than the mere subjective impressions of a particular officer" and must be based on the "specific, articulable facts" available to the officer at the time of the stop).

Reasonable suspicion, therefore, is a clear standard, but it is a relatively low standard, less than that for probable cause. *Navarette v. California*, 572 U.S. 393, 397 (2014), *citing United States v. Sokolow*, 490 U.S. 1, 7 (1989) ("[T]he level of suspicion required for a *Terry* stop is

---

[2] "The principles of the Fourth Amendment" apply when immigration officials "interrogate any person" believed to be an alien. *United States v. Rodriguez-Franco*, 749 F.2d 1555, 1559 (11th Cir. 1985). Initial encounters between aliens and federal immigration officials are not necessarily detentive stops. As the court in *Rodriguez-Franco* recognized, "a request for identification by the INS does not, by itself, amount to a detention protected by the Fourth Amendment." *Id.*

obviously less demanding than that for probable cause").[3] And in applying this standard, courts must look to the "totality of the circumstances—the whole picture," *United States v. Cortez*, 449 U.S. 411, 417-18 (1981), *Narvette*, 572 U.S. at 397, *Hernanez-Alvarado*, 891 F.2d at 1416, while also accounting for officers' training and experience in drawing rational inferences from particular facts, that is, determining whether reasonable suspicion justifies a stop "not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Cortez*, 449 U.S. at 418. *See also Hernandez-Alvarado*, 891 F.2d at 1416, (Same, citing *Cortez*).

As the Supreme Court elaborated in *Kansas v. Glover*, 589 U.S. 376 (2020):

> "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Prado Navarette v. California*, 572 U. S. 393, 397, 134 S. Ct. 1683, 188 L. Ed. 2d 680 (2014) (quotation altered); *United States v. Sokolow*, 490 U. S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989).
>
> Because it is a "less demanding" standard, "reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause." *Alabama v. White*, 496 U. S. 325, 330, 110 S. Ct. 2412, 110 L. Ed. 2d 301 (1990). The standard "depends on the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Navarette*, *supra*, at 402, 134 S. Ct. 1683, 188 L. Ed. 2d 680 (quoting *Ornelas v. United States*, 517 U. S. 690, 695, 116 S. Ct. 1657, 134 L. Ed. 2d

---

[3] "Probable cause exists when police officers have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." *United States v. Noster*, 590 F.3d 624, 633 (9th Cir. 2009)(quotation marks and citation omitted).

911 (1996) (emphasis added; internal quotation marks omitted)). Courts "cannot reasonably demand scientific certainty where none exists." *Illinois v. Wardlow*, 528 U. S. 119, 125, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000). Rather, they must permit officers to make "commonsense judgments and inferences about human behavior." *Ibid.*; see also *Navarette*, *supra*, at 403, 134 S. Ct. 1683, 188 L. Ed. 2d 680 (noting that an officer "'need not rule out the possibility of innocent conduct'").

589 U.S. at 380-81.

Reasonable suspicion is inherently a fact-specific inquiry suited to determinations after an individual stop has taken place and that stop has led to particularized individual proceeding, not to blanket determinations made beforehand and with respect to millions of people. And individual stops, if ultimately determined not to meet reasonable suspicion, allow for individually tailored remedies in the context of specific proceedings arising out of those individual stops. For example, suppression of evidence, which is available not only in criminal court may also be available in immigration court, *see INS v. Lopez-Mendoza*, 468 U.S. 1032 (1984),[4] or monetary damages in a Section 1983 or *Bivens* action. *See* 42 U.S.C. § 1983 (providing for a federal cause of action for monetary damages against state or local officials who violate civil rights "under color of state law"); *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971) (setting forth an analogous federal cause of action against federal officials).

---

[4] The Exclusionary Rule does not apply in civil deportation proceedings to evidence obtained in violation of the Fourth Amendment. A plurality of the Supreme Court, though, suggested that the Rule may apply in deportation proceedings where "egregious violations of the Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained." 468 U.S. at 1050-51. The plurality, though, did not exegete on what type of "egregious violations" may qualify, though suggested that the standard would be that of "fundamentally unfair" in violation of the Due Process requirements of the Fifth Amendment. *Id*. at n. 5.

