1
2
3
4
5
6
7
8                     UNITED STATES DISTRICT COURT

9                     CENTRAL DISTRICT OF CALIFORNIA

10

11   Pedro Vasquez Perdomo *et al.*,          Case No.: 2:25-cv-05605-MEMF-SP

12                              Plaintiffs,
                                             **ORDER GRANTING PLAINTIFFS'**
13            v.                             **MOTION FOR PRELIMINARY**
                                             **INJUNCTION [DKT. NO. 127]**
14   Kristi Noem *et al.*,

15                              Defendants.

16

17

18

19

20          This summer, two organizations, the Coalition for Humane Immigrant Rights and Immigrant

21   Defenders Law Center, told this Court that federal law enforcement was keeping individuals picked

22   up in immigration raids in the basement of a federal building in downtown Los Angeles and keeping

23   them from talking to lawyers who could help them navigate the legal process.

24          As this Court stated this summer, both sides of this case agreed on the answers to the

25   following key questions:

26          •   Do all individuals—regardless of immigration status—share in the rights guaranteed

27              by the Fifth Amendments to the Constitution, including the right to have access to a

28              lawyer? Yes, they do.

1

- Is it unlawful to prevent people from having access to lawyers who can help them in immigration court? Yes, it is.

What the Court really had to decide was (1) whether the federal government was denying individuals in that basement (called "B-18") from having access to lawyers and (2) if so, what should be done about it. Looking at all of the evidence, the Court decided that the federal government was denying individuals in B-18 access to lawyers. And the Court ordered the government to stop, in an order called a "temporary restraining order," that can only last for a short period of time.

The two organizations are back, asking this Court to put a longer order in place (called a "preliminary injunction"), and pointing out that the federal government is still blocking access to lawyers.

The Court has examined all of the new evidence presented by both sides and decides once again that the federal government is partially blocking access to lawyers. Lawyer visiting hours have been closed down repeatedly without letting lawyers know—even though this Court ordered that the government should let the lawyers know. Officers insist on keeping the door open when lawyers are trying to have private conversations with their clients—even though this means the conversations are no longer private. Officers sometimes will not let lawyers meet with people who want to work with lawyers—even though they are not supposed to. Individuals in B-18 do not get the free, confidential phone calls with their lawyers that even the government says they should have. And sometimes, individuals are moved from B-18 to another location which does not allow lawyer visits at all.

And, once again, the Court is ordering the federal government to stop—this time for the rest of this lawsuit.

***

Before the Court is a Motion for Preliminary Injunction, Dkt. No. 127 ("Mot."), filed by
Plaintiffs Coalition for Humane Immigrant Rights ("CHIRLA") and Immigrant Defenders Law
Center ("ImmDef") (referred to herein, collectively, as "Access/Detention Plaintiffs").[1] Defendants
(referred to herein, collectively, as "Defendants" or "the Government")[2] opposed, Dkt. No. 168
("Opp. to Mot."), and Access/Detention Plaintiffs replied, Dkt. No. 186 ("Reply"). For the reasons
stated herein, the Court hereby GRANTS the Motion for Preliminary Injunction.

**I.    Background[3]**

The facts alleged in the First Amended Complaint, Dkt. No. 16 ("1AC"), are recounted more
fully in the Court's July 11, 2025, Order Granting Plaintiffs' Ex Parte Applications for a Temporary
Restraining Order and Order to Show Cause Regarding Preliminary Injunction. Dkt. No. 87 ("TRO
Order"). Here, the Court will provide additional background only as relevant to the instant Motion.

Since early June, Defendants have conducted large-scale immigration enforcement raids
through the Central District of California and detained individuals in the basement of 300 North Los
Angeles Street, commonly referred to as "B-18." 1AC ¶ 74. On July 2, 2025, Access/Detention
Plaintiffs filed an Ex Parte Application for a Temporary Restraining Order and Order to Show Cause
Regarding Preliminary Injunction. Dkt. No. 38 ("TRO Application"). Access/Detention Plaintiffs
contended that Defendants denied Access/Detention Plaintiffs' attorneys access to the individuals
detained in B-18 in conjunction with the immigration enforcement raids across this District. TRO

---

[1] Additional Plaintiffs to the suit include two organizations and five named individuals (Plaintiffs
Pedro Vasquez Perdomo ("Vasquez Perdomo"), Carlos Alexander Osorto ("Osorto"), Isaac Villegas
Molina ("Villegas Molina"), Jorge Hernandez Viramontes ("Hernandez Viramontes"), and Jason
Brian Gavidia ("Gavidia") (collectively the "Individual Plaintiffs")). Only ImmDef and CHIRLA—
the Access/Detention Plaintiffs—assert the claim at issue in the instant Motion. Dkt. No. 87 ("TRO
Order") at 3–4.

[2] Defendants are Immigration and Customs Enforcement ("ICE") and twelve named individuals sued
in his or her official capacity, all of whom are federal officials with responsibility for and authority
over federal law enforcement and/or immigration enforcement activities. TRO Order at 4–6.

[3] All facts stated herein are taken from the allegations in Access/Detention Plaintiffs' Complaint
unless otherwise indicated and are included for background purposes. Dkt. No. 16 ("1AC").

1    Application at 5–7.[4] Access/Detention Plaintiffs sought the entry of a Temporary Restraining Order

2    enjoining Defendants from limiting legal access to the individuals at B-18. *Id.* Access/Detention

3    Plaintiffs supported their TRO Application with evidence including numerous declarations and news

4    stories. *See generally id.*

5    The Court held a hearing on the TRO Application on July 10, 2025. Dkt. No. 114. After

6    considering the arguments, written positions, and evidence presented by the parties, the Court

7    determined Defendants denied entry to Access/Detention Plaintiffs and/or otherwise frustrated

8    Access/Detention Plaintiffs' attempts to communicate with detained individuals and offer them legal

9    services. TRO Order at 2, 19–21 (citing to a "mountain of evidence" and explaining how federal

10   agents prevented Access/Detention Plaintiffs' attorneys from communicating with detained

11   individuals, including denying them entry, blasting their horns to drown out communications, and

12   deploying "an unknown chemical agent" against the attorneys that caused "everyone to cough and

13   inflicted a burning sensation in the eyes, nose, and throat").

14   Accordingly, the Court found Access/Detention Plaintiffs were likely to succeed on their

15   Fifth Amendment claims and an temporary restraining order was necessary to prevent further

16   constitutional violations. *Id.* at 23–30. All Access/Detention Plaintiffs were seeking was the same

17   access to legal visitation and confidential phone calls as *already provided* at other facilities. *Id.* at 26.

18   Specifically, the Court ordered Defendants to permit legal visitation at B-18 "seven days per week,

19   for a minimum of eight hours per day on business days (Monday through Friday), and a minimum of

20   four hours per day on weekends and holidays" and provide "individuals detained at B-18 with access

21   to confidential telephone calls with attorneys, legal representatives, and legal assistants at no charge

22   to the detainee." *Id.* at 49. The Court further ordered that, when "exigent circumstances require

23   closure for the safety of human life or the protection of property, the Defendants must notify

24   Access/Detention Plaintiffs as soon as practicable and certainly within four (4) hours to make

25   alternative arrangements for legal visitation and/or notice to affected detainees and attorneys, legal

26

27   _____

28   [4] All page references herein are to internal page numbers, rather than those inserted by the CM/ECF
     system.

