# Exhibit 6

JOSEPH T. MCNALLY
Attorney for Defendants,
Acting Under Authority Conferred by 28 U.S.C. § 515
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
JOANNE S. OSINOFF
Assistant United States Attorney
Chief, Complex and Defensive Litigation Section
PAUL LA SCALA (Cal. Bar No,186939)
ADAM GAFNI (Cal. Bar No. 2330045)
CHRISTINA MARQUEZ (Cal. Bar No. 305301)
GREGORY J. AGRON (Cal. Bar No. 311844)
JONATHAN R. BLAKEY (Cal. Bar No. 333584)
Assistant United States Attorney
Federal Building, Suite 7516
300 North Los Angeles Street
Los Angeles, California 90012
Telephone: (213) 894-2083
E-mail: Paul.LaScala@usdoj.gov
Adam.Gafni@usdoj.gov
Christina.Marquez@usdoj.gov
Gregory.Agron@usdoj.gov
Jonathan.Blakey@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| OSNY SORTO-VASQUEZ KIDD, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ALEJANDRO MAYORKAS, Secretary, U.S. Department of Homeland Security, in his official capacity, et al.,<br><br>Defendants. | No. CV 20-3512-ODW (JPRx)<br><br>**DELCARATION OF A[redacted] P[redacted] IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO THE ORGANIZATIONAL PLAINTIFFS' CLAIMS**<br><br>Hearing Date: August 7, 2023<br>Hearing Time: 1:30 p.m.<br>Ctrm: 5D<br><br>Honorable Otis D. Wright II<br>United States District Judge |

**DECLARATION OF A[redacted] P[redacted]**

I, A[redacted] P[redacted], hereby declare:

1. I am currently employed by the U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) as a Deputy Assistant Director. As a Deputy Assistant Director, I oversee the Criminal Apprehension Division, consisting of the Criminal Apprehension Program, the 287(g) Unit, and the Program Management Office. I report directly to Assistant Director Chris M. Cronen. I have held this position since September 26, 2021.

2. Prior to this position, I served as the Deputy Assistant Director overseeing the Enforcement and Removal Operations Training Division starting on December 9, 2018. In this capacity, I was responsible for the oversight, direction, and coordination of training and accreditation activities conducted by ERO personnel from the Glynco, Charleston, and Dallas ERO Academies. These training and accreditation activities included the operation of basic training for ERO officers with the Basic Immigration Enforcement Training Program and the Deportation Officer Training Program, and advanced training for ERO officers with the ICE Deportation Officer Field Operations Training Program.

3. I make this declaration based on my personal knowledge of the facts and circumstances set forth herein as well as the information provided to me by other employees of DHS.

4. Attached hereto as Exhibit "1" is a true and correct copy of Office of the Principal Legal Advisor Fourth Amendment Refresher Training, dated June 2021.

5. Attached hereto as Exhibit "2" is a true and correct copy of Office of the Principal Legal Advisor Fourth Amendment Refresher Training Instructor Notes, dated June 2021

6. Attached hereto as Exhibit "3" is a true and correct copy of 2018 ICE Enforcement and Removal Operations Fugitive Operations Handbook.

7. Attached hereto as Exhibit "4" is a true and correct copy of ICE's Memorandum on Uses of Ruses in Enforcement Operations, dated March 6, 2006.

8. Attached hereto as Exhibit "5" is a true and correct copy of ICE's Memorandum on Uses of Ruses in ICE Enforcement Operations, dated August 22, 2006.

9. Attached hereto as Exhibit "6" is a true and correct copy of ICE Enforcement and Removal Operations Field Application Lesson Plan, dated April 27, 2020.

10. Attached hereto as Exhibit "7" is a true and correct copy of ICE Enforcement and Removal Operations Probable Cause and Warrant Exceptions training, dated April 23, 2020.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on November 21, 2022, in Washington D.C.

A[redacted] S P[redacted]

Digitally signed by A[redacted] S P[redacted]
Date: 2022.11.21 13:43:03 -05'00'

A[redacted] P[redacted]
Deputy Assistant Director, Criminal Alien Division Enforcement
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement

Confidential Subject to Protective Order

ICE

# Fourth Amendment Refresher Training

**Office of the Principal Legal Advisor**
**Revised June 2021**

U.S. Immigration and Customs Enforcement

**USA 035774**

Exhibit 0004

Attorney Work Product/For Review Only/Not For Distribution



**EXHIBIT 1**

ICE

U.S. Immigration and Customs Enforcement

# Impact of Fourth Amendment Violations on ICE Operations

- Fourth Amendment violations may result in:
  - the release of the target
  - suppression of evidence
  - termination of removal proceedings
  - dismissal of criminal charges

- Violations may also lead to:
  - civil liability, *Giglio* impairment, and discipline
  - adverse impact on public trust and negative media coverage

Confidential Subject to Protective Order

ICE

# The Fourth Amendment

- The Fourth Amendment prohibits unreasonable searches and seizures.

- A search or seizure is unreasonable if it is conducted without a valid warrant and does not fall under an exception to the warrant requirement.




U.S. Immigration and Customs Enforcement

Confidential Subject to Protective Order

ICE

# Motions to Suppress

- Under the exclusionary rule, evidence obtained in violation of the Fourth Amendment – as well as "fruit of the poisonous tree" – is inadmissible.
- Although the exclusionary rule is triggered only by "egregious violations" in the civil immigration context, many courts have interpreted that standard very broadly.
  - This could result in exclusion of your only evidence of noncitizenship and removability, including the Form I-213 and Record of Sworn Statement.
  - That is why it is important to document your encounters. You may be called to testify in Immigration Court at a later date.

U.S. Immigration and Customs Enforcement

Confidential Subject to Protective Order

ICE

# *Bivens* Liability

- An individual may file a lawsuit against an *individual* officer alleging that the officer knowingly violated his or her constitutional rights.
- The burden is high. The individual must establish that the violation was the result of knowing, deliberate indifference, or plain incompetence.
  - If you were following the rules, you will be provided DOJ representation.
- A court may order punitive damages and attorneys fees.

U.S. Immigration and Customs Enforcement

ICE

# *Giglio* Impairment

- Misconduct allegations (including constitutional violations) may be investigated by the Office of Professional Responsibility.

- When an officer testifies at a criminal trial, agency misconduct findings, discipline, or violations of policies and procedures by an officer that relate to credibility must be disclosed to a defendant.
  - Such evidence may render you "*Giglio* impaired."
  - A finding that you are *Giglio* impaired may lead to removal from the agency.

U.S. Immigration and Customs Enforcement

Confidential Subject to Protective Order

ICE

# Negative Media Coverage and Social Media



U.S. Immigration and Customs Enforcement

USA 035780

Attorney Work Product/For Review Only/Not For Distribution



EXHIBIT 1

Confidential Subject to Protective Order

ICE

U.S. Immigration and Customs Enforcement

# Negative Media Coverage and Social Media

- **<u>WARNING</u>:** Everyone has a cell phone and a camera. Always assume you are being recorded *and* that these recordings will end up on social media or in the press.
    - Always act professionally and courteously.
    - Targets and advocates want you to lose your cool and act unprofessionally.

- Prepare responses for members of the public prior to operations (*e.g.*, how to introduce yourself, alert management to engage OPA when needed).

Confidential Subject to Protective Order

ICE

# Self-Identification as ICE Officer

8 C.F.R. § 287.8(c)(2)(iii) requirements:

<u>At the time of the arrest</u>, the designated immigration officer shall, as soon as it is practical and safe to do so:

(A) Identify himself or herself as an immigration officer who is authorized to execute an arrest; and

(B) State that the person is under arrest and the reason for the arrest.

U.S. Immigration and Customs Enforcement

Confidential Subject to Protective Order

ICE

# Request for Officer Identification

- In the course of your immigration law enforcement duties, you may be asked to identify yourself prior to an arrest.
  - If the request comes from someone you are engaging, *e.g.*, resident of a home you are seeking consent to enter, or the target of an enforcement action, you must identify yourself as an “ICE” officer.
  - Your badge should be clearly displayed when making a stop, for officer safety/liability.
  - If the request is made in a public place by someone **other than** the individual the officer is engaging/interviewing, there is no requirement for the officer to respond.
  - Even when declining information, be professional.

U.S. Immigration and Customs Enforcement

**USA 035783**

Attorney Work Product/For Review Only/Not For Distribution



**EXHIBIT 1**

Confidential Subject to Protective Order

ICE

# Disruptive Protestors

- Ideally local police will enforce state or local law violations by protestors.
- Nevertheless, when disruptors interfere with a lawful administrative arrest, ERO Officers should first advise the disruptors that their action may constitute a violation of federal criminal statutes and seek to defuse the situation.
- While attempting to defuse the situation, ERO officers should assess if any force should be used against the disruptor(s) consistent with the ICE Directive No. 19009.1, *ICE Firearms and Use of Force Policy* (Nov. 8, 2019), and the DHS Policy Statement No. 044-05, *Department Policy on the Use of Force*, or any successor policy, if their efforts to defuse are unsuccessful.

U.S. Immigration and Customs Enforcement

Confidential Subject to Protective Order

ICE

# Disruptive Protestors

- When dealing with the protestor(s), ERO officers should consider whether the conduct of the disruptor(s) is criminal in nature. When a protestor violates federal law – whether for a felony or misdemeanor – ERO may invoke its general arrest authority under INA § 287(a)(5) or its delegated arrest authority under 19 U.S.C. § 1589a(3).

- Keep in mind, the local U.S. Attorney's Office (USAO) must be willing to accept these criminal cases for prosecution. FODs may, through the local OPLA, consult the local USAO to determine the USAO's threshold requirements for accepting criminal cases involving disruptive protestor(s) and uncooperative noncitizen targets.

U.S. Immigration and Customs Enforcement

Confidential Subject to Protective Order

ICE

# Disruptive Protestors

- The ERO officer who makes a criminal arrest must provide *Miranda* warnings before an interrogation, in a language the subject understands, with an acknowledgement from the subject that the warnings are understood.
- The fact that a subject has been advised of his rights must be documented on appropriate forms and made part of the arrest record.
- After a criminal arrest, the arrestee must be brought before a judge "without unnecessary delay." ERO should immediately transport the arrestee to the U.S. Marshals Service before contacting the U.S. Attorney's Office to discuss prosecution.

U.S. Immigration and Customs Enforcement

ICE

# Disruptive Protestors

- As federal law enforcement officers, ERO officers have no authority to enforce *state* criminal law.
- Each state's law on peace officer status and citizen's arrest vary. Therefore, ERO officers should never assume that they have the authority to enforce state criminal law as a peace officer or a citizen.
- Consult OPLA for guidance on a state's current law on peace officer status and citizen's arrest.

U.S. Immigration and Customs Enforcement

Confidential Subject to Protective Order

ICE

# Disruptive Protestors – Scenario 1

- An individual who is not the target of an immigration enforcement action learns of an ICE arrest in progress, appears at the scene and physically shoves an ERO officer who is performing his official duty.

- **What legal options are available to the officer to address the disruptor's conduct?**

U.S. Immigration and Customs Enforcement

Confidential Subject to Protective Order

ICE

# Disruptive Protestors – Scenario 2

- A group learns of an administrative immigration arrest by ICE in progress, appears at the scene, and passively prevents officers from accessing a vehicle containing the target noncitizen by forming a human chain around the vehicle. The ICE officers advise the group that they are there to execute a warrant of arrest, display the warrant, and instruct the group members to step aside. The group members refuse and instead provide the driver with gas and food. The group members take no direct action against the ICE officers.

- **What legal options are available to the officers to address the group's conduct?**

U.S. Immigration and Customs Enforcement

**USA 035789**

Confidential Subject to Protective Order

ICE

# Administrative Warrants are not Judicial Warrants

- When conducting a targeted arrest, ERO officers must possess either a Form I-205 (Warrant of Removal) or Form I-200 (Warrant for Arrest of Alien).
- An administrative warrant **does not** authorize entry into a dwelling.
- Even with an administrative warrant, you will need **consent** to enter an area in which there is a reasonable expectation of privacy.

U.S. Immigration and Customs Enforcement

USA 035790

ICE

U.S. Immigration and Customs Enforcement

# Government Action – Scenario

- You are investigating a criminal fugitive noncitizen and are using an informant in order to obtain information about his whereabouts. The informant enters the target's house with his permission. At your urging, the informant begins looking through the target's belongings without permission.

- **Is this a Fourth Amendment violation?**

Confidential Subject to Protective Order

ICE

# What Constitutes a Search?

***Katz* search:**

- Governmental intrusion into area where individual has reasonable expectation of privacy:
  - subjective expectation of privacy,
  - which, society is prepared to recognize as objectively reasonable.

***Jones* search:**

- Physical intrusion by the government into a "constitutionally protected area" (*i.e.*, persons, houses, papers, and effects);
- coupled with the purpose of gathering information (*e.g.*, an installed GPS monitor).

U.S. Immigration and Customs Enforcement

Confidential Subject to Protective Order

ICE

# *Katz* Search

| REP Present | No REP |
| --- | --- |
| • Person's body<br>• Dwellings<br>• Curtilage<br>• Private Buildings and Spaces<br>• Baggage<br>• Conveyances<br>• Private Communications | • Open Field<br>• Plain View Observations<br>• Conversation Overheard in Public<br>• Abandoned Property<br>• ID and Travel Documents |

U.S. Immigration and Customs Enforcement

USA 035793

20

Attorney Work Product/For Review Only/Not For Distribution

**EXHIBIT 1**

Confidential Subject to Protective Order

# ICE

U.S. Immigration and Customs Enforcement

# *Jones* Search

| Protected Areas | Means that have been found to violate *Jones* |
| --- | --- |
| • Person<br>• Home<br>• Papers<br>• Effects | • GPS<br>• Dog sniff of *private* property (dog sniff in public still OK) |

USA 035794



Attorney Work Product/For Review Only/Not For Distribution

Confidential Subject to Protective Order

ICE

# *There's no place like home!*

- Fourth Amendment protections are at their strongest in a person's dwelling under both *Katz* and *Jones*.



U.S. Immigration and Customs Enforcement

USA 035795

Confidential Subject to Protective Order

ICE

# What Constitutes a Seizure?

- There is a seizure of a person when:
  - Government
  - Interferes with a person's freedom of movement
  - Resulting in a reasonable person (objective) not feeling free to leave or terminate the encounter.
- Brief seizures are allowed with reasonable suspicion that criminal activity is afoot or the person is here illegally. (*Terry* stop)
- A consensual encounter is *not* a Fourth Amendment seizure.
- There is a seizure of property when there is some meaningful interference with an individual's possessory interests in the property.

U.S. Immigration and Customs Enforcement

**USA 035796**

Attorney Work Product/For Review Only/Not For Distribution



**EXHIBIT 1**

ICE

# Seizure – Scenarios

- You are driving on the street to the location where you believe the target is in the middle of the day. You suddenly notice who you believe to be your target walking on the sidewalk next to the car. You slow down and your partner tries to talk to the target.

- You encounter a person you think is your target while walking down the street. You identify yourself as an ICE officer and ask for the person's name. You cannot make a positive identification, so you grab the person by the arm.

U.S. Immigration and Customs Enforcement

ICE

# Seizure – Scenarios

You enter the home of a targeted noncitizen based on consent of a co-tenant. You visually identify the target inside the home and arrest him based on probable cause.

You have a mobile fingerprinting device with you, with which you take fingerprints from all other residents found in the home. Is this a seizure as to the co-tenants?

U.S. Immigration and Customs Enforcement

ICE

# Exceptions to the Warrant Requirement

- Consent
- *Terry* Stop
- *Terry* Frisk
- Search incident to arrest
- Protective sweep
- Vehicle inventory (**Not** Permissible by ERO)
- Plain view seizure
- Exigent circumstances
  - Hot pursuit
  - Emergency aid
  - Imminent destruction of evidence
  - Officer safety

U.S. Immigration and Customs Enforcement

Confidential Subject to Protective Order

ICE

# The Fourth Amendment and Fugitive Operations

- At the beginning of a case:
  - Does an investigative technique involve a search for Fourth Amendment purposes?
  - HINT – Think about *Katz* and *Jones*.

U.S. Immigration and Customs Enforcement

Confidential Subject to Protective Order

ICE

# Surveillance – Scenarios

- May an officer:
  - Peer into house from a location where general public is allowed?
  - Talk to neighbors?
  - Talk to an employer?
  - Investigate abandoned property?
  - Bag abandoned on the road?
  - Go through trash?

U.S. Immigration and Customs Enforcement


Attorney Work Product/For Review Only/Not For Distribution

Confidential Subject to Protective Order

ICE

# Ruses – Scenario

- You learn that your target lives in a residential neighborhood and you are trying to determine her schedule. You arrive in a non-descript white work van and walk around the street with a clip board while observing the comings and goings of the target's house. **Is this permissible?**

U.S. Immigration and Customs Enforcement

ICE

# Use of Technology

- Is it a *Jones* search? Is it a *Katz* search?
- Factors:
  - sophistication of the device; and
  - whether the activity occurred in public or private.
- Practical Application:
  - If technology merely allows the officer to see something more clearly which was already open to his or her view, its unlikely to be considered a search.
  - If the use of technology permits observation of something that could not otherwise be observed, it will likely be considered a search.

U.S. Immigration and Customs Enforcement

Confidential Subject to Protective Order

ICE

# Use of Technology

- Technology commonly used by ERO:
  - Flashlights?
  - Binoculars?
  - Night vision?
  - Dog?
  - Mobile Tracking Devices (GPS)?

U.S. Immigration and Customs Enforcement

Confidential Subject to Protective Order

ICE

# Conducting an Arrest at a Home/Dwelling

- Fourth Amendment protections are strongest here.
- Know where you are going. Is your location a home or a dwelling?
- Whose dwelling is it? Consent will depend on this person.
- Since you don’t have a judicial warrant, what Fourth Amendment exception allows you to enter the home?

U.S. Immigration and Customs Enforcement

ICE

U.S. Immigration and Customs Enforcement

# "Knock and Talk" Rules

- Operations generally may only take place during daytime hours – 6am to 9pm.
- Operation outside daytime hours?
  - Must receive written supervisory authorization
  - Must articulate why necessary
- A target leaving for work before 6:00 am does **not** constitute necessity for operation outside daytime hours
- What is an example of "necessary"?

Confidential Subject to Protective Order

ICE

# Approaching a Home: Curtilage

- Curtilage is "the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life."
- When determining curtilage, consider:
  - Proximity to home
  - Single enclosure with home
  - Area's use
  - Steps taken to prevent observation by passersby
- Factors are analyzed under the "totality of the circumstances."

U.S. Immigration and Customs Enforcement

USA 035807

Attorney Work Product/For Review Only/Not For Distribution



**EXHIBIT 1**

Confidential Subject to Protective Order

ICE

# Curtilage – Scenario 1

- You approach an apartment complex with multiple buildings and walkways that connect the buildings. Your target lives on the first floor of one of the buildings. Using the walkway, you walk by the unit, but the walkway at this point is not close to the building. There is a hedge partly covering the area around the window, but you notice a grill there and a picnic table with some items on it. You step off of the walkway and decide to investigate the contents of the grill and the table.

- **Were you in the apartment's curtilage?**

U.S. Immigration and Customs Enforcement

Confidential Subject to Protective Order

ICE

# Curtilage – Scenario 2

- Your target lives in a rural area on a large parcel of property which includes a house and fields. There is a shed on the property about 50 feet away from the house.
  - Is the shed part of the curtilage?
  - What about the farm's corn field?
  - How do you get to the front door, which is CLEARLY in the curtilage, to get the needed consent?

U.S. Immigration and Customs Enforcement

ICE

# Curtilage - Implied License

- May walk across curtilage to speak to the occupants if the general public could do so as well.
- However, a law enforcement officer may not exceed the scope of a license.
  - License is granted for the purpose of making contact with occupant, not looking through windows or conducting other "searches."





U.S. Immigration and Customs Enforcement

Confidential Subject to Protective Order

ICE

U.S. Immigration and Customs Enforcement

# Curtilage - Implied License

- Implied license can be revoked.
- Locked gates and signs indicating you or the public are prohibited from entering are common ways to revoke implied license.
- A closed but unlocked gate alone does not generally indicate the absence of implied license.
  - Consider the totality of the circumstances in determining if the general public would approach the door for the purpose of making contact with an occupant. Where would FedEx approach to leave a package?
- **Scenario:** Multiple "No trespassing" signs adorn the walkway of a home. **Has the target effectively revoked implied license?**

ICE

# Knock and Talk: Consent to Enter/Search

- Consent is an exception to the warrant requirement.
- Consent requires that the person granting consent:
  - have **authority**; and
  - provide consent **voluntarily**.
- Consent must be obtained **before** entry or search starts.
- Officers must remain within the **scope** of consent.

U.S. Immigration and Customs Enforcement

Confidential Subject to Protective Order

ICE

# Consent: Authority

- **Actual Authority**: The person with the expectation of privacy in the thing/place to be searched has authority to consent.
  - **Common Authority**: Mutual use of property demonstrates joint access or control.

- **Apparent Authority**: If officers reasonably believe that the person who gives consent has the authority to do so, they may rely on that consent. (This is a defense in case something goes awry, do *not* rely on this in practice).

U.S. Immigration and Customs Enforcement


Attorney Work Product/For Review Only/Not For Distribution

Confidential Subject to Protective Order

ICE

# Consent: Authority

- May the following people consent to search of a dwelling:
  - Co-tenant?
    - If both present?
  - Landlord?
  - Employer in company housing?
  - Houseguest?
  - Maid?
- May the following people consent to search of a vehicle:
  - Driver?
  - Passenger?

U.S. Immigration and Customs Enforcement

ICE

# Consent: Authority-Scenarios

- You go to the front door of a dwelling and the person at the door is wearing a shirt indicating he works at a cleaning service and there is a cleaning service truck parked outside. **Does this person have authority to consent?**
- You go to a home seeking a young man but an elderly woman answers the door. Although she is not the target, she is the target's grandmother and lives there with him. **Does she have authority to consent to entry?**

U.S. Immigration and Customs Enforcement

Confidential Subject to Protective Order

ICE

U.S. Immigration and Customs Enforcement

# Consent: Was it Voluntary?

- Consent must be voluntary and not the product of coercion. **Government bears burden.**
  - Cannot be demonstrated by mere acquiescence
  - Determined by **a totality of the circumstances**
  - Factors:
    - knowledge of right to refuse
    - age, intelligence, education, language ability
    - degree to which the individual cooperates
    - person's attitude
    - length of detention and questioning
    - ruses or misrepresentations

USA 035816



**EXHIBIT 1**

ICE

# Consent: Was it Voluntary? Scenarios

- The person you are talking at an open front door resides in the home and can properly give consent. You ask if you can enter the home and the person steps aside, seemingly to let you in. **Is this consent voluntary?**

- You knock on the door loudly and repeatedly. When the person opens the door, seemingly after waking up from sleep in a daze, you ask for consent to enter. **Is this consent voluntary?**

- The person nods as if agreeing to let you enter, but you doubt whether the person can understand you. **Is this consent voluntary?**

U.S. Immigration and Customs Enforcement

ICE

U.S. Immigration and Customs Enforcement

# Consent: Ruses

- The use of a ruse may impact the voluntariness of consent.
- Ruses must **<u>not</u>** be coercive:
  - May not convince resident they have no choice but to let officer inside.
  - The totality of circumstances will determine if a particular ruse is coercive.
- Ruses to gain access to home will be more closely scrutinized than ruses to convince a person to exit a residence.
- When doing a "knock and talk" with another law enforcement agency, need consent to enter for ICE purposes.

Confidential Subject to Protective Order

ICE

U.S. Immigration and Customs Enforcement

# Consent: Ruses

- You may **not**:
  - Represent yourself as employee of a real business (*e.g.*, FedEx)
  - Represent yourself as employee of another Government agency (*e.g.*, OSHA, child welfare)
  - Use license plates or government identification that is not properly issued
  - Fabricate a life threatening emergency, (*e.g.*, gas leak or fire), or fake exigency (*e.g.*, missing child)

USA 035819

Attorney Work Product/For Review Only/Not For Distribution

Confidential Subject to Protective Order

ICE

# Consent: Ruses – Scenarios

- Is it voluntary?
  - You tell the resident that there is a gas leak you need to investigate.
  - You tell the resident that a dangerous criminal is on the loose and show them a picture.
  - You tell the resident that you are looking for a man who stole a cell phone and show them a picture that is not the target (who resides in the home).
    - What if the person is elderly and does not speak good English?
  - You leave a flier on the doorstep inviting the target to a free barbeque at the ICE office.

U.S. Immigration and Customs Enforcement

Confidential Subject to Protective Order

ICE

U.S. Immigration and Customs Enforcement

# Consent: Timing and Positioning Matters

- Obtain consent **before** entering and beginning to search.
- Obtain consent while still located at a place with less Fourth Amendment protection (*e.g.*, a porch that can be accessed by the general public).
- **Scenario:** At the doorway before obtaining consent to enter, you place your foot on the threshold to keep the door open. **Is this a problem?**



USA 035821

Attorney Work Product/For Review Only/Not For Distribution

Confidential Subject to Protective Order

ICE

# Consent: Best Practices

- Obtain **express** consent from the **resident**.
- Document consent on the Form I-213 and on the Field Officer Worksheet (FOW).
  - **Who** gave consent, and **what** authority did they have to give consent? (Tenant? Co-tenant?)
  - **What** exactly did they say? What language did they use? Include clear statement of consent on Form I-213?
  - **When** did they say it?
  - **Where** were they when they said it?
  - **Who** witnessed the consent statement?

U.S. Immigration and Customs Enforcement

USA 035822



EXHIBIT 1

ICE

U.S. Immigration and Customs Enforcement

# Consent: Scope and Withdrawal

- Search must not exceed the scope of consent.
- Consent to *enter* a home is not consent to *search* the entire home.
- Withdrawal or narrowing of consent must be honored:
  - Must be clearly expressed by actions or words.
  - Plain view seizure of evidence or target is permitted even following withdrawal of consent *but only* if officer has PC to seize evidence or person and lawful access to it.
- Co-tenant may revoke or narrow the consent.

ICE

# Consent: Scope and Withdrawal Scenarios

- You are in the home and ask whether you can search the bedrooms and the resident of the home says no. **Can you still search?**
- You are in the home and the spouse of the target shows up and starts yelling "get out of my house now jerks!" **Do you have to leave?**
- Police officers came along with you and they recognize the spouse. He has three outstanding warrants so they arrest him and take him away. You ask the resident again whether you can enter and search the bedrooms and she agrees. **Can you search?**
- Your search is taking longer than expected and the resident starts impatiently stamping her foot. **Should you continue your search?**

U.S. Immigration and Customs Enforcement

Confidential Subject to Protective Order

ICE

# Protective Sweep



- **<u>Not</u>** automatically permissible simply because officers are in a house to arrest someone.
- Circuits vary as to when protective sweep is available:
  - Entry lawfully made incident to an arrest and area searched may harbor a danger to the officers; or
  - Lawful presence at a location and reasonable search based on specific and articulable facts that an area searched may harbor a danger to the officers.
  - Some Circuits have not decided the issue.

U.S. Immigration and Customs Enforcement

**USA 035825**

Attorney Work Product/For Review Only/Not For Distribution



**EXHIBIT 1**

ICE

# Protective Sweep

- Examples of specific and articulable facts that may aid in justifying a protective sweep:
  - History of weapons use and/or possession
  - Violent criminal history; gang involvement
  - Noise from supposedly unoccupied part of house
  - Information from surveillance
- Officers are only permitted to look in locations where a person can hide.
- The search should last no longer than is necessary to dispel suspicion.

U.S. Immigration and Customs Enforcement

ICE

# Protective Sweep – Scenarios

- You obtain consent to enter an apartment and, upon entry, see narcotics on a table. **Does this justify a protective sweep?**
  - What if in addition to the narcotics you also saw two guys rushing out of the place through a back door?
- You go to a three-flat dwelling and are in one of the units arresting a person. You hear noises from the apartment above which you expected to be vacant. **Can you search that unit?**
- You conduct a protective sweep in a bedroom and find no danger. You think to yourself, "I'm already in here, might as well look around." **Can you keep searching?**

U.S. Immigration and Customs Enforcement

Confidential Subject to Protective Order

ICE

# *Perez Cruz v. Barr*
# *(9th Cir. June 13, 2019)*

- ICE executed a search warrant for employment records at a factory – this was a worksite case – during which all workers, including *Perez Cruz,* were detained and segregated for questioning about noncitizenship.
- While detained and questioned, Perez Cruz admitted to lacking lawful immigration status.
- **Result:** Evidence suppressed, case terminated. The court held that ICE violated 8 C.F.R. § 287.8(b)(2) and the 4th Amendment by detaining and questioning Perez Cruz without "reasonable suspicion, based on specific articulable facts, that the person being questioned is, or is attempting to be, engaged in an offense against the United States or is an undocumented noncitizen in the United States."
- **Note:** This case applies only within the Ninth Circuit, but is persuasive authority and courts in other jurisdictions may adopt a similar approach.

U.S. Immigration and Customs Enforcement

Confidential Subject to Protective Order

ICE

U.S. Immigration and Customs Enforcement

# *Perez Cruz v. Barr (cont'ed)*

8 C.F.R. § 287.8 *Standards for enforcement activities.*

(b) Interrogation and detention not amounting to arrest.

(2) If the immigration officer has a reasonable suspicion, based on specific articulable facts, that the person being questioned is, or is attempting to be, engaged in an offense against the United States or is an alien illegally in the United States, the immigration officer may briefly detain the person for questioning.

**USA 035829**

Confidential Subject to Protective Order

ICE

U.S. Immigration and Customs Enforcement

# *Perez Cruz v. Barr: Key Points*

- **Be Cognizant of the Spectrum of Engagement**
  - A consensual encounter is an encounter during which an officer has no reasonable suspicion as to an individual he would like to question and the individual consents to the officer's questioning, while feeling free to walk away.
  - *Terry* stop – must be based on individualized, articulable reasonable suspicion specific to the individual being stopped.
  - Arrest – must be based on probable cause (PC).
- **Application to Collaterals**
  - Must have individualized, reasonable suspicion based on specific articulable facts prior to detaining to question about noncitizenship, or asking for ID.

Confidential Subject to Protective Order

ICE

# What Can You Do?

- Targets - once identified, there is PC to arrest.
- If you have individualized reasonable suspicion as to a non-target - you may briefly detain to question. If no such suspicion exists, only engage in a consensual conversation. For example, "You are not under arrest, and free to leave, but would you mind answering some questions?"
- For collaterals: Do NOT show force other than that necessary to secure the scene. Do NOT indicate that not answering questions will have negative consequences. Do NOT move the collateral from the scene in the absence of probable cause.

U.S. Immigration and Customs Enforcement

ICE

# What Can You Do? (Cont'ed)

- As soon as possible after the collateral encounter, *document in the I-213 either the basis for the particularized reasonable suspicion, or* how the officer made it clear to the collateral that s/he was free to leave.
- <u>Documentation is KEY</u> – By the time the circumstances of the stop is litigated, years will have passed since the arrest. The Officers will likely have no independent recollection of the stop leading to an arrest. In that case, without a detailed I-213 documenting the circumstances of the collateral's arrest, the Government has no way to rebut a claim of unlawful detention.

U.S. Immigration and Customs Enforcement

Confidential Subject to Protective Order

ICE

# Exigent Circumstances: Emergency Aid and Officer Safety

- Exception permits law enforcement officers to enter a home or curtilage without a warrant based on the need to render emergency assistance to an injured occupant or to protect an occupant from **imminent** injury.
  - Has also been used for warrantless GPS searches and vehicle stops in cases of imminent danger to a victim.
- Officer safety can also permit the entry of a home without a warrant, but the cases that discuss this exception involve **immediate unambiguous** threats.

U.S. Immigration and Customs Enforcement

Confidential Subject to Protective Order

ICE

# Exigent Circumstances: Emergency Aid and Officer Safety

- You approach a target's home and can see from the street that a vehicle has crashed into the side of the home. You observe a trail of blood leading to the door. The door is ajar and you try to get consent to enter, but the visibly bleeding and injured target refuses to let you in. **Can you enter the residence anyway?**

- You approach the home of a target who you know has a history of violent crime, including assaults on police. As you approach the home, the target states he has a "g**d*** gun" and is not afraid to use it. **Can you enter for officer safety?**

U.S. Immigration and Customs Enforcement

Confidential Subject to Protective Order

ICE

# Plain View Seizure

- Must have plain view from a lawful vantage point.
- Must have lawful right of access.
- Illegal/evidentiary nature must be immediately recognizable.



U.S. Immigration and Customs Enforcement

Confidential Subject to Protective Order

ICE

# Out and About: Street Arrests

- What exceptions to the warrant requirement apply in this case?
  - Consensual conversations
  - *Terry* stop
  - *Terry* stop – VEHICLES
  - *Terry* Frisk
  - Exigent Circumstances – Hot Pursuit

U.S. Immigration and Customs Enforcement

ICE

# Consensual Conversation – Scenarios

- You are walking down the street and see a person who resembles your target. You approach him, introduce yourself as an ICE agent, and ask for his name. **Is this OK?**
- What if the person sounds annoyed, but is still talking to you?
- You try to get information from him, but he says, "I am leaving now." **Can you stop him?**
- The person gives a name that does not match your target. You keep asking questions and learn he is an undocumented noncitizen. **Can you arrest the person?**

U.S. Immigration and Customs Enforcement

Confidential Subject to Protective Order

ICE

U.S. Immigration and Customs Enforcement

# *Terry* Stop

- A *Terry* stop is a **brief** seizure that may lead to release or full arrest **if** probable cause is developed.
- Requires:
  - reasonable suspicion of criminal activity; or
  - reasonable suspicion of removability.
- Scope:
  - To investigate and confirm suspicion in order to make an arrest or dispel suspicion in order to terminate the seizure.
- Officer must use "due diligence" and "least intrusive means" in order for the seizure to maintain its lawfulness, unless PC is developed.

Confidential Subject to Protective Order

ICE

# *Terry* Stop

- The legality of a *Terry* stop depends on the officer's ability to articulate reasonable suspicion **prior** to any seizure.
- Document **with specificity** the factors that lead to the seizure.
- It is an open question whether a *Terry* stop permits an officer to fingerprint an individual. At the very least, an officer must have RS prior to printing since it amounts to a (brief) seizure.
- **Not** allowed in subject's home (*e.g.*, you enter a home and encounter a resident who is not the target but don't have enough for PC).

U.S. Immigration and Customs Enforcement

Confidential Subject to Protective Order

ICE

U.S. Immigration and Customs Enforcement

# *Terry* Stop – Scenarios

| Border Patrol stop of a vehicle 200 miles from the border | Border Patrol stop of a vehicle 200 miles from the border |
|---|---|
| **What the officers described:** an SUV with multiple passengers at 8:30 a.m. The SUV is sagging in the rear.<br><br>The driver switches from the left lane to the right lane, getting behind a truck that was traveling much slower than the speed limit despite the fact there is no traffic on the left lane.<br><br>The agents observe a passenger in the cargo area of the vehicle where there was no seat. The car is registered in a town north of the location of travel, essentially it appears the car is driving from the border to the north. Although the driver is well groomed and dressed appropriately for the weather, the passengers look dirty and are wearing clothes that are not appropriate for the weather.<br><br>The agents try to get the attention of the driver by honking, but he ignores them. | **What the officers described:** an extended cab truck traveling west with a driver and five other people. The truck was dragging some brush. When the officers drove up to the vehicle the passengers did not make eye contact with them. The car was registered in Fort Worth/Dallas which the officers stated was common for persons smuggling. |

**USA 035840**

Confidential Subject to Protective Order

ICE

# *Terry* Stop – Vehicles

- **Vehicle Stops** (*Terry* stops in vehicles) are permitted only with reasonable suspicion of any occupant of the vehicle.
  - ICE cannot conduct a *Terry* stop based on local traffic laws.(*e.g.* ICE officers cannot pull someone over for speeding or a broken tail light.)

- **Vehicle Pursuits** of persons not complying with your direction to stop are **not** authorized.

- Pursuant to a lawful stop, the officer may order the driver/passengers to step out of a vehicle.

U.S. Immigration and Customs Enforcement

Confidential Subject to Protective Order

ICE

# *Terry* Stop – Vehicles

- Reasonable suspicion is required at **<u>all</u>** stages of a vehicle stop.
- After such questioning, any further detention or search must be based on consent or probable cause.
- If the target is not in the car, the officers may not continue to detain and question the occupants of the car, (*e.g.*, ask for ID) without reasonable suspicion that an occupant(s) may be in violation of the law.

U.S. Immigration and Customs Enforcement

ICE

U.S. Immigration and Customs Enforcement

# *Terry* Stop – Vehicles

In relevant part, 8 U.S.C. § 1357(a)(2) states:

> Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant--
>
> (2) [. . .] to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation *and* is likely to escape before a warrant can be obtained for his arrest[.]

- The "reason to believe" standard requires ICE Officers to have **probable cause** that an individual is in the United States in violation of U.S. immigration laws and is likely to escape prior to making a warrantless arrest.

Confidential Subject to Protective Order

ICE

# The "Likely to Escape" Analysis is Required

- Must consider the totality of circumstances
- There is no exhaustive list of factors that should be considered in determining whether an individual is "likely to escape before a warrant can be obtained" under 8 U.S.C. § 1357(a)
- *However, some* examples of relevant factors may include:
  - the individual's true identity and residence, prior escapes or evasions of immigration authorities, attempted flight from an officer, lack of ties to the community, or any other specific circumstances that justify a reasonable belief that the subject is likely to abscond.

U.S. Immigration and Customs Enforcement

Confidential Subject to Protective Order

ICE

U.S. Immigration and Customs Enforcement

# The "Likely to Escape" Analysis is Required

- Family, home, or employment may be examples of community ties that weigh against a likelihood of escape
- Mere presence within the United States in violation of U.S. immigration law is not, by itself, enough to conclude that a noncitizen is likely to escape before a warrant for arrest can be obtained
- Examples from case law:
  - An individual in jail for a crime could not flee.
  - No evidence that a woman in her own home was likely to escape. Warrantless arrest was improper.

Confidential Subject to Protective Order

ICE

# "Likely to Escape" Analysis is Required

- More examples from case law:
  - A noncitizen living with his wife who filed an application to adjust status was not likely to escape.
  - Where immigration officers received a tip about a noncitizen from bail bondsmen and the noncitizen had always been home over three visits from the bondsmen, the local man was not a flight risk.
  - Likelihood of flight was a serious threat where the suspects were travelling on interstate highway at high speed over a great distance.

U.S. Immigration and Customs Enforcement

Confidential Subject to Protective Order

ICE

# "Likely to Escape" Analysis is Required

Key points.

- The flight risk analysis must take place *prior to* the warrantless arrest.
- The flight risk analysis is required for all warrantless arrests, whether the individual is the target or a collateral.
- Any questioning of the collateral must be either consensual or supported by reasonable suspicion to believe the individual is not authorized to be in the United States.

U.S. Immigration and Customs Enforcement

ICE

# Vehicle Stops and the Flight Risk Analysis

Key Points:

- The "likely to escape" analysis under 8 U.S.C. § 1357 (a)(2) applies to all warrantless arrests, including those resulting from vehicle stops.
- All vehicle stops to enforce civil immigration laws require specific articulable facts that reasonably warrant suspicion that the vehicle contains a noncitizen who may be illegally in the country.
- As federal law enforcement officers, ICE Officers lack authority to enforce state or local vehicle or traffic laws.

U.S. Immigration and Customs Enforcement

Confidential Subject to Protective Order

ICE

# Flight Risk Analysis and I-213 Documentation

- HYPO: Three years after the arrest, you are interviewed by a DOJ attorney about the circumstances of the arrest as the noncitizen has sued alleging racial profiling.

- Would you remember whether you conducted a flight risk analysis, much less what factors you considered before deciding that this individual would be gone by the time you returned with a warrant?

U.S. Immigration and Customs Enforcement

Confidential Subject to Protective Order

ICE

U.S. Immigration and Customs Enforcement

# Flight Risk Analysis & I-213 Documentation

If you won't be able to remember what happened in any given arrest years after the fact--what can you do?

- Form I-213: After a warrantless arrest under 8 U.S.C. § 1357(a)(2), an ICE Officer must document the facts and circumstances surrounding that warrantless arrest in the narrative section of the noncitizen's I-213 as soon as practicable.

Confidential Subject to Protective Order

ICE

# Flight Risk Analysis and Form I-213 Documentation

## The I-213 Must Document the following 6 Facts:

1. the noncitizen was arrested without a warrant
2. the location of the arrest (e.g., place of business, residence, vehicle, or a public area)
3. whether the noncitizen is an employee of the business, if arrested at a place of business, or whether the noncitizen is a resident of the residence, if arrested at a residential location
4. the noncitizen's ties to the community, if known at the time of arrest, including family, home, or employment

U.S. Immigration and Customs Enforcement

Confidential Subject to Protective Order

ICE

# Flight Risk Analysis and Form I-213 Documentation

5. the specific, particularized facts supporting the conclusion that the noncitizen was likely to escape before a warrant could be obtained.

6. a statement of how "at the time of arrest, the designated immigration officer [did], as soon as it [wa]s practical and safe to do so, identify himself or herself as an immigration officer who is authorized to execute an arrest; and state[d] that the person is under arrest and the reason for the arrest."

U.S. Immigration and Customs Enforcement

Confidential Subject to Protective Order

ICE

# Flight Risk Analysis and Documentation

- Alternatively, officers may carry blank DHS Form I- 200 Warrant for Arrest of Alien ("administrative warrant" or "Form I-200") to arrest collaterals WITH a warrant so that an individualized flight risk analysis is not needed.
- The Form I-200 may not be pre-signed.
- A supervisor needs to be available to each team to sign off on the Form I-200.

U.S. Immigration and Customs Enforcement

Confidential Subject to Protective Order

ICE

# Vehicle Stops – Use of Force

- The amount of force required to effect the exit of a driver or passenger from a vehicle should be **minimal force that is both necessary and reasonable** to effectuate a lawful purpose (*i.e.*, first step in arresting an occupant of a vehicle is NOT to reach in and grab him, unless there are specific circumstances requiring that action).
- The use of force to remove a target from the car should only be used where probable cause can clearly be established and there is some element of danger or threat.
- The reasonableness of the degree of force used depends on the specific circumstances, *e.g.*, presence of feasible alternatives.

U.S. Immigration and Customs Enforcement

USA 035854

Attorney Work Product/For Review Only/Not For Distribution

ICE

# Vehicle Stops – Use of Force

In analyzing an excessive-force claim, courts examine whether the force used was objectively reasonable, considering:

1. The severity of the crime at issue;
2. Whether the suspect is actively resisting arrest or attempting to evade arrest by flight;
3. Whether the suspect poses an immediate threat to safety of the officers or others;
4. Whether the suspect is violent or dangerous;
5. The duration of the action;
6. Whether the action takes place in the context of effecting an arrest;
7. Possibility suspect is armed; and
8. Number of persons LEO must contend with at one time.

U.S. Immigration and Customs Enforcement

Confidential Subject to Protective Order

ICE

# Vehicle Stops – Use of Force (Examples)

## Summary Dismissal of Excessive Force Claim Upheld

*Ickes v. Grassmyer*, 704 Fed. Appx. 190 (3d Cir. 2017)

- Target: known to the officers as member of an anti-tax movement who had many previous run-ins with police.
- Plus suspicious action: refusing to pull over until reaching a secluded private driveway belonging to a fellow member of movement who confronted police with a gun in the past.
- The key factor for the court - use of force was limited & directly related to effecting the arrest: officer broke a car window to reach in and open the car door, through which he pulled the target out.

## No Qualified Immunity for Officers

*Davis v. Clifford*, 825 F.3d 1131 (10th Cir. 2016)

- Target: No immediate threat could be articulated (her car had handicapped plates, and although key was left in the ignition and she refused to exit as ordered, she was surrounded on all sides by police cars).
- Use of force went beyond that needed for an arrest: Police broke a window, and instead of reaching in to open the door, they grabbed her by her hair and arms and pulled her through the shattered window, and pinned her faced down on broken glass.

U.S. Immigration and Customs Enforcement

USA 035856

Attorney Work Product/For Review Only/Not For Distribution

Confidential Subject to Protective Order

ICE

# *Terry* Frisk

- Requires:
  - Lawful seizure; and
  - Reasonable suspicion person is armed and dangerous.
- Scope:
  - Pat down for weapons only.
- Do **not** *Terry* frisk persons you do not have authority to seize (*i.e.*, persons you have consensual encounters with).

U.S. Immigration and Customs Enforcement

Confidential Subject to Protective Order

ICE

# Exigent Circumstances: Hot Pursuit

- Applies if:
  - PC to arrest the suspect of a ***serious violent*** crime (not an administrative arrest); and
  - In immediate or continuous pursuit of suspect.

- Possible applications: Cross-Check Operation involving a noncitizen wanted for a serious crime, *i.e.*, a felony, who is found on the street or rused out of the home, and runs back into the home upon officers attempting to arrest him.

U.S. Immigration and Customs Enforcement

USA 035858

Attorney Work Product/For Review Only/Not For Distribution

Confidential Subject to Protective Order

ICE

# Search Incident to Arrest

- Requires:
  - Lawful arrest
- Purpose:
  - Discover weapons;
  - Prevent destruction or concealment of evidence; or
  - Discover tools that may be used to escape
  - Spaces immediately adjoining the place of arrest from which an attack could be immediately launched
- Search must be contemporaneous with arrest.

U.S. Immigration and Customs Enforcement

Confidential Subject to Protective Order

ICE

# Search Incident to Arrest

- Scope:
  - Arrestee's person
  - Arrestee's area of "immediate control"
  - This is different from a protective sweep because it does not extend to other areas of the home.
  - Example of adjoining area of potential danger: Opening a bedroom closet door when an arrest is made in that bedroom in order in order to prevent access to weapons or means of escape.



U.S. Immigration and Customs Enforcement

USA 035860

Attorney Work Product/For Review Only/Not For Distribution



**EXHIBIT 1**

Confidential Subject to Protective Order

ICE

# Search Incident to Arrest: Cell Phones

- Must generally secure a warrant before search of a cell phone incident to arrest.
- During a lawful arrest, ERO officers may still seize a cell phone.
- During a lawful arrest, ERO officers may examine the physical aspects of the phone to ensure it will not be used as a weapon, *e.g.*, hidden razor blade in case.
- Officers may also rely on another exception to the warrant requirement, *e.g.*, consent, exigent circumstances or plain view.
- **Consent should always be requested and, if possible, documented in writing.**

U.S. Immigration and Customs Enforcement

Confidential Subject to Protective Order

ICE

# Search Incident to Arrest: Vehicles

***Gant* Rule** – The search of a **vehicle** incident to a lawful arrest of recent vehicle occupants is authorized **only** when either:

- The arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search; or,
- It is reasonable to believe *evidence relevant to the crime of arrest* might be found in the vehicle.

U.S. Immigration and Customs Enforcement

Confidential Subject to Protective Order

ICE

# Vehicle Inventory

- After taking custody of a vehicle, police may conduct an inventory search provided the officer's custody was lawful and it is done according to policy.

- **BUT** a vehicle inventory search cannot be done without a written policy, and ERO does not have such a policy. Therefore, ERO **may not** conduct a vehicle inventory.

U.S. Immigration and Customs Enforcement

Confidential Subject to Protective Order

ICE

# QUESTIONS?




*Enforcing the law means nothing if we don't follow the law while doing so*

U.S. Immigration and Customs Enforcement

USA 035864

Confidential Subject to Protective Order

U.S. Immigration
and Customs
Enforcement

# ICE

SA 035865

**EXHIBIT 1**

**Fourth Amendment Refresher Training**
**Instructor Notes (Revised June 2021)**

| Slide No. | Notes |
|---|---|
| 1 | This training was revised to better focus more on operational realities in the field, rather than black letter law. These instructor notes include case law and statutory and regulatory authorities for reference and in order to assist presenters in addressing questions. Presenters should focus on the scenarios presented and **not** read from the notes. |
| 2 | None. |
| 3 | None. |
| 4 | The exclusionary rule does not apply in removal proceedings absent an egregious violation of the Fourth Amendment. *INS v. Lopez-Mendoza,* 468 U.S. 1032 (1984). The Second, Third, Fourth, and Eighth Circuits acknowledge an egregiousness test and use a totality of the evidence standard. *See, e.g., Cotzojay v. Holder*, 725 F.3d 172, 181-84 (2d Cir. 2013) (pre-dawn entry without consent could be considered egregious even in the absence of force); *Oliva-Ramos v. Att'y Gen.*, 694 F.3d 259, 274-80 (3d Cir. 2012) (interpreting the *Lopez-Mendoza* egregiousness test to include a case-by-case analysis of all the conduct involved in a specific arrest and adding widespread violations as a factor) *Yanez-Marquez v. Lynch*, 789 F.3d 434, 459 (4th Cir. 2015) (adopting totality of the circumstances approach); *Puc-Ruiz v. Holder*, 629 F.3d 771, 778 (8th Cir. 2010) (acknowledging the egregiousness standard and finding it required no physical brutality although it required more than a violation of the Fourth Amendment).<br><br>In the Ninth Circuit essentially any violation of a well-established Fourth Amendment principle will serve to suppress the Form I-213. The Ninth Circuit deems all "bad faith" violations of the Fourth Amendment to be egregious. *Lopez-Rodriguez v. Mukasey*, 536 F.3d 1012, 1018 (9th Cir. 2008) ("A Fourth Amendment violation is 'egregious' if 'evidence is obtained by deliberate violations of the [F]ourth [A]mendment, or by conduct a reasonable officer should [have known] is in violation of the Constitution.'"). Please note that this Court has been known in at least one case to read an egregious violation in the absence of a statement from the arresting officer. *Sanchez v. Sessions*, 870 F.3d 901, 910 (9th Cir. 2017) (finding the seizure of an individual without articulable reasonable suspicion of noncitizenship was based on race in the absence of a statement from the arresting Coast Guard officer to the contrary, and thus, suppressible). On July 18, 2018, the panel that decided *Sanchez* withdrew the decision pending a new disposition, while denying the Government's petition for rehearing *en banc* as moot. *Sanchez v. Sessions*, 895 F.3d 1101 (9th Cir. 2018).<br><br>On September 19, 2018, the panel reissued a decision, *Sanchez v. Sessions*, 904 F.3d 643 (9th Cir. 2018), which finds that Sanchez made a prima facie showing that Coast Guard officers, acting as "immigration officers," violated 8 C.F.R. § 287.8(b)(2) (detention for |



USA 035705

Exhibit
0005

| | |
|---|---|
| | questioning based on reasonable suspicion of undocumented noncitizenship) when after rescuing him at sea, they detained him at the harbor for two hours [allegedly for no reason other than his race] for CBP officers who questioned and searched him, and prepared I-213 reflecting his admission that he entered the United States without inspection and was not in lawful status. [Unfortunately, the I-213 shed no light on the reasonable suspicion supporting his detention at the harbor.] The case was remanded with instructions for the BIA to afford DHS an opportunity to rebut Sanchez's prima facie showing that the violation was egregious.<br><br>* <u>Practice Pointers</u>: In light of how broadly the Ninth Circuit has defined "egregious violations," *e.g.*, *Lopez-Rodriguez v. Mukasey*, 536 F.3d 1012 (9th Cir. 2008), *pet. for reh'g denied*, *Lopez-Rodriguez v. Holder*, 560 F.3d 1098 (9th Cir. 2009), as well as the *Sanchez* court's holding that violation of the "reasonable suspicion" regulation ("egregious" violation of the regulation *not* required) warrants termination, it is imperative that OPLA attorneys make every effort to argue that there was no constitutional or regulatory violation.<br><br>**For ICE officers, *Sanchez* underscores how crucial it is for them to take detailed notes in the I-213 articulating reasonable suspicion of noncitizenship that led to the stop, and what constituted the probable cause for the particular noncitizen's arrest.** The First, Fifth, Sixth, Seventh, Tenth and Eleventh Circuits acknowledge the "egregiousness" exception but have not discussed its application in detail. Discuss with officers the need to start thinking about these issues prior to an arrest. At the time of arrest, they should include enough information in the Form I-213 and/or Field Officer Worksheet so that they can recall an encounter with sufficient detail if called to testify months or years later. |
| 5 | Findings of Fourth Amendment violations may result in personal civil liability in a *Bivens* lawsuit. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). The Civil Division of the U.S. Attorney's Office may represent and provide legal assistance to ICE employees sued in their individual capacity. Representation must be requested through ICE and approved by the Department of Justice (DOJ). To be eligible, DOJ must determine that the conduct giving raise to the claim occurred within the scope of federal employment and it is in the interest of the United States to assign a DOJ attorney to defend you. So it is imperative that you adhere to all ICE policies and procedures. If DOJ decides not to represent you, you are responsible for your own defense. An officer found liable in a *Bivens* suit can ask DHS for reimbursement, but reimbursement is not an entitlement and DHS may refuse. For this and for other reasons, you should consider buying professional liability insurance.<br><br>Although in some circuits *Bivens* does not apply to civil immigration enforcement, case law can vary with the facts. The Fifth Circuit has held that officers enforcing civil immigration law are generally not subject to *Bivens De La Paz v. Coy*, 786 F.3d 367, 375-80 (5th Cir. 2015), *cert. denied*, 137 S.Ct. 2289 (2017). The court noted there were remedies under the immigration laws for Fourth Amendment violations. *Id.* The court |

Confidential Subject to Protective Order

cited to two similar cases from the Ninth and the Second Circuits. One, in the Ninth Circuit, found no liability where plaintiffs were detained while immigration proceedings were pending after being arrested on what they claimed were false accusations. *Mirmehdi v. U.S.*, 689 F.3d 975, 981-82 (9th Cir. 2011). In *Arar v. Ashcroft*, 585 F.3d 559, 571-80 (2d Cir. 2009), the Second Circuit declined to extend *Bivens* in a case involving a Syrian man who was a Canadian citizen submitted to extraordinary rendition. However, a lot of the reasoning in the case was justified by national security concerns so its application is limited.

These cases only raise more questions than they answer so they should not be relied upon for the notion that officers cannot be sued under *Bivens*. To start, the Fifth Circuit retained the applicability of *Bivens* to cases involving excessive force. *De La Paz v. Coy,* 786 F.3d at 737-74. Moreover, a *Bivens* claim was allowed to go forward in the case of a woman who was subjected to expedited removal after claiming fear of returning to Mexico, and died at the hands of her ex-boyfriend there as a result. *Maria S. v. Garza,* No. 1:13-CV-108, 2015 WL 4394745 (S.D. Tex. July 15, 2015). The court found that the claimants, her surviving U.S. citizen children, would have had no recourse under the immigration laws so extending *Bivens* was justified. Other cases have held that where the plaintiff is a U.S. citizen and, as a result, would not have remedies available in immigration court, *Bivens* is an appropriate remedy. *See, e.g.*, *Lyttle v. U.S.*, 867 F.Supp.2d 1256, 1276-77 (M.D. Ga. 2012). Most significantly, the Ninth Circuit recently extended the applicability of a *Bivens* action in the immigration context where a government immigration attorney intentionally submitted a forged document in removal proceedings to bar a noncitizen from relief from removal. *Lanuza v. Love*, 899 F.3d 1019 (9th Cir. 2018). The Ninth Circuit distinguished the case from prior decisions refusing to expand *Bivens* to the immigration context because the instant case involved a "run-of-the-mill immigration proceeding," a "low-level immigration official[]," was unrelated to any national security decisions or interests, and did not interfere with foreign affairs and diplomacy. *Id.* at 1030.

Where the plaintiff is a U.S. citizen wrongly identified by ICE officers as a deportable noncitizen, courts have held that a *Bivens* remedy is available to the U.S. citizen, as the remedy under the INA does not provide such a plaintiff meaningful safeguards, remedies, or review procedure. *See Mendia v. Garcia*, 165 F.Supp.3d 861, 883 (N.D. Cal. 2016) (foreign-born plaintiff who acquired derivative U.S. citizenship was interviewed by an ICE officer while in jail for financial crimes, and ICE lodged a detainer after the plaintiff provided his social security number and informed ICE officers that he had a U.S. passport as evidence of his citizenship. Based on these facts, the California District Court held that the *Bivens* remedy was available to the plaintiff, and denied qualified immunity for the ICE officers involved on the Fourth Amendment and Equal Protection claims). *See also Lyttle v. United States*, 867 F.Supp.2d 1256 (M.D. Ga. 2012) (*Bivens* remedy available to U.S. citizen plaintiff who alleged ICE agents detained and deported him to Mexico despite knowing that he was a U.S. citizen).

Notably, the Ninth Circuit recently extended the applicability of a *Bivens* action to the First Amendment, holding that *Bivens* remedies were available where a United States citizen claims that a border patrol agent violated the Fourth Amendment by using

| | |
|---|---|
| | excessive force while carrying out official duties related to another individual, and violated the First Amendment by engaging in retaliation entirely unconnected to his official duties. Boule v. Egbert, No. 18-35789, 2020 WL 9607113, at *19 (9th Cir. Nov. 20, 2020).<br><br>In sum, it's a complicated issue and the officer, during his daily duties cannot assume that he is protected from possible legal action despite cases that suggest the opposite is true. |
| 6 | An officer who has been the subject of disciplinary or civil proceedings will likely have to disclose these allegations to prosecutors in criminal cases as potential impeachment evidence under *Giglio v. United States*, 405 U.S. 150, 154 (1972). Pursuant to this obligation, prosecutors have established procedures to ensure agents and officers testifying in criminal cases are credible and not subject to impeachment by the defendant at trial, which can include in depth interviews and information requests relating to any misconduct by the officer in the past. These procedures are reflected in DHS Directive No. 116-054, which stresses that DHS personnel must provide truthful and complete answers to prosecutors who may use them as witnesses. Disciplinary matters, including those involving Fourth Amendment violations are specifically mentioned. These reports may result in demotion. *See, e.g., Nguyen v. Dep't of Homeland Se.,* 737 F.3d 711, 715 (Fed. Cir. 2013) (sustaining demotion in case where officer could no longer perform duties of his office due to credibility issues).<br><br>Law enforcement officers are held to a high standard of honesty and credibility because of the need for public trust and confidence attendant to their job responsibilities, including testifying at criminal trials. *See Hernandez v. Department of Homeland Security*, 324 F. App'x 908, 911 (Fed. Cir. 2009). Officers must therefore be especially careful not to engage in any conduct that could even slightly damage their credibility. If an officer's credibility is compromised, his or her ability to testify at trial is damaged and his or her job is put at risk. When an officer testifies at a criminal trial, her agency is required to turn over to the prosecution any information that reflects on his or her credibility. This includes (but is not limited to): specific instances of the officer's conduct that may be used to attack his/her credibility or character for truthfulness; evidence in the form of opinion or reputation as to the officer's character for truthfulness; prior inconsistent statements; and information that may be used to suggest that an officer is biased. |
| 7 | Some ICE arrests have generated significant negative coverage in the news media and have been widely broadcast through social media.<br><br>The widespread availability of handheld devices capable of capturing audio and video as well as the ease of disseminating such recordings quickly and to a large audience has fueled citizen journalism and "copwatching." All circuits that have addressed the issue have found that filming, videotaping, and audio recording of government officials engaged in their duties in a public place is protected by the First Amendment. *See, e.g., Turner v. Lt. Driver*, 848 F.3d 678 (5th Cir. 2017); *ACLU of Ill. v. Alvarez*, 679 F.3d 583 (7th Cir. 2012); *Glik v. Cunniffee*, 655 F.3d 78 (1st Cir. 2011); *Johnson v. Hawe*, 388 F.3d 676 (9th Cir. 2004); |

| | |
|---|---|
| | *Smith v. City of Cumming*, 212 F.3d 1332 (11th Cir. 2000). This right, however, is not an unqualified right. Reasonable restrictions on the exercise of the right to film may be imposed when the circumstances justify them. *Gericke v. Begin*, 753 F.3d 1 (1st. Cir. 2014) (recognizing that reasonable time, place, and manner restrictions may be imposed for reasons such as to maintain safety and control or if filming is interfering with an officer's duties); Crocker v. Beatty, 2021 WL 1540665 (11th Cir. 2021) (holding that despite *Smith's* reference to reasonable time, manner and place restrictions to a bystander's right to record police conduct under the First Amendment, a bystander was not entitled to record police where the bystander was arguably in violation of Florida law by recording from an impermissible place on the highway and when, in the heat of the moment, it would not be obvious to law enforcement that the bystander was recording police pursuant to the First Amendment.<br><br>**Bottom Line: Be mindful of your words and actions when performing your duties in public as it is likely that bystanders are in possession of recording devices and generally have the right to record you.** |
| 8 | **Bullet one:** Unfortunately, a bad arrest can make the agency look bad for weeks or months even if it's an isolated incident. In fact, even if you do everything right, if you act unprofessionally or rude, that can come across poorly on video.<br><br>**Bullets two and three:** Officers in the field must be prepared to face public scrutiny during any operation. Officers should be able react appropriately to any confrontation in public and to justify his or her actions in any eventuality. Things for officers to keep in mind: 1) Use good manners when interacting with the public; 2) Look professional by having badge and clothing with markings indicating they are federal officers, taking care to dress appropriately and be well groomed; 3) Watch the tone of their voice by avoiding sounding sarcastic or annoyed.<br><br>**Bullet four:** Officers should discuss with management how they prefer to address third parties in public. |
| 9-10 | None. |
| 11-13 | Disruptive Protestors<br><br>Under 18 U.S.C. § 111(a), whoever: (1) forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in 18 U.S.C. § 1114 while engaged in or on account of the performance of official duties; or (2) forcibly assaults or intimidates any person who formerly served as a person designated in 18 U.S.C. § 1114 [which covers officers and employees of the United States engaged in the performance of official duties] on account of the performance of official duties during such person's term of service, shall be punished. |

18 U.S.C. § 111(a) creates two distinct offenses – a misdemeanor and a felony. The misdemeanor offense is for "simple assault"; the felony offense is for an assault involving physical contact with the victim, or the intent to commit another felony. The key distinction between a misdemeanor "simple assault" and felony assault under §111(a) appears to be physical contact. However, because the term "simple assault" is not defined, there is a circuit split as to what it means, and whether one may be convicted of 18 U.S.C. § 111 without engaging in some form of assault.

In the Ninth Circuit, a conviction under 18 U.S.C. § 111 requires at least some form of assault. *See United States v. Chapman*, 528 F.3d 1215, 1221 (9th Cir. 2008). In this case, Chapman "tensed up" in anticipation of the Federal Protective Service Officer's arrest, and disobeyed his orders to move and lie down, thereby making the officer's job more difficult. However, according to the Ninth Circuit, Chapman's actions did not amount to an assault. Because Chapman's conduct did not amount to an assault, the Ninth Circuit reversed and vacated the judgment of conviction. Thus, in the Ninth Circuit, an individual may resist, oppose, impede, intimidate, or interfere, but he cannot be convicted under § 111 unless his conduct also amounted to an assault.

In addition to 18 U.S.C. § 111, there may be circumstances in which a disruptive protestor may be guilty of violating INA §§ 274(a)(1)(A)(ii) & (iii), 8 U.S.C. §§ 1324(a)(1)(A)(ii) & (iii) (Harboring certain aliens by transporting or shielding them from detection).

With respect to noncitizens against whom a final order of removal is outstanding by reason of the noncitizen being removable under INA § 237, 8 U.S.C. § 1227, where the noncitizen connives or conspires, or takes any other action, designed to prevent or hamper or with the purpose of preventing or hampering the noncitizen's departure pursuant to the final order of removal, such noncitizen may be in violation of INA § 243(a)(1)(C), 8 U.S.C. § 1253(a)(1).

If the protest takes place at ERO offices located in a property owned or leased by the federal government, individual protestor's actions may violate a Government Services Administration regulation regarding willfully destroying or damaging property, creating any hazard on property to persons or things, or throwing articles of any kind from or at a building or climbing upon statues, or any part of the building. 4 C.F.R. § 102-74.380. Moreover, persons in and on federal property must at all times comply with official signs of a prohibitory nature and with the lawful direction of Federal police officers and other authorized individuals.

A key requirement of a provable violation of these regulations is that the individual was provided with *notice* before an arrest. In this respect, courts will look at whether there was signage prominently posted warning the public of prohibited conduct, and whether the officer warned the individual personally of the rule, as well as the consequences of continuing to engage in violating the rule (i.e., that an arrest will follow) prior to the arrest. The notice and warning must be documented as evidence.

| | |
|---|---|
| | * Note: The local U.S. Attorney's Office (USAO) must be willing to accept these criminal cases for prosecution. FODs may want to plan ahead by consulting the local USAO, through the local OPLA, to determine the USAO's threshold requirements for accepting criminal cases involving disruptive protestor(s) and uncooperative noncitizen targets. |
| 14 | Disruptive Protestors.<br>As federal law enforcement officers, ERO officers have no authority to enforce *state* criminal law.<br>**Special Note on California:** ICE officers do not have peace officer status in California because "[f]ederal criminal investigators and law enforcement officers are not California peace officers[.]" California Penal Code § 830.8(a). Additionally, in July 2017, Governor Brown signed into law Assembly Bill 1440, adding § 830.85 to the California Penal Code relating to peace officers. California Penal Code § 830.85 provides, "Notwithstanding any other law, United States Immigration and Customs Enforcement officers and United States Customs and Border Protection officers are not California peace officers."<br><br>Nevertheless, even without peace officer status, California Penal Code § 830.8 allows federal criminal investigators and law enforcement officers to exercise the powers of arrest of a peace officer under certain circumstances:<br><br>(1) Any circumstances specified in California Penal Code § 836 (*e.g.*, probable cause to believe the person to be arrested has committed a public offense in the officer's presence; the person arrested has committed a felony, although not in the officer's presence; or the officer has probable cause to believe that the person to be arrested has committed a felony, whether or not a felony, in fact, has been committed. **Note:** These overlap with the circumstances under which a private person may arrest another, under California Penal Code § 837 for violations of state or local laws.<br>(2) When these investigators and law enforcement officers are engaged in the enforcement of federal criminal laws and exercise the arrest powers only incidental to the performance of these duties.<br>(3) When requested by a California law enforcement agency to be involved in a joint task force or criminal investigation.<br>(4) When probable cause exists to believe that a public offense that involves immediate danger or persons or property has just occurred or is being committed.<br>In all of the above instances, there shall be no civil liability on the part of, and no cause of action against a federal criminal investigator or law enforcement officer, acting within the scope of his/her authority, for false arrest or false imprisonment.<br><br>Prior to the exercise of these arrest powers, however, the federal criminal investigators and law enforcement officers must have been certified by their agency heads as having satisfied the training requirements of a California peace officer under section 832, or the equivalent thereof. |

| | |
|---|---|
| | Without such training certification, ERO officers may still make an arrest under California Penal Code § 837 which authorizes private persons to arrest another for a public offense committed or attempted in his presence; when the person arrested has committed a felony, although not in his presence; or when a felony has been in fact committed, and he has reasonable cause for believing the person arrested to have committed it. |
| 15 | <u>Disruptive Protestors – Scenario 1:</u><br><br>Any individual who uses force against a federal law enforcement official engaged in carrying out his official duties is subject to arrest and prosecution for violating 18 U.S.C. § 111 (assaulting, resisting, or impeding certain officers or employees). In addition to 18 U.S.C. § 111, there may be circumstances in which a disruptive protestor may be guilty of violating INA §§ 274(a)(1)(A)(ii) & (iii), 8 U.S.C. §§ 1324(a)(1)(A)(ii) & (iii) (Harboring certain aliens by transporting or shielding them from detection).<br><br>Where protestor attempts to disrupt ERO enforcement operations is anticipated, the FODs may, through the local OPLA, consult the local USAO to determine the USAO's threshold requirements for accepting criminal cases involving disruptive protestor(s) and uncooperative noncitizentargets. |
| 16 | <u>Disruptive Protestors – Scenario 2:</u><br><br><u>Outside the jurisdiction of the U.S. Court of Appeals for the Ninth Circuit, the actions of the group members may violate 18 U.S.C. § 111. In the Ninth Circuit, however, some use of force by the individual group members, even if no physical contact results, is required to establish a violation of 18 U.S.C. § 111. The group members may also be in violation of 8 U.S.C. § 1324(a)(1)(A)(iii) in some jurisdictions.</u><br><br><u>Prior to making any arrest, the officers should advise the group members that their action may constitute a violation of federal criminal statutes and seek to defuse the situation.</u><br><br>Keeping in mind that the local USAO must be willing to accept these criminal cases for prosecution, FODs may plan ahead by consulting the local USAO, through the local OPLA, to determine the USAO's threshold requirements for accepting criminal cases involving disruptive protestor(s) and uncooperative noncitizen targets. |
| 17 | <u>Administrative Warrants are not Judicial Warrants.</u><br><br>A judicial arrest warrant is required to arrest an individual in a house, unless there are exigent circumstances or another exception to the warrant requirement. *Kirk v. Louisiana*, 536 U.S. 635, 637-38 (2002) (reiterating that officers may not enter a home and arrest a defendant without a warrant). When conducting fugitive operations based on administrative immigration warrants, consent is required to enter a home, and officers must document that consent. |

| | |
|---|---|
| 18 | **RESPONSE:** YES, it is a Fourth Amendment violation. If a person, including an informant or a neighbor offers to assist and officers employ a plan using the person's help, the individual becomes an agent of the government. Conversely, if a private individual obtains evidence, without first consulting law enforcement, then offers the evidence to an officer, that person was not acting as an agent of the government.<br><br>**CAVEAT:** "[T]he Government may not exceed the scope of the private search unless it has the right to make an independent search." *See United States v. Jacobsen*, 466 U.S. 109, 116 (1984) (quoting *Walter v. United States*, 447 U.S. 649, 657 (1980)). In short, the Government may not use an informant to engage in a search on its behalf to get around the warrant requirement.<br><br>**General Rule:** "[T]he Fourth Amendment proscribes only governmental action, and does not apply to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official." *Walter v. United States*, 447 U.S. 649, 662 (1980) (concurring opinion); *See also United States. v. Day*, 591 F.3d 679, 690 (4th Cir. 2010) (declining to find private security guards acted as government agents where case lacked evidence government participated or affirmatively encouraged private search and did not acquiesce or possess knowledge of "public function" role by private security guards).<br><br>*Burdeau v. McDowell*, 256 U.S. 465, 475-76 (1921) (affirming that the protections of the Fourth Amendment only apply to government action). Case Summary: J. C. McDowell ("McDowell") was employed by Doherty & Co., ("Doherty") as a director of a national gas company in Pittsburgh where he maintained the company's offices. McDowell was discharged for unlawful and fraudulent conduct, and Doherty sent an officer to inspect the gas company's office and McDowell's private office in Pittsburgh. As part of the inspection, two safes and McDowell's desk were pried open. Some of the materials taken from the desk and the company's safe were incriminating evidence, and eventually the company turned them over to the government. The issue in this case was whether the government could rely on the materials taken from McDowell's desk in prosecuting him for mail fraud. The court found that the papers were wrongly taken from McDowell by private individuals and that the government could retain them for use as evidence in McDowell's prosecution because the government did not participate or have knowledge of the wrongful procurement of the materials.<br><br>*New Jersey v. T.L.O.*, 469 U.S. 325, 333-36 (1985) (holding that the Fourth Amendment's prohibition on unreasonable searches and seizures applies to searches conducted by school officials)<br><br>*Camara v. Municipal Court*, 387 U.S. 523, 534 (1967) (building inspector was government official whose actions were limited by the Fourth Amendment).<br><br>*United States v. Cacace*, 796 F.3d 176, 187-90 (2d Cir. 2015) (confidential informant took items from a home with permission of the targets as instructed by law enforcement. |

| | |
|---|---|
| | She also took other items surreptitiously without permission from law enforcement or the target. The Court found no violation of the Fourth Amendment where the informant acted in contravention to government instruction).<br><br>*United States v. Ziegler*, 474 F.3d 1184, 1190 (9th Cir. 2007) (private sector employees were acting as government agents when acting under the direction of the FBI).<br><br>*United States v. McGill*, 718 F.Supp.2d 1240 (S. D. Cal. 2010) discusses a helpful standard applicable to the Ninth Circuit to determine whether a private individual is acting a government agent: "1) whether the government knew of and acquiesced in the intrusive conduct; and 2) whether the party performing the search intended to assist law enforcement efforts or further his own ends." *Id.* at 1243. This case also discusses how federal regulations can convert private actors into government agents. *Id.* at 1244. For example "airline employees searching a passenger's carry-on luggage pursuant to federal regulations is acting on behalf of the state; thus the Fourth Amendment applied to such searches." *Id.* |
| 19 | For purposes of the traditional *Katz* reasonable expectation of privacy (REP) analysis, a Fourth Amendment search does not occur unless the individual manifested a subjective expectation of privacy in the object of the challenged search and society is willing to recognize that expectation as reasonable. *California v. Ciraolo*, 476 U.S. 207, 211 (1986) (holding aerial view from aircraft of a fenced-in backyard did not involve a cognizable intrusion).<br><br>In *United States v. Jones*, 565 U.S. 400 (2012), the Supreme Court retained the *Katz* definition of a search that, "[w]hat a person knowingly exposes to the public, even in his own home or office, is not subject to fourth amendment protection." *Katz v. United States*, 389 U.S. 347, 351 (1967), but also reinstated the traditional *Olmstead* definition of a search based on a trespass to a specifically enumerated area of protection. *See Olmstead v. United States*, 277 U.S. 438, 464-65 (1928) (overruled in part by *Berger v. State of N.Y.*, 388 U.S. 4 (1967), and overruled in part by *Katz v. United States*, 389 U.S. 347 (1967)).<br><br>As a result of *Jones*, there are now two ways for government action to trigger Fourth Amendment protection as a result of conducting a "search." The *Katz* definition of search is still valid and under *Jones*, Fourth Amendment protections will be triggered when there is a physical intrusion by the government into a "constitutionally protected area" for the purpose of gathering information. The protected areas are "people, houses, papers, and effects." Because *Jones* requires a physical trespass (*e.g.*, installation of GPS) in a protected area (*i.e.*, people, houses, papers, and effects), coupled with the purpose of gathering information (*e.g.*, monitoring the GPS), a tracking device must be both installed *and* monitored in order to trigger Fourth Amendment protection, requiring the law enforcement officer to obtain a GPS warrant. |
| 20 | None. |

| | |
|---|---|
| 21 | Post-*Jones*, to determining whether the installation of a tracking device constitutes a physical intrusion into a constitutionally protected area, we need to ask two questions: (1) is the area intruded upon a constitutionally protected area, *i.e.*, "person, house, paper, or effect"? If the answer is "no," there can be no *Jones* search. If the answer is "yes," then we must ask, (2) did the person who is raising the issue have "possession" of the object to which the tracking device was affixed at the time it was affixed?"<br>If the tracking device was affixed to the protected object, *e.g.*, a car (an "effect") *before* the complainant took possession of the car, there is no requisite physical intrusion under the *Jones* analysis, which means it will not constitute a trespassory "search."<br><br>**Hypothetical:** an informant owns a nice car which the target admires. The federal agents believe the target is involved in a criminal activity. The informant consents to installation of a GPS in his car, and also agrees to lend his nice car to the target. There would be no *Jones* "search" in that the target did not "possess" the constitutionally protected "effect" (the car) at the time the GPS was affixed. Thus, monitoring would not trigger Fourth Amendment protection under the *Jones* analysis.<br><br>**Caveat with respect to leased vehicles:** Even if the target did not have possession of the vehicle when the GPS device was installed, the target could still claim a violation of his Fourth Amendment right based on a breach of his REP under the traditional *Katz* analysis. *See*, e.g., *United States v. Walker*, 237 F.3d 845, 849 (7th Cir. 2001) ("A person listed as an approved driver on a rental agreement has an objective expectation of privacy in the vehicle due to his possessory and property interest in the vehicle"). Also, the U.S. Supreme Court recently held that as long as the person is in lawful possession or control of a rental car, the mere fact that the driver is not listed on the rental agreement will not defeat the driver's otherwise reasonable expectation of privacy. *Byrd v. United States*, __ U.S. ____, 138 S. Ct. 1518, 1531 (2018). Some circuit courts have subsequently considered whether an *unlicensed* driver has a reasonable expectation of privacy that confers standing to challenge a search. *See United States v. Lyle*, 919 F.3d 716, 729 (2d Cir. 2019)( holding that an unlicensed, unauthorized driver of a rental car does not have standing to challenge a search); *cf. United States v. Bettis*, 946 F.3d 1024, 1029 (8th Cir. 2020)(finding that an individual driving a rental car with a suspended license has a reasonable expectation of privacy in that vehicle).<br><br>Keep in mind, *Jones* is not limited to GPS context but applies to any means that the government uses to gather information. For example, in *Florida v. Jardines*, 569 U.S. 1, 10-11 (2013), the Supreme Court applied the *Jones* analysis to dog sniff at the front door of a home where police suspected drugs were grown. The court held that because the police went onto curtilage of the suspect's home, a constitutionally protected area, to conduct the dog sniff and because the purpose was to gather information, the police conducted a "search" for which they required a search warrant. Based on this finding, the majority decision found it unnecessary to decide whether the dog sniff also violated the suspect's REP. |

Confidential Subject to Protective Order

| | |
|---|---|
| | **<u>Dog Sniff in Public (No Trespass)</u>:** *Jardines* involved the "search" of a home, which is afforded the greatest Fourth Amendment protection. Dog sniff in *public* will not necessarily trigger Fourth Amendment protection. *See United States v. Place*, 462 U.S. 696, 707 (1983) (dog sniff of the *exterior* of luggage at the airport was not a search). This should still be the case post-*Jardines*. Although one's luggage is an "effect," no trespass is involved in a dog sniff since the luggage was not opened. *See Florida v. Harris*, 568 U.S. 237 (2013). *Harris* is another dog sniff case, decided in the same term as *Jardines*. In *Harris*, the suspect had been pulled over for a routine traffic stop. The driver appeared nervous and there was an open can of beer in the cup holder. After the driver refused consent to search the vehicle, the officer retrieved from his vehicle a police dog trained to detect controlled substances, and walked the dog around the vehicle for a "free air sniff." The issue in *Harris* was whether police officer could have probable cause to think the dog a reliable indicator of drugs in the absence of field performance records for the dog. A unanimous Court held that because training and testing records supported the dog's reliability in detecting drugs and the defendant failed to undermine that evidence, the officer had probable cause to search the vehicle based on the dog's alerting him to presence of controlled substance. Notably, although a vehicle is a constitutionally-protected "effect," the Supreme Court did not find that the "free air sniff" by the dog around the vehicle violated defendant's Fourth Amendment right. What distinguishes *Harris* from *Jones*/*Jardines* is that there was no physical trespass involved in *Harris*, *i.e.*, the dog did not enter the vehicle.<br><br>**<u>CAVEAT</u>:** Canine sniff of a *person* (as opposed to a vehicle or luggage) may be an unreasonable search. *Compare, B.C. v. Plumas Unified School Dist.*, 192 F.3d 1260, 1268 (9th Cir. 1999) (holding "random and suspicionless dog sniff search of student was unreasonable in the circumstances"), and *Horton v. Goose Creek Independent School Dist.*, 690 F.2d 470 (5th Cir, 1982) (holding that the random and unannounced dog sniff of students is an unreasonable search where there is no individualized suspicion), with *Doe v. Renfrow*, 631 F.2d 91 (7th Cir. 1981), *cert. denied*, 451 U.S. 1022 (1981) (affirming lower court's decision that the dog sniff of the entire students body without individualized suspicion is not a search under the Fourth Amendment).<br>Post- *Jardines*, whether dog-sniff of a person triggers Fourth Amendment protection will turn on not just whether the suspect had a REP, but also the *Jones* factors, *i.e.*, whether there was physical trespass into a Constitutionally protected area, and whether the purpose of the intrusion was to gather evidence |
| 22 | Residences are given the highest level of protection against warrantless intrusion. "The physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585 (1980) (quoting *United States v. United States District Court*, 407 U.S. 297, 313 (1972)). "No reasonable officer could claim to be unaware of the basic rule, well established by our cases, that, absent consent or exigency, a warrantless search of the home is presumptively unconstitutional." *Groh v. Ramirez*, 540 U.S. 551, 565 (2004) (*citing Payton v. New York*, 445 U.S. at 586.<br><br>In addition to the owner or a renter, an overnight guest has an expectation of privacy in a home invaded. *Minnesota v. Olson*, 495 U.S. 91 (1990). |

| | |
|---|---|
| | **General Rule:** "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *See United States v. Jacobsen*, 466 U.S. 109, 113 (1984).<br><br>**Exceptions for squatters, trespassers and evicted tenants:** Persons present without legal permission do not have REP. *Olvera v. City of Modesto*, 38 F.Supp.3d 1162, 1170 (E.D. Cal. 2014) ("[A] squatter lacks standing to contest a search of the structure in which he or she is squatting, regardless of the squatter's subjective belief. Society is not prepared to recognize as reasonable the expectation of privacy of an individual who unlawfully occupies a piece of property.") (internal citations omitted).; *United States v. Cortez–Dutrieville*, 743 F.3d 881, 884 (3d Cir.2014) (Dutrieville, who was prohibited from entering the home of the mother of his child as a result of a protection order, lacked standing to challenge the search that led to seizure of narcotics evidence used against him); and *United States v. Ruckman*, 806 F.2d 1471, 1472 (10th Cir.1986) (reasoning that a trespasser living in a cave on federally-owned land did not have an objectively reasonable expectation of privacy). [Note for those in the Ninth Circuit: The Ninth Circuit disagreed with the Tenth Circuit's *Ruckman* holding. In *United States v. Sandoval*, 200 F.3d 659, 661 n.4 (9th Cir. 2000), the Ninth Circuit held that warrantless search of a makeshift tent on federal land near a marijuana growing site violated Fourth Amendment. This was based on the Ninth Circuit's finding that the defendant had a subjective expectation of privacy as indicated by the tent's location in an area heavily covered by vegetation and virtually impenetrable, fact that tent was closed on all four sides, the seized contraband could not be seen from the outside; and that the defendant's expectation of privacy in the tent was objectively reasonable, notwithstanding that it was unclear whether he had permission to camp on public land.]<br><br>**CAVEAT:** These exceptions for squatter, trespassers, and evicted tenants only apply to a search of the property where the person is present. Remember that REP still applies to personal items and the person's body. Also remember violations of the Fourth Amendment must be analyzed under the *Katz* REP analysis *and* the *Jones* intrusion analysis. In these squatter scenarios a *Jones* violation may occur if there is an intrusion into the actual personal property or person of the squatter or trespasser in order to get information, (*e.g.*, sleeping bag, backpack, dog sniff of person, cell phone). For these items an exception to the Fourth Amendment would have to apply such as consent or search incident to arrest (discussed below). |
| 23 | A Fourth Amendment "seizure" of a person occurs when a law enforcement officer "by means of physical force or show of authority has in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 20 n.16 (1968). "[T]he test for the existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *California v. Hodari D.*, 499 U.S. 621, 628 (1991). A seizure occurs if "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). "Examples of circumstances that might |

| | |
|---|---|
| | indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.*<br><br>*Terry v. Ohio*, 392 U.S. 1, 1924 (1968) (brief investigatory stops are seizures, but justified in instances where articulable facts suggest criminal activity is afoot and the subject may be dangerous).<br><br>Recently, the Supreme Court held that "[t]he application of physical force to the body of a person with intent to restrain is a seizure, even if the force does not succeed in subduing the person." *Torres v. Madrid*, 592 U.S.—, 141 S. Ct. 989, 993, 209 L.Ed. 2d 190 (2021) (finding that when defendant officers shot an individual fleeing the execution of a warrant, they seized the individual from the moment their bullets struck her despite her eluding arrest until the next day).<br><br>**Case Summary:** A plain clothes police officer with 39 years of experience observed two men repeatedly walking past a store front at approximately 2:30 p.m. in downtown Cleveland, as if planning a robbery. He approached them after they met up with a third person, identified himself as a police officer and asked their names. The officer then conducted a weapons pat-down on Terry and felt a handgun. He ordered all three of the men into a store, where he then removed Terry's jacket, and retrieved a .38-caliber pistol. He then conducted pat-downs on the other two men, finding another gun. Terry and the other man, Chilton, were charged with carrying concealed weapons. The men moved to suppress the guns as evidence alleging that the officer's search and seizure was unlawful. The Court held that a stop and frisk is a seizure and search under the Fourth Amendment but found that it was not subject to the Warrant Clause because it involved swift "on-the-spot observations that could not be subject to the warrant procedure." *Id.* at 19-20. The Court found that there must be "a narrowly drawn authority to permit a reasonable search for weapons for the protection of [a] police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probably cause." *Id.* at 27. The Court determined that the officer's pat-down was "justified at its inception" and "reasonably related in scope to the circumstances." However, it noted that such searches are only justified for the protection of the officer and others nearby and could not be justified by any need to prevent the disappearance or destruction of evidence of a crime. *Id.* at 29.<br><br>**NOTE:** An investigatory stop can become an arrest if it is not limited in duration and extends longer than necessary to dispel suspicion of wrongdoing. *See e.g. U.S. v. Dixon*, 51 F.3d 1376, 1380 (8th Cir. 1995) ("If the detention lasts too long, or if the officer's conduct is too intrusive, then the stop is converted to an arrest.").<br><br>**Bullet four:** *United States v. Jacobsen*, 466 U.S. 109, 122-25 (1984) (finding destruction of a small amount of cocaine in the course of a field test was not an unreasonable seizure). |

| | |
|---|---|
| | **<u>Case Summary</u>:** During the examination of a damaged package consisting of a cardboard box wrapped in brown paper, Federal Express employees observed a white powdery substance in plastic bags that had been concealed in a tube. The Court held that where the government intrusion is limited in scope to the extent of a prior private intrusion of a container, the Fourth Amendment is not implicated since the reasonable expectation of privacy is destroyed to the extent of the private intrusion. Although testing the white powder (which resulted in the destruction of a small amount of it) to see if it was cocaine exceeded the prior private examination, the court likened that to a "canine sniff" test on luggage and determined it did not infringe on any legitimate interest in privacy and was not a search. The Court further explained that the destruction of a small amount of the cocaine was not an unreasonable seizure because the law enforcement interests justified it. *See also Walter v. United States*, 447 U.S. 649, 657 (1980) (where a private party opened a misdirected carton containing films and government agents were called because of suspected contraband the court held that the additional invasions of respondents' privacy by a government agent must be tested by the degree to which they exceeded the scope of the private search). |
| 24 | **<u>Scenarios</u>:**<br><br>1. NO seizure, the person was free to leave.<br><br>2. YES, there was a seizure. A reasonable person would not feel free to leave after being physically seized. |
| 25 | <u>Scenarios</u>:<br><br>YES, this is a seizure as to the co-tenants, which triggers Fourth Amendment protections. At a minimum, such seizure must be based on *articulable, individualized* reasonable suspicion; or consent. *See United States v. Cortez*, 449 U.S. 411, 417-18 (1981) ("the detaining officer must have a particularized and objective basis for suspecting the particular person stopped of criminal activity. [Internal citations omitted.] The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment must be based upon all the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions – inferences and deductions that might well elude an untrained person." *See also Perez Cruz v. Barr*, 926 F.3d 1128, 1138 (9th Cir. 2019) ("It is a fundamental tenet of Fourth Amendment law that 'a search or seizure of a person must be supported by probable cause particularized with respect to that person.' (internal citation omitted)"; and 8 C.F.R. § 287.8(b)(2) ("If the immigration officer has a reasonable suspicion, based on specific articulable facts, that the person being questioned is, or is attempting to be, engaged in an offense against the United States or is an alien illegally in the United States, the immigration officer may briefly detain the person for questioning.") |

| | |
|---|---|
| | As to consent, telling an individual (against whom there is no probable cause for arrest) that either s/he can consent to be fingerprinted on scene, or downtown at ICE offices, will not be deemed a voluntary consent because it falsely creates the impression that consent cannot be withheld. See *Bumper v. North Carolina*, 391 U.S. 543, 550 (1968).<br><br>With respect to consent, it is absolutely crucial that the officers document the consent in as much detail as possible in writing, preferably in the I-213, *e.g.*, date, place, time, location, name of the person giving the consent, the language in which the officer communicated in with the consent-giver, the language in which the consent was given, name of anyone else who was present when the individual gave consent, and anything else that may help establish that the consent was voluntary and knowing. A detailed I-213 would hopefully prevent the officer having to testify months, or years, later. Even if the officer eventually must take the stand to testify, a detailed I-213 would help the officer refresh his recollection. |
| 26 | None. |
| 27 | The rest of the training is structured to follow the life of a case from investigation stage to arrest. |
| 28 | "What a person knowingly exposes to the public, even in his own home or office, is not a subject of fourth amendment protection." *Katz v. United States*, 389 U.S. at 351.<br><br>**Case Summary:** Defendant was transmitting gambling information from a public phone booth. The FBI eavesdropped using electronic surveillance, the recordings were submitted at trial and the defendant was convicted. Defendant appealed, arguing that the recordings violated his Fourth Amendment rights. The U.S. Supreme Court held that the government's recording of Katz's telephone conversations was an unreasonable search in violation of the Fourth Amendment and therefore the recordings were inadmissible as evidence.<br><br>**Instructor Notes:** An officer's discovery of evidence through the use of one or more of their senses from a legal vantage point does not pose Fourth Amendment limitations because there is no legitimate expectation of privacy.<br><br>**Peering into house:** There is no violation of the Fourth Amendment for officers to stand next to the property and observe and smell anything that a neighbor could also see or smell. *United States v. Martin*, 509 F.2d 1211 (9th Cir. 1975) (surveillance of a home and vehicle from public spaces and adjacent home with consent of the neighbor).<br><br>**Caveat:** Remind officers that they must not be in the curtilage. Just as an officer must be lawfully present in a dwelling to make a plain-view seizure, an officer must have lawful access to the car parked in the driveway to search it. In *Collins v. Virginia*, 138 S.Ct. 1663 (2018), the U.S. Supreme Court held that the top portion of the driveway enclosed on two sides by a brick wall and on a third side by the house, with a side door |

| | |
|---|---|
| | providing access between the house and the partially enclosed section of the driveway constituted curtilage. By lifting the tarp from a vehicle parked inside the partially enclosed top portion of the driveway that abutted the house, the officer physically intruded on the curtilage of Collins' home to search for the vehicle. In doing so, the officer not only invaded Collins' Fourth Amendment interest in the vehicle, but also invaded his Fourth Amendment interest in the curtilage of his home. The automobile exception did not justify the officer's intrusion onto the curtilage of Collins' home. Just as an officer must have a lawful right of access to any contraband he discovers in plain view in order to seize it, the Court held that an officer must have a lawful right of access to a vehicle in order to search it under the automobile exception.<br><br>Also, although officers may use visual aids, using more invasive technology such as thermal imaging devices, will not be acceptable. *See Kyllo v. United States,* 533 U.S. 27 (2001) (use of a thermal imaging device or any other non-public technology to learn details about the inside of a home was a search); *but see United States v. Dunn*, 480 U.S. 294, 305 (1987) (finding that "the officers' use of the beam of a flashlight, directed through the essentially open front of respondent's barn, did not transform their observations into an unreasonable search within the meaning of the Fourth Amendment.").<br><br>**Talk to neighbors/employers:** Neighbors and employers are free to talk to anyone they want, including law enforcement. *See United States v. Martin*, 509 F.2d 1211 (9th Cir. 1975) (neighbors provided permission to observe from their home). Obviously officers must obtain their consent.<br><br>**Trash/abandoned property:** Trash that has not been moved to the curb is not yet considered abandoned. As such, police may not dig in garbage until it is left at the curb for collection by a third-party, *i.e.*, garbage collector. A defendant has no standing to challenge the search of an item which he has abandoned. *Abel v. United States*, 362 U.S. 217, 240-41 (1960) (trash found in vacated hotel room, hotel gave permission for search). Even if a person had an expectation of privacy at one point, that interest can be abandoned through words or conduct. *United States v. Cella*, 568 F.2d 1266, 1283-84 (9th Cir. 1977) (instructions to destroy documents evidence of intent to abandon); *United States v. Nowak*, 825 F.3d 946, 948-49 (8th Cir. 2016) (Car passenger fled abandoning backpack and leaving driver. Driver consented to search and police search of backpack that was in the car was upheld.) |
| 29 | **Scenario**:<br><br>YES. Allowed for surveillance since the same principle applies: if it's public, it's available to you.<br><br>**CAVEAT:** Be careful where you conduct your activities. If you enter the curtilage of the home it's problematic (more on this below). |

| | |
|---|---|
| 30 | *United States v. Dunn*, 480 U.S. 294 (1987) ("the officers' use of the beam of a flashlight, directed through the essentially open front of respondent's barn, did not transform their observations into an unreasonable search within the meaning of the Fourth Amendment, where the barn was not considered part of the curtilage of the home.").<br><br>*U.S. v. Kim*, 415 F. Supp. 1252, 1257-58 (D. Haw. 1976), analyzed the use of binoculars and telescopes in surveillance in relation to REP protected locations. The court determined observations made using a telescope toward an outdoor patio of a high-rise apartment did not result in a search, however, observations made using the same telescope from the same location targeting the inside of the high-rise apartment, to include the observance of articles read by the defendant, did result in a search.<br><br>*U.S. v. Whitaker*, 820 F.3d 849 (7th Cir. 2016), found that the use of a canine to sniff the inside of an apartment while it was stationed in a common hallway was a violation of the Fourth Amendment based on the same rationale as *Kyllo v. United States.,* 533 U.S. 27, (2001) (finding that the use of a thermal imaging device or any other non-public technology to learn details about the inside of a home was a search).<br><br>**Case Summary:** Kyllo pleaded guilty to manufacture of marijuana, after losing a motion to suppress the government's thermal images of his home, which showed a large amount of heat emanating from his garage, presumably from high-intensity lamps typically used for indoor marijuana growth. The government had used the images to get a search warrant and found marijuana when they searched the home. Defendant moved to exclude the evidence, arguing that it was an unlawful search. The U.S. Supreme Court rejected the argument that the thermal image was not an intrusion into the home because it was only an "off-the-wall," not "through-the-wall" reading, and similarly rejected the argument that the image was not an intrusion because it didn't record intimate details of the home. Instead, the Court held that the Fourth Amendment draws a clear line at the entrance of the home and therefore "where, as here, the Government uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a 'search' and is presumptively unreasonable without a warrant." *Id*., at 40.<br><br>**Note on night vision goggles:** The technology involved in night vision goggles, unlike the thermal imaging devices involved in *Kyllo*, do not provide the wearer with the ability to "see through walls." Thus any Fourth Amendment concerns are diminished. Moreover, night vision goggles are readily available to the general public. A Court, citing these factors held wearing night vision goggles does not to constitute a search under the Fourth Amendment when used in an open field. *United States v. Dellas*, 355 F. Supp.2d 1095, 1107-08 (N. D. Cal. 2005). The court in that case held open the question of whether there would be a Fourth Amendment search if the goggles were aimed into the curtilage or the home, but based on the *Kim* case above, it's likely that scenario would be more problematic. In another case involving vehicles, a Border Patrol agent used the night vision goggles to look into a vehicle while driving on an open highway at night. *United States v. Vela*, 486 F. Supp. 2d 587, 589-91 (W.D. Tex. 2005). The Court |

| | |
|---|---|
| | held that was not a search because the vehicle was driving in a public highway, the technology involved was not invasive and was readily available to the public. *Id.*<br><br>**<u>DRONES</u>:** In the event officers have questions regarding drones, they should know that although ERO is currently interested in integrating drones to enforcement actions, currently no policy exists that permits their use and that would be the first step in making them available to officers. The potential legal issues pertaining to their use are still in flux as states and the federal government pass laws in response to their increased popularity with the general public and law enforcement agencies. For example, a law in Texas criminalizes the use of drones to take images of individuals and private properties. Tex. Gov't Code § 423.003. There are exceptions for law enforcement but this legislation is an example of the possible issues that will be raised on a state-by-state basis. Tex. Gov't Code § 423.002. Fourth Amendment issues are also unclear as of today. One state appellate court has held that individuals have a reasonable expectation of privacy in their property against drone surveillance. <u>*Long Lake Twp. v. Maxon*</u>, No. 349230, 2021 WL 1047366 (Mich. Ct. App. Mar. 18, 2021). |
| 31 | **Do any of these involve a Fourth Amendment search?**<br><br>**Flashlights:** Use alone will not result in a search assuming physical presence is not already a search.<br><br>**Binoculars:** Same as flashlights. Courts will take into consideration the power of the binoculars, steps taken by the individual to shield objects/activity from view.<br><br>**Night vision:** Use not a search generally, may be problematic in a home or curtilage.<br><br>**Dog:** Search in curtilage and/or used to sniff into home problematic. OK in public.<br><br>**Mobile Tracking Devices (GPS):** Use alone is a search when attached to a constitutionally protected place under *Jones* (persons, effects, houses, papers). |
| 32 | **<u>Bullet two</u>:** Whether a location is a home or dwelling may not be obvious, for example, if it's a multi-unit building or the place where officers are going is undergoing renovations, etc. Officers should endeavor to determine this prior to conducting an arrest. |
| 33 | "Knock and talk" is "an exception to the warrant requirement. *See, e.g.*, *Estate of Smith v. Marasco*, 318 F.3d 497, 519 (3d Cir. 2003) (*citing Rogers v. Pendleton*, 249 F.3d 279, 289-90 (4th Cir. 2001); *United States v. Taylor*, 458 F.3d 1201, 1204 (11th Cir. 2006)).<br><br>Courts analyze the circumstances of a "knock- and talk" with an objective standard, so it's important to be certain that, for example, a violation of the curtilage does not happen. An illustrative case is *United States v. Hammett*, 236 F.3d 1054 (9th Cir. 2001), which is now overturned. The main issue was whether the officers' inspection of the outside of the |



USA 035723

EXHIBIT 2

| | |
|---|---|
| | home violated the Fourth Amendment's privacy protection which extends to the curtilage of a home. In that case, officers had entered the property of the subject from an adjoining lot of land abutting it, and encircled the home unaware that he had posted "No Trespassing" signs on a fence that faced the public road. Although the court upheld a "good faith" search of the exterior of the property, that holding appears to have been limited to its facts (or even overruled) by more recent case law, which unequivocally disallows reliance on the good faith or subjective beliefs of officers as part of the analysis of whether they are violating the Fourth Amendment. *United States v. Perea-Rey*, 680 F.3d 1179, 1187 (9th Cir. 2012), *citing Kentucky v. King*, 563 U.S. 452, 464 (2011) (the U.S. Supreme Court rejected an exigent circumstances test that looked to the officers' bad faith, reasoning that only objective factors lend themselves to analysis under the Fourth Amendment's reasonableness standard). Based on the "only objective factors" language of *Kentucky v. King*, the "good faith" language of *Hammett* appears to have been implicitly overruled.<br><br>*United States v. Daoust*, 916 F.2d 757, 758 (1st Cir. 1990) (holding that officers could move to the back yard in an attempt to contact someone).<br><br>**<u>Case Summary</u>:** Daoust was convicted of unlawful possession of a firearm by a felon. Police officers, who looked through a window in Daoust's back yard, saw a gun. Daoust lived in a log cabin dug into the side of a hill with no electricity or phone, situated down a driveway off a dirt road. The front door was five feet above ground with no steps and was therefore inaccessible. The police went to the home twice both times knocking on a glass cellar door with no response. During the second visit, the police walked around the house to find someone. While in the back, one of the officers looked up through a kitchen window, the bottom of which was just at his head, and saw a gun hanging above the sink. The police used this observation to obtain a search warrant for the gun. The Court held it was not unlawful to go to the back looking for an accessible main entrance in an attempt to interview the resident.<br><br>Pursuant to ICE policy, "knock and talks" shall occur between 6 a.m. and 10 p.m. This policy is based on Rule 41(e)(2)(A)(ii) of the Fed. Rules of Criminal Procedure, which limits execution of criminal search warrants to daytime barring express finding of good cause by a judge. Rule 41 (a)(2)(B) defines "daytime" as the hours between 6 a.m. and 10 p.m., local time.<br><br>Although "daytime" for purposes of executing a criminal search warrant is defined as 6 a.m. to 10 p.m., to the extent that ICE's warrants are civil, not criminal, in nature, it is recommended that any "knock and talk" take place prior to 9 p.m. This is based on case law. In *Welsh v. Wisconsin*, 466 U.S. 740 (1984), the U.S. Supreme Court held that warrantless "nighttime entry into a home" to arrest an individual for non-criminal, non-jailable offense (driving under the influence of intoxicants) was prohibited by the Fourth Amendment. In *Welsh*, the police entered the suspect's home at approximately 9 pm.<br><br>Violating the daytime requirement has resulted in adverse case law. *See Oliva-Ramos v. Attorney General*, 694 F.3d 259 (3d Cir. 2012). In that case, the evidence was that a |

| | |
|---|---|
| | fugitive operations team entered a home at 4:30 am, with an administrative warrant for a relative of Oliva-Ramos who was not home at the time. The target's family members, excluding one legal permanent resident, were arrested as unlawfully present in the United States. Mr. Oliva-Ramos argued that the IJ violated his right to due process by failing to rule on his motions to subpoena witnesses (*i.e.*, the other fugitive operations team members in addition to the arresting officer who testified that she had no independent recollection of the case) and documents. He also claimed that the BIA denied him due process by declining to remand his case to the IJ to consider newly available evidence of egregious and/or widespread abuses of his rights and liberties.<br><br>The Third Circuit rejected the BIA's reading of *United States v. Lopez-Mendoza,* 481 U.S. 828 (1987) which would only permit suppression of evidence based on "fundamentally unfair" circumstances. The Third Circuit found that the IJ and BIA misapplied *Lopez-Mendoza* – they should have first determined whether the officers violated Mr. Oliva-Ramos' Fourth Amendment rights, and second, whether any such violations were "egregious." If an egregious violation occurred, any evidence pertaining to noncitizenship must be suppressed. The Third Circuit also held that the IJ abused her discretion under 8 C.F.R. §1003.35(b) in finding that the witnesses and documents Mr. Oliva-Ramos sought to subpoena were not essential and that the BIA abused its discretion in denying the motion to reopen to supplement the record with such information.<br><br>A recent case in the Ninth Circuit creates additional concerns for the practice of late-night "knock and talks." *United States v. Lundin*, 817 F.3d 1151,1158 (9th Cir. 2016). The police had already established probable cause for an arrest through witness statements, but failed to get a warrant and instead, went to conduct the "knock and talk" at the suspect's house at 4 a.m. *Id.* at 1156. Upon hearing the knock, the suspect tried to flee which created an exigency that the police used to enter the residence where they found firearms. *Id.* The Court found that the "knock and talk" at 4 a.m. was a violation of the Fourth Amendment such that the exigency was not justified. Although there is language in the decision that states a "knock and talk" for the purpose of an arrest is a violation of the Fourth amendment, the Court tempered that statement by saying, "An officer does not violate the Fourth Amendment by approaching a home at a reasonable hour and knocking on the front door with the intent merely to ask the resident questions, even if the officer has probable cause to arrest the resident." *Id.* at 1160. This case does not mean officers cannot conduct "knock and talks" for the purposes of arrest. In *Lundin*, the option to obtain a judicial warrant was readily available to the police, whereas ERO officers are generally reliant on administrative warrants. But the bottom line is that late-hour "knock and talks" are unlikely to withstand a challenge in court.<br><br>**Note:** If the target regularly leaves for work at 5 a.m., officers may wait for the target to leave his/her home and arrest the target in the street, parking lot, etc. |
| 34 | **Bullet one:** Curtilage is the area outside the home itself but so close to and intimately connected with the home and the activities that normally go on there that it can reasonably be considered part of the home. Both the home and curtilage are within the |

scope of the Fourth Amendment's protection from unreasonable searches and seizures. *United States v. Shanks*, 97 F.3d 977, 979 (7th Cir. 1996) (internal citation omitted). Thus, the government cannot enter or search this area absent a warrant or some exception to the warrant requirement, such as consent. See *Siebert v. Severino*, 256 F.3d 648, 654-55 (7th Cir. 2001).

*Oliver v. United States*, 466 U.S. 170, 180 (1984) (defining the term curtilage and finding no Fourth Amendment violation because the government's intrusion was not on curtilage but on an open field).

**Case Summary:** Narcotic agents, acting on a report that marijuana was being grown on the defendant's farm, went to the farm to investigate. They drove past the defendant's house to a locked gate with a "no trespassing" sign, but with a footpath around the gate on one side. The agents walked around the gate and along the footpath and found a field of marijuana over a mile from the defendant's house. The issue was whether the officer's observations were made in the open field. The Court held that the observation was made in an open field. The defendant's steps taken to protect privacy, such as planting the marijuana on secluded land and erecting fences and "no trespassing" signs around the property do not necessarily establish an expectation of privacy in an open field. Open fields do not provide the setting for the types of intimate activities that the Fourth Amendment is intended to shelter from government intrusion or surveillance.

**Bullet two:** In *United States v. Dunn*, 480 U.S. 294, 294-95, 301 (1987), the Court held that "curtilage questions should be resolved with particular reference to four factors:"

1. The proximity of the area claimed to be curtilage to the home;
2. Whether the area is included within an enclosure surrounding the home;
3. The nature of the uses to which the area is put; and
4. The steps taken by the resident to protect the area from observation of people passing by.

The front yard is generally less protected than the back yard because it's more visible from public sidewalk. Even if the area is in private property, the resident must take steps to keep the public out.

**Case Law Update:** In *Collins v. Virginia*, -- U.S. --, 138 S. Ct. 1663 (2018), the U.S. Supreme Court examined the scope of curtilage to determine whether a police officer could enter private property without a warrant or consent and search a vehicle parked a few feet from the house. The Supreme Court determined that the driveway where the motorcycle was parked is considered curtilage of the home. "According to photographs in the record, the driveway runs alongside the front lawn and up a few yards past the front perimeter of the house. The top portion of the driveway that sits behind the front perimeter of the house is enclosed on two sides by a brick wall about the height of a car and on a third side by the house. A side door provides direct access between this partially enclosed section of the driveway and the house. A visitor endeavoring to reach the front door of the house would have to walk partway up the driveway, but would turn off before entering the enclosure and instead proceed up a set of steps leading to the front porch. When [the officer] searched

| | |
|---|---|
| | the motorcycle, it was parked inside this partially enclosed top portion of the driveway that abuts the house." *Id.* at 1670-71.<br><br>The Supreme Court further held that, "Just as an officer must have a lawful right of access to any contraband he discovers in plain view in order to seize it without a warrant . . . so, too, an officer must have a lawful right of access to a vehicle in order to search it . . . The automobile exception does not afford the necessary lawful right of access to search a vehicle parked within a home or its curtilage because it does not justify an intrusion on a person's separate and substantial Fourth Amendment interest in his home and curtilage." *Id.* at 1672.<br><br>**<u>Caveat</u>:** In *Florida v. Jardines*, 569 U.S. 1, 6-8 (2013), the U.S. Supreme Court held that the customary invitation of homeowners allowing visitors to approach a home and knock on the front door did not allow police to conduct a "search" by using a drug-sniffing dog on the front porch of the home. |
| 35 | **Curtilage Scenario 1:**<br><br>Yes, you were in the apartment's curtilage. Although this was an apartment complex, it was close to the home, there was a measure of privacy provided by the hedge and it was used for household activities.<br><br>A similar example is a recent case from the Eighth Circuit that involved an apartment complex. A dog sniff was conducted about six inches away from the apartment's window. However, the Court found that although it was a complex of many units, this particular window was about six feet away from any common area walkway, there was a grill, which was evidence the tenants used the area for personal use, and a bush partially covered the area. The dog sniff was found to be an impermissible search of the curtilage. *United States v. Burston*, 806 F.3d 1123, 1127 (8th Cir. 2015).<br><br>Shared and common spaces in apartment buildings, however, are not considered curtilage. For example in *United States v. Sweeney*, 821 F.3d 893, 899-903 (7th Cir. 2016), the Seventh Circuit found that a search of a basement area that was common to all units in an apartment building was not a violation of the Fourth Amendment since there was not REP and there was no trespass on the suspect's property. |
| 36 | **Curtilage Scenario 2:**<br><br>Farms: Curtilage on a large property can be extensive. In this case, the shed is likely curtilage since it is close enough to the home.<br><br>Open fields, however, are not curtilage.<br><br>**<u>Open Field v. Curtilage</u>:** In *Hester v. United States*, 265 U.S. 57, 59 (1924), the Supreme Court held that the right to privacy does not extend to a person's open fields, |



USA 035727

EXHIBIT 2
118

| | |
|---|---|
| | and that even if there had been a trespass, the agents did not violate the Fourth Amendment.<br><br>An open field is not a house or an effect and therefore, the government's intrusion upon the open fields is not one of those unreasonable searches proscribed by the text of the Fourth Amendment. *Oliver v. United States*, 466 U.S. 170, 176-77 (1984). The erection of fences on an open field (at least for fences consisting mainly of posts and multiple strands of barbed wire like those used in *Dunn*, *Hester* or *Oliver*) does not create a constitutionally protected privacy. *Id.* at 182-83; *Dunn,* 480 U.S. at 304. The term "open field" may include any unoccupied or undeveloped area outside of the curtilage and need not be open or a field as those terms are used in common speech. *Id.* at 180, n.11.<br><br>Be aware that in rural areas the extent of the curtilage may be greater than in urban settings so it may not be as obvious. *See*, *e.g.*, *United States v. Dellas*, 355 F. Supp.2d 1095, 1102 (N. D. Cal. 2005). However, curtilage is rarely found to extend more than 100 feet from the dwelling place. *Id.* |
| 37 | In *Florida v. Jardines*, 569 U.S. 1 (2013), the Supreme Court cautioned that the scope of a license to enter onto the curtilage is limited not only to the *particular area* but also to a *specific purpose*, and there is no customary invitation to enter the curtilage simply to conduct a search, *e.g.*, dog sniff at the front door.<br><br>**<u>Case Summary</u>:** *United States v. Robbins*, 682 F.3d 1111, 1115 (8th Cir. 2012). Officers responding to a 911 hang up call entered onto the Defendant's curtilage through a closed but unlocked gate. The officers proceeded to the front of the residence and knocked on the front door. While knocking on the front door, they detected a strong odor of marijuana leading the officers to obtain a search warrant. The Court held the entry into the curtilage to be lawful. In its opinion it stated, "[w]e have held that police entry through an unlocked gate on a driveway to approach the front door of a residence for a 'knock and talk' is a reasonable, limited intrusion for legitimate law enforcement objectives. *United States v. Weston*, 443 F.3d 661, 667 (8th Cir. 1984); *see also Nikolas v. City of Omaha*, 605 F.3d 539, 545-46 (8th Cir. 2010) (noting that "it is clear that, without a warrant, [inspector] could enter the property through its open gate and proceed up the driveway to the front door of the main residence to ask for consent to search inside any part of the residence" (citing *United States v. Lakoskey*, 462 F.3d 965, 973 (8th Cir. 2006)) (concluding that officers "were lawfully allowed to approach [defendant's] front door and contact him for investigative purposes."); *Florida v. Jardines*, 569 U.S. 1 (2013) (finding no implied license for a dog-sniff search in a home's curtilage).<br><br>**<u>Case Summary</u>:** *Harris v. O'Hare*, 770 F.3d 224, 231-237 (2d Cir. 2014). Officers arrested George Hemingway for possession of heroin. While in the police car, Hemingway indicated there were guns in an abandoned car in the rear yard of one of his acquaintances. The officers went the location Hemingway had referenced. The officers did not approach the front door of the residence even though it appeared the occupants were home. Instead, they walked along the side of the house to the rear of the yard when they encountered a dog. The dog chased the officers until one the officers shot it. The |

| | |
|---|---|
| | owner of the dog, who also resided at the home filed suit against the officers and city. The officers contended that their entry into the yard was not a Fourth Amendment search and even if it was, that they were entitled to qualified immunity based on the exigent circumstances due to a belief there were guns in an abandoned car on the property. The Court first held that the entry into the yard of the residence was in fact a search and that as a result, it is presumptively unreasonable because they did not have a criminal warrant. The Court next addressed whether the officers could justify their entry on to the property due to an exigency, and found that they could not because while there were allegedly guns in an abandoned car, they were not confronted by an urgent need to render aid or take action. On the issue of qualified immunity, the Court again ruled against the Officers and city because the law related to government entry into curtilage is so well established that it was not "objectively reasonable for them to believe their conduct was lawful."<br><br>**Note:** Entry onto the curtilage by law enforcement is a search even if it is for a legitimate police purpose. Implied license permits this entry for the limited purpose of making contact with the occupant of a home. If courts are not going to permit law enforcement to enter onto curtilage for the purpose of locating guns with ties to the drug trade, it stands to reason that they will not permit entry onto curtilage for other less serious reasons such as setting up a perimeter to see if a suspected noncitizen is going to exit out a back door. |
| 38 | **Scenario**: Probably not, in the absence of additional indicia such as a fence/gate to reflect revocation of the implied license to approach the house and knock on the front door.<br><br>Whether the "no trespass" signs along the walkway of a home revoked the implied license that the public has to approach the house and knock on the front door depends on the context – *what message would the signs have conveyed to a member of the public or an officer seeking to conduct a knock and talk?*<br><br>The 10th Circuit has held that the mere presence of multiple "No Trespassing" signs placed about one's home is not *alone* sufficient to convey to an objective officer, or member of the public, that he cannot go to the front door and knock. *See United States v. Carloss*, 818 F.3d 988, 995 (10th Cir. 2016), *cert. denied*, __ U.S. ____, 137 S.Ct. 231 (2016). Among the cases the *Carloss* court cited in support was *State v. Christensen*, No. W2014-00931-CCA-R3-CD, 2015 WL 2330185, at *8 (Tenn. Crim. App. May 14, 2015) (unpublished), holding that "the emerging rule appears to be that the implied invitation of the front door can be revoked but that the revocation must be obvious to the casual visitor who wishes only to contact the residents of a property."<br><br>Subsequent to the 10th Circuit's decision in *Carloss*, the Supreme Court of Tennessee upheld the *Christensen* decision on appeal. See *State v. Christensen*, 517 S.W.3d 60, 72 (Tenn. 2017), *cert. denied*, __ U.S. ___, 138 S.Ct. 737 (Jan. 16, 2018) (As a matter of first impression, "No Trespassing" signs, alone, are insufficient to revoke the implied license allowing persons, including police officers acting without a warrant, to approach |

| | |
|---|---|
| | a front door and knock). The Supreme Court of Tennessee observed that a few states have concluded that "No Trespassing" signs establish a legitimate expectation of privacy that renders a knock and talk invalid; however, most jurisdictions that considered the issue appear to hold that such "No Trespassing" signs, in and of themselves, will not invalidate a knock and talk. *Christensen*, 73, citing *e.g., United States v. Bearden*, 780 F.3d 887, 892-94 (8th Cir. 2015) (upholding knock and talk where officers entered property through open driveway gate despite "No Trespassing" signs); *United States v. Hopper*, 58 Fed. Appx. 619, 623 (6th Cir. 2003) (holding that knock and talk was allowed despite several "No Trespassing" signs near driveway); *United States v. Holmes*, 143 F.Supp.3d 1252, 1265 (M.D. Fla. 2015) (holding that, "in the absence of another barrier (such as a fence and gate), 'No Trespassing' signs do not, in and of themselves, withdraw the implied consent to conduct a knock and talk"); *Davis v. City of Milwaukee*, No. 13-CV-982-JPS, 2015 WL 5010459, at *13 (E.D. Wis. Aug. 21, 2015) (stating that "signs stating 'Private Property' or 'No Trespassing' do not, by themselves, create an impenetrable privacy zone"); *United States v. Jones*, No. 4:13CR00011-003, 2013 WL 4678229, at *2 n.2, *6, *9 (W.D. Va. Aug. 30, 2013) (holding that multiple signs along driveway and on property stating "No Trespassing," "Posted: Private Property," and "Keep Out" did not invalidate knock and talk under the Fourth Amendment); *United States v. Denim*, No. 2:13-CR-63, 203 WL 4591469, at *4 (E.D. Tenn. Aug. 28, 2013) (stating, post-*Jardines*, that "[e]ven in the face of No Trespassing signs, it is not unreasonable for a police officer to intrude upon private property to ask if the resident has any information that will aid in the investigation of a crime"); *United States v. Schultz*, No. 13-20023, 2013 WL 2352742, at *5 (E.D. Mich. May 29, 2013) (holding that knock and talk entry via driveway was valid under the Fourth Amendment despite "No Trespassing" signs). |
| 39 | <u>Knock and Talk: Consent to Enter/Search</u><br><br>**<u>General Rule</u>:** Government actors may conduct a search without a warrant or probable cause based upon an individual's voluntary consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).<br><br>Along with the requirement that consent be voluntary, consent must be given by a person with authority to give the consent; the consent can be expressed or implied; the search then must not exceed the scope of the consent; and consent can be withdrawn at any time.<br><br>**Each bullet will be discussed separately in the next slides.**<br><br>**<u>Instructor Note</u>:** Please encourage officers to document consent contemporaneously with the search. Consent should be documented in the Field Operation Work Sheet (FOW), which revised on January 4, 2017, and on the Form I-213: who, what, where, why, and when. Also document the demeanor of the person consenting. ICE Academy, Fugitive Operations Training Program, which all fug ops officers have gone through, or should be scheduled to attend, teaches documentation in the FOW. |

| | |
|---|---|
| 40 | **<u>Bullet one</u>: Actual Authority**<br><br>**<u>Generally</u>:** The person giving consent should have actual authority to consent to the place or item searched (by having joint access or control). *United States v. Matlock*, 415 U.S. 164, 177-78 (1974) (finding a woman had the authority to consent to a search because she told officers that she shared a bedroom with the defendant).<br><br>**<u>Case Summary</u>:** William Matlock ("Matlock") was arrested for bank robbery while in the front yard of the house in which he rented a room. Several people lived in the home, including Ms. Graff. The officers approached Ms. Graff, who stated she shared a bedroom with Matlock in the home. The officers obtained Ms. Graff's consent to search the house without a warrant for money and a gun. They found money in the bedroom which was shared by Ms. Graff and Matlock. The Court held that Ms. Graff and Matlock had joint authority over the premises and therefore Mrs. Graff's consent to a search was binding on Matlock. Common authority cannot be implied from the mere property interest but must be based on mutual use of the property by persons having joint access or control. *See also United States v. James*, 571 F.3d 707 (7th Cir. 2009) (mother of suspect had actual authority to consent to removal of a safe where suspect had left the property in her home and she had access and control over it for a long period of time. Note that contents of safe were obtained via warrant).<br><br>**<u>Bullet two</u>: Common Authority**<br><br>Courts recognize common authority to consent in each person whose mutual use of the property demonstrates joint access or control for most purposes. *United States v. Witzlib*, 796 F.3d 799 (7th Cir. 2015).<br><br>**<u>Case Summary</u>:** Local police received a tip from relatives of Witzlib that he was making M-80 firecrackers in a home he shared with his grandmother. Police went to the property and Witzlib departed the house to speak to officers in the driveway. During conversation, he refused to consent to a search. Witzlib stayed outside the home with one officer while the rest went up to the house and spoke to his grandmother, the owner of the house. She gave written permission to search the house. Police found about a thousand M-80's in the basement of the house, a common element. Witzlib was convicted of manufacturing and dealing explosives. On appeal, Witzlib argued that his lack of consent should have prevented officers from searching the house. The Court found that his grandmother, as owner of the home, had authority to grant access to the basement, a common area of the home. The Court found all residents of the home had control over this common area so his grandmother could consent even if Witzlib did not. The Court noted his refusal to agree to a search but noted he had departed the house and was not present at the threshold when his grandmother granted consent.<br><br>*See also United States v. Wright*, 838 F.3d 880 (7th Cir. 2016) (live-in girlfriend had common authority over computer when she and the residing children used the computer regularly and files were not password protected). |



USA 035731

**Hotel rooms:** A Third Circuit case dealt with the issue of whether the person who pays for a hotel room and is registered as the guest is the only one with authority to consent to entry by law enforcement. *United States v. Murray*, 821 F.3d 386 (3d Cir. 2016). In this case, the subject of the investigation rented motel rooms where he engaged in prostitution and drug distribution. The police went to a hotel room and a woman, who worked for the subject as a prostitute but did not rent the room, opened the door. As the police interviewed her, the subject knocked on the door and when the police opened the door, they recognized him. The police frisked him and found inculpatory evidence as a result. The Court found that the woman who consented when she was working in the room had common authority to consent because she had control of the room including who entered. The Court also found that, in the alternative, she had apparent authority.

**Caveat:** *Trulock v. Freeh*, 275 F.3d 391, 403 (4th Cir. 2001) (co-resident of a home and co-user of a computer, who did not know the necessary password for her co-user's password-protected files, lacked the authority to consent to a warrantless search of those files when she had no access or control over these files); *see also Georgia v. Randolph*, 547 U.S. 103, 120 (2006) (if two co-residents are present and one declines the search, there is no valid consent to the search).

**Bullet three: Apparent Authority**
As long as the officers reasonably believe that the person who gives consent to search has the authority, in other words, *has apparent authority* to do so, they may rely on that consent. *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990).

The Ninth Circuit, in *United States v. Enslin*, 327 F.3d 788, 793-94 (9th Cir. 2003), has held that to establish apparent authority, the Government must show that:
(1) The officers believed an untrue fact that they used to assess the individual's control of the area;
(2) It was objectively reasonable for the officers to believe that the fact was true; and
(3) If the fact was true, the individual would have had actual authority to consent.

*United States v. Carrasco*, 540 F.3d 43 (1st Cir. 2008). Two men (Mala and Carrasco) were traveling from the U.S. Virgin Islands to Puerto Rico in a 21-foot boat when they were stopped by Marine Enforcement Officers of the U.S. Customs Service. During the stop the officers asked Mala, whose family owned the boat, for permission to conduct a search. Mala consented and the officers subsequently found cocaine and heroin in two toolboxes, a backpack, and a shoebox all of which were in a wheel housing on the boat. At trial, Carrasco claimed the items were his and therefore the officers did not have authority to search them. The Court noted that the items were not locked, nor identified as Carrasco's and neither man mentioned during the search that the items did not belong to Mala. Accordingly, the Court held that the officers "had a reasonable belief that Mala possessed authority to consent to the search" and therefore the evidence was admissible. *Id.* at 49. The two men were convicted but those convictions were vacated on a different issue. *See also Moore v. Andreno*, 505 F.3d 203, 209-13 (2d Cir. 2007) (no apparent authority where parties lived together but consenting person had no access to the room containing the evidence, and had to break a lock to enter); *United States v. Buckner*, 473

| | |
|---|---|
| | F.3d 551, 555 (4th Cir. 2007) (spouse had no actual authority to allow password protected files in the computer to be searched, but Court found apparent authority where computer was leased to her name, fraudulent transactions were made in her name and officers were unaware that files were protected); *U.S. v. Purcell*, 526 F.3d 953, 963-65 (6th Cir. 2008) (girlfriend who consented to search of bags had no apparent authority over bags that officers observed had the personal effects of the suspect).<br><br>**<u>Caveat</u>:** While helpful, this case law has limited usefulness for day-to-day operations. When seeking consent, officers should make every effort to ascertain the person's authority to consent and should be able to articulate why they had this belief when documenting said consent. |
| 41 | **Consent: Authority**<br><br>**Examples with responses**: Do the following people have authority to give consent to search:<br><br>**<u>Bullet one/two</u>:**<br><br>Yes, those with joint possession, may give consent to search common areas. *See, e.g., Fernandez v. California*, 571 U.S. 292 (2014), and *Stein v. United States,* 166 F.2d 851 (9th Cir. 1948) *cert. denied* 334 U.S. 844 (1948).<br><br>**<u>Case Summary</u>:** *Stein v. United States*, 166 F.2d 851 (9th Cir. 1948), *cert denied* 334 U.S. 844 (1948). BUT if both present one may withdraw or decline consent. Fred Stein ("Stein") and his wife Margaret Brander ("Brander") resided together until they had a fight regarding his use of opium. He then left to live at his mother's home taking his wife's clothes, locking the house and retaining the keys. Later, Brander found eight tins of opium in the garage and buried them in the yard before going to live with a friend who formerly was a deputy sheriff and police officer. Later, Brander went to her former home with federal narcotic agents, broke in and allowed them to search the home. Brander found a bottle containing yen shee (residue formed in the bowl of an opium pipe by smoking) which she gave to the agents. The consent issue related to this bottle containing yen shee, which Stein alleged was obtained by an illegal search. As a co-owner and co-occupant Brander had the same possession and occupancy rights as Stein (a fact he admitted at trial) and she freely and voluntarily invited the agents in to search. Accordingly, the Court held that because "the original entry and search [were] authorized, evidence discovered during the search was properly seized and its admission into evidence was proper."<br><br>**<u>Case summary</u>:** *Georgia v. Randolph*, 547 U.S. 103, 122-23 (2006), if permission to enter is "disputed" among co-occupants of a residence at the time an officer enters, the consent to enter is not valid. If consent is granted by one occupant at the door and another occupant is encountered inside, the second occupant can withdraw consent (*e.g.,* by yelling "get out!"). The officer must cease the search at that point. Anything discovered prior to the revocation of consent (or in plain view at the time of revocation) |

| | |
|---|---|
| | will not be suppressed, but the search cannot continue. However, if the removal of the objecting tenant is lawful, *i.e.*, there are reasonable grounds for removing the objecting tenant from the scene, or probable cause to arrest the objecting tenant, such lawful removal of the objector from the scene does not, alone, invalidate the remaining tenant's consent.<br><br>**Case summary**: *Bonivert v. City of Clarkston*, 883 F.3d 865 (9th Cir. 2018). This case is helpful in demonstrating what is *not* a valid example of consent (joint tenant's consent is invalid when a fellow tenant has locked himself in the house and refuses to let the police inside). Whereas *Georgia v. Randolph* considered disagreeing co-tenants in the context of a warrantless *search* of a home, the principle that a present and objecting co-tenant invalidate another co-tenant's consent was extended to a warrantless *entry* in *Bonivert*. In *Bonivert*, police officers responded to a domestic violence call where the adult female co-tenant and child had safely removed themselves from the home and advised officers that there were no weapons in the home and that the suspect co-tenant did not pose a danger to himself. The suspect refused to respond to the officers' requests to come to the door and engage in conversation, locked the back door of the home, and tried shutting the door when officers began to breach the home. The Ninth Circuit found that the suspect co-tenant's conduct amounted to "express refusal" of consent within the meaning of *Randolph* and determined that the officers' warrantless entry was no longer justified under the consent exception.<br><br>Note, the emergency aid exception did not apply since there was no evidence the person in the home was a danger to himself or others; and there was no evidence of exigency in that there was no evidence a crime was being committed or that police entry was necessary to prevent destruction of evidence or escape of a criminal.<br><br>The *Bonivert* case is chock full of issues, including qualified immunity for alleged use of excessive force: "evidence established that: Bonivert remained inside the home at all times; that Bonivert did not threaten or advance toward the officers; that Bonivert posed no immediate threat to the officers; that Officer Combs threw Bonivert across the room; that Bonivert did not resist arrest; that Officer Combs deployed his taser in drive-stun mode even though Bonivert complied with his commands. Accordingly, the court concluded that if a jury believed Bonivert's version of the incident, it could reasonably find that Officer Combs used excessive force against Bonivert."<br><br>Compare that scenario in *Bonivert* with the one underlying *United States v. Morales*, 893 F.3d 1360 (11th Cir. 2018). In *Morales*, officers were investigating an individual believed to be selling drugs out of his house. When officers went to the suspect's house, they were greeted at the door by a female who identified herself as a co-tenant and advised that she lived with the suspect and their two young children and has access to the entire house. Officers conversed with the female co-tenant in Spanish, advised her of her right to refuse consent twice, and had her sign an English-language consent-to-search form after explaining it to her in Spanish. During the duration of this encounter with the female at the door, the male suspect stood outside the house conversing with other individuals. The Eleventh Circuit found that the female co-tenant's consent was voluntary under these |

circumstances and determined that officers did not have a duty to obtain the consent of another present co-tenant who does nothing to express his or her objection to a co-tenant's consent to the entry or search of the home.

**Case summary:** *Fernandez v. California*, 571 U.S. 292, 302-03 (2014). Police could conduct a warrantless search of defendant's apartment following defendant's arrest based on consent to the search by a woman who also occupied the apartment. Defendant had objected to the search prior to his arrest and was absent at the time of the woman's consent because of his arrest. Here, the police had reasonable grounds for removing defendant from the apartment so that they could speak with the woman (an apparent victim of domestic violence) outside of defendant's potentially intimidating presence, and had probable cause to place defendant under arrest for robbery. "[A]n occupant who is absent due to a lawful detention or arrest stands in the same shoes as an occupant who is absent for any other reason." *Id.* at 303.

**Note:** Police may not remove the objecting co-tenant from the scene solely to overcome the objection to their entry into the home; they must have lawful authority to do so. *Id.*

**Bullet three:** If the landlord does not live there, the landlord may not give officers consent to enter. *United States v. Chapman*, 365 U.S. 610, 616-17 (1961).

**Case Summary:** Acting without a warrant but with the consent of Elmer Chapman's ("Chapman") landlord, Georgia law enforcement officers entered the house he was renting through an unlocked window and found a distillery and 1,300 pounds of mash. Chapman was indicted for liquor law violations and promptly moved for an order suppressing the use of the seized items at trial, as being obtained by an unlawful search and seizure. The landlord claimed common law rights to enter the premises but the court found no authority to support entry absent an express covenant permitting it. The Court held that the search was unlawful and further stated that allowing landlords to consent to searches of tenants' premises without a warrant would reduce the Fourth Amendment to a nullity and leave tenants' homes secure only in the discretion of landlords.

**Bullet four:** Employer may not consent to search employee housing. *Illinois Migrant Council v. Pilliod*, 540 F.2d 1062 (7th Cir. 1976) *on reh'g*, 548 F.2d 715 (7th Cir. 1977).

**Case Summary:** Class action lawsuit brought on behalf of Mexican nationals and others against the former Immigration and Naturalization Service (INS), seeking injunctive relief to stop a pattern and practice of harassment ("including illegal searches, seizures, arrests, interrogations, detentions, and mass raids"). Several searches and interrogations took place at early morning hours on Del Monte Food Company property where workers resided. With regard to the workplace searches, the court stated, "the warrantless entry of living quarters by law enforcement personnel is of course prohibited by the Fourth Amendment in the absence of reasonableness or probable cause" and that Del Monte "officials could not validly consent to the search of the employees' rooms." *Id.* at 1069

| | |
|---|---|
| | (*citing Stoner v. California,* 376 U.S. 483, 484 (1964)). The court upheld the class certification and preliminary injunction which prevents the INS from, among other things, conducting workplace searches of living quarters and street stops without a warrant or probable cause.<br><br>**<u>Bullets five and six</u>:** If the person is not a tenant/resident, they may not consent.<br><br>**Vehicle Examples**<br><br>**<u>Bullet one</u>:** Yes, the driver of a vehicle is either the owner of the vehicle who has actual authority to grant consent, or the driver was granted control over the vehicle by the owner which carries with it the actual authority to grant consent to search.<br><br>**<u>Bullet two</u>:** No, unless the passenger is also the owner of the vehicle.<br><br>The person registered as the car's renter can consent even if he or she is a passenger.<br><br>**<u>Case Summary</u>:** *United States v. Davis*, 636 F.3d 1281, 1292 (10th Cir. 2011). Kansas troopers stopped a rental car driven by Myron Wynn. Davis and another individual were passengers, and the rental agreement was in Davis's name. After officers noted discrepancies in travel plans, excessive nervousness, and Davis's prior criminal conviction for cocaine trafficking, they requested consent to search. Wynn denied the request, and Davis also declined to consent, but later changed his mind and agreed to a search. Officers found a bag containing cocaine in the vehicle and arrested all three occupants of the vehicle. The Court upheld the search as the combination of factors present showed troopers had reasonable suspicion to extend a traffic stop. Furthermore, Davis's consent was voluntary when he chose to have the trooper search the car instead of waiting for a canine unit.<br><br>"[T]he Fourth Amendment unquestionably prohibits the search of a vehicle's interior unless law enforcement officials receive consent, have a warrant, or otherwise establish probable cause to support the search." *United States v. Forbes*, 528 F.3d 1273, 1277–78 (10th Cir. 2008) (finding search of trailer without consent of the driver was not lawful, but was unrelated to independent findings of lawful canine sniff outside the cab). |
| 42 | **Consent: Authority - Scenarios:**<br><br>**<u>Bullet one</u>:** No, it appears this person is just working there for the day and has no authority to consent to enter the dwelling. **How would you resolve this situation?** By getting consent from a person who has authority.<br><br>**<u>Bullet two</u>:** Yes, but note that if the target has a locked room, she may not have authority to grant consent to its search. |



USA 035736

**EXHIBIT 2**
**127**

| | |
|---|---|
| 43 | **<u>Consent: Was it Voluntary?</u>**<br><br>**<u>General Rule</u>:** Government actors may conduct a search without a warrant or probable cause based upon an individual's voluntary consent.<br><br>**<u>Case Summary</u>:** *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). A police officer made a routine traffic stop and found Bustamonte and six other men in the vehicle. One of the passengers was the brother of the owner of the vehicle and the only person with identification. He consented to the search of the car. The officer found stolen checks under the left rear seat. The Supreme Court noted that it's the governments' burden to show consent was voluntary and held that in order to meet this burden, the totality of circumstances must be examined. *Id.* at 227. The Court considered some of the factors that have been taken into account in making a decision on voluntariness, including: the timing, *e.g., Oliva-Ramos v. Attorney General*, 694 F.3d 259, 281 (3d Cir. 2012) (in addressing the issue of whether ICE officers' conduct was egregious and widespread, the Third Circuit considered the fact that ICE fugitive operations officers took the noncitizen into custody "in the course of a pre-dawn raid. Such raids of homes have traditionally been viewed with particular opprobrium …."); youth of the accused, *e.g.*, *Haley v. Ohio*, 332 U.S. 596, 603, 613 (1948); his lack of education, *e.g.*, *Payne v. Arkansas*, 356 U.S. 560, 562 (1958); or his low intelligence, *e.g.*, *Fikes v. Alabama*, 352 U.S. 191,196-97 (1957); the lack of any advice to the accused of his constitutional rights, *e.g.*, *Davis v. North Carolina*, 384 U.S. 737, 739, 740-41, 753-54 (1966); the length of detention, *e.g.*, *Chambers v. Florida*, 309 U.S. 227, 239-240 (1940); the repeated and prolonged nature of the questioning, *e.g.*, *Ashcraft v. Tennessee,* 322 U.S. 143, 153 n.8, 161 (1944); and the use of physical punishment such as the deprivation of food or sleep, *e.g.*, *Reck v. Pate,* 367 U.S. 433, 439, 441-44, 452 (1961). The Court rejected the idea that subjects have to be advised of their right of refusal but it can be a factor to be considered in the analysis. *Schneckloth* at 232-34. No one factor is dispositive in the analysis. *Id*. at 226.<br><br>**<u>Note</u>:** With regard to minors, ERO policy is that the individual must appear to be at least 18. <u>ERO Fugitive Operations Handbook, Part 3, pages 16-17 "Consent."</u><br><br>**<u>Note</u>:** Officers should familiarize themselves with the <u>ERO Language Access Plan</u> updated on January 17, 2017. Many of its directives affect what the officers do in the event they encounter an individual who does not speak English. One example is the prohibition on using third parties present as interpreters.<br><br>**<u>Government's burden to prove consent is voluntary</u>:** When seeking to admit evidence obtained as a result of a consent search, "the government … bears the burden of proving by a preponderance of the evidence that the consent was voluntary." *United States v. Snype*, 441 F.3d 119, 131 (2d Cir. 2006) (finding voluntary consent even after law enforcement made an unlawful forceful entry into an apartment where the apartment dweller was aware she did not have to consent, enough time had elapsed that circumstances were calmer and her free movement had been restored). Consent is involuntary when obtained by false claim of authority. *See Bumper v. North Carolina*, |

| | |
|---|---|
| | 391 U.S. 543, 550 (1968) (False claim by officer that he had a warrant to search an elderly woman's home made consent involuntary).<br><br>**Do not claim to have a warrant when you do not!**<br><br>**<u>The person must consent, not simply acquiesce</u>:** "A person's obedience to a show of authority is by itself insufficient to establish voluntary consent." *United States v. Chan-Jimenez*, 125 F.3d 1324, 1328 (9th Cir. 1997) (finding no voluntariness where policeman was wearing plain clothes, had seized the subject by taking his documents and had his hand on his revolver during his interaction with the subject. The subject did not state he consented but pulled tarp back from pickup truck bed). |
| 44 | **<u>Consent: Was it Voluntary?</u>**<br><br>**Scenario:**<br><br>NONE OF THE SCENARIOS LOOK GOOD – Remember it's our burden so think like the target.<br><br>The first example was about "implied consent" where the target shows via gestures that they consented, but this is not permitted in some circuits and presents problems for immigration enforcement where cultural barriers may lead to misunderstanding. Always rely on express consent.<br><br>The person in the second example may have felt compelled to answer the door and may have been confused or thought there was an emergency.<br><br>The third example shows someone who may have had significant language problems and could not provide effective consent as a result. |
| 45 | **<u>Consent: Ruses</u>**<br><br>Law enforcement use of ruses is permitted within certain limits but can affect the consent analysis. *See United States v. Hardin*, 539 F.3d 404, 425 (6th Cir. 2008) ("As a general proposition . . . a ruse or officers' undercover activity does not usually violate individuals' rights [.]"); *see also, United States v. Montes-Reyes*, 547 F. Supp. 2d 281, 290 (S.D.N.Y. 2008) ("In sum, the case law demonstrates that a deceptive law enforcement tactic . . . does not itself require or preclude a finding of consent.").<br><br>**<u>General Rule</u>:** Consent gained through a *coercive* ruse is not consent.<br><br>The key point to remember when using a ruse to gain entry to a home is that Fourth Amendment protections are at their apex in the home. *See, e.g., Payton v. New York*, 445 U.S. 573 (1980) (finding that Fourth Amendment prohibits police from making warrantless and nonconsensual entry into suspect's home in order to make routine felony-arrest). Since warrantless arrests are *per se* unreasonable under the Fourth Amendment, |

officers are best advised to at least have probable cause to support an arrest following a warrantless entry in order to withstand a motion to suppress and any resulting liability under *Bivens* should the entry/search later be deemed invalid. *See*, *e.g.*, *United States v. Watzman*, 486 F. 3d 1004, 1007-08 (7th Cir. 2007) (court upheld evidence in ICE child pornography case where search warrant was supported by probable cause independent of tainted evidence from a prior invalid search based on a ruse).

**Examples of Coercive Ruses:**

Stating a gas leak was reported; indicating officers saw someone enter the home through an open window; claiming someone inside the home is having a medical emergency.

**Case law finding ruse coercive:**

Elderly and ill target on fixed income was told by agents that he had been a victim of identity theft and they needed to look at his computer. *United States v. Parson*, 599 F.Supp.2d 592 (W.D. Pa. 2009).

**Case Summary:** Defendant Greg Parson ("Parson") was indicted on child pornography charges based on a forensic examination of his personal computer. Parson is a 65 year-old man who lives in a small trailer on his brother's property. He was hard of hearing and could not see well because of cataracts. His income consisted of $725 per month in social security benefits and part time work as a repairman at his brother's used car lot. ICE agent James Stitzel ("Stitzel") identified Parson as a potential user of an illegal child pornography website based on information he received from the National Center for Missing and Exploited Children and his follow up investigation. To further the investigation, Stitzel and two other law enforcement officers went to Parson's residence to conduct a "knock and talk." Upon arrival, Stitzel stated that "there was a chance [Parson] could be a victim of identity theft" and asked if he could come in to discuss the situation. *Id.* at 597-98. Parson allowed the three officers into his home and later testified that he was in shock and that he "thought they were there to help [him]…" The agents asked to look at Parson's computer and continued to ask Parson's about his credit cards and whether he had experienced any problems. While they were looking at his computer, the officers encountered a locked file, and Parson gave them the password. When an image of child pornography was seen, Parson asked whether he could be arrested for having it and the officers said they weren't looking for that type of thing. Ultimately, the officers requested permission to take the computer to conduct a further inspection. Parson testified that he actually began to think that the officers were criminals trying to steal his computer but he signed a blanket consent form permitting the seizure and search. After the officers left, Parson went to the bank to attempt to protect his assets by changing his account numbers and stopping his credit cards. A forensic inspection of the computer revealed approximately 13,000 images and 128 videos of suspected child pornography. The primary issue was whether Parson's consent was involuntary due to the officer's misrepresentations. The Court concluded that the identity theft ruse used by the agents "on the doorstep was deceptive and deliberately misleading" and "the visit became problematic from a Fourth Amendment perspective the moment

that the agents misled Parson into believing that he was a victim of identity theft." *Id.* at 604. The Court also pointed out that the agent's "lies and trickery in this matter violated widely shared social expectations" which under Supreme Court precedent is to be given great significance in Fourth Amendment cases. *Id.* at 605. The court concluded that "in this matter, the agents' conduct fell far afield the realm of reasonable, and thus the computer files and related evidence, including Parson's statements, obtained from this illegal entry, search and seizure must be suppressed." *Id.* at 612.

Officers conducting a drug investigation knocked on defendant's hotel room door and said they were looking for an abducted girl. *United States v. Montes-Reyes*, 547 F.Supp.2d 281, 291-93 (S.D.N.Y. 2008) (holding that this "extreme" misrepresentation of investigatory purpose deprived the person of ability to make fair assessment of the need to surrender privacy).

**Case Summary:** Leonardo Montes-Reyes ("Montes") was arrested for drug possession after law enforcement officers used a ruse to gain his consent to search his hotel room. Officers conducting a drug investigation knocked on Montes' hotel room door and said they were looking for an abducted girl. After showing Montes a flier from the National Center for Missing and Exploited Children that contained a picture of a four-year-old girl and her alleged abductor, the officers asked if they could enter the room to check for the missing girl. Montes consented not knowing that the real intent of the officers was to search Montes' room for drugs. Five officers entered the small room and conducted a brief search. Montes was then asked if he had any guns on him and consented to a search of the room for guns and signed a consent form affirming his consent. The officers found a black bag on the floor asked for permission to search it for guns, which Montes' granted. The bag contained heroin and Montes was arrested. The main issue was whether the consent given in response to the officer's deception ruse was voluntary under the totality of the circumstances. The Court held that the consent was not voluntary because the ruse created a false sense of exigent circumstances that deprived Montes of his ability to make a fair assessment of the need to surrender his privacy. The additional consents by Montes did not provide an independent basis for the admission of the evidence because the taint of the initial entry had not dissipated. *See Kaupp v. Texas*, 538 U.S. 626, 633 (2003) (finding the taint of the original Fourth Amendment violation was not dissipated by *Miranda* warnings when there was no meaningful temporal break and circumstances remained coercive).

**General Rule:** Government's Burden to Prove Consent is Voluntary

When seeking to admit evidence obtained as a result of a consent search, "the government … bears the burden of proving by a preponderance of the evidence that the consent was voluntary." *United States v. Snype*, 441 F.3d 119, 131 (2d Cir. 2006); *see generally Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971); *United States v. Oliver*, 686 F.2d 356, 371 (6th Cir. 1982) ("[T]he burden rests on the Government to establish that a warrantless search was conducted within the narrow confines of an established exception to the Fourth Amendment ['s warrant requirement].").

| | |
|---|---|
| | **<u>General Rule</u>:** Consent involuntary when obtained by false claim of authority. *See Bumper v. North Carolina*, 391 U.S. 543, 550 (1968) (False claim by officer that he had a warrant to search an elderly woman's home made consent involuntary.)<br><br>**<u>General Rule</u>:** Consent involuntary when obtained by falsely claiming or creating an apprehension of exigent circumstances. *See United States v. Giraldo*, 743 F. Supp. 152, 153-54 (E.D.N.Y. 1990) (Consent was involuntary when the defendant was led to believe that there was a life-threatening emergency by agents disguised as gas workers who asked for permission to enter the premises to check for a gas leak).<br><br>On the other hand, a ruse misrepresenting the true purpose of the law enforcement officer's visit and capitalizing on suspect's desire to assist law enforcement has been upheld where the officials did not create a false sense of exigent circumstances that deprived the suspect of his ability to assess the need to surrender his privacy. *See United States v. Monzon-Luna*, 2013 WL 6175818 at *5 (E.D.N.Y. 2013). In *Monzon-Luna*, HSI agents trying to locate a female minor victim of sex trafficking gained entry into an apartment building by telling a woman headed into the building that they are "police," looking for an individual who stole a cell phone who they believed was hiding behind the building. *Id.* *1. The HSI agents claimed they needed entry to the building roof to check, and asked for her permission to accompany her into the building. *Id.* Once inside the building, the agents followed the woman to her apartment, asked if the apartment was hers, and if so, for her permission to enter. *Id.* The female responded that it is her apartment, and let them inside. *Id.* Once in the apartment, the female explained that in order to view the rear of the building, they needed to enter the room she was renting to a male who was staying in it with a female from Mexico, and that they needed the male's permission to enter. *Id.*<br><br>Monzon-Luna responded to knocks on the door to the rented room. *Id.* *2. The agents repeated their cover story about looking for an individual who stole a cell phone, and asked to have a look out of Monzon-Luna's rear window to see if the individual was hiding behind the building. *Id.* Monzon-Luna consented, and was very cooperative throughout. *Id.* When asked for ID so that the "police" could include it in a report for their supervisor, Monzon-Luna provided an ID bearing a name different from the name he gave the agents earlier. *Id.* Confronted with the discrepancy in names, Monzon-Luna admitted he was in the United States illegally. *Id.* After observing additional evidence tying Monzon-Luna to the sex trafficking offense they were investigating, the agents identified themselves as Homeland Security agents and again asked whether he was in the country illegally. *Id.* *3.<br><br>Monzon-Luna admitted that he was present in the United States in violation of the law, and he was then arrested for the administrative violation. *Id.* Later, after waiving his *Miranda* rights, Monzon-Luna made incriminating statements. *Id.* At trial, Monzon-Luna moved to suppress statements made inside his residence, subsequent post-arrest statements, and evidence recovered from the residence. *Id.* *4. Monzon-Luna argued that the initial entry into his residence, obtained by ruse, violated his 4th Amendment rights, requiring suppression of all evidence recovered. *Id.* |

The District Court denied the suppression motion, holding that although the ruse misrepresented the true purpose of the agents' visit and capitalized on Monzon-Luna's desire to assist law enforcement, it did not create a false sense of exigent circumstances that deprived the defendant of his ability to assess the need to surrender his privacy. *Id.* The ruse employed here (investigating a stolen cell phone) was innocuous and wholly distinguishable from a search for a missing child (*Montes-Reyes*) or an imminent gas explosion (*Giraldo*). *Id.* *4.

In *United States v. Rose*, 2014 WL 4109619 (W.D. Ky. 2014), state troopers conducting a drug investigation gained consent to enter a home by claiming they were looking for an individual with an outstanding arrest warrant for failure to pay child support. The troopers checked the suspects' identification by explaining that they wanted to ensure they were who they claimed to be. The District Court upheld the ruses because the troopers "did not create a sense of exigent circumstances, urgency, or compulsion to gain [ ] consent to enter the home or accompany [a suspect] as he moved from room to room [citing *Monzon-Luna*]," and "[a] search for an individual wanted for child support is distinguishable from a search for a missing child, a kidnapping victim, a water leak, or a gas leak (internal citation omitted)." *Id.* *4.

Contrast *Monzon-Luna* and *Rose* with *United States v. Hernandez-Juarez*, SA-09-CR-19-XR, 2009 WL 693172, at *1 (W.D. Tex. Mar. 16, 2009) (unreported decision), full summary in the notes for Slide 47. Part of the search consent analysis included the fact that ICE agents used a ruse to get the property owner to consent, namely, a photo of a different individual than the target who was her son, and she spoke very little English. The Court found consent was not voluntary in light of all the circumstances.

**<u>Bottom line</u>:** *Monzon-Luna*, *Rose*, and *Hernandez-Juarez*, are all unreported District Court decisions. As such, they have no precedential value. Their value is in pointing out the inconsistent approaches by courts to law enforcement use of ruses in order to gain consent to enter/search. In the Eastern District of New York, a ruse misrepresenting officer's purpose for seeking entry was held permissible as long as the ruse does not make the resident believe that s/he has no option other than to consent. In the Western District of Texas, the same type of ruse was found to vitiate voluntariness of the consent. Note, there were other evidence in *Hernandez-Juarez* that seem to have affected the Texas District Court's ruling, *e.g.*, "the ICE agents entered [ ] a home, [ ] with only a hunch that the person they were looking for would be inside. The ICE agents used a ruse upon a non-English speaking noncitizen to obtain entry. [ ] The questioning of a female American citizen with a nursing infant indicates that the agents used their fraudulent entry for the purposes of a general roundup once they realized that [the target] was not in the premises." *Id.* *4.

Attorneys should check regularly for updates in ruse caselaw specific to their jurisdiction.

**<u>Conducting a "knock and talk" with another LEA</u>:** Some courts have held that a search may violate the Fourth Amendment if the government misrepresents the purpose

of its search or investigation when obtaining consent. This could happen in two ways, impersonating another government entity or failing to obtain additional consent if accompanying another government agent who is also searching the residence but for a different purpose. *See*, *e.g.*, *United States v. Bosse*, 898 F.2d 113, 115 (9th Cir. 1990) ("Special limitations apply when a government agent obtains entry by misrepresenting the scope, nature, or purpose of a government investigation. '[A]ccess gained by a government agent, known to be such by the person with whom the agent is dealing, violates the fourth amendment's bar against unreasonable searches and seizures if such entry was acquired by affirmative or deliberate misrepresentation of the nature of the government's investigation'") *citing United States v. Little*, 753 F.2d 1420, 1438 (9th Cir. 1984); *see also*, *United States v. Watzman*, 486 F.3d 1004, 1007 (7th Cir. 2007) (holding that a resident's consent to allow police officers to enter did not apply to ICE officers who were accompanying the police as part of a child pornography investigation when the officers failed to obtain separate consent to enter for that purpose). For that reason, we advise that officers check with their respective OPLA field office to ensure that any planned impersonation of another government or private entity is permissible in your specific jurisdiction.

**Additional issues:**

Third-party "actors" are deemed to be agents of the government and therefore cannot be used to get around Fourth Amendment requirements. *See, e.g., United States v. Hardin*, 539 F.3d 404, 407-08, 417-20, 424-25 (6th Cir. 2008) (apartment manager acting on police officer instructions entered an apartment stating there was a leak, Court found he was acting as an agent of the government, consent was not found to be valid under the circumstances where manager entered without asking and it appeared tenants had no option to decline).

Do not use bank accounts or spending money as part of a ruse.

Do not promise any immigration benefit as part of a ruse.

Please verify other limitations on ruses found on ERO Policy Memoranda issued by John P. Torres dated Aug 15, 2005, "Addition to Section 5, Chapter 19 (Field Operations and Tactics) of the Detention and Deportation Officer's Manual (DDFM) – Use of Ruses During Arrest Operations;" March 6, 2006: "Use of Ruses in Enforcement Operations," and August 22, 2006: "Use of Ruses in ICE Enforcement Operations."

**Case summary:** *Lawal v. McDonald,* No. 12-CV-3599-CDJ, 2015 WL 1137624, at *1-2, *7 (E.D. Pa. March 13, 2015). ICE officers devised a ruse whereby letters were sent to target cab drivers asking them to go to a parking facility at a certain date and time to get a parking fee refund. The ICE officers issued the letter to cab drivers whose immigration status could not be verified. On the day of the operation, it was discovered that a few of the drivers were actually U.S. citizens, but they were held in custody while the operation was ongoing in order to prevent other targets who had not yet arrived at the scene from being alerted. The district court found ICE officers were not entitled to qualified

| | |
|---|---|
| | immunity because they held the U.S. citizen targets without lawful authority after their status was discovered, thus violating their constitutional rights. **CAVEAT:** ICE officers should ensure that a ruse does not target U.S. citizens. In the event U.S. citizens are encountered as a result of a ruse, they should be immediately released.<br><br>**CAVEAT:** Officers should be cautioned to consult with local OPLA before employing a ruse to ensure the ruse is proper under the Fourth Amendment as interpreted in the jurisdiction's case law. |
| 46 | **Consent: Ruses**<br><br>None. |
| 47 | **Consent: Ruses**<br><br>**Scenarios:**<br><br>1. No, because you implied there was an emergency, this is coercive.<br>2. No, because you implied there was imminent danger, this is coercive.<br>3. This is likely permissible but note the characteristics of the person providing consent.<br>4. Likely not permissible.<br>5. This is likely permissible. |
| 48 | **Consent: Timing and Positioning Matter**<br><br>"When an individual consents to a search after an illegal entry is made, consent is not valid and 'suppression is required of any items seized during the search . . . , unless the taint of the initial entry has been dissipated before the 'consents' to search were given.'" *United States v. Chambers*, 395 F.3d 563, 569 (6th Cir. 2005) (finding no valid consent where an illegal search had taken place a few minutes prior and subjects felt coerced due to presence of law enforcement), *abrogated on other grounds*; *see also United States v. Hotal*, 143 F.3d 1223, 1228 (9th Cir. 1998) ("Consent to search that is given after an illegal entry is tainted and invalid under the Fourth Amendment").<br><br>*Payton v. New York*, 445 U.S. 573, 589-90 (1980) (the Fourth Amendment's protection against in-home warrantless arrests begins at the "firm line" of the home's threshold)<br><br>*United States v. Hernandez-Juarez*, SA-09-CR-19-XR, 2009 WL 693172, at *1 (W.D. Tex. Mar. 16, 2009) (unreported decision): The court found that consent was not given voluntarily when a resident testified that an "ICE agent already had crossed the threshold of her front door when she said 'well, you're already inside, go in and check.'" ICE officers had also used a ruse to get her to cooperate, a photo of a different individual than the target who was her son, and she spoke very little English. |

| | |
|---|---|
| | **<u>Note</u>:** Be careful with sticking a foot in a door to keep it open, stepping across a threshold to continue a conversation, or accepting an equivocal consent statement such as "you're already inside, so go ahead."<br><br>**Scenario:** Yes, you went into the home prior to obtaining consent. All of your limbs must remain outside the door until consent is given. |
| 49 | **<u>Consent: Best Practices</u>**<br><br>**Express v. Implied Consent**<br><br>Best practices are based on the fact that express consent is desired. "Although consent can be inferred from nonverbal actions, the Government must show that consent was "unequivocal and specific" and "freely and intelligently given." *United States v. Chan-Jimenez*, 125 F.3d 1324, 1328 (9th Cir. 1997).<br><br>Officers should be cautioned from relying on implied consent (or consent by silence).<br><br>**The case law from the circuits is mixed.**<br><br>Your memory of what happened on a particular operation will fade by the time the removal hearing begins or by the time your testimony is needed in a civil lawsuit. If you don't have written documentation of how and from whom you obtained consent, you – and the agency – will have a difficult time establishing that the entry and search were consensual. As a result, the Immigration Judge could terminate removal proceedings and the defense of a civil suit will become much more difficult. So, make accurate notes in the field and then as soon as possible document the consent on the Form I-213 and in the consent portion of the FOW.<br><br>**<u>Example</u>:** *Oliva-Ramos v. Attorney General*, 694 F.3d 259 (3d Cir. 2012).<br>Mr. Oliva-Ramos was taken into ICE custody on March 26, 2007, by Fugitive Operations Officers. The removal hearing did not take place until April 23, 2008. The sole ICE witness, the arresting and interviewing ICE officer, testified that having taken part in "hundreds of home raids since [ ] March 26, 2007, [the officer] did not have independent recollection of the raid that led to Oliva-Ramos's detention. [The officer] stated that she "did not remember anything about the apprehension." *Id.* at 264-65, 268 n.13. Although the Form I-213 indicated that consent to enter the residence was obtained from Clara Oliva, Mr. Oliva-Ramos submitted an affidavit from Clara Oliva disputing whether there was valid consent. The fact that the designated arresting officer, the government's sole witness, could not recall the circumstances of the consent was among the basis for the Third Circuit ruling that the Immigration Judge erred in not ruling on Mr. Oliva-Ramos's request to subpoena other members of the fugitive operations team involved in his apprehension to testify at the suppression hearing. The *Oliva-Ramos* case demonstrates why it is so important to take detailed notes pertaining to circumstances of consent, not just the name of the consent-giver, such that the notes would help to refresh the officer's recollection months or years after the apprehension. |

| | |
|---|---|
| | The Ninth Circuit rejected the notion of implied consent, noting that "coercion is implicit in situations where consent is obtained under the color of the badge." *United States v. Shaibu*, 920 F.2d 1423, 1427 (9th Cir. 1990). Thus, no valid consent was found where defendant failed to object to officers entering an apartment's open door while they followed him in. *Id.* at 1427. The Court of Appeals for the Eleventh Circuit, in *United States v Gonzalez*, agreed with the Ninth Circuit by noting its "hesitancy to find implied consent (*i.e.*, consent by silence) in the Fourth Amendment context. *United States v Gonzalez*, 71 F.3d 819, 829-30 (11th Cir. 1996), *abrogated on other grounds*. The Circuit upheld the District Court's finding of consent based on other factors present in the case, but the agent's initial entry into the home was found to be illegal when the agent followed the owner in without getting explicit permission to do so. *Id.* at 829-32.<br><br>However, in another circuit, implied consent (consent by silence) was found to be valid, where defendant did not respond to police knocking on door and request for entry, even though door was locked. Care should be taken when relying on implied consent, as the analysis involved the totality of the circumstances and here, the bathroom was a common area of a building, and the landlord who owned the property had given permission, so the Court did a common authority analysis, moreover, the Court also found that exigent circumstances would have justified the search. *See United States v Esparza*, 162 F.3d 978, 980 (8th Cir. 1998). In practice, implied consent should not be relied upon and, when looking at consent cases, there's a clear preference for affirmative consent.<br>In cases where **silence was coupled with some kind of body movement** or language, the cases are equally as mixed.<br><br>In the Sixth Circuit, the Court found a valid consent given where a defendant simply stepped aside to let police officers inside his hotel room. *See United States v. Carter*, 378 F.3d 584, 588 (6th Cir. 2004).<br><br>However, in similar cases **stepping aside was found not be a valid consent**. *See United States v. Poe*, 462 F.3d 997, 998-1000 (8th Cir. 2006) (consent to enter residence not implied where defendant opened door and stepped back into house because he was responding to 10 minutes of knocking and commands to open the door); *United States v. Albrektsen*, 151 F.3d 951, 955 (9th Cir. 1998) (consent not implied because defendant moved aside to allow officers enter hotel room only to avoid being knocked down by officers).<br><br>The point is that implied consent poses a problem not only because of the mixed views from the circuits but also because silence or body movement could mean different things. A person stepping back from the door may be allowing another person coming down the hall to step into the doorway and speak to the officers, or he may be stepping back so he is not within reach of the officers. Head nodding could be a resident's way of saying that he is listening, or it could be done subconsciously while he is translating an officer's English into his native language in his head. |

| | |
|---|---|
| | It is important to remember the burden will be on the government to prove the lawfulness of a warrantless search or seizure.<br><br>**<u>Best practice</u>:** If the resident is giving permission to enter, clarifying this intent by asking "does that mean yes, we may come in" may change the person's consent but will clarify that consent is being given. |
| 50 | **<u>Consent: Scope and Withdrawal</u>**<br><br>Generally, the scope of the search must not exceed the scope of the consent.<br><br>**<u>Bullet two</u>:** Consent to enter a home in and of itself will not support a search of the home. *See United States v. Gandia*, 424 F.3d 255, 265 (2d Cir. 2005) (remand was required to determine whether defendant, by not objecting when officers moved on to another part of his home, consented to a warrantless search of his home. The officers obtained Gandia's consent to enter the home to speak to him, but never explicitly asked for permission to search the home and were not explicitly granted such permission).<br><br>**<u>Bullet three</u>:** Generally, officers must honor a withdrawal of consent or narrowing of consent. *Manzanares v. Higdon*, 575 F.3d 1135 (10th Cir. 2009). As an exception to the warrant requirement for a search and seizure, the scope of a consensual encounter is controlled by the consenting person. *Id.* at 1146-47, citing *Florida v. Jimeno*, 500 U.S. 248, 251 (2002). If a person effectively withdraws consent before the search is complete, an officer may not continue searching based on prior consent. *Manzanares*, at 1147. In *Manzanares*, a former detainee filed a § 1983 suit against Officer Higdon, claiming violations of Fourth Amendment arising from, among other things, his initial in-home detention. The Tenth Circuit Court of Appeals framed the issue thus: "We are asked to decide whether law enforcement officers may remain in a home absent probable cause when consent to enter is granted but later revoked." *Id.* at 1140. The court concluded that when Manzanares asked the officers to leave, the consensual encounter ended, he was "seized," and Officer Higdon's continued presence was permitted only if it comported with the Fourth Amendment. *Id.* at 1143. The police violated homeowner's "clearly established constitutional rights by remaining in his home after consent was withdrawn [even though there was no probable cause to arrest Manzanares]." *Id.* at 1147. The officer was not protected by qualified immunity from Fourth Amendment claim for the in-home detention when there was no probable cause to seize Manzanares. *Id.* at 1147; *see also Gates v. Texas Dept. of Protective and Regulatory Services*, 537 F.3d 404, 426 (5th Cir. 2008) ("[C]onsent which waives Fourth Amendment rights may be limited, qualified, or withdrawn"); *Painter v. Robertson*, 185 F.3d 557, 567 (6th Cir. 1999) ("[T]he consenting party may limit the scope of that search, and hence at any moment may retract his consent").<br><br>**<u>Bullet four</u>:** Withdrawal of consent must be clearly expressed by action or words, not simply an expression of impatience. *See United States v. Ross*, 263 F.3d 844 (8th Cir. 2001) (mere expression of impatience did not amount to revocation of consent); *see also United States v. Martel-Martines*, 988 F.2d 855, 858 (8th Cir. 1993) (consent not |

| | |
|---|---|
| | withdrawn because defendant failed to object to continued search of car; defendant's "passive conduct" was not unequivocal act or statement of withdrawal required to withdraw consent); *but see United States v. Fuentes*, 105 F.3d 487, 489 (9th Cir. 1997) (consent withdrawn because suspect shouted "no wait" as officer reached in to grab object in his pants pocket, and tried to push one officer away and pull his arm free from second officer but search was upheld because at that point there was sufficient probable cause); *United States v. Ho*, 94 F.3d 932, 935-36 (5th Cir. 1996) (consent withdrawn when individual pulled portfolio away from officer, officer struggled for portfolio after consent withdrawn but Court found there was no probable cause at that point so conviction was vacated).<br><br>**Bullet five:** However, consent cannot be withdrawn once evidence of a crime has been discovered, thereby permitting a plain view seizure of evidence of a crime, provided officers have lawful access to the items at the time of withdrawal. *See, e.g., United States v. Jachimko*, 19 F.3d 296, 299 (7th Cir. 1994) ("Where a suspect does not withdraw his valid consent to a search for illegal substances *before* they are discovered, the consent remains valid and the substances are admissible as evidence"), *citing United States v. Dyer*, 784 F.2d 812, 816 (7th Cir. 1986). Also, where the manner of withdrawal is, in itself, so suspicious as to trigger sufficient cause to search, the revocation may not be upheld. *See, e.g., United States v. Carter*, 985 F.2d 1095 (D.C. Cir. 1993) (suspect nervously withdrew consent as the officer pulled out a paper bag from the suspect's pack. Snatching the bag away from the officer, the suspect claimed that it only contained food. The suspect put his hand in it and withdrew it acting as though it was now empty. The court cautioned that automatically using withdrawal of consent to trigger a further intrusion would render the right to withdraw illusory, but noted that the withdrawal here was sufficiently peculiar as to justify the police calling in the drug-sniffing dog.).<br><br>Generally, evidence that establishes probable cause must be found before consent is withdrawn in order for the search to be withstand legal challenge.<br><br>**Case Summary:** *United States v. Ho*, 94 F.3d at 932. Al Doc Ho ("Ho") was stopped by narcotics officers who suspected him of drug offenses at the New Orleans Airport. Ho, a passenger on a flight from Los Angeles aroused the officers' suspicion because he walked briskly down the concourse, had no carry-on luggage, and made no attempt to claim any checked luggage. The officers approached Ho, identified themselves, and asked Ho to produce his ticket, which was one-way and purchased with cash. Ho consented to a search of his person and a small leather portfolio he was carrying. He told the officers that he planned to stay in New Orleans for two weeks. The next day, a concerned citizen advised one of the officers that Ho had purchased a one-way airline ticket back to Los Angeles, which departed that morning. As Ho's flight was boarding, he was again approached by officers and consented to a search of his person and leather portfolio. While inspecting the portfolio, the officer focused on a blank, white plastic card the size and shape of a credit card. Ho immediately struggled to retrieve the portfolio after the officer found the card. It was obvious that Ho did not want the officer to look further at the portfolio. The officer was able to retain the portfolio and upon further investigation of the white plastic card, he discovered a magnetic strip on the back. |

Confidential Subject to Protective Order

The officers then arrested Ho for possession of a counterfeit credit card. After the arrest, the officers searched the rest of the portfolio and found a similar blank credit card, seventeen counterfeit travelers' checks and several pieces of paper with what appeared to be credit card account numbers on them. The sole issue was whether the officer had probable cause to arrest Ho at the time that Ho revoked his consent. The Court found that Ho withdrew his consent when he tried to retrieve the portfolio and therefore the officer could not lawfully continue the search without probable cause to arrest Ho. Viewing the record as a whole, the Court determined that the government did not satisfy its burden of proving that a reasonable person with the officer's knowledge and experience would have had probable cause to arrest Ho when Ho revoked consent. The officer's experience was in narcotics and he suspected Ho of drug trafficking, not credit card fraud. Additionally, the officer did not find the magnetic strip indicating that the white card might be a fake credit card until after Ho withdrew consent. Based on these facts, the officer did not have probable cause to arrest Ho and therefore could not conduct a lawful search incident to his arrest.

**Bullet six:** Withdrawal of Consent – Shared Property. A difficult issue arises when officers obtain consent to enter shared premises (*e.g.*, a house where many unrelated undocumented noncitizens are living together). After obtaining consent from one resident at the door, another resident, encountered inside, withdraws consent and asks the officers to leave a common living room.

Under *Georgia v. Randolph*, 547 U.S. 103, 122-23 (2006), if permission to enter is "disputed" among co-occupants of a residence at the time an officer enters, the consent to enter is not valid. If consent is granted by one occupant at the door and another occupant is encountered inside, the second occupant can withdraw consent (*e.g.*, by yelling "get out!"). The officer must cease the search at that point. Anything discovered prior to the revocation of consent (or in plain view at the time of revocation) will not be suppressed, but the search cannot continue.

However, if the removal of the objecting tenant is lawful, *i.e.*, there are reasonable grounds for removing the objecting tenant from the scene, or probable cause to arrest the objecting tenant, such lawful removal of the objector from the scene does not, alone, invalidate the remaining tenant's consent. *See Fernandez v. California*, 571 U.S. 292, 303 (2014) (Police could conduct warrantless search of defendant's apartment following defendant's arrest based on consent to the search by a woman who also occupied the apartment. Defendant had objected to the search prior to his arrest and was absent at the time of the woman's consent because of his arrest. Here, the police had reasonable grounds for removing defendant from the apartment so that they could speak with the woman (an apparent victim of domestic violence) outside of defendant's potentially intimidating presence, and had probable cause to place defendant under arrest for robbery. "[A]n occupant who is absent due to a lawful detention or arrest stands in the same shoes as an occupant who is absent for any other reason"); *see also United States v. Witzlib*, 796 F.3d 799 (7th Cir. 2015). Subject declined search but had departed the home shared with his grandmother. She provided consent in his absence. Thus, if a person makes him or herself absent, their refusal to consent may be overcome by a co-tenant.

| | |
|---|---|
| | The effect of a co-tenant's objection or lack of objection to another resident's consent was previously addressed by comparing *Bonivert v. City of Clarkston*, 883 F.3d 865 (9th Cir. 2018) (consent was withdrawn where occupant gave consent but co-tenant subsequently expressly refused entry to the home through clear, affirmative conduct) and *United States v. Morales*, 893 F.3d 1360 (11th Cir. 2018) (consent was valid where co-tenant was present and observed as the other occupant consented to the entry and search of their home but did not say or do anything to express his objection). |
| 51 | **Consent: Scope and Withdrawal**<br><br>**Scenarios**:<br>NO, the resident can define the scope of the consent at any time.<br>YES, you must leave because he is a co-tenant.<br>YES, provided it was a lawful arrest and it was not just a means to get him out of the way.<br>YES, she has not expressed a withdrawal of consent clearly. |
| 52-53 | **Protective sweeps:** These are not automatic. "The Fourth amendment allows protective sweeps in conjunction with an in-home arrest when an officer possesses reasonable belief based on specific and articulable facts that a specific area harbors an individual posing a danger to officers on the scene." *Maryland v. Buie*, 494 U.S. 325, 336-37 (1990).<br><br>**Simply being an officer in a house is not enough to justify a protective sweep**. Must be able to articulate the reasonable belief of danger. For example, if the officers arrive at the house to arrest a fugitive noncitizen with a criminal history, there are five cars in the driveway, one person answers the door and gives the officers consent to enter, states nobody else is home, but the officers hear noises in the back room, it could be a cat that jumped from a dresser, but it could also be someone preparing to launch an attack on the officers. In this circumstance, the officers may conduct a protective sweep if they articulate a reasonable belief of danger – *i.e.*, target's criminal history, number of cars in the driveway, noise coming from room although stated nobody is in the house. *See, e.g., United States v. Garcia*, No. 13 CR 950, 2014 WL 6757949, at *4-6, n. 3 (N.D.Ill. Dec. 1, 2014) (unpublished) (protective sweep justified where, after consent entry, ICE agents saw narcotics and two individuals fleeing the apartment); *but see United States v. Keefauver*, 74 M.J. 230, 234-35 (C.A.A.F. 2015) (the presence of narcotics in and of themselves do not justify a protective sweep).<br><br>**Special Note About Children:** When officers encounter minors inside a residence, they should take special care. Officers should be sensitive to a child's potentially heightened fear. A failure to act with care is bad for ICE's public image and thus undermines its ability to carry out its mission.<br><br>**Case Summary:** *Maryland v. Buie*, 494 U.S. at 325 (1990). Two men committed armed robbery in a restaurant. One of the robbers wore a red running suit. After obtaining arrest warrants for the defendant and his suspected accomplice, the police executed the |

| | |
|---|---|
| | arrest warrant for the defendant at his house. Once inside, the officers fanned out. One of the officers found the defendant in the basement, arrested him and left the basement with the suspect. Another officer entered the basement in case there was someone else down there. While in the basement, he saw a red running suit on a stack of clothing in plain view and seized it. The red running suit was introduced into evidence against the defendant. The issue was whether the Fourth Amendment permits police officers to conduct a warrantless protective sweep of the premises when making an arrest. The court held that protective sweeps of a house in conjunction with an arrest warrant are lawful when the officers possess "a reasonable belief based on specific articulable facts that the area to be swept harbors an individual posing a danger." A protective sweep is a quick and limited search of a premise, incident to an arrest and conducted to protect the safety of the police and others; a sweep must last no longer than necessary to dispel the "reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 335-36. They are not automatically permitted and extend only to a cursory inspection of those spaces where a person may be found as justified by the circumstances.<br><br>The sweep may be only of the area(s) for which you can articulate a reasonable belief of danger. You cannot automatically sweep the entire house if the only potential source of danger is, for example, in the basement.<br><br>Following the traditional view, the Ninth and Tenth Circuits have applied the protective sweep doctrine only where entry has been made incident to an arrest, declining to extend the specific parameters of the doctrine as announced in *Buie*. *See United States v. Torres–Castro,* 470 F.3d 992, 997 (10th Cir. 2006) (noting that a "protective sweep must be performed incident to an arrest); *United States v. Reid,* 226 F.3d 1020, 1028 (9th Cir. 2000) (concluding "that the warrantless search of apartment 101" was not a protective sweep where the individual being detained by police was not under arrest, and was not justified by exigent circumstances). However, the Tenth Circuit appears to have also created an exception where exigent circumstances exist "if reasonable grounds existed to search to protect the safety of someone besides the officers." *Armijo ex rel. Armijo Sanchez v. Peterson*, 601 F.3d 1065, 1072 (10th Cir. 2010).<br><br>The First, Second, Fifth, Sixth, Seventh, Eighth, Eleventh, D.C. Circuits, and the U.S. Court of Appeals for the Armed Forces, have extended the doctrine to allow protective sweeps of living quarters in non-arrest situations. *See United States v. Rodriguez*, 834 F.3d 937 (8th Cir. 2016) (recognizing the applicability of protective sweeps in non-arrest situation upon a showing of a reasonable suspicion of dangerous individuals in the home, but emphasized that "officers may not sweep solely for weapons or contraband"); *United States v. Holland*, 522 Fed.Appx. 265, 277 (6th Cir. May 24, 2013) (surveying the circuit split and contrasting the 10th Circuit's decision in *Torres-Castro* above, against the majority circuits' position that a protective sweep is permissible as long as the officers were lawfully present (whether authorized by arrest warrant, exigent circumstances or consent) and had reasonable, articulable suspicion of danger); *United States v. Hassock*, 631 F.3d 79, 87-89 (2d Cir. 2011) (holding that although a protective sweep may be justified where officers are lawfully on the premises and have specific and articulable facts |



USA 035751

EXHIBIT 2
142

justifying a reasonable inference of danger, the officers in this case had no legitimate purpose or authority for entering the defendant's bedroom); *United States v. Miller*, 430 F.3d 93, 100 (2d Cir. 2005) ("The restriction of the protective sweep doctrine only to circumstances involving arrests would jeopardize the safety of officers in contravention of the pragmatic concept of reasonableness embodied in the Fourth Amendment."); *United States v. Martins*, 413 F.3d 139, 149-50 (1st Cir. 2005) (holding, where a boy was in need of emergency assistance and "notwithstanding the absence of a warrant, the officer's entry into the defendant's apartment was justified by exigent circumstances"); *Leaf v. Shelnutt*, 400 F.3d 1070, 1087 (7th Cir. 2005) (upholding protective sweep where exigent circumstances, suspicion of burglary, justified entry, and officers "had substantial reason to believe that their safety might have been at risk"); *United States v. Gould*, 364 F.3d 578, 590 (5th Cir. 2004) (en banc) (holding prospective sweep valid where officers admitted to a mobile home by co-occupant "for a legitimate governmental purpose," i.e., to question the defendant about threats) (abrogated on different grounds); *United States v. Taylor,* 248 F.3d 506, 513 (6th Cir. 2001) ("[T]he principle enunciated in *Buie* with regard to officers making an arrest—that the police may conduct a limited protective sweep to ensure the safety of those officers—applies with equal force to an officer left behind to secure the premises while a warrant to search those premises is obtained."); *United States v. Patrick*, 959 F.2d 991, 996–97 (D.C. Cir. 1992), abrogated on other grounds, (upholding a protective search where "police were lawfully on premises" pursuant to consent of the lessee to search the apartment and, under the circumstances, the occupant's bedroom); *United States v. Keefauver*, 74 M.J. 230, 234-35 (C.A.A.F. 2015) (agreeing with the majority of Circuits that the protective sweep doctrine applies when law enforcement agents enter a home lawfully for an objective other than an arrest, in this case, seizure of a package in a controlled delivery); *United States v. Caraballo*, 595 F.3d 1214, 1224-25 (11th Cir. 2010) (fisheries officer conducted protective sweep in a boat while lawfully checking for contraband lobsters and found smuggled noncitizens).

The Third and Fourth have not issued decisions addressing this point.

**Examples from Case Law**
Permissible sweeps: looking under beds or behind couches, opening doors to rooms and/or closets.
Impermissible sweeps: opening drawers, opening birthday presents, examining papers or photographs.

**Timing of Protective Sweep**: A protective sweep should be contemporaneous with the arrest or when the officer acquires reasonable suspicion that the home harbors a dangerous person(s). However, protective sweeps have been upheld even *after* the suspect was arrested, handcuffed, and removed from the home. *See United States v. Waters*, 88. F.3d 1022 (8th Cir. 2018) (upholding protective sweep after an individual with outstanding arrest warrants and suspected of dealing drugs was arrested and removed from the premises, where officers observed window blinds move on both floors of the home within a short period of time, the suspect was descending the stairs at the time officers breached the door, and some time passed since officers announced their presence giving others time to hide within the house, and determined that the moving of a

| | |
|---|---|
| | couch positioned up against the wall was justified since it was large enough for an individual to hide behind or inside it). |
| 54 | **Protective Sweep - Scenarios:**<br><br>1. No, you must be able to articulate there was imminent danger. Unless there were other indicia of danger, narcotics only will likely not justify a protective sweep.<br>2. Yes<br>3. No, unless the two units were connected in some way.<br>4. No, once you verify there is no danger, the sweep must end. |
| 55-59 | *Perez Cruz v. Barr*, 926 F.3d 1128 (9th Cir. 2019).<br><br>• **Who it applies to:** Collateral arrests.<br>• **Short summary of holding:** The Ninth Circuit held, that the seizure of a worker against whom there was no individualized suspicion violated 8 C.F.R. § 287.8(b)(2), which requires an immigration officer to have "reasonable suspicion, based on specific articulable facts, that a person being questioned is, or is attempting to be, engaged in an offense against the United States or is an alien illegally in the United States" in order to briefly detain the person for questioning. Evidence obtained regarding noncitizenship was suppressed.<br>• **Operational Impact:** Articulable, reasonable suspicion *specific to the individual* is required before questioning a collateral to include questions concerning noncitizenship, or asking for identification. Moving an individual from the location of the encounter without probable cause will likely be found an unlawful arrest. Therefore, probable cause determination should be made on the scene.<br>• <u>Note</u>: ***Perez-Cruz* does not represent a change in the law. *Perez-Cruz* represents the application of existing law. The 4th Amendment of the U.S. Constitution and DHS's own regulation, 8 C.F.R. § 287.8(b)(2), require particularized reasonable suspicion to justify a brief investigatory detention.**<br><br>• **What can officers do:**<br>    • Once the scene has been secured, engage in consensual conversation with the collateral, e.g., "You are not under arrest. You are free to leave, but would you mind answering some questions?" |

i. Telling the collateral that he is "free to leave" is likely to be the strongest evidence in the government's favor at a potential suppression hearing or federal court litigation based on an allegation that the collateral was detained in violation of the 4th Amendment;

ii. However, it is not the only means of proving that a collateral was free to leave the scene. Other indicia of the collateral being free to leave may include: the doors to the room/residence being left open, no weapons having been displayed, and no handcuffs/restraints having been used;

iii. **Documentation is Key**: As soon as practicable after the arrest, Officers need to document in detail, preferably in the I-213, the particularized reasonable suspicion with respect to the collateral that led to the collateral's brief investigatory detention. In the absence of particularized reasonable suspicion, the circumstances of the collateral's consent to remain and answer questions must be documented in detail. This is because any 4th Amendment challenge to the collateral's arrest will not be litigated until years after the arrest date, by which time the Officer will have no independent recollection of the arrest. Without a detailed I-213 memorializing the circumstances of the collateral's arrest, there is no way for the government to rebut the collateral's claims that the Officers engaged in an unlawful detention leading to his arrest.

- If the collateral agrees to remain at the location and answer questions, the officer may ask whether the collateral would consent to be fingerprinted on a mobile fingerprinting device. However, the officer may not move the collateral from the scene in the absence of probable cause. This is because such a physical transfer of a suspect will likely be found an arrest by a reviewing court.
- If individualized articulable suspicion develops during the consensual conversation that the collateral is illegally present in the United States, the officer can detain further and ask for ID. *But not before.*
- If the collateral says s/he does not want to answer any questions, let him/her go ASAP. Do not continue to detain/question/or ask for ID. Do not handcuff or transport the collateral to another location – it will likely be deemed an unlawful arrest, i.e., unsupported by probable cause, in subsequent lawsuit.

| | |
|---|---|
| 60 | **<u>Exigent Circumstance: Emergency Aid and Officer Safety</u>:** Exception permits law enforcement officers to enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.<br><br>**<u>Case Summary</u>:** *Michigan v. Fisher*, 558 U.S. 45, 47-49 (2009). Police officers responded to a complaint of a disturbance at a residence. One of the officers testified that, as he and his partner approached the area, a couple directed them to a residence where a man was "going crazy." Upon their arrival, the officers found a household in considerable chaos: a pickup truck in the driveway with its front smashed, damaged fence posts along the side of the property, and three broken house windows, the glass still on the ground outside. The officers also noticed blood on the hood of the pickup and on clothes inside of it, as well as on one of the doors to the house. Through a window, the officers could see Defendant, Jeremy Fisher ("Fisher"), inside the house, screaming and throwing things. The back door was locked, and a couch had been placed to block the front door.<br><br>The officers knocked, but Fisher refused to answer. They saw that Fisher had a cut on his hand, and they asked him whether he needed medical attention. Fisher ignored these questions and demanded, with accompanying profanity, that the officers get a search warrant. One of the officers then pushed the front door partway open and ventured into the house. Through the window of the open door he saw Fisher pointing a long gun at him.<br><br>Fisher was ultimately charged with assault with a dangerous weapon and possession of a firearm during the commission of a felony. The state trial court granted defendant's motion to suppress evidence obtained as a result of the warrantless entry into defendant's residence, and the State appealed. The Court of Appeals of Michigan affirmed. Stating that reasonableness is the ultimate touchstone of the Fourth Amendment, the Court observed that while searches and seizures inside a home without a warrant are presumptively unreasonable, this presumption can be overcome by the exigencies of the situation which make the needs of law enforcement so compelling that the warrantless search is objectively reasonable. In this instance, the Court held the search reasonable in light of the exigent circumstances presented and the emergency aid exception to the warrant requirement.<br><br>*See also United States v. Conerd*, 828 F.3d 1009, 1011-12 (8th Cir. 2016) (emergency aid exception applied where police received information that suspect was in the process of battering a victim and suspect had a history of domestic violence. Police also knew suspect had a firearm and closed circuit cameras trained on his front door. Police entry into curtilage to look into basement where battery was reportedly taking place was justified).<br><br>*See also Brigham City, Utah v. Stuart*, 547 U.S. 398, 406-407 (2006) (finding police officers were justified in entering a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury without violating the Fourth Amendment). |

| | |
|---|---|
| | *United States v. Toussaint*, 838 F.3d 503, 508-10 (5th Cir. 2016). An interesting case extends the doctrine of emergency aid to a vehicle stop. An FBI agent conducting a wiretap heard a suspect give permission to an associate to murder a rival, who turned out to be the defendant in this case. He relayed this information to local police along with information regarding the target of the threat and the vehicle he was driving. They located the vehicle and "paced" it for a while. Police noted it was going over the speed limit so they stopped the car. The police told the defendant to exit the vehicle, but he fled instead. A chase ensued and he was apprehended. A search incident to arrest revealed he was carrying a gun and drugs. The Court found that the threat to the defendant provided exigent circumstances that justified the vehicle stop. They noted only 45 minutes had elapsed since the threat was reported, a relatively short amount of time and the credibility of the information provided by the FBI agent which was the basis for the stop.<br><br>*United States v. Gilliam*, 842 F.3d 801, 803-04 (2d Cir. 2016). In another case, exigent circumstances were used to uphold a cell phone GPS search where a minor victim was in imminent danger of being trafficked by the defendant. He had taken the child from her foster home and was driving her to New York in order to prostitute her.<br><br>*United States v. Morales*, 893 F.3d 1360 (11th Cir. 2018) (previously discussed in the section relating to curtilage) is also an example of circumstances that would <u>not</u> justify a warrantless entry under the <u>emergency aid exception</u> or <u>exigency exception</u>. With respect to the emergency aid exception, there were no circumstances demonstrating actual or imminent injury inside the home as all other occupants were already safely outside by the time officers arrived, additional officers arrived on the scene to assist, and the adult female co-tenant confirmed that there were no weapons in the house and did not believe her co-tenant was a danger to himself. As for the exigency exception, the alleged victim was safely outside the home, there was no reason to believe contraband or evidence of a crime was inside the home, and the suspect never attempted to flee the home (in fact, he tried to remain in the home). Based on these facts and circumstances, the officers were not entitled to qualified immunity.<br><br>*<u>To instructor</u>: Be prepared for questions on what does or does not constitute the need for emergency assistance. There is no bright line rule on what is or is not an emergency, rather officers need to possess a reasonable belief, based on articulable facts that emergency assistance is needed.*<br><br>**<u>Officer safety</u>:** In order for this exception to apply, the threat must be immediate and unambiguous. For example, in a recent case, the Eighth Circuit upheld the entry to a home of officers when they were attempting to serve a warrant on a dangerous individual wanted for a homicide. They approached his apartment and a visitor told them the suspect was high. When they knocked, the door opened suddenly and the suspect was there and looked intoxicated, the place smelled of marijuana and marijuana was visible, the officers entered as they felt exposed and proceeded to arrest the suspect. The Court stated, "When the door opened unexpectedly after a hard police knock, the officers found themselves caught off-guard, isolated, and framed in an open doorway to an apartment |

they thought might contain a gunman—potentially still armed and dangerous—facing someone who matched what they knew about the suspect and whom they had reason to believe might be under the influence of drugs and liable to act unpredictably. Experienced officers confronted by such an event would have readily realized the risk of staying where they were and reasonably could have decided to reduce the danger by moving into the room to control the situation." *U.S. v. Roberts*, 824 F.3d 1145, 1147 (8th Cir. 2016).

*United States v. Lim*, 897F.3d 673 (5th Cir. 2018). Lim, a lawful permanent resident was ordered removed after he was convicted of rape. Years later, ICE officers went to his mobile home to execute the removal warrant. Lim answered the door in his underwear and was placed under arrest and handcuffed. The officers allowed Lim to reenter the home with them to permit him to change clothing. While being escorted to the bedroom to change, Lim was asked whether there were any firearms in the home and he answered there were two, including one in the bedroom. Because the officers had to uncuff Lim to permit him to get dressed in the bedroom, the Fifth Circuit found an exigency existed (the officers' safety) so as to search that bedroom for the firearm. As for the second firearm located in the laundry room, the Court determined that its location in a completely separated area of the home was insufficient to constitute an exigency for purposes of the Fourth Amendment. In so doing, the Fifth Circuit recognized the ease by which a gun is removable and disposable but noted its long-standing holding that the presence of a firearm, by itself, does not create an exigency.

**Not on the slides:**

**<u>Exigent Circumstance: Imminent destruction of evidence</u>:** *Kentucky v. King*, 563 U.S. 452 (2011) (where law enforcement agents "did not create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment, warrantless entry to prevent the destruction of evidence is reasonable and thus allowed").

The law is unsettled with regard to precisely what is required to show that evidence destruction is imminent. "Mere fear or apprehension alone that evidence will be destroyed will not justify a warrantless entry of a private home." *United States v. Perez*, 700 F.2d 1232, 1237 (8th Cir. 1983). There must be "specific and articulable facts." *United States v. Licata*, 761 F.2d 537, 543 (9th Cir. 1985). Courts have considered several different indicators, such as the sound of people moving around quickly, the sound of toilets flushing, and the smell of burning marijuana. Decisions have been very inconsistent. **It is important to check with the local OPLA field office to learn the law in their area of responsibility.** In some jurisdictions, smelling marijuana and hearing movement might be enough to give officers a reasonable belief that evidence destruction is occurring. In other jurisdictions, much more might be required (*e.g.*, hearing a resident shout, "It's the police! Flush the stuff!"). *Compare, State v. Robinson*, 786 N.W.2d 463, 475 (Wis. 2010) (when police have probable cause to believe drugs are in a house and they hear footsteps running away from the door when they knock and announce their presence, they have a reasonable belief that evidence destruction is imminent*), with Howe v. State*, 916 P.2d 153, 160-61 (Nev. 1996) (the smell of burning

| | |
|---|---|
| | marijuana is not sufficient to give officers a reasonable belief that evidence destruction is imminent).<br><br>In most cases, evidence that might be destroyed is evidence of offenses that are not immigration violations (*e.g.*, drug crimes) and thus peripheral to NFOP's main mission. Protect yourself by documenting each encounter and articulate all circumstances surrounding it…who, what, where, when, why, how. |
| 61 | **Exigent Circumstance: Emergency Aid and Officer Safety - Scenarios:**<br><br>1. Yes, under the emergency aid exception you can enter to procure medical aid.<br>2. Yes, the history of the target and his statements that he was armed and intending to use a firearm present an imminent danger to the officers. *U.S. v. Walker*, 474 F.3d 1249, 1253 (10th Cir. 2007) (entry was justified when resident stated he "had a goddam gun" when officer was at the door). |
| 62 | **Plain view:** Officer must have plain view from lawful vantage point, must have lawful right of access, and illegal/evidentiary nature must be immediately recognizable. *Coolidge v. New Hampshire*, 403 U.S. 443, 464-71 (1971), *abrogated in part on other grounds by Horton v. California*, 496 U.S. 128 (1990).<br><br>**Case Summary:** *Horton v. California*, 496 U.S. 128, 137-142 (1990). Terry Horton ("Horton") was convicted of armed robbery after stealing coins and jewelry from Erwin Wallaker ("Wallaker"). Wallaker was attacked and handcuffed by two masked men with a stun gun and a machine gun. Based on identifying information, the police obtained a search warrant for Horton's house to locate the proceeds of the robbery including three specific rings. A search of Horton's home failed to uncover the rings or other proceeds but police saw in plain view, a machine gun, two stun guns and a handcuff key, which they seized. The issue was whether these items were illegally seized because their discovery was not inadvertent. The Court held that the Fourth Amendment does not prohibit the warrantless seizure of evidence in plain view even though the discovery was not inadvertent. The investigating officer admitted that while looking for the rings he was also interested in finding other evidence connecting Horton to the robbery and therefore was looking for items such as the masks and guns.<br><br>In a recent case, a police officer stopped a vehicle matching the description of one reported by a dispatcher as recently involved in a shooting. After arresting the occupants the officer crouched and looked into the vehicle (the Court found the officer did not intrude into the vehicle). The officer saw a handgun under the front passenger seat which resulted in the defendant's conviction for a firearms offense. The Eighth Circuit held that the discovery of the gun fell under the plain view exception. *United States v. Vinson*, 805 F.3d 1150, 1152 (8th Cir. 2015).<br><br>An interesting case involving gift cards upheld a plain view seizure when a police officer saw a bag filled with gift cards under the passenger seat of a vehicle. The driver consented to the search of the bag and the officer saw it contained more than 100 gift |

| | |
|---|---|
| | cards. The driver admitted he did not have receipts for them and the officer had information regarding unlawful uses of gift cards related to drug dealing, fraud and theft so the Court upheld the seizure of the cards as lawful. The Court also found there was no REP in the magnetic strip data of the cards. *United States v. Turner*, 839 F.3d 429, 432-33 (5th Cir. 2016). |
| 63 | **Out and About: Street Arrests**: Many noncitizens now refuse entry to their home, so encounters in public are becoming increasingly common. We get many questions on issues pertaining to vehicle stops but the concept of *Terry* is what informs these encounters, so the presenters should ensure officers understand the concept of reasonable suspicion before moving on. |
| 64 | **Scenarios:**<br>1. Yes.<br>2. Still OK, the person has the right to walk away if they choose. Note that just because they are annoyed does not mean they are "seized."<br>3. Not unless you have already developed reasonable suspicion or probable cause.<br>4. Yes, at this point you at the very least have grounds to conduct a *Terry* stop as discussed below.<br><br>A lot of the background material related to these slides is found in the "Seizure" portion of the Instructor Notes but it is reinforced here to place it in the context of street encounters.<br><br>It is well settled law enforcement officers may engage in consensual conversation as long as no seizure occurs. "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions." *Florida v. Royer*, 460 U.S. 491, 497 (1983). "As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). § |
| 65-66 | **Terry Stops**: *Terry v. Ohio*, 392 U.S. 1, 1924 (1968) (brief investigatory stops are seizures, but justified in instances where articulable facts suggest criminal activity is afoot and the subject may be dangerous). See notes for slide 17 for full summary.<br><br>**<u>Case Summary</u>:** *Moore v. Pederson*, 806 F.3d 1036 (11th Cir. 2015). A police officer went to an apartment after neighbors reported an argument in the parking lot. Upon arrival, a resident of the complex pointed to Moore's apartment. As the officer approached the apartment he heard loud music and what sounded like people arguing loudly. He knocked on the door and saw Moore with a towel around his waist and two women, one of whom seemed upset. The officer was concerned about domestic violence and asked about the parking lot argument. Moore denied knowledge of any prior fight. |

The officer requested Moore's name and identification and he refused multiple times. The officer them took out his handcuffs and directed Moore to submit to arrest which he did. The officer reached into the apartment, handcuffed Moore and arrested him. The charges for resisting arrest were dismissed and Moore sued. The Court held in the absence of exigent circumstances, which did not exist here because there was no evidence of violence, *Terry* did not apply in someone's home. While the officer was in his right to ask for information regarding the argument, he did not develop probable cause and Moore could refuse to state his name. Moreover, the Court found Moore's motion of turning around to allow the handcuffs to be placed did not amount to consent to enter. The Court, however, still held that the officer was entitled to qualified immunity because the law on *Terry* stops at the time was unclear.

This case is applicable to situations in which officers may encounter collaterals in their homes. In order to err on the side of caution, arrests should not take place in the scenario where an individual is in his or her abode and no probable cause exists to arrest them.

**Fingerprinting:** The Supreme Court has not decided the issue of whether fingerprinting is a search, but many courts have found prints are not private, so no search is involved. *Williams v. Berry*, 977 F. Supp. 2d 621, 631-32 (S.D. Miss. 2013) (surveying case law). Nevertheless, it requires a brief *seizure* to complete, so the Fourth Amendment applies. *Davis v. Mississippi*, 394 U.S. 721, 727 (1969). Fingerprints taken as a result of an unlawful detention will be suppressed. *Id.* at 728 (fingerprint evidence properly suppressed where police unlawfully held suspect overnight with no probable cause). A warrantless arrest for taking fingerprints is generally not allowed, although the Supreme Court has left open the question of whether a *Terry* stop may suffice. Specifically, in *Hayes v. Florida*, 470 U.S. 811, 815 (1985), the Court stated that "in the absence of probable cause or a warrant investigative detentions at the police station for fingerprinting purposes could not be squared with the Fourth Amendment while at the same time repeating the possibility that the Amendment might permit a narrowly circumscribed procedure for fingerprinting detentions on less than probable cause." The Court went on to note, in dicta, "[t]here is thus support in our cases for the view that the Fourth Amendment would permit seizures for the purpose of fingerprinting, if there is reasonable suspicion that the suspect has committed a criminal act, if there is a reasonable basis for believing that fingerprinting will establish or negate the suspect's connection with that crime, and if the procedure is carried out with dispatch." *Id.* at 817. As the case law stands, fingerprinting would require at least reasonable suspicion of the individual being printed. Consequently, fingerprinting all persons present at the site of an arrest, i.e., using a mobile fingerprinting device like EDDIE, would likely not be justifiable in the absence of individualized suspicion or consent. Remember also the precedent from the Tenth Circuit in *United States v. De La Cruz*, 703 F.3d 1193 (10th Cir. 2013) (holding reasonable suspicion necessary for all stages of a stop, and finding no reasonable suspicion where Fug Ops officers determined the suspect was not the target of their investigation. Moreover, the flight of an individual from the vehicle where no evidence of criminal activity existed did not provide suspicion over the driver).

| | |
|---|---|
| 67 | Taken from *United States v. Cervantes*, 797 F.3d 326 (5th Cir. 2015) and *United States v. Olivares-Pacheco*, 633 F.3d 399, 401 (5th Cir. 2011).<br><br>**Reasonable suspicion was found in the *Cervantes*** case discussed in the first column. The *Cervantes* case does a good job of fleshing out the standard set out in *U.S. v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975) (" . . .when an officer's observations lead him reasonably to suspect that a particular vehicle may contain [noncitizens]who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion"). There is a useful discussion of cases where reasonable suspicion was not found. Also note the lengthy dissent that weighs the same evidence in a completely different way. *Cervantes*, 797 F.3d at 339-345. The takeaway here is that when performing investigative stops the ability to clearly articulate the basis of reasonable suspicion is important. Notice in this decision how the small details build up to the reasonable suspicion standard based on the agents' ability to explain why these details matter.<br><br>**Reasonable suspicion was not found** in the case described in the second column. In *United States v. Olivares-Pacheco*, 633 F.3d 399, 401 (5th Cir. 2011) there was no reasonable suspicion and the Court provides an overview of cases where reasonable suspicion was found. Bottom line is more is better when it comes to RS. |
| 68 | ***Terry* Stop – Vehicles**<br><br>**Bullet one - Vehicle Stops:** "[W]e hold that when an officer's observations lead him reasonably to suspect that a particular vehicle may contain noncitizens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion." *U.S. v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975). Notice the Court does not distinguish between whether the suspected undocumented noncitizen is a passenger or driver. ICE cannot conduct a *Terry* stop based on local traffic laws. This is because, as federal law enforcement officers, ERO officers lack federal statutory authority to enforce state law (the same applies to HSI Special Agents). There may be state peace officer laws or citizen's arrest laws that allow certain federal LEOs to stop someone for violation of state law, but such laws are generally limited to ongoing violent felonies, and other serious offenses; *not traffic violations*. Additionally, some states require a federal LEO to receive certification of training in state criminal law in order to enforce state law as a peace officer.<br><br>**Bullet two – Vehicle Pursuits:** *See* 8 C.F.R. § 287.8(e). DOs [and IEAs] are not expressly authorized by the regulation to conduct vehicle pursuits and the ICE Director has not authorized such pursuits, which given the wording of the above regulation, would be the only way vehicle pursuits would be permitted.<br><br>**Bullet three – Ordering People Out of the Vehicle:** It is lawful to order a driver and passengers out of a vehicle. Due to the valid safety concerns and the minimal intrusion involved, the Supreme Court has found it reasonable for an officer conducting a lawful traffic stop to order both driver and passengers out of a vehicle, pending completion of |

| | |
|---|---|
| | the traffic stop. *Pennsylvania v. Mimms*, 434 U.S. 106, 110-11 (1977) (finding it's permissible to request a driver exit a vehicle during a traffic stop); *Maryland v. Wilson*, 519 U.S. 408, 411-15 (1997) (extending rule permitting officers to order drivers out of the vehicle to passengers).<br><br>Reasonable suspicion that a vehicle contains noncitizens illegally in the country gives ERO the authority to effect a vehicle stop, but does not authorize ERO to use force to compel a driver and passengers out of the vehicle. ERO must have probable cause before such conduct is authorized, as further explained below. |
| 69 | **<u>Terry Stop – Vehicles</u>**:<br><br>As a threshold matter, a traffic stop, even if brief and for a limited purpose, "constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Whren v. United States*, 517 U.S. 806, 809–10 (1996). Accordingly, even if a police officer had reasonable suspicion to conduct the stop (*e.g.*, person ran through a stop sign, or failed to signal when changing lanes), the stop may, nevertheless, become an "unreasonable" seizure in violation of the Fourth Amendment if the stop is impermissibly prolonged. After completion of a traffic stop (including attending to any related safety concerns), the law enforcement officer must let the individual go on his way. A police stop that exceeds the time needed to handle the matter for which the stop was made violates the Fourth Amendment of the U.S. Constitution. *Rodriquez v. United States*, 135 S.Ct. 1609 (2015). A seizure justified only by a police-observed traffic violation becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation. *Id.*<br><br>The relevant facts in *Rodriguez* are as follows. After issuing a written warning to the driver and returning his documents, the police officer detained the driver for an additional *seven to eight minutes* to conduct a dog sniff around the driver's vehicle. The officer had only a "hunch"; the officer could not articulate a reasonable suspicion to justify the further detention for purpose of the dog sniff. The dog sniff was positive and the driver was charged with possession of the methamphetamine seized from the vehicle. The lower court denied the driver's suppression motion, holding that despite the absence of reasonable suspicion supporting the detention once the officer issued the written warning, under the circuit precedent, extension of the stop by "seven to eight minutes" for the dog sniff was only a *de minimis* intrusion on the driver's Fourth Amendment rights and was therefore permissible; the Eight Circuit affirmed said ruling. *Rodriguez*, 1613-14. The U.S. Supreme Court reversed.<br><br>The Supreme Court explained that the mission of a traffic stop is to "address the traffic violation that warranted the stop and attend to related safety concerns," while the ultimate objective of the traffic stop mission is to ensure roadway safety. 135 S.Ct. at 1614-16. Therefore, the critical question for the court was whether conducting the sniff prolonged – *i.e.*, added time to – the stop. *Id.*, 1616. A stop becomes unlawful when it "last[s] … longer than is necessary" to complete its mission, the rationale being that the "[a]uthority for the seizure … ends when tasks tied to the [mission] are[,] or reasonably should have been[,] completed." *Id.*, 1614. To prolong a stop beyond that point, the |

| | |
|---|---|
| | officer must have acquired reasonable suspicion during the mission to justify further investigation. *Id.*, 1615.<br><br>RS is required to support every stage of a stop. *See United States v. De La Cruz*, 703 F.3d 1193 (10th Cir. 2013). *De La Cruz* involved an ICE Fug Ops arrest of a driver who was stopped due to mistaken ID. The officer immediately realized after stopping the car that driver was not the target, but asked for ID, which turned out to be a forgery, and formed the basis of a criminal prosecution. The U.S. Court of Appeals for the Tenth Circuit held that RS is required for every stage of a stop, and that once the officer realized the individual was not the target, independent reasonable suspicion was required to justify the continued stop, and questioning (*e.g.*, ask for ID). This is a case in which a passenger in the same car fled, and when officers caught him, admitted to being in the United States illegally and to being the driver's brother. The court held that none of this furnished reasonable suspicion as to the driver. |
| 70 | Section 1357(a)(2) of the INA states, in relevant part, that warrantless arrests are authorized if the officer "has *reason to believe* that the alien so arrested is in the United States in violation of any such law or regulation *and* is likely to escape before a warrant can be obtained for his arrest [.]" 8 U.S.C. § 1357(a)(2) (emphasis added). The use of the words "reason to believe" within the statute "are properly taken to signify probable cause." *United States v. Cantu*, 519 F.2d 494, 496 (7th Cir. 1975). "Probable cause to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed [. . .] an offense." *See*, e.g., *Cahaly v. Larosa*, 796 F.3d 399, 407 (4th Cir. 2015).<br><br>Thus, prior to making a warrantless arrest of a removable noncitizen, an ICE officer must first conduct an individual assessment of whether the noncitizen is likely to evade arrest. |
| 71 | Factors such as attempted flight from an ICE officer, nervous or erratic behavior, and evidence of the subject's mobility in conjunction with other specific circumstances may also justify a reasonable belief that the subject is likely to abscond. *See, e.g., United States v. Hernandez-Rojas*, 470 F. Supp. 1212, 1220 (N.D.N.Y 1979); *Cantu*, 519 F.2d at 496. The particular circumstances before the ICE officer are not to be dissected and viewed singly; rather they must be considered as a whole. *See, e.g., United States v. Hall*, 525 F.2d 857, 859 (D.C. Cir. 1976). |
| 72 | Mere presence within the United States in violation of U.S. immigration law is not, by itself, sufficient to conclude that a noncitizen is likely to escape before a warrant for arrest can be obtained. *Moreno v. Napolitano*, 213 F. Supp. 3d 999, 1007 (N.D. Ill. 2016) (noting that an individual in jail for a crime was not a flight risk and being potentially removable alone cannot be the basis for a flight risk determination); *see also Westover v. Reno*, 202 F.3d 475, 479-80 (1st Cir. 2000) (finding no evidence that a woman in her own home was likely to escape and that a warrantless arrest was improper). |

| | |
|---|---|
| 73 | The case law examples are from the following opinions:<br><br>*Araujo v. United States*, 301 F. Supp. 2d 1095, 1102 (N.D. Cal. 2004) (finding a noncitizen living with his wife who filed an application to adjust status was not likely to escape).<br><br>*United States v. Harrison*, No. 97-4178, 1999 WL 26921, at *3 (4th Cir. Jan. 25, 1999) (unpublished) (finding no likelihood of escape for a noncitizen who had been home over three visits from bondsmen and the officers had time to obtain a warrant).<br><br>*United States v. Cantu*, 519 F.2d 494, 497 (7th Cir. 1975) (Likelihood of flight was a serious threat where the suspects were travelling on interstate highway at high speed over a great distance). |
| 74 | 8 C.F.R. § 287.8(b)(2) requires an immigration officer to have "reasonable suspicion, based on specific articulable facts, that a person being questioned is, or is attempting to be, engaged in an offense against the United States or is an alien illegally in the United States" in order to briefly detain the person for questioning. |
| 75 | As federal law enforcement officers, ICE officers lack federal statutory authority to enforce state and local traffic laws. Instead, federal ICE officers may investigate and enforce civil immigration law by "interrogat[ing] any alien or person believed to be an alien as to his right to be or to remain in the United States." 8 U.S.C. § 1357(a)(1).<br><br>ICE officers may stop vehicles pursuant to this authority only if "they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *United States v. Brignoni-Ponce*, 422 U.S. 873, 881–84 (1975) (holding that when an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion). |
| 76-78 | None |
| 79 | *See* 8 C.F.R. § 287.8(c)(iii)( "At the time of the arrest, the designated immigration officer shall, as soon as it is practical and safe to do so: (A) Identify himself or herself as an immigration officer who is authorized to execute an arrest; and (B) State that the person is under arrest and the reason for the arrest.") |
| 80 | None |
| 81 | Where there is probable cause to arrest a person who is inside a car, **<u>the officer must first order the individual out of the car</u>**. Once the person refuses to leave the car pursuant to lawful order, force that is both necessary and reasonable may be used.<br><br>The term "necessary" means some force is required to accomplish one's lawful duty. "Reasonable" means there are facts and circumstances that justify the degree of force to be used in the given situation. *See* ICE Policy No. 19009.1: *Firearms and Use of Force* |

(Nov. 8, 2019), sections 2, 5.1, and 5.3, and the *ICE Firearms and Use of Force Handbook* (Nov. 8, 2019). . Officers should also review the Department's use of force policy. *See* Policy Statement 044-05: *Department Policy on the Use of Force* (Sept. 7, 2018).

As a general principle, courts have held that "police officers need not employ the 'least intrusive' degree of force." *Bryan v. MacPherson*, 630 F.3d 805, 813 (9th Cir. 2010) (internal citations omitted). Nevertheless, "the use of force by law enforcement must be justified by an appropriate government interest" and "the presence of feasible alternatives is a *factor* to include in [the court's] analysis." *Id.* (emphasis in the original) (internal citations omitted). Thus, while "an officer need not use the least intrusive means in apprehending a suspect, there may be circumstances in which an officer who does not use the least intrusive means might use a level of force that cannot be justified." *Id.* It all depends on the facts. Due to litigation risks to the officer and the agency, in using force, an officer should use **only the minimum amount of force necessary and reasonable** to overcome resistance.

**Once an individual is subdued, any use of force will be deemed to be excessive**. *See, e.g.*, *Curran v. Aleshire*, 800 F.3d 656, 661 (5th Cir 2015) (" . . . the force calculus changes substantially once that resistance ends."); *see also Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008) (officer liable when he punched suspect and he no longer offered resistance because he was handcuffed).

Use of force should be judiciously used only in circumstances where **probable cause can be clearly established**, as well as some element of **danger or threat**. *See, e.g.*, *Valencia v. DeLuca*, 612 Fed. Appx. 512, 518-19 (10th Cir. 2015) (unpublished) (officers had reasonable suspicion for traffic stop where car was driving at night with only parking lights on, probable cause was established by the smell of marijuana in the vehicle and the use of force was justified where driver refused to leave the vehicle and only minimal force was used on the arms of the suspect); *see also Mitchell v. County of Washtenaw*, No. 06-13160, 2009 WL 909581, at *2 (E. D. Mich. March 31, 2009) (unpublished decision) (court denied motion to dismiss a § 1983 action in a case where the plaintiff claimed he did not resist but refused to exit the vehicle and police broke the window to pull him out causing injury to his eye and his ear, finding this could be considered excessive force); *Davis v. Clifford*, 825 F.3d 1131, 1135 (10th Cir. 2016) (Court found excessive force where officers broke window and dragged suspect who was the subject of a warrant for a minor traffic offense, and where she posed no threat although she did resist somewhat).

As you can see from the cases, the specific circumstances can change the calculus of what force can be considered excessive so there is no clear-cut answer, erring on the side of caution is always best.

**NOTE:** The use of force is discouraged by ICE. Moreover, officers should take into consideration that using force on anyone but the most serious target may present an unjustifiable risk of litigation against an officer.

| | |
|---|---|
| | Two cases below present factually similar cases which demonstrate the importance of being able to articulate the threat element in defending an officer's actions in subsequent excessive force claims. |
| 82 | Courts routinely apply the test set forth in *Graham v. Connor*, 490 U.S. 386, 396 (1989), to determine whether the use of force used to effect a seizure is objectively reasonable. Although the list of factors is non-exhaustive, the *Graham* test emphasizes the following three (3) factors:<br><br>(1) The severity of the crime at issue;<br>(2) Whether the suspect poses an immediate threat to the safety of the officers or others; and<br>(3) Whether the suspect is actively resisting arrest or attempting to evade arrest by flight.<br><br>Use of force claims are viewed from the perspective of a reasonable officer <u>on the scene</u> and not with the benefit of hindsight. This evaluation makes "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396-97 (1989). While ICE officers are permitted to use force in the course of their official duties as authorized by law and under the guidelines set forth in the Department's and ICE's policies regarding the use of force, any use of force must be proportional to the nature and extent of the safety threat the individual poses and/or resistance offered. As a general principle, the more compliant the subject is, the less likely an officer's use of force will be judged to be reasonable.<br><br>Although the use of force discussion in this presentation is included within a review of vehicle stops, all excessive force claims are analyzed using the same framework outlined above.<br><br>Note: Because the bulk of ERO's targets will be noncitizens believed to be removable from the United States (a civil offense), the first *Graham v. Connor* prong (the severity of the crime at issue) will likely weigh in favor of the noncitizen. |
| 83 | All Fourth Amendment cases are fact-specific. This slide offers side-by-side comparison of two cases involving LEOs removal of a non-compliant individual from a vehicle: *Ickes v. Grassmyer*, 704 Fed. Appx. 190 (3d Cir. 2017) (under the specific facts of that case, it was not excessive force to break car window to reach in and open the door, through which open doorway the officer pulled out the driver for arrest), against *Davis v. Clifford*, 825 F.3d 1131 (10th Cir. 2016) (breaking a car window and dragging the female driver out by her hair and arms through that broken window was excessive use of force because it was beyond what was needed for an arrest). The key factor for the courts appear to be presence of immediate threat of harm to the officers. In the absence of articulable threat of |

| | |
|---|---|
| | immediate harm to the officers, it will likely be difficult to justify breaking a car window to retrieve a target. |
| 84 | **Terry Frisk:**<br><br>*Terry v. Ohio*, 392 U.S. 1 (1968). Such stops are narrow in scope and may be conducted upon reasonable, articulable belief that a person is armed and dangerous.<br><br>**Case Summary:** A plain clothes police officer with 39 years of experience observed two men repeatedly walking past a store front at approximately 2:30 p.m. in downtown Cleveland, as if planning a robbery. He approached them after they met up with a third person, identified himself as a police officer and asked their names. The officer then conducted a weapons pat down on Terry and felt a handgun. He ordered all three of the men into a store, where he then removed Terry's jacket, and retrieved a .38-caliber pistol. He then conducted pat downs on the other two men finding another gun. Terry and the other man, Chilton, were charged with carrying concealed weapons. The men moved to suppress the guns as evidence alleging that the officer's search and seizure was unlawful. The Court held that a stop and frisk is a seizure and search under the Fourth Amendment but found that it was not subject to the Warrant Clause because it involved swift "on-the-spot observations that could not be subject to the warrant procedure." *Id.* at 19-20. The Court found that there must be "a narrowly drawn authority to permit a reasonable search for weapons for the protection of [a] police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause" *Id.* at 27. The court determined that the officer's pat down was "justified at its inception" and "reasonably related in scope to the circumstances." However, it noted that such searches are only justified for the protection of the officer and others nearby and could not be justified by any need to prevent the disappearance or destruction of evidence of a crime. *Id.* at 29.<br><br>**Case Summary:** *Ybarra v. Illinois*, 444 U.S. 85 (1980). Ventura Ybarra, was a patron at a bar when a search warrant was executed. The warrant was based on an informant's report that the bartender sold drugs. The warrant was specifically limited to the business and the bartender "Greg." During the search, police conducted pat downs of all patrons. During an initial pat down of Ybarra, a police officer felt a cigarette pack but completed his safety pat downs before returning to Ybarra. During a second pat down, six tinfoil packets were discovered in Ybarra's cigarette pack. Ybarra had made no suspicious gestures and the state could not articulate any specific fact justifying a suspicion that Ybarra was armed and dangerous. Under *Terry*, a law enforcement officer, for his own safety, may conduct a pat down to find weapons that he reasonably believes or suspects are in the possession of a person he has accosted. However, *Terry* does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked. *Id.* at 93-94. The searches of Ybarra and the seizure of what was in his pocket violated the Fourth and Fourteenth Amendments.<br><br>*See also Adams v. Williams*, 407 U.S. 143, 146-47 (1972) (allowing pat down search where lone officer, in high-crime district, at night, approached person believed to possess a gun and narcotics pursuant to a tip from a reliable informant). |

| | |
|---|---|
| 85 | **<u>Exigent Circumstance: Hot pursuit</u>:** A law enforcement officer may enter without a warrant to make an arrest when they are in hot pursuit of a suspect fleeing the scene of a crime. *Warden v. Hayden*, 387 U.S. 294, 298-300 (1967). There must be immediate and continuous pursuit of the suspect from the scene and the **crime must be sufficiently serious**. *See, e.g.*, *Welsh v. Wisconsin*, 466 U.S. 740, 748-54 (1984) (no hot pursuit where police entered suspect's home minutes after a witness had observed suspect in an apparently intoxicated condition fleeing from the scene of an accident, a civil offense); *United States v. Morgan*, 743 F.2d 1158, 1161-64 (6th Cir. 1984) (no hot pursuit where officers met at a local coffee shop to assess the situation and then waited for the arrival of the sheriff before proceeding to defendant's house).<br><br>**<u>NOTE</u>:** Officers should also be aware of officer safety before choosing to chase a person believed to be armed and dangerous into an unknown building.<br><br>Courts consider hot pursuit as a form of the exigency exception to the warrant requirement, but it must really be "hot" (immediate or continuous pursuit of suspect) as per *Welsh*, *supra*, at 753. This will not apply to routine "knock and talks" where the encounter is initiated at the front door of the home and does not involve a chase from a public street into a home. Hot pursuit is also limited to serious crimes. *Welsh, supra*, at 741, 752-53. It does not apply to a civil offense. *Welsh, supra*, at 746, n.6.<br><br>Because "hot pursuit" is limited to serious crimes, it is not generally applicable to immigration cases. It *could* have limited relevance for ICE officers if there is an outstanding felony arrest warrant for a noncitizen who is wanted for a *serious crime* as well as an immigration arrest warrant.<br><br>**<u>In other words, hot pursuit will *not* be available in the vast majority of cases</u>.**<br><br>"Serious crime" is defined according to state law and there are many cases defining it in different jurisdictions so a broad description of the term is not helpful. Instructors are encouraged to research the matter in their jurisdictions if questions come up. |
| 86-87 | **<u>Search Incident to Arrest</u>:**<br><br>Purpose of Search Incident to Arrest is to: (1) discover weapons (for officer safety); (2) prevent destruction or concealment of evidence; (3) discover any tools that may be used to later escape. *Chimel v. California*, 395 U.S. 752, 762-63 (1969) *abrogated on different grounds*.<br><br>**<u>Case Summary</u>:** Three officers arrived at the defendant's home with a warrant for his arrest. The officers knocked on the door, identified themselves to the defendant's wife, and asked if they could come inside. She let the officers in the house where they waited for the defendant to return home from work. When Chimel entered the house, an officer handed him the arrest warrant. One of the officers asked the defendant if he could look around. He said no, but was advised that on the basis of the lawful arrest the officers would nonetheless conduct a search. The officers accompanied by the defendant's wife, |

searched the entire house. In the master bedroom, the officers directed the wife to open drawers and to physically move their contents from side to side so they could view any items that would have come from the crime. The officers seized numerous items that constituted evidence of the crime. The issue was whether the warrantless search the entire house was lawful as being incident to his arrest. The Court held that it was not reasonable the search extended beyond the defendant's person and the area under his immediate control. Officers are entitled to search the arrested person and remove any weapons and to seize any evidence on the arrestee to prevent its concealment or destruction. However, officers may only search the area within an arrestee's immediate control, an area where the person might gain possession of a weapon, means of escape or destructible evidence. There is no justification for routinely searching any room other than that in which an arrest occurs or for that matter, searching through desk drawers or other closed areas in that room.

**NOTE:** In other words, need to be able to articulate that the arrestee has the ability to access a weapon and use it.

**NOTE:** There must be an arrest, and search must be contemporaneous to arrest. Scope includes area within the persons "immediate control." *Id.* Immediate control considerations: 1) distance; 2) restraints; 3) positioning of officers and suspect; 4) access; 5) number of officers v. suspects. In other words, need to be able to articulate that the arrestee has the ability to access a weapon and use it.

**NOTE:** May accompany arrestee into another area of the house for purpose of obtaining clothing, travel documents, medication, but may not lead person around the house for purpose of executing a broader 'incident to arrest' search. *United States v. Whitten*, 706 F.2d 1000, 1015-16 (9th Cir. 1983), implied overruling on other grounds recognized by *United States v. Rodriguez-Rodriguez*, 441 F.3d 767, 771 (9th Cir. 2006) (search of room was not justified when arrest had already been accomplished and there was no danger to the officers, and no danger evidence would be destroyed).

**Search of backpack incident to arrest:**

*United States v. Cook*, 808 F.3d 1195, 1199-1200 (9th Cir. 2015). DEA agents were surveilling a home where two known drug suppliers lived. They saw Cook entering the residence carrying a backpack and then saw him leave a short time thereafter with the same backpack, which looked lighter. A controlled buy was arranged the same day in which the two suppliers were arrested and they identified Cook as their source of narcotics. Agents returned to the suppliers' house, searched it and found two firearms. Agents had one of the suppliers call Cook to come by. Cook arrived 15 minutes later carrying the same backpack he wore earlier. Agents ordered him to the ground at gunpoint and handcuffed him. One of the officers picked up the backpack and did a quick search for weapons or contraband. Concerned with officer safety because a crowd had gathered and they were afraid other co-conspirators may interfere, they moved Cook and the backpack to a secluded parking lot close by where they found narcotics in the backpack. Cook contested the search of the backpack in a motion to suppress claiming

| | |
|---|---|
| | the first search violated his rights under the Fourth Amendment. (He did not contest the second search because if the first one was valid, the second was also permitted if it remained in police custody as a search incident to arrest). Cook argued he was already handcuffed at the time of the search so there was no concern for officer safety or evidence destruction. The Court held the search was appropriate because it occurred contemporaneously to the arrest with the intention to locate dangerous weapons and when none were found, the search stopped. The Court distinguished this case from *Arizona v. Gant,* 556 U.S. 332, 351 (2009), because in that case the suspect was already in the patrol car and the charges involved were minimal, whereas Cook was charged with serious narcotics related felonies and the search occurred while he was within reaching distance of the backpack. The Court also noted that the agents had already found guns in the house, the arrest occurred in front of said house and there was a crowd that could have included co-conspirators. |
| 88 | **Search Incident to Arrest: Cell Phones**:<br><br>**Case Summary:** *Riley v. California*, 134 S.Ct. 2473 (2014) (two cases consolidated for appeal - *Riley v. California* and *U.S. v. Wurie*).<br><br>**Riley factual background:** Riley was pulled over by police when he was driving on expired registration tags. Because Riley's driver's license was suspended, police policy required that the car be impounded and as a result they conducted an inventory search. During the search, police located two guns and subsequently arrested Riley for possession of the firearms. Riley had his cell phone in his pocket when he was arrested, so a gang unit detective analyzed videos and photographs of Riley making gang signs and other gang indicia that were stored on the phone to determine whether Riley was affiliated with a gang. In addition, a photograph was found of him standing in front of a vehicle that had been involved in a drive-by shooting a few weeks earlier. Riley was subsequently tied to the shooting on August 2 through ballistics tests, and he was charged with shooting at an occupied vehicle, attempted murder, and assault with a semi-automatic firearm. Before trial, Riley moved to suppress the evidence regarding his gang affiliation which was acquired through the cell phone search incident to his arrest.<br><br>**Wurie factual background:** Police observed a drug deal from Wurie's car and arrested him. They seized two cell phones from him, one of which was ringing from a number identified as "my house" on the screen. The officers then looked at the phone's call log and determined the number associated with the label "my house." From this information, the police were able to determine the address and, after obtaining a search warrant the police found and seized 215 grams of crack cocaine, four bags of marijuana, drug paraphernalia, cash, a firearm, and ammunition. Wurie was later charged with possession with intent to distribute, distributing cocaine base, and being a felon in possession of a firearm and ammunition. Wurie moved to suppress the evidence that was obtained from the warrantless search of his phone.<br><br>**Holding:** The Supreme Court held that the warrant exception for searches conducted incident to arrest, exist for the purpose of protecting officers' safety and preserving |

| | |
|---|---|
| | evidence and therefore did not apply in either case (*Riley* or *Wurie*). The Court reasoned that digital data cannot be used as a weapon to harm an arresting officer and police officers have the ability to preserve evidence while awaiting a warrant by disconnecting the phone from the network and placing the phone in a "Faraday bag." The Court characterized cell phones as minicomputers filled with massive amounts of private information, which distinguished them from the traditional items that can be seized from an arrestee's person, such as a wallet. |
| 89 | **<u>Search Incident to Arrest: Vehicles</u>:**<br><br>*Arizona v. Gant*, 556 U.S. 332, 351 (2009). "Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest. When these justifications are absent, a search of an arrestee's vehicle will be unreasonable unless police obtain a warrant or show that another exception to the warrant requirement applies." "[T]he vehicle exception provides that a warrantless search of a vehicle is constitutionally permissible if police have probable cause to believe the vehicle contains contraband or other evidence of illegal activity." *United States v. Sands*, 815 F.3d 1057, 1062 (7th Cir. 2015) (upholding legality of search where officers became aware that the suspect was selling drugs out of his vehicle from information provided by an informant, they witnessed a drug transaction and they saw a gun in the console of the vehicle. This information was provided to the arresting officer who was found to have probable cause based on these facts that the vehicle would contain evidence of the crime and contraband).<br><br>**<u>Case Summary</u>:** *Arizona v. Gant*, 556 U.S. 332, 351 (2009). In this case, police approached the suspect and arrested him after he had stepped out of his vehicle for driving without a license. (There was an ongoing investigation on narcotics trafficking but the police admitted they had no probable cause to arrest Gant on narcotics charges). After he was cuffed and taken to a police vehicle, officers searched his car and found a gun and narcotics. The Court held the search was not lawful and stated, "Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." In this case, Gant had already been secured in a police vehicle and there was not likely to be any evidence regarding the charged offense.<br><br>**What constitutes danger so as to justify a search?** *United States v. Hussain,* 835. F.3d 307 (2d Cir 2016). Police officers were tailing a vehicle and the vehicle went through a stop sign without stopping. The officers signaled for the car to stop and as the car slowed down one of the officers observed the driver's arm move up and down in the middle console area. One officer got out of the vehicle and approached the driver who was using a cell phone. The officer asked the driver to put down the phone but the driver did not comply immediately and the officer asked for his license and registration. The driver failed to comply again. After a second request for the license, the driver fumbled with the middle console and then the glove compartment. The officer ordered the driver out |

| | |
|---|---|
| | of the vehicle, fearing for his safety and the driver immediately complied. The officer frisked the driver and found a legal knife, after which he directed the driver to the back of the car where two other officers were waiting. The officer went back to the car and searched the driver's side of the car where he found a loaded gun. One of the other officers testified he saw the passenger behave in a suspicious manner because he was sitting unnaturally as if trying to shield something before he approached the vehicle. This passenger attempted to flee when the gun was found. The Court of Appeals considered four facts that raised the reasonable suspicion of the officers that the men posed a danger and were used to justify the vehicle search: 1) the driver moved his arm toward the center console of the car; 2) the passenger sat in an unnatural position; 3) the driver was carrying a knife; and 4) the driver failed to comply with orders at first. Based on these facts, the Court found there was not enough for reasonable articulable suspicion of danger to justify the search as protective. The Court noted the race and ethnicity of the drivers may have acted to heighten suspicions in the officers. Moreover, the movement of the driver toward the console was easily explained by the fact he had his phone in his hand. The Court also found the failure to comply at first could have been due to confusion or fear of being caught, but was not indicative of dangerousness by itself, likewise, the passengers' unnatural position did not suggest danger. Regarding the knife, the Court noted the driver announced its presence and complied with the officer. This case highlights the fact that dangerousness in this context means just that, an immediate threat, not just an impression that there may be a weapon somewhere in the vehicle.<br><br>**Search to find contraband:** *United States v. Williams*, 846 F.3d 303 (9th Cir. 2017). A citizen contacted police to report a man sleeping in a parked vehicle who was a known drug dealer. Two officers went to the area, saw the vehicle and blocked it in the parking space. The defendant sat up and started the car as the officers approached. The officers ordered him to shut the engine and exit the vehicle and he did so, although he immediately fled. The officers pursued on foot and eventually reached him. A pat down revealed cash and narcotics and he was cuffed and taken to the police vehicle. The officers searched the defendant's vehicle and found a purse with a gun inside. The Court upheld the search of the vehicle noting "[o]fficers may conduct a warrantless search of an automobile, including containers within it, when they have probable cause to believe that the vehicle contains contraband or evidence of criminal activity." The Court found the officers had met that standard based on the facts because the tip from the citizen stated the suspect was sleeping in his car in an unauthorized location and was known to deal drugs. Moreover, the events took place at 5 a.m. in a high crime area and the suspect fled when approached. Once apprehended he had narcotics and money in his possession in small bills. Based on all these factors probable cause was established to search the vehicle incident to arrest. |
| 90 | **<u>Vehicle Inventory</u>:**<br><br>After taking custody of a vehicle, police may conduct an inventory search provided the officer's custody was lawful and it is done according to policy. |

| | |
|---|---|
| | **<u>NOTE</u>: A vehicle inventory search cannot be done without a written policy. ERO does not have such a policy and therefore cannot do a vehicle inventory.** *See, e.g.*, *United States v. Sanders*, 796 F.3d 1241, 1248 (10th Cir. 2015) (holding search of vehicle unlawful when car was improperly impounded). In other words, call the locals to take possession of a vehicle.<br><br>**<u>Case Summary</u>:** *Colorado v. Bertine*, 479 U.S. 367 (1987). Police arrested the defendant for driving under the influence of alcohol. They called a tow truck, searched the defendant's car and inventoried its contents in accordance with police procedures. An officer opened a closed backpack in which he found a controlled substance, cocaine paraphernalia, and a large amount of cash. The issue was whether the police could enter a closed container during an inventory search. The Court held that a warrantless inventory search of an impounded vehicle may include places where personal items can be found including a search of the contents of closed containers found inside the vehicle. Inventories are well-defined exceptions to the warrant requirement. However, two conditions must be met before an inventory search of an impounded vehicle is lawful. First, there was no showing that the police acted in bad faith (*i.e.*, that they were not conducting the inventory to advance a criminal investigation). Second, that the police must follow standardized procedures so that the searching officer does not have unbridled discretion to determine the scope of the search. The police were responsible for the property because it was in their custody. By securing it, the police were protecting it from unauthorized access. Also, knowledge of the precise nature of the property helped guard against claims of theft, vandalism, or negligence. This knowledge also helped to avert any danger to police or others that may have been presented by the potential danger of the property. |
| 91 | None. |
| 92 | None. |



USA 035773

EXHIBIT 2

Confidential Subject to Protective Order

Effective Date: October 31, 2018
Review Date: October 31, 2022
Office of Primary Responsibility: Enforcement

Enforcement and Removal Operations

# Fugitive Operations Handbook

Law Enforcement Sensitive

Approved by: David A. Marin
Title: Acting Assistant Director, Enforcement
Date signed: October 30, 2018

Exhibit
0002

# FOREWORD

The *Fugitive Operations Handbook* is an operational guide for Fugitive Operations Teams, Mobile Criminal Alien Teams, and all officers conducting at-large enforcement actions in the field. The Handbook incorporates policies, procedures, and best practices established by the National Fugitive Operations Program within the Office of Enforcement and Removal Operations.

The memoranda cited in the Handbook contain more detailed information, and employees conducting fugitive operations or at-large enforcement actions should familiarize themselves with their content.

David A. Marin,
Acting Assistant Director, Enforcement

## Table of Contents

FOREWORD ........ i

**PART 1: Fundamentals of the National Fugitive Operations Program** ........ 1

- Introduction ........ 1
- NFOP Overview ........ 1
- Authorities/References ........ 2
- Roles and Responsibilities ........ 3
- Definitions ........ 4
- Enforcement Activities ........ 5
- Training Requirements ........ 5

**PART 2: Fugitive Operations Team Casework** ........ 6

- Lead Development ........ 6
- Sources of Information ........ 7
- Case Management ........ 7
  - Enforce Alien Removal Module (EARM) and Docket Management ........ 7
  - A-File Review ........ 8
- Administrative Subpoenas ........ 10
- Referral to the Law Enforcement Support Center ........ 10
  - Administrative Warrants: NCIC Entry Requirements ........ 10
  - Criminal Warrants: NCIC Entry Requirements ........ 11
- Target Folder Creation ........ 12
- ICE "Wanted" Posters ........ 13
- Aliens Located While Incarcerated ........ 14
- Field Office Initiated Operations ........ 14
- Headquarters-Initiated Operations ........ 15

**PART 3: Conducting Operations** ........ 16

- Surveillance ........ 16
- Communications ........ 16
- Law Enforcement Visibility ........ 17
- Pre-operational Briefing ........ 17
- Ruses ........ 18
- Consent ........ 18

Travel Documents........ 20
Vehicle Pursuits........ 20
Vehicle Stops........ 20
Gangs........ 21
Arrests........ 21
- Officer Safety........ 21
- Sensitive Locations........ 22
- Courthouses........ 22
- Special Considerations for Arrest........ 22
- Current or Prior United States Military Service........ 22
- Juveniles/Unaccompanied Alien Children........ 23
- Consular Notifications........ 24

Prosecutorial Discretion........ 25
Post-Operational Debrief........ 25
**PART 4: Processing Cases**........ 25
Reporting Requirements........ 26
- Operations Management Module........ 26
- Exhausted Leads........ 27

Special Activities........ 28
Timely and Accurate Reporting of Significant Incidents........ 28
Alternatives to Detention Violations........ 28
Escapes........ 28
Fugitive Alien Removal Requests........ 28
Liaisons and Task Forces........ 29
Media........ 30
**Appendix of Terms**........ 31

# PART 1: Fundamentals of the National Fugitive Operations Program

## A. *Introduction*

To assist the field in its enforcement efforts, the National Fugitive Operations Program (NFOP) has assembled the *Fugitive Operations Handbook* ("Handbook"), a comprehensive policy and procedural resource to support ERO field personnel with at-large enforcement activities. This Handbook serves as an operational guide incorporating policies, procedures, and best practices utilized during the course of daily enforcement activities. In addition, the memoranda cited throughout this Handbook and available on the ICE insight page, contain more detailed information and therefore should be thoroughly reviewed by the user.

Those documents relating to fugitive operations previously issued by ERO and its predecessor, Detention and Removal Operations, now take on the status of historical reference material or supplemental information. As of the effective date of this Handbook, these documents may be found in the "Archived Documents" folder in the ERO Resource Library.

## B. *NFOP Overview*

The NFOP was established in 2003 to dramatically expand U.S. Immigration and Customs Enforcement's (ICE) efforts to locate, arrest, or otherwise reduce the fugitive alien population in the United States. In December 2009, NFOP's responsibilities expanded to include the identification, location, and arrest of at-large criminal and previously removed aliens. Currently, ERO Fugitive Operations Teams (FOTs), target, arrest and remove aliens who present a danger to national security, or are a risk to public safety, as well as those who enter the United States illegally or otherwise undermine the integrity of our immigration laws and our border control efforts.

Pursuant to 8 U.S.C. Section 1357(a)(1), an immigration officer has the authority, without a warrant, to interrogate any alien or person believed to be an alien as to his right to be or remain in the United States. 8 U.S.C. Section 1357(a)(2) provides the authority to make an arrest of an alien who the officer has reason to believe is in the United States in violation of immigration law and is likely to escape before an arrest warrant can be obtained. Furthermore, 8 U.S.C. Section 1357(a)(5) and 19 U.S.C 1589A provide an immigration officer with the authority to make an arrest, without a warrant, for a federal crime committed in the officer's presence, or for a federal felony based on probable cause if the officer has reasonable grounds to believe the person to be arrested has committed or is committing such a felony. These sections also authorize qualified officers to carry firearms and to execute and serve any order, warrant, subpoena, summons, or other process issued under authority of the United States in the course of performing their duties or any other law enforcement duties that have been designated for them.

## C. *Authorities/References*

*The information found in this Handbook reflects current policies and directives, which may be subject to change or revision at any time. It is the responsibility of the FOT officer to remain informed of any updated material.*

**Executive Orders:**

- Executive Order 13768 entitled, *Enhancing Public Safety in the Interior of the United States*, dated January 25, 2017

**United States Code:**

- Title 8: Aliens and Nationality (§ 1357)
- Title 19: Aliens and Nationality (§1589A)

**Immigration and Nationality Act:** Field Officers; Powers and Duties (§ 287)

**Code of Federal Regulations:** Title 8; Aliens and Nationality (Part 287)

**ICE Policy Memoranda:**

- ICE Policy Memorandum 10039.1 of June 21, 2004, *Issuances of Notices to Appear, Administrative Orders of Removal, or Reinstatement of a Final Removal Order on Aliens with United States Military Service*
- *Uses of Ruses in Enforcement Operations* dated March 6, 2006
- *Escape Reporting* dated July 14, 2006
- *Use of Ruses in ICE Enforcement Operations* dated August 22, 2006
- *Standard Operating Procedure, Escapes and Releases* dated December 11, 2006
- Designation of Cold Case Fugitive Files and the Creation of a Fugitive Docket for the Fugitive Operations Support Center dated September 4, 2009
- *Alien Registration File (A-File) Creation, Maintenance, Organization, and Disclosure Information* dated October 2, 2009
- *Department of Defense (DOD) Enlistment of Certain Nonimmigrant and other Aliens Determined to be Vital to the National Interest* dated October 14, 2009
- *Documentation of Consent in Enter and Search* dated January 19, 2010
- *ERO Quick Reference for Processing Guide, Version 1.1* dated June 10, 2010
- *Prosecutorial Discretion – Certain Victims, Witnesses and Plaintiffs* dated June 17, 2011
- *Enforcement Actions at or Focused on Sensitive Locations* dated October 24, 2011
- ICE Policy Memorandum 11064.1 – *Facilitating Parental Interests in the Course of Civil Immigration Enforcement Activities* dated August 23, 2013
- *Guidance for E-mailing Scanned Documents to the Law Enforcement Support Center for Entry into the National Crime Information Center* dated March 14, 2017

## D. *Roles and Responsibilities*

**Deputy Assistant Director (DAD), Fugitive Operations Division:** Oversees Headquarters (HQ) Fugitive Operations. Facilitates logistical and operational support to all ERO field offices and all designated FOTs nationwide; develops, implements and oversees plans, policies, and procedures, both budgetary and operational, to ensure enforcement priorities are met; and maintains standards of efficiency through periodic reports and administrative reviews.

**Unit Chief, NFOP:** Provides NFOP leadership and guidance to ERO Field Office Directors (FODs) and FOTs. Serves as the principal point of contact for all NFOP queries within HQ; interprets directives and guidance from Congress, DHS, and ICE senior management; and monitors field implementation and reporting of statistical data. Identifies and develops efficiencies and methodologies to increase effectiveness of at-large enforcement.

**Section Chief, NFOP:** Serves as an expert on program and administrative policies affecting programmatic issues and requirements. Specifically, provides management and technical oversight to staff members and performs related supervisory functions, and serves as a principal advisor to the Unit Chief, DAD, and other management staff at the NFOP.

**Field Office Director (FOD):** Directs field activity to accomplish at-large performance goals. Oversees local implementation of Fugitive Operations-related policy; determines rotation and assignment of FOT members (locations are determined by HQ); coordinates staffing of FOT positions based on available resources and funding; and uses NFOP resources and funding to advance the NFOP mission and enforcement objectives.

**Assistant Field Office Director (AFOD):** Provides guidance and oversight to FOT Supervisory Detention and Deportation Officers (SDDOs). Briefs the FOD on FOT operations and concerns, serves as the field office's main point of contact with NFOP, and ensures proper alignment and optimization of resources.

**Supervisory Detention and Deportation Officer (SDDO):** Plans and implements team operations based on guidance and goals set by ICE. Provides first line supervision to FOT members, carrying out a wide range of activities, including training; oversees FOT preparation and processing activities; oversees the development of leads and analysis of data from multiple sources to support field enforcement operations; reviews and updates cases in ENFORCE EARM; reviews field operation worksheets (FOWs), alien files (A-files), and target folders; and ensures the safe conduct of officers during enforcement activities. Monitors compliance in accordance with all DHS and ICE policies and guidance and provides on-site leadership.

**Fugitive Operations Team:** Comprised of one SDDO, five deportation officers (DOs), and one enforcement and removal assistant (ERA). Conducts enforcement activities based on the policies set forth by ICE and as provided in this Handbook.

Confidential Subject to Protective Order

## E. *Definitions*

**Arrest:** The taking or keeping of a person in custody by legal authority.

**At-large alien:** An alien not in ICE custody who is in the United States in violation of immigration law but is not a fugitive alien, or an alien who has illegally reentered the United States after having been removed.

**ENFORCE Alien Removal Module (EARM):** The primary case management system for ERO; provides uniform control of cases related to inadmissibility, deportation, or removal.

**Foreign fugitive:** A removable alien currently in the United States who is wanted by a foreign country for crimes committed outside the United States.

**Fugitive alien:** An alien who has failed to depart the United States pursuant to a final order of removal, deportation or exclusion; or who has failed to report to an ERO officer after receiving notice to do so.

**Fugitive operations:** At-large enforcement actions to locate and arrest a target for whom a warrant of arrest can be issued (Form I-200).

**Juvenile / Child:** For the purpose of this document, any individual under the age of 18.

**Lead:** Information that can be developed, for investigative purposes, to identify and locate a target.

**Re-entry:** An alien who has reentered the United States after having been removed.

**Ruse:** A tactic designed to control the time and location of a law enforcement encounter.

**Source of information:** Person or entity who provides information concerning the identification and/or possible location of a target or unlawful activity.

**Target folder:** A folder that contains the investigative information needed to locate and arrest the target.

**Vehicle pursuit:** Per 8 CFR 287.8(e), an active attempt to apprehend fleeing suspects who are attempting to avoid apprehension.

## F. *Enforcement Activities*

The January 25, 2017 Executive Order 13768 entitled "*Enhancing Public Safety in the Interior of the United States*" requires ERO to make use of all available resources to ensure the efficient and faithful execution of the United States immigration laws.

Officers will target removable aliens who:

(a) Have been convicted of any criminal offense;
(b) Have been charged with any criminal offense, where such charge has not been resolved;
(c) Have committed acts that constitute a chargeable criminal offense;
(d) Have engaged in fraud or willful misrepresentation in connection with any official matter or application before a governmental agency;
(e) Have abused any program related to receipt of public benefits;
(f) Are subject to a final order of removal, but who have not complied with their legal obligation to depart the United States; or
(g) In the judgment of an immigration officer, otherwise pose a risk to public safety or national security.

## G. *Training Requirements*

**SDDOs overseeing FOT activities must:**

1. Become familiar with the content of this Handbook and provide all FOT officers with a copy of this Handbook.

2. Provide the Senior Field Training Officer (SFTO) with a signed acknowledgment of receipt of this Handbook from each assigned FOT officer. The SFTO will add these receipts to the officers' training files.

3. Successfully complete the ICE ERO Field Operations Training Program (D-FOTP) within six months of assignment to a FOT, unless training resources are unavailable. If compliance is not possible due to other issues outside the SDDO's control, a one-time six-month extension may be requested through the Deputy Assistant Director over ERO Training, with concurrence of the Fugitive Operations Division.

4. Attend Fourth Amendment training provided by the ICE Office of the Principal Legal Advisor (OPLA) every six months.

5. Work closely with the SFTO to identify training that will improve the skill sets of FOT officers, such as officer survival, emergency medical procedures, defensive tactics, and response coordination.

6. Qualify every quarter with all assigned firearm(s).

7. Become familiar with the various firearm models, including long arms, carried by FOT officers. (**NOTE:** Due to the variety of firearms that may be used, a

second day of advanced firearms training exercises is considered a best practice, and should be adopted by all field offices.)

**FOT officers must:**

1. Become familiar with the Handbook, upon assignment to a FOT.

2. Successfully complete the DFOTP within six months of assignment to a FOT unless training resources are unavailable. If compliance is not possible due to other issues outside the officer's control, a one-time six-month extension may be requested through the Deputy Assistant Director over ERO Training with concurrence of the Fugitive Operations Division.

3. Attend Fourth Amendment training provided by ICE OPLA every six months.

4. Qualify every quarter with all assigned firearm(s).

5. Become Familiar with the various firearm models, including long arms carried by FOT officers.

# PART 2: Fugitive Operations Team Casework

## A. *Lead Development*

Leads for NFOP cases may come from docket management, the National Criminal Analysis and Targeting Center (NCATC), the Pacific Enforcement Response Center (PERC), the ICE Tip Line (888-DHS-2ICE), INTERPOL, other FOTs, other DHS entities, such as U.S. Citizenship and Immigration Services (USCIS), probation and parole offices, other law enforcement agencies (LEAs), and numerous other sources of information.

In the event an inter-office case transfer is necessary, all lead information will be transferred to the receiving office where the target is believed to be located.

**SDDOs overseeing FOT activity:**

1. Assign the NFOP case or investigative lead to a FOT officer.

2. Review and approve the target folder before a FOT conducts an enforcement operation.

**FOT Officers:**

1. Assess leads for viability and develop supporting information for the identification and location of the target.

2. Update the transfer of the case in EARM.

3. Consolidate any temporary files into the A-file. Transfer the A-file, work folder(s), and the target folder to the FOT AFOD or SDDO in the receiving office (consistent with the USCIS Records Operations Handbook). **Do not combine any target folders, investigative notes, or other information with the A-file**; simply include the A-file and the case folders into a package to be transferred to the receiving field office.

## B. *Sources of Information*

ICE ERO does not have a confidential informant (CI) policy. Only ICE Homeland Security Investigations (HSI) is permitted to document and manage CIs; however, ERO officers may develop sources of information.

**FOT AFODs:** Approve, as appropriate, the use of prosecutorial discretion or Alternatives to Detention (ATD) as a possible means to continue an individual's cooperation.

**SDDOs supervising FOT activity:**

1. Before deciding whether to consider prosecutorial discretion, carefully review the totality of the circumstances that surround the subject, with particular emphasis on the subject's criminal background.
2. Consult and inform the officer prior to offering an incentive to a subject providing information.
3. Recommend to the AFOD, as appropriate, the use of prosecutorial discretion or ATD as possible means to continue an individual's cooperation.

**FOT Officers:**

1. Carefully review the totality of the circumstances that surround the subject, with particular emphasis on the subject's criminal background.
2. Consult with and obtain approval from the SDDO to determine if the subject would be a valuable source of information.
3. Consider the use of prosecutorial discretion or ATD as possible means to obtain an individual's cooperation.

## C. *Case Management*

### (a) Enforce Alien Removal Module (EARM) and Docket Management

Docket management includes comprehensive, systematic review and updating of an officer's assigned caseload. An appropriately managed docket reduces the chances of unnecessary duplication of effort.

**SDDOs supervising FOT activity:**

1. Assign cases in a fair and equitable manner.

2. Track progress of arrests by threat level and criminality, and adjust caseload as needed.

**FOT Officers:**

1. Update EARM [Operations Management Module ($OM^2$)] after receiving each investigative lead.

2. Ensure all cases are properly coded in EARM and that all the information entered in EARM is correct, complete, and up-to-date.

3. Ensure that the Crime Entry Screen (CES) is up to date with all charges and convictions.

   - In the Case Comments section, annotate the exact disposition as it reads in the judgement and conviction (JC) document if the conviction is not listed by NCIC Code / Charge in the CES.

   - Review the charges alleged on the charging document to ensure accuracy. Alleged criminal convictions must be confirmed through certified JC documents. It is the case officer's responsibility to request and obtain certified JCs not found within the A-file.

4. Periodically review assigned caseload to maintain EARM data quality and integrity.

5. Note any actions taken or decisions made on a case in the Case Comments section using clear and concise language.

6. Verify that the case category is correct when reviewing or updating a case to reflect the subject's current status.

Note: Some cases will not be found in EARM because of the lack of an encounter.

### (b) A-File Review

**FOT Officers:**

1. Verify removability by conducting the following **mandatory** checks:

   - EARM
   - Person Centric Query System (PCQS)
   - TECS MOD
   - Computer Linked Application Information Management System (CLAIMS)
   - Board of Immigration Appeals (BIA)
   - National Crime Information Center (NCIC)

2. De-conflict with other law enforcement investigations by conducting **mandatory** checks in TECS MOD (SQ11, SQAD, NN16), as well as state and local databases.

3. Coordinate with local task forces, such as the High Intensity Drug Trafficking Areas Task Force, which may maintain a local de-confliction database.

4. Review information that might be available from other sources. These sources may include:

    - Customer Profile Management System (CPMS)
    - Executive Office for Immigration Review (EOIR) Hotline (1-800-898 7180)
    - Principal Legal Advisor Net (PLAnet)
    - Consular Consolidated Database (CCD)
    - Student Exchange Visitor Information System (SEVIS)
    - United States Visitor and Immigrant Status Indicator Technology (US-VISIT)
    - Public Access to Court Electronic Records (PACER)
    - Online investigative software such as CLEAR or Accurint
    - Automated Targeting System–Passenger (ATS-P)
    - Analytical Framework for Intelligence (AFI)
    - Public utility records; telephone records
    - U.S. Postal Service mail and address information
    - State and local police department records
    - Fish and game licenses
    - Records from the Department of Motor Vehicles
    - Clerks of court; probation and parole departments
    - Correctional institutions
    - Child support enforcement
    - Employment and unemployment departments
    - Financial institutions
    - Insurance databases
    - Educational institutions
    - State and local birth and death records
    - Internet sources, social media etc.
    - ICE Office of Intelligence
    - Local business records (e.g., shopper membership cards, video rentals, etc.)

5. Update EARM if a fugitive alien appears to reside outside of the FOT's area of responsibility (AOR).

6. Update the $OM^2$ with new lead information found during the review.

7. Establish contact with the FOT that has jurisdiction over the suspected new location to request a field investigation.

8. If the alien is located in the suspected new location, forward case documents and information to the FOT in that new location following the procedures for case assignment. The A-file should also be forwarded to the respective FOT (**do not combine the A-file and target folder**).

## D. *Administrative Subpoenas*

Immigration Enforcement Subpoenas (DHS Form I-138) are used to compel the appearance and testimony of witnesses and the production of books, papers, and documents, (phone records, forwarding address, etc.) consistent with 8 U.S.C. Section 1225(d)(4)(A) and 8 C.F.R. § 287.4.

**FODs or designee:** Approve and sign the DHS Form I-138.

**FOT Officers:**

1. Fill out Immigration Enforcement Subpoenas (DHS Form I-138).

2. Serve the approved and signed DHS Form I-138 upon the person or entity to which it is addressed.

## E. *Referral to the Law Enforcement Support Center*

Timely submission of data is the key for NCIC to work effectively. Placing fugitive cases into NCIC via the Law Enforcement Support Center (LESC) increases the probability of arrest, thus providing a service to ICE and the community. NCIC warrants enable other LEAs to serve as a force multiplier to help identify, locate, and arrest at-large aliens. The March 14, 2017, ERO memorandum entitled *Guidance for E-mailing Scanned Documents to the Law Enforcement Support Center for Entry into the National Crime Information Center* sets the procedures for entering documents into NCIC.

### (a) Administrative Warrants: NCIC Entry Requirements

**FOT Officers:**

1. Review the A-file and complete all checks to determine the probability of locating the target. If no viable address is found, scan and email the following documents to the LESC for entry into NCIC:

   - Removal orders (i.e., EOIR immigration judge or Board of Immigration Appeals orders, administrative removal orders under INA § 238(b) or judicial orders under INA § 238(c), expedited removal orders, etc.)
   - Warrant of Removal (Form I-205), both sides
   - FD-249 fingerprint card, both sides
   - Photograph
   - Record of Deportable/Inadmissible Alien (Form I-213) or Information for Travel Document or passport (Form I-217)

**Additional documents required for aggravated felon entries include criminal history documents** (i.e., judgment and conviction records) that indicate sentencing information qualifying the offense as an aggravated felony.

2. Scanning Requirements:

   Documents must be scanned in color, using a portable document format (.pdf) and a minimum of 600 dots per inch (dpi).

   - When naming the scanned .pdf document, use the target's alien number and name (i.e., "**A000 000 000, LAST NAME, First Name.pdf**").
   - Save a copy of the .pdf file to the local share drive in the folder designated by the SDDO supervising FOT activity.

3. Email Requirements:

   - Send the e-mail to LESC.CrimWarrants@ice.dhs.gov, with a courtesy copy to the responsible docket officer, and place a copy of the e-mail in the A-file for record keeping.
   - The subject line of the e-mail must contain "NCIC," the alien number, and the target's name (i.e., "**NCIC: A000 000 000, LAST NAME, First Name**").
   - Attach the scanned documents relating to that subject.
   - The body of the e-mail should read: "Please accept the attached documents that relate to the subject referenced in the subject line of this e-mail for input into NCIC."

4. Transfer the physical file to the local File Control Office for proper maintenance per USCIS policies and procedures (consistent with the USCIS Records Operations Handbook).

## (b) Criminal Warrants: NCIC Entry Requirements

**FOT Officers**:

1. Review the A-file and complete all checks to determine the viability of locating the subject. If no viable address is found, scan and email the following documents to the LESC for entry into the NCIC:

   - Removal orders (i.e., EOIR Immigration Judge or Board of Immigration Appeals orders, administrative removal orders under INA § 238(b) or judicial orders under INA § 238(c), expedited removal orders, etc.)
   - Warrant of Removal (Form I-205), both sides
   - FD-249 fingerprint card, both sides
   - Photograph
   - Record of Deportable/Inadmissible Alien (Form I-213), or Information for Travel Document or passport (Form I-217)
   - Criminal history documents (e.g., JC records) that indicate sentencing information qualifying the offense an aggravated felony

- Additional supporting documentation (e.g., copies of the criminal complaint, indictment) should be included if available, but are not required.

2. Submit both the criminal warrant and a Fugitive Report (DHS Form 59) to the LESC for entry **within 24-hours of the issuance of the warrant**. If submission is outside the 24-hour period, a reason for the delay must be annotated in the Block 32 "Remarks" section.

   - Criminal warrant NCIC entries must include a copy of the Criminal Warrant for Arrest issued by a United States District or Magistrate Court, signed by either the Federal District Court Judge, a Magistrate Judge of the United States District Court, or other court official.

   - DHS Form 59 must include:
     - All pertinent information as annotated in "red" on the form.
     - The signature of the FOT officer and the approving FOD, or designee.

3. Scanning Requirements:

   Documents must be scanned in color, using a portable document format (.pdf)

   and a minimum of 600 dots per inch (dpi).

   - Name the scanned .pdf document with the alien number and the name of the subject (i.e., "**A000 000 000, LAST NAME, First Name.pdf**").
   - Save a copy of the .pdf file to the local share drive in the folder designated by the FOT SDDO.

4. Email Requirements:

   - Send the e-mail to LESC.CrimWarrants@ice.dhs.gov, with a courtesy copy to the responsible docket officer, and place a copy of the e-mail in the A-file for recordkeeping.
   - The subject line of the e-mail must contain "NCIC," the alien number, and the subjects name (i.e., "**NCIC: A000 000 000, LAST NAME, First Name**").
   - Attach the scanned documents relating to that subject.
   - The body of the e-mail should read: "Please accept the attached documents that relate to the subject referenced in the subject line of this e-mail for input into NCIC."

5. Transfer the physical file to the local File Control Office for proper maintenance per USCIS policies and procedures (consistent with the USCIS Records Operations Handbook).

## F. *Target Folder Creation*

**FOT Officers:** Take target folders into the field (A-files are not intended for field use). Copies of the following documents relating to the NFOP case should be included in a target folder:

- Signed FOW and instruction sheet

- Signed Form I-205 (Warrant of Deportation/Removal)
- Final Order and BIA decision(s)
- Judicial decision(s) on removal
- Signed Form I-200 (Warrant for Arrest of Alien)
- Recent photographs
- Information about family members and known associates
- Fingerprint card
- Initial and subsequent I-213s (Record of Deportable/Inadmissible Alien)
- Benefit applications and forms (I-130, G-325A, I-485, etc.)
- Public record database queries
- Online investigative search results
- Mandatory database checks (may be noted on FOW)
- Employment information
- G-166C (Memorandum of Investigation)
- Criminal search warrant
- Criminal arrest warrant
- Miscellaneous information (e.g., driver's license, vehicle registration, firearm registration, passport, travel documents, Social Security card, etc.)

The FOT member maintains target folders pending completion of the FOW. **Do not combine the target folder with the A-file.** FOWs and other documents containing intelligence or sensitive information are not to be included in the A-file. The FOW must be signed by the FOT SDDO prior to surveillance and/or arrest.

## G. *ICE "Wanted" Posters*

In certain cases, officers may create an ICE Wanted Poster (M-551), but should check with the SDDO supervising FOT activity for approval.

**SDDOs supervising FOT activity:**

1. Prior to releasing the poster for circulation, confirm that the subject of the wanted poster is entered into NCIC via the LESC (see NCIC warrant entry requirements above). Wanted posters for escapees, threats to national security, NFOP directive, or other exigent circumstance may be circulated prior to NCIC entry.

2. Submit the wanted poster to the FOD or designated representative for concurrence.

**FOT Officers:**

1. Ensure the subject of the wanted poster is entered into NCIC via the LESC. Exceptions to NCIC warrant entry requirements include an escape, threat to national security, NFOP directive, or other exigent circumstance.

2. On the wanted poster, include all pertinent subject data (do not include the alien number), as well as a photograph of the subject's face in JPG format (for

ease and use of manipulation) that is at least 100 kilobytes but does not exceed 1 megabyte.

3. Submit the poster to the SDDO supervising FOT activity for FOD, or designated representative, concurrence prior to submission to HQ.

## H. *Aliens Located While Incarcerated*

The Criminal Alien Program (CAP) is responsible for all foreign-born nationals found while incarcerated.

**FOT Officers:**

1. Work with docket officers to make sure the case category in EARM reflects that the individual is not or no longer a fugitive (Case Category 5B to 3, 8E to 8C, 8I to 8G) and that all other EARM screens are updated accordingly.

2. Work with CAP to obtain a daily listing of any aliens encountered.

3. If a fugitive alien is incarcerated, defer to local protocols for processing.

4. Do not enter an incarcerated "arrest" as an arrest in $OM^2$.

5. Upload the information received into $OM^2$ as "LOCD - Located/Detainer (I-247 Lodged)".

## I. *Field Office-Initiated Operations*

Field office enforcement initiatives that require operations plans (op plans) are those efforts conceived and implemented at the local level which:

- Target 10 or more subjects;
- Target a specific population set (e.g. gang members, sex offenders);
- Are expected to attract media attention;
- Extend beyond the typical geographical boundaries of a FOT AOR – even if targeting only one individual.

As with other aspects of operational casework, appropriate preparation can solve or mitigate potential sensitive challenges. When planning for every operation, officers should address the possibility that the FOT will encounter a juvenile. As a part of the planning process, the FOT will ascertain the local Child Protective Services (CPS) protocol for referring children. For further information in handling juveniles, refer current ICE policies regarding juveniles and unaccompanied alien children.

**FODs:** Approve the op plan at least two weeks prior to execution of the initiative.

**FOT AFODs:**

1. Give guidance in the creation of an op plan and target list for FOT Officers.

2. Review and update the op plan and target list.

3. If assistance in finding bed space is needed, contact Field Operations at least two weeks prior to the operation.

**SDDOs supervising FOT activity:**

1. Forward the op plan and target list through the local chain of command to the FOD for review and signature.

2. Forward a copy of the op plan (word document), the target list (excel document), and a scanned copy of the FOD signature page (.pdf) to the HQERO. FUGOPS mailbox at least two weeks prior to the operation. **Only the FOD signature page should be a scanned (.pdf) copy.**

3. Notify the LESC at (802) 872-6020 and the National Law Enforcement Communications Center (NLECC), also known as Sector Communications, at 1-800-973-2867 at least two weeks prior to an operation to allow for adjustments in staffing levels.

4. Involve the Field Office Juvenile Coordinator (FOJC) in the planning process when surveillance, file review, or any other activity reveals that a juvenile may be encountered during a particular operation.

**FOT Officers:**

1. Per SDDO guidance, create an op plan and target list utilizing the HQ-approved Enforcement Operations Plan and target list templates unless directed otherwise.

2. Targets will be queried in TECS MOD utilizing SQAD, SQ11, and NN16 to ensure de-confliction with HSI and other law enforcement agencies.

3. Select the approved enforcement initiative title (i.e., Cross Check, Return to Sender, Secure Streets, etc.).

4. Send the op plan and target list to the SDDO supervising FOT activity.

## J. *HQ-Initiated Operations*

HQ-initiated operations include operations in which:

1. HQ directs the field to conduct a national or regional targeted operation.

2. Targets are of a sensitive nature and may result in significant media or departmental attention (i.e., high profile individuals, public officials, religious or political organizations, or requests made by foreign governments).

3. HQ may distribute targets to FOTs and oversee the planning of a large-scale operation.

**FODs:** Approve the op plan at least two weeks prior to execution of the initiative.

**FOT AFODs:**

1. Review and update the op plan and target list with guidance from HQ NFOP and the NCATC.

2. If assistance in finding bed space is needed, contact Field Operations at least two weeks prior to the operation.

**SDDOs supervising FOT activity:**

1. Forward the op plan and target list through the local chain of command to the FOD for review and signature.

2. Forward a copy of the op plan (word document), the target list (excel document), and a scanned copy of the FOD signature page (.pdf) to the HQERO. FUGOPS@ice.dhs.gov mailbox at least two weeks prior to the operation. **Only the FOD signature page should be a scanned (.pdf) copy.**

**FOT Officers:**

1. Create an op plan and target list utilizing the HQ-approved templates unless directed otherwise by HQ. (Current templates can be found on the Fugitive Operations insight page)

2. Submit the op plan and target list to the FOT SDDO.

## PART 3: Conducting Operations

### A. *Surveillance*

Field surveillance should precede operations. An FOW must be completed and signed prior to conducting operations.

**FOT SDDOs and AFODs:** Review, monitor, and approve FOWs.

**FOT Officers:**

1. Complete an FOW and forward to the FOT SDDO for review and signature.

2. When conducting surveillance, notify the local LEA with jurisdiction, unless directed otherwise by the FOD.

### B. *Communications*

The primary point of contact for criminal and administrative record checks during operations is the LESC at (802) 872-6020. NLECC/Sector is also available to assist

in conducting records and systems checks. NLECC/Sector may be reached at 1-800-X-SECTOR (1-800-973-2867).

**SDDOs supervising FOT activity or designated FOT Officers:**

1. Notify local LEAs of FOT operations in their jurisdiction.
2. Identify and perform a function check of primary and secondary means of communication (e.g., vehicle radios, hand-held radios, cell phones, etc.) and provide to FOT officers before commencing the enforcement action.
3. Contact both the LESC and NLECC/Sector to create a personal information number (PIN) and ensure your profile is active to ensure prompt records checks.

## C. *Law Enforcement Visibility*

Consider environmental conditions, officer safety, and public perception when planning operations and determining the appropriate level of officer visibility. Officers may choose either high or low visibility marking based on environmental and tactical considerations.

During enforcement actions, officers must identify themselves to immediate parties involved, and provide credentials upon request when safe and practical. If operationally feasible, officers may identify themselves to third person parties.

1. High Visibility: When conducting high-visibility operations, acceptable means of identification include vest placards or clothing clearly identifying you as a law enforcement officer, such as Agency-issued shirts, windbreakers, and external body armor carriers distinctly marked with "Police." In addition, officers must have an ICE badge visible.
2. Low Visibility: If circumstances dictate a low-visibility approach, FOT officers may wear clothing that helps them blend into the environment. Officers must have police identifiers and/or badges immediately available for display as needed.
3. Whenever an officer's weapon(s) is (are) visible, an ICE badge must also be visible.
4. Body armor shall be worn during all planned enforcement actions.

## D. *Pre-operational Briefing*

An operational briefing will precede every enforcement action, absent exigent circumstances. All officers and any other law enforcement personnel participating in the operation will attend the pre-operational briefing.

The briefing must include:

- Review of target folders, including FOWs, and team assignments (contact, cover, search team, perimeter etc.)
- Risk/threat assessment (i.e., escape risk, combative with law enforcement, etc.)
- Type of warrant being executed, i.e., criminal arrest, criminal search, or administrative arrest. (Explaining the scope of an ICE administrative warrant is particularly important for officers from other LEAs with limited or no experience participating in ICE administrative arrests.)
- Communications
- Deployment or assignment of long arms
- Non-deadly force weapons
- Personal body armor (Body armor is required during all field operations, regardless of whether it is a formal, preplanned operation. (See *Body Armor Policy.*)
- Information regarding any medical issues
- Presence of children or elderly
- Potential media interest

## E. *Ruses*

Ruses improve safety for the officers and the public by limiting opportunities for the target to flee. FOT use of ruses must comply with the current ICE memoranda entitled, *Uses of Ruses in Enforcement Operations* dated March 6, 2006, and *Use of Ruses in ICE Enforcement Operations* dated August 22, 2006.

Due to the potential liability involved in ruse operations using legitimate entities, ruses will be limited to fictitious entities. No ruses involving health and safety programs will be used.

## F. *Consent*

Neither a Warrant for Arrest of Alien (I-200) nor a Warrant of Removal (I-205) authorizes officers to enter the target's residence or anywhere else where the target has a reasonable expectation of privacy. A government intrusion into an area where a person has a reasonable expectation of privacy for the purpose of gathering information will trigger Fourth Amendment protections, including a physical intrusion into a constitutionally protected area ("people, houses, papers, effects, and curtilage" under the U.S. Supreme Court's landmark decision, *United States v. Jones*, 132 S. Ct. 945 (2012)) for the purpose of gathering information.

Therefore, without a criminal warrant, officers must obtain voluntary consent before entering a residence or area where there is a reasonable expectation of privacy. Consent may never be coerced. (See memorandum entitled *Documentation of Consent in Enter and Search* dated January 19, 2010.)

Consent is involuntary when it is the product of coercion or threat, whether expressed or implied. Other factors affecting voluntariness include: an officer's claim or show of authority, prior illegal government action, mental or emotional state of the person, cooperation or lack thereof, and custody. Officers need not advise the person that consent may be refused.

Whether or not the FOT obtained consent to enter and search, is frequently a ground for litigation. Additionally, if contraband is seized and/or a criminal prosecution is contemplated, the criminal prosecution could be impacted by whether officers had consent to search. Therefore, it is essential for officers to immediately, or as soon as practicable, record all pertinent information regarding the consent process in the FOW, rather than waiting until completion of the operation. A civil suit questioning consent may be filed months or years following the conclusion of an operation, at which time members of the FOT may not recall what transpired at a particular location.

**SDDOs supervising FOT activity:**

1. Assign one officer the primary duty of requesting consent to enter and search.

2. Assign a different officer to observe the process and record consent information on the FOW while on scene.

**FOT Officers:**

1. Obtain voluntary consent before entering a residence. For consent-based home operations, make reasonable efforts to have an officer proficient in the language spoken by the target available. Additionally, officers are reminded that consent to enter or search a private residence must be sought in a language understood by the resident who grants consent whenever feasible, and one or more Spanish–speaking officers must be available to seek such consent where the target is thought to be from a Spanish-speaking country. (See memorandum entitled, *Documentation of Consent to Enter and Search*, dated January 19, 2010.) The memorandum instructs ERO officers to fill out FOWs and document consent to search on both the FOW and the I-213. The documentation for the operation should reflect the language used in seeking to obtain consent.

2. Do not enter, search, or remain inside a residence without the consent of a person who is at least 18 years of age and who is authorized to grant consent, including apparent authority.

3. Record immediately or as soon as practicable on the FOW the request and receipt of consent. Include the name of the person giving consent, the time and scope of the consent, and other relevant factors, such as the names of witnesses.

4. If consent is denied, document the denial on the FOW, noting that the FOT departed without entering the residence and other relevant factors.

5. If consent is withdrawn prior to an officer seeing the target, the officers must leave the residence. The time of the withdrawal must be recorded on the FOW.

6. If an arrest is made, the narrative of Record of Deportable/Inadmissible Alien (Form I-213) must include the consent information that is included on the FOW. This should reduce the possibility of inconsistencies.

## G. *Travel Documents*

**FOT Officers:**

1. To the extent that officer safety is not compromised, FOT officers should attempt to obtain travel documents, birth certificates, or other foreign identification documents at the time of arrest.

2. If travel documents are not in plain view or on the arrestee's person, request consent to look in areas where documents may be found. Verbal consent in the presence of at least one other law enforcement officer is acceptable.

3. If consent to look for travel documents is granted, inform the person documenting consent on the FOW, so that the FOW is annotated in case a claim of a non-consensual search is made by an alien. This is especially important, as illicit items may be discovered during the course of the search.

## H. *Vehicle Pursuits*

**FOT officers are not authorized to conduct vehicle pursuits under any circumstances.**

## I. *Vehicle Stops*

FODs have discretion to authorize vehicle stops in their respective field offices. Officers who have successfully completed Federal Law Enforcement Training Center or ICE vehicle stop training may conduct vehicle stops. Vehicles used to perform these stops must have emergency equipment (lights/siren) in compliance with state laws. The standard Federal Law Enforcement Package with which ERO vehicles are currently equipped may or may not be in compliance with state regulations for law enforcement vehicles. The FOD shall ensure that the field office coordinates with the state authority to determine if any additional retrofitting is needed.

**FODs:** Authorize officers to conduct vehicle stops, as appropriate.

**SDDOs supervising FOT activity:** Review the vehicles utilized for field operations to ensure they have emergency equipment (lights/siren) and comply with applicable state laws.

**FOT Officers:**

1. Review the vehicles utilized for field operations to ensure they have emergency equipment (lights/siren) and comply with applicable state laws.

2. Officers should not pursue a target who fails to pull over, as ERO law enforcement officers are not authorized to engage in vehicular pursuits. If the

suspect vehicle fails to pull over (flees in the vehicle), do not pursue. Instead, officers should obtain accurate vehicle and occupant information and direction of travel.

## J. *Gangs*

In the event officers encounter an alien affiliated with a street gang, officers must record the appropriate information on the Form I-213 and photograph any tattoos. Where operationally safe, photos will be taken in residences where gang tags and/or paraphernalia are prevalent, to include a photo of the front of the house for future officer safety concerns.

A gang member is defined as anyone who admits gang affiliation, is convicted of violations associated with 18 U.S.C. § 521 or any other federal or state law punishing or imposing civil consequences for gang-related activity or association, or falls under two or more of the following criteria, one of which occurred in the previous five years. An associate gang member is defined as an individual who exhibits one of the following criteria but may not have been formally initiated into the gang:

- Has tattoos identifying a specific gang.
- Frequents an area notorious for gangs and or associates with known gang members.
- Seen displaying gang hand signs/symbols.
- Identified as a gang member by a reliable source or by an informant (tested or untested).
- Arrested on two or more occasions with known gang members. (If the most recent arrest occurred in the past five years, the "previous five years" requirement is deemed to have been met).
- Identified as a gang member by a jail, prison, or other LEA.
- Identified as a gang member through seized written or electronic correspondence.
- Seen wearing gang apparel or been found possessing gang paraphernalia.
- Identified as a gang member through documented reasonable suspicion.

The officers/agents conducting the arrest will determine whether indications of gang association are present.

## K. *Arrests*

Arrests in a public place may occur at any time. Arrests at a private residence or any other area with a reasonable expectation of privacy may only be conducted between the hours of 6:00 a.m. and 10:00 p.m.

A planned arrest requires the participation of at least two law enforcement officers who identify themselves as law enforcement officers at the time of arrest.

### (a) Officer Safety

Confidential Subject to Protective Order

**<u>Safety is paramount.</u>** All participating officers should be fully equipped with both deadly and non-deadly force weapons, service-issued firearms, and personal body armor.

All ICE field management shall consider officer safety issues and available intelligence to ensure the welfare of all officers involved in the operation. In general, it is important to consider that a majority of the target locations associated with this operation will result in the arrest of more than one subject. Supervisors are encouraged to allocate greater manpower than is traditionally assigned to each target location in order to account for larger groups and associates with criminal histories.

### (b) Sensitive Locations

ICE officers will conduct enforcement actions consistent with current ICE Sensitive Locations Policy.

### (c) Courthouses

ICE officers will conduct enforcement actions at courthouses consistent with current policy on Civil Immigration Enforcement Actions Inside Courthouses.

### (d) Special Considerations for Arrest

**FOT Officers:**

Upon arrest, ask the subject the following:

- Do you have any medical issues or concerns?
  - If so, do you have medication or an assistive device to take with you?
- Do you have any children or other custodial responsibilities?
  - If so, are you the sole caregiver?
- Do you have a travel document (either valid or expired)?

### (e) Current or Prior United States Military Service

When encountering an alien with prior U.S. military service, review all current memoranda and policies available on the ICE insight page.

**FODs:**

1. Must approve the issuance of a charging document for current or prior military members.
2. Should not initiate removal proceedings against aliens who are eligible for naturalization under sections 328 or 329 of the INA, notwithstanding an order of removal. (An order of removal does not preclude their naturalization.)

**SDDOs supervising FOT activity:**

1. Thoroughly review the case folder to determine eligibility for United States citizenship under sections 328 and 329 of the INA. OCC must review and sign off for legal sufficiency.

2. Present the FOD with the findings of the review to allow the FOD to decide whether to issue an NTA.

### (f) Juveniles/Unaccompanied Alien Children

ERO officers may encounter juveniles during enforcement activities. The presence of non-targeted juveniles at a target location or in the care of a targeted alien is always a possibility, and should be explored during initial investigation to the fullest extent possible. Depending on whether the minor is accompanied, unaccompanied, a citizen, or a non-citizen, procedures vary.

ICE personnel should not take custody of, or transport, juveniles they encounter during an enforcement action who are a USC, an LPR, or are otherwise not removable from the United States.

Absent indications of child abuse or neglect, ICE personnel should accommodate, to the extent practicable, an alien parent or legal guardian's efforts to make alternative care arrangements for his or her juvenile. In such cases, ICE personnel should document the alien parent or legal guardian's request for transfer of custody of a USC or LPR juvenile to a verifiable third party.

If the alien parent or legal guardian cannot make an alternative care arrangement for the juvenile, or if there is an indication that the juvenile has been subject to abuse or neglect by a parent or other adult who may be asked to take custody of the juvenile, ICE personnel should contact the local child welfare authority or law enforcement agency to take custody of the juvenile.

Once a detained alien has been determined to be a parent or legal guardian of a USC or LPR juvenile, ICE personnel should enter this information in ENFORCE Alien Removal Module (EARM), or its successor system.

If a juvenile is to be taken into custody, the processing of the juvenile requires the Field Office Juvenile Coordinator (FOJC) to coordinate with the Health and Human Services (HHS) Office of Refugee Resettlement (ORR) for both transportation and custody.

**FODs:** Weigh whether an exercise of prosecutorial discretion may be warranted for a given alien and consider all relevant factors in this determination, including whether the alien is a parent or legal guardian of a USC or LPR juvenile, or is a primary caregiver of a juvenile. (Note: Prosecutorial discretion may be exercised at any stage of an enforcement proceeding.)

**SDDOs supervising FOT activity:**

1. Should evaluate any custody determination when an alien parent, legal guardian or primary caregiver of a juvenile is encountered.

2. In the event that non-targeted juveniles are identified, or are likely to be encountered, SDDOs ensure that family members, care providers, and community, as well as state and local juvenile resources, are identified and a plan of care for non-targeted juveniles is addressed prior to the commencement of operations.

FOT Officers:

1. Should not take custody of or transport anyone under the age of 18, unless the individual is being processed for an immigration violation, or charged with a federal crime.

2. If available information indicates that non-targeted juveniles will likely be present, obtain authorization from ICE supervisors prior to taking any enforcement action.

3. When encountering an alien responsible for the custody of a USC or LPR juvenile but is ineligible for release officers should reference the most current Juvenile and Family Residential Management (JFRMU) policy.

4. Maintain a current and relevant list of contacts for child welfare agencies.

5. Do not use juveniles as interpreters in furtherance of an enforcement action, except under exigent circumstances, or in the interest of officer safety or the safety of those encountered. The officer should make every reasonable effort to use available ICE language services.

6. In the event that officers encounter an unaccompanied alien child, contact the FOJC for processing requirements and for custody arrangements.

### (g) Consular Notifications

See 8 CFR 236.1(e) regarding Consular Notification for Alien Detained Prior to an Order of Removal.

Every detained alien shall be notified that he or she may communicate with the consular or diplomatic officers of the country of his or her nationality in the United States.

Some countries have agreements with the United States which require immediate communication with appropriate consular or diplomatic officers whenever their nationals are detained or in removal proceedings, whether or not this is requested by the alien and even if the alien requests that no communication should be undertaken on his or her behalf (see 8 CFR 236.1(e)). A list of current mandatory notification countries can be found on the Department of State website.

When notifying consular or diplomatic officials, ERO officers shall not reveal the fact or indicate anything that would give rise to a reasonable inference that the alien has applied for asylum, withholding of removal, withholding or deferral under Article 3 of the Convention Against Torture, and/or claims related to credible or reasonable fear determinations.

## L. *Prosecutorial Discretion*

**FOT Officers:**

1. Absent extraordinary circumstances, officers should not detain anyone who is physically or mentally ill, disabled, elderly, pregnant, nursing, or the sole caregiver(s) of children or the infirm.

2. Do not initiate removal proceedings against an individual known to be the immediate victim or witness to a crime without considering the requirements of the directive *Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs* dated June 17, 2011.

3. Officers should exercise discretion within the limits of agency authority and are expected to do so in a judicious manner throughout the enforcement process.

## M. *Post-Operation Debrief*

**SDDOs supervising FOT activity:** Hold a debriefing session after the enforcement action to address best practices, safety issues, and evaluation of the operation.

# PART 4: Processing Cases

**AFODs or designees:** Will ensure that target folders are maintained for three years after the last day of the calendar year the target folder was created (consistent with Records Schedule: DAA-0567-2015-0016).

Example: A target folder created on Jan 11, 2014, must be maintained until December 31, 2017, at which time it can be destroyed.

**FOT Officers:**

1. Follow the standard procedures for the processing of an alien (see the ERO Quick Reference for Processing Guide, Version 1.1 dated August 3, 2010).

2. Update EARM with all criminal activity, case category changes, and case actions. Concisely note the arrest and any special circumstances surrounding the case in the Case Comments box under the Comments tab.

3. If an A-file must be obtained from the National Records Center or another field office, request the file and document it in EARM.

4. Review case for possible criminal prosecution.

5. In instances where an alien may be subject to prosecution, the case will be presented to the U.S. Attorney's Office/State Attorney's Office, as appropriate. If the alien is being presented for prosecution:

   - Present the case to the United States Attorney's Office in accordance with local procedures, or refer cases to the Violent Criminal Alien Section (VCAS).
   - The officer presenting the case for prosecution shall enter the case in TECS MOD and complete a report of investigation (ROI).

6. If the case is accepted for prosecution, a Form I-247A (Immigration Detainer – Notice of Action) will be filed with the agency assuming custody of the alien.

7. If the U.S. Attorney's Office/State Attorney's Office declines to prosecute, the declination will be recorded in the EARM Prosecution Module and the narrative portion of the Form I-213 (Record of Deportable/Inadmissible Alien) and included in the file.

8. When transferring a case to the detained docket, provide any available travel documents or birth certificates, the I-217, the final order of removal, any decisions by the BIA, any judicial decisions on removal, and a signed I-205.

9. ***Do not place originals or copies of FOWs or investigative paperwork into the A-file.***

## A. *Reporting Requirements*

### (a) Operations Management Module

Full instructions for entering cases into OM² can be found in the OM² Quick Reference Guide located on the Fugitive Operations Web Page

At-large arrests must be documented in OM². Custodial encounters and arrests should not be documented as an arrest in OM².

Enter daily enforcement activities into OM² as they occur. Any user can add or edit an activity before the end of each week. After the end of each week only NFOP Headquarters can edit activity information, so requests for edits should be sent to the HQERO, FUGOPS HQERO, FUGOPS mailbox). The following information can be added or edited in OM² as long as the alien has been added to EARM:

Add/Edit Activity Screen

- **Activity Occurred On**: Can be edited by the user. Indicates the date which the activity occurred.
- **Activity**: Select an "arrest" or "non-arrest" activity from the drop down list.

- **Place of Arrest**: Select one of the dropdown options that best fits the enforcement action. This field is required on all arrests.
- **Level of Police Markings**: Select High or Low Visibility (Refer to Part 3, Section **C: Law Enforcement Visibility** of this Handbook). This field is required on all arrests.
- **Target v. Non-Target**: utilize the dropdown to indicate if this was a targeted or non-targeted arrest. This field is required on all arrests.
- **Identification Documents Acquired**: Indicate via the dropdown if any identification documents were obtained at the time of arrest. This field is required on all arrests.
- **Operation**: Based on the activity selected, an Operation may be able to be selected (e.g., Cross Check, Return to Sender, Secure Streets, etc.). This field is required on all arrests.
- **AOR**: Select the AOR from the drop down. This field is required.
- **Program**: Select the program that completed the activity (i.e., FOT, CAP, ATD, Other).
- **Team**: Select the team designation from the drop-down list. This field is required if FOT or CAP was selected in the program field.
- **State**: Select the state or territory from the drop down. This field is required only if the activity selected is an arrest; otherwise, the field is optional.
- **Classification**: Select one of the dropdown options (Fugitive, Re-Entry, or At Large)
- **Criminality**: This field is pre-populated based on convictions entered in the crime entry screen.

### (b) Exhausted Leads

**SDDOs supervising FOT activity:** Review the ROI and the Cold Case Checklist to verify that all investigative leads have been pursued.

**FOT Officers:**

1. If all leads are exhausted, as confirmed by the Fugitive Alien Cold Case checklist, generate a ROI via form G-166c for the FOT SDDO for review.
2. After the ROI is reviewed and approved by the SDDO, place the completed G-166C into the target folder.
3. Update comments in the case comments portion of EARM to state that "all investigative leads have been exhausted and there are no further investigative leads at this time." (This is in accordance with the ERO memorandum entitled *Designation of Cold Case Fugitive Files and the Creation of a Fugitive Docket for the Fugitive Operations Support Center* dated September 4, 2009.)
4. Ensure that the "Fugitive Alien Cold Case Checklist" located on page 5 of the memorandum was utilized.
5. For additional information concerning the documentation of exhausted leads and cold cases, contact your NCATC staff officer.

## B. *Special Activities*

### (a) Timely and Accurate Reporting of Significant Incidents

Certain enforcement activities or incidents that occur during enforcement activities may warrant the completion of a "Significant Incident or Prospective Enforcement Activity Report." Guidelines can be accessed at the following site:

https://reporting.ice.dhs.gov/sen/common/asp/login_ex.asp

### (b) Alternatives to Detention Violations

ATD violations require immediate action. Therefore, open communication between the FOT and local ATD is extremely important. The likelihood of recovery decreases substantially as the time between the violation and referral to the FOT increases.

The ATD program has an established reporting procedure for ATD violations, which differs from escapes. The ATD officer takes the lead on reporting, unless the FOD decides otherwise.

**SDDOs supervising FOT activity:** Work closely with the local ATD unit to establish a protocol for ATD violations.

### (c) Escapes

**Field Offices:** Upon any initiation of field surveillance in an attempt to locate an escapee, provide weekly ROIs to Field Operations and the HQ NFOP Unit Chief detailing the status of leads and case progress.

**SDDOs supervising FOT activity or SDDOs assigned to the operation:** In the event of an escape, assume the duties of the "officer in charge" of investigating the incident.

**FOT Officers:**

1. Investigate, track, and locate the escapee.

2. Upon arrest of the escapee, promptly (i.e., within one hour) notify Field Operations and the HQ NFOP Chief with a follow up "Significant Incident Report" via the Significant Event Notification database.

3. Completing all required actions as specified in the current ERO Escapes directive.

### (d) Fugitive Alien Removal Requests

Fugitive Alien Removal (FAR) cases are aliens wanted for crimes committed abroad who are physically present within the United States and are removable from the United States. The following criteria apply to FAR cases:

- The fugitive has an outstanding criminal arrest warrant issued by a recognized authority of the criminal justice system in foreign state.
- The fugitive's crime is also considered a crime within the United States.
- The requesting government has provided evidence of the existence of the arrest warrant through official correspondence, such as the issuance of an INTERPOL red notice, INTERPOL diffusion message, or translated copy of the warrant.
- The requesting government has agreed to the expeditious issuance of a travel document to facilitate the target's return.

**NFOP Officers:**

1. When INTERPOL issues a FAR request (Red Notice, Diffusion Message, or Special Notice) for a foreign fugitive believed to be in the United States, NFOP alerts the FOT AFODs with jurisdiction.

2. When encountering an INTERPOL notice in NCIC or otherwise, officers should confirm the status of the notice by contacting the Transnational Law Enforcement Operations Unit liaison at INTERPOL Washington at INTERPOL.AlienFugitiveDivision@ice.dhs.gov, or contact the INTERPOL Operations Command Center (IOCC) at (202) 616-3900 or usncb.interpol.washington@usdoj.gov.

3. The NFOP liaisons can confirm the wanted status of an individual, the type of notice they have, the crime for which he or she is wanted, age of the notice, whether the subject country is seeking extradition, and whether INTERPOL has vetted the notice and revoked after determining it was invalid.

4. Contact information for the NFOP Interpol liaison can also be found on the Fugitive Operations Web Page.

## (e) Liaisons and Task Forces

FOTs are encouraged to build and maintain positive partnerships with other LEAs and task forces to foster cooperative relationships in their AOR and contribute to the enhancement of ERO's mission. This includes information sharing, consistent with law and policy. Team members are encouraged to advise and cooperate with local law enforcement partners when conducting operations, and are encouraged to build relationships with community groups to identify and address concerns about the conduct of fugitive operations. This may involve embedding ERO officers with state and local law enforcement.

Embedding officers with other LEAs combines the resources and expertise of ICE ERO with local LEAs to arrest criminal aliens, fugitive aliens, and previously removed aliens. Rather than a conventional task force model, this method allows ERO officers within local LEAs to provide investigate support for those cases with an immigration enforcement nexus, and establish a proactive response in local jurisdictions in order to better support public safety in those areas.

This embedded partnership and direct access to local LEA resources aids in the development of investigative leads, prioritization of enforcement efforts, and furtherance of officer safety awareness for fugitive operations and other ERO assets conducting at-large enforcement in the AOR. As with conventional task forces, FOTs are encouraged to establish these partnerships as resources permit and adopt problem-oriented law enforcement strategies to identify, investigate, and address public safety threats.

**SDDOs supervising FOT activity:** With approval from the FOD, assign FOT officers to serve on law enforcement task forces that share complementary goals with ERO, promote information sharing, and further ICE ERO mission objectives. Provide on-site leadership and supervision of any embedded ERO officers and/or serve as the embedded ERO representative to the LEA, plan and implement daily joint effort operations, and maintain regular contact with the local ERO chain-of-command on administrative and operational issues.

**FOT Officers:** Serve on task forces to advise and cooperate with law enforcement partners, develop and exchange investigative information, and provide mutual support in enforcement activities. Officers who have undergone a selection and vetting process by the host LEA will serve as primary ICE point(s) of contact to the LEA and work with patrol, investigative, or support specialized units (e.g., gang enforcement) as appropriate.

### (f) Media

Media ride-alongs require approval from Field Operations and the ICE Office of Public Affairs.

**AFODs for Congressional Relations:** Coordinate media requests with Field Operations, the ICE Office of Public Affairs, and HQ NFOP.

**SDDOs supervising FOT activity:** If a "ride-along" is approved, submit an op plan and target list to the FOD and HQERO. FUGOPS mailbox.

**FOT Officers:**

1. Do not interact with media representatives. Refer media inquiries to the AFOD for Congressional Relations and the ICE Office of Public Affairs or to the ICE Public Affairs Officer (PAO) (according to local procedures).

2. Refer all requests for a "ride-along" to the AFOD for Congressional Relations and the ICE Office of Public Affairs or to the ICE PAO (according to local procedures).

## Appendix of Terms

**AFOD** – Assistant Field Office Director
**AOR** – Area of Responsibility
**ATD** – Alternatives to Detention
**BIA** – Board of Immigration Appeals
**CAP** – Criminal Alien Program
**CI** – Confidential Informant
**CPS** – Child Protective Services
**DAD** – Deputy Assistant Director
**DFOD** – Deputy Field Office Director
**DFOTP** – Field Operations Training Program
**EOIR** – Executive Office of Immigration Review
**ERO** – Enforcement and Removal Operations
**FAR** – Fugitive Alien Removal
**FLETC** – Federal Law Enforcement Training Center
**FOD** – Field Office Director
**FOJC** – Field Office Juvenile Coordinator
**FOT** – Fugitive Operations Team
**FOT Officer** – FOT Law Enforcement Officers (SDDO, DO)
**FOW** – Field Operations Worksheet
**ICE** – U.S. Immigration and Customs Enforcement
**INA** – Immigration and Nationality Act
**JFRMU** – Juvenile and Family Residential Management Unit
**LEA** – Law Enforcement Agency
**LESC** – Law Enforcement Support Center
**NCATC** – National Criminal Analysis and Targeting Center
**NCIC** – National Crime Information Center
**NFOP** – National Fugitive Operations Program
**NLECC** – National Law Enforcement Communications Center
**Officer** – Deportation Officer
**OM$^2$** – Operations Management Module
**Op Plan** – Operations Plan
**PCQS** – Person Centric Query System
**PERC** – Pacific Enforcement Response Center
**SDDO** – Supervisory Detention and Deportation Officer
**SFTO** – Senior Field Training Officer
**Supervisor** – Individual overseeing a program or person
**Team Member** – Member of a Fugitive Operations or At-large Team (SDDO, DO, ERA)
**UAC** – Unaccompanied Alien Child
**USCIS** – U.S. Citizenship and Immigration Services
**VCAS** – Violent Criminal Alien Section

CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Date Correction

The stamped date of March 6, 2005 on the following memorandum, "Uses of Ruses in Enforcement Operations", is incorrect. The correct date is March 6, 2006.

If additional verification is required, please send your inquiry to the ERO Policy mailbox.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

*Office of Detention and Removal Operations*

U.S. Department of Homeland Security
425 I Street, NW
Washington, DC 20536

U.S. Immigration and Customs Enforcement

MAR – 6 2005

MEMORANDUM FOR: Headquarters Divisions
All Field Office Directors

FROM: John P. Torres
Acting Director

SUBJECT: Uses of Ruses in Enforcement Operations

Purpose

This memorandum serves to provide additional guidance originally issued on August 15, 2005, regarding the use of ruses during arrest operations. This memorandum, with forthcoming updated policy directive, applies to all Detention and Removal enforcement operations. The use of ruses in the performance of U.S. Immigration and Customs Enforcement (ICE) law enforcement mission remains a valuable and effective tool. Ruses are used by virtually every law enforcement agency in the federal government. One of the main objectives of the ruse is to prevent violators from fleeing; thereby allowing for a safe arrest that does not place the violator, the arresting officer or innocent bystanders at risk.

Discussion

The use of a ruse during an arrest involves controlling the time and location of the encounter as dictated by ICE officers. Ruses may involve impersonating employment with other federal, state, local, or private entities. As outlined in the original guidance, it is still incumbent upon the arresting officers to provide prior notice to the affected entity. This notice affords the affected entity the opportunity to raise concerns regarding the affect the ruse may have on their security or public image. The point of contact with the proposed cover entity shall be the appropriate agency head authorized for giving concurrence. A memorandum to the file shall be prepared to document these discussions.

Any issues raised by the affected entity shall be forwarded within two working days to the appropriate Headquarters Deputy Assistant Director. The Deputy Assistant Director, in consultation with the Office of Principal Legal Advisor, will consider the issues and provide guidance as appropriate.

In particular, ICE Headquarters has directed that the use of ruses involving *health and safety* programs administered by a private entity or a federal, state, or local government agency, such as Occupational Safety and Health Administration (OSHA), will be discontinued. All other ICE investigative enforcement actions requiring the use of a health or safety-based ruse must

CONFIDENTIAL - ATTORNEYS' EYES ONLY



be pre-approved by the Assistant Secretary of ICE and coordinated with the respective government agency or private entity.

LE

CONFIDENTIAL - ATTORNEYS' EYES ONLY

U.S. Department of Homeland Security
425 I Street, NW
Washington, DC 20536

U.S. Immigration
and Customs
Enforcement

AUG 2 2 2006

MEMORANDUM FOR: All Special Agents in Charge
All ICE Attachés
[redacted]

FROM: Acting Director, Detention and Removal Operations

SUBJECT: Use of Ruses in ICE Enforcement Operations

This memorandum serves as joint guidance on the use of ruses in criminal investigations and law enforcement operations. The use of ruses in law enforcement operations is an effective law enforcement tool that enhances officer safety. One main objective of a ruse is to prevent violators from fleeing and placing themselves, officers and innocent bystanders in a potentially dangerous situation.

However, the use of ruses utilizing the names of agencies and companies involved in the administration of health and safety programs can impede the functions of those organizations by creating a perception that these organizations are acting as an enforcement tool of ICE. The use of ruses involving health and safety programs undermines the efforts to increase safety in the workplace and undercuts workers willingness to report workplace safety violations based on a fear of law enforcement action being initiated against the reporting worker.

Pursuant to memorandums dated March 6, 2006, subject Use of Ruses in Enforcement Operations, the Offices of Investigations and Detention and Removal Operations discontinued the use of ruses involving health and safety programs administered by a private entity or a federal, state, or local government agency, such as the Occupational Safety and Health Administration (OSHA), for the purpose of immigration worksite enforcement. The cited memorandums require Assistant Secretary pre-approval of all other investigative enforcement actions requiring the use of a health or safety-based ruse, as well as appropriate coordination with the respective government agency or private entity.

This jointly issued memorandum reinforces the prohibitions and approval requirements outlined in the March 6, 2006, memorandums.

LE

Exhibit
0012

Confidential Subject to Protective Order

# US Immigration and Customs Enforcement
# ENFORCEMENT AND REMOVAL OPERATIONS

## ERO Training

# FIELD APPLICATION
## (11106117)

## Lesson Plan

# Basic Immigration Enforcement Training Program

WARNING: This document is FOR OFFICIAL USE ONLY (FOUO). This contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.G. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public, to anyone outside the ERO Academy, or to other personnel who do not have a valid "need-to-know" without prior approval of the ERO Academy Chief or his designee.

U.S. Immigration and Customs Enforcement

ERO Academy

## Control Page

| | |
|---|---|
| **Key Contributors:** | **APR 2012** |
| [redacted] Attorney Instructor, ICEA OPLA Training Division | |
| [redacted] Instructional Systems Specialist, OTD IMU | |
| [redacted] Attorney Instructor, ICEA OPLA Training Division | **JUN 2015** |
| [redacted] Instructional Systems Specialist, OTD IMU | |
| [redacted] Attorney Instructor, ICEA OPLA Training Division | **SEP 2016** |
| [redacted] Instructional Systems Specialist, OTD IMU | |
| **Instructional Management Unit Review:** | **FEB 2019** |
| [redacted] Chief, Instructional Management Unit | |
| [redacted] | |
| **ERO Academy Approval:** | **FEB 2019** |
| [redacted] Unit Chief, ERO Academy, ERO Training Division | |
| [redacted] | |

# Control Page

**Key Contributors:** **APR 2012**
[redacted] Attorney Instructor, ICEA OPLA Training Division
[redacted] Instructional Systems Specialist, OTD IMU

[redacted] Attorney Instructor, ICEA OPLA Training Division **JUN 2015**
[redacted] Instructional Systems Specialist, OTD IMU

[redacted] Attorney Instructor, ICEA OPLA Training Division **SEP 2016**
[redacted] Instructional Systems Specialist, OTD IMU

**Instructional Management Unit Review:** **FEB 2019**
[redacted] Chief, OLCD Instructional Management Unit

______________________________

Signature (optional)

**ERO Academy Approval:** **FEB 2019**
[redacted] Unit Chief, ERO Academy, ERO Training Division

______________________________

Signature

Confidential Subject to Protective Order

U.S. Immigration and Customs Enforcement



# Record of Changes

| Date of Change | A=Add. M=Mod. D=Del. | Description of Change | Reason for Change | Responsible |
|---|---|---|---|---|
| 2/16/2016 | Modify | Changed IEA to ERO Officer and associated revisions | Title of target audience changed | [redacted] IMU |
| 9/28/2016 | Modify | Changed lesson title | To better reflect content of LP | [redacted] OPLA<br>[redacted] IMU |
| 9/28/2016 | Modify | Updated Control Page | To reflect change in approval authority and key contributors | [redacted] IMU |
| 2/25/2019 | Modify | • Revise organization identity<br>• Revise format<br>• Add DOTP designation – same content for both programs | • Organization change<br>• Comply with changes to Curriculum Development Guide<br>• Creation of DOTP | [redacted] IMU |
| 2/25/2019 | Modify | • Add info on Civil Immigration Enforcement Actions Inside Courthouses<br>• Add explanation of conditions related to vehicle stops as an investigative detention.<br>• Add limits on entering curtilage to open containers, lift tarps<br>• Add to definition of search the opening of a mailbox.<br>• Add to description of actual authority<br>• Add to Best Practice on actual authority, question to determine other privacy interests | • Add Jan 2018 policy<br>• Clarify policy requirements<br>• Per Collins v. Virginia, 2018<br>• Clarify for students<br>• Per US v. Terry, 2019<br>• Clarify for students | [redacted] |
| 6/11/2019 | Modify | Revise instructor designation to reflect agency organization and include an ICE- | Allow for a qualified substitute instructor | [redacted] IMU |



USA 032980

EXHIBIT 6
207

| | | | | |
|---|---|---|---|---|
| | | Certified Instructor approved by the ERO Attorney/Instructor | | |
| 4/27/2020 | Modify | Create separate BIETP and DOTP materials<br><br>Remove reference to "Student Handouts" and incorporate as Attachment in LP and SG | New TMSS protocol<br><br>Incorporate all materials in lesson plan | [redacted] IMU |

U.S. Immigration and Customs Enforcement

ERO Training

# Table of Contents

**Lesson Description** ........ 6

**Lesson Administration** ........ 7

**Lesson Plan** ........ 8

**Introduction** ........ 8

**Instruction** ........ 11

I. Explanation and Demonstration ........ 11

A. EPO 1: Recognize 4th Amendment application to seizures and searches during field operations ........ 11

B. EPO 2: Explain how to lawfully approach a dwelling for a knock and talk ........ 15

C. EPO 3: Determine voluntary consent to enter a dwelling ........ 23

D. EPO 4: Describe how to lawfully enter a dwelling ........ 28

E. EPO 5: Describe methods to maintain and document consent ........ 31

F. EPO 6: Recognize the scope of consent when searching containers ........ 33

G. EPO 7: Recognize when consent is expired or withdrawn ........ 34

H. EPO 8: Explain how to apply other warrant exceptions during knock and talks. ........ 35

II. Student Practice ........ 37

III. Feedback and Remediation ........ 38

**Conclusion** ........ 39

**Attachment** ........ 40



USA 032982

EXHIBIT 6
209

# LESSON DESCRIPTION

## I. Lesson Title

Field Application

## II. Program/Course Title

Basic Immigration Enforcement Training Program

## III. Description

This lesson provides an overview of the evidence collection process while conducting field operations, as well as when working with other law enforcement agencies. It introduces the required elements and process of a knock and talk, including voluntary consent.

## IV. Terminal Performance Objective (TPO)

Given an alien encounter through a field operation, obtain evidence to determine the alien's citizenship in accordance with the 4th Amendment, due process, and administrative warnings.

## V. Enabling Performance Objectives (EPOs)

EPO 1: Recognize 4th Amendment application to seizures and searches during field operations.
EPO 2: Explain how to lawfully approach a dwelling for a knock and talk.
EPO 3: Describe how to ensure voluntary consent to enter a dwelling.
EPO 4: Describe how to lawfully enter a dwelling.
EPO 5: Recognize how to maintain and document consent.
EPO 6: Recognize the scope of consent when searching containers.
EPO 7: Recognize when consent is expired or withdrawn.
EPO 8: Explain how to apply other warrant exceptions during knock and talks.

## VI. Length of Lesson

| EXPLANATION & DEMONSTRATION | PRACTICE | ASSESSMENT | TOTAL |
|---|---|---|---|
| 1 Hour and 15 Minutes | 45 Minutes | Criminal Encounters Practical Exercise | 2 Hours |

U.S. Immigration and Customs Enforcement

ERO Training

# LESSON ADMINISTRATION

## I. Lesson Title

Field Application

## II. Risk Management

None

## III. Facility Requirements

General classroom with multi-media capable instructor workstation

## IV. Transportation Requirements

None

## V. Required Staff

One ICE-Certified, OPLA Attorney/Instructor, or an ICE-Certified Instructor approved by the ERO Attorney/Instructor

## VI. Academy-Provided Training Aids and Equipment

Field Application PowerPoint

## VII. Student-Provided Equipment

None

## VIII. Student Handouts and Materials

BIETP Field Application Student Guide, included in Legal Student Binder

## IX. Attachments

Civil Immigration Enforcement Actions Inside Courthouses

## X. References

Aguilar v. ICE Settlement Agreement
Civil Immigration Enforcement Actions Inside Courthouses, Jan. 10, 2018

U.S. Immigration and Customs Enforcement

ERO Training

# Lesson Plan

## Field Applications

## INTRODUCTION

## I. Motivation

As an ERO Officer, a significant portion of your job is determining alienage or if someone is a United States citizen. But to do that, you must have information. This lesson will expose you to the process of obtaining information from a person while you are in the field. Mastery of the "knock and talk" will be advantageous to you as you collect physical evidence from your subjects.

## II. Objectives

A. Terminal Performance Objective (TPO)

Given an alien encounter through a field operation, obtain evidence to determine the alien's citizenship in accordance with the 4th Amendment, due process, and administrative warnings.

B. Enabling Performance Objectives (EPOs)

**EPO 1:** Recognize the 4th Amendment application to seizures and searches during field operations
**EPO 2:** Explain how to lawfully approach a dwelling for a knock and talk
**EPO 3:** Determine voluntary consent to enter a dwelling
**EPO 4:** Describe how to lawfully enter a dwelling
**EPO 5:** Describe methods to maintain and document consent
**EPO 6:** Recognize scope of consent when searching containers
**EPO 7:** Recognize when consent is expired or withdrawn
**EPO 8:** Explain how to apply other warrant exceptions during knock and talks

## III. Review of the Past

In your previous lesson, Statutory Authority, you learned the statutes that give you the authority to question aliens. This lesson takes it a step further by applying 4th Amendment protections when collecting evidence from aliens.

U.S. Immigration and Customs Enforcement

ERO Training

## IV. Main Ideas

**Instructor Note:** Display the graphic, pointing out where this lesson falls within the legal block of courses.

ICE "Immigration Officer" Alien Encounter



## V. Agenda

In this lesson, we will discuss evidence collection while conducting a field operation, specifically the process, rules, and nuances of a knock and talk. I will then demonstrate some of these principles, and you will have a chance to practice them. You will be tested on these concepts during the Criminal Encounters Practical Exercise.

## INSTRUCTION

## I. Explanation and Demonstration

> **Instructor Note:** At the end of each EPO, there is a demonstration. Read the scenarios and/or questions to the class and allow the students to respond. Confirm when the responses are correct and provide the right answers when the responses are incorrect. Be prepared to offer further explanation for students who do not understand the answers.

### A. EPO 1: Recognize 4th Amendment application to seizures and searches during field operations.

1. Settings
   a. Single family dwellings
   b. Multi-family dwellings
   c. Businesses
   d. Open fields
   e. Probation and parole offices
   f. NOT sensitive locations
2. Sensitive Locations
   a. Examples:
      1) Schools
      2) Hospitals
      3) Churches, synagogues, mosques or other institutions of worship, such as buildings rented for the purpose of religious services;
      4) The site of a funeral, wedding, or other public religious ceremony
      5) A site during the occurrence of a public demonstration, such as a march, rally, or parade
      6) Courthouse for a non-criminal defendant target (See Directive 11072.1, Civil Immigration Enforcement Actions Inside Courthouses, Jan. 10, 2018, in Attachments)

b. General rule

Any planned enforcement action (arrests, interviews, searches, and surveillance for immigration enforcement) at or focused on a sensitive location must have prior approval of one of either the Assistant Director for Field Operations or Executive Associate Director (EAD).

3. 4th Amendment seizures overview/review

a. Arrests made pursuant to Administrative Arrest Warrants

1) Not a Criminal Arrest Warrant.

2) Require Probable Cause the arrestee is named in the warrant (identity).

b. Warrantless arrests (arrest in public)

1) Require Probable Cause of criminal activity or removability and lawful access.

2) Usually applies to (collaterals) individuals encountered while attempting to locate a target you have an administrative arrest warrant for.

3) Don't arrest aliens who you know will qualify for prosecutorial discretion.

4) If administrative, ERO Officer MUST articulate in I-213 why he is believed to be a flight risk as required by INA § 287(a)(2).

c. When making an arrest, Immigration officers must identify self as such and purpose for the arrest. 8 C.F.R. § 287.8(c)(2).

d. When making an arrest, Immigration officers must inquire as to:

1) Medical issues and medicine

2) Travel documents

3) Minor children for whom they are responsible

4. Investigative detentions

a. Reasonable Suspicion individual either is the person named in an administrative arrest warrant, is removable absent a warrant, or is committing a crime for which you have arrest authority. DO NOT

SEIZE EVERYBODY IN THE HOUSE JUST BECAUSE THEY ARE THERE. YOU MUST HAVE REASONABLE SUSPICION.

b. Must use due diligence and least intrusive means.

c. May lead to an arrest.

5. Consensual encounters

a. Not a seizure.

b. IEA cannot do anything that would make a reasonable person believe he is not free to leave or end an encounter.

c. Used to locate targets and as initial encounter with a target.

d. Example: Knock and talk.

6. Vehicle stops

a. Traditionally considered an investigative detention requiring only reasonable suspicion, but some local policies require Probable Cause to stop a vehicle.

b. As an investigative detention, Due Diligence is required. Due diligence is not offended by directing the driver and passengers out a vehicle. *Maryland v. Wilson*, 519 U.S. 408 (1997). Due diligence is also not offended if Officers make inquiries into matters unrelated to the justification for the stop "so long as those inquiries do not measurably extend the duration of the stop". *Arizona v. Johnson*, 555 U.S. 323 (2009). If the seizure is measurably extended by asking unrelated questions, etc., a Fourth Amendment violation has occurred. (See the lessons on Seizures and Investigative Detention versus Arrest. The use of additional officers may be required to ensure the seizure is not measurably extended.)

c. Requires completion of driving training provided in Basic Immigration Law Enforcement Training.

d. Pursuits are prohibited by regulation (8 C.F.R. § 287.8(e)).

e. Vehicles have a reasonable expectation of privacy and are also considered protected areas. Therefore, physical entry into them is considered a Fourth Amendment Search.

f. Physically removing an uncompliant subject from a vehicle is likely both a Fourth Amendment Search and Use of Force. As a Use of Force, its application must be both necessary and reasonable.

Officers need to consider relevant factors before using such force paying particular attention to: 1) the severity of the crime; 2) whether the subject poses an immediate threat to the safety of the officers or others; and 3) whether the subject is actively resisting arrest or attempting to evade arrest by flight.

A subject's refusal ALONE to comply with an ERO Officer's direction to exit a vehicle will likely not justify the breaking of a window and physical extraction.

7. Transportation

a. Persons must be transported in a manner that ensures the safety of the persons being transported and shall not be left unattended during transport unless the immigration officer needs to perform a law enforcement function. 8 C.F.R. § 287.8(d)(1).

b. Excessive periods of time in transport while other operations are being conducted may be unreasonable.

8. 4th Amendment searches review/overview

a. Setting

1) Administrative Arrest Warrant.

2) No inherent search authority.

3) Initial encounter will typically be consensual.

b. Knock and talks

1) Single family dwelling or duplex. Approach is considered a search, but lawful based on Implied License/Consent as long as the IEA's intrusion is limited to where the general public would go for the purpose of making contact with the occupant of the home.

2) Multi-family dwelling. Entry into common walkways is not a search

3) Only 6:00 a.m. to 10:00 p.m. by policy unless prior written approval articulating why it is necessary. (Target leaving for work before 6:00 a.m. is not necessary.)

c. Dwelling

1) Entry is always a search – Even if an agent were only to reach in to grab and pull out a target.

2) Must have Search Warrant, Criminal Arrest Warrant at the residence of named person, or an exception to enter.

3) Surveillance on a dwelling will generally not amount to a 4th Amendment search unless technology is used in order to allow you to see or hear into an area considered to have a Reasonable Expectation of Privacy (REP) that you otherwise could not see or hear into without said technology. Example: Infrared Imaging.

d. Search Incident to Arrest (SIA)

1) Lawful arrest based on Probable Cause.

2) Searching for weapons, evidence, and means of escape.

e. Exigent circumstances searches

1) Hot Pursuit, Now or Never, and Emergency.

2) Perform only if circumstances would justify.

9. **Demonstration**

You are preparing to conduct a field operation and receive information that your target leaves for work at 5:30 in the morning. So you decide the best time for the knock and talk will be 5:00 a.m. Is this appropriate? *No. ERO policy states that knock and talks are to be conducted between 6:00 a.m. and 10:00 p.m.*

B. **EPO 2: Explain how to lawfully approach a dwelling for a knock and talk.**

1. ICE Policy prohibits knock and talks prior to 6 a.m. and after 10 p.m. without prior written approval.

2. Curtilage – Area immediately surrounding a home where a REP exists. If the area is not curtilage or an out building, it is considered an open field which does not have a REP and therefore entrance into that area is not a search.

3. Factors in determining if area is curtilage

a. Proximity of area to house

1) There is no fixed distance at which curtilage ends.

2) Proximity must be analyzed in light of the other Dunn Factors.

3) **Best Practices: Unless there are compelling facts indicating private land surrounding a home is NOT curtilage, in a typical city setting, the entire piece of property surrounding a home should be treated as curtilage.**

**Note**: If you are going to deviate from the Best Practice and determine a portion of a city lot is not curtilage, it is likely that unprotected area will not be the backyard due to the other three factors and courts' general view toward backyards and REP.

4) Because of this factor, there is nothing a homeowner on a large piece of land can do in order to make his entire property curtilage. Remember, the definition of curtilage includes the area immediately surrounding a home…

b. Whether area is included within an enclosure surrounding a house

1) Fences and/or walls makes the labeling of an area as curtilage more likely than not.

2) If a fence or wall is nearly complete or if a gate is left open, the likelihood of the area being labeled as curtilage is NOT significantly diminished, although that fact will be vitally important in determining if an IEA is permitted to pass through the fence in order to approach a house and conduct a knock and talk. *Discussed in more detail later.*

c. Nature of the use of the area

1) Labeled by the U.S. Supreme Court as being "especially significant."

2) Evidence of "Intimate activities of the home" being performed in an area provide a strong indication that an area is curtilage, as long as the areas other characteristics are not opposite of the remaining Dunn Factors.

3) Real life indicators:

a) Presence of children's toys, games, bicycles, grill, chairs, table, fire ring, swing, clothesline, etc.

b) Yard maintenance (maintained grass versus wild grass)

c) Existence of a personal garden

d) Signs indicating a private area such as "no trespassing"

d. Steps taken to protect area from observation

1) Construction of a solid fence that is tall enough to obstruct a view and the planting of trees or tall shrubs are strong indicators of curtilage, provided the area's other characteristics are consistent with curtilage.

2) House construction in an isolated area of private property increases the likelihood of the surrounding isolated areas being considered curtilage.

4. Analysis

a. Totality of the Circumstances.

b. "The central component of this inquiry is whether the area harbors the 'intimate activity associated with the sanctity of a man's home and the privacies of life'."

5. Walkways/path to house door (depends on circuit). Courts disagree on what to call areas such as paths, walkways, and driveways which are commonly encroached upon either in passing or for a stated purpose such as knocking on a door in an attempt to speak with an occupant or for delivering a package. There are two approaches to justify such actions.

a. Approach 1: Implied license/consent to enter curtilage

1) Approach expressly adopted by 7th and 8th Circuits.

2) Area surrounding a House is defined as curtilage pursuant to *Dunn*, but "homeowners grant members of the visiting public – mail carriers, sanitation workers, neighbors, and Girl Scouts, to name a few – an implied consent to enter these areas for those purposes that accompany the normal interactions of a social, civilized society."

3) Implied consent will generally not be found if law enforcement officers make no attempt to reach the homeowner at the front door/main entrance.

4) Implied consent to approach a non-front door/main entrance following a failed attempt at the main entrance is cautiously, but expressly permitted if it is reasonable for

the IEA to believe an occupant is home and there are no signs implied consent has been taken away (discussed next) in the 4th, 6th, 7th, and 8th Circuits.

5) <u>Taking away implied consent:</u> Locked gates (unlocked gate alone does not indicate no implied consent because it may only be a pet gate), signs indicating the public is not welcome, placement of the mailbox outside a gate, a roaming dog in fenced in area, etc.

6) **Best Practices: If there is no indication a homeowner is attempting to restrict the public's access to his/her home, follow the most obvious path to the home's entrance most open to public view in order to conduct a knock and talk. If there is no response to your actions, do not seek to use another entrance unless it too is open to public view with a clear path for the public.**

b. Approach 2: No REP – not a search. This approach is questionable given the Supreme Court's recent decision in *Florida v. Jardines*.

1) Approach expressly adopted by the 9th and 10th Circuits and an approach although not expressly adopted by the 5th Circuit, one that seems to be preferred.

2) Areas that are visually open to the public and are also generally open to physical intrusion by the public such as paths, walkways, and driveways leading to a dwelling do not have REP and are therefore not part of the home's curtilage. Entering these areas will not be considered a search.

3) Homeowners can ensure all areas including paths, walkways, and driveways are curtilage provided such a finding is consistent with *Dunn*, if they take away the perception that the public is welcome in these areas, just as if homeowners take away implied consent.

For example: locked gates (Unlocked gate alone does not indicate the public is not welcome), signs indicating the public is not welcome, placement of the mailbox outside a gate, a roaming dog in fenced in area.

4) **Best Practices: If there is no indication a homeowner is attempting to restrict the public's access to his/her home, follow the most obvious path to the home's entrance most open to public view in order to conduct**

**a Knock and Talk. If there is no response to your actions, do not seek to use another entrance unless it too is open to public view with a clear path for the public.**

c. It does not matter what the court calls these areas officers are seeking to enter; all courts are ultimately using the same analysis.

1) If an ERO Officer is in a circuit that recognizes these areas close to the dwelling as curtilage even though members of the public may frequent them for various reasons, the officer is granted implied consent to approach the dwelling in order to conduct a knock and talk as long as there is no indication the homeowner is attempting to keep the public out. The ERO Officer's conduct in this situation would be a search, but lawful based upon implied consent.

2) On the other hand, if the ERO Officer is in a circuit that holds the position that these areas frequented by the public in order to conduct knock and talks are not typically curtilage, then the ERO Officer's entry into these areas for that purpose would not even be a search, unless the homeowner has taken steps to indicate he does not want the public to approach; which by doing so, he has effectively turned these areas into curtilage leaving the ERO Officer with no warrant exception authorizing a knock and talk.

d. Officers do not have implied license to enter curtilage for the purpose of opening containers or lifting tarps, covers, etc. even if they have probable cause to believe evidence of a crime is inside. See *Collins v. Virginia*, 138 S. Ct. 1663 (2018).

6. Dwelling-attached enclosed areas

a. Dwelling-attached enclosed areas such as porches and mudrooms must be treated with extreme caution. In determining whether an ERO Officer can enter these areas in order to conduct a knock and talk or whether the ERO Officer must stay outside of these areas; it must be determined whether the area in question is part of the actual dwelling or merely part of the curtilage.

b. Why determining if dwelling or curtilage is important

1) If a dwelling-attached enclosed area is considered part of the dwelling, there is no warrant exception that would allow an officer to cross the threshold of the dwelling in order to conduct a knock and talk. Of course, the officer could

conduct a knock and talk from outside the dwelling-attached enclosed area if he has lawful access to it.

2) If the dwelling-attached enclosed area is considered curtilage and not part of the dwelling, then the same rules mentioned above apply related to implied license/consent.

c. Making the determination

1) Totality of the Circumstances.

2) Determining question: Would members of the public reasonably believe they had to enter the first threshold of the building to knock on the interior set of doors to obtain the attention of the residents and access the dwelling? If yes, the attached enclosed area is likely not part of the dwelling, rather only part curtilage, making entry for the limited purpose of a knock and talk lawful.

3) Common factors.

a) General appearance: If the dwelling-attached enclosed area resembles the rest of the dwelling (same foundation, paint, siding, curtains on windows, etc.) it is more likely to be deemed part of the dwelling than if it is different.

b) Doorbell: If the doorbell or knocker is on the outside of the dwelling-attached enclosed area, there is a strong likelihood the enclosure is part of the dwelling, unless there is a significant factor to the contrary. Likewise, the absence of a doorbell or knocker may lead reasonable officers to believe the enclosure is readily accessible to the general public.

c) Mailbox: If the mailbox is on the outside of the dwelling-attached enclosed area, there is a strong likelihood the enclosure is part of the dwelling, unless there is a significant factor to the contrary. Likewise, if in open view an officer can see a mailbox inside the enclosure, that is a strong factor supporting the position the general public is welcome (implied consent) into the curtilage for a lawful purpose.

d) Door condition: If the door has the appearance of being intentionally left open (broken, propped, etc.) then the attached enclosed area is more likely to be

deemed only part of the curtilage than if the door was closed. However, courts have rejected the idea that glass doors or doors with no locks cannot be the threshold to a dwelling, so do not use that fact as the sole justification for the dwelling-attached enclosed area only being curtilage.

e) History: How the occupant has interacted with the general public in the past with regard to the dwelling-attached enclosed area is an important factor. For example, if neighbors always enter the area and knock on the interior door, then that is a good indication law enforcement can do the same.

d. **Best Practices: Unless it is absolutely clear that a dwelling-attached enclosed area is not part of the dwelling and is only curtilage, officers should not enter these areas to conduct a knock and talk unless or until they are granted express consent or some other warrant exception applies.**

7. Officer actions leading up to initial contact

a. Must adhere to the curtilage and walkway, etc. rules referenced above; deviation will result in an unlawful search.

1) Approaching/contact officers

a) Stay on walkways, paths, and driveways most likely to be used by the general public when approaching the home.

b) Do not deviate from paths in order to look in windows.

c) It is a search to look in a person's mailbox in order to see to whom a letter is addressed.

2) Perimeter officers

a) Attempt to position in non-curtilage areas.

b) Do not chase "runners" into/across curtilage solely for an administrative arrest because arrests occurring in the curtilage result in illegal searches, when the officer does not have a warrant or an applicable warrant exception. This even applies when an agent has probable cause and the authority to conduct an arrest.

b. Ultimate question: Is the knock and talk a reasonable strategy of investigation or is it merely a show of force?

1) Totality of the Circumstances.

2) Factors:

a) Number: The more visible uniformed officers, the more likely the action is a show of force. Many officers, even for a legitimate purpose such as safety due to a target's violent past may have another negative impact in the event a protective sweep becomes appropriate because a court may say the government created the exigency with its presence.

b) Weapons: Presence of holstered weapons has no impact but raised weapons may.

c) Demands: Demands are consistent with show of force but not consensual encounters (examples: open the door, come outside).

d) Banging on doors: More consistent with show of force than consensual encounters (just knock).

e) Simultaneous knocking: More consistent with show of force than consensual encounters.

f) Police cars and helicopters: Too many cars and any helicopters flying over a knock and talk house are more consistent with show of force than consensual encounters.

8. **Demonstration**

As you arrive at the dwelling of your target, you notice there is an unlocked gate around the quarter acre property. You also notice a mailbox attached to the dwelling next to front door and there are no signs indicating your presence is unwelcome.

a. Is the area within the fence considered curtilage? *Likely yes given the brief facts.*

b. Do you have implied license/consent to knock on the front door? *Likely yes. In general, you have implied consent to knock on the front door. Although there is a gate, it is unlocked and it appears others including mail carriers approach the dwelling in a similar*

*fashion. Look for other factors that indicate the general public is or is not welcome to knock on the door.*

C. **EPO 3: Determine voluntary consent to enter a dwelling.**

1. Identification and purpose for request communicated

a. Truth (lack of requirement)

There is no requirement to tell the truth (ruse) when seeking consent; however, agents must ensure consent is voluntary and not a result of coercion. (See the Probable Cause and Warrant Exceptions lesson addressing consent and ruses.)

| **Instructor Note:** Briefly remind the students of consent basics before proceeding. |
|---|

b. Scope

1) The scope of a consent search will be determined by the ERO Officer's communicated purpose for the search and the consenting party's response to that request.

2) Examples:

a) If an ERO Officer asks to "come in" and that request is granted, he is only permitted to walk inside the door. He may only proceed further into the house if he seeks additional consent and it is granted.

b) If an ERO Officer asks to "come in and look for "John" and the request is granted, he is permitted to enter the house and look in all places John could be. After he finds John, he must stop searching unless he asks for additional consent to search, which is then granted.

c. Documentation

Consent must be documented in detail. ERO Officers must do so on the Field Operation Worksheet (FOW) and I-213.

2. Avoiding duress/coercion

a. Words used

1) **Best Practices: Always be polite but direct in your request for consent. Never make your request a**

**statement or demand. Good Examples include: "Can we ...?" or "May I ...?**

2) Avoid the following:

a) A loud or angry tone.

b) Statements or demands
Example: "Come here," "Open the door," or "I'm going to..."

c) Confusing language.

Example: "Do you mind if...?" People are generally confused by this question. Keep your questions direct; furthermore, the focus is voluntary consent not if a person "minds."

3) Language barriers

"Consent to enter or search a private residence must be sought in a language understood by the resident of the residence granting consent whenever feasible, and one or more Spanish-speaking officers must be available to seek such consent where the target is thought to be from a Spanish-speaking country." *Aguilar v. Ice Settlement Agreement.*

b. Actions of officer

1) **Best Practices: Keep firearms holstered and keep a reasonable and customary distance while conversing with the occupant making sure to not enter the dwelling prior to obtaining consent.**

2) Avoid the following:

a) Removing your firearm from its holster.

b) Entering the home prior to consent.

c) Propping a door open with your foot or hand while conversing with an occupant.

c. Outside agency assistance

1) Local law enforcement will be notified of operations and may show up to assist.

2) Locals are government and their actions will be tied to your ERO operation.

3) Control the situation.

a) Tell them the plan if they show up to assist.

b) Remind them of your limited purpose and authority.

4) Example: City Cop Joe shows up as you are about to perform a knock and talk. He walks behind you as you approach the door and knock. When the homeowner answers the door, you begin to converse with her when all of a sudden, City Cop Joe starts talking loudly to someone else in the house through the open door and proceeds to walk in uninvited.

5) Example: You are performing a knock and talk with the occupant of a home who is not being forthcoming with information. Out of nowhere, Deputy Tim points his finger at the occupant and says, "If you don't start talking I'm going to arrest you and haul your butt to jail." She immediately invites you in and takes you to your target.

d. Document

1) Officer actions.

2) Consent giver's actions/responses supporting voluntariness and scope.

a) Keep in mind the government has the burden of showing that consent was "unequivocal and specific" and "freely and intelligently given."

b) While implied consent (consent by silence) and silence coupled with some kind of inviting body movement have been found to be valid in very specific instances, it is difficult to prove.

c) **Best Practices: Always obtain and document express verbal consent.**

3. Determining authority

a. Age

1) There is no minimum age requirement to obtain consent; the question is whether the consent was voluntary. As

indicated earlier however, age is a relevant factor in determining voluntariness.

2) ERO policy requires the consent giver to appear to be at least 18.

b. Actual authority

1) Test: Whether law enforcement can reasonably conclude consent giver has authority to let them search.

a) Law enforcement has a duty to assess a situation critically.

Example: Even when the invitation is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry.

b) The 10th and D.C. Circuits expressly require law enforcement to go behind appearances to verify third party authority with other circuits taking a more liberal approach.

c) Nevertheless, law enforcement is entitled to draw the usual inferences from what they see and hear.

Example: During surveillance, agents see X move freely in and out of a house over a one-week period. Based on these observations, it is reasonable to believe X has the authority to consent to the entering of the home.

d) Police may draw the inference that the person is indeed an occupant unless there are other circumstances that would cause a reasonable man to doubt the validity of that inference.

e) It would be unjustifiably impractical to require the police to take affirmative steps to confirm the actual authority of a consenting individual whose authority was apparent, however, in *United States v. Terry*, No. 18-1305 (7th Cir. 2019), the Court found that a woman answering the door of a residence wearing a bathrobe and looking sleepy was not enough for officers to rely upon in determining authority.

f) **Best Practice: Always ask, "Do you live here?" to a consent giver prior to entering a residence.**

2) Scope of Authority

a) In determining the scope of a consenter's authority, law enforcement is allowed to rely on facts that would convince a person of reasonable caution that the consent giver has such authority.

Example: Police obtained consent to enter an apartment from Squire, who rented the apartment, and then relied on her consent and the key she supplied to search a locked cabinet. The police were entitled to rely on Squire's apparent authority over the cabinet in accepting her consent to the search. They were not obliged to inquire about who owned the cabinet or its contents.

b) When law enforcement encounters circumstances that would put them on notice of limited authority, they may not ignore such signals. The most common example is the existence of a roommate.

c) Where a third party appears to have authority over the entire premises, the police may rely on that person's consent to search throughout the house, so long as the consent appeared to extend so far.

d) If part of a dwelling appears to be appropriated for the exclusive use of one occupant, other occupants of the house have no right to consent to entry into that space from which they themselves are excluded.

e) To the extent a person wants to ensure that his possessions will be subject to a consent search only due to his *own* consent, he is free to place these items in an area over which others do *not* share access and control.

3) **Best Practices: If there are <u>any</u> questions or concerns regarding an occupant's authority, ask questions to resolve those concerns and document the answers.**

**Prior to searching around the interior of a residence based upon consent, ask the consent giver, "Who else lives here?" in order to determine other privacy interests in play.**

4. **Demonstration**

Upon knocking on the door, a young person answers. You ask if you can enter and search for Pablo. She states, "Yes."

a. Did you receive consent to enter the home? *Maybe. Although the person said yes, her age might be a factor when determining voluntary consent. Also, a person's authority to give consent should be determined prior to entry.*

b. Did you receive consent to search the home? *If it is determined the person provided voluntary consent to enter the home, then there was also voluntary consent to search the home. If it is determined that voluntary consent was not provided to enter the home, then voluntary consent was not provided to search the home.*

**D. EPO 4: Describe how to lawfully enter a dwelling.**

1. Number of agents

a. Only agents who obtain consent to enter a home may actually enter the home.

Example: If an occupant grants the two agents who knocked on her door consent to enter her home, the perimeter agents are not permitted to enter unless the occupant specifically grants them consent as well.

b. The number of agents who approach a home in order to obtain consent should be limited because the more agents approaching a home, the more likely a court will find a show of force rather than voluntary consent.

2. Areas entered

a. Based on scope

1) Initial consent (Can we talk inside?)

a) If the initial grant of consent is limited to entering, the agent is limited to entering.

b) Absent exigent circumstances, officers/agents cannot proceed much past the dwelling's threshold.

2) Initial consent (Can we look for this person?)

a) If the initial grant of consent is broad, including looking for a person or an object, then the agents can enter and look in places where those things or persons could be located.

b) If agents are given consent, it is vitally important they confirm the consenter's authority to search those locations.

3) **Best Practices: Any indication there are multiple occupants of a home should put the agents on notice that there may be restricted access areas, especially if the occupants are unrelated. In circumstances like this, the agents should be careful to assess the entrance into any potentially private area critically. If the consenting party has unrestricted access to an area, he can consent to an agent's entry into that same area.**

b. Closed doors

1) If there are any concerns as to the consent giver's authority who granted consent to search, it is imperative agents confirm his/her authority prior to opening closed doors.

2) If a door is locked, entry cannot be forced unless voluntary consent from a person with authority is given.

3. Overruling consent

a. Residential co-occupancies (husband/wife, roommates, etc.)

1) All occupants of a dwelling need not be present in order to obtain consent to search that residence.

2) If one co-occupant, <u>who is present at a residence</u>, refuses to grant consent, the agents cannot enter the residence even if there are other co-occupants present who consent to the entry.

b. Hierarchy (parent/minor child, guardian/minor, visitor, etc.)

1) If co-occupants fall within a recognized hierarchy, agents can ignore the refusal to grant consent of the person with the lesser privacy interest.

2) Even a person with a lesser privacy interest in a residence, such as a house guest, has the authority to grant consent to search areas he or she has unrestricted access, even if a person with a greater interest is absent and may object if present.

c. Consent to search the interior of a home does not necessarily include consent to search the curtilage or outbuildings.

4. **Demonstration**

To further ensure voluntary consent, you ask the young lady how old she is, and she states that she is 19. So you and your team of six proceed to enter the house.

a. Does your team have consent to conduct a search? *Not likely. You asked if you could enter and search, you did not ask if your team could enter and search. Although an argument for consent once removed exists, it is a better practice to ensure the entire team has consent to enter.*

b. As you are searching the home, you notice a closed door and proceed to open it. Do you have consent to do this? *Maybe. Prior to opening the door, you needed to verify the authority from the consenter and identify other possible privacy interests.*

E. **EPO 5: Describe methods to maintain and document consent.**

1. Maintaining consensual nature

a. **Best Practices: Use a professional tone and language when interacting with occupants, making sure they do things because they voluntarily choose to, not because they are ordered to.**

b. Practices to avoid (Remember this is not a Rule 41 Search)

1) Ordering or telling people to open doors.

2) Ordering or telling people to come out of a room.

3) Touching people who are not being placed under arrest or lawfully investigated for an independent reason from the consent search.

4) Rounding up occupants and placing them in a single location.

5) Using an aggressive tone or foul language.

2. Uncooperative occupants

a. Because this is a consensual search and encounter, the wishes of uncooperative occupants must generally be adhered to.

b. If an uncooperative occupant is a co-occupant who is <u>not</u> a recognized category on the hierarchy (Examples of hierarchy categories: child or minor; Examples of non-hierarchy categories: husband/wife, roommates, parent/adult child), then their objections must be adhered to as referenced above in "Overruling consent."

Example: You are searching a home based upon consent when you knock on a bedroom door occupied by a roommate of the consent giver. You inform the roommate you are ICE through the closed door in response to her inquiry, "Who's there?" She tells you to stay out, to which you must comply.

c. If an uncooperative occupant is a co-occupant who is a recognized category on the hierarchy as having an inferior interest, then their objection can be ignored unless it appears they have exclusive access to certain areas.

Example: While searching a home based upon the consent of the owner of the home, you enter a bedroom of a minor child and

open a dresser drawer. When the minor child objects to the search, you are able to continue the search because the child's mother has access to the entire room and is higher in the hierarchy.

3. Documenting consent

a. There is no constitutional requirement regarding documenting the circumstances surrounding obtaining consent, but the government does bear the burden of proving it was consensual in nature.

b. ERO policy requires documentation to be done in the Field Operation Worksheet and in the narrative portion of Form I-213 if an arrest is made of a removable alien.

c. Facts documented

1) Name of person giving consent.

2) The scope of consent given.

3) Names of witnesses.

4) Time of day consent was given.

5) Time search was completed and if consent was withdrawn, the time of withdrawal.

6) Other relevant facts supporting that consent was voluntary, including, but not limited to: age of consenting party, facts supporting they understood your request (no language barrier), consenting party's general demeanor and actions, actions you took to ensure you were not causing duress.

**Instructor Note:** Inform students they will not remember the specifics of each case when they are called to testify, which will likely be months or years down the road. Documentation is the only way to ensure exclusionary rule does not apply and to protect themselves from lawsuits.

d. **Best Practices: All interactions must be documented in detail because if incriminating evidence is discovered, there will likely be claims related to agent conduct in an effort to make the consent appear to be involuntary. These allegations often involve a show of force such as pointing firearms, yelling, ordering people around, and ignoring objections.**

4. **Demonstration**

You ask the consent giver what her relationship is to Pablo, and she tells you she is his wife. During your search, you walk into a bedroom where two children are sitting on a bed, playing a video game. One of the children looks up and says, "Get out of my room." Do you have consent to search the room? *Yes.*

F. **EPO 6: Recognize the scope of consent when searching containers.**

1. Ability is based on scope of consent.

    a. Agents are only permitted to search containers that are capable of containing the person or object identified as the target.

    b. Example: If an agent asks to search a house for a person, he is not permitted to open a nightstand drawer unless he asks for additional consent to do so.

    c. Example: If an agent asks to search a house for a small object, he is permitted to search anywhere (big or small) that could hold that object.

2. Locked containers

    a. Locked containers cannot be forcibly opened based upon consent, unless such consent is expressly granted.

    b. Example: While searching a home based upon consent of the owner, you come across a large trunk that is locked with a cheap lock and chain. You ask the owner if you can search the trunk, and she responds that you can, but that she does not have a key. You ask if you can break the lock to which she says that you can. Provided you are diligent in ensuring she has authority, (it is odd for an owner not to have a key) you can break the lock.

3. **Demonstration**

Continuing from the previous Demonstration scenario…As you search the child's room, you notice him staring at a box on his nightstand. Do you have consent to search the box? *No, you asked if you could search for Pablo. If you wish to search the box, you will need to ask for consent from Pablo's wife.*

G. **EPO 7: Recognize when consent is expired or withdrawn.**

1. Consent expires
   a. When you discover what was the basis for the scope of your consent, the search must stop unless additional consent is requested and granted.

   b. Example: You ask to search for an individual; after he is discovered and arrested, you cannot continue to look around based upon consent.

   c. Example: You are granted consent to search for identification and travel documents in a bedroom. Upon entering the room, you immediately identify the target's driver's license on a dresser. Not sure if there are other identification or travel documents, you continue to search all areas those items could be located and discover child pornography in a nightstand drawer. The continued search was lawful because you were still looking for the stated documents.

2. Consent withdrawn

   a. Who can withdraw

      1) Consenter

      2) Spouse/co-owner

      3) Co-occupant (not inferior based on hierarchy)

   b. The withdrawal

      Must be clearly expressed by action or words, not simply an expression of impatience.

   c. Agent response

      1) Upon a proper withdrawal of consent, an agent must immediately honor the request to stop.

      2) A consent giver cannot withdraw consent regarding evidence already discovered as a result of a consent search. So while an agent cannot continue the consent search, he should continue to process the situation accordingly, which may include the use of other warrant exceptions.

      3) If the target of the administrative arrest warrant is within arm's reach, he can be secured despite the withdrawal of

consent. However, if the target is not within arm's reach, even if he is positively identified, agents must adhere to the withdrawal of consent.

4) Example: A fugitive operations team was given consent to enter a home and look for their target. Upon entering the home, they identified their target upstairs, but before they could make their way upstairs, the consent giver told the team to leave.

3. **Demonstration**

You reach what seems to be the last room in the house, and the consenter tells you that you cannot enter that room. Do you have consent to enter anyway? *No, the consent has been withdrawn.*

H. **EPO 8: Explain how to apply other warrant exceptions during knock and talks.**

1. All Warrant Exceptions can apply during knock and talks.

Example: While consent searching a home, you discover a firearm in the bedroom of an individual you know to be an illegal alien. You arrest the alien (Arrest in Public) for violating 18 U.S.C. § 922(g). In conjunction with the arrest, you seize the firearm as evidence (plain view seizure) and search him (search incident to arrest), but find nothing.

2. Exigent searches (Hot Pursuit, Now or Never, and Emergency)

a. Rule: Law enforcement cannot create an exigency and then rely upon that exigency as the basis for a warrantless search. In other words, exigent circumstances may not consist of the likely consequences of the government's own actions or inactions.

b. Example: While conducting surveillance on a home known for gang activity in a high-crime neighborhood, you observe your target, who is known to be violent. You want to speak to this target, but you do not have an arrest warrant or search warrant, so you decide to conduct a knock and talk. You approach the home wearing your clearly marked "police" vest along with two other agents, while six other agents set up a visible perimeter. You knock on the front door and yell, "Police, we'd like to speak with you." Nobody answers, but you hear what sounds like multiple occupants scrambling around inside the home. Feeling at risk of an attack, you and the two other agents break inside the door and secure the residence. **Illegal Search.**

3. Protective sweeps

a. Rule: Following an arrest inside a REP-protected location, an officer may conduct a limited search if there is a Reasonable Suspicion that others are present in that location that may intend to assault the officer or others.

1) Traditionally, this search is conducted incident to an arrest in an REP-Protected area, but has been expanded in some circuits.

2) Expansion of this search beyond an arrest in an REP has been expressly rejected by the 9th and 10th Circuits.

3) In circuits that have expanded protective sweeps to include instances where an arrest is not made, the analysis is framed more consistent with "Exigency," specifically "Emergency Search," than with protective sweeps. In these instances, the courts require Probable Cause of an exigency as opposed to Reasonable Suspicion.

b. Scope: An agent may conduct a cursory search of those places in which a person may be hiding.

1) No locked doors may be opened.

2) Must take no longer than necessary to dispel suspicion of danger.

3) Example: During the course of a Knock and Talk, you are granted consent to search a home for your target. You discover your target in the closet of a downstairs bedroom and arrest him. As you are speaking with the arrestee and the other occupants in the living room, you ask if anyone else is present in the house, to which they respond, "No." Despite this response, you hear rustling noises upstairs and what sounds like muted footsteps down an out of view staircase. Based on this information, you conduct a lawful protective sweep.

4) Example: You perform a consent search of a home and locate your target and arrest him. As you are leading him toward the front door to take him outside, you walk past a slightly open bathroom door and notice the light is on. For officer safety, you open the door and then you discover drugs. **Illegal search because there was no reasonable suspicion that others were present who intended to commit an assault.**

4. **Demonstration**

As you walk away from the bedroom, you hear a noise that sounds like a gun being racked. Can you perform a protective sweep? *Yes. Although protective sweeps traditionally are done following arrests, this is a perfect example of when an arrest is not required.*

## II. Student Practice

> **Instructor Note:** Break students into groups of four or five. Allow each group 15 minutes to complete the questions. As a class, have each group report their answers.

1. You are on your way to a knock and talk and notice a sheriff's deputy car pursuing one of your targets. What should you do? *Nothing. ERO is prohibited from pursuing vehicles.*

2. When you arrive at your target's residence, you realize there is a closed-in porch in front of the house. How do you proceed? *You must determine if the porch is part of the dwelling or merely curtilage by looking at factors such as appearance, doorbell location, etc. If the porch is part of the dwelling, you must stay outside; if it is part of the curtilage, you may enter and knock on the interior door.*

3. You proceed to knock on the door and an elderly woman answers. You ask her if you can "Come in." She states that you can, so you enter the home and start checking rooms. Did you obtain lawful consent for these actions? *You gained consent to enter the house, but you must ask for additional consent to search the house further.*

4. While searching the home, you encounter a door that is closed. What should you do? *Open in only if you are sure the consent giver has authority to grant entry.*

5. As you continue to search the house, you realize that you have not documented consent. What forms do you need to use? *FOW and I-213.*

6. You reach another room in the house and notice an external closet. You proceed to open it, but it is locked. What should you do? *If the consent giver has the authority, ask her to unlock the closet.*

7. As you are walking through the kitchen, you notice a door and ask the consent giver to what it leads. She responds that it is the door to the basement, but you cannot search there. What should you do? *You cannot search the basement. The only other option is to ask again.*

8. As you leave the kitchen, you hear someone scream. What should you do? *You should conduct a protective sweep or emergency search.*

## III. Feedback and Remediation

State why the answers provided are correct or incorrect. Watch student reactions to see if there is confusion or questions. Be prepared to add a similar scenario and get a verbal check from the student(s) who might not have gotten it the first time.

# CONCLUSION

## I. Summary of Main Ideas

This lesson provided you with an overview of the evidence collection process while conducting a field operation. It offered the process of the knock and talk, including the basics of voluntary consent.

## II. Integration

This lesson will continue with evidence collection when working with other law enforcement agencies, programs in ICE that do not fall directly under ERO fugitive operations teams, the Criminal Alien Program (CAP), and Secure Communities.

## III. Objectives

Given an alien encounter through a field operation, you are now able to obtain evidence to determine the alien's citizenship, in accordance with the 4th Amendment, due process, and administrative warnings.

## IV. Test or Final Activity

You will be tested on this material in the Criminal Encounters Practical Exercise.

Confidential Subject to Protective Order

U.S. Immigration and Customs Enforcement



## Attachment

Directive 11072.1 Civil Immigration Enforcement Actions Inside Courthouses, Jan. 10, 2018

Confidential Subject to Protective Order

## U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT

**Directive Number 11072.1**: Civil Immigration Enforcement Actions Inside Courthouses

**Issue Date:** January 10, 2018
**Effective Date:** January 10, 2018
**Superseded:** None
**Federal Enterprise Architecture Number:** 306-112-002b

1. **Purpose/Background.** This Directive sets forth U.S. Immigration and Customs Enforcement (ICE) policy regarding civil immigration enforcement actions inside federal, state, and local courthouses. Individuals entering courthouses are typically screened by law enforcement personnel to search for weapons and other contraband. Accordingly, civil immigration enforcement actions taken inside courthouses can reduce safety risks to the public, targeted alien(s), and ICE officers and agents. When practicable, ICE officers and agents will conduct enforcement actions discreetly to minimize their impact on court proceedings.

   Federal, state, and local law enforcement officials routinely engage in enforcement activity in courthouses throughout the country because many individuals appearing in courthouses for one matter are wanted for unrelated criminal or civil violations. ICE's enforcement activities in these same courthouses are wholly consistent with longstanding law enforcement practices, nationwide. And, courthouse arrests are often necessitated by the unwillingness of jurisdictions to cooperate with ICE in the transfer of custody of aliens from their prisons and jails.

2. **Policy.** ICE civil immigration enforcement actions inside courthouses include actions against specific, targeted aliens with criminal convictions, gang members, national security or public safety threats, aliens who have been ordered removed from the United States but have failed to depart, and aliens who have re-entered the country illegally after being removed, when ICE officers or agents have information that leads them to believe the targeted aliens are present at that specific location.

   Aliens encountered during a civil immigration enforcement action inside a courthouse, such as family members or friends accompanying the target alien to court appearances or serving as a witness in a proceeding, will not be subject to civil immigration enforcement action, absent special circumstances, such as where the individual poses a threat to public safety or interferes with ICE's enforcement actions.[1]

[1] ICE officers and agents will make enforcement determinations on a case-by-case basis in accordance with federal law and consistent with U.S. Department of Homeland Security (DHS) policy. *See* Memorandum from John Kelly, Secretary of Homeland Security, *Enforcement of the Immigration Laws to Serve the National Interest* (Feb. 20, 2017); Memorandum from John Kelly, Secretary of Homeland Security, *Implementing the President's Border Security and Immigration Enforcement Improvements Policies* (Feb. 20, 2017).

ICE officers and agents should generally avoid enforcement actions in courthouses, or areas within courthouses that are dedicated to non-criminal (e.g., family court, small claims court) proceedings. In those instances in which an enforcement action in the above situations is operationally necessary, the approval of the respective Field Office Director (FOD), Special Agent in Charge (SAC), or his or her designee is required.

Civil immigration enforcement actions inside courthouses should, to the extent practicable, continue to take place in non-public areas of the courthouse, be conducted in collaboration with court security staff, and utilize the court building's non-public entrances and exits.

Planned civil immigration enforcement actions inside courthouses will be documented and approved consistent with current operational plans and field operations worksheet procedures. Enforcement and Removal Operations (ERO) and Homeland Security Investigations (HSI) may issue additional procedural guidance on reporting and documentation requirements; such reporting and documentation shall not impose unduly restrictive requirements that operate to hamper or frustrate enforcement efforts.

As with any planned enforcement action, ICE officers and agents should exercise sound judgment when enforcing federal law and make substantial efforts to avoid unnecessarily alarming the public. ICE officers and agents will make every effort to limit their time at courthouses while conducting civil immigration enforcement actions.

This policy does not apply to criminal immigration enforcement actions inside courthouses, nor does it prohibit civil immigration enforcement actions inside courthouses.

3. **Definition** The following definitions apply for the purposes of this Directive only.

3.1. **Civil immigration enforcement action.** Action taken by an ICE officer or agent to apprehend, arrest, interview, or search an alien in connection with enforcement of administrative immigration violations.

4. **Responsibilities.**

4.1. The **Executive Associate Directors** for **ERO** and **HSI** are responsible for ensuring compliance with the provisions of this Directive within his or her program office.

4.2. **ERO FODs** and **HSI SACs** are responsible for:

1) Providing guidance to officers and agents on the approval process and procedures for civil immigration enforcement actions at courthouses in their area of responsibility beyond those outlined in this Directive; and

2) Ensuring civil immigration enforcement actions at courthouses are properly documented and reported, as prescribed in Section 5.1 of this Directive.

**4.3.** **ICE Officers and Agents** are responsible for complying with the provisions of this Directive and properly documenting and reporting civil immigration enforcement actions at courthouses, as prescribed in Section 5.1 of this Directive.[2]

**5. Procedures/Requirements.**

**5.1. Reporting Requirements.**

1) ICE officers and agents will document the physical address of planned civil immigration enforcement actions in accordance with standard procedures for completing operational plans, noting that the target address is a courthouse.[3]

2) Unless otherwise directed by leadership, there will be no additional reporting requirements in effect for this Directive.

**6. Recordkeeping.** ICE maintains records generated pursuant to this policy, specifically the Field Operations Worksheets (FOW) and Enforcement Operation Plan (EOP). ERO will maintain the FOW in accordance with the Fugitive Operations schedule DAA-0567-2015-0016. HSI will maintain EOPs in accordance with the Comprehensive Records Schedule N1-36-86-1/161.3. The EOPs will be maintained within the Investigative Case Files.

**7. Authorities/References.**

**7.1.** DHS Directive 034-06, *Department Reporting Requirements,* October 23, 2015.

**7.2.** DHS Instruction 034-06-001, Rev. 1, *Department Reporting Requirements*, March 28, 2017.

**8. Attachments.** None.

**9. No Private Right.** This document provides only internal ICE policy guidance, which may be modified, rescinded, or superseded at any time without notice. It is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigative prerogatives of ICE.

---

[2] *See also* ICE Directive No. 10036.1, *Interim Guidance Relating to Officer Procedure Following Enactment of VAWA 2005* (Jan. 22, 2007), for additional requirements regarding civil immigration enforcement actions against certain victims and witnesses conducted at courthouses.

[3] ERO will use the Field Operations Worksheet and HSI will use the Enforcement Operation Plan.

Confidential Subject to Protective Order

Thomas D. Homan
Deputy Director and
Senior Official Performing the Duties of the Director
**U.S. Immigration and Customs Enforcement**



**USA 033020**

**EXHIBIT 6**
**247**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

# U.S. Immigration and Customs Enforcement
# ENFORCEMENT AND REMOVAL OPERATIONS

## ERO Training

# PROBABLE CAUSE AND WARRANT EXCEPTIONS
## (11106109)

## Lesson Plan

# Basic Immigration Enforcement Training Program

WARNING: This document is FOR OFFICIAL USE ONLY (FOUO). This contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.G. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public, to anyone outside the ERO Academy, or to other personnel who do not have a valid "need-to-know" without prior approval of the ERO Academy Chief or his designee.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Control Page

**Key Contributors:** **JUL 2012**

[redacted] Attorney Instructor, ICEA OPLA Training Division
[redacted] Instructional Systems Specialist, OTD IMU
[redacted] Instructional Systems Specialist, OTD IMU

[redacted] Attorney Instructor, ICEA OPLA Training Division **JUN 2015**
[redacted] Instructional Systems Specialist, OTD IMU

**Instructional Management Unit Review:** **FEB 2019**

[redacted] Chief, Instructional Management Unit
[redacted]

**ERO Academy Approval:** **FEB 2019**

[redacted] Unit Chief, ERO Academy, ERO Training Division
[redacted]

Case 2:20-cv-03612-DIDWF-JBR Document 407-3 Filed 06/18/23 Page 250 of 284
Page ID #:15705
CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Control Page

**Key Contributors:** **JUL 2012**

[redacted] Attorney Instructor, ICEA OPLA Training Division
Instructional Systems Specialist, OTD IMU
Instructional Systems Specialist, OTD IMU

[redacted] Attorney Instructor, ICEA OPLA Training Division **JUN 2015**
Instructional Systems Specialist, OTD IMU

**Instructional Management Unit Review:** **FEB 2019**

[redacted] Chief, OLCD Instructional Management Unit

______________________________

Signature (optional)

**ERO Academy Approval:** **FEB 2019**

[redacted] Unit Chief, ERO Academy, ERO Training Division

______________________________

Signature

CONFIDENTIAL - ATTORNEYS' EYES ONLY

U.S. Immigration and Customs Enforcement

ERO Training

# Record of Changes

| Date of Change | A=Add. M=Mod. D=Del. | Description of Change | Reason for Change | Responsible |
|---|---|---|---|---|
| 12/1/2015 | M. | Modified verbiage in Student Practice scenario 2 | To use an example with which students would be familiar | [redacted] OPLA |
| 2/16/2016 | M | Changed IEA to ERO Officer and associated revisions | Title change for target audience | [redacted] IMU |
| 2/25/2019 | Modify | Delete scenario 2, question 2 on authority<br><br>Change scenario 3 to read "10 minutes" of questioning | Clarify for students<br><br>Clarify for students | [redacted] OPLA |
| 2/25/2019 | Modify | Revise organization identity<br>Revise format<br><br>Add designation of DOTP – same content for both programs | Organization change<br><br>Comply with changes to Curriculum Development Guide<br><br>Creation of DOTP | [redacted] IMU |
| 6/11/2019 | Modify | Revise instructor designation to reflect agency organization and include an ICE-Certified Instructor approved by the ERO Attorney/Instructor | Allow for a qualified substitute instructor | [redacted] IMU |
| 4/23/2020 | Modify | Revise TPO: "search, seize, and arrest" to "search and seize"<br><br>Add Use of Ruses memorandum as Attachment<br><br>Create separate BIETP and DOTP materials | Remove redundancy<br><br>All reference materials included in LP and SG<br><br>New TMSS protocol | [redacted] OPLA<br><br>[redacted] IMU |

# Table of Contents

**Lesson Description** .......... 5

**Lesson Administration** .......... 6

**Lesson Plan** .......... 8

**Introduction** .......... 8

**Instruction** .......... 12

I. Explanation and Demonstration .......... 12

A. EPO 1: Describe the elements required to conduct a search incident to arrest .......... 12

B. EPO 2: Determine the elements required to conduct a consent search .......... 18

C. EPO 3: Determine the elements required to conduct an investigative detention. .......... 25

D. EPO 4: Describe the elements required to conduct a “Terry” frisk. .......... 27

E. EPO 5: Describe the elements required to conduct a protective sweep .......... 28

F. EPO 6: Describe the elements required to conduct an inventory search. .......... 29

G. EPO 7: Explain how to conduct a search of an arrestee at a detention facility .......... 30

II. Student Practice .......... 31

III. Feedback and Remediation .......... 33

**Conclusion** .......... 34

**Attachment** .......... 35

U.S. Immigration and Customs Enforcement

ERO Training

# LESSON DESCRIPTION

## I. Lesson Title

Probable Cause and Warrant Exceptions

## II. Program/Course Title

Basic Immigration Enforcement Training Program

## III. Description

At the end of this lesson, students will be able to determine when they can conduct searches and seizures where there is no probable cause and no warrant. Each of the following scenarios will be presented:

- Search incident to arrest
- Consent searches
- Investigative detentions
- "Terry" frisks
- Protective sweeps
- Inventory searches
- Detention facility searches

## IV. Terminal Performance Objective (TPO)

Given enforcement-related situations, articulate the legal requirements to search and seize without probable cause and without a warrant in accordance with the 4th Amendment.

## V. Enabling Performance Objectives (EPOs)

EPO 1: Describe the elements required to conduct a search incident to arrest.
EPO 2: Describe the elements required to conduct a consent search.
EPO 3: Describe the elements required to conduct an investigative detention.
EPO 4: Describe the elements required to conduct a "Terry" frisk.
EPO 5: Describe the elements required to conduct a protective sweep.
EPO 6: Describe the elements required to conduct an inventory search.
EPO 7: Explain how to conduct a detention facility search.

## VI. Length of Lesson

| EXPLANATION & DEMONSTRATION | PRACTICE | ASSESSMENT | TOTAL |
|---|---|---|---|
| 90 Minutes | 30 Minutes | Legal Comprehensive Examination | 2 Hours |

Case 2:26-cv-03610-MEMF-JBR Document 487-3 Filed 06/21/23 Page 254 of 284
Page ID #:17030

# LESSON ADMINISTRATION

## I. Lesson Title

Probable Cause and Warrant Exceptions

## II. Risk Management

None

## III. Facility Requirements

Standard classroom with multimedia-capable instructor workstation

## IV. Transportation Requirements

None

## V. Required Staff

One ICE-Certified, OPLA Attorney/Instructor, or an ICE-Certified Instructor approved by the ERO Attorney/Instructor

## VI. Academy-Provided Training Aids and Equipment

Probable Cause and Warrant Exceptions PowerPoint

## VII. Student-Provided Equipment

None

## VIII. Student Handouts and Materials

BIETP Probable Cause and Warrant Exceptions Student Guide included in Legal Student Binder

## IX. Attachments

Use of Ruses in Enforcement Operations

## X. References

- *New York v. Belton*, 453 U.S. 454 (1981)
- *Arizona v. Gant*, 556 U.S. 332 (2009)
- *Thornton v. United States,* 541 U.S. 615 (2004)
- *Preston v. United States*, 376 U.S. 364 (1964)
- *Chimel v. California*, 395 U.S. 752 (1969)
- The Carroll Doctrine, *Carroll v. United States*, 1924 (267 U.S. 132)

Case 2:20-cv-03612-MEMF-JBR Document 207-3 Filed 06/28/25 Page 255 of 284
Page ID #:5701


- Fugitive Operations Handbook
- DOJ Guidance on Gant
- Chimel Rule Checklist
- Use of Ruses in Enforcement Operations

CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Lesson Plan

## Probable Cause and Warrant Exceptions

## INTRODUCTION

## I. Motivation

Engaging in **LAWFUL** searches and seizures allows you to effectively carry out the responsibilities of an ERO Officer. However, if you overstep your **LEGAL** bounds as an ERO Officer, not only will you fail to carry out the responsibilities of your position, you might also make yourself subject to employment and/or criminal punishments. In this lesson, you will learn the circumstances in which you are authorized to search or seize without probable cause and without a warrant.

## II. Objectives

A. Terminal Performance Objective (TPO)

Given enforcement-related situations, articulate the legal requirements to search and seize without probable cause and without a warrant in accordance with the 4th Amendment.

B. Enabling Performance Objectives (EPOs)

**EPO 1:** Determine the elements required to conduct a search incident to arrest.
**EPO 2:** Describe the elements required to conduct a consent search.
**EPO 3:** Determine the elements required to conduct an investigative detention.
**EPO 4:** Determine the elements required to conduct a “Terry” frisk.
**EPO 5:** Determine the elements required to conduct a protective sweep.
**EPO 6:** Determine the elements required to conduct an inventory search.
**EPO 7:** Explain how to conduct a detention facility search.

## III. Review of the Past

To prepare students for this lesson, ask the following questions.

1. What is the requirement for permanent seizures/arrests?
*Probable Cause.*

2. An investigative detention is what kind of seizure?
*A temporary seizure based on Reasonable Suspicion and one that must be conducted with due diligence and the least intrusive means.*

3. Which of the following does <u>not</u> have a reasonable expectation of privacy?
   a. Person's body
   **b. Overheard conversation**
   c. Curtilage
   d. Car

4. Which of the following are not grounds for an exigent circumstances search?
   a. Hot pursuit
   b. Now or never
   **c. Near certainty**
   d. Emergency

5. Name two employment consequences of exceeding your authority.
   *Any two of the following: 1) Reprimand; 2) Termination of employment; 3) Personal lawsuit; or 4) Criminal prosecution*

## IV. Main Ideas

**<u>Instructor Note</u>:** Display the ERO Officer Alien Encounter and quickly run through the top-level process. Highlight the current topic "Legal issues related to Probable Cause and Warrant Exceptions."

CONFIDENTIAL - ATTORNEYS' EYES ONLY

## ICE "Immigration Officer" Alien Encounter




This lesson will continue to build on what you already know about the 4 h Amendment. ERO Officers conduct searches and seizures as part of their job. In some instances, these searches and seizures are conducted with a warrant supported by Probable Cause, but other times, they will be conducted without a warrant, but based on an

CONFIDENTIAL - ATTORNEYS' EYES ONLY

exception. Some exceptions still require Probable Cause, but you will learn today that some exceptions allow for a level of suspicion less than Probable Cause.

## V. Agenda

This lesson will revolve around the types of searches and seizures that can be conducted without a warrant or probable cause. After providing a general overview, agenda, and performance objectives for the lesson, we'll get into the seven topics regarding warrant exceptions and no probable cause.

The seven topics will discuss how to determine the elements required to:

- Conduct a search incident to arrest
- Conduct an investigative detention
- Conduct a consent search
- Conduct a "Terry" frisk
- Conduct a protective sweep
- Conduct an inventory search
- Conduct a search of a person at a detention facility

Periodically, knowledge checks will test what you know at that point. After covering all of the topics, you will complete a practice activity to see if you can complete a search or seizure based on an exception and then defend your answer.

## INSTRUCTION

### I. Explanation and Demonstration

> **Instructor Note:** Throughout each section, there are demonstrations and/or examples. Additionally, there are verbal knowledge checks. Read the scenarios and/or questions to the class and allow the students to respond. Confirm when the responses are correct and provide the right answers when the responses are incorrect. Be prepared to offer further explanation for students who do not understand the answers.

**A. EPO 1: Describe the elements required to conduct a search incident to arrest.**

LE/Non-Responsive

Case 2:20-cv-03612-MEMF-JPR Document 460-3 Filed 06/28/23 Page 261 of 284
Page ID #:5707
CONFIDENTIAL - ATTORNEYS' EYES ONLY

# LE/Non-Responsive

CONFIDENTIAL - ATTORNEYS' EYES ONLY

# LE/Non-Responsive

CONFIDENTIAL - ATTORNEYS' EYES ONLY

# LE/Non-Responsive

CONFIDENTIAL - ATTORNEYS' EYES ONLY

# LE/Non-Responsive

Case 2:20-cv-03612-DDW-JBR Document 207-3 Filed 06/28/23 Page 265 of 284 Page ID #:1570
CONFIDENTIAL - ATTORNEYS' EYES ONLY

# LE/Non-Responsive

CONFIDENTIAL - ATTORNEYS' EYES ONLY

# LE/Non-Responsive

**B. EPO 2: Describe the elements required to conduct a consent search.**

1. Purpose: Provides person with opportunity to voluntarily comply with law enforcement's request for assistance.

2. Rule:

   a. ERO Officers may obtain consent that is voluntarily given and given by a person with authority to consent to the search.

   b. Consent is "voluntary" if it is the product of a person's free will; that is, if the person made a free choice among lawful options and chose to permit the search. The Supreme Court has said that consent is not voluntary if it is "the product of duress or coercion, express or implied…." *Schneckloth v. Bustamonte,* 412 U.S. 218, 227 (1973). Mere failure to object to a search or otherwise resist is not consent. The burden is on the government to establish that consent was voluntary and was not "coerced by threats or force, or granted only in submission to a claim of lawful authority…" *Schneckloth v. Bustamonte*, 412 U.S. 218, 233 (1973). In evaluating whether or not consent was voluntary, the judge will consider the "totality of the circumstances" (all of the facts and

CONFIDENTIAL - ATTORNEYS' EYES ONLY

circumstances present at the time consent was requested and granted).

3. Factors considered in determining whether consent was voluntary may include:

a. <u>Coercion or Duress:</u> Any coercion, intimidation, or threat, whether actual or implied, will result in a court finding that the consent was not given voluntarily, and therefore that resulting search was unlawful.

1) Coercion may result from acts or words intended to force or intimidate a person into granting consent. However, there is no coercion when officer/agents merely communicate the lawful consequences of the various options available to the person. While the person may not like any of the choices presented, as long as the choices accurately describe what the law provides, requiring him to make a selection from a limited set of the options presented will not make his choice coerced.

2) For example, in one case, agents explained to an arrestee that they believed that there were drugs in his apartment and that one of two things was going to happen.

a) First, they could present their facts to a judge, and if they obtained a search warrant, they would return and search to whatever extent was necessary until they found the drugs.

b) Alternatively, the arrestee could simply tell them where the drugs were.

The arrestee told the officers where the drugs were hidden to avoid the search based on a warrant. A court later upheld the validity of the consent search, stating: "The threat to obtain a warrant which would facilitate a thorough and perhaps disruptive search of the premises was merely a threat by the officers to exercise rights granted them by the law. The record does not show the threat was misleading or made groundlessly in bad faith**."** *United States v. Gardner,* 553 F.2d 946, 949 (5th Cir. 1977).

b. <u>Bad Faith Threat to Obtain a Warrant:</u> Consent to search is invalid when the requesting officer/agent has no grounds to obtain a warrant but "advises" the person that unless he consents, he or his property will be held until a warrant is obtained. Under these facts, the person did not make a free choice among lawful options. The same would be true where an officer/agent claims to have a warrant, but in fact does not have one or knows that the warrant

CONFIDENTIAL - ATTORNEYS' EYES ONLY

he has is invalid (for example, a federal search warrant that is more than 14 days old).

c. <u>Free Choice among Lawful Options</u>: Where consent is gained as a result of giving the consenting party two lawful options (one of them being consent to search and the other being some other method of authorized search such as obtaining a search warrant or applying an exception to the warrant requirement), the consent can be voluntary provided other facts support a finding of voluntariness.

For example, ERO Officers ask the owner of a home for consent to enter a home to search for a fugitive. During their conversation, the homeowner asks if she is required to let the officer/agent in, to which the ERO Officer responds, “No, but if you don’t, we’re just going to wait outside until he leaves, and we’ll arrest him outside.” Not wanting to call attention to her home, the homeowner consents to the search.

d. <u>Show of Force:</u> Where officer/agents enter a building or approach a person with weapons drawn, consent to search may be invalid. Mere submission to authority is not valid consent, and a court is likely to find that the weapons resulted in intimidation.

e. <u>Ruses or Entry by Trick:</u> Consent to enter a building or REP-protected location, even if obtained by deception or trick, will be valid consent unless:

1) The officer/agent pretends to be a person who is responsible for public safety, such as an employee of the electric or natural gas company.

2) The ruse involves representation of the following, unless approved by ICE Director:

a) Religious worker

b) Health and safety worker/inspector

c) Census taker

3) The ruse involves impersonation of the following, unless permission was granted by the cover employer:

a) Federal employee

b) State employee

c) Public-sector employee

Case 2:25-cv-05605-MEMF-SP Document 207-3 Filed 06/21/25 Page 269 of 284
Page ID #:7421



d) An actual private-sector employee. (An employee for a made-up company is okay.)

e) See ICE Memorandum, Use of Ruses in ICE Enforcement Operations, Aug. 22, 2006, in the Attachments

4) Examples of Coercive Ruses

a) Seeking consent based on safety: For example, a gas leak or looking for an abducted child.

b) Informing an elderly and ill target that he was a victim of identity theft and that his computer needs to be looked at.

c) False claim of authority by claiming to have a search warrant when the officer/agent does not.

d) Use of a fake photograph of a fugitive target. **Note**: Western District of Texas only.

f. Knowledge of Right to Refuse: An officer/agent who seeks consent to search is not required to inform the person of his right to refuse to consent unless the individual asks if he is free to not consent. The Supreme Court has held that a person's knowledge of his right to refuse to give consent is just one factor to be considered in determining if consent was voluntary. *Ohio v. Robinette,* 519 U.S. 33 (1996). If an officer/agent does choose to advise a subject that consent may be refused, such an advisory is a positive factor in determining voluntariness.

g. Mental Capacity to Consent: The age (ERO policy requires an appearance of at least 18), education, intelligence, and physical and psychological condition of the person who consents must be considered in determining voluntariness. If a person is mentally incompetent at the time he gives consent, the consent is not voluntary.

h. Clarity of the Consenting Party's Response to Your Request to Search: Did the subject expressly say, "Sure, go ahead and search," or did he "consent" by a nod or a gesture? How clear was his expression of consent? The burden of showing consent is heavier where consent is not explicit, and "[t]he existence of consent to search is not lightly to be inferred…" *United States v. Patacchia,* 602 F.2d 218, 219 (9th Cir. 1979).

*Best Practice: Always obtain a verbal expression of consent and document all circumstances surrounding that expression of consent.*

i. The government always has the burden of proving that consent was voluntarily given.

4. Search is limited to the scope of consent.

5. Scope: The person who gives consent sets the scope and duration of the search. The consenting party may revoke consent at any time.

6. Authority to Consent

a. Actual Authority: The person you seek consent from actually has a privacy interest in the location you wish to search.

For example, you want to search an out-building on a piece of private property. You talk with a person at the home on the property and that person explains that he is the property owner and the out-building is his. You request consent to search the out-building, and the owner gives consent to do so. In this instance, you obtained consent from one who had Actual Authority to consent to the search.

b. Apparent Authority: The person you seek consent from, by all outward appearances, seems to have a legitimate privacy interest in the location you wish to search. Obtaining consent from a person who has Apparent Authority to consent is as legitimate as obtaining consent from one who has Actual Authority to consent to the search.

For example, now you want to search an out-building on a piece of private property. You are greeted by a female standing inside the doorway of the home. You ask this person for consent to search the out-building, and the occupant agrees to the search. The occupant grabs a key from a hook on the wall and takes you to the out-building. The occupant then unlocks the out-building for you. Later, you learn that the female who gave consent is merely a next door neighbor who had been called in by the homeowner to watch the house while the homeowner took his daughter to the hospital. The person who provided consent did not have Actual Authority to consent, but, by all outward appearances, seemed to have authority to consent. As such, she had Apparent Authority to consent to the search and the consent would be deemed lawful.

c. "Common Authority/Third-Party Consent" is based on the recognition that a person who grants another person access to his property assumes the risk that the other person will give the government consent to search the property.

1) Co-occupants (husband/wife, joint tenants, etc.): A co-occupant may consent to a search of any area subject to

CONFIDENTIAL - ATTORNEYS' EYES ONLY

his exclusive control, as well as any area subject to joint control with the other occupant in the absence of the other occupant. **However**, the Supreme Court has ruled that if two people occupy a location and one consents to a search but the other is present and objects to the search, the consenting individual cannot waive the rights of the other person. Thus, evidence found cannot be used against the "present and objecting" person. *Georgia v. Randolph,* 547 U.S. 103, 114 (2006).

2) Host-House Guest: A host can generally consent to a search of premises occupied by a visitor. This would not extend to personal items belonging to the visitor or to a room occupied by a house guest that has been made available for that guest's exclusive personal use.

3) Hotel Guest: A hotel clerk cannot consent to the search of a room that is registered to a guest. Authorization for hotel personnel to enter rooms for purposes of cleaning and repair does not authorize entry for law enforcement purposes. **Only when the term of occupancy ends and the hotel guest loses his right to remain in the room can hotel management consent to a search.** *Stoner v. California*, 376 U.S. 483 (1964).

4) Landlord-Tenant: A landlord cannot consent to a search of the tenant's premises unless the tenant has abandoned the property or has been evicted.

5) Employer-Employee: An employer cannot normally consent to a search of the personal belongings of an employee in areas assigned to the employee for his exclusive use.

6) Bailor-Bailee: A person with custody of personal property belonging to another may consent to its search if he has been given sufficient control over the property to establish joint access or use.

7) Limitations on Third-Party Consent: When a person reserves a closet, desk, room, or any other object or area for his exclusive use, others (even parents, spouses, or cohabitants) cannot consent to a search of that object or area.

d. Additional information:

1) The person who gives consent, whether he has actual or apparent authority, has the ability to limit the scope of the search consented to.

2) That person may stop the search/revoke consent at any time that he chooses.

3) Any evidence collected before the revocation of consent will have been lawfully collected.

5. **Demonstration**

You approach a home that is believed to be the residence of your target and ring the doorbell. A woman answers the door and tells you the target is her roommate and that your team can come in and look for him, as she does not know if he is home. In your conversation with her, you learn the target's bedroom is the only bedroom upstairs, so you go there and knock on the door. A man, who you have reason to believe is the target, asks, "Who is it?" You indicate you are the police and would like to speak with him, to which he responds, "Go away." You open the door, positively identify the target, and arrest him.

a. Was entry into the home lawful? *Yes.*

b. Was going upstairs and knocking on the target's bedroom door lawful? *Yes.*

c. Was opening the bedroom door and entry lawful? *No, the agents did not have consent to enter the bedroom, which was under the exclusive control of the target; the roommate did not have authority to grant consent to that area.*

<u>**Instructor Note**</u>: **KNOWLEDGE CHECK** Answers in italics.

1. **T or F**: A person can withdraw their consent at any time.

*TRUE. When a person withdraws his consent to search, you must stop your search immediately unless continuing it is authorized by some other exception. Note that anything discovered before the withdrawal was done so lawfully and can be used against the applicable party.*

2. Name four of the eight different factors considered in determining whether consent was voluntary.

*1) Coercion or duress, 2) Bad faith threat to obtain a warrant, 3) Free choice among lawful options, 4) Show of force, 5) Ruse or entry by trick, 6) Knowledge of right to refuse, 7) Mental capacity to consent, and 8) Clarity of consenting party's response to your request to search.*

# LE/Non-Responsive

Case 2:20-cv-03612-MEMF-JPR Document 247-3 Filed 06/28/23 Page 274 of 284
Page ID #:5729
CONFIDENTIAL - ATTORNEYS' EYES ONLY

# LE/Non-Responsive

# LE/Non-Responsive

CONFIDENTIAL - ATTORNEYS' EYES ONLY

*Particularized facts are actions taken and words used by the person to be searched that creates an officer safety concern for the ERO Officer. Generalized facts are facts that are common to the type of law enforcement action engaged in, but not necessarily unique to the person to be searched. Therefore, the more that you can do to show that the person to be searched has done or said something that caused concern, the greater the chance the court will find that reasonable suspicion existed to conduct the frisk.*

**E. EPO 5: Describe the elements required to conduct a protective sweep.**

1. Purpose: A protective sweep is meant to provide law enforcement with the means to maintain officer safety during a lawful encounter with a person.

2. Rule: An ERO Officer may search if there is a reasonable suspicion that others are present in the location that may intend to assault or impede the ERO Officer from carrying out lawful duties. Typically, this means an arrest in the REP-protected area.

3. Scope: An ERO Officer may search the private location and spaces within the private location from which a potential assailant could launch an attack on the ERO Officer.

4. Example: While conducting a "knock and talk," you speak with the home's occupant, identify yourself, and ask if you can speak with her. She agrees and invites you into the home. While in the home, you identify a person for whom you have an arrest warrant and place him under arrest. Following the arrest, you continue talking to the two known occupants and ask if there was anyone else present in the house, to which they both respond, "No." Despite their answers, you hear what sounds like human footsteps on the second floor of the home. Under these circumstances, a protective sweep would be authorized since you had a reasonable suspicion that someone was present who could be a potential assailant.

__Instructor Note__: **KNOWLEDGE CHECK** Answers in italics.

1. What is the purpose of a protective sweep without a warrant and probable cause?

   *It is meant to provide law enforcement with the means to maintain officer safety during a lawful encounter, typically concurrent to an arrest in the REP-protected area. This is done by way of a search to determine if there are others present in the location that may intend to assault or impede the ERO Officer who is carrying out lawful duties.*

2. In the following scenario, would the protective sweep without probable cause or a warrant be considered lawful?

While conducting a "knock and talk" at a house with a reputation of housing gang activity, you speak with the home's occupant, identify yourself, and ask if you can speak with her. She agrees and invites you into the home. While inside the home, you encounter an individual who you have probable cause to believe is illegally present in the United States, so you arrest him. You ask the arrestee and the woman if there is anyone else present in the house, to which they both respond, "No." Despite their answers, you hear what sounds like human footsteps on the second floor of the home, which makes you concerned about your safety and that of your fellow agents/officers. As you proceed to conduct a protective sweep of the home, she asks you to leave. You continue to conduct the protective sweep since you had a reasonable suspicion that someone was present who could be a potential assailant.

*Yes. You made a lawful arrest inside a home and had reasonable suspicion that there were others present that may launch an attack. Since an arrest was made, it does not matter that the female occupant of the home revoked consent; your presence was no longer based on said consent.*

**F. EPO 6: Describe the elements required to conduct an inventory search.**

# LE/Non-Responsive

CONFIDENTIAL - ATTORNEYS' EYES ONLY

# LE/Non-Responsive

LE/Non-Responsive

## II. Student Practice

> **Instructor Note:** Divide students into four groups. Students will have 10-15 minutes to review four scenarios that cover the types of searches and seizures that were covered during this lesson. Then they will answer a series of questions within their group. Each group will select a group member to present the group's answers for discussion.

**Scenario 1: Search incident to an arrest**

LE/Non-Responsive

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Scenario 2: Search with consent to search**

You are serving an administrative warrant on a visa overstay. You drive to the home at a time that you've determined that the alien is usually there, knock on the door, and identify yourself as "Glynn County Sheriff's Department." You present the warrant and ask if the alien on the warrant is in the home. The homeowner says, "No," but you believe the person is there and ask for permission to conduct a search. The person consents. You search the home but don't find the alien.

Was the consent given by the owner voluntary?
*No, the ERO Officer misrepresented himself as a member of the Hazard County Police.*

**Scenario 3: Investigative Detention**

LE/Non-Responsive

**Scenario 4: Protective Sweep**

While conducting a knock and talk, you speak with the home's occupant, identify yourself, and ask if you can enter. She agrees and invites you into the home. While in the home, you identify a person for whom you have an arrest warrant and place him under arrest. Following the arrest, you continue talking to the two known occupants and ask if there was anyone else present in the house, to which they both respond, "No." You proceed to conduct a protective sweep just in case because you don't want to be caught off guard by a potential assailant.

Were the elements required to conduct a protective sweep met?

*No. You do not have reasonable suspicion that someone will launch an attack on you. Rule: Reasonable suspicion that others present at the location intend to assault or impede the ERO Officer from carrying out lawful duties.*

## III. Feedback and Remediation

Instructor remediation and feedback will follow all group presentation of answers. Through discussion and guidance, the instructors will provide specific praise for correct answers (why it was correct) and explanations for incorrect answers.

# CONCLUSION

## I. Summary of Main Ideas

This lesson addressed an ERO Officer's authority to perform searches and seizures without probable cause or search warrants. These types of searches and seizures, arrests are:

- Search incident to an arrest
- Consent search
- Investigative detentions
- "Terry" frisk
- Protective sweep
- Inventory search
- Detention facility search

## II. Integration

Previous lessons provided the legal knowledge of performing searches and seizures consistent with the 4th Amendment when ERO Officers have either a warrant supported by probable cause or a warrant exception with probable cause. This lesson covers the authority to conduct searches and seizures consistent with the 4th Amendment without a warrant or probable cause. Subsequent lessons will provide knowledge that will allow you to use evidence gained during **legal** searches and seizures to determine whether an alien is subject to criminal or administrative removal processes.

## III. Objectives

**Instructor Note:** Ask students to explain the conditions for each of the seven searches, which is the same as the enabling objectives.

## IV. Test or Final Activity

On the Legal comprehensive multiple-choice examination, you will be assessed on your ability to determine an ERO Officer's legal authority to search and/or seize a subject without probable cause and without a warrant.

Case 2:20-cv-03512-DDW-JBR Document 407-3 Filed 06/28/23 Page 283 of 284
Page ID #:15073
CONFIDENTIAL - ATTORNEYS' EYES ONLY

## Attachment

Use of Ruses in ICE Enforcement Operations, ICE Memorandum, Aug. 22, 2006

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**U.S. Department of Homeland Security**
425 I Street, NW
Washington, DC 20536

U.S. Immigration and Customs Enforcement

AUG 22 2006

MEMORANDUM FOR: All Special Agents in Charge
All ICE Attachés
All Field Office Directors

FROM: Marcy M. Forman
Director, Office of Investigations

John P. Torres
Acting Director, Detention and Removal Operations

SUBJECT: Use of Ruses in ICE Enforcement Operations

This memorandum serves as joint guidance on the use of ruses in criminal investigations and law enforcement operations. The use of ruses in law enforcement operations is an effective law enforcement tool that enhances officer safety. One main objective of a ruse is to prevent violators from fleeing and placing themselves, officers and innocent bystanders in a potentially dangerous situation.

However, the use of ruses utilizing the names of agencies and companies involved in the administration of health and safety programs can impede the functions of those organizations by creating a perception that these organizations are acting as an enforcement tool of ICE. The use of ruses involving health and safety programs undermines the efforts to increase safety in the workplace and undercuts workers willingness to report workplace safety violations based on a fear of law enforcement action being initiated against the reporting worker.

Pursuant to memorandums dated March 6, 2006, subject Use of Ruses in Enforcement Operations, the Offices of Investigations and Detention and Removal Operations discontinued the use of ruses involving health and safety programs administered by a private entity or a federal, state, or local government agency, such as the Occupational Safety and Health Administration (OSHA), for the purpose of immigration worksite enforcement. The cited memorandums require Assistant Secretary pre-approval of all other investigative enforcement actions requiring the use of a health or safety-based ruse, as well as appropriate coordination with the respective government agency or private entity.

This jointly issued memorandum reinforces the prohibitions and approval requirements outlined in the March 6, 2006, memorandums.

Questions on this matter from OI offices should be directed to Acting Deputy Assistant Director Matthew Allen at (202) 305-3295 and from DRO offices to Deputy Assistant Director Mark Lenox at (202) 616-9625.