# Exhibit 15

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

Pedro Vasquez Perdomo, *et al.*,

Plaintiffs,

v.

Kristi Noem, *et al.*,

Defendants.

Case No.: 2:25-cv-05605-MEMF-SP

**ORDER GRANTING PLAINTIFFS' EX PARTE APPLICATIONS FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE REGARDING PRELIMINARY INJUNCTION [ECF NOS. 38, 45]**

On June 6, 2025, federal law enforcement arrived in Los Angeles to participate in what federal officials have described as "the largest Mass Deportation Operation . . . in History."[1] The individuals and organizations who have brought this lawsuit argue that this operation had two key features, both of which were unconstitutional: "roving patrols" indiscriminately rounding up numerous individuals without reasonable suspicion and, having done so, denying these individuals access to lawyers who could help them navigate the legal process they found themselves in. On this, the federal government agrees: Roving patrols without reasonable suspicion violate the Fourth

[1] ECF No. 45-19 Att. C.

Amendment to the Constitution and denying access to lawyers violates the Fifth Amendment to the Constitution. What the federal government would have this Court believe—in the face of a mountain of evidence presented in this case—is that none of this is actually happening.

Most of the questions before this Court are fairly simple and non-controversial, and both sides in this case agree on the answers.

- May the federal government conduct immigration enforcement—even large scale immigration enforcement—in Los Angeles? Yes, it may.
- Do all individuals—regardless of immigration status—share in the rights guaranteed by the Fourth and Fifth Amendments to the Constitution? Yes, they do.
- Is it illegal to conduct roving patrols which identify people based upon race alone, aggressively question them, and then detain them without a warrant, without their consent, and without reasonable suspicion that they are without status? Yes, it is.
- Is it unlawful to prevent people from having access to lawyers who can help them in immigration court? Yes, it is.

There are really two questions in controversy that this Court must decide today.

First, are the individuals and organizations who brought this lawsuit likely to succeed in proving that the federal government is indeed conducting roving patrols without reasonable suspicion and denying access to lawyers? This Court decides—based on all the evidence presented—that they are.

And second, what should be done about it? The individuals and organizations who have brought this lawsuit have made a fairly modest request: that this Court order the federal government to stop.

For the reasons stated below, the Court grants their request.

/ / /

/ / /

/ / /

/ / /

/ / /

Before the Court are two Ex Parte Applications for Temporary Restraining Order and Order to Show Cause Regarding Preliminary Injunction filed by Plaintiffs. ECF Nos. 38, 45. For the reasons stated herein, the Court GRANTS the Ex Parte Applications.

## I. Background

### A. Factual Background

The Court begins by summarizing the allegations in the First Amended Complaint. ECF No. 16 ("1AC").

#### i. Plaintiffs

Petitioner-Plaintiffs Pedro Vasquez Perdomo ("Vasquez Perdomo"), Carlos Alexander Osorto ("Osorto"), and Isaac Villegas Molina ("Villegas Molina") are residents of Pasadena, California, who were arrested at a bus stop as they were waiting to be picked up for a job on June 18, 2025. 1AC ¶¶ 12–14. They filed this action while detained in the basement of a Los Angeles downtown federal building, B-18. *Id.* ¶¶ 12–14.

Plaintiff Jorge Hernandez Viramontes ("Hernandez Viramontes") is a resident of Baldwin Park, California. *Id.* ¶ 15. He works at a car wash in Orange County, California, that has been visited three times by immigration agents, most recently on June 18, 2025, when he was questioned and detained by agents despite informing them that he is a U.S. citizen. *Id.*

Plaintiff Jason Brian Gavidia ("Gavidia") is a resident of East Los Angeles, California. *Id.* ¶ 16. He was stopped and questioned by immigration agents at a tow yard in Los Angeles County on June 12, 2025, despite explaining multiple times that he is a U.S. Citizen. *Id.*

Plaintiff Los Angeles Worker Center Network ("LAWCN") is a multi-racial, multi-ethnic, and multi-industry organization comprised of worker centers and labor organizations that work together to address injustices faced by low-wage workers in the greater Los Angeles area, including immigrant and non-English-speaking workers. *Id.* ¶ 17. LAWCN has worker center members, who in turn have individual members, including noncitizens with legal status and U.S. citizens. *Id.*

Plaintiff United Farm Workers ("UFW") is a farm worker union with approximately 10,000 members, with more members in California than in any other state. *Id.* ¶ 18. UFW's members in

California work at agricultural sites as well as non-agricultural sites within the District. *Id*. UFW's members include noncitizens with legal status and U.S. citizens. *Id*.

Plaintiff Coalition for Humane Immigrant Rights ("CHIRLA") is a nonprofit organization with its principal place of business in Los Angeles, California. *Id*. ¶ 19. CHIRLA was founded in 1986 to advance the human and civil rights of immigrants and refugees. *Id*. As a membership organization, CHIRLA has approximately 50,000 members across California, including both U.S. citizens and noncitizens of varying immigration status. *Id*. CHIRLA has members in every county in the District. *Id*.

Plaintiff Immigrant Defenders Law Center ("ImmDef") is a nonprofit organization having its principal place of business in Los Angeles, California. *Id*. ¶ 20. Besides Los Angeles, ImmDef has offices in Riverside, Santa Ana, and San Diego, California, and works across the U.S.-Mexico border in Tijuana. *Id*. ImmDef was founded in 2015 to protect the due process rights of immigrants facing deportation. *Id*.

The Court will refer to the five individual plaintiffs, LAWCN, UFW, and CHIRLA as "Stop/Arrest Plaintiffs." The Court will refer to ImmDef and CHIRLA as "Access/Detention Plaintiffs."[2] The Court will address all plaintiffs as "Plaintiffs."

ii. Defendants

Defendant Kristi Noem ("Noem") is the Secretary of the Department of Homeland Security ("DHS"), which is responsible for administering and enforcing the nation's immigration laws pursuant to 8 U.S.C. § 1103(a). *Id*. ¶ 21. Noem is sued in her official capacity. *Id*.

Defendant Todd M. Lyons ("Lyons") is the Acting Director of U.S. Immigration and Customs Enforcement ("ICE"), an agency of the United States within the DHS. *Id*. ¶ 22. ICE is responsible for the stops, arrests, and custody of individuals believed to be in violation of civil immigration law. *Id*. Lyons is sued in his official capacity. *Id.*

---

[2] Plaintiffs refer to ImmDef and CHIRLA as "Access/*Conditions*" Plaintiffs and "Access/*Detention*" Plaintiffs in the 1AC. *Compare* 1AC at 61 (referring to "Access/Conditions Plaintiffs" under the fifth and sixth causes of action), 62 (same, under the seventh cause of action) *with* ¶ 8 (referring to "Access/Detention Plaintiffs"), Prayer for Relief ¶ 8 (same). For consistency, the Court will use the term "Access/Detention Plaintiffs" throughout this Order.

Defendant Rodney S. Scott ("Scott") is the Commissioner of U.S. Customs and Border Protection ("CBP"), the agency within the DHS that is responsible for enforcing immigration laws at or close to the U.S. border. *Id.* ¶ 23. Scott has direct authority over all CBP policies, procedures, and practices related to stops, arrests, and detention. *Id.* Scott is sued in his official capacity. *Id.*

Defendant Michael W. Banks ("Banks") is Chief of the U.S. Border Patrol. *Id.* ¶ 24. Banks has direct authority over all Border Patrol policies, procedures, and practices related to stops, arrests, and detention. *Id.* Banks is sued in his official capacity. *Id.*

Defendant Kash Patel ("Patel") is Director of the U.S. Federal Bureau of Investigation ("FBI"). *Id.* ¶ 25. In that capacity, Patel is responsible for the direction and oversight of all operations of the FBI. *Id.* Patel is sued in his official capacity. *Id.*

Defendant Pam Bondi ("Bondi") is the U.S. Attorney General. *Id.* ¶ 26. Bondi is head of the Department of Justice ("DOJ") and is responsible for the direction and oversight of all operations of the DOJ. *Id.* Bondi is sued in her official capacity. *Id.*

Defendant Ernesto Santacruz Jr. ("Santacruz Jr.") is the Acting Field Office Director for the Los Angeles Field Office of ICE. *Id.* ¶ 27. Santacruz Jr. is responsible for the supervision of personnel within ICE's Enforcement and Removal Operations ("ERO") in the geographic area covered by the Los Angeles Field Office, which comprises the seven counties in the District, and facilities within the District, including B-18. *Id.* Santacruz Jr. is sued in his official capacity. *Id.*

Defendant Eddy Wang ("Wang") is the U.S. Homeland Security Investigations Special Agent in Charge for Los Angeles. *Id.* ¶ 28. Wang is responsible for the supervision of agents within ICE's Homeland Security Investigations ("HSI") in the Los Angeles area. *Id.* Wang is sued in his official capacity. *Id.*

Defendant Gregory K. Bovino ("Bovino") is the Chief Patrol Agent for the El Centro Sector of the CBP. *Id.* ¶ 29. In that capacity, Bovino is responsible for the supervision of agents in the El Centro Sector. *Id.* Bovino is sued in his official capacity. *Id.*

Defendant D. Stalnaker ("Stalnaker") is the Acting Chief Patrol Agent for the San Diego Sector of the CBP. *Id.* ¶ 30. In that capacity, Stalnaker is responsible for the supervision of agents in the San Diego Sector. *Id.* Stalnaker is sued in his official capacity. *Id.*

Defendant Akil Davis ("Davis") is the Assistant Director of the Los Angeles Office of the FBI. *Id.* ¶ 31. In that capacity, Davis is responsible for the supervision of all agents in the Los Angeles Office. *Id.* Davis is sued in his official capacity. *Id.*

Defendant Bilal A. Essayli ("Essayli"; together with all other defendants, "Defendants") is the U.S. Attorney for the Central District of California. *Id.* ¶ 32. Essayli has authority over federal law enforcement operations within the District. *Id.* Essayli is sued in his official capacity. *Id.*

iii. Arrests and Detentions

On June 6, 2025, federal agents detained multiple day laborers outside of the Westlake Home Depot. *Id.* ¶ 38. In the following days, similar raids occurred throughout the District. *Id.* Car wash workers,[3] farm and agricultural workers, street vendors, recycling center workers, tow yard workers, and packing house workers were targeted. *Id.* ¶¶ 39, 40 ("Between Monday, June 9, 2025, and June 13, 2025, at least 43 people were detained on farms in Ventura and Santa Barbara Counties"), 42. Various places have been targeted by federal agents. *Id.* ¶ 42 (listing farmers markets, swap meet, bus stops, parks, gym, and church). In one instance, the agents approached and prevented a non-white individual from walking away but not those who appeared to be Caucasians. *Id.* ¶ 43. In another, the agents arrived in unmarked vehicles, pointed a gun, and demanded to see identification without providing a reason for the stop. *Id.* ¶ 44; *see id.* ¶ 46 (describing "a military-style raid" at a swap meet). Yet in a different context, the agents provided no reason for stopping individuals at a church. *Id.* ¶ 45. Since they began on June 6, 2025, federal immigration raids have led to the arrest of over 1,500 people. *Id.* ¶ 165.

Agents and officers approach suddenly and in large numbers in military style or SWAT clothing, heavily armed with weapons displayed, masked, and with their vest displaying a generic "POLICE" patch (if any display at all). *Id.* ¶ 51. Agents typically position themselves around individuals, aggressively engage them, and/or shout commands, making it nearly impossible for individuals to decline to answer their questions. *Id.* ¶ 52. When individuals have tried to avoid an

---

[3] One of LAWCN's member organizations is CLEAN Carwash Worker Center ("CLEAN"), on whose behalf LAWCN brings this suit. 1AC ¶ 169; *see id.* ¶¶ 173 ("Dozens of CLEAN's members have been detained by immigration agents while at work. At least one identifiable CLEAN member, Jesus Aristeo Cruz Utiz, has been subjected to Defendants' unlawful stop and arrest practices.").

encounter with agents and officers, they have been followed and pushed to the ground, sometimes even beaten, and then taken away. *Id.* ¶ 53. These incidents have been widely reported in the news. *Id.* ¶ 54.

Defendants have a policy and practice of effectuating warrantless arrests without making an individualized flight risk determination. *Id.* ¶ 65. Defendants also have a policy and practice of not identifying themselves or explaining the basis for an arrest upon taking someone into custody. *Id.* ¶ 71. Agents and officers often show up masked, without any visible badges or insignia indicating what agency they work for, and have refused to identify themselves when asked. *Id.*

iv. Conditions at B-18

During the ongoing raids, and as an integral part of the policy and pattern of unlawful stops and arrests, Defendants have been taking individuals who are swept up to the basement of the federal building at 300 North Los Angeles Street in Los Angeles, commonly referred to as B-18. *Id.* ¶ 74. B-18 is a facility for immigrant detainees designed to hold a limited number of individuals *temporarily* so they can be processed and released, or processed and transported to a long-term detention facility. *Id.* It does not have beds, showers, or medical facilities. *Id.* Individuals taken to B-18 are being kept in small, windowless rooms with dozens or more other detainees in cramped quarters. *Id.* ¶ 76. Some rooms are so cramped that detainees cannot sit, let alone lie down, for hours at a time. *Id.* As of June 20, 2025, over 300 individuals were being held at B-18. *Id.* ¶ 77.

Detainees are also routinely deprived of food, and some have not even been given water other than what comes out of the combined sink and toilet in the group detention room. *Id.* ¶ 79. Upon asking for food, detainees have been told repeatedly that the facility has run out. *Id.*

Detainees are denied access to necessary medical care and medications. *Id.* ¶ 80. Individuals with conditions that require consistent medications and treatment are not given any medical attention, even when that information is brought to the attention of the officers on duty. *Id.*; *see id.* ¶ 91 ("On June 19, 2025, an ImmDef attorney arrived at B-18 to meet with detainees, including one who was scheduled for a chemotherapy appointment the next day. Despite showing a doctor's note confirming the appointment and specifying that missing the appointment would be detrimental to the detainee's health, the guards repeatedly would not allow the attorney to meet with the ill detainee.").

