# Exhibit 21

No. 25A169

# In the Supreme Court of the United States

KRISTI NOEM, SECRETARY OF HOMELAND SECURITY, ET AL., APPLICANTS

*v.*

PEDRO VASQUEZ PERDOMO, ET AL.

**REPLY IN SUPPORT OF APPLICATION TO STAY THE ORDER ISSUED BY THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA**

D. JOHN SAUER
*Solicitor General*
*Counsel of Record*
*Department of Justice*
*Washington, D.C. 20530-0001*
*SupremeCtBriefs@usdoj.gov*
*(202) 514-2217*

## TABLE OF CONTENTS

A. Respondents' Theory Of Standing Is Impermissibly Speculative .......... 4

B. The Injunction Contravenes This Court's Fourth Amendment Cases... 9

C. The Injunction Improperly Covers Millions Of Nonparties.................. 14

D. The Irreparable Harm To The Government And Other Factors Justify A Stay ........................................................................................ 16

# In the Supreme Court of the United States

No. 25A169

KRISTI NOEM, SECRETARY OF HOMELAND SECURITY, ET AL., APPLICANTS

*v.*

PEDRO VASQUEZ PERDOMO, ET AL.

**REPLY IN SUPPORT OF APPLICATION TO STAY THE ORDER ISSUED BY THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA**

In June, the government ramped up immigration stops to identify illegal aliens and enforce federal immigration laws in the Central District of California, which is ground zero for the effects of the border crisis. Nearly 2 million illegal aliens—out of an area population of 20 million—are there unlawfully, encouraged by sanctuary-city policies and local officials' avowed aim to thwart federal enforcement efforts. For more than a month, the United States District Court for the Central District of California has impeded federal efforts by superintending on-the-ground immigration enforcement via sweeping injunction. That injunction bars agents of U.S. Immigration and Customs Enforcement (ICE) and Customs and Border Protection (CBP) from conducting investigative stops of any of the District's 20 million residents if those stops rely, alone or in combination, on apparent race or ethnicity; use of Spanish or accented English; whether the location is one where illegal aliens look for work (*e.g.*, certain Home Depots); and whether the suspect works or appears to work in a job associated with illegal aliens (*e.g.*, day labor and other jobs that do not require docu-

mentation). Appl. App. (App.) 111a. The district court did so at the behest of several organizations and five named respondents—three of whom are illegal aliens. The injunction raises the specter of contempt for every stop in the district, threatening agents with sanctions if the court disbelieves that they relied on additional factors in making any particular stop. It chills the exercise of Executive authority and usurps the President's Article II powers to enforce our immigration laws.

Seldom in the Fourth Amendment field have so few obtained an injunction for so many in such clear conflict with this Court's precedents. Bedrock Article III principles should have foreclosed this injunction: five named plaintiffs and unidentified organizational members cannot enjoin *future* law-enforcement conduct just because they experienced past, allegedly unlawful conduct and fear a recurrence—especially where the purported "policy" would be inapplicable if officials consider *any factor* in addition to the proscribed four. Plaintiffs must show it is likely that *they* will be harmed in the future. Respondents' objection (Opp. 17, 26) that "millions" of people fit ICE's factors for stops dooms that showing. They do not dispute that ICE has stopped thousands (not millions) of people over more than two months, or that ICE has not *exclusively* relied on allegedly impermissible factors in those stops. They thus cannot show that it is likely that they, among a population of 20 million, will be stopped again, let alone *solely* on the grounds proscribed by the district court.

Bedrock Fourth Amendment precepts also foreclose this injunction. It categorically rules out the possibility that four factors, alone or in combination, could ever suffice to support reasonable suspicion for any immigration stop of any one of the District's 20 million people. This Court has repeatedly viewed similar categorical rules as presumptively suspect when they treat certain factors (especially ones recognized to be salient to law enforcement) as insufficient for reasonable suspicion, be-

cause the reasonable-suspicion inquiry is flexible, context-specific, and not amenable to sweeping per se rules that could limit millions of possible encounters. See Appl. 24 (citing, *e.g.*, *United States* v. *Arvizu*, 534 U.S. 266, 272-274 (2002)). The district court erred in holding these four factors categorically insufficient, even in combination—even if an ICE agent encounters someone who speaks exclusively Spanish who works as a day laborer at a worksite known to employ illegal aliens as day laborers. Reasonable suspicion is a low bar by design. Especially in an area where 1 in 10 people are present illegally, it defies common sense to hold that the government cannot use these factors to meet that low bar.

