# Exhibit 22

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

DREW C. ENSIGN
Deputy Assistant Attorney General

TIBERIUS DAVIS
SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney General

JONATHAN K. ROSS
Senior Litigation Counsel
STEPHANIE L. GROFF
JASON K. ZUBATA
ANIELLO DESIMONE
JACOB A. BASHYROV
Trial Attorneys
Office of Immigration Litigation
Civil Division, U.S. Dept. of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 616-3477
Email: Jacob.Bashyrov@usdoj.gov

BILAL A. ESSAYLI
Acting United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
DANIEL A. BECK
Assistant United States Attorney
Chief, Complex and Defensive Litigation Section
ALEXANDER L. FARRELL (SBN 335008)
PAULINE H. ALARCON (SBN 345785)
Assistant United States Attorneys
Federal Building, Suite 7516
300 North Los Angeles Street
Los Angeles, California 90012
Telephone: (213) 894-5557 | 3992
E-mail: Alexander.Farrell@usdoj.gov
Pauline.Alarcon@usdoj.gov

*Counsel for Defendants*

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

PEDRO VASQUEZ PERDOMO; *et al.*,

Plaintiffs,

v.

KRISTI NOEM, in her official capacity as Secretary of Homeland Security; *et al.*,

Defendants.

No. 2:25-cv-05605-MEMF-SP

**DEFENDANTS' SUPPLEMENTAL OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION (Fourth Amendment Claim) [ECF 128]**

Hearing Date: September 24, 2025
Hearing Time: 9:00 a.m.
Location: First Street Courthouse
350 West First Street
Los Angeles, CA 90012
Courtroom 8B
8th Floor

Hon. Maame Ewusi-Mensah Frimpong
United States District Judge

Plaintiffs return with more paper, not more proof. Their supplement to their motion for preliminary injunction ("Supplement") adds only anecdotal declarations, social-media clips, and a handful of press clippings to the record. What the Supplement does not contain is any evidence of systemic Fourth Amendment violations or noncompliance with this Court's July 11 Order. ECF 87 ("TRO"). Plaintiffs' own declarants give the game away: they acknowledge that no raids took place at Los Angeles-area sites in the weeks after the TRO. *See* ECF 163-1 ¶¶ 3-4; ECF 163-2 ¶¶ 3-4. That lull, record of targeted operations, status checks, and prompt releases of individuals whose immigration status was verified undercuts any claim of a continuing, officially sanctioned practice of indiscriminate unconstitutional stops and detentions. If anything, Plaintiffs' seriatim filings demonstrate the irreparable harm to the government and how untenable it is to have courts review every immigration enforcement operation ex post. Nor does Plaintiffs' flurry of new declarations transform speculation into likelihood, nor unauthenticated screenshots into evidence. *Winter* requires proof of likely success and irreparable harm, not repetitive conjecture. 555 U.S. 7, 22 (2008); *Herb Reed Enters. v. FEM*, 736 F.3d 1239, 1250 (9th Cir. 2013) (requiring evidence, not presumptions, of irreparable harm to obtain injunctive relief). Compiling anecdotes from different places, dates, and teams cannot establish the "real and immediate" threat needed for forward-looking relief. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 101-11 (1983).

All the Supplement shows is compliance: individualized, time-and-place-specific encounters; brief investigative stops resolved upon status verification; and releases when lawful status is confirmed. The rest—unauthenticated video snippets and third-hand descriptions—fails Rules of Evidence 901 and 403 at the threshold, and, even if considered, merits no weight. Unable to meet the *Winter* factors, Plaintiffs instead ask the Court to supervise every immigration stop district-wide—an overbroad "obey-the-law" injunction. The Court should reject the Supplement, deny the motion, and limit any relief to the parties to this litigation. *See Reno v. AADC*, 525 U.S. 471, 491-92 (1999) (dismissing challenges that rely solely on speculation that enforcement actions were discriminatory or unconstitutional without evidence of misconduct and reiterating limited judicial review over immigration enforcement discretion).

