# Exhibit 24

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Pedro VASQUEZ PERDOMO, et al.,<br>Plaintiffs,<br>v.<br>KRISTI NOEM, IN HER OFFICIAL CAPACITY AS SECRETARY OF HOMELAND SECURITY, et al.,<br>Defendants. | Case No. 2:25-cv-05605-MEMF-SP<br><br>**DECLARATION OF BORDER PATROL AGENT C217** |

**DECLARATION OF BORDER PATROL AGENT C217**

I, Border Patrol Agent C217, declare and affirm that the following is true to the best of my knowledge, recollection, and belief:

1. I am employed by U.S. Border Patrol, an operational division of U.S. Customs and Border Protection (CBP) within the Department of Homeland Security (DHS). My STAR number is C217, which is a unique identifier. CBP is charged with enforcing the Nation's immigration laws in order to protect national security and uphold the integrity of the immigration system. As part of my official duties, I am responsible for enforcing the immigration laws of the United States in accordance with the Constitution, as well as applicable statutes and regulations. This includes preventing the unlawful entry of individuals into the United States, apprehending those who attempt to enter illegally, and addressing violations of immigration laws. These efforts aim to secure the border, combat human smuggling and trafficking networks, and ensure consistent enforcement of the immigration laws of the United States.

2. I am a Border Patrol Agent (herein referred to as BPA) of the El Centro, California Sector and have been in this position since July 2016. I entered on duty with

the U.S. Border Patrol in 2011 and was assigned to the Tucson Sector-Nogales Station prior to my current assignment. As part of my duties as a BPA, I receive operational and legal training throughout the year. For instance, I have received legal training regarding the Fourth Amendment on numerous occasions, including training within CBP and training by U.S. Attorneys.

3. On June 6, 2025, to support U.S. Immigration and Customs Enforcement (ICE), BPAs were deployed to Los Angeles, California, area as part of a multi-agency operation focused on enforcing immigration law and enhancing public safety, called Operation at Large. I was in Los Angeles from June 11 to June 15, 2025 to support this operation.

4. On June 12, 2025, at approximately 3:00 to 4:00 PM, four BPAs, including myself, were assisting with Operation at Large. We were assigned to conduct consensual encounters at 1537 W. Olympic Blvd in Montebello, California. I understand consensual encounters to be interactions where individuals are free to walk away, or decline to answer questions and terminate the encounter. We were directed to that location via radio from our intelligence group. I was dressed in green cargo pants, a black long-sleeved shirt, face mask, and a green armor vest that says "US Border Patrol - Federal Agent" on the back of the vest. The front of my vest also has patches that state "US Border Patrol" and identify me as a BPA.

5. 1537 W. Olympic Blvd in Montebello, California is a vehicle tow yard and auto mechanic business. As I exited the vehicle, I observed an open fence door with green plastic tarp covering the fence around the tow yard. I walked into the business through the open fence door and scanned the vehicle tow yard for any individuals to engage in a consensual discussion regarding their immigration status. I observed that dozens of cars were parked closely together in the tow yard, making it very difficult to clearly see anyone. I also observed that upon entering the tow yard, an individual ran from the yard into a small building, and another person darted between vehicles seemingly in an attempt to evade us. We could not assess how many people were within the tow yard and

whether they might be hostile or aggressive. I observed a tall male that was working on a vehicle with the car hood up and the vehicle running. I walked over to him and asked if I could speak with him. I then asked what country his is a citizen of and he replied "Mexico" and looked down and did not make eye contact with me. I asked whether he had any immigration documents he could present to me regarding his status in the U.S. and he continued to look down to the ground and not make eye contact. I then asked if he was here illegally and he mumbled "uh huh." He then put one of his hands behind his back as if to indicate that I should arrest him, so I contacted the other agents and informed them that I was going to handcuff and detain the individual. I waited inside the tow yard with the subject and called via radio to arrange to transport the subject for further immigration processing and detention.

6. As I was guarding the arrestee, two other Agents had another person (later identified as Javier Ramirez, a US citizen) on the ground and they were attempting to handcuff him. I asked the subject I was holding for transport to take a knee so I could monitor the other agents and assist them with Ramirez if necessary because there were no additional agents inside the tow-yard who could provide assistance. I called out to the Agents who were holding Ramirez to "watch your 6," which means to watch their backs in case there were other members of the public we could not see that might interfere with our efforts. While I did not see the initial encounter between Mr. Ramirez and the other two Agents, when I turned my attention to them, I observed that Mr. Ramirez, even though on the ground, was actively resisting arrest and it required both Agents to handcuff him. I found out later that Javier Ramirez had bitten one of the Agents in the leg.

7. As the other Agents were arresting Mr. Ramirez, another Agent exited the tow yard through the open fence door to investigate the activities on the street. Less than a minute later, I heard that Agent yell out to us "somebody get out here" and then a few seconds later, the Agent specifically yelled for me, by name, to get out there. Due to the

urgency in his voice, I thought that Agent was in trouble. I have worked with this Agent for over 8 years and never heard him call for help in such an urgent tone. Given his tall height and stature, he generally does not need assistance when being confronted by individuals. He was also carrying his M-4 rifle at the time, which is very visible because of its size. Based on my prior experience working with him and unfolding events, I believed he was under physical threat. I asked another Agent to watch over the individual I had arrested so that I could assist the Agent who had yelled for help and/or assistance.

8. When I stepped out the gate, I observed a crowd of approximately 10 people starting to move closer and yelling out various curse words towards us. I also observed an individual standing just a few feet away from the Agent, who was later identified as Brian Gavidia. Due to the close proximity of Mr. Gavidia to the Agent and the fact that I believed that the Agent was under physical threat, I placed my hands on Mr. Gavidia, turned him around, and placed him up towards the fence holding one of his arms behind his back for my safety. I did not ask Mr. Gavidia any questions at this point. He volunteered to me that he was American, so I asked what hospital he was born in. He stated he did not remember which hospital. He stated again he was a U.S. Citizen. I asked him what state he was born in and he said "here, East L.A." He then indicated he had an ID and kept stating, "let me show you my shit."

9. After less than a minute of conversation, I allowed Mr. Gavidia to turn around, unrestrained, to get his ID out from his wallet. As this was happening, the crowd came right up to us and telling us "to get the fuck out of here", and "we are all U.S. Citizens bitch." The crowd was preventing me from being able to continue to ask questions and check Mr. Gavidia's identification. At about this point, the other Agents brought Mr. Ramirez out onto the street to await transport. At that time, Mr. Ramirez stated, "I am a U.S. Citizen, are you supposed to do that shit?" and "I've got my fucking passport." While Mr. Ramirez tried to get this documentation, another man pushed an Agent, which

making threatening gestures, and clenching fists. This caused some members of the crowd, including Mr. Gavidia, to try and hold back some of the aggressive crowd members. Other Agents and I were yelling to the crowd to calm down and stand back. At one point, I had to take out and show my OC Spray and threaten to spray it, if they kept getting too close and making threatening gestures. I was unable to verify the citizenship of Mr. Gavidia due to chaos and danger presented by the crowd, which diverted my attention.

10. During the chaotic scene with the crowd, and the attentions of all the Agents diverted, the individual I had handcuffed was able to abscond.

11. Mr. Ramirez was transported to a detention center to ascertain his immigration status and for presentation for prosecution for assault on a federal officer. Mr. Gavidia was left at the tow yard.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my information, knowledge and belief.

Executed this 27th day of August, 2025.

C-217

Border Patrol Agent C217