# Exhibit 29

BRETT A. SHUMATE
Assistant Attorney General
Civil Division
DREW C. ENSIGN
Deputy Assistant Attorney General
TIBERIUS DAVIS
SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney General
JONATHAN K. ROSS
Senior Litigation Counsel
STEPHANIE L. GROFF
JASON K. ZUBATA
ANIELLO DESIMONE
JACOB A. BASHYROV
Trial Attorneys
Office of Immigration Litigation
Civil Division, U.S. Dept. of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 598-0919
Email: Jacob.Bashyrov@usdoj.gov

BILAL A. ESSAYLI
Acting United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
DANIEL A. BECK
Assistant United States Attorney
Chief, Complex and Defensive Litigation Section
ALEXANDER L. FARRELL (SBN 335008)
PAULINE H. ALARCON (SBN 345785)
Assistant United States Attorneys
Federal Building, Suite 7516
300 North Los Angeles Street
Los Angeles, California 90012
Tel: (213) 894-5557 | 3992
E-mail: Alexander.Farrell@usdoj.gov
Pauline.Alarcon@usdoj.gov

*Counsel for Defendants*

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| PEDRO VASQUEZ PERDOMO; *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security; *et al.*,<br><br>Defendants. | No. 2:25-cv-05605-MEMF-SP<br><br>**DECLARATION OF BENJAMIN MARK MOSS IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR EXPEDITED DISCOVERY**<br><br>Hon. Maame Ewusi-Mensah Frimpong<br>United States District Judge |

**DECLARATION OF BENJAMIN MARK MOSS**

I, BENJAMIN MARK MOSS, DECLARE pursuant to 28 U.S.C. § 1746 that:

1. I am the Acting Senior Counsel for District Court Litigation of the Office of Immigration Litigation – General Litigation and Appeals Section ("OIL-GLAS"), an office within the Civil Division of the United States Department of Justice. I joined the Civil Division of the Department of Justice in 2011 as a trial attorney, a career civil service position, within the Office of Immigration Litigation. Since then, in addition to handling cases in federal district and appellate courts, I have performed various management functions, including as a senior litigation counsel and an acting assistant director. In 2025, I was promoted to the position of Acting Senior Counsel for District Court Litigation. In this career federal civil servant role, I support and manage oversight of OIL-GLAS's district court litigation. My direct supervisor is Acting Deputy Director Glenn Girdharry, also a career federal civil servant. My background, training, and experience have given me familiarity with and an understanding of various civil discovery processes, parameters, abilities, and limitations in a range of civil cases handled by OIL-GLAS.

2. The principal responsibility of OIL-GLAS is to litigate immigration cases originating in federal district courts (including appeals from those cases), as well as petitions for review of final orders of removal in federal appellate courts. OIL-GLAS represents the Government in the above-captioned case.

3. I make this declaration in support of Defendants' Opposition to Plaintiffs' motion for expedited discovery requests in the above-captioned matter based on personal knowledge and review of records and information related to this case. Because I make this declaration for a limited purpose as a summary of some of the steps involved with and challenges we face in completing compressed timelines for expedited discovery requests, I do not share here all the information that is known to me about the subjects presented below, but rather, I present a summary and certain illustrative details.

4. I understand that Plaintiffs' request for expedited discovery includes multiple categories of requests. Specifically, Plaintiffs have served proposed interrogatories seeking the identification of on-scene personnel involved in alleged "detentive stops," the sources of prior declarations, the recipients of

certain training or guidance, and any review mechanisms concerning stops. *See* ECF 211-1 at 5-6.[1] Plaintiffs have also served proposed requests for production seeking operational documents, training materials, and messaging communications (including text and mobile applications) relating to specified enforcement actions. *Id.* at 19-28. In addition, Plaintiffs indicated their intent to notice several depositions, including a Rule 30(b)(6) deposition of DHS, along with depositions of high-ranking officials such as Chief Patrol Agent Bovino. *Id.* at 14-18. Plaintiffs ask that all of these discovery responses and depositions be completed on an expedited basis—interrogatory responses within 10 days of service, document productions within 10 days, and depositions within 14 days of notice. ECF No. 211-1 at 9-10.

