# EXHIBIT B – VERIFICATION DECLARATION BY THE U.S. CUSTOMS AND BORDER PROTECTION REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

Pedro VASQUEZ PERDOMO, et al.,
Plaintiffs,
v.
KRISTI NOEM, IN HER OFFICIAL CAPACITY AS SECRETARY OF HOMELAND SECURITY, et al.,
Defendants.

Case No. 2:25-cv-05605-MEMF-SP

**DECLARATION OF [redacted]**

## DECLARATION OF [redacted]

I, [redacted] declare and affirm that the following is true to the best of my knowledge, information, and belief:

1. I am the Associate Chief Counsel of the West Region of the Office of Chief Counsel (OCC) for U.S. Customs and Border Protection (CBP). The mission of CBP includes the enforcement and administration of customs, immigration, and agriculture laws and regulations of the United States, as well as the enforcement of numerous other laws on behalf of other federal agencies. OCC provides legal advice to, and legal representation of, CBP officials in matters relating to the activities and functions of CBP. OCC also reviews proposed policies and actions to advise agency officials regarding applicable legal requirements; preparing legal opinions for issuance to the CBP agency client; and rendering litigation assistance to the U.S. Department of Justice in criminal or civil court actions involving CBP. OCC operates under the umbrella of the Department of Homeland Security's (DHS) Office of General Counsel.

2. As the Associate Chief Counsel for the West Region, and on behalf of the CBP Chief Counsel, I oversee and provide legal guidance to all CBP officials within my assigned geographic region, covering a broad range of legal practice areas, including

both affirmative and defensive litigation involving customs, immigration, and other federal laws. I have held the position of Associate Chief Counsel for the West Region since 2024. Prior to this role, I served as Assistant Chief Counsel and Chief of Staff for OCC from 2020 to 2024. Since 2007, I have held various attorney positions within OCC, and since 1997, I have served in legal roles with the Department of Justice, Immigration and Customs Enforcement, and Citizenship and Immigration Services.

3. As the Associate Chief Counsel for the West Region, I provide strategic oversight and direction for the litigation team assigned to this matter. Under my leadership, two Deputies and a Team Lead manage and coordinate a team of attorneys who are responsible for all aspects of discovery in this case, including the identification, collection, verification, and production of responsive records.

4. I provide this declaration based on my personal knowledge, reasonable inquiry, and information obtained from various records and other CBP employees in the regular course of business.

5. I have reviewed Plaintiffs' Motion for Temporary Restraining Order and Order to Show Cause re: Preliminary Injunction (Dkt. 45), Plaintiffs' Motion for Preliminary Injunction: Memorandum of Points and Authorities in Support Thereof (Dkt 128), Plaintiffs' Supplement to Motion for Preliminary Injunction (Dkt 163) Defendants' Opposition to Plaintiffs' Application for Temporary Restraining Order ("TRO Opposition") (Dkt. 71), Opposition to the Plaintiffs' Motion for Preliminary Injunction ("PI Opposition") (Dkt. 170), and Supplemental Opposition to Plaintiffs' Motion for Preliminary Injunction ("Supplemental Opposition") (Dkt. 178) filed in this litigation.

6. I have reviewed Plaintiff CHIRLA's Expedited Requests for Production, Set One, and Plaintiff CHIRLA's Expedited Interrogatories, Set One ("Discovery Requests").

7. I have also reviewed the October 7, 2025 discovery (Dkt. 223) and the October 23, 2025 discovery schedule order (Dkt. 227) requiring Defendants to produce documents and other materials responsive to Plaintiffs' Requests for Production on a rolling basis with the production of documents they relied on in opposing the motions for a temporary

restraining order and preliminary injunction to be made no later than November 4, 2025. I have also reviewed the December 12, 2025 order requiring Defendants to submit a "verified statement, certifying they have produced all reliance materials and explaining their production process for the reliance materials…" (Dkt. 305)

8. In support of the Defendants' TRO Opposition (Dkt. 71), CBP submitted a declaration from Kyle C. Harvick, Deputy Incident Commander ("DIC") for Operation at Large. In the declaration, DIC Harvick refers to legal training Border Patrol Agents and other CBP law enforcement officers receive. The referenced trainings were formal legal instructions/education provided and delivered by OCC, which educated agents and other employees on the specific Fourth Amendment principles and doctrines implicated in the instant and similar Fourth Amendment-related cases. DIC Harvick's statements were based on his training, experience, and knowledge of these formal legal trainings. DIC Harvick's declaration discusses the content of these trainings at a very general level (see, e.g., ¶ 9) based on his recollection from having received some of these trainings in the past and/or knowledge about the general contents of the trainings.

