BRETT A. SHUMATE
Assistant Attorney General
Civil Division
DREW C. ENSIGN
Deputy Assistant Attorney General
TIBERIUS DAVIS
SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney General
JONATHAN K. ROSS
Senior Litigation Counsel
STEPHANIE L. GROFF
JASON K. ZUBATA
ANIELLO DESIMONE
JACOB A. BASHYROV
Trial Attorneys
Office of Immigration Litigation
Civil Division, U.S. Dept. of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 598-0919
Email: Jacob.Bashyrov@usdoj.gov

BILAL A. ESSAYLI
Acting United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
DANIEL A. BECK
Assistant United States Attorney
Chief, Complex and Defensive Litigation Section
ALEXANDER L. FARRELL (SBN 335008)
PAULINE H. ALARCON (SBN 345785)
Assistant United States Attorneys
   Federal Building, Suite 7516
   300 North Los Angeles Street
   Los Angeles, California 90012
   Tel: (213) 894-5557 | 3992
   E-mail:   Alexander.Farrell@usdoj.gov
                  Pauline.Alarcon@usdoj.gov

*Counsel for Defendants*

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| PEDRO VASQUEZ PERDOMO; *et al.*,<br><br>      Plaintiffs,<br><br>v.<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security; *et al.*,<br><br>      Defendants. | No. 2:25-cv-05605-MEMF-SP<br><br>**DECLARATION OF BENJAMIN MARK MOSS IN SUPPORT OF DEFENDANTS' OBJECTIONS TO MAGISTRATE JUDGE'S ORDER**<br><br>Hon. Maame Ewusi-Mensah Frimpong<br>United States District Judge |

**JANJUARY 20, 2026 DECLARATION OF BENJAMIN MARK MOSS**

I, BENJAMIN MARK MOSS, DECLARE pursuant to 28 U.S.C. § 1746 that:

1. I incorporate my prior declaration, ECF No. 214-1 as if fully set forth herein.

2. I am the Acting Senior Counsel for District Court Litigation of the Office of Immigration Litigation ("OIL"), an office within the Civil Division of the United States Department of Justice. I joined the Civil Division of the Department of Justice in 2011 as a trial attorney, a career civil service position, within the Office of Immigration Litigation. Since then, in addition to handling cases in federal district and appellate courts, I have performed various management functions, including as a senior litigation counsel and an acting assistant director. In 2025, I was promoted to the position of Acting Senior Counsel for District Court Litigation. In this career federal civil servant role, I support and manage oversight of OIL's district court litigation. My direct supervisor is Acting Deputy Director Glenn Girdharry, also a career federal civil servant. My background, training, and experience have given me familiarity with and an understanding of various civil discovery processes, parameters, abilities, and limitations in a range of civil cases handled by OIL.

3. The principal responsibility of OIL is to litigate immigration cases originating in federal district courts (including appeals from those cases), as well as petitions for review of final orders of removal in federal appellate courts. OIL represents the Government in the above-captioned case.

4. I make this declaration in support of Defendants' objections to the Magistrate Judge's January 16, 2026 Order (ECF No. 370). The purpose of this declaration is to describe factually, based on my experience overseeing district court litigation and discovery across the Office of Immigration Litigation, why certain discovery measures combined with the timeline ordered are burdensome and inconsistent with customary discovery practices commonly employed in defensive civil litigation on behalf of the U.S. government. In particular, I explain why the Order requires discovery methods and timelines that are not reasonably achievable given the nature of the materials at issue, the number of custodians implicated, and the technical and legal constraints governing federal law-enforcement records. Because I make this declaration for a limited purpose as a summary of some of the steps involved with and challenges we face in completing compressed timelines for expedited discovery requests, I do not share

here all the information that is known to me about the subjects presented below, but rather, I present a summary and certain illustrative details.

5. I understand that the January 16, 2026 Order requires Defendants, among other things, to: (a) *collect and produce* "standardized documentation, including any targeting information or slide presentations given to agents" from the fifteen identified law-enforcement operations identified in FRP No. 2; (b) *identify* "all persons who were arrested during any of these operations [listed in RFP No. 2] and gather all documents concerning their arrests"; (c) *collect* "documents from every agent present at the operations listed in RFP No. 2, including any reports or notes they generated and any communications they exchanged relating to the operations"; (d) *produce* "all body worn camera footage recorded by any agent present" at any of the operations in RFP No. 2; (e) *forensically image* "any cell phone used by any agent present at any of the 15 operations" in FRP No. 2, and *review* those devices for materials responsive to RFP Nos. 2 and 3; and (f) *provide* "affidavits detailing [Defendants'] document collection processes." ECF No. 370 at 8-9. The Order further requires that the "majority" of this discovery be completed within a little over a week on January 23, with remaining production and affidavits due shortly thereafter on January 30. *Id.* at 9.

