# EXHIBIT 1

Stacy Tolchin (CA SBN #217431)
Law Offices of Stacy Tolchin
776 E. Green St., Ste. 210
Pasadena, CA 91101
Telephone: (213) 622-7450
Facsimile: (213) 622-7233
Email: Stacy@Tolchinimmigration.com

Counsel for Petitioner Carlos Osorto

UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Pedro VASQUEZ PERDOMO, *et al*,<br><br>Petitioners-Plaintiffs,<br><br>v.<br><br>Kristi NOEM, Secretary, Department of Homeland Security, *et al*,<br><br>Respondents-Defendants. | Case No.  2:25-cv-05605-MEMF-SP<br><br>**DECLARATION OF STACY TOLCHIN IN SUPPORT OF PETITIONER CARLOS OSORTO'S *EX PARTE* APPLICATION FOR RELEASE FROM IMMIGRATION CUSTODY** |

I, Stacy Tolchin, hereby declare and state the following:

1.    My business address is Law Offices of Stacy Tolchin, 776 E. Green St. Suite 210, Pasadena, CA 91101.

2.    I have personal knowledge of the events described below.

3.    I represent Petitioner Carlos Osorto before this Court and in immigration court.

4.    On July 21, 2025, I emailed and spoke with Pauline Alarcon, counsel for Respondents. I informed her of Petitioner Osorto's intent to file an *ex parte* motion for release and sent a copy of the motion to her office via electronic email. Ms. Alarcon also informed me by electronic mail:

> As reflected in ECF No. 106, "Respondents will promptly request that Mr. Osorto receive an expedited bond hearing, and will agree there is jurisdiction for a bond hearing for him." Respondents have made these efforts, and they are continuing to do so. Respondents oppose your *ex parte* application, to the extent that it attempts to circumvent bond process and the Immigration Judge's authority, but they agree that the IJ should promptly hold a bond hearing and that there is jurisdiction for it.

5.    Attached as **Exhibit A** are the bond release orders for Petitioners Vasquez Perdomo and Villegas Molina. I also represented them before the immigration court in their bond redetermination hearings.

6.    Attached as **Exhibit B** is the Notice to Appear issued by the Department of Homeland Security in Petitioner Osorto's case, charging him with having entered the United States without admission or parole.

7.    Attached as **Exhibit C** is the bond packet in support of release that I submitted on behalf of Petitioner Osorto in the bond redetermination hearing.

8.    Attached as **Exhibit D** is the bond packet submitted by the Department of Homeland Security in the bond redetermination hearing.

9.    On July 16, 2025, I appeared with Petitioner Osorto for an immigration bond redetermination hearing. The Department of Homeland Security

argued to the immigration judge that the court lacked jurisdiction over a bond redetermination hearing because Petitioner Osorto entered the United States without admission or parole, and therefore was seeking admission to the United States. The DHS attorney argued that 8 U.S.C. § 1225(b) precluded jurisdiction over a bond hearing.

10.     Attached as **Exhibit E** is the immigration judge's order that the immigration court did not have jurisdiction over a bond redetermination hearing in Petitioner Osorto's case.

11.     As of the date of filing of this motion, no bond hearing has been set.

12.     Petitioner Osorto has requested release from DHS with a reasonable bond, but DHS has refused to agree to release.

Pursuant to 28 C.F.R. § 24.201(f), I hereby verify that the information provided in the application and all accompanying material is true and correct to the best of my information and belief. Executed this 21st day of July 2025 at Pasadena, CA.

s/ Stacy Tolchin
Stacy Tolchin
Declarant

# EXHIBIT A



**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**ADELANTO IMMIGRATION COURT**

☐  Other:



5



**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**ADELANTO IMMIGRATION COURT**

25

# EXHIBIT B

DEPARTMENT OF HOMELAND SECURITY
**NOTICE TO APPEAR**

## Notice to Respondent

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are in removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 1003.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear, including that you are inadmissible or removable. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge. You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge.

**One-Year Asylum Application Deadline:** If you believe you may be eligible for asylum, you must file a Form I-589, Application for Asylum and Withholding of Removal. The Form I-589, Instructions, and information on where to file the Form can be found at **www.uscis.gov/i-589.** Failure to file the Form I-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to section 208(a)(2)(B) of the Immigration and Nationality Act.

**Failure to appear:** You are required to provide the Department of Homeland Security (DHS), in writing, with your full mailing address and telephone number. You must notify the Immigration Court and the DHS immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to your local DHS office, listed on the internet at **http://www.ice.gov/contact/ero,** as directed by the DHS and required by statute and regulation. Immigration regulations at 8 CFR 1241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after your departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Immigration and Nationality Act.

U.S. Citizenship Claims: If you believe you are a United States citizen, please advise the DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

**Sensitive locations:** To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in 8 U.S.C. § 1229(e)(1), such action complied with 8 U.S.C. § 1367.

## Request for Prompt Hearing

To expedite a determination in my case, I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.

Before:

_____

*(Signature of Respondent)*

_____

*(Signature and Title of Immigration Officer)*

Date: _____

## Privacy Act Statement

**Authority:**
The Department of Homeland Security through U.S. Immigration and Customs Enforcement (ICE), U.S Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS) are authorized to collect the information requested on this form pursuant to Sections 103, 237, 239, 240, and 290 of the Immigration and Nationality Act (INA), as amended (8 U.S.C. 1103, 1229, 1229a, and 1360), and the regulations issued pursuant thereto.

**Purpose:**
You are being asked to sign and date this Notice to Appear (NTA) as an acknowledgement of personal receipt of this notice. This notice, when filed with the U.S. Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR), initiates removal proceedings. The NTA contains information regarding the nature of the proceedings against you, the legal authority under which proceedings are conducted, the acts or conduct alleged against you to be in violation of law, the charges against you, and the statutory provisions alleged to have been violated. The NTA also includes information about the conduct of the removal hearing, your right to representation at no expense to the government, the requirement to inform EOIR of any change in address, the consequences for failing to appear, and that generally, if you wish to apply for asylum, you must do so within one year of your arrival in the United States. If you choose to sign and date the NTA, that information will be used to confirm that you received it, and for recordkeeping.

**Routine Uses:**
For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the following DHS systems of records notices (SORN): DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, DHS/USCIS-007 Benefit Information System, DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER), and DHS/ICE-003 General Counsel Electronic Management System (GEMS), and DHS/CBP-023 Border Patrol Enforcement Records (BPER). These SORNs can be viewed at https://www.dhs.gov/system-records-notices-sorns. When disclosed to the DOJ's EOIR for immigration proceedings, this information that is maintained and used by DOJ is covered by the following DOJ SORN: EOIR-001, Records and Management Information System, or any updated or successor SORN, which can be viewed at https://www.justice.gov/opcl/doj-systems-records. Further, your information may be disclosed pursuant to routine uses described in the abovementioned DHS SORNs or DOJ EOIR SORN to federal, state, local, tribal, territorial, and foreign law enforcement agencies for enforcement, investigatory, litigation, or other similar purposes.

For all others, as appropriate under United States law and DHS policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties for enforcement, investigatory, litigation, or other similar purposes.

**Disclosure:**
Providing your signature and the date of your signature is voluntary. There are no effects on you for not providing your signature and date; however, removal proceedings may continue notwithstanding the failure or refusal to provide this information.

# EXHIBIT C

Stacy Tolchin
Law Offices of Stacy Tolchin
776 E. Green St. Suite 210
Pasadena, CA  91101
Telephone:  (213) 622-7450
Facsimile:  (213) 622-7233

Attorney for Respondent

**DETAINED**

## UNITED STATES DEPARTMENT OF JUSTICE

## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

## OFFICE OF THE IMMIGRATION JUDGE

## ADELANTO, CALIFORNIA

| | |
|---|---|
| In the Matter of: | No. ▮▮▮▮▮ |
| Carlos OSORTO | Date: July 16, 2025 |
| Respondent, | Time: 1:30 PM |
| | Before: Hon. Patrick D. Barrett |
| In Bond Proceedings. | |

**RESPONDENT'S DOCUMENTS  IN SUPPORT OF BOND**

**RESPONDENT'S DOCUMENTS  IN SUPPORT OF BOND**

A.  DOCUMENT'S SUPPORTING RESPONDENT'S MOTION TO TERMINATE
BASED ON UNLAWFUL ARREST

1.  Declaration of Respondent……………………………………………….…1

2.  First Amended Petition for Writ Of Habeas Corpus And Complaint For Declaratory
And Injunctive Relief Class Action in <u>Vasquez Perdomo v. Noem</u>  ……………3

3.  Petition for Writ of Habeas Corpus in <u>Vasquez Perdomo v. Noem</u>………………68

4.  <u>Sanchez v. Sessions</u>, 904 F.3d 643 (9th Cir. 2018) (establishing termination of
removal proceedings for unlawful arrest under egregious circumstances)………..75

B.  DOCUMENTS DEMONSTRATING THAT RESPONDENT IS NOT A FLIGHT RISK

# BOND EXHIBIT  A

## DECLARATION OF CARLOS ALEXANDER OSORTO

I, Carlos Alexander Osorto, declare the following based on my personal knowledge:

1.     I make this declaration from my personal knowledge and if called to testify to these facts I could and would do so competently.

2.     My name is Carlos Alexander Osorto. I am 50 years old. I am Hispanic.

3.     I have lived in Pasadena, California for about 14 years. I am a day laborer. I work in construction. I have built homes all over Los Angeles. I am a proud grandfather to seven U.S. citizen grandchildren, ages 2-13, including two step-grandchildren.

4.     On June 18, 2025 around 5:50 A.M., I was sitting on a bench at the Metro stop in front of Winchell's Donuts near the corner of Orange Grove Boulevard and Los Robles Avenue in Pasadena, CA waiting to be picked up for a construction job. I was with a few co-workers. We were drinking coffee and things were calm.

5.     Suddenly, my coworker said to me, "those cars seem strange." I looked up and saw four unmarked, regular sedans with tinted windows and no license plates had pulled up in front of and surrounding us. They came up quickly and really scared me. At that moment, the car doors swung open and at least four men in masks and civilian clothes with guns strapped to their legs started running at us. One of the men had a large gun. They did not identify themselves; they just started running. None of them had visible badges, just a vest.

6.     I was terrified. I didn't know who the men were and I was afraid they would hurt me. It felt like mercenaries, like a kidnapping. For weeks, I had seen videos and heard stories of these things happening all around Los Angeles. I had also heard that the masked people taking people away weren't even government agents, but bounty hunters. I got up and tried to run. I heard the men yelling "stop!" but they still did not identify themselves as immigration or any type of law enforcement officers. Soon, one of the men caught up to me. He pointed what looked like a gun, but I think it was a taser, over my heart and yelled "stop or I'll use it!" I stopped immediately. He handcuffed me without

asking any questions, or identifying himself, and took me back to the bench. My coworkers were already in handcuffs when I got back.

7.    We were each put in a different car. The men drove us two blocks over to a CVS parking lot, which was empty at that time. They removed us from the cars. All of the officers had guns and tasers strapped to their legs. One had a big gun, like you would have in war, and he held it in front of his chest. It was very intimidating.

8.    One of the men asked me if I had papers. I said no. This was the first time I was asked for my immigration papers. I was already handcuffed, but they chained me in three places: my feet, my waist, and my wrists. Then they put me back in the car and drove me to a jail. I was never informed that there was any warrant for my arrest.

9.    When we arrived at the jail, the men who arrested us put on their jackets and uniform that said police. Officers took my fingerprints and photo. They asked me lots of questions and got mad when I did not want to answer.

10.    The jail was already really full. Some people had been there for days. The officers kept yelling "No water! No food! No medicine!" when people would ask for help. I was held there for two days and then they moved us. I was shackled again at my feet, waist and wrists and moved to Adelanto, where I am currently detained.

11.    At Adelanto I am held in a cell with three other men. There is one toilet in the room that we have to share with no privacy. I am afraid for my safety here. I saw a man fall and hit his head. We told the officers, but they told us just to leave him there and that he did not need medical care. Another man was banging his head against the wall repeatedly because he was in so much pain from a toothache, but the officers said there was nothing they could do about it.

12.    The doctor who screened me told me I have dangerously high blood pressure. I have never had high blood pressure before, I think it is the stress from this whole situation. I have been scared and sad and overwhelmed by the arrest and my detention.

13.    I think I was targeted for arrest because I am Latino and because I was in my construction clothes. I am afraid that I am likely to be arrested again for the same reason.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct. Executed at Adelanto, California on June 27, 2025.

Carlos Alexander Osorto

# CERTIFICATE OF INTERPRETATION

I, Mariano Barrera, am competent to interpret between the English and Spanish languages. I certify that I read the attached "DECLARATION OF CARLOS ALEXANDER OSORTO IN SUPPORT OF PLAINTIFFS' COMPLAINT, AND MOTION FOR TEMPORARY RESTRAINING ORDER" to Carlos Alexander Osorto in the Spanish language and that he understood it and agreed that it was true and accurate before signing. I certify that my interpretation of the attached document was true and accurate to the best of my abilities.

_____          06/27/2025
Signature of interpreter                          Date
Mariano Barrera
Law Offices of Stacy Tolchin
776 E. Green St. Ste 210
Pasadena, CA 91101
(213)622-7450

5

4

STACY TOLCHIN (SBN 217431)
*stacy@tolchinimmigration.com*
LAW OFFICES OF STACY TOLCHIN
776 E. Green St., Suite 210
Pasadena, CA 91101
Telephone: (213) 622-7450
Facsimile:  (213) 622-7233

MOHAMMAD TAJSAR (SBN 280152)
*mtajsar@aclusocal.org*
MAYRA JOACHIN (SBN 306065)
*mjoachin@qclusocal.org*
EVA BITRAN (SBN 302081)
*ebitran@aclusocal.org*
DAE KEUN KWON (SBN 313155)
*akwon@aclusocal.org*
OLIVER MA (SBN 354266)
*oma@aclusocal.org*
STEPHANIE PADILLA (SBN 321568)
*spadilla@qclusocal.org*
DIANA SANCHEZ (SBN 338871)
*dianasanchez@aclusocal.org*
ACLU FOUNDATION OF
SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, CA 90017-4022
Telephone: (213) 977-5232
Facsimile: (213) 201-7878

*Counsel for Stop/Arrest Plaintiffs*
(*additional counsel information on cont.
page*)

MARK ROSENBAUM (SBN 59940)
*mrosenbaum@publiccounsel.org*
REBECCA BROWN (SBN 345805)
*rbrown@publiccounsel.org*
SOPHIA WRENCH (SBN 354416)
*swrench@publiccounsel.org*
RITU MAHAJAN (SBN 252970)
*rmahajan@publiccounsel.org*
GINA AMATO (SBN 215519)
*gamato@publiccounsel.org*
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, CA 90005
Telephone: (213) 385-2977

*Counsel for All Plaintiffs*

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Pedro VASQUEZ PERDOMO; Carlos Alexander OSORTO; and Isaac VILLEGAS MOLINA; Jorge HERNANDEZ VIRAMONTES; Jason Brian GAVIDIA; LOS ANGELES WORKER CENTER NETWORK; UNITED FARM WORKERS; COALITION FOR HUMANE IMMIGRANT RIGHTS; IMMIGRANT DEFENDERS LAW CENTER, <br><br>     Plaintiffs, <br><br>    v. | Case No.: 2:25-cv-05605-MEMF-SP <br><br>**FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br>**CLASS ACTION** <br><br>Hon. Maame Ewusi-Mensah Frimpong |

1  Kristi NOEM, in her official capacity as
2  Secretary, Department of Homeland
   Security; Todd M. LYONS, in his official
3  capacity as Acting Director, U.S.
   Immigration and Customs Enforcement;
4  Rodney S. SCOTT, in his official
   capacity as Commissioner, U.S. Customs
5  and Border Patrol; Michael W. BANKS,
   in his official capacity as Chief of U.S.
6  Border Patrol; Kash PATEL, in his
   official capacity as Director, Federal
7  Bureau of Investigation; Pam BONDI, in
   her official capacity as U.S. Attorney
8  General; Ernesto SANTACRUZ JR., in
   his official capacity as Acting Field
9  Office Director for Los Angeles, U.S.
   Immigration and Customs Enforcement;
10 Eddy WANG, Special Agent in Charge
   for Los Angeles, Homeland Security
11 Investigations, U.S. Immigration and
   Customs Enforcement; Gregory K.
12 BOVINO, in his official capacity as Chief
13 Patrol Agent for El Centro Sector of the
   U.S. Border Patrol; Jeffrey D.
14 STALNAKER, in his official capacity as
   Acting Chief Patrol Agent, San Diego
15 Sector of the U.S. Border Patrol; Akil
   DAVIS, in his official capacity as
16 Assistant Director in Charge, Los
17 Angeles Office, Federal Bureau of
   Investigation; Bilal A. ESSAYLI, in his
18 official capacity as U.S. Attorney for the
   Central District of California,
19
20      Defendants.
21
22
23
24
25
26
27
28

6

ANNE LAI (SBN 295394)
alai@law.uci.edu
UC IRVINE SCHOOL OF LAW
IMMIGRANT AND RACIAL
JUSTICE
SOLIDARITY CLINIC
P.O. Box 5479
Irvine, CA 92616-5479
Telephone: (949) 824-9894
Facsimile: (949) 824-2747

*Counsel for Stop/Arrest Plaintiffs*

LAUREN MICHEL WILFONG*
lwilfong@ndlon.org
NATIONAL DAY LABORER
ORGANIZING NETWORK
1030 S. Arroyo Parkway, Suite 106
Pasadena, CA 91105
Telephone: (626) 214-5689

*Counsel for Stop/Arrest Plaintiffs*

BREE BERNWANGER (SBN 331731)
bbernwanger@aclunc.org
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF
NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493

*Counsel for Stop/Arrest Plaintiffs*

BRISA VELAZQUEZ OATIS
(SBN 339132)
bvoatis@aclu-sdic.org
ACLU FOUNDATION OF
SAN DIEGO & IMPERIAL
COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
Telephone: (619) 398-4199

*Counsel for Stop/Arrest Plaintiffs*

MATTHEW J. CRAIG (SBN 350030)
mcraig@heckerfink.com
MACK E. JENKINS (SBN 242101)
mjenkins@heckerfink.com
HECKER FINK LLP
1150 South Olive Street, Suite 10-140
Los Angeles, CA 90015
Telephone: (212) 763-0883
Facsimile: (212) 564-0883

*Counsel for Access/Conditions Plaintiffs*

EDGAR AGUILASOCHO
(SBN 285567)
eaguilasocho@farmworkerlaw.com
MARTINEZ AGUILASOCHO LAW, INC.
1527 19th Street #332
Bakersfield, CA 93301
Telephone: (661) 859-1174

*Counsel for Plaintiff United Farm Workers*

CARL BERGQUIST*
cbergquist@chirla.org
COALITION FOR HUMANE
IMMIGRANT RIGHTS
2351 Hempstead Road
Ottawa Hills, OH 43606
Telephone: (310) 279-6025

*Counsel for Plaintiff Coalition for Humane Immigrant Rights*

ALVARO M. HUERTA (SBN 274787)
ahuerta@immdef.org
BRYNNA BOLT (SBN 339378)
bbolt@immdef.org
ALISON STEFFEL (SBN 346370)
asteffel@immdef.org
IMMIGRANT DEFENDERS LAW
CENTER
634 S. Spring St., 10th Floor
Los Angeles, CA 90014
Telephone: (213) 634-0999

*Counsel for Plaintiff Immigrant Defenders Law Center*

* Pro hac vice application forthcoming

# **INTRODUCTION**

1. This lawsuit seeks to enjoin Defendants' ongoing pattern and practice of flouting the Constitution and federal law in connection with ongoing immigration raids in the Los Angeles area.

2. Since early June, this District has been under siege. Masked federal agents, sometimes dressed in military-style clothing, have conducted indiscriminate immigration operations, flooding street corners, bus stops, parking lots, agricultural sites, day laborer corners, and other places, setting up checkpoints, and entering businesses, interrogating residents as they are working, looking for work, or otherwise trying to go about their daily lives, and taking people away.

3. The raids in this District follow a common, systematic pattern. Individuals with brown skin are approached or pulled aside by unidentified federal agents, suddenly and with a show of force, and made to answer questions about who they are and where they are from. If they hesitate, attempt to leave, or do not answer the questions to the satisfaction of the agents, they are detained, sometimes tackled, handcuffed, and/or taken into custody. In these interactions, agents typically have no prior information about the individual and no warrant of any kind. If agents make an arrest, contrary to federal law, they do not make any determination of whether a person poses a risk of flight before a warrant can be obtained. Also contrary to federal law, the agents do not identify themselves or explain why the individual is being arrested.

4. Further, apparently to accommodate the sharp rise in arrests, the government has resorted to keeping individuals at what is supposed to be a short-term processing center and ICE basement holding area in downtown Los Angeles, known as "B-18," often for days. In these dungeon-like facilities, conditions are deplorable and unconstitutional. The government has also unlawfully deprived those arrested of access to counsel. Under such conditions, some of those arrested are pressured into accepting voluntary departure. The government is aware that its

-4-

1    actions are unconstitutional and contrary to officers' training, but deliberately
2    persists because this system allows it to coerce removals, avoid public
3    accountability, and ultimately—given the limited bed space at longer-term detention
4    facilities in the area—keep arrest numbers high.

5        5.    Federal immigration enforcement is constrained by law. But since the
6    federal government began its mass immigration enforcement operations in this
7    District on June 6, 2025, all of these legal requirements have given way to one
8    overriding consideration: "numbers, pure numbers. Quantity over quality"[1]

9        6.    In late May, the White House and the Department of Homeland
10   Security imposed a quota of 3,000 immigration-related arrests per day—with
11   "consequences for not hitting arrest targets."[2]  In order to reach this target, White
12   House Deputy Chief of Staff Stephen Miller directed high-level officials to change
13   their approach to stops and arrests in the field. Agents and officers, according to
14   him, should no longer conduct targeted operations based on investigations. Instead,
15   they should "just go out there and arrest [unauthorized noncitizens]" by rounding up
16   people in public spaces like "Home Depot" and "7-Eleven" convenience stores.[3]

17       7.    This comprehensive scheme has been guised as a crackdown on the
18   "worst of the worst."[4] But the preponderance of individuals stopped and arrested in
19   the raids have not been targeted in any meaningful sense of the word at all, except
20
21

---

22   [1] Jennie Taer, *Trump admin's 3,000 ICE arrests per day quota is taking focus off criminals and 'killing morale': insiders*, New York Post (June 17, 2025),
23   https://nypost.com/2025/06/17/us-news/trump-admins-3000-ice-arrests-per-day-quota-is-taking-focus-off-criminals-and-killing-morale-insiders/.
24   [2]  Elizabeth Findell, et al., *The White House Marching Orders That Sparked the L.A. Migrant Crackdown*, The Wall Street Journal (June 9, 2025),
25   https://www.wsj.com/us-news/protests-los-angeles-immigrants-trump-f5089877.
26   [3] *Id.*
27   [4] *Dep't of Homeland Sec., ICE Captures Worst of the Worst Illegal Alien Criminals in Los Angeles Including Murderers, Sex Offenders, and Other Violent Criminals*
28   (June 8, 2025), https://www.dhs.gov/news/2025/06/08/ice-captures-worst-worst-illegal-alien-criminals-los-angeles-including-murderers

on the basis of their skin color and occupation.[5] Those who have borne the brunt of Defendants' heavy-handed pattern of unlawful conduct include day laborers, car wash workers, farm workers, street vendors, service workers, caregivers and others who form the lifeblood of communities across Southern California. Over a thousand residents in the District have already been impacted, including a shocking (though hardly surprising) number of U.S. citizens and individuals lawfully present in the country.

