UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

Pedro VASQUEZ PERDOMO, et al.,

    Plaintiffs,

    v.

KRISTI NOEM, IN HER OFFICIAL CAPACITY AS SECRETARY OF HOMELAND SECURITY, et al.,

    Defendants.

Case No. 2:25-cv-05605-MEMF-SP

██████████████ **N OF** A.A.M.

**DECLARATION OF** A.A.M. ██████████

I, A.A.M. ██████████, declare and affirm that the following is true to the best of my knowledge, information, and belief:

1.    I am a Senior Attorney, Office of Assistant Chief Counsel, Seattle, West Region, Office of Chief Counsel (OCC) for U.S. Customs and Border Protection (CBP). The mission of CBP includes the enforcement and administration of customs, immigration, and agriculture laws and regulations of the United States, as well as the enforcement of numerous other laws on behalf of other federal agencies. OCC provides legal advice to, and legal representation of, CBP officials in matters relating to the activities and functions of CBP. OCC performs many functions including rendering litigation assistance to the U.S. Department of Justice in criminal or civil court actions involving CBP. OCC operates under the umbrella of the Department of Homeland Security's (DHS) Office of General Counsel.

2.    As Senior Attorney in the West Region I have been assigned to this litigation and I work with, and coordinate, a small team of attorneys who are responsible for all aspects of discovery in this case, including the identification, collection, verification, and production of responsive records.

1

3.    I provide this declaration based on my personal knowledge, reasonable inquiry, information obtained from the lawyers on this team and within OCC, various documents, and other CBP employees, in the regular course of business.

4.    The Court has ordered CBP to collect documentation and communications from fifteen operations listed in Request for Production ("RFP") No. 2.  Order Granting Plaintiffs' Motion to Compel (ECF No. 320) ECF No. 370 ("Order").  Of these operations, CBP was present only at twelve, specifically (b), (c), (e), (g)-(o) ("CBP Operations").  We explain the burden of this Order as to CBP Operations.

5.    The Order requires CBP to produce "standardized documentation."  CBP enforcement activities do not necessarily generate a standardized or required set of operational documents.  Depending on the circumstances, some operations may involve pre-operation briefings/slide presentations, reports of investigation, arrest narratives, and/or I-44s, while others may generate no written materials at all.  For example, if there were no arrests for immigration violations made during an operation there would be no arrest narrative.  There is no policy or requirement that such documents exist for every operation, and there is no centralized electronic location where all such materials are stored.

6.    The Order requires the government to "[i]dentify all persons who were arrested during any of these operations and gather all documentation concerning their arrests[.]"Order at 8.  Because the Order relates to requests for the production of documents, CBP interprets the first part of this directive as requiring CBP to identify all persons who were arrested during the twelve operations in which CBP participated for the purposes of gathering "all documentation concerning their arrests," and not requiring CBP to create a list to be produced.  CBP did not maintain a centralized roster identifying all individuals arrested during these operations, and there is usually no documentation generated in connection with each arrest other than the narrative.  CBP has already produced all documentation concerning arrests of approximately eleven (11) individuals who were identified in CBP Operations in RFP No. 2.  CBP disputes that

2

Plaintiff Viramontes was arrested by Border Patrol on June 18, 2025.  We estimate that an additional forty-six (46) individuals were arrested in the CBP Operations.  Documents concerning their arrests that were within CBP's possession, custody, and/or control have been collected and were produced on Friday, January 23, 2026.

7.    The Order also requires CBP to "collect documents from every agent present at the 15 operations, including reports or notes they generated and any communication they exchanged relating to the operations."  Order at 8.  To comply with this requirement, CBP must determine every agent present at the twelve CBP operations.  This is not a simple endeavor because there is no standardized database, or other document, listing every agent present at every operation.  Border Patrol was able to provide OCC with a list of teams they believed were present at the CBP Operations on Saturday, January 17, 2026.  OCC began the process of working to determine which teams and which agents were actually present at the CBP Operations on Tuesday, January 20, 2026.  OCC is still engaged in that process, but based on our efforts to date OCC estimates the number of Border Patrol Agents present at the twelve CBP Operations is between 200 to 300.  That range is because team members on the lists may not have been present at the operation, i.e., were operating on standby and not actually present at the location of the operation.  Only after OCC finishes the process of determining who was present—which OCC began doing last week and continues through the present—will the agency be able to ensure the most accurate list of the agents present at the CBP Operations.

8.    To comply with the order as written, once all agents are identified, CBP would need to conduct an electronically stored information ("ESI") search of the above-described agents for a period of time running from on or shortly before June 12, 2025 to on or shortly after September 25, 2025, representing the window between the first-in time and last-in-time requested operation.  It is less burdensome to narrow that timeframe into smaller time frames when such documents were likely generated and some additional time on either side of that to ensure fulsome collection—such as two days before an operation and two days after an operation.  That would still be five search

periods.  The search periods would be as follows: June 10-14, June 16-21, August 1-14, August 20-24, and September 20-27.  These date ranges were selected to prioritize timely compliance with the Court's deadline while still capturing the period when responsive materials were most likely to have been created.

