O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

Pedro Vasquez Perdomo *et al.*,

                        Plaintiffs,

       v.

Kristi Noem *et al.*,

                     Defendants.

Case No.: 2:25-cv-05605-MEMF-SP

**ORDER DENYING DEFENDANTS' MOTION TO DISMISS FIRST AMENDED INTERVENORS' COMPLAINT [DKT. NO. 236]**

       The Court does not have to repeat in detail what it has already said in this case. The short story is that a number of people and organizations who brought this lawsuit are asking this Court to put a stop to the roving patrols that began last summer and ensure that everyone detained by ICE can speak to a lawyer.

       Several cities across this district—Anaheim, Bell Gardens, Beverly Hills, Carpinteria, Culver City, Huntington Park, Long Beach, Lynwood, Los Angeles, Montebello, Monterey Park, Oxnard, Paramount, Pasadena, Pico Rivera, Pomona, Santa Ana, Santa Barbara, Santa Monica, South Gate, and West Hollywood—and one county—the County of Los Angeles—asked to be part of this

lawsuit, and the Court has allowed them to because they have stated that they have been harmed—and continue to be harmed—by the roving patrols.

The Government has asked this Court to dismiss all of them from this lawsuit for a number of reasons. But all of the Government's arguments are wrong. Probably most significant, the Government accuses these cities and the County of Los Angeles of being against lawful immigration enforcement. According to the Government, these cities and the County of Los Angeles are not being harmed by the roving patrols, but rather by their "sanctuary city policies." None of this aligns with what is laid out in the legal filings.

And for that reason, this Court decides that these cities and the County of Los Angeles can continue their lawsuit.

*** 

## I.    Introduction

Before this Court is the Motion to Dismiss Intervenors' First Amended Complaint filed by Defendants, Dkt. No. 235, which incorporates a Request for Judicial Notice. For the reasons given below, the Motion is DENIED.

## II.    Factual Allegations

This Court's Order on the Motion to Dismiss Plaintiffs' Complaint provides more detailed factual and procedural background information as to this case. *See* Order Denying Defendants' Request for Judicial Notice and Denying Defendants' Motion to Dismiss as to All Claims Except Count Eight. This Court details additional factual and procedural background here only to the extent that it is relevant to this Motion.

Unless stated otherwise, the following factual background is derived from the allegations in Intervenors' operative Amended Complaint in Intervention for Declaratory and Injunctive Relief. Dkt. No. 141 ("Intervenors' 1AC"). For the purposes of this Motion, the Court treats these factual allegations as true, but at this stage of the litigation, the Court makes no finding on the truth of these allegations, and is therefore not—at this stage—finding that they *are* true.

1

2

**A.  The Parties**

    1.   <u>Plaintiffs</u>

Plaintiffs Pedro Vasquez Perdomo ("Vasquez Perdomo"), Carlos Alexander Osorto

("Osorto"), and Isaac Villegas Molina ("Villegas Molina") are residents of Pasadena, California.

Plaintiffs' First Amended Complaint, Dkt. No. 16 ¶¶ 12–14 ("Plaintiffs'1AC"). They were arrested

at a bus stop as they were waiting to be picked up for a job on June 18, 2025. *Id.* ¶¶ 12–14. They

filed this action while detained in the basement of a Los Angeles downtown federal building, B-18.

*Id.* ¶¶ 12–14.

Plaintiff Jorge Hernandez Viramontes ("Hernandez Viramontes") is a resident of Baldwin

Park, California. *Id.* ¶ 15. He works at a car wash in Orange County, California. *Id.* Immigration

agents have visited the car wash three times. *Id.* On June 18, 2025, agents questioned and detained

him, despite informing them that he is a U.S. citizen. *Id.*

Plaintiff Jason Brian Gavidia ("Gavidia") is a resident of East Los Angeles, California. *Id.* ¶

16. He is a U.S. citizen. *Id.* Though he explained this to immigration agents multiple times,

immigration agents stopped and questioned Gavidia at a tow yard in Los Angeles County on June

12, 2025. *Id.*

Plaintiff Los Angeles Worker Center Network ("LAWCN") is a "multi-racial, multi-ethnic,

and multi-industry organization comprised of worker centers and labor organizations that work

together to address injustices faced by low-wage workers in the greater Los Angeles area, including

immigrant and non-English-speaking workers." *Id.* ¶ 17. LAWCN has worker centers as

organizational members; they, in turn, have individual members, including noncitizens with legal

status and U.S. citizens. *Id.*

Plaintiff United Farm Workers ("UFW") is a farm worker union with approximately 10,000

members, with more members in California than in any other state. *Id.* ¶ 18. UFW's members in

1    California work at agricultural sites as well as non-agricultural sites within the District. *Id.* UFW's

2    members include noncitizens with legal status and U.S. citizens. *Id.*

3        Plaintiff Coalition for Humane Immigrant Rights ("CHIRLA") is a nonprofit organization

4    with its principal place of business in Los Angeles, California. *Id.* ¶ 19. CHIRLA was founded in

5    1986 to advance the human and civil rights of immigrants and refugees. *Id.* As a membership

6    organization, CHIRLA has approximately 50,000 members across California, including both U.S.

7    citizens and noncitizens of varying immigration statuses. *Id.* CHIRLA has members in every county

8
9    in the District. *Id.*

10       Plaintiff Immigrant Defenders Law Center ("ImmDef") is a nonprofit organization with its

11   principal place of business in Los Angeles, California. *Id.* ¶ 20. Besides Los Angeles, ImmDef has

12   offices in Riverside, Santa Ana, and San Diego, California, and works across the U.S.–Mexico

13
14   border in Tijuana. *Id.* ImmDef was founded in 2015 to protect the due process rights of immigrants

15   facing deportation. *Id.*

16       The Court refers to the five individual plaintiffs, LAWCN, UFW, and CHIRLA collectively

17   as "Stop/Arrest Plaintiffs." The Court refers to ImmDef and CHIRLA collectively as

18   "Access/Detention Plaintiffs." The Court addresses all plaintiffs collectively as "Plaintiffs."

19                    2.    Defendants

20       Defendant Kristi Noem ("Noem") is the Secretary of the Department of Homeland Security

21   ("DHS"), which is responsible for administering and enforcing the nation's immigration laws

22   pursuant to 8 U.S.C. § 1103(a). *Id*. ¶ 21. Noem is sued in her official capacity. *Id*.

23
24   Defendant Todd M. Lyons ("Lyons") is the Acting Director of U.S. Immigration and Customs

25   Enforcement ("ICE"), an agency of the United States within the DHS. *Id*. ¶ 22. ICE is responsible

26   for the stops, arrests, and custody of individuals believed to be in violation of civil immigration law.

27   *Id*. Lyons is sued in his official capacity. *Id*.

28

Defendant Rodney S. Scott ("Scott") is the Commissioner of U.S. Customs and Border Protection ("CBP"), the agency within the DHS that is responsible for enforcing immigration laws at or close to the U.S. border. *Id*. ¶ 23. Scott has direct authority over all CBP policies, procedures, and practices related to stops, arrests, and detention. *Id*. Scott is sued in his official capacity. *Id*.

Defendant Michael W. Banks ("Banks") is Chief of the U.S. Border Patrol. *Id*. ¶ 24. Banks has direct authority over all Border Patrol policies, procedures, and practices related to stops, arrests, and detention. *Id*. Banks is sued in his official capacity. *Id*.

Defendant Kash Patel ("Patel") is Director of the U.S. Federal Bureau of Investigation ("FBI"). *Id*. ¶ 25. In that capacity, Patel is responsible for the direction and oversight of all operations of the FBI. *Id*. Patel is sued in his official capacity. *Id*.

Defendant Pam Bondi ("Bondi") is the U.S. Attorney General. *Id*. ¶ 26. Bondi is head of the Department of Justice ("DOJ") and is responsible for the direction and oversight of all operations of the DOJ. *Id*. Bondi is sued in her official capacity. *Id*.

Defendant Ernesto Santacruz Jr. ("Santacruz Jr.") is the Acting Field Office Director for the Los Angeles Field Office of ICE. *Id*. ¶ 27. Santacruz Jr. is responsible for the supervision of personnel within ICE's Enforcement and Removal Operations ("ERO") in the geographic area covered by the Los Angeles Field Office, which comprises the seven counties in the District, and facilities within the District, including B-18. *Id*. Santacruz Jr. is sued in his official capacity. *Id*.

Defendant Eddy Wang ("Wang") is the U.S. Homeland Security Investigations Special Agent in Charge for Los Angeles. *Id*. ¶ 28. Wang is responsible for the supervision of agents within ICE's Homeland Security Investigations ("HSI") in the Los Angeles area. *Id*. Wang is sued in his official capacity. *Id*.

Defendant Gregory K. Bovino ("Bovino") is the Chief Patrol Agent for the El Centro Sector of the CBP. *Id*. ¶ 29. In that capacity, Bovino is responsible for the supervision of agents in the El Centro Sector. *Id*. Bovino is sued in his official capacity. *Id*.

