O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

Pedro Vasquez Perdomo *et al.*,

                        Plaintiffs,

        v.

Kristi Noem *et al.*,

                    Defendants.

Case No.: 2:25-cv-05605-MEMF-SP

**ORDER DENYING DEFENDANTS' MOTION TO DISMISS AS TO ALL CLAIMS EXCEPT COUNT EIGHT [DKT. NO. 235]**

     As this Court has explained in its prior orders, the people and organizations who brought this lawsuit are asking this Court to put a stop to the roving patrols that began last summer and ensure that everyone detained by ICE can speak to a lawyer.

     The Government is asking this Court to dismiss the lawsuit and end the case here for two reasons.

     First, the Government argues that the people and organizations have only pointed to "isolated incidents" of people being detained or not being able to speak to a lawyer.

This is not true. The legal complaint—which by law, this Court must assume is all true at this stage of the lawsuit—points to frequent, recurrent, and practically common incidents of persons being stopped by roving patrols and not having access to lawyers. This is the opposite of "isolated."

Second, the Government argues that the Supreme Court has already decided that everything they did was lawful.

It is critically important that this Court be very clear about this: The Supreme Court has not issued any decisions saying that what the Government did in Los Angeles—and appears to continue doing—was lawful. The Supreme Court has actually said nothing about what the Government did in Los Angeles. What the Government is saying about the Supreme Court decision is false.

It is therefore the job of this Court to decide whether the people and organizations can continue their lawsuit. This Court decides they can.

\*\*\*

I.    **Introduction**

Before this Court is the Motion to Dismiss filed by Defendants. Dkt. No. 235. For the reasons given below, the Motion to Dismiss is DENIED as to all claims, except for one. The Motion to Dismiss is GRANTED with respect to Count Eight—which concerned the ongoing detention of named plaintiffs Vasquez Perdomo, Osorto, and Villegas Molina—as the three plaintiffs have now been released from detention.

II.    **Factual Allegations**

The following factual background is derived from the allegations in Plaintiffs' operative First Amended Complaint, Dkt. No. 16 ("1AC"), except where otherwise indicated. For the purposes of this Motion, the Court treats these factual allegations as true, but at this stage of the litigation, the Court makes no finding on the truth of these allegations, and is therefore not—at this stage—finding that they are true.

/ / /

/ / /

/ / /

### A. The Parties

#### 1. Plaintiffs

Plaintiffs Pedro Vasquez Perdomo ("Vasquez Perdomo"), Carlos Alexander Osorto ("Osorto"), and Isaac Villegas Molina ("Villegas Molina") are residents of Pasadena, California. 1AC ¶¶ 12–14. They were arrested at a bus stop as they were waiting to be picked up for a job on June 18, 2025. *Id.* ¶¶ 12–14. They filed this action while detained in the basement of a Los Angeles downtown federal building, B-18. *Id.* ¶¶ 12–14.

Plaintiff Jorge Hernandez Viramontes ("Hernandez Viramontes") is a resident of Baldwin Park, California. *Id.* ¶ 15. He works at a car wash in Orange County, California. *Id.* Immigration agents have visited the car wash three times. *Id.* On June 18, 2025, agents questioned and detained him, despite informing them that he is a U.S. citizen. *Id.*

Plaintiff Jason Brian Gavidia ("Gavidia") is a resident of East Los Angeles, California. *Id.* ¶ 16. He is a U.S. citizen. *Id.* Though he explained this to immigration agents multiple times, immigration agents stopped and questioned Gavidia at a tow yard in Los Angeles County on June 12, 2025. *Id.*

Plaintiff Los Angeles Worker Center Network ("LAWCN") is a "multi-racial, multi-ethnic, and multi-industry organization comprised of worker centers and labor organizations that work together to address injustices faced by low-wage workers in the greater Los Angeles area, including immigrant and non-English-speaking workers." *Id.* ¶ 17. LAWCN has worker centers as organizational members; they, in turn, have individual members, including noncitizens with legal status and U.S. citizens. *Id.*

Plaintiff United Farm Workers ("UFW") is a farm worker union with approximately 10,000 members, with more members in California than in any other state. *Id.* ¶ 18. UFW's members in California work at agricultural sites as well as non-agricultural sites within the District. *Id.* UFW's members include noncitizens with legal status and U.S. citizens. *Id.*

Plaintiff Coalition for Humane Immigrant Rights ("CHIRLA") is a nonprofit organization with its principal place of business in Los Angeles, California. *Id.* ¶ 19. CHIRLA was founded in 1986 to advance the human and civil rights of immigrants and refugees. *Id.* As a membership

organization, CHIRLA has approximately 50,000 members across California, including both U.S. citizens and noncitizens of varying immigration statuses. *Id.* CHIRLA has members in every county in the District. *Id.*

Plaintiff Immigrant Defenders Law Center ("ImmDef") is a nonprofit organization with its principal place of business in Los Angeles, California. *Id.* ¶ 20. Besides Los Angeles, ImmDef has offices in Riverside, Santa Ana, and San Diego, California, and works across the U.S.–Mexico border in Tijuana. *Id.* ImmDef was founded in 2015 to protect the due process rights of immigrants facing deportation. *Id.*

The Court refers to the five individual plaintiffs, LAWCN, UFW, and CHIRLA collectively as "Stop/Arrest Plaintiffs." The Court refers to ImmDef and CHIRLA collectively as "Access/Detention Plaintiffs." The Court addresses all plaintiffs collectively as "Plaintiffs."

2.    Defendants

Defendant Kristi Noem ("Noem") is the Secretary of the Department of Homeland Security ("DHS"), which is responsible for administering and enforcing the nation's immigration laws pursuant to 8 U.S.C. § 1103(a). *Id.* ¶ 21. Noem is sued in her official capacity. *Id.* Defendant Todd M. Lyons ("Lyons") is the Acting Director of U.S. Immigration and Customs Enforcement ("ICE"), an agency of the United States within the DHS. *Id.* ¶ 22. ICE is responsible for the stops, arrests, and custody of individuals believed to be in violation of civil immigration law. *Id.* Lyons is sued in his official capacity. *Id.*

Defendant Rodney S. Scott ("Scott") is the Commissioner of U.S. Customs and Border Protection ("CBP"), the agency within the DHS that is responsible for enforcing immigration laws at or close to the U.S. border. *Id.* ¶ 23. Scott has direct authority over all CBP policies, procedures, and practices related to stops, arrests, and detention. *Id.* Scott is sued in his official capacity. *Id.*

Defendant Michael W. Banks ("Banks") is Chief of the U.S. Border Patrol. *Id.* ¶ 24. Banks has direct authority over all Border Patrol policies, procedures, and practices related to stops, arrests, and detention. *Id.* Banks is sued in his official capacity. *Id.*

1    Defendant Kash Patel ("Patel") is Director of the U.S. Federal Bureau of Investigation

2 ("FBI"). *Id*. ¶ 25. In that capacity, Patel is responsible for the direction and oversight of all

3 operations of the FBI. *Id*. Patel is sued in his official capacity. *Id*.

4    Defendant Pam Bondi ("Bondi") is the U.S. Attorney General. *Id*. ¶ 26. Bondi is head of the

5 Department of Justice ("DOJ") and is responsible for the direction and oversight of all operations of

6 the DOJ. *Id*. Bondi is sued in her official capacity. *Id*.

7    Defendant Ernesto Santacruz Jr. ("Santacruz Jr.") is the Acting Field Office Director for the

8 Los Angeles Field Office of ICE. *Id*. ¶ 27. Santacruz Jr. is responsible for the supervision of

9 personnel within ICE's Enforcement and Removal Operations ("ERO") in the geographic area

10 covered by the Los Angeles Field Office, which comprises the seven counties in the District, and

11 facilities within the District, including B-18. *Id*. Santacruz Jr. is sued in his official capacity. *Id*.

12    Defendant Eddy Wang ("Wang") is the U.S. Homeland Security Investigations Special

13 Agent in Charge for Los Angeles. *Id*. ¶ 28. Wang is responsible for the supervision of agents within

14 ICE's Homeland Security Investigations ("HSI") in the Los Angeles area. *Id*. Wang is sued in his

15 official capacity. *Id*.

16    Defendant Gregory K. Bovino ("Bovino") is the Chief Patrol Agent for the El Centro Sector

17 of the CBP. *Id*. ¶ 29. In that capacity, Bovino is responsible for the supervision of agents in the El

18 Centro Sector. *Id*. Bovino is sued in his official capacity. *Id*.

19    Defendant D. Stalnaker ("Stalnaker") is the Acting Chief Patrol Agent for the San Diego

20 Sector of the CBP. *Id*. ¶ 30. In that capacity, Stalnaker is responsible for the supervision of agents in

21 the San Diego Sector. *Id*. Stalnaker is sued in his official capacity. *Id*.

22    Defendant Akil Davis ("Davis") is the Assistant Director of the Los Angeles Office of the

23 FBI. *Id*. ¶ 31. In that capacity, Davis is responsible for the supervision of all agents in the Los

24 Angeles Office. *Id*. Davis is sued in his official capacity. *Id*.

25    Defendant Bilal A. Essayli ("Essayli," and together with all other defendants, "Defendants")

26 is the U.S. Attorney for the Central District of California. *Id*. ¶ 32. Essayli has authority over federal

27 law enforcement operations within the District. *Id*. Essayli is sued in his official capacity. *Id*.

