1  STACY TOLCHIN (SBN 217431)
   *stacy@tolchinimmigration.com*
2  LAW OFFICES OF STACY TOLCHIN
   776 E. Green St., Suite 210
3  Pasadena, CA 91101
   Tel: 213-622-7450; Fax: 213-622-7233
4
   MOHAMMAD TAJSAR (SBN 280152)
5  *mtajsar@aclusocal.org*
   MAYRA JOACHIN (SBN 306065)
6  *mjoachin@aclusocal.org*
   EVA BITRAN (SBN 302081)
7  *ebitran@aclusocal.org*
   DAE KEUN KWON (SBN 313155)
8  *akwon@aclusocal.org*
   STEPHANIE PADILLA (SBN 321568)
9  *spadilla@aclusocal.org*
   DIANA SANCHEZ (SBN 338871)
10 *dianasanchez@aclusocal.org*
   ACLU FOUNDATION OF
11 SOUTHERN CALIFORNIA
   P.O. Box 811370
12 Los Angeles, CA 90081
   Tel: 213-977-9500; Fax: 213-915-0219
13
   *Counsel for Stop/Arrest Plaintiffs*
14

15

16

17 (*Additional counsel listed on next page*)

MARK ROSENBAUM (SBN 59940)
*mrosenbaum@publiccounsel.org*
REBECCA BROWN (SBN 345805)
*rbrown@publiccounsel.org*
SOPHIA WRENCH (SBN 354416)
*swrench@publiccounsel.org*
RITU MAHAJAN (SBN 252970)
*rmahajan@publiccounsel.org*
GINA AMATO (SBN 215519)
*gamato@publiccounsel.org*
AMANDA MANGASER SAVAGE
(SBN 325996)
*asavage@publiccounsel.org*
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, CA 90005
Tel: 213-385-2977

*Counsel for All Plaintiffs*

ANNE LAI (SBN 295394)
*alai@law.uci.edu*
UC IRVINE SCHOOL OF LAW
IMMIGRANT AND RACIAL JUSTICE
SOLIDARITY CLINIC
P.O. Box 5479
Irvine, CA 92616-5479
Tel: 949-824-9894; Fax: 949-824-2747

*Counsel for Stop/Arrest Plaintiffs*

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 20 Pedro VASQUEZ PERDOMO; Carlos Alexander OSORTO; and Isaac VILLEGAS | Case No.: 2:25-cv-05605-MEMF-SPx |
| 21 MOLINA; Jorge HERNANDEZ VIRAMONTES; Jason Brian GAVIDIA; LOS | ***DISCOVERY MATTER*** |
| 22 ANGELES WORKER CENTER NETWORK; UNITED FARM WORKERS; COALITION | **JOINT STIPULATION RE: PLAINTIFFS' MOTION TO REMOVE** |
| 23 FOR HUMANE IMMIGRANT RIGHTS; IMMIGRANT DEFENDERS LAW CENTER, | **CONFIDENTIALITY DESIGNATION FROM GOV_VID_001** |
| 24 | |
| Plaintiffs, | Hon. Maame Ewusi-Mensah Frimpong |
| 25 | |
| v. | Referred to Hon. Sheri Pym |
| 26 | United States Magistrate Judge |
| Kristi NOEM, in her official capacity as | |
| 27 Secretary, Department of Homeland Security; | Date:  March 17, 2026 |
| Todd M. LYONS, in his official capacity as | Time:  11:00 a.m. |
| 28 Acting Director, U.S. Immigration and Customs | Discovery Cutoff:  None set |

1   Enforcement; Rodney S. SCOTT, in his official
    capacity as Commissioner, U.S. Customs and
2   Border Patrol; Michael W. BANKS, in his
    official capacity as Chief of U.S. Border Patrol;
3   Kash PATEL, in his official capacity as Director,
    Federal Bureau of Investigation; Pam BONDI, in
4   her official capacity as U.S. Attorney General;
    Ernesto SANTACRUZ JR., in his official
5   capacity as Acting Field Office Director for Los
    Angeles, U.S. Immigration and Customs
6   Enforcement; Eddy WANG, Special Agent in
    Charge for Los Angeles, Homeland Security
7   Investigations, U.S. Immigration and Customs
    Enforcement; Gregory K. BOVINO, in his
8   official capacity as Chief Patrol Agent for El
    Centro Sector of the U.S. Border Patrol; Jeffrey
9   D. STALNAKER, in his official capacity as
    Acting Chief Patrol Agent, San Diego Sector of
10  the U.S. Border Patrol; Akil DAVIS, in his
    official capacity as Assistant Director in Charge,
11  Los Angeles Office, Federal Bureau of
    Investigation; Bilal A. ESSAYLI, in his official
12  capacity as U.S. Attorney for the Central District
    of California,

13          Defendants.

14

Pre-Trial Conf.:  None set

Trial:  None set

1   JACOB S. KREILKAMP (SBN 248210)
    jacob.kreilkamp@mto.com
2   DAVID FRY (SBN 189276)
    david.fry@mto.com
3   SARA H. WORTH (SBN 341088)
    sara.worth@mto.com
4   HENRY D. SHREFFLER (SBN 343388)
    henry.shreffler@mto.com
5   LAUREN E. KUHN (SBN 343855)
    lauren.kuhn@mto.com
6   LAURA R. PERRY (SBN 342504)
    laura.perrystone@mto.com
7   MAGGIE BUSHELL (SBN 354048)
    maggie.bushell@mto.com
8   MUNGER, TOLLES & OLSON LLP
    350 S. Grand Ave., 50th Floor
9   Los Angeles, CA 90071
    Tel: 213-683-9100; Fax: 213-683-9100
10
    Counsel for Stop/Arrest Plaintiffs
11
    LAUREN MICHEL WILFONG*
12  lwilfong@ndlon.org
    NATIONAL DAY LABORER
13  ORGANIZING NETWORK
    1030 S. Arroyo Parkway, Suite 106
14  Pasadena, CA 91105
    Tel: 626-214-5689
15
    Counsel for Stop/Arrest Plaintiffs
16

17  BREE BERNWANGER (SBN 331731)
    bbernwanger@aclunc.org
18  AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION OF NORTHERN
19  CALIFORNIA
    39 Drumm Street
20  San Francisco, CA 94111
    Tel: 415-621-2493
21
    Counsel for Stop/Arrest Plaintiffs
22
    BRISA VELAZQUEZ OATIS
23  (SBN 339132)
    bvoatis@aclu-sdic.org
24  ACLU FOUNDATION OF
    SAN DIEGO & IMPERIAL COUNTIES
25  P.O. Box 87131
    San Diego, CA 92138-7131
26  Tel: 619-398-4199

27  Counsel for Stop/Arrest Plaintiffs

28

MATTHEW J. CRAIG (SBN 350030)
mcraig@heckerfink.com
MACK E. JENKINS (SBN 242101)
mjenkins@heckerfink.com
HECKER FINK LLP
1150 South Olive Street, Suite 10-140
Los Angeles, CA 90015
Tel: 212-763-0883; Fax: 212-564-0883

Counsel for Access/Conditions Plaintiffs

EDGAR AGUILASOCHO (SBN 285567)
eaguilasocho@farmworkerlaw.com
MARTÍNEZ AGUILASOCHO LAW, INC.
900 Truxtun Ave., Suite 300
Bakersfield, CA 93301
Tel: 661-859-1174

Counsel for Plaintiff United Farm Workers

CARL BERGQUIST*
cbergquist@chirla.org
COALITION FOR HUMANE IMMIGRANT
RIGHTS
2351 Hempstead Road
Ottawa Hills, OH 43606
Tel: 310-279-6025

Counsel for Plaintiff Coalition for Humane
Immigrant Rights

ALVARO M. HUERTA (SBN 274787)
ahuerta@immdef.org
BRYNNA BOLT (SBN 339378)
bbolt@immdef.org
ALISON STEFFEL (SBN 346370)
asteffel@immdef.org
IMMIGRANT DEFENDERS LAW CENTER
634 S. Spring Street, 10th Floor
Los Angeles, CA 90014
Tel: 213-634-0999

Counsel for Plaintiff Immigrant
Defenders Law Center

* Admitted pro hac vice

JOINT STIPULATION RE: PLAINTIFFS' MOTION TO REMOVE CONFIDENTIALITY DESIGNATION
FROM GOV_VID_001

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on March 17, 2026, at 11:00 a.m., or as soon thereafter as this matter may be heard in Courtroom 4, 3rd Floor, of the above-captioned Court, located at 3470 Twelfth Street, Riverside, California 92501, the Stop/Arrest Plaintiffs will and hereby do move for an order removing the confidentiality designation applied to the video file produced by Defendants with the document control number GOV_VID_001, subject to a blurring of the faces of members of the public other than Brian Gavidia.

