# EXHIBIT 2

Sealed Version
Filed Separately

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Assistant Director in Charge,
Los Angeles Office, Federal Bureau
of Investigation; Bilal A. ESSAYLI,
in his official capacity as U.S.
Attorney for the Central District
of California.

Defendants.

_____

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

VIDEOTAPED DEPOSITION OF C█████ C█████

LOS ANGELES, CALIFORNIA

WEDNESDAY, MAY 20, 2026

VOLUME I

Reported by

Daryl Baucum, RPR, CRR, RMR, CSR No. 10356

Job No. 8036035,  PAGES 1 - 321

Veritext Legal Solutions
866-299-5127        calendar-ca@veritext.com        www.veritext.com

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

DEPOSITION EXHIBITS

C█████ C█████

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 170 | I-213 of Pedro Vasquez Perdomo | 135 |
| Exhibit 171 | I-213 of Carlos Osorto | 142 |
| Exhibit 172 | EARM printout of Villegas-Molina | 144 |
| Exhibit 173 | July 12, 2025, Email from C█████ C███████ to C█████ C█████ | 147 |
| Exhibit 174 | July 12, 2025, Email from C█████ C█████ to C█████████ M█████████ | 153 |
| Exhibit 175 | Email thread, most current Email dated June 20, 2025, from I███ R█████ to C█████████ M█████████ | 157 |
| Exhibit 176 | Link to news video | 172 |
| Exhibit 177 | Forensic Examination Report Case Number C████████ iPhone | 172 |
| Exhibit 178 | I-213 of B██████ P█████ I█████ G██████ | 190 |
| Exhibit 179 | Department of Homeland Security Report of Investigation | 205 |

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

DEPOSITION EXHIBITS (continued)

C▮▮▮▮ C▮▮▮▮

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 180 | "Los Angeles Times" article titled "'Amateur hour at the U.S. attorney's office': L.A. prosecutors face more losses in protect cases" | 223 |
| Exhibit 181 | I-213 of W▮▮▮▮▮▮▮▮ C▮▮▮▮▮▮▮ | 230 |
| Exhibit 182 | Screenshot on Google maps | 242 |
| Exhibit 183 | I-213 of A▮▮▮▮▮ P▮▮▮▮▮▮-B▮▮▮▮▮ | 248 |
| Exhibit 184 | E-213 of E▮▮▮▮ H▮▮▮▮▮-M▮▮▮▮▮ | 254 |
| Exhibit 185 | Email thread, most current Email dated June 11, 2015, from C▮▮▮ C▮▮▮ to T▮▮▮ F▮▮▮ and others | 262 |

REPORTER'S NOTE:  All quotations from exhibits are reflected in the manner in which they were read into the record and do not necessarily indicate an exact quote from the documents.

Page 12

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Q    And that is the same title that you hold                09:53
presently?

A    Yes.

Q    Is that correct?

And have you been based in Long Beach                       09:53
throughout that from 2007 until -- until
the present?

MS. SAFAVI:  Objection to form.

THE WITNESS:  2007 when I joined ICE, I
moved to the L.A. field office.                             09:53

MS. SAFAVI:  Do you want to let them
know --

MX. WILFONG:  I think we just muted them.
Thank you.

BY MX. WILFONG:                                             09:54

Q    Excuse me.

You said that in 2007, you joined the L.A.
field office.

Is that correct?

A    Yes.                                                   09:54

Q    And have you been with the L.A. field
office since that time?

A    Yes.

Q    What is the role of a Supervising
Detention and Deportation Officer?                          09:54

Page 40

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

A    My specific role, I am a supervisor over a    09:54

Fugitive Apprehension Team.  My job is prominently

field work.

Q    Have you been a supervisor of a Fugitive

Apprehension Team since 2007 -- excuse me -- since    09:54

2011 when you became a supervisor?

MS. SAFAVI:  Objection; form.

THE WITNESS:  For the majority of the

time, yes.  There was a three-year period where I

supervised an alternative to the detention unit.    09:55

BY MX. WILFONG:

Q    Was that also in the L.A. field office?

