HYDEE FELDSTEIN SOTO (SBN 106866)
City Attorney
hydee.feldsteinsoto@lacity.org
VALERIE L. FLORES (SBN 138572)
valerie.flores@lacity.org
MICHAEL J. DUNDAS (SBN 226930)
mike.dundas@lacity.org
MARIA LOUISE COUSINEAU (SBN 122280)
maria.cousineau@lacity.org
RANDALL G. SOMMER (SBN 214099)
randall.sommer@lacity.org
SHUBHRA SHIVPURI (SBN 295534)
shubhra.shivpuri@lacity.org
OFFICE OF THE LOS ANGELES CITY ATTORNEY
City Hall 200 North Spring Street 21st Floor
Los Angeles, CA 90012-4130
Tel.: 213-922-8382; Fax: 213-978-7957

*Attorneys for Intervenor City of Los Angeles*

E. MARTIN ESTRADA (SBN 223802)
martin.estrada@mto.com
DANIEL B. LEVIN (SBN 226044)
daniel.levin@mto.com
JOHN L. SCHWAB (SBN 301386)
john.schwab@mto.com
V. GRACE DAVIS (SBN 336732)
grace.davisfisher@mto.com
V. ROMAN LEAL (SBN 348892)
roman.leal@mto.com
WENDY QIUYU XIAO (SBN 342702)
wendy.xiao@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue 50th Floor
Los Angeles, California 90071
Tel.: 213-683-9100; Fax: 213-687-3702

*Attorneys for Intervenors Cities of Los Angeles, Anaheim, Bell Gardens, Beverly Hills, Carpinteria, Culver City, Huntington Park, Long Beach, Lynwood, Montebello, Monterey Park, Oxnard, Paramount, Pico Rivera, Pomona, Santa Ana, Santa Barbara, Santa Monica, South Gate, and West Hollywood*

NICOLE DAVIS TINKHAM (SBN 229592)
ntinkham@counsel.lacounty.gov
LILIANA CAMPOS (SBN 255753)
lcampos@counsel.lacounty.gov
BRIGIT GREESON ALVAREZ (SBN 237301)
bgreesonalvarez@counsel.lacounty.gov
OFFICE OF THE COUNTY COUNSEL
648 Kenneth Hahn Hall of Admin.,
500 West Temple Street
Los Angeles, California 90012-2713
Tel.: 213-808-8736; Fax: 213-633-1915

*Attorneys for Intervenor County of Los Angeles*

MICHELE BEAL BAGNERIS (SBN 115423)
City Attorney
mbagneris@cityofpasadena.net
ARNOLD F. LEE (SBN 278610)
aflee@cityofpasadena.net
ANDREW AARONIAN (SBN 318245)
aaaronian@cityofpasadena.net
OFFICE OF THE CITY ATTORNEY OF PASADENA
100 N Garfield Ave, Rm N-210
Pasadena, CA 91101
Tel.: 626-744-4141; Fax: 626-744-4190

*Attorneys for Intervenor City of Pasadena*

NORMAN L. EISEN*
Norman@democracydefenders.org
STEPHEN A. JONAS (SBN 542005)
Steve@democracydefenders.org
JOSHUA G. KOLB*
Joshua@democracydefenders.org
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Ave. SE, Suite 15180
Washington, DC 20003
Tel: (202) 594-9958

*Admitted Pro Hac Vice

*Attorneys for Intervenor City of Los Angeles*

DECLARATION OF ALINE ASSAF

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

Pedro VASQUEZ PERDOMO; Carlos Alexander OSORTO; and Isaac VILLEGAS MOLINA; Jorge HERNANDEZ VIRAMONTES; Jason Brian GAVIDIA; LOS ANGELES WORKER CENTER NETWORK; UNITED FARM WORKERS; COALITION FOR HUMANE IMMIGRANT RIGHTS; IMMIGRANT DEFENDERS LAW CENTER,

*Plaintiffs*,

v.

Markwayne MULLIN, in his official capacity as Secretary, Department of Homeland Security; Todd M. LYONS, in his official capacity as Acting Director, U.S. Immigration and Customs Enforcement; Rodney S. SCOTT, in his official capacity as Commissioner, U.S. Customs and Border Patrol; Michael W. BANKS, in his official capacity as Chief of U.S. Border Patrol; Kash PATEL, in his official capacity as Director, Federal Bureau of Investigation; Pam BONDI, in her official capacity as U.S. Attorney General; Jaime RIOS, in his official capacity as Acting Field Office Director for Los Angeles, U.S. Immigration and Customs Enforcement; Dean T. SORENSON, Special Agent in Charge for Los Angeles, Homeland Security Investigations, U.S. Immigration and Customs Enforcement; Gregory K. BOVINO, in his official capacity as Chief Patrol Agent for El Centro Sector of the U.S. Border Patrol; Justin DE LA TORRE, in his official capacity as Acting Chief Patrol Agent, San Diego Sector of the U.S. Border Patrol; Akil DAVIS, in his official capacity as Assistant Director in Charge, Los Angeles Office, Federal Bureau of Investigation; Bilal A. ESSAYLI, in his official capacity as U.S. Attorney for the Central District of California.

*Defendants*,

Case No.: 2:25-cv-05605-MEMF-SP

**DECLARATION OF ALINE ASSAF**

-2-
DECLARATION OF ALINE ASSAF

# DECLARATION OF ALINE ASSAF

I, Aline Assaf, hereby declare:

1.      The following declaration is made in support of Plaintiffs' Motion for Protective order in this case. I have personal knowledge of each of the following facts and if called to testify, I could and would testify to each of them. I read and speak English fluently. Each of my communications and interactions with Government agents described below were in English.

2.      I am a resident of the state of California and have no criminal history. I reside in Glendale, California. At the time of the events described below, my two adult daughters resided with me in my home.

3.      I have a master's degree in Economics from the prestigious American University of Beirut. I worked in the Administration of the University for over 25 years. Since arriving in the United States I have established a commendable career as an Administrator in private schools.

4.      I was born in Lebanon. In 2020, I miraculously survived the 2020 Beirut port explosion, which claimed over 200 lives, caused thousands of injuries, and resulted in widespread destruction. Just months prior to the explosion, at a time when people were at risk of exposure and death from Coronavirus Disease 2019 (COVID-19), I was diagnosed with advanced breast cancer.

5.      Immediately after the Beirut port explosion, I fled Lebanon to the United States seeking safety I felt the United States could give me. I arrived in the

-3-

DECLARATION OF ALINE ASSAF

United States – on a Visa - on August 15, 2020. Due to my critical medical condition, I immediately sought medical care. I underwent surgery and chemotherapy. Five years later, I am still under close monitoring and preventive treatment that necessitates active intervention and infusion. The healthcare system in the United States saved my life. Before my authorized period of admission expired, my attorney submitted an application for asylum on my behalf. USCIS accepted the application and issued a receipt notice.

6.      Since 2021, I have been living and working full-time in the United States and paying my income taxes. I have two daughters, ages 21 and 20. Both of them were living with me in Glendale in June and July of 2025. Both are pursuing degrees at the University level.

7.      My brother is a U.S. citizen. He filed an I-130 Petition on my behalf. The process is expected to take a few more years. My father, a permanent resident of the U.S., passed away on May 9, 2023 from cancer, and was buried in the U.S., further demonstrating my strong ties to the U.S., which I consider home.

8.      For the entire time my asylum application has been pending, I have strictly adhered to the terms and requirements I was told to follow, including being timely fingerprinted, and applying for an identification card, social security card, driver's license, and a work permit. I have renewed each of them when required.

-4-

DECLARATION OF ALINE ASSAF

**June 28, 2025 - DAY 1 OF 13**

9.      On Saturday, June 28, 2025, at approximately 8:30 a.m., I was outside my apartment in Glendale, California, cleaning my vehicle that was parked on the curb. I was wearing shorts and sneakers. A man wearing black sunglasses and a green shirt (Agent 1) approached me and asked if I was Aline Assaf. I greeted him and inquired about the purpose of his inquiry. He identified himself as a Border Patrol agent and stated that he was there to arrest me. He said that I was undocumented and had overstayed my visa. I told him he was wrong - that I have a pending immigration case and that I am not here illegally. Since I was simply cleaning my car, I had nothing with me but my car key – no purse, no identification, no money and no phone. I told him I have proper documentation in my house to show that I am here legally, and asked permission to retrieve it. He refused. I also questioned his jurisdiction because Glendale is not a border area. He said that it is part of LA, which is a port of entry. Agent 1 then attempted to handcuff me. I expressed my concern about the legitimacy of the arrest and asked to see his identification. I asked him how I would know he wasn't just a kidnapper. He then handed me a billfold-type wallet that had a badge on one side. I looked at the badge but did not know what I was looking at, as I had never seen a badge like that before. He did not show me anything else – not even a warrant for my arrest; nor did any of the other agents involved in my arrest.

DECLARATION OF ALINE ASSAF

10.     At this point, a second individual (Agent 2), a large-man wearing a lighter green shirt, black sunglasses and a mask, joined the first agent. A third individual, older in age and muscular, wearing a dark hat and plaid shirt also appeared (Agent 3). I attempted to reason with all three of them, explaining that I was not a criminal and had done nothing wrong. I requested permission to inform my daughters, who were still inside my home, about the situation, but they refused my request.

11.     I was handcuffed on the spot and taken to a large vehicle parked in my driveway. My neighbor, who was leaving for work at that moment, saw what was happening, saw me handcuffed, and saw them walk me into the vehicle. I saw my neighbor raise her phone and take a video or photographs of what was happening.

12.     When Agent 1 opened the front passenger door for me to enter, I was alarmed to see a shotgun upright next to the front seat. I asked Agent 1 to remove the shotgun so that I could sit safely.

13.     Below are two photographs taken by my neighbor while the events I described in the prior four paragraphs were happening. These photographs are of the front of my house and they document these events and the agents that were involved in them. My neighbor shared these photographs with me after I was released after my release. The picture on the left is of Agent 3 after Agent 1 placed me in their vehicle.  The picture on the right is of Agent 2, who eventually entered the vehicle

-6-

DECLARATION OF ALINE ASSAF

on the driver's side and drove the vehicle to the next destination. Agent 1 sat in the back seat of the vehicle during my transport.

 

14.     The following photographs were also taken by my neighbor and shared with me after my release. The left photo shows me being made to get into the front passenger seat of the car; the middle two pictures are of me sitting in the vehicle while Agent 3 talks to my neighbors. The right photo is a closer photo of Agent 2. All of these photos accurately reflect the scene of my detention, and the people who detained me.

   

-7-

DECLARATION OF ALINE ASSAF

15.     While they were putting me into the vehicle (after they had me in handcuffs), I told Agents 1 and 2 that I am sick and asked them to at least allow me to get my medications. I told them that I have cancer and that I cannot be without my medication. They would not let me get the medications – and said that my family could bring them to me later. I then asked if I could get my phone so that I could at least contact someone. Surprisingly, they said yes, but then they said they would have to get it for me.

16.     As I sat in the vehicle, I saw Agent 3 interacting with my neighbors. He was directing the other Agents and appeared to be coordinating the entire operation. My neighbors told me that Agent 3 asked them for my phone, but they did not have my phone so they could not give it to him. Instead, using their own phones, they took pictures of Agent 3 and demanded to see a warrant. I heard Agent 3 tell my neighbors they had shown a warrant to me, but that was not a true statement as they had not shown anything like that to me. Agent 3 never showed a warrant to anyone else at the scene. The following are additional photographs my neighbor took the morning of my detention. These photographs accurately depict Agent 3 and the vehicle they took me away in.

DECLARATION OF ALINE ASSAF

  

17. The whole time I was confined in the vehicle, I tried to remain calm and composed. I communicated with the Agents in a respectful manner, hoping they would reconsider their detention of me. I did not resist or cause a disturbance. However, as they drove away from my home, I became frightened and distressed about the uncertain and potentially perilous situation I was in, and my demeanor changed.

18. The agents that detained me never asked whether I had documentation for my residency; nor did they allow me to obtain my documents to prove my legal status. Instead, they took me away quickly, as if to avoid being confronted with documents proving their error. During the transport, Agent 1 (in the backseat) remarked that I looked different than the picture they had of me, noting that I had short hair in the photo identification he possessed. I told him that this was due to my cancer treatment. He had no response, and showed no empathy for me. It was clear to me that these individuals were acting with a singular focus on detaining me,

-9-

DECLARATION OF ALINE ASSAF

disregarding not only my medical circumstances but also any effort to prove the mistake they were making. At that point, I ceased attempting to reason with them and turned away, silently crying, as tears streamed down my face. I tried to conceal my emotional state, fearing that displaying weakness might exacerbate the situation.

19.    As we drove through Glendale, they appeared to be trying to evade detection, moving from one location to another. Eventually, we arrived at what I knew to be a remote area in Eagle Rock overlooking the highway. There, we were joined by additional vehicles and individuals that appeared to be government agents. At one point I saw one of the Agents from another vehicle walk over to a shaded area and urinate – in public. I found it disgusting; it showed that Agent's utter disregard for rules and social norms. It also underscored the hostile and degrading treatment I was subjected to.

20.    Sometime after my release from custody, I was searching social media to find information about unlawful detentions like mine and I came across a post on Instagram that was taken in the same area of Eagle Rock where we had stopped. The video in that post showed one of the Agents relieving himself in the same place I witnessed an Agent do the same thing. I do not know if that video was taken at the same time I was being held in that location, but it was the same location where I had been. I took a screen shot from that video as well as a screen shot of some of the

-10-

comments to that post. One of the comments appears to relate to my detention.

Below are the screen shots I took of the video and of the comments:





21.    Also, while I watched that same video, I found a picture of Agent 1 (who originally approached me) which was taken in Eagle Rock, next to what appears to be the same vehicle the Agents took me away in. Again, I do not know if

-11-

DECLARATION OF ALINE ASSAF

this is the exact time I was in that location – and in that vehicle – but it is the same location. The following is a screenshot of that photo posted on Instagram:



22.    While I was in the Agent's vehicle, the Agents detaining me were discussing their intentions to apprehend additional individuals. One of them said that they were waiting for another woman who had just been detained. According to that Agent, the woman they were waiting for had not been an intended target, but nonetheless they proceeded with her arrest. Within a few minutes, a vehicle arrived with a female detainee inside. That detainee and I were then transferred to a Transit van.

23.     At that point my transport could best be described as reckless, as the van sped through the streets and made sudden and abrupt turns. Inside the van, I was seated on a long metal bench with no seatbelts; the other detainee and I were unable to secure ourselves because we were handcuffed. The driver proceeded to a building which I now believe was the ICE processing center, located in the basement of a building on Los Angeles Street. As soon as we arrived and were checked-in, the agents there confiscated all of my personal belongings, including a gold & diamond necklace, a gold bracelet, and a hair clip.

24.     I was placed in a holding cell with 13 other people. The conditions there were deplorable. The holding cell was unsanitary and presented a high health hazard risk to all of us, but especially to me because of my fragile medical condition. We were required to eat, sit, and sleep in a room with two dirty and exposed toilet seats. They were stinky and overflowing with sewage coming from the use of the toilet in the adjacent room that was occupied by male detainees. The holding cell had two wall phones out in the open, which prevented us from having any private conversations.

25.     I was not able to call my family until I was placed in the holding cell that afternoon. I told my family about the deplorable conditions of the cell they had me in. I told them I wanted to be home. The only place to sit in the cell (other than the disgusting floor or on the toilet) was on one of the narrow metal benches; The

-13-

benches were too narrow to lie down on. One of the detainees in the cell with me was menstruating for days, and blood was seeping through her pants onto the bench where we had to sit because there was no other space. When we called a female guard and showed her the blood, she ignored our concerns, and refused to disinfect the area. The holding cell was freezing cold and there were no covers - they provided some of us with pants, but they never had enough to go around. Because of inadequate space, some detainees had no choice but to sleep on the filthy, germ-ridden concrete floor.

26.    The daily lunch in this facility consisted of burritos and chips and they were served at irregular and odd times. There was no way to tell the time because the bright lights were on 24 hours a day. I was able to keep track of the time only when someone would make a phone call and ask about the time.

27.    Other detainees informed me that they had been held there for weeks, and that minimal activity occurred on weekends, which I took to mean I was going to have to remain there for a long while. I realized that I must maintain my strength. I decided not to eat any of the junk food that they provided out of fear that it would lead to diarrhea or constipation, and since the toilet was in the open, visible to all, either situation would be humiliating.

28.    Later that day, I was able to make another phone call to my family, during which I expressed feelings of distress and anxiety. Even though I had access

-14-

DECLARATION OF ALINE ASSAF

to phone calls, each call incurred a significant cost. My family was not allowed to call into the facility to speak with me. The only way I could speak to anyone was if I initiated the call. Most of the detainees with me in the cell told me their families could not afford to refill money for them, so they could not call home. I described my location to my family as being underground. Although I knew I was in Downtown Los Angeles, at the time of my initial detention, I was unable to determine the exact location. I also told my family that I had been provided with limited clothing.

29.     My mental state at the time was extremely shattered. The experience of detention was shocking and traumatic for me. I felt overwhelmed and uncertain about how to react. However, I was determined to assert my rights and demonstrate that the treatment I received was unjust and unacceptable. The prospect of being detained and potentially subjected to conditions similar to those in a prison setting was distressing.

30.     I learned from other detainees that lawyers had to wait for hours to see their client, including one detainee who told me her lawyer arrived at the facility around 9 a.m. but she was not allowed to meet with that detainee until 3:30 p.m. When my family tried to give me a lawyer's phone number, I was unable to memorize it and had no way to write it down.

DECLARATION OF ALINE ASSAF

31. Later in the afternoon, I was interrogated by an ICE agent, and I informed him of my medical condition, including my need for medication and an upcoming bone scan scheduled for July 2, 2025. When I noticed that he was careless and sloppy, I requested that he call his supervisor. The agent called someone and told that person that I was "claiming" to have cancer. I told him my family could send my medical records and medications to verify my condition.

32. At 5:45 p.m., I learned that my family had dropped off my medications and medical reports. Although the security guard who administered my medication told me he feared potential repercussions for doing so, he was kind enough to give them to me. I tried my best to let everyone know of my medical condition including the guards, ICE agents, and fellow detainees, but no one seemed to care (except for the one guard that gave me my medicine). I asked the other detainees to keep an eye on me and provide me with necessary attention if needed.

33. The holding cell did not allow me to get proper sleep. Sometime in the early hours of the next day, I did my best to squeeze into a tiny spot by leaning my head against the side of the toilet stall. It was a disgusting place but I knew I had to try and get much needed rest.

**June 29, 2025 - DAY 2 OF 13**

34. At approximately 4:30 a.m. Sunday, June 29, 2025, I experienced a severe panic attack, which had been exacerbated by the cold conditions in the

-16

holding cell and the awkward position I was forced into. My cellmate, observing my loud breathing attempts, tried to ask for help by hitting the glass window and shouting. An ICE agent responded, took me outside the cell and tried to get me to calm down through conversation.

35.    After approximately 15-20 minutes, my condition subsided. I informed the ICE agent that my fingerprints were not yet taken so my name is still not in the system, which meant my detention was not properly documented. I expressed concern that without fingerprints and proper documentation, my detention time would not be accurately accounted for and my family could not find me.

36.    At around 6:00 a.m. I called my family to report the events that had occurred. I felt hopeless and ignored. I was very close to giving up due to this ordeal. A few hours later, I experienced another panic attack, prompting someone to call the guards again. I reiterated to the Guard that responded that I needed my medication and I needed to be fingerprinted and documented. I repeatedly requested that the guards take my fingerprints to ensure my presence in the system and to facilitate tracking. Initially, the officer seemed surprised that this had not been done on the first day of my detention, but he did not follow through until after my second panic attack.

37.    At 9:00 a.m., I contacted my family and informed them of the situation. Then an individual wearing an ICE shirt called me out of the cell, asked me several

DECLARATION OF ALINE ASSAF

questions, and requested that I sign documents that I believe were a consent to deport, but I declined to sign. At this time, I emphasized the importance of my upcoming bone scan scheduled for July 2, 2025; I explained to the ICE Agent that the scan is crucial for monitoring my cancer status. Despite my request for medical attention, the facility employees (guards and ICE) appeared unconcerned. My claustrophobia exacerbated my distress, and I struggled with being confined. I observed disorganization and chaos in the facility's operations, and I was disturbed by the way detainees were treated.

38.    That afternoon, my lawyer came to visit me. I watched my attorney hand my medical file to the ICE agent who happened to pass by the glass office where we were sitting. He promised us he would upload the documents to my file and said he would get back to me later that day, but he did not.

### June 30, 2025 - DAY 3 OF 13

39.    On Monday, June 30, 2025, I learned that my lawyer was unable to send the facility documents relating to a bond and a letter from the hospital about my medical condition due to the facility's lack of a fax number or any other method of electronic submission.

40.    In the late afternoon/early evening, an ICE agent finally called me for intake processing, something that usually occurs upon initial arrival, but in my case, was delayed by two days. He inquired about my cancer type and medication even

-18-
DECLARATION OF ALINE ASSAF

though my medical documents had already been provided and should have been in my records. Just before 6:00 p.m., when I returned to the holding cell, I called my family and learned that my sister-in-law, Ashley, had been waiting for hours outside the building but was never granted permission to visit me.

41.    At 10:00 p.m., I attempted to follow up with any Guard to confirm my medical records were in my file. I needed them to see that I had to be able to get my scheduled bone scan. No one would help me. The facility staff did not assist with this matter or provide any assurance of the document submission process.

**July 1, 2025 - DAY 4 OF 13**

42.    On Tuesday, July 1, 2025, at approximately 5:00 a.m., I was awakened by a guard who rushed me into getting ready to leave. He said I had five minutes to get ready. I asked him what was happening but he refused to provide me with any information, stating that ICE would notify me instead. They gave me a paper bag with my belongings (my gold necklace and bracelet, and the medical records and 3-month supply of medication that my family had dropped off at the facility). I made a quick phone call to my family to let them know something was happening.

43.    The guard quickly chained and restrained me with handcuffs, waist chains, and leg restraints and then they transported me to Los Angeles International Airport without telling me anything about my destination. He gave me a paper bag containing my medication, which I kept for the entire trip. On the way, there was

constant communication between the ICE driver and what seemed to be the people who were waiting for me at the airport. The ICE driver was speeding to arrive on time and not to miss the flight. Upon arrival at the airport, we were met by two ICE agents in civilian clothes, but clearly armed (even two women standing nearby commented that their "guns are showing"). These two agents escorted me onto a commercial flight to Tacoma, Washington. These agents were unfamiliar with my case and asked me several irrational questions regarding my immigration status. One of them was bragging that he was in the Navy. .

44. Despite the fact that I repeatedly informed agents, guards, and medical personnel that I was a breast cancer survivor undergoing ongoing treatment and monitoring, no minimal or meaningful effort was made to evaluate whether transferring me across the country would interfere with my scheduled medical care or ongoing treatment plan.

45. In my head, I was wondering how much my arrest cost and who was benefiting from it. I asked about the price of the ticket as I was trying to figure out how to manage a trip home once released, when I had no money with me. One of the agents told me that each ticket costs $1,000.

46. During the whole trip, one ICE agent was constantly texting and taking photos of me and sending them to others.

-20-
DECLARATION OF ALINE ASSAF

47.     When we landed, I was taken to a detention center in Tacoma Washington. I arrived at approximately 1:30 pm and I was placed in a solitary holding cell for hours. The only place to sit was on concrete blocks. After my detention I did some research on the internet and found information about the Tacoma Detention site. The picture on the left, which I took of my computer screen, is a drawing of the Tacoma Detention facility where they took me on July 1, 2025. The picture on the right, which I also took from my computer screen, is a photo of that Detention facility. I do not know where in this complex they held me.

 

48.     I also found on social media, a video of intake area of the Tacoma facility. I believe these were posted by a local TV station. I took screen shots of some of the images from that video. The left photo is of the intake area with windows into a large group cell. The right photo is a zoomed-in picture of the cell in the left side of the first screen shot. In it you can see a person laying on hard concrete. Upon arrival, I was placed in an individual holding cell only concrete benches (like the benches in these photos) to sit or lay on. The last photo is a

DECLARATION OF ALINE ASSAF

screenshot from the same video. It accurately depicts an intake area just like the one I was in when I arrived and when I was released. The bottom photo shows a detainee arriving and undergoing an intake process like the one I had to endure.

 



49.    Later in the evening, I was placed in a larger holding cell in the intake area, with a group of approximately 15 detainees who told me they had just arrived on a charter plane from another state's detention center.

50.    The check-in process was lengthy and took several hours to complete. I was evaluated by a nurse at around 2:00 a.m. I explained my medical history to the nurse and gave her my medical records. She allowed me to take my medicine before she took the remaining 3-month supply of medications from me. I explained to her

DECLARATION OF ALINE ASSAF

how important it was that I not skip a dose of my medicine. She did not express any concern.

51.     I was then escorted to my assigned pod. The pod was a large area with many bunk beds along the perimeter and numerous individual one-bunk cells behind the doors of the perimeter wall. The video posted by a news station that I found after my release showed a picture of a men's pod in the Tacoma facility. I took a screenshot of that picture and provide it below. The individual cells are on two floors while the common area is in the middle on the first floor. The women's pod I was in looked like this one, except the doors to the individual cells of the women's pod were green, not white.



52.     When the guard brought me to the pod, she instructed me to occupy an individual cell and told me to climb onto the top bunk bed, which had no rails. Someone was already occupying the lower bunk. I was shocked, my eyes widened, and my heart skipped a beat because I knew I was too weak to climb up to the top bunk. I immediately explained that I had medical conditions, and I could not go to

the top bunk. I explained to her that I have cancer, my body is not strong, and I have many health problems. Despite my objections, she insisted that I follow her orders. Due to extreme fatigue and lack of sleep, I ultimately complied.

### July 2, 2025 - DAY 5 OF 13

53.    On Wednesday, July 2, 2025, at approximately 5:00 a.m., I was awakened abruptly. In the confusion of not knowing what was happening, as well as my haste to get out of bed, I placed my right foot on the metal step ladder, but my calf cramped immediately and my foot slipped.

54.    I tried to grab onto the ladder to keep myself from falling, but the metal edges were too sharp to hold, and I fell approximately 1.5 meters to the floor. I was lucky not to have broken my hip or leg, but the fall caused severe pain and bruising all over my body. I was especially lucky that the fall did not harm the breast implants I have as a result of breast cancer. My left ankle was swollen, my buttocks was bruised, I had punctures on my palm and breast, and several bruises on my body. I was unable to get up off the floor. The same shift guard that insisted I get onto the top bunk showed up and when I told her what happened, she immediately touched my calf to feel the cramp. It seemed to me she was doing so to see if I was telling the truth about my injury, not because she intended to take any action.

55.    I requested assistance getting up and getting around, but no one provided me any help. With difficulty, I got up onto one foot and hopped over to the

-24-

DECLARATION OF ALINE ASSAF

cell door and asked for a wheelchair. That same guard refused to provide one for me. Due to the pain and discomfort, I was in, I told the guards I would not leave the cell without a wheelchair. At this time, I also initiated a food strike to emphasize my distress and to protest the lack of care. I knew that my actions would not change anything for me, but it was a measure that I felt I needed to take because of the lack of medical attention I received. I later learned from fellow detainees that other prisoners had initiated a similar food strike but it did not bring any change to the conditions or the treatment we received.

56.    In addition to my regular medication, which I had provided to the nurse the previous night, I was now in serious need of something for my pain. No one would give me anything for my pain, and I had not received the daily medications I had given to the nurse the day before; the three-month supply of medications my family had brought to me in the Los Angeles Detention facility seemed to simply disappear. I repeatedly asked for my medications, and was repeatedly ignored - which just exacerbated my condition. I experienced severe claustrophobia in the enclosed spaces where I was being locked in for hours during the day and all night, leading to intense anxiety and panic attacks.

**July 3, 2025 - DAY 6 OF 13**

57.    On Thursday, July 3, 2025, more than 24 hours after I fell, the guard who insisted I get on the top bunk and witnessed my fall, finally got me a

-25-

DECLARATION OF ALINE ASSAF

wheelchair. Only then was I able to go to sick call. However, the nurse on duty said I was only allowed to make ONE request, so I had to choose between asking for my cancer medications or asking for pain medication for the injuries from my fall. I chose to get medication for my fall because I was in severe pain; the nurse gave me Advil.

58.    On that day, my relative Trisha, who lives in another state, made the expensive and extraordinary trip to Washington to visit me and stay close to me. She had to book an expensive hotel as it was the closest to the detention center, and she had to incur expenses for airfare, car rental, and food throughout the period of my detention. She came to provide me with support, to visit me, and to monitor the progress of my case. She was also awaiting delivery of my identification documents, which my family mailed to the hotel address, as I was without any form of identification.

59.    Trisha arrived at the detention center at 5:30 p.m. to check in for my scheduled 6:00 p.m. visitation. When I learned Trisha was here, I went to the visitation room. I waited nearly an hour before finding a guard to remind them I was waiting for a visitor. Then, finally, someone brought Trisha to the visitation area. This was how it was with visitation all the time – making me and my visitor wait a long time without explanation. Those delays in seeing my family exacerbated my feelings of uncertainty and lack of control. During the visit with Trisha, we were

DECLARATION OF ALINE ASSAF

only able to talk with a glass partition between us, and both of us on telephones with horrible sound quality. All calls, in addition to being monitored and recorded, were of a very low and poor quality. I often had to scream to be heard. The delays and lack of transparency throughout the process, including prolonged periods of isolation during transportation, contributed to a sense of helplessness and extreme discomfort. The following is a picture of a visitation space like the one I was forced to use in Tacoma. This picture is a screenshot from that same video mentioned above that had been posted on social media by a news agency. The square in the framed part of the wall is a glass partition. I sat on one side of the glass and my visitor sat on the other side of the glass.

60.    Finally, after being without my cancer medication for almost three days, it was administered to me. However, the nurse also included medication that I had not been taking before my detention. I did not take them, believing they were trying to sedate me.

DECLARATION OF ALINE ASSAF

## July 4, 2025 - DAY 7 OF 13

61. On Friday, July 4, 2025, the guards woke us up very early for breakfast, which is regularly served at 6:00 a.m. Most of the time, I had little appetite and was unable to eat. I then learned that the guards would not allow me to save any food items for later. This made no sense to me.

62. There was a large television in the middle of my pod where they sometimes played movies or local television stations. There was also a smaller screen which constantly played a promotional video on repeat. The video felt like propaganda as it glorified the Tacoma detention center and falsely claimed (or showed) amenities and services that were absolutely NOT available to detainees. For instance, the video said that detainees are afforded face-to-face visitation and that we have access to a cafeteria with menu options for meals. The video showed detainees wearing smartwatches, working and earning money, sleeping in bedrooms with windows and multiple bunk beds with railings and unrestricted access to medical professionals. None of that was true. The video explained that the Detention facility I was in was operated by a company called The GEO Group.

63. The actual conditions within the facility were absolutely the opposite. In reality, we were only allowed to communicate with our visitors through a glass partition, we were provided poor meal options and very small amounts, and we were

-28-

DECLARATION OF ALINE ASSAF

fed at inconsistent and odd times. We were not allowed to save any food. Instead, the guards threw any uneaten food away. Furthermore, access to medical care was restricted, often requiring lengthy wait times, and we frequently experienced delays or denials in receiving necessary medication. The facility did not provide basic necessities such as shampoo and toothpaste, instead requiring detainees to purchase them. They did provide iPads for use by detainees (to pay for necessities and to make calls) but there were never enough and they were rarely available. They also employed people that had no respect for other humans and who clearly were not experienced or trained well for their jobs.

64.    Two other relatives arrived with Trisha that day to visit me. After completing the check-in process, they waited for approximately 40 minutes before being allowed in to the visitation room to see me and talk to me through the telephone. After that visit concluded, I waited in the locked visitation room, with no restroom facility, for several hours before being released to my pod. By that time, I was agitated and angry and started to weigh the value of visits from my family against the cruel treatment from the guard safter my visitors left.

65.    After this ordeal, when I was back in the pod, I was finally called to visit the doctor. The doctor had a cold demeanor and complete lack of compassion. He made it seem like it was justifiable that detainees suffer, as if it is their fault, as if they deserve it, as if they are guilty. I explained to him that most of the prisoners

-29-

DECLARATION OF ALINE ASSAF

inside the pods are not criminals, but that we were abducted based on race, skin color, and ethnicity. He expressed no concern. He also provided me inadequate medical attention. I told him my history with breast cancer and he had no response. I requested a bandage wrapping as support for my foot, but he did not provide for one. I expressed concerns about potential complications from the fall affecting my breast implants, and he told me not to worry because if the fall had punctured an implant, I would see the leak. I told him about my low back pain, but he did not look at my body or do any physical examination. I left the appointment feeling profoundly disappointed and let down by the level of care he provided. He prescribed multiple medications, including Hydrochlorothiazide (25mg and 12.5mg) and Cholecalciferol (125mcg), without conducting a comprehensive medical examination, without ordering blood tests and without any diagnostic evaluation. He did not tell me what these medications were for, did not give dosage instructions, did not warn me of any potential side effects, and did not look to see if any of them would counteract my cancer medications. While I was there, I overheard one of the nurses ask a federal immigration enforcement agent what they should tell prisoners if they had the chance to speak to them. The ICE staff responded that nurses should tell detainees to sign their deportation papers.

-30-

DECLARATION OF ALINE ASSAF

**July 5, 2025 - DAY 8 OF 13**

66.    On Saturday, July 5, 2025, I experienced extreme distress and frustration due to the conditions within the facility, particularly with cells being locked. As I explained above, I was assigned to an individual cell within the pod. The bottom bunk was occupied by another detainee; ever since my fall, I had been sleeping on the floor. The door to the individual cells were very heavy and they were locked at night. This prohibited me from going into the common area at night. Here is a screenshot from the news agency video I found after I was released. This accurately depicts some of doors on the perimeter of a pod just like the one to which I was assigned.



67.    After my fall, my mattress was eventually placed on the floor, but that meant I was much closer to my cellmate during lock downs day and night. The language barrier made communication with her impossible, and she repeatedly scolded me to be quiet. This situation exacerbated my feelings of anxiety and claustrophobia, to the point where I felt unable to cry or even breathe. During the

-31-

DECLARATION OF ALINE ASSAF

mid-day count that day, I vocalized my distress through the glass opening in my cell and requested a grievance form from the officer. Instead of providing just the appropriate form, the officer handed me what looked to be a voluntary deportation form. She apparently underestimated my ability to read and understand the process. With the pen she gave me, I wrote a statement in large capital letters, addressed to ICE, asserting that I am not a criminal, that my legal status is legitimate, that I came to the U.S. to escape death and now the U.S. is taking away my sanity, which is equally bad for me. I also said that because of my medical condition, the confinement was hazardous to my health. I submitted this statement in a sealed envelope to the guard. I was on the verge of a mental breakdown. I did not hear from anyone regarding my grievance.

68. I then took a sharpie and started writing on my arm "This too shall pa_" but the guard immediately snatched the pen from my hand and said that I am not allowed to do that.

69. Trisha arrived at the facility at 1:00 p.m. to visit me. After checking in, she had to wait an hour before being allowed to enter the visitation area. Our visit lasted for the allotted time, but no officer arrived to escort me back to my designated area at the conclusion of the visit. I asked Trisha to stay in her side of the visitation area until someone comes to let me out. I repeatedly rang the bell by the door to alert the guards, but no one responded. Trisha then exited the visitation area and

-32-

DECLARATION OF ALINE ASSAF

seemed to be communicating with one of the guards. Eventually someone let me out and Trisha left the facility.

70.    It became apparent that the employees and officers at the facility exhibit a pattern of forgetfulness, which suggests a lack of regard for the well-being and basic needs of the detainees. This is exemplified by an incident in which two detainees in solitary confinement were not provided with food for an entire day when the officers forgot to deliver their meals.

71.    During a video call at 9:30 p.m., I showed my family the bruises and injuries, which were still visible even days after the fall. My family took screen shots of my injured body parts as I showed them. They shared with me the pictures she took, some of which are below. These photos, though somewhat blurry, accurately depict the bruises on my body on July 5, 2025. From left to right, these screenshots show the bruises on my buttocks, my left hand, my arm, my left palm, left foot and my right foot.



DECLARATION OF ALINE ASSAF

72.    Due to the carelessness of the facility's medical system, I resorted to self-care measures, such as wrapping my ankle with socks. The facility consistently failed to respond to detainee needs, including my own, and that became an additional source of significant concern and distress to me. The environment and interactions with the staff were totally inadequate, against the wellbeing of detainees, and extremely troubling.

**July 6, 2025 - DAY 9 OF 13**

73.    On Sunday, July 6, 2025, Trisha visited me in the early morning. Due to a high volume of visitors, the visit was brief. Later that morning, at approximately 11:45 a.m., I was called by a guard for another medical visit. During this visit, I requested accommodation for a bottom bunk bed, specifically one that is in the common area and not in a cell. I made this request because of my claustrophobia, anxiety, and physical injuries. I consistently informed the guards about my claustrophobia and the distress caused by being locked in my cell for extended periods, which triggered panic attacks. Instead of moving me, they instructed me to attend "Sick Hour" at 5:00 a.m. each morning to request that the nurse arrange for my door to remain open which was a lie because later I was informed that the guards have the say in anything that relates to the detainees.

74.    The computer tablets given to detainees were monitored, we were charged by the minute to use them, and they were awkward to navigate. For

-34-

DECLARATION OF ALINE ASSAF

example, when accessing text message chats, the screen often experienced glitches and rapid movement, making it challenging to read messages. Each line of a text had to be approved before sending and each send costs $0.35. The audio quality of telephone and video calls was also bad.

75.    The food served at the facility was of poor quality and unpalatable. Meals mainly consisted of beans, boiled carrot cubes, tasteless cake, and a mix resembling canned pet food. Meals lacked taste and had no nutritional value.

### July 7, 2025 - DAY 10 OF 13

76.    On Monday, July 7, 2025, I attended Sick Call at 5:00 a.m. at a nurse station. During this visit, I again requested a change to my sleeping arrangements, one without scheduled lock-ins, as opposed to my current location where I was confined to my room for extended periods during "Quinta time." This accommodation was necessary due to my diagnosed claustrophobia and frequent panic attacks triggered by prolonged confinement.

77.    Despite previously requesting this accommodation from everyone including the guards and on multiple occasions, I was then directed to seek approval from medical staff. When I raised this issue with medical personnel, I was informed that this is a security matter and that I should discuss it with the guards. I was constantly being bounced around like this without finding a solution.

DECLARATION OF ALINE ASSAF

78. This time, I told the nurse that I was no longer able to tolerate the current conditions and that I required either relocation or for the door to remain open at night. In response, the nurse made a statement suggesting that either I sign my deportation papers or I endure the consequences of my detention, implying that any violation will cause a potential harm.

79. The officer that accompanied me back to the pod asked what happened with my request to move, and she indicated a willingness to attempt to address my concerns. Subsequently, a bed in the open pod became available due to the departure of a detainee, and I was able to relocate.

80. Later that day, I learned from my family that my bond hearing had been scheduled for Wednesday, July 9, 2025.

**July 8, 2025 - DAY 11 OF 13**

81. On Tuesday, July 8, 2025, I attended Sick Call at 5:00 a.m., as scheduled, to undergo a blood test. After a lengthy wait, the nurse informed me that blood tests are not conducted on Tuesdays and I was instructed to return the next day - a simple example of how prisoners are manipulated and scheduled false appointments, apparently to keep staff and the detainees busy.

82. When I returned to my pod, I learned that some of the detainees thought I was faking the injuries from my fall. I was really hurt and afraid of their intentions. I also noticed that the guards were closely monitoring me, even when I

-36-

DECLARATION OF ALINE ASSAF

was just lying in my bed. I noticed this heightened level of scrutiny after my relocation to the common room sleeping arrangement.

### July 9, 2025 - DAY 12 OF 13

83.    On July 9, 2025, I attended Sick Call at 5:00 a.m. During my consultation with the nurse, I learned I was <u>not</u> officially scheduled for a blood test, despite previous instructions to undergo the procedure. Nevertheless, the nurse finally proceeded with drawing my blood.

84.    Following the medical appointment, I returned to the pod and had breakfast. At 7:00 a.m., I was told to go to the courtroom for my bond hearing, but the guard decided to take the wheelchair away from me so I had to hop the whole way. I waited in the courtroom waiting area for nearly three hours before the hearing started. As I was limping to get to the chair in the middle of the courtroom, the judge was concerned and asked what happened. I told him about my fall from the top bunk and that I was denied a wheelchair to come to court. As a result of the hearing, my bail bond was set, and the Judge freed me to leave with <u>no conditions</u> imposed. The Judge did not find that I posed a danger to the community or a flight risk.

85.    When I returned to the pod, a therapist was waiting for me and told me I was scheduled for a consultation with her. I told her that there was no need for a consultation as I would be leaving any time now. She considered this a refusal and

DECLARATION OF ALINE ASSAF

asked me to sign a paper saying I refused treatment, which I refused to sign. She told me that even if a Judge orders my release, ICE has the final say and ICE may choose not to release me. Therefore, she said I needed to proceed with the consultation. I could not believe what I just heard and signed the paper with reservation.

86.    Luckily, I was transferred for check-out in the afternoon. I was detained in one of the intake holding cells for hours until my check-out process ended and the ICE officers were ready to release me. Despite the judge's ruling that there were <u>no conditions</u> on my release, ICE installed a heavy GPS ankle bracelet on my right ankle, which made it even more difficult for me to get around. I was released at 5:40 p.m. with nothing but my original belongings and a few days' worth of medication. Below are two photos of my release from one of the gates at the Tacoma Detention Center. These photos are screen shots of a video taken by Trisha, who met me there. If Trisha had not been waiting for me, I would have been on the street with no money, no transportation, no phone, and no identification. They would have put me outside and left me as if I were an animal. It was humiliating and disrespectful.

-38-

DECLARATION OF ALINE ASSAF

 

87.    Trisha took me to her hotel so I could rest and decompress from the ordeal. She took photographs of my injuries which remained visible seven days after my fall. The following are the photographs she took of my left ankle and buttocks/lower back, and my left foot:

  

88.    This is a picture of the injury to my breast implant that occurred as the result of being forced to sleep on a top bunk without any protections from a fall:

-39-



89.     This is a picture of the ankle monitor that ICE put on me even though the Judge clearly said there were no conditions to my release:

**July 10, 2025 - DAY 13 OF 13**

90.     On Thursday, July 10, 2025, with the GPS bracelet on my ankle, Trisha and I flew from Seattle, Washington to Burbank, California, at our own expense. I needed a wheelchair to get from the plane to the loading area. Here is a picture of me at Burbank Airport, trying to hide the ankle bracelet from public view, as we

-40-
DECLARATION OF ALINE ASSAF

waited for our family to pick us up. Having an ankle bracelet was humiliating. It made me feel like a criminal when I am not.



91.    When I was being released from the Tacoma facility, I begged them for the medications that they had confiscated from me upon arrival. Instead of giving me what I had arrived with, they gave me a few days' worth of my cancer medicine as well as the medications the doctor in Tacoma had prescribed – medications I was not taking prior to my detention. The following pictures, which I took, shows they were issued in Tacoma, WA. I never received the medications that arrived with me in Tacoma, and it was very difficult to get some of them filled again as the pharmacy's records showed I still had plenty. Even explaining that mine were taken from me did not help.

DECLARATION OF ALINE ASSAF



## POST-DETENTION

92.    On July 16, 2025, six days after my release from the Tacoma detention facility, I attended the first post-release appointment with ICE at the USCIS Los Angeles Field Office. During this meeting, my lawyer requested that the GPS monitoring device be removed. ICE initially declined to grant this request, but the lawyer insisted that the court ordered my release without conditions. After checking with a supervisor, the ICE agent returned with an authorization form for the GPS removal. However, to get it removed, I had to take the form to the Intensive Supervision Appearance Program (ISAP) in Chatsworth, where they finally removed it. I then had to rush back to Los Angeles Radiology center for my long overdue and critically important bone scan.

93.    During my visit to ISAP, I was instructed to download a mobile application designed to monitor my location and activities. Again, this was contrary to the Judge's order that I be released without condition. Additionally, they gave me an identification card and told me it was the only form of identification I was allowed to use from now on. They told me not to use any other government

-42-

DECLARATION OF ALINE ASSAF

identification I had – including my driver's license. I pointed out to them that my name is misspelled on the ID card (Alien, not Aline), but they did not seem to care. This is a photo of the ID card they issued to me:

 

94.    The entire immigration process I was forced to endure was disorganized, inconsistent, demeaning, intimidating, and dismissive. Every encounter I had with an agent or an officer or a guard was humiliating. For instance,

- On my second visit to ISAP, I asked the officer about the difference between a virtual home visit and a virtual office visit. Instead of explaining it to me, she said she had already told me the difference in the first visit but said I was in a rush and I had ignored her. I was astonished by her answer and remembered that on my first visit I was in a rush for my bone scan appointment, which I had mentioned to her. But I had not ignored her.-

DECLARATION OF ALINE ASSAF

- On September 2, 2025, ISAP scheduled two different appointments with me – with overlapping times. One was a "home visit" where they could show up to my home anytime between 7:00 am and 4:00 pm, and the other was an in-person "check-in" at the Immigration office at 8:00 a.m. I was told that a no-show is a violation, so on August 21, 2025, I asked my ISAP Officer (Sarahi) via text what I should do about the double booking. I said if I did not hear from her, I would just go to the ERO building (Enforcement and Removal Operations) for my check-in. In response, ISAP Officer Sarahi agent called me and said she does not "answer obvious questions". Not knowing what to do, and since the answer was clearly not "obvious" to me, I decided to go to the ERO building for my check-in, as I had said I would during my phone call. While I was at the ERO for my check-in, ISAP Officer Sarahi called me and said that she was at my door for the home in person check in. She absolutely knew the quandary I was in and could have come in the afternoon instead, but she chose to make her home visit at a time she knew for certain I was not going to be there. This incident shows once again how little the people within ICE care about those of us that they have detained – regardless of whether we have a pending immigration case. Their actions convey that they just want us removed and off their lists.

-44-

DECLARATION OF ALINE ASSAF

95.     During my entire pre and post detention, I repeatedly requested to be treated with dignity and respect, but the treatment I received at every stage and at every level was the exact opposite.

96.     The 13-day detention was detrimental to me on many levels. My weight dropped almost 8 kg (over 17 pounds), I missed a necessary bone scan and a critical medical infusion that was crucial to my continuing cancer treatment, and I continue to struggle to with my physical and mental wellbeing. .

97.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 8 day of June, 2026, at Los Angeles, California.

Aline Assaf

-45-

DECLARATION OF ALINE ASSAF