BRETT A. SHUMATE
Assistant Attorney General
Civil Division
DREW C. ENSIGN
Deputy Assistant Attorney General
TIBERIUS DAVIS
SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney General
JONATHAN A. ROBBINS
Assistant Director
JASON K. ZUBATA
NANCY N. SAFAVI
ANIELLO DESIMONE
TOLA M. MYCZKOWSKA
LAURIE WIESNER
JACOB A. BASHYROV
Trial Attorneys
Office of Immigration Litigation
Civil Division, U.S. Dept. of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 305-8275
Email: Jonathan.A.Robbins@usdoj.gov

*Counsel for Defendants*

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| Pedro Vasquez Perdomo, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> Markwayne Mullin, in his official capacity as Secretary of Homeland Security, *et al.*, <br><br> Defendants. | No. 2:25-cv-05605-MEMF-SP <br><br> **Defendants' Opposition To Intervenors' Joinder In Motion For Preliminary Injunction [ECF 570]** <br><br> Hearing Date:  August 13, 2026 <br> Hearing Time:  10:00 a.m. <br> Location:       First Street Courthouse <br>            350 West First Street <br>            Los Angeles, CA 90012 <br>            Courtroom 8B <br>            8th Floor <br><br> Hon. Maame Ewusi-Mensah Frimpong <br> United States District Judge <br><br> Referred to Hon. Sheri Pym <br> United States Magistrate Judge |

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................... 1

II.     BACKGROUND AND PROCEDURAL POSTURE ................................................. 2

III.    FEDERAL LAW ENFORCEMENT PROCEDURES ............................................... 3

IV.     ARGUMENT ........................................................................................................... 4

        A.      Standard ....................................................................................................... 4

        B.      Intervenors Lack Standing .......................................................................... 5

                1.      Intervenors cannot vindicate the rights of third parties ...................... 5

                2.      Intervenors speculative downstream effects cannot establish standing ................ 7

        C.      Intervenors Joinder Fails *Winter* On Every Element .......................................... 11

                1.      No policy of warrantless arrests without likelihood of escape
                        determination ........................................................................................ 11

                *2.*    Intervenors' irreparable-harm showing fails under *Winter* ................................. 12

                3.      Equities and public interest weigh decisively against an injunction................... 13

V.      CONCLUSION........................................................................................................ 15

L.R. 11-6.2 CERTIFICATE OF COMPLIANCE .................................................................. 16

# TABLE OF AUTHORITIES

**Cases**

*Alderman v. United States*,
394 U.S. 165 (1969) ......................................................................................................... 6

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) .......................................................................................... 5

*Arizona v. Biden*,
40 F.4th 375 (6th Cir. 2022) ........................................................................................... 11

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) ....................................................................................................... 5, 6

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ................................................................................................. 1, 5, 7

*District of Columbia v. Wesby*,
583 U.S. 48 (2018) ........................................................................................................... 4

*Food and Drug Administration v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ................................................................................................. 1, 6, 8

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) ........................................................................................... 5

*Kaley v. United States*,
571 U. S. 320 (2014) ........................................................................................................ 4

*Linda R.S. v. Richard D.*,
410 U.S. 614 (1973) ..................................................................................................... 7, 8

*Lopez v. Brewer*,
680 F.3d 1068 (9th Cir. 2012) ...................................................................................... 4, 5

*Los Angeles Mem'l Coliseum Comm'n v. NFL*,
634 F.2d 1197 (9th Cir. 1980) ....................................................................................... 13

*Lujan v. National Wildlife Federation*,
497 U.S. 871 (1990) ....................................................................................................... 12

*Massachusetts v. Mellon*,
262 U.S. 447 (1923) ......................................................................................................... 6

*Missouri ex rel. Koster v. Harris,*
  847 F.3d 646 (9th Cir. 2017) ................................................................................................ 11

*Nken v. Holder.,*
  556 U.S. 418 (2009) ............................................................................................................... 2

*Noem v. Vasquez Perdomo,*
  146 S. Ct. 1 (2025) ................................................................................................ 1, 3, 4, 14

*Rakas v. Illinois,*
  439 U.S. 128 (1978) ............................................................................................................... 6

*Schmidt v. Lessard,*
  414 U.S. 473 (1974) ............................................................................................................... 5

*Summers v. Earth Island Institute,*
  555 U.S. 488 (2009) ............................................................................................................... 6

*Tejeda-Mata v. INS,*
  626 F.2d 721 (9th Cir. 1980) ................................................................................................. 3

*Trump v. CASA, Inc.,*
  606 U.S. 831 (2025) ............................................................................................................... 5

*U.S. v. Arvizu,*
  534 U.S. 266 (2002) ............................................................................................................. 14

*United States v. Reyes,*
  963 F.3d 482 (5th Cir. 2020) ............................................................................................... 12

*United States v. Texas,*
  599 U.S. 670 (2023) ................................................................................................ 1, 7, 8, 10

*Wal-Mart Stores, Inc. v. Dukes,*
  564 U.S. 338 (2011) ............................................................................................................. 12

*Washington v. U.S. Food & Drug Admin.,*
  108 F.4th 1163 (9th Cir. 2024) ........................................................................................... 11

*Widakuswara v. Lake,*
  2025 WL 1288817 (D.C. Cir. May 3, 2025) ....................................................................... 12

*Winter v. Natural Resources Defense Council,*
  555 U.S. 7 (2008) ................................................................................................................... 5

**Statutes**

8 U.S.C. § 1101(a)(15)(U) ....................................................................................................... 13

iii

8 U.S.C. § 1225.................................................................................................................. 3

8 U.S.C. § 1226(a) ............................................................................................................. 3

8 U.S.C. § 1231(a) ............................................................................................................. 3

8 U.S.C. § 1357............................................................................................................. 5, 14

8 U.S.C. § 1357(a) ......................................................................................................... 3, 12

8 U.S.C. § 1357(a)(1)........................................................................................................... 2

8 U.S.C. § 1357(a)(2).............................................................................................. 2, passim

**Regulations**

8 C.F.R. § 287.5 .................................................................................................................. 2

8 C.F.R. § 287.5(e).............................................................................................................. 3

8 C.F.R. § 287.8(c)(2)(i) ...................................................................................................... 3

8 C.F.R. § 287.8(c)(2)(ii) ................................................................................................... 12

**Other Authorities**

California Values Act SB 54................................................................................................. 3

## I.    INTRODUCTION

Intervenors' joinder motion, ECF No. 570, asks this Court to transgress Article III, the Fourth Amendment, the Immigration and Nationality Act (INA), and settled principles of equity.  Each of these defects are independently dispositive, and in combination should foreclose this joinder motion.  Although styled as a motion to protect the sovereign interests of twenty-two local governments (and their constituents), Intervenors seek the same relief as Plaintiffs: a district wide injunction that seeks judicial supervision over warrantless immigration arrests that are plainly authorized by Congress in the INA.  *See* 8 U.S.C. § 1357(a)(2).  Intervenors are free to participate as amicus to share their views.  But they cannot be parties in this case.  Intervenors attempt to bolster Plaintiffs' motion for a preliminary injunction (ECF 529) by alleging federal immigration enforcement's downstream effects on municipal operations, public services, local economies, and community participation.  Those speculative allegations, even if taken as true, do not prove that Defendants are violating the INA or the Fourth Amendment in conducting warrantless arrests (and of course, the local governments lack Fourth Amendment rights in any event), and certainly do not establish a basis for the extraordinary remedy of preliminary injunctive relief.

As a threshold matter, the joinder adds no plaintiff with standing to obtain prospective relief and therefore cannot expand this Court's jurisdiction.  And the current Plaintiffs adequately represent the interests that the localities seek to assert.  To be sure, organizational plaintiffs likely lack standing in this case for the reasons already explained to this Court and the Supreme Court.  *See* Prop. PI ECF 529-86 at 15-17; *Noem v. Vasquez Perdomo*, 146 S. Ct. 1, 2 (2025).  The standing theories of the Intervenors are one step removed, and cannot survive given the clear limits set out in *Food and Drug Administration v. All. for Hippocratic Med.*, 602 U.S. 367, 390 (2024), where the Supreme Court rejected efforts to base standing on the downstream effects of regulatory action.  *See also United States v. Texas*, 599 U.S. 670 (2023).  This precludes Intervenors from obtaining prospective equitable relief on account of alleged (speculative) harms to their municipal budgets, public services, or relationships with their community members.  Nor may Intervenors manufacture standing through asserted economic or operational consequences that depend upon the independent actions of third parties. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409-16 (2013).  Intervenors' participation in this action does not expand this Court's

jurisdiction or enlarge the permissible scope of equitable relief.

Even if Intervenors possessed standing, their joinder motion fails on the merits. Sections 1357(a)(1) and (2) of Title 8 and 8 C.F.R. § 287.5 allow Department of Homeland Security ("DHS") officers to question and detain individuals for immigration-related administrative violations. *See* 8 U.S.C. §§ 1357(a)(1)-(2) (allowing officers to interrogate, without a warrant, any person believed to be an alien regarding their right to be or remain in the United States, and to arrest aliens in the U.S. in violation of immigration law and likely to escape before a warrant is obtained). Intervenors fail to identify an official policy directing officers to disregard the statutory or regulatory requirements governing warrantless immigration arrests under 8 U.S.C. § 1357(a)(2). Misleading quotations, anecdotal accounts of individual enforcement encounters, allegations concerning crowd-control measures during public demonstrations, and descriptions of post-arrest detention decisions should not be mistaken as evidence of an official policy or pattern or practice of flouting the INA's warrantless arrests requirement to determine if an individual is "likely to escape" prior to a warrantless arrest.

Moreover, the joinder motion also fails to satisfy any of the *Winter* factors to warrant a preliminary injunction: there is not likelihood of success in establishing a policy or pattern or practice of violating 8 U.S.C. § 1357(a)(2), no imminent, non-speculative, irreparable harm to Intervenors themselves, and it is not in the public interest to sideline lawful immigration enforcement based on speculative harms and conjecture. *See Nken v. Holder*. 556 U.S. 418, 435 (2009). At bottom, because Intervenors lack standing, fail to demonstrate a likelihood of success on the merits, cannot establish irreparable harm, and seek relief exceeding the permissible scope of this Court's equitable authority, their joinder motion should be denied.

## I.    BACKGROUND AND PROCEDURAL POSTURE

Defendants incorporate by reference all of the arguments set forth in their opposition to Plaintiffs' motion for a preliminary injunction. ECF No. 582. Intervenors seek to join Plaintiffs' motion for a preliminary injunction in "requiring Defendants to comply with existing legal standards—by making an individualized escape-risk determination before a warrantless arrest." *See* ECF 570 at 18. Although Intervenors' motion alleges distinct municipal interests at stake, they expressly "join Plaintiffs' Motion in full" and adopt Plaintiffs' legal arguments concerning 8 U.S.C. § 1357(a)(2). ECF

570.  They contend that universal relief is somehow justified based on the mere presence of municipal parties allegedly experiencing district-wide effects.  That repackaging does not change who has Article III standing to seek an injunction, does not expand the Court's equitable authority, and does not alter the statutory merits that govern likelihood of success.  The Supreme Court has already indicated Plaintiffs' standing arguments are on shaky ground, and the Intervenors' case for standing is significantly weaker.  *Vasquez Perdomo*, 146 S. Ct. at 2.

Intervenors group their alleged municipal harms into three categories: (1) reallocation of public-safety resources; (2) economic effects; and (3) reduced utilization of healthcare and/or municipal benefits.  *See* ECF 570 at 5.  Intervenors further decry that "Defendants routinely refuse to provide advance notice of operations" despite the fact that declarations from Intervenors' city officials admit that the California Values Act (SB 54), codified at Cal. Gov't Code § 17.25, prohibits them from sharing information with or coordinating alongside federal immigration enforcement.  *See, e.g.*, ECF No. 570-19 ¶ 6.  Intervenors' declarations largely describe discretionary reallocations (*e.g.*, Los Angeles Police Department and Los Angeles Sheriff's Department expenditures and personnel deployments), third party reactions (such as protests, impersonators, and resident perceptions), and preliminary or seasonal revenue variances that are contingent upon subjective fears over prospective immigration enforcement.  *See* ECF 570 at 9-12, 14-16.

## II.    FEDERAL LAW ENFORCEMENT PROCEDURES

To facilitate enforcement of our nation's immigration laws, Congress vested the Executive Branch with broad authority to inspect, investigate, arrest, detain, and remove unlawful aliens.  *See, e.g.*, 8 U.S.C. §§ 1225, 1226(a), 1231(a), 1357(a).  The authority to issue and execute immigration warrants has been delegated to only certain immigration officers.  *See* 8 U.S.C. § 1226(a); 8 C.F.R. § 287.5(e).  Officers are allowed to make warrantless arrests, "if [the officer] has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest."  8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8(c)(2)(i).  The "reason to believe" language has been equated with the constitutional requirement of probable cause.  *Tejeda-Mata v. INS*, 626 F.2d 721, 725 (9th Cir. 1980).  Establishing probable cause "is not a high bar."  *Kaley*

*v. United States*, 571 U. S. 320, 338 (2014).  "It requires only a probability or substantial chance of criminal activity, not an actual showing of such activity."  *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (internal quotations omitted).

Moreover, on January 26, 2026, ICE issued guidance providing direction for the lawful exercise of the warrantless arrest authority.  *See* ECF 582, Exh. C, Civil Immigration Arrest Authority: Administrative Arrest Warrants and Warrantless Arrests ("Lyons Memo").  Though § 1357 does not define "likely to escape," the memo distinguishes that phrase from a post-arrest determination of flight risk, explaining that "likely to escape" in the context of a warrantless arrest means the alien "is unlikely to be located at the scene of the encounter or another clearly identifiable location once an administrative warrant is obtained," rather than the individual complying with future immigration obligations.  *Id.* at 3-5.  The Lyons Memo similarly instructs that an alien's likelihood of escape depends on the totality of the circumstances and provides several non-exhaustive but relevant factors to consider.  *Id.* at 3-4.

## III.    ARGUMENT

The Court should deny the joinder motion.  Plaintiffs' anecdotes and cherry-picked narratives are not *prima facie* evidence of a policy or ratified practice of unlawful warrantless immigration arrests; and Intervenors' joinder adds nothing to change that reality.  Intervenors seek joinder to redress meritless grievances they allege occurred as a result of Defendants' immigration enforcement activities.  However, such speculative harms are not redressable because this Court lacks authority to enjoin Defendants' lawful warrantless arrest authority as codified in the INA at 8 U.S.C. § 1357(a)(2).  Intervenors' declarations concerning the alleged effects of federal immigration enforcement on municipal operations neither alter the statutory analysis governing Plaintiffs' claims nor establish that Intervenors are entitled to the extraordinary remedy of a preliminary injunction.  And it also fails for the same reasons set out in Defendants' opposition to Plaintiffs' motion for a preliminary injunction and Defendants' opposition to class certification, ECF Nos. 582, 577.  Defendants fully incorporate those arguments here.

### A.    Standard

Injunctive relief "is an extraordinary and drastic remedy," *Lopez v. Brewer*, 680 F.3d 1068,

1072 (9th Cir. 2012) (internal quotation marks and citation omitted), that is "never awarded as of right," *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (internal quotation marks and citation omitted). Thus, this relief "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Lopez*, 680 F.3d at 1072 (internal quotation marks and citation omitted; emphasis in original). To prove their entitlement to such relief, Plaintiffs (and those who join them) must establish that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20(2008). Critically, these are independent requirements; failure on any one is fatal to preliminary relief. Under the Ninth Circuit's sliding scale test for preliminary injunctive relief, "serious questions going to the merits" and "a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).

Joinder does not relax Article III. Every party seeking forward-looking equitable relief must show a concrete, imminent threat of injury to itself, fairly traceable to Defendants that is likely redressable. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 101-11 (1983); *Clapper*, 568 U.S. at 409-16. And a federal court's equitable power extends only to complete relief for the parties before it, not the world at large. *See Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025); *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974).

### B.   Intervenors Lack Standing

#### 1.   Intervenors cannot vindicate the rights of third parties

Intervenors do not allege that they personally face an imminent warrantless arrest in violation of 8 U.S.C. § 1357 (a)(2), nor could they. Intervenors consist of municipalities that cannot endure such alleged harm. Because of this reality, they assert their municipal interests are affected by federal immigration enforcement in the district. This does not satisfy their burden in obtaining a forward-looking injunction. A plaintiff seeking a prospective order must demonstrate a real and immediate threat that it will again be wronged in a similar way. *Lyons*, 461 U.S. at 105-06, 111. The downstream

impacts of federal action are insufficient; otherwise local government would always have standing to challenge any policy change at the federal level.  *See Alliance for Hippocratic Medicine*, 602 U.S. at 391.  The suggestion that municipal interests may be implicated by lawful enforcement operations directed at third parties does not satisfy that standard.

More fundamentally, Fourth Amendment rights are personal and may not be asserted vicariously by municipalities, organizations, or other third parties.  *Alderman v. United States*, 394 U.S. 165, 174 (1969); *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978).  The same is true of any statutory rights implicated by 8 U.S.C. § 1357(a)(2).  This precludes Intervenors from obtaining prospective equitable relief on account of alleged (speculative) harms to their municipal budgets, public services, or relationships with their community members.  The law does not permit cities to obtain forward-looking injunctions to protect unnamed persons from hypothetical future warrantless arrests.  The Court should reject any attempt to repackage generalized community concerns as Article III injuries or to invoke *parens patriae* theories against the federal government.  *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923).  To the extent Intervenors hint at associational theories, those too fail because they have not identified a member with a concrete and imminent threat of being subjected to a warrantless arrest without a likelihood of escape determination.  *Summers v. Earth Island Institute*, 555 U.S. 488, 497-99 (2009).  Nor is it apparent what members a municipality would have other than its citizens, which is simply a *parens patriae* theory that cannot be maintained.

Moreover, even if Intervenors could demonstrate the existence of an unlawful policy of practice, that would not be sufficient to confer standing.  As the Supreme Court has explained, that would merely be a re-hash of the standing theory squarely rejected in *Lyons*, where the Court presumed that there was a policy of using illegal chokeholds, yet that was insufficient to confer standing.  461 U.S. at 106.  The declarations submitted by Plaintiffs describe alleged past, fact-specific encounters and do not show a real and immediate threat of repetition to any identified person.  Intervenors' evidence adds nothing to change that analysis.  For the same reasons discussed in Defendants' principal opposition, ECF No. 582, the Court should deny prospective relief for lack of jurisdiction.  The joinder does not change that result.

**2.      Intervenors speculative downstream effects cannot establish standing**

Intervenors cannot manufacture standing through asserted economic or operational consequences that depend upon the independent actions of third parties far downstream from any actions of Defendants. *Clapper*, 568 U.S. at 409-16.  Indeed, Intervenors' theory would dramatically expand municipal standing beyond its constitutional limits.  Under their approach, any local government could challenge virtually any federal enforcement initiative by alleging indirect effects on public confidence, economic activity, municipal expenditures, or participation in public programs.  The Constitution does not permit federal jurisdiction to rest upon such generalized grievances or derivative policy disagreements.

In *United States v. Texas*, 599 U.S. 670 (2023), the Supreme Court considered claims brought by states seeking "to order the Executive Branch to alter its arrest policy so as to make more arrests." *Id*. at 674.  The states' theory was that by refusing to mandatorily detain certain aliens, the states were required to "continue to incarcerate or supply social services such as healthcare and education to noncitizens who should be (but are not being) arrested by the Federal Government." *Id.*  Despite these fairly direct costs imposed on states by the refusal to enforce a mandatory detention provision, the Supreme Court held the states lacked standing to challenge the United States' enforcement choices. *Id.* at 681.  Indeed, the Supreme Court made clear that "federal policies frequently generate indirect effects on state revenues or state spending.  And when a State asserts, for example, that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated." *Id.* at 680 n.3.

The Court observed that it had "long held 'that a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution.'" *Id*. at 674 (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)).  It held that this principle extends more broadly to bar "challenges to the Executive Branch's exercise of enforcement discretion over whether to arrest or prosecute." *Id*. at 677.  It concluded that this principle bars states from establishing standing to challenge federal immigration enforcement policies on the ground that they were adversely affected by those policies. *Id*. at 674.

In reaching this conclusion, the Court explained that only certain injuries have been traditionally recognized as "judicially cognizable" in that they were "traditionally thought to be capable of resolution

through the judicial process." *Id.* at 676 (internal quotation marks omitted). It then reasoned that the states could not assert a cognizable injury from federal immigration enforcement policies. The Court explained the Executive Branch has long had discretion as to how to enforce the laws, particularly in the area of immigration. It stated: "Under Article II, the Executive Branch possesses authority to decide how to prioritize and how aggressively to pursue legal actions against defendants who violate the law." *Id*. at 678 (quotation marks omitted). "That principle of enforcement discretion over arrests and prosecutions extends to the immigration context, where the Court has stressed that the Executive's enforcement discretion implicates not only normal domestic law enforcement priorities but also foreign-policy objectives." *Id*. at 679 (quotation marks omitted).

The Court concluded that "federal courts lack Article III jurisdiction over this suit," but that "other forums remain open for examining the Executive Branch's arrest policies," including oversight by Congress and elections. *Id*. at 685. It clarified that irrespective of whether the states' claims had merit, the states lacked standing to bring claims challenging federal immigration enforcement policies. *Id*. ("We take no position on whether the Executive Branch here is complying with its legal obligations under" the relevant statutes). Thus, even if the states had asserted meritorious claims, they lacked a cognizable injury. After all, a cognizable injury requires more than "an asserted right to have the Government act in accordance with law." *Hippocratic Med.*, 602 U.S. at 381 (quotation marks omitted).

The Court's decision in *Texas* shows that Intervenors (and Plaintiffs) lack standing to challenge Defendants' policies. *Texas* establishes that parties challenging the downstream effects of the government's immigration enforcement policies—as Intervenors do here—lack a cognizable Article III injury. The Court's logic in *Texas* also applied to challenges to federal policies that involve the use of discretion in prioritizing immigration enforcement. Here, too, Plaintiffs seek to challenge the Lyons Memo to the extent it provides guidance in how the likelihood of escape is being assessed by immigration officers. But Plaintiffs, like the states in the *Texas* case, lack standing to challenge that guidance.

Because Intervenors' asserted injuries depend upon the independent choices of countless third parties: including residents, businesses, healthcare providers, witnesses, crime victims, employers, advocacy organizations, and local officials—they lack the direct causal connection Article III demands.

For example, John Nachbar, the City Manager of Culver City declared that the municipality purposely "divert[ed] resources to address community safety concerns" in response to suspected federal immigration enforcement activities. ECF 570-19 ¶ 8. Mr. Nachbar goes on to describe additional voluntary expenditures Culver City made, which includes the authorization of "$50,000 in financial assistance to two nonprofit organizations for the purpose of assisting individuals impacted by the federal immigration enforcement activities." *Id.* ¶ 9. The affidavit conspicuously omits whether this money was spent on assisting individuals who were not lawfully in the United States. Such voluntary expenditures, that were made to further Culver City's self-professed sanctuary city agenda cannot be used as a basis to obtain standing. Defendants' lawful warrantless immigration arrests did not force Culver City to make these expenditures, and to the extent Culver City seeks to thwart the federal government's authority to enforce national immigration laws as a sanctuary city, this does not constitute "harm" upon which standing can be conferred.

Intervenors also provide declarations that claim to demonstrate lost tax revenue due to the alleged immigration policies of Defendants, but these declarations actually do nothing of the sort. For example, in a declaration from Matthew Crawford, one of the Intervenors purports to show a decrease in tax revenue by 3 to 5 percent from June and July of 2024 as compared to the same time frame in 2025. *See* ECF 570-2 ¶ 9. But the declaration does not fill in any gaps as to *why* that revenue dropped. And there are myriad reasons to explain such variance which have nothing to do with alleged warrantless arrests lacking an assessment of an alien's likeliness to escape before a warrant is obtained. Perhaps this was a run-of-the-mill economic variance, or maybe it is related to the publicly-recognized fact that many thousands of Californians have recently moved to other states; there are a plethora of reasons which could explain those numbers. And even if the loss in tax revenue were related to immigration enforcement, it still does not establish a causal link to any supposed unlawful policy: perhaps revenue dropped because of an increase in immigration enforcement that sent such aliens back to their home countries, without any violation of law whatsoever. Or maybe some aliens self-deported under the concern that immigration enforcement was on the rise, and they realized they should leave before being caught. Declarations of this nature do not purport to fill in the causal chain to convey

standing.  This is exactly the kind of "indirect effect[]" on "state [and local] spending" that is insufficient to generate an Article III case or controversy.  *Texas*, 599 U.S. at 680 n.3.  And even if the Intervenors could tie these revenue losses to the federal government's immigration policies generally, it borders on the absurd to suggest the revenue losses are connected to the lack of an escape-risk determination.

Even the declarations which attempt to link decreases in community participation for a variety of programs or services to an alleged communal fear of immigration enforcement do not resolve Intervenors' standing problem, as they are too attenuated to the government's increased enforcement efforts.  To start, it is not apparent that reduced participation and reliance on certain community programs causes the Intervenors any harm at all, as reduced participation would decrease the cost and burden of running many of those programs.  More fundamentally, these types of claimed harms do not account for the fact that the individuals who fear going to work might feel that way because they are not lawfully in the United States, or because they are closely tied to someone who is not in the country legally.  If an individual is afraid to come to work because that person is not in the United States lawfully, and has no work authorization from immigration authorities, it would pervert the concept of standing to suggest that the chilling effect on such individuals could serve as a "harm" sufficient for a municipality to challenge the federal government's enforcement of the law.  To be sure, if the government deported every illegal alien in the Central District of California, one would *expect* a significant economic impact on the municipalities, given how many illegal aliens have been working there unlawfully without repercussion.  But again, there is no basis to think that fear or conduct is related to an alleged unlawful policy of conducting warrantless arrests without a proper escape analysis rather than an increase in immigration enforcement generally.  At bottom, it is clear that Intervenors' complaint is not about how some warrantless arrests are carried out, but about increased immigration enforcement generally.  That is a classic generalized non-cognizable injury.  *Texas*, 599 U.S. at 676.

Again, these declarations do not account for the multitude of third parties within the alleged chains of causation which make it impossible to trace any purported injuries to Defendants.  Illegal aliens in these municipalities would have to be unlawfully arrested or fearful of such arrests, decide not

to work or shop because of that fear, and do so on a scale that would harm the revenue and programs of the cities.  The Ninth Circuit rejected a similar theory of standing from Idaho, which argued that removing an in-person requirement for a drug would increase Medicaid costs and undermine law enforcement.  *Washington v. U.S. Food & Drug Admin.*, 108 F.4th 1163, 1174 (9th Cir. 2024).  The Ninth Circuit found no standing based on such an "attenuated chain of healthcare decisions by independent actors that will have only indirect effects on state revenue." *Id.*  The Ninth Circuit made clear that a "theory of state standing 'in which all peripheral costs imposed on the States by actions of the [executive branch]' constitute cognizable injuries would 'make a mockery' of Article III." *Id.* at 1175 (quoting *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022)).  That is precisely the theory Intervenors advance here.  Standing cannot be manufactured in this way, and to allow the Intervenors to do so would eviscerate the traceability requirement.  *See Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 654 (9th Cir. 2017) (Causation is not traceable to the defendant when an injury is contingent upon the decisions of multiple third party or independent actors in the casual chain).

**C.**      **Intervenors Joinder Fails *Winter* On Every Element**

**1.**      **No policy of warrantless arrests without likelihood of escape determination**

Intervenors cannot show evidence of an unlawful policy or practice any more than Plaintiffs.  Both say an unlawful arrest is likely based on Defendants alleged unwritten policy of arresting their members "without a warrant and without the requisite escape risk analysis."  ECF 529 at 11.  In response, Defendants respectfully incorporate the arguments set forth in their opposition to Plaintiffs' motion for a preliminary injunction.  ECF No. 582.  Plaintiffs here have not presented evidence of an unlawful policy or practice relating to warrantless arrests.  Without a concrete finding of a policy or settled practice, neither Intervenors nor Plaintiffs cannot show the "real and immediate" threat of future injury required.  To support their claim, Plaintiffs highlight generalized statements by Department officials encouraging collateral arrests.  ECF 529 at 2-3, 5.  However, nothing in these statements demonstrate that Defendants are encouraging or informing officers to forego any likelihood of escape analysis when conducting a warrantless arrest.  Plaintiffs also attempt to use their statistical calculations to point to an unlawful policy.  Yet, the evidence shows that 72 of the 113 arrest narratives Plaintiffs

gathered provided some discussion of an escape risk.  ECF 529 at 6; see ECF 529-1 ¶ 20.  If there was a policy of *not* making an escape risk assessment, then zero of the narratives would mention it.  Even if some arrests were unlawful, parties cannot simply aggregate "necessarily fact-specific" encounters, *United States v. Reyes*, 963 F.3d 482, 488 (5th Cir. 2020), into a single policy to then attack wholesale, *See Widakuswara v. Lake*, 2025 WL 1288817, at *3 (D.C. Cir. May 3, 2025) ("[t]he 'dismantling' that plaintiffs allege is a collection of 'many individual actions' that cannot be packaged together and 'laid before the courts for wholesale correction under the APA.'"); *Lujan v. National Wildlife Federation*, 497 U.S. 871, 890 (1990) (concluding that an alleged "land review program" was not a final agency action because it did "not refer to a single [agency] order or regulation, or even to a completed universe of particular [agency] orders and regulations").

Indeed, the written policy provides for exactly the opposite—that each warrantless arrest requires probable cause of an immigration violation *and* analysis into whether the alien is likely to escape before a warrant, which tracks the statutory and regulatory language.  *See* Lyons Memo 3-4.  The memo also informs officers that they "shall document in the narrative section of the Form I-213, Record of Deportable/Inadmissible Alien, all factors considered in determining that the alien was likely to escape before a warrant could be obtained" which encourages best practice and is not required by the statue or regulations.  *Id.*; *see*, *e.g.*, 8 U.S.C. § 1357(a); 8 C.F.R. § 287.8(c)(2)(ii).  That all makes it clear that there is no policy of conducting an unlawful arrests.  It makes no sense to then infer an unwritten policy contrary to the written and reaffirmed policy.  *Cf. Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 354 (2011) ("In such a company [that forbids sex discrimination], demonstrating the invalidity of one manager's use of discretion will do nothing to demonstrate the invalidity of another's.").

### 2. Intervenors' irreparable-harm showing fails under *Winter*

Intervenors fail to establish the irreparable harm required for preliminary injunctive relief.  Their evidence remains largely anecdotal and documents perceived downstream effects rather than imminent injuries caused by the alleged constitutional violations.  Defendants respectfully incorporate their arguments pertaining to irreparable harm and standing as set forth in their opposition to Plaintiffs'

motion for a preliminary injunction.  ECF No. 582.

The declarations from municipal finance officials are replete with conclusory statements attributing revenue declines to federal enforcement operations.  However, these declarations fail to provide any sound economic methodology to support their conclusions.  They do not account for numerous confounding variables, such as post-pandemic economic shifts, inflation, changes in local employment, or seasonal tourism fluctuations.  For example, the decline in public transit ridership (ECF 570-4 ¶¶ 5-8) or the drop in community activities (ECF-570-9 ¶¶ 3-4) are common trends in many cities for reasons entirely unrelated to immigration enforcement.  *See Southern California Association of Governments Transportation Trends for June 2025*, at 6, *located at* https://scag.ca.gov/sites/default/files/2025-09/26-417-MMI-0343-Transportation-Trends-Report-June-2025.pdf (indicating "[a] decline in ridership to 27.1 million trips was observed June 2025, a seasonal decrease that coincides with school breaks").  Without a rigorous analysis that isolates the specific impact of the alleged constitutional violations from these other powerful economic and social factors, the Intervenors' claims of economic harm are nothing more than post hoc, ergo propter hoc fallacy.  Purely economic injuries are generally not irreparable.  *See Los Angeles Mem'l Coliseum Comm'n v. NFL*, 634 F.2d 1197, 1202 (9th Cir. 1980).

Furthermore, Intervenors' claim that they are being forced to dismiss criminal cases (ECF 570-10 ¶ 5) is a mischaracterization of prosecutorial discretion.  The decision to proceed with or dismiss a case when a witness is reluctant to testify—for any reason—is a core function of a prosecutor's office.  And Intervenors neglect to mention that the law allows for aliens to apply for U-visas specifically to address this issue.  8 U.S.C. § 1101(a)(15)(U).  Attributing these ordinary, discretionary choices to a constitutional injury creates a boundless theory of harm.  Ultimately, every category of harm identified by Intervenors shares the same fundamental defect: they rely on speculative causal chains linking alleged constitutional violations to the independent choices of countless third parties.  And, of course, Article III does not permit standing to rest upon such attenuated theories.

### 3.    Equities and public interest weigh decisively against an injunction

The balance of equities and the public interest weigh decisively against the extraordinary relief

Intervenors seek.  The public interest does not favor sweeping judicial intervention into the Executive Branch's administration of the Nation's immigration laws absent a clear showing of an unconstitutional policy.  The Supreme Court has already said as much in this very case.  *Vasquez Perdomo*, 146 S. Ct. at 5-6 (Kavanaugh, J., concurring in grant of stay) (reinforcing the proper role of the judiciary and cautioning against "improperly restrict[ing] reasonable Executive Branch enforcement of the immigration laws").

On the other side of the balance lie concrete institutional harms.  The Intervenors, alongside the Plaintiffs, seek an injunction that would impose a rigid, court-mandated checklist on federal officers, superseding the flexible "totality of the circumstances" standard required by the Fourth Amendment (*U.S. v. Arvizu*, 534 U.S. 266, 273 (2002)).  This would place federal officers in an impossible position: caught between their statutory duty to enforce federal immigration laws pursuant to 8 U.S.C. § 1357 and the threat of contempt for failing to adhere to a hyper-specific, judicially-created protocol that goes beyond what the Constitution or the INA requires.  This is not just a matter of chilling enforcement; it is a direct judicial intrusion into the Executive Branch's authority and would create an unworkable and litigious environment for officers in the field.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny Intervenors' joinder motion.

Dated: July 14, 2026                              Respectfully submitted,


BRETT A. SHUMATE
Assistant Attorney General
Civil Division

DREW C. ENSIGN
Deputy Assistant Attorney General

TIBERIUS DAVIS
SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney General

JASON K. ZUBATA
NANCY N. SAFAVI
ANIELLO DESIMONE
JACOB A. BASHYROV
Trial Attorneys

*/s/ Jonathan A. Robbins*
JONATHAN A. ROBBINS
Assistant Director
Office of Immigration Litigation
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-8275
Email: Jonathan.A.Robbins@usdoj.gov

*Counsel for Defendants*

## L.R. 11-6.2 CERTIFICATE OF COMPLIANCE

The undersigned counsel of record certifies that this filing is 6,068 words, which complies with L.R. 11-6.1 and this Court's Standing Order, Part VIII.C.

Dated: July 14, 2026

Respectfully submitted,

*/s/ Jonathan A. Robbins*
JONATHAN A. ROBBINS
Assistant Director
Office of Immigration Litigation
U.S. Department of Justice

*Counsel for Defendants*