# EXHIBIT 2

Sealed Version
Filed Separately

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Assistant Director in Charge,
Los Angeles Office, Federal Bureau
of Investigation; Bilal A. ESSAYLI,
in his official capacity as U.S.
Attorney for the Central District
of California.

          Defendants.

_____

          CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
             VIDEOTAPED DEPOSITION OF C█████ C█████
                   LOS ANGELES, CALIFORNIA
                   WEDNESDAY, MAY 20, 2026
                        VOLUME I

Reported by

Daryl Baucum, RPR, CRR, RMR, CSR No. 10356


Job No. 8036035,  PAGES 1 - 321

                                           Page 2

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

DEPOSITION EXHIBITS

C████  C████

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| Exhibit 170 | I-213 of Pedro Vasquez Perdomo | 135 |
| Exhibit 171 | I-213 of Carlos Osorto | 142 |
| Exhibit 172 | EARM printout of Villegas-Molina | 144 |
| Exhibit 173 | July 12, 2025, Email from C████  C██████ to C████  C████ | 147 |
| Exhibit 174 | July 12, 2025, Email from C████  C████ to C████████  M███████ | 153 |
| Exhibit 175 | Email thread, most current Email dated June 20, 2025, from I███  R██████  to C████████  M███████ | 157 |
| Exhibit 176 | Link to news video | 172 |
| Exhibit 177 | Forensic Examination Report Case Number C███████  iPhone | 172 |
| Exhibit 178 | I-213 of B██████  P██████ I████  G█████ | 190 |
| Exhibit 179 | Department of Homeland Security Report of Investigation | 205 |

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

                    DEPOSITION EXHIBITS (continued)

                           ▮▮▮▮  ▮▮▮▮▮

   NUMBER            DESCRIPTION                              PAGE

   Exhibit 180       "Los Angeles Times" article              223
                     titled "'Amateur hour at the
                     U.S. attorney's office': L.A.
                     prosecutors face more losses
                     in protect cases"

   Exhibit 181       I-213 of W▮▮▮▮▮ A▮▮▮▮▮                   230
                     C▮▮▮▮▮-V▮▮▮

   Exhibit 182       Screenshot on Google maps                242

   Exhibit 183       I-213 of A▮▮▮▮▮▮                         248
                     P▮▮▮▮▮▮-B▮▮▮▮▮

   Exhibit 184       E-213 of E▮▮▮▮                           254
                     H▮▮▮▮▮-M▮▮▮▮▮

   Exhibit 185       Email thread, most current               262
                     Email dated June 11, 2015,
                     from ▮▮▮▮ ▮▮▮▮ to T▮▮▮▮
                     F▮▮▮ and others

   REPORTER'S NOTE:  All quotations from exhibits are reflected
   in the manner in which they were read into the record and do
   not necessarily indicate an exact quote from the documents.

                                                          Page 12

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Q    And that is the same title that you hold presently?

A    Yes.

Q    Is that correct?

And have you been based in Long Beach throughout that from 2007 until -- until the present?

MS. SAFAVI:  Objection to form.

THE WITNESS:  2007 when I joined ICE, I moved to the L.A. field office.

MS. SAFAVI:  Do you want to let them know --

MX. WILFONG:  I think we just muted them. Thank you.

BY MX. WILFONG:

Q    Excuse me.

You said that in 2007, you joined the L.A. field office.

Is that correct?

A    Yes.

Q    And have you been with the L.A. field office since that time?

A    Yes.

Q    What is the role of a Supervising Detention and Deportation Officer?

Page 40

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

A    My specific role, I am a supervisor over a    09:54

Fugitive Apprehension Team.  My job is prominently

field work.

Q    Have you been a supervisor of a Fugitive

Apprehension Team since 2007 -- excuse me -- since    09:54

2011 when you became a supervisor?

MS. SAFAVI:  Objection; form.

THE WITNESS:  For the majority of the

time, yes.  There was a three-year period where I

supervised an alternative to the detention unit.    09:55

BY MX. WILFONG:

Q    Was that also in the L.A. field office?

A    Yes.

Q    And what years were those?

A    2019 until, maybe, 2003.    09:55

Q    I'm sorry, you said 2009 or '19?

A    '19.

Q    '19 to 2000.

A    And 3 -- I mean 2023.

Q    Thank you.    09:55

And is that a position that you requested?

A    Yes.

Q    And why did you leave that position in

2023?

A    Wanted to do something different.    09:56

Page 41

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Q    And when you left in 2023, you went back    09:56
to your role as a supervisor of the Fugitive
Apprehension Team?

A    Yes.

Q    Were there any differences in that role    09:56
after 2023 as opposed to previously?

A    As far as the job, no.

Q    And since 2023, you have been supervising
Fugitive Apprehension Teams --

A    Yes.    09:56

Q    -- the entire time?

Which of those teams do you supervise?  Do
they have numbers?

MS. SAFAVI:  Objection; form, vague, and
confusing.    09:57

THE WITNESS:  Currently, I supervise a
team called MCAT, Mobile Criminal Alien Team.

BY MX. WILFONG:

Q    Does that MCAT team have a number?

A    No, it doesn't.    09:57

Q    How long have you been supervising the
MCAT?

A    For about -- it was created about three
years ago.

Q    Have you been supervising that team since    09:57

Page 42

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

you left your position as an ATD supervisor?                    09:57

    A    Yes.

    Q    And you said it was created about three
years ago.

         MCAT did not exist prior to 2023?           09:57

    A    Not in the L.A. field office.

    Q    And what is MCAT?

    A    It's designation is Mobile Criminal Alien
Team, I think.

         Basically, it's not really specialized but    09:58
we are more mobile to go to different parts of the
country.

    Q    What is your understanding of why MCAT was
created in 2023?

         MS. SAFAVI:  Objection; calls for           09:58
speculation.

         THE WITNESS:  My opinion, they just wanted
a team that they can say hey, go to New Orleans and
we're going to conduct a so-many-week operation, and
we basically sign an agreement that we're mobile      09:58
enough to do that.

BY MX. WILFONG:

    Q    So you said that your activities are not
different than other teams -- other Fugitive
Operations teams.                                      09:59

Page 43

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

A    No.                                                    09:59

MS. SAFAVI:  Objection; form.

THE WITNESS:  They're not different.

BY MX. WILFONG:

Q    So the main difference is your unit, MCAT,          09:59
is a mobile team.

A    Yes.

Q    Are there any other differences that you
can think of?

A    None.                                                 09:59

Q    And has MCAT been operational since 2023?

MS. SAFAVI:  Objection; vague.

THE WITNESS:  What do you mean?

BY MX. WILFONG:

Q    Have you been -- for example, have you            09:59
been mobile since 2023?

A    No.

Q    When did -- what about now?

A    Now, no.  We have -- that specific team
has not been deployed.                                    10:00

Q    Does that mean that -- has the MCAT team
been sent to any operations outside of L.A. field
office area of responsibility?

A    No, not specifically the MCAT team.

Q    And so if MCAT is not mobile, are there          10:00

Page 44

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Q    And which officers were those?                          10:05

A    Deportation Officer F████ T█████,

Deportation Officer C████ C███████, Deportation

Officer C████████ G███████.

There is one more.  I don't remember his            10:05

name right now.

Q    And are all of those officers part of the

MCAT today?

A    Yes.

Q    And how did you become aware of the               10:05

creation of MCAT?

A    Email.

Q    From who?

A    From my -- from my supervisor.

Q    Your supervisor at ATD?                            10:05

A    No, my supervisor in Fugitive Operations.

Q    And what was that Email saying?

A    Basically, hey, we are creating a new

team, here is a description, anybody who is

interested can contact me.                                  10:06

Q    And what was the description?

A    That the team was more mobile, you're

going to focus more on the criminal aspect.  I think

that was about it.

Q    And when you say focus more on the                 10:06

Page 48

Q   Who makes those decisions?                                    10:08

A   My supervisor.

Q   And who is that?

A   ██████ M██████.

Q   And did you have communications with your              10:08
supervisor regarding the increased staffing for the
team?

A   What do you mean?

Q   How did you learn that your team would be
expanding?                                                        10:08

      MS. SAFAVI:  Objection; vague.

      THE WITNESS:  My supervisor had a meeting.

BY MX. WILFONG:

Q   A meeting with you?

A   With all of the supervisors for Fugitive           10:09
Operations basically telling us that okay, we are
going to get this many more staff, so we divide them
up.

Q   And when was that meeting?

A   Yeah, I have no idea, we have so many              10:09
meetings.

Q   Do you -- was that meeting in 2025?

A   Yes.

Q   Going back to the temperature, but L.A.
doesn't really help us with that.                                 10:09

                                                        Page 50

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Persons convicted of criminal acts in the United                    11:04

States that are unlawfully present.  That goes the

same with persons that have a green card, also

people that came over the border without inspection.

    Q    So would that include the apprehension of         11:05

anyone -- not only of people with deportation orders

or criminal records but you said it's a broader

category?

    A    Yes.

    Q    And do you understand what I mean when I           11:05

refer to a "target folder"?

    A    Target folder as in?

    Q    Is that a term that you have heard or used

in your work?

    A    We don't really use that terminology.             11:05

Normally, we would say is FOW, Field Operations

Worksheet.  So it's sort of a target folder.

    Q    And what is a Field Operations Worksheet?

    A    It's a form that we use that has all the

biographical data on it, a picture, boxes to check          11:05

off, local law enforcement, local hospitals, and the

criminal history of the target, generally speaking.

    Q    And when would you prepare -- or when

would your team prepare a Field Operations

Worksheet?                                                  11:06

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

A    It just depends.  It could be when they find the target.  It could be the day before the operation.  It varies.

Q    But a Field Operations Worksheet is prepared as part -- for what purpose?

A    The purpose is so that all the officers that are on the team that is a party to that -- a part of that targeted enforcement have all the same information.

Q    All the same information regarding what?

A    The target of the arrest.

Q    And in addition to the Field Operations Worksheet, is there any other documentation that would be prepared prior to an arrest operation?

A    An I-200 which is an administrative warrant, send out Emails to other boxes that state that we're going to be in a specific location to see if there would be any conflict or to de-conflict with other law enforcement agencies.

Q    Prior to filling out the Field Operations Worksheet, is there any preparation that your team would do in order to be able to fill out the Field Operations Worksheet?

A    Yes.

Q    What does that involve?

11:06
11:06
11:06
11:07
11:07
11:08

Page 70

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

A    So you would do database checks, criminal    11:08
history checks, immigration history checks.
Sometimes you may do a drive-by of the location
around that.

Q    And what cases would you -- or in what    11:08
situations would do you a drive-by of the location?
You said sometimes that would be done.

A    When you want more information.
If there is a vehicle registered in the
person's name, where the house is located, you know,    11:08
if it's across the street from a school, next to a
church, things like that.

Q    And what would be the purpose of that
additional information?

A    As far as getting a vehicle, it would be    11:09
just to know that that target may drive that
vehicle, and across the street from a school or
stuff like that, it would be what time are we going
to do this enforcement operation because I try to be
cautious because it is across the street from a    11:09
school.  We could reschedule it to a weekend,
something like that.

Q    Thank you.
And does a Field Operations Worksheet
require a supervisor's signature --    11:09

Page 71

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

        A    Yes.                                              11:09

        Q    -- prior to --

        A    Yes.

        Q    And does your team have prior -- excuse
me.                                                           11:09

             Prior to 2025, did your team always have a
Field Operations Worksheet -- I'm just going to call
it "FOW" for going forward.

             Did your team always have an FOW prior to
an arrest operation?                                          11:10

        A    Yes.

             MS. SAFAVI:  Objection; form.

             THE WITNESS:  Yes.

BY MX. WILFONG:

        Q    Has that changed at all in the last year?       11:10

        A    Yes, it's changed a little bit.

        Q    How has it changed?

        A    We have different forms of FOWs.

        Q    When you say "different forms," what does
that -- how are they different?                               11:10

        A    Our traditional one was a PDF that we
plugged in all the information in.  Our newer ones
can be printed out of a database and get the
pictures and stuff like that.

        Q    When you say printed out of a database, do     11:10

                                                      Page 72

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

efficiency of developing leads?                          11:24

        MS. SAFAVI:  Objection; vague.

        THE WITNESS:  I wouldn't say increased the

efficiency but it puts more information in one spot.

BY MX. WILFONG:                                          11:24

    Q    And I know you mentioned Elite is a

relatively new database.

        Did you and your team receive training on

how to use that?

    A    Yes.                                            11:24

    Q    Who provided that training?

    A    The people who developed the database.

    Q    Would that be Palentir?

    A    I don't know the name of the company.

    Q    The company that developed Elite provided    11:25

the training?

    A    Yes.

    Q    And you said before that prior to the last

year, your team was in the field maybe once, twice a

week at that time.                                       11:25

        How many leads -- let's say in a week or a

month -- would your team identify?

        MS. SAFAVI:  Objection; law enforcement

privilege.

        Go ahead and answer the question.                11:26

Page 82

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

THE WITNESS:  I don't know.                    11:26

BY MX. WILFONG:

Q    Would you give an estimate.

A    So leads or arrests?

Q    Start with leads.                         11:26

A    Leads, I would say average officer would
produce two to three a day.

Q    And then what about arrests?

MS. SAFAVI:  Objection; calls for law
enforcement privilege.                         11:26

Go ahead and answer the question.

THE WITNESS:  At that time, maybe two or
three arrests a week per team.

BY MX. WILFONG:

Q    And so just to clarify, that was those two    11:26
to three leads per day per officer and two to three
arrests per week per team.

Is that correct?

A    Yes.

Q    And then what about now for identifying    11:27
leads?

MS. SAFAVI:  Objection; calls for law
enforcement privilege.

Go ahead and answer the question.

THE WITNESS:  Right now, a lot.  I don't       11:27

Page 83

know how many leads are developed.  You know, we
have more team members, so it's a lot.

BY MX. WILFONG:

Q    You said before it would be about two to
three per officer per day.

Is it more than that now?

A    It's safe to say yes.

Q    Would you say twice as many?

A    I couldn't say because I sign a lot of
them and they're put on my desk and I do a case
review and give it back to the officers.  So it's a
lot.  I always have a stack.

Q    And when you say a lot of them, are you
referring to the FOWs?

A    Yes.

Q    How many FOWs would you say you are
signing per day?

A    Maybe eight to nine, maybe.

Q    And what does that process entail in the
review process?

A    When I review the case, what I do is I go
through the immigration history to see if it's true
and correct and then I go through the criminal
history to look for any officer safety issues,
things like that.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Q    Is there anything else that you look for in that review?                                                      11:28

A    No, those are my go-tos.

Q    And you said that previously it was about two to three arrests per week for your team.                      11:29

How many arrests would you say your team is making now?

MS. SAFAVI:  Objection; calls for law enforcement privilege.

Go ahead and answer the question.                                                        11:29

THE WITNESS:  From ten to fifteen.

BY MX. WILFONG:

Q    And how many of those are you typically out in the field for?

A    Probably seven or eight.                                                            11:29

Q    Is there a way that you pick which -- which you will go on?

MS. SAFAVI:  Objection; vague and confusing.

THE WITNESS:  Yes.                                                                      11:30

BY MX. WILFONG:

Q    What is that?  What does that depend on?

A    The first thing I look is if there is going to possibly be an officer safety issue, the person was convicted of a violent crime.            11:30

Page 85

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

the street.  That would still be proximity.  We                    11:43

wouldn't talk to him because he wasn't a part of

that arrest.

    Q    Did you provide any other guidance about

the implementation of the policy?                                  11:43

         MS. SAFAVI:  Objection; vague.

         THE WITNESS:  Probably just reiterated

that over the course of the year since we have been

doing this.

BY MX. WILFONG:                                                    11:44

    Q    Reiterated what?

    A    Proximity, interview techniques.  If the

person doesn't talk to you or doesn't provide ID,

that you cannot continue interviewing them or just

take them into custody.                                            11:44

    Q    And why did you reiterate that?

    A    I like to ensure that the officers are up

to date.

    Q    Did you have any concerns about whether

the officers were complying with that guidance?                    11:44

         MS. SAFAVI:  Objection; objection; form

and ambiguous.

         THE WITNESS:  No.

BY MX. WILFONG:

    Q    And did this change in policy impact the                  11:45

Page 95

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

work of your team?                                        11:45

     A    Yes.

     Q    How so?

     A    We started doing collateral arrests versus
just the targeted enforcement.                            11:45

     Q    And of the ten to fifteen arrests your
team is making per week, how many would you say are
collateral arrests?

     A    Maybe four.  Just a rough number, maybe
four.                                                     11:45

          As a supervisor, I don't keep the
individual stats and break individual stats down.
That is more of a stat unit or headquarters thing.

     Q    So as supervisor, you are not tracking
which of the arrests are targets versus collaterals?      11:46

     A    Right.

          MX. WILFONG:  Pardon me?

          MS. SAFAVI:  We have a lot of empathy for
bad tech.

          Counselor, would now be a good time to ask      11:46
when we would be going on lunch?

          MX. WILFONG:  Yes, I was thinking since we
are getting close to 12:00, probably the next break
would be the lunch break if that works for folks.

          MS. SAFAVI:  Yes.                                11:46

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

bus stop.                                                          13:26

Corey Clement made contact with one person.  I made contact with another person and Deportation Officer Gutierrez made contact with the other person.                                          13:26

Q    Anything else that you recall?

A    The person at the bus stop that didn't run was a U.S. citizen, people in the doughnut shop was recording us.  That's about it.

Q    Anything else?                                      13:27

A    That's it.

Q    Were you involved in planning the operation?

A    No.

Q    And you mentioned that there was a           13:27 briefing that morning.

Who provided the briefing?

A    Deportation Officer Corey Clement.

Q    And who was involved in the operation?

A    Myself, Corey Clement, Gutierrez --           13:27 Christian Gutierrez, and Deportation Officer Felix Thomas.

Q    Anything else?

A    That's all that I can think of right now.

Q    And those are all members of the MCAT         13:27

Page 118

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

team?                                                    13:27

    A    Yes.

    Q    And you said you were looking for a white
van in the neighborhood?

    A    Yes.  That was one of -- the van that the    13:28
target of the operation drove.

    Q    Did you have the license plate for the
van?

    A    I don't remember.  I remember a picture
with a logo on the side.                                 13:28

    Q    And did you see that white van?

    A    No.

    Q    And you said that you -- Clement said
something over the radio.

         What did he say?                               13:28

    A    I don't remember exactly what he said.

    Q    Do you remember the gist of what he said?

         MS. SAFAVI:  Objection; asked and
answered.

         THE WITNESS:  Maybe go.  I don't know.        13:28
BY MX. WILFONG:

    Q    And you said that you hopped out of the
vehicles to make contact with people at the bus
stop?

    A    Yes.                                           13:28

                                             Page 119

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Q    Why did you do that?                                    13:28

A    That would be the only way to make contact

and to see if our target of the investigation was

there.

Q    So you did not see the van in the area.           13:29

Did you have a photo of the target?

A    Yes.

Q    And did you see anyone that matched the

description of the photo -- matched the photo, I

should say?                                                 13:29

A    Deportation Officer Clement was what we

call "the eye."  So he was the person that was

supposed to try to get a visual.

Q    And did he get that visual?

A    I would assume that he thought one of the         13:29

persons at the bus stop was the target of the

investigation, just assuming.

Q    But you don't know whether he believed

that?

A    I don't know.                                     13:29

Q    And I know you said that Clement was the

team lead.

What was your role in the operation?

A    Supervisor.

Q    And a supervisor on scene, what do              13:30

Page 120

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

those -- what do your supervising responsibilities     13:30

entail?

MS. SAFAVI:  Objection; vague, form.

THE WITNESS:  In that situation, I would

operate as another officer on scene and the     13:30

supervisor for officer safety, team evaluation,

individual evaluation.

BY MX. WILFONG:

Q     And you said that once you got out of the

vehicle that people began to run and that you made     13:31

contact with somebody.

How did you make contact with them?

A     I yelled "Police, stop."  He kept running,

ran about a quarter of a block.  I chased him and

once I grabbed his arm he -- he stopped.     13:31

Q     And why did you chase him?

A     To see if he was a target of the

investigation.

Q     Had you seen the photo of the target prior

to the operation?     13:31

A     Yes.

Q     And did you -- did this person match -- or

match the photo?

A     At the time the person that I was chasing

turned and ran.  So the only thing I could see was     13:31

Page 121

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

kind of the clothes that he was wearing and the back          13:32

of his head.

Q    What clothes was he wearing?

A    I don't recall at this time.

Q    And so once you made contact, what               13:32

happened next?

A    Once I made contact, I put handcuffs on

him, walked him back to the bus stop, handed him off

to Deportation Officer Gutierrez and Clement, and

they started doing the field interviews.              13:32

Q    So you did not interview this person prior

to handing them off to Gutierrez and Clement?

A    No, I didn't.

Q    And is it standard practice to chase

somebody to determine whether they're a target of an          13:33

investigation?

MS. SAFAVI:  Objection; vague, confusing,

ambiguous.

THE WITNESS:  I can't say it's standard

practice but when you are doing an enforcement               13:33

action and if you think your target is right there

in that location and once you exit your vehicle

everybody runs, you try to figure out who is --

which one of the runners is your target.

Page 122

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

BY MX. WILFONG:                                              14:25

Q     Why?

A     Why?  I like to be factual.

Q     And earlier we looked at Mr. Carlos
Osorto's I-213, and that's the one had you listed in       14:25
the byline, as you may recall.

A     Yes.

Q     Is it possible that it was Mr. Osorto that
you arrested?

A     Very possible.                                        14:26

Q     Mr. Osorto recalls as he was being chased
that the officer pulled out a taser and pointed it
at him.

      Did you at any time point your weapon or
your taser?                                                 14:26

      MS. SAFAVI:  Objection; foundation, form.

      Go ahead and answer the question.

      THE WITNESS:  It's possible that I pulled
a taser but I don't remember if I did or didn't but
it's possible, especially if a person is fleeing.          14:26

BY MX. WILFONG:

Q     So there are times it would be justified
to point a taser on someone who is fleeing?

A     Yes, more of an officer-presence thing.

Q     And in what circumstances?                            14:26

Page 156

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Robles' face.                                                    15:24

        Q     And tango means?

        A     The target.

        Q     And then DEA did nothing and we got to
watch those guys, what are you referring to there?              15:24

        A     As in the DEA didn't assist the officers
in taking the subject into custody.

        Q     And what do you mean by you have to watch
those guys?

        A     As in we got to watch them because they     15:25
don't have our back or our best interest.

        Q     Were DEA some of those fed partners that
you were mentioning earlier?

        A     Yes.

        Q     What is your understanding of why those     15:25
federal partners were being assigned to Title 8
Teams?

        A     Headquarters initiated.  They all got
Title 8 authority and they were out as a force
multiplier for us.                                        15:25

        Q     And why was that?

        A     Because of the ongoing operation.

        Q     Which ongoing operation are you referring
to?

        A     Operation Surge or whatever the name the    15:26

Page 180

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

operation at the time was called.                    15:26

Q    Thank you.

We can put this document aside.

So other than the text thread that we were

just reviewing, did you have any other              15:26

communications about this operation on June 18?

A    Not that I remember.

Q    And were you using Zello at that time or

other radio for communications?

A    At that time we were -- depending on what      15:26

fed partners that we were with, that would dictate

what messaging app we would use.

Q    So for this operation, were you using

Zello?

A    I think so.                                     15:27

Q    So you think so.

A    I think so.  I don't know.

Q    And did you, yourself, enter new data or

information into any of the databases about this

operation?                                           15:27

A    No.

Q    And just before we move off this topic,

the I-213 for Mr. Vasquez Perdomo which is 170, and

so just returning again to the arrest narrative here

which we discussed earlier and you shared that this  15:28

Page 181

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

investigation of your conduct or Agent Ribner's                    16:04

conduct?

    A   No.

    MS. SAFAVI:  Objection; compound.

BY MX. WILFONG:                                                    16:04

    Q   And when you spoke with AFOD Menjivar, did

he express any concern about your conduct towards

Mr. Huerta?

    A   No, he did not.

    Q   Thank you.  You can put that on the side.     16:04

Thank you.

    And do you recall being present at an

operation on June 24 in downtown Los Angeles that

involved the arrest of two U.S. citizens, Andrea

Velez and Luis Hipolito?  I think this may be the     16:05

case you can referring to earlier.

    A   Hipolito?

    Q   Yes.

    A   I'm from Mississippi.

    Q   Sorry, you recall -- you recall that        16:05

operation on the 24th of June?

    A   Yes, I was involved in that operation.

    Q   How did you -- who organized that

operation on the 24th of June?

    A   That operation was led by Deportation        16:05

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Officer Gutierrez.                                              16:05

Q    Who is a member of the MCAT team?

A    Yes.

Q    And did you -- was there an FOW for that
operation?                                                      16:05

A    Not specifically at the location right
there where the incident happened but a distance
away from that.  I don't remember how far because we
were driving.

Q    And so how was it that you -- that the            16:06
operation came to take place at that location?

A    Deportation Officer Gutierrez -- we were
coming back from the office.  We were coming back
from the prior location and he was on the radio.

He said I think -- I think he said -- I'm            16:06
not a hundred percent because it is -- it has been a
minute -- I think that is tango right there, I think
that is tango right there.

And then we exited the vehicle, gave chase
to that person, and the rest is Hipolito's stuff.      16:06

Q    So you were -- Officer Gutierrez stated
that he believed the tango -- meaning target --

A    Yeah.

Q    -- for the operation was -- was where?

A    At the corner at like a little fruit stand       16:07

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

or something to that effect.                          16:07

Q    And you said this was some distance from the operation location?

A    Yes.

Q    And who was the target for the operation?       16:07

MS. SAFAVI:  Objection; calls for law enforcement privilege.

Go ahead and answer.

THE WITNESS:  I wouldn't remember who that would have been.                          16:07

BY MX. WILFONG:

Q    Do you recall what type of location the operation was to take place at?

A    The initial operation?

Q    Yes.                          16:07

A    No, I don't.

Q    And what was the -- so you had already gone to the initial location.

And where -- and what had happened there?

A    If my memory is correct, I think we       16:08
arrested one person, left that one, and was headed to the next location or something to that effect.

Q    And when you say "next location," what are you referring to?

A    Like he had another FOW, another target       16:08

Page 210

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

for another location.                                       16:08

   Q    And so you had already conducted an

arrest.

        And was that an arrest of the target or a

collateral?                                                16:08

   A    I can't remember.

   Q    And you were the -- when Officer Gutierrez

said that he believed he saw the target, was he

referring to the target from the location you were

coming from or the location you were going to?             16:08

        MS. SAFAVI:  Objection; form.

        THE WITNESS:  I don't remember.  I don't

remember.

BY MX. WILFONG:

   Q    And were there any other officers with you        16:09

and Officer Gutierrez as part of this operation?

   A    Yes.  We had mostly FBI agents, and we had

a team from -- bop, bop, bop, bop, bop --

New York -- via New York that were TDY to L.A. to

assist in the field operations assisting us.              16:09

   Q    And just so the record is clear, what do

you mean by "TDY"?

   A    Temporary duty.

   Q    Those were ICE officers in the New York

office?                                                    16:09

Page 211

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

A    Yes.                                                    16:09

Q    Who were temporarily on assignment in L.A.?

A    Yes.

Q    Did that happen a lot at that time?        16:09

MS. SAFAVI:  Objection; vague.

THE WITNESS:  Yes.

BY MX. WILFONG:

Q    And why were there -- why were there officers from other field offices on assignment in        16:10 L.A.?

MS. SAFAVI:  Objection; calls for speculation.

THE WITNESS:  Just as a force multiplier.

BY MX. WILFONG:                                            16:10

Q    For what purpose?

MS. SAFAVI:  Objection; calls for speculation.

THE WITNESS:  I think the initial operation started in L.A.                                      16:10

BY MX. WILFONG:

Q    What initial operation is that?

A    I can't remember the operation name but like the surge operation.

Q    And what was the -- when Officer Gutierrez        16:10

Page 212

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

saw a person at a fruit stand, was that a person        16:10

working at the fruit stand? a person buying --

    A    A person working at the fruit stand.

    Q    And did Officer Gutierrez have reason to

believe that that individual worked at a fruit stand     16:11

in the area?

    A    I don't know.

    Q    When -- when an officer believes they see

somebody in a location other than the known -- a

known location to be associated with them, are there     16:11

practices that you take to confirm whether that

person is, in fact, the target?

    A    That is where the field interview would

come in.

    Q    So the way to confirm would be to conduct     16:11

a field interview?

    A    Yes.

    Q    And did Officer Gutierrez have a photo

of this individual in the vehicle with him -- of the

target?                                                  16:12

    A    Of the target, I don't remember that.  I

don't remember if he did or if he didn't.

    Q    Would that be expected during an

operation?

    A    Yes.  Standard practice would be to have a     16:12

Page 213

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

photo FOW available.                                            16:12

Q    But you are not sure whether he did?

A    Not sure, and there was a brief time in
there where there were -- FOWs were suspended.  So
it was a different time.                                        16:12

Q    When were FOWs suspended?

A    I think partially during that initial
operation.

Q    And what do you mean by "suspended"?

A    As in you didn't need an FOW if you had a         16:12
picture, the immigration history, or what we call
baseball card.  It was allowed out in the field.

Q    And how was that communicated to you?

MS. SAFAVI:  Objection; vague.

THE WITNESS:  Possibly during through              16:13
Email, possibly.

BY MX. WILFONG:

Q    And how did Officer Gutierrez determine
that that individual at the fruit stand was his
target?                                                        16:13

A    I think when we were on the street, he was
probably four or five feet from him in his vehicle.
The deportation officer was in his vehicle looking
at a guy a few feet away from him.

Q    And this is when you say you were driving      16:14

Page 214

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

back to the office?                                             16:14

A     Yes.

Q     So what happened at that time when he said

that he believed that he was the target?

A     Once we stepped out of the vehicle, the      16:14

target started running, ran, and then the whole

Hipolito incident happened.

Q     And you said you had several -- it was

you, Officer Gutierrez, several agents from the

New York field office, and agents from the FBI.     16:14

Is that right?

A     Yes.

Q     So how many agents in total would you say

were with you?

A     I would say twelve at the time.             16:14

Q     And did all twelve agents stop at this

location?

A     Yes.

Q     And when you pulled over to this location,

did you spend any time surveilling from inside the  16:15

vehicle prior to existing the vehicle?

MS. SAFAVI:  Objection; form.

THE WITNESS:  I don't think so.

BY MX. WILFONG:

Q     And did all twelve agents exit their        16:15

Page 215

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

vehicles?                                                    16:15

        A    No.

            MS. SAFAVI:  Objection; form.

BY MX. WILFONG:

        Q    But all twelve agents pulled up in           16:15

vehicles?

            MS. SAFAVI:  Objection; form.

            THE WITNESS:  Yes.

BY MX. WILFONG:

        Q    And did it end up was the person that was    16:15

this fruit stand worker, were they, indeed, the

target that you were looking for?

            MS. SAFAVI:  Objection; form.

            THE WITNESS:  He was a little bit faster

than us, so he got away.                                  16:15

BY MX. WILFONG:

        Q    Understood.

            MS. SAFAVI:  Counsel, can we have a short

two-minute break.

            MX. WILFONG:  Just after this, yes.           16:16

            MS. SAFAVI:  Okay.

BY MX. WILFONG:

        Q    Were -- did agents make contact with any

other individuals for purposes of immigration

investigation at that -- at that location?               16:16

                                            Page 216

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

individual?                                                    16:39

A    Yes.

Q    And how far was the fruit stand from the target location?

A    I don't know.  I'm confused now.            16:39

Q    The initial location -- sorry, you said where you were going to conduct the targeted operation.

A    Oh, the initial location where we made the first arrest?                                        16:39

Q    The last known address for this target.

A    So we had a prior target which was arrested.  We were on our way back.  We had another target -- do a lot of arrests.  I do a lot of field work, so stuff blends together.                  16:39

We were on our way back to another target location.  From that target location we were going to be en route to the office.

Gutierrez saw what I think he believed was target, and he said target, I'm going to make         16:40 contact, bam, out the vehicle he goes.

At the moment he opened the door and he walks around the vehicle, the guy started running, and then I gave chase with Gutierrez.

Q    And did he say the name of the target or           16:40

Page 228

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

he just said "target"?                                      16:40

    A    We typically say just "target."

    Q    And I know you mentioned there were

multiple targets that day.

         Did you know at the time which target he      16:40

was referring to?

    A    Yeah.

    Q    And do you remember how far the fruit

stand was from the last known address for that

target?                                                     16:40

    A    No.

    Q    Was that something you would have been

evaluating -- you were evaluating at the time?

    A    I don't understand.

    Q    As supervisor on the scene, were you         16:40

evaluating prior to making contact with the fruit

vendor the likelihood or the basis for believing

that the fruit vendor was the target?

         MS. SAFAVI:  Objection; form.

         THE WITNESS:  No, because things like that    16:41

happen all the time.

         MS. SAFAVI:  All right.

         Do you need a break?

         MX. WILFONG:  Yes, I think we should

probably go on break.                                       16:42

                                                    Page 229

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

THE VIDEOGRAPHER:  Going off the record at       16:42

4:42 p.m.

(Off the record.)

THE VIDEOGRAPHER:  Going back on the

record at 5:04 p.m.                               17:04

BY MX. WILFONG:

Q    All right.  Welcome back, Officer Crook.

We have taken a break.

You understand you are still under oath

from this morning?                               17:04

A    Yes.

MX. WILFONG:  All right.

So if I could get exhibit -- mark this as

181, please, and there is no Bates stamp for this

document.                                        17:04

(Deposition Exhibit 181 was marked

for identification by the court

reporter and is attached hereto.)

BY MX. WILFONG:

Q    So do you recognize this type of document,  17:04

Officer Crook?

A    Yes.

Q    This is another I-213.  We have been

looking at a number of them.

And do you see at the bottom right-hand    17:04

Page 230

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

corner of page 1 the examining Officer Carey Crook?          17:04

Is that your signature?

A    Yeah, it is.

Q    So would that mean you reviewed this

document --                                                  17:05

A    Yes.

Q    -- at the time?

And do you recall this I-213?

A    I don't recall the name.  The face is

blocked out but let me take a look at it.                    17:05

Yes, I don't remember the specific case

but I recognize the narrative, the 213.

Q    And when you say "I recognize the

narrative," what does that mean?

A    It's more the format that I use.                        17:06

Q    And is Officer Dominguez who signed or who

is listed here as the officer, do you know -- do you

know that officer?

A    Yes.

Q    And is Officer Dominguez a member of your          17:06

team?

A    No, he is not.

Q    And how do you know Officer Dominguez?

A    I have worked with him over the last like

two years, I think.                                          17:06

Page 231

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Q    Is Officer Dominguez a Fugitive Operations   17:06

officer?

A    Yes.

Q    With another team within the L.A. field

office?                                            17:06

A    Yes.

MS. SAFAVI:  And then we're going to

object on the foundation on the document.

BY MX. WILFONG:

Q    So you have taken a few minutes to review   17:07

the narrative.  The arrest took place on January 5

in Pasadena.

Were you present for this operation?

A    I don't remember.

Q    Would you have been -- in January of this   17:07

year, do you recall conducting any operations in

Pasadena California?

A    Yes, we conducted a lot of operations in

Pasadena and around Pasadena.

Q    What about operations around the Pasadena   17:07

courthouse, did you conduct any operations at the

courthouse or around the courthouse in January 2026?

MS. SAFAVI:  Objection; form.

THE WITNESS:  I don't remember but it's

possible.                                          17:08

Page 232

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

BY MX. WILFONG:                                          17:08

Q     And in January 2026, were you ever out in the field with Officer Dominguez?

A     Yes.

Q     On what occasions?                                17:08

A     Numerous occasions.  I can't pinpoint an occasion but at that time supervisors -- if deportation officers needed assistance out in the field and their direct supervisor wasn't available or doing another operation, we would fill in for each other.                                                17:08

Q     So you were out in the field with members of other -- immigration officers from other teams.

A     Yes.

Q     And you mentioned that there have been --        17:08
you have been part of a lot of arrests in Pasadena in this time period.

      Can you estimate how many.

A     I can't.  To me, too long ago and we were -- we just worked a lot during that time frame.   17:09

Q     In January of 2026, would you say you were part of more than five arrests in Pasadena?

A     I honestly couldn't put a number on it.

Q     If you wanted to confirm that information, is there a way that you could do that?              17:09

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

A    I would have to ask our stat unit or the    17:09
command center if that is -- if that is possible.

Q    And you said that you recall being out in
the field with Officer Dominguez in Pasadena
specifically in January on numerous occasions.    17:10

A    Yes.

Q    And you said you weren't sure whether you
had participated in any operations near the Pasadena
courthouse in January?

A    No, I didn't say near but I am pretty sure    17:10
we did take -- we did do operations in the vicinity
of courthouses.

Q    And what is that belief based on?

A    The current and past enforcement posture
that we were allowed to arrest not in a courthouse    17:10
but on the outside of a court.

Q    And are courthouses locations where your
team is often conducting operations, or around
courthouses?

A    We have conducted operations -- I wouldn't    17:11
say often but we have conducted operations near
courthouses.

Q    Has that become more common in the last
year?

A    Yes.    17:11

Veritext Legal Solutions
866-299-5127        calendar-ca@veritext.com        www.veritext.com

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Q    And why is that?                                          17:11

A    Change in policies, change in administration.

Q    And what is the change in policy that has made that more common?                                17:11

A    During a prior administration, we couldn't arrest anybody within -- so distant -- specific distance of a courthouse.

Q    And did that change at some point?

A    Yes.                                                      17:11

Q    When did that change?

A    June 6, 2025, or around this year -- that year.

Q    Around June 6, 2025?

A    Yes.                                                      17:12

Q    And how was that policy change conveyed to you?

A    I think a meeting and Email.  I can't -- I can't be sure.

Q    And meeting with who?                                    17:12

A    AFOD Menjivar.

Q    And has that impacted the way that your team operates, that change in policy?

A    I don't understand how it would impact -- the change in policy would impact us.          17:12

Page 235

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Q    Has it changed the way that your team    17:12
operates in, for example, the types of locations
that you are making arrests at?

MS. SAFAVI:  Objection; form.

THE WITNESS:  Yes, it has.    17:13

BY MX. WILFONG:

Q    And when you were making arrests near
courthouses, do you ever encounter collaterals,
non-targets?

MS. SAFAVI:  Objection; form.    17:13

THE WITNESS:  No.  When we do operations
near courthouses, it's a targeted enforcement.

BY MX. WILFONG:

Q    And so has your team ever encountered a
collateral or a non-target during an operation near    17:13
a courthouse?

A    I don't know.

MS. SAFAVI:  Objection; calls for
speculation.

THE WITNESS:  I don't -- I don't know    17:14
that.

BY MX. WILFONG:

Q    When you are conducting an operation near
a courthouse, how are you identifying -- or the
target?    17:14

Page 236

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

MS. SAFAVI:  Objection; vague, ambiguous, confusing.                                                    17:14

THE WITNESS:  We would conduct surveillance, watch the target go to court.  After his court ended, we would watch him walk out and arrest him.                                    17:14

BY MX. WILFONG:

Q   And how do you confirm that it is, in fact, your target?

A   We have more time to do surveillance when a person is going to court.                                17:14

Q   How so?

A   How so?  Well, through parking -- as they're walking through the parking lot, walking on the sidewalk, going inside the court, in line for the court, we can have a better visual description of the person.                                         17:15

Q   Is there any way ICE is tracking whether or not an operation is near a courthouse?

MS. SAFAVI:  Objection; vague.                                                    17:15

THE WITNESS:  So are you saying do we run specific stats and say that this arrest will take place near said courthouse?

BY MX. WILFONG:

Q   Yes, or is it documented in any way                                          17:15

Page 237

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

whether -- whether an arrest took place near a                    17:15

courthouse?

     MS. SAFAVI:  Objection; form.

     THE WITNESS:  From my knowledge, most of

the time the address of the court would be what we              17:15

would put as the arrest location.

BY MX. WILFONG:

    Q    So if you knew the address, you could

confirm whether it was a courthouse?

    A    Yes.                                               17:16

    Or let's say if the person walked out and

was on the sidewalk leaving the court area, we would

document on a public street, a sidewalk at this

cross street intersection, something to that effect.

    Q    Any other ways that your team documents        17:16

whether an arrest is near a courthouse?

    A    No.

    Q    Let's return -- let's look back to 213 and

I will give you another minute to -- I think you

already reviewed part of the narrative but just to           17:16

review the arrest narrative.

    Were you able to read?

    A    I got a good gist of it.

    Q    So from your review of this arrest

narrative, did the officers have -- well, first of           17:16

Page 238

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

all, was Mr. C███████ the target of this operation?                    17:17

        A    From the 213, it looks like they were

there to arrest a C███████ A███████ (phonetic) and they

made the arrest of a K███████ A███████.

        Q    I believe it's the other way around.           17:17

        A    Other way around, yes.

        Q    So at the bottom of 2, you see it,

             ". . . attempt to locate and arrest

             K███████ A███████."

             And then at the top of 3 the subject was       17:18

W███████ A███████ C███████.

        A    Yes.

        Q    So Mr. C███████ was not the target of the

operation?

        A    That is what it appears to me.                 17:18

        Q    And from your review of this narrative,

did the agents have reasonable suspicion to

detain -- to detentively stop Mr. C███████?

             MS. SAFAVI:  Objection; form.

             THE WITNESS:  I would say they would have       17:18

probable cause to do a consensual encounter.

BY MX. WILFONG:

        Q    And what about an investigative stop?

        A    An investigative stop?

             MS. SAFAVI:  Objection; form.                   17:19

                                        Page 239

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

THE WITNESS:  Are you talking about
investigative stop where they are stopping a vehicle
or walking with up to a person that is exiting the
court?                                                          17:19

BY MX. WILFONG:                                                 17:19

Q    In this case, walking up to a person that
is near -- that is near the court to the rest of
them.

A    Yes, if -- from the physical description
and they thought that that was the purpose of the              17:19
investigation, once they conduct that consensual
encounter and field interview, yes.

Q    And the narrative states that Mr. C████
matched the description enclosed of Mr. A██████.

What do you understand that to mean,                    17:19
matching the description?

A    Matching the description, physical
characteristics, five-ten, tattoo on left arm,
things like that, 180 pounds, things like that.

Q    So height, weight?                                  17:20

A    Yeah.

Q    Any other characteristics?

A    Well, they only listed -- listed physical
characteristics.  So that is about what I can go on.

Q    What about apparent race or ethnicity,             17:20

Page 240

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

would that be a factor that could be considered in    17:20

determining if somebody matched the description?

A    I would have to say yes.

Q    And earlier we discussed in these

operations that there is typically a photo, right?    17:20

If you are going in to do a targeted

operation, you have a photo of the target?

A    Yes.

Q    So when you reviewed this I-213, did you

discuss it with Officer Dominguez?    17:21

A    I don't remember if I specifically

discussed this 213 with him but in a general

practice, if I was to review the 213 I would ask

more questions.

Q    You would have asked more questions based    17:21

on this narrative?

A    Yes.

Q    What kinds of questions?

A    Did you -- was the original target going

to court, and when he exited the court did you feel    17:21

like that was your target upon exiting the court,

how did you come to think he was your target.

Q    Well, in this -- I will just direct your

attention to page 2.  So it says officers arrived at

207 Garfield Avenue in Pasadena.    17:22

Page 241

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Do you know that location?   17:22

A   I don't know that address.

Q   I will represent to you that that is a police station and jail --

A   Okay.   17:22

Q   -- in Pasadena.

And then on the next page, they mention how a few minutes later they observed an adult male matching the clothing description standing at the corner of Walnut and Euclid, which are different   17:22 streets from Garfield Avenue.

A   Yes.

Q   And so according to this narrative, were the agents originally -- officers originally at the courthouse or seeking somebody at the courthouse?   17:23

A   What is the address the courthouse?

Q   Good question.

MX. WILFONG:  I actually have -- we have a Google maps that we can use.  We can introduce that as an exhibit for reference, a screenshot of it.   17:23

(Deposition Exhibit 182 was marked for identification by the court reporter and is attached hereto.)

BY MX. WILFONG:

Q   So see the screenshot on Google maps and   17:24

Page 242

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

we have 207 Garfield, Pasadena Police Department, 17:24

and that's the address on page 2 where the officers

went to look for Mr. A████████.  Then we can see on

the map Walnut Street and Euclid.

          Do you see that?                    17:24

     A    I see Walnut Street and Euclid, yes.

     Q    That is the corner where they have

identified that Mr. C████ was.  That is about a

block away --

     A    Yes.                                17:24

     Q    -- from the police department.

          And it says Pasadena Courthouse there on

Walnut at -- the building at the corner of Walnut

and Euclid.

     A    Uh-huh.                             17:24

     Q    That is just to orient ourselves to.

          So you were discussing the questions that

you would have had for Officer Dominguez regarding

the narrative.

     A    Yes.                                17:24

     Q    And so in this situation, the narrative is

saying that the officers went to the Police

Department to look for Mr. A████████.  He had -- was

not there and then they observed Mr. C████ about a

block away from the courthouse.               17:25

Page 243

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

A    Okay.  So I think I understand what they're saying, is they went to the Long Beach -- I mean the Pasadena jail to locate the first individual, C█████.

And at the top of page 3, it says,

". . . before ERO officers arrive,

PPD did not honor the immigration

detainer issued by PERC."

So since they didn't honor the detainer, they went driving on the street looking for the person that was released, Mr. C█████, and with that description they ran into -- what's his name?

Q    And just for the record, it's the other. So Mr. A██████ was the target.

A    Yes.

Q    Mr. C█████ is the person --

A    Yeah, yeah.

Q    -- just to be clear.

A    Yeah, Mr. A██████.

They ran into C█████ then that fitted this description of Mr. A██████, and on that field interview, they discovered that the person was illegally present in the United States.

Q    So does that affect -- you were saying the questions that you would -- as the reviewing officer

17:25

17:25

17:25

17:26

17:26

17:26

Page 244

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

that you would ask.  One was about whether they were                17:26
observing him going into court and coming out.

Does it affect your analysis of whether
there was reasonable suspicion that the person that
they were targeting was not, in fact, at the                       17:27
courthouse?

MS. SAFAVI:  Objection; form.

BY MX. WILFONG:

Q    That they did not have reason to believe
that that individual would be at the courthouse.                   17:27

A    Correct.

They didn't have reasonable suspicion that
he was the person who went to court.  They did have
reasonable suspicion that the original target --
after the Police Department didn't honor the                       17:27
detainer, the guy left on foot, and just so happened
where they ran into the target number 2, and due to
him fitting the description of target 1, they
stopped to do a field interview and discovered that
this person was illegally present in the United                    17:27
States.

Q    And is that a common practice, for a
Fugitive Operations Team to drive around the
vicinity looking for an individual if they don't
locate them at the first location?                                 17:28

Page 245

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

MS. SAFAVI:  Objection; form.                    17:28

THE WITNESS:  Yes.  Due to the local
Police Departments not honoring detainers, sometimes
we get there and they say hey, we released him five
minutes ago.                                     17:28

And now, we say okay, more than likely the
guy left walking because he had a DUI -- so his car
was more than likely impounded or he is going to
take public transportation.

So we would go in the local area and see     17:28
if we can locate him walking.

BY MX. WILFONG:

Q    I understand.

And are officers trained about risks
around mistaken identity around these kinds of       17:28
stops?

A    You mean the Fourth Amendment violations?

Q    Not necessarily.

Is the topic of mistaking -- stopping
somebody based on a matching description and the     17:29
risk of mistaken identity, is that something that is
discussed with officers?

MS. SAFAVI:  Objection; form.

THE WITNESS:  I don't know if there has
been any specific training on that.                  17:29

Page 246

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

BY MX. WILFONG:                                                    17:29

Q    Has your team -- have you discussed that

risk with your team?

MS. SAFAVI:  Objection; form.

THE WITNESS:  I have discussed the risk of          17:29

I would rather arrest the target of the

investigation instead of a collateral arrest.

BY MX. WILFONG:

Q    Have you discussed what is sufficient as

far as matching description in order to make an          17:29

investigative stop in a public location?

MS. SAFAVI:  Objection; form.

THE WITNESS:  I don't think so.

MX. WILFONG:  You can put this one to the

side.                                                    17:30

MS. SAFAVI:  Can we get a time stamp

please.

THE VIDEOGRAPHER:  Current, five hours,

thirty-one minutes on the record.

BY MX. WILFONG:                                          17:30

Q    And just to close out or clarify before we

move on to the next exhibit, you said you did have

additional questions based on reading the narrative

but you did sign off on the I-213.

A    I said on -- I don't remember this arrest          17:31

Page 247

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

but if I was to read this 213, I would have more                    17:31

questions for the officer that made the arrest.

Q    And you did -- you believe that you did

read this 213 prior to signing it?

A    Yes.                                                            17:31

Q    And based on what you read, do you have

concerns regarding the arrest -- of whether the

arrest of Mr. C█████ complied with agency policy?

A    No.

MS. SAFAVI:  Objection; form.                                       17:31

THE WITNESS:  No, I don't have any other

concerns.

MX. WILFONG:  Thank you.

So we will ask the court reporter to mark

this.                                                               17:31

(Deposition Exhibit 183 was marked

for identification by the court

reporter and is attached hereto.)

BY MX. WILFONG:

Q    So another I-213.                                              17:32

Do you see at the bottom right corner

Examining Officer C█████  C█████?

That is you?

A    That is me but I don't know if I reviewed

this one because there is no signature on it.                       17:32

Page 248

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

A    Yes.                                                    18:25

Q    All right.

I'm going to take you back to a discussion
we were having earlier today about the June 24
operation, the operation that resulted in the arrest        18:26
of Mr. Hipolito and that you explained began with
Officer Gutierrez stopping to approach somebody he
believed matched a target that you were on an
operation for that day.

A    Yes.                                                    18:26

Q    And so just to clarify, you explained that
the target for that operation had a last known
address.  You couldn't recall whether you were on
your way to that address or had already been to that
address.                                                    18:27

Did your team have any information at that
time to believe that the target would have been at
that location like where -- where you stopped?

A    No.

Q    Thank you.                                              18:27

Switching gears again, you spoke earlier
about officers logging information about arrests in
several different databases, including Eagle, EARM,
and Elite.

Do you know how long that information          18:27

Page 271

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

STATE OF _____ )

                                               ) Ss.

COUNTY OF _____ )

        I, DARYL BAUCUM, a Certified Shorthand Reporter of the State of California, do hereby certify;

        That the foregoing proceedings were taken before me at the time and place herein set forth, at which time the witness named in the foregoing proceeding was placed under oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; and that the foregoing pages contain a full, true and accurate record of all proceedings and testimony to the best of my skill and ability.

        I further certify that I am neither financially interested in the outcome nor a relative or employee of any attorney or any party to this action.

        IN WITNESS WHEREOF, I have subscribed my name this 27th day of May 2026.


                           _____

                           DARYL BAUCUM, CSR No. 10356

Page 319

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.