fSTACY TOLCHIN (SBN 217431)
*stacy@tolchinimmigration.com*
LAW OFFICES OF STACY TOLCHIN
776 E. Green St., Suite 210
Pasadena, CA 91101
Tel: 213-622-7450; Fax: 213-622-7233

MOHAMMAD TAJSAR (SBN 280152)
*mtajsar@aclusocal.org*
MAYRA JOACHIN (SBN 306065)
*mjoachin@aclusocal.org*
DAE KEUN KWON (SBN 313155)
*akwon@aclusocal.org*
STEPHANIE PADILLA (SBN 321568)
*spadilla@aclusocal.org*
ALYSSA MORONES (SBN 343358)
*amorones@aclusocal.org*
ACLU FOUNDATION OF
SOUTHERN CALIFORNIA
P.O. Box 811370
Los Angeles, CA 90081-0007
Tel: 213-977-9500; Fax: 213-915-0219

*Counsel for Stop/Arrest Plaintiffs*

(*Additional counsel listed on next page*)

MARK ROSENBAUM (SBN 59940)
*mrosenbaum@publiccounsel.org*
REBECCA BROWN (SBN 345805)
*rbrown@publiccounsel.org*
RITU MAHAJAN (SBN 252970)
*rmahajan@publiccounsel.org*
GINA AMATO (SBN 215519)
*gamato@publiccounsel.org*
AMANDA MANGASER SAVAGE
(SBN 325996)
*asavage@publiccounsel.org*
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, CA 90005
Tel: 213-385-2977

*Counsel for All Plaintiffs*

ANNE LAI (SBN 295394)
*alai@law.uci.edu*
UC IRVINE SCHOOL OF LAW
IMMIGRANT AND RACIAL JUSTICE
SOLIDARITY CLINIC
P.O. Box 5479
Irvine, CA 92616-5479
Tel: 949-824-9894; Fax: 949-824-2747

*Counsel for Stop/Arrest Plaintiffs*

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Pedro VASQUEZ PERDOMO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> Markwayne MULLIN, in his official capacity as Secretary, Department of Homeland Security, et al., <br><br> Defendants. | Case No.: 2:25-cv-05605-MEMF-SP <br><br> **NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> Hon. Maame Ewusi-Mensah Frimpong <br><br> Date: September 24, 2026 <br> Time: 10:00 a.m. <br> Place: Courtroom 8B |

Case No. 2:25-cv-05605-MEMF-SP

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION; MEMORANDUM OF POINTS AND AUTHORITIES

JACOB S. KREILKAMP (SBN 248210)
jacob.kreilkamp@mto.com
DAVID FRY (SBN 189276)
david.fry@mto.com
ADAM B. WEISS (SBN 296381)
adam.weiss@mto.com
SARA H. WORTH (SBN 341088)
sara.worth@mto.com
LAURA R. PERRY (SBN 342504)
laura.perrystone@mto.com
HENRY D. SHREFFLER (SBN 343388)
henry.shreffler@mto.com
LAUREN E. KUHN (SBN 343855)
lauren.kuhn@mto.com
ANGELA URIBE (SBN 353579)
angela.uribe@mto.com
MAGGIE BUSHELL (SBN 354048)
maggie.bushell@mto.com
MUNGER, TOLLES & OLSON LLP
350 S. Grand Ave., 50th Floor
Los Angeles, CA 90071
Tel: 213-683-9100; Fax: 213-683-9100

*Counsel for Stop/Arrest Plaintiffs*

BREE BERNWANGER (SBN 331731)
bbernwanger@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Tel: 415-621-2493

BRISA VELAZQUEZ OATIS (SBN 339132)
bvoatis@aclu-sdic.org
ACLU FOUNDATION OF
SAN DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
Tel: 619-398-4199

*Counsel for Stop/Arrest Plaintiffs*

EDGAR AGUILASOCHO (SBN 285567)
eaguilasocho@farmworkerlaw.com
MARTÍNEZ AGUILASOCHO LAW, INC.
900 Truxtun Ave, Suite 300
Bakersfield, CA 93301
Tel: 661-859-1174

*Counsel for Plaintiff United Farm Workers*

JESSICA KARP BANSAL (SBN 277347)
jessica@ndlon.org
LAUREN MICHEL WILFONG*
lwilfong@ndlon.org
JIA FU*
jennifer@ndlon.org
NATIONAL DAY LABORER ORGANIZING
NETWORK
1030 S. Arroyo Parkway, Suite 106
Pasadena, CA 91105
Tel: 626-214-5689

*Counsel for Stop/Arrest Plaintiffs*

MATTHEW J. CRAIG (SBN 350030)
mcraig@heckerfink.com
MACK E. JENKINS (SBN 242101)
mjenkins@heckerfink.com
HECKER FINK LLP
1150 South Olive Street, Suite 10-140
Los Angeles, CA 90015
Tel: 212-763-0883; Fax: 212-564-0883

*Counsel for Access/Conditions Plaintiffs*

CARL BERGQUIST*
cbergquist@chirla.org
COALITION FOR HUMANE IMMIGRANT
RIGHTS
2351 Hempstead Road
Ottawa Hills, OH 43606
Tel: 310-279-6025

*Counsel for Plaintiff CHIRLA*

ALVARO M. HUERTA (SBN 274787)
ahuerta@immdef.org
BRYNNA BOLT (SBN 339378)
bbolt@immdef.org
ALISON STEFFEL (SBN 346370)
asteffel@immdef.org
IMMIGRANT DEFENDERS LAW CENTER
634 S. Spring St., 10th Floor
Los Angeles, CA 90014
Tel: 213-634-0999

*Counsel for Plaintiff ImmDef*

* Admitted pro hac vice

Case No. 2:25-cv-05605-MEMF-SP

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION; MEMORANDUM OF POINTS AND AUTHORITIES

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT on September 24, 2026 at 10:00 a.m., before the Honorable Maame Ewusi-Mensah Frimpong, in Courtroom 8B, Eighth Floor, 250 West First Street, Los Angeles, CA 90012, Plaintiffs Pedro Vasquez Perdomo, Carlos Alexander Osorto, Isaac Villegas Molina, Jorge Hernandez Viramontes, Jason Brian Gavidia, Los Angeles Worker Center Network, United Farm Workers, and Coalition for Humane Immigrant Rights (collectively, "Stop/Arrest Plaintiffs" or "Plaintiffs") will, and hereby do, respectfully move the court for a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure and Local Civil Rule 65-1 of the U.S. District Court for the Central District of California on Counts One and Eight of their Second Amended Complaint ("SAC").[1]

Plaintiffs respectfully request that the Court grant a preliminary injunction enjoining Defendants from continuing their policy and practice of conducting detentive stops in this District without a pre-stop individualized, particularized assessment of reasonable suspicion that the person to be stopped is present within the United States in violation of U.S. immigration law, and instead relying on the individual's apparent status as low-income or working-class and Latino. Plaintiffs also request that the Court enjoin Defendants from relying on a person's perceived Latino ethnicity to conduct detentive stops, except in connection with a known target description (provided there is a reasonable basis to believe that the individual is the person Defendants identified as their "target"). Plaintiffs further request that the Court impose certain documentation requirements to ensure adherence to the preliminary injunction.

Plaintiffs previously proposed that the Court hold time on its calendar for an evidentiary hearing on this Motion. In light of the current record, as augmented by expedited discovery since the Court issued a TRO in 2025, Plaintiffs do not believe an evidentiary hearing is necessary.

---

[1] Plaintiffs previously moved for a preliminary injunction on Count One last year, but the Court took the motion off calendar and granted Plaintiffs' request for expedited discovery to more fully develop the record. Plaintiffs subsequently amended their complaint to add, inter alia, Count Eight, and now move for a preliminary injunction on this new claim as well. Plaintiffs allege two equal protection theories in their SAC: that Defendants expressly classify individuals based on Latino race, color, and/or ethnicity, ECF 485, ¶ 70, and alternatively, that Defendants' policies and practices are motivated by discriminatory intent and have a discriminatory effect, *id.*, ¶ 71. Plaintiffs are moving for preliminary relief on their express classification theory.

Case No. 2:25-cv-05605-MEMF-SP

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION; MEMORANDUM OF POINTS AND AUTHORITIES

Even without an evidentiary hearing, the Court can make credibility determinations. *See Int'l Molders' & Allied Workers' Loc. Union No. 164 v. Nelson*, 799 F.2d 547, 555 (9th Cir. 1986); *Atlas Ins. Agency, Inc. v. Ulmann*, No. CV 24-00391 JAO-KJM, 2024 WL 5344432, at *3, *7 (D. Haw. Nov. 25, 2024).

Plaintiffs' Motion is based on this Notice of Motion and Motion for Preliminary Injunction, the accompanying Memorandum of Points and Authorities, the declarations and all exhibits in support of the same, including attachments, all pleadings and other papers on file in this action, and all oral and documentary evidence that may be presented at the time of the hearing of this Motion.

DATED:  July 27, 2026

UC IRVINE IMMIGRANT AND RACIAL JUSTICE SOLIDARITY CLINIC

By     */s/ Anne Lai*
ANNE LAI
*Counsel for Stop/Arrest Plaintiffs*

Case No. 2:25-cv-05605-MEMF-SP

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION; MEMORANDUM OF POINTS AND AUTHORITIES

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION .................................................................................................1

II.  FACTUAL BACKGROUND .............................................................................2

    A.  Defendants' campaign of non-targeted immigration raids ........................2

        1.  Roving patrols .................................................................................3

        2.  "Targeted area" operations ............................................................4

        3.  So-called "targeted" operations .....................................................5

    B.  Defendants' policy and practice of racial profiling ...................................8

III.  LEGAL STANDARD .......................................................................................11

IV.  ARGUMENT ....................................................................................................11

    A.  Plaintiffs have standing to obtain injunctive relief ................................11

        1.  Both individual and organizational Plaintiffs have standing .......11

        2.  Defendants' standing arguments at the TRO stage cannot succeed on the current record ................................................................14

    B.  Plaintiffs are likely to succeed on the merits ..........................................16

        1.  Plaintiffs' Fourth Amendment Claim ...........................................16

            (a)  Defendants' policy and practice of demographic profiling violates the Fourth Amendment .........................................16

            (b)  The post-TRO record refutes Defendants' TRO-stage arguments ...............................................................................17

        2.  Defendants' policy and practice violates the guarantee of equal protection under the Fifth Amendment ........................................24

    C.  Without an injunction, Plaintiffs will suffer irreparable harm ...............25

    D.  The balance of hardships tips sharply in Plaintiffs' favor, and an injunction is in the public interest ...........................................................27

V.  CONCLUSION .................................................................................................28

CERTIFICATE OF SERVICE .......................................................................................29

CERTIFICATE OF COMPLIANCE .............................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Adarand Constructors, Inc. v. Peña,*
515 U.S. 200 (1995) ...................................................................................................25

*All. for the Wild Rockies v. Cottrell,*
632 F.3d 1127 (9th Cir. 2011) ...................................................................................11

*Arevalo v. Hennessy,*
882 F.3d 763 (9th Cir. 2018) .....................................................................................26

*Armstrong v. Davis,*
275 F.3d 849 (9th Cir. 2001) ...............................................................................11, 12

*Buck v. Davis,*
580 U.S. 100 (2017) ...................................................................................................24

*City of Los Angeles v. Lyons,*
461 U.S. 95 (1983) .........................................................................................11, 14, 15

*Coal. on Homelessness v. City & Cnty. of San Francisco,*
758 F. Supp. 3d 1102 (N.D. Cal. 2024) .....................................................................13

*Columbia Basin Apartment Ass'n v. City of Pasco,*
268 F.3d 791 (9th Cir. 2001) .....................................................................................13

*Drakes Bay Oyster Co. v. Jewell,*
747 F.3d 1073 (9th Cir. 2014) ...................................................................................27

*Floyd v. City of New York,*
959 F. Supp. 2d 540 (S.D.N.Y. 2013) ........................................................................25

*Garcia v. City of Los Angeles,*
611 F. Supp. 3d 941 (C.D. Cal. 2020) .......................................................................13

*Gonzalez-Rivera v. I.N.S.,*
22 F.3d 1441 (9th Cir. 1994) .....................................................................................25

*Hassan v. City of New York,*
804 F.3d 277 (3d Cir. 2015) ......................................................................................16

*Heckler v. Mathews,*
465 U.S. 728 (1984) ...................................................................................................16

*Hernandez v. Sessions,*
872 F.3d 976 (9th Cir. 2017) .....................................................................................27

*Hodgers-Durgin v. de la Vina,*
199 F.3d 1037 (9th Cir. 1999)....................................................................................12

Case No. 2:25-cv-05605-MEMF-SP

MOTION FOR PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) ........................................................................................................13

*Int'l Molders' & Allied Workers' Loc. Union No. 164 v. Nelson*,
799 F.2d 547 (9th Cir. 1986)............................................................................................26

*Kansas v. Glover*,
589 U.S. 376 (2020) ........................................................................................................17

*LaDuke v. Nelson*,
762 F.2d 1318 (9th Cir. 1985)..........................................................................................11

*Lomeli v. County of San Diego*,
637 F. Supp. 3d 1046 (S.D. Cal. 2022) ..........................................................................21

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012)................................................................................11, 12, 26

*Melendres v. Arpaio*,
989 F. Supp. 2d 822 (D. Ariz. 2013), *aff'd in part, vacated in part*, 784 F.3d
1254 (9th Cir. 2015).................................................................................................24, 25

*Noem v. Vasquez Perdomo*,
No. 25A169 (U.S. Aug. 13, 2025) ................................................................... 4, passim

*Orhorhaghe v. I.N.S*,
38 F.3d 488 (9th Cir. 1994)..............................................................................................17

*Palmore v. Sidoti*,
466 U.S. 429 (1984) ........................................................................................................24

*Perez Cruz v. Barr*,
926 F.3d 1128 (9th Cir. 2019)..........................................................................................20

*Reid v. Georgia*,
448 U.S. 438 (1980) ........................................................................................................17

*Rios v. Cnty. of Los Angeles*,
No. 2:24-CV-04782-MEMF-MBK, 2025 WL 2841145 (C.D. Cal. Oct. 7, 2025) ....................21

*Rodriguez v. Robbins*,
715 F.3d 1127 (9th Cir. 2013)..........................................................................................26

*Rodriguez v. United States*,
575 U.S. 348 (2015) ........................................................................................................23

*Sharp v. Cnty. of Orange*,
871 F.3d 901 (9th Cir. 2017)............................................................................................21

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023) .................................................................................................24, 25

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*,
240 F.3d 832 (9th Cir. 2001)............................................................................................11

MOTION FOR PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL
PROTECTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

*Susan B. Anthony List v. Driehaus,*
573 U.S. 149 (2014) ...........................................................................................................12

*Trump v. Illinois,*
146 S. Ct. 432 (2025) ........................................................................................................24

*United States v. Brignoni-Ponce,*
422 U.S. 873 (1975) ...............................................................................................16, 17, 19

*United States v. Brown,*
925 F.3d 1150 (9th Cir. 2019)...........................................................................................23

*United States v. Carillo Rea,*
393 F. Supp. 3d 1025 (D. Mont. 2019) ..............................................................................23

*United States v. Cortez,*
449 U.S. 411 (1981) ..........................................................................................................19

*United States v. Delgadillo-Velasquez,*
856 F.2d 1292 (9th Cir. 1988)...........................................................................................21

*United States v. Evans,*
786 F.3d 779 (9th Cir. 2015).............................................................................................23

*United States v. Manzo-Jurado,*
457 F.3d 928 (9th Cir. 2006).......................................................................................17, 20

*United States v. Montero-Camargo,*
208 F.3d 1122 (9th Cir. 2000)..........................................................................18, 19, 20, 21

*United States v. Rodella,*
804 F.3d 1317 (10th Cir. 2015).........................................................................................23

*United States v. Rodriguez,*
976 F.2d 592 (9th Cir. 1992).......................................................................................17, 20

*United States v. Sipe,*
388 F.3d 471 (5th Cir. 2004)...............................................................................................2

*United States v. Washington,*
387 F.3d 1060 (9th Cir. 2004)...........................................................................................17

*United States v. Washington,*
490 F. 3d 765 (9th Cir. 2007)............................................................................................17

*Warsoldier v. Woodford,*
418 F.3d 989 (9th Cir. 2005).............................................................................................26

*Washington v. Lambert,*
98 F.3d 1181 (9th Cir. 1996).............................................................................................21

*Wayte v. United States,*
470 U.S. 598 (1985) ..........................................................................................................25

MOTION FOR PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

*Whren v. United States*,
   517 U.S. 806 (1996) ........................................................................................24

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ..........................................................................................11

*Ybarra v. Illinois*,
   444 U.S. 85 (1979) ........................................................................................20

*In re Zappos.com, Inc.*,
   888 F.3d 1020 (9th Cir. 2018)......................................................................11

*Zepeda v. I.N.S.*,
   753 F.2d 719 (9th Cir. 1983).........................................................................28

**CONSTITUTIONAL PROVISIONS**

U.S. Const., amend. IV .............................................................................................16, 17

**OTHER AUTHORITIES**

Alison Durkee and Zachary Folk, *Man Shot By ICE In Maine Was Not Operation's
   Target*, Forbes (July 13, 2026),
   https://www.forbes.com/sites/alisondurkee/2026/07/13/man-shot-by-ice-in-
   maine-was-not-operations-target-senator-says/.........................................................27

Anthony Victoria, *Attorneys say Ontario ICE shooting fits 'pattern' of aggressive
   enforcement*, KVCR (Nov. 15, 2025), https://www.kvcrnews.org/local-
   news/2025-11-15/attorneys-say-ontario-ice-shooting-fits-pattern-of-aggressive-
   enforcement .................................................................................................................27

Aoife Walsh, *Man fatally shot by ICE in Houston was not intended target, DHS
   says,* BBC (July 10, 2026), https://www.bbc.com/news/articles/cm2rm66xd17o .....................27

Brittny Mejia and Rachel Uranga, *Fears of racial profiling rise as Border Patrol
   conducts 'roving patrols,' detains U.S. citizens*, L.A. Times (June 15, 2025),
   https://www.latimes.com/california/story/2025-06-15/latinos-targeted-in-raids-
   u-s-citizens-detained-indiscriminate-sweeps-home-depot-lots-targeted....................3

Colorado Information Analysis Center, *Situational Awareness Bulletin*, Department
   of Public Safety (March 10, 2026),
   https://www.documentcloud.org/documents/28132538-colorado-information-
   analysis-center-2026-0000860/ ....................................................................................3

Donald J. Trump, @realDonaldTrump, Truth Social (June 8, 2025 2:06 PM),
   https://truthsocial.com/@realDonaldTrump/posts/114649780431129598%5C .........................2

Gustavo Solis, *Experts Concerned About White Nationalist Imagery in ICE
   Recruiting Materials*, KPBS (Sept. 22, 2025),
   https://www.kpbs.org/news/borderimmigration/ 2025/09/22/experts-concerned-
   about-white-nationalist-imagery-in-icerecruitment-materials ....................................3

Hamed Aleaziz, *Immigrant Arrests Surge to 10,000 in 5 Days as ICE Clamps
   Down*, N.Y. Times (July 1, 2026) ...............................................................................27

MOTION FOR PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL
PROTECTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

Matthew Cantor, *The Anti-Immigrant Slur Border Patrol Tried to Ban*, The Guardian (March 4, 2024), https://www.theguardian.com/us-news/2024/mar/04/border-patrol-slur-immigration ...................................................................2

Orlando Mayorquín and Jesus Jiménez, *Before Urban Raids, Border Patrol Tested Tactics in California Farm Country*, N.Y. Times (Jan. 26, 2026)................................................3

MOTION FOR PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

## I.  INTRODUCTION

Plaintiffs request a preliminary injunction to halt Defendants' ongoing campaign of suspicionless and discriminatory detentive stops in violation of the Constitution.  To this day, Defendants roam the District, armed and masked, seizing citizens and non-citizens alike, based on a demographic profile Defendants deem "suspicious": people who appear Latino and low-income or working-class.  Although Defendants have responded to court orders and public backlash with claims of changes, the record shows that Defendants have remained steadfastly committed to immigration enforcement based on racial stereotype, not investigation.  This ongoing manner of enforcement originated with and is endorsed by agency leadership, which has encouraged profile-based stops in service of getting more "handcuffs on wrists."  It poses an ever-present, imminent threat to the individual Plaintiffs and the members of the organizational Plaintiffs, who fit the precise profile that Defendants target.

That the Supreme Court stayed this Court's temporary restraining order (TRO) last year does not bar the relief Plaintiffs seek.  As this Court has explained, it is impossible to know on what basis the majority granted its stay.  *See, e.g.*, ECF 419 n.7.  And the record presented with this Motion—which follows expedited discovery and is (with the exception of named Plaintiffs' declarations) all evidence that was not part of the TRO record—flatly disproves the representations Defendants made about their operations in pursuit of the stay, and the assumptions in the concurring opinion of one Justice.[2]  The post-TRO record now shows that Plaintiffs indisputably are threatened by future application of Defendants' policy and practice, that race is the predominant characteristic driving Defendants' stops, and that Defendants' ongoing stops— including of U.S. citizens—are neither brief nor unintrusive.  Absent intervention from this Court, Plaintiffs will continue to face serious irreparable harm in the form of violations of their Fourth Amendment rights and the guarantee of equal protection under the Fifth Amendment.

---

[2] By engaging with Justice Kavanaugh's concurrence in this Motion, Plaintiffs do not suggest that the concurrence is binding authority or that it can be attributed to the Court at large.  It is not and cannot. *Id*.  Plaintiffs instead show how assumptions in the concurrence have failed to withstand the adversarial process and test of time.

MOTION FOR PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

Plaintiffs also no longer seek the four-factor TRO that the Supreme Court stayed.  Rather, Plaintiffs seek an injunction tailored to the particular race-based policy, substantiated by the current record, that Defendants are applying in the District.  For all the reasons below, Plaintiffs respectfully ask the Court to grant their requested relief.

## II.    FACTUAL BACKGROUND

### A.    <u>Defendants' campaign of non-targeted immigration raids</u>

"Yeah, just plug us in wherever you see some tonks[3] and we'll jump out."  Ex. 78 [GOV-P16-001].  That sentiment sums up Defendants' field enforcement operations over the past fourteen months.  For decades, immigration enforcement in the District proceeded based largely on target folders relating to individualized investigations of specific persons.  *See* Ex. 2 [SDDO C.C. Dep.] at 69:10-72:11 (describing target folder); *see also* Ex. 3 [Kerlikowske Decl.], ¶ 27.  At the direction of administration officials, this changed last year.  An email from ICE headquarters in late May 2025 told field offices to begin arresting what Defendants call "collaterals," or non-targets, en masse.  ECF 539-2 [e-mail chain].  In early June 2025, President Trump directed the entire federal law enforcement apparatus "to take all such action necessary to liberate Los Angeles from the Migrant Invasion."[4]  Defendants subsequently embarked on a coordinated campaign of suspicionless stops based on demographic profiling.

Since last year, Defendants have referred to their operations by different names and the personnel involved have varied, but Defendants' policy and practice has remained constant.  As one ICE officer put it: "We're [still] doing the same thing [as "Operation at Large"] just with a different name."  ECF 539-3 [DO E.O. Dep.] at 175:2-176:21.[5]

---

[3] *See* Matthew Cantor, *The Anti-Immigrant Slur Border Patrol Tried to Ban*, The Guardian (March 4, 2024), https://www.theguardian.com/us-news/2024/mar/04/border-patrol-slur-immigration; *United States v. Sipe*, 388 F.3d 471, 484 n. 33 (5th Cir. 2004) (agent stating that "tonk" is "the sound heard when a 'wetback' is hit over the head with a flashlight").

[4] Donald J. Trump, @realDonaldTrump, Truth Social (June 8, 2025, 2:06 PM), https://truthsocial.com/@realDonaldTrump/posts/114649780431129598%5C.

[5] Citations to Plaintiffs' Motion for Preliminary Injunction Re: Warrantless Arrests and associated exhibits are to the subsequently filed errata versions, where applicable.

-2-                          Case No. 2:25-cv-05605-MEMF-SP

Operations in Southern California initially were led by El Centro Sector Border Patrol Chief Gregory Bovino, who had commanded controversial roving patrol operations in Kern County in early 2025 that were quickly enjoined on Fourth Amendment grounds by a federal court in the Eastern District of California.[6]  Undeterred by the injunction, Defendants moved to this District.  Defendants installed agents, led by Chief Bovino, to conduct sustained, militarized patrols.  *See* Ex. 4 [CBP 30(b)(6) Dep.] at 54:2-57:21.  At the same time, ICE ramped up non-targeted enforcement, including with CBP and other federal partners.  *See* ECF 539-8 at 4 n.10; *id.* at 2-3; *see also* Ex. 2 [SDDO C.C. Dep.] at 180:12-181:1.  Thanks in part to recruitment ads employing white nationalist messaging,[7] ICE doubled the ranks of its field teams.  ECF 539-8 at 8; Ex. 5 [DO E.O. Dep.] at 55:24-56:23.  While some CBP personnel have left the District, both ICE and CBP continue to conduct suspicionless stops in the District.  *See infra* at 4, 6-7.

### 1.    *Roving patrols*

One way that Defendants execute their policy of race-based profiling is through "roving patrols."  ECF 539-8 at 4-5.  Defendants make no claim in such operations that agents have any enforcement "target."  Ex. 4 [CBP 30(b)(6) Dep.] at 147:20-148:10, 167:21-171:4.  Rather, agents sweep through communities looking for "possibles" whom they deem suspicious.  Ex. 6 [agents text chain] at GOV 6643-55, 6755 (discussing "soft counts" of "possibles" based on location drive-bys); ECF 539-2 [agents text chain] at GOV 7608, 7610 (discussing "snatch & grabs" and "roaming DT area"); *see also* Ex. 7 [D.V.V. Decl.], ¶¶ 3-8; Ex. 8 [D.V.V. I-213]; ECF 529-66 [H.S.P. Decl.], ¶¶ 3-8 (stopped while walking to bus stop wearing work attire); Ex. 9 [H.S.P. I-

---

[6] Orlando Mayorquín and Jesus Jiménez, *Before Urban Raids, Border Patrol Tested Tactics in California Farm Country*, N.Y. Times (Jan. 26, 2026), https://www.nytimes.com/2026/01/19/us/border-patrol-tactics-rural-california.html. Defendants viewed those operations as "proof of concept" for operations elsewhere. Brittny Mejia and Rachel Uranga, *Fears of racial profiling rise as Border Patrol conducts 'roving patrols,' detains U.S. citizens,* L.A. Times (June 15, 2025), https://www.latimes.com/california/story/2025-06-15/latinos-targeted-in-raids-u-s-citizens-detained-indiscriminate-sweeps-home-depot-lots-targeted.

[7] *See* Gustavo Solis, *Experts concerned about white nationalist imagery in ICE recruitment materials*, KPBS (Sept. 22, 2025), https://www.kpbs.org/news/borderimmigration/2025/09/22/experts-concerned-about-white-nationalist-imagery-in-icerecruitment-materials; Colorado Information Analysis Center, *Situational Awareness Bulletin*, Department of Public Safety (March 10, 2026), https://www.documentcloud.org/documents/28132538-colorado-information-analysis-center-2026-0000860/.

-3-                    Case No. 2:25-cv-05605-MEMF-SP

MOTION FOR PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

213]; Ex. 10 [J.L.M. Decl.], ¶¶ 4-10; Ex. 11 [J.L.M. I-213].  This is how agents ended up at Yank Towing in Montebello, where they ordered Plaintiff Gavidia, a Latino U.S.-born citizen, to "stop right there," slammed him against a fence, and demanded the name of the L.A. hospital where he was born.  Ex. 12 [SBPA V.S. Dep.] at 85:8-90:4, 144:7-148:5; Ex. 13 [Gavidia Decl.], ¶¶ 6-11.  Discovery has confirmed that this is also how agents descended upon the car wash in Whittier— after Googling nearby car washes—and ultimately took away Plaintiff Hernandez Viramontes, a Latino U.S. citizen, to "verif[y]" his citizenship.  Ex. 14 [Hernandez Viramontes Decl.], ¶¶ 8-13; Ex. 15 [BPA J.M. Dep.] at 217:16-219:22.

Roving patrols continue this year.  For example, a member of Plaintiff LAWCN'S CLEAN Carwash Worker Center was detained during a roving patrol in late January.  Ex. 16 [Reyes Romo Decl.], ¶¶ 6-10; Ex. 17 [GOV-25776] (noting "roving patrol" at address where Reyes Romo works and listing 14 other roving patrol operations that day); *see also* ECF 529-27 [M.F.R. Decl.], ¶¶ 2-8 (January 2026 stop by masked men who dragged him away); ECF 529-25 [M.F.R. I-213]; Ex. 18 [I.U.V. Decl.], ¶¶ 5-9 (tamale vendor describing January 2026 stop); Ex. 19 [I.U.V. report]; ECF 529-26 [M.D.L. Decl.], ¶¶ 2-8 (January 2026 stop); ECF 529-24 [M.D.L. I-213].  And although Defendants have not yet produced arrest documentation in discovery for operations after January, Plaintiffs' own investigation has confirmed that Border Patrol conducted a roving patrol in this District in April.  ECF 529-28 [Chapman Decl.], ¶¶ 2-8; ECF 529-78 [video].

### 2.    *"Targeted area" operations*

After this Court entered the TRO, Defendants commenced what they called "targeted area" operations.  ECF 539-8 at 4.  Defendants represented to this Court and the Supreme Court that these operations were based on "intelligence."  ECF 178 at 5, 7; *see* Reply Brief for Defendants ("Stay Reply") at 19, *Noem v. Vasquez Perdomo*, No. 25A169 (U.S. Aug. 13, 2025).  But discovery revealed that Defendants' paltry "intelligence" was manufactured to justify operations at public access locations Defendants were already intent on raiding.  As one veteran HSI agent who was assigned to participate on the operations forthrightly testified under oath, the operations were not "designed in good faith" to arrest the identified "targets."  Ex. 20 [HSI SA G.A. Dep.] at 195:5-196:11, 199:6-213:4; *see also* Ex. 3 [Kerlikowske Decl.], ¶ 26.

-4-                    Case No. 2:25-cv-05605-MEMF-SP

MOTION FOR PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

In so-called "target area" operations, Defendants sent intelligence-gathering teams to Home Depots and car washes.  Once there, they ran checks until they identified an arbitrary number—typically a small number—of possibly unlawfully present individuals.  ECF 529-18 [CBP 30(b)(6) Dep.] at 213:17-214:9, 270:4-277:9, 293:16-295:25; Ex. 21 [Westlake and Paramount HD ROI] at GOV 341-44; Ex. 22 [Magnolia ROI] at GOV 321.  Defendants then selected a day to raid the location, without regard to whether the previously identified "targets" were present.  Ex. 4 [CBP 30(b)(6)] at 280:10-282:10, ECF 529-52 [Tijerino-Garmendia Westlake HD narrative]; Ex. 23 [SBPA I.F. Dep.] at 281:3-21; *see also* Ex. 24 [BPA J.C. Dep.] at 100:22-101:15.  Sometimes the agents did not even bother to bring "target" information with them.  *See, e.g.*, Ex. 23 [SBPA I.F. Dep.] at 280:13-281:2; Ex. 12 [SBPA V.S. Dep.] at 114:1-116:9, 292:14-293:10; *see also id.* at 234:11-237:1 (unaware E.K.Z.L. was a "target" and had not asked his name before agents restrained E.K.Z.L.); ECF 529-47 [E.K.Z.L. narrative].  Unsurprisingly, Defendants frequently did not arrest their supposed "targets," even as they arrested numerous others.  *See, e.g.*, Ex. 25 [SBPA J.E. Dep.] at 184:10-12; Ex. 12 [SBPA V.S. Dep.] at 272:16-19; ECF 539-8 at 4 (objective is to make as many "Title 8" arrests as possible); *see also* ECF 529-84 [GOV-P17-061] (agent says "get out and start grabbing people" right before detaining legal resident A.T.); Ex. 26 [agents text chain] at GOV 10543 ("I think [the Border Patrol agents] only know one way to operate. See bodies, chase bodies.").  Apart from documentation changes, a supervisory Border Patrol agent testified that he could not identify any difference in operations before and after the TRO.  Ex. 12 [SBPA V.S. Dep.] at 194:10-196:4; Ex. 20 [HSI SA G.A. Dep.] at 206:8-18 (received no guidance whatsoever from DHS about TRO).

### 3.      So-called "targeted" operations

Another way that Defendants execute their policy is through so-called "targeted" operations where officers have a single "target," but the "target" is used as pretext for stopping other Latino individuals near the "target's" claimed location.  ECF 539-8 at 3-4.

This is how officers encountered named Plaintiffs Vasquez Perdomo, Villegas Molina, and Osorto in Pasadena in June 2025.  *Id.*  Defendants asserted that ICE was trying to locate a "target" when they ambushed Plaintiffs, who were at a bus stop blocks away, to question them about the

"target's" whereabouts.  Ex. 27 [DO C.C. Dep.] at 218:8-226:13, 315:24-317:17; *see also* Ex. 2 [SDDO C.C. Dep.] at 118:15-122:2, 156:4-24; Ex. 28 [J.C.B. Field Operations Worksheet ("FOW")] (listing address).  But discovery proved that false: the officers' express intention that day always was to arrest "collaterals."  *See* Ex. 29 [officers' text chain] (lead officer telling colleague to "bring extra cuffs").  *See also* ECF 529-16 [Villegas Molina Decl.], ¶¶ 5-6 (describing how "men [were] . . . running out" of vehicles, armed, masked, not identifying themselves, and shouting "don't run!" even though he was standing still); ECF 529-15, [Vasquez Perdomo Decl.], ¶¶ 6-7; ECF 529-17 [Osorto Decl.], ¶¶ 5-6.  Officers did not ask Plaintiffs about the officers' "target" and never went back to the location to look for the "target."  Ex. 27 [DO C.C. Dep.] at 257:25-258:14.

Defendants continue to use pretextual operations to make "collateral" stops.  For example, the officer (currently a "team lead") who stopped F.H.S. in San Bernardino in June 2025 as she rode as a passenger in a pickup truck with other fruit vendors, allegedly because the driver resembled someone the officer was targeting at an address over a mile away, recently employed the same tactic when he stopped H.S.H. in February 2026. ECF 539-3 [DO E.O. Dep.] at 49:5-11, 196:17-198:6; ECF 529-53 [F.H.S. Decl.], ¶¶ 3-8; Lai Decl., ¶ 32.  H.S.H. was driving his son to soccer when an unmarked ICE vehicle, upon seeing him, made a U-turn and pulled him over. ECF 529-57 [H.S.H. Decl.], ¶¶ 3-4.  The officer wrote that he was looking for a "target".  Ex. 30 [H.S.H. I-213].  But he does not allege that H.S.H. was near the "target's" home or driving a vehicle associated with the "target."  *Id.*  The officer told H.S.H. he pulled H.S.H. over because he looked like a "paisa."  ECF 529-57 [H.S.H. Decl.], ¶¶ 9-12.[8]

These stops fit a disturbing pattern.  In February 2026, J.C. was riding his e-bike to work when officers initiated a stop by colliding into him, claiming they were looking for someone else. *See* ECF 529-58 [J.C. Decl.], ¶¶ 2-6, 12; ECF 529-40 [J.C. I-213] (claiming J.C. was observed "departing the residence" of "target" but revealing J.C. lived at an entirely different address); Ex. 5 [DO E.O. Dep.] at 293:10-312:4.  In April 2026, officers stopped passenger R.M.D. in a vehicle

---

[8] "Paisa" is a derogatory term for a person from a rural part of Mexico.  *Id.*, ¶ 12.

MOTION FOR PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

just outside a mobile home community predominantly inhabited by farmworkers with close to 100 lots. Ex. 31 [R.M.D. Decl.], ¶¶ 4-13.  Officers claimed they were looking for a "target" more than 20 years younger than R.M.D. and listed the address of the "target" as the whole park.  Ex. 32 [R.M.D. I-213].  In May 2026, officers boxed in E.C.H. as he was on his way to church.  ECF 529-60 [E.C.H. Decl.], ¶¶ 3-5; ECF 529-42 [E.C.H. I-213] ("target's" address on a different street); Ex. 5 [DO E.O. Dep.] at 256:3-257:19, 264:5-270:5, 275:1-15.  And in June 2026, officers blocked A.S.L.'s path soon after he left home on his bike.  Ex. 33 [A.S.L. Decl.], ¶¶ 2-8; Ex. 34 [A.S.L. I-213] ("target's" address almost a half mile away).  *See also* Ex. 5 [DO E.O. Dep.] at 245:23-255:15; ECF 539-3 [DO E.O. Dep.] at 145:7-146:3 (officer stating he routinely stops persons who are not his "target"); ECF 529-41 [G.N.L. I-213]; ECF 529-59 [G.N.L. Decl.], ¶¶ 3-5 (April 2026 stop in which officers boxed G.N.L. in while in his work truck); ¶ 8 (reporting that *in the time G.N.L. was being processed*, three other Latino men were brought in who were stopped in an identical manner).

Defendants conduct these types of stops across the District.  *See, e.g.*, ECF 529-55 [G.V.C. Decl.], ¶¶ 3-5 (July 2025 stop outside donut shop in Ontario); Ex. 35 [G.V.C. I-213]; Ex. 2 [SDDO C.C. Dep.] at 208:12-216:15, 228:3-229:21, 271:3-19 (June 2025 downtown L.A. incident in which team chased street vendor that an officer claimed could be a "target"); *id.* at 230:13-248:12 (January 2026 stop of W.C. outside a Pasadena courthouse); ECF 529-56 [W.C. Decl.], ¶¶ 3-11.  Recent stops of U.S. citizens also confirm the pattern.  In March 2026, ICE officers trapped a Latino U.S. citizen in a McDonald's parking lot in San Bernardino with vehicles and interrogated him with his two-year-old in the backseat.  Ex. 36 [J.A.P. Decl.], ¶¶ 3-6; Ex. 77 [video depicting stop].  And in May 2026 in Inglewood, officers surrounded Latino U.S. citizen D.O.A. and two family members as they were on a sidewalk preparing to perform landscaping work.  Ex. 37 [D.O.A. Decl.], ¶¶ 3-8.  Officers claim they approached D.O.A. and the others in an attempt to locate a "target"—in a different part of the neighborhood. Ex. 38 [J.A.S. I-213].  The officers were from the same team that arrested Plaintiffs Vasquez Perdomo, Villegas Molina, and Osorto.  *See also* Ex. 2 [SDDO C.C. Dep.] at 95:25-96:13 (estimating that about 25-40% of arrests his team currently makes are of non-targets).

MOTION FOR PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

**B.    Defendants' policy and practice of racial profiling**

Across all of Defendants' operations above, which are quick and meant to take people by surprise, ECF 539-8 at 8, Defendants are not taking the time to adduce particularized information about individuals.  Instead, Defendants base their stops on individuals' apparent Latino ethnicity and their perceived status as "laborers."

Defendants have *admitted under oath* to targeting individuals on the basis of apparent ethnicity:

> Q  So in what way would [apparent ethnicity] be relevant, for example, at Operation At Large?
> A  That one particular -- just the one articulable fact?
> Q  Yes. Apparent ethnicity or apparent Mexican ancestry.
> A  I mean, I wouldn't even know that I would just define it as that because I wouldn't -- I don't really see a difference, like, if they're Honduran or Mexican or Guatemalan. I'd just say, like, Hispanic ethnicity.
>
> . . .
>
> Q  If I told you that a high percentage of people who are Hispanic are legally present or U.S. citizens, would that make you rethink whether Hispanic ethnicity should be part of your reasonable suspicion calculus? . . .
> [A]: I still think it could be one of -- one articulable fact.

Ex. 12 [SBPA V.S. Dep.] at 125:2-137:3; *see also* Ex. 23 [SBPA I.F. Dep.] at 137:10-139:1; Ex. 12 [SBPA V.S. Dep.] at 134:6-20, 187:16-192:14 (speaking Spanish considered suspicious).

Body camera footage and forensically recovered text messages confirm that during operations Defendants are in fact looking for Latinos—whom Defendants refer to using dehumanizing racialized epithets.  *See supra* at 2 (discussing Ex. 78 [GOV-P16-001]); Ex. 39 [agent text chains] at GOV 24294 (referring to "tonks everywhere selling food"), 24291 (using term "wet"); Ex. 79 [GOV-P16-015] (SBPA V.S. from Westlake HD: "Who's backpack is that? Tonk's backpack?"); Ex. 80 [GOV-P17-008] (agent who stopped Plaintiff Gavidia referring to "tonk" in English and Spanish); Ex. 81 [GOV-P17-015] (from Hollywood HD: "There was a guy, I'm pretty sure he's wet he was just sitting in that minivan"); Ex. 82 [GOV-P19-044] (from Paramount HD: "So the guy in the car was a tonk, he wasn't the LPR [whom agents had detained]").

MOTION FOR PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

Defendants testified that they target "day laborers" for enforcement. *See* Ex. 4 [CBP 30(b)(6) Dep.] at 155:11-161:5 (teams targeted places that they believed were "standard practice for day laborers"), 242:5-245:18.  But the evidence shows that "day laborer"—as they use the term—is simply shorthand for a low-income or working-class Latino.

*First*, when asked to articulate what a "day laborer" is, Defendants' descriptions were amorphous and incoherent.  In response to a question posed in English, ICE's 30(b)(6) witness testified in Spanglish that a "day laborer" is "[s]omeone that is out there -- like . . . 'pico y pala'" or who "work[s] in the fields."  Ex. 40 [ICE 30(b)(6) Dep.] at 156:20-157:18.  Meanwhile, CBP's 30(b)(6) witness testified that "day laborer types of occupations" are "[c]onstruction, agricultural, yard work of [sic] the like."  Ex. 4 [CBP 30(b)(6) Dep.] at 159:3-161:5.  And although "day laborers and car wash employees are two different [things]," Ex. 12 [SBPA V.S. Dep.] at 217:24-218:14; Ex. 23 [SBPA I.F. Dep.] at 279:13-280:9 (had *no* information about whether car washes to be raided paid workers in cash or hired day laborers), Border Patrol materials repeatedly lump them together, along with many other types of workers deemed inherently "suspicious."  *See, e.g.*, ECF 529-24 [M.D.L. I-213]; Ex. 4 [CBP 30(b)(6) Dep.] at 298:5-300:2; Ex. 41 [Magnolia PPT Briefing] at GOV 000313.[9]

*Second*, despite organizing operations around the ability of agents to "spot" "day laborers," when agents attempted to explain what a "day laborer" looked like, they admitted it came down to race.  When lead officer C.C. from the Pasadena bus stop operation leading to the arrest of Plaintiffs was asked about the appearance of individuals he looks for—the men "hanging around" that he deems suspicious—he answered bluntly, "Older Hispanic males."  Ex. 27 [DO C.C.] Dep. at 158:3-162:17.  The officer in fact stated "I don't call them 'day laborers.' I call them 'illegal aliens.'"  Ex. 27 [DO C.C.] at 158:3-162:17, 247:2-249:8.  Other explanations likewise revealed it was really race animating Defendants' actions.  All one agent in a "roving patrol" could muster

_____

[9] Defendants had no actual statistics about the locations they were going to nor the proportion of "day laborers," however Defendants define them, who are not lawfully present in the Los Angeles area.  Ex. 25 [SBPA J.E. Dep.] at 84:7-13; Ex. 23 [SBPA I.F. Dep.] at 197:3-198:11; Ex. 12 [SBPA V.S. Dep.] at 121:5-124:23; Ex. 4 [CBP 30(b)(6) Dep.] at 161:7-165:17 (agency does not have this information); Ex. 40 [ICE 30(b)(6) Dep.] at 158:8-13 (same); *see also* Ex. 42 [Zuniga Decl.] ¶ 4.

MOTION FOR PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

when writing down why he approached M.D.L. was that M.D.L. was "dressed in attire consistent with day laborers [he] ha[d] apprehended in the past." ECF 529-24 [M.D.L. I-213].  But as M.D.L. explains, he was dressed in black pants, orange sweater, and Sketcher shoes, with a backpack— and was getting off the bus to get breakfast.  ECF 529-26 [M.D.L. Decl.], ¶ 5; *see also* Ex. 25 [SBPA J.E. Dep.] at 154:10-161:2.

    *Third*, the record now shows that Defendants frequently ignore white-appearing individuals *working alongside* Latino workers they stop, even as they stop Latino *customers* of businesses.  Officers stopped CLEAN member Angel Santiago Tafolla, a Latino U.S. citizen, while his light-skinned co-workers who ran from officers were left alone.  Ex. 43 [Santiago Tafolla Decl.], ¶¶ 2, 4-17; *accord* Ex. 44 [A.V. Decl.], ¶¶ 3-7 (Latino U.S. citizen worker stopped while light-skinned coworker not approached).  *See also* ECF 529-61 [E.M.M. Decl.], ¶¶ 3-10 (Latino shopper thrown to the ground while white-appearing persons in HD parking lot were left alone); ECF 529-62 [A.G. Decl.], ¶¶ 3-7 (Latino car wash client surrounded by agents and interrogated); ECF 529-65 [V.M.B. Decl.], ¶¶ 3-6 (Latino gas station client accosted before agents knew his name); Ex. 14 [Hernandez Viramontes Decl.], ¶ 7 (customers at car wash questioned).

    In sum, the record plainly establishes that Defendants are really looking for Latinos.  Indeed, if officers were not simply looking for Latinos and instead trying to locate their "target" in Pasadena last June, they could have approached anyone in the shopping plaza to ask about their "target's" whereabouts.  They didn't.  They stopped Plaintiffs, whom they knew nothing about other than their skin color and that they were dressed in work clothes.  ECF 529-15 [Vasquez Perdomo Decl.], ¶¶ 4-7, 14; ECF 529-16 [Villegas Molina Decl.], ¶¶ 4-6, 11; ECF 529-17 [Osorto Decl.], ¶¶ 4-6, 13.  Other putative class members' experiences are in accord.[10]

_____

[10] *See* ECF 529-68 [J.D.S. Decl.], ¶¶ 4-9; ECF 529-54 [E.C.P. Decl.], ¶¶ 3-6; Ex. 45 [N.B. Decl.], ¶¶ 3-6; Ex. 46 [Gutierrez Reyes Decl.], ¶¶ 3-6; ECF 529-23 [Tijerino Garmendia Decl.], ¶¶ 4-8; Ex. 47 [Ayala Decl.], ¶¶ 3-8; Ex. 48 [J.G.S.C. Decl.], ¶¶ 5-8; Ex. 49 [F.F.L. Decl.], ¶¶ 4-9; ECF 529-63 [R.C.N.G. Decl.], ¶¶ 3-10; ECF 529-64 [L.C.C. Decl.], ¶¶ 3-12; Ex. 50 [Luna Decl.], ¶¶ 3-10; Ex. 10 [J.L.M. Decl.], ¶¶ 4-10; Ex. 51 [M.G. Decl.], ¶¶ 5-8; Ex. 52 [Castillo Decl.], ¶¶ 6-13; Ex. 53 [M.A.R.C. Decl.], ¶¶ 3-7; ECF 529-66 [H.S.P. Decl.]; Ex. 7 [D.V.V. Decl.], ¶¶ 3-8; Ex. 54 [E.L.L. Decl.], ¶¶ 3-17; Ex. 18 [I.U.V. Decl.], ¶¶ 5-10; ECF 529-27, [M.F.R. Decl.], ¶¶ 3-8; ECF 529-26 [M.D.L. Decl.], ¶¶ 4-7; Ex. 42 [Zuniga Decl.], ¶¶ 5-6; Ex. 16 [Reyes Romo Decl.], ¶¶ 6-12 (CLEAN member); ECF 529-28 [Chapman Decl.], ¶¶ 3-8; Ex. 83 [GOV-P17-048] (detention of Latino man remaining silent at San Bernardino HD operation).

MOTION FOR PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

## III.    LEGAL STANDARD

Plaintiffs are entitled to a preliminary injunction if (1) they are likely to succeed on the merits of their claims; (2) they are likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).  Where a moving party would suffer irreparable harm and demonstrates that an injunction would be in the public interest, "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011) (internal quotation marks omitted).

## IV.    ARGUMENT

### A.    <u>Plaintiffs have standing to obtain injunctive relief</u>

#### 1.    *Both individual and organizational Plaintiffs have standing*

A plaintiff has standing for injunctive relief if they are "realistically threatened" by future injury.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983); *In re Zappos.com, Inc.*, 888 F.3d 1020, 1024 (9th Cir. 2018).  One way Plaintiffs can make that showing is to establish that they are the "target[s]" of a government "policy" or "pattern of officially sanctioned behavior." *Melendres v. Arpaio*, 695 F.3d 990, 998 (9th Cir. 2012) (citation modified); *see also Armstrong v. Davis*, 275 F.3d 849, 861 (9th Cir. 2001); *LaDuke v. Nelson*, 762 F.2d 1318, 1323 (9th Cir. 1985).  The record since this Court issued its TRO last year now establishes precisely that.

The record shows that Defendants maintain a policy and practice of making detentive stops in the District based on broad demographic profiling.  Defendants admit to relying on Latino ethnicity, *see* Ex. 12 [SBPA V.S. Dep.] at 125:2-137:3; *see also* Ex. 23 [SBPA I.F. Dep.] at 137:10-139:1, *supra* at 8, and to targeting "day laborers," whom they equate with Latino low-wage workers, *see* Ex. 27 [DO C.C.] Dep. at 158:3-162:18, *supra* at 8-10.

Defendants' policy and practice is "officially sanctioned." *Melendres*, 695 F.3d at 998.  Defendants' CBP 30(b)(6) witness confirmed that the agency endorses the manner in which agents have conducted operations in the District. *See, e.g.*, Ex. 4 [CBP 30(b)(6)] at 230:5-234:7 & Ex. 55

-11-

MOTION FOR PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

[CBP 30(b)(6) Dep. Ex. 150] (approving agent's reliance on ethnicity), *id.* at 167:21-172:17, 241:19-243:16, 224:5-229:2, 217:15-219:18.  And ICE's 30(b)(6) witness echoed that endorsement as to ICE officers' conduct. Ex. 40 [ICE 30(b)(6) Dep.] at 159:13-161:1, 183:13-184:7.  Defendants' policy and practice originated following a direction from ICE headquarters for field offices to "turn the creativity knob up to 11" for arrests of "collaterals," ECF 539-2 [e-mail chain], which law enforcement expert and former CBP Commissioner Gil Kerlikowske explains would have been interpreted as an order to deviate from standard practice and protocols to get more "handcuffs on wrists."  Ex. 3 [Kerlikowske Decl.] ¶¶ 38-39; *see also id.* ¶¶ 23-25, 35-38.  DHS personnel in the District have followed that order by engaging in widespread detentive stops of Latinos without real investigative work.  That was not a rogue method of operationalizing agency orders; it was precisely what agency leadership demanded.[11]

The only remaining question is whether Plaintiffs are targets of the policy and practice they challenge.  *See Melendres*, 695 F.3d at 998.  They are.  The individual Plaintiffs have already been stopped pursuant to the policy and practice, *see supra* at 4 (discussing stops of Plaintiffs Gavidia and Hernandez Viramontes) and 6 (discussing stops of Plaintiffs Vasquez Perdomo, Villegas Molina, and Osorto), and they match the precise demographic profile that Defendants are targeting.[12]  *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) ("[P]ast enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical.'") (citation omitted); *Armstrong*, 275 F.3d at 861 (similar).  There is no avoiding Defendants' dragnet because it targets Plaintiffs in the places where they work and live.  *See Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1041 (9th Cir. 1999).  And there is no reason to believe that the prior stops of the individual Plaintiffs make a future stop less likely.  To the

---

[11] Additional factors showing this was the intended outcome include the decision to deploy Border Patrol to the interior, the dramatic drop in the ratio of ICE supervisors to field officers, the decision not to track field contacts that lead to release, and the lack of any internal accountability structure.  Ex. 3 [Kerlikowske Decl.], ¶¶ 23-25, 36, 41-45; *see also* Ex. 2 [SDDO C.C. Dep.] at 82:18-85:15; Ex. 5 [DO E.O. Dep.] at 51:11-25; Ex. 4 [CBP 30(b)(6) Dep.] at 319:12-320:2; Ex. 40 [ICE 30(b)(6) Dep.] at 179:11-184:7.

[12] Ex. 13 [Gavidia Decl.], ¶¶ 12-13; Ex. 14 [Hernandez Viramontes Decl.], ¶ 15; ECF 529-15, [Vasquez Perdomo Decl.], ¶14; ECF 529-16 [Villegas Molina Decl.], ¶ 13; ECF 529-17 [Osorto Decl.], ¶ 13.

-12-
Case No. 2:25-cv-05605-MEMF-SP

MOTION FOR PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

contrary, multiple individuals have been stopped more than once, *see infra* at 14, 16, and Defendants have gone to numerous locations more than once, *see, e.g.*, Ex. 14 [Hernandez Viramontes Decl.], ¶¶ 6-8, 14; Ex. 56, [Anderson Decl.], ¶¶ 5, 9; ECF 529-74 [Melendrez Decl.], ¶¶ 4, 8-10; Ex. 42 [Zuniga Decl.], ¶ 4.  Defendants acknowledge that they have no system for tracking stops that led to release[13] or for tracking the places agents have previously gone[14] to avoid recurrence.

Members of the organizational Plaintiffs are similarly threatened.[15]  LAWCN, UFW, and CHIRLA collectively have tens of thousands of members across the District who fit the profile Defendants are targeting.  ECF 529-73 [Salas Decl.], ¶ 4; ECF 529-76 [Strater Decl.], ¶¶ 5-6; *supra* at 9 (including agricultural workers in Defendants' understanding of "day laborers"); ECF 529-75 [Gudino Decl.], ¶¶ 2, 13-14; ECF 529-74 [Melendrez Decl.], ¶ 1.  It is thus unsurprising that Defendants' policy has already resulted in multiple suspicionless stops of the organizational Plaintiffs' members, including stops of Latino U.S. citizens.  ECF 529-74 [Melendrez Decl.], ¶¶ 7-10, 12-15 (members stopped while at work, operating mobile car wash, or using public transportation); Ex. 43 [Santiago Tafolla Decl.], ¶¶ 2, 4-16; ECF 529-76 [Strater Decl.], ¶¶ 29-31 (member stopped while walking in Ventura County); ECF 529-73 [Salas Decl.], ¶¶ 18-21 (members stopped while selling food or driving).  And there is every reason to think those stops

---

[13] Ex. 4 [CBP 30(b)(6) Dep.] at 208:6-209:5, 235:5-241:9; Ex. 40 [ICE 30(b)(6) Dep.] at 167:3-172:25.

[14] *See* Ex. 4 [CBP 30(b)(6) Dep.] at 172:18-175:14, 178:14-17; Ex. 40 [ICE 30(b)(6) Dep.] at 169:13-170:15; Ex. 5 [DO E.O. Dep.] at 134:2-23.

[15] "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members." *Coal. on Homelessness v. City & Cnty. of San Francisco*, 758 F. Supp. 3d 1102, 1122 (N.D. Cal. 2024) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).  Defendants do not contest that the organizational Plaintiffs here meet the second and third prongs.  Safeguarding LAWCN's, UFW's, and CHIRLA members' liberty interests is clearly germane to the respective organizations' missions. *See Garcia v. City of Los Angeles*, 611 F. Supp. 3d 941, 952 (C.D. Cal. 2020).  ECF 529-75 [Gudino Decl.], ¶ 7; ECF 529-74 [Melendrez Decl.], ¶ 3; ECF 529-76 [Strater Decl.], ¶¶ 11, 17; ECF 529-73 [Salas Decl.], ¶ 2.  And the participation of individual members is not required as Plaintiffs seek injunctive relief. *See Columbia Basin Apartment Ass'n v. City of Pasco*, 268 F.3d 791, 799 (9th Cir. 2001).

MOTION FOR PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

will continue; in fact, some organizational Plaintiff members have already been stopped multiple times. *See* ECF 529-74 [Melendrez Decl.], ¶¶ 8-9, 13 (CLEAN members stopped twice).

### 2. *Defendants' standing arguments at the TRO stage cannot succeed on the current record*

Defendants previously argued at the Supreme Court that future injury is speculative. Application for Stay ("Stay App.") at 17-18, *Noem v. Vasquez Perdomo*, No. 25A169 (U.S. Aug. 7, 2025). But as noted above, the record now conclusively establishes the very thing that Defendants have acknowledged would suffice for standing, *see* Stay Reply at 6—evidence that Plaintiffs are "realistically threatened" by unlawful detentive stops pursuant to Defendants' race-based policy and practice. *See supra* at 11-14; *Lyons*, 461 U.S. at 109. Unlike in *Lyons*, where the plaintiff could not establish that he would "illegally resist arrest or detention" and thus fall subject to the city's alleged policy of using chokeholds in response to "resistance or other provocation," *Lyons*, 461 U.S. at 106, 110, here Plaintiffs need do nothing more than go about their daily lives to be threatened by Defendants' policy and practice.

The record further refutes Defendants' prior conclusory assertions about the likelihood of future stops against Plaintiffs. Contrary to Defendants' assertion that it was speculative to believe that Plaintiffs Gavidia and Hernandez Viramontes would be stopped again, the record shows similarly situated U.S. citizens throughout the District regularly being subjected to the very same type of harm. Indeed, the record shows *multiple stops* of the *same* U.S. citizens. *See* Ex. 56 [Anderson Decl.], ¶¶ 4-13 (describing stop of U.S. citizens at Euclid Car Wash); Ex. 84 (video taken by Anderson); Ex. 57 [H.A. Decl.], ¶¶ 5-18 (U.S. citizen stopped twice). And Defendants recently detained Latino U.S. citizen J.A.P., not believing his claim of citizenship even after he showed his passport, and U.S. citizen D.O.A., demanding his ID after officers ordered him to put his hands up. Ex. 36 [J.A.P. Decl.], ¶¶ 3-6; Ex. 37 [D.O.A. Decl.], ¶¶ 3-8. Defendants also detained Latino U.S. citizen Santiago Tafolla, pointing a gun at him. Ex. 43 [Santiago Tafolla Decl.], ¶¶ 2, 4-17. *See also* Ex. 85 [GOV-P17-76] (body camera video showing stop of a Latino U.S. citizen). The record underscores why the risk of future stops of U.S. citizens is so substantial: Defendants frequently do not even allow Latino individuals to retrieve proof of

MOTION FOR PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

citizenship before detaining them.  *See* Ex. 58 [V.M.C. Decl.], ¶¶ 7-14 (U.S. citizen not allowed to retrieve birth certificate); Ex. 44 [A.V. Decl.], ¶¶ 3-7 (U.S. citizen told Real ID was "fake" and not allowed to retrieve passport); Ex. 43 [Santiago Tafolla Decl.] ¶ 11 (agents refused to review documentation).

The record shows similar risks for other Latinos such as Plaintiffs Vasquez Perdomo, Villegas Molina, and Osorto.  Although Defendants at the TRO stage tried to portray these stops as a one-off incident "in connection with 'a targeted enforcement action,'" Stay App. 29 (citation omitted), discovery has shown that Plaintiffs were in fact seized as part of ICE's bid to make arrests of non-targets through race-based profiling.  *See* Ex. 29 [officers' text chain] (C.C. saying "bring extra cuffs"); Ex. 27 [DO C.C.] Dep. at 158:3-162:18.  These Plaintiffs thus face a continued threat of future stops arising from the very same policy and practice—a threat that in no way abates because they are in removal proceedings, *see* ECF 539-8 at 7; ECF 529-74 [Melendrez Decl.], ¶¶ 8-9; Ex. 54 [E.L.L.], ¶¶ 3-17.  *Contra* Stay App. at 22 (claiming that Plaintiffs had not shown a "sufficient likelihood that [they] will again be wronged *in a similar way*" (quoting *Lyons*, 461 U.S. at 111)).

Defendants likewise previously dismissed the "risk of future harm for the organizations' members" as "speculative."  Stay App. at 18; *see also Noem*, 146 S. Ct. at 3-4 (Kavanaugh, J., concurring) (not addressing members of organizational Plaintiffs).  But the record shows the opposite.  Organizational Plaintiff members include individuals of varying immigration status, including those who have permission to live in the United States.  As with Latino U.S. citizens, Defendants have a disturbing track record of seizing Latino noncitizens who are lawfully present. *See, e.g.*, Ex. 86 [GOV-P16-006] (stop of legal resident at Home Depot); Ex. 59 [Ortiz Decl.], ¶¶ 2-5, 8; ECF 529-71 [A.T. I-44]; Ex. 60 [Zapata Santiago Decl.], ¶¶ 3-10; ECF 529-68 [J.D.S. Decl.], ¶¶ 4-9; ECF 529-70 [M.L.S. Decl.], ¶¶ 4-7; Ex. 61 [Johnson Decl.], ¶¶ 5-16.  The record also shows Defendants stopping the *same* Latino noncitizens *multiple times*.  For example, CLEAN member "Manuel," who has deferred action and work authorization, was stopped in October and December 2025.  *See* ECF 529-74 [Melendrez Decl.], ¶ 13).  *See also* Ex. 54 [E.L.L.], ¶¶ 3-17 (stopped at a Home Depot and second outside apartment building); ECF 529-64

MOTION FOR PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

[L.C.C. Decl.], ¶¶ 3-12; *contra* Stay Reply 6 (discussing limited evidence of individuals being stopped twice).  This makes sense, as Defendants' practice is to seize Latinos first and ask questions later, making it impossible for individuals to invoke their lawful status or the fact that they have been stopped before to avoid a detentive stop.  *See, e.g.*, Ex. 87 [GOV-P19-060] (stating "[c]uff him up" as to legal resident J.A.); ECF 529-79 [GOV-P17-051] (stating, with respect to individual with work authorization, "[w]e'll take him to ORP, and if he's good, we'll release him."); Ex. 6 [agents text chain] at GOV 6763-66 (similar).

Finally, Plaintiffs have standing to seek the injunction being requested for an additional reason related to their new Equal Protection claim.  As the Supreme Court has recognized, "discrimination itself, by perpetuating 'archaic and stereotypic notions' or by stigmatizing members of the disfavored group as 'innately inferior' and therefore as less worthy participants in the political community, can cause serious non-economic injuries to those . . . in a disfavored group." *Heckler v. Mathews*, 465 U.S. 728, 739-40 (1984) (citation modified).  As the targets of Defendants' race-based policy, Plaintiffs "are unquestionably affected in a personal and individual way" by this discriminatory classification. *Hassan v. City of New York*, 804 F.3d 277, 291 (3d Cir. 2015) (citation modified).  They are unable to move freely—including to engage in constitutionally-protected activities such as going to church—without the specter of unlawful seizure on account of their Latino ethnicity.  That harm warrants injunctive relief.

**B.**     **Plaintiffs are likely to succeed on the merits**

*1.*     ***Plaintiffs' Fourth Amendment Claim***

*(a)*     ***Defendants' policy and practice of demographic profiling violates the Fourth Amendment***

The Fourth Amendment guarantees the right of the people against unreasonable seizures.  U.S. Const. amend. IV.  "Except at the border and its functional equivalents," immigration agents may seize individuals, even briefly, only based on "specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion" that the persons to be stopped are not lawfully present. *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975).  Defendants' policy and practice violates that protection.

The record demonstrates that Defendants are effecting seizures. "A seizure occurs when a law enforcement officer . . . in some way restricts the liberty of a person." *United States v. Washington*, 387 F.3d 1060, 1068 (9th Cir. 2004) (citation and internal quotation marks omitted). Defendants' typical practice is to ambush individuals, surrounding them and yelling verbal commands, or physically grab them. *See, e.g.*, *supra* at 6 (discussing stops of Plaintiffs Vasquez Perdomo, Villegas Molina, and Osorto). This is on top of the significant show of force by armed, masked agents typical of Defendants' operations. *See* Ex. 3 [Kerlikowske Decl.], ¶ 33; Ex. 88 [sUAS footage] (showing agents blocking egress at car wash). Far from resembling a voluntary encounter, Defendants' stops plainly qualify as involuntary seizures. *United States v. Washington*, 490 F. 3d 765, 771-72 (9th Cir. 2007) (relevant factors include number of officers, display of a weapon, physical touching, and use of language and tone); *see also Orhorhaghe v. I.N.S*, 38 F.3d 488, 494-96 (9th Cir. 1994). Those stops are lawful only if they are supported by reasonable suspicion.

The record shows that they are not. The law is clear that reasonable suspicion cannot be based on a "demographic profile." *Kansas v. Glover*, 589 U.S. 376, 385 & n. 1 (2020) (citing *Brignoni-Ponce*, 422 U.S. at 876). Yet that is precisely what Defendants are relying on when they stop individuals throughout the District based on perceived ethnicity and socioeconomic status. Defendants' reliance on that profile runs headlong into the bedrock Fourth Amendment principle that officers, including immigration officers, cannot "rely solely on generalizations" that cast suspicion on "large segments of the lawabiding population" to make a detentive stop. *United States v. Manzo-Jurado*, 457 F.3d 928, 935 (9th Cir. 2006); *Reid v. Georgia*, 448 U.S. 438, 441 (1980) (stops cannot be based on circumstances that "describe a very large category of presumably innocent" people); *see also United States v. Rodriguez*, 976 F.2d 592, 595-96 (9th Cir. 1992) (a "prefabricated or recycled profile of suspicious behavior very likely to sweep many ordinary citizens" will not suffice).

***(b)***      ***The post-TRO record refutes Defendants' TRO-stage arguments***

Defendants have sought to defend their conduct by invoking the "totality of the circumstances" standard: They argued that agents here use that standard when determining whom

-17-

MOTION FOR PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

to stop, and that race is but one of many (purportedly) relevant or "salient" factors that inform their assessment of reasonable suspicion.  Stay App. at 7-8; *Noem*, 146 S. Ct. at 3 (Kavanaugh, J. concurring).  But the record confirms that Defendants in fact have abandoned any "totality" analysis by embracing the unlawful "shortcut" of racial profiling.  Ex. 3 [Kerlikowske Decl.], ¶ 21.

Even if race were simply one basis for stops, that would be unlawful.  *United States v. Montero-Camargo*, 208 F.3d 1122, 1134-35 (9th Cir. 2000).  But the record establishes that race is not only one basis for stops, but the predominant and essential one motivating Defendants' stops.  Agents routinely use a person's Latino appearance as the sole basis for finding that person suspicious.  *See, e.g.*, *supra* at 3 (text chains about looking for "possibles" based on appearance); *supra* at 8 (body camera footage discussing identifying individuals as "tonks" or "wet" based on appearance); ECF 529-57 [H.S.H. Decl.] ¶¶ 9-12 (officer pulling over individual because he looks like a "paisa").  Further, multiple supervisory agents have acknowledged that agents look for individuals with "Hispanic ethnicity."  Ex. 12 [SBPA V.S. Dep.] at 125:2-137:3; Ex. 23 [SBPA I.F. Dep.] at 137:10-139:1.  They do so *in disregard of* the demographics of the District, where a high percentage of Latinos are legally present or U.S. citizens.  *See* Ex. 12 [SBPA V.S. Dep.] at 135:10-137:3.  Even under a standard that would allow race as *one* consideration among other distinct factors, the post-TRO record shows that Defendants' policy and practice is unlawful.  *See Noem*, 146 S. Ct. at 3 (Kavanaugh, J. concurring).

Some of Defendants' witnesses have tried to avoid the impression that they are making stops solely based on race by insisting that they instead are targeting "day laborers."  *See, e.g.*, Ex. 4 [CBP 30(b)(6) Dep.] at 155:11-161:5.  Even accepting that proposition, it does not establish they are complying with the Fourth Amendment; moreover, the record shows that Defendants use "day laborer" as shorthand for low-income or working-class *Latino*.  *See supra* at 8-10.  Defendants' witnesses did not have information about whether the workers they stopped were paid in cash, Ex. 23 [SBPA I.F. Dep.] at 201:25-202:3, 279:13-280:9, Ex. 12 [SBPA V.S. Dep.] at 122:19-21, 224:9-15, consistently lumped in "day laborer" occupations with those that do not frequently offer daily work, *see supra* at 9, and agents routinely stopped individuals—including

MOTION FOR PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

when they were not even at work or trying to obtain work—based on their purported *appearance* as a "day laborer," *see supra* at 10, an appearance that one officer testified meant "[o]lder Hispanic male[]," Ex. 27 [DO C.C.] Dep. at 158:3-162:18.  Defendants' enforcement practices at purported "day laborer" locations leave no doubt that race is driving their decisions about whom to stop:  The record shows agents seizing Latino *customers* while leaving non-Latino *workers* alone. *See supra* at 10.  If race was not driving Defendants' enforcement policy, that would not happen.

Defendants' reliance on race as the basis for their detentive stops is dispositive of the Fourth Amendment analysis.  Even Defendants have acknowledged that race alone is not a sufficient basis for reasonable suspicion.  *See* Stay App. at 29-30.  As the Supreme Court has explained, being or appearing Latino has limited probative value where "[l]arge numbers of native-born and naturalized citizens have the physical characteristics identified with [Latino ethnicity]." *Brignoni-Ponce*, 422 U.S. at 886; *see also Montero-Camargo*, 208 F.3d at 1134-35. The population of this District is nearly half Latino, *see* Lai Decl., ¶¶ 110-111, making it nonsensical to rely on apparent Latino ethnicity to try to infer immigration status.

Any other would-be "salient" factors on which Defendants claim to rely do not bridge the gap to reasonable suspicion.  Contrary to Defendants' suggestions at the TRO stage, the record now shows that Defendants (at most) use language or location as a basis for demographic profiling, not as part of the individualized totality-of-the-circumstances analysis that the law requires.  *See United States v. Cortez*, 449 U.S. 411, 417-18 (1981).  To the extent Defendants are relying on the language a person speaks, they are not doing so to assess whether an individual *can* speak English.  *See, e.g.*, Ex. 43 [Santiago Tafolla Decl.], ¶ 12 (U.S. citizen who spoke to agents in Spanish because that's how agents initiated encounter); Ex. 58 [V.M.C. Decl.], ¶ 9; Ex. 36 [J.A.P. Decl.], ¶ 4.[16]  Under such circumstances, speaking Spanish is a mere proxy for Latino ethnicity.  And one's location in relation to other individuals who may lack status—e.g., frequenting the same shopping plaza or living in the same neighborhood—can hardly be the basis for reasonable suspicion.  It is well established that officers cannot seize an individual because of

---

[16] More than a third of the population of Los Angeles speaks Spanish at home.  Lai Decl., ¶ 114.

MOTION FOR PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

the individual's "mere propinquity to others." *Ybarra v. Illinois*, 444 U.S. 85, 91, 94 (1979); *Montero-Camargo*, 208 F.3d at 1138-39 (warning that reliance on presence in a "high crime area" can likewise easily become "a proxy for race or ethnicity").[17]  These demographic characteristics, i.e., speaking a language millions of people in the District speak and spending time in neighborhoods where hundreds of people live or work, do little to "winnow[]the broad profile into an objective and particularized suspicion of the person to be stopped." *Manzo-Jurado*, 457 F.3d at 936-40 (apparent ethnicity, location, not understanding English, and appearing to be part of a work crew insufficient); *Rodriguez*, 976 F.2d at 595-96 (a "prefabricated or recycled profile of suspicious behavior very likely to sweep many ordinary citizens" won't suffice).

Defendants' demographic profiling is perhaps shown most clearly by their pattern of stopping non-targets in allegedly "targeted" operations.  The record shows that when Defendants conduct such operations, they routinely stop individuals who are not at the last known address of their "target," not driving the vehicle associated with their "target," and do not resemble their "target."  *See supra* at 6-8. [18, 19]  As expert Kerlikowske explains, this is inconsistent with how officers would behave if they were actually attempting to apprehend a "target."  *See* Ex. 3 [Kerlikowske Decl.], ¶¶ 29-31; *see also* Ex. 5 [DO E.O. Dep.] at 162:7-163:2, 197:4-198:1,

---

[17] Stopping a worker merely because another worker at the car wash may not have status is likewise unreasonable.  *See* Ex. 23 [SBPA I.F. Dep.] at 244:11-20, 262:3-263:7 (discussing stop of Latino legal resident Zapata Santiago); Ex. 89 [I.F. body camera video]; Ex. 4 [CBP 30(b)(6) Dep.] at 246:13-249:25, 296:7-317:7 & Ex. 62 [CBP 30(b)(6) Dep. Ex. 160]; *Perez Cruz v. Barr*, 926 F.3d 1128, 1138 (9th Cir. 2019).

[18] The circumstances surrounding the stop of F.H.S. are particularly troubling.  Defendants claimed in a declaration prior to discovery that ICE "followed [a] target from their residence." ECF 170-3 [Quinones Decl.], ¶ 11.  But the officer conceded in a deposition that he did not encounter F.H.S. while following a "target."  ECF 539-3 [DO E.O. Dep.] at 196:17-198:6.  And ICE could not reasonably have believed that F.H.S. was associated with the "target," because the "target" drove a Mercedes-Benz SL500, while F.H.S. was riding in a truck.  *See* Ex. 5 [DO E.O. Dep.] at 192:5-7, 231:23-233:11; Ex. 63 [FOW] (showing vehicle of "target").  Officers have made no attempts to locate their supposed "target" since F.H.S.'s arrest.  Ex. 5 [DO E.O. Dep.] at 231:5-15.

[19] Defendants allege that G.V.C. was approached because he "resembl[ed]" someone ICE was looking for at the same shopping center.  ECF 529-37 [G.V.C. I-213].  But apart from sharing the same ethnicity, G.V.C. does not resemble the "target" C.G.C. at all.  *Compare id.* (depicting photo of G.V.C.) *with* Ex. 64 [officers' text chain] at GOV 7884-85 (showing C.G.C. "baseball card" with photo); Ex. 5 [DO E.O. Dep.] at 93:7-103:15, 119:4-129:25 (discussing current use of "baseball cards" generated from Elite).

-20-                    Case No. 2:25-cv-05605-MEMF-SP

204:13-205:15, 248:12-250:7, 265:7-19, 292:6-293:3 (testifying he did not run license plates prior to initiating stops).  Defendants acknowledge in these instances that they are using ethnicity to determine whom to stop.  *See, e.g.*, Ex. 2 [SDDO C.C. Dep.] at 240:13-241:3 (admitting reliance on ethnicity); Ex. 5 [DO E.O. Dep.] at 267:2-24, 300:8-13 (same).

Defendants' practice in allegedly "targeted" operations contravenes the Fourth Amendment.  That is true even where a person fits the same broad demographic characteristics of a suspect.  In *Lomeli v. County of San Diego*, 637 F. Supp. 3d 1046 (S.D. Cal. 2022), a court held that officers would not have reasonable suspicion to stop a vehicle approximately 1.4 miles from a reported robbery even though the officers believed the occupants of the vehicle "matched the race and sex of the suspects."  *Id.* at 1059-62.  Reliance on those characteristics "cast [ ] too wide a net to play any part in a particularized reasonable suspicion determination."  *Id.* at 1061 (citing *Montero-Camargo*, 208 F.3d at 1133-34); *see also Sharp v. Cnty. of Orange*, 871 F.3d 901, 911 (9th Cir. 2017) (discussing *United States v. Delgadillo-Velasquez*, 856 F.2d 1292 (9th Cir. 1988)); *Rios v. Cnty. of Los Angeles*, No. 2:24-CV-04782-MEMF-MBK, 2025 WL 2841145, at *7 (C.D. Cal. Oct. 7, 2025) (officers' misidentification less reasonable because they actually knew what suspect looked like).  Unlike in *Lomeli*, Defendants' stops are not even limited in time to a reported incident.  Anyone who shares general characteristics of Defendants' "targets" may be stopped by virtue of living in, spending time in, or passing through an area.  *Cf. Washington v. Lambert*, 98 F.3d 1181, 1183, 1190–91 (9th Cir. 1996) (that plaintiffs "bore a resemblance to a general description of two African-American suspects" was "an insufficient basis for such an intrusive stop" as that could cover "a significant percentage of African-American males walking, eating, going to work or to a movie, ball game or concert").  To be sure, law-enforcement officers may validly use any number of factors as part of a particularized, totality-of-the-circumstances analysis regarding a specific person.  But the record shows that Defendants' current policy of sweeping up individuals based on broad demographic profiling is not that.

Defendants urged the Court to look past the myriad issues with their detentive-stop policy at the TRO stage by portraying their stops as mere "brief" encounters.  Stay App. at 27; *see also Noem*, 146 S. Ct. at 5 (Kavanaugh, J. concurring).  But the record is now clear that Defendants'

-21-    Case No. 2:25-cv-05605-MEMF-SP

portrayal was grossly inaccurate and misleading. The record shows a practice of detaining individuals without allowing them to show documentation of citizenship or lawful presence. *See supra* at 15 (U.S. citizens detained without being allowed to retrieve documentation or where agents refused to review documentation). U.S. citizen V.M.C. was prohibited from retrieving his birth certificate and was taken downtown and detained for hours. Ex. 58 [V.M.C. Decl.], ¶¶ 7-14. Still others have been subject to prolonged detention despite their lawful presence, or to harsh treatment despite being citizens. ECF 529-74 [Melendrez Decl.], ¶ 13 (CLEAN member with lawful presence taken away from car wash before being released); Ex. 90 [GOV-VID_001]; Ex. 91 [GOV-P17-006] (videos showing agents slamming Plaintiff Gavidia against a fence even as he protested that he was born in L.A.). That is consistent with how agents have approached their job since June 2025. *See supra* at 17 (evidence showing Defendants' practice of seizing first and asking questions later); Ex. 92 [GOV-P17-045] (agent stating crudely in response to question about individual described as "not wet" whom Defendants had taken from a car wash, "[i]f he's a citizen . . . we'll let him go, easy as that").

The record also shows that Defendants' claims of allegedly *consensual* encounters are wrong. Defendants last year characterized their contact with Plaintiff Viramontes as "consensual." *See* ECF 170 at 3-4. But the agent who stopped Viramontes has now admitted that his interaction with Viramontes was "a detention." Ex. 15_[BPA J.M. Dep.] at 261:14-25; *see also* Ex. 14 [Hernandez Viramontes Decl.], ¶¶ 8-10 (explaining he was surrounded by agents and interrogated, then escorted to SUV); Ex. 65 [Third Hernandez Viramontes Decl.], ¶¶ 3-6; Ex. 93 [video] (corroborating Viramontes' account). Defendants also claimed that Plaintiff Gavidia's contact with agents was "self-initiated." ECF 170 at 8-9. But the body camera video flatly disproved that claim. Ex. 90 [GOV-VID_001]; Ex. 91 [GOV-P17-006]; *see also* ECF 492; Ex. 13 [Gavidia Decl.], ¶¶ 7-8.[20]

---

[20] Arrest narratives where Defendants had asserted encounters were voluntary were also proven wrong. *See* ECF 529-47 [E.K.Z.L. narrative] (suggesting E.K.Z.L. freely admitted he was not lawfully present); Ex. 12 [SBPA V.S. Dep.] at 233:22-234:4 (acknowledging he had "hands on" E.K.Z.L. before questioning began); Ex. 94 [body camera video]. *See also* ECF 529-36 [E.C.P. I-213] (claiming encounter was consensual); Ex. 66 [E.C.P. narrative] (contradicting I-213 and conceding E.C.P. was detained, allegedly because she ran); Ex. 67 [Second E.C.P. Decl.]

Finally, the record shows a regular practice of agents extending vehicle stops even after they have *resolved* any prior, purported basis for reasonable suspicion. In these circumstances, Defendants prolong stops without providing any indication that the person is free to leave. *See, e.g., supra* at 6-7; Ex. 3 [Kerlikowske Decl.], ¶ 34; Ex. 5 [DO E.O. Dep.] at 251:23-253:24 (did not explain motorist was free to leave). That is unquestionably a seizure. *See, e.g.*, *United States v. Evans*, 786 F.3d 779, 785 (9th Cir. 2015) (discussing *Rodriguez v. United States*, 575 U.S. 348 (2015)); *United States v. Carillo Rea*, 393 F. Supp. 3d 1025, 1033 (D. Mont. 2019). Defendants do not even try to justify the extension of vehicle stops with reasonable suspicion; rather, they claim, incorrectly, that the subsequent questioning is "consensual." *See.* Ex. 5 [DO E.O. Dep.] at 253:13-21, 281:11-284:10 (other narratives of vehicle stop "collateral" arrests follow same pattern); ECF 529-41 [G.N.L. I-213]; ECF 529-42 [E.C.H. I-213].

Aggregating broad characteristics does not produce the individualized assessment the Fourth Amendment requires. Defendants may not abandon the totality of the circumstances test in favor of a demographic profile. Defendants' policy and practice violates the Fourth Amendment.[21]

---

(explaining that due to an injury she could not run); Ex. 68 [E.L.R. narrative] (suggesting E.L.R. freely admitted he did not have documents when approached for questioning); Ex. 95 [GOV-P17-059] (showing agent placed a hand on E.L.R.'s shoulder to question him).

[21] Defendants may argue that their stops are based on someone taking flight, but that fails too. First, in numerous cases, there simply is no flight. Even where arrest narratives claim flight, available body camera video often show otherwise. *See* ECF 539-8 at 6-7; *see also* compare Ex. 69 [J.A.V. I-44] (claiming flight) with Ex. 87 [GOV-P19-060] (body camera video showing no flight). An analysis of arrest narratives produced in expedited discovery shows that identical language about reasonable suspicion and flight came from a template and was repeated in nearly every narrative from the Westlake HD operation, for example, further undermining the trustworthiness of the narratives. *See* Lai Decl, ¶¶ 76-77; *see also* Ex. 3 [Kerlikowske Decl.], ¶ 43. And the narratives sometimes contain errors indicating that they are copied and pasted from prior narratives. *See, e.g.*, Lai Decl., ¶ 80 (showing that even narratives from car wash operations contained the same language about reasonable suspicion and flight that clearly pertains to a Home Depot operation); Ex. 70 [M.G. I-213] (listing target name as "The target alien" and indicating repeatedly that stop took place at an incorrect Home Depot location 20 miles away); Ex. 51 [M.G. Decl.], ¶¶ 4-5 (explaining he did not run); Ex. 52 [Castillo Decl.], ¶¶ 6-11. Moreover, where Defendants are approaching individuals so aggressively, with masked, armed agents coming out of nowhere, there can be little surprise that they sometimes provoke flight. *See, e.g.*, Ex. 57 [H.A. Decl.] (U.S. citizen who took flight); Ex. 43_[Santiago Tafolla Decl.] (same); Ex. 96 [GOV-P16-014] (TPS holder who fled at Westlake HD); *United States v. Brown*, 925 F.3d 1150, 1157 (9th Cir. 2019); *United States v. Rodella*, 804 F.3d 1317, 1326 (10th Cir. 2015). Agents ignored the minimal probative value of provoked flight. *See, e.g.*, Ex. 12_[SBPA V.S. Dep.] at 277:5-279:11;

-23-                Case No. 2:25-cv-05605-MEMF-SP

**2.      *Defendants' policy and practice violates the guarantee of equal protection under the Fifth Amendment***

Defendants' policy and practice of considering apparent Latino ethnicity in determining whom to stop is a clear form of race-based decision-making, where the government relies, in whole or in part, on express racial categorization to cast a group of people as presumptively suspicious.  Independent of the Fourth Amendment, this contravenes the "'core purpose' of the Equal Protection Clause: 'do[ing] away with all governmentally imposed discrimination based on race.'" *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023) (quoting *Palmore v. Sidoti*, 466 U.S. 429, 432 (1984)); *see also Buck v. Davis*, 580 U.S. 100, 124 (2017) ("Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice.") (citation omitted).  The Supreme Court has made clear that "the Constitution prohibits selective enforcement of the law based on considerations such as race." *Whren v. United States*, 517 U.S. 806, 813 (1996).  Interior immigration enforcement is no exception.  *See  Trump v. Illinois*, 146 S. Ct. 432, 436 n.4 (2025) (Kavanaugh, J., concurring) ("officers must not make interior immigration stops or arrests based on race or ethnicity" (citing *Whren*, 517 U.S. at 813)).

Defendants have openly admitted, under oath, to relying on Latino ethnicity to target individuals like Plaintiffs and their members.  *See, e.g.*, Ex. 12 [SBPA V.S. Dep.] at 125:2-137:3; Ex. 23 [SBPA I.F. Dep.] at 137:10-139:1; *see also supra* at 10, 21.  One need look no further than the fact that Defendants have stopped so many U.S. citizens, *supra* at 14-15, and even customers of businesses, *supra* at 10.  This express reliance on race is endorsed by leadership.  *See, e.g.*, Ex. 4 [CBP 30(b)(6)] at 230:5-234:7; *supra* at 12.

When Defendants single out individuals to stop based on their Latino ethnicity, that constitutes a suspect racial classification.  *Melendres v. Arpaio*, 989 F. Supp. 2d 822, 902 (D. Ariz. 2013), *aff'd in part, vacated in part*, 784 F.3d 1254 (9th Cir. 2015) (policies "make overt racial classifications because they permit the consideration of race as one factor among others in making

Ex. 27_[DO C.C. Dep.] at 244:23-245:22; Ex. 23_[SBPA I.F. Dep.] at 327:24-328:5; Ex. 24_[BPA J.C. Dep.] at 327:6-11.

MOTION FOR PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

law enforcement decisions"); *Floyd v. City of New York*, 959 F. Supp. 2d 540, 663 (S.D.N.Y. 2013) (directive to target "'male blacks 14 to 21' for stops" constitutes express classification). So too when Defendants choose locations to target because Latinos frequent them. *See supra* at 9; *Melendres*, 989 F. Supp. 2d at 850-51, 899-900 (conducting operations based on "combination of race and work status" is an express classification).

Such racial classifications "automatically trigger strict scrutiny regardless of evidence of intent," *Gonzalez-Rivera v. I.N.S.*, 22 F.3d 1441, 1450 (9th Cir. 1994), and regardless of whether "race is merely one factor that motivates action," *Melendres*, 989 F. Supp. 2d at 901; *see also Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 201 (1995); *Wayte v. United States*, 470 U.S. 598, 610 n.10 (1985). Defendants' policy and practice fails strict scrutiny analysis. *See Adarand Constructors*, 515 U.S. at 227; *Melendres*, 989 F. Supp. 2d at 902. No court has ever recognized a compelling interest in race-based decision-making in interior immigration enforcement. *See Students for Fair Admissions, Inc.*, 600 U.S. at 207 (recounting the only two circumstances in which the Court recognized a compelling government interest).

Reliance on Latino ancestry also is not narrowly tailored, particularly in a region so heavily populated by Latinos of all statuses. *Melendres*, 989 F. Supp. 2d at 901 ("[T]he fact that a person is Hispanic and is in Maricopa County is not a narrowly-tailored basis on which one could conclude that the person is an unauthorized [immigrant], even if a great majority of the unauthorized persons in Maricopa County are Hispanic."). Defendants' racial classification is over-inclusive, subjecting an unprecedented number of U.S. citizens and those who are lawfully present to discriminatory treatment. *See supra* at 14-16 (discussing stops of U.S. citizens and those lawfully present and the stigmatizing impact of the denial of equal treatment). And it also is under-inclusive if their actual goal is immigration enforcement, because it causes officers to divert their attention from would-be targets based on individualized investigations. Ex. 3 [Kerlikowske Decl.], ¶ 21. Defendants' policy and practice violates the Fifth Amendment.

**C.      <u>Without an injunction, Plaintiffs will suffer irreparable harm</u>**

Without judicial intervention, Defendants' illegal policy and practice is likely to cause Plaintiffs continued irreparable harm. Plaintiffs here need only demonstrate "a real possibility" of

irreparable harm. *Melendres*, 695 F.3d at 1002. "It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Warsoldier v. Woodford*, 418 F.3d 989, 1001-02 (9th Cir. 2005). So too does the "[d]eprivation of physical liberty." *Arevalo v. Hennessy*, 882 F.3d 763, 767 (9th Cir. 2018); *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013).

As discussed above, Plaintiffs face "a real possibility" that they will "be . . . stopped or detained [unlawfully]." *Melendres*, 695 F.3d at 1002; *Int'l Molders' & Allied Workers' Loc. Union No. 164 v. Nelson*, 799 F.2d 547, 553 (9th Cir. 1986). Plaintiffs thus are unable to freely go about their daily lives. *See* ECF 529-73 [Salas Decl.], ¶¶ 21-23, ECF 529-76 [Strater Decl.], ¶ 23, ECF 529-75 [Gudino Decl.], ¶¶ 27-29; ECF 529-74 [Melendrez Decl.], ¶¶ 5, 17-20 (describing how members have limited their activity including avoiding going to the doctor, attending religious services, and running basic errands). And each day Defendants' policy remains in effect, Plaintiffs, including U.S. citizens, suffer irreparable harm by being subject to discriminatory treatment on account of their race, consequently enduring a persistent threat to their liberty, dignity, and sense of belonging. Community members who have experienced stops, including U.S. citizens, have discussed the heavy toll they take. *See* Ex. 43 [Santiago Tafolla Decl.], ¶ 18 ("I could not sleep for a week I was so shocked by what happened to me."); Ex. 44 [A.V. Decl.], ¶ 9 ("I feel like I have no sense of security—that my citizenship means nothing."); Ex. 13 [Gavidia Decl.], ¶¶ 12-13; Ex. 65 [Third Hernandez Viramontes Decl.], ¶ 8 (now carries passport card out of fear of being stopped again).

Defendants have shown no sign of backing away from their policy and practice. *See supra* at 3 (operation names may change, but practices remain the same); *id.* (ICE field teams have doubled their ranks). Community members, including U.S. citizens, continue to report experiences with profiling. *See supra* at 4, 6-7.

In fact, leadership in Washington D.C. recently announced plans to "flood the zone" and increase "collateral arrests" even more. ECF 539-8 at 8. Just weeks ago, ICE officials were told

MOTION FOR PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

to double daily arrest numbers to meet the government's "pledge of mass deportations."[22]  That directive resulted in a "surge" in enforcement operations, even as DHS attempted to leave a "quieter" footprint.[23]  The recent killings of Lorenzo Salgado Araujo and others show the potentially deadly consequences of Defendants' non-targeted profiling practices.[24]  Defendants' actions and statements remove any doubt that, absent an injunction, that harm will continue.[25]

> **D.**    **<u>The balance of hardships tips sharply in Plaintiffs' favor, and an injunction is in the public interest</u>**

When the federal government is a party, the balance of the equities and public interest factors merge.  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073 (9th Cir. 2014).  Here, the balance of equities tips sharply in Plaintiffs' favor because the "public interest benefits" when "individuals are not deprived of their liberty" by unlawful processes and "preventable human suffering" is avoided.  *Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017) (citation modified).  The interest at stake for Plaintiffs, who include U.S. citizens, is not "an interest in evading the law."  *Contra Noem*, 146 S. Ct. at 5 (Kavanaugh, J., concurring).  It is an interest, safeguarded by our Constitution, in constraining the abuse of government power and in living free from discrimination.

---

[22] Hamed Aleaziz, *Immigrant Arrests Surge to 10,000 in 5 Days as ICE Clamps Down*, N.Y. Times (July 1, 2026), https://www.nytimes.com/2026/07/01/us/politics/ice-immigrant-arrests-surge.html.

[23] *Id*.

[24] *See* Aoife Walsh, *Man fatally shot by ICE in Houston was not intended target, DHS says,* BBC (July 10, 2026), https://www.bbc.com/news/articles/cm2rm66xd17o; Alison Durkee and Zachary Folk, *Man Shot By ICE In Maine Was Not Operation's Target*, Forbes (July 13, 2026), https://www.forbes.com/sites/alisondurkee/2026/07/13/man-shot-by-ice-in-maine-was-not-operations-target-senator-says/.

[25] For example, Defendants have conducted virtually no investigations into misconduct by DHS personnel.  Ex. 3 [Kerlikowske Decl.], ¶ 44.  Officer E.O. has never been subject to discipline despite appearing to regularly engage in extraordinary uses of force in this District, including shooting a U.S. citizen who was attempting to drive away from the scene of an immigration vehicle stop after having been ordered by E.O. to leave.  Ex. 5 [DO E.O. Dep.] at 326:17-327:24, 330:22-340:22; *see also* Anthony Victoria, *Attorneys say Ontario ICE shooting fits 'pattern' of aggressive enforcement*, KVCR (Nov. 15, 2025), https://www.kvcrnews.org/local-news/2025-11-15/attorneys-say-ontario-ice-shooting-fits-pattern-of-aggressive-enforcement.  He is still in the field today.

MOTION FOR PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

Defendants, on the other hand, cannot demonstrate they are likely to suffer harm by complying with the Constitution. "Complying with the law does not impose harm." *Zepeda v. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983). In fact, the contrary is true. *See* Ex. 3 [Kerlikowske Decl.], ¶¶ 46-49 ("[t]rained and experienced agents and officers can enforce the nation's immigration laws without resorting to profiling").

## V.    CONCLUSION

Injunctive relief is the standard remedy for widespread legal violations. *See, e.g., LaDuke*, 762 F.2d at 1333; *Melendres*, 695 F.3d at 1002. Here, all four preliminary injunction factors weigh in Plaintiffs' favor. The Court should grant the District-wide relief requested.[26] Further, no security is necessary. *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003).

Respectfully Submitted,

DATED:  July 27, 2026    UC IRVINE IMMIGRANT AND RACIAL JUSTICE SOLIDARITY CLINIC

By:    */s/ Anne Lai*
ANNE LAI
*Counsel for Stop/Arrest Plaintiffs*

DATED:  July 27, 2026    ACLU OF SOUTHERN CALIFORNIA

By:    */s/ Mayra Joachin*
MAYRA JOACHIN
*Counsel for Stop/Arrest Plaintiffs*

DATED:  July 27, 2026    NATIONAL DAY LABORER ORGANIZING NETWORK

By:    */s/ Lauren Michel Wilfong*
LAUREN MICHEL WILFONG
*Counsel for Stop/Arrest Plaintiffs*

DATED:  July 27, 2026    MUNGER, TOLLES & OLSON LLP

By:    */s/ Jacob S. Kreilkamp*
JACOB S. KREILKAMP
*Counsel for Stop/Arrest Plaintiffs*

---

[26] Plaintiffs also intend to move concurrently to certify the Suspicionless Stop Class and the first Discriminatory Treatment Class identified in the SAC, ECF 485, ¶¶ 240, 243.

-28-    Case No. 2:25-cv-05605-MEMF-SP

**CERTIFICATE OF SERVICE**

I hereby certify that on July 27, 2026, I electronically filed the foregoing with the Clerk of the U.S. District Court for the Central District of California using the CM/ECF system, which provided notification of such filing to all registered CM/ECF users, including all adverse parties. L.R. 65-1.

DATED:  July 27, 2026                                    UC IRVINE IMMIGRANT AND RACIAL
                                                                        JUSTICE SOLIDARITY CLINIC

                                                                        By      */s/ Anne Lai*
                                                                              ANNE LAI
                                                                              *Counsel for Stop/Arrest Plaintiffs*

MOTION FOR PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

# CERTIFICATE OF COMPLIANCE

The undersigned counsel of record for Stop/Arrest Plaintiffs certifies that this brief contains 10,999 words, which complies with the word limit in the parties' stipulation concerning this Motion filed with the Court.


DATED:  July 27, 2026                    UC IRVINE IMMIGRANT AND RACIAL
                                         JUSTICE SOLIDARITY CLINIC

                                         By      */s/ Anne Lai*
                                             ANNE LAI
                                             *Counsel for Stop/Arrest Plaintiffs*

MOTION FOR PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF