# EXHIBIT 3

Sealed Version
Filed Separately

STACY TOLCHIN (SBN 217431)
stacy@tolchinimmigration.com
LAW OFFICES OF STACY TOLCHIN
776 E. Green St., Suite 210
Pasadena, CA 91101
Tel: 213-622-7450; Fax: 213-622-7233

MOHAMMAD TAJSAR (SBN 280152)
mtajsar@aclusocal.org
MAYRA JOACHIN (SBN 306065)
mjoachin@aclusocal.org
DAE KEUN KWON (SBN 313155)
akwon@aclusocal.org
STEPHANIE PADILLA (SBN 321568)
spadilla@aclusocal.org
ALYSSA MORONES (SBN 343358)
amorones@aclusocal.org
ACLU FOUNDATION OF
SOUTHERN CALIFORNIA
P.O. Box 811370
Los Angeles, CA 90081-0007
Tel: 213-977-9500; Fax: 213-915-0219

*Counsel for Stop/Arrest Plaintiffs*

(*Additional counsel listed on next page*)

MARK ROSENBAUM (SBN 59940)
mrosenbaum@publiccounsel.org
REBECCA BROWN (SBN 345805)
rbrown@publiccounsel.org
RITU MAHAJAN (SBN 252970)
rmahajan@publiccounsel.org
GINA AMATO (SBN 215519)
gamato@publiccounsel.org
AMANDA MANGASER SAVAGE
(SBN 325996)
asavage@publiccounsel.org
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, CA 90005
Tel: 213-385-2977

*Counsel for All Plaintiffs*

ANNE LAI (SBN 295394)
alai@law.uci.edu
UC IRVINE SCHOOL OF LAW
IMMIGRANT AND RACIAL JUSTICE
SOLIDARITY CLINIC
P.O. Box 5479
Irvine, CA 92616-5479
Tel: 949-824-9894; Fax: 949-824-2747

*Counsel for Stop/Arrest Plaintiffs*

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Pedro VASQUEZ PERDOMO, et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>Markwayne MULLIN, et al.,<br><br>    Defendants. | Case No.: 2:25-cv-05605-MEMF-SP<br><br>**DECLARATION OF R. GIL KERLIKOWSKE** |

JACOB S. KREILKAMP (SBN 248210)
jacob.kreilkamp@mto.com
DAVID FRY (SBN 189276)
david.fry@mto.com
ADAM B. WEISS (SBN 296381)
adam.wess@mto.com
SARA H. WORTH (SBN 341088)
sara.worth@mto.com
HENRY D. SHREFFLER (SBN 343388)
henry.shreffler@mto.com
LAURA R. PERRY STONE (SBN 342504)
laura.perrystone@mto.com
LAUREN E. KUHN (SBN 343855)
lauren.kuhn@mto.com
MAGGIE BUSHELL (SBN 354048)
maggie.bushell@mto.com
ANGELA URIBE (SBN 353579)
angela.uribe@mto.com
MUNGER, TOLLES & OLSON LLP
350 S. Grand Ave., 50th Floor
Los Angeles, CA 90071
Tel: 213-683-9100; Fax: 213-683-9100

*Counsel for Stop/Arrest Plaintiffs*

BREE BERNWANGER (SBN 331731)
bbernwanger@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Tel: 415-621-2493

*Counsel for Stop/Arrest Plaintiffs*

BRISA VELAZQUEZ OATIS
(SBN 339132)
bvoatis@aclu-sdic.org
ACLU FOUNDATION OF
SAN DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
Tel: 619-398-4199

*Counsel for Stop/Arrest Plaintiffs*

EDGAR AGUILASOCHO (SBN 285567)
eaguilasocho@farmworkerlaw.com
MARTÍNEZ AGUILASOCHO LAW, INC.
900 Truxtun Ave, Suite 300
Bakersfield, CA 93301
Tel: 661-859-1174

*Counsel for Plaintiff United Farm Workers*

JESSICA KARP BANSAL (SBN 277347)
Jessica@ndlon.org
LAUREN MICHEL WILFONG*
lwilfong@ndlon.org
JIA FU*
jennifer@ndlon.org
NATIONAL DAY LABORER ORGANIZING
NETWORK
1030 S. Arroyo Parkway, Suite 106
Pasadena, CA 91105
Tel: 626-214-5689

*Counsel for Stop/Arrest Plaintiffs*

MATTHEW J. CRAIG (SBN 350030)
mcraig@heckerfink.com
MACK E. JENKINS (SBN 242101)
mjenkins@heckerfink.com
HECKER FINK LLP
1150 South Olive Street, Suite 10-140
Los Angeles, CA 90015
Tel: 212-763-0883; Fax: 212-564-0883

*Counsel for Access/Conditions Plaintiffs*

CARL BERGQUIST*
cbergquist@chirla.org
COALITION FOR HUMANE IMMIGRANT
RIGHTS
2351 Hempstead Road
Ottawa Hills, OH 43606
Tel: 310-279-6025

*Counsel for Plaintiff Coalition for Humane
Immigrant Rights*

ALVARO M. HUERTA (SBN 274787)
ahuerta@immdef.org
BRYNNA BOLT (SBN 339378)
bbolt@immdef.org
ALISON STEFFEL (SBN 346370)
asteffel@immdef.org
IMMIGRANT DEFENDERS LAW CENTER
634 S. Spring St., 10th Floor
Los Angeles, CA 90014
Tel: 213-634-0999

*Counsel for Plaintiff Immigrant
Defenders Law Center*

* Admitted pro hac vice

DECLARATION OF GIL KERLIKOWSKE

## <u>DECLARATION OF R. GIL KERLIKOWSKE</u>

I, R. Gil Kerlikowske, declare the following:

1.      I am the former Commissioner of U.S. Customs and Border Protection. I have worked in law enforcement and policy for 52 years including serving as the Chief of Police in Seattle from 2000 through 2009.

2.      I received a BA and MA from the University of South Florida in Tampa. I also graduated from the Executive Institute at the FBI National Academy in Quantico, Virginia. I served in the United States Army and Military Police from 1970 through 1972, where I was awarded the Presidential Service Badge. I have served as the Director of the Office of National Drug Control Policy, and I have served as Deputy Director of the U.S. Department of Justice, Office of Community Oriented Policing Services. A true and correct copy of my curriculum vitae is attached as **Exhibit 1**.

3.      Over the course of my law enforcement career, I developed expertise and experience with policing in racially and ethnically diverse communities. I have conducted numerous *Terry* stops and arrests, and I have overseen initiatives by law enforcement agencies of varying sizes to carry out investigations and operations in a way that comports with applicable laws.

4.      I have been asked to evaluate whether immigration agents and officers in this case appear to be adhering to generally accepted standards for law enforcement conduct when it comes to investigative stops, and how the operational set-up, staffing, and accountability structure for Department of Homeland Security ("DHS") enforcement actions impacts the risk of individual rights violations in the field. I have also been asked to evaluate whether the preliminary injunction proposed by Plaintiffs is comprehensible and workable from a law enforcement perspective. I base this declaration on my years of experience in law enforcement, as well as materials from this case including deposition testimony, direct witness accounts, arrest narratives, operational and training documents, text messages and videos relating to immigration enforcement operations in Los Angeles and surrounding counties in this judicial district. My conclusions are as follows:

5.      **Opinion No. 1**: Immigration agents and officers in the judicial district are not adhering to generally accepted standards for law enforcement conduct during investigative stops. Witnesses admit to relying on Hispanic ethnicity and appearance as a "laborer" to determine who to stop. This is racial profiling. Even when officers conduct allegedly "targeted" operations, they are not taking steps to determine if an individual is their target before making a stop. The encounters are not voluntary and a reasonable person would not feel free to leave.

6.      **Opinion No. 2**: The operational set-up, staffing, and limited accountability for enforcement actions at issue in this case creates a high risk of widespread rights violations. The deployment of Border Patrol to the interior without adequate preparation for the different patrol environment, ICE's directive to increase arrests and "turn the creative knob up to 11," the rapid expansion of field teams without a commensurate expansion of supervisory capacity, the decision not to track field contacts if they do not lead to arrest, and the lack of meaningful internal accountability are problematic and contribute to this risk.

7.      **Opinion No. 3**: The preliminary injunction proposed by Plaintiffs is understandable and workable. Law enforcement agencies should be able to effectively operationalize requirements such as those in the proposed preliminary injunction. To the extent confusion arises as to what the injunction means, that would likely come from a lack of leadership or inadequate training or communication.

QUALIFICATIONS

8.      I am an expert in policing in diverse communities, community-oriented policing, and accountability and integrity in policing, including with respect to the use of force.  I have more than five decades of hands-on law enforcement experience, spanning front-line patrol and investigative work to executive level leadership. To complement my practical experience, I have had substantial training on and have studied law enforcement tactics.

9.      I started in 1969 as a police cadet with the St. Petersburg, Florida Police Department, and rose through the ranks from 1972 to 1980. During this time, I performed patrol duty with an inner-city policing unit and conducted detective assignments in narcotics and

DECLARATION OF GIL KERLIKOWSKE

robbery-homicide. This provided me with a street-level understanding of policing that I have carried with me throughout my career.

10.    From 1980 to 1987, I served as a Lieutenant commanding key sections and divisions of the St. Petersburg Police Department, ranging from Field Training, Vice and Narcotics, Internal Affairs, and eventually the Criminal Investigation Division. During this period, I also spent time as a Visiting Fellow with the U.S. Department of Justice, National Institute of Justice (NIJ), where I was exposed to developments in the criminal justice field from around the country. I had supervisory responsibility over numerous officers and oversaw implementation of programs relating to statistical reporting, community engagement, and management review and allocation of personnel.

11.    From 1987 to 1990, I served as Chief of Police in Port St. Lucie, Florida, and then from 1990 to 1993, I served as Chief of Police in Fort Pierce, Florida. I guided both departments through the process of seeking national accreditation, and during my tenure, each department received the Attorney General's Crime Prevention Award. Fort Pierce is a racially and ethnically diverse city that was experiencing significant crime problems at the time. As chief, I led the introduction of community-oriented policing strategies to improve law enforcement effectiveness, with a focus on building trust with the community.

12.    From 1994 to 1998, I served as Police Commissioner of Buffalo, New York. I was the first outside Commissioner in 30 years and was specifically tasked by the Mayor with restructuring a department that had had some catch-up to do in crime prevention and control methods, training, and the use of technology, and that had become isolated from the community it served. Under my leadership, serious crime fell by more than 31%, violent crime by 46%, and homicides by 51%—all while officers' relationship with Buffalo's diverse and historically underserved communities improved. I was praised for my management efforts, made changes to how detectives were selected, and secured a random drug-testing program for all officers including the command staff.

13.    By this point in my career, I had become a leading voice on community-oriented policing. In 1998, I went to serve as Deputy Director of the U.S. Department of Justice's Office of

-3-                Case No.: 2:25-cv-05605-MEMF-SP

DECLARATION OF GIL KERLIKOWSKE

Community Oriented Policing Services (COPS). The COPS office was charged with providing training, educational materials, and grants to support constitutional, community-based policing nationwide. I was responsible for the stewardship of $6 billion in federal investments to local departments. In this role, I gained valuable perspective on best practices for policing across dozens of jurisdictions.

14. The last police department I led, from 2000 to 2009, was the Seattle Police Department. My tenure was marked by measurable improvements in both public safety and police accountability. In 2007, Seattle recorded its lowest crime rate in 40 years. Seattle is a major metropolitan city with significant racial, ethnic, and cultural diversity. During the time I was there, the Department retained an outside academic expert to study racially disparate policing in our ranks, including with respect to stop-and-frisks. I implemented the first civilian oversight mechanism in the department's history, marking an important step towards transparency and accountability. I also oversaw the formation of a Crime Scene Investigation unit in 2004 and a Cold Case unit that solved multiple homicides.

15. From 2009 to 2014, upon nomination by the President, I served as Director of the White House Office of National Drug Control Policy (ONDCP). Then, in 2014, upon nomination by the President and confirmation by the U.S. Senate, I became Commissioner of United States Customs and Border Protection (CBP). CBP is the largest law enforcement organization in the country, with more than 60,000 employees worldwide and a $13 billion budget at the time. As Commissioner, I had ultimate command authority over the Border Patrol, Air and Marine Operations, and Field Operations. During my time as Commissioner from 2014 to 2017, CBP established a new internal accountability structure to promote workforce integrity, among other accomplishments. I oversaw a significant reduction in the use of force by Border Patrol agents. During this time, I received the Women in Federal Law Enforcement Award in 2015 for the "elimination of systemic barriers" in law enforcement.

16. Since 2017, I have provided consultancy services on topics ranging from border security to public safety to drug policy issues and practice. I have participated in numerous programs on law enforcement leadership and policing, served as President of the Police Executive

DECLARATION OF GIL KERLIKOWSKE

Research Forum, been elected twice as President of the Major Cities Chiefs Association, and received other recognitions and awards. I have also served as adjunct faculty at Seattle University, Florida Atlantic University, Buffalo State College, Northeastern University, and the University of South Carolina, and as a resident fellow at Harvard Kennedy School of Government and non-resident fellow at Rice University and at the Global Resilience Institute operated through Northeastern University.

MATERIALS REVIEWED

17.    In connection with the development of my declaration, I was provided with the following materials pertaining to this case:

i.    Second Amended Complaint

ii.    Deposition transcripts:

(1)    Supervisory BP Agent J.E.

(2)    Supervisory BP Agent V.S.

(3)    ICE ERO Deportation Officer C.C.

(4)    BP Agent J.M.

(5)    Supervisory BP Agent I.F.

(6)    BP Agent J.C.

(7)    G.L. as a CBP 30(b)(6) witness

(8)    J.R. as an ICE 30(b)(6) witness

(9)    ICE ERO Supervisory Detention and Deportation Officer C.C.;

(10)    ICE ERO Deportation Officer E.O.

(11)    HSI Special Agent G.A.

iii.    Plaintiffs' motion for preliminary injunction on warrantless arrests and exhibits, including: witness declarations; I-213s, EARM reports, and other arrest narratives; CBP briefing; text chains; ICE e-mail to field offices; and training materials

iv.    Additional witness declarations: Santiago Tafolla, A.V., H.A., D.O.A., J.A.P., Gavidia, Hernandez Viramontes, Zapata Santiago, V.M.C., R.M.D.

v.   Additional I-213s: J.A.S., R.M.D.

vi.   Additional CBP briefings and reports: GOV 310-16, GOV 319-30, GOV 341-58, GOV 17830, GOV 25776-77

vii.   Additional orientation/training materials: GOV 577-78, GOV 001-03, GOV 004-05

viii.   Additional text chains and video: GOV-5607, 6643-55, 6731-34, 6755-67, 6872; GOV 7717, 7884-86; GOV-P17-059, GOV-P19-60, GOV-P17-45, Axon_Body_4_Video_2025-08-22_1412_I_F██████, Redacted_Axon_Body_4_Video_2025-08-22_1415_M████████, GOV-P17-006, GOV-P16-006, GOV-VID_001, Exhibit 5 to Hernandez Viramontes Dep, GOV-VID_ 010. 08.22.25 Pasadena Auto Wash sUAS

18.    These materials are of the type typically considered by experts conducting this type of evaluation.

DISCUSSION AND ANALYSIS

**Opinion 1: Immigration agents/officers in this judicial district are failing to adhere to generally accepted standards for investigative stops.**

19.    *Terry* stops are a tool that permits law enforcement to briefly detain an individual for investigation based on articulable facts that give rise to reasonable suspicion of a violation of the law. Because many such stops do not lead to arrest, but can nevertheless have significant consequences for law enforcement and the public, this is an area where agencies need to exercise vigilance to ensure that officers' exercise of discretion comports with the law.

20.    Sometimes officers will not admit that they are relying on race or ethnicity to make law enforcement decisions and it is up to leadership to determine if that is occurring and take appropriate action. Here, DHS witnesses acknowledge targeting individuals based on ethnicity, in addition to work status.[1] To them, fitting the description of a "day laborer" is reason enough to

---

[1] Supervisory BP Agent V.S. Deposition at 125-137; Supervisory BP Agent I.F. Deposition at 137-139, ERO DO C.C. Deposition at 158-62.

stop someone.[2] CBP's 30(b)(6) witness, an acting deputy chief in a Border Patrol headquarters directorate, and the ICE ERO Los Angeles Field Office Director for a time, testifying as ICE's 30(b)(6) witness, agree with this practice.[3]

21.    Reliance on these factors alone or these factors primarily to stop a person is racial profiling, plain and simple. It is a shortcut many police agencies have moved away from, not only because of legal liability—for example, in New York, a court put in place an independent monitor and ordered reforms due to officers' discriminatory "stop and frisk" practices—but because it can seriously undermine the public trust, including with members of the public who experience repeated encounters with police. Further, there is a high risk of confirmation bias, causing officers to become complacent and miss actual potential indicators of unlawful activity.

22.    Class members in this case describe being targeted by immigration agents based on their skin color and being dressed in work clothes or being present in a work vehicle. For example, Angel Santiago Tafolla, a U.S. citizen, works at a car wash that agents had visited multiple times; he was surrounded, chased, handcuffed, and taken away despite being a U.S. citizen.[4] Mr. Zapata Santiago was a legal resident who was likewise taken away from the car wash where he works even though he had proof of his status in his vehicle.[5] M.D.L. was dressed in regular clothes, crossing the street after getting off the bus, when his path was blocked agents.[6] And R.M.D. was riding as a passenger in a car, dressed for a day in the fields, when she and other farm workers were cut off by ICE.[7] Hispanic U.S. citizens have been stopped in a variety of places, from workplaces to tow yards to sidewalks to the parking lot of a McDonald's.[8] Their experiences were

[2] Supervisory BP Agent I.F. Deposition at 262-63; Supervisory BP Agent J.E. Deposition at 154-61; ERO DO C.C. Deposition at 247-49.

[3] G.L. CBP 30(b)(6) Deposition at 155-61, 230-234, 242-45, 296-317; J.R. ICE 30(b)(6) Deposition at 154-57, 159-61.

[4] Declaration of Angel Santiago Tafolla.

[5] Declaration of Inoel Zapata Santiago.

[6] Declaration of M.D.L.; Form I-213 of M.D.L.

[7] Declaration of R.M.D.; Form I-213 of R.M.D.

[8] Declarations V.M.C., A.V., Jorge Hernandez Viramontes, Henry Atanacio, Brian Gavidia, D.O.A. and J.A.P.

not dissimilar to that of the five individual plaintiffs in this case.[9] No matter where they go, they have been unable to avoid suddenly being subject to immigration inspection. This should not happen.

***Operation types***

23.    Roving patrols are an activity that Border Patrol agents engage in near the international border. They involve, typically, driving through an area looking for anything that might give rise to suspicion of a criminal or immigration violation. Roving patrols often focus on routes leading from the border and serve as a mobile complement to fixed highway border checkpoints.

24.    Starting around June 2025, teams of Border Patrol agents began conducting regular "roving patrols" in the Los Angeles area. In these operations, agents were sent out to a city or area of a city, but not a particular location. There was no claimed "target" and teams were given broad latitude to go where they wanted.[10]

25.    Experience conducting roving patrols near the international border does not automatically translate to conducting immigration operations in the interior. They are very different patrol environments. Near the border, an agent will often be able to know if a person or vehicle has recently crossed the border, and may even be able to observe it directly.[11] In a place like Los Angeles, it may be difficult for agents to be able to know how to apply their experience unless they are specifically sensitized to the differences as compared to the border environment or have worked an area for some time. Agents in this case seem to have been sent out into the field without such guidance.[12] DHS witnesses did not consider the high number of Hispanic persons who are U.S. citizens and lawfully present in the Los Angeles area.[13]

---

[9] Plaintiffs' Second Amended Complaint, Doc. 485, at 53-58.

[10] G.L. CBP 30(b)(6) Deposition at 167-72, 241-43; Phone Messages, GOV 5607, 6643-55, 6731-34, 6755-67, 6872; GOV 6928, 7601-02, 7606-10.

[11] HSI Special Agent G.A. Deposition at 240-41.

[12] BP Agent J.M. Deposition at 162-66, 169-71; Supervisory BP Agent V.S. Deposition at 127-28; Supervisory BP Agent J.E. Deposition at 84.

[13] Supervisory BP Agent V.S. Deposition at 135-37.

26.     CBP has also conducted something called targeted area operations. For these operations, usually taking place at a Home Depot or car wash, CBP would identify a handful of targets that it claimed to be looking for, and that served as the justification for the operation.[14] Despite the use of the label "targeted," however, the operations have been conducted in a way that do not appear targeted at all.[15] ████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████.[16] Operations would proceed whether or not individual targets were present. Multiple teams were deployed and agents would contact as many people as they could to try to make arrests.[17]

27.     Over the past year, ICE ERO has led operations that they call "targeted" but that look notably different than the operations they have historically conducted. In the past, ICE ERO demonstrated it could successfully conduct targeted operations by building target folders with specific information about a specific individual's potential residence, place of employment, and vehicle(s). Officers would then conduct surveillance and, when they had enough information, they would proceed with an arrest.

28.     Now, ICE ERO seems to no longer be creating target folders as it did in the past.[18] Instead of Field Operations Worksheets (FOWs), ICE ERO is now often using what it calls "baseball cards."[19] These documents are not generated by officers based on research, but created by a platform called Elite.[20]

29.     Whereas it would be typical in the past when conducting a targeted operation to take measures to determine if an individual is ICE ERO's target, such as getting direct visual

---

[14] Report of Investigation, GOV 341-58; Report of Investigation, GOV 319-330.

[15] HSI Special Agent G.A. Deposition at 199-213.

[16] G.L. CBP 30(b)(6) Deposition at 213-14, 270-77, 293-95.

[17] Briefing Presentation, GOV 00000359-89.

[18] Deportation Officer E.O. Deposition at 130-31.

[19] https://www.nbcnews.com/politics/national-security/trump-administration-ice-scraps-paperwork-officers-immigration-arrests-rcna229407.

[20] Deportation Officer E.O. Deposition at 119-29; Phone Messages, 7717, 7884-85; Supervisory Detention and Deportation Officer C.C. Deposition at 82-85.

DECLARATION OF GIL KERLIKOWSKE

confirmation of a person leaving a potential residence or place of employment or running checks on license plates of vehicles,[21] in cases documented in this lawsuit ICE ERO did not do this. Instead, ICE ERO stopped an individual and alleged that it was because the individual resembled a target, but the person was not encountered at a target's residence or other potential location. For example, the vehicle R.M.D. was riding in was stopped departing the "residence area," but the residence area was a mobile home community with close to 100 lots.[22] F.H.S. was also stopped while riding as a passenger in a vehicle. The vehicle she was stopped in was not at the target location, but first noticed by officers at a grocery store parking lot in the vicinity.[23] And H.S.H. was likewise stopped on a public street when an ICE vehicle drove past him and made a U-turn. Officers said they were looking for him, but it became clear they were not when they did not know where H.S.H. lived.[24]

30.    On some days, ICE ERO field teams may have up to 40 targeting sheets.[25] Teams report that a sizeable percentage of their arrests are now the result of "collateral" encounters, or encounters with persons who are not their target, including cases where they have stopped someone who they claim they believed might be their target.[26]

31.    The ICE ERO stops here are not consistent with standard police practice. If officers' intent is to arrest their target, they would want to be confident that an individual is in fact their target before making contact. Otherwise they may tip off the true target, risk unnecessary detention and use of force against someone who is not their target, and alienate others in the neighborhood who otherwise may want to assist them in their mission. The pattern of stops here only makes sense if officers are less committed to finding their actual targets than they are to making arrests overall. The label of a "targeted" operation appears designed to allow officers to

---

[21] Deportation Officer E.O. Deposition at 162-63.

[22] Declaration of R.M.D.; Form I-213 of R.M.D.

[23] Declaration of F.H.S.; Deportation Officer E.O. Deposition at 196-98.

[24] Declaration of H.S.H.; Form I-213 of H.S.H.

[25] Deportation Officer E.O. Deposition at 67.

[26] Deportation Officer E.O. Deposition at 145-46; Supervisory Detention and Deportation Officer C.C. Deposition at 95-96.

cast a wide net and investigate anyone in the general vicinity of an address fitting the broad demographic characteristics of the target.

***"Consensual" encounters***

32.   In some places, DHS claimed or suggested that encounters were consensual. For example, the report for the stop of D.O.A. and his father and their relative asserts that "ERO officers approached the group" and conducted a "consensual encounter/conversation" with J.A.S.[27] But D.O.A. explains that three vehicles pulled up to the group as they were on the sidewalk. Multiple agents, including some who were masked, surrounded each of them before any questioning began. Officers flashed their lights.[28] During an operation at a car wash in Pasadena, an agent stood in the doorframe of a vehicle and asks the person inside, "Where are you from?" four times. Even so, a supervisory agent claimed the encounter was consensual.[29]

33.   DHS's characterization of encounters as consensual seems to arise in part from a failure to appreciate how the sudden appearance of armed agents, sometimes masked, often arriving in full gear and in multiple vehicles, can itself impact the degree to which a reasonable person would feel free to walk away or decline to answer questions. It is not necessary for agents to physically touch or grab someone—though they also did do that. Under these circumstances, surrounding a person, blocking the doorframe of a vehicle, and asking a question multiple times or speaking in an authoritative tone are all things that can transform what might otherwise be a "conversation" into an involuntary seizure.

34.   I was also concerned by the manner in which ICE ERO officers apparently conduct vehicle stops. Multiple individuals describe being cut off and closed in by vehicles, even when they willingly complied with officer requests. This type of maneuver is sometimes referred to as a "felony stop" in police parlance. It involves a greater level of intrusion and risk and can be disorienting for people to experience, even more so when officers are masked and driving unmarked vehicles. It ensures that individuals do not feel free to leave. If the driver flees then the

---

[27] Form I-213 of J.A.S.

[28] Declaration of D.O.S.

[29] Supervisory BP Agent I.F. Deposition at 269-71.

DECLARATION OF GIL KERLIKOWSKE

encounter is escalated. For these reasons, law enforcement officers are typically trained to limit when they use these types of stops to specific circumstances, such as when police have reason to believe a vehicle's occupants are dangerous or wanted for a serious crime.

**Opinion 2: The set-up, staffing, and limited accountability in DHS operations create a high risk of individual rights violations in the field.**

35.    DHS's operations in this case have some distinctive features that significantly increase a known risk of individual rights violations. The features are a product of choices by leadership that suggest a willingness to accept the tradeoff between arrests numbers and violations.

36.    As noted above, DHS has deployed Border Patrol to areas of the interior that they typically do not patrol on a regular basis.[30] As far as I am aware, this is unprecedented.

37.    One sector has had a particularly prominent role, the El Centro Sector. This Sector was led at the time by Chief Patrol Agent in Charge Gregory Bovino. Chief Bovino had taken his agents to Kern County, California, to conduct roving patrols in January 2025.[31] Those operations received some criticism and resulted in an injunction by a federal judge imposed in April 2025.[32] Instead of keeping him out of the spotlight, as one would expect a law enforcement agency to do following such developments, DHS installed him as commander over operations in Los Angeles in June 2025.[33]

38.    Around this time, ICE leadership also increased their messaging to field offices about arrests. This coincided with prominent public reporting about aggressive arrest targets the administration was setting.[34] At the end of May, an email from headquarters directed offices to "look at efforts to increase our arrests," noting "[i]f it involves handcuffs on wrists, it's probably worth pursuing." The Acting Executive Associate Director of ICE ERO reiterated that offices

---

[30] Supervisory BP Agent J.E. at 61-64; G.L. CBP 30(b)(6) Deposition at 54-57.

[31] https://www.nytimes.com/2025/04/29/us/politics/trump-farm-workers-california-lawsuit.html.

[32] https://www.nytimes.com/2025/04/29/us/politics/trump-farm-workers-california-lawsuit.html.

[33] https://www.nytimes.com/2025/08/29/us/gregory-bovino-immigration-california.html.

[34] https://www.nbcnews.com/nightly-news/video/top-trump-aide-sets-quota-of-3-000-undocumented-migrant-arrests-per-day-240743493828.

DECLARATION OF GIL KERLIKOWSKE

should "turn the creative knob up to 11 and push the envelope," and that "[a]ll collateral encounters . . . found amenable to removal need[] to be arrested."[35]

39.    In my opinion, this type of messaging to law enforcement officers is a red flag. It is tantamount to a city finance director telling police to write more traffic citations in order to increase revenue, but the stakes here for unlawful detention are even greater. Directives like this make it almost inevitable that officers will do whatever is most expedient to get numbers up; indeed, officers were instructed to get "creative," which often involves deviating from standard police practice. The allusion to "not being allowed to do our job" before and "now being the time to step up!"[36] sends a message that more attention will be paid to results than to adherence to protocols and training.

40.    I understand that during this time, ICE HSI agents were working with Border Patrol teams. And federal partners including CBP Office of Field Operations were working with ICE ERO teams. At one point, ICE ERO field teams reported to Chief Bovino.[37]

41.    Meanwhile, ICE and CBP have been growing their ranks. In my experience, this type of agency growth needs to be managed carefully. I have seen significant issues arise from rapid growth and hiring, including with Border Patrol, perhaps not always right away but over the course of several years.

42.    The testimony by ICE witnesses in the ERO Los Angeles Field Office (LAFO) is concerning. In the downtown Los Angeles sub-office of the LAFO, field teams have approximately doubled in size but still have only one supervisor.[38] The increase in size and volume of enforcement activity impacts the span of supervisory control and means supervisors cannot always be in the field with officers where important on the job training would typically occur.[39] And whereas field teams used to consist of officers who had been with the agency for

---

[35] Email Messages, GOV-0024101.

[36] Email Messages, GOV-0024101.

[37] Supervisory Detention and Deportation Officer C.C. Deposition at 278-81.

[38] Supervisory Detention and Deportation Officer C.C. Deposition at 45-47, 49-52.

[39] Supervisory Detention and Deportation Officer C.C. Deposition at 61-62, 85-87.

-13-    Case No.: 2:25-cv-05605-MEMF-SP

DECLARATION OF GIL KERLIKOWSKE

some time, now there are officers joining right out of the academy.[40] In the San Bernardino sub-office, the supervision structure is just as concerning. As the number of teams has grown, supervisors are sometimes assigned to oversee two teams.[41] An officer with a little more than one year of field experience was assigned to team lead and sometimes serves as acting supervisor.[42]

43.     DHS's decision not to track field contacts, including investigative stops, that do not lead to arrest[43] is out of step with current police practice. All encounters (unless very short) should be documented including those that result in the person being released. If they are not documented, then agencies are unable to identify or track patterns. I am also aware that in many cases, arresting officers are not the ones who completed a Form I-213 related to an arrest.[44] And Border Patrol appears to have utilized a template narrative for at least some of its operations.[45] These types of approaches to saving time undermine the confidence one can place in the documentation that does exist.

44.     Additionally, I observed witnesses attesting to the fact that almost no internal investigations concerning immigration operations in Los Angles have been conducted.[46] I did not find this entirely surprising, as I am aware that the internal accountability structure at DHS has been significantly curtailed since the beginning of 2025. It is nevertheless problematic. One would expect there to be at least *some* investigations given the number of publicly reported incidents of apparent misconduct. This extends to ERO Deportation Officer E.O., who has conducted some of the stops in this case and who continues to lead operations in the field even after discharging his weapon against a bystander in December 2025.[47]

---

[40] Supervisory Detention and Deportation Officer C.C. Deposition at 285-86.

[41] Deportation Officer E.O. Deposition at 47, 50-51, 55-56.

[42] Deportation Officer E.O. Deposition at 46-49, 52-55.

[43] G.L. CBP 30(b)(6) Deposition at 174-78, 208-09, 235-41, 319-20; J.R. ICE 30(b)(6) Deposition at 167-72, 179-84.

[44] Supervisory Detention and Deportation Officer C.C. Deposition at 194-97; Deportation Officer C.C. Deposition at 292-93.

[45] Narrative, GOV-0020020-23.

[46] G.L. CBP 30(b)(6) Deposition at 318-20; J.R. ICE 30(b)(6) Deposition at 181-85.

[47] Deportation Officer E.O. Deposition at 326-27, 330-40.

DECLARATION OF GIL KERLIKOWSKE

45.     Not only have incidents not been investigated, but after an incident, DHS is either radio silent or rushes to defend agents' or officers' actions as justified. Widespread masking and refusal of personnel to identify themselves to the public also limits accountability, including in a very practical sense in that members of the public do not know who to name in any complaint. And the lack of coordination or communication with local law enforcement on operations is likewise a departure from standard practice, with impacts on public safety.

**Opinion 3: The proposed preliminary injunction is understandable and workable.**

46.     The preliminary injunction proposed by Plaintiffs is workable. Trained and experienced agents and officers can enforce the nation's immigration laws without resorting to profiling. They can locate their targets without sweeping in numerous others that happen to be going about their daily business.

47.     To the extent any confusion arises with what the terms of the preliminary injunction mean, that would come from a lack of leadership or be a function of inadequate training and communication. It appears that after the Temporary Restraining Order was entered in this case, DHS did not brief agents on its specific terms.[48]

48.     For any law enforcement agency concerned with complying with the Constitution and federal laws, the proposed preliminary injunction provides necessary guidance without unduly limiting officers' discretion to respond to real-time developments in the field. Indeed, if properly implemented, the proposed preliminary injunction should encourage officers to consider *more* information, and avoid shortcuts, which will reduce mistakes.

49.     Law enforcement agencies are able to effectively operationalize provisions like those in the proposed preliminary injunction all the time, whether as a consequence of externally imposed forces such as litigation or new legislation or out of a desire to improve and update their systems and protocols. The documentation provisions are also standard and are not only a first step towards meaningful accountability, but will help leadership better track what is going on and make appropriate interventions.

---

[48] HSI Special Agent G.A. Deposition at 199-213.

DECLARATION OF GIL KERLIKOWSKE

DATED: July 23, 2026

_____
R. Gil Kerlikowske

Case No.: 2:25-cv-05605-MEMF-SP
DECLARATION OF GIL KERLIKOWSKE