# EXHIBIT 4

Sealed Version
Filed Separately

CONFIDENTIAL

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

_____

PEDRO VASQUEZ PERDOMO,           )

et al.,                          )

             vs.                 ) Case No.

KRISTI NOEM, Secretary,          ) 2:25-cv-05605-MEMF-SPX

Department of Homeland           )

Security, et al.,                )

          Defendants.            )

_____)

*** CONFIDENTIAL ***

VIDEOTAPED DEPOSITION OF THE 30(b)(6) WITNESS ON

BEHALF OF US CUSTOMS AND BORDER PATROL

G█████ L██████

Los Angeles, California

Monday, February 2, 2026

Volume I

Stenographically Reported By:

Melissa M. Villagran, RPR, CSR No. 12543

Job No. 7867576

PAGES 1 - 386

Page 1

CONFIDENTIAL

INDEX


DEPONENT                                          EXAMINATION

G██████  L███████

Volume I

          BY MS. LAI                                    20

          BY MS. DAVIS FISHER                           321




                         EXHIBITS

DEPOSITION                                              PAGE

Exhibit 147  List of sectors                            48


Exhibit 148  Information sheet                          118


Exhibit 149  Video clip                                140


Exhibit 150  Excerpt of Deposition of V██████          167
                    ██  S███████


Exhibit 151  End of Shift Report                       191


Exhibit 152  I-44                                      215

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

INDEX (CONTINUED)

EXHIBITS

DEPOSITION                                                    PAGE

Exhibit 153   Driving Instructors Legal              230
              Refresher U.S. Customs and
              Border Protection document

Exhibit 154   Excerpt of Deposition Transcript       241
              of J███████ M███████

Exhibit 155   End of shift report, August 6,         263
              2025

Exhibit 156   Report of Investigation                269

Exhibit 157   Operational Brief                      278

Exhibit 158   Report of Investigation                296

Exhibit 159   Arrest narrative                       298

Exhibit 160   Deposition excerpt from SBPA           300
              F████████

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

INDEX (CONTINUED)

EXHIBITS

DEPOSITION                                           PAGE

Exhibit 161  Video                                   311


Exhibit 162  Declaration of D███████ ██ P██████     344


Exhibit 163  AEOTP Training Schedule                 354


Exhibit 164  Enforcement Law Course AMBTP            357
             5000 Unit 2: The Fourth
             Amendment document


Exhibit 165  Fourth Amendment refresher              358
             training


Exhibit 166  Training curriculum for Mobile          361
             Field Force For the CBP Basic
             Training Academy For Field
             Operations

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

INDEX (CONTINUED)


                          EXHIBITS

DEPOSITION                                              PAGE

Exhibit 167   Applied authorities delivered to       366

              border patrol agents at their

              basic training


Exhibit 168   C500 Unit 3 Law Enforcement            368

              Authority document


Exhibit 169   Legal Refresher First Amendment        377

              and Fourth Amendment

              Considerations document







              PREVIOUSLY MARKED EXHIBITS

NUMBER                                                 PAGE

Exhibit 137                                            39

Exhibit 138                                            39

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

A    No.

Q    Okay.

You told me earlier that you are an acting deputy chief.

How long have you served in this position?    09:41:08

A    Since November of 2025.

Q    Okay.

What are your day-to-day responsibilities?

A    Day to day responsible for oversight of the strategic planning and analysis directory, which    09:41:23 includes seven divisions.

Q    And prior to becoming the acting deputy chief in November 2025, did you have a position in this division?

A    Within the directory, yes, ma'am.    09:41:42

Q    Yes.  And this is a headquarters directorate, correct?

A    That is correct.

Q    Okay.

And what other positions have you held in    09:41:50 that directorate?

A    Within the strategic planning and analysis directorate, my permanent position is the division chief for United States Border Patrol Systems Division.    09:42:03

Page 26

CONFIDENTIAL

Q   Is that one of the seven parts of the directorate?

A   Yes, ma'am.

Q   Okay.

Thank you.                                          09:42:08

And what does -- you said that you were -- your permanent position is division chief for -- can you repeat that again?

A   Systems division.

Q   Okay.                                          09:42:25

What does that do?

A   Systems division has oversight over the modernization and sustainment of United States Border Patrol enforcement information systems, administrative information systems, statistics, and    09:42:37 data integrity.

Q   Thank you.

What are the other six divisions within the directorate?

A   Let me go down the list.                      09:42:47

So first is operational requirements management division.

Q   Okay.

A   And then there is operational solutions division.                                          09:42:58

Page 27

CONFIDENTIAL

Labor and settlements division.

Planning and innovation division.

Policy and compliance division.

And integrated services division.

Q   Okay.                                           09:43:14

Thank you.

And so why did you become the acting deputy chief of the directorate?

A   The former deputy chief was promoted to chief of the Border Patrol Academy and relocated.         09:43:27

Q   And who was that?

A   That was Robert Simon.

Q   So you worked under Mr. Simon prior to your promotion?

A   Yes, ma'am.                                     09:43:38

Q   And you're an acting -- does that mean that you may go back to your permanent role if there's a new deputy chief?

A   That is correct.

Q   Are there any plans for a new deputy chief?    09:43:49

A   I believe they are working on announcing that position, yes, ma'am.

Q   Okay.

How long have you been employed by the -- by CBP?                                                09:43:58

Page 28

A    By CBP, just over 23 years.

Q    Okay.

And CBP stands for Customs and Border Protection, correct?

A    That is correct.                                09:44:07

Q    Okay.

And your directorate is within the US Border Patrol?

A    Yes, ma'am.

Q    And so as the acting deputy chief, who do you    09:44:13
report to?

A    I report to the executive director of strategic planning and analysis, which is Heather Santiago.

Q    Who does she report to?                         09:44:27

A    She reports to the deputy chief of the border patrol.

Q    And that person reports to?

A    The chief of the border patrol.

Q    Okay.                                           09:44:37

And the chief of the border patrol reports to the commissioner?

A    Yes, ma'am.

Q    How long has it been since you were out in the field on a daily basis?                           09:44:48

Page 29

BY MS. LAI:

Q   Can you give me an example of a type of operation where a patrol agent without a specialized skill set would be sent away from the border from, for example, the pre-2025 time period?                    10:11:34

MS. SAFAVI:  Objection; scope.

THE DEPONENT:  Sure.

In response to national disasters, hurricanes, tornados, there's a need for law enforcement to protect safety and security -- life    10:11:48 and safety.  Excuse me.

Or infrastructure support.  So they would be deployed as would other law enforcement agencies to that area as general law enforcement.

BY MS. LAI:                                              10:12:04

Q   Okay.

Thank you.

And you understand what I mean when I use the term "roving patrols"?

A   Yes, ma'am.                                          10:12:08

Q   And how do you understand that term?

A   Roving patrols would be agents assigned to basically drive through an area and look for anything that would elevate their level of suspicion for criminal activity or immigration related.          10:12:24

Page 54

Q   Border patrol agents who are assigned to their stations, would they be engaged in roving patrols on a regular basis near the border?

MS. SAFAVI:  Objection; form and assumes facts.                                                    10:12:39

THE DEPONENT:  That is one of the normal assignments that agents are assigned, yes, ma'am.

BY MS. LAI:

Q   And when they are conducting these roving patrols, are they typically doing vehicle stops or    10:12:48 are they typically on foot?

MS. SAFAVI:  Objection; compound.

It would depend on the area of operations. If they are assigned to, for example, highway interdiction operations, then they would be along    10:13:06 the highway.

If they were assigned to something like transportation check, they would be on foot.  Again, depending on the area of operation.

BY MS. LAI:                                                    10:13:15

Q   In a roving patrol situation, you talked about transportation check.

Are there any other situations where they would be conducting roving patrols on foot?

A   Scenarios -- an example would be in an urban    10:13:25

Page 55

environment, where there's a more urban type of

environment, like, what comes to mind, Nogales,

Arizona, where there's less rural, more urban, where

make -- being on foot makes more sense than being in

a vehicle.                                              10:13:47

   Q   Thank you.

     Did border patrol agents have a presence in

the Greater Los Angeles area?

     And when I talk about Greater Los Angeles

area, I'm talking about the seven counties that are     10:14:00

part of the judicial district in this case.

     It also maps onto the ICE ERO area of

responsibility.  I understand you guys are border

patrol, but, really, we are talking about LA County,

Orange County, San Bernardino, Riverside, and then      10:14:20

the central coast, which is Ventura County, Santa

Barbara, and San Luis Obispo.

     Are you familiar with that geographic area?

     MS. SAFAVI:  Objection; form.

     THE DEPONENT:  I am not.                          10:14:34

BY MS. LAI:

   Q   Okay.

     Well, we are sitting it in now.  I'm going

to -- when I talk about the Greater Los Angeles

area, I'm going to be referring to those seven          10:14:38

Page 56

CONFIDENTIAL

counties today.

Do you understand that?

A    Yes, ma'am.

Q    Okay.

And so my question is, did border patrol    10:14:44

agents have a presence -- a regular presence in the

Greater Los Angeles area, these seven counties,

before 2025?

MS. SAFAVI:  Objection; ambiguous.

THE DEPONENT:  If you mean regular presence,    10:14:58

you mean day by day, no.

If you mean on occasion following up on

immigration-related investigations, then, yes.

BY MS. LAI:

Q    Okay.

So on occasion they might have been up here,

but on a day-to-day basis they were not up here

conducting patrols; is that correct?

MS. SAFAVI:  Objection; misstates testimony.

THE DEPONENT:  On a day-to-day basis, they    10:15:21

were not normally in the Los Angeles area.

BY MS. LAI:

Q    All right.

If you take a look at Exhibit 147, do you see

how the San Diego sector is along the coast and the    10:15:34

Page 57

CONFIDENTIAL

ongoing as part of Operation At Large?

          MS. SAFAVI:  Objection; confusing.

          THE DEPONENT:  So roving patrols are
specifically nothing -- not what's being conducted
with Operation At Large currently.                    12:29:16

BY MS. LAI:

     Q   Okay.

          Tell me when that changed.

     A   I don't have an exact date of when that
changed.  But, also, in response to the heightened    12:29:24
sense of awareness for personnel with Operation At
Large, they focus their limited resources on --
instead of doing roving patrols, but targeted
enforcement.

     Q   And you're saying you don't know when that   12:29:42
change occurred?

     A   If I had to speculate, it would be early
July.

     Q   Okay.

          And the way that you're distinguishing these  12:29:51
different kinds of enforcement activities, roving
patrols versus target enforcement, is it fair to say
that when agents are out doing roving patrols, they
are not looking for a particular person?

          MS. SAFAVI:  Objection; assumes facts.      12:30:07

                                              Page 147

CONFIDENTIAL

THE DEPONENT:  So with roving patrol, typically, there's not a specific individual they are looking for.

BY MS. LAI:

Q   And what about in Los Angeles when border    12:30:20
patrol was engaged in roving patrols?  What were they looking for?

A   They would look for anything that would elevate their level of suspicion for anybody engaged in criminal activity or in violation of Title 8.    12:30:36

Q   In -- when you -- I think you heard in the video Mr. Kim said, "We know where to look."

Did you hear that?

A   I believe so.

Q   And how do border patrol agents know where to    12:30:48
look?

A   Typically, the areas that we look in are based on reports of investigation of where confirmed Title 8 violators tend to congregate.

Q   So for roving patrol -- so if there's a    12:31:06
Report of Investigation, would that be in connection with a roving patrol?

A   No.  A Report of Investigation would be in connection -- in connection, I'm sorry, with surveillance, observation, intelligence collection.    12:31:20

Page 148

CONFIDENTIAL

THE DEPONENT:  There was an intelligence section, and it got more structured as the operation progressed.

BY MS. LAI:

Q   And who was in charge of that?                    12:38:25

A   I'm trying to remember her name.

I'm drawing a blank, but I know there was an intelligence section as part of the incident command structure.

Q   Thank you.                                         12:38:46

What are the -- what are the kinds of public access locations teams went to?

A   Any manner of public access.  They could go through parking lots.  They could go up and down city streets.  Anywhere where general public is    12:39:00 allowed to go, agents could potentially go.

Q   Were they doing vehicle stops or was there foot patrol?

A   Both, I believe.

Q   Okay.                                              12:39:11

What -- were there particular kinds of businesses for public access locations?

A   No specific businesses, no.

Q   I think I saw car washes and Home Depots. Would it have been part of the locations that teams  12:39:30

Page 155

CONFIDENTIAL

went to in that time period in June 2025?

A    So if they were operating at a specific location, it wasn't because of the location.  It was because of confirmed Title 8 violators that had been observed and confirmed in that location.                    12:39:46

Q    Okay.

And I'm talking about June when the roving patrols were going on.

If a team went to a car wash or a Home Depot, would that have been typical of that time period?    12:39:57

A    If that happened to be where one would find Title 8 violators or was standard practice for day laborers, which is -- which is known to be where persons without work permits or without legal documentation to be in or remain in the                12:40:18 United States would be, then, yes, that would be standard.

Q    And what are the places where I think you said standard practice for day laborers would be known to be?                                                        12:40:30

A    Can you repeat that whole question?

Q    Yes.

What places would it be standard practice for day laborers to be known to be?  I think those were the words you used.                                            12:40:42

Page 156

CONFIDENTIAL

A   I don't think there is a standard location. It would be depending on the environment where -- where would be a typical place where someone would look for cash labor.

Q   What are typical places where somebody would look for cash labor?    12:40:52

A   It would be any manner of places.  I would be hard-pressed to say that it would be a certain place, but there are certain businesses and certain locations that typically day laborers would congregate.    12:41:10

Do those happen to be the same locations wherever you go?  No.  But...

So I'm -- I think I'm floundering to answer those questions.    12:41:25

Q   Do you know where those locations are?

A   Where which locations are?

Q   Where day laborers are known to congregate?

MS. SAFAVI:  Objection; assumes facts.

THE DEPONENT:  Again, it depends on where they congregate.  So that's not for CBP to call out. That would be based on observations and the practices of those that were congregating for day labor.    12:41:39

So I'm not sure I understand the question.    12:41:52

Page 157

CONFIDENTIAL

BY MS. LAI:

Q   I think my question is, does the agency know where those locations are?

A   I think the officers and agents are aware, once they are in an area for a little while, where those -- where those locations are.   12:41:59

Q   Where are they?  What types of locations are those?

MS. SAFAVI:  Objection; form.

THE DEPONENT:  Again, we're -- I think we're going in circles.  I think you're looking for a specific answer and I'm not sure I'm going to give that you specific answer that you're looking for.   12:42:08

BY MS. LAI:

Q   I think I'm looking for an answer -- if the agency knows or is aware of the locations, I would like to know what those are.  If the agency doesn't know what those locations are, then that's fine.  We can move on.   12:42:20

MS. SAFAVI:  Objection; form.   12:42:32

THE DEPONENT:  So going in -- going in, they don't know where those locations are.  It would be based on observations once they are in an area to determine where those locations are at.

///

Page 158

CONFIDENTIAL

BY MS. LAI:

Q   Okay.

And if they are not looking in an enforcement system, what are those observations?

A   They are looking at where individuals would   12:42:49 be congregating in the morning to be picked up for day or cash labor, what typical businesses would cover that cash labor, agricultural work -- usually the types of occupations that would provide cash labor.                                              12:43:14

Q   And what are those types of occupations?

A   It depends.  Vary -- it depends and varies from location to location.

If you are involved in agricultural work, it could be agricultural work.  If you are involved in   12:43:26 construction, it could be construction.  It just depends on where -- where you're at.

Q   I guess what I'm asking is, does the agency know what occupations -- when you refer to occupations that would be -- or typical businesses   12:43:39 that involve cash labor, does the agency know what types of occupations or businesses those are?

A   Based on past practice, the agency knows that there are certain day labor types of occupations that pay cash and that are -- enable those without   12:43:58

Page 159

work permits to work, yes.

Q   And which occupations are those?

A   Construction, agricultural, yard work of the like.

Q   Anything else?                                    12:44:12

A   I'm sure there's others.

Q   Which ones are they, to the agency's knowledge?  You don't have to tell me all that exist.

A   That general category.                            12:44:22

Q   Okay.

The agency doesn't know of any others -- occupations where they pay cash work, that they -- sorry -- that they pay cash for work?

MS. SAFAVI:  Objection; form.                         12:44:42

BY MS. LAI:

Q   So you told me agricultural, yard work, and construction.

A   Uh-huh.

Q   Are there any other occupations that the agency is aware of where individuals are paid cash to work?

A   Again, it's a categorical occupational series.  Not a specific occupational series.  It depends by region.  It depends on where you are at.  12:45:06

Page 160

Those are the general categories that one would be able to pay cash for labor: agricultural, construction, yard work, those sorts of things.

But as far as a list, I'm not aware any of list of specific occupations.                               12:45:23

Q   Okay.

And does the agency have information, let's say, with -- let's just take agricultural.

How many people who work in the agricultural industry are paid by cash or some other method?      12:45:37

A   I don't have that information.

Q   Does the agency have information about, for those who work in the agricultural industry, how many of those workers are unauthorized noncitizens as opposed to legally present in the US?            12:45:56

MS. SAFAVI:  Objection; form.

THE DEPONENT:  I'm not -- I'm not aware of that information.

BY MS. LAI:

Q   Is the agency aware of that information?      12:46:04

A   The agency is aware of past practices and past arrests of confirmed Title 8 violators that happened to have that occupation.

Q   Does the agency have data about what proportion of those who work in the agricultural      12:46:15

Page 161

CONFIDENTIAL

industry are lawfully present as opposed to not?

A    No, the agency does not have that
information.

Q    How about yard work?  Does the agency have
information within a proportion within the yard work    12:46:28
industry?

A    No.  We don't collect that information.

Q    How about construction?

A    No.

Q    How about for the Greater Los Angeles area,    12:46:34
the seven counties, has the agency done any analysis
of -- within these industry in the seven counties
the proportion that are lawfully present as opposed
to not?

A    The agency's done research on the number of    12:46:48
individuals that are illegally present in the
United States that have given the intended us
address of Los Angeles, yes.

Q    But what about with respect to these
industries, a breakdown for the Greater Los Angeles    12:46:59
area -- well, actually let me go back.  I want to
follow under what you said.

So the agency has done research on the number
of individuals that have given an intended address
of Los Angeles.    12:47:16

Page 162

CONFIDENTIAL

Is that analysis documented anywhere?

MS. SAFAVI:  Objection; form.

THE DEPONENT:  It's documented in the system of record of those US-intended -- intended US addresses of being within Los Angeles, yes.          12:47:28

BY MS. LAI:

Q   So in terms of the enforcement records for those individuals who were encountered, there would be information about their intended addresses; is that what you are saying?          12:47:39

A   Can you repeat that question?  I'm sorry.

Q   Yes.

In the record of, let's say, an arrest, and that person was interviewed, in the arrest record there would be information about the intended          12:47:49 address of that person, correct?

A   That's correct.

Q   Okay.

And has the agency compiled any report or done an analysis using those addresses in any kind          12:47:57 of data that I could look at, for example, if -- if your lawyers were to permit me to see it?

MS. SAFAVI:  Objection; form.

Objection; vague and ambiguous.

THE DEPONENT:  So a level of analysis has          12:48:14

Page 163

CONFIDENTIAL

been done.  I'm not aware of a specific report with those very, very specific parameters, but I know that I have seen a number of US addresses on some of the arrest narratives that I have reviewed in preparation for this deposition.                    12:48:33

BY MS. LAI:

Q   And in terms of a level of analysis that was done, have you seen that analysis?

A   I have not specifically seen that analysis. Only the results.                                        12:48:42

Q   Okay.

And where did you see the results?

A   It was in the arrest narrative.

Q   Okay.

So you're referring to the fact that arrest     12:48:49 narratives refer to individuals encountered by the border patrol giving addresses in Los Angeles?

A   Correct.

Q   Okay.

And do you have information or the agency       12:48:59 have information about individuals who gave addresses outside of Los Angeles?

MS. SAFAVI:  Objection; outside the scope.

THE DEPONENT:  So if -- when they were apprehended by the border patrol or Office of Field    12:49:12

Page 164

CONFIDENTIAL

Operations, if they gave a US-intended address, it's captured in the system of record, yes.

BY MS. LAI:

Q   I think my question is a little bit different, which is has there been an analysis of the proportion of individuals encountered by the border patrol who gave an address outside of the Los Angeles area?

MS. SAFAVI:  Objection; confusing, outside scope.

And to the extent that this calls for law enforcement privilege and deliberative process privilege, I'm going to instruct the witness to answer to the extent that you're able without divulging privileged information.

THE DEPONENT:  I'm not personally aware of a report with those specific parameters.

BY MS. LAI:

Q   Okay.

And did you withhold any information from me based on the invocation of privileges by your attorney?

A   No.

Q   Thank you.

All right.

Page 165

CONFIDENTIAL

Was there a sense that the teams knew where to go based on their professional experience as border patrol agents?

A   Yes.

Q   Because border patrol -- border patrol agents     12:51:17 had conducted roving patrols before this time, correct?

A   As one of the standard operational assignments, yes.

Q   Okay.                                                12:51:26

And so there was a sense that they would be able to apply their experience and training doing roving patrols in their day-to-day operations to the Los Angeles area; is that correct?

A   Yes.                                                 12:51:40

Q   All right.

So I'm going to show you -- let's try to do this exhibit before lunch.

Are we okay to keep going for a few minutes?

A   Yes.                                                 12:51:49

Q   I'm going to show you the next exhibit.  This is going to be marked as 150.

(Exhibit 150 was marked for

identification and is attached

hereto.)                                             12:52:18

Page 167

CONFIDENTIAL

BY MS. LAI:

Q   What I'm showing you is a transcript from the deposition of one of the supervisory border patrol agents who served as a team lead in this case.

Have you reviewed SBPA S███████'s deposition testimony before?                                                    12:52:44

A   I have not.

Q   And are you familiar with what he -- the content of what he testified to?

A   I'm not.                                                  12:52:58

Q   Okay.

I want to --

MS. SAFAVI:  So we're going to object on foundation and any line of questioning on this document.                                                         12:53:05

MS. LAI:  Okay.

BY MS. LAI:

Q   If you can turn your attention to page -- you can see at the first page that this is the transcript of that deposition.  I'm going to turn    12:53:14 your attention to Page 144.

A   What was the number?  I'm sorry.

Q   144.

At the bottom of 144, S███████ is talking about an operation that occurred in the city of            12:53:44

Page 168

CONFIDENTIAL

Montebello, California, in June 2025, I believe the date might be June 12, 2025, at a business on Olympic Parkway.

So starting at line 20 -- sorry.  21 on Page 144, you can read the rest of that page and 12:54:05 then the next page.

MS. SAFAVI:  Counsel?

MS. LAI:  Yes.

MS. SAFAVI:  What topic is this line of questioning?                                            12:54:17

MS. LAI:  Locations.

MS. SAFAVI:  Locations?

MS. LAI:  Yeah.

MS. SAFAVI:  Okay.

BY MS. LAI:                                                    12:54:45

Q   Let me know when you get to the bottom of Page 145.

A   Okay.

Q   Okay.

And do you see that SBPA S███████ is talking 12:54:54 about being out on a roving patrol?

A   From 144?

Q   144 to 145.

A   Okay.

I looked at 144.                                    12:55:10

Page 169

Q   Yeah.  I wanted to give you a chance to see the general back and forth.

A   Okay.

Q   Okay.

And so he's talking about conducting a roving    12:55:42 patrol and being out there just patrolling the city as opposed to being given instructions to go to a specific location, correct?

A   That's what it appears to be, yeah.

Q   And that's consistent with what you told me    12:55:55 earlier, that teams were sent out to particular -- I mean, teams were sent out to locations, but not specific addresses to go to, correct?

MS. SAFAVI:  Objection; form.

BY MS. LAI:                                             12:56:11

Q   And this is in the June 2025 period.

A   Yes, that's correct.

Q   And team leads like S███████, were they given any information about the geographic area they were told to go to, like the city of Montebello?    12:56:23

A   When you say information about the city, what do you mean.

Q   For example, go to these -- maybe not a specific address, but go to this street corner, or here's the breakdown of the demographics of the    12:56:38

Page 170

CONFIDENTIAL

city.  Any information like that?

MS. SAFAVI:  Objection; compound.

THE DEPONENT:  I'm not aware of any specific information that was handed out like that.

BY MS. LAI:                                           12:56:52

Q   Okay.

If you go to the next page, on Page 146, just read Page 146.  And then I'll ask you a question.

Have you had a chance to read Page 146?

A   Uh-huh.                                          12:57:39

Q   Do you see where he's talking about how he -- his team or he got a tip from somebody on his team from a friend of an agent that said, "Go check out that spot."

Do you see that testimony?                           12:57:49

A   I do.

Q   Okay.

And is that -- getting a tip like this, would that have been an acceptable basis to go to a location in June 2025?                                   12:57:57

MS. SAFAVI:  Objection; ambiguous.

THE DEPONENT:  It would be similar to agents operating in their normal area of operation where they received a citizen's report.

///

Page 171

CONFIDENTIAL

BY MS. LAI:

Q   Okay.

And based on the citizen's report like this, you know, check out that spot.  It's a high probability of noncitizens there.  That would be    12:58:18 enough for a border patrol agent to act on?

A   It would be enough --

MS. SAFAVI:  Objection; assumes facts.

THE DEPONENT:  It would be enough information for border patrol agents to go to the area to see    12:58:29 what they could observe in that area.

BY MS. LAI:

Q   And were team leads or border patrol agents given any parameters or limits on how they could respond to a citizen's report or a tip of places to    12:58:42 go in -- at that time period?

A   No restrictions that I've been made aware of.

Q   You talked about places that people in certain occupations, agricultural, yard work and construction, might seek work.    12:59:03

What kinds of public access locations are those?  Are they street corners?  Parking lots? What are we talking about?

A   There's no set prescriptive manner.  It could be a parking lot.  It could be a street corner.  It    12:59:16

Page 172

CONFIDENTIAL

could be wherever it's advantageous to that

population for cash labor.

    Q    Okay.

         Could it be near a school?

    A    Again, I don't have a -- there's no                12:59:28

prescription as to yes or no this, yes or no that.

It could, in fact, be near a school.  One would hope

no, but could be.

    Q    Could it be near a church?

    A    It could be.                                        12:59:43

    Q    Could it be near a park?

    A    Assuming there's no prescription as to where

it could be, it could be near a park.

    Q    Is there any documentation border patrol

keeps about all the locations teams went to?               01:00:01

    A    If there were arrests made, then there would

be information recorded about those arrests.

    Q    Apart from arrest records, would there be any

documentation of where border patrol teams went to?

         MS. SAFAVI:  Objection; vague and ambiguous,       01:00:18

confusing.

         THE DEPONENT:  There's no specific reporting

requirement as to where they would patrol at.

BY MS. LAI:

    Q    Okay.

Page 173

CONFIDENTIAL

Was there any kind of tracking or analysis that was done of locations that border patrol went to?

A ███████████        ████████████████

███████████████████    ████████████████        01:00:36

████████████████████████████

█████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████        01:00:53

Q    And has there been any analysis done across different reports of locations where border patrol has been to?

A    Could you --

Q    Yes.        01:01:01

Is there any kind of analysis or report that compiles information about where border patrol teams have been to?

A ██████████████████████

█████████████████████        01:01:14

████████

Q ███████████████████████

████████████████████████

████████████████████████

████████        01:01:26

Page 174

CONFIDENTIAL

A    Not that I'm aware of.

Q    Okay.

And if a team goes back to the same place that it's been to before, would that be a coincidence?                                    01:01:39

A    I'm not sure I understand the question.

Q    For example, if there has not been a kind of analysis compiling information about where teams have gone, would it be possible that a team might go back to a same location that has already been    01:01:54 visited by the border patrol?

MS. SAFAVI:  Objection; confusing.

THE DEPONENT:  That could potentially happen, yeah.

BY MS. LAI:                                    01:02:04

Q    And if they do that, would it be just a coincidence that another team goes back to the same location that has already been visited by border patrol in a roving patrol?

A    It could be a coincidence, or it could be as    01:02:15 a result of yielding confirmed Title 8 violations and arrests in a certain location.

Q    Okay.

Thank you.

Approximately how many teams go out of this    01:02:25

Page 175

hundred or 99 for Title 8 enforcement?

A    That's a decision made by the tactical operations.  It is dependent on the number of resources available, considering days off, sick leave.  What the environment is.  Whether there's a need for additional response forces for civil unrest and how many are available for immigration enforcement.

So there's not a set number.

Q    Can you give me some kind of a range or ballpark?  Is it two teams?  Ten teams?  Fifty teams?

A    Again, it's dependent on the operational environment, so depending on how many persons the operations center is deciding to make about that team, if it's a four-man team, then the number of resources divided by four.  If it's a five-man team, the same.  And on and on.

Q    But you said earlier it's approximately 50 percent, roughly, dedicated to immigration enforcement versus other activities.

Is that still the case today?

A    So since the civil unrest has ebbed, that would not be the same distribution, no.

Q    Okay.

Page 176

CONFIDENTIAL

Would it be closer to 100 percent that are dedicated to immigration enforcement?

MS. SAFAVI:  Objection.  The math.

Objection; form.

THE DEPONENT:  Purely from a speculation on    01:03:50
my part, it would not be 100 percent because you would always want that available reaction should something unforeseen come up.

BY MS. LAI:

Q   Somewhere between 50 and 100 percent?    01:04:00

A   That's fair.

Q   Okay.

And do the teams go to more than one location a day?

A   It -- I hate answering with "depends," but it    01:04:07
depends on what happens at the initial encounter or the initial location they go to.

Q   Okay.

And do teams still report to the command center at the Coast Guard and back to the command    01:04:22
center each day?

A   You confused me there.

Q   Okay.  Do teams report to the command center each morning?

A   Typically for muster, yes.    01:04:37

Page 177

CONFIDENTIAL

Q   And at the end of the day, do they go back to the command center?

A   It depends on the activity of the day.  If there's no arrest made or no reports required, then there's no requirement for them to go physically and    01:04:49 check out at the ICP as long as communications is made and they have accountability of the personnel.

Q   Okay.

████████████████████████████████████

████████████████████████████████████    01:05:01

██████████████████

A   ████████████████████████████████████

████

Q   Has CBP done any information with the location of agents at the back end, like an analysis    01:05:13 of where agents have gone?

A   No.

Q   Okay.

MS. LAI:  Let's go off the record.

THE VIDEOGRAPHER:  This marks the end of    01:05:21 Media Number 2.

Going off the record at 1:05 p.m.

(Whereupon, at the hour of

1:05 p.m., a luncheon recess was

taken, the proceedings to be resumed

Page 178

CONFIDENTIAL

THE DEPONENT:  No, CBP does not have a system that identifies who was targeted or who was not. It's in violation of Title 8 or -- or another violation.

BY MS. LAI:                                          02:58:55

Q  Does CBP create any documentation of investigative detentions that do not lead to arrest?

A  Unless there is a reporting requirement that happens as a part of that incident, no.

Q  In what circumstances would there be a        02:59:13 reporting requirement other than use of force?

A  That's exactly what I was thinking is use of force.

Q  And how about consensual encounters that don't lead to an arrest?  Would that be documented  02:59:23 anywhere?

A  Not specifically, no.

Q  Does CBP use field encounter reports?

A  That term is used in one of the intelligence databases.                                          02:59:38

Q  Does CBP use field encounter reports for their daily activities?

A  Not that I'm aware of, no.

Q  How about for Operation At Large?

A  If they're -- again, as part of the          02:59:49

Page 208

CONFIDENTIAL

intelligence database that were the field

intelligence reports -- not field encounter, field

intelligence report is captured, I'm not aware of

any database where we capture a field encounter

report.                                                           03:00:08

Q   Use-of-force incidents are documented in

E-STAR?

A   That is correct.

Q   Is pulling a weapon a reportable use of

force?                                                            03:00:17

MS. SAFAVI:  Objection; outside the scope.

THE DEPONENT:  It is not.

MS. SAFAVI:  Also assumes facts.

BY MS. LAI:

Q   How about a takedown?  Is that a reportable   03:00:25

use of force?

A   It is.

Q   In what circumstances would a takedown be

required to be documented in E-STAR?

A   If you are using mechanical or physical force   03:00:35

to make the arrest, then that's a reportable use of

force, and it would be documented in E-STAR.

Q   Okay.

What if an agent in the course of trying to

make a detention or an arrest pushes somebody      03:00:50

Page 209

BY MS. LAI:

Q   -- because it's been identified as a targeted area?

MS. SAFAVI:  Objection; form, compound, and assumes facts.                                                03:04:34

THE DEPONENT:  Nothing would prevent border patrol from going back to that area at another time once it's been designated, so no.

BY MS. LAI:

Q   And does border patrol have or would it be   03:04:46 able to create a list of targeted areas?

A

03:05:01

Q   And the process of identifying a targeted area, tell me more about that process.  How does the agency confirm they are Title 8 violators?

A

03:05:16

03:05:37

Page 213

CONFIDENTIAL



Q    Thank you.                                              03:06:04

MS. LAI:  I don't know who just joined.  Oh, it's Mara.

BY MS. LAI:

Q    I think you said earlier today that Tom Homan is now the national incident commander for Operation    03:06:14 At Large; is that right?

A    He is the commander for operations in Minneapolis.  I have not been advised if he's the national incident commander over everything.

Q    Is there anyone who holds that title today?    03:06:29

A    Other than Mr. Homan, I'm not aware of anyone.

Q    Does that mean Mr. Homan is now a CBP employee?

A    No.                                                03:06:42

Page 214

CONFIDENTIAL

that happen.  And those are the indicators that I believe he was speaking to.

Q   Can you give me an example of a articulable fact that would raise an agent's suspicion that somebody is engaged in a Title 8 violation?                03:09:27

A   If an agent were to approach a subject and identify themselves as border patrol, and that person, without any other reason, turn and fled, that would elevate the agent's level of suspicion to that of reasonable suspicion that the person is    03:09:47 engaged in some form of criminal activity or in violation of Title 8.

Q   Okay.

We can come back to that.

Are there any other examples you can think    03:09:55 of?

A   I'm trying to narrow it down.

So there's -- again, there is a number of different articulable facts that would raise an agent's level of suspicion.                           03:10:16

If they were encountering someone for a consensual encounter and that person doesn't make eye contact or is turning away from the agent or is something that's culturally different than American culture where eye contact is normal.  Where they    03:10:31

Page 217

CONFIDENTIAL

present a document that's not made in the United States.  A voter card from Mexico, for example.  Or they present a passport and its on-face value doesn't match the person that you are discussing with, but it's been the document that's          03:10:49 been presented to you.

All of those things would be examples of articulable facts that would raise that reasonable -- that level of suspicion up to reasonable suspicion.          03:10:59

Q    Okay.

A    I said "suspicion" too many times.

Q    I think you said culturally somebody might not make any eye contact.

Are there any other cultural indicators that          03:11:09 would raise suspicion in the Title 8 context?

MS. SAFAVI:  Objection.

THE DEPONENT:  My brain is locking on the failure to make eye contact.  I'm sorry.

There's other cultural anomalies.  In the          03:11:28 United States, normal reaction to law enforcement would be to make eye contact, if the officer asks you a request, to respond to the question, not to run.

So a culture anomaly would be anything          03:11:39

Page 218

contrary to what you would normally see in an
American society.

BY MS. LAI:

Q    Okay.

But are you able to articulate any other          03:11:50
examples?  Is it hard to articulate?

A    Outside of, like, a specific incident, it's
hard to think of a case.

Someone sitting in a car, not looking up,
hands locked on the steering wheel, again, not doing   03:12:08
anything furtive to avoid enforcement encounter but
doing everything they can to stay invisible.

Q    And would you attribute that to culture?

I'm sorry.  I'm just asking at this point.

Are there any other examples of cultural          03:12:26
differences that would raise suspicion?

A    I'm sure there are.  I can't think of
anything off the top of my head.

Q    Okay.

What about a person's appearance?  Can that       03:12:37
be significant?

I think I heard Mr. Homan, on TV, saying a
person's appearance can be significant.

MS. SAFAVI:  Objection; form.

And objection; vague.                             03:12:50

Page 219

CONFIDENTIAL

confirmed Title 8 violation there.

Q   Okay.

You can turn to -- thank you for that clarification.

You can turn to page -- Exhibit 152.  The    03:17:16
narrative actually starts on the third page of this document.

I-44 relates to the arrest of a US citizen who -- the arrest was conducted by Agent M████ P████.    03:17:43

If you can direct your attention to the third page where the narrative appears -- do you see that?

A   I do.

Q   I'm going to ask you to focus on the third paragraph.  There's something in the third paragraph    03:18:05 I want to ask you about.

The first sentence says (as read):

        "Ramirez began shouting in Spanish, which further raised my suspicion -- "    03:18:15

Do you see that?

A   I do.

Q   (As read):

        "-- and they begin speaking in the Spanish language."    03:18:19

Page 224

CONFIDENTIAL

And eventually -- at this point, you can take my word for it, what happens is that Agent P███ engages in a takedown.

But before that, he indicates Ramirez was shouting in Spanish and that raised his suspicion.    03:18:38

Can somebody speaking in Spanish raise an agent's suspicion that they are an unauthorized noncitizen?

MS. SAFAVI:  Objection; assumes facts, argumentative.    03:18:51

THE DEPONENT:  So it depends on the circumstances.  And I'd like to read the rest of this in a second.

But in -- just from what I have read in the first couple of paragraphs, it further raises    03:19:02 suspicion, the subject had already made physical contact with the agent, knocking his cell phone out of his hand, and then began shouting in Spanish.

Typically when someone shouts in an engagement like this, they are going to their native    03:19:19 language, which in the United States is typically English.

So someone involved in a -- what looks to be the start of a physical altercation and then initially starts shouting in the Spanish language is    03:19:29

Page 225

CONFIDENTIAL

an indication that Spanish is their primary language and their go-to, which is an articulable fact that would raise the level of suspicion, yes.

BY MS. LAI:

Q   And if Spanish is somebody's go-to language, 03:19:40 how does it raise an articulable fact that contributes to suspicion?

A   So if you were born and raised in the United States or you've been in the United States for a long time, even if your primary language is not 03:19:55 English, English is such prevalent in the United States where your normal language that you would revert to is English.

So someone reverting to Spanish is either new to the country or hasn't been in the country long 03:20:13 enough to -- what's the word -- change their preferred language.

It's not the only articulable fact, but it would raise that element of suspicion, especially in this instance where they are engaged in a physical 03:20:30 altercation.

Q   And what is this based on, what you just told me, that somebody -- their go-to language being Spanish is an indicator?

A   I'm not sure I understand your question. 03:20:42

Page 226

CONFIDENTIAL

Q   You just told me that if somebody's reverting to Spanish, that it can be an indicator for unlawful presence.

What is your testimony based on?

MS. SAFAVI:  Misstates testimony.          03:20:57

MS. LAI:  Okay.

THE REPORTER:  What -- what's your answer?

THE DEPONENT:  Personal experience.

BY MS. LAI:

Q   Is your personal experience consistent with          03:21:02
agency policy?

MS. SAFAVI:  Objection; form.

THE DEPONENT:  So experience and policy are -- are -- my personal experience does not dictate policy, but it doesn't violate policy.  So          03:21:19
it is consistent with policy, but it's based on my personal experience.

BY MS. LAI:

Q   If an agent speaks to someone and they speak -- they respond in Spanish, does that          03:21:33
indicate -- does that serve as an indicator for reasonable suspicion?

A   It would depend on the circumstances.

Q   What are the circumstances?

A   In this circumstance -- again, I haven't read          03:21:50

Page 227

CONFIDENTIAL

the entire document, where there's a physical altercation and someone looking to be -- trying to escape, reverting to Spanish language as their emergency language, for lack of a better term, in this circumstance, it would be an articulable fact    03:22:13 in my personal experience to elevate that level of suspicion.

Q   I think my question is, if the agent spoke to him in Spanish and he responded in Spanish, does that change anything about whether the use of    03:22:26 Spanish is an indicator?

A   Again, it depends on the circumstances.

I don't see where he spoke to him in Spanish on this report.

Q   I think it's just a question I'm asking you.    03:22:44 If that is what occurred, would that change your answer?

MS. SAFAVI:  Objection; assumes facts.

THE DEPONENT:  It depends on the circumstances again.  If I were to speak to someone    03:23:00 in Spanish in a normal setting that wasn't this particular set of circumstances, if I walked up on the street to an individual in southern Arizona, southern Texas, and spoke to them in Spanish, and they responded in Spanish, no, that wouldn't raise    03:23:13

Page 228

my level of suspicion.  But that's a different set of circumstances than this report.

BY MS. LAI:

Q   Okay.

And you're aware I believe as the designee        03:23:22
that the position of the border patrol and other defendants in this lawsuit is that apparent Mexican ancestry can be a relevant factor as part of the totality of the circumstances for developing reasonable suspicion, are you not?                03:23:44

A   Can you repeat that one more time?

Q   Yes.

A   Sorry.

Q   You're aware that the border patrol in this lawsuit, its position is that apparent Mexican        03:23:48 ancestry or Hispanic ethnicity can be a relevant factor for developing reasonable suspicion for a Title 8 violation.

MS. SAFAVI:  Objection; form.

BY MS. LAI:                                          03:24:02

Q   Is that correct?

MS. SAFAVI:  Objection; form.  Objection; calls for a legal conclusion.

THE DEPONENT:  So it could be, again, depending on the circumstances unarticulable fact,    03:24:12

Page 229

CONFIDENTIAL

again, depending on the whole circumstance.

MS. LAI:  Okay.

Let's mark the next exhibit.  This is going to be 153.

(Exhibit 153 was marked for                    03:24:39

identification and is attached

hereto.)

BY MS. LAI:

Q    This is going to take some time.  And I will let you look at the document before I ask you any    03:24:50 questions about it.

But I think my question is, are you aware of the government's position in this lawsuit?

A    Can you repeat the position again?

Q                                                                  03:25:04

A                                                                                     03:25:15

Q

A

Q                                                                                     03:25:21

Page 230

CONFIDENTIAL



Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL



A ███

Q ████████████████████████████

████████████                    03:26:47

A █████████

Q ██████████████████████

████████████████████████████

████████████████████████████

████████████████████████████    03:26:59

████████████████

A ████████

Q  If you can -- I'm sorry to jump back and forth.  But if you can come back to Agent S█████'s -- I'm sorry, Supervisory Agent Sanchez's    03:27:17 deposition testimony?

I'll give you the number.  It's 150.

And what you can do is turn to page 129. Toward the bottom, I'm talking to Supervisory Agent S█████ about this same issue.  And at the bottom of    03:27:59 the page 129, I'm asking him about the Los Angeles area, whether ethnicity could be used as one of the articulable facts, and it continues on page 130.

Do you see that?

A  I think so.                    03:28:20

Page 232

Q    You can keep reading on page 130.

And on page 131.

Let me know when you get to the bottom of page 131.

A    Okay.                                                    03:29:43

Q    You're there?

Okay.

And so my question is, as we've been talking about, apparent ethnicity or Mexican ancestry can be one of the totality of the circumstances.  Agent    03:29:54

S████    is talking about how he may consider it.

Is there any CBP policy that would prohibit a factor like this from being considered in

Los Angeles specifically?

A    So the --                                               03:30:08

MS. SAFAVI:  Objection; assumes facts and form.

Go ahead.

THE DEPONENT:  The antidiscrimination policy would prevent you from using race or ethnicity as    03:30:15 the sole facts to infer that someone was engaged in a criminal activity.

BY MS. LAI:

Q    Okay.

And what about as a factor in the -- you    03:30:26

Page 233

CONFIDENTIAL

know, not the sole fact, but the totality of the circumstances.  He's talking about Los Angeles.  Is there any CBP policy that would prohibit consideration as part of the totality of the circumstances?                                          03:30:40

A    Not as part of the totality of the circumstances, no.

Q    Okay.

I think you can close that, that exhibit.

We're going to move to -- you can shift          03:30:52
gears.  You can put the exhibits down.

There was an operation in this case that occurred in June at the Whittier car wash.

Are you familiar with that operation?

A    Not specifically that operation, no, ma'am.    03:31:08

Q    Okay.

And does the agency know what specifically occurs on operations that agents are out in the field doing, apart from what might be recorded in a narrative?                                                03:31:23

A    The tactical command is aware of the assignments and the operations that are taking place.  From the strategic standpoint, it would not be something that we would know from the -- down in the tactical weeds of what was happening day to day.    03:31:39

Page 234

More of the large muscle movements, overarching

priorities, arrests made, assaults, or uses of

force, things of that nature.

Q    Okay.

I think you indicated earlier that if there's    03:31:54

investigative detention that's made and a person is

not arrested, that there wouldn't be any

documentation of that, correct?

A    There's no requirement for that

documentation.                                              03:32:10

Q    Okay.

And so would the tactical command be aware of

what occurred on that stop that did not lead to

arrest if there is no use of force report or any

other incident report?                                     03:32:20

A    I would venture that they would be aware of

the specific nature of the operation that was

happening and then what happened during the

operation, yes.

Q    Is command going out with the teams and aware    03:32:32

of what happens in each interaction they have with a

member of the public?

A    On occasion, they will.  As a consistent

basis, no.

Q    Okay.                                               03:32:46

Page 235

CONFIDENTIAL

And so when you said you would venture, do you, in fact, know if tactical command is tracking what happens for stops that don't lead to arrest?

MS. SAFAVI:  Objection; form.  Objection; vague.  Objection; assumes facts.                     03:33:03

THE DEPONENT:  I cannot speak personally to whether or not they are aware.  However, it is standard practice that supervisory team leads or however the teams are broken up report back to the command on the outcome of whatever specific     03:33:18 assignment or operation that they conduct for the day.

BY MS. LAI:

Q   And would team leads be reporting, for example, the number of contacts they made that did     03:33:24 not lead to arrest?

A   Less likely --

MS. SAFAVI:  Objection; vague.

THE DEPONENT:  -- that they would be reporting in the context that did not lead to     03:33:32 arrest.

BY MS. LAI:

Q   Okay.

And would team leads be -- is there any requirement for team leads to report contacts they     03:33:40

Page 236

made with US citizens or individuals who turned out

to be lawfully present on Title 8 operations?

MS. SAFAVI:  Objection; ambiguous.

THE DEPONENT:  The only reason that I would

assume that they would report anything like that is    03:33:56

if something out of the normal came from it, whether

there was a screaming match or something that could

raise attention from a larger audience or media

attention.

BY MS. LAI:                                             03:34:09

Q   And you're aware this has occurred, right,

that border patrol has stopped individuals who are

US citizens and lawfully present noncitizens, and

then released them later on Title 8 operations,

correct?

A   Yes.

Q   Okay.

Is that of concern to the agency that that is

occurring?

MS. SAFAVI:  Objection; argumentative.           03:34:28

THE DEPONENT:  No.

BY MS. LAI:

Q   It doesn't concern the agency that somebody

who is a US citizen might be stopped by border

patrol and made to answer questions, and then let go   03:34:43

Page 237

later?

        MS. SAFAVI:  Objection; argumentative, and asked and answered.

        THE DEPONENT:  No.

BY MS. LAI:                                            03:34:50

    Q    Do you know how often that's occurring?

    A    I don't per se know how often because there's no reporting requirement.

    Q    Would you know -- would border patrol know if they're going back to a location where a US citizen   03:35:05 had been stopped before, stopped the same person again?

    A    That could potentially happen, yes.

    Q    How would that happen?  Why do you say that potentially could happen?                               03:35:19

        MS. SAFAVI:  Objection; compound.

        THE REPORTER:  If the -- there's a couple of different reasons why that would happen.

        If the area was being targeted and that person happened to be in that area again, they may   03:35:30 have additional contacts with agents or officers that didn't contact them the first time.

        Or if the person was acting in a manner that raised the suspicion of the agent to do an investigatory stop or investigatory detention and   03:35:42

                                                      Page 238

they were acting in the same manner again with a

different agent, then they could be stopped again.

BY MS. LAI:

Q   If the agency doesn't track this information,

would the agency know the basis for any stops where    03:35:57

somebody ultimately is not arrested?

MS. SAFAVI:  Objection; form.

Objection; calls for speculation.

THE DEPONENT:  No.

BY MS. LAI:

Q   I think I'm asking each time a border patrol

agent makes an arrest, there is a requirement to

document the circumstances of the arrest on a I-213

or some other document, correct?

A   Correct.                                          03:36:24

Q   And so if the agency doesn't have an I-213 or

a narrative or use-of-force report for the incident,

does the agency know what the basis of a stop was?

THE DEPONENT:  The agency knows that the

basis of the stop is according to the trainings       03:36:40

being given by that agent, that -- in that

particular set of circumstances and the articulable

facts known to the agent at the time or the officer

at the time, based on those circumstances, warranted

either a consensual encounter or an investigative     03:36:51

Page 239

stop to determine whether that person was engaged in

criminal activity or was in violation of Title 8.

BY MS. LAI:

Q   So the agency is relying on agent's training.

Is the agency able to independently verify     03:37:02
what the basis of the stop was?

MS. SAFAVI:  Objection; vague and ambiguous.

THE DEPONENT:  I'm not sure I understand your
question.  I'm sorry.

BY MS. LAI:                                           03:37:16

Q   I think my question is, is the agency relying
on agents training to guide them on the field?

A   Yes.

Q   Does the agency do any other verification of
the basis of stops if they are not recorded in an     03:37:25
I-213?

A   Not to my knowledge.

Q   Why are you confident that agents are going
to follow their training -- you trust them to follow
your training?                                        03:37:39

A   Agents are aware of what happens and the
liability if you don't follow training.  If you
don't follow policy procedure, if you don't abide by
applied authority, that it's misconduct and that
could cost you your employment, could cost you your   03:37:57

Page 240

CONFIDENTIAL

job or, at minimum, disciplinary corrective action.

Q   So you're relying on agents being aware and motivated by this information, correct?

MS. SAFAVI:  Objection; misstates testimony.

THE DEPONENT:  I'm relying on agents being    03:38:11 professional law enforcement and relying on the training they've been given to be the best training available to guide them in their day-to-day activity.

BY MS. LAI:                                    03:38:21

Q   What I'm going to do is ask you to take a look at another one, another exhibit.

This relates to the car wash operation in June that I was just referencing.  And it's going to -- it's going to be an excerpt from another    03:38:36 deposition of an agent in this case.

THE DEPONENT:  When we hit a stopping point, I could use a break.

MS. LAI:  We're close.  This is going to be 154.                                           03:39:00

(Exhibit 154 was marked for

identification and is attached

hereto.)

BY MS. LAI:

Q   Okay.  If you can turn -- first of all, do    03:39:23

Page 241

you know J███████ M█████?

A    I do not.

Q    He's an agent with the border patrol.  He was involved in this operation.

If you can, turn to Page 217.                          03:39:33

When we go back on the record after a break, he's talking about the events of the June 18th raid at Whittier car wash.  And he's asked toward the bottom of Page 217 (as read):

"Why did your team go to the                          03:40:03

Whittier car wash?

"From what I remember, we Googled a list of -- the nearest car washes and that was one of the places that came out on the list as the                          03:40:15

nearest location."

Do you see that?

MS. SAFAVI:  We're going to object to the line of questioning on this.  Lack of foundation.

MS. LAI:  Okay.  Thanks.

MS. SAFAVI:  Uh-huh.                          03:40:24

BY MS. LAI:

Q    And so he Googled car washes in the area and then he went to this car wash because it came up on the list.

Is that something that would occur during                          03:40:32

Page 242

this time, when border patrol was doing patrols in June 2025?

MS. SAFAVI:  Objection; calls for speculation, incomplete hypothetical, improper witness.                                    03:40:49

THE DEPONENT:  It appears based on his testimony that it did happen.

BY MS. LAI:

Q   And based on what you see here, did Agent Morales's team fail to follow any protocols for       03:41:00 Operation At Large?

MS. SAFAVI:  Objection; argumentative.

Objection; calls for a legal conclusion.

And objection; improper witness.

THE DEPONENT:  Based on the small portion       03:41:16 that I've been able to read, no.

BY MS. LAI:

Q   Okay.

Is there anything about a car wash that is suspicious as it relates to Title 8 violations?       03:41:24

MS. SAFAVI:  Objection; vague.

THE DEPONENT:  From my personal experience, no.  However, based on other documents that I've seen in preparation for this deposition, it's apparent that car washes are one of the locations       03:41:44

Page 243

CONFIDENTIAL

that pays cash for labor and that was included in several area targeted enforcement operations.

So that -- my assumption is that this information was passed to the agents and he took it to the next step and looked for car washes.          03:42:00

BY MS. LAI:

Q   Okay.

Thank you.

And so it's the agency's view that car washes as a kind of general matter are locations that pay     03:42:11 cash for labor?

A   It was proven to be a technique and tactic of that local area, that car washes paid day laborers cash and didn't do the appropriate documentation checks for people that were working there.          03:42:28

Q   What's that area?

A   The Los Angeles area where they were working, from the previous articles that you have shown for car washes and based on those reports of investigation where it was shown that there was     03:42:49 confirmed Title 8 violations at those car washes and confirmed arrest of those present illegally in the United States.

Q   Okay.

And so you're suggesting that there are     03:43:00

Page 244

reports of investigations that show car washes in
the Los Angeles area generally have this practice of
hiring day laborers?

MS. SAFAVI:  Objection; misstates testimony.

THE DEPONENT:  No.  What I'm saying is there    03:43:17
are certain car washes that have been proven to have
hired illegal aliens to work for them for cash.

BY MS. LAI:

Q    And what about this car wash that Agent
M▓▓▓▓'s team Googled?    03:43:30

A    I'm not familiar with that specific car wash.

Q    If they Googled the car wash, would they be
relying on information about prior operations?

MS. SAFAVI:  Objection; calls for
speculation.    03:43:43

THE DEPONENT:  They would be taking
information relevant to other car washes and looking
for additional car washes.

BY MS. LAI:

Q    Additional car washes.    03:43:55

Okay.

And does the agency have any information
about the actual practices for how car washes pay
their workers in the Los Angeles area?

A    Only after arresting the illegal aliens that    03:44:07

Page 245

CONFIDENTIAL

were found working at the car washes was that
information provided.

Q   What about data across the industry in the
Los Angeles area?

A   No.                                           03:44:18

MS. SAFAVI:  Objection; vague.

BY MS. LAI:

Q   And does the agency have any information
about the proportion of people working at car washes
that are US citizens who are lawfully present?      03:44:24

A   Not to my knowledge.

Q   Okay.

One of the named plaintiffs in this case,
Mr. Viramontes Hernandez, was stopped at this car
wash.  He's a citizen of the US and of Mexico.  He's   03:44:40
a dual citizen.

And so on June 18th, he was one of the
individuals asked about his citizenship and he was
detained at the car wash because he didn't have his
passport.                                          03:44:58

Is that something that violates agency
policy?

MS. SAFAVI:  Objection; form.

Objection; argumentative.

Objection; improper -- incomplete          03:45:08

Page 246

CONFIDENTIAL

hypothetical and improper witness.

Actually, I'm going to in- -- as phrased, I'm going to instruct the witness not to answer.

MS. LAI:  On which one are you instructing, which objection?                                    03:45:21

MS. SAFAVI:  The improper witness.

BY MS. LAI:

Q    My question is about agency policy.

If somebody is detained because they didn't have their passport, would that violate agency            03:45:35 policy?

A    It would not.

Q    In this case, he was actually escorted by Agent M███████ into a vehicle and taken to another location to verify his citizenship.                         03:45:51

Would that violate agency policy?

A    It would not.

Q    And at the time Agent M███████ decided to escort him off the premises to verify his citizenship, he knew that this individual was              03:46:12 encountered at a car wash, claimed to be a dual citizen, and had a state ID but not a passport, is that enough to take him away from the car wash to verify his citizenship --

MS. SAFAVI:  Objection; argumentative and        03:46:25

Page 247

improper witness.

BY MS. LAI:

Q    -- according to agency policy?

A    It would not.

MS. SAFAVI:  Improper witness objection.          03:46:33

BY MS. LAI:

Q    Your answer is it's not enough?

A    No.  I'm sorry.  My answer is it would not violate agency policy.

Q    Okay.  Thank you.                             03:46:43

The fact that Agent M█████ wanted to conduct an investigation and escorted him to a vehicle and took him to a different location to verify his citizenship, did Agent M█████ need anything other than suspicion of unlawful status for that?          03:46:57

MS. SAFAVI:  I'm going to object to improper witness, and I'm going to go ahead and instruct the witness not to answer.

BY MS. LAI:

Q    As a matter of agency policy?                 03:47:08

MS. SAFAVI:  Yeah, actually, I'm still -- like, I've given some leeway on this line of questioning.

I'm actually going to instruct the witness not to answer.                                          03:47:18

Page 248

CONFIDENTIAL

BY MS. LAI:

Q   Okay.

Are you going to take your attorney's instruction?

A   Yes.                                          03:47:24

MS. WORTH:  I'm sorry.

Just for the record, the instruction was on improper witness?

MS. SAFAVI:  Yes.

BY MS. LAI:                                       03:47:31

Q   And, to clarify, my question is about whether agency policy permits this kind of action.

MS. SAFAVI:  If you want to, rephrase the question.  But as the question stood, that's my instruction.                                  03:47:44

MS. LAI:  Okay.

BY MS. LAI:

Q   The fact that -- let me rephrase.

The fact that Agent M█████ wanted to conduct an immigration investigation, escorted the plaintiff  03:47:52 to a vehicle and took him to a different location to verify his citizenship, did he need anything other than reasonable suspicion of unlawful status to do that under agency policy?

A   He did not.                                  03:48:06

Page 249

CONFIDENTIAL

THE REPORTER: 156.

MS. LAI: 156. I'm sorry.

BY MS. LAI:

Q   Do you see that Document 156 is a Report of
Investigation?                                              04:36:41

A   I do.

Q   Okay.

And so there are a number of different
locations that are discussed here, but I want to
draw your attention onto the first page, what's          04:36:47
listed as the first location, 1675 Wilshire Avenue.

Do you see that?

A   I see 1675 Wilshire Boulevard.

Q   I'm sorry. You are absolutely right. 1675
Wilshire Boulevard.

A   I do.

Q   Okay.

And under this ROI, it says that -- actually,   04:37:13
the intelligence agents here, are they from the El
Centro Sector intelligence unit?

A   I'm sorry. Can you repeat your question?

Q   Yes. The intelligence agents that worked on
the recon that constitute this Report of                 04:37:30

Page 270



Investigation, are they from the El Centro Sector?

A    According to the report, yes.

Q    ████████████████████████████
████████████████████

A    ██████                                    04:37:41

Q    ████████████████████████████
████████████████████████████████████
██████

A    ████████████████████    ████████
████████████████████████████████    04:37:53
███████████████████.

Q    Okay.

And this -- this location, the first location, I'll represent to you this is the -- this is a Home Depot location in Los Angeles.    04:38:08

Do you see how it says (as read):

"Agents observed approximately 150 people scattered throughout the Home Depot property"?

A    I do.    04:38:20

Q    And then in the next paragraph, it says 40 to -- approximately 40 to 50 subjects along the entrance of a street, an adjacent street?

A    I do.

Q    And then approximately 20 food vendors.    04:38:30

Page 271

CONFIDENTIAL

Do you see that?

A    I do.

Q    And then along a different boulevard, approximately 30 day laborers and then another 30 subjects within the parking lot of the Home Depot.    04:38:43

Do you see that?

A    I do.

Q    Okay.

And are all of these individuals described -- that I just described to you potential subjects for    04:38:52 investigation for this recon?

MS. SAFAVI:  Objection; form.  Objection; vague.

THE DEPONENT:  No.  As I read the document, it's just describing the situation going from the    04:39:12 macro to the micro.

BY MS. LAI:

Q    Okay.

The fact that there were 150 people scattered throughout the property was not in and of itself    04:39:20 suspicious?

MS. SAFAVI:  Objection; improper witness.

I'm going to instruct you not to answer the question.

THE DEPONENT:  Okay.    04:39:35

Page 272

CONFIDENTIAL

BY MS. LAI:

Q   Are you going to follow your attorney's instruction?

A   Yes.

Q   Okay.                                                04:39:39

I'm just asking questions based on the document.

So you told me about a Report of Investigation and surveillance that supported these operations.                                                04:39:51

And so my question is just, in this recon that is being conducted, is the presence of this large group of people a reason to suspect this is a target-rich location?

MS. SAFAVI:  Objection; improper witness.    04:40:09

I'm going to instruct the witness not to answer.

BY MS. LAI:

Q   Okay.

Tell me how this Report of Investigation    04:40:18 supports an operation at this location?

A   Can I read the rest of the document?

Q   Yes.

You can read -- I don't need you to read the rest of the document because there are other    04:40:30

Page 273

locations that are described in the ROI, but you can --

A    I'll just read about the first location, if that's okay.

Q    And, sir, while you're reading, my question 04:41:07 is not -- actually, go ahead and read, and I'll ask you the question.

Sir, have you gotten to the end of the narrative about the first location?

A    Yes.    04:43:02

Q    Okay.

And so how does this -- you testified earlier that the ROI supports operations.  How does this ROI support an operation at this location?

A    ██████████████████████    04:43:14

███████████████████████

████████████████████████████

███████████████████████████

███████████████████  ████████████

███████████████████████    04:43:32

████████████

So all indications that would provide articulable facts to the agents to believe that there were confirmed Title 8 violators frequenting this area.    04:43:49

Page 274



Q   Okay.

Thank you.

04:43:57

A

Q

04:44:08

A

04:44:18

04:44:36

Q   Okay.

Is there anything in this narrative that would help a reader understand why this location in particular was investigated?

04:44:50

Page 275

CONFIDENTIAL

I understand that agents went there and they did some checks, and they confirmed some individuals who they believed to have violated Title 8, but was there anything in the narrative that would explain why the agents went there in the first place?

MS. SAFAVI:  Objection; form, misstates facts.



there are confirmed Title 8 violators in this area, which would be an area where if you had limited resources, you could deploy resources to apprehend those that are in the country illegally.

BY MS. LAI:

Q

Page 276



Q

A     04:46:08

Q     04:46:21

A     04:46:36

Q

04:46:52

Do you see that?

A   I do.

Q   Okay.

In this ROI that we were just looking at,
would this be typical of ROIs to support the -- what     04:47:05

Page 277

CONFIDENTIAL

And then I want to make sure -- thank you for that information.  It's helpful.

I want to make sure I understand your testimony.

04:50:16

A

Q    Okay.

Thank you?

So you can take a look at Document 157.    04:50:24

This is a -- we understand from other witnesses, to be a briefing that was given prior to an operation that occurred at the Westlake Home Depot on August 6, 2025.

Have you seen briefings like this before?    04:50:39

A    Yes.

Q    What is the purpose of this briefing?

A    This is a preshift briefing to provide information to agents that are operating before shift and when they are going through on task    04:50:54 assignments.

Q    Okay.

A    What did you say the date for this one was?

Q    The operation took place on August 6, 2025.

If you look at the fourth page, it says (as    04:51:14

Page 280

CONFIDENTIAL

read):

            "Target 1 for August 6, 2025."

    A    Which page?  I'm sorry.

    Q    The fourth page of the PowerPoint.  At the bottom, in the micro letters, it says "GOV 336."    04:51:28

    A    Yep.

    Q    Okay.

         And so I just want to understand -- we learned from other witnesses that this briefing was given at the Coast Guard Command Center.    04:51:47

         Does that sound right?

         MS. SAFAVI:  Objection; form.

         THE DEPONENT:  That would -- that sounds right.

BY MS. LAI:    04:52:00

    Q    Okay.

         And that it was, like, shown to the agents, but it wasn't, like, hard copies given to everybody there.

         Does that sound right?    04:52:08

    A    That sounds accurate.

    Q    And on Page 4, do you see how there's information that seems to track what we just looked at in the ROI, the -- where -- under the surveillance side?    04:52:25

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

A    Yes.

Q    ███████████████████████████

████████████████████████████████

███████████████████████████████

A    █████                                    04:52:37

Q    ███████████████████████████████

████████████████████████████████████

██████████

A    █████████████████████████████

████                                          04:52:53

Q    Okay.

And do you see a couple pages later that one of the -- there's a page that has -- says (as read):

"Direct action targets."

A    I do.                                     04:52:59

Q    ████████████████████████████

████████████████████████████████████

████████████████████

A    I do.

Q    And if he already had an immigration hearing,    04:53:10 why is he identified on the list of targets?

A    If he's already a confirmed Title 8 violator, priorities have changed to where we were no longer allowing those with removal hearings and removal proceedings to remain at large.    04:53:31

Page 282

CONFIDENTIAL

BY MS. LAI:

Q   And is there any information other than this Report of Investigation that the command staff is making that decision based on?

A   Not that I'm aware of.                                    05:32:59

Q   Okay.  Let's go to the next exhibit.

This one is going to be marked as 158.

(Exhibit 158 was marked for identification and is attached hereto.)                                                 05:33:08

BY MS. LAI:

Q   All right.

158 is another ROI.  I'll represent to you that it pertains to an operation that took place at a car wash in Pasadena on August 22nd.  The address   05:33:27 of the car wash is the one on the second page where you see (as read):

        "Location, Pasadena Auto Wash at

        164 Del Mar Boulevard in Pasadena."

Do you see that?                                          05:33:41

A   Pasadena Auto Wash?

Q   Yes.

A   Yes.

Q   Okay.

And on the first page you can see that the          05:33:53

Page 296

CONFIDENTIAL

████████████████████████████████████████

██████████████████████████████ .

        Do you see that?

    A    I do.

    Q    Okay.                                                    05:33:59

        And this first paragraph, it indicates that

agents went to this car wash and observed 15

workers, that there were three entrances, and

there's some information about where employees park

their cars.  And that there's a room -- waiting room    05:34:16

████████████████    ████████████████████

██████████████████████████████████

████████████████████████████████████████

██████████████████████

        Do you see that?                                        05:34:36

        MS. SAFAVI:  Objection; form.

        THE DEPONENT:  Can I read through this

particular area?

BY MS. LAI:

    Q    Take a moment, but because this one is            05:34:45

similar to the last one, I just want to ask you --

I'm not going to ask you details of the particular

vehicles.

    A    Okay.

    Q    All right.                                            05:35:12

Page 297

Now, let's get the next one ready.

So you've had a chance to look the at the general document.

This one is 159.

(Exhibit 159 was marked for                05:35:25

identification and is attached

hereto.)

BY MS. LAI:

Q    This appears to be an arrest narrative.

Do you see that?                            05:35:45

A    Yes.

Q    And do you see that it's of Agent I⬛⬛⬛

G⬛⬛⬛?

A    Yes.

Q    Do you see on the third page there's some    05:36:02

background information, but on the third page, it

says (as read):

     "I arrived at 164 West Del Mar

     Boulevard, Pasadena"?

A    Yes.                                   05:36:17

Q    Okay.

And this is -- I'll represent to you this is

Agent G⬛⬛⬛'s narrative from one of the arrests he

conducted that day on August 22nd.

What I want to draw your attention to is    05:36:27

Page 298

CONFIDENTIAL

the -- his description of the intelligence briefing,

and he describes that on page 2 at the top in the

second paragraph (as read):

     "Prior to my team's deployment, I

     attended an intelligence briefing."     05:36:42

     And it says (as read):

     "It provided actionable information

     regarding targeted location and

     subjects previously associated to it.

     It included details about the     05:36:52

     subject's identity and immigration

     status, locations, and suspected

     activities, such as illegal day

     workers."

     Do you see that?     05:37:00

   A   I do.

   Q   And in the next paragraph it says that agents

conducted surveillance where individuals were

observed engaging in behavior consistent with the

information provided in the briefing.     05:37:16

     And in terms of "behavior consistent with

information provided in the briefing," do you

understand that to mean individuals working at the

car wash?

   A   Sorry.  Just reading.     05:37:25

Page 299

Q    Yes.

A    Yes, that's what appears to be.

Q    I'm going to show you the next one.

This is 160.

(Exhibit 160 was marked for                05:37:50

identification and is attached

hereto.)

BY MS. LAI:

Q    Exhibit 160 is excerpts from a deposition of

an agent, a supervisory border patrol agent, I██████    05:38:11

F█████████ .

In this case, SBPA F█████████ was one of the

team leads who was on scene that day of this

operation.

I'd like to turn your attention to Page 242.    05:38:23

And this is going to span a few pages.

Mr. -- Agent F█████████ is talking about an

encounter he had with an individual at the car wash

who turned out to be a legal resident and LPR of the

United States, and he's describing the encounter.    05:38:53

So if you start at the top of Page 242, you

can just read through the bottom and then onto

Page 243.

When you get to the part of 243 where he    05:38:23

says, "I believe I did have reasonable suspicion,"    05:39:50

Page 300

just let me know.

A   Okay.

Q   Okay.

And did you see on the page on 242 where
the -- Agent F████████, this individual was escorted    05:40:06
to him by another agent and apparently he was --
this individual was not answering questions.

Do you see that?

MS. SAFAVI:  And we're going to object to any
line of questioning on this document based on    05:40:22
foundation.

THE DEPONENT:  I see that, yes.

BY MS. LAI:

Q   Okay.

And Agent F██████ states (as read):    05:40:30

"He was subject to an
investigative detention at that
time."

Do you see that?

A   I do.    05:40:38

Q   Okay.

And, now, when you go back to Page 243, I'd
like you to continue reading because he describes
what he believes was the reasonable suspicion for
the detention at that time.    05:40:49

Page 301

Just read to the bottom of Page 244.

A    Okay.

Q    Okay.

And so the facts that Agent F██████████ is identifying, that there was an intelligence brief    05:41:47
and that there were employees at the business that were part of the intelligence brief, that the subject refused to answer questions, and I believe there's discussion of this individual being of Hispanic descent, would that be enough to raise    05:42:07
reasonable suspicion for detention?

MS. SAFAVI:  Objection; improper witness.

Going to instruct the witness not to answer.

BY MS. LAI:

Q    Under agency policy, would that be enough?    05:42:23

MS. SAFAVI:  Same objection, same instruction.

Don't answer the question.

MS. LAI:  I want to note for the record that Topic 6 of this deposition is defendants' practices    05:42:30
and procedures in connection with immigration enforcement operations that occurred June 6th.

So our position is that it is perfectly within the scope, and also the party's stipulation, the questions that I'm asking about what occurred    05:42:43

Page 302

and the practices on operations.

If you want to maintain your decision not to answer, that -- that's fine, but it is within the scope.

And that's our position.                                    05:42:54

MS. SAFAVI:  So we would just, for the record, state that our position is that question as worded is asking for expert witness testimony and this is a 30(b)(6) fact witness.

MS. LAI:  Okay.  Well, you're instructing him    05:43:05 not to answer my question.  He can say whether or not he understands the question.

BY MS. LAI:

Q   Let me ask the question again, Mr. Lairmore -- Chief.                                       05:43:19

So my question is, under the agency's policies, is the information provided by SBPA F█████████ here sufficient for reasonable suspicion to detain an individual?

MS. SAFAVI:  Objection; improper witness.      05:43:36

THE DEPONENT:  So SBPA -- is it F█████████?

BY MS. LAI:

Q   Yes.

A   F█████████ was not the person that detained the individual.  He was holding an individual that    05:43:45

Page 303

CONFIDENTIAL

was detained by another agent.

Q   I understand.

And so he was asked, though, whether there was reasonable suspicion and he identified these factors.                                                    05:43:56

So my question is, under agency policy, are these factors sufficient for reasonable suspicion to detain a person?

A   So, again, this is out of context when we are talking about the actual detention of the subject.    05:44:08 That was the agent that made the initial contact. And Mr. F█████ says that he did not witness that initial contact.

So he did not have all the information that the first contacting agent had that made the    05:44:18 detention.  He was just maintaining that person in a detained state while the other agent took care of what other business was going on that's not -- that I have not read.

So I don't know all the facts and    05:44:34 circumstances of what sort of emergent/nonemergent work was being conducted, so I don't think it's appropriate to -- even the question of this supervisor, border patrol agent, whether or not he had reasonable suspicion to detain the subject,    05:44:49

Page 304

CONFIDENTIAL

because he didn't.

Q   Okay.

So are you -- let me make sure I'm understanding.

Are you -- Agent F███████ says (as read):    05:44:56

"I believe I had --"

He continued the investigation (as read):

"I had basis to continue the investigation."

Are you suggesting that the factors he    05:45:07 identified here were not sufficient and that there needed to be additional information from the other agent to support the detention?

MS. SAFAVI:  Objection; misstates testimony and facts.    05:45:17

THE DEPONENT:  That the agent that had the initial encounter had made the decision to detain that subject would be the appropriate person to ask about whether or not they had sufficient reasonable suspicion to conduct an investigatory detention on    05:45:27 the individual.

BY MS. LAI:

Q   Looking at what Agent F███████ indicated here, is there anything in agency policy that would prohibit a detention based on the factors that he    05:45:38

Page 305

has identified?

MS. SAFAVI:  Objection; vague and confusing, incomplete hypothetical, and improper witness.

THE DEPONENT:  Based on -- I'm forgetting his name.  It's F████████?                                    05:45:50

BY MS. LAI:

Q    F████████?

A    Okay.

Based on what F███████ articulates in his testimony and the fact that I don't know what -- the   05:45:55 initial encounter took place -- so based on here, Agent F███████ was right and did not violate any policy by continuing to detain the subject.

Q    Thank you.

And the factor about this individual not   05:46:08 answering questions, are you aware that sometimes individuals who are lawfully present would decline to answer questions?

MS. SAFAVI:  Objection; assumes facts, form.

THE DEPONENT:  That is always possible.   05:46:21

BY MS. LAI:

Q    Is the fact that somebody declines to answer questions a reason to raise suspicion for a Title 8 violation?

A    It would depend on the nature of the   05:46:35

Page 306

encounter.

Q   Okay.

Sometimes it does and sometimes it doesn't;
is that what you were saying?

A   So if the encounter is consensual, then      05:46:44
there's no requirement for the individual to answer
questions.  That individual is free to walk away.

However, if the agent had reasonable
suspicion already at the point where he made the
encounter, then the investigative detention in order   05:46:57
to determine that person's rights or legal right to
be present in the United States is requisite of the
response of the individual or to be able to prove
the identity and immigration documents for said
individual.  So...                                     05:47:10

Q   Okay.

If a person begins walking away, can that
raise suspicion for a Title 8 violation?

A   Are we talking a consensual encounter or an
encounter where the agent already has reasonable       05:47:24
suspicion?

Q   Let's go one by one.

If a person begins walking away -- actually,
no, let me talk about it in the -- in this context.

If a person is detained and the agent has       05:47:38

Page 307

reasonable suspicion, and the person begins walking

away, would that raise suspicion or justify a longer

detention?

MS. SAFAVI:  Objection; vague and incomplete

hypothetical.                                    05:47:53

THE DEPONENT:  If by walking away, that

person is attempting to evade encounter of law

enforcement, that would be another articulable fact

that would raise the level of suspicion.

BY MS. LAI:                                      05:48:03

Q    Okay.  And how about if the agent doesn't

have reasonable suspicion yet and the person walks

away or tries to avoid contact with the agent, is

that reason to suspect, then, Title 8 violation --

MS. SAFAVI:  Objection; vague and incomplete    05:48:16

hypothetical.

BY MS. LAI:

Q    -- through walking away?

A    Again, depending on the circumstances, if

it's a consensual encounter and there's no          05:48:23

reasonable suspicion already there, there's nothing

to restrict the person from walking away.

Q    Okay.

And if this individual, the LPR, had -- did

want try to run or resist -- he was washing his     05:48:34

Page 308

car -- would it be -- did Agent F█████████ act appropriately to handcuff him and then put him in a vehicle to verify his status?

MS. SAFAVI:  Objection; improper witness.

Going to instruct the witness not to answer.    05:48:49

MS. LAI:  I think that's improper.  I asked if it would be appropriate under agency policy for Agent F█████████ to handcuff and put him in a vehicle.

MS. SAFAVI:  And, actually, if you have the    05:48:59 real-time screen, if you would like to read the question again, I stand by my instruction, though, based on what I heard.

BY MS. LAI:

Q   Okay.

Did Agent F█████████ act appropriately according to agency policy by handcuffing him and putting him in a vehicle to verify his status?

MS. SAFAVI:  Same instruction.  Same objection.    05:49:20

I'm sorry.  Same objection.

Same instruction:  Don't answer the question.

BY MS. LAI:

Q   Okay.

Did Agent F█████████ need any information    05:49:27

Page 309

beyond reasonable suspicion of unlawful status to

handcuff and put him in a vehicle to verify his

status under agency policy?

MS. SAFAVI:  Objection; incomplete

hypothetical.                                            05:49:43

THE DEPONENT:  So given that there was

reasonable suspicion articulated by the agent that

was encountering, and the subject wasn't answering

questions in order to safely determine that

subject's identity and to prevent the potential     05:49:55

fleeing of that subject, yes, he's within policy.

BY MS. LAI:

Q   And it's within policy even if the subject

did not run or try to resist; is that correct?

MS. SAFAVI:  Objection; misstates testimony.   05:50:07

THE DEPONENT:  Again, if there was reasonable

suspicion as already articulated by the original

agent that made the encounter, then, yes, he is

within policy.

BY MS. LAI:                                              05:50:19

Q   Okay.

We're going to go to the next exhibit, which,

bear with me, is a video.  We are going to start

playing at the beginning of the video.  And I'll

represent that this video we are about to see is     05:50:34

Page 310

Agent F[REDACTED]'s body cam video from that day from this encounter.

(Exhibit 161 was marked for identification and is attached hereto.)

(Playing video.)

MS. LAI:  Okay.

We stopped the video at a minute and four seconds into the body cam footage.

MS. SAFAVI:  Counsel, can you state how long    05:51:57 the video actually is for the record?

MS. LAI:  Yes.  The total video is four minutes and 17 seconds.

MS. SAFAVI:  Okay.

And we object on foundation.    05:52:03

MS. LAI:  Okay.

BY MS. LAI:

Q   Chief L[REDACTED], do you speak and understand Spanish?

A   I do.    05:52:15

Q   Okay.

And so were you able to understand everything that was part of the exchange on that video?

A   I am.

Q   Okay.    05:52:20

Page 311

And you are able to see that, at least when Agent F███████ began speaking with him, he did not refuse to answer questions; he was answering questions.

Were you able to see that?                    05:52:29

A    Yes.

Q    Okay.

And so if we take that factor off the table, Agent F███████ testified that he still had reason to continue detaining this individual because he was    05:52:39 at the car wash, and the intelligence briefing had indicated that individuals at the car wash were unlawfully present.

Was Agent F███████ wrong under agency policy?                    05:52:53

MS. SAFAVI:  Okay.

Objection; form.  It misstates facts and improper witness.

Don't answer the question.

MS. WORTH:  What is the improper witness    05:53:01 objection?

MS. SAFAVI:  I'm sorry, but your co-counsel is the one taking the deposition, so I will respond to her if she has a question on clarification.

MS. LAI:  Okay.                    05:53:13

CONFIDENTIAL

Let's go off the record, because I don't want to lose time.

THE VIDEOGRAPHER:  Going off the record at 5:53 p.m.

(Recess.)                                                05:53:20

THE VIDEOGRAPHER:  Going back on the record at 6:10 p.m.

BY MS. LAI:

Q   All right.

Chief L███████, we had a discussion -- the    06:10:18
counsel had a discussion off the record and we took a break.

I just want to ask as a formality, during the break, did you have any discussions with your counsel about the substance of your testimony as    06:10:32
opposed to parking or any other unrelated matters?

A   I did not.

Q   Okay.

Thank you.

All right.                                               06:10:39

So we were talking about this incident with Agent F████████ detaining a gentleman, and the question I was trying to ask you that I am now going to ask you with slightly different wording, is Agent F████████, you recall, had identified several    06:10:58

Page 313

factors that he said supported reasonable suspicion
for the continued detention of this individual.

Do you recall that?

A   I do.

Q   And one of the factors was that the          06:11:06
individual was not answering questions, and as we
saw in the body cam footage, he was answering
questions.

Do you recall that?

A   I do.                                         06:11:16

Q   And so my question is, if we remove that
factor, the other factors we discussed that
supported Agent F███████'s continued detention of
this individual, would agency policy allow
Agent F██████ to continue the detention based on   06:11:33
those factors?

A   So, again, based on the factors of the
initial encounter, which we didn't see and we don't
have -- I haven't seen a record of here, he's
continuing the investigative detention of the       06:11:46
original encountering agent.  So he's within policy
to maintain that investigative detention until
they've come to a law enforcement resolution.

Q   I understand that.

I think my question is just about the -- if    06:11:58

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

he was not answering questions and it turns out he was answering questions and he was answering questions of Agent F▮▮▮▮, based on the other information that we've discussed, would agency policy allow Agent F▮▮▮▮ to handcuff and continue the detention of this individual?

　　　　MS. SAFAVI:  Objection; vague.

　　　　THE DEPONENT:  So, again, I'm going back to Agent F▮▮▮▮ was not the initial encountering agent for this subject, so he's continuing an investigative detention on a subject that was encountered by another agent.  So if we're asking the hypothetical question on -- whether or not based on what was written here and what I saw in the video, whether he's within policy to continue the detention, yes, he is.

BY MS. LAI:

　　Q　Okay.

　　　　Thank you.

　　　　And when you say "written here," you were pointing to the deposition; is that correct?

　　A　Correct.

　　Q　Okay.

　　　　And would it be out of the typical conduct of agents on operations like this for Agent F▮▮▮▮

06:12:16

06:12:32

06:12:47

06:12:51

06:13:02

Page 315

CONFIDENTIAL

to have handcuffed and put the individual in the

vehicle to verify the individual's status?

MS. SAFAVI:  Objection; vague and ambiguous.

THE DEPONENT:  Is the question is it outside

of typical procedures?                           06:13:21

BY MS. LAI:

    Q    Yes.

    A    It is not.

    Q    Okay.

         And this individual, you saw in the video    06:13:28

that he offered to -- he said that he had status and

offered to retrieve his papers.

         Did you remember -- do you recall that in the

video?

    A    He said he was a citizen of Mexico and he had   06:13:35

papers in his car.

    Q    Yes, that's right.

         You recall that on the body cam, correct?

    A    Correct.

    Q    And would it be -- would agency policy allow    06:13:43

Agent F███████ to handcuff and take the individual

away when he has said he had status and offered to

retrieve his documents?

    A    Yes.

    Q    Okay.                                          06:14:01

Page 316

CONFIDENTIAL

And having watched the video and just based on the materials we reviewed, the ROI, the narrative, the deposition testimony, and the video, is there anything you've seen that would concern -- be of concern for the agency under agency policy of what Agent Fernandez did?    06:14:15

A    No.

Q    I think you said, let me know, earlier today that there had been targeted area -- sorry.  I'm sorry.  I'm using the wrong terminology.  But targeted location operations, and that those are still continuing today, right?    06:14:41

A    That is correct.

Q    And are roving patrols prohibited today?

A    They are not specifically prohibited, no.    06:14:54

Q    Does the agency -- would the agency know -- for example, there was an agent that testified that after July, after doing the -- one of these targeted location operations, they did -- their team did roving patrols for the rest of the day.    06:15:12

Would that be prohibited?

A    It would not be prohibited.

Q    And does the agency -- would the agency know whether or not agents were doing roving patrols for the rest of their shift after they completed their    06:15:22

Page 317

CONFIDENTIAL

Large is operating?

    A    For Operation At Large Los Angeles, no.

    Q    Are there any future changes to how Operation

At Large will operate based on -- sorry -- in

Los Angeles?                                              06:16:45

    A    That I'm aware of, no.

    Q    There are any locations that are off limits

in terms of, you know, whether agents can go to

those locations for Operation At Large in

Los Angeles at this time?                                06:16:57

    A    No.

    Q    Is there anything -- has the agency opened

any internal investigation to any of the incidents

we've discussed today?

    A    Not that I'm aware of.                          06:17:12

    Q    Is there anything you've learned about with

respect to any of the incidents today that would

warrant investigation?

    A    No.

    Q    Anything you've learned about the agency has  06:17:22

learned about with respect to any of the incidents

of Operation At Large that would warrant

investigation?

    A    No.

    Q    And has the agency conducted any             06:17:29

Page 319

investigation of incidents in Operation At Large?

A    Not that I'm aware of.

Q    Have you ever been the subject of any complaint or investigation in the context of your work?                                                     06:17:41

A    In the context of my work as a border patrol agent, me, personally?

Q    Yes.

A    I think I've been -- I can't remember any specific case.  But I -- rather than be inaccurate,    06:17:54 I can't imagine that I have not been the subject of a complaint.

Q    Well, I suppose I'm asking you, sitting here today, about any complaint or investigation that you have been the subject of.                          06:18:11

Are you aware of any complaint or investigation that you have been the subject of?

A    I'm not aware of any, no.

Q    Okay.

MS. LAI:  I think we are ready to go off the    06:18:22 record.

THE VIDEOGRAPHER:  Going off the record at 6:18 p.m.

(Recess.)

THE VIDEOGRAPHER:  Going back on the record    06:30:13

Page 320

CONFIDENTIAL

I, the undersigned, a Certified Shorthand Reporter of the State of California, Registered Professional Reporter, Certified Live Note Reporter, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [  ] was [  ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: February 3, 2026

MELISSA M. VILLAGRAN, CSR No. 12543 RPR

Page 383

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.