# EXHIBIT 5

Sealed Version
Filed Separately

CONFIDENTIAL

Assistant Director in Charge, Los Angeles Office, Federal Bureau of Investigation; Bilal A. ESSAYLI, in his official capacity as U.S. Attorney for the Central District of California.

Defendants.

_____

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

VIDEOTAPED DEPOSITION of E███████ O██████

LOS ANGELES, CALIFORNIA

FRIDAY, MAY 22, 2026

VOLUME 1

Reported by

Daryl Baucum, RPR, CRR, RMR, CSR No. 10356

Job No. 8174475,  PAGES 1 - 385

Page 2

CONFIDENTIAL

DEPOSITION EXHIBITS

E████████ O████

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 186 | Baseball card of C████ G████████-C████████ | 119 |
| Exhibit 187 | EARM printout of F████████ H████████ S████████ | 212 |
| Exhibit 188 | Incident Report - Vehicle Stop on June 11, 2025 | 223 |
| Exhibit 189 | Field Operations Worksheet of ████████ | 230 |
| Exhibit 190 | Google Maps screenshot | 233 |
| Exhibit 191 | Google Maps screenshot | 234 |
| Exhibit 192 | I-213 of G████████ N████ L████ | 243 |
| Exhibit 193 | E-213 of E████████ C████ H████████ | 255 |
| Exhibit 194 | Google Maps screenshot | 270 |
| Exhibit 195 | Google Maps screenshot | 278 |
| Exhibit 196 | I-213 of J████ C████████ | 293 |
| Exhibit 197 | Google Maps screenshot | 312 |
| Exhibit 198 | Google Maps screenshot | 315 |
| Exhibit 199 | Declaration of [Redacted] | 328 |

REPORTER'S NOTE:  All quotations from exhibits are reflected in the manner in which they were read into the record and do not necessarily indicate an exact quote from the documents.

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

CONFIDENTIAL

then counsel may proceed.                        09:23:49

THE REPORTER:  Good morning.

Daryl Baucum, CSR No. 10356.

E███████ O███████

having been first duly sworn, was

examined and testified as follows:

EXAMINATION

BY MS. LAI:                                      09:24:15

Q    All right.

Good morning, Officer O█████

My name is Annie.  I'm going to be asking
you questions today.

We're going to take -- spend a long day     09:24:25
together.  So I appreciate your time in advance.

I know you just said your name but could
you please spell your name for the record.

A    My complete name?

Q    Yes.                                        09:24:34

A    So my first is E███████   So it's
E███████████   last name O█████  O██████████

Q    And what is your current title with ICE?

A    It's going to be Deportation Officer.

Q    And is that in a particular office?       09:24:56

Page 15

CONFIDENTIAL

then counsel may proceed.                          09:23:49

            THE REPORTER:  Good morning.

            Daryl Baucum, CSR No. 10356.


                    EUSEBIO ORTIZ,

            having been first duly sworn, was

            examined and testified as follows:


                    EXAMINATION

BY MS. LAI:                                        09:24:15

    Q    All right.

            Good morning, Officer Ortiz.

            My name is Annie.  I'm going to be asking

you questions today.

            We're going to take -- spend a long day    09:24:25

together.  So I appreciate your time in advance.

            I know you just said your name but could

you please spell your name for the record.

    A    My complete name?

    Q    Yes.                                      09:24:34

    A    So my first is Eusebio.  So it's

E-U-S-E-B-I-O, last name Ortiz, O-R-T-I-Z.

    Q    And what is your current title with ICE?

    A    It's going to be Deportation Officer.

    Q    And is that in a particular office?       09:24:56

                                                  Page 15

BY MS. LAI:                                          09:48:56

Q   Any steps, like any -- go down a checklist and make sure that documents are being kept, anything like that.

A   Well, I haven't done anything to store any   09:49:06 documents or anything like that.  I don't think I am supposed to take any steps because there is nothing to do like as far as to not delete anything.  So I haven't done anything to delete anything.

Q   Thank you.                                    09:49:24

Let me switch gears a little bit.  I'm going to ask you about your employment at ICE.

And so how long have you been employed at ICE?

A   I have been with Immigration Custom          09:49:41 Enforcement since 2015.

Q   Have you worked in the L.A. field office that entire time?

A   Yes.

Q   And how did you start in 2015?  You came      09:50:00 from the Academy straight to the L.A. field office.

And what position did you take?

A   So when you say the field office, as far as Los Angeles, itself, or --

Q   That's correct.  The Los Angeles area of     09:50:16

Page 36

CONFIDENTIAL

A    As far as us making arrests?                        10:00:09

Q    Correct.  In the field.

A    No, it was similar.

Q    And then after ATD, you said you went to
Fugitive Operations?                                     10:00:20

A    That's correct.

Q    Which team did you join?

A    We have two teams.  Both of them.

Q    And is that Team 21 and 27?

A    That's correct.                                     10:00:33

Q    Did you start on one?

A    I don't remember where I started.  I
just -- I know I been to both teams.

Q    And what year did you leave ATD and start
in Fugitive Operations?                                  10:00:42

A    It was last year, 2025.

Q    2025?

A    I think so, or end of 2024, somewhere
around there.

Q    So let me just make sure I understand the           10:00:58
timelines.

        So you said you were in CAP for a couple
of months.

A    Yes.

Q    And then you went to ATD for two to three           10:01:06

Page 45

CONFIDENTIAL

years?                                                      10:01:09

        A    Correct.

        Q    Then you went to Fugitive Operations?

        A    That's correct.

             So if I recall, correctly, I joined      10:01:15
Fugitive Operations towards the end of 2024 or the
beginning of 2025.

        Q    Why did you go to Fugitive Operations?

        A    I was voluntold (sic).

        Q    And who voluntold you?                   10:01:34

        A    Management.

        Q    What did they say was the reason why you
were being moved?

        A    I don't ask questions.

        Q    Was fugitive ops work that you had been  10:01:45
interested in at any point prior?

        A    No.

             MS. SAFAVI:  Objection; vague.
BY MS. LAI:

        Q    What team are you on today?              10:02:03

        A    Team 1.

        Q    And that is not one of the teams you
mentioned before.

             Was Team 1 created recently?

        A    It was created maybe a month ago.        10:02:13

Page 46

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

Q    Have you been on Team 1 since it was    10:02:18
created?

A    You know, I don't recall because they keep
moving everything around, so . . .

Q    Do you know how many Fugitive Operations    10:02:28
teams there are in the San Bernardino office today?

MS. SAFAVI:  Objection; speculation.

THE WITNESS:  If I am correct, I think
it's five, six.

BY MS. LAI:    10:02:39

Q    So there is Team 21 and 27, and then
Team 1, which is what you are on.

What are the other teams?

A    It's -- I believe it's 1 through 6.
Actually, I'm sorry, I will take that back.    10:02:57

It's 1 through 5.

Q    1 through 5?

A    Yeah.

Q    So there is Team 1, 2, 3, 4, and 5.

And do Teams 21 and 27 still exist?    10:03:08

A    Not to my knowledge.

Q    Have you -- apart from Teams 1 and 5 --
no, sorry.

Have you served on any of the Teams 1
through 5 apart from Team 1?    10:03:29

Page 47

MS. SAFAVI:  Objection; form.                 10:03:32

THE WITNESS:  Not that I recall.

BY MS. LAI:

Q    And have you -- and what is your position
on Team 1?                                     10:03:42

A    I'm a team lead.

Q    And your -- does that mean you are a team
supervisor?

A    No, we have a supervisor.

Q    And you said your supervisor is B████?    10:03:58

A    Yes.

Q    And is he an SDDO?

A    That's correct.

Q    Any other SDDOs on your team?

A    No.                                        10:04:10

Q    What does it mean to be a team lead in
Team 1?

A    I have no clue.

Q    Are your -- are your job responsibilities
any different than any other member of the team    10:04:23
apart from SDDO B████?

A    No.

Q    Are you the most senior member of the
team --

A    No.                                        10:04:40

Page 48

Q    -- apart from SDDO B███████?                    10:04:40

MS. SAFAVI:  Objection; form.

THE WITNESS:  No.

BY MS. LAI:

Q    Is this role as team lead something you        10:04:46
volunteered for?

A    No.

Q    How did it come to you that you were
placed in the team lead role?

A    Somebody put in my name and put "TL" in        10:04:56
front of it and that's it.

Q    When they put "TL" in front of it, did
they tell you what that was going to mean?

A    No.

Q    Are there any other team leads on Team 1?      10:05:09

A    Yes.

Q    Who are they?

A    DO S█████.

Q    Anybody else?

A    That's it.                                     10:05:24

Q    So two team leads on Team 1.

Is that right?

A    That's correct.

Q    And how many officers total?

A    Five total.                                    10:05:34

Page 49

type of team?                                          10:06:55

        A    I really don't know what they do.

        Q    Do you know if they do field enforcement?

        A    I think so.

        Q    In the San Bernardino suboffice are there    10:07:04
any other teams that do field enforcement?

            MS. SAFAVI:   Objection; calls for
speculation.

            THE WITNESS:   Not -- not -- no.

BY MS. LAI:                                             10:07:21

        Q    And at this time, SDDO Sanchez, do you
know what team he is supervising -- or they are
supervising?

        A    I know she is supervising two teams.  I
don't know what team she is supervising.              10:07:32

        Q    So between Teams 1 and 5, she is
supervising two of those teams?

        A    The only thing I know is my supervisor
supervises 1 and 2.  Beyond that, I don't know who
supervises what.                                       10:07:45

        Q    And do you know what team SDDO Herrera
supervises?

        A    No.

        Q    And SDDO Burdick supervises Teams 1 and 2?

        A    That is correct.                          10:08:00

                                              Page 51

CONFIDENTIAL

Q    Anyone else?                                    10:11:14

A    That is it.

Q    And when you serve as acting supervisor, do you supervise Teams 1 and 2 or just your team?

A    1 and 2.                                        10:11:25

Q    And so do you know who the officers are on Team 2?

A    Yes.

Q    Who -- who have you supervised on Team 2?

A    I'm sorry?                                      10:11:32

Q    Who have you supervised on Team 2 when serving as acting supervisor?

A    DO Enis, DO Brown, DO Guzman, and DO Isaias.

Q    Anybody else?                                   10:12:04

A    That is it.

Q    How about targeting sheets?

When you are supervising as acting supervisor, do you ever sign targeting sheets?

A    Yes.                                            10:12:20

Q    Any other document you sign as acting supervisor that we haven't talked about yet?

A    Not that I recall.

Q    Now, you said FO team -- FOT Team 1 is new.                                            10:12:35

Page 55

Have you been on FOT Team 1 since it's    10:12:37
creation?

A    Yes.

Q    How did you learn that FOT Team 1 was
being created?    10:12:47

A    We had a meeting.  We had a meeting or it
was an Email.  I don't remember, exactly.

Q    What was discussed in that meeting or
Email?

A    It was just -- it was a group of names    10:13:01
that would be together as a team.

Q    Was that the time when the other FOT
teams, 2 through 5, were also being created?

MS. SAFAVI:  Objection; form.

THE WITNESS:  Yes.    10:13:18

BY MS. LAI:

Q    And so around this time the San Bernardino
suboffice went from two Fugitive Operations teams to
five.

Is that right?    10:13:30

A    Correct.

Q    And you said that was a few months ago?

A    From -- from what I recall, yes.

Q    And the officers serving on these five
teams, are any of them officers who had not served    10:13:46

Page 56

CONFIDENTIAL

that are like out there and like to protest about          11:12:00

what we do and so I try to avoid them.

    Q   Are there particular areas you know they

are likely to be and you try to avoid those areas?

    A   No, they are all over.  So I just avoid          11:12:15

all areas.

    Q   So I think going back to my question,

why -- why do you pick particular areas to go to?

    A   Well, depending on what -- you know, on

where I am -- I want to go for that day.  If I want          11:12:31

to go further out, I think for me is better.

    Q   What goes into your decision making for

where your team is going to go for that day?

    A   I don't know, just whatever I feel like

doing that day.                                              11:12:48

    Q   Anything else?

    A   No, that is it.

    Q   How much gas you have in your tank?

    A   It's a government vehicle, so it has gas.

    Q   Is there any type of criteria you are          11:12:57

supposed to consider or is it really just up to you?

    A   It's --

        MS. SAFAVI:  Objection; form.

        THE WITNESS:  It's just go looking for the

people that have final orders.  They're -- they are          11:13:07

Page 93

all over.  So it's just we get to pick wherever we          11:13:09

want to go.

We have Riverside and San Bernardino

counties, so . . .

BY MS. LAI:                                                 11:13:14

Q    It is a large area.

A    Yeah.

Q    How about your supervisor, does your

supervisor have any say or is it really up to you

which area your team's going to go to?                     11:13:21

A    For the most part, they let us -- they let

us pick wherever we want to.

Q    And you said before you have gone back to

the same place more than once?

A    That's correct.                                       11:13:35

Q    Have you sometimes gone back to like the

same neighborhood more than once?

A    That's correct.

MS. SAFAVI:  And just, Agent Ortiz, if you

could just speak a little louder.                          11:13:45

THE WITNESS:  Okay.

MS. SAFAVI:  Thank you.

BY MS. LAI:

Q    A couple of more questions about Elite and

then I think we can move on.                               11:13:52

Page 94

So again, I am trying to understand how          11:13:54
Elite tells you people who have final orders in a
particular area.

Is it something like a -- like a
Google Maps or is there -- is it like a list that          11:14:04
you put in the coordinates of that area and that
Elite tells you the list?

MS. SAFAVI:  Objection; form, and in
addition calls for law enforcement privilege.

Go ahead and answer to the extent that you          11:14:17
can without disclosing privileged information.

THE WITNESS:  So it just gives me a
general idea of where people -- where they're
staying but that is about it.

BY MS. LAI:                                              11:14:30

Q    And does that -- is that shown to you,
again, through a map or some kind of list?

MS. SAFAVI:  Objection; law enforcement
privilege.

Go ahead and answer to the extent that you          11:14:40
can without disclosing privilege.

BY MS. LAI:

Q    I think my question is if we want to make
it simpler, what does the screen look like.

MS. SAFAVI:  Thank you.                                  11:14:50

Page 95

CONFIDENTIAL

THE WITNESS:  The screen could be split.    11:14:53
It's a split screen.

BY MS. LAI:

Q    And if it's a split screen, is there like
a map on one side and a list on the other?    11:15:03

MS. SAFAVI:  Objection; form and
privilege, but go ahead and answer.

THE WITNESS:  So it's -- it's split into
both.

BY MS. LAI:    11:15:16

Q    And then so how do you use the map then?

Can you click into particular like dots on
the map to find more information?

A    You are able to click on the map and kind
of like it gives you -- how can I put it to you.    11:15:35

You are able to click on a map and zoom in
and be able to put -- place people in certain
locations.

Q    And is there a way to click it to learn
more information about a particular person?    11:15:55

A    Can you elaborate more on what the answer
entitles.

Q    Yes.

Again, I'm just asking what the screen
looks like on the map.    11:16:06

Page 96

CONFIDENTIAL

Can you zoom in and then click on the map    11:16:08
to find out more information about a particular
person?

A    No.

Q    So is there anywhere you can click on the    11:16:17
map to find out more information about a particular
person or is it just showing you where people in
general are?

MS. SAFAVI:  Objection; form, vague.

THE WITNESS:  It could show the last known    11:16:38
address of the person.

BY MS. LAI:

Q    And so from the map, you can pull up
information about a person?

A    No.                                           11:16:52

Q    I'm sorry for the disconnect.

How do you see the last known address of a
person in Elite?

A    On the split screen on the bottom.

Q    So is this on the part of the split screen    11:17:04
that is not the map?

A    That's correct.

Q    And what information does Elite tell you
about a person?

MS. SAFAVI:  Objection; form.                   11:17:16

Page 97

THE WITNESS:  It will have the name,          11:17:19

biometrics, last known address, crim history, final

order.  That's about it.

BY MS. LAI:

Q    Any other information?                    11:17:48

A    Not that I can remember.

Q    Is there any information about where a

person might be other than their last known address?

A    I wouldn't know.

Q    And why wouldn't you know?                11:17:58

Have you tried to find out where a person

might be in Elite other than at their home?

A    They could be at work.  They could be

anywhere.

Q    Would Elite have that information?        11:18:11

A    I wouldn't know.

Q    Are there people in Elite that don't have

a final order, as well?

MS. SAFAVI:  Objection; calls for

speculation.                                         11:18:23

THE WITNESS:  I wouldn't know.  I would

have to double-check and run through every single

person in the system to see if yes or no.

BY MS. LAI:

Q    Is there a way to filter Elite for just   11:18:36

Page 98

CONFIDENTIAL

people who have a final order?                                    11:18:39

        A     I believe so.

        Q     Is that a filter that you use?

              Apart from people who have a final order,

who else might be in Elite?                                       11:18:54

        A     People may be going through proceedings.

        Q     How about people who have filed an

application with the USCIS, could they be in Elite?

        A     I wouldn't know.

        Q     And you said before you haven't received    11:19:15

any training on Elite?

        A     That's correct.

        Q     Does Elite contain like a percentage score

of some kind?

              MS. SAFAVI:   Objection; ambiguous.          11:19:28

              THE WITNESS:   Yeah.

BY MS. LAI:

        Q     What is that percentage score for?   What

does it show you, if you know?

        A     I believe from my understanding is that     11:19:44

the percentage is the accuracy of the person staying

there.

        Q     What is that percentage based on?

              MS. SAFAVI:   Objection; calls for

speculation.                                                      11:19:57

                                                        Page 99

THE WITNESS:  From my personal    11:19:57
understanding is maybe different factors.  I would
not know the different factors, what they are, but
the system scores it somehow.

BY MS. LAI:    11:20:11

Q    And do you use that score to make
decisions about where to go?

A    Yes.

Q    How do you use the score?

A    Well, probably them being there or likely    11:20:22
they're going to be there.

Q    And so if the score is higher, they're
more likely to end up on your target list -- or how
does that work?

A    More than likely it would be more fruitful    11:20:33
for an arrest.

Q    And is there a certain percentage you
think is not acceptable?

Like, for example, what if it says
70 percent, is that still somebody who could end up    11:20:44
on your target list?

A    Well, at the beginning, I didn't know how
the system works, and when it had 0 percent and he
was listing -- staying -- living at that the same
house, so it -- to me just that number is not -- it    11:20:58

Page 100

doesn't mean anything to me because at the end of          11:21:03

the day, that was an address that I was -- person

was there and he was there, so . . .

Q    And so Elite's information about a

person's address could be incorrect or the          11:21:15

percentage could be incorrect because in that case

the person was there?

MS. SAFAVI:  Objection; calls for

speculation, object to form.

THE WITNESS:  Like I said, I wouldn't -- I    11:21:28

wouldn't be able to tell you what entitles or what

percentages or what -- how the percentages are

calculated.

The only thing is I know that these people

that we're going after, they have a final order and    11:21:39

I did my research and they're -- they're ready to be

removed or so forth.

BY MS. LAI:

Q    Do you ever go back after an operation and

see if Elite was right about a person's address?    11:21:51

MS. SAFAVI:  Objection; vague ambiguous.

THE WITNESS:  Can you repeat the question.

BY MS. LAI:

Q    Yes.

After an operation, do you ever go back    11:22:00

Page 101

CONFIDENTIAL

and see how accurate Elite's prediction of a          11:22:04

person's address was?

     A    No.

     Q    And then what happens after you contact a

person in the field?          11:22:12

         Do you ever go back and put information

back into Elite?

     A    So after I make an arrest, we process the

person in Eagle and it communicates with Elite and

it closes that case out.          11:22:26

     Q    Is there any other information you put

back into Elite other than you're ready to close a

case out?

     A    No.

     Q    And can you edit the information in Elite     11:22:40

about a person if your record checks reveal that

there is something incorrect?

     A    I never had to do anything like that.

     Q    Are you able to do it?

     A    I wouldn't know.  I haven't tried it.  All     11:22:54

I know is that it's an option.

     Q    Once you identify a person from Elite and

you run your checks, do you ever go back and check

if the information Elite gave you about the person

was correct?          11:23:08

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

CONFIDENTIAL

A    No.  The only thing I do is I check and if    11:23:12
the check -- those checks then come back good then I
will print out what I have to print out.

Q    And what if the checks don't come back
good?                                                        11:23:24

A    Then I don't print out that card.

Q    And is it -- how often is it that you
don't you print out the card from Elite?

A    Not often.

Q    I think I heard you say something like      11:23:37
baseball card before.

Is that -- what you're printing out from
Elite, is that what you are referring to as a
baseball card?

A    That's correct.                             11:23:48

Q    And what information is on the baseball
card?

A    Just a picture sometimes.

Q    Any other information?

A    Biometrics.                                 11:24:00

Q    Anything else?

A    Sometimes crim history.  Sometimes I just
decision (sic) or any pending BIAs or so forth or
Ninth Circuits, last known addresses.

Q    Anything else?                              11:24:22

Page 103

CONFIDENTIAL

I'm going to have the court reporter mark    11:41:54
our first exhibit for the day.  This is going to be
185 -- 186.

            (Deposition Exhibit 186 was marked
            for identification by the court    11:42:08
            reporter and is attached hereto.)

BY MS. LAI:

    Q    So Officer Ortiz, I'm going to direct your
attention to -- I know this is a little awkwardly
formatted, but there is an image that starts on the    11:42:49
bottom of the first page of this document.  There is
a number -- a little number at the bottom right-hand
corner that lawyers use.  It says 7884.  So at the
bottom of that page going onto the next page, and
then -- and then I think it ends at the bottom of    11:43:08
the second page.

            Do you see that?

    A    Uh-huh.

    Q    Do you recognize that?

    A    Yes.    11:43:18

    Q    What is it?

    A    It's a baseball card.

    Q    It's a baseball card.

            And so that's the targeting sheet
developed or created by Elite that you can print out    11:43:27

                                            Page 119

CONFIDENTIAL

that we have been talking about?                           11:43:29

A     That's correct.

Q     And this particular baseball card pertains

to -- you can see the date of these messages that

are sent, July 21, in San Bernardino where the            11:43:42

target's name was O██████  G█████████  O████████.

Did you participate in that operation?

A     No.

Q     Do you recognize any of the officers who

are part of this chain?                                   11:44:01

A     Maybe one.

Q     Which one?

A     Perera.

Q     And who is that?

A     He works in San Bernardino as a DO.         11:44:20

Q     Did you work with him?

A     Have I ever worked with him?  I think so,

a couple of times.

MS. SAFAVI:  And we're going to object on

foundation on the document.                               11:44:34

BY MS. LAI:

Q     How many baseball cards have you seen?

A     Can you elaborate.

Q     Yes.

In your job, you have seen many types of          11:44:45

Page 120

these targets sheets?                                          11:44:49

A    Probably hundreds.

Q    Are you pretty confident this is a targeting sheet?

A    Yes.                                                      11:44:54

Q    And then at the bottom of the second page, do you see -- it's kind of in fuzzy print where it says "Approval."

Is that where SDDO would have to approve?

A    Yes.                                                      11:45:11

Q    So how does the approval work?

Is the SDDO doing that electronically in Elite or is it -- are you printing it out and then they sign their name there?

A    It could go either/or.                                   11:45:19

Q    And then to go out in the field with your target list, you just need to have it either physically signed or signed in Elite.

Is that right?

A    That's correct.                                          11:45:30

Q    And do you print these out all -- for all of -- everybody on your target list?

A    I am just going to tell you what I do.

Q    Okay.

A    I print them out.                                        11:45:38

Page 121

Q    Are there some teams that don't print all    11:45:40
of them out?

A    I wouldn't know.

MS. SAFAVI:  Objection; calls for
speculation.                                              11:45:46

BY MS. LAI:

Q    When you're out in the field, would you
ever add targets to your list after you have already
left to go out?

MS. SAFAVI:  Objection; form.                11:46:04

THE WITNESS:  For the most part, if we
don't have that many targets and somebody else wants
to give more targets that they know they have not
arrested the people from there, they will give us
those targets and we will go out there.                  11:46:16

BY MS. LAI:

Q    Has that happened to your team?

A    Sometimes.

Q    And why would that happen?

Are they done for the day and they still    11:46:25
have targets on their list?

A    That's correct.

Q    I think you said earlier that there is
some FOWs that were already approved that could also
be added to your target list, correct?                   11:46:40

Page 122

A    That's correct.                                    11:46:42

Q    On any given day, how many of your targets would be FOWs and how many might be these baseball cards?

MS. SAFAVI:  Objection; form.                    11:46:53

THE WITNESS:  I wouldn't know.  Like it could be -- you know, if we're working at an area that we don't have that many targets and we have FOWs, we will use the FOWs for that target.

BY MS. LAI:                                             11:47:11

Q    Would it be the majority are FOWs and the minority are targeting sheets or maybe the other way around?

A    Just depends.

Q    The targeting sheets are these baseball      11:47:20
cards.

Apart from the baseball cards, would you have anything else out in the field with you?

MS. SAFAVI:  Objection; vague.

THE WITNESS:  A signed 200.                      11:47:38

BY MS. LAI:

Q    Anything else?

A    That's it.

Q    And do you see how -- it starts on actually the very bottom of the first page and the    11:47:46

Page 123

CONFIDENTIAL

top of the second page.                                11:47:48

        Do you see a photo of this individual?

    A    That's correct.

    Q    And so when you print it out -- you know,

you have printed it out on this sheet or we printed   11:47:57

it out for this deposition, is this approximately

what it might look like for a piece of paper when

you print it out?

        MS. SAFAVI:  Objection; form.

        THE WITNESS:  What do you mean it might      11:48:14

look like it?

BY MS. LAI:

    Q    So when you print it out from Elite, does

it look any different than -- you know, we printed

this on a standard printer.                           11:48:22

        Is there any special printer you are using

or does it look any different than what you are

seeing here?

    A    No, it just print out to the size of the

paper.                                                11:48:31

    Q    Black and white?

    A    Yeah, depending on the printer.

    Q    And do you use different printers at work?

    A    No.

    Q    What is your printer?                        11:48:42

                                            Page 124

A    Black and white.                          11:48:43

Q    Do you see how the bottom of this person's face is cut off?

A    Yeah.

Q    Do you know why that would be?          11:48:55

A    I would not know.  Maybe a bad printer.

Q    And then Officer Perera, do you know what team he is on now?

MS. SAFAVI:  Just for clarification, are you saying Perera with a "P"?                  11:49:07

MS. LAI:  Perera, P-E-R-E-R-A, the one on this chain.

MS. SAFAVI:  Okay.

THE WITNESS:  He is in our field office. He works on the team but I don't know exactly what   11:49:16 team right now.

BY MS. LAI:

Q    If you look at the top of the second page, do you see where it says COC, unknown; eye color, no value; hair color, no value; height, weight no data   11:49:31 available?

A    Uh-huh.

Q    It says final order indicator available, IJ decision unknown; current status, immigrant; and then it says EARM case status, and then it says   11:49:44

Page 125

CONFIDENTIAL

something property -- oh, configure properly.    11:49:49

A    Where are you looking at?

Q    EARM case status -- under Current -- USCIS current status, it says "Configure properly"?

A    I see where it says EID criminality    11:50:12 indication.

Q    That's another place where it says "configure properly."

Is that something you have seen before when you print it out from Elite, "configure    11:50:24 properly"?

A    For the most part, like I -- like I said, I never seen it like that, but for my cases, like I said, we do checks, and I have -- I print out all of my checks.    11:50:42

So just based on this -- oh, you are talking about the right-hand side, the ER?

Q    Yes, the case status.

A    So this gets a reinstate?

Q    It says "configure properly," and then    11:50:53 below that it says "reinstate" but I was just asking about --

A    Oh, you are talking about case status on the bottom.

Q    Yes.    11:51:01

Page 126

A    Okay.  Now I see it.                                11:51:01

Yeah, so I wouldn't know who that -- what that is.

Q    And then do you see where the officer -- well, I don't -- I don't know if it's the officer 11:51:14 who does it but there is some handwriting there.

A    Uh-huh.

Q    Do you see that?

And it's referring to a car.

Do you see that?                                   11:51:22

A    Yeah.

Q    And so once this printout is made, you take it out in the field with you.

Do you ever keep the printouts anywhere --

A    Yeah.                                             11:51:36

Q    -- once the operation is done?

A    I keep them.

Q    Where do you keep them?

A    By my cubicle.

Q    Is there a requirement to keep them or --    11:51:45

A    No.

Q    -- is that just something you decided to do?

A    I just decided to see how many captured or whatever.                                             11:51:53

Page 127

CONFIDENTIAL

Q    Do you sometimes put handwriting --    11:51:53

A    No.

Q    -- on the targeting sheets?

A    If I am in the field and I'm -- and I'm doing checks, then yes.  They -- anything that    11:52:04 pertains to the case, I will write it here.

Q    Do you sometimes -- sometimes make notes in the field about information you learn apart from checks that you run?

A    Yes.    11:52:18

Q    And then we talked before about the left-hand side where it says eye color, hair color, height, weight, and it doesn't have information.

Have you seen that before when you print out a targeting sheet from Elite?    11:52:28

A    Yes.

Q    Why would that be?

A    Because it either -- so it could be multiple reasons why.  Maybe the system didn't generate all the information.    11:52:40

Sometimes the person has been encountered and when the prior encounter, no one enters that information into the system, so they have no -- no information that is available to us to indicate that information.    11:52:57

Page 128

CONFIDENTIAL

So it could be multiple reasons why.  So I    11:52:57
wouldn't be able to tell you precisely why this one
doesn't have it, but from my experience that's what
I have been looking at.

Q    And has it happened more than once before    11:53:08
where this -- these particular fields --

A    Yeah, it's that -- that isn't -- this is
sometimes common of what happens.

Q    The photo, where does the photo come from?
Do you know?    11:53:21

A    It could --

Q    In Elite?

A    It could happen from the last prior
encounter.  It could happen -- I wouldn't be able to
tell you where the system is pulling this    11:53:28
information from.

Q    Could the photo sometimes be if the last
prior encounter was ten years ago from ten years
ago?

A    Yeah, it could be -- it could be from the    11:53:38
last encounter.

So people have encounters maybe like when
they were young or just recent.  So we wouldn't be
able to tell you when was the last encounter from
the picture.    11:53:48

Page 129

BY MS. LAI:                                                    11:58:07

Q    And if you don't end up arresting or
locating a target on a particular day, do they roll
over to the next day's list?

A    We will probably come back a different        11:58:20
date for that target but that wouldn't roll over for
like the next day, just whatever next time that we
come in for that or that location, we will bring
whatever is available for that location.

Q    Do you put those to the side or do you        11:58:36
start from scratch and go back in Elite and maybe
you will come across the same person again?

A    We will put it to the side and come back
to it.

Q    When you put it to the side, do you           11:58:49
organize it by geographic location or how do you --
is it just a big stack of paper?

A    So what I do is I have crates and I have
folders, and in the folders I have cities and that's
what I do.                                                     11:59:06

Q    So you have a folder that says
San Bernardino?

A    All the cities.

Q    Is your folder -- San Bernardino is very
large.                                                         11:59:18

Page 134

guidelines about what you can and cannot do.    13:44:27

A    So we basically are able to take a collateral into custody as long as we are able to establish alienage.

Q    Any other guidance or --    13:44:43

A    No.

Q    So this morning, we were talking about a situation where you have a last known address of a target, you go to that last known address, that location, and you conduct intelligence gathering.    13:45:05

I'm going to ask you again because I had a discussion with your counsel.

Can part of that intelligence gathering include license plate checking?

MS. SAFAVI:  Objection; law enforcement    13:45:18
privilege.

Go ahead and answer the question.

THE WITNESS:  Yes.

BY MS. LAI:

Q    And staying on this topic, is license    13:45:22
plate checking you do all the time or sometimes?

A    That is something that we do whenever we do surveillance.

Q    Do you check vehicles just at that residence or in the vicinity such as like on the    13:45:42

Page 162

CONFIDENTIAL

same street?                                                    13:45:46

A    We check in the vicinity.

Q    I'm going to ask you some questions about documentation.  Bear with me because I know not everyone loves this topic.                            13:45:58

So after you conduct an arrest, what type of documentation do you have to complete?

I know, your favorite topic.

A    So we have to process the case.  So it just depends on the type of case that we have to    13:46:19 process, on the type of documentation that we need to serve on an individual that hasn't been arrested.

Q    So when you go nowadays -- sorry, let me withdraw that.

You are the team lead and also              13:46:34 Officer Smith, correct?

A    That is correct.

Q    And when your team conducts an arrest, is there a designated case officer for that arrest?

A    Not necessarily.                               13:46:47

Q    And is there any -- are there any rules or norms about who would process that arrest?

MS. SAFAVI:  Objection; form.

THE WITNESS:  No, we don't have a set like who is going to process.  They just -- one day might   13:47:08

Page 163

A    No.                                          14:00:36

Q    Have you heard of something called
Operation At Large?

A    Yes.

Q    What is your understanding of that         14:00:45
operation?

A    That we're looking for people that have
final orders, our targets.

Q    That sounds similar to the mission of
Fugitive Operations.                             14:00:56

Did Fugitive Operations teams participate
in Operation At Large?

A    I think so.

Q    Did your -- did you participate in
Operation At Large?                              14:01:06

A    Well, to me it's just -- so to clarify, to
me, our operations, they just changed the name.
We're doing the same thing just with a different
name.  So if we did participate, then yes, we did.

Q    Is there a name for the operation today    14:01:24
that is not Operation At Large?

A    I believe so but they -- they just changed
the name.  I think it's called is -- what is it
called?

I don't recall the name because we use the       14:01:41

Page 175

CONFIDENTIAL

dropdown on -- on our system.  It just puts it in.    14:01:42

Q    Is that the JOC system?

A    No, it's under Eagle when we process a case.

Q    Under Eagle.  Sorry to talk over you.    14:01:51

Is it something like Fiscal Year '26?

A    Yeah, I think it's FOD -- FOD 2026, something like that.

Q    What determines when you are going to select that dropdown menu option versus another    14:02:07 operation name or no operation name?

A    So every case we process has to be processed under certain -- certain -- certain operation.

If they change the name, then they will    14:02:23 tell us to hey, we are going to have an operation and it's going to be "X" name, then we are going to process the case under that operation.

Q    And the FOD 26 operation name, is that something you are still using now?    14:02:39

A    As of the day before yesterday, yes.

Q    For Operation At Large, did you participate in any briefing or training?

MS. SAFAVI:  Objection; form.

THE WITNESS:  So I think we had maybe a    14:03:01

Page 176

CONFIDENTIAL

most part, we all carry all of our gear.                    14:19:30

Q    Did you conduct traffic stops that day?

A    I don't remember how many -- how many --
if we did, how many we did or not.

Q    Do you recall making any vehicle stops       14:19:42
that day?

A    Yes.

Q    What do you recall?

A    Making a vehicle stop on a truck.

Q    Tell me about that vehicle stop.           14:19:52

What do you remember?

A    We did a vehicle stop.  I don't remember
the name of the street.  It was off of some main
street and a little street.  I don't remember what
the name of the streets were.                            14:20:07

We conducted a vehicle stop and four
people fled the vehicle.  We ended up arresting the
female.

Q    Anything else you can remember?

A    The lady that we arrested ended up falling   14:20:24
and tripping and hitting a picket fence and we took
her back into the office.

Q    Anything else?

A    That is all.

Q    You said that this occurred near a main      14:20:44

Page 192

866-299-5127          calendar-ca@veritext.com          www.veritext.com

CONFIDENTIAL

Q    How long did you observe this person
before you made a decision to initiate a stop?            14:25:11

A    Maybe five, ten minutes.

Q    Why were you in this parking lot?

A    I was looking for my target.            14:25:27

Q    And so had you been to any other locations
or did you start at the parking lot?

A    I started at the person's home address.

Q    And how did you get to the parking lot
from the home address?            14:25:41

A    I started driving around to see if I would
see anybody.

Q    Did you see anybody at the home address?

A    There was no -- there was no movement.

Q    How long did you stay at the home address?    14:25:51

A    Maybe like five, ten minutes.

Q    You said there was no movement.

      Were there any vehicles there?

A    No.

Q    Did you run any plates?            14:26:00

A    No.

Q    Why not?

A    There was no vehicles.

Q    What about other vehicles on the street,
did you run any plates?            14:26:07

                                                        Page 197

A    No.                                                    14:26:08

Q    And so you're at the target location for about five to ten minutes and then you decide you're going to start driving around the area.

Is that right?                                             14:26:18

A    That's correct.

Q    Were you looking for any particular type of vehicle?

A    We had no information that the person drove any type of vehicle.  So he could be taking   14:26:26 public transportation, bicycle, walking.  We don't know.

Q    Did you know anything else about the target?

A    No.                                                    14:26:37

Q    Did you know, for example, what type of you work they do?

A    I believe he was a day laborer.

Q    And where would that have been --

A    I don't know.                                          14:26:48

Q    -- indicated?

Would that be in the FOW?

A    That case belonged to one of my colleagues.  It was given to me.

Q    Who did the case belong to?                            14:26:56

Page 198

CONFIDENTIAL

She saw who I was and she offered me to   14:32:33
some -- if I want to buy oranges, and I told her no,
thank you.

So at that point, she went -- she hurried
up to her car.  She was -- she was telling something   14:32:45
to the two guys.

One of the guys called the other guy and
told him -- told him like come over here, waved at
him to come over.

They got into the car by throwing   14:33:00
everything into the back of the car and they took
off.

Q    And then what happened?

A    So at that point I called -- I contacted
my partner and I'm like -- I told him hey, bro, we   14:33:09
have the male -- our male target that is
leaving the -- leaving the parking lot.  They're
leaving this certain direction.

He said okay.  You know, like I got you.

And I go okay.   14:33:26

So the vehicle exited the parking lot
pretty fast and then we -- we went -- I went behind
them.  I just couldn't go right behind because there
was traffic coming.

So when it was safe to do so, I proceeded   14:33:41

Page 204

CONFIDENTIAL

to go south on that main road and follow the        14:33:44
vehicle.

My partner who came behind me, and you
know, catched -- catched up to me.

When I was closing -- getting close to        14:33:55
that vehicle, I initiated a vehicle stop.

So going on the main road southbound when
I initiated -- initiated the lights and sirens, the
vehicle pulled over to a small street and made a
right and yield.        14:34:13

That's when we made the initial encounter
with the male.

Q    Did you try to run the plates of this
vehicle?

A    No.        14:34:24

Q    And apart from -- let's set aside the
driver you believe resembled the target.

Did the fact that the individuals got in a
vehicle and left the parking lot, was that
suspicious?        14:34:46

A    What got me suspicious is that -- the way
the lady reacted, scared, and the way they put
everything away so fast that it initiated my
reasonable suspicion.

Q    Were you wearing your face covering at the    14:34:58

Page 205

Do you recognize this document?                    15:29:11

A     Yes.

Q     What is it?

A     It's an FOW.

Q     Is this the FOW for Mr. -- was this the       15:29:20
FOW for the target that day?

A     The intended target, yes.

Q     Did you ever arrest him, by the way?

A     No, I didn't.

Q     After the arrest of Ms. H███████, did you    15:29:37
make any other attempts to locate him?

A     No.

Q     Why not?

A     Because I have other targets that I am
working on.                                          15:29:48

Q     This was a copy given to us by the
government in the case.

      Do you still have the original?

A     No.

Q     Why not?                                      15:30:00

A     Because I'm not the case officer for this
case.

Q     Did you have this FOW with you that day?

A     Yes.

Q     That was what you had in the folder next      15:30:08

                                          Page 231

to you in the vehicle?                                        15:30:10

A    That's correct.

Q    Is this the photo of the target you were looking at?

A    Yes.                                                    15:30:17

Q    Do you see an address on this FOW?

A    Yes.

Q    And that is the last known address that you had visited just before you went to the parking lot?                                                        15:30:38

A    Correct.  I believe so.

Q    Do you see where it says "back house"?

A    Uh-huh.

Q    And do you see any vehicle information for this individual?                                             15:30:48

A    Yes.

Q    Can you read that out for the record?

A    It's a 2003 Mercedes Benz.

Q    Do you see any employment information for this individual?                                             15:31:09

A    Not on here.

Q    I want to direct your attention to the bottom of the document.  It says "Employer and Address."

Do you see that?                                        15:31:28

Page 232

A    Next to the photo.  Okay.                    15:31:30

Q    Is that employer information for this individual?

A    I think so.

Q    Are you familiar with Marcos Tires --        15:31:40

A    No.

Q    -- San Bernardino?

A    No.

Q    Did you make any attempt to go to Marcos Tires that day?                                    15:31:46

A    No.

MS. LAI:  I'm going to have the court reporter -- you can set that aside -- mark this one as 190.

(Deposition Exhibit 190 was marked            15:32:11
for identification by the court
reporter and is attached hereto.)

BY MS. LAI:

Q    All right.

Officer Ortiz, I'm going to represent to        15:32:23
you that 190 is a Google Maps printout of the vicinity of the last known address on the FOW we were just looking at as well as the supermarket parking lot we were just talking about.

And if you see on the lower left-hand part    15:32:51

Page 233

CONFIDENTIAL

document is not an authentic document?                    15:46:26

      A    I can't see like pictures or anything like

that.  So I wouldn't know.

           It seems to be my signature, my initials,

my writing.                                              15:46:43

      Q    From what you can see, the information

that is visible to you, does it look similar to

other I-213s that you have generated?

      A    Aside from the bottom where it says -- the

bottom before "Disposition," that is the only thing       15:47:20

we were doing different at that time.

      Q    Are you talking about the bottom of the

first page where it says "Disposition"?

      A    Right above it.

      Q    Where it says April 20?                        15:47:37

      A    Where it says served on date and then it

says location, name of the person being served --

      Q    Understood.

           So the service paragraph on the third page

is something that was newer.                              15:47:51

           Is that correct?

      A    Correct.

      Q    Do you remember when that was added?

      A    That was part of -- I believe part of

the -- I think of the Perdomo case.  I'm not sure.       15:48:00

Page 245

CONFIDENTIAL

It's one of those cases.                                    15:48:05

Q    If you can go back to the first page on the right-hand column, do you see where it says "By" and then it lists Officer Najera?

A    Yeah.                                                  15:48:18

Q    What does it mean that his name is in that box?

A    I don't know.  I don't know.  Maybe he was the one helping put some of the information in the system.                                                      15:48:33

Q    Is that the name that would show up as the primary agent in the EARM encounter report?

A    I wouldn't know that.

Q    Were you out with the team on this day? You can take a moment to look at the narrative.     15:48:56

A    What was the question?

Q    My question is were you out with the team on this day in the field for this.

A    I think so.

Q    You believe you were there?                           15:49:59

A    Yeah, I don't remember -- I mean without a faith, I wouldn't be able to tell you "yes" or "no," but if I wrote this and I signed it, I was probably there.

Q    Let's see, the second page it says --              15:50:13

Page 246

toward the top, it says "Arrested At/Near" and it          15:50:17

says North Tipacanoe Avenue, San Bernardino.

        Do you see that?

    A    On what paragraph?

    Q    Toward the top, it says "Current          15:50:37

Administrative Charges."  Then it says "Records

Checked," and then it says "Arrested At/Near."

        Do you see that?

    A    Yeah.

    Q    Is that information something that can be          15:50:46

searched for in Eagle, the "Arrested At/Near"

information?

    A    So I'm not sure -- I'm not sure because

whenever they -- towards the end of the system, it

says "Arrested At.  "          15:51:03

        When we bring people in -- into our -- our

processing floor, the people downstairs that are

helping us out create the event for that day, they

will put a general location into it.  So they will

probably type in whatever they think it was or the          15:51:24

arresting thing.  I'm not sure if that was the name

of the arresting thing.

        I could have overseen that location but

whatever is in the narrative should be correct.

    Q    So if you processed this arrest, are you          15:51:42

Page 247

saying the location information would have been          15:51:43

inputted by somebody else?

    A    Well, whatever the system -- whoever put

it on the system to auto fill that -- that box,

someone could have done it but the narrative was          15:51:56

done by me.

    Q    Thank you.

    And do you -- you just took a moment

earlier to look at the narrative.

    Do you have any memory of this incident?          15:52:08

    A    No.

    Q    If you take a look at the narrative, would

you have had a -- it says in the first paragraph

under "Encounter Information," an FOW sheet and an

I-200 administrative arrest warrant for          15:52:28

Mr. Ga███-C███████ .

    A    Uh-huh.

    Q    And when it says "FOW," could that have

been a baseball card or would it have definitely

been an FOW?          15:52:40

    A    It could be --

    MS. SAFAVI:  Objection; form.

    THE WITNESS:  It could be either/or.

BY MS. LAI:

    Q    And apart from the FOW or the targeting          15:52:45

Page 248

CONFIDENTIAL

sheet and the I-200, what information did the team    15:52:51

have about Mr. G██████-C█████████?

        MS. SAFAVI:  Objection; form.

        THE WITNESS:  Well, whatever we had in our

possession.  I don't remember what else we had at    15:53:03

that day.

BY MS. LAI:

    Q    Would you have had vehicle information?

    A    I would have to see on the baseball cards,

the FOW.    15:53:09

    Q    It's possible the baseball card would have

contained vehicle information?

    A    Could have.

    Q    What about the type of work he did?

    A    Possibly.    15:53:22

    Q    And that could be on the FOW, too, as

well, as we just saw, correct?

    A    Yeah, FOW or baseball card.

    Q    And then it says you -- your team saw

Mr. N█████ L█████.    15:53:32

        As the team lead, who would have -- would

you have made that decision to start following him

or somebody else?

        MS. SAFAVI:  Objection; form.

        THE WITNESS:  Probably one of our    15:53:45

Page 249

CONFIDENTIAL

teammates or myself.  I can't remember.                    15:53:46

BY MS. LAI:

        Q     And do you recall -- you said you don't
have any memory of this incident.

              So would you know whether you ran his        15:53:58
plates?

        A     I don't remember.

        Q     Would you know what type of vehicle he was
driving?

        A     If it's not on the narrative, no.           15:54:10

        Q     Do you see where it says in the third
paragraph under the encounter, the DOs were in
tactical gear with approved police and ICE
identifiers; informed the subject they were
investigating and requested his identification          15:54:27
and name.

              Do you see that?

        A     That is correct.

        Q     What would you have told him you were
investigating?                                            15:54:33

        A     We were looking for a specific person.

        Q     Would you have told him who the person was
that you were looking for, the name?

        A     Not initially.

        Q     When you say "not initially," would you     15:54:49

Page 250

have eventually told him?                                    15:54:51

A    Yes.

Q    At what point?

A    After he identified himself.

Q    And it says -- just one second.             15:54:58

It says that he provided his ID and his
name.

Is that correct?

A    On what paragraph?

Q    Right after that, the subject identified    15:55:19
himself as N▇▇▇ L▇▇▇ G▇▇▇▇▇▇▇.

Do you see that?

A    Okay.

Q    What identification did he provide?

A    At this moment, I don't remember what he     15:55:33
provided because it's not listed here.

Q    Is there anyplace where that information
can be found?

A    I would have to look at the A file to see
what it -- what it -- what ID he provided.  He could  15:55:44
have provided a California ID.  He could have
provided a "matricula" or a passport.

Q    And then it says it was determined that
N▇▇▇ L▇▇▇ was not the target of the operation.

Is that correct?                          15:55:59

Page 251

CONFIDENTIAL

A     That is correct.                                    15:56:00

Q     And is that based on him having identified
himself and provided an ID for himself and it was
not the target?

A     That's correct.                                    15:56:08

        MS. SAFAVI:  Objection; form.

        THE WITNESS:  That's correct.

BY MS. LAI:

Q     And then it says you asked him if he would
answer some questions.                                   15:56:19

        Do you see that?

A     That's correct.

Q     Did you tell him he was free to leave at
that point?

A     Did I ask him?                                     15:56:28

Q     Did you tell him he was free to go and he
did not have to answer your questions?

A     I asked him if I could ask additional
questions.

Q     Did you say anything else?                         15:56:37

A     No, that is all.

Q     And then it says you asked him about
citizenship and immigration status and he
self-admitted his status.

        Is that correct?                                 15:56:50

                                                         Page 252

CONFIDENTIAL

A    That's correct.                                      15:56:51

Q    It's your testimony that this is what
happened?

A    To my best of my knowledge, yes.

Q    And then it says you contacted LESC over    15:56:57
the phone.

Is that correct?

A    That's correct.

Q    If he self-admitted status, what was the
reason why you would contact LESC over the phone?    15:57:09

A    Just to make sure what type of case I
would have in front of me.

Q    And at this point is he under arrest?

A    At what point?

Q    When you are contacting LESC.                 15:57:21

A    He is probably still in the vehicle.

Q    At this point he is still voluntary.

He is consensually answering your
questions and remaining on scene until you can
verify the information?                               15:57:35

A    That is correct.

Q    At what point is he arrested?

A    Once we put him out of the vehicle and put
cuffs on him.

Q    And apart from the information he gave you    15:57:46

Page 253

CONFIDENTIAL

here that you say he gave you and the information    15:57:48

from the LESC check, did you attempt to seek any

other information about him?

    A    As far as?

    Q    Anything else about him before you arrest.    15:58:00

    A    For example, can you elaborate more on

your question.

    Q    I think just anything.

        So you have his statements from this

interview, and then you contacted LESC to verify    15:58:14

information about his status.

        Was there any other information that you

would have obtained as part of your investigation?

        MS. SAFAVI:  Objection; form, calls for

law enforcement privilege.    15:58:32

        Go ahead and answer the question to the

extent that you can.

        THE WITNESS:  For -- you are talking about

for immigration purposes only?  Like, for example,

for status or anything like that?    15:58:38

BY MS. LAI:

    Q    Anything before you decide to make the

arrest.

    A    Well, I already had made up my mind I was

going to take him, place him under arrest, once he    15:58:48

Page 254

CONFIDENTIAL

self-admitted he was here illegally.                15:58:51

Q    And then do you recall how you effectuated

that arrest?

A    No.

Q    Do you recall anything else about this        15:59:02

operation?

A    No.

Q    To process his arrest, would you have been

the one to take him back to San Bernardino?

A    I don't know who brought him back because     15:59:18

for the most part, either one of my teammates or

myself will transport the person back to the office.

Q    And do you know where you first started

following him on this Tippecanoe?

A    No.                                           15:59:36

Q    I think we can go to the next one.

I'm going to bring you up top, May 3.  It

is a Sunday and it is -- do you recall going out in

the field on Sunday, May 3?

A    That is part of -- one of my days that I      16:00:12

actually did work.

Q    So do you remember what happened on May 3

when you went out in the field?

MS. SAFAVI:  Objection; form.

THE WITNESS:  No.                                  16:00:25

Page 255

CONFIDENTIAL

MS. LAI:  May 3 was about two and a half    16:00:26
weeks ago.

I am going to give this to the court
reporter.

(Deposition Exhibit 193 was marked    16:01:00
for identification by the court
reporter and is attached hereto.)

BY MS. LAI:

Q    The court reporter has provided you
Exhibit 193.                                    16:01:02

Do you recognize what type of document
Exhibit 193 is?

A    Yes.

Q    And Exhibit 193 was -- is a document that
appears to have been created by Officer Smith.    16:01:29

Do you see that?

A    Yes.

Q    And under Officer Smith's name, you see
SDDO Burdick's name.

Do you see that?                                16:01:43

A    That's correct.

Q    And just for the record, the one we were
just looking at, did SDDO Burdick sign that one,
too, as a supervisor, 192?

A    Yes.                                       16:01:58

Page 256

MS. SAFAVI:  We're going to object on    16:01:59
foundation to this document.

BY MS. LAI:

Q    If you look under the right-hand column
under the "By," do you see your name there?    16:02:05

A    That's correct.

Q    And I think I know the answer but do you
know what the significance is of your name being in
the "By" box there?

A    No.    16:02:15

Q    All right.

You can go ahead and take a moment to read
the narrative, and my question is going to be
whether you remember if you were out with the team
that day on this vehicle stop.    16:02:31

A    So what is your question?

Q    My question is do you remember being out
with the team on this vehicle stop.

A    I am -- more than likely I was here.

Q    Do you have a memory of this vehicle stop?    16:03:45

A    No.

Q    On the second page toward the top in the
field where it says "Arrested at/Near," do you see
where it says Sixth Street and El Sobrante, Corona?

A    Uh-huh.    16:04:23

Page 257

A    What was the question, again?    16:10:32

Q    My question is does the office through iTAK track your location in the field.

A    Someone is tracking it.  I don't know who.

Q    Do you see in this narrative that the    16:10:42 individual who is listed as the person you're looking for is Mr. H██████-M███████?

A    That is correct.

Q    And the individual who is arrested is a different person, correct?    16:11:02

A    Yes.

Q    And again, do you know what information your team had about Mr. Heredia-Martinez?

A    I would have to look at the -- at the documentation that is that -- for that target so I    16:11:21 would be able to tell you more about him.

Q    And who would have made the decision to start following Mr. C█████  H████████?

A    Probably me or one of my teammates.

Q    And if you don't remember this, I take it    16:11:43 you don't remember where you started to follow him?

A    No.  Well, probably from the last known address of this person, maybe, the Rimpau.

Q    Would you have had the target's photo?

A    For that -- for the baseball card?    16:12:09

Page 264

Q    Yes.                                                16:12:11

A    I would have to see the baseball card in order for me to answer that question.

Q    Is it possible if that a baseball card would not have a photo?                              16:12:18

A    Possibly.

Q    And if you were following Mr. C███████ H███████, would you have run his plates?

A    So I wouldn't be able to tell you until I see the baseball card or the FOW for that case.      16:12:34

Q    What about the plates of the person you arrested, can you tell me if you ran his plates?

A    Like I said, I don't remember if we did a vehicle stop.  More than likely not.  If we -- if he was on foot walking out of the place, there was      16:12:57 no -- probably no vehicle to run.

Q    And it was a vehicle stop that you conducted.

A    Yeah, according to the narrative, yes.

Q    And do you see where the narrative says in      16:13:12 the third paragraph, the DOs were in tactical gear with approved police identifiers and requested his identification and name?

A    That is correct.

Q    And it says he identified himself as      16:13:30

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

C████ H███████, E██████o.                                16:13:33

A    Uh-huh.

Q    And then it says it was determined that he was not the target of the operation.

A    That is correct.                                   16:13:40

Q    And would that be because looking at ID and how he identified himself?

A    That is correct.

Q    And then from there, you ask him some questions, correct?                                    16:13:51

A    That is correct.

Q    And then according to this he self-admits --

A    Uh-huh.

Q    -- his status, and then from there is it   16:13:57 the same, you have -- you made a decision you were going to arrest him but you contacted LESC to verify.

A    That's correct.

Q    And then at that point, it's consensual in   16:14:09 your -- in your view and then you place him under arrest after that?

        MS. SAFAVI:   Objection; form.

        THE WITNESS:   That's correct.

                                                    Page 266

CONFIDENTIAL

BY MS. LAI:                                    16:14:21

Q    And do you see where in the second paragraph it says,

"At approximately 0525 hours, officers observed a male matching      16:14:35 the physical appearance and photographs of Heredia-Martinez near the vicinity of the last known address."

A    That is correct.                          16:14:47

Q    And for that analysis, is that what led you to develop reasonable suspicion to conduct the stop?

MS. SAFAVI:  Objection; form.

THE WITNESS:  Yes.                            16:14:56

BY MS. LAI:

Q    And for that analysis, was it relevant that Mr. ████ H████████ appeared Hispanic?

MS. SAFAVI:  Objection; form.

THE WITNESS:  We were looking for a           16:15:09 Hispanic person.

BY MS. LAI:

Q    Is your answer "yes"?

A    Yeah.

Q    And then apart from -- you are going to be   16:15:17

Page 267

866-299-5127          calendar-ca@veritext.com          www.veritext.com

CONFIDENTIAL

able to predict this.                                                  16:15:20

Apart from the information he -- the narrative says he provided you here and the information that came back from the check.

Is there any other information you                       16:15:30
attempted to obtain as part of your investigation before making the decision to arrest?

MS. SAFAVI:  Objection; form.

THE WITNESS:  So as clearly -- I don't think it's stated here.  Sometimes they do provide     16:15:42
an ID or an ID for their country or passport.  So sometimes it's not annotated in the 213.

So I wouldn't be able to tell you that, per se.

BY MS. LAI:                                                            16:16:00

Q    Anything else?

A    As far as what?

Q    Any other information you would have tried to obtain as part of your investigation before making the decision to arrest.                                  16:16:11

MS. SAFAVI:  Objection; form.

THE WITNESS:  No, the moment he self-admits that he is here illegally, have no status, making sure he had no, then no.

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

CONFIDENTIAL

BY MS. LAI:                                                      16:16:22

Q    And Mr. C█████ H███████ was -- would you classify this as a collateral arrest?

A    Yes.

Q    So you would not have had an I-200 for       16:16:28
him, correct?

A    That is correct.

Q    And after this occurred, do you know if you would have -- your team would have gone back to that location to try to locate Mr. H██████ M████████?   16:16:41

A    Yes.

Q    And did you?

A    No, I'm not sure if we arrested him yet or not.

Q    If Mr. Officer Smith is processing this,    16:16:53
would you have gone back to the office and then gone back out to Corona?

MS. SAFAVI:  Objection; form.

THE WITNESS:  Can you repeat the question.

BY MS. LAI:                                                      16:17:05

Q    Yes.

Would you have taken Mr. C█████ H███████ back to the suboffice to process the arrest and then gone back out to Corona or stayed around in Corona?

A    I don't remember.                           16:17:20

Page 269

Q    What would be your typical practice, bring    16:17:20
the person back and then come back to that area or
stay in that area?

A    It just depends if we have transportation
available to bring the body back or not.    16:17:31

Q    And is there anything else you haven't
told me about that you remember about this
particular encounter?

A    Not that I can remember.

MS. LAI:  I'm going to ask the court    16:17:42
reporter to mark our next exhibit.  That is going to
be 194.  You can keep this one open.

(Deposition Exhibit 194 was marked
for identification by the court
reporter and is attached hereto.)    16:17:56

MS. LAI:  I will just remind the witness
you are free to look at your phone --

THE WITNESS:  I turned it off.  It was
vibrating a lot.

MS. SAFAVI:  You said 194?    16:18:27

MS. LAI:  This is 194, yes.

MS. SAFAVI:  It's another map.

BY MS. LAI:

Q    So 194, I will represent to you, depicts a
Google Maps printout of the general area where this    16:18:41

Page 270

Q    Do you remember how you conducted that    16:24:05
vehicle stop?

A    Initiated lights and sirens.

Q    And if Mr. C█████ H████████ says a van
pulled in front of him and one behind him --    16:24:17

A    A van?

Q    A vehicle pulled in front of him and one
behind him, would that be surprising to you?

A    No, it just depends on the situation on
the vehicle stop by itself.    16:24:34

If we initiate a vehicle stop and they
pull over on the side on their own, we won't -- we
won't actually try to get in front of them, but for
the most part, once we initiate a vehicle stop, they
pull over.  Then we have a vehicle parked in front.    16:24:49

Q    And this type of stop where there is a
vehicle in front and a vehicle behind, is there a
particular name for that?

A    No.

Q    And I'm just going to call if a "maneuver"    16:25:02
for purposes of talking about it today.

This type of maneuver, is that something
that you are permitted to do as an ICE officer?

MS. SAFAVI:  Objection; form.

THE WITNESS:  There is not -- we are able    16:25:19

Page 275

and Gilbert?                                                    16:32:39

    A    Somewhere near the vicinity of that area.

    Q    So then let's go back to 194.  That's the
other map.

         Could you mark with an "X" just for this    16:32:50
so the record is clear, the intersection of
East Sixth Street and El Sobrante Road.

    A    Thank you.

    Q    We already talked about this but I just
want to make clear the record.                                 16:33:05

         If you can take a look at Exhibits 192 and
193, the two I-213 narratives.

         My question is I noticed that they're
similar.  Just looking for my missing page.  I
noticed that they were similar.                                16:33:38

         Do they look similar to you?

    A    Could be, yeah.

    Q    Is it possible that this is created from
some kind of narrative that is then adjusted with
subject's name and the target's name --                        16:33:59

    A    Yes.

    Q    -- during the processing process?

    A    Correct.

    Q    And how does that work?

    A    What do you mean how does that work?       16:34:09

                                                    Page 281

Q    How does that work where the narrative is    16:34:11

adjusted to substitute the target's name and the

subject's name?

A    I'm not -- I'm kind of confused when you

say "substitute."                                    16:34:30

Q    For example, one of these is process

created by you, Officer Ortiz.  The other one is

created by Officer Smith.

Would Officer Smith have taken a narrative

you created and then adjusted for the new arrest?    16:34:40

MS. SAFAVI:  Objection; calls for

speculation.

THE WITNESS:  So what happened, I could

have probably worked on the narratives, myself, both

of them, and he actually finished serving one of     16:35:05

the -- one of the -- one of the cases and I did the

other case.

BY MS. LAI:

Q    And can you explain to me why the

narratives look so similar?                          16:35:15

A    Because I wrote them.

Q    You wrote both of them?

A    Probably, they look like -- if they're the

same, they are probably me.

Q    This is your verbiage --                        16:35:27

Page 282

CONFIDENTIAL

A    Yes.                                                    16:35:29

Q    -- in other words?

And are there other narratives that have similar verbiage?

MS. SAFAVI:  Objection; form.                               16:35:33

THE WITNESS:  So they're done by me. There is different cases that I do.  So it just depends on the type of disposition on the case. That will determine that.

BY MS. LAI:                                                 16:35:42

Q    And in cases where you are looking for a target, it turns out the person who encountered is not the target and it's a vehicle stop, would it have -- are there other cases that would be verbiage similar to this one?                                    16:35:58

A    If it's my target?

Q    Yes.

A    If --

Q    No, if it's not your target.

MS. SAFAVI:  Objection; confusing.                          16:36:04

THE WITNESS:  So can you elaborate more on that.

BY MS. LAI:

Q    Yes.

Apart from these two, are there other                       16:36:10

Page 283

CONFIDENTIAL

arrests where we might see a similar narrative where    16:36:14

you were looking for the target and the person you

ended up arresting was not the target?

A    No.  If it is my narrative, it will

probably look the same more than likely -- more than    16:36:27

likely.

It just depends on if -- if there was

other factors that would change the narrative, that

would determine changes here and there on the

narrative, itself.    16:36:40

Q    But otherwise, it would be the same?

A    Well, alienage and criminal history and so

forth.

Q    Understood.

And this narrative, is this something that    16:36:51

you wrote from scratch or did you borrow from

somewhere else and then adjust it?

MS. SAFAVI:  Objection; form.

THE WITNESS:  It's something that I

actually probably adjusted.    16:36:59

BY MS. LAI:

Q    Where would you have adjusted it from?

A    I don't know.  Somebody gave it to me.

Q    Somebody on your team?

A    Probably.    16:37:13

Page 284

Veritext Legal Solutions
866-299-5127            calendar-ca@veritext.com        www.veritext.com

CONFIDENTIAL

A    That's all.                                          17:11:18

Q    Do you remember what he looked like?

A    If I recall correctly, I think it was a
male.  I don't know.  I don't remember like how old
was he, exactly.                                          17:11:36

Q    And when you stopped him, had you run his
plates?

A    No, I don't run plates.  Somebody -- some
of my coworker -- fellow DOs that will usually run
plates or whatever.                                      17:11:56

Q    And you recall in 195 that you were the
one who initiated the stop?

A    Yes.

Q    Thank you.

     Is there -- sitting here today, is there    17:12:03
anything else you remember about this stop?

A    No.

Q    You can set that to the side.  We're going
to go to the next one.

     Do you remember being out in the field on    17:12:19
Sunday, February 2 -- 22?  Sorry.

A    No, I don't remember.

Q    And just to quickly go back, you said you
didn't run the plates of the individual in --

A    195?                                          17:12:36

Page 292

Q    -- 195.                                            17:12:36

Did you have somebody else run his plates?

A    I don't remember.

Q    All right.

So on Sunday, February 22, can you                  17:12:44
remember what operations you were on?

A    No.

MS. LAI:  I will go ahead and have the
court reporter mark this as 196.

(Deposition Exhibit 196 was marked               17:12:55
for identification by the court
reporter and is attached hereto.)

BY MS. LAI:

Q    Do you recognize what type of document
this is?                                                17:13:26

A    213.

Q    Do you see that it was created by
Officer Flores?

A    I don't know who Officer Flores is.

Q    Do you know what who SDDO Clark is?        17:13:39

A    That would be acting supervisor.  I
know -- I know Deportation Officer Clark.

Q    What team is he on?

A    It's a female.  It's a female.

Q    What team is she on?                       17:14:01

Page 293

A    I think she is part of the CAP unit.                    17:14:04

MS. SAFAVI:  We're going to object to foundation on this document.

BY MS. LAI:

Q    You think it was -- she is acting for the    17:14:17
CAP unit.

Was that your testimony?

A    So according to this narrative, she is acting supervisor for that day or maybe that week. I'm not sure.                    17:14:27

Q    What team is she on, is my question.

A    I answered the question.  She is part of the CAP unit.

Q    CAP unit.  I just wanted to be clear.

Do you see your name on the upper    17:14:36
right-hand where it says "By"?

A    I do.

Q    And if you take a look at -- would it be fair to say if Officer Flores's name is on the front page that you didn't process this arrest?    17:14:56

A    Yeah, it doesn't seem like I processed this -- this arrest.

Q    If you take a look at the narrative, can you tell me if you were present.

A    Yes.                    17:16:10

Page 294

So according to this narrative, it states to me that I was -- I was -- I was there.    17:16:10

Q    Did you provide Officer Flores with the information to create this narrative?

A    I don't know an Officer Flores.    17:16:28

Q    Did you write this narrative?

A    No.

Q    Do you know who did?

A    Well, according to the signature on this -- on this case, it's Officer Flores.    17:16:41

Q    Was -- because you don't know her, is it fair to say she was not out with you on the operation?

A    No, I think -- I think Officer Flores might be in Los Angeles.    17:16:57

Q    Was she with you on the operation?

A    No.

Q    Do you see where it says DO Ortiz on the third paragraph under encounter with assisting federal partners?    17:17:12

A    Correct.

Q    Who are the assisting federal partners on this day?

A    I don't remember precisely when HSI stopped coming out to assist it, but for sure it    17:17:26

Page 295

CONFIDENTIAL

would have been OFO.                                          17:17:28

Q    Any other federal partners?

A    No.

Q    Do you recall this operation?

A    I think I recall -- I recall this event     17:17:47
somewhat.

Q    How many vehicles did you have in your
group?

A    I don't recall that information.

Q    Were you in a vehicle by yourself?         17:17:59

A    More than likely not.

Q    And which vehicle would you have been in?

A    I don't remember.

Q    And do you see where the "Arrested
at/Near" says Kingsley Avenue, Montclair?        17:18:20

A    What paragraph?

Q    Towards the top, the "Arrested at/Near"
field that we have looked at a few times today.

A    Okay.

Q    Do you see where it says Kingsley Avenue,   17:18:34
Montclair?

A    That's correct.

Q    Are you familiar with that area?

A    Yes.

Q    How familiar are you with that area?        17:18:41

Page 296

A    I am familiar with it.                    17:18:43

Q    Have you -- had you done enforcement
operations in that area before?

A    How close are you talking about?

Q    Kingsley Avenue in Montclair.           17:19:06

A    Well, Kingsley runs parallel east and
west.  So it's a pretty long street.  So can you
elaborate how far.

Q    Yes.

How about in this neighborhood where the     17:19:17
stop occurred?

A    So that stopped occurred there but the
initial encounter was not done there.

Q    Understood.

And my question is just whether you had       17:19:26
done enforcement actions in this general area before
that helped you to be familiar with the area.

MS. SAFAVI:  Objection; form.

THE WITNESS:  So this -- for this
particular area, yes and no.                          17:19:43

BY MS. LAI:

Q    Can you help me understand that.

A    So yes, because I did -- I conducted a
stop there for that area; and no, we have done
operations farther down from Kingsley.                17:19:58

Page 297

CONFIDENTIAL

Q    So on the -- beginning of the encounter,    17:20:02
it says that you were attempting to locate an O███
M███████-M██████.

Do you see that?

A    That's correct.    17:20:14

Q    And it lists his last known address as
1130 West Fourth Street in Ontario, correct?

A    That's correct.

Q    And Ontario is this area Montclair.

Is that correct?    17:20:26

A    I'm sorry?

Q    Is 1130 West Fourth Street, Ontario, close
to Kingsley Avenue, Montclair?

A    Yeah, kind of -- that is kind of like
border line, Montclair/Ontario.    17:20:45

Q    Understood.

So then it says that at approximately
0630 hours, a male matching the physical description
of M███████ M██████ was observed leaving the
residence on an electric bicycle.    17:21:07

Do you see that?

A    That's correct.

Q    And I didn't see the mention of an FOW or
an I-200.

Did you have an FOW or targets sheet with    17:21:15

Page 298

you that day?                                          17:21:18

        A    For that particular individual?

        Q    Yes.

        A    For our target -- intended target?

        Q    Yes.                                      17:21:24

        A    Yes.

        Q    And an I-200, as well?

        A    Yeah.  If we have an FOW then we have
an 200, as well.

        Q    Is there a reason it's not in the        17:21:32
narrative here?

             MS. SAFAVI:  Objection; form.

             THE WITNESS:  Well, like I said, I did not
write the narrative.  So I wouldn't be able to tell
you why it's not there.                                17:21:41

BY MS. LAI:

        Q    And drawing your attention to the second
paragraph where it says a male matching the physical
description, do you see that?

        A    For what?  What paragraph?                17:21:54

        Q    At approximately 0300 -- 030 -- sorry,
it's late.

             "At approximately 0630 hours,
             a male matching the physical
             description."                             17:22:04

                                                       Page 299

CONFIDENTIAL

Do you see that?                                          17:22:06

A    I do see it.

Q    And so there is this individual riding a
bicycle who this states matched the physical
description.                                              17:22:15

Is that what happened?

A    Yes.

Q    And the ethnicity of -- the Hispanic
ethnicity of the individual, is that relevant to
matching the physical description here?                  17:22:30

A    The ethnicity?

Q    Yes.

A    That is one factor.

Q    And was there a photo, do you know?

A    I would have to see the FOW to let you             17:22:45
know for sure yes or no.

Q    And then it says you observed Mr. O███████
departing the residence of Mr. H██████ M████████?

It says he was observed departing the
residence on an electric --                              17:23:06

A    Let me get my facts straight real quick.

Q    Okay.

A    So the person we were targeting is O████
Ma██████, correct?

Q    Correct.                                            17:23:17

Page 300

CONFIDENTIAL

A    And you are talking about who now?    17:23:18

Q    Mr. C███████.

A    The person that we arrested?

Q    Yes.

A    So what is the question?    17:23:23

Q    The question is was Mr. C██████ observed
departing the residence on an electric bicycle.

A    That's correct.

Q    And when it says "the residence," which
residence is it referring to?    17:23:36

A    The one on the -- on the narrative on the
1130 West Fourth Street.

Q    Thank you.

And then after that what happened?

A    So we observed the male get into the eBike    17:23:53
and just -- just left.  He left the area.

We actually kind of like followed him a
bit and I was in the only vehicle around that area.
So I called my partners on the radio.

I still continued to follow in the    17:24:17
distance.  When I finally had the people to initiate
the stop, we initiated a stop.

Q    About how long did that take?

A    It was -- so we followed him from the one
main street.  It wasn't a main street.  It was a    17:24:37

Page 301

CONFIDENTIAL

side street going east and west, and he went south    17:24:41

on Benson and we initiated a stop before Kingsley.

Q    And what happened then?

A    So we -- if I remember correctly, we

talked to him and we made -- we initiated contact    17:24:56

and turned out it wasn't our target.

Q    At some point did you lose visual of him?

A    We did.

Q    Was that before your partners arrived?

A    That's correct.    17:25:15

Q    And were there other cars on the road?

A    I kind of like lost my -- my coms radio.

I looked down and by the time I looked up, he was

gone.

Q    And were there other bicycles on the road?    17:25:33

A    No, not that day, not that I remember.

Q    If you lost visual of him, would he have

lost visual of you if he had visual of you?

       MS. SAFAVI:  Objection; calls for

speculation.    17:25:48

       THE WITNESS:  I wouldn't know that.

BY MS. LAI:

Q    And then you tried to talk -- so well,

after you reengaged visual, how do you then try to

stop him?    17:26:07

Page 302

A    We initiated in the lights on him and then    17:26:08
I honked my horn.

Q    Did you try to speak to him?

A    When I got out of the vehicle, I did.

Q    How about before that?    17:26:18

A    I couldn't talk to him.

Q    The I-213 says officers then proceeded to
talk to the subject while he was riding on the
eBike.

Is that incorrect?    17:26:32

A    Where does it say that?

Q    At the bottom of the second page.

A    We probably gave him verbal commands to
stop and pull over to the side.

Q    It doesn't mention here that you honked    17:27:08
your horn.

Is that incorrect?

A    I'm sorry?

Q    The I-213 doesn't mention that you honked
your horn.    17:27:19

Is that incorrect?

MS. SAFAVI:  Objection; form.

THE WITNESS:  So first of all, I'm going
to go back to my first statement when I made -- this
narrative was done by Officer Flores.  So all of the    17:27:28

Page 303

CONFIDENTIAL

facts probably were not here.                           17:27:32

I'm trying to remember from based on my --
what I could remember.  Maybe all the facts are not
here.  So that could have been a possibility.

BY MS. LAI:                                            17:27:45

Q    Are there any facts here that are not
correct?

MS. SAFAVI:  Objection; form.

THE WITNESS:  So I'm going to -- I'm going
to take time to read the whole narrative because I      17:28:31
think I remember more facts about the -- about what
happened that day.

BY MS. LAI:

Q    Let me ask you a couple of questions and
then --                                                17:28:42

A    Can I read that narrative first before you
ask me for questions.

Q    We can go off the record for that, and you
can take your time.

Would you like to do that?                    17:28:50

A    If it's going to be questions about the
narrative, itself, then I would like to take time to
read it.

MS. LAI:  Let's do that.  Let's go off the
record.  You can take as much time as you want.         17:29:01

Page 304

THE VIDEOGRAPHER:  Going off the record at 17:29:04 5:29 p.m.

(Off the record.)

THE VIDEOGRAPHER:  Going back on the record at 5:30 p.m.                                     17:30:23

BY MS. LAI:

Q    Officer Ortiz, have you had a chance to review the narrative?

A    Yes.

Q    Is there anything here that is not                   17:30:31 correct?

MS. SAFAVI:  Objection; form.

THE WITNESS:  From my best of my knowledge, that's some of the stories of what happened that day.                                        17:30:41

BY MS. LAI:

Q    What is missing?

A    Like how we activated the lights and -- and I honked my horn to him to get his attention.

Q    Anything else?                                       17:31:18

A    From what I could remember, that's -- for right now, that's it.

Q    And then at some point it says officers pulled towards a driveway and the subject -- this might be a typo -- collided with a government        17:31:34

Page 305

CONFIDENTIAL

vehicle.                                                          17:31:38

Do you see that?

A    Yes.

Q    Who was it that pulled towards the driveway?                                                        17:31:42

A    One of our fed partners.

Q    Do you recall who?

A    I don't remember who it was -- who was driving the vehicle -- well, I think -- hold on.

I think it was OFO.                                              17:31:54

Q    And why did they do that?

A    Because the guy did not -- they did not want to stop.

Q    Do you agree with their decision to pull towards the driveway?                                          17:32:10

MS. SAFAVI:  Objection; calls for law enforcement privilege.

Go ahead and answer to the extent that you can.

THE WITNESS:  To me, it's just I couldn't    17:32:22 dictate what the officer was going to do.  I was more focused on talking to the guy.

BY MS. LAI:

Q    And who was in the lead for this vehicle stop?                                                            17:32:35

Page 306

A    Myself.                                                17:32:35

Q    And did you know they were going to pull towards the driveway?

A    Who was going to pull towards the driveway?                                            17:32:49

Q    OFO.

A    No.

Q    And the OFO officers, were they wearing any body cam?

MS. SAFAVI:  Objection; calls for                17:32:57 speculation, also, law enforcement privilege.

Go ahead and answer to the extent that you can.

THE WITNESS:  No, not to my knowledge.

BY MS. LAI:                                                17:33:04

Q    Do you have any issue with OFO's decision to pull towards the driveway?

MS. SAFAVI:  Objection; form, calls for a legal conclusion.

BY MS. LAI:                                                17:33:21

Q    As the officer who was in the lead.

A    Repeat the question.

Q    Yes.

Do you have any issue with the OFO's decision to pull towards the driveway as the officer   17:33:31

Page 307

who was in the lead for a vehicle stop?                    17:33:34

A    That is --

MS. SAFAVI:  Objection; calls for a legal conclusion and improper witness.

THE WITNESS:  So I can only say for         17:33:55 myself.

I was talking to the subject.  Whether I agree, disagree is irrelevant because at that point I have already talked to the person.  He was talking to me and he proceeded to move forward.         17:34:05

So by the time he pulled forward, that guy that was talking to me was facing me and he collided with the vehicle.

So I mean I don't disagree with it because he didn't do it initially.                      17:34:18

BY MS. LAI:

Q    You don't disagree with OFO's decision to pull into the driveway.

A    No, because he was at a stop right there in the front to turn around and back up.         17:34:28

Q    And this point, do you have an estimate of how -- the speed at which the eBike was going?

A    No, I wasn't looking at my console.

Q    And did you witness the OFO vehicle pull into the driveway?                               17:34:43

Page 308

A    No.                                              17:34:44

Q    Where were you?

A    I was on the side talking sideways to the guy.

Q    So you didn't see the collision at all?      17:34:48

A    No.

Q    Did you see what happened after the collision?

A    That guy was on the floor.

Q    So Mr. C██████ was knocked off his bike      17:35:00
from the collision?

A    He fell.

Q    Was he injured?

A    No.

Q    The vehicles that you and OFO were in,       17:35:18
were they marked?

A    They were unmarked.

Q    And when you said activated -- that lights
were activated before, whose vehicle activated their
lights?                                               17:35:30

A    I did.

Q    Anybody else?

A    Not that I remember because everybody else
is behind me.

Q    When you were talking to the guy, did he     17:35:40

Page 309

CONFIDENTIAL

turn to face you?                                          17:35:43

A    Yeah.

Q    And did he respond?

A    Yes.

Q    What did he respond?                                17:35:52

A    (Answering in Spanish.)

Q    Anything else?

A    No.

Q    What did you say to him?

A    (Answering in Spanish).                             17:36:02

Q    Once he is off the bike, what happens

next?

A    I asked him for his name.

Q    And it says here that you informed him you

were investigating and asked him for his ID and his   17:36:23

name.

A    Correct.

Q    That language sounds similar to language

we saw before.

     Is it possible that was adapted from a          17:36:31

prior narrative?

A    No, because that is what we do.  We ask

for a person's identity.

Q    What I am saying is this verbiage sounds

like it's your verbiage, and even though you didn't   17:36:43

Page 310

write this -- Officer Flores did -- could it have    17:36:46

been possible the verbiage came from you somehow?

        A    Maybe.

            MS. SAFAVI:  Objection; form.

            THE WITNESS:  Maybe he used one of my    17:36:55

prior narratives.  I am not sure.  I wouldn't be

able to tell you.

BY MS. LAI:

        Q    And then you learned he was not the

target, correct?                                      17:37:04

        A    That is correct.

        Q    And it had the language we looked at

before, the similar verbiage of contacting LESC,

correct?

        A    Correct.                                 17:37:12

        Q    And asking him some questions, correct?

        A    That is correct.

        Q    And you found out he had a deportation

case but it was dismissed, correct?

        A    I don't recall straight off my memory.   17:37:24

        Q    It looks like if you look halfway down the

page about, it says,

            "DO Ortiz contacted LESC over the

            phone and LESC stated that C█████

            case was dismissed."                       17:37:40

                                              Page 311

CONFIDENTIAL

And then it looks like there is maybe a    17:37:41
date there.

A    So if it's there, that's what happened.
That is the answer that I got from probably LESC.

Q    And is that relevant to your determination    17:37:52
of whether or not to arrest him?

A    Yes.

Q    How?

A    Well, he is here illegally in the United
States with no status.    17:38:01

Q    And what about the significance of his
case having been dismissed, does that factor in any
way?

A    No.

MS. LAI:  I'm going to ask -- we're going    17:38:13
to go to the next exhibit, 197.

(Deposition Exhibit 197 was marked
for identification by the court
reporter and is attached hereto.)

BY MS. LAI:    17:39:05

Q    I will represent to you that 197 is a
Google Maps printout of the area we have just been
talking about.

There is a circle in the upper right-hand
place where it says "Summit Place."    17:39:13

Page 312

BY MS. LAI:                                                    17:53:34

Q    Have you heard of something called the
Fugitive Operations Handbook?

A    Yes.

Q    What is the most current version?  What      17:53:41
year is it?

A    I don't know what version year it is.

Q    Is it still in effect?

A    Yes.

Q    Is there anything else like the Fugitive     17:53:54
Operations Handbook that provides a manual of how
you should do your work in the field?

A    Yes.

Q    What is that?

A    I will have to read the book and let you     17:54:09
know what it is by verbatim.

Q    Your supervisor, Burdick, does he go out
in the field with you?

A    Yes.

Q    Does he go out in the field with you all     17:54:23
the time?

A    For the most part, yes.

Q    He has a good knowledge of what goes on
out in the field with you and your team?

A    Yes.                                          17:54:36

Page 326

CONFIDENTIAL

Q    Has he ever raised any concerns with you?    17:54:36

A    No.

Q    And how about your supervisor before Burdick, have they ever raised concerns with you?

A    I am trying to remember who my supervisor,    17:54:50 but no.

Q    How about anyone up in the chain of command, have they had any -- raised any concerns with you?

MS. SAFAVI:  Objection; form.    17:54:57

THE WITNESS:  No.

BY MS. LAI:

Q    Have you been subject to any kind of disciplinary proceeding of any kind at the agency?

A    Disciplinary proceeding, can you elaborate    17:55:10 more on that.

Q    Yes.

Like an investigation into possible misconduct or a proceeding.

A    No.    17:55:18

Q    How about an investigation of any kind, have you been subject to any investigation of a use of force or anything like that?

A    No.

MS. LAI:  I'm going to ask the court    17:55:31

Page 327

I can't remember.                                            17:58:27

Q    You have received a document about your
personal phone?

A    My personal phone?  If I ever use my
personal phone?                                             17:58:33

Q    Yes.

A    I never use my personal phone for work
related.

Q    My question is have you received a
document that asks you --                                   17:58:40

A    I can't remember.

Q    And did anyone in ICE ask you to write a
statement or a declaration about whether you have
used your personal phone for work?

A    I can't remember if I have or not.       17:58:50

Q    You can set that document aside.

     Have you ever spoken -- ever spoken
directly to Chief Bovino?

A    No.

Q    Do you know who he is?                    17:59:08

A    Yes.

Q    I believe that you were involved in an
incident where you discharged your weapon on
October 30, 2025.

     Does that sound familiar?                 17:59:22

Page 330

MS. SAFAVI:  Objection; foundation.                    17:59:24

THE WITNESS:  Yes.

BY MS. LAI:

Q    Was this an enforcement operation?

A    Yes.                                              17:59:32

Q    Were you conducting a vehicle stop?

A    Yes.

Q    Was -- was it a targeted operation?

A    Yes.

Q    Who was the person you were stopping in          17:59:43
the vehicle stop?

A    I would have to look at my statement that
I made before.

I had multiple targets in that area --
other trailer park.                                    17:59:57

Q    Do you recall if the person you had
stopped in the vehicle stop was a target or turned
out to be a collateral?

A    We did not take them into custody.  So I
would not be able to tell.                             18:00:10

Q    So he was not the target -- the person you
stopped was not the target.

A    I could not -- I could not answer that
question because I couldn't determine what happened
because an incident happened.                          18:00:21

Page 331

Q    You are saying that you never made a    18:00:24
determination as to whether the individual was a
target or not?

A    That is correct.

Q    And the person you were trying to target,    18:00:33
did you have like a baseball card?

A    Yes, I had multiple baseball cards.

Q    And you had a baseball card for the person
you thought you were pulling over?

A    Yes.    18:00:49

Q    And the way that you pulled them over, was
there a vehicle that pulled out in front of the car
or to the side or was it behind?

A    I was the vehicle that pulled over to the
front of the vehicle.    18:01:01

Q    And was that your vehicle?

A    That is correct.

Q    So you cross the front of vehicle and then
there it was a vehicle behind or to the side?

A    There was a vehicle behind it.    18:01:10

Q    And you ended up discharging your weapon
on somebody named Carlos Jiminez?

A    I believe so.

Q    Was there ever an internal investigation
about this incident?    18:01:27

Page 332

A    Yes.                                          18:01:28

Q    Who connected that investigation?

A    FBI and HSI.

Q    Anyone in ICE?  I mean -- sorry -- anyone
in ERO?                                              18:01:37

A    Not from my knowledge.

Q    Were you interviewed?

A    I was.

Q    And was there a recording of the
interview?                                           18:01:46

A    I don't recall.

Q    Did you receive any kind of administrative
leave?

A    What do you mean "administrative"?

Q    Were you taken off duty for any period of   18:01:56
time?

A    I went on -- the doctor put me away for --
took me out of work for three weeks.

Q    Who is that doctor?

A    I don't remember his name.               18:02:12

Q    What kind of doctor?

A    A Workers' Comp.

Q    And were you injured in the incident?

A    Physically injured, no, but emotionally,
yes.                                                 18:02:23

Page 333

Q    And after that you returned to work?    18:02:25

A    Yes.

Q    Did anybody tell you you should not return to work?

MS. SAFAVI:  Objection; form.    18:02:37

BY MS. LAI:

Q    Sorry.  While the investigation was ongoing.

A    No.

Q    And which firearm did you discharge?    18:02:42

A    My service weapon.

Q    That is the handgun?

A    That is correct.

Q    And did you testify in court relating to this incident?    18:03:02

A    I have not gone to court for that case.

Q    And I believe -- so when you discharged your firearm, Mr. Jiminez was driving away.

Is that correct?

A    That is incorrect.    18:03:16

Q    Tell me what happened.

A    The vehicle had left, Jiminez stopped, put the car in reverse, started coming towards the officers, and I discharged my weapon at him.

Q    Who were the officers that Mr. Jiminez    18:03:37

Page 334

started coming towards?                                    18:03:40

        A    Myself and OFO.

        Q    And did the OFO officers draw their
weapons?

             MS. SAFAVI:  Objection; form.                 18:03:49

             THE WITNESS:  That officer was making an
interview and was unaware of Jiminez's actions.

BY MS. LAI:

        Q    Was it one or more ONO officers?

        A    There was two.  There was one officer was   18:04:00
directly in the line of the vehicle that was coming
in reverse.

        Q    And before you discharged your weapon, you
had drawn your weapon on Mr. Jiminez, correct?

        A    Can --                                        18:04:13

             MS. SAFAVI:  Objection; assumes facts.

             THE WITNESS:  Can we take a break.

BY MS. LAI:

        Q    Could you answer my question and then we
can take a break.                                          18:04:22

        A    What was the question?

        Q    Before you had discharged your weapon, you
had drawn your weapon on Mr. Jiminez, correct?

             MS. SAFAVI:  Objection; assumes facts.

             And if he -- if he needs to check on like   18:04:33

Page 335

privileged information --                                          18:04:37

THE WITNESS:  That is --

MS. SAFAVI:  -- he is entitled to do that

on a break.

BY MS. LAI:                                                        18:04:41

Q    That's the reason --

A    Yes.

Q    -- you want to take the break?

A    It is.

Q    You can do that and then we will go back        18:04:45

on the record and make a record of that.

THE VIDEOGRAPHER:  This marks the end of

media number five.

Going off the record at 6:04 p.m.

(Off the record.)                                18:04:55

THE VIDEOGRAPHER:  This marks the

beginning of media number six.

Going back on the record at 6:15 p.m.

BY MS. LAI:

Q    Officer Ortiz, the question that was           18:15:29

pending before we took a break is before you had

discharged your weapon, you had drawn your weapon on

Mr. Jiminez, correct?

MS. SAFAVI:  So I'm going to object

assumes facts and then also attorney-client          18:15:42

Page 336

CONFIDENTIAL

privilege.                                              18:15:44

          And instruct the witness not to answer.

          MS. LAI:  And I will say for the record we

believe that instruction is improper.  The question

is just about factual information of what happened.   18:15:52

BY MS. LAI:

     Q    Are you going to follow your attorney's

instruction?

     A    Yes.

     Q    And when you were on the break, what did    18:16:01

you discuss with your attorney?

          MS. SAFAVI:  Objection; attorney-client

privilege.

          I'm going to instruct you not to answer.

BY MS. LAI:                                            18:16:15

     Q    Are you going to follow your attorney's

instruction?

     A    Yes.

     Q    Did you discuss anything during the break

other than the applicability of the attorney-client  18:16:20

privilege?

          MS. SAFAVI:  Objection; I'm just going to

object to any line of questioning on this as

attorney-client privilege.

          MS. LAI:  Are you instructing?             18:16:34

Page 337

CONFIDENTIAL

MS. SAFAVI:  Yes, and I'm instructing you    18:16:35
not to answer.

BY MS. LAI:

Q    Are you going to follow your attorney's
instruction?                                              18:16:41

A    Yes.

Q    During the encounter, had you holstered
your weapon after drawing it?

MS. SAFAVI:  So I'm going to object to any
line of questioning about this incident.       18:16:55

MS. LAI:  And the basis is?

MS. SAFAVI:  Attorney-client privilege.

MS. LAI:  And with respect to factual
questions about what happened?

MS. SAFAVI:  Yes.                             18:17:05

And then I would also object on law
enforcement privilege, as well.

MS. LAI:  What is the basis of the law
enforcement privilege?

MS. SAFAVI:  It was a law enforcement        18:17:11
operation.

MS. LAI:  Like the ones we have been
discussing all day?

MS. SAFAVI:  Uh-huh.

Page 338

CONFIDENTIAL

BY MS. LAI:                                                    18:17:21

Q    Are you going to follow your attorney's instruction?

A    Yes.

Q    Is there any video of the incident that    18:17:25
you are aware of?

A    No.

Q    Before you discharged your weapon, did you give Mr. Jiminez any warning that you were going to discharge your weapon?                                  18:17:41

MS. SAFAVI:  Objection; attorney client and law enforcement privilege.

MS. LAI:  Are you going to instruct?

MS. SAFAVI:  I'm going to instruct not to answer.                                                   18:17:51

BY MS. LAI:

Q    And are you going to follow your attorney's instruction?

A    Yes.

Q    After this incident, did you receive any    18:17:55
kind of commendation for the incident?

A    No.

MS. SAFAVI:  Objection; form.

BY MS. LAI:

Q    Did you receive any kind of praise from    18:18:02

Page 339

anyone at the agency?                                    18:18:04

   MS. SAFAVI:  Objection; form.

   THE WITNESS:  No.

BY MS. LAI:

  Q And did you receive any kind of discipline   18:18:09

following the incident about the incident?

   MS. SAFAVI:  Objection; asked and

answered.

   THE WITNESS:  No.

BY MS. LAI:                                              18:18:17

  Q Did you discuss the incident in any

subsequent performance review?

  A No.

  Q Did you receive any additional training as

a result of the incident?                               18:18:27

  A No.

  Q Did your job duties change as a result of

the incident?

  A No.

  Q And did your access to government weapons   18:18:36

or equipment change as a result of the incident?

  A No.

   MS. LAI:  I'm going to have us go off the

record.

   THE VIDEOGRAPHER:  Going off the record at   18:18:49

Page 340

CONFIDENTIAL

I, DARYL BAUCUM, a Certified Shorthand Reporter of the State of California, do hereby certify;

That the foregoing proceedings were taken before me at the time and place herein set forth, at which time the witness named in the foregoing proceeding was placed under oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; and that the foregoing pages contain a full, true and accurate record of all proceedings and testimony to the best of my skill and ability.

I further certify that I am neither financially interested in the outcome nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have subscribed my name this 29th day of May, 2026.

DARYL BAUCUM, CSR No. 10356

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.