# EXHIBIT 12

Sealed Version
Filed Separately

CONFIDENTIAL UNDER PROTECTIVE ORDER

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

PEDRO VASQUEZ PERDOMO, ET AL.,   )
                                 )
            PLAINTIFFS,          ) CASE NO.
                                 ) 2:25-cv-05605
         VS.                     ) MEMF-SP
                                 )
KRISTI NOEM, SECRETARY OF        )
HOMELAND SECURITY, ET AL.,       )
                                 )
            DEFENDANTS.          )
_____)

*** CONFIDENTIAL - UNDER PROTECTIVE ORDER ***

VIDEOTAPED DEPOSITION OF V█████ █ S███████

WEDNESDAY, DECEMBER 10, 2025

JOB NO.  7779909

REPORTED BY KIMBERLY EDELEN,

CSR. NO. 9042, CRR, RPR.

PAGES 1 - 358

Page 1

CONFIDENTIAL UNDER PROTECTIVE ORDER

                              I N D E X


       WITNESS                    EXAMINATION                    PAGE
       V██████  S███████
                                  BY MS. LAI                       10
                                  BY MS. XIAO                      253



                            E X H I B I T S


        NO.            PAGE        DESCRIPTION
       EXHIBIT 1       102         8-5-2025 E-MAIL RE: 3
                                   NARRATIVES,
                                   BATES NO. GOV-00000787
       EXHIBIT 2       138         PLAINTIFF CHIRLA'S
                                   EXPEDITED REQUESTS FOR
                                   PRODUCTION TO DEFENDANTS,
                                   SET ONE

       EXHIBIT 3       175         "YANK TOW YARD"
                                   TRANSCRIPTION,
                                   BATES NOS.
                                   GOV-00000952 – GOV-00000963
       EXHIBIT 4       180         BORDER PATROL REPORT OF
                                   APPREHENSION OR SEIZURE,
                                   BATES NOS.
                                   GOV-00000490 – GOV-00000493

       EXHIBIT 5       208         POWERPOINT TITLED U.S.
                                   CUSTOMS AND BORDER
                                   PROTECTION, UNITED STATES
                                   BORDER PATROL, OPERATION AT
                                   LARGE, BATES NOS.
                                   GOV-00000310 – GOV-00000316
       (EXHIBITS CONTINUED ON FOLLOWING PAGE)


                                                      Page 5

CONFIDENTIAL UNDER PROTECTIVE ORDER

                        E X H I B I T S (CONTINUED)


     NO.              PAGE          DESCRIPTION
   EXHIBIT 6          226           E-MAIL THREAD RE: ROI FOR
                                    SURVEILLANCE ON [REDACTION]
                                    2025 IN LOS ANGELES, CA,
                                    BATES NOS.
                                    GOV-00000791 - GOV-00000804
   EXHIBIT 7          230           CBP EXECUTIVE SUMMARY,
                                    BATES NOS.
                                    GOV-00000317 - GOV-00000318
   EXHIBIT 8          230           8-5-2025 E-MAIL RE: ARREST
                                    NARRATIVES FOR REVIEW,
                                    BATES NOS.
                                    GOV-00000940 - GOV-00000942

   EXHIBIT 9          245           CHAT LOG, BATES NOS.
                                    GOV-00000865 - GOV-00000871
   EXHIBIT 10         258           POWERPOINT TITLED UNITED
                                    STATES BORDER PATROL TROJAN
                                    HORSE, HOME DEPOT,
                                    BATES NOS.
                                    GOV-00000359 - GOV-00000389
   EXHIBIT 11         262           POWERPOINT TITLED U.S.
                                    CUSTOMS AND BORDER
                                    PROTECTION, UNITED STATES
                                    BORDER PATROL, OPERATION AT
                                    LARGE, BATES NOS.
                                    GOV-00000333 - GOV-00000339

   EXHIBIT 12         279           SCREENSHOT OF CHAT LOG,
                                    BATES NO. GOV-00000950
   EXHIBIT 13         279           SCREENSHOT OF CHAT LOG,
                                    BATES NO. GOV-00000951

   EXHIBIT 14         287           8-6-2025 E-MAIL RE:
                                    TIJERINO GARMENDIA 8-6-25,
                                    BATES NOS.
                                    GOV-00000944 - GOV-00000948
   (EXHIBITS CONTINUED ON FOLLOWING PAGE)


                                                        Page 6

CONFIDENTIAL UNDER PROTECTIVE ORDER

                        E X H I B I T S (CONTINUED)


     NO.              PAGE        DESCRIPTION
   EXHIBIT 15          328        OPERATION AT LARGE –
                                  LOS ANGELES, INFORMATION
                                  SHEET, BATES NOS.
                                  GOV-00000577 – GOV-00000579

   EXHIBIT 16          330        EL CENTRO SECTOR MUSTER,
                                  BATES NOS.
                                  GOV-00000001 – GOV-00000003

   EXHIBIT 17          336        EL CENTRO SECTOR MUSTER,
                                  BATES NOS.
                                  GOV-00000004 – GOV-00000005




            QUESTIONS INSTRUCTED NOT TO BE ANSWERED
                         PAGE        LINE
                          61          22
                         214           8
                         215           9
                         228          15
                         229          13
                         264          21
                         302           8
                         304          21
                         312           6
                         327           7










                                                    Page  7

CONFIDENTIAL UNDER PROTECTIVE ORDER

Q    Okay.  And were you asked to look for any documents that you tried to find but no longer exist?

A    No.

Q    All right.  Mr. S█████, I am going to switch gears and ask you some questions about your employment.

So how long have you been with the Border Patrol?

A    A little over 15 years.

Q    Okay.  And other than the Border Patrol, have you worked for the federal government in any other capacity?

A    No.

Q    And can you confirm your current title and position with the Border Patrol.

A    Supervisory Border Patrol agent is my title, a supervisor.

Q    And you are assigned to a particular sector, I take it?

A    Yes.

Q    Which sector?

A    El Centro sector.

Q    Are you assigned to a station within that sector?

Page 27

CONFIDENTIAL UNDER PROTECTIVE ORDER

A    Yes.    09:48:18

Q    Which one?    09:48:19

A    Calexico station.    09:48:19

Q    Okay.  How long have you been with the    09:48:21
Calexico station?    09:48:22

A    Since about April.    09:48:25

Q    Okay.  Now, for those of us who don't spend    09:48:26
a lot of time at the border, can you tell me about    09:48:29
the Calexico station, the area of responsibility and    09:48:32
what kinds of activities you do as a Border Patrol    09:48:35
agent at that station.    09:48:38

A    It's comprised of urban area and some    09:48:40
remotes area out in the desert, some farmland,    09:48:44
obviously immediately adjacent to the border so    09:48:47
there's a border fence, patrol the area, look for    09:48:53
any incursions.    09:48:58

Q    Give me a moment while I just go back so I    09:49:02
don't have to repeat myself.    09:49:08

And how long have you been with the    09:49:13
El Centro sector?    09:49:15

A    Since about April.    09:49:18

Q    Prior to being assigned to the El Centro    09:49:24
sector, where were you within the Border Patrol?    09:49:26

A    Blythe station.    09:49:29

Q    Is that Blythe, Texas?    09:49:31

Page 28

you have to do an interview, either in person or by    09:53:09

Teams.  Then depending on your scoring on your    09:53:15

interview, your application then gets promoted to    09:53:18

vetting to ensure that you can pass vetting.    09:53:22

And then -- so you get the offer.    09:53:27

Q    Okay.  At the time that you applied to be a    09:53:30

supervisor at Calexico -- actually, let me -- let me    09:53:36

ask a different question.    09:53:42

Is there a minimum number of years that an    09:53:44

agent needs to be a Border Patrol agent before    09:53:47

they're eligible to be considered for promotion?    09:53:49

A    I'm sure there is.  I don't know what that    09:53:53

is.    09:53:55

Q    Okay.  Is it fair to say that you probably    09:53:56

exceeded that number of years, if you got the    09:54:00

position?    09:54:03

A    Yes.    09:54:03

Q    Okay.  Tell me about your duties as a    09:54:04

supervisor.  How does your day-to-day look different    09:54:08

than when you were an agent?    09:54:11

A    The administrative aspect of it, having to    09:54:17

do assignments or give out assignments for the day,    09:54:24

preparing equipment for the -- for the shift, for    09:54:29

the agents prior to the shifts, to the shift starts.    09:54:32

And then collecting the oncoming shift's    09:54:38

Page 32

CONFIDENTIAL UNDER PROTECTIVE ORDER

equipment, putting it away, doing inventory over 09:54:40

armory of the equipment that's there, that should be 09:54:44

there, make sure -- accounting for everything. 09:54:46

Q    And is there a particular team that you're 09:54:50

assigned to supervise at Calexico? 09:54:52

A    Yes. 09:54:56

Q    And how many members of your team are 09:54:57

there? 09:54:59

A    I am assigned to the evening shift, and 09:55:02

because I just came back from the operation, 09:55:05

I haven't actually been assigned my own direct 09:55:07

reportees so I'm just one of the other supervisors 09:55:11

on shift. 09:55:15

        I don't have direct reportees yet. 09:55:16

Q    When did you go to the operation? 09:55:19

        You were promoted in April, and I take it 09:55:22

you started at Calexico in April? 09:55:24

A    Yes. 09:55:26

Q    And when did you go to the operation in 09:55:27

L.A.? 09:55:29

A    I went on -- in June 7th, was the first day 09:55:33

I got to L.A.  I was here for a week, and then I 09:55:40

went back. 09:55:44

Q    So let me make sure I have that timeline 09:55:49

right. 09:55:51

Page 33

CONFIDENTIAL - UNDER PROTECTIVE ORDER

Q    Did you have any conversations in    11:14:20

connection with Operation At Large about why    11:14:24

Los Angeles was initially a focus?    11:14:29

        MR. ROSS:  Objection.    11:14:35

        THE WITNESS:  No.  I can't think of any,    11:14:38

no.    11:14:42

BY MS. LAI:    11:14:47

    Q    Okay.  Now, I want to talk about June, and    11:14:52

then we'll talk about August.    11:15:00

        With respect to June, how many locations    11:15:03

was your team going on a particular day?    11:15:06

    A    I -- I don't know.  I don't remember.    11:15:11

    Q    Would it be more than one location?    11:15:14

    A    Yes.    11:15:16

    Q    More than five locations?    11:15:17

    A    Possibly.  I don't remember.    11:15:21

    Q    Did you go out every day during that week    11:15:23

in June?    11:15:26

    A    Yes.    11:15:26

    Q    Did the number of locations you went to    11:15:33

fluctuate from day to day?    11:15:35

    A    Yes.  I didn't keep track of how many    11:15:38

places I went to.    11:15:41

    Q    Did anyone tell you where you and your team    11:15:43

should go?    11:15:45

Page 85

CONFIDENTIAL - UNDER PROTECTIVE ORDER

A    No.

Q    Was that a decision you made, where you and your team would go, during that week in June?

A    Yes.

As far as, like, going back to the previous question, we were given, like, general areas, like go to this area, go to that area.  But as far as going to specific locations, we weren't given -- we weren't given specific locations.

Q    When you were given general areas that you should go to, if that's your testimony, in what form were you given that information?

MR. ROSS:  Objection.

THE WITNESS:  I'm not sure what you mean by "what form."

BY MS. LAI:

Q    Did you receive it in e-mail?  Was it on some kind of platform or application?

A    Oh, verbal.

Q    Can you give me an example of a general area that you would have been told to go to in that week?

A    Norwalk.

Q    Any particular place in Norwalk that you might have been told to go?

Page 86

A    No.                                          11:16:57

Q    And all the -- let me back up.               11:16:58

During that week, did you do anything other       11:17:04
than roving patrols?                              11:17:06

A    Not that I can think of.                     11:17:10

Q    Your team, was that called a strike team,    11:17:13
or was there another name to refer to your team?  11:17:16

A    I think eventually that's what they became.  11:17:19
That week, I don't think we were called strike teams  11:17:22
yet.  They were just team.                        11:17:25

Q    Okay.  Thank you.                            11:17:27

A    And I don't recall what team I was at that   11:17:29
point.                                            11:17:30

Q    Can you think of, in June, any direction to  11:17:33
go to a general area that was not a city or a     11:17:35
particular part of L.A. as opposed to a particular  11:17:40
location, like an address?                        11:17:43

     MR. ROSS:  Objection.                        11:17:46

     THE WITNESS:  I can't think of -- like,      11:17:48
that I was given that instruction, no.            11:17:52

BY MS. LAI:                                        11:17:57

Q    Did you speak with other team supervisors    11:17:58
that week about their activities in the field?    11:18:00

A    Yes.                                         11:18:04

Q    Are you aware of any other team that was     11:18:05

Page 87

given an instruction to go to a particular address?    11:18:07

A    No.    11:18:11

Q    When you use the term "roving patrol," what    11:18:15
do you mean?    11:18:17

A    You rove the streets patrolling the area.    11:18:22
You know, just drive around.    11:18:26

Q    Is there a working definition that the    11:18:30
Border Patrol uses for roving patrol for those of us    11:18:33
who are uninitiated?    11:18:37

A    You mean like -- like a term that we use as    11:18:39
agents?    11:18:43

Q    If there's an understanding or working    11:18:44
definition within Border Patrol, just so I    11:18:47
understand what you mean by the term "roving    11:18:49
patrol."    11:18:51

A    I mean, just that, roving patrol.  We're    11:18:53
going to go conduct roving patrol operations.    11:18:56

Q    Have you -- I think earlier you said    11:19:01
sometimes in your career you have been called out to    11:19:04
a particular location where there's maybe a tip    11:19:06
about a particular vehicle.    11:19:10

Do you recall that?    11:19:12

A    Uh-huh.    11:19:13

Q    Would you call that a roving patrol?    11:19:14

A    You're conducting roving patrols but you're    11:19:20

Page 88

CONFIDENTIAL - UNDER PROTECTIVE ORDER

given a tip so you head to a particular area to try    11:19:23

to intercept that vehicle, if you find it.    11:19:26

Q    And within Border Patrol, would that be    11:19:30

something that's called a roving patrol or do you    11:19:32

use a different term for an operation like that?    11:19:34

MR. ROSS:  Objection.    11:19:38

THE WITNESS:  I mean, that's what I would    11:19:40

think of calling it, yeah, roving patrol or    11:19:42

patrolling.    11:19:46

BY MS. LAI:    11:19:47

Q    How about a planned operation at a    11:19:48

particular address, location, checkpoint, would that    11:19:52

be called a roving patrol?    11:19:55

A    No.    11:19:57

Q    What would you call that?    11:19:57

A    Like you said, a checkpoint.  That wouldn't    11:20:00

be a roving patrol.  That would be a checkpoint.    11:20:03

Checkpoint operations.    11:20:06

Q    And have you participated in operations    11:20:08

that are preplanned where there might be, like, an    11:20:11

operational plan and a briefing, something like    11:20:15

that?    11:20:19

A    Yes.    11:20:21

Q    And for a roving patrol, when you go out to    11:20:23

a particular location, would there be a briefing    11:20:27

Page 89

CONFIDENTIAL - UNDER PROTECTIVE ORDER

with a preplanned operations planned -- operations    11:20:30

plan?    11:20:34

    A    For roving patrols, no.  I can't think of    11:20:36

one, no.    11:20:40

    Q    You said earlier that you heard there was a    11:20:42

operation in Sacramento involving a roving patrol.    11:20:48

        Do you recall that, in July?    11:20:51

    A    Yes.    11:20:53

    Q    In what way was that operation a roving    11:20:54

patrol, if you know?    11:20:56

        MR. ROSS:  Objection.    11:20:58

        THE WITNESS:  I don't -- I wasn't there,    11:21:01

so...    11:21:02

BY MS. LAI:    11:21:03

    Q    And why did you use the terminology "roving    11:21:04

patrol" if you weren't there?    11:21:06

    A    That was my understanding of what was --    11:21:08

what happened up there or was set to happen.    11:21:11

    Q    Is that what you were told happened up    11:21:14

there?    11:21:16

    A    Yes.    11:21:17

    Q    In June, July and August, has Border    11:21:26

Patrol, to your knowledge, conducted operations in    11:21:29

the Los Angeles area that are not part of Operation    11:21:32

At Large?    11:21:35

Page 90

CONFIDENTIAL - UNDER PROTECTIVE ORDER

Q    Okay.  You said sometimes you'd be given    11:50:59

the PowerPoint presentation.  Is it the case that    11:51:03

sometimes you went on a strike operation and you    11:51:07

didn't have the PowerPoint presentation?    11:51:09

A    Yes.    11:51:10

Q    How often would you have the PowerPoint    11:51:11

presentation versus not have it?    11:51:14

A    Like -- just to clarify, like sometimes the    11:51:17

intelligence agent that gave the presentation would    11:51:21

be, like, I'll send it to you to reference it later.    11:51:24

I don't know, probably more times than not, I didn't    11:51:29

have it.    11:51:31

Q    Okay.  And when the intelligence agent said    11:51:33

"I'll send it to you to reference it later," did    11:51:35

they send it, like, later in the day or a few    11:51:38

minutes later?  For example, did you receive it    11:51:42

before or after you arrived at the strike location?    11:51:45

A    Either/or.    11:51:48

Q    Do you have an understanding of whether    11:51:52

there was a protocol or any rule that you should    11:51:53

have the PowerPoint with you on the operation or    11:51:57

not?    11:52:00

A    I'm not aware of a rule set for that, no.    11:52:02

Q    Did you ever take notes during these    11:52:05

briefings?    11:52:08

Page 114

A   I'm not usually a notetaker, so I don't recall taking any notes.  I might have but I don't recall.

Q   Okay.  Is it fair to say you didn't have a regular practice of taking down notes during the briefing presentation?

A   That is very fair, yes.

Q   How about your agents on your team, did they have a regular practice of taking down notes?

MR. ROSS:  Objection.

BY MS. LAI:

Q   If you know.

A   Yeah.  If they did, I wouldn't know. I wouldn't ask for notes.  That was for their own personal recordkeeping.  I wouldn't know.

Q   Did you ever tell any of your agents on your team to take notes?

A   No.

Q   For a strike operation, did you do any research yourself about a location prior to heading out?

A   Yes.

Q   What kind of research?

A   Avenues of egress, other businesses nearby, just try to get familiar with the area.

Page 115

Q    Any other kind of research you would do    11:53:16
about the location?    11:53:18

A    I can't think off the top of my head.    11:53:21
Mostly it was just that, try to get familiar with    11:53:23
the area.    11:53:26

Q    Any research about the particular business    11:53:26
itself as opposed to operational details like    11:53:29
ingress or egress?    11:53:32

A    No, not that I could think of now.    11:53:36

Q    If you wanted to go back and try to find    11:53:41
all the information about a particular operation,    11:53:43
including who was arrested, the PowerPoint, any    11:53:46
other information about that particular operation,    11:53:51
could you go to one location?    11:53:54

A    I'm sure there's a place where it's all at.    11:54:00
I don't know where it is.    11:54:02

Q    Is it fair to say that you haven't needed    11:54:05
to find out if there's a folder for a particular    11:54:08
operation to go back and find everything related to    11:54:13
that operation?    11:54:15

MR. ROSS:  Objection.    11:54:16

THE WITNESS:  I haven't had the need to do    11:54:20
that.    11:54:22

BY MS. LAI:    11:54:33

Q    Have you received information indicating    11:54:34

Page 116

CONFIDENTIAL - UNDER PROTECTIVE ORDER

MR. ROSS:  Same objection.    11:59:29

THE WITNESS:  I mean, aside from    11:59:32
experience.    11:59:33

BY MS. LAI:    11:59:39

Q    And what -- what is that view, opinion or    11:59:40
experience?  What kinds of jobs pay cash?    11:59:44

A    I believe I listed a few prior:  Working in    11:59:47
the fields, day laborers for construction, tip jobs    11:59:50
pay cash.    12:00:02

Q    Okay.  Let's go through each one.    12:00:03
Working in the fields, do you have an    12:00:06
understanding or information about what proportion    12:00:08
of individuals working in the fields are paid by    12:00:12
cash?    12:00:15

A    What proportion?    12:00:17

Q    That's right.    12:00:19

A    I don't know.    12:00:19

Q    Do you know if it's 100 percent of people    12:00:20
who work in the fields?    12:00:23

A    I don't know.    12:00:25

Q    What about the percentage of those who work    12:00:27
in the fields who are unauthorized immigrants as    12:00:31
opposed to U.S. citizens or legally present    12:00:34
immigrants?    12:00:38

A    I don't know.    12:00:39

Page 121

CONFIDENTIAL - UNDER PROTECTIVE ORDER

Q    And for day laborers -- first of all, can you help me understand what you mean by "day laborers"?

A    They're employed for that day.  They're paid for that day.

Q    What if somebody is employed for a week, would that be a day laborer?

A    I think in the colloquial meaning of day laborer, probably.

Q    What's the time limitation for you as opposed to a job, like, that you have at the Border Patrol?

A    I don't think it's the time.  I think it's the -- how the way they're paid.

Q    Okay.  And so, for example, somebody who's working a temp job, would that count as a day laborer?  They're hired for the day or for the week?

A    I don't know.  Probably not.

Q    Do you have an understanding as to what proportion of day laborers are paid by cash?

A    I don't know.

Q    Do you have any understanding of what proportion of day laborers are unauthorized immigrants as opposed to citizens or legal residents?

Page 122

CONFIDENTIAL - UNDER PROTECTIVE ORDER

A    I don't.                                        12:02:07

Q    You also indicated -- it will probably help     12:02:08
me out -- tip jobs.                                   12:02:12

What are tip jobs?                                    12:02:14

A    Jobs where the majority of their income         12:02:19
comes by tips.                                        12:02:21

Q    Okay.  So what about like a Uber or Lyft        12:02:22
driver?                                               12:02:27

A    What about them?                                12:02:30

Q    Would that count as somebody who works a        12:02:30
tip job?                                              12:02:33

A    I don't know what percentage of their           12:02:35
income comes from tips or paying for the ride.        12:02:36
I don't know.                                         12:02:41

Q    What kinds of jobs do you mean when you say     12:02:42
"tip jobs"?                                           12:02:44

A    Like a server at a restaurant or a busboy.      12:02:46

Q    Any others?                                     12:02:50

A    That's all I can think of now.                  12:02:53

Q    I just want to give you a moment.               12:02:59

Can you think of any other tip jobs that             12:03:01
might fall in this category?                          12:03:03

A    No.  I can't think of any.                      12:03:09

Q    Do you have any understanding of the            12:03:11
proportion of people who work tip jobs that are      12:03:13

Page 123

CONFIDENTIAL - UNDER PROTECTIVE ORDER

unauthorized immigrants as opposed to citizens or          12:03:19

legally present immigrants?                                12:03:21

   A   No.                   12:03:23

   Q   Let me go back.        12:03:28

     Any other information you have or have    12:03:30

received suggesting that unauthorized immigrants in        12:03:32

Los Angeles do certain kinds of work?                      12:03:36

   A   One more time.          12:03:42

   Q   Yes.                    12:03:43

     Any other information that you have or have    12:03:44

received suggesting that unauthorized immigrants in        12:03:45

the Los Angeles area do certain kinds of work?             12:03:49

     MR. ROSS:  Objection.           12:03:52

     THE WITNESS:  I mean, I think that was    12:03:54

already asked prior, like I mentioned.                     12:03:55

BY MS. LAI:                                                 12:03:59

   Q   Yeah.  It absolutely was.  You're very    12:04:00

right.                                                     12:04:02

     I just want to make sure there's        12:04:03

anything -- if there's anything else that we haven't       12:04:05

talked about.                                              12:04:07

   A   There might be.  I can't think of any right    12:04:08

now.                                                       12:04:10

   Q   Okay.  I think we're getting close to the    12:04:10

lunch hour, actually.  I just want to ask a few more       12:04:17

Page 124

questions to close this out.                          12:04:19

When you are out in the field, separate             12:04:21

from Operation At Large, what kinds of things do you  12:04:25

look for to try to determine if somebody should be    12:04:28

investigated further as a possible unauthorized       12:04:32

immigrant?                                            12:04:35

    A    Like, out in the field?                      12:04:39

    Q    That's right.                                12:04:40

    A    I mean, it depends the area I'm working at.  12:04:40

When I worked in Laredo, they -- there was a river.   12:04:44

That was a boundary.  Muddy feet, wet clothes, that   12:04:48

was an indicator.                                     12:04:53

    Q    Anything else?                               12:04:55

    A    That's what I can think of.                  12:05:03

    Q    In your 15 years of Border Patrol            12:05:07

experience, muddy feet?                               12:05:09

    A    How many -- how many examples do you want?   12:05:12

    Q    I'm going to give you another minute.        12:05:13

    A    How many examples do you want?               12:05:16

    Q    I'd love to hear as many as you can think    12:05:19

of, and I'm talking --                                12:05:19

    A    We're going to be here a long time.          12:05:19

    Q    -- about outside of Operation At Large.      12:05:19

         THE REPORTER:  One at a time, please.        12:05:21

         THE WITNESS:  Oh, sorry.                     12:05:24

CONFIDENTIAL - UNDER PROTECTIVE ORDER

I mean, as far as articulable facts to develop reasonable suspicion, there's location, like I mentioned, the clothing, their appearance, their behavior.

BY MS. LAI:

Q    How would you -- how would location be relevant if we're talking about near the border?

A    Yeah.  Proximity to the border and how remote they are.

Q    Any other way that location is relevant?

A    I can't think of it right now.

Q    How about the way somebody addresses, how would that be relevant?

A    I didn't say the way somebody dresses.

Q    Oh, I'm sorry.  That is my bad.

You said location.

Their clothing and appearance, how might that be relevant?

A    Well, like I mentioned, if it's muddy or wet.

Q    Anything else?

A    Dirty.

Q    Anything else?

A    That's what I can think of.

Q    And their behavior?

Page 126

A    I mean, if -- if I approach them and they    12:06:39
run, that's a pretty clear indicator.    12:06:42

Q    Anything else?    12:06:45

A    Attempting to hide, perhaps.    12:06:48

Q    Anything else you can think of?    12:06:51

A    That's all I can think of right now.    12:06:53

Q    Typically, as we talked about before, you    12:06:55
would be mostly doing these patrols in a vehicle?    12:06:57

A    Outside of operation?    12:07:02

Q    Outside of Operation At Large.    12:07:04

A    No.  I mean, a portion of it would be on    12:07:07
foot, get out --    12:07:10

Q    Okay.    12:07:12

A    -- walk the area.  There would be areas    12:07:12
that are inaccessible by vehicle.    12:07:13

Q    Okay.  So when you were talking about these    12:07:15
factors, you were talking about vehicle patrol and    12:07:17
possibly foot patrol as well?    12:07:20

A    Yes.    12:07:22

Q    Okay.  Thanks.    12:07:22

And is your analysis of reasonable    12:07:23
suspicion and the factors that might lead you to    12:07:26
believe somebody could be an unauthorized immigrant    12:07:33
any different in the Los Angeles area?    12:07:35

A    I'm sorry.  One more time on that question.    12:07:42

Page 127

Q    Yes.    12:07:45

Is the analysis of whether somebody might    12:07:46
be an unauthorized immigrant, for example, the    12:07:48
factors you would consider, any different in the    12:07:51
Los Angeles area?    12:07:54

A    No.    12:07:59

Q    Have you -- actually, I'm going to skip    12:07:59
that.    12:08:03

Are you aware in this lawsuit that the    12:08:05
government is taking a position that apparent    12:08:09
ethnicity, such as apparent Mexican ancestry, can be    12:08:11
relevant to developing reasonable suspicion?    12:08:16

MR. ROSS:  Objection.    12:08:19

THE WITNESS:  Am I aware that that's the --    12:08:20
what their -- the government is saying?    12:08:22

BY MS. LAI:    12:08:24

Q    Yes.    12:08:24

A    I wasn't aware of that.    12:08:25

Q    Okay.  You can verify this later, but for    12:08:26
purposes of this question, let's assume that's true.    12:08:30

Do you agree with that?    12:08:34

A    Yes.    12:08:35

Q    In what way?    12:08:36

A    It could be one of many articulable facts    12:08:38
to develop my reasonable suspicion.    12:08:42

Page 128

Q    Can you give me an example?                          12:08:44

A    It could be used to -- depending on the              12:08:51

population percentage in a certain area, if I see         12:08:55

somebody wearing a burqa I would probably assume          12:09:02

that they might not be a native of the                    12:09:07

United States.                                            12:09:10

Q    Any other example of how apparent ethnicity          12:09:10

or apparent Mexican ancestry would be relevant to         12:09:13

developing reasonable suspicion that somebody is an       12:09:16

unauthorized immigrant?                                   12:09:20

A    I can't think of one now.                            12:09:21

Q    And you said it is relevant.                         12:09:23

Are there any geographic areas where it is                12:09:27

not relevant or more relevant?                            12:09:33

MR. ROSS:  Objection.                                     12:09:38

THE WITNESS:  Yeah, I wouldn't know how to                12:09:40

answer that.                                              12:09:41

BY MS. LAI:                                                12:09:42

Q    When you said it's relevant, would it be             12:09:43

relevant near the border?                                 12:09:46

A    It would probably bear less of a -- less             12:09:51

weight in developing RS near the border than, like,       12:09:55

maybe the northern border.  It would probably be          12:09:58

more of a stronger factor to use.                         12:10:02

Q    And what about in the Los Angeles area,              12:10:05

Page 129

CONFIDENTIAL - UNDER PROTECTIVE ORDER

would it be relevant?    12:10:07

A    I think it could be used as one of the    12:10:11
multiple or articulable facts.    12:10:13

Q    And you said you didn't know that the    12:10:18
government was taking this position before.  So when    12:10:20
you tell me it could be relevant, are you speaking    12:10:23
from your own personal experience or anything that    12:10:26
you've heard at Border Patrol?    12:10:28

A    It'd be my own personal experience.    12:10:30

Q    What about anything you've heard at    12:10:33
Border Patrol, is there anything that informs this    12:10:35
discussion we're having, any conversations with    12:10:40
anybody else at Border Patrol, any materials you've    12:10:43
seen?    12:10:47

A    That lead me to believe that that's    12:10:50
accurate?    12:10:52

Q    Yes.    12:10:53

A    I mean, I know from -- from training, that    12:10:55
that is one of the articulable facts that can be    12:10:58
used but more so from experience.    12:11:02

Q    And does this include your experience in    12:11:06
Operation At Large?    12:11:08

A    Yes.    12:11:12

Q    In what way?  Can you think of an example?    12:11:14

A    That ethnic background bears weight.  It's    12:11:17

Page 130

CONFIDENTIAL - UNDER PROTECTIVE ORDER

a -- maybe think of the locations where -- or the    12:11:20

people that we've apprehended, where they're from.    12:11:30

Q    Any other way?    12:11:37

A    I can't think of right now.    12:11:40

Q    You indicated that it could be relevant to    12:11:41

developing reasonable suspicion.  That would be    12:11:44

before an apprehension, correct?    12:11:46

A    Uh-huh.    12:11:48

Q    So in what way would it be relevant, for    12:11:48

example, at Operation At Large?    12:11:52

A    That one particular -- just the one    12:11:58

articulable fact?    12:12:02

Q    Yes.  Apparent ethnicity or apparent    12:12:03

Mexican ancestry.    12:12:06

A    I mean, I wouldn't even know that I would    12:12:08

just define it as that because I wouldn't -- I don't    12:12:10

really see a difference, like, if they're Honduran    12:12:12

or Mexican or Guatemalan.  I'd just say, like,    12:12:15

Hispanic ethnicity.    12:12:19

Q    Okay.    12:12:22

A    How would that be relevant?    12:12:22

I would think -- well, No. 1, the number of    12:12:23

people the previous years that entered the country,    12:12:25

the majority were from Latin American countries so    12:12:27

that could be a determining factor.    12:12:31

Page 131

CONFIDENTIAL - UNDER PROTECTIVE ORDER

Q    And how do you know that?    12:12:34

A    I worked it.    12:12:36

Q    Okay.  Anything other than your personal    12:12:37
experience?    12:12:39

A    I haven't looked up specific numbers or    12:12:41
anything.  I'm going from my personal experience.    12:12:44

Q    Okay.  I think earlier you started to say    12:12:50
location.    12:12:52

Is there a relationship between location    12:12:52
and apparent ethnicity or, for example, Hispanic    12:12:54
ethnicity?    12:13:00

A    Can you ask that again.    12:13:11

Q    Yes.    12:13:12

I may have misheard you, but I thought    12:13:13
earlier when I was asking you about apparent    12:13:15
ethnicity or Hispanic ethnicity that you started to    12:13:17
say location.    12:13:21

Is there a relationship between a location,    12:13:22
for example, in the Los Angeles area, and Hispanic    12:13:26
ethnicity?    12:13:31

A    Is there a relationship?    12:13:32

Q    Yes, that would be relevant to reasonable    12:13:33
suspicion.    12:13:35

A    Oh, no, I think I was mentioning, like,    12:13:36
location being, like, proximity to the border and    12:13:38

Page 132

CONFIDENTIAL - UNDER PROTECTIVE ORDER

Hispanic ethnicity as opposed to if you're at the      12:13:42

northern border.      12:13:45

Q    Okay.   What about particular kinds of      12:13:45

locations, not like proximity to the border, but a      12:13:47

car wash or a Home Depot or other public access      12:13:51

area, is there a relationship between Hispanic      12:13:54

ethnicity, that kind of location and reasonable      12:13:58

suspicion?      12:14:01

A    My personal experience.      12:14:03

Q    Yes.      12:14:05

A    I mean, the apprehensions that I've      12:14:06

personally made at those locations are      12:14:09

overwhelmingly Hispanic.      12:14:11

Q    Is there any relationship as it relates to      12:14:13

developing reasonable suspicion as opposed to who      12:14:18

ends up being arrested?      12:14:22

A    Based on ethnicity alone?      12:14:25

Q    Ethnicity, if there's relationship with      12:14:27

ethnicity to a location like a car wash.      12:14:30

I'm trying to better understand how you      12:14:35

think about reasonable suspicion.      12:14:37

A    Well, I mean, the totality of      12:14:39

circumstances.   It's not just those two factors      12:14:41

alone.   The behavior of the person, again, their      12:14:44

appearance, their clothing can all be added together      12:14:47

Page 133

CONFIDENTIAL - UNDER PROTECTIVE ORDER

to build that reasonable suspicion.    12:14:50

Q    Okay.  And part of that totality of the    12:14:52
circumstances could be a person's apparent Hispanic    12:14:55
or other ethnicity?    12:14:59

A    That could be one of the other factors.    12:15:01

Q    Okay.  I think you said earlier you    12:15:03
mentioned to a burqa.  How is a burqa -- how is that    12:15:07
related to somebody's ethnicity?    12:15:10

A    Well, not Hispanic, obviously, but mostly    12:15:13
going to be -- the majority of people who wear those    12:15:16
are non-native to the United States.    12:15:22

Q    And do you rely on other kinds of clothing    12:15:23
or things that people wear to kind of understand    12:15:27
somebody's ethnicity?    12:15:30

A    Yeah.  If they got, like, a Mexican soccer    12:15:34
team jersey, I could probably infer that they might    12:15:37
be a fan of that soccer team jersey -- or that team.    12:15:41
They might be from that particular place.    12:15:45

Q    Anything else?  Nothing on the soccer.    12:15:49

A    Sorry.  Yeah.    12:15:54

No, I can't -- I can't think of it.    12:15:55

Q    Okay.  And do you have any knowledge or    12:15:57
understanding of the percentage of Hispanic    12:16:03
individuals in the Los Angeles area that would be    12:16:07
unauthorized immigrants as opposed to citizens or    12:16:11

Page 134

CONFIDENTIAL - UNDER PROTECTIVE ORDER

legal residents?    12:16:13

    A    It's about 10 percent.    12:16:14

    Q    10 percent of Hispanic individuals --    12:16:16

    A    Of illegal aliens in the area.    12:16:21

    Q    In the Los Angeles area?    12:16:23

    A    Yes.    12:16:24

    Q    And you're talking about the seven    12:16:25
counties?    12:16:26

    A    I believe so, uh-huh.    12:16:27

    Q    And does it matter what the percentage of    12:16:30
individuals who are, you know, particular ethnicity    12:16:32
are unauthorized or not for the reasonable suspicion    12:16:36
analysis?    12:16:38

        MR. ROSS:  Objection.    12:16:40

        THE WITNESS:  Can you -- can you ask that    12:16:43
again.    12:16:44

BY MS. LAI:    12:16:44

    Q    Yes.    12:16:45

        Is it relevant to you the percentage of    12:16:46
individuals who are, for example, of Hispanic    12:16:51
ethnicity who are unauthorized versus U.S. citizens    12:16:54
or legal residents?    12:16:58

        MR. ROSS:  Objection.    12:16:59

        THE WITNESS:  You're still asking    12:17:04
specifically about Hispanic?    12:17:05

Page 135

BY MS. LAI:                                              12:17:06

Q    Yes.                                                12:17:07

A    I'm not -- I'm not sure I'm tracking your          12:17:07

question.                                               12:17:09

Q    Does it matter whether it's relevant to            12:17:10

reasonable suspicion if -- I'm going to take as an      12:17:13

example somebody is of Hispanic ethnicity in this       12:17:16

example -- the percentage of people who are of          12:17:21

Hispanic ethnicity in the Los Angeles area that are     12:17:24

unauthorized as opposed to U.S. citizens or legally     12:17:27

present, does that matter for the reasonable            12:17:30

suspicion calculus?                                     12:17:33

        MR. ROSS:  Objection.                           12:17:34

        THE WITNESS:  If it matters, I'm not sure       12:17:37

it could be used as a -- as an articulable fact.        12:17:39

I'm not sure if -- again, I'm not understanding your    12:17:42

question.  But I think it could be used as an           12:17:46

articulable fact if you know what percentages those     12:17:48

are.                                                    12:17:51

BY MS. LAI:                                             12:17:52

Q    If I told you that a high percentage of            12:17:53

people who are Hispanic are legally present or          12:17:55

U.S. citizens, would that make you rethink whether      12:17:58

Hispanic ethnicity should be part of your reasonable    12:18:04

suspicion calculus?                                     12:18:07

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

MR. ROSS:  Objection.                                12:18:09

THE WITNESS:  I still think it could be one           12:18:12
of -- one articulable fact.                           12:18:14

BY MS. LAI:                                           12:18:16

Q    Okay.  Do you know if anyone else at the         12:18:19
agency shares your view?                              12:18:24

MR. ROSS:  Objection.                                12:18:25

THE WITNESS:  I wouldn't know.                        12:18:26

MS. LAI:  Okay.  Apart -- I think -- I                12:18:28
think we should probably take a lunch break.  This    12:18:33
is a good stopping point.  I was going to change      12:18:35
topics.                                               12:18:37

THE WITNESS:  Okay.                                  12:18:38

MS. LAI:  Thank you for your time --                  12:18:39

THE WITNESS:  Of course.                             12:18:41

MS. LAI:  -- Agent S███████.  We will see             12:18:41
you after lunch.                                      12:18:42

THE WITNESS:  Yes.                                   12:18:43

MS. LAI:  Please have a good lunch.                   12:18:43

THE WITNESS:  Thank you.                             12:18:45

THE VIDEOGRAPHER:  The time is 12:18 p.m.            12:18:46
Off record.                                           12:18:47

(Lunch recess taken at 12:18 p.m.)

\\\

Page 137

A    I don't recall if at that time or not we had Air and Marine Operations which would be, like, the helicopter.  I don't know if we had them yet. I mean, I'm sure they were available to us but I don't recall using them much.  Mostly for our air, we had the drill, which was Border Patrol.

Q    Okay.  Let's go to Yank Towing.  That's the operation under small letter b. in the document we just looked at.

Do you recall being involved in that operation at Yank Towing in June?

A    I think so.  I don't recall if that was the name of the place, but if you have the information, would you be able to tell me what street it was on?

Q    I do have that information.  Let me see if I can refresh your recollection.

This is a business in Montebello, California.  Do you recall being in the City of Montebello in June?

A    Not -- not by the name specifically.

Q    How about Olympic Parkway?

A    Yes.  Olympic.

Q    Okay.  What do you recall about the operation at Olympic Parkway?

A    It wasn't set to be specifically at that

13:50:53
13:50:58
13:51:01
13:51:04
13:51:07
13:51:10
13:51:20
13:51:23
13:51:27
13:51:28
13:51:29
13:51:32
13:51:35
13:51:38
13:51:43
13:51:46
13:51:49
13:51:51
13:51:53
13:51:55
13:51:58
13:51:59
13:52:01
13:52:03
13:52:08

Page 144

place.  It was just we were just patrolling the city    13:52:11

of Montebello.    13:52:15

Q    Would it be fair to say you were out on a    13:52:16

roving patrol?    13:52:18

MR. ROSS:  Objection.    13:52:19

MS. LAI:  Let me re-ask the question in a    13:52:31

clearer way.    13:52:33

BY MS. LAI:    13:52:34

Q    When you say that you were just out there    13:52:35

not at a specific location, tell me what you mean.    13:52:37

A    We were assigned that area.    13:52:41

And this was still in June, correct?    13:52:43

Q    Yes.    13:52:44

A    Yeah, so that was prior to the TRO so I    13:52:46

believe it might have been that.  I don't recall    13:52:49

exactly.  We were out in that area looking for --    13:52:51

for aliens.    13:52:55

Q    Understood.    13:52:56

In the -- when you say you were out in that    13:52:58

area, do you mean the city of Montebello?    13:53:00

A    Yes.    13:53:03

Q    Any area more specific like a particular    13:53:05

part of Montebello that you were asked to go to?    13:53:08

A    I might have been asked to go to a certain    13:53:14

area but I don't recall exactly what part of town to    13:53:16

Page 145

go.                                                              13:53:19

Q    Were you given any direction to go to that             13:53:20

particular location on Olympic Parkway?                          13:53:22

A    Not from Border Patrol.                                 13:53:34

Q    Okay.  And when you say "not from                       13:53:38

Border Patrol," was there someone else you received             13:53:46

the direction from to go to that specific location?             13:53:49

A    One of the agents in my team had a friend             13:53:53

that lived in the area and told him go check that               13:53:56

spot out, that -- that area there.                               13:53:59

Q    What information was conveyed to you by the           13:54:03

agent on your team that the friend had that informed            13:54:08

the suggestion to go to that location?                           13:54:12

    MR. ROSS:  Objection.                                   13:54:15

    THE WITNESS:  What information?                          13:54:20

    He just -- I think he said his friend knows             13:54:21

the area well and knows that it's high probability              13:54:24

of aliens there.                                                 13:54:28

BY MS. LAI:                                                      13:54:29

Q    And when you say "there," what is "there"?            13:54:30

A    Location.                                              13:54:35

Q    We were talking about --                              13:54:37

A    The general area.                                      13:54:38

Q    Okay.  Do you mean that particular                    13:54:39

neighborhood, cross streets?                                     13:54:46

Page 146

CONFIDENTIAL - UNDER PROTECTIVE ORDER

A    I believe they mentioned, like, the -- that    13:54:50

avenue or parkway.    13:54:52

Q    Anything more specific?    13:54:56

A    Not that I can recall.  This was, like,    13:55:01

second- or third-hand.  I had a buddy of mine in the    13:55:04

area says, Go check out this general area here.    13:55:08

I mean, I can explain to you how that came    13:55:14

up.    13:55:16

Q    Please.    13:55:17

A    So, yeah, one of my agents had a friend, Go    13:55:18

check out this area.  I said, Just give me, like --    13:55:22

just pick a spot on the map so we can head to that    13:55:25

general area.  And that was -- that was how that    13:55:27

came up.    13:55:30

Q    Is that a conversation you had with a    13:55:31

friend of your agent or --    13:55:33

A    No.    13:55:34

Q    -- with your agent?    13:55:35

A    With the agent.    13:55:36

Q    Okay.  This process of somebody providing    13:55:37

information that was a friend of an agent or someone    13:55:44

outside of Border Patrol, did that happen any other    13:55:48

time, a suggestion to go to a particular location?    13:55:52

MR. ROSS:  Objection.    13:55:56

THE WITNESS:  I mean, it happened to us    13:56:04

Page 147

CONFIDENTIAL - UNDER PROTECTIVE ORDER

even when we were out doing our strikes in certain    13:56:06

areas, people would, oh, why are you here, go to    13:56:09

this other area, there's more criminals there, go to    13:56:12

this other area.    13:56:15

So it would happen like that.    13:56:15

BY MS. LAI:    13:56:17

Q    And when that happened, like, with this    13:56:17

operation at Olympic Parkway, did you ever follow    13:56:20

that suggestion to go to a particular area?    13:56:24

A    I can't recall off the top of my head if    13:56:28

I -- if I did or not.    13:56:30

Q    Is there any agency policy that tells you    13:56:33

what you should do with information like this from    13:56:36

somebody outside of Border Patrol?    13:56:40

A    I can't think of one off the top of my    13:56:44

head.    13:56:46

Q    Okay.  Anything that prohibits you from    13:56:46

acting on information like this, a suggestion to go    13:56:48

to a particular street or area?    13:56:51

A    Not one that I can think off the top of my    13:56:56

head.    13:56:58

Q    Okay.  Have you reviewed any documents in    13:56:58

connection with this operation on Olympic Parkway?    13:57:01

A    I don't think so.  I don't recall.    13:57:09

Maybe like the day of, I think there were    13:57:12

Page 148

CONFIDENTIAL - UNDER PROTECTIVE ORDER

MS. LAI:  Yes.                                      14:45:41

BY MS. LAI:                                             14:45:41

Q    This is a narrative attached to an I-44.        14:45:44

Is there understanding that this narrative      14:45:47
should contain the justification for a stop or    14:45:50
arrest if that occurred?                          14:45:54

A    Yes.  Or I'm not sure that one could write    14:46:01
all of the totality of the circumstances in one    14:46:05
page.                                              14:46:10

Q    Okay.  Have you heard anything at the         14:46:11
agency that suggests that a narrative should contain    14:46:15
the justification for a stop or an arrest?         14:46:19

A    I don't -- I'm not sure.  I don't recall.     14:46:34
It's, you know...                                  14:46:36

Q    Okay.  I'm almost done with this document.    14:46:39

Do you see the language here that says --        14:46:42
Agent P███  said that "RAMIREZ began shouting in    14:46:44
Spanish which further raised my suspicion."        14:46:55

Do you see that?                                 14:46:57

A    Yes.                                          14:47:07

Q    So do you -- do you agree with that          14:47:12
statement that shouting in Spanish can raise the    14:47:17
suspicion of an agent?                            14:47:20

A    I believe that shouting in Spanish can be     14:47:26
an articulable fact to assist in reasonable        14:47:28

Page 187

CONFIDENTIAL - UNDER PROTECTIVE ORDER

suspicion, yes.                                          14:47:33

        Q    If agents spoke to Ms. Ramirez in Spanish   14:47:34

and he responds in Spanish, would that change your       14:47:38

view?                                                    14:47:40

        A    No.                                         14:47:40

        Q    And then do you see how he says "I asked    14:47:41

RAMIREZ, in the Spanish language, what county he was      14:47:44

a citizen of to which he refused to answer"?             14:47:47

        A    I see that, uh-huh.                         14:47:50

        Q    At that point does Agent P███ have          14:47:52

probable cause to arrest Mr. Ramirez?                    14:47:56

        MR. ROSS:  Objection.                            14:47:59

        THE WITNESS:  I mean, again, I don't know        14:48:03

the totality of the circumstances.  I wasn't there       14:48:04

so I wouldn't be able to speak on his behalf.            14:48:06

BY MS. LAI:                                              14:48:08

        Q    Based on the information in the document,   14:48:08

do you believe that at that point there's enough         14:48:10

that's been articulated to justify an arrest?           14:48:14

        MR. ROSS:  Objection.                            14:48:18

        THE WITNESS:  I think at a very minimum, he      14:48:23

has enough to further investigate.                       14:48:25

BY MS. LAI:                                              14:48:27

        Q    Okay.  And do you see where he says he      14:48:28

attempts to place him in handcuffs?  We looked at        14:48:29

Page 188

CONFIDENTIAL - UNDER PROTECTIVE ORDER

that before.                                                   14:48:32

A    Uh-huh.                                                   14:48:33

Q    Is Agent P████'s actions to place him in                 14:48:34
handcuffs to investigate further something that               14:48:37
needs any additional justification once he has                14:48:41
reasonable suspicion?                                         14:48:45

A    No.                                                      14:48:46

Q    And is this something that's been done on                14:48:48
other operations, somebody is placed in handcuffs to          14:48:49
investigate further?                                          14:48:52

A    Yes.                                                     14:48:53

MR. ROSS:  Objection.                                         14:48:54

BY MS. LAI:                                                   14:48:54

Q    Is that something you personally have done?             14:48:55

A    Yes.                                                     14:48:57

Q    Is that something you do commonly?  Is                   14:48:59
it -- is it unusual?  Just help me understand, is             14:49:04
placing in handcuffs to investigate further                   14:49:09
something that was a regular occurrence?                      14:49:11

MR. ROSS:  Objection.                                         14:49:16

THE WITNESS:  I mean, I can't speak for                       14:49:19
anybody else.  It's at the agent's discretion.                14:49:20

I do it sometimes.  I don't do it                             14:49:23
sometimes.  It depends on the circumstance.                   14:49:25

\\\

Page 189

CONFIDENTIAL - UNDER PROTECTIVE ORDER

BY MS. LAI:                                                    14:49:27

Q    Okay.  And then do you see how the                       14:49:27

narrative says that Agent D█████ assisted Agent P█████        14:49:31

and they were able to perform a controlled take down          14:49:37

on Ramirez?                                                   14:49:40

A    Uh-huh.                                                  14:49:41

Q    Is that something that they needed                       14:49:41

additional justification for --                              14:49:43

MR. ROSS:  Objection.                                        14:49:47

BY MS. LAI:                                                    14:49:47

Q    -- once Agent P█████, if he had reasonable              14:49:47

suspicion, had reasonable suspicion?                          14:49:49

MR. ROSS:  Objection.                                        14:49:56

THE WITNESS:  Yeah.  I'm not sure.                           14:50:03

BY MS. LAI:                                                    14:50:07

Q    Okay.  I just want to draw your attention                14:50:07

back to the first page of this document, and then I           14:50:09

think we might be done.                                       14:50:12

Do you see the instruction on the first                       14:50:14

page that has the bold, capital font that says                14:50:18

"NARRATIVE:  (Include Circumstances of apprehension           14:50:22

and seizure and facts to which apprehending officers          14:50:24

can testify.)"?                                               14:50:28

A    Uh-huh.                                                  14:50:30

Q    Do you understand that one purpose of this               14:50:31

                                                              Page 190

CONFIDENTIAL - UNDER PROTECTIVE ORDER

report is to justify what happened to Mr. Ramirez?          14:50:33

          MR. ROSS:  Objection.                            14:50:39

          THE WITNESS:  I mean, I believe                  14:50:57

circumstances of apprehension were included.               14:50:58

BY MS. LAI:                                                 14:51:00

     Q    I understand.                                     14:51:00

          My question is a little bit different,           14:51:01

which is that:  Do you understand one purpose of           14:51:04

this document to be for the agency to justify the          14:51:06

seizure of Mr. Ramirez?                                    14:51:13

          MR. ROSS:  Objection.                            14:51:15

          THE WITNESS:  You say that's one purpose of      14:51:25

this document?                                             14:51:26

BY MS. LAI:                                                 14:51:26

     Q    Yes.                                              14:51:26

     A    Maybe, yes.                                       14:51:34

     Q    And would it be in Agent P████'s interest        14:51:35

to include any fact that might justify the seizure         14:51:39

of Mr. Ramirez?                                            14:51:43

          MR. ROSS:  Objection.                            14:51:45

          THE WITNESS:  I mean, I can't speak on his       14:51:46

behalf.                                                    14:51:48

BY MS. LAI:                                                 14:51:49

     Q    Okay.  I'm going to -- you can set that          14:51:49

document aside.  I made a promise.  I'm going to           14:51:51

Page 191

CONFIDENTIAL - UNDER PROTECTIVE ORDER

keep it.

A    It's okay.

Q    So from what we've just reviewed and what you know about what Mr. P███ -- Agent P███ and, I believe it was, Agent D██ did in this encounter with Mr. Ramirez, is there anything that concerns you?

MR. ROSS:  Objection.

THE WITNESS:  Anything that concerns me about what?

BY MS. LAI:

Q    About what Agent P███, who was under your supervision at this time, and Agent D██ did.

A    No.

Q    And from what you know about Agent C██████ and what his encounter was with somebody you may not know, his name is Mr. Gavidia, the other U.S. citizen, is there anything that concerns you?

MR. ROSS:  Objection.

THE WITNESS:  I didn't -- I didn't see it happen, so...

BY MS. LAI:

Q    Is it your understanding that what occurred at Yank Towing that day is consistent with what higher ups in your agency would have expected to be

Page 192

CONFIDENTIAL - UNDER PROTECTIVE ORDER

BY MS. LAI:                                                 14:53:54

    Q    Anything you're aware of that would have           14:53:54

made the events of that day not acceptable under            14:53:56

agency policy?                                              14:53:59

    A    Anything that I am aware of?                       14:54:03

    Q    Yes.                                               14:54:05

    A    I'm not sure.                                      14:54:08

    Q    We're going to take a break very soon but          14:54:11

let me just ask you a couple more questions.                14:54:13

         The temporary restraining order, you said         14:54:16

this morning, was something -- let me know if I'm           14:54:19

misstating what you said -- that asked the                  14:54:22

government to have intelligence report prior to             14:54:26

executing strike operations.                                14:54:28

         Is that --                                         14:54:32

         MR. ROSS:   Objection.                             14:54:33

BY MS. LAI:                                                 14:54:35

    Q    -- the way you understood?                         14:54:36

    A    Just paraphrasing.  It's an order for the          14:54:38

government to -- for intelligence reports to be             14:54:41

generated prior to strikes, was my understanding.           14:54:46

    Q    Is there anything else that you understand         14:54:49

the temporary restraining order to have required?           14:54:52

    A    That's what I understand it was.                   14:54:56

    Q    Anything else?                                     14:54:58

                                                  Page 194

A    I can't think of anything right now.                14:55:00

Q    After the temporary restraining order,             14:55:03
other than the fact of these intelligence reports        14:55:07
prior to executing strike operations, were there any     14:55:09
other changes operationally to how, you know, strike      14:55:11
operations occurred in the field?                        14:55:16

A    Other than the intelligence reports?               14:55:20

Q    Yes.                                               14:55:22

A    The targeting.  The target folders.                14:55:26

Q    I believe you said there were not target           14:55:29
folders, but targeting information; is that correct?     14:55:31

A    So it was the -- the targeting information         14:55:34
on the intelligence reports when we would do the         14:55:37
strikes, but we also had target folders that were a      14:55:40
separate part of the operation.                          14:55:43

Q    A separate type of --                              14:55:45

A    Enforcement action.                                14:55:47

Q    Understood.                                        14:55:48
And so for the strike operations, was there          14:55:49
anything other than the intelligence reports that       14:55:51
changed operationally?                                   14:55:55

A    I don't think so.                                  14:55:59

Q    Did it change how you contacted people in          14:56:00
the field once you were on scene?                        14:56:02

A    No.                                                14:56:06

Page 195

CONFIDENTIAL - UNDER PROTECTIVE ORDER

Q    Did it change how many people were    14:56:07

contacted in the field once you were on scene?    14:56:09

A    I mean, I didn't keep track of the numbers    14:56:13

so I wouldn't know.    14:56:16

Q    Okay.  I understand.    14:56:20

Did you have any conversations other than    14:56:21

the one you told me about regarding the temporary    14:56:23

restraining order?    14:56:27

MR. ROSS:  Objection.    14:56:30

THE WITNESS:  Yeah.  I don't think so.    14:56:36

BY MS. LAI:    14:56:38

Q    Do you know how long the temporary    14:56:38

restraining order was in effect?    14:56:40

A    I don't know.    14:56:43

MS. LAI:  Okay.  I think this is a good    14:56:43

time for a break.  Do people want 15?  Let's do it.    14:56:46

THE VIDEOGRAPHER:  The time is 2:56 p.m.    14:56:51

Off record.    14:56:53

(Off the record from 2:56 - 3:27 p.m.)    14:56:54

THE VIDEOGRAPHER:  The time is 3:27 p.m.    15:20:37

We're back on record.    

BY MS. LAI:    15:27:09

Q    All right.  Agent S████, welcome back.    15:27:10

I do want to go back and ask one question about the    15:27:13

operation on Olympic Parkway.    15:27:18

Page 196

BY MS. LAI:                                                          15:50:38

Q   What would be the reason to share this                          15:50:42
information with the teams going out that day?                       15:50:44

MR. ROSS:  Objection.                                               15:50:48

THE WITNESS:  I think I answered it before.                         15:50:50
Situational awareness.                                               15:50:53

BY MS. LAI:                                                          15:50:54

Q   Yes, I did hear that answer, and I think                        15:50:54
I'm just trying to understand what that means.                       15:50:56

A   Be aware of your surroundings.                                  15:50:58

Q   Was there anything about the presence of 15                     15:51:00
to 20-plus day laborers that would be relevant to                    15:51:03
the operation?                                                       15:51:06

A   Well, with prior experiences being that                         15:51:09
whenever we show up anywhere we get surrounded and                   15:51:11
sometimes things thrown at us, it might be good to                   15:51:14
know that that could happen at that place.                           15:51:16

Q   What about customers, would it be relevant                      15:51:19
to know how many customers were observed at that                     15:51:22
location?                                                            15:51:24

A   Maybe.                                                          15:51:28

Q   Could customers throw things?                                   15:51:29

A   They could.                                                     15:51:32

Q   So why -- do you have an understanding as                       15:51:33
to why there's a focus on "15 to 20-plus day                         15:51:35

Page 217

CONFIDENTIAL - UNDER PROTECTIVE ORDER

laborers observed" here?                                    15:51:38

MR. ROSS:  Objection.                                       15:51:40

THE WITNESS:  I don't know why that was put                 15:51:42
there and not the customers numbers.  I don't know.         15:51:43

BY MS. LAI:                                                 15:51:48

Q    In I think -- I asked this before but I                15:51:48
want to make sure I understand.                             15:51:52

The 15 to 20 day laborers, when you                         15:51:54
received this briefing, did you understand those to         15:51:56
be the same as the people who work at the car wash?         15:51:59

MR. ROSS:  Objection.                                       15:52:02

THE WITNESS:  No.  I mean, it's -- day                      15:52:09
laborers and car wash employees are two different           15:52:11
distinctions.                                               15:52:13

BY MS. LAI:                                                 15:52:14

Q    Is there any information in this                       15:52:14
surveillance briefing about the individuals who are         15:52:17
working at the car wash?                                    15:52:21

MR. ROSS:  Objection.                                       15:52:26

THE WITNESS:  Are you talking about the                     15:52:33
entire briefing?                                            15:52:34

BY MS. LAI:                                                 15:52:36

Q    That's correct.  You can take your time and            15:52:36
flip through it.                                            15:52:38

Any information about people who work at                     15:52:39

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - UNDER PROTECTIVE ORDER

you think the day laborers could be that are    15:58:41

identified here as relevant surveillance information    15:58:44

from your intelligence agent at this car wash?    15:58:47

MR. ROSS:  Objection.    15:58:52

THE WITNESS:  I don't know.  Who did I    15:58:56

think those day laborers could be?    15:58:57

I don't know.    15:58:58

BY MS. LAI:    15:59:06

Q    Do you know anything about how car wash    15:59:06

workers are paid?    15:59:08

A    No.    15:59:11

Q    Is that "no"?    15:59:12

A    Do I know how they are paid?    15:59:14

Q    Yes.    15:59:15

A    I haven't confirmed it, no.    15:59:16

Q    So in these interviews that you described    15:59:24

before, did you ever talk to any car wash workers?    15:59:26

MR. ROSS:  Objection.    15:59:29

THE WITNESS:  I might have.  I don't    15:59:35

recall.    15:59:36

BY MS. LAI:    15:59:37

Q    You don't recall?    15:59:38

A    I might have.  Yeah, I -- I don't recall.    15:59:39

Q    The individuals -- I'm going to draw your    15:59:42

attention to Page 6 of this presentation -- that are    15:59:45

Page 224

CONFIDENTIAL - UNDER PROTECTIVE ORDER

of the operation and the purpose of the operation    16:12:21

kind of remains the same for all of them.  What    16:12:24

changes is obviously locations, people, encounters.    16:12:28

    Q    What about the fourth paragraph on the    16:12:35

first page of the narrative about your years of    16:12:38

experience, would that be something that would be    16:12:41

cut and paste?    16:12:44

    A    No.  I would have updated that.  But this    16:12:46

was prior to me having 15 years, so it's 14 years.    16:12:48

    Q    That's fair.    16:12:53

        Okay.  I think on that first page in the    16:12:55

second paragraph, there's something called ATrac.    16:13:00

        Do you know what that is?    16:13:04

    A    Alien Tracker.    16:13:14

    Q    Is that something you've used?    16:13:16

    A    Not personally, no.    16:13:17

    Q    Is it something anybody else you know has    16:13:19

used?    16:13:21

    A    I'm not sure.    16:13:23

    Q    Have you even seen the ATrac system?    16:13:26

    A    I'm not sure.  I don't recall seeing it.    16:13:31

    Q    All right.  I think I recall from    16:13:34

information in this case that you put -- I think you    16:13:40

said earlier you put your hands on this individual    16:13:44

when you made contact with him.    16:13:48

Page 233

My recollection is that you put your hands    16:13:51
on before you asked him his citizenship.    16:13:54

Is that what your recollection is?    16:13:57

A    I think so, yes.    16:13:59

Q    Once you asked him his citizenship, as you    16:14:01
indicated earlier, he said Mexico; is that correct?    16:14:03

A    Uh-huh.    16:14:06

Q    And then you handed him off to other    16:14:06
agents?    16:14:08

A    Yes.    16:14:09

Q    When you handed him off to other agents,    16:14:09
was your intent that he would be arrested?    16:14:11

A    That he would be secured to further    16:14:13
investigate his status.    16:14:18

Q    How would he be secured?    16:14:19

MR. ROSS:    Objection.    16:14:21

THE WITNESS:    Pat down, make sure he's got    16:14:24
no weapons.  If the agents that now have custody of    16:14:25
him think he needs to be handcuffed, handcuff him,    16:14:30
put him in a secure location where he's not going to    16:14:33
get up and run.    16:14:36

BY MS. LAI:    16:14:37

Q    When you handed him off, do you have an    16:14:37
awareness of whether he was handcuffed?    16:14:39

A    I don't recall.    16:14:41

Page 234

CONFIDENTIAL - UNDER PROTECTIVE ORDER

Q    Do you know if he was placed in a vehicle?    16:14:42

A    He was.  I didn't see it happen, but he was    16:14:46
then transported to a secondary location so he must    16:14:48
have, yes.    16:14:51

Q    When you handed him off, did you have any    16:14:52
idea who he was?    16:14:54

A    Not at the time, no.    16:14:56

Q    Did you know his name?    16:14:58

A    Not at the time, no.    16:14:59

Q    Would this be true for other operations as    16:15:04
well, where a person is handed off or detained,    16:15:06
handcuffed without knowing their name?    16:15:14

        MR. ROSS:  Objection.    16:15:18

        THE WITNESS:  Ask me again.    16:15:25

BY MS. LAI:    16:15:26

Q    Yes.    16:15:27

        Is this something you recall happening at    16:15:28
other operations as well, where somebody would be    16:15:29
restrained without knowing their -- without the    16:15:32
agent knowing their name?    16:15:36

        MR. ROSS:  Objection.    16:15:37

        THE WITNESS:  If they're -- if the subject    16:15:39
is being detained, he can be handcuffed prior to    16:15:41
knowing their name.    16:15:45

\\\

Page 235

CONFIDENTIAL - UNDER PROTECTIVE ORDER

BY MS. LAI:    16:15:46

Q    I think my question is a little different.    16:15:46

It's about what you observed or experienced on these    16:15:48

operations.    16:15:51

A    Uh-huh.    16:15:51

Q    Did you observe or experience individuals    16:15:52

being restrained without Border Patrol knowing their    16:15:53

name?    16:15:56

A    Probably.    16:15:58

Q    And what about other ways to identify him,    16:16:02

did you attempt to identify him using any other    16:16:05

technology or information prior to handing him off?    16:16:08

A    No.    16:16:12

Q    On the part of the narrative on the final    16:16:22

page, I think it's the second page, do you see how    16:16:27

the narrative indicates that this individual,    16:16:33

Mr. Z███████, was arrested without a warrant?    16:16:36

A    Yes.    16:16:40

Q    Is that accurate?    16:16:40

A    That he was arrested without a warrant?    16:16:42

Q    Yes.    16:16:44

A    So it wasn't until later.  Because the name    16:16:48

he gave me wasn't his true name so it wasn't until    16:16:50

later that we found out he was, in fact, a target,    16:16:55

but at the time he was arrested, not -- the warrant    16:16:57

Page 236

was not given to him.                                    16:17:01

Q    Just so the record is clear, is there some      16:17:03

period after which you -- after you handed him off       16:17:04

where you interviewed him?                               16:17:06

A    Yes.                                            16:17:08

Q    When was that?                                  16:17:09

A    Once we got to the secondary location          16:17:12

before he went to transport.                             16:17:13

Q    Okay.  And he did not have a warrant; is       16:17:15

that correct?                                            16:17:21

A    I don't recall.                                16:17:25

Q    Do you have any reason to believe your         16:17:28

narrative report is not accurate?                        16:17:30

A    I think with the information I had at the      16:17:35

time, that was the name he gave me, but I don't -- I     16:17:37

don't think so.  I don't recall if he had a warrant      16:17:42

or not.                                                  16:17:44

Q    I think my question is:  Do you have any       16:17:46

information to believe that this report that you         16:17:48

wrote close in time to the event was not accurate?       16:17:52

A    Do I have any information now?                  16:17:57

Q    Yes.  Or reading the report, that he did       16:17:59

not have -- that there was no warrant.                   16:18:02

MR. ROSS:  Objection.                               16:18:06

THE WITNESS:  I mean, again, I don't recall         16:18:06

Page 237

MR. ROSS:  Objection.                           17:13:54

THE WITNESS:  Sorry.                            17:13:55

BY MS. XIAO:                                        17:14:03

Q    As to the individuals on 338, so the same   17:14:03

four folks, do you know if these four individuals   17:14:07

had any criminal history?                           17:14:09

A    I do not know.                            17:14:11

Q    Okay.  Do you know if any information was   17:14:13

provided to you or your team about these individuals   17:14:15

other than what's on this slide in Exhibit 11?    17:14:18

A    I'm not sure.  I don't remember if on that   17:14:23

day an ROI was provided to us or not.             17:14:25

Q    Okay.  So you don't recall one way or       17:14:27

another?                                            17:14:30

A    I don't recall.                          17:14:30

Q    And just to clarify, were any of the       17:14:33

individuals arrested in the operation that day one   17:14:35

of the four people identified as targets?          17:14:37

A    I don't recall.                          17:14:40

Q    I want to also ask you some more general    17:14:44

questions about Operation Trojan Horse.  You led one   17:14:46

of the teams there.                                 17:14:50

How many teams total were participating?      17:14:51

A    I don't know off the top of my head how     17:14:54

many there were.                                    17:14:55

Page 272

CONFIDENTIAL - UNDER PROTECTIVE ORDER

the agents in the back of the truck developed    17:19:08

reasonable suspicion to stop those individuals?    17:19:10

A    Yeah.  They would have developed reasonable    17:19:15

suspicion to detain anybody.    17:19:17

Q    And then at some point you exited the back    17:19:26

of the truck?    17:19:31

A    Yes.    17:19:33

Q    And would you agree that -- let me go back.    17:19:35

Were you masked at the time?    17:19:43

A    Not inside the truck.  But when I exited,    17:19:46

yes.    17:19:48

Q    Were you armed at the time?    17:19:48

A    Yes.    17:19:50

Q    Were other -- the other teams in the back    17:19:51

of the truck also masked and armed?    17:19:53

A    Yes.    17:19:56

Q    Would you agree that these agents along    17:19:57

with you then sort of suddenly jumped out the back    17:19:59

of the truck?    17:20:03

A    Suddenly?  I mean, they jumped out of the    17:20:06

truck or we got out of the truck.    17:20:09

Q    So you jumped out of the truck into the    17:20:11

parking lot of the Home Depot?    17:20:15

A    Yes.    17:20:16

Q    And if someone takes flight under those    17:20:17

Page 277

CONFIDENTIAL - UNDER PROTECTIVE ORDER

circumstances, is that provoked or unprovoked    17:20:20

flight?    17:20:24

    A    Somebody exiting the back of a truck?    17:20:25

    Q    So under the circumstances where the    17:20:29

Border Patrol agents are masked and armed and jump    17:20:32

out of the back of their truck, if someone takes    17:20:35

flight under those circumstances, is that provoked    17:20:37

or unprovoked flight?    17:20:39

    A    I mean, I don't know.  It depends on the    17:20:43

person.  I know a lot of people didn't run.    17:20:46

    Q    Why -- what is your understanding of why    17:20:54

the operation had agents starting off in the back of    17:20:57

the Penske truck?    17:21:01

    A    Concealment.    17:21:04

    Q    Okay.  So you wanted to surprise the    17:21:05

individuals outside of the truck?    17:21:08

        MR. ROSS:  Objection.    17:21:11

        THE WITNESS:  I wouldn't -- I wouldn't -- I    17:21:12

wouldn't phrase it that way.    17:21:19

BY MS. XIAO:    17:21:21

    Q    How would you phrase it?    17:21:22

    A    Concealment.    17:21:23

    Q    Okay.    17:21:24

    A    We wanted to conceal ourselves.    17:21:24

    Q    Conceal yourselves from being seen by the    17:21:28

Page 278

individuals outside of the truck?                          17:21:30

A    Correct.                                              17:21:31

Q    Okay.  And are you aware of the difference           17:21:32
between provoked and unprovoked flight?                     17:21:34

A    I think I have an idea.                               17:21:37

Q    What is the idea?                                     17:21:39

A    Unprovoked, I mean, I'm not doing anything            17:21:44
in particular to make somebody run.                         17:21:47

Q    Okay.  And what about provoked?                       17:21:50

A    I'm doing something intentionally to make             17:21:52
them run.                                                   17:21:54

Q    What is your understanding of why Operation           17:21:56
Trojan Horse was conducted in this manner in order          17:21:58
to apprehend four targets?                                  17:22:03

A    I'm not sure.                                         17:22:07

MS. XIAO:  Can I have the new ones.                         17:22:15

This is a one-page document I'm going to                    17:22:35
mark as Exhibit 12.                                         17:22:38

              (Deposition Exhibit 12                       17:22:38

         was marked for identification.)                   17:22:38

MS. XIAO:  I'm also going to pass you a                     17:22:47
separate one-page document that I'm going to mark as        17:22:48
Exhibit 13.                                                 17:22:50

              (Deposition Exhibit 13                       17:22:51

         was marked for identification.)                   17:22:51

Page 279

A    No.                                                    17:37:09

MS. XIAO:  Let's take a five-minute break.                 17:37:16

Let's go off the record.                                   17:37:17

THE VIDEOGRAPHER:  The time is 5:37 p.m.                   17:37:19

Off record.                                                17:37:20

(Off the record from 5:37 - 5:50 p.m.)                     17:37:21

THE VIDEOGRAPHER:  The time is 5:50 p.m.                   17:39:00

We're back on record.                                      17:50:41

BY MS. XIAO:                                                17:50:44

Q    Mr. S███████, we just got back from a break.          17:50:44
Do you understand that you're still under oath             17:50:47
today?                                                     17:50:49

A    Yes.                                                  17:50:49

Q    Referring back to Operation Trojan Horse,             17:50:51
do you recall bringing any documents with you to           17:50:54
Operation Trojan Horse?                                     17:50:57

A    I don't recall.                                       17:51:00

Q    Do you recall briefing -- excuse me,                  17:51:01
bringing any of the briefing with you to Operation         17:51:04
Trojan Horse?                                               17:51:06

A    No, I don't recall.                                   17:51:07

Q    If you had brought it with you, I guess,              17:51:08
where would you have put it?  Did you have a               17:51:10
backpack?                                                  17:51:13

A    No, I didn't.                                         17:51:14

Page 292

CONFIDENTIAL - UNDER PROTECTIVE ORDER

Q    Okay.  So you would be holding it in your hands?    17:51:14 17:51:17

A    Yeah, so I highly doubt I brought anything with me.    17:51:17 17:51:19

Q    Do you know if anyone on your team brought anything with them?    17:51:20 17:51:22

A    I don't think anybody did.    17:51:23

Q    Because they would have had to be holding it in their hands, right?    17:51:25 17:51:26

A    Correct.    17:51:29

Q    And turning back to Exhibit 10 to the page that is Bates stamped Government 363, a large "Mission" at the top.    17:51:29 17:51:44 17:51:51

Do you see it?    17:51:53

A    Yes.    17:51:53

Q    So earlier you mentioned that you believed the intent for Operation At Large was to arrest as many aliens present in the United States as possible.    17:51:54 17:51:58 17:52:01 17:52:03

Have you heard that the agency is trying to make a particular number of immigration arrests per day?    17:52:07 17:52:09 17:52:13

A    No.    17:52:14

Q    And I don't mean just within the agency.    17:52:18

Have you heard from any source that the    17:52:20

Page 293

CONFIDENTIAL - UNDER PROTECTIVE ORDER

STATE OF CALIFORNIA        )

COUNTY OF LOS ANGELES      )    ss.


        I, Kimberly A. Edelen, C.S.R. No. 9042, in and for the State of California, do hereby certify:

        That prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify the truth, the whole truth and nothing but the truth;

        That said deposition was taken down by me in shorthand at the time and place therein named, and thereafter reduced to typewriting under my direction, and the same is a true, correct and complete transcript of said proceedings;

        That if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript {X} was { } was not requested.

        I further certify that I am not interested in the event of the action.

        Witness my hand this 11th day of December, 2025.


                KIMBERLY A. EDELEN, C.S.R. NO. 9042

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.