# EXHIBIT 15

Sealed Version
Filed Separately

*** CONFIDENTIAL UNDER PROTECTIVE ORDER ***

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

_____

)

PEDRO VASQUEZ PERDOMO, et        )

al.,                             )

                                 )

          vs.                    )No. 2:25-cv-05605-MEMF-SPX

                                 )

KRISTI NOEM, Secretary,          )

Department of Homeland           )

Security, et al.,                )

                                 )

          Defendants.            )

_____)

*** CONFIDENTIAL UNDER PROTECTIVE ORDER ***

VIDEOTAPED DEPOSITION OF J███████ M███████

Los Angeles, California

Tuesday, December 16, 2025

Volume I

Stenographically Reported By:

Melissa M. Villagran, RPR

CSR No. 12543

Job No. 7784354

PAGES 1 - 332

Page 1

*** CONFIDENTIAL UNDER PROTECTIVE ORDER ***

                          INDEX


DEPONENT                                    EXAMINATION

J███████  M███████

Volume I

            BY MS. HANSEN                        17

            BY MR. KREILKAMP                     87



                        EXHIBITS

DEPOSITION                                        PAGE

Exhibit 101  E-mail                               264


Exhibit 102  WhatsApp messages                    271


Exhibit 103  Transcript                           289


Exhibit 104  P█████  declaration                  294


Exhibit 105  Video                                301


Exhibit 106  Call log                             312




                                        Page 12

*** CONFIDENTIAL UNDER PROTECTIVE ORDER ***

for the plaintiffs in this case, and I'm going to be asking you some more questions today.

I want to start with just a little bit of background about your experience -- your prior experience, both at CBP and maybe elsewhere.      11:11:31

So you're currently employed by CBP, correct?

A   By US Border Patrol.

Q   Border patrol.  Okay.

And how long -- you may have answered this before; if so, I apologize.      11:11:45

But tell me how long you've been employed by border patrol?

A   Over 24 years.

Q   24 years.

And did you have any other jobs from after      11:11:53 high school to when you started working for border patrol?

A   Yes.

Q   And so we -- I don't want to spend a lot of time on this, but could you give me a quick rundown      11:12:08 of the -- of your employment prior to working for border patrol?

A   Restaurant, construction, security.  And I was a college student also throughout those years.

Q   And tell me what your job or jobs in security      11:12:25

Page 87

*** CONFIDENTIAL UNDER PROTECTIVE ORDER ***

were?

A   It was at a computer plant facility.

Q   And when was that employment?

A   Maybe 1997.  When I was in college.

Q   What is your current title and position?      11:12:52

A   I'm a border patrol agent.

Q   And are you assigned to a certain sector?

A   El Centro Sector.

Q   And are you assigned to a certain station?

A   El Centro Station, yes.                        11:13:12

Q   Can you tell me your -- at a high level, your -- the responsibilities of your job as a border patrol agent?

A   Well, I'm currently the union president, so I'm no longer in uniform patrol duties.            11:13:31

Q   So you previously had uniform patrol duty responsibilities and you don't anymore; is that right?

A   I was elected union president on November 19th.  And from that day to the present,   11:13:48 now I'm -- I deal with union issues.

Q   Okay.

So just a few weeks ago you became union president; is that right?

A   Yes, sir.                                      11:14:04

Page 88

Q   Okay.

So tell me about your day-to-day responsibilities -- prior to becoming union president -- as a border patrol agent, starting with most recent period?                               11:14:13

A   I was assigned to the sensor unit.  It's a unit that deals with technology.  And we do the placement of underground sensors to alert agents where -- wherever there's traffic, I would say.

Q   And when were you assigned to the sensor      11:14:33 unit?

A   It was a two-year assignment.  So it was approximately October 2023 till October 2025.

Q   Tell me a little more about what your day-to-day work with the sensor unit looked like,      11:15:04 what you would be doing?

A   Well, we would perform maintenance on sensors that -- they needed battery changes or they needed adjustments in the sensitivity.  Or we would place them in new areas where there may be more activity      11:15:25 going on.  Or we would just search for recent trends in alien trafficking.  So we would look for new trails or new areas, new breaches in the fences where we can place the sensors.

Q   Was it common in your day-to-day job in the      11:15:48

Page 89

*** CONFIDENTIAL UNDER PROTECTIVE ORDER ***

sensor unit to have encounters with individuals who

were potentially unlawfully present in the

United States?

   A   Occasionally, in the course of our duties, we

would encounter illegal aliens while working.        11:16:08

   Q   How about prior to your assignment to the

sensor unit?

        Tell me what your prior assignment was?

   A   I was assigned to what we say the "line

unit," and that would just be patrolling the border.   11:16:22

   Q   And tell me what period of time you were

assigned to the line unit?

   A   Prior to my commencement of the sensor unit

and -- I mean, I don't remember going back if I had

any other assignments in between or whatever.       11:16:47

   Q   And you said you've been employed by border

patrol for about 24 years; is that right?

   A   Yes.

   Q   And so these last two years, you were in the

sensor unit?                                         11:17:01

   A   Yes.

   Q   Were you assigned to the line unit for

roughly the 22 years before that?

   A   Yes.

   Q   And for that whole 22-year period, were you   11:17:08

Page 90

*** CONFIDENTIAL UNDER PROTECTIVE ORDER ***

Q   And you said they were shown to you.

Who showed them to you?

A   They were shown yesterday during deposition.

Q   Who was with you at the car wash that day?

A   In my vehicle, it was Agent S████, Agent    03:45:08

A███, and I don't remember the names of the agents

in the other vehicles.

Q   What's your best estimate of how many agents

there were at the car wash that day with you?

MS. SAFAVI:  Objection; calls for law    03:45:31

enforcement privilege.

Go ahead and answer the question to the best

you can without disclosing privilege.

THE DEPONENT:  To my knowledge, there were

three vehicles, and each vehicle, approximately,    03:45:50

with three agents inside.

BY MR. KREILKAMP:

Q   So about nine agents, give or take one or

two?

A   Based on the formula of three agents per one    03:45:57

vehicle.

Q   And what was your role that day in that visit

to that car wash?

A   My role was a border patrol agent performing

my assigned duties.    03:46:23

Page 216

*** CONFIDENTIAL UNDER PROTECTIVE ORDER ***

Q   And was everyone else -- were all the other agents who were there with you that day performing the same duties that you were?

A   Yes.

MS. SAFAVI:  Counsel, would you mind taking a   03:46:37 break?

MR. KREILKAMP:  No.  This is a good time.

MS. SAFAVI:  Okay.

THE VIDEOGRAPHER:  We are going off the record.  The time is 3:46 p.m.   03:46:44

(Recess.)

THE VIDEOGRAPHER:  This is Media 8.  We are going back on the record.  The time is 4:08 p.m.

BY MR. KREILKAMP:

Q   Okay.

So let's get back to talking about the events at the June 18th raid at the Whittier car wash.

How did you your team decide to stop at the Whittier car wash on June 18th?

MS. SAFAVI:  Objection; form.   04:08:15

BY MR. KREILKAMP:

Q   Let me go a slightly different way.

Why did your team go to the Whittier car wash on June 18th?

A   From what I remember, we Googled a list of   04:08:25

Page 217

nearest car washes, and that was one of the places that came out on the list as the nearest location.

Q   And is your recollection that this was something that happened, like, that morning?

A   Yes.                                                      04:08:43

Q   Can you think of any documents or communications that might exist about that planning, whether text messages or otherwise?

A    There was that screenshot that referenced that possible location, but nothing by -- to my    04:09:06 knowledge, by name or address.

Q   All right.  And maybe we will look at that in a little bit.

So do I have it right that you were part of the group who made the decision to go to the    04:09:29 Whittier car wash?

A   Yes.

Q    And was there -- did you make that decision with some of the other agents who went with you to the car wash?                                                     04:09:36

A   Yes.

Q   Was there anyone who wasn't part of the group that went to the car wash that participated in that decision?

MS. SAFAVI:  Objection; form.                            04:09:41

Page 218

Page ID #:18213

THE DEPONENT:  When we would go to location, all persons involved were aware of the location we were going to go.

BY MR. KREILKAMP:

Q   I'm sorry.  What do you mean by "all persons       04:09:55
involved"?

A   All persons you're referring to that went to the car wash.

Q   I have a slightly different question, which is, can you remember in addition to agents who went       04:10:06
with you to the car wash, was there anybody else who didn't go who participated in that planning and the decision to go to that car wash?

A   I don't really understand your question, but I want to say just the three vehicles that went, we       04:10:21
were the ones that knew.

Q   Got it.

And so do I have it right that there was -- or let me just ask.  Was there any specific person or persons who were identified as targets when you       04:10:40
went to that car wash in advance?

A   No.

Q   Had you previously gone to that car wash prior to June 18th?

A   No.                                                 04:11:07

Page 219

*** CONFIDENTIAL - UNDER PROTECTIVE ORDER ***

got your testimony on this.

Did you put your arm around Mr. Viramontes when you led him to your car -- or you don't remember, correct?

A   I'm trying to think.  Since he voluntarily or he agreed to go, there was no reason to go hands-on physical with him.   05:04:51

Q   So you don't remember whether you laid any hands on him, put your arm around him to take him to the car?   05:05:08

A   Not that I recall.  He wasn't resisting or putting up a fight, so there was no reason to be aggressive and put hands on.

Q   So did you -- do you consider this interaction with Mr. Viramontes from start to finish to be a detentive stop?   05:05:31

MS. SAFAVI:  Objection; form.

THE DEPONENT:  That's a term that we don't use in the border patrol.

BY MR. KREILKAMP:   05:05:46

Q   Do you consider it to be a detention?

A   Yes.

Q   And tell me what that means to you.  What's a "detention"?

A   Temporarily detained for questioning.   05:05:56

Page 261

*** CONFIDENTIAL - UNDER PROTECTIVE ORDER ***

I, the undersigned, a Certified Shorthand Reporter of the State of California, Registered Professional Reporter, Certified Live Note Reporter, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ XX ] was [  ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: December 17, 2025

MELISSA M. VILLAGRAN

CSR No. 12543 RPR

Page 331

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the deposition officer. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the deposition officer and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to
access the material. Our data is hosted in SSAE 16
certified facilities.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
deposition services, and maintains its neutrality and
independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.