# EXHIBIT 20

Sealed Version
Filed Separately

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

_____

PEDRO VASQUEZ PERDOMO, et al.,    )
                                  )
         Plaintiffs,              )
                                  ) CASE No.
v.                                ) 2:25-cv-05605-MEMF-SP
                                  )
MARKWAYNE MULLIN, in his official)
capacity as Secretary, Department)
of Homeland Security, et al.,     )
                                  )
         Defendants.              )
_____)

   *** CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER ***

         VIDEOTAPED DEPOSITION OF G██████  A████

                Los Angeles, California

                 Friday, July 10, 2026

Reported by:

RENEE A. PACHECO, RPR, CLR

CSR No. 11564

Job No. 8241593

PAGES 1 - 314

Page 1

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

                              INDEX

DEPONENT                                      EXAMINATION

G[PII]   A[PII]

         BY MR. SHREFFLER                              13

         BY MR. KIM                                  275

         BY MS. SAFAVI                               307



                            EXHIBITS

PLAINTIFF'S                                          PAGE

Exhibit 200  Amended Notice of Videotaped             17

             Deposition of G[PII]  A[PII]

Exhibit 201  13-page Organizational Chart             36

Exhibit 202  Fourth Amendment Refresher               70

             Training

Exhibit 203  Immigration Enforcement and              73

             Fourth Amendment: A Refresher

Exhibit 204  E-mail chain                             97

Exhibit 205  PowerPoint                              104

Exhibit 206  Report of Investigation,                107

             Control No. GOV672

Exhibit 207  E-mail chain                            108

Exhibit 208  Executive Summary                       116

Exhibit 209  E-mail                                  121

Exhibit 210  E-Mail chain                            190


                                           Page 7

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

```
                          EXHIBITS

   PLAINTIFF'S                                    PAGE


   Exhibit 211  Forensic Report of Text             195

                Messages

   Exhibit 212  Declaration Signed By GSA Jr.       266




                 INFORMATION REQUESTED

                       (None)




                 INSTRUCTION NOT TO ANSWER

                       (None)
```

Page 8

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Electronics.

And then you transitioned to federal service.  And then you started at the TSA.  And then you transitioned to the Border Patrol and then C.B.P. Office of Field Operations, and then HSI; is that correct?    09:39AM

A    Correct.

Q    When did you join TSA?

A    In September of 2006.

Q    What was your role at TSA?    09:39AM

A    I was a transportation security officer.

Q    Were you at an airport?

A    Yes, I was.

Q    Which airport?

A    O'Hare.    09:39AM

Q    O'Hare.

Are you originally from the Midwest?

A    I am.

Q    How long were you a TSA officer at O'Hare?

A    Until 2008.    09:39AM

Q    And then you went to Border Patrol?

A    Correct.

Q    How long were you at Border Patrol?

A    From 2008 to 2014.

Q    What was your title at Border Patrol?    09:40AM

Page 30

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A    I was a Border Patrol agent.

Q    What sector were you stationed in?

A    El Centro Sector.

Q    Which station in El Centro Sector were you stationed in?                                    09:40AM

A    El Centro Station.

Q    Were you stationed at the El Centro Station your entire time at Border Patrol?

A    Yes.

Q    And what were your -- at high level, what          09:40AM
were your duties as a Border Patrol agent?

A    So I would pretty much drive around the desert or other areas along the border.  And looking for anyone trying to cross the border.

Additionally, aside from, like, those                09:40AM
duties, I was also a prosecutions officer.  Where I would pretty much go through court proceedings for anyone that was being prosecuted for violating laws.

And I was, also, on our strategic planning
team, where we kind of went over a broad view of how     09:40AM
to implement -- like Border Patrol's like strategic plan throughout our sector.

Q    Were you ever -- you ever assigned to any specialized details within El Centro sector such as smuggling detail or trafficking detail or anything        09:45AM

Page 31

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

like that?

A   I was a prosecution officer.  I was on a strategic planning team.

DEPOSITION REPORTER:  I need to go off the record real quick.                                            09:45AM

MR. SHREFFLER:  We're going off the record.

THE VIDEOGRAPHER:  We're going off the record the time is 9:41 -- sorry.  9:40 a.m.

(Recess.)

THE VIDEOGRAPHER:  All right.  We are back     09:45AM on the record.  The time is 9:45 a.m.

BY MR. SHREFFLER:

Q   Thanks for bearing with us there, Agent Airdo.

Before we went off the record, we were        09:45AM talking about your time at Border Patrol.  And you had told me that you had served in the El Centro Sector at the El Centro Station.  And at one point you told me you were a prosecuting officer?

A   Yes.                                       09:45AM

Q   Could you tell me what kinds of federal laws you were enforcing as a prosecuting officer?

A   Generally violations of immigration laws, like reentering the United States after being deported, smuggling, stuff like that.              09:45AM

Page 32

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q   If you know, were these laws -- were you generally enforcing federal criminal laws?

A   Yes.

Q   Did you ever enforce federal civil laws in your role as prosecuting officer?          09:46AM

A   No.

Q   And then you left Border Patrol in 2014; correct?

A   Correct.

Q   And you went to the CBP Office of Field          09:46AM
Operations; correct?

A   Correct.

Q   Why did you make that transition?

A   Because I was offered a promotion.

Q   Well, congratulations, sir.          09:46AM

What were your duties in the Office of Field Operations?

A   I was a -- as a supervisor.  So I supervised CBPOs at L.A.X.

Q   And how long were you at Office of Field          09:46AM
Operations?

A   From 2014 to 2016.

Q   And you said CBPOs.  Could you just tell me what that term means?

A   Customs and border protection officers.          09:47AM

Page 33

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q   And what do CBPOs do?

A   They -- I mean, there's a wide variety of things that they do.  Generally, they admit people into the country.  So they -- they'll check visas passports, stuff like that.                        09:47AM

Q   So when you come back internationally and your waiting in line --

A   Yes.

Q   You're interacting with a CBPO?

A   Correct.                                    09:47AM

Q   Understood.  And then in 2016 you transitioned from Office of Field Operations to HSI; correct?

A   Correct.

Q   Why did you make that transition?          09:47AM

A   To be frank, I -- I kind of just despise being at the airport.  Having to go to the airport every day is not a fun experience.  So I -- so I wanted some -- a job where I wouldn't have to go to the airport.                                       09:48AM

Q   I hope you didn't have to take that employee shuttle at L.A.X. that everyone has to take?

A   Luckily, I did not have to take a shuttle.

Q   Well, I cannot blame you for wanting to not    09:48AM

Page 34

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

work at L.A.X. every day.

And so what was your first position in Homeland Security Investigations?

A   I was a special agent.

Q   And what is your current title and position?    09:48AM

A   Still a special agent.

Q   So you've been a special agent from 2016 to the present?

A   Yes.    09:48AM

Q   Have you been in the Los Angeles field office for that entire decade?

A   Yes.

Q   I want you to think back to early June 2025, if you can.  What was your -- well, I know that your title in June 2025 was special agent.    09:48AM

What were your duties as a special agent in June 2025?

A   So in May and part of June, I was on parental leave.  I just had a -- a kid.    09:49AM

Q   Congratulations.

A   Thank you.

And then when I returned from parental leave, I went back to my assigned group which was a drug group.  And I somewhere -- probably sometime in    09:49AM

Page 35

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

June, I was informed I was going to be participating in Operation At Large.

Q   So you used the term Operation At Large a few times, and we will get there.  Could you, just for now, tell me how -- what you define that term to be?                                                          09:49AM

A   It was an -- a surge in immigration enforcement in the Los Angeles area.

Q   When did Operation At Large begin?

A   I don't recall the exact date it began.        09:49AM

Q   We can put a pin in this for now.

MR. SHREFFLER:  I am going to show you a document that I have -- will mark as Exhibit 201.

I'm passing a copy to the court reporter which she will pass to you.  I am also passing      09:50AM copies to Ms. Savafi.

MS. SAFAVI:  Thank you.

MR. SHREFFLER:  And my lapel pin has fallen off.

And I'm passing copies to my co-counsel,          09:50AM the intervenor, and to a client representative.

(Plaintiff's Exhibit 201 was marked for identification.)

MR. SHREFFLER:  Exhibit 201.

DEPOSITION REPORTER:  Give me one second.       09:50AM

Page 36

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

BY MR. SHREFFLER:

Q   Exhibit 201 is a 13-page document.  It was produced to us in discovery by the Government in this case.  And it bears Control No. GOV3868.

Do you -- have you ever seen Exhibit 201                09:51AM
before?

A   I don't know if I've seen this specific org chart, but I've seen our org charts in the past.

Q   I'd like you to turn to the second page. These are single-sided pages.                                       09:51AM

MS. SAFAVI:  We're going to object on foundation.

Go ahead.

BY MR. SHREFFLER:

Q   Do you see at the bottom of the page that          09:51AM
this document has the legend June 2025?

A   Yes.

Q   And then let's go back to the first page. There's a title at the bottom of the document.  The title of the document is, "Homeland Security                    09:51AM
Investigations, Office of the Special Agent in charge, Los Angeles, California."

Do you see that?

A   Yes, I do.

Q   Is that what you would call the HSI field          09:52AM

Page 37

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

office in Los Angeles?

A    Yes.

Q    So am I reading correctly -- am I reading this title correctly to be saying that this is an org chart of the HSI field office in Los Angeles?    09:52AM

A    Yes.

Q    What's your understanding of the geographic area that HSI's Los Angeles field office is responsible for?

A    The Los Angeles area.    09:52AM

Q    And that's the definition that we used earlier?

A    Yes.

Q    All seven counties in the Central District?

A    Yeah.  Yes, generally in the Central District of California.    09:52AM

Q    Do you ever -- do you ever have operations to take you outside the Central District?

A    Yes.

Q    Do those operations take you within California?    09:52AM

A    Within California?

Q    Within California, yes.

A    Yes.

Q    Do they take you outside of California?    09:52AM

Page 38

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A    Yes.

Q    But you yourself you -- you're -- when you go to the office, you go to an office in Los Angeles; correct?

A    Yes.                                                    09:53AM

Q    Let's go to the ninth page of the document which has the Control No. 3876.  Hopefully, printed vertically on the left-hand side of the page.

In the -- are you there?

A    Yes, I am.                                              09:53AM

Q    In the second column from the right, do you see where it says, "OCDETF strike force LES          "?

A    Yes, I do.

Q    And if we go below that, we see your name    09:53AM in the right-hand column of the three columns that report up to that unit?

A    Yes.

Q    And it says your title is special agent. And I spent some time in federal service, so I think    09:53AM I know what this is.

But can you tell me what GS181113 means?

A    So -- so that's a special, like, designation for my job series which is a criminal investigator special agent, which is 1811.    09:54AM

Page 39

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q    So the 1811 in your job series, it means that you're a federal criminal investigator?

A    Yes.

Q    And you're at the GS11 -- GS13 pay scale?

A    Yes.                                        09:54AM

Q    And does this chart -- does this org chart correctly show your assignment in June 2025 as a member of the OCDETF Track Task Force?

MS. SAFAVI:  Objection; confusing.

Go ahead and answer the question.           09:54AM

THE DEPONENT:  I was a part of the LES ,  which was kind of like grouped together with that.

BY MR. SHREFFLER:

Q    Understood.  So this -- in the org chart, there is a collection of officers.  And you're       09:55AM telling me that this represents both the OCDTF Strike Force and the LES group, but they're separate units but they're grouped together for an organizational purpose?

A    So they're grouped together because they    09:55AM have the same supervisor.  The same supervisor supervises both groups.  But the groups were separate.

Q    Understood.  But you were a part of LES ?                                             09:55AM

Page 40

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A    Yes.

Q    What does ███ stand for?

A    ███████████████████ And then ██ is the group number, Group No. ██.

Q    And does ███████ have a specific geographical focus?          09:55AM

A    Los Angeles area.

Q    And what's the mission of ███████?

A    To interdict and investigate drug trafficking organizations in the Los Angeles area.          09:56AM

Q    And do you see where it says, "███," in all caps?

A    Yes.

Q    Is gangs an acronym for anything?

A    I don't believe it is.          09:56AM

Q    And I suspect I know the answer to this, but can you tell me what the -- is gangs a separate task force that also reported to Agent M████?

A    Yes.  It's a -- I believe -- I believe the agents that were assigned to the gangs group were          09:56AM attached to other, like, task forces, and they reported to M███████.

Q    And so in your day-to-day work, you worked on ███████?

A    Yes.          09:57AM

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q    Is there a shorthand that you would use in your work to describe this group other than the acronym?

A    I mean, we'd call LES .

Q    LES .  Can you describe the mission of            09:57AM
LES ?

A    Investigating drug trafficking organizations in the Los Angeles area.

Q    And can you describe your responsibilities as a -- you know, for the record, I'm just going to            09:57AM
call it LES .

Can you tell me your responsibilities as a special agent assigned to LES ?

A    Yes.  I'd work closely with drug enforcement administration personnel to conduct            09:57AM
investigations.

Q    Anything else?

A    I mean, do you want me to go into the full breadth of what an investigation details or --

Q    Yeah.            09:57AM

MS. SAFAVI:  Objection; calls for law enforcement privilege.

Go ahead and answer to the extent that you can.

THE DEPONENT:  I mean, we would conduct            09:58AM

Page 42

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

instruction whatsoever that -- or let me take that back.

Have you ever been party to conversations where someone further up in the chain of command has given an explicit instruction to officers that they needed to increase the number of immigration arrests that they were personally making?    11:10AM

A   No.  Like I said, I was part of a drug group.  So we generally didn't focus on immigration related stuff.  So no conversations like that ever trickled down my way.    11:10AM

Q   What about when you were detailed with Border Patrol?

A   I -- I wasn't privy to any of their, like, management conversations.  My dealings with Border Patrol was generally with Border Patrol agents, and just executing the operation for that day.    11:10AM

Q   Has anything about your job changed as part of the surge?

A   I mean, when I was a part of that Operation At Large that, you know, impacted me anywhere from, like, one to three days a week, because I would be going out with Border Patrol.  But other than that, not too much.    11:10AM

Q   So other than Operation At Large, was HSI    11:11AM

Page 81

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

involved in other aspects of the immigration surge?

A   Like I said, I recall them soliciting for people to help out with ERO.  I don't know if that was considered as part of Operation At Large or not.

Q   So you told me earlier that at some point          11:11AM
you were told that you were going to be -- going to be working with Operation At Large.

Do I have your testimony correct?

A   Yes.

Q   When were you told that you were going to          11:11AM
be helping out with Operation At Large?

A   I don't recall if it was when I was on leave or if it was like right when I got back from leave.  It was sometime around there.  So I don't know if it was, like, end of May or beginning of          11:12AM
June or -- or when.  But I recall being told I was going to be assigned to help out.

Q   And who told you?

A   My supervisor.

Q   Is that Agent M PII ?          11:12AM

A   Yes, it is.

Q   Did you have any say in the matter?

A   I did not.

Q   What were you told about your assignment to Operation At Large?          11:12AM

Page 82

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A    That they would -- I don't think Supervisor M[PII] really knew much about it.  I think he told me, like, someone will contact me and tell me, give me more specific details about, like, when it is, where it is.  It seemed like he was given my name and told to tell me.    11:12AM

Q    Do you know how your name was selected?

A    I think because a lot of people in my office were like -- were cycling through, like, other related details and stuff.    11:13AM

And since I was on leave, and I hadn't -- you know, I was largely left alone even up to this day largely get left alone from having to go to other places.

So I'm probably going to be up soon again somewhere, who knows.  But, yeah, I hadn't done anything in a while.    11:13AM

Q    And when you got back from leave, did you have a conversation with supervisor M[PII] about going on Operation At Large?    11:13AM

A    Not much.  I don't think he really knew much about what it was from what I recall.  I think he just told me that -- that I was going to be -- my name was given to our management, and that I would be given details later.    11:13AM

Page 83

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q   How did you feel about that at the time?

A   I felt like it took away from my main operational duties.  But, like, I understand that, like, I have -- I have the authority to enforce immigration law.                                  11:14AM

So it's not really outside of my scope of duty, per se.  It's just not a group that I'm assigned to.

Q   So after you learned that you'd be hearing more about your involvement in Operation At Large    11:14AM what happened next?

A   I don't recall specifics, but eventually I'm -- I received, like, an e-mail perhaps.  There was, like, a group conference call kind of saying, like, where we're going to report to.  And then    11:14AM just, like, typically I would receive, like, an e-mail the day before saying you're going to meet at this time, at this place and your liaison is going to be this particular person.

Q   And do you now if other HSI agents detailed    11:14AM to Operation At Large were assigned the same way as you?

A   We would all be on, like, a group e-mail and that's -- yes, we would all get kind of the same, like, assignment daily.                       11:15AM

Page 84

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

I'll pass a copy to the court reporter,

please.  Two to defense counsel.

MS. SAFAVI:  Thank you.

MR. SHREFFLER:  And then --

(Plaintiff's Exhibit 211 was marked          03:12PM

for identification.)

BY MR. SHREFFLER:

Q   Agent A▓▓▓, I'm going to represent to you

that this is what the government has told us is a

forensic report of text messages extracted from the    03:12PM

cell phone of Agent W▓▓▓.  Am I saying her name

right?

A   I believe so.

Q   It's a long document, and I'm sorry about

that, and I'm sorry for the trees involved.  Could      03:12PM

you please turn to Page 10542, which is about 15

pages before the end of the document.  Let me know

when you're there.

A   I'm there.

Q   At the top of the page, do you see your        03:12PM

name?

A   Yes, I do.

Q   Is that your phone number next to it?

A   Yes, it is.

Q   Is that phone number associated with your      03:13PM

Page 195

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

personal phone or your government-issued phone?

A    My government-issued phone.

Q    And below, it says (as read):

       "Local user."

       Do you see that?                                    03:13PM

A    Yes.

Q    And because we're referring to what I

understand to be an extract from Agent WPII       's

phone, would you agree that it's safe to say that

the local user in this case is Agent WPII     ?    03:13PM

A    Yes.

Q    The first message in the conversation is

from you to Agent WPII     , and you tell her that

you're (as read):

       "... doing this B.P. stuff,                 03:13PM

       plus got assigned as TL for this

       op."

       Which operation are you referring to?

A    I believe that was part of Operation Broken

Blade, which is separate from the B.P. stuff.      03:14PM

Q    And what was Operation Broken Blade?

A    It was a large multi-takedown of -- of

criminals associated to like sex trafficking in --

in Los Angeles.

Q    What were your responsibilities as a team    03:14PM

Page 196

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q   Have a lot going on?

A   Yes.

Q   Having Operation At Large on top of your ordinary responsibilities?

A   Yes.                                          03:17PM

Q   So there's a text messages at the bottom of that Page, 10:06 p.m. on August 11th.  You write to Agent W[PII] that you had complained about the Home Depot stuff saying that you thought it violates the TRO?                                            03:17PM

A   Yes.

Q   And by "Home Depot stuff," are you referring to the Paramount operation that we discussed earlier?

A   Yes.  To the Home Depots at the Paramount,   03:17PM
but then they kept doing Home Depots also after that.

Q   Did you make another complaint after?

A   No.  Just the one.

Q   Just the one.                                03:17PM

But you're referring to not just the Paramount operation here but the --

A   I complained about just the one Paramount.
That's the one I complained about.  But --

Q   But the sentiment applies to the other Home  03:18PM

Page 199

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Depot operations as well?

A    Yes.

Q    Why did you tell Agent W[PII] that you had complained?

A    I don't recall why I specifically mentioned    03:18PM
it to her.

Q    On the next page, you -- well, did you think it was something that she ought to know how you felt about it?

A    I could've been trying to see like what her    03:18PM
thoughts on it were.  Because I -- I forgot that I even talked to her about this.  But I haven't really talked to too many people about it, so I was just kind of like probably interested to know what someone else thinks.    03:18PM

Q    Were you close with Agent W[PII]?

A    Before this, no, not particularly.  I got to know her a little bit more because we tend to work on the same days together.

Q    So you would both be in Long Beach together    03:18PM
in the mornings?

A    Well, I don't think that's considered Long -- Terminal Island, is that San Pedro I think?

DEPOSITION REPORTER:  I don't know if any of that got on the record.  You guys were talking    03:19PM

Page 200

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

over each other.

MR. SHREFFLER:  For a clear record, I asked whether he -- Agent A[PII] and Agent W[PII] worked together in Long Beach.  And Agent A[PII] rightly corrected me and said that the Coast Guard base was    03:19PM on Terminal Island.

BY MR. SHREFFLER:

Q    Would you agree?

A    Yes.

Q    Was it at the Coast Guard base on Terminal    03:19PM Island where you got to know Agent W[PII] a little bit better?

A    That's where I started to begin talking to her a little more, yes.

Q    Did you work with her on any specific    03:19PM operations in the field before that day?

A    I believe so on a couple occasions.  But she wasn't someone I regularly worked with.

Q    Did you work with Agent W[PII] during field operations as part of Operation At Large?    03:20PM

A    Mostly just like I said, at the Coast Guard base.  Generally, we got assigned to different teams.

Q    And as of -- well, the next page, your first message.  (As read):    03:20PM

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

"Since then they haven't assigned me to any of those again."

Do you see that?

A    Yes.

Q    As of August 11th, had anybody in a    03:20PM
position of authority in your chain of command
spoken to you about your complaint at the Paramount
operation other than the conversations we've
previously spoke about with Agent M PII     and Agent
Q PII    ?    03:20PM

A    No.

Q    You just knew that you hadn't been assigned
to any operations like the Paramount operation since
you complained?

A    I saw that they were still doing Home Depot    03:21PM
operations, but I have not been assigned to any.

Q    And Agent W PII tells you (as read):

"Yeah, I'm pretty sure it does,
especially Ninth Circuit."

She's agreeing with you that she thinks    03:21PM
that violates the TRO too?

MS. SAFAVI:  Objection; calls for
speculation.

THE DEPONENT:  That's my understanding.

///

Page 202

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

BY MR. SHREFFLER:

Q    She told you that she's pretty sure that the Home Depot stuff violates the TRO?

MS. SAFAVI:  Objection; speculation, legal conclusion.                                                      03:21PM

BY MR. SHREFFLER:

Q    Do you know -- did you ever ask Agent WPII if she had complained to her supervisors about these operations at Home Depots?

A    I don't believe I did.                                          03:21PM

Q    And Agent WPII tells you that she's glad she has professional liability insurance; correct?

A    Yes.

Q    That's what PLI stands for?

A    She clarifies it in the message.  I didn't            03:21PM
understand what it meant at the time.

Q    That's right.  She does.

And you respond (as read):

"For sure."

What did you mean when you said for sure?          03:22PM

A    She said she was glad she has professional liability insurance, and I said -- I'm pretty much agreeing saying that I'm -- you know, it's probably a good thing you do because a lot of the stuff happening -- if we -- if we think it's going to            03:22PM

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

violate something, it's probably good to have some

sort of coverage.

Q   Do you have professional liability
insurance?

A   I do not.                                    03:22PM

Q   Did you ever think about getting

professional liability insurance during this time?

A   I thought about it.  I -- I have not gotten

it though.

Q   Tell me the reasons why you thought about    03:22PM

it, getting professional liability insurance.

A   Just in case I do something that's -- I

would need some sort of -- I would need like a

personal attorney for, I guess, to represent me.

But I -- I personally believe that I covered myself   03:23PM

in my scope of duty, so it's not necessary.

Q   And you believed that you might need a

personal attorney if you had been asked to violate a

court order and you did then violate a court order?

MS. SAFAVI:  Objection; form,                    03:23PM

mischaracterizes testimony.

BY MR. SHREFFLER:

Q   You can answer.

A   I -- can you say it -- can you --

Q   You believed that had you been asked to     03:23PM

Page 204

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

violate a court order and then actually did go out

and violate a court order, that you might need

professional liability insurance?

      MS. SAFAVI:  Objection; form.

BY MR. SHREFFLER:                                              03:23PM

    Q    Had you done so.

    A    Had I done so, yeah.  I mean, any time you

break the law, like there's a -- a chance you may

need an attorney.

    Q    And so you're -- and so you then go on to     03:24PM

say (as read):

        "Still, they shouldn't ask us

        to do anything that violates a

        court order."

      And you're referring to the Paramount         03:24PM

operation on August 3rd there?

    A    Yes.

    Q    When you say in that message "they," who

are you referring to?

    A    I think I was referring to just our          03:24PM

management.

    Q    By "our management," what do you mean?

    A    Homeland Security Investigation management.

    Q    You weren't referring to Border Patrol?

    A    I guess I could have been referring to like   03:24PM

Page 205

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

the whole -- the situation as a whole, whether it's our management or whether it's Border Patrol or whether it's them working together or not.

Being put in a position where we're asked to be put in a position of having to decide whether    03:25PM something violates it or not, we're not -- we don't have the legal knowledge to determine that.

Q   Just to be clear, as of August 11th, you had still not received any guidance from your supervisors on the scope of the TRO; correct?    03:25PM

A   I had not.

Q   Had you received any guidance from your daily briefings in Long Beach, your daily briefings at Terminal Island on the scope of the TRO?

A   I had not.    03:25PM

Q   Had you received any guidance whatsoever from anybody at DHS on the scope of the TRO?

A   I had not.

Q   Agent W[PII] says (as read):

"I think they only know one way    03:26PM
to operate.  See bodies, chase
bodies."

Tell me how you interpreted her message.

A   That Border Patrol tends to be very focused on their mission of arresting anyone in the country    03:26PM

Page 206

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

illegally.  So when they see people, they just chase.

Q   Do you think that fairly describes Border Patrol's way of operating?

MS. SAFAVI:  Objection; form.                    03:26PM

THE DEPONENT:  I think it -- it's -- I don't think it's unfair to say.

BY MR. SHREFFLER:

Q   Are there specific circumstances where you saw Border Patrol, so to speak, "see bodies, chase    03:27PM bodies"?

A   In a few instances, yes.

Q   Tell me about those instances.

A   We spoke about at least a couple of them at the car washes.  They -- we'd go in, and they just    03:27PM chase after pretty much everyone who went running. I can't say whether or not they were targets or not.

I wasn't really included in all those conversations afterwards.  I was never debriefed on who they arrested, and I never saw their 213s or    03:27PM anything.

But I did see them exit their vehicles, people went running, and they chased after the people that went running.

Q   And those people who went running when you    03:28PM

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

saw those people go running, did those people appear

to be Latino?

    A   At the time they went running, I couldn't

say for sure.  I mean, I -- I wasn't trying to put

myself in a position where I was going to chase          03:28PM

anyone.  I was kind of more responding to be present

for when they -- they were trying to effect any

arrests so I could hold security around them.

        I can't really speak to what race they were

when they took off running.  I wasn't there to          03:29PM

observe that.

    Q   When you saw Border Patrol run after people

who went running, do you know if Border Patrol had

any information about those people other than the

location they were at and the fact that they were       03:29PM

running?

        MS. SAFAVI:  Objection; asked and answered,

calls for speculation.

        THE DEPONENT:  Like I said, I know whenever

we went out, we would have targets.  And we were        03:29PM

looking for those specific targets.  Now, whether or

not the people running were the targets, I couldn't

say.

BY MR. SHREFFLER:

    Q   You had no way to know?                          03:29PM

Page 208

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

A    Yeah.

Q    Do you know if Border Patrol had super --
do you know if Border Patrol had superior
information to you in identifying targets in the
field in the moment?                                    03:30PM

MS. SAFAVI:  Objection; ambiguous.

THE DEPONENT:  I can't speak to every
Border Patrol agent's vision to -- what they were in
a position to see, what they knew.  I can only speak
to what I -- what I saw.                                 03:30PM

BY MR. SHREFFLER:

Q    And just to tie this off, you then respond
to Agent W PII  (as read):

"Which is my argument to why
these ops violate the TRO and                   03:30PM
aren't being done in good faith."

So you're saying your argument for why
these operations violate the TRO is that Border
Patrol sees bodies and chases bodies; correct?

MS. SAFAVI:  Objection; mischaracterizes         03:30PM
testimony.

Go ahead and answer.

THE DEPONENT:  I would say to clarify what
I was saying is that Border Patrol, they may go to
these places with targets in mind.  But they're         03:31PM

Page 209

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

often going to wind up catching people who are

collateral to their targets.

And are they -- I don't -- I can't speak to

their intent.  Intent is hard to speak to.  So

whether their intent is only to go after people          03:31PM

they're targeting or knowing that they're going to

get collaterals that are in those locations because

of what those locations are.

But I did not feel that like they were

solely going after targets.                              03:31PM

BY MR. SHREFFLER:

Q    And so you said the up -- or withdraw that

question.

Tell me the reasons why you did not feel

that they were going solely after targets?               03:31PM

A    I just think that kind of like she said,

"see bodies, chase bodies," that once they see

people running, they're going to chase.

Once they see people -- Border Patrol

presence is going to cause people to want to be out      03:32PM

of the area that they're in.  And then they're going

to see people running, and they're just going to

chase them whether they're targets or not.

And, I mean, our typical facts and totality

of the circumstances and everything, does that give      03:32PM

Page 210

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

them reasonable suspicion to stop those people?

That's up to those agents.  They're stopping them.

Q    And you also said that these ops, quote,

(as read):

"Aren't being done in good                          03:32PM

faith."

What did you mean by that?

A    I think that Border Patrol knew that when

they went out to these public areas, that they were

going to get large amounts of people to run and that    03:33PM

was going to give them people to chase after.

They weren't just going to these -- to

these locations solely to target specific people.

Q    They're going to these locations to find

people who they knew nothing about before the         03:33PM

operation?

MS. SAFAVI:  Objection; mischaracterizes

testimony.

THE DEPONENT:  I mean, I don't know

everyone that Border Patrol does or does not have     03:33PM

intel on.  I just know the targets that I saw them

present to me that we were going after and then if

we arrested more people than targets we had, it's

fair to say they're arresting collaterals.

///

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

BY MR. SHREFFLER:

Q    Did you feel that these operations at Home Depots were designed to arrest collaterals?

MS. SAFAVI:  Objection; speculation.

THE DEPONENT:  I mean, I don't have any    03:34PM
specific knowledge saying that.  I would say it's
probably -- I don't know how to answer that.  I
guess I think there's a high probability of
arresting nontargets when you go to areas like Home
Depots.    03:34PM

BY MR. SHREFFLER:

Q    And that's why you felt that these
operations weren't designed in good faith?

MS. SAFAVI:  Objection; mischaracterizes
testimony.    03:34PM

THE DEPONENT:  I feel that they weren't in
good faith because they weren't solely going after
just the targets that they had like the i-200s
immigration warrants for.

BY MR. SHREFFLER:    03:34PM

Q    You felt that they were doing these
operations so that they could go after collaterals?

MS. SAFAVI:  Objection.

THE DEPONENT:  I wouldn't say that they
were doing them solely to go after collaterals, but    03:35PM

Page 212

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

knowing that there's a large amount of people in these areas, I think that's specifically why they were choosing these areas because they could get multiple arrests.

BY MR. SHREFFLER:                                                    03:35PM

    Q   Going back to this.  Do you know why they were choosing these locations, Home Depots specifically?

       MS. SAFAVI:  Objection; calls for speculation.                                              03:35PM

       THE DEPONENT:  I was not a part of like any of the planning of these operations.  So I don't -- I don't know.  I can't say that.

BY MR. SHREFFLER:

    Q   So going down, Agent W[PII] says (as            03:35PM
read):

       "Makes we wonder how much
       longer they're going to last.
       They're headed to Chicago and
       Boston soon, and they told me they             03:35PM
       wanted to bring HSI L.A. agents
       with them.  I told them no chance."
       And then you respond (as read):
       "I was told the original op was
       funded through August.  Not sure if            03:36PM

Page 213

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

agenda" on the next page.

What did you mean by that?

A   They marched to a democratic governor's press conference.  It seemed to be purely political. It did not seem like there was a good operational   04:48PM basis to be doing that.  To me, it appeared political.

Q   And Mr. Bovino didn't tell you that you were -- the plan was to march to Governor Newsom's press conference; correct?   04:49PM

A   No.

Q   And you said (as read):

"Hopefully, I can get replaced

soon."

And you sent that early in the morning of   04:49PM August 15th.

You wanted to get taken off of your duty with Operation At Large at this time?

A   Yes.

Q   And tell me was -- was this the straw that   04:49PM broke the camel's back for you?

A   It was definitely one of them, yes.

Q   What were the others?

A   I mean, the Home Depot was like -- being put in a position to potentially violate like a TRO.   04:49PM

Page 234

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Then like this was just, I thought, ridiculous as I've stated.

Q   Any others beyond the Home Depots and this?

A   I mean, I thought the -- just the overall aggression that Border Patrol pursued this mission with seemed a little intense for like a large city. Yeah.

Q   And how did you see that aggression manifest?

MS. SAFAVI:  Objection; vague.

THE DEPONENT:  I guess in like ways that we spoke about.  Like, you know, see bodies running, you chase after bodies, right?  It seemed to be pushing into like public spaces, you know, more and more frequently.  It seemed to be escalating to less and less targeted.

BY MR. SHREFFLER:

Q   You felt that over time, the operations became less and less targeted?

A   That was my perception, yes.

Q   To the point where on August 14th, you weren't given any targets at all?

A   Yes.

Q   Did you see Border Patrol use physical aggression during Operation At Large?

04:50PM
04:50PM
04:50PM
04:50PM
04:51PM

Page 235

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

the individual agents like media attention, I don't know.

Did Border Patrol management and like Gregory Bovino like media attention? That's also speculation, but they were definitely on -- in the media often.                                                                04:56PM

Q   When you were a Border Patrol agent, I think you just said that you never saw us going into the interior like this and conducting these types of operations.                                                                04:56PM

Can you tell me a little bit more about what you meant.

A   Well, I was a Border Patrol agent from 2008 until 2014.  I was only assigned to one station and one sector, so I didn't get to see the entire Border   04:56PM Patrol, you know, area of responsibility.

But when I was in El Centro Station at El Centro Sector, we patrol -- we had a set area that we patrolled.  And, generally, we stayed pretty close to the border, right?                                               04:56PM

Like, some people would go like a little bit further in, but like we're talking like -- we're talking about like, you know, anywhere from like 25 to 50 miles.  We're not like, you know, hours away from the border.                                                      04:57PM

Page 239

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Q   And in your experience as a Border Patrol agent in the El Centro Sector, what are some ways that the operations that you were familiar with 20 to 25 miles from the border were different from urban operations in Los Angeles?          04:57PM

A   So I was never assigned to like an urban environment.  I know that Border Patrol just -- they have -- they have agents in like San Diego.  They -- we have like a office in like Indio.

So they -- I know they have offices like in          04:57PM
other locations, some that are possibly more urban than where I was stationed.

Where I was stationed is very rural.  Like we were in a lot of desert, a lot of farmlands, mountains.  We rarely ever went into populated          04:58PM
cities at all.  And much of the border is unpopulated.  It is like, you know, uninhabited much like that.

Q   And so does that change how you conduct operations?          04:58PM

A   I think you encounter a lot less people.  And it's a lot more of a controlled environment in the sense of like people that you're encountering.  When I was in the Border Patrol, we have cameras all throughout the desert.  So you have like so much of          04:58PM

Page 240

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

the area is under video surveillance.

So you could literally see when someone walks across the border.  So there's like no question as to whether or not they crossed the border illegally, if they were in the country          04:58PM illegally because you -- the cameras actually saw them.

So I think it's a much different environment where people are living in a populated city.          04:59PM

Q   Are there any other ways that it's a different environment operating in an urban setting compared to at the border, at the border in the El Centro Sector?

A   Like I said, it's mostly just like the          04:59PM terrain, the density of people.  They're very different.  You're -- you're having to create more reasonable suspicion I'd imagine like away from the border.

Like I said, when you're on the border, you          04:59PM literally can follow someone's footprints as they cross the border.  It's a lot easier to, you know, gather those facts, so it's a much different job. It's a job I've never performed having to be in a urban environment trying to --          05:00PM

Page 241

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

I, the undersigned, a Certified Shorthand Reporter of the State of California, Registered Professional Reporter, Certified Live Note Reporter, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [  ] was [  ] was not requested. I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name this 13th day of July, 2026

RENEE A. PACHECO

CSR No. 11564 RPR, CLR

Veritext Legal Solutions
866-299-5127     calendar-ca@veritext.com     www.veritext.com