# EXHIBIT 23

Sealed Version
Filed Separately

CONFIDENTIAL - UNDER PROTECTIVE ORDER

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

PEDRO VASQUEZ PERDOMO, ET AL.,  )
                                )
            PLAINTIFFS,          ) CASE NO.
                                ) 2:25-cv-05605
         VS.                     ) MEMF-SP
                                )
KRISTI NOEM, SECRETARY OF        )
HOMELAND SECURITY, ET AL.,       )
                                )
            DEFENDANTS.          )
_____)


     *** CONFIDENTIAL - UNDER PROTECTIVE ORDER ***


      VIDEOTAPED DEPOSITION OF I█████  F██████████
           WEDNESDAY, DECEMBER 17, 2025


JOB NO.  7784375
REPORTED BY KIMBERLY EDELEN,
CSR. NO. 9042, CRR, RPR.
PAGES 1 - 334

Page 1

CONFIDENTIAL - UNDER PROTECTIVE ORDER

                         I N D E X


   WITNESS                    EXAMINATION              PAGE
   I██████  F████████

                             BY MR. NIU                 11
                             BY MX. WILFONG             126
                             BY MR. SKEDZIELEWSKI       322
                             BY MX. WILFONG             327



                        E X H I B I T S


    NO.           PAGE        DESCRIPTION


   EXHIBIT 107      92        OPERATION AT LARGE - LOS
                             ANGELES INFORMATION SHEET,
                             BATES NOS.
                             GOV-00000577 - GOV-00000579
   EXHIBIT 108      96        EL CENTRO SECTOR MUSTER,
                             BATES NOS.
                             GOV-00000001 - GOV-00000003
   EXHIBIT 109      99        EL CENTRO SECTOR MUSTER,
                             BATES NOS.
                             GOV-00000004 - GOV-00000005
   EXHIBIT 110     186        CBP EXECUTIVE SUMMARY,
                             BATES NOS.
                             GOV-00000504 - GOV-00000505
   EXHIBIT 111     225        PLAINTIFF CHIRLA'S
                             EXPEDITED REQUESTS FOR
                             PRODUCTION TO DEFENDANTS,
                             SET ONE

   (EXHIBITS CONTINUED ON FOLLOWING PAGE)


                                          Page 5

CONFIDENTIAL - UNDER PROTECTIVE ORDER

E X H I B I T S (CONTINUED)

NO.            PAGE        DESCRIPTION

EXHIBIT 112    257         VIDEO LABELED REDACTED_
                           AXON_BODY_4_VIDEO_
                           2025-08-22_14:12_I.

EXHIBIT 113    265         VIDEO LABELED REDACTED_
                           AXON_BODY_4_ VIDEO_
                           2025-08-22_14:15_
                           M█████████

EXHIBIT 114    282         POWERPOINT TITLED U.S.
                           CUSTOMS AND BORDER
                           PROTECTION, UNITED STATES
                           BORDER PATROL, OPERATION AT
                           LARGE, BATES NOS.
                           GOV-00000451 - GOV-00000458

EXHIBIT 115    301         REPORT OF INVESTIGATION,
                           BATES NOS.
                           GOV-00000459 - GOV-00000473

EXHIBIT 116    314         U.S. DEPARTMENT OF HOMELAND
                           SECURITY, RECORD OF
                           DEPORTABLE/INADMISSIBLE
                           ALIEN


QUESTIONS INSTRUCTED NOT TO BE ANSWERED
                    PAGE       LINE
                     22         15
                     35          5
                    150         13
                    150         21
                    153          2
                    153          8
                    154         23
(INDEX CONTINUED ON FOLLOWING PAGE)

Page 6

CONFIDENTIAL - UNDER PROTECTIVE ORDER

during my time at Sears, so it was -- it was both -- 09:22:28
I guess both positions. 09:22:33

Q   And this took place one -- while you were 09:22:35
in high school? 09:22:38

A   No.  This was after high school. 09:22:40

Q   When did you graduate from high school? 09:22:43

A   1996. 09:22:45

Q   Oh, I see. 09:22:45

So after you finished high school, you 09:22:47
worked for a period of time and then you joined CBP. 09:22:49
And then after you joined CBP, you started your 09:22:52
bachelor studies -- 09:22:55

A   Correct. 09:22:57

Q   -- is that correct? 09:22:57

A   Yes, sir. 09:22:59

Q   Okay.  What is your current position at 09:22:59
CBP?  You said supervisory Border Patrol agent; is 09:23:02
that correct? 09:23:08

A   Correct.  Yes, sir. 09:23:09

Q   How long have you been a supervisory Border 09:23:11
Patrol agent? 09:23:14

A   My anniversary will be next month so just 09:23:15
about two years. 09:23:17

Q   Two years. 09:23:18

So we'll briefly cover your work at CBP, 09:23:20

Page 20

CONFIDENTIAL - UNDER PROTECTIVE ORDER

but let's start with supervisory Border Patrol agent    09:23:24
position.    09:23:28

So you testified that you are based out of    09:23:29
the El Paso sector, and the east -- I missed the    09:23:32
second word?    09:23:38

A    Ysleta.    09:23:40

Q    Ah, I see.  Okay.    09:23:41

And that's the station, correct?    09:23:41

A    Correct.  Yes, sir.    09:23:43

Q    What is the geographic area of    09:23:45
responsibility of your station?    09:23:47

A    The geographic area of the Ysleta Border    09:23:49
Patrol station is located within the city limits of    09:23:53
El Paso, Texas, and it's covering a portion of the    09:23:56
international boundary with Mexico.    09:24:07

And I don't know the exact square foot    09:24:10
mileage of the area, but it's within the -- the city    09:24:14
limit, and then it ends a little bit outside, still    09:24:19
within El Paso County.    09:24:24

Q    That's okay.  That's specific enough.    09:24:27
Thank you.    09:24:29

Are you assigned to a unit in the    09:24:30
station -- at the station?    09:24:33

A    Yes.    09:24:34

Q    What is the unit?    09:24:36

Page 21

CONFIDENTIAL - UNDER PROTECTIVE ORDER

A    Unit would be bravo unit, meaning that would be day shift at the moment.

Q    Is that a line duty unit as opposed to a special duty unit?

A    No, sir.  It's -- I don't want to say regular duties, but it's -- it's, I guess, a line unit where we would be conducting enforcement operations on the -- on the international border.

Q    How many units are in the sector?  Do you know?

A    In the sector, I don't.  I don't know.

Q    What about at the station?

A    At the station, we have three units covering three different shifts.

Q    And do you know how many agents are in your unit?

MR. SKEDZIELEWSKI:  Objection.  Assert law enforcement privilege over the number of agents in the unit.

So don't answer that question.

BY MR. NIU:

Q    Are you going to take your attorney's instruction not to answer that question?

A    Yes, sir, I would.

MR. NIU:  I will note for the record that

Page 22

CONFIDENTIAL - UNDER PROTECTIVE ORDER

the law enforcement privilege is subject to the

parties' dispute and so intervenors reserve the

right to reopen the deposition once the privilege is

resolved.

BY MR. NIU:

Q   Where is your home assignment?

A   I'm not sure I understand the home -- what

do you mean by the "home assignment"?

Q   So the sector and station that you just

described, that is where you're primarily working

out of; is that correct?

A   Yes, sir.  Ysleta station would be my -- my

home station, yes, sir.

Q   Have you worked outside of that station in

the past, say, two years?

A   In the past two years, yes, sir, I've

worked outside of the Ysleta station.

Q   What percent of your time would you say do

you work within that station versus outside of that

station?

A   I would say 95 percent of the time I -- I

work out of the Ysleta station.

Q   Okay.  So looking only at 2025, what states

have you worked in other than your own station and

sector?

Page 23

CONFIDENTIAL - UNDER PROTECTIVE ORDER

A    I would say one other state.                    09:27:26

Q    Which one?                                       09:27:30

A    California.                                      09:27:31

Q    And was that in connection with Operation        09:27:33
At Large?                                              09:27:38

A    Yes, sir, that was in connection with            09:27:39
Operation At Large.                                   09:27:40

Q    So I'll ask a couple questions briefly           09:27:42
about Operations At Large.                            09:27:44

So you are familiar with the term                     09:27:46
"Operations At Large"?                                09:27:47

A    I am familiar with Operation At Large, yes,      09:27:49
sir.                                                  09:27:51

Q    What is Operation At Large?                       09:27:52

A    Operation At Large is a current operation        09:27:56
for -- immigration enforcement within the             09:27:59
Los Angeles area.                                     09:28:03

Q    And you testified that you participated in       09:28:05
Operation At Large?                                   09:28:07

A    Correct.  Yes, sir, I did participate.           09:28:09

Q    What time period were you part of Operation      09:28:12
At Large?                                             09:28:14

A    I participated in Operation At Large             09:28:22
beginning August 10th of 2025 through                 09:28:25
September 20th, 2025.                                 09:28:32

Page 24

CONFIDENTIAL - UNDER PROTECTIVE ORDER

Q    And is that the only period of time when you were part of Operation At Large?    09:28:39 09:28:41

A    Correct.  Yes, sir.    09:28:45

Q    You did not come back to participate in Operation At Large after September, correct?    09:28:47 09:28:49

A    Correct.  I did not.    09:28:52

Q    And you did not participate in Operation At Large before August?    09:28:54 09:28:55

A    Correct.  I did not.    09:28:58

Q    So other than Operation At Large during which you came to California, were you operating out of any other states this year, 2025?    09:29:01 09:29:06 09:29:09

A    Not that I can recall.  No, sir.    09:29:18

Q    So I'll ask you a couple questions about your work duty in your home station in El Paso sector.    09:29:26 09:29:28 09:29:32

Can you walk me through at a high level your responsibility in your day-to-day?    09:29:33 09:29:35

A    My day-to-day, just at my home station in Ysleta?    09:29:40 09:29:45

Q    Correct.    09:29:47

A    My day begins with issuing assignments to agents.  From there, making sure equipment is ready to be issued.  I brief my unit on any important matters that need to be passed on from -- from a    09:29:48 09:29:55 09:30:00 09:30:06

Page 25

CONFIDENTIAL - UNDER PROTECTIVE ORDER

previous shift.  And then just depending if there's 09:30:10 any administrative duties. 09:30:13

Q    And these are your responsibilities as a 09:30:20 supervisory Border Patrol agent, correct? 09:30:23

A    Among others, correct.  I didn't list all, 09:30:26 but I -- I mean, that's pretty much the gist of it, 09:30:27 sir. 09:30:31

Q    Do you also participate in operations out 09:30:31 in the field? 09:30:34

A    I'm not sure what you mean by "operations 09:30:38 out in the field," but I do also go out into the 09:30:41 field and -- and help my agents patrol and enforce 09:30:45 immigration laws.  If that's what you mean, yes, 09:30:50 sir. 09:30:53

Q    Yeah. 09:30:53

So you're not -- your duty is not limited 09:30:54 to the office -- 09:30:56

A    Correct. 09:30:56

Q    -- correct? 09:30:57

A    Yes, sir. 09:30:58

Q    And are you a supervisory agent on a 09:31:04 specific team? 09:31:09

A    Not a specific team.  Just assigned to a 09:31:11 shift. 09:31:14

Q    A shift. 09:31:14

Page 26

CONFIDENTIAL - UNDER PROTECTIVE ORDER

A    Yes, sir.                                         09:31:17

Q    And does your team or your shift -- what         09:31:18
type of responsibility does that unit perform, at a    09:31:23
high level?                                            09:31:29

A    Immigration enforcement.  That's -- those       09:31:31
are our duties for our shift.                          09:31:33

Q    By "immigration enforcement," do you mean       09:31:38
the unit would patrol border areas to enforce         09:31:40
immigration law?  Is that a correct description?      09:31:45

A    Correct.  Yes, sir.                             09:31:49

Q    Would you describe the responsibility in        09:31:50
any other way?                                         09:31:51

A    I don't -- I don't think I would, no, sir.      09:31:57
Just immigration enforcement.                          09:32:00

Q    Are you familiar with the term "roving          09:32:03
patrol"?                                               09:32:05

A    Yes, sir, I am.                                  09:32:08

Q    What is roving patrol?                          09:32:09

A    My understanding of a roving patrol is when     09:32:11
my agents drive within their assigned areas on or     09:32:15
near the international boundary.                        09:32:25

Q    And is it accurate to characterize roving       09:32:28
patrol as a non-targeted operation, meaning you're    09:32:31
not looking for a specific identified person?         09:32:35

A    Can you repeat the question again.              09:32:41

Page 27

CONFIDENTIAL - UNDER PROTECTIVE ORDER

targeted individual. 12:33:15

And if they happen to run from us, that's 12:33:18 another indicator, in my experience, that they are 12:33:22 trying to get away from -- from us as Border Patrol 12:33:28 agents. 12:33:31

BY MX. WILFONG: 12:33:35

Q   Okay.  I know that we're past the time that 12:33:35 Ms. Lai needs -- we will need to take a break in a 12:33:38 moment as discussed off record. 12:33:40

But just to wrap this up, are there any 12:33:44 factors that you cannot consider when you are making 12:33:48 a decision about whether to stop a person? 12:33:51

MR. SKEDZIELEWSKI:  Objection.  Vague. 12:33:54

THE WITNESS:  Factors that we are not 12:33:57 allowed to be considered? 12:33:57

BY MX. WILFONG: 12:34:00

Q   Uh-huh.  That's correct. 12:34:01

A   Well, I mean, we're not allowed to profile 12:34:01 any individual based on, you know, ethnicity or 12:34:04 things like that. 12:34:08

Q   Okay.  When you say "profile," what do 12:34:11 you -- what do you mean? 12:34:13

A   Well, profiling specific ethnicities.  I'm 12:34:15 not sure.  Does that answer your question? 12:34:24

Q   When you say "profile" in this context, 12:34:27

Page 137

CONFIDENTIAL - UNDER PROTECTIVE ORDER

what does that mean in terms of making -- making a

stop or not making a stop?

MR. SKEDZIELEWSKI:  Objection.  Vague.

THE WITNESS:  Stopping somebody, for

example, based on the fact that they may look

Hispanic or from Mexico or -- I mean, profiling,

that's -- that's how I understand it.

BY MX. WILFONG:

Q   Okay.  Understood.

So is it your testimony that you cannot

consider those factors when you're making a decision

about whether to stop a person --

MR. SKEDZIELEWSKI:  Objection.

BY MX. WILFONG:

Q   -- factors including ethnicity and if they

appear Hispanic?

MR. SKEDZIELEWSKI:  Objection.  Form.

THE WITNESS:  I -- I'm not allowed to

profile and make a stop just based on that factor

alone.

BY MX. WILFONG:

Q   Okay.  But you're allowed to consider that

factor along with other factors?  Is that...?

A   Well, I mean, we have to consider all

factors, as many as -- as are present during --

Page 138

CONFIDENTIAL - UNDER PROTECTIVE ORDER

during that -- that encounter.                                    12:35:27

            MX. WILFONG:  Okay.  Thank you.  We'll go             12:35:31

off the record at this time.                                     12:35:32

            MR. SKEDZIELEWSKI:  That's fine.                      12:35:34

            THE VIDEOGRAPHER:  Going off the record at            12:35:35

12:35 p.m.                                                       12:35:36



            (Lunch recess taken at 12:35 p.m.)


\\\

\\\

\\\

\\\

\\\

\\\

\\\

\\\

\\\

\\\

\\\

\\\

\\\

\\\

\\\

Page 139

CONFIDENTIAL - UNDER PROTECTIVE ORDER

reason why they would seek cash-paying jobs.    15:29:14

BY MX. WILFONG:    15:29:20

Q    Do you know what percentage of people who    15:29:21
are paid in cash in the Los Angeles area are    15:29:22
lawfully present or U.S. citizens?    15:29:26

MR. SKEDZIELEWSKI:  Objection.  Foundation.    15:29:30

THE WITNESS:  No, ma'am.  I wouldn't know.    15:29:33

BY MX. WILFONG:    15:29:38

Q    Other than the briefings that you've    15:29:38
mentioned, was there any other -- anything else that    15:29:40
informs your understanding that unauthorized    15:29:44
immigrants prefer cash-paying jobs?    15:29:46

MR. SKEDZIELEWSKI:  Objection.    15:29:53

THE WITNESS:  No, ma'am.  Just -- just the    15:29:55
briefings.    15:29:57

BY MX. WILFONG:    15:30:03

Q    Earlier I asked you if you knew what    15:30:03
percentage of people in the Los Angeles area who are    15:30:05
paid in cash are lawfully present and you testified    15:30:10
that you did not know.    15:30:12

Would that information be relevant to your    15:30:14
analysis about reasonable suspicion and cash-paying    15:30:16
jobs?    15:30:22

MR. SKEDZIELEWSKI:  Objection.    15:30:23

THE WITNESS:  I think that would possibly    15:30:27

Page 197

CONFIDENTIAL - UNDER PROTECTIVE ORDER

be one element.  But we try to take the total    15:30:29

elements to make that judgment.    15:30:36

BY MX. WILFONG:    15:30:42

Q    And you said that about 75 percent of the    15:30:42

operations you conducted were at car washes and    15:30:45

hardware stores.    15:30:48

Prior to Operation At Large, had you    15:30:50

conducted any enforcement operations at car washes    15:30:53

or hardware stores?    15:30:57

MR. SKEDZIELEWSKI:  Objection.    15:31:00

THE WITNESS:  Not that I can recall, ma'am.    15:31:03

BY MX. WILFONG:    15:31:12

Q    And as part of Operation At Large, has your    15:31:12

team detained anyone that you believed to be a day    15:31:14

laborer?    15:31:19

MR. SKEDZIELEWSKI:  Objection.  Vague.    15:31:20

THE WITNESS:  Can you repeat your question.    15:31:25

BY MX. WILFONG:    15:31:26

Q    Yes.    15:31:26

As part of Operation At Large, has your    15:31:26

team detained anyone that you believed to be a day    15:31:28

laborer?    15:31:32

MR. SKEDZIELEWSKI:  Same objection.    15:31:34

THE WITNESS:  Yes, ma'am.    15:31:36

\\\

Page 198

CONFIDENTIAL - UNDER PROTECTIVE ORDER

BY MX. WILFONG:                                          15:35:06

Q    Yes.                                               15:35:06

A    I mean, unless -- again, I mean, until I --        15:35:07
I can question somebody, I mean, I wouldn't -- I        15:35:09
wouldn't know.                                          15:35:12

Q    And you mentioned that car washes are one          15:35:28
of the -- car washes and hardware stores are the two    15:35:32
locations where the majority of operations took         15:35:37
place.                                                  15:35:39

Do you believe that people who work at car              15:35:41
washes are likely to be unauthorized immigrants?        15:35:42

MR. SKEDZIELEWSKI:  Objection.                           15:35:45

THE WITNESS:  Again, I mean, if -- unless               15:35:47
I -- I speak to them.  But just going off of what we     15:35:50
were briefed is how those locations, I'm guessing,      15:35:54
were -- were chosen.                                    15:36:00

BY MX. WILFONG:                                          15:36:03

Q    Outside of the briefing, do you have any           15:36:05
basis to believe that people who work at car washes     15:36:09
are likely to be unauthorized immigrants?               15:36:12

MR. SKEDZIELEWSKI:  Objection.                           15:36:15

THE WITNESS:  Based off -- not -- not                   15:36:18
considering that, no, ma'am.                            15:36:20

BY MX. WILFONG:                                          15:36:32

Q    And do you know anything about how car wash        15:36:32

Page 201

CONFIDENTIAL - UNDER PROTECTIVE ORDER

workers are paid?                                          15:36:34

          MR. SKEDZIELEWSKI:  Objection.              15:36:37

          THE WITNESS:  No, ma'am, I don't.           15:36:39

BY MX. WILFONG:                                            15:36:45

     Q    Do you know what percentage of car wash     15:36:46

workers are lawfully present or U.S. citizens in the  15:36:47

Los Angeles area?                                          15:36:51

          MR. SKEDZIELEWSKI:  Objection.              15:36:52

          THE WITNESS:  No, ma'am, I don't.           15:36:54

BY MX. WILFONG:                                            15:36:56

     Q    Is that -- would that be relevant           15:36:57

information when you're conducting an operation at a  15:36:59

car wash?                                                  15:37:03

          MR. SKEDZIELEWSKI:  Objection.              15:37:03

          THE WITNESS:  I'm not understanding what    15:37:06

the relevant information.                                  15:37:07

BY MX. WILFONG:                                            15:37:09

     Q    Would it be relevant to forming reasonable  15:37:10

suspicion while conducting an operation at a car      15:37:11

wash what percentage of car wash workers in the       15:37:15

Los Angeles area are lawfully present or              15:37:17

U.S. citizens?                                             15:37:19

          MR. SKEDZIELEWSKI:  Objection.              15:37:21

          THE WITNESS:  If I knew the percentage, I   15:37:27

believe that would be relevant information.           15:37:29

Page 202

CONFIDENTIAL - UNDER PROTECTIVE ORDER

is known to hire people who are illegally present.    16:51:27

Another would be that he refused to answer    16:51:35
any questions regarding immigration.  In my previous    16:51:37
experience, that has happened before where people    16:51:42
later found to be illegally present attempted also    16:51:49
to avoid answering questions.    16:51:53

But, I mean, that's -- those were pretty    16:51:59
much some of the factors.    16:52:02

Q    Were there any other factors?    16:52:07

A    That I can recall at this moment, no.    16:52:11

Q    Do you recall the apparent race or    16:52:21
ethnicity of this person?    16:52:25

MR. SKEDZIELEWSKI:  Objection.  Asked and    16:52:27
answered.    16:52:28

THE WITNESS:  Well, the race was white.    16:52:32
Ethnicity, I couldn't tell you exactly.    16:52:34

BY MX. WILFONG:    16:52:44

Q    Did you believe him to be Hispanic or    16:52:44
non-Hispanic?    16:52:47

A    I believed him to be of Hispanic descent.    16:52:50

Q    Who was the agent who made the initial    16:53:02
investigative detention?    16:53:04

A    I don't recall his name.    16:53:13

Q    Was he part of your team?    16:53:15

A    Yes, ma'am.    16:53:18

Page 244

A    Yes, ma'am, I did.                                    17:44:35

Q    Okay.  Just one follow-up question.                 17:44:38

Prior to the break, we were discussing the          17:44:40

detention and release of an individual at the car       17:44:42

wash who turned out to be a lawful permanent            17:44:45

resident.                                               17:44:49

You testified after watching the body              17:44:50

camera footage that at the moment that you detained     17:44:52

this individual initially, the basis of your            17:44:55

detention was that he was a car wash worker at a        17:44:59

location where you had intelligence that another car    17:45:02

wash worker did not have status; is that correct?       17:45:07

MR. SKEDZIELEWSKI:  Objection.  Misstates           17:45:11

testimony.                                              17:45:12

THE WITNESS:  Correct.  Yes, ma'am.                 17:45:15

BY MX. WILFONG:                                         17:45:16

Q    Okay.  Would that have given you -- would       17:45:16

that same -- would that be true of other -- of the      17:45:19

other workers at the car wash as well, then?            17:45:24

MR. SKEDZIELEWSKI:  Objection.  Form.               17:45:27

THE WITNESS:  I believe so, yes.                    17:45:30

BY MX. WILFONG:                                         17:45:32

Q    So you would have had reasonable suspicion     17:45:32

to detain any of the car wash workers on that basis;    17:45:34

is that correct?                                        17:45:36

Page 262

CONFIDENTIAL - UNDER PROTECTIVE ORDER

MR. SKEDZIELEWSKI:  Objection.    17:45:38

THE WITNESS:  I would have had reasonable    17:45:40
suspicion to -- to question.    17:45:41

BY MX. WILFONG:    17:45:45

Q    To conduct an investigative detention to    17:45:46
determine their status?    17:45:48

A    Correct.    17:45:49

Q    Okay.  Thank you.    17:45:50

You testified earlier that you watched two    17:45:52
body camera videos in preparation for this    17:45:55
deposition; is that correct?    17:45:59

A    Correct.  Yes, ma'am.    17:46:01

Q    Was the second video of Mr. M████████'s    17:46:02
body camera video?    17:46:09

A    I believe it was.    17:46:11

Q    And what do you recall about that -- what    17:46:12
you saw from that interaction?    17:46:16

A    That he approached an individual and    17:46:24
conducted his immigration inspection.    17:46:28

Q    Okay.  Anything else that you recall?    17:46:33

A    Me appearing on his angle of -- of the body    17:46:43
cam.    17:46:46

Q    Okay.  What were you -- how did you -- what    17:46:47
was your involvement in the -- in the interaction    17:46:52
such that you were on the footage?    17:46:55

Page 263

CONFIDENTIAL - UNDER PROTECTIVE ORDER

targets for that operation?    18:08:49

A    I don't know, ma'am.    18:08:53

Q    And other than -- I know you mentioned    18:09:02
receiving biographic information about the targets.    18:09:04
Does that mean things like name, date of birth,    18:09:06
country of origin?    18:09:09

A    Correct.  For the -- for the targeted    18:09:12
individuals, yes.    18:09:13

Q    Was there any other information you would    18:09:15
have received or received about those individuals?    18:09:17

A    Their status, their current status,    18:09:23
immigration status, I should say.    18:09:25

Q    Okay.  And what information, other than you    18:09:38
mentioned, I think, the location of the -- of the    18:09:42
target, which would -- I assume was the car wash; is    18:09:45
that correct?    18:09:49

A    Correct.  Yes, ma'am.    18:09:49

Q    Did you receive any other information about    18:09:51
the car wash other than its address?    18:09:53

A    The name of the car wash was included and    18:09:59
then the -- the address.    18:10:01

Q    Any other information about the car wash?    18:10:05

A    Typically, no, ma'am.    18:10:11

Q    Would you have received information about    18:10:14
whether the car wash paid its workers in cash, for    18:10:16

Page 279

CONFIDENTIAL - UNDER PROTECTIVE ORDER

example?                                                    18:10:19

A     No, ma'am.                                            18:10:20

Q     Would you receive information about whether           18:10:24
the car wash hired day laborers?                            18:10:25

A     Not that I could recall.                              18:10:35

Q     Did you receive any information other than            18:10:40
about the individual targets as to other people who         18:10:43
worked at the car wash?                                     18:10:47

A     No, ma'am.                                            18:10:51

Q     Did you take any notes during that                    18:10:55
briefing?                                                   18:10:56

A     No, ma'am.                                            18:11:00

Q     And did you access the briefing at any                18:11:11
point during the operation?                                 18:11:14

A     During this operation, no, ma'am.                     18:11:18

Q     Did you ever use -- look up a briefing                18:11:23
during an operation, during one of these car wash or        18:11:28
hardware store operations?                                  18:11:33

A     Not when it came to the hardware stores or            18:11:39
car wash.  I don't recall, no.                              18:11:44

Q     You don't recall ever having accessed it              18:11:52
during the operation?                                       18:11:54

A     For this one specifically?                            18:11:56

Q     You said as to car washes and the hardware            18:11:58
stores, you don't recall ever having accessed the           18:12:01

Page 280

CONFIDENTIAL - UNDER PROTECTIVE ORDER

presentations during the operation; is that correct?    18:12:04

A    Correct.    18:12:06

Q    Okay.  And did you do any of your own    18:12:06
research or surveillance prior to beginning this    18:12:10
operation at the Pasadena Auto Wash?    18:12:14

A    Research, yes.    18:12:18

Q    What would that have consisted of?    18:12:19

A    The location of the car wash, the cross    18:12:24
streets, how big the streets were, how -- how much    18:12:29
traffic to expect and, again, going back to the    18:12:34
hospitals, any nearby hospitals in case anything    18:12:38
went bad.    18:12:41

Q    Anything else?    18:12:43

A    No, ma'am.    18:12:47

Q    What about surveillance, would you have    18:12:49
conducted any surveillance prior to the beginning of    18:12:51
the operation yourself?    18:12:54

A    No, ma'am.  Not myself.    18:12:55

Q    Just the information that you received    18:12:58
in -- in the briefing; is that right?    18:13:00

A    Correct.  Yes, ma'am.    18:13:02

Q    And were there arrest warrants for the    18:13:05
individual targets at this operation prior to the    18:13:07
operation?    18:13:10

A    Correct.  Yes, ma'am.    18:13:12

Page 281

CONFIDENTIAL - UNDER PROTECTIVE ORDER

record at 7:23 p.m.                                     19:23:40

          (Off the record from 7:23 - 7:34 p.m.)        19:23:43

          THE VIDEOGRAPHER:  Going back on the record   19:34:32

at 7:34 p.m.                                            19:34:33


                  FURTHER EXAMINATION                   

BY MX. WILFONG:

     Q    Mr. F████████, to be clear, did you make an  19:34:39

independent assessment --                              19:34:41

          (Clarification by the Reporter.)             19:34:41

BY MX. WILFONG:                                         19:34:41

     Q    -- that you had a reasonable suspicion to    19:34:41

detain the lawful permanent resident at the Pasadena   19:34:49

Auto Wash?                                              19:34:52

     A    Yes, ma'am.                                   19:34:52

     Q    Is there any other factors you can           19:34:55

articulate, sitting here today, beyond what we've      19:34:57

already discussed for why you had reasonable           19:34:59

suspicion to detain him?                               19:35:01

     A    All -- besides all the factors that I had    19:35:07

said before?                                           19:35:11

     Q    Uh-huh.                                       19:35:12

     A    Nothing else, I don't believe, no.           19:35:15

     Q    Regarding running during an operation, do    19:35:19

you know the difference between provoked and           19:35:21

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - UNDER PROTECTIVE ORDER

unprovoked flight?    19:35:23

    A    No, ma'am.  I've never heard that.    19:35:28

    Q    Is that something you've been trained on?    19:35:31

    A    No, ma'am.  I've never heard the -- that    19:35:36
phrase.    19:35:37

    Q    Is it your testimony that you would take    19:35:39
into account the number of arrests in Operation At    19:35:41
Large as part of reasonable suspicion for a stop of    19:35:45
a particular individual?    19:35:47

    A    Can you repeat your question again.    19:35:49

    Q    Is it your testimony that you would take    19:35:51
into account the number of arrests in Operation At    19:35:52
Large as part of reasonable suspicion for a stop of    19:35:54
a particular individual?    19:35:57

        MR. SKEDZIELEWSKI:  Objection.  Misstates    19:35:59
testimony.    19:36:00

        THE WITNESS:  No, ma'am.    19:36:02

BY MX. WILFONG:    19:36:05

    Q    That is not your testimony?    19:36:05

        MR. SKEDZIELEWSKI:  We're at seven hours.    19:36:07

        MX. WILFONG:  Okay.    19:36:09

        MR. SKEDZIELEWSKI:  I'd just like to put on    19:36:10
the record that we'd like to reserve our right to    19:36:11
review the draft transcript for errata and for the    19:36:14
witness to sign.    19:36:18

                                    Page 328

CONFIDENTIAL - UNDER PROTECTIVE ORDER

STATE OF CALIFORNIA        )

COUNTY OF LOS ANGELES      )    ss.

        I, Kimberly A. Edelen, C.S.R. No. 9042, in and for the State of California, do hereby certify:

        That prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify the truth, the whole truth and nothing but the truth;

        That said deposition was taken down by me in shorthand at the time and place therein named, and thereafter reduced to typewriting under my direction, and the same is a true, correct and complete transcript of said proceedings;

        That if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript {X} was { } was not requested.

        I further certify that I am not interested in the event of the action.

        Witness my hand this 18th day of December, 2025.

        KIMBERLY A. EDELEN, C.S.R. NO. 9042

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.