# EXHIBIT 25

Sealed Version
Filed Separately

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

_____

PEDRO VASQUEZ PERDOMO, et    )

al.,                         )

            Vs.              ) Case No.

KRISTI NOEM, Secretary,      ) 2:25-cv-05605-MEMF-SP

Department of Homeland       )

Security, et al.,            )

            Defendants.      )

_____)

 *** CONFIDENTIAL - UNDER THE PROTECTIVE ORDER ***

    VIDEOTAPED DEPOSITION OF J███████ C. E████████

                Los Angeles, California

                Monday, December 8, 2025

                    Volume I

Stenographically Reported By:

Melissa M. Villagran, RPR

CSR No. 12543

Job No. 7777850

PAGES 1 - 305

                                            Page 1

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

                              INDEX


DEPONENT                                          EXAMINATION

J█████  █  E██████

Volume I

            BY MR. SHREFFLER                           12

            BY MS. XIAO                               210



                            EXHIBITS

DEPOSITION                                              PAGE

Exhibit 1    Zello messages                             177


Exhibit 2    WhatsApp messages                          181


Exhibit 3    Narrative                                  195


Exhibit 4    Untitled document, narrative               196


Exhibit 5    E-mail                                     197


Exhibit 6    Narrative                                  198


Exhibit 7    E-mail                                     198

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

INDEX (CONTINUED)


                             EXHIBITS

DEPOSITION                                                 PAGE

Exhibit 8    Narrative                                      199


Exhibit 9    E-mail                                         199


Exhibit 10   Untitled document, narrative        200


Exhibit 11   Operation At LARGE - Los Angeles    285
             Information Sheet


Exhibit 12   El Centro Sector Muster Sheet        288


Exhibit 13   El Centro Sector Muster             293

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

testify in court much more than I do.  So as a

border patrol agent, I wouldn't say regularly, no.

      COURT REPORTER:  Can we go off the record for

a second?

      THE VIDEOGRAPHER:  We are going off the    09:34:30

record.  The time is 9:34 a.m.

      (Recess.)

      THE VIDEOGRAPHER:  We are going back on the

record.  The time is 9:37 a.m.

BY MR. SHREFFLER:    09:37:26

   Q   Mr. E███████, of all of the times that you

testified at trials, have all of those cases been

criminal cases?

   A   Yes.

   Q   Have you ever been a party to a case?    09:37:36

   A   Meaning?

   Q   Either a plaintiff or a defendant yourself?

   A   Like sat in a courtroom as a plaintiff?

   Q   Uh-huh.

   A   No.    09:37:51

   Q   Have you ever sat in the courtroom as a

defendant?

   A   As a defendant, no.

   Q   Okay.

      I'm going to -- I'm going to go over some    09:37:58

Page 17

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

basic ground rules.

A   Let me change that.  I had a -- one time in 1997.

Q   When you were -- this one time in 1997, were you a defendant?                                    09:38:18

A   Yes.

Q   Was this a civil case?

A   No.

Q   Was this a criminal case?

A   Yes.                                              09:38:26

Q   What was the criminal case about?

A   Driving under the influence.

Q   And how did the criminal case resolve?

A   Pled to driving under the influence, misdemeanor.                                           09:38:43

Q   So I'm -- now that we've got that out the way, I'm going to go over some basic ground rules to make sure that we're clear and on the same page, although I expect since you've testified before, some of this will familiar to you.            09:38:58

I apologize that we're going to go over things you may already know, but just to make sure for the record today that we're clear.

A   Ok.

Q   You just took an oath to tell the truth, the   09:39:04

Page 18

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

of your work?

A   On occasion I have used my government-issued phone to video record subjects in the field.

Q   Did you do so on August 3rd?

A   No.                                              10:10:35

Q   Mr. E_____, what's your educational background?

A   High school graduate, some college.

Q   When did you graduate high school?

A   1993.                                            10:10:54

Q   How long have you been employed by CBP?

A   Approximately 20 years.

Q   Can you give me a quick rundown of the jobs you have held since high school?

A   Since -- jobs since high school?                 10:11:12

Q   Yeah.

A   I was in the Marine Corps for eight and a half years.  And then when I got out of the Marine Corps I was going to school, and I was a freight team supervisor for a Home Depot while I was going   10:11:33 to school.

And then border patrol.

Q   What rank did you achieve in the Marines?

A   Sergeant.

Q   Well, thank you for your service, sir.           10:11:53

Page 44

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

When you were in the Marines -- just so that I best understand, you graduated high school in 1993.

Did you enlist that same year?

A   Yes.                                              10:12:15

Q   And you were there for eight and a half years?

A   Yes.

Q   Were you deployed outside of the United States while you were a Marine?          10:12:25

A   Yes.

Q   As a -- within the Marines, did you have any particular specialty or assignment that you -- that was your role?

A   Yes.                                              10:12:41

Q   What was that?

A   Intelligence.

Q   What is your current position at CBP?

A   Supervisory border patrol agent.

Q   How long have you held that position?        10:13:07

A   Since March of 2023.

Q   Can you describe your responsibilities as a supervisory border patrol agent?

A   Yes.  I'm responsible for the day-to-day operations of the unit I'm assigned to and the          10:13:30

Page 45

CONFIDENTIAL - UNDER THE PROTECTIVE ORDER

agents that work with me.  You know, their administrative needs.

Q   Can you describe the types of assignments you do as a supervisory boarder patrol agent?

A   Scheduling.  There's a lot, and then all of a   10:13:54 sudden, what do I do?  Not much.  No, I'm just kidding.

Scheduling.  Planning operations for the team that I'm assigned to.  The well-being of the agents that work with me.                                        10:14:15

Q   Training?

A   Training.

Q   Do you deliver trainings?

A   Yes.

Q   What sorts of trainings do you deliver?      10:14:29

A   They are generally impromptu trainings.  I also sign up my team for actual -- actual training, but the impromptu training -- was that the question or -- the ones that I actually give?

Q   Yes, sir.                                     10:14:51

A   So I have my MT license, so we do medical training as it relates to seeing things we might see on the job.

Tactics as far as how to handle certain situations in the field.                                 10:15:05

Page 46

Administrative processes.  How to do certain types of administrative things related to our jobs.

Q   So you -- as a supervisory border patrol agent, you are responsible for scheduling, planning, well-being of your agents, and training your agents.   10:15:33

Is there anything else you are responsible for?

A   I think that's kind of a shell of what it is.

Q   Is there anything else that immediately comes to mind that I'm missing?   10:15:46

A   No.

Q   Would you tell me if later in the assignment?

A   Yes.  Yes.

Q   Are you assigned to a unit?

A   Yes.   10:16:00

Q   Which one?

A   I'm the supervisor for the El Centro Station anti-smuggling unit.  It's officially called "Disrupt."

Q   And I think I get a sense from the name, but   10:16:11 what are the -- what sorts of -- what are the responsibilities of this unit?

A   So we are responsible for identifying and interdicting criminal smuggling activity, highway interdiction -- and highway interdiction.   10:16:36

Page 47

Q    And your home assignment is the El Centro Sector?

A    El Centro Sector -- El Centro Station, which is in El Centro Sector, yes.

Q    How long have you been assigned to the ELC    10:16:58 Anti-smuggling Disrupt Unit?

A    August of 2024.

Q    And before that, what was your assignment?

A    I was a supervisory border patrol agent assigned to Shift A, which is our midnight shift for    10:17:19 line watch operations, which is in uniform, on a shift.

Q    Going back to the anti-smuggling disrupt, the smugglers you were targeting, were they carrying drugs?    10:17:59

MS. FUDIM:  Objection.

You can answer.

BY MR. SHREFFLER:

Q    I can rephrase.  Is the -- was the purpose -- what sorts of commodities or persons were    10:18:08 being smuggled that you were targeting?

A    It's a wide range.  Our responsibility is identifying or deterring smuggling operations within our area of responsibility.

We've -- I mean, it's anything that's    10:18:30

Page 48

different task forces.  What were your
responsibilities -- what task force was that?

A   It was called the Brawley Investigations
Team.

Q   And that's in Brawley, California?        10:51:56

A   Brawley, California, yes.

Q   And what were you -- what were the
responsibilities of the Brawley Investigation Team?

A   Identifying and investigating narcotics and
violent crimes.                               10:52:10

Q   Did you have any particular roles on that
team?

A   I was just an investigator.

Q   And before you were on the Brawley
Investigations Team, what was the other unit that   10:52:19
you mentioned?

A   I was part of the border crime suppression
team.

Q   And how long were you in this position?

A   I was there for three years.             10:52:35

Q   And what were your responsibilities on the
border crimes suppression team?

A   Task force officer.

Q   And what does that mean?

A   It's an investigator.                    10:52:47

Page 60

Q   And what were the responsibilities of the border crime suppression team?

A   Investigate crimes related to border activity, not immigration stuff.  It was more narcotics, guns, violent crimes.                    10:53:08

Q   You were based in the El Centro Sector, correct?

A   Yes.

Q   That's in the Imperial Valley?

A   Yes.                                                10:53:29

Q   Is there a particular geographic area that the El Centro Sector is tasked with patrolling?

A   Yes.

Q   What is that area?

A   It is west of the City of Calexico.  Actually   10:53:36 west of the Calexico West Port of Entry to the -- I guess it would be like the In-Ko-Pah exit just right next to San Diego County.

Q   And can you spell that last word?  I don't think I got that.                                          10:54:05

A   Actually it's an Indian word.  It's like three -- it's I-n, hyphen, K-o, hyphen, P-a-h.

Q   I've seen that exit before.

A   So if you're going from west to east, it's right before you drop into the beautiful Imperial     10:54:21

Page 61

County.

Q    During your career as a border patrol agent in the El Centro Sector, can you estimate the percentage of your time spent on duty that has been in the El Centro Sector area of responsibility?    10:54:38

A    Year -- I could tell you September of 2009.

Q    You have been in the El Centro Sector since 2009?

A    Yes.

Q    And during the course of your -- while you    10:54:59 have been a border patrol agent in El Centro, how much time on duty have you spent in the El Centro Sector versus outside of the El Centro Sector?

A    Actually doing enforcement?

Q    Yes, sir.    10:55:21

A    Percentage-wise it would be 90 percent at least.

Q    Would that percentage be any different if we just looked at the year 2025?

A    Well, let me rephrase.  Working on -- I was    10:55:32 on another task force before then.  We did -- we did work outside of the El Centro area of responsibility from time to time.

But as far as sustained daily, it would be January of 2025.    10:55:59

Page 62

A    That's hard to say, like, these many days or
anything like that.  It's -- it depends on where
we're at.

Like I said, on occasion.  I couldn't give
you a timeframe, but on occasion we do have            11:26:57
experience in that, yes.

Q    Do you know what percentage of day laborers
are U.S. citizens or lawfully present?

A    I don't.

Q    Do you know what percentage of day laborers    11:27:17
in the Los Angeles area are U.S. citizens or
lawfully present?

A    No.

Q    Can you tell by looking at a day laborer
whether they are a U.S. citizen?                       11:27:28

A    No.

Q    Are you aware of anything that specifically
sets U.S. citizen day laborers apart from
non-U.S. citizen day laborers?

A    Not until I speak to them.  Visually, no.       11:27:42

Q    Can you tell by looking at a day laborer
whether they have legal status?

A    No.

Q    Are you aware that the court issued a
temporary restraining order in this case?              11:27:59

Page 84

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

Q    Did your team all enter through the same entrance?

A    My team?

Q    Yes, sir.

A    Yes.                                                    02:21:50

Q    Did other teams enter through that same entrance?

A    I don't remember.

Q    Okay.

So you're in the parking lot.  You're still    02:22:06
in your cars.  And you -- and you see people start to run.

What happens next?  What do you do next?

A    Well, like I said, it's sectored off, so we're kind of staying in our area.  And then I    02:22:23
see -- you know, it was multiple people in an area that we had information saying that it's like a day laborer area.

And so I saw a subject in the far corner of the Home Depot parking lot, parked.  So I got out of    02:22:50
the vehicle to make a -- to have a discussion with him, to talk to him.

Q    Why did you approach this person?

A    Another -- a number of different factors.

Like I said, we are immigration enforcement agents.    02:23:15

Page 154

There's -- you know, we were there looking for specific people.  But while we are there, we also know that it's a high concentration of day laborers that -- you know, that -- and day laborer jobs are generally -- not all, but people that are in the     02:23:44 country illegally will do day labor jobs because they can't legally get a -- for the most part, they can't legally get other jobs.

I'm sorry.  What was the -- what was the question?     02:24:07

Q    Why did you approach this specific person?

A    Okay.  There you go.

I know from, you know, normal people that -- normally when people go to shop at Home Depot, for example, myself included, not just Home Depot, any     02:24:21 store, will try to find a parking spot as close to the doors as possible.  We park, get out, walk into the store, go back to our car, and then we drive.

People that are normally there for those types of things don't park at the far back corner of     02:24:41 the parking lot.

It was a known area for subjects that are day laborers to congregate out there.  Oftentimes, day laborers will either be out on foot in groups or parked sitting in their cars, waiting for people to     02:24:59

Page 155

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

offer them -- offer them work.

So that's what I observed.

So I decided to go speak to that person to
see what he was -- what was going on.  What he was
up to.                                                  02:25:18

Q   Was there a specific portion of the parking
lot that your intelligence had indicated was a day
laborer -- was an area where a large number of day
laborers would congregate?

A   Yes.                                               02:25:32

Q   What portion of the parking lot was that?

A   Like I said, I don't remember the north,
south, east, or west, but it was, like, a back
corner away from the store.

Q   Was that the only portion of the parking lot    02:25:42
that your intelligence had identified?

A   It was, like, a section.  It was, like, back
corner section.

Q   And that was the only section that was
identified?                                            02:25:54

A   That I can recall.

Q   And the place to find this information that
you can't recall would be on the intelligence
itself, correct?

A   Yes.                                               02:26:09

Page 156

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

Q   How long did you observe this individual before you decided to approach him?

A   I don't know.

Q   You have no idea?

A   It wasn't more than -- it wasn't many minutes.                                                   02:26:28

Q   If you went back and reviewed your body camera footage, would you be able to determine how long you observed this person?

A   Depends on when I turned it on.  Probably                                                         02:26:45
not.  We drive into the parking lot.  As we are driving, we are looking for, you know, the targets in their vehicles.  Also, looking at the whole surrounding area for any threats or anybody else that might be suspicious or, you know, might cause                                                    02:27:03
concern or interest.

     It could be anywhere from a minute to three minutes.  I mean, that's -- you know, it could shorter.  Every situation is different.

Q   And so this particular situation, you drove                                                      02:27:23
into the parking lot.  You looked around for everyone to identify suspects, to identify possible threats, and then you identified this person.  And all of that happened within the span of one to three minutes?                                                                                             02:27:48

Page 157

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

A    The one to three minutes was a generalization. I wasn't looking at my watch. I'm not exactly sure of the time, but it happens fairly quick. I mean, you are driving. You are looking at the particular situation.                                                02:28:14

If there's not -- you know, like I said, in my particular area, I didn't see the specific person that we were looking for. However, I did see that gentleman sitting in his car, way in the back corner with the day laborers. So I decided to go speak    02:28:37 with him.

Q    Was anyone else standing near him when you approached?

A    No. Well, like, next to his car, no.

Q    So you've testified that you made the    02:28:57 decision to approach this person because he was sitting in his car and his car was located in the specific portion of the parking lot?

A    Yes.

Q    Are there any other reasons that you decided    02:29:16 to approach this person?

A    Yeah. He was in an area with -- in an area identified as an area where many day laborers are. When we drove in, we saw a number of people, a few of them were running. He was parked in next to a    02:29:37

Page 158

CONFIDENTIAL UNDER THE PROTECTIVE ORDER

Penske truck.  You know, I know that, like I said,
people that are looking for people to help them move
often hire people that work.  It's far away from the
front doors.  He was sitting in the car with his
door open on his cell phone.  He was dressed like he     02:30:03
may be looking to do some sort of manual labor.

Q   And how was he dressed?

A   He had a T-shirt on and jeans.  You know,
kind of work-type clothes, not necessarily clean.

Q   What made the clothes work type?                    02:30:34

A    It doesn't -- it's -- it looked like
something that I personally would work in, like an
older shirt with an older pair of jeans.  I mean,
that's subjective, but that's something that I would
do.  Old shirt, old jeans.                               02:30:50

Q   So he was sitting in his car with the door
open, wearing an old shirt and old jeans in a part
of the parking lot that was far from the store that
your intelligence indicated was an area where day
laborers may congregate.                                 02:31:10

Is there anything else that led you to
approach this person?

A   No.

Q   Those are all the reasons you decided to
approach this person?                                    02:31:24

Page 159

A   Yes.

Q   And, sitting here today, you can't recall how long you observed this person before you approached him?

A   No.

Q   Did you see him walking out of the Home Depot?

A   No.

Q   Had you seen him walking out of the Home Depot, would that have changed your decision?    02:31:40

A   I don't know.

Q   Could it have changed your decision?

A   I don't know.  It's a totality of the circumstances.  I would have to see the whole situation.    02:31:52

Q   How full was the parking lot?

A   I don't remember.

Q   Was it totally -- do you remember was it 50 percent full?

A   I don't remember.  I would be guessing.    02:32:08

Q   Do you remember -- you testified that he was wearing work-type clothes.  What else do you remember about what he looked like?

A   Just that sitting in his car on his phone next to a Penske van far away from the front of the    02:32:37

Page 160

CONFIDENTIAL UNDER THIS PROTECTIVE ORDER

store right next to a group of day laborers that ran
from us.

Q   Where did the -- did you see where the day
laborers who ran, where did they go?

A   I can't tell you exactly where they went.   02:33:15

Q   Did you think about going after -- going to
chase after them?

A   I can't remember what was going on in my head
at that time.  But if I made the decision not to, it
was probably because they were already far enough   02:33:30
away to where it was out of my area of
responsibility, for lack of a better phrase.

Like, this was my -- our area that we were
supposed to be in.

Q   Did you notify your colleagues either on your   02:33:47
team or another team that there were individuals who
had ran out of your area of expertise?

A   I don't remember.

Q   And this person did not run?

A   No.                                              02:34:09

Q   What happened after you approached him?

A   His door was -- to his vehicle was wide open.
In English, in a casual tone of voice, I asked him,
"How's it going?"

And I think he asked me in Spanish if I knew   02:34:31

Page 161

the document, do you see towards the bottom of the

document Mr. H█████ sends four photos, and then

writes (as read):

        "Identified targets at this

        Paramount HD"?                                    03:29:55

    A    Yes.

    Q    Does "HD" stand for Home Depot?

    A    Yes.

    Q    Do you know if these targets -- strike that.

         Were these targets arrested that day at the     03:30:04

Paramount Home Depot?

    A    I don't remember.

    Q    If you wanted to find this information out,

is there somewhere you would look?

    A    Yes.                                             03:30:13

    Q    Where would you look?

    A    E3.

    Q    And where in E3 would you look?

    A    You would just be able to query the name,

date of birth --                                         03:30:44

    Q    So you would be able to identify -- if you

had the name of the target, you would be able to

identify whether they have been arrested or not?

    A    Yes.

    Q    Sitting here today, you don't recall if they    03:31:03

                                                    Page 184

I, the undersigned, a Certified Shorthand Reporter of the State of California, Registered Professional Reporter, Certified Live Note Reporter, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [  ] was [  ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name this 9th day of December, 2025.

MELISSA M. VILLAGRAN

CSR No. 12543 RPR

Page 303

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.