# EXHIBIT 27

Sealed Version
Filed Separately

*** CONFIDENTIAL UNDER PROTECTIVE ORDER ***

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

_____

PEDRO VASQUEZ PERDOMO, et
al.,                            )
                                )
                                )
        vs.                     )No. 2:25-cv-05605-MEMF-SPX
                                )
KRISTI NOEM, Secretary,         )
Department of Homeland          )
Security, et al.,               )
                                )
        Defendants.             )
_____)

*** CONFIDENTIAL UNDER PROTECTIVE ORDER ***

VIDEOTAPED DEPOSITION OF C█████ █ C███████

Los Angeles, California

Friday, December 12, 2025

Volume I

Stenographically Reported By:

Melissa M. Villagran, RPR

CSR No. 12543

Job No. 7784284

PAGES 1 - 373

Page 1

*** CONFIDENTIAL UNDER PROTECTIVE ORDER ***

                              INDEX


DEPONENT                                    EXAMINATION

██████ █ ████████

Volume I

               BY MR. KIM                          17

               BY MS. PADILLA                      135

               BY MR. SKEDZIELEWSKI                363

               BY MS. PADILLA                      366




                           EXHIBITS

DEPOSITION                                            PAGE

Exhibit 1    E-mail                                    40


Exhibit 2    Fourth Amendment Refresher              109

             Training document


Exhibit 3    El Centro Sector Muster                 131


Exhibit 4    E-mail                                  136


Exhibit 5    The Guardian article                    150




                                        Page 11

*** CONFIDENTIAL UNDER PROTECTIVE ORDER ***

INDEX (CONTINUED)


EXHIBITS

DEPOSITION                                            PAGE

Exhibit 6     FOW                                      197


Exhibit 7     LACLEAR War Room Inquiry or              212
              Operation Form


Exhibit 8     Photo                                    214


Exhibit 9     Photo                                    215


Exhibit 10    Map                                      228


Exhibit 11    213                                      287


Exhibit 12    EARM printout                            303


Exhibit 13    E-mail                                   326


Exhibit 14    E-mail                                   345

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

*** CONFIDENTIAL UNDER PROTECTIVE ORDER ***

I'll use the word "interveners" to refer to my clients collectively.

Does that make sense to you?

A   Yes.

Q   Can you please state and spell your full name   09:31:40 for the record?

A   C████, C████████, middle name, L████████, last name, C█████████.

Q   What is your current tile and position?

A   Currently, I'm a deportation officer.   09:31:59

Q   Have you ever been deposed before?

A   No.

Q   Have you ever testified at a trial or a hearing in another matter?

A   No.   09:32:13

Q   Now, before we start, I'd like to briefly cover some ground rules for a deposition.  You just took an oath to tell the truth, the whole truth, and nothing but the truth.

Do you understand that?   09:32:27

A   Yes.

Q   Although we are in a conference room in a deposition, that oath has the same effect and will be subject to the same penalties as though you are testifying in a court of law.   09:32:39

Page 18

*** CONFIDENTIAL UNDER PROTECTIVE ORDER ***

Q   Not a Social Security number.

Do you have a badge number?

A   Yes.

Q   What is it?

A   8831.                                               10:29:47

Q   How long have you been a deportation officer?

A   Ten years.

Q   So you didn't hold any position prior -- with ICE prior to becoming a deportation officer?

A   Can you explain that again?                        10:30:06

Q   Did you have any position before becoming a deportation officer at ICE?

A   No.

Q   Have you had any other positions at ICE?

A   Can you explain -- can you please rephrase          10:30:24 "position"?

Q   Position being your employee title.  So, for example, if your current title is a deportation officer, have you had any other title at ICE?

A   No.                                                 10:30:50

Q   Are you familiar with the term Operation At Large?

A   Yes.

Q   What is Operation At Large?

A   I was TDY in Egypt when they did the                10:31:09

Page 53

*** CONFIDENTIAL UNDER PROTECTIVE ORDER ***

week or would they happen more frequently during
some weeks more so than others?

    A   I think that's law enforcement sensitive.

    Q   So how would you -- how often would you
do -- can you brief -- sorry.  Scratch that.      10:37:44

        Can you at a high level describe when those
20 operations occurred from June to August?

    A   Can you rephrase that again, sir?

    Q   Did most of them happen in June?

    A   No.      10:38:07

    Q   But they were spread out throughout June to
August?

    A   Spread out, yes.

    Q   Okay.

        Are you part of the unit or team?      10:38:16

    A   Yes.

    Q   What unit or team are you with?

    A   Currently, I'm with the mobile Fug Op team.

    Q   And what office are you with?

    A   Los Angeles.      10:38:36

    Q   Is there a sub office?

    A   Just the field office.

    Q   What's your current team number?

    A   Team 36.

    Q   Does your team have any particular geographic  10:38:49

Page 59

*** CONFIDENTIAL UNDER PROTECTIVE ORDER ***

focus?

A    No.

Q    So being in the Los Angeles office, you're not focused only on the Los Angeles area?

A    We are global.                                      10:39:06

Q    Where else have you conducted operations?

A    We just came back from Minnesota.

Q    Before 2025, did you have a particular geographic focus?

A    No.                                                 10:39:25

Q    So you were global before 2025 as well?

A    Yes.

Q    Would you say most of your operations happen within the LA County area or within the Los Angeles area?                                                       10:39:37

A    No.

Q    When you say "global," do you mean outside the United States as well?

A    Not global.  I mean national.  National. National.                                                    10:39:52

Q    Okay.

     So just to clarify, by "global," you mean --

A    Throughout the United States, yes.

Q    About how much -- how many of your operations would you say are outside of the Los Angeles area    10:40:10

Page 60

*** CONFIDENTIAL UNDER PROTECTIVE ORDER ***

versus inside the Los Angeles area?

A    I do not know.

Q    Could you estimate?

A    No, I can't.

Q    Why not?                                    10:40:20

A    Because each team member has a different case.  There's five members on the team.  They can have a case in San Diego.  They can have one up there in Palmdale.  It just depends on the officer.

Q    So let's break that down a little.          10:40:34

Each team member has a separate case.

So are you going with your team to each of the team member's individual case?

A    Whoever the lead officer is, we'll follow his case, we'll go to his case.                     10:40:53

Q    And the lead officer is the -- what is the lead officer?

A    The reason why you have me in here, because I was the lead officer on this arrest.  It was my case.  Even though it wasn't Babosa (sic) that we    10:41:07 arrested, I was the lead.

Q    And so there is no fixed lead officer on a team?  It's more lead officers per each case?

A    Yes.

Q    For cases on which you are a lead officer,    10:41:22

Page 61

*** CONFIDENTIAL - UNDER PROTECTIVE ORDER ***

are most of your cases in the Los Angeles area or
outside the Los Angeles area?

    A    It varies.

    Q    Can you estimate what the proportion might
be?                                                          10:41:57

    A    No, I can't.

    Q    Why not?

    A    Because there's too many.

    Q    Would you say more than 25 percent are
outside the Los Angeles area?                                10:42:08

    A    What do you consider Los Angeles area?

    Q    As I stated earlier for the definition, I
mean broadly all the counties within the Central
District of California?

    A    I would say 20 percent is in LA and the rest   10:42:23
may be outside of LA.

    Q    Okay.

         Have you ever been assigned to a different
unit or Fugitive Operations team prior to Team 36?

    A    Yes.                                               10:42:42

    Q    Which team?

    A    Team 9.

    Q    What office was Team 9 at?

    A    Los Angeles.

    Q    How long were you assigned to Team 9?             10:42:51

                                                    Page 62

*** CONFIDENTIAL - UNDER PROTECTIVE ORDER ***

A    Over three years.

Q    Were your responsibilities the same or different?

A    Same.

Q    Any other teams?                                    10:43:04

A    Also, Team 19.

Q    And what office was Team 19 at?

A    Los Angeles.

Q    How long?

A    One year.                                           10:43:18

Q    And your responsibilities were the same there as well?

A    Yes.

Q    Any other teams?

A    No.                                                 10:43:31

Q    Were you at Team 9 first before Team 19 or vice versa?

A    I was on Team 19 first.  And then I went to Team 9.  And then to Team 36.

Q    And both of those teams, were they Fugitive    10:43:50 Operations teams?

A    All of them were.

Q    So you have been assigned to work Fugitive Operations for the ten years that you've worked at ICE; is that correct?                                  10:44:02

Page 63

A    No.

Q    Who is your direct supervisor?

A    SDDO C████.

Q    And what is their title?

A    Supervisor SDDO, last name, C████████    10:48:16

Q    Just for the record, what does SDDO stand for?

A    Supervisor detention officer.

Q    And who does Mr. C████ report to?

A    To AFOD M██████, C████████    10:48:37

Q    Sorry, can you repeat that?

You said A -- a what?

A    AFOD, A-F-O-D.

Q    And what does that stand for?

A    Assistant field office director.    10:48:55

Q    And who does Mr. C████████ I believe, report to?

A    He reports to the new FOD, Rivero -- not Rivero. R-████████

Q    And you said he was new.    10:49:23

When did he start his job?

A    Like, last month. Last month.

Q    And you said he's a FOD, which I assume stands for field officer director?

A    Yes.    10:49:45

Page 68

brief was set that I was flying to Egypt, and when I landed, that's when I heard that he's now in charge.

Q   So you don't know if he was just in charge of border patrol or the entire operation?

A   No.                                                11:30:33

Q   And do you know if ICE also reported to Chief Bovino?

A   I do not know.

Q   Okay.

I'd like to discuss your training during your      11:30:43 time with ICE on stops/arrests and the Fourth Amendment.  And when I say "training," I just want to define that term.  I mean, official trainings, but also guidance documents, informal guidance, and any other instruction that you've received.            11:31:01

You understand that?

A   Yes.

Q   When you joined ICE, did you attend a basic academy training?

A   Yes.                                               11:31:10

Q   Where?

A   Brunswick, Georgia.

Q   When did that happen?

A   Around June of 2016.

Q   Who taught the training?                          11:31:18

Page 82

*** CONFIDENTIAL - UNDER PROTECTIVE ORDER ***

A   I cannot remember the instructors.

Q   Do you remember if they were an attorney?

A   There was a class that's given by the attorney for Fourth Amendment.

Q   When you say for the Fourth Amendment, do you also mean for stops and arrests as well?   11:31:36

A   He didn't cover that, but he just spoke about the Fourth Amendment.

Q   Did you cover stops and arrests -- did you cover -- well, let me break that down.  Did the basic academy training cover stops?   11:31:51

A   Yes.

Q   Did it cover arrests?

A   Yes.

Q   Did it cover report writing?   11:32:02

A   No.  Because each field office is a different style of writing or how their OPLA will say that this is good to go on legal sufficient.

Q   So each field office has their own guidance on how to fill out the report?   11:32:33

A   The 213, yes.

Q   And what's your understanding of the differences between field offices and their guidance and report writing?

A   I don't think there's no difference, but you   11:32:53

Page 83

still have to state the five Ws.

Q   What are the five Ws?

A   Who, what, when, where, and how and why.

Q   And what was the -- are there any other instructions with report writing that you've    11:33:14 received from the Los Angeles office?

A   More detailed -- more detailed criminal history, immigration history.  They want the whole entire story.

Q   Anything else?                                  11:33:27

A   That's it, sir.

Q   So they told you the five Ws, write a detailed criminal history.

Are there any other instructions that you can recall about what the LA office said about filling    11:33:44 213s?

A   No.

Q   I believe earlier you testified that an attorney at basic academy and training instructed you on the Fourth Amendment.                          11:33:59

Do you recall who instructed you on stops and arrests?

A   It was instructors.

Q   Instructors who weren't attorneys?

A   No.  Instructors who were actually senior    11:34:17

Page 84

*** CONFIDENTIAL - UNDER PROTECTIVE ORDER ***

field officers.

Q   Okay.

And, to your understanding, they aren't attorneys?

A   No, they are not attorneys.  They are --      11:34:27

Q   Okay.

A   -- former or still ICE officers.

Q   Were you required to take the basic academy training or was it voluntary?

A   Required.                                      11:34:37

Q   And, to your knowledge, are all other ICE officers required to take basic academy training?

A   Yes.

Q   Are you also familiar with ICE Academy Team Tactics training?                                 11:34:52

A   What do you mean by "teams tactics"?

Q   Does that name ring a bell for you, ICE Academy Team Tactics training?

A   It does, but it may not be with what the academy teaches.  It may be at another advanced       11:35:14 class that they teach you tactics.  Like, I went to prosecution course, so I learned tactics on how to breach a door.  You're not going to learn that in the academy.

Q   When you say "you're not going to learn that   11:35:29

Page 85

*** CONFIDENTIAL - UNDER PROTECTIVE ORDER ***

BY MS. PADILLA:

Q   That's okay.

I said, you know, I'm just asking generally the location indicators that you would use to stop someone?                                              02:50:41

MR. SKEDZIELEWSKI:  Same objection.

THE DEPONENT:  Again, it would have to be a targeted arrest that I'm effecting.

BY MS. PADILLA:

Q   Right.                                              02:50:50

A   It's not so much collateral.  Because I've already done surveillance in that area, I know their patterns.  I know who -- what time people come in and out.  It's all about surveillance.

Q   I understand the way that you conduct           02:51:01
targeted enforcement operations and that's the way that you do your job.

But just in general, you talked about if you were to stop someone, you would take in consideration totality of the circumstance and       02:51:15
factors, and one of those factors was the type of location that the person was at.

And so I'm just wondering, you know, what are those indicators that you would look at?

You said if it's a heavily populated location    02:51:25

Page 158

*** CONFIDENTIAL - UNDER PROTECTIVE ORDER ***

by Hispanic people, by Asian folks.

So I'm just wondering what other sort of types of indicators you would utilize in -- for a location?

A    The main thing I would use is, again, the location.  Also, I would run the license plates, and I would know that that area is highly populated that there are illegal individuals trying to get work.  Like, I ran an individual and it was a female, ran her tags, she came back, she was removed.

I ran another individual.  He did not have work authorization to be back in the United States, and he was a reinstate.

Q    How do you know an area is a high probability of someone trying to get work?

A    Men that are out there -- I would say the word "loitering."

Q    And what does that mean to you?

A    Just hanging around, just hanging around.  Just not -- they're not doing nothing bad, but they're just hanging in that area.

Q    And when you say they're hanging in that area, what types of areas would they be hanging out in?

MR. SKEDZIELEWSKI:  Objection; vague.

02:51:42
02:52:02
02:52:16
02:52:34
02:52:46

Page 159

*** CONFIDENTIAL-UNDER PROTECTIVE ORDER ***

BY MS. PADILLA:

Q   You may answer.

A   At that time, they could be anywhere.  They could hang out -- they could hang on the side of the street.  They can hang at the grocery store, gas station.  They can hang out anywhere.     02:52:59

Q   And -- and who are these type of men, and what do they look like?

MR. SKEDZIELEWSKI:  Objection; vague, calls for speculation, assumes facts not in EVIDENCE.     02:53:13

BY MS. PADILLA:

Q   You may answer.

MR. SKEDZIELEWSKI:  Assumes testimony.

THE DEPONENT:  Please rephrase that.  Are you going to say race or what color?     02:53:23

BY MS. PADILLA:

Q   No.  You said that -- you know, that one of the things that you -- that it's typically men who are just loitering.

And so I'm just wondering, what do these men     02:53:38
who are just loitering look like?

MR. SKEDZIELEWSKI:  Same objection.

BY MS. PADILLA:

Q   You may answer.

A   Older Hispanic males.     02:53:49

Page 160

Q   And are there other particular characteristics that these older -- like, would it just be any holder Hispanic male, or are there particular characteristics that would be indicators to you?                                                02:54:00

MR. SKEDZIELEWSKI:  Objection; vague.

BY MS. PADILLA:

Q   You may answer.

A   Can you please tell me what you mean by "characteristics"?                                              02:54:10

Q   Yeah.  Are there any sort of physical observations that you would -- that would help inform you, you know, that you'd want to approach this older Hispanic male?

A   It's not so much I want to approach him.    02:54:24 Again, I only did two consensuals.  So there's got to be more than just saying he's Hispanic.

I'm just trying to find out my target.

Q   Right.  I understand.

But when you -- are there -- so would you say    02:54:40 that any older Hispanic male, or are there, like, additional things that you observe that would help inform sort of the totality of circumstances assessment that you make?

MR. SKEDZIELEWSKI:  Objection; misstates    02:54:54

Page 161

*** CONFIDENTIAL - UNDER PROTECTIVE ORDER ***

testimony.

BY MS. PADILLA:

Q   You may answer.

A   I would, again, say "loitering."  They're day
workers, as your other counsel said.  I've seen          02:55:10
where illegal individuals are picked up for work by
lawn care companies.  And also, with me actually
verifying individuals, just not random males.  I've
also checked females and males who should not be
here in the United States that illegally entered the     02:55:37
United States.

Q   And when you say "day worker," what does day
worker mean to you?

A   That's a term your counsel used.

Q   Or day laborer?                                       02:55:47

A   I don't call them "day laborers."  I call
them "illegal aliens."

Q   Understood.

How would you -- how would you -- what would
you -- what are sort of observations that you make       02:55:57
that someone might be here unlawfully -- have
unlawful status?

A   Again, I'll run it through -- through my
phone.  I'll call up to our designated law
enforcement agency who will run that individual, and     02:56:28

Page 162

*** CONFIDENTIAL - UNDER PROTECTIVE ORDER ***

Q   Okay.

Would you make any sort of notation that you actually meant for June 18th --

A   No.  Once I send it to them and they verify it, then I'm just waiting on a call for possible --   04:20:07 any other officers that are in the area that I'm in.

Q   Understood.

So you started the enforcement operation at his address on June 18th like it says in the LA CLEAR?   04:20:18

A   Correct.

Q   And you said that you had the FOW with you that day?

A   Yes.

Q   Can you just describe a little -- can you   04:20:28 describe what happened next?  So you go to his home and then what happens?

A   We were going to set up around the perimeter of the doughnut shop.  I drove by the house.  I saw the father's vehicle parked in the back of the   04:20:49 premises.  The father is the first one who leaves, around 6:05.

Okay?

Everybody else was behind me.  Some people had turned to the right -- down -- going down Los   04:21:01

Page 218

Avenue.  I was making a left-hand turn.  And then I said, "Hey, let's speak to those gentlemen over there."  And then I said, "I hope they do not run."

I pulled up.  Put my vehicle in park.  Opened the door.  Your client was running, started running.  04:21:23  Another officer was following him.  And then the other officer was hurt, so I ran up to your target -- I mean, to your client, and tapped him on the shoulder, and then I spoke Spanish to him.

And I asked him, "Why did you run?"  04:21:50

He didn't say nothing.

I said, "Can you come back to the bench?"

Your client walked back to the bench.

That's when I asked him again in Spanish and in English, ▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐▐  04:22:04
▐▐▐▐▐▐▐▐▐▐▐▐

Then I waited.

Q   What did you wait for?

A   Because he really didn't understand my Spanish, and I needed an officer who spoke more  04:22:18  fluent Spanish than me.

Q   Understood.

When you were talking about how you're in the vehicle and you're -- how were you communicating with the other officers?  04:22:34

Page 219

*** CONFIDENTIAL - UNDER PROTECTIVE ORDER ***

A    Radio.

Q    Radio.

And did you ever intend to go to the house?

A    We cannot go to the house because the Kidd litigation.                                          04:22:50

Q    But earlier you said that you could go to -- earlier you said that you could arrest someone if they're outside of the curtilage, correct?

A    Yes.

Q    So that would allow you to conduct          04:23:01 surveillance of someone's home and wait for them to exit the curtilage area to then conduct an enforcement operation, correct?

A    Yes.

Q    And why was that not -- why was that not    04:23:13 done?

A    Because that was not the plan.  The father leaves at 6:05.  The target usually is not in that vehicle.  The target usually come in the Tesla or one of the two trucks that comes on this side of the   04:23:26 doughnut shop.

Q    But to be able to get to the doughnut shop -- they would need to be -- they would need to, like, exit their home.  And earlier you said that one of the ways that you can conduct an operation is      04:23:50

Page 220

*** CONFIDENTIAL - UNDER PROTECTIVE ORDER ***

through a vehicle stop.

So why was that type of operation not conducted?

A    The father was not a target.  The father is a US citizen.  We already verified that.                    04:24:00

Q    Right.  But you said that Mr. B███████ sometimes drives his Tesla around or, you know, near where this Winchell's is.  And so you would have -- to have made that observation that he exits the home in his Tesla or one of the other three vehicles, I'm    04:24:14 just wondering why the enforcement operation wasn't conducted through a vehicle stop.

A    I never seen him leave his house.  I've never.  The father is the only one that leaves the house with the vehicle.  The other brothers and the    04:24:27 other workers, they have the Tesla, the truck, and another vehicle with that same brand.  B████ (sic), when I saw him the first time, came from the back and pulled into the parking lot.

He didn't come straight, like, going from    04:24:47 where his father --  his father lived down here.  There's a traffic light and there's a shopping center.  He always came down this road and went into the doughnut shop.  So I don't know if his family kicked him out of the house or what, but I've never    04:25:02

Page 221

*** CONFIDENTIAL - UNDER PROTECTIVE ORDER ***

seen him actually drive that vehicle.  Only his father.

Q   Understood.

And do you know if Mr. B████ was at Winchell's that morning?                    04:25:15

A   We could not go back.

Q   Did you observe him prior to conducting the enforcement operation?

A    I seen him a couple of months prior to that.

Q    And -- but the day of the enforcement            04:25:26 operation, did you confirm whether he was at the Winchell's?

A    We were going to.  We were just waiting on -- if we didn't talk to your client, who ran from us, then we would have then done vehicle stops on all            04:25:42 four vehicles to find out where the target was at.

Q    And when you say "all four vehicles," you mean all four vehicles that you have identified as being part of -- or that you have identified are related to Mr. B████?                                 04:25:59

A   To his father's company.

Q    And why did you decide to talk to our client?

A    Because your client had on a shirt with a rival grass cutting company.

Q    And how do you know it's a rival grass            04:26:27

Page 222

*** CONFIDENTIAL - UNDER PROTECTIVE ORDER ***

cutting company?

A    Because I've been doing surveillance over

years, so I know all of them.  I seen all of them

come through.

Q    And what would be the importance of talking    04:26:37

to him?

A    To see if he saw who B▮▮▮▮ was.  If he ever

seen him before.  That is the reason why we made

contact or attempted to make contact with your --

your guy who ran from us, to ask him, "Do you know    04:26:52

B▮▮▮▮?  Have you ever seen him before?"

Q    You said that -- why not just park and walk

up to the clients to ask them?

MR. SKEDZIELEWSKI:  Objection; misstates

testimony.    04:27:24

BY MS. PADILLA:

Q    You can answer.

A    Please repeat again.

Q    Yeah.  You testified earlier that you pulled

up in your vehicle, and there were other vehicles    04:27:32

from your officers that pulled up right after, and

then you got out.  And I'm wondering why you didn't

just park in a -- in, like, a designated parking

area to speak to -- to these gentlemen.

A    Your client ran before I can even get out of    04:27:50

Page 223

the vehicle.

Q   Did you park in a bus zone stop?

A   No.  It was green.

Q   Did the other officers park in a bus zone stop?                                                                04:28:07

A   I don't know.  I don't know.

Q   And why would they -- why would you not just park in a designated parking area if you were intending to talk to these three individuals?

MR. SKEDZIELEWSKI:  Objection;                  04:28:20 mischaracterizes your testimony.

BY MS. PADILLA:

Q   You can answer.

A   Where would I park at?  The whole parking lot was fulled (sic).                                                 04:28:28

Q   How many vehicles did you take to the location?

MR. SKEDZIELEWSKI:  I think you can answer that question.

THE DEPONENT:  Five vehicles.           04:28:45

BY MS. PADILLA:

Q   And can you describe what vehicles you had?

A   My vehicle was a black Dodge Charger. There's a blue Dodge Durango.  There's a gray -- a gray, like, police interceptor.  And then there was    04:29:14

Page 224

*** CONFIDENTIAL - UNDER PROTECTIVE ORDER ***

a blue -- like the blue car is burned, so the blue

car is no longer in play no more.  I don't know what

color car.  Just a blue car.

    Q    So I think that's four vehicles, the black

Charger, the blue Dodge Durango, the gray police        04:29:32

interceptor, and then the blue car that's no

longer --

    A    Okay.

        Another black Charger, another black Charger.

    Q    So two black Chargers?                         04:29:41

    A    Yes.

        MR. SKEDZIELEWSKI:  Are you ready for a break

or --

        THE DEPONENT:  Yes.

        MR. SKEDZIELEWSKI:  Let's take a ten-minute    04:29:44

break.

        MS. PADILLA:  Can I finish this line of

questioning, and then we can take a break?  It

should be about --

        MR. SKEDZIELEWSKI:  I think it's been a        04:29:51

while.  I think he's ready for a break.

        MS. PADILLA:  I would like to just finish

these last couple of questions, and I think we can

then take a break.

        MR. SKEDZIELEWSKI:  Do you need a break right   04:30:02

                                                        Page 225

*** CONFIDENTIAL-UNDER PROTECTIVE ORDER ***

now, or do you want to keep going for a few more

questions?

        THE DEPONENT:  We can go with two more

questions.

        MR. SKEDZIELEWSKI:  All right.  Let's          04:30:07

continue.

BY MS. PADILLA:

    Q    And were any of these vehicles marked?

    A    What do you mean by "marked"?

    Q    Did they have any decal that said "ICE"?      04:30:13

    A    We don't have vehicles that has "ICE" on it.

    Q    So they were unmarked vehicles?

    A    Yes.

        MS. PADILLA:  Okay.

        That's fine.  We can go on a break and then     04:30:23

we can come back.

        THE VIDEOGRAPHER:  We are going off the

record.  The time is 4:30 p.m.

        (Recess.)

        THE VIDEOGRAPHER:  This is Media 9.  We are     04:45:12

going back on the record.  The time is 4:45 p.m.

BY MS. PADILLA:

    Q    On the day of June 18th, was there

pre-operational briefing that was conducted?

    A    Yes.                                            04:45:24

                                              Page 226

Q    Then why do you say if you had had lights, they would have ran?

A    I do have lights.  I'm just speculation of what you were saying.  You were saying, well, what if I just came up there and said, "Police," or if I    05:04:52 came up there with my emergency lights on, they would have still ran, because they said it was unmarked vehicles.

You asked me a question previously about unmarked vehicles.  If I had turn my light on, they    05:05:02 would have ran.

Q    Why did you chase them?

MR. SKEDZIELEWSKI:  Objection; mischaracterizes the testimony, argumentative.

BY MS. PADILLA:    05:05:40

Q    You may answer.

A    The individual fled a federal officer after being ordered to stop.  We detained them. Questioned them. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮    05:05:57

▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮

Q    Do you know the difference between provoked and unprovoked flight?

MR. SKEDZIELEWSKI:  Could you repeat the    05:06:14

Page 244

*** CONFIDENTIAL - UNDER PROTECTIVE ORDER ***

question, please?

BY MS. PADILLA:

Q   Do you know the difference between "provoked" and "unprovoked flight"?

A   No.                                                05:06:22

Q   Have you been trained on these concepts?

A   Can you explain it to me?  Put it in a scenario.

Q   I'm just wondering if you've been trained on what provoked flight is versus unprovoked flight?   05:06:42

MR. SKEDZIELEWSKI:  Objection; compound. Form.

BY MS. PADILLA:

Q   Have you been trained on the concept of provoked flight?                                         05:06:53

A   Is that a law enforcement term or a civilian term?

Q   I'm just wondering if you have been trained on provoked flight.

A   I don't know.                                      05:07:03

Q   Have you been trained on unprovoked flight?

A   I said again, I do not know.

Q   If you were to approach someone and they run away, does that pretty much always give you reasonable suspicion, in your opinion?                05:07:27

Page 245

*** CONFIDENTIAL - UNDER PROTECTIVE ORDER ***

A    The ones that I decided to run.

Q    And how did you decide which ones to run?

A    Again, I'm not bias.  I went man, woman, man, woman, man, woman.

Q    But was there anything in particular that    05:08:31
made you want to run checks on a particular
individual?

A    Yes.

Q    What were those -- what was that?

A    Again, the way the workers and obvious that    05:08:40
some of the tags were expired or didn't have
identification on them.  The vehicle they had was,
like, really rundown, like, they did construction.
Those are the reasons why.

Q    And how would you know that -- that a    05:08:57
particular vehicle, who that belonged to?

A    Just, like, running license plates.

Q    But how would you know that a particular
vehicle belonged to one of the individuals that was
supposedly standing there?    05:09:15

MR. SKEDZIELEWSKI:  Objection;
mischaracterizes testimony.

BY MS. PADILLA:

Q    You may answer.

A    I don't understand what you mean by "who was    05:09:21

Page 247

standing there."

Q   Well, you pointed to this picture at this Winchell's that you said you took a year before this operation, and said that you had ran -- that, you know, folks here were undocumented, and that no one    05:09:34 was a US citizen and you had ran license plate checks on them.

MR. SKEDZIELEWSKI:  Objection; mischaracterizes the testimony.

BY MS. PADILLA:                                           05:09:53

Q   How did you know that those particular people in the photo were not US citizens?

MR. SKEDZIELEWSKI:  Objection; mischaracterizes testimony.

BY MS. PADILLA:                                           05:09:58

Q   You may answer.

A   Again, these are the gentlemens that wait right here for, as your previous counsel said, "day workers."  I call them "illegal aliens."  I have ran vehicles that pulled up to the doughnut shop, and I    05:10:13 seen them go in.  They may be wearing a landscaping uniform, a fluorescent shirt.  I would run that tag on that vehicle.  I would see them with these gentleman right would yell, "Trabaja" to one of these vehicles that had one of those shirts.  They    05:10:31

Page 248

*** CONFIDENTIAL - UNDER PROTECTIVE ORDER ***

would be looking for work.

I just ran random vehicles.  I didn't care who -- what race they were.  I just ran random vehicles that looked kind of suspicious.  That's old, beat up.  And, yes, I did run some new ones.    05:10:51 But I just wanted to see, what do I have in this area?  Is everybody not illegal or everybody US citizen.

Q   If you approach someone and they start to walk away, could that give you reasonable suspicion?   05:11:11

A   No.

Q   Why not?

A   Because it's cut off then.  There's no consensual.

Q   Why would you say it's "not consensual"?   05:11:25

A   Because they don't want to talk to us.

Q   And would you just leave them alone and walk away?

A   Yes.

Q   If you approached someone and they refuse to   05:11:33 answer your questions, does that give you reasonable suspicion?

A   No.

Q   If you approach someone and they refuse to produce an identification, does that give you   05:11:43

Page 249

*** CONFIDENTIAL - UNDER PROTECTIVE ORDER ***

company, that's why I wanted to speak to your client

that ran from me.

BY MS. PADILLA:

Q    I understand your answer.

My question is just a yes-or-no question.          05:20:08

A    No.

Q    Did you interview our client the first --

after the first individual that you encountered

after arresting him?

A    No.                                                   05:20:19

Q    Who interviewed him?

A    There was another officer that spoke fluent

Spanish.

Q    Did you learn what kind of work he actually

does?                                                      05:20:32

A    No.

Q    Did you ever learn what kind of work he

actually does?

A    No.

Q    Did you learn that he actually is a             05:20:39

construction worker and not a -- doesn't work in the

landscaping industry?

A    No.  Again, like I said, on the shirt, it had

landscaping/constructions.  I think I did say that.

Q    And did you ask Mr. Vasquez Perdomo, which is   05:21:07

Page 257

*** CONFIDENTIAL - UNDER PROTECTIVE ORDER ***

the first individual that you encountered, any

questions about Mr. B███████?

MR. SKEDZIELEWSKI:  Objection; form.

BY MS. PADILLA:

Q  You can answer.                                    05:21:24

A  No.

Q  Did you find Mr. B███████ that day?

A  We had to clear the area.

Q  Did you -- have you found Mr. B███████?  Have

you arrested Mr. B███████ since this incident?     05:21:38

A  I have not gone back to Pasadena since.

Q  So would that be a no, you have not arrested

Mr. B███████?

A  No.

Q  At the point where you had handcuffs on        05:21:53

Mr. Vasquez Perdomo, what information did you have

about him?

MR. SKEDZIELEWSKI:  Objection; foundation.

THE DEPONENT:  Again, who is this?  ███

███████████                                           05:22:07

BY MS. PADILLA:

Q  This is the first individual that you

encountered him.

A  I didn't put handcuffs on him.

Q  Who put handcuffs on him?                       05:22:13

Page 258

concerns about how the operation unfolded?

A    No.

Q    He was there, correct?

A    Yes.

Q    Anyone else in your chain of command express    06:48:11
any concerns about how the operation unfolded?

MR. SKEDZIELEWSKI:  Objection; foundation.

You may answer.

THE DEPONENT:  No.

BY MS. PADILLA:

Q    Did any of the other officers on the team
ever express concerns about how this operation
unfolded?

A    No.  Except your client ran or the three
clients ran.    06:48:55

MR. SKEDZIELEWSKI:  Break in about five
minutes?

MS. PADILLA:  We can take a break now.

BY MS. PADILLA:

Q    Oh.  Two more.    06:49:11

Okay.

Sorry.

Yes.

When you were stopped at the intersection --
so going back to June 18th when you were stopped at    06:50:00

Page 315

*** CONFIDENTIAL UNDER PROTECTIVE ORDER ***

the intersection at Los and --

A    Orange.

Q    -- Orange, about how far would you say that you were from Mr. Vasquez Perdomo at the bus stop?

A    I would say maybe 100 feet.  Maybe 100 feet.    06:50:16

Q    I'm going to ask if you can direct your attention to the plastic dispenser on the counter in the back of the room behind Mr. Niu.

MS. PADILLA:  For the record, he's approximately 15 to 20 feet away from the witness.    06:50:52

BY MS. PADILLA:

Q    Are you able to read what's on the label?

MR. SKEDZIELEWSKI:  What object are you referring to?

THE DEPONENT:  Yes.

MS. PADILLA:  The plastic dispenser.

MR. SKEDZIELEWSKI:  Dispenser of what?

MS. PADILLA:  I'm talking about the -- like the plastic dispenser with the pump in the corner of the room.    06:51:26

THE DEPONENT:  No.  Due to the fact of my diabetes diagnosis, I'm losing some of my sight.  So I can't see that.  Unless I put my glasses on, and I still cannot see that far.  But at that time in June, my eyes were good.  My eyes were good.    06:51:40

Page 316

*** CONFIDENTIAL - UNDER PROTECTIVE ORDER ***

BY MS. PADILLA:

Q   When was your --

A   I had -- I just went to see my doctor -- well, three weeks after I came back from June and that's when I was diagnosed with type 2.                06:51:49

Q   And did you wear glasses before your diagnosis?

A   I did a -- how do you want to say it -- I did a retinal of the eyes before and my eyes were good. But now my eyes now are, like, fuzzy.                06:52:06

MR. SKEDZIELEWSKI:  Can we let the record reflect that the plaintiff's counsel is asking the witness to try to read a label that's about 20 feet away from him that is print of which is no larger than a quarter of an inch.                06:52:21

I have 20/20 vision and I can't read it. With my contacts in.

MS. PADILLA:  I think we can take a break.

MR. SKEDZIELEWSKI:  Okay.

Mr. Clement, is ten minutes okay?                06:52:47

THE DEPONENT:  Yes.

THE VIDEOGRAPHER:  We're going off the record.  The time is 6:52 p.m.

(Recess.)

THE VIDEOGRAPHER:  This is Media 11.  We are                07:12:21

Page 317

*** CONFIDENTIAL - UNDER PROTECTIVE ORDER ***

I, the undersigned, a Certified Shorthand Reporter of the State of California, Registered Professional Reporter, Certified Live Note Reporter, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [xx ] was [  ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: December 15, 2025


MELISSA M. VILLAGRAN

CSR No. 12543 RPR

Page 370

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the deposition officer. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the deposition officer and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to

access the material. Our data is hosted in SSAE 16

certified facilities.

Veritext Legal Solutions complies with all federal and

State regulations with respect to the provision of

deposition services, and maintains its neutrality and

independence regardless of relationship or the

financial outcome of any litigation. Veritext requires

adherence to the foregoing professional and ethical

standards from all of its subcontractors in their

independent contractor agreements.

Inquiries about Veritext Legal Solutions'

confidentiality and security policies and practices

should be directed to Veritext's Client Services

Associates indicated on the cover of this document or

at www.veritext.com.