# EXHIBIT 40

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

_____

PEDRO VASQUEZ PERDOMO, ET      )

AL.,                           )

            Plaintiffs,        )

      vs.                      ) Case No.

KRISTI NOEM, SECRETARY OF      ) 2:25-cv-05605-MEMF-SP

HOMELAND SECURITY, ET AL.,     )

            Defendants.        )

_____)

   ** CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER **


   VIDEOTAPED DEPOSITION OF THE 30(b)(6) WITNESS ON

    BEHALF OF IMMIGRATION AND CUSTOMS ENFORCEMENT

                   JAIME RIOS

               Los Angeles, California

               Friday, January 30, 2026

                     Volume I


   Reported by:

NADIA NEWHART, CSR No. 8714

Job No. 7867541


PAGES 1 - 199

Page 1

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

                              INDEX

WITNESS                                         EXAMINATION

JAIME RIOS

Volume I

                    BY MR. KIM                            16

                    BY MS. LAI                            57


                           EXHIBITS

NUMBER                   DESCRIPTION                    PAGE

Exhibit 137  Plaintiffs' and Intervenors'         26

             Notice of Videotaped Rule

             30(b)(6) Deposition of Defendants

             Noem, Lyons, and Scott; 9 pages


Exhibit 138  Order Regarding 30(B)(6)             27

             Depositions; 4 pages


Exhibit 139  Fourth Amendment Refresher           46

             Training; 101 pages


Exhibit 140  Fourth Amendment Refresher           48

             Training Instructor Notes;

             GOV-00000180 to 259

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

INDEX (Continued):

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 141 | Immigration Enforcement Fourth Amendment Refresher document; 32 pages | 51 |
| Exhibit 142 | Typewritten notes; GOV-00000173 to 179 | 54 |
| Exhibit 143 | Declaration of Andre Quinones; 5 pages | 55 |
| Exhibit 144 | Record of Deportable/ Inadmissible Alien; 4 pages | 60 |
| Exhibit 145 | Email chain dated 8/4/25 with attachment; GOV-00000791 to 804 | 74 |
| Exhibit 146 | EARM document; GOV-00000536-538 | 162 |

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXAMINATION

BY MR. KIM:

Q   Good afternoon, Mr. Rios.  My name is Bobby Kim, and I represent the intervenors who are municipalities within the Central District of California.  That includes the City of Los Angeles. I understand plaintiffs will have some questions later on in the day.

Can you please state and spell your full name for the record.

A   Excuse me.  I'm coming down with a cold, so excuse me.

Jaime Rios, J-a-i-m-e, R-i-o-s.

Q   What is your current title and position?

A   I am the acting field office director for ERO Los Angeles Enforcement Removal Operations, Immigration Customs Enforcement.

Q   Have you ever been deposed before?

A   Yes, sir.

Q   How many times?

A   I believe two times, previous times.

Q   When was the most recent time you've been deposed?

A   Approximately a year ago.

Q   And then the other time?

Page 16

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

answer on that.

Q   Yeah, but you'd estimate about 20 to 30 hours?

A   Guesstimate.

Q   Okay.                                              09:38:41

A   Not estimate.  Guesstimate.

Q   Okay.  So you previously stated that you are the acting director of ICE's Los Angeles Field Office for ERO.

    Do I have that correct?  That's your current   09:38:52 title?

A   Yes, that is correct.

Q   And how long have you held this position?

A   Since November 2nd, 2025.

Q   Okay.  Before this role as acting director,   09:39:04 what roles did you hold at ICE?  Let's start with the most recent.

A   I currently hold a diplomatic role at the United States Embassy in Mexico City as an ERO attache.                                             09:39:20

Q   You currently hold that role?

A   That is correct.

Q   Okay.  Are there any other roles that you currently hold?

A   No.                                               09:39:29

Page 34

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Q   And so what if it is an indicator among others, is that permissible?

A   Not amongst others but multiple factors.

Q   Okay.

A   Multiple factors.                                    12:42:38

Q   So it can be considered among multiple factors?

A   Yes, ma'am.

Q   And the agency agrees with that, with respect to the L.A. area?                                        12:42:45

MS. SAFAVI:  Objection; form.

THE WITNESS:  As stated previously, that's -- that -- him being a day laborer is not a sole factor for making an arrest at all, whatsoever.

BY MS. LAI:                                              12:42:59

Q   Okay.  And if you take a look at the -- I heard you to say "sole factor," but it can be a factor among others, correct?

A   Yes.

Q   Okay.  What is a day laborer?              12:43:09

A   It depends where you live.

Q   Okay.  What is a day laborer in Los Angeles?

A   A day laborer in Los Angeles can mean someone that works in construction, someone that is a construction worker.  Someone that is out there --   12:43:24

Page 156

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

like, they say it Spanish, "pico y pala," shovel and pick.

Someone that busts their butt to make a living.  Someone that gets up early in the morning and works and provides.  Someone that is working in       12:43:36 construction, someone that's working out here in the street, somebody that is conducting and just doing labor work, labor-intensive work.  Obviously, we're not here -- day laborers, we're professionals, so we're not day laborers.       12:43:52

So when I say -- when I ask you what reference to laborers, so you have the day -- the laborers in the -- Central California that work in the fields, that work in the grapes, that work in the tabla, that work in the orange field, those are       12:44:05 laborers as well.  So that's why I'm referencing laborers.  Those are also considered day laborers as well.

Q   Okay.  And you were just using some Spanish phrases.  Why were you using Spanish phrases?       12:44:15

A   I'm fluent in Spanish.

Q   Okay.  But is there a reason why you couldn't share that in English with me?

A   No reason at all.

Q   Okay.       12:44:25

Page 157

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

A    I just -- that's just who I am.  I like to express myself, "de vez cuando en Español," every now and then in Spanish.  Like I said, I am stationed at the U.S. Embassy in Mexico City, so it's just something that -- a habit that I speak Spanish.

Q    Well, good thing that I understand Spanish.

But does the agency have information on the proportion of day laborers that are lawfully versus unlawfully present in the Los Angeles area?                    12:44:49

A    Not --

MS. SAFAVI:  Objection; form.

THE WITNESS:  Not that I'm aware of, ma'am.

BY MS. LAI:

Q    Okay.  I -- Officer Clement was the case          12:44:54 officer who arrested this individual.  You don't -- you have to take my word for that, because it's not stated specifically like that in the I-213.

But is he somebody you know?

MS. SAFAVI:  Objection; form.                        12:45:15

BY MS. LAI:

Q    Sir, I'm just asking if you know Officer Clement.

A    I'm reading up -- you're also stating that he made the arrest.  Just so you know, on the front      12:45:31

Page 158

page of the I-213, whoever made the arrest, it should be -- it should be the front document here.

It should be the officer's name here.

So I see Felix here.  So I'm looking somewhere in the narrative, Officer Clement's name.   12:45:41

Q   Yes, sir.

A   That's what I'm looking for, ma'am.

Q   Okay.  You can turn around -- you can put the document to the side.

A   That's why, I was -- I was looking for his   12:45:55 name here, ma'am.

Q   Okay.  You can flip that document over.

Do you know Officer Clement?

A   Yes, I do.

Q   Okay.  And is he somebody who you have   12:46:03 confidence in?

MS. SAFAVI:  Objection; form.

THE WITNESS:  He is a ERO officer assigned to the fugitive operations team in Los Angeles, California.   12:46:16

BY MS. LAI:

Q   Has he done anything improper in his role as an ERO officer in the agency's view?

MS. SAFAVI:  Objection; form.

THE WITNESS:  Regarding what, ma'am?   12:46:25

Page 159

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

BY MS. LAI:

Q   His activities in the field.

A   Not that I'm aware of, ma'am, no.

Q   Okay.  And not in the -- you're testifying as the agency, just to remind you, so not that the    12:46:33 agency is aware of?

A   Not that I'm aware of, ma'am, and the agency, correct.  Well, here, myself, you're asking me, so no, not that I'm aware of.

Q   Okay.  Mr. Vasquez Perdomo was moved to a    12:46:48 secondary location for Officer Clement to continue his investigation, meaning a location other than the bus stop.  He was taken to another location to investigate his immigration status.

Is that something that is acceptable?    12:47:02

MS. SAFAVI:  Objection; form.

THE WITNESS:  It is.  Maybe for safety reasons, it could be.

BY MS. LAI:

Q   Is there any specific justification needed    12:47:13 for an officer to do that, or is it officer discretion?

A   Officer discretion --

MS. SAFAVI:  Objection to form.

THE WITNESS:  -- also if the individual, if    12:47:21

Page 160

he grants consent, then that is also acceptable.

MS. LAI:  Okay.  If it's okay, Nancy, can we go off the record?

MS. SAFAVI:  Sure.

THE VIDEOGRAPHER:  Going off the record at    12:47:30
12:47 p.m.

(Recess.)

THE VIDEOGRAPHER:  Going back on the record at 1:19 p.m.

BY MS. LAI:                                                01:19:22

Q   All right.  Acting Director Rios, welcome back.  Earlier, we are talking about things that should be in an I-213.

If an operation was a targeted operation, should that be in the I-213?                          01:19:32

MS. SAFAVI:  Objection; form.

THE WITNESS:  Yes, ma'am.

BY MS. LAI:

Q   Thank you.  And earlier, we were talking about Officer Clement, who you know.  Are you aware    01:19:52
of any deposition testimony Officer Clement gave in this case?

A   It's my understanding he did give a deposition, but I -- I haven't see it.

Q   Okay.  Have you personally spoken with          01:20:08

Page 161

Q   Okay.  Thank you.  You can close that document now.

Apart -- does the agency track information about investigative detentions or stops conducted by officers that do not lead to arrests?                    01:26:23

MS. SAFAVI:  Objection; form.

THE WITNESS:  Say it again, the question, ma'am?

BY MS. LAI:

Q   Does the agency track information about    01:26:30 stops, for example, investigative detentions, that do not lead to an arrest?

A   No, ma'am.

Q   Okay.  And does -- if the agency doesn't track information about stops that do not lead to an    01:26:41 arrest, does the agency track information about stops where a person turns out to be a U.S. citizen or lawfully present?

MS. SAFAVI:  Objection; form.

THE WITNESS:  No, ma'am.                    01:26:54

BY MS. LAI:

Q   And you're aware this has occurred, right, in the -- in the past six or seven months, that individuals who are U.S. citizens have been stopped and then released later?                    01:27:03

Page 167

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

MS. SAFAVI:  Objection; form.

THE WITNESS:  Can you be more specific on an incident, maybe?

BY MS. LAI:

Q   Yes.  In immigration operations, there have been U.S. citizens who have been arrested, stopped and arrested, and then released later.  You're aware that's occurred, correct?                                      01:27:13

A   I believe so, yeah, throughout the United States.  Yes, ma'am.                                          01:27:23

Q   And is that of concern to the agency?

A   It all depends on the circumstances, so I can't answer specifically to why it happened. Obviously, multiple factors play into why such instances occur.  Safety -- again, right now, the anti-ICE rhetoric, so maybe safety is -- is -- is of -- most paramount.  So maybe that's the issue, but I would need more specifics specifically on what case you're referring to.                                    01:27:36

Q   Well, I'm talking about immigration stops, investigations, involving Title 8 where a U.S. citizen or somebody who is lawfully present, for example, a legal resident, is stopped and then later released.                                                    01:27:51

Is that a concern to you?                               01:28:02

Page 168

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

MS. SAFAVI:  Objection; form.

THE WITNESS:  I feel the officers, through the training, Fourth Amendment training, and their experience, totality of circumstances, make that decision real-time on the ground.  Sometimes they      01:28:15 have to make these decisions split-second.

If it means maybe making a determination at a safer location, then that's up to the officer to make that decision.

BY MS. LAI:                                              01:28:24

Q   Okay.  And you -- so you trust your officers?

A   Yes, ma'am.

Q   If the agency doesn't track information about stops that did not lead to an arrest, would you know if you're going back to a location where you had      01:28:35 previously conducted stops, for example, of a U.S. citizen or legal resident and that didn't lead to arrest?

MS. SAFAVI:  Objection; form.

THE WITNESS:  Can you repeat that question?       01:28:45

BY MS. LAI:

Q   Would you know if you were going back to the same place where you previously conducted a stop of somebody and it did not lead to arrest?

A   Yes.                                               01:28:55

Page 169

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

MS. SAFAVI:  Objection; form.

THE WITNESS:  If it's a targeted enforcement and the target was not -- that -- successful -- that operation wasn't successful and that the patterns of life lead you to that location, absolutely.          01:29:04

BY MS. LAI:

Q   Absolutely, you might go back to that same location?

A   Yes.

Q   But if you didn't track information about the          01:29:13 particular stop where somebody was released, then you wouldn't know if you are going back to the same place where somebody was previously stopped and released?

A   Correct.          01:29:24

MS. SAFAVI:  Objection; form.

THE WITNESS:  And it would be up to the case officer.

MS. LAI:  Okay.

THE WITNESS:  Each case officer knows where          01:29:29 they're going, due to patterns of life and operation not being successful.  They will usually come back if that pattern of life continues through human intelligence work.

BY MS. LAI:          01:29:38

Page 170

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Q   Okay.  And does the agency track information about the basis for stops, other than what you might find in the I-213?

A   No, ma'am.

Q   Does the agency track information about what you maintain might be consensual encounters if it doesn't lead to an arrest?    01:29:45

MS. SAFAVI:  Objection; form.

THE WITNESS:  No, ma'am.

BY MS. LAI:    01:29:57

Q   And in that case, is there any way to verify if the encounter was, in fact, consensual, if there's no I-213 and it didn't lead to an arrest?

MS. SAFAVI:  Objection; form.

THE WITNESS:  We do not track -- the agency    01:30:06
does not track anything like that.

BY MS. LAI:

Q   Does the agency track any information about how many arrests of collaterals are done with or without an administrative warrant?    01:30:15

MS. SAFAVI:  Objection; form.

THE WITNESS:  Every collateral arrest must have an administrative I-200 Warrant of Arrest.

BY MS. LAI:

Q   And that's the one that's filled out in the    01:30:31

Page 171

field or after that you indicated earlier?

A   That is correct.

Q   Okay.  And does the agency track information about how many arrests, overall, where there was an administrative arrest warrant before the arrest or    01:30:43 not?  Is that information tracked?

MS. SAFAVI:  Objection; form.

THE WITNESS:  Repeat the question, and -- and -- and just to -- you're kind of confusing me when you say "administrative arrests," because you    01:30:53 also have what's administrative moves, someone that's here illegally that has --

MS. LAI:  Understood.

THE WITNESS:  Yeah, no, so just I wanted to make sure -- why I'm kind of asking the question, to    01:31:00 give clarification.

MS. LAI:  Yes.  Thank you.

THE WITNESS:  That's the only reason, so...

BY MS. LAI:

Q   I'm talking about administrative warrants,    01:31:06 whether it's a warrant of removal or an I-200.

Does the agency track information about how many arrests are conducted where such a warrant was created before the arrest versus after?

A   No, ma'am.                                   01:31:20

Page 172

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

psychologically fit for duty.

A   No.

Q   Okay.  How about for HSI?  Is that required?

A   It all depends on what type of unit you're working on.                                                 01:37:17

Q   Okay.  I have a few questions about -- I'm going to switch topics now.

The supervisors for a team, you -- you call those SDDOs?

A   You called them SDDOs.                           01:37:34

Q   Okay.  What do you call supervisors on teams for Title 8 enforcement in ICE?

A   Well, SDDO stands for -- that's an acronym for supervisor detention and deportation officer.

Q   Okay.  And do they audit I-213s?              01:37:46

MS. SAFAVI:  Objection; form.

THE WITNESS:  They don't audit.  They oversee the signing -- any I-213 generated or produced by a deportation officer has to be signed off by a supervisory --                                              01:38:02

MS. LAI:  Okay.

THE WITNESS:  -- supervisory detention deportation officer, which is going to be an SDDO.

So whoever the SDDO is on duty or in processing, that's going to be that supervisor.      01:38:11

Page 179

BY MS. LAI:

Q   Is there any guidance or document that tells supervisors what they're supposed to look at an I-213 for --

MS. SAFAVI:  Objection; form.                01:38:24

BY MS. LAI:

Q   -- before they sign?

MS. SAFAVI:  Same objection.

THE WITNESS:  Well, supervisors get -- if you're a supervisor, you get trained.  You to go to       01:38:29 what's called SLT, supervisor leadership training. Then you also -- depending on the current platform or if there's any training scheduling -- then they go to what's called ASLT, advanced supervisor leadership training.  This is held at the Leadership       01:38:43 Development Center in Dallas, Texas.

So they go to these training courses, and they provide them guidance on how to become a -- an effective leader, an effective supervisor.

BY MS. LAI:                                    01:38:54

Q   And so that training is where we would go look to see what they're supposed to do before they sign an I-213?

A   No, I --

MS. SAFAVI:  Objection; form.                01:38:59

Page 180

THE WITNESS:  No.  I mentioned that's where -- to become a good leader.  So training is usually, you know, for something like this, for a supervisor, is to say, Hey, this is what you're supposed to do and what look for, you know, through    01:39:07 other SDDOs that are there or through mentorship or through just guidance from a fellow supervisors that's been in -- in -- a supervisor longer.

BY MS. LAI:

Q   My question is, is there a document that one    01:39:18 could look at to see what supervisors are supposed to do before they sign an I-213?

A   No.

Q   Do you understand what I mean when I say Giglio impaired?    01:39:32

A   Yes, ma'am.

Q   Do you track officers who are Giglio impaired?

A   No.

Q   Does the agency -- has the agency conducted    01:39:39 any investigation of any of the incidents involving the people in this lawsuit that we discussed today?

A   What do you mean have they -- what do you mean by that?  Say --

Q   Any kind of internal investigation --    01:39:55

Page 181

MS. SAFAVI:  Objection --

BY MS. LAI:

Q    -- about Mr. Vasquez Perdomo or any of the people we've talked about today?

MS. SAFAVI:  Objection; form.                    01:40:04

THE WITNESS:  Investigating the?

BY MS. LAI:

Q    Whether the officer's conduct was proper.

A    There is currently no allegation, Fourth Amendment violations, pending from June 2025 to    01:40:14 present time.

Q    Okay.

A    There's only one that's currently pending, which I believe happened in December 17th, 2025. That is currently pending, and it has nothing to do    01:40:24 with these individuals.

Q    Okay.  So no other investigations about activities from June 2025 until present?

MS. SAFAVI:  Objection; form.

THE WITNESS:  No other violations of Fourth    01:40:34 Amendment.

BY MS. LAI:

Q    No other investigations involving violations of the Fourth Amendment from June 2025 to present; is that correct?                    01:40:45

Page 182

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

A    Correct, except the one that I mentioned.

Q    Okay.

A    Yes, ma'am.

Q    And what about in connection with Operation At Large?  I take it -- has the agency opened any investigation as to any incidents that were part of Operation At Large?    01:40:53

MS. SAFAVI:  Objection; form.

THE WITNESS:  I couldn't answer for CBP or border patrol, so in regards to ERO officers, no, ma'am.    01:41:05

BY MS. LAI:

Q    Has the agency learned of any incidents in Operation At Large or otherwise since June 2025 that would warrant an internal investigation?    01:41:16

MS. SAFAVI:  Objection; form.

THE WITNESS:  I can only answer for ERO Los Angeles.  No, I can't answer for any current, past misconduct that is done under Operation At Large for CBP/Border Patrol.  I can't answer to that.    01:41:30

BY MS. LAI:

Q    And your answer for ICE is no?

A    That's correct.

Q    Okay.  Has any discipline or consequence of    01:41:36

Page 183

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
Page ID #:18586

any kind been imposed in connection with ICE conduct

for Operation At Large or since June 2025 --

          MS. SAFAVI:  Objection; form.

BY MS. LAI:

     Q   -- for the violation of constitutional          01:41:51

rights?

     A   No, ma'am.

          MS. SAFAVI:  Same objection.

BY MS. LAI:

     Q   And have you been the subject of any --          01:42:00

          THE REPORTER:  I'm sorry.  Was the answer "I

don't know" or "No, ma'am"?

          THE WITNESS:  No, ma'am.

BY MS. LAI:

     Q   And this is a standard question.  Have you       01:42:01

been subject to any complaint or investigation in

your career?

     A   No, ma'am.

     Q   And what was the December 17th investigation

about?                                                    01:42:10

     A   Fourth Amendment violation.

     Q   Involving --

          MS. SAFAVI:  Objection --

BY MS. LAI:

     Q   -- what?                                         01:42:16

                                                   Page 184

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: Februray 3, 2026

NADIA NEWHART, CSR NO. 8714

Page 196

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.