# EXHIBIT 55

Sealed Version
Filed Separately

CONFIDENTIAL - UNDER PROTECTIVE ORDER

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

PEDRO VASQUEZ PERDOMO, ET AL.,   )
                                 )
          PLAINTIFFS,            ) CASE NO.
                                 ) 2:25-cv-05605
     VS.                         ) MEMF-SP
                                 )
KRISTI NOEM, SECRETARY OF        )
HOMELAND SECURITY, ET AL.,       )
                                 )
          DEFENDANTS.            )
_____ )

*** CONFIDENTIAL - UNDER PROTECTIVE ORDER ***

VIDEOTAPED DEPOSITION OF V███████ █ S████████

WEDNESDAY, DECEMBER 10, 2025

JOB NO.  7779909

REPORTED BY KIMBERLY EDELEN,

CSR. NO. 9042, CRR, RPR.

PAGES 1 - 358

Page 1

CONFIDENTIAL UNDER PROTECTIVE ORDER

                         I N D E X


    WITNESS                    EXAMINATION                    PAGE
    V▌▌▌▌▌ ▌ S▌▌▌▌▌▌
                               BY MS. LAI                       10
                               BY MS. XIAO                     253



                          E X H I B I T S


     NO.          PAGE        DESCRIPTION
    EXHIBIT 1      102        8-5-2025 E-MAIL RE: 3
                             NARRATIVES,
                             BATES NO. GOV-00000787
    EXHIBIT 2      138        PLAINTIFF CHIRLA'S
                             EXPEDITED REQUESTS FOR
                             PRODUCTION TO DEFENDANTS,
                             SET ONE

    EXHIBIT 3      175        "YANK TOW YARD"
                             TRANSCRIPTION,
                             BATES NOS.
                             GOV-00000952 - GOV-00000963
    EXHIBIT 4      180        BORDER PATROL REPORT OF
                             APPREHENSION OR SEIZURE,
                             BATES NOS.
                             GOV-00000490 - GOV-00000493

    EXHIBIT 5      208        POWERPOINT TITLED U.S.
                             CUSTOMS AND BORDER
                             PROTECTION, UNITED STATES
                             BORDER PATROL, OPERATION AT
                             LARGE, BATES NOS.
                             GOV-00000310 - GOV-00000316
    (EXHIBITS CONTINUED ON FOLLOWING PAGE)


                                              Page 5

CONFIDENTIAL UNDER PROTECTIVE ORDER

E X H I B I T S (CONTINUED)

| NO. | PAGE | DESCRIPTION |
|---|---|---|
| EXHIBIT 6 | 226 | E-MAIL THREAD RE: ROI FOR SURVEILLANCE ON [REDACTION] 2025 IN LOS ANGELES, CA, BATES NOS. GOV-00000791 - GOV-00000804 |
| EXHIBIT 7 | 230 | CBP EXECUTIVE SUMMARY, BATES NOS. GOV-00000317 - GOV-00000318 |
| EXHIBIT 8 | 230 | 8-5-2025 E-MAIL RE: ARREST NARRATIVES FOR REVIEW, BATES NOS. GOV-00000940 - GOV-00000942 |
| EXHIBIT 9 | 245 | CHAT LOG, BATES NOS. GOV-00000865 - GOV-00000871 |
| EXHIBIT 10 | 258 | POWERPOINT TITLED UNITED STATES BORDER PATROL TROJAN HORSE, HOME DEPOT, BATES NOS. GOV-00000359 - GOV-00000389 |
| EXHIBIT 11 | 262 | POWERPOINT TITLED U.S. CUSTOMS AND BORDER PROTECTION, UNITED STATES BORDER PATROL, OPERATION AT LARGE, BATES NOS. GOV-00000333 - GOV-00000339 |
| EXHIBIT 12 | 279 | SCREENSHOT OF CHAT LOG, BATES NO. GOV-00000950 |
| EXHIBIT 13 | 279 | SCREENSHOT OF CHAT LOG, BATES NO. GOV-00000951 |
| EXHIBIT 14 | 287 | 8-6-2025 E-MAIL RE: TIJERINO GARMENDIA 8-6-25, BATES NOS. GOV-00000944 - GOV-00000948 |

(EXHIBITS CONTINUED ON FOLLOWING PAGE)

Page 6

CONFIDENTIAL UNDER PROTECTIVE ORDER

E X H I B I T S (CONTINUED)

NO.              PAGE         DESCRIPTION

EXHIBIT 15       328          OPERATION AT LARGE –
                              LOS ANGELES, INFORMATION
                              SHEET, BATES NOS.
                              GOV-00000577 – GOV-00000579

EXHIBIT 16       330          EL CENTRO SECTOR MUSTER,
                              BATES NOS.
                              GOV-00000001 – GOV-00000003

EXHIBIT 17       336          EL CENTRO SECTOR MUSTER,
                              BATES NOS.
                              GOV-00000004 – GOV-00000005


QUESTIONS INSTRUCTED NOT TO BE ANSWERED
                 PAGE         LINE
                  61           22
                 214            8
                 215            9
                 228           15
                 229           13
                 264           21
                 302            8
                 304           21
                 312            6
                 327            7

Page 7

CONFIDENTIAL UNDER PROTECTIVE ORDER

Q    Okay.  And were you asked to look for any documents that you tried to find but no longer exist?

A    No.

Q    All right.  Mr. S███████, I am going to switch gears and ask you some questions about your employment.

So how long have you been with the Border Patrol?

A    A little over 15 years.

Q    Okay.  And other than the Border Patrol, have you worked for the federal government in any other capacity?

A    No.

Q    And can you confirm your current title and position with the Border Patrol.

A    Supervisory Border Patrol agent is my title, a supervisor.

Q    And you are assigned to a particular sector, I take it?

A    Yes.

Q    Which sector?

A    El Centro sector.

Q    Are you assigned to a station within that sector?

09:47:19
09:47:25
09:47:28
09:47:29
09:47:33
09:47:37
09:47:40
09:47:41
09:47:42
09:47:45
09:47:46
09:47:51
09:47:53
09:47:54
09:47:56
09:48:00
09:48:02
09:48:05
09:48:07
09:48:10
09:48:11
09:48:12
09:48:13
09:48:15
09:48:17

Page 27

CONFIDENTIAL – UNDER PROTECTIVE ORDER

Q    Yes.

Is the analysis of whether somebody might be an unauthorized immigrant, for example, the factors you would consider, any different in the Los Angeles area?

A    No.

Q    Have you -- actually, I'm going to skip that.

Are you aware in this lawsuit that the government is taking a position that apparent ethnicity, such as apparent Mexican ancestry, can be relevant to developing reasonable suspicion?

MR. ROSS:  Objection.

THE WITNESS:  Am I aware that that's the -- what their -- the government is saying?

BY MS. LAI:

Q    Yes.

A    I wasn't aware of that.

Q    Okay.  You can verify this later, but for purposes of this question, let's assume that's true.

Do you agree with that?

A    Yes.

Q    In what way?

A    It could be one of many articulable facts to develop my reasonable suspicion.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL UNDER PROTECTIVE ORDER

Q    Can you give me an example?                          12:08:44

A    It could be used to -- depending on the             12:08:51

population percentage in a certain area, if I see        12:08:55

somebody wearing a burqa I would probably assume         12:09:02

that they might not be a native of the                   12:09:07

United States.                                           12:09:10

Q    Any other example of how apparent ethnicity         12:09:10

or apparent Mexican ancestry would be relevant to        12:09:13

developing reasonable suspicion that somebody is an      12:09:16

unauthorized immigrant?                                  12:09:20

A    I can't think of one now.                           12:09:21

Q    And you said it is relevant.                        12:09:23

Are there any geographic areas where it is               12:09:27

not relevant or more relevant?                           12:09:33

MR. ROSS:  Objection.                                    12:09:38

THE WITNESS:  Yeah, I wouldn't know how to               12:09:40

answer that.                                             12:09:41

BY MS. LAI:                                               12:09:42

Q    When you said it's relevant, would it be            12:09:43

relevant near the border?                                12:09:46

A    It would probably bear less of a -- less            12:09:51

weight in developing RS near the border than, like,      12:09:55

maybe the northern border.  It would probably be         12:09:58

more of a stronger factor to use.                        12:10:02

Q    And what about in the Los Angeles area,             12:10:05

Page 129

CONFIDENTIAL UNDER PROTECTIVE ORDER

would it be relevant?
12:10:07

A   I think it could be used as one of the multiple or articulable facts.
12:10:11
12:10:13

Q   And you said you didn't know that the government was taking this position before.  So when you tell me it could be relevant, are you speaking from your own personal experience or anything that you've heard at Border Patrol?
12:10:18
12:10:20
12:10:23
12:10:26
12:10:28

A   It'd be my own personal experience.
12:10:30

Q   What about anything you've heard at Border Patrol, is there anything that informs this discussion we're having, any conversations with anybody else at Border Patrol, any materials you've seen?
12:10:33
12:10:35
12:10:40
12:10:43
12:10:47

A   That lead me to believe that that's accurate?
12:10:50
12:10:52

Q   Yes.
12:10:53

A   I mean, I know from -- from training, that that is one of the articulable facts that can be used but more so from experience.
12:10:55
12:10:58
12:11:02

Q   And does this include your experience in Operation At Large?
12:11:06
12:11:08

A   Yes.
12:11:12

Q   In what way?  Can you think of an example?
12:11:14

A   That ethnic background bears weight.  It's
12:11:17

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

a -- maybe think of the locations where -- or the    12:11:20

people that we've apprehended, where they're from.    12:11:30

Q    Any other way?    12:11:37

A    I can't think of right now.    12:11:40

Q    You indicated that it could be relevant to    12:11:41

developing reasonable suspicion.  That would be    12:11:44

before an apprehension, correct?    12:11:46

A    Uh-huh.    12:11:48

Q    So in what way would it be relevant, for    12:11:48

example, at Operation At Large?    12:11:52

A    That one particular -- just the one    12:11:58

articulable fact?    12:12:02

Q    Yes.  Apparent ethnicity or apparent    12:12:03

Mexican ancestry.    12:12:06

A    I mean, I wouldn't even know that I would    12:12:08

just define it as that because I wouldn't -- I don't    12:12:10

really see a difference, like, if they're Honduran    12:12:12

or Mexican or Guatemalan.  I'd just say, like,    12:12:15

Hispanic ethnicity.    12:12:19

Q    Okay.    12:12:22

A    How would that be relevant?    12:12:22

I would think -- well, No. 1, the number of    12:12:23

people the previous years that entered the country,    12:12:25

the majority were from Latin American countries so    12:12:27

that could be a determining factor.    12:12:31

Page 131

CONFIDENTIAL - UNDER PROTECTIVE ORDER

Q    And how do you know that?    12:12:34

A    I worked it.    12:12:36

Q    Okay.  Anything other than your personal    12:12:37
experience?    12:12:39

A    I haven't looked up specific numbers or    12:12:41
anything.  I'm going from my personal experience.    12:12:44

Q    Okay.  I think earlier you started to say    12:12:50
location.    12:12:52

Is there a relationship between location    12:12:52
and apparent ethnicity or, for example, Hispanic    12:12:54
ethnicity?    12:13:00

A    Can you ask that again.    12:13:11

Q    Yes.    12:13:12

I may have misheard you, but I thought    12:13:13
earlier when I was asking you about apparent    12:13:15
ethnicity or Hispanic ethnicity that you started to    12:13:17
say location.    12:13:21

Is there a relationship between a location,    12:13:22
for example, in the Los Angeles area, and Hispanic    12:13:26
ethnicity?    12:13:31

A    Is there a relationship?    12:13:32

Q    Yes, that would be relevant to reasonable    12:13:33
suspicion.    12:13:35

A    Oh, no, I think I was mentioning, like,    12:13:36
location being, like, proximity to the border and    12:13:38

Page 132

Hispanic ethnicity as opposed to if you're at the          12:13:42

northern border.                                            12:13:45

    Q    Okay.  What about particular kinds of            12:13:45

locations, not like proximity to the border, but a          12:13:47

car wash or a Home Depot or other public access             12:13:51

area, is there a relationship between Hispanic              12:13:54

ethnicity, that kind of location and reasonable             12:13:58

suspicion?                                                  12:14:01

    A    My personal experience.                          12:14:03

    Q    Yes.                                              12:14:05

    A    I mean, the apprehensions that I've              12:14:06

personally made at those locations are                      12:14:09

overwhelmingly Hispanic.                                    12:14:11

    Q    Is there any relationship as it relates to       12:14:13

developing reasonable suspicion as opposed to who           12:14:18

ends up being arrested?                                     12:14:22

    A    Based on ethnicity alone?                        12:14:25

    Q    Ethnicity, if there's relationship with         12:14:27

ethnicity to a location like a car wash.                    12:14:30

         I'm trying to better understand how you           12:14:35

think about reasonable suspicion.                           12:14:37

    A    Well, I mean, the totality of                    12:14:39

circumstances.  It's not just those two factors            12:14:41

alone.  The behavior of the person, again, their           12:14:44

appearance, their clothing can all be added together        12:14:47

Page 133

CONFIDENTIAL - UNDER PROTECTIVE ORDER

to build that reasonable suspicion.                    12:14:50

Q    Okay.  And part of that totality of the      12:14:52

circumstances could be a person's apparent Hispanic    12:14:55

or other ethnicity?                                    12:14:59

A    That could be one of the other factors.      12:15:01

Q    Okay.  I think you said earlier you          12:15:03

mentioned to a burqa.  How is a burqa -- how is that   12:15:07

related to somebody's ethnicity?                       12:15:10

A    Well, not Hispanic, obviously, but mostly    12:15:13

going to be -- the majority of people who wear those   12:15:16

are non-native to the United States.                   12:15:22

Q    And do you rely on other kinds of clothing   12:15:23

or things that people wear to kind of understand       12:15:27

somebody's ethnicity?                                  12:15:30

A    Yeah.  If they got, like, a Mexican soccer   12:15:34

team jersey, I could probably infer that they might    12:15:37

be a fan of that soccer team jersey -- or that team.   12:15:41

They might be from that particular place.              12:15:45

Q    Anything else?  Nothing on the soccer.       12:15:49

A    Sorry.  Yeah.                                 12:15:54

No, I can't -- I can't think of it.               12:15:55

Q    Okay.  And do you have any knowledge or      12:15:57

understanding of the percentage of Hispanic            12:16:03

individuals in the Los Angeles area that would be      12:16:07

unauthorized immigrants as opposed to citizens or      12:16:11

Page 134

CONFIDENTIAL - UNDER PROTECTIVE ORDER

legal residents?                                      12:16:13

     A    It's about 10 percent.                      12:16:14

     Q    10 percent of Hispanic individuals --       12:16:16

     A    Of illegal aliens in the area.              12:16:21

     Q    In the Los Angeles area?                    12:16:23

     A    Yes.                                         12:16:24

     Q    And you're talking about the seven          12:16:25

counties?                                             12:16:26

     A    I believe so, uh-huh.                        12:16:27

     Q    And does it matter what the percentage of   12:16:30

individuals who are, you know, particular ethnicity   12:16:32

are unauthorized or not for the reasonable suspicion  12:16:36

analysis?                                             12:16:38

          MR. ROSS:  Objection.                       12:16:40

          THE WITNESS:  Can you -- can you ask that   12:16:43

again.                                                12:16:44

BY MS. LAI:                                            12:16:44

     Q    Yes.                                         12:16:45

          Is it relevant to you the percentage of     12:16:46

individuals who are, for example, of Hispanic         12:16:51

ethnicity who are unauthorized versus U.S. citizens   12:16:54

or legal residents?                                   12:16:58

          MR. ROSS:  Objection.                       12:16:59

          THE WITNESS:  You're still asking           12:17:04

specifically about Hispanic?                          12:17:05

Page 135

BY MS. LAI:                                                    12:17:06

Q    Yes.                                                      12:17:07

A    I'm not -- I'm not sure I'm tracking your                12:17:07
question.                                                     12:17:09

Q    Does it matter whether it's relevant to                 12:17:10
reasonable suspicion if -- I'm going to take as an            12:17:13
example somebody is of Hispanic ethnicity in this            12:17:16
example -- the percentage of people who are of               12:17:21
Hispanic ethnicity in the Los Angeles area that are          12:17:24
unauthorized as opposed to U.S. citizens or legally          12:17:27
present, does that matter for the reasonable                 12:17:30
suspicion calculus?                                          12:17:33

        MR. ROSS:  Objection.                                12:17:34

        THE WITNESS:  If it matters, I'm not sure            12:17:37
it could be used as a -- as an articulable fact.             12:17:39
I'm not sure if -- again, I'm not understanding your         12:17:42
question.  But I think it could be used as an                12:17:46
articulable fact if you know what percentages those          12:17:48
are.                                                         12:17:51

BY MS. LAI:                                                   12:17:52

Q    If I told you that a high percentage of                 12:17:53
people who are Hispanic are legally present or               12:17:55
U.S. citizens, would that make you rethink whether           12:17:58
Hispanic ethnicity should be part of your reasonable         12:18:04
suspicion calculus?                                          12:18:07

Page 136

CONFIDENTIAL - UNDER PROTECTIVE ORDER

MR. ROSS:  Objection.                                  12:18:09

THE WITNESS:  I still think it could be one             12:18:12

of -- one articulable fact.                             12:18:14

BY MS. LAI:                                             12:18:16

Q    Okay.  Do you know if anyone else at the          12:18:19

agency shares your view?                               12:18:24

MR. ROSS:  Objection.                                  12:18:25

THE WITNESS:  I wouldn't know.                          12:18:26

MS. LAI:  Okay.  Apart -- I think -- I                  12:18:28

think we should probably take a lunch break.  This     12:18:33

is a good stopping point.  I was going to change        12:18:35

topics.                                                12:18:37

THE WITNESS:  Okay.                                     12:18:38

MS. LAI:  Thank you for your time --                    12:18:39

THE WITNESS:  Of course.                                12:18:41

MS. LAI:  -- Agent S██████.  We will see                12:18:41

you after lunch.                                       12:18:42

THE WITNESS:  Yes.                                      12:18:43

MS. LAI:  Please have a good lunch.                     12:18:43

THE WITNESS:  Thank you.                                12:18:45

THE VIDEOGRAPHER:  The time is 12:18 p.m.               12:18:46

Off record.                                            12:18:47

(Lunch recess taken at 12:18 p.m.)

\\\

Page 137

CONFIDENTIAL - UNDER PROTECTIVE ORDER

A    I don't recall if at that time or not we    13:50:53

had Air and Marine Operations which would be, like,    13:50:58

the helicopter.  I don't know if we had them yet.    13:51:01

I mean, I'm sure they were available to us but I    13:51:04

don't recall using them much.  Mostly for our air,    13:51:07

we had the drill, which was Border Patrol.    13:51:10

Q    Okay.  Let's go to Yank Towing.  That's the    13:51:20

operation under small letter b. in the document we    13:51:23

just looked at.    13:51:27

       Do you recall being involved in that    13:51:28

operation at Yank Towing in June?    13:51:29

A    I think so.  I don't recall if that was the    13:51:32

name of the place, but if you have the information,    13:51:35

would you be able to tell me what street it was on?    13:51:38

Q    I do have that information.  Let me see if    13:51:43

I can refresh your recollection.    13:51:46

       This is a business in Montebello,    13:51:49

California.  Do you recall being in the City of    13:51:51

Montebello in June?    13:51:53

A    Not -- not by the name specifically.    13:51:55

Q    How about Olympic Parkway?    13:51:58

A    Yes.  Olympic.    13:51:59

Q    Okay.  What do you recall about the    13:52:01

operation at Olympic Parkway?    13:52:03

A    It wasn't set to be specifically at that    13:52:08

Page 144

place.  It was just we were just patrolling the city    13:52:11

of Montebello.    13:52:15

Q    Would it be fair to say you were out on a    13:52:16

roving patrol?    13:52:18

MR. ROSS:  Objection.    13:52:19

MS. LAI:  Let me re-ask the question in a    13:52:31

clearer way.    13:52:33

BY MS. LAI:    13:52:34

Q    When you say that you were just out there    13:52:35

not at a specific location, tell me what you mean.    13:52:37

A    We were assigned that area.    13:52:41

And this was still in June, correct?    13:52:43

Q    Yes.    13:52:44

A    Yeah, so that was prior to the TRO so I    13:52:46

believe it might have been that.  I don't recall    13:52:49

exactly.  We were out in that area looking for --    13:52:51

for aliens.    13:52:55

Q    Understood.    13:52:56

In the -- when you say you were out in that    13:52:58

area, do you mean the city of Montebello?    13:53:00

A    Yes.    13:53:03

Q    Any area more specific like a particular    13:53:05

part of Montebello that you were asked to go to?    13:53:08

A    I might have been asked to go to a certain    13:53:14

area but I don't recall exactly what part of town to    13:53:16

Page 145

CONFIDENTIAL - UNDER PROTECTIVE ORDER

go.

13:53:19

        Q    Were you given any direction to go to that particular location on Olympic Parkway?

13:53:20
13:53:22

        A    Not from Border Patrol.

13:53:34

        Q    Okay.  And when you say "not from Border Patrol," was there someone else you received the direction from to go to that specific location?

13:53:38
13:53:46
13:53:49

        A    One of the agents in my team had a friend that lived in the area and told him go check that spot out, that -- that area there.

13:53:53
13:53:56
13:53:59

        Q    What information was conveyed to you by the agent on your team that the friend had that informed the suggestion to go to that location?

13:54:03
13:54:08
13:54:12

            MR. ROSS:  Objection.

13:54:15

            THE WITNESS:  What information?

13:54:20

            He just -- I think he said his friend knows the area well and knows that it's high probability of aliens there.

13:54:21
13:54:24
13:54:28

BY MS. LAI:

13:54:29

        Q    And when you say "there," what is "there"?

13:54:30

        A    Location.

13:54:35

        Q    We were talking about --

13:54:37

        A    The general area.

13:54:38

        Q    Okay.  Do you mean that particular neighborhood, cross streets?

13:54:39
13:54:46

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - UNDER PROTECTIVE ORDER

A    I believe they mentioned, like, the -- that avenue or parkway.

Q    Anything more specific?

A    Not that I can recall.  This was, like, second- or third-hand.  I had a buddy of mine in the area says, Go check out this general area here.

I mean, I can explain to you how that came up.

Q    Please.

A    So, yeah, one of my agents had a friend, Go check out this area.  I said, Just give me, like -- just pick a spot on the map so we can head to that general area.  And that was -- that was how that came up.

Q    Is that a conversation you had with a friend of your agent or --

A    No.

Q    -- with your agent?

A    With the agent.

Q    Okay.  This process of somebody providing information that was a friend of an agent or someone outside of Border Patrol, did that happen any other time, a suggestion to go to a particular location?

MR. ROSS:  Objection.

THE WITNESS:  I mean, it happened to us

Page 147

MS. LAI:  Yes.          14:45:41

BY MS. LAI:          14:45:41

Q    This is a narrative attached to an I-44.          14:45:44

Is there understanding that this narrative          14:45:47
should contain the justification for a stop or          14:45:50
arrest if that occurred?          14:45:54

A    Yes.  Or I'm not sure that one could write          14:46:01
all of the totality of the circumstances in one          14:46:05
page.          14:46:10

Q    Okay.  Have you heard anything at the          14:46:11
agency that suggests that a narrative should contain          14:46:15
the justification for a stop or an arrest?          14:46:19

A    I don't -- I'm not sure.  I don't recall.          14:46:34
It's, you know...          14:46:36

Q    Okay.  I'm almost done with this document.          14:46:39

Do you see the language here that says --          14:46:42
Agent P███ said that "RAMIREZ began shouting in          14:46:44
Spanish which further raised my suspicion."          14:46:55

Do you see that?          14:46:57

A    Yes.          14:47:07

Q    So do you -- do you agree with that          14:47:12
statement that shouting in Spanish can raise the          14:47:17
suspicion of an agent?          14:47:20

A    I believe that shouting in Spanish can be          14:47:26
an articulable fact to assist in reasonable          14:47:28

Page 187

CONFIDENTIAL - UNDER PROTECTIVE ORDER

suspicion, yes.

Q   If agents spoke to Ms. Ramirez in Spanish and he responds in Spanish, would that change your view?

A   No.

Q   And then do you see how he says "I asked RAMIREZ, in the Spanish language, what county he was a citizen of to which he refused to answer"?

A   I see that, uh-huh.

Q   At that point does Agent P██ have probable cause to arrest Mr. Ramirez?

MR. ROSS:  Objection.

THE WITNESS:  I mean, again, I don't know the totality of the circumstances.  I wasn't there so I wouldn't be able to speak on his behalf.

BY MS. LAI:

Q   Based on the information in the document, do you believe that at that point there's enough that's been articulated to justify an arrest?

MR. ROSS:  Objection.

THE WITNESS:  I think at a very minimum, he has enough to further investigate.

BY MS. LAI:

Q   Okay.  And do you see where he says he attempts to place him in handcuffs?  We looked at

Page 188

CONFIDENTIAL - UNDER PROTECTIVE ORDER

was asking for the -- for the owner of the vehicle.    15:40:23

I went and I flagged him down.  He came.  The guy    15:40:25

opened the car, got out.    15:40:28

        That was my extensive involvement in that    15:40:32

arrest.    15:40:35

    Q    Do you know if he had actually locked    15:40:37

himself in the vehicle?  In other words, do you know    15:40:40

if he had locked the door?    15:40:41

    A    I mean, I didn't go check myself and    15:40:44

verify, but that's what the agents were relaying.    15:40:46

    Q    Okay.  You can take a look at this document    15:40:48

which has been marked as Exhibit 5.    15:40:53

                (Deposition Exhibit 5    15:40:55

            was marked for identification.)    15:40:55

BY MS. LAI:    15:41:01

    Q    Do you recognize what type of document this    15:41:02

is?    15:41:03

    A    It looks like a PowerPoint.    15:41:04

    Q    What type of PowerPoint?    15:41:09

    A    It was part of the PowerPoint presentation    15:41:12

given to us prior to the strikes.    15:41:14

    Q    Okay.  Is this a PowerPoint presentation    15:41:17

you would have received on that day?    15:41:21

    A    I believe so, yes.    15:41:22

    Q    Do you know whether or not you retained or    15:41:25

Page 208

CONFIDENTIAL - UNDER PROTECTIVE ORDER

were given a copy?    15:41:27

A    I don't remember if one was sent to me    15:41:29

specifically or not.    15:41:31

Q    Well, you participated in this operation.    15:41:37

Do you remember if in the vehicle on the way to the    15:41:39

operation you had this document with you on your    15:41:42

person?    15:41:45

A    I don't remember.    15:41:47

Q    If you did have the document with on you    15:41:50

your person, would you have taken it out of the    15:41:51

vehicle?    15:41:53

A    Oh, I didn't have it printed out for sure,    15:41:54

yeah.  No, I didn't have it.    15:41:59

Q    Did you have any notes with you?    15:42:01

A    No.    15:42:02

Q    Photographs?    15:42:03

A    No.    15:42:04

Q    Is this typical of the type of briefing you    15:42:09

would have received prior to strike operations in    15:42:13

July and August?    15:42:15

A    This is part of the briefing we would have    15:42:17

received.    15:42:19

Q    Can you turn to Page 2 for me of the    15:42:20

document.    15:42:25

A    Uh-huh.    15:42:26

Page 209

CONFIDENTIAL - UNDER PROTECTIVE ORDER

(Deposition Exhibit 7                        16:06:11

was marked for identification.)              16:06:11

BY MS. LAI:                                      16:06:40

    Q    Do you recognize Exhibit 7, Agent S███████?    16:06:40

    A    I think this might be the first time I see    16:06:46

this.                                               16:06:48

    Q    Have you seen this type of document before?    16:06:50

    A    An Executive Summary?  Maybe.  I'm not    16:06:55

sure.                                               16:07:00

    Q    Do you see toward the top of the document    16:07:01

where it has a number for daily arrests and total    16:07:03

arrests?                                            16:07:07

    A    I see that.                               16:07:08

    Q    Have you seen documents that have this kind    16:07:09

of information before?                              16:07:11

    A    Not like this.                           16:07:17

    Q    Okay.  You can set that document aside.    16:07:18

         We're going to ask the court reporter to    16:07:21

mark Exhibit 8.                                     16:07:22

             (Deposition Exhibit 8                 16:07:36

             was marked for identification.)       16:07:36

BY MS. LAI:                                          16:07:36

    Q    You can take a moment to review it.       16:07:37

         Do you recognize Exhibit 8 as an e-mail you    16:08:12

sent with an attachment?                            16:08:15

Page 230

CONFIDENTIAL - UNDER PROTECTIVE ORDER

A    Yes.    16:08:17

Q    What would be the reason -- well, so I    16:08:19
understand that one of these individuals was an    16:08:23
individual that you arrested, the person you were    16:08:27
describing before, and there are other individuals    16:08:30
who were arrested during this operation whose arrest    16:08:32
narratives are attached to your e-mail; is that    16:08:36
correct?    16:08:38

A    Yes.    16:08:38

Q    What would be the reason that you are the    16:08:40
one sending this e-mail with all the narratives to    16:08:42
Mr. T█████?    16:08:46

A    Because I've reviewed the narratives.    16:08:48

Q    And were these individuals arrested by    16:08:50
agents that were part of the team you were    16:08:53
supervising?    16:08:55

A    Yes.    16:09:02

Q    Okay.  I'd like you to turn to one of the    16:09:03
narratives, which is the narratives -- the narrative    16:09:05
describing the arrest that you conducted.    16:09:08

A    Yes.    16:09:11

Q    It appears on the next two pages.    16:09:12

     Is this a narrative that you drafted?    16:09:16

A    Yes.    16:09:19

Q    Please take a close look, is there anything    16:09:22

Page 231

CONFIDENTIAL - UNDER PROTECTIVE ORDER

that's not accurate in this narrative?    16:09:24

A    I think just the -- the time of how the    16:10:56

arrest went.  When I asked him where he was from, he    16:11:03

claimed Mexico.  And then at that point I turned him    16:11:08

over to agents to secure him while I finished the --    16:11:10

the operation there.    16:11:12

It was later when I interviewed him that he    16:11:15

admitted that he was from Mexico --    16:11:18

Q    Okay.    16:11:20

A    -- or, I'm sorry, that he was illegally    16:11:20

present in the United States.    16:11:22

Q    Thank you.    16:11:23

Is there anything else that is not    16:11:24

accurate?    16:11:26

A    I don't believe so.    16:11:48

Q    Okay.  I did notice that some of the    16:11:52

language in this narrative looks identical to other    16:11:56

narratives I've seen.    16:12:00

A    Uh-huh.    16:12:02

Q    Did you, as part of the process of drafting    16:12:03

this narrative, do any kind of, like, cut and paste?    16:12:05

A    Yes.    16:12:08

Q    Can you describe that for me?  What is the    16:12:09

cut-and-paste process?    16:12:13

A    Some of the verbiage describing the extent    16:12:17

Page 232

CONFIDENTIAL - UNDER PROTECTIVE ORDER

of the operation and the purpose of the operation

kind of remains the same for all of them.  What

changes is obviously locations, people, encounters.

Q    What about the fourth paragraph on the

first page of the narrative about your years of

experience, would that be something that would be

cut and paste?

A    No.  I would have updated that.  But this

was prior to me having 15 years, so it's 14 years.

Q    That's fair.

Okay.  I think on that first page in the

second paragraph, there's something called ATrac.

Do you know what that is?

A    Alien Tracker.

Q    Is that something you've used?

A    Not personally, no.

Q    Is it something anybody else you know has

used?

A    I'm not sure.

Q    Have you even seen the ATrac system?

A    I'm not sure.  I don't recall seeing it.

Q    All right.  I think I recall from

information in this case that you put -- I think you

said earlier you put your hands on this individual

when you made contact with him.

Page 233

CONFIDENTIAL - UNDER PROTECTIVE ORDER

My recollection is that you put your hands                16:13:51

on before you asked him his citizenship.                  16:13:54

Is that what your recollection is?                        16:13:57

A     I think so, yes.                                     16:13:59

Q     Once you asked him his citizenship, as you          16:14:01

indicated earlier, he said Mexico; is that correct?       16:14:03

A     Uh-huh.                                              16:14:06

Q     And then you handed him off to other                16:14:06

agents?                                                   16:14:08

A     Yes.                                                 16:14:09

Q     When you handed him off to other agents,            16:14:09

was your intent that he would be arrested?                16:14:11

A     That he would be secured to further                 16:14:13

investigate his status.                                   16:14:18

Q     How would he be secured?                            16:14:19

MR. ROSS:  Objection.                                     16:14:21

THE WITNESS:  Pat down, make sure he's got                16:14:24

no weapons.  If the agents that now have custody of       16:14:25

him think he needs to be handcuffed, handcuff him,        16:14:30

put him in a secure location where he's not going to      16:14:33

get up and run.                                           16:14:36

BY MS. LAI:                                                16:14:37

Q     When you handed him off, do you have an             16:14:37

awareness of whether he was handcuffed?                   16:14:39

A     I don't recall.                                      16:14:41

Page 234

CONFIDENTIAL - UNDER PROTECTIVE ORDER

Q    Do you know if he was placed in a vehicle?    16:14:42

A    He was.  I didn't see it happen, but he was    16:14:46
then transported to a secondary location so he must    16:14:48
have, yes.    16:14:51

Q    When you handed him off, did you have any    16:14:52
idea who he was?    16:14:54

A    Not at the time, no.    16:14:56

Q    Did you know his name?    16:14:58

A    Not at the time, no.    16:14:59

Q    Would this be true for other operations as    16:15:04
well, where a person is handed off or detained,    16:15:06
handcuffed without knowing their name?    16:15:14

MR. ROSS:  Objection.    16:15:18

THE WITNESS:  Ask me again.    16:15:25

BY MS. LAI:    16:15:26

Q    Yes.    16:15:27

Is this something you recall happening at    16:15:28
other operations as well, where somebody would be    16:15:29
restrained without knowing their -- without the    16:15:32
agent knowing their name?    16:15:36

MR. ROSS:  Objection.    16:15:37

THE WITNESS:  If they're -- if the subject    16:15:39
is being detained, he can be handcuffed prior to    16:15:41
knowing their name.    16:15:45

\\\

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL - UNDER PROTECTIVE ORDER

BY MS. LAI:                                                        16:15:46

    Q    I think my question is a little different.             16:15:46

It's about what you observed or experienced on these            16:15:48

operations.                                                      16:15:51

    A    Uh-huh.                                                 16:15:51

    Q    Did you observe or experience individuals              16:15:52

being restrained without Border Patrol knowing their            16:15:53

name?                                                            16:15:56

    A    Probably.                                               16:15:58

    Q    And what about other ways to identify him,             16:16:02

did you attempt to identify him using any other                 16:16:05

technology or information prior to handing him off?             16:16:08

    A    No.                                                     16:16:12

    Q    On the part of the narrative on the final              16:16:22

page, I think it's the second page, do you see how              16:16:27

the narrative indicates that this individual,                   16:16:33

Mr. Z████, was arrested without a warrant?                     16:16:36

    A    Yes.                                                    16:16:40

    Q    Is that accurate?                                       16:16:40

    A    That he was arrested without a warrant?                16:16:42

    Q    Yes.                                                    16:16:44

    A    So it wasn't until later.  Because the name            16:16:48

he gave me wasn't his true name so it wasn't until             16:16:50

later that we found out he was, in fact, a target,             16:16:55

but at the time he was arrested, not -- the warrant            16:16:57

                                                    Page 236

CONFIDENTIAL - UNDER PROTECTIVE ORDER

was not given to him.                                16:17:01

Q    Just so the record is clear, is there some    16:17:03

period after which you -- after you handed him off    16:17:04

where you interviewed him?                           16:17:06

A    Yes.                                            16:17:08

Q    When was that?                                 16:17:09

A    Once we got to the secondary location          16:17:12

before he went to transport.                         16:17:13

Q    Okay.  And he did not have a warrant; is       16:17:15

that correct?                                        16:17:21

A    I don't recall.                                16:17:25

Q    Do you have any reason to believe your         16:17:28

narrative report is not accurate?                    16:17:30

A    I think with the information I had at the       16:17:35

time, that was the name he gave me, but I don't -- I  16:17:37

don't think so.  I don't recall if he had a warrant   16:17:42

or not.                                              16:17:44

Q    I think my question is:  Do you have any       16:17:46

information to believe that this report that you      16:17:48

wrote close in time to the event was not accurate?    16:17:52

A    Do I have any information now?                  16:17:57

Q    Yes.  Or reading the report, that he did       16:17:59

not have -- that there was no warrant.               16:18:02

MR. ROSS:  Objection.                                16:18:06

THE WITNESS:  I mean, again, I don't recall          16:18:06

Page 237

CONFIDENTIAL - UNDER PROTECTIVE ORDER

if there was one or not, there was a warrant for him    16:18:08

or not.    16:18:11

BY MS. LAI:    16:18:14

Q    Do you see the paragraph second to last    16:18:14

where it says "Due to Z██████s attempt to evade"?    16:18:16

A    Yes.    16:18:21

Q    Why is this information there?    16:18:22

A    Because I'm establishing that I arrested    16:18:25

him without a warrant.    16:18:27

Q    And is there any other reason why this    16:18:30

information is in your narrative?    16:18:33

A    Because I'm establishing that I -- I didn't    16:18:39

have a warrant.    16:18:41

Q    Are you trying to establish anything else    16:18:44

with this information?    16:18:46

A    Well, I'm establishing why -- why I'm    16:18:52

making a warrantless arrest.    16:18:55

Q    Can you explain that for me?    16:18:57

MR. ROSS:  Objection.    16:18:59

BY MS. LAI:    16:19:20

Q    Okay.  Is there -- the sentence -- I just    16:19:20

read the complete sentence.  Is there anything other    16:19:23

than what's in the sentence that establishes why you    16:19:28

made a warrantless arrest?    16:19:30

MR. ROSS:  Objection.  Which sentence?    16:19:32

Page 238

CONFIDENTIAL - UNDER PROTECTIVE ORDER

BY MS. LAI:    16:19:35

Q    This is the sentence that starts "Due to    16:19:36

Z███████'s attempt to evade."    16:19:38

A    Are you saying are those all the factors    16:19:58

why?    16:20:01

Q    I'm asking if this sentence describes    16:20:01

the -- you said you were establishing why you made a    16:20:05

warrantless arrest.    16:20:10

If this sentence describes the universe of    16:20:11

information that justifies the warrantless arrest?    16:20:14

A    I --    16:20:21

MR. ROSS:  Objection.    16:20:21

You can answer if you understand.    16:20:22

THE WITNESS:  Yeah.  I believe so, yes.    16:20:23

BY MS. LAI:    16:20:26

Q    This language in this sentence, is this    16:20:26

language you've seen in other narratives?    16:20:29

A    Parts of it, yes.    16:20:34

Q    What parts?    16:20:36

A    "Unlawful presence," I mean, verbiage is    16:20:36

commonly used by law enforcement.    16:20:44

Q    Is this verbiage that you commonly use in    16:20:48

your own arrest narratives?    16:20:51

MR. ROSS:  Objection.    16:20:53

THE WITNESS:  It is verbiage I use when it    16:20:57

Page 239

CONFIDENTIAL - UNDER PROTECTIVE ORDER

applies.                                                  16:21:00

BY MS. LAI:                                               16:21:05

Q    Okay.  And you've seen this in other                16:21:05

agents' arrest narratives; is that correct?              16:21:07

A    I have seen their explanation as to why             16:21:09

they executed a warrantless arrest.                      16:21:11

Q    Is their verbiage that you've seen in other         16:21:14

arrest narratives, that's similar to this verbiage?      16:21:17

A    It might be similar.  Maybe.  I don't know.          16:21:20

Q    You've -- in your capacity as supervisor            16:21:22

for Operation At Large, you've seen many arrest          16:21:24

narratives; is that correct?                             16:21:26

A    I've seen a few, yes.                                16:21:27

Q    Okay.  I want to ask a little bit about the         16:21:30

second individual that you encountered in this           16:21:32

operation.                                               16:21:41

You said you questioned somebody; is that                16:21:41

correct?                                                 16:21:43

A    Yes.                                                 16:21:43

Q    I think I recall that you asked him his             16:21:46

citizenship.                                             16:21:48

Do you recall that?                                      16:21:50

A    The second subject?                                 16:21:51

Q    Yes.                                                16:21:52

A    Yes.                                                16:21:54

Page 240