UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Pedro VASQUEZ PERDOMO, et al., | Case No. 2:25-cv-05605-MEMF-SP |
| Plaintiffs, | **[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION** |
| vs. | |
| Markwayne MULLIN, in his official capacity as Secretary, Department of Homeland Security, et al., | Judge:    Hon. Maame Ewusi-Mensah Frimpong |
| Defendants. | |

On July 27, 2026, Plaintiffs Pedro Vasquez Perdomo, Carlos Alexander Osorto, Isaac Villegas Molina, Jorge Hernandez Viramontes, Jason Brian Gavidia, Los Angeles Worker Center Network, United Farm Workers, and Coalition for Humane Immigrant Rights (collectively, "Stop/Arrest Plaintiffs" or "Plaintiffs") filed a Motion for Preliminary Injunction re: Suspicionless Stops and Violation of Equal Protection ("Motion").  ECF ___.  Having considered the parties' papers and the arguments of counsel, and for the reasons stated herein, the Court GRANTS the Motion.

The Court finds that Plaintiffs have demonstrated a strong likelihood of success on the merits of their claim that Defendants have an officially sanctioned policy and practice of

conducting suspicionless and discriminatory stops of individuals who appear Latino and are low-income or working-class, rather than developing particularized suspicion that they are not lawfully present in the United States, in violation of the Fourth Amendment's prohibition against unreasonable search and seizure and the Fifth Amendment's guarantee of equal protection. The Court further finds that, absent interim injunctive relief, Plaintiffs face immediate, irreparable harm, and that the balance of the equities and the public interest favor such relief.

That the Supreme Court stayed this Court's temporary restraining order (TRO) last year does not bar the relief Plaintiffs seek now. As an initial matter, Plaintiffs no longer seek the four-factor TRO that the Court stayed. Rather, Plaintiffs seek an injunction tailored to the particular race-based policy, substantiated by the current record, that Defendants are applying in this District. The former Commissioner of Customs and Border Protection ("CBP") opines that this particular injunction sought by Plaintiffs is administrable for immigration enforcement agents.

Further, as this Court has previously explained, it is impossible to know on what basis the majority granted its stay. *See, e.g.*, ECF 419 n.7. One Justice filed a concurring opinion, but the order of the Supreme Court did not include any reasoning. The Court also finds that, in view of the current record, the individual concurrence rested on erroneous assumptions about Defendants' operations. That evidentiary record follows expedited discovery and is—with the exception of named Plaintiffs' declarations—all evidence that was not part of the TRO record. For example, the record now includes evidence that U.S. citizens have been stopped more than once pursuant to Defendants' policy of racial profiling. The record also now includes evidence that organizational Plaintiff members have been stopped more than once. Considering this record, the Court finds that Plaintiffs and their members are imminently threatened by future application of Defendants' policy and practice, that race is the predominant characteristic driving Defendants' stops, and that the stops—including of U.S. citizens—are neither brief nor unintrusive. The Court also finds that, absent intervention from this Court, Plaintiffs will continue to face serious irreparable harm in the form of violations of their Fourth Amendment rights and the guarantee of equal protection under the Fifth Amendment, and that the balance of hardships plainly favors the Plaintiffs. For all these reasons, the Court grants the preliminary injunction.

[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION

I.       **LEGAL STANDARD**

Plaintiffs are entitled to a preliminary injunction if they show that (1) they are likely to succeed on the merits of their claims; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). Where a moving party would suffer irreparable harm in the absence of relief and demonstrates that an injunction would be in the public interest, "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011) (internal quotation marks omitted).

II.      **STANDING**

A.       **The Plaintiffs have standing to obtain injunctive relief.**

A plaintiff has standing for injunctive relief if they can show that they are "realistically threatened" by future injury. *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983); *In re Zappos.com, Inc*, 888 F.3d 1020, 1024 (9th Cir. 2018). One way Plaintiffs can make that showing is to establish that they are the "target[s]" of a government "policy" or "pattern of officially sanctioned behavior." *Melendres v. Arpaio*, 695 F.3d 990, 998 (9th Cir. 2012) (citation modified); *see also Armstrong v. Davis*, 275 F.3d 849, 861 (9th Cir. 2001); *LaDuke v. Nelson*, 762 F.2d 1318, 1323 (9th Cir. 1985).

This Court finds that the record establishes that Plaintiffs have standing because they are "target[s]" of Defendants' "policy" or "pattern of officially sanctioned behavior" of making detentive stops in the District based on broad demographic profiling—specifically, against low income and working-class Latino individuals.

1.       **The individual Plaintiffs have standing to obtain injunctive relief on their Fourth Amendment claims.**

This Court finds that each individual Plaintiff has standing to seek injunctive relief on their Fourth Amendment claims because Defendants maintain a policy and practice of making detentive stops in the District based on broad demographic profiling, this policy and practice is "officially

-3-
[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION

sanctioned" by agency leadership, and each Plaintiff was targeted and faces an imminent threat of future injury because they remain a target of Defendants' policy and practice.

>    (a)    *Defendants have a policy and practice of stopping low-income or working class Latino individuals.*

The record establishes that Defendants maintain a policy and practice of making detentive stops in the District based on broad demographic profiling. Regardless of the type of operation—roving patrol, "targeted area" operation, and "targeted" operation—Defendants' agents and officers do not develop particularized information about individuals or individually evaluate those individuals considering the totality of the circumstances. Instead, Defendants are stopping people based on their apparent Latino ethnicity and perceived status as low-income or working-class.

**Roving patrols.** The Court finds that Defendants engage in demographic profiling through their "roving patrol"-style operations. In these types of operations—which Defendants' agents refer to as "snatch & grabs," *see* ECF 539-2 [agents text chain] at GOV 7608, 7610—Defendants make no claim that agents have any enforcement "target." Ex. 4 [CBP 30(b)(6) Dep.] at 147:20-148:10, 167:21-171:4. Rather, the record establishes that Defendants' agents sweep through communities looking for people they deem suspicious based solely on their appearance. Former CBP Commissioner explains that Border Patrol agents typically conduct roving patrol operations along the border, looking for indications of illegal crossing, and not in the interior; but Defendants have sent agents into the interior to conduct roving patrols in this District without the necessary experience or guidance to develop reasonable suspicion in a "very different patrol environment[]," consequently resorting to racial profiling. *See* Ex. 3 [Kerlikowske Decl.], ¶¶ 21, 23-25. This deployment of agents into the District was "unprecedented." *Id.*, ¶ 36.

Defendants' reliance on appearance during roving patrols is shown, for example, in text messages among Defendants' agents discussing their visual "soft counts" of "possibles" when driving past locations such as Home Depots, car washes, construction sites, and donut shops. Ex. 6 [agents text chain] at GOV 6643-55, 6755. The focus on appearance is also shown by agents pulling over to investigate people like D.V.V. and his co-workers because they "appeared to be laborers" based on attire and the presence of "tools in the back of [their] van." Ex. 8 [D.V.V.

-4-

[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION

I-213].  Based on these facts alone, armed, masked agents approached D.V.V. and his co-workers, all of whom are Latino, with their weapons drawn.  Ex. 7 [D.V.V. Decl.], ¶¶ 3-8.

The record shows that during these roving patrols, Defendants are specifically targeting people going about their daily lives who appear to be low-income or working-class Latinos. H.S.P., a working-class Latino, was surrounded by agents while walking to the bus stop on his daily commute in his Eataly work uniform, boots, and company badge.  ECF 529-66 [H.S.P. Decl.], ¶¶ 3-8.  The agents who arrested H.S.P. were part of a "roving patrol."  Ex. 9 [H.S.P. I-213].  The agents implausibly wrote that they stopped H.S.P. because they considered his uniform "appropriate[] dress[] to work outdoors doing manual labor." *Id*.  Agents said the same thing about, J.L.M. who briefly stopped to greet a friend near a U-Haul property when he was approached by agents.  Ex. 10 [J.L.M. Decl.], ¶¶ 4-10.  The arresting agent wrote that he found J.L.M. suspicious because he was "loitering" and wearing "appropriate[] dress[] to work outdoors doing manual labor."  Ex. 11 [J.L.M. I-213].  It appears that these arrest narratives also used copy and pasted language about the appearance of the detainees, which undermines their credibility. *See* Ex. 3 [Kerlikowske Decl.], ¶ 43.  Taken together, this evidence supports the inference that Defendants stop low-income and working-class Latinos as they go about their daily business based on broad stereotypes about their appearance, rather than on investigation or facts.

The record also establishes that roving patrol operations, which target low-income or working-class Latinos based on their appearance, have continued into this year, including at least as recently as April 2026.  On January 12, 2026, M.F.R., a Latino day laborer, was distributing pamphlets for his evangelical church and discussing the Bible with other Latino day laborers when masked officers ran at him, handcuffed him, dragged him on the ground, and grabbed him with enough force to break his necklace.  ECF 529-27 [M.F.R. Decl.], ¶¶ 2-8.  The agent who arrested M.F.R. described the operation as a "roving patrol."  ECF 529-25 [M.F.R. I-213].  Another Latino individual, I.U.V., was selling tamales on the morning of January 12, 2026 when he was tackled to the ground by masked men.  Ex. 18 [I.U.V. Decl.], ¶¶ 5-9.  The arresting agent "saw" I.U.V. and "exited [his] vehicle with the intention of having a conversation," but when I.U.V. exercised his right to not respond, the agent handcuffed him and detained him for questioning.  Ex. 19 [I.U.V.

-5-

[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION

report].  On January 17, 2026, M.D.L., a Latino man, was stopped on his way to work at a car dealership after getting dialysis treatment.  ECF 529-26 [M.D.L. Decl.], ¶¶ 2-8.  The agent who arrested M.D.L. described the operation as a "roving patrol."  ECF 529-24 [M.D.L. I-213].  On January 23, 2026, a Latino member of Plaintiff LAWCN'S CLEAN Carwash Worker Center was detained while he was working at a car wash.  Ex. 16 [Reyes Romo Decl.], ¶¶ 6-10.  Defendants' end of shift report for January 23, 2026 noted a "roving patrol" occurred at the address of Reyes Romo's workplace and listed 14 other "roving patrol" operations that day.  Ex. 17 [GOV-25776]. And on April 3, 2026, a community member received reports of Border Patrol vehicles in four different locations in San Juan Capistrano in a ten-minute period and later observed agents pull a U-turn to stop a "Latino-appearing" man "sitting at a picnic table under a tree."  ECF 529-28 [Chapman Decl.], ¶¶ 2-8; ECF 529-78 [video] (community member video showing the U-turn and arrest).

**"Targeted area" operations.**  The Court finds that Defendants engaged in the same demographic profiling through their "targeted area"-style operations.  After this Court entered the TRO, Defendants started conducting what they called "targeted area" operations.  ECF 539-8 at 4. While the TRO was in place, Defendants represented to this Court and the Supreme Court that these operations were based on "intelligence."  ECF 178 at 5, 7; *see* Reply Brief for Defendants ("Stay Reply") at 19, *Noem v. Vasquez Perdomo*, No. 25A169 (U.S. Aug. 13, 2025).  However, a veteran HSI agent who was assigned to participate in the operations testified that the operations were not "designed in good faith" to arrest the identified "targets."  Ex. 20 [HSI SA G.A. Dep.] at 195:5-196:11, 199:6-213:4.  As discussed below, the Court finds that Defendants' "intelligence" was manufactured to justify operations at public access locations Defendants were already intent on raiding.

The record shows that the Home Depot and car wash operations were supported by surveillance about only a small number of "targets."  ECF 529-18 [CBP 30(b)(6) Dep.] at 213:17-214:9, 270:4-277:9, 293:16-295:25; Ex. 21 [Westlake and Paramount HD ROI] at GOV 341-43; Ex. 22 [Magnolia ROI] at GOV 321.  Defendants would then select a day to raid a location— without regard to whether the previously identified "targets" were present.  Narratives did not

[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION

mention any day-of surveillance.  ECF 529-52 [Tijerino-Garmendia Westlake HD narrative].  And agents testified that they did not personally conduct any surveillance prior to the operations.  Ex. 23 [SBPA I.F. Dep.] at 281:3-21.

Agents also admitted that it did not matter whether the "targets" in the briefing were present at the location when they chose to raid it.  Ex. 24 [BPA J.C. Dep.] at 100:22-101:15.  Sometimes the agents did not even bring "target" information with them, which confirms to this Court that Defendants were not seeking to arrest any targets at the operation.  One supervisory agent admitted he did not reference briefing materials with "target information" during operations.  Ex. 23 [SBPA I.F. Dep.] at 280:13-281:2.  Another agent testified that "more times than not" he did not have the intelligence briefing with him during an operation, did not take notes on the briefing, and sometimes did not receive a reference copy of the briefing with the target information until after he arrived at the location.  Ex. 12 [SBPA V.S. Dep.] at 114:1-116:9, 292:14-293:10.

Based on those facts, this Court finds that Defendants' objective was not to actually seek to arrest the "targets" included in the intelligence briefings that supported their "targeted area" operations.  This is confirmed by the fact that agents arrested "targets" included in intelligence briefing materials without *realizing* they were the "target" they were (purportedly) there to arrest.  For example, the agent who arrested E.K.Z.L testified he was unaware E.K.Z.L was the "target" of the operation during their interaction and did not ask his name before agents restrained him.  *Id.* at 234:11-237:1.  The agent was briefed about E.K.Z.L. prior to arriving at the location, but did not realize he was interacting with a "target."  ECF 529-47 [E.K.Z.L. narrative].  In fact, according to his arrest narrative, the agent handed E.K.Z.L. over to another agent "while [he] attempted to search for [the] target."  *Id.*

Additionally, the record shows that Defendants frequently did not arrest their supposed "targets" during a raid, though they arrested numerous others.  Agents testified that they could not remember whether any targets were arrested at the operations they participated in.  *See, e.g.,* Ex. 25 [SBPA J.E. Dep.] at 184:10-12 (agent could not remember whether targets were arrested); Ex. 12 [SBPA V.S. Dep.] at 272:16-19 (same).  Instead, the evidence shows that agents were focused

-7-

on arresting as many people as possible, regardless of their status as "targets." In preparation for one operation, agents were briefed that the objective was to make as many "Title 8" arrests as possible. ECF 539-8 at 4. Body camera footage confirms that agents carried out this directive with one agent instructing others in his vehicle to "get out and start grabbing people" right before detaining, A.T., a legal resident. ECF 529-84 [GOV-P17-061]. Texts between agents reveal that individuals within DHS recognized this practice, with one saying: "I think [the Border Patrol agents] only know one way to operate. See bodies, chase bodies." Ex. 26 [agents text chain] at GOV 10543.

Apart from documentation changes, a supervisory Border Patrol agent testified he could not identify any difference in operations before and after the TRO. Ex. 12 [SBPA V.S. Dep.] at 194:10-196:4. Agents appear to have received no guidance whatsoever from DHS about the TRO. Ex. 20 [HSI SA G.A. Dep.] at 206:8-18.

**What Defendants call "targeted" operations**. The Court finds that Defendants further execute their policy of demographic profiling through what they call "targeted" operations. In these operations, which are ongoing, officers have a single "target," but the record establishes that the "target" is actually used as pretext for stopping other Latino individuals who happen to be near the "target's" claimed location. ECF 539-8 at 3-4.

For example, an officer (who is currently in the role of "team lead"), ECF 539-3 [DO E.O. Dep.] at 49:5-11, stopped F.H.S. in San Bernardino in June 2025 as she rode as a passenger in a pickup truck with other fruit vendors, allegedly because the driver resembled a "target." *Id.* at 196:17-198:6; ECF 529-53 [F.H.S. Decl.], ¶¶ 3-8. In a declaration Defendants filed in opposition to Plaintiffs' motion for a preliminary injunction last year, prior to discovery, they claimed that officers who stopped F.H.S. "followed [a] target from their residence." ECF 170-3 [Quinones Decl.], ¶ 11. Discovery has shown that claim false. The officer conceded in his deposition that he did not encounter F.H.S. while following a "target." ECF 539-3 [DO E.O. Dep.] at 196:17-198:6. And ICE could not reasonably have believed that F.H.S. was associated with the "target." The target drove a Mercedes-Benz, and F.H.S. was riding in a pickup truck. *See* Ex. 5 [DO E.O. Dep.] at 192:5-7, 231:23-233:11; Ex. 63 [FOW] (showing vehicle of "target"). Additionally, the target

-8-

lived more than a mile away from where F.H.S. was stopped. *Id.* (showing address of "target"). Officers have made no attempts to locate their supposed "target" since F.H.S.'s arrest. Ex. 5 [DO E.O. Dep.] at 231:5-15. The Court finds the explanation of this operation as "targeted" not credible.

The same ICE officer who stopped F.H.S. recently employed the same tactic when he stopped H.S.H. in February 2026. Lai Decl., ¶ 32. H.S.H. was driving his son to soccer when an unmarked ICE vehicle, upon seeing him, made a U-turn and pulled him over. ECF 529-57 [H.S.H. Decl.], ¶¶ 3-4. The officer wrote in the arrest report (known as a Form I-213) that he was looking for a target. Ex. 30 [H.S.H. I-213]. However, he did not indicate that H.S.H. was near the target's home or driving a vehicle associated with the target. *Id.* At the time, the officer expressly admitted to H.S.H. that he pulled H.S.H. over because H.S.H. looked like a "paisa." ECF 529-57 [H.S.H. Decl.], ¶¶ 9-12. "Paisa" is a derogatory term for a person from a rural part of Mexico. *Id.*, ¶ 12. Therefore, Officer E.O. appears to have seized H.S.H. in February 2026 not because H.S.H. was plausibly a pre-identified target for enforcement, but because of H.S.H.'s apparent ethnicity as Latino. That same officer admitted that he stops people who are not his target "quite often," up to "several times" a week. ECF 539-3 [DO E.O. Dep.] at 145:7-146:3.

Former CBP Commissioner Kerlikowske explains that these "targeted" operations are "not consistent with standard police practice." Ex. 3 [Kerlikowske Decl.], ¶ 31. Defendants' officers are not using police practices that would be consistent with an objectively reasonable attempt to locate and arrest a target, such as getting direct visual confirmation of a person leaving a potential residence or place of employment or running license plate checks prior to making a stop. *Id.*, ¶ 29 (discussing the stops of F.H.S. and H.S.H.). Instead, Kerlikowske opines that "[t]he label of a 'targeted' operation appears designed to allow officers to cast a wide net and investigate anyone in the general vicinity of an address fitting the broad demographic characteristics of the target." *Id.* The Court agrees.

In another example of Defendants' profiling practice from February 2026, J.C. was riding his e-bike to work when officers initiated a stop by physically colliding into him, claiming they were looking for someone else. *See* ECF 529-58 [J.C. Decl.], ¶¶ 2-6, 12. The Court finds that this

-9-

[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION

official explanation for the stop of J.C. once again is not credible.  ICE claimed in the arrest narrative that J.C. was seen "departing the residence" of their "target," yet the same arrest narrative reveals that J.C. lives at a different address.  ECF 529-40 [J.C. I-213].  The officer involved in the stop testified that J.C.'s Hispanic ethnicity was a factor in the decision to stop him.  *See* Ex. 5 [DO E.O. Dep.] at 300:8-13.  The record shows that his ethnicity was, in fact, determinative.

In April 2026, officers stopped passenger R.M.D. in a vehicle just outside a mobile home community predominantly inhabited by farmworkers.  Ex. 31 [R.M.D. Decl.], ¶¶ 4-13.  Officers claimed they were looking for a "target"—but that explanation is not credible in light of the record, which establishes that this target was more than 20 years younger than R.M.D.  Ex. 32 [R.M.D. I-213].  Officers listed the address of the "target" as the whole mobile home park, but the park has nearly 100 different lots on it.  *Id.*  Moreover, officers put her in a car with four other Latinos in work clothes who had just been arrested.  Ex. 31 [R.M.D. Decl.], ¶¶ 13-14. Therefore, the record instead shows that R.M.D. was seized because of her appearance as a Latino farmworker—not because officers reasonably believed she was a pre-identified target for immigration enforcement.

In May 2026, officers boxed in E.C.H. as he was driving to church.  ECF 529-60 [E.C.H. Decl.], ¶¶ 3-5.  The arrest report states that officers were looking for a target and noted that E.C.H. "match[ed] the physical appearance and photographs" of the target.  ECF 529-42 [E.C.H. I-213].  Officer E.O, who was present for the arrest, confirmed that the team relied on E.C.H.'s Hispanic ethnicity to initiate the vehicle stop, and he could not remember if the agents ran E.C.H.'s vehicle plates to determine if he was the intended target, though he admitted it was "more than likely" that they did not.  Ex. 5 [DO E.O. Dep.] at 256:3-257:19, 264:5-270:5, 275:1-15.  After officers realized E.C.H. was not the target, they continued to question him and ultimately arrested him.  ECF 529-42 [E.C.H. I-213].  The record shows that E.C.H. was seized because of his Latino ethnicity—not because officers reasonably believed he was a pre-identified target for immigration enforcement.

[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION

In June 2026, officers blocked A.S.L.'s path soon after he departed from home on his bike. Ex. 33 [A.S.L. Decl.], ¶¶ 2-8. Officers claimed they were looking for a "target"—but that explanation is not credible in light of the record, which establishes that A.S.L.'s address is almost a half a mile away from that of the "target." Ex. 34 [A.S.L. I-213]. Therefore, the record instead shows that A.S.L. was seized because of his Latino ethnicity—not because officers reasonably believed he was a pre-identified target for immigration enforcement.

On April 20, 2026, officers boxed G.N.L. in while he was driving in his work truck. ECF 529-59 [G.N.L. Decl.], ¶¶ 3-5. Officers claimed they were "looking for a specific person," but they did not tell G.N.L. he was free to leave after G.N.L. presented identification proving he was *not* the "target". Ex. 5 [DO E.O. Dep.] at 245:23-255:15. The officer continued to question G.N.L. and ultimately arrested him. ECF 529-41 [G.N.L. I-213]. Therefore, the record shows that G.N.L. was seized because of his Latino ethnicity—not because officers reasonably believed he was a pre-identified target for immigration enforcement. G.N.L. reported that in the time he was being processed, three other Latino men were brought in who reported being stopped in an identical manner. ECF 529-59 [G.N.L. Decl.], ¶ 8.

Recent stops of U.S. citizens also confirm the profiling practice. In March 2026, ICE trapped a Latino U.S. citizen in a McDonald's parking lot in San Bernardino with vehicles; officers interrogated him with his two-year-old in the backseat. Ex. 36 [J.A.P. Decl.], ¶¶ 3-6; Ex. 77 [video depicting stop]. And in May 2026 in Inglewood, officers surrounded Latino U.S. citizen D.O.A. and two family members as they were on a sidewalk preparing to perform landscaping work, Ex. 37 [D.O.A. Decl.], ¶¶ 3-8. Officers claim they approached D.O.A. and the others in an attempt to locate a "target"—but that target lived in a different part of the neighborhood. Ex. 38 [J.A.S. I-213]. The officers were from the same team that unlawfully detained and arrested Plaintiffs Vasquez Perdomo, Villegas Molina, and Osorto. The supervisor of that team estimated that about 25-40% of arrests his team currently makes are arrests of non-targets. Ex. 2 [SDDO C.C. Dep.] at 95:25-96:13.

Finally, the record establishes that Defendants conduct these types of pretextual stops of Latinos across the District. *See, e.g.*, ECF 529-55 [G.V.C. Decl.], ¶¶ 3-5 (July 2025 stop outside

-11-

donut shop in Ontario); Ex. 35 [G.V.C. I-213]; Ex. 2 [SDDO C.C. Dep.] at 208:12-216:15, 228:3-229:21, 271:3-19 (June 2025 downtown Los Angeles incident in which team chased street vendor that an officer claimed could be a "target," leading to arrests of U.S. citizens Andrea Velez and Luis Hipolito, without having any reason to believe "target" would be at that location); *id.* at 230:13-248:12 (January 2026 stop of W.C. outside a Pasadena courthouse); ECF 529-56 [W.C. Decl.], ¶¶ 3-11.

***

The Court concludes that, however they label their enforcement operations, Defendants have an ongoing policy and practice of targeting individuals on the basis of their Latino ethnicity. In discovery, supervisory agents admitted that they rely on "Hispanic ethnicity" in determining whom to stop, regardless of the percentage of Latinos who are legally present:

> Q  So in what way would [apparent ethnicity] be relevant, for example, at Operation At Large?
> A  That one particular -- just the one articulable fact?
> Q  Yes. Apparent ethnicity or apparent Mexican ancestry.
> A  I mean, I wouldn't even know that I would just define it as that because I wouldn't -- I don't really see a difference, like, if they're Honduran or Mexican or Guatemalan. I'd just say, like, Hispanic ethnicity.
>
> . . .
>
> Q  If I told you that a high percentage of people who are Hispanic are legally present or U.S. citizens, would that make you rethink whether Hispanic ethnicity should be part of your reasonable suspicion calculus? . . .
> [A]: I still think it could be one of -- one articulable fact.

Ex. 12 [SBPA V.S. Dep.] at 125:2-137:3.  One supervisory agent testified he believed he was allowed to consider Hispanic ethnicity along with other factors.  Ex. 23 [SBPA I.F. Dep.] at 137:10-139:1.  However, the record before the Court shows that the other factors Defendants claim to use to develop reasonable suspicion, including supposed appearance as a "day laborer", are proxies for low-income or working-class Latino individuals.  Agents testified that they rely on clothing to inform their perception of a person's ethnicity, though this Court finds their reliance amounts to profiling based on statements like the "majority of people who wear [burqas] are non-native to the United States" and wearing a Mexican soccer team jersey suggests an individual is a not a citizen.  Ex. 12 [SBPA V.S. Dep.] at 134:6-20.  The Court notes that many U.S. citizens and

lawfully present people wear burqas and foreign soccer team jerseys. Agents also admitted that simply speaking in Spanish could be considered suspicious, even if an officer initiates a conversation in Spanish. *Id.* at 187:16-192:14. The Court notes that many U.S. citizens and lawfully present people speak Spanish. These facts support this Court's finding that Defendants have a pattern of targeting people because of their Latino ethnicity.

Body camera footage and forensically collected text messages produced in response to expedited discovery confirm that Defendants are in fact looking for Latinos. Defendants' agents regularly refer to Latinos using dehumanizing racialized epithets, which is probative of the fact that they are intentionally targeting them for immigration enforcement based on racial appearance. For example, agents use the terms "wet" and "tonk"[1] to refer to working-class Latino individuals they see while conducting operations in the District. Ex. 39 [agent text chains] at GOV 24293-94 (referring to "tonks everywhere selling food"), 24291 (using the term "wet"); Ex. 79 [GOV-P16-015] (SBPA V.S. from Westlake Home Depot operation: "Who's backpack is that? Tonk's backpack?"); Ex. 80 [GOV-P17-008] (agent who stopped Plaintiff Gavidia in Yank Towing operation referring to "tonk" in English and Spanish); Ex. 81 [GOV-P17-015] (from Hollywood Home Depot operation: "There was a guy, I'm pretty sure he's wet he was just sitting in that mini van"); Ex. 82 [GOV-P19-044] (from Paramount Home Depot operation: "So the guy in the car was a tonk, he wasn't the LPR [whom agents had detained]"). One body worn camera captured an agent stating, "Yeah, just plug us in wherever you see some tonks and we'll jump out". *See* Ex. 78 [GOV-P16-001]. This Court finds that this statement, and others like it, support a finding that Defendants have a pattern of targeting individuals because they are low-income or working-class Latinos, not because of pre-stop individualized suspicion, "targeting," "intelligence," or "experience."

---

[1] *See* Matthew Cantor, *The anti-immigrant slur US border patrol tried to ban: 'It reflects sanctioned violence'*, The Guardian (March 4, 2024), https://www.theguardian.com/us-news/2024/mar/04/border-patrol-slur-immigration; *United States v. Sipe*, 388 F.3d 471, 484 n.33 (5th Cir. 2004) (agent stating that "tonk" is "the sound heard when a 'wetback' is hit over the head with a flashlight").

[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION

Defendants testified that they target "day laborers" for enforcement.  For example, Defendants state that they selected locations to raid to find "day laborers."  *See* Ex. 4 [CBP 30(b)(6) Dep.] at 155:11-161:5 (teams targeted places that they believed were "standard practice for day laborers"), 242:5-245:18.  Based on the record, this Court finds Defendants use the term "day laborer" as simply shorthand for Latino low-income or working-class individuals.

First, when asked to articulate what a "day laborer" is, Defendants' testimony was amorphous and incoherent.  In response to a question posed in English, ICE's 30(b)(6) witness testified in Spanglish that a "day laborer" is "[s]omeone that is out there -- like . . . 'pico y pala'" or who "work[s] in the fields."  Ex. 40 [ICE 30(b)(6) Dep.] at 156:20-157:18.  The use of Spanish was unprompted.  CBP's 30(b)(6) witness testified that "day laborer types of occupations" are "[c]onstruction, agricultural, yard work of [sic] the like."  Ex. 4 [CBP 30(b)(6) Dep.] at 159:3-161:5.  Although agents acknowledged that "day laborers and car wash employees are two different [things]," Ex. 12 [SBPA V.S. Dep.] at 217:24-218:14; Ex. 23 [SBPA I.F. Dep.] at 279:13-280:9 (had no information about whether car washes to be raided paid workers in cash or hired day laborers), Border Patrol materials repeatedly lump them together along with many other types of workers deemed inherently "suspicious."  *See, e.g.*, ECF 529-24 [M.D.L. I-213]; Ex. 4 [CBP 30(b)(6) Dep.] at 298:5-300:2; Ex. 41 [Magnolia PPT Briefing] at GOV 000313.

Notably, Defendants have no actual statistics about the locations they were going to nor the proportion of "day laborers," however Defendants define them, who are not lawfully present in the Los Angeles area.  When asked whether agents knew what percentage of "day laborers" are U.S. citizens or lawfully present, agents testified that they did not know.  Ex. 25 [SBPA J.E. Dep.] at 84:7-13; Ex. 23 [SBPA I.F. Dep.] at 197:3-198:11 (same); Ex. 12 [SBPA V.S. Dep.] at 121:5-124:23 (same).  CBP's 30(b)(6) witness testified that the agency does not have information about the proportion of unauthorized noncitizens who work in industries they identified as "day laborer" industries as opposed to legally present individuals. Ex. 4 [CBP 30(b)(6) Dep.] at 161:7-165:17.  ICE admitted it did not possess this information either.  Ex. 40 [ICE 30(b)(6) Dep.] at 158:8-13.  A local non-profit serving day laborers explains that there can be numerous reasons why people seek day work, including needing flexible hours or being in between jobs.  Ex. 42 [Zuniga Decl.],

-14-

¶ 4.  Defendants' limited information about the locations where they are going or about "day laborers" supports a finding that Defendants are conducting their operations based on racial stereotyping.

Second, Defendants' agents' testimony resolves any potential lingering doubt that they are in fact relying on Latino ethnicity.  Despite organizing operations around the ability of agents to "spot" "day laborers," when agents attempted to explain what a "day laborer" looked like, they admitted it was about race.  For example, when lead officer C.C. from the Pasadena bus stop operation leading to the arrest of named Plaintiffs was asked about the appearance of workers he looks for, he answered bluntly: "Older Hispanic males." Ex. 27 [DO C.C. Dep.] at 158:3-162:17.  (The officer in fact stated, "I don't call them 'day laborers.' I call them 'illegal aliens.'"  Ex. 27 [DO C.C. Dep.] at 158:3-162:18, 247:2-249:8.)  One agent who conducted a "roving patrol" that led to the seizure of M.D.L. wrote in the arrest narrative that he targeted M.D.L. because M.D.L. was "dressed in attire consistent with day laborers [the agent] ha[d] apprehended in the past." ECF 529-24 [M.D.L. I-213].  In other words, the agent invoked his experience with "day laborers" to justify the seizure.  But the record establishes that M.D.L. was dressed in black pants, an orange sweater, and Sketcher shoes, carrying a backpack, and was getting off the bus to get breakfast. ECF 529-26 [M.D.L. Decl.], ¶ 5; *see also* Ex. 25 [SBPA J.E. Dep.] at 154:10-161:2.  This is not indicative of any particular job, let alone immigration status.  This indicates to the Court that M.D.L.'s Latino ethnicity was the dispositive factor that resulted in his seizure.

Third, Defendants' reliance on race—as opposed to simply one's status as a "day laborer"—is shown by the fact that Defendants frequently ignore white-appearing individuals *working alongside* Latino workers they stop, even as they also stop Latino *customers* of the same businesses.  For example, officers stopped CLEAN member Angel Santiago Tafolla, a Latino U.S. citizen, while his light-skinned co-workers who ran from officers were left alone.  Ex. 43 [Santiago Tafolla Decl.], ¶¶ 2, 4-17; *accord* Ex. 44 [A.V. Decl.], ¶¶ 3-7 (Latino U.S. citizen worker stopped while light-skinned coworker not approached).  *See also* ECF 529-61 [E.M.M. Decl.], ¶¶ 3-10 (Latino shopper thrown to the ground while white-appearing persons in Home Depot parking lot were left alone); ECF 529-62 [A.G. Decl.], ¶¶ 3-7 (Latino car wash client

[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION

surrounded by agents and interrogated); ECF 529-65 [V.M.B. Decl.], ¶¶ 3-6 (Latino gas station client accosted before agents knew his name); Ex. 14 [Hernandez Viramontes Decl.], ¶ 7 (customers at car wash questioned).

If officers were not simply looking for Latinos and instead trying to locate their "target" in Pasadena, they could have approached anyone in the shopping plaza to ask about their "target's" whereabouts. They didn't. They stopped Plaintiffs, whom they knew nothing about other than their skin color and that they were dressed in work clothes. ECF 529-15 [Vasquez Perdomo Decl.], ¶¶ 4-7, 14; ECF 529-16 [Villegas Molina Decl.], ¶¶ 4-6, 11; ECF 529-17 [Osorto Decl.], ¶¶ 4-6, 13. Other putative class members' experiences are in accord; the record is replete with instances of agents stopping Latino individuals, often forcefully, based only on their appearance as working-class Latinos.[2]

---

[2] *See* ECF 529-68 [J.D.S. Decl.], ¶¶ 4-9 (armed, masked agent handcuffed a Deaf Latino car wash worker with lawful status); ECF 529-54 [E.C.P. Decl.], ¶¶ 3-6 (armed, masked agents threw a Latino food vendor onto the street and zip tied her hands together before asking her any questions); Ex. 45 [N.B. Decl.], ¶¶ 3-6 (agents pepper sprayed, beat, and handcuffed a Latino gardener outside an IHOP); Ex. 46 [Gutierrez Reyes Decl.], ¶¶ 3-6 (agents ran at Latino car wash worker who was walking, grabbed him, and threw him to the ground); ECF 529-23 [Tijerino Garmendia Decl.], ¶¶ 4-8 (agents used ruse to speak with workers and then jumped out of back of Penske truck and put Latino individual on the ground, with a knee in his back); Ex. 47 [Ayala Decl.], ¶¶ 3-8 (agent grabbed and handcuffed Latino car wash worker before asking him any questions); Ex. 48 [J.G.S.C. Decl.], ¶¶ 5-8 (armed, masked agent grabbed and handcuffed Latino car wash worker on his lunch break); Ex. 49 [F.F.L. Decl.], ¶¶ 4-9 (masked agents violently grabbed Latino car wash worker, asked him his name, and threw him into a car before asking any other questions); ECF 529-63 [R.N.G. Decl.], ¶¶ 3-10 (armed, masked agent tackled and handcuffed a Latino construction worker who had stopped at a Home Depot to pick up materials); ECF 529-64 [L.C.C. Decl.], ¶¶ 3-12; Ex. 50 [Luna Decl.], ¶¶ 3-10 (armed agents raided the same car wash twice and only approached Latino workers, while leaving other workers alone); Ex. 10 [J.L.M. Decl.], ¶¶ 4-10; Ex. 51 [M.G. Decl.], ¶¶ 5-8 (armed, masked agents grabbed a Latino man in a Home Depot parking lot drinking coffee near his work truck and handcuffed him before asking any questions); Ex. 52 [Castillo Decl.], ¶¶ 6-13 (describing agents acting aggressively toward M. G.); Ex. 53 [M.A.R.C. Decl.], ¶¶ 3-7 (armed agents tackled and arrested a Latino recycling center worker who was standing still with his hands in the air); ECF 529-66 [H.S.P. Decl.], ¶¶ 3-8; Ex. 7 [D.V.V. Decl.], ¶¶ 3-8; Ex. 54 [E.L.L. Decl.], ¶¶ 4-17; Ex. 18 [I.U.V. Decl.], ¶¶ 5-10; ECF 529-27, [M.F.R. Decl.], ¶¶ 3-8; ECF 529-26 [M.D.L. Decl.], ¶¶ 4-7; Ex. 42 [Zuniga Decl.], ¶¶ 5-6; Ex. 16 [Reyes Romo Decl.], ¶¶ 6-12 (CLEAN member); ECF 529-28 [Chapman Decl.], ¶¶ 3-8; Ex. 83 [GOV-P17-048] (detention of Latino man remaining silent at San Bernardino Home Depot operation).

-16-

[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND
VIOLATION OF EQUAL PROTECTION

This Court finds that the evidence plainly establishes that Defendants have a policy and practice of stopping individuals because they appear to be low-income or working class Latinos. Since last year, Defendants have referred to their operations by different names and the personnel involved have varied, but Defendants' policy and practice has remained constant. Despite Defendants' claims that "Operation at Large" is over, the Court finds that the underlying policy and practice of suspicionless stops based on demographic profiling has continued. As one ICE officer aptly put it: "We're [still] doing the same thing [as "Operation at Large"] just with a different name." ECF 539-3 [DO E.O. Dep.] at 175:2-176:21.

*(b)     Defendants' policy and practice is officially sanctioned.*

This Court also finds that Defendants' policy and practice of stopping low-income or working class Latinos is "officially sanctioned" by agency leadership. *Melendres*, 695 F.3d at 998. For decades, immigration enforcement in this District proceeded based largely on target folders relating to individualized investigations of specific persons. *See* Ex. 2 [SDDO C.C. Dep.] at 69:10-72:11 (describing target folder); *see also* Ex. 3 [Kerlikowske Decl.], ¶ 28. At the direction of administration officials, that changed in 2025.

The record shows that Defendants' unlawful policy and practice started in late May 2025 following a direction from ICE headquarters for field offices to begin arresting what Defendants call "collaterals," or non-targets, en masse. ECF 539-2 [e-mail chain]. In early June 2025, President Trump directed the entire federal law enforcement apparatus "to take all such action necessary to liberate Los Angeles from the Migrant Invasion."[3] These directives from leadership empowered and encouraged Defendants to embark on a campaign of suspicionless seizures.

These directives were coupled with Defendants' decision to deploy Border Patrol agents to conduct "roving patrols" far away from the border in densely populated Los Angeles knowing it was likely to lead to profiling and other rights violations. *Id.*; *see* Ex. 3 [Kerlikowske Decl.] ¶¶ 23-25, 35-38. Operations in Southern California were led by El Centro Sector Border Patrol

---

[3] Donald J. Trump, @realDonaldTrump, Truth Social (June 8, 2025, 2:06 PM), https://truthsocial.com/@realDonaldTrump/posts/114649780431129598%5C.

[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND
VIOLATION OF EQUAL PROTECTION

Chief Gregory Bovino, who had commanded controversial roving patrol operations in Kern County in early 2025 that were quickly enjoined on Fourth Amendment grounds by a federal court in the Eastern District of California.[4]  Undeterred by the injunction, Defendants directed Chief Bovino to this District to conduct sustained, militarized patrols.  *See* Ex. 4 [CBP 30(b)(6) Dep.] at 54:2-57:21.  This Court finds Defendants' decision to allow Chief Bovino to continue overseeing operations in a highly populated urban area shows that these unlawful practices were officially sanctioned.  At the same time, ICE ramped up its non-targeted enforcement, including with CBP and other federal partners.  *See* ECF 539-8 at 4 n.10; *id.* at 2-3; *see also* Ex. 2 [SDDO C.C. Dep.] at 180:12-181:1.  ICE doubled the ranks of its field teams.  ECF 539-8 at 8; Ex. 5 [DO E.O. Dep.] at 55:24-56:23.  Defendants have grown their ranks without the supervision resources necessary to comply with the law.  *See* Ex. 3 [Kerlikowske Decl.] ¶¶ 41-42.

Kerlikowske also explains that the instruction from ICE to "turn the creativity knob up to 11" and the declaration that they complained about "not being allowed to do [their] job" and "now being the time to step up!" would have been interpreted as an order to deviate from standard practice and protocols to get more "handcuffs on wrists."  Ex. 3 [Kerlikowske Decl.] ¶¶ 38-39.  DHS personnel in the District delivered on leadership's messages by engaging in widespread detentive stops of low-income and working-class Latino individuals without the investigative work that previously characterized immigration enforcement in the interior.  Discovery revealed that suspicionless and discriminatory stops were not a rogue method of operationalizing agency orders, but were precisely what agency leadership demanded.  Additional factors showing this was the intended outcome include the dramatic drop in the ratio of supervisors to field officers for ICE, the decision not to track field contacts that lead to release, and the lack of any internal

---

[4] Orlando Mayorquín and Jesus Jiménez, *Before Urban Raids, Border Patrol Tested Tactics in California Farm Country*, N.Y. Times (Jan. 26, 2026), https://www.nytimes.com/2026/01/19/us/border-patrol-tactics-rural-california.html. Defendants viewed those operations as "proof of concept" for operations elsewhere. Brittny Mejia and Rachel Uranga, *Fears of racial profiling rise as Border Patrol conducts 'roving patrols,' detains U.S. citizens*, L.A. Times (June 15, 2025), https://www.latimes.com/california/story/2025-06-15/latinos-targeted-in-raids-u-s-citizens-detained-indiscriminate-sweeps-home-depot-lots-targeted.

[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND
VIOLATION OF EQUAL PROTECTION

accountability structure, signaling to officers that their conduct would not be scrutinized so long as they deliver arrests.  Ex. 3 [Kerlikowske Decl.], ¶¶ 41-45; *see also* Ex. 2 [SDDO C.C. Dep.] at 82:18-85:15; Ex. 5 [DO E.O. Dep.] at 51:11-25; Ex. 4 [CBP 30(b)(6) Dep.] at 319:12-320:2; Ex. 40 [ICE 30(b)(6) Dep.] at 179:11-184:7.

If there were any doubt, Defendants' CBP 30(b)(6) witness confirmed that the agency endorses the manner in which agents have conducted operations in the District.  *See, e.g.*, Ex. 4 [CBP 30(b)(6) Dep.] at 230:5-234:7; Ex. 55 [CBP 30(b)(6) Dep. Ex. 150] (approving agent's reliance on ethnicity), *id.* at 167:21-172:17, 241:19-243:16, 224:5-229:2, 217:15-219:18.  And ICE's 30(b)(6) witness and L.A. Field Office Director likewise echoed that endorsement with respect to ICE officers' conduct. Ex. 40 [ICE 30(b)(6) Dep.] at 159:13-161:1, 183:13-184:7.

The record supports this Court's finding that the policy and practice at issue here is officially sanctioned.

> (c)    *Individual Plaintiffs are the targets of the challenged policy and practice.*

This Court finds that Plaintiffs are the targets of the policy and practice they challenge. *See Melendres*, 695 F.3d at 998 (plaintiffs had standing where they fit within the category of individuals that the challenged practice was "targeting").  The individual Plaintiffs have already been stopped pursuant to the policy and practice, *see infra* at 19-21 (discussing stops of Plaintiffs Gavidia and Hernandez Viramontes) and 22 (discussing stops of Plaintiffs Vasquez Perdomo, Villegas Molina, and Osorto), and this Court finds it likely these Plaintiffs will be subjected to this policy again because they match the precise demographic profile that Defendants are targeting. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) ("[P]ast enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical.'" ) (citation omitted); *Armstrong*, 275 F.3d at 861 (similar).

Plaintiff Gavidia, a U.S.-born citizen, was stopped on the basis of his Latino ethnicity and class in the past.  The record establishes that agents were conducting a "roving patrol" in Montebello not based on target intelligence.  Gavidia, a car mechanic, was standing on the sidewalk minding his business when a masked and heavily armed agent chased him down the

[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION

sidewalk, told him to "stop right there," slammed him against a fence, and demanded to know the L.A. hospital where Gavidia was born. Ex. 12 [SBPA V.S. Dep.] at 85:8-90:4, 144:7-148:5; Ex. 13 [Gavidia Decl.], ¶¶ 6-11. Defendants previously claimed to this Court that Gavidia's contact with agents was "self-initiated" and that he was among a crowd of people yelling at agents and threatening their safety. ECF 170 at 8-9. But the body camera video—produced after the TRO—flatly disproved that claim. The video shows that Gavidia was standing on the sidewalk alone, talking on his cellphone, with one hand holding the phone to his ear and the other up in the air to show surrender. Ex. 90 [GOV-VID_001]; Ex. 91 [GOV-P17-006]; *see also* ECF 492; Ex. 13 [Gavidia Decl.], ¶¶ 7-8. The video footage shows no people around Gavidia before or at the time he was seized. The only inference the Court can draw is that Gavidia was seized because he is Latino and appeared to be working class. Plaintiff Gavidia still matches the precise demographic profile that Defendants continue to target. Ex. 13 [Gavidia Decl.], ¶¶ 12-13. Because of this, Plaintiff Gavidia reasonably fears he "might get picked up just because I am walking while brown, walking while dirty, coming home from work" despite being a U.S. citizen. *Id.* at 13. Other U.S. citizens have been stopped in the same way, even twice. *See infra*, 25-26. This Court finds Plaintiff Gavidia has standing because he fits the demographic profile of Defendants' policy and officially sanctioned practice and is, therefore, sufficiently likely to be injured by it again.

Plaintiff Hernandez Viramontes, a U.S. citizen, also was seized on the basis of his Latino ethnicity while working at a car wash agents found through a Google search for nearby car washes during a "roving patrol." Ex. 14 [Hernandez Viramontes Decl.], ¶¶ 8-13; Ex. 15 [BPA J.M. Dep.] at 217:16-219:22. Agents surrounded and interrogated him, then physically escorted him to a SUV and ultimately took him away to "verif[y]" his citizenship. Ex. 14 [Hernandez Viramontes Decl.], ¶¶ 8-13. In Defendants' opposition to Plaintiffs' preliminary injunction motion last year, Defendants characterized their contact with Plaintiff Viramontes as "consensual." *See* ECF 170 at 3-4. But the agent who stopped Viramontes has now admitted that his interaction with Viramontes was "a detention," and video taken by a customer of the car wash corroborates Hernandez Viramontes' account. Ex. 15 [BPA J.M. Dep.] at 261:14-25; *see also* Ex. 14 [Hernandez Viramontes Decl.], ¶¶ 8-10; Ex. 65 [Third Hernandez Viramontes Decl.], ¶¶ 3-6; Ex.

-20-

93 [video].  Plaintiff Hernandez Viramontes matches the precise demographic profile that Defendants continue to target.  He is a Latino car wash worker who described being "targeted due to [his] brown skin and accent."  Ex. 14 [Hernandez Viramontes Decl.], ¶ 15.  Despite being a U.S. citizen, he now carries a passport card out of fear he will be stopped again.  Ex. 65 [Third Hernandez Viramontes Decl.], ¶ 8.  And the record shows that possessing documentation of citizenship or lawful status is not enough to avoid being stopped because agents detain first and ask questions later, and prevent people from presenting such documentation if they believe the individual fits the profile of a working-class Latino.  *See infra,* 26.  This Court finds Plaintiff Hernandez Viramontes has standing because he fits the demographic profile of Defendants' policy and practice and is, therefore, sufficiently likely to be subjected to it again.

Plaintiffs Vasquez Perdomo, Osorto, and Villegas Molina were approached on the basis of their apparent Latino ethnicity while waiting at a public bus stop blocks away from the address of a supposed ICE "target."  *See* ECF 45-1, 45-2, 45-3.  Defendants asserted that ICE was trying to locate their "target" when they ambushed Plaintiffs to question them about the "target's" whereabouts.  Ex. 27 [DO C.C. Dep.] at 218:8-226:13, 315:24-317:17; *see also* Ex. 2 [SDDO C.C. Dep.] at 118:15-122:2, 156:4-24; Ex. 28 [J.C.B. Field Operations Worksheet ("FOW")] (listing address of "target").  But that claim is no longer credible after discovery.  The record shows that the officers' express  intention that day always was to arrest "collaterals."  *See* Ex. 29 [officers' text chain] (lead officer telling colleague to "bring extra cuffs").  Plaintiffs were not free to leave when agents ran out of vehicles and towards them armed, masked, not identifying themselves, and shouting "don't run!"  *See* ECF 529-16 [Villegas Molina Decl.], ¶¶ 5-6; ECF 529-15, [Vasquez Perdomo Decl.], ¶¶ 6-7; ECF 529-17 [Osorto Decl.], ¶¶ 5-6.  Officers did not ask Plaintiffs about the officers' "target" and never went back to the location to look for the "target."  Ex. 27 [DO C.C. Dep.] at 257:25-258:14.  Plaintiffs Vasquez Perdomo, Villegas Molina, and Osorto match the precise demographic profile that Defendants continue to target.  They are Latino construction workers.  ECF 529-15, [Vasquez Perdomo Decl.], ¶14; ECF 529-16 [Villegas Molina Decl.], ¶ 13; ECF 529-17 [Osorto Decl.], ¶ 13.  Defendants' prior unlawful stops based on Plaintiffs' appearance as low-wage Latino workers is evidence that they are likely to be targeted under

-21-

Defendants' policy again.  This Court finds Plaintiffs Vasquez Perdomo, Osorto, and Villegas Molina have standing because they fit the demographic profile of Defendants' policy and practice and are, therefore, sufficiently likely to be subjected to it again.

The record shows that the individual Plaintiffs cannot avoid Defendants' policy and practice because it targets them in the places where they work and live.  *See Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1041 (9th Cir. 1999).  And there is no reason to believe that the prior stops of the individual Plaintiffs make a future stop less likely.  To the contrary, multiple individuals have been stopped more than once, *see infra* at 25-26, and Defendants have gone to numerous locations more than once, *see, e.g.*, Ex. 14 [Hernandez Viramontes Decl.], ¶¶ 6-8, 14; Ex. 56, [Anderson Decl.], ¶¶ 5, 9; ECF 529-74 [Melendrez Decl.], ¶¶ 4, 8-10; Ex. 42 [Zuniga Decl.], ¶ 4.  Defendants acknowledge that they have no system for tracking stops that led to release[5] or for tracking the places agents have previously gone[6] to avoid recurrence.  The Court finds that these structural factors make it more likely that Latinos subject to Defendants' unlawful profiling policy will be unlawfully seized in the future.

This Court finds each individual Plaintiff has standing because—as low-income or working-class Latinos—they are the targets of Defendants' officially sanctioned policy and practice and are sufficiently likely to be stopped pursuant to that policy and practice again.

### 2.  The organizational Plaintiffs have standing to obtain injunctive relief on their Fourth Amendment claims.

This Court finds that each organizational Plaintiff has standing to seek injunctive relief on its Fourth Amendment claim because Defendants maintain a policy and practice of making detentive stops in the District based on broad demographic profiling, this policy and practice is "officially sanctioned" by agency leadership, and members of the organizational Plaintiffs are threatened because they are targets of the policy and practice.

---

[5] Ex. 4 [CBP 30(b)(6) Dep.] at 208:6-209:5, 235:5-241:9; Ex. 40 [ICE 30(b)(6) Dep.] at 167:3-172:25.

[6] *See* Ex. 4 [CBP 30(b)(6) Dep.] at 172:18-175:14, 178:14-17; Ex. 40 [ICE 30(b)(6) Dep.] at 169:13-170:15; Ex. 5 [DO E.O. Dep.] at 134:2-23.

[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION

"[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Coal. on Homelessness v. City & Cnty. of San Francisco*, 758 F. Supp. 3d 1102, 1122 (N.D. Cal. 2024) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

LAWCN, UFW, and CHIRLA each meet the *Hunt* test. The first *Hunt* prong is met because LAWCN, UFW, and CHIRLA have members who have standing in their own right. This Court has already found that Defendants have a policy and practice of stopping low-income or working-class Latinos and that this policy is officially sanctioned. *See supra,* 4-19. To establish standing, LAWCN, UFW, and CHIRLA must show that their members are the target of Defendants' unlawful policy and practice.

This Court finds that each organizational Plaintiff has members who are subject to Defendants' policy of suspicionless and discriminatory stops based on a broad demographic profile. LAWCN, UFW, and CHIRLA collectively have tens of thousands of members across the District who fit the profile that Defendants are targeting. ECF 529-73 [Salas Decl.], ¶ 4; ECF 529-76 [Strater Decl.], ¶¶ 5-6; *supra* at 14 (including agricultural workers in Defendants' understanding of "day laborers"); ECF 529-75 [Gudino Decl.], ¶¶ 2, 13-14; ECF 529-74 [Melendrez Decl.], ¶ 1. It is thus unsurprising that Defendants' policy has already resulted in multiple suspicionless stops of the organizational Plaintiffs' members, including Latino U.S. citizens. Members of LAWCN's CLEAN Carwash Worker Center's members have been stopped while at work, while operating a mobile car wash, and while using public transportation. *See* ECF 529-74 [Melendrez Decl.], ¶¶ 7-10, 12-15; Ex. 43 [Santiago Tafolla Decl.]), ¶¶ 2, 4-16. A UFW member was stopped while walking in Ventura County. *See* ECF 529-76 [Strater Decl.], ¶¶ 29-31. CHIRLA members, including a legal resident, have been stopped while selling food or driving in a vehicle. *See* ECF 529-73 [Salas Decl.], ¶¶ 18-21. And there is every reason to think those stops will continue; in fact, some organizational Plaintiff members have already been stopped multiple times. For example, "Manuel," a lawfully present CLEAN member who has deferred action and

-23-

work authorization, was stopped once in October 2025 and again in December 2025. *See* ECF 529-74 [Melendrez Decl.], ¶ 13; *see also id.*, ¶¶ 8-9. The Court accordingly finds that members of the organizational Plaintiffs have suffered an injury because they are targets of Defendants' officially sanctioned policy and practice and are sufficiently likely to be stopped pursuant to that policy and practice in the future.

The second *Hunt* prong is met because safeguarding LAWCN's, UFW's, and CHIRLA's members' liberty interests is germane to the respective organizations' purposes. *See Garcia v. City of Los Angeles*, 611 F. Supp. 3d 941, 952 (C.D. Cal. 2020). LAWCN is a network of worker centers, which exist to support "low-wage, often immigrant workers." ECF 529-75 [Gudino Decl.], ¶ 7. CLEAN, one of the member organizations of LAWCN, fights for car wash workers' dignity in the workplace, where Defendants have repeatedly targeted its members for unlawful arrests. 529-74 [Melendrez Decl.], ¶ 3. UFW's mission is to "improve the lives, wages, and working conditions of agricultural workers and their families," and it "is a national leader in the movement for immigration reform and immigrants' rights." ECF 529-76 [Strater Decl.], ¶¶ 11, 17. CHIRLA's mission is to "advance the human and civil rights of immigrants and refugees and ensure immigrants communities are fully integrated into our society with full rights and access to resources." ECF 529-73 [Salas Decl.], ¶ 2.

Finally, the third *Hunt* factor is met. The participation of individual members is not required because the organizations seek injunctive relief. *See Columbia Basin Apartment Ass'n v. City of Pasco*, 268 F.3d 791, 799 (9th Cir. 2001).

**3.    Defendants' stay arguments cannot succeed on the current record**

Defendants cannot rely on the Supreme Court stay to refute standing. As this Court has explained, the Supreme Court did not indicate the basis for the stay. Moreover, the current record comprises almost entirely *new* evidence that was not part of the TRO record—and that evidence overwhelmingly establishes the likelihood of future injury to Plaintiffs and their members.

In seeking a stay from the Supreme Court, Defendants argued that the individual Plaintiffs were like the plaintiff in *Lyons* because they had provided "no basis beyond speculation to believe that [they] will be stopped again without reasonable suspicion based solely on the four factors"

[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION

identified in the TRO. Application for Stay ("Stay App.") at 17-18, *Noem v. Vasquez Perdomo*, No. 25A169 (U.S. Aug. 7, 2025). There is no evidence that a majority of the Court agreed with that argument, but one Justice did. *See Noem v. Vasquez Perdomo*, 146 S. Ct. 1, 3 (2025) (Kavanaugh, J. concurring) ("[L]ike in *Lyons*, plaintiffs have no good basis to believe that law enforcement will unlawfully stop *them* in the future based on the prohibited factors"). Defendants now make the same argument against the preliminary injunction. However, the record now conclusively establishes the very thing that Defendants have acknowledged would suffice for standing, *see* Stay Reply at 6—evidence that Plaintiffs are "realistically threatened" by unlawful detentive stops pursuant to Defendants' race-based policy and practice. *See supra* at 11-14; *Lyons*, 461 U.S. at 109.

For one thing, the record now shows overwhelmingly that Defendants have a policy and officially-sanctioned pattern of making detentive stops based on demographic profiling, rather than investigation. *Contra* Stay App. at 22; *Noem*, 146 S. Ct. at 4 (Kavanaugh, J., concurring) (assuming that officers "use their experience to stop suspected illegal immigrants based on a variety of factors"). And unlike in *Lyons*, where the plaintiff could not establish that he would "illegally resist arrest or detention" and thus fall subject to the city's alleged policy of using chokeholds in response to "resistance or other provocation," *Lyons*, 461 U.S. at 106, 110, here the individual Plaintiffs need do nothing more than go about their daily lives to be threatened by Defendants' policy and practice.

The record further refutes Defendants' prior conclusory assertions about the likelihood of future stops against Plaintiffs. Contrary to Defendants' assertion that it was speculative to believe that Plaintiffs Gavidia and Hernandez Viramontes would be stopped again, the record shows similarly situated U.S. citizens throughout the District regularly being subjected to the very same type of harm. Indeed, the record shows *multiple stops* of the *same* U.S. citizens. *See* Ex. 56 [Anderson Decl.], ¶¶ 4-13 (describing stop of U.S. citizens at Euclid Car Wash); Ex. 84 (video taken by Anderson); Ex. 57 [H.A. Decl.], ¶¶ 5-18 (U.S. citizen stopped twice). Further, on March 27, 2026, ICE surrounded a Latino U.S. citizen J.A.P's car in a McDonald's parking lot even with his two-year-old child in the backseat. Ex. 36 [J.A.P. Decl.], ¶¶ 3-6. Officers refused to believe

-25-

his claim of citizenship even after he showed his passport. *Id.* On May 29, 2026, officers suddenly surrounded D.O.A.—another U.S. citizen—and his family members as they were preparing to perform landscaping work. Ex 37 [D.O.A. Decl.], ¶¶ 3-8. Officers ordered him to put his hands up before demanding his ID. *Id.* Defendants also detained Latino U.S. citizen Santiago Tafolla, pointing a gun at him while his light-skinned co-workers who ran from officers were left alone. Ex. 43 [Santiago Tafolla Decl.]), ¶¶ 2, 4-17. And there are yet more examples in the record. *See, e.g.*, Ex. 85 [GOV-P17-76]) (body camera video showing stop of a Latino U.S. citizen).

The record underscores why the risk of future stops of U.S. citizens is so substantial: Defendants frequently do not even allow Latino individuals to retrieve proof of citizenship before detaining them. For example, agents grabbed V.M.C. while he was detailing a car at his workplace and asked him if he had papers. *See* Ex. 58 [V.M.C. Decl.], ¶¶ 7-14. V.M.C. explained he was a U.S. citizen and requested to retrieve his birth certificate from his backpack nearby, but the agent refused. *See id.* Instead, the agent led V.M.C. to an unmarked car and took him downtown, where he was held for hours, even though he repeatedly told the officers he was a citizen. *See id.* One agent told a U.S. citizen car wash worker A.V. that his Real ID was fake and demanded to see his passport, but refused to let him get it from the manager's office. Ex. 44 [A.V. Decl.], ¶¶ 3-7. Another agent refused to let a manager get the passport of a handcuffed U.S. citizen worker and pointed a gun at the manager when he attempted to retrieve it. Ex. 43 [Santiago Tafolla Decl.], ¶ 11 (CLEAN member). Based on these facts, the Court finds it likely that Plaintiffs will be stopped again in the future even if they are citizens or lawfully present.

The current record shows similar risks for other Latinos such as Plaintiffs Vasquez Perdomo, Villegas Molina, and Osorto. Although Defendants at the TRO stage tried to portray their stops as a one-off incident "in connection with 'a targeted enforcement action,'" Stay App. 29 (citation omitted), the Court finds that in fact these Plaintiffs were in fact stopped as part of ICE's bid to make arrests of non-targets through race-based profiling. *See* Ex. 29 [officers' text chain] (C.C. saying "bring extra cuffs"); Ex. 27 [DO C.C. Dep.] at 158:3-162:18. There is no reason to think they would not be subjected to the same harm again. They thus face a continued

-26-

threat of future stops arising from the very same policy that Defendants continue to perpetrate. *Contra* Stay App. at 22 (claiming that Plaintiffs had not shown a "sufficient likelihood that [they] will again be wronged *in a similar way*" (quoting *Lyons*, 461 U.S. at 111)).

The threat to Plaintiffs in no way abates because they are in removal proceedings. People already in immigration proceedings are nevertheless stopped. ECF 529-74 [Melendrez Decl.], ¶¶ 8-9; *see also* ECF 539-8 at 7. For instance, E.L.L. was tackled by three agents in a Home Depot parking lot and was detained for five months despite having a pending application for permanent residence. Ex. 54 [E.L.L. Decl.], ¶¶ 4-17. A week after being released from detention, a vehicle pulled up in front of E.L.L. while he was visiting with a neighbor in front of his apartment building. *See id.* Masked agents exited the vehicle, said "don't move", and began interrogating him and his neighbor. *See id.* When E.L.L. told the agents ICE had kept his identification after he was released from detention, they accused him of lying. *See id.* He had to show them his ankle monitor to avoid another arrest. *See id.*

This Court therefore finds that Defendants' arguments against the individual Plaintiffs' standing are without merit and unsupported by the current record.

This Court likewise finds that Defendants' arguments opposing the organizational Plaintiffs' standing at the TRO stage are likewise unsupported by the current record. Defendants previously dismissed the "risk of future harm for the organizations' members" as "speculative." Stay App. at 18; *see also Noem*, 146 S. Ct. at 3-4 (Kavanaugh, J., concurring) (not addressing members of organizational Plaintiffs). But the record shows the opposite. Organizational Plaintiff members include individuals of varying immigration status, including those who have permission to live in the United States. As with Latino U.S. citizens, Defendants have a disturbing track record of seizing noncitizens who are lawfully present. Ex. 86 [GOV-P16-006] (stop of legal resident at Home Depot); Ex. 59 [Ortiz Decl.], ¶¶ 2-5, 8; ECF 529-71 [A.T. I-44]; Ex. 60 [Zapata Santiago Decl.], ¶¶ 3-10; ECF 529-68 [J.D.S. Decl.], ¶¶ 4-9; ECF 529-70 [M.L.S. Decl.], ¶¶ 4-7; Ex. 61 [Johnson Decl.], ¶¶ 5-16. The record also shows Defendants stopping the *same* Latino noncitizens *multiple times*. For example, CLEAN member "Manuel," who has deferred action and work authorization, was stopped in October and December 2025. *See* ECF 529-74 [Melendrez

-27-

[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND
VIOLATION OF EQUAL PROTECTION

Decl.], ¶ 13; *see also* Ex. 54 [E.L.L. Decl.], ¶¶ 3-17 (a deferred action recipient with work authorization and a pending permanent residence application stopped first time at a Home Depot and second time outside apartment building); ECF 529-64 [L.C.C. Decl.], ¶¶ 3-12; *contra* Stay Reply 6 (discussing limited evidence of individuals being stopped twice).  This makes sense, as Defendants' practice is to seize Latinos first and ask questions later—making it impossible for individuals to invoke their lawful status to avoid a detentive stop.  *See, e.g.*, Ex. 87 [GOV-P19-060] (stating "[c]uff him up" as to legal resident J.A.); ECF 529-79 [GOV-P17-051] (stating, with respect to individual with work authorization, "[w]e'll take him to ORP, and if he's good, we'll release him."); Ex. 6 [agents text chain] at GOV 6763-66 (similar).

The record shows that Defendants widely use the very same enforcement methods that led to the stops of individual Plaintiffs and members of organizational Plaintiffs—methods that threaten those very same individuals to this day.  Therefore, Defendants' reliance on the Supreme Court stay and Justice Kavanaugh's views on the TRO record are unavailing.

**B.      The Plaintiffs have standing on their Fifth Amendment claims.**

This Court finds that each Plaintiff has standing to seek injunctive relief on their Fifth Amendment claims.  Each individual Plaintiff and the members of organizational Plaintiffs face a sufficient likelihood that Defendants will violate their Fifth Amendment rights for the reasons stated in Section II, A.

This Court finds that Plaintiffs have standing to seek the injunction being requested for an additional reason related to their new Equal Protection claim.  As the Supreme Court has recognized, "discrimination itself, by perpetuating 'archaic and stereotypic notions' or by stigmatizing members of the disfavored group as 'innately inferior' and therefore as less worthy participants in the political community, can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group." *Heckler v. Mathews*, 465 U.S. 728, 739-40 (1984) (citation modified).  As the targets of Defendants' race-based policy, the individual Plaintiffs and organizational Plaintiffs' members "are unquestionably affected in a personal and individual way" by this discriminatory classification.  *Hassan v. City of New York*, 804 F.3d 277, 291 (3d Cir. 2015) (citation modified).

-28-

They are unable to move freely—including to engage in constitutionally-protected activities such as going to church—without the specter of unlawful seizure on account of their Latino ethnicity.

The Court finds that each Plaintiff has standing on their Fifth Amendment claims because each has been injured by Defendants' unlawful policy and practice of relying on apparent Latino ethnicity to make a stop, and the individual Plaintiffs and organizational Plaintiffs' members face an imminent risk of future injury because of their apparent Latino ethnicity and presence in this District. That harm warrants injunctive relief.

## III.    LIKELIHOOD OF SUCCESS

### A.    The Plaintiffs are likely to succeed on the merits of their Fourth Amendment claim.

This Court finds that plaintiffs are likely to succeed on the merits of their Fourth Amendment claim. The Fourth Amendment guarantees the right of the people against unreasonable seizures. U.S. Const. amend. IV. "Except at the border and its functional equivalents," immigration agents may seize individuals, even briefly, only based on "specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion" that the persons to be stopped are not lawfully present. *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975). This Court finds that Defendants' policy and practice violates that protection.

#### 1.    Defendants' policy and practice of demographic profiling violates the Fourth Amendment

Plaintiffs' newly submitted evidence supports this Court's finding that Defendants are effecting seizures across all types of operations, regardless of what Defendants call those operations.

"A seizure occurs when a law enforcement officer, through coercion, physical force, or a show of authority, in some way restricts the liberty of a person." *United States v. Washington*, 387 F.3d 1060, 1068 (9th Cir. 2004) (citation and internal quotation marks omitted). When Defendants encounter individuals in the District, their typical practice is to ambush them, surrounding them and yelling verbal commands, or physically grab them. This Court finds that the Plaintiff Gavidia, a U.S. citizen, was seized during a roving patrol based on the facts of his

[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION

encounter. *See supra* at 19-20. Similarly, during a so-called "targeted" operation, armed, masked unidentified officers exited their vehicles running and shouting "don't run!" at Plaintiffs Vasquez Perdomo, Villegas Molina, and Osorto. *See* ECF 529-16 [Villegas Molina Decl.], ¶¶ 5-6; ECF 529-15, [Vasquez Perdomo Decl.], ¶¶ 6-7; ECF 529-17 [Osorto Decl.], ¶¶ 5-6. During "targeted area" operations, agents frequently blocked entrances and exits to public areas with their vehicles. For example, Defendants' aerial footage shows agents simultaneously parking their vehicles to block both exits, preventing cars from leaving a Pasadena car wash during a raid. Ex. 88 [sUAS footage of Pasadena Car Wash raid]. This is on top of the significant show of force by armed, masked agents typical of Defendants' operations. *See* Ex. 3 [Kerlikowske Decl.], ¶ 33.

When assessing whether a person is seized for purposes of the Fourth Amendment, courts consider factors such as the number of officers, display of a weapon, physical touching, or the use of language and tone. *United States v. Washington*, 490 F.3d 765, 771-72 (9th Cir. 2007); *see also Orhorhaghe v. I.N.S.*, 38 F.3d 488, 494-96 (9th Cir. 1994). Far from resembling a voluntary encounter, this Court finds that Defendants' stops plainly qualify as involuntary seizures. Moreover, when Defendants conduct vehicle stops on so-called "targeted" operations, that is by definition a seizure. *United States v. Evans*, 786 F.3d 779, 785 (9th Cir. 2015) (discussing *Rodriguez v. United States*, 575 U.S. 348 (2015)); *United States v. Carillo Rea*, 393 F. Supp. 3d 1025, 1033 (D. Mont. 2019)). Defendants' stops are lawful only if they are supported by reasonable suspicion.

The record shows that they are not. The law is clear that reasonable suspicion cannot be based on a "demographic profile." *Kansas v. Glover*, 589 U.S. 376, 385 & n. 1 (2020) (citing *Brignoni-Ponce*, 422 U.S. at 876). Yet that is precisely what Defendants are relying on when they stop Latinos throughout the District based on perceived ethnicity and socioeconomic status. Defendants' reliance on that profile runs headlong into the bedrock Fourth Amendment principle that officers, including immigration officers, cannot "rely solely on generalizations" that cast suspicion on "large segments of the lawabiding population" to make a detentive stop. *United States v. Manzo-Jurado*, 457 F.3d 928, 935 (9th Cir. 2006); *Reid v. Georgia*, 448 U.S. 438, 441 (1980) (stops cannot be based on circumstances that "describe a very large category of presumably

-30-

innocent" people); *see also United States v. Rodriguez*, 976 F.2d 592, 595-96 (9th Cir. 1992) (a "prefabricated or recycled profile of suspicious behavior very likely to sweep many ordinary citizens" will not suffice).

The Court finds that Defendants are effecting seizures under the Fourth Amendment, and that those seizures are unlawful because they are not supported by reasonable suspicion.

**2.    Defendants' stay arguments cannot succeed on the current record**

Defendants have sought to defend their conduct by invoking the "totality of the circumstances" standard:  They argued that agents here use that standard when determining whom to stop, and that race is but one of many (purportedly) relevant or "salient" factors that inform their assessment of reasonable suspicion.  Stay App. at 7-8; *Noem*, 146 S. Ct. at 3 (Kavanaugh, J. concurring).  The post-TRO record confirms that Defendants in fact have abandoned any "totality of the circumstances" analysis by embracing the unlawful "shortcut" of racial profiling.  Ex. 3 [Kerlikowske Decl.], ¶ 21.

The Court's determination that Defendants rely on race as the basis for their detentive stops is dispositive of the Fourth Amendment analysis.  Even if race were simply one basis for stops, that would be unlawful.  *United States v. Montero-Camargo*, 208 F.3d 1122, 1134-35 (9th Cir. 2000).  But the record establishes that race is not only one basis for stops, but the predominant and essential one motivating Defendants' stops.  Agents routinely use a person's Latino appearance as the sole basis for finding that person suspicious.  *See, e.g.*, *supra* at 4 (text chains about looking for "possibles" based on appearance); *supra* at 13 (body camera footage discussing identifying individuals as "tonks" or "wet" based on appearance); ECF 529-57 [H.S.H. Decl.] ¶¶ 9-12 (officer pulling over individual because he looks like a "paisa").  Further, multiple supervisory agents have acknowledged that agents look for individuals with "Hispanic ethnicity." Ex. 12 [SBPA V.S. Dep.] at 125:2-137:3; Ex. 23 [SBPA I.F. Dep.] at 137:10-139:1.  They do so *in disregard of* the demographics of the District, where a high percentage of Latinos are legally present or U.S. citizens.  *See* Ex. 12 [SBPA V.S. Dep.] at 135:10-137:3.  Even under a standard that would allow race as *one* consideration among other distinct factors, the post-TRO record

[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION

shows that Defendants' policy and practice is unlawful. *See Noem*, 146 S. Ct. at 3 (Kavanaugh, J. concurring).

Some of Defendants' witnesses have tried to avoid the impression that they are making stops solely based on race by insisting that they are targeting "day laborers." *See, e.g.*, Ex. 4 [CBP 30(b)(6) Dep.] at 155:11-161:5. Even accepting that proposition, it does not establish they are complying with the Fourth Amendment; moreover, record shows that Defendants use "day laborer" as shorthand for low-income or working-class *Latino*. *See supra* at 12-16. Defendants' witnesses did not have information about whether the workers they stopped were paid in cash, Ex. 23 [SBPA I.F. Dep.] at 201:25-202:3, 279:13-280:9, Ex. 12 [SBPA V.S. Dep.] at 122:19-21, 224:9-15, consistently lumped in "day laborer" occupations with those that do not frequently offer daily work, *see supra* at 14-15, and agents routinely stopped individuals—including when they were not even at work or trying to obtain work—based on their purported *appearance* as a "day laborer," *see supra* at 15, an appearance that one officer described as "[o]lder Hispanic male[]," Ex. 27 [DO C.C. Dep.] at 158:3-162:18. Defendants' enforcement practices at purported "day laborer" locations leave no doubt that race is driving their decisions about whom to stop: The record shows agents seizing Latino *customers* while leaving non-Latino *workers* alone. *See supra* at 15. If race was not driving Defendants' enforcement policy, that would not happen.

None of the other would-be "salient" factors Defendants claim to rely upon bridge the gap to reasonable suspicion. Contrary to Defendants' suggestions at the TRO stage, the record shows that Defendants (at most) use language or location as a basis for demographic profiling, not as part of the totality-of-the-circumstances analysis that the law requires. *See United States v. Cortez*, 449 U.S. 411, 417-18 (1981) (requiring a "particularized and objective basis for suspecting the particular person stopped of criminal activity"). To the extent Defendants are relying on the language a person speaks, they are not doing so to assess whether an individual *can* speak English. For example, a U.S. citizen car wash worker initially responded to agents in Spanish because agents spoke to him in Spanish. *See, e.g.*, Ex. 43 [Santiago Tafolla Decl.], ¶ 12; *see also* Ex. 58

[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION

[V.M.C. Decl.], ¶ 9 (similar); Ex. 36 [J.A.P. Decl.], ¶ 4 (agents began encounter in Spanish).[7] Under such circumstances, the Court finds that Defendants view speaking Spanish as a mere proxy for ethnicity. And one's location in relation to other individuals who may lack status—e.g., frequenting the same shopping plaza or living in the same neighborhood—can hardly be the basis for reasonable suspicion. It is well established that officers cannot seize an individual because of the individual's "mere propinquity to others." *Ybarra v. Illinois*, 444 U.S. 85, 91, 94 (1979); *Montero-Camargo*, 208 F.3d at 1138-39 (warning that reliance on presence in a "high crime area" can likewise easily become "a proxy for race or ethnicity").[8] The Court finds that these demographic characteristics, i.e., speaking a language millions of people in the District speak and spending time in neighborhoods where hundreds of people live or work, do little to "winnow[]the broad profile into an objective and particularized suspicion of the person to be stopped." *Manzo-Jurado*, 457 F.3d at 936-40 (apparent ethnicity, location, not understanding English, and appearing to be part of a work crew insufficient); *see also Rodriguez*, 976 F.2d at 595-96 (a "prefabricated or recycled profile of suspicious behavior very likely to sweep many ordinary citizens" will not suffice).

Defendants' demographic profiling is perhaps shown most clearly by their pattern of stopping non-targets in allegedly "targeted" operations. The record shows that when Defendants conduct such operations, they routinely stop individuals who are not at the last known address of their "target," not driving the vehicle associated with their "target," and do not resemble their "target." For example, Defendants allege that G.V.C. was approached because he "resembl[ed]" someone ICE was looking for at the same shopping center. ECF 529-37 [G.V.C. I-213]. But apart from sharing the same ethnicity, G.V.C. does not resemble the "target" C.G.C. at all. *Compare id.* (depicting photo of G.V.C.) *with* Ex. 64 [officers' text chain] at GOV 7884-85

[7] More than a third of the population of Los Angeles speaks Spanish at home. Lai Decl., ¶ 114.
[8] Stopping a worker merely because another worker at the car wash may not have status is likewise unreasonable. *See* Ex. 23 [SBPA I.F. Dep.] at 244: 11-20, 262:3-263:7 (discussing stop of Latino legal resident Zapata Santiago); Ex. 89 [I.F. body camera video]; Ex. 4 [CBP 30(b)(6) Dep.] at 246:13-249:25, 296:7-317:7; Ex. 62 [CBP 30(b)(6) Dep. Ex. 160]; *Perez Cruz v. Barr*, 926 F.3d 1128, 1138 (9th Cir. 2019).

[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION

(showing C.G.C. "baseball card" with photo); Ex. 5 [DO E.O. Dep.] at 93:7-103:15, 119:4-129:25 (discussing current use of "baseball cards" generated from Elite).

If Defendants were actually trying to stop their "targets," they could take any manner of steps to confirm that a person was indeed who they were looking for prior to seizing them.  But as expert Kerlikowske explains, Defendant's behavior is inconsistent with how officers would behave when attempting to apprehend a "target."  *See* Ex. 3 [Kerlikowske Decl.], ¶¶ 29-31; *see also* Ex. 5 [DO E.O. Dep.] at 162:7-163:2, 197:5-198:1, 204:13-205:15, 248:12-250:7, 265:7-19, 292:6-293:3 (testifying that even though he can check vehicles at an address of a "target" in cases here he did not run license plates prior to initiating any stops).  Defendants acknowledge in these instances that they are using ethnicity to determine who to stop.  *See, e.g.*, Ex. 2 [SDDO C.C. Dep.] at 240:13-241:3 (admitting reliance on ethnicity); Ex. 5 [DO E.O. Dep.] at 267:2-24, 300:8-13 (same).

The Court finds that Defendants' practice in allegedly "targeted" operations contravenes the Fourth Amendment.  That is true even where a person fits the same broad demographic characteristics of a suspect.  In *Lomeli v. County of San Diego*, 637 F. Supp. 3d 1046 (S.D. Cal. 2022), for example, a court held that officers would not have reasonable suspicion to stop a vehicle approximately 1.4 miles from a reported robbery even though the officers believed the occupants of the vehicle "matched the race and sex of the suspects."  *Id.* at 1059-62.  The court explained that reliance on those characteristics "cast [ ] too wide a net to play any part in a particularized reasonable suspicion determination."  *Id.* at 1061 (citing *Montero-Camargo*, 208 F.3d at 1133-34); *see also Sharp v. Cnty. of Orange*, 871 F.3d 901, 911 (9th Cir. 2017) (discussing *United States v. Delgadillo-Velasquez*, 856 F.2d 1292 (9th Cir. 1988)); *Rios v. Cnty. of Los Angeles*, No. 2:24-CV-04782-MEMF-MBK, 2025 WL 2841145, at *7 (C.D. Cal. Oct. 7, 2025) (officers' misidentification less reasonable because they actually knew what suspect looked like).

This Court finds that unlike in *Lomeli*, Defendants' stops are not even limited in time to a reported incident.  The record shows that anyone who shares general characteristics of Defendants' "targets" may be stopped by virtue of living in, spending time in, or passing through an area.  *Cf. Washington v. Lambert*, 98 F.3d 1181, 1183, 1190-91 (9th Cir. 1996) (that plaintiffs

-34-

"bore a resemblance to a general description of two African-American suspects" was "an insufficient basis for such an intrusive stop" as that could cover "a significant percentage of African-American males walking, eating, going to work or to a movie, ball game or concert"). To be sure, law-enforcement officers may validly use any number of factors as part of a particularized, totality-of-the-circumstances analysis regarding a specific person. But this Court finds that Defendants' policy and practice of sweeping up individuals based on broad demographic profiling is not that.

Defendants urged the Court to look past the myriad issues with their detentive-stop policy at the TRO stage by portraying their stops as mere "brief" encounters. Stay App. at 27; *see also Noem*, 146 S. Ct. at 3 (Kavanaugh, J. concurring). But the record is now clear that Defendants' portrayal was grossly inaccurate and misleading. The record shows a practice of detaining individuals without affording them an opportunity to show documentation of citizenship or lawful presence. *See supra* at 26 (examples of U.S. citizens detained without being allowed to retrieve documentation or where agents refused to review documentation). U.S. citizen V.M.C. was prohibited from retrieving his birth certificate and was taken downtown and detained for hours despite repeatedly telling agents he was a U.S. citizen. Ex. 58 [V.M.C. Decl.], ¶¶ 7-14. Still others have been subject to prolonged detention despite their lawful presence, or to harsh treatment despite being citizens. ECF 529-74 [Melendrez Decl.], ¶ 13 (CLEAN member with lawful presence taken away from car wash before being released); Ex. 90 [GOV-VID_001]; Ex. 91 [GOV-P17-006] (videos showing agents slamming Plaintiff Gavidia against a fence even as he protested that he was born in Los Angeles); Ex. 36 [J.A.P. Decl.], ¶¶ 3-6 (ICE vehicles trapped Latino U.S. citizen in a McDonald's parking lot in San Bernardino). The Court finds that evidence of officers detaining and conducting intrusive stops of citizens and lawfully present individuals is consistent with how Defendants have generally approached their job since June 2025. *See supra* at 27-28 (evidence showing Defendants' practice of seizing first and asking questions later); Ex. 92 [GOV-P17-045] (agent stating crudely in response to question about individual described as "not wet" whom Defendants had taken from a car wash, "[i]f he's a citizen . . . we'll let him go, easy as that").

-35-

The record also shows that Defendants' claims of *consensual* encounters are not credible. For example, in Defendants' opposition to Plaintiffs' preliminary injunction motion last year, Defendants characterized their contact with Plaintiff Viramontes as "consensual." *See* ECF 170 at 3-4. But video footage corroborated Plaintiff Viramontes' account that the encounter was a seizure. *See supra,* at 20. Body camera footage also flatly disproved that Plaintiff Gavidia's encounter with agents was "self-initiated." *See supra,* at 19-20.[9]

Finally, the record shows a regular practice of extending vehicle stops even after they have *resolved* any prior, purported basis for reasonable suspicion. In these circumstances, Defendants routinely prolong vehicle stops without any indication that the person is free to leave. *See, e.g., supra* at 8-11 (individuals describing being boxed in by ICE vehicles); Ex. 3 [Kerlikowske Decl.], ¶ 34; Ex. 5 [DO E.O. Dep.] at 251:23-253:24 (did not explain motorist was free to leave). The Court finds that these prolonged vehicle stops are unquestionably seizures. *See, e.g.*, *Evans*, 786 F.3d at 785 (discussing *Rodriguez*, 575 U.S. 348); *Carillo Rea*, 393 F. Supp. 3d at 1033). Defendants do not even try to justify the extension of vehicle stops with reasonable suspicion; rather, they claim, incorrectly, that the subsequent questioning is "consensual." *See* Ex. 5 [DO E.O. Dep.] at 253:13-21, 281:11-284:10 (other narratives of vehicle stop "collateral" arrests follow same pattern); ECF 529-41 [G.N.L. I-213]; ECF 529-42 [E.C.H. I-213]; ECF 529-40 [J.C. I-213]; Ex. 32 [R.M.D. I-213].

**Flight.** Defendants argue that their stops are based on someone taking flight. The Court finds that in numerous cases there is simply no flight. Even where arrest narratives claim flight, available body camera video often shows otherwise. *See* ECF 539-8 at 6-7; *see also* compare Ex. 69 [J.A.V. I-44] (claiming flight) with Ex. 87 [GOV-P19-060] (body camera video showing no

---

[9] Arrest narratives where they had asserted encounters were voluntary were also wrong. *See* ECF 529-47 [E.K.Z.L. narrative] (suggesting E.K.Z.L. freely admitted he was not lawfully present); Ex. 12 [SBPA V.S. Dep.] at 233:22-234:4 (acknowledging he had "hands on" E.K.Z.L. before asking him his citizenship); Ex. 94 [body camera video]. *See also* ECF 529-36 [E.C.P. I-213] (claiming encounter was consensual); Ex. 66 [E.C.P. narrative] (contradicting I-213 and conceding E.C.P. was detained, allegedly because she ran); Ex. 67 [Second E.C.P. Decl.] (explaining that due to an injury she could not run); Ex. 68 [E.L.R. narrative] (suggesting E.L.R. freely admitted he did not have documents when approached for questioning); Ex. 95 [GOV-P17-059] (showing agent placed a hand on E.L.R.'s shoulder to question him).

[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND
VIOLATION OF EQUAL PROTECTION

flight).  An analysis of arrest narratives produced in expedited discovery shows that identical language about reasonable suspicion and flight came from a template and was repeated in nearly every narrative from the Westlake Home Depot operation, for example.  *See* Lai Decl, ¶¶ 76-77.  And the narratives sometimes contain errors indicating that they are copied and pasted from prior narratives.  *See, e.g.*, Lai Decl., ¶ 80 (showing that even narratives from car wash operations contained the same language about reasonable suspicion and flight that clearly pertains to a Home Depot operation); Ex. 70 [M.G. I-213] (listing target name as "The target alien" and indicating repeatedly that stop took place at an incorrect Home Depot location 20 miles away); Ex. 51 [M.G. Decl.], ¶¶ 4-5 (explaining he did not run); Ex. 52 [Castillo Decl.], ¶¶ 6-11.  In many cases, arresting officers are not the individuals completing the required forms related to an arrest, which further undermines the trustworthiness of the narratives.  Ex. 3 [Kerlikowske Decl.], ¶ 43.  Moreover, where Defendants are approaching individuals so aggressively, with masked, armed agents coming out of nowhere, there can be little surprise that they sometimes provoke flight.  *See, e.g.*, Ex. 57 [H.A. Decl.] (took flight despite being a U.S. citizen); Ex. 43 [Santiago Tafolla Decl.] (same); Ex. 96 [GOV-P16-014] (TPS holder who fled at Westlake Home Depot operation); *United States v. Rodella*, 804 F.3d 1317, 1326 (10th Cir. 2015).  *See also United States v. Brown*, 925 F.3d 1150, 1157 (9th Cir. 2019).  The Court finds that agents ignored the minimal  probative value of any provoked flight.  *See, e.g.*, Ex. 12 [SBPA V.S. Dep.] at 277:5-279:11; Ex. 27 [DO C.C. Dep.] at 244:23-245:22; Ex. 23 [SBPA I.F. Dep.] at 327:24-328:5; Ex. 24 [BPA J.C. Dep.] at 327:6-11.  Defendants' claim of flight therefore cannot rescue their stops.

Aggregating broad characteristics does not produce the individualized assessment the Fourth Amendment requires.  Because Defendants may not abandon the totality of the circumstances test in favor of a demographic profile, this Court finds that Defendants' policy and practice violates the Fourth Amendment.

**B.**    **Plaintiffs are likely to succeed on the merits of their Fifth Amendment claim.**

This Court finds that Plaintiffs are likely to succeed on the merits of their claim that Defendants' policy and practice of considering Latino ethnicity in determining who to stop is a form of clear race-based decision-making, where the government relies, in whole or in part, on

-37-

express racial categorization to cast a group of people as presumptively suspicious.  Independent of the Fourth Amendment, this contravenes the "'core purpose' of the Equal Protection Clause: 'do[ing] away with all governmentally imposed discrimination based on race.'"  *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023) (quoting *Palmore v. Sidoti*, 466 U.S. 429, 432 (1984)); *see also Buck v. Davis*, 580 U.S. 100, 124 (2017) ("Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice." (citation omitted)).  The Supreme Court has made clear that "the Constitution prohibits selective enforcement of the law based on considerations such as race." *Whren v. United States*, 517 U.S. 806, 813 (1996).  Interior immigration enforcement is no exception.  *See Trump v. Illinois*, 146 S. Ct. 432, 436 n.4 (2025) (Kavanaugh, J., concurring) ("officers must not make interior immigration stops or arrests based on race or ethnicity" (citing *Whren*, 517 U.S. at 813).

Defendants have openly admitted under oath to relying on Latino ethnicity to target individuals like Plaintiffs and their members.  *See, e.g.*, Ex. 12 [SBPA V.S. Dep.] at 125:2-137:3; Ex. 23 [SBPA I.F. Dep.] at 137:10-139:1; *see also supra* at 15, 34.  The Court need look no further than the fact that Defendants have stopped so many U.S. citizens, *supra* at 25-26, and even customers of businesses, *supra* at 15-16, to know this.  This express reliance on race is endorsed by leadership.  *See, e.g.*, Ex. 4 [CBP 30(b)(6) Dep.] at 230:5-234:7; *supra* at 17-19.

When Defendants single out individuals to stop based on their Latino ethnicity, that constitutes a suspect racial classification.  *Melendres v. Arpaio*, 989 F. Supp. 2d 822, 902 (D. Ariz. 2013), *aff'd in part*, *vacated in part*, 784 F.3d 1254 (9th Cir. 2015) (policies "make overt racial classifications because they permit the consideration of race as one factor among others in making law enforcement decisions"); *Floyd v. City of New York*, 959 F. Supp. 2d 540, 663 (S.D.N.Y. 2013) (directive to target "'male blacks 14 to 21' for stops" constitutes an express classification).  Defendants also employ an express racial classification when they choose locations to target for enforcement activity because Latinos frequent them, such as Home Depots and car washes.  *See supra* at 6-12 (discussing how Defendants select locations for operations); *Melendres*, 989 F.

-38-
[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND
VIOLATION OF EQUAL PROTECTION

Supp. 2d at 850-51, 899-900 (conducting operations based on "combination of race and work status" of those present is an express classification).

Such racial classifications "automatically trigger strict scrutiny regardless of evidence of intent," *Gonzalez-Rivera v. I.N.S.*, 22 F.3d 1441, 1450 (9th Cir. 1994), and regardless of whether "race is merely one factor that motivates action," *Melendres*, 989 F. Supp. 2d at 901; *see also Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 201 (1995) ("any official action that treats a person differently on account of his race or ethnic origin is inherently suspect."); *Wayte v. United States*, 470 U.S. 598, 610 n.10 (1985) (strict scrutiny applies even in the absence of discriminatory purpose). This Court finds that Defendants' policy and practice fails strict scrutiny analysis. *See Adarand Constructors, Inc.*, 515 U.S. at 227 ("[A]ll governmental action based on race—a group classification long recognized as 'in most circumstances irrelevant and therefore prohibited'— should be subjected to detailed judicial inquiry to ensure that the personal right to equal protection of the laws has not been infringed." (citation omitted)); *Melendres*, 989 F. Supp. 2d at 902. No court has ever recognized a compelling interest in prohibited race-based decision-making in interior immigration enforcement. *See Students for Fair Admissions, Inc.*, 600 U.S. at 207 (recounting the only two circumstances in which the Court recognized a compelling government interest in using an express racial classification).

Defendants' reliance on Latino ancestry fails the Fifth Amendment's narrow tailoring requirement, particularly in a region so heavily populated by Latinos of all statuses. *Melendres*, 989 F. Supp. 2d at 901 ("[T]he fact that a person is Hispanic and is in Maricopa County is not a narrowly-tailored basis on which one could conclude that the person is an unauthorized [immigrant], even if a great majority of the unauthorized persons in Maricopa County are Hispanic."). This Court finds that Defendants' racial classification is over-inclusive, subjecting an unprecedented number of U.S. citizens and those who are lawfully present to discriminatory treatment. *See supra* at 25-26 (discussing stops of U.S. citizens and those lawfully present and the stigmatizing impact of the denial of equal treatment). The Court also finds that it is underinclusive if their actual goal is immigration enforcement, because it causes officers to divert their attention from would-be targets based on individualized investigations. Ex. 3 [Kerlikowske Decl.], ¶ 21.

[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION

This Court finds that Plaintiffs are likely to succeed on their claim that Defendants' policy and practice of targeting Latinos is an express racial classification that violates the Fifth Amendment's guarantee of equal protection.

## IV.    IRREPARABLE HARM

The Court finds that without judicial intervention, Defendants' illegal policy and practice is likely to cause Plaintiffs continued irreparable harm.  Plaintiffs here need only demonstrate "a real possibility" that they are likely to suffer irreparable harm absent preliminary relief. *Melendres*, 695 F.3d at 1002.  "It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Warsoldier v. Woodford*, 418 F.3d 989, 1001-02 (9th Cir. 2005).  So too does the "[d]eprivation of physical liberty by detention constitute[] irreparable harm." *Arevalo v. Hennessy*, 882 F.3d 763, 767 (9th Cir. 2018); *Rodriguez v. Robbins*, 715 F.3d 1127, 1144-45 (9th Cir. 2013).

Plaintiffs experience irreparable harm because they face "a real possibility" that they will "be . . . stopped or detained [unlawfully]." *Melendres*, 695 F.3d at 1002; *Int'l Molders' & Allied Workers' Loc. Union No. 164 v. Nelson*, 799 F.2d 547, 553 (9th Cir. 1986).  Because of that, Plaintiffs are unable to freely go about their daily lives.  Each organization's members have limited their activities because they fit the demographic profile targeted by Defendants' policies and fear of future unlawful detentions.  For example, a CHIRLA member who is visibly Latino and who works in construction changed his behavior to avoid future stops.  ECF 529-73 [Salas Decl.], ¶¶ 21-23.  He no longer commutes in his construction clothes because he fears that he will be stopped for driving in dirty, dusty clothing.  *Id.*  Instead, he changes into more formal clothes to drive.  *Id.*  Similarly, LAWCN members have "limited leaving the house to absolute necessities" and "[woken] up in the night in panic".  ECF 529-74 [Melendrez Decl.], ¶¶ 17-21.  UFW members describe how they have  "avoided going to doctor's appointments, church, or the store" and reduced "number of trips to . . . other public places".  ECF 529-76 [Strater Decl.], ¶¶ 23, 35-38. And each day Defendants' policy remains in effect, Plaintiffs, including U.S. citizens, suffer irreparable harm by being subject to discriminatory treatment on account of their race, consequently enduring a persistent threat to their liberty, dignity, and sense of belonging.

-40-

Community members who have experienced stops, including U.S. citizens, have discussed the heavy toll they take.  *See* Ex. 43 [Santiago Tafolla Decl.], ¶ 18 ("I could not sleep for a week I was so shocked by what happened to me."); Ex. 44 [A.V. Decl.], ¶ 9 ("I feel like I have no sense of security—that my citizenship means nothing."); Ex. 13 [Gavidia Decl.], ¶¶ 12-13; Ex. 65 [Third Hernandez Viramontes Decl.], ¶ 8 (now carries passport card with him out of fear of being stopped again).

Defendants have shown no sign of backing away from their policy and practice and continue to engage in suspicionless stops of Latinos across the District today.  *See supra* at 17 (operation names may change, but practices remain the same); *see supra* at 18 (ICE field teams have doubled their ranks).  Community members, including U.S. citizens, continue to report experiences with profiling.  *See supra* at 5-6, 9-11.

Leadership in Washington D.C. recently announced plans to "flood the zone" and increase "collateral arrests" even more.  ECF 539-8 at 8.  Just weeks ago, ICE officials were told to double daily arrest numbers to meet the government's "pledge of mass deportations."[10]  That directive resulted in a "surge" in enforcement operations, even as DHS attempted to leave a "quieter" footprint.[11]  The recent killings of Lorenzo Salgado Araujo and others show the potentially deadly consequences of Defendants' non-targeted profiling practices.[12]  Defendants' actions and statements remove any doubt that, absent an injunction, that harm will continue.[13]

---

[10] Hamed Aleaziz, *Immigrant Arrests Surge to 10,000 in 5 Days as ICE Clamps Down*, N.Y. Times (July 1, 2026), https://www.nytimes.com/2026/07/01/us/politics/ice-immigrant-arrests-surge.html.

[11] *Id.*

[12] *See* Aoife Walsh, *Man fatally shot by ICE in Houston was not intended target, DHS says,* BBC (July 10, 2026), https://www.bbc.com/news/articles/cm2rm66xd17o; Alison Durkee and Zachary Folk, *Man Shot By ICE In Maine Was Not Operation's Target*, Forbes (July 13, 2026), https://www.forbes.com/sites/alisondurkee/2026/07/13/man-shot-by-ice-in-maine-was-not-operations-target-senator-says/.

[13] For example, Defendants have conducted virtually no investigations into misconduct by DHS personnel.  Ex. 3 [Kerlikowske Decl.], ¶ 44.  Officer E.O. has never been subject to discipline despite appearing to regularly engage in extraordinary uses of force, including shooting a U.S.

[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION

## V.    BALANCE OF EQUITIES AND PUBLIC INTEREST

When the federal government is a party, the balance of the equities and public interest factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073 (9th Cir. 2014). The Court finds that the balance of equities tips sharply in Plaintiffs' favor because the "public interest benefits" when "individuals are not deprived of their liberty" by unlawful processes and "preventable human suffering" is avoided. *Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017) (citation modified). Notably, the interest at stake for Plaintiffs, who include U.S. citizens, is not "an interest in evading the law." *Contra Noem*, 146 S. Ct. at 5 (Kavanaugh, J., concurring). It is an interest, safeguarded by our Constitution, in constraining the abuse of government power and living free from discrimination.

In contrast, Defendants cannot demonstrate they are likely to suffer harm by complying with the Constitution. "Complying with the law does not impose harm." *Zepeda v. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983). In fact, the contrary is true. *See* Ex. 3 [Kerlikowske Decl.], ¶¶ 46-49 ("[t]rained and experienced agents and officers can enforce the nation's immigration laws without resorting to profiling"). Former CBP Commissioner Kerlikowske opines that the preliminary injunction proposed by Plaintiffs is understandable and workable because it "provides necessary guidance without unduly limiting officers' discretion to respond to real-time developments in the field" and its documentation provisions are "standard" and "will help leadership better track what is going on and make appropriate interventions." *Id.* at ¶¶ 48-49. The Court credits that opinion based on the witness's direct experience leading CBP.

The Court, having considered Plaintiffs' Motion for Preliminary Injunction, the parties, filings, the arguments of counsel, and the record in this case, and finding good cause therefore, hereby **GRANTS** the Motion and **ORDERS** as follows:

---

citizen who was attempting to drive away from the scene of an immigration vehicle stop after having been ordered by E.O. to leave. Ex. 5 [DO E.O. Dep.] at 326:17-327:24, 330:22-340:22; *see also* Anthony Victoria, *Attorneys say Ontario ICE shooting fits 'pattern' of aggressive enforcement*, KVCR (Nov. 15, 2025), https://www.kvcrnews.org/local-news/2025-11-15/attorneys-say-ontario-ice-shooting-fits-pattern-of-aggressive-enforcement. He is still in the field today.

[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION

1.      Pursuant to the Fourth Amendment, except when such a stop is conducted at a port of entry, checkpoint, or other functional equivalent of the border, Defendants are enjoined from enforcing their policy and practice of conducting detentive stops in this District based on racial stereotyping, rather than a pre-stop individualized, particularized assessment of reasonable suspicion that the person to be stopped is present within the United States in violation of U.S. immigration law.

a.      In developing reasonable suspicion, an immigration agent or officer must consider the totality of circumstances and may not rely solely on apparent status as low-income or working-class and Latino.

b.      An immigration agent or officer may not stop an individual on the ground that an individual may be a "target" without a reasonable basis to believe that the individual is the person Defendants identified as their "target."

2.      Pursuant to the guarantee of Equal Protection in the Fifth Amendment, when conducting a detentive stop in this District, Defendants are enjoined from relying in whole or in part on a person's perceived Latino ethnicity, except in connection with a known target description provided there is a reasonable basis to believe that the individual is the person Defendants identified as their "target."

3.      Defendants are ordered to document, as soon as practicable, the facts and circumstances surrounding any field encounter involving questioning that they conduct in this District in a narrative form, including:

a.      The immigration violation being investigated;

b.      The name, unique identifying number, and team/unit of each agent or officer involved;

c.      Identifying information and the agent or officer's subjective perception of the race and ethnicity of the person encountered;

d.      The date, time, and location of the encounter;

e.      A statement of whether the encounter is a detentive stop, and if not, why not;

-43-

[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND
VIOLATION OF EQUAL PROTECTION

f.    For all detentive stops, including stops that do not result in arrest, the individualized, particularized facts that supported an agent's or officer's assessment of reasonable suspicion, based on facts known in advance of the stop, that the individual to be stopped—or for vehicle stops, that someone in the vehicle to be stopped—was present within the United States in violation of U.S. immigration law;

g.    The outcome of the encounter, including whether agents or officers made an arrest;

h.    Whether agents contemporaneously recorded the encounter in any manner; and

i.    The date and time the agent or officer completed the documentation.

4.    Within 30 days of this Order and every 30 days thereafter until this litigation is terminated or the Court rules otherwise, Defendants shall provide to Plaintiffs' counsel the documentation describing any field encounter involving questioning, including detentive stops that do not result in arrest, made by Defendants and their agents or officers within this District, or if requested by Plaintiffs' counsel, documentation concerning any specific individual, no later than seven days after the request.

5.    The Court, having found a strong likelihood of success on the merits and that the balance of equities overwhelmingly favors Plaintiffs, further ORDERS that no security shall be required under Federal Rule of Civil Procedure 65(c).

IT IS SO ORDERED.

DATED: _____, 2026


_____
HON. MAAME EWUSI-MENSAH FRIMPONG

[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION