O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Pedro Vasquez Perdomo *et al.*,<br><br>             Plaintiffs,<br><br>       v.<br><br>Markwayne Mullin *et al.*,<br><br>             Defendants. | Case No.: 2:25-cv-05605-MEMF-SP<br><br>**ORDER DENYING DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT [DKT. NO. 494]** |

The people and organizations who brought this lawsuit accuse the Government of breaking the law in two ways. First, they accuse the Government of stopping people without a valid reason. Second, they accuse the Government of preventing people in immigration detention from speaking with attorneys. This case asks this Court to put a stop to those actions.

The Government asks this Court to end this case now. They say that accusations in the latest version of the complaint—the legal document at the heart of this case—are not enough to support their legal claims. After reviewing this version of the complaint, this Court rules that the accusations are enough for this case to go forward at this time.

1

\*    \*    \*

Before this Court is the Motion to Dismiss Plaintiffs' Second Amended Complaint filed by Defendants. Dkt. No. 494. For the reasons that follow, the Motion is DENIED.

## I.    Factual Allegations

The following factual background is derived from the allegations in Plaintiffs' newly operative Second Amended Complaint, Dkt. No. 485 ("2AC"), except where otherwise indicated. For the purposes of adjudicating this Motion, the Court treats these factual allegations as true. *Soo Park v. Thompson*, 851 F.3d 910, 918 (9th Cir. 2017). At this stage of the litigation, however, the Court makes no finding on the truth of these allegations, and is therefore not—at this stage—finding that they *are* true.

### A.  Factual Background

i.  The Parties

1.  *Plaintiffs*

Plaintiffs Pedro Vasquez Perdomo ("Vasquez Perdomo"), Carlos Alexander Osorto ("Osorto"), and Isaac Villegas Molina ("Villegas Molina") are residents of Pasadena, California. 2AC ¶¶ 15–17. They were arrested at a bus stop as they were waiting to be picked up for a job on June 18, 2025. *Id*. They filed this action while in detention. *Id.*

Plaintiff Jorge Hernandez Viramontes ("Hernandez Viramontes") is a resident of Baldwin Park, California. *Id.* ¶ 18. He works at a car wash in Whittier, California. *Id.* Immigration agents have visited the car wash multiple times. *Id.* On June 18, 2025, though he informed federal agents that he is a U.S. citizen, agents questioned and detained him. *Id.*

Plaintiff Jason Brian Gavidia ("Gavidia") is a resident of East Los Angeles, California. *Id.* ¶ 19. He is a U.S. citizen. *Id.* Though he explained this to immigration agents multiple times, immigration agents stopped and questioned Gavidia at a tow yard in Los Angeles County on June 12, 2025. *Id.*

/ / /

Plaintiff Los Angeles Worker Center Network ("LAWCN") is a "multi-racial, multi-ethnic, and multi-industry organization comprised of worker centers and labor organizations that work together to address injustices faced by low-wage workers in the greater Los Angeles area, including immigrant and non-English-speaking workers." *Id.* ¶ 20. LAWCN has worker centers as organizational members; they, in turn, have individual members, including noncitizens with legal status and U.S. citizens. *Id.*

Plaintiff United Farm Workers ("UFW") is a farm worker union with approximately 10,000 members, with more members in California than in any other state. *Id.* ¶ 21. UFW's members in California work at agricultural sites as well as non-agricultural sites within this District. *Id.* UFW's members include noncitizens with legal status and U.S. citizens. *Id.*

Plaintiff Coalition for Humane Immigrant Rights ("CHIRLA") is a nonprofit organization with its principal place of business in Los Angeles, California. *Id.* ¶ 22. CHIRLA was founded in 1986 to advance the human and civil rights of immigrants and refugees. *Id.* As a membership organization, CHIRLA has approximately 50,000 members across California, including both U.S. citizens and noncitizens of varying immigration statuses. *Id.* CHIRLA has members in every county in the District. *Id.*

Plaintiff Immigrant Defenders Law Center ("ImmDef") is a nonprofit organization with its principal place of business in Los Angeles, California. *Id.* ¶ 23. Besides Los Angeles, ImmDef has offices in Riverside, Santa Ana, and San Diego, California, and works across the U.S.–Mexico border in Tijuana. *Id.* ImmDef was founded in 2015 to protect the due process rights of immigrants facing deportation. *Id.*

The Court refers to the five individual plaintiffs, LAWCN, UFW, and CHIRLA collectively as "Stop/Arrest Plaintiffs." The Court refers to ImmDef and CHIRLA collectively as "Access/Detention Plaintiffs."[1] The Court addresses all plaintiffs collectively as "Plaintiffs."

/ / /

---

[1] The 2AC at times refers to these plaintiffs as the "Access/Conditions Plaintiffs." *See* 2AC ¶¶ 11, 281–91.

2. *Defendants*

Defendant Kristi Noem ("Noem") is the Secretary of the Department of Homeland Security ("DHS"), which is responsible for administering and enforcing the nation's immigration laws pursuant to 8 U.S.C. § 1103(a). *Id*. ¶ 24. Noem is sued in her official capacity. *Id*.

Defendant Todd M. Lyons ("Lyons") is the Acting Director of U.S. Immigration and Customs Enforcement ("ICE"), an agency of the United States within the DHS. *Id*. ¶ 25. ICE is responsible for the stops, arrests, and custody of individuals believed to be in violation of civil immigration law. *Id*. Lyons is sued in his official capacity. *Id*.

Defendant Rodney S. Scott ("Scott") is the Commissioner of U.S. Customs and Border Protection ("CBP"), the agency within the DHS that is responsible for enforcing immigration laws at or close to the U.S. border. *Id*. ¶ 26. Scott has direct authority over all CBP policies, procedures, and practices related to stops, arrests, and detention. *Id*. Scott is sued in his official capacity. *Id*.

Defendant Michael W. Banks ("Banks") is Chief of the U.S. Border Patrol. *Id*. ¶ 27. Banks has direct authority over all Border Patrol policies, procedures, and practices related to stops, arrests, and detention. *Id*. Banks is sued in his official capacity. *Id*.

Defendant Kash Patel ("Patel") is Director of the U.S. Federal Bureau of Investigation ("FBI"). *Id*. ¶ 28. In that capacity, Patel is responsible for the direction and oversight of all operations of the FBI. *Id*. Patel is sued in his official capacity. *Id*.

Defendant Pam Bondi ("Bondi") is the U.S. Attorney General. *Id*. ¶ 29. Bondi is head of the Department of Justice ("DOJ") and is responsible for the direction and oversight of all operations of the DOJ. *Id*. Bondi is sued in her official capacity. *Id*.

Defendant Jaime Rios ("Rios") is the Acting Field Office Director for the Los Angeles Field Office of ICE. *Id*. ¶ 30. Rios is responsible for the supervision of personnel within ICE's Enforcement and Removal Operations ("ERO") in the geographic area covered by the Los Angeles Field Office, which comprises the seven counties in the District, and facilities within the District, including one known as B-18. *Id*. Rios is sued in his official capacity. *Id*.

Defendant Dean T. Sorenson ("Sorenson") is the U.S. Homeland Security Investigations Special Agent in Charge for Los Angeles. *Id*. ¶ 31. Wang is responsible for the supervision of agents

within ICE's Homeland Security Investigations ("HSI") in the Los Angeles area. *Id*. Wang is sued in his official capacity. *Id*.

Defendant Gregory K. Bovino ("Bovino") is the Chief Patrol Agent for the El Centro Sector of the CBP. *Id*. ¶ 32. In that capacity, Bovino is responsible for the supervision of agents in the El Centro Sector. *Id*. Bovino is sued in his official capacity. *Id*.

Defendant Justin De La Torre ("De La Torre") is the Acting Chief Patrol Agent for the San Diego Sector of the CBP. *Id*. ¶ 33. In that capacity, De La Torre is responsible for the supervision of agents in the San Diego Sector. *Id*. De La Torre is sued in his official capacity. *Id*.

Defendant Akil Davis ("Davis") is the Assistant Director of the Los Angeles Office of the FBI. *Id*. ¶ 34. In that capacity, Davis is responsible for the supervision of all agents in the Los Angeles Office. *Id*. Davis is sued in his official capacity. *Id*.

Defendant Bilal A. Essayli ("Essayli," and together with all other defendants, "Defendants") is the U.S. Attorney for the Central District of California. *Id*. ¶ 35. Essayli has authority over federal law enforcement operations within the District. *Id*. Essayli is sued in his official capacity. *Id*.

ii.    Arrests and Detentions

On June 6, 2025, federal agents detained multiple day laborers outside of the Westlake Home Depot. *Id*. ¶ 41. In the following days, similar raids occurred throughout the District—including in Los Angeles, Whittier, Huntington Park, Santa Ana, Downey, Upland, Paramount, Hollywood, Costa Mesa, Inglewood, Baldwin Park, Sylmar, Glendale, Marina Del Rey, Hawthorne, and Pico Rivera. *Id*. Car wash workers,[2] farm and agricultural workers, street vendors, recycling center workers, tow yard workers, and packing house workers were targeted. *Id*. ¶¶ 39–40, 42, 45. Various places have been targeted by federal agents. *Id*. ¶ 45 (listing farmers markets, a swap meet, bus stops, parks, a gym, and a church). In one instance, the agents approached several people working in their yards, questioning and detaining only those who did not appear to be white. *Id*. ¶ 46. In another,

---

[2] One of LAWCN's member organizations is CLEAN Carwash Worker Center ("CLEAN"), on whose behalf LAWCN brings this suit. 2AC ¶ 209; *see id.* ¶¶ 213 ("Dozens of CLEAN's members have been detained by immigration agents while at work. At least one identifiable CLEAN member, Jesus Aristeo Cruz Utiz, has been subjected to Defendants' unlawful stop and arrest practices.").

the agents arrived in unmarked vehicles, pointed a gun, and demanded to see identification without providing a reason for the stop. *Id*. ¶ 47. In yet another "military-style raid," a witness to the raids noted that people were detained if they "looked Hispanic in any way." *id*. ¶¶ 48–49. Since they began on June 6, 2025, federal immigration raids have led to the arrest of over 1,500 people and counting. *Id*. ¶ 205.

In a typical encounter, large numbers of agents and officers approach suddenly in military-style or SWAT clothing, heavily armed with weapons displayed. *Id*. ¶ 54. The agents are masked; their vests display a generic "POLICE" patch (or no identification with law enforcement at all). *Id*. Agents typically position themselves around individuals, aggressively engage them, and/or shout commands, forcing individuals to answer their questions even involuntarily and without legal authority to do so. *Id*. ¶ 55. "That is the intent." *Id.* When individuals have tried to avoid an encounter with agents and officers, they have been followed and pushed to the ground, sometimes even beaten, and then taken away. *Id*. ¶ 56.

Defendants lack reasonable suspicion for the stops effectuated throughout these raids. *Id*. ¶ 66. Instead, Defendants rely on apparent race and/or ethnicity to meet their policy goals. *Id.* Their policy and practice is to intentionally stop individuals based on their apparent race, color, and ethnicity; to rely in apparent ethnicity in their selection of locations to raid and of whom they investigate, question, or arrest; and to subject individuals to different, burdensome, stigmatizing, and injurious treatment during the raids. *Id*. ¶¶ 68–69. Defendants unreasonably rely on race and ethnicity in selecting locations for raids and in determining who should be detained. *Id*. ¶¶ 81–82, 86.

Defendants have a policy and practice of effectuating warrantless arrests without making an individualized flight risk determination. *Id*. ¶ 105. Defendants also have a policy and practice of not identifying themselves or explaining the basis for an arrest upon taking someone into custody. *Id*. ¶ 111. Agents and officers often show up masked, without any visible badges or insignia indicating what agency they work for. *Id.* When asked to identify themselves, they have refused. *Id.*

/ / /

### iii.  Conditions at B-18

During the ongoing raids, and as an integral part of the policy and pattern of unlawful stops and arrests, Defendants have been taking individuals who are swept up to the basement of the federal building at 300 North Los Angeles Street in Los Angeles, commonly referred to as B-18. *Id*. ¶ 114. B-18 is a facility for immigrant detainees designed to hold a limited number of individuals *temporarily* so they can be processed and released, or processed and transported to a long-term detention facility. *Id*. It does not have beds, showers, or medical facilities. *Id*. Individuals taken to B-18 are being kept in small, windowless rooms with dozens or more other detainees in cramped quarters. *Id*. ¶ 116. Some rooms are so cramped that detainees cannot sit, let alone lie down, for hours at a time. *Id*. As of June 20, 2025, over 300 individuals were being held at B-18. *Id*. ¶ 117.

Detainees are also routinely deprived of food, and some have not even been given water other than what comes out of the combined sink and toilet in the group detention room. *Id*. ¶ 119. Upon asking for food, detainees have been told repeatedly that the facility has run out. *Id*.

Detainees are denied access to necessary medical care and medications. *Id*. ¶ 120. Individuals with conditions that require consistent medications and treatment are not given any medical attention, even when that information is brought to the attention of the officers on duty. *Id*.; *see also id*. ¶ 131 ("On June 19, 2025, an ImmDef attorney arrived at B-18 to meet with detainees, including one who was scheduled for a chemotherapy appointment the next day. Despite showing a doctor's note confirming the appointment and specifying that missing the appointment would be detrimental to the detainee's health, the guards repeatedly would not allow the attorney to meet with the ill detainee."). The facility cannot provide detainees with basic hygiene supplies; individuals who are menstruating have had to wait long periods before receiving menstrual pads, if they receive them at all. *Id*. ¶ 120.

### iv.  Denial of Access to Counsel

Individuals detained at B-18 have had their access to prospective or retained counsel restricted. *Id*. ¶ 121.

On June 6, 2025, attorneys and legal representatives from CHIRLA and ImmDef attempted to gain access to B-18 to advise detainees of their rights and assess their eligibility for relief, but they

were not permitted to enter. *Id*. ¶ 122. When they returned to B-18 the next morning, attorneys identified a handwritten notice on the door of the family and attorney entrance at B-18 indicating that B-18 would not permit any visits that day. *Id*. ¶ 123. Federal officers then deployed an unknown chemical agent against family members, attorneys, and representatives. *Id*. The chemical agent caused everyone to cough and inflicted a burning sensation in the eyes, nose, and throat. *Id*. That same morning, numerous unmarked white vans quickly departed B-18 with a group of detainees. *Id*. ¶ 124. CHIRLA and ImmDef attorneys and representatives attempted to loudly share know-your-rights information with the detainees in the vans. *Id*. Federal agents blasted their horns. *Id*. On other occasions, several attorneys affiliated with Plaintiffs have been denied the ability to meet with detainees. *Id*. ¶¶ 130–31.

On the rare occasions when attorneys and family members were allowed access to their clients or loved ones, they were made to wait hours at a time to see them, and the resulting visits were limited to a mere five to ten minutes. *Id*. ¶ 127. In many cases, attorneys and family members were unable to determine whether a particular individual is even detained at B-18, or whether they had been transferred to another facility. *Id*. ¶ 128. B-18 officers have refused to provide clear answers to questions about detainees' whereabouts, or refused to answer questions altogether. *Id*. ICE's online locator, which provides information about detainees' location, is not updated in a timely manner. *Id*.

### v.    Officially Sanctioned Conduct

In January 2025, the administration gave ICE field offices an arrest quota of seventy-five arrests a day. *Id*. ¶ 137. The administration also shut down multiple oversight agencies. *Id*. ¶ 139. The administration later set a new arrest quota of three thousand arrests per day. *Id*. ¶ 141. It reportedly threatened job consequences if officials failed to meet arrest quotas. *Id*. ¶¶ 141–42.

### vi.    Individual Plaintiffs' Experiences

In the early morning of June 18, 2025, in Pasadena, California, Vasquez Perdomo was waiting at a bus stop across the street from Winchell's Donuts with several coworkers to be picked up for a job. *Id*. ¶ 151. About four cars converged on his location, and about half a dozen masked agents jumped out on either side of him. *Id*. ¶ 152. They had weapons and masks, and did not

identify themselves. *Id*. Vasquez Perdomo tried to leave but was surrounded, grabbed, handcuffed, and put into one of the vehicles. *Id*. ¶ 153. No warrant was shown. *Id*. ¶ 156. It was only after he was brought to a nearby CVS parking lot that agents checked Vasquez Perdomo's identification. *Id*. ¶ 155. Agents did not inform Vasquez Perdomo that they were immigration officers authorized to make an arrest or of the basis for his arrest. *Id*. ¶ 159. At the time this action was filed, Vasquez Perdomo had been transported to and was being held at B-18. *Id*. ¶ 160. There, he experienced extremely crowded and unsanitary conditions, was given little to eat or drink, and slept on the floor. *Id*.

In the early morning of June 18, 2025, in Pasadena, California, Osorto was waiting to be picked up for work with his coworker Vasquez Perdomo. *Id*. ¶ 164. When federal agents approached, he tried to run, but one of the agents caught up to him and pointed a taser at his head and said, "Stop or I'll use it!" *Id*. ¶ 165. Osorto stopped immediately. *Id*. Osorto was handcuffed and put into a vehicle. *Id*. ¶ 166. It was only after he was brought to a nearby CVS parking lot that agents asked Osorto if he had papers. *Id*. ¶ 168. No warrant was shown. *Id*. ¶ 169. Agents did not inform Osorto that they were immigration officers authorized to make an arrest or of the basis for his arrest. *Id*. ¶ 172. At the time this action was filed, Osorto had been transported to and was being held at B-18. *Id*. ¶ 173. The facility was full, and when people asked for help, officers told them there was no food, no water, and no medicine. *Id*.

In the early morning of June 18, 2025, in Pasadena, California, Villegas Molina was waiting to be picked up for work with his coworkers Vasquez Perdomo and Osorto. *Id*. ¶ 177. When federal agents approached, an agent yelled at Villegas Molina not to run, even though he remained calm. *Id*. ¶ 179. He was told to provide his identification, and he provided his California ID, but the agent kept questioning him. *Id*. No warrant was shown. *Id*. ¶ 181. Agents did not inform Villegas Molina that they were immigration officers authorized to make an arrest or of the basis for his arrest. *Id*. ¶ 184. At the time this action was filed, Villegas Molina had been transported to and was being held at B-18. *Id*. ¶ 185. He slept on the floor and was given almost nothing to eat. *Id*.

On the morning of June 18, 2025, Hernandez Viramontes was working at a car wash in Whittier, California, where he has worked for approximately ten years, when immigration agents

arrived. *Id.* ¶ 188. During this visit, the agents did not identify themselves. *Id.* ¶ 189. Agents asked Hernandez Viramontes whether he was a citizen, and he replied yes and explained that he was a dual citizen of the U.S. and Mexico. *Id.* ¶ 191. They asked for an ID, which he provided. *Id.* Agents then explained that his ID was not enough and because he did not have his passport, they were taking him. *Id.* Agents placed Hernandez Viramontes in a vehicle and transported him away. *Id.* ¶ 192. During this time, Hernandez Viramontes did not know whether they were going to take him to a detention center. *Id.* Agents verified his citizenship and, about twenty minutes later, brought him back to the car wash. *Id.* ¶ 193. When agents brought Hernandez Viramontes back to the car wash, they did not apologize. *Id.* ¶ 194. Shortly after agents returned Hernandez Viramontes to the car wash, yet another group of agents raided the car wash again. *Id.* ¶ 195.

In the afternoon of June 12, 2025, Gavidia, a U.S. citizen, was at a tow yard in Los Angeles County, California, that was visited by immigration agents conducting a roving patrol. *Id.* ¶ 197. Around 4:30 p.m., upon hearing someone say that immigration agents may be at the premises, Gavidia went outside to confirm this. *Id.* ¶ 198. At the time, his clothes were dirty from working on his car. *Id.* On the sidewalk outside the gate, Gavidia saw a federal agent between two cars step forward. *Id.* ¶ 199. Soon after, Gavidia saw several other agents wearing similar vests with the words "Border Patrol Federal Agent." *Id.* He also noticed that the agents were carrying handguns and at least two of the agents had a military-style rifle. *Id.* When Gavidia attempted to head back inside the tow yard premises, a masked agent said, "Stop right there." *Id.* ¶ 200. While the agent approached Gavidia, another unmasked agent ran toward him and asked if he was American. *Id.* ¶ 201. Gavidia told the agent that he is American multiple times. *Id.* The agent responded by asking, "What hospital were you born in?" *Id.* Gavidia calmly replied that he did not know. *Id.* The agent repeated the same question two more times, and each time Gavidia provided the same answer. *Id.* At that point, the agents pushed Gavidia up against the metal gated fence, put his hands behind his back, and twisted his arm. *Id.* Gavidia had been on his phone, and the masked agent also took his phone from his hand at that point. *Id.* Gavidia explained that the agents were hurting him and that he was American. *Id.* ¶ 202. The unmasked agent asked a final time, "What hospital were you born in?" *Id.* Gavidia responded again that he did not know and said East L.A. *Id.* Gavidia then told the agents that he

could show them his Real ID. *Id*. The agents had not asked to see Gavidia's identification. *Id*. When Gavidia showed his Real ID to the agents, one of them took it from him. *Id*. ¶ 203. It ultimately took about twenty minutes for Gavidia to get his phone back, and the agents never returned his Real ID. *Id*.

vii.    Harm to Organizational Plaintiffs and Their Members

LAWCN is a regional organization made up of eight worker centers and labor organizations that work together to build power and develop worker leadership organizing with Black, immigrant, and refugee workers and other workers of color in the Los Angeles region. *Id*. ¶ 207. At least one of LAWCN's member organizations, CLEAN, has been harmed by the ongoing raids in Southern California. *Id*. ¶¶ 209, 212 ("Carwashes have been a consistent and ongoing target of immigration agents during the course of the raids—at least two dozen have been raided so far.").

UFW's members have been harmed by the ongoing immigration raids in Southern California and fear being subjected to unlawful stops, arrests, and detention practices in the future. *Id*. ¶ 219. At least one UFW member has been subjected to Defendants' stop and arrest practices. *Id*.

As a result of Defendants' actions, CHIRLA's mission to serve the immigrant community, including through the provision of legal advice and services, is being frustrated. *Id*. ¶ 230. Throughout the month of June 2025, CHIRLA's attorneys and representatives have attempted to communicate with individuals at B-18 but were denied access and thwarted in their efforts to offer legal advice to even those detainees they saw at a distance. *Id*. CHIRLA also coordinates the Los Angeles Rapid Response Network ("LARRN"). *Id*. ¶ 228. Through LARRN, CHIRLA educates its membership, as well as the broader community, through know-your-rights programming, workshops, social media, and educational literature about a variety of social services and benefits, including immigration law, financial literacy, workers' rights, and civic engagement. *Id*. Defendants' actions are also thwarting CHIRLA's work to coordinate the LARRN, as other attorneys and representatives summoned by CHIRLA to B-18 have been similarly denied access. *Id*. ¶ 230.

ImmDef's Rapid Response team is also part of LARRN. *Id*. ¶ 233. In this capacity, ImmDef monitors a hotline and responds to notifications about individuals detained in ICE immigration enforcement actions. *Id*. As a result of Defendants' actions, ImmDef's mission to serve the

immigrant community, including through the provision of legal advice and services, is being fundamentally frustrated. *Id.* ¶ 234.

### B. Procedural History

Plaintiffs Vasquez Perdomo, Villegas Molina, and Osorto initiated this action by filing a Petition for Writ of Habeas Corpus on June 20, 2025. Dkt. No. 1. They, along with the other Plaintiffs, filed the operative Second Amended Complaint on April 9, 2026. *See* 2AC. It alleges the following claims.

| Claim | Plaintiffs[3] | Defendants |
|---|---|---|
| Count One: Violation of Fourth Amendment: Suspicionless Seizures | Stop/Arrest Plaintiffs | All Defendants |
| Count Two: Violation of 8 U.S.C. 1357(a)(2)—Warrantless Arrests Without Probable Cause of Flight Risk | LAWCN, UFW, and CHIRLA | All Defendants |
| Count Three: Violation of 8 C.F.R. § 278.2(c)(2)(ii)—Standards for Stops and Warrantless Arrests | LAWCN, UFW, and CHIRLA | All Defendants |
| Count Four: Violation of 8 C.F.R. § 287.8(c)(2)(iii)—Failure to Identify Authority and Reason for Arrest | LAWCN, UFW, and CHIRLA | All Defendants |
| Count Five: Violation of Fifth Amendment—Access to Counsel | Access/Detention Plaintiffs | Noem, Lyons, and Rios |
| Count Six: Violation of 8 U.S.C. § 1362—Access to Counsel | Access/Detention Plaintiffs | Noem, Lyons, and Rios |
| Count Seven: Violation of Fifth Amendment—Conditions of Confinement | Access/Detention Plaintiffs | Noem, Lyons, and Rios |
| Count Eight: Violation of Fifth Amendment—Due Process | Stop/Arrest Plaintiffs | All Defendants |

---

[3] Several claims are also brought on behalf of putative classes. This Court will not treat this as a class action at this stage, however, because no classes have yet been certified.

| Count Nine: Violation of Fourth Amendment— Unreasonable Manner of Seizure | Stop/Arrest Plaintiffs | All Defendants |
|---|---|---|

2AC. Plaintiffs seek declaratory and injunctive relief, as well as fees and costs. *Id.* at 64–65.

On July 2, 2025, Access/Detention Plaintiffs filed an Ex Parte Application for a Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction. Dkt. No. 38. They sought a TRO on the Access/Detention Plaintiffs' Fifth Amendment claims, on the basis that Defendants' denial of access to counsel at B-18 violated the Fifth Amendment. *Id.* at 7.

On July 3, 2025, Stop/Arrest Plaintiffs filed an Ex Parte Application for a Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction. Dkt. No. 45. They sought a TRO on the Stop/Arrest Plaintiffs' Fourth Amendment claims. *Id.* at 18.

On July 10, 2025, this Court held a hearing on both Ex Parte Applications. Dkt. No. 51. On July 11, 2025, this Court granted both Ex Parte Applications. Dkt. No. 87 ("TRO Order"). This Court refers to its grant of Dkt. No. 38 as the "Fifth Amendment TRO," and to its grant of Dkt. No. 45 as the "Fourth Amendment TRO."

On July 13, 2025, Defendants filed a Notice of Appeal to the Ninth Circuit. Dkt. No. 89. They also filed an Ex Parte Application for Stay of Order Granting the Temporary Restraining Orders, which would have stayed issuance of the Fourth Amendment TRO pending appeal. Dkt. No. 94 at 1. Defendants explained that they sought a stay both from this Court and from the Ninth Circuit concurrently. *Id.* On July 17, 2025, this Court denied Defendants' Ex Parte Application to Stay. Dkt. No. 108.

On August 1, 2025, the Ninth Circuit ruled on Defendants' emergency motion for a stay pending appeal. *Vasquez Perdomo v. Noem*, 148 F.4th 656 (9th Cir. 2025). The Ninth Circuit granted Defendants' motion to stay as to one clause in the Fourth Amendment TRO, and otherwise denied it. *Id.* at 690. Defendants then asked the Supreme Court to stay the Fourth Amendment TRO. *Noem v. Vasquez Perdomo*, No. 25A169, 2025 WL 2585637, at *1 (Sep. 8, 2025). The Supreme Court granted the request and stayed the Fourth Amendment TRO. *Id.* The Court did not issue an opinion explaining the Court's reasoning. But one Justice filed a concurrence. *See id.* (Kavanaugh,

J., concurring). And another Justice filed a dissent, which two other Justices joined. *See id.* at \*5 (Sotomayor, J., dissenting).

Unlike the Fourth Amendment TRO, the Fifth Amendment TRO was not stayed or appealed. On July 28, 2025, Plaintiffs filed a Motion for Preliminary Injunction as to the Fifth Amendment TRO. Dkt. No. 127. This Court held a hearing on October 23, 2025. Dkt. No. 230. On November 13, 2025, this Court granted Plaintiffs' request. Dkt. No. 256 ("Fifth Amendment PI"). On January 9, 2026, Defendants filed a Notice of Appeal as to the Fifth Amendment PI. Dkt. No. 350. The appeal is pending.

On October 29, 2025, Defendants filed their first Motion to Dismiss Plaintiffs' First Amended Complaint. Dkt. No. 235. On November 12, 2025, Plaintiffs filed their Opposition. Dkt. No. 255. On November 19, 2025, Defendants filed their Reply. Dkt. No. 264. This Court held a hearing on the Motion on January 15, 2026, after which it took the Motion under submission. And on February 19, 2026, this Court issued its decision. Dkt. No. 419 ("MTD Order"). There, this Court denied Defendants' Motion except as to Count Eight—which Plaintiffs agreed should be dismissed, and which was dismissed without prejudice. MTD Order at 34.

On February 26, 2026, Plaintiffs filed a Motion for Leave to File a Second Amended Complaint, Dkt. No. 436, which Defendants opposed, Dkt. No. 458. On April 7, 2026, this Court granted Plaintiffs' Motion. Dkt. No. 484.

On April 21, 2026, Defendants filed the instant Motion to Dismiss the 2AC. Dkt. No. 494 ("Motion"). On May 5, 2026, Plaintiffs filed an Opposition. Dkt. No. 500 ("Opp."). On May 12, 2026, Defendants filed a Reply. Dkt. No. 502.

This Court held a hearing on the Motion on July 9, 2026. At the hearing, Defendants requested the opportunity to submit supplemental briefing regarding the Supreme Court's recent decision in *Mullin v. Doe*. Dkt. No. 599 at 7:1–7 ("Tr."), but otherwise submitted on the Court's tentative ruling, while maintaining the positions stated in their briefing. Plaintiffs did not oppose. *Id.* at 11:1–2. This Court granted the request. Dkt. No. 594.

On July 23, 2026, Defendants filed their supplemental brief. Dkt. No. 620 ("Def. Supp."). On July 30, 2026, Plaintiffs filed a response brief. Dkt. No. 637 ("Pla. Supp.").

II.    **Applicable Law**

A.  **Rule 12(b)(1)**

A court must have subject matter jurisdiction to resolve a claim. Fed. R. Civ. P. 12(b)(1). A plaintiff's standing under Article III is a necessary component of subject matter jurisdiction. *Chandler v. State Farm Mut. Auto. Ins.*, 598 F.3d 1115, 1121 (9th Cir. 2010); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 417 (2021). "Because standing is 'an indispensable part of the plaintiff's case,' it 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.'" *Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

For a plaintiff to show Article III standing, the plaintiff must demonstrate that (1) the plaintiff has suffered an injury in fact that is (a) concrete and particularized, (b) actual or imminent, not conjectural or hypothetical; (2) the injury is traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the plaintiff's injury will be redressed by a favorable decision. *Friends of the Earth v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). A plaintiff "must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion*, 594 U.S. at 431. "[A] person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." *Id.* at 435. But, when there is no finding that a plaintiff faces a real and immediate threat of recurring harm, the plaintiff lacks standing to seek injunctive relief. *City of Los Angeles v. Lyons*, 461 U.S. 95, 110 (1983).

For an organization to have associational standing as the representative of its members, it must show that: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023); *see also Warth v. Seldin*, 422 U.S. 490, 511 (1975). The organization may represent its

15

members "so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause." *Warth*, 422 U.S. at 511. And "a class action plaintiff must 'allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants.'" *Easter v. Am. W. Fin.*, 381 F.3d 948, 961 (9th Cir. 2004) (quoting *Warth*, 422 U.S. at 501).

"Under Rule 12(b)(1), a defendant may challenge the plaintiff's jurisdictional allegations in one of two ways." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). Courts need not presume the truthfulness of a plaintiffs' allegations when facing a factual attack on standing. *Id.* Instead, "[o]nce the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003).

### B.  Rule 12(b)(6)

Rule 12(b)(6) allows a party to seek to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  Labels, conclusions, and "formulaic recitation of a cause of action's elements" are insufficient.  *Twombly*, 550 U.S. at 545.

The determination of whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."

16

*Iqbal*, 556 U.S. at 679. Generally, a court must accept the factual allegations in the pleadings as true and view them in the light most favorable to the plaintiff. *Soo Park*, 851 F.3d at 918; *Lee*, 250 F.3d at 679. But a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

Leave to amend a dismissed complaint should be freely granted unless it is clear the complaint could not be saved by any amendment. Fed. R. Civ. P. 15(a); *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

### III.    Discussion

Defendants move to dismiss the 2AC on four grounds. First, they allege Plaintiffs lack standing to seek injunctive relief.[4] Motion at 6–13. Second, they contend that Plaintiffs' Fifth Amendment claims are jurisdictionally barred by 8 U.S.C. § 1252. *Id.* at 14. Third, they allege that Plaintiffs fail to state any constitutional claims. Motion at 14–15. And fourth, they allege that Plaintiffs have failed to state any violation of the APA. Motion at 16–17.

For the reasons below, the Motion is denied.

### A.  Plaintiffs have Article III standing to pursue injunctive relief.

Defendants contend that Plaintiffs lack standing to pursue injunctive relief. They contend that, "[a]t bottom, Plaintiffs once again have failed to show any real and immediate threat of being harmed again under the Fourth or Fifth Amendment." Motion at 13. "Without such a showing," Defendants maintain that "their claims lack the necessary foundation, and the [2AC] should be dismissed in its entirety."[5] *Id.*

---

[4] Defendants refer to the injunctive relief Plaintiffs seek as "prospective equitable relief." *See, e.g.*, Motion at 6.

[5] With respect to standing, the Motion only challenges Plaintiffs' standing to seek *injunctive* relief. Motion at 6. Although they do not say so explicitly, it appears Defendants assert that the 2AC should be dismissed in its entirety because, without standing to pursue injunctive relief, Plaintiffs should not be permitted to seek any other of their stated forms of relief, including declaratory relief.

Given that Plaintiffs do have standing to pursue injunctive relief, the Court need not reach the question of whether the absence of standing to pursue injunctive relief would be fatal to the requests for declaratory relief.

Plaintiffs spend much of their opposition faulting Defendants for restating or reiterating arguments this Court has purportedly rejected. *See generally* Opp. This Court does not find that Defendants have done so improperly. Defendants are entitled to express their continued objection to this Court's jurisdiction particularly because this Court must satisfy itself of its jurisdiction at every stage. *RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1056 (9th Cir. 2002).

For the reasons below, this Court finds that, at this stage, Plaintiffs have met their burden to show standing for injunctive relief. To be clear, Defendants' arguments on standing fail not because this Court has rejected them in the past or because the Ninth Circuit found standing at an earlier stage of this case; this Court has considered each and every argument on its merits and determined that standing for injunctive relief has been established at this stage.

> i.  The individual Plaintiffs have standing to pursue injunctive relief.

First, Defendants challenge Plaintiffs' Article III standing to pursue injunctive relief for their constitutional claims. Motion at 6. Defendants acknowledge that they can make a facial or factual challenge to this Court's jurisdiction, *see id.* at 5, but they do not explicitly state whether they intend to make a facial or factual challenge to Plaintiffs' standing. At times it appears they are making a facial challenge, as they focus on the sufficiency of the 2AC's allegations. *See, e.g.*, *id.* at 8 ("[Plaintiffs' 2AC] reiterates the same stale generalized fears that are not conducive to demonstrating standing . . . without allegations of recurrence[.]"). But at other times, they appear to be making a factual challenge as they state that Plaintiffs have not presented evidence of recurrence and there are "evidentiary gaps" in the 2AC. *See, e.g.*, *id.* at 11 ("Plaintiffs' [2AC], filed nine months after their [1AC], still does not . . . present any additional *evidence* that ongoing violations have continued since the June and July 2025 immigration enforcement actions." (emphasis added)); Reply at 2 ("At the outset, this Court should acknowledge the *evidentiary gap* in Plaintiffs' SAC as to Defendants' alleged policy and practice 'of flouting the Constitution and federal law . . . during immigration raids in the Los Angeles area.'" (emphasis added)). Accordingly, this Court understands that Defendants are making both a factual and facial challenge and addresses both. For the reasons

below, regardless of whether Defendants' challenge is facial or factual, Plaintiffs have standing to pursue injunctive relief.

### 1. The Fourth Amendment claims

The individual Plaintiffs' allegations, taken together and read as true, plausibly allege the requirements for Article III standing as to both of their Fourth Amendment claims.[6]

### a. Defendants' facial challenge regarding suspicionless stops fails.

First, through Plaintiffs' allegations of stops lacking in reasonable suspicion, Plaintiffs allege injury in fact. As the *TransUnion* Court held, a plaintiff may pursue injunctive relief "to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." 594 U.S. at 435. The individual Plaintiffs have alleged the following in the 2AC: Each has been detained and questioned by agents of the Government, each without an individualized determination

---

[6] This Court has, consistent with its obligation to assure itself of standing, evaluated this question at several prior stages. As it found at the TRO stage:

> Here, this Court affirmatively finds that there is a real and immediate threat that the conduct complained of will continue. Numerous individuals have been subjected to multiple stops, including Gavidia. All of the evidence adduced suggests a high likelihood of recurrent injury, as required. *See LaDuke v. Nelson*, 762 F.3d 1318, 1324 (9th Cir. 1985).

TRO Order at 35. And, as the Ninth Circuit affirmed:

> The district court here found that Plaintiffs' evidence demonstrated "a pattern of conduct," and that "a plethora of statements suggest[ed] approval or authorization" of the challenged stop-and-arrest practices, including a recent statement by Defendant Gregory K. Bovino, the Chief Patrol Agent for the El Centro Sector of the CBP. Defendants do not meaningfully dispute these findings, and they are well supported by the record. . . . [Defendants'] general descriptions of training regarding the requirements for a lawful seizure do little to overcome Plaintiffs' specific evidence showing a series of similar detentive stops without reasonable suspicion. On this record, we agree with the district court that Plaintiffs have shown that the challenged conduct is "part of a pattern of officially sanctioned behavior" and thus that the alleged injury is "likely to recur."

*Vasquez Perdomo*, 148 F.4th at 674. And, as this Court determined in its MTD Order, applying the requisite standard for evaluating Article III standing at the motion to dismiss stage:

> Defendants have not meaningfully disputed the veracity of Plaintiffs' allegations in the 1AC; each individual Plaintiff sufficiently states that he has been detained and questioned by immigration agents. *See* 1AC ¶¶ 12–16. And each states that he fears being subject to a future stop by federal agents without reasonable suspicion. *See id.* Moreover, Plaintiffs state extensive allegations in the 1AC suggesting that immigration officers are repeatedly targeting the same locations, *see id.* ¶¶ 6–7, 38–40, and stopping people absent reasonable suspicion, *see id.* ¶¶ 36, 44–49, 67–69. Put another way, it is simply untrue that the Plaintiffs have only alleged "isolated incidents." The actual allegations they have made, taken as true and read together, are part of what led this Court to find that Plaintiffs have sufficiently alleged they face a "real and immediate threat" of future detention without reasonable suspicion.[6] TRO Order at 35.

MTD Order at 17–18.

of reasonable suspicion or risk of flight, as part of the Government's pattern of detaining individuals at the same places and without reasonable suspicion. *See* 2AC ¶¶ 46–52; 151–204; *see also* MTD Order at 17–18. These allegations, taken together and read as true, plausibly allege unlawful detention. As this Court has found as a matter of law, the sole reliance on the four enumerated factors alone or in concert is unlawful. TRO Order at 49–52; *see also Vasquez Perdomo*, 148 F.4th at 683 ("We agree with the district court that . . . the four enumerated factors at issue—apparent race or ethnicity, speaking Spanish or speaking English with an accent, particular location, and type of work, even when considered together—describe only a broad profile and 'do not demonstrate reasonable suspicion for any particular stop.'" (quoting TRO Order at 44)). In addition, the Plaintiffs have alleged the following in the 2AC: They all fear redetention absent reasonable suspicion, due in part to the Government's practice of making no individualized suspicion or flight risk determinations, and due to the Government's practice of targeting the same locations for repeated raids—and, in particular, the Government's practice of targeting Latino individuals. *See* 2AC ¶¶ 39–52, 66–102, 103–11. These allegations, taken together and read as true, plausibly state the immediate threat of future detention absent reasonable suspicion. MTD Order at 18.

Second, Plaintiffs have alleged that their injuries were caused by Defendants' challenged actions. The Ninth Circuit has "'enumerated . . . [that] a plaintiff can demonstrate that [the alleged] injury is likely to recur'" by alleging one of two things. *Melendres v. Arpaio*, 695 F.3d 990, 998 (9th Cir. 2012) (quoting *Mayfield v. United States*, 599 F.3d 964, 971 (9th Cir. 2010)). "First, a plaintiff may show that the defendant had, at the time of the injury, a written policy, and that the injury 'stems from' that policy." *Id.* (quoting *Armstrong*, 275 F.3d at 861). "Second, the plaintiff may demonstrate that the harm is part of a 'pattern of officially sanctioned . . . behavior, violative of the plaintiffs' [federal] rights.'" *Id.* (quoting *Armstrong*, 275 F.3d at 861) (alteration in original). Plaintiffs' allegations, which this Court reads as true at this stage, contend that Defendants have conducted detentive stops without reasonable suspicion, made warrantless arrests without

individualized flight risk determinations, and used excessive force resulting in de facto arrests absent probable cause. *See* 2AC ¶¶ 265–66, 270–71, 302–03. These allegations plainly contend harm (e.g., ensuing arrests, loss of liberty) caused by Defendants' actions. *See id.* ¶ 86. To that end, as Plaintiffs have pleaded factual allegations in support of Defendants' action constituting an officially sanctioned policy, Plaintiffs have shown the requisite likelihood of recurrence.

Third, Plaintiffs have alleged redressability. Their 2AC alleges that they have been harmed, that they will likely be harmed again, and that their sought injunctive relief—"enjoining further violations of Plaintiffs' rights" and vacating policies violative of statutory and regulatory law—will redress their injuries. 2AC at 83. Again, Defendants do not dispute that Plaintiffs' sought injunction would redress the injuries they allege. And it appears beyond dispute that an injunction preventing violations of Plaintiffs' rights would redress their injuries stemming from the threat of future violations of Plaintiffs' rights.

Defendants' arguments to the contrary are not persuasive. *Cf.* MTD Order at 16–22.

Defendants first argue that Plaintiffs' theory of injury in fact largely tracks *Lyons*, where the Supreme Court rejected the argument that a plaintiff had standing to pursue injunctive relief enjoining an unconstitutional policy absent a showing that the plaintiff would personally face harm from the policy again. *Lyons*, 461 U.S. at 107–08. But the factual allegations at issue here, as the Ninth Circuit has instructed, are "a far cry from *Lyons*." *Vasquez Perdomo*, 148 F.4th at 675. "To start, Plaintiffs seek to enjoin the stops themselves, not some subsequent conduct that might occur only after a stop." *Id.* "Unlike in *Lyons*, the individual plaintiffs here cannot escape future injury by avoiding unlawful activity." *Id.* Reading Plaintiffs' allegations as true, Plaintiffs face a high likelihood of recurrence, given that the challenged stops are part of an officially sanctioned pattern. *Id.*; *see also* 2AC ¶¶ 136–42 (alleging well-pleaded facts in support of Defendants' pattern of conduct). And, though both the Ninth Circuit and this Court's prior MTD Order explain the grounds on which *Lyons* is distinguishable, the Motion does not contend with the Court's reasoning on this

issue or explain why it is no longer valid. Accordingly, the Court concludes that *Lyons* is distinguishable and declines to dismiss the 2AC on this basis.

With respect to Defendants' facial challenge, this Court finds that Plaintiffs *have* established a likelihood of recurrence with their well-pleaded allegations. As discussed above, because Plaintiffs properly allege that the unlawful stops are pursuant to an officially sanctioned practice, they have properly alleged—as they must—that the stops are likely to recur.

> b. *Defendants' factual challenge regarding suspicionless stops fails.*

Even if the Motion is read as a factual challenge to Plaintiffs' Article III standing, this challenge fails. Defendants point to several declarations which they assert controvert Plaintiffs' allegations regarding the stops. These declarations purportedly establish that officers "operate pursuant to pre-operation intelligence packets," and that they "develop individualized reasonable suspicion" prior to detaining individuals. Motion at 4–5 (citing declarations of Andre Quinones, Daniel Parra, and Border Patrol Agent C217). But those declarations do not support dismissal of this action.

First, Defendants cite the two declarations of ICE Deputy Field Office Director Andre Quinones from July 2025. Motion at 5 (first citing Dkt. No. 71-1 ("First Quinones Decl.")[7]; and then citing Dkt. No. 94-1 ("Second Quinones Decl.")). At that time, Deputy Field Office Director Quinones attested to the following:

> ERO Los Angeles Officers are trained that . . . brief detention for questioning requires an immigration officer to have reasonable suspicion, based on specific, articulable facts, that the person being questioned is a [noncitizen[8]] illegally in the United States. . . .

---

[7] The Motion actually cites Dkt. No. 74-1 as "Quinones Decl." *See* Motion at 5. This Court understands Defendants to intend to reference Dkt. No. 71-1, the first declaration by Quinones that appears on the docket. *See generally* First Quinones Decl. No filing exists at Dkt. No. 74-1.

[8] Where it does not change the meaning, this Court uses the term "noncitizen" in place of alien. *See Avilez v. Garland*, 69 F.4th 525, 527 (9th Cir. 2023) ("[U]se of the term noncitizen has become a common practice of the Supreme Court . . . .

> ERO Los Angeles agents are trained to follow ICE procedures for apprehensions of illegal [noncitizens] . . . [and] to develop reasonable suspicion through consensual encounters.

First Quinones Decl. ¶¶ 5–7. He also attested to the following:

> ERO Los Angeles officers are trained that, under the Fourth Amendment, case law, and relevant regulations, brief detention for questioning requires an immigration officer to have reasonable suspicion, based on specific, articulable facts, that the person being questioned is a [noncitizen] illegally in the United States. . . . In my experience, officers develop reasonable suspicion based in part on prior investigation and surveillance but also based on events and interactions occurring in real time on the ground.

Second Quinones Decl. ¶¶ 5, 9. Next, they cite the declaration of U.S. Border Patrol Deputy Chief Patrol Agent Daniel Parra from August 2025. *See* Motion at 5. At that time, Deputy Chief Patrol Agent Parra attested that:

> CBP agents also engaged in lawful investigative detentions during the operation in Los Angeles. Prior to engaging in investigative detentions, agents are trained to have developed reasonable suspicion . . . based on the totality of the circumstances.

Dkt. No. 170-2 ¶¶ 8–10 ("Parra Decl."). Finally, they cite the Declaration of Border Patrol Agent C217 from August 2025. At that time, this Border Patrol Agent attested that:

> As part of my duties as a [Border Patrol Agent], I receive operational and legal training throughout the year. For instance, I have received legal training regarding the Fourth Amendment on numerous occasions, including training within CBP and training by U.S. Attorneys.

Dkt. No. 170-1 ¶¶ 2 ("C217 Decl.").

These declarations—which are the only evidence presented by Defendants in support of a facial challenge to Plaintiffs' standing—do not support dismissal for lack of standing for two independent reasons: First, they dispute factual issues that go to the merits of the claim and second, they do not undermine Plaintiffs' allegations or their evidence.

---

[In addition,] [t]he word alien can suggest 'strange,' 'different,' 'repugnant,' 'hostile,' and 'opposed,' *Alien*, *Webster's Third New International Dictionary* 53 (2002), while the word noncitizen, which is synonymous, *see Alien* and *Noncitizen*, *American Heritage Dictionary of English Language* 44, 1198 (5th ed. 2011), avoids such connotations. Thus, noncitizen seems the better choice.").

First, these declarations do not support dismissal because, at best, they dispute issues regarding the merits, which the Court is not to resolve at this time. It is true that a district court may treat a defendant's "motion to dismiss for lack of subject matter jurisdiction as a factual attack on standing," permitting the court to "consider evidence outside the pleadings." *Bowen v. Energizer Holdings, Inc.*, 118 F.4th 1134, 1142 (9th Cir. 2024). But, as the *Bowen* Court explained, when "jurisdictional issues are 'intertwined with an element of the merits of the plaintiff's claim,' the court must treat the motion like a motion for summary judgment and 'leave the resolution of material factual disputes to the trier of fact.'" *Id.* at 1143 (quoting *Leite*, 749 F.3d at 1122). Conversely, "if the 'existence of jurisdiction turn[s] on disputed factual issues,' and those 'jurisdictional disputes [are] not intertwined with the merits of the claim,'" the district court must resolve those factual disputes. *Id.* (quoting *Leite*, 749 F.3d at 1121–22 & n.3). Here, the factual dispute Defendants raise—regardless of the sufficiency of Defendants' proffered evidence—plainly intertwines with the merits of Plaintiffs' claims: They assert, and Defendants dispute with these declarations, that immigration agents have not been forming reasonable suspicion before making stops. To resolve that disputed factual question would effectively require this Court to step into the fact-finder's role and determine the merits of Plaintiffs' claims well before trial—or the close of discovery. To do so at this stage would be premature. Binding authority requires this Court to leave the resolution of the underlying factual disputes to the trier of fact; dismissal at this early stage is not warranted.[9]

---

[9] Nor is this Court persuaded by Defendants' arguments about the staleness of the 2AC's allegations. *See* Motion at 7; Reply at 1, 5. Defendants contend that their "operation in Los Angeles has officially been demobilized since February 10, 2026." Reply at 5. But they cite no evidentiary support for this factual proposition, nor can this Court find any in their attached declarations. Nor, even accepting the proposition as true, does it necessarily follow that the Government's "demobilization" means that the Government's alleged ongoing conduct can no longer be ongoing. As the Opposition notes, Defendants cite to no requirement for Plaintiffs to continuously amend their complaint to add contemporaneous examples of the policies they challenge. *See* Opp. at 6. Indeed, courts assess "[a plaintiff's] standing for prospective injunctive relief as of the time when [the plaintiff] commenced suit, relying on the allegations in the operative amended complaint." *Gonzalez v. U.S. Immigr. & Customs Enf't*, 975 F.3d 788, 803 (9th Cir. 2020).

The two citations the Government offers on their staleness argument miss the mark. *See* Reply at 5 (first citing *Lyons*, 461 U.S. at 102–03; and then citing *Clapper v. Amesty Int'l USA*, 586 U.S. 398, 401 (2013)). The cited part of *Lyons*

Second, even if this Court's task were to resolve the disputed factual issues, Defendants' evidentiary showing would fall short. The evidence they cite merely supports the proposition that ICE agents have, at some point, received training and instruction on conducting lawful stops. None of it unsettles the plausible allegations that, in practice, Defendants' agents *do* conduct unlawful stops. Nor does Defendants' evidentiary showing unsettle Plaintiffs' evidence supporting their allegations. *See* Dkt. Nos. 45-1 to 45-9 (declarations by Plaintiffs and witnesses to Government's stops supporting the conclusion that stops are being conducted without reasonable suspicion); *see also* Opp. at 7 ("Of course, this Court *has* found such evidence [of unlawful policies and practices regarding Defendants' stops]—it issued a Temporary Restraining Order."); TRO Order at 39–40 (discussing Plaintiffs' showing that the Government conducted unlawful stops). For that reason, Defendants' citations to the factual record do not support dismissal.

Defendants also analogize to *Hussen v. Noem*, 822 F. Supp. 3d 944 (D. Minn. 2026), in support of their factual challenge. In that case, another district court, in ruling on a motion for preliminary injunction, found, in relevant part: "Though Plaintiffs have shown that Defendants likely maintained unconstitutional policies, Plaintiffs have not shown that irreparable injury is likely to befall them in the immediate future. This is largely owing to a significant reduction in the scope of Defendants' Minnesota-based operations." *Id.* at 955. According to Defendants, this Court should dismiss the 2AC because they, too, like the plaintiffs in *Hussen*, cannot establish a likelihood of

---

merely discusses the legal proposition that allegations of past conduct, standing alone, do not confer standing for prospective relief—a proposition this Court has already distinguished. *See* Section III.A *supra*. And the cited part of *Clapper* similarly notes that "respondents' theory of future injury is too speculative to satisfy the well-established requirement that threatened injury must be 'certainly impending.'" *Clapper*, 586 U.S. at 401. Again, this Court has found otherwise here.

It bears mention that, though Defendants criticize Plaintiffs and the 2AC for failing to document more recent allegations of wrongdoing, Defendants—in the litigation regarding possible sanctions, *see* Dkt. No. 538,—have acknowledged in writing and in open court that they have not turned over material that the assigned Magistrate Judge has ordered them to. It is curious that Defendants would make so much of Plaintiffs' supposed failure to supplement their allegations when it appears Defendants themselves have not been turned over material that Plaintiffs believe will further support their claims.

recurrence. Specifically, Defendants state: "Similarly, even assuming Defendants maintained an unlawful policy or practice relating to stops and arrests in the Los Angeles region, or unlawful restrictions at B-18, both of which Defendants continue to contest, Plaintiffs cannot point to evidence that show a likelihood of reoccurrence and their [2AC] reiterates the same stale generalized fears that are not conducive to demonstrating standing." Motion at 7; *see also id.* at 7–8 ("Indeed, the passage of time since the denial of the motion to dismiss Plaintiffs' [1AC], without any allegations of recurrence in their [2AC], eviscerates their claim that any future injury they face is 'real and immediate.'"). Clearly, another district court's factual findings on a motion for preliminary injunction regarding ICE actions in another district at another time do not control here. At best, *Hussen* stands for the uncontroversial principle—which this Court has reiterated in nearly every decision on standing in this case—that Plaintiffs must establish a likelihood of recurrence. Defendants do not present any evidence—besides the evidence already discussed and dismissed above—which would support a factual challenge to Plaintiffs' allegations regarding a likelihood of recurrence. *See* Motion at 7–8.

> c.  *Defendants' facial challenge regarding intrusive stops fails.*

So, too, for Plaintiffs' new Fourth Amendment claim, which challenges the Government's unreasonable manners of seizure. 2AC ¶¶ 300–07. Though Defendants' Motion does not appear to make claim-specific arguments that Plaintiffs lack standing for this newly added ninth cause of action, this Court addresses it regardless, consistent with its obligation to assure itself of standing throughout this action. *See Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 662–63 (2019). Because it does not appear that Defendants make a factual challenge regarding the new claim, *see* Motion at 14–15, the Court only addresses their challenge as a facial one.

Plaintiffs allege that the Government has been conducting detentive stops so intrusively that they constitute de facto arrests requiring probable cause; because the Government lacks probable

cause, Plaintiffs reason that the stops are unconstitutional seizures. *Id.* ¶¶ 302–05; *see also Terry v. Ohio*, 392 U.S. 1 (1968). The tactics Plaintiffs allege constitute this unlawful conduct include "handcuffing, confinement, relocation, and prolonged detention." 2AC ¶ 302. And each individual Plaintiff alleges being subject to these tactics. *See id.* ¶¶ 153–55 (Vasquez Perdomo handcuffed and relocated to a CVS parking lot prior to any arrest); *id.* ¶¶ 166–68 (Osorto handcuffed and relocated to a CVS parking lot prior to any arrest); *id.* ¶ 179 (Villegas Molina detained and questioned, such that he did not feel free to leave, without being arrested); *id.* ¶¶ 189–94 (Hernandez Viramontes questioned, placed in a vehicle, and relocated without being arrested); *id.* ¶¶ 200–03 (Gavidia questioned and physically restrained for extended period of time without being arrested). These allegations, taken together and read as true, establish individual Plaintiffs' injury in relation to their new Fourth Amendment claim.

The 2AC's allegations also establish causation. Taking the allegations as true, the causal link between Defendants' alleged practices—of, through their agents, following a policy of conducting detentive stops intrusively in a way that constitutes a seizure—plainly cause Plaintiffs' alleged harm of being subject to those unconstitutionally intrusive stops. The causal link as alleged is therefore "entirely plausible." *Gonzalez*, 975 F.3d at 806.

And the 2AC's allegations establish redressability. Plaintiffs allege that they are being harmed by being deprived of the constitutional right to be free from unreasonable seizures. *See* 2AC ¶¶ 305–06. As with the other Fourth Amendment–based cause of action, there appears to be no dispute that an injunction preventing violations of Plaintiffs' rights would redress their injuries, nor do Defendants appear to dispute this prong.

For these reasons, this Court is satisfied that Plaintiffs have standing to bring their ninth cause of action for intrusive stops.

/ / /

2. *The Fifth Amendment claims*

As a threshold matter, as with the Fourth Amendment claims, it is not clear whether Defendants' challenge to Plaintiffs' standing to pursue the Fifth Amendment claims is facial or factual. *See* Motion at 7 ("Plaintiffs cannot point to *evidence* that show a likelihood of reoccurrence and their [2AC] reiterates the same stale generalized fears that are not conducive to demonstrating standing." (emphasis added)). This Court therefore addresses both below.

a. *Defendants' facial challenge to the Fifth Amendment claims fails.*

To the extent the Motion makes a facial challenge to Plaintiffs' Article III standing to bring the Fifth Amendment claims, it is unavailing. Defendants contend that there is no injury in fact because Plaintiffs "primarily relied on isolated past instances," thereby failing to allege real and immediate future harm under *Lyons.* Motion at 12.

Defendants' argument—that *Lyons* requires dismissal because Plaintiffs unduly relied on past instances—is unavailing in light of Plaintiffs' allegations of an ongoing pattern of conduct. As this Court has thoroughly explained, Plaintiffs' allegations of harm are real and immediate. In the Fifth Amendment context, Plaintiffs allege *ongoing* unlawful conditions at B-18, including the *ongoing* denial of access to counsel. *See* 2AC ¶¶ 114, 116–21, 132. This, in short, is sufficient.

b. *Defendants' factual challenge to the Fifth Amendment claim fails.*

Understanding Defendants' challenge as a factual challenge to Fifth Amendment standing, it also fails. In contrast with their Fourth Amendment argument, Defendants do not appear to cite to any extrinsic evidence refuting Plaintiffs' allegations regarding the likelihood of recurrence. *See* Motion at 10–13. So Defendants do not meaningfully "dispute[] the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air for Everyone*, 373 F.3d at 1039.

Defendants argue that Plaintiffs "have not presented evidence of an unlawful policy or practice" related to the conditions at B-18. Motion at 12. Defendants also argue that, even assuming they maintained an unlawful policy or practice regarding unlawful restrictions on the right to counsel at B-18—a proposition they "continue to contest"—"Plaintiffs cannot point to evidence that shows a likelihood of reoccurrence." Motion at 7.

As an initial matter, it is only once "the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court [that] the party opposing the motion must furnish . . . evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Savage*, 343 F.3d at 1039 n.2 (9th Cir. 2003). So Defendants' Motion does not shift the burden to Plaintiffs to produce extrinsic evidence in support of subject matter jurisdiction.

And even if the burden did shift, Defendants would not prevail because Plaintiffs have presented evidence, which the Court previously cited, which the Court finds sufficient to withstand a factual challenge. *See, e.g.*, Fifth Amendment PI at 8–13 (citing evidence of ongoing conduct violating Plaintiffs' right to counsel[10]); *id.* at 13 ("Altogether, . . . Access/ Detention Plaintiffs are still regularly being denied access to detainees such that Access/Detention Plaintiffs are unable to effectively provide meaningful legal services to the detainees.").

---

[10] Plaintiffs have cited substantial factual support for their Fifth Amendment claims.

Namely, Plaintiffs have substantiated their contention that B-18 has been closed to attorney visitation on numerous occasions without notice. *See* Fifth Amendment PI at 8–9 (citing, inter alia, Dkt. No. 127-1 (Declaration of Andrew Freire); Dkt. No. 186-8 (Declaration of Lindsay Toczylowski); Dkt. No. 186-6 (Declaration of Christopher Duran); Dkt. No. 168-2 (Declaration of Rogelio Gudino)).

Plaintiffs have evinced infringements of the right through counsel through conditions that make it impracticable or impossible for attorney–client conversations to take place in confidence. *See id.* at 10–11 (citing, inter alia, Dkt. No. 186-5 (Declaration of Sophia Wrench); Declaration of Christopher Duran; Dkt. No. 168-2 (Declaration of Rogelio Gudino)).

And Plaintiffs have supported their allegation that Defendants move detainees between facilities without notice, further jeopardizing Plaintiffs' right to counsel. *See id.* at 12 (citing, inter alia, Declaration of Lindsay Toczylowski; Dkt. No. 186-7 (Declaration of Premjit Panicker)).

And finally, in light of Plaintiffs' evidence, just as with the Fourth Amendment claims, when—as here—contested jurisdictional issues are intertwined with an element of the merits, the Court must not resolve the factual disputes. *Bowen*, 118 F.4th at 1143.

In sum, Defendants' reliance on *Lyons* is misplaced, and their repeated contention that Plaintiffs lack evidence is without merit. This Court remains satisfied that individual Plaintiffs have standing to bring their Fifth Amendment claims.

> ii.   The organizational Plaintiffs have standing to pursue injunctive relief.

Next, at issue is whether the organizational Plaintiffs have standing to seek injunctive relief as part of the Fourth and Fifth Amendment claims. For the reasons below, this Court finds that they do.

"[O]rganizations are entitled to sue on their own behalf for injuries they have sustained." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19. Organizational standing can be satisfied if the organization alleges "(1) frustration of its organizational mission; and (2) diversion of its resources to combat the particular [issue] in question." *Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004); *Fair Hous. v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002). In contrast, "an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553 (1996) (internal quotation marks omitted) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 97 S. Ct. 432 U.S. 342–43 (1977)). The Supreme Court recently confirmed the test for organizational standing in *Students For Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181, 199 (2023).

Plaintiffs make the following allegations in the 2AC: As to the first prong for associational standing, the organizational Stop/Arrest Plaintiffs have members that would have standing to sue in their own right, because they allege that their members have been subjected, and/or reasonably fear being subjected, to the policies and practices at issue in this case. *See* 2AC ¶¶ 20–21 (discussing LAWCN and UFW); *id.* at ¶ 229 (discussing CHIRLA). As to the second, the Stop/Arrest organizational Plaintiffs' participation in this lawsuit would seek to protect interests germane to the organizations' purpose. *See id.* ¶ 20 (describing LAWCN's purpose as "work[ing] together to address injustices faced by low-wage workers in the Los Angeles area, including immigrant and non-English speaking workers"); *id.* ¶ 21 (describing UFW's purpose as "aim[ing] to improve the lives, wages, and working conditions of agricultural workers and their families, including by advocating for immigration reform and immigrants' rights"); *id.* ¶ 22 (describing CHIRLA's purpose as "organizing, educating and defending immigrants and refugees in the streets, in the courts, and in the halls of power"). And as to the third, the claims at issue here do not require the participation of individual members in the lawsuit—nor do Defendants argue otherwise. Taken together, the organizational Stop/Arrest Plaintiffs have standing to bring this suit on behalf of their members.

And the organizational Access/Detention Plaintiffs—CHIRLA and ImmDef—further allege that Defendants' conduct frustrates their organizational mission. *See id.* ¶ 230 (CHIRLA); *id.* ¶ 234 (ImmDef). And their allegations, taken together, convey that the organizations have diverted resources in response to Defendants' conduct. *See id.* ¶¶ 229–30 (CHIRLA); *id.* ¶¶ 233–34 (ImmDef); *see also* ¶¶ 122–25 (describing CHIRLA and ImmDef attorneys' continued efforts to contact detainees despite Government policies). So Plaintiffs' allegations sufficiently support a finding of organizational standing to participate in this action.

These allegations, taken together, establish that all organizational Plaintiffs have at least one form of standing—to pursue this case in their own capacity or as representatives of their members. *Cf.* MTD Order at 18–19.

Defendants' principal argument against organizational standing is that the organizations lack standing "[a]bsent any nonspeculative probability of injury to their members." Motion at 10. As Defendants put it, the organizational Plaintiffs "identify no individuals with a concrete Fourth and Fifth Amendment injury and this Court cannot find associational standing where the record demonstrates none." *Id.* (citing *Perdomo*, 146 S. Ct. at *2–3). But this Court has already explained its finding that, unlike the *Lyons* Court, the 2AC plausibly alleges that Plaintiffs have suffered an injury in fact, and that their future threat of injury is not speculative. *See* section III.A.i *supra.* Nor do Defendants propose any authority that holds that, to prevail on standing, an organizational plaintiff must name an individual member who would independently have standing. Their allegations, taken together as true, support the conclusion that the organizations *do* have members with standing, which appears sufficient at this stage. And, similarly, this Court has already explained its conclusion that the threat of future harm alleged in the 2AC is not merely speculative. So neither argument cuts in favor of dismissal.

Defendants' other arguments against organizational standing similarly fail. First, Defendants contend that "CHIRLA has not asserted that their individual members would independently have standing to bring an access to counsel claim." Motion at 11. This is not correct. *See* 2AC ¶ 122 ("On June 6, 2025, attorneys and legal representatives from organizational Plaintiffs CHIRLA and ImmDef attempted to gain access to B-18 to advise detainees of their rights and assess their eligibility for relief, but they were not permitted to enter."); *id.* ¶ 230 ("CHIRLA's attorneys and representatives have attempted to communicate with individuals at B-18, were denied access, and were thwarted in their efforts to offer legal advice to even those detainees they saw at a distance . . . ."); *see also* TRO Order at 21 ("Here, the evidence presented shows that the members of CHIRLA satisfy Article III standing on their own in light of their reasonable fear of imminent detention without access to counsel." (citations omitted)). Defendants' Motion offers no further analysis of why these findings do not suffice. To that end, taking the 2AC's allegations as true,

CHIRLA has alleged that its members would themselves have standing to sue. And, given the Motion does not contest this prong for any other organizational Plaintiff, this Court is satisfied that the first prong is met.

Second, Defendants argue—relying on *Alderman v. United States*, 394 U.S. 165, 174 (1969), and *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978)— that Fourth Amendment rights are personal rights that cannot be vicariously asserted. Motion at 10. But *Alderman* and *Rakas* were criminal cases, standing for the proposition that a criminal defendant may not raise a Fourth Amendment challenge to the unlawful search of a third party's property. Not only do they not control the question of whether an organization may assert the Fourth Amendment rights of its members, the Court reads *Stavrianoudakis v. U.S. Fish & Wildlife Service*, 108 F.4th 1128, 1135, 1143 (9th Cir. 2024), as holding that an organization may. Defendants do not contend with *Stavrianoudakis*, although the Court has relied upon it in prior orders.

Defendants do, however, cite to *Black Lives Matter Los Angeles v. City of Los Angeles*, 113 F.4th 1249 (9th Cir. 2024), in support of their argument. But there, the Ninth Circuit did not hold that an organization cannot assert the Fourth Amendment rights of its members; this was not the question before the court. The question before the court was whether the district court's decision to certify the class in that case was proper. The Ninth Circuit found it was not. In its analysis, the Ninth Circuit pointed out that "[w]hether the use of tight handcuffs violates the Fourth Amendment, like other excessive force issues, is usually fact-specific and likely to turn on the credibility of the witnesses." *Id.* at 1261 (internal quotation marks omitted). Ultimately, it did not determine that it was not possible to certify such a class. Rather, it remanded to the district court to address what questions, if any, "the plaintiffs could resolve using class-wide evidence" and "whether those questions predominate over the many individual issues." *Id.* This—and the fact that Fourth Amendment claims may be fact-intensive and diverse—clearly is not dispositive on whether an organization can assert the Fourth Amendment rights of its members. In short, Defendants have

33

pointed the Court to no contrary authority on this issue. Associational standing is available to organizations seeking to bring Fourth Amendment claims arising from members' injuries.

Third, they contend that the organizational Plaintiffs have failed to demonstrate that their Fifth Amendment challenges fall within the constitutional "zone-of-interests requirement." Motion at 12. As the Supreme Court has instructed, "a statutory cause of action extends only to plaintiffs whose interests 'fall within the zone of interests protected by the law invoked.'" *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (quoting *Allen*, 468 U.S. at 751). "Whether a plaintiff comes within 'the "zone of interests"' is an issue that requires [courts] to determine, using traditional tools of statutory interpretation, whether a *legislatively conferred* cause of action encompasses a particular plaintiff's claim." *Id.* at 127 (emphasis added). *Lexmark* clarifies that the zone of interests test applies to causes of action created by Congress—that is, legislative and regulatory causes of action. *Id.*; *see also Sierra Club v. Trump*, 929 F.3d 670, 702 (9th Cir. 2019) ("We recognize that the Supreme Court has consistently applied a zone of interests test to causes of action arising under the APA."). The Reply maintains that the Supreme Court "has not definitively overruled its previous rulings applying the test to constitutional claims pre-*Lexmark*." Reply at 7. Be that as it may, *Lexmark* is clear: The zone of interests test relates only to legislatively conferred causes of action—and the Fifth Amendment claims are, by definition, not legislatively conferred. This Court is not persuaded by the Reply's authorities to the contrary, all of which are nonbinding (and one of which appears to predate *Lexmark*).

\* \* \*

In sum, this Court is satisfied that all Plaintiffs have made the requisite showing of Article III standing, particularly given the requisite showing at the motion to dismiss stage. For that reason, the Motion as to Rule 12(b)(1) for lack of standing is denied.

/ / /

## B. 8 U.S.C. § 1252 does not bar Plaintiffs' claims.

Next, at issue is whether Section 1252 strips this Court of jurisdiction over Plaintiffs' constitutional claims. It does not.

Section 1252(a)(5) states: "[A] petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter." 8 U.S.C. § 1252(a)(5). Section 1252(b)(9) follows: "Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove a[] [noncitizen] from the United States under this subchapter shall be available only in judicial review of a final order under this section." *Id.* § 1252(b)(9).

The Ninth Circuit has previously held that a noncitizen's right to counsel "is part and parcel of the removal proceeding itself," so claims relating to a noncitizen's right to counsel must be raised through a petition for review process. *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031–35 (9th Cir. 2016) (quoting *Aguilar v. ICE*, 510 F.3d 1, 13 (1st Cir. 2007)). But, since *J.E.F.M.*, the Supreme Court has clarified the meaning of "arising from" and found that the INA "does not present a jurisdictional bar where those bringing suit are not asking for review of an order of removal, [or] the decision . . . to seek removal." *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 19 (2020) (cleaned up) (quoting *Jennings v. Rodriguez*, 583 U.S. 281, 294–95 (2018)).

Here, Plaintiffs do not ask for review of removal proceedings, nor do they challenge existing proceedings. Instead, Plaintiffs challenge Defendants' conduct in systematically interfering with their ability to provide legal services to prospective and existing clients. *See* 2AC ¶¶ 282, 285–87, 291. The relevant facts and legal questions occur outside any individual's removal proceeding; in no sense are they inextricably linked to the removal process. *See Gonzalez*, 975 F.3d at 810 (quoting *Dep't of Homeland Sec.*, 591 U.S. at 19) (describing Section 1252(b)(9) as a "targeted" and "narrow" provision). So, too, for the Fourth Amendment Plaintiffs; the challenged conduct as alleged involves unconstitutional detentions and other conduct as part of Defendants' raids. No claim, in short, requires review or challenge of removal proceedings.

Thus, this argument is unavailing.[11]

### C.  Plaintiffs sufficiently state their constitutional claims.

Defendants next argue, that, "[e]ven assuming this Court assured itself of having jurisdiction . . . , Plaintiffs' [2AC] asserts broad violations of the Fourth and Fifth Amendments that fail to pass muster." Motion at 14. This Court addresses these arguments in turn.[12]

i.   The Fourth Amendment claims are sufficiently stated.[13]

1.  *The first cause of action, for suspicionless stops, is sufficiently stated.*

As the parties agree, "immigration stops . . . requi[re] a reasonable suspicion inquiry grounded in specific articulable facts." Motion at 15; *see also* Opp. at 5. In the first cause of action for Fourth Amendment claims, Plaintiffs' 2AC alleges that Defendants are falling short: It challenges as unconstitutional Defendants' practice of conducting stops absent reasonable suspicion. 2AC ¶¶ 262–67. And, in the newly added ninth cause of action, Plaintiffs challenge Defendants' alleged practice of "routinely using highly intrusive tactics during detentive stops," in a manner

---

[11] In their supplemental briefing, Defendants also argue that the Supreme Court's decision in *Mullin v. Doe* "emphasizes that in the immigration context, the lower courts need to take seriously review bars in the INA." *See* Def. Supp. at 1 (citing *Mullin v. Doe*, 146 S. Ct. 2121, 2133 (2026)). But *Mullin* does not offer support to Defendants' arguments about Section 1252. Defendants quote *Mullin* for the proposition that the "'plain meaning' of [the] relevant review bar 'is very broad.'" *Id.* (citing *Mullin*, 146 S. Ct. at 2133). But the quoted portion of *Mullin* actually refers to a different provision of the TPS statute. *See* 146 S. Ct. at 2133 (discussing 8 U.S.C. § 1254a(b)(5)(A)). The provision at issue in *Mullin* bars judicial review of "any determination of the [Secretary of Homeland Security] with respect to the designation, or termination or extension of a designation, of a foreign state." 8 U.S.C. § 1254a(b)(5)(A). The bar at issue in this case is distinct.

[12] Although this Court addressed and rejected similar arguments in ruling on Plaintiffs' Motion to Amend their Complaint, that ruling is not dispositive as to whether the claims have been properly stated. In fact, this Court expressly stated that its order granting leave to amend was without prejudice to Defendants seeking to dismiss as appropriate, which would of course include on the same or similar grounds as raised in opposition to the motion for leave to amend. *See* Dkt. No. 484 at 13 n.8.

[13] This Court notes Plaintiffs' representation that, at the L.R. 7-3 conference, Defendants advised Plaintiffs that "they would challenge the merits only of the equal protection claim—specifically, the disparate impact theory"—in the Motion. Opp. at 10; *see also* Dkt. No. 500-1 ¶ 5. Defendants characterize this as a miscommunication, explaining that "Defendants would not agree to waive [their] challenge to the merits of Plaintiffs' constitutional claims." Reply at 9. Though this Court will adjudicate the Motion on the merits, the parties are reminded that this Court may refuse to entertain future arguments that are not in strict compliance with this District's Local Rules and with this Court's Standing Order.

disproportionate to any legitimate investigative purpose, resulting in unreasonable seizures. *Id.* ¶¶ 300–07.

Defendants challenge both Fourth Amendment claims under Rule 12(b)(6). Primarily, they contend that "[n]o single factor, whether related to appearance, behavior, or an officer's experience, is per se irrelevant to the analysis," because "law enforcement may consider multiple contextual factors in forming reasonable suspicion regarding immigration status." Motion at 14–15. As a result, they say Plaintiffs cannot make out a Fourth Amendment claim based upon the allegations in the 2AC: Because officers may rely on a totality-of-the-circumstances analysis in making findings of reasonable suspicion, and because the Court must consider the totality of the circumstances in determining whether an officer had reasonable suspicion, Plaintiffs cannot make out a Fourth Amendment claim based on the 2AC's allegations.

In support, they direct this Court to three cases: *United States v. Brignoni-Ponce*, 422 U.S. 873 (1975), *United States v. Montero-Camargo*, 208 F.3d 1122, 1127 (9th Cir. 2000), and *United States v. Arvizu*, 534 U.S. 266 (2002). But these cases merely stand for the uncontroversial principle that officers may rely on totality-of-the-circumstances analyses in determining whether reasonable suspicion exists. *Brignoni-Ponce*, 422 U.S. at 884; *Arvizu*, 534 U.S. at 275.[14] No part of the 2AC calls that general principle into question, nor does finding in Plaintiffs' favor on the Fourth Amendment claims require rejecting that principle. Indeed, the gravamen of Plaintiffs' allegations are that officers are *not* relying on the totality of circumstances in making arrests; instead, they are relying on four factors that cannot establish reasonable suspicion, either individually or jointly. *See* 2AC ¶ 39 ("One of the clearest patterns that have emerged in the raids in Southern California has been stops and interrogations based on nothing but broad profiles, including on the basis of apparent race and ethnicity."). As this Court has already explained, assuming without deciding the truth of those allegations, they describe constitutionally impermissible conduct. *Vasquez Perdomo*, 148 F.4th at 681.

---

[14] Defendants agree that "considering a person's ethnicity or race without other factors is not 'reasonable suspicion of criminal activity.'" Motion at 15 (quoting *Brignoni-Ponce*, 422 U.S. at 886–87).

The Court understands that Defendants maintain that reliance on these factors is consistent with the Constitution. Binding law supports the view that reliance on one or more of these factors, without more, cannot support reasonable suspicion even under a totality-of-the-circumstances approach. *See Montero-Camargo*, 208 F.3d at 1129 ("The requirement of particularized suspicion encompasses two elements. First, the assessment must be based upon the totality of the circumstances. Second, that assessment must arouse a reasonable suspicion that the *particular person being stopped* has committed or is about to commit a crime." (citations omitted) (emphasis added)); *see also Whren v. United States*, 517 U.S. 806, 813 (1996) ("[T]he Constitution prohibits selective enforcement of the law based on considerations such as race."). And the Ninth Circuit, in binding precedent, has agreed with this Court that, "in the context of the Central District of California, the four enumerated factors at issue—apparent race or ethnicity, speaking Spanish or speaking English with an accent, particular location, and type of work, even when considered together—describe only a broad profile and 'do not demonstrate reasonable suspicion for any particular stop.'" *Vasquez Perdomo*, 418 F.4th at 683 (quoting TRO Order at 44). So Defendants' position is inconsistent with binding law, and offers no grounds for dismissal.

> 2.  *The ninth cause of action, for intrusive stops, is sufficiently stated.*

The Motion argues that "Plaintiffs' [2AC] asserts broad violations of the Fourth and Fifth Amendments that fail to pass muster." Motion at 14. To that end, this Court understands Defendants to challenge the 2AC's sufficiency under Rule 12(b)(6) regarding both the first and the ninth causes of action, given that these constitute the Fourth Amendment claims. Nevertheless, Defendants' Motion appears to raise no substantive argument as to why Plaintiffs' claims of excessively intrusive detentions are insufficiently stated as a matter of law. On Reply, Defendants describe the posture of the Motion and Opposition as follows: "Defendants' underlying Motion specifically detailed that Plaintiffs added 'a new cause of action under the Fourth Amendment that Defendants' conduct during stops exceed[s] the reasonable bounds of a *Terry* stop.'" Reply at 10 (quoting Motion at 1). "Defendants then argued that they 'have lawfully conducted immigration enforcement operations within the Central District of California consistently with the Fourth and Fifth Amendments[,]' and

therefore 'Plaintiffs' [2AC's] new causes of action should be dismissed." *Id.* (quoting Motion at 1). In sum, then, it appears Defendants' primary argument regarding Rule 12(b)(6) as to the ninth cause of action is simply that their operations have complied with the Fourth Amendment, so the intrusive stops claim fails as a matter of law.

This argument, however, is unavailing. In ruling on Defendants' motion under Rule 12(b)(6), this Court must accept the factual allegations in the pleadings as true and view them in the light most favorable to Plaintiffs. *Soo Park*, 851 F.3d at 918; *Lee*, 250 F.3d at 679. Therefore, the fact that Defendants contest that they conducted unconstitutionally detentive stops is no reason to dismiss a claim at the pleadings stage.

As Plaintiffs assert—and as Defendants appear to concede—an unreasonably intrusive stop can violate the Fourth Amendment.[15] Plaintiffs properly allege that they were subjected to unreasonably intrusive stops; in particular, they describe "handcuffing, confinement, relocation, and prolonged detention." 2AC ¶ 302. *See also* 2AC ¶¶ 91–102 (alleging Government's routine practice of conducting detentive stops in unreasonable manners). Crucially, Defendants do not argue that Plaintiffs' allegations, taken as true, do not describe unconstitutional conduct. This Court is therefore satisfied that Plaintiffs' ninth cause of action properly states a claim.

\* \* \*

To that end, finding that Plaintiffs' Fourth Amendment claims are not foreclosed by law, this Court denies Defendants' request to dismiss the first and ninth causes of action.

/ / /

---

[15] There is clear Ninth Circuit authority on this point:

> The Fourth Amendment protects persons "from the terrifying and humiliating experience of being pulled from their cars at gunpoint, handcuffed, or made to lie face down on the pavement when insufficient reason for such intrusive police conduct exists." While circumstances may sometimes call for such intrusive tactics during a *Terry* stop, the police may not employ them "*every time* they have an 'articulable basis' for thinking that someone may be a suspect in a crime." Rather, there must be "special circumstances" that make such tactics reasonable.

> Whether a particular *Terry* stop warrants the use of intrusive tactics depends on the tactics' objective reasonableness assessed under the totality of the circumstances.

*Chinaryan v. City of Los Angeles*, 113 F.4th 888, 897 (9th Cir. 2024), *cert. denied sub nom. Cueto v. Chinaryan*, 145 S. Ct. 1927 (2025) (footnotes and citations omitted).

ii.   The Fifth Amendment claims are sufficiently stated.

Defendants next challenge, under Rule 12(b)(6), Plaintiffs' eighth cause of action, for violations of the Fifth and Fourteenth Amendments' guarantee of due process. 2AC ¶¶ 292–99. This claim alleges that Plaintiffs—both the individuals and members of the organizations—are members of a protected class on the basis of race, color, and/or ethnicity. *Id.* ¶ 294. Plaintiffs allege that Defendants, by engaging in policies of "racially and ethnically discriminatory treatment of individuals they perceive to be Latino," are in violation of the Equal Protection Clause. *Id.* ¶ 295. These policies result in Plaintiffs being denied equal protection of the law. *Id.* ¶ 296.

Defendants' first argument in support of dismissal on 12(b)(6) grounds is that, "[t]o properly plead an equal protection claim, a plaintiff must raise a plausible inference that an 'invidious discriminatory purpose was a motivating factor' in the relevant decision." Motion at 15 (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)). But, Defendants argue, "Plaintiffs merely establish that Defendants are interested in lawfully enforcing the law, in locations where there is known to be a larger proportion of individuals with no lawful basis to be in the country." *Id.*

This argument fails for two reasons. First, as Plaintiffs' Opposition notes and the Reply appears to concede, "[a] showing of discriminatory intent is not necessary when the equal protection claim is based on an overtly discriminatory classification." *Wayte v. United States*, 470 U.S. 598, 608 n.10 (1985); *see also* 2AC ¶ 70 (alleging express classification theory). Defendants, on Reply, respond by contending that "Plaintiffs do not identify any practice, policy, or enforcement action that expressly applies to Latinos." Reply at 10. But the Complaint is rife with allegations that, taken as true, constitute actions taken to target Latino individuals. *See, e.g.*, 2AC ¶¶ 48–49 (alleging eyewitnesses to Defendants' immigration enforcement noticed that only "dark-skinned" or "Hispanic" appearing individuals were stopped); *id.* ¶¶ 68–69 (alleging Defendants intentionally stop individuals based on their apparent race, color, and ethnicity); *id.* ¶¶ 81–82 (alleging Defendants unreasonably rely on race and ethnicity in selecting locations for raids and detention targets); *id.* ¶¶ 294–95 (alleging Defendants' racially and ethnically discriminatory treatment of individuals they perceive to be Latino). Defendants' failure to engage with any of these allegations—whether to

explain why this Court should not take them as true or explain why they fail as a matter of law—is fatal.

Further, the Motion's characterization—that no allegations of discriminatory purpose were made—grossly understates the 2AC's allegations. The 2AC alleges several bases from which to infer that Defendants' actions were performed with discriminatory purpose: racially charged statements made by Defendants' agents during raids (2AC ¶ 72) and elsewhere (*id.* ¶ 77), departure from historical enforcement practices (*id.* ¶¶ 74–75), and a lack of training and oversight intended to prevent impermissible racial profiling (*id.* ¶ 76). Defendants engage with none of this. Instead, characterizing their enforcement as permissibly targeting those without immigration status rather than impermissibly targeting individuals based on race, they argue that the claim fails. Motion at 16 (citing *Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 591 U.S. 1, 34–35 (2020)). But no factual or legal authority they cite permits this Court to dismiss Plaintiffs' claims solely on Defendants' unsupported assertion that the enforcement activity was permissible and did not target Latinos based on their race. In Reply, Defendants reference *Trump v. Hawaii*, 585 U.S. 667 (U.S. 2018), to contend that "the Supreme Court has already rejected reliance on [] political statements to undermine a facially neutral authority." Reply at 10. At most, this argument only addresses one of the 2AC's several theories for finding discriminatory purpose: relying on statements made by some Defendant members of the Executive Branch regarding immigration policy and enforcement. *See* 2AC ¶ 79. So even if this Court were persuaded that government officials' statements can never suffice to demonstrate the discriminatory purpose behind a policy, the argument provides no basis to dismiss any claim.

Defendants' second argument supporting dismissal, raised at the hearing and in supplemental briefing,[16] is that "Equal Protection claims based on political statements by government officials

---

[16] Defendants' other argument raised in their supplemental briefing fail. Defendants state that "the mere fact that many of the individuals who are ultimately affected may be Hispanic does not transform lawful immigration enforcement into unconstitutional discrimination" because immigrants without lawful status are more likely to be Hispanic in the first place. Def. Supp. at 3–4. Yet Defendants' argument is also not compelling for two reasons, as explained above. *See* section III.C.ii First, Plaintiffs allege that immigration enforcement used overtly discriminatory classifications, which negates any defense that immigration policy was race-neutral. *See* 2AC ¶¶ 48–49, ¶¶ 68–69, ¶¶ 81–82, ¶¶ 294–95. Second, Plaintiffs also allege multiple instances of discriminatory intent that demonstrate targeted racial enforcement.

would likely fail . . . [when the claim] is not meaningfully distinguishable from that in *Doe*." Def. Supp. at 1 (citing *Mullin v. Doe*, 146 S. Ct. 2121 (2026)). Defendants assert that, "[l]ike the plaintiffs in *Doe*, Plaintiffs rely almost exclusively on political statements by government officials, very similar to the ones reviewed and rejected by Supreme Court as a basis for an Equal Protection claim." *Id.* at 3. In *Mullin*, Syrian and Haitian noncitizens challenged the termination of Temporary Protected Status for Syria and Haiti respectively. 146 S. Ct. at 2127. The Haitian litigants claimed that the TPS termination violated the Equal Protection Clause because the termination was racially motivated. *Id.* at 2137. The Supreme Court determined that government officials' "derogatory comments about immigration" and "express[ions of] antipathy toward travelers from [certain] countries," which Plaintiffs proffered as evidence of an Equal Protection Clause violation, were insufficient. *Id.* at 2138. In the context of this case, this argument is unavailing. As previously established, official statements are not the sole evidence used by Plaintiffs; instead, they represent one part of the basis for the Equal Protection claim.[17] *See* 2AC ¶ 79; *see also* Pla. Supp. at 1 (noting that the 2AC "includes extensive factual allegations showing discriminatory intent, including evidence unrelated to the statements of officials"). As such, the supplemental briefing's claims, even accepting Defendants' interpretations, do not suffice for this Court to dismiss the claim.

In sum, Defendants' Motion as to the Fifth Amendment claim fails.

/ / /

---

S*ee* 2AC ¶ 72, ¶ 74–77. Therefore, even if *Mullin* held that official statements can never form the basis for an Equal Protection Clause claim, dismissal would not follow.

Defendants cite *Department of Homeland Security v. Regents of University of California* to support their claim that Equal Protection claims are rarely recognized in the context of immigration enforcement. 591 U.S. 1, 34 (2020). (The Defendants appear to have abandoned the argument made at the hearing that *Mullin* addresses whether Equal Protection Clause claims are viable in the immigration context at all. Tr. 8:21–25.) *Department of Homeland Security* does not stand for this proposition and does not apply to the facts of this case. There, the plaintiffs purportedly used "the *disparate impact* of the rescission [of DACA] on Latinos from Mexico, who represent 78% of DACA recipients" as evidence of animus, in which the court determined that "because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program." *Id.* (emphasis added). But here, Plaintiffs do not rest their Equal Protection claim on the fact that the immigration enforcement purportedly has a disparate impact on Latinos. Instead, Plaintiffs allege specific *racially targeted* policy and actions that, taken as true, demonstrate racially discriminatory activity.

[17] The Motion, at most, negates one of several valid theories for relief, and the 2AC contains several theories, so dismissal is inappropriate. "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).

### D. Plaintiffs sufficiently state their APA claims.

Defendants' fourth challenge to the 2AC is that, "to the extent Plaintiffs base their claims under the APA, they have failed to sufficiently preserve this claim and do not present allegations . . . that Defendants engaged in unlawful agency action." As presented, Defendants' argument is bipartite: (1) that "Plaintiffs fail to support their broad claim of APA jurisdiction with any legal argument and thus, any argument under the APA is waived," and (2) that "Plaintiffs' vague APA argument does not actually identify a final agency action, but instead alleges a policy of violating various statutory provisions without tethering [them] to concrete examples of violating those statutes." Motion at 16–17. This Court addresses each in turn.

First, Defendants cite *Greenwood v. Federal Aviation Administration*, 28 F.3d 971, 977 (9th Cir. 1994), for the proposition that Plaintiffs' "argument under the APA is waived" because Plaintiffs "fail to support their broad claim of APA jurisdiction with any legal argument." Motion at 16. They explain that, contrary to Intervenors, Plaintiffs' 2AC "d[oes] not provide *any* allegation of violations under the APA." *Id.* They do not further explain this argument or detail why the allegations in the 2AC fall short. But *Greenwood* does little to support Defendants' argument on this basis. There, the Ninth Circuit discussed an appellate brief that did not clarify on what basis the plaintiff challenged the constitutionality of a statute. 28 F.3d at 977. As the court explained, it reviews "review only issues which are argued specifically and distinctly in a party's opening brief." *Id.* So, the court reasoned, "[w]e will not manufacture arguments for an appellant, and a bare assertion does not preserve a claim, particularly when, as here, a host of other issues are presented for review." To that end, for several reasons, *Greenwood* does not control here. It discusses the review of an appellate court, not a determination under Rule 12(b)(6) by a district court. And it referred to an appellate brief, not a complaint. More generally, it is not clear to what Defendants refer when they contend that Plaintiffs have "waived" argument under the APA by not including

43

more legal argument in their 2AC. Indeed, such an argument appears at odds with the pleading requirements enumerated in Rule 8.

Second, Defendants posit that the 2AC identifies no final agency actions. Motion at 17. Plaintiffs respond that, as this Court has previously determined, the APA claims are sufficiently stated to withstand dismissal at this early stage. Opp. at 14–15. To that end, Plaintiffs note that "Defendants' APA arguments are unchanged, and the Court already has rejected them." Opp. at 14. In Reply, Defendants acknowledge this Court's prior decision, but maintain their position. Reply at 11. They do not meaningfully explain, however, why this Court should decide differently—only that this Court *can* decide differently and is not bound by its prior determinations. *Id.*

While this Court agrees that it is not bound by law of the case doctrine in its findings in this Order, it remains satisfied that the APA causes of action are sufficiently pleaded. The relevant causes of action—Plaintiffs' third and fourth claims—identify final agency actions of the Government's "policy, pattern, and/or practice of making warrantless arrests without the required individualized flight risk analysis," 2AC ¶ 271, and "policy, pattern, and practice of making arrests without any warrant [and] without making an individualized determination of flight risk," *id.* ¶ 275. They explain that these alleged final agency actions are "in excess of statutory jurisdiction, authority, or limitations." *Id.* ¶¶ 271, 276. Defendants do not offer any authority as to why these allegations must fail. Instead, they characterize Plaintiffs as seeking to "mount a programmatic challenge to how immigration enforcement operations have been carried out in the District." Motion at 17. This Court does not read Plaintiffs' challenge to be so sweeping: Nowhere in Plaintiffs' 2AC do they suggest they challenge the general practice of immigration enforcement, and Plaintiffs' claims are not at odds with the Government's latitude to carry out immigration policy. Instead, Plaintiffs' challenge is specific to what they call "Defendants' ongoing pattern and practice of flouting the Constitution and federal law, including their open and deliberate reliance on racial profiling." 2AC ¶ 1. None of this reads to this Court as an impermissible programmatic challenge: Were this Court to adopt

44

Defendants' reasoning, it would call into question whether Plaintiffs may challenge any agency action as unconstitutional. Here, Plaintiffs have—as they must— "[directed their] attack against some particular 'agency action' that causes [Plaintiffs] harm." *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1010 (9th Cir. 2021). So this Court remains satisfied that Plaintiffs have sufficiently stated claims under the APA. *Cf.* MTD Order at 32–33.

As Defendants note, this Court is not bound by its prior decisions, and it has considered Defendants' arguments on their merits even where it previously rejected similar arguments. Nevertheless, this Court remains satisfied that—though it *may* determine issues differently upon reconsideration—Defendants have not shown why this Court *should* do so. For these reasons, the claims alleging APA violations are sufficiently stated, and will not be dismissed at this stage.

**IV. Conclusion**

The Motion is DENIED.

IT IS SO ORDERED.

Dated: August 11, 2026

MAAME EWUSI-MENSAH FRIMPONG

United States District Judge