UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Pedro VASQUEZ PERDOMO, et al.,<br>Plaintiffs,<br>v.<br>MARKWAYNE MULLIN, IN HIS OFFICIAL CAPACITY AS SECRETARY OF HOMELAND SECURITY, et al.,<br>Defendants. | Case No. 2:25-cv-05605-MEMF-SP<br><br>**DECLARATION OF H.B.** |

**DECLARATION OF H.B.**

I, H.B., declare and affirm that the following is true to the best of my knowledge, information, and belief:

1. I am the Associate Chief Counsel of the West Region of the Office of Chief Counsel (OCC) for U.S. Customs and Border Protection (CBP). The mission of CBP includes enforcement and administration of customs, immigration, and agriculture laws and regulations of the United States, as well as the enforcement of numerous other laws on behalf of other federal agencies. OCC provides legal advice to, and legal representation of, CBP officials in matters relating to the activities and functions of CBP. OCC also reviews proposed policies and actions to advise agency officials regarding applicable legal requirements; preparing legal opinions for issuance to the CBP agency client; and rendering litigation assistance to the U.S. Department of Justice in criminal or civil court actions involving CBP. OCC operates under the umbrella of the Department of Homeland Security's (DHS) Office of General Counsel.

2. As the Associate Chief Counsel for the West Region, and on behalf of the CBP Chief Counsel, I oversee and provide legal guidance to all CBP officials within my

assigned geographic region, covering a broad range of legal practice areas, including both affirmative and defensive litigation involving customs, immigration, and other federal laws. I have held the position of Associate Chief Counsel for the West Region since 2024. Prior to this role, I served as Assistant Chief Counsel and Chief of Staff for OCC from 2020 to 2024. Since 2007, I have held various attorney positions within OCC, and since 1997, I have served in legal roles with the Department of Justice, Immigration and Customs Enforcement, and Citizenship and Immigration Services.

3. As the Associate Chief Counsel for the West Region, I provide strategic oversight and direction for the litigation team assigned to this matter. Under my leadership, two Deputies and a Team Lead manage and coordinate a team of attorneys who are responsible for all aspects of discovery in this case, including the identification, collection, verification, and production of responsive records.

4. I am aware of *Perdomo v. Mullin* (Docket No. 2:25-cv-05605), including the underlying claims and ongoing progress of discovery. I provide this declaration based on my personal knowledge, reasonable inquiry, information obtained from those that were involved in searching for, collecting, and reviewing documentation related to this matter, and information obtained in the course of my employment.

**Limited Expedited Discovery**

5. This declaration is intended to supplement my verification statement filed on December 22, 2025 (ECF No. 317-4) and A.A.M.'s Declaration filed on January 30, 2026 (ECF No. 395-1), both of which explain CBP's discovery collection process and the associated burdens through January 2026.

6. The Court ordered CBP to collect documentation and communications from the fifteen operations listed in CHIRLA's Expedited Request for Production ("RFP") No. 2, Order Granting Plaintiffs' Motion to Compel (ECF No. 320), and as expanded under ECF No. 370 ("Order"). Of these operations, CBP was present only at twelve, specifically (b), (c), (e), (g)-(o) ("CBP Operations"). A.A.M. Decl. ¶ 4. This declaration briefly addresses CBP's collection process for the RFPs prior to the Court's Order and

then addresses each of the bullets at pages 8-9 of the Court's Order, respectively.

*Limited Expedited Discovery – Pre-ECF 370*

7. On October 29, 2025, and to respond to RFP No. 3, CBP requested the electronically stored information ("ESI") of the thirteen agents identified in CBP's response to CHIRLA's Expedited Interrogatories, Set One, No. 1, namely the agents who effectuated arrests of the individuals identified in that interrogatory that involved CBP. The ESI search parameters differed by agent, but all the same repositories were searched (email and Microsoft Teams). The date range was approximately two days before to two days after each operation. The keywords generally included the following: operation, mission, deployment, target, subject, custody, arrest, detain, encounter, stop, suspicion, Home Depot, car wash, trojan horse, at large, alien, illegal, run, ran, running, Mexican, Spanish, Latino, worker, day laborer, vendor, take in, ready, execute, confirm, update. However, CBP also included additional keywords based on the location, type of operation, and detainee. For example, one search included these tailored keywords: Yank, tow yard, Ramirez, Javier.

8. In addition to the ESI pulled for this RFP, CBP manually collected communications through messaging applications to or from the agents identified in Expedited Interrogatory No. 1. This was done by contacting the agents involved in the arrest of the individuals named in Expedited Interrogatory No. 1 and inquiring about the types of communications that may have existed, including information on any messaging applications that were used. CBP then reached out to the individual agents and attempted to collect the communications manually by having agents either export the messages, when available, from applications, such as WhatsApp; provide screenshots if an export was unavailable; or provide a screen recording of audio messages from any audio applications, such as Zello. If the arresting agent did not have the specific communication, CBP requested information about who else may have been on the communication. CBP continued to contact those agents identified as being on the communications until a copy of the communication could be obtained, if available, via at

least one of the three methods identified above.

9. To respond to RFP Nos. 1, 2, and 4, CBP manually collected the requested documentation from the operational client. *See* H.B. Decl. ¶¶ 8-16. The operational client included individuals in the incident command post at U.S. Border Patrol who knew where such documents were located and had access to such documents. The first production of these documents was made on November 13, 2025, with a subsequent production occurring on December 19, 2025. CBP produced the body-worn camera ("BWC") of the thirteen agents identified above on November 26, 2025, and December 4, 2025.

*Limited Expedited Discovery – ECF 370: Bullet Nos. 1 and 3*

10. The Court ordered Defendants to "[c]ollect standardized documentation, including any targeting information or slide presentations given to agents from all relevant operations and produce them to plaintiffs." Order at 8 ("Bullet No. 1"). To comply with the Order with respect to Bullet No. 1, and because Plaintiffs did not define "standardized documentation" in their requests and the Court did not clarify in its Order, CBP had to ascertain what was meant by "standardized documentation." A.A.M. Decl. ¶ 5. "Standardized documentation" generated confusion within the agency because CBP enforcement activities do not necessarily generate a standardized or required set of operational documents. As required by the rules of discovery, CBP continues to search for such materials in the extensive ESI collections for limited expedited discovery and with the additional merits discovery requests and, while it believes nearly all, if not all, responsive documentation has been produced, the agency will supplement its productions should it discover additional responsive ESI.

11. The Court ordered Defendants to "[c]ollect documents from every agent present at the 15 operations, including any reports or notes they generated and any communications they exchanged relating to the operations." Order at 8 ("Bullet No. 3"). As for compliance with Bullet No. 3, CBP had to first identify "every agent present" at the CBP Operations, which took several months for the reasons previously explained in A.A.M.'s

Declaration ¶ 7. Based on the months of research and investigation, CBP requested the ESI of approximately 446 agents. The search parameters for the ESI requests included: (1) a date range from approximately June 10, 2025 to September 27, 2025, representing the window between the first-in time and last-in-time requested operation with two days before and two days after included as a buffer; (2) emails from Archive360 (an email journaling solution, which captures all emails sent to or from a CBP mailbox) and Microsoft365 (which included all Microsoft data from OneDrive, Teams Chats, Teams Channels, and custodian mailboxes, but excluded emails that were collected from Archive360); and (3) using search terms (Yank, tow, Montebello, carwash, car wash, Whittier, Touch and Glow, Hollywood, Paramount, home depot, Handy, Culver, Magnolia, Fountain Valley, Westlake, San Bernardino, Pasadena, Naples, Long Beach, Contractor, Warehouse, Pomona, Trojan Horse, Carmenita, Sunset, Alondra, Wilshire, Washington Blvd, Washington Boulevard, Del Mar, Walnut).

12. As the ESI searches were completed, the data was uploaded to CBP's Relativity platform ("RelOne"). The ESI searches covered more than just the fifteen encounters for limited expedited discovery and pulled a total of approximately 434,878 documents. After de-duplication, there were approximately 167,945 documents left for review. Given the volume of documents to review against the compressed timeline ordered by the Court, CBP used an active learning protocol to take reems of information down to something more feasible for human review. Applying Computer Assisted Learning ("CAL"), also known as Technology Assisted Review, CBP trained RelOne to distinguish documents as responsive versus non-responsive. That training was completed in June 2026 with an elusion rate of 1.2%, which is below the human error rate in making the distinction between responsive and non-responsive documents. CAL was then applied to the pool of presumptively responsive documents and staged for human review. Even as CBP was training RelOne and CAL was used to stage documents for human review, CBP created searches to identify, review, and prioritize documents responsive to limited expedited discovery for immediate production. CBP made repeated

productions, and continues to do so, from this subset of documents. Despite CBP prioritizing review of the government phones, as this seems of most interest to Plaintiffs, CBP has sent approximately 2,924 documents to DOJ for review. Some of those 2,924 documents are responsive to limited expedited discovery and some are responsive to merits discovery. As of today's date, CBP has approximately 14,560 documents still to review from all of the ESI collections, which includes documents responsive to limited expedited discovery and also documents that are relevant to merits discovery. Once we come to agreement with Plaintiffs regarding the merits discovery, the already reviewed documents that are responsive can be produced.

*Limited Expedited Discovery – ECF 370: Bullet No. 2*

13. The Court's Order also required the government to "[i]dentify all persons who were arrested during any of these operations and gather all documentation concerning their arrests[.]" Order at 8 ("Bullet No. 2"). As previously explained, CBP complied with this order and produced all documentation from its manual collection of the arrestees, known at that time, within its possession, custody, and control by January 23, 2026. H.B. Decl. ¶¶ 13-14; A.A.M. Decl. ¶ 6. The mandate to "gather all documentation concerning their arrests" is necessarily included in the collection process detailed above and below, for previously identified and any newly identified arrestees, because CBP's ESI collections cover this documentation and is subject to Defendants' duty to supplement productions as discovered.

*Limited Expedited Discovery – ECF 370: Bullet No. 5*

14. The Court ordered that CBP "forensically image any cell phone used by an agent present at any of the 15 operations and review these devices for material responsive to RFP No. 2 and 3." Order at 9 ("Bullet No. 5"). Once again, while the parties ultimately and belatedly agreed on a list of custodians to have their devices forensically imaged, this portion of the Court's order still required CBP to identify every agent present at the operations. For government phones, this amounts to approximately 446 phones.

15. When the Court issued its Order, though, CBP did not already have a

comprehensive list of agents present on scene at the CBP Operations and began generating that list on January 20, 2026. A.A.M. Decl. ¶ 7. While the government was negotiating with Plaintiffs regarding custodians, on February 9, 2026, CBP began collecting the government phones of the agents that were believed to be present at the CBP Operations. The first government phone was delivered to CBP's Laboratories and Scientific Services ("LSS") on February 12, 2026, and LSS began extracting data from government phones shortly thereafter in mid-February 2026, and continues to do so. To date, of the approximately 205 government phones that have been collected, all have been forensically imaged or attempted to be forensically imaged.

16. CBP previously explained the process for collecting, imaging, exporting, and reviewing government phones. *See* A.A.M. Decl. ¶¶ 12-15; J.R. Decl. (ECF No. 503-26) ¶¶ 6-8, 10. OCC had extensive technical discussions with LSS about search criteria for the phones to ensure that relevant data was being captured. For example, certain repositories can exclude data if a date limitation is imposed. Additionally, Plaintiffs and Defendants were in the midst of negotiations regarding custodians, search terms, date ranges, the format to produce the phones, and repositories until March 25, 2026. The finalized search criteria includes: a date range of artifacts (excluding M365 applications) created and/or modified from June 6, 2025 through September 27, 2025, from photos and videos stored in the DCIM folder; photos and videos sent/received via third-party messaging applications; voicemails and other voice messages sent/received via messaging applications; and SMS, MMS, and/or third-party messaging applications.

17. After LSS completes the report and uploads it to a CBP repository, OCC downloads the file and then uploads it to another storage site accessible by DOJ. As previously explained, OCC and DOJ must review the reports for responsiveness, confidentiality, and privilege before any documents are produced. A.A.M. Decl. ¶ 13. There are limited counsel available to conduct such review. *Id.* Additionally, during review, CBP modified how it exported reports from governments phones through months of technical trial and error, and to accommodate Plaintiffs' preferences. This

required OCC to have further technical discussions with LSS to ensure data was provided in a readable and digestible format for all parties. CBP then had to recreate reports for some phones and re-review those phones.

18. When Plaintiffs and Defendants agreed to limit the custodians with respect to the forensic imaging of government phones to "supervisors," "team leads," and "any officers who initiated arrests" on March 16, 2026, CBP ceased collection of the outstanding government phones of non-priority custodians. *See* Joint Stipulation (ECF No. 461) at 6. However, given that the stay on imaging government phones has expired (ECF No. 527 ¶ 4), CBP has started the process of collecting the outstanding government phones for agents identified as non-priority custodians, but who were present during the CBP Operations.

19. For personal phones, from the Questionnaire provided to every employee that CBP reasonably understands assisted in Operation at Large – Los Angeles, of the approximately 1,358 who answered the Questionnaire as of August 28, 2026, approximately 926 used their personal phone during Operation at Large – Los Angeles. *See* H.B Decl. (ECF No. 700-1) ¶¶ 12-13. CBP is unsure how many of that 926 were also part of the fifteen encounters for limited expedited discovery. For an explanation of the collection process for personal devices, I respectfully refer the Court to the previous declarations submitted in this matter as there are no updates. *See* D.S. Decl. (ECF No. 503-25); J.R. Decl.; H.B. Decl. (ECF No. 700-1). Five agents consented to their personal phones being imaged, which was completed as of August 13, 2026. H.B. Decl. (ECF No. 700-1) ¶ 9. As of August 28, 2026, seven additional people indicated a willingness to have their personal phones imaged, but have not yet signed the consent forms. *Id.* ¶ 14.

20. CBP continues to transmit completed reports of the imaged phones to DOJ and review those reports in DOJ's Relativity platform pursuant to the Court's order granting a stipulation between the parties to extend production deadlines. Order (ECF No. 527). DOJ has ingested approximately seventeen CBP government phones in CORA for a total of approximately 67,957 images. Out of those 67,957 images, the government has

reviewed approximately 50,895 images. Of those 50,895 images, approximately 13,696 images have been identified as responsive and have been produced (or production is in progress). As noted above, the mandate for Bullet Nos. 1, 2, 3, and 5 all necessarily encompass each other and discovery is ongoing.

*Limited Expedited Discovery – ECF 370: Bullet No. 4*

21. The Court further ordered that CBP must "produce all [BWC] footage recorded by any agent present at any of the 15 operations listed in RFP No. 2." Order at 9 ("Bullet No. 4"). As described above, CBP made an initial production of BWC in November and December 2025. As previously explained, CBP identified additional agents, which necessitated additional productions of BWC. A.A.M. ¶ 11. BWC footage was searched for by the date and address/location of each CBP Operation in RFP No. 2, which was collected and produced on February 5, 12, and 26, 2026. The final production of BWC related to limited expedited discovery was made on September 2, 2026, after CBP located supplemental BWC footage. *See* Production 54.

**Merits Discovery**

22. Per the parties' stipulation (ECF No. 527), CBP manually collected all end of shift reports from June 2025 through February 2026 and produced them as of June 12, 2026. *See* Production 38. CBP's investigation has not uncovered end of shift reports relating to Operation at Large – Los Angeles dated after demobilization on February 10, 2026. Thus, this production fulfilled CBP's obligations for UFW's RFP No. 7.

23. CBP manually collected the daily apprehension logs from June 2025 through January 2026 and produced them on May 29, 2026. CBP's investigation has not uncovered daily apprehension logs relating to Operation at Large – Los Angeles dated after demobilization on February 10, 2026. Thus, this production fulfilled CBP's obligations for UFW's RFP No. 9.

24. As the parties move into merits discovery, CBP will continue to produce any document it reviews that is responsive to limited expedited discovery even if not responsive to the merits discovery. CBP has and will continue to comply with its

ongoing discovery obligations. This declaration is submitted in compliance with the Court's Order to "[p]rovide affidavits detailing their document collection process." Order at 9.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my information, knowledge and belief.

Executed this 4th day of September, 2026.

H.B.

______________________________

H. B.
Associate Chief Counsel, West Region
Office of Chief Counsel
U.S. Customs and Border Protection