O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

Pedro Vasquez Perdomo *et al.*,

Plaintiffs,

v.

Markwayne Mullin *et al.*,

Defendants.

Case No.: 2:25-cv-05605-MEMF-SP

**AMENDED* ORDER GRANTING IN PART PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION RE: WARRANTLESS ARRESTS [DKT. NO. 529] AND GRANTING INTERVENORS' JOINDER [DKT. NO. 570] (AMENDING ORDER AT DKT. No. 704)**

Three of the organizations who brought this lawsuit say the Government is using an illegal policy to arrest individuals without a warrant. They specifically accuse the Government of arresting

* This Amended Order corrects two clerical errors found in the original Order filed under seal on Dkt. No. 704 on September 2, 2026.

First, on page 19, the Order incorrectly stated that the discussion of the preliminary injunction proceeded in four parts instead of five.

Second, on page 52, the Order inadvertently included language from the August 13 tentative about using bold and strikethrough to explain the Court's then-intended preliminary injunction and how it differed from the proposed order.

Finally, the parties have advised, Dkt. No. 730, that no part of this order needs to be sealed. In light of that, this version shall be placed on the public docket and omits the language from the sealed order, Dkt. No. 704, requiring the parties to meet and confer regarding sealing.

people without a warrant and without figuring out whether those people are likely to escape before the arresting officer can get a warrant. But even the Government agrees that officers need to figure out whether someone is likely to escape before they can arrest that person without a warrant.

These organizations are asking this Court to grant a preliminary injunction. Here, that means the organizations are asking for a Court order saying that going forward, the Government has to figure out whether someone is likely to escape before they can arrest that person without a warrant, and has to write down the reasons why they think the person is likely to escape.

The Court has considered the evidence and the arguments and decides that it should issue a preliminary injunction, although a slightly different one from what the organizations asked for.

All that is decided for now is that two of the organizations are *likely* to be able to show that the Government is following an illegal policy, and so it will have to follow the preliminary injunction for now. It is not the final decision on whether the Government is following an illegal policy. That will be decided later in this case.

* * *

Before this Court is a Motion for Preliminary Injunction Re: Warrantless Arrests filed by Plaintiffs Los Angeles Worker Center Network ("LAWCN"), United Farm Workers ("UFW"), and Coalition for Humane Immigrant Rights ("CHIRLA"; together with LAWCN and UFW, "Warrantless Arrest Plaintiffs"). Dkt. No. 529 ("Motion"). The Motion is fully briefed. *See* Dkt. No. 582 ("Opp."); Dkt. No. 616 ("Reply"). Also before this Court is Intervenors' request to join in the Motion. *See* Dkt. No. 570 ("Joinder").

For the reasons that follow, Intervenors' Joinder is GRANTED, and Warrantless Arrest Plaintiffs' Motion is GRANTED IN PART. This Court issues a preliminary injunction accordingly.

## I. Background

The facts alleged in the Second Amended Complaint, Dkt. No. 485 ("2AC"), are recounted more fully in the Court's Order dated August 11, 2026, regarding the Government's motion to dismiss the 2AC. Dkt. No. 658 ("Second MTD Order"). Here, the Court will provide background into the factual allegations only as relevant to the instant Motion.

/ / /

/ / /

### A. Factual Summary

Warrantless Arrest Plaintiffs—LAWCN, UFW, and CHIRLA—challenge the Government's alleged unlawful conduct. They allege that the Government's practice is to conduct warrantless arrests without consideration of whether the arrestee is likely to escape. This practice, Plaintiffs contend, violates statutes, regulations, and the APA. This Order refers to that alleged practice as the Government's Escape Risk Policy. The Government denies that its warrantless arrests are unlawful.

### B. Procedural History

Plaintiffs filed the operative Second Amended Complaint on April 9, 2026. *See* 2AC. It alleges the following claims.

| Claim | Plaintiffs | Defendants |
|---|---|---|
| Count One: Violation of Fourth Amendment: Suspicionless Seizures | Stop/Arrest Plaintiffs[1] | All Defendants |
| Count Two: Violation of 8 U.S.C. 1357(a)(2)—Warrantless Arrests Without Probable Cause of Flight Risk | Warrantless Arrest Plaintiffs | All Defendants |
| Count Three: Violation of 8 C.F.R. § 278.2(c)(2)(ii)—Standards for Stops and Warrantless Arrests | Warrantless Arrest Plaintiffs | All Defendants |

[1] This refers collectively to the five individual Plaintiffs, as well as the organizational plaintiffs LAWCN, UFW, and CHIRLA.

| | | |
|---|---|---|
| Count Four: Violation of 8 C.F.R. § 287.8(c)(2)(iii)—Failure to Identify Authority and Reason for Arrest | Warrantless Arrest Plaintiffs | All Defendants |
| Count Five: Violation of Fifth Amendment—Access to Counsel | Access/Detention Plaintiffs[2] | Mullin, Lyons, and Rios |
| Count Six: Violation of 8 U.S.C. § 1362—Access to Counsel | Access/Detention Plaintiffs | Mullin, Lyons, and Rios |
| Count Seven: Violation of Fifth Amendment—Conditions of Confinement | Access/Detention Plaintiffs | Mullin, Lyons, and Rios |
| Count Eight: Violation of Fifth Amendment—Due Process | Stop/Arrest Plaintiffs | All Defendants |
| Count Nine: Violation of Fourth Amendment—Unreasonable Manner of Seizure | Stop/Arrest Plaintiffs | All Defendants |

*Id.* Plaintiffs seek declaratory and injunctive relief, as well as fees and costs. *Id.* at 82–83.

On April 21, 2026, Defendants filed a Motion to Dismiss the 2AC. Dkt. No. 494. This motion was fully briefed. Dkt. No. 500; Dkt. No. 502. This Court held a hearing on July 9, 2026. After receiving supplemental briefing, it denied the motion. Second MTD Order.

On June 11, 2026, Magistrate Judge Pym, to whom discovery matters in this action have been referred, issued an Order to Show Cause requiring Defendants to explain why they should not be held in civil contempt for violations of a discovery order. Dkt. No. 538. This Court held a hearing on the OSC on June 25, 2026. Dkt. No. 569. On July 28, 2026, it found Defendants in civil contempt and issued sanctions. Dkt. No. 635.

Warrantless Arrest Plaintiffs—UFW, LAWCN, and CHIRLA—filed the instant Motion on June 8, 2026. *See* Motion. The following day, Warrantless Arrest Plaintiffs filed a Motion for Class Certification, which this Court addresses in separate order. Per the parties' stipulated briefing schedule, Defendants opposed the motions and Warrantless Arrest Plaintiffs replied. *See* Opp.; Reply.

---

[2] This refers to ImmDef and CHIRLA.

This Court held a hearing on the requests for class certification and preliminary injunction on August 13, 2026. *See* Dkt. No. 665 ("Tr."). After the hearing, it took both motions under submission.

## II. Applicable Law

### A. Article III Standing

A court must have subject matter jurisdiction to resolve a claim. Fed. R. Civ. P. 12(b)(1). A plaintiff's standing under Article III is a necessary component of subject matter jurisdiction. *Chandler v. State Farm Mut. Auto. Ins.*, 598 F.3d 1115, 1121 (9th Cir. 2010); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 417 (2021). "Because standing is 'an indispensable part of the plaintiff's case,' it 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.'" *Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

For a plaintiff to show Article III standing, the plaintiff must demonstrate that (1) the plaintiff has suffered an injury in fact that is (a) concrete and particularized, (b) actual or imminent, not conjectural or hypothetical; (2) the injury is traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the plaintiff's injury will be redressed by a favorable decision. *Friends of the Earth v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). A plaintiff "must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion*, 594 U.S. at 431. "[A] person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." *Id.* at 435. But, when there is no finding that a plaintiff faces a real and immediate threat of recurring harm, the plaintiff lacks standing to seek injunctive relief. *City of Los Angeles v. Lyons*, 461 U.S. 95, 110 (1983).

For an organization to have associational standing as the representative of its members, it must show that: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023); *see also Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Warth v. Seldin*, 422 U.S. 490, 511 (1975). The organization may represent its members "so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause." *Warth*, 422 U.S. at 511. And "a class action plaintiff must 'allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants.'" *Easter v. Am. W. Fin.*, 381 F.3d 948, 961 (9th Cir. 2004) (quoting *Warth*, 422 U.S. at 501).

**B. Preliminary Injunctions**

Federal Rule of Civil Procedure 65 sets forth the procedure for issuance of a preliminary injunction. *See* Fed. R. Civ. P. 65(b). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To qualify for injunctive relief, Plaintiff must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood that he will suffer irreparable harm without an injunction; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Id.* at 20.

The Ninth Circuit has held that injunctive relief may issue, even if the moving party cannot show a likelihood of success on the merits, if "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Under either formulation of the principles, preliminary injunctive relief should be denied if the probability of success on the merits is low. *Martin v. Int'l Olympic Comm.*, 740 F.2d 670, 675 (9th Cir. 1984) ("[E]ven if the balance of hardships tips decidedly in favor of the moving party, it must be shown as an irreducible minimum that there is a fair chance of success on the merits.").

A preliminary injunction is "an extraordinary and drastic remedy" and "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). At this stage, the Court is only determining whether Plaintiffs have met their burden for a preliminary injunction. *See L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*,

634 F.2d 1197, 1200 (9th Cir. 1980). **To that end, this Order is not a final decision on the merits of any claim, nor is it a decision on the merits of the factual assertions either party made in support of any claim.**

/ / /

/ / /

/ / /

/ / /

**C. 8 U.S.C. 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)**

"The federal statutory structure instructs when it is appropriate to arrest a [noncitizen[3]] during the removal process." *Arizona v. United States*, 567 U.S. 387, 407 (2012). This authority is "more limited" where "no federal warrant has been issued." *Id.* at 408. An immigration agent may conduct a warrantless arrest of "any [noncitizen] in the United States, if he has reason to believe that the [noncitizen] so arrested [1] is in the United States in violation of any such law or regulation [regulating the admission, exclusion, expulsion, or removal of noncitizens] and [2] is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2).

Section 1357's corresponding regulation confirms this standard. "An arrest shall be made only when the designated immigration officer has reason to believe that the person to be arrested has committed an offense against the United States or is a[ noncitizen] illegally in the United States." 8 C.F.R. § 287.8(c)(2)(i). But a warrant is required "except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained." *Id.* ¶ 287.8(c)(2)(ii).

---

[3] Where it does not change the meaning, this Court uses the term "noncitizen" in place of alien. *See Avilez v. Garland*, 69 F.4th 525, 527 (9th Cir. 2023) ("[U]se of the term noncitizen has become a common practice of the Supreme Court . . . . [In addition,] [t]he word alien can suggest 'strange,' 'different,' 'repugnant,' 'hostile,' and 'opposed,' *Alien*, *Webster's Third New International Dictionary* 53 (2002), while the word noncitizen, which is synonymous, *see Alien* and *Noncitizen*, *American Heritage Dictionary of English Language* 44, 1198 (5th ed. 2011), avoids such connotations. Thus, noncitizen seems the better choice.").

The phrase "has reason to believe" equates to the constitutional "probable cause" requirement under the Fourth Amendment. *Tejeda-Mata v. Immigr. & Naturalization Serv.,* 626 F.2d 721, 725 (9th Cir. 1980) (citing *United States v. Cantu*, 519 F.2d 494, 496 (7th Cir. 1975), *cert. denied*, 423 U.S. 1035 (1975)).

**D. The APA**

"The APA provides a right to judicial review of all 'final agency action for which there is no other adequate remedy in a court,' § 704, and applies universally 'except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (first quoting 5 U.S.C. § 504; then quoting 5 U.S.C. § 701(a)). An agency action is final if it (1) "mark[s] the consummation of the agency's decisionmaking process," and (2) is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Am. Fed'n of Gov't Emps. v. Trump*, 139 F.4th 1020, 1038 (9th Cir. 2025).

A statutory cause of action extends only to plaintiffs whose interests fall within the zone of interests protected by the law invoked. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) . In the APA context, this zone of interests test is not especially demanding. *Id.* at 130. "The test forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012).

## III. Findings of Fact

The Court makes the following findings of fact based upon the record currently before it.

**A. Defendants conduct immigration enforcement in Los Angeles.**

During the summer of 2025, two separate immigration enforcement operations occurred in the greater Los Angeles area, both of which involved the deployment of Department of Homeland Security ("DHS") personnel to the area. Dkt. No. 582-2 ¶ 6 ("Larios Decl.").

The first was Operation at Large. This was a national effort to prioritize the arrests of individuals with no legal status and with executable final orders of removal. *Id.* Both Immigration and Customs Enforcement ("ICE") and Customs and Border Protection ("CBP") officers contributed to this operation. *Id.* The second was Operation at Large–Los Angeles. This operation involved the deployment of CBP agents to Los Angeles to conduct their own immigration enforcement operations and assist Federal Protective Services ("FPS") with the protection of federal buildings and property in the Los Angeles area. *Id.* ¶ 7; *see also* Dkt. No. 582-1 ¶ 4 ("Parra Decl.").

Although some aspects of these operations have concluded, immigration agents continue to conduct immigration enforcement in the Central District of California. *See generally* Larios Decl., Parra Decl..

**B. Defendants make statements about immigration enforcement policy.**[4]

On January 26, 2025, "border czar" Tom Homan warned that "collateral arrests[5]" were coming, and emphasized that anyone in the country unlawfully was "on the table." Mike Levine & Meghan Mistry, *Trump's Border Czar: 'If You're in the Country Illegally, You Got a Problem'*, ABC News (Jan. 26, 2025), https://abcnews.com/Politics/trumps-border-czar-youre-country-illegally-problem/story?id=118085728 [https://perma.cc/HEW7-V9PT]. Former ICE Director Todd Lyons confirmed, stating that "non-criminals living in the U.S. without authorization w[ould] also be taken into custody during arrest operations." Camilo Montoya-Galvez, *ICE Head Says Agents Will Arrest Anyone Found in the U.S. Illegally, Crack Down on Employers of Unauthorized Workers*, CBS News (July 25, 2025), https://www.cbsnews.com/news/ice-head-todd-lyons-agents-will-arrest-anyone-found-illegally-crack-down-on-employers/ [https://perma.cc/V2XS-AW7L].

In May 2025, White House Deputy Chief of Staff Stephen Miller announced that "the White House was looking for ICE to arrest 3,000 people a day, a major increase in enforcement." Hamed

[4] The statements quoted below are cited in the Motion. *See* Motion at 1-3.

[5] "Collateral arrests," or "collaterals," refers to the Government's practice of arresting someone who is not identified as the target of the enforcement operation. *See* Dkt. No. 529-14 at 160:4–162:4 ("E.O. Dep.").

Aleaziz, *Top Officials Overseeing Deportations Leave Their Roles at ICE*, N.Y. Times (May 29, 2025), https://www.nytimes.com/2025/05/29/us/politics/ice-deportations-officials-trump.html (on file with the Court).[6]

/ / /

/ / /

/ / /

/ / /

**C. Defendants instruct officers about warrantless arrests.**

In addition to public statements, the Government has given its officers guidance about how to conduct warrantless arrests—in the form of a memorandum from Defendant Todd M. Lyons as well as other guidance.

On January 28, 2026, Lyons issued a memorandum to all ICE personnel regarding, in part, warrantless arrests. Dkt. No. 582-3 ("Lyons Memo").The thrust of this memo was that the previous approach used by ICE—to base its required escape risk assessment on whether an individual was likely to flee from law enforcement generally—was incorrect. The Lyons Memo introduced a new interpretation of Section 1357, instructing agents that "likelihood of escape" exists where an officer "determines [the arrestee] is unlikely to be located [(1)] at the scene of the encounter or [(2)] another clearly identifiable location once an administrative warrant is obtained."[7] *Id.* at 3. The Lyons Memo reads in relevant part:

> ICE previously applied the phrase "likely to escape" as being the equivalent of "flight risk." That unreasoned position was incorrect. . . . While the flight-risk analysis assesses whether an already identified and detained [noncitizens] is likely to comply

---

[6] The Motion cites to this quotation from a different source; The Court has cited to an accessible link. Motion at 2 n.7.

[7] At other points, it appears that the Lyons Memo suggests that "another clearly identifiable location" is not part of the analysis, and that officers should only attempt to ascertain "[w]hether a[] [noncitizen] is likely to remain at the scene of the encounter." *Id. at 3*, at the hearing, the Government clarified that the Lyons Memo is not intended to eliminate the other-clearly-identifiable-location part of the analysis. Tr. at 48:15–17 ("We stand by what the Lyons[] memo says, that it's whether the [noncitizen] can be located at that location or at another clearly identifiable location.").

> with future immigration obligations such as court appearances and appearance before ERO, the likelihood-of-escape analysis is narrowly focused on determining whether the person is likely to escape before the officer can practically obtain an administrative arrest warrant, while in the field. This on-the-spot determination as to the likelihood of escape is often made with limited information about the subject's identity, background, or place of residence and no corroboration of any self-serving statements made by the subject.

*Id.* at 4–5.

The Lyons Memo also requires that ICE officers document their likelihood-of escape analysis. It explains as follows:

> Because the actions of ICE law enforcement personnel are often challenged months or years after the fact, it is important for officers and agents to clearly, succinctly, and contemporaneously document all factors that led to an immigration officer's determination that the subject was likely to escape before a warrant could be obtained. To this end, following a warrantless arrest, officers and agents shall document in the narrative section of the Form I-213, Record of Deportable/Inadmissible Alien, all factors considered in determining that the [noncitizen] was likely to escape before a warrant could be obtained. . . . If an immigration officer encounters and arrests multiple collateral [noncitizen], his or her analysis as to the likelihood of escape must be specific to <u>each</u> [noncitizen] arrested. That one collateral [noncitizen] is likely to escape does not necessarily mean another collateral [noncitizen] is also likely to escape.

*Id.* at 5.

Though the Lyons Memo instructs agents to conduct a risk of escape analysis, agents attested to receiving different guidance—or instructions to arrest individuals without mention of the risk of escape analysis. In text conversations between ICE agents, one expressed: "[T]he agency wants everyone who is not a usc to be arrested. Things change every day[;] not consistent." Dkt. No. 529-12 at 1. In the same thread, an agent explained: "We have been instructed to encounter[,] ask for id[;] if they are not us citizen[,] apprehend them." *Id.* Agents confirmed these instructions have come from agency officials. One ICE deportation officer explained that, in the words of "border czar" Tom Homan, "if the target is in the vehicle and he has his friend with him, yes, we're going to question that individual and find out his immigration history." Dkt. No. 529-13 at 153:9–13, 170:7–17 ("C.C. Dep."). And, "[i]f he comes back with immigration history, we're going to bring him into custody." *Id.* at 153:13–15. A second ICE deportation officer confirmed receipt of similar guidance:

> Q: I'm just wondering if you have had any discussions with your supervisor about arresting collaterals that is in the nature of guidance or guidelines about what you can and cannot do.
>
> A: So we basically are able to take a collateral into custody as long as we are able to establish alienage.
>
> Q: Any other guidance or –
>
> A: No.

Dkt. No. 529-14 at 161:22–162:6 ("E.O. Dep.").

In other words, deportation officers have been instructed that they may conduct warrantless arrests of individuals without consideration of the individual's likelihood of escape.

**D. Defendants' warrantless arrests fail to account for risk of escape.**

Many of the Government's immigration enforcement operations do not appear to include individualized prearrest escape risk determinations for arrestees.

At a deposition, ICE's agency representative suggested that warrantless arrests could be performed absent an escape risk analysis. *See* Dkt. No. 529-11 ("Rios Dep."). In the deposition, the official reviewed an Encounter Report for an individual involved in this lawsuit. *See id.* at 162:18–163:25. When asked whether the document reflected a determination of escape risk, the official responded as follows[8]:

> **ICE OFFICIAL:** There was a determination made . . . on this third page. When the officer stated in the narrative (as read) : "I approached a male on foot and identified myself as ICE. . . . I asked the male where he was coming from. He advised the Miss Donuts. I asked what country he was born in, and he advised" – I'm assuming it was a foreign country. "I asked the male if he had any documents to be in the United States . . . and he said 'no.'" He asked the individual if he was here illegally. He said, "Yes." Then he asked him if he had any documentation, and he said, "Yes," in his wallet. He provided an employment authorization card with the [A] number, blah, blah, blah. An employment authorization card is not a document that allows you to be or remain in the United States legally.

[8] The Encounter Report discussed at the deposition was lodged at Dkt. No. 219-37.

**ATTORNEY:** Okay. And so your testimony, as the agency representative, is this paragraph is indication that somebody is a flight risk?

**ICE OFFICIAL:** No. . . . [H]e established probable cause that the subject is here illegally . . . therefore, he established probable cause to make an arrest.

**ATTORNEY:** Okay. And is there a determination that the individual was a flight risk?

**ICE OFFICIAL:** *There was nothing mentioned in this document about a flight risk* . . . but other factors are – key factors, where were you born? Mexico. Do you have any immigration documents? No. Are you here illegally? Yes.

**ATTORNEY:** And is there enough information here to determine if somebody is a flight risk?

**ICE OFFICIAL:** Well, it – *there's nothing in the narrative that states that*, but the officer did his job. He met the parameters leading up to probable cause to make an arrest.

**ATTORNEY:** Okay. . . . [S]o is your testimony that there was sufficient basis for a warrantless arrest?

**ICE OFFICIAL:** Absolutely.

**ATTORNEY:** Okay. And . . . that's the agency's position, *is that there's sufficient information here to make a warrantless arrest*?

**ICE OFFICIAL:** *Absolutely*.

*Id.* 164:12–165:25 (emphasis added).

Warrantless Arrest Plaintiffs, three organizations with membership in this District, attest that their members have been subject to—or observed—the Government's Escape Risk Policy. *See* Dkt. No. 529-73 ("Salas Decl.") (declaration from Executive Director of Plaintiff CHIRLA); Dkt. No. 529-74 ("Melendrez Decl.") (declaration from Executive Director of CLEAN, one of LAWCN's member organizations); Dkt. No. 529-75 ("Gudino Decl.") (declaration from Executive Director of Plaintiff LAWCN); Dkt. No. 529-76 ("Strater Decl.") (declaration from Director of Strategic Campaigns and National Vice President of Plaintiff UFW). Each Plaintiff, through these declarations, attests that their membership has been subject to, or observed, warrantless arrests where the arrestee did not flee, the agents did not appear to know the identity of the arrestee prior to the

encounter, and the agents did not ask any questions regarding the arrestee's likelihood of escape. *E.g.*, Salas Decl. ¶¶ 16, 18–21; Melendrez Decl. ¶¶ 8, 11, 14, 16, 21; Gudino Decl. ¶ 28; Strater Decl. ¶¶ 17, 19, 37, 41. In one of these instances, agents grabbed and restrained a LAWCN member "before asking any questions." Melendrez Decl. ¶ 7. "The agents did not appear to know who he was or have a warrant for his arrest." *Id.* In a second instance, agents arrested a LAWCN member who "did not run." *Id.* ¶ 8. "They did not know who [he] was, and did not ask him questions other than about his status before arresting him." *Id.* Immigration agents conducted a raid on August 12, 2025, where a witness attested that "it didn't matter if [the car wash workers] ran or not, agents grabbed anyone who was close by." *Id.* ¶ 11. And, in a third, agents arrested a LAWCN member, who has lived in the same Los Angeles address for twenty years, without "ask[ing] him questions about his community ties." *Id.* ¶ 13.

Video footage of arrests also supports the existence of the Government's Escape Risk Policy. In one video, agents appear to follow a car, pursue an individual who exists the car, and arrest that individual, seemingly without asking the arrestee any questions. Dkt. No. 529-78 at 00:50–01:49. Footage of other raids shows "car wash workers [being] aggressively grabbed and violently arrested without a warrant and often without the agents knowing who they are." Melendrez Decl. ¶ 18; *see also* Gudino Decl. ¶ 27 ("[T]he immigration agents seem to target non-white, Spanish-speaking workers, regardless of whether they have long-standing ties to the community or lawful presence in the United States.").

Based on those observations and experiences, Plaintiffs believe they have been subject to the Government's Escape Risk Policy.

**E. Defendants' documentation of warrantless arrests contain insufficient risk of escape assessments.**

Government agents are required to document any evaluation of risk of escape. Government agents are advised to "clearly, succinctly, and contemporaneously document all factors that led to an

immigration officer's determination that the subject was likely to escape before a warrant could be obtained." Lyons Memo at 5. To that end, ICE instructs its officers and agents to "document in the narrative section of the Form I-213, Record of Deportable/Inadmissible Alien, all factors considered in determining that the [noncitizen] was likely to escape before a warrant could be obtained." *Id.*

ICE emphasizes the importance of documentation in its Fourth Amendment Refresher Training, which tells officers: "As soon as possible after the collateral encounter, *document in the I-213 either the basis for the particularized reasonable suspicion, or* how the officer made it clear to the collateral that the individual was free to leave. **Documentation is KEY**." Dkt. No. 529-29 at 70. And the training highlights the same for risk of escape analyses. "Officers shall document, in the narrative section of the I-213, all factors considered in determining the [noncitizen] was likely to escape[.] Both aggravating and mitigating factors should be included[.] Only facts learned prior to the warrantless arrest should be included[.]" *Id.* at 88; *see also* Dkt. No. 529-30 at 27 (emphasizing importance of conducting likelihood of escape analysis).

Accordingly, the documentation provided constitutes further evidence of the nature of the escape risk assessment made.

1. <u>No escape risk assessment documentation</u>

In some cases, Defendants' documentation of warrantless arrests gives no indication that the arresting officer considered the arrestee's risk of escape.

Warrantless Arrest Plaintiffs explained that they reviewed 871 Government-produced documents to connect them to individual arrestees and determine whether they reflect that a risk of escape analysis took place. Dkt. No. 529-1 ¶¶ 10–11 ("Stone Decl."). This resulted in 871 documents in the final document set, corresponding to 113 unique arrestees. *Id.* ¶¶ 11, 20.

> Reviewers [] assessed whether each document contained language describing any potential escape risk analysis conducted in connection with a warrantless arrest ("Escape Risk Language"). A document was identified as containing Escape Risk

Language if it contained any of the following phrases: "likely to escape," "before a warrant," "flight risk," "flight without warrant," "escape risk," "escape before warrant." *Id.* ¶ 16.

"Of those arrestees, 72 distinct arrestees were associated with at least one document containing Escape Risk Language." *Id.* ¶ 20. In contrast, 41 distinct arrestees—over one third of the dataset—"were associated with documents that did not contain any Escape Risk Language." *Id.*

Numerous arrest records submitted lack any written risk of escape analysis. *E.g.*, Dkt. No. 542-15 (ENFORCE Alien Removal Module, or EARM, report discussing warrantless arrest of F.H.S.); Dkt. No. 529-32 (I-213 narrative discussing warrantless arrest of Pedro Vasquez Perdomo only "after determining alienage"); Dkt. No. 529-33 (EARM report containing no arrest narrative for warrantless arrest of Isaac Villegas-Molina); Dkt. No. 529-34 (I-213 narrative discussing warrantless arrest of Carlos Alexander Osorto without mention of risk of escape); Dkt. No. 529-35 (I-213 narrative discussing warrantless arrest of J.D.S. without mention of risk of escape); Dkt. No. 542-16 (I-213 narrative discussing warrantless arrest of E.C.P. without mention of risk of escape); Dkt. No. 542-17 (I-213 narrative discussing warrantless arrest of G.V.C. without mention of risk of escape); Dkt. No. 529-38 (I-213 narrative discussing warrantless arrest of W.C. without mention of risk of escape); Dkt. No. 529-39 (I-213 narrative discussing warrantless arrest of H.S.H. without mention of risk of escape); Dkt. No. 529-40 (I-213 narrative discussing warrantless arrest of J.C., where arrestee was only asked his place of birth and method of entry to the United States prior to his arrest); Dkt. No. 529-41 (I-213 narrative discussing warrantless arrest of G.N.L., where arrestee was only asked his country of citizenship and method of entry to the United States prior to his arrest); Dkt. No. 529-42 (I-213 narrative discussing warrantless arrest of E.C.H., where arrestee was only asked his country of citizenship and method of entry to the United States prior to his arrest). No documented risk of escape analysis appears in any of these documents.

2. <u>Escape risk assessment documentation based upon immigration status alone.</u>

In some cases, the documentation indicates that the only factor considered in making the escape risk assessment was the unlawful status of the individual. One I-213 arrest narrative, for example, explains:

> Based on [M.D.L.]'s illegal presence in the United States, his willful disregard for the United States immigration and criminal laws, and his ability to disappear into the millions of people living in the Los Angeles area, along with Agents' collective belief (based on training and experience) that he would abscond if released, I determined that [M.D.L.] was a flight risk.

Dkt. No. 529-24. At least one other document contains an identical escape risk considerations. *See* Dkt. No. 529-25 (I-213 form describing warrantless arrest of M.F.R.). Both M.D.L. and M.F.R. submitted declarations describing their arrest; neither appears to have been asked questions to discern their escape risk. Dkt. No. 529-26 ("M.D.L. Decl."); Dkt. No. 529-27 ("M.F.R. Decl."). Nor do the escape narratives explain why M.D.L. and M.F.R. in particular would abscond if released.

3. <u>False escape risk assessment documentation</u>

In some cases, the documentation appears to evidence a risk of escape analysis, but it is controverted by other evidence from the arrest.

In one arrest, the Government's escape narrative claims that an individual—E.G.G.—was likely to escape before a warrant could be obtained based, in part, on "his flight from law enforcement." Dkt. No. 529-49 at 4. But a video of this arrest shows E.G.G. remained working and standing in the same place from the time that the agent entered the car wash to the time that the agent called him over. Ex. 520-22 at 00:00–00:36. E.G.G., contrary to the Government's written escape risk analysis, did not flee.

In a second arrest, the Government's escape narrative claims that an individual—M.W.—was "running away" from CBP agents prior to being questioned, which was one factor in the Government's risk of escape analysis. Dkt. No. 529-51 at 4–5. But a video of this arrest shows M.W. walking at a normal pace and texting on his phone prior to the agent asking him about his status. Dkt. No. 530-24 at 00:00–00:10. Prior to his arrest, M.W. did not appear—contrary to the Government's position—to be running away.

And in a third arrest, the Government's escape narrative claims that an individual—M.T.G.—"stated he had no U.S. government-issued identification displaying his identity or home address," which was a factor in the Government's escape risk determination. Dkt. No. 529-52 at 3. But a video of this arrest shows that M.T.G. did not volunteer this information, nor does he appear to have been asked prior to his arrest. Dkt. No. 530-25 at 00:00–03:43. So it is not clear that M.T.G gave the information the Government imputes to him—or, at minimum, that he gave the information prior to his arrest.

4. <u>"Boilerplate" escape risk assessment documentation</u>

Finally, in some cases, Defendants' documentation uses a template format to describe the consideration of the arrestee's risk of escape.

Warrantless Arrest Plaintiffs explain that, of the 113-arrestee dataset for which they received discovery documents, seventy-two distinct arrestees' files revealed the use of escape risk language by Government agents. Stone Decl. ¶ 20. They further analyzed those seventy-two files as follows.

> We determined that 48 of the 72 unique arrestees for whom Escape Risk Language was identified (66.66%) were associated with narratives containing substantially identical Escape Risk Language. Specifically, these narratives contained [] at least two of the three phrases: "likely to escape before a warrant could be obtained," "flight from law enforcement," and "illegal presence in the United States," and generally followed the template below.

| Escape Risk Template | Arrestees |
|---|---|
| I determined that [subject] was **likely to escape before a warrant could be obtained for** [his/her] arrest based on [his/her] **flight from law enforcement**, the fact that [he/she] ignored agent commands, [his/her] **illegal presence in the United States**, and the facts outlined above. | 48 of 72<br>66.66% |

Stone Decl. ¶ 26. This is consistent with a template narrative produced by the Government, which the Government appears to have followed in crafting several individual escape narratives:

> I determined that X was likely to escape before a warrant could be obtained for his arrest based on his flight from law enforcement, the fact that he ignored agent commands, his illegal presence in the United States, and the facts outlined above. When asked, the subject stated he lived and worked in the area but was unwilling to provide an address for either his home or work location. The subject stated he had no U.S. government-issued identification displaying his identity or home address and admitted

> he was present in the United States unlawfully. In my experience as a [Border Patrol Agent], [immigrants] who have fled from law enforcement and fail to provide basic details about their home and work circumstances will seek to abscond rather than face apprehension and possible deportation.

Dkt. No. 529-43.

/ / /

## IV. Discussion

This Order proceeds in five parts.

First, this Court discusses the parties' dispute as to whether Intervenors' joinder in this motion is proper. *See* Dkt. No. 570 ("Joinder"); Dkt. No. 606 ("Joinder Opp."); Dkt. No. 622 ("Joinder Reply"). It concludes that joinder is proper. *See* Section IV.A *infra*.

Second, this Court addresses Defendants' threshold contention that Plaintiffs and Intervenors lack Article III standing to pursue preliminary injunctive relief. *See* Opp. at 4–7; Joinder Opp. at 5–10. It finds that two of the three Plaintiffs have standing, and Intervenors do not need it. *See* Section IV.B *infra*.

Third, this Court addresses the *Winter* factors in determining whether a preliminary injunction should issue. It concludes that the *Winter* factors support the issuance of a preliminary injunction. *See* Section IV.C *infra.*

Fourth, this Court adjudicates Defendants' scope arguments as to Plaintiffs' requested preliminary injunction—overbreadth, universality, and statutory preclusion. Opp. at 16–18. As this Order explains, this Court modifies some of Plaintiffs' proposed language to narrowly tailor the preliminary injunction as governing law requires. *See* Section IV.D *infra*.

Fifth, this Court determines whether a bond should be required and whether this Order should be stayed pending appeal. *See* Section IV.E – IV.F *infra*.

### A. Intervenors' joinder is proper.

First, at issue is whether Intervenors may join Warrantless Arrest Plaintiffs' request for a preliminary injunction. This Court concludes they may.

Defendants appear to advance three arguments in opposition to Intervenors' joinder: that they "cannot be parties in this case" at all, *see* Joinder Opp. at 1, that this Court should prevent them from

participating in the request for a preliminary injunction, *see id.* at 2 and that Intervenors are not entitled to a preliminary injunction—both because they lack standing and because the *Winter* test does not support their request, *see id.* at 5–15. This Court addresses the first two arguments in this section; Plaintiffs' and Intervenors' Article III standing and entitlement to preliminary relief under *Winter* is addressed jointly in later sections. *See* Sections IV.B–.C *infra.*

Defendants ask this Court to deny the joinder motion because "Intervenors are free to participate as amicus to share their views," but that "they cannot be parties in this case." Joinder Opp. at 1. Defendants' argument on this front is untimely: This Court has already granted a motion to intervene. Dkt. No. 129. Defendants have already moved to dismiss Intervenors from this matter. Dkt. No. 236. And this Court has already denied that motion. Intervenors' MTD Order. To the extent Defendants ask this Court to reconsider that determination, their request is lacking. This District's Local Rules limit motions for reconsiderations to the following grounds:

> (a) a material difference in fact or law from that presented to the Court that, in the exercise of reasonable diligence, could not have been known to the party moving for reconsideration at the time the Order was entered, or (b) the emergence of new material facts or a change of law occurring after the Order was entered, or (c) a manifest showing or a failure to consider material facts presented to the Court before the Order was entered.

L.R. 7-18. The Joinder Opposition does not address this rule, nor is it clear on what basis this Court should reconsider its decision on intervention or dismissal. And, in any event, "[a]bsent good cause shown, any motion for reconsideration must be filed no later than 14 days after entry of the Order." *Id.* So the request, to the extent it seek to limit Intervenors' participation in this action writ large, is denied.

Alternatively, construing the Joinder Opposition as challenging Intervenors' participation in the request for injunctive relief (as opposed to the lawsuit more generally), Defendants' argument lacks support. Defendants cite no authority, binding or otherwise, in support of the proposition that an already-joined intervening party needs court approval to join in a party's motion. Such a position would run counter to the principle that "the intervenor is entitled to litigate fully on the merits once

intervention has been granted." 7C Wright & Miller's Federal Practice and Procedure § 1920 (3d ed.); *see also Ruotolo v. Ruotolo*, 572 F.2d 336, 339 (1st Cir. 1978) (noting an intervenor's ability "to play an active role during the pendency of private litigation").

Defendants, in sum, have not explained why Intervenors should not be permitted to participate in the request for preliminary injunctive relief—or more generally in this action. For that reason, Intervenors' Joinder is proper, and this Order discusses their briefing on the merits in the sections below.

**B. Plaintiffs have sufficiently shown standing.**

The parties raise two disputes regarding Article III standing. First, they disagree about who needs to show standing: Defendants contend that Warrantless Arrest Plaintiffs and Intervenors must both show that they have standing. *See* Joinder Opp. at 5. Intervenors respond that they need not establish standing. *See* Joinder Reply at 2. Second, they disagree about whether the parties have standing: Plaintiffs and Intervenors say they do, and Defendants say they do not. *Compare* Motion at 11–13 (arguing Plaintiffs have standing) *and* Joinder Reply at 3–8 (arguing Intervenors have standing) *with* Opp. at 4–9 (arguing Plaintiffs lack standing) *and* Joinder Opp. at 5–11 (arguing Intervenors lack standing).

For the reasons below, this Court concludes only Plaintiffs need to make a showing of standing, and at least two of them have made that showing.

1. <u>Intervenors need not show standing.</u>

"[S]tanding is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 328 n.6 (1996). This means that, "'[f]or all relief sought, there must be a litigant with standing.'" *Washington v. U.S. Food & Drug Admin.*, 108 F.4th 1163, 1172 (9th Cir. 2024) (quoting *Town of Chester v. Laroe Estates*, 581 U.S. 433, 439 (2017)).

In opposition to Intervenors' joinder, Defendants argue that "Intervenors seek the same relief as Plaintiffs," but also that Intervenors' lack of standing is fatal to the preliminary injunction request. Joinder Opp. at 1–5. The first contention defeats the second. "[I]ntervenors that seek the same relief sought by at least one existing party . . . need not" independently establish Article III standing. *Cal.*

*Dep't of Toxic Substances Control v. Jim Dobbas, Inc.*, 54 F.4th 1078, 1085 (9th Cir. 2022); *see also McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 233 (2003), *overruled in part on other grounds by Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010). Put another way, Defendants have not explained that Intervenors need to make a showing of Article III standing at this stage at all. This is consistent with this Court's prior orders on Intervenors' standing. *See* Intervenors' MTD Order at 20 ("Because Intervenors' first four claims seek no relief beyond that sought by the Plaintiffs . . . Intervenors need not independently demonstrate standing to maintain them."). The Joinder Opposition does not engage with this case law or the Court's prior orders, and therefore does not establish Intervenors' independent burden to show standing.

To that end, this Court need not make a finding on Intervenors' standing at this time.

2. Plaintiffs have standing.

An organization has associational standing when (1) its members have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Students for Fair Admissions*, 600 U.S. at 199 (2023).[9]

i. Plaintiffs' members have standing to sue.

For the reasons that follow, Warrantless Arrest Plaintiffs have made the requisite showing of standing.

---

[9] At the hearing, Defendants asked this Court to consider *Arizona Alliance for Retired Americans v. Mayes*, No. 22-16490, 2026 WL 2277101 (9th Cir. Aug. 7, 2026), in support of their argument that Warrantless Arrest Plaintiffs lack standing. Tr. at 38:17–40:7. But that case, by Defendants' own admission, "focused on organizational standing and not associational standing." *Id.* at 39:19–20; *see also Ariz. All. for Ret. Ams.*, 2026 WL 2277101, at *4 n.1. And, though Defendants correctly note that the Ninth Circuit overturned several of its prior decisions on standing in that opinion, this Court's order does not rely on the overruled authorities; unlike the plaintiffs in that case, Warrantless Arrest Plaintiffs' relevant theory of standing is associational, not organizational. And it is only in relation to the organizational standing test that those cases were overruled. In the Ninth Circuit's words:

> Prior to *Hippocratic Medicine*, we read *Havens* to hold that an organization has direct standing to sue where it establishes that the defendant's behavior has frustrated its mission and caused it to divert resources in response to that frustration of purpose. But these earlier cases, decided without the benefit of *Hippocratic Medicine*, did not ask whether the challenged conduct directly affected and interfered with the plaintiff organizations' core activities. The organizational standing analyses in these cases are therefore overruled.

*Ariz. All. for Ret. Ams.*, 2026 WL 2277101, at *7. Though Defendants also offered to submit supplemental briefing on *Arizona Alliance*, this Court does not find it necessary based on its read of the authority and the parties' arguments at the hearing.

"The three elements of standing . . . are (1) a concrete and particularized injury, that (2) is fairly traceable to the challenged conduct, and (3) is likely to be redressed by a favorable decision." *Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 662 (2019). To show injury in fact, "past exposure to illegal conduct" does not suffice absent "continuing, present adverse effects." *Lyons*, 461 U.S. at 102 (1983) (quoting *O'Shea v. Littleton*, 414 U.S. 188, 195–96 (1974)). "At th[e] preliminary injunction stage, [a plaintiff] 'must make a clear showing of each element of standing[.]'" *Yazzie v. Hobbs*, 977 F.3d 964, 966 (9th Cir. 2020) (quoting *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013)).

An immigration officer's authority to make a warrantless arrest requires either (1) that an offense against the United States was committed in the officer's presence, or (2) if the officer has reasonable grounds to believe that the person is committing a felony *and* "if there is a likelihood of the person escaping before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(5)(A). The injury the Warrantless Arrest Plaintiffs complain of is that their members have been arrested in violation of these requirements—specifically, without the required likelihood-of-escape analysis.

*First*, at least two of Warrantless Arrest Plaintiffs have shown that their members have suffered an injury in fact.[10] LAWCN and CHIRLA represent tens of thousands of members across this District. *See* Melendrez Decl. ¶¶ 1–8 (attesting that LAWCN's membership includes over 2,000 car wash worker members across Southern California); Gudino Decl. ¶¶ 13–22 (attesting that LAWCN's member organizations collectively represent over 3,800 workers); Salas Decl. ¶¶ 2-4 (attesting that CHIRLA has approximately 50,000 members).

---

[10] This Court also understands that UFW members allege being fearful of the possibility that they may be subject to the Escape Risk Policy in the future. Strater Decl. ¶ 30 (attesting that co-worker of UFW member was stopped and arrested without a warrant in member's presence, without any inquiries or fleeing from officers and feared the same would happen to the member); *id.* ¶ 37 (attesting that husband of UFW member was stopped and arrested without a warrant, without any inquiries or fleeing from officers and feared the same would happen to the member). At the hearing, however, Plaintiffs clarified that the record does not contain evidence that UFW members have been subject to the Escape Risk Policy. Tr. at 8:22–9:5.

This Court, however, need not find that all three Warrantless Arrest Plaintiffs have standing to grant preliminary injunctive relief "For all relief sought, there must be *a litigant* with standing, whether that litigant joins the lawsuit as a plaintiff, a coplaintiff, or an intervenor of right." *Town of Chester*, 581 U.S. at 439; *see also* Tr. at 8:15–21.

As this Court discusses in this section, LAWCN and CHIRLA have shown they have standing based in part on their members being subject to the Government's Escape Risk Policy. To that end, this Court need not, and so does not, reach the question of whether UFW would independently have standing.

LAWCN and CHIRLA have each offered evidence that their members have already experienced the injury of Defendants' disregard for the statutory requirement of a likelihood-of-escape analysis upon a warrantless arrest.[11] *See, e.g.*, Melendrez Decl. ¶ 8 (attesting that member of LAWCN member organization CLEAN Carwash Worker Center was stopped and arrested without a warrant, despite that agents did not know his name or make any inquiries which would go to risk of flight and despite the fact that member did not flee from officers); Salas Decl. ¶¶ 20-21 (attesting that CHIRLA members were stopped and arrested without a warrant, despite that agents did not appear to know their names or make any inquiries which would go to risk of flight and despite the fact that members did not flee from officers).

And both LAWCN and CHIRLA have shown that their members are likely to suffer future injury. The Ninth Circuit has held that a plaintiff may show that an injury is likely to recur and therefore that he has standing for injunctive relief by "demonstrat[ing] that the harm is part of a 'pattern of officially sanctioned . . . behavior, violative of the plaintiffs' [federal] rights.'" *Melendres v. Arpaio*, 695 F.3d 990, 998 (9th Cir. 2012). Defendants argued at the hearing—in direct contravention of *Melendres*—that the Ninth Circuit has held that the existence of such a policy or practice is not enough to demonstrate the required likelihood-to-recur showing.[12] There is no support for this reading of *Melendres*, and this Court is bound to follow *Melendres*. 695 F.3d at 997–98 ("We have enumerated two ways in which a plaintiff can demonstrate that [their] injury is likely to recur. First, a plaintiff may show that the defendant had, at the time of the injury, a written policy, and that the injury stems from that policy. Second, the plaintiff may demonstrate that the harm is

---

[11] This factual finding therefore distinguishes this case from *National Park Service v. National Trust for Historic Preservation*, where the Supreme Court found that the plaintiff rested its assertion of a concrete and particularized injury merely on "offense alone." No. 26A203, 2026 WL 2564318, at *2 (U.S. Aug. 31, 2026). Plaintiffs do not claim to be merely offended by Defendants' actions. Their members have suffered actual arrests, and this Court is not aware of any case—including *Lyons*—holding that an arrest is not a sufficiently concrete and particularized injury.

[12] At the hearing, Defendants also advocated that *Melendres* is distinguishable because there, unlike here, the Government had effectively conceded the existence of the policy that the Court ultimately found was unlawful. 695 F.3d at 998; *see also* Tr. at 32:16–23. But it appears to this Court that this is a distinction without a difference where—as here—this Court independently finds sufficient evidence to support the existence and unlawfulness of a Government policy.

part of a pattern of officially sanctioned . . . behavior, violative of the plaintiffs' federal rights." (citation modified)).

This Court finds ample evidence that Defendants have an *ongoing* policy and practice of conducting warrantless arrests in violation of the requirement to conduct a likelihood-of-escape analysis. This is discussed in greater detail in the likelihood of success discussion below, but one example—taken from testimony of the ICE official designated as the person most knowledgeable on this topic—will suffice here. *See* Rios Dep. In the deposition, the official reviewed an Encounter Report for an individual involved in this lawsuit. *See id.* at 162:18–163:25. When asked whether the document reflected a determination of escape risk, the official responded as follows[13]:

> **ICE OFFICIAL:** There was a determination made . . . on this third page. When the officer stated in the narrative (as read) : "I approached a male on foot and identified myself as ICE. . . . I asked the male where he was coming from. He advised the Miss Donuts. I asked what country he was born in, and he advised" – I'm assuming it was a foreign country. "I asked the male if he had any documents to be in the United States . . . and he said 'no.'" He asked the individual if he was here illegally. He said, "Yes." Then he asked him if he had any documentation, and he said, "Yes," in his wallet. He provided an employment authorization card with the [A] number, blah, blah, blah. An employment authorization card is not a document that allows you to be or remain in the United States legally.
>
> **ATTORNEY:** Okay. And so your testimony, as the agency representative, is this paragraph is indication that somebody is a flight risk?
>
> **ICE OFFICIAL:** No. . . . [H]e established probable cause that the subject is here illegally . . . therefore, he established probable cause to make an arrest.
>
> **ATTORNEY:** Okay. And is there a determination that the individual was a flight risk?
>
> **ICE OFFICIAL:** *There was nothing mentioned in this document about a flight risk* . . . but other factors are – key factors, where were you born? Mexico. Do you have any immigration documents? No. Are you here illegally? Yes.
>
> **ATTORNEY:** And is there enough information here to determine if somebody is a flight risk?
>
> **ICE OFFICIAL:** Well, it – *there's nothing in the narrative that states that*, but the officer did his job. He met the parameters leading up to probable cause to make an arrest.

---

[13] The Encounter Report discussed at the deposition was lodged at Dkt. No. 219-37.

**ATTORNEY:** Okay. . . . [S]o is your testimony that there was sufficient basis for a warrantless arrest?

**ICE OFFICIAL:** Absolutely.

**ATTORNEY:** Okay. And . . . that's the agency's position, *is that there's sufficient information here to make a warrantless arrest*?

**ICE OFFICIAL:** *Absolutely*.

*Id.* 164:12–165:25 (emphasis added). This evidence—which demonstrates ICE's position that sufficient information existed for a warrantless arrest, when the 30(b)(6) witness could identify no evidence that escape risk was considered—supports the existence and ongoing nature of Defendants' Escape Risk Policy.[14] Warrantless Arrest Plaintiffs have therefore offered evidence in support of that their members' harm "is part of a 'pattern of officially sanctioned . . . behavior, violative of the plaintiffs' [federal] rights.'" *Melendres*, 695 F.3d at 997 (quoting *Armstrong*, 275 F.3d at 861). This, in turn, evinces that Warrantless Arrest Plaintiffs' members are "realistically threatened by a repetition of [the violation]." *Id.* (quoting *Lyons*, 461 U.S. at 109). This shows the members' injuries in fact.

*Second*, Warrantless Arrest Plaintiffs' members have shown that their injuries were caused by Defendants' Escape Risk Policy. Warrantless Arrest Plaintiffs offer at least a dozen narratives containing evidence that arrests took place without individualized determinations of escape risk. For example: Immigration agents grabbed and restrained a LAWCN member "before asking any questions." Melendrez Decl. ¶ 7. "The agents did not appear to know who he was or have a warrant for his arrest." *Id.* Immigration agents arrested a LAWCN member who "did not run." *Id.* ¶ 8. "They did not know who [he] was, and did not ask him questions other than about his status before arresting him." *Id.* Immigration agents conducted a raid on August 12, 2025, where a witness attested that "it didn't matter if [the car wash workers] ran or not, agents grabbed anyone who was close by." *Id.* ¶ 11. Immigration agents arrested a LAWCN member, who has lived in the same Los

[14] At the hearing, Defendants argued that Plaintiffs could not rely on the testimony of a Rule 30(b)(6) witness without stipulating to the preparedness of the witness. Tr. at 69:20–70:19. Defendants, however, did not offer any citation in support of this principle, nor is it an argument raised in the papers. To that end, this Court declines to find accordingly.

Angeles address for twenty years, without "ask[ing] him questions about his community ties." *Id.* ¶ 13. Footage of other raids shows "car wash workers [being] aggressively grabbed and violently arrested without a warrant and often without the agents knowing who they are." *Id.* ¶ 18; *see also* Gudino Decl. ¶ 27 ("[T]he immigration agents seem to target non-white, Spanish-speaking workers, regardless of whether they have long-standing ties to the community or lawful presence in the United States."). And the testimony of numerous agents support the conclusion that it was due to the Policy—and not isolated instances of agents "going rogue"—that these arrests occurred in this manner. Accordingly, Plaintiffs have shown to this Court's satisfaction that Defendants' Escape Risk Policy caused the harm that ensued—that is, violations of federal rights as a result of being subject to wrongful warrantless arrests.

*Third*, Warrantless Arrest Plaintiffs have shown—and Defendants do not appear to dispute—that injunctive relief would redress their injuries. Plaintiffs ask this Court to issue "a preliminary and permanent injunction enjoining further violations of Plaintiffs' rights." 2AC at 83. Because Defendants' Escape Risk Policy is in ongoing violation of Plaintiffs' statutory rights, it follows that enjoining the Government from following that policy will grant Warrantless Arrest Plaintiffs relief. Put another way, their asserted harms—which they allege arise directly from illegal conduct at the hands of the Government and their agents—can be redressed with an injunction.

Because LAWCN and CHIRLA have shown their members have an injury in fact caused by Defendants' policy and redressable through an injunction, the organizations' members have standing.

Defendants argue that Plaintiffs' argument on standing fails because it does not "engage with the Supreme Court's order staying the Ninth Circuit's decision finding standing"—noting that the Supreme Court could not have stayed the TRO unless Plaintiffs lacked a likelihood of success on either standing or the merits. Opp. at 8 (citing *Vasquez Perdomo v. Noem*, 146 S. Ct. 1 (2025)). But, as this Court has explained, it will not speculate as to the unspoken logic behind the Supreme Court's decision to stay the Fourth Amendment TRO. Dkt. No. 20 n.7. Because there is no associated majority opinion, the Justices may well have disagreed on the reasons for the stay, even if

they agreed that a stay should issue. To that end, Defendants do not persuade this Court that the stay order conveys binding authority or guidance on how to approach standing.

Defendants' continued reliance on *Lyons*, too, is misplaced. The Ninth Circuit has explained that *Lyons* should be distinguished when a district court "ma[kes] an explicit finding of likelihood of recurrence, there is evidence that the complained-of conduct stems from a pattern or practice by Defendants, and there is no specific predicate action required by Plaintiffs to trigger Defendants' challenged practice." *Vasquez Perdomo*, 148 F.4th at 675. So too here. This Court explains in this Order the evidence it finds of an officially sanctioned pattern and practice, that it has found Plaintiffs' injury is likely to recur, in part because Warrantless Arrest Plaintiffs and their members are not taking predicate actions to invoke the harm they suffer.[15] The Ninth Circuit's binding interpretation of *Lyons*, therefore, leads this Court to find *Lyons* does not preclude standing.

ii. <u>The interests Plaintiffs seek to protect are germane to Plaintiffs' purposes.</u>

As Warrantless Arrest Plaintiffs contend, and Defendants do not appear to dispute, the interests Plaintiffs seek to protect through this litigation are germane to Plaintiffs' organizational purposes.

LAWCN focuses on "collaboration among worker centers of the Greater Los Angeles region." Gudino Decl. ¶ 6. It is comprised of worker centers, which are "non-profit, community-based organizations that offer support to low-wage, often immigrant workers who are not part of a collective bargaining entity." *Id.* ¶ 7. These include "groups supporting day laborers and those focused on workforce development, as well as immigrant rights organizations, faith-based groups, and movements focused on equity and justice." *Id.* LAWCN's work "supports immigrant justice by improving the conditions and dignity of immigrant workers in Southern California." *Id.* ¶ 12. To that

---

[15] At the hearing, Defendants argued that *Lyons* did not suggest that predicate actions are a factor in determining injury-in-fact, and therefore, standing. Tr. at 38:21–23. But this Court does read *Lyons* to make this point. *See, e.g.*, *Lyons*, 461 U.S. at 108 ("We cannot agree that the odds that Lyons *would not only again be stopped for a traffic violation but would also be subjected to a chokehold without any provocation whatsoever* are sufficient to make out a federal case for equitable relief." (citation modified)). As did the Ninth Circuit. *Vasquez Perdomo*, 148 F.4th at 675.

end, "LAWCN has a long-term and sustained focus on issues related to immigration and immigrant workers." *Id.* ¶ 9.

UFW "is the largest farm worker union in the country." Strater Decl. ¶ 4. Its mission is "to improve the lives, wages, and working conditions of agricultural workers and their families." *Id.* ¶ 11. As part of its work to "protect farmworkers and advance their rights," "UFW is a national leader in the movement for immigration reform and immigrants' rights." *Id.* ¶¶ 12–13.

And CHIRLA "is the largest statewide immigrant rights organization in California." Salas Decl. ¶ 3. Its mission is to "advance the human and civil rights of immigrants and refugees and ensure immigrant communities are fully integrated into our society with full rights and access to resources." *Id.* ¶ 2. It is often "a first point of contact for individuals seeking direct assistance as well as accurate information about recent policy changes impacting immigrants." *Id.* ¶ 10.

In sum, Warrantless Arrest Plaintiffs' missions turn in part on advocating for the civil rights of immigrants; a clear nexus exists between those missions and a lawsuit seeking to protect immigration detainees' rights from allegedly unlawful immigration enforcement. The second *Hunt* prong, therefore, is met.

iii. <u>The participation of Plaintiffs' individual members is not required.</u>

"[E]ven where the members of an association have suffered the sort of injury that might otherwise support a suit by the association, 'whether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought.'" *Brock*, 477 U.S. at 287 (quoting *Warth*, 422 U.S. at 515). In *Warth*, this meant that an organization of construction firms could not recover damages for its members' lost profits: "[W]hatever injury might have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof." 422 U.S. at 515–16. As "the damages claims [were] not common to the entire membership, nor shared by all in equal degree," the organization could not recover damages. *Id.* at 515.

Here, contra *Warth*, "the association seeks a declaration, injunction, or some other form of prospective relief." *Id.* Warrantless Arrest Plaintiffs seek declaratory and injunctive relief, not monetary damages. 2AC at 82–83. So "it can reasonably be supposed that the remedy, if granted,

will inure to the benefit of those members of the association actually injured." *Warth*, 422 U.S. at 515.

* * *

For the foregoing reasons, LAWCN and CHIRLA have sufficiently shown standing, and this Court proceeds to the merits of their Motion.[16]

[16] Accordingly, the remainder of the opinion will focus on these two plaintiffs.

### C. The *Winter* factors support a preliminary injunction.

1. <u>Warrantless Arrest Plaintiffs are likely to prevail on their Escape Risk Policy–based claims.</u>

First, this Court considers whether Warrantless Arrest Plaintiffs are likely to prevail on the merits. The Court finds that Defendants operate a coordinated set of policies concerning escape risk assessments, three of which—no escape risk assessment, escape risk assessment based solely on unlawful status, and escape risk assessment based on false assertions—operate in tandem to support the stated goal of arresting everyone without lawful status, thereby avoiding the escape risk assessment requirement, and by doing so, violating federal law and the rights of Plaintiffs.

a. *Escape Risk Policy*

At issue here are two claims, based on the same pattern of conduct: At bottom, Plaintiffs allege Defendants "have a policy, pattern, and practice of making arrests without any warrant without making an individualized determination of flight risk." 2AC ¶¶ 270, 275. This is what this Court refers to as the Government's alleged Escape Risk Policy.

Plaintiffs allege that the Escape Risk Policy violates 8 U.S.C. § 1357(a)(2), its corresponding regulation, 8 C.F.R. § 287.8(c)(2)(ii), and the APA.[17] *Id.* ¶ 269, 274. Section 1357 requires that an officer who seeks to conduct a warrantless arrest must have "reason to believe . . . that the [noncitizen] is *likely to escape* before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2) (emphasis added). The corresponding regulation requires that a "warrant of arrest [] be obtained except when the designated immigration officer has reason to believe that the person is *likely to escape* before a warrant can be obtained." 8 C.F.R. § 287.8(c)(2)(ii) (emphasis added). And pursuant

[17] This Court reads the Motion to seek relief under the second and third causes of action, which derive from these statutes and regulation. Motion at 13. It is not persuaded by the Opposition's argument that Plaintiffs' "cause of action is unclear." Opp. at 8. Moreover, to the extent that Defendants challenge the APA claim on the basis that Plaintiffs identify no qualifying final agency action, this Court cannot agree. It has already explained that Plaintiffs adequately plead that the Escape Risk Policy is a final agency action. Dkt. No. 419 at 32–33. If Defendants sought to ask this Court to reconsider that finding, they were required to meet Local Rule 7-18 and its requirements for reconsideration motions. Defendants have not done so.

to the APA, this court *must* set aside agency actions taken "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

The Ninth Circuit has held that the phrase "has reason to believe" is the equivalent of the constitutional "probable cause" requirement under the Fourth Amendment. *Tejeda-Mata*, 626 F.2d at 725 (citing *Cantu*, 519 F.2d at 496). And this probable cause requirement in Section 1357 and its corresponding regulation requires an individualized determination: It "cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). In other words, the probable cause inquiry must be "particularized with respect to that person." *Id.* Moreover, "[w]hether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).

In support of the existence of an Escape Risk Policy, Plaintiffs cite a wealth of record evidence. Government directives, analyses of arrest narratives, agent depositions, witness and arrestee narratives, and video evidence support the conclusion that the Government is arresting individuals without consideration of their likelihood of escape. *See* Section III *supra*.

First, Plaintiffs have shown that the Government has instructed its agents not to consider likelihood of escape at all while making arrests. *See* Section III.C *supra*.

Second, they have offered evidence of at least a dozen warrantless arrest narratives where witness observations support the conclusion that the Government conducted no escape risk analysis, and at least forty-one others where no likelihood of escape analysis was documented.[18] *See* Sections III.D–.E.1 *supra*. And Defendants have not submitted any controverting evidence that, in these cases where no risk of escape analysis was documented, a risk of escape analysis in fact took place.

---

[18] In their arrest narratives, Plaintiffs describe arrests where the arrestees did not attempt to flee, agents did not ask any questions to ascertain risk of escape, and agents did not appear to know the names of the arrestees prior to approaching them. Taken together, these observations support the conclusion that no likelihood of escape analysis took place: When an agent approaches someone without knowing who they are, the only way the agent could gather the requisite information for a likelihood of escape analysis is by learning more about the detainee. Where no questions—or no questions beyond the arrestee's immigration status—were asked, no likelihood of escape analysis could have been conducted.

Third, they have documented at least two warrantless arrests where evidence supports the conclusion that the Government's only escape risk analysis was that the individual was unlawfully present—which is no escape risk analysis at all. *See* Section III.E.2 *supra*. Again, Defendants provide no controverting evidence showing that some other analysis took place. So, though these I-213 form contained a risk of escape analysis, the analysis is limited to factors—illegal presence, willful disregard for U.S. law, ability to disappear into the Los Angeles area's population, and agents' "belief" that the immigrant would abscond—that could be true of any detainee believed to have no lawful status.

Finally, they have documented at least three warrantless arrests where the likelihood of escape analysis is patently false when compared to the clear video evidence. *See* Section III.E.3 *supra*.

The Court therefore finds that Plaintiffs are likely to succeed in showing that the Government has engaged in a pattern, practice, and policy of conducting no escape risk analysis at all, relying solely on unlawful status to determine escape risk, or basing the escape risk on false assertions. And Plaintiffs are thus likely to succeed in showing that the Government's Escape Risk Policy violates the clear dictates of Section 1357 and its corresponding regulation in violation of the APA.

b. *The Lyons Memo*

Plaintiffs assert that the Lyons Memo "rescinded long-held guidance on warrantless arrests and redefined the agency's obligation to conduct a 'likelihood of escape' analysis, essentially nullifying the requirement." Motion at 9. To that end, they ask this Court to enjoin Government agents' reliance on the Lyons Memo. Defendants counter that the Lyons Memo merely "reinforces that officers should be looking to the totality of the circumstances known to the immigration officer at the time of the encounter," and that it "provides possible factors while explicitly noting officers are not limited to them." Opp. at 11-12. This Court concludes that the Lyons Memo, to the extent that it suggests unlawful status alone can satisfy the likelihood of escape analysis, is contrary to Section 1357 and its corresponding statute.

Both Section 1357 and its corresponding statute explain two prerequisites for a warrantless arrest: The agent must have probable cause that (1) the detainee is in the United States in violation of

any law or regulation regulating the admission, exclusion, expulsion, or removal of noncitizens, *and* (2) the detainee "is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357.

This Court's primary concern with the Lyons Memo is that it suggests that an immigrant's legal status alone can form the basis for the likelihood-of-escape determination. *See* Lyons Memo at 4 ("The circumstances of [a noncitizen]'s failure to comply with the immigration laws of the United States or unwillingness to cooperate with an immigration officer's lawful authority to enforce those laws may support the conclusion that the [noncitizen] is likely to escape . . . ."). Though the Lyons Memo also correctly clarifies that no single factor is determinative, the example above appears to treat unlawful status as two factors (and therefore sufficient by themselves) in the likelihood of escape inquiry: (1) whether the arrestee has complied with immigration law and (2) whether the arrestee is willing to cooperate with enforcement of those laws. In effect, then, the Lyons Memo permits the possibility where an arrestee's immigration status by itself serves as the reason that the agent concludes the arrestee is likely to escape—and, therefore, enacts a warrantless arrest.

Basic principles of statutory construction do not permit this reading of Section 1357 or its corresponding regulation. Both clearly require two determinations: (1) unlawful presence and (2) likelihood of escape. *See* 8 U.S.C. § 1357 ("Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant— . . . to arrest any [noncitizen] in the United States, *if* he has reason to believe that the [noncitizen] so arrested is in the United States in violation of any such law or regulation *and* is likely to escape before a warrant can be obtained for his arrest" (emphasis added)). To permit an officer to make the required likelihood of escape determination simply by determining that an individual is unlawfully present in the United States would render the language regarding the likelihood of escape determination superfluous. A "core canon of statutory construction is the rule against surplusage," which requires that this Court interpret a statute so as to give meaning to *all* its provisions. *In re Saldana*, 122 F.4th 333, 342–43 (9th Cir. 2024), *cert. denied sub nom. Bronitsky v. Saldana*, 145 S. Ct. 2815 (2025) (citing *Corley v. United States*, 556 U.S. 303, 314 (2009)). Accordingly, this Court cannot accept an interpretation which eliminates the likelihood of escape analysis altogether by permitting a finding of likely to escape based solely on unlawful status.

For that reason, this Court concludes that Plaintiffs have shown they are likely to prevail in challenging the Lyons Memo's guidance on Section 1357 as contrary to law on this ground.

The Court does not, however, find that Plaintiffs are likely to succeed in challenging the Lyons Memo's guidance on Section 1357 as contrary to law on their other proffered ground, namely that it improperly defines "likely to escape" as merely "likely to leave the location" and the Court should clarify that the likelihood-of-escape analysis must include a determination that the noncitizen is not just likely to leave the location but also not "likely to be found at another identifiable location." Tr. at 9:25–10:2. This argument is largely moot, as Defendants explicitly asserted that the Lyons Memo is properly read to include both prongs: unlikely to leave the location *or be found at "another clearly identifiable location."* Lyons Memo at 3; *see also id.* ("The phrase 'likely to escape' is not specifically defined . . . . The plain meaning of that phrase . . . is that an alien is 'likely to escape' if an immigration officer determines he or she is *unlikely to be located at the scene of the encounter <u>or</u> another clearly identifiable location* once an administrative warrant is obtained." (emphasis added)). The Government conceded this at the August 13 hearing. Tr. at 48:15–17. But to the extent that Plaintiffs maintain that even the two-prong definition in Lyons is improper, the Court addresses that argument below.

Plaintiffs also assert that the Lyons Memo is inconsistent with prior agency interpretations of escape. *See, e.g.*, Reply at 10. But, even if true, this does not render the Lyons Memo's guidance incorrect or impermissible. There appears to be no binding authority addressing this question and the legislative history of the statute appears inconclusive. Some of the case law that exists supports the notion that the interpretation in the Lyons Memo is correct. *See, e.g.*, *Cantu*, 519 F.2d at 497 (finding "likelihood of escape" where individuals were "highly mobile": "Throughout the entire two-day period they were in a moving car, possessing the capacity to change momentarily their location and direction. They travelled a heavily-trafficked interstate highway system at high speeds and for a great distance."). And to the extent that this Court should interpret the "likely to escape" language consistent with how it was used in other historical legislation concerning other arrests powers (such

as the power of FBI agents to conduct arrests), it is not clear that Plaintiffs' broad interpretation is correct.[19]

Furthermore, Plaintiffs argue that Defendants' proffered "definition of likelihood to escape that only includes likely to leave the specific location would also obliterate the need to have any ties to the community analysis whatsoever," Tr. at 14:18–21, and "would make it so that officers could never . . . make an analysis about community ties." Tr. at 15:1-2. This, they contend, is improper because many courts have found that community ties are to be considered. As discussed above, Defendants conceded that the Lyons Memo requires a finding that an individual is unlikely to be found at the location *or* at another identifiable location. And the Lyons Memo does not say that officers cannot consider community ties; it merely says that officers

> should consider the factors relevant to immediacy of obtaining and serving an arrest warrant on [a noncitizen] who may not yet have been subject to immigration enforcement, rather than factors relevant to whether an alien is likely to appear for immigration hearings and cooperate after having already been subject to immigration enforcement."

Lyons Memo at 5. And even a definition of likely to leave the location does not necessarily mean that a consideration of community ties is irrelevant or improper. Moreover, Plaintiffs concede that a consideration of community ties is not required. Tr. at 14:22–23 ("And . . . plaintiffs agree that ties to the community is not required . . . ."). Therefore, Plaintiffs' "community ties" argument fails, and the Court will not order that officers must inquire into community ties.

---

[19] *United States v. Watson* discussed the history of analogous language as applied to FBI agents:

> Until 1951, 18 U.S.C. s 3052 conditioned the warrantless arrest powers of the agents of the Federal Bureau of Investigation on there being reasonable grounds to believe that the person would escape before a warrant could be obtained. The Act of Jan. 10, 1951, c. 1221, s 1, 64 Stat. 1239, eliminated this condition. The House Report explained the purpose of the amendment, H.R.Rep.No.3228, 81st Cong., 2d Sess., 1-2 (1950), U.S. Code Cong. Service 1950, p. 4322, and the amendment was given effect by the courts in accordance with its terms. *Compare United States v. Coplon*, 185 F.2d 629, 633-636 (CA2 1950), cert. denied, 342 U.S. 920, 72 S.Ct. 362, 96 L.Ed. 688 (1952), *with Coplon v. United States*, 89 U.S.App.D.C. 103, 108-109, 191 F.2d 749, 753-754 (1951), cert. denied, 342 U.S. 926, 72 S.Ct. 363, 96 L.Ed. 690 (1952).

423 U.S. 411, 424 n.13 (1976). The *Coplon* cases cited therein suggest that the "likely to escape" language required a determination of exigency, but do not suggest that something more is needed than that the individual will have left the location.

Plaintiffs rely on *Mountain High Knitting, Inc. v. Reno*, 51 F.3d 216, 218 (9th Cir. 1995), for the proposition that "the Ninth Circuit held that individuals who were arrested at their factory jobs were not likely to abscond before a warrant could be obtained." Motion at 14. This, they reason, would prohibit Defendants from making a likelihood-of-escape finding for any noncitizens arrested at their places of employment. But *Mountain High Knitting* does not stand for this proposition; the Ninth Circuit did not so find. It merely found that the Immigration and Naturalization Service ("INS," ICE's predecessor for these purposes) did not *allege* that the individuals were likely to escape; because the INS failed to do so, an arrest under Section 1357 was improper.[20] *Mountain High Knitting, Inc. v. Reno*, 51 F.3d 216, 218 (9th Cir. 1995). In the Ninth Circuit's words:

> "Meanwhile, the plain language of 8 U.S.C. § 1357(a)(2), which grants INS officers the power to make warrantless civil deportation arrests, forecloses the possibility of a permissible civil arrest under these circumstances. Section 1357(a)(2) requires that the arresting officer reasonably believe that the alien is in the country illegally *and* that she 'is likely to escape before a warrant can be obtained for [her] arrest.' Again, the INS did not allege nor do appellants concede the existence of grounds for a reasonable belief that they were particularly likely to escape."

*Id.*; *see also* Tr. at 12:5-14:13. Accordingly, the Court will not find that an officer cannot make the required likelihood-of-escape finding simply because a noncitizen is arrested at their place of employment. The Court will also not "clarify . . . that compliance with the Lyons Memo does not mean that anyone that's in a vehicle or at their place of work or any other place that is not their home does not automatically mean that there's an escape risk, a likelihood of escape." Tr. at 54:5–9. Such a clarification is not necessary; that is not what the Lyons Memo instructs.

Be that as it may, the three aspects of the Escape Risk Policy described above—no escape risk determination, escape risk determination based solely on unlawful status, and escape risk determination based upon false assertions—all independently support the granting of a preliminary injunction. In sum, Warrantless Arrest Plaintiffs' evidence shows the following: the Government has an Escape Risk Policy, it does not always conduct prearrest likelihood of escape analyses, and many arrestees appear to have been detained without such an analysis. This, in sum, shows Warrantless

---

[20] Similarly, *Cantu* does not address the question before the Court of the proper definition of likelihood of escape; it only addresses how a court might determine whether the likelihood of escape requirement has been met. *See* 519 F.2d at 497–98.

Arrest Plaintiffs are likely to prevail. Warrantless Arrest Plaintiffs' evidence need not be dispositive of the ultimate claims at this stage; of course, a trial on the merits may call some of this evidence into question or offer competing evidence. But, meaningfully, Defendants do not substantively engage with much of the evidence. They offer no competing declarations calling into question Plaintiffs' arrest narratives, depositions, videos, Government records, and other evidence showing the Government's Escape Risk Policy. To that end, on this record, Plaintiffs are likely to succeed.

Defendants' arguments against likelihood of success are unavailing. First, they contend that the Lyons Memo "does nothing more than reiterate the legal and regulatory framework immigration agents should use when assessing the totality of the circumstances in warrantless arrest escape risks." Opp. at 17. It is true that, at times, the Lyons Memo correctly notes that escape risk analyses are a prerequisite to warrantless arrest, and in that sense, it is not contrary to law. But, as this Court has explained, the Lyons Memo's guidance unduly permits the likelihood-of-escape analysis to be based on unlawful status alone. Accordingly, an injunction preventing Defendants' reliance on this aspect of the Lyons Memo is warranted.

Second, Defendants explain that an officer conducting an individualized risk of escape analysis may properly consider a series of factors. *See* Opp. at 12–13. Many of their cited cases are from outside this Circuit and do not bind this Court. Nevertheless, this Court agrees with (and Plaintiffs do not appear to dispute) the general proposition that evaluating risk of escape should properly rely on many factors. But this argument does not unsettle one of Plaintiffs' central assertions: The Government is regularly *abstaining* from conducting a likelihood of escape analysis at all. Put another way, it matters little that such an analysis could be individualized and wide-ranging when Defendants, as a policy matter, are not conducting the analysis. Nor is it true that Plaintiffs merely seek relief "because Defendants are not assessing [likelihood of escape] factors in the way Plaintiffs prefer." Opp. at 13. Plaintiffs contend Defendants are not assessing likelihood of escape factors at all.[21]

---

[21] Even the Opposition appears to conflate a reasonable suspicion inquiry of illegal presence inquiry with a likelihood of escape inquiry at times. *See* Opp. at 13 ("Under [the Supreme Court]'s precedents, not to mention common sense, those

Defendants also ask this Court to rely upon the "presumption of regularity" to reject Plaintiffs' evidence where it shows that no analysis, or only a generic analysis, of likelihood of escape took place. Opp. at 9–10, 13. "Courts have long presumed that 'official acts of public officers, . . . in the absence of clear evidence to the contrary, . . . properly discharged their official duties.'" *Cruz v. Bondi*, 146 F.4th 730, 739 (9th Cir. 2025) (quoting *United States v. Chem. Found.*, 272 U.S. 1, 14–15 (1926)). And it is true that the "presumption of regularity applies in the immigration context, as the presumption 'normally attends' the Department of Homeland Security's actions." *Id.* (quoting *Biden v. Texas*, 597 U.S. 785, 811 (2022)). But the presumption is rebuttable. *Id.* at 740 (noting a petitioner was required to "present clear, affirmative evidence that the agency did not review the evidence before it"). So even if the presumption of regularity applies to Warrantless Arrest Plaintiffs' claims—an assumption Defendants do not support[22]—Warrantless Arrest Plaintiffs' evidentiary showing rebuts it. And, in any event, Defendants' invocation of this presumption is questionable: They say that it should lead this Court to reject Government statements that appear to instruct officers to conduct arrests without individualized likelihood of escape analyses, because the Government officials *themselves* were "presum[ing] that in making the determination to initiate an arrest, the officer is adhering to all applicable laws and regulations." Opp. at 9. But this Court cannot speculate as to the unstated assumptions of Government officials whose statements are in the record. Their plainest read supports that officers were being instructed to conduct arrests without regard to a likelihood of escape analysis. And this is in accord with what the officers themselves testified to.

In sum, Warrantless Arrest Plaintiffs have shown they are likely to prevail on their claims on the legality of the Government's Escape Risk Policy and the Lyons Memo's guidance on the specific

---

circumstances taken together can constitute at least reasonable suspicion of illegal presence in the United States." (quoting *Vasquez Perdomo*, 146 S. Ct. at 3 (Kavanaugh, J., concurring))). Of course, they are different analyses and should not always involve the same factors. *See* 8 U.S.C. § 1357(a)(2) (noting an officer can make a warrantless arrest "if he has reason to believe that the [noncitizen] so arrested is in the United States in violation of any such law or regulation *and* is likely to escape before a warrant can be obtained for his arrest" (emphasis added)). To understand otherwise would render the statutory requirement for a likelihood-of-escape analysis superfluous.

[22] The Ninth Circuit has applied the presumption in these contexts: service of notices to appear, IJ and BIA proceedings, and CAT proceedings. *See Cruz*, 146 F.4th at 738–39. But Defendants do not cite any cases where any court has applied such a presumption in the context of immigration detention or warrantless arrests—nor is this Court aware of any.

topic this Court has identified. Therefore, as to these requests for a preliminary injunction, the first *Winter* factor is met.

c. *"Boilerplate" likelihood of escape analyses*

Plaintiffs also ask this Court to enjoin Defendants from relying on what they call "boilerplate" documentation in making their likelihood of escape analyses. For two reasons, Plaintiffs have not sufficiently shown they are likely to prevail on this portion of their challenge.

First, to enjoin Defendants' use of "boilerplate" language raises substantial administrability concerns. Plaintiffs' Motion does not present this Court with a workable approach to determine what constitutes *impermissibly* "boilerplate" language. In other words, it is not clear how general or commonly used language needs to be in order to qualify as "boilerplate" language. Nor did Plaintiffs propose suitable parameters for how to define "boilerplate" language at the hearing. To that end, Plaintiffs' challenge is amorphous in scope, which weighs against finding that Plaintiffs are likely to prevail in this challenge at this time. And this Court is disinclined to issue an injunction that the Government could not readily follow.

Second, more generally, the Court does not find that Plaintiffs are likely to succeed in showing that the Government's practice of using "boilerplate" language violates Section 1357 or its corresponding regulation. Neither the statute nor the regulation require any particular language to be used in the Government's documentation of a likelihood of escape analysis. Indeed, it appears reasonable to this Court that officers might use similar language when describing similar arrests with similar fact patterns; in that sense, language may be arguably "boilerplate" only insofar as it describes a common immigration enforcement scenario. Similarly, it appears reasonable to this Court that officers might be provided example language to use—where applicable to the facts of a given arrest—and that versions of that language might appear across different arrest narratives. Language may be commonly seen in arrest narratives simply because it accurately describes common kinds of arrests. Nor do Plaintiffs cite any binding legal authority declaring the use of what they call "boilerplate" language to be unlawful. For this reason, as discussed below, this Court will not categorically enjoin the use of "boilerplate" language.

At the hearing, Plaintiffs asked this Court to enjoin the Government's use of "boilerplate" language or confirm that "boilerplate" language may signal noncompliance with this Court's preliminary injunction as issued below. Tr. at 18:13–22:4. This Court declines to do so. As it explains above, the Government may well have reasonable and lawful reasons to use similar language across escape risk documentations, and the law does not appear to require otherwise. So it is disinclined to enjoin the use of such language, or to conclude that use of this language by itself signals noncompliance with this Court's orders.

To be clear, however, the Government's use of "boilerplate" likelihood of escape language, *combined with an insufficient actual likelihood of escape analysis*, is impermissible. Clearly, where "boilerplate" language is used but no actual analysis was conducted, or where the language is contrary to what the officers obviously observed, the Government is in violation of Section 1357, its corresponding regulation, and the APA. That language is commonly used, however, does not (by itself) appear to violate these rules. So this Court will not enjoin the Government's use of what Plaintiffs call "boilerplate" language at this time.

2. Absent an injunction, Warrantless Arrest Plaintiffs will suffer irreparable harm.

Second, this Court considers whether Warrantless Arrest Plaintiffs have shown "a real possibility" that, absent relief, they will suffer irreparable harm. *See Arc of Cal. v. Douglas*, 757 F.3d 975, 991 (9th Cir. 2014); *see also* Motion at 17–28. They have done so.

When a plaintiff "shows he is likely to prevail on the merits, that showing will almost always demonstrate he is suffering irreparable harm as well." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023). So too here. Warrantless Arrest Plaintiffs' evidence of the Escape Risk Policy strongly supports a finding of irreparable harm. They have shown that they are likely to prevail on the merits of their relevant causes of action. *See* Section III.C.1 *supra.* They have also demonstrated that the Policy is ongoing, and that Plaintiffs' members risk redetention subject to that Policy. And the ensuing detention (that would stem from an unlawful arrest) naturally constitutes irreparable harm.

Defendants' arguments to the contrary do not persuade this Court otherwise. First, they cite *Lyons* to reiterate their arguments that Plaintiffs' members cannot demonstrate an injury in fact. As

this Court has explained, both in this Order and elsewhere, it disagrees and finds Plaintiffs have shown standing. Second, they argue that this Court should not find irreparable harm where, as here, the passage of time between this case's initiation and the instant Motion was substantial. It is true that courts sometimes consider this passage of time as evidence against irreparable harm. *E.g.*, *Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015). But courts are "loath to withhold relief solely on that ground." *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1214 (9th Cir. 1984). And courts also consider the reason for the delay—for example, in a case where the alleged injury becomes more severe over time, such a finding "undermines any inference that the plaintiff was sleeping on its rights." *Arc of Cal. v. Douglas*, 757 F.3d 975, 991 (9th Cir. 2014). To the contrary, in cases like these, "waiting to file for preliminary relief until a credible case for irreparable harm can be made is prudent rather than dilatory." So the passage of time is a nondispositive and fact-intensive factor.

Here, this Court is not persuaded that the time factor weighs heavily against Warrantless Arrest Plaintiffs. As they explain, discovery in this matter has been ongoing, and has permitted Plaintiffs to make the evidentiary showing that they have at this stage. *See* Reply at 14 n.20. Nor do Defendants contend that Warrantless Arrest Plaintiffs have not been diligent in seeking the discovery they now present to this Court here. *See generally* Opp. To that end, it is not clear that Warrantless Arrest Plaintiffs, facing the complexity and volume of discovery in this matter, have unduly delayed in their filing of the instant Motion.

3. <u>The balance of the equities and public interest weigh in Warrantless Arrest Plaintiffs' favor.</u>

Third, this Court considers the balance of equities and interests. When, as here, the nonmoving party is a governmental entity, the last two *Winter* factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). This Court thus considers the third and fourth factors—whether the "balance of equities" is in Petitioner's favor and whether an injunction is in the public interest—jointly. *All. for the Wild Rockies*, 632 F.3d at 1135.

True, "[t]he Government has a significant and compelling interest in the steady enforcement of its immigration laws." Opp. at 15. Defendants explain that Los Angeles "remains a crucial priority

for immigration enforcement where millions of [noncitizens] have broken the law and remain illegally." *Id.* That may well be so. And it is the Government's prerogative to set its immigration enforcement priorities consistent with executive policy. But Warrantless Arrest Plaintiffs' sought injunction does not unsettle any of that: They do not seek to prevent the Government from conducting immigration enforcement operations, arresting noncitizens, or scheduling for removal proceedings. They merely ask this Court to ensure the Government is abiding by its statutory and regulatory responsibilities in its actions in this District. To that end, though Defendants name legitimate government interests, they do not show that injunctive relief would unsettle those interests.

More generally, the Government "cannot reasonably assert that it is harmed in any legally cognizable sense" by being enjoined to comply with the law.[23] *Zepeda v. Immigr. & Naturalization Serv.*, 753 F.2d 719, 727 (9th Cir. 1983). Put another way, the Government's explanation of its general interest in immigration enforcement does not outweigh the injuries suffered by Plaintiffs, their members, and the putative classes. To that end, "[a]ny additional administrative costs to the government are far outweighed by the considerable harm to plaintiffs' [] rights in the absence of the injunction." *Hernandez*, 872 F.3d at 996. "Faced with such a conflict between [the minimal cost to implement additional safeguards] and preventable human suffering, . . . the balance of hardships tips decidedly in plaintiffs' favor." *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983).

**D. Plaintiffs' proposed preliminary injunction is appropriate as modified.**

"A district court has considerable discretion in fashioning suitable relief and defining the terms of an injunction. Appellate review of those terms 'is correspondingly narrow.'" *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) (quoting *Coca-Cola Co. v. Overland, Inc.*, 692 F.2d 1250, 1256 n.16 (9th Cir. 1982)). But injunctive relief must be "tailored to remedy the specific harms alleged." *Id.* (citing *Aviation Consumer Action Project v. Washburn*, 535 F.2d 101, 108 (D.C. Cir. 1976)).

---

[23] Particularly where, as here, Defendants say that their ongoing enforcement conduct does not violate the law at all. "Defendants cannot be harmed by an order enjoining an action they will not take." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012).

Having found the *Winter* factors are met, this Court turns to Defendants' remaining arguments on scope and addresses them below.

1. The injunction is not overbroad.

Defendants contend that Plaintiffs' sought injunction is broader than necessary.

First, Defendants contend that the requested injunction is overbroad and improper because it prohibits Defendants from following the Lyons Memo. As discussed above, it does not appear that the entirety of the Lyons Memo contains guidance contrary to law, so this Court will not enjoin Defendants from following the Lyons Memo as a whole. Nevertheless, for the reasons explained above, this Court does find that the Lyons Memo offers guidance contrary to law to the extent that it suggests that an immigrant's lack of legal status alone supports a likelihood of escape determination.

Second, Defendants contend that the requested injunction is overbroad because it is barred by Section 1252; third, Defendants contend that the requested injunction is improper because it is an impermissible universal injunction. Both arguments are addressed below.

Finally, Defendants contend that the requested injunction is overbroad in requiring certain reporting requirements. Opp. at 17. They challenge the overbreadth of Plaintiffs' request for documentation of both arrests and "situations where Defendants do not pursue an arrest," noting, with respect to the latter, that Plaintiffs do not "explain the need or legal basis for requiring decisions not to arrest." *Id.*; *see also* Dkt. No. 529-89 at 16 (Plaintiffs' proposed order requiring Defendants to "provide to Plaintiffs' counsel documentation of instances where they do not proceed with a civil immigration arrest because they determined that an individual was not likely to escape"). On Reply, Plaintiffs argue that "[d]ocumentation requirements to ensure compliance are standard in cases like this," note that four other district courts have issued similar reporting requirements, and explain that the reporting requirements are not burdensome "in light of Defendants' concession that their policy and training *already* require them to document the facts and circumstances surrounding warrantless civil immigration arrests." Reply at 17.

Plaintiffs do not carry their burden of showing that the reporting requirement is warranted. First, *Thomas v. Cnty. of Los Angeles*, 978 F.2d 504, 510 (9th Cir. 1992), *as amended* (Feb. 12, 1993), cited by Plaintiffs, concerns submission of reports in camera and under seal to the Court, not

to the plaintiffs. *Id.* ("Paragraph two of the district court's injunction directs the Los Angeles County Sheriff's Department to "[s]ubmit to the Court, *in camera* and under seal, copies of reports alleging the use of excessive force that are in the possession of the Department on the first of every month."). And although it indicates that such reports are authorized, it in no way indicates that they are required or that they need not be justified. *Id.* ("The district court is authorized to direct the submission of such reports to ensure compliance with an injunction."). Plaintiffs have failed to justify the production of these reports in this case, particularly where discovery is ongoing. To the extent that this was required in other cases, they are distinguishable. In *Ramirez Ovando v. Mullin*, it appears that the request was narrower—there, defendants produced to plaintiffs a randomly selected third of the Form I-213s for warrantless arrests effected within the district. No. 25-3183, Dkt. No. 112. And in *Escobar Molina v. Department of Homeland Security*, the Court identified significant concerns about the likelihood of compliance—in that case, lack of compliance with a preliminary injunction order—that this Court does not find here. 832 F. Supp. 3d 22, 45 (D.D.C. 2026).

At the hearing, Plaintiffs asserted that the reporting requirement is required because Defendants have already violated other preliminary injunctions requiring the likelihood of escape analysis.[24] In particular, they point to the orders issued in *Escobar Molina* and *Ramirez Ovando*. The *Escobar Molina* order found that the Lyons Memo—which was issued after the Court's preliminary injunction order in that case—failed to fully comply with the preliminary injunction order. *Id.* at 45. It bears mention that this request is to hold against *these* Defendants in *this* case—which concerns their conduct in this district—their noncompliance in *another* case—which concerns their conduct in another district. Moreover, given that the *Escobar Molina* Court and this Court have now made clear

---

[24] In addition, Plaintiffs assert that Defendants violated the Fourth Amendment TRO that this Court issued in this case, pointing to the assertions made in their separate pending motion for a preliminary injunction. Dkt. No. 632 at 4–5 (alleging that Defendants did not advise agents of the TRO and that operations continued that violated detainees' Fourth Amendment rights). But this Court has made no such finding; the Fourth Amendment TRO was dissolved at Plaintiffs' request before the Court could. *See* Dkt. No. 234 (Court order dissolving the Fourth Amendment TRO); Dkt. No. 203 at 7–8 (Plaintiffs' request that this Court issue an indicative ruling that it would dissolve the Fourth Amendment TRO).

Defendants also assert that Defendants have violated discovery orders in this case. It is true that the Court has issued sanctions against Defendants for failing to comply with an order to forensically image certain phones. Dkt. No. 635. But the Court does not find that this means that Defendants are unlikely to comply with this preliminary injunction order and the substantial reporting that is requested is therefore necessary.

their respective interpretations of the Lyons Memo and what is required for compliance, the Court sees no reason why Defendants should not be given the opportunity to comply with this Court's orders before imposing the requested reporting requirements. Similarly, the *Ramirez Ovando* order largely concerned the conduct of the Colorado field office. No. 25-3183, Dkt. No. 112 at 5–8. It therefore appears improper to assume that because that field office violated that preliminary injunction order that the relevant field offices in this case will violate this Court's orders, especially given the clarification that the *Ramirez Ovando* order provides.

Certainly, to the extent that Plaintiffs obtain through discovery or other means evidence that Defendants are violating this order, the Court will readily consider adding a reporting requirement to ensure compliance—on an expedited basis if necessary.

Plaintiffs also acknowledged that information being requested is encompassed by pending discovery requests, but argued that the reporting requirements are needed so that Defendants provide the requested information after the close of discovery and until trial. Given that the specific wording and status of those requests is not before this Court, the Court cannot say—and Defendants have not had a chance to address—whether Rule 26(e)'s requirement that parties "supplement or correct" their discovery responses would apply to this. As the Rule instructs:

> A party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response:
>
> > (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or
> >
> > (B) as ordered by the court.

Fed. R. Civ. P. 26(e). Accordingly, after meeting and conferring with Defendants, Plaintiffs can make such a request for a supplement or correction towards the end of discovery and/or request that this Court order reporting to cover any period not covered by Rule 26(e).

When given the opportunity to propose a more narrow reporting requirement in light of the Court's view that the request was unsupported and therefore overly burdensome, Plaintiffs' only proposal to narrow their requested reporting requirement was to require reporting every sixty days,

rather than every thirty days. Tr. at 18:3–11. This does not meaningfully address the Court's proportionality concerns regarding the volume of materials to which Plaintiffs are entitled—and Plaintiffs do not persuade this Court that, on this record, more reporting would be required to enforce the preliminary injunction. This is particularly so where, as here, much of what Plaintiffs seek to request through this preliminary injunction could also be obtained through discovery.

Plaintiffs also do not carry their burden that the reporting requirement is warranted insofar as it encompasses instances where no warrantless arrests take place. That other courts have offered similar relief is not, by itself, reason for this Court to do the same. And Plaintiffs' specific justification of the no-warrantless-arrests reporting requirement is not persuasive. Plaintiffs say that "this reporting requirement would pose no burden at all" if Defendants are complying with Section 1357 "because the reportable event would never occur." Reply at 17 n.22. But this appears to have it backwards. Assuming that Defendants do comply with Section 1357, at least some immigration encounters will result in no warrantless arrests because Government agents conclude that, though an individual lacks legal status, the individual is not likely to escape. The Government, in those instances, may later arrest that same individual with a warrant. *Cf. Johnson v. Guzman Chavez*, 594 U.S. 523, 527 ("In the ordinary course, if [DHS] discovers that a[ noncitizen] is living in the United States without authorization, it may initiate removal proceedings against the [noncitizen] by sending him a 'notice to appear.'" (footnote omitted)). So, as Plaintiffs do not substantiate their request for information where the Government chooses not to conduct a warrantless arrest, this Court will not grant it at this time.

The requirement that Defendants properly *document* each arrest is proper, however. Without this, Defendants cannot show that any arrest was proper. At the hearing, Defendants argued that the documentation requirement is overbroad because it has no statutory or regulatory basis. This is an astounding claim given that it is well-settled that this is the purpose of I-213 forms—to document the arrest. *Hernandez-Guadarrama v. Ashcroft*, 394 F.3d 674, 676 n.1 (9th Cir. 2005) ("An I–213 is the form upon which immigration officers record the biographical information of an apprehended alien and describe the details surrounding the alien's arrest. It is entitled 'Record of Deportable /Inadmissible Alien.'") It is also astounding given that Defendants regularly rely on the I-213 in

Immigration Court and the Ninth Circuit has treated them as official records that are reliable. *Espinoza v. Immigr. & Naturalization Serv.*, 45 F.3d 308, 310 (9th Cir. 1995), *as amended on denial of reh'g* (Jan. 12, 1995) (finding that I-213 form was properly admitted because "information on an authenticated immigration form is presumed to be reliable in the absence of evidence to the contrary presented by the alien" under circumstances where "the form appears to have been prepared in accordance with normal recordkeeping requirements, and is signed and dated by the officer who completed it."); *see also Matter of Mejia*, 16 I. & N. Dec. 6, 6 (BIA 1976) ("Absent proof that the Form I–213 contains information that is incorrect or which was obtained by coercion or force, that document is inherently trustworthy . . . ."); *Matter of Mercado-Martinez*, 29 I. & N. Dec. 529, 530 (BIA 2026) ("A Form I-213 is presumptively admissible and reliable."); *Matter of Barcenas*, 19 I. & N. Dec. 609, 611 (BIA 1988) ("[Counsel] offered no evidence to even suggest that the contents of the form did not relate to the respondent, that the information was erroneous, or that it was the result of coercion or duress. Absent any indication that a Form I–213 contains information that is incorrect or was obtained by coercion or duress, that document is inherently trustworthy and admissible . . . .").

Finally, Defendants' position that the Lyons Memo merely "encourages" best practice is at odds with the actual language of the Lyons Memo. In its words:

> Because the actions of ICE law enforcement personnel are often challenged months or years after the fact, it is important for officers and agents to clearly, succinctly, and contemporaneously document all factors that led to an immigration officer's determination that the subject was likely to escape before a warrant could be obtained. To this end, following a warrantless arrest, *officers and agents <u>shall</u> document in the narrative section of the Form I-213, Record of Deportable/Inadmissible Alien, all factors considered in determining that the alien was likely to escape before a warrant could be obtained. . . .*
> Documentation should be completed during processing, as soon as practicable following the arrest.

Lyons Memo at 5 (emphasis added); *see also Bufkin v. Collins*, 604 U.S. 369, 379 (2025) ("'Shall' means 'must.'" (citing *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171–172 (2016))). As this demonstrates, the Lyons Memo requires documentation precisely because documentation is necessary for any court to litigate any challenges to arrests. In light of this Court's factual findings regarding the I-213 forms produced in this case—and because of the fact that it is unlikely that every

officer will remember at the time of trial the reasons for his arrest and Plaintiffs are entitled to examine officers based upon contemporary documentation—the Court will order Defendants to properly document each arrest in the I-213 just as they are instructed to do in the Lyons Memo.

Other modifications to the preliminary injunction are appropriate so that this Court does not unduly encroach into the individualized risk of escape inquiry. In particular, Plaintiffs' request does not substantiate why Defendants should be specifically required to inquire about community ties. This Court is unaware of binding authority requiring Defendants' risk of escape analysis to include questions about an individual's community ties, in the case where risk of escape can be properly determined through other factors. So this Court's order does not include that proposed language.

2. The injunction is not universal.

Defendants posit that, "[t]o the extent Plaintiffs are seeking broad injunctive relief that is not tied to a properly defined class, that relief violates the Supreme Court's decision in *CASA*." Opp. at 17–18. But even the *CASA* excerpt upon which Defendant rely belies their argument. The *CASA* Court held there that "universal injunctions circumvent Rule 23's procedural protections." 606 U.S. at 849–50. A universal injunction refers to the "power to prohibit enforcement of a law or policy against anyone." *Id.* at 837. But Defendants offer no argument or authority in support of the idea that Plaintiffs' Motion requests a universal injunction, nor do they engage with the fact that Warrantless Arrest Plaintiffs plainly request an injunction preventing the Government from conducting its policy and practice of making warrantless civil immigration arrests *in this District* without a prearrest individualized determination. Notice of Motion at 1. And the Ninth Circuit has, in the year following the Supreme Court's *CASA* decision, noted that temporary relief does not run afoul of *CASA* where the geography of the relief is "not national, but limited to one judicial district." *Vasquez Perdomo*, 148 F.4th at 686. Nor is a universal injunction per se impermissible. *See Washington v. Trump*, 145 F.4th 1013, 1038 (9th Cir. 2025), *cert. denied*, No. 25-364, 2026 WL 1871300 (U.S. June 30, 2026) (concluding that "the district court did not abuse its discretion in issuing a universal injunction in order to give the States complete relief").

To that end, Warrantless Arrest Plaintiffs' sought relief is neither universal nor impermissible in scope.

3. 8 U.S.C. § 1252(f)(1) does not bar the injunction.

Second, at issue is whether the INA strips this Court of jurisdiction over Plaintiffs' claims. Opp. at 17. It does not.

Aside from the Supreme Court, no court has "jurisdiction or authority to enjoin or restrain the operation of provisions of [sections 1221 through 1232] other than with respect to the application of such provisions to an individual [noncitizen]." 8 U.S.C. § 1252(f)(1). Defendants contend that Plaintiffs' sought relief would implicate the government's authority to detain (as discussed in sections 1225, 1226, and 1231) and to initiate removal proceedings (as discussed in section 1229). *See* Opp. at 8. They argue that—because warrantless arrests "are a paradigmatic means of enforcing or implementing the government's authority to detain and initiate removal proceedings under those covered provisions,"—a classwide injunction on warrantless arrests would unduly enjoin or restrain the Government's exercise of power through those enumerated provisions. *Id.* at 8–9.

But neither section 1252(f)(1) nor binding case law support this position. Defendants rely upon *Garland v. Aleman Gonzalez*, which explains that "§ 1252(f)(1) generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." 596 U.S. 543, 550 (2022). The specified statutory provisions are Sections 1221-1232, namely Part IV of the same subchapter as Section 1252. The plaintiffs in *Aleman Gonzalez* sought a classwide injunction concerning the operation of Section 1231(a)—which governs the detention and removal of certain noncitizens—asserting that it required bond hearings for these detained non-citizens. 596 U.S. at 546–48. They argued that the Section 1252(f) bar did not apply because they merely sought the proper interpretation of 1231. *Id*. at 552–53. The Supreme Court held that the Section 1252(f) bar applied to any request for injunctive relief concerning the operation of Section 1231, even if the plaintiffs' theory was that the Government's interpretation of Section 1231 was incorrect. *Id.* at 551. In the Court's words:

> The district courts' orders 'enjoin or restrain the operation' of § 1231(a)(6) because they require officials to take actions that (in the Government's view) are not required by § 1231(a)(6) and to refrain from actions that (again in the Government's view) are allowed by § 1231(a)(6). Those injunctions thus interfere with the Government's

> efforts to operate § 1231(a)(6), and the injunctions do not fall within the exception for individualized relief because the injunctions were entered on behalf of entire classes of [noncitizens]."

*Id.*

The facts of this case are distinct. Unlike in *Aleman Gonzalez*, the proposed injunctive relief concerns the operation of Section 1357, which is not an enumerated provision under Section 1252(f); Section 1357 is contained in an entirely separate part of the subchapter, Part IX. And enjoining the Government from carrying out warrantless arrests absent a escape risk determination would not require the Government to "refrain from taking actions to enforce, implement, or otherwise carry out" its *detention* or *removal* power—the powers at issue in *Aleman Gonzalez* and the enumerated provisions of Section 1252(f). *Id.* So *Aleman Gonzalez* does not require denial of the sought injunction.

Defendants also rely upon the D.C. Circuit's decision in *N.S. v. Dixon*, 141 F.4th 279 (D.C. Cir. 2025); *see also* Opp. at 17. But *N.S.* is both nonbinding and inapposite. There, the Circuit overturned an injunction that "prevent[ed] the Marshals from arresting and detaining any criminal defendant in the D.C. Superior Court for a suspected civil immigration violation, including arrests made pursuant either to an ICE detainer and I-200 form or pursuant to an ICE detainer alone." *Id.* at 289. In particular, the court found that the injunction applied to "arrests made with a warrant issued pursuant to § 1226(a) and the detention of any [noncitizen] charged with any of the crimes listed in § 1226(c)" *in addition to* arrests made without a warrant pursuant to Section 1357. *Id.* at 290. Because the injunction applied to arrests and detentions pursuant to Section 1226—a provision covered by Section 1252(f)—it was barred. The court did not have occasion to opine on an injunction which only implicates Section 1357—such as the one the Warrantless Arrest Plaintiffs seek here.

This Court is satisfied, therefore, that Section 1252(f) does not bar Warrantless Arrest Plaintiffs' requested injunction.

**E. No bond is warranted.**

Plaintiffs argue the Court should waive Rule 65(c) security. Motion at 19; Defendants state no position, and so arguably concede that waiver is appropriate. "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the

court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "Rule 65(c) invests the district court with discretion as to the amount of security required, *if any*." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (citation modified) (internal quotation marks omitted). "[T]he district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Id*. (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003)).

In any event, the Court finds that there is no realistic likelihood of harm to Defendants from requiring them to conduct a legally required escape risk analysis or to document such an analysis. As such, the Court concludes that there is no need for a bond.

**F. No stay is warranted.**

At the hearing, Defendants requested that—if this Court is inclined to issue a preliminary injunction—this Court should stay its issuance by fourteen days so that Defendants can determine whether to appeal. Tr. at 52:16–22. Plaintiffs opposed the request. *Id.* at 83:3–8.

As a threshold matter, this Court is disinclined to grant such a request where it was not made in the Government's Opposition, or—it appears—in any filings prior to the hearing. It appears to this Court that the Government could have requested a stay as an alternative to denial of the Motion when preparing its opposition, or that it could have separately moved for a stay. The Government did neither. This is of particular importance because the Government is not entitled to a stay pending appeal by default; instead, as the proponent of a stay, it bears the burden of demonstrating that one is warranted here. *United States v. Mitchell*, 971 F.3d 993, 996 (9th Cir. 2020). Absent any facts or law cited in support of such a request, the Government cannot meet its burden.

Relatedly, applying the relevant law, the Government falls short. A stay pending appeal is an "extraordinary remedy." *Mitchell*, 971 F.3d at 999. Such a "stay is not a matter of right, even if irreparable injury might otherwise result." *Nken v. Holder*, 556 U.S. 418, 433–34 (2009). In determining whether to grant a stay, courts consider: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be

irreparably injured absent a stay; (3) whether the issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* at 434.

The Government does not make the requisite showing. As this Court has determined, Plaintiffs are likely to prevail on the theories for which this Court grants preliminary injunctive relief; the Government has not shown otherwise in its Opposition, at the hearing, or otherwise. Moreover, the Government does not appear to face irreparable injury from this Court's issued injunction. The Opposition does that the Government is harmed by the possibility that an injunction would "usurp[] authority over enforcement of our Nation's immigration laws." *See* Opp. at 15. But, again, the Government "cannot reasonably assert that it is harmed in any legally cognizable sense" by being enjoined to refrain from unlawful practices. *Zepeda*, 753 F.2d at 727.

To that end, the Government shows neither the requisite likelihood of success nor the requisite irreparable injury on this posture. These two factors are "'the most critical,'" so courts "consider the final two factors only '[o]nce an applicant satisfies the first two.'" *Mitchell*, 971 F.3d at 996 (quoting *Nken*, 556 U.S. at 434–35). Because the Government satisfies neither, the request for a stay fails. This denial is without prejudice.

## V. Conclusion

For the foregoing reasons, the Motion is GRANTED IN PART. The Court issues a preliminary injunction as described below.

1. Defendants are enjoined from enforcing their policy and practice of making warrantless civil immigration arrests in this District without a prearrest individualized determination by the arresting agent or officer of probable cause that the person being arrested is likely to escape before a warrant can be obtained, as required by 8 U.S.C. 1357(a)(2) and 8 C.F.R. § 287.8(c)(2).

2. In considering the likelihood of a person's escape before a warrant can be obtained for their arrest, an immigration agent or officer must consider the totality of the circumstances known to the agent or officer before making the arrest. These include circumstances the agent or officer learns or can discover between first encountering a person and arresting them without a warrant. Mere presence within the United States in

violation of United States immigration law is not, by itself, sufficient to conclude that a person is likely to escape before a warrant for arrest can be obtained.

3. Defendants are further enjoined from relying on the escape risk standard or analytical approach set forth in the five-page memorandum from former Acting Director of ICE, Todd Lyons, Senior Off. Performing Duties of Dir., Re: Civil Immigration Arrest Authority: Administrative Arrest Warrants and Warrantless Arrests (Jan. 28, 2026), to the extent that it suggests that unlawful status alone suffices to create a likelihood of escape.

4. In cases where Defendants proceed to make a warrantless civil immigration arrest in this District, Defendants must document, as soon as practicable, the facts and circumstances surrounding the warrantless civil immigration arrest in narrative form, including:
   a. That the individual was arrested without a warrant;
   b. The specific, particularized facts that supported the agent's or officer's prearrest probable cause to believe that the person was likely to escape before a warrant could be obtained.

5. When completing the above documentation, Defendants must include the date, time, and location of the arrest, and the date and time the agent or officer completed the documentation.

6. The Court, having found a strong likelihood of success on the merits and that the balance of equities overwhelmingly favors Plaintiffs, waives security under Rule 65(c).

7. Defendants' request for a stay is DENIED.

Dated: September 2, 2026.

MAAME EWUSI-MENSAH FRIMPONG

United States District Judge