JONES MAYER
Krista MacNevin Jee, SBN 198650
3777 N. Harbor Blvd.
Fullerton, California 92835
Telephone: (714) 446 1400
Facsimile: (714) 446-1448
kmj&jones-mayer.com

Attorneys for *Amici Curiae*
CITIES OF FULLERTON, COSTA MESA,
GOLETA AND SANTA PAULA

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Pedro VASQUEZ PERDOMO, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>Markwayne MULLIN, in his official capacity as Secretary, Department of Homeland Security, et al.,<br><br>Defendants. | Case No.: 2:25-cv-05605-MEMF-SP<br><br>**BRIEF OF *AMICI CURIAE* CITIES OF FULLERTON, COSTA MESA, GOLETA AND SANTA PAULA IN SUPPORT OF INTERVENORS' JOINDER IN PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION [DK NOS. 632, 649]**<br><br>Hon. Maame Ewusi-Mensah Frimpong |

**"There is danger from all [persons]. The only maxim of a free government ought to be to trust no [person] living with power to endanger the public liberty." -- John Adams**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................... 3

AMICI CURIAE BRIEF OF CITIES OF FULLERTON, COSTA MESA, SANTA PAULA AND GOLETA IN SUPPORT OF INTERVENORS' JOINDER IN PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION .................... 4

I. IDENTITY AND INTEREST OF AMICI CURIAE .................... 4

II. BASIS FOR LEAVE TO FILE AMICUS CURIAE BRIEF .................... 4

III. ARGUMENT .................... 5

A. Defendants' Immigration Enforcement Operations Violate the Constitutional Rights of Amici's Community Members and Cause Direct, Negative Impacts to Amici's Operations and Services. .................... 5

B. Defendants' Unconstitutional Immigration Enforcement Operations Have Significant Detrimental Impacts on Amici's Communities .................... 8

IV. CONCLUSION .................... 12

# TABLE OF AUTHORITIES


Page(s)

**Cases**

*Almeida-Sanchez v. United States*, 413 U.S. 266 (1973) ..... 13

*INS v. Delgado*, 466 U.S. 210 (1984) ..... 5

*Mapp v. Ohio*, 367 U.S. 643 (1961) ..... 10

*Navarette v. Cal.*, 572 U.S. 393 (2014) ..... 5

*Terry v. Ohio*, 392 U.S. 1 (1968) ..... 5

*United States v. Brignoni-Ponce*, 422 U.S. 873 (1975) ..... 6

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ..... 5

*Zadvydas v. Davis*, 533 U.S. 678 (2001) ..... 5

**Other Authorities**

*Proceedings of the National Academy of Sciences* (November 4, 2025), https://www.pnas.org/doi/10.1073/pnas.2510395122 (last accessed August 24, 2025) ..... 12

*UCLA Latino Policy and Politics Institute* (July 22, 2026), *https://latino.ucla.edu/research/immigration-enforcement-small-businesses-los-angeles/* (last accessed August 24, 2026) ..... 12

# *AMICI CURIAE* BRIEF OF CITIES OF FULLERTON, COSTA MESA, SANTA PAULA AND GOLETA IN SUPPORT OF INTERVENORS' JOINDER IN PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION RE: SUSPICIONLESS STOPS AND VIOLATION OF EQUAL PROTECTION

## I. IDENTITY AND INTEREST OF AMICI CURIAE

*Amici Curiae* are the Cities of Fullerton, Costa Mesa, Goleta and Santa Paula (collectively, "Amici"), which are four municipal corporations, each existing under and in accordance with the laws of the State of California. Amici are all located in California and within the Central District.

The City of Fullerton is in northern Orange County, encompasses 22.44 square miles, and is home to approximately 140,000 residents. (U.S. Census Bureau, 2020). The City of Costa Mesa is also located in Orange County and spans 15.8 square miles, with a population of approximately 111,000 residents. *Id.* The City of Santa Paula is located in Ventura County, is 4.59 square miles, and has a population of approximately 30,700 residents. *Id.* The City of Goleta is in southern Santa Barbara County, encompasses approximately 7.9 square miles, and has a population of approximately 32,690 residents.

Amici are concerned with the impact of Defendants' continued violation of the constitutional rights of individuals in Amici communities, including citizens and residents, by Defendants' suspicionless stops of individuals based on their appearance as Latino and apparent status as low-income or working-class. Amici have received information that Defendants' continued, unconstitutionally-based immigration enforcement operations have had a detrimental impact on Amici's communities, including businesses, community members, municipal services, public safety, education, local economies, and public programs and services.

## II. BASIS FOR LEAVE TO FILE *AMICUS CURIAE* BRIEF

As set forth in Amici's motion for leave to file this brief, filed concurrently herewith, district courts have broad discretion to permit the filing of such briefs. Amici can provide the Court with a unique perspective on the effects of Defendants' immigration enforcement actions on local

municipalities and their communities that are not otherwise provided by the parties and will assist the Court in considering the issues presented by Plaintiffs. In particular, the impacts are far-reaching, even to Amici's communities that are adjacent to and also well outside Los Angeles County. The implications of Defendants' constitutional violations are significant and widespread.

## III. ARGUMENT

### A. Defendants' Immigration Enforcement Operations Violate the Constitutional Rights of Amici's Community Members and Cause Direct, Negative Impacts to Amici's Operations and Services.

The Due Process Clause of the Fifth Amendment provides that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The Supreme Court has long established that this protection applies broadly, holding that "the Due Process Clause applies to all persons within the United States, including aliens, whether their presence is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis,* 533 U.S. 678, 693 (2001). Due process rights "are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality." *Yick Wo v. Hopkins,* 118 U.S. 356, 369 (1886).

Further, the Fourth Amendment guarantees "[t]he right of the people to be secure in their persons … against unreasonable searches and seizures. U.S. Const. amend. IV. The Supreme Court has recognized that "whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Terry v. Ohio,* 392 U.S. 1, 16 (1968). The Fourth Amendment permits ***brief investigative*** stops "when a law enforcement officer has 'a ***particularized*** and objective basis for suspecting the ***particular person*** stopped of criminal activity.'" *Navarette v. Cal.*, 572 U.S. 393, 396-397 (2014) (emphasis added) (quoting *United States v. Cortez*, 449 U.S. 411, 417-418 (1981)) (citing *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968)). The Supreme Court has also held that Fourth Amendment protections apply to seizures of a person in the immigration context, even including brief workplace determinations. *INS v. Delgado,* 466 U.S. 210, 216 (1984).

Law enforcement's immigration authority does not supersede individual constitutional rights. Defendants violate an individual's constitutional rights when stopping them without

reasonable suspicion. To the extent Defendants' immigration officers are still conducting operations that use *generalized* criteria, alone, to detain individuals – even to check identification or verify valid immigration status, in public locations, these stops are invalid. Immigration officers may only conduct stops where they first have reasonable suspicion of *particular* individuals or based on specific factual circumstances. If officers do not have such a reasonable suspicion, then their actions in detaining a specific person do not gain constitutional validity after-the-fact, simply because that person is later found to be in violation of immigration laws.

In the immigration context, *random* stops of individuals are not permitted under the Fourth Amendment, which "forbids stopping or detaining persons for questioning about their citizenship on less than a reasonable suspicion that they may be aliens." *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975). More importantly, the race or ethnicity of an individual, or the language they speak, cannot serve as a valid constitutional basis for stopping a person, or to verify immigration status, even though appearance can be one relevant factor in forming a reasonable suspicion. "[R]eliance on a single factor to justify [a] stopping[, namely] … the apparent Mexican ancestry" of an individual is an insufficient constitutional basis to justify the wholesale stopping of all people of a certain appearance, or even at certain locations, to inquire about immigration documentation. *Id.* at 885-86. While the government has broad immigration powers, "this power cannot diminish the Fourth Amendment rights of citizens who may be mistaken as aliens." *Id.* at 884.

This Court previously found that Defendants' operations were in violation of the above-reference constitutional requirements, and this Court previously enjoined such actions to the extent stops of individuals was based on race, ethnicity, language, or presence at a certain location. While that injunction was stayed and vacated, Plaintiffs have now renewed their request to this Court, and Intervenors have joined in that request, based on a new, extensive record establishing continued violations of the same constitutional provisions -- namely that Defendants are still stopping and detaining individuals based solely on perceived ethnicity as Latino and apparent status as low-income or working-class. Plaintiffs and Intervenors have now submitted evidence to this Court that the main criteria Defendants are actually using to stop individuals is perceived race or ethnicity, i.e.,

they are stopping and detaining individuals *not* based on any reasonable suspicion of that person, but only based on the perceived fact that the person is Latino or Hispanic.

Plaintiffs and Intervenors have now demonstrated by preliminary evidence that Defendants' operations consist of "roving patrols" where there is no specific "target," and for which the emphasis of their operations is to do "snatch & grabs" of "possibles" that have been vaguely deemed suspicious. (Motion [DK No. 632], p. 3; Joinder [DK No. 649], p. 2.) Defendants have detained perceived Latinos who are United States citizens and not detained perceived non-Hispanics at the same location or businesses. (Motion [DK No. 632], p. 10.) Plaintiffs have submitted widespread evidence that Defendants have justified their general operations by identifying "target" information or "target" individuals that are not actually used to inform their sweeps or stops. (Motion [DK No. 632], pp. 4-6.) In other words, the "target" information is merely a general justification for operations, while the actual operations are not actually related to that "target" and the only goal is to arrest "collateral" individuals in the vicinity; Defendants do not take information about the "target" with them and instead detain many individuals not even in physical proximity to the location of the "target," fitting the description of the "target," or in any way related to the "target" information. (*Id.*)

Plaintiffs and Intervenors have shown that Defendants' current operations for immigration stops and detentions are based only on the perceived physical appearance of individuals on the street as Latinos or Hispanics, based on language spoken and the perception of individuals as low-income, working class "day laborers," including agricultural workers. As noted above, Amici have large Hispanic populations that are directly impacted by Defendants' unconstitutional operations. Indeed, Santa Paula has a significant Hispanic population, as well as being largely an agricultural area, since it is a major distribution for citrus fruits and avocado producing and processing. *See* Joinder [DK No. 649], p. 4 (farm workers' fears).

Defendants have not used particularized reasonable suspicion of specific individuals, but have, instead, been shown by Plaintiffs and Intervenors to have unconstitutionally used race and ethnicity as the sole driving force in guiding their immigration operations. This is constitutionally

untenable – particularly in Amici's communities and businesses with significant Hispanic populations. Race, ethnicity and perceived income status or job cannot serve as a proxy for assumed suspicion of illegal immigration status, and cannot lawfully be used as the primary measure for a stop or detention.

### B. Defendants' Unconstitutional Immigration Enforcement Operations Have Significant Detrimental Impacts on Amici's Communities.

Each Amici city has a large Hispanic or Latino population, and therefore, Amici's communities are substantially and detrimentally affected by Defendants' unconstitutional manner of enforcement as preliminarily demonstrated by Plaintiffs. More than 80% of Santa Paula's population is Hispanic or Latino; approximately 35-38% of the populations of Costa Mesa, Fullerton' and Goleta are Hispanic or Latino. The Hispanic or Latino populations of Costa Mesa and Fullerton each exceed the overall percentage of such populations within the County of Orange.[1] Therefore, the challenged enforcement actions of Defendants, which have been preliminarily demonstrated to be race/ethnicity-based, place a large portion of Amici's community members under generalized suspicion on that criterion alone, and thus at direct risk of unlawful stopping and detention.

Amici have received information that Defendants' immigration enforcement actions have created fear in Amici's communities and have resulted in an erosion of their overall sense of safety, as well as hampering Amici's ability to effectively provide for the safety and security of their community members. Amici are informed that lawful residents and citizens fear being harassed or detained, including on the streets, at their jobs, or while dropping off their children at school, as well as being fearful of the potential use of force against them, including potential lethal force by Defendants. Amici Cities have received reports that their community members are not shopping at stores or frequenting restaurants and other businesses because of this justified fear that they will be stopped and detained on the street or in public places merely based on their appearance.

---

[1] All population and demographic data are taken from the most recent 2020 United States Census and are available at data.census.gov.

Based on the evidence presented by Plaintiffs and Intervenors, these fears are not irrational or unjustified, because race/ethnicity are the primary criteria actually being used by Defendants. Plaintiffs and Intervenors have shown that Defendants are stopping and actually physically detaining lawful residents and citizens, without any reasonable suspicion against the specific individual. In addition, these stops and detentions are shown *not* to be merely brief inquiries. Indeed, the racial/ethnicity-based nature of enforcement has the direct consequence of creating such fear, and it does so *equally* for Amici's community members who are *lawful* residents and full citizens.

Some Amici have seen a noticeable and significant decline in public participation in community events, which have historically been well-attended; Hispanic individuals have had heightened concerns about being in public due to Defendants' operations. *See also*, Joinder [DK No. 649], p. 10-11. Some Amici have also experienced burdens to their governmental services and an overall erosion in their local governing and law enforcement authority.

Defendants' officers have routinely engaged in their operations with minimal or no insignia identifying them; their clothing often does not identify them as law enforcement officers at all, and they often conduct operations from unmarked vehicles. Thus, Defendants' operations on public streets in Amici communities has been, or threatens to be, by plainclothes immigration officers or those wearing non-descript tactical gear and in unmarked vehicles, which makes it difficult for members of Amici's communities – and even for some of Amicis' own officials and law enforcement officers[2], to verify that immigration officers are, in fact, valid governmental officers at all. In addition, Defendants have conducted such operations in some of Amici communities without advanced notice to local law enforcement agencies. *See also*, Joinder [DK No. 649], pp. 2, 5 (same).

Defendants' enforcement actions have created confusion by obscuring the distinction between federal immigration enforcement officers and local law enforcement officers. The manner

[2] Goleta does not have its own police force and instead contracts for law enforcement services with the County of Santa Barbara.

in which Defendants have conducted operations in Amici communities – often without any forewarning or cooperation with local law enforcement (which has in the past been routine), and without clear identification of immigration officers -- makes it difficult or impossible for members of the public, and for some of Amici's own law enforcement and public safety officers, to differentiate between federal and local officers. Such manner of operations imposes an additional burden on local law enforcement, and creates potentially unsafe conditions; the roving and unsubstantiated manner in which the operations are conducted furthers uncertainty and causes local law enforcement to conduct additional investigation and responses to reports of unknown activities. Similarly, the distinction between federal and local law enforcement has been further blurred at protests where local law enforcement officers have responded to ensure community safety. Local law enforcement officers for some Amici have been unable to identify federal officers with valid authority, and the public cannot easily differentiate between federal and local officers.

Thus, Defendants' actions have severely undermined law enforcement authority in some of Amici's communities, and specifically the relationships Amici have with their residents, workers, and citizens. Public trust in law enforcement is essential to the safety and orderly operation of Amici's communities. "Nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence." *Mapp v. Ohio,* 367 U.S. 643, 659 (1961).

Based on Defendants' unconstitutional actions, Amici have received information that there has been growing mistrust towards law enforcement in Amici communities, which has been mis-directed toward local police. Amici have received information that members of Amici's communities are more hesitant to request public safety assistance and are afraid to reach out for help from law enforcement because of the fear of being detained when help arrives. *See* also, Joinder [DK No. 649], p. 6. Data supports the fact that police calls diminished during Defendants' operations. As the *Los Angeles Times* reported "[d]ata [it] obtained. . . show[ed] a citywide decrease in calls for help to the LAPD during the weeks when immigration enforcement ramped up," as compared to the same period the prior year. Jany, Libor, and Wang, Hailey, "As ICE raids

surged this summer, emergency calls to LAPD plummeted," *Los Angeles Times* (Sept. 20, 2025), *https://www.latimes.com/california/story/2025-09-20/ice-raids-911-calls* (last accessed August 24, 2026). This was characterized as a "major decrease" in calls for service. *The Times* noted that "[t]he findings caused concern among advocates about domestic violence and other crimes going unreported due to deportation fears."

Trust in local law enforcement is essential to public safety, as well as to the orderly and predictable management of daily life within Amici's communities. Local law enforcement is essential to some of Amici's communities, and decreased trust in local law enforcement results in reduced public cooperation and, in turn, decreased public safety.

In addition to public safety, some Amici Cities have also been harmed by decreased community participation, both socially and economically. Defendants' enforcement actions have directly undermined the safety, security, and peacefulness of Amici's communities, which is the fundamental underpinning of daily life.

Some Amici have had reports from community members that individuals have not attended school and community activities and events, because of Defendants' unlawful actions. This is true even as to events that were once widely attended. Information Amici have received indicates members of communities have declined to participate in religious gatherings, shop or frequent businesses and restaurants, go to work, or join public gatherings.

Thus, Defendants' actions have impacted some Amici's communities economically, because some local businesses have reported fewer customers in direct response to the raids. Fearful individuals are not frequenting businesses or going to work, which is detrimental to Amici's local economies. All members of Amici's community should be able to fully participate in the community, both socially and economically.

In a report published on July 22, 2026 by the UCLA Latino Policy and Politics Institute, Defendants' enforcement operations in Los Angeles had a "'chilling effect'" on local Latino businesses, which "substantially disrupted business operations" in or near enforcement areas. Armenta, Armada, et al., "The Cost of Fear: The Impacts of Immigration Enforcement on Small

Businesses and Latino Entrepreneurs an LA County," *UCLA Latino Policy and Politics Institute* (July 22, 2026), *https://latino.ucla.edu/research/immigration-enforcement-small-businesses-los-angeles/* (last accessed August 24, 2026). This is significant when, as the Report indicates, the 4.76 million population of Los Angeles County is one-half Latino and Latinos own more than a quarter of businesses. The Report also found negative business impacts a year later, due to continued enforcement and public fear.

Amici have also received information that some community members have feared leaving their homes, even to take their children to school. Thus, community impacts have extended to schools. Studies have found that immigration sweeps increase school absences and adversely affect educational outcomes for children. A Stanford study found that school absences increased by 22% in the Central Valley of California, where enforcement activities were occurring. Dee, Thomas, S., "Recent immigration raids increased student absences," *Proceedings of the National Academy of Sciences* (November 4, 2025), https://www.pnas.org/doi/10.1073/pnas.2510395122 (last accessed August 24, 2025).

Amici are all cities that pride themselves on being homes for everybody, including immigrants, and on providing safe, secure, and thriving communities for residents, visitors, workers, and businesses. Defendants' unlawful operations have directly undermined these goals. As well as being unconstitutionally implemented, Defendants' operations have had significant negative impacts on some of Amici's communities.

## IV. <u>CONCLUSION</u>

For all of the foregoing reasons, the Court is respectfully urged by Amici Cities to grant Plaintiffs' Motion for Preliminary Injunction against suspicionless stops and violations of equal protection by Defendants as to their demonstrated, actual, unconstitutional practices. As the Supreme Court has recognized:

> The needs of law enforcement stand in constant tension with the Constitution's protections of the individual against certain exercises of official power. It is precisely the predictability of these pressures that counsels a resolute loyalty to constitutional safeguards. It is well to recall the words of Mr. Justice Jackson, soon after his return from the Nuremberg Trials: "These [Fourth Amendment rights], I protest, are not mere second-class rights but belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a

> population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government." *Brinegar v. United States*, 338 U.S. 160, 180 (Jackson, J., dissenting).

*Almeida-Sanchez v. United States*, 413 U.S. 266, 273-274 (1973). The very fabric of our democracy and the legitimacy of all levels of government come from this premise -- that we are *all* protected against arbitrary, indiscriminate, and widespread surveilling and detention by any governmental agency.

Dated: October 8, 2026

JONES MAYER

By: /s/*Krista MacNevin Jee*
Krista MacNevin Jee
Attorneys for Proposed *Amici Curiae*, Cities of Fullerton, Costa Mesa, Goleta and Santa Paula