STACY TOLCHIN (SBN 217431)
*stacy@tolchinimmigration.com*
LAW OFFICES OF STACY TOLCHIN
776 E. Green St., Suite 210
Pasadena, CA 91101
Tel: 213-622-7450; Fax: 213-622-7233

MOHAMMAD TAJSAR (SBN 280152)
*mtajsar@aclusocal.org*
MAYRA JOACHIN (SBN 306065)
*mjoachin@aclusocal.org*
DAE KEUN KWON (SBN 313155)
*akwon@aclusocal.org*
STEPHANIE PADILLA (SBN 321568)
*spadilla@aclusocal.org*
ALYSSA MORONES (SBN 343358)
*amorones@aclusocal.org*
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
P.O. Box 811370
Los Angeles, CA 90081
Tel: 213-977-5232; Fax: 213-201-7878

*Counsel for Stop/Arrest Plaintiffs*

(*Additional counsel listed on next page*)

MARK ROSENBAUM (SBN 59940)
*mrosenbaum@publiccounsel.org*
REBECCA BROWN (SBN 345805)
*rbrown@publiccounsel.org*
RITU MAHAJAN (SBN 252970)
*rmahajan@publiccounsel.org*
GINA AMATO (SBN 215519)
*gamato@publiccounsel.org*
AMANDA MANGASER SAVAGE (SBN 325996)
*asavage@publiccounsel.org*
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, CA 90005
Tel: 213-385-2977

*Counsel for All Plaintiffs*

ANNE LAI (SBN 295394)
*alai@law.uci.edu*
UC IRVINE SCHOOL OF LAW
IMMIGRANT AND RACIAL JUSTICE SOLIDARITY CLINIC
P.O. Box 5479
Irvine, CA 92616-5479
Tel: 949-824-9894; Fax: 949-824-2747

*Counsel for Stop/Arrest Plaintiffs*

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

Pedro VASQUEZ PERDOMO, et al.,

Plaintiffs,

v.

Markwayne MULLIN, in his official capacity as Secretary, Department of Homeland Security, et al.,

Defendants.

Case No.: 2:25-cv-05605-MEMF-SP

***DISCOVERY MATTER***

**RESPONSE TO DEFENDANTS' OCTOBER 9, 2026 LETTER BRIEF**

Hon. Maame Ewusi-Mensah Frimpong

Referred to Hon. Sheri Pym
United States Magistrate Judge

JACOB S. KREILKAMP (SBN 248210)
*jacob.kreilkamp@mto.com*
DAVID FRY (SBN 189276)
*david.fry@mto.com*
ADAM B. WEISS (SBN 296381)
*adam.weiss@mto.com*
SARA H. WORTH (SBN 341088)
*sara.worth@mto.com*
LAURA R. PERRY (SBN 342504)
*laura.perrystone@mto.com*
HENRY D. SHREFFLER (SBN 343388)
*henry.shreffler@mto.com*
LAUREN E. KUHN (SBN 343855)
*lauren.kuhn@mto.com*
ANGELA URIBE (SBN 353579)
*angela.uribe@mto.com*
MAGGIE BUSHELL (SBN 354048)
*maggie.bushell@mto.com*
MUNGER, TOLLES & OLSON LLP
350 S. Grand Ave., 50th Floor
Los Angeles, CA 90071
Tel: 213-683-9100; Fax: 213-683-9100

*Counsel for Stop/Arrest Plaintiffs*

BREE BERNWANGER (SBN 331731)
*bbernwanger@aclunc.org*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Tel: 415-621-2493

*Counsel for Stop/Arrest Plaintiffs*

BRISA VELAZQUEZ OATIS (SBN 339132)
*bvoatis@aclu-sdic.org*
ACLU FOUNDATION OF SAN DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
Tel: 619-398-4199

*Counsel for Stop/Arrest Plaintiffs*

EDGAR AGUILASOCHO (SBN 285567)
*eaguilasocho@farmworkerlaw.com*
MARTÍNEZ AGUILASOCHO LAW, INC.
900 Truxtun Ave, Suite 300
Bakersfield, CA 93301
Tel: 661-859-1174
*Counsel for Plaintiff United Farm Workers*

JESSICA KARP BANSAL (SBN 277347)
*jessica@ndlon.org*
LAUREN MICHEL WILFONG*
lwilfong@ndlon.org
NATIONAL DAY LABORER ORGANIZING NETWORK
1030 S. Arroyo Parkway, Suite 106
Pasadena, CA 91105
Tel: 626-214-5689

*Counsel for Stop/Arrest Plaintiffs*

MATTHEW J. CRAIG (SBN 350030)
*mcraig@heckerfink.com*
MACK E. JENKINS (SBN 242101)
*mjenkins@heckerfink.com*
HECKER FINK LLP
1150 South Olive Street, Suite 10-140
Los Angeles, CA 90015
Tel: 212-763-0883; Fax: 212-564-0883

*Counsel for Access/Conditions Plaintiffs*

CARL BERGQUIST*
*cbergquist@chirla.org*
COALITION FOR HUMANE IMMIGRANT RIGHTS
2351 Hempstead Road
Ottawa Hills, OH 43606
Tel: 310-279-6025

*Counsel for Plaintiff Coalition for Humane Immigrant Rights*

ALVARO M. HUERTA (SBN 274787)
*ahuerta@immdef.org*
BRYNNA BOLT (SBN 339378)
*bbolt@immdef.org*
ALISON STEFFEL (SBN 346370)
*asteffel@immdef.org*
IMMIGRANT DEFENDERS LAW CENTER
634 S. Spring St., 10th Floor
Los Angeles, CA 90014
Tel: 213-634-0999

*Counsel for Plaintiff Immigrant Defenders Law Center*

* Admitted pro hac vice

Defendants promised the Court an "industry standard" for when point-of-collection searches are warranted. ECF 771 at 36:7-12. Not only do they fail at that, they do not cite a single case ordering point-of-collection searches to be followed by a second round of search terms prior to review, as they propose here. In the only case Defendants cite that actually addressed the issue, the court *rejected* a proposal to apply search terms pre-collection. *Livingston v. City of Chicago*, 2020 WL 5253848, at *1 (N.D. Ill. Sept. 3, 2020) ("[T]he City wanted to use its own Microsoft Tool to perform a simple search *prior to exporting any data*. … [T]he court required the City to retain an outside vendor to export emails dated from July 1, 2014, to September 3, 2015, and *then* apply an initial keyword search." (emphasis added)). Rather than address the question the Court posed, Defendants burden the Court with pages of irrelevant and grossly misleading information. To be clear, the issue at this stage is how Defendants will *collect* the ESI—not how it will be *reviewed*. Other than *Livingston*, which supports Plaintiffs' position, Defendants cite no cases addressing how ESI is to be collected.

### A. Defendants Offer No Support for the Supposed "Industry Standard" They Described to the Court—Nor Any Support for Pre-Collection Term Searches.

Defendants have altogether failed to substantiate their claim that there is an "industry standard" under which search terms are applied prior to the *collection* of custodial data in large document productions. At the last Status Conference, the Court instructed Defendants on what they should be briefing: "I would like to see the law, Mr. Robbins, that you're citing to on these benchmarks." ECF 771 at 55:15-16. The "benchmarks" refer to what Defendants told the Court was an "industry standard": that "once you get past a certain amount of data, you really should be using key words in addition to date range." *Id.* at 36:9-11. Defendants' letter brief cites no authority supporting pre-collection search terms at all—much less authority providing a standard or benchmark for when that should occur.

The first two sections of argument in Defendants' letter brief do not purport to address either search terms or the collection process and, as discussed below, those sections are misleading and irrelevant. Defendants turn to the collection issue only in their final section, which asserts that "[c]ourts have approved point-of-collection keyword searches when dealing with large datasets."

ECF 784 at 5. If true, that still would not amount to an industry standard, but Defendants have not shown that there is any authority supporting pre-collection searches at all. *None* of the cases Defendants cite provides for pre-collection search terms. Rather, they all concern applying search terms *after collection*.

In *Schulte v. LinkedIn Corp.*, 2026 WL 1905851 (N.D. Cal. July 1, 2026), the court addressed whether the defendant could apply search terms to voluminous data that had *already been collected* before applying an artificial intelligence tool to assist in the responsiveness review. *Id.* at *2.[1] The question before the court was, in effect, whether search terms should be applied at the same point in the process where they are normally applied—post-collection, pre-review—when AI, rather than humans, will do the responsiveness review. Far from supporting Defendants' assertions, this case supports Plaintiffs' position that search terms are applied only post-collection, even where there is a large volume of data. *See id.* at *3 (noting that custodial documents would amount to "multiple terabytes" of documents).

Similarly, *In re Biomet M2A Magnum Hip Implant Products Liability Litigation*, 2013 WL 1729682, at *1 (N.D. Ind. Apr. 18, 2013) ("*In re Biomet*"), concerned application of search terms prior to applying "technology-assisted review" for "predictive coding" (essentially a machine-learning approach more primitive than today's AI) as part of the responsiveness review. Again, this case had nothing to do with applying pre-collection search terms, as Defendants propose.

In Defendants' next case—*Livingston v. City of Chicago*, 2020 WL 5253848, at *1—the court affirmatively *rejected* the procedure Defendants propose here. The court explained this sequence of events:

> Plaintiffs proposed that an outside vendor first export the emails and then perform keyword searches to identify the initial universe of emails, while the City wanted to use its own Microsoft Tool to perform a simple search prior to exporting any data.

[1] If the court's discussion of the dispute is not sufficiently clear that the search terms were to be applied against already-collected documents, that point is explicit in the parties' filings. *See Schulte v. LinkedIn Corp.*, No. 22-cv-00237 HSG(LB) (N.D. Cal. June 23, 2026), ECF No. 186 at 2 ("LinkedIn has declined to identify the number of custodial documents collected prior to the application of search terms.").

> . . . On November 20, 2019, the court entered an order granting in part and denying in part Plaintiffs' motion. (R. 239) As part of this order, the court required the City to retain an outside vendor to export emails dated from July 1, 2014, to September 3, 2015, and then apply an initial keyword search using Plaintiffs' search terms.

*Id.* The court went on to permit the City to use search terms followed by technology assisted review as part of its *responsiveness* review (*id.* at *3), but the collection was based on date range only. Defendants again misportray a case concerning the application of search terms at the responsiveness stage as concerning the application of search terms at the collection stage.

Like the other three cases they cite, Defendants' final case, *McNulty v. Reddy Ice Holdings, Inc.*, 271 F.R.D. 569, 571 (E.D. Mich. 2011), addresses the application of search terms post-collection and so provides no support whatsoever for Defendants' request for pre-collection search terms. But there is one otherwise relevant aspect of the case: the defendant's consultant had collected approximately 4 terabytes of data (in addition to 744 boxes of paper documents) in a *single-plaintiff* employment case. *See id.* at 570. Obviously, the stakes in the present case are larger than those in *McNulty*—by many orders of magnitude—and the Defendants here have vastly more resources than the Home City Ice Company, which was the business that collected 4 terabytes of data for Mr. McNulty's case. While *McNulty* is by no means representative of single-plaintiff employment cases, it does vividly illustrate how out of touch Defendants—the most heavily-resourced law enforcement agencies in the country, if not the world—are in claiming that discovery in this case is disproportionate to the stakes or unduly burdensome in light of their resources.

In sum, Defendants have provided no support at all for applying pre-collection search terms, and certainly have not demonstrated the "industry standard" that they told the Court existed and should control this issue.

**B. <u>Defendants' Discussion of How Many Pages Make Up a Terabyte Is Both Misleading and Irrelevant.</u>**

At pages 2-3 of their letter brief, Defendants ask the Court to digest a hodgepodge of authorities for a variety of propositions that supposedly "shed light" on "data in a litigation

context," but that are not relevant to this case and do not address the "benchmarks" the Court requested.[2] Although Defendants do not explain how this material relates to the issues before the Court, they seem to be suggesting that a terabyte of data corresponds to tens of millions of pages of text. That point is both irrelevant and, in this case, false.

*First*, the issue at this stage is not what Defendants will *review*, but what they will *collect*. The volume of data *collected* matters only to the extent it will materially slow the collection process. Defendants estimate they would collect 5.82 terabytes of custodial data (as opposed to Team URLs) under Plaintiffs' proposal. ECF 784 at 4. They also note that Microsoft caps downloads at 5 terabytes per day. *Id.* at 4-5. That means Defendants could download the custodial data over the course of one week—just the business days—and still use less than 25% of the daily cap. The volume of data is not a meaningful constraint on how long it will take to conduct the collection.

*Second*, even if the parties were addressing the *review* process, rather than just the collection process, Defendants grossly overstate the number of documents that are likely at issue. Defendants first seek to establish that a given volume of data translates into a particular (typically very large) number of pages of text or emails. So, for instance, Defendants quote a case saying that "[a] 'gigabyte,' in computer parlance, is the equivalent of over 100,000 pages of e-mails." ECF 784 at 3 (quoting *Bagley v. Yale Univ.*, 307 F.R.D. 59, 61 (D. Conn. 2015)). They also reference a filing in another case that cites a book published 17 years ago for the proposition that a terabyte equals 50 million pages in business litigation. *Id.* Later in their letter brief, Defendants extrapolate from these (and similar) numbers and examples and assert that "this is a multi-terabyte

---

[2] Some of the information offered by Defendants is so far afield that it seems to have no purpose other than to waste time. Defendants advise the court, for instance, that printing 8,000,000 pages of word processing documents costs $504,000 (ECF 784 at 2), but no one is asking Defendants to produce their documents in paper form—quite the opposite. Defendants also inform the Court that Bill Koch—Chairman of the Board at Oxbow Carbon LLC, sibling to the famous Koch brothers, accomplished competitive sailor, and avid wine collector—possessed roughly 130 gigabytes of data almost 10 years ago (*id.* at 3)—a fact that has literally *nothing* to do with this case.

case implicating hundreds of millions of documents." *Id.* at 4. That assertion is totally baseless—indeed, it is ridiculous.

The absurdity of Defendants' estimate is demonstrated first by calculating what "hundreds of millions of documents" would mean on a per-custodian basis. According to Defendants, there are 97 custodians at issue. ECF 784 at 4. The period in question begins on January 1, 2025 and runs to the present—20 months. The 97 custodians would *each* have had to accumulate an average of more 50,000 documents per month (approximately 1,700 documents per day, every day), to get even to 100 million documents—with "hundreds" obviously requiring a multiple of that. It is entirely implausible that Border Patrol agents are individually generating 50,000 or 100,000 documents per month—and Defendants certainly provide no evidence that they are. Defendants' fantastical estimates illustrate why parties asserting undue burden must come forward with specific *evidence* supporting their arguments. *See Rivera v. Portfolio Recovery Assoc., LLC*, 2021 WL 1214516, at *1 (C.D. Cal. Mar. 2, 2021) ("To the extent undue burden is asserted as an objection, the objecting party has an obligation to present evidence of the burden."); *United States v. McGraw-Hill Cos.*, 2014 WL 1647385, at *8 (C.D. Cal. Apr. 15, 2014) (similar); *Stork v. Textor*, 2011 WL 13217542, at *3 (C.D. Cal. June 27, 2011) (party claiming burden "must show specifically how . . . by submitting affidavits or offering evidence revealing the nature of the burden" (citation omitted)); *DirectTV, Inc. v. Trone*, 209 F.R.D. 455, 458 (C.D. Cal. 2002) ("The party who resists discovery has the burden to show that discovery should not be allowed, and has the burden of clarifying, explaining, and supporting its objections.").

Defendants have provided Plaintiffs with specific (albeit not complete) information for just one custodian—Gregory Bovino. Defendants have elected not to provide most of that information to the Court in their letter brief, perhaps because it suggests that Defendants' "hundreds of millions of documents" claim is overstated by *more than two orders of magnitude*. On August 25, 2026, Defendants reported that they had collected approximately 1.26 terabytes of data for Mr. Bovino—1.2 terabytes from Team URLs and 60 gigabytes from custodial sources (principally email and OneDrive). Declaration of David H. Fry ("Fry Decl.") Ex. A at 1. Defendants further reported that Bovino's data yielded a total of 186,236 documents against which they ran search

terms. Fry Decl. Ex. B at 1. Extrapolating from Mr. Bovino's data, the 5.82 terabytes Defendants estimate they would have to collect from the 97 custodians they have identified could be expected to yield approximately 860,000 documents[3]—not "hundreds of millions of documents."[4] While Defendants should provide the Court with the actual number of documents for all of the custodians, it is plain that Defendants' speculation regarding that volume is self-serving nonsense.

### C. Whether the Volume of Data Is Labelled "Massive" Has No Legal Consequence and Is Irrelevant to the Court's Question.

Defendants go on to assert that the dataset at issue is "massive," ECF 784 at 4-5, as if that term has some legal consequence. Yet they do not explain why this is, nor do they cite any legal authority of any kind in this section of their letter brief. They certainly do not suggest that the mythical "industry standard" for pre-collection search terms depends on whether the dataset is deemed to be "massive" (as opposed to "giant," "enormous," "large," or some other entirely indefinite term). The label "massive" either has no legal implications or it has legal implications that Defendants do not explain.[5] Either way, the appropriate course is for the Court to disregard the argument altogether.

Whether or not anyone chooses to label the amount of data at issue in this case "massive," it is clear that the quantity of data here cannot be labeled "unprecedented." The caselaw shows that numerous parties have *produced* more data than Defendants are resisting *collecting*. *See*, *e.g.*,

[3] 5.82 TB/1.26 TB=4.619 and 4.619*186,236=860,224.

[4] The most obvious problem with Defendants' approach (other than their failure to simply ascertain the actual number of documents at issue—information that is in their possession) is that custodians have many files that are larger than text files—such as videos, photographs, and PowerPoint files. As an example, GOV_VID_001—the video from which the Court removed the confidentiality designation in April (ECF 492) is—by itself—0.71 gigabytes. Fry Decl. ¶ 5. Applying the *Bagley* court's rule of thumb, 0.71 gigabytes is about 71,000 pages of email. So asserting that a certain volume of data will mean a particular number of documents—or pages of documents—that need to be searched or reviewed is just wrong.

[5] One possibility is that Defendants are trying to sidestep their obligation to support their claims of burden with specific evidence by persuading the Court to adopt a general characterization of the volume of data at issue. The Court should decline that invitation—Defendants are required to provide specific evidence. *See supra* at 6.

*Encyclopaedia Britannica, Inc. v. Perplexity AI, Inc.*, 2026 WL 2593275, at *2 (S.D.N.Y. Sept. 2, 2026) (noting that Dow Jones had produced over 400 terabytes of data to Perplexity); *In re Local TV Advertising Antitrust Litig.*, 2026 WL 1688307, at *1 n.3 (N.D. Ill. June 11, 2026) (a *non-party*—Comscore, Inc.—had produced approximately 18 terabytes and anticipated producing an additional 9 terabytes); *Margul v. Evolve Bank & Trust*, 2026 WL 1030313, at *1 (D. Colo. Apr. 16, 2026) (production to date by parties and non-parties totaled over 10 terabytes); *Corrente v. Charles Schwab Corp.*, 2025 WL 3270219, at *1 (Nov. 24, 2025) (defendant produced over 6.5 terabytes of data); *United States v. Bussey*, 2024 WL 4879865, at *2 (S.D. Ga. Nov. 25, 2024) (government produced over 15 terabytes of material to criminal defendant); *Cameron v. Apple Inc.*, 2022 WL 22954126, at *4 (June 10, 2022) (defendant had produced 13 terabytes of data).

### D. <u>The Court Should Address Whether Pre-Collection Search Terms Are Appropriate.</u>

In their effort to distract from their inability to substantiate the claim that pre-collection search terms are the norm when large data volumes are involved, Defendants wrongly assert that the Court should not reach this issue at all because it was already decided. ECF 784 at 1. But the Court is free to revisit its own orders. *See Traer v. Domino's Pizza LLC*, 2023 WL 6369712, at *7 (C.D. Cal. 2023) (noting Ninth Circuit's emphasis on "a district court's inherent and broad power to rescind its own orders prior to a final judgment"). As an historical matter, the issue is before the Court again because the Court ordered the parties to meet and confer about how pre-collection searching would work. ECF 580 at 3. In that process, Defendants disclosed that A360—one of Defendants' email systems—cannot search for partially-indexed terms (ECF 673 at ECF p. 16), whereas the Court's order expressly relied on Defendants' representation that their software would not suffer from that technical problem. *See* ECF 580 at 3. And, moreover, Defendants had taken the position in the meet and confer process that their willingness to turn on the Purview settings that would at least partially mitigate the problem was dependent on Plaintiffs agreeing in advance to search terms agreeable to Defendants. ECF 673 at ECF p. 5. Those circumstances would have been sufficient reason for the Court to revisit the issue, but the order was also expressly premised on the volume of ESI at issue (ECF 580 at 3) and there is new information on that front. At the

time of the order, the Court had no specific information before it concerning the data at issue. The custodians had not even been identified at that time and neither the Court nor the Plaintiffs had information concerning the volume of data that any custodian actually possessed. Defendants still have not provided the total amount of data or number of documents at issue; but they have finally provided information concerning the number of custodians and, for a single custodian—Gregory Bovino—they have provided both the volume of data and number of documents. Based on that information—which could not have been placed before the Court (at least not by Plaintiffs) prior to the issuance of ECF 580, the Court can reasonably and appropriately revisit the question whether pre-collection term searches are warranted in this case.

**E. <u>Defendants' Improper Confidentiality Designations Are Imposing Burdens on Plaintiffs and Causing Information that Should Be Public to Be Concealed.</u>**

Separate from the merits of the ESI dispute discussed above, filing this brief has raised—once again—and ongoing problem with Defendants' excessive confidentiality designations. This behavior imposes burdens on Plaintiffs and infringes the public's right of access to court records. In this instance, the dispute is minor, but illustrative.

In anticipation of this filing, Plaintiffs' counsel inquired whether Defendants would have any objection to the public disclosure of the report of the Bovino search results – Exhibit B to the Fry Declaration. Fry Decl. Ex. C at 9 (email exchange with request). Defendants responded that they would have no objection except as to five email addresses of current or former high-level officials reflected in the search terms, which they said were properly Confidential under Section A(2)(b)(vi) of the Protective Order. *Id.* at 6. That section states, in relevant part, that the parties can designate as confidential "confidential government personnel information" including contact information of "nonpublic-facing supervisory and non-supervisory federal and non-federal employees and contractors . . . where disclosure of such information to the public may adversely impact identifiable law enforcement operations or national security interests." ECF 247 at 4-5.

Plaintiffs responded that these email addresses could not be confidential under that provision because (1) three of the individuals were no longer employees and disclosure of their former emails could not adversely impact law enforcement operations or national security and (2)

the emails of the other two individuals were the product of a publicly-known formula for White House email addresses. Fry Decl. Ex. C at 4-5. The email of one of them, moreover, is definitely available to the public, as evidenced by 2020 FOIA request by an organization called American Oversight, which Plaintiffs found on the Internet and provided to Defendants' counsel. *Id.* at 5.

Defendants' initial response was that "[t]he question is not whether this information is publicly accessible online, but whether it is considered confidential under the protective order." *Id.* at 3. Plaintiffs responded by noting that the first clause of the definition of "Confidential Information" in the Protective Order is "(a) is not in the public domain, or if in the public domain, is improperly in the public domain." *Id.* at 2 (quoting ECF 247 at 3). In response, Defendants acknowledged the language of the protective order but argued first that the Protective Order "doesn't explicitly define the phrase 'public domain', and what appears online doesn't always count as properly in the public domain in the context of this litigation." Second, Defendants asserted that in the search terms report "[t]hese names are linked to specific allegations in this case and tied to defined search terms" which "transforms otherwise public information into sensitive litigation information." *Id.* at 1.

Plaintiffs have redacted the email addresses from the report and the names of the officials from the email exchange because, given Defendants' choice to designate the report as "Confidential," Plaintiffs are not free to disclose its contents. But Defendants' arguments that the emails are properly designated confidential are untethered to the language of the Protective Order and make no sense. Defendants should be admonished that fees may be imposed as a sanction in the future when they request sealing or redaction of information that cannot properly be sealed.

DATED: October 14, 2026 MUNGER, TOLLES & OLSON LLP

By: */s/ David H. Fry*
DAVID H. FRY
*Counsel for Stop/Arrest Plaintiffs*

**CERTIFICATE OF COMPLIANCE**

The undersigned counsel of record certifies that this filing is 3551 words, which complies with L.R. 11-6.1.

DATED: October 14, 2026

MUNGER, TOLLES & OLSON LLP

By: *\/s/ David H. Fry*
DAVID H. FRY
*Counsel for Stop/Arrest Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 14, 2026, I electronically filed the foregoing with the Clerk of the U.S. District Court for the Central District of California using the CM/ECF system, which provided notification of such filing to all registered CM/ECF users.

DATED: October 14, 2026

MUNGER, TOLLES & OLSON LLP

By: *\/s/ David H. Fry*

DAVID H. FRY

*Counsel for Stop/Arrest Plaintiffs*