!

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Pedro VASQUEZ PERDOMO, et al.,<br>Plaintiffs,<br>v.<br>MARK WAYNEMULLIN, IN HIS OFFICIAL CAPACITY AS SECRETARY OF HOMELAND SECURITY; U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,<br>Defendants. | Case No. 2:25-cv-05605<br><br>**DECLARATION OF ANDRE QUINONES** |

**DECLARATION OF ANDRE QUINONES**

I, Andre Quinones, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am employed by the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) as a Deputy Field Office Director (DFOD) of the Los Angeles Field Office (ERO Los Angeles). I have held this position since June 2020.

2. I have been employed by ICE, or its predecessor, Immigration and Naturalization Service (INS), since June 2000. In April 2011, I was promoted to Supervisory Detention and Deportation Officer and in October 2016, I was promoted to Assistant Field Office Director. In June 2020, I was promoted to Deputy Field Office Director (DFOD). During my career, I have also served as the Acting Field Office Director (FOD) in Los Angeles.

3. ICE is the largest investigative branch of DHS and is charged with the enforcement of more than 400 federal statutes. The agency was created after the September 11, 2001, terrorist attacks, by combining components of the former INS and the former U.S. Customs Service, to more effectively enforce federal

immigration and customs laws and to protect the United States against terrorist attacks. The mission of ICE is to protect the United States from cross-border crime and illegal immigration that threaten national security and public safety. To carry out that mission, ICE focuses on enforcing immigration laws, preventing terrorism, and combating transnational criminal threats. ICE consists of three core operational directorates: (1) ERO, which includes 25 field offices led by Field Office Directors (FODs); (2) Homeland Security Investigations, which includes 30 field offices led by Special Agents-in-Charge; and (3) the Office of the Principal Legal Advisor, which includes 9 regions led by Regional Counsels.

4. ERO's mission is to identify, arrest, and remove aliens who present a danger to national security or are a risk to public safety, as well as those who enter the United States illegally—including those who cross the border illegally, which is a federal misdemeanor, 8 U.S.C. § 1325, and those who illegally reenter after having been removed, which is a federal felony, 8 U.S.C. § 1326—or otherwise undermine the integrity of our immigration laws and our border control efforts.

5. The majority of ERO's immigration enforcement operations take place in the interior of the country. ERO manages all logistical aspects of the removal process by identifying, apprehending, and, when appropriate, detaining removable aliens during immigration proceedings and pending physical removal from the United States. This includes locating and taking into custody fugitive aliens and at large criminal aliens, as well as identifying aliens in federal, state, and local prisons and jails and working with those authorities to transfer them to ICE custody without releasing them into the community. When aliens are ordered removed, ERO is responsible for safely repatriating them, or otherwise overseeing their departure from the United States.

6. This declaration is based on my personal knowledge and information made available to me in the course of my official duties.

7. ICE ERO Los Angeles officers receive law enforcement training on the requirements of the Fourth Amendment of the U.S. Constitution, and the related statutory and regulatory provisions of the Immigration and Nationality Act (INA) as part of their basic Academy training at the Federal Law Enforcement Training Center. Currently, ICE ERO Los Angeles officers receive Ninth Circuit-specific immigration enforcement training in addition to the general Fourth Amendment training three times per year. This training includes the statutory requirements for warrantless arrests under 8 U.S.C. § 1357(a)(2),

the requirements of having and documenting reasonable suspicion and/or probable cause, and the requirements of consensual encounters.

8. ICE ERO Los Angeles officers are trained that, under the law, brief detention for questioning requires an immigration officer to have reasonable suspicion, based on specific, articulable facts, that the person being questioned is an alien illegally in the United States. ICE ERO Los Angeles personnel are trained that an arrest requires probable cause that the person being arrested is an alien illegally present in or otherwise removable from the United States.

9. ICE ERO Los Angeles officers are trained to follow ICE procedures for apprehensions of illegal or otherwise removable aliens in the United States by using targeted investigations, conducting operations, and making arrests. Individual targeting packages, consisting of the targeted alien's immigration history and/or status, criminal history, last known residence and employment information are prepared during the targeted investigation, prior to contact with the targeted alien. Targeted investigations generally focus on aliens with final removal orders and/or serious criminal history. When non-targeted individuals are encountered during the targeted operations, ICE ERO Los Angeles officers are trained to develop reasonable suspicion through consensual encounters. ICE ERO Los Angeles officers identify themselves to the arrestee at the time of arrest/encounter or as soon as practicable when safe to do so.

10. I am familiar with the District Court's preliminary injunction order (ECF No. 807), which is referred to herein as the PI Order.

11. The PI Order requires immigration officers and agents to use the "totality of the circumstances" in developing reasonable suspicion but determines the factors of being: (1) "apparent status as low-income or working-class" and (2) "Latino" are "not enough, standing alone, to provide reasonable suspicion [for an investigatory stop]." These terms are vague, ambiguous and, largely, undefined. As a result, implementation of PI Order will pose significant operational challenges, and further, will have a chilling effect on immigration enforcement in the Central District of California. This judicial micromanagement of officer decision making has a chilling effect since an officer has always been free to rely on many factors alone or in combination.

12. The term "Latino" as defined in the PI Order is vague.[1] The court notes that an individual may appear to be Latino based on the observer's perception of the individual's: (1) ethnic background, (2) race, and/or (3) skin color. The court also notes that it believes the term "Hispanic" synonymous for "Latino." In an effort to define "Latino," the court cites to a Pew Research article that begins by saying, "[t]here's no simple answer to the question 'Who is Hispanic?'"[2] Without clarification of who is "Latino," ICE law enforcement officers and agents cannot determine whether an individual meets these criteria by perception alone. The court's order requires ICE law enforcement personnel to make snap decisions in the field about whether an individual is "Hispanic" or "Latino" based on little more than their apparent physical appearance. Rather these terms relate to the part of the world an individual comes from and the language they speak.[3]

13. The problems posed by this vague language are compounded by the population of removable aliens in California. According to ICE's national docket, there are 614,469 aliens in California who self-identified as being from Latin American countries[4] and were already encountered and subject to removal. There are only 195,015 aliens from all other countries combined. Put another way, approximately 76% of aliens who were already encountered in the past by a DHS component in California and subject to removal are from Latin America. According to information posted by the United States District Court for the Central District of California, the population of the district of 19,384,341 was 46% Hispanic in 2020.[5] Accordingly, it is highly probable that an alien encountered in this District will part of the population subject to the PI Order.[6]

---

[1] PI Order at 3 n.1.

[2] Mark Hugo Lopez, Joseph Copeland & Jeffrey S. Passel, *Who Is Hispanic?*, Pew Rsch. Ctr. (Sep. 15, 2026), https://www.pewresearch.org/short-reads/2026/09/15/who-is-hispanic/.

[3] *Latino*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/Latino (Accessed on Oct. 28, 2026); *Hispanic*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/hispanic (Accessed on Oct. 28, 2026).

[4] Latin American countries include Costa Rica, El Salvador, Guatemala, Honduras, Mexico, Nicaragua, Panama, Cuba, Dominican Republic, Haiti, Argentina, Bolivia, Brazil, Chile, Colombia, Ecuador, Paraguay, Peru, Uruguay, and Venezuela. *Latin American Countries*. WorldAtlas (May 21, 2021). https://www.worldatlas.com/geography/latin-american-countries.html.

[5] *2020 Central District of California Profile*, United States District Court Central District of California, https://www.cacd.uscourts.gov/sites/default/files/documents/2020%20Central%20District%20of%20California%20Profile.pdf (Accessed Oct. 26, 2026).

[6] See *Undocumented Immigrants in Los Angeles County, 2025 Data Estimates*, USC Dornsife Equity Research Institute, https://dornsife.usc.edu/eri/wp-content/uploads/sites/41/2025/11/USC_ERI_LA_County_Undoc_Estimates_...

*(footnote cont'd on next page)*

14. Similar operational challenges are posed by the economic categorization under the PI Order. The term "working-class" is undefined but is noted to "explicitly include[ ] individuals who appear to be low-income laborers and day laborers."[7] The term "low-income" is similarly not defined in the PI Order. The court does not provide a maximum household income for who it has determined are "low-income" individuals. Operationally, it is not possible for ICE law enforcement personnel to determine an individual's income while in the field conducting enforcement actions.

15. The court also does not provide any physical characteristics typical of those it has deemed to be "working class" or "low-income." Neither term is legally definable or a quantifiable, objective metric that the officer on the ground can apply. Officers trained to evaluate articulable facts are now chilled from acting in environments where standard appearance or occupational indicators (such as work uniforms or construction apparel commonly associated with targeted worksites) overlap with the court's undefined prohibitions. Additionally, a person's appearance (clothing brand, grooming, vehicle models, types of footwear, etc.) is unreliable when determining income level, which can potentially lead officers to make other stereotypical assessments that the court is mandated to prevent. For example, a worker at a construction site may be dressed in an ill-fitting hooded sweatshirt, stained jeans, dirty work boots, and a high visibility vest. Under the court's view, ICE officers and agents may be second guessed based on stereotypical factors that a court could ascribe as reflecting "low-income" solely due to his physical appearance—and therefore subject to special protections from immigration enforcement—when in fact he may be a site manager and earn a salary that places him outside the court's undefined "low-income" status. In other words, the court is likely to employ improper stereotypes for all "working class" or "low-income" individuals (such as being poorly dressed and groomed) and providing such individuals increased protection from immigration enforcement and distorting the actual requirement to consider all facts and circumstances. Accordingly, it is not possible for ICE law enforcement personnel to identify an

---

(Accessed on Oct. 28, 2026)(finding that 35% of Los Angeles County residents are immigrants (3.5 million) and 27% of them are "undocumented" (948,000)) ; *Changing Origins, Rising Numbers: Unauthorized Immigrants in the United States*, Migration Policy Institute (Oct. 2025) https://www.migrationpolicy.org/sites/default/files/publications/mpi-unauthorized-immigrants-fact-sheet-2025_FINAL.pdf?shem=aimgspe,(estimating there are1,101,000 "unauthorized immigrants" in Los Angeles County).

[7] PI Order at 3 n.2.

individual the court has determined are "working class" or "low-income," as opposed to middle class or affluent individuals.

16. As an additional example, an officer with knowledge of an organization alleged to have committed immigration violations with its hired staff will worry that they still lack reasonable suspicion to conduct an investigation of workers entering the facility, given that the probability of a worker being Hispanic is higher in the Central District. Therefore, if the demographic profile of the targeted workforce matches the general demographic profile of the surrounding community's working-class population, an instruction to ignore those factors will chill the officer's ability to act on worksite allegations

17. ERO has processed approximately 8,066 immigration arrests in FY 2025, and 11,469 in FY 2026 in the Los Angeles Area of Responsibility.

18. In essence, the court is requiring ICE immigration officers and agents to racially and economically categorize potential immigration enforcement targets based on vague, undefined, and ambiguous terminology in order to apply the Court's injunction, and, more troublingly, draws a connection between individuals who appear to be "Hispanic" or "Latino" and those who are "working class" or "low-income." This is not operationally feasible to implement.

19. Based on my training and experience as a law enforcement officer, no level of suspicion is required for a consensual encounter. Officers are permitted to engage in consensual encounters with anyone, at any time, for any reason.

20. In addition, I understand that immigration officers are authorized by federal law to interrogate any alien or person believed to be an alien as to his or her right to be or remain in the United States.

21. The court's order and its ambiguous terminology and application, however, will likely chill the officer's enforcement of consensual and collateral encounters. Specifically, officers will be less likely to engage in immigration enforcement because the court's order effectively ensures the Court will second-guess immigration officers when exercising their enforcement authority in a substantial number of cases and creates uncertainty as to which individuals and encounters the court's order applies.

22. Moreover, because an officer's determination of reasonable suspicion, while based on a variety of factors such as employment and the place they are encountered, may be later construed as "relying solely on apparent status as low-income or working class," this judicial intervention will have a chilling

effect on immigration enforcement in the Central District. Therefore, the court's PI Order infringes upon otherwise valid and legitimate law enforcement determinations and effectively impedes federal immigration operations in the Central District of California, which accounts for approximately 19 million people, and is the most populous federal judicial district per the 2020 Census.[8]

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed this 28th day of October 2026 in Seattle, Washington.

ANDRE G QUINONES

Digitally signed by ANDRE G QUINONES
Date: 2026.10.28 19:29:38 -07'00'

Andre Quinones
Deputy Field Office Director
Enforcement and Removal Operations Los Angeles
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

[8] *District Population*, United States Attorney's Office Central District of California (Oct. 20, 2023) https://www.justice.gov/usao-cdca/our-district/district-population.