**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Pedro Vasquez Perdomo, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>Markwayne Mullin, et al.,<br><br>Defendants. | Case No. 2:25-cv-05605<br><br>**DECLARATION OF DANIEL I. PARRA** |

**DECLARATION OF DANIEL I. PARRA**

I, Daniel I. Parra, declare and affirm as follows:

1. I am employed by U.S. Border Patrol, an operational component of U.S. Customs and Border Protection (CBP) within the Department of Homeland Security (DHS). CBP is charged with enforcing the Nation's immigration laws in order to protect national security and uphold the integrity of the immigration system. As part of this mission, CBP agents and officers are responsible for preventing the unlawful entry of individuals into the United States and apprehending those who attempt to enter illegally or who have violated the immigration laws. Through these activities, CBP seeks to secure the border, disrupt human smuggling and trafficking networks, and ensure consistent enforcement of the immigration laws of the United States.

2. I serve as the Deputy Chief Patrol Agent of the U.S. Border Patrol's El Centro Sector, overseeing operations and administrative functions across 70 miles of land border and inland areas of California extending to the Nevada and Oregon state lines. The El Centro Sector, located in Imperial County north of Mexicali, Baja California, Mexico, is a border region requiring complex operational management. I oversee a workforce of over 1,200 employees and manage a

multimillion-dollar budget. I have served in this capacity since May 8, 2022.

3. I entered on duty with the U.S. Border Patrol on July 28, 2002. Upon graduating from the 520th session of the U.S. Border Patrol Academy in Charleston, South Carolina, my first duty assignment was at the El Centro Station, El Centro Sector. Throughout my career, I have held progressive leadership positions across multiple sectors, demonstrating expertise in operational management, policy implementation, and program oversight. My assignments have included Supervisory Border Patrol Agent and Field Operations Supervisor, Indio Station; Executive Officer of Operations, El Centro Sector; Assistant Chief, U.S. Border Patrol Headquarters, Law Enforcement Operations Directorate – Pacific Corridor; Deputy Patrol Agent in Charge of Operations, Ajo Station, Tucson Sector; Patrol Agent in Charge, Blythe Station, Yuma Sector; and Division Chief, Law Enforcement Operational Programs, Tucson Sector. In these roles, I have led complex operational programs, strategic initiatives, and cross-sector coordination.

4. I have also served in various external and developmental assignments, which reflect the breadth of my leadership and strategic experience. I have completed overseas deployments in support of the U.S. State Department's Presidential Security Governance Initiative in Kenya, served as a staff member to the Assistant Commissioner for the Office of Professional Responsibility, and held developmental assignments with the Office of Training and Development as Acting Deputy Chief Patrol Agent and Acting Chief Patrol Agent of the U.S. Border Patrol Academy. I also served with the DHS Office of Strategy, Policy, and Plans as the Acting Deputy Assistant Secretary for Border Management, providing strategic oversight of the Department's national and border security operations.

5. Most recently, I served as Incident Commander for Operation At Large, leading one of DHS's most historic and complex interior enforcement missions. I served in this role from June

2025 to February 10, 2026, when U.S. Border Patrol's involvement in this operation ended. In this position, I had operational oversight and was responsible for all U.S. Border Patrol assets and operations in the greater Los Angeles area, as well as other cities throughout the United States. As part of a national, multi-agency effort, the mission focused on enhancing public safety and enforcing immigration law through targeted law enforcement actions. Furthermore, I ensured that personnel under my command had the proper resources and requisite training needed to operate in such a complex and fluid environment.

6. I am familiar with the preliminary injunction order entered in this case on October 23, 2026 (ECF No. 807), which is referred to herein as the PI Order.

7. The first paragraph of the PI Order requires CBP agents and officers conducting immigration enforcement activities outside of a port of entry, checkpoint, or the functional equivalent of the border to have reasonable suspicion that a person is violating federal immigration law before making a detentive stop. This simply restates what CBP agents and officers are trained to do and regularly do in the course of their duties.

8. Prior to engaging in investigative detentions, agents and officers are trained to have developed reasonable suspicion that the specific individual to be stopped has committed or is committing a federal crime or federal immigration violation. This determination is evaluated based on the totality of the circumstances. The factors that contribute to a reasonable suspicion analysis are numerous and include, but are not limited to: information from intelligence sources; information from law enforcement and open-source databases; analysis of trends and patterns associated with immigration violations; information provided by human sources, which may include confidential informants; previous encounters with aliens at a specific location; the geographical location in which the alien was observed or found; whether that location is known to

be frequented by illegal aliens seeking work; whether the location is known to be associated with specific businesses or employment engaged in criminal activity, including the smuggling, trafficking, or employment of illegal aliens; suspicious or evasive behavior of the individual observed prior to or during the encounter; a pattern or practice of suspicious or evasive behavior; any investigation or surveillance showing the above; and any other particularized facts based on agent observations justifying a detentive stop. An agent is permitted to analyze these factors and use their training and experience to make a rational inference to suspect that an individual has committed a criminal or immigration violation. Agents are trained to consider all these factors together rather than in isolation to evaluate the totality of the circumstances when determining whether reasonable suspicion exists.

9. The officers and agents assigned to this operation had significant field experience in developing reasonable suspicion based upon the totality of the circumstances and effectuating lawful detentive stops. Over time, they have developed specialized expertise and practical knowledge of the factors that are most indicative of immigration violations. Their understanding is informed by thousands of prior stops, arrests, interviews, and operations, as well as surveillance and intelligence reporting regarding migration flow. That experience and information enable agents to identify settings that are often associated with unlawful presence. For example, certain industries, such as construction, agriculture, street vendors, and car washing businesses, among others, that rely heavily on cash-paid day labor have historically attracted undocumented workers because one can earn a living without producing the required documentation to work lawfully in the United States. Thus, and as described above, agents know from past encounters that occupation is a critical consideration because it can be tied to known patterns of immigration violations.

10. The PI Order states that investigative detentions require reasonable suspicion based on an

individualized and particularized assessment—a standard our officers and agents already uphold. It also restricts reliance on the socioeconomic status of certain aliens, i.e. "working class" or "low income" individuals. While the PI Order qualifies that agents cannot rely "solely" on socioeconomic status in establishing reasonable suspicion, it implies that, when considered along with other information, their use is permissible. But it suggests that there will be special scrutiny on these factors that is not provided for other reasonable suspicion factors. Moreover, ambiguity remains despite the apparent definition of the term "working-class." The PI order fails to provide clear instructions and the terms "working class" and "low income" lack specificity making it impractical to implement and ensure compliance. It is particularly problematic given that many factors that agents routinely consider every day in thousands of operations are likely to fall within those broad and amorphous categories. It also does not delineate identifiable characteristics or attributes of an individual who would be considered "working class" or "low income." Such broad, imprecise categorizations make it difficult to train agents on how identify who qualifies as "low income" or "working class" versus individuals who fall outside these imprecise terms. This lack of clarity will also cause confusion among agents regarding what factors they can legally consider in analyzing reasonable suspicion and will cause agents to hesitate in taking legitimate enforcement actions for fear of inadvertently running afoul of the PI Order.

11. As mentioned above, in the context of immigration enforcement, certain occupations, like day laborers, have a consistently reliable association with unlawful immigration activity, making them highly probative indicators of such activity even when other factors are limited. Giving little or no weight to these factors contradicts the established method for developing reasonable suspicion, as it would force agents to ignore their training, experience, and common sense—an approach that is unworkable in real-world operational settings. Preventing agents from

appropriately considering these factors disregards decades of enforcement experience and hampers effective law enforcement, since factors that may appear insignificant in one context can be highly meaningful when evaluated within the broader investigative and operational framework.

12. The PI Order will also cause officers and agents to doubt their own judgment, training, and specialized experience, and lead to hesitation in the field. Hesitation in the field increases the danger CBP agents face in an already dangerous, fast-moving environment. Officers and agents working within this District have faced hostility, including violent crowds, assaults involving rocks, frozen bottles, Molotov cocktails, and even gunfire. In this volatile environment, officers and agents must make split-second decisions. Any delay or uncertainty about their legal authority compromises the effectiveness of the enforcement operation and can significantly increase the risk of harm to the officers, agents, and the public around them. Ultimately, the PI Order will undermine CBP's ability to conduct lawful enforcement operations effectively and safely.

13. Enjoining the ability to rely, in part, on a person's perceived Latino ethnicity is impractical to implement because it goes against the training on the "totality of the circumstances" that officers and agents are permitted to consider. Enjoining the ability to rely, in part, on a person's perceived Latino ethnicity is impractical to implement because it goes against the training on the "totality of the circumstances" that officers and agents are permitted to consider. The court does not define what it means by "Latino," or explain the distinction between perceived Latino ethnicity versus an individual's nationality as a factor in the reasonable suspicion analysis. This lack of clarity will create a chilling effect on officers' consideration of apparent nationality—a key element immigration officers' use in their calculation of whether an individual is potentially present in violation of immigration law.

14. Furthermore, the PI Order impermissibly chills enforcement and invites judicial

micromanagement of enforcement operations anytime there is a mix of prohibited and non-prohibited factors. Uncertainty over how the court might later view an agent's reliance on a mix of factors will cause hesitation and delay in the field, which in turn increases the risk of assaults on officers, escalations during volatile encounters, and injuries to both officers and the public, particularly in the already high-risk and unpredictable environment of Los Angeles. Although the agency has not yet been ordered to implement additional training and guidance for agents and officers on developing reasonable suspicion, the practical effect of this PI Order is that it will require the development of new training protocols that only apply to the Central District of California.

15. Additionally, the PI Order's requirement that the government can only detain individuals if they have "reasonable suspicion that the person to be stopped is within the United States in violation of immigration law" improperly limits the scope of CBP's law enforcement authority to immigration violations, ignoring the broad spectrum of federal laws that CBP enforces, particularly federal criminal law. This is especially relevant in those situations in which CBP engages in immigration enforcement activities and someone (regardless of citizenship) damages federal property or assaults a federal officer. The PI Order does not make clear whether "detentive stops" for crimes that arise from immigration enforcement activities are covered by the PI Order.

16. As written, this PI Order creates confusion, disrupts operations, and diverts resources from mission critical tasks. The vague terms and conditions make it difficult to assess CBP's compliance and could lead to hesitation by officers and agents, which risks their safety. These additional burdens on CBP's critical mission are especially concerning in the Central District of California, which is the largest district in the country with nearly 20 million people, 10% of which are estimated to be illegal aliens, making it one of the most important areas for immigration

enforcement in the country.

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed on this 28th day of October 2026.

Daniel I. Parra
Deputy Chief Patrol Agent
El Centro Sector