**O**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

PEDRO VASQUEZ PERDOMO *et al.*,

Plaintiffs,

v.

MARKWAYNE MULLIN *et al.*,

Defendants.

Case No.: 2:25-cv-05605-MEMF-SP

**AMENDED[*] ORDER GRANTING IN PART STOP/ARREST PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION [DKT. NO. 632] AND GRANTING INTERVENORS' JOINDER [DKT. NO. 649][^]**

[*] The Court amends the order previously issued as follows: (1) On page 9, it adds a docket reference to the deposition of Gregory Lairmore. (2) On page 32, it corrects a pincite from page 114 to page 144. (3) On pages 30 and 45, it eliminates the references to Victor Sanchez being ICE's designated witness pursuant to Rule 30(b)(6).

[^] The Court filed its original order under seal and ordered the parties to meet and confer regarding appropriate redactions for the publicly filed version. Dkt. No. 807. The Court has considered the parties' submissions, Dkt. No. 814, consistent with the Court's separately issued rulings on the parties' pending Applications to Seal (filed at Dkt. Nos. 629, 645, and 650), only one redaction is needed.

"'Tonk' is "the sound heard when a 'wetback' is hit over the head with a flashlight."[1]

"Just plug us in wherever you see some tonks and we'll jump out."[2]

"Border Patrol tends to be very focused on their mission of arresting anyone in the country illegally. So when they see people, they just chase."[3]

"Border Patrol presence is going to cause people to want to be out of the area that they're in. And then they're going to see people running, and they're just going to chase them whether they're targets or not."[4]

"[T]hey only know one way to operate . . . See bodies, chase bodies."[5]

"One of the agents in my team had a friend that lived in the area and told him to check that spot out . . . . [H]e said his friend knows the area well and knows that it's a high probability of aliens there."[6]

"I would know that that area is highly populated that there are illegal individuals trying to get work. . . . . Men that are out there . . . loitering. . . . Just hanging around, just hanging around. . . . . Older Hispanic males."[7]

These recorded statements are among the startling evidence that this Court has been presented with in this case.

Under the Fourth Amendment to the Constitution, a federal agent can only detain a person for immigration purposes if the agent has "reasonable suspicion," particular to that person, that the person is in the United States illegally. It goes without saying that just because someone is Latino does not mean that the person is in the United States illegally.

---

[1] *United States v. Sipe*, 388 F.3d 471, 484 n.33 (5th Cir. 2004).

[2] Ex. 78 at 2:25–30.

[3] Airdo Dep. at 206:19–07:2.

[4] Airdo Dep. at 210:14–:23.

[5] Ex. 26 at GOV 10543.

[6] Sanchez Dep. at 145:6–47:14.

[7] Clement Dep. at 158:3–62:17.

And under the Fifth Amendment to the Constitution, federal agents cannot decide who to stop just based upon their race.

The organizations and individuals who have brought this lawsuit say that the Government is breaking both of these parts of the Constitution. They say that federal agents in the Los Angeles area have been stopping people for immigration purposes just because they look Latino or because they look Latino and working class.

They asked this Court to put a stop to this.

Having looked at all of the evidence—including the recorded statements above[8]—this Court finds that—at this stage, the organizations and individuals have shown that they will likely be able to prove the Government does have a policy in the Los Angeles area of stopping people for immigration purposes just because they look Latino or because they look Latino and working class.

Because such a policy would violate the Constitution in multiple ways, and because, if it continues, it will wreak untold harm, this Court, by way of this Order, orders the Government to stop.

Importantly, this Order is not a final decision on whether the Government is, in fact, following an unlawful policy. That question remains for later in this case.

* * *

Before this Court are two motions. The first is a Motion for Preliminary Injunction Re: Suspicionless Stops and Violation of Equal Protection filed by Plaintiffs Pedro Vasquez Perdomo, Carlos Alexander Osorto, Isaac Villegas Molina, Jorge Hernandez Viramontes, Jason Brian Gavidia, Los Angeles Worker Center Network ("LAWCN"), United Farm Workers ("UFW"), and Coalition for Humane Immigrant Rights ("CHIRLA"; collectively, "Stop/Arrest Plaintiffs"). Dkt. No. 632 ("Motion"). The Motion is fully briefed. *See* Dkt. No. 678 ("Opp."); Dkt. No. 710 ("Reply"). The

[8] This, is, of course, with the exception of the quotation from the *Sipes* decision.

second is a Joinder in Plaintiffs' Motion for Preliminary Injunction filed by Intervenors.[9] Dkt. No. 649 ("Joinder"). It is also fully briefed. Dkt. No. 688 ("Joinder Opp."); Dkt. No. 713 ("Joinder Reply").

For the reasons that follow, Intervenors' Joinder is GRANTED, and the Stop/Arrest Plaintiffs' Motion is GRANTED IN PART. This Court issues a preliminary injunction accordingly.

## I. Background

The facts alleged in the Second Amended Complaint, Dkt. No. 485 ("2AC"), are recounted more fully in the Court's Order dated August 11, 2026, regarding the Government's motion to dismiss the 2AC. Dkt. No. 658 ("Second MTD Order"). The Court will provide background into the factual allegations only as relevant to the instant Motion.

### A. Factual Summary

The Stop/Arrest Plaintiffs allege that, as part of its increased immigration enforcement in the Los Angeles area, the Government selects individuals for detentive stops based upon their appearance as Latino[10] or Latino and working class.[11] The Court will refer to this alleged conduct as the Racially Based Stops Policy. According to the Stop/Arrest Plaintiffs, the Racially Based Stops Policy violates the Constitution in two ways: (1) It violates the Fourth Amendment because the stops

---

[9] Intervenors are twenty-one cities—the City of Anaheim, the City of Bell Gardens, the City of Beverly Hills, the City of Carpinteria, the City of Culver City, the City of Huntington Park, the City of Los Angeles, the City of Long Beach, the City of Lynwood, the City of Montebello, the City of Monterey Park, the City of Oxnard, the City of Paramount, the City of Pasadena, the City of Pico Rivera, the City of Pomona, the City of Santa Ana, the City of Santa Barbara, the City of Santa Monica, the City of South Gate, and the City of West Hollywood—and the County of Los Angeles. Joinder at 1.

[10] This Court acknowledges that, as a factual matter, an individual may appear to be Latino based on the observer's perception of the individual's ethnic background, race, and/or skin color. All three possible determinations of Latino identity are incorporated into this Court's discussion of individuals who appear Latino. *See* Mark Hugo Lopez, Joseph Copeland & Jeffrey S. Passel, *Who Is Hispanic?*, Pew Rsch. Ctr. (Sep. 15, 2026), https://www.pewresearch.org/short-reads/2026/09/15/who-is-hispanic/ [https://perma.cc/4CWX-CE5W]. The Court also notes that some witnesses use the term "Hispanic," which this Court understands is intended as a synonym for Latino.

[11] For the purposes of this Order, the term "working-class" explicitly includes individuals who appear to be low-income laborers and day laborers.

At the hearing, Plaintiffs emphasized that their challenge is to the Government's alleged practice of detaining people on the basis of appearing Latino, and of detaining people based on appearing Latino *and* working class. The Motion does not challenge a practice of detaining people solely for appearing working class. In other words, race is at issue in all the alleged stops. *See* Tr. at 9:16–:22.

are based upon a perceived demographic profile rather than a pre-stop particularized determination of reasonable suspicion that the person to be stopped is present within the United States in violation of federal immigration law. (2) It violates the Fifth Amendment because it subjects Latino individuals to unequal treatment under the law. The Defendants deny the existence of the Racially Based Stops Policy and deny that they have otherwise conducted detentive stops for immigration purposes in violation of the Fourth or Fifth Amendments.

### B. Procedural History

Plaintiffs filed the operative Second Amended Complaint on April 9, 2026. *See* 2AC. It alleges the following claims.

| **Claim** | **Plaintiffs** | **Defendants** |
|---|---|---|
| Count One: Violation of Fourth Amendment: Suspicionless Seizures | Stop/Arrest Plaintiffs | All Defendants |
| Count Two: Violation of 8 U.S.C. § 1357(a)(2)—Warrantless Arrests Without Probable Cause of Flight Risk | Warrantless Arrest Plaintiffs | All Defendants |
| Count Three: Violation of 8 C.F.R. § 278.2(c)(2)(ii)—Standards for Stops and Warrantless Arrests | Warrantless Arrest Plaintiffs | All Defendants |
| Count Four: Violation of 8 C.F.R. § 287.8(c)(2)(iii)—Failure to Identify Authority and Reason for Arrest | Warrantless Arrest Plaintiffs | All Defendants |
| Count Five: Violation of Fifth Amendment—Access to Counsel | Access/Detention Plaintiffs[12] | Mullin, Lyons, and Rios |
| Count Six: Violation of 8 U.S.C. § 1362—Access to Counsel | Access/Detention Plaintiffs | Mullin, Lyons, and Rios |
| Count Seven: Violation of Fifth Amendment—Conditions of Confinement | Access/Detention Plaintiffs | Mullin, Lyons, and Rios |

[12] This refers to ImmDef and CHIRLA.

| | | |
|---|---|---|
| Count Eight: Violation of Fifth Amendment—Due Process | Stop/Arrest Plaintiffs | All Defendants |
| Count Nine: Violation of Fourth Amendment—Unreasonable Manner of Seizure | Stop/Arrest Plaintiffs | All Defendants |

*Id.* Plaintiffs seek declaratory and injunctive relief, as well as fees and costs. *Id.* at 82–83.

On April 21, 2026, Defendants filed a Motion to Dismiss the 2AC. Dkt. No. 494. This motion was fully briefed. Dkt. No. 500; Dkt. No. 502. This Court held a hearing on July 9, 2026. After receiving supplemental briefing, it denied the motion. Second MTD Order.

On June 11, 2026, Magistrate Judge Pym, to whom discovery matters in this action have been referred, issued an order to show cause requiring Defendants to explain why they should not be held in civil contempt for violations of a discovery order. Dkt. No. 538. This Court held a hearing on the OSC on June 25, 2026. Dkt. No. 569. On July 28, 2026, it found Defendants in civil contempt and issued sanctions. Dkt. No. 635.

On September 2, this Court granted in part Warrantless Arrest Plaintiffs' motion for a preliminary injunction. Dkt. No. 704 ("Warrantless Arrest PI Order"). In that order, this Court addressed Warrantless Arrest Plaintiffs' contentions that Defendants were conducting warrantless arrests absent an escape risk determination, and issued an injunction accordingly. *Id.* at 1.

Stop/Arrest Plaintiffs filed the instant Motion on July 27, 2026. *See* Motion. The Motion informed the Court that Plaintiffs did not intend to seek an evidentiary hearing on the Motion. Dkt. No. 632 at 3.[13] On August 4, 2026, Stop/Arrest Plaintiffs filed a motion for class certification, which this Court will address in a separate order. Per the parties' stipulated briefing schedule, the Government opposed the motions and Stop/Arrest Plaintiffs filed replies.[14] *See* Opp.; Reply.

---

[13] This citation references the Notice of Motion, filed concurrently with the Motion. It relies on the CM/ECF-generated pagination, as the Notice of Motion is not itself paginated.

[14] As part of their briefing, Plaintiffs filed a forty-four-page "proposed order," containing the language of the injunction they were seeking as well as forty-two pages of the opinion that they apparently would like this Court to issue. *See* Dkt. No. 632-90. The Court assumes that the Plaintiffs thought that this was required by the District's Local Rules or this Court's Standing Orders. It is not. Because of the concern that such an extensive proposed order could be considered an unpermitted supplemental brief that increases a party's page limitations, the Court has disregarded the proposed order in its entirety, with the exception of the proposed injunctive relief language found in the final two pages.

This Court held a hearing on the Motion and the separate motion for class certification on September 24, 2026. *See* Dkt. No. 757 ("Tr."). After the hearing, it took both motions under submission.

After the hearing, this Court permitted the parties to file supplemental briefing to address any evidence discussed at the hearing but not integrated in the briefs. The parties did so. *See* Dkt. No. 765 ("Pla. Supp."); Dkt. No. 763 ("Def. Supp.").

## II. Applicable Law

### A. Article III Standing

A court must have subject matter jurisdiction to resolve a claim. Fed. R. Civ. P. 12(b)(1). A plaintiff's standing under Article III is a necessary component of subject matter jurisdiction. *Chandler v. State Farm Mut. Auto. Ins.*, 598 F.3d 1115, 1121 (9th Cir. 2010); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 417 (2021). "Because standing is 'an indispensable part of the plaintiff's case,' it 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.'" *Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

For a plaintiff to show Article III standing, the plaintiff must demonstrate that (1) the plaintiff has suffered an injury-in-fact that is (a) concrete and particularized, (b) actual or imminent, not conjectural or hypothetical; (2) the injury is traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the plaintiff's injury will be redressed by a favorable decision. *Friends of the Earth v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). A plaintiff "must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion*, 594 U.S. at 431. "[A] person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." *Id.* at 435. But, when there is no finding that a plaintiff faces a real and immediate threat of recurring harm, the plaintiff lacks standing to seek injunctive relief. *City of Los Angeles v. Lyons*, 461 U.S. 95, 110 (1983).

For an organization to have associational standing as its members' representative, it must show that: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023); *see also Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Warth v. Seldin*, 422 U.S. 490, 511 (1975). The organization may represent its members "so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause." *Warth*, 422 U.S. at 511. And "a class action plaintiff must 'allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants.'" *Easter v. Am. W. Fin.*, 381 F.3d 948, 961 (9th Cir. 2004) (quoting *Warth*, 422 U.S. at 501).

**B. Preliminary Injunctions**

Federal Rule of Civil Procedure 65 sets forth the procedure for issuance of a preliminary injunction. *See* Fed. R. Civ. P. 65(b). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To qualify for injunctive relief, Plaintiff must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood that he will suffer irreparable harm without an injunction; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Id.* at 20.

The Ninth Circuit has held that injunctive relief may issue, even if the moving party cannot show a likelihood of success on the merits, if "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Under either formulation of the principles, preliminary injunctive relief should be denied if the probability of success on the merits is low. *Martin v. Int'l Olympic Comm.*, 740 F.2d 670, 675 (9th Cir. 1984) ("[E]ven if the balance of hardships tips decidedly in favor of the moving party, it must be shown as an irreducible minimum that there is a fair chance of success on the merits.").

A preliminary injunction is "an extraordinary and drastic remedy" and "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). At this stage, the Court is only determining whether Plaintiffs have met their burden for a preliminary injunction. *See L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1200 (9th Cir. 1980). **To that end, this Order is not a final decision on the merits of any claim, nor is it a decision on the merits of the factual assertions either party made in support of any claim.**

## III. Findings of Fact

The Stop/Arrest Plaintiffs have presented this Court with scores of declarations, deposition transcripts,[15] and other record evidence in support of their Motion. The Defendants have presented the Court with very little record evidence contravening the Plaintiffs' evidence, nor do they provide the Court with any valid objection on which the Court can reject the Plaintiffs' evidence. Instead, they largely ignore the Plaintiffs' evidence. Where they do engage with it, they ask this Court to adopt their alternative explanations of the evidence and urge the Court to read the evidence in

[15] Several of the deposition transcripts upon which this Court relies are excerpted at different filings. For ease of reference, below is a summary of the docket filings that each deposition citation references. Filings under seal are noted with an asterisk. The Court directed the parties to file an appendix containing all referenced material from each deposition in this Order. A publicly viewable version of this appendix will be made available on this Court's docket.

| Deponent | Docketed at |
|---|---|
| Gregory Lairmore, Custom and Border Patrol Rule 30(b)(6) witnesses ("Lairmore Dep.") | Dkt. No. 529-18, Dkt. No. 632-4, Dkt. No. 644-1, Dkt. No. 710-5, Dkt. No. 630-3*, Dkt. No. 711-4* |
| Jaime Rios, Immigration and Customs Enforcement Rule 30(b)(6) witness ("Rios Dep.") | Dkt. No. 529-11, Dkt. No. 632-40, Dkt. No. 542-9* |
| Gregory Airdo ("Airdo Dep.") | Dkt. No. 632-20, Dkt. No. 630-9* |
| Jorge Carmona ("Carmona Dep.") | Dkt. No. 632-24, Dkt. No. 630-13* |
| Corey L. Clement ("Clement Dep.") | Dkt. No. 632-27, Dkt. No. 710-2, Dkt. No. 630-16*, Dkt. No. 711-2* |
| Carey Crook ("Crook Dep.") | Dkt. No. 629-2, Dkt. No. 630-1* |
| Justin Elizalde ("Elizalde Dep.") | Dkt. No. 632-25; Dkt. No. 630-14* |
| Ismael Fernandez ("Fernandez Dep.") | Dkt. No. 632-62, Dkt. No. 710-2, Dkt. No. 630-24*, Dkt. No. 711-1* |
| Jonathan Morales ("Morales Dep.") | Dkt. No. 632-15, Dkt. No. 710-4, Dkt. No. 630-7*, Dkt. No. 711-3* |
| Eusebio Ortiz ("Ortiz Dep.") | Dkt. No. 539-3, Dkt. No. 632-5, Dkt. No. 644-2, Dkt. No. 542-9*, No. 630-4*, Dkt. No. 646-2* |
| Victor Sanchez ("Sanchez Dep.") | Dkt. No. 632-12, Dkt. No. 630-6* |

context. *E.g.*, Tr. at 63:4–:8. The Court has considered the Defendants' evidence, their alternative explanations, and the context to which they points. Having done so, the Court adopts the following Findings of Fact.

### A. Defendants conduct increased immigration enforcement in Los Angeles beginning in the summer of 2025.

#### 1. High-level Government officials instruct the relevant agencies to increase immigration enforcement in Los Angeles and elsewhere.

On January 26, 2025, "border czar" Tom Homan warned that "collateral arrests"[16] were coming, and emphasized that anyone in the country unlawfully was "on the table." Mike Levine & Meghan Mistry, *Trump's Border Czar: 'If You're in the Country Illegally, You Got a Problem'*, ABC News (Jan. 26, 2025), https://abcnews.com/Politics/trumps-border-czar-youre-country-illegally-problem/story?id=118085728 [https://perma.cc/HEW7-V9PT].

On May 28, 2025, White House Deputy Chief of Staff Stephen Miller announced that "the White House was looking for ICE to arrest 3,000 people a day, a major increase in enforcement." Hamed Aleaziz, *Top Officials Overseeing Deportations Leave Their Roles at ICE*, N.Y. Times (May 29, 2025), https://www.nytimes.com/2025/05/29/us/politics/ice-deportations-officials-trump.html (on file with the Court).

Three days later—on May 31, 2025—the Acting Executive Associate Director of ICE instructed field office directors to begin maximizing arrests of "collaterals," or individuals who are not identified as the target of an enforcement operation. Dkt. No. 529-10 at 2. He encouraged field office directors to "turn the creative knob up to 11 and push the envelope." *Id.* He further explained, "*All* collateral[] encounters need to be interviewed and *anyone* that is found to be amenable to removal needs to be arrested." *Id*. (emphasis added). And he asked recipients to "[p]lease convey this to your local federal partners and teams," as "the time ha[d] come for [agents] to step up!" *Id.* Earlier that day, the Interim Deputy Assistant Director of ICE's Western Operations instructed field

---

[16] "Collateral arrests," or "collaterals," refer to the Government's practice of arresting someone who is not identified as the target of the enforcement operation. *See* Ortiz Dep. at 160:4–62:4 (Government agent discussing collateral arrests policy: "We discussed that if we encounter somebody that is not our target and we establish alienage, we are able to take them into custody.").

office directors to "please look at efforts to increase [] arrests," noting that "[i]f it involves handcuffs on wrists, it's probably worth pursuing." *Id.*; *see also* Dkt. No. 529-12 at 1 (text chain between agents where one commented, "the agency wants *everyone* who is not a usc [U.S. citizen] to be arrested" (emphasis added)).

On June 8, 2025, President Donald J. Trump directed all federal law enforcement "to take all such action necessary to liberate Los Angeles from the Migrant Invasion." Donald J. Trump, @realDonaldTrump, Truth Social (June 8, 2025, 2:06 PM), https://truthsocial.com/@realDonaldTrump/posts/114649780431129598%5C (on file with the Court).

In July 2025, former ICE Director Todd Lyons confirmed that "non-criminals living in the U.S. without authorization w[ould] also be taken into custody during arrest operations."[17] Camilo Montoya-Galvez, *ICE Head Says Agents Will Arrest Anyone Found in the U.S. Illegally, Crack Down on Employers of Unauthorized Workers*, CBS News (July 25, 2025), https://www.cbsnews.com/news/ice-head-todd-lyons-agents-will-arrest-anyone-found-illegally-crack-down-on-employers/ [https://perma.cc/V2XS-AW7L].

2. <u>Defendants respond by increasing immigration enforcement in Los Angeles.</u>

Defendants responded by funneling personnel and resources to the Los Angeles area to support a surge in immigration enforcement in the area; this commenced in the summer of 2025 under the name Operation at Large. Airdo Dep. at 35:19–36:8.

Through Operation at Large (and a related operation referred to as "Operation at Large—Los Angeles"), Border Patrol and ICE increased their presence and enforcement operations in the

---

[17] At the hearing, Defendants' counsel suggested that this quotation from the article was an inaccurate paraphrase of what Lyons said. Tr. at 62:10–:19. The Court reproduces the relevant exchange from the transcript of the conversation below, demonstrating that the article accurately characterized Lyons's comments:

> [Reporter] CAMILO MONTOYA-GALVEZ: And you're saying that now, if your agents encounter anyone who is here illegally, irrespective of whether or not they have a criminal record, that person will be taken into custody?
>
> ACTING DIRECTOR LYONS: If they're here in the United States illegally, yes, they will.

*Transcript: Acting ICE Director Todd Lyons on "Face the Nation with Margaret Brennan*", CBS News (July 21, 2025), https://www.cbsnews.com/news/todd-lyons-ice-director-face-the-nation-transcript-07-20-2025/ [https://perma.cc/A7UQ-57BE].

District. *See* Lairmore Dep. at 319:2–20:2; Ortiz Dep. at 175:9–:19. Since last year, Defendants have referred to their operations in Los Angeles by different names and executed their efforts through different personnel. Ortiz Dep. at 175:2–76:21. (Government agent, in response to question "did you participate in Operation at Large?," stating: "to me, our operations, they just changed the name. We're doing the same thing [as Operation at Large], just with a different name. So if we did participate, then yes, we did."). But, to the extent that Defendants have made attempts to alter their policies or practices at any point since the summer of 2025, it has not abated the impression among some officers that no substantive change has occurred. Ortiz Dep. at 176:8–18 ("So every case we process has to be processed under certain . . . operation. If they change the name, then they will tell us to hey, we are going to have an operation and it's going to be "X" name, then we are going to process the case under that operation.").

3. Defendants conduct a variety of immigration enforcement operations in this District.

Defendants have primarily used three methods for large-scale immigration enforcement in this District – targeted operations, targeted area operations, and roving patrols.

a. *"Targeted operations"*

Sometimes, the Government conducts what it calls "targeted operations." *E.g.*, Kerlikowske Decl.[18] ¶¶ 26–27. Over the past year, ICE has led operations that it refers to as "targeted." *E.g.*, Ortiz Dep. at 62:16–63:1 (declarant, Government agent, describing that his work as part of a Fugitive Operations Team consisted of "targeted individuals"). One agent described operations involving targeted operations as follows: "It means we go after . . . people that, you know, either have a final order of removal or . . . have a detainer and so forth." Ortiz Dep. at 62:9– 62:23. In targeted operations, officers' task is "to locate and apprehend the individuals and execute either the removal order or put them in proceedings." Ortiz Dep. at 62:24–63:1.

[18] Gil Kerlikowske is the former Commissioner of U.S. Customs and Border Protection. Kerlikowske Decl. ¶ 1; *see also* Dkt. No. 753-1 at 21 (curriculum vitae). He has "worked in law enforcement and policy for 52 years including serving as the Chief of Police in Seattle from 2000 through 2009." Kerlikowske Decl. ¶ 1; *see also* Dkt. No. 753-1 at 22–25 (describing work experience).

In conducting described targeted operations, agents sometimes developed intelligence on targets in advance of their operations, without relying on that intelligence when conducting the operations themselves. For example, though agents sometimes received information about their "targeted individuals" including their "name, date of birth, country of origin," some agents did not rely on that intelligence while conducting the relevant operation itself. *E.g.*, Fernandez Dep. at 279:3–81:2 (Government agent being asked: "You said as to car washes and the hardware stores, you don't recall ever having accessed the presentations [containing the target-specific intelligence] during the operation; is that correct?" and answering, "correct"). As one officer testified:

> Q. Do you have an understanding of whether there was a protocol or any rule that you should have the PowerPoint [presentation containing the target-specific intelligence] with you on the operation or not?
> A. I'm not aware of a rule set for that, no.
> Q. Did you ever take notes during these briefings?
> A. I'm not usually a notetaker, so I don't recall taking any notes. I might have but I don't recall.
> Q. Okay. Is it fair to say you didn't have a regular practice of taking down notes during the briefing presentation?
> A. That is very fair, yes.
> Q. How about your agents on your team, did they have a regular practice of taking down notes?
> A. If they did, I wouldn't know.

Sanchez Dep. at 114:1–15:18 (Supervisory Border Patrol agent). In addition, during targeted operations, officers routinely stopped and questioned individuals without regard to whether the target was present at the location. As one agent attested:

> Q. And when you would go out to these sites, if you saw someone who fit those indicators, you would interview them?
> A. No.
> Q. No?
> A. I was trained to look for the individual that was the targeted individual on the slide.
> Q. Okay. And if you didn't see that person, you would interview someone who met these other indicators [that someone might be unlawfully in the country, including looking nervous or appearing to seek employment as a day laborer]?
> A. Yes.
> Q. . . . And it didn't matter whether the target was there or not?
> . . .
> A. No.

Carmona Dep. at 100:2–01:15 (testimony of CBP agent); *see also* Lairmore Dep. at 280:17–82:10 (CBP's Rule 30(b)(6) witness stating that it was "within the bounds" and "typical" to conduct surveillance and gather target information days prior to the operation). And frequently, officers did not know whether targets were arrested during an operation designated as a targeted operation. *See, e.g.*, Sanchez Dep. at 272:8–19 (Government agent attesting he did not recall whether information on target individuals was provided or whether targets were arrested); Elizalde Dep. at 184:10–12 (Government agent attesting that he did not recall whether targets were arrested during a Paramount Home Depot raid).

Instead, consistent with the May 2025 directive, the Government has often performed detentions and arrests of "collaterals" at these targeted operations—namely, detentions and arrests of individuals other than the purported "target" of the targeted operation. Officers acknowledge multiple detentions of U.S. citizens that they originally believed were targets. *See* Ortiz Dep. at 323:7–:21. There are also documented instances of individuals being arrested as an identified target under circumstances which call into question whether this identification was legitimate. For instance, federal agents detained a fifty-year-old Latina woman as having "matched the description" of a twenty-seven-year-old individual living in the same large trailer home park. Ex. 31 ¶¶ 3–13 ("R.M.D. Decl."); Ex. 32 (I-213). Similarly, federal agents detained a Latino individual, telling him that it was because he "look[ed] like a paisa,"[19] when he later learned that they had been looking for another individual altogether. Dkt. No 529-57 ¶¶ 3–4, 9–12 ("H.S.H. Decl.").

At times, it appears that the purpose of these "targeted" operations may have been to make these collateral arrests. *See* Kerlikowske Decl. ¶ 26 ("Despite the use of the label 'targeted,' however, the operations have been conducted in a way that do[es] not appear targeted at all. There is no guidance on how many targets agents should try to identify at a given location or what the proportion of targets should be in relation to the total number of individuals at the location. Operations would proceed whether or not individual targets were present. Multiple teams were

---

[19] *See Ramirez v. Grounds*, No. 13-4605, 2014 WL 6682646, at *2 (C.D. Cal. Nov. 21, 2014) (defining *paisas* as "Mexican nationals"); *Medina v. U.S. Dep't of Homeland Sec.*, 313 F. Supp. 3d 1237, 1241 (W.D. Wash. 2018) (noting a witness's understanding that "the colloquial use of 'Paisas' [means] Mexicans").

deployed and agents would contact as many people as they could to try to make arrests."). For instance, the testimony of one former agent suggests that the purpose of the targeted operations may have been to induce individuals to run and then to arrest them based on this "flight." Airdo Dep. at 210:14–:23 ("[O]nce [agents] see people running, they're going to chase. . . . Border Patrol presence is going to cause people to want to be out of the area that they're in. And then they're going to see people running, and they're just going to chase them whether they're targets or not."). As this agent and his colleague described this mode of operations in their contemporaneous text messages, "See bodies, chase bodies."[20] Airdo Dep. at 210:16–:18; Ex. 26 at 10543 (forensically retrieved text messages).

b. *"Targeted area operations"*

In addition to "targeted operations" which focus on known, *individual* "targets," the Government also conducts immigration enforcement through what it has referred to as "targeted *area* operations." Lairmore Dep. at 212:3–14:9 (CBP's Rule 30(b)(6) witness). And once an area has been so designated, officers may return to it later. Lairmore Dep. at 213:2–:8 (attesting that, when a location has been "identified as a targeted area," Government officers may "go[] back to that area at another time once it's been designated). The Government's process for identifying a targeted area is as follows:

> [T]ypically, [the agency] will send plain clothes agents to observe areas where either they have leads where Title 8 violators have been congregating or where they have observed them in the past. And they use various methods in order to identify who those subjects are, even before they make contact with them, through registered owners of vehicles. Then they can research those registered owners against internal and law enforcement databases to include pictures where they could compare the pictures of confirmed violators of Title 8 with the person that they are seeing in order to make that positive identification that that person is who is the person that's shown in [the agency's] records as a confirmed Title 8 violator.

---

[20] The Court acknowledges that the testimony of this agent can be read in multiple ways. Other parts of his testimony—where he disclaims the ability to speak to any officer's "intent"—suggest that he was merely saying that they were not "solely" going after targets, not that they were not going after targets at all. Airdo Dep. at 209:12–11:02 (deponent, Homeland Security Investigations agent and former Border Patrol agent, testifying that he believed immigration enforcement operations were not "being done in good faith" and that he "did not feel like [Border Patrol] was solely going after targets");.

Lairmore Dep. at 213:20–14:9. The Government asserts it uses targeted area operations where its officers observe "a pattern of confirmed Title 8 violators congregating in a certain area on a number of days." Lairmore Dep. at 212:10–13. Defendants' officers who are sent to gather intelligence run checks on license plates and other data collected on site to screen for possibly unlawfully present individuals. *E.g.*, Ex. 21 at GOV 341–44 (CBP Report of Investigation documenting agents' surveillance gathering efforts); Ex. 22 at GOV 319–22 [redacted] This intelligence includes mention of whether individuals present at a location appear to be "food vendors" and "day laborers." *E.g.*, Ex. 21 at GOV-341, GOV-343. Officers later return to execute raids in these areas, though it is "typical" that operations would take place days after the relevant surveillance was gathered. Lairmore Dep. at 280:10–82:10 (CBP's Rule 30(b)(6) witness).

c. *Roving patrols*

The final method of large-scale immigration enforcement that Defendants utilize is roving patrols. *Id.* ¶ 23. These roving patrols are not conducted in pursuit of any target individual or targeted area based upon vehicle checks. Instead, officers are given wide latitude to drive through broad geographical areas and attempt to make arrests. Lairmore Dep. at 147:20–48:10 ("Roving patrols would be agents assigned to basically drive through an area and look for anything that would elevate their level of suspicion for criminal activity or immigration related." ); Sanchez Dep. at 85:10–87:1 (agent describing that, instead of being directed to go to a particular location at a given time, "[officers] were given . . . general areas, like go to this area, go to that area"); *see also* Kerlikowske Decl. ¶ 24 ("There [is] no claimed 'target' and teams were given broad latitude to go where they wanted."). The directions given were nonspecific; for example, one agent was directed to conduct a roving patrol in the City of Norwalk, as opposed to any particular place within the city. Sanchez Dep. at 86:20–87:1. Government officers conducting roving patrols would drive by selected locations to perform sweeps, gathering "soft counts" of "possibles" based on their observations. *E.g.*, Ex. 6 at GOV 6643–55, 6755 (agent text thread describing "soft counts" in given locations, including numbers like "possible 8+" at a car wash and sixty-five at a Hollywood Home Depot); *see*

*also* Dkt. No. 539-2 at GOV 7608, 7610 (agent text thread describing that agents were "all spread out scoping Home Depot[]s for future ops," and that some were "roaming [the] DT area").

The Government's use of roving patrols in this District is relatively new. Although roving patrols are typically conducted near the international border, "often focus[ing] on routes leading from the border," these actions became commonplace in Los Angeles during the summer of 2025. Kerlikowske Decl. ¶ 23–24. This change in immigration enforcement operation methods upset the settled practice of conducting largely target-based operations in which officers relied on target folders—personalized folders featuring identifying information about specific target individuals. *See* Kerlikowske Decl. ¶ 27–28; *see also* Crook Dep. at 69:10–72:11 (describing target folder).

The Government's officers appeared to select locations for roving patrols based on a generalized belief that undocumented immigrants would be likely to be there—unlike with targeted operations or targeted area operations, officers did not have pre-identified targets before beginning enforcement activities. Lairmore Dep. at 54:22–25 (describing practice during roving patrols to "drive through an area and look for anything that would elevate [the officer's] level of [immigration-related] suspicion").

The Government's agents formed this impression through a variety of informational sources. For example, officers sometimes relied on secondhand or thirdhand reports regarding the presence of individuals presumed to be day laborers or undocumented individuals. *See* Sanchez Dep. at 145:6–47:14 (noting that agent patrolled the City of Montebello based on a friend's direction that "it's high probability of aliens there"); Lairmore Dep. at 167:21–72:17 (reviewing the testimony of aforementioned testimony of agent Sanchez and attesting that was standard for agents' normal operations to rely on a tip or "citizen's report"). In other cases, officers would rely on their past knowledge that a given area "is highly populated [with] [undocumented] individuals trying to get work." Clement Dep. at 158:15–59:8. Agents targeted locations like car washes based on this belief. *See* Lairmore Dep. at 244:9–15 (Q: "And so it's the agency's view that car washes as a kind of general matter are locations that pay cash for labor?" A: "It was proven to be a technique and tactic of that local area, that car washes paid day laborers cash and didn't do the appropriate documentation checks for people that were working [in the Los Angeles area]."); Lairmore Dep. at

244:25–45:7 ("And so you're suggesting that there are reports of investigations that show car washes in the Los Angeles area generally have this practice of hiring day laborers?" A: "No. What I'm saying is there are certain car washes that have been proven to have hired illegal aliens to work for them for cash."). During a roving patrol conducted on June 18, 2025, officers chose to raid a Whittier car wash after "Googl[ing] a list of nearest car washes." Morales Dep. at 217:16–19:25.

Roving patrols continued into 2026. Ex. 17 at 1–2 (CBP document instructing on locations for roving patrols in late January of 2026).

4. Increased immigration enforcement in this District continues.

Immigration enforcement operations in this District continue. *See generally* Dkt. No. 531-3 (ICE arrest data for the Los Angeles area spanning from August 2025 to May 2026, demonstrating what appear to be multiple arrests per day within the time frame).

This is consistent with further instructions from high-level government officials nationwide. For instance, CBP has reiterated, as recently as the summer of 2026, "Our message is clear: If you come to our country illegally, we will find you, we will arrest you and we will deport you." Hamed Aleaziz, *Immigrant Arrests Surge to 10,000 in 5 Days as ICE Clamps Down*, N.Y. Times (July 1, 2026), https://www.nytimes.com/2026/07/01/us/politics/ice-immigrant-arrests-surge.html (on file with the Court). Similarly, in the summer of 2026, "ICE officials were told that the White House wanted an increase in arrests, according to three officials with knowledge of the conversations. . . . ICE officials had been told that 2,000 arrests a day was the new standard for enforcement." *Id.* And in accordance with those instructions, over the summer of 2026, arrest numbers doubled from the 1,000 per day from earlier in the year. *Id.*

**B. Defendant officers receive training on the Fourth Amendment and the requirements of reasonable suspicion.**

When conducting the operations above, Defendant officers receive some training on conducting an individualized reasonable suspicion analysis prior to making a detentive stop. Dkt. No. 71-2 ¶ 12 ("Harvick Decl.") (CBP Patrol Agent in Charge of the El Centro Station). As one Government agent put it:

> The actions undertaken by CBP law enforcement officers are informed by their experience and the comprehensive training they receive at various stages of their

> careers. . . . During the CBP Officer Basic Training program . . . and the U.S. Border Patrol Agent Basic Training program . . . trainees receive . . . approximately 100 hours of legal instruction that is prepared and presented by officers within the CBP Office of Chief Counsel. This legal training provides officers and agents with the framework necessary to recognize violations of the laws they enforce and to take appropriate law enforcement actions. Legal topics include criminal law [and] criminal procedure . . . . Following their time at the Basic Academies, CBP law enforcement officers receive additional on-the-job training and periodic refreshers on a full range of topics.

*Id.* One of these supplemental trainings appears to be titled "Fourth Amendment Law: Basic 4th Amendment Overview," and seemingly discusses enforcement operations outside of points of entry and border searchers, enforcement scenarios, and arrest procedures. Dkt. No. 678-1 at 1 (title slide of what appears to be CBP training materials). Government agents are trained to rely on "reasonable suspicion," based on a "totality of circumstances," when making investigative detentions. *See* Harvick Decl. ¶ 8. But it has not been established who receives this training (for example, Government agents outside of CBP), or how often it is held.

In addition, it appears that CBP's written policy on its website prohibits certain uses of race. It reads as follows:

> The DHS policy defines "racial profiling" as the invidious use of race or ethnicity as a criterion in conducting stops, searches, and other law enforcement, investigation, or screening activities. The policy notes "racial profiling is premised on the erroneous assumption that any particular individual of one race or ethnicity is more likely to engage in misconduct than any particular individual of another race or ethnicity."
>
> Consistent with the DHS policy, CBP personnel may use race or ethnicity when a compelling governmental interest is present and its use is narrowly tailored to that interest. National security is per se a compelling interest, but use of race and ethnicity to serve compelling interest must still be narrowly tailored. Race or ethnicity-based information that is specific to particular suspects or incidents or ongoing criminal activities, schemes, or enterprises may be considered. These standards are designed to ensure that racial and ethnic stereotypes will not be used in conducting stops, searches and other law enforcement activities, but that law enforcement officers rely on specific and trustworthy information to make law enforcement decisions.

U.S. Customs & Border Prot., *CBP Policy on Nondiscrimination in Law Enforcement Activities and all other Administered Programs*, https://www.cbp.gov/about/eeo-diversity/policies/nondiscrimination-law-enforcement-activities-and-all-other-administered [https://perma.cc/FFQ3-2KLC] (last visited Oct. 22, 2026) (cited by Defendants in Opp. at 10). But it has not been established that the officers who are part of the large-scale immigration enforcement are ever informed of or trained on this policy.

**C. Defendants identify individuals to detain based upon their apparent Latino race.**

Despite this training and these policies, Defendants routinely make detentive stops of individuals because those individuals appear Latino or Latino and working class. In fact, Defendant Bovino has openly stated that agents determine whether to arrest an individual based in part on "how they look," explaining to a White reporter that by "how they look," he meant, "How do they look compared to, say, you?"[21]

1. Officers explicitly use apparent Latino race as part of their reasonable suspicion analysis.

Apparent Latino race is an explicit part of the reasonable suspicion calculus for the Defendants and their officers. Sanchez Dep. at 128:9–:25 (Border Patrol agent opining that apparent Mexican ancestry can contribute to the basis for reasonable suspicion); *see also* Fernandez Dep. at 137:10–39:3 (supervisory CBP agent attesting that, in forming reasonable suspicion, it is permissible to rely on whether an individual appears Latino so long as that is not the only factor considered).

2. Officers detain seemingly working-class Latino individuals without asking any identifying questions.

The sworn declarations of at least forty-five detainees and four observers demonstrate that at least fifty-one detainees were stopped and detained without any identifying questions being asked.

/ / /

---

[21] Chip Mitchell, Ashlee Rezin, Kaitlin Washburn, Mary Norkol and Jon Seidel, *Feds march into Downtown Chicago; top border agent says people are arrested based partly on 'how they look'*, WBEZ Chicago (Sep. 29, 2025), https://www.wbez.org/immigration/2025/09/29/feds-march-into-downtown-chicago-top-border-agent-says-people-are-arrested-based-on-how-they-look [https://perma.cc/E4L9-YK4Y]; *see also* Chip Mitchell, *Transcript: Gregory Bovino says arrestees in Downtown Chicago chosen based partly on 'how they look'*, WBEZ Chicago (Sep. 30, 2025), https://www.wbez.org/immigration/2025/09/30/transcript-audio-gregory-bovino-arrestees-downtown-chicago-chosen-how-they-look [https://perma.cc/8P3Z-UQH4].

This interaction is described in the Second Amended Complaint at paragraph 82. Though it was not incorporated into the briefing for the instant Motion, it was discussed at the September 24 hearing, and this Court permitted the parties to submit supplemental briefs addressing this and other evidence discussed at the hearing but not included in the moving papers. *See* Pla. Supp.; Def. Supp.

The declarations of detainees are listed below:

1. Dkt. No. 632-7 ¶¶ 2–7 ("D.V.V. Decl.") (declarant, a Latino man wearing work clothes, alleging that armed immigration agents approached and detained him before asking any questions).[22]
2. Dkt. No. 632-10 ¶¶ 4–7, 10–11 ("J.L.M. Decl.") (declarant, a Latino individual in plain clothes, alleging that he was stopped while visiting a friend near a U-Haul facility along with three other Latino individuals who were workers, while manager of the business was not questioned about her status when she emerged to speak to officers).
3. Dkt. No. 632-13 ¶¶ 2, 7–12 ("Gavidia Decl.") (declarant, a Latino U.S. citizen, alleging that immigration officers stopped and then forcefully detained him after he explained that he was American and presented his Real ID, but could not answer in what hospital he was born).
4. Dkt. No. 632-14 ¶¶ 5, 9–11 ("Hernandez Viramontes Decl.") (declarant, a Latino U.S. citizen who works as a car wash manager, alleging that officers detained and transported him to a warehouse to investigate his immigration status even after he provided identification); *id.* ¶¶ 5–8 (attesting that the car wash had been raided three times in one month and that during previous raids, both employees and customers were questioned).
5. Dkt. No. 632-16 ¶¶ 2, 6–12 ("Reyes Romo Decl.") (declarant, a Latino man who works at a car wash, attesting that he was detained at work in his uniform before being questioned about his identity or status and was never provided a reason for the stop or arrest).
6. Dkt. No. 632-18 ¶¶ 3, 5–9 ("I.U.V. Decl.") (declarant, a Latino individual who works as a street vendor, alleging that he was detained by immigration officers who tackled and arrested him without identifying themselves or asking him any questions).

---

[22] *Compare* D.V.V. Decl. ¶¶ 2–7 (immigration officers ran up to group including D.V.V. at gunpoint, leading D.V.V. to feel as though D.V.V. could not leave) *with* Ex. 8 (agent attesting that, prior to approaching D.V.V. and beginning a conversation, agent observed that D.V.V. and others appeared to be roofing laborers, a typical profession for an "[undocumented immigrant]").

The agent's arrest narrative does not state that immigration officers ran up to D.V.V. with firearms drawn on the basis of D.V.V.'s apparent race or socioeconomic class. But it also does not dispute it or provide any controverting facts—nor any explanation for the approach.

7. R.M.D. Decl. ¶¶ 2, 4–11, 13 (declarant, a Latina and indigenous individual who works on a farm, attesting that during a ride to work with three coworkers, their vehicle was stopped and boxed in by officers who demanded that everyone exit the vehicle and arrested her after asking nothing but her name).
8. Dkt. No. 632-36 ¶¶ 2–7 ("J.A.P. Decl.") (declarant, a Latino U.S. citizen, attesting that his car was surrounded by unmarked vehicles in a McDonald's parking lot, trapping him inside while he was questioned by officers regarding his status, while other individuals present in the parking lot were left alone).
9. Dkt. No. 632-37 ¶¶ 2–5 ("D.O.A. Decl.") (declarant, a Latino U.S. citizen who works as a day laborer, describing being detained at a landscaping job site in a predominantly Black and Latino neighborhood).
10. Dkt. No. 632-43 ¶¶ 2, 5, 7–11 ("Santiago Tafolla Decl.") (declarant, a Latino U.S. citizen and CLEAN member, describing being detained at the car wash where he worked, during which officers refused to look at his documents, claiming that they were false, and arrested him without any questioning despite that the declarant and his coworkers asserted his U.S. citizenship); *id.* ¶¶ 6, 17 (alleging that other light-skinned coworkers who ran from officers were not chased or stopped); *id.* ¶¶ 9, 14 (alleging that officers disputed that the declarant was a U.S. citizen because he was Latino and because he was not speaking English).
11. Dkt. No. 632-44 ¶¶ 2–8 ("A.V. Decl.") (declarant, a Latino U.S. citizen who works at a car wash, attesting that he was detained by officers who initially claimed his Real ID was fake and refused to let him get his passport from the office, while his light-skinned coworker was not stopped or approached during the raid).
12. Dkt. No. 632-45 ¶¶ 2–6 ("N.B. Decl.") (declarant, a Latino individual who worked in lawn care, describing being approached by armed men who did not identify themselves and asked if he "had papers" while the declarant performed garden work outside an IHOP; the declarant initially believed he was free to leave, but was then rushed by more officers, sprayed in the face with a substance, threw him to the ground, and handcuffed).

13. Dkt. No. 632-46 ¶¶ 1–3, 7 ("Gutierrez Reyes Decl.") (declarant, a Latino man who works at a car wash and was wearing work clothes, attesting that he was detained by officers, thrown to the ground, pepper-sprayed in the face, and handcuffed before being questioned about his identity or status).
14. Dkt. No. 632-47 ¶¶ 2–7 ("Ayala Decl.") (declarant, a Latino individual who works at a car wash, alleging that he was detained and handcuffed at work before being questioned on his identity or status, and that no questioning occurred until he was taken to a secondary location after his arrest); *id.* ¶¶ 8–9 (alleging that officers did not stop or question a white coworker who was present, solely ordering him, "Get out of the way or we will hit you").
15. Dkt. No. 632-48 ¶¶ 2, 5, 7 ("J.G.S.C. Decl.") (declarant, an individual of Latino race who worked at a car wash, attesting to being detained by an officer before being questioned about his status or identity).
16. Dkt. No. 632-49 ¶¶ 3–8 ("F.F.L. Decl.") (declarant, an individual of Latino race who worked at a car wash, attesting to officers violently grabbing and detaining him before asking any questions about his identity or status).
17. Dkt. No. 632-50 ¶¶ 2–9 ("Luna Maciel Decl.") (declarant, a Latino man who works in construction, alleging that he was detained by officers while standing under a Home Depot sign before any questions were asked, and then arrested after failing to respond when asked if he had documents).
18. Dkt. No. 632-53 ¶¶ 2–8 ("M.A.R.C. Decl.") (declarant, a Latino individual who works at a recycling center, describing six unmarked vans pulling into the parking lot of his workplace and officers in green vests running towards him and other Latino people; the declarant stood still and immediately put his hands in the air, but was tackled, arrested, and taken away); *id.* ¶ 5 ("[T]he agents only ran towards Latinos. They did not pay attention to the Black or white people in the parking lot.").
19. Dkt. No. 632-54 ¶¶ 2–7 ("E.L.L. Decl.") (declarant, a Latino day laborer, recounting being tackled and thrown to the ground by three officers "[a]ll of a sudden" and being taken away); *id.* ¶ 6 ("There were about 20 other people there who were also handcuffed. They

appeared to be Latino, like me."); *id.* ¶¶ 7–15 (describing an incident a week after being released from detention where he and another Latino man were approached by officers, told "don't move," and questioned).

20. Dkt. No. 632-57 ¶¶ 5–12, 15–18 ("H.A. Decl.") (declarant, a Hispanic U.S. citizen who works at a hand car wash, describing two separate "raids," and each time being detained and then released when someone else tells agents he is a U.S. citizen); *id.* ¶¶ 20–21 ("During both raids, I believe I was targeted and treated this way because of my race and ethnicity. . . . I observed that people who appeared white were not stopped or questioned, while those who looked like me were targeted.").

21. Dkt. No. 632-58 ¶¶ 2–8 ("V.M.C. Decl.") (declarant, a U.S. citizen of Latino descent who works at a car wash, describing his workplace being surrounded by black SUVs and him being grabbed by an agent from behind "as [he] was getting out of the car that [he] was detailing" and put into the back of an SUV); *id.* ¶ 14 ("All of the workers they detained were Latino. White customers were not even questioned.").

22. Dkt. No. 632-59 ¶¶ 2–7 ("Ortiz Decl.") (declarant, a concerned community member, observing "about eight vehicles with tinted windows" quickly pull into a parking lot where Latino-appearing day laborers were working and "masked agents in camouflage" arrest two men).

23. Dkt. No. 632-60 ¶¶ 2–10 ("Zapata Santiago Decl.") (declarant, a Latino man who works at a car wash, attesting that an armed officer held him in place and, after learning the declarant was from Mexico, handcuffed him, put him into a vehicle, and drove away, before ultimately returning declarant to a location a few blocks away from the car wash after checking his information); *id.* ¶ 11 ("I know they weren't looking for anyone specific because I heard them say in the car that they hadn't even planned to go to the car wash at all, that they had just happened to be driving by and noticed there were a bunch of car washers . . . so they decided to stop there.").

24. Dkt. No. 529-27 ¶¶ 2–8 ("M.F.R. Decl.") (declarant, a Latino individual who works as a day laborer, attesting that he was detained by immigration officers while standing on a

corner in Pasadena waiting for work and that he was dragged into an SUV, handcuffed, and transported to a "federal building in downtown Los Angeles" without officers ever identifying themselves).

25. Dkt. No. 529-26 ¶¶ 1–10 ("M.D.L. Decl.") (declarant, a Latino individual who works at a car wash and was wearing work clothes, who was detained by armed officers before being asked any questions about M.D.L.'s identity or status).

26. Dkt. No. 529-16 ¶¶ 1–8 ("Villegas Molina Decl.") (declarant, a Latino individual who works as a construction day laborer, attesting that he was standing at a bus stop and was detained by armed officers before being asked about his identity or status).

27. Dkt. No. 529-15 ¶¶ 1–7 ("Vasquez Perdomo Decl.") (declarant, a Latino individual who works as a day laborer, attesting that federal officers detained and arrested him without viewing his identification or asking any questions).

28. Dkt. No. 529-17 ¶ 1–8 ("Osorto Decl.") (declarant, a Latino individual who works as a day laborer, attesting that federal officers detained and arrested him without asking any questions).

29. Dkt. No. 529-53 ¶¶ 1–9 ("F.H.S. Decl.") (declarant, a Latino individual who works as a food vendor, attesting that federal officers approached, detained, struck, and arrested her without asking her any questions about her identity or legal status).

30. H.S.H. Decl. ¶¶ 1–12 (declarant, a Latino man who was driving his son to soccer practice, attesting that federal officers surrounded his car and stated that they pulled him over because he "look[s] like a paisa").

31. Dkt. No. 529-58 ¶¶ 1–10 ("J.C. Decl.") (declarant, a Latino individual who was on a bicycle in street clothes, attesting that officers in an unmarked vehicle detained J.C. by "crossing into [J.C.'s] path and physically striking [J.C.] with the vehicle," breaking J.C.'s foot before asking J.C. any questions).

32. Dkt. No. 529-59 ¶¶ 1–11 ("G.N.L. Decl.") (declarant, a Latino individual who was driving a pickup truck containing tools, attesting that federal officers detained him before asking any questions about his identity or legal status).

33. Dkt. No. 529-55 ¶¶ 1–8 (“G.V.C. Decl.”) (declarant, a Latino individual who was at a donut shop, attesting that federal officers grabbed him and arrested him without asking him any questions, and that he observed other federal officers grabbing another nearby Latino-appearing man and throwing him to the ground).
34. Dkt. No. 529-61 ¶¶ 1–11, 18–19 (“E.E.M.M. Decl.”) (declarant, a Latino man who was approaching Home Depot, attesting that federal officers grabbed him and threw him to the ground without asking any questions, and noticing that white individuals were not approached).
35. Dkt. No. 529-62 ¶¶ (“A.A.G. Decl.”) (declarant, a Latino man who works in construction and who was having his truck cleaned, attesting that federal agents detained him before asking any questions about his identity or legal status).
36. Dkt. No. 529-65 ¶¶ 1–8 (“V.M.B. Decl.”) (declarant, a Latino man and car body shop worker, alleging that he was arrested while putting air in his tires, that officers did not ask him any questions or look at his identification, and that officers did not appear to know his name—only that he “look[s] Latino”).
37. Dkt. No. 529-68 ¶¶ 1–9 (“J.D.S. Decl.”) (declarant, a Deaf Latino individual working at a car wash, alleging that he was arrested before being able to answer any questions, as he could not sign answers while handcuffed).
38. Dkt. No. 529-54 ¶¶ 1–5 (“E.C.P. Decl.”) (declarant, a Latina individual and food vendor, alleging that she was arrested and held at gunpoint without being asked any questions about her identity or status).
39. Dkt. No. 529-23 ¶¶ 1–8 (“Tijerino Garmendia Decl.”) (declarant, a Latino day laborer in work clothes, alleging that he was seized and arrested before being asked any questions about his identity or status).
40. Dkt. No. 529-63 ¶¶ 1–4, 7–9 (“R.C.N.G. Decl.”) (declarant, a Latino day laborer in work clothes, alleging that federal agents tackled him to the ground without being asked any questions).

41. Dkt. No. 529-64 ¶¶ 1–11, 13 ("L.C.C. Decl.") (declarant, a Latino individual working at a car wash, alleging that federal agents detained L.C.C. along with only the Latino-appearing car wash workers, and that L.C.C. was detained before being asked any questions).
42. Dkt. No. 529-66 ¶¶ 1–8 ("H.S.P. Decl.") (declarant, a Latino individual in a restaurant work uniform who was at a bus stop, alleging that CBP agents detained and handcuffed him without asking him any questions).
43. Dkt. No. 529-70 ¶¶ 1–6 ("M.L.S. Decl.") (declarant, a Latino individual wearing a car wash worker uniform, alleging that federal agents seized him without a warrant, and arrested him before asking him to answer any questions).
44. Dkt. No. 529-54 ("E.C.P. Decl.") (declarant, a Latina vendor who sold food near a Home Depot, attesting that officers approached with firearms drawn and pointed at E.C.P. and others, threw her down onto the street, and was arrested without being asked any questions about her identity or status).

The declarations of observers are listed below:

1. Dkt. No. 632-52 ¶¶ 2, 4–5 ("Castillo Decl.") (declarant, an individual who works as a street vendor, attesting to witnessing the detention of "an older Latino deaf man" who worked as a day laborer before he was questioned about his identity or status); *id.* ¶¶ 6–13 (attesting to witnessing officers chasing a man in work clothing who was walking to his truck near the Home Depot before officers arrested him, claiming to have a warrant, but refused to show the warrant); *id.* ¶ 14 ("There were many agents swarmed around the Home Depot and nearby gas station. . . . They seemed to focus on the day laborers and people with work trucks. They did not seem to be looking for anyone in particular."); *id.* (attesting that, if federal agents "saw a Latino worker, they started to chase them").
2. Dkt. No. 529-28 ¶¶ 3–7 ("Chapman Decl.") (declarant, who documents Border Patrol in her area, observing that agents pursued a Latino-appearing man and detained him before asking any questions about his identity or receiving any information as to his legal status).

3. Dkt. No. 632-42 ¶¶ 1–2, 4–5 ("Zuniga Decl.") (declarant, officer of a community organization, describing one member being detained while he was gardening at a private home and then arrested after he remained silent during questioning about his immigration status; agents later stated the reason for the stop was that the member looked "suspicious").
4. Dkt. No. 632-56 ¶¶ 3–10 ("Anderson Decl.") (declarant, leader of an immigration services organization, observing an "immigration raid" at a car wash and seeing masked, armed agents tackle, detain, and take away two Hispanic workers from two different areas of the car wash); *id.* ¶ 6 ("The agents did not appear to ask any questions to the car wash workers, nor did they identify who they were.").
5. Dkt. No. 632-61 ¶¶ 10–14 ("Johnson Decl.") (declarant, a concerned community member, attesting that she observed ICE officers surround the pickup truck of a "Latino man in work clothes") *id.* ¶¶13–14 (attesting that, upon speaking to the detained man, the man "spoke fluent English with an American accent" and reported that the officers claimed he "looked like someone they were looking for").

And the declarations of officers of Organizational Plaintiffs, who are aware of detentions involving their membership and community members, are listed below.

1. Dkt. No. 529-74 ¶¶ 1–3, 8–9 ("Melendrez Decl.") (declarant, Executive Director of CLEAN, alleging that member Rodrigo, a Latino CLEAN member and car wash worker, was detained twice, and did not run either time, nor did federal agents ask him questions prior to his detention–but federal agents "stopp[ed] anyone in a work uniform who looked Latino");
2. Dkt. No. 529-73 ¶¶ 1–3, 18–21 ("Salas Decl.") (declarant, Executive Director of CHIRLA, alleging that four members, all of whom were day laborers and/or Latino, were detained or arrested absent questioning or explanation).
3. Dkt. No. 529-76 ¶¶ 1–3, 29–31 ("Strater Decl.") (declarant, officer of UFW, alleging that member Angel, a Latino UFW member and U.S. citizen who was seeking day labor work, was approached and detained by CBP with no identifying questions and only released

when he provided his hospital of birth and showed California ID and that Angel's coworker was detained apparently only because he responded to officers in Spanish).

4. Dkt. No. 529-75 ¶¶ 1–3, 27–28 ("Gudino Decl.") (declarant, Executive Director of LAWCN, alleging that "on at least one occasion[,] immigration agents detained and arrested a Spanish-speaking customer at [a] car wash," and that "immigration agents seem to target non-white, Spanish-speaking workers").

### 3. Though officers claim to develop reasonable suspicion based upon "day laborer" status, "day laborer" serves as shorthand for working-class Latino individuals.

Defendants' officers also appear to select for detention individuals who they indicate appear to be "day laborers." Elizalde Dep. at 154:23–55:8 ("[W]e were there looking for specific people. But while we are there, we also know it's a high concentration of day laborers . . . And day laborer jobs are . . . Not all, but people that are in the country illegally will do day labor jobs . . . ."); *see also* Dkt. No. 529-24 at 3 (I-213 arrest narrative for M.D.L. describing him only as "dressed in attire consistent with day laborers [the federal agent] apprehended in the past," so the agent "exited [their] vehicle with the intent of . . . subsequently conducting an immigration inspection").

But although Defendants and their officers use the label "day laborer," it appears that the label is used generally to refer to any person who appears to be Latino and working class. For example, one declarant—ICE's Rule 30(b)(6) witness—defined a day laborer as "someone who is out there – like . . . 'pico y pala'"[23] or who "works in the fields." *See* Rios Dep. at 156:20–57:18. Another, a deportation officer, admitted to his understanding of "day laborers,"—a type of individual who would raise suspicion—as being "[o]lder Hispanic males" who were "loitering," by which he meant "just hanging around." Clement Dep. at 158:3–62:17 ("Just hanging around, just hanging around. Just not – they're not doing nothing bad, but they're just hanging in that area."). In that officer's words: "I don't call them day laborers. I call them illegal aliens." Clement Dep. at 247:2–49:8.

---

[23] *Pico y pala* is Spanish for *pickaxe and spade* or *shovel*. Pico, *SpanishDictionary.com*, https://www.spanishdict.com/translate/pico [perma.cc] (last visited Oct. 15, 2026); Pala, *SpanishDictionary.com*, https://www.spanishdict.com/translate/pala [https://perma.cc/C97F-XU9A] (last visited Oct. 15, 2026).

And, in other instances, Declarants and their officers appeared to have ambiguous definitions and limited information as to what it meant to be a "day laborer." One deponent, a Supervisory Border Patrol Agent, explained that a "day laborer" is simply someone who is "employed for that day," but that he was unsure as to whether "someone who's working a temp job" and gets paid daily qualifies as a "day laborer." Sanchez Dep. at 122:1–18. Moreover, the agent did not know anything about how those workers are in fact paid, or what proportion of "day laborers" do not have lawful status. *Id.* at 122:19–23:1; 224:9–15. Another deponent, CBP's Rule 30(b)(6) witness, understood "day laborers" to refer to those in "construction, agricultural, [or] yard work," because these occupations "pay cash" and "enable those without work permits to work." Lairmore Dep. at 156:7–59:10. Though the definition of "day laborer" varies somewhat between the Government's officers, the Government's practice was to send officers "where one would find Title 8 violators or . . . day laborers." *Id.* at 156:6–17.

Defendants' targeting of those they perceive to be "day laborers" is corroborated by individuals who observed immigration enforcement operations in this District. *See, e.g.*, Zapata Santiago Decl. ¶ 11 ("I know they weren't looking for anyone specific [when conducting arrests at a car wash] because I heard them say in the car that they hadn't even planned to go to the car wash at all, that they had just happened to be driving by and noticed there were a bunch of car washers out at the car wash and so they decided to stop there."); Gudino Decl. ¶¶ 27–28 ("[O]n at least one occasion[,] immigration agents detained and arrested a Spanish-speaking customer at [a] car wash . . . immigration agents seem to target non-white, Spanish-speaking workers"). "Class members in this case describe being targeted by immigration agents based on their skin color and being dressed in work clothes or being present in a work vehicle." Kerlikowske Decl. ¶ 22 (collecting examples).

Defendants' proffered "day laborer" justification is at times in conflict with the facts. For example, one agent's sole documented reason for stopping M.D.L. during a roving patrol was that M.D.L. was "dressed in attire consistent with day laborers [he] ha[d] apprehended in the past." Dkt. No. 529-24 at 3 (I-213 arrest narrative). But it is not clear what about M.D.L.'s attire raised suspicion: M.D.L. attests that he was wearing black pants, a sweater, sneakers, and a backpack.

M.D.L. Decl. ¶ 5. Another agent reported that he stopped an individual during a roving patrol based on attire appropriate for doing manual labor outdoors. Ex. 9. The individual in question reports that he was wearing his uniform for his job at Eataly, a high-end marketplace including several restaurants and a grocery store, along with his company badge. H.S.P. Decl. ¶¶ 4.

4. <u>The Government selectively detains Latino-appearing individuals (purportedly as "day laborers"), whether they are workers or customers, and does not detain those who do not appear Latino.</u>

The record shows that, in some cases, Defendants' officers ignored White-appearing individuals in the vicinity while stopping Latino-appearing individuals, including both workers and customers of businesses. One Latino U.S. citizen attests to being stopped while working at a car wash, while his light-skinned co-worker was not stopped or approached. A.V. Decl. ¶¶ 3–9. Another Latino U.S. citizen attests to being detained at a car wash and states that *everyone* who was detained appeared to be Latino. V.M.C. Decl. ¶¶ 2, 14. "White customers were not even questioned." *Id.* In August 2025, officers stopped and threw one Latino shopper to the ground in a Home Depot parking lot while White-appearing persons in the same parking lot were not approached. E.E.M.M. Decl. ¶¶ 3–9; *see also* A.A.G. Decl. ¶¶ 4, 8 (Latino car wash customer surrounded and questioned by agents, while non-Latino customers were not); V.M.B. Decl. ¶¶ 3–4 (Latino gas station customer stopped and detained by agents).

5. <u>Officers often use violent and offensive racial epithets to refer to the people they seek to detain.</u>

The Government's position is that its officers should not use inappropriate language while enforcing immigration policy. *See* U.S. Immigr. & Customs Enf't, Language Access and Cross-Cultural Communication 21, https://www.ice.gov/doclib/foia/policy/guidanceLanguageAccessCrossCulturalComms.pdf [https://perma.cc/72YZ-KQAD] (last visited Oct. 22, 2026) (slide deck instructing to "[a]void disrespectful terms/names"). A spokesperson for CBP has stated that "[t]he use of any derogatory language towards others is unacceptable and will not be tolerated." Washington Off. on Latin Am., Border Oversight, https://borderoversight.org/agency/border-patrol/ [https://perma.cc/67LN-DTWV] (last visited Oct. 22, 2026) (article

referencing CBP spokesperson's statement in response to reports of "the widespread use of inappropriate language among Border Patrol officials").

Nevertheless, agents referred to detainees using racial epithets in several instances. In a text conversation between ICE agents, one referenced "tonks[24] everywhere selling food" while another agent used the term "wet" to describe an individual. Ex. 39 at GOV 24294, 24291. Body-worn camera footage also reveals the use of these terms during active operations. *See* Ex. 78 at 2:25–30 (officer stating, "Just plug us in wherever you see some tonks and we'll jump out"); Ex. 79 at 0:21–:25 (officer stating, "Whose backpack is that? Tonk . . . Tonk's backpack?"); Ex. 80 at 00:13–17, 1:06–08 (agent referring to "tonk" in English and Spanish); Ex. 81 at 00:35–:39 (agent stating, "There was a guy . . . I'm pretty sure he was wet, he just sitting in that minivan"); Ex. 82 at 00:25–:36 (agent stating, "That looked like a tonk in the driver's seat," and another responding, "It probably was"); *id.* at 9:31–:35 (agent stating, "So the guy in the car was a tonk").

### D. Moving Plaintiffs are subject to Defendants' immigration enforcement.

#### 1. Individual Plaintiffs

The individual named plaintiffs in this action are subject to Defendants' immigration enforcement policy and practice outlined above.

On June 12, 2025, Plaintiff Gavidia, a Latino U.S. citizen, was stopped during a roving patrol that led agents to Yank Towing in Montebello. Sanchez Dep. at 114:7–47:19; Gavidia Decl. ¶¶ 6–11. This location was selected for enforcement action based on a tip from an agent's friend who claimed that there was a high probability of undocumented individuals in the area. Sanchez Dep. at 144:7–47:19. Gavidia explains that he was detained and physically restrained, holding his hands behind his back and twisting his arm against a fence, after agents asked him two questions: Whether he is American, which he explained that he was, and what hospital he was born in, which he explained he did not know. Gavidia Decl. ¶ 9. In a body camera video of Gavidia's arrest, another agent appears

---

[24] *See* Matthew Cantor, *The Anti-Immigrant Slur US Border Patrol Tried to Ban*, The Guardian (Mar. 4, 2024), https://www.theguardian.com/us-news/2024/mar/04/border-patrol-slur-immigration [https://perma.cc/AUN4-RSKF]; *Sipe*, 388 F.3d at 484 n.33 (agent stating that *tonk* is "the sound heard when a 'wetback' is hit over the head with a flashlight").

to run up to Gavidia, restrain him, and slam him against a fence before he was asked—or could answer—any questions about his identity or status. Ex. 90 at 2:15–:25.

Plaintiff Hernandez Viramontes, also a Latino U.S. citizen, was stopped under similar circumstances on June 18, 2025, after agents had conducted two prior actions at his workplace within the month. Hernandez Viramontes Decl. ¶¶ 8–11. Agents chose to target this Whittier car wash during a roving patrol after performing a Google search for car washes in the area. Morales Dep. at 217:16–19:25.

Plaintiffs Vasquez Perdomo, Villegas Molina, and Osorto are Latino working-class individuals. Vasquez Perdomo Decl. ¶¶ 2–3; Villegas Molina Decl. ¶¶ 2–3; Osorto Decl. ¶¶ 2–3. Vasquez Perdomo, Villegas Molina, and Osorto were stopped during allegedly targeted operations in Pasadena in June 2025. Ex. 28; Crook Dep. at 118:6–22:24; *see also* Lai Decl. ¶ 30 (authenticating Exhibit 28 and attesting that it corresponds to the arrests of the three named Plaintiffs referenced above). Officers stopped the above-named Plaintiffs at a bus stop blocks away from the address of the target individual for the operation. Clement Dep. at 218:8–26:13. But officers did not ask the named Plaintiffs any questions about the target and never returned to search for the target after arresting the named Plaintiffs. *Id*. at 257:25–58:14; Villegas Molina Decl. ¶¶ 4–6; Osorto Decl. ¶¶ 4–6; Vasquez Perdomo Decl. ¶¶ 7–8.

2. Organizational Plaintiffs

Members of the Organizational Stop/Arrest Plaintiffs are subject to Defendants' immigration enforcement policy and practice outlined above.

LAWCN, UFW, and CHIRLA consist of tens of thousands of members across the District who fit the demographic profile that is at risk of being subjected to Defendants' immigration enforcement policy and practice outlined above—namely, Latino or Latino and working class. Salas Decl. ¶ 4 ("CHIRLA's membership is predominantly Latino."); Strater Decl. ¶¶ 4–6 ("UFW has approximately 10,000 members. . . . UFW is the largest farm worker union in the country."); Gudino Decl. ¶¶ 6–22 ("LAWCN is a multi-racial, multi-ethnic, and multi-industry organization made up of eight worker centers . . . LAWCN has a long-term and sustained focus on issues related to immigration and immigrant workers."); Melendrez Decl. ¶ 1 (director of CLEAN, an organization

that partly comprises LAWCN, attesting that their "members are predominantly Latine, and many are immigrants"). Multiple members of Plaintiff organizations have already been stopped in circumstances similar to those described above. Melendrez Decl. ¶¶ 7–10, 12–15 (CLEAN/LAWCN members stopped while at work, operating mobile car wash, or awaiting public transportation); Strater Decl. ¶¶ 29–31 (UFW member stopped while walking to a community center); Salas Decl. ¶¶ 18–21 (CHIRLA members stopped while selling food or driving).

When one member of Plaintiff LAWCN's CLEAN Carwash Worker Center was detained during a roving patrol operation, officers did not ask his name or review his identification until he was already placed inside a locked van. Reyes Romo Decl. ¶¶ 6–12 (describing detention and arrest at his workplace); Ex. 17 (noting "roving patrol" at address where Reyes Romo works). Another member, a Latino U.S. citizen, was stopped during a raid on his workplace while his light-skinned coworkers who ran from officers were left alone. Santiago Tafolla Decl. ¶¶ 2, 4–17. Some of Organizational Stop/Arrest Plaintiffs' members have already been stopped multiple times. *See* Melendrez Decl. ¶¶ 8–9, 13.

## IV. <u>Discussion</u>

This Order proceeds in six parts.

First, the question of whether Plaintiffs and Intervenors have shown the existence and unlawfulness of the Racially Based Stops Policy drives this Court's determination on two contested legal issues: Article III standing and likelihood of success on the merits under the *Winter* test. So this Court begins by addressing the Government's policy. The Court finds that the Plaintiffs and Intervenors have established—on the standard which applies at this stage—that the Racially Based Stops Policy exists and that it is unlawful. *See* Section IV.A *infra*.

Second, this Court discusses the parties' dispute as to whether Intervenors may properly join the Motion. *See* Joinder; Joinder Opp.; Joinder Reply. It concludes that joinder is proper. *See* Section IV.B *infra*.

Third, having found that the Racially Based Stops Policy exists and that it is unlawful, this Court addresses Defendants' threshold contention that Plaintiffs and Intervenors lack Article III standing to seek a preliminary injunction. *See* Opp. at 7–14; Joinder Opp. at 7–12. It finds that

Intervenors need not show standing, and that Stop/Arrest Plaintiffs have standing. *See* Section IV.C *infra*.

Fourth, this Court applies the *Winter* test to determine whether Stop/Arrest Plaintiffs are entitled to a preliminary injunction. *See* Motion at 16–27; Opp. at 16–25; Reply at 16–23. Having found that the Racially Based Stops Policy exists and that it is unlawful, the Court concludes that the *Winter* test weighs in Stop/Arrest Plaintiffs' favor. *See* Section IV.D *infra.*

Fifth, this Court adjudicates Defendants' scope arguments as to Plaintiffs' requested preliminary injunction: statutory preclusion, universality, vagueness, and overbreadth. Opp. at 26–28. It modifies some of Stop/Arrest Plaintiffs' proposed language to narrowly tailor the preliminary injunction as the governing law requires, but otherwise rejects Defendants' arguments. *See* Section IV.E *infra*.

Sixth, having decided to issue a preliminary injunction, this Court considers whether, as Defendants request, it should require Stop/Arrest Plaintiffs to post a bond or stay the injunction "to permit the government to seek a stay pending appeal in an orderly manner." Opp. at 28. It finds that neither a bond nor a stay is warranted. *See* Section IV.F *infra*.

**A. This Court finds that the Defendants have engaged in an unlawful, officially sanctioned practice of detaining individuals solely based upon their appearance as Latino or Latino and working class.**

The Findings of Fact lead to the inexorable conclusion that Defendants maintain an unwritten policy, practice, and pattern of detaining individuals because they appeared to be Latino or Latino and working class. This does not constitute reasonable suspicion, and it is not permissible under the Constitution.

1. <u>Defendants have an unwritten policy of detaining individuals based upon their appearance as Latino or Latino and working class.</u>

The Findings of Fact—and the evidence in support—demonstrate that Defendants have a practice of detaining individuals based upon their appearance as Latino or Latino and working class and that this was pursuant to an unwritten policy. To the extent that Defendants considered any other factors or criteria in determining who to stop, it was whether the individuals appeared to be "day laborers." Putting to one side whether it would be permissible to stop someone simply because they

appeared to be a "day laborer"—as discussed below, it is not—the Court need not even reach that question: The evidence shows that "day laborer" was not used to actually refer to a particular profession or type of employment; it was simply a shorthand for a person who appeared to be Latino and working class.

First, as Defendants themselves acknowledge, a significant portion of their immigration enforcement involves arresting collaterals, not people who were identified targets or about whom they otherwise had intelligence. *See* Sections III.A.1, III.C *supra*. This does not appear to be by accident. Instead, officers attested (including in at least one deposition under oath) that their guiding principle was "see bodies, chase bodies." Airdo Dep. at 210:14–18 (Q: "Tell me the reasons why you did not feel that they were going solely after targets?" A: "I just think that kind of like she said, 'see bodies, chase bodies' . . . ."); Ex. 26 at GOV 10543 (agent opining via text message, "I think they only know one way to operate . . . See bodies, chase bodies."); *see also* Section III.A.3.a *supra*. The evidence supports the conclusion that the intention was not to go after targets at all, but to go to locations where a large number of seemingly Latino working-class individuals would be found and attempt to detain them—usually by a show of force that would cause people to run and once people were running, start detaining: "see bodies, chase bodies."

Second, to the extent that Defendants identify any other criteria, it is that individuals were identified based upon their apparent status as "day laborers." But witness testimony reveals that this was merely a proxy for a working-class Latino person. Officers had no consistent or coherent definition of a "day laborer," even using it explicitly as a synonym for an "illegal alien." *See* Sections III.C.3–.4 *supra*; *see also, e.g.*, Rios Dep. at 156:20–57:18 (explaining a day laborer is someone who "is out there – like . . . 'pico y pala'" or "works in the fields"); Sanchez Dep. at 217:24–18:14 (explaining day laborer types of occupations include "construction, agricultural, yard work o[r] the like"); Clement Dep. at 158:3–62:17 (naming "older Hispanic males" who were "just hanging around" as the type of individual to raise his suspicion); *id.* at 247:2–49:8 ("I don't call them day laborers. I call them illegal aliens."). In accordance with this, officers labeled as possible "day laborers" even individuals whose attire did not plausibly resemble clothing specific to a "day labor uniform" at all. *Compare* M.D.L. Decl. ¶ 5 (attesting to wearing black pants, a sweater,

sneakers, and a backpack when detained) *with* Dkt. No. 529-24 at 3 (I-213 arrest narrative of M.D.L. noting that M.D.L. was "dressed in attire consistent with day laborers [he] ha[d] apprehended in the past."). Another agent reported that he stopped an individual during a roving patrol based on attire appropriate for doing manual labor outdoors. Ex. 9. The individual reports that he was wearing his uniform for his job at Eataly, a high-end marketplace including several restaurants and a grocery store, along with his company badge. H.S.P. Decl. ¶¶ 3–8.

Third, when Defendants conducted operations at locations containing both Latino and non-Latino individuals, they detained the Latino individuals and ignored the non-Latino individuals. *See* Section III.C.4 *supra*. In fact, officers went so far as to detain *customers* at these locations, as long as they were Latino. E.E.M.M. Decl. ¶¶ 3–9; A.A.G. Decl. ¶¶ 5–8 (Latino car wash client surrounded and questioned by agents); V.M.B. Decl. ¶¶ 5–6 (Latino gas station client stopped and detained by agents).

Fourth, the sworn testimony of detainees and third party observers bears out the single-minded reliance on apparent race and working-class status. Dozens of detainees testified that no questions were asked before Defendants' officers detained them. *See, e.g.*, Section III.B.2 *supra*. Given the volume of stops where this was the case, it is a reasonable inference that the officers had not targeted these individuals, had no intelligence on them, and were not making any attempt to ask questions that might lead to reasonable suspicion. The Court finds it striking that the Defendants have failed to provide evidence of a reasonable suspicion analysis regarding any one of the declarants. Presumably Defendants would possess this evidence if it existed—and they have had ample opportunity to present it. The absence of this controverting evidence in this record supports a logical inference: The controverting evidence does not exist. And what *does* exist, which Plaintiffs cite and this Court incorporated into its Findings of Fact, corroborates that the reasons for the stop are that the detainees looked Latino or Latino and working class—not anything else.

Tellingly, the record is replete with examples where officers rejected attempts by individuals to prove their documented status or United States citizenship.[25] *See, e.g.*, Reyes Romo Decl. ¶ 10 ("[The immigration officer] said in Spanish, 'do you have documents?' and I said 'they're over there.' The man told me he couldn't let me go get them, and that he'd figure it out later. He said 'Let's go' and started to walk me toward the white van, with his hand on my shoulder. Afraid, I cooperated as he walked me to the vehicle."); Santiago Tafolla Decl. ¶¶ 2, 5, 7–11 (declarant, a Latino U.S. citizen, describing being detained at the car wash where he worked, during which officers refused to look at his documents (claiming that they were forged) and arrested him without any questioning despite that declarant and his coworkers asserted the declarant's U.S. citizenship); A.V. Decl. ¶¶ 4–6 (declarant, a Latino U.S. citizen, noting that during a detentive stop, he "offered to go get [his] passport from the office [of the car wash where the stop took place], but [the agent] refused to let [A.V.] get it").

In fact, where I-213s are in the record as to a declarant's detention and arrest, they do not appear to controvert the declarations' contentions that detentions occurred before (not after) agents gathered information as to the individuals' identities or statuses. For instance, declarant D.V.V. stated that agents ran up to group including him at gunpoint, leading D.V.V. to feel as though he could not leave, and the I-213 does not controvert that agents approached D.V.V. with guns drawn, leading D.V.V. to feel that D.V.V. could not leave, while only appearing to know that he was a Latino-appearing construction laborer who was eating lunch. *Compare* D.V.V. Decl. ¶¶ 2–7 (agents ran up to group including D.V.V. at gunpoint, leading D.V.V. to feel as though D.V.V. could not leave) *with* Ex. 8 (agent attesting that, prior to approaching D.V.V. and beginning a conversation,

[25] This is consistent with CBP's Rule 30(b)(6) witness's testimony. Lairmore Dep. at 237:23–38:4. ("Q: It doesn't concern [CBP] that somebody who is a US citizen might be stopped by border patrol and made to answer questions, and then let go later? . . . A: No.").

agent observed that D.V.V. and others appeared to be roofing laborers, a typical profession for an "[undocumented immigrant]").[26]

Finally, while not dispositive, the casual use of violent and offensive racial epithets when referring to Latino individuals, further persuades this Court of the nature of the policy the Defendants were carrying out. *See* Ex. 39 (one agent describing "tonks everywhere serving food" while another referred to an individual as "wet"); Ex. 79 (one agent asking whether a nearby backpack was a "[t]onk's"). At times, the context surrounding these derogatory terms suggests that Defendants' agents are detaining Latino individuals merely because they appear Latino. *See* Ex. 78 (officer stating, "just plug us in wherever you see some tonks and we'll jump out"). The use of these terms is not consistent with a race-neutral, lawful totality-of-the-circumstances analysis.

Taken together: Defendants' officers appear to routinely detain individuals in this District because they perceive those individuals to be Latino or Latino and working class. The extensive factual record on this Motion—including at least forty-five declarations from detained individuals and over a dozen more instances from those who have witnessed the Government's practices—compels this Court to find the existence of a Racially Based Stops Policy. In accordance with this policy, officers approach individuals for possible detention based only upon their apparent Latino race and perceived working-class status, ignoring others who do not fit this demographic. In accordance with this policy, officers detain individuals before asking for the identity of those being detained and rejecting attempts to show documentation or citizenship. In accordance with this policy, officers refer to working-class Latino individuals that they encounter as "day laborers," using the label in a manner that is totally untethered from any meaningful taxonomy or categorization. And

[26] This I-213 makes reference to Glendale as being a city within Humboldt County, but it is actually a city within Los Angeles County; the Court assumes the reference to Humboldt County was an unintentional error.

finally, in accordance with this policy, officers casually refer to Latino individuals that they seek to detain with an array of violent and offensive racial epithets.

Meaningfully, much of Stop/Arrest Plaintiffs' evidence is uncontroverted. As far as this Court is aware, and as far as the parties have cited in their briefing for this Motion, no evidence in this record refutes the forty-five declarations from the individuals who were detained on the basis of appearing Latino or Latino and working class. Defendants had every opportunity to submit detailed exhibits contesting the factual account laid out in Stop/Arrest Plaintiffs' Motion; they did not do so.

Defendants' arguments as to consensual encounters and the role of flight, detailed below, are not persuasive.

a. *Alleged Consensual Encounters*

Defendants indicate that some of the encounters that Plaintiffs rely upon were consensual and therefore lawful. Opp. at 4. But their citations to agent declarations on this basis merely speak to the general proposition that "[a]gents often approach and question individuals without physical restraint or coercion." Opp. at 18 (collecting examples). And they only contend that three of the dozens of encounters discussed by Plaintiffs were, in fact, consensual—so, even if this Court agreed on all three, it would do little to disprove the evidence that Plaintiffs have set forth.

In any event, this Court is not persuaded that Defendants have shown that the three detentions they discuss—of Villegas Molina, Hernandez Viramontes, and Gamez—show what Defendants purport they do.

Defendants' proof as to Villegas Molina is one paragraph cited from two identical versions of Villegas Molina's declaration:

> One of the men came up to me and yelled "don't run!" I said calmly "I'm not going to run" in English. Once he said that, I knew I could not move and had to stay in place. He was masked, aggressive, and armed. I was afraid to move. He asked me to see my ID and I showed him my California Driver's License. He asked me if I had any papers and I said no. He did not ask me any other questions. He handcuffed me and placed me

> in one of the unmarked vehicles. He never told me he was an immigration official. I was never informed that there was any warrant for my arrest.

Villegas Molina Decl. ¶ 6. This Court does not read this encounter as consensual: Villegas Molina was clear that he felt that he could not leave because he was told not to leave. This is not, counter to Defendants' suggestion, an instance where an agent being armed is the only evidence that a detainee may not have felt able to leave. Opp. at 19 (noting that an officer being armed "alone cannot suffice for a seizure").

Defendants' proof as to Hernandez Viramontes is a paragraph from a declaration by Hernandez Viramontes, which reads in full: "On Saturday, June 14, 2025, agents arrived again. This time they were driving border patrol vehicles and were wearing clothing that identified them as border patrol. They started asking people if they were citizens and took one coworker. They even questioned customers at the carwash." Hernandez Viramontes Decl. ¶ 7. But, assuming without deciding that the encounter was indeed consensual, that is not what Plaintiffs challenge—and Hernandez goes on to explain that an agent grabbed his arm, escorted him away, and detained him for approximately twenty minutes *after* Hernandez explained that he is a U.S. citizen. *Id.* ¶ 10–11. There is no tension between that (1) Hernandez Viramontes would voluntarily tell agents that he has lawful status and (2) agents could nonetheless detain Hernandez Viramontes on the basis of his apparent race and low-income status.

And as to Gamez, "Mr. Gamez is not a Plaintiff and Plaintiffs do not proffer his encounter as a seizure." Reply at 19 n.18.

In sum, these instances do not support Defendants' position on consensual encounters.

b. *Alleged Instances of Flight*

At the hearing, counsel for Defendants contended that Plaintiffs Vasquez Perdomo and Osorto "both admitted to fleeing when the agents appeared." Tr. at 65:21-:22. Counsel also noted that Villegas Molina was at the same location as Vasquez Perdomo and Osorto when they attempted

to flee, which counsel suggested could serve as the reasonable suspicion analysis for Villegas Molina—even if he did not flee. Tr. at 66:11-67:13.This is not persuasive.

First, Defendants' evidentiary support is thin. Defendants cite no factual authority in their papers, nor did they do so at the hearing, in support of the contention that any of these individuals fled—much less that this is what led to their arrest. The sole record citation provided, to Dkt. No. 529-59, involves none of these three Plaintiffs. Moreover, as best as this Court can determine, there is at minimum a factual dispute as to when the detention began: To the extent that Vasquez Perdomo admits he "tried to move away" from officers, and Osorto admits he "tried to run," this was only after unidentified armed officers exited from unmarked vans and started running at the two men. Vasquez Perdomo Decl. ¶ 7; Osorto Decl. ¶ 6. There is no indication in the record that Villegas Molina fled, and Defendants offer no authority in support for the striking proposition that merely being present in an area while someone else flees can constitute reasonable suspicion for a detentive stop.

Second, some record evidence suggests that Defendants' practice is to—as a tactic—chase individuals by default. It is easy to see how this sort of strategy would naturally result in inducing individuals to flee from aggressive tactics—this, in turn, could justify "flight" as a factor. *See* Section III.A.3.a *supra* (discussion of "see bodies, chase bodies").

Third, even crediting Defendants' position, it does not create reasonable suspicion. It is unclear how this sort of "flight"—that is, from armed, unidentified officers running out of unmarked cars—could support reasonable suspicion. The point of a reasonable suspicion analysis is that it must support that "the particular person being stopped has committed or is about to commit a crime." *Montero-Camargo*, 208 F.3d at 1129. It is not inherently suspicious for individuals to try to move away from masked, armed men who give no indication that they are officers. Tr. at 70:20–71:10; *see also* Osorto Decl. ¶¶ 5–6 ("[A]t least four men in masks and civilian clothes with guns . . . started

running at us. . . . They did not identify themselves; they just started running. None of them had visible badges, just a vest. I was terrified. I didn't know who the men were and I was afraid they would hurt me. It felt like mercenaries, like a kidnapping.”).

Fourth, there is tension between this theory and Defendants’ position on “consensual encounters.” After all, if an encounter is truly consensual, then merely leaving the encounter cannot create suspicion.

Beyond the explanations about consensual encounters and flight, Defendants maintain that detentions “were supported by specific articulable facts beyond the individuals’ appearance,” without showing what facts they had or which detentions these facts would support. By way of example, during the several instances where Plaintiffs allege that agents arrived at a location and detained only those who appeared Latino, the Government could have cited controverting evidence—explaining, for example, that the Government had intelligence as to the detainees beyond their race that led them to develop reasonable suspicion. The Government has submitted nothing of the sort.[27] So this Court’s understanding of the Government’s immigration enforcement turns in large part on Plaintiffs’ undisputed evidence at this stage.

At bottom, the Court has reviewed a wealth of declarations by detained individuals and witnesses detailing over fifty detentions based upon the criteria mentioned, corroborating video evidence, deposition testimony from Defendants’ agents, proposed expert testimony, and more. The Government has not built a record that meaningfully disputes Stop/Arrest Plaintiffs’ theories of the

[27] This Court issued a tentative order the day before the September 24 hearing—where the Findings of Fact largely aligned with those presented in this Order—and gave Defendants multiple opportunities to dispute any fact tentatively found therein. *See* Tr. at 63:1–:2, 64:16–65:1, 97:12–98:6. Defendants advocated for this Court to read Plaintiffs’ evidence in context, but did not point this Court to controverting evidence. Defendants also noted that this Court’s finding that Plaintiffs’ evidence was uncontroverted “contorts the preliminary injunction burden.” Tr. at 65:6–:7. None of this is meant to suggest the burden is on Defendants to disprove a policy; it is not. Still, it is of course relevant if Defendants are meaningfully silent on the factual support that Plaintiffs have built out in support of their Motion.

nature of the policy. Faced with this record, this Court concludes that Stop/Arrest Plaintiffs are likely to prevail in showing that a Racially Based Stops Policy exists.

2. Plaintiffs are likely to show that Racially Based Stops Policy is officially sanctioned.

Not only are Plaintiffs likely to show the Racially Based Stops Policy exists; Plaintiffs are also likely to show that the Policy is officially sanctioned.

The Court begins with the instructions provided by high-level officials. As discussed above, the Government's instruction to its agents was to materially increase the number of immigration detentions conducted in 2025, and enforcement activity ramped up accordingly. *See* Sections III.A.1 –.2 *supra*. There is nothing inherently unlawful about the Government seeking to increase immigration arrests. But it bears mention that at the highest levels, Defendants appear to have approved the use of apparent Latino race in determining who to stop and arrest.[28]

---

[28] The parties appear to agree on the relevant interaction:

> Gregory Bovino, commander at large of the border force, contrasted the people being arrested with a white WBEZ reporter, saying agents consider a person's appearance before taking them into custody.
>
> "You know, there's many different factors that go into something like that," Bovino said. "It would be agent experience, intelligence that indicates there's illegal aliens in a particular place or location.
>
> "Then, obviously, the particular characteristics of an individual, how they look. How do they look compared to, say, you?" he said to the reporter, a tall, middle-aged man of Anglo descent.

Chip Mitchell, Ashlee Rezin, Kaitlin Washburn, Mary Norkol and Jon Seidel, *Feds march into Downtown Chicago; top border agent says people are arrested based partly on 'how they look'*, WBEZ Chicago (Sep. 29, 2025), https://www.wbez.org/immigration/2025/09/29/feds-march-into-downtown-chicago-top-border-agent-says-people-are-arrested-based-on-how-they-look [https://perma.cc/E4L9-YK4Y].

This interaction was alleged and substantiated (albeit with a different journalistic source) in the Second Amended Complaint. 2AC ¶ 82. As it was not discussed in the parties' moving papers, but was raised at the September 24 hearing, the Court offered the parties an opportunity to submit supplemental briefing addressing it. *See* Pla. Supp.; Def. Supp.

Defendants do not dispute that this quote is real, but note that it (1) misses context—the phrasing of the question that was asked—and (2) fails to show that the Government directed its agents to rely solely on race. *See* Def. Supp. at 1–2. But the article makes clear that Bovino had been asked about agents' considerations in deciding whether to take an individual into custody. Moreover, as Plaintiffs note, their source links to one which includes a transcript of the interaction. *See* Chip Mitchell, *Transcript: Gregory Bovino says arrestees in Downtown Chicago chosen based partly on 'how they look'*, WBEZ Chicago (Sep. 30, 2025), https://www.wbez.org/immigration/2025/09/30/transcript-audio-gregory-bovino-arrestees-downtown-chicago-chosen-how-they-look [https://perma.cc/8P3Z-UQH4].

And Plaintiffs do not seem to suggest—nor does this Court infer—that this is an explicit direction that race can be the sole basis for a stop. It does, however, support Plaintiffs' overall showing that a policy to rely on race exists, and that it is officially sanctioned. *See* Pla. Supp. at 1 ("Plaintiffs identified this interview not as the sole evidence of official sanction, but as part of a body of evidence—including agent and officer testimony and 30(b)(6) testimony—supporting official sanction.").

The depositions of Defendants' officers, including Rule 30(b)(6) witnesses, are in accord.[29]

Victor A. Sanchez is a Supervisory Border Patrol Agent who has been working with Border Patrol for fifteen years. Sanchez Dep. at 28:8–:18. Sanchez testified that it was agency policy to consider the sole trait of "[a]pparent race or apparent Mexican ancestry" as a "determining factor" in whether someone may be unlawfully present. *Id.* at 131:9–:25. He explained that apparent race was relevant, in his view, because most people "the previous years that entered the country . . . were from Latin American countries." *Id.* But Sanchez's justification of ancestry as a factor based on his understanding that immigration mainly comes from Latin American countries is telling. Sanchez explains that this is his understanding of immigration patterns, not of *unlawful* immigration patterns. *Id.* at 131:21–:25. And, when asked why that is his understanding, Sanchez explained that he "worked it," and was solely relying on "personal experience," not on "look[ing] up specific numbers or anything." *Id.* at 132:1–:8. And Sanchez suggested that, in his experience, there was a connection between locations and apparent race—for example, noting that, at locations like a car wash or a Home Depot, "the apprehensions that [Sanchez] personally made . . . are overwhelmingly Hispanic." *Id.* at 133:1–:13.

CBP's Rule 30(b)(6) testimony further confirms the Government's practices. Gregory Lairmore serves as Acting Deputy Chief within CBP, the organization for which he served as the Rule 30(b)(6) witness. Lairmore Dep. at 26:3–6. Lairmore reviewed Sanchez's testimony regarding "[a]pparent ethnicity or apparent Mexican ancestry" being relevant factors in determining whether to apprehend an individual, *see* Sanchez Dep. at 131:5–:25, and confirmed that this does not run counter to any CBP policy, *see* Lairmore Dep. at 230:15–34:7.

In addition, Lairmore testified that, though there is nothing about a car wash that indicates those present have unlawful status, it was not against any of Operation at Large's protocols for a border patrol agent to choose a raid target merely by conducting an online search for the nearest car washes. *Id.* at 242:12–44:2. Lairmore hypothesized that agents had been made aware that "car

---

[29] Under this Rule, the witnesses speak for the organization, as "[t]he persons designated must testify about information known or reasonably available to the organization." Fed. R. Civ. P. 30(b)(6).

washes are one of the locations that pays cash for labor," which explained why car washes were frequently targeted. *Id.* at 243:22–44:15. Lairmore offered no factual basis, however, for his conclusion that agents had received this instruction, or that this instruction was actually accurate. Lairmore similarly attested that "agricultural, construction, and yard work" were among professions that he believed were likely to pay in cash, creating suspicion that one employed in those fields may not have employment authorization. *Id.* at 159:18–61:5. But Lairmore also attested that the agency did not know how many agricultural, construction, or yard workers had work authorization, or what proportion of workers in those fields had it. *Id.* at 161:7–62:9.

Furthermore, agents and officers in the field testified that their chain of command approved of their conduct.

One of them, Deportation Officer Eusebio Ortiz, explained that he had been one of the officers involved in the detention of J.C.—who, as discussed above, in the Findings of Fact, is a Latino man who attests that Government agents struck him with a vehicle while he was riding his bicycle.[30] J.C. Decl. ¶ 1–10; *see also* Section III.C.2 *supra*. Ortiz explains that he understood J.C. fell due to the collision, and that he had not been the target of the operation; agents had been attempting to detain someone else. Ortiz Dep. at 339:9–:11. In another instance, the arrest of C.H., Ortiz explained that his reasonable suspicion relied in part on that the suspect appeared Latino. *Id.* at 267:18–:24. Ortiz also noted that C.H. appeared to resemble a target, but did not name other traits of the target's—only that the target and C.H. both appeared Latino. *Id.* And Ortiz noted that, though his supervisor "has a good knowledge of what goes on in the field" as to Ortiz and his team, his supervisor had never raised any concerns with him as to his conduct. *Id.* at 326:17–27:11. Nor had Ortiz ever been subject to an investigation. *Id.* at 327:13–:24.

A second, Deportation Officer Corey Clement, explained that "older Hispanic males" who appear to be "hanging around in an area" is an indicator to him that the location has "a high probability of someone trying to get work"—which, in turn, serves as a location indicator for

---

[30] Ortiz suggests that J.C. collided with the Government vehicle—not the other way around, as J.C. describes it. Ortiz Dep. at 308:5–:15. But Ortiz also admits that he did not see the collision. *Id.* at 309:5–:6.

detention. Clement Dep. at 158:1–60:25. Clement also attested that he was part of the June 18 operation that resulted in the arrest of individuals including Plaintiffs Vasquez Perdomo, Osorto, and Villegas Molina. Clement stated that this had been a targeted operation. Clement Dep. at 220:17–:21. But, as part of this operation, officers did not ask the named Plaintiffs any questions about the target and never returned to search for the target after arresting the named Plaintiffs. *Id*. at 257:25–58:14; Villegas Molina Decl. ¶¶ 4–6; Osorto Decl. ¶¶ 4–6. Clement, too, attested that his supervisor was aware of how the June 18 operation was conducted, and had no concerns about it. *Id.* at 314:20–15:14.

A third, CBP Supervisory Patrol Agent Ismael Fernandez, attested that he had conducted a detention of someone who had lawful permanent resident status. Fernandez Dep. at 262:2–:16. He agreed that the "basis of his detention was that [the individual] was a car wash worker at a location where [Fernandez] had intelligence that another car wash worker did not have status." *Id.* Plaintiffs explain, and Defendants do not contest, that this arrest was of Zapata Santiago. *See* Zapata Santiago Decl. Though Fernandez attested that this would have given him reason to detain any car wash worker employed at the location, agents only appeared to detain Zapata Santiago—a Latino man—and one of his coworkers, whose race is not mentioned. *See id.* ¶¶ 4–7. And Fernandez, like Ortiz and Clement, attested that he reported his arrest of the lawful permanent resident to his supervisor, who expressed that "it was fine" that that had happened. *Id.* at 313:9–:25.

To be clear: The Government appears to be aware of this conduct, and it does not appear concerned. As Lairmore testified:

> Q: [H]as the agency opened any internal investigation to any of the incidents we've discussed today?
> A: Not that I'm aware of.
> Q: Is there anything you've learned about with respect to any of the incidents today that would warrant investigation?
> A: No.
> Q: Anything . . . the agency has learned about with respect to any of the incidents of Operation at Large that would warrant investigation?
> A. No.
> Q. And has the agency conducted any investigation of incidents in Operation At Large?
> A. Not that I'm aware of.

Lairmore Dep. at 319:12–20:2. As Kerlikowske attests, "I observed witnesses attesting to the fact that almost no internal investigations concerning immigration operations in Los Ang[e]les have been conducted. I did not find this entirely surprising . . . . It is nevertheless problematic." Kerlikowske Decl. ¶ 44 (footnote omitted[31]).

The Government does little to controvert Plaintiffs' showing that the Racially Based Stops Policy was officially sanctioned. What the Government *does* cite in opposition offers only scant support for their argument. The sole exhibit attached to the Opposition appears to be the first slide in a slideshow meant to train CBP agents on the Fourth Amendment, including enforcement operations outside points of entry and border searches, enforcement scenarios, and arrest procedures. Dkt. No. 678-1. The content and frequency of this training is unclear from the exhibit. But, needless to say, the Government's showing that it trains agents to follow the law cannot defeat the mountain of evidence that, in practice, agents do not follow the law. Relatedly, Defendants attempt to minimize Plaintiffs' evidence of their agents' use of racial slurs and other dehumanizing language—they note that "Defendants have directives prohibiting their use," and that they do not "tolerate or condone the use of such terms." Opp. at 20. Again, it is difficult to see how this could defeat a showing that, in practice, agents *do* use these words.

Defendants also oppose this finding because, in their words, "the actual directives Defendants have issued instruct immigration officers to comply with the Constitution when making investigative stops." Opp. at 10 n.1. But "no official statement or express policy is required to demonstrate a 'pattern of officially sanctioned behavior, violative of the plaintiffs' federal rights.'" *Vasquez Perdomo*,[32] 148 F.4th at 675–76 (quoting *Armstrong v. Davis*, 275 F.3d 849, 861 (9th Cir.

---

[31] This Court notes that one of the sources cited in the footnote—the deposition of J.R. at pages 181 through 185—does not appear to be included in the deposition excerpts provided to this Court.

[32] At the hearing, counsel for Defendants advocated that this Court should not treat the Ninth Circuit's *Vasquez Perdomo* decision as binding. Tr. at 48:2–51:9. Defendants cite *East Bay Sanctuary Covenant v. Biden* for this proposition, where the Ninth Circuit considered whether it should "affirm the preliminary injunction because the published motions panel order denying a stay of the injunction pending appeal controls [the Ninth Circuit's] decision on the merits of the preliminary injunction appeal." 993 F.3d 640, 660 (9th Cir. 2021), *overruled in other part by Ariz. All. for Retired Americans v. Mayes*, 186 F.4th 622 (9th Cir. 2026). It does not appear this case is cited in Defendants' Opposition. But in any event, this Court reads *East Bay* for the uncontroversial proposition that the Ninth Circuit's denial of a stay of a PI

2001) (citation modified)). And the Ninth Circuit has found official sanction "based on the plaintiffs' testimony about their experiences." *Id.* at 676 (internal quotation marks omitted) (quoting *Nicacio v. U.S. Immigr. & Naturalization Serv.*, 797 F.2d 700, 701–04 (9th Cir. 1985), *overruled in part on other grounds*, *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1045 (9th Cir. 1999) (en banc)). In other words, a policy need not be written or explicitly ratified to exist.

And, in any event, that Defendants' written instructions tell their agents to follow the law is of no moment. This Court is not persuaded that Defendants' written instructions to follow the law[33] override the documented practices of Defendants' officers when conducting immigration enforcement. Nor are the Defendants' conclusory assertions that there is a "plethora of evidence showing that Defendants conducted targeted area operations based upon pre-gathered intelligence," Opp. at 12, particularly given that there was no such intelligence for the numerous roving patrols.

/ / /

---

does not require the Ninth Circuit to affirm the PI in substance. This makes sense: "The inquiry with respect to the stay differs from the inquiry as to the preliminary injunction." *Id.* at 662.

This does not indicate, however, that the Ninth Circuit's statements of law in adjudicating a stay request do not bind this Court when it considers the issuance of a new preliminary injunction. It is true that stays and preliminary injunctions rely on different burdens of proof and evidentiary showings, but none of this would lead the Ninth Circuit to state legal principles erroneously on either posture. And, of course, this Court does not justify its decision on this Motion on the fact that the Ninth Circuit denied a stay of a similar TRO. So Defendants' argument that this Court is internally inconsistent by referring to this case as both analogous to the prior PI request (so that *Vasquez Perdomo* controls) and distinct from the prior PI request (so that the Supreme Court stay order does not control) is erroneous on several levels. Tr. at 48:18–:22. As this Court has explained at length, an unreasoned stay order cannot give the Court basis in law to adjudicate this Motion.

[33] Moreover—as the Reply notes—Defendants assert, but do not wholly substantiate, the existence of "a written policy forbidding their current practice of demographic profiling." Reply at 11. The sole exhibit they submit in opposition shows a title slide, though no contents, of a Fourth Amendment training. *See* Dkt. No. 678-1. And there is no indication from the evidentiary record as to when, where, how often, and to whom such a training was given. Though some of Defendants' declarations attempt to bridge this gap, Defendants do not make a showing that all of their agents are meaningfully trained. *Cf.* Harvick Decl. ¶ 8 (CBP Patrol Agent in Charge of the El Centro Station attesting that "CBP agents and officers . . . are trained to consider the totality of the circumstances when determining whether reasonable suspicion exists," but offering no further detail into frequency of training or whether non-CBP Government agents receive similar guidance).

Without more, this cannot constitute evidence of a written policy to follow the law—even if this Court found that dispositive, which it does not here.

3. Plaintiffs are likely to show that the Racially Based Stops Policy was unlawful.[34]

a. *Stop/Arrest Plaintiffs will likely show that the Racially Based Stops Policy violates the Fourth Amendment.*

"No one disputes that Defendants' conduct during investigative stops implicates the Fourth Amendment." Opp. at 14. To that end, having found Plaintiffs will likely succeed in showing that a Racially Based Stops Policy exists, this Court must determine whether that policy violates the Fourth Amendment.

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. "A seizure occurs when a law enforcement officer, through coercion, physical force, or a show of authority, in some way restricts the liberty of a person." *United States v. Washington*, 387 F.3d 1060, 1068 (9th Cir. 2004) (cleaned up). Generally speaking, an officer's actions rise to the level of a seizure if any one of the following occurs: "if there is a threatening presence of several officers, a display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Washington*, 490 F.3d 765, 771 (9th Cir. 2007) (internal quotation and citation omitted).

"Except at the border and its functional equivalents," immigration agents may stop individuals in public only after identifying "specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that [the persons stopped are noncitizens] who may be illegally in the country." *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975). Reasonable suspicion comprises two elements: "the assessment must be based upon the totality of the circumstances," and it "must arouse a reasonable suspicion that *the particular person being stopped* has committed or is about to commit a crime." *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (emphasis in original). "[T]o establish reasonable suspicion, an

---

[34] Although Defendants accuse Plaintiffs of "seek[ing] to implement a regime in which illegal aliens reside in the Central District in violation of the INA without consequence or fear of enforcement," Opp. at 13, the Court finds no evidence of this. It appears merely that they seek to hold Defendants to the requirements of the Constitution.

officer cannot rely solely on generalizations that, if accepted, would cast suspicion on large segments of the lawabiding population." *United States v. Manzo-Jurado*, 457 F.3d 928, 935 (9th Cir. 2006). "Where, as here, the majority (or any substantial number) of people share a specific characteristic, that characteristic is of little or no probative value in such a particularized and context-specific analysis." *Montero-Camargo*, 208 F.3d at 1131; *see id.* at 1135 ("Hispanic appearance is … of such little probative value that it may not be considered as a relevant factor where particularized or individualized suspicion is required."); *see also Manzo-Jurado*, 457 F.3d at 937 ("By itself . . . an individual's inability to understand English will not justify an investigatory stop because the same characteristic applies to a sizable portion of individuals lawfully present in this country.").

Given all this, Stop/Arrest Plaintiffs will likely prevail in showing that the Racially Based Stops Policy violates the Fourth Amendment. Particularly relevant to the role of race in individualized suspicion is the Ninth Circuit's holding in *Montero-Camargo*, which binds this Court. As the Court found then:

> [W]e are confronted with the narrow question of how to square the Fourth Amendment's requirement of individualized reasonable suspicion with the fact that the majority of the people who pass through the checkpoint in question are Hispanic. In order to answer that question, we conclude that, at this point in our nation's history, and given the continuing changes in our ethnic and racial composition, Hispanic appearance is, in general, of such little probative value that it may not be considered as a relevant factor where particularized or individualized suspicion is required. Moreover, we conclude, for the reasons we have indicated, that it is also not an appropriate factor.

*Montero-Camargo*, 208 F.3d at 1135. And to the extent that there is any question, the Ninth Circuit has made clear that it is not acceptable use of race to detain an individual simply because they share the same race as an identified target:

> [A] stop based *solely* on the fact that the racial or ethnic appearance of an individual matches the racial or ethnic description of a specific suspect would *not* be justified.
>
> . . . .
>
> Hispanic appearance, or any other racial or ethnic appearance, including Caucasian, may be considered when the suspected perpetrator of a specific offense has been identified as having such an appearance. Even in such circumstances, however, persons of a particular racial or ethnic group may not be stopped and questioned because of such appearance, unless there are other individualized or particularized factors which, together with the racial or ethnic appearance identified, rise to the level of reasonable suspicion or probable cause. To the extent that our prior cases have approved the use of Hispanic appearance as a factor where there was no particularized, individual suspicion, they are overruled.

*Montero-Camargo*, 208 F.3d at 1134 nn.21–22.

Though race is at issue in all the challenged stops, it bears mention that the Government has not shown that apparent working-class status is any more probative. The Ninth Circuit's binding opinion in *Montero-Camargo* is instructive: "Where, as here, the majority (or any substantial number) of people share a specific characteristic, that characteristic is of little or no probative value in such a particularized and context-specific analysis." *Montero-Camargo*, 208 F.3d at 1131. As the Ninth Circuit found in *Manzo-Jurado*, where the Government stated it had reason to believe that some work crews contained undocumented immigrants, the Government did not provide evidence about how many local work crews did not—nor did it appear to have information about the employer of the specific work crew at issue. 457 F.3d at 938. So too here: Faced with only nonspecific factors—such as officers' belief that undocumented immigrants often seek day labor, without any observation as to specific employers or the proportion of individuals with legal status who seek day labor—reasonable suspicion cannot properly exist.

This all confirms what the Ninth Circuit concluded last year: "We agree with the district court that, in the context of the Central District of California, the four enumerated factors at issue—apparent race or ethnicity, speaking Spanish or speaking English with an accent, particular location, and type of work, even when considered together—describe only a broad profile and do not demonstrate reasonable suspicion for any particular stop." *Vasquez Perdomo v. Noem*, 148 F.4th 656, 683 (9th Cir. 2025) (internal quotation marks omitted). Given this finding, it naturally follows that, where Defendants continue relying on apparent race and type of work—whether individually or jointly—they cannot lawfully form reasonable suspicion.

It simply cannot be that apparent Latino race—which applies to a very large proportion of individuals in the District—and working-class status (or actual employment as a day laborer)—which applies to a very large proportion of individuals in the District—can demonstrate reasonable suspicion for any particular stop. Not only do they describe an extremely broad profile, but they do not correlate with undocumented immigration status in any meaningful way.

As contrary authority, Defendants cite only one source—the concurring opinion of one justice in the Supreme Court's grant of Defendants' stay of this Court's TRO. Opp. at 16–17 (citing

*Vasquez Perdomo*, 146 S. Ct. at 1 (Kavanaugh, J., concurring)). But, as this Court has repeatedly explained, a concurring opinion has no precedential value, and this Court will not speculate into the specific reasons that the Supreme Court granted the stay in the absence of a reasoned opinion of the Court.[35] In any event, this concurring opinion does not unsettle the binding Ninth Circuit that leads this Court to conclude that a policy that relies upon apparent Latino race in order to develop particularized, individualized suspicion violates the Fourth Amendment.

In sum, given that Plaintiffs will likely prevail in showing that the Racially Based Stops Policy exists, Plaintiffs are also likely to show that it violates the Fourth Amendment.

b. *Stop/Arrest Plaintiffs will likely show that the Racially Based Stops Policy violates the Fifth Amendment.*

Next at issue is whether the Racially Based Stops Policy violates the Fifth Amendment. For the reasons below, this Court concludes it does.

"[T]he Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups." *Washington v. Davis*, 426 U.S. 229, 239 (1976); *see also Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217 (1995) ("[T]he equal protection obligations imposed by the Fifth and the Fourteenth Amendments [are] indistinguishable."); *Bolling v. Sharpe*, 347 U.S. 497, 500 (1954). ("[T]he

---

[35] Defendants' September 24 hearing arguments to the contrary are not persuasive. Tr. at 40:10–44:16. Defendants propose that this Court rely on *Trump v. Boyle* for the proposition that, "[a]lthough [the Supreme Court's] interim orders are not conclusive as to the merits, they inform how a court should exercise its equitable discretion in like cases." 145 S. Ct. 2653, 2654 (2025). Defendants reason that this Court should, applying *Boyle*'s logic, rely upon the Supreme Court's unsigned stay order in this case and rule accordingly. But—as this Court explained at the hearing and in prior orders—this Court cannot lean on reasoning that the Supreme Court did not give. It would be improper conjecture for this Court to attempt to infer why the Supreme Court stayed the Fourth Amendment TRO. This is particularly so where, as here, the Supreme Court's reasons may well have involved the evidentiary record that Plaintiffs had developed at the TRO stage—which, as discussed above, meaningfully differs now.

*Boyle* is easily distinguished on this basis. There, the Supreme Court held that its *stated* reasoning in a prior order, issued in *Trump v. Wilcox*, 145 S. Ct. 1415 (2025), controlled the issues presented in the case before it. *Boyle*, 145 S. Ct. at 2654 (citing *Wilcox*, 145 S. Ct. at 1415). In *Trump v. Wilcox*, the Supreme Court issued a reasoned, substantive decision explaining why the application for a stay was granted, which was several paragraphs long. 145 S. Ct. at 1415.

Here, the Supreme Court's stay decision merely states that the application for a stay is granted. It gives no indication as to why. As the Defendants well know, there is therefore no reasoning like that in *Wilcox* for this Court to apply. Tr. at 41:19–:22 (counsel for Defendants agreeing that "we do not have a reasoned opinion from the majority of the Court").

This Court cannot be faulted for failing to follow guidance that was never given.

Constitution prohibits the states from maintaining racially segregated public schools[;] it would be unthinkable that the same Constitution would impose a lesser duty on the Federal Government.")

Ancestry-based distinctions "are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Rice v. Cayetano*, 528 U.S. 495, 517 (2000) (quoting *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943)). "Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice." *Buck v. Davis*, 580 U.S. 100, 124 (2017) (quoting *Rose v. Mitchell*, 443 U.S. 545, 555 (1979)). For that reason, "[a]ny exception to the Constitution's demand for equal protection" must withstand strict scrutiny. *Students for Fair Admissions*, 600 U.S. at 206.

Given this, assuming that Stop/Arrest Plaintiffs show the existence of a Racially Based Stops Policy as outlined in this Order's Findings of Fact, they will have shown a violation of the Fifth Amendment's equal protection guarantee. "[A]ll racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny." *Adarand Constructors*, 515 U.S. at 227. "In other words, such classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests." *Id.* The classifications outlined by this Court are not. The Government does not meaningfully address how the Racially Based Stops Policy could meet strict scrutiny's exacting standards: It merely repeats its argument that "Defendants' investigatory stops are based on several salient factors," which this Court has already thoroughly addressed, and that this Court "should not accept a theory of discriminatory animus where discerning a relationship to legitimate statutory interests is not impossible." Opp. at 24. Of course, the latter argument materially misstates the burden Defendants would face under strict scrutiny on two fronts: The correct test requires a governmental interest to be compelling, not merely legitimate. *See Adarand Constructors*, 515 U.S. at 227; *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1075–76 (9th Cir. 2015) (distinguishing between the two tests). And Defendants' contention that a relationship to statutory interests is merely "not impossible"—as opposed to likely or demonstrable—drastically lowers the standard. "A racial classification, regardless of purported motivation, is presumptively invalid and can be upheld only upon an extraordinary justification." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979) (citing *Brown*

*v. Bd. of Educ.*, 347 U.S. 483 (1954)). So Defendants' proposed requirements would turn the standard on its head. More importantly, the Court finds that there is no compelling governmental interest in stopping and detaining individuals for immigration purposes based upon race.

Defendants further rely on *Trump v. Hawaii*, 585 U.S. 667, 704–05 (2018), in opposition. Opp. at 22. In *Trump v. Hawaii*, because the Supreme Court considered a government action that was facially neutral, it applied rational basis review—"whether the . . . policy is plausibly related to the Government's stated objective." *Hawaii*, 585 U.S. at 704–05. But this wholly fails to engage with Plaintiffs' evidence of direct racial classifications by the agents effectuating the Policy. *See, e.g.*, Section III.C.5 *supra* (detailing Government agents' and officers' express consideration of race, including through the use of slurs to describe individuals to be detained). In contrast, the Supreme Court found the policy at issue in *Hawaii*—the temporary suspension of "the entry of foreign nationals from seven countries,"—did not classify on a protected characteristic on its face, though most of the seven nations were Muslim-majority nations. To that end, the Supreme Court held that the rational basis standard was appropriate there. But, given this Court has found that Defendants are specifically detaining individuals based on their perceived Latino race—an explicitly racial classification—rational basis review is not appropriate here.

At the hearing, Defendants relied on *Mullin v. Doe*, 609 U.S. 324 (2026), and *Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1 (2020), for the proposition that, where a particular policy disproportionately affects "certain people from certain countries," that is insufficient to show an equal protection violation. Tr. at 74:12–75:9. But this misunderstands both Plaintiffs' theory and the evidence they have marshaled in support of it. It is true that, first in *Regents* and then again in *Mullin*, the Supreme Court explained that the fact that a policy has an outsized effect on a protected group is not evidence that an equal protection violation has taken place. *Regents*, 591 U.S. at 34 ("None of these points, either singly or in concert, establishes a plausible equal protection claim. First, because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program. . . . Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds."); *Mullin*,

609 U.S. at 349–50 ("Most would regard this as a racially diverse group of countries, but Miot respondents see them all as "non-white" nations. They claim that TPS has not been terminated for any predominantly white nation, and they therefore infer that the reason for the termination of the TPS designation for Haiti was having a predominantly non-white population. . . . Viewing all the relevant evidence, we conclude that Miot respondents are unlikely to prove that race was a motivating factor in the decision to terminate Haiti's TPS designation. It follows that they are not entitled to interim relief on their equal protection claim.").

But again, the Government misframes Plaintiffs' theory. According to the Government, the Plaintiffs' theory is that the Government is applying a facially neutral policy (not conducting a reasonable suspicion analysis) to Latino-appearing individuals alone. Tr. at 74:5–:11. That is not what the Court understands Plaintiffs to be saying—instead, it is that apparent Latino race and low-income status are improperly constituting the core of the reasonable suspicion analysis. Tr. at 76:15–:18. Plaintiffs' arguments are not fairly characterized as an assertion that Latino individuals are disproportionately impacted by a facially neutral policy. The record is replete with evidence—including Government agents' admissions, 30(b)(6) testimony, testimonials from observers and detainees, video footage of arrests, and more—that the Government has been arresting people for appearing Latino, or Latino and working class. This is far from facially neutral and renders *Regents* and *Mullin* inapposite.

Defendants further argue that, "if there really was a policy to stop people on apparent Latino ethnicity alone, I think the record would be replete . . . [with evidence] that many more U.S. citizens would be being detained, because . . . just under fifty percent of the population in the Central District is Latino." Tr. at 77:2–:16. But counsel for the Government did not have a meaningful rebuttal to Plaintiff's contention that Defendants do not track many of these stops, and so the factual record would necessarily undercount arrests of U.S. citizens. Tr. at 77:17–78:4. And, more generally, this Court is not persuaded that the fact that not every Latino-appearing person in this District has been detained is evidence that a policy targeting Latino-appearing people, particularly those who appear low-income, does not exist.

* * *

Having determined that Plaintiffs have established the existence of the Racially Based Stops Policy, and that they are likely to show the Policy violates the Fourth and Fifth Amendments, the Court turns to the other issues it must address in determining whether to grant Plaintiffs' request for a preliminary injunction.

**B. Intervenors' joinder is proper.**

At issue is whether Intervenors may join Stop/Arrest Plaintiffs' request for a preliminary injunction. This Court concludes they may.

Defendants make three arguments in opposition to Intervenors' joinder: that they "should not be parties in this case" at all, *see* Joinder Opp. at 1, that this Court should prevent them from participating in the request for a preliminary injunction by "deny[ing] the joinder motion," *see id.* at 2, and that Intervenors are not entitled to a preliminary injunction on the merits—both because they lack standing and because the *Winter* test does not support their request, *see id.* at 7–17. This Court addresses the first two arguments in this section; Plaintiffs' and Intervenors' Article III standing and entitlement to preliminary relief under *Winter* is addressed in later sections. *See* Sections IV.C–.D *infra.*

Defendants ask this Court to deny the joinder motion because "Intervenors are free to participate as amici to share their views," but that "they should not be parties in this case." Joinder Opp. at 1. As this Court explained in its recent Warrantless Arrest PI Order—and again at the hearing on August 13—Defendants' argument on this front is improper because it is untimely: This Court has already granted a motion to intervene, which Defendants did not timely oppose. Dkt. No. 129. Defendants have already moved to dismiss Intervenors from this matter. Dkt. No. 236. And this Court has already denied that motion. Intervenors' MTD Order. To the extent Defendants ask this Court to reconsider that determination, their request is lacking. This District's Local Rules limit motions for reconsiderations to the following grounds:

> (a) a material difference in fact or law from that presented to the Court that, in the exercise of reasonable diligence, could not have been known to the party moving for reconsideration at the time the Order was entered, or (b) the emergence of new material facts or a change of law occurring after the Order was entered, or (c) a manifest showing or a failure to consider material facts presented to the Court before the Order was entered.

L.R. 7-18. The Joinder Opposition does not address this rule, nor is it clear on what basis this Court should reconsider its decision on intervention or dismissal. And, in any event, "[a]bsent good cause shown, any motion for reconsideration must be filed no later than 14 days after entry of the Order." *Id.* So the request, to the extent it seek to limit Intervenors' participation in this action writ large, is denied.

Alternatively, construing the Joinder Opposition as challenging Intervenors' participation in the request for injunctive relief in particular, Defendants' argument lacks support. Defendants cite no authority, binding or otherwise, in support of the proposition that an already-joined intervening party needs court approval to join in a party's motion. Such a position would run counter to the principle that "the intervenor is entitled to litigate fully on the merits once intervention has been granted." 7C Wright & Miller's Federal Practice and Procedure § 1920 (3d ed.); *see also Ruotolo v. Ruotolo*, 572 F.2d 336, 339 (1st Cir. 1978) (noting an intervenor's ability "to play an active role during the pendency of private litigation").

Defendants, in sum, have not explained why Intervenors should not be permitted to participate in the request for preliminary injunctive relief—or more generally in this action. For that reason, Intervenors' Joinder is proper, and this Order discusses their briefing on the merits in the sections below.

**C. Stop/Arrest Plaintiffs have made the requisite showing of standing.**

The parties raise two disputes regarding Article III standing.

First, they disagree about who needs to show standing: Defendants suggest that Stop/Arrest Plaintiffs and Intervenors must both show that they have standing. *See* Joinder Opp. at 5–6. Intervenors respond that they need not establish standing. *See* Joinder at 5 n.3; Joinder Reply at 7.

Second, they disagree about whether the parties have standing: Stop/Arrest Plaintiffs and Intervenors say they do, and Defendants say they do not. *Compare* Motion at 11–15 (arguing Stop/Arrest Plaintiffs have standing) *and* Joinder Reply at 8–13 (arguing Intervenors have standing)

*with* Opp. at 7–15 (arguing Plaintiffs lack standing) *and* Joinder Opp. at 7–12 (arguing Intervenors lack standing).

For the reasons below, this Court concludes only Stop/Arrest Plaintiffs need to show standing, and that they have done so.

1. Intervenors need not show standing.

"[S]tanding is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996). This means that, "'[f]or all relief sought, there must be a litigant with standing.'" *Washington v. U.S. Food & Drug Admin.*, 108 F.4th 1163, 1172 (9th Cir. 2024) (quoting *Town of Chester v. Laroe Ests.*, 581 U.S. 433, 439 (2017)).

Defendants oppose joinder on the basis that Intervenors lack standing. Joinder Opp. at 7–12. But they also note that "Intervenors seek the same relief as Plaintiffs: a district-wide injunction." *Id.* at 1. As this Court has previously explained, the second argument renders the first untenable. It is well-settled that "intervenors that seek the same relief sought by at least one existing party . . . need not" independently establish Article III standing. *Cal. Dep't of Toxic Substances Control v. Jim Dobbas, Inc.*, 54 F.4th 1078, 1085 (9th Cir. 2022); *see also McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 233 (2003), *overruled in part on other grounds by Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010). So, because all parties agree that Intervenors and Stop/Arrest Plaintiffs seek the same relief on this posture, Intervenors' independent Article III standing is irrelevant unless this Court found that none of Stop/Arrest Plaintiffs had standing. As this Court explains in the following section, it does not reach that conclusion.[36]

In sum, Intervenors' standing is not at issue.

/ / /

---

[36] It bears mention, however, that Intervenors' assertion—that "this Court has also already held[ that] Intervenors have Article III standing"—is not wholly accurate. Intervenors' citation for this matter is this Court's denial of the motion to dismiss Intervenors' complaint. Dkt. No. 418 at 21. "Because standing is 'an indispensable part of the plaintiff's case,' it 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.'" *Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

As *Washington* makes clear, a satisfactory showing of standing at the motion to dismiss stage does not mean that, for all other purposes and at all later stages, a party has standing.

2. Stop/Arrest Plaintiffs have standing.

At issue is whether Stop/Arrest Plaintiffs have Article III standing to seek injunctive relief. For the reasons below, they do.

Though this Court has previously found some of the plaintiffs have standing, it must—and therefore does—conduct this analysis anew. As Defendants observe, this Court must assure itself of jurisdiction at each stage of the litigation. Opp. at 5–6; *see also Trump*, 847 F.3d at 1159. This Court's prior standing rulings do not absolve Plaintiffs of the evidentiary showing required at this stage. This Court therefore considers the injuries asserted here, the evidence of continued exposure to the challenged practices, and the relief sought—and it makes its determination on the merits rather than on the law of the case doctrine.

a. Individual Stop/Arrest Plaintiffs have standing.

"The three elements of standing . . . are (1) a concrete and particularized injury, that (2) is fairly traceable to the challenged conduct, and (3) is likely to be redressed by a favorable decision." *Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 662 (2019).

The first element is also referred to as "injury-in fact." To show injury-in-fact, "past exposure to illegal conduct" does not suffice absent "continuing, present adverse effects." *Lyons*, 461 U.S. at 102 (quoting *O'Shea v. Littleton*, 414 U.S. 188, 195–96 (1974)). "At th[e] preliminary injunction stage, [a plaintiff] 'must make a clear showing of each element of standing[.]'" *Yazzie v. Hobbs*, 977 F.3d 964, 966 (9th Cir. 2020) (quoting *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013)).

In a challenge to government conduct, the injury-in-fact determination requires the plaintiff to "show that he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *Lyons*, 461 U.S. at 101–02. Accordingly, a plaintiff seeking prospective relief must demonstrate a real and immediate threat of injury; a past injury alone does not suffice. *Id.* at 102–06, 111. But past encounters are relevant when considered with evidence

of an ongoing, officially sanctioned practice and the plaintiff's continued exposure to it.[37] *Melendres*, 695 F.3d at 997–98.

Therefore, to assert a claim for prospective injunctive relief, a plaintiff must demonstrate "that he is realistically threatened by a repetition of [the violation]." *Lyons*, 461 U.S. at 109. Following *Lyons*, the Ninth Circuit has "enumerated two ways in which a plaintiff can demonstrate that [their] injury is likely to recur." *Melendres*, 695 F.3d at 997–98 (quoting *Armstrong v. Davis*, 275 F.3d 849, 861 (9th Cir. 2001)). A plaintiff may do so by one of two ways: showing that (1) "the defendant had . . . a written policy . . . that the injury 'stems from,'" or (2) "the harm is part of a 'pattern of officially sanctioned . . . behavior, violative of the plaintiffs' [federal] rights.'" *Id.* at 998 (first quoting *Armstrong*, 275 F.3d at 861, and then quoting *LaDuke v. Nelson*, 762 F.2d 1318, 1323 (9th Cir. 1985)). A district court need only find that future injury is "sufficiently likely," not that the likelihood of future injury to a given plaintiff is "high." *Id.* at 998. Defendants assertion to the contrary—that the existence of official sanction merely increases the likelihood of future injury, but does not establish it, *see* Tr. at 55:6–:14—is simply incorrect. The case law does not indicate that—having established a pattern of officially sanctioned behavior and the absence of a predicate act—plaintiffs need to separately show a "certainly impending" or "real and immediate" threat. The pattern of officially sanctioned behavior, together with the absence of a predicate act, establishes the requisite threat of future injury.

i. *Individual Stop/Arrest Plaintiffs have shown injury-in-fact.*

The five individual Stop/Arrest Plaintiffs have shown that they have suffered a qualifying injury-in-fact.

As an initial matter, as discussed in the Findings of Fact, they have each suffered past injury being detained based upon their appearance as Latino, or Latino and working class. *See* Section III.B.2 *supra* (detailing each individual Plaintiffs' declaration in the context of proving that Plaintiffs

---

[37] At the hearing, Defendants advocated that *Melendres* is distinguishable on the basis that, there, the government admitted to implementing the challenged policy. Tr. at 45:18–46:3. As this Court has previously explained, however, this amounts to a distinction without a difference: Here, though Defendants do contest the existence of the Racially Based Stops Policy, this Court has independently found evidence that it exists, that it is unlawfully sanctioned, and that Plaintiffs will likely prove it is unlawful.

are subject to an unlawful detention); Section III.D.1 *supra* (detailing the harm suffered by each Individual Plaintiff). The declarations proffered by the individual Stop/Arrest Plaintiffs, particularly in the context of the Racially Based Stops Policy, further establish that they have suffered past harm as a result of the Government's unlawful conduct. Vasquez Perdomo describes being surrounded, grabbed, and handcuffed at the Pasadena bus stop where he waited for work—without being asked any questions about his identity or status. Dkt. No. 647-7 ¶¶ 3–8 ("Second Vasquez Perdomo Decl."). Villegas Molina describes the same operation, including remaining in place, telling an officer he was not running, and being directed not to move before officers asked for identification and immigration papers. Dkt. No. 647-10 ¶¶ 4–6 ("Second Villegas Molina Decl."). Osorto identifies the same circumstances of work and residence that expose him to the asserted practice, and he describes his continuing fear of another stop while seeking work. Dkt. No. 647-11 ¶¶ 1–3 ("Second Osorto Decl.") *see also* Osorto Decl. ¶¶ 1–8 (attesting that federal agents detained and arrested him without asking any questions). Hernandez Viramontes describes being questioned about his citizenship and taken from the Whittier car wash where he worked, notwithstanding his assertion of United States citizenship. Dkt. 647-8 ¶¶ 2–3 ("Second Hernandez Viramontes Decl."). Gavidia reiterates his account of being stopped at his workplace by agents who did not appear to know his identity or status. Dkt. No. 647-9 ¶¶ 1–2 ("Second Gavidia Decl."); *see also* Gavidia Decl. ¶¶ 6–11 (attesting to being detained with force before being asked about his identity or legal status, despite repeating that he has U.S. citizenship); Ex. 90 at 2:15–3:00 (body camera video corroborating his declaration). All five individuals offer support for the idea that they were profiled due to appearing Latino during their past detention. *See* Section III.C.2 *supra*; *see also* Second Vasquez Perdomo Decl. ¶ 14; Second Hernandez Viramontes Decl. ¶ 3; Second Gavidia Decl. ¶ 2; Second Villegas Molina Decl. ¶ 11; Second Osorto Decl. ¶ 3. In short, each Plaintiff cites reason for this Court to conclude that their detention was pursuant to the Racially Based Stops Policy.

The question Defendants raise is whether these plaintiffs have shown a threat of injury that is "real and immediate," not "conjectural" or "hypothetical." The Court finds that consistent with *Melendres*, these plaintiffs have demonstrated this threat by showing that Defendants (1) caused

their harm through (2) a pattern of officially sanctioned behavior which (3) violates Plaintiffs' federal rights.[38] 695 F.3d at 997–98.

As the Court explains above in its Findings of Fact—and in the discussion of likelihood of success under *Winter*—it finds here that Defendants have a pattern of officially sanctioned behavior. *See* Sections III.B, IV.A *supra*. The Racially Based Stops Policy of which this Court finds evidence in this Order means that, in lieu of developing individualized, reasonable suspicion to justify detentive stops, Defendants routinely rely on sweeping generalizations about appearing Latino, or Latino and working class, to detain individuals in violation of their constitutional rights. As this Court discusses below, Stop/Arrest Plaintiffs are likely to prevail on that the Racially Based Stops Policy exists, and that its existence violates Plaintiffs' Fourth and Fifth Amendment rights. *See* Section IV.A.1 *supra* (finding Plaintiffs will likely show the Government's policy exists); Section IV.A.2 *supra* (finding Plaintiffs will likely show the Government's policy is officially sanctioned); Section IV.A.3 *supra* (finding Plaintiffs will likely show the Government's policy is illegal).

The Ninth Circuit's interpretation of *Lyons* instructs that a determination that individuals have been subjected multiple times to unlawful stops and that the Government continues to target the same kinds of locations can satisfy the requirements in *Lyons* of a threat that is "real and immediate," not "conjectural" or "hypothetical." *Vasquez Perdomo*, 148 F.4th at 674–75 ("As they note, the record shows only one individual, J.M.E., has been stopped by Defendants twice. But that one recurrence is significant . . . . [And] Defendants' ongoing Operation At Large involves sending contact teams to public places and types of businesses, such as carwashes and Home Depots that they believe are 'utilized' by [undocumented] immigrants."). What the Ninth Circuit discussed in *Vasquez Perdomo* remains true: Multiple declarants have been detained twice. Melendrez Decl. ¶ 8–9 (CLEAN member "Rodrigo" detained and questioned twice); *id.* ¶13 (CLEAN member "Manuel"

---

[38] The *Melendres* formulation of standing for injunctive relief addresses injury-in-fact and causation, but not redressability. It bears mention that Defendants do not contest, and therefore concede, that Stop/Arrest Plaintiffs' alleged harms can be redressed through injunctive relief. In any event, this Court has no trouble concluding—as it did in the Warrantless Arrest PI Order—that an injunction preventing the government's unlawful conduct would redress the risk of future harm due to that unlawful conduct. *See* Warrantless Arrest PI Order at 27.

detained and questioned twice); H.A. Decl. ¶¶ 5–20 (U.S. citizen, who is Latino and works at a car wash, attesting that he was detained and questioned multiple times).

Each Individual Plaintiff describes continued exposure to the circumstances in which the challenged encounters occurred. Vasquez Perdomo expects to continue seeking work at bus stops in Pasadena; Villegas Molina continues to seek construction work and use the same area for transportation; Osorto continues to live and seek work in Pasadena. Vasquez Perdomo Decl. ¶¶ 14–15; Villegas Molina Decl. ¶¶ 13–14; Osorto Decl. ¶¶ 2–3. Hernandez Viramontes works almost daily at the car wash where he was stopped, and Gavidia anticipates returning to his work at Yank Towing. Hernandez Viramontes Decl. ¶¶ 2, 4; Gavidia Decl. ¶ 2. Their asserted (and uncontroverted) exposure concerns ordinary, recurring activities at identified places—not a hypothetical series of future choices.

Moreover, the Ninth Circuit has distinguished *Lyons* on three bases that all apply here: "the district court . . . made an explicit finding of likelihood of recurrence, there is evidence that the complained-of conduct stems from a pattern or practice by Defendants, and there is no specific predicate action required by Plaintiffs to trigger Defendants' challenged practice." *Vasquez Perdomo*, 148 F.4th at 675.

In Opposition, Defendants emphasize that what was called "Operation at Large" has now concluded. *See* Opp. at 5–6. The relevant question, however, is whether the challenged practices continue—not whether an operation retains its original name or personnel. The evidence of subsequent encounters, continuing non-targeted enforcement, and approval of the challenged methods supports a finding of continued exposure regardless of those changes. *See* Crook Dep. at 95:25–96:13; Ortiz Dep. at 145:7–46:3, 175:2–76:21. Though aggregate arrest data alone cannot establish unlawful conduct, they do corroborate continued field enforcement. See Dkt. No. 647-1 ¶¶ 14–19. Regardless of how Defendants refer to it, widespread immigration enforcement is ongoing. Whether Operation at Large is ongoing, then, is far from dispositive.

In sum, this Court is satisfied that—particularly read in tandem with the Court's findings on the Government's reliance on an unlawful policy—Stop/Arrest Plaintiffs have sufficiently shown a realistic chance that they will suffer future harm at the hands of the policy.

ii. *Individual Stop/Arrest Plaintiffs have shown Defendants' conduct caused their injury.*

Second—as Defendants do not appear to meaningfully dispute—Plaintiffs have sufficiently shown causation. The harm that the individual Plaintiffs face naturally flows from Defendants' policy of unlawfully developing reasonable suspicion on the basis of appearing to be Latino, or Latino and working class. Based on the over fifty declarations, the Government's admissions, and the controverting I-213 and video evidence—along with expert testimony—this Court has no trouble concluding that (assuming without deciding that the Government is following an unlawful policy) Plaintiffs have shown their harm is downstream of it.

Defendants' only opposition on this point appears to be that the alleged unlawful policy does not exist. This is an argument that this Court addresses in greater depth in its discussion of Plaintiffs' demonstrated likelihood of success under *Winter*. *See* Section IV.A *supra*.

iii. *Individual Stop/Arrest Plaintiffs have shown their injury is redressable.*

Third—as Defendants do not appear to address, and therefore concede—injunctive relief is likely to redress Plaintiffs' injuries that flow from the Racially Based Stops Policy. Plaintiffs ask this Court to issue "a preliminary and permanent injunction enjoining further violations of Plaintiffs' rights." 2AC at 83. Because Defendants' policy, which this Court discusses at length in Section IV.A *supra*, is in ongoing violation of Plaintiffs' constitutional rights, it follows that enjoining the Government from following that policy will grant Plaintiffs relief. Put another way, their asserted harms—which they allege arise directly from illegal conduct at the hands of the Government and their agents—can be redressed with an injunction.

* * *

All in all, Plaintiffs have shown that the Government has likely stopped them as part of the Government's unlawful policy of conducting immigration detentions on the basis of race. Plaintiffs have shown that the Racially Based Stops Policy has caused them past harm—and, because the Policy is ongoing, because it regularly targets people like Plaintiffs, and because they cannot realistically take action to avoid being subject to the Policy in the future, they have a realistic

prospect of imminent harm. And, as Defendants do not meaningfully dispute, Plaintiffs' injuries were caused by the Policy, and an injunction preventing the policy would redress Plaintiffs' harms. In sum, Individual Plaintiffs have standing.

b. Organizational Stop/Arrest Plaintiffs have standing.

As the request for a preliminary injunction merely requires one plaintiff with Article III standing, this Court need not consider Organizational Stop/Arrest Plaintiffs' standing to continue to the merits. Nevertheless, even if the three moving organizations required an independent showing of standing—they have made that showing.

An association has associational standing when (1) its members have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Students for Fair Admissions*, 600 U.S. at 199.

*First*, LAWCN, CHIRLA, and UFW each identify at least one member who has likely been subject to the Government's Racially Based Stops Policy. *See* Sections III.B.2, III.C.2 *supra*. They do so through sworn affidavits describing the Policy's impact on their membership. *See* Gudino Decl. ¶¶ 1–3, 27–28 (declarant, Executive Director of LAWCN, alleging that "on at least one occasion[,] immigration agents detained and arrested a Spanish-speaking customer at [a] car wash," and that "immigration agents seem to target non-white, Spanish-speaking workers"); Salas Decl. ¶¶ 1–3, 18–21 (declarant, Executive Director of CHIRLA, alleging that four members, all of whom were day laborers and/or Latino, were detained or arrested absent questioning or explanation); Strater Decl. ¶¶ 1–3, 29–31 (declarant, officer of UFW, alleging that member Angel, a Latino UFW member and U.S. citizen who was seeking day labor work, was detained by CBP until he confirmed his hospital of birth and showed California ID). The Government does not appear to controvert or dispute these accounts in its Opposition.

And members of LAWCN, UFW, and CHIRLA face a realistic threat of future harm stemming from the Racially Based Stops Policy. Again, a plaintiff may show that an injury is likely to recur and therefore that he has standing for injunctive relief by "demonstrat[ing] that the harm is part of a 'pattern of officially sanctioned . . . behavior, violative of the plaintiffs' [federal] rights.'"

*Melendres*, 695 F.3d at 998. This Court has detailed its findings when discussing Stop/Arrest Plaintiffs' likelihood of success. *See* Section IV.A *supra*. But it bears mention that Defendants' agents' testimony serve as a compelling reason to think that the Racially Based Stops Policy is ongoing, that it violates Plaintiffs' members' rights, and that Plaintiffs' members have faced past and realistically likely future harm as a result. As one agent testified:

> Q. [S]o would you say that any older Hispanic male, or are there, like, additional things you observe that would help inform sort of the totality of circumstances assessment that you make?
> . . .
> A. I would, again, say "loitering." They're day workers, as your other counsel said. . . .
> Q. And when you say "day worker," what does day worker mean to you? . . . Or day laborer?
> A. I don't call them "day laborers." I call them "illegal aliens."

Clement Dep. at 161:20–62:17. And Defendants do not seem to dispute that—if they *did* follow a policy through which officers developed reasonable suspicion entirely on impermissible considerations—this would violate Plaintiffs' members' rights and cause them harm. Indeed, the risk of future harm is further strengthened where at least one of Plaintiffs' members has been stopped multiple times. Melendrez Decl. ¶ 13 (member of LAWCN and CLEAN "has been stopped twice at the car wash where he works," including one detention during which Government agents drove him away from his place of employment).

Defendants' efforts to refute standing largely turn on their characterizations of Organizational Plaintiffs' showing of standing as "pure statistical inference and anecdotes from certain uncorroborated members." Opp. at 14. This fails for multiple reasons. First, as discussed in the Findings of Fact, Stop/Arrest Plaintiffs do not merely stand on statistical analyses and a handful of anecdotes. Substantial evidence—including Defendants' own admissions—supports the existence of the Racially Based Stops Policy. *See, e.g.*, Sanchez Dep. at 125:2–37:3; Clement Dep. at 158:3–62:17; 247:2–49:8. Second, Defendants' characterization of the evidence as uncorroborated anecdotes is inconsistent with this Court's view of the record; many of the arrest narratives are, in fact, corroborated by Defendants' officers testimony, other witnesses, or video evidence. *See, e.g.*, Gavidia Decl. ¶¶ 7–8; Ex. 91 at 2:15–3:00 (body camera video showing agents slamming Gavidia against a fence as he protested that he was born in Los Angeles); *see also* Ex. 65 ("Third Hernandez

Viramontes Decl.") ¶¶ 3–6; Ex. 93 (video corroborating Viramontes' account); Ex. 15 at 261:14–25 (agent who stopped Viramontes admitting that the interaction constituted a detention). And third, in any event, Defendants do not meaningfully dispute the factual accounts presented—for example, competing declarations by their officers calling Plaintiffs' narratives into question.

*Second*, protecting those members against the asserted detention practices is germane to the organizations' purposes. LAWCN coordinates the work of worker centers and labor organizations and addresses issues affecting low-wage workers, including immigrant workers, in the Los Angeles area. Gudino Decl. ¶¶ 6–14, 25–30. CHIRLA is a membership organization engaged in protecting immigrant rights and assisting members affected by immigration enforcement. Salas Decl. ¶¶ 2–4, 10–11. And UFW is a national leader in the movement for immigration reform and immigrants' rights. Strater Decl. ¶¶ 12–14. Seeking prospective relief against the practices affecting those members falls within each organization's established mission. Defendants do not appear to contest this prong,[39] but in any event, it is met.

*Third*, adjudicating the asserted practices and granting the prospective relief sought does not require each affected members to participate as a party. The use of member declarations to establish standing or illustrate an operation does not make every member an indispensable participant in a challenge to a generally applicable practice. Plaintiffs seek neither individualized damages nor an adjudication of every member's entitlement to release. *See Brock*, 477 U.S. at 287–88.

Defendants' argument in opposition to the third prong rests entirely on cases that this Court has already explained do not apply. Defendants' reliance on the personal nature of Fourth

---

[39] At the hearing, counsel for Defendants advocated that the way that LAWCN, CHIRLA, and UFW describe their respective missions on their websites weighs against germaneness. It does not. First, the language that counsel for Defendants represented was from Organizational Plaintiffs' websites did not controvert or undercut Plaintiffs' declarations, discussed above. Tr. at 58:3–59:5. Second, Defendants offer no authority in support that website descriptions are in any way dispositive of organizational purpose—particularly for entities that, like Plaintiffs, appear to engage in a variety of interrelated missions. Third, Defendants did not properly disclose any of this proffered evidence through their moving papers or through any exhibit. Fourth, accepting Defendants' position would substantially overread the germaneness requirement to require a precise fit between the organization's core mission and the interests it seeks to vindicate through litigation. That is not the standard. 13A *Wright & Miller's Federal Practice and Procedure* § 3531.9.5 (3d ed.) ("Germaneness is often found without difficulty. Many cases recognize a wide range of purposes as germane to a labor union's interest in protecting members' interests. Some opinions suggest that the threshold is low, or even that a member's injury that is not germane to organization purposes can be borrowed to support litigation for purposes that are germane.").

Amendment rights does not defeat this showing. Opp. at 15. *Alderman v. United States* addressed the attempt to *suppress evidence* based on a violation of another person's rights—which is not this case's posture. 394 U.S. 165, 174 (1969). LAWCN, UFW, and CHIRLA instead proceed under the established doctrine permitting an association to represent its own injured members. *See Stavrianoudakis v. U.S. Fish & Wildlife Serv.*, 108 F.4th 1128, 1135, 1143 (9th Cir. 2024). Similarly, *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978), another criminal case, stands for the inapposite principle that criminal defendants may not raise a Fourth Amendment challenge to the unlawful search of a third party's property. And *Black Lives Matter v. City of Los Angeles*, 113 F.4th 1249 (9th Cir. 2024), turned on the Ninth Circuit's conclusion that the district court had not sufficiently identified commonality within a class asserting Fourth Amendment claims. It did not find that the court could not have concluded that commonality was met—it merely remanded the action for the district court to identify whether Rule 23's commonality requirement was met. *Id.* at 1261. Of course, this does little to show that LAWCN, UFW, and CHIRLA require their individual members to participate in this litigation. For that reason, the arguments to the contrary are unavailing, and the third *Hunt* factor is met.

In sum, LAWCN, UFW, and CHIRLA have standing.

**D. The *Winter* test supports a preliminary injunction.**

1. Stop/Arrest Plaintiffs are likely to succeed in pursuing their claims.

At the heart of the Motion is whether Stop/Arrest Plaintiffs have shown they will likely prevail on their Fourth and Fifth Amendment claims challenging the Racially Based Stops Policy. For the reasons above, *see* Section IV.A *supra*, this Court concludes that they have.

a. *Stop/Arrest Plaintiffs are likely to show the Government has a Racially Based Stops Policy.*

The Racially Based Stops Policy alleged involves "a policy and practice of conducting detentive stops in this District without a presto individualized, particularized assessment of reasonable suspicion that the person to be stopped is present within the United States in violation of U.S. immigration law, and instead relying on the individual's apparent status as low-income or working-class and Latino." Dkt. No. 632 at 3.

The evidence in support of a Racially Based Stops Policy is substantial. This Court's Findings of Fact explain the evidentiary record in detail. *See* Section III *supra*. And this Court's analysis which determines that the Policy exists is extensive. *See* Section IV.A *supra*.

At bottom, the Court has reviewed dozens of declarations by detained individuals and witnesses detailing over fifty apparent unlawful detentions, corroborating video evidence, deposition testimony from Defendants' officers, proposed expert testimony, and more. The Government has not built a record that meaningfully disputes Stop/Arrest Plaintiffs' theories of unlawful policies. Faced with this record, this Court concludes that Stop/Arrest Plaintiffs are likely to prevail in showing that a Racially Based Stops Policy exists.

b. *Stop/Arrest Plaintiffs will likely show that the Racially Based Stops Policy violates the Fourth Amendment.*

"No one disputes that Defendants' conduct during investigative stops implicates the Fourth Amendment." Opp. at 14. To that end, having found Plaintiffs will likely succeed in showing that a Racially Based Stops Policy exists, this Court must determine whether that policy violates the Fourth Amendment. And, as discussed above, *see* Section IV.A.3.a, it has.

In sum, given that Plaintiffs will likely prevail in showing that the Racially Based Stops Policy exists, Plaintiffs are also likely to show that it violates the Fourth Amendment.

c. *Stop/Arrest Plaintiffs will likely show that the Racially Based Stops Policy violates the Fifth Amendment.*

Next, at issue is whether the Racially Based Stops Policy runs counter to the Fifth Amendment. For the reasons discussed above, *see* Section IV.A.3.b, this Court concludes it does.

At bottom, in the absence of a compelling showing of how Defendants' Policy would meet the strict scrutiny standard, Plaintiffs would likely prevail in showing the Policy violates the Fifth Amendment.

* * *

Accordingly, the first *Winter* factor is met as to both the Fourth and Fifth Amendment claims.

/ / /

2. Stop/Arrest Plaintiffs face irreparable harm absent an injunction.

Second, this Court considers whether Warrantless Arrest Plaintiffs have shown a likelihood that, absent preliminary relief, they will suffer irreparable harm. *Melendres*, 695 F.3d at 1000; *Arc of Cal. v. Douglas*, 757 F.3d 975, 990 (9th Cir. 2014). They have done so.

When a plaintiff "shows he is likely to prevail on the merits, that showing will almost always demonstrate he is suffering irreparable harm as well." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023). Stop/Arrest Plaintiffs have done just that: As this Court has already detailed in its Findings of Fact and under the framework of the first *Winter* prong, the existence of the Racially Based Stops Policy strongly supports Stop/Arrest Plaintiffs' showing on this prong. As this Court found regarding the Warrantless Arrest PI, these Stop/Arrest Plaintiffs have also demonstrated that the relevant policy is ongoing, and that Plaintiffs and their members risk redetention subject to that Policy. And the ensuing detentive stop that would stem from the Racially Based Stops Policy—meaning, the fact that the foreseeable consequences of an unlawful detentive stop is unlawful detention—further supports the conclusion that, absent this injunction, Stop/Arrest Plaintiffs risk irreparable harm.

Because Defendants' only argument in opposition reiterates their arguments against Article III standing—which this Court has already considered and rejected—the Court does not reiterate its reasoning here. Opp. at 24–25. Stop/Arrest Plaintiffs, therefore, have shown that the second *Winter* prong is met.

3. The equities and interests favor an injunction.

Third, this Court considers the balance of equities and interests. As the parties note, and as this Court has previously explained, when the nonmoving party is a governmental entity, the last two *Winter* factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). This Court thus considers the third and fourth factors—whether the "balance of equities" is in Petitioner's favor and whether an injunction is in the public interest—jointly. *All. for the Wild Rockies*, 632 F.3d at 1135.

As this Court has acknowledged, it is true that Defendants have an interest in "enforcement of our Nation's immigration laws." Opp. at 25. Defendants explain that Los Angeles "is a crucial priority for immigration enforcement," so granting this order would risk unintended operational consequences and public safety concerns. *Id.* And it may well be true that Defendants seek to

prioritize immigration enforcement within Los Angeles, as is their prerogative. But they do not explain why it follows that the order would "throw a central element of immigration enforcement (investigative immigration stops) into intolerable uncertainty." *Id.* Stop/Arrest Plaintiffs' sought injunction—and this Court's issued injunction herein—do not prevent the Government from conducting any number of investigative immigration stops. *See* Kerlikowske Decl. ¶¶ 46–48 ("The preliminary injunction proposed by Plaintiffs is workable. Trained and experienced agents and officers can enforce the nation's immigration laws without resorting to profiling."). They merely seek to prevent the Government from doing so illegally. *Cf.* Warrantless Arrest PI Order at 42 ("But Warrantless Arrest Plaintiffs' sought injunction does not unsettle any of that: They do not seek to prevent the Government from conducting immigration enforcement operations, arresting noncitizens, or scheduling for removal proceedings. They merely ask this Court to ensure the Government is abiding by its statutory and regulatory responsibilities in its actions in this District."). To that end, though Defendants name legitimate government interests, they do not show that injunctive relief runs counter to those interests.

In any event, the Government "cannot reasonably assert that it is harmed in any legally cognizable sense" by being enjoined to comply with the law.[40] *Zepeda v. Immigr. & Naturalization Serv.*, 753 F.2d 719, 727 (9th Cir. 1983). Put another way, the Government's explanation of its general interest in immigration enforcement does not outweigh the substantial articulated injuries suffered by Plaintiffs, their members, and the putative classes. To that end, "[a]ny additional administrative costs to the government are far outweighed by the considerable harm to plaintiffs' [] rights in the absence of the injunction." *Hernandez*, 872 F.3d at 995–96. "Faced with such a conflict between [the minimal cost to implement additional safeguards] and preventable human suffering, . . .

---

[40] "Defendants cannot be harmed by an order enjoining an action they will not take." *Melendres*, 695 F.3d at 1002. So Defendants' insistence that they have, at all times, "acted well within a totality-of-the circumstances analysis" is at some tension with the position that this injunction would run counter to the equities and the public interest. Opp. at 21. As this Court has previously explained, "requiring law enforcement to comply with the constitution does not prevent law enforcement from enforcing the law." Dkt. No. 87 at 30 ("TRO Order") (citing *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1502 (9th Cir. 1996)).

the balance of hardships tips decidedly in plaintiffs' favor." *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983).

At bottom, all four *Winter* prongs weigh in favor of granting Stop/Arrest Plaintiffs' request for preliminary injunctive relief.[41] For that reason, this Court will grant it, and continues to consider Defendants' remaining arguments on scope.

**E. The injunction as modified is appropriate in scope.**

Separate from their arguments on Article III standing and the *Winter* test, Defendants raise three other arguments in opposition to the issuance of an injunction: that the INA prevents the Court from issuing classwide relief, that the injunction is impermissibly universal, and that the injunction is overbroad. The Court addresses these arguments below.

1. Section 1252(f)(1) does not preclude the injunction.

First, at issue is whether—as Defendants posit—Section 1252(f)(1) prevents this Court from issuing a classwide injunction. It does not.

In general, only the Supreme Court has "jurisdiction or authority to enjoin or restrain the operation of the provisions of [8 U.S.C. Sections 1221 to 1232]." 8 U.S.C. § 1252(f)(1). Defendants contend that the requested injunction implicates Sections 1226 and 1229. These sections respectively

[41] One of Defendants' most overarching arguments—and one Defendants have made on prior postures before this Court—deserves mention.

Defendants' arguments largely turn on what they characterize as "déjà vu": "Plaintiffs seek the same extraordinary injunctive relief regarding immigration stops that the Supreme Court rejected less than a year ago." Opp. at 1. Defendants are mistaken: Plaintiffs seek a substantially different preliminary injunction than the one they requested—and the one this Court granted—last year. *Compare* Dkt. No. 632-90 (proposed order attached to the Motion) *with* Dkt. No. 45-22 (proposed order attached to the July 2025 TRO request).

The Opposition relies heavily on the Supreme Court's grant of a stay regarding the TRO that this Court granted in July 2025. *See, e.g.*, Opp. at 6–13. But that stay does not decide this Motion. First, the requested preliminary injunction materially differs from last year's temporary restraining order. The two requests differ in the injunctions they seek, the evidence they cite in support, and their underlying theories of relief under the Fourth and Fifth Amendment. And second—as this Court has explained, and contrary to Defendants' suggestions—the Supreme Court's stay order was not accompanied by an opinion of the Court. *Compare Vasquez Perdomo v. Noem*, 146 S. Ct. 1 (2025) (noting that no opinion of the Court was issued) *with* Opp. at 13 (contending that "*the Supreme Court* has explained" a theory and citing a concurring opinion in support (emphasis added)). So this Court can only guess as to the Supreme Court's reasoning for granting the stay—and it would be improper to rely on that conjecture as controlling precedent. Though the stay order was accompanied by two opinions (one concurring and one dissenting), neither is binding precedent. Of course, the parties are entitled to respectful consideration of the authorities they cite, binding or not. And this Court has considered each of Defendants' arguments on the merits. But this Court must follow the law that binds it. A concurrence does not provide it here.

address the apprehension and detention of noncitizens and the initiation of removal proceedings. The Opposition, relying on *Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022), thus asks this Court to deny the injunction as an impermissible restriction on the Government's ability to carry out its covered immigration enforcement activities.

*Aleman Gonazlez*, however, does not control this outcome. It interprets the relevant statute as follows: Section 1252(f)(1) "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." 596 U.S. at 550. But the sought injunction here does not directly compel Defendants to (or not to) enforce, implement, or carry out their power to remove, apprehend, or detain noncitizens. Put another way, Stop/Arrest Plaintiffs' proposed injunction does not prevent the government from detaining or removing any noncitizen that is properly detainable or removable. It merely requires that Defendants' officers refrain from relying solely on impermissible factors in their formation of reasonable suspicion prior to a detentive stop. This Court is unpersuaded that Section 1252(f)(1) would reach so broadly as to prevent this Court from entering an injunction to prevent further violations of detainees' constitutional rights—many of whom, as discussed in the Findings of Fact, have lawful status. *Aleman Gonzalez* does not stand for such a sweeping proposition. To the contrary, courts read Section 1252 narrowly. *Biden v. Texas*, 597 U.S. 785, 798 (2022) (noting the "narrowness of . . . scope" of Section 1252(f)(1)); *see also Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 989 (9th Cir. 2025), *overruled in part on other grounds*, *Ariz. All. for Retired Americans v. Mayes*, No. 22-16490, 2026 WL 2277101 (9th Cir. Aug. 7, 2026).

Moreover, the Ninth Circuit "has repeatedly held that § 1252(f)(1) does not prohibit an injunction simply because of collateral effects on a covered provision." *Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 138 F.4th 1102, 1125 (9th Cir. 2025), *rev'd and remanded sub nom. on other grounds*, *Mullin v. Al Otro Lado*, 146 S. Ct. 2079 (2026). So an injunction is permissible even to the extent it has a downstream impact, "one step removed," from Sections 1221 to 1232. *Gonzales v. Dep't of Homeland Sec.*, 508 F.3d 1227, 1233 (9th Cir. 2007).

For these reasons, this Court is disinclined to find that Section 1252(f)(1) bars the injunction because of its indirect effect on Defendants' discretionary power to detain, apprehend, and remove.

2. The injunction is not universal.

In *CASA v. Trump*, the Supreme Court addressed what it called "universal injunctions," defined as "district courts asserting the power to prohibit enforcement of a law or policy against *anyone*." 606 U.S. at 837. It concluded: "Because the universal injunction lacks a historical pedigree, it falls outside the bounds of a federal court's equitable authority under the Judiciary Act." *Id.* at 847.

Defendants suggest that Stop/Arrest Plaintiffs' sought injunction runs afoul of *CASA v. Trump* because it would impermissibly bar Defendants from enforcing a law or policy against "anyone." Opp. at 28 (quoting *CASA*, 606 U.S. 831, 837 (2025)).

In *CASA*, the Court addressed what it called "universal injunctions," defined as "district courts asserting the power to prohibit enforcement of a law or policy against *anyone*."606 U.S. at 837. It concluded: "Because the universal injunction lacks a historical pedigree, it falls outside the bounds of a federal court's equitable authority under the Judiciary Act." *Id.* at 847.

But the sought injunction, is far from universal. *See* Dkt. No. 632 at 3 ("Plaintiffs respectfully request that the Court grant a preliminary injunction enjoining Defendants from conducting detentive stops in this District without a pre-stop individualized, particularized assessment of reasonable suspicion . . . . "). Defendants do not offer any authority—binding or otherwise—in support of finding that such an injunction is impermissibly universal. Indeed, they do not explain this argument further at all. Moreover, as the Ninth Circuit has confirmed following *CASA*, a District-wide injunction is permissible where the location of the injury "not national, but limited to one judicial district." *Vasquez Perdomo*, 148 F.4th at 686.

Moreover, given the nature of the policy this Court has identified and the nature of the relief sought, the injunction is narrowly tailored to provide Plaintiffs complete relief. *See Washington v. Trump*, 145 F.4th 1013, 1038 (9th Cir. 2025), *cert. denied*, No. 25-364, 2026 WL 1871300 (U.S. June 30, 2026) (concluding that "the district court did not abuse its discretion in issuing a universal injunction in order to give the States complete relief"). After all, as Plaintiffs noted at the hearing, and as the Ninth Circuit held in an analogous context, it would be impracticable to issue relief only as to named parties where—as here—many detentive stops seem to take place before Government agents ascertain the detainee's identity. The Ninth Circuit determined that the Court's analogous

TRO—which enjoined certain stops throughout the District—was "reasonably necessary to provide complete relief to the Plaintiffs and benefits non-plaintiffs only incidentally." *Vasquez Perdomo*, 148 F.4th at 686. The Ninth Circuit went on to explain why:

> Plaintiffs assert that federal officials are stopping people "based not on individualized suspicion, but ... profiling"—in other words, individuals in the Los Angeles area are being subjected to detentive stops based on group rather than individual characteristics, *before* the federal agents conducting the roving patrols know who the people stopped are. As the district court recognized, given the nature of the challenged conduct—detentive stops of individuals based solely on a broad profile—enjoining Defendants from stopping *only the Plaintiffs* would not afford the Plaintiffs meaningful relief. How would a federal agent who is about to detain a person whose identity is not known, based on some combination of the person's ethnicity, language, location, and occupation, discern in advance whether that person is on the list of individuals that agents are enjoined from stopping? The agents cannot stop first and then check whether the stopped person is one of the covered individuals; at the point of the stop, the challenged harm has already occurred.

*Id.* at 686–87. Because an injunction in which the Government is enjoined from this unlawful practice with respect to only a finite list of individuals in the Central District would not be administrable, this Court rejects Defendants' requests to narrow the relief only to named parties. Opp. at 26; *see also* Tr. at 82:22–83:15.

For these reason, this Court finds that the sought injunction does not run afoul of *CASA*.

3. <u>The injunction is not impermissibly vague.</u>

Next, Defendants contend that the sought injunction is an impermissibly vague follow-the-law injunction. Opp. at 27. For the reasons below, it is not.

As Defendants note, Rule 65 requires a court issuing preliminary injunctive relief to describe in reasonable detail what it seeks to restrain. Fed. R. Civ. P. 65(d); *see also Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (noting that Rule 65 seeks to prevent "the possible founding of a contempt citation on [an preliminary injunction] too vague to be understood"). As a nonbinding court of appeals has noted, where an injunction "would do no more than instruct [the nonmovant] to obey the law, . . . it would not satisfy the specificity requirements" of this rule. *Burton v. City of Belle Glade*, 178 F.3d 1175, 1201 (11th Cir. 1999).

But Defendants do not meaningfully grapple with the proposed order's scope on this point: They cite the motion's characterization of the relief sought as that from an "ongoing campaign of

suspicionless and discriminatory detentive stops in violation of the Constitution." Opp. at 27 (citing Motion at 1). But the relief sought itself—seen in the docketed proposed order at Dkt. No. 632-90—is far more specific about the specific activities it seeks to prevent. Upon review of the modified injunction issued below, this Court is satisfied that Defendants can readily administer the injunction and understand the parameters of the conduct it seeks to prevent. In sum, this argument is unavailing.

4. The injunction as modified is not overbroad.

Fourth, this Court addresses Defendants' contention that "the requested injunction is impermissibly overbroad," in that it "imposes reporting and documentation obligations and [dictates] what reasonable suspicion factors immigration officers may and must consider in the field." Opp. at 2. Defendants do not more meaningfully explain what about the sought preliminary injunction is overbroad and why the reporting and documentation obligations are inappropriate. Nevertheless, because this Court has an independent obligation to set the scope of the relief it grants, it narrows some of the sought injunction's terms.

"A district court has considerable discretion in fashioning suitable relief and defining the terms of an injunction. Appellate review of those terms 'is correspondingly narrow.'" *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) (quoting *Coca-Cola Co. v. Overland, Inc.*, 692 F.2d 1250, 1256 n.16 (9th Cir. 1982)). Injunctive relief must be "tailored to remedy the specific harm alleged." *Id.* (citing *Aviation Consumer Action Project v. Washburn*, 535 F.2d 101, 108 (D.C. Cir. 1976)).

As a preliminary matter, Stop/Arrest Plaintiffs ask this Court to issue separate injunctive provisions tied to the Fourth and Fifth Amendment violations, reasoning that this will make the injunction "severable" should a challenge to this Court's determinations as to the Fourth or Fifth Amendment fail on appeal. Tr. at 28:9–:13. The Court does not find that this is necessary or helpful. This Court's remit is to draft an injunction that is clear. Although the Court has found that the Racially Based Stops Policy likely violates the Constitution in two ways, two injunctions saying virtually the same thing is not necessary and may cause confusion. The Court will simply enjoin the Policy.

Beyond this, Stop/Arrest Plaintiffs seek an injunction that is in part untethered to the likely violations this Court has found.

First, Plaintiffs would have this Court enjoin any use of race or ethnicity outside of instances except where connected with a known target description, and so long as Defendants have reasonable basis to think a detainee is the target. But this is not in keeping with the violations the Court has identified or what the law permits. The Court has found that the Racially Based Stops Policy likely violates the Fourth and Fifth Amendments, but it has not found that *any* use of race is per se impermissible. It is possible that there may be permissible uses of race outside of a specific target—for instance, a tip that a certain employer regularly employs undocumented persons of a certain race from a certain country. The Court will therefore not grant Plaintiffs' request to enjoin any use of race "in part."

Second, the Plaintiffs ask this Court to require Defendants to document all field encounters and turn over this documentation to the Plaintiffs every thirty days. Given that the Policy identified and found to be unlawful concerns detentive stops—not all field encounters—the Plaintiffs have not justified why the injunction should be extended to all field encounters, and the Court therefore declines to do so.

More significantly, the Motion does not explain why this Court should grant the reporting and documentation requirement at all, and the Reply's discussion is not persuasive: It merely calls the sought injunction "straightforward and routine." Reply at 24. And, though Plaintiffs are correct that the Opposition improperly characterizes the sought relief as dictating the factors that officers should consider, they do not affirmatively explain what makes the documentation and reporting necessary here. And their cited authorities do not help make this case. *Patterson v. Six Flags Theme Parks, Inc.*, No. 25-2070, 2026 WL 2137692, at *2 (9th Cir. July 24, 2026), a nonprecedential and unpublished case, merely stands for the uncontroversial proposition that district courts have considerable discretion in fashioning appropriate injunctive relief. *Id.* at *2. The fact that that district court, on that factual record, found reporting requirements to be necessary to grant the plaintiff

complete relief does not necessitate finding similarly here.[42] Similarly, in *Unknown Parties v. Johnson*, the district court determined that the record warranted reporting requirements—but the determination in that case, which turned on immigration detainees' claims of unlawfully substandard detention conditions, does little to inform whether these Plaintiffs have substantiated their specific request. No. 15-250, 2016 WL 8188563, at *1–3, *16 (D. Ariz. Nov. 18, 2016), *clarified on denial of reconsideration*, No. CV-15-00250-TUC-DCB, 2017 WL 467238 (D. Ariz. Jan. 3, 2017), *aff'd sub nom. Doe v. Kelly*, 878 F.3d 710 (9th Cir. 2017). And Plaintiffs' citation to *Index Newspapers LLC v. United States Marshals Service*, 977 F.3d 817, 834 n.11 (9th Cir. 2020), misses key context. There, the Court explained, "[T]he district court went to great lengths to make sure the terms of the injunction do not impede the federal defendants' ability to safely achieve their mission. . . . [B]ut requiring the officers' uniforms to bear unique identifiable markings is a common-sense method to ensure that non-compliance with the court's order may be addressed." *Id.* at 834 & n.11. This form of compliance requirement is not at issue here, so *Index Newspapers* does little to support Plaintiffs' request.

Plaintiffs' arguments at the hearing—that they seek documentation already required of Government agents, and that discovery is not a viable alternate route to monitoring the injunction—do not persuade otherwise. Plaintiffs' request would impose substantial reporting requirements beyond what the Government presently does.[43] This is of note because, as the Supreme Court has

---

[42] In any event, the *Patterson* district court had ordered quarterly compliance reports to the court—not, as Stop/Arrest Plaintiffs ask here, extensive documentation and monthly reporting to Plaintiffs themselves. *Id.*

[43] Plaintiffs' Supplemental Brief asks this Court to "decline to make a finding that the proposed documentation requirements would be unduly burdensome or interfere with lawful enforcement operations." Pla. Supp. at 2. As explained above, all this Court is finding at this stage is that Plaintiffs have not sufficiently justified their request for the broad documentation requirements that they seek to impose—not that Plaintiffs could not justify such a request, nor that Defendants have affirmatively shown that the request is unduly burdensome.

At the hearing, Plaintiffs justified their sought injunction on the basis that Defendants' "written policies and trainings actually require [the] tracking" that Plaintiffs request. *See* Tr. at 32:6-:10. In supplemental briefing, Plaintiffs concede that this is not the case regarding ICE—ICE's training documents do not appear to instruct agents on documentation requirements in cases that do not result in an I-213. *See* Dkt. No. 529-29 at 70-71; Pla. Supp. at 3. Plaintiffs maintain that CBP instructs agents to document this. Pla. Supp. at 3. It does appear that the cited CBP training slides instruct officers to "carefully document" consensual encounters, detentions, and uses of force — not just arrests. Dkt. No. 529-30 at 36. Defendants' argument to the contrary is unavailing: What they cite as instructions to terminate an encounter when there is no reasonable suspicion is wholly compatible with a requirement to document the interaction after the fact. Def. Supp. at 4. Nevertheless, this Court is not persuaded that this CBP training means that it would not be burdensome for this

instructed, "[i]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *CASA*, 606 U.S. at 852 (citation modified) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). Plaintiffs also contend that they seek documentation that does not exist otherwise, so cannot be acquired through discovery. Tr. at 31:25–32:5. But Plaintiffs do not require this documentation in this form to seek enforcement of this injunction; as this Motion has shown, other evidence can demonstrate that the preliminary injunction is being violated and/or should be enforced. For these additional reasons, this Court will not require documentation and reporting of all detentive stops at this stage.

The denial of this request is without prejudice. Should a change in circumstances warrant it, Plaintiffs may move to enforce the preliminary injunction or ask this Court to reconsider imposing documentation or reporting requirements.

**F. No bond or stay is warranted.**

1. <u>Stop/Arrest Plaintiffs need not post a bond.</u>

First, Defendants ask that—if this Court is inclined to issue injunctive relief—this Court should require Stop/Arrest Plaintiffs to post security. Opp. at 26–27. This Court finds that no bond is necessary.

"Rule 65(c) invests the district court with discretion as to the amount of security required, *if any*." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (citation modified). Under Rule 65, a court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 56(c). District courts have "wide discretion in setting the amount of the bond." *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003) (citing *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725,

---

Court to impose the requested documentation requirements. Whether it is CBP policy or not, it appears undisputed that CBP does not presently document what Plaintiffs seek to compel them to document. So for this Court to impose reporting that is not currently being done—reporting that would capture substantial amounts of interactions—does appear burdensome, and Plaintiffs have not justified that burden.

In any event, because this Court concludes that Plaintiffs have not made a sufficient showing that the breadth of what they request is necessary to afford Plaintiffs "complete relief," it is of no moment whether Government policy is consistent with some of the documentation that Plaintiffs seek. *CASA*, 606 U.S. at 852.

733 (9th Cir. 1999)). The bond amount "may be zero if there is no evidence the party will suffer damages from the injunction." *Id.* (citing *Gorbach v. Reno*, 219 F.3d 1087, 1092 (9th Cir. 2000)). As the Ninth Circuit has explained, the language of Rule 65 does not "absolve[] the party affected by the injunction from its obligation of presenting evidence that a bond is needed." *Id.* at 883.

Defendants fall short of this obligation. Their request to this Court explains:

> The Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). If the Court issues an injunction here, it should require Plaintiffs to post an appropriate bond commensurate with the scope of any injunction.

Opp. at 26. As a preliminary matter, this mischaracterizes the standard in Rule 65(c): As this Court has explained, and the Ninth Circuit explained in *Connecticut General Life Insurance*, the requirement for movants to post security is constrained by whatever amount the court finds is proper to pay the nonmovant's costs, should the injunction later be found to be wrongfully issued. Defendants do not quote, or meaningfully address, the part of the standard that obliges them to show that a bond is needed. Perhaps tellingly, Defendants do not offer any exhibits or calculations in support of their costs in complying with the requested injunction, suggest any specific amount in bond, or otherwise expand upon their request. In sum, Defendants give this Court no evidence upon which it could award any nonzero bond amount.

In the absence of such an evidentiary showing, this Court concludes that no bond is needed: Defendants have not shown proof of their damages from compliance with the injunction. For that reason, this request fails.

2. <u>The Government does not show it is entitled to a stay.</u>

Second, Defendants ask that—if this Court is inclined to issue injunctive relief—it should stay that relief at the outset for fourteen days. Opp. at 28. This Court is disinclined to do so.

As the proponents of a stay, Defendants bear the burden of demonstrating that one is warranted. *United States v. Mitchell*, 971 F.3d 993, 996 (9th Cir. 2020). A stay pending appeal is an "extraordinary remedy." *Id.* at 999. A "stay is not a matter of right, even if irreparable injury might otherwise result." *Nken v. Holder*, 556 U.S. 418, 433–34 (2009). In determining whether to grant a stay, courts consider: "(1) whether the stay applicant has made a strong showing that he is likely to

succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* at 426.

The Government does not make the requisite showing. Defendants' request in full is as follows: "Defendants respectfully request that if this Court does enter injunctive relief, that relief be stayed for a period of fourteen days to permit the government to seek a stay pending appeal in an orderly manner." Opp. at 28. This falls far short of meeting the "extraordinary" standard for a stay. *Mitchell*, 971 F.3d at 999. Defendants do not explain why staying the relief will assist then in seeking a stay pending appeal in an orderly manner. Nor does it appear to this Court that complying with the injunction—even temporarily, should Defendants file a future application to stay and should this Court or another grant it—would meaningfully inhibit or prejudice Defendants from exercising their right to appeal. What's more, Defendants do not cite any authority, binding or nonbinding, in support of stays granted on similar postures. Because they explain their request no further, this Court cannot find the standard met at this time.

Moreover, as this Court has determined, Stop/Arrest Plaintiffs will likely prevail on the theories for which this Court grants preliminary injunctive relief, so it does not find that Defendants have made a strong showing of likelihood of success on the merits. Moreover, the Government does not appear to face irreparable injury from this Court's issued injunction. The Opposition does assert, just as Defendants contended at the Warrantless Arrest PI stage, that the Government risks harm because an injunction could "usurp[] authority over enforcement of our Nation's immigration laws." *See* Opp. at 25. But, again, Defendants "cannot reasonably assert that [they are] harmed in any legally cognizable sense" by being enjoined from unlawful practices. *Zepeda*, 753 F.2d at 727. And, though this Court acknowledges that Defendants' compliance with this Court's ordered injunction will require resources, Defendants have failed to show that they would be irreparably or unduly injured by that effort. Instead, in granting this injunction, this Court has concluded that the injunction is proportionate and narrowly tailored to the needs of this case.

To that end, the Government shows neither the requisite likelihood of success nor the requisite irreparable injury on this posture. Because these two factors are "'the most critical,'" courts

"consider the final two factors only '[o]nce an applicant satisfies the first two.'" *Mitchell*, 971 F.3d at 996 (quoting *Nken*, 556 U.S. at 434–35). Because the Government satisfies neither, the request for a stay fails.

**V. Conclusion**

For the foregoing reasons, the Court issues a preliminary injunction as described below. This Court ORDERS as follows:

1. Intervenors' Joinder is GRANTED.
2. Stop/Arrest Plaintiffs' Motion is GRANTED IN PART.
3. This Court issues the following preliminary injunction:
   i. Except when such a stop is conducted at a port of entry, checkpoint, or other functional equivalent of the border, Defendants are enjoined from enforcing their policy and practice of conducting detentive stops in this District based on racial stereotyping, rather than a pre-stop individualized, particularized assessment of reasonable suspicion that the person to be stopped is present within the United States in violation of U.S. immigration law.
   ii. In developing reasonable suspicion, an immigration agent or officer must consider the totality of circumstances and may not rely solely on apparent status as low-income or working-class and Latino, even when an identified target is allegedly low-income or working-class and Latino. Put another way, the fact that an identified target is allegedly low-income or working-class and Latino and the fact that an individual being considered for apprehension is allegedly low-income or working-class and Latino is not enough, standing alone, to provide reasonable suspicion.

4. Under Rule 65(c), this Court determines that no security is needed.

5. Defendants' request for a stay is DENIED.

Dated: October 23, 2026.

MAAME EWUSI-MENSAH FRIMPONG
United States District Judge