**O**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

PEDRO VASQUEZ PERDOMO *et al.*,

Plaintiffs,

v.

MARKWAYNE MULLIN *et al.*,

Defendants.

Case No.: 2:25-cv-05605-MEMF-SP

**AMENDED[*] ORDER GRANTING IN PART STOP/ARREST PLAINTIFFS' MOTION TO CERTIFY CLASS [DKT. NO. 647]**

Under the Fourth Amendment to the Constitution, a federal agent can only detain a person for immigration purposes if the agent has "reasonable suspicion," particular to that person, that the

[*] The Court filed its original order under seal and ordered the parties to meet and confer regarding appropriate redactions for the publicly filed version. Dkt. No. 808. The Court has considered the parties' submissions, Dkt. No. 814, consistent with the Court's separately issued rulings on the parties' pending Applications to Seal (filed at Dkt. Nos. 629, 645, and 650), no redactions are needed.

person is in the United States illegally. It goes without saying that just because someone is Latino does not mean that the person is in the United States illegally.

And under the Fifth Amendment to the Constitution, federal agents cannot decide who to stop just based upon their race.

The organizations and individuals who have brought this lawsuit say that the Government is breaking both of these parts of the Constitution. They say that federal agents in the Los Angeles area have been stopping people for immigration purposes just because they look Latino or because they look Latino and working class.

They have asked this Court to let them represent all people who have been stopped for these reasons and seek a permanent Court order against this—in legal terminology, certify a class, or in this case, two classes.

This Court has granted their request.

* * *

Before this Court is the Motion for Class Certification and Appointment of Class Counsel filed by Plaintiffs Pedro Vasquez Perdomo, Carlos Alexander Osorto, Isaac Villegas Molina, Jorge Hernandez Viramontes, Jason Brian Gavidia (the "Individual Plaintiffs"), Los Angeles Worker Center Network, United Farm Workers, and Coalition for Humane Immigrant Rights (the "Organizational Plaintiffs," and collectively with Individual Plaintiffs, the "Stop/Arrest Plaintiffs"). Dkt. No. 647 ("Motion").

The Motion asks this Court to certify the following two classes pursuant to Rule 23(b)(2):

> Suspicionless Stops Class: All persons who, since June 6, 2025, have been or will be subjected to a detentive stop by federal agents or officers for purposes of immigration enforcement in this District, other than at a port of entry, checkpoint, or other functional equivalent of the border, based on their apparent status as low-income or working-class and Latino, instead of a pre-stop, individualized assessment of reasonable suspicion that the person to be stopped (1) is engaged in an offense against the United States or (2) is a noncitizen unlawfully present in the United States.
>
> First Discriminatory Treatment Class: All persons in this District who, since June 6, 2025, have been or will be subjected to a detentive stop by federal agents or officers at least in part because of their apparent Latino race, color, and/or ethnicity, other than at a port of entry, checkpoint, or other functional equivalent of the border, or in connection

> with a known target description if there are other objective bases to believe that the individual is the target.

*Id.* at 1–2.

The Motion is GRANTED IN PART, and the classes are certified—with one certified as modified—pursuant to Rule 23.

## I. **Background**

The facts alleged in the Second Amended Complaint, Dkt. No. 485 ("2AC"), are recounted more fully in the Court's Order dated August 11, 2026, regarding the Government's motion to dismiss the 2AC. Dkt. No. 658 ("Second MTD Order"). The Court will provide background into the factual allegations only as relevant to the instant Motion.

### A. Factual Summary

The Stop/Arrest Plaintiffs—the five Individual Plaintiffs, Coalition for Humane Immigrant Rights ("CHIRLA"), Los Angeles Worker Center Network ("LAWCN"), and United Farm Workers ("UFW")—challenge an alleged unlawful Government policy.

The Stop/Arrest Plaintiffs allege that, as part of its increased immigration enforcement in the Los Angeles area, the Government selects individuals for detentive stops based upon their appearance as Latino[1] or Latino and working class.[2] The Court will refer to this alleged conduct as the Racially Based Stops Policy. According to the Stop/Arrest Plaintiffs, the Racially Based Stops Policy violates the Constitution in two ways: (1) It violates the Fourth Amendment because the stops are based upon a perceived demographic profile rather than a pre-stop particularized determination of reasonable suspicion that the person to be stopped is present within the United States in violation

---

[1] This Court acknowledges that, as a factual matter, an individual may appear to be Latino based on the observer's perception of the individual's ethnic background, race, and/or skin color. All three possible determinations of Latino identity are incorporated into this Court's discussion of individuals who appear Latino. *See* Mark Hugo Lopez, Joseph Copeland & Jeffrey S. Passel, *Who Is Hispanic?*, Pew Rsch. Ctr. (Sep. 15, 2026), https://www.pewresearch.org/short-reads/2026/09/15/who-is-hispanic/ [https://perma.cc/4CWX-CE5W]. The Court also notes that some witnesses use the term "Hispanic," which this Court understands is intended as a synonym for Latino.

[2] For the purposes of this Order, the term "working-class" explicitly includes individuals who appear to be low-income laborers and day laborers. At the hearing, Plaintiffs emphasized that their challenge is to the Government's alleged practice of detaining people on the basis of appearing Latino, and of detaining people based on appearing Latino *and* working class. The Motion does not challenge a practice of detaining people solely for appearing working class. In other words, race is at issue in all the alleged stops. *See* Tr. at 9:16–:22.

of federal immigration law. (2) It violates the Fifth Amendment because it subjects Latino individuals to unequal treatment under the law. The Defendants deny the existence of the Racially Based Stops Policy and deny that they have otherwise conducted detentive stops for immigration purposes in violation of the Fourth or Fifth Amendments.

### B. Procedural History

Plaintiffs Vasquez Perdomo, Villegas Molina, and Osorto initiated this action by filing a Petition for Writ of Habeas Corpus on June 20, 2025. Dkt. No. 1. They, along with the other Plaintiffs, filed the operative Second Amended Complaint on April 9, 2026. *See* 2AC. It alleges the following claims.

| **Claim** | **Plaintiffs** | **Defendants** |
|---|---|---|
| Count One: Violation of Fourth Amendment: Suspicionless Seizures | Stop/Arrest Plaintiffs | All Defendants |
| Count Two: Violation of 8 U.S.C. 1357(a)(2)—Warrantless Arrests Without Probable Cause of Flight Risk | Warrantless Arrest Plaintiffs | All Defendants |
| Count Three: Violation of 8 C.F.R. § 278.2(c)(2)(ii)—Standards for Stops and Warrantless Arrests | Warrantless Arrest Plaintiffs | All Defendants |
| Count Four: Violation of 8 C.F.R. § 287.8(c)(2)(iii)—Failure to Identify Authority and Reason for Arrest | Warrantless Arrest Plaintiffs | All Defendants |
| Count Five: Violation of Fifth Amendment—Access to Counsel | Access/Detention Plaintiffs | Noem, Lyons, and Rios |
| Count Six: Violation of 8 U.S.C. § 1362—Access to Counsel | Access/Detention Plaintiffs | Noem, Lyons, and Rios |
| Count Seven: Violation of Fifth Amendment—Conditions of Confinement | Access/Detention Plaintiffs | Noem, Lyons, and Rios |
| Count Eight: Violation of Fifth Amendment—Due Process | Stop/Arrest Plaintiffs | All Defendants |

| | | |
|---|---|---|
| Count Nine: Violation of Fourth Amendment—Unreasonable Manner of Seizure | Stop/Arrest Plaintiffs | All Defendants |

2AC. Plaintiffs seek declaratory and injunctive relief, as well as fees and costs. *Id.* at 82–83.

On October 29, 2025, Defendants filed their first motion to dismiss Plaintiffs' First Amended Complaint. Dkt. No. 235. The motion was fully briefed. Dkt. No. 255; Dkt. No. 264. This Court held a hearing on the Motion on January 15, 2026, after which it took the Motion under submission. And on February 19, 2026, this Court issued its decision. Dkt. No. 419 ("First MTD Order"). There, this Court denied Defendants' Motion except as to Count Eight—which Plaintiffs agreed should be dismissed, and which was dismissed without prejudice. *Id.* at 34.

On April 21, 2026, Defendants filed a second motion to dismiss. Dkt. No. 494. The Motion was fully briefed. Dkt. No. 500; Dkt. No. 502. This Court held a hearing on the Motion on July 9, 2026, after which it denied the motion. Dkt. No. 658 ("Second MTD Order").

On July 27, 2026, Stop/Arrest Plaintiffs filed a motion for a preliminary injunction on the first and eighth causes of action. Dkt. No. 632 ("PI Motion"). The motion was fully briefed. Dkt. No. 678 ("PI Opp."); Dkt. No. 710 ("PI Reply"). Intervenors joined the motion. Dkt. No. 649. This Court held a hearing on that motion on September 24, 2026.

On August 4, 2026, Stop/Arrest Plaintiffs filed a Motion for Class Certification. Dkt. No. 647. The Motion asks this Court to certify the following two classes:

> Suspicionless Stops Class: All persons who, since June 6, 2025, have been or will be subjected to a detentive stop by federal agents or officers for purposes of immigration enforcement in this District, other than at a port of entry, checkpoint, or other functional equivalent of the border, based on their apparent status as low-income or working-class and Latino, instead of a pre-stop, individualized assessment of reasonable suspicion that the person to be stopped (1) is engaged in an offence against the United States or (2) is a noncitizen unlawfully present in the United States; and
>
> First Discriminatory Treatment Class: All persons in this District who, since June 6, 2025, have been or will be subjected to a detentive stop by federal agents or officers at least in part because of their apparent Latino race, color, and/or ethnicity, other than at a port of entry, checkpoint, or other functional equivalent of the border, or in connection with a known target description if there are other objective bases to believe that the individual is the target.

*Id.* at 1–2. Pursuant to the parties' agreed-upon briefing schedule, Defendants opposed the Motion, *see* Dkt. No. 689 ("Opposition"), and Stop/Arrest Plaintiffs replied, *see* Dkt. No. 708 ("Reply").

The Court held a hearing on the Motion, along with the request for a preliminary injunction, on September 24, 2026. *See* Dkt. No. 757 ("Tr."). After the hearing, this Court took both motions under submission. The Court also inquired of the Defendants whether they wished to provide supplemental briefing. Dkt. No. 756. Defendants advised the Court that they did, and asked for the opportunity to submit a five-page brief by October 8, 2026. Dkt. No. 762. This Court granted that request, Dkt. No. 766, and the parties filed their supplemental briefs accordingly. *See* Dkt. No. 780 ("Def. Supp."); Dkt. No. 787 ("Pla. Supp.").

This Court incorporates by reference its findings of fact from the Order Granting in Part Plaintiffs' Motion for a Preliminary Injunction ("PI Order"), issued concurrently. PI Order § III ("Findings of Fact"). It references those findings of fact throughout this Order as relevant.

## II. Legal Standard

A district court has broad discretion in certifying a class under Rule 23. *Navellier v. Sletten*, 262 F.3d 923, 941 (9th Cir. 2001); *see also Reiter v. Sonotone Corp.*, 442 U.S. 330, 345 (1979) (noting that district courts "have broad power and discretion vested in them by" Rule 23). But a court must exercise this discretion "within the framework" of the Rule. *Navellier*, 262 F.3d at 941. Under Rule 23, a court may only certify a class if the following prerequisites are met:

(1) Numerosity: The class must be so numerous that joinder of all members individually is "impracticable";
(2) Commonality: There must be questions of law or fact common to the class;
(3) Typicality: The claims or defenses of the class representative must be typical of the claims or defenses of the class; and
(4) Adequacy of Representation: The class representative must be able to fairly and adequately to protect the interests of all members of the class.

Fed. R. Civ. P. 23(a). "Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Rather, a plaintiff "must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Id.* In evaluating whether the Rule 23(a) prerequisites have been met, a district court should consider whether the claims are

supported by a preponderance of the evidence. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022).

**A. Numerosity**

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P 23(a). Although this requirement "imposes no absolute limitations," the Supreme Court has held that a class of only 15 "would be too small to meet the numerosity requirement." *Gen. Tel. Co. v. Equal Emp. Opportunity Comm'n*, 446 U.S. 318, 330 (1980); *see also Harik v. Cal. Tchrs. Ass'n*, 326 F.3d 1042, 1051 (9th Cir. 2003). Courts regularly, however, certify classes comprised of at least forty members. *See Davis v. Four Seasons Hotel Ltd.*, 277 F.R.D. 429, 435 (D. Haw. 2011) (collecting cases); *Arevalo v. Trump*, No. 25-01207, 2025 WL 1554183, at *13 (C.D. Cal. June 2, 2025) ("Generally, the numerosity requirement is satisfied when a proposed class includes 40 or more members."); *Kidd v. Mayorkas*, 343 F.R.D. 428, 437 (C.D. Cal. 2023); *see also Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) (noting that "numerosity is presumed at a level of 40 members").

**B. Commonality**

"Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Dukes*, 564 U.S. at 349–50. The claims of the proposed class members "must depend upon a common contention," which "must be of such a nature that is capable of class wide resolution—which means that determination of its truth or falsity will resolve *an issue* that is central to the validity of each one of the claims in one stroke." *Id.* at 350 (emphasis added). As the Supreme Court reiterated in *Dukes*, to establish commonality, "even a single common question will do." *Id.* at 359 (citation modified).

**C. Typicality**

"The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct, which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). "Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Id.*

**D. Adequacy of Representation**

"To determine whether named plaintiffs will adequately represent a class, courts must resolve two questions: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011).

The Supreme Court has noted that the requirements of Rule 23(a) "also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel." *Dukes*, 564 U.S. at 349 n.5. In appointing class counsel, a court must consider: (1) "the work counsel has done in identifying or investigating potential claims in the action"; (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action"; (3) "counsel's knowledge of the applicable law"; and (4) "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). Moreover, class counsel "must fairly and adequately represent the interests of the class." *Id.* 23(g)(4).

**E. Rule 23(b) Requirements**

In addition to demonstrating that the Rule 23(a) prerequisites have been met, a party moving for class certification must establish that the action falls within one of the three categories of class suits provided for in Rule 23(b). Here, Plaintiffs seek to establish that the requirements of Rule 23(b) are satisfied through Rule 23(b)(2), which requires the Court to find that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(3).

**F. Burden of Proof**

The moving party "bears the burden of establishing that the proposed class meets the requirements of Rule 23." *Edwards v. First Am. Corp.*, 798 F.3d 1172, 1177 (9th Cir. 2015). In carrying this burden, a plaintiff "may use any admissible evidence." *Olean*, 31 F.4th at 665. Resolution of a motion for class certification requires a "rigorous analysis" as to whether Rule 23's requirements have been met. *Id.* at 350–51.

In determining whether to certify a class, the question for the Court "is not whether the plaintiff has stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) (citing *Miller v. Mackey Int'l, Inc.*, 452 F.2d 424, 427 (5th Cir. 1971)). During this analysis, "[m]erits questions may be considered . . . *only to the extent* . . . that they are relevant to determining whether Rule 23 prerequisites for class certification are satisfied." *Stockwell v. City & County of San Francisco*, 749 F.3d 1107, 1111 (9th Cir. 2014) (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013)). Thus, although an analysis of the Rule 23 factors "will entail some overlap with the merits of the plaintiff's underlying claim," the Court will not conduct a "mini trial" at this class certification stage. *Dukes*, 564 U.S. at 351; *Ellis*, 657 F.3d at 983 n.8. Rather, Plaintiffs need only prove by a preponderance of any admissible evidence that the prerequisites of Rule 23 are satisfied. *Olean*, 31 F.4th at 644.

## III. Discussion

Plaintiffs move to certify the Suspicionless Stops Class and the First Discriminatory Treatment Class under Federal Rule of Civil Procedure 23(a) and (b)(2), and to appoint class representatives and class counsel. Dkt. No. 647 ("Motion").

Defendants oppose certification on grounds of standing, the organizational Plaintiffs' eligibility to represent a class, each of Rule 23(a)'s requirements, Rule 23(b)(2), and the proposed class definitions. Dkt. No. 689 ("Opposition").

Having considered the parties' submissions and the record relevant to certification, this Court GRANTS IN PART the Motion, certifying the First Discriminatory Treatment Class and a modified version of the Suspicionless Stops Class and permitting Stop/Arrest Plaintiffs—the five Individual Plaintiffs, Los Angeles Worker Center Network ("LAWCN"), United Farm Workers ("UFW"), and Coalition for Humane Immigrant Rights ("CHIRLA")—to serve as class representatives.

### A. Stop/Arrest Plaintiffs have standing.

First, at issue is whether Stop/Arrest Plaintiffs have Article III standing to seek classwide relief. For the reasons below, they do.

For class certification purposes, the Ninth Circuit has "consistently held that Article III's requirements are satisfied before a class is certified as long as at least one named plaintiff has standing." *Healy v. Milliman*, Inc., 164 F.4th 701, 706 (9th Cir. 2026); *see also Olean*, 31 F.4th at 682 n.32 (clarifying that a class may be certified containing members lacking Article III standing). To that end, this Order's inquiry focuses on the class representatives.

Though this Court has previously found some of the plaintiffs have standing, it must—and therefore does—conduct this analysis anew. As Defendants observe, this Court must assure itself of jurisdiction at each stage of the litigation. Opp. at 5–6; *see also Trump*, 847 F.3d at 1159. This Court's prior standing rulings do not absolve Plaintiffs of the evidentiary showing required at this stage. This Court therefore considers the injuries asserted here, the evidence of continued exposure to the challenged practices, and the relief sought—and it makes its determination on the merits rather than on the law of the case doctrine.

Because the Opposition to the instant Motion makes only general arguments as to standing, which are largely duplicative of those raised and addressed in the accompanying PI Order, *see* Opp. at 5–6, in this Order, the Court will consider and address the arguments made in both Oppositions.

1. Individual Stop/Arrest Plaintiffs have standing.

"The three elements of standing . . . are (1) a concrete and particularized injury, that (2) is fairly traceable to the challenged conduct, and (3) is likely to be redressed by a favorable decision." *Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 662 (2019).

The first element is also referred to as "injury-in fact." To show injury-in-fact, "past exposure to illegal conduct" does not suffice absent "continuing, present adverse effects." *Lyons*, 461 U.S. at 102 (quoting *O'Shea v. Littleton*, 414 U.S. 188, 195–96 (1974)).

In a challenge to government conduct, the injury-in-fact determination requires the plaintiff to "show that he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *Lyons*, 461 U.S. at 101–02. Accordingly, a plaintiff seeking prospective relief must demonstrate a real and immediate threat of injury; a past injury alone does not suffice. *Id.* at 102–06, 111. But past encounters are relevant when considered with evidence

of an ongoing, officially sanctioned practice and the plaintiff's continued exposure to it.[3] *Melendres*, 695 F.3d at 997–98.

Therefore, to assert a claim for prospective injunctive relief, a plaintiff must demonstrate "that he is realistically threatened by a repetition of [the violation]." *Lyons*, 461 U.S. at 109. Following *Lyons*, the Ninth Circuit has "enumerated two ways in which a plaintiff can demonstrate that [their] injury is likely to recur." *Melendres*, 695 F.3d at 997–98 (quoting *Armstrong v. Davis*, 275 F.3d 849, 861 (9th Cir. 2001)). A plaintiff may do so by one of two ways: showing that (1) "the defendant had . . . a written policy . . . that the injury 'stems from,'" or (2) "the harm is part of a 'pattern of officially sanctioned . . . behavior, violative of the plaintiffs' [federal] rights.'" *Id.* at 998 (first quoting *Armstrong*, 275 F.3d at 861, and then quoting *LaDuke v. Nelson*, 762 F.2d 1318, 1323 (9th Cir. 1985)). A district court need only find that future injury is "sufficiently likely," not that the likelihood of future injury to a given plaintiff is "high." *Id.* at 998. Defendants assertion to the contrary—that the existence of official sanction merely increases the likelihood of future injury, but does not establish it, *See* Tr. at 55:6–:14—is simply incorrect. The case law does not indicate that—having established a pattern of officially sanctioned behavior and the absence of a predicate act—plaintiffs need to separately show a "certainly impending" or "real and immediate" threat. The pattern of officially sanctioned behavior, together with the absence of a predicate act, establishes the requisite threat of future injury.

*a. Individual Stop/Arrest Plaintiffs have shown injury-in-fact.*

The five individual Stop/Arrest Plaintiffs have shown that they have suffered a qualifying injury-in-fact.

As an initial matter, as discussed in the Findings of Fact, they have each suffered past injury being detained based upon their appearance as Latino, or Latino and working class. *See* PI Order § III.B.2 (detailing each individual Plaintiffs' declaration in the context of proving that Plaintiffs are

---

[3] At the hearing, Defendants advocated that *Melendres* is distinguishable on the basis that, there, the government admitted to implementing the challenged policy. Tr. at 45:18–46:3. As this Court has previously explained, however, this amounts to a distinction without a difference: Here, though Defendants do contest the existence of the Racially Based Stops Policy, this Court has independently found evidence that it exists, that it is unlawfully sanctioned, and that Plaintiffs will likely prove it is unlawful.

subject to an unlawful detention); *id.* § III.D.1 (detailing the harm suffered by each Individual Plaintiff). The declarations proffered by the individual Stop/Arrest Plaintiffs, particularly in the context of the Racially Based Stops Policy, further establish that they have suffered past harm as a result of the Government's unlawful conduct. Vasquez Perdomo describes being surrounded, grabbed, and handcuffed at the Pasadena bus stop where he waited for work—without being asked any questions about his identity or status. Dkt. No. 647-7 ¶¶ 3–8 ("Second Vasquez Perdomo Decl."). Villegas Molina describes the same operation, including remaining in place, telling an officer he was not running, and being directed not to move before officers asked for identification and immigration papers. Dkt. No. 647-10 ¶¶ 4–6 ("Second Villegas Molina Decl."). Osorto identifies the same circumstances of work and residence that expose him to the asserted practice, and he describes his continuing fear of another stop while seeking work. Dkt. No. 647-11 ¶¶ 1–3 ("Second Osorto Decl.") *see also* Osorto Decl. ¶¶ 1–8 (attesting that federal agents detained and arrested him without asking any questions). Hernandez Viramontes describes being questioned about his citizenship and taken from the Whittier car wash where he worked, notwithstanding his assertion of United States citizenship. Dkt. 647-8 ¶¶ 2–3 ("Second Hernandez Viramontes Decl."). Gavidia reiterates his account of being stopped at his workplace by agents who did not appear to know his identity or status. Dkt. No. 647-9 ¶¶ 1–2 ("Second Gavidia Decl."); *see also* Gavidia Decl. ¶¶ 6–11 (attesting to being detained with force before being asked about his identity or legal status, despite repeating that he has U.S. citizenship); Ex. 90 at 2:15–3:00 (body camera video corroborating his declaration). All five individuals offer support for the idea that they were profiled due to appearing Latino during their past detention. *See* PI Order § III.C.2 *supra*; *see also* Second Vasquez Perdomo Decl. ¶ 14; Second Hernandez Viramontes Decl. ¶ 3; Second Gavidia Decl. ¶ 2; Second Villegas Molina Decl. ¶ 11; Second Osorto Decl. ¶ 3. In short, each Plaintiff cites reason for this Court to conclude that their detention was pursuant to the Racially Based Stops Policy.

The question Defendants raise is whether these plaintiffs have shown a threat of injury that is "real and immediate," not "conjectural" or "hypothetical." The Court finds that consistent with *Melendres*, these plaintiffs have demonstrated this threat by showing that Defendants (1) caused

their harm through (2) a pattern of officially sanctioned behavior which (3) violates Plaintiffs' federal rights.[4] 695 F.3d at 997–98.

As the Court explains above in its Findings of Fact—and in the discussion of likelihood of success under *Winter*—it finds here that Defendants have a pattern of officially sanctioned behavior. *See* PI Order §§ III.B, IV.A. The Racially Based Stops Policy of which this Court finds evidence in this Order means that, in lieu of developing individualized, reasonable suspicion to justify detentive stops, Defendants routinely rely on sweeping generalizations about appearing Latino, or Latino and working class, to detain individuals in violation of their constitutional rights. As this Court discusses below, Stop/Arrest Plaintiffs are likely to prevail on that the Racially Based Stops Policy exists, and that its existence violates Plaintiffs' Fourth and Fifth Amendment rights. *See* PI Order § IV.A.1; *id.* § IV.A.2 (finding Plaintiffs will likely show the Government's policy is officially sanctioned); *id.* § IV.A.3 (finding Plaintiffs will likely show the Government's policy is illegal).

The Ninth Circuit's interpretation of *Lyons* instructs that a determination that individuals have been subjected multiple times to unlawful stops and that the Government continues to target the same kinds of locations can satisfy the requirements in *Lyons* of a threat that is "real and immediate," not "conjectural" or "hypothetical." *Vasquez Perdomo*, 148 F.4th at 674–75 ("As they note, the record shows only one individual, J.M.E., has been stopped by Defendants twice. But that one recurrence is significant . . . . [And] Defendants' ongoing Operation At Large involves sending contact teams to public places and types of businesses, such as carwashes and Home Depots that they believe are 'utilized' by [undocumented] immigrants."). What the Ninth Circuit discussed in *Vasquez Perdomo* remains true: Multiple declarants have been detained twice. Melendrez Decl. ¶ 8–9 (CLEAN member "Rodrigo" detained and questioned twice); *id.* ¶13 (CLEAN member "Manuel" detained and questioned twice); H.A. Decl. ¶¶ 5–20 (U.S. citizen, who is Latino and works at a car wash, attesting that he was detained and questioned multiple times).

---

[4] The *Melendres* formulation of standing for injunctive relief addresses injury-in-fact and causation, but not redressability. It bears mention that Defendants do not contest, and therefore concede, that Stop/Arrest Plaintiffs' alleged harms can be redressed through injunctive relief. In any event, this Court has no trouble concluding—as it did in the Warrantless Arrest PI Order—that an injunction preventing the government's unlawful conduct would redress the risk of future harm due to that unlawful conduct. *See* Warrantless Arrest PI Order at 27.

Each Individual Plaintiff describes continued exposure to the circumstances in which the challenged encounters occurred. Vasquez Perdomo expects to continue seeking work at bus stops in Pasadena; Villegas Molina continues to seek construction work and use the same area for transportation; Osorto continues to live and seek work in Pasadena. Vasquez Perdomo Decl. ¶¶ 14–15; Villegas Molina Decl. ¶¶ 13–14; Osorto Decl. ¶¶ 2–3. Hernandez Viramontes works almost daily at the car wash where he was stopped, and Gavidia anticipates returning to his work at Yank Towing. Hernandez Viramontes Decl. ¶¶ 2, 4; Gavidia Decl. ¶ 2. Their asserted (and uncontroverted) exposure concerns ordinary, recurring activities at identified places—not a hypothetical series of future choices.

Moreover, the Ninth Circuit has distinguished *Lyons* on three bases that all apply here: "the district court . . . made an explicit finding of likelihood of recurrence, there is evidence that the complained-of conduct stems from a pattern or practice by Defendants, and there is no specific predicate action required by Plaintiffs to trigger Defendants' challenged practice." *Vasquez Perdomo*, 148 F.4th at 675.

In Opposition, Defendants emphasize that what was called "Operation at Large" has now concluded. *See* PI Opp. at 5–6. The relevant question, however, is whether the challenged practices continue—not whether an operation retains its original name or personnel. The evidence of subsequent encounters, continuing non-targeted enforcement, and approval of the challenged methods supports a finding of continued exposure regardless of those changes. *See* Crook Dep. at 95:25–96:13; Ortiz Dep. at 145:7–46:3, 175:2–76:21. Though aggregate arrest data alone cannot establish unlawful conduct, they do corroborate continued field enforcement. *See* Dkt. No. 647-1 ¶¶ 14–19. Regardless of how Defendants refer to it, widespread immigration enforcement is ongoing. Whether Operation at Large is ongoing, then, is far from dispositive.

In sum, this Court is satisfied that—particularly read in tandem with the Court's findings on the Government's reliance on an unlawful policy—Stop/Arrest Plaintiffs have sufficiently shown a realistic chance that they will suffer future harm at the hands of the policy.

/ / /

*b. Individual Stop/Arrest Plaintiffs have shown Defendants' conduct caused their injury.*

Second—as Defendants do not appear to meaningfully dispute—Plaintiffs have sufficiently shown causation. The harm that the individual Plaintiffs face naturally flows from Defendants' policy of unlawfully developing reasonable suspicion on the basis of appearing to be Latino, or Latino and working class. Based on the over fifty declarations, the Government's admissions, and the controverting I-213 and video evidence—along with expert testimony—this Court has no trouble concluding that (assuming without deciding that the Government is following an unlawful policy) Plaintiffs have shown their harm is downstream of it.

Defendants' only opposition on this point appears to be that the alleged Racially Based Stops Policy does not exist—and, to the extent that a Government policy is in place, there is nothing unlawful about it. Opp. at 6. This is an argument that this Court addresses in depth in its discussion of Plaintiffs' demonstrated likelihood of success under *Winter* in the PI Order. *See* PI Order § IV.A. As it explains there, it has concluded both that the Policy likely exists and that it is likely illegal. To that end, Defendants' arguments to the contrary are unavailing.

*c. Individual Stop/Arrest Plaintiffs have shown their injury is redressable.*

Third—as Defendants do not appear to address, and therefore concede—injunctive relief is likely to redress Plaintiffs' injuries that flow from the Racially Based Stops Policy. Plaintiffs ask this Court to issue "a preliminary and permanent injunction enjoining further violations of Plaintiffs' rights." 2AC at 83. Because Defendants' policy, which this Court discusses at length in Section IV.A of the PI Order, is in ongoing violation of Plaintiffs' constitutional rights, it follows that enjoining the Government from following that policy will grant Plaintiffs relief. Put another way, their asserted harms—which they allege arise directly from illegal conduct at the hands of the Government and their agents—can be redressed with an injunction.

* * *

All in all, Plaintiffs have shown that the Government has likely stopped them as part of the Government's unlawful policy of conducting immigration detentions on the basis of race. Plaintiffs

have shown that the Racially Based Stops Policy has caused them past harm—and, because the Policy is ongoing, because it regularly targets people like Plaintiffs, and because they cannot realistically take action to avoid being subject to the Policy in the future, they have a realistic prospect of imminent harm. And, as Defendants do not meaningfully dispute, Plaintiffs' injuries were caused by the Policy, and an injunction preventing the policy would redress Plaintiffs' harms. In sum, Individual Plaintiffs have standing.

2. <u>An organization may serve as class representative.</u>

As a threshold matter, Defendants take the position that an organizational Plaintiff cannot serve as a class representative. Opp. at 4.

The Ninth Circuit has already foreclosed the Defendants' position. For example, in *Cal. Rural Legal Assistance, Inc. v. Legal Servs. Corp.*, 917 F.2d 1171, 1175 (9th Cir. 1990), the defendants argued that the union plaintiffs could not represent a class of individual plaintiffs because they were not themselves members of that class. The Ninth Circuit rejected that argument. As that court explained, "in their associational capacity, the unions are acting on behalf of" the individuals who belonged to the class. *Id.* The same principle permits an association with standing to represent its members to seek appointment as class representative, if it the requirements of Rule 23 are met. See *Viet. Vets. of Am. v. C.I.A.*, 288 F.R.D. 192, 204–05 (N.D. Cal. 2012); *see also* 13A *Wright & Miller's Federal Practice and Procedure* § 3531.9.1 (3d ed. 2026) ("The familiar concept of representation underlies the rule that an organization can borrow a member's standing."). Associational standing does not dispense with those requirements; neither does organizational status establish that the requirements cannot be met.

Defendants' reliance on *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395 (1977), and *Dukes* does not establish otherwise. Those decisions require representatives to possess the same interest and suffer the same injury as the class members. *Rodriguez*, 431 U.S. at 403; *Dukes*, 564 U.S. at 348–49. In *Rodriguez*, the proposed representatives lacked the qualifications for the positions at issue and therefore could not have suffered the asserted discriminatory injury. 431 U.S. at 403–04. Neither decision holds that an association otherwise entitled to litigate its injured

members' claims is categorically disqualified from representing a class of individuals asserting those claims.

Nor does *International Union v. Brock*, 477 U.S. 274 (1986), support the categorical prohibition Defendants propose. The passage quoted in the Opposition describes concerns advanced by the Secretary of Labor about an association's ability to represent its members adequately—concerns that the Supreme Court ultimately dismissed. Opp. at 4–5; *Brock*, 477 U.S. at 288–89. The Supreme Court explained the advantages associations may bring to litigation, including their existing expertise, resources, and relationship with their members. *Id.* at 289–90. It actually reaffirmed associational standing while recognizing that evidence of inadequate representation would require consideration. *Id.* This Court likewise considers the actual representatives and the actual claims, rather than presuming either adequacy or inadequacy from the representatives' organizational form.

Accordingly, an organizational plaintiff that has associational standing and otherwise meets Rule 23 may represent the proposed classes. Whether LAWCN, CHIRLA, and UFW satisfy those requirements is addressed below.

3. <u>Organizational Stop/Arrest Plaintiffs have standing.</u>

As the request for class certification requires one plaintiff with Article III standing, *see* note 1 *supra*, this Court need not consider Organizational Stop/Arrest Plaintiffs' standing to continue to the merits. Nevertheless, even if the three moving organizations required an independent showing of standing—they have made that showing.

An association has associational standing when (1) its members have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Students for Fair Admissions*, 600 U.S. at 199.

*First*, LAWCN, CHIRLA, and UFW each identify at least one member who has likely been subject to the Government's Racially Based Stops Policy. *See* Sections III.B.2, III.C.2 *supra*. They do so through sworn affidavits describing the Policy's impact on their membership. *See* Gudino Decl. ¶¶ 1–3, 27–28 (declarant, Executive Director of LAWCN, alleging that "on at least one occasion[,] immigration agents detained and arrested a Spanish-speaking customer at [a] car wash,"

and that "immigration agents seem to target non-white, Spanish-speaking workers"); Salas Decl. ¶¶ 1–3, 18–21 (declarant, Executive Director of CHIRLA, alleging that four members, all of whom were day laborers and/or Latino, were detained or arrested absent questioning or explanation); Strater Decl. ¶¶ 1–3, 29–31 (declarant, officer of UFW, alleging that member Angel, a Latino UFW member and U.S. citizen who was seeking day labor work, was detained by CBP until he confirmed his hospital of birth and showed California ID). The Government does not appear to controvert or dispute these accounts in its Opposition.

And members of LAWCN, UFW, and CHIRLA face a realistic threat of future harm stemming from the Racially Based Stops Policy. Again, a plaintiff may show that an injury is likely to recur and therefore that he has standing for injunctive relief by "demonstrat[ing] that the harm is part of a 'pattern of officially sanctioned . . . behavior, violative of the plaintiffs' [federal] rights.'" *Melendres*, 695 F.3d at 998. This Court has detailed its findings when discussing Stop/Arrest Plaintiffs' likelihood of success. *See* PI Order § IV.A. But it bears mention that Defendants' agents' testimony serve as a compelling reason to think that the Racially Based Stops Policy is ongoing, that it violates Plaintiffs' members' rights, and that Plaintiffs' members have faced past and realistically likely future harm as a result. As one agent testified:

> Q. [S]o would you say that any older Hispanic male, or are there, like, additional things you observe that would help inform sort of the totality of circumstances assessment that you make?
>
> . . .
>
> A. I would, again, say "loitering." They're day workers, as your other counsel said. . . .
>
> Q. And when you say "day worker," what does day worker mean to you? . . . Or day laborer?
>
> A. I don't call them "day laborers." I call them "illegal aliens."

Clement Dep. at 161:20–62:17. And Defendants do not seem to dispute that—if they *did* follow a policy through which officers developed reasonable suspicion entirely on impermissible considerations—this would violate Plaintiffs' members' rights and cause them harm. Indeed, the risk of future harm is further strengthened where at least one of Plaintiffs' members has been stopped multiple times. Melendrez Decl. ¶ 13 (member of LAWCN and CLEAN "has been stopped twice at the car wash where he works," including one detention during which Government agents drove him away from his place of employment).

Defendants' efforts to refute standing largely turn on their characterizations of Organizational Plaintiffs' showing of standing as "pure statistical inference and anecdotes from certain uncorroborated members." *See* PI Opp. at 14. This fails for multiple reasons. First, as discussed in the Findings of Fact, Stop/Arrest Plaintiffs do not merely stand on statistical analyses and a handful of anecdotes. Substantial evidence—including Defendants' own admissions—supports the existence of the Racially Based Stops Policy. *See, e.g.*, Sanchez Dep. at 125:2–37:3; Clement Dep. at 158:3–62:17; 247:2–49:8; *see also generally* PI Order §§ III–IV. Second, Defendants' characterization of the evidence as uncorroborated anecdotes is inconsistent with this Court's view of the record; many of the arrest narratives are, in fact, corroborated by Defendants' officers testimony, other witnesses, or video evidence. *See, e.g.*, Gavidia Decl. ¶¶ 7–8; Ex. 91 at 2:15–3:00 (body camera video showing agents slamming Gavidia against a fence as he protested that he was born in Los Angeles); *see also* Ex. 65 ("Third Hernandez Viramontes Decl.") ¶¶ 3–6; Ex. 93 (video corroborating Viramontes' account); Ex. 15 at 261:14–25 (agent who stopped Viramontes admitting that the interaction constituted a detention). And third, in any event, Defendants do not meaningfully dispute the factual accounts presented—for example, competing declarations by their officers calling Plaintiffs' narratives into question.

*Second*, protecting those members against the asserted detention practices is germane to the organizations' purposes. LAWCN coordinates the work of worker centers and labor organizations and addresses issues affecting low-wage workers, including immigrant workers, in the Los Angeles area. Gudino Decl. ¶¶ 6–14, 25–30. CHIRLA is a membership organization engaged in protecting immigrant rights and assisting members affected by immigration enforcement. Salas Decl. ¶¶ 2–4, 10–11. And UFW is a national leader in the movement for immigration reform and immigrants' rights. Strater Decl. ¶¶ 12–14. Seeking prospective relief against the practices affecting those members falls within each organization's established mission. Defendants do not appear to contest this prong, but in any event, it is met.

*Third*, adjudicating the asserted practices and granting the prospective relief sought does not require each affected members to participate as a party. The use of member declarations to establish standing or illustrate an operation does not make every member an indispensable participant in a

challenge to a generally applicable practice. Plaintiffs seek neither individualized damages nor an adjudication of every member's entitlement to release. *See Brock*, 477 U.S. at 287–88.

Defendants' argument in opposition to the third prong rests entirely on cases that this Court has already explained do not apply. Defendants' reliance on the personal nature of Fourth Amendment rights does not defeat this showing. Opp. at 15. *Alderman v. United States* addressed the attempt to *suppress evidence* based on a violation of another person's rights—which is not this case's posture. 394 U.S. 165, 174 (1969). LAWCN, UFW, and CHIRLA instead proceed under the established doctrine permitting an association to represent its own injured members. *See Stavrianoudakis v. U.S. Fish & Wildlife Serv.*, 108 F.4th 1128, 1135, 1143 (9th Cir. 2024). Similarly, *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978), another criminal case, stands for the inapposite principle that criminal defendants may not raise a Fourth Amendment challenge to the unlawful search of a third party's property. And *Black Lives Matter v. City of Los Angeles*, 113 F.4th 1249 (9th Cir. 2024), turned on the Ninth Circuit's conclusion that the district court had not sufficiently identified commonality within a class asserting Fourth Amendment claims. It did not find that the court could not have concluded that commonality was met—it merely remanded the action for the district court to identify whether Rule 23's commonality requirement was met. *Id.* at 1261. Of course, this does little to show that LAWCN, UFW, and CHIRLA require their individual members to participate in this litigation. For that reason, the arguments to the contrary are unavailing, and the third *Hunt* factor is met.

In sum, LAWCN, UFW, and CHIRLA, along with the Individual Plaintiffs, have standing. This Court accordingly turns to Rule 23.

**B. Per Rule 23(a)(1), Stop/Arrest Plaintiffs have shown numerosity.**

Turning to Rule 23's requirements, this Court first considers whether Stop/Arrest Plaintiffs have shown, by a preponderance of the evidence, that their proposed class is so numerous that class treatment is appropriate. Classes with at least forty members routinely meet this requirement. *Davis*, 277 F.R.D. at 435 (collecting cases). Some courts relax this requirement when the relief requested is declaratory or injunctive. *Horn v. Assoc. Wholesale Grocers, Inc.*, 555 F.2d 270, 275–76 (10th Cir. 1977); *see also Sueoka v. United States*, 101 F. App'x 649, 653 (9th Cir. 2004) (unpublished)

("Because plaintiffs seek injunctive and declaratory relief, the numerosity requirement is relaxed . . . ."). And courts may rely on commonsense assumptions to support findings of numerosity. *See Freedman v. La.-Pac. Corp.*, 922 F. Supp. 377, 398 (D. Or. 1996); 7A *Wright & Miller's Federal Practice & Procedure* § 1762 (4th ed. 2022).

Stop/Arrest Plaintiffs meet this requirement. As they describe it, they have presented fifty-five individual accounts where the Government detained individuals absent reasonable suspicion, instead improperly relying on apparent Latino race or apparent Latino race and perceived status as low-income, working-class, or a day laborer. *See* Motion at 9 n.7. It bears mention that a few of these declarations do not offer strong evidence, without more, that a person was unlawfully detained. For example, in one case, the declarant does not appear to attest to their race or appearance as a day laborer at the time that they were detained. *See generally* Dkt. No. 529-60 ("E.C.H. Decl."). In another instance, the declaration does not sufficiently detail into the declarant's encounter with federal agents such that this Court can conclude that the stop was detentive in nature. *See generally* Dkt. No. 539-6 ("W.A.C.V. Decl."); *see also United States v. Guzman-Padilla*, 573 F.3d 865, 884 (9th Cir. 2009) ("[I]t is well-established that intrusive measures may convert a stop into an arrest if the measures would cause a reasonable person to feel that he or she will not be free to leave after brief questioning . . . .").

But the overwhelming majority of these declarations—as this Court has recounted, *see* PI Order § III.C.2—do offer evidence of nearly sixty examples where agents followed an unlawful policy and detained someone without reasonable suspicion. These include forty-five declarations from detainees, as well as over a dozen more documented instances from Organizational Plaintiffs' leadership and from community advocates. Of course, these declarations' proof of a policy—or of the instances they purport to describe—are not beyond any doubt. But Defendants do not meaningfully attempt to controvert much of the evidence. Indeed, in opposing the motions for preliminary injunction and class certification, Defendants had every opportunity to controvert the evidence presented by Plaintiffs. But it bears mention that the only exhibit attached to Defendants' opposition to the PI Motion is a title slide, purportedly from a training on the Fourth Amendment given to some unknown number of officers at an unknown time with indeterminate frequency. This,

of course, does little to unsettle the showing Plaintiffs have made. *See* Dkt. No. 678-1; *cf.* PI Order § IV.A.1 (concluding that, based on the Findings of Fact and applicable law, Plaintiffs will likely prevail in showing the existence of the Government's Racially Based Stops Policy). So this Court is satisfied, based on its review of the record and in particular of Plaintiffs' documentation of stops, that it is more likely than not that over forty members belong to each class.

For the Suspicionless Stops Class, the Court's calculation of numerosity derives from evidence that the Defendants engaged in many large operations affecting multiple people, where numerous individuals were detained without an individualized reasonable suspicion determination. For example, the accounts of the Pasadena operation describe officers stopping Vasquez Perdomo, Villegas Molina, and Osorto at a bus stop based on their appearance as Latino men in work clothes while ostensibly seeking another person. Mot. at 5; *see also* PI Order § III.D.1. The record contains an array of similar experiences. *See, e.g.*, Dkt. No. 529-64 ¶¶ 1–11, 13 ("L.C.C. Decl.") (declarant, a Latino individual working at a car wash, alleging that federal agents detained L.C.C. along with only the Latino-appearing car wash workers, and that L.C.C. was detained before being asked any questions); Dkt. No. 529-54 ¶¶ 1–5 ("E.C.P. Decl.") (declarant, a Latina vendor who sold food near a Home Depot, attesting that officers approached with firearms drawn and pointed at E.C.P. and others, threw her down onto the street, and was arrested without being asked any questions about her identity or status). And, as discussed in the Findings of Fact, the Defendants' operations were designed to maximize detention of "collaterals."

Consistent with that design, the Government agents confirm that the Defendants executed operations where large groups of people were detained and declarants consistently describe the "see bodies, chase bodies" approach which this Court has found inconsistent with individualized reasonable suspicion. *See* PI Order § III.A.3.a; Airdo Dep. at 210:14–18 (Q: "Tell me the reasons why you did not feel that they were going solely after targets?" A: "I just think that kind of like she said, 'see bodies, chase bodies' . . . ."); Ex. 26 at GOV 10543 (agent opining via text message, "I think they only know one way to operate . . . See bodies, chase bodies."). Taken together, these accounts support an inference that the Policy affected numerous individuals across multiple operations and the numerosity requirement is satisfied. *See* PI Order § III.C.2; Castillo Decl. ¶¶ 6–13

(attesting to witnessing officers chasing a man in work clothing who was walking to his truck near the Home Depot before officers arrested him, claiming to have a warrant, but refused to show the warrant); *id.* ¶ 14 (street vendor attesting that, if federal agents "saw a Latino worker, they started to chase them"); Chapman Decl. ¶¶ 3–7 (declarant, who documents Border Patrol in her area, observing that agents pursued a Latino-appearing man and detained him before asking any questions about his identity or receiving any information as to his legal status).

For the First Discriminatory Treatment Class, testimony concerning the use of apparent race and accounts of differential selection support the inference that a substantial number of individuals were subject to the asserted criterion. Supervisory Border Patrol Agent Victor Sanchez testified that apparent race could contribute to the reasonable suspicion assessment. Sanchez Decl. at 128:22–130:3; *see also* Findings of Fact § III.C.1. At least two Latino United States citizens described being stopped while lighter-skinned coworkers were left alone. Santiago Tafolla Decl. ¶¶ 2, 4–17 (declarant, a Latino U.S. citizen, attesting he was stopped during a raid on his workplace while his light-skinned coworkers who ran from officers were not pursued). A.V. Decl. ¶¶ 2–8 (declarant, a Latino U.S. citizen who works at a car wash, attesting that he was detained by agents who initially claimed his Real ID was fake and refused to let him get his passport from the office, while his light-skinned coworker was not stopped or approached during the raid). *See also* Findings of Fact § III.C.1 (citing agent depositions confirming that "Hispanic ethnicity" is part of their reasonable suspicion calculus). In addition, as discussed above, numerous declarants described being detained on the basis of apparent Latino race and working-class status alone. Accordingly, it appears that the use of apparent Latino race "in whole or in part" affected a large number of individuals and the numerosity requirement is met.

The classes also include persons who will be subjected to the practices as operations continue. This makes it particularly impracticable to join these additional possible plaintiffs individually. *See A. B. v. Haw. State Dep't of Educ.*, 30 F.4th 828, 838 (9th Cir. 2022); *see also* Motion at 10.

Considering the weight of Plaintiffs' showing, and making reasonable inferences about the number of class members based on what is before this Court, this Court is satisfied that each class

extends substantially beyond the named Plaintiffs and is numerous enough to make individual joinder impracticable.

In arguing against numerosity, Defendants do not meaningfully grapple with Stop/Arrest Plaintiffs' contention that their dozens of declarations, including dozens from class members, establish numerosity. They do not, for example, identify which of the declarations should not be counted toward the Court's calculation of numerosity. And, though true that Plaintiffs do not identify the exact "number of putative class members," Defendants do not offer any authority in support of a requirement that Plaintiffs do so—particularly where, as here, classwide injunctive and declaratory relief are all that is sought. *See* Opp. at 6–7; *see also* Section III.G.1 *infra* (addressing Defendants' ascertainability arguments). Without more, Defendants' references to Plaintiffs' showing on numerosity as impermissible "speculation" and "indeterminacy" are unavailing. Opp. at 7.

Moreover, they argue that Stop/Arrest Plaintiffs "cannot identify even five individuals with the same factual pattern—status, location, and alleged stop—who would be entitled to the same uniform injunction." Opp. at 7. This, of course, is not the standard. As an initial matter, Defendants offer no reason this Court should adopt their framework and require the class to be identical as to its members' immigration status, location within the Central District, and nature of the alleged stop. The Government can, through the same policy and in the same way, violate individuals' constitutional rights regardless of whether they have lawful status. Indeed, this Court understands Stop/Arrest Plaintiffs argue exactly that. Nor does it appear to matter, for the purposes of the sought declaratory and injunctive relief, whether an unlawful stop took place at a Glendale Home Depot or a Pasadena car wash. E.L.L. Decl. ¶¶ 4–5; Zapata Santiago Decl. ¶¶ 3–4.

For these reasons, both classes satisfy Rule 23(a)(1).

**C. Per Rule 23(a)(2), Stop/Arrest Plaintiffs have shown commonality.**

Under Rule 23(a)(2), Stop/Arrest Plaintiffs next need to show commonality. "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Dukes*, 564 U.S. at 349–50. To establish commonality, "even a single common question will do." *Id.* at 359 (citation modified).

As this court explains in the accompanying PI Order, it has concluded that Stop/Arrest Plaintiffs—that is, the five Individual and three Organizational Plaintiffs discussed above—are likely to prevail on their claims alleging the existence of, and challenging, a policy of relying on perceived Latino race or perceived Latino race and working-class status, which Plaintiffs allege violate both the Fourth and the Fifth Amendments. *See* PI Order § IV.A.1. Here, accordingly, it finds that the named Plaintiffs and at least some of the putative class members whose declarations are detailed experienced a common injury.[5]

It is true that the classes as certified are more expansive than the injury that this Court has found in its PI Order. *See* PI Order § IV.A.3. In particular, the Court has found that the practice of *solely* relying upon an individual's appearance as Latino or Latino and working class in conducting a reasonable suspicion analysis likely violates the Fourth and Fifth Amendment. *Id.* The Court has not found that *any* use of Latino race ("in whole or in part" with an exception, as the Plaintiffs describe it in their First Discriminatory Treatment Class proposal) is unlawful. But this does not prevent the Court from finding commonality as the Plaintiffs do *allege* common injuries among the members of the two classes: With respect to the Suspicionless Stops Class, the common injury is the constitutional violation of class members' Fourth Amendment right to be free from unreasonable searches and seizures. *See* U.S. Const. amend. IV. And, with respect to the First Discriminatory Treatment Class, the common injury is the constitutional violation of class members' Fifth Amendment right to receive equal protection from the federal government. *See* U.S. Const. amend. V; *see also Washington v. Davis*, 426 U.S. 229, 238 (1976); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217 (1995). So, though this Court applies Rule 23(a)(2) and finds it satisfied here, it wishes to be clear: It, at this time, has not found that *any* use of race is categorically unlawful.

For the Suspicionless Stops Class, the common questions include whether Defendants employ a practice of selecting individuals for detentive immigration stops based upon their appearance as Latino or Latino and working-class in place of an individualized reasonable suspicion

[5] This Court does not accept Plaintiffs' suggestion that Defendants abandoned any commonality objection to the First Discriminatory Treatment Class. *See* Reply at 6. Defendants contest both the existence of a common practice and the legal significance of considering race. This Court addresses those contentions on their merits for purposes of Rule 23.

assessment, and whether that practice satisfies the Fourth Amendment. The answer concerns the method used to select people for stops, rather than merely the ultimate sufficiency of the evidence against each person. Motion at 11–12.

For the First Discriminatory Treatment Class, common questions include whether Defendants use apparent Latino race, color, or ethnicity as an express criterion for detentive stops outside the stated border and known-target exceptions, and whether that practice violates equal protection. *Id.* Defendants' position that consideration of apparent race is legally permissible among other factors directly presents a third common legal issue. Opp. at 6, 12 n.3. In short, because the class's claims and defenses largely rise and fall on common proof—proving or disproving Defendants' actions relying on Latino race, whether they are policies, and whether they are unlawful—commonality is met.

Defendants argue that the Fourth Amendment necessarily requires an encounter-specific inquiry and therefore precludes commonality. Opp. at 8–10. But *Gonzalez v. Immigration & Customs Enforcement* rejects that categorical approach: "Fourth Amendment claims concerning government policies, practices or procedures for probable cause determinations are plainly suitable for classwide resolution." 975 F.3d 788, 809 (9th Cir. 2020). There, the Ninth Circuit upheld certification of a class challenging ICE's practice of relying on database checks for probable cause determinations, notwithstanding the Government's arguments that probable cause depends on the totality of each person's circumstances. *Id.* at 808–09. The common issue was the challenged method of decision-making as opposed to whether ICE could establish probable cause in every individual case. *Id.*

The same distinction applies here. *See* Mot. at 12–13. Defendants may contest the asserted practices with their policies, training materials, operational records, and testimony. Plaintiffs may seek to establish them with the common proof discussed above. Determining whether a race-based selection practice exists and whether it supplies a constitutionally sufficient method of finding reasonable suspicion will answer questions central to the Suspicionless Stops Class. Determining whether the asserted express racial criterion is employed and constitutionally permissible will

answer questions central to the First Discriminatory Treatment Class. Individual circumstances may remain important to particular encounters without eliminating those shared questions.

The Opposition relies on *Dukes* extensively in attempting to show a lack of commonality here. In particular, the Government contends, Plaintiffs have not succeeded in proving the Government has either of the alleged policies, and the Government has shown the opposite: the Government's "written policy requires a finding of probable cause."[6] Opp. at 10. As discussed extensively in this Court's PI Order, in spite of the existence of any written policy, Plaintiffs will likely prevail in demonstrating that the Government's alleged unwritten policies exist and that they are unlawful. *See* PI Order § IV.A.

Moreover, *Dukes* is distinguishable. There, the plaintiffs—who sought to represent a class alleging Wal-Mart's policy of discriminating upon gender in effect—claimed, "[i]mportantly for [the Court's] purposes," that "the discrimination to which they ha[d] been subjected is common to *all* Wal-Mart's female employees." 564 U.S. at 344–45. Plaintiffs therefore sought to litigate "the Title VII claims of all female employees at Wal-Mart's stores in a nationwide class action." *Id.* at 345. The Court reasoned, "The crux of this case is commonality." *Id.* at 349. Relying on *General Telephone Co. of Southwest v. Falcon*, 564 U.S. 338, the *Dukes* court explained:

> This Court's opinion in *Falcon* describes how the commonality issue must be approached. "Conceptually, there is a wide gap between an individual's claim that he has been denied a promotion [or higher pay] on discriminatory grounds, and the existence of a class of persons who have suffered the same injury as that individual [under Rule 23]." *Falcon* suggested two ways in which that conceptual gap might be bridged. First, if the employer "used a biased testing procedure to evaluate both applicants for employment and incumbent employees, a class action on behalf of every applicant or employee who might have been prejudiced by the test clearly would satisfy the commonality and typicality requirements of Rule 23(a)." Second, "[s]ignificant proof that an employer operated under a general policy of discrimination conceivably could justify a class of both applicants and employees if the discrimination manifested itself in hiring and promotion practices in the same general fashion, such as through entirely subjective decisionmaking processes."

---

[6] And the Government does not appear to give a record cite for its purported written policy to require probable cause prior to a detentive stop—even if its existence were dispositive of the claims.

*Id.* at 352–53 (quoting *Falcon*, 457 U.S at 157–58, 159 n.15) (citation modified). Because the *Dukes* court found neither *Falcon* method of proof met, the plaintiffs failed on commonality. *Id.* at 359–60. On this basis, *Falcon* and *Dukes* are distinguishable as this Court *has* found evidence of a generalized policy.

Further, *Black Lives Matter Los Angeles v. City of Los Angeles*, 113 F.4th 1249 (9th Cir. 2024), comments on the requirement of a rigorous analysis of the evidence linking individual injuries to an asserted common practice. It does not, as Defendants suggest, categorically prohibit certification of constitutional claims involving law enforcement. Opp. at 8–9. The Ninth Circuit there addressed the specific evidentiary deficiencies in the proposed damages classes and separately found that the district court had failed to analyze commonality for the injunctive class. *Black Lives Matter L.A.*, 113 F.4th at 1259–60, 1265. This Court has identified both the specific questions and the common evidence relevant to each proposed class. The showing is also not confined to isolated instances of mistreatment of the kind that were insufficient to establish a systemic practice in *Willis v. City of Seattle*, 943 F.3d 882, 885 (9th Cir. 2019). Opp. at 9–10. The testimony concerning recurring operations and agency approval supplies a connection beyond the individual accounts themselves.

The fact that Defendants maintain written policies requiring reasonable suspicion is relevant counterevidence,[7] but it does not foreclose proof that the authorized practice differs from the written formulation. Conversely, a large Latino population and a high number of Latino arrestees do not, without more, establish either asserted practice. This Court relies on evidence of the method of selection, not demographic disparity in the aggregate. That distinction also answers Defendants' reliance on *Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1,

---

[7] Though it bears mention, as discussed in the PI Order, that Defendants offer only scant evidence of a written policy or training protocols requiring their agents and officers to uphold detainees' constitutional rights. *See* PI Order § III.B; *see also id.* § IV.A.2 (discussing evidence in support of that Racially Based Stops Policy is officially sanctioned, notwithstanding Government's contention that Government's written policy is not to violate constitutional rights).

34–35 (2020), to characterize the discrimination claim as one based solely on disparate impact. Opp. at 6. The theory certified here is the asserted express use of a racial criterion, as Stop/Arrest Plaintiffs' PI Motion makes clear. *See* Dkt. No. 632 at 3.

Both classes therefore satisfy Rule 23(a)(2).

**D. Per Rule 23(a)(3), Stop/Arrest Plaintiffs have shown typicality.**

A Rule 23(a)(3) typicality inquiry turns on "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon*, 976 F.2d at 508 (quoting *Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D. Cal. 1985)). "Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Id.* (quoting *Weinberger v. Thornton*, 114 F.R.D. 599, 603 (S.D. Cal. 1986)).

1. The individual Plaintiffs' claims are typical of both classes.

Vasquez Perdomo, Osorto, Villegas Molina, Hernandez Viramontes, and Gavidia challenge their selection and detention through the same methods described by other affected persons. The three Pasadena Plaintiffs' claims arise from selection at a location associated with day labor work, followed by immigration questioning. The claims of Gavidia and Hernandez Viramontes arise from workplace encounters in which their Latino appearance allegedly contributed to their selection for detention and citizenship verification. Their claims thus share the asserted demographic selection practices, constitutional theories, and demand for prospective relief with the respective classes. *See* Dkt. Nos. 647-7 through 647-11; Dkt. No. 632-13 ¶¶ 6–13.

The differences in their immigration status do not make those claims atypical. Neither definition limits members to noncitizens. A citizen, a lawful permanent resident, and a person without lawful status may each challenge the method by which officers select and detain them. *Gonzalez* similarly rejected an asserted distinction between the citizen representative and noncitizen class members in a challenge to an immigration detention practice. 975 F.3d at 809–11. Defendants' statutory authority to question persons believed to be noncitizens does not establish that citizens subjected to the challenged selection methods must be excluded from the classes.

Defendants' principal individualized defense concerns Vasquez Perdomo and Osorto, whom Defendants assert fled from approaching officers. Opp. at 11–12, 18. Flight may be relevant to reasonable suspicion, and a defense peculiar to a representative must be examined if it threatens to become the focus of the litigation. *Hanon*, 976 F.2d at 508. This Court does not disregard that evidence or decide that the Plaintiffs were necessarily seized before any movement occurred. Vasquez Perdomo's declaration describes attempted movement when armed, masked men approached, followed by immediate surrounding and restraint. Dkt. No. 647-7 ¶¶ 5–7. Defendants rely on different descriptions of the sequence and significance of the encounter. Opp. at 2, 12, 18 (citing Dkt. No. 128-7 ¶ 7 & Dkt. No. 45-2 ¶ 6).

Those disputes do not dominate the prospective classes discussed here. The common inquiry concerns the practices by which officers select people for detentive stops, including what officers relied upon before the stop, rather than a demand for classwide declaration that every aspect of each Plaintiff's encounter lacked justification. Defendants' flight argument does not resolve whether the asserted selection practices existed or whether an express racial selection criterion is permissible. Other proposed representatives also provide claims without that asserted defense, including Villegas Molina's account that he remained in place. Dkt. No. 647-10 ¶ 6. On this record, the defense does not prevent Vasquez Perdomo and Osorto from presenting the same prospective challenges as the other representatives and class members.[8]

Defendants also contend that Gavidia cannot qualify because his encounter was collateral to an operation at his workplace. Opp. at 13. Neither class definition excludes an otherwise qualifying stop because it occurred during an operation directed at another person. The asserted absence of individualized grounds for detaining Gavidia, and the asserted role of race in selecting him, are the questions his claim shares with the classes. The existence of an operation nearby does not itself make that claim atypical.

---

[8] This Court does not resolve when a seizure occurred merely from the appearance of armed officers. The disputed sequence and the circumstances known to the officers remain relevant to the merits of an individual Fourth Amendment claim. The narrower conclusion here is that the asserted defense will not displace the common prospective questions as the focus of the litigation.ss

2. <u>LAWCN, CHIRLA, and UFW satisfy typicality through their affected members.</u>

Each Organizational Plaintiff identifies members subjected to the same asserted practices. *E.g.*, Melendrez Decl. ¶¶ 7–10, 12–15 (describing multiple LAWCN members, Latino car wash workers, whom federal agents detained without a warrant and without asking any questions); Salas Decl. ¶¶ 19–21 (describing several Latino CHIRLA members who were detained without being asked any questions); Dkt. No. 632-43 ¶¶ 2, 4–16 ("Tafolla Decl.") (alleging that declarant, a dark-skinned Latino man and CLEAN member who was wearing a car wash uniform, was detained while lighter-skinned individuals were not, and that federal agents pointed a firearm at him before he had moved or been asked any questions); Strater Decl. ¶¶ 1–3, 29–31 (declarant, officer of UFW, alleging that member Angel, a Latino UFW member and U.S. citizen who was seeking day labor work, was detained by CBP until he confirmed his hospital of birth and showed California ID). And the record on Plaintiffs' declarations, which are largely uncontroverted, are coextensive with the named Plaintiffs' injuries; they allege materially similar fact patterns, averring that the circumstances of their detention support the conclusion that the detention occurred without an individualized determination. Though Defendants correctly note that individual circumstances may vary—for example, as to putative class members' citizenship status or the details of their arrest—none of this persuades the Court that named Plaintiffs' claims are atypical. All in all, Plaintiffs and their members' claims are reasonably coextensive with those of absent members of both classes. The organizations seek the same prospective relief against the same course of conduct, not compensation for distinct institutional injuries.

Defendants repeat that organizations possess different interests and include members with lawful status or members never subjected to the conduct. Opp. at 10–11. As explained above, the organizations seek to act in their associational capacity on behalf of affected members. *See Cal. Rural Legal Assistance*, 917 F.2d at 1175. The presence of other people in their membership does not render the affected members' claims atypical, and differences in lawful status do not remove otherwise qualifying individuals from the class definitions. Nor does the abstract possibility that

organizational priorities could shift—not meaningfully supported in the Opposition—change the outcome; this Court has seen no evidence in support of the plausibility of that risk. *See* Opp. at 13.

In sum, Plaintiffs have shown typicality.

**E. Per Rule 23(a)(4), the appointed representatives and proposed class counsel have shown adequacy.**

"To determine whether named plaintiffs will adequately represent a class, courts must resolve two questions: '(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *Ellis*, 657 F.3d at 985 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (1998)). The Court examines these matters with particular care because Rule 23(b)(2) does not provide the mandatory notice and opt-out rights applicable to a Rule 23(b)(3) damages class. *See Dukes*, 564 U.S. at 361–62.

The individual Plaintiffs have declared their willingness to serve, their understanding of the responsibilities of class representation, and their commitment to the interests of the classes. Dkt. No. 647-7 ¶ 16; Dkt. No. 647-8 ¶ 5; Dkt. No. 647-9 ¶ 3; Dkt. No. 647-10 ¶ 15; Dkt. No. 647-11 ¶ 4. LAWCN and CHIRLA likewise describe their work with affected members and commitment to ending the challenged practices. Dkt. No. 529-75 ¶¶ 25–30; Dkt. No. 529-73 ¶¶ 37–38. The representatives seek the same prospective determination of the challenged practices' legality and the same protection against their continued application.

Defendants identify no concrete conflict concerning that relief. Different immigration statuses and different encounter facts do not establish antagonistic interests where all appointed representatives seek an end to the same asserted practices. Nor, as this Court explained during the Warrantless Arrest PI and class certification stage, does the possibility that an organization might someday pursue other priorities establish present inadequacy. Opp. at 12–13. That a class representative's priorities might change is always a possibility, organization or not: Defendants offer no reason to think that this is a meaningful risk here.

And Defendants' efforts to distinguish some of Individual Plaintiffs miss the mark. It is true that Defendants allege that some of Individual Plaintiffs have nonshared circumstances—for

example, citizenship or alleged flight from authorities. Opp. at 13. But this Court is unpersuaded that that prevents Individual Plaintiffs from representing the classes as proposed here. As it has explained, an individual could ultimately prove that their Fourth and Fifth Amendment rights were violated regardless of whether they have legal status; their constitutional protections are not contingent on citizenship. Similarly, whether a plaintiff attempted to move away from authorities does not eliminate their ability to show that they were stopped without particularized, individualized suspicion—or that they were stopped based as part of a discriminatory practice that runs counter to their equal protection rights.

The record also satisfies Rule 23(g). Counsel have investigated the asserted practices, obtained and analyzed discovery, developed the factual record, and litigated the related claims and motions. Their declarations establish experience in class actions, complex federal litigation, immigration law, and constitutional litigation; knowledge of the applicable law; and the ability and commitment to provide the resources needed to represent the classes. *See* Dkt. No. 647-1 ¶¶ 2–13; Dkt. No. 647-2 ¶¶ 3–21; Dkt. No 647-3 ¶¶ 6–24; Dkt. No. 647-4 ¶¶ 4–12; Dkt. No. 647-5 ¶¶ 4–9; Dkt. No. 647-6 ¶¶ 4–15. Defendants do not identify a conflict of counsel or a deficiency in counsel's qualifications or commitment.

This Court therefore appoints the proposed eight organizations and firms as counsel for both classes, as set forth in the conclusion below. The appointed representatives satisfy Rule 23(a)(4), and counsel satisfy Rule 23(g).

**F. Stop/Arrest Plaintiffs have shown Rule 23(b)(2) applies.**

Stop/Arrest Plaintiffs ask this Court to certify the class under Rule 23(b)(2). Motion at 17. This requires a showing that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The essential requirement is that a single injunction or declaratory judgment provide relief to each member; a collection of different, individualized injunctions will not suffice. *Dukes*, 564 U.S. at 360. This Court applies that requirement independently of its Rule 23(a) findings.

Rule 23(b)(2)'s requirements are met here. For the Suspicionless Stops Class, the proposed relief would address the asserted practice of substituting the identified demographic profile for an individualized reasonable suspicion assessment. If warranted, an injunction governing that method would apply to Defendants' conduct toward every person subjected to it. For the First Discriminatory Treatment Class, the proposed relief would govern the asserted use of apparent Latino race, color, or ethnicity as a selection criterion, with the defined exceptions. The legality of each practice can be adjudicated, and any appropriate prohibition can operate, across the respective class. *See Gonzalez*, 975 F.3d at 811; *Parsons v. Ryan*, 754 F.3d 657, 687–89 (9th Cir. 2014).

An officer applying a lawful reasonable suspicion standard would still evaluate the circumstances of each encounter individually. That does not mean each class member requires a different injunction. The distinction is between individual application of a common rule governing the challenged method and individual judicial relief tailored to the legality of each completed encounter. The classes seek the former. They do not seek classwide individual damage awards, suppression rulings, release orders, or invalidation of removal orders through this certification motion.

Defendants' objections concerning differing counties, immigration statuses, and encounter details do not show that the prospective remedy is divisible. Opp. at 14–15. The relevant commonality of interests concerns the challenged practices and relief, and those interests are shared across the proposed classes. *Dukes*' requirement of an indivisible remedy is satisfied here. The Court will not impose an additional cohesion or predominance requirement beyond Rule 23's requirements. *See Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 937 (9th Cir. 2019) (concluding that "the district court erred in imposing a 'cohesiveness' requirement for the proposed Rule 23(b)(2) class").

Defendants also argue that class treatment is unnecessary because individual injunctions or habeas remedies might be available. Opp. at 5. The Court declines to deny class certification upon this criterion, which is found nowhere in the Rule. Rule 23(b)(2) does not condition certification on a showing that no individual remedy could be obtained. The question is whether the established practices operate on grounds generally applicable to the class and whether the relief sought is

appropriate for the class as a whole. Nevertheless, individual habeas proceedings would not supply the prospective determination of selection practices sought by persons who were released after their stops and remain exposed to the same asserted methods.

Finally, Defendants argue that "certification risks harming class members through claim preclusion," and that "a broad class judgment could bar individuals from raising additional challenges to their stops under principles of res judicata and collateral estoppel." Opp. at 15. This Court takes seriously the concern that absent members could be bound without a right to opt out. *See Molski v. Gleich*, 318 F.3d 937, 947 (9th Cir. 2003) ("In contrast to a class certified under Rule 23(b)(3), members of a Rule 23(b)(2) class do not have the right to opt-out." (footnote omitted)), *overruled in part on other grounds*, *Dukes v. Wal-Mart Stores,* Inc., 603 F.3d 571 (9th Cir. 2010). That concern supports careful application of adequacy, definition of the adjudicated claims, and due consideration for procedural safeguards at later stages. *See id.* (noting that a district court "may require notice and the right to opt-out under its discretionary authority provided in Rule 23(d)(2)."). But none of these concerns warrant categorically barring a civil rights class under Rule 23(b)(2). This Order certifies the prospective classes described above; it does not purport to adjudicate individual removability, the validity of every completed stop, or separate claims for individualized relief. The preclusive effect of a later judgment will depend on the issues and claims actually adjudicated and applicable law, not on Defendants' assumption that certification resolves every issue arising from an immigration encounter.

In sum, as to both classes, the availability and terms of preliminary or final injunctive relief remain to be determined at a future date. But, on this record, this Court is satisfied that both proposed classes satisfy Rule 23(b)(2).

**G. Defendants' arguments regarding the class definitions largely fail, except as to the Suspicionless Stops Class.**

Defendants characterize the classes as overbroad, amorphous, unascertainable, and impermissibly fail-safe. Opp. at 15–18. This Court addresses those objections below.[9]

1. The definitions are sufficiently ascertainable.

First, at issue is whether—As Defendants put it—"Plaintiffs' classes are neither definite nor ascertainable." Opp. at 18. As this Court explains, ascertainability is not an independent requirement, and in any event, the classes are sufficiently definite.

Defendants' administrative feasibility objection, to the extent it suggests a necessary standalone inquiry, conflicts with Ninth Circuit law. *Briseño v. ConAgra Foods, Inc.* rejects a freestanding requirement that plaintiffs demonstrate an administratively feasible way to identify every class member. 844 F.3d 1121, 1123–25 (9th Cir. 2017). And *True Health Chiropractic, Inc. v. McKesson Corp.* reiterates that rule. 896 F.3d 923, 929 (9th Cir. 2018). The latter decision does not support Defendants' suggestion that administrative feasibility is an independent prerequisite. Opp. at 16. Though some courts have considered ascertainability as part of their inquiry into standing, commonality, and other requirements for class certification under Rule 23, ascertainability is not an independent question, and it does not demand a separate answer.

This distinction is especially pertinent to a class seeking prospective relief from a practice under Rule 23(b)(2). Because the class seeks common injunctive relief, an injunction governing the grounds for initiating stops can operate without a prior list of everyone who may be stopped. The absence of records for stops ending in release does not make prospective regulation of the challenged conduct impossible. And the inclusion of future members does not include everyone who merely fears a stop. The definitions concern persons who have been or will be subjected to the specified conduct. *See J.D. v. Azar*, 925 F.3d 1291, 1319–20, 1322 (D.C. Cir. 2019).

---

[9] Although not addressed by the parties, the Court also modifies both class definitions to make clear that they are limited to persons who were stopped *in this District*, by moving the placement of the phrase "in this District" within the definition to directly after the phrase "detentive stop." Based upon the parties' arguments, the Court understands that all parties were operating from this implicit understanding and therefore do not need to be separately heard on this clarifying modification.

In addition, the Court also modifies the Suspicionless Stops Class to make clear that it is limited to persons whose stops were based on both low-income (or working class) status and Latino race. Again, based upon the parties' arguments, the Court understands that all parties were operating from this implicit understanding and therefore do not need to be separately heard on this clerical modification.

Both definitions identify a date, a geographic area, federal officers or agents, detentive stops, and the selection practices at issue. Both exclude encounters at ports of entry, checkpoints, and functional equivalents of the border. The First Discriminatory Treatment Class also excludes the specified use of a known target description supported by other objective bases for believing the person is the target. Mot. at 1–2. A consensual encounter is not a detentive stop. Nor does an arrest automatically establish that the preceding encounter satisfies either definition.

The terms concerning apparent working-class status and apparent Latino race, color, or ethnicity describe the criteria attributed to detainees by the officers, rather than requiring the Court to classify people's actual income or race. Whether officers used those criteria is a factual issue susceptible to evidence such as testimony and contemporaneous records. The possibility of disputed membership in a particular case does not mean that the definitions have no discernible boundaries. For the discrimination class, the Court reads the reference to federal detentive stops in the context of the immigration enforcement practices challenges in Count Eight and this Motion; certification does not add unrelated federal enforcement practices to the case.

In sum, to the limited extent that it is proper to consider a class's ascertainability in the context of a Rule 23 motion, Plaintiffs make the requisite showing.

2. The definitions do not improperly sweep in uninjured plaintiffs.

Defendants also invoke the principle that federal courts cannot order relief for uninjured plaintiffs. Opp. at 1, 15–18. But this Court disagrees with Defendants that "the proposed classes . . . necessarily encompass individuals who are not yet (and may never be) subject to an immigration stop within this District." *Id.* at 17. This Court reads the proposed classes differently—in particular, their requirement that members must "have been[,] or will be[,] subjected to a detentive stop" due to an unlawful policy. Motion at 1. It understands both class definitions to exclude people who, by the end of this litigation, were never personally subjected to the challenged practices. To that end, this Court finds no reason to think that the class definitions currently sweep in uninjured people—even if this was a basis for denial of class certification, which it is not. *See Olean*, 31 F.4th at 669 (noting that a class that "potentially includes more than a de minimis amount of uninjured class members" can still be certified).

This Court has found standing for each representative it appoints and has identified an ongoing practice, an affected class, and a form of prospective relief directed to that practice. The Court must, and will, continue to ensure that any judgment and injunction address the injuries and threatened injuries actually established in the litigation. *See Healy v. Milliman, Inc.*, 164 F.4th 701, 706–08 (9th Cir. 2026) (addressing the evidence of standing required at summary judgment in a certified damages action). On the present record, Defendants' generalized invocation of "uninjured persons" does not defeat the specific definitions and common claims before the Court. Finally, Defendants appear to argue that the definition of the First Discriminatory Treatment Class sweeps in plaintiffs who have not suffered a cognizable injury since consideration of race "in part" is permissible. Opp. at 5-6. But, even if true, denial of class certification does not follow. "Every class member must have Article III standing in order to recover individual damages." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." *Id.* (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466 (2016) (Roberts, C.J., concurring)). But the Supreme Court has not addressed "whether every class member must demonstrate standing *before* a court certifies a class." *Id.* at 431 n.4. To that end, following *TransUnion*, the Ninth Circuit has confirmed that a class that "potentially includes more than a de minimis number of uninjured class members" can still be certified. *Olean*, 31 F.4th at 669. The Ninth Circuit has most recently addressed this question in *Healy*, where it concluded that *TransUnion* "compels unnamed class members to demonstrate evidence of standing . . . *after class certification* but prior to trial at summary judgment." 164 F.4th at 708 (emphasis added). As the Ninth Circuit stated: "Drawing from our typical summary judgment standard, though unnamed class members 'need not establish that they in fact have standing,' they would at least have to demonstrate 'that there is a genuine question of material fact as to the standing elements.'" *Id.* (quoting *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 947 (9th Cir. 2002)). This Court relies on the Ninth Circuit's guidance in *Olean* and *Healy*, both of which offer binding instructions applicable to this matter's current posture (that is, prior to summary judgment or trial).

To that end, the question of class members' standing is most appropriately addressed via a motion for summary judgment, where Stop/Arrest Plaintiffs would need to identify, regarding the First Discriminatory Treatment Class as defined, a genuine question of material fact as to the standing elements. *See Healy*, 164 F.4th at 708.

3. Neither the now-modified Suspicionless Stops Class nor the First Discriminatory Treatment Class is fail-safe.

Defendants object that both classes are impermissible "fail-safe" classes, reasoning that Plaintiffs "improperly tether class membership to the ultimate merits of their respective claims of being subject to a suspicionless stop or discriminatory treatment." Opp. at 18 (internal quotation marks omitted). Plaintiffs counter: "Plaintiffs have not proposed fail-safe classes because they have not defined the class based on who had their rights violated." Reply at 16. As this Court explains below, the First Discriminatory Treatment Class is not fail-safe, but the Suspicionless Stops Class as originally proposed is fail-safe. In accordance with Ninth Circuit law, this Court will modify and certify the Suspicionless Stops Class rather than denying the request altogether.

"A court may not . . . create a 'fail safe' class that is defined to include only those individuals who were injured by the allegedly unlawful conduct." *Olean*, 31 F.4th at 669 n.14. A definition that makes membership depend on prevailing on the merits can unfairly allow unsuccessful claimants to fall outside the class and avoid an adverse judgment. *See Kamar v. RadioShack Corp.,* 375 F. App'x 734, 736 (9th Cir. 2010); *see also Brown v. DirecTV, LLC*, 330 F.R.D. 260, 268 (C.D. Cal. 2019) ("A fail-safe class is 'one that is defined so narrowly as to preclude[ ] membership unless the liability of the defendant is established.'" (quoting *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1138 n.7 (9th Cir. 2016))). Other district courts interpret this to mean that a class is fail-safe if determining its membership, in turn, requires answering a legal question that may entitle the membership to relief. *E.g.*, *Brazil v. Dell, Inc.*, No. 07-1700, 2008 WL 2693629, at *7 (N.D. Cal. July 7, 2008) (striking class definition for a false advertising claim, where the class was defined as all persons who purchased products from Dell that Dell "falsely advertised as discounted").

Membership in the First Discriminatory Treatment Class does not require a finding that the stop was unconstitutional. The class definition merely focuses on whether apparent Latino race,

color, or ethnicity contributed to the selection for a detentive stop, subject to the express exclusions. Defendants maintain that such consideration is lawful. That defense could prevail while the affected persons would remain members of the class. The criterion thus identifies challenged conduct—not a guaranteed entitlement to relief. Put another way, the class is not fail-safe: Nothing prevents Defendants from prevailing at a later stage and showing, on the merits, that they did not maintain the alleged policy or that it was not unlawful.

But the Court's read of the Suspicionless Stops Class as proposed in the Motion is that it would create a fail-safe class. Membership in the Suspicionless Stops Class requires a finding that the detention at issue was unlawful under the Fourth Amendment; it builds into the definition not just that the class member's detention was based upon apparent working-class or low-income status and Latino appearance, but also that it was *not* based upon a pre-stop, individualized assessment—which the parties agree is required under the Fourth Amendment. The class definition focuses not just on the asserted method of initiating the detention (selection based on apparent Latino race and working-class status), but also that it violates the Fourth Amendment. Put another way, someone who belongs in the Suspicionless Stops Class (per the Motion's proposed definition) has already proved a violation of the Fourth Amendment.[10]

---

[10] Plaintiffs' Supplemental Brief maintains that the initially proposed Suspicionless Stops Class is not fail-safe. Pla. Supp. at 2–4. Plaintiffs maintain that "membership [in the Suspicionless Stops Class] alone does not presume Defendants' liability, even if the class definition refers to the ultimate legal standard." *Id.* at 2. But the Class as originally proposed does more than reference the legal standard; it would create a schema where, assuming an individual was part of the class, it would naturally follow that the Government is liable for violating the individual's Fourth Amendment rights.

Plaintiffs' Supplemental Brief also notes that the Ninth Circuit "appears to reject a prohibition on fail-safe classes." *Id.* at 1. Plaintiffs note, citing *Vizcaino*, that the Ninth Circuit held that the relevant class was not fail safe because putative class members "*claim*[ed] to have been (or to be) common law employees," and that the Ninth Circuit reasoned that to prohibit fail-safe classes "would preclude certification of just about any class of persons alleging injury from a particular action" because they are all linked by the common complaint that the class definition references. *Id.* (citing *Vizcaino v. U.S. Dist. Ct.*, 173 F.3d 713, 720, 722 (9th Cir.), *as amended* (June 10, 1999), *opinion amended on denial of reh'g sub nom. In re Vizcaino*, 184 F.3d 1070 (9th Cir. 1999)). But the class in *Vizcaino* did not automatically presuppose liability by virtue of an individual's belonging in the class. In the Court's words:

> It is implicit in the definition of the class that its members are persons who *claim to* have been (or to be) common law employees who were denied ESPP benefits. That under this definition ultimate success may turn on resolution of a disputed legal issue does not make it circular.

*Id.* at 722. The Suspicionless Stops Class presents—at minimum—a closer question: There, unlike in *Vizcaino*, anyone who is a class member would necessarily be able to prevail on their claim. So, though true that the Ninth Circuit has no

Nevertheless, this Court will modify the class rather than deny class certification.

Ahead of the September 24 hearing, this Court provided a tentative order to the parties, explaining that it was inclined to deny certification of the Suspicionless Stops as fail-safe. Counsel for Stop/Arrest Plaintiffs proposed the possibility of granting the Suspicionless Stops Class with a modification to ensure that the class is not fail-safe. Tr. at 105:15–06:14. All parties had an opportunity to be heard on the proposal, and this Court received supplemental briefing from the parties as to whether the modified class definition was appropriate. *See* Pla. Supp.; Def. Supp. The Court granted Defendants' request as to timing and page length for the supplemental briefing. Dkt. No. 766.

Having considered the parties' arguments as to the modified class, this Court is persuaded that modification of the class to render it not fail-safe would be preferable than denying class certification. *See Olean*, 31 F.4th at 669 n.14 ("[T]he problem of a potentially over-inclusive class can and often should be solved by refining the class definition rather than by flatly denying class certification on that basis."), *see also Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012) ("Defining a class so as to avoid, on one hand, being over-inclusive and, on the other hand, the fail-safe problem is more of an art than a science. Either problem can and often should be solved by refining the class definition rather than by flatly denying class certification on that basis." (collecting cases)). Plaintiffs' proposed amendment to the definition is as follows:

| **<u>Suspicionless Stops Class</u>** | **<u>Suspicionless Stops Class (as modified)</u>** |
| --- | --- |
| All persons who, since June 6, 2025, have been or will be subjected to a detentive stop by federal agents or officers for purposes of immigration enforcement in this District, other than at a port of entry, checkpoint, or other functional equivalent of the border, based on their apparent status as low-income or working-class and Latino~~, instead of a pre-stop, individualized assessment of reasonable suspicion that the person to be stopped (1) is engaged in an offense against the United States~~ | All persons who, since June 6, 2025, have been or will be subjected to a detentive stop by federal agents or officers for purposes of immigration enforcement in this District, other than at a port of entry, checkpoint, or other functional equivalent of the border, based on their apparent status as low-income or working-class and Latino. |

per se prohibition on fail-safe classes, Plaintiffs' authority does not resolve the question in their favor. And, in any event, Plaintiffs' supplemental brief does not address *Olean*'s more recent disapproval of fail-safe classes, which binds this Court and postdates the guidance in *Vizcaino*.

~~or (2) is a noncitizen unlawfully present in the United States~~.

By omitting the language that would effectively require a Suspicionless Stops Class member to have faced a per se Fourth Amendment violation, Plaintiffs' proposal ensures that the certified class is not fail-safe. Put another way, the modified class definition does not automatically guarantee that class members within the Class's ambit have proved that the Government has violated their Fourth Amendment rights.

Defendants were given an opportunity to be heard at the September 24 hearing on the possible modification of this class, and upon their request, this Court has considered their supplemental briefing. *See* Def. Supp. Defendants' arguments, however, do not warrant denial of certification of the Suspicionless Stops Class.

First, Defendants contend that the modified class definition is still fail-safe. *See id.* at 2. They claim the "modified definition improperly tethers class membership to the ultimate merits of being subject to a 'suspicionless stop' and what Plaintiffs view as improper 'discriminatory treatment' based on their 'apparent status as low income or working class and Latino.'" *Id.* But neither of the first two terms—"suspicionless stop" and "discriminatory treatment"—appear in the modified class definition. Moreover, unlike the originally proposed class definition, it is not automatically true that anyone who falls within the definition of the Class has had their constitutional rights violated; Defendants could still contend that Class Members received a constitutionally sufficient reasonable suspicion determination. And Defendants' argument that "apparent status as low income or working class and Latino are legitimate factors," meaning that the modified class remains fail-safe, misunderstands the fail-safe concept. That Defendants can maintain that the described conduct is not illegal, and that they may prevail on the merits following class certification, confirms that the class is *not* fail-safe. *Ochoa v. City of Los Angeles*, No. 20-06963, 2025 WL 3248088 (C.D. Cal. Aug. 11, 2025), is distinguishable on this basis: There, the Court noted that the definition included those "*wrongfully* identified and/or recorded as gang members or gang associates by the LAPD," analogizing to a case that describes a fail-safe class example as "all persons who bought a product that the defendant '*falsely* advertised.'" *Id.* at *15–16 (emphasis added) (quoting *Nichols v. eHealthInsurance Servs., Inc.*, No. 23-06720, 2025 WL 689721, at *4 (N.D. Cal. Mar. 3, 2025)).

Second, Defendants note that the modification to the class "is also too substantial to be made in this posture," arguing that "the government is severely prejudiced by being deprived of addressing these issues in normal motions practice." Def. Supp. at 3. This argument is meritless. Not only did the Court provide the parties with the opportunity to be heard extensively at the hearing, but despite *no* request by the Defendants to provide supplemental briefing, the Court *offered* the Defendants the opportunity to do so. Dkt. No. 762. And then Court granted the Defendants the time and page limits they requested, over the opposition of the Plaintiffs. *See* Dkt. No. 766. Defendants have not asked for another hearing, further briefing, more time, or any other opportunity to develop their position. Defendants have had ample notice of the modification to the class that this Court is considering, and this Court has heard them on it. Defendants cannot, therefore, claim that they have been prejudiced, as they have been granted everything that "normal motions practice" would have granted them—the opportunity to be heard.[11]

---

[11] In addition, this Court notes that Defendants have failed to identify any binding law—nor is the Court aware of any—that defines what changes are "too substantial" to be made on this posture. To the contrary, numerous cases make clear that courts—where they can—*should* redefine classes rather than deny certification. *E.g.*, *Olean,* 31 F.4th at 669 n.14 (noting that an over-inclusive class "can and often should be solved by refining the class definition rather than by flatly denying class certificaton on that basis" (internal quotation marks omitted)); *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1139 (9th Cir. 2016) ("If necessary, however, the district court may construe the class definition more narrowly, or otherwise conform its interpretation of the class definition with the prevailing theory of liability."), *abrogated in part on other grounds*, *Healy*, 164 F.4th 701.

Defendants cite three cases in support of the proposition that this Court may make only "minor" modifications to the class definition at class certification, but none offer strong support for their position. *Cancino Castellar v. Mayorkas*, No. 17-491, 2021 WL 4081559, at *8 (S.D. Cal. Sep. 8, 2021); *see also Arevalo v. Trump*, 785 F. Supp. 3d 644, 658 (C.D. Cal. 2025) ("Class certification is inherently tentative, so the judge remains free to modify it in the light of subsequent developments in the litigation." (citation modified)); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 590–91 (N.D. Cal. 2010) (noting that "the proposed [class] modifications are minor, require no additional discovery, and cause no prejudice to defendants" in support of denying the request to strike the modified class definitions, without noting that any of these factors was required).

And Defendants cite *Cancino Castellar* for the proposition that "[t]he definition of the class at the class certification stage may diverge from that set forth in the Complaint, as long as the new class definition is narrower than the original, or the proposed change is minor and non-prejudicial to the defendant." 2021 WL 4081559 at *8 (citations omitted). But Defendants do not explain how that purported rule, even if it exists, applies here: They do not explain why the substance of the proposed modification to the Suspicionless Stops Class is *prejudicial* to Defendants. Moreover, Plaintiffs' authority in support of the modification is instructive. As the D.C. Circuit discussed in the context of modifying a class that is arguably fail-safe but otherwise proper, so that it is not fail-safe:

> For those rare cases (if any) in which a truly "fail-safe" class hurdles all of Rule 23's requirements, then the problem will in all likelihood be one of wording, not substance. After all, a class of human beings cannot itself be circular. Only a class definition attempting to describe them can. For example, assume a class defined as "all workers of Company X employed in its Washington, D.C. and New York City offices between 2021 and 2023 who were unlawfully denied promotion to clerical supervisor due to

Third, though Defendants baldly state that the change *does* have other Rule 23 implications, they do nothing more to explain those implications than merely restate their argument on ascertainability. *See* Def. Supp. at 4 ("[T]here is no way to ascertain who is in the class as defined, and accordingly, no way to bar class members from future duplicative claims."); *id.* ("The only defining feature contains over-generalized claims that do not have clear meaning . . . ."). This Court has already explained why it will not, beyond Rule 23's requirements, consider the ascertainability of the proposed class at this stage. *See* Section III.G.1 *supra*. It need not repeat that argument here. And, given this Order's analysis of Rule 23 and its application to both proposed classes, together with this Court's Findings of Fact in the PI Order, modification of the class definition does materially alter this Court's conclusions on numerosity, commonality, typicality, adequacy, or predominance, nor do Defendants demonstrate otherwise.

In sum, this Order adopts Plaintiffs' proposed modification.

## IV. Conclusion

The Motion is GRANTED IN PART. This Court ORDERS as follows:

1. The First Discriminatory Treatment Class is certified and defined as follows:

   All persons who, since June 6, 2025, have been or will be subjected to a detentive stop in this District by federal agents or officers at least in part because of their apparent Latino race, color, and/or ethnicity, other than at a port of entry, checkpoint, or other functional equivalent of the border, or in connection with a known target description if there are other objective bases to believe that the individual is the target.

2. The Suspicionless Stops Class is certified and defined as follows:

   All persons who, since June 6, 2025, have been or will be subjected to a detentive stop in this District by federal agents or officers for purposes of immigration enforcement, other than at a point of entry, checkpoint, or other functional equivalent of the border, based on their apparent status as both low-income (or working-class) and Latino.

---

enforcement of the Company X Skills Test." The one word in that definition that makes it fail safe is "unlawfully." By deleting that, the definition loses any fail-safe character and might otherwise pass all of Rule 23's requirements.

*In re White*, 64 F.4th 302, 314 (D.C. Cir. 2023); *see also* Pla. Supp. at 3. So, though the proposed change is meaningful in that it renders the class not fail-safe, the change does not appear so substantial that it meaningfully impacts the Rule 23 analysis.

3. Plaintiffs Pedro Vasquez Perdomo, Carlos Alexander Osorto, Isaac Villegas Molina, Jorge Hernandez Viramontes, Jason Brian Gavidia, Los Angeles Worker Center Network (LAWCN), United Farm Workers (UFW), and the Coalition for Humane Immigrant Rights (CHIRLA) are appointed as class representatives of the First Discriminatory Treatment Class.

4. The American Civil Liberties Union Foundation of Southern California; the American Civil Liberties Union Foundation of Northern California; the American Civil Liberties Union Foundation of San Diego and Imperial Counties; the UC Irvine School of Law Immigrant and Racial Justice Solidarity Clinic; Munger, Tolles & Olson, LLP; the National Day Laborer Organizing Network; the Law Offices of Stacy Tolchin; and Public Counsel are appointed as class counsel for the First Discriminatory Treatment Class.

IT IS SO ORDERED.

Dated: October 23, 2026



MAAME EWUSI-MENSAH FRIMPONG

United States District Judge