Whether there is reasonable suspicion is not decided by a strict scrutiny analysis: whether an officer's suspicion and acts pursuant to that suspicion were reasonable "does not necessarily or invariably turn on the existence of alternative 'less intrusive' means." *Illinois v. Lafayette*, 462 U.S. 640, 647 (1983). Intrusiveness, itself, relates more to warrantless searches and investigative stops than to *Terry*-type investigative or detentive stops. *United States v. Sharpe*, 470 U.S. 675, 686-87 (1985) (Directing courts to not second guess whether police are acting properly in "a swiftly developing situation" and noting that whether a search might "have been accomplished by a less intrusive means does not, itself, render the search unreasonable").[5]

Finally, courts must consider the extent of a detainee's reasonable expectation of privacy in determining whether an officer had reasonable suspicion, needed reasonable suspicion, or could properly develop reasonable suspicion under the circumstances. For example, an officer generally need not have reasonable suspicion to enter areas of a business held open to the public, or to take a position immediately outside such areas, and could develop reasonable suspicion based on observations or other evidence subsequent to doing so. *See, e.g.*, *Florida v. White*, 526 U.S. 559 (1999); *Delgado*, above. And an officer asking someone for their name, date and place of birth, or immigration status is not "a discrete Fourth Amendment event" requiring independent reasonable suspicion at all. *See Muehler* 544 U.S. at 100-01, *quoting Bostick*, 501 U.S. at 434 ("mere police questioning does not constitute a seizure").

In their request for a TRO and as part of their motion for preliminary

---

[5] The Supreme Court also rejected per se rules limiting *Terry* stops. 470 U.S. at 686-87

injunction, the Plaintiffs have asked this Court to enjoin the government from relying on certain factors when seeking to question potential illegal aliens. They claim that these factors should not form reasonable suspicion for a detentive stop:

> • "Apparent race or ethnicity";

> • "Speaking Spanish or speaking English with an accent";

> • "Presence at a particular location (e.g. bus stop, car wash, tow yard, day laborer pick up site, agricultural site, etc.)"; and

> • "The type of work one does."

> *E.g.* ECF No. 87 at 50.

Plaintiffs' arguments ignore both ICE regulations and prior Supreme Court precedent concerning the factors immigration officials may rely on first when questioning a potential illegal alien during a consensual encounter and then, when necessary, converting that encounter into a detentive stop. *E.g. United States v. Brignoni-Ponce*, 422 U.S. 873, 884-85 (1975) (listing acceptable factors for stopping a car in the border area, while noting that not all factors need to be present), *United States v. Bejar-Guizar*, 142 F.4th 1188, 2025 U.S.App.LEXIS 16841, *6-8 (9th Cir. 2025) (acceptable factors include agents' length of experience, usual patterns of traffic, appearance or behavior of the individuals involved)

Regulations rightly recognize that presence at particular locations, such as locations at which illegal aliens are known to be picked up for work, alone are probative of unlawful presence and expressly permit ICE to question any person whom the officer believes to be an alien at various work sites without any particularized suspicion. *See, e.g.*, 8 C.F.R. § 287.8(f) ("Nothing in this section prohibits an immigration officer from entering into any area of a business or other activity to which the general public has access or onto open fields that are not farms or other outdoor agricultural

operations without a warrant, consent, *or any particularized suspicion* in order to question any person whom the officer believes to be an alien concerning his or her right to be or remain in the United States.") (emphasis added). As discussed by the Supreme Court, those regulations safeguard the rights of those lawfully present require that "no one be detained without reasonable suspicion of illegal alienage, and that no one be arrested unless there is an admission of illegal alienage or other strong evidence thereof." *Lopez-Mendoza* 468 U.S. at 1044-45.

By enjoining the government from relying to any degree on four factors that obviously are probative of reasonable suspicion, especially to those with the specialized knowledge officers possess, this Court risks flipping the hierarchy of standards on its head, making reasonable suspicion a far higher and more exacting standard than probable cause and "demand[ing]" the very "scientific certainty" that the Supreme Court has expressly rejected. *Glover*, 589 U.S. at 380. Even those with a cursory knowledge of current conditions, let alone trained and experienced officers, would reasonably suspect that persons meeting the four factors were illegal aliens; the reasonable suspicion standard demands no more.

This Court should not impose a standard beyond that required by the Fourth Amendment. The Plaintiffs are unlikely to succeed on the merits, and the Court should deny the request for an injunction.

**B. The Fourth Amendment is less demanding in the immigration context than in the criminal context.**

The Fourth Amendment states that "[t]he right of *the people* to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated …" U.S. Const., amend IV (emphasis added). Who are "the people" whose rights are protected by this provision? The Constitution uses the term "the people" in a number of

provisions, *see id.*; *see also* U.S. Const., pmbl.; art. I, § 2, cl. 1; amends. I, II, IV, IX, X, XVII, while it uses "persons" in others.  *See, e.g.*, U.S. Const., amends. V, XIV. Most famously, of course, in the Preamble it is "We the People" who "ordain and establish" the entire Constitution itself: in other words, it is "the people" who are the sovereign authority upon which the Constitution's legitimacy rests. *See* U.S. Const., pmbl. In the Preamble, at least, the people must be seen as coterminous with U.S. citizens, for aliens, whatever their connections with and length of residence in the United States, have no right to vote or assume other governing functions, and have been near-universally excluded from doing so—hardly characteristics of members of a "sovereign" People. *See, e.g., Foley v. Connelie*, 435 U.S. 291, 297 (1978) (holding that "the right to govern is reserved to citizens").

The Supreme Court stated in *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), that, at minimum, "the people" refers to those "persons who are part of a national community," *id.* at 265, or who have "*substantial connections*" to the United States. *Id.* at 271 (emphasis added).

The Court narrowed this statement in *District of Columbia v. Heller*, stating that "the people" "refers to all members of the political community," 554 U.S. 570, 580 (2008), a reading in line with the Court's prior restriction of the self-governing people to citizens. *See, e.g., Cabell v. Chavez-Salido*, 454 U.S. 432, 439-40 (1982) ("The exclusion of aliens from basic governmental processes is not a deficiency in the democratic system but a necessary consequence of the community's process of political self-definition. Self-government, whether direct or through representatives, begins by defining the scope of the community of the governed and thus of the governors as well: Aliens are by definition those outside of this community.").

Lower courts have divided over whether illegal aliens must establish that they have "substantial connections" to the United States in order to be afforded the protections of the Fourth Amendment at all; the Ninth Circuit has never entirely answered this question. *See Cruz v. Barr*, 926 F.3d 1128 (9th Cir. 2019) (holding that suspicionless detention of an unlawfully present alien, who had resided in the United States for more than a decade, violated the Fourth Amendment); *United States v. Portillo-Muñoz*, 643 F.3d 437, 440 (5th Cir. 2011) ("[N]either this court nor the Supreme Court has held that the Fourth Amendment extends to a native and citizen of another nation who entered and remained in the United States illegally"); *Martinez-Aguero v. Gonzalez*, 459 F.3d 618, 625 (5th Cir. 2006) ("There may be cases in which an alien's connection with the United States is so tenuous that he cannot reasonably expect the protection of its constitutional guarantees; the nature and duration of [a Mexican national's] contacts with the United States, however, are sufficient to confer Fourth Amendment rights"); *United States v. Gutierrez-Casada*, 553 F. Supp. 2d 1259, 1272 (D. Kan.) (holding that a previously deported felonious alien who had unlawfully reentered the United States fell outside of Fourth Amendment protections).

In fact, what the Constitution generally and the Fourth Amendment more specifically require with respect to aliens in the context of immigration law enforcement can frequently be less than what they require in the context of criminal prosecution. *See, e.g., Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders"); *Landon v. Plasencia*, 459 U.S. 21, 32 (1982) ("This Court has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his

application, for the power to admit or exclude aliens is a sovereign prerogative").

The Supreme Court discussed more than a century of binding precedent on the subject of what constitutional rights arriving aliens have in *DHS v. Thuraissigiam*, 591 U.S. 103 (2020):

> In 1892, the Court wrote that as to "foreigners who have never been naturalized, nor acquired any domicile or residence within the United States, nor even been admitted into the country pursuant to law," "the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, are due process of law." *Nishimura Ekiu*, 142 U. S., at 660, 12 S. Ct. 336, 35 L. Ed. 1146. Since then, the Court has often reiterated this important rule. *See, e.g., Knauff*, 338 U. S., at 544, 70 S. Ct. 309, 94 L. Ed. 317 ("Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned"); *Mezei*, 345 U. S., at 212, 73 S. Ct. 625, 97 L. Ed. 956 (same); *Landon v. Plasencia*, 459 U. S. 21, 32, 103 S. Ct. 321, 74 L. Ed. 2d 21 (1982) ("This Court has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative").
>
> Respondent argues that this rule does not apply to him because he was not taken into custody the instant he attempted to enter the country (as would have been the case had he arrived at a lawful port of entry). Because he succeeded in making it 25 yards into U. S. territory before he was caught, he claims the right to be treated more favorably. The Ninth Circuit agreed with this argument.
>
> We reject it. It disregards the reason for our century-old rule regarding the due process rights of an alien seeking initial entry. That rule rests on fundamental propositions: "[T]he power to admit or exclude aliens is a sovereign prerogative," *id.*, at 32; the Constitution gives "the political department of the government" plenary authority to decide which aliens to admit, *Nishimura Ekiu*, 142 U. S., at 659, 12 S. Ct. 336, 35 L. Ed. 1146; and a concomitant of that power is the power to set the procedures to

be followed in determining whether an alien should be admitted, *see Knauff*, 338 U. S., at 544, 70 S. Ct. 309, 94 L. Ed. 317.

This rule would be meaningless if it became inoperative as soon as an arriving alien set foot on U. S. soil. When an alien arrives at a port of entry—for example, an international airport—the alien is on U.S. soil, but the alien is not considered to have entered the country for the purposes of this rule. On the contrary, aliens who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are "treated" for due process purposes "as if stopped at the border." *Mezei*, 345 U. S., at 215, 73 S. Ct. 625, 97 L. Ed. 956; *see Leng May Ma v. Barber*, 357 U. S. 185, 188-190, 78 S. Ct. 1072, 2 L. Ed. 2d 1246 (1958); *Kaplan v. Tod*, 267 U. S. 228, 230-231, 45 S. Ct. 257, 69 L. Ed. 585 (1925).

The same must be true of an alien like respondent. As previously noted, an alien who tries to enter the country illegally is treated as an "applicant for admission," §1225(a)(1), and an alien who is detained shortly after unlawful entry cannot be said to have "effected an entry," *Zadvydas v. Davis*, 533 U. S. 678, 693, 121 S. Ct. 2491, 150 L. Ed. 2d 653 (2001).

591 U.S. at 139-40. Whatever the meaning of "shortly," the Fourth Amendment's protections surely do not apply to every one of the two million illegal aliens estimated to reside in the Central District of California.

This Court should not make the reasonable suspicion standard in the immigration context greater than in the criminal context. Instead, this Court should recognize that the Supreme Court and other Circuit Courts have appropriately recognized that something less than reasonable suspicion is required for immigration officials to initiate a consensual encounter. Because the standard to initiate a consensual encounter is low, and the reasonable suspicion standard is also lower in the immigration context, the Plaintiffs are unlikely to succeed on the merits.

## C. The Border Search Exception Doctrine Applies To Most of the Central District.

Even if the Fourth Amendment's protections would normally apply to some Plaintiffs who are seeking the injunction, the Border Search Exception Doctrine applies to most of the Central District's population.

For example, while the Supreme Court held that the Border Patrol could not simply stop vehicles either at random or based solely on the apparent Mexican ancestry of occupants in *Brignoni-Ponce*, the Court recognized that "[t]he Government makes a convincing demonstration that the public interest demands effective measures to prevent the illegal entry of aliens at the Mexican border," 422 U.S. at 879, holding that "*[e]xcept at the border and its functional equivalents*, officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *Id.* at 885 (emphasis added).

The "functional equivalents" of the border are not necessarily limited to the border plus ports of entry. Rather, Congress has drawn a line by statute: under § 287(a)(3) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1357(a)(3), immigration officers:

> under regulations prescribed by the Attorney General shall have power without warrant … within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle, and within a distance of twenty-five miles from any such external boundary to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States

Regulations promulgated by the Attorney General pursuant to this statutory grant of authority define "reasonable distance" as "within 100 air miles from any external boundary of the United States" (or shorter distances

if set at the discretion of specified officials). 8 C.F.R. § 287.1(a)(2). "External boundary" in turn "means the land boundaries and the territorial sea of the United States extending 12 nautical miles from the baselines of the United States determined in accordance with international law." 8 C.F.R. § 287.1(a)(1). Taken together this clearly covers much if not most of the Central District of California and certainly most of its populated area.

Courts both before and after the enactment of the INA have repeatedly held that searches and seizures at or near the border are more presumptively reasonable and valid than further into the interior. As the Supreme Court explained in *United States v. Ramsay*, 431 U.S. 606 (1977):

> That searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border, should, by now, require no extended demonstration. The Congress which proposed the Bill of Rights, including the Fourth Amendment, to the state legislatures on September 25, 1789, 1 Stat. 97, had, some two months prior to that proposal, enacted the first customs statute, Act of July 31, 1789, c. 5, 1 Stat. 29. Section 24 of this statute granted customs officials "full power and authority" to enter and search "any ship or vessel, in which they shall have reason to suspect any goods, wares or merchandise subject to duty shall be concealed...." This acknowledgment of plenary customs power was differentiated from the more limited power to enter and search "any particular dwelling-house, store, building, or other place..." where a warrant upon "cause to suspect" was required. The historical importance of the enactment of this customs statute by the same Congress which proposed the Fourth Amendment is, we think, manifest.

431 U.S. at 616-17, *citing Carroll*, supra, 267 U.S. at 153-54 and *Boyd v. United States*, 116 U.S. 616, 623 (1886). Indeed, therefore, "[t]his longstanding recognition that searches at our borders without probable cause

and without a warrant are nonetheless 'reasonable' has a history as old as the Fourth Amendment itself." *Ramsay* 431 U.S. at 619.

The Border Search Exception Doctrine is why "it was 'without doubt' that the power to exclude aliens 'can be effectuated by routine inspections and searches of individuals or conveyances seeking to cross our borders.'" *Id.* (quoting *Almeida-Sanchez v. United States*, 413 U.S. 266, 272 (1973)). Such "routine" inspections have been held to include checkpoints on a major highway near to but not immediately adjacent to the border: such searches are "reasonable" without being based on individualized suspicion. *See United States v. Martinez-Fuerte*, 428 U.S. 543 (1976).

The current principal divide between the Courts of Appeals over the Border Exception Doctrine is over whether a search warrant is required for forensic searches of electronic devices seized at the border, in the wake of the Supreme Court's holding in *Riley v. California*, 573 U.S. 373 (2014), that warrants are otherwise generally required for such searches even when incident to a lawful arrest. *Compare Alasaad v. Mayorkas*, 988 F.3d 8 (1st Cir. 2021) (holding that no warrant was required); *United States v. Touset*, 890 F.3d 1227 (11th Cir. 2018) (no warrant required); *United States v. Kolsuz*, 890 F.3d 133 (4th Cir. 2018) (warrant required); *United States v. Cotterman*, 709 F.3d 952 (9th Cir. 2013) (warrant required).

If the Border Search Exception can even conceivably apply to such vastly more intrusive searches and seizures, though, it undoubtedly applies to such routine consensual encounters and stops as are at issue in this case. Because the Boarder Search Exception applies to most of the Central District, the Plaintiffs cannot succeed on the merits and this Court should deny the Plaintiffs' request for preliminary injunction.

**CONCLUSION**

For the foregoing reasons, this Court should deny the Plaintiff's request for injunctive relief.

DATED: September 2, 2025         Respectfully submitted,

/s/ Jonathon P. Hauenschild
Jonathon P. Hauenschild
FEDERATION FOR AMERICAN
IMMIGRATION REFORM
25 Massachusetts Ave., NW, Suite 330
Washington, DC 20001
Telephone: (202) 328-7004

Counsel for *Amicus Curiae*
Federation for American Immigration
Reform

## **Certificate of Compliance**

The undersigned, counsel of record for proposed *amicus* Federation for American Immigration Reform, certifies that this document contains 4,767 words, which complies with the word limit of L.R. 11-6.1.

Dated this 2nd day of September, 2025

s/ Jonathon P. Hauenschild
Jonathon P. Hauenschild