1  representatives, and legal assistants." *Id.* The Court granted the TRO Application and entered the

2  TRO Order on July 11, 2025.[5]

3         On July 28, 2025, Access/Detention Plaintiffs filed the instant Motion for Preliminary

4  Injunction, seeking to convert the TRO into a preliminary injunction. In their Motion,

5  Access/Detention Plaintiffs contend Defendants continue to deny them access to the individuals

6  detained in B-18, despite the Court's TRO Order. *See generally* Mot. Defendants filed their

7  Opposition on August 29, 2025, and Access/Detention Plaintiffs responded September 10, 2025. *See*

8  Opp. to Mot.; Reply. The Court heard the matter on October 23, 2025. *See* Dkt. No. 230.

9         At the October 23, 2025, hearing (the "Hearing"), Counsel for Intervenors[6] confirmed that

10  although Intervenors joined the Motion, Dkt. No. 147 ("Joinder"), they did not need to be heard on

11  the matter. Dkt. No. 230 at 1. At the Hearing, the Court heard from the parties with respect to

12  Defendants' Ex Parte Application to Strike Access/Detention Plaintiffs' Reply or, in the Alternative,

13  To Allow Defendants to File Surreply With Evidence, Dkt. No. 198, and the Access/Detention

14

15  _____

16  [5] On July 14, 2025, Defendants filed an Ex Parte Application to Stay the TRO Order, as it related to
17  a separate, Fourth Amendment claim also resolved in the TRO Order. Dkt. No. 94. The Court denied
     that application on July 17, 2025. Dkt. No. 108. Defendants then sought an emergency stay of the
18  TRO Order from the United States Court of Appeals for the Ninth Circuit that same day. *See
     Vasquez Perdomo v. Noem*, 148 F.4th 656, 664 (9th Cir. 2025). The Ninth Circuit reviewed this
19  Court's factual findings for clear error and, discerning no such error, denied the government's
     motion for a stay in substantial part. *Id.* at 679, 690. On August 7, 2025, Defendants filed an
20  Application to Stay the TRO Order with the Supreme Court of the United States. [No. 25A169]. On
     September 8, 2025, before Plaintiffs filed their replies, the Supreme Court granted that application to
21  stay the TRO Order pending the disposition of the Ninth Circuit appeal and the disposition of the
     writ of certiorari, if timely sought. *Noem v. Vasquez Perdomo*, No. 25A169, 2025 WL 2585637, at
22  *1 (U.S. Sep. 8, 2025). Both parties requested the Court continue the hearing originally scheduled
     for September 24, 2025. *See* Dkt. Nos. 194, 196. On October 10, 2025, after receiving a status report
23  from the parties, the Court issued an order (1) denying Defendants' Motion to Stay Fourth
     Amendment Proceedings (Dkt. No. 196) and Ex Parte Application (Dkt. No. 216); (2) granting
24  Plaintiffs' and Intervenors' Request for an Indicative Ruling Regarding the Fourth Amendment TRO
     (Dkt. No. 203); and (3) determining the Court will move forward with the Fifth Amendment
25  Proceedings. Dkt. No. 220.
26

27  [6] Intervenors are the City of Los Angeles, County of Los Angeles, City of Montebello, City of
     Monterey Park, City of Pasadena, City of Pico Rivera, City of Santa Monica, City of West
28  Hollywood, and Culver City. *See* Dkt. No. 147.

1    Plaintiffs' Opposition thereto, Dkt. No. 200. The Court concluded it would not strike the Reply but

2    would consider the Defendants' Surreply. Dkt. No. 230 at 1.[7]

3    **II.    <u>Applicable Law</u>**

4        Federal Rule of Civil Procedure 65 sets forth the procedure for issuance of a preliminary

5    injunction. *See* Fed. R. Civ. P. 65(b). "A preliminary injunction is an extraordinary remedy never

6    awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To qualify for

7    injunctive relief, Plaintiff must demonstrate: (1) a likelihood of success on the merits; (2) a

8    likelihood that he will suffer irreparable harm without an injunction; (3) the balance of equities tips

9    in his favor; and (4) an injunction is in the public interest. *Id.* at 20.

10        The Ninth Circuit has held that injunctive relief may issue, even if the moving party cannot

11    show a likelihood of success on the merits, if "'serious questions going to the merits' and a balance

12    of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction,

13    so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the

14    injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th

15    Cir. 2011). Under either formulation of the principles, preliminary injunctive relief should be denied

16    if the probability of success on the merits is low. *Martin v. Int'l Olympic Comm.*, 740 F.2d 670, 675

17    (9th Cir. 1984) ("[E]ven if the balance of hardships tips decidedly in favor of the moving party, it

18    must be shown as an irreducible minimum that there is a fair chance of success on the merits.").

19

20    _____

21    [7] Defendants provided seven additional declarations, Dkt. Nos. 198-3–9. However, all but one of the

22    declarations only detail events that occurred prior to the TRO Order. Dkt. No. 198-4–9. As the Court
     now mainly focuses on Defendants' conduct continuing after the TRO Order, these additional

23    declarations are not material to the Motion. The single declaration relating to events occurring after
     the Court issued the TRO Order, Dkt. No. 198-3, Declaration of Sean Skedzielewski

24    ("Skedzielewski Decl.") ¶¶ 2–6, references Defendants' communications to Access/Detention
     Plaintiffs regarding closures after September 10, 2025. However, the Court notes that Defendants

25    only started providing such notice after Access/Detention Plaintiffs filed the instant Motion, which
     allows the Court to infer that the potential of a preliminary injunction encouraged the notice, and

26    accordingly, a preliminary injunction may be necessary to ensure Defendants continue to provide
     detainees the protections stated in the TRO Order. *Armstrong v. Brown*, 768 F.3d 975, 986 (9th Cir.

27    2014) (finding it appropriate for a court to "prescrib[e] more specific mechanisms of compliance"
     where the court's previous less intrusive means have failed).

28

1    A preliminary injunction is "an extraordinary and drastic remedy" and "should not be granted

2 unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520

3 U.S. 968, 972 (1997). At this stage, the Court is only determining whether Plaintiffs have met their

4 burden for a preliminary injunction. *See L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*,

5 634 F.2d 1197, 1200 (9th Cir. 1980). **Accordingly, this Order is not a final decision on the merits**

6 **of any claim, nor is it a decision on the merits of the factual assertions either party made in**

7 **support of any claim.**

8    **III.    Discussion**

9    As a preliminary matter, Defendants argue Access/Detention Plaintiffs' claims fail because

10 (1) they are moot; (2) the Court lacks jurisdiction under Section 1252; and (3) the Access/Detention

11 Plaintiffs lack standing because there is not a likelihood of reoccurrence of harm. Opp. to Mot. at 5–

12 15.

13    Many of Defendants' arguments against the granting of the preliminary injunction turn on the

14 factual question of whether any restrictions on access to counsel persist and whether they have

15 occurred since June 2025 and since the issuance of the TRO. The Court will therefore address the

16 competing evidence on this at the outset. Then, the Court will address the Defendants' arguments on

17 mootness, jurisdiction, and standing. Finally, the Court will consider the *Winter* factors and

18 determine if a preliminary injunction is warranted.

19    **A.    Access to Counsel Issues Persist at B-18.**

20    Access/Detention Plaintiffs contend Defendants continue to restrict B-18 detainees' access to

21 counsel in numerous ways, including closing B-18 during scheduled operating hours, moving

22 detainees to different facilities, and failing to provide proper areas for and methods of free and

23 confidential communications between detainees and attorneys. Mot. at 1–9. Defendants attest they

24 have complied with the TRO Order since it was issued, and any remaining restrictions are sporadic

25

26

27

28

7

1    and/or required by exigent circumstances.[8] Mot. to Opp. at 19–20; Dkt. No. 168-2, Declaration of

2    Rogelio Gudino ("Gudino Decl.") ¶ 20 (explaining B-18 has resumed regular visitation hours). The

3    Court has reviewed all of the evidence currently in the record and makes the factual findings set

4    forth below.

5           Access/Detention Plaintiffs assert—with support from sworn declarations—that B-18 was

6    closed to attorney visitation on numerous occasions without notice. According to Access/Detention

7    Plaintiffs, B-18 was closed to attorney visitation on July 25, 2025; and August 1, 2025, through

8    August 4, 2025. Dkt. No. 127-1, Declaration of Andrew Freire ("Freire Decl.") ¶¶ 2–3 (stating on

9    July 25, 2025, when an attorney visited B-18, a B-18 officer stated visiting hours were cancelled for

10   the rest of the day); Dkt. No. 186-8, Declaration of Lindsay Toczylowski ("Toczylowski Third

11   Decl.") ¶ 3 (stating on July 31, 2025, B-18 closed early and ImmDef did not receive notice B-18

12   reopened until August 5, 2025); Dkt. No. 186-6, Declaration of Christopher Duran ("Duran Third

13   Decl.") ¶ 3 (stating on August 1, 2025, a CHIRLA attorney attempted to visit potential clients at B-

14   18, but when he arrived, a sign stated the facility was closed until further notice); *id.* ¶ 5 (stating that

15   on August 1, 2025, a "Case Management Specialist [at B-18] said she thought [B-18] had been

16   closed for a few days"). For their part, Defendants assert that B-18 currently allows attorneys to visit

17   potential clients and reference multiple instances in Access/Detention Plaintiffs' evidence stating

18   attorneys had access to detainees and met with detainees in person. Opp. to Mot. at 19–20 (citing to

19   Access/Detention Plaintiffs' declarations discussing successful visits); *see* Dkt. No. 127-3,

20   Declaration of Nicolas Thompson-Lleras ("Thompson-Lleras Third Decl.") ¶¶ 3, 7–22 (discussing

21   an in-person meeting with a prospective client detained at B-18 on July 16, 2025); Dkt. No. 127-4,

---

[8] Initially, Defendants provided the Court with two declarations to support this assertion, but one
was not relevant to the issues at hand. *See* Dkt. No. 168-1 Declaration of Daniel I. Parra ("Parra
Decl.") (explaining why the TRO's requirements relating to the reasonable suspicion factors impede
immigration enforcement efforts but failing to mention B-18 or any of Defendants' practices and
policies relating access to counsel). However, in their Surreply, Dkt. No. 198-2, Defendants
supplemented the record with additional declarations from law enforcement officers detailing the
dangers of the demonstrations and difficulties of crowd control. *See* Dkt. No. 198-4–9.

1  Declaration of Ming Tanigawa-Lau ("Lau Decl.") ¶¶ 7–9 (discussing an in-person meeting with a

2  client at B-18 on July 23, 2025).

3        Defendants further explain impending protests justified any B-18 closure during scheduled

4  hours and even reference one of Access/Detention Plaintiffs' declarations to support the assertion.[9]

5  Opp. to Mot. at 22–23; *see also* Freire Decl. ¶ 3 (stating that after a B-18 officer denied entry to an

6  ImmDef attorney, he explained B-18 was closed due to protests); Gudino Decl. ¶¶ 18, 21, 22

7  (explaining that: detainees were moved from B-18 on July 25, 2025, for their safety and security due

8  to protests; generally, emergency transfers occur for the safety and security of detainees when

9  warranted by exigent circumstances; and there are notification procedures for closures due to safety

10  and security which involve Enforcement and Removal Operations emailing ICE attorneys to notify

11  the Department of Justice within the required TRO time frame). However, Defendants' declarations

12  do not specifically address the closures that occurred on August 1, 2025, through August 4, 2025.

13  *See generally* Gudino Decl.; *see also id.* ¶ 8 (stating the closure on July 25, 2025, occurred due to

14  protests). The Court finds that Access/Detention Plaintiffs have established by a preponderance of

15  the evidence that (1) B-18 was closed to attorney visitation without explanation on the following

16  dates: August 1, 2025, August 2, 2025, August 3, 2025, and August 4, 2025; and (2) B-18 was

17  closed to attorney visitation due to possible protests on July 25, 2025.

18        In its TRO, the Court acknowledged that exigent circumstances might occasionally require

19  closure of B-18 to attorney visitation, and for that reason, simply ordered that Defendants must

20  notify Access/Detention Plaintiffs "as soon as practicable and certainly within four (4) hours to make

---

[9] Defendants also provided two articles to illustrate "riots" were occurring such that Defendants could not provide Access/Detention Plaintiffs access to detained individuals because of safety concerns. One article makes no mention of a riot or violence, while the other describes escalated confrontations between protestors and the government. *See* Anti-Trump Protestors March in DTLA as Part of Nationwide 'Rage Against the Regime' Rallies, ABC7 (Aug. 3, 2025), https://abc7.com/post/anti-trump-protesters-march-la-partrage-regime-rallies/17411282; *see also* MacArthur Park Protest Over Immigration Raids Turns Chaotic, NBC4 Los Angeles (Aug. 9, 2025), https://www.nbclosangeles.com/news/local/macarthurpark- protest-immigration-raids/3762065/; Protestors Descend Upon MacArthur Park in Opposition of Immigration Raids, NBC4 Los Angeles (Aug. 9, 2025), https://www.nbclosangeles.com/news/local/macarthur-park-protestimmigration-raids/3762065.

1  alternative arrangements for legal visitation." TRO Order at 49. But it appears that has not occurred

2  either. Dkt. No. 186-1, Declaration of Matthew J. Craig ("Craig Decl.") ¶ 4 (Access/Detention

3  Plaintiffs stated that "[a]t no point between July 11, 2025, and September 10, 2025, have [they]

4  received any notice of closure or received any information about alternative arrangements for legal

5  visitation as required by the TRO."); Toczylowski Third Decl. ¶ 3 (stating that on July 31, 2025, a

6  third party, rather than Defendants informed ImmDef that B-18 was closing early). And the

7  correspondence between counsel does not rebut the showing by Access/Detention Plaintiffs that no

8  required notice was given. *See* Dkt. No. 186-2, Craig Decl. Ex. 1, Letter from Matthew J. Craig to

9  Jonathan K. Ross (Aug. 8, 2025); Dkt. No. 186-3, Craig Decl. Ex. 2, Letter from Jonathan K. Ross to

10  Matthew J. Craig (Aug. 20, 2025); Dkt. No. 186-4, Craig Decl. Ex. 3, Letter from Matthew J. Craig

11  to Jonathan K. Ross (Aug. 22, 2025). The Court therefore finds that Access/Detention Plaintiffs have

12  established by a preponderance of the evidence that no notice was provided of the B-18 closure on at

13  least the following dates: July 25, 2025; and August 1, 2025, through August 4, 2025.

14          Access/Detention Plaintiffs also assert that they have been unable to meet privately with their

15  clients because, on a number of occasions, B-18 guards and officers have insisted that the door to the

16  private attorney room be open while they met with their clients. *See* Thompson-Lleras Third Decl. ¶¶

17  3, 9–10 (stating that on July 16, 2025, an attorney met with a detainee, but the officer insisted that

18  pursuant to a security policy, the door was required to be left open, and as a result "the prospective

19  client and [the attorney] had to speak in a strained, hushed tone in order to maintain

20  confidentiality"); Dkt. No. 186-5, Declaration of Sophia Wrench ("Suppl. Wrench Decl.") ¶ 6

21  (stating that on August 6, 2025, an attorney met with a detainee, but the officer "left the door to the

22  private meeting room ajar"); Duran Third Decl. ¶¶ 8, 15–16 (stating that on August 18, 2025, an

23  attorney met with a detainee in a private interview room, but he was separated from the detainee by a

24  thick glass window only allowing conversation through a small round screen, which caused both the

25  attorney and the detainee to raise their voices and lose any semblance of privacy). Defendants do not

26  present evidence to contradict these specific examples, and Gudino merely asserts, "There are two

27  private interview rooms with closing doors that are . . . available to allow for confidential, in-person

28  meetings with detained aliens and their attorney. An officer is to remain outside the door on the other

side of the glass window for the safety and security of both the attorney and detainee." Gudino Decl. ¶ 9. Notably, Gudino does not state that the policy permits the doors to be closed, only that apparently the doors can physically be closed. Considering that, on the one hand, Defendants provide a declaration that speaks to practices that the declarant has been *advised* are *supposed* to occur, and, on the other hand, Access/Detention Plaintiffs provide multiple, credible, detailed accounts of specific events, the Court finds Access/Detention Plaintiffs have established by a preponderance of the evidence Defendants have not provided facilities to detainees that actually allow for meaningful private communication.

In addition, Access/Detention Plaintiffs assert that they have been prohibited from meeting with prospective clients. *See* Suppl. Wrench Decl. ¶ 5 (stating that, on July 28, 2025, a B-18 officer denied access to an attorney who asked to meet with people who need a free lawyer because B-18 does not allow solicitation, afterwards correcting himself that the attorney needed a Form G-28 to meet with anyone); Toczylowski Third Decl. ¶ 4 (stating that, on August 5, 2025, when attorneys attempted to speak with clients and potential clients, B-18 guards did not allow attorneys to speak to detainees for whom they did not have Form G-28). Defendants' evidence consists merely of a declaration attesting—with little detail or support—that "[c]urrently, attorneys seeking to visit prospective individual clients detained at B-18 can do so under B-18 legal visitation rules." Gudino Decl. ¶ 19 (also stating that "[n]o attorney will be denied access to the facility solely because they do not have a Form G-28"). However, these general statements regarding policy do not address Access/Detention Plaintiffs' actual experiences. The Court therefore finds Access/Detention Plaintiffs have established by a preponderance of the evidence that Defendants prevented them from meeting with prospective clients on the following dates: July 28, 2025, and August 5, 2025.

With respect to telephone calls, Access/Detention Plaintiffs present compelling evidence that detainees are not provided access to confidential telephone calls with attorneys and legal representatives at no charge to the detainee. *See, e.g.*, Toczylowski Third Decl. ¶ 11 ("ImmDef attorneys have heard different reports about phone access at B-18."); Suppl. Wrench Decl. ¶¶ 5–6 (stating a B-18 officer informed an attorney of the following phone practices: "If someone needs to make a phone call, they can ask an ICE officer. Their phone call outside is free, but once they are in

1   the cell, I don't know how much they cost, because we use a third-party system, Tel-Com."); *id.* ¶ 26

2   (referencing a detainee who stated that whether the call was outside or inside the cell, the

3   conversations were not in private due to the location of the phone); Duran Third Decl. ¶ 13 (stating

4   that Defendants allowed a detainee to call his family, but did not allow him to call an attorney).

5   Defendants assert that the holding cells in B-18 have constant access to telephones, detainees can

6   make free calls to pro bono legal institutions, and that after the TRO Order, Defendants set up two

7   private call rooms detainees can use to make unscreened, unmonitored calls to their attorneys. *See*

8   Gudino Decl. ¶¶ 5–9. However, these declarations speak to general practices; Defendants do not

9   refute Access/Detention Plaintiffs' specific claims with their own evidence regarding the specific

10  facts in question.[10] For instance, photos of rooms that should be available to detainees do not

11  controvert the evidence regarding what attorneys and detainees were specifically told regarding

12  phone calls.

13      Finally, it appears that Defendants have moved detainees between B-18 and the Santa Ana

14  facility without notice. Toczylowski Third Decl. ¶¶ 5–6 (stating that on multiple occasions, ImmDef

15  attorneys have attempted to visit B-18 to speak with a detained individual, only to find the individual

16  was transferred to the Santa Ana processing center). It appears that this has hindered attorney-client

17  visitation because, on a number of occasions, counsel could not find their clients, or—when they

18  located them at Santa Ana—were told that Santa Ana does not allow for attorney visitation. *See* Dkt.

19  No. 186-7, Declaration of Premjit Panicker ("Panicker Decl.") ¶ 9 (stating an attorney was told he

20  "could not meet [a client] as [the] facility was a processing facility and they were not set up for

21  attorneys to meet with clients"); Toczylowski Third Decl. ¶¶ 7–8 (stating an ICE officer informed an

22  attorney that detainees at the Santa Ana facility do not have the right to speak to counsel).

23

24  _____

25  [10] The Gudino Declaration references exhibits with photos and other documentation: a true and
    correct copy of the numbers that can be called for free that are posted in each holding cell, Dkt. No.
26  193-1; four photographs of the two telephone rooms Dkt. No. 193-2; packets provided to detainees
    with pro bono legal services, Dkt. No. 193-3; and a true and correct copy of the sign listing visitation
27  hours at B-18, Dkt. No. 193-4. *See* Dkt. 193; Opp. to Mot. ¶¶ 5, 7–8, 20. Still, this photo evidence
    merely supports that protections could be in place; it does not illustrate that protections were actually
28  provided to the individuals referenced in Access/Detention Plaintiffs' evidence.

1    Altogether, Plaintiffs have provided numerous, consistent declarations about specific

2    statements and events that show Access/Detention Plaintiffs are still regularly being denied access to

3    detainees such that Access/Detention Plaintiffs are unable to effectively provide meaningful legal

4    services to the detainees. This evidence, in comparison to Defendants' two relevant declarations

5    (speaking mainly to general practices and lacking cited exhibits for specific claims) and two news

6    articles, easily meets Access/Detention Plaintiff's burden of persuading the Court by a

7    preponderance of the evidence.

8    **B.      Access/Detention Plaintiffs' Fifth Amendment Claims Are Not Moot.**

9    Defendants contend Access/Detention Plaintiffs' Fifth Amendment claims are moot because

10   (1) Access/Detention Plaintiffs challenged practices that ceased taking place on June 24, 2025, when

11   normal access to B-18 resumed (subject to modification during exigent circumstances); and (2) the

12   case is no longer a live controversy because Vasquez Perdomo, Osorto, and Villegas Molina are no

13   longer being held at B-18. Opp. to Mot. at 5–7; *see also* Dkt. No. 70-1, Decl. of Lilia A. Uyeda

14   ("Uyeda Decl.") ¶ 11. Access/Detention Plaintiffs argue the claim still requires resolution because

15   Defendants continue impeding Access/Detention Plaintiffs' ability to provide legal services to

16   immigrants and refugees. Reply at 2–6, 11–14. For the following reasons, the Court finds that the

17   Access/Detention Plaintiffs' claim is not moot.

18   "Pursuant to Article III of the U.S. Constitution, federal courts can only adjudicate live cases

19   or controversies." *Bishop Paiute Tribe v. Inyo Cnty.*, 863 F.3d 1144, 1153 (9th Cir. 2017). As a

20   result, courts lack subject-matter jurisdiction to adjudicate moot claims. *Id.* at 1155. "[A] case is

21   moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in

22   the outcome." *Cnty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (quoting *Powell v.*

23   *McCormack*, 395 U.S. 486, 496 (1969)). But "[m]ere voluntary cessation of allegedly illegal conduct

24   does not moot a case." *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203

25   (1968).

26   "Nevertheless, part or all of a case may become moot if (1) 'subsequent events [have] made

27   it *absolutely clear* that the allegedly wrongful behavior [cannot] reasonably be expected to recur,'

28   *and* (2) 'interim relief or events have completely and irrevocably eradicated the effects of the alleged

13

1  violation.'" *Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260, 1274 (9th Cir. 1998)

2  (alterations in original) (emphasis added) (first quoting *Concentrated Phosphate Export Ass'n*, 393

3  U.S. at 203; and then quoting *Lindquist v. Idaho State Bd. of Corrections*, 776 F.2d 851, 854 (9th

4  Cir.1985)); *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 n.10 (1982). "The heavy

5  burden of persuading the court that the challenged conduct cannot reasonably be expected to recur

6  lies with the party asserting mootness." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC),*

7  *Inc.*, 528 U.S. 167, 170 (2000).[11]

8          Defendants argue that because the three Individual Plaintiffs previously detained in B-18

9  (Vasquez Perdomo, Osorto and Villegas Molina) were released and none of the other Individual

10  Plaintiffs are detained in B-18 currently, there is no effective relief the Court can provide. Opp. to

11  Mot. at 5–6; *see also* Dkt. No. 143 at 4. However, none of the Individual Plaintiffs filed the

12  Motion— CHIRLA and ImmDef filed the Motion. Thus, Defendants are correct that the

13  Access/Detention Plaintiffs "must continue to have a 'personal stake in the outcome' of the lawsuit."

14  *Lewis v. Cont'l Bank Corp.,* 494 U.S. 472, 478 (1990) (quoting *Los Angeles v. Lyons*, 461 U.S. 95,

15  101 (1983)); *see also* Opp. to Mot. at 5–6. And Access/Detention Plaintiffs easily meet this standard.

16  Both are organizations with a core mission of providing legal counseling and services to immigrants.

17  TRO Order at 18. The Court previously has found Defendants' frustration of their core mission

18  appropriate grounds for standing. *Id.* at 21.

19          Defendants contend that they only limited operating hours during the "June 2025 Los

20  Angeles riots," and since those have now ended, much of Access/Detention Plaintiffs' evidence is

21

22

23  _____

24  [11] Defendants cite a Ninth Circuit concurrence to shift the burden to the Access/Detention Plaintiffs.

25  *See Smith v. Helzer*, 95 F.4th 1207, 1226 (9th Cir. 2024) (explaining that initially, the party asserting mootness has the burden, but after, when a court considers whether an exception applies, the burden

26  shifts to the party opposing mootness). Even if the Court were to apply this analysis specifically, Defendants first carry the heavy burden to establish it is not "absolutely clear" the alleged wrongful

27  conduct cannot be reasonably expected to recur before the burden shifts to Access/Detention Plaintiffs. *See Aladdin's Castle, Inc.*, 455 U.S. at 289 n.10. Defendants have not done so, so the

28  burden has not shifted.

1    outdated and no longer relevant or reflective of Defendants' current practices.[12] Opp. to Mot. at 5–6,

2    22. Though the Court disagrees that Defendants' prior actions are completely irrelevant, the Court

3    agrees the more relevant question is whether Defendants' have continued to unlawfully limit

4    Access/Detention Plaintiffs from providing legal representation and counsel to immigrants since the

5    Court's TRO Order. *See Valdivia v. Schwarzenegger*, 599 F.3d 984, 993 (9th Cir. 2010) (quoting

6    *Hutto v. Finney*, 437 U.S. 678, 687 (1978) abrogated on other grounds by *Department of Agriculture*

7    *Rural Development Rural Housing Service v. Kirtz*, 601 U.S. 42 (2024)) ("Where the state has not

8    'fully complied with the court's earlier orders,' the district court has 'ample authority to go beyond

9    earlier orders.'"). Accordingly, the Court relies on Access/Detention Plaintiffs' evidence regarding

10    Defendants' practices occurring after the Court issued the TRO Order. As discussed above, although

11    Access/Detention Plaintiffs confirm the TRO Order has improved matters by allowing for some in-

12    person visitation, the current record shows Defendants still are not fully in compliance with the TRO

13    Order. *See supra* Section III.A. To summarize, Defendants continue to refuse Access/Detention

14    Plaintiffs' attorneys during regular hours or provide the Access/Detention Plaintiffs with the required

15    notice when closures occur. Even when they are granted access to detainees via phone calls or in-

16    person meetings, the calls are not always free and the areas for calls or meetings are not truly private,

17    consequently preventing any truly confidential communication. *See id.* As clearly Access/Detention

18    Plaintiffs' access to the detained individuals and the Court's TRO is still at issue between the parties,

19    the matter cannot be moot.

20        Having determined that the claim is not moot, the Court need not address the parties'

21    remaining arguments regarding exceptions to mootness. *See* Opp. to Mot. at 6-7.

22        / / /

23        / / /

24

25    _____

26    [12] The Court also notes that the Access/Detention Plaintiffs' evidence ends—as one would expect—
just before the filing of their Motion; that is to say, it was certainly current as of the filing of their
27    Motion. The fact that the hearing was scheduled several weeks later to accommodate the parties
should not weigh against the Access/Detention Plaintiffs, as discussed below, *infra* note 14. This is
28    particularly so, given that the time frame at issue is a matter of weeks.

**C.  Section 1252 of the Immigration and Nationality Act Does Not Bar the Organizational Plaintiffs' Claims.**

Defendants argue the Court lacks jurisdiction because Section 1252(a)(5) and (b)(5) of the Immigration and Nationality Act ("INA") channel the Fifth Amendment claim to the petition for review process. Opp. to Mot. at 8. Just as this Court previously found, TRO Order at 31–33, the Court finds again that Section 1252 does not bar this Court's consideration of this claim.

Section 1252(a)(5) states: "[A] petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter." Section 1252(b)(9) follows "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section."

The Ninth Circuit has held that an "alien's right to counsel is part and parcel of the removal proceeding itself" and as such, claims relating to an alien's right to counsel must be raised through a petition for review process. *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031–35 (9th Cir. 2016) (quoting *Aguilar v. ICE*, 510 F.3d 1, 13 (1st Cir. 2007)). However, since *J.E.F.M. v. Lynch*, the Supreme Court has clarified the meaning of "arising from" and found that the INA "does not present a jurisdictional bar where those bringing suit are not asking for review of an order of removal, [or] the decision . . . to seek removal." *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 19 (2020) (cleaned up) (quoting *Jennings v. Rodriguez*, 583 U.S. 281, 294–95 (2018)).

Here, Access/Detention Plaintiffs do not ask for review of or challenge removal proceedings; Plaintiffs challenge Defendants' conduct in systematically interfering with their ability to provide legal services to prospective and existing clients. The relevant facts and legal questions occur outside any individual's removal proceeding and are not in any sense inextricably linked to the removal process. *See Gonzalez v. United States Immigr. & Customs Enf't*, 975 F.3d 788, 810 (9th Cir. 2020) (quoting *Dep't of Homeland Sec.*, 591 U.S. at 19) (describing Section 1252(b)(9) as a "targeted" and "narrow" provision.).

**D.    The Plaintiffs Have Shown that They Continue to Have Standing.**

Defendants argue that the Access/Detention Plaintiffs do not have standing. Opp. to Mot. at 8–16. The Access/Detention Plaintiffs assert that because the Court has determined they have standing, the Court has no reason to reconsider the issue. Reply at 8. But—as Defendants correctly argue—the Access/Detention Plaintiffs continue to bear the burden of establishing standing throughout the litigation. Opp. to Mot. at 9. If new evidence becomes available that establishes plaintiff does not actually have standing, it is appropriate for the court to reexamine the standing issue. *See Murthy v. Missouri*, 603 U.S. 43, 58 (2024) ("[P]laintiff 'bears the burden of establishing standing as of the time [s]he brought th[e] lawsuit and maintaining it thereafter." (alteration in original) (quoting *Carney v. Adams*, 592 U.S. 53, 59 (2020))); *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 115 n.31 (1979) ("Although standing generally is a matter dealt with at the earliest stages of litigation, usually on the pleadings, it sometimes remains to be seen whether the factual allegations of the complaint necessary for standing will be supported adequately by the evidence adduced at trial.").

To establish standing, a plaintiff must show first that it has suffered an "injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks and citations omitted) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990). The plaintiff must then show causation and redressability. *Id*. at 560–61. In the TRO Order, the Court found Access/Detention Plaintiffs have organizational standing because Defendants directly impaired their "ability to engage in the representation of immigrants and refugees that is at the core of their founding missions." Mot. at 18–19.

The only new evidence the Defendants have presented is their evidence purporting to show that any access to counsel issues were sporadic and have long ceased. Defendants argue Plaintiffs cannot show an injury in fact because they "present no evidence of recurring misconduct during the intervening period through the filing of their TRO," and as such cannot show injury in fact. Opp. to Mot. at 8. As discussed above, the Court has considered the competing evidence on this issue and has determined that (1) Defendants continue to deny access to Access/Detention Plaintiffs' during

the scheduled hours as required by the TRO; (2) Defendants have not provided notice to Access/Detention Plaintiffs regarding B-18 closures necessitated by exigent circumstances, as required by the TRO; and (3) when Access/Detention Plaintiffs' attorneys do meet with individuals detained in B-18, Defendants fail to provide Access/Detention Plaintiffs with free and confidential methods to communicate with the detainees, as required by the TRO. *See supra* Section III.A; *see also* TRO Order at 49. In particular, these issues persisted even after the issuance of the TRO, which this Court finds demonstrates that the effects are continuous, so as to justify standing. Accordingly, the Defendants' standing argument fails: Plaintiffs have shown an injury in fact.[13]

**E.    The *Winter* Factors Weigh in Favor of Granting the Preliminary Injunction.**

Having addressed the preliminary arguments, this Court turns to consideration of the substance of the Motion—whether, under the *Winter* factors, the Access/Detention Plaintiffs are entitled to the preliminary injunction they seek.

            i.    <u>The Access/Detention Plaintiffs Have Established that They Are Likely to Succeed on the Merits.</u>

Access/Detention Plaintiffs argue they are likely to succeed on the merits because Defendants prevented Access/Detention Plaintiffs from providing legal services to B-18 detainees. Mot. at 13–18. Defendants respond that: (1) Access/Detention Plaintiffs have not established the process Defendants employed at B-18 was constitutionally insufficient; and (2) Access/Detention Plaintiffs have made no showing of a liberty interest, error, or prejudice. Opp. to Mot. at 16–21. These are the very same arguments the Court considered and rejected in granting the TRO. The Defendants have not explained why the Court should reach a different result this time.

In particular, both Access/Detention Plaintiffs' relationships or potential relationships to the detainees help establish a likelihood of success. First, due to Defendants' stop and arrest policies (and their efforts to continue in those policies), CHIRLA members have a reasonable fear of being

---

[13] Defendants also contend that Plaintiffs cannot establish third-party, next-friend, and associational standing. Opp. to Mot. at 10–16. As Plaintiffs only rely on organizational standing, the Court need not address these arguments. *See* Mot. at 11–13; TRO Order at 18–22.

1   stopped, arrested, and detained without access to counsel, which may constitute a violation of

2   CHIRLA's members' Fifth Amendment rights. TRO Order at 24. Next, due to Defendants'

3   restrictions at B-18, ImmDef attorneys have been unable to meet their potential clients—the

4   detainees—also implicating the detainees' Fifth Amendment rights. *Id.*; *see also Immigrant Defs. L.*

5   *Ctr. v. Noem*, 781 F. Supp. 3d 1011, 1049 (C.D. Cal. 2025) (finding that a likelihood of success may

6   be found where an organization alleges "ongoing or potential relationships with" individual plaintiffs

7   or a proposed class). Though Defendants argue their restrictions were not punitive or excessive, as

8   detailed above in Section III.A, *supra*, Access/Detention Plaintiffs have adequately established

9   attorneys continue to be denied meaningful, consistent access to B-18 detainees.

10         At the Hearing, Defendants argued Access/Detention Plaintiffs' evidence is not convincing

11  because it is too "anecdotal"—which the Court understood to mean that the evidence only shows a

12  handful of instances and does not demonstrate a consistent policy or practice. Dkt. No. 232 at 32. At

13  this preliminary stage in the litigation, the parties have not conducted discovery, so the

14  Access/Detention Plaintiffs necessarily only have access to limited evidence. Still, Access/Detention

15  Plaintiffs provided numerous, detailed declarations of similar accounts. *See supra* Section III.A.

16  Further, Defendants did not even provide sufficiently detailed evidence to outweigh the evidence

17  Access/Plaintiffs did present. *See id.* n.11. And the examples Defendants provided to counter

18  Access/Detention Plaintiffs' evidence only show partial compliance with the TRO Order; for

19  instance, it is undisputed that Defendants did not provide Access/Detention Plaintiffs any notice of

20  B-18 closures through September 10, 2025.[14] Craig Decl. ¶ 4. Though Defendants explained

21  operational delays slowed initial enforcement of the TRO Order, it is clear that for two months past

22  its issuance, Defendants did not provide Access/Detention Plaintiffs notice of B-18 closures or

23

24  _____

25  [14] At the Hearing, Defendants argued Access/Detention Plaintiffs' evidence is stale because
    Defendants provided Access/Detention Plaintiffs notice of any closures occurring after September

26  10, 2025. Dkt. No. 232 at 27. The Court does not find this argument persuasive. The Court initially
    scheduled the Hearing for September 24, 2025, but continued it to October 23, 2025, at both

27  Defendants' and Access/Detention Plaintiffs' requests. *See* Dkt. Nos. 194, 196. As the delay relates
    directly to Defendants' request, Access/Detention Plaintiffs should not bear an additional burden of

28  continuously obtaining evidence from detainees.

1    provide alternative options to contact detainees, thus denying the detainees access to counsel—the

2    core violation complained of.

3        Defendants also contend that their actions, when measured against the governing Fifth

4    Amendment standards, do not amount to a potential Fifth Amendment violation. Citing *Orantes-*

5    *Hernandez v. Thornburgh,* 919 F.2d 549 (9th Cir. 1990), Defendants argued that overall, "the

6    cumulative effect" of their actions did not "prevent aliens from contacting counsel and receiving *any*

7    legal advice,"—and therefore do not constitute a Fifth Amendment violation. *Id.* at 565 (emphasis

8    added). Defendants misread that decision. In particular, although the *Orantes-Hernandez* court found

9    that the facts established that the cumulative effect of the defendants' actions prevented the

10   noncitizens from contacting counsel and receiving any legal advice, at no point did the court indicate

11   that such a complete bar on access was required to find a Fifth Amendment violation nor did it hold

12   that something less than blocking all legal advice could not establish a Fifth Amendment violation.

13   Rather, the key question in *Orantes-Hernandez* was whether the defendants were respecting the right

14   to counsel "in substance as well as in name" or treating it "casually" and "interfering" with access to

15   counsel. *Id*. at 554 (quoting *Baires v. I.N.S.*, 856 F.2d 89, 91 n.2 (9th Cir. 1988)). The Ninth Circuit

16   therefore explained that the defendants' conduct (such as limiting visitation hours, delaying

17   interviews, providing inadequate systems to inform detainees their attorneys were present, and using

18   inadequate efforts to ensure communications were confidential) interfered with detainees'

19   relationship with counsel such that it created an access to counsel issue. *Id.* at 564–567. Similarly,

20   here, ongoing closures and privacy issues continue to interfere with B-18 detainees' relationship

21   with counsel or potential counsel. *See supra* Section III.A. The cumulative effect of Defendants'

22   continued conduct establishes—just as in *Orantes-Hernandez*—"a pattern of practices which

23   severely impeded [detainees] from communicating with counsel." 919 F.2d at 567.

24       In regard to Defendants' claim that Access/Detention Plaintiffs failed to show that they have

25   the necessary liberty interest independent of any individuals, the Court finds that under the Ninth

26   Circuit's "sliding scale" approach, the evidence submitted shows such "serious questions going to

27   the merits" that the requested relief is warranted. *See Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir.

28   2012) ("'[S]erious questions going to the merits' and a balance of hardships that tips sharply towards

1   the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that

2   there is a likelihood of irreparable injury and that the injunction is in the public interest." (alteration

3   in original) (quoting *All. for the Wild Rockies*, 632 F.3d at 1135)).

4       As to Defendants' claim that Access/Detention Plaintiffs must establish prejudice or error,

5   this is not a requirement. In the Ninth Circuit, this "rule rests on the view that the results of a

6   proceeding should not be overturned if the outcome would have been the same even without the

7   violation." *Gomez-Velazco v. Sessions*, 879 F.3d 989, 993 (9th Cir. 2018). Here, Access/Detention

8   Plaintiffs are not challenging the proceedings; rather, they are seeking protections against alleged

9   unconstitutional conduct. Accordingly, Access/Detention Plaintiffs need not make a showing of

10  prejudice to state their claim. *See Hernandez-Gil v. Gonzales*, 476 F.3d 803, 808–09 (9th Cir. 2007)

11  (not requiring a showing of prejudice in due process challenge); *see also Torres v. U.S. Dep't of*

12  *Homeland Sec.*, 411 F. Supp. 3d 1036, 1062 (C.D. Cal. 2019) (not requiring a showing of prejudice

13  where plaintiffs were forced to appear pro se). As such, the Access/Detention Plaintiffs have

14  demonstrated a minimum of a serious question going to the merits, so the first *Winter* factor weighs

15  in their favor.

16              ii.   The Access/Detention Plaintiffs Have Established That They Will Suffer

17                    Irreparable Harm.

18       Access/Detention Plaintiffs argue Defendants' actions will cause Access/Detention Plaintiffs

19  irreparable harm. Mot. at 18–22. As explained in the TRO Order, "[g]overnment action that

20  frustrates an organization's core missions gives rise to irreparable harm." TRO Order at 27–28

21  (citing *E. Bay Sanctuary Covenant v. Biden,* 993 F.3d 640, 677–78 (9th Cir. 2021) (finding

22  irreparable harm where governmental action prompted organizations "to change their core

23  missions")). The Court finds that the Access/Detention Plaintiffs are suffering harm as Defendants

24  frustrate their mission to provide legal services and counseling to immigrants. *See* TRO Order at 18–

25  22, 27 ("The Court finds that the Access/Detention Plaintiffs' missions will be—and have been—

26  frustrated by Defendants' actions for the same reasons that the Court has found that they established

27  their standing").

28

1        The factors that established irreparable harm for purposes of the TRO are relevant here as

2    well: expediency in applying for a preliminary injunction suggests "urgency and impending

3    irreparable harm." *E. Bay Sanctuary Covenant*, 993 F.3d at 678; *California v. Azar,* 911 F.3d 558,

4    581 (9th Cir. 2018) ("That the [state government plaintiffs] promptly filed an action following [the

5    federal government defendants' action] also weighs in their favor."); *see Washington v. Trump*, 847

6    F.3d 1151, 1169 (9th Cir. 2017) (finding "separated families" a "substantial," even "irreparable"

7    injury). Similarly, here, Access/Detention Plaintiffs have been expedient in filing this Motion (July

8    28, 2025), the lAC (July 2, 2025), and the prior TRO Application (July 2, 2025). Additionally,

9    CHIRLA's members are at risk of being separated from their families as a result of the Defendants'

10    enforcement actions. Altogether, this supports a finding of imminent irreparable harm.

11        Defendants contend that Access/Detention Plaintiffs cannot show a likelihood of imminent

12    irreparable harm because Access/Detention Plaintiffs rely on outdated evidence and temporary

13    policy changes during exigent circumstances. Opp. to Mot. at 23; *see Park Vill. Apartment Tenants*

14    *Ass'n v. Mortimer Howard Tr.,* 636 F.3d 1150, 1160 (9th Cir. 2011) (holding injunctive relief is not

15    an appropriate remedy "if the person or entity seeking injunctive relief shows a mere 'possibility of

16    some remote future injury.'" (quoting *Winter*, 555 U.S. at 375)). As discussed above,

17    Access/Detention Plaintiffs have provided a range of additional declarations that establish

18    Defendants are not fully complying with the TRO Order and that these actions are likely to cause

19    Access/Detention Plaintiffs imminent irreparable harm. *See supra* Section III.A. For instance,

20    Defendants closed B-18 to visitors on numerous instances between the issuance of the TRO Order

21    and the date of this Order, and one of these closures lasted for four consecutive days (August 1 to

22    August 4, 2025). Toczylowski Third Decl. ¶¶ 3–4; Craig Decl. ¶ 3. Further, Defendants never

23    provided notice about these closures, as required by the TRO. Craig Decl. ¶ 4. Even when detainees

24    are allowed access to counsel via the phone or in-person, the communications are rarely private.

25    Thompson-Lleras Third Decl. ¶¶ 7–10; Wrench Supp. Decl. ¶ 26. Defendants strenuously argue that

26    nothing more is needed as any issues have been resolved long ago.[15] The Court finds, based upon the

27    ———————————————

28    [15] See *supra* notes 12, 14.

evidence currently in the record that this is not the case. The fact that these access limitations persisted even after the issuance of the TRO rebuts the Defendants' claim and suggests that further injunctive relief—in the nature of this preliminary injunction—is required. In sum, this Court finds that the second *Winter* factor weighs in their favor.

>                 iii.    The Access/Detention Plaintiffs Established that the Balance of Equities
>                         Weighs in Their Favor.

Access/Detention Plaintiffs argue that the balance of equities analysis remains the same and because the Preliminary Injunction merely would require Defendants provide due process protections, the balance of the equities weigh in their favor. Mot. at 22–24.

Defendants contend that "[t]he government has a legitimate and significant interest in ensuring that immigration laws are enforced, and any limitation would severely infringe on the President's Article II authority." Opp. to Mot. at 24 (citing *U.S. v. Texas*, 599 U.S. 670, 679 (2023)). However, it is unclear to the Court how allowing individuals detained at B-18 access to counsel would infringe Defendants' ability to enforce immigration laws and Defendants have not provided the Court with such an explanation.[16] Further, the ordered schedule for legal visitation is the same as provided by Defendants' National Detention Standards and U.S. Immigration and Customs Enforcement, Non-Dedicated Intergovernmental Service Agreement Standards 11 (2025): "[T]he Service Provider [county and local government partners] shall permit legal visits seven days per week, for at least eight hours per day on weekdays and four hours per day on weekends and holidays."[17] Considering "Defendants already provide the same visitation schedule to ICE detainees at their facilities, the Court finds that any prejudice to Defendants, e.g., cost of implementing the

---

[16] Defendants provided declarations describing how the TRO Order limits Defendants' ability to effectively perform stops, searches, and seizures in furtherance of immigration laws, but the declarations do not address B-18 or access to counsel at all and certainly does not purport to explain why allowing detainees to communicate with counsel would hinder their efforts to conduct stops, searches, and seizures. *See, e.g.,* Parra Decl. ¶¶ 17–21.

[17] The National Detention Standards may be found at https://www.ice.gov/doc1ib/detention-standards/2025/nds2025.pdf. The Non-Dedicated Intergovernmental Service Agreement Standards may be found at https://www.ice.gov/doclib/detention-standards/2025/ndids2025.pdf.

visitation schedule for B-18 detainees, would be minimal." TRO Order at 29. Meanwhile, Access/Detention Plaintiffs do face hardship as Defendants' actions frustrate their ability to fulfill their core missions. Thus, the Court finds that the balance of equities tips in the Access/Detention Plaintiffs' favor; the third *Winter* factor weighs in favor of granting the Preliminary Injunction.

> iv.  The Access/Detention Plaintiffs Established that the Public Interest Weighs in Their Favor.

Defendants argue that public interest weighs in their favor, because the public benefits from "the government taking prompt, responsive action to preserve the safety of detainees and the public in light of the extraordinary circumstances it has and may face again in the future." Opp. to Mot. at 24–25. Defendants fail to explain, however, how complying with the Preliminary Injunction would disincentivize the government from taking such actions, as the language of the Preliminary Injunction allows for additional closure when safety and protection of property so require, so long as Defendants notify Access/Detention Plaintiffs "as soon as practicable and certainly within four (4) hours to make alternative arrangements for legal visitation and/or notice to affected detainees and attorneys, legal representatives, and legal assistants." TRO Order at 49.

Even further, in Access/Detention Plaintiff's favor, "public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution." *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005). As mentioned in the TRO Order, "[v]iolation of the Fifth Amendment raises public interest concerns, not only for those who are currently detained, but also for those who may be arrested and/or detained in the future." TRO Order at 29. This matter then imposes risks not only upon the Access/Detention Plaintiffs, who are prevented from engaging in their core missions, but also members of the general public who could also be detained in the future.

## F.  Injunction Bond, Limitations and Stay

> i.  The Court Does Not Find a Bond Warranted.

Access/Detention Plaintiffs argue the Court should waive Rule 65(c) security. Mot. at 24; Reply at 15. Defendants contend the Court should require it. Opp. to Mot. at 25. "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in

1  an amount that the court considers proper to pay the costs and damages sustained by any party found

2  to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "Rule 65(c) invests the

3  district court with discretion as to the amount of security required, *if any.*" *Johnson v. Couturier*, 572

4  F.3d 1067, 1086 (9th Cir. 2009) (citation modified) (internal quotation marks omitted). "[T]he

5  district court may dispense with the filing of a bond when it concludes there is no realistic likelihood

6  of harm to the defendant from enjoining his or her conduct." *Id*. (quoting *Jorgensen v. Cassiday*, 320

7  F.3d 906, 919 (9th Cir. 2003)).

8      As the Court has found above, the requested injunction is identical to what Defendants

9  already provide to other detainees at their facilities. *See supra* Section III.D(iii). The Court finds that

10  there is no realistic likelihood of harm to Defendants from requiring them to permit legal visitations

11  in a manner consistent with their existing schedules. As such, the Court concludes that there is no

12  need for a bond. *See* Opp. to Mot. at 25 (requesting bond without specific amount).

13              ii.   The Preliminary Injunction is Not a Universal Injunction.

14      Defendants contend relief should be limited to ImmDef and CHIRLA, and not to all similarly

15  situated groups because the Supreme Court recently held district courts do not have equitable power

16  to issue a "universal injunction." Opp. to Mot. at 25; *see also Trump v. CASA*, *Inc.*, 145 S. Ct. 2540,

17  2548 (2025). However, as the scope of the injunction relates solely to the B-18 facility, the Court

18  finds the scope appropriately limited and Defendants' concerns unpersuasive. *See* TRO Order 30

19  n.21.

20              iii.   Defendants' Request for a Stay is Denied.

21      Defendants request that the Court stay any injunctive relief it issues to Access/Detention

22  Plaintiffs via this Order. Opp. to Mot. at 25. To support their request, Defendants contend they

23  satisfied the requirements for a stay of an injunction pending appeal because the standard

24  substantially overlaps with the *Winter* factors as addressed in Defendants' Opposition. *See Nken v.*

25  *Holden*, 556 U.S. 418, 434 (2009) (listing the four factors considered for an application of stay and

26  noting their "substantial overlap" to the *Winter* factors). A discussed in detail above, the Court finds

27  the *Winter* factors favor Access/Detention Plaintiffs, so Defendants do not meet the requirements for

28  a stay and the Request to Stay is DENIED.

## IV.    Conclusion

For the foregoing reasons, the Court hereby ORDERS as follows: The Access/Detention Plaintiffs' Motion for Preliminary Injunction, Dkt. No. 127, is GRANTED.

1. Defendants Kristi Noem, Todd M. Lyons, and Ernesto Santacruz Jr. shall provide access to Room B-18 of the Federal Building located at 300 North Los Angeles Street, Los Angeles, CA 90012 ("B-18") for legal visitation by current and prospective attorneys, legal representatives, and legal assistants. Legal visitation shall be permitted seven days per week, for a minimum of eight hours per day on business days (Monday through Friday), and a minimum of four hours per day on weekends and holidays. Defendants shall provide private rooms for closed-door discussions between detainees and current and prospective attorneys, legal representatives, and legal assistants. Should exigent circumstances require closure for the safety of human life or the protection of property, the Defendants must notify Access/Detention Plaintiffs as soon as practicable and certainly within the four (4) hours following a B-18 closure to make alternative arrangements for legal visitation and/or notice to affected detainees and attorneys, legal representatives, and legal assistants. No such closure shall last any longer than reasonably necessary for the safety of human life or the protection of property.

2. Defendants Kristi Noem, Todd M. Lyons, and Ernesto Santacruz Jr. shall provide individuals detained at B-18 with access to confidential telephone calls with attorneys, legal representatives, and legal assistants at no charge to the detainee. Such legal telephone calls shall not be screened, recorded, or otherwise monitored.

3. The Court, having found a strong likelihood of success on the merits and that the balance of the equities overwhelmingly favors CHIRLA and ImmDef, further ORDERS that no security shall be required under Federal Rule of Civil Procedure 65(c).

4. Defendants Kristi Noem, Todd M. Lyons, and Ernesto Santacruz Jr. are each hereby ordered to show cause on a date to be set by the Court, or as soon thereafter as counsel may be heard in the courtroom of the Honorable Maame Ewusi-Mensah Frimpong, located at 350 West First Street, Los Angeles, CA 90012, why they should not be enjoined from further violations

1  of the Fifth Amendment to the United States Constitution pending the final disposition of this

2  action.

3

4  Dated: November 13, 2025

_____

5  MAAME EWUSI-MENSAH FRIMPONG

6  United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28