The facility cannot provide detainees with basic hygiene; individuals who are menstruating have had to wait long periods before receiving menstrual pads, if they receive them at all. *Id.*

v. Denial of Access to Counsel

Individuals detained at B-18 have had their access to prospective or retained counsel restricted. *Id.* ¶ 81. On June 6, 2025, attorneys and legal representatives from CHIRLA and ImmDef attempted to gain access to B-18 to advise detainees of their rights and assess their eligibility for relief, but they were not permitted to enter. *Id.* ¶ 82. When they returned to B-18 the next morning, attorneys identified a handwritten notice on the door of the family and attorney entrance at B-18 indicating that B-18 would not permit any visits that day. *Id.* ¶ 83. Federal officers then deployed an unknown chemical agent against family members, attorneys, and representatives. *Id.* The chemical agent caused everyone to cough and inflicted a burning sensation in the eyes, nose, and throat. *Id.* That same morning, numerous unmarked white vans quickly departed B-18 with a group of detainees. *Id.* ¶ 84. CHIRLA and ImmDef attorneys and representatives attempted to loudly share know-your-rights information with the detainees in the vans. *Id.* Federal agents blasted their horns. *Id.*

On the rare occasions when attorneys and family members were allowed access to their clients or loved ones, they were made to wait hours at a time to see them, and the resulting visits were limited to a mere five to ten minutes. *Id.* ¶ 87. In many cases, attorneys and family members were unable to determine whether a particular individual is even detained at B-18, or whether they had been transferred to another facility. *Id.* ¶ 88. B-18 officers have refused to provide clear answers to questions about detainees' whereabouts, or refused to answer questions altogether. *Id.* ICE's online locator, which provides information about detainees' location, is not updated in a timely manner. *Id.*

vi. Officially Sanctioned Conduct

In January, the administration gave ICE field offices an arrest quota of seventy-five (75) arrests a day. *Id.* ¶ 97. The administration also shut down multiple oversight agencies. *Id.* ¶ 99. The administration set a new arrest quota of 3,000 arrests per day and reportedly threatened job consequences if officials failed to meet arrest quotas. *Id.* ¶ 101.

vii. Individual Plaintiffs' Experiences

In the early morning of June 18, 2025, in Pasadena, California, Vasquez Perdomo was waiting at a bus stop across the street from Winchell's Donuts with several co-workers to be picked up for a job. *Id.* ¶ 111. About four cars converged on his location, and about half a dozen masked agents jumped out on either side of him. *Id.* ¶ 112. They had weapons and masks, and did not identify themselves. *Id.* Vasquez Perdomo tried to leave but was surrounded, grabbed, handcuffed, and put into one of the vehicles. *Id.* ¶ 113. No warrant was shown. *Id.* ¶ 115. It was only after he was brought to a nearby CVS parking lot that agents checked Vasquez Perdomo's identification. *Id.* ¶ 114. Agents did not inform Vasquez Perdomo that they were immigration officers authorized to make an arrest or of the basis for his arrest. *Id.* ¶ 119. At the time this action was filed, Vasquez Perdomo had been transported to and was being held at B-18. *Id.* ¶ 120. There, he experienced extremely crowded and unsanitary conditions, was given little to eat or drink, and slept on the floor. *Id.*

In the early morning of June 18, 2025, in Pasadena, California, Osorto was waiting to be picked up for work with his co-worker Vasquez Perdomo. *Id.* ¶ 124. When federal agents approached, he tried to run, but one of the agents caught up to him and pointed a taser at his head and said "stop or I'll use it!" *Id.* ¶ 125. Osorto stopped immediately. *Id.* Osorto was handcuffed and put into a vehicle. *Id.* ¶ 126. It was only after he was brought to a nearby CVS parking lot that agents asked Osorto if he had papers. *Id.* ¶ 128. No warrant was shown. *Id.* ¶ 129. Agents did not inform Osorto that they were immigration officers authorized to make an arrest or of the basis for his arrest. *Id.* ¶ 132. At the time this action was filed, Osorto had been transported to and was being held at B-18. *Id.* ¶ 133. The facility was full, and when people asked for help, officers told them there was no food, no water, and no medicine. *Id.* Today, he remains in custody at the Adelanto ICE Processing Center. *Id.*

In the early morning of June 18, 2025, in Pasadena, California, Villegas Molina was waiting to be picked up for work with his co-workers Vasquez Perdomo and Osorto. *Id.* ¶ 137. When federal agents approached, an agent yelled at Villegas Molina not to run, even though he was still and calm. *Id.* ¶ 139. He was told to provide his identification, and he provided his California ID, but the agent

kept questioning him. *Id.* No warrant was shown. *Id.* ¶ 141. Agents did not inform Villegas Molina that they were immigration officers authorized to make an arrest or of the basis for his arrest. *Id.* ¶ 144. At the time this action was filed, Villegas Molina had been transported to and was being held at B-18. *Id.* ¶ 145. He slept on the floor and was given almost nothing to eat. *Id.*

On the morning of June 18, 2025, Hernandez Viramontes was working at a car wash in Orange County, where he has worked for approximately ten (10) years, when immigration agents arrived. *Id.* ¶ 148. During this visit, the agents did not identify themselves. *Id.* ¶ 149. Agents asked Hernandez Viramontes whether he was a citizen, and he replied yes and explained that he was a dual citizen of the U.S. and Mexico. *Id.* ¶ 151. They asked for an ID, which he provided. *Id.* Agents then explained that his ID was not enough and because he did not have his passport, they were taking him. *Id.* Agents placed Hernandez Viramontes in a vehicle and transported him away. *Id.* ¶ 152. During this time, Hernandez Viramontes did not know whether they were going to take him to a detention center. *Id.* Agents verified his citizenship and, about twenty minutes later, brought him back to the car wash. *Id.* ¶ 153. When agents brought Hernandez Viramontes back to the car wash, they did not apologize. *Id.* ¶ 154. Shortly after agents returned Hernandez Viramontes to the car wash, yet another group of agents raided the carwash again. *Id.* ¶ 155.

In the afternoon of June 12, 2025, Gavidia, a U.S. citizen, was at a tow yard in Los Angeles County that was visited by immigration agents conducting a roving patrol. *Id.* ¶ 157. Around 4:30 p.m., upon hearing someone say that immigration agents may be at the premises, Gavidia went outside to confirm this. *Id.* ¶ 158. At the time, his clothes were dirty from working on his car. *Id.* On the sidewalk outside the gate, Gavidia saw a federal agent between two cars step forward. *Id.* ¶ 159. Soon after, Gavidia saw several other agents wearing similar vests with the words “Border Patrol Federal Agent.” *Id.* He also noticed that the agents were carrying handguns and at least two of the agents had a military-style rifle. *Id.* When Gavidia attempted to head back inside the tow yard premises, a masked agent said, “Stop right there.” *Id.* ¶ 160. While the agent approached Gavidia, another unmasked agent ran toward him and asked if he was American. *Id.* ¶ 161. Gavidia told the agent that he is American multiple times. *Id.* The agent responded by asking, “What hospital were you born in?” *Id.* Gavidia calmly replied that he did not know. *Id.* The agent repeated the same

question two more times, and each time Gavidia provided the same answer. *Id.* At that point, the agents pushed Gavidia up against the metal gated fence, put his hands behind his back, and twisted his arm. *Id.* Gavidia had been on his phone, and the masked agent also took his phone from his hand at that point. *Id.* Gavidia explained that the agents were hurting him and that he was American. Id. ¶ 162. The unmasked agent asked a final time, “What hospital were you born in?” *Id.* Gavidia responded again that he did not know and said East L.A. *Id.* Gavidia then told the agents that he could show them his Real ID. *Id.* The agents had not asked to see Gavidia’s identification. *Id.* When Gavidia showed his Real ID to the agents, one of them took it from him. *Id.* ¶ 163. It ultimately took about twenty minutes for Gavidia to get his phone back, but the agents never returned his Real ID. *Id.*

viii. Harm to Organizational Plaintiffs and/or Their Members

LAWCN is a regional organization made up of eight worker centers and labor organizations that work together to build power and develop worker leadership organizing with Black, immigrant, and refugee workers and other workers of color in the Los Angeles region. *Id.* ¶ 167. At least one of LAWCN’s member organizations, CLEAN, has been harmed by the ongoing raids in Southern California. *Id.* ¶¶ 169, 172 (“Carwashes have been a consistent and ongoing target of immigration agents during the course of the raids—at least two dozen have been raided so far.”).

UFW’s members have been harmed by the ongoing immigration raids in Southern California and fear being subjected to unlawful stops, arrests, and detention practices in the future. *Id.* ¶ 179. At least one UFW member has been subjected to Defendants’ stop and arrest practices. *Id.*

As a result of Defendants’ actions, CHIRLA’s mission to serve the immigrant community, including through the provision of legal advice and services, is being frustrated. *Id.* ¶ 190. Throughout the month of June 2025, CHIRLA’s attorneys and representatives have attempted to communicate with individuals at B-18 but were denied access and thwarted in their efforts to offer legal advice to even those detainees they saw at a distance. *Id.* CHIRLA also coordinates the Los Angeles Rapid Response Network (“LARRN”) and educates its membership as well as the broader community through know-your-rights programming, workshops, social media, and educational literature about a variety of social services and benefits, including immigration law, financial

literacy, workers' rights, and civic engagement. *Id.* ¶ 188. Defendants' actions are also thwarting CHIRLA's work to coordinate the LARRN, as other attorneys and representatives summoned by CHIRLA to B-18 have been similarly denied access. *Id.* ¶ 190.

ImmDef's Rapid Response team is also part of LARRN, with CHIRLA, and monitors a hotline and responds to notifications about individuals detained in ICE immigration enforcement actions. *Id.* ¶ 193. As a result of Defendants' actions, ImmDef's mission to serve the immigrant community, including through the provision of legal advice and services, is being fundamentally frustrated. *Id.* ¶ 194.

**B. Procedural History**

On June 20, 2025, Petitioner-Plaintiffs filed a Petition for Writ of Habeas Corpus. ECF No. 1 ("Petition" or "Pet."). The Petition alleged five causes of action: (1) Warrantless Arrests Without Probable Cause of Flight Risk in violation of 8 U.S.C. § 1357(a)(2); (2) Warrantless Arrests Without Probable Cause of Flight Risk in violation of 8 C.F.R. § 287.8(c)(2)(ii); (3) Arrests Without Probable Cause in violation of the Fourth Amendment; (4) Failure to Identify Officers and Basis for Arrest in violation of 8 C.F.R. § 287.8(c)(2)(iii);[4] and (5) Violation of Due Process. *See generally id.*

On June 20, 2025, Petitioner-Plaintiffs filed an ex parte application and requested the Court grant their request for a temporary restraining order and enjoin Defendants Noem, Bondi, ICE, and Lyons from transferring Petitioner-Plaintiffs outside of this judicial district. *See generally* ECF No. 4. The same day, the parties stipulated to withdraw the ex parte application. ECF No. 9. The Court granted the stipulation on June 23, 2025. ECF No. 11.

Following the Magistrate Judge's July 1, 2025 Order Vacating Status Conference (ECF No. 15), the parties filed a Joint Notice Following Order Vacating Status Conference (ECF No. 36), through which they informed the Court that the Petitioner-Plaintiffs' bond hearings were set for July 3, July 7, and July 8, 2025. On July 8, 2025, the parties filed another Joint Notice Following Order Vacating Status Conference, informing the Court that Vasquez Perdomo was granted bond on July 3, 2025, and that Villegas Molina was granted bond on July 7, 2025. ECF No. 62.

---

[4] The Court finds that the Petition erroneously cites to 8 C.F.R. § 287.8(c)(3). Reading the regulation, it appears to the Court that 8 C.F.R. § 287.8(c)(2)(iii) is the correct citation.

On July 2, 2025, Plaintiffs filed the operative First Amended Complaint. 1AC. The 1AC adds as plaintiffs Viramontes, Gavidia, LAWCN, UFW, CHIRLA, and ImmDef. *Id.* ¶¶ 15–20. The 1AC also adds as defendants Scott, Bank, Patel, Santacruz Jr., Wang, Bovino, Stalnaker, Davis, and Essayli. *Id.* ¶¶ 23–32. Moreover, the 1AC contains class action allegations, *id.* ¶¶ 199–214, seeking to represent a class under Federal Rule of Civil Procedure 23(b)(2) consisting of three classes, *id.* ¶¶ 199 ("Suspicionless Stop Class"),[5] 202 ("Warrantless Arrest Class"),[6] 205 ("Failure to Identify Class").[7] Plaintiffs allege the following causes of action:

| Count | Cause of Action | On Behalf of: | Against Defendants: |
| --- | --- | --- | --- |
| One | Violation of Fourth Amendment, Unreasonable Seizures | Stop/Arrest Plaintiffs and the Suspicionless Stop Class | All Defendants |
| Two | Violation of 8 U.S.C. § 1357(a)(2), Warrantless Arrests Without Probable Cause of Flight Risk | LAWCN, UFW, CHIRLA, and the Warrantless Arrest Class | All Defendants |
| Three | Violation of 8 C.F.R. § 287.8(c)(2)(ii), Standards for Stops and Warrantless Arrests | LAWCN, UFW, CHIRLA, and the Warrantless Arrest Class | All Defendants |
| Four | Violation of 8 C.F.R. § 287.8(c)(2)(iii), Failure to Identify Authority and Reason for Arrest | LAWCN, UFW, CHIRLA | All Defendants |
| Five | Violation of the Fifth Amendment, Access to Counsel | Access/Detention Plaintiffs | Noem, Lyons, and Santacruz Jr. |
| Six | Violation of 8 U.S.C. § 1362, Access to Counsel | Access/ Detention Plaintiffs | Noem, Lyons, and Santacruz Jr. |
| Seven | Violation of the Fifth Amendment, | Access/ Detention Plaintiffs | Noem, Lyons, and Santacruz Jr. |

[5] The Suspicionless Stop Class is defined as "[a]ll persons who, since June 6, 2025, have been or will be subjected to detentive stop by federal agents in this District without a pre-stop, individualized assessment of reasonable suspicion concerning whether the person (1) is engaged in an offense against the United States or (2) is a noncitizen unlawfully in the United States." 1AC ¶ 199.

[6] The Warrantless Arrest Class is defined as "[a]ll persons, since June 6, 2025, who have been arrested or will be arrested in this District by federal agents without a warrant and without a pre-arrest, individualized assessment of probable cause that the person poses a flight risk." 1AC ¶ 202.

[7] The Failure to Identify Class is defined as "[a]ll persons who, since June 6, 2025, have been arrested or will be arrested in this District by federal agents, where agents (1) fail to identify as an immigration officer who is authorized to execute an arrest, and/or (2) fail to state that person is under arrest and the reason for arrest, after it is practical and safe to do so." 1AC ¶ 205.

| | | | |
|---|---|---|---|
| | Conditions of Confinement | | |
| Eight | Violation of Fifth Amendment, Due Process | Petitioner-Plaintiffs | Noem, Lyons, and Santacruz Jr. |

On July 2, 2025, the Access/Detention Plaintiffs filed an Ex Parte Application for Temporary Restraining Order and Order to Show Cause Regarding Preliminary Injunction. ECF No. 38 ("Access/Detention TRO").[8] The same day, the Court ordered the parties to fully brief the Access/Detention TRO by July 9, 2025. ECF No. 42. After the Court's Order, Plaintiffs filed another Ex Parte Application for Temporary Restraining Order and Order to Show Cause Regarding Preliminary Injunction. ECF No. 45 ("Stop/Arrest TRO"). On July 7, 2025, the Court ordered the parties to follow the same briefing schedule outlined in its July 2, 2025 Order. ECF No. 51. Defendants filed their Oppositions on July 8, 2025. ECF Nos. 70 (Opposition to the Access/Detention TRO), 71 (Opposition to the Stop/Arrest TRO). On July 9, 2025, Plaintiffs filed their Replies. ECF Nos. 81 (Reply to the Stop/Arrest TRO), 82 (Reply to the Access/Detention TRO).

On July 7, 2025, States of Arizona, Colorado, Connecticut, Hawaiʻi, Illinois, Maryland, Maine, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Vermont, Washington, and the Commonwealth of Massachusetts ("Amici States") filed a Motion for Leave to File Brief of Amici Curiae. ECF No. 49. The Court granted the motion on the same day. ECF No. 52; *see* ECF No. 49-1 ("Amici Curieae Brief").

On July 8, 2025, the City of Los Angeles, the County of Los Angeles, the City of Culver City, the City of Montebello, the City of Monterey Park, the City of Pasadena, the City of Pico Rivera, the City of Santa Monica, and the City of West Hollywood ("Plaintiffs-Intervenors") filed an Unopposed Ex Parte Application to Participate in July 10 TRO Hearing. ECF No. 63. The Court granted the ex parte application the same day. ECF No. 69.

On July 8, 2025, the Plaintiffs-Intervenors filed a Motion to Intervene, which remains pending. ECF No. 61. On July 10, 2025, the Court held a hearing on both TROs.

[8] The Access/Detention TRO is filed against Defendants Noem, Lyons, Santacruz Jr. *See* Access/Detention TRO at 1 n.1.

## II. Applicable Law

The preliminary injunction and temporary restraining order standards are "substantially identical." *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). Accordingly, the Court will outline the governing law for granting a preliminary injunction. A preliminary injunction is an extraordinary remedy never awarded as of right. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Id.* at 20 ("*Winter* Test").

The Ninth Circuit also recognizes a "serious questions" variation of the *Winter* Test. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Under this variation, "a preliminary injunction is proper if there are serious questions going to the merits; there is a likelihood of irreparable injury to the plaintiff; the balance of the hardships tips sharply in favor of plaintiff; and injunction is in the public interest." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).

A preliminary injunction is "an extraordinary and drastic remedy" and "should not be granted unless the movant, *by clear showing*, carries the burden of persuasion." *Id.* at 1072 (emphasis in original) (quotations omitted). At this stage, the Court is only determining whether Plaintiffs have met their burden for a preliminary injunction. *See Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1200 (9th Cir. 1980). **Accordingly, this Order is not a final decision on the merits of any claim, nor is it a decision on the merits of the factual assertions either party made in support of any claim.**

/ / /

/ / /

/ / /

/ / /

/ / /

## EX PARTE APPLICATIONS

### I. Applicable Law

"[C]ircumstances justifying the issuance of an ex parte order are extremely limited." *Reno Air Racing Ass'n., Inc. v. McCord*, 452 F.3d 1126, 1131 (quoting *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 438–39 (1974)). "Consistent with [the Supreme Court's] overriding concern, courts have recognized very few circumstances justifying the issuance of an ex parte TRO." *Id.* (discussing parties' failure to provide notice under Fed. R. Civ. P. 65(b)).

In this District, ex parte applications are solely for extraordinary relief and are rarely justified. *Mission Power Eng'g Co. v. Cont'l Cas. Co.*, 883 F. Supp. 488, 490 (C.D. Cal. 1995). A party filing an ex parte application must support its request for emergency relief with "evidence . . . that the moving party's case will be irreparably prejudiced if the underlying motion is heard according to regularly noticed motion procedures," and a showing "that the moving party is without fault in creating the crisis that requires ex parte relief, or that the crisis occurred as a result of excusable neglect." *Id.* at 492. "Ex Parte applications are not intended to save the day for parties who have failed to present requests when they should have." *Id.* at 493 (internal quotation marks omitted).

This Court's operative Civil Standing Order states: "Counsel are reminded that ex parte applications are solely for extraordinary relief. Applications that do not meet the requirements set forth in Local Rule 7-19 will not be considered. Sanctions may be imposed for misuse of ex parte applications." Civil Standing Order § XII.

### II. Discussion

Defendants argue that Plaintiffs cannot establish that they are entitled to seek the instant TRO on an ex parte basis because (1) they delayed filing the 1AC and the two TROs that are before this Court by over a month, and (2) they elected not to file a new case but instead joined a "largely mooted" small habeas petition. ECF No. 70 at 6–7. Defendants further argue that Plaintiffs have not

satisfied the *Mission Power* standard.[9] *See id.* at 6; ECF No. 71 at 6 ("[Plaintiffs'] application does not even mention [the *Mission Power*] threshold legal standard, which they do not meet."). Plaintiffs have shown that they are entitled to seek relief on an ex parte basis under *Mission Power*.

The Court finds that Plaintiffs acted expeditiously in this case. It is undisputed that the events underlying this action started in early June 2025 and that Plaintiffs filed the 1AC on July 2, 2025. Defendants contend that this month-long delay should be construed against Plaintiffs, but provide no authority holding that a month is an unacceptable amount of time for purposes of ex parte applications. *See generally* ECF No. 70 at 6. Rather, the Court finds that a month is a reasonable amount of time for Plaintiffs to prepare a class action complaint alongside the instant TROs in this case, especially considering that Plaintiffs would have needed just as much, if not more, time to intake, investigate, request a summons, and complete service if they decided to file a new case. Similarly, Defendants provide no authority holding that the "highly anomalous procedural status" of a case should be grounds to deny an ex parte application. *See generally id.* at 7. Rather, considering the totality of the circumstances—in particular, the alleged ongoing denial of access to counsel that continued at least until the filing of the instant TRO, *see* ECF No. 38-9 ("Salas Declaration" or "Salas Decl.") ¶ 33 ("To date [July 2, 2025], access to detainees at B-18 has been sporadic and ineffective."); ECF No. 38-11 ("Toczylowski Declaration" or "Toczylowski Decl.") ¶¶ 51–52 (testifying that the access to counsel issue persists today based on an ImmDef attorney's failure to have a confidential conversation with a client on June 27, 2025)—the Court finds that Plaintiffs acted swiftly to file the 1AC and the instant TROs.

As Plaintiffs also note, there is no binding authority indicating that a party seeking a TRO must meet the *Mission Power* standard in addition to the TRO standard and the requirements of Rule

[9] During the hearing, Defendants additionally argued that the ex parte nature of these TROs is inappropriate because it gave too little time for them to review and collect evidence. But the Court is not persuaded. As the Court will note later, Defendants did not provide even the documents related to the named individual plaintiffs, such as the *three* Petitioner-Plaintiffs, in support of their Oppositions. The only post-detention record related to the Petitioner-Plaintiffs, ECF No. 81-1 at 8–12 (Form I-213, Record of Deportable/Inadmissible Alien), was provided by Plaintiffs, not Defendants, despite the record having been prepared by the DHS.

65.[10] And even if they did, in light of the exigent circumstances alleged in the 1AC and the TROs and the relatively expeditious manner in which Plaintiffs appear to have proceeded, the Court finds that the *Mission Power* standard has been met.

As such, the Court proceeds to evaluating the merits of the TROs.

**THE ACCESS/DETENTION TRO [ECF NO. 38]**

**I. Discussion**

**A. The Access/Detention Plaintiffs Have Shown that They Have Standing.**

The Access/Detention Plaintiffs assert that they have standing because Defendants have impeded their "ability to engage in the representation of immigrants and refugees that is at the core of their founding mission." *See* ECF No. 38 at 11 (collecting cases). Defendants respond that the Access/Detention Plaintiffs have not established standing. *See* ECF No. 70 at 10–15. The Court finds that the Access/Detention Plaintiffs have standing.

To establish standing, a plaintiff must show first that they have suffered an "injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical[.]" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks omitted). The plaintiff must then show causation and redressability. *Id*. at 560–61.

Where it is alleged that a defendant's conduct has "perceptibly impaired" an organization's "ability to provide counseling and referral services" for indigent population, "there can be no question that the organization has suffered injury in fact." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (explaining that in

---

[10] Although it is true that this Court has relied on *Mission Power* in its past orders on ex parte applications, it has done so as persuasive authority to provide the context in which the Court has made its rulings—that is, the parties seeking ex parte applications generally have not shown that a regularly noticed motion is insufficient and that they are not at fault for creating the crisis that requires an ex parte relief. The standard the Court has applied—including Rule 65—accomplishes essentially the same purpose here. Considering the totality of circumstances before this Court and the members of this District allegedly face, the Court finds that Plaintiffs' failure to make explicit arguments based on *Mission Power* is of no moment for purposes of these TROs.

*Havens Realty*, "[the defendant's] action directly affected and interfered with [the plaintiff organization's] core business activities").[11]

The Court finds that the Access/Detention Plaintiffs have established an injury in fact. Specifically, the Court first finds that Plaintiffs have sufficiently shown that the Access/Detention Plaintiffs' missions are to provide legal representation and counsel to immigrants, such as the detainees at B-18. CHIRLA was founded to "advance the human and civil rights of immigrants and refugees" and that it has become "one of the largest and most effective advocates for immigrant rights, organizing, educating and defending immigrants and refugees in the streets, in the courts, and in the halls of power." 1AC at ¶ 19. Its staff includes "attorneys and Department of Justice (DOJ) accredited representatives who provide pro bono legal services to clients in removal proceedings, including those who are detained." *Id.* Similarly, ImmDef is a nonprofit organization that "focuse[s] on ensuring that every immigrant before the immigration court had a lawyer by their side." *Id.* at ¶ 20. ImmDef has "expanded its mission beyond helping individuals facing deportation to also work towards systemic changes" and providing "deportation defense, legal representation, legal education, and social services to detained and non-detained children and adults." *Id.* These allegations are supported by the testimony of Angelica Salas, the Executive Director of CHIRLA, and Lindsay Toczylowski, the President and Chief Executive Officer of ImmDef. Salas Decl. ¶¶ 2, 3; Toczylowski Decl. ¶ 2. Defendants have not presented any evidence to seriously dispute this.[12]

The Court further finds that Plaintiffs have adequately shown the Access/Detention Plaintiffs' missions have been frustrated by Defendants' actions. In particular, Toczylowski represents that multiple ImmDef attorneys were unable to provide legal counsel to—let alone meet with—clients. *See id.* ¶¶ 5–14 (on June 6, 2025, ImmDef attorneys could not enter B-18; although two attorneys were eventually permitted to enter, they were unable to meet with any clients), 18–19 (on June 7, 2025, ImmDef attorneys attempted to yell legal advice to the detainees who were being

---

[11] In light of the holding in *Alliance for Hippocratic Medicine*, albeit in a different "context" than *Havens Realty*, the Court finds Defendants' warning that *Havens Realty* should not apply here unavailing. *See* ECF No. 70 at 10 n.7.

[12] Instead, they say without support that "organizational Plaintiffs are publicly dedicated to preventing and obstructing federal immigration enforcement." ECF No. 71 at 10.

transported by vans, but the guards added partitions to obstruct the attorneys' view of the vans and began to honk "whenever the attorneys spoke"), 23–24 (on June 8, 2025, a handwritten sign was on the door of the facility, reading, "Attorney/Family Visit Temporary Cancelled Today," without further explanation), 25–31 (ImmDef attorneys were unable to meet with clients the following week); *see also* ECF No. 82-6 ("Toczylowski Supp. Decl.") ¶ 8 (on July 8, 2025, an ImmDef attorney was unable to meet with a person referred to ImmDef). Salas similarly testifies that CHIRLA attorneys and representatives were denied access to the detainees at B-18. *See* Salas Decl. ¶¶ 12–15 (denied access on June 6, 2025), 16–23 (denied access on June 7, 2025), 32–36 ("To date, access to detainees at B-18 has been sporadic and ineffective. CHIRLA attorneys, representatives, and members are not given adequate information to locate clients and family members. CHIRLA attorneys and representatives have not been able to provide legal advice or representation to detainees at B-18 . . . ."); *see also* ECF No. 82-5 ("Thompson-Lleras Supp. Decl.) ¶¶ 13–15 (CHIRLA attorney was not able to meet with detainees on July 8, 2025). Toczylowski and Salas further testify that the attorneys were sprayed with "an unknown chemical agent" that caused "everyone to cough and inflicted a burning sensation in the eyes, nose, and throat." *Id.* ¶¶ 17–24; Toczylowski Decl. ¶¶ 21, 24. This testimony aligns with the allegations of the 1AC regarding denied access to counsel. *See* 1AC ¶¶ 81– 92. Again, Defendants do not present evidence controverting this in any meaningful way; they merely attempt to minimize the impact of these facts or characterize them as limited to a short period of time justified by nearby civil unrest.[13]

---

[13] During the hearing, Defendants contended that because normal operations at B-18 have resumed, there is no likelihood that the Access/Detention Plaintiffs would again be sprayed or honked at. This argument misses the point. At issue are the denial of access to counsel and interference with the Access/Detention Plaintiffs' core missions, not that the attorneys were sprayed or honked at (although one would hope not to be sprayed or honked at during the course of their job). That there is no likelihood of spraying and honking does not eliminate the likelihood that the Access/Detention Plaintiffs' missions will continue to be interrupted, especially in light of the evidence submitted alongside the Reply that the attorneys were still denied access as of July 9, 2025. *See* Toczylowski Supp. Decl. ¶¶ 15 (an attorney could not speak with a detainee), 16 (the private rooms at B-18 was not accessible).

Considering that the denial of access issue persists despite there being no protests of similar scale, the Court also finds Defendants' arguments based on *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013)—that Plaintiffs rely on a highly attenuated chain of events—fall flat.

Based on these allegations and supporting testimony, the Court finds that the Access/Detention Plaintiffs have sufficiently established that their missions of providing legal representation to immigrants, such as those allegedly detained at B-18, have been frustrated by Defendants' actions. Further, insofar as the Access/Detention Plaintiffs were not able to meaningfully meet with the detainees at B-18 as of the filing of this TRO and even afterwards, the Court finds that they have alleged "continuing, present adverse effects" *and* a "sufficient likelihood that [they] will again be wronged in a similar way" for purposes of standing.[14] *See City of Los Angeles v. Lyons*, 461 U.S. 95, 102–03 (1983).

Having found that the Access/Detention Plaintiffs have established injury in fact, the Court also finds that they have sufficiently alleged causation (i.e., Defendants denied access, including by not permitting entry, blocking the attorneys' vision with vans, honking, and spraying chemicals) and redressability (i.e., the instant TRO seeks restoration of opportunities to meet with detainees to resume the Access/Detention Plaintiffs' core missions).

The Court also finds that CHIRLA has associational standing. An organization has standing to bring suit on its members' behalf if (1) its members would otherwise have standing to sue in their own right, (2) the interests it seeks to protect are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Here, the evidence presented shows that the members of CHIRLA satisfy Article III standing on their own in light of their reasonable fear of imminent detention without access to counsel. 1AC ¶ 189; *see* Salas Decl. ¶¶ 24–31 (testifying that CHIRLA's individual members are fearful of being stopped, arrested, detained, and deported). The Court has already found that the Access/Detention Plaintiffs' core missions are being interrupted. Considering the ability of the Access/Detention Plaintiffs to litigate this matter (investigating and collecting evidence, preparing and presenting briefs and arguments),

---

[14] As such, the Court finds Defendants' repeated arguments that the Access/Detention Plaintiffs failed to show actual or future injury to themselves unavailing. *See* ECF No. 70 at 9 ("Plaintiffs have presented no evidence that any alleged misconduct will occur in the future."), 11 ("Here, at bottom, Plaintiffs lack standing to pursue claims based on injuries they are unlikely to experience in the future.").

the Court finds that neither the claim asserted nor the relief sought requires individual members' participation. As such, the Court finds that CHIRLA also has associational standing.[15]

Defendants' arguments against the Access/Detention Plaintiffs are not persuasive. They argue that the Access/Detention Plaintiffs failed to identify any "statute or regulations that confers on them 'legally cognizable interests' to pursue their mission in representing unidentified individuals currently held at B-18," ECF No. 70 at 12 (citing *Spokeo Inc. v. Robins*, 578 U.S. 330, 341 (2016)), but *Spokeo* does not require such a showing. Rather, as Defendants quote, the Supreme Court in *Spokeo* held that "Article III standing requires a *concrete injury* even in the context of a statutory violation"—that is, a plaintiff must satisfy the injury in fact element to establish Article III standing, which this Court has already found that the Access/Detention Plaintiffs have done. *Id*. Moreover, the Court finds Defendants' argument that the Access/Detention Plaintiffs are merely concerned about loss of "prospective clients" to be based on a misreading of the TRO. *See* ECF No. 70 at 12. Rather, as the allegations and the evidence identified above show, the Court finds that the Access/Detention Plaintiffs are asserting injury in fact based on the alleged interference with their ability to carry on their core missions, which is to provide legal services to immigrants and refugees; finding "new clients" is a mischaracterization and improperly focuses on a tangential issue at best. *See* 1AC at ¶¶ 19, 20; Salas Decl. ¶¶ 2, 3; Toczylowski Decl. ¶ 2. Defendants also argue that the Access/Detention Plaintiffs cannot establish "next friend standing," but as the Court has already found that they have shown organizational standing under *Havens Realty* as well as associational standing, there is no need to evaluate this argument. *See* ECF No. 70 at 13–15.

---

[15] Defendants argue that the Access/Detention Plaintiffs need to assert their own "liberty interest" independent of their members' liberty interest. *See* ECF No. 70 at 18 (quoting *Erickson v. U.S. ex rel. Dep't. of Health and Human Servs*., 67 F.3d 858, 861 (9th Cir. 1995)). But this argument appears to be based on the assumption that the Access/Detention Plaintiffs lack standing to sue on their members' behalf. Because the Court has found that they have associational standing, and Defendants do not provide binding authority holding that an organization that has associational standing needs to have its own, independent liberty interest, the Court finds this argument unavailing.

Even assuming that the Access/Detention Plaintiffs are required to show that they have independent liberty interest and could not show it, the Court finds that under the "sliding scale" approach the Ninth Circuit applies to TROs, the evidence submitted show such "serious questions going to the merits" that the requested relief is warranted. *See Lopez*, 680 F.3d at 1072.

In sum, the Court finds that the Access/Detention Plaintiffs have established standing for this action.

**B. The Access/Detention Plaintiffs Have Established that They Are Likely to Succeed on the Merits.**

The Access/Detention Plaintiffs argue that they are likely to succeed on their Fifth Amendment-based causes of action. In particular, they argue that Defendants "have obstructed established attorney-client relationship and prevented CHIRLA and ImmDef attorneys from providing legal advice to B-18 detainees." *See id.* at 9–10. They also argue that Defendants prevented the organizations' "prospective clients from accessing CHIRLA's and ImmDef's legal services as well" and that "the lack of contact with the outside world . . . raises the concern that Defendants are holding detainees at B-18 incommunicado, which also violates the Fifth Amendment." *Id.* at 10–11. The Access/Detention Plaintiffs have also alleged and submitted testimony that their members have a fear of being detained. *See* 1AC ¶ 189. Defendants respond that the restrictions on the Access/Detention Plaintiffs' communication with current and prospective clients were not punitive or excessive, and that there is no showing of a liberty interest, ECF No. 70 at 18, or error or prejudice, *id*. at 19. The Court finds that the Access/Detention Plaintiffs have established likelihood of success on the merits on the Violation of the Fifth Amendment claim.

"Rooted in the Due Process Clause . . . , noncitizens have the right to counsel in removal proceedings[.]" *Usubakunov v. Garland*, 16 F.4th 1299, 1303 (9th Cir. 2021); *see Biwot v. Gonzales*, 403 F.3d 1094, 1098 (9th Cir. 2005) ("The right to counsel in immigration proceedings is rooted in the [Fifth Amendment] Due Process Clause[.]"); *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 554, 565 (9th Cir. 1990) (recognizing that "aliens have a due process right to obtain counsel of their choice at their own expense," and affirming injunction against government practices "the cumulative effect of which was to prevent aliens from contacting counsel and receiving any legal advice," including the practice of denying visits with counsel); *Colmenar v. INS*, 210 F.3d 967, 971 (9th Cir. 2000) ("The Fifth Amendment guarantees due process in deportation proceedings. . . . As a result, an alien who faces deportation is entitled to a full and fair hearing of his claims and a reasonable opportunity to present evidence on his behalf."). Consequently, immigrants are entitled to "a

reasonable time to locate counsel, and permit counsel to prepare for [immigration] hearing." *Rios-Berrios v. INS*, 776 F.2d 859, 863 (9th Cir. 1985). The government cannot impose restrictions on access to counsel that undermine the immigrant's opportunity to obtain one. *See Orantes-Hernandez*, 919 F.2d at 554, 565 (construing the government's failure to provide an accurate legal services list as "prevent[ing] aliens from contacting counsel and receiving any legal advice"). Such impediments to "an established, on-going attorney-client relationship" constitute a "constitutional deprivation." *See Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1439 (9th Cir. 1986).

CHIRLA has members who this Court finds "reasonably fear being subject to the stop and arrest practices challenged in this case and *subsequent detention at B-18*." 1AC ¶ 189 (emphasis added); *see* Salas Decl. ¶¶ 24–31 (testifying that CHIRLA's individual members are fearful of being stopped, arrested, detained, and deported). In light of the allegations and declaration testimony regarding the ongoing denial of access to counsel and the evidence submitted in support thereof, the Court finds that fear of being detained without access to counsel among the members of CHIRLA in the absence of the requested TRO is well-grounded on the facts of this case and therefore reasonable. And insofar as denial of access to counsel may constitute a violation of CHIRLA's members' Fifth Amendment rights, the Court finds that Access/Detention Plaintiffs have demonstrated the likelihood of success on the merits for the fifth cause of action.

The same is true of ImmDef. As another court in this district recently found, standing and likelihood of success may be found where an organization alleges "ongoing or potential relationships with" individual plaintiffs or proposed class. *Immigrant Defenders Law Ctr. v. Noem*, No. CV 20-9893 JGB (SHKx), 2025 WL 1172442, *21, *22 (C.D. Cal. April 16, 2025). Here, the Toczylowski Declaration presents ample anecdotal evidence that ImmDef attorneys have been unable to meet with the detainees at B-18. *See generally* Toczylowski Decl. (recounting repeated failed attempts to meet with the detainees). Moreover, the Court finds that Defendants' arguments that any restrictions on counsel are "not punitive or excessive" are based on the misreading of the TRO and the evidence submitted in support thereof. For instance, contrary to Defendants' argument that there is no evidence of "recurring misconduct," the Access/Detention Plaintiffs' declaration evidence shows

that the attorneys were denied (meaningful) access as recently as July 8, 2025.[16] *See* Salas Decl. ¶ 33; Toczylowski Decl. ¶ 51–53 (an attorney was denied access on June 27, 2025, because she did not have her "bar card"); Toczylowski Supp. Decl. ¶ 9 ("Another attorney who was at B-18 [on July 8, 2025] to visit a client that same day was unable to do so because her potential client had also been transferred."); Thompson-Lleras Supp. Decl. ¶¶ 13–15 (on July 8, 2025, CHIRLA attorney was unable to meet with three detainees). Similarly, Defendants' recount of what happened on various dates in June are not consistent with what the evidence shows. For example, Defendants argue that on June 6, 2025, "one employee [who was told by a different attorney that B-18 was full] was never denied entry," ECF No. 70 at 4, but the TRO and the underlying Salas Declaration show that the attorney was indeed denied access, Salas Decl. ¶¶ 13–15 (CHIRLA employee was not allowed into B-18). Further, based on the events on June 7, 2025, Defendants argue that the Access/Detention Plaintiffs do not allege that any of the detainees are their clients, but the evidence shows that the attorneys could not have had a clear view of the "group" of detainees who were being transported because the agents blocked them with vans. *See* Salas Decl. ¶ 19 ("Several unmarked vans were also parked inside the garage in such a way as to obstruct the view through the garage gates of detainees being walked through and loaded into vehicles."); ECF No. 70 at 4 (omitting Salas's testimony of obstructed view). Most telling, Defendants argue that a chemical was sprayed "about the same time that law enforcement was attempting to clear a large protest from an adjacent building," *id.* at 5 n.2, but the news article in support of this argument shows the date of July 8, 2025, whereas the spray incident occurred the previous day, *see* Salas Decl. ¶ 20 (testifying that "federal agents sprayed an unknown chemical irritant" on July 7, 2025).

---

[16] At the hearing, Defendants argued that because the normal operations at B-18 resumed as of June 24, 2025, the Access/Detention Plaintiffs cannot show that the denial of access issue will reoccur. But the evidence before the Court shows that the harm persists.

Defendants also argued that detainees often provide false names, which contributes to the attorney's inability to meet their clients or prospective clients. But Defendants provide no evidence with regard to the frequency or severity of this false-name issue. As such, the Court finds this argument unconvincing.

Such misreading of the evidence,[17] coupled with the effect on the Access/Detention Plaintiffs and their members (even if the limitations were "responsive to the volatile situation at hand," ECF No. 70 at 18), compels this Court to conclude that Defendants' conduct—even if not necessarily intended to be so—was punitive and had the effect of unlawfully "prevent[ing] aliens from contacting counsel and receiving any legal advice." *See Block v. Rutherford*, 468 U.S. 576, 583–84 (1984); *Orantes-Hernandez*, 919 F.2d at 565. And it was not rationally related to any legitimate purpose as even when there were "no protests happening," B-18 was not accessible to attorneys.[18] Toczylowski Decl. ¶¶ 30–31 (visit on June 16, 2025).

As such, the Court finds the first *Winter* factor weighs in favor of granting this TRO.

In addition, the injunctive relief requested is tailored to the specific harms identified. *See Melendres v. Arpaio*, 784 F.3d 1254, 1265 (9th Cir. 2015). The Access/Detention Plaintiffs merely ask for the same access to legal visitation and confidential telephone calls at B18 as at other locations. Although Defendants argue that the requested TRO is overbroad, ECF No. 82 at 21, the Court finds that restoring visitations and permitting confidential telephone calls are sufficiently narrow and "necessary to give prevailing party the relief to which they are entitled." *E. Bay Sanctuary Covenant*, 993 F.3d at 680. Contrary to the Defendants' opposition, *Schmidt* does not stand for the proposition that it is improper to craft an injunction requiring adherence to existing law.

---

[17] The Court notes that Defendants miss the point on the telephones. It appears to the Court that in addition to lack of access to the telephones at B-18, the Access/Detention Plaintiffs' concern is over the lack of *confidential* telephone conversations. *See* ECF No. 38-1 at 2 (Proposed Order for the Access/Detention TRO, seeking Defendants to provide "confidential telephone calls with attorneys . . . ."). Moreover, although Defendants argued at the hearing that there are attorney rooms at B-18 such that attorneys and their clients can have confidential conversations, where an attorney is denied access to B-18 (as alleged and shown here) or denied access to a client even when they are permitted to enter B-18 (*see* Toczylowski Supp. Decl. ¶ 15 (ImmDef attorney was "told that she could not speak to the individual because she did not have the individual's A number"), the existence of these rooms are a moot point. Furthermore, there is evidence that the private rooms are insufficient or unavailable. Toczylowski Supp. Decl. ¶ 16 ("[ImmDef attorneys] noted that they could still hear officers clearly from the rooms. One attorney was prevented from using a room at all because she did not have a bar card. When she tried explaining to the officer that she did not have a bar card because she was barred in a state that did not provide them and offered to show him her letter of good standing, he still refused to give her access to a private room."). Defendants did not dispute this evidence during the hearing, except by repeating that there are private rooms at B-18.

[18] At the hearing, Defendants asserted that if "riots" resumed and the requested TRO was in place, they would not be able to protect their employees and the detainees at B-18. But granting access to counsel is not the same as granting unrestricted access to the public. Similarly, permitting confidential telephone attorney-client calls is not the same as granting physical access into B-18. As such, the argument fails.

ECF No. 71 at 9; *Schmidt v. Lessard*, 414 U.S. 473 (1974). In *Schmidt*, the injunction—such as it was—merely advised the defendants in these terms: "not to enforce 'the present Wisconsin scheme'" against class members. 414 U.S. at 476. This is a far cry from the specific provisions of the requested TRO here. Further, given that the requested TRO is limited to this one basement facility, the Court finds Defendants' concern over a "universal injunction" unwarranted. *See* ECF No. 38-1 at 2 (seeking visitations and confidential telephone calls at B-18).

At the hearing, Defendants did raise a legitimate concern about the need to make adjustments to access in exigent circumstances, which the Court has accommodated in its order.

### C. The Access/Detention Plaintiffs Have Established that They Will Suffer Irreparable Harm.

The Access/Detention Plaintiffs argue that they have shown that they will suffer irreparable harm. ECF No. 38 at 11–12. The Court finds that they have done so.

Government action that frustrates an organization's core missions gives rise to irreparable harm. *See E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677–78 (9th Cir. 2021) (finding irreparable harm where governmental action prompted organizations "to change their core missions"). Expediency in applying for a preliminary injunction (or a TRO) suggests "urgency and impending irreparable harm." *Id.* at 678; *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) ("That the [state government plaintiffs] filed an action following [the federal government defendants' action] also weighs in their favor.").

The Court finds that the Access/Detention Plaintiffs' missions will be—and have been—frustrated by Defendants' actions for the same reasons that the Court has found that they established their standing. *See* Section I.A, *supra*.

Considering the fear of being separated from their families as a result of the enforcement actions taken by Defendants, the Court finds that CHIRLA's members are at an imminent risk of irreparable harm. *See Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017) (finding "separated families" a "substantial," even "irreparable," injury).

The Court finds that the alleged irreparable harm is also imminent. The Court finds that Plaintiffs have been expedient in filing this action (June 20, 2025), the 1AC (July 2, 2025), and the

instant TRO (July 2, 2025). This supports a finding of imminent irreparable harm. *See E. Bay Sanctuary Covenant*, 993 F.3d at 678; *Azar*, 911 F.3d at 581. Moreover, that the above-described events at B-18 took place only slightly more than one month ago supports the Court's finding of imminence.

In sum, because the Access/Detention Plaintiffs have shown that their core missions have been frustrated by Defendants, that CHIRLA's members will suffer irreparable harm if subjected to detention without meaningful access to counsel, and that they have acted expeditiously and without delay in seeking the TRO, the Court finds that the second *Winter* factor weighs in their favor.

### D. The Access/Detention Plaintiffs Have Established that the Balance of Equities Tips in Their Favor.

The Access/Detention Plaintiffs argue that the balance of equities tips in their favor because the requested TRO "merely requires Defendants to comply with a well-established due process right of access to counsel by providing individuals detained at B-18 with the same access that the government already affords those held at immigration detention facilities." ECF No. 38 at 12–13 (emphasizing that the requested TRO "is the same legal visiting schedule that the government agreed to" in *Julio Castellano et al v. Janet Napolitano et al*, Case No. 2:09-cv-02281-PA-VBK (C.D. Cal. April 1, 2009)). They further argue that the cost to Defendants would be far outweighed by the harm to constitutional rights in the absence of an injunction. *Id.* at 13 (quoting *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017)). Defendants provide no response on this point. The Court finds that the balance of equities tips in the Access/Detention Plaintiffs' favor.

The Court finds that Defendants' National Detention Standards already provide that detainees at their immigration facilities are entitled to "legal visitation seven days a week, including holidays. [Facilities] shall permit legal visits for a minimum of eight hours per day on regular business days, and a minimum of four hours per day on weekends and holidays." U.S. Immigration and Customs Enforcement, National Detention Standards at 166 (2025).[19] Similarly, ICE permits legal visitations at "non-dedicated facilities," such as "facilities that house both inmates and [ICE]

[19] The Standards may be found at https://www.ice.gov/doclib/detention-standards/2025/nds2025.pdf.

detainees," under the same schedule. U.S. Immigration and Customs Enforcement, Non-Dedicated Intergovernmental Service Agreement Standards at 11 (2025) ("[T]he Service Provider [county and local government partners] shall permit legal visits seven days per week, for at least eight hours per day on weekdays and four hours per day on weekends and holidays.").[20] Because it appears that Defendants already provide the same visitation schedule to ICE detainees at their facilities, the Court finds that any prejudice to Defendants, e.g., cost of implementing the visitation schedule for B-18 detainees, would be minimal. Further, in light of the harm that has been (and likely to be) imposed on the Access/Detention Plaintiffs in that their missions have been obstructed by denied legal visitations, the Court finds that the balance of equities tips in the Access/Detention Plaintiffs' favor.

In sum, the third *Winter* factor weighs in favor of granting the TRO.

**E. The Access/Detention Plaintiffs Have Established that the Temporary Restraining Order is in the Public Interest.**

The Access/Detention Plaintiffs argue that public interest "heavily favors" them because the requested injunction would "ensure that Defendants' conduct complies with the law." ECF No. 38 at 13. Defendants respond that the government has a legitimate and significant interest in ensuring that immigration laws are enforced. ECF No. 70 at 20. The Court finds that the Access/Detention Plaintiffs have made their required showing.

"Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution." *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005).

Violation of the Fifth Amendment raises public interest concerns, not only for those who are currently detained, but also for those who may be arrested and/or detained in the future. *See* Section I.B, *supra* (collecting cases regarding immigrants' right to counsel). Although the instant TRO was filed by the Access/Detention Plaintiffs, the Court finds that the risk imposed on their core mission and on CHIRLA's members as well as the general public warrants finding that the requested TRO is in the public interest. *See also Preminger*, 422 F.3d at 826 ("The public interest inquiry primarily

---

[20] The Non-Dedicated Intergovernmental Service Agreement Standards may be found at https://www.ice.gov/doclib/detention-standards/2025/ndids2025.pdf.

addresses [the] impact on non-parties rather than parties.") (citation omitted). Moreover, although it is true that the government has an interest in enforcing immigration laws, Defendants make no showing that immigration enforcement cannot be conducted without undermining the rights afforded to immigrants under the Fifth Amendment. *See generally* ECF No. 70 at 20. As the Ninth Circuit said in a case concerning alleged Fourth Amendment violations by another law enforcement agency, requiring law enforcement to comply with the Constitution does not prevent law enforcement from enforcing the law. *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1502 (9th Cir. 1996). As such, the fourth *Winter* factor weighs in the Access/Detention Plaintiffs' favor.

In sum, the Court finds that all four *Winter* factors supporting granting the requested TRO.

**F. The Court Does Not Find a Bond Warranted.**

"The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "Rule 65(c) invests the district court with discretion as to the amount of security required, *if any.*" *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (emphasis in original; cleaned up). "[T]he district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Id.*

As the Court has found above, the requested TRO is identical to what Defendants already provide to other detainees at their facilities. *See* Section I.D, *supra*. The Court finds that there is no realistic likelihood of harm to Defendants from requiring them to permit legal visitations in a manner consistent with their existing schedules. As such, the Court concludes that there is no need for a bond. *See* ECF No. 70 at 20–21 (requesting bond without specific amount).[21]

/ / /

/ / /

/ / /

[21] Defendants rely on the Supreme Court's recent holding that district courts do not have equitable power to issue a "universal injunction." *See* ECF No. 70 at 21. Because the requested injunction is only District-wide and not nationwide, the Court finds Defendants' concerns unavailing.

Case 2:25-cv-05605-MEMF-SP Document 266-16 Filed 11/21/25 Page 32 of 53 Page ID #:5203

**<u>THE STOP/ARREST TRO [ECF NO. 45]</u>**

**I. <u>Discussion</u>**

**A. This Court Has Jurisdiction.**

Similar to the arguments they raised in *United Farm Workers v. Noem*, No. 1:25-cv-00246 JLT CDB (E.D. Cal. April 29, 2025), Defendants contend here that this Court lacks jurisdiction under 8 U.S.C. §§ 1252(a)(5) and (b)(9). ECF No. 71 at 14. Defendants additionally assert that 8 U.S.C. § 1252(g) bars this Court from considering Plaintiffs' claims. *Id.* at 15. Although Defendants raise these arguments under the first *Winter* factor, the Court will address this issue first, as jurisdiction is a "threshold matter." *See Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 94-95 (1998) ("The requirement that jurisdiction be established as a threshold matter springs from the nature and limits of the judicial power of the United States") (cleaned up); *see also Garland v. Gonzalez*, 596 U.S. 543, 548 (2022) (the "threshold question" was "whether the District Courts had jurisdiction to entertain respondents' requests for class-wide injunctive relief").

The Immigration and Nationality Act ("INA") sets forth jurisdictional limitations in Section 1252, entitled "Judicial review of orders of removal." *See* 8 U.S.C. § 1252. Pursuant to Section 1252(a)(5), "a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of [the] Act . . . ." 8 U.S.C. § 1252(a)(5). In addition, Section 1252(b)(9) indicates: "Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final [removal] order under this section." 8 U.S.C. § 1252(b)(9).

This Court rejects Defendants' arguments based upon Sections 1252(a)(5) and (b)(9). The key authority with respect to these provisions is *Jennings v. Rodriguez*, 583 U.S. 281 (2018), *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1907 (2020), and *Gonzalez v. U.S. Immigration & Customs Enf't*, 975 F.3d 788 (9th Cir. 2020). In particular, the binding authority dictates that treating everything related to and leading up to removal proceedings as "arising from" a removal action is an incorrect reading of the relevant statutes. As the Supreme

Court held in *Jennings*, "cramming review of . . . questions [concerning inhumane detention conditions or a claim related to actions during detention] into the review of final removal orders would be absurd." 583 U.S. at 293. The same is true here. If even challenges to detention conditions are not barred, then it appears to this Court that the manner in which an individual is first arrested and detained is also not barred.[22] Similarly, the Supreme Court held that Section 1252(b)(9) is "certainly not a bar where, as here, the parties are not challenging any removal proceedings." *Regents of the Univ. of California*, 140 S. Ct. at 1907. And as the Ninth Circuit held in *J.E.F.M.*, "claims that are independent of or collateral to the removal process do not fall within the scope of § 1252(b)(9)." *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1032 (9th Cir. 2016). Finally, although a motion to suppress in the context of removal proceedings was permitted in *Sanchez v. Sessions*, 904 F.3d 643 (9th Cir. 2018), *Sanchez* does not stand for the provision that all such constitutional claims may only be brought in removal proceedings. And how could they? This would mean that U.S. citizens—who Plaintiffs allege have also been unlawfully stopped, arrested, and detained—would have no venue to raise their claims. *See, e.g.*, ECF No. 45-9 ("Gavidia Declaration" or "Gavidia Decl.") (a U.S. citizen testifying that he was stopped and questioned "just because of the way I look—because I am brown, Latino"). This cannot be, and none of the authority cited by Defendants says it is.[23]

The Court similarly finds Defendants' argument based on 8 U.S.C. § 1252(g) without merit. The provision reads: "Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." 8 U.S.C. § 1252(g). The Supreme Court held that "[t]he provision applies only to three discrete actions that the Attorney General may take: her 'decision or action' to '*commence*

---

[22] Another district court in this Circuit came to a similar conclusion in a case raising similar facts where the defendants made similar arguments as the Defendants do here. *United Farm Workers v. Noem*, No. 1:25-cv-00246 JLT CDB (E.D. Cal. April 29, 2025), ECF No. 47

[23] *See also Hernandez v. Sessions*, 872 F.3d 976 (2017) (rejecting similar jurisdictional challenges to immigration-related claims).

proceedings, *adjudicate* cases, or *execute* removal orders.'" *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999) (emphasis in original). Plaintiffs are not raising constitutional claims related to the Attorney General's decision or action to commence proceedings, adjudicate cases, or execute removal orders; rather, the claims here concern "issues which ripened before removal proceedings began," such as stop and detention of even those who cannot be subject to removal proceedings without reasonable suspicion. This is in contrast, for instance, from the cases cited by Defendants where the claims did arise from removal proceedings. Insofar as the instant action and the TRO seeks prohibiting Defendants from engaging or ratifying pre-removal-proceeding conduct that may violate the public's constitutional rights, the Court finds that 8 U.S.C. § 1252(g) is not a bar to this Court's jurisdiction over this action.

As such, the Court finds that the above-referenced statutes do not bar district court jurisdiction over Plaintiffs' Fourth Amendment-based claims.

**B. The Requested TRO is Sufficiently Specific.**

Defendants argue that the requested TRO is overbroad and insufficiently specific. ECF No. 71 at 8–9 ("[The TRO] putatively orders the government to comply with extant law."). The Stop/Arrest Plaintiffs argue that the TRO "specifies the illegal behavior to be enjoined." ECF No. 81 at 9. The Court finds that the TRO is sufficiently specific in light of the conduct at issue.

"[I]njunctive relief must be tailored to the specific harm alleged." *Melendres v. Arpaio*, 784 F.3d 1254, 1265 (9th Cir. 2015). "[A] district court has broad discretion in fashioning a remedy." *Id.*

Here, the Stop/Arrest Plaintiffs largely seek to enjoin Defendants from conducting "detentive stops without the legally required reasonable suspicion" and from solely relying on four enumerated factors alone or in combination.[24] ECF No. 81 at 9 (internal quotation marks omitted); ECF No. 45-22 at 5 (Proposed Order). In light of the allegations and the evidence submitted in support thereof, the Court finds that these forms of injunctive relief are "narrowly tailored to remedying the specific constitutional violations at issue." *See Melendres*, 784 F.3d at 1267 (affirming most of the district court's injunction order prohibiting defendants from carrying out "unconstitutional policy of

---

[24] The four factors are: (1) apparent race or ethnicity, (2) speaking Spanish or speaking English with an accent; (3) presence at a particular location; or (4) the type of work one does. ECF No. 45-22 at 5.

Case 2:25-cv-05605-MEMF-SP Document 87 Filed 07/11/25 Page 34 of 52 Page ID #:1714

considering race as a factor in determining where to conduct patrol operations, in deciding whom to stop and investigate for civil immigration violations, and in prolonging the detentions of Latinos while their immigration status was confirmed"). It is not a mere "obey the law" injunction, and *Schmidt*—cited by Defendants—does not remotely suggest that it is, given the vagueness of the purported injunction in that case. *See* 414 U.S. at 476 ("Rather, the defendants are simply told not to enforce 'the present Wisconsin scheme' against [class members]."). Similarly, the Court finds Defendants' concern over the breadth without justification because, as Defendants concede, "any law enforcement officials within the Department of Justice" are authorized to "exercise immigration enforcement authorities." ECF No. 71 at 2. The Court concludes that the requested TRO is narrowly tailored in light of Defendants' own representation that a broad body of government officials are authorized to conduct—and *are* conducting—immigration enforcement.

As such, the Court finds that the requested TRO is sufficiently specific. The Court discusses below—after addressing likelihood of success on the merits—why the specific injunction requested is tailored to the specific harm alleged.

### C. Standing is Established.

Defendants argue that (1) the organizational plaintiffs lack standing and (2) the named plaintiffs lack standing to seek relief for others. ECF No. 71 at 11–14.

"In a class action, standing is satisfied if at least one named plaintiff meets the requirements." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir.2007) (en banc).

The Court finds that Plaintiffs have established standing for this putative class action at this time. As the Ninth Circuit instructs, only one plaintiff needs to meet the standing requirement in a class action, and the Court finds that the individual plaintiffs here have adequately alleged facts that give rise to standing. In particular, Gavidia testifies that despite being a U.S. citizen, he was stopped, "forcefully pushed up against the metal gated fence," and questioned by individuals wearing "a green vest" and "similar vests with the words 'Border Patrol Federal Agent.'" Gavidia Decl. ¶¶ 7–11. He further testifies that "[i]t was the worst experience I have ever felt. I felt like I was going to die; in fact, one agent literally racked a chamber in his rifle. And going forward, I am disturbed and deeply concerned that federal agents will stop me and violate my rights again for the same reason"—

"based on my skin color . . . because I am brown, Latino." *Id.* ¶ 12. The Court finds that this testimony sufficiently shows that Gavidia meets the Article III standing requirements under *Lujan*: he has suffered an "invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical[.]" 504 U.S. at 560. And insofar as Gavidia, a named plaintiff, meets this requirement, the Court concludes that Plaintiffs have standing for this putative class action.[25]

The Court also rejects Defendants' arguments based upon *Rizzo v. Goode*, 423 U.S. 362, 371 (1976) and *City of Los Angeles v. Lyons*, 461 U.S. 95, 110 (1983) that there has not been a requisite showing that the conduct complained of will recur. Those cases are wholly distinguishable. In *Rizzo*, there was no link between various incidents of police misconduct and any plan or policy or other approval or authorization of such conduct. The Stop/Arrest Plaintiffs have pointed to a plethora of statements suggesting approval or authorization pointing to a high likelihood that the conduct will continue.[26] And in *Lyons*, there was no finding that Lyons faced a real and immediate threat of being illegally choked again. Here, this Court affirmatively finds that there is a real and immediate threat that the conduct complained of will continue. Numerous individuals have been subjected to multiple stops, including Gavidia. All of the evidence adduced suggests a high likelihood of recurrent injury, as required. *See LaDuke v. Nelson*, 762 F.3d 1318, 1324 (9th Cir. 1985).

**D. Preliminary Injunction is Available Even in the Absence of Class Certification.**

Defendants briefly argue that absent class certification, Plaintiffs cannot seek the requested TRO. ECF No. 71 at 23. However, "[w]hile injunctive relief generally should be limited to apply only to named plaintiffs where there is no class certification . . . 'an injunction is not necessarily made overbroad by extending benefit or protection to persons other than prevailing parties in the lawsuit-even if it is not a class action-*if such breadth is necessary to give prevailing parties the relief*

---

[25] As such, the Court declines to evaluate the remaining arguments about standing. *See* ECF No. 71 at 11–14.

[26] One such statement occurred just one day before the hearing. *See* Melissa Gomez et al., *Heavily Armed Immigration Agents Descend on L.A.'s MacArthur Park*, L.A. TIMES (July 7, 2025), https://www.latimes.com/california/story/2025-07-07/immigration-agents-descend-on-macarthur-park. (describing a "show of force" at MacArthur Park in Los Angeles, and discussing a statement by Defendant Bovino that "We may well go back to MacArthur Park or other places in and around Los Angeles. Illegal aliens had the opportunity to self deport, now we'll help things along a bit.").

Case 2:25-cv-05605-MEMF-SP Document 266-16 Filed 11/21/25 Page 36 of 58 Page ID #:5208

*to which they are entitled.*" *Easyriders*, 92 F.3d at 1502 (emphasis in original). As will be discussed below, the Court finds that the breadth of the TRO is necessary to give Plaintiffs what they are entitled to.

To be clear—to provide complete relief to the named Stop/Arrest Plaintiffs, even without considering the unnamed class members and the propriety of certifying a class—this Court must enjoin the conduct of all law enforcement engaged in immigration enforcement throughout the District. Particularly given how these enforcement actions appear to have been conducted, it would be a fantasy to expect that law enforcement could and would inquire whether a given individual was among the named Stop/Arrest Plaintiffs or the (putative) class before proceeding with a seizure. *See id.* ("Because the CHP policy regarding helmets is formulated on a statewide level, other law enforcement agencies follow the CHP's policy, and it is unlikely that law enforcement officials who were not restricted by an injunction governing their treatment of all motorcyclists would inquire before citation into whether a motorcyclist was among the named plaintiffs or a member of Easyriders, the plaintiffs would not receive the complete relief to which they are entitled without statewide application of the injunction.").

**E. The Stop/Arrest Plaintiffs Have Established that They Are Likely to Succeed on the Merits.**

The Stop/Arrest Plaintiffs argue that they are likely to succeed on the merits of their Fourth Amendment-based claims because they are likely to succeed in showing that (1) Defendants are conducting seizures that require at least reasonable suspicion, but (2) their seizures are not supported by reasonable suspicion. ECF No. 45 at 18–22. Defendants respond that the Stop/Arrest Plaintiffs have failed to show likelihood of success because (i) this Court lacks jurisdiction,[27] and (ii) they have not shown violation of the Fourth Amendment or 8 U.S.C. § 1357(a)(7). ECF No. 70 at 17–21. The Court finds that the Stop/Arrest Plaintiffs have sufficiently shown that they are likely to succeed on their Fourth Amendment claims.

---

[27] Because the Court has already found that it has jurisdiction, Section I.A, *supra*, the Court will address only the second of Defendants' arguments.

i. The Stop/Arrest Plaintiffs Are Likely to Succeed in Showing Seizures Requiring Reasonable Suspicion Have Occurred.

First, the Court finds that seizures requiring reasonable suspicion have occurred. *Id.* at 18–19. "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. "A seizure occurs when a law enforcement officer, through coercion, physical force, or a show of authority, in some way restricts the liberty of a person." *United States v. Washington*, 387 F.3d 1060, 1068 (9th Cir. 2004) (cleaned up). Generally speaking, an officer's actions rise to the level of a seizure if any one of the following occurs: "if there is a threatening presence of several officers, a display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Washington*, 490 F.3d 765, 771 (9th Cir. 2007) (internal quotation and citation omitted).

The Stop/Arrest Plaintiffs have provided ample evidence that seizures have occurred. The Petitioner-Plaintiffs testify that when they were waiting at a Metro stop in Pasadena on June 18, 2025, four large, unmarked, tinted cars suddenly pulled up—one crossed in front of them and stopped to their right, the others stopped to their left. ECF No. 45-1 ("Vazquez Perdomo Declaration" of "Vazquez Perdomo Decl.") ¶ 5. Men in masks with guns ran toward them. *Id.* The men grabbed Vazquez Perdomo, put his hands behind his back, and handcuffed him. *Id.* ¶ 6. Vazquez Perdomo was put into a car, still handcuffed; was driven to a nearby CVS and asked for identification; was put in chains on his feet, wrist, and hands; and eventually was taken to a detention center in Los Angeles. *Id.* ¶ 7. Osorto's and Villegas Molina's declarations echo Vazquez Perdomo's testimony. *See* ECF No. 45-2 ("Osorto Declaration" or "Osorto Decl.") ¶¶ 4–8 (testifying that one of the masked men pointed "what looked like a gun" over Osorto's heart and yelled, "Stop or I'll use it!"); ECF No. 45-3 ("Villegas Molina Declaration" or "Villegas Molina Decl.") ¶¶ 4–9 ("Then they shackled us all on our feet, waist, and wrists."). The Petitioner-Plaintiffs all report feeling afraid and that the encounter "felt like a kidnapping." Vazquez Perdomo Decl. ¶ 6; *see* Osorto Decl. ("I was terrified. I didn't know who the men were and I was afraid that they would hurt me."); Villegas Molina Decl. ¶¶ 5, 6 ("I thought we were being kidnapped. . . . I was afraid to

move."). This testimony adequately shows that there was "a threatening presence of several officers," as well as "a display of a weapon," "physical touching of the person," and "the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *See Washington*, 490 F.3d at 771 (holding that the occurrence of any one of such events is enough to give rise to a seizure). And these seizures do not appear to be isolated or accidental. Plaintiffs point to numerous other similar incidents reported in the media and a plethora of public comments by government officials which appear to support the conduct described. *See* ECF No. 45 at 5–6.

Given the Ninth Circuit's guidance as to seizures, and all the evidence submitted by the Stop/Arrest Plaintiffs that such events have occurred on an ongoing basis throughout the District, the Court finds that Defendants are conducting seizures requiring reasonable suspicion. *See* ECF No. 45 at 9–13 (describing in detail the most recent stops and arrests with citations to the underlying testimony).

Having found that seizures are occurring, the Court considers whether they are supported by reasonable suspicion.

ii. <u>The Stop/Arrest Plaintiffs Are Likely to Succeed in Showing the Seizures Are Not Supported by Reasonable Suspicion.</u>

The Court also finds that the Stop/Arrest Plaintiffs are likely to succeed in showing the seizures that have occurred are not supported by reasonable suspicion.[28]

"Except at the border and its functional equivalents," immigration agents may stop individuals in public only after identifying "specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that [the persons stopped are noncitizens] who may be illegally in the country." *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975). Reasonable suspicion comprises two elements: "the assessment must be based upon the

---

[28] Defendants argue that the Court "should not consider whether a violation of 8 C.F.R. § 287(b)(2) occurred because Plaintiffs did not raise that argument." ECF No. 70 at 18. 8 C.F.R. § 287(b)(2) states: "If the immigration officer has a reasonable suspicion, based on specific articulable facts, that the person being questioned is, or is attempting to be, engaged in an offense against the United States or is an alien illegally in the United States, the immigration officer may briefly detain the person for questioning." Contrary to Defendants' assertion, the Court finds that Plaintiffs have raised the argument. *See* ECF No. 45 at 20–22 (section titled, "Defendants' seizures are not supported by reasonable suspicion."). As such, the Court will evaluate whether the seizures were supported by reasonable suspicion.

totality of the circumstances," and it "must arouse a reasonable suspicion that *the particular person being stopped* has committed or is about to commit a crime." *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (emphasis in original). "[T]o establish reasonable suspicion, an officer cannot rely solely on generalizations that, if accepted, would cast suspicion on large segments of the law-abiding population." *United States v. Manzo-Jurado*, 457 F.3d 928, 935 (9th Cir. 2006). "Where, as here, the majority (or any substantial number) of people share a specific characteristic, that characteristic is of little or no probative value in such a particularized and context-specific analysis." *Montero-Camargo*, 208 F.3d at 1131; *see id.* at 1135 ("Hispanic appearance is … of such little probative value that it may not be considered as a relevant factor where particularized or individualized suspicion is required."); *Manzo-Jurado*, 457 F.3d at 937 ("By itself . . . an individual's inability to understand English will not justify an investigatory stop because the same characteristic applies to a sizable portion of individuals lawfully present in this country.").

The Stop/Arrest Plaintiffs have provided ample evidence that seizures occurred based solely upon the four enumerated factors, either alone or in combination, and that reliance solely upon the four enumerated factors either alone or in combination does not meet the requirements of the Fourth Amendment.

*1. The Stop/Arrest Plaintiffs Are Likely to Succeed in Showing the Seizures Are Based Upon the Four Enumerated Factors*

The Court begins by addressing the evidence adduced regarding the basis upon which the seizures were made. The Petitioner-Plaintiffs all testify that they were waiting to be picked up for their work on the morning of June 18, 2025, while having coffee. Vazquez Perdomo Decl. ¶ 4; Osorto Decl. ¶ 4; Villegas Molina Decl. ¶ 4. They were suddenly approached by four unmarked cars, and the Petitioner-Plaintiffs were eventually taken to a detention facility. Vazquez Perdomo Decl. ¶ 5–8; Osorto Decl. ¶¶ 5–8; Villegas Molina Decl. ¶¶ 5–9. Nothing in the Petitioner-Plaintiffs' declarations suggests that they are in the country without proper documentation or otherwise have or are about to commit a crime. *See* ECF No. 81-1 at 11 (Form I-213 for Vazquez Perdomo, indicating no criminal history). Nevertheless, the masked and armed men proceeded to seizing them. In fact, the one report regarding Vazquez Perdomo's seizure provides no details as to how Vazquez

Perdomo was initially identified. *Id.* Rather, it provides only general terms about the various enforcement operations conducted by the government, further supporting the notion that there was no requisite reasonable suspicion here. *Id.* And the other declarations submitted in support of the instant TRO show a similar pattern of seizure without any basis outside of the four enumerated factors. *See* ECF No. 45 at 6–9 (describing in detail the instances of "racial profiling" with citations to the underlying testimony).

Defendants contest the idea that they relied solely on these factors. They contend, in reliance on the declarations of Andre Quinones and Kyle C. Harvick, that the seizures were based upon a particularized assessment of reasonable suspicion based upon articulable facts. ECF No. 71 at 19–21. But these declarations do not support this contention in the slightest, particularly as they do not appear to acknowledge the existence of roving patrols at all. For instance, Deputy Field Officer Quinones merely describes what officers are *trained* to do. *See, e.g.*, ECF 71-1 ¶ 5 ("ERO Los Angeles officers are *trained* that . . . brief detention for questioning requires an immigration officer to have reasonable suspicion, based on specific, articulable facts, that the person being questioned is an alien illegally in the United States. ERO Los Angeles officers are *trained* that an arrest requires probable cause that the person being arrested is an alien illegally in the United States."). And Patrol Agent in Charge Harvick speaks only in general terms about what CBP agents and officers have done in Los Angeles. *See* ECF No. 71-2 ¶ 8 ("Prior to engaging in investigative detentions, officers and agents had reasonable suspicion that the individual had committed or was committing a federal crime or federal immigration violation. This reasonable suspicion was based on various factors including intelligence sources, information from law enforcement and open-source databases, analysis of trends, facts developed in the field by agents, rational inferences that led an agent or officer to suspect criminal or immigration violations, and the officers or agents' observations, training, and experience."). And in doing so, he seems to confirm that he and his colleagues are relying solely on these factors. *See id.* ¶ 7 ("CBP agents and officers are typically divided into teams, composed of three to five agents, who contact individuals in public places such as streets and sidewalks, parking lots, or the publicly-accessible portions of businesses. Certain types of businesses, including car washes, have been selected for encounters because past experiences have

demonstrated that illegal aliens utilize and seek work at these locations."). This evidence is entirely too general to show what factors the agents relied upon in seizing the Petitioner-Plaintiffs. In fact, these two declarations do not even discuss the Petitioner-Plaintiffs or any other individuals at all.

During the hearing, Defendants pointed to the arrests effected at consecutive visits to a car wash in Whittier as evidence that their stops are based upon factors beyond the enumerated factors. In particular, Defendants argued that because their first two visits resulted in arrests, this provided a basis to stop and question Omar Andres Gamez, a U.S. citizen. *See* ECF No. 45-5 ("Gamez Declaration" or "Gamez Decl."). But Defendants did not provide any details[29] as to the factors considered other than that Gamez was at the very *location* where the agents previously made arrests. *See Montero-Camargo*, 208 F.3d at 1129; *see also Brignoni-Ponce*, 422 U.S. at 886 n.11 (declining to consider "any weight to the location of the stop" because the officers gave no other meaningful reasons). This reasoning is circular at best, and no details were provided to support the idea that the multiple visits were indeed based upon "intelligence" or investigation rather than reliance upon one of the enumerated factors.

And despite having nearly a week to produce information demonstrating the basis of any one of the Stop/Arrest Plaintiffs' arrests or any of the numerous media reports, Defendants have failed to do so. The Court therefore concludes that the Stop/Arrest Plaintiffs have sufficiently shown at this stage a likelihood of success on the question of whether the stops and arrests at issue have been based solely upon the enumerated factors.[30]

/ / /

/ / /

[29] Instead of specific details, Defendants explained that what may appear arbitrary to the public may actually give rise to reasonable suspicion to Defendants' field agents, especially in light of the surveillance and intelligence data they share with the agents. Be that as it may, the Court notes that Defendants still failed to provide any concrete details as to what factors led Defendants to stop and question Gamez specifically nor indicate the nature of surveillance and intelligence data gathered that would give rise to reasonable suspicion.

[30] To the extent that the Defendants point to any specific factors besides these enumerated factors, they do not show that they support reasonable suspicion. For example, Defendants do not explain why fleeing upon seeing unidentified masked men with guns exiting from tinted cars without license plates raises suspicion. ECF No. 71 at 20, 21; *see United States v. Brown*, 925 F.3d 1150, 1157 (9th Cir. 2019) ("Given that racial dynamics in our society—along with a simple desire not to interact with police—offer an 'innocent' explanation of flight . . . .").

*2. The Stop/Arrest Plaintiffs Are Likely to Succeed in Showing that Sole Reliance on the Four Enumerated Factors Does Not Constitute Reasonable Suspicion.*

Having reached this conclusion, the Court turns to the question of whether sole reliance on these factors could give rise to reasonable suspicion.

First, the Court considers whether race could give rise to reasonable suspicion.[31] Binding authority makes clear it cannot in these circumstances. The Ninth Circuit's holding in *Montero-Camargo* bears repeating:

> [W]e are confronted with the narrow question of how to square the Fourth Amendment's requirement of individualized reasonable suspicion with the fact that the majority of the people who pass through the checkpoint in question are Hispanic. In order to answer that question, we conclude that, at this point in our nation's history, and given the continuing changes in our ethnic and racial composition, Hispanic appearance is, in general, of such little probative value that it may not be considered as a relevant factor where particularized or individualized suspicion is required. Moreover, we conclude, for the reasons we have indicated, that it is also not an appropriate factor.

*Montero-Camargo*, 208 F.3d at 1135.

Second, the Court considers whether speaking Spanish or speaking English with an accent could give rise to reasonable suspicion. There is no case law that supports that it could. In *United States v. Manzo-Jurado*, 457 F.3d 928, 937 (9th Cir. 2006), the Ninth Circuit indicated that "[a]n individual's *inability to speak English* may support an officer's reasonable suspicion that the individual is in this country illegally, [but] [by] itself, however, an individual's *inability to understand English* will not justify an investigatory stop because the same characteristic applies to a sizable portion of individuals lawfully present in this country." Defendants point to no case law addressing speaking Spanish or speaking English with an accent, and obviously neither of those activities demonstrates an *inability* to speak English. This, therefore, appears to be a factor akin to those described as having "such a low probative value that no reasonable officer would have relied

---

[31] At the hearing, Defendants vehemently denied any reliance on race and disputed that the reference to "appearance" in their briefing was a reference to race, even though the cases cited were specifically speaking about a particular racial appearance. ECF No. 71 at 20; *Orhorhaghe v. I.N.S.*, 38 F.3d 488, 498 (9th Cir. 1994) ("foreign-looking appearance"); *United States v. Brignoni-Ponce*, 422 U.S. 873, 885-886 (1975) ("characteristic appearance of persons who live in Mexico" "apparent Mexican ancestry").
").;

on them to make an investigative stop [such that it] must be disregarded as a matter of law." *Montero-Camargo*, 208 F.3d at 1132.

Third, the Court considers whether presence at a particular location or the type of work one does could give rise to reasonable suspicion. The Court considers them together as they appear to be overlapping factors. With respect to the Petitioner-Plaintiffs, Defendants do not explain why being at a bus stop in Pasadena raises suspicion that the Petitioner-Plaintiffs may be undocumented immigrants. *Id*. at 19–20. Although Patrol Agent in Charge Harvick indicates that "past experiences have demonstrated that illegal aliens utilize and seek work at" "certain types of businesses, including car washes," this is insufficient to make these factors fit the particularized assessment needed. In fact, the Ninth Circuit addressed similar factor in *Manzo Jurado*, where one of the factors relied upon was a group's "appearance as a work crew." *Manzo-Jurado*, 457 F.3d at 937. Although the agent in that case had experience that local work crews "on occasion included illegal aliens," they did not provide evidence about how many local work crews did not. *Id.* at 938. Nor did they have any information about the employer of the specific work crew at issue. *Id.* In the same vein, knowledge that undocumented individuals use and seek work at car washes falls woefully short of the reasonable suspicion needed to target any particular individual at any particular car wash. The same is true of the other locations and other occupations at issue.

Defendants' reliance on authority such as *Orhorhaghe v. INS* and *Brignoni-Ponce* to support seizures based upon the factors identified by the Stop/Arrest Plaintiffs is misplaced. Those cases actually stand for the proposition that factors like race are insufficient and often wholly improper. To the extent that either of those cases even permit consideration of "appearance," it is clearly only in connection with other factors actually correlated to immigration status. *Orhorhaghe*, 38 F.3d 488, 503 ("Like *one's appearance*, one's name is frequently correlated with one's racial or ethnic background, and in both instances the racial or ethnic background which results in adverse action by immigration officers *almost always is that of people of color*") (emphasis added). And as discussed extensively in *Montero-Camargo*, the Supreme Court's holding in *Brignoni-Ponce* was based upon outdated census data from three decades ago. 422 U.S. 873, 886 n.12 (1975). The demographics of

this district in 2025 are clearly very different from 1970, and Defendants do not point to any demographic data in support of their enforcement approach. *See Montero-Camargo*, 208 F.3d 1136.

At best, in support of their reliance on these factors, Defendants rely heavily on the "experience" of law enforcement, but the Ninth Circuit has already held that an agent's experience cannot provide unbridled discretion and is no substitute for objective facts, rational inferences, permissible deductions capable of rational explanation. *Orhorhaghe*, 38 F.3d at 499. The factors that Defendants appear to rely on for reasonable suspicion seem no more indicative of illegal presence in the country than of legal presence—such as working at low wage occupations such as car wash attendants and day laborers. This is insufficient and impermissible, and is the proper subject of an injunction.[32]

For the reasons discussed above, the Stop/Arrest Plaintiffs are likely to succeed in showing that the four enumerated factors taken alone or in combination do not demonstrate reasonable suspicion for any particular stop. "Although an officer, to form a reasonable suspicion of criminality, may rely in part on factors composing a broad profile, he must also observe *additional* information that winnows the broad profile into an objective and particularized suspicion of the person to be stopped." *Manzo-Jurado*, 457 F.3d at 939 (emphasis added).

During the hearing, Defendants argued that Plaintiffs did not carry their burden of proof by failing to produce evidence that (1) race is a motivating factor of the allegedly unconstitutional stops and arrests, (2) any one particular agent engaged in unconstitutional stops and arrests, and (3) that the stops and arrests are not consensual. But the evidence before the Court at this time portrays the reality differently. For instance, Plaintiffs have provided citations to news articles where those who appear to be the members of this District feel that the stops and arrests are overwhelmingly focused

---

[32] At the hearing, Defendants relied on *U.S v. Arvizu* to argue that even seemingly innocuous actions, such as children's waiving of hands, can give rise to reasonable suspicion. 534 U.S. 266 (2002). But there, the factors were much more detailed. *See id.* at 277 (the respondent used "little-traveled route"; it was unlikely that the respondent and the respondent family was on a picnic because "the minivan had turned away from the known recreational areas"; children's knees were "elevated," suggesting "the existence of concealed cargo in the passenger compartment"; and "the children's mechanical-like waving, which continued for a full four to five minutes"). In contrast, Defendants provided no such detailed factors individualized to any of the Petitioner-Plaintiffs.

on Latinos.[33] *See* ECF No. 45 at 3–6; ECF No. 81 at 6. The declarants in support of the TRO also testify that they believe that race is a motivating factor. *E.g.*, Gavidia Decl. ¶ 12; ECF No. 45-12 ¶ 27 ("Based on the raids I have heard about from LAWCN's member organizations, the immigrant agents seem to target non-white, Spanish-speaking workers, regardless of whether they have long-standing ties to the community or lawful presences in the United States."): ECF No. 45-10 ¶ 11 ("I believe that the agents only stopped people who look Latino. Two of my coworkers at the car wash have light skin. One of them is Persian, and the other is from Russia. Neither of them was approached by immigration agents, and they were not arrested with us."). Moreover, it is undisputed that the agents are masked and often do not identify themselves[34]; absent such identifying information readily available to Plaintiffs, the Court finds Defendants' argument about failure to identify a particular agent unconvincing. Lastly, at least one news article reports that people were dragged out of the *bathrooms* at a swap meet, which makes Defendants' arguments that their stops and arrests are consensual unpersuasive. *See* ECF No. 45 at 6 n.37. In light of this evidence, the Court finds that Plaintiffs have, for purposes of the TRO, shown that they carried their burden.[35]

---

[33] The Court finds that this pattern of conduct is sufficient evidence even if there is no "official" policy to engage in "roving patrols." In *LaDuke v. Nelson*, the Ninth Circuit found that the field agents' testimony (that it was "INS policy to conduct complete sweeps of all community residences, with or without information as to specific residences"), which contradicted the official policy of the defendant agency (that such sweeps should be done only upon "individualized suspicion"), was sufficient to affirm the district court's grant of an injunction. *See* 762 F.2d 1318, 1331, 1327 n.12 (9th Cir. 1985). Here, although there is no testimony from Defendants' field agents with respect to the policy being carried out on the streets, the Court finds that based on the evidence that is before the Court, Plaintiffs have sufficiently shown that Defendants' policies are being carried out differently.

For this reason, the Court also finds that it is not dispositive that Plaintiffs have not pointed to any "official" policy that authorizes or ratifies the alleged "roving patrols" for purposes of this TRO.

[34] Defendants speculated in the hearing that the agents may wear masks in light of COVID-19, in light of the "extraordinary violence" they have faced, and to avoid "doxing."

[35] In the criminal context, such as when a defendant brings a motion to suppress based on a Fourth Amendment violation, all a defendant needs to show in the first instance is that there was a warrantless stop or search. *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978). Afterwards, the burden shifts to the government to show that the stop or search was justified. *U.S. v. Cervantes*, 703 F.d3 1135, 1141 (9th Cir. 2012). Even if no similar burden-shifting operates in the immigration context, it points to the fact that where a person claims to have been arrested without probable cause or searched without reasonable suspicion, it will nearly always be the case that she lacks direct evidence of what led to the arrest or search. Therefore, the absence of this direct evidence at this stage does not cause this Court to conclude that there is no likelihood of success on the merits of this claim.

For the foregoing reasons, the Court finds that the Stop/Arrest Plaintiffs have shown that they are likely to succeed on the merits of their Fourth Amendment-based claims.

In addition, the Court finds that the injunction they seek is tailored to the specific harm alleged. They seek only to enjoin reliance *solely* on these four enumerated factors alone or in combination. They do not seek to enjoin reliance on these factors along with other factors, nor—contrary to Defendants' mischaracterizations—seek to require that Defendants ignore these factors or "put blinders on" when they run across these factors.

**F. The Stop/Arrest Plaintiffs Have Established that They Will Suffer Irreparable Harm.**

The Stop/Arrest Plaintiffs argue that Defendants' policies and practices are causing and will continue to cause irreparable harm to the organizational plaintiffs and their members. ECF No. 45 at 22–23. Defendants assert that Plaintiffs have not shown irreparable harm. ECF No. 71 at 22. The Court finds that the Stop/Arrest Plaintiffs have shown that the third *Winter* factor weighs in their favor.

"It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Melendres*, 695 F.3d at 1002. "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Warsoldier v. Woodford*, 418 F.3d 989, 1001–02 (9th Cir. 2005) (cleaned up) (quoting from treatise). Irreparable harm exists where plaintiffs face "a real possibility" that they will "again be stopped or detained and subjected to unlawful detention." *Melendres*, 695 F.3d at 1002.

The Stop/Arrest Plaintiffs have established that the organizational plaintiffs and their members have experienced significant harm and that they are likely to suffer irreparable harm unless the instant TRO is granted. In particular, with the widespread news reporting of stops and arrests, like the one that the Petitioner-Plaintiffs experienced, the organizational plaintiffs' members have increasingly become afraid to go outside. *See* Salas Decl. ¶ 25 (testifying that CHIRLA members are "experiencing significant levels of fear over the possibility of being grabbed and snatched in immigration raids in public areas based on racial profiling"); ECF No. 45-13 ("Melendrez Declaration" or "Melendrez Decl.") ¶¶ 15–17 (testifying as to awareness of "dozens of CLEAN's

members [] hav[ing] been stopped and arrested" and that "many members and their families . . . are feeling anxious, worried, and fearful about their safety and the safety of their loved ones because of the ongoing immigration raids happening through Southern California"). Moreover, insofar as Plaintiffs assert the first cause of action—Violation of the Fourth Amendment, Unreasonable Seizures—on behalf of the Suspicionless Stop Class, the Court finds that the broader public may also be in fear of having their constitutional rights violated by seizures without reasonable suspicion, especially in light of the ongoing reports of stops and arrests as recently as July 1, 2025. *See* ECF No. 45 at 15 (listing dates and locations of recent stops and arrests); ECF No. 81 at 6 (listing more dates, with emphasis in early July); *see also* ECF No. 45-18 ("Price Declaration" or "Price Decl.") (containing a list of videos on various social media platforms showing members of the public being detained). The Court finds that this evidence supports a finding of "real possibility" that irreparable harm will continue absent the instant TRO in place.

As such, the Court finds that the second *Winter* factor weighs in favor of granting the TRO.

**G. The Stop/Arrest Plaintiffs Have Established that the Balance of Hardships Tips in Their Favor and that District-Wide Injunction is Permissible and in the Public Interest.**

The Stop/Arrest Plaintiffs argue that the requested TRO is warranted because it would simply require Defendants to "adhere to the Fourth Amendment" and it is always in the public interest to prevent constitutional violations. ECF No. 45 at 23–24. Defendants respond that because "the government's practices comply with the Constitution . . . alteration to the status quo is unnecessary." ECF No. 71 at 23. The Court finds that the last two *Winter* factors are in the Stop/Arrest Plaintiffs' favor.

The Court does not find prejudice to Defendants. As the Stop/Arrest Plaintiffs point out, compliance with the Fourth Amendment is nothing new, contrary to Defendants' claims. *LaDuke*, 762 F.2d at 1333 (upholding permanent injunction against warrantless searches of workplace housing); *Melendres*, 695 F.3d at 1002 (upholding injunction against state officer practice of detaining people for civil immigration offenses); *Easyriders*, 92 F.3d at 1501 (collecting cases awarding injunctions against Fourth Amendment violations). Complying with the law does not impose harm. *Zepeda v. INS*, 753 F.2d 719, 727 1146 (9th Cir. 1983) (an agency "cannot reasonably

assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations"). Additionally, the Court has already found that the seizures at issue occurred unlawfully, without reasonable suspicion; therefore, Defendants' arguments regarding an alteration to the status quo fail. *See* ECF No. 71 at 23. And, as stated above, requiring law enforcement to comply with the Constitution does not prevent law enforcement from enforcing the law. As such, the third *Winter* factor is in the Stop/Arrest Plaintiffs' favor.

Moreover, as "public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution," and the instant TRO raises Fourth Amendment issues, the Court finds that the fourth *Winter* factor weighs in favor of granting the TRO. *See Preminger*, 422 F.3d at 826.

In sum, the Court finds that all four *Winter* factors point to granting the requested TRO.[36]

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[36] Defendants additionally argue that bond is necessary. ECF No. 71 at 23–24. At the hearing, Defendants specified that they seek a $30 million bond because they would need to re-train the agents if the instant TRO were to be issued. The Court concludes that a bond is not necessary, as the TRO does not require any deviation from the training and the policies that appear to be in place, but rather compliance with the existing law.

## CONCLUSION

For the foregoing reasons, the Court ORDERS as follows:

1. The Access/Detention Plaintiffs' Ex Parte Application for TRO (ECF No. 38) is GRANTED.

   a. Defendants Kristi Noem, Todd M. Lyons, and Ernesto Santacruz Jr. shall provide access to Room B-18 of the Federal Building located at 300 North Los Angeles Street, Los Angeles, CA 90012 ("B-18") for legal visitation by current and prospective attorneys, legal representatives, and legal assistants. Legal visitation shall be permitted seven days per week, for a minimum of eight hours per day on business days (Monday through Friday), and a minimum of four hours per day on weekends and holidays. Should exigent circumstances require closure for the safety of human life or the protection of property, the Defendants must notify Access/Detention Plaintiffs as soon as practicable and certainly within four (4) hours to make alternative arrangements for legal visitation and/or notice to affected detainees and attorneys, legal representatives, and legal assistants. No such closure shall last any longer than reasonably necessary for the safety of human life or the protection of property.

   b. Defendants Kristi Noem, Todd M. Lyons, and Ernesto Santacruz Jr. shall provide individuals detained at B-18 with access to confidential telephone calls with attorneys, legal representatives, and legal assistants at no charge to the detainee. Such legal telephone calls shall not be screened, recorded, or otherwise monitored.

   c. The Court, having found a strong likelihood of success on the merits and that the balance of the equities overwhelmingly favors CHIRLA and ImmDef, further ORDERS that no security shall be required under Federal Rule of Civil Procedure 65(c).

   d. Defendants Kristi Noem, Todd M. Lyons, and Ernesto Santacruz Jr. are each hereby ordered to show cause on a date to be set by the Court, or as soon

thereafter as counsel may be heard in the courtroom of the Honorable Maame Ewusi-Mensah Frimpong, located at 350 West First Street, Los Angeles, CA 90012, why they should not be enjoined from further violations of the Fifth Amendment to the United States Constitution pending the final disposition of this action.

2. The Stop/Arrest Plaintiffs' Ex Parte Application for TRO (ECF No. 45) is GRANTED.

   a. As required by the Fourth Amendment of the United States Constitution, Defendants shall be enjoined from conducting detentive stops in this District unless the agent or officer has reasonable suspicion that the person to be stopped is within the United States in violation of U.S. immigration law.

   b. In connection with paragraph (1), Defendants may not rely solely on the factors below, alone or in combination, to form reasonable suspicion for a detentive stop, except as permitted by law:

      i. Apparent race or ethnicity;

      ii. Speaking Spanish or speaking English with an accent;

      iii. Presence at a particular location (e.g. bus stop, car wash, tow yard, day laborer pick up site, agricultural site, etc.); or

      iv. The type of work one does.

   c. The Court, having found a strong likelihood of success on the merits and that the balance of equities overwhelmingly favors Plaintiffs, further ORDERS that no security shall be required under Federal Rule of Civil Procedure 65(c).

   d. Defendants are each hereby ORDERED TO SHOW CAUSE on a date to be set by the Court or as soon thereafter as counsel may be heard in the courtroom of the Honorable Maame Ewusi-Mensah Frimpong, located at 350 West First Street, Los Angeles, CA 90012, why a preliminary injunction should not issue ordering that:

      i. As required by the Fourth Amendment of the United States Constitution, Defendants are enjoined from conducting detentive stops in this District

unless the agent or officer has reasonable suspicion that the person to be stopped is within the United States in violation of U.S. immigration law;

ii. In connection with paragraph (a), Defendants may not rely solely on the factors below, alone or in combination, to form reasonable suspicion for a detentive stop, except as permitted by law;

1. Apparent race or ethnicity;
2. Speaking Spanish or speaking English with an accent;
3. Presence at a particular location (e.g. bus stop, car wash, tow yard, day laborer pick up site, agricultural site, etc.); or
4. The type of work one does.

iii. Defendants will maintain and provide documentation of detentive stops, including factors supporting reasonable suspicion, to Plaintiffs' counsel on a regular schedule.

iv. Defendants will develop guidance concerning how agents and officers should determine whether "reasonable suspicion" exists when conducting detentive stops.

v. Defendants will implement associated training for Defendants' agents and officers involved in immigration operations in this District.

3. The parties shall meet and confer and file a joint status report with respect to re-designating this case in light of the Petitioner-Plaintiffs' bond hearings and their outcome. The joint status report shall be filed within three (3) days of the outcome of the last bond hearing and shall address whether any of the submissions currently on the docket should be sealed or redacted.

4. In light of the concerns raised by Defendants regarding the time needed to address these issues, the Court shall seek the views of the parties before setting a date for the Order to

Show Cause hearing noted above.[37] The parties shall meet and confer and file a joint status report regarding their proposed date for the Order to Show Cause hearing, including a proposed briefing schedule. The joint status report shall be filed by 5pm Wednesday, July 16, 2025.

IT IS SO ORDERED.

Dated: July 11, 2025

MAAME EWUSI-MENSAH FRIMPONG
United States District Judge

[37] The request for a stay is DENIED. Defendants have failed to address the applicable law governing stays or make any showing that such a stay is warranted besides stating that they want time to determine whether to appeal and seek a stay pending appeal. ECF No. 71 at 24.