If nothing else, the scope of relief is vastly overbroad: the district court entered district-wide relief for an area more populous than many States, blithely dismissing any narrower injunction as a "fantasy." App. 97a. But under *Trump* v. *CASA, Inc.*, 145 S. Ct. 2540 (2025), district courts are obliged to tailor injunctions to the parties and grant no more relief than necessary, not supersize relief because they doubt that law-enforcement officers could manage a narrower injunction. After all, managing a narrower injunction "is initially the National Government's problem, not" the court's. *Arizona* v. *Biden*, 40 F.4th 375, 398 (6th Cir. 2022) (Sutton, C.J., concurring).

Respondents fight fact with fiction. They describe (Opp. 3) "roving federal raiders" terrorizing Los Angeles, bent on meeting a goal of 3000 immigration arrests per day even if reasonable suspicion falls by the wayside. In reality, ICE agents are enforcing federal immigration law by employing statutorily authorized detentive stops; they must find reasonable suspicion for every stop; and ICE has no 3000-per-day policy, C.A. Doc. 47.1, at 1 (July 30, 2025); see App. 4a n.2. Respondents portray (Opp. 35, 40) this injunction as a "tailored TRO" because it may last only another "month or so." But the court of appeals correctly deemed this TRO an appealable injunction,

App. 34a-35a, doubtless because it extends indefinitely, has already exceeded Federal Rule of Civil Procedure 65's 28-day maximum, and plainly affects immigration enforcement across the district. Respondents paint the government (Opp. 21-22) as categorically rejecting standing for anyone to enjoin egregiously unconstitutional policies, but the government's modest point is that *this* injunction rests on rank speculation of future harm and disregard of basic Fourth Amendment principles.

Meanwhile, respondents deny the actual, problematic contours of this injunction, suggesting (at 10 n.2, 38-39) that ICE agents could rely on their experience to form reasonable suspicion for a stop. If they were correct, their theory of standing would be even further doomed, since no respondent is likely to be stopped by an officer who does not include his own experience in the reasonable-suspicion mix. Yet the Ninth Circuit below unambiguously collapsed "officers' experience" into the four factors that the injunction deems categorically insufficient. App. 43a. That respondents and the lower courts cannot even agree on how and when agents can use their own experience as a basis for detentive stops underscores the urgent need for a stay. Agents who rely on their experience risk contempt if the district court decides that the agent lacked additional, objective facts and that the stop just rested on the four impermissible factors. Agents unwilling to take that risk must forgo enforcing federal immigration law at the epicenter of the illegal-immigration crisis. This Court should put an end to this judicial micromanagement.

### A. Respondents' Theory Of Standing Is Impermissibly Speculative

This Court's Article III precedents establish that standing to obtain future injunctive relief does not exist merely because plaintiffs experienced past harm and fear its recurrence. Appl. 16-22; *City of Los Angeles* v. *Lyons*, 461 U.S. 95, 105 (1983). Only a sufficiently "concrete, particularized, and actual or imminent" injury warrants

forward-looking injunctive relief, *TransUnion LLC* v. *Ramirez*, 594 U.S. 413, 423 (2021), and a showing of a mere increased risk of harm is inadequate when the risk is speculative, see *Clapper* v. *Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). Thus, respondents had to show not only that they were likely to be stopped in the future by federal immigration agents, but also that they would likely be stopped on the basis prohibited by the injunction—*i.e.*, based *solely* on the four prohibited factors. See *Lyons*, 461 U.S. at 111 (plaintiff must show "a sufficient likelihood that he will again be wronged in a similar way"). They have done neither.

Respondents' claim (at 12) of "overwhelming" evidence that they face future stops is baseless. Their evidence consists of (1) allegations that respondents were previously stopped and that agents visited one respondent's workplace multiple times; (2) inferences that these stops rested solely on the four prohibited factors; and (3) ICE's supposed unstated policy of using only the four prohibited factors in "frequent and widespread" "raids." Opp. 13. That evidence fails to show why *these* respondents (whether individuals or unnamed members of respondents' organizations) would likely be stopped again, out of what respondents describe (Opp. 13, 17) as "millions" who purportedly share the "characteristics that plaintiffs possess" and go to "places that plaintiffs go." Given that ICE processed fewer than 3000 immigration arrests in Los Angeles over a recent six-week period, Appl. 10, the notion that such repeat stops are reasonably likely in a district of 20 million people is irredeemably speculative. And that evidence is even weaker in suggesting that agents would *only* rely on the four prohibited factors—not other factors, like respondents' demeanor when encountering agents or intelligence gathered before enforcement operations—if respondents were, in fact, stopped again.

Quite the contrary, respondents' evidence underscores why being stopped in

the past is not predictive of future stops. Despite touting a "mountain of evidence," Opp. 1 (citing App. 63a), respondents identify just one anonymous person who "'has been stopped by the government twice,'" with no details about the circumstances, Opp. 12 (brackets omitted); see Appl. 22. Respondents point to multiple raids of respondent Viramontes's car wash (Opp. 12), but ignore that Viramontes was detained only once despite agents visiting his workplace multiple times, which refutes respondents' theory (Opp. 11) that agents' visitations of particular "locations multiple times" show a likelihood that respondents will be repeatedly stopped. Likewise, respondents and the lower courts inferred (Opp. 13) that agents relied only on race or ethnicity in detaining workers at a car wash, but observations about the apparent race of who was questioned fail to show that no other factors were considered.

Respondents insist (Opp. 13, 15) that ICE's "officially sanctioned pattern or practice of unlawful behavior" shows they would be detained solely based on the same four prohibited factors as before, since officials supposedly "vowed to continue" acting unconstitutionally. The government denies such a policy exists, see Appl. 8, and Secretary Noem's "vow[]" to continue refers to the government's general commitment to continue enforcing the immigration laws in Los Angeles, not avowed defiance. See Resp. C.A. Stay Opp. 8 & n.5 (citing statement of Secretary Noem).

More fundamentally, however, respondents' argument defies *Lyons*, which held that even if the plaintiff's alleged prior injury—there, a police chokehold imposed "without any provocation or legal excuse whatsoever"—was conducted "pursuant to a City policy," the plaintiff still lacked Article III standing to seek injunctive relief absent credible allegations "that he faced a realistic threat from the future *application* of the City's policy." 461 U.S. at 106 n.7 (emphasis added); see *id.* at 108-109. Alleging an official policy is no showing that *this* plaintiff will be subject to it—

and here, even if there were an official policy of the extremely narrow scope that respondents have inferred, they would need to allege some likelihood that they would be subject to it again when ICE processed some 2800 immigration arrests total (in a district of 20 million) in the six weeks preceding the injunction. See D. Ct. Doc. 94-1, at 4 (July 14, 2025) (Quinones Decl.).

Respondents offer no convincing response to *Lyons*. This Court's decisions in *Allee* v. *Medrano*, 416 U.S. 802 (1974); *Hague* v. *CIO*, 307 U.S. 496 (1939); and *Rizzo* v. *Goode*, 423 U.S. 362 (1976), do not contradict *Lyons*, contra Opp. 15. Neither *Allee* nor *Hague* addressed Article III standing at all. See *Allee*, 416 U.S. at 809-821; *Hague*, 307 U.S. at 500. *Rizzo* found standing lacking for much the same reason it is absent here, and did not suggest that the existence of a governmental policy is sufficient (even if necessary) to support injunctive relief against such a policy, see *Lyons*, 461 U.S. at 103-104 (discussing *Rizzo*). And although respondents attempt (Opp. 15-16) to dismiss *Clapper* based on the absence of evidence there that the plaintiffs' communications were previously monitored under the challenged program, that was just one of several indications that the plaintiffs' theory of harm was impermissibly speculative, see 568 U.S. at 411-414. Past harm alone does not establish future injury in the law-enforcement context, especially when the harm turns on an officer's subjective reasons for a seizure.

Respondents stress (Opp. 14) that the plaintiff in *Lyons* could have avoided future chokeholds by not provoking the police or breaking the law, whereas respondents purportedly cannot do anything to avoid stops. That is irrelevant. *Lyons* rests on the notion that plaintiffs must show a likelihood that they—not other people—will be subject to alleged law-enforcement misconduct in the future. Whether plaintiffs could avoid that likely future harm by modifying their own behavior does not control

the Article III calculus.

Respondents' standing is especially defective because they do not dispute (see Opp. 37) that ICE agents also detain suspected illegal aliens based on *other* permissible factors—meaning that, even if ICE employed the policy that respondents posit, they might not do so if they encountered respondents. Respondents (Opp. 15) say that if the government did not want to rely solely on the four prohibited factors, "it would not be fighting so hard." But the government is fighting hard because it does not want to labor under an unlawful injunction that raises the specter of contempt even when the government relies on additional factors the injunction does not cover. Under *Lyons*, "[i]t is the *reality* of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions." 461 U.S. at 107 n.8.

Respondents cannot establish they will likely face future unlawful stops "merely by aggregating the allegations of different kinds of plaintiffs, each of whom may have claims that are remote or speculative taken by themselves," *ASARCO Inc.* v. *Kadish*, 490 U.S. 605, 615 (1989) (opinion of Kennedy, J.), then claiming that future injury is sufficiently likely because the government is acting on a broad basis, contra Opp. 16-17. Such reasoning "threatens * * * to eviscerate th[is Court's] standing doctrine." *Public Citizen, Inc.* v. *National Highway Traffic Safety Admin.*, 489 F.3d 1279, 1294 (D.C. Cir. 2007) (Kavanaugh, J.). Respondents' reference to "the breadth and the specific nature of the government's actions" (Opp. 17) confirms the self-contradictory nature of their claims. They assert that the government's practices allow it to choose anyone within vast swaths of the population as the subject of a stop, yet insist that they in particular are likely to be caught up in a "dragnet" (Opp. 2) based on those practices.

Nor is there anything "contradictory" about the government's own position.

Contra Opp. 18. The government is not asking for "*definitive[]*" proof that any given plaintiff will be repeatedly subject to "blatantly unconstitutional" raids. *Ibid.* The government asks for a straightforward application of *Lyons*: plaintiffs who want to enjoin future law-enforcement conduct must show a likelihood that they—not someone else—will be subject to the same—not different—conduct in the future. If the police repeatedly raided the same skatepark and each time arrested all of its regular users solely because they were lawfully skating, the government would be hard-pressed to argue that those individuals lacked Article III standing to seek injunctive relief against such arrests, even if future raids were not a certainty. But in a district of 20 million people, where ICE processed fewer than 3000 immigration arrests over a recent six-week period (Appl. 10), any particular respondent's chance of being detained—let alone detained based only on the four factors—is insufficient for standing.

### B. The Injunction Contravenes This Court's Fourth Amendment Cases

The injunction also violates bedrock Fourth Amendment principles. The injunction bars applicants from forming reasonable suspicion based "solely" on four factors, "alone or in combination": "Apparent race or ethnicity"; "Speaking Spanish or speaking English with an accent"; "Presence at a particular location (e.g. bus stop, car wash, tow yard, day laborer pick up site, agricultural site, etc.)"; and "The type of work one does." App. 111a. Respondents do not dispute that reasonable suspicion is a low bar—well below probable cause, which itself requires less than 50-percent confidence. Appl. 23-24; see *United States* v. *Sokolow*, 490 U.S. 1, 7 (1989); *Kaley* v. *United States*, 571 U.S. 320, 338 (2014). Nor do respondents dispute the context: ICE agents are trying to identify some 2 million illegal aliens out of a district population of 20 million, meaning that 1 in 10 people are present unlawfully. This Court's Fourth Amendment jurisprudence forbids courts from categorically ruling out the possibility

that the four factors could provide reasonable suspicion for at least some of the district's 20 million people. These factors plainly *can* support reasonable suspicion in and of themselves in some circumstances—as the government has consistently argued. See, *e.g.*, Gov't C.A. Stay Mot. 16-17; Gov't C.A. Stay Reply 7-9; contra Opp. 18.

1. Respondents attack strawmen. The government is not arguing that "courts can *never* issue injunctions restraining officers from violating the Fourth Amendment," Opp. 18, or that courts can never find *some* facts insufficient to create reasonable suspicion on particular fact patterns, Opp. 21. The problem with this injunction is that it impermissibly treats certain broadly framed factors as categorically insufficient for reasonable suspicion across a wide range of cases. The injunction thus resembles the rule this Court rejected in *Arvizu*, 534 U.S. 266, which broadly deemed factors like a driver's slowing speed and failure to acknowledge a nearby officer as "carr[ying] little or no weight in the reasonable-suspicion calculus," *id.* at 272. The four basic factors at issue here cannot categorically be deemed insufficient to support investigative stops of potentially large numbers of people, least of all where those factors can be highly probative of unlawful presence.

Respondents emphasize (Opp. 20-21) that certain considerations taken in isolation, like a person's apparent ethnicity or presence in a given location, will not alone support reasonable suspicion for an investigative stop. That of course is sometimes true; no one disputes that speaking Spanish alone, for instance, often cannot supply reasonable suspicion. But immigration agents conduct investigative stops based on the totality of the circumstances, see *United States* v. *Brignoni-Ponce*, 422 U.S. 873, 885 n.10 (1975); Appl. 7-8, and that inquiry is not susceptible to categorical rules deeming certain sets of factors per se insufficient for reasonable suspicion across large swaths of a population. Take *Reid* v. *Georgia*, 448 U.S. 438 (1980) (per curiam) (dis-

cussed at Opp. 21), where this Court held the police lacked reasonable suspicion to stop a man at an airport based on his having "traveled from a city known as a source of cocaine; 'arrived in the early morning, when law enforcement activity is diminished'; * * * carried only [a] 'shoulder bag[;]'" and behaved surreptitiously. Opp. 21 (quoting 448 U.S. at 440-441). That holding would not justify an injunction broadly barring police from making airport stops based on a person's city of origin, time of arrival, personal accessories, and demeanor—a rough analogy to what the district court ordered here—because "[e]ven in the discrete category of airport encounters" between police and suspected criminals, "there will be endless variations in the facts and circumstances, so much variation that it is unlikely that the courts can reduce to a sentence or a paragraph a rule that will provide unarguable answers to the question whether there has been an unreasonable search or seizure in violation of the Fourth Amendment." *Florida* v. *Royer*, 460 U.S. 491, 506-507 (1983) (plurality opinion). It is "'seldom'" possible to craft a broad rule to dictate application of the "commonsense, nontechnical" reasonable-suspicion inquiry across even two cases, let alone thousands or millions. *Ornelas* v. *United States*, 517 U.S. 690, 695, 698 (1996) (citation omitted).

2. Respondents similarly mischaracterize (Opp. 20) the government's position as claiming that the injunction prohibits the government from relying on the four factors *at all*, even in combination with other factors. The injunction need not go that far to be impermissible. The fundamental problems are that (1) these factors, in and of themselves, can create reasonable suspicion in at least some circumstances, and (2) the injunction chills immigration enforcement by subjecting every stop to potential contempt proceedings to ascertain which factors the agent used. Appl. 24-30. Respondents assert that the four factors, alone or in combination, can never support

reasonable suspicion because they "amount to nothing more than a 'broad profile.'" Opp. 24 (quoting App. 48a). That argument—like the lower courts' analysis—rests on a basic legal error, artificially raising the bar for reasonable suspicion way beyond "some minimal level of objective justification" for a stop. *INS* v. *Delgado*, 466 U.S. 210, 217 (1984). The notion that some characteristics (like a "particular job type" or location) carry no probative value even if they "attract[] a disproportionate share of people without lawful status," unless the job or location "'exclusively'" or "'predominantly'" attracts illegal aliens, Opp. 24 (quoting App. 47a), would impermissibly elevate the low reasonable-suspicion standard and effectively prohibit stops of anyone who had not already been identified as an illegal alien. Similarly, respondents suggest (Opp. 10-11, 19, 25-28) that if agents may briefly detain U.S. citizens and other lawfully present people, that itself heralds a Fourth Amendment violation. But the reasonable-suspicion standard necessarily contemplates that some lawful stops of innocent people may occur—again, not even probable cause is required. Appl. 23.

Moreover, the fact that certain factors (such as apparent ethnicity) may constitute a broad profile in some contexts does not entail that they do so even "in combination," App. 111a, as respondents insist, Opp. 24-25. Certain of the factors do not constitute a broad profile even in isolation—by its very terms, the injunction refers to "[p]resence at a *particular* location" (listing several discrete examples, like a "tow yard" or "day laborer pick up site") and "[t]he type of work *one* does." App. 111a (emphasis added). Accordingly, the injunction prohibits stops that are grounded in a "particularized and objective basis for suspecting the particular person stopped" of being unlawfully present in the United States, Opp. 23 (quoting *United States* v. *Cortez*, 449 U.S. 411, 417-418 (1981)), even though such a basis is all the Fourth Amendment demands. It does not require "individualized suspicion" based exclusively on

characteristics that are always "independently []suspicious" and that the suspect shares with only a few other people, as respondents posit (Opp. 2-3, 17, 24). On respondents' implausible theory, officers would lack reasonable suspicion to stop a person unable to speak a language other than Spanish and frequenting a storefront advertising jobs for illegal aliens, even though there would be a particularized and objective basis for a stop in those circumstances. Nor is the government extolling racial profiling, contra Opp. 26; this Court's cases recognize that apparent ethnicity can be relevant to reasonable suspicion, especially in immigration enforcement, even though of course race and ethnicity are not categorically dispositive. See, *e.g.*, *United States* v. *Martinez-Fuerte*, 428 U.S. 543, 563 (1976). Ethnicity, like other factors, may be considered as part of the totality of the circumstances.

Respondents (Opp. 10 n.2, 38-39) try to rehabilitate the injunction by claiming that immigration agents' relevant experience is a separate factor that can bring a stop into the lawful zone, outside the injunction's prohibitions. But the lower courts held the opposite. As the court of appeals put it, the injunction restricts reliance upon a person's presence at "a location selected 'because *past experiences have demonstrated* that illegal aliens utilize or seek work at these locations,'" or a person's occupation in a job "that, *in the officers' experience*, is more often performed by illegal immigrants than are other jobs." App. 43a (emphasis added); see App. 47a, 50a n.13, 105a. Even though the Fourth Amendment "permits reliance" on the common sense "of the reasonable officer, developed through her experiences in law enforcement," *Kansas* v. *Glover*, 589 U.S. 376, 395 (2020) (Sotomayor, J., dissenting), the lower courts folded that experience into the four prohibited factors. Appl. 14, 23. At a minimum, the fact that respondents and the lower courts disagree about how to treat a nearly ubiquitous aspect of many stops underscores the perilous unworkability of

this injunction. The government should not have to guess, on pain of contempt, whether officers can conduct stops if they rely on their own experiences as well as one or more of the factors in the injunction.

**C. The Injunction Improperly Covers Millions Of Nonparties**

The scope of this injunction further warrants relief. To benefit five named respondents and some unspecified number of organizational members, the district court enjoined federal officials from treating the four factors as sufficient to stop *anyone* among the 20 million people across the Central District of California. That is textbook universal relief of the kind rejected by *CASA*, 145 S. Ct. 2540, not a "tailored TRO," contra Opp. 40. Otherwise, under the lower courts' and respondents' theory, one or two plaintiffs could always obtain an injunction covering millions of people and vast territory just by contending that law-enforcement officers who operate throughout that region employ an unconstitutional policy or practice. What respondents describe (Opp. 32) as their "rare" case would become commonplace.

Respondents tellingly all but abandon (Opp. 3) the lower courts' defense that the injunction is confined to "a single judicial district"—one that comprises about 20 million people. See App. 53a-54a. Nor do respondents defend the Ninth Circuit's view that it does not matter whether there is a "conceivable injunction that is *more* tailored while providing equal relief." App. 52a. Respondents instead maintain (Opp. 30) that the lower courts adequately considered, and rejected, the notion that a narrower injunction would provide complete relief. But though respondents urge (Opp. 29, 31, 32) deference to the district court's "exercise of its discretion," "factual findings," and "equitable judgment" in support of universal relief, the district court devoted less than a page of its opinion to that issue. App. 96a-97a. The court supported its decision to "enjoin the conduct of all law enforcement engaged in immigration en-

forcement throughout" the entire Central District with the conclusory assertion that effective narrower relief would be a "fantasy" because it would supposedly be too difficult for the government to administer. App. 97a. But "that is initially the National Government's problem, not [the district court's], and [the government] indeed acknowledged that" a party-specific injunction "remains a feasible alternative." *Arizona*, 40 F.4th at 398 (Sutton, C.J., concurring).

Likewise, the court of appeals assumed, based on allegations that officers have previously stopped people without asking their identities first, that no party-specific injunction could possibly rely on such a procedure going forward. See App. 54a-56a. But immigration officers are clearly capable of asking people to identify themselves before engaging in any detentive stop, as respondents' own factual allegations reflect. See ICE, Homeland Sec. Investigations, *Search and Seizure Handbook* 16 (Sept. 14, 2012) (describing agents' consensual encounters and review of identification documents); D. Ct. Doc. 16, at 16 (July 2, 2025) (alleging that people have been stopped "*sometimes* without even being asked for identification") (emphasis added).

Respondents now suggest that it was the government's burden, not theirs, to "make a record showing that a narrower injunction is sufficient to provide party relief here." Opp. 33; see Opp. 31-32. But it is respondents' burden, not the government's, to justify the scope of the injunctive relief sought and to identify parties that face imminent harm absent relief. And it is up to the government, not the district court, to determine whether complying with a properly limited injunction would be too unworkable. See *Arizona*, 40 F.4th at 398 (Sutton, C.J., concurring). That possibility does not excuse the district court's failure to meaningfully consider narrower relief. See *Zepeda* v. *INS*, 753 F.2d 719, 729 n.1 (9th Cir. 1983).

Respondents press (Opp. 33-34) the court of appeals' suggestion in a footnote

that the district-wide injunction "might alternatively be permissible as an exercise of the district court's authority to protect its jurisdiction to address the putative class members' claims, before even 'provisional' class certification." App. 56a n.15. But this Court is "a court of review, not of first view," *Cutter* v. *Wilkinson*, 544 U.S. 709, 718 n.7 (2005), and the lower courts did not pass upon class certification, let alone justify the injunction's scope as necessary to protect the district court's jurisdiction. For good reason: the district court would still retain jurisdiction even under a narrower injunction. And the district court could not appropriately have provisionally certified a class, because Fourth Amendment reasonable-suspicion claims are too fact-specific and context-dependent to satisfy the commonality, typicality, and other requirements to maintain a class action. See Fed. R. Civ. P. 23(a) and (b). Lower courts, including the Ninth Circuit itself, have rejected other Fourth Amendment class actions for that reason. See *Black Lives Matter L.A.* v. *City of Los Angeles*, 113 F.4th 1249, 1258-1262 (9th Cir. 2024). "The premise of the class certification is that one rule applies to all members," but "[b]ecause [Fourth Amendment] reasonableness is a standard rather than a rule, and because one detainee's circumstances differ from another's, common questions do not predominate and class certification is inappropriate." *Portis* v. *City of Chicago*, 613 F.3d 702, 705 (7th Cir. 2010). Far from "an *application* of *CASA*," Opp. 29, the decisions below provide a roadmap for evasion of *CASA* that this Court should not countenance.

**D. The Irreparable Harm To The Government And Other Factors Justify A Stay**

Applicants amply satisfy this Court's remaining criteria for granting a stay.

1. This Court would likely grant a writ of certiorari to review the injunction, no matter that the district court labeled that injunction a TRO. See *Department*

*of Educ.* v. *California*, 145 S. Ct. 966 (2025) (per curiam) (staying TRO); *Trump* v. *JGG*, 145 S. Ct. 1003 (2025) (per curiam) (vacating TROs); contra Opp. 34-35. As the court of appeals recognized, whatever its label, the order is in effect an injunction that is set to last for at least two and a half months, if not longer, see Appl. 12-13, and will irreparably harm the government and public interest for its duration. If respondents can bypass review of such orders just by characterizing them as too short-lived to warrant review, district courts will be emboldened to issue indefinite TROs and ignore Rule 65's 28-day limit, which the district court here has already exceeded. See Fed. R. Civ. P. 65(b)(2).

The three legal issues presented also satisfy the certiorari criteria. All of them involve the court of appeals' resolution, in conflict with this Court's precedents, of important questions involving the Fourth Amendment and the jurisdiction and equitable powers of federal courts. Sup. Ct. R. 10(c). As noted, the lower courts' standing analysis conflicts with *Lyons*; their approval of a categorical framework limiting reasonable suspicion conflicts with a host of Fourth Amendment precedents, such as *Arvizu*; and the injunction's scope defies *CASA*. Other circuits' precedents would also not countenance such a sweeping injunction, least of all one predicated on standing and Fourth Amendment errors. See, *e.g.*, Appl. 24, 26, 29, 32-33. Nor does respondents' pending class-certification motion, see Opp. 35; pp. 15-16, *supra*, preclude this Court's intervention. Even if a class were certified, respondents would still lack standing and the injunction would still egregiously misapply the Fourth Amendment.

2. Respondents' contention (Opp. 36-39) that the injunction inflicts no irreparable harm on the government blinks reality. The injunction hangs the "potent" threat of judicial contempt over applicants' efforts to enforce the immigration laws across the Central District of California. *International Longshoremen's Ass'n* v. *Phil-*

*adelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967). The government's interest in enforcing the immigration laws by detaining and removing illegal aliens is urgent. See *Nken* v. *Holder*, 556 U.S. 418, 436 (2009); *Jennings* v. *Rodriguez*, 583 U.S. 281, 286 (2018). Every day that the district court's injunction remains in effect, that interest is frustrated throughout the most populous judicial district, where some 2 *million* illegal aliens reside. As representatives of ICE and CBP have explained, the injunction has created serious roadblocks for immigration enforcement in the Central District of California and has generated uncertainty over how a court would assess officers' compliance with its terms. See Quinones Decl. 4; D. Ct. Doc. 94-2, at 4 (July 14, 2025).

Respondents insist (Opp. 37) that enforcement can proceed as "long as the government is not relying only on the four factors the TRO lists and there are facts giving rise to reasonable suspicion." But that restriction still bars the government from conducting stops that the Fourth Amendment permits and may be necessary to apprehend illegal aliens; nor is it even clear, as discussed above, what precisely the injunction means. To the extent the injunction does no more than direct applicants to follow the Fourth Amendment, as respondents suggest, that is itself a fatal defect. See *Longshoremen*, 389 U.S. at 74 (rejecting a decree containing "only an abstract conclusion of law"). Respondents say (Opp. 37) the government can revert to an earlier, less robust "mode of enforcement" in the Central District—but that just confirms that the injunction hampers vigorous enforcement of the immigration laws. See *Harlow* v. *Fitzgerald*, 457 U.S. 800, 807 (1982) (noting the "public interest in encouraging the vigorous exercise of official authority") (citation omitted). And respondents' carefully hedged statement (Opp. 39) that they have not yet asked the district court to proceed with additional injunctive orders provides no comfort at all when they have

obtained an injunction opening the doors to reframing every stop as a potential violation of a court order.

Respondents' criticism (Opp. 37) of the government's supposed "slow pace in seeking to displace the TRO" is meritless. The government sought relief from the court of appeals on an emergency basis, see Gov't C.A. Stay Mot. v (requesting relief within four days), and then promptly turned to this Court for relief and requested an immediate administrative stay, Appl. 39 (noting the harms being inflicted "[e]very day that the district court's order remains in effect").

Respondents posit (Opp. 38) that the government's continued efforts to enforce the law consistently with the district court's intrusive injunction preclude a showing of irreparable harm based on the injunction's hindrance of those efforts. An episode last week, however, demonstrates how the injunction casts a pall over continued enforcement efforts no matter the circumstances. Immigration agents carried out an enforcement operation in Los Angeles' Westlake neighborhood on August 6, resulting in the arrests of 16 illegal aliens from Mexico and Central America. See Jesus Jiménez & Orlando Mayorquín, *After Lull in L.A., Agents Grab Migrants at a Home Depot*, N.Y. Times, at A18 (Aug. 8, 2025). The Department of Homeland Security has informed this Office that the operation was not based solely on the four factors enumerated in the injunction, but relied on additional information gathered through an intelligence operation beforehand. Yet one of the respondents here promptly stated "that it was reviewing information about the raid to assess whether agents may have violated the court order." *Ibid.* The district court's injunction establishes a district-wide regime under which every investigative stop of a suspected illegal alien—even stops that result in arrests of proven illegal aliens—opens the door to potential contempt proceedings. The chilling effect on robust immigration enforcement is obvious.

3. Finally, respondents drastically overstate (Opp. 39-40) their own interest in keeping the district court's injunction in place. Consistent with the sensationalist rhetoric throughout, respondents refer (Opp. 40) to unproven allegations of "violent" seizures, even though the injunction does not even purport to regulate the manner in which investigative stops are carried out. And respondents wrongly dismiss (*ibid.*) the long-recognized deterrent effect that potential "case-by-case adjudication" of meritorious Fourth Amendment claims—the normal means of adjudicating such claims—has on potential Fourth Amendment violations by law-enforcement officers.

For decades, the immigration laws have gone underenforced in the Central District of California, prompting some 2 million illegal aliens to remain there unlawfully. Any effort to intensify immigration enforcement in the district is bound to be contentious. "A federal court, however, is not the proper forum to press such claims unless the requirements for entry and the prerequisites for injunctive relief are satisfied." *Lyons*, 461 U.S. at 111-112. They have not been satisfied in this case. This Court should stay the district court's injunction and halt the lower courts' misplaced attempt to seize control of immigration enforcement in the Central District.

* * *

For the foregoing reasons and those stated in the government's application, this Court should stay the district court's July 11 order.

Respectfully submitted.

D. JOHN SAUER
*Solicitor General*

AUGUST 2025