## I. DHS' Immigration Enforcement Since July 11 Does Not Violate the TRO

On July 11, 2025, this Court enjoined what the Fourth Amendment already forbids: stopping individuals absent reasonable suspicion. ECF 87. The Court then went beyond the requirements of the

Fourth Amendment and barred agents from relying on four enumerated factors to form reasonable suspicion, **whether considered singly or collectively without more**: (i) apparent race or ethnicity; (ii) speaking Spanish or English with an accent; (iii) presence in certain locations; and (iv) type of work performed. *Id.* at 50-51. But even adopting this Court's view of the Fourth Amendment *arguendo*, Plaintiffs fail to demonstrate a Fourth Amendment violation, nor a likelihood of one.[1] Plaintiffs' attempts to establish both a violation of the Fourth Amendment and the TRO fail for four principal reasons. First, after this Court issued its TRO, DHS promptly provided updated guidance to its field offices and agents requiring compliance. Second, consistent with DHS's pre-TRO practice, agents conduct targeted investigations based on reasonable suspicion consistent with Fourth Amendment requirements. Field agents engage in consensual encounters, arrests, and *Terry* stops, all in compliance with constitutional requirements. And every challenged stop involved additional facts beyond the four enumerated factors. So, there is no basis to conclude that past or future stops violate the Fourth Amendment. Third, Plaintiffs' bear the burden of making a "clear showing" that they are entitled to relief. *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). Plaintiffs' supplemental evidence is long on guesswork and short on facts. Their declarants spin theories about why they were stopped, but they neither know—nor could possibly know—what officers actually observed when initiating those encounters. That cannot justify broad relief.

**A. DHS Promptly Provided Guidance to Field Offices and Agents**

Contrary to Plaintiffs' unsupported suggestions that Defendants ignored the TRO, ECF 163 at 4-5, DHS promptly provided guidance to field offices and agents concerning the TRO to ensure compliance while maintaining effective immigration enforcement. Indeed, as explained in Defendants' evidence, U.S. Customs and Border Protection ("CBP") informed agents that they are prohibited from considering apparent race or ethnicity, speaking Spanish or speaking English with an accent, presence at a particular

---

[1] Defendants maintain and incorporate their legal arguments from their initial preliminary injunction opposition. ECF 170. Defendants do not rehash those arguments here but instead focus on the specific evidence presented. Even so, defendants reiterate their position that ethnicity remains a relevant factor in immigration investigations, particularly when targeting locations where individuals who are illegally in the United States work or seek employment. In *United States v. Brignoni-Ponce*, 422 U.S. 873, 886 (1975), the Supreme Court sanctioned reliance on ethnic appearance to support an investigatory stop based on the demographic link between Mexican ethnicity and alienage. The Ninth Circuit in *United States v. Montero-Camargo*, 208 F.3d 1122, 1133-34 (9th Cir. 2000) (in banc), clarified that ethnicity's probative value depends on the local demographic context. Taken together, these cases establish that ethnicity, combined with other facts, can form part of particularized suspicion in investigations involving locations known for employing unauthorized individuals.

location, or occupation alone or in combination without other specific articulable facts. Parra Decl., ¶¶ 7, 10-13. ECF 94-2, Parra Decl. ¶¶ 7, 9; Molina Decl. ¶ 4. DHS ensured agents in the Los Angeles operation received proper training and resources to interpret and apply the TRO and addressed ambiguous provisions which have created operational challenges and confusion in the field. Parra Decl., ¶¶ 8, 11, 13-14. The guidance emphasized that agents must apply their specialized training and expertise to develop reasonable suspicion based on a comprehensive assessment of behavioral indicators, intelligence, and situational factors, consistent with constitutional requirements and agency policy. Parra Decl., ¶¶ 11-13. This timely field guidance reflects DHS's commitment to conducting immigration enforcement lawfully and effectively, despite complexities arising from the Court's injunction. Parra Decl., ¶¶ 4, 21. The guidance pursuant to the TRO is in addition to rigorous, Ninth Circuit-specific training ICE's Los Angeles Enforcement and Removal Operations ("ERO") receives that includes comprehensive instruction on reasonable suspicion and probable cause. ECF 74-1, Quinones Decl. ¶¶ 4-6; ECF 94-1, Quinones Decl. ¶ 5; ECF 170-1, C217 Decl. ¶ 2; ECF 170-2, Parra Decl. ¶ 4.

**B. Plaintiffs Fail to Identify Any Encounters That Are Unlawful Under the Fourth Amendment or the TRO**

The allegedly unlawful stops, attached to Plaintiffs' Supplement, ECF 163-1 through 14, fall into three distinct categories of encounters—consensual encounters, arrests, and *Terry* stops premised on additional facts—that do not violate the Fourth Amendment or the Court's TRO. The four declarants Plaintiffs identified by name[2] describe encounters that, viewed under the totality of the circumstances, reflect compliance with the TRO. Each account involves additional, case-specific facts beyond the four enumerated factors and thus cannot establish reliance "solely" on those factors.

First, many encounters constitute consensual encounters, which do not amount to seizures under the Fourth Amendment. *See United States v. Mendenhall*, 446 U.S. 544, 553-54 (1980). Agents often approach and question individuals without physical restraint or coercion—typical examples include consensual questioning at job centers and marketplaces. ECF 71-1, Quinones Decl., ¶ 9; ECF 94-1, Second Quinones Decl., ¶ 5; ECF 170-1, C217 Decl., ¶¶ 5; ECF 170-2, Parra Decl., ¶¶ 9-14.

[2] Notwithstanding Plaintiffs' unilateral redactions—which limit the present record—the four named declarants show no violations of the TRO; their accounts reflect totality-based, TRO-compliant practices. Defendants reserve all objections and the right to supplement as identities, sources, and context emerge.

Second, even if the encounters were not consensual, they amount to *Terry* stops (*Terry v. Ohio*, 392 U.S. 1 (1968)) supported by specific articulable facts beyond the mere presence or appearance of the individuals. The Fourth Amendment allows federal immigration agents to perform "brief investigatory stops of persons or vehicles" when "the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot." *Arvizu*, 534 U.S. at 273 (citations omitted). In forming reasonable suspicion, the agent is entitled to draw upon personal experience and specialized training and to make inferences from and deductions about the cumulative information available to him that "might well elude an untrained person." *Id*. (citation omitted). The Fourth Amendment's reasonable suspicion standard is inherently individualized and context-specific, allowing law enforcement officers to consider a wide range of articulable facts and rational inferences under the totality of the circumstances. Supreme Court precedent indicates that stops need only be supported by specific and articulable facts that warrant suspicion of unlawful presence, a standard far lower than probable cause. *See Brignoni-Ponce*, 422 U.S. at 880, 885-86; *United States v. Sokolow*, 490 U.S. 1, 7 (1989). For example, officers may lawfully rely on knowledge about locations with histories of employing undocumented workers or occupations that attract such workers as part of forming reasonable suspicion. *See United States v. Montero-Camargo*, 208 F.3d 1122, 1138 (9th Cir. 2000) (en banc); *Maldonado v. Holder*, 763 F.3d 155, 161 (2d Cir. 2014). Given the enforcement context in this District and agents' location-specific experience, considering time-and-place indicators, job-site patterns, and language ability—and, consistent with *United States v. Brignoni-Ponce*, 422 U.S. 873, 885-86 (1975), apparent ethnicity as a corroborating factor among others—within a totality-of-the-circumstances analysis is neither per se unreasonable nor unconstitutional.[3]

Third, the encounters only turned into arrests after additional evidence from the consensual encounter or *Terry* stop provided probable cause that the individuals were violating immigrations laws. *See* 8 U.S.C. § 1357(a) (an officer is authorized to make a warrantless civil arrest of any alien in the United States if he has "reason to believe" that the alien is in the United States in violation of immigration law and "is likely to escape before a warrant can be obtained for his arrest."); *Tejeda-Mata v. INS*, 626

[3] Against this backdrop—approximately 27% of California residents are foreign-born, credible estimates place the unauthorized share around 10% (with some estimates 15-20%), and Latin America is the predominant region of origin—considering these contextual factors, alone or in combination, is not per se unreasonable or unconstitutional. *See* Public Policy Institute of California, *Immigrants in California* (May 2025), at https://www.ppic.org/publication/immigrants-in-california.

F.2d 721, 725 (9th Cir. 1980) ("The phrase 'has reason to believe' has been equated with the constitutional requirement of probable cause.").

All of Plaintiffs' evidence reflects encounters that fall into these constitutional buckets. To start, on August 6, 2025, the Border Patrol ran a targeted operation at the Westlake Home Depot based on intelligence, resulting in several encounters. Molina Decl., ¶ 12. Miguel Angel Tijerino Garmendia described a driver in a yellow Penske truck soliciting work from individuals outside of a Home Depot. ECF 163-6, Garmendia Decl., ¶ 5. The driver was, in fact, an undercover immigration enforcement officer, initiating consensual contact. *See INS v. Delgado*, 466 U.S. 210, 216-18 (1984); *Florida v. Bostick*, 501 U.S. 429, 434 (1991); Garmendia Decl., ¶¶5. The subsequent arrests occurred only after planning, coordination, and by relying on factors including acceptance of transport under the ruse of offering wages for labor, proximity to the designated load area, operation-specific intelligence, and individualized officer observations at the moment of detention. *See Arvizu*, 534 U.S. at 273; Quinones Decl. ¶¶ 6, 9; Parra Decl. ¶¶ 8-13. As Parra explains, agents asked about status only after detention and promptly released individuals who established lawful status. *See* ECF 170-2, Parra Decl. ¶¶ 10-13; Molina Decl., ¶ 12.

On August 7, 2025, CBP conducted a targeted operation at the San Bernardino Home Depot based on actionable intelligence about specific individuals and their immigration status associated with that location. Molina Decl., ¶ 13. Juan Francisco Aparicio Saldana, who was at that location, acknowledges that he ran when agents arrived. ECF 163-9 ¶¶ 7-9. Molina Decl., ¶ 13. Unprovoked flight in the presence of officers is a pertinent factor supporting reasonable suspicion. *See Illinois v. Wardlow*, 528 U.S. 119, 124-25 (2000). And combined with time, place, and contemporaneous observations, it justified a *Terry* stop that complied with the TRO. *Id*.

Next, prior to August 22, 2025, CBP gathered intelligence identifying specific individuals working at Pasadena Car Wash without lawful status. Molina Decl., ¶ 15. Upon CBP's arrival, all six individuals who were initially detained either fled or hid. *Id*. Inoel Zapata Santiago reports he is a lawful permanent resident who was briefly detained at Pasadena Car Wash while officers verified his status—according to him, the whole encounter "took about 30 minutes." ECF 163-11 ¶¶ 3-10; *see also* Molina Decl., ¶ 16 (corroborating the stop and the fact that Mr. Santiago was released after a short stop). A short investigative detention to confirm identity and immigration status during an active operation is

permissible when supported by articulable facts and promptly terminated upon verification. *See Hiibel v. Sixth Jud. Dist. Ct.*, 542 U.S. 177, 185 (2004); *Delgado*, 466 U.S. at 218. The rapid release here is consistent with the officers undertaking a brief, fact-based inquiry that ended as soon as his lawful status was confirmed. *See Hiibel*, 542 U.S. at 186.

Angelica Salas states she encountered agents who briefly engaged her with consensual questions during an ongoing operation and, after she confirmed her lawful status, she was released. ECF 163-12 ¶ 2. The encounter was brief, incident-specific, and resolved upon status verification, consistent with DHS guidance and practice to avoid stops based solely on the enumerated factors and to release individuals upon confirmation of lawful status. *See* Parra Decl. ¶¶ 7, 10-13. In each instance, additional facts—ruse acceptance and proximity, unprovoked flight, and prompt status verification and release—defeat Plaintiffs' theory that officers relied solely on race, language, location, or occupation.[4]

Plaintiffs also submitted four declarations from individuals identified only by their initials: ECF 163-4, Declaration of S.C.C.H. ("S.C.C.H. Decl."); ECF 163-10, Declaration of J.R.R. ("J.R.R. Decl."); ECF 163-5, Declaration of E.K.Z.L. ("E.K.Z.L. Decl."); and ECF 163-7, Declaration of C.C. ("C.C. Decl."). These declarations align with those previously submitted by the named individuals. Specifically, S.C.C.H., J.R.R., and E.K.Z.L. each describe encounters with federal agents who questioned them regarding their immigration status and either released them or detained them for further verification. C.C., by contrast, was present only as a witness.

On August 3, 2025, Border Patrol Agents conducted an immigration enforcement operation at Paramount Home Depot. Molina Decl., ¶ 9. S.C.C.H. reports that he encountered the agents. S.C.C.H. Decl. ¶¶ 5–6. Agents approached S.C.C.H. and consensually asked him questions in an open and public space. Molina Decl., ¶¶ 9. The agents did not impede S.C.C.H.'s means of exit and he was free to leave. *Id.* After agents confirmed that his visa had expired, he was arrested. S.C.C.H. Decl., ¶¶ 7–11.

---

[4] Plaintiffs' declarations present a one-sided narrative and omit officer-safety facts from field operations. Many of these encounters began as consensual contacts and escalated only after subjects resisted or interfered. For example, on July 21, 2025, during a targeted action to apprehend an individual previously removed who had reentered unlawfully, the target threw hot coffee at an officer and fled; while establishing a perimeter, an officer then encountered G.V.C., who admitted he lacked lawful status and was processed accordingly. ECF 170-3, Quinones Decl. ¶ 9. Other recent operations likewise involved resistance and interference, including: a non-compliant driver who kicked an officer during a traffic stop; a subject who refused commands and pushed officers; a subject who resisted arrest while his spouse assaulted an officer; a subject who fled and then pushed officers; and a subject who became combative during arrest. *Id.* ¶¶ 17-21.

Next, Border Patrol Agents were provided with intelligence that multiple individuals at Magnolia Car Wash were known illegals. Molina Decl., ¶ 11. E.K.Z.L. states that on August 5, 2025, while washing cars at the Magnolia Car Wash, he was approached by agents. He freely spoke to agents in a public place. E.K.Z.L. Decl., ¶ 7; Molina Decl., ¶ 11. After determining that he was present in the country unlawfully, the agents arrested him. E.K.Z.L. Decl. ¶¶ 3–10; Molina Decl., ¶ 11. Similarly, J.R.R. attests that he was approached by agents at the Culver City Car Wash, and he started to "move away." J.R.R. Decl., ¶ 5; Molina Decl., ¶ 14. J.R.R.'s declaration, however, obfuscates the fact that he attempted to flee from the agents, ignored their commands to stop, but eventually was apprehended. Molina Decl., ¶ 14. Once officers verified his immigration status, J.R.R. was arrested. J.R.R. Decl. ¶¶ 3–10.

Unlike the others, C.C. was not interrogated or detained but merely observed the agents questioning and arresting others. C.C. Decl. ¶¶ 4–10. On August 6, 2025, she was at the corner near the Westlake Home Depot, a location where street vendors and day laborers regularly congregate. According to her, the individuals present were predominantly from Mexico or Guatemala. C.C. Decl. ¶¶ 3–4.

Plaintiffs' evidence falls well short of demonstrating any constitutional violation. Instead, the declarations confirm that agents initiated contact in a peaceful and routine manner, consistent with standard enforcement practices. To the extent encounters escalated, it was because the individuals themselves responded with hostility or, more often, because they admitted to being in the country unlawfully. For example, S.C.C.H. does not dispute that agents only asked about his immigration status, that he voluntarily disclosed his visa had expired, and was subsequently detained. *Compare* Molina Decl. ¶¶ 9-10, *with* S.C.C.H. Decl. ¶ 8. Similarly, E.K.Z.L.'s declaration provides no account contradicting DHS's evidence; it omits details about what was said, but even his version confirms that agents detained him only after he disclosed his immigration status. *Compare* Molina Decl. ¶ 11, *with* E.K.Z.L. Decl. ¶¶ 3–10. In both instances, the declarations corroborate that detention resulted directly from the individuals' own admissions, not from any overreach by agents.

Far from being a "smoking gun," Plaintiffs' evidence reinforces the government's account: that agents conduct professional, courteous interactions, and that detentions occur only when lawful grounds exist—namely, an individual's acknowledgment of unlawful status. These incidents represent a small fraction of the Department's daily interactions. In the overwhelming majority of cases, individuals

provide documentation and proceed without incident. Ultimately, Plaintiffs' real grievance lies not with unconstitutional conduct, but with the fact that immigration laws were enforced against individuals who admitted they were unlawfully present. The constitutional standard under the Fourth Amendment requires reasonable suspicion or probable cause to justify detention. That requirement was met here, as the detentions flowed *directly* from the individuals' own disclosures. Accordingly, Plaintiffs have failed to establish any evidence of unlawful government conduct.

## II. Plaintiffs' Supplement Does Not Cure Organizational Standing Defects

Associational standing requires an organization to demonstrate, among other things, that its members "would otherwise have standing to sue in their own right" and that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 398 (2024) (Thomas, J., concurring) (quoting *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). Plaintiffs' own declarants identify no continuing policy and instead show individualized, time- and location-specific encounters—a set of facts antithetical to organizational standing. Here, the organizational-Plaintiffs fail to meet the threshold for standing because, like the individual Plaintiffs, the alleged risk of future harm to their members is speculative and lacks the concrete, particularized injury required for Article III standing. *See id*. at 381 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). Without nonspeculative allegations of injury to identified members, the organizations lack standing altogether.

### A. Fourth Amendment Rights are Personal, Not Assertable by Organizations

It is well-established that Fourth Amendment rights are personal and may not be vicariously asserted by organizations on behalf of their members. *Alderman v. United States*, 394 U.S. 165, 174 (1969); *see also Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978). This principle extends beyond suppression motions to section 1983 claims based on constitutional violations. *See Knife Rts., Inc. v. Vance*, 802 F.3d 377, 387 (2d Cir. 2015); *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1111 (9th Cir. 2001). Fourth Amendment claims involve highly fact-specific inquiries that are unsuitable for organizational standing or class actions. *In Black Lives Matter L.A. v. City of Los Angeles*, 113 F.4th 1249, 1258-62 (9th Cir. 2024), the Ninth Circuit held that excessive force claims—including claims involving the use of tight handcuffs—turn on individual facts and witness credibility, making class-action treatment

inappropriate. For this reason alone, Plaintiffs' attempt to assert Fourth Amendment rights on behalf of unidentified members fails.

**B. LAWCN and CHIRLA Face No Imminent Threat to Members**

LAWCN and CHIRLA lack associational standing because they fail to show an imminent, concrete injury to their members as required by the Supreme Court. Organizational standing demands specific, identifiable injuries rather than generalized fears or statistical probabilities. *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). The supplemental declarations merely rehash past harms and speculative threats to unnamed members. Without such proof, generalized, speculative harm allegations cannot satisfy Article III standing requirements. *Summers*, 555 U.S. at 498.[5]

The CLEAN Carwash Worker Center's Executive Director recounts an unnamed member was briefly questioned twice at Magnolia Car Wash but was not arrested. ECF 163-2, Third Melendrez Decl. ¶ 7. Similarly, CHIRLA's Executive Director describes one member questioned about her immigration status and another arrested, without showing these encounters lacked reasonable suspicion. ECF 163-12 ¶¶ 2-3. These accounts do not establish the required "concrete injury," nor do they refute that the stops were based on reasonable suspicion considering the totality of the circumstances. Mere "belief" unsupported by evidence fails to meet the Supreme Court's clear showing standard for standing.

Further, Maegan Ortiz, Executive Director of IDEPSCA, reports that DHS conducted raids at three Home Depot locations more than once starting August 3, 2025, with agents "grabbing as many people as they can, often without asking any questions." ECF 163-1 ¶¶ 4-7. Yet the only identified detained individual with lawful status was released and no raids occurred at these centers between July 11 and August 2. *Id.* Similarly, Flor Melendrez, Executive Director of CLEAN, documents over 20 raids at car washes, including stops of workers described as "grabbed" or "surrounded." ECF 163-2 ¶¶ 6-10. But the referenced incidents primarily recount brief field contacts with unidentified non-members or lawful permanent residents who were released, not concrete injury to an identified member. *Id.* Other

[5] UFW did not submit any new declarations in support of supplement to PI motion.

declarations reflect isolated encounters—such as a CHIRLA member briefly questioned without arrest, ECF 163-12 ¶ 2—falling short of a concrete, particularized injury or a constitutional violation.

**III. Plaintiffs' Social-Media Videos Are Inadmissible Under the Federal Rules of Evidence**

Plaintiffs' social-media videos are inadmissible under Rule of Evidence 901(a), which requires "evidence sufficient to support a finding that the item is what the proponent claims it is." Authentication cannot rest on the mere existence of a video or screenshot; a foundation showing authenticity and integrity is required. *See United States v. Farrad*, 895 F.3d 859, 879-80 (6th Cir. 2018); *United States v. Browne*, 834 F.3d 403, 412 (3d Cir. 2016). Even if considered, their probative value is outweighed by risks of prejudice and misleading impressions from cropped clips lacking context. Fed. R. Evid. 403.

First, Plaintiffs offer no chain of custody; without it, videos are vulnerable to alteration or tampering. *See McHale v. Crown Equip. Corp.*, 2022 WL 4350702, at *4 (11th Cir. Sept. 20, 2022); *United States v. Vayner*, 769 F.3d 125, 132-33 (2d Cir. 2014). Second, they present no witness with knowledge to authenticate the clips under Rule 901(b)(1). Third, the videos contain hearsay overlays and captions, and in some instances hearsay-within-hearsay. Fed. R. Evid. 801-802. Accordingly, the videos should be excluded or, at minimum, given no weight. *See Vayner*, 769 F.3d at 133 (finding that authentication of a web page requires sufficient evidence beyond a witness's mere testimony to allow a factfinder to conclude the page is what it purports to be; absent such a showing, the evidence should be excluded). In addition, these videos do not establish that any detention was conducted without reasonable suspicion. They merely demonstrate that agents were engaged in immigration enforcement.

## CONCLUSION

For the reasons here and in Defendants' opposition, ECF 170, the Court should deny Plaintiffs' motion for preliminary injunction.

Dated: September 4, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

DREW C. ENSIGN
Deputy Assistant Attorney General

TIBERIUS DAVIS
SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney General

JONATHAN K. ROSS
Senior Litigation Counsel

STEPHANIE L. GROFF
JASON K. ZUBATA
ANIELLO DESIMONE
Trial Attorneys

*/s/ Jacob A. Bashyrov*
JACOB A. BASHYROV
Trial Attorney
Office of Immigration Litigation
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 616-3477
Email: Jacob.Bashyrov@usdoj.gov

*Counsel for Defendants*

## L.R. 11-6.2 CERTIFICATE OF COMPLIANCE

The undersigned counsel of record certifies that this filing is less than ten pages, which complies with the Court's Order on the parties' joint stipulation, ECF No. 160 ¶ 4.

Dated: September 4, 2025

Respectfully submitted,

*/s/ Jacob A. Bashyrov*
JACOB A. BASHYROV
Trial Attorney
Office of Immigration Litigation
U.S. Department of Justice

*Counsel for Defendants*