5. An order requiring that these tasks be completed on such a compressed timeline would require a staggering expenditure of time and resources and would likely require an undertaking which, given current resources, likely cannot be completed on that timeline. Based on my experience overseeing district court litigation, compressed timelines of the sort Plaintiffs propose are unworkable: what ordinarily takes weeks and months cannot with existing OIL-GLAS resources realistically be done in mere days. Indeed, even routine identification of potential custodians of responsive documents and subsequent collection of documents from those custodians requires the sustained attention of multiple personnel across DOJ and DHS components, diverting them from their other enforcement and litigation responsibilities.

6. In completing document production in a case such as this, depending on the volume of documents involved it would take Defendants months or at a minimum several weeks to perform the following tasks before documents could be produced:

a. Work with Plaintiffs to reach an Electronically Stored Information ("ESI") protocol and submit for the Court's approval an appropriate proposed protective order which collectively will control certain parameters to be employed in document discovery.

b. Identify document custodians and collection parameters.

---

[1] All page citations to ECF documents refer to the ECF-generated pagination appearing at the top of each page.

c. Perform collections of ESI from those custodians.

d. Transmit necessary data to the Civil Division's Automation Litigation Support Lab ("the Lab"), which processes and loads data into Relativity document review software, referred to internally as "CORA." If data reaches the Lab without having been processed, it takes between one and three weeks to process it into a format that can be reviewed using Relativity.

e. Prepare search terms reports (also known as hit reports) to ensure that appropriate search terms are employed; and then, once the search terms are finalized, run a search of collected ESI to populate the subset of data to be manually reviewed for responsiveness and privilege.

f. Once pre-review data processing is complete, the data must be sorted into appropriate batches and passed on to a team of document reviewers for review.

g. Each batch of documents goes through several layers of review for responsiveness and, if responsive, privilege: first level (1L) and often second level (2L) review within the originating agency (here DHS, ICE, CBP, as well as their sub-components); then DOJ reviews; and in the event of a question about responsiveness or privilege, one or more additional rounds of interagency (IA) review is conducted until a final determination is made concerning whether a given document is responsive, and if so, whether any privilege applies.

h. In the event a document is responsive and privileged, care is taken to draft the privilege description that describes the basis for the privilege. It can routinely take 30 minutes or more to review a document, consult with a colleague to ask questions and prepare a privilege description.

i. When it is time to run a production of documents, all document reviewers are required to exit the Relativity software for a period of time to allow the assembly of a production search.

j. Running a production of documents will take the Lab somewhere between two and six hours, depending on various factors.

k. Once the Lab confirms that a run of documents is ready for production, it generally takes between two and five hours for the DOJ litigation team to conduct quality checks and secure mandatory consultation with leadership before making productions available.

l. For the document review steps summarized above to occur, document reviewers within the Defendant agencies and within the DOJ need to be identified, trained, and then assigned batches of documents for review. As noted above, reviewing documents for responsiveness and privilege is no small task; it can routinely take 30 minutes or more to review a single document.

m. Over the past six months, approximately 60 attorneys have departed from OIL-GLAS. An order requiring expedited document discovery would require emergency efforts to rapidly identify and then train document reviewers. The departure of the approximately 60 attorneys has already increased the workload on the attorneys who remain at OIL-GLAS, making the task of identifying trained personnel available to participate in document review extremely difficult.

Each of these steps is sequential, not parallel. Document discovery routinely takes months to complete under ordinary scheduling orders. Attempting to condense this process into a two-week discovery period would either result in incomplete or erroneous productions or require such a diversion of staff that other litigation and enforcement responsibilities would be neglected, and, frankly, it may not realistically be possible to complete document discovery in just two weeks. For these reasons, it is not feasible to provide written responses in 10 days or to produce documents within 14 days, as Plaintiffs request. Even small custodial ESI collections routinely take several weeks to collect, process, review, and clear for production. Attempting to meet Plaintiffs' proposed deadlines would almost certainly result in incomplete or erroneous productions.

7. As mentioned above, document discovery cannot begin responsibly until the parties finalize a protective order and an ESI protocol. As of the date of this declaration, the parties have exchanged draft protective orders but have not finalized one, and they have not yet engaged on an ESI protocol (including format, metadata, custodians, search terms, or date ranges). In my experience, negotiating these foundational guardrails to ensure discovery that is fair for all parties requires multiple rounds of meet and confer and typically takes a few weeks even where the parties act diligently. These agreements are essential because productions in cases like this often implicate Privacy Act restrictions, law-enforcement-

sensitive information, and privileged communications. Attempting to begin production without them would risk disclosure of protected material and generate avoidable disputes. Moreover, in my experience, it is crucial to establish an ESI protocol at the outset of discovery to avoid considerable inefficiencies that typically result in the absence of an ESI protocol if there are disagreements about the ESI parameters later on. Take, for example, deduplication and batching of near-duplicate documents into a single batch (or single set of batches) for efficient review. For these tasks to have the desired practical benefit of speeding along document review and ultimately hastening document production, the entire universe of ESI must be assembled and collection and review parameters determined before document review can commence.

8. Collecting and reviewing records from high-ranking officials typically requires creating time-consuming controls and procedures to ensure security, including a severely curtailed number of document reviewers granted access to sensitive documents.

9. To the extent Plaintiffs' proposed document production requests would require collection from high-level officials at the Department of Homeland Security, this would require careful screening for responsiveness and any applicable privileges and time-consuming rounds of conferral with agency attorneys. In my experience, documents from high-level agency officials often implicate the deliberative-process privilege, law-enforcement privilege, or attorney-client and work-product protections. Even to the extent Plaintiffs request documents from lower level agency employees, these documents may implicate privileges, such as the deliberative process privilege and the attorney-client privilege, for instance. Determining whether to assert these privileges requires time-consuming consultation with agency counsel, sometimes at the Department-head level, and drafting privilege log entries that accurately describe the basis for asserting the privilege. This process cannot be accelerated without jeopardizing the integrity of privilege claims.

10. Although I have not seen the universe of documents Plaintiffs request, I predict based on prior cases that a substantial number of the documents collected in response to Plaintiffs' proposed production requests, once reviewed, will be deemed either non-responsive or privileged, resulting in an enormous expenditure of time with comparatively few documents to produce. For instance, Plaintiffs' proposed production request includes a request for "All documents relating to [Plaintiffs' 13 identified and 3 not-

yet-determined] operations . . . including Field Operations Worksheets (FOWs), targeting sheets, operations plans, pre-operations briefings and/or intelligence reports, targeting packages, notes, videos (including body camera footage), Forms I-213s, database entries, post-operation briefings, after-action reports, other communications describing or characterizing the operation, documents reflecting review of the operation, and documents reflecting any arrest quotas or goals." ECF 211-1 at 28-29. Based on my experience, such documents may be highly sensitive, in many cases privileged, and review likely will require extensive coordination across multiple department agencies.

11. Although I have not seen the universe of documents Plaintiffs request, in my experience, training materials generally are not simple "hand-outs" that can be produced immediately. They may integrate legal standards with operational examples, enforcement tactics, and internal deliberative discussions. Reviewing and redacting such materials to separate what may be relevant and non-privileged from what is not requires extensive, line-by-line review across multiple agency offices. In my experience, this process takes weeks, not days, and may result in withholding or redaction based on, *inter alia*, the deliberative-process privilege, law-enforcement privilege, and attorney-client communications.

12. Although I have not seen the universe of documents Plaintiffs request, in my experience, intelligence reports can be particularly sensitive. They may contain raw leads, references to confidential sources, and information about ongoing investigations. These materials cannot be produced responsibly on an expedited basis but rather must be reviewed for possible law enforcement and other applicable privilege. Even partial production requires careful review and redaction to protect sources and methods, which cannot be done within the 10-day timeframe Plaintiffs propose.

13. Although I have not seen the universe of documents Plaintiffs request, I understand that requests for stop-level records such as body-worn camera footage, Field Operations Worksheets, or contemporaneous notes are especially burdensome. Locating and retrieving such materials requires coordination across field offices, pulling data from secure evidence systems, and often imaging and review by IT staff. All such records must then undergo Privacy Act and privilege review before production.

14. Although I have not seen the universe of documents Plaintiffs request, with respect to declarations submitted by DHS in cases of this nature, there is reason to believe they are not mere "secondhand accounts," as Plaintiffs contend. Rather, I understand that declarants compile information from operational files and from input provided by line personnel familiar with the relevant incidents. That process ensures the declaration reflects official agency knowledge rather than one individual's personal recollection.

15. Further, Plaintiffs' expedited discovery requests that include "any kind" of communications, including text messages or informal communications, ECF 211-1 at 29, would be especially burdensome on a short timeframe. In my experience, locating, preserving, and reviewing such communications sometimes requires procuring appropriate software and generally requires device imaging, search-term calibration, and line-by-line review for personal information, responsiveness, and privilege. In my experience, this process can consume weeks of attorney and IT staff time for relatively few responsive documents, and nearly all such documents required redactions or were ultimately withheld as privileged.

16. If Plaintiffs' proposed expedited discovery schedule were to be imposed, OIL-GLAS would have to attempt to mobilize dozens of attorneys to work nights and weekends, setting aside their other assigned cases. Based on my litigation oversight role, depending on the volume of data that is ultimately collected and needs to be reviewed, I estimate expedited discovery of the scope Plaintiffs propose could consume thousands of attorney hours, producing only a small fraction of responsive, non-privileged documents. That resource drain would prejudice the government's ability to handle other litigation and enforcement matters.

17. Plaintiffs' proposed depositions likewise would be extremely burdensome on such a short timeframe. In particular, preparing for a Rule 30(b)(6) deposition requires the agency to identify one *or more* witnesses with knowledge of the broad topics set out in the notice, gather and review responsive records, and educate those witnesses so that their testimony reflects the organization's position rather than only their personal recollection. That process ordinarily takes weeks of coordination across multiple agency and DOJ offices. Attempting to complete it within fourteen days would be unrealistic and risk incomplete or inaccurate testimony. In addition, preparing individual fact witnesses for depositions

requires time-intensive witness preparation sessions with counsel, which cannot occur simultaneously with the already compressed discovery schedule Plaintiffs propose. In practice, the demands of accelerated deposition preparation would divert the same limited agency and DOJ personnel who must also conduct privilege review and document production, meaning that one set of tasks could only be accomplished at the expense of the other.

18. Plaintiffs also propose an expedited deadline for responding to interrogatories. ECF 211-1 at 17-18. Preparing any appropriate objections and responses to these interrogatories would impose an additional burden on Defendants if the Court were to require this task to be completed within the compressed timeline that Plaintiffs propose. This burden would be further magnified by an acute shortage of personnel who could be tasked with preparing interrogatory objections and responses while simultaneously engaging with a severely compressed document discovery and deposition schedule, if ordered.

19. Plaintiffs raise concerns about possible loss of evidence. In my capacity as Acting Senior Counsel, I confirm that DOJ and DHS have issued litigation holds that preserve potentially relevant materials. Those litigation holds are designed to ensure no relevant material is lost during the pendency of this litigation.

I DECLARE, under the penalty of perjury, that the foregoing is true and correct.

Executed on September 29, 2025

*<u>/s/ Benjamin Mark Moss</u>*
BENJAMIN MARK MOSS
Acting Senior Counsel for District Court Litigation
Office of Immigration Litigation
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8675
Email: benjamin.m.moss2@usdoj.gov