9. Shortly after the Court issued its order granting expedited discovery on October 17, 2025, and before Plaintiffs served the Discovery Requests on October 21, 2025, CBP began collecting those training materials in response to Plaintiff's Request for Production ("RFP") No. 1. This collection required contacting a variety of locations, including OCC's Assistant Chief Counsel (Training) offices located in Glynco, Georgia; Artesia, New Mexico; and Harpers Ferry, West Virginia; as well as local OCC offices in Long Beach and San Diego which had given such trainings or guidance to those operating within the Central District of California as part of Operation At Large in 2025. These trainings, in their entirety, were collected and reviewed by November 3, 2025 and the cover pages (with appropriate privilege redactions) were produced on November 4, 2025. Thereafter on or about November 26, 2025, to alleviate confusion that resulted from the production of the cover pages only, the entire training documents were produced with appropriate redactions. Because of the scope of redactions the entire

training documents provided essentially the same information as the cover pages did.

10. In support of the Defendants' PI Opposition, CBP submitted the Declarations of Daniel I. Parra and C217. In support of the Defendants' Supplemental Opposition, CBP provided the Declaration of Manny Molina Jr.

11. Any training materials referenced in the Declarations of Daniel Parra, C217, and Manny Molina Jr. ("PI Declarations") are the same materials discussed above in Paragraph 8 and 9 above and which was produced (with appropriate privileges redactions) to Plaintiffs.

12. The PI Declarations also discuss specific incidents and particular individuals that were raised in Plaintiff's moving papers. These declarations were made on information available to the declarants in various CBP systems, as well as their colleagues who had first-hand knowledge of an event, and/or their own personal knowledge. The PI Declarations did not include exhibits.

13. Starting on or about October 20, 2025, and in tandem with CBP's efforts to produce responsive training materials, OCC worked with various individuals at Border Patrol to ensure all responsive documents to Plaintiffs' RFP No. 2 were collected. RFP No. 2 requests documents that relate to certain incidents and encounters, some of which were described in the PI Declarations and some of which were not at issue in the PI Declarations. There is no single system containing all documents related to a specific encounter and not all encounters would have the same type of documents. As a result, CBP had to determine what types of documents might exist for a given encounter which required consultation with at least two individuals, if not more, and then tracking those documents down from different sources. Responsive documents that were relied on in preparing the PI Declarations (primarily the arrest narratives and some of BWC footage as explained in ¶ 14) were more readily accessible due to earlier collection efforts. However, both the documents relied on in the PI Declarations and all of the other documents responsive to RFP No. 2 had to be reviewed carefully for Law Enforcement Privilege (LEP) prior to production.

14. As set forth above, materials collected and produced in response to RFP No. 2 included materials that were relied on in preparing the PI Declarations. Specifically, the C217's declaration relied on his body worn camera ("BWC") footage (GOV-VID-001) and the I-44 related to Ramirez (GOV-00000490-493). Both were provided in response to RPF No. 2. Additional examples include written narratives involving the arrest of individual Plaintiffs/declarants. For example, Incident Commander of Operation at Large Los Angeles ("IC") Molina's declaration relied on information contained in the written narrative about the arrest of S.C.C.H. (GOV-00000288-289). Declaration of Manny Molina Jr., ¶ 9. IC Parra's declaration relied on I-44 related to Ramirez (GOV-00000490-493) as well as the written narrative about the arrest of E.D.P (sometimes referred to as E.C.P) (GOV-00000498-499). Declaration of Daniel I. Parra, ¶¶ 14, 15. Both were produced in response to RFP No. 2. IC Molina's declaration relied on the report of investigation regarding Operation Trojan Horse (GOV-00000341-358) and this was produced in response to RFP No. 2.

15. The documents relied upon in the declarations of Parra, C217, and Molina were included within the responsive material to RFP No. 2 produced on November 14, 2025. The majority of BWC relied on in the declarations was produced on November 26, 2025. There was one additional BWC produced December 4, 2025 after it was brought to our attention that one was missing. The inadvertent (but remedied) exclusion was an oversight made in haste to produce the BWC as ordered.

16. The BWC was particularly challenging to produce on an expedited timeline as it required careful review and, where necessary, appropriate redaction for LEP material. Visual and audio redactions, as opposed to text redactions, are time consuming as the removal of a video is much more labor intensive than redactions of written documents.

17. While CBP was focused on promptly collecting, reviewing, and producing responsive materials that were relied on for TRO and PI briefing, CBP was also preparing its responses to written interrogatories, and collecting, reviewing, redacting and producing numerous other materials that were not directly at issue in the briefing.

These included materials requested in RFP No. 3—which included a search of ESI and for communications on agents' phones—and some of the materials requested in RFP No. 2, like video footage obtained from SUAS. This collection was time-consuming and laborious. The numerous repositories and coordination required with various personnel, as well as the privileged nature of many of the responsive materials, proved challenging for the collection, review, and production on the expedited timeline ordered by the Court.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my information, knowledge and belief.

Executed this 22nd day of December, 2025, at San Francisco, California.

[redacted]

[redacted],
Associate Chief Counsel, West Region
Office of Chief Counsel
U.S. Customs and Border Protection