6. The order requiring that these tasks be completed on such a compressed timeline likely will require a staggering expenditure of time and resources and likely will require an undertaking which, given current resources, likely cannot be completed on that timeline. Based on my experience overseeing district court litigation, compressed timelines of the sort the Court identifies are unworkable: what ordinarily takes weeks and months cannot with existing OIL resources realistically be done in mere days. Indeed, even routine identification of potential custodians of responsive documents and subsequent collection of documents from those custodians requires the sustained attention of multiple personnel across DOJ and DHS components, diverting them from their other enforcement and litigation responsibilities. In my experience, the discovery measures ordered here combined with the timeline on which they have been ordered are extraordinary. In my experience, it is unusual to require forensic imaging of every custodial device, universal production of all data from the device of a custodian without allowing assessments of responsiveness, or affidavits detailing internal document collection processes

absent findings of bad faith, spoliation, or discovery misconduct. To my knowledge, no such findings were made here.

7. In completing document production following an Order such as the Court's January 16, 2026 Order, depending on the volume of materials involved it would take Defendants months or at a minimum several weeks to perform the following tasks before documents could be produced:

a. Identify document custodians and collection parameters.

b. Perform collections of ESI from those custodians.

c. Transmit necessary data to the Civil Division's Automation Litigation Support Lab ("the Lab"), which processes and loads data into Relativity document review software, referred to internally as "CORA." If data reaches the Lab without having been processed, it takes between one and three weeks to process it into a format that can be reviewed using Relativity.

d. Prepare search terms reports (also known as hit reports) to ensure that appropriate search terms are employed; and then, once the search terms are finalized, run a search of collected ESI to populate the subset of data to be manually reviewed for responsiveness and privilege.

e. Once pre-review data processing is complete, the data must be sorted into appropriate batches and passed on to a team of document reviewers for review.

f. Each batch of documents goes through several layers of review for responsiveness and, if responsive, privilege: first level (1L) and often second level (2L) review within the originating agency (here DHS, ICE, CBP, as well as their sub-components); then DOJ reviews; and in the event of a question about responsiveness or privilege, one or more additional rounds of interagency (IA) review is conducted until a final determination is made concerning whether a given document is responsive, and if so, whether any privilege applies.

g. In the event a document is responsive and privileged, care is taken to draft the privilege description that describes the basis for the privilege. It can routinely take 30 minutes or more to review a document, consult with a colleague to ask questions and prepare a privilege description.

  h. When it is time to run a production of documents, all document reviewers are required to exit the Relativity software for a period of time to allow the assembly of a production search.

  i. Running a production of documents will take the Lab somewhere between two and six hours, depending on various factors.

  j. Once the Lab confirms that a run of documents is ready for production, it generally takes between two and five hours for the DOJ litigation team to conduct quality checks and secure mandatory consultation with leadership before making productions available.

  k. For the document review steps summarized above to occur, document reviewers within the Defendant agencies and within the DOJ need to be identified, trained, and then assigned batches of documents for review. As noted above, reviewing documents for responsiveness and privilege is no small task; it can routinely take 30 minutes or more to review a single document.

  l. Over the past eleven months, approximately 80 attorneys have departed from OIL. An order requiring expedited document discovery would require emergency efforts to rapidly identify and then train document reviewers. The departure of the approximately 80 attorneys has already increased the workload on the attorneys who remain at OIL, making the task of identifying trained personnel available to participate in document review extremely difficult.

Each of these steps is sequential, not parallel. Document discovery routinely takes months to complete under ordinary scheduling orders. Attempting to condense this process into a two-week discovery period would either result in incomplete or erroneous productions or require such a diversion of staff that other litigation and enforcement responsibilities would be neglected, and, frankly, it may not realistically be possible to complete document discovery in just two weeks. For these reasons, even with best efforts, it will not be feasible to provide the majority of the materials ordered to be produced by January 23, 206, or to produce the remaining materials by January 30, 2026, as the Court ordered. Even small custodial ESI collections routinely take several weeks to collect, process, review, and clear for production. Attempting to meet the Court's deadlines would almost certainly result in incomplete or erroneous productions.

8. For example, the requirement that Defendants forensically image any cell phone used by any agent present at any of the identified operations is particularly burdensome and atypical. Forensic imaging is a highly intrusive process that captures the entire contents of a device, potentially including (depending on the device and its contents) substantial volumes of personal, non-responsive, and privileged material. In my experience, such imaging is not ordered as a routine discovery measure but, rather, a proportionality analysis customarily is conducted. In my experience, requiring forensic device imaging from a number of custodians imposes substantial technical, legal, and privacy burdens.

9. Similarly, as I understand it, the Order's requirement that Defendants produce all body worn camera footage recorded by any agent present at any of the fifteen operations expands discovery beyond encounter-specific materials and into comprehensive operation-wide data. Locating, retrieving, reviewing, redacting, and producing such footage requires coordination with multiple field offices, secure evidence systems, and technical personnel, followed by time-intensive Privacy Act and privilege review. This process cannot be meaningfully expedited without substantial risk of error or improper disclosure. In addition, in my experience, it may be necessary to undertake one or more procurements to obtain software needed to conduct forensic imaging, adding to the time needed to complete that task. It is doubtful that reasonably available resources will allow these processes to occur within the one- to two-week period identified by the Court.

10. There is a protective order in this case, ECF No. 247. However, based on my experience, a protective order governs how information produced in a case may be shared or disclosed, but it generally does not convert privileged material into discoverable material or substitute for a responsiveness or privilege determination.

11. To the extent the Order requires collection from high-level officials at the Department of Homeland Security ("DHS"), this would require careful screening for responsiveness and any applicable privileges and time-consuming rounds of conferral with agency attorneys. In my experience, documents from high-level agency officials often implicate the deliberative-process privilege, law-enforcement privilege, or attorney-client and work-product protections. Even to the extent the Court orders documents from lower level agency employees, these documents may implicate privileges, such as the deliberative

process privilege and the attorney-client privilege, for instance. Determining whether to assert these privileges requires time-consuming consultation with agency counsel, sometimes at the Department-head level, and drafting privilege log entries that accurately describe the basis for asserting the privilege. This process cannot be accelerated without jeopardizing the integrity of privilege claims.

12. The requirement that Defendants provide affidavits detailing their document-collection processes further compounds the burden imposed by the Order. Preparing such affidavits requires (re)constructing and documenting complex, multi-agency discovery workflows while discovery is still ongoing. The requirement will also have the unintended side effect of slowing down production, is it will divert personnel from production so that they can spend time describing the production.

13. Although I have not seen the universe of documents that the Court ordered be produced by January 30, I predict based on prior cases that a substantial number of the documents collected in response to the Order, once reviewed, will be deemed either non-responsive or privileged, resulting in an enormous expenditure of time with comparatively few documents to produce. For instance, the Court's order requires the collection "standardized documentation," ECF No. 370 at 8, but it is unclear what that phrase means. To the extent the Order contemplates targeting packages, slides, arrest documentation, reports, notes, body camera footage, and other communications, based on my experience, such documents may be highly sensitive, in many cases privileged, and review likely will require extensive coordination across multiple Defendant (sub)agencies. Complying with the Order as written would require the rapid redeployment of substantial Department of Justice and technical resources away from other pressing litigation and enforcement matters, and it is uncertain whether it will be feasible to make such a reallocation within the extremely short time contemplated by the Order.

14. Although I have not seen the universe of documents that the Court ordered be produced by January 30, I understand that requests for stop-level records such as body worn camera footage, Field Operations Worksheets, or contemporaneous notes are especially burdensome. Locating and retrieving such materials requires coordination across field offices, pulling data from secure evidence systems, and often imaging and review by IT staff. All such records must then undergo Privacy Act and privilege review before production.

15. The Court's discovery schedule requires OIL to attempt to mobilize dozens of attorneys to work nights and weekends, setting aside their other assigned cases. Based on my litigation oversight role, depending on the volume of data that is ultimately collected and needs to be reviewed, I estimate expedited discovery of the scope the Court ordered could consume thousands of attorney hours, producing only a small fraction of responsive, non-privileged documents. That resource drain would prejudice the government's ability to handle other litigation and enforcement matters.

16. In my capacity as Acting Senior Counsel, I confirm that DOJ and DHS have issued litigation holds that preserve potentially relevant materials. Those litigation holds are regularly retransmitted to the agencies. Those litigation holds are designed to ensure no relevant material is lost during the pendency of this litigation.

I DECLARE, under the penalty of perjury, that the foregoing is true and correct.

Executed on January 20, 2026

/s/ Benjamin Mark Moss
BENJAMIN MARK MOSS
Acting Senior Counsel for District Court Litigation
Office of Immigration Litigation
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8675
Email: benjamin.m.moss2@usdoj.gov