8. This case challenges the government's use of unlawful tactics to achieve its intended arrest numbers in the District. Plaintiffs include five individuals and three membership organizations, the Los Angeles Worker Center Network, United Farm Workers, and the Coalition for Humane Immigrant Rights (together, the "Stop/Arrest Plaintiffs"), who, on behalf of themselves and others similarly situated, bring claims challenging Defendants' unlawful stop and arrest practices. Plaintiffs also include the Immigrant Defenders Law Center, who, alongside the Coalition for Humane Immigrant Rights (together, the "Access/Detention Plaintiffs"), seek to challenge Defendants' denial of access to counsel and illegal conditions of confinement at B-18. Despite the fear and risks associated with speaking publicly, they are taking courageous action to enforce the rule of law. They seek declaratory and injunctive relief as well as relief under the Administrative Procedure Act (APA).

## JURISDICTION AND VENUE

9. Jurisdiction is proper and relief is available pursuant to 28 U.S.C. § 1331 (federal question), 5 U.S.C. §§ 702 and 706 (Administrative Procedure Act), 28 U.S.C. § 2241 (federal habeas statute), U.S. Const. art. I, § 9 (Suspension

---

[5] Rachel Uranga, "Most nabbed in L.A. raids were men with no criminal conviction, picked up off street," L.A. Times (June 24, 2025), https://www.latimes.com/california/story/2025-06-24/detention-centers-swell-with-immigrants-with-no-criminal-record.

-6-

1    Clause), 28 U.S.C. § 1651 (All Writs Act), 28 U.S.C. §§ 2201-02 (Declaratory

2    Judgment Act), and Fed. R. Civ. P. 65 (injunctive relief).

3        10.    Defendants do not have immunity. *See, e.g.*, 5 U.S.C. § 702; *Larson v.*

4    *Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689–90 (1949); *The Presbyterian*

5    *Church (U.S.A.) v. United States*, 870 F.2d 518, 526 (9th Cir. 1989).

6        11.    Venue is proper under 28 U.S.C. § 1391(e)(1) because Defendants are

7    officers or employees of the United States and at least one Plaintiff resides in this

8    District; a substantial part of the events or omissions giving rise to the claims

9    occurred in this District; and/or because a Defendant resides in this District.

10                                    **PARTIES**

11       12.    **Plaintiff-Petitioner Pedro Vasquez Perdomo** is a resident of

12   Pasadena, California who was arrested at a bus stop as he was waiting to be picked

13   up for a job on June 18, 2025. He filed this action while detained in the basement of

14   the Los Angeles downtown federal building, B-18. Because of his Latino ethnicity

15   and identity as a day laborer, he fears being subject to a future stop by federal agents

16   without reasonable suspicion.

17       13.    **Plaintiff-Petitioner Carlos Alexander Osorto** is a resident of

18   Pasadena, California who was arrested at a bus stop as he was waiting to be picked

19   up for a job on June 18, 2025. He filed this action while detained in the basement of

20   the Los Angeles downtown federal building, B-18. Because of his Latino ethnicity

21   and identity as a day laborer, he fears being subject to a future stop by federal agents

22   without reasonable suspicion.

23       14.    **Plaintiff-Petitioner Isaac Villegas Molina** is a resident of Pasadena,

24   California who was arrested at a bus stop as he was waiting to be picked up for a job

25   on June 18, 2025. He filed this action while detained in the basement of the Los

26   Angeles downtown federal building, B-18. Because of his Latino ethnicity and

27   identity as a day laborer, he fears being subject to a future stop by federal agents

28   without reasonable suspicion.

15.     **Plaintiff Jorge Hernandez Viramontes** is a resident of Baldwin Park, California. He works at a car wash in Orange County, California that has been visited three times by immigration agents, most recently on June 18, 2025, when he was questioned and detained by agents despite informing them he is a U.S. citizen. He fears being subjected to similar actions again on the basis of his Latino ethnicity and accent.

16.     **Plaintiff Jason Brian Gavidia** is a resident of East Los Angeles, California. He was stopped and questioned by immigration agents at a tow yard in Los Angeles County on June 12, 2025, despite explaining multiple times he is a U.S. Citizen. Agents pushed him against the metal gated fence, put his hands behind his back, and twisted his arm. He was finally let go, but was terrified by this experience and fears being subjected to similar actions again on the basis of his Latino ethnicity.

17.     **Plaintiff Los Angeles Worker Center Network (LAWCN)** is a multi-racial, multi-ethnic, and multi-industry organization comprised of worker centers and labor organizations that work together to address injustices faced by low-wage workers in the greater Los Angeles area, including immigrant and non-English speaking workers. LAWCN's worker center members include the CLEAN Carwash Worker Center, the Garment Worker Center, the Koreatown Immigrant Workers Alliance, the Los Angeles Black Worker Center, the Philipino Workers Center, and the Warehouse Worker Resource Center. These worker center members in turn have members, including noncitizens with legal status and U.S. citizens, who have been subjected to and are at risk of being subjected in the future to the stop and arrest policies and practices challenged in this case.

18.     **Plaintiff United Farm Workers (UFW)** is the largest farm worker union in the country with approximately 10,000 members, with more members in California than in any other state. UFW aims to improve the lives, wages, and working conditions of agricultural workers and their families, including by

1  advocating for immigration reform and immigrants' rights. UFW's members in

2  California work at agricultural sites as well as non-agricultural sites within the

3  District. UFW has members, including noncitizens with legal status and U.S.

4  citizens, who have been, and are at risk of being, subjected in the future to the stop

5  and arrest policies and practices challenged in this case.

6        19.    **Plaintiff Coalition for Humane Immigrant Rights (CHIRLA)** is a

7  nonprofit organization with its principal place of business in Los Angeles,

8  California. CHIRLA was founded in 1986 to advance the human and civil rights of

9  immigrants and refugees. Since then, CHIRLA has become one of the largest and

10  most effective advocates for immigrant rights, organizing, educating and defending

11  immigrants and refugees in the streets, in the courts, and in the halls of power. As a

12  membership organization, CHIRLA has approximately 50,000 members across

13  California, including both U.S. citizens and noncitizens of varying immigration

14  status. CHIRLA has members in every county in the District. CHIRLA's staff also

15  includes attorneys and Department of Justice (DOJ) accredited representatives who

16  provide pro bono legal services to clients in removal proceedings, including those

17  who are detained. Additionally, CHIRLA coordinates the Los Angeles Rapid

18  Response Network (LARRN) and educates its membership as well as the broader

19  community through know-your-rights programming, workshops, social media, and

20  educational literature about a variety of social services and benefits, including

21  immigration law, financial literacy, workers' rights, and civic engagement.

22        20.    **Plaintiff Immigrant Defenders Law Center (ImmDef)** is a nonprofit

23  organization having its principal place of business in Los Angeles, California.

24  Besides Los Angeles, ImmDef has offices in Riverside, Santa Ana, and San Diego,

25  California, and works across the U.S.-Mexico border in Tijuana. ImmDef was

26  founded in 2015 to protect the due process rights of immigrants facing deportation.

27  At its founding, ImmDef was focused on ensuring that every immigrant before the

28  immigration court had a lawyer by their side. In the years that followed, ImmDef

-9-

expanded its mission beyond helping individuals facing deportation to also work towards systemic change that reimagines a more just immigration system. ImmDef provides deportation defense, legal representation, legal education, and social services to detained and non-detained children and adults.

21.     **Defendant Kristi Noem** is the Secretary of the Department of Homeland Security (DHS), which is responsible for administering and enforcing the nation's immigration laws pursuant to 8 U.S.C. § 1103(a). In this role, she oversees component agencies such as ICE and U.S. Customs and Border Protection (CBP). Defendant Noem is sued in her official capacity.

22.     **Defendant Todd M. Lyons** is the Acting Director of U.S. Immigration and Customs Enforcement (ICE), an agency of the United States and a division of DHS. ICE's mission includes the enforcement of criminal and civil laws related to immigration. Among other things, ICE is responsible for the stops, arrests, and custody of individuals believed to be in violation of civil immigration law. Defendant Lyons is sued in his official capacity.

23.     **Defendant Rodney S. Scott** is the Commissioner of CBP, the agency within DHS that is responsible for enforcing immigration laws at or close to the U.S. border. In that capacity, Defendant Scott has direct authority over all CBP policies, procedures, and practices related to stops, arrests, and detention. Defendant Scott is sued in his official capacity.

24.     **Defendant Michael W. Banks** is Chief of the U.S. Border Patrol. In that capacity, Defendant Banks has direct authority over all Border Patrol policies, procedures, and practices related to stops, arrests, and detention. Defendant Banks is sued in his official capacity.

25.     **Defendant Kash Patel** is Director of the U.S. Federal Bureau of Investigation (FBI). In that capacity, Defendant Patel is responsible for the direction and oversight of all operations of the FBI. Defendant Patel is sued in his official capacity.

-10-

26. **Defendant Pam Bondi** is the U.S. Attorney General. In that capacity, Defendant Bondi is head of the Department of Justice (DOJ) and is responsible for the direction and oversight of all operations of the DOJ, including DOJ law enforcement agencies such as the FBI, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and the Drug Enforcement Administration (DEA). Defendant Bondi is sued in her official capacity.

27. **Defendant Ernesto Santacruz Jr.** is the Acting Field Office Director for the Los Angeles Field Office of ICE. In that capacity, Defendant Santacruz Jr. is responsible for the supervision of personnel within ICE's Enforcement and Removal Operations (ERO) in the geographic area covered by the Los Angeles Field Office, which comprises the seven counties in the District, and facilities within the District including the basement of the Los Angeles federal building, B-18. Defendant Santacruz Jr. is sued in his official capacity.

28. **Defendant Eddy Wang** is the U.S. Homeland Security Investigations Special Agent in Charge for Los Angeles. In that capacity, Defendant is responsible for the supervision of agents within ICE's Homeland Security Investigations (HSI) in the Los Angeles Area including as to stops and arrests. Defendant Wang is sued in his official capacity.

29. **Defendant Gregory K. Bovino** is the Chief Patrol Agent for the El Centro Sector of CBP. In that capacity, Defendant Bovino is responsible for the supervision of agents in the El Centro Sector including as to stops, arrests, and detention. Defendant Bovino is sued in his official capacity.

30. **Defendant D. Stalnaker** is the Acting Chief Patrol Agent for the San Diego Sector of CBP. In that capacity, Defendant Stalnaker responsible for the supervision of agents in the San Diego Sector including as to stops, arrests, and detention. Defendant Stalnaker is sued in his official capacity.

31. **Defendant Akil Davis** is the Assistant Director of the Los Angeles Office of the FBI. In that capacity, Defendant Davis is responsible for the

-11-

supervision of all agents in the Los Angeles Office including as to stops and arrests. Defendant Davis is sued in his official capacity.

32.     **Defendant Bilal A. Essayli** is the U.S. Attorney for the Central District of California. In that capacity, Defendant Essayli has authority over federal law enforcement operations within the District, including those of the FBI, ATF, and DEA. Defendant Essayli is sued in his official capacity.

## FACTUAL ALLEGATIONS

33.     Starting on or around June 6, 2025, the federal government unleashed immigration agents and officers into the streets, worksites, and neighborhoods of Los Angeles and surrounding counties, creating an illegal detention and deportation dragnet that shows no signs of ceasing.

### A.     Suspicionless Stops Based on Racial Profiling

34.     The constitutional, statutory, and regulatory framework is clear about the practices immigration officers must follow. The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. "Except at the border and its functional equivalents," immigration agents may stop individuals in public only after identifying "specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion" of a violation of immigration law. *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975); *Benitez-Mendez v. I.N.S.*, 752 F.2d 1309, 1311 (9th Cir. 1983), *amended*, 760 F.2d 907 (9th Cir. 1983); *see also* 8 C.F.R. § 287.8(b)(2). Reasonable suspicion cannot be based "on broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped." *United States v. Rodriguez Sanchez*, 23 F.3d 1488, 1492 (9th Cir. 1994).

35.     Immigration officials in Southern California are not abiding by this framework.

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

36. One of the clearest patterns that have emerged in the raids in Southern California over the past few weeks has been stops and interrogations based on nothing but broad profiles, including on the basis of apparent race and ethnicity.[6] On information and belief, Defendants have adopted a policy and practice of conducting immigration operations in violation of their obligation to stop individuals in public only if there is reasonable suspicion.

37. As often happens when agencies adopt a pattern and practice of racial profiling, among those most vulnerable have been individuals whose work makes them a visible target in public spaces.

38. Day laborer pickup locations have become central sites of immigration enforcement.[7] On June 6, 2025, federal agents detained multiple day laborers outside of the Westlake Home Depot.[8] In the following days, similar raids occurred

---

[6] Brittany Mejia & Rachel Uranga, *Fears of racial profiling rise as Border Patrol conducts 'roving patrols,' detains U.S. Citizens*, L.A. Times (June 15, 2025), https://www.latimes.com/california/story/2025-06-15/latinos-targeted-in-raids-u-s-citizens-detained-indiscriminate-sweeps-home-depot-lots-targeted

[7] Kaitlyn Huamani, *Home Depot caught in the crosshairs of L.A. immigration raids*, L.A. Times (June 9, 2025), https://www.latimes.com/business/story/2025-06-09/home-depot-in-the-crosshairs-of-immigrations-raids (discussing how Home Depots across Southern California have been impacted by the immigration raids); Maanvi Singh, *At Home Depot, Ice raids terrorize the workers who helped build LA: "They just come and grab you"*, The Guardian (June 16, 2025), https://www.theguardian.com/us-news/2025/jun/16/home-depot-ice-raids-los-angeles; Pat Maio, *Home Depot's day laborer haven turns into immigration target across Southern California*, L.A. Daily News (June 13, 2025), https://www.dailynews.com/2025/06/13/home-depot-a-longtime-destination-for-day-laborers-part-of-symbolic-southern-california-raids/ (listing multiple Home Depot locations in Los Angeles and Orange County where day laborers have been detained).

[8] Cameron Kiszla, *Immigration agents raid several L.A. businesses, encounter protesters*, KTLA 5 (June 6, 2025), https://ktla.com/news/local-news/federal-agents-raid-home-depot-in-westlake-district/ (reporting that masked officers wearing vests emblazoned with "HSI" took individuals into custody at a Home Depot in Westlake); Helen Jeong, *45 people arrested during ICE raids at 3 downtown LA locations*, NBC 4 (June 6, 2025), Telemundo 52, *Actividad de autoridades federales en distintas areas de Los Angeles*, YouTube (June 7, 2025), https://www.youtube.com/watch?v=y-MrC5tzd3o (featuring a day laborer witness who recalled hearing someone yell "la migra, la migra!" and observed officers arrest several day laborers without presenting any documents or warrants; the entire operation reportedly lasted only 20 minutes).

at Home Depot stores in Whittier,[9] Huntington Park,[10] Santa Ana,[11] Downey,[12] Upland,[13] Paramount,[14] Hollywood,[15] Costa Mesa,[16] Inglewood,[17] Baldwin Park,[18]

---

[9] Kaitlyn Huamani, *Home Depot caught in the crosshairs of L.A. immigration raids*, L.A. Times (June 9, 2025), https://www.latimes.com/business/story/2025-06-09/home-depot-in-the-crosshairs-of-immigrations-raids (noting an immigration raid conducted by federal agents at a Home Depot in Whittier); Maanvi Singh, *At Home Depot, Ice raids terrorize the workers who helped build LA: "They just come and grab you"*, The Guardian (June 16, 2025), https://www.theguardian.com/us-news/2025/jun/16/home-depot-ice-raids-los-angeles (same); Tracey Leong & Karla Rendon, *'Hope he comes back.' Long Beach family says father detained outside Whittier Home Depot*, NBC 4 (Jun, 14, 2025), https://www.nbclosangeles.com/news/local/long-beach-grandfather-detained-immigration/3724461/ (highlighting the emotional impact of immigration raids on a Long Beach family after a loved one was detained outside the Whittier Home Depot).

[10] Pat Maio, *supra*, note 7; Nathan Solis, et al., *What businesses are the feds targeting during L.A. immigration sweeps? Here's what we know*, L.A. Times (June 10, 2025), https://www.latimes.com/california/story/2025-06-10/ice-sweep-targets-what-we-know.

[11] Pat Maio, *supra*, note 7; Nathan Solis, *supra*, note 10.

[12] Karla Rendon, *Immigration raids reported near Downey churches*, NBC 4 (June 11, 2025), https://www.nbclosangeles.com/news/local/downey-churches-home-depot-immigration-raids/3721686/.

[13] Helen Jeong, *ICE agents fail to detain day laborers at Upland Home Depot after bystanders intervene*, NBC 4 (June 16, 2025), https://www.nbclosangeles.com/news/local/ice-agents-fail-to-detain-day-laborers-at-upland-home-depot-after-bystanders-intervene/3725645/.

[14] Pat Maio, *supra*, note 7.

[15] Brittny Mejia & Rachel Uranga, *Raid at a Home Depot in Hollywood shatters an immigrant refuge*, L.A. Times (June 20, 2025), https://www.latimes.com/california/story/2025-06-20/border-patrol-agents-arrest-street-vendors-outside-hollywood-home-depot.

[16] Pat Maio, *supra*, note 7. .

[17] NBCLA, *Federal agents detain people near Hollywood Home Depot*, YouTube (June 19, 2025), https://www.youtube.com/watch?v=sjCJYBR24gw.

[18] *Baldwin Park Among Cities Targeted in Immigration Raids Wednesday Morning*, Baldwin Park News (June 29, 2025), https://baldwinparknewsonline.com/baldwin-park-among-cities-targeted-in-immigration-raids-wednesday-morning/.

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Sylmar,[19] Glendale, [20] Marina Del Rey,[21] and Los Angeles.[22]  Other day laborer pickup sites—a 99 cents store in Hawthorne,[23] a shopping center in Los Angeles,[24] a Walmart in Pico Rivera,[25]—have also been targeted.

39.     Car wash workers have also been heavily impacted. Car washes, in which workers typically wash, dry, and detail vehicles outdoors, have been hit across Southern California, including more than once. Indeed, during the initial days of the raids, between June 7, 2025, and June 11, 2025, federal agents raided at least nine car washes in Los Angeles and Orange Counties, with at least 25 workers and one customer arrested.[26]

---

[19] Semantha Raquel Norris, *Federal Immigration Agents Terrorize the Northeast Valley*, San Fernando Valley Sun (June 19, 2025), https://sanfernandosun.com/2025/06/19/federal-immigration-agents-terrorize-the-northeast-valley/.

[20] 209 Drone Shots (@209_drone_shots), Instagram (June 27, 2025), https://www.instagram.com/p/DLZCN6TOHoW.

[21] NBC San Diego (@nbcsandiego), Instagram (June 28, 2025, https://www.instagram.com/p/DLP893MsqS6/

[22] Unión Del Barrio (@uniondelbarrio), Instagram (June 26, 2025), https://www.instagram.com/p/DLYF94bBUYs.

[23] Eric Villagomez (@puroslatinotx), Instagram (June 8, 2025), https://www.instagram.com/p/DKqboCRptBU.

[24] Eric Villagomez (@purolatinostv), Instagram (June 6, 2025), https://www.instagram.com/p/DKkr84sBSgX.

[25] Pico Rivera, California (@picoriveracommunity), Instagram (June 17, 2025), https://www.instagram.com/p/DLA7wZYzlKY; Fox 11 Los Angeles, *Adrian Martinez: Young man detained by ICE outside a Walmart in Pico Rivera*, YouTube (June 17, 2025), https://www.youtube.com/watch?v=iZ6J99cnYqs.

[26] Emily Baumgaertner Nunn & Anushka Patil, *Carwashes become easy targets in California's ICE raids*, N.Y. Times (June 11, 2025), https://www.nytimes.com/live/2025/06/11/us/los-angeles-protests-trump-ice?smid=url-share#carwashes-become-easy-targets-in-californias-ice-raids; Suhauna Hussain, *'They are grabbing people.' L.A. and Orange County car wash workers targeted by federal immigration raids*, L.A. Times (June 11, 2025), https://www.latimes.com/business/story/2025-06-11/l-a-orange-county-car-washes-hit-by-ice-raids.

40.     Additionally, farm and agricultural workers have been targeted. Between Monday, June 9, 2025, and June 13, 2025, at least 43 people were detained on farms in Ventura and Santa Barbara Counties.[27]

41.     The manner in which the foregoing raids have been conducted bears no hallmarks of reasonable suspicion: there are no indicia that agents had any specific articulable facts sufficient to justify a seizure. Instead, those who appear to be non-white have been categorically stopped, sometimes without even being asked for identification.

42.     This pattern has continued with other types of workers as well. On the first day of the raids, HSI agents executed a search warrant and made collateral arrests of workers they encountered as well.[28] The raids have also resulted in interrogation of street vendors[29] and workers at recycling centers,[30] tow yards,[31] and

---

[27] Amy Taxin & Dorany Pineda, *Immigration Raids are threatening businesses that supply America's food, farm bureaus say*, Associated Press (June 13, 2025), https://www.kvpr.org/local-news/2025-06-13/immigration-raids-are-threatening-businesses-that-supply-americas-food-farm-bureaus-say.

[28] Génesis Miranda Miramontes, *US Attorney confirms FBI, federal agencies serve a search warrant in downtown LA*, NBC 4 (June 6, 2025), https://www.nbclosangeles.com/news/local/us-attorney-confirms-fbi-federal-agencies-search-warrant-downtown-los-angeles/3717411/.

[29] Leanne Suter, *Community members try to help street vendor taken by federal agents in Ladera Heights, video shows*, ABC7 (June 27, 2025), https://abc7.com/post/community-members-try-help-street-vendor-taken-ice-ladera-heights/16863236/.

[30] *See, e.g.*, Ryan P. Cruz, *Immigration Enforcement Shakes Up Communities of Santa Barbara County*, Santa Barbara Independent (June 20, 2025), https://www.independent.com/2025/06/20/immigration-enforcement-shakes-up-communities-of-santa-barbara-county/.

[31] *See, e.g.*, Brittny Mejia, *Video shows immigration agents interrogating a Latino U.S. citizen: 'I'm American, bro!'*, L.A. Times (June 13, 2025), https://www.latimes.com/politics/story/2025-06-13/video-shows-immigration-agents-interrogating-a-latino-u-s-citizen-im-american-bro.

1  packing houses.[32] Farmers markets and a swap meet have been visited,[33] as well as

2  bus stops,[34] parks,[35] an LA Fitness gym,[36] and a church.[37]

3        43.    For example, on the morning of June 6, 2025, a local resident, R.H.D.,

4  and his brother-in-law were helping their relative paint his home in Orange County.

5  Both are Latino. As they were working outside, a group of ICE and FBI agents

6  approached and began questioning them. This questioning was not voluntary. The

7

8  ————————————————
   [32] Al Rojo Vivo, *Agentes federales realizan redadas en zona industrial de*
   *California,* (June 14, 2025), https://www.youtube.com/watch?v=TXMlJqmME0U

9  (reporting that at least two women leaving work at packing house, along with one
   woman's son who had gone to pick her up, were detained during an immigration

10 raid).

   [33] Josh Dubose, *Dozens of heavily armed ICE agents swarm popular L.A. County*
11 *swap meet*, KTLA 5 (June 15, 2025), https://ktla.com/news/local-news/dozens-of-
   heavily-armed-ice-agents-swarm-popular-l-a-county-swap-meet/; Jasmine Mendez,
12 et al., *Immigration raids continue as Trump appears to soften on targeting some*
   *workplaces*, L.A. Times (June 15, 2025),
13 https://www.latimes.com/california/story/2025-06-15/los-angeles-immigration-
   raids-continue ("If you looked Hispanic in any way, they just took you."); Tim
14 Pulliam & Amanda Palacios, *Several people taken into custody during immigration*
   *raid at Santa Fe Springs Swap Meet*, ABC 7 (June 16, 2025),
15 https://abc7.com/post/several-people-taken-custody-during-immigration-raid-santa-
   fe-springs-swap-meet/16753752/; Levi Sumagaysay & Lauren Hepler, *From San*
16 *Diego to the Bay Area, California Restaurants are on Edge Over Immigration*
   *Raids,* CalMatters (June 19, 2025),
17 https://calmatters.org/economy/2025/06/california-restaurants-immigration-raids/.

18 [34] Sophie Flay, *ICE agents detain several people at Pasadena bus stop, conducts*
   *raids across the city*, ABC 7 (June 19, 2025), https://abc7.com/post/ice-agents-
19 detain-2-men-pasadena-bus-stop-conduct-raids-city/16785979/.

20 [35] Douglas Saunders Sr., *OC attorney says she was detained in ICE raid at Santa*
   *Ana park*, Daily Journal (June 19, 2025),
21 https://www.dailyjournal.com/articles/386228-oc-attorney-says-she-was-detained-
   in-ice-raid-at-santa-ana-
22 park#:~:text=Orange%20County%20attorney%20Heidi%20M,an%20operation%20
   in%20the%20area (detailing how a U.S. citizen and Orange County attorney was
23 detained by ICE agents while walking at a park.)

24 [36] Ricardo Tovar, *LA County Officials Say ICE Agents Targeted Individuals at*
   *Churches*, KSBW8 (June 12, 2025), https://www.ksbw.com/article/la-county-ice-
   agents-targeted-individuals-church/65039805 ("A council member confirmed that
25 ICE conducted raids at a Home Depot, LA Fitness, and inside and outside of two
   churches in the city."); Union del Barrio (@uniondelbarrio), Instagram (June 11,
26 2025), https://www.instagram.com/p/DKxKR5AIOUq/.

27 [37] Vicent Medina, *Tensions high as immigration sweeps reach Downey churches*,
   The Downey Patriot (June 16, 2025),
28 https://www.thedowneypatriot.com/articles/tensions-high-as-immigration-sweeps-
   reach-downey-churches.

agents surrounded the man and prevented him from walking away before they knew who he was. There were several people at nearby residences who appeared Caucasian and were also working outside in their yards, but on information and belief, they were not questioned or detained.

44. At a Home Depot in Santa Ana on June 10, 2025, Junior Ortega recounted that agents arrived in unmarked vehicles and began detaining individuals at gunpoint.[38] An agent approached him, pointed a gun and then demanded to see his identification. He complied, fearing for his safety. After inspecting the identification, the agent released Junior without ever providing a reason for the stop.

45. At the Downey Memorial Christian Church on June 11, 2025, a witness recalled that "the gentleman who they took was dark-skinned and only spoke Spanish. They don't care if you have papers, as long as you look like what they want you to look like, they'll take you."[39] No reason for the stop was provided.

46. At a military-style raid at the Santa Fe Springs swap meet on June 14, 2025, 60 heavily armed agents were present.[40] One witness reported that "if you looked Hispanic in any way, they just took you."[41] Another witness described seeing agents pull people from the bathrooms and demand identification from everyone they encountered.[42]

47. It is illegal for Defendants to stop anyone—U.S. citizens or not—without reasonable suspicion. But predictably, in addition to noncitizens,

---

[38] *Raids in Southern California rattle immigrant communities – including those in the US legally*, The Tribune (June 11, 2025), https://tribtown.com/2025/06/11/raids-in-southern-california-rattle-immigrant-communities-including-those-in-the-us-legally/.

[39] Travis Schlepp, *ICE agents make arrest at Los Angeles area church*, KTLA 5 (June 11, 2025), https://ktla.com/news/local-news/ice-agents-make-arrest-at-los-angeles-area-church/#:~:text=Community%20members%20and%20religious%20leaders,in%20the%20church%20parking%20lot.

[40] Josh Dubose, *supra*, note 33.

[41] *Id.*

[42] *Id.*

Defendants' practices have led to numerous U.S. citizens who work, reside, or just happen to be in neighborhoods with large numbers of people of color also getting swept up.

48.     On June 14, 2025, Heidi Plummer, a U.S. citizen, was walking through a park in Santa Ana when she got caught up in an immigration raid occurring there. She was handcuffed, placed in a vehicle with others, and taken to an ICE station in Santa Ana where she was kept for an hour and a half before being released.[43]

49.     Additionally, more recently, Andrea Velez, a U.S. citizen, was being dropped off at work in downtown Los Angeles when federal agents grabbed her without explanation. Her mother, who witnessed the incident, described it as looking like "they'e kidnapping [her]." Witnesses said agents never asked Andrea for identification. No justification was provided. Her mother remarked, "the only thing wrong with her . . . was the color of her skin."[44]

## B.     A Show of Force: Intimidation, Violence, and Anonymity

50.     While the government may describe the encounters agents and officers are having with individuals as consensual, they are far from that. A stop, even brief, must be supported by reasonable suspicion if "a reasonable person would [believe] that he was not free to leave." *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

51.     In a typical encounter, agents and officers approach suddenly and in large numbers. Typically dressed in military style or SWAT clothing, heavily armed with weapons displayed, and masked, their vests may display only a generic "POLICE" patch (if they display anything at all). For example, an estimated 60 ICE

---

[43] Douglas Saunders Sr., *OC Attorney Says She Was Detained in ICE Raid at Santa Ana Park*, Daily Journal (June 19, 2025), https://www.dailyjournal.com/articles/386228-oc-attorney-says-she-was-detained-in-ice-raid-at-santa-ana-park.

[44] Dani Anguiano, *US Citizen Arrested During ICE Raid in What Family Describes as 'Kidnapping,'* The Guardian (June 26, 2025), https://www.theguardian.com/us-news/2025/jun/26/immigration-ice-raid-andrea-velez.

-19-

agents dressed in military tactical gear and carrying rifles raided a swap meet in Los Angeles on June 15, 2025[45]:



*Dozens of heavily armed, masked ICE agents seen raiding a Santa Fe Springs Swap Meet on June 14, 2025. (OnSceneTV)*

52.    This grossly disproportionate display of force is enough to make any person fear for their safety and feel compelled to comply. Moreover, agents typically position themselves around individuals, aggressively engage them, and/or bark commands, making it nearly impossible for individuals to decline to answer their questions.

53.    When individuals have tried to avoid an encounter with agents and officers, they have been chased and pushed to the ground, sometimes even beaten, and then taken away. Such seizures look less like lawful arrests and more like brazen, midday kidnappings.

54.    These incidents have been widely reported in the news, further contributing to the climate of intimidation and fear.[46]

---

[45] Josh DuBose, *supra*, note 33.

[46] Alicia A. Caldwell, *Stun grenades, armored trucks in ICE raids spur tensions*, Bloomberg (June 6, 2025), https://www.bloomberg.com/news/articles/2025-06-06/rifles-stun-grenades-armored-trucks-in-ice-raids-spur-tensions?srnd=undefined.

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

55.     For example, in Westchester on June 8, 2025, several armed agents in camouflage uniforms and helmets tackled a fruit vendor on a corner, pinning him to the ground.[47] A witness recalled: "They had him pressed down on the ground. They had weapons drawn so no one could get near to help him."[48]

56.     At a hand car wash in Culver City also on June 8, 2025, agents dressed in either camouflaged fatigues or plainclothes arrived in unmarked vehicles.[49] A witness, waiting for her car to be washed, recalled seeing "an agent carrying an assault rifle . . . chasing after a customer, pursuing him across a four-lane road," while other customers screamed "Don't shoot!"[50] The federal agent caught the man and took him into custody.[51]

57.     At a Home Depot in Santa Ana on June 9, 2025, a U.S. asylum seeker from Peru was detained and later released upon producing documents. He recalls that "[the agents] arrived in an aggressive manner," pointing guns, as if to "rob them."[52]

58.     At the Downey Memorial Christian Church on June 11, 2025, three SUVs with tinted windows pulled up to the church.[53] Six agents with neck gaiters, hats, and sunglasses, rushed out of unmarked vehicles. Armed, some carrying

---

[47] L.A. Times, *Unidentified agents detain L.A. fruit vendor: 'Like he'd been kidnapped'*, L.A. Times (June 12, 2025), https://www.latimes.com/00000197-61d1-d4a7-addf-f1d59c1d0000-123.

[48] *Id.*

[49] Dani Anguiano, et al., *'Snatching off the streets': Ice targets churches, car washes and workplaces*, The Guardian (June 12, 2025), https://www.theguardian.com/us-news/2025/jun/12/los-angeles-ice-raids.

[50] *Id.*

[51] *Id.*

[52] Hetty Change & Jonathon Lloyd, *Day laborers targeted in raid at Santa Ana Home Depot, OC officials say*, NBC 4 (June 10, 2025), https://www.nbclosangeles.com/news/local/day-laborers-santa-ana-home-depot-immigration-raid/3720487.

[53] Jesus Jiménez & Emily Baumgaertner Nunn, *Church Leaders Shaken After a Man was Detained in Their Parking Lot*, N.Y. Times (June 11, 2025), https://www.nytimes.com/2025/06/11/us/la-protests-ice-raids-church-arrest.html.

-21-

assault rifles, they detained a man in the parking lot.[54] The agents refused to identify which agency they worked for and did not provide a warrant.[55] When a senior pastor of the church tried to communicate in Spanish with the man being detained, an agent pointed a gun at her.[56]

59. Recently, in Santa Ana, agents were observed on video repeatedly beating Narciso Barranco, father to three sons who have served in the U.S. Marines, on the head and neck, even though Barranco was already on the ground.[57]

60. Two days later at a Home Depot in Ladera Heights, eight heavily armed masked men surrounded a young woman street vendor clinging to a tree. After they had arrested the woman and were driving away, they threw three tear gas canisters at the small group of community members bearing witness to the arrest. The men refused to identify themselves.[58]

61. When people refuse to answer questions and try to leave, agents respond with violence. In one widely circulated social media video, a driver refused to answer questions and tried to drive away. The undercover agent pointed his

---

[54] Jesus Jiménez & Emily Baumgaertner Nunn, *Church Leaders Shaken After a Man was Detained in Their Parking Lot*, N.Y. Times (June 11, 2025), https://www.nytimes.com/2025/06/11/us/la-protests-ice-raids-church-arrest.html.

[55] *Id.*; Travis Schlepp, *ICE agents make arrest at Los Angeles area church*, KTLA 5 (June 11, 2025), https://ktla.com/news/local-news/ice-agents-make-arrest-at-los-angeles-area-church/#:~:text=Community%20members%20and%20religious%20leaders,in%20the%20church%20parking%20lot.

[56] Jesus Jiménez & Emily Baumgaertner Nunn, *supra*, note 54.

[57] Obed Manuel, *U.S. Marine veteran says father's violent arrest by immigration agents was 'inhumane'*, NPR (June 27, 2025), https://www.npr.org/2025/06/27/nx-s1-5442653/father-of-u-s-marines-violently-arrested-by-ice#:~:text=Father%20of%20U.S.%20Marines%20violently%20arrested%20by%20ICE&text=The%20scene%20in%20Santa%20Ana,when%20the%20agent%20strikes%20him

[58] Leanne Suter, *Community members try to help street vendor taken by federal agents in Ladera Heights, video shows*, ABC 7 (June 27, 2025), https://abc7.com/post/community-members-try-help-street-vendor-taken-ice-ladera-heights/16863236/.

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

firearm at the driver and said "I'll [expletive] shoot you," before being instructed by another agent to let him go.[59]

62.    Agents and officers have not only employed these tactics with alarming regularity, but they have also refused to identify themselves or what agency they are with when asked. Such refusal to identify themselves endangers public safety,[60] frustrates any efforts at accountability, including in this case, and ultimately normalizes lawless and dangerous conduct behind the shield of anonymity.

## C.    Warrantless Arrests Without an Individualized Determination of Flight Risk

63.    Congress enacted a strong preference that immigration arrests be based on warrants. *See Arizona v. U.S.*, 567 U.S. 387, 407–08 (2012). The Immigration and Nationality Act thus provides immigration agents with only limited authority to conduct warrantless arrests. 8 U.S.C.§ 1357(a)(2). Federal regulations track the strict limitations on warrantless arrests. *See* 8 C.F.R. § 287.8(c)(2)(ii).

64.    An immigration officer can make an arrest without a warrant only if they have probable cause to believe that the individual "is in the United States in violation of any [immigration] law or regulation," *and* (2) the individual "is likely to escape before a warrant can be obtained" for his arrest. § 1357(a)(2); § 287.8(c)(2)(ii) (same); *Tejeda-Mata v. INS*, 626 F.2d 721, 725 (9th Cir. 1980). The requirement that officers establish probable cause of flight risk before conducting a warrantless arrest requires a particularized finding of likelihood of escape. *Mountain High Knitting, Inc. v. Reno*, 51 F.3d 216, 218 (9th Cir. 1995).

---

[59] Benicia Garcia (@ b_b_b_beniandthejets), Instagram (June 26, 2025), https://www.instagram.com/p/DLXk-kSRRy3/.

[60] *See, e.g.*, Lily Dallow, *L.A. man with previous human smuggling arrest may have been impersonating ICE agent*, KTLA 5 (June 27, 2025), https://ktla.com/news/local-news/l-a-man-arrested-in-huntington-park-for-possibly-impersonating-federal-agent/; José Olivares, *US sees spate of arrests of civilians impersonating Ice officers*, The Guardian (June 28, 2025), https://www.theguardian.com/us-news/2025/jun/28/civilians-impersonating-ice-officers.

65. Defendants have a policy and practice of effectuating warrantless arrests without making an individualized flight risk determination.

66. As one witness to a raid at a Home Depot recounted, the officers "just grab[] people" and "don't ask questions."[61]

67. For example, on June 8, 2025, Jesus Cruz Uitz, a member of CLEAN Carwash Worker Center, which is part of Plaintiff LAWCN, was working at the car wash he has worked at for approximately 8 years when masked agents arrived. Mr. Cruz Uitz stayed where he was working but an officer angrily approached him, grabbed him by the arms, and ultimately arrested him. The officer did not have a warrant to arrest Mr. Cruz Uitz and did not ask him any questions to assess his individualized flight risk.

68. On June 9, 2025, a resident, M.N., was working at the same car wash when agents arrested him without a warrant and without asking him any questions relevant to assess his flight risk.

69. And on June 9, 2025, Jose Valdez Rios was at Home Depot when agents arrested him without a warrant and without asking him any questions relevant to assess his flight risk. Agents never asked him about his job, family, community, or other ties to the United States.

**D. Arrests Without Identification of Authority or Reason**

70. Regulations also require immigration officers to (1) identify themselves "as an immigration officer who is authorized to execute an arrest"; and (2) "[s]tate that the person is under arrest and the reason for the arrest," as soon as it is practical and safe to do so. 8 C.F.R. § 287.8(c)(2)(iii).

71. Defendants have a policy and practice of failing to identify themselves or explain the basis for an arrest upon taking someone into custody. As noted above,

---

[61] Arelis R. Hernández, *'La migra!': Day laborers recount ICE raid outside Los Angeles Home Depot*, The Washington Post (June 8, 2025) https://www.washingtonpost.com/immigration/2025/06/08/ice-los-angeles-home-depot-raid-trump/.

1   agents and officers have often shown up masked, without any visible badges or

2   insignia indicating what agency they are with, and have refused to identify

3   themselves when asked. This has extended through the time of arrest, with

4   individuals left in the dark about who they are interacting with or why they are

5   under arrest.

6   **E.     Conditions at B-18 and the Denial of Access to Counsel**

7         72.    James Pendergraph, former Executive Director of ICE Office of State

8   and Local Coordination once said, "If you don't have enough evidence to charge

9   someone criminally but you think he's illegal, we can make him disappear."[62] That

10  ethos is animating Defendants' Los Angeles operations today.

11        73.    Individuals detained in immigration operations have a right to counsel

12  that is rooted in the Due Process Clause of the Fifth Amendment. *Usubakunov v.*

13  *Garland*, 16 F.4th 1299, 1304 (9th Cir. 2021); *Biwot v. Gonzales*, 403 F.3d 1094,

14  1098 (9th Cir. 2005); *see also Torres v. United States Dep't of Homeland Sec.*, 411

15  F. Supp. 3d 1036, 1060-61 (C.D. Cal. 2019). When the government detains

16  individuals as part of immigration enforcement efforts, it cannot impose restrictions

17  on access to attorneys that undermine the opportunity to obtain counsel or

18  communicate with retained counsel. *See Orantes-Hernandez v. Thornburgh*, 919

19  F.2d 549, 554, 565 (9th Cir. 1990); *see also Usubakunov*, 16 F.4th at 1300

20  ("Navigating the asylum system with an attorney is hard enough; navigating it

21  without an attorney is a Herculean task."); *Comm. of Cent. Am. Refugees v. INS*, 795

22  F.2d 1434, 1439 (9th Cir. 1986) (recognizing that impediments to communication,

23  especially in connection with a difficult-to-access facility, can constitute a

24

25

---

26  [62] Debbie Cenziper et. al, *Under Trump, ICE aggressively recruited sheriffs as*
    *partners to question and detain undocumented immigrants*, The Washington Post

27  (Nov. 23, 2021),
    https://www.washingtonpost.com/investigations/interactive/2021/trump-ice-sheriffs-

28  immigrants-287g/.

"constitutional deprivation" where they obstruct an "established on-going attorney-client relationship.").

74.     Further, civil detainees have "a right to adequate food, shelter, clothing, and medical care." *Youngberg v. Romeo*, 457 U.S. 307 (1982). Their conditions of confinement become unconstitutional if they "amount to punishment," *Bell v. Wolfish*, 441 U.S. 520, 535 (1979), in other words, when "the harm or disability caused by the government's action . . . significantly exceed[s], or [is] independent of, the inherent discomforts of confinement[.]" *Demery v. Arpaio*, 378 F.3d 1020, 1030 (9th Cir. 2004). During the ongoing raids, and as an integral part of the policy and pattern of unlawful stops and arrests described above, Defendants have been taking individuals who are swept up en masse to the basement of the federal building at 300 North Los Angeles Street in Los Angeles, commonly referred to as "B-18." B-18 is a facility for immigrant detainees designed to hold a limited number of individuals temporarily so they can be processed and released, or processed and transported to a long-term detention facility. It does not have beds, showers, or medical facilities.

75.     B-18 was previously the subject of litigation in this District, and a lawsuit over the inhumane treatment of detainees there resulted in a 2009 settlement agreement requiring that individuals not be held at B-18 for more than 12 hours. *See Castellano v. Napolitano*, No. 2:09-CV-02281 (C.D. Cal. Sept. 16, 2009). Other provisions of the agreement required that detainees at B-18 be allowed to "visit with current or prospective legal representatives and their legal assistants seven days a week, including holidays, for eight hours per day on regular business days (Monday through Friday), and four hours per day on weekends and holidays."

76.     The settlement agreement has since expired. But under the immense pressure to receive individuals arrested in recent weeks, the unlawful conditions that led to the settlement more than a decade ago are recurring today. Individuals taken to B-18 are being kept in overcrowded, inhumane conditions. They are held in small

-26-

windowless rooms with dozens or more other detainees, in extremely cramped quarters. Some rooms are so cramped that detainees cannot sit, let alone lie down, for hours at a time.

77.     As of June 20, 2025, upon information and belief, over 300 individuals were being held at B-18. They are expected to sleep in cold rooms on floors without cots, bedding, or blankets. Some are even forced to sleep in tents outside.

78.     When asked why detainees have been forced to sleep in such cramped conditions, an officer at B-18 explained that B-18 is meant to be a processing center, not a detention facility. Historically, processing of individuals in removal proceedings would result in the release of an individual detained pending their next court hearing or, barring release, immediate transfer to a detention facility. But B-18 is not being used that way today, and individuals are being held there far longer than 12 hours, often for days on end.

79.     Detainees are also routinely deprived of food. Some have not even been given water other than what comes out of the combined sink and toilet in the group detention room. And upon asking for food, detainees have been told repeatedly that the facility has run out.

80.     Detainees are routinely denied access to necessary medical care and medications, too. Individuals with conditions that require consistent medications and treatment are not given any medical attention, even when that information is brought to the attention of the officers on duty. The facility cannot even provide detainees with basic hygiene. Individuals who are menstruating have had to wait long periods before receiving menstrual pads, if they receive them at all.

81.     To make matters worse—and, indeed, to keep the true nature and scope of Defendants' constitutional violations, including those related to stops and arrest, hidden from the outside world—individuals detained at B-18 have had their access to prospective or retained counsel severely and unconstitutionally restricted.

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

82.     On June 6, 2025, attorneys and legal representatives from organizational Plaintiffs CHIRLA and ImmDef attempted to gain access to B-18 to advise detainees of their rights and assess their eligibility for relief, but they were not permitted to enter.

83.     When they returned to B-18 the next morning, attorneys identified a handwritten notice on the door of the family and attorney entrance at B-18 indicating that they would not permit any visits that day. Federal officers then deployed an unknown chemical agent against family members, attorneys, and representatives, including CHIRLA and ImmDef legal staff, who were peacefully requesting access to detained individuals. The chemical agent that federal agents sprayed caused everyone to cough and inflicted a burning sensation in the eyes, nose, and throat.

84.     That same morning, numerous unmarked white vans quickly departed B-18 with a group of detainees. CHIRLA and ImmDef attorneys and representatives attempted to loudly share know your rights information with the detainees in the vans. To prevent the detainees from hearing their rights, and therefore exercising them, the federal agents blasted their horns to drown them out.

85.     On June 7, 2025, another ImmDef attorney arrived at B-18 to find a handwritten notice that the facility was closed to visitation, as shown below:[63]

---

[63] Photos taken by LARRN attorney Helen Boyer Saturday June 7, 2025 at approx 8:50 AM.

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF



86.     As a result, attorneys and family members were unable to access B-18 the entire weekend during the first few days of the raids.

87.     On the rare occasions when attorneys and family members have been allowed access to their clients or loved ones, they have been made to wait hours at a time to see them, and the resulting visits have been limited to a mere five to 10 minutes. Detention officers screen the very limited phone calls that detainees are permitted to make, and phone calls cannot be used for confidential legal communications.

88.     In many cases, attorneys and family members have been unable to determine whether a particular individual is even detained at B-18, or whether they have been transferred to another facility. B-18 officers have refused to provide clear answers to questions about detainees' whereabouts, or refused to answer questions altogether. ICE's online locator, which provides information about detainees' location, is not updated in a timely manner.

89.     The severe access restrictions have persisted as Defendants' mass arrests continue to occur across Southern California.

90.     On June 16, 2025, ImmDef attorneys, as well as Congressman Jimmy Gomez, arrived at B-18 around 3:00 p.m. on a day when B-18 was purportedly open for visiting between 8:00 a.m. to 4:00 p.m. But they were denied access, along with family members who had been instructed to go to B-18 to pick up their loved ones' possessions.

91.     On June 19, 2025, an ImmDef attorney arrived at B-18 to meet with detainees, including one who was scheduled for a chemotherapy appointment the next day. Despite showing a doctor's note confirming the appointment and specifying that missing the appointment would be detrimental to the detainee's health, the guards repeatedly would not allow the attorney to meet with the ill detainee.  One officer told the attorney that he had no way to find the individual because hundreds of people were detained in the facility.

92.     B-18 officers have and continue to consistently close the doors to detainees' prospective or retained counsel at unexpected and unexplained times.

93.     The use of B-18 as a makeshift, long-term detention center for hundreds of individuals has and continues to cause significant, ongoing harm. Defendants have intentionally restricted detainees' access to those who may be able to intervene on their behalf at a critical time when they are likely to face imminent government action in their case. Indeed, one of ImmDef's clients who has been granted asylum and who should never have been arrested was picked up at a Home Depot looking for work. He would have disappeared into the detention system if not for an ImmDef attorney's last minute intervention at B-18 on June 19, 2025.

94.     In fact, some individuals have accepted voluntary departure from this country under 8 U.S.C. § 1229c(a)(1), without having had the opportunity to consult with counsel, even though due process requires that any waiver of a right to a hearing be knowing and voluntary. *See, e.g., United States v. Ramos*, 623 F.3d 672,

-30-

682–83 (9th Cir. 2010). Upon information and belief, the inhumane conditions at B-18 create a coercive environment that pressures some of those detained individuals to take voluntary departure without first consulting with counsel and despite potential deportation relief because they fear lengthy detention in deplorable conditions.

95.     Combined with the continued deplorable conditions at B-18—lack of food, medical care, basic hygiene, and overcrowding—B-18 is a disaster continuing to happen. And until these issues are resolved, the true scale of the legal violations Defendants are engaged in will remain unknown.

**F.     Defendants' Pattern of Illegal Conduct Is Officially-Sanctioned**

96.     Defendants' unlawful stops, arrests, denial of access to counsel and conditions at B-18 are the predictable result of directives from top officials to agents and officers.

97.   In January, the administration gave ICE field offices an arrest quota of 75 arrests a day.[64] As offices attempted to carry out such a mandate, workplace raids increased,[65] ICE check-ins became traps,[66] and courthouse arrests surged.[67]

98.   Also, to help meet the quota, the administration granted agencies outside of DHS immigration enforcement powers.[68]

---

[64] Nick Miroff & Maria Sacchetti, *Trump Officials Issue Quotas to ICE Officers to Ramp Up Arrests*, The Washington Post (last updated Jan. 26, 2025), https://www.washingtonpost.com/immigration/2025/01/26/ice-arrests-raids-trump-quota/.

[65] Marianne LeVine, et al., *ICE is Arresting Migrants in Worksite Raids. Employers are Largely Escaping Charges*, The Washington Post (June 30, 2025), https://www.washingtonpost.com/immigration/2025/06/30/ice-raids-arrests-workers-companies/ (noting an April announcement by ICE officials that the agency had arrested more than 1,000 workers during Trump's first 100 days and collecting stories of workplace raids across the country); Mark Moran, *ICE Detains More than 530 People in Workplace 'Raids' in U.S. Northeast*, United Press International (Jan. 23, 2025), https://www.upi.com/Top_News/US/2025/01/23/ice-details-538-ion-workplace-raids/7811737692376/.

[66] Maanvi Singh & Will Craft, *As deportations ramp up, immigrants increasingly fear Ice check-ins: 'All bets are off'*, The Guardian (Apr. 6, 2025), https://www.theguardian.com/us-news/2025/apr/06/deportations-immigrants-ice-trump; Nidia Cavazos, *Immigrants at ICE check-ins detained, held in basement of federal building in Los Angeles, some overnight*, CBS News (June 7, 2025), https://www.cbsnews.com/news/immigrants-at-ice-check-ins-detained-and-held-in-basement-of-federal-building-in-los-angeles/.

[67] Julia Ainsley, *Trump admin tells immigration judges to dismiss cases in tactic to speed up arrests*, NBC News (June 11, 2025), https://www.nbcnews.com/politics/national-security/trump-admin-tells-immigration-judges-dismiss-cases-tactic-speed-arrest-rcna212138; Luis Ferré-Sadurní, *Inside a Courthouse, Chaos and Tears as Trump Accelerates Deportations*, N.Y. Times (June 12, 2025), https://www.nytimes.com/2025/06/12/nyregion/immigration-courthouse-arrests-trump-deportation.html; Ximena Bustillo, *ICE's novel strategy allows for more arrests from inside immigration courts*, NPR (June 12, 2025), https://www.npr.org/2025/06/12/nx-s1-5409403/trump-immigration-courts-arrests; Martha Bellisle, et al., *Immigration officers intensify arrests in courthouse hallways on a fast track to deportation*, AP News (June 11, 2025), https://apnews.com/article/immigration-court-arrests-ice-deportation-99d822cdc93ae7dc26026c27895d5ea1 (describing new tactic in which immigration judges grant a government motions dismiss deportation proceedings, enabling ICE officers—often masked—to arrest noncitizens immediately outside in the hallway and place them on an expedited path to removal).

[68] Press Release, DHS, *Statement from a DHS Spokesperson on Directive Expanding Immigration Law Enforcement to Some Department of Justice Officials* (Jan. 23, 2025), https://www.dhs.gov/news/2025/01/23/statement-dhs-spokesperson-directive-expanding-immigration-law-enforcement.

-32-

99.     Meanwhile, the administration began systematically dismantling internal accountability mechanisms and restraints on immigration agents' and officers' conduct. The administration shut down multiple oversight agencies (retaining only a version of their former selves after the administration was sued).[69] Investigations were closed.[70] Officers no longer had to abide by enforcement priorities.[71] Long-standing guidance restricting enforcement operations in sensitive locations—schools, hospitals, places of worship and public demonstrations—was rescinded.[72]

100.   But these changes were not enough, according to the administration. In late May, Deputy Chief of Staff Stephen Miller summoned 25 ERO Field Office Directors and 25 HSI Special Agents to a meeting to demand that "everybody" be targeted.[73] Under Miller's directive, agents no longer needed to develop vetted target

---

[69] Nicolae Viorel Butler, *Court Forces DHS to Preserve Immigrant Rights Offices,* Migrant Insider (May 27, 2025), https://migrantinsider.com/p/court-forces-dhs-to-preserve-immigrant?utm_source=CLINIC%2BMail&utm_campaign=f9e1ee6428-tips-6-2-25&utm_medium=email&utm_term=0_-663ab9ab77-284225192"https://migrantinsider.com/p/court-forces-dhs-to-preserve-immigrant?utm_source=CLINIC%2BMail&utm_campaign=f9e1ee6428-tips-6-2-25&utm_medium=email&utm_term=0_-663ab9ab77-284225192.

[70] Press Release, Government Accountability Project, *DHS Halted 500+ Civil Rights Investigations When It Shut Down Oversight Office, Whistleblowers Say* (May 15, 2025), https://whistleblower.org/press-release/dhs-halted-500-civil-rights-investigations-when-it-shut-down-oversight-office-whistleblowers-say/.

[71] Press Release, DHS, Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole (Jan. 21, 2025), https://www.dhs.gov/news/2025/01/21/statement-dhs-spokesperson-directives-expanding-law-enforcement-and-ending-abuse (noting a directive "rescind[ing] the Biden Administration's guidelines for . . . enforcement actions that thwart law enforcement in or near so-called "sensitive" areas).

[72] Marisa Kabas, *ICE agents get green light to make unjustified warrantless arrests*, The Handbasket (June 12, 2025), https://www.thehandbasket.co/p/ice-warrantless-arrests-castanon-nava.

[73] Stuard Anderson, *Stephen Miller's Order Likely Sparked Immigration Raids and Protests*, Forbes, Jun. 9, 2025, https://www.forbes.com/sites/stuartanderson/2025/06/09/stephen-millers-order-likely-sparked-immigration-arrests-and-protests/.

1  lists of individuals suspected of being in the United States unlawfully.[74] ICE agents

2  were instructed in an email to "turn the creativity knob up to 11" and aggressively

3  "push the envelope," including by pursuing "collaterals"—individuals that by

4  definition would not have warrants.[75] As another e-mail put it: "If it involves

5  handcuffs on wrists, it's probably worth pursuing."[76]

6        101.   The administration set a new arrest quota of 3,000 arrests per day and

7  reportedly threatened job consequences if officials failed to meet arrest quotas.[77]

8        102.   The overriding message to agents and officers carrying out immigration

9  operations on the ground was to prioritize arrest numbers, regardless of the law.

10  Agents and officers were granted sweeping discretion to achieve this goal.

11  **G.    Defendant Agencies Have a History of Unconstitutional and Unlawful Conduct**

12        103.   The agencies involved in the Los Angeles area immigration raids

13  include DHS and its components, ICE ERO, ICE HSI, and the U.S. Border Patrol, as

14  well as DOJ law enforcement agencies including the FBI[78] and others (including

15

16

17  _____

[74] Elizabeth Findell, s*upra* note 2 (reporting that agents were no longer required to develop target lists of noncitizens unlawfully present in the U.S., marking a shift from longstanding policy).

18

19  [75] José Olivares, *US immigration officers ordered to arrest more people even without warrants*, The Guardian (June 4, 2025), https://www.theguardian.com/us-news/2025/jun/04/immigration-officials-increased-detentions-collateral-arrests.

20

21  [76] José Olivares, *US immigration officers ordered to arrest more people even without warrants*, The Guardian, (June 4, 2025), https://www.theguardian.com/us-news/2025/jun/04/immigration-officials-increased-detentions-collateral-arrests.

22  [77] Elizabeth Findell, et al., s*upra* note 2; Julia Ainsley, et al., *A sweeping new ICE operation shows how Trump's focus on immigration is reshaping federal law enforcement,* NBC News (June 4, 2025),  https://www.nbcnews.com/politics/justice-department/ice-operation-trump-focus-immigration-reshape-federal-law-enforcement-rcna193494.

23

24

25  [78] Cameron Kiszla, *Immigration agents raid several L.A. businesses, encounter protestors*, KTLA (June 6, 2025), https://ktla.com/news/local-news/federal-agents-raid-home-depot-in-westlake-district/ ("The FBI confirmed to KTLA that it is participating in the HSI raids, not just in Los Angeles but nationwide, 'as directed by the Attorney General. As we have been asked to do, we are sending Agents to participate in these immigration enforcement efforts,' the statement said.").

26

27

28

ATF[79] and DEA).[80] A number of these agencies have a history of engaging in unconstitutional and unlawful stops and arrests.

104.   For example, the U.S. Border Patrol has a documented history of Fourth Amendment violations in the U.S. interior: U.S. Border Patrol agents have relied on perceived race or ethnicity to select who to stop, conducted suspicionless stops, executed warrantless home raids, and carried out illegal worksite operations. Courts have repeatedly intervened to curb these practices. *See LaDuke v. Nelson*, 762 F.2d 1318 (9th Cir. 1985), *amended*, 796 F.2d 309 (9th Cir. 1986), *affirmed*, 799 F.2d 547, 551 (9th Cir. 1986) (upholding permanent classwide injunction against warrantless raids on farmworker housing in Washington, Idaho, and Montana); *International Molders' and Allied Workers' Local Union No. 164 v. Nelson*, 643 F. Supp. 884, 887-89, 899-901 (N.D. Cal. 1986) (granting preliminary injunction barring the now-defunct Livermore Border Patrol Sector from replicating the unlawful practices it had used in "Operation Jobs," a weeklong series of about 50 workplace raids across Northern California where agents stopped workers for questioning without reasonable suspicion and arrested people who refused to answer questions, including U.S. citizens).

105.   Most recently, the El Centro Sector of the U.S. Border Patrol, one of the key participants in the raids being challenged in this suit, was the focus of a suit filed in the Eastern District of California over a Kern County operation called "Operation Return to Sender." The tactics challenged here—including widespread racial profiling, suspicionless stops, and warrantless arrests without determination of

---

[79] Press Release, ICE, *ICE Los Angeles announces 239 illegal aliens were arrested during recent operation* (May 14, 2025), https://www.ice.gov/news/releases/ice-los-angeles-announces-239-illegal-aliens-were-arrested-during-recent-operation (confirming ATF's involvement in ICE operations in the Los Angeles area).

[80] *Id*. (confirming DEA's involvement in ICE operations in the Los Angeles area).

1    flight risk—bear the unmistakable hallmarks of "Operation Return to Sender."[81]

2    Like the raids challenged here, "Operation Return to Sender" spread through

3    agricultural communities and also targeted day laborer pick up sites. On April 29,

4    2025, the court granted a preliminary injunction barring the U.S. Border Patrol from

5    engaging in these unlawful practices. *United Farm Workers v. Noem*, No. 1:25-CV-

6    00246 JLT CDB, 2025 WL 1235525, at *1 (E.D. Cal. Apr. 29, 2025). The ruling

7    recognizes that, in the Ninth Circuit, "Hispanic appearance is of little or no use in

8    determining which particular individuals among the vast Hispanic populace should

9    be stopped." *Id.* at *46 (quoting *United States v. Montero-Camargo*, 208 F.3d 1122,

10    1134 (9th Cir. 2000)). And the El Centro Sector Chief Bovino, who led "Operation

11    Return to Sender," is now at the helm of operations in the Los Angeles area, inviting

12    him to replicate his tactics in this District.

13        106.    ICE, which typically handles immigration enforcement in the interior

14    and "manag[es] all aspects of the immigration enforcement process, including the

15    identification, arrest, detention, and removal of [noncitizens],"[82] has likewise been

16    found to violate the Fourth Amendment, statutory, and regulatory rights of

17    individuals it encounters in the field.

18        107.    For instance, in 2008, ICE HSI agents conducted a workplace raid in

19    Van Nuys, California. Agents executed a search warrant but also engaged in

20    detentive stops of workers without individualized reasonable suspicion. The Ninth

21    Circuit eventually ruled that this was unlawful and invalidated the ensuing removal

22    proceedings. *Perez Cruz v. Barr*, 926 F.3d 1128, 1137 (9th Cir. 2019) (citing 8

23    C.F.R. § 287.8(b)).

24

25

---

26   [81] Sergio Olmos & Wendy Fry, *Border Patrol said it targeted known criminals in*
27   *Kern County. But it had no record of 77 of 78 arrestees*, CalMatters (Apr. 8, 2025), https://calmatters.org/economy/2025/04/border-patrol-records-kern-county/.

28   [82] *Enforcement and Removal Operations*, U.S. Immigration & Customs Enforcement, *https://www.ice.gov/about-ice/ero* (last visited June 30, 2025).

108.    In *Nava v. DHS*, a plaintiff class in Chicago challenged a pattern and practice of ICE conducting warrantless arrests without making required determinations under 8 U.S.C. § 1357. *Nava v. Dep't of Homeland Sec.*, 435 F. Supp. 3d 880, 885 (N.D. Ill. 2020). The case resulted in a settlement that included a nationwide policy about warrantless arrests and vehicle stops.[83] In June 2025, despite a pending motion to enforce the settlement agreement and motion to extend the settlement agreement, ICE terminated its policy under the settlement that required officers to document the circumstances of warrantless arrests and vehicle stops.[84]

109.    Meanwhile, in this District, in May 2024, plaintiffs secured a summary judgment order in *Kidd v. Mayorkas*, 734 F. Supp. 3d 967, 982 (C.D. Cal. 2024), holding unlawful ICE's practice of entering onto the curtilage of homes during "knock and talks" for the purpose of carrying out arrests without a judicial warrant. Public reports confirm that in late May, Defendant Essayli, instead directed DOJ law enforcement agencies to take over door knocking tasks.[85]

110.    In sum, Defendants in this case have demonstrated a willingness to bypass basic constitutional, statutory, and regulatory requirements when it comes to immigration enforcement, even before top-down pressure demanded adherence with

---

[83] *See Nava v. DHS*, Proposed Settlement Agreement, https://www.aclu-il.org/sites/default/files/field_documents/proposed_settlement.pdf; see also National Immigrant Justice Center, *Final Settlement Regarding ICE Warrantless Arrests and Vehicle Stops: Overview of Settlement Requirements and Remedies* (last updated Jan. 17, 2025), https://immigrantjustice.org/final-settlement-regarding-ice-warrantless-arrests-and-vehicle-stops-overview-of-settlement-requirements-and-remedies/.

[84] Marisa Kabas, *ICE agents get green light to make unjustified warrantless arrests*, The Handbasket (June 12, 2025), https://www.thehandbasket.co/p/ice-warrantless-arrests-castanon-nava.

[85] Hamed Aleaziz & Todd Heisler, *Under Pressure From the White House, ICE Seeks New Ways to Ramp Up Arrests*, N.Y. Times (June 11, 2025), https://www.nytimes.com/2025/06/11/us/politics/ice-la-protest-arrests.html. Defendants in that case also indicated in a court pleading that they intend to resume ICE knock and talks as of July 1, 2025. Plaintiffs in that case have sought to confirm whether this is still their intent and have not received a response.

1   dramatically higher arrest quotas. When their practices have come under scrutiny,

2   rather than take the opportunity to conform their conduct to the law, they have

3   evaded accountability by replicating those practices in another geographic area,

4   declining to document what they do, and directing other federal partners not under

5   court order to take over tasks that have been found to be unconstitutional. It is

6   therefore no surprise that the immigration raids in the Los Angeles area have been

7   marked by systematic disregard of the law.

8   **H.      Experiences of Individual Plaintiffs**

9   *Petitioner-Plaintiff Pedro Vasquez Perdomo*

10      111.   In the early morning of June 18, 2025, in Pasadena, California,

11  Petitioner-Plaintiff Vasquez Perdomo was waiting at a bus stop across the street

12  from Winchell's Donuts with several co-workers to be picked up for a job.

13      112.   Suddenly, about four cars converged on his location, and about half a

14  dozen masked agents jumped out on either side of him. They had weapons and

15  masks, and did not identify themselves.

16      113.   To Petitioner-Plaintiff Vasquez Perdomo, it felt like a kidnapping. He

17  tried to leave but was swiftly surrounded, grabbed, handcuffed, and put into one of

18  the vehicles.

19      114.   At the time he was handcuffed, agents did not have reasonable

20  suspicion of a violation of immigration law.

21      115.   It was only after he was brought to a nearby CVS parking lot that

22  agents checked Petitioner-Plaintiff Vasquez Perdomo's identification.

23      116.   No warrant was shown. Upon information and belief, agents did not

24  have a warrant of any kind for Petitioner-Plaintiff Vasquez Perdomo's arrest.

25      117.   Agents proceeded with a warrantless arrest of Petitioner-Plaintiff

26  Vasquez Perdomo without making an individualized determination of risk of flight.

27      118.   If agents had evaluated Petitioner-Plaintiff Vasquez Perdomo for risk of

28  flight, they would have learned he had lived in Pasadena for decades.

-38-

42

119. Agents did not inform Petitioner-Plaintiff Vasquez Perdomo that they were immigration officers authorized to make an arrest or of the basis for his arrest.

120. At the time this action was filed, Petitioner-Plaintiff Vasquez Perdomo had been transported to and was being held at the federal building at 300 North Los Angeles St. in B-18. There he experienced extremely crowded and unsanitary conditions, was given little to eat or drink, and slept on the floor. Today he remains in custody at the Adelanto ICE Processing Center.

121. Petitioner-Plaintiff has representation in his removal proceedings. His counsel is located in Pasadena, California.

122. Petitioner-Plaintiff's family is located in Pasadena, California.

123. Petitioner-Plaintiff is diabetic and has felt increasingly ill since his arrest. He has felt depressed since his arrest and reasonably fears being racially profiled again if he is released from detention.

*Petitioner-Plaintiff Carlos Alexander Osorto*

124. In the early morning of June 18, 2025, in Pasadena, California, Petitioner-Plaintiff Osorto was waiting to be picked up for work with his co-worker Petitioner-Plaintiff Vasquez Perdomo.

125. When federal agents approached, Petitioner-Plaintiff Osorto was terrified. He had seen videos of what had been happening around Los Angeles and also had heard of masked people who were not even government agents taking community members away. He tried to run, but one of the agents caught up to him and pointed a taser at his head and said "stop or I'll use it!" Petitioner-Plaintiff Osorto stopped immediately.

126. Petitioner-Plaintiff Osorto was handcuffed and put into a vehicle.

127. At the time he was handcuffed, agents did not have reasonable suspicion of a violation of immigration law.

128. It was only after he was brought to a nearby CVS parking lot that agents asked Petitioner-Plaintiff Osorto if he had papers.

129.   No warrant was shown. Upon information and belief, agents did not have a warrant of any kind for Petitioner-Plaintiff Osorto's arrest.

130.   Agents proceeded with a warrantless arrest of Petitioner-Plaintiff Osorto without making an individualized determination of risk of flight.

131.   If agents had evaluated Petitioner-Plaintiff Osorto for risk of flight, they would have learned he had built homes all around Los Angeles, lived in Pasadena for more than a decade, and had 7 grandchildren who are U.S. citizens.

132.   Agents did not inform Petitioner-Plaintiff Osorto that they were immigration officers authorized to make an arrest or of the basis for his arrest.

133.   At the time this action was filed, Petitioner-Plaintiff Osorto had been transported to and was being held at the federal building at 300 North Los Angeles St. in B-18. The facility was full and when people asked for help officers told them there was no food, no water, and no medicine. Today he remains in custody at the Adelanto ICE Processing Center.

134.   Petitioner-Plaintiff Osorto has representation in his removal proceedings. His counsel is located in Pasadena, California.

135.   Petitioner-Plaintiff Osorto's family is located throughout Los Angeles County, including in Pasadena, California.

136.   Petitioner-Plaintiff Osorto has developed high blood pressure, he believes as a result of the stress he has experienced. He has been scared and overwhelmed by what happened and fears being targeted again, if he is released, for being a Latino person in construction clothes.

*Petitioner-Plaintiff Isaac Antonio Villegas Molina*

137.   In the early morning of June 18, 2025, in Pasadena, California, Petitioner-Plaintiff Villegas Molina was waiting to be picked up for work with his co-workers Petitioner-Plaintiff Vasquez Perdomo and Petitioner-Plaintiff Alexander Osorto.

138.　When federal agents approached, Petitioner-Plaintiff Villegas Molina was also afraid but tried his best to stay calm.

139.　An agent yelled at Petitioner-Plaintiff Villegas Molina not to run, even though he was still and calm. He was told to provide his ID and he provided his California ID, but the agent kept questioning him. At this point, he did not feel free to leave.

140.　When they were questioning him, agents did not have reasonable suspicion of a violation of immigration law.

141.　No warrant was shown. Upon information and belief, agents did not have a warrant of any kind for Petitioner-Plaintiff Villegas Molina's arrest.

142.　Agents proceeded with a warrantless arrest of Petitioner-Plaintiff Villegas Molina without making an individualized determination of risk of flight.

143.　If agents had evaluated Petitioner-Plaintiff Villegas Molina for risk of flight, they would have learned he had lived in Pasadena for 13 years and had worked at restaurants across Los Angeles.

144.　Agents did not inform Petitioner-Plaintiff Villegas Molina that they were immigration officers authorized to make an arrest or of the basis for his arrest.

145.　At the time this action was filed, Petitioner-Plaintiff Villegas Molina had been transported to and was being held at the federal building at 300 North Los Angeles St. in B-18. He slept on the floor and was given almost nothing to eat. Today he remains in custody at the Adelanto ICE Processing Center.

146.　Petitioner-Plaintiff has representation in his removal proceedings. His counsel is located in Pasadena, California.

147.　Petitioner-Plaintiff has had a difficult time in detention. He fears being targeted again because of his race.

*Plaintiff Jorge Hernandez Viramontes*

148.　On the morning of June 18, 2025, Plaintiff Hernandez Viramontes was working at a car wash in Orange County, where he has worked for approximately 10

-41-

years, when immigration agents arrived. This was the third time that agents had raided the carwash since June 9, 2025.

149. During this visit by agents, like with previous visits, agents did not identify themselves. They did not show a warrant. They simply went from person to person interrogating them about their identity and immigration status.

150. Agents questioned Plaintiff Hernandez Viramontes' co-worker, a U.S. citizen, about his citizenship *three* separate times in one visit.

151. When agents got to Plaintiff Hernandez Viramontes, they asked him if he was a citizen, and he replied yes and explained he was a dual citizen of the U.S. and Mexico. They asked for an ID, which he provided. Agents then explained that his ID wasn't enough and since he didn't have his passport, they were taking him.

152. Agents placed Plaintiff Hernandez Viramontes in a vehicle and transported him away. During this time, Plaintiff Hernandez Viramontes did not know if they were going to take him to a detention center.

153. Agents verified his citizenship and about 20 minutes later, brought him back to the car wash, but not before his brother called his wife, who had become deeply worried.

154. When agents brought Plaintiff Hernandez Viramontes back to the car wash, they did not apologize.

155. Shortly after agents returned Plaintiff Hernandez Viramontes to the car wash, yet *another* group of agents raided the carwash again.

156. Plaintiff Hernandez Viramontes is shaken by what happened and fears being targeted again on the basis of his Latino appearance and accent.

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

*Plaintiff Jason Brian Gavidia*

157.  In the afternoon of June 12, 2025, Plaintiff Gavidia, a U.S. citizen, was at a tow yard in Los Angeles County that was visited by immigration agents conducting a roving patrol.[86]

158.  Around 4:30 p.m., upon hearing someone say immigration agents may be at the premises, Plaintiff Gavidia went outside to confirm this. At the time, his clothes were dirty from working on his car.

159.  On the sidewalk outside the gate, Plaintiff Gavidia saw a federal agent between two cars step forward. Soon after, Plaintiff Gavidia saw several other agents wearing similar vests with the words "Border Patrol Federal Agent." He also noticed the agents were carrying handguns and at least two of the agents had a military-style rifle.

160.  As Plaintiff Gavidia attempted to head back inside the tow yard premises, an agent said, "Stop right there." At this point, Plaintiff Gavidia did not feel that he could leave. The agent was masked.

161.  While the agent approached Plaintiff Gavidia, another unmasked agent ran towards him and asked if he was American. Plaintiff Gavidia told the agent that he is American multiple times. The agent responded by asking, "What hospital were you born in?" Plaintiff Gavidia calmly replied that he did not know. The agent repeated the same question two more times, and each time Plaintiff Gavidia provided the same answer. At that point, the agents forcefully pushed Plaintiff Gavidia up against the metal gated fence, put his hands behind his back, and twisted his arm. Plaintiff Gavidia had been on his phone, and the masked agent also took his phone from his hand at that point.

162.  Plaintiff Gavidia explained that the agents were hurting him and that he was American. The unmasked agent asked a final time, "What hospital were you

---

[86] Complaint, *United States v. Javier Ramirez*, No. 2:25-MJ-03646-DUTY (C.D. Cal. June 13, 2025); *see also* Brittny Mejia, *supra* note 23.

born in?" Plaintiff Gavidia responded again that he did not know and said East L.A. Plaintiff Gavidia then told the agents that he could show them his Real ID. The agents had not asked to see Plaintiff Gavidia's identification.

163.   When Plaintiff Gavidia showed his Real ID to the agents, one of them took it from him. It ultimately took about 20 minutes for -Plaintiff Gavidia to get his phone back. But the agents never returned Plaintiff Gavidia's Real ID.

164.   Plaintiff Gavidia's interaction with the federal agents was one of the worst experiences he has ever had. He is disturbed and deeply concerned about being targeted again because of his race.

## I.   Harms to Organizational Plaintiffs and/or Their Members

165.   Since they began on June 6, 2025, federal immigration raids have led to the arrest of over 1,500 people and counting, many of whom have been stopped without reasonable suspicion, and/or arrested without probable cause. For those who have been arrested, many have been denied the right to consult with their attorneys, and have been held under conditions with insufficient food, shelter, clothing, and medical care. These conditions, of both arrests and detentions, have caused profound harm to individuals and families, and destabilized entire communities. The chilling effect extends beyond directly impacted individuals. For example, the Mayor of Pasadena described seeing a "huge drop in attendance at local community programs," once "vibrant neighborhoods" now "eerily quiet" and business owners "concerned that their workers and customers alike are too afraid to show up."[87]

166.   These harms have extended to organizational Plaintiffs and/or their members.

---

[87] Victor M. Gordo, *Pasadena Mayor: Trump's Immigration Raids Hurt Communities Like Mine,* Time (June 18, 2025), https://time.com/7295305/pasadena-trump-immigration-raids.

***Plaintiff Los Angeles Worker Center Network (LAWCN)***

167. LAWCN is a regional organization made up of eight worker centers and labor organizations that work together to build power and develop worker leadership organizing with Black, immigrant, and refugee workers and other workers of color in the Los Angeles region. LAWCN's member organizations work to improve conditions in low-wage industries, including car wash, garment, home care, restaurant, retail, warehouse, and other low-wage sectors. LAWCN's members each have at least one representative on its Executive Committee, and the Committee has regular standing meetings in which the member organizations provide input on LAWCN's strategic planning and goals, including by having the voting members cast votes on key strategic questions.

168. LAWCN improves conditions for low-wage workers through capacity building, organizing, services, and policy advocacy at the city, county, and state level. In pursuing LAWCN's mission to build the power and grow the capacity of local worker centers to organize and advocate for low-wage workers, LAWCN has a long term and sustained focus on issues related to immigration and immigrant workers. LAWCN has engaged in policy reform and advocacy aimed at increasing immigrant workers' access to governmental services. Additionally, through its capacity-building efforts, LAWCN's work supports immigrant justice by improving the conditions and dignity of immigrant workers in Southern California.

169. LAWCN brings this suit on behalf of its member organizations, worker centers that organize and advocate for low-wage workers in the greater Los Angeles region. At least one of LAWCN's member organizations, CLEAN Carwash Worker Center (CLEAN), has been harmed by the ongoing raids in Southern California. CLEAN is a grassroots worker center that fights for the self-determination of immigrant and working-class people by empowering carwash workers to make lasting changes in the carwash industry and their communities.

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

170.   CLEAN has approximately 1,800 members who are carwash workers from the greater Los Angeles area. Its members are predominantly Latino and many are immigrants or the children of immigrants. CLEAN has three tiers of membership available to workers, depending on how much each member wishes to participate in CLEAN's organizing work. CLEAN's members help set the priorities for the organization. It holds standing membership meetings during which members provide feedback and input into CLEAN's goals and work.

171.   CLEAN's mission includes fighting for the self-determination of immigrants. A consistent focus of CLEAN's work is to provide its members access to immigration-related support and resources. Some of this work involves providing training and support to members about immigration issues. CLEAN has also organized programming and events, including attending rallies and events, in support of immigration reform.

172.   Carwashes have been a consistent and ongoing target of immigration agents during the course of the raids—at least two dozen have been raided so far.[88] Some carwashes have closed because so many workers have either been detained or fear future raids.[89]

173.   Dozens of CLEAN's members have been detained by immigration agents while at work. At least one identifiable CLEAN member, Jesus Aristeo Cruz Utiz, has been subjected to Defendants' unlawful stop and arrest practices.

174.   Many CLEAN members, regardless of the stability or permanence of their immigration status, fear that immigration agents will subject them to unlawful stops and arrests. They are terrified that masked and unidentifiable immigration agents will invade their workplaces without a warrant, grab them, handcuff them,

---

[88] Kaitlyn Huamani & Suhauna Hussain, *More L.A. car washes targeted in immigration raids, some closed amid fears of further sweeps*, L.A. Times (June 20, 2025), https://www.latimes.com/business/story/2025-06-20/la-car-washes-targeted-immigration-raids-business-closures.

[89] *Id.*

and take them away. They are fearful of being racially profiled and stopped by immigration agents while in public or at their places of employment.

***Plaintiff United Farm Workers (UFW)***

175.   Founded in 1962 by Cesar Chavez, Dolores Huerta, Larry Itliong and other labor leaders, UFW is the largest farm worker union in the country. UFW's mission is to improve the lives, wages, and working conditions of agricultural workers and their families. UFW is dedicated to the cause of eliminating discrimination against farm workers, immigrants, people of color, and any other groups that have been the target of unfair or unlawful treatment. As part of this work, UFW is a national leader in the movement for immigration reform and immigrants' rights.

176.   UFW has approximately 10,000 members. California is home to more UFW members than any other state, with members in counties across the Central District of California, such as Los Angeles County, Orange County, Riverside County, Ventura County, and San Bernardino County. UFW membership is voluntary and consists of various categories of members. Among these, contributing or associate members are individuals who make a monthly or annual contribution of a designated amount to UFW. Dues-paying members are those who benefit from a UFW collective bargaining agreement.

177.   UFW members play an important role in deciding what activities UFW engages in as an organization. At the UFW's quadrennial Constitutional Convention, members introduce and vote on motions to govern and guide the union's work, and to elect the Union Executive Board. On an ongoing basis, UFW members respond to surveys, provide feedback, and participate in advisory meetings (known as "consejo de base" in Spanish) to actively participate in the Union's decisions. UFW has created various programs in response to members' feedback and requests.

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

178.   UFW membership comes with a variety of benefits. Dues-paying members receive protections from collective bargaining in which UFW engages on their behalf. Contributing or associate members (also called "direct" members) receive UFW photographic identification, accidental life insurance of $4,000, access to UFW discounts with private businesses, and other benefits. For services that prioritize agricultural workers, UFW direct membership establishes membership.

179.   UFW brings this action on behalf of its members. UFW's members have been harmed by the ongoing immigration raids in Southern California and fear being subjected to unlawful stops, arrests, and detention practices in the future. At least one UFW member—Angel—has been subjected to Defendants' stop and arrest practices.

180.   Despite UFW's lawsuit against DHS and the Border Patrol, filed on February 26, 2025,[90] these concerns remain today.

181.   Many UFW members, regardless of the stability or permanence of their immigration status, fear that immigration agents will continue to subject farm workers and day laborers to unlawful immigration stops and arrests, especially those who appear non-white. These members face irreparable harm from Defendants' unlawful practices.

**Plaintiff the Coalition for Humane Immigrant Rights (CHIRLA)**

182.   CHIRLA was founded in 1986, and its mission is to advance the human and civil rights of immigrants and refugees. CHIRLA ensures immigrant communities are fully integrated into our society with full rights and access to resources.

183.   As a membership organization, CHIRLA has approximately 50,000 members across California, including both U.S. citizens and noncitizens of varying

---

[90] Complaint, *UFW v. Noem*, No. 1:25-cv-00246 JLT CDB (E.D. Cal. Feb. 26, 2025), https://www.aclusocal.org/sites/default/files/001_complaint.pdf.

1 immigration status. CHIRLA has members in every county in this District. Many of

2 CHIRLA members are day laborers, car wash workers, and street vendors.

3 CHIRLA's membership is predominantly Latino.

4     184.   CHIRLA is the largest statewide immigrant rights organization in

5 California, with over 185 staff members who provide services to thousands of

6 Californians each year. Its legal department has assisted approximately 30,000

7 people with direct services and legal education, including numerous CHIRLA

8 members.

9     185.   Some of CHIRLA's members pay dues to the organization, and those

10 dues help fund the organization's operations. Other CHIRLA members have become

11 members by virtue of their participation in the organization's meetings, programs,

12 and policy campaigns.

13     186.   CHIRLA's members regularly meet with each other in regional

14 committees. Committee meetings can range from a small handful of people to

15 hundreds. In addition, CHIRLA's student members hold regional statewide

16 conference calls and meetings throughout the year. During these meetings,

17 CHIRLA's members plan local advocacy campaigns, share information, and discuss

18 issues that affect them, their families, and their local communities. Information from

19 these meetings is reported to CHIRLA's leadership and used to guide CHIRLA's

20 programmatic agenda.

21     187.   CHIRLA also holds quarterly membership retreats at which coreleaders

22 discuss issues they are seeing in their communities and set priorities for the

23 organization.

24     188.   CHIRLA also coordinates the Los Angeles Rapid Response Network

25 (LARRN) and educates its membership as well as the broader community through

26 know your rights programming, workshops, social media, and educational literature

27 about a variety of social services and benefits, including immigration law, financial

28 literacy, workers' rights, and civic engagement. CHIRLA is often a first point of

-49-

1  contact for individuals seeking direct assistance and accurate information about

2  policy changes impacting immigrants.

3      189.   CHIRLA brings this action on behalf of its members who reasonably

4  fear being subject to the stop and arrest practices challenged in this case and

5  subsequent detention at B-18. Since immigration authorities began arresting and

6  detaining predominately Latino people across Southern California, including in

7  places where CHIRLA members live and go, they have become terrified that they

8  too will be taken from their families and communities. Indeed, some CHIRLA

9  members, including those with legal status, have begun carrying around their

10  passports, have refrained from being at bus stops, and have reduced how much they

11  go out in public because they are afraid of being stopped and detained unlawfully.

12      190.   As a result of Defendants' actions, CHIRLA's mission to serve the

13  immigrant community, including through the provision of legal advice and services,

14  is being frustrated. Throughout the last month, CHIRLA's attorneys and

15  representatives have attempted to communicate with individuals at B-18, were

16  denied access, and were thwarted in their efforts to offer legal advice to even those

17  detainees they saw at a distance as government officials used car horns to drown

18  them out. Defendants' actions are also thwarting CHIRLA's work to coordinate the

19  LARRN as other attorneys and representatives summoned by CHIRLA to B-18 have

20  been similarly denied access.

21  **_Plaintiff Immigrant Defenders Law Center (ImmDef)_**

22      191.   ImmDef was founded in 2015 with the mission of protecting the due

23  process rights of immigrants facing deportation. At its inception, it sought to achieve

24  this goal through implementation of the universal representation model—i.e.,

25  ensuring that every immigrant appearing before the immigration court was

26  represented by an attorney. ImmDef is now the largest removal defense nonprofit

27  organization in Southern California, providing full-scale deportation defense, legal

28

-50-

representation, legal education, and social services to approximately 30,150 detained and non-detained children and adults annually.

192.   ImmDef's Welcoming Project provides "Know Your Rights" trainings throughout ImmDef's service area, which includes the counties of Los Angeles, Orange, Kern, Riverside, San Bernardino, and San Diego. These trainings aim to educate immigrant community members about the immigration system and about their due process and civil rights.

193.   ImmDef's Rapid Response team is also part of LARRN, with CHIRLA, and monitors a hotline and responds to notifications about individuals detained in enforcement actions. When possible, ImmDef takes referrals to represent detained individuals in their removal proceedings within ImmDef's service area.  If ImmDef is unable to represent an individual referred through LARRN, ImmDef attempts to connect that individual with pro bono representation.

194.   ImmDef's attorneys and representatives have been denied access to people in detention, including those being held at B-18. As a result of Defendants' actions, ImmDef's mission to serve the immigrant community, including through the provision of legal advice and services, is being fundamentally frustrated.

**J.     Defendants' Illegal Conduct Will Continue if Not Enjoined**

195.   The federal government has repeatedly made clear its intent to continue its operations and unlawful stops, arrests, and detentions. Defendants have been candid about their determination to continue pursuing these unlawful policies and practices, unless this Court enjoins them from doing so.

196.   Indeed, federal officials have been open about the ongoing and expanding nature of these unlawful immigration raids.

197.   White House official Tom Homan recently maligned Los Angeles as a sanctuary city and vowed, "We're going to send a whole boatload of agents. . . .

We're going to swamp the city.[91] He has stated, "This operation is not going to end,"[92] and, "Every day in LA we're going to enforce immigration law. I don't care if they like it or not."[93]  Kristi Noem has also said, "We're going to stay here and build our operations until we make sure that we liberate the city of Los Angeles."[94] Noem told agents "your performance will be judged every day by how many arrests you, your teammates and your office are able to effectuate. Failure is not an option."[95]

198.   While immigration enforcement may be done lawfully, these statements demonstrate a commitment to continue operations at any cost, including at the expense of individuals' constitutional and legal rights. Plaintiffs have already been harmed, and they face a reasonable likelihood of continuing harm, as a result of Defendants' unlawful policies and practices described herein. Plaintiffs have no

---

[91] Jenny Jarvie & Grace Toohey, *Trump immigration raids: Stunning, yet predictable*, L.A. Times Online (June 15, 2025), https://www.latimes.com/california/story/2025-06-15/clash-trump-los-angeles-immigration-inevitable.

[92] Andrea Castillo, *'We need to find these people': L.A. immigration raids a sign of what's to come, officials say*, L.A. Times Online (June 12, 2025), https://www.latimes.com/politics/story/2025-06-12/we-need-to-find-these-people-l-a-immigration-raids-a-sign-of-whats-to-come-officials-say.

[93] Jacob Soboroff & Doha Madani, *Trump's border czar threatens arrest for immigration interference, warns Newsom and Bass not to 'cross that line'*, NBC (June 8, 2025), https://www.nbcnews.com/news/us-news/tom-homan-trump-border-czar-los-angeles-rcna211701.[94] Adrian Florido & Liz Baker, *DHS vows immigration raids will continue as resistance mounts*, NPR (June 12, 2025), https://www.npr.org/2025/06/12/g-s1-72513/dhs-immigration-raids-los-angeles-protests.[95] Tyler Pager, et al., *Trump's Conflicting Messages on Workplace Raids Leave Businesses Reeling*, N.Y. Times (June 17, 2025), https://www.nytimes.com/2025/06/17/us/politics/trump-conflicting-messages-workplace-raids.html.

[94] Adrian Florido & Liz Baker, *DHS vows immigration raids will continue as resistance mounts*, NPR (June 12, 2025), https://www.npr.org/2025/06/12/g-s1-72513/dhs-immigration-raids-los-angeles-protests.[95] Tyler Pager, et al., *Trump's Conflicting Messages on Workplace Raids Leave Businesses Reeling*, N.Y. Times (June 17, 2025), https://www.nytimes.com/2025/06/17/us/politics/trump-conflicting-messages-workplace-raids.html.

[95] Tyler Pager, et al., *Trump's Conflicting Messages on Workplace Raids Leave Businesses Reeling*, N.Y. Times (June 17, 2025), https://www.nytimes.com/2025/06/17/us/politics/trump-conflicting-messages-workplace-raids.html.

plain, adequate, or complete remedy at law to address the wrongs described herein. Injunctive and declaratory relief is necessary to redress their ongoing injuries.

### CLASS ACTION ALLEGATIONS

199. The Stop/Arrest Plaintiffs bring this action on behalf of themselves, and in the case of the organizational Stop/Arrest Plaintiffs, their members. In addition, the Stop/Arrest Plaintiffs bring this action under Federal Rules of Civil Procedure 23(a) and (b)(2), on behalf of classes of persons similarly situated to themselves and their members. Plaintiffs seek to represent three classes of individuals who have been or will be subjected to several of the unlawful practices this lawsuit challenges: suspicionless stops; warrantless arrests without evaluations of flight risk; and the failure to identify authority and the reason for arrest.

***The Suspicionless Stop Class***

The Stop/Arrest Plaintiffs seek to represent a class under Federal Rules of Civil Procedure 23(b)(2) consisting of:

> All persons who, since June 6, 2025, have been or will be subjected to a
> detentive stop by federal agents in this District without a pre-stop,
> individualized assessment of reasonable suspicion concerning whether
> the person (1) is engaged in an offense against the United States or (2)
> is a noncitizen unlawfully in the United States.

200. *Numerosity.* The proposed class meets the numerosity requirements of Rule 23(a)(1) because it consists of a large number of similarly situated individuals located within this District, such that joinder of all members of the class is impracticable. Although the number of individuals who have been or will be subject to unconstitutional detentive stops by federal agents is not known with precision, class members number in the thousands. Since June 6, 2025, federal agents have arrested more than 1,500 people within the District, and likely conducted unconstitutional detentive stops on many more.

201. *Common Questions of Law and Fact.* The proposed class meets the commonality requirements of Rule 23(a)(2) because all members of the proposed class have been or will be subjected to the same unconstitutional practices. Thus, there are numerous questions of law and fact common to the proposed class, which predominate over any individual questions, including:

(a) Whether Defendants have a policy, pattern, or practice of conducting stops without regard to whether reasonable suspicion exists that the person (1) is engaged in an offense against the United States or (2) is a noncitizen unlawfully in the United States; and

(b) Whether Defendants' policy, pattern, or practice of conducting stops without regard to whether reasonable suspicion exists that the person (1) is engaged in an offense against the United States or (2) is a noncitizen unlawfully in the United States violates the Fourth Amendment or applicable regulations.

***The Warrantless Arrest Class***

202. The organizational Stop/Arrest Plaintiffs—LAWCN, UFW, and CHIRLA—also seek to represent a class consisting of:

All persons, since June 6, 2025, who have been arrested or will be arrested in this District by federal agents without a warrant and without a pre-arrest, individualized assessment of probable cause that the person poses a flight risk.

203. *Numerosity.* The proposed class meets the numerosity requirements of Rule 23(a)(1) because it consists of a large number of similarly situated individuals located within this District, such that joinder of all members of the class is impracticable. Although the number of individuals who have been or will be subject to unlawful warrantless arrests by Defendants is not known with precision, class members number in the thousands. Since June 6, 2025, federal agents have arrested more than 1,500 people within the District, with no indications of possessing a

-54-

warrant or conducting any sort of pre-arrest, individualized assessment of probable cause that the person poses a flight risk.

204. *Common Questions of Law and Fact.* The proposed class meets the commonality requirements of Rule 23(a)(2) because all members of the proposed class have been or will be subjected to the same unconstitutional practices. Thus, there are numerous questions of law and fact common to the proposed class, which predominate over any individual questions, including:

(a) Whether Defendants have a policy, pattern, or practice of conducting warrantless arrests without probable cause that an individual is likely to escape before a warrant can be obtained for the arrest;

(b) Whether Defendants' policy, pattern, or practice of conducting stops without probable cause that an individual is likely to escape before a warrant can be obtained for the arrest violates 8 U.S.C. § 1357(a)(2); and

(c) Whether Defendants' policy, pattern, or practice of conducting stops without probable cause that an individual is likely to escape before a warrant can be obtained for the arrest violates 8 C.F.R. § 287.8(c)(2)(ii).

### The Failure to Identify Class

205. The organizational Stop/Arrest Plaintiffs—LAWCN, UFW, and CHIRLA—also seek to represent a class consisting of:

All persons who, since June 6, 2025, have been arrested or will be arrested in this District by federal agents, where agents (1) fail to identify as an immigration officer who is authorized to execute an arrest, and/or (2) fail to state that person is under arrest and the reason for arrest, after it is practical and safe to do so.

206. *Numerosity.* The proposed class meets the numerosity requirements of Rule 23(a)(1) because it consists of a large number of similarly situated individuals located within this District, such that joinder of all members of the class is impracticable. Although the number of individuals who have been or will be subject

-55-

to unlawful arrests in which agents failed to identify themselves in the manner required by law is not known with precision, class members number in the thousands. Since June 6, 2025, federal agents have arrested more than 1,500 people within the District, and it has been widely reported that Defendants do not generally identify themselves during these arrests.

207. *Common Questions of Law and Fact.* The proposed class meets the commonality requirements of Rule 23(a)(2) because all members of the proposed class have been or will be subjected to the same unconstitutional practices. Thus, there are numerous questions of law and fact common to the proposed class, which predominate over any individual questions, including:

(a) Whether Defendants have a policy, pattern, or practice of (1) failing to (1) identify as an immigration officer who is authorized to execute an arrest, or (2) failing to state that person is under arrest and the reason for arrest, after it is practical and safe to do so; and

(b) Whether Defendants' policy, pattern, or practice of (1) failing to identify as an immigration officer who is authorized to execute an arrest, or (2) failing to state that person is under arrest and the reason for arrest, after it is practical and safe to do so violates 8 C.F.R. § 287.8(c)(2)(iii).

**Allegations Common to All Classes**

208. The proposed classes satisfy the requirements of Federal Rule of Civil Procedure 23(a)(1) because they are sufficiently numerous so as to make joinder impracticable.

209. Joinder is also impractical because the proposed class includes individuals who will be subject to Defendants' unlawful practices in the future and therefore cannot be joined.

210. *Typicality.* The proposed classes further meet the typicality requirement of Federal Rule of Civil Procedure 23(a)(3). Plaintiffs' legal claims are typical to all members of the proposed classes. Plaintiffs have no interests separate from those of

the classes they seek to represent, and seek no relief other than the relief sought on behalf of each class. Defendants have acted and intend to act in a manner adverse to the rights of the Suspicionless Stops Class and the Warrantless Arrest Class, making final injunctive and declaratory relief appropriate with regard to each class as a whole.

211. *Propriety of Class Action Mechanism.* The prosecution of individual actions against Defendants by individual members of the proposed class would be inefficient and create a risk of inconsistent and varying adjudications.

212. *Adequacy of Class Representation.* The proposed classes meet the adequacy requirements of Federal Rule of Civil Procedure 23(a)(4). Each putative class representative has committed to fairly and adequately representing the interests of the Suspicionless Search Class, the Warrantless Arrest Class, and the Failure to Identify Class. Plaintiffs know of no conflict between their interests and those of the proposed class and, in fact, seek relief identical to the relief sought by all class members.

213. *Adequacy of Counsel for the Class.* The Stop/Arrest Plaintiffs' counsel are experienced in class action, civil rights, and immigrants' rights litigation. Plaintiffs' counsel have the requisite level of expertise to adequately prosecute this case on behalf of Plaintiffs and the proposed classes. Plaintiffs' counsel will fairly and adequately represent the interests of each class.

214. Finally, the proposed classes satisfy Rule 23(b)(2) because Defendants have acted on grounds generally applicable to the class, thereby making equitable relief appropriate with respect to the class as a whole.

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

# CAUSES OF ACTION

## COUNT ONE

### Violation of Fourth Amendment:
### Unreasonable Seizures
### On Behalf of the Stop/Arrest Plaintiffs and the Suspicionless Stop Class
### Against All Defendants

215.    Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

216.    Except at the border and its functional equivalents, the Fourth Amendment prohibits Defendants from conducting a detentive stop to question a person without reasonable suspicion that a person is a noncitizen unlawfully in the United States.

217.    "A person's mere propinquity to others independently suspected of [unlawful] activity does not, without more, give rise to probable cause to search [or seize] that person." *Perez Cruz v. Barr*, 926 F.3d 1128, 1138 (9th Cir. 2019) (quotation omitted). "'Reasonable suspicion' is no different." *Id*.

218.    Defendants have a policy, pattern, and practice of stopping individuals without regard to reasonable suspicion that they are unlawfully in the United States.

219.    As a part of Defendants' policy, pattern, and practice, when conducting stops,  Defendants engage in a show of force so overwhelming that a reasonable person would not feel free to leave.  As a matter of policy, pattern, and practice, Defendants do not evaluate the need for force or tailor the force they use to the circumstances of individual stops and arrests.

220.    Defendants' policy, pattern, and practice violates the Fourth Amendment to the U.S. Constitution.

# COUNT TWO

### Violation of 8 U.S.C. § 1357(a)(2)
### Warrantless Arrests Without Probable Cause of Flight Risk
### On Behalf of Plaintiffs LAWCN, UFW, CHIRLA,
### and the Warrantless Arrest Class
### Against All Defendants

221.   Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

222.   8 U.S.C. § 1357(a)(2) requires that arrests without a warrant be accompanied by "reason to believe" that an individual is "likely to escape before a warrant can be obtained for [their] arrest."

223.   Defendants have a policy, pattern, and practice of making arrests without any warrant without making an individualized determination of flight risk. They have no mechanism for ensuring compliance with the statutory limits of agents' and officers' warrantless arrest authority and do not provide guidance to agents and officers on how to make an individualized determination of likelihood of escape. Defendants permit agents and officers to make warrantless arrests *carte blanche* in violation of law.

224.   Defendants' policy, pattern, and/or practice of making warrantless arrests without the required individualized flight risk analysis is "final agency action" that is "in excess of statutory jurisdiction, authority, or limitations" under 8 U.S.C. § 1357(a)(2). 5 U.S.C. §§ 704, 706(2)(C).

225.   Separate from the APA, Defendants' policy, pattern, and practice of making warrantless arrests without the required individualized flight risk analysis is *ultra vires*.

-59-

63

## COUNT THREE

*Violation of 8 C.F.R. § 287.8(c)(2)(ii)*
*Standards for Stops and Warrantless Arrests*
*On Behalf of Plaintiffs LAWCN, UFW, CHIRLA,*
*and the Warrantless Arrest Class*
*Against All Defendants*

226. Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

227. Defendants are bound by regulation to conform warrantless arrests to the standards in 8 C.F.R. § 287.8(c), including the requirement at 8 C.F.R. § 287.8(c)(2)(ii) that officers have reason to believe that an individual is "likely to escape before a warrant can be obtained."

228. Defendants have a policy, pattern, and practice of making arrests without any warrant without making an individualized determination of flight risk. They have no mechanism for ensuring compliance with the regulatory limits of agents' and officers' warrantless arrest authority and do not provide guidance to agents and officers on how to make an individualized determination of likelihood of escape. Defendants permit agents and officers to make warrantless arrests *carte blanche* in violation of law.

229. Defendants' policy, pattern, and practice is "final agency action" that is "in excess of statutory jurisdiction, authority, or limitations" under 8 C.F.R. § 287.8(c)(2)(ii). 5 U.S.C. §§ 704, 706(2)(C).

## COUNT FOUR

*Violation of 8 C.F.R. § 287.8(c)(2)(iii)*
*Failure to Identify Authority and Reason for Arrest*
*On Behalf of Plaintiffs LAWCN, UFW, CHIRLA*
*Against All Defendants*

230. Plaintiffs incorporate the allegations in the paragraphs above as though fully set forth here.

231. The regulations require agents and officers, at the time of an arrest or as soon as it is practicable and safe to do so, to identify themselves as "an immigration

officer who is authorized to execute an arrest" and "state that the person is under arrest and the reason for the arrest." 8 C.F.R. § 287.8(c)(3).

232. Defendants have a policy, pattern, and practice of not timely identifying themselves, their authority to execute an immigration arrest, or the reasons for an arrest.

233. Defendants' policy, pattern, and practice is a "final agency action" that is "in excess of statutory jurisdiction, authority, or limitations" under 8 C.F.R. § 287.8(c)(2)(ii). 5 U.S.C. §§ 704, 706(2)(C).

## COUNT FIVE

### Violation of the Fifth Amendment:
### Access to Counsel
### On Behalf of the Access/Conditions Plaintiffs
### Against Defendants Noem, Lyons, and Santacruz Jr.

234. Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

235. Individuals detained at B-18 have the right to hire and consult with attorneys. Due process also requires that detainees have adequate opportunities to obtain counsel and to visit and communicate with counsel once counsel is retained. Defendants have a policy, pattern, and practice of turning away attorneys at the door of B-18 and depriving detainees of access to confidential legal consultations by phone. This lack of counsel has severe consequences. Detainees are forced to interact with federal immigration officials without the benefit of legal advice even though it is readily available.

236. Defendants' actions violate the Fifth Amendment.

## COUNT SIX

### Violation of 8 U.S.C. § 1362
### Access to Counsel
### On Behalf of the Access/Conditions Plaintiffs
### Against Defendants Noem, Lyons, and Santacruz Jr.

237. Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

238.   The Immigration and Nationality Act (INA) guarantees noncitizens the right to counsel in connection with inadmissibility and deportability proceedings. 8 U.S.C. §1362; *see also* 8 U.S.C. § 1229a(b)(4)(A); *Colmenar v. INS*, 210 F.3d 967, 971 (9th Cir. 2000); *Orantes-Hernandez*, 919 F.2d at 564.

239.   This protection necessarily entails the right to consult with an attorney in advance of any hearing—especially a hearing at which a noncitizen faces potentially permanent banishment from the United States. *Rios-Berrios*, 776 F.2d at 862. The same substantive standards that protect the Plaintiffs' right to counsel under the Due Process Clause apply to their statutory rights under the INA. *See Agyeman v. INS*, 296 F.3d 871, 877 (9th Cir. 2002) ("If a[] [noncitizen] is prejudiced by a denial of any of the applicable procedural protections, he is denied his constitutional guarantee of due process.").

240.   Defendants have a policy, pattern, and practice of turning away attorneys at the door of B-18 and depriving detainees of access to confidential legal consultations by phone. This lack of counsel has severe consequences. Detainees are forced to interact with federal immigration officials without the benefit of legal advice even though it is readily available.

241.   Defendants' policy, pattern, and practice of denying detained individuals access to legal advice is "final agency action" that is in excess of statutory authority. *See* 5 U.S.C. §§ 704, 706(2)(C).

### COUNT SEVEN

***Violation of the Fifth Amendment:***
***Conditions of Confinement***
***On Behalf of the Access/Conditions Plaintiffs***
***Against Defendants Noem, Lyons, and Santacruz Jr.***

242.   Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

243.   Civil detainees' conditions of confinement are unconstitutional if they "amount to punishment." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).

244. Defendants have allowed conditions to deteriorate at B-18 to an extent that they amount to punishment. They have failed to provide basic necessities like food, water, adequate hygiene facilities, and medical care. Defendants have also violated detainees' constitutional right to due process by subjecting them to overcrowding and failing to provide adequate sleeping accommodations at B-18.Defendants' ongoing violations of the Fifth Amendment directly harm CHIRLA and ImmDef's missions to provide legal services and assistance to community members, and harm CHIRLA members who will be subject to detentions at B-18 by depriving them of their fundamental right to an "appropriate place of detention," and serving to coerce some detained individuals into accepting voluntary departure before they have an opportunity to consult counsel.

## COUNT EIGHT

### Violation of Fifth Amendment:
### Due Process
### On Behalf of Petitioner-Plaintiffs Perdomo, Osorto, and Molina
### Against Defendants Noem, Lyons, and Santacruz Jr.

245. Petitioners-Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

246. The government may not deprive a person of life, liberty, or property without due process of law. U.S. Const. amend. V. "Freedom from imprisonment— from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that the Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).

247. The government's detention of Petitioners-Plaintiffs violates their rights to due process because they have been detained without lawful authority, infringing on their fundamental right to liberty.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that this Court grant the following relief:

(1)     Assume jurisdiction over this matter;

(2)     Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2);

(3)     Appoint the counsel for Stop/Arrest Plaintiffs as class counsel pursuant to Federal Rule of Civil Procedure 23(g);

(4)     Declare that Defendants' policy, pattern, and practice of conducting stops without reasonable suspicion violate the Fourth Amendment of the United States Constitution;

(5)     Declare that Defendants' policy, pattern, and practice of making warrantless arrests without individualized flight risk determinations violate 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8(c)(2)(ii); and the APA;

(6)     Declare that Defendants' policy, pattern, and practice of failing to identify the authority and reasons for arrests violate 8 C.F.R. § 287.8(c)(2)(iii); and the APA;

(7)     Declare that Defendants' denial of access to counsel violates the Due Process Clause of the Fifth Amendment of the United States Constitution;

(8)     Declare that Defendants' policy and practice of denying access to counsel violate the rights of the Access/Detention Plaintiffs under 8 U.S.C. § 1362 and the APA;

(9)     Declare that the conditions of confinement imposed by Defendants at B-18 violate the Fifth Amendment of the United States Constitution;

(10)    Issue a preliminary and permanent injunction enjoining further violations of Plaintiffs' rights;

(11)    Vacate Defendants' unlawful policies and practices that violate statutory and regulatory law under the APA;

(12)    Enjoin Defendants from transferring Petitioner-Plaintiffs outside of this judicial district during the pendency of removal proceedings;

-64-

(13)     Enjoin Defendants from removing Petitioner-Plaintiffs from the United States without the procedures for removal identified in the INA;

(14)     Order the immediate release of Petitioner/Plaintiffs pending these proceedings;

(15)     Award reasonable attorneys' fees, costs, and other disbursements permitted under the Equal Access to Justice Act, 28 U.S.C. § 2412, and any other applicable statute, and;

(16)     Order any and all such other relief as the Court deems just, equitable, and proper.

DATED:  July 1, 2025                    Respectfully submitted,


By:     /s/ *Stacy Tolchin*
        Stacy Tolchin
        *Attorneys for Stop/Arrest Plaintiffs*


By:     /s/ *Mohammad Tajsar*
        Mohammad Tajsar
        *Attorney for Stop/Arrest Plaintiffs*


By:     /s/ *Mark Rosenbaum*
        Mark Rosenbaum
        *Attorney for Plaintiffs*

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Stacy Tolchin (CA SBN #217431)
Megan Brewer (CA SBN #268248)
Law Offices of Stacy Tolchin
776 E. Green St., Ste. 210
Pasadena, CA 91101
Telephone: (213) 622-7450
Facsimile: (213) 622-7233
Email: Stacy@Tolchinimmigration.com
Email: Megan@Tolchinimmigration.com

Counsel for Petitioners

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Pedro VASQUEZ PERDOMO, Carlos Alexander OSORTO, and Isaac VILLEGAS MOLINA;<br><br>    Petitioners,<br><br>    v.<br><br>Kristi NOEM, Secretary, Department of Homeland Security; Pam BONDI, Attorney General; IMMIGRATION AND CUSTOMS ENFORCEMENT; and Todd LYONS, Acting Los Angeles Field Office Director, Immigration and Customs Enforcement.<br><br>    Respondents. | Civil Case No.:<br><br>**PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

70

## **INTRODUCTION**

1. Petitioners were detained in Pasadena, California on June 18, 2025 for civil immigration violations and are currently being held at the B-18 processing office in downtown Los Angeles.

2. They were detained without reasonable suspicion, without an arrest warrant, and in violation of the immigration regulations and due process.

3. Petitioners face transfer outside of this judicial district and away from their family and legal representation. They also face imminent removal from the United States.

4. Petitioners seek an order from this Court that they be released from custody, and, in the interim, an order from the Court that they are not removed from this judicial district or removed from the United States, pending disposition of their petition for writ of habeas corpus.

## **JURISDICTION AND VENUE**

5. This Court has jurisdiction under 28 U.S.C. § 2241 (federal habeas statute); 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 2201-2 (declaratory judgment); United States Constitution Article I, Section 9 (Suspension Clause).

6. Venue properly lies within the Central District of California under 28 U.S.C. § 1391, because this is a civil action in which Respondents are agencies of the United States, Petitioners are detained in this district, and because a substantial part of the events or omissions giving rise to this action occurred in the District.

## **PARTIES**

7. Petitioner Pedro Vasquez Perdomo resides in Pasadena, California and is currently detained at the Los Angeles downtown federal building in the basement, Room B-18.

8. Petitioner Carlos Alexander Osorto resides in Pasadena, California and is currently detained at the Los Angeles downtown federal building in the basement, Room B-18.

9. Petitioner Isaac Villegas Molina resides in Pasadena, California and is currently detained at the Los Angeles downtown federal building in the basement, Room B-18.

10. Respondent Kristi Noem is the Secretary of the Department of Homeland Security ("DHS"), and is sued in her official capacity. The Secretary of Homeland Security is charged with the administration and enforcement of immigration laws. 8 U.S.C. § 1103(a).

11. Respondent Pam Bondi is the Attorney General of the United States and is sued in her official capacity as the head of the Department of Justice. The Attorney General is responsible for the fair administration of the laws of the United States.

12. Respondent Immigration and Customs Enforcement is the agency responsible for the detention of noncitizens, and the transfer or removal of Petitioners outside of this judicial district.

13. Respondent Todd Lyons is the Acting Director of the Los Angeles Field Office of the Immigration and Customs Enforcement, Department of Homeland Security, and is sued in his official capacity. Respondent Lyons is responsible for the detention of noncitizens in the Los Angeles district and for any transfer or removal of Petitioners outside of this judicial district.

## **FACTS**

14. They were detained by immigration enforcement officers in Pasadena, California on June 18, 2025.

15. They were sitting at a bus stop on a bench on the corner of Los Robles Ave. and Orange Grove Blvd. in Pasadena when around 5:50 a.m., multiple vehicles pulled up aggressively in front of them.

16. Agents wearing dark green vests that said POLICE on them exited the vehicles. At least one agent had a vest that said ICE. Petitioners were surrounded.

17.    The agents had guns and were masked so that their faces could not be seen. They were acting aggressively, shouting at Petitioners. Petitioners were not free to leave the area.

18.    Petitioners were petrified. Agents surrounded them and handcuffed them.

19.    Respondents did not have reasonable suspicion that Petitioners were in the United States unlawfully.

20.    After Petitioners were handcuffed, officers demanded Petitioners' identification.

21.    Respondents did not have probable cause for Petitioners' arrest.

22.    Respondents did not have warrants for Petitioners' arrest.

23.    Respondents did not make an individualized finding of flight risk.

24.    Respondents did not identify themselves as immigration agents and did not inform Petitioners of the basis for their arrest.

25.    Petitioners were placed in the agents' vehicles and transported to the federal building at 300 North Los Angeles St. where they have been held in the basement, room B-18, since June 18, 2025.

26.    Petitioners are being processed for removal proceedings to be removed from the United States.

27.    Petitioners have representation in their removal proceedings. Their counsel is located in Pasadena, California.

28.    Petitioners' family is location in Pasadena, California.

29.    Petitioners face imminent transfer outside of this judicial district and face removal from the United States.

73

## CAUSES OF ACTION

## COUNT ONE

### *Violation of 8 U.S.C. § 1357(a)(2):*

### *Warrantless Arrests Without Probable Cause of Flight Risk*

30.    Petitioners repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

31.    Respondents ICE arrested Petitioners without probable cause and without warrants. Before each arrest, Respondents failed to make an individualized finding of flight risk.  The failure to meet these requirements is a violation of 8 U.S.C. § 1357(a)(2).

## COUNT TWO

### *Violation of 8 C.F.R. § 287.8(c)(2)(ii):*

### *Warrantless Arrests Without Probable Cause of Flight Risk*

32.    Petitioners repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

33.    Respondents ICE arrested Petitioners without a warrant and without "reason to believe" that they were "likely to escape before a warrant can be obtained" in violation of 8 C.F.R. § 287.8(c)(2)(ii). The reason to believe standard meets the probable cause standard of the Fourth Amendment. *Perez Cruz v. Barr*, 926 F.3d 1128, 1137 (9th Cir. 2019).

34.    Arrest in violation of the regulation is unlawful. *See Sanchez v. Sessions*, 904 F.3d 643, 650 (9th Cir. 2018); *Perez Cruz v. Barr*, 926 F.3d 1128, 1137 (9th Cir. 2019).

## COUNT THREE

### *Fourth Amendment: Arrests Without Probable Cause*

35.     Petitioners repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

36.     The Fourth Amendment prohibits Respondents from conducting arresting an individual for an immigration violation without probable cause.

37.     Respondents ICE arrested Petitioners without probable cause that any of them was a noncitizen unlawfully in the United States.


## COUNT FOUR

### *(Failure to Identify Officers and Basis for Arrest in Violation of 8 C.F.R. § 287.8(c)(3))*

38.     Petitioners incorporate the allegations in the paragraphs above as though fully set forth here.

39.     The regulations require arresting offers identify themselves as "an immigration officer who is authorized to execute an arrest" and "state that the person is under arrest and the reason for the arrest." 8 C.F.R. § 287.8(c)(3).

40.     Respondent ICE failed to identify themselves at the time of arrest and failed to inform Petitioners of the reasons for their arrest.


## COUNT FIVE

### *(Violation of Due Process )*

41.     Petitioners incorporate the allegations in the paragraphs above as though fully set forth here.

42.     The government may not deprive a person of life, liberty, or property without due process of law. U.S. Const. amend. V. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that the Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001).

43.     The government's detention of Petitioners violates their rights to due process because they have been detained without lawful authority, infringing on their fundamental right to liberty.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Petitioners pray that this Court grant the following relief:

(1)    Assume jurisdiction over this matter;

(2)    Declare that Petitioners are detained in violation of law;

(3)    Enjoin Respondents from transferring Petitioners outside of this judicial district during the pendency of removal proceedings;

(4)    Enjoin Respondents from removing Petitioners form the United States without the procedures for removal identified in the Immigration and Nationality Act;

(5)    Order the immediate release of Petitioners pending these proceedings;

(6)    Award costs and reasonable attorney fees incurred under this action under 28 U.S.C. § 2412, et. seq. (Equal Access to Justice Act); and

(7)    Grant any further relief that this Court may deem fit and proper.


Dated: June 20, 2025          Respectfully Submitted,

*S/Stacy Tolchin*
Stacy Tolchin (CA SBN #217431)
Megan Brewer (CA SBN #268248)
Law Offices of Stacy Tolchin
776 E. Green St., Ste. 210
Pasadena, CA 91101
Telephone: (213) 622-7450
Facsimile: (213) 622-7233
Email:
Stacy@Tolchinimmigration.com
Email:
Megan@Tolchinimmigration.com

Counsel for Petitioners

🚩 KeyCite Yellow Flag

Declined to Extend by United Farm Workers v. Noem, E.D.Cal., April 29, 2025

904 F.3d 643
United States Court of Appeals, Ninth Circuit.

Luis Enrique SANCHEZ, aka Enrique Cruz Sanchez, aka Luis Llamas Sanchez, aka Luis Charles Sanchez, aka Enrique Sanchez Cruz, aka Luis Enrique Sanchez Llamas, Petitioner,

v.

Jefferson B. SESSIONS III, Attorney General, Respondent.

No. 14-71768
|
Argued and Submitted March 8, 2017
|
Decided August 30, 2017
|
Opinion withdrawn July 18, 2018 Pasadena, California
|
Filed September 19, 2018

**Synopsis**

**Background:** Alien, a citizen of Mexico, petitioned for review of decision of the Board of Immigration Appeals (BIA) which, in removal proceedings, admitted evidence of both his alienage and his entry into the United States without inspection.

**Holdings:** The Court of Appeals, Paez, Circuit Judge, held that:

[1] Coast Guard officers who detained alien were acting as "immigration officers";

[2] alien made prima facie showing that he was detained by Coast Guard officers solely on basis of his race; and

[3] remand was required to give Government opportunity to rebut alien's prima facie showing.

Petition granted, and remanded with instructions.

Paez, Circuit Judge, filed concurring opinion.

Opinion at 870 F.3d 901 withdrawn on denial of rehearing en banc.

Superseding 895 F.3d 1101.

West Headnotes (17)

**[1]** **Aliens, Immigration, and Citizenship** 👈 Review of initial decision or administrative review

Where Board of Immigration Appeals (BIA) adopts Immigration Judge's (IJ) decision in removal proceedings while adding some of its own reasoning, Court of Appeals reviews both decisions.

5 Cases that cite this headnote

**[2]** **Federal Courts** 👈 Questions of Law in General

**Federal Courts** 👈 Constitutional questions in general

Court of Appeals reviews constitutional claims and questions of law de novo.

**[3]** **Aliens, Immigration, and Citizenship** 👈 Admissibility

Although exclusionary rule generally does not apply to removal proceedings, there are two exceptions to this rule: (1) when the agency violates a regulation promulgated for the benefit of alien petitioners and that violation prejudices the petitioner's protected interests, and (2) when the agency egregiously violates a petitioner's Fourth Amendment rights. U.S. Const. Amend. 4.

19 Cases that cite this headnote

**[4]** **Aliens, Immigration, and Citizenship** 👈 Officers and Agents

**Aliens, Immigration, and
Citizenship** 🔑 Investigatory stops and
temporary detention; interrogation

Coast Guard officers who detained alien were
acting as "immigration officers" within meaning
of regulation requiring that an immigration
officer have reasonable suspicion, based on
specific articulable facts, that a person is, or
is attempting to be, engaged in an offense
against the United States, or is an alien
illegally in the United States, in order for the
immigration officer to briefly detain the person
for questioning; Coast Guard was required by
law to enforce or assist in enforcement of all
Federal laws on, under, and over the high seas
and waters subject to the jurisdiction of the
United States, and the officers were subject
to the same regulations as their counterparts
in Customs and Border Protection (CBP) and
Immigration and Customs enforcement (ICE).
U.S. Const. Amend. 4; 14 U.S.C.A. § 89(b); 8
C.F.R. § 287.8(b)(2).

1 Case that cites this headnote

[5]    **Aliens, Immigration, and
Citizenship** 🔑 Admissibility

Evidence in removal proceedings may be
excluded for a regulatory violation as long as
three conditions are satisfied: (1) the agency
violated one of its regulations; (2) that regulation
serves a purpose of benefit to the alien; and
(3) the violation prejudiced interests of the alien
which were protected by the regulation.

5 Cases that cite this headnote

[6]    **Aliens, Immigration, and
Citizenship** 🔑 Admissibility

Alien made prima facie showing, in removal
proceedings, that he was detained by Coast
Guard officers solely on basis of his race, rather
than on account of any reasonable suspicion that
he was unlawfully present in the United States,
as would support decision to apply exclusionary
rule in removal proceedings based on a violation
of immigration regulation meant to protect alien;
the officers detained alien and called Customs

and Border Protection (CBP) before they asked
him for identification and obtained his driver's
license. U.S. Const. Amend. 4; 8 C.F.R. §
287.8(b)(2).

2 Cases that cite this headnote

[7]    **Aliens, Immigration, and
Citizenship** 🔑 Investigatory stops and
temporary detention; interrogation

Immigration regulation providing that officers
could briefly detain an individual upon
reasonable suspicion that such person was
illegally in the United States was promulgated to
benefit aliens, as required to support decision to
apply exclusionary rule in removal proceedings
based on a violation of that regulation. U.S.
Const. Amend. 4; 8 C.F.R. § 287.8(b)(2).

2 Cases that cite this headnote

[8]    **Search, Seizure, and Arrest** 🔑 Necessity of
reasonable or articulable suspicion

Officers may not stop and briefly detain a
person for investigative purposes under the
Fourth Amendment unless they have reasonable
suspicion supported by articulable facts that
criminal activity may be afoot. U.S. Const.
Amend. 4.

2 Cases that cite this headnote

[9]    **Aliens, Immigration, and
Citizenship** 🔑 Presumptions

Since immigration regulation providing that
officers could briefly detain an individual upon
reasonable suspicion that such person was
illegally in the United States was mandated by
Fourth Amendment, Court of Appeals would
presume that Coast Guard officers' violation of
that regulation was prejudicial, as required to
support decision to apply exclusionary rule in
removal proceedings. U.S. Const. Amend. 4; 8
C.F.R. § 287.8(b)(2).

1 Case that cites this headnote

[10]    **Aliens, Immigration, and Citizenship** 🔑 Presumptions

Ordinarily, it is the alien's responsibility to specifically identify any prejudice from a violation that potentially affected the outcome of the alien's removal proceeding, but where compliance with the regulation is mandated by the Constitution, prejudice may be presumed.

3 Cases that cite this headnote

[11]    **Aliens, Immigration, and Citizenship** 🔑 Determination

Although a successful prima facie showing of a regulatory violation for evidentiary suppression purposes would normally have entitled alien to a remand in his removal proceedings, to allow Government to rebut that showing, fact that alien's unlawful status could be independently established through his Family Unity Benefits and Employment Authorization applications, both of which were admissible, might entitle alien to termination of his removal proceedings without prejudice for egregious regulatory violations. 8 C.F.R. § 287.8(b)(2).

7 Cases that cite this headnote

[12]    **Criminal Law** 🔑 Causal nexus; independent discovery or basis or source

Fruit-of-the-poisonous-tree doctrine does not extend backwards to taint evidence that existed before any official misconduct took place.

[13]    **Aliens, Immigration, and Citizenship** 🔑 Remand

Alien's prima facie showing, in removal proceedings, that he was detained solely on basis of his Latino appearance, and that his detention was contrary to the requirements of immigration regulation providing that officers could briefly detain an individual upon reasonable suspicion that such person was illegally in the United States, was conscience-shocking and therefore egregious, requiring remand with instructions to afford Government opportunity to rebut

alien's prima facie showing, and, if Government failed to rebut showing that the violation was egregious, agency should consider whether alien was entitled to termination without prejudice. U.S. Const. Amend. 4; 8 C.F.R. § 287.8(b)(2).

3 Cases that cite this headnote

[14]    **Aliens, Immigration, and Citizenship** 🔑 Determination

An alien is entitled to termination of their removal proceedings without prejudice as long as the following requirements are satisfied: (1) the agency violated a regulation; (2) the regulation was promulgated for the benefit of aliens; and (3) the violation was egregious, meaning that it involved conscience-shocking conduct, deprived the alien of fundamental rights, or prejudiced the alien.

9 Cases that cite this headnote

[15]    **Aliens, Immigration, and Citizenship** 🔑 Determination

**Aliens, Immigration, and Citizenship** 🔑 Remand

Simply remanding for a new hearing or for further proceedings will be insufficient, in removal proceedings in which it is established that an egregious regulatory violation occurred in the past, since the agency's violations predate any hearing; only full termination of the proceedings without prejudice can effectively cure any procedural defect by putting the parties into the position they would have been had no procedural error taken place.

4 Cases that cite this headnote

[16]    **Aliens, Immigration, and Citizenship** 🔑 Investigatory stops and temporary detention; interrogation

For purposes of removal proceedings, detentions and interrogations based on racial or ethnic profiling and stereotyping egregiously violate immigration regulation providing that officers could briefly detain an individual upon reasonable suspicion that such person was

2018 A.M.C. 2977, 18 Cal. Daily Op. Serv. 9445, 2018 Daily Journal D.A.R. 9511

illegally in the United States. U.S. Const. Amend. 4; 8 C.F.R. § 287.8(b)(2).

1 Case that cites this headnote

**[17]**    **Civil Rights** 🔑 Race, color, ethnicity, or national origin

**Civil Rights** 🔑 Discrimination in General

Discrimination on basis of race is illegal, immoral, unconstitutional, inherently wrong, and destructive of democratic society.

**Attorneys and Law Firms**

**\*645** John Wolfgang Gehart (argued), Lourdes Barrera Haley, Elena Yampolsky, and Carlos Vellanoweth, Vellanoweth & Gehart LLP, Los Angeles, California, for Petitioner.

Tim Ramnitz (argued), Attorney; Jennifer P. Levings and Andrew C. MacLachlan, Senior Litigation Counsel; John W. Blakeley, Assistant Director; Donald E. Keener, Deputy Director; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals, Agency No. AXXX-XX9-028

Before: Kim McLane Wardlaw, Richard A. Paez, and Morgan B. Christen, Circuit Judges.

Concurrence by Judge Paez

**OPINION**

PAEZ, Circuit Judge:

**\*646** As Judge Pregerson poignantly described in our prior opinion: "This case is about Luis Sanchez, a small boat owner, who took some friends on a fishing trip within United States territorial waters, and ended up in removal proceedings before an immigration judge ('IJ') under section 240 of the Immigration and Nationality Act, 8 U.S.C. § 1229a." *Sanchez*

*v. Sessions*, 870 F.3d 901, 904 (9th Cir. 2017), *withdrawn*, 895 F.3d 1101 (9th Cir. 2018).[1]

Neither Sanchez nor his friends could have predicted the sequence of events that produced this outcome. Their plan had been to go fishing for a few hours, but after they had been out for about thirty minutes, the boat unexpectedly lost power. Stranded and with an infant on board, Sanchez's friend called for emergency assistance. Some time later, United States Coast Guard ("Coast Guard") officers arrived and towed the boat safely into Channel Islands Harbor, a recreational harbor near Oxnard, California, where Sanchez and his friends were promptly detained, frisked, and asked for identification. Although Sanchez complied and produced his driver's license, the Coast Guard continued to hold him and his friends without explanation. The Coast Guard also contacted Customs and Border Protection ("CBP") because they suspected that Sanchez and his friends were "possib[ly]" "undocumented worker[ ] aliens."

Sanchez was eventually taken into custody by CBP and placed in removal proceedings, where he unsuccessfully sought to suppress the Government's evidence of both his alienage and his entry into the United States without inspection as the products of Fourth Amendment and regulatory violations. Sanchez petitions for review of the agency's decision to admit the Government's evidence. We grant the petition and conclude that Sanchez has made a prima facie showing that he was seized solely on the basis of his Latino appearance, which constitutes a particularly egregious regulatory violation. We remand for further proceedings before the IJ so that the Government may rebut Sanchez's prima facie showing. We hold that the agency may consider on remand after the Government's rebuttal whether the Coast Guard officers violated 8 C.F.R. § 287.8(b)(2) and if so, whether the violation was egregious and therefore warrants terminating Sanchez's removal proceedings without prejudice.

**I.**

Sanchez is a forty-seven year old citizen of Mexico. He was seventeen years old when he entered the United States without inspection in 1988 and has lived in this country ever since. Until December 1, 1988, Sanchez's father was a legalized Special Agricultural Worker. This meant that Sanchez was eligible to apply for Family Unity Benefits, a program that grants unmarried children of such legalized

workers authorization to reside and work in the United States. *See* 8 C.F.R. § 236.12(a)(1).

Sanchez submitted his Family Unity Benefits and Employment Authorization applications to the United States Citizenship and Immigration Service ("USCIS") on May 11, 2004. Both applications were granted, with his Family Unity Benefits set to expire on May 11, 2006. Sanchez applied for an extension in December 2008. This time, however, USCIS denied Sanchez's **\*647** applications. USCIS concluded that he was ineligible for Family Unity Benefits and that his prior application for benefits had been approved in error, because he had previously been convicted of several California Vehicle Code violations.[2] *See* 8 C.F.R. § 236.13(b).

As a result, Sanchez was without lawful status on February 25, 2010, the day he and his friends embarked on their ill-fated fishing trip from Channel Islands Harbor. The weather was balmy and the group planned to go fishing for approximately two hours. The trip was not meant to be particularly arduous: one of Sanchez's friends brought his fourteen-month-old son and the small recreational boat they took out to sea never made it beyond two or three miles from the harbor—well within United States territorial waters. *See* Proclamation No. 5928, 54 Fed. Reg. 777 (Jan. 9, 1989) (extending U.S. territorial waters to twelve nautical miles from the baseline).

The friends had just settled into their trip when, approximately thirty minutes after leaving the harbor, the boat's engines lost power. Unable to make their way back to shore, one of Sanchez's friends called 911 to request assistance. The 911 operator, in turn, contacted the Coast Guard for assistance. The Coast Guard proceeded to tow the boat and its occupants back to Channel Islands Harbor. The Coast Guard officers, however, did not inform Sanchez and his friends that they would be detained once they reached the shore. When Sanchez disembarked from the boat around 5:00 p.m., he was confronted by approximately eight Coast Guard officers waiting to take him into custody. The officers frisked Sanchez and his friends and then ordered them to turn over their identification documents and belongings. Sanchez complied with the officers' orders and produced his driver's license, which the officers took. Sanchez later testified at his removal hearing that the Coast Guard officers only asked him two questions while he was detained: his name and address, both of which he provided.

Understandably alarmed by the turn of events, Sanchez tried to ask the Coast Guard officers why they were detaining him.

Instead of answering, the officers ordered Sanchez to stop asking questions and to stay put until "some other people" came to speak with him. What Sanchez did not know at the time was that the Coast Guard had already contacted CBP to report "the possibility of 4 undocumented worker[ ] aliens" and that the officers were simply waiting for CBP agents to arrive and take custody of Sanchez.[3] The CBP agents arrived approximately two hours later, at which point the Coast Guard officers allowed the group to release the infant to a relative. CBP then transported Sanchez and his two friends, also Latino, to a facility where they were strip searched and interrogated. The CBP officers also confiscated their identification documents. It was during this interrogation that Sanchez admitted he had entered the United States without inspection.

The CBP officers released Sanchez later that evening and advised him to try and retain an attorney. A CBP officer separately **\*648** prepared a Form I-213 (Record of Deportable/Inadmissible Alien), which noted that CBP had been contacted after the Coast Guard officers failed to "establish positive identity or nationality" for Sanchez and his companions. The form did not mention that Sanchez gave his driver's license to the Coast Guard, but it did note that subsequent Immigration and Naturalization Service ("INS") checks in four databases all returned "negative" results.[4]

Although Sanchez was released the same day he was detained, his reprieve was short lived. The United States Department of Homeland Security ("DHS") ultimately served him with a Notice to Appear for removal proceedings.[5] At the hearing, the Government sought to establish Sanchez's nationality and entry without inspection by submitting CBP's Form I-213 into evidence. Sanchez responded by filing a motion to suppress and to terminate removal proceedings. He argued that the Coast Guard egregiously violated his Fourth Amendment rights because the detention was based solely on race.[6] He also argued that his detention violated 8 C.F.R. § 287.8(b), which requires that officers possess "reasonable suspicion" that a person is unlawfully present in the United States before detaining her or him. Sanchez contended that the Form I-213 was therefore inadmissible and requested that the IJ terminate removal proceedings.

The IJ denied Sanchez's motion because he had failed to attach an affidavit in support of his motion; nonetheless, the IJ scheduled a suppression hearing. At the suppression hearing, which was held before a different IJ after Sanchez submitted

Case 2:25-cv-05605-MEMF-SP    Document 390-1    Filed 07/27/26    Page 100 of 137
Page ID #:8029

**Sanchez v. Sessions, 904 F.3d 643 (2018)**
2018 A.M.C. 2977, 18 Cal. Daily Op. Serv. 9445, 2018 Daily Journal D.A.R. 9511

an affidavit, the Government introduced into evidence Sanchez's 2008 Family Unity Benefits and Employment Authorization applications. Although the IJ found that Sanchez's testimony was consistent with his affidavit, she denied his motion and ordered Sanchez removed to Mexico. In her decision, the IJ found that Sanchez had failed to establish a prima facie case of either an egregious Fourth Amendment violation or a regulatory violation. The IJ also concluded that Sanchez's Family Unity Benefits and Employment Authorization applications were separately and independently admissible to prove Sanchez's identity.

Sanchez unsuccessfully appealed the IJ's decision to the Board of Immigration Appeals ("BIA"). In a brief, unpublished decision, the BIA concluded that even assuming the Coast Guard officers violated Sanchez's rights, the Government was entitled to rely on independent evidence —here, Sanchez's Family Unity Benefits and Employment Authorization applications—to establish his nationality and identity. The BIA therefore affirmed the IJ's decision denying Sanchez's motion to suppress **\*649** and terminate removal proceedings and the IJ's removal order.

Sanchez timely petitioned us for review.

## II.

**[1]** **[2]** We have jurisdiction over final orders of removal pursuant to 8 U.S.C. § 1252. "Where, as here, the BIA adopts the IJ's decision while adding some of its own reasoning, we review both decisions." *Lopez-Cardona v. Holder*, 662 F.3d 1110, 1111 (9th Cir. 2011). "We review constitutional claims and questions of law *de novo*." *Id.*

## III.

**[3]** It is well-established that the exclusionary rule generally does not apply to removal proceedings. *See Chuyon Yon Hong v. Mukasey*, 518 F.3d 1030, 1034 (9th Cir. 2008). There are, however, two critical exceptions to this rule: (1) when the agency violates a regulation promulgated for the benefit of petitioners and that violation prejudices the petitioner's protected interests, *see id.* at 1035; and (2) when the agency egregiously violates a petitioner's Fourth Amendment rights, *see Lopez-Rodriguez v. Mukasey*, 536 F.3d 1012, 1018 (9th Cir. 2008). Because Sanchez has made a prima facie showing that the Coast Guard officers violated 8 C.F.R. § 287.8(b)

(2) when they detained him, we do not address Sanchez's constitutional argument.

### A.

**[4]** The subject regulation, 8 C.F.R. § 287.8(b)(2), states that "[i]f the immigration officer has a reasonable suspicion, based on specific articulable facts, that the person being questioned is, or is attempting to be, engaged in an offense against the United States or is an alien illegally in the United States, the immigration officer may briefly detain the person for questioning." As an initial matter, we reject the Government's argument that the Coast Guard officers who detained Sanchez were not acting as "immigration officers" within the meaning of the regulation.

The Coast Guard is required by law to "enforce or assist in the enforcement of all applicable Federal laws on, under, and over the high seas and waters subject to the jurisdiction of the United States." 14 U.S.C. § 2(1). This includes enforcing all applicable provisions of the Immigration and Nationality Act ("INA"). *See* Gary W. Palmer, *Guarding the Coast: Alien Migrant Interdiction Operations at Sea*, 29 Conn. L. Rev. 1565, 1567, 1570 (1997) (explaining that the Coast Guard "enforce[s] compliance with the [INA] on behalf of INS and the Attorney General" (footnote omitted) ). The Coast Guard is thus empowered to search, seize, and arrest anyone "for the prevention, detection, and suppression of violations of laws of the United States" as long as the individuals in question are located within the high seas and waters over which the United States has jurisdiction. 14 U.S.C. § 89(a).

The Coast Guard's broad law enforcement powers are not, however, without restriction. Because they are tasked with "enforcing any law of the United States," including all those for which they do not have primary enforcement authority, officers of the Coast Guard are considered "agents of the particular executive department or independent establishment charged with the administration of the particular law" subject to "all the rules and regulations promulgated by such department or independent establishment with respect to the enforcement of that law." *Id.* § 89(b). In practice, 14 U.S.C. § 89(b) ensures that when—as here—Coast Guard officers detain individuals in service of the INA, they act as immigration agents subject **\*650** to the same regulations as their counterparts in CBP and Immigration and Customs Enforcement ("ICE").[7] We therefore conclude that when the Coast Guard officers detained Sanchez, they were acting as

2018 A.M.C. 2977, 18 Cal. Daily Op. Serv. 9445, 2018 Daily Journal D.A.R. 9511

"immigration officers" within the meaning of 8 C.F.R. § 287.8(b)(2).

**B.**

 **[5]**   For nearly four decades, it has been the law in our circuit that evidence may be excluded for a regulatory violation as long as three conditions are satisfied: (1) the agency violated one of its regulations; (2) the subject regulation serves a "purpose of benefit to the alien"; and (3) the violation "prejudiced interests of the alien which were protected by the regulation." *Matter of Garcia-Flores*, 17 I. & N. Dec. 325, 328 (BIA 1980) (quoting *United States v. Calderon-Medina*, 591 F.2d 529, 532 (9th Cir. 1979) ); *see also Chuyon Yon Hong*, 518 F.3d at 1035. Sanchez has made a prima facie showing that all three of these conditions have been met here.

**1.**

 **[6]**   Section 287.8(b)(2) requires that officers possess reasonable suspicion on the basis of "specific articulable facts" that a person is unlawfully present in the country before they detain the person. The record before us is devoid of any such specific articulable facts. CBP's Form I-213 is remarkably terse in its recitation of events surrounding Sanchez's detention. The form simply states, in relevant part, that "US Coast Guard was not able to establish positive identity or nationality of the 3 adult males and 14 month infant on board the vessel" and that "US Customs and Border Protection was notified of the possibility of 4 undocumented worker[ ] aliens."

The narrative in the Form I-213 is troubling for two reasons. First, Sanchez consistently testified and maintained throughout his removal proceedings that he provided the Coast Guard with his driver's license when he was initially detained.[8] A valid driver's license would, of course, positively establish Sanchez's identity. Second, Sanchez testified that he was *immediately* detained and met by a number of Coast Guard officers once they returned to the Channel Island Harbor. The Government has yet to dispute the veracity of Sanchez's testimony. Crediting both the information in the Form I-213 and Sanchez's testimony, the record indicates that the Coast Guard officers thought Sanchez was an "undocumented worker alien" before they returned to the harbor. In other words, as the record currently stands, the officers could not have reasonably suspected Sanchez was

unlawfully present in this country for lack of identification because they detained him and called CBP *before* they asked for identification and obtained Sanchez's driver's license.

On these facts, we agree with Sanchez that it appears he was detained solely on the basis of his race. The Government has yet to offer specific and articulable facts that would support the Coast Guard officers' decision to detain Sanchez on the basis of reasonable suspicion that he was unlawfully present in this country or otherwise **\*651** engaged in illegal activity. There is no evidence, for instance, that Sanchez's boat contained contraband of any kind or that he informed the Coast Guard officers before his detention that he had entered the United States without inspection two decades ago. Because race and ethnicity are never grounds for reasonable suspicion, we conclude that Sanchez has made a prima facie showing that the Coast Guard officers who detained him violated 8 C.F.R. § 287.8(b)(2). *See United States v. Brignoni-Ponce*, 422 U.S. 873, 886, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) ("We cannot conclude that [the apparent Mexican ancestry of the occupants in a car] furnished reasonable grounds to believe that the three occupants were aliens.").

**2.**

 **[7]**   We also conclude that 8 C.F.R. § 287.8(b)(2) was promulgated to serve a "purpose of benefit" to petitioners like Sanchez. *Calderon-Medina*, 591 F.2d at 531.

The Department of Justice ("DOJ") proposed § 287.8(b) (2)—along with a number of other regulations—to "establish enforcement standards in the areas of force, interrogation and detention not amounting to arrest." 57 Fed. Reg. 47011, 47011 (Oct. 14, 1992). The goal was to "bring immigration officers in line with other Department of Justice law enforcement officers" and to "assure the continuance of disciplined and professional conduct by Service enforcement personnel." *Id.* During the notice and comment period, a number of commenters suggested amending the proposed regulation to "include current judicial precedent defining 'reasonable suspicion' and the general authority to interrogate and detain." 59 Fed. Reg. 441093, 42411 (Aug. 17, 1994).

DOJ ultimately declined to adopt the commenters' suggestions. *See id.* DOJ explained that it would not "be appropriate to codify" current judicial precedent defining reasonable suspicion because "*binding* judicial precedent ... is subject to revision in the ongoing process of litigation."

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2018 A.M.C. 2977, 18 Cal. Daily Op. Serv. 9445, 2018 Daily Journal D.A.R. 9511

*Id.* (emphasis added) (citing *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) ). DOJ thus made clear that the regulation was intended to reflect constitutional restrictions on the ability of immigration officials to interrogate and detain persons in this country —a doctrine rooted in the Fourth Amendment. *See INS v. Lopez-Mendoza*, 468 U.S. 1032, 1044–45, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984) (explaining that "the INS has its own comprehensive scheme for deterring Fourth Amendment violations by its officers," including "regulations requir[ing] that no one be detained without reasonable suspicion of illegal alienage").

[8] The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures [ ] shall not be violated." U.S. Const. amend. IV. As the Supreme Court has long held, officers may not "stop and briefly detain a person for investigative purposes" under the Fourth Amendment unless they have "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.' " *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 S.Ct. 2d 1 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ). Section 287.8(b)(2) all but parrots this standard: it provides that immigration officers may not briefly detain a person for questioning unless the officer has a "reasonable suspicion, based on specific articulable facts, that the person being questioned is, or is attempting to be, engaged in an offense against the United States or is an alien illegally in the United States."

*652 The regulation and the Fourth Amendment standards it reflects are undoubtedly for the benefit of petitioners and not mere best-practices suggestions for immigration officers. We therefore conclude that § 287.8(b)(2) was promulgated for the benefit of petitioners like Sanchez.[9]

**3.**

[9] [10] This brings us to the final condition that Sanchez must satisfy: prejudice. Ordinarily, it is the petitioner's responsibility to " 'specifically' identify any prejudice from the violation" that potentially affected the outcome of the petitioner's removal proceeding. *Garcia-Flores*, 17 I. & N. Dec. at 328 (quoting *Calderon-Medina*, 591 F.2d at 532). But where, as here, "compliance with the regulation is mandated by the Constitution, prejudice may be presumed."[10] *Id.*; *see also Puc-Ruiz v. Holder*, 629 F.3d 771, 780 (8th Cir. 2010)

(" 'As a general rule, ... prejudice will have to be specifically demonstrated,' unless compliance with the regulation is mandated by the Constitution, in which case prejudice may be presumed." (alteration in original) (quoting *Garcia Flores*, 17 I. & N. Dec. at 328) ); *Martinez Camargo v. INS*, 282 F.3d 487, 492 (7th Cir. 2002) (same). Because 8 C.F.R. § 287.8(b) (2) reflects the Fourth Amendment's requirement that brief detentions be supported by reasonable suspicion, we presume that Sanchez was prejudiced by the Coast Guard officers' failure to abide by § 287.8(b)(2)'s requirements.

**C.**

The BIA erroneously concluded that there was "nothing unreasonable about the Coast Guard seeking assurances that the occupants of ... a vessel are entitled to be present in the United States before allowing *653 them to enter the country."[11] That is not the test that applies here. The test for an alleged violation of § 287.8(b)(2) is whether the Coast Guard officers possessed reasonable suspicion that Sanchez was unlawfully present in the country when they detained him. Sanchez has made a prima facie showing that the Coast Guard officers did not.

**IV.**

[11] [12] We turn to the heart of this case. A successful prima facie showing of a regulatory violation for evidentiary suppression purposes would normally entitle the petitioner to a remand for the government to rebut the petitioner's showing. *See Matter of Barcenas*, 19 I. & N. Dec. 609, 611 (BIA 1988) (explaining that a petitioner must establish a prima facie case for suppression "before the Service will be called on to assume the burden of justifying the manner in which it obtained the evidence"). This remedy, however, is beyond Sanchez's reach. The BIA correctly concluded in the alternative that Sanchez's unlawful status could be independently established through his Family Unity Benefits and Employment Authorization applications, both of which are admissible.[12] Put simply, the Government does not need Sanchez's Form I-213 to prove that he entered this country without inspection.

[13] Were suppression of tainted evidence the only remedy available to Sanchez, our review—much like the BIA's— would end here. But that is not the case. In *Calderon-Medina*,

2018 A.M.C. 2977, 18 Cal. Daily Op. Serv. 9445, 2018 Daily Journal D.A.R. 9511

we recognized that regulatory violations may invalidate deportation proceedings. *See* 591 F.2d at 531. At the time, we did not elaborate on what such an invalidation would entail. Today, we join the Second Circuit and hold that petitioners may be entitled to termination of their removal proceedings without prejudice for egregious regulatory violations. *See Rajah v. Mukasey*, 544 F.3d 427, 446–47 (2d Cir. 2008) (holding that pre-hearing regulatory violations may be grounds for termination without prejudice if they resulted in "prejudice that may have affected the outcome of the proceeding, conscience-shocking conduct, or a deprivation of fundamental rights"). Because Sanchez has made a prima facie showing that he was detained solely on the basis of his race and that his detention was contrary to the requirements of § 287.8(b)(2), we grant his petition for review and remand for the agency to determine in the first instance **\*654** whether termination without prejudice is appropriate here.

**A.**

The roots of termination without prejudice may be traced back to *Calderon-Medina*, when we first held that regulatory violations could "invalidate a deportation proceeding." 591 F.2d at 531. *Calderon-Medina* concerned criminal indictments against two defendants for illegal re-entry following deportation. *See id.* at 530. The question was whether the defendants' original deportations had been the unlawful product of a regulatory violation, such that they could not serve as a basis for the defendants' criminal indictments. *See id.* We concluded that although the INS had violated its own regulation, remand was necessary to give the defendants an opportunity to show prejudice. *See id.* at 532. Because it was impossible to invalidate the defendants' original deportations, which were carried out long before the defendants were criminally indicted for subsequent re-entry, we instructed the district court to dismiss the criminal indictments if the defendants successfully demonstrated prejudice on remand. *See id.* Put differently, invalidating the defendants' deportation proceedings in *Calderon-Medina* meant nullifying their deportations as a legal matter for purposes of their criminal proceedings. Our decision, however, did not limit invalidation of removal proceedings to criminal indictments.[13]

The BIA's decision in *Garcia-Flores* built upon *Calderon-Medina* and recognized that certain types of regulatory violations can "render *subsequent* agency actions invalid." 17 I. & N. Dec. at 328 (emphasis added). This suggests

that the invalidation remedy turns on *when* in the process the regulatory violation occurred. Indeed, the Second Circuit has recognized as much. *See Rajah*, 544 F.3d at 446–47 (distinguishing between pre-hearing regulatory violations and regulatory violations that take place during a deportation hearing). In *Montilla v. INS*, 926 F.2d 162 (2d Cir. 1991), for example, the Second Circuit concluded that the IJ presiding over Montilla's hearing violated a regulation by failing to ask Montilla to state on the record whether he wished to procure representation. *See id.* at 169. The court then granted Montilla's petition and remanded for a new hearing. *See id.* at 170.

*Montilla*'s remedy fits cleanly within *Garcia-Flores*'s framework for invalidating deportation proceedings: the regulatory violation took place *during* the hearing, thereby invalidating the agency's actions that took place from the hearing onwards—but, critically, not any action that took place before. Montilla was not entitled to termination with prejudice because his initial presence in removal proceedings was not the product of a disqualifying regulatory violation. He was, however, entitled to a new hearing because the IJ's failure to properly inquire about representation at the start of his hearing rendered the hearing itself invalid. By remanding for a new hearing, the Second Circuit effectively afforded Montilla a new hearing devoid of any of the regulatory infirmities that had taken place at the first one.

Nor is the Second Circuit the only circuit to have recognized the importance of providing petitioners with a clean slate on remand. The Seventh Circuit emphasized in *Snajder v. INS*, 29 F.3d 1203 (7th Cir. 1994), that the agency's interference with the petitioner's regulatory right to counsel "call[s] for the prophylactic remedy of vacating the order of deportation and for **\*655** writing *thereafter on a clean slate*." *Id.* at 1207 (emphasis added) (quoting *Castaneda-Delgado v. INS*, 525 F.2d 1295, 1302 (7th Cir. 1975) ). Because the agency's actions tainted Snajder's hearing, the Seventh Circuit concluded that Snajder's case "must be remanded for a new hearing." *Id.*

 **[14]**   **[15]**  Applying our sister circuits' reasoning to this case, we agree with the Second Circuit that certain kinds of pre-hearing regulatory violations can be remedied only by termination without prejudice as opposed to a new hearing. *See Rajah*, 544 F.3d at 446–47. Accordingly, we conclude that a petitioner is entitled to termination of their proceedings without prejudice as long as the following requirements are satisfied: (1) the agency violated a

regulation; (2) the regulation was promulgated for the benefit of petitioners; and (3) the violation was egregious, meaning that it involved conscience-shocking conduct, deprived the petitioner of fundamental rights, or prejudiced the petitioner. *See Calderon-Medina*, 591 F.2d at 531; *Rajah*, 544 F.3d at 447. For this rare subset of cases, simply remanding for a new hearing or for further proceedings will be insufficient because the agency's violations predate any hearing. Only full termination of the proceedings without prejudice can "effectively cure[ ] any procedural defect by putting the parties into the position they would have been had no procedural error taken place." *Batanic v. INS*, 12 F.3d 662, 667 (7th Cir. 1993).

We emphasize that this remedy is reserved for truly egregious cases. Termination without prejudice is undoubtedly burdensome; it effectively means that the agency must hit the reset button and begin deportation proceedings anew. We also acknowledge that the Supreme Court has expressed particular concern with the unique costs of "releas[ing] from custody persons who would then immediately resume their commission of a crime though their continuing, unlawful presence in this country." *Lopez-Mendoza*, 468 U.S. at 1050, 104 S.Ct. 3479. Nonetheless, we conclude that the costs of termination without prejudice do not outweigh its considerable benefits when the Government crosses the line into conscience-shocking conduct.

"Careless observance by an agency of its own administrative processes weakens its effectiveness in the eyes of the public because it exposes the possibility of favoritism and of inconsistent application of the law." *Montilla*, 926 F.2d at 170. This is particularly true when the agency stands accused of singling out persons for detention and deportation based on race or ethnicity. In such circumstances, the Government cannot simply rely on the existence of untainted evidence to continue with removal proceedings that are "tainted from their roots." *Castaneda-Delgado v. INS*, 525 F.2d 1295, 1302 (7th Cir. 1975) (quoting *United States v. Robinson*, 502 F.2d 894, 896 (7th Cir. 1974) ). To permit the Government to pick up where it left off would not only do a great disserve to petitioners, who have been subjected to conscience-shocking racial and ethnic profiling, but also remove from the table an effective tool for deterrence, specifically, termination without prejudice. *See Lopez-Mendoza*, 468 U.S. at 1043, 104 S.Ct. 3479 (acknowledging the reduced "deterrent value of the exclusionary rule in a civil deportation proceeding").

**B.**

Applying our test for termination without prejudice, we conclude that Sanchez has made a prima facie showing that the Coast Guard officers' violation of § 287.8(b)(2) was conscience-shocking and therefore egregious. *Cf. Omni Behavioral Health v. Miller*, 285 F.3d 646, 652 (8th Cir. 2002) ("If ... Miller conducted his **\*656** investigation in order to harass Woodlawn employees because of their race, it is possible, if not likely, that such conduct would meet the 'shock the conscience' test."). As discussed earlier, *see supra* pp. 650–51, we agree with Sanchez that the record indicates that the Coast Guard detained him on the basis of his Latino appearance.[14] The Government, to date, has offered no explanation for why Coast Guard officers contacted CBP and detained Sanchez and his companions for two hours, even after Sanchez produced his driver's license. Nor does CBP's Form I-213 shed much light on the Coast Guard officers' motivations that afternoon beyond noting that the officers suspected that Sanchez and his companions were "undocumented worker[ ] aliens."

**[16]    [17]** It is beyond question that detentions and interrogations based on racial or ethnic profiling and stereotyping egregiously violate § 287.8(b)(2)'s requirement that all detentions be based on reasonable suspicion.[15] *See, e.g., Maldonado v. Holder*, 763 F.3d 155, 159 (2d Cir. 2014) (explaining that a seizure "may nevertheless qualify as an egregious violation if the stop was based on race (or some other grossly improper consideration)" (quoting *Almeida-Amaral v. Gonzales*, 461 F.3d 231, 235 (2d Cir. 2006) ) ). "[W]e have long regarded racial oppression as one of the most serious threats to our notion of fundamental fairness and consider reliance on the use of race or ethnicity as a shorthand for likely illegal conduct to be 'repugnant under any circumstances.' " *Gonzalez-Rivera v. INS*, 22 F.3d 1441, 1449 (9th Cir. 1994) (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 571 n.1, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) ). "[D]iscrimination on the basis of race is illegal, immoral, unconstitutional, inherently wrong, and destructive of democratic society." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 521, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (Scalia, J., concurring). When the Government ignores this country's commitment to equality and fairness by engaging in racial and ethnic profiling, it betrays all of its people— citizens, lawful permanent residents, visitors, and migrants alike who live within its borders.

We emphasize that race and ethnicity alone can never serve as the basis for reasonable suspicion. The violation alleged by Sanchez here is egregious both for its grotesque nature and its patent unlawfulness. We therefore conclude that Sanchez has made a prima facie showing of an egregious violation of 8 C.F.R. § 287.8(b)(2).[16]

**V.**

When Sanchez first decided to gather his friends for a fishing trip on his boat, he could never have imagined that the short excursion would ensnare him in removal proceedings. Sanchez has since introduced evidence suggesting that the Coast Guard's decision to detain him was based on his race alone in contravention of 8 C.F.R. § 287.8(b)(2)'s requirements. Nonetheless, because the Government has not yet had an opportunity to introduce evidence **\*657** rebutting Sanchez's prima facie showing that the Government egregiously violated the regulation, we grant Sanchez's petition and remand for further proceedings. On remand, the agency shall afford the Government an opportunity to rebut Sanchez's prima facie showing that there was both a regulatory violation and that the violation was egregious. If the Government fails to rebut Sanchez's showing that the violation was egregious, the agency shall consider whether Sanchez is entitled to termination without prejudice.

**PETITION FOR REVIEW GRANTED AND REMANDED.**

**PAEZ, Circuit Judge, concurring:**
In our prior panel opinion, Judge Pregerson wrote a separate concurrence expressing his frustration with the Government practice of encouraging noncitizens to apply for immigration relief, and later using that information against noncitizens in removal proceedings. *See Sanchez v. Sessions*, 870 F.3d 901, 913–14 (9th Cir. 2017) (Pregerson, concurring), *withdrawn*, 895 F.3d 1101 (9th Cir. 2018). I share these concerns about the dilemma created by the Government's contradictory positions.

On the one hand, when the Government enacts immigration relief programs—such as driver's licenses, deferred action, and work authorization—it encourages noncitizens to apply and thereby provide the Government with personal information. *See Plyler v. Doe*, 457 U.S. 202, 220, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (noting there are "significant

social costs borne by our Nation when select groups are denied the means to absorb the values and skills upon which our social order rests."). On the other hand, the Government could at a later date use that personal information against noncitizens—as was the case here with Sanchez. Maj. Op. at 653 fn.12. As a result, many noncitizens are reluctant to "com[e] out of the shadows" and "step[ ] into the potential net of immigration enforcement." *See* Angélica Cházaro, *Challenging the "Criminal Alien" Paradigm*, 63 UCLA L. Rev. 594, 642–43 (2016). I agree with Judge Pregerson that the Government's practice in this regard contradicts the nation's longstanding principle of welcoming immigrants into our communities.

Judge Pregerson's concurrence is quoted in full below:

> I write separately to explain why it is unfair for the Government to encourage noncitizens to apply for immigration relief, and at a later date use statements in those relief applications against noncitizens in removal proceedings.
>
> The Government should not be permitted to use noncitizens' applications for immigration relief to remove noncitizens from their homes and their families in our country. When the Government enacts immigration relief programs, it encourages noncitizens to apply because there are "significant social costs borne by our Nation when select groups are denied the means to absorb the values and skills upon which our social order rests." *Plyler v. Doe*, 457 U.S. 202, 220, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982).
>
> The Government asks noncitizens to provide personal information to receive benefits, such as driver's licenses, visas, deferred action, and work authorization. But because noncitizens are afraid that the Government could at a later date use that information against them, many are reluctant to apply. *See* Angélica Cházaro, *Challenging the "Criminal Alien" Paradigm*, 63 UCLA L. Rev. 594, 642–43 (2016) ("Coming out of the shadows to be counted and accounted for, however, while it may bring the benefits of work authorization and a social security number, involves stepping into the potential **\*658** net of immigration enforcement.").
>
> The Government's practice in this regard contradicts the principle of welcoming immigrants into our communities. This practice also contradicts President Kennedy's view that our nation's "[i]mmigration policy should be generous; it should be fair; it should be flexible." John Fitzgerald

Kennedy, *A Nation of Immigrants* (1964). We should encourage, not punish, noncitizens who come out of the shadows seeking avenues to lawful status.

I am also concerned about the Government's argument that the exclusionary rule does not apply to Sanchez's Family Unity Benefits and Employment Authorization applications because they predate the egregious constitutional violation. *See United States v. Del Toro Gudino*, 376 F.3d 997 (9th Cir. 2004).

Categorically exempting applications that predate an egregious constitutional violation from the exclusionary rule allows immigration and other law enforcement agencies to prey on migrant and working-class communities. Law enforcement officers can unconstitutionally round up migrant-looking individuals, elicit their names, and then search through Government databases to discover incriminating information in pre-existing immigration records. *See* Eda Katharine Tinto, *Policing the Immigrant Identity*, 68 Fla. L. Rev. 819, 864 (2016).

Nothing prevents law enforcement from engaging in this unfair tactic if, as the Government contends, immigration records that predate an egregious constitutional violation

can never be the fruit of the poisonous tree. *See Elkins v. United States*, 364 U.S. 206, 217, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960) ("[The] purpose [of the exclusionary rule] is ... to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it."); *United States v. Olivares-Rangel*, 458 F.3d 1104, 1120 (10th Cir. 2006) ("[T]he deterrence purpose of the exclusionary rule would effectively be served only by excluding the very evidence sought to be obtained by the primary illegal behavior, not just the means used to obtain that evidence.").

This troubling end-around the exclusionary rule corrupts our justice system. The Government should not be allowed to flout the protections of the Fourth Amendment and then use a noncitizen's application for immigration relief against her or him. We should foster communication, not distrust, between migrant communities and law enforcement.
*See Sanchez*, 870 F.3d at 913–14 (Pregerson, concurring).

**All Citations**

904 F.3d 643, 2018 A.M.C. 2977, 18 Cal. Daily Op. Serv. 9445, 2018 Daily Journal D.A.R. 9511

---

**Footnotes**

1    Following Judge Pregerson's death, Judge Wardlaw was drawn to replace him. The newly reconstituted panel withdrew the prior opinion. Portions of this opinion draw from Judge Pregerson's previous opinion in this case.

2    On September 16, 1993, Sanchez was convicted of violating California Vehicle Code § 23109(c) (speeding on a highway), § 12500(a) (driving without a license), and § 40508(b) (failing to pay a court fine arising from a Vehicle Code violation). On September 27, 1995, Sanchez was convicted of violating California Vehicle Code § 20002(a) (failing to stop a vehicle at the nearest location after an accident). On February 8, 2008, Sanchez was convicted again of violating California Vehicle Code § 12500(a).

3    Sanchez's group consisted of his two friends, himself, and an infant. The infant was a United States citizen.

4    The four databases were the Automated Fingerprint Identification System, the Consular Consolidated Database, the National Crime Information Center, and the Treasury Enforcement Communications System.

5    The Notice to Appear charged Sanchez as removable under 8 U.S.C. § 1182(a)(6)(A)(i) (entry without admission or parole), § 1182(a)(2)(A)(i)(II) (conviction of a controlled substance offense), and § 1182(a)(2)(A)(i)(I) (conviction of a crime involving moral turpitude).

6    Sanchez argues that the Coast Guard officers engaged in ethnic profiling by detaining him based on his Hispanic or Latino appearance. Nonetheless, because courts have "also used the language of race when discussing the relevant constitutional principles in cases involving Hispanic persons," we "refer[ ] to the nature of the bias as racial in keeping with the primary terminology" used by the Supreme Court. *Pena-Rodriguez v. Colorado*, —— U.S. ——, 137 S.Ct. 855, 863, 197 L.Ed.2d 107 (2017).

2018 A.M.C. 2977, 18 Cal. Daily Op. Serv. 9445, 2018 Daily Journal D.A.R. 9511

7   Contrary to the Government's argument, it matters little that the DHS does not formally include Coast Guard officers in its non-exhaustive, regulatory definition of immigration officers. *See* 8 C.F.R. § 1.2. Lest there be any doubt, 14 U.S.C. § 89(b) declares that Coast Guard officers who act to enforce immigration laws "shall[ ] be deemed to be acting as agents" of the relevant immigration agency.

8   The IJ acknowledged that Sanchez's testimony at the suppression hearing was "consistent[ ] with his declaration."

9   Our conclusion is not affected by 8 C.F.R. § 287.12, which states that all regulations within Part 287 of the Code of Federal Regulation "do not, are not intended to, shall not be construed to, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter, civil or criminal."

Section 287.12's bark is worse than its bite. DOJ made clear when it first promulgated section 287.12—previously designated section 287.11—that the provision was "only intended to ensure that the regulations do not create rights not otherwise existing in law." 59 Fed. Reg. 42406, 42414 (Aug. 17, 1994). DOJ pushed back against concerns that the disclaimer would somehow "preclude victims of unlawful Service enforcement practices from pursuing remedies for regulatory violations," adding that section 287.12 would not "prevent any party from pursuing relief for alleged violations of the Constitution or laws of the United States." *Id.* The agency also clarified that section 287.12 was wholly consistent with *United States v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979), *see* 59 Fed. Reg. 42406, 42414, which held that "[a] court's duty to enforce an agency regulation is most evident when compliance with the regulation is *mandated by the Constitution* or federal law." *Caceres*, 440 U.S. at 749, 99 S.Ct. 1465 (emphasis added); *see also Bridges v. Wixon*, 326 U.S. 135, 152–53, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945) (invalidating a deportation order because the INS violated a regulation designed to "afford [petitioners] due process of law").

Section 287.12 thus leaves in place all regulatory rights derived from the Constitution or federal law. This necessarily includes 8 C.F.R. § 287.8(b)(2), which was promulgated to effectuate the Fourth Amendment.

10  The regulation need not explicitly invoke the Constitution for the Constitution to mandate compliance with the regulation. *See Bridges*, 326 U.S. at 153, 65 S.Ct. 1443 (concluding that a number of regulations, including one requiring statements to be signed and delivered under oath, were "designed as safeguards against essentially unfair procedures" and that the agency's failure to abide by those regulations necessitated vacating the petitioner's order of deportation); *see also Garcia-Flores*, 17 I. & N. Dec. at 328 (citing *Bridges* approvingly).

11  Sanchez was seized at Channel Islands Harbor, which is not a United States port of entry. *See* 8 C.F.R. § 100.4; 19 C.F.R. §§ 101.1, 101.3. Nor is there any evidence in the record that Sanchez's boat entered United States territorial waters from international waters.

12  It is well-established that "the simple fact of who a defendant is cannot be excluded, regardless of the nature of the violation leading to his identity." *United States v. Del Toro Gudino*, 376 F.3d 997, 1001 (9th Cir. 2004). Here, however, Sanchez seeks to suppress evidence that he entered the country without inspection. Accordingly, that aspect of Sanchez's Form I-213 is suppressible. Because his Family Unity Benefits and Employment Authorization applications predated the Coast Guard officers' actions, they are admissible. *See United States v. Crews*, 445 U.S. 463, 472, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980) (concluding that evidence of the victim's identity was admissible because it "was known long before there was any official misconduct, and her presence in court [was] thus not traceable to any Fourth Amendment violation"). The fruit-of-the-poisonous-tree doctrine does not extend backwards to taint evidence that existed before any official misconduct took place. *See id.* at 475, 100 S.Ct. 1244 ("The exclusionary rule enjoins the Government from benefiting from evidence it has unlawfully obtained; it does not reach backward to taint information that was in official hands prior to any illegality.").

13  Since then, courts have invalidated removal proceedings by remanding for new hearings. *See, e.g.*, *Montilla v. INS*, 926 F.2d 162 (2d Cir. 1991).

14  Sanchez has also made a prima facie showing that the Coast Guard violated 8 C.F.R. § 287.8(b)(2) and that the regulation was promulgated for the benefit of petitioners. *See supra* pp. 649–53.

2018 A.M.C. 2977, 18 Cal. Daily Op. Serv. 9445, 2018 Daily Journal D.A.R. 9511

15    The Government concedes in its brief that a "stop made solely on the basis of ethnicity constitutes an egregious Fourth Amendment violation." Because 8 C.F.R. § 287.8(b)(2) is premised on Fourth Amendment standards, it follows that such a stop would also egregiously violate the regulation.

16    Consequently, we need not consider whether the Coast Guard and CBP officers also violated other regulations.

**End of Document**                                                © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# BOND EXHIBIT B







## PROOF OF SERVICE BY ECAS

Carlos OSORTO 

I, Stacy Tolchin, the undersigned, say:

I am over the age of eighteen years and not a party to the within action or proceedings; my business address is Law Offices of Stacy Tolchin, 776 E. Green St. Suite 210, Pasadena, CA 91101.

On July 11, 2025, I caused to be served the within:

### RESPONDENT'S DOCUMENTS IN SUPPORT OF BOND

on the opposing counsel by first class mail to the following address(es):

> Office of Chief Counsel
> Department of Homeland Security
> Adelanto Detention Facility
> 10250 Rancho Road
> Adelanto, CA 92301

Executed on July 11, 2025, at Pasadena, California. I declare under penalty of perjury, under the laws of the State of California that the foregoing is true and correct.


Stacy Tolchin
Declarant

# EXHIBIT D

Sandra Anderson                                                        DETAINED
Chief Counsel
Philip J. Betz Jr.
Deputy Chief Counsel
Bledar Gora
Assistant Chief Counsel
U.S. Department of Homeland Security
U.S. Immigration and Customs Enforcement
Office of the Principal Legal Advisor
10250 Rancho Road
Adelanto, California 92301


UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
ADELANTO, CA

| | |
|---|---|
| In the Matter of:<br><br>Respondent/Applicant<br><br>OSORTO, CARLOS ALEXANDER<br><br>IN BOND PROCEEDINGS | File No.: ▮▮▮▮▮ |


Immigration Judge: Barrett            Next Hearing: July 16, 2025 at 1:00 PM


**U.S. DEPARTMENT OF HOMELAND SECURITY'S FILING OF EVIDENCE**

Uploaded on 07/16/2025 at 05:03:06 AM (Pacific Daylight Time) - Base City ACU

The Department of Homeland Security hereby submits the following documents for the

above captioned hearing.

July 16, 2025                                    **RESPECTFULLY SUBMITTED**,

                                                *Bledar Gora*

                                                _____

                                                Bledar Gora
                                                Assistant Chief Counsel
                                                U.S. Immigration and Customs Enforcement
                                                U.S. Department of Homeland Security

**INDEX**

| TAB | DOCUMENT | PAGE |
|-----|----------|------|
| A | Form I-213 | 1-4 |
| B | FBI Rap Sheet | 5-10 |
| | | |
| | | |

Uploaded on 07/16/2025 at 03:04:06 AM (Pacific Daylight Time) Banc1City-ADU
Case 2:25-cv-05605-MEMF-SP Document 390-1 Filed 07/21/26 Page 120 of 138
Page ID #:8632

EOIR — 4 of 16

# TAB A

EOIR — 5 of 16

Uploaded on 07/16/2025 at 08:44:06 AM (Pacific Daylight Time) Base City - ADI

Uploaded on 07/16/2025 at 08:04:06 AM (Pacific Daylight Time)   Rose City FNU

EOIR — 9 of 16

# TAB B

Uploaded on 07/16/2025 at 08:01:06 AM (Pacific Daylight Time) Base City FDL

EOIR — 10 of 16

EOIR — 11 of 16

Uploaded on 07/16/2025 at 03:47:06 AM (Pacific Daylight Time) Base City: IDL

EOIR — 13 of 16

OSORTO, CARLOS ALEXANDER

A 

## PROOF OF SERVICE

On July 16, 2025, I, Bledar Gora, caused to be served a copy of this U.S
U.S. DEPARTMENT OF HOMELAND SECURITY'S FILING OF BOND EVIDENCE and
any attached pages to the respondent's counsel VIA ECAS.


*Bledar Gora*

_____                    July 16, 2025

Bledar Gora
Assistant Chief Counsel
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

# EXHIBIT E



**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**ADELANTO IMMIGRATION COURT**

of



# EXHIBIT F