9.      To estimate the volume of ESI to review, CBP is running an ESI search using a limited set of terms likely to return responsive documents with a limited set of custodians.  The search terms proposed were as follows:  Yank, tow, Montebello, carwash, car wash, Whittier, Touch and Glow, Hollywood, Paramount, home depot, Handy, Culver, Magnolia, Fountain Valley, Westlake, San Bernardino, Pasadena, Naples, Long Beach, Contractor, Warehouse, Pomona, Trojan Horse, Carmenita, Sunset, Alondra, Wilshire, Washington, and Del Mar, Walnut.  CBP limited the search to 47 custodians who were selected because they were the agents who arrested individuals at the CBP Operations. That limited search is currently underway and, therefore, while it continues to work diligently to understand the full universe of responsive documents, OCC does not yet know the volume of potentially responsive documents that will need to be reviewed for just those 47 custodians with those limited timeframes and search terms.

10.     Once the ESI search is completed, the results of the ESI search must then be processed through the appropriate CBP document review system and reviewed for responsiveness, confidentiality, and privilege.  The timeframe to do this review is hard to predict as it depends greatly on the volume of documents (which depends on the number of custodians the Court intended to encompass in the search), the nature of the documents themselves (some document can be reviewed in seconds where as others require much longer), and redactions (where necessary).  Given that CBP still does not know the precise volume of documents to be reviewed, and will not know with certainty the volume until we have been able to confirm all the agents at the CBP Operations, it is difficult to assess how long it would take to review these documents for responsiveness and privilege.

11.     The Order further states that CBP must "produce all body worn camera [("BWC")] footage recorded by any agent present at any of the 15 operations listed in RFP No. 2." Order at 9. It is my understanding that the storage location for BWC footage for all agents that participated in Operation At Large in the Central District of California was searched by the date and address/location of each CBP Operation. As a result of that search, notwithstanding the videos that have already been produced to Plaintiffs, CBP must review approximately 152 additional videos. Those videos constitute approximately 26 hours, 37 minutes, and 30 seconds of footage. It often takes longer to review video evidence because it may need to be slowed down and/or reviewed twice. Therefore, we estimate it will take at least 60 hours to review these videos. If any of the videos contain privileged information, then additional time is needed to apply and review privilege redactions.

12.     Finally, the Court has ordered that CBP "forensically image any cell phone used by an agent present at any of the 15 operations and review these devices for material responsive to RFP No. 2 and 3." Order at 9. This requires CBP to forensically image the government cell phones of between 200 and 300 agents. It is difficult to estimate the timeline and workload associated with this process because of the number of cell phones at issue, the geographic distribution of the agents that possess them, and unknown volume of material to review. The first step in this process is to finalize the list of the agents present so there is a list of the phones that need to be collected.

13.     The forensic imaging is handled by CBP's Laboratories and Scientific Services ("LSS") at various locations across the country where there is a LSS Regional or Forward Operating Lab ("Labs"). CBP will need a Local Property Officer ("LPO") to retrieve the phone from the agent at their duty station, or their temporary assignment if they are not at their duty station. The LPOs will work with each agent to collect their phone, ensure the phones are ready for imaging, fill out the appropriate paperwork to be sent with the phones, put the phones in evidence bags, and mail them to the designated LSS Labs that will do the forensic imaging. Agents will also need to be issued

5

replacement phones when they provide their phones to the LPOs.

14. The LSS Labs will make a forensic image of all information on each agent's phone. LSS will do a full file extraction to ensure compliance with the Court's Order. A full file extraction takes approximately 4 to 6 hours per phone. Thus, forensic imaging of the phones could take up to 1,800 hours, and likely no fewer than 800 hours depending on the number of phones at issue. The Labs can image up to three phones at once and the phones will be sent to different Labs to facilitate their imaging as to not overwhelm one lab with this work, and to facilitate the work being completed more quickly. The Labs primarily image phones for law enforcement investigations and that work will be delayed as a result of prioritizing this imaging.

15. Once the forensic images have been collected and processed, CBP OCC will have to review the full forensic images of the phones for responsiveness, confidentiality, and privilege before any documents are produced. There are limited counsel available to conduct such review. Even after review is complete, there are multiple steps required to prepare the document for production, as was discussed in the January 20, 2026 Declaration of Benjamin Mark Moss (ECF No. 379-1). At this time, given all of the variables involved in the cell phone collection and imaging process, it is difficult to predict how long it will be before CBP is able to produce any responsive documents that may exist on these phones. It is unlikely CBP will be able to collect, image, review, and produce records from the government cell phones of every agent present by February 13, 2026.

16. In addition, some agents used their personal cell phones at these CBP Operations. Notwithstanding the legal concerns associated with forensically imaging CBP employees' personal cell phones, those devices are outside CBP's possession, custody, or control, and CBP lacks authority to compel agents to surrender their personal phones. CBP may request voluntary cooperation. If an agent declines, CBP can only request the agent provide screenshots of any potentially responsive material.

17. Throughout this process, CBP has acted diligently and in good faith to comply

with the Court's Order, including making rolling productions where feasible, prioritizing categories of materials that could be produced immediately, attempting to collect and produce before deadline, and devoting substantial personnel and technical resources to collection and review efforts.  Any remaining production challenges described above are the result of logistical and technical constraints, not a lack of diligence or cooperation.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my information, knowledge and belief.

Executed this 30th day of January, 2026, at Seattle, WA.



A.A.M.
Senior Attorney
Office of Assistant Chief Counsel, Seattle
U.S. Customs and Border Protection

7