Defendant D. Stalnaker ("Stalnaker") is the Acting Chief Patrol Agent for the San Diego Sector of the CBP. *Id.* ¶ 30. In that capacity, Stalnaker is responsible for the supervision of agents in the San Diego Sector. *Id.* Stalnaker is sued in his official capacity. *Id.*

Defendant Akil Davis ("Davis") is the Assistant Director of the Los Angeles Office of the FBI. *Id.* ¶ 31. In that capacity, Davis is responsible for the supervision of all agents in the Los Angeles Office. *Id.* Davis is sued in his official capacity. *Id.*

Defendant Bilal A. Essayli ("Essayli," and together with all other defendants, "Defendants") is the U.S. Attorney for the Central District of California. *Id.* ¶ 32. Essayli has authority over federal law enforcement operations within the District. *Id.* Essayli is sued in his official capacity. *Id.*

### 3.    Intervenors

Intervenor City of Los Angeles is a municipality organized under California law. Intervenors' 1AC ¶ 20. As a result of Defendants' immigration enforcement, Los Angeles law enforcement officers' relationships with the city's communities have suffered. *Id.* ¶ 20–26. Defendants' actions have also chilled economic activity in Los Angeles. *Id.* ¶ 28. As a result, Los Angeles has lost business and sales tax income. *Id.* Defendants' enforcement efforts interfere with Los Angeles' efforts in protecting the public health, safety, and well-being of its residents. *Id.* ¶ 21.

Intervenor Los Angeles County is a subdivision of the State of California. *Id.* ¶ 29. Defendants' enforcement actions have created distrust between County employees and members of the public, hampering the County's law enforcement, social work, and public health efforts. *Id.* ¶¶ 35–38. Because of Defendants' enforcement actions, the County has diverted resources to managing the fallout. *Id.* And the County's economy has experienced a chilling effect that has decreased the County's revenue. *Id.* ¶¶ 39–40, 43. Defendants' enforcement efforts interfere with the County's efforts in protecting the public health, safety, and well-being of its residents. *Id.* ¶ 30–33.

Intervenor City of Anaheim is a municipality organized under California law. *Id.* ¶ 44. As a result of Defendants' immigration enforcement efforts, Anaheim has diverted resources to address

community safety concerns. *Id.* ¶ 47. The Anaheim economy has experienced a chilling effect with negative impacts on Anaheim's revenue. *Id.* ¶¶ 46, 48. Defendants' enforcement efforts interfere with Anaheim's efforts in protecting the public health, safety, and well-being of its residents. *Id.* ¶¶ 45–56.

Intervenor City of Bell Gardens is a municipality organized under California law. *Id.* ¶ 49. As a result of Defendants' immigration enforcement efforts, Bell Gardens has diverted resources to address community safety concerns. *Id.* ¶ 52. The Bell Gardens economy has experienced a chilling effect with negative impacts on Bell Gardens' revenue. *Id.* ¶ 54. Defendants' enforcement efforts interfere with Bell Gardens' efforts in protecting the public health, safety, and well-being of its residents. *Id.* ¶¶ 51, 53.

Intervenor City of Beverly Hills is a municipality organized under California law. *Id.* ¶ 55. As a result of Defendants' immigration enforcement efforts, Beverly Hills has diverted resources to address community safety concerns. *Id.* ¶ 59. The Beverly Hills economy has experienced a chilling effect with negative impacts on Beverly Hills' revenue. *Id.* ¶¶ 57–58. Defendants' enforcement efforts interfere with Beverly Hills' efforts in protecting the public health, safety, and well-being of its residents. *Id.*

Intervenor City of Carpinteria is a municipality organized under California law. *Id.* ¶ 60. As a result of Defendants' immigration enforcement efforts, Carpinteria has diverted resources to address community safety concerns. *Id.* ¶ 66. The Carpinteria economy has experienced a chilling effect with negative impacts on Carpinteria's revenue. *Id.* ¶¶ 65–66. Defendants' enforcement efforts interfere with Carpinteria's efforts in protecting the public health, safety, and well-being of its residents. *Id.* ¶¶ 61, 66–67.

Intervenor City of Culver City is a municipality organized under California law. *Id.* ¶ 68. As a result of Defendants' immigration enforcement efforts, Culver City has diverted resources to address community safety concerns. *Id.* ¶ 70. The Culver City economy has experienced a chilling

effect with negative impacts on Culver City's revenue. *Id.* ¶ 71. Defendants' enforcement efforts interfere with Culver City's efforts in protecting the public health, safety, and well-being of its residents. *Id.* ¶¶ 69–70.

Intervenor City of Huntington Park is a municipality organized under California law. *Id.* ¶ 72. As a result of Defendants' immigration enforcement efforts, Huntington Park has diverted resources to address community safety concerns. *Id.* ¶¶ 77–78. The Huntington Park economy has experienced a chilling effect with negative impacts on Huntington Park's revenue. *Id.* ¶ 80. Defendants' enforcement efforts interfere with Huntington Park's efforts in protecting the public health, safety, and well-being of its residents. *Id.* ¶¶ 76–79.

Intervenor City of Long Beach is a municipality organized under California law. *Id.* ¶ 81. As a result of Defendants' immigration enforcement efforts, Long Beach has diverted resources to address community safety concerns. *Id.* ¶ 84. Defendants' enforcement efforts interfere with Long Beach's efforts in protecting the public health, safety, and well-being of its residents. *Id.* ¶¶ 82–83.

Intervenor City of Lynwood is a municipality organized under California law. *Id.* ¶ 85. As a result of Defendants' immigration enforcement efforts, Lynwood has diverted resources to address community safety concerns. *Id.* ¶¶ 88–90. The Lynwood economy has experienced a chilling effect with negative impacts on Lynwood's revenue. *Id.* ¶ 87. Defendants' enforcement efforts interfere with Lynwood's efforts in protecting the public health, safety, and well-being of its residents. *Id.* ¶¶ 89–91.

Intervenor City of Montebello is a municipality organized under California law. *Id.* ¶ 93. As a result of Defendants' immigration enforcement efforts, Montebello has diverted resources to address community safety concerns. *Id.* ¶¶ 100, 103. The Montebello economy has experienced a chilling effect with negative impacts on Montebello's revenue. *Id.* ¶¶ 102, 104. Defendants' enforcement efforts interfere with Montebello's efforts in protecting the public health, safety, and well-being of its residents. *Id.* ¶¶ 96–99.

Intervenor City of Monterey Park is a municipality organized under California law. *Id.* ¶ 105. As a result of Defendants' immigration enforcement efforts, Monterey Park has diverted resources to address community safety concerns. *Id.* ¶¶ 110, 113. Defendants' enforcement efforts interfere with Monterey Park's efforts in protecting the public health, safety, and well-being of its residents. *Id.* ¶¶ 112–13.

Intervenor City of Oxnard is a municipality organized under California law. *Id.* ¶ 114. As a result of Defendants' immigration enforcement efforts, Oxnard has diverted resources to address community safety concerns. *Id.* ¶¶ 116–17, 119–20. Defendants' enforcement efforts interfere with Oxnard's efforts in protecting the public health, safety, and well-being of its residents. *Id.* ¶¶ 115, 121–23.

Intervenor City of Paramount is a municipality organized under California law. *Id*. ¶ 124. As a result of Defendants' immigration enforcement efforts, Paramount has diverted resources to address community safety concerns. *Id.* ¶ 126. The Paramount economy has experienced a chilling effect with negative impacts on Paramount's tax revenue. *Id*. ¶¶ 128–29. Defendants' enforcement efforts interfere with Paramount's efforts in protecting the public health, safety, and well-being of its residents. *Id.* ¶ 126.

Intervenor City of Pasadena is a municipality organized under California law. *Id.* ¶ 130. As a result of Defendants' immigration enforcement efforts, Pasadena has diverted resources to address community safety concerns. *Id.* ¶¶ 132, 134–35. The Pasadena economy has experienced a chilling effect with negative impacts on Pasadena's tax revenue. *Id*. ¶¶ 134, 137. Defendants' enforcement efforts interfere with Pasadena's efforts in protecting the public health, safety, and well-being of its residents. *Id.* ¶¶ 132–33, 136.

Intervenor City of Pico Rivera is a municipality organized under California law. *Id.* ¶ 138. As a result of Defendants' immigration enforcement efforts, Pico Rivera has diverted resources to address community safety concerns. *Id.* ¶¶ 144–45. The Pico Rivera economy has experienced a

chilling effect with negative impacts on Pico Rivera's tax revenue. *Id.* ¶¶ 148–49. Defendants' enforcement efforts interfere with Pico Rivera's efforts in protecting the public health, safety, and well-being of its residents. *Id.* ¶¶ 145–47.

Intervenor City of Pomona is a municipality organized under California law. *Id.* ¶ 150. As a result of Defendants' immigration enforcement efforts, Pomona has diverted resources to address community safety concerns. *Id.* ¶¶ 151, 153. Defendants' enforcement efforts interfere with Pomona's efforts in protecting the public health, safety, and well-being of its residents. *Id.* ¶¶ 151–53.

Intervenor City of Santa Ana is a municipality organized under California law. *Id.* ¶ 154. The Santa Ana economy has experienced a chilling effect with negative impacts on Santa Ana's revenue. *Id.* ¶ 157. Defendants' enforcement efforts interfere with Santa Ana's efforts in protecting the public health, safety, and well-being of its residents. *Id.* ¶¶ 155–56.

Intervenor City of Santa Barbara is a municipality organized under California law. *Id.* ¶ 158. As a result of Defendants' immigration enforcement efforts, Santa Barbara has diverted resources to address community safety concerns. *Id.* ¶¶ 144–45. The Santa Barbara economy has experienced a chilling effect with negative impacts on Santa Barbara's tax revenue. *Id.* ¶¶ 162, 164–66. Defendants' enforcement efforts interfere with Santa Barbara's efforts in protecting the public health, safety, and well-being of its residents. *Id.* ¶¶ 164–66.

Intervenor City of Santa Monica is a municipality organized under California law. *Id.* ¶ 174. As a result of Defendants' immigration enforcement efforts, Santa Monica has diverted resources to address community safety concerns. *Id.* ¶¶ 177, 179. The Santa Monica economy has experienced a chilling effect with negative impacts on Santa Monica's tax revenue. *Id.* ¶¶ 175–76. Defendants' enforcement efforts interfere with Santa Monica's efforts in protecting the public health, safety, and well-being of its residents. *Id.* ¶¶ 177, 179–80.

Intervenor City of South Gate is a municipality organized under California law. *Id.* ¶ 181. As a result of Defendants' immigration enforcement efforts, South Gate has diverted resources to address community safety concerns. *Id.* ¶ 184. The South Gate economy has experienced a chilling effect with negative impacts on South Gate's tax revenue. *Id.* ¶ 185. Defendants' enforcement efforts interfere with South Gate's efforts in protecting the public health, safety, and well-being of its residents. *Id.* ¶¶ 182–83.

Intervenor City of West Hollywood (together with all other intervenors, "Intervenors") is a municipality organized under California law. *Id.* ¶ 186. As a result of Defendants' immigration enforcement efforts, West Hollywood has diverted resources to address community safety concerns. *Id.* ¶¶ 190–92. The West Hollywood economy has experienced a chilling effect with negative impacts on West Hollywood's tax revenue. *Id.* ¶¶ 188–89. Defendants' enforcement efforts interfere with West Hollywood's efforts in protecting the public health, safety, and well-being of its residents. *Id.* ¶ 193.

## B. Factual Background

Throughout the summer of 2025, Defendants engaged in the use of unlawful searches and seizures to "terrorize [Intervenors'] residents under the guise of federal immigration enforcement." *Id.* ¶ 194. In communities throughout the Los Angeles region, in the weeks leading up to the Intervenors' filing of the 1AC, Defendants carried out increasingly aggressive and unlawful immigration enforcement raids. *Id.* Their enforcement actions have included mass arrests without probable cause—leading Intervenors' residents to infer that the detentions are based on residents' appearance alone. *Id.* ¶ 198–99. And they have led to the detention, arrest, and use of force against individuals with legal status, including U.S. citizens. *Id.* In carrying out this conduct, Defendants "have sparked terror throughout the region." *Id.* ¶ 194.

The immigration agents performing these raids carry firearms, wear masks, and often do not visibly identify themselves as law enforcement. *Id.* ¶ 197. So, from Intervenors' residents'

perspective, many of these activities resemble criminal activity. *Id.* Witnesses to these immigration raids have called 911 to report their observations as kidnappings. *Id.* As a result, local law enforcement agencies have been required to divert their limited resources to determining "whether armed and masked individuals jumping out of unmarked vehicles are federal agents or individuals committing crimes." *Id.* Conversely, at least one local law enforcement agency has arrested a civilian, posing as a border patrol agent, who carried a list of purported undocumented immigrants and loaded firearms. *Id.*

Defendants' unlawful raids impair Intervenors' maintenance of law and order. *Id.* ¶ 195. Defendants, in a departure from longstanding practices, are carrying out their roving raids without prior notice to the Los Angeles County Sheriff's Department or any of the Intervenor cities' police departments. *Id.* As a result, local authorities do not know when and where immigration enforcement actions will occur in their jurisdictions. *Id.* And local authorities are left to address "the aftermath of Defendants' actions"—including protests and hostility from Intervenors' residents. *Id.* ¶ 200. Defendants' immigration actions strain the relationship between Intervenors' law enforcement and Intervenors' residents. *Id.* ¶ 201. Intervenors' police officers, social workers, firefighters, and building inspectors are being confused with federal agents. *Id.* As a result, they face increased hostility, confrontations, and difficulty in tasks like victim outreach. *Id.*

Defendants' unlawful raids also drain Intervenors' revenue. *Id.* ¶¶ 202–06. Intervenors rely on revenue from business, sales, and hospitality taxes to fund municipal operations. *Id.* ¶ 202. Defendants' raids impact citizens and noncitizens alike. *Id.* So people who live or work in Intervenors' jurisdiction increasingly choose to stay home. *Id.* ¶¶ 202–03. So are international tourists. *Id.* ¶ 202. The result has been a de facto lockdown of neighborhoods throughout the region. *Id.* ¶¶ 204–05. Shops and restaurants have seen a decrease in business, akin to that of the COVID-19 pandemic. *Id.* ¶ 205. Intervenors, in turn, lose vital tax revenue. *Id.* ¶ 206.

And Defendants' unlawful raids threaten the functioning of California's courts. *Id.* ¶ 207. California law prohibits the civil arrest of any person in a courthouse who is attending a court proceeding or attending to legal business. *Id.* (citing Cal. Civ. Code § 43.54). And federal common law forbids civil arrests in or near courthouses. *Id.* ¶ 208. But Defendants' immigration enforcement raids have seized Intervenors' residents in and near courthouses, including the arrest of two women immediately after they attended a scheduled court appearance. *Id.* ¶¶ 208–09. And prosecutors in Intervenors' jurisdiction report that some victims and witnesses have been reluctant to come to court, citing fears of detention at the hands of immigration enforcement. *Id.* ¶ 210.

As described in the Plaintiffs' 1AC, Defendants' indiscriminate enforcement efforts violate the rights of Intervenors' community members under the Fourth and Fifth Amendments, as well as the Immigration and Nationality Act. *Id.* ¶ 195. Those same actions violate Intervenors' Tenth Amendment rights. *Id.*

### C. Procedural History

Plaintiffs Vasquez Perdomo, Villegas Molina, and Osorto initiated this action by filing a Petition for Writ of Habeas Corpus on June 20, 2025. Dkt. No. 1. They, along with the other Plaintiffs, filed the operative First Amended Complaint on July 2, 2025. Plaintiffs' 1AC. Plaintiffs' 1AC alleges the following claims:

| Claim | Plaintiff(s) | Defendant(s) |
|---|---|---|
| Count One: Violation of Fourth Amendment: Unreasonable Seizures | Stop/Arrest Plaintiffs | All Defendants |
| Count Two: Violation of 8 U.S.C. 1357(a)(2)— Warrantless Arrests Without Probable Cause of Flight Risk | LAWCN, UFW, and CHIRLA | All Defendants |

| Count Three: Violation of 8 C.F.R.(c)(2)(ii)—Standards for Stops and Warrantless Arrests | LAWCN, UFW, and CHIRLA | All Defendants |
|---|---|---|
| Count Four: Violation of 8 C.F.R. § 287.8(c)(2)(iii)—Failure to Identify Authority and Reason for Arrest | LAWCN, UFW, and CHIRLA | All Defendants |
| Count Five: Violation of Fifth Amendment—Access to Counsel | Access/Detention Plaintiffs | Noem, Lyons, and Santacruz Jr. |
| Count Six: Violation of 8 U.S.C. § 1362—Access to Counsel | Access/Detention Plaintiffs | Noem, Lyons, and Santacruz Jr. |
| Count Seven: Violation of Fifth Amendment—Conditions of Confinement | Access/Detention Plaintiffs | Noem, Lyons, and Santacruz Jr. |
| Count Eight: Violation of Fifth Amendment—Due Process | Perdomo, Osorto, and Villegas Molina | Noem, Lyons, and Santacruz Jr. |

*See* Plaintiffs' 1AC. Plaintiffs seek declaratory and injunctive relief, as well as fees and costs. *Id.* at 64–65.

On July 8, 2025, the original Intervenors[1] filed a Motion to Intervene in this matter. Dkt. No. 61. On July 29, 2025, this Court granted that motion.[2] Dkt. No. 129 ("Intervention Order"). There, it

---

[1] These are the City of Los Angeles, the County of Los Angeles, the City of Culver City, the City of Montebello, the City of Monterey Park, the City of Pasadena, the City of Pico Rivera, the City of Santa Monica, and the City of West Hollywood. Dkt. No. 130 at 2.

[2] Although the Defendants assert that this Court "permitted Intervention[] without [Defendants] being able to oppose their intervention," Motion at 1, this is inaccurate. Defendants had the same opportunity of every other party to oppose a duly filed Motion. As the Defendants themselves acknowledge, they failed to file an opposition on time, despite having the *ability* to do so. *See* Dkt. No. 136 (noting "the government's mistake regarding the deadline for opposition").

The Court notes another mischaracterization by the Defendants in their motion—their statement that Justice Kavanaugh "*held* that the Government demonstrated a strong prospect of reversal of this Court's TRO." Motion at 3 (emphasis added). Justice Kavanaugh's concurring opinion was not a holding of the Supreme Court and this Court is unaware that an individual Supreme Court justice can have her own holding. At the hearing, Defendants confirmed that they understand the concurring opinion to be persuasive, not binding, authority.

found that the original Intervenors had established that they could, pursuant to Rule 24, intervene as of right. *Id.* at 3.

Also on July 29, 2025, the original Intervenors filed their Complaint in Intervention. Dkt. No. 130. On August 8, 2025, they filed the operative Intervenors' First Amended Complaint, which added the rest of the Intervenors. *See* Intervenors' 1AC. The Intervenors, at that time, moved this Court for leave to file the First Amended Complaint. Dkt. No. 142. On September 19, 2025, this Court granted that motion. Dkt. No. 202.

Intervenors' 1AC alleges the following claims against all Defendants:

| Claim | Plaintiff(s) |
|---|---|
| Count One: Violation of Fourth Amendment: Detention Stops Without Reasonable Suspicion | Intervenors and Stop/Arrest Plaintiffs |
| Count Two: Violation of 8 U.S.C. § 1357(a)(2)—Warrantless Arrests Without Probable Cause of Flight Risk | Intervenors and LAWCN, UFW, and CHIRLA |
| Count Three: Violation of 8 C.F.R. § (c)(2)(ii)—Standards for Stops and Warrantless Arrests | Intervenors and LAWCN, UFW, and CHIRLA |
| Count Four: Violation of 8 C.F.R. § 287.8(c)(2)(iii)—Failure to Identify Authority and Reason for Arrest | Intervenors and LAWCN, UFW, and CHIRLA |
| Count Five: Administrative Procedure Act—Agency Action Exceeding Statutory Authority | Intervenors |
| Count Six: Administrative Procedure Act—Agency Action Contrary to Constitutional Right, Power, Privilege, or Immunity | Intervenors |

| Count Seven: Administrative Procedure Act—Arbitrary and Capricious Action | Intervenors |
| --- | --- |
| Count Eight: Tenth Amendment | Intervenors |

*See* Intervenors' 1AC. Intervenors' claims generally cover two sets of facts. Counts One through Four allege claims stemming from the practice of unlawful immigration stops and arrests ("Unlawful Stops Claims"). *Id.* ¶¶ 218–33. Counts Five through Eight allege claims stemming from Defendants' courthouse arrests ("Courthouse Arrests Claims"). *Id.* ¶¶ 234–60.

On October 29, 2025, Defendants filed the instant Motion to Dismiss Intervenors' First Amended Complaint. Dkt. No. 236 ("Motion"). On November 12, 2025, Intervenors filed their Opposition. Dkt. No. 254 ("Opp."). On November 19, 2025, Defendants filed their Reply. Dkt. No. 265 ("Reply").

This Court held a hearing on the Motion on January 15, 2026.

### III.    Applicable Law

#### A.  Rule 12(b)(1)

A court must have subject matter jurisdiction to resolve a claim. Fed. R. Civ. P. 12(b)(1). A plaintiff's standing under Article III is a necessary component of subject matter jurisdiction. *Chandler v. State Farm Mut. Auto. Ins.*, 598 F.3d 1115, 1121 (9th Cir. 2010); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 417 (2021). "Because standing is 'an indispensable part of the plaintiff's case,' it 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.'" *Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

For a plaintiff to show they have Article III standing, they must demonstrate that (1) they have suffered an injury in fact that is (a) concrete and particularized, (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the

defendant; and (3) it is likely, as opposed to merely speculative, that the plaintiff's injury will be redressed by a favorable decision. *Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). A plaintiff "must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion*, 594 U.S. at 431. "[A] person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." *Id.* at 435. But, when "there is no finding that [a plaintiff] face[s] a real and immediate threat" of recurring harm, the plaintiff lacks standing to seek injunctive relief." *City of Los Angeles v. Lyons*, 461 U.S. 95, 110 (1983).

"For all relief sought, there must be a litigant with standing, whether that litigant joins the lawsuit as a plaintiff, a coplaintiff, or an intervenor of right." *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017). So, when an intervenor of right seeks relief not requested by a plaintiff, the intervenor must have Article III standing. *Id.* at 435, 439. "[A]n intervenor whose claims arise under a different legal theory 'seeks different relief.'" *Washington v. U.S. Food & Drug Admin.*, 108 F.4th 1163, 1173 (9th Cir. 2024) (quoting *Chester*, 581 U.S. at 439). By contrast, "intervenors that seek the same relief sought by at least one existing party . . . need not [establish independent Article III standing]." *Cal. Dep't of Toxic Substances Control v. Jim Dobbas, Inc.*, 54 F.4th 1078, 1085 (9th Cir. 2022).

### B. Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) allows a party to seek to dismiss a complaint for "failure to state a claim upon which relief can be granted." "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for

the misconduct alleged." *Id.*  Labels, conclusions, and "formulaic recitation of a cause of action's elements" are insufficient.  *Twombly*, 550 U.S. at 545.

The determination of whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.  Generally, a court must accept the factual allegations in the pleadings as true and view them in the light most favorable to the plaintiff.  *Soo Park v. Thompson*, 851 F.3d 910, 918 (9th Cir. 2017); *Lee*, 250 F.3d at 679.  But a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

Leave to amend a dismissed complaint should be freely granted unless it is clear the complaint could not be saved by any amendment. Fed. R. Civ. P. 15(a); *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

/ / /

## IV.    <u>Discussion</u>

Defendants move to dismiss the 1AC on four grounds. First, under Rule 12(b)(1), they argue Intervenors lack standing to seek prospective relief. Motion at 5. Second, under Rule 12(b)(6), they argue Intervenors have not stated a Fourth Amendment claim, both because Intervenors improperly seek to sue the United States as parens patriae and because Intervenors cannot show a past or future Fourth Amendment violation. *Id.* at 10–11. Third, under Rule 12(b)(6), they argue Intervenors' APA claims must all fail because they have not identified any discrete actions subject to judicial review. *Id.* at 15. Fourth, under Rule 12(b)(6), they argue that federal preemption forecloses Intervenors' Tenth Amendment claim. *Id.* at 16.

For the reasons below, the Motion is denied.

### A.  Intervenors have sufficiently established Article III standing.

Defendants first argue that Intervenors lack Article III standing as to all of their claims, including Intervenors' Fourth Amendment claim. They argue that Intervenors fail to establish injury

in fact, causation, or redressability. Motion at 6–9. In Opposition, Intervenors argue that they need not establish independent Article III standing for the Fourth Amendment claim, and that they have sufficiently alleged independent standing to the extent that Intervenors' unique claims require it. Opp. at 4–5. In Reply, Defendants respond that Intervenors are impermissibly attempting to vicariously assert their residents' personal Fourth Amendment rights. Reply at 1–6.

This Court first defines the scope of the claims for which Intervenors need to demonstrate standing, then evaluates whether they have done so.

1.  Intervenors need not establish Article III standing for claims properly brought by Plaintiffs.

The parties disagree as to how much standing Intervenors need to establish. Intervenors argue that, because they are joining Plaintiffs' Unlawful Stops Claims, they need not establish standing to bring those claims. Opp. at 4. They argue that this is because intervenors who seek the same relief sought by at least one existing party to the case need not separately show Article III standing. *Id.* (citing *Cal. Dep't of Toxic Substance Control*, 54 F.4th at 1085). Defendants respond that Intervenors' argument "turns a foundational principle of standing on its head," Reply at 1, as it contradicts the general rule that parties "must demonstrate standing for each claim [they] seek[] to press and for each form of relief that is sought." *Chester*, 581 U.S. at 439. For the reasons below, the Court finds that Intervenors need not show standing for claims identical to Plaintiffs. But even if they did, as explained in Section III.B, *infra*, Intervenors have shown they have standing.

Plaintiffs' 1AC and Intervenors' 1AC, as to their respective first four claims, are identical. They state the same four legal theories of recovery: (1) violations of the Fourth Amendment, (2) violations of 8 U.S.C. § 1357(a)(2), (3) violations of 8 C.F.R. § 287.8(c)(ii), and (4) violations of 8 C.F.R. § 287.8(c)(2)(iii). *Compare* Intervenors' 1AC at 57–61 *with* Plaintiffs' 1AC at 58–61. And

Intervenors do not appear to seek any relief under these four claims that Plaintiffs do not seek.[3] To that end, on the first four claims, Intervenors' claims and sought relief mirror those of Plaintiffs.

Because Intervenors' first four claims seek no relief beyond that sought by the Plaintiffs, this Court finds that Intervenors need not independently demonstrate standing to maintain them. "For all relief sought, there must be *a litigant* with standing, whether that litigant joins the lawsuit as a plaintiff, a coplaintiff, or an intervenor of right." *Id.* (emphasis added). The Supreme Court in *Chester* established that an intervenor need only show standing to the extent that they "wish[] to pursue relief not requested by a plaintiff." *Id.* at 435. This is also consistent with this Court's prior finding on the same question. *See* Intervention Order at 3 (noting that Intervenors must have constitutional standing where their claims, or sought forms of relief, do not overlap with Plaintiffs').

Defendants' arguments to the contrary are unavailing. Defendants note that "[p]arties 'must demonstrate standing for each claim [they] seek [] to press and for each form of relief that is sought." Reply at 1 (quoting *Chester*, 581 U.S. at 439). But the quote in its fuller context undercuts Defendants' argument. The *Chester* Court stated:

> Our standing decisions make clear that standing is not dispensed in gross. To the contrary, a *plaintiff* must demonstrate standing for each claim he seeks to press and for each form of relief that is sought. The same principle applies when there are multiple plaintiffs. At least one plaintiff must have standing to seek each form of relief requested in the complaint. . . .
>
> The same principle applies to intervenors of right. Although the context is different, the rule is the same: For all relief sought, there must be a litigant with standing, whether that litigant joins the lawsuit as a plaintiff, a coplaintiff, or an intervenor of right. Thus, at the least, an intervenor of right must demonstrate Article III standing when it seeks additional relief beyond that which the plaintiff requests.

---

[3] Intervenors do seek some forms of relief that Plaintiffs do not. For example, Intervenors seek declaratory relief that Defendants' courthouse arrests policy is unconstitutional. Intervenors' 1AC at 65. But none of those forms of relief appear to relate to Intervenors' and Plaintiffs' shared first four claims. Instead, this Court understands that this is relief sought in connection with Intervenors' sixth, seventh, and eighth causes of action. *Id.* ¶¶ 246–60.

581 U.S. at 439 (citations, footnotes, and internal quotation marks omitted) (emphasis added). In context, *Chester* noted that it is not all parties, as Defendants suggest, who must demonstrate standing for each claim they support. Instead, a *plaintiff* who seeks to bring a claim must demonstrate Article III standing to do so. And, given that the plaintiff has standing, an intervenor of right need not demonstrate independent standing to joint in plaintiff's relief sought. Defendants' reliance on *Lujan* is similarly unpersuasive. They quote *Lujan* for the proposition that, because "[t]he party invoking federal jurisdiction bears the burden of establishing [standing] elements" as "an indispensable part of the plaintiff's case." 504 U.S. at 561. But none of this suggests that Intervenors—as parties *joining* an existing claim—bear this burden independently from Plaintiffs.

For these reasons, the standing Intervenors must establish pertains specifically to Counts Five, Six, Seven, and Eight, as these theories of relief are distinct from Plaintiffs' causes of action.

> 2. <u>Intervenors have sufficiently alleged they have the required Article III standing.</u>

At issue next is whether Intervenors have sufficiently shown standing to bring their four separate causes of action. For the reasons below, this Court finds that they have done so.

> i. *Intervenors have alleged an injury in fact.*

First, Intervenors have sufficiently demonstrated an injury in fact. Intervenors, as discussed above, all allege that they have suffered a tangible harm in connection with Intervenors' actions as alleged in Counts Five through Eight. The Ninth Circuit has, at least twice, endorsed the view that "[a]n expected loss of tax revenue can constitute a sufficient injury for purposes of Article III standing." *City of Oakland v. Lynch*, 798 F.3d 1159, 1164 (9th Cir. 2015); *see also City of Sausalito v. O'Neill*, 386 F.3d 1186, 1194–99 (9th Cir. 2004) (affirming an asserted harm of increased congestion, crime, and lost tax revenue as "cognizable as both an aesthetic injury and . . . an economic injury"). Such injuries confer standing when the losses are "not an 'indirect' effect on state

spending that relies on a chain of causation with multiple links, or assumptions about the effects of [other causal links], or the unpredictable actions of third parties." *Washington*, 145 F.4th at 1023.

The injuries as alleged are "concrete and particularized." *Friends of the Earth*, 528 U.S. at 180–81. In *Washington*, states sought to challenge an Executive Order that would deny citizenship to children born in the United States to parents who were unlawfully present. 145 F.4th at 1019. The Court found that the harm was sufficiently concrete where state plaintiffs showed "that the loss of reimbursements, funding, and additional expenses incurred by the development of a new system to determine eligibility" for state-run programs such as Medicaid. *Id.* at 1022–23. Applying the *Washington* and *Friends of the Earth* standards, Intervenors' injuries as alleged are concrete; Intervenors allege (and provide supporting evidence of) the resources they have used, in the form of "personnel hours and funds," due to Defendants' conduct. *See* Opp. at 6.

And the injuries as alleged are "actual or imminent." *Friends of the Earth*, 528 U.S. at 180–81. Intervenors detail at length the expenses that they have incurred in response to Defendants' actions threatening Intervenors' exercise of their police powers. Several of them have attached supporting declarations to this extent; one Intervenor, the City of Los Angeles, estimates substantial personnel labor days and additional costs. Opp. at 6. In response to Defendants' allegedly unlawful immigration raids, Los Angeles estimates that the LAPD has devoted tens of thousands of labor days, and incurred $27 million in additional costs. *Id.* (citing Dkt. No. 147-4 ¶ 5). These diversions of resources frustrate Intervenors' ability to respond to high-priority calls, including violent crimes and other emergencies, and carry out efforts in crime prevention and other public safety initiatives. *Id.* (citing Dkt. No. 147-21 ¶ 9).

Defendants dispute the idea that these allegations create a qualifying injury in fact. Motion at 6 (citing *Clapper*, 568 U.S. at 409–16). It is true that a claim for standing "can become more attenuated" when a state plaintiff asserts that federal policy has generated indirect effects on state revenues or state spending. *United States v. Texas*, 599 U.S. 670, 674 (2023). But Defendants do not

appear to question that Intervenors' allegations of harm—stemming from adverse impacts to their

tax revenues and frustration of law enforcement plans—*could* confer Article III standing. Instead,

Defendants challenge Intervenors' evidence on this theory, calling Intervenors' allegations of lost

tax revenue "speculative at best." Motion at 6. The Motion cites two of Intervenors' supporting

declarations as examples. *Id.* at 6–7. Once a defendant has contested the truth of a plaintiff's

jurisdictional allegations—including allegations of standing—the plaintiff bears the burden of

supporting their jurisdictional allegations with competent proof. *Bowen v. Energizer Holdings, Inc.*,

118 F.4th 1134, 1142 (9th Cir. 2024). Applying this rule to Intervenors, this Court finds that they

have sufficiently supported their jurisdictional allegations with competent proof. Defendants'

arguments challenging Intervenors' jurisdictional allegations are not persuasive, as Defendants do

not accurately characterize the dozens of declarations that Intervenors have filed in support of

standing, as discussed below. Moreover, even if their arguments *did* suffice, a finding of no Article

III standing would not necessarily follow: Intervenors only challenge the sufficiency of two of

Intervenors' declarations on standing. *See* Motion at 6–7. Intervenors have filed dozens. *See* Dkt.

No. 147 (collecting thirty-two declarations from Intervenors); *see also* Opp. at 5 ("Intervenors have

dozens of allegations—backed up by more than 75 fact declarations and news reports—detailing the

irreparable harm Defendants' illegal raids are currently inflicting on Intervenors[] . . . ."); Reply at 5

(acknowledging Intervenors' "flood of declarations"). And, though Intervenors generally call the

declarations into question as "self-serving" and "speculative," *see* Reply at 6, they present no

evidence of their own to dispute that of Intervenors.[4] To that end, Defendants' challenge to standing

only calls into question a small subset of Intervenors' supporting evidence, does so insufficiently,

---

[4] Defendants do provide this Court with extrinsic evidence that purports to challenge Intervenors' showing of causation. This Court addresses that evidence in the following section.

1    and does not actually refute Intervenors' substantial evidence on injury in fact. So Defendants'

2    challenge fails.

3        Defendants also argue, relying upon *Clapper*, that this Court should not allow Intervenors to

4    "manufacture a concrete, imminent injury to themselves." Motion at 6 (citing 568 U.S. at 409–16).

5    They argue that Intervenors' alleged harms amount to "voluntary expenditure of municipal funds in

6    furtherance of their sanctuary city policies." Motion at 7; Reply at 3. This argument fails for several

7    reasons.

8

9        First, it fails to account for the Intervenors' 1AC's allegations that the "loss of tax revenue"

10   and "threats to core police powers," Intervention Order at 3, have arisen despite no action by

11   Intervenors. Put another way, Defendants suggest without evidence that Intervenors *chose* to

12   experience decreases in their tax revenue, or that they elected to face the threats to their police

13   powers—by planning protest actions, decreasing public trust, and increasing suspicion that local law

14   enforcement may be working in tandem with ICE. Defendants, however, offer no argument as to

15   *how* Intervenors can fairly be deemed to have opted into the downstream effects of Defendants' own

16   actions.

17

18       Second, Defendants' theory largely tracks one that the defendants argued—and the Ninth

19   Circuit rejected—in *Washington v. Trump*. There, the Court found that defendants claimed that they

20   would suffer economically from an executive action by losing reimbursements and incurring

21   additional expenses. *Id.* at 1024. Defendants argued that "any economic losses would be self-

22   inflicted, because the State need not provide social services to an individual who is ineligible under

23   the federal program unless they so choose." *Id.* (internal quotation marks omitted). But the Ninth

24   Circuit found that "it was not a voluntary choice by the States . . . to assume the costs that follow"

25   from the executive action. *Id.* To that end, a municipality's undertaking of costs stemming from

26   executive action are not self-inflicted injuries. And *Washington* is plainly more instructive than

27

28

Defendants' nonbinding authority. Motion at 7 (citing *Int'l Primate Prot. League v. Inst. for Behav. Rsch., Inc.*, 799 F.2d 934 (4th Cir. 1986)). There, the Court held that the plaintiffs—individuals and organizations, not municipalities—voluntarily contributed to the maintenance of animals only after the contested conduct, which did not confer a stake in the litigation sufficient to confer standing. *Int'l Primate Prot. League*, 799 F.2d at 938.

Third, it is not clear from where Defendants' claims of Intervenors' "sanctuary city policies" arise.[5] But, in any event, the argument is not relevant to this Court's present Order, because it rests its finding of Article III standing on Intervenors' loss of tax revenue and police power frustration, not on any of Intervenors' responsive programs that, for example, offer legal support to immigrants. To that end, Defendants' citations on these purported "sanctuary city policies" are a red herring that do not bear on this Court's decision. *See* Motion at 7.

This Court is, therefore, not persuaded that there is anything self-inflicted or manufactured about Intervenors' relevant injuries.

Moreover, Defendants mischaracterize Intervenors' supporting declarations. The first they reference is the Declaration of Matthew Crawford. Dkt. No. 147-3 ("Crawford Decl."). They say that it "elucidates the speculative nature of Intervenors['] alleged injury: his office 'may see a decrease' in tax collection but is 'unable to make this determination with any semblance of it being a likely outcome.'" Motion at 6 (quoting Crawford Decl. ¶ 10). But that is not what the declaration states.

---

[5] Based on Defendants' arguments at the hearing, this Court understands their arguments regarding Intervenors' "sanctuary city policies" to be bipartite. First, Defendants appear to argue that, because Intervenors have enacted sanctuary city policies, they have offered an incentive to undocumented immigrants to move to their communities—such that Intervenors cannot challenge the Government's efforts to enforce immigration law. But, even if this were true, this argument misses the mark. As this Court has already explained, Intervenors and Plaintiffs do not challenge immigration enforcement broadly; they challenge *allegedly unlawful conduct* within immigration enforcement. Second, Defendants appear to argue that the Intervenors, as cities pursuing "sanctuary city" status, are self-inflicting monetary harm in response to Defendants' enforcement activities. But, as this Court has discussed, it does not rest its finding of standing on the voluntary programs that Intervenors allege they have initiated.

Instead, it offers evidence that in June and July of 2025, one tax that the City of Los Angeles collects—the Transient Occupancy Tax—*did* measurably decrease. *Id.* ¶¶ 7–9. And, in the paragraph Defendants quote, Crawford states:

> While the Office of Finance may see a decrease in Business Tax and Sales Tax collection during this same period, due to the structure and timing of those taxes, the City is unable to make this determination at the time of the preparation of this declaration. As noted earlier, Sales Tax is remitted to the City roughly three months in arrears[]. Similarly, because the City's Business Tax is due each year on the last day of February, the Office of Finance does not know a business's gross receipts for the previous year until a business submits their filing.

*Id.* ¶ 10. In other words, the City of Los Angeles *has* offered evidence that their tax revenue has decreased as Defendants' immigration enforcement has allegedly occurred—it just cannot currently establish that *all forms* of its tax revenue have decreased. And Defendants do nothing to call into question the City of Los Angeles's four other concurrently filed declarations, all offering some evidence of the harm that Los Angeles has suffered due to Defendants' actions. *See* Dkt. No. 147-1; Dkt. No. 147-2; Dkt. No. 147-4; Dkt. No. 147-5; Dkt. No. 147-6.

The second declaration to which Defendants cite is the Declaration of Steve Carmona, City Manager for the City of Pico Rivera. Dkt. No. 147-22 ("Carmona Decl."). Defendants state that this "similarly makes speculative allegations of declining sales and tax revenues." Motion at 6–7 (citing Carmona Decl.). But the declaration does not convey uncertainty about the harm that Pico Rivera has suffered due to Defendants. Instead, it states: Defendants' immigration enforcement has resulted in "injury to the operations of [Pico Rivera's] police department, management of its community programs, and production of its tax revenue." Carmona Decl. ¶ 13. And it explains: "Pico Rivera depends on local taxes to fund its municipal operations. Federal immigration enforcement has harmed and produced chilling effects on Pico Rivera businesses, causing declines in businesses' sales revenue and a corresponding decrease in Pico Rivera's tax revenue." *Id.* ¶ 15. This suffices as competent evidence in support of Intervenor Pico Rivera's concrete harm. And Defendants cite no authority for the idea that, to demonstrate standing at this stage, the city would need to give concrete

amounts of tax revenue that they have lost due to Defendants' actions. *See* Motion at 7 (citing no authority for the proposition that a concrete, particularized injury must be evidenced by "concrete numbers" at the motion to dismiss stage). Moreover, even if this Court were to accept Defendants' arguments on both declarations, they would do little to show that all other Intervenors similarly lack standing.

Moreover, this Court has already considered this question and found that Intervenors' pleadings sufficiently demonstrated injury in fact.[6] Intervention Order at 3 ("[T]he court finds that the Proposed Intervenors have sufficiently alleged such injury [in fact] due to loss of tax revenue, threats to core police powers, or both."). Defendants argue that this Court should decide differently, noting that this Court's earlier determination of standing is not necessarily binding law of the case. Reply at 2. This Court agrees that it is not bound to follow its earlier determination, given courts' continuing duty to ascertain subject-matter jurisdiction exists throughout the controversy. *Ctr. for Biological Diversity*, 894 F.3d at 1011. Defendants do not, however, offer compelling justifications as to why this Court should adopt their view.

In sum, relying on *Lynch* and *O'Neill*—and noting that Defendants' argument that is not responsive to Intervenors' 1AC, their Opposition, or this Court's prior ruling—this Court remains satisfied that Intervenors have sufficiently alleged they suffered an injury in fact.

ii.    *Intervenors have alleged causation.*

Intervenors have sufficiently alleged a causal link between Defendants' actions and the harm Intervenors are suffering.

---

[6] Defendants do not argue that a different standard of proof applies to Article III standing on a motion to intervene and on a motion to dismiss. This Court, in the Intervention Order and now, focused on the allegations in the operative Complaint and construed them as true.

As Intervenors note, causation is established at the standing stage when the defendants' unlawful conduct is "at least a substantial factor motivating the third parties' actions." *Mendia v. Garcia*, 786 F.3d 1009, 1013 (9th Cir. 2004). As the *Lujan* Court explained:

> When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred . . . in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it. When, however, as in this case, a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, much more is needed. In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well. The existence of one or more of the essential elements of standing depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict, and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury.

504 U.S. at 561–62 (citations and internal quotation marks omitted). The Court ultimately concluded that the plaintiffs in *Lujan* could not establish redressability: The sought resolution would not bind the nonparty agencies, who were more directly responsible for the plaintiffs' injury in fact, and who had the power to take action that would remedy respondents' alleged harm. *Id.* at 569–70. So "any relief the District Court could have provided . . . was not likely to produce that action." *Id.* at 571.

Not so here. Though Intervenors' alleged harm stems from enforcement actions taken against third parties—not themselves—standing is not precluded when "the plaintiff is not himself the object of the government action" he challenges. *Id.* at 562. But it appears likely, and not overly attenuated, that the sought relief would redress Intervenors' harms. The connection between Intervenors' alleged harm and Intervenors' sought injunctive relief is apparent.

To that end, Intervenors sufficiently allege causation relating to the Courthouse Arrests Claims. Intervenors allege harm based on the "daily onslaught of armed, unidentified, often masked, and openly hostile forces appearing at workplaces, schools, courthouses, churches, parks, homes, baseball games, neighborhoods, and other public and private places where families and other

1    residents live, work, worship and recreate." Intervenors' 1AC ¶ 6. "This has left many of

2    Intervenors' residents, regardless of immigration status, frightened to go to work, shop, visit,

3    recreate, pray, study, seek Intervenors services, or even venture outside." *Id.* As alleged, Defendants'

4    enforcement actions have caused that fear. *Id.* ¶¶ 6–7. In particular, Intervenors allege that

5    Defendants' practice is to seize Intervenors' residents while they are in courthouses and while they

6    travel into (or out of) courthouses. *Id.* ¶ 209. This practice, Intervenors state, is contrary to federal

7    and state law. *Id.* ¶¶ 207–08.

8

9          Taking Intervenors' allegations as true, Defendants' courthouse arrest policy causes

10    Intervenors harm. *Id.* ¶ 252. They have struggled to prosecute cases because Defendants are

11    unlawfully[7] using county courthouses as "staging grounds for federal immigration enforcement." *Id.*

12    ¶¶ 12, 209. As a result, undocumented immigrant witnesses are afraid to appear in county

13    courthouses. *Id.* Victims of crimes have also declined to come to court or cooperate with law

14    enforcement, citing fears stemming from Defendants' actions. *Id.* ¶¶ 27, 201. In response,

15    Intervenors seek declaratory judgment that Defendants' actions are unlawful, and an injunction

16    preventing Defendants from "civilly arresting parties, witnesses, and any other individual coming to,

17    attending, or returning from state courthouses or court-related proceedings." *Id.* at 65.

18

19          Nor do Defendants appear to contest the core factual allegations grounding the Courthouse

20    Arrests Claims. Instead, they state that they have a "duty to enforce immigration law in the Central

21    District of California—including courthouses among other locations." Motion at 16. But, crucially,

22    Defendants do not contest that their policy of conducting arrests in and around courthouses ensues in

23    harm to Intervenors.

24

25

26

27    _____

28    [7] Defendants do not dispute that their conduct violates California law. Motion at 17. They do not address Intervenors'
      argument that their conduct also violates federal law.

This Court has explained, before this Order and again now, that Intervenors' allegations sufficiently state that they suffer a cognizable injury from loss of tax revenue and/or threats to core police powers. Intervention Order at 3; *see also* Section II.A.2, *supra*. Though Intervenors themselves are not the targets of the challenged government actions, this Court is satisfied that there is a clear causal link between Defendants' actions as alleged, Intervenors' residents' reaction, and Intervenors' harm. Intervenors' 1AC makes allegations that establish that causal link. To put it plainly, (1) Defendants are conducting unlawful courthouse arrests, so (2) Intervenors' residents are not willing to appear in courthouses, so (3) Intervenors' own efforts to enforce laws and secure justice are frustrated. This causal chain has been sufficiently pleaded at every step. So this Court finds that this standing requirement is met.

Defendants' arguments against causation miss the mark. They note that "Intervenors fail[ed] to consider" other relevant factors that might have influenced their decrease in business or tax revenue. Motion at 9. Defendants cite declining tourism, increasing natural disasters, a rising cost of living, and inflation as alternate reasons that business and tax revenues may be lower than expected. *Id.* And Defendants cite a series of news articles to propose that alternate causes may explain Intervenors' alleged loss of tax revenue. *See* Motion at 9 nn.4–6. Though they correctly note that this Court may consider extrinsic material on a Rule 12(b)(1) challenge, their evidence does not challenge the existence of a causal link between Intervenors' harm and Defendants' actions; it merely suggests that other causes may also have contributed. It may well be true that these other causes have, in fact, contributed to Intervenors' decline in tax revenue. But none of these theories of economic downturn negate the fact that Intervenors' 1AC—taking all relevant allegations as true— sufficiently states and explains a causal link between Defendants' actions and Intervenors' harm. As it need not be the only causal link to be a substantial one, Defendants' arguments lack support.

Nor do Defendants cite cases in support of the proposition that, at the motion to dismiss stage, this Court should find a lack of standing merely because Defendants can point to other

possible contributors to Intervenors' harm. On Reply, Defendants argue that the existence of alternate causes defeat causation because "[a]ny of these intervening factors could disrupt Intervenors' unrealistic causal narrative." Reply at 5. But Defendants offer no evidence that what they term "intervening factors" are not merely other factors working alongside the harm that Defendants have caused Intervenors. And the authority they cite on this point, *Food & Drug Admin v. All. for Hippocratic Med.*, 602 U.S. 367 (2024), is consistent with this Court's ruling. As this Court has explained, Intervenors have pleaded (and offered support) for every causal link in their theory, and Defendants' arguments do not create "speculative links" where it is not sufficiently predictable how third parties would react to government action or cause Intervenors downstream injury. *Id.* at 383. At most, Defendants have suggested other causes that, together with their alleged conduct, caused Intervenors harm. None of this warrants dismissal.

Moreover, Intervenors' supporting declarations (which Defendants do not address on causation) *do* substantiate the link between Defendants' actions and Intervenors' harm. *See, e.g.*, Dkt. No. 147-4 ¶¶ 7–8 (LAPD Deputy Chief stating that victims of crimes have reported fear of coming to court or cooperating with law enforcement due to concerns about federal immigration enforcement); Dkt. No. 147-6 ¶ 4 (noting City of Los Angeles public spaces "experiencing heavy ICE activity have been visibly less utilized"); Dkt. No. 147-8 ¶¶ 10–11 (noting County of Los Angeles residents' fears of going to work because of the ongoing immigration raids, resulting in losses of income and decreased economic participation); Dkt. No. 147-12 ¶¶ 9–16 (detailing increases in hostility and decreases in cooperation facing employees of County of Los Angeles Department of Children and Family Services). So, to the extent that Intervenors must rebut a factual Rule 12(b)(1) attack with competent evidence, this Court finds that they have done so.

Intervenors, therefore, have sufficiently pleaded causation.

        iii.    *Intervenors have alleged redressability.*

Intervenors have sufficiently alleged that the relief they seek will redress their injuries. For an injury to be redressable, it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561. For similar reasons that this Court finds causation, applying the *Lujan* framework, redressability has been established.

The injunction request surrounding the Courthouse Arrests Claims would likely redress Intervenors' harm. It appears likely that enjoining Defendants from conducting allegedly unlawful arrests in and near courthouses would reduce individuals' fear of participating in court proceedings. This, in turn, would help alleviate the harm that Intervenors face in the frustration of their local law enforcement efforts. Though it is not clear that this would wholly alleviate Intervenors' alleged harms, that is not the standard: "[T]he ability 'to effectuate a partial remedy' satisfies the redressability requirement." *Uzuegbunam v. Preczewski*, 592 U.S. 279, 292 (2021) (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13 (1992)).

\* \* \*

In sum, Intervenors allege injuries that are concrete, traceable, and redressable. To that end, on their pleadings, and as to all claims, Intervenors have standing.

### B. Intervenors have sufficiently stated their Fourth Amendment claim.

Defendants next argue that, even if this Court finds that Intervenors have the requisite standing under Article III, Intervenors' Fourth Amendment claim still fails for two reasons. First, they argue that claim is impermissible, as local municipalities and counties may not sue the United States as parens patriae. Motion at 10. Second, they argue that Intervenors' Fourth Amendment claim impermissibly attempts to enforce individual Fourth Amendment rights vicariously.

The Supreme Court has long "recognized the legitimacy of Parens patriae suits." *Pennsylvania v. New Jersey*, 426 U.S. 660, 675 (1976). A suit brought parens patriae allows the plaintiff to pursue certain claims based on their citizens' harm. *Id.* A parens patriae plaintiff must "articulate an interest apart from the interest of particular private parties." *Missouri ex rel. Koster v.*

*Harris*, 847 F.3d 646, 651 (9th Cir. 2017). And it requires the plaintiff to "express a quasi-sovereign interest." *Id.* But municipal subdivisions, "such as cities and counties," cannot sue as parents patriae. *City of Rohnert Park v. Harris*, 601 F.2d 1040, 1044 (9th Cir. 1979) (quoting *In re Multidistrict Vehicle Air Pollution*, 481 F.2d 122, 130 (9th Cir. 1973)).

Intervenors' 1AC and the Opposition, however, make clear that Defendants do not intend to join in the Fourth Amendment claim merely to vindicate the rights of Intervenors' residents' constitutional rights. Just as in *Washington v. Trump*, Intervenors "are not asserting standing based on the rights of their citizens; instead, they assert injuries to their own pocketbooks" based on Defendants' actions. 145 F.4th at 1024. To that end, Intervenors are suing to vindicate their own property interests; as Intervenors have alleged, Defendants' encroachment upon some individuals' Fourth Amendment claims causes independent injury to Intervenors. This is because Defendants' enforcement actions are causing Intervenors to experience reduced tax revenue, increased necessary expending of resources into addressing Defendants' raids' aftermath, and individual hardships in advocating for the public health and community within their respective municipalities. To that end, this Court does not find compelling authority to term this an impermissible parens patriae suit, so Defendants' argument is unavailing.

Second, Defendants argue that Intervenors cannot state their Fourth Amendment claim because it is an impermissible attempt to vicariously enforce individuals' Fourth Amendment rights. In support of this proposition, Defendants cite three cases: *Lyons*, *Alderman v. United States*, and *Rakas v. Illinois*. Motion at 5 (first citing *Lyons*, 461 U.S. at 101–11; then citing *Alderman v. United States*, 394 U.S. 165, 174 (1969); and then citing *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978)). But these authorities do not establish that intervention in Plaintiffs' valid Fourth Amendment claim[8]

---

[8] This Court has already denied Defendants' Motion to Dismiss Plaintiffs' 1AC. *See* Dkt. No. _____. Defendants' motion, inter alia, attacked the 1AC's ability to state the Fourth Amendment claim. *See id.* at 27–29.

is improper. First, the citation to *Lyons* is of unclear relevance: *Lyons* discusses neither intervention nor the vicarious assertion of Fourth Amendment claims. 461 U.S. at 101–11. As for *Alderman* and *Rakas*, neither case appears to weigh on whether intervention is appropriate here. *Alderman* and *Rakas* were criminal matters, where the Court considered—and rejected—the theory that a *criminal defendant* can "assert that a violation of the Fourth Amendment rights of a third party entitled him to have evidence suppressed at his trial." *Rakas*, 439 U.S. at 132–33. In effect, *Alderman* and *Rakas* clarified that a criminal defendant may not raise a Fourth Amendment challenge to the unlawful search of a third party's property. But the criminal defendant–third party relationship plainly differs from the one between a civil plaintiff and an intervenor. Moreover, as Intervenors note, their suit does not merely intend to volunteer to vindicate their residents' individual rights; Intervenors have sufficiently alleged that Defendants' actions that violated the Fourth Amendment independently caused Intervenors harm. Intervenors, in short, "are not asserting standing based on the rights of their citizens; instead, they assert injuries to their own pocketbooks that will be caused by enforcement of the Executive Order." *Washington*, 145 F.4th at 1024.

To that end, this Court reads none of these authorities to suggest that a municipality's intervention in Fourth Amendment cases, where it alleges independent qualifying harms, is impermissible. The Motion on this basis is therefore denied.

### C. Intervenors' APA claims are sufficiently stated.

This Court next turns to Counts Five, Six, and Seven, which allege violations of the APA. Defendants argue that these claims must fail because Intervenors have failed to "identify any discrete agency action, including any individual stops or arrests, subject to judicial review." Motion at 15. Citing *Lujan* and *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004), Defendants argue that Intervenors' APA claims challenging Defendants' courthouse arrests policy impermissibly seek to mount a "programmatic challenge to how immigration enforcement operations have been carried out in the Central District of California." *Id.* at 15–16; *see also* Reply at 7. Intervenors

1    respond that their claims target "a series of concrete, unlawful actions that fall squarely within the

2    scope of APA review." Opp. at 16.

3        The APA permits a range of challenges to agency action. Under the APA, courts may

4    "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

5    Separately, courts may "hold unlawful and set aside agency action, findings, and conclusions" when

6    they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *Id.* §

7    706(2)(A), "contrary to constitutional right, power, privilege, or immunity," *id.* § 706(2)(B), or "in

8

9    excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C).

10   To prevail on an APA claim, the plaintiff "must direct its attack against some particular 'agency

11   action' that causes it harm." *Lujan*, 497 U.S. at 891. "Thus, a claim under § 706(1) can proceed only

12   where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to

13   take." *Norton v. S. Utah Wilderness All.*, 542 U.S. at 64.

14       But Intervenors here *have* directed a challenge to a discrete set of agency actions—the

15   allegedly sanctioned practice of arresting individuals in, entering, or exiting courthouse proceedings.

16   This is not, unlike *Norton*, an instance where the challenged conduct falls within the ambit of agency

17   discretion. Defendants suggest that this practice[9] is simply a "decision committed to agency

18   discretion and thus not reviewable." Motion at 15. They suggest their practice is downstream of

19   immigration officers' decisions to "interrogate any alien or person believed to be an alien as to his

20   right to be or remain in the United States." *Id.* (citing 8 U.S.C. § 1357(a)). But the fact that

21

22   Defendants may conduct such interrogations does not mean that Congress granted the relevant

23   agencies the discretion conduct these interrogations *in any location of their choosing*, or to detain

24

25

26

27   _____

28   [9] Defendants' suggestion that no final agency action exists because no official courthouse arrest policy document exists, *see* Reply at 17, is unavailing. The Court has already explained that allegations of a pattern of conduct are sufficient evidence even absent an explicit agency directive. *See* TRO Order at 45 n. 33. And a policy "need not be written, or even made known to the public, to be judicially reviewable." *Washington v. U.S. Dep't of Homeland Sec.*, 614 F. Supp. 3d 863, 872 (W.D. Wash. 2020) (collecting cases). Defendants cite no authority to the contrary.

them *at any time of their choosing*. Nowhere do Intervenors suggest that Defendants should be precluded from conducting stops; they merely challenge the policy of arresting individuals in the courthouse. Intervenors allege—and Defendants do not appear to dispute—that this practice violates both federal and state law. To find in Defendants' favor at this time would be tantamount to saying that Congress, without explicitly saying so, sanctioned unlawful conduct from the relevant agencies.

As such, Defendants have not established that the APA claims impermissibly launch programmatic challenges, or that they target actions within the ambit of Defendants' discretion. For that reason, the Motion on this basis is denied.

### D. Intervenors' Tenth Amendment claim is not preempted.

Finally, Defendants argue that, under Rule 12(b)(6), Intervenors' Tenth Amendment claim is insufficiently stated for two reasons. First, Defendants argue the claim fails because "federal law preempts state and municipal laws in the area of immigration enforcement." Motion at 16. Defendants note that the federal government enjoys "broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). They reason that Intervenors' Tenth Amendment claim would impermissibly empower Intervenors to "superimpose requirements upon the federal government or otherwise limit the government's discretion to enforce immigration law at a specific location." Motion at 16–17. Second, Defendants more generally attack the basis of the claim, noting that "Intervenors' broad and generalized declarations do not support their allegations that Defendants' actions are threatening their core police powers." *Id.* at 17. For the reasons below, this Court finds that the Tenth Amendment claim is sufficiently pleaded.

Defendants' first argument—that Intervenors' Tenth Amendment allegations are preempted by the federal power over immigration law—fails. Though Defendants accurately state that the federal government enjoys broad power over immigration enforcement, they do not demonstrate that this claim is preempted. Defendants correctly note, for example, that the Constitution authorizes

Congress to "establish a uniform Rule of Naturalization." U.S. Const. art. I § 8. Similarly, Defendants' citation to *Arizona v. United States* misses the mark; Intervenors do not dispute that the federal government has broad power over the subject of immigration. 567 U.S. at 394–95. But nothing about Intervenors' Tenth Amendment claim conflicts with Congress's power to pass laws about how individuals may be naturalized.

Defendants argue that obstacle preemption operates to foreclose the Tenth Amendment argument. Motion at 16. Obstacle preemption occurs "where, under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (citation modified). The question of what qualifies as a sufficient obstacle "is a matter of judgment, to be informed by reading the federal statute as a whole and identifying its purpose and intended effects." *Id.*; *see also Savage*, 225 U.S. at 533 ("If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress[.]"). *Crosby* and *Savage* both stand for the proposition that not every state law with any adverse impact on a federal law automatically counts as obstacle preemption. This is consistent with Intervenors' argument. As they note, "not all state law that 'makes the jobs of federal immigration authorities more difficult' triggers preemption." *United States v. California*, 921 F.3d 865, 886 (9th Cir. 2019); *see also Arizona v. United States*, 567 U.S. 387, 400 (2012) ("In preemption analysis, courts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947))). Applying this standard, Defendants' arguments fall short of establishing obstacle preemption. Fatal to Defendants' argument is that they do not cite a federal law that they claim would negate Intervenors' Tenth Amendment claim under obstacle preemption. Absent this, it is not clear what federal law would even arguably cabin Intervenors' claim. Both *Crosby* and *Savage*

explicitly instruct this Court that a necessary part of the preemption analysis is the weighing of the state law against the federal law. Absent any citation to federal law, Defendants' preemption attack on the Tenth Amendment claim lacks merit.

Moreover, Defendants' second argument—that Intervenors' declarations do not sufficiently support the allegation that Defendants' actions are threatening their core police powers—is premature. On a motion to dismiss under Rule 12(b)(6), this Court has already explained that it must take the 1AC's allegations as true. To that end, it would be improper and contrary to binding precedent to find that a claim was insufficiently alleged on this basis, even assuming Defendants did successfully show that the declarations do not support the claims.

In Reply, Defendants appear to suggest that they intended to factually attack the allegations in the Intervenors' 1AC. Reply at 5. But Defendants have not met the standard for a factual attack in a motion to dismiss. The "moving party" may convert a motion to dismiss into a factual attack, but to do so, it must "present[] affidavits or other evidence properly brought before the court." *Savage v. Glendale Union High Sch., Dist. No. 205*, 343 F.3d 1036, 1040 (9th Cir. 2003). So, to the extent that Defendants intend to factually attack Intervenors' allegations of the likelihood of ongoing and future harm, they must cite to facts that dispute the truth of the 1AC's allegations. And Defendants do not cite to declarations of their own that this Court can consider in testing the sufficiency of the 1AC's statements. Indeed, they acknowledge that Intervenors have offered a "flood" of over seventy-five fact declarations in support of their 1AC. Reply at 5.

/ / /

/ / /

/ / /

/ / /

/ / /

V.    **Conclusion**

For the foregoing reasons, the Motion is DENIED.

IT IS SO ORDERED.

Dated: February 18, 2026.



_____

MAAME EWUSI-MENSAH FRIMPONG

United States District Judge