28    / / /

**B. Factual Background**

1. <u>Arrests and Detentions</u>

On June 6, 2025, federal agents detained multiple day laborers outside of the Westlake Home Depot. *Id*. ¶ 38. In the following days, similar raids occurred throughout the District. *Id*. Car wash workers,[1] farm and agricultural workers, street vendors, recycling center workers, tow yard workers, and packing house workers were targeted. *Id*. ¶¶ 39, 40 ("Between Monday, June 9, 2025, and June 13, 2025, at least 43 people were detained on farms in Ventura and Santa Barbara Counties"), 42. Various places have been targeted by federal agents. *Id*. ¶ 42 (listing farmers markets, a swap meet, bus stops, parks, a gym, and a church). In one instance, the agents approached and prevented a non-white individual from walking away but not those who appeared to be Caucasians. *Id*. ¶ 43. In another, the agents arrived in unmarked vehicles, pointed a gun, and demanded to see identification without providing a reason for the stop. *Id*. ¶ 44; *see also id*. ¶ 46 (describing "a military-style raid" at a swap meet). Yet in a different context, the agents provided no reason for stopping individuals at a church. *Id*. ¶ 45. Since they began on June 6, 2025, federal immigration raids have led to the arrest of over 1,500 people. *Id*. ¶ 165.

Large numbers of agents and officers approach suddenly in military style or SWAT clothing, heavily armed with weapons displayed. *Id*. ¶ 51. The agents are masked; their vests display a generic "POLICE" patch (or no identification with law enforcement at all). *Id*. Agents typically position themselves around individuals, aggressively engage them, and/or shout commands, making it nearly impossible for individuals to decline to answer their questions. *Id*. ¶ 52. When individuals have tried to avoid an encounter with agents and officers, they have been followed and pushed to the ground, sometimes even beaten, and then taken away. *Id*. ¶ 53. These incidents have been widely reported in the news. *Id*. ¶ 54.

---

[1] One of LAWCN's member organizations is CLEAN Carwash Worker Center ("CLEAN"), on whose behalf LAWCN brings this suit. 1AC ¶ 169; *see id.* ¶¶ 173 ("Dozens of CLEAN's members have been detained by immigration agents while at work. At least one identifiable CLEAN member, Jesus Aristeo Cruz Utiz, has been subjected to Defendants' unlawful stop and arrest practices.").

1    Defendants have a policy and practice of effectuating warrantless arrests without making an

2    individualized flight risk determination. *Id*. ¶ 65. Defendants also have a policy and practice of not

3    identifying themselves or explaining the basis for an arrest upon taking someone into custody. *Id*. ¶

4    71. Agents and officers often show up masked, without any visible badges or insignia indicating

5    what agency they work for. *Id.* When asked to identify themselves, they have refused. *Id.*

6                    2.    Conditions at B-18

7    During the ongoing raids, and as an integral part of the policy and pattern of unlawful stops

8    and arrests, Defendants have been taking individuals who are swept up to the basement of the federal

9    building at 300 North Los Angeles Street in Los Angeles, commonly referred to as B-18. *Id*. ¶ 74. B-

10   18 is a facility for immigrant detainees designed to hold a limited number of individuals *temporarily*

11   so they can be processed and released, or processed and transported to a long-term detention facility.

12   *Id*. It does not have beds, showers, or medical facilities. *Id*. Individuals taken to B-18 are being kept

13   in small, windowless rooms with dozens or more other detainees in cramped quarters. *Id*. ¶ 76. Some

14   rooms are so cramped that detainees cannot sit, let alone lie down, for hours at a time. *Id*. As of June

15   20, 2025, over 300 individuals were being held at B-18. *Id*. ¶ 77.

16   Detainees are also routinely deprived of food, and some have not even been given water

17   other than what comes out of the combined sink and toilet in the group detention room. *Id*. ¶ 79.

18   Upon asking for food, detainees have been told repeatedly that the facility has run out. *Id*.

19   Detainees are denied access to necessary medical care and medications. *Id*. ¶ 80. Individuals with

20   conditions that require consistent medications and treatment are not given any medical attention,

21   even when that information is brought to the attention of the officers on duty. *Id*.; *see id*. ¶ 91 ("On

22   June 19, 2025, an ImmDef attorney arrived at B-18 to meet with detainees, including one who was

23   scheduled for a chemotherapy appointment the next day. Despite showing a doctor's note confirming

24   the appointment and specifying that missing the appointment would be detrimental to the detainee's

25   health, the guards repeatedly would not allow the attorney to meet with the ill detainee."). The

26   facility cannot provide detainees with basic hygiene; individuals who are menstruating have had to

27   wait long periods before receiving menstrual pads, if they receive them at all. *Id*.

28   / / /

### 3. Denial of Access to Counsel

Individuals detained at B-18 have had their access to prospective or retained counsel restricted. *Id*. ¶ 81. On June 6, 2025, attorneys and legal representatives from CHIRLA and ImmDef attempted to gain access to B-18 to advise detainees of their rights and assess their eligibility for relief, but they were not permitted to enter. *Id*. ¶ 82. When they returned to B-18 the next morning, attorneys identified a handwritten notice on the door of the family and attorney entrance at B-18 indicating that B-18 would not permit any visits that day. *Id*. ¶ 83. Federal officers then deployed an unknown chemical agent against family members, attorneys, and representatives. *Id*. The chemical agent caused everyone to cough and inflicted a burning sensation in the eyes, nose, and throat. *Id*. That same morning, numerous unmarked white vans quickly departed B-18 with a group of detainees. *Id*. ¶ 84. CHIRLA and ImmDef attorneys and representatives attempted to loudly share know-your-rights information with the detainees in the vans. *Id*. Federal agents blasted their horns. *Id*.

On the rare occasions when attorneys and family members were allowed access to their clients or loved ones, they were made to wait hours at a time to see them, and the resulting visits were limited to a mere five to ten minutes. *Id*. ¶ 87. In many cases, attorneys and family members were unable to determine whether a particular individual is even detained at B-18, or whether they had been transferred to another facility. *Id*. ¶ 88. B-18 officers have refused to provide clear answers to questions about detainees' whereabouts, or refused to answer questions altogether. *Id*. ICE's online locator, which provides information about detainees' location, is not updated in a timely manner. *Id*.

### 4. Officially Sanctioned Conduct

In January 2025, the administration gave ICE field offices an arrest quota of seventy-five (75) arrests a day. *Id*. ¶ 97. The administration also shut down multiple oversight agencies. *Id*. ¶ 99. The administration set a new arrest quota of three thousand arrests per day. *Id.* ¶ 101. It reportedly threatened job consequences if officials failed to meet arrest quotas. *Id*. ¶ 101.

/ / /

/ / /

5.    Individual Plaintiffs' Experiences

In the early morning of June 18, 2025, in Pasadena, California, Vasquez Perdomo was waiting at a bus stop across the street from Winchell's Donuts with several coworkers to be picked up for a job. *Id*. ¶ 111. About four cars converged on his location, and about half a dozen masked agents jumped out on either side of him. *Id*. ¶ 112. They had weapons and masks, and did not identify themselves. *Id*. Vasquez Perdomo tried to leave but was surrounded, grabbed, handcuffed, and put into one of the vehicles. *Id*. ¶ 113. No warrant was shown. *Id*. ¶ 115. It was only after he was brought to a nearby CVS parking lot that agents checked Vasquez Perdomo's identification. *Id*. ¶ 114. Agents did not inform Vasquez Perdomo that they were immigration officers authorized to make an arrest or of the basis for his arrest. *Id*. ¶ 119. At the time this action was filed, Vasquez Perdomo had been transported to and was being held at B-18. *Id*. ¶ 120. There, he experienced extremely crowded and unsanitary conditions, was given little to eat or drink, and slept on the floor. *Id*.

In the early morning of June 18, 2025, in Pasadena, California, Osorto was waiting to be picked up for work with his coworker Vasquez Perdomo. *Id*. ¶ 124. When federal agents approached, he tried to run, but one of the agents caught up to him and pointed a taser at his head and said, "Stop or I'll use it!" *Id*. ¶ 125. Osorto stopped immediately. *Id*. Osorto was handcuffed and put into a vehicle. *Id*. ¶ 126. It was only after he was brought to a nearby CVS parking lot that agents asked Osorto if he had papers. *Id*. ¶ 128. No warrant was shown. *Id*. ¶ 129. Agents did not inform Osorto that they were immigration officers authorized to make an arrest or of the basis for his arrest. *Id*. ¶ 132. At the time this action was filed, Osorto had been transported to and was being held at B-18. *Id*. ¶ 133. The facility was full, and when people asked for help, officers told them there was no food, no water, and no medicine. *Id*.

In the early morning of June 18, 2025, in Pasadena, California, Villegas Molina was waiting to be picked up for work with his coworkers Vasquez Perdomo and Osorto. *Id*. ¶ 137. When federal agents approached, an agent yelled at Villegas Molina not to run, even though he was still and calm. *Id*. ¶ 139. He was told to provide his identification, and he provided his California ID, but the agent kept questioning him. *Id*. No warrant was shown. *Id*. ¶ 141. Agents did not inform Villegas Molina

1   that they were immigration officers authorized to make an arrest or of the basis for his arrest. *Id*. ¶

2   144. At the time this action was filed, Villegas Molina had been transported to and was being held at

3   B-18. *Id*. ¶ 145. He slept on the floor and was given almost nothing to eat. *Id*.

4        On the morning of June 18, 2025, Hernandez Viramontes was working at a car wash in

5   Orange County, California, where he has worked for approximately ten years, when immigration

6   agents arrived. *Id*. ¶ 148. During this visit, the agents did not identify themselves. *Id*. ¶ 149. Agents

7   asked Hernandez Viramontes whether he was a citizen, and he replied yes and explained that he was

8   a dual citizen of the U.S. and Mexico. *Id*. ¶ 151. They asked for an ID, which he provided. *Id*.

9   Agents then explained that his ID was not enough and because he did not have his passport, they

10  were taking him. *Id*. Agents placed Hernandez Viramontes in a vehicle and transported him away.

11  *Id*. ¶ 152. During this time, Hernandez Viramontes did not know whether they were going to take

12  him to a detention center. *Id*. Agents verified his citizenship and, about twenty minutes later, brought

13  him back to the car wash. *Id*. ¶ 153. When agents brought Hernandez Viramontes back to the car

14  wash, they did not apologize. *Id*. ¶ 154. Shortly after agents returned Hernandez Viramontes to the

15  car wash, yet another group of agents raided the carwash again. *Id*. ¶ 155.

16       In the afternoon of June 12, 2025, Gavidia, a U.S. citizen, was at a tow yard in Los Angeles

17  County, California, that was visited by immigration agents conducting a roving patrol. *Id*. ¶ 157.

18  Around 4:30 p.m., upon hearing someone say that immigration agents may be at the premises,

19  Gavidia went outside to confirm this. *Id*. ¶ 158. At the time, his clothes were dirty from working on

20  his car. *Id*. On the sidewalk outside the gate, Gavidia saw a federal agent between two cars step

21  forward. *Id*. ¶ 159. Soon after, Gavidia saw several other agents wearing similar vests with the words

22  "Border Patrol Federal Agent." *Id*. He also noticed that the agents were carrying handguns and at

23  least two of the agents had a military-style rifle. *Id*. When Gavidia attempted to head back inside the

24  tow yard premises, a masked agent said, "Stop right there." *Id*. ¶ 160. While the agent approached

25  Gavidia, another unmasked agent ran toward him and asked if he was American. *Id*. ¶ 161. Gavidia

26  told the agent that he is American multiple times. *Id*. The agent responded by asking, "What hospital

27  were you born in?" *Id*. Gavidia calmly replied that he did not know. *Id*. The agent repeated the same

28  question two more times, and each time Gavidia provided the same answer. *Id*. At that point, the

agents pushed Gavidia up against the metal gated fence, put his hands behind his back, and twisted his arm. *Id*. Gavidia had been on his phone, and the masked agent also took his phone from his hand at that point. *Id*. Gavidia explained that the agents were hurting him and that he was American. Id. ¶ 162. The unmasked agent asked a final time, "What hospital were you born in?" *Id*. Gavidia responded again that he did not know and said East L.A. *Id*. Gavidia then told the agents that he could show them his Real ID. *Id*. The agents had not asked to see Gavidia's identification. *Id*. When Gavidia showed his Real ID to the agents, one of them took it from him. *Id*. ¶ 163. It ultimately took about twenty minutes for Gavidia to get his phone back, but the agents never returned his Real ID. *Id*.

### 6.    Harm to Organizational Plaintiffs and/or Their Members

LAWCN is a regional organization made up of eight worker centers and labor organizations that work together to build power and develop worker leadership organizing with Black, immigrant, and refugee workers and other workers of color in the Los Angeles region. *Id*. ¶ 167. At least one of LAWCN's member organizations, CLEAN, has been harmed by the ongoing raids in Southern California. *Id*. ¶¶ 169, 172 ("Carwashes have been a consistent and ongoing target of immigration agents during the course of the raids—at least two dozen have been raided so far."). UFW's members have been harmed by the ongoing immigration raids in Southern California and fear being subjected to unlawful stops, arrests, and detention practices in the future. *Id.* ¶ 179. At least one UFW member has been subjected to Defendants' stop and arrest practices. *Id*.

As a result of Defendants' actions, CHIRLA's mission to serve the immigrant community, including through the provision of legal advice and services, is being frustrated. *Id.* ¶ 190. Throughout the month of June 2025, CHIRLA's attorneys and representatives have attempted to communicate with individuals at B-18 but were denied access and thwarted in their efforts to offer legal advice to even those detainees they saw at a distance. *Id*. CHIRLA also coordinates the Los Angeles Rapid Response Network ("LARRN"). *Id.* ¶ 188. Through LARRN, CHIRLA educates its membership, as well as the broader community, through know-your-rights programming, workshops, social media, and educational literature about a variety of social services and benefits, including immigration law, financial literacy, workers' rights, and civic engagement. *Id*. ¶ 188.

Defendants' actions are also thwarting CHIRLA's work to coordinate the LARRN, as other attorneys and representatives summoned by CHIRLA to B-18 have been similarly denied access. *Id.* ¶ 190.

ImmDef's Rapid Response team is also part of LARRN. *Id.* ¶ 193. In this capacity, ImmDef monitors a hotline and responds to notifications about individuals detained in ICE immigration enforcement actions. *Id.* As a result of Defendants' actions, ImmDef's mission to serve the immigrant community, including through the provision of legal advice and services, is being fundamentally frustrated. *Id.* ¶ 194.

### C. Procedural History

Plaintiffs Vasquez Perdomo, Villegas Molina, and Osorto initiated this action by filing a Petition for Writ of Habeas Corpus on June 20, 2025. Dkt. No. 1. They, along with the other Plaintiffs, filed the operative First Amended Complaint on July 2, 2025. 1AC. The 1AC alleges the following claims:

| Claim | Plaintiff(s) | Defendant(s) |
|---|---|---|
| Count One: Violation of Fourth Amendment: Unreasonable Seizures | Stop/Arrest Plaintiffs | All Defendants |
| Count Two: Violation of 8 U.S.C. 1357(a)(2)— Warrantless Arrests Without Probable Cause of Flight Risk | LAWCN, UFW, and CHIRLA | All Defendants |
| Count Three: Violation of 8 C.F.R.(c)(2)(ii)—Standards for Stops and Warrantless Arrests | LAWCN, UFW, and CHIRLA | All Defendants |
| Count Four: Violation of 8 C.F.R. § 287.8(c)(2)(iii)— Failure to Identify Authority and Reason for Arrest | LAWCN, UFW, and CHIRLA | All Defendants |
| Count Five: Violation of Fifth Amendment—Access to Counsel | Access/Detention Plaintiffs | Noem, Lyons, and Santacruz Jr. |
| Count Six: Violation of 8 U.S.C. § 1362—Access to Counsel | Access/Detention Plaintiffs | Noem, Lyons, and Santacruz Jr. |

| Count Seven: Violation of Fifth Amendment—Conditions of Confinement | Access/Detention Plaintiffs | Noem, Lyons, and Santacruz Jr. |
|---|---|---|
| Count Eight: Violation of Fifth Amendment—Due Process | Vasquez Perdomo, Osorto, and Villegas Molina | Noem, Lyons, and Santacruz Jr. |

1AC. Plaintiffs seek declaratory and injunctive relief, as well as fees and costs. *Id.* at 64–65.

On July 2, 2025, Access/Detention Plaintiffs filed an Ex Parte Application for a Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction. Dkt. No. 38. It sought a TRO on the Access/Detention Plaintiffs' Fifth Amendment claims, on the basis that Defendants' denial of access to counsel at B-18 violated the Fifth Amendment. *Id.* at 7.

On July 3, 2025, Stop/Arrest Plaintiffs filed an Ex Parte Application for a Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction. Dkt. No. 45. It sought a TRO on the Stop/Arrest Plaintiffs' Fourth Amendment claims. *Id.* at 18.

On July 10, 2025, this Court held a hearing on both Ex Parte Applications. Dkt. No. 51. On July 11, 2025, this Court granted both Ex Parte Applications. Dkt. No. 87 ("TRO Order"). This Court refers to its grant of Dkt. No. 38 as the "Fifth Amendment TRO," and to its grant of Dkt. No. 45 as the "Fourth Amendment TRO."

On July 13, 2025, Defendants filed a Notice of Appeal to the Ninth Circuit. Dkt. No. 89. They also filed an Ex Parte Application For Stay of Order Granting the Temporary Restraining Orders, which would have stayed issuance of the Fourth Amendment TRO pending appeal. Dkt. No. 94 at 1. Defendants explained that they sought a stay both from this Court and from the Ninth Circuit concurrently. *Id.* On July 17, 2025, this Court denied Defendants' Ex Parte Application to Stay. Dkt. No. 108.

On August 1, 2025, the Ninth Circuit ruled on Defendants' emergency motion for a stay pending appeal. *Vasquez Perdomo v. Noem*, 148 F.4th 656 (9th Cir. 2025). The Ninth Circuit granted Defendants' motion to stay as to one clause in the Fourth Amendment TRO, and otherwise denied it. *Id.* at 690. Defendants then asked the Supreme Court to stay the Fourth Amendment TRO.

*Noem v. Vasquez Perdomo*, No. 25A169, 2025 WL 2585637, at *1 (Sep. 8, 2025). The Supreme Court granted the request and stayed the Fourth Amendment TRO. *Id.* The Court did not issue an opinion explaining the Court's reasoning. But one Justice filed a concurrence, *See id.* (Kavanaugh, J., concurring). And another Justice filed a dissent, which two other Justices joined. *See id.* at *5 (Sotomayor, J., dissenting).

Unlike the Fourth Amendment TRO, the Fifth Amendment TRO was not stayed or appealed. On July 28, 2025, Plaintiffs filed a Motion for Preliminary Injunction as to the Fifth Amendment TRO. Dkt. No. 127. This Court held a hearing on October 23, 2025. Dkt. No. 230. On November 13, 2025, this Court granted Plaintiffs' request. Dkt. No. 256 ("Fifth Amendment PI"). On January 9, 2026, Defendants filed a Notice of Appeal as to the Fifth Amendment PI. Dkt. No. 350.

On October 29, 2025, Defendants filed the instant Motion to Dismiss Plaintiffs' First Amended Complaint. Dkt. No. 235 ("Motion"). On November 12, 2025, Plaintiffs filed their Opposition. Dkt. No. 255 ("Opp."). On November 19, 2025, Defendants filed their Reply.[2] Dkt. No. 264 ("Reply").

This Court held a hearing on the Motion on January 15, 2026.

## II.    <u>Applicable Law</u>

Defendants bring their Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

### A.  <u>Rule 12(b)(1)</u>

A court must have subject matter jurisdiction to resolve a claim. Fed. R. Civ. P. 12(b)(1). A plaintiff's standing under Article III is a necessary component of subject matter jurisdiction. *Chandler v. State Farm Mut. Auto. Ins.*, 598 F.3d 1115, 1121 (9th Cir. 2010); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 417 (2021). "Because standing is 'an indispensable part of the plaintiff's case,' it 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the

---

[2] In their Reply, Defendants withdrew the request for judicial notice of an ICE Directive they had made in their opening brief. *See* Motion at 7 n.1; Reply at 3 n.1. At the hearing, Defendants confirmed that they do not request that this Court take judicial notice of the ICE Directive.

litigation.'" *Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

For a plaintiff to show they have Article III standing, they must demonstrate that (1) they have suffered an injury in fact that is (a) concrete and particularized, (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the plaintiff's injury will be redressed by a favorable decision. *Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). A plaintiff "must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion*, 594 U.S. at 431. "[A] person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." *Id.* at 435. But, when "there is no finding that [a plaintiff] face[s] a real and immediate threat" of recurring harm, the plaintiff lacks standing to seek injunctive relief." *City of Los Angeles v. Lyons*, 461 U.S. 95, 110 (1983).

For an organization to have associational standing as the representative of its members, it must show that: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023); *see also Warth v. Seldin*, 422 U.S. 490, 511 (1975). The organization may represent its members "so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the case." *Warth*, 422 U.S. at 511. And "a class action plaintiff must 'allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants.'" *Easter v. Am. W. Fin.*, 381 F.3d 948, 961 (9th Cir. 2004) (quoting *Warth*, 422 U.S. at 501).

**B.  Rule 12(b)(6)**

Federal Rule of Civil Procedure 12(b)(6) allows a party to seek to dismiss a complaint for "failure to state a claim upon which relief can be granted." "To survive a motion to dismiss, a

complicaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Labels, conclusions, and "formulaic recitation of a cause of action's elements" are insufficient. *Twombly*, 550 U.S. at 545.

The determination of whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Generally, a court must accept the factual allegations in the pleadings as true and view them in the light most favorable to the plaintiff. *Soo Park v. Thompson*, 851 F.3d 910, 918 (9th Cir. 2017); *Lee*, 250 F.3d at 679. But a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

Leave to amend a dismissed complaint should be freely granted unless it is clear the complaint could not be saved by any amendment. Fed. R. Civ. P. 15(a); *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

**III.    Discussion**

Defendants move to dismiss the 1AC on four grounds. First, they allege Plaintiffs lack standing to seek prospective relief. Second, they allege that Plaintiffs failed to state a viable Fourth Amendment claim. Third, they allege that Plaintiffs' Fifth Amendment claims are moot and jurisdictionally barred by 8 U.S.C. § 1252. Fourth, they allege that Plaintiffs have failed to state violations of the APA. For the reasons below, the Motion is granted in part.

**A. Plaintiffs have Article III standing to pursue injunctive relief.**

1.    Fourth Amendment Claims

First, Defendants argue that Plaintiffs lack Article III standing to pursue injunctive relief, and continue to advance the view that Plaintiffs have only alleged "isolated incidents" which cannot support the broad relief they seek. *See* Motion at 6–10. As the Ninth Circuit found in its order on the TRO, "[t]he record shows—and Defendants do not dispute—that each of the individual plaintiffs, and members of both UFW and LAWCN, were stopped by government agents as part of the

challenged operation." *Vasquez Perdomo*, 148 F.4th at 673. Just as in the emergency motion for a

stay pending appeal, Defendants only dispute whether Plaintiffs can seek "prospective [injunctive]

relief." *Id.*; *see also* Motion at 1. For the reasons below, this Court finds that Plaintiffs have

sufficiently shown that they have standing.

The Court finds that the individual Plaintiffs have demonstrated standing to pursue injunctive

relief. The 1AC's allegations as to the individual Plaintiffs sufficiently establish that their "risk of

harm is sufficiently imminent and substantial." *TransUnion*, 594 U.S. at 435. As this Court has

already found:

> Here, this Court affirmatively finds that there is a real and immediate threat that the
> conduct complained of will continue. Numerous individuals have been subjected to
> multiple stops, including Gavidia. All of the evidence adduced suggests a high
> likelihood of recurrent injury, as required. *See LaDuke v. Nelson*, 762 F.3d 1318, 1324
> (9th Cir. 1985).

TRO Order at 35. The Ninth Circuit found similarly:

> The district court here found that Plaintiffs' evidence demonstrated "a pattern of
> conduct," and that "a plethora of statements suggest[ed] approval or authorization" of
> the challenged stop-and-arrest practices, including a recent statement by Defendant
> Gregory K. Bovino, the Chief Patrol Agent for the El Centro Sector of the CBP.
> Defendants do not meaningfully dispute these findings, and they are well supported by
> the record. . . . [Defendants'] general descriptions of training regarding the
> requirements for a lawful seizure do little to overcome Plaintiffs' specific evidence
> showing a series of similar detentive stops without reasonable suspicion. On this record,
> we agree with the district court that Plaintiffs have shown that the challenged conduct
> is "part of a pattern of officially sanctioned behavior" and thus that the alleged injury
> is "likely to recur."

*Vasquez Perdomo*, 148 F.4th at 674.

Though this case is in a different posture now than it was when this Court issued the TRO

Order—or when the Ninth Circuit considered staying the TRO Order—the parties' positions are

similar. Defendants have not meaningfully disputed the veracity of Plaintiffs' allegations in the 1AC;

each individual Plaintiff sufficiently states that he has been detained and questioned by immigration

agents. *See* 1AC ¶¶ 12–16. And each states that he fears being subject to a future stop by federal

agents without reasonable suspicion. *See id.* Moreover, Plaintiffs state extensive allegations in the

1AC suggesting that immigration officers are repeatedly targeting the same locations, *see id.* ¶¶ 6–7, 38–40, and stopping people absent reasonable suspicion *see id.* ¶¶ 36, 44–49, 67–69. Put another way, it is simply untrue that the Plaintiffs have only alleged "isolated incidents." The actual allegations they have made, taken as true and read together, are part of what led this Court to find that Plaintiffs have sufficiently alleged they face a "real and immediate threat" of future detention without reasonable suspicion.[3] TRO Order at 35.

For similar reasons, the organizational Plaintiffs have sufficiently demonstrated they have standing to pursue injunctive relief. Based on the 1AC's allegations, each organizational Plaintiff meets the requirements set forth in *SFFA*. First, each organization's members would have standing to sue in their own individual right. *See id.* ¶¶ 165–98. The Plaintiffs have plausibly alleged that the organizations "have thousands of members throughout the District in low-wage industries targeted repeatedly by Defendants' illegal raids." *See* Opp. at 16. They have also offered evidence that individual, named members of LAWCN and UFW have, like the named individual Plaintiffs, been detained without reasonable suspicion.[4]  *See id.* (collecting record citations); *see also* 1AC ¶ 173 (member of CLEAN and LAWCN unlawfully stopped and arrested); *id.* ¶ 179 (member of UFW unlawfully stopped and arrested). And CHIRLA has alleged that its members have personally been prevented from giving legal advice to detained individuals at B-18. *Id.* ¶ 190. Again, the assessment

---

[3] About six months have passed since this Court's issuance of the TRO Order. But the passage of time does not bear on this Court's finding that Plaintiffs have alleged that, at the time of the 1AC's filing and now, they face a real and immediate threat of future detention. In the hearings this Court held regarding the TROs and the Fifth Amendment PI, Plaintiffs represented that Defendants' unlawful conduct is ongoing. Defendants have given no indication that they are implementing different policies or new training with respect to immigration enforcement. Indeed, Defendants maintain the position that their conduct is lawful and do not argue that the facts on the ground are meaningfully different from what they were at the time of the filing of the 1AC. *See* Motion at 7 (describing that "[o]fficers lawfully relied on the totality of objective factors" when making investigative stops").

[4] The Court notes that it is not a requirement for representational standing to identify named members of the organization. "As a general rule of representational standing, when it is clear and not speculative that a member of a group will be adversely affected by a challenged action and a defendant does not need to know the identity of a particular member to defend against an organization's claims, the organization does not have to identify particular injured members by name." *Mi Familia Vota v. Fontes*, 129 F.4th 691, 708 (9th Cir. 2025).

that the allegations only describe "isolated incidents" is patently false. In sum, because the organizational Plaintiffs have sufficiently alleged that their members would have standing to sue in their individual capacities, the first requirement for organizational standing is met.

As to the second requirement for organizational standing, each organizational Plaintiff has alleged that the interests they seek to protect are germane to each organization's purpose. 1AC ¶ 167–69 (describing LAWCN's "work to improve conditions in law-wage industries" and to "support[] immigrant justice by improving the conditions and dignity of immigrant workers in Southern California"); *id.* ¶ 175 (describing UFW's cause "of eliminating discrimination against farm workers, migrants, [and] people of color," and of leading the movement "for immigration reform and immigrants' rights); *id.* ¶ 182 (describing CHIRLA's mission "to advance the human and civil rights of immigrants and refugees"). And, as to the third, neither the claims pursued nor the relief sought require the participation of individual LAWCN, UFW, and CHIRLA members. For these reasons, the organizational Plaintiffs have standing to pursue injunctive relief.

This, too, aligns with the Ninth Circuit's determination in adjudicating the stay of the Fourth Amendment TRO that all Plaintiffs had, at that stage, sufficiently established standing. In the Court's words:

> The associations have thousands of members across California and the Central District, and the evidence suggests that Defendants are engaged in a high-volume, District-wide practice of making detentive stops with less than reasonable suspicion. The large scale of the association plaintiffs' Los Angeles–area memberships "increases the threat of future harm to [the association plaintiffs'] members." *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1100 (9th Cir. 2024) (quoting *Nat. Res. Def. Council v. U.S. E.P.A.*, 735 F.3d 873, 878 (9th Cir. 2013)). In these circumstances, it is highly likely that at least one member of each association will be subject to Defendants' challenged practices.

*Vasquez Perdomo*, 148 F.4th at 676.

Importantly, Defendants do not meaningfully contest any of the *SFFA* factors as applied to any of the organizational Plaintiffs.[5] Nor do they, for the most part, offer evidence to dispute Plaintiffs' 1AC allegations of stops without reasonable suspicion.[6] Instead, Defendants' primary argument is that Plaintiffs' standing theory fails because Plaintiffs cannot demonstrate that the previous unconstitutional conduct that they have allegedly faced is likely to recur. Motion at 6. They note that, applying *Lyons*, Plaintiffs' claims of future harm are overly speculative; "they cannot show any realistic immediate threat that they will likely be stopped and detained solely based on their claimed purported prohibited factors again." Motion at 8. In support, they cite to Justice Kavanaugh's concurrence, which observes that "Plaintiffs' standing theory largely tracks the theory rejected in *Lyons*." *Perdomo*, 2025 WL 2585637 at *2 (Kavanaugh, J., concurring).

Both the Ninth Circuit and this Court have considered, and ultimately rejected, the idea that *Lyons* controls this case's outcome.[7] As the Opposition explains, the Ninth Circuit noted that this

---

[5] Defendants' argument appears to be that, because *Lyons* precludes a finding of standing for any individual Plaintiff, it necessarily follows that the organizations cannot pursue injunctive relief. As this Court explains below, however, *Lyons* does not control the Motion's outcome.

[6] Just as at the TRO stage, Defendants challenge Plaintiffs' allegations on the basis that "none were stopped based solely on one enumerated factor, as officers are required to rely on a totality-of-the-circumstances standard to assess reasonable suspicion for an investigative stop." Motion at 7 n.1. This fails for two reasons. First, it is not adequately supported. Defendants' only citation in support appears to be to a regulation stating the reasonable suspicion standard. But directing this Court to a regulation that states that immigration agents *should* apply the reasonable suspicion standard, of course, does nothing to prove that immigration agents *did* apply the reasonable suspicion standard. Defendants' "general descriptions of training regarding the requirement for a lawful seizure do little to overcome Plaintiffs' specific evidence showing a series of similar detentive stops without reasonable suspicion." *Vasquez Perdomo*, 148 F.4th at 674. Second, in any event, it is not relevant. To survive dismissal, the 1AC need not allege "a stop based solely on ethnicity or language." Motion at 7. Instead, it must—and does—allege detentions in violation of the Fourth Amendment for unreasonable seizures. 1AC ¶¶ 215–20.

[7] While this Court gives due consideration to Defendants' arguments in the Motion, the concurrence on which Defendants rely is not binding authority. A statement "contained in a concurrence" does not "constitute[] binding precedent." *Maryland v. Wilson*, 519 U.S. 408, 412–13 (1997). Nor can this Court fairly attribute the concurrence's opinion—which was signed by one Justice—to the Supreme Court at large. As this Court has already explained, "it would be patently inappropriate for this Court to speculate as to the Supreme Court's reasoning [in granting the stay] and then attempt to apply it." Dkt. No. 220 at 6. Defendants argue that, "[t]o stay the TRO, the Supreme Court necessarily held that Defendants are likely to succeed on the merits of Plaintiffs' TRO claims (which largely mirror those of the [1AC]), would suffer irreparable harm absent a stay of the TRO, and have equities weighing in favor of the stay." Motion at 7. This, however, does not necessarily follow. "Neither the District Court nor the parties . . . know whether the

case is distinguishable from *Lyons* for at least three reasons. Opp. at 16–18. First, unlike in *Lyons*, this Court made an "explicit finding of likelihood of recurrence." *Vasquez Perdomo*, 148 F.4th at 675. It made that finding in ruling on the TRO, *see* TRO Order at 35, and it reiterates that finding in adjudicating the instant Motion. Second, unlike in *Lyons*, "there is evidence [in this case] that the complained-of conduct stems from a pattern or practice by Defendants." *Vasquez Perdomo*, 148 F.4th at 675. And third, unlike in *Lyons*, "there is no specific predicate action required by Plaintiffs to trigger Defendants' challenged practice." *Vasquez Perdomo*, 168 F.4th at 675. This is relevant because, in *Lyons*, plaintiffs could arguably have escaped some future injury by avoiding unlawful activity; here, in contrast, Plaintiffs "must return to where agents previously stopped them simply to go to work or otherwise move about freely." Opp. at 17. In sum, because this Court has found that Plaintiffs are likely to face future unlawful stops, because the stops themselves (and not conduct downstream of the stops) are being challenged, and because Plaintiffs have sufficiently alleged that Defendants' pattern or practice is to continue unlawful stops, *Lyons* is distinguishable. *Cf. Melendres v. Arpaio*, 695 F.3d 990, 997–98 (9th Cir. 2012) (distinguishing *Lyons* and holding that motorists had standing to pursue injunction as to the Fourth Amendment claims against county sheriff for racially profiling Latinos in connection with vehicle stops).

Defendants also argue that the organizational Plaintiffs lack standing to assert claims predicated on their members' Fourth Amendment claims. *See* Motion at 9. They cite a pair of cases for this proposition. Motion at 9 (first citing *Alderman v. United States*, 394 U.S. 165, 174 (1969); then citing *Rakas v. Illinois*, 439 U.S. 128, 133 (1978)). Both cases were criminal matters, in which the Court considered—and rejected—the theory that a *criminal defendant* can "assert that a violation

---

majority believed the key issue was standing, the merits, or the scope of relief, *any one of which could have been the basis for the majority's order.*" *Vasquez Perdomo*, 2025 WL 2585637, at *14 (Sotomayor, J., dissenting) (emphasis added). At the hearing, Defendants agreed that the concurrence is not binding upon this Court, and that they cite it as persuasive authority only.

of the Fourth Amendment rights *of a third party* entitled him to have evidence suppressed at his trial." *Rakas*, 439 U.S. at 132–33. In effect, *Alderman* and *Rakas* clarified that a criminal defendant may not raise a Fourth Amendment challenge to the unlawful search of a third party's property. But the criminal defendant–third party relationship plainly differs from the one between a civil plaintiff and an organization to which the individual belongs. To that end, this Court reads neither authority to suggest that the Supreme Court intended to foreclose Article III standing for organizational plaintiffs in Fourth Amendment cases. Indeed, Plaintiffs point this Court to binding authority that suggests otherwise. *See Stavrianoudakis v. U.S. Fish & Wildlife Serv.*, 108 F.4th 1128, 1135, 1143 (9th Cir. 2024) (finding organization plaintiff met associational standing requirements to bring Fourth Amendment claim on behalf of its members). And Defendants do not address this authority in their Reply. To that end, this Court is satisfied that the organizational Plaintiffs have shown Article III standing to assert Fourth Amendment claims.

2.    Fifth Amendment Claims

Defendants also argue that Plaintiffs lack standing for their Fifth Amendment claims. They note that this Court's finding that organizational Plaintiffs *did* have standing to bring access to counsel claims should not control, because this Court must ensure that it possesses jurisdiction at every stage of the litigation. Reply at 4 (citing *Ctr. for Biological Diversity*, 894 F.3d at 1011). It is true that standing must persist throughout all stages of the litigation. *Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013). To that end, this Court's earlier determination that there was standing at the TRO stage is not, at this stage, dispositive.

Defendants make two arguments against standing for the Fifth Amendment claims. First, they argue that *Lyons*' requirement of a real and immediate threat of future injury precludes standing for access to counsel violations. Reply at 4. But, as Plaintiffs note in Opposition, the 1AC alleges that access restrictions are ongoing. *See* 1AC ¶ 89. Moreover, at the TRO stage, this Court found that the conditions alleged in the 1AC were ongoing. *See* TRO Order at 20. As recently as November 13,

2025, this Court found similarly when granting Plaintiffs' motion for a preliminary injunction on the Fifth Amendment claims. *See* Dkt. No. 256 at 8–13. Because the 1AC alleges that access restrictions at B-18 remained in place, and because this Court has now repeatedly found that this remained true months later, Plaintiffs have sufficiently shown that their harm is ongoing—and certainly that there is a real, immediate threat that it will recur in the future.

Second and relatedly, they argue that "there is no evidence in the record to suggest future modifications to the operating schedule at B-18 will occur absent similar riots justifying restrictions, or minor delays that do not entirely limit detainees' access to counsel." Reply at 5. But this appears to misconstrue the standard for a factual attack in a motion to dismiss. The "moving party" may convert the motion to dismiss into a factual attack, but to do so, it must "present[] affidavits or other evidence properly brought before the court." *Savage v. Glendale Union High Sch., Dist. No. 205*, 343 F.3d 1036, 1040 (9th Cir. 2003). So, to the extent that Defendants intend to factually attack Plaintiffs' allegations of the likelihood of ongoing and future harm, they must cite to facts that dispute the truth of the 1AC's allegations. But Defendants' only citations to the record in this section are to a portion of the TRO Order—where this Court explained that exigent circumstances justify closures of B-18 for legal visitation in some circumstances, *see* TRO Order at 49—and to Dkt. No. 127-3, a sworn declaration submitted by Plaintiffs where an attorney waited twenty minutes to be let into B-18. *See* Reply at 5. Neither of these citations calls into question the truth of Plaintiffs' allegations. To the extent that the citation to the declaration is intended to suggest that the twenty-minute delay is representative of the extent of Defendants' access to counsel restrictions at B-18 following the 1AC's filing, the argument is not persuasive. This Court has already detailed the substantial access to counsel issues that persisted at B-18 upon its grant of Plaintiffs' request for a preliminary injunction on the Fifth Amendment. *See* Dkt. No. 256 at 7–13.

*   *   *

1    For these reasons, this Court finds that all Plaintiffs have sufficiently shown that they have

2    Article III standing to pursue injunctive relief under the Fourth and Fifth Amendments. On the Rule

3    12(b)(1) basis, then, the Motion is DENIED.

4

5    **B.  Plaintiffs have sufficiently alleged their Fifth Amendment claims.**

6    Defendants allege that Plaintiffs' Fifth Amendment claims—that is, Counts Five through

7    Eight of the 1AC—fail for two independent reasons: because they are moot, and because 8 U.S.C.

8    Section 1252 prevents this Court from exercising jurisdiction over Plaintiffs' Fifth Amendment

9    claims. Motion at 10–12. This Court addresses each argument in turn.

10    1.    Plaintiffs' Fifth Amendment claims are not moot.

11    Defendants next argue that "Plaintiffs' B-18 allegations are moot because the challenged

12    conditions were temporary, have ceased, and cannot reasonably be expected to recur." Motion at 10.

13    Plaintiffs, in opposition, argue that Counts Five, Six, and Seven are not moot because

14    Access/Detention Plaintiffs "plausibly allege that Defendants are subjecting detainees to deplorable,

15    punitive conditions of confinement, and systematically interfering with the ability of detainees to

16    retain and communicate with counsel." Opp. at 24.

17    "Pursuant to Article III of the U.S. Constitution, federal courts can only adjudicate live cases

18    or controversies." *Bishop Paiute Tribe v. Inyo Cnty.*, 863 F.3d 1144, 1153 (9th Cir. 2017). As a

19    result, courts lack subject matter jurisdiction to adjudicate moot claims. *Id.* at 1155. "[A] case is

20    moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in

21    the outcome." *Cnty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (quoting *Powell v.*

22    *McCormack*, 395 U.S. 486, 496 (1969)). But "[m]ere voluntary cessation of allegedly illegal conduct

23    does not moot a case." *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203

24    (1968). "Nevertheless, part or all of a case may become moot if (1) 'subsequent events [have] made

25    it *absolutely clear* that the allegedly wrongful behavior [cannot] reasonably be expected to recur,'

26    *and* (2) 'interim relief or events have completely and irrevocably eradicated the effects of the alleged

27    violation.'" *Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260, 1274 (9th Cir. 1998)

28    (alterations in original) (emphasis added) (first quoting *Concentrated Phosphate Export Ass'n*, 393

1    U.S. at 203; and then quoting *Lindquist v. Idaho State Bd. of Corrections*, 776 F.2d 851, 854 (9th

2    Cir.1985)); *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 n.10 (1982). "The heavy

3    burden of persuading the court that the challenged conduct cannot reasonably be expected to recur

4    lies with the party asserting mootness." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC),*

5    *Inc.*, 528 U.S. 167, 170 (2000).

6        Defendants argue that "B-18 has returned to normal operations following the end of the June

7    2025 riots, which form the basis of the [1AC]'s allegations and provide the backdrop against which

8    this Court's TRO was issued." Motion at 11. They reason that the 1AC therefore no longer states a

9    live controversy, as the challenged B-18 policies are no longer in force at B-18—so no effective

10   relief can be granted by this Court. *Id.* In support, they cite two declarations. The first is the

11   Declaration of Lilia A. Uyeda. Dkt. No. 70-3. The paragraph Defendants cite reads as follows:

12   "Based on my understanding, attorney visitation hours at B-18 as of June 24, 2025, have resumed as

13   normal." *Id.* ¶ 12. The second is the Declaration of Rogelio Gudino. Dkt. No. 168-2. The paragraph

14   Defendants cite reads as follows:

15            Generally, emergency temporary transfers of detainees from B-18 may occur in
16       some exigent circumstances that require closure for the safety of human life or the
         protection of property, including but not limited to protests, public safety threats, or
17       physical plant issues. As of August 28, 2025, the last temporary transfer of detainees
         occurred on August 8, 2025.

18
19   *Id.* ¶ 21. For several reasons, this evidence falls far short of carrying Defendants' heavy burden to

20   prove mootness. First, as this Court explained extensively in granting the Fifth Amendment

21   preliminary injunction, it has reviewed evidence indicating that access to counsel issues remained

22   well past June 2025. *See* Dkt. No. 256 at 7–13. Second, these two cited paragraphs only address

23   discrete portions of a broader pattern of access to counsel issues; even taking them as conclusive

24   proof of what they allege, they only establish that attorney visitation hours at B-18 had returned to

25   normal as of June 24, 2025, and that B-18 had ceased the temporary transfer of detainees as of

26   August 8, 2025. Neither purports to suggest—much less prove—that it is "absolutely clear" that the

27

28

1    allegedly wrongful behavior cannot reasonably be expected to recur. *Norman-Bloodsaw*, 135 F.3d at

2    1274.[8]

3        Defendants also suggest that the burden is on Plaintiffs, who have offered "no reason to

4    expect recurring alterations in the operating hours at B-18, especially given post-June 24, 2025[,] B-

5    18 conditions have [substantially] complied with this Court's TRO." Motion at 11. They state that

6    Plaintiffs' claim fails because Plaintiffs "fail to identify any current detainees being denied counsel

7    access or evidence of recurring misconduct since June 2025." *Id.* at 11–12. Again, this Court has

8    already stated why it finds that it does not appear that access to counsel issues have ceased, and why

9    it finds that Defendants have failed to carry their burden to prove that those conditions would

10    reasonably not recur. Moreover, Defendants cite no authority for the proposition that organizational

11    Plaintiffs must name a current detainee being denied counsel access for their claims to survive. As

12    this Court has already explained—and as it previously explained in granting the Fifth Amendment

13    preliminary injunction, Dkt. No. 256 at 14—Defendants' frustration of organizational Plaintiffs' core

14    mission forms appropriate grounds for standing.

15        In sum, Defendants have not shown that Access/Detention Plaintiffs' Fifth Amendment

16    claims are moot. So the Motion on this basis is DENIED.

17        Having determined that Access/Detention Plaintiffs' Fifth Amendment claims are not moot,

18    the Court need not address the parties' remaining arguments regarding whether this case falls within

19    the exception of "wrongs capable of repetition yet evading review." Opp. at 21; Reply at 6.

20             2.    8 U.S.C. Section 1252 does not strip this Court of jurisdiction over

21                  Plaintiffs' Fifth Amendment claims.

22        Defendants argue the Court lacks jurisdiction because Section 1252(a)(5) and (b)(5) of the

23    Immigration and Nationality Act ("INA") channel the Fifth Amendment claim to the petition for

24

25

26

---

27    [8] Defendants also argue, in support of mootness, that "Plaintiffs . . . acknowledge 'improvements' made by Defendants to ensure access to counsel." Reply at 5 (quoting Opp. at 20). But Plaintiffs' comment that conditions have *improved*

28    does nothing to establish that there are no more access to counsel issues at B-18, or that it is absolutely clear that those issues could not recur.

1    review process. Motion at 12. This Court finds that Section 1252 does not bar this Court's

2    consideration of the Fifth Amendment claims.

3        This Court has considered this argument twice before. *See* TRO Order at 31–33; PI Order at

4    16. Both times, it found that Section 1252 did not strip this Court of jurisdiction over Plaintiffs' Fifth

5    Amendment claims. While its past determinations are not necessarily dispositive of the issues

6    presented in the instant Motion, Plaintiffs cite no new argument or law as to why this Court would

7    lack jurisdiction under Section 1252. Seeing no new facts or law that weigh in favor of a different

8    answer, this Court considers the same arguments and comes to the same conclusion.

9        Section 1252(a)(5) states: "[A] petition for review filed with an appropriate court of appeals

10   in accordance with this section shall be the sole and exclusive means for judicial review of an order

11   of removal entered or issued under any provision of this chapter." Section 1252(b)(9) follows:

12   "Judicial review of all questions of law and fact, including interpretation and application of

13   constitutional and statutory provisions, arising from any action taken or proceeding brought to

14   remove an alien from the United States under this subchapter shall be available only in judicial

15   review of a final order under this section."

16       The Ninth Circuit has held that a noncitizen's right to counsel "is part and parcel of the

17   removal proceeding itself" and as such, claims relating to a noncitizen's right to counsel must be

18   raised through a petition for review process. *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031–35 (9th Cir.

19   2016) (quoting *Aguilar v. ICE*, 510 F.3d 1, 13 (1st Cir. 2007)). However, since *J.E.F.M. v. Lynch*,

20   the Supreme Court has clarified the meaning of "arising from" and found that the INA "does not

21   present a jurisdictional bar where those bringing suit are not asking for review of an order of

22   removal, [or] the decision . . . to seek removal." *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,

23   591 U.S. 1, 19 (2020) (cleaned up) (quoting *Jennings v. Rodriguez*, 583 U.S. 281, 294–95 (2018)).

24   Here, Access/Detention Plaintiffs do not ask for review of or challenge removal proceedings;

25   Plaintiffs challenge Defendants' conduct in systematically interfering with their ability to provide

26   legal services to prospective and existing clients. *See* 1AC ¶¶ 235, 238–40, 244. The relevant facts

27   and legal questions occur outside any individual's removal proceeding; in no sense are they

28   inextricably linked to the removal process. *See Gonzalez v. United States Immigr. & Customs Enf't*,

1    975 F.3d 788, 810 (9th Cir. 2020) (quoting *Dep't of Homeland Sec.*, 591 U.S. at 19) (describing

2    Section 1252(b)(9) as a "targeted" and "narrow" provision.).

3         For those reasons, this Court finds that Section 1252 does not bar this Court from considering

4    Access/Detention Plaintiffs' Fifth Amendment claims. The Motion on this basis is DENIED.

5         **C.  Under Rule 12(b)(6), Plaintiffs have sufficiently stated their constitutional**

6              **claims.**

7         Defendants next argue that, "[e]ven assuming this Court assured itself of having

8    jurisdiction . . . , Plaintiffs' [1AC] asserts broad violations of the Fourth and Fifth Amendments that

9    fail to pass muster." Motion at 12. This Court addresses these arguments below.

10             1.    The Fourth Amendment claims are sufficiently stated.

11        For the reasons below, the Fourth Amendment claims are sufficiently stated.

12        As the parties agree, "immigration stops . . . requi[re] a reasonable suspicion inquiry

13   grounded in specific articulable facts." Motion at 13; *see also* Opp. at 22 n.8. Plaintiffs' 1AC alleges

14   that Defendants are falling short: it alleges Defendants' practices of stopping people without

15   reasonable suspicion, using such excessive force that a reasonable person would not feel free to

16   leave, and failing to tailor their use of force to an individualized assessment of the circumstances of

17   individual stops and arrests. 1AC ¶¶ 215–19.

18        Defendants argue that the Fourth Amendment claims are insufficient because they would

19   constitute an "unreasonable restriction on DHS's ability to determine reasonable suspicion," fail to

20   consider "officers' need to consider the totality of the circumstances based on specific and objective

21   evidence," and because the claims arise from enforcement operations that are "a lawful exercise of

22   statutory authority." *Id.* at 12–13. In Opposition, Plaintiffs argue that they "plausibly allege, and the

23   Ninth Circuit correctly concluded, that Defendants employ a pattern and practice of stopping

24   individuals based on broad demographic profiles and without the requisite reasonable suspicion in

25   violation of the Fourth Amendment." Opp. at 22.

26        Defendants' arguments do not demonstrate that Plaintiffs have failed to state a claim. On

27   their first argument, that Plaintiffs' claims would constitute unreasonable restrictions on DHS's

28   ability to determine reasonable suspicion, Defendants cite no authority to support that this (even if

true) should lead to dismissal of a Fourth Amendment claim. Moreover, the argument is not persuasive; Plaintiffs' claims ask Defendants, among other things, to find reasonable suspicion before performing immigration stops. So it is not clear how that claim would *restrict* Defendants from doing what it asks Defendants to do.

So, too, for Defendants' second argument—that "Plaintiffs' Fourth Amendment challenges do not consider officers' need to consider the totality of the circumstances based on specific and objective evidence underlying the basis for reasonable suspicion." Motion at 13. Defendants argue that no factor is per se impermissible as part of this totality-of-the-circumstances approach. But the argument appears inapposite to Defendants' Rule 12(b)(6) challenge. The 1AC itself (which states different claims and seeks different relief than the TRO and PI did) does not hinge on the idea that any one factor is per se unusable in an officer's consideration of the circumstances. So accepting Defendants' arguments would not necessarily lead to this claim being dismissed. Moreover, Defendants' cited authority undercuts their claim: They point to a case where the Supreme Court *did* suggest that reliance on a single factor (apparent Mexican ancestry) did not form reasonable grounds to stop the respondent's car. *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975).

Finally, Defendants claim the Fourth Amendment claims must fail because "the Supreme Court," in granting Defendants' stay request, "has since recognized [Defendants' enforcement operations during June 2025] as a lawful exercise of statutory authority." Motion at 13. The Supreme Court has done no such thing. As this Court has already explained, the Supreme Court did not accompany its grant of Defendants' stay request with a precedential opinion explaining its reasoning. This Court will not speculate as to the Supreme Court's rationale. And, as Defendants cite no other authority as to why the June 2025 enforcement actions were valid exercises of statutory power—or why that would lead the Fourth Amendment claim to fail—this Court declines to adopt Defendants' reasoning.

For these reasons, Plaintiffs' Fourth Amendment claims are sufficiently pleaded, and this Court will not dismiss them.

> 2.    The Fifth Amendment claims are sufficiently stated.

Defendants contend that, "in the supposed name of due process under the Fifth Amendment," Access/Detention Plaintiffs "seek to impose a wish list of improvements to B-18." Motion at 13. They argue that Plaintiffs' Fifth Amendment claims fail because "Plaintiffs identify no cognizable interest left unsatisfied or any prejudice from any temporary restrictions." For the reasons below, this Court finds that the Fifth Amendment claims are sufficiently stated.

First, this Court has already rejected Defendants' theory that the Access/Detention Plaintiffs failed to identify a liberty interest. As this Court has already explained, the argument that the Access/Detention Plaintiffs need to assert a liberty interest "appears to be based on the assumption that the Access/Detention Plaintiffs lack standing to sue on their members' behalf." TRO Order at 22 n.15. As this Court has explained, Plaintiffs have associational standing, and this Court is not aware of any authority to support the idea that an organization with associational standing separately needs to plead an independent liberty interest. TRO Order at 22 n.15. And Defendants do not appear to provide authority that stands for this proposition. To that end, this Court's analysis of this point has not changed.

Second, Defendants' characterization that Plaintiffs have not pleaded "prejudice from any temporary restrictions" is wrong. Motion at 13–14. Each of the Access/Detention Plaintiffs has pleaded that the access to counsel restrictions at B-18 prejudice their efforts. CHIRLA has pleaded that, for at least a month, its affiliates have been denied access in attempting to communicate with individuals at B-18. 1AC ¶ 190. So, too, for ImmDef, which has "been denied access to people in detention, including those being held at B-18." *Id.* ¶ 194. Defendants do not address these allegations or explain why, in their view, they do not show that Access/Detention Plaintiffs have been prejudiced from access to counsel restrictions at B-18. Third and relatedly, Defendants argue that "Plaintiffs have not established that the process afforded to them at B-18 was insufficient." Motion at 14. Again, Defendants do not address Access/Detention Plaintiffs' allegations that B-18's processes rendered them unable to communicate with B-18 detainees. To that end, both arguments are unavailing.

Fourth, Defendants make a factual attack on Plaintiffs' allegations that phone calls at B-18 are "very limited," 1AC ¶ 87, arguing that "the existing record tells a different story." Motion at 14.

Defendants cite two declarations from the record in support of this argument. The first is the

Declaration of C.B. Dkt. No. 38-4. Defendants cite a portion that reads: "My sister [who was

detained at B-18] called me and my nieces on June 19, 2025. She told us the conditions in B-18 were

not good. She was very cold, and there were no blankets or beds. She said she was only given a

Capri-Sun and burrito to eat the whole day." *Id.* ¶ 8. The second is the Declaration of S.A.R. Dkt.

No. 38-7. It states:

> My husband [who was detained at B-18] called us on June 9, 2025. He told me
> to write down his A number and to please ask for an attorney because he wanted to get
> out as soon as possible because he missed his children. Also, he told me that calls
> needed to be short because it was not safe to tell me anything about what is going on
> because he can get physically punished.

*Id.* ¶ 10.[9] But citations to two declarations, offering proof that two B-18 detainees were able to make

one call each, do little to dispute the idea that phone calls at B-18 are "very limited." 1AC ¶ 87. To

that end, Defendants' argument falls short of successfully mounting a factual challenge to the 1AC's

Fifth Amendment claims.

Fifth, Defendants argue that this Court should evaluate Plaintiffs' Fifth Amendment claim

"in the light of the central objective of safeguarding institutional security." Motion at 14 (internal

quotation marks omitted) (quoting *Bull v. City & Cnty. of San Francisco*, 539 F.3d 1193, 1202 (9th

Cir. 2008). They argue, citing *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549 (9th Cir. 1990), that

"the Ninth Circuit has upheld mandatory injunctions designed to remedy government practices *only*

when the 'cumulative effect' of such practices 'was to prevent [noncitizens[10]] from contacting

counsel and receiving any legal advice.'" Motion at 15 (quoting *Orantes-Hernandez*, 919 F.3d at

565) (emphasis added). But Defendants overstate the holding in *Orantes-Hernandez*; the Court there

---

[9] Defendants also cite paragraph 12 of the S.A.R. Declaration. But, in that paragraph, S.A.R. explains that she "spoke to [her] husband on June 22, 2025[,] while he was at Adelanto," after being transferred from B-18. Dkt. No. 38-7 ¶¶ 11–12. To that end, it is not relevant to the question of access to counsel issues at B-18.

[10] Where it does not change the meaning, this Court uses the term "noncitizen" in place of alien. *See Avilez v. Garland*, 69 F.4th 525, 527 (9th Cir. 2023) ("[U]se of the term noncitizen has become a common practice of the Supreme Court . . . . [In addition,] [t]he word alien can suggest 'strange,' 'different,' 'repugnant,' 'hostile,' and 'opposed,' Alien, Webster's Third New International Dictionary 53 (2002), while the word noncitizen, which is synonymous, *see Alien* and *Noncitizen*, *American Heritage Dictionary of English Language* 44, 1198 (5th ed. 2011), avoids such connotations. Thus, noncitizen seems the better choice.").

1  did hold that the cumulative effect of the government's actions was to prevent noncitizens from

2  receiving any legal advice, but it did not hold that injunctive relief is *only* appropriate in those

3  instances. 919 F.3d at 565. And elsewhere in that opinion, the Ninth Circuit confirmed that total

4  prevention of access is not required: the Court found that injunctive relief was appropriate when a

5  pattern of practices "*severely impeded* class members from communicating with counsel." *Id.* at

6  566–67 (emphasis added). So this Court need not find that Defendants completely deprived B-18

7  detainees of their right to counsel for injunctive relief to be proper.

8      In sum, Defendants' arguments on its Rule 12(b)(6) motion regarding Plaintiffs' Fifth

9  Amendment claims do not, as a matter of law, defeat Plaintiffs' claims at this stage. For that reason,

10  the Motion on this basis is DENIED.

11               **D.  Plaintiffs have sufficiently alleged violations of the APA.**

12      Lastly, Defendants argue that—"to the extent Plaintiffs base their claims under the APA"—

13  they have failed to sufficiently preserve this claim because they "do not present allegations or any

14  distinct claims that support an inference that Defendants engage[d] in unlawful agency action."

15  Motion at 17. For the reasons below, the 1AC sufficiently alleges violations of the APA.

16      As Plaintiffs point out, the sole case Defendants cite in support is not germane to the 12(b)(6)

17  context. In that case, *Greenwood v. Federal Aviation Administration*, 28 F.3d 971 (9th Cir. 1994),

18  the Court faced a separate question in a distinct posture. There, the plaintiff stated on appeal that a

19  statute was unconstitutional, but explained no grounds and cited no authorities. *Id.* at 977. In that

20  context, the Ninth Circuit explained, "We will not manufacture arguments for an appellant, and a

21  bare assertion does not preserve a claim . . . for review." *Id.* "Accordingly, [the plaintiff's]

22  challenge . . . [was] waived due to his failure to present a specific, cogent argument for our

23  consideration." *Id.* For several reasons, then, *Greenwood* is inapposite. It discussed the review of an

24  appellate court, not a determination by a district court. And it referred to an appellate brief, not a

25  complaint.

26      Moreover, Defendants' argument—that "Plaintiffs' [1AC] did not provide *any* allegation of

27  violations under the APA," is at odds with this Court's read of the 1AC. Accompanying several of

28  the 1AC's claims are allegations that several of "Defendants' polic[ies], pattern[s], and practice[s]

[are] 'final agency action[s]' that [are] 'in excess of statutory jurisdiction, authority, or limitations'" under the APA. *See, e.g.*, 1AC ¶¶ 229, 233. These paragraphs always appear to follow an allegation of a specific policy, pattern, and practice that Plaintiffs allege Defendants maintain. *See, e.g.*, 1AC ¶¶ 228, 232. This satisfies Rule 8's requirement of a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Put another way, taking those allegations as true, they substantiate Plaintiffs' claims of APA violations. To the extent that Defendants argue that Plaintiffs failed by not "tethering [their claims] to concrete examples of violating the statutes," this Court finds that stating the policies that are allegedly final agency action *does* tether Plaintiffs' claims to instances that (if proven true) may violate the APA). Nor do Defendants offer authority as to what details the 1AC is missing.[11] Defendants further argue that Plaintiffs' claims are unreviewable under the APA insofar as Plaintiffs' claims are "a challenge to officers' arrests of individual Plaintiffs." Reply at 11. But the 1AC does not state challenges to individual arrests under the APA. Rather, it appears that Plaintiffs intend to prove that Defendants' generalized policies, patterns, and practices form the basis for APA violations.

In sum, because Defendants have not demonstrated a deficiency in the 1AC's allegations that the APA is a source of law for some of Plaintiffs' claims, the Motion on this basis is DENIED.

### E. As Plaintiffs concede, Count Eight can be dismissed because Perdomo, Osorio, and Molino have succeeded in their effort to be released from detention.

Defendants allege that Count Eight of the 1AC must be dismissed as moot because Plaintiffs Perdomo, Osorto, and Molina have been released from detention—which is all they were seeking in this claim. Motion at 10. Plaintiffs Vasquez Perdomo, Osorto, and Villegas Molina agree. Opp. at 24 n.9. Given that the parties seem to agree that Count Eight no longer presents a live controversy for

---

[11] In Reply, Defendants' leading citation—to *Miranda v. Clark County*, 279 F.3d 1102, 1109 (9th Cir.), *reh'g en banc granted, opinion vacated*, 295 F.3d 1380 (9th Cir. 2002), *and on reh'g en banc*, 319 F.3d 465 (9th Cir. 2003), is not relevant. First, the opinion was vacated, and so has no precedential weight. Second, the Court there found that the alleged policy was insufficiently pleaded because "neither policy, as alleged, [was] unconstitutional." *Id.* at 1110. That is unlike this case; Defendants do not argue that the policies are constitutional as alleged, but rather that they were insufficiently alleged. Third, the policy in question was alleged in connection to a *Monell* claim, not an APA claim. *Id.* at 1109.

this Court to adjudicate, the Motion on this basis is GRANTED. The Court therefore dismisses the claim in Count Eight without prejudice.

**IV.**     **Conclusion**

For the foregoing reasons, the Court hereby ORDERS as follows:

1.     Defendants' motion to dismiss Count Eight of the 1AC is GRANTED. Count Eight is DISMISSED. Dismissal is without prejudice.

2.     On all other grounds, the Motion is DENIED.

IT IS SO ORDERED.

Dated: February 19, 2026.

_____

MAAME EWUSI-MENSAH FRIMPONG

United States District Judge