Pursuant to the Protective Order issued in this action (ECF 247), counsel for Plaintiffs gave Defendants written notice of their intent to seek de-designation and the reasons therefore on January 21, 2026.  Counsel for Defendants responded on January 22, 2026.  Counsel for Plaintiffs and Defendants met and conferred via a telephonic conference on January 26, 2026, and again briefly on February 6, 2026.  On February 10, 2026, counsel for Defendants advised counsel for Plaintiffs that Defendants maintained their position on the confidentiality designation.  The parties have been unable to reach agreement regarding the subject matter of this Motion.  This Motion is based upon this Notice of Motion, the Joint Stipulation, the Declaration of Sara Worth and exhibits thereto, and any other papers or argument of counsel that may be filed or submitted in connection with this Motion.

DATED:  February 24, 2026                    MUNGER, TOLLES & OLSON LLP


By: _____/s/ Jacob S. Kreilkamp_____
JACOB S. KREILKAMP
*Counsel for Stop/Arrest Plaintiffs*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      PLAINTIFFS' INTRODUCTORY STATEMENT .................................................1

II.     DEFENDANTS' INTRODUCTORY STATEMENT ............................................1

III.    PLAINTIFFS' CONTENTIONS AND POINTS AND AUTHORITIES...........................4

    A.    Factual Background....................................................................................4

        1.    Mr. Gavidia Averred that CBP Assaulted Him Without Any Basis. .............4

        2.    Defendants Told the District Court Mr. Gavidia's Account Was False. ........4

        3.    The Video Proves Defendants Provided a False Account of Mr. Gavidia's Stop to the Court and the Public. ....................................5

            (a)    There Was No Urgent Call for Assistance. .........................................6

            (b)    There Was No Crowd of People. .....................................................6

            (c)    Mr. Gavidia Was Not "Close" to Agent E and Posed No Threat. ..........10

            (d)    Mr. Gavidia Was Not "Placed Against the Fence for Officer Safety" and Did Not "Voluntarily" Discuss His Citizenship. ..........12

        4.    Defendants Have Maligned Mr. Gavidia's Reputation in Out-of-Court Statements As Well. ....................................12

        5.    Defendants Take the Position that the Public Should Not Be Given Access to the Video That Would Disprove Their False Statements. ..........13

    B.    Argument.................................................................................14

        1.    Discovery Materials Are Presumptively Available to the Public, and Courts Have Repeatedly Found that Body Camera Footage Should Be Public. ....................................14

        2.    Defendants Have Not Shown Any Particularized Harm. .........................15

        3.    The *Glenmede* Factors Weigh Heavily Against Confidentiality.................17

            (a)    The Privacy Interests Are Minimal. .................................17

            (b)    Disclosure Is Sought for a Legitimate Purpose. ...............................17

            (c)    Any Embarrassment to Defendants Stems from Their Own Wrongdoing. ....................................18

            (d)    The Information Is Highly Pertinent to Public Safety....................18

|   |   |   | (e) | Sharing these Materials Has Promoted Fairness and Efficiency. | 18 |
|   |   |   | (f) | The Party Seeking Confidentiality Is a Public Body | 19 |
|   |   |   | (g) | The Issues in this Case Could Not Be More Important to the Public | 19 |

IV.    DEFENDANTS' CONTENTIONS AND POINTS AND AUTHORITIES ........................19

    A.    Factual Background ................................................................................19

        1.    Defendants Take the Position that Sensitive Information Must Be Protected and Should be Blurred if Plaintiffs Intend to Publicly Disclose the BWC Footage. ..........................19

    B.    Argument ................................................................................21

        1.    This Court Has Found Good Cause For Protecting This Sensitive Information From Public Disclosure. ..........................21

        2.    Defendants Have Demonstrated Particularized Harm That Would Result from Public Disclosure ..........................22

        3.    Balancing of Interests Involved Weigh Against Public Disclosure ............24

            (a)    The Privacy Interests Are Significant. ..........................24

            (b)    Disclosure Is Not Sought for a Legitimate Purpose. ..........................25

            (c)    Any Embarrassment or Harassment to Defendants Would Be Motivated by Plaintiffs' Purpose of Seeking Public Disclosure. ..........................26

            (d)    The Information Is Highly Pertinent to Public Safety. ..........................26

            (e)    Sharing these Materials Outside of This Litigation Does Not Promote Fairness and Efficiency. ..........................26

            (f)    Neither Do the Remaining Factors Support Public Disclosure. ..........................27

    C.    Conclusion. ................................................................................27

## I.    PLAINTIFFS' INTRODUCTORY STATEMENT

Defendants should be ordered to remove the "Confidential" designation from body-worn camera footage of the raid that resulted in the illegal detention and assault of Plaintiff Brian Gavidia by Customs and Border Protection ("CBP").  The public interest demands disclosure of this evidence, and Defendants have not articulated any colorable reason—let alone the "particularized harm" required by case law—to keep this evidence from the public that employs them.  Defendants cannot meet the demanding standard for barring public access to materials produced in discovery, an especially high bar for public agencies seeking to conceal their official conduct.  And public access to this video is not even a close question, as the footage depicts events that took place on, or were visible from, the public sidewalk.

Plaintiff Gavidia has a unique interest in disclosure of this footage, because it proves he told the truth, and Defendants lied, about what happened to him.  In opposing Plaintiffs' Motion for Preliminary Injunction, Defendants challenged Mr. Gavidia's account of his encounter with and assault by CBP, referring to a declaration from the agent who assaulted Mr. Gavidia ("C217"). Declaration of Sara Worth ("Worth Decl."), Ex. 11 (ECF 170) at 8; Ex. 12 (ECF 170-1) ¶¶ 4-11. Defendants also made public statements—on social media, in formal press releases, and directly to the press—saying that it was *Mr. Gavidia* who had committed assault and had been "arrested" for it.  Worth Decl., Exs. 2-6.  But the video proves Defendants' version of events was false in every material respect.  The public should see an accurate account of his stop and arrest and learn that the statements made by Defendants about him were false.  No one—and particularly not the government—should be permitted to perpetuate damaging lies about someone while concealing the evidence that refutes those lies.  Moreover, the public should know what their government officials are actually doing as they carry out their enforcement mandate in this District—and not be left only with the government's false characterizations.

## II.    DEFENDANTS' INTRODUCTORY STATEMENT

Defendants appropriately designated this video—body warn camera footage taken during the encounter in question—as "Confidential" under the terms of this case's Protective Order, ECF No. 247 ("PO"), which was extensively negotiated by both parties and as ordered by this Court.

-1-

1    Now Plaintiffs demand the release of this Body Worn Camera ("BWC") video in full. To be clear,

2    Defendants are not opposed to making the BWC video in question here public.  Rather the parties'

3    dispute centers on what in the video should be blurred prior to public disclosure. Despite

4    Defendants' attempts to reach a compromise, Plaintiffs have been unwilling to blur the specific

5    portions of the BWC that Defendants properly designated as confidential.  Specifically, in the video,

6    the name of a Border Patrol Agent clearly appears, and there are three points of a few seconds each

7    where an agent's phone shows what Defendants observe is one of its sensitive law enforcement

8    systems.  Instead of negotiating in good faith to blur information that is properly designated as

9    "Confidential" under the PO, information that does not concern Defendants' interaction with

10   Plaintiff Gavidia and if released would result in actual, serious risks to the officers as well as

11   undermine law enforcement methods and systems, Plaintiffs insist on only blurring the faces of by-

12   standers and others non-government participants.

13        As such, their demand appears calculated to generate public attention and to impose

14   reputational and practical burdens upon Defendants. This is precisely the kind of gamesmanship and

15   public spectacle the Federal Rules and courts have long cautioned against, recognizing that the

16   discovery process is not a tool for public amplification or strategic harassment or embarrassment

17   and providing safeguards against such consequences of disclosure in litigation. *See* Fed. R. Civ. P.

18   26(c); *In re Roman Catholic Archbishop of Portland in Oregon*, 661 F.3d 417, 424 (9th Cir. 2011)

19   (providing courts with discretion to issue a PO "to protect a party or person from annoyance,

20   embarrassment, oppression, or undue burden or expense."). Recognizing that materials in this

21   litigation would require "special protection from public disclosure and from use for any purpose

22   other than prosecution of this action[,]" the Court issued a PO to cover "Confidential Information,"

23   which includes, among other information, both identifying details of non-parties as well as

24   "sensitive information about law enforcement or national security . . . or other identifying details of

25   non-public facing supervisory and non-supervisory federal . . . employees . . . involved in

26   enforcement operations . . . where disclosure of such information to the public may", *inter alia*,

27   "pose privacy or safety risks" to those involved. ECF No. 247 at 2-5. The video that Plaintiffs seek

28

to release contains precisely the kind of "Confidential Information" and is why Defendants designated this Body Worn Camera as "Confidential".

The fact that the parties dispute what occurred during Plaintiff Gavidia's encounter is not relevant to the issue that remains: what portions of the video should be blurred. Plaintiffs have articulated no explanation as to why the minimal, yet justified blurring Defendants have requested is not workable as all of their briefing focuses on a desire to make the BWC public. While Defendants are willing to agree to removing the "Confidential" designation for this video, the PO's terms govern and must be respected to prevent sensitive information from being publicly disseminated, especially where it carries a risk to non-public facing agents and creates vulnerabilities to law enforcement methods and systems.

Nevertheless, while Defendants remain committed to negotiating resolution of disputes without the need for judicial intervention, Defendants maintain that they properly designated this footage as "Confidential" and have demonstrated to this Court that there is good cause to protect this sensitive information from public disclosure based on "the serious and well-documented safety and privacy risks posed by disclosure." *See* ECF No. 246 (describing the various threats made to immigration enforcement agents, including "tiered" bounties by Mexican drug cartels, doxxing of agency employees, and other violence against agents).[1] And while Plaintiffs repeatedly contend that "the public interest demands disclosure of this evidence," *see infra*, parties to an action can prevent—and here, have received protection from—public disclosure of discovery by showing good cause in support of the PO currently in effect, and a presumption of public access does not apply to such materials. *See Phillips v. G.M. Corp.*, 307 F.3d 1206, 1210-13 (9th Cir. 2002); *see also* ECF No. 247 at 2 (this Court's adopted "Good Cause Statement" recognizing that "Confidential Information" requires "special protection from public disclosure"). Defendants are simply exercising the safeguards afforded by the PO, which contemplated designating information including that which Defendants seek protection over here as "Confidential."

---

[1] In line with Defendants' arguments identifying the risks of public disclosure, this Court adopted Defendants' proposed provision protecting such "identifying details." *See* ECF No. 247 § A.2.b.vi.

JOINT STIPULATION RE: PLAINTIFFS' MOTION TO REMOVE CONFIDENTIALITY DESIGNATION
FROM GOV_VID_001

III.    **PLAINTIFFS' CONTENTIONS AND POINTS AND AUTHORITIES**

    A.    **Factual Background**

    The video disproves Defendants' representations to the Court and the public about Plaintiff Gavidia's stop, which is why Plaintiffs have moved to de-designate this video footage at this time.

    1.    **Mr. Gavidia Averred that CBP Assaulted Him Without Any Basis.**

    In a declaration supporting Plaintiffs' motion for a preliminary injunction, Mr. Gavidia states that he was at Yank Towing, in Montebello, on the afternoon of June 12, 2025. Worth Decl., Ex. 10 (ECF 45-9) ¶ 6. He heard someone say that immigration agents might be at the premises, and he went outside to confirm. *Id.* ¶ 7. He was on his phone and a masked agent carrying an assault rifle approached him and told him to "Stop right there." *Id.* ¶¶ 7-8. He felt he could not leave and he stopped. *Id.* ¶ 8. As the masked agent approached him, a second agent— this one without a mask—came running toward him. *Id.* ¶ 9. The unmasked agent asked him if he is an American; Mr. Gavidia responded that he is. *Id.* The agent asked repeatedly what hospital Mr. Gavidia was born in, to which Mr. Gavidia responded that he did not know. *Id.* The agent twisted Mr. Gavidia's arm behind his back, and the two agents forcefully pushed him up against a metal gated fence. *Id.*

    2.    **Defendants Told the District Court Mr. Gavidia's Account Was False.**

    In their opposition to the motion for preliminary injunction, Defendants denied Mr. Gavidia's account of this encounter. Their response merits quoting at length. Under the heading "Self-Initiated Contact with Federal Agents" (there was nothing "self-initiated" about this contact), here is what Defendants said happened:

> However, CBP agents dispute Mr. Gavidia's recollection of what transpired that day. Based on direction from their intelligence group, officers were directed to conduct immigration enforcement at the tow yard through consensual encounters. During the arrest of Ramirez, an agent exited the tow yard to investigate activities in the street. A minute later that same agent yelled out "somebody get out here" and then specifically called out to C217[2] by name to "get out there."

---

[2] Plaintiffs do not believe that Defendants have made the showing necessary to maintain confidentiality over the names or faces of agents involved in these public operations. The agents

> When C217 stepped out to assist, he saw "a crowd of approximately 10 people" approach the officers on scene and began "yelling out various curse words toward us." C217 observed that an individual, later identified as Mr. Gavidia, stood very close to another officer. Based on Mr. Gavidia's close proximity to the officer and the determination that the other officer's safety was threatened, Mr. Gavidia was restrained by C217. While Mr. Gavidia was placed against the fence for officer's safety, he *voluntarily* disclosed that he was an American citizen.

Worth Decl. Ex. 11 (ECF 170) at 8 (emphasis in original) (internal citations omitted). Defendants relied on this version of events to argue that Plaintiffs lacked standing to seek an injunction. *Id.* at 11. And they contended that because Mr. Gavidia's contact with CBP was supposedly "self-initiated," there was no Fourth Amendment violation. *Id.* at 22-23.

### 3. The Video Proves Defendants Provided a False Account of Mr. Gavidia's Stop to the Court and the Public.

The video proves Defendants' account of this encounter is false or misleading in essentially every material respect. The agent who assaulted Mr. Gavidia was not responding to an urgent call for help; no crowd of people existed, let alone yelled at the agents before Mr. Gavidia's stop and assault; and Mr. Gavidia was standing nowhere near an agent at the time of his stop or assault.[3]

---

are public employees, paid by the taxpayers, conducting operations in public places, and acting under color of authority granted by the People. Accountability to the public requires that they not be anonymous. Nevertheless, because Defendants have designated references to their names as confidential, the names would—at least initially—have to be redacted in the publicly available version of this brief. To minimize such redactions, this brief does not use their names.

[3] In addition to the discrepancies revealed by the video specifically, other evidence adduced in expedited discovery shows that agents were *not* acting "on direction from their intelligence group." Rather, as the agent in charge of the operation testified: "One of the agents in my team had a friend that lived in the area and told him to go check that spot out, that—that area there." Worth Decl. Ex. 7 at 146:5-10. "This was, like, second- or third-hand. I had a buddy of mine in the area says, Go check out this general area here." *Id.* at 147:3-6. So, contrary to Defendants' representations to the District Court, the agents were visiting Yank Towing based not on any law enforcement "intelligence" work, but at the suggestion of an agent's "buddy."

1

      *(a)     There Was No Urgent Call for Assistance.*

2      Defendants accurately state that while other agents were (illegally) arresting Javier

3 Ramirez, one agent (henceforth, "Agent E") exited through the gate.  ECF 170 at 8.  But then

4 Defendants' claim that Agent E "yelled out 'somebody get out here' and subsequently called out

5 to C217 by name to 'get out there.'"  *Id.*  Agent C217 elaborated on that story in his declaration,

6 saying that "[d]ue to the urgency in his voice, I thought that Agent was in trouble."  ECF 170-1

7 ¶ 7.  These claims are contradicted by the video.  Based on Agent C217's body camera footage,

8 Agent E may have said "[Agent C217] come on," but there is no indication on the video that he

9 called out twice and, to the extent it can be heard at all, there is no notable urgency in his voice.

10 Worth Decl. Ex. 1 at 2:07.  And Agent E is visible on the body camera at that moment and

11 presumably was visible to Agent C217, so he could see that Agent E was not "in trouble."  *Id.*

12

      *(b)     There Was No Crowd of People.*

13      Defendants then assert that "[w]hen C217 stepped out to assist, he saw 'a crowd of

14 approximately 10 people' approach the officers on scene and began 'yelling out various curse

15 words toward us.'"  ECF 170 at 8.  But the body camera footage nowhere shows any other people

16 outside the tow yard before Mr. Gavidia was assaulted by Agent C217—not a single person (other

17 than Agent E).  Worth Decl. Ex. 1 at 1:22-2:26.  Here are stills of some of the video angles with

18

19

20

21

22

23

24

25

26

27

28

the best view outside the fence, and none of them shows any member of the public outside the

fence other than Mr. Gavidia:



Worth Decl. Ex. 1 at 1:26.



*Id.* at 1:56.

JOINT STIPULATION RE: PLAINTIFFS' MOTION TO REMOVE CONFIDENTIALITY DESIGNATION
FROM GOV_VID_001

1
2
3
4
5
6
7
8
9
10



11
12   *Id.* at 2:13.
13



Brian Gavidia

14
15
16
17
18
19
20
21
22
23
24
25

26
27   *Id.* at 2:16.
28   Based on the body camera footage, it appears there was no one present but Mr. Gavidia.

JOINT STIPULATION RE: PLAINTIFFS' MOTION TO REMOVE CONFIDENTIALITY DESIGNATION
FROM GOV_VID_001

When asked at his deposition where the people he supposedly saw were located, Agent C217 placed at least some of them quite near Mr. Gavidia, but in the street, maybe five feet off the sidewalk. *See* Worth Decl. Ex. 8 (C217 Depo.) at 168:20-25.

```
 3          So where Mr. Gavidia was on the sidewalk, but
 4     in the street, maybe five feet from the sidewalk,
 5     there were people?
 6        A   Yes.
 7        Q   How many people?
 8        A   I don't know.
 9        Q   More than three people?
10        A   Yes.
11        Q   More than five people?
12        A   Possibly, yes.
```

*Id.* at 170:3-12. As this still shot from the video shows, there were no such people in the street next to Mr. Gavidia.



Worth Decl. Ex. 1 at 2:16.[4]

---

[4] A number of people did gather near Mr. Gavidia *after* Agent C217 assaulted him and other agents brought out Mr. Ramirez, whose face was visibly bruised. *See* Worth Decl. Ex. 1 at 3:22-4:30. Of

1

*(c)      Mr. Gavidia Was Not "Close" to Agent E and Posed No Threat.*

2       The most important falsehood in Defendants' story is the claim that Mr. Gavidia "stood

3  very close to another officer" (i.e., Agent E) and that, it was "[b]ased on Mr. Gavidia's close

4  proximity" to Agent E that Agent C217 made "the determination that the other officer's safety was

5  threatened," and therefore he "restrained" Mr. Gavidia.  ECF 170 at 8.  This lie is central because

6  it blames Mr. Gavidia for Agent C217's assault on him—Mr. Gavidia was "restrained" because he

7  supposedly got too close to Agent E, and therefore, posed a safety threat.

8       *First*, Mr. Gavidia was not standing close to Agent E.  In his declaration opposing the

9  Preliminary Injunction, Agent C217 claims Mr. Gavidia was "*just a few feet away*" from the other

10  agent.  ECF 170-1 ¶ 8 (emphasis added).  But the video that makes clear that that was a complete

11  fiction:



Agent E

22  Indeed, at his deposition, Agent C217 admitted that, "when [he] ran out, Gavidia was already—

23  maybe six feet, more—I mean, maybe seven feet, ten feet away from [the other agent]."  C217

24

25

26  ─────────────────
   course, what happened after the agent assaulted Mr. Gavidia cannot justify the assault.  And it is
27  hardly surprising that other members of the public gravitated to the scene.  Immigration agents had
   at that point assaulted two American citizens, who were vocally questioning the propriety of that
28  conduct.  *Id.*

JOINT STIPULATION RE: PLAINTIFFS' MOTION TO REMOVE CONFIDENTIALITY DESIGNATION
FROM GOV_VID_001

1  Depo. at 137:11-13.  Agent C217 ultimately conceded that Mr. Gavidia "wasn't in his [Agent E's]

2  immediate area."  *Id.* at 171:11-172:9.

3       *Second*, Defendants' claim that Mr. Gavidia was restrained *because of* his "close

4  proximity" to Agent E is necessarily false given that they were not in close proximity, and Agent

5  C217 abandoned that story at his deposition, adopting a different false narrative.  Agent C217

6  testified that even though Agent E was a large man and a body builder who was holding an M4

7  assault rifle, while Mr. Gavidia did not have a weapon (at least none that Agent C217 could see)

8  and was holding his hands up, Agent C217 thought Mr. Gavidia posed a threat because of—"[h]is

9  attitude and yelling."  C217 Depo. at 167:23-168:5, 172:11-23, 179:3-180:3.  Specifically, Mr.

10  Gavidia supposedly yelled, "That's my family."  *Id.* at 181:6-12.  Agent C217 further said that Mr.

11  Gavidia's "stance" caused him to believe Mr. Gavidia was a threat—"[h]ow he was standing and

12  the look on his face."  *Id.* at 181:15-21.

13       Setting aside whether Mr. Gavidia yelling "That's my family" could possibly justify

14  applying physical force to restrain him (it could not), the body camera footage indicates that Mr.

15  Gavidia was not yelling—he was talking on his phone.  Worth Decl. Ex. 1 at 2:14-19.  And here is

16  Mr. Gavidia's decidedly *not* threatening stance and the look on his face immediately before Agent

17  C217 grabbed him:

18
19
20
21
22
23
24
25
26
27



28  Worth Decl. Ex. 1 at 2:18.

JOINT STIPULATION RE: PLAINTIFFS' MOTION TO REMOVE CONFIDENTIALITY DESIGNATION
FROM GOV_VID_001

        (d)      *Mr. Gavidia Was Not "Placed Against the Fence for Officer Safety" and Did Not "Voluntarily" Discuss His Citizenship.*

Finally, Defendants falsely assert that "[w]hile Mr. Gavidia was placed against the fence for officer's safety, he *voluntarily* disclosed that he was an American citizen." ECF 170 at 8 (emphasis in original). But Mr. Gavidia posed no threat to officer safety; he was unarmed, standing on the sidewalk, talking on his phone, at a safe distance from Agent E, who was holding an M4 assault rifle. There is *nothing* about the scenario depicted on the video that suggests any threat to officer safety at all. The "safety" explanation for the assault is a post hoc rationalization of an illegal stop.

And Defendants' account betrays a very peculiar understanding of the word "voluntary." At the time Mr. Gavidia stated that he is an American citizen, an armed agent who—by the agent's own account—was wearing a vest that identified him as a Border Patrol Agent (ECF 170-1 ¶ 4), had run up to Mr. Gavidia and grabbed him by the arm. Worth Decl. Ex. 1 at 2:19. While Agent C217 did not initially ask him if he was a citizen, Mr. Gavidia's statement that he is a citizen was a very natural and understandable response for a citizen accosted by an immigration agent. But Mr. Gavidia's response clearly was not "voluntary" in the sense of a consensual encounter—Mr. Gavidia was already being physically assaulted.

The reason Defendants contend that Agent C217 pushed Mr. Gavidia against the fence for "officer safety" and claim that Mr. Gavidia "*voluntarily*" (ECF. 170 at 8 (emphasis in original)) identified himself as an American citizen is that it is patently obvious Agent C217 did not have reasonable suspicion warranting an immigration stop.

    **4.**    **Defendants Have Maligned Mr. Gavidia's Reputation in Out-of-Court Statements As Well.**

Defendants lied about Mr. Gavidia outside of court, too. Two days after the incident, the Department of Homeland Security ("DHS") re-posted a photo of Mr. Gavidia surrounded by CBP agents on X, identifying him by name, and asserted: "The facts are a U.S. citizens [sic] was arrested because they ASSAULTED U.S. Border Patrol Agents." Worth Decl. Ex. 2. The video shows Mr. Gavidia did not assault anyone, and he also was not arrested for such conduct. According to X, more than 200,000 people have seen this false and defamatory post. *Id.*

-12-

That post was picked up in the *Los Angeles Times* (Worth Decl. Ex. 3 at 2) and CNN (*id.* Ex. 4 at 4).  CNN published a further statement DHS apparently made directly to the network in which it asserted DHS "was conducting a 'lawful immigration enforcement operation' when Gavidia 'attempted to flee, assaulting an agent in the process.  The subject was arrested for assaulting and interfering with agents during their duties.'" *Id.*  That further statement was also untrue.  The CBP agent was engaged in an unconstitutional seizure of Mr. Gavidia, who did not attempt to flee, did not assault anyone, and was not arrested for assault or interference with agents.

On October 1, 2025, DHS issued a press release repeating the claim that Mr. Gavidia was arrested and had assaulted a law enforcement officer and interfered with the agents.  The press release stated that Mr. Gavidia "was arrested for **assaulting a law enforcement officer and interfering with agents performing their duties.**"  Worth Decl. Ex. 5 at 1 (emphasis in original). Again, the video establishes that those statements are entirely false.[5]

### 5. Defendants Take the Position that the Public Should Not Be Given Access to the Video That Would Disprove Their False Statements.

On January 21, 2026, Plaintiffs advised Defendants by email that, pursuant to the terms of the Protective Order, Plaintiffs would seek to remove the confidentiality designation from Agent C217's body camera video because (1) "Defendants have not identified any particularized harm that would come from disclosure of the video to the public"; and (2) "the public interest strongly favors disclosure, both because the video reflects the manner in which federal agents are conducting themselves and because the Defendants have sought to mislead the public regarding their conduct, including with respect to events that are specifically reflected in this video."  Worth Decl. Ex. 9.  Defendants responded that the video "contains sensitive law enforcement information and non-public identifying details that raise safety and operational concerns warranting continued

---

[5] This time, DHS appears to have realized that it is defamation *per se* to falsely say someone was arrested or committed assault, because they subsequently modified the press release to say that Mr. Gavidia "was detained on the street for investigation for **interference** and released after being confirmed to be a U.S. citizen with no outstanding warrants." *Id.* Ex. 6 at 1 (emphasis in original). It is true, of course, that Mr. Gavidia was detained on the street (technically, on the sidewalk), but the suggestion that he was interfering with the agents is not true, as is clear from the body camera footage.

confidential treatment." *Id.* Despite having viewed the body camera footage at least during Agent

C217's deposition, Defendants further stated that "Plaintiffs offer no basis for their assertion that

Defendants misled the public." *Id.*

On January 26, 2026, counsel met and conferred regarding Plaintiffs' request to remove

the confidentiality designation. Worth Decl. ¶ 5. At the outset, Defendants' counsel noted that the

Protective Order gave Defendants 20 days to make a decision regarding whether to agree to the

de-designation. *Id.* Defendants did not provide a substantial basis for maintaining confidentiality.

During a February 6, 2026 meet and confer on other matters, Plaintiffs advised that, in response to

comments Defendants had made, Plaintiffs would blur the faces of third parties to the encounter.

*Id.* ¶ 13. Plaintiffs hoped this would resolve, or at least narrow, the dispute.

On February 10, 2026, Defendants' counsel notified Plaintiffs via email that Defendants'

position remained unchanged. *Id.* ¶ 14.

**B.    Argument**

**1.    Discovery Materials Are Presumptively Available to the Public, and Courts Have Repeatedly Found that Body Camera Footage Should Be Public.**

"As a general rule, the public is permitted access to litigation documents and information

produced during discovery." *In re Roman Cath. Archbishop of Portland in Or.*, 661 F.3d 417, 424

(9th Cir. 2011) (internal quotations and citation omitted). "The party opposing disclosure has the

burden of proving 'good cause,' which requires a showing that specific prejudice or harm will

result if the protective order is not granted." *Id.* (internal quotations and citation omitted). Where,

as here, the court has entered a blanket protective order making a finding of good cause for

material generally, but did not "make any finding that there was good cause to protect any

document or other information in particular," the party seeking to protect the information from

disclosure bears the burden of persuasion that the confidentiality designations should remain in

place. *Graves v. Whitmore*, 2022 WL 17361976, at *5 (C.D. Cal. Mar. 10, 2022). In other words,

CBP has the burden of persuading the Court that the video should remain confidential.

The courts apply a two-step process for analyzing whether the good cause standard has

been met. *First*, the party opposing disclosure must establish a "particularized harm" that would

stem from disclosure of the information to the public.  *Roman Cath. Archbishop*, 661 F.3d at 424. Broad allegations of harm, "unsubstantiated by specific examples or articulated reasoning" do not qualify.  *Id.* (citation omitted).  *Second*, even if the party opposing disclosure can show such particularized harm, the court must "balance the public and private interests" to determine whether to maintain confidentiality.  *Id.* (internal quotations and citation omitted).

The second step—the interest balancing—is assessed under a multipart test first articulated by the Third Circuit in *Glenmede Trust Co. v. Thompson*, 56 F.3d 476 (3d Cir. 1995).  *Roman Cath. Archbishop*, 661 F.3d at 424.  The *Glenmede* factors are:

> (1) whether disclosure will violate any privacy interests; (2) whether the information is being sought for a legitimate purpose or for an improper purpose; (3) whether disclosure of the information will cause a party embarrassment; (4) whether confidentiality is being sought over information important to public health and safety; (5) whether the sharing of information among litigants will promote fairness and efficiency; (6) whether a party benefitting from the order of confidentiality is a public entity or official; and (7) whether the case involves issues important to the public.

*Id.* at 424 n.5 (quoting *Glenmede*, 56 F.3d at 483).

Applying this two-step process, courts in the Ninth Circuit have repeatedly found that law enforcement body camera footage should *not* be kept confidential.  *See, e.g.*, *LaRocca v. City of Los Angeles*, 2023 WL 4291066, at *4 (C.D. Cal. May 31, 2023); *Gonzales v. City of San Jose*, 2020 WL 4430799, at *5 (N.D. Cal. July 31, 2020); *Dominguez v. City of Los Angeles*, 2018 WL 6333661, at *4 (C.D. Cal. Apr. 23, 2018); *Harmon v. City of Santa Clara*, 323 F.R.D. 617, 623 (N.D. Cal. 2018); *Sampson v. City of El Centro*, 2015 WL 11658713, at *11 (S.D. Cal. Aug. 31, 2015).  As outlined below, there is no cognizable reason to keep this footage from the public.  And the arguments for public access are uniquely strong here because the Defendants have misled the public regarding the events captured by the video.

### 2.    Defendants Have Not Shown Any Particularized Harm.

Courts have repeatedly found that law enforcement agencies could not show particularized harm from the release of body camera footage.  For instance, the court in *LaRocca* rejected arguments that such footage was subject to the official information privilege, would improperly taint the jury pool, or would infringe on the privacy rights of third parties or non-defendant police

officers. 2023 WL 4291066, at *2-4. Because particularized harm was not shown, the court did not reach the balancing of interests. *Id.* at *4. In *Gonzales*, the only harm the defendants even came up with was the risk of tainting the jury, which the court rejected—because defendants relied on vague allegations, not specific examples. 2020 WL 4430799, at *4. And in *Harmon*, the court acknowledged that there was a *potential* for particularized harm because the officers involved were part of a specialized unit that worked entirely in plain clothes and depended for its effectiveness on "a level of anonymity"—but even that specific potential harm was outweighed by the public interest in disclosure. 323 F.R.D. at 624-25.

Here, Defendants have articulated only generalized notions of harm, not any specific negative consequence that would flow from disclosure of the video. During the meet and confer, for instance, they suggested that the video shows images of an agent's mobile phone screen, but they did not identify any information (either specific or general) that was disclosed on the screen that could lead to any harm if made public; nor is any information visible on the screen. Worth Decl. ¶ 7. They further suggested that the physical positioning of agents when effectuating stops or arrests might be disclosed and people could use that information to defeat the agents' techniques, but they identified no specific positioning technique that the agents used that is not known to the public. *Id.* ¶ 8. In this instance, and in many others, immigration agents are effectuating stops and arrests in public where people can watch and even video what they are doing. *See id.* Ex. 1 at 4:16-9:14 (showing numerous members of the public using mobile phones to video the agents). Defendants have offered no reason to think that this particular video includes secret techniques that are not on display to the public every day.[6]

Defendants also expressed generalized concerns regarding agent safety, but articulated no specific reason to believe that the disclosure of this video would lead to any harm of any agent. *Id.* ¶ 11. This is not a situation where the agents are working undercover—they are out in the streets.

---

[6] Since Defendants themselves publicized an image of this particular encounter on X, it is even less clear how the video could divulge an otherwise-secret officer-placement technique.

JOINT STIPULATION RE: PLAINTIFFS' MOTION TO REMOVE CONFIDENTIALITY DESIGNATION FROM GOV_VID_001

**3.**    **The *Glenmede* Factors Weigh Heavily Against Confidentiality.**

*(a)    The Privacy Interests Are Minimal.*

The privacy interests in this video are minimal or nonexistent.  Plaintiffs have blurred the faces of members of the public shown on the video, other than Mr. Gavidia.  As for the agents, this was a law enforcement operation on a public sidewalk (or visible therefrom), with the law enforcement officers wearing uniforms labeling them as Border Patrol, so they cannot contend that their work requires secrecy.  *See Gonzales*, 2020 WL 4430799, at *4 ("Indeed, the events took place in public, are described as allegations in the public complaint, and Officer Lezama's job as a police officer means that he is in the public eye every day."); *Harmon*, 323 F.R.D. at 625 ("This plain sight, public operation belies the notion that [the officers were] operating under strict secrecy.").  And, because the operation played out on a public sidewalk, the agents could have been—and were—photographed and videotaped by members of the public who were present at the scene.  *See* Worth Decl. Ex. 1 at 4:16-9:14; *id.* Ex. 2.  It is doubtful that uniformed law enforcement officers ever have a privacy interest in how they conduct themselves on the job out in public.  *See Santa Ana Police Officers Ass'n v. City of Santa Ana*, 723 F. App'x 399, 402 (9th Cir. 2018) (officers did not establish reasonable expectation of privacy in body-camera videos of on-duty incidents); *Dominguez*, 2018 WL 6333661, at *3 ("privacy interests are diminished for public actors subject to legitimate public scrutiny").  But, if they ever do have such an interest, it is not in this kind of public situation.  *Dominguez*, 2018 WL 6333661, at *3 ("Defendant City has not made a showing of particularized harm that outweighs the public interest in disclosure.  Not only is the instant lawsuit highly public in nature, but the shooting of Jesse Romero took place in a public setting and was apparently witnessed by numerous individuals.")

*(b)    Disclosure Is Sought for a Legitimate Purpose.*

The public has a right to see the evidence adduced in this case, which concerns rampant constitutional abuses in our community.  They have that right under the law *unless* CBP demonstrates a particular harm from disclosure *and* those risks outweigh the public's strong interest in access to the evidence.  The purpose of this disclosure is plainly proper: to demonstrate to the public, with body camera footage, that their government is, in fact, violating constitutional

-17-

rights as part of Operation At Large.  There is nothing improper about Plaintiffs seeking to correct the record and educate the public regarding the unconstitutional conduct of agents who are supposed to be public servants.

      (c)     *Any Embarrassment to Defendants Stems from Their Own Wrongdoing.*

Plaintiffs concede that disclosure of this information may cause embarrassment to the federal government.  Indeed, Defendants should be embarrassed—both by the conduct of Agent C217 and by the false representations they have made to the Court and the public.  But, given that this is a civil rights case against public officials, the level of embarrassment is correlated to the public value of disclosure.  Plaintiffs do not seek to disclose embarrassing facts about anyone's personal life; rather, these facts concern Defendants' performance of their duties as agents of our government.  When government actors perform their public duties so badly that disclosure of their conduct is embarrassing to them, the public has a correspondingly strong interest in knowing the facts so they can seek to prevent a recurrence.

      (d)     *The Information Is Highly Pertinent to Public Safety.*

Plainly, it is important to the public's health and safety to understand how armed government agents are conducting themselves.  *Gonzales*, 2020 WL 4430799, at *4 ("The public has a strong interest in knowing whether members of their tax-funded police department who swear to protect and serve them are using excessive force in violation of the United States Constitution, thereby endangering the health and safety of the community.").  This is particularly true where the incident involves unwarranted physical violence by an armed government agent.  It is equally important to the public health and safety for the public to receive accurate information about the manner in which enforcement operations are carried out.

      (e)     *Sharing these Materials Has Promoted Fairness and Efficiency.*

Sharing the video among the litigants plainly has promoted fairness and efficiency, because it provided a source of truth about the event that could not reasonably be contested.  *See Roman Cath. Archbishop*, 661 F.3d at 424 n.5 (listing as the fifth *Glenmede* factor "whether the

sharing of information among litigants will promote fairness and efficiency"). Because the video has already been shared among the litigants, this factor is not directly relevant in this context.

*(f)      The Party Seeking Confidentiality Is a Public Body.*

Where the party that would benefit from non-disclosure is a public agency, disclosure is favored. *Pansy v. City of Stroudsbourg*, 23 F.3d 772, 788 (3d Cir. 1994); *Sampson*, 2015 WL 11658713, at *9. Here, the Defendants are various officials of the federal government, so this factor weighs in favor of disclosure.

*(g)      The Issues in this Case Could Not Be More Important to the Public.*

The public "unquestionably holds a hefty interest in police force transparency, and especially so when fundamental rights are at stake." *Gonzales*, 2020 WL 4430799, at *4 (quoting *Harmon*, 323 F.R.D. at 624). This case concerns a massive federal initiative, affecting many thousands of people.[7] Whether the federal agencies engaged in that effort are complying with the Constitution is of fundamental importance to the people of the Central District, and to the nation. The government cannot be permitted to mislead the public concerning their misconduct while concealing the evidence of that misconduct.

## IV.    **DEFENDANTS' CONTENTIONS AND POINTS AND AUTHORITIES**

### A.    **Factual Background[8]**

#### 1.    **Defendants Take the Position that Sensitive Information Must Be Protected and Should be Blurred if Plaintiffs Intend to Publicly Disclose the BWC Footage.**

On January 21, 2026, Plaintiffs initiated the process for challenging designations pursuant to section D.2 of the PO. On January 26, the parties met and conferred as to Plaintiffs' challenge,

---

[7] *See* U.S. DEP'T OF HOMELAND SEC., *More Than 10,000 Illegal Aliens Arrested in Sanctuary Los Angeles Since DHS Launched Operations in June* (Dec. 11, 2025), https://www.dhs.gov/news/2025/12/11/more-10000-illegal-aliens-arrested-sanctuary-los-angeles-dhs-launched-operations.

[8] While the parties dispute what occurred during Plaintiff Gavidia's encounter, that is not relevant to the issue raised in Plaintiffs' instant motion, whether blurring is required to publicly disclose the challenged video. As such, Defendants do not reassert its previous assertions as to this encounter in this filing.

JOINT STIPULATION RE: PLAINTIFFS' MOTION TO REMOVE CONFIDENTIALITY DESIGNATION FROM GOV_VID_001

where Defendants maintained their designation was proper. Defendants noted during this meeting that an agent can be seen in the video accessing an internal law enforcement system[9] and identifying details of officers is visible, both of which constitute "Confidential Information" under the PO. Plaintiffs took the position that there would be no harm from publicly disclosing this information, and Defendants agreed to consider in good faith not opposing their request to remove the "Confidential" designation.

On February 10, Defendants communicated to Plaintiffs that they maintain their designation was proper but would consider de-designation if Plaintiffs could articulate the basis for needing to de-designate this video for purposes of this litigation. Plaintiffs have not acknowledged or responded to this inquiry. On February 22, in an ongoing good faith effort to resolve this dispute, Defendants followed up to ask once more whether Plaintiffs would agree to blur faces of officers and the internal law enforcement system visible in the video. On February 23, Plaintiffs responded, alleging Defendants have not articulated a "particularized harm" to support these redactions. Defendants reiterated their position that visuals of the internal law enforcement database must be protected to avoid publicly revealing sensitive information and facilitating manipulation of said system as well as agent identifying details must be protected based on "the serious and well-documented safety and privacy risks posed by disclosure." *See also* ECF No. 246 (describing the various threats made to immigration enforcement agents, including "tiered" bounties by Mexican drug cartels, doxxing of agency employees, and other violence against agents). Despite this, the parties were not able to come to a resolution, resulting in the instant filing.

---

[9] In Plaintiffs' supporting declaration, counsel for Plaintiffs misstates Defendants' stated position and instead allege that "Defendants' counsel said that [the footage] was designated "because it's a text screen." Worth Decl. ¶ 7. That is not what Defendants' counsel said; rather, counsel indicated that a confidential designation was proper, *inter alia*, because of the law enforcement sensitive information that is visible from the agent's screen which was accessing information in the internal law enforcement database, which would be protected under this Court's PO, *see* § A.2.b.vi.

**B.**    **Argument**

   **1.**    **This Court Has Found Good Cause For Protecting This Sensitive Information From Public Disclosure.**

Although discovery materials are generally subject to a presumption of public access, this Court has already determined—upon Defendants' showing of good cause, that sensitive information, such as the BWC here contains, warrants protection from public disclosure and should remain shielded from unnecessary dissemination. ECF No. 247 at 2 (recognizing that there is good cause for "Confidential Information" such as this to require "special protection from public disclosure"). The Ninth Circuit has recognized judicial authority to restrict public disclosure of materials produced in litigation, allowing parties to seek to prevent public disclosure of discovered materials by showing good cause in favor of a PO, and a presumption of public access does not apply to such materials. *See Phillips v. G.M. Corp.*, 307 F.3d 1206, 1210-13 (9th Cir. 2002). Here, the Court found such good cause exists, recognizing that materials disclosed in this litigation merit "special protection from public disclosure and from use for any purpose other than prosecution of this action is warranted." ECF No. 247 at 2.

To be sure, the PO was issued to protect, among other information and materials: (1) "sensitive information about law enforcement . . . staffing, resources, intelligence, and/or methods"; "confidential government personnel information, including identifying information . . . or other identifying details of non-public-facing . . . employees" to avoid creating "privacy or safety risks, or operational concerns"; and the "names of non-parties" where disclosure could create risks of harassment or retaliation. ECF No. 247 § A.2.b.ii, vi. Defendants maintain that significant portions of this footage are confidential and cannot be publicly disclosed because the footage contains precisely the type of information the PO was intended to protect, including sensitive law enforcement resources, intelligence, and methods via internal government database data; and identifying details of government agents.[10] While Plaintiffs claim that this footage was taken in

---

[10] Although Plaintiffs have blurred the faces of non-parties (i.e., bystanders) to ensure their protection (as already afforded by this Court's PO), the video they propose to make public has not been properly redacted to the extent it still discloses sensitive law enforcement resources,

JOINT STIPULATION RE: PLAINTIFFS' MOTION TO REMOVE CONFIDENTIALITY DESIGNATION FROM GOV_VID_001

public, not all of what is depicted in these videos happened in public or could be seen by other people, including, for example, the officer who is accessing the internal law enforcement database.

Relevant here, a court considering a challenge to a designation pursuant to a protective order must determine whether there is good cause to maintain those protections, which involves a two-step inquiry: (1) whether "particularized harm will result from disclosure of information to the public"; and (2) whether a balance of the public and private interests favor maintaining a PO's protections. *Roman Cath. Archbishop*, 661 F.3d at 424. Given Defendants already demonstrated good cause—grounded in the sensitive nature of the information at issue and the concrete harms that would result from its release, as further discussed below, *see supra* § B.2—and the public and private interests weigh against public disclosure, *see supra* § B.3, the material should remain protected and not be subjected to public disclosure, especially where Plaintiffs have failed to show any legitimate litigation purpose or need for public disclosure in order to litigate this action.

### 2. Defendants Have Demonstrated Particularized Harm That Would Result from Public Disclosure.

Even setting aside this Court's previous finding of good cause, ECF No. 247 at 2, Defendants have established that they have good cause for protecting this footage as Defendants (and their agents) will face particularized harm as a result of Plaintiffs publicly disclosing an agent's identifying information and a law enforcement sensitive database.

Particularly relevant to this challenge, moments of footage show an officer using an internal law enforcement database during the operation—information that was not visible to the public— that if disclosed could reveal structural details of this internal government system. Disclosure of this information risks the possibility of enabling offenders to gain access or insight as to how the

intelligence, and methods (e.g., internal database data) as well as identifying details (e.g., faces and names) of government agents involved in enforcement operations.

JOINT STIPULATION RE: PLAINTIFFS' MOTION TO REMOVE CONFIDENTIALITY DESIGNATION FROM GOV_VID_001

database operates, which carries the serious risk of unauthorized use or manipulation of the database and law enforcement information contained therein.

Furthermore, this footage contains—besides identifying details of non-parties (which Plaintiffs conveniently blurred)—identifying details of non-public facing federal employees that would likely "pose privacy or safety risks" to them if publicly disclosed. ECF No. 247 § A.2.b.vi. In fact, Defendants expressed their concerns to this Court of these actual, "serious and well-documented safety and privacy risks posed by disclosure" to the public at the conclusion of negotiations for the PO, in their joint statement. ECF No. 246 at 10-11. There have been documented incidents involving: (1) Mexican drug cartels placing bounties on immigration enforcement officers, using "spotters armed with firearms and radio communications to track the real-time movements of CBP and ICE agents";[11] (2) officers being doxed, including hackers publishing personal data belonging to government officials involved in enforcement operations; and (3) violence against officers within the District. *See also* ECF No. 172 at 7 n.1 (noting an 830-percent increase in assaults, threats, and doxing incidents targeting immigration officers).

These articulated harms are neither generalized nor an indirect consequence that would flow from disclosure of the portions of the video Defendants are seeking to protect that Plaintiffs have refused to blur. First, Plaintiffs' argument that the BWC footage must be made public because it occurred in public does not line up with their request to blur the faces of certain non-parties but not others, including the agents whose identifying details are visible. Second, contrary to Plaintiffs' description of representations made during the meet and confer, *see* Worth Decl. ¶ 7, Defendants identified an officer who was accessing the agency's law enforcement database, which was visible

---

[11] See Luke Barr, "Cartels issuing bounties, $50,000 hits on ICE, CBP agents," ABC News (Oct. 14 2025), https://abcnews.go.com/US/cartels-issuing-bounties-50000-hits-ice-cbpagents/story?id=126521867.

JOINT STIPULATION RE: PLAINTIFFS' MOTION TO REMOVE CONFIDENTIALITY DESIGNATION
FROM GOV_VID_001

from the officer's BWC but not in open view of nearby bystanders. Those moments show the database interface and can possibly result in sensitive information being disclosed such that offenders could use that information to gain unauthorized access or otherwise manipulate the database and law enforcement information contained therein. And finally, given the serious risk of threats and harm to officers, as described above, there would certainly be a particularized harm posed by releasing this footage which includes identifying details about the agents on scene, including their badges and partial face identification.

In the aggregate, Defendants have demonstrated particularized harm that would arise from public disclosure of the portions of the video it seeks to protect, and for which Plaintiffs have provided no objection based on any legitimate litigation purpose.

### 3.    Balancing of Interests Involved Weigh Against Public Disclosure

#### (a)    The Privacy Interests Are Significant.

As Defendants demonstrated above, the privacy interests in this video are significant. While Plaintiffs have blurred the face of non-parties, specifically bystanders, from the video, the officers seen on video have ongoing privacy interests that Plaintiffs rely on to support blurring the faces of bystanders but do not believe supports officers, who also have privacy concerns that Plaintiffs cannot simply discard as convenient for their argument. While officers routinely engage in immigration enforcement operations in public, limited or contextual public exposure does not result in a blanket waiver of their privacy interests. In fact, besides the fact they have not explained why this information must not be blurred for purposes of prosecuting this action, Plaintiffs have expressed their intent to publicize this encounter and draw scrutiny to Defendants before this litigation has played out, implicitly acknowledging that officers will be identified and that they simply have no privacy interest because of the nature of their work. That is insufficient to entirely displace the privacy interests of agents conducting lawful immigration enforcement operations. And the fact that certain aspects of an incident have entered the public domain does not eliminate the Court's responsibility to safeguard against unnecessary amplification of sensitive information. *See,*

*e.g.*, *Carpenter Tech. Corp. v. Armco, Inc.*, 132 F.R.D. 24, 26 (E.D. Pa. 1990) (recognizing that courts must "keep[] in mind the need to safeguard confidential information transmitted within the discovery process from disclosures harmful to the . . . interests" of those involved). Prior public footage cannot be used as a blanket justification to nullify the agent's remaining privacy interests, especially when the intent behind seeking public disclosure is as blatantly antagonistic and unnecessary to litigate this case.

Therefore, given the privacy interests at issue, this factor weighs against public disclosure of the agent's identifying details, as protected by the terms of the PO.

*(b)    Disclosure Is Not Sought for a Legitimate Purpose.*

Plaintiffs claim that they have a legitimate purpose for seeking public disclosure of this video when in fact they simply seek to bring public attention and scrutiny to this litigation, before the Court has had the chance to evaluate the evidence before it. Plaintiffs also maintain that there is nothing improper about "seeking to correct the record" but this point is dead on arrival. Defendants have already disclosed this video to Plaintiffs through the limited, expedited discovery ordered by this Court, and the parties will have an opportunity to brief and present their arguments based on the scheduling order this Court issues. In addition to the privacy concerns for the agents visible in the challenged video, Defendants take issue with Plaintiffs' attempts to create public scrutiny for Defendants while litigation is ongoing, especially where Plaintiffs have indicated their intent to request a jury trial, biasing any jury pool that may come before this Court and decide this case.[12]

Plaintiffs also acknowledge that Defendants have a right against public disclosure if there would be particular harm from disclosure and those risks outweigh the public's interest in access to the evidence. As described above, there is particularized harm, including the realistic prospect of doxxing, threats, and violence towards agents seen in the footage. *See* ECF No. 246 (discussing

---

[12] As explained in Defendants' portion of the Rule 26(f) report filed with the Court, Plaintiffs waived their right to request a jury trial because Plaintiffs failed to previously include a jury demand with their original and first amended complaint; thus, because the "issues in the original complaint and the amended complaint turn on the same matrix of facts," whether immigration enforcement operations in this District are unlawful, Plaintiffs cannot now request a jury trial. *Las Vegas Sun, Inc. v. Summa Corp.*, 610 F.2d 614, 620 (9th Cir. 1979).

actual threats to officers). Immigration enforcement officers have faced hostility and even physical violence while carrying out their assigned duties under existing law, as evident from the footage at issue here. *Id.* And given Plaintiffs' stated purpose to create more public scrutiny for these immigration enforcement operations, which is in no way a legitimate *litigation* purpose, this factor weights against public disclosure.

        (c)     *Any Embarrassment or Harassment to Defendants Would Be Motivated by Plaintiffs' Purpose of Seeking Public Disclosure.*

While Plaintiffs rightfully concede that disclosure of this information may cause embarrassment to the federal government, they are wrong to say agents' conduct would result in embarrassment, as these agents are simply carrying out sanctioned immigration enforcement operations. Rather, any embarrassment or harassment that would stem from public disclosure of this video can be attributed to the rhetoric Plaintiffs intend to expand upon through their actions here. Whether or not the officers lawfully engaged in immigration enforcement is the crux of this litigation, and the Court must evaluate these issues—particularly, whether this was a lawful encounter—without outside influence or distortion by additional public scrutiny resulting from public disclosure of this footage.

        (d)     *The Information Is Highly Pertinent to Public Safety.*

While Defendants understand Plaintiffs' point about a need to understand how armed government agents are conducting themselves, that is the purpose of this litigation, and their request—which fails to indicate why this particular evidence needs to remain unredacted and publicly disclosed in order to prosecute this action—cannot be entertained at the risk of the officers' privacy interests, their safety, and threats to sensitive law enforcement techniques, methods, and intelligence.

        (e)     *Sharing these Materials Outside of This Litigation Does Not Promote Fairness and Efficiency.*

Defendants agree that sharing the video among the litigants helps ensure fairness and efficiency but take issue with Plaintiffs' notion that fairness and efficiency in this litigation requires public disclosure. As expressed above, Plaintiffs fail to identify a single legitimate purpose for

-26-

1  needing to have an agent's identifying details and sensitive law enforcement systems de-designated

2  for purposes of this litigation that in any way supports their "need" to publicly disclose this video.

3  Rather, their attempt to vilify Defendants' agents only serves the purpose of creating embarrassment

4  by rhetoric as well as harassment and heightened scrutiny to officers simply carrying out their

5  assigned duties under the law.

6            (f)      *Neither Do the Remaining Factors Support Public Disclosure.*

7            To the extent an agent's identifying details are visible, while Defendants are a "Public

8  Body", the agent himself is not; their identity should not be put at risk, especially when there are

9  ongoing concerns of doxxing and violence towards immigration enforcement officers. ECF No. 246

10  (describing the various threats made recently to agents engaging in immigration enforcement

11  operations).

12            Defendants do not dispute that law enforcement is an important public safety issue, but the

13  small portions Defendants ask to be blurred, as properly contemplated by the PO, do nothing to

14  inhibit public disclosure of the BWC footage at issue here.

15       **C.      <u>Conclusion.</u>**

16            For the foregoing reasons, Defendants have demonstrated good cause to keep the challenged

17  designation in place—based on the particularized threat to individual officers in the footage as well

18  as law enforcement operational structure generally—and the balancing of interests weigh against

19  public disclosure, especially where Plaintiffs may rely on this material in accordance with this

20  Court's PO and where Plaintiffs otherwise lack a legitimate litigation purpose for seeking removal

21  of the confidential designation.

22

23

24

25

26

27

28

JOINT STIPULATION RE: PLAINTIFFS' MOTION TO REMOVE CONFIDENTIALITY DESIGNATION
FROM GOV_VID_001

1   DATED:  February 24, 2026            MUNGER, TOLLES & OLSON LLP

2

3                                     By:  _____/s/ Jacob S. Kreilkamp_____

4                                            JACOB S. KREILKAMP
                                          *Counsel for Stop/Arrest Plaintiffs*
5

6   DATED:  February 24, 2026

7

8                                     By:  _____/s/ Jason K. Zubata_____

9                                            JASON K. ZUBATA
                                          Trial Attorney
10

11                                           JONATHAN A. ROBBINS
                                          Assistant Director
12

    *Counsel for Defendants*
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**ATTESTATION OF FILER**

2         I attest that the other signatories listed, and on whose behalf this filing is submitted, concur

3  in the filing's content and have authorized the filing.

4  Dated: February 24, 2026                       */s/ Jacob S. Kreilkamp*

                                           JACOB S. KREILKAMP

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT STIPULATION RE: PLAINTIFFS' MOTION TO REMOVE CONFIDENTIALITY DESIGNATION
FROM GOV_VID_001