A    Yes.

Q    And what years were those?

A    2019 until, maybe, 2003.    09:55

Q    I'm sorry, you said 2009 or '19?

A    '19.

Q    '19 to 2000.

A    And 3 -- I mean 2023.

Q    Thank you.    09:55

And is that a position that you requested?

A    Yes.

Q    And why did you leave that position in

2023?

A    Wanted to do something different.    09:56

Page 41

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Q    And when you left in 2023, you went back        09:56
to your role as a supervisor of the Fugitive
Apprehension Team?

A    Yes.

Q    Were there any differences in that role        09:56
after 2023 as opposed to previously?

A    As far as the job, no.

Q    And since 2023, you have been supervising
Fugitive Apprehension Teams --

A    Yes.                                            09:56

Q    -- the entire time?

Which of those teams do you supervise?  Do
they have numbers?

MS. SAFAVI:  Objection; form, vague, and
confusing.                                           09:57

THE WITNESS:  Currently, I supervise a
team called MCAT, Mobile Criminal Alien Team.

BY MX. WILFONG:

Q    Does that MCAT team have a number?

A    No, it doesn't.                                 09:57

Q    How long have you been supervising the
MCAT?

A    For about -- it was created about three
years ago.

Q    Have you been supervising that team since      09:57

Page 42

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

you left your position as an ATD supervisor?    09:57

A    Yes.

Q    And you said it was created about three years ago.

MCAT did not exist prior to 2023?    09:57

A    Not in the L.A. field office.

Q    And what is MCAT?

A    It's designation is Mobile Criminal Alien Team, I think.

Basically, it's not really specialized but    09:58
we are more mobile to go to different parts of the country.

Q    What is your understanding of why MCAT was created in 2023?

MS. SAFAVI:  Objection; calls for    09:58
speculation.

THE WITNESS:  My opinion, they just wanted
a team that they can say hey, go to New Orleans and
we're going to conduct a so-many-week operation, and
we basically sign an agreement that we're mobile    09:58
enough to do that.

BY MX. WILFONG:

Q    So you said that your activities are not
different than other teams -- other Fugitive
Operations teams.    09:59

Page 43

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

        A    No.                                              09:59

             MS. SAFAVI:  Objection; form.

             THE WITNESS:  They're not different.

    BY MX. WILFONG:

        Q    So the main difference is your unit, MCAT,       09:59

    is a mobile team.

        A    Yes.

        Q    Are there any other differences that you

    can think of?

        A    None.                                            09:59

        Q    And has MCAT been operational since 2023?

             MS. SAFAVI:  Objection; vague.

             THE WITNESS:  What do you mean?

    BY MX. WILFONG:

        Q    Have you been -- for example, have you           09:59

    been mobile since 2023?

        A    No.

        Q    When did -- what about now?

        A    Now, no.  We have -- that specific team

    has not been deployed.                                    10:00

        Q    Does that mean that -- has the MCAT team

    been sent to any operations outside of L.A. field

    office area of responsibility?

        A    No, not specifically the MCAT team.

        Q    And so if MCAT is not mobile, are there          10:00

Veritext Legal Solutions
866-299-5127        calendar-ca@veritext.com        www.veritext.com

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

any differences between the work that MCAT is doing          10:00

here in L.A. and the work of any other Fugitive

Operations team?

      A    No.

      MS. SAFAVI:  Objection; form.          10:00

BY MX. WILFONG:

      Q    And has your -- how large is the MCAT?

      MS. SAFAVI:  Objection; vague.

BY MX. WILFONG:

      Q    How many officers are there?          10:01

      A    How many officers, at this time eleven.

      Q    Has that changed over time?

      A    Yes.

      Q    At what -- how many officers -- I guess

what is the range of the number of officers over the          10:01

last three years?

      A    The range -- it was originally five or

six, and in the last year we have become eleven.

      Q    So in the first two years or so, it was

about five to six officers and then in the last year          10:01

it has grown to about eleven officers?

      A    Yes.

      Q    What is your -- why has the team grown so

much?

      A    We have more officers.          10:02

Page 45

Q    You have more officers in the Los Angeles    10:02
field office?

A    Yes.

Q    Have other field teams grown, as well?

MS. SAFAVI:  Objection; calls for    10:02
speculation and vague.

THE WITNESS:  Yes.

BY MX. WILFONG:

Q    So that is about a doubling in size for
the MCAT.    10:02

Have other teams doubled in size, as well?

A    As far as I know with the teams that are
in my area, all the teams have doubled.

Q    And what is that area?

A    Los Angeles field office, specifically    10:02
downtown L.A.

Q    And what teams are those, specifically?

A    Team 9, 17, 19, 18 around -- I think those
are the team numbers.

Q    Are those all Fugitive Operations teams?    10:03

A    Yes.

Q    Are there any other MCAT teams in the L.A.
field office?

A    No, just one.

Q    Are there any other supervisors on the    10:03

Page 46

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

MCAT team?                                                      10:03

          MS. SAFAVI:  Objection; form.

          THE WITNESS:  No, just me.

BY MX. WILFONG:

     Q    I know you said the team has doubled, but      10:03

those original five to six officers, have those

stayed mainly the same or is there a lot of changing

in staffing?

     A    No, we -- all the original officers stayed

and we just got new officers.                            10:04

     Q    In addition to the original officers?

     A    Yes.

     Q    Is there a reason you were interested in

being a supervisor of the MCAT team specifically as

opposed to other Fugitive Operations teams?            10:04

          MS. SAFAVI:  Objection; form.

          THE WITNESS:  I worked with the guys that

were -- wanted to go to the MCAT team and I thought

it would have been a good team to work with.

BY MX. WILFONG:                                          10:04

     Q    You were already working with the officers

who are now part of the MCAT team before MCAT was

created.

          Is that correct?

     A    Yes.                                           10:04

                                                    Page 47

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Q    And which officers were those?                    10:05

A    Deportation Officer F████ T█████,
Deportation Officer C████ C███████, Deportation
Officer C█████████ Gu███████.

There is one more.  I don't remember his          10:05
name right now.

Q    And are all of those officers part of the
MCAT today?

A    Yes.

Q    And how did you become aware of the            10:05
creation of MCAT?

A    Email.

Q    From who?

A    From my -- from my supervisor.

Q    Your supervisor at ATD?                        10:05

A    No, my supervisor in Fugitive Operations.

Q    And what was that Email saying?

A    Basically, hey, we are creating a new
team, here is a description, anybody who is
interested can contact me.                            10:06

Q    And what was the description?

A    That the team was more mobile, you're
going to focus more on the criminal aspect.  I think
that was about it.

Q    And when you say focus more on the            10:06

Page 48

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

criminal aspect, what do you mean by that?                    10:06

A    Persons with higher criminal histories.

Q    And has that been your experience with the MCAT team?

MS. SAFAVI:  Objection; vague.                    10:07

THE WITNESS:  Yes.  You know, you have higher -- higher levels of criminality, lower levels of criminality.

BY MX. WILFONG:

Q    You said earlier that at some point in the    10:07
last year that your team had grown in size.

Do you recall when that was?

A    It's been a slow progression over the last six months.

Q    Making me do attorney math again.    10:07

So that would be, well, late 2025, sometime in the fall of 2025?

A    I will say late 2025.

Q    And when you say slow progression, does
that mean like one or two new agents at a time?    10:08

A    Yes.

Q    And as the supervisor for the team, do you make those decisions about who joins your team?

A    I have a little bit of input, not the final say but a little bit.    10:08

Page 49

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Q    Who makes those decisions?                        10:08

A    My supervisor.

Q    And who is that?

A    ██████  M█████.

Q    And did you have communications with your         10:08
supervisor regarding the increased staffing for the
team?

A    What do you mean?

Q    How did you learn that your team would be
expanding?                                              10:08

MS. SAFAVI:  Objection; vague.

THE WITNESS:  My supervisor had a meeting.

BY MX. WILFONG:

Q    A meeting with you?

A    With all of the supervisors for Fugitive          10:09
Operations basically telling us that okay, we are
going to get this many more staff, so we divide them
up.

Q    And when was that meeting?

A    Yeah, I have no idea, we have so many              10:09
meetings.

Q    Do you -- was that meeting in 2025?

A    Yes.

Q    Going back to the temperature, but L.A.
doesn't really help us with that.                       10:09

Page 50

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

A    Right.                                            10:09

Q    Do you think that was in the fail of 2025? earlier in the year?

A    Honestly, I don't know.  I don't know.

Q    You said it's been about six months that          10:10 you have been slowly increasing?

A    Yes.

Q    So sometime prior to those six months?

A    Yes.

Q    And how many teams are in the L.A. field          10:10 office doing enforcement in the field?

         MS. SAFAVI:  Objection; vague.

         THE WITNESS:  I think there is about six teams total.

BY MX. WILFONG:                                        10:10

Q    Six teams?

A    Yes.

Q    And are those all Fugitive Operations teams?

A    No.                                               10:10

Q    How many are Fugitive Operations teams?

A    Well, it will be six for Fugitive Operations and then I think we have one other team with the alternative to detention unit that does field work, but they wouldn't be classified as a     10:11

Page 51

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Q    Is there anything else that you look for     11:28

in that review?

A    No, those are my go-tos.

Q    And you said that previously it was about

two to three arrests per week for your team.     11:29

How many arrests would you say your team

is making now?

MS. SAFAVI:  Objection; calls for law

enforcement privilege.

Go ahead and answer the question.     11:29

THE WITNESS:  From ten to fifteen.

BY MX. WILFONG:

Q    And how many of those are you typically

out in the field for?

A    Probably seven or eight.     11:29

Q    Is there a way that you pick which --

which you will go on?

MS. SAFAVI:  Objection; vague and

confusing.

THE WITNESS:  Yes.     11:30

BY MX. WILFONG:

Q    What is that?  What does that depend on?

A    The first thing I look is if there is

going to possibly be an officer safety issue, the

person was convicted of a violent crime.     11:30

Page 85

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

it?                                                      13:43

          A     I reviewed the FOW.  I just didn't sign

it.  It had already been signed by another SDDO.

          Q     And with an understanding of why -- why

did you go to the bus stop location that day as          13:44

opposed to the last known address, for example?

          A     We did a drive-by where I think Clement

said the van was parked and it wasn't there.

          Q     And is it consistent or is it common that

when you arrive at a location that you would exit         13:44

your vehicles and make contact prior to confirming

whether, for example, the vehicle was present that

you were looking for?

          MS. SAFAVI:  Objection; form and

ambiguous.                                               13:45

          THE WITNESS:  Situational.

BY MX. WILFONG:

          Q     What do you mean by "situational"?

          A     Situational could be -- let's say we know

that he works at that location and somebody dropped      13:45

him off and we see him outside of the store, for

instance.  Then the vehicle wouldn't be there and

then we would make contact or we would sit and

surveil the scene to see if there is any what we

call movement.                                           13:45

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Q   In this case, did you sit and surveil the   13:45
scene?

A   Yes, we were there for a short time.

Q   And did you make any attempt during that
time to search for the white van?   13:45

A   Prior to that.

Q   And you testified that you did not see it
at the scene.

Is that correct?

A   That's correct.   13:46

Q   And you said that you were surveilling for
a short time.

How long would you say you were
surveilling?

A   I don't know.   13:46

Q   A few minutes longer? a short time?

A   It could have been ten minutes.  It could
have been five, could have been twenty.  I don't
remember at this time.

Q   And you testified that you don't know the   13:46
reason that Officer O█████ chose to approach these
individuals at the bus stop.

Is that correct?

A   That's correct.

Q   Is that something that you would want to   13:46

Page 131

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

know as supervisor?                                           13:46

          MS. SAFAVI:  Objection; form.

          THE WITNESS:  Yes.

BY MX. WILFONG:

   Q    Did you ask him about that after the        13:46
operation?

   A    No.

   Q    And why not?

   A    It didn't cross my mind.

   Q    And did it turn out that any of those        13:47
individuals had a connection to the target?

          MS. SAFAVI:  Objection; vague, ambiguous.

          THE WITNESS:  I didn't -- didn't interview
them to ascertain whether they were connected to the
target.                                                       13:48

BY MX. WILFONG:

   Q    Were any of the individuals, in fact, the
target?

   A    No.

   Q    And did your team make any additional        13:48
attempts to locate the target during that operation?

   A    I don't know.

   Q    You were -- as supervisor, you are not
sure whether anyone -- whether there were any
additional steps to locate the target during that            13:48

Page 132

operation?                                                    13:48

          MS. SAFAVI:  Objection; vague, confusing,

ambiguous, form.

          THE WITNESS:  Correct.

          Deportation officers have a lot of          13:48

autonomy where he could still keep that same FOW and

do drive-byes of the location trying to see if he

sees the van or not, and he doesn't have to report

to me every time, hey, I am going to swing by this

location.                                                     13:48

BY MX. WILFONG:

     Q    Thank you for clarifying.

          And because, as you testified, none of

these individuals were the target, did you have

warrants -- administrative warrants for these          13:49

individuals at the time of the operation?

     A    No, because we didn't know who they were

prior to that.

     Q    Did you -- did your team issue I-200

administrative warrants for these individuals --      13:50

     A    Yes.

     Q    -- after contacting them?

     A    Yes.

     Q    Was that then back at the office or in the

field?                                                        13:50

                                           Page 133

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

A    I don't remember which one.  We do it both ways sometimes.                                                         13:50

Q    And you said that you do it both ways.

Does -- when you issue I-200s in the field, how does that work?                                                       13:50

A    We would have the standard form.  We fill out the information that we know to be correct, a number, name, I think country of citizenship, something like that, and then I would sign them.

Q    And that would be after making contact and detaining the individual?                                              13:51

A    Yes.

Q    How long does that process usually take?

A    To issue the I-200?

Q    Yeah.                                                    13:51

A    For me, I like to get a clear understanding of the person's immigration background through database checks so, you know, between -- depending on how fast the databases are and how much history the person has, five, ten -- ten minutes.       13:51

Q    And you testified you can't recall whether you issued the I-200 in the field versus back at the office but your team did --

A    Yes.

Q    -- issue those.                                          13:52

Page 134

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

operation at the time was called.                    15:26

Q   Thank you.

We can put this document aside.

So other than the text thread that we were just reviewing, did you have any other                    15:26 communications about this operation on June 18?

A   Not that I remember.

Q   And were you using Zello at that time or other radio for communications?

A   At that time we were -- depending on what                    15:26 fed partners that we were with, that would dictate what messaging app we would use.

Q   So for this operation, were you using Zello?

A   I think so.                    15:27

Q   So you think so.

A   I think so.  I don't know.

Q   And did you, yourself, enter new data or information into any of the databases about this operation?                    15:27

A   No.

Q   And just before we move off this topic, the I-213 for Mr. Vasquez Perdomo which is 170, and so just returning again to the arrest narrative here which we discussed earlier and you shared that this                    15:28

Page 181

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

would have been -- or assuming that there was no                15:28

warrant at the time of the operation -- in advance

of the operation for this individual, is there

sufficient basis from this narrative to determine if

his arrest was justified?                                       15:28

      MS. SAFAVI:  Objection; vague, ambiguous,

confusing.

      THE WITNESS:  Based on a consensual

encounter and his immigration history and him

████████████ that he was in the country without                15:29

documents, yes.

BY MX. WILFONG:

    Q   And this is -- you consider this a

consensual encounter though the person fled and was

apprehended?                                                    15:29

    A   Yes.

    Q   And what -- I think we can switch gears

slightly -- well, sort of.

      Staying on the topic of I-213 -- so what

is the purpose of an I-213?                                     15:29

    A   The 213 is a report of the -- it acts as

the police report for an encounter or an arrest

where I feel it's designed that any law enforcement

agency can pick it up, read it, and have a clear

view of the person's legal status, things like that.           15:30

Page 182

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

A    How the verbiage and the breakdown of it, the 213, whether it's the immigration history, criminal history mixed in together or separate or chronological, how we would put Los Angeles Police Department on it, and then the next time he mentioned them, you would just say LAPD.

So he liked it a specific way.  So that's the format we adopted.

Q    And from your training and experience, what is an I-213 supposed to document in the case of a warrantless arrest?

A    In the case of a warrantless arrest?

MS. SAFAVI:  Objection; form.

BY MX. WILFONG:

Q    Yes.

A    Just like any 213, place, method of apprehension, immigration history, criminal history, the processing type of case, like if it's going to be a notice to appear, things like that.

Q    Anything else?

A    Medical history, document whether you served certain things on them.  It's many things you can document.

You can document in a 213 almost anything you want.

15:34

15:34

15:35

15:35

15:35

15:35

Page 186

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Q    Anything else that you haven't mentioned    15:35
that is supposed to be in?

A    Not that I can think of right now.

Q    Thank you.

And have you been provided any templates    15:35
for I-213 narratives, you and your team in the last
year, or examples?

MS. SAFAVI:  Objection; compound form.

THE WITNESS:  Yes, when the AFOD finds
like a complicated 213 and he might correct it and    15:36
say hey, guys, this is a really good one, you
should -- I will look at it and review it.

BY MX. WILFONG:

Q    When you say "complicated," what do you --
what do you mean by that?    15:36

A    Like a person that has an extensive
immigration history, extensive criminal history,
very complicated immigration case.

Q    Any other templates or any other scenarios
where you would receive a template or example?    15:36

A    Yeah, basic reports.

Just anything that I would have to use a
specific format on, he will send those out when the
format changes or he would find a good format and he
would send that out.    15:37

Page 187

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

that you would ask.  One was about whether they were observing him going into court and coming out.

Does it affect your analysis of whether there was reasonable suspicion that the person that they were targeting was not, in fact, at the courthouse?

MS. SAFAVI:  Objection; form.

BY MX. WILFONG:

Q    That they did not have reason to believe that that individual would be at the courthouse.

A    Correct.

They didn't have reasonable suspicion that he was the person who went to court.  They did have reasonable suspicion that the original target -- after the Police Department didn't honor the detainer, the guy left on foot, and just so happened where they ran into the target number 2, and due to him fitting the description of target 1, they stopped to do a field interview and discovered that this person was illegally present in the United States.

Q    And is that a common practice, for a Fugitive Operations Team to drive around the vicinity looking for an individual if they don't locate them at the first location?

Page 245

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

MS. SAFAVI:  Objection; form.                    17:28

THE WITNESS:  Yes.  Due to the local

Police Departments not honoring detainers, sometimes

we get there and they say hey, we released him five

minutes ago.                                         17:28

And now, we say okay, more than likely the

guy left walking because he had a DUI -- so his car

was more than likely impounded or he is going to

take public transportation.

So we would go in the local area and see      17:28

if we can locate him walking.

BY MX. WILFONG:

Q    I understand.

And are officers trained about risks

around mistaken identity around these kinds of       17:28

stops?

A    You mean the Fourth Amendment violations?

Q    Not necessarily.

Is the topic of mistaking -- stopping

somebody based on a matching description and the     17:29

risk of mistaken identity, is that something that is

discussed with officers?

MS. SAFAVI:  Objection; form.

THE WITNESS:  I don't know if there has

been any specific training on that.                  17:29

Page 246

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

BY MX. WILFONG:                                                    17:29

        Q    Has your team -- have you discussed that

risk with your team?

                MS. SAFAVI:  Objection; form.

                THE WITNESS:  I have discussed the risk of       17:29

I would rather arrest the target of the

investigation instead of a collateral arrest.

BY MX. WILFONG:

        Q    Have you discussed what is sufficient as

far as matching description in order to make an                  17:29

investigative stop in a public location?

                MS. SAFAVI:  Objection; form.

                THE WITNESS:  I don't think so.

                MX. WILFONG:  You can put this one to the

side.                                                            17:30

                MS. SAFAVI:  Can we get a time stamp

please.

                THE VIDEOGRAPHER:  Current, five hours,

thirty-one minutes on the record.

BY MX. WILFONG:                                                  17:30

        Q    And just to close out or clarify before we

move on to the next exhibit, you said you did have

additional questions based on reading the narrative

but you did sign off on the I-213.

        A    I said on -- I don't remember this arrest         17:31

                                                         Page 247

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

but if I was to read this 213, I would have more          17:31

questions for the officer that made the arrest.

    Q   And you did -- you believe that you did

read this 213 prior to signing it?

    A   Yes.          17:31

    Q   And based on what you read, do you have

concerns regarding the arrest -- of whether the

arrest of Mr. C███ complied with agency policy?

    A   No.

        MS. SAFAVI:  Objection; form.          17:31

        THE WITNESS:  No, I don't have any other

concerns.

        MX. WILFONG:  Thank you.

        So we will ask the court reporter to mark

this.          17:31

        (Deposition Exhibit 183 was marked

        for identification by the court

        reporter and is attached hereto.)

BY MX. WILFONG:

    Q   So another I-213.          17:32

        Do you see at the bottom right corner

Examining Officer C███ C███?

        That is you?

    A   That is me but I don't know if I reviewed

this one because there is no signature on it.          17:32

Page 248

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

A    Yes.                                                    17:39

Q    And having reviewed the arrest narrative, are you able to tell if there was reasonable suspicion to detain Mr. P███████-B████████?

A    I would say due to the fact that they were     17:40
doing a targeted enforcement operation at that specific residence and at -- the time is about 4:00 o'clock in the morning -- they probably had to use physical descriptors to try to determine whether that was the target of the arrest.                  17:40

Q    Is there any indication in the arrest narrative that Mr. P████████-B██████ matched the description of Mr. P██████ P██████ or that the officers believed him to be?

A    No.                                                    17:40

        MS. SAFAVI:  Objection; compound.

        THE WITNESS:  No.

BY MX. WILFONG:

Q    Based on the information provided in the arrest narrative, can you determine whether an     17:40
arrest was properly made of Mr. P██████ B████████?

        MS. SAFAVI:  Objection; form, vague.

        THE WITNESS:  I would say yes due to them trying to do a vehicle stop, trying to identify the person getting in the vehicle.                          17:41

Page 253

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

And once they start -- do the

identification and then due to the person's

self-admission, I would say yes.

BY MX. WILFONG:

Q   So the self-admission of alienage was

sufficient to justify the arrest despite not being

the target for the operation.

Is that right?

A   Yes, it would fall into that collateral --

collateral arrest category.

MX. WILFONG:  You can put this to the side

and take the next exhibit, please.

I will hand this to the court reporter to

mark 184.  It is another I-213.

(Deposition Exhibit 184 was marked

for identification by the court

reporter and is attached hereto.)

BY MX. WILFONG:

Q   And do you see at the bottom right-hand

side of the first page the examining officer is

listed as C███  C███?

A   Yes.

Q   That's you.

And the deportation officer is listed as

M██████-R███.

17:41

17:41

17:42

17:42

17:42

17:43

Page 254

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

STATE OF _____ )

                                          )  Ss.

COUNTY OF _____ )


          I, DARYL BAUCUM, a Certified Shorthand

Reporter of the State of California, do hereby

certify;

          That the foregoing proceedings were taken

before me at the time and place herein set forth,

at which time the witness named in the foregoing

proceeding was placed under oath; that a record

of the proceedings was made by me using machine

shorthand which was thereafter transcribed under my

direction; and that the foregoing pages contain a

full, true and accurate record of all proceedings

and testimony to the best of my skill and ability.

          I further certify that I am neither

financially interested in the outcome nor a relative

or employee of any attorney or any party to this

action.

          IN WITNESS WHEREOF, I have subscribed my

name this 27th day of May 2026.




                    _____

                    DARYL BAUCUM